**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


BLACK ROCK CITY LLC
660 Alabama St.
San Francisco, CA 94110

      Plaintiff,

v.

DAVID L. BERNHARDT,
in his official capacity as Secretary of the
United States Department of the Interior,
1849 C Street, N.W.
Washington D.C. 20240; and

UNITED STATES DEPARTMENT
OF THE INTERIOR,
1849 C Street, N.W.
Washington D.C. 20240; and

WINNEMUCCA DISTRICT OFFICE
FOR THE BUREAU OF LAND MANAGEMENT,
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445; and

INTERIOR BOARD OF
LAND APPEALS,
801 N. Quincy Street, Suite 300
Arlington, VA 22203

      Defendants.

_____

Civil Action No. _____

## INTRODUCTION

1.      Plaintiff Black Rock City LLC ("BRC") brings this action under the Administrative Procedure Act ("APA"), 5 USC §§ 701-706, to seek relief from Defendants' ongoing, unlawful, and prejudicial conduct towards BRC that threatens the viability of the iconic Burning Man Event ("Burning Man" or "Event"), held annually on public lands in Nevada's Black Rock Desert. Defendants' conduct over the course of years, including, but not limited to, unreasonable delays in issuing decisions and imposition of excessive permit costs, has severely hampered BRC's ability to make critical plans and budget adequately for its lawful permitted assembly on public lands. Defendants' pattern and practice of delay has also had the effect of institutionally biasing the administrative decision-making process against BRC, causing damage to BRC and threatening the rights of BRC and its participants to use public lands, as well as the viability of the Burning Man Event on a year-to-year basis. Defendants' decisions and unreasonable delays therefore require judicial intervention.

2.      Specifically, BRC challenges the costs imposed by Defendant Winnemucca District Office for the Bureau of Land Management ("BLM"), the process by which those costs have been demanded, the inadequate justification for the costs, and the unreasonable delay confronted by BRC during the appeal of those costs. In addition to unreasonable conduct on the part of BLM, Defendant Interior Board of Land Appeals ("IBLA") has unlawfully withheld and unreasonably delayed decisions in multiple cost recovery appeal proceedings that have been filed by BRC over the past four years. These appeals filed with the IBLA are necessary to challenge the burdensome, unjustified, and excessive costs and other unlawful practices imposed upon BRC by BLM through the Special Recreation Permit ("SRP") process, which BRC must undergo each year in order to hold the Burning Man Event on public lands.

3.      Using the SRP process, BLM annually imposes inflated and unnecessary costs on BRC without providing adequate justification as required by federal regulations regarding cost recovery. BRC is unable, as a practical matter, to effectively object to BLM's estimated and inflated costs for a pending SRP or to refuse to pay these costs given the dilatory timing and manner in which they are presented. Because BLM typically provides its final cost recovery estimate agreement to BRC within weeks of each Event, and requires that BRC sign the agreement and pay all of the estimated costs as a condition of receiving the SRP, objecting to the costs would effectively ensure that the SRP could not be processed in time for that year's Event.  On a year-to-year basis, BRC therefore has no choice but to pay BLM's onerous demand and accede to any additional imposed requirements for the pending permit.

4.      In an effort to obtain relief from this broken and unreasonably burdensome pattern and practice, BRC has filed six timely appeals of Defendant BLM's excessive costs and other decisions to Defendant IBLA over the last four consecutive years[1] (collectively referred to as the "IBLA Appeals").

5.      Defendant IBLA has yet to render decisions on any of BRC's IBLA Appeals, even as BLM continues to annually impose impermissible, burdensome costs and additional unnecessary requirements on the Burning Man Event SRP. BLM has indicated that it will not make any changes to its cost recovery practices unless the IBLA issues a decision requiring it to do so. Presently, the oldest of BRC's appeals has been pending for nearly four years.

---

[1] The docket numbers and docketed dates for these appeals are: IBLA-2016-0115 (Mar. 15, 2016); IBLA-2017-0126 (Mar. 10, 2017); IBLA-2018-0086 (Mar. 7, 2018); IBLA-2019-0008 (Oct. 16, 2018); IBLA-2019-0009 (Oct. 16, 2018) (consolidated with IBLA-2019-0008); and IBLA-2019-0109 (May 2, 2019).

6.      Because the IBLA — the only tribunal to which BRC may take an original appeal from this type of BLM decision — is unwilling to act in a timely manner, critical questions of law and policy remain unanswered. Until the IBLA acts, BRC must pay BLM an annual assessed cost recovery charge, which presently amounts to approximately $2,953,966.79 per year and continues to rise, and adhere to BLM decisions that BRC believes are unreasonable and contrary to law.

7.      IBLA's unreasonable delay creates a condition of unfettered and unchecked control by Defendant BLM over BRC and threatens the continued viability of the Burning Man Event. IBLA's failure to act is effectively a denial without recourse, other than commencing this action.

8.      IBLA's unreasonable delay and withholding of decisions biases the administrative process against BRC in a manner that is both impermissible and highly damaging to the interests, culture, and long-term viability of the Burning Man Event, and on an annual basis, affects tens of thousands of users of public lands.

9.      BRC seeks relief from this institutional pattern and practice of unreasonable delay and unlawful withholding of decisions. Accordingly, BRC requests that this Court declare IBLA's inaction an unlawful abuse of discretion, treat such inaction by IBLA as constructive denial of BRC's appeals, and maintain jurisdiction to provide judicial resolution of the pending matters at issue. In the alternative, BRC requests that this Court declare IBLA's inaction unlawful and compel IBLA to take action in the pending IBLA Appeals in the form of an injunction.

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Federal Land Policy and Management Act, 43 U.S.C. §§ 1301 *et seq.* ("FLPMA"), the Federal Lands Recreation Enhancement Act, 16 U.S.C.

§§ 6801 *et seq.* ("FLREA"), and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA").

11. An actual, justiciable controversy now exists between Plaintiff and Defendants. The requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the Defendants maintain offices in this judicial district and a substantial part of the events or omissions giving rise to this claim occurred in this district.

13. The federal government has waived sovereign immunity from suit, by operation of the APA, pursuant to 5 U.S.C. § 701.

## PARTIES

14. Plaintiff BLACK ROCK CITY LLC ("BRC") is a Nevada limited liability company headquartered in San Francisco, California. Originally incorporated in 1997 by members of the community who created the Burning Man Project, BRC was the operational body responsible for production of the Burning Man Event, held annually in the Black Rock Desert of Northwestern Nevada, until 2018. Since 2014, BRC has been wholly owned by the charitable non-profit Burning Man Project ("BMP"), which assumed responsibility for producing the Burning Man Event in 2019. BRC retains no profits and all earnings are dedicated to the charitable activities of BMP.

15. BRC, along with its predecessors and BMP, are now and have been at all relevant times since 1992, permittees of Department-administered public lands located within the Black Rock Desert National Conservation Area in Pershing County, Nevada (the "Black Rock NCA"), for the purposes of conducting the annual Burning Man Event.

16. Defendant DAVID L. BERNHARDT ("Secretary") is the Secretary of the United States Department of the Interior and is sued in his official capacity.

17.    Defendant UNITED STATES DEPARTMENT OF THE INTERIOR ("Department") is a federal executive department of the United States government charged by law with administering public lands, including the Black Rock NCA.

18.    Defendant WINNEMUCCA DISTRICT OFFICE FOR THE BUREAU OF LAND MANAGEMENT ("BLM") is an office of the administrative body to which the Department has delegated management of these public lands.

19.    Defendant INTERIOR BOARD OF LAND APPEALS ("IBLA") is a quasi-judicial appellate review body within the Department's Office of Hearing and Appeals. Defendant IBLA exercises authority delegated from the Secretary to issue final decisions for the Department with respect to administrative appeals of BLM decisions relating to the use, management, and disposition of public lands and their resources.

## FACTUAL ALLEGATIONS

### I. Background

20.    The Burning Man Event currently attracts more than 70,000 individuals who, over the course of eight days, camp and participate in a unique experimental community on the public lands managed by BLM in northern Nevada.  Each year since 1990 (except for 1997, when the Event was held on private land), the Burning Man Event has taken place on the public lands located in what is now the Black Rock Desert—High Rock Canyon Emigrant Trails National Conservation Area ("Black Rock NCA") in northern Nevada.

21.    Over the past 27 years, the Event has grown in size, popularity, and complexity. Most recently, the population of the 2019 Event peaked at 78,850 persons. Tickets for the Event have sold out every year for the past nine years, and tickets from the main sale event sell out within minutes of being offered. The Event generates an estimated $75 million per year for the local Nevada economy and represents more than 560,000 visitor days to the public lands.

22.     The Event has been managed and executed by BRC and its successor, BMP, since 1997, and its ethos and culture are rooted in the Ten Principles of Burning Man: Radical Inclusion, Gifting, Decommodification, Radical Self-reliance, Radical Self-expression, Communal Effort, Civic Responsibility, Leaving No Trace, Participation, and Immediacy. These concepts are central to the participants' experience at Burning Man, and they are also reflected in the Event's commitment to and record of health, safety, and environmental compliance.

23.     Event operations are organized into and implemented by over fifty year-round departments and teams dedicated to ensuring the Event is properly permitted and run in a manner that promotes public health and safety for all persons on location. BRC engages thousands of competent and highly trained health and safety employees, contractors, and volunteers, many of whom have supported the Burning Man Event for a decade or more in their respective fields of expertise. These health and safety personnel include the Black Rock Rangers, an internal BRC department tasked to help ensure the safety of all participants by, among other activities, providing security at the perimeter of scheduled artwork burns and engaging in 24-hour patrols on foot and bicycle for the duration of the Event. The BRC Emergency Services Department deploys hundreds of licensed, professional personnel who staff multiple first-aid stations and provide triage to the Nevada-licensed emergency care facility onsite. BRC ensures the availability of ground and air ambulance services and a dedicated runway for nighttime medivac needs. Hundreds of traffic management staff provide management and security at the entrance gates, airport, and perimeter of the Event, utilizing state-of-the-art means and methods. BRC also engages over six hundred trained employees, contractors, and volunteers to safely construct and manage the Event's infrastructure, and several hundred more to ensure environmental compliance and to provide Event-related communications and information to participants. BLM has active knowledge of

BRC's operational and implementation plans on a year-to-year basis. BRC involves BLM in all levels of environmental compliance planning and execution. Moreover, BRC has a robust team that utilizes state-of-the-art GPS technology to prevent, remediate, and track potential environmental impacts, and BRC provides this information to BLM.

24.     Consistent with Burning Man's Ten Principles, BRC and BLM have developed and refined a "Leave No Trace" standard for the Event. The standard governs BRC's installation, operation, and deconstruction of the Burning Man Event, so that the portion of the Black Rock Desert utilized by the Event is returned to its natural desert state in the weeks following the Event. Over the approximately 35 days leading up to the Burning Man Event, BRC constructs and installs complex infrastructure to help ensure that the Burning Man Event runs in a manner that prioritizes safety and environmental protection. Following the conclusion of the Burning Man Event, such infrastructure is deconstructed and removed from the site within 35 days so that there is effectively no trace of the Event. BLM typically inspects the Burning Man Event site approximately six weeks after the Event's completion to ensure that BRC is in compliance with the rigorous "Leave No Trace" requirements of its SRP. To date, BRC has passed every inspection following the annual Event, including its most recent inspection for the 2019 Burning Man Event.

**II. Circumstances Giving Rise to IBLA Appeals**

25.     Congress established the Black Rock NCA in 2000 and included express findings that large-scale, permitted recreational activities, such as the Burning Man Event, are expected to continue on the site. The Event was specifically made a part of the Resource Management Plan for the Black Rock NCA.

26.     Pursuant to the requirements of FLPMA and FLREA, BRC must apply for a Special Recreation Permit ("SRP") to allow the Event to take place on the public lands within the Black

Rock NCA.  Planning for each event is a multi-year process. Before one Event is over, BRC has already begun planning for the next year's Event, which includes preparing and submitting an SRP application to BLM.

27.     The SRP permitting process includes review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*  Up until 2019, the yearly Event's SRP was issued pursuant to a series of Environmental Assessments, the results of which were confirmed as necessary under a Determination of NEPA Adequacy ("DNA") issued by BLM. BRC initially submitted a proposed action in December 2014 for a five-year Environmental Assessment ("EA") that would be effective from 2017-2021, as the existing EA was effective from 2012-2016. Defendant BLM refused to process the proposed action until after the 2015 and 2016 events were completed. In February 2017, at BLM's insistence, BRC submitted a proposed action for an Environmental Impact Statement ("EIS") instead of an Environmental Assessment. The BLM-proposed EIS would cover a ten-year period from 2018 through 2027. Once finalized, BLM would rely on the EIS for environmental compliance with NEPA when it issues the Event's annual SRP. On June 20, 2018, BLM published its intent to prepare an EIS to analyze the potential impacts of the annual Burning Man Events held during the ten-year period from 2019 through 2028. This review culminated in BLM's issuance of a Record of Decision in July 2019 and SRP approval.

28.     BLM charges BRC annually for its costs to administer the Burning Man SRP pursuant to FLPMA, FLREA, and the SRP Regulations, 43 C.F.R. Part 2930 *et seq.* (collectively, "Cost Recovery Requirements"). Under this cost recovery scheme, BLM charges BRC for all of BLM's direct and indirect costs (collectively, "Cost Recovery Charge"), in addition to 3% of BRC's gross receipts as a commercial use fee.

29.     Pursuant to the Cost Recovery Requirements, 43 U.S.C. § 1734, 16 U.S.C. § 6802, and 43 C.F.R. § 2932.31, BLM is only permitted to assess reasonable costs necessary for the administration of the SRP, including the cost of issuing the SRP, necessary documentation, on-site monitoring, and permit enforcement.

30.     In accordance with these requirements, BLM must provide the permittee with a reasoned, written explanation for all assessed costs supported by the facts of record to demonstrate that such costs are not arbitrary, capricious, or an abuse of discretion. Stated simply in DOI's H-2390-1 Recreation Permit and Fee Administration Handbook, which provides general policy, guidance, and direction for BLM's administration of recreation permits, "[t]he applicant is entitled to a thorough accounting of the use of cost recovery funds" (BLM Handbook Rel. 2-300, Nov. 17, 2014, at 1-30; *see also* BLM Manual 1323 – Cost Recovery for Reimbursable Projects/Activities, Nov. 23, 1987, at .18B2).

31.     The Cost Recovery Charge is estimated by BLM on an annual basis, prior to that year's Event. The Cost Recovery Charge is provided to BRC in the form of a Cost Recovery Estimate Agreement, and BRC must sign the agreement and pay the estimated amount in full as a condition of receiving the SRP for that year's Event. After the Event, BLM inspects the site to ensure that BRC is in compliance with the terms of its SRP.  BLM then issues a Final Decision on the Cost Recovery Charge, typically in late January of the following year. This Final Decision on the Cost Recovery Charge assesses to BRC all costs that BLM alleges it actually incurred for the prior year's Event. That amount is generally slightly lower than the estimated amount that BRC was required to pay prior to the Event, and BLM sends BRC a refund for any overage along with the Final Decision.

32.     Through 2011, BLM increased its Cost Recovery Charge by about 10% per year. During this time, population at the Burning Man Event increased by about 4% per year.

33.     Since 2011, however, BLM has significantly increased its Cost Recovery Charges while failing to provide any reasoned, written basis for such cost escalation, as is required by law.

34.     In 2012, BLM's Cost Recovery Charge increased to a total of $1,371,731, equating to a 60% year-over-year increase. The Burning Man Event's participant population increased by only 4% that year.

35.     BLM's Cost Recovery Charge more than doubled in 2013 to a total of over $2.93 million, and its 2014 Cost Recovery Charge further increased by $700,000, representing a total increase of over 291% (over $2.8 million) in just three years. During this time, attendance at the Burning Man Event increased by 39%.

36.     Moreover, despite BLM's lack of a reasoned explanation for its assessed costs, BRC has been able to identify numerous instances in which BLM's expenditures were unreasonably excessive and unnecessary. BLM's aggressive demands even caught the attention of the press a few years ago, *see* Jenny Kane, *BLM Demands Burning Man Provide 24-hour Access to Ice Cream*, RENO GAZETTE JOURNAL, June 26, 2015, https://www.rgj.com/story/news/2015/06/26/blm-demands-burning-man-provide-hour-access-ice-cream/29357065/, as well as State congressional representatives, *see* Benjamin Siegel, *How Harry Reid is Fighting for Burning Man*, ABC News, Jul. 1, 2015, https://abcnews.go.com/Politics/harry-reid-fighting-burning-man/story?id=32161151, when BLM personnel insisted BRC provide "outlandishly unnecessary" amenities such as 24-hour access to certain snack foods and a luxury compound for BLM guests.

37.     The BLM personnel who were primarily responsible for these unnecessary demands and escalated cost increases for the administration of the Burning Man SRP were ultimately reassigned to other positions in 2015, in the wake of ethical investigations. Yet, despite violations of their duties as agency officials, and promises by BLM to rectify the unreasonable and unjustified cost recovery scheme that had originated with these officials, BLM continues to provide insufficient explanation for its costs. BLM has claimed that its "hands are tied" until the IBLA issues a decision on BRC's pending appeals, despite BLM's ongoing duty to comply with cost recovery regulations.

38.     On an annual basis, BRC requests that BLM explain in writing why various costs were necessary for the administration of the Burning Man SRP, which BRC is entitled to as the permittee.

39.     Despite BRC's requests, BLM has never provided a sufficient level of detail regarding the costs it alleges to have incurred each year from administration of the Burning Man SRP.

40.     Specifically, BLM has habitually limited the documentation it provides BRC to summary spreadsheets that contain minimal information and copies of BLM's receipts and contracting documents each year, without any explanation that would enable BRC to confirm whether the expenses are reasonably necessary to BLM's administration of the Burning Man SRP.

41.     Moreover, BLM presents its Cost Recovery Estimate Agreement for each year's Event just a few weeks before BRC must begin onsite work for the Event, and after BRC has sold thousands of tickets and incurred significant Event production expenses. BRC must sign this Cost Recovery Estimate Agreement before BLM will issue an SRP for the forthcoming Event, leaving

BRC with no reasonable time to review, consider, or negotiate the terms of the Cost Recovery Estimate Agreement.

42.      Defendant Department of the Interior's control over the SRP process, assessment of costs, and decisions on appeals of those costs gives it considerable leverage over a permit applicant such as BRC. If BRC were to object to the Cost Recovery Charge set forth in the annual Cost Recovery Estimate Agreement and decline to pay it, BLM would refuse to issue the SRP, and the forthcoming Event would be jeopardized. Due to the late date that BLM sets forth its Cost Recovery Charge, BRC must make significant investments in the Event prior to receiving the cost estimate. Moreover, tens of thousands of Event participants from around the world purchase tickets and make plans to assemble at the Event. The late date that BRC receives the Cost Recovery Charge makes objection to BLM's estimate essentially infeasible.

43.      Therefore, BRC has no choice but to pay BLM's unreasonable Cost Recovery Charges, despite the lack of sufficient supporting information or time for BRC to review or engage in discussion with BLM regarding the estimated costs.  By delaying issuance of the Cost Recovery Charges until the last minute and providing scant supporting information and opportunity for objection, BLM deprives BRC of its due process rights under FLPMA, as a practical matter, by effectively denying BRC the ability to assess the legitimacy of any of the charges prior to payment. This abusive pattern and practice results in an administrative "Hobson's choice" for BRC to either accept BLM's charges and conditions, however unreasonable, or cancel the already-scheduled Burning Man Event.

44.      BLM's pattern and practice of delay is not limited to Cost Recovery Charges. BLM often delays providing BRC with the annual SRP stipulations until so close to the upcoming Event — when BRC has already planned operations, expended significant sums, and entered into

contractual agreements for the Event — that BLM claims there is no time for negotiation of the proposed stipulations. As with the Cost Recovery Charges, BLM's delay in providing the proposed stipulations effectively leaves BRC no choice but to agree to the stipulations, however unreasonable they may be, or cancel the Event.

45.     BLM delays similarly curtailed BRC's opportunity to object to administrative decisions in the context of the recent EIS. Despite BRC's attempts to engage in the EIS process as early as 2014, BLM did not make the Draft EIS available for public comment until March 15, 2019, mere months before the 2019 Burning Man Event was scheduled to occur, and well beyond the schedule that BLM outlined in January 2018. When commenters, including the Congressional representative for Northern Nevada, requested an extension of the 45-day period for public comment on the complex Draft EIS, BLM denied the request. Notwithstanding BLM's control over the start of the public comment period, the agency explained that such an extension would make it impossible to complete the NEPA process in time for the 2019 Event because the comment period commenced so close to the Event.  BLM also refused to allow for more time, and to depressurize the NEPA process by refusing to issue a DNA (as it had in the preceding two years) under the prior Environmental Assessment for the 2019 Event.  Even under BLM's compressed timeline, it did not issue its "Abbreviated Final EIS" until June 14, 2019, and the Record of Decision was not published until July 17, 2019—eight days before the effective date of the temporary Closure Order on the public lands upon which the 2019 Burning Man Event would be held, and barely one month before the 2019 Event itself. Moreover, before the potential environmental impacts had been documented in the Abbreviated Final EIS, before BRC had an opportunity to fully understand how BLM intended to modify the Draft EIS, and after BRC and other commenters had pointed out that BLM had exceeded the scope of NEPA in the draft EIS,

BLM demanded that BRC start negotiating measures to be included in the NEPA Record of Decision ("ROD") and 2019 SRP Stipulations. When BRC declined, given that the Final EIS that would govern these documents was not yet complete and the draft EIS confirmed that BLM had failed to comply with NEPA, BLM declared that BRC was refusing to cooperate and established final measures without input from BRC. These final measures include multiple conditions that continue to overstep BLM's authority and burden BRC with unnecessary expenses.

46.     Further, in 2019, BLM also unreasonably delayed presenting BRC with BLM's National Historic Preservation Act ("NHPA") Effects Determination and Memorandum of Agreement ("MOA"), forcing BRC to review and sign it in the course of a single weekend, or face exclusion from the cultural monitoring compliance process. The MOA must be executed before the NEPA process is complete. Thus, while BRC had a theoretical right to object to the MOA, if BRC had objected, then either conclusion of the NEPA process would have been unacceptably delayed or BLM would have excluded BRC from cultural resources compliance activities for the 10-year SRP period. In short, just as BRC has had no meaningful opportunity to negotiate Cost Recovery Charges and SRP requirements due to the BLM-imposed time constraints described above, BRC had no choice but to sign the MOA as presented.

47.     In an effort to seek relief from the unreasonable charges imposed through BLM's cost recovery program, BRC has filed several timely appeals of BLM decisions with the Department's Interior Board of Land Appeals ("IBLA") since 2016.[2] These include appeals of four

---

[2] Although BRC did not file its first appeal until 2016, BLM's practice of assessing unreasonable costs and burdensome requirements on BRC through the SRP process began as early as 2011. The previous BLM leadership personnel responsible for initiating these cost increases also threatened to delay or deny BRC's SRP altogether if BRC exercised its right to appeal. Only after these personnel were reassigned in 2015, due to ethical violations and other misconduct, did BRC believe that it could viably exercise its right to appeal without automatically jeopardizing the

consecutive Cost Recovery Final Decisions, covering the 2015 through 2018 Burning Man Event SRPs, and the consolidated appeal of two Notices of Noncompliance that BLM issued to BRC without cause at the 2018 Event. Each of these appeals remains pending to date.

48.     Meanwhile, BRC must continue to request that BLM authorize the annual Event. During this process, BRC always risks cancellation of the Event if it does not accept BLM's last-minute costs and SRP conditions, regardless of whether they are unnecessarily onerous, impractical, unexpected, or excessive.

**III. IBLA Appeals**

49.     The planning process for the 2015 Burning Man SRP was marred by delays and friction resulting from BLM's unprecedented demands of BRC, including a luxury compound to accommodate "VIP" personnel and 24-hour access to ice cream. These demands became the subject of a public outcry and criticism by elected officials, with then-Senator Harry Reid admonishing then-Interior Secretary Sally Jewell that such facilities "should be beyond the scope of the permitting requirements." BLM ultimately withdrew its demands for the VIP compound and reassigned its District Manager and Event law enforcement lead from further work on the Burning Man SRP.

50.     On January 27, 2016, BLM issued a Final Decision on the Cost Recovery Charge for the 2015 Event totaling over $2.7 million.

51.     BLM's 2015 Cost Recovery Charge included only minimal, summary information that was insufficient to satisfy the regulatory requirement of a written, reasoned explanation in accordance with 43 U.S.C. § 1734, 16 U.S.C. § 6802, and 43 C.F.R. § 2932.31.

_____

Event. Thus, BRC filed its first appeal following the BLM personnel reassignment in 2015, after new BLM leadership indicated it would rectify the wrongs that had been done.

52.     On January 30, 2016, and again on February 22, 2016, BRC requested written explanations for why each of BLM's costs were necessary for the administration of the Burning Man SRP, to which is BRC, as permittee, was legally entitled.   BLM declined to provide information sufficient for BRC to assess the reasonableness of all of the costs assessed in the 2015 Cost Recovery Charge.

53.     As a result, BRC timely filed a Notice of Appeal of BLM's 2015 Cost Recovery Charge to the IBLA on February 24, 2016 (Case No. IBLA 2016-115) ("2015 Cost Recovery Appeal"), requesting that IBLA determine BLM's 2015 Cost Recovery to be deficient and unreasonable; disallow BLM's 2015 cost recovery; and remand to BLM for proper refund to BRC accordingly.

54.     Concerning the 2016 Event, BLM issued a Final Decision on the Cost Recovery Charge on January 30, 2017, that reflected a slight overall reduction in its costs. However, much of the year-over-year reduction was attributable to BRC's taking on some of BLM's responsibilities and costs — including several government contracts for the Joint Operations Center — that were formerly managed by BLM and paid through cost recovery.  Taking these "in kind" costs into account, the total amount BRC paid BLM to administer the 2016 SRP decreased by 7% from 2015, but the 2016 costs were 274% higher than just five years earlier in 2011.

55.     Again, BLM's Final Decision on the Cost Recovery Charge for the 2016 Event lacked the sufficient explanation of the charges assessed that BRC, as permittee, was legally entitled to receive.

56.     Given the lack of explanation and apparent unreasonableness of many of the costs, while the 2015 Cost Recovery Appeal was still pending, BRC timely filed a Notice of Appeal of BLM's 2016 Cost Recovery Charge to the IBLA on February 28, 2017 (Case No. IBLA 2017-

0126) ("2016 Cost Recovery Appeal"), seeking dismissal of BLM's unjustified costs included in the 2016 Cost Recovery Charge and remand to BLM for refund to BRC accordingly.

57.     The following year, BLM likewise failed to adequately justify the 2017 Cost Recovery Charge, which remained about the same as the previous year, and the minimal evidence available to BRC indicated that many of these costs were objectively unreasonable.

58.     As a result, while the 2015 and 2016 Cost Recovery Appeals were still pending, BRC timely filed a Notice of Appeal of BLM's 2017 Cost Recovery Charge to the IBLA on February 22, 2018 (Case No. IBLA 2018-0086) ("2017 Cost Recovery Appeal"), seeking a determination that BLM's 2017 Cost Recovery Charge was unjustified and unreasonable; requesting that IBLA order BLM to comply with cost recovery requirements and provide reasoned explanations to justify all charges assessed against BRC; and requesting a refund to BRC for the charges not reasonably incurred in connection with the Burning Man SRP.

59.     In 2018, in addition to unlawfully assessing unnecessary costs, BLM ramped up its prejudicial conduct towards BRC by issuing unsubstantiated Notices of Non-Compliance during the 2018 Event, and then refusing to amend or rescind the Notices after BRC provided documentation that the violation notices were based on erroneous information.

60.     As a result, while the 2015, 2016, and 2017 Cost Recovery Appeals were still pending, BRC timely filed two Notices of Appeal to the IBLA on September 20, 2018, which have been consolidated into one proceeding (Case No. IBLA 2018-0008) ("2018 Notices of Non-Compliance Appeal"), requesting that IBLA strike the 2018 Notices of Non-Compliance from BRC's performance evaluation record and order BLM not to consider the Notices, or alternatively, requesting that IBLA remand to BLM for reconsideration.

61.     In 2018, BLM also continued its pattern of assessing unreasonable, substantial costs against BRC through the 2018 Cost Recovery Charge process without providing a sufficient explanation that such costs were reasonably necessary to the administration of the Burning Man SRP.

62.     As a result, while the 2015, 2016, and 2017 Cost Recovery and the 2018 Notices of Non-Compliance Appeals were still pending, BRC timely filed a Notice of Appeal of BLM's 2018 Cost Recovery Charge to the IBLA on April 26, 2019 (Case No. IBLA 2019-0109) ("2018 Cost Recovery Appeal"),[3] requesting that IBLA order BLM to comply with cost recovery requirements and grant a refund for unreasonable costs assessed against BRC through the cost recovery charge process.

63.     BLM's pattern of annually imposing unreasonable and excessive costs through the Cost Recovery Charge process has persisted while the IBLA Appeals remain pending, up to and including the Cost Recovery Charge for the 2019 Burning Man Event, which BLM has estimated will cost approximately $3 million. Like the Cost Recovery Charges for the preceding four years, BRC anticipates also having to appeal the 2019 Cost Recovery Charge once BLM has issued its final decision, given BLM's unbroken pattern and practice of cost recovery abuse, as outlined above.

---

[3] The 2018 Cost Appeal proceeding is still relatively new as of the date of this complaint. Therefore, BRC is not challenging IBLA's actions with respect to the 2018 Cost Appeal at this time; however, BRC notes that the 2018 Cost Appeal nonetheless reflects the greater pattern and practice of delay and abuse by the Defendants.

**IV. Inaction by the IBLA**

64.     For four years, BRC, as a party adversely affected by a decision of the Department, has continued to timely exercise its right to appeal to the IBLA, pursuant to 43 C.F.R. §§ 4.410, 2931.8, to seek relief from BLM's abusive practices described above.

65.     BLM's appeal regulations have an exhaustion provision requiring that an administrative appeal be filed with IBLA for cost recovery actions before a lawsuit can be filed in United States District Court, 4 C.F.R. § 4.21(c).  BLM decisions remain in effect while the appeal is pending unless IBLA issues a stay order.

66.     As an adversely affected party rightfully appearing before IBLA, BRC is entitled to prompt and efficient resolution of the matters presented to IBLA with due regard given to the convenience and necessity of the parties.

67.     As of the date of this Complaint, however, the 2015, 2016, and 2017 Cost Recovery Appeals and the 2018 Notices of Non-Compliance Appeals (collectively, "IBLA Appeals") are all still pending, and disputes that BRC first appealed in 2015 remain unaddressed.

68.     The Department's list of IBLA Pending Appeals available on its website indicates the status of the IBLA Appeals, as of November 30, 2019, as "under review" or "case awaiting action," both of which indicate that all of the IBLA Appeals are ripe for decision by the IBLA.

69.     IBLA has failed to issue a decision in any of the pending Appeals, however, despite the 2015 Cost Recovery Appeal having been fully briefed since July 2016.

70.     When BRC has attempted to discuss revising BLM's cost practices to ensure that BRC is only charged for those reasonable costs that are demonstrably connected to administration of the Burning Man SRP, BLM has indicated that it will not do so unless required by IBLA in connection with BRC's pending appeals, even though regulations require BLM to do so.

71.     IBLA's unreasonable withholding and delay of a decision undermines the very purpose of BRC exercising its right to administrative review: to seek redress from BLM's unlawful practices.

72.     From 2015 through 2018, BRC paid BLM a total of more than $18 million for BLM's costs of administering the annual Burning Man SRP. These charges were made without adequate justification and unduly burden BRC. In addition, BRC paid over $2.9 million to BLM as the Cost Recovery Charge estimate for the 2019 Event, much of which BLM spent on labor and equipment that was unsupported by any reasoned explanation. It is unreasonable to expect  BRC to continue carrying the enormous expense of BLM's ongoing failure to follow cost recovery regulations each year.

73.     For so long as IBLA continues to withhold rendering a decision, BLM is free to continue assessing unjustified costs and engaging in other prejudicial conduct towards BRC with no regard for the law, thereby effectively eliminating BRC's ability to obtain warranted relief.

74.     DOI's combination of sole authority over permit issuance, cost recovery, and cost recovery appeals places it in a position of incredible power over permittees of public lands such as BRC. IBLA's unreasonable delay in rendering decisions creates an institutional bias against BRC. The unreasonable delay also denies BRC recourse against arbitrary decisions that not only unreasonably burden BRC, but also threaten the very future of the Burning Man Event and lawful recreation activities on public lands in general.

**FIRST CAUSE OF ACTION: DEFENDANT INTERIOR BOARD OF LAND APPEALS' UNREASONABLE DELAY AND FAILURE TO TAKE ACTION ON THE IBLA APPEALS CONSTITUTE AN UNLAWFUL ABUSE OF AGENCY DISCRETION AND CONSTRUCTIVE DENIAL OF THE APPEALS.**

75.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

76.     IBLA has engaged in unreasonable delay and has failed to take action in the 2015, 2016, and 2017 Cost Recovery Appeals and 2018 Notices of Non-Compliance Appeals.

77.     Parties appearing before an agency are entitled to conclusion of the matter within a reasonable time, with due regard for the convenience and necessity of the parties, pursuant to the APA. 5 U.S.C. § 555(b).

78.     Defendant IBLA has failed to provide conclusion of the matters at issue in the IBLA Appeals within a reasonable time by withholding decisions for unreasonable periods of time, and in the worst case, for nearly four years from the filing of the Notice of Appeal.

79.     Defendant IBLA's failure to provide lawful and timely decisions in the IBLA Appeals has resulted in BRC suffering severe economic harm due to Defendant BLM's unlawful practice of charging excessive costs without justification to administer the Burning Man SRP, an unlawful practice that will continue without restraint for as long as Defendant IBLA continues to unreasonably delay rendering a decision.

80.     Defendant IBLA's failure to provide lawful and timely decisions in the IBLA Appeals has deprived BRC of its right to timely relief from arbitrary decisions, created an impermissible institutional bias against BRC in the context of Cost Recovery demands, and functionally required BRC to accept SRP stipulations and other terms and conditions that are onerous and in excess of the agency's limited authority.

81.     Defendant IBLA's failure to provide lawful and timely decisions in the IBLA Appeals is therefore an abuse of discretion that has caused BRC serious prejudice and injury to BRC, threatens the continued viability of the Burning Man Event, and constitutes constructive denial of the IBLA Appeals.

**SECOND CAUSE OF ACTION: DEFENDANT INTERIOR BOARD OF LAND APPEALS HAS UNLAWFULLY WITHHELD AND UNREASONABLY DELAYED ACTION ON THE IBLA APPEALS IN VIOLATION OF THE APA.**

82.  Plaintiff realleges and incorporates by reference the preceding paragraphs.

83.  Defendant IBLA has engaged in a pattern of unlawful withholding and unreasonable delay of issuing decisions pertaining to the 2015, 2016, and 2017 Cost Recovery Appeals and 2018 Notices of Non-Compliance Appeals pursuant to the APA. 5 U.S.C. § 706(1).

84.  Defendant IBLA is an administrative authority of the Government of the United States within the Office of Hearings and Appeals for the United States Department of the Interior, 43 C.F.R. § 4.1(b)(2), comprised of administrative law judges appointed by the Department pursuant to 5 U.S.C. § 3105, and is therefore an administrative agency subject to the requirements of the APA. 5 U.S.C. § 701(b)(1).

85.  The decisions and actions of BLM and IBLA in addressing cost recovery appeals are agency actions within the definition of the APA. 5 U.S.C. §§ 701(b)(2); 551.

86.  Under the APA, administrative agencies have a statutorily mandated duty to decide issues presented to them within a reasonable time. 5 U.S.C. § 555(b).

87.  Under the APA, the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

88.  If a reviewing court finds that an agency has violated its statutorily mandated duty to decide issues presented to it within a reasonable time, then the reviewing court has a duty to compel the agency to perform its mandatory obligations that have been unlawfully withheld or unreasonably delayed.

89.  As an administrative agency, Defendant IBLA has a statutorily mandated duty to decide issues presented to it within a reasonable time under the APA.

90.     As of the date of this Complaint, Defendant IBLA has continued to unlawfully withhold and unreasonably delay deciding issues in the IBLA Appeals for well over three years.

91.     Therefore, Defendant IBLA has violated its statutorily mandated duty to decide issues presented to it within a reasonable time, which has resulted in serious economic harm to BRC and threatens the culture and long-term viability of the Burning Man Event.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Declare that Defendant IBLA's unreasonable delay and failure to take action in the IBLA Appeals is an abuse of discretion and constitutes an improper constructive denial of the IBLA Appeals;

B.  Declare that such constructive denial of the pending IBLA Appeals is a final agency action subject to judicial review;

C.  Maintain jurisdiction to provide judicial resolution at issue given IBLA's failure to act;

D.  Declare that Defendants have unlawfully withheld and unreasonably delayed actions relating to the Burning Man SRP and the IBLA Appeals arising therefrom;

E.  Issue an injunction to compel Defendant IBLA to take immediate action in the IBLA Appeals;

F.  Award Plaintiff its costs and reasonable attorney's fees; and,

G.  Grant such other relief as may be appropriate in the circumstances.

Respectfully submitted this 13th day of December, 2019.

HOLLAND & KNIGHT LLP

By:    /s/ Rafe Petersen
       Rafe Petersen
       Nicholas W. Targ
       Alexandra E. Dobles
       800 17th Street NW, #1100
       Washington, D.C. 2006
       (202) 419-2481

*Attorneys for Plaintiff Black Rock City LLC*