PRERAK SHAH
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

PAUL A. TURCKE
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
(202) 353-1389
paul.turcke@usdoj.gov

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ————————————————— )<br>BLACK ROCK CITY LLC, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>DAVID BERNHARDT, )<br>SECRETARY OF THE INTERIOR *et al*., )<br> )<br>Defendants. )<br>————————————————— ) | Civil Action No. 19-cv-03729-DLF |

# DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

LEGAL BACKGROUND ..................................................................................................... 2

    I.     Failure to Act Under the Administrative Procedure Act, 5 U.S.C. § 706(1) .......... 2

    II.    Special Recreation Permit Legal Authority ........................................................... 3

    III.   Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) .................... 5

FACTUAL BACKGROUND ................................................................................................. 6

ARGUMENT ......................................................................................................................... 9

    I.     The Absence of an IBLA Decision Cannot be Deemed Constructive Denial ........ 9

    II.    Plaintiff Fails to State a Claim under Section 706(1) .......................................... 10

CONCLUSION ..................................................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Am. Hosp. Ass'n v. Burwell,*
812 F.3d 183 (D.C. Cir. 2016) .................................................................. 13, 14, 15

*\*Anglers Conservation Network v. Pritzker,*
70 F. Supp. 3d 427 (D.D.C. 2014) ..................................................................... 6, 12

*\*Anglers Conservation Network v. Pritzker,*
809 F.3d 664 (D.C. Cir. 2016) ........................................................................... 6, 17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................................. 5

*Bark v. U.S. Forest Serv.,*
37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................................. 4

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .................................................................................................. 5

*\*Connecticut v. U.S. Dep't of the Interior,*
344 F. Supp. 3d 279 (D.D.C. 2018) ..................................................................... 6, 12

*\*Ctr. for Biological Diversity v. Zinke,*
260 F. Supp. 3d 11 (D.D.C. 2017) .................................................................. 6, 9, 12

*Darby v. Cisneros,*
509 U.S. 137 (1993) ................................................................................................ 16

*Ecology Ctr. v. U.S. Forest Serv.,*
192 F.3d 922 (9th Cir. 1999) .................................................................................. 10

*Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior,*
864 F.3d 1105 (10th Cir. 2017) .............................................................................. 16

*Fletcher v. U.S. Dep't of Justice,*
17 F. Supp. 3d 89 (D.D.C. 2014) ............................................................................. 5

*In re: Am. Rivers & Idaho Rivers United,*
372 F.3d 413 (D.C. Cir. 2004) .......................................................................... 13, 14

*Nat'l Wildlife Fed'n v. Burford,*
835 F.2d 305 (D.C. Cir. 1987) ................................................................................. 3

*Nevada v. Watkins,*
939 F.2d 710 (9th Cir. 1991) .................................................................................. 10

*\*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ......................................................................... 3, 6, 9, 10, 11, 17

*Telecommunications Research & Action Center v. FCC,*
750 F.2d 70 (D.C. Cir. 1984) ........................................................................... 13, 14

*United States v. Philip Morris, Inc.*,
   116 F. Supp. 2d 131 (D.D.C. 2000) ........................................................................... 5

**Statutes**

16 U.S.C. § 6801 ......................................................................................................... 1

16 U.S.C. § 6802 ......................................................................................................... 4

43 U.S.C. § 1301 ......................................................................................................... 2

43 U.S.C. § 1701 ......................................................................................................... 3

43 U.S.C. § 1732 ......................................................................................................... 3

43 U.S.C. § 1734 ......................................................................................................... 3

5 U.S.C. § 551 ............................................................................................................. 2

5 U.S.C. § 555(b) ................................................................................................... 11, 12

5 U.S.C. § 702 ............................................................................................................. 2

5 U.S.C. § 704 ........................................................................................................... 16

5 U.S.C. § 706(1) ................................................................................................ 2, 3, 6, 12

Pub. L. No. 104-134 § 315, 110 Stat. 1321 ............................................................... 4

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 5

**Regulations**

43 C.F.R. § 2930 .................................................................................................. 1, 4, 7

43 C.F.R. § 2931.2 ...................................................................................................... 4

43 C.F.R. § 2931.8 ...................................................................................................... 4

43 C.F.R. § 2932.26 .................................................................................................... 4

43 C.F.R. § 2932.31 .................................................................................................... 4

43 C.F.R. § 2932.32 .................................................................................................... 4

43 C.F.R. § 4.1 ............................................................................................................ 2

43 C.F.R. § 4.21(c) .................................................................................................... 16

**Other Authorities**

67 Fed. Reg. 61,732 (Oct. 1, 2002) ............................................................................ 4

72 Fed. Reg. 7,832 (Feb. 21, 2007) ........................................................................... 4

## INTRODUCTION

Plaintiff Black Rock City LLC is a Nevada limited liability headquartered in San Francisco, and is the legal foundation and operational force behind the Burning Man Project. Compl. ¶ 14, ECF No. 1.  The Burning Man Project is best known for its "iconic" event "held annually on public lands in Nevada's Black Rock Desert."  *Id*. ¶ 1.  The event "attracts more than 70,000 individuals who, over the course of eight days, camp and participate in a unique experimental community" on these public lands.  *Id*. ¶ 20.  This "has grown in size, popularity, and complexity," most recently peaking at 78,850 persons, who purchase tickets which "sell out within minutes of being offered."  *Id*. ¶ 21.  Burning Man "generates an estimated $75 million per year for the local Nevada economy and represents more than 560,000 visitor days to the public lands."  *Id*.

Defendant Bureau of Land Management ("BLM") is the bureau within the U.S. Department of the Interior that manages these public lands.  BLM's duties encompass a wide range of natural resource and other concerns, including the administration of special recreation permits under the Federal Lands Recreation Enhancement Act, 16 U.S.C. § 6801 et seq. ("FLREA") and implementing regulations, codified at 43 C.F.R. § 2930.  Aside from analyzing the environmental effects of more than 70,000 people inhabiting a Nevada desert site, which are not at issue here, BLM administers terms and conditions of the Burning Man event permit, including assessment and recovery of permit-related costs.  Plaintiff disputes BLM's cost-recovery determinations and notices of non-compliance for the events conducted in 2015, 2016, 2017, and 2018, and has availed itself of the opportunity to appeal and seek further administrative review of each of those BLM decisions.  Compl. ¶¶ 49-63.

Defendant Interior Board of Land Appeals ("IBLA") is "a quasi-judicial appellate review body" within the Department of Interior Office of Hearing and Appeals.  *Id*. ¶ 19.  The Office "is

an authorized representative of the Secretary [of Interior] for the purpose of hearing, considering, and deciding matters within the jurisdiction of the Department involving hearings, appeals, and other review functions of the Secretary."  43 C.F.R. § 4.1.  As such, Plaintiff's aforementioned appeals challenging BLM's cost-recovery determinations have been submitted to the IBLA.

Plaintiff brings this case to force the IBLA to act on its pending appeals challenging BLM's decisions.  Alternatively, Plaintiff asks the Court to declare that IBLA's failure to issue a decision(s) on the pending appeals constitutes IBLA's constructive denial of them.  The complaint invokes FLREA, the Federal Lands Policy and Management Act, 43 U.S.C. § 1301, *et seq.* ("FLPMA"), and the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* (the "APA"). Plaintiff asks this Court to act under the APA and to "compel agency action unlawfully withheld or unreasonably delayed."  Compl. ¶¶ 87-88; 5 U.S.C. § 706(1).

Plaintiff is not entitled to the relief it seeks.  The APA's "failure to act" provision is well defined and provides no basis for the claims presented.  Plaintiff's Complaint thus fails to state a claim for which relief can be granted, and should be dismissed.

## LEGAL BACKGROUND

### I.      Failure to Act Under the Administrative Procedure Act, 5 U.S.C. § 706(1)

The Administrative Procedure Act ("APA") waives the sovereign immunity of the United States for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.  The APA review often involves complaints about the sufficiency of agency action – such as a formal decision reached through rulemaking or a public planning process.  *See id.* § 706(2) (outlining "arbitrary and capricious" review of agency action).  There can exist instances where a party feels "aggrieved" by an agency's failure to act, and the APA prescribes at least some instances in which a "reviewing court…shall compel agency action unlawfully withheld or unreasonably

delayed." *Id*. § 706(1).  A series of western public lands management cases provided the

occasion for the Supreme Court to "consider[ ] what limits the APA places upon judicial review

of agency inaction." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004).  In a unanimous

decision authored by Justice Scalia the Court held that "a claim under § 706(1) can proceed only

where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required*

*to take*." *Id*. at 64 (emphasis in original).

## II.      Special Recreation Permit Legal Authority

Plaintiff's asserted cause of action exists entirely within the APA, but various public

lands authorities provide context to the underlying dispute.  Compl. ¶¶ 10, 26-28.  FLPMA was

enacted in 1976 and "provides [BLM], the subagency of the Department [of the Interior] charged

with land management responsibilities, with permanent, comprehensive guidelines for carrying

out its mandate." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 308 (D.C. Cir. 1987).  FLPMA

creates a framework that "requires land use planning for public lands under BLM's jurisdiction

and outlines procedures for the development, maintenance, and revision of land use plans." *Id*.

Recognized uses to be addressed in such plans include "outdoor recreation and human

occupancy and use" in concert with "scientific, scenic, historical, ecological, environmental" and

other recognized values.  43 U.S.C. § 1701(a)(8).  Such management shall reflect "principles of

multiple use and sustained yield." *Id*. § 1732(a).  Management agencies, "subject to [FLPMA]

and other applicable law," may "regulate, through easements, permits, leases, licenses, published

rules, or other instruments as the Secretary deems appropriate, the use, occupancy, and

development of the public lands . . . ." *Id*. § 1732(b).  FLPMA further authorizes the Secretary to

"establish reasonable filing and service fees and reasonable charges . . . relating to the public

lands. . . ." *Id*. § 1734(a).

3

Congress has further addressed the manner in which federal agencies can assess and collect fees relating to certain uses of our public lands.  This started with the Recreational Fee Demonstration Program, Pub. L. No. 104-134 § 315, 110 Stat. 1321, 1321-200 to -202 (1996), "whose purpose was 'to demonstrate the feasibility of user-generated cost recovery for the operation and maintenance of recreation areas or sites and habitat enhancement projects on Federal lands." *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 45 (D.D.C. 2014) (quoting § 315(a)).  This "fee demo" program was replaced in 2004 by FLREA, which outlines general authority of the Secretaries of Agriculture and Interior to establish recreation fees.  16 U.S.C. § 6802(a)-(c).  This includes charging "a special recreation permit fee . . . for specialized recreation uses of Federal recreational lands and waters, such as group activities, recreation events, motorized recreational vehicle use." *Id*. § 6802(h).

BLM has promulgated rules further interpreting this authority.  67 Fed. Reg. 61,732 (Oct. 1, 2002), as amended, 72 Fed. Reg. 7,832 (Feb. 21, 2007) (published at 43 C.F.R. § 2930).  Permit and fee systems may be created in association with special recreation permits "for commercial use, organized group activities or events, competitive use, and for use of special areas" and "for use of fee areas such as campgrounds and day use areas."  43 C.F.R. § 2931.2.

Special recreation permits are more specifically covered in subpart 2932, which provides definitions, identifies activities for which one must obtain a permit, and specifies application procedures.  Upon receipt of a proper application, "BLM has discretion over whether to issue" any permit and will base its decision on prescribed factors, including conformance with laws and land use plans, public safety, conflicts with other uses, resource protection, the public interest served, the applicant's past compliance with permit terms, and "[s]uch other information that BLM finds appropriate."  43 C.F.R. § 2932.26.  A fee structure is established by the BLM

Director and each BLM State Director, which may be adjusted due to direct or indirect costs to

the government, the types of services or facilities provided, comparable fees in other settings, or

other factors.  *Id.* § 2932.31.  For commercial or competitive/organized group event uses, BLM

charges a fee and may impose an additional charge for cost recovery if more than 50 hours of

staff time is required to process the permit.  *Id.* at (e)(1)-(2).  However, cost recovery charges

"will be limited to BLM's costs of issuing the permit, including necessary environmental

documentation, on-site monitoring, and permit enforcement."  *Id.* at (e)(3).  These fees and

charges will be estimated and must be paid before BLM will fully process and authorize the

proposed use.  *Id.* § 2932.32.

A party "adversely affected by a decision under this part [2930] may appeal the decision

under parts 4 and 1840 of this title [43]."  *Id.* § 2931.8(a).  While a decision under appeal will

"go into effect immediately and will remain in effect while appeals are pending" an appellant is

afforded the opportunity to seek and obtain a stay of the decision "under §4.21(b) of this title."

*Id.* at (b).

### III.       Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Dismissal is appropriate if a complaint "fail[s] to state a claim upon which relief can be

granted[.]"  FED. R. CIV. P. 12(b)(6).  A court considering a Rule 12(b)(6) motion presumes "the

complaint's factual allegations are true and construes them liberally in the plaintiff's favor."

*Fletcher v. U.S. Dep't of Justice*, 17 F. Supp. 3d 89, 92-93 (D.D.C. 2014) (citing *United States v.*

*Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000)).  Even with this presumption "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  Further, the "court need not accept a plaintiff's legal

conclusions as true, nor must a court presume the veracity of the legal conclusions that are

couched as factual allegations." *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 296 (D.D.C. 2018) (citations omitted). The interplay of APA 706(1) and Rule 12(b)(6) has become increasingly clear in this Court, and where "a complaint containing an APA claim under 5 U.S.C. § 706(1) fails to identify a discrete and mandatory agency duty, the court must grant the defendant's Rule 12(b)(6) motion and dismiss the claim." *Id.*; *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 18 (D.D.C. 2017); *Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 439-41 (D.D.C. 2014), *aff'd*, 809 F.3d 664 (D.C. Cir. 2016).

## FACTUAL BACKGROUND

For nearly three decades, Plaintiff has been authorized by BLM to create its "unique experimental community" on public lands in remote northern Nevada. Compl. ¶ 20.[1] The Event reflects an "ethos and culture…rooted in the Ten Principles of Burning Man: Radical Inclusion, Gifting, Decommodification, Radical Self-reliance, Radical Self-expression, Communal Effort, Civic Responsibility, Leaving No Trace, Participation, and Immediacy." *Id.* ¶ 22. It has also been referred to as a "famed do-it-yourself celebration" and "a famously grungy affair in the Nevada desert where attendants camp out, bring their own food and share bathrooms." *See* https://abcnews.go.com/Politics/harry-reid-fighting-burning-man/story?id=32161151 (cited in Compl. ¶ 36) (last visited May 22, 2020). As the federal land manager that evaluates and oversees Burning Man, once again "BLM faces a classic land use dilemma of sharply inconsistent uses . . . ." *See Norton*, 542 U.S. at 60.

Plaintiff takes understandable satisfaction in its considerable efforts at conducting Burning Man. These involve "over fifty year-round departments and teams" engaging

---

[1] In the context of Rule 12(b)(6) the factual allegations of the complaint must be presumed to be true. Defendants do not through this "factual background" admit or otherwise address the truthfulness of any allegations of the complaint, but will do so in an answer to the extent necessary following the Court's ruling on this motion.

"thousands of competent and highly trained health and safety employees, contractors, and volunteers" to address management, construction, security, first-aid and environmental compliance.  Compl. ¶ 23.  Plaintiff also acknowledges BLM's duty to evaluate and make determinations in accordance with various environmental statutes, such as the National Environmental Policy Act and the National Historic Preservation Act.  *Id*. ¶¶ 27, 45-46.

These efforts culminate in Plaintiff's application for, and BLM's potential issuance of, a special recreation permit to conduct each annual event.  The applicable legal guidance for this process comes from FLPMA, FLREA and the regulations at 43 C.F.R. § 2930.  These include charging Plaintiff for "costs to administer the Burning Man [permit]" under the aforementioned authorities.  Compl. ¶ 28.  For an event involving over 70,000 people with annual economic impacts over $75 million, these costs are considerable.  *See id*. ¶ 50 (stating that cost recovery charges for the 2015 Event were $2.7 million).

The long history and popularity of Burning Man might be considered by some a multiple-use management success story, but Plaintiff complains of "ongoing, unlawful and prejudicial conduct" including a "pattern and practice of delay" which is "institutionally biasing the administrative decision-making process . . . causing damage . . . and threatening the rights of [Plaintiff] and its participants to use public lands, as well as the viability of the Burning Man Event on a year-to-year basis."  Compl. ¶ 1.  Plaintiff particularly voices concerns with the cost-recovery determinations and resulting charges, which it contends since 2011 have "significantly increased" despite BLM's "failing to provide any reasoned, written basis for such cost escalation, as is required by law."  *Id*. ¶ 33.  Plaintiff alleges it receives "habitually limited" or "minimal information" but "has no choice but to pay" BLM's charges in "an administrative

'Hobson's choice' for [Plaintiff] to either accept BLM's charges or conditions, however unreasonable, or cancel the already-scheduled Burning Man Event." *Id*. ¶¶ 40-43.

Plaintiff has voiced these concerns by filing "several timely appeals of BLM decisions with the [IBLA] since 2016." *Id*. ¶ 47.  BLM issued a final cost-recovery decision for the 2015 event on January 27, 2016, assessing a final charge to Plaintiff of $2.7 million.  *Id*. ¶ 50. Plaintiff disputes BLM's decision and filed a timely notice of appeal to the IBLA.  *Id*. ¶¶ 51-53. The 2016 event cost-recovery decision was similarly issued in January of 2017, which "reflected a slight overall reduction in costs" which Plaintiff again timely appealed to the IBLA on February 28, 2017.  *Id*. ¶¶ 54-56.  The same pattern occurred for the 2017 event, with BLM's charges being "about the same as the previous year" and again being challenged in a February, 2018, appeal to the IBLA.  *Id*. ¶¶ 57-58.  In 2018, more allegedly "unreasonable, substantial costs" were charged to Plaintiff by BLM, as well as two Notices of Non-Compliance, all of which were the subject of three more appeals to the IBLA.  *Id*. ¶¶ 59-62.  In summary, Plaintiff has six different appeals pending before the IBLA, four of which seek review of what Plaintiff contends is a "pattern of annually imposing unreasonable and excessive costs through the Cost Recovery Charge process . . . ."  *Id*. ¶ 63.

Plaintiff theorizes that the Department of Interior is wielding "incredible power over permittees of public lands" through a combination of "arbitrary" BLM cost recovery decisions and IBLA's "unreasonable delay" in deciding the resulting appeals.  *Id*. ¶ 74.  Plaintiff contends this "unreasonable delay" denies it "recourse against arbitrary decisions that not only unreasonably burden [Plaintiff], but also threaten the very future of the Burning Man Event and

lawful recreation on public lands in general." *Id.*[2]  Against the option of further awaiting an

IBLA answer to its grievances, Plaintiff filed the present action on December 13, 2019.

## ARGUMENT

Plaintiff's concerns are not properly brought before this Court.  Even if the factual

allegations of the Complaint are accepted as true, Plaintiff fails to state a plausible claim for

relief under the APA.  The Court should grant Defendants' motion and dismiss this case.

## I.   The Absence of an IBLA Decision Cannot be Deemed Constructive Denial

Plaintiff erroneously suggests the Court can declare that the IBLA's failure to have yet issued

a decision can be deemed constructive denial of one or more of its appeals.  The First Cause of

Action alleges IBLA's "failure to provide lawful and timely decisions" is "an abuse of

discretion…and constitutes constructive denial of the IBLA appeals." Compl. ¶ 81.  Plaintiff

elaborates in the Prayer for Relief, requesting that the Court "[d]eclare that such constructive

denial of the pending IBLA Appeals is a final agency action subject to judicial review . . . ." *Id.*

at 24, ¶ B.

Plaintiff's interpretation is foreclosed by *Norton*.  Plaintiff suggests an agency can

abdicate its duties in such a way as to constitute "denial" of a request, triggering a right to

judicial review of final agency action.  The *Norton* plaintiffs hinted at this reasoning as well,

seizing on a phrase in the APA's definitions of agency action.  *Norton*, 542 U.S. at 62

(discussing "prescribed terms following those five categories of agency action [that] are not

defined in the APA: 'or the equivalent or denial thereof, or failure to act.' § 551(13).").  The

---

[2]      Plaintiff has announced that coronavirus-related concerns will prevent the 2020 event
from occurring on BLM-managed lands within the Black Rock Desert.  See
https://journal.burningman.org/2020/04/news/official-announcements/brc-2020-update/ (last
visited May 22, 2020).

Court rejected any suggestion that a "delay" can ever be transformed into a "denial" under the

APA:

> A "failure to act" is not the same thing as a "denial." The latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request—for example, the failure to promulgate a rule or take some decision by a statutory deadline. The important point is that a "failure to act" is properly understood to be limited, as are the other items in § 551(13), to a *discrete* action.

*Id*.  As one court observed in the buildup to *Norton*, the constructive denial theory presents

"complaints about the sufficiency of an agency action 'dressed up as an agency's failure to act."

*Ecology Ctr. v. U.S. Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999) (quoting *Nevada v. Watkins*,

939 F.2d 710, 714 n.11 (9th Cir. 1991)).  Plaintiff's First Cause of Action should be dismissed,

because there has been no "denial" of Plaintiff's IBLA claims, constructive or otherwise.

## II.   <u>Plaintiff Fails to State a Claim under Section 706(1)</u>

Plaintiff's "failure to act" claim should be dismissed for the same reasons this Court has

dismissed similar post-*Norton* claims.  The Second Cause of Action alleges "Defendant IBLA

has engaged in a pattern of unlawful withholding and unreasonable delay of issuing decisions

pertaining to the 2015, 2016, and 2017 Cost Recovery Appeals and 2018 Notices of Non-

Compliance Appeals" under APA § 706(1).  Compl. ¶ 83.  Plaintiff claims "Defendant IBLA has

violated its statutorily mandated duty to decide issues presented to it within a reasonable time . . .

."  *Id*. ¶ 91.

Again, *Norton* provides the legal framework for measuring these claims.  The succinct

recitation of its holding is that an APA § 706(1) claim "can proceed only where a plaintiff asserts

that an agency failed to take a *discrete* action that it is *required to take*."  *Norton*, 542 U.S. at 64

(emphasis in original).  In reaching this formulation, the Court emphasized that "the APA carried

forward the traditional practice prior to its passage, when judicial review was achieved through

use of the so-called prerogative writs—principally writs of mandamus . . . ."  *Id*. at 63.  That

remedy "was normally limited to enforcement of 'a specific, unequivocal command,' the

ordering of 'a precise, definite act…about which [an official] had no discretion whatever,'"[.]

*Id*. (citations omitted, ellipsis and bracketing in *Norton*).

Plaintiff's claim falls well short of these requirements.  From the outset, the Complaint

acknowledges the IBLA "is a quasi-judicial appellate review body . . . ."  Compl. ¶ 19.  None of

the words in the quoted phrase can be squared with the requirement that Plaintiff seek to compel

an "unequivocal" act about "which [an IBLA judge] had no discretion whatever."  There is no

mandatory timetable for IBLA decision-making in any regulation or statute.  Plaintiff relies

solely upon a phrase in the APA which it claims creates for "administrative agencies . . . a

statutorily mandated duty to decide issues presented to them within a reasonable time."  *Id*. ¶ 87

(citing 5 U.S.C. § 555(b)).  Section 555 is entitled "Ancillary matters" and it appears within the

APA Chapter 5, Subchapter II covering "Administrative Procedure" in a sequence of sections

addressing open meetings (section 552b), rule making (section 553), adjudications (section 554),

hearings (section 556), initial decisions (557), and imposition of sanctions and determination of

applications (section 558).  In its entirety, the relied-upon section reads:

> A person compelled to appear in person before an agency or representative
> thereof is entitled to be accompanied, represented, and advised by counsel or, if
> permitted by the agency, by other qualified representative.  A party is entitled to
> appear in person or by or with counsel or other duly qualified representative in an
> agency proceeding.  So far as the orderly conduct of public business permits, an
> interested person may appear before an agency or its responsible employees for
> the presentation, adjustment, or determination of an issue, request, or controversy
> in a proceeding, whether interlocutory, summary, or otherwise, or in connection
> with an agency function.  With due regard for the convenience and necessity of
> the parties or their representatives and within a reasonable time, each agency shall
> proceed to conclude a matter presented to it.  This subsection does not grant or
> deny a person who is not a lawyer the right to appear for or represent others
> before an agency or in an agency proceeding.

5 U.S.C. § 555(b) (emphasis added).  Plaintiff's interpretation and application of the cited phrase is fundamentally at odds with Justice Scalia's analysis in *Norton*.  The APA's proffered "reasonableness" requirement cannot plausibly form a basis to characterize a quasi-judicial body's duty to decide contested appellate matters before it as unequivocal, lacking discretion, or subject to some unidentified mandatory time limit.

Multiple post-*Norton* decisions in this Court are instructive.  In *Connecticut*, the Court considered claims by the State of Connecticut and the Mashantucket Pequot Tribe that the Department of the Interior had unlawfully failed to act in amending the "Pequot procedures" interpreting the Indian Gaming Regulatory Act.  *Connecticut*, 344 F. Supp. 3d at 306.  The Court deferred to the Secretary's interpretation and dismissed a § 706(1) claim under Rule 12(b)(6), concluding "Plaintiffs have failed to show that the Secretary has a clear, nondiscretionary duty to act within a specific timeframe on the proposed amendments to the Pequot Procedures."  *Id.* at 321 n.37.  In *Center for Biological Diversity*, plaintiffs sought to compel the Department of Interior to complete review of certain agency procedures.  260 F. Supp. 3d at 18.  The Court granted defendants' Rule 12(b)(6) motion, finding, among other things, that the applicable regulation's "absence of any well-defined requirements . . . for a specific course of action, such as a mandate that each agency complete its review before a set deadline and publish the results" supported "the Court's conclusion that this regulation fails to prescribe a discrete duty."  *Id.* at 28.  Finally, in dismissing claims against various federal agencies seeking to compel actions to address certain Atlantic fisheries, the Court concluded the statute at issue "does not impose a 'discrete' statutory requirement to identify the river herring and shad as overfished."  *Anglers Conservation Network*, 70 F. Supp. 3d at 441.  Plaintiff's claim should be dismissed under similar reasoning; IBLA is not required to rule on appeals within any specific time period, nor is

it required to render a decision that takes some specified action. A strict application of *Norton* and the above-cited cases is sufficient to resolve this case.

Some "unreasonable delay" cases still consider the D.C. Circuit's decision in *Telecommunications Research & Action Center v. Federal Communications Commission*, 750 F.2d 70 (D.C. Cir. 1984). That dispute arose from a petition filed by public interest groups seeking "enforcement and accounting" of alleged excess revenue collected by large telecommunications companies, including AT&T. After concluding that it could exercise original jurisdiction, the Court of Appeals reached the "unreasonable delay claim" and cited APA §§ 555(b) and 706(1) while instructing "the first stage of the judicial inquiry is to consider whether the agency's delay is so egregious as to warrant mandamus." *Id*. at 79. In this inquiry the Circuit Court observed "one can discern the hexagonal contours of a standard" which it outlined:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Id*. at 80 (numbering in original, internal quotations and citations omitted). These subsequently labeled "*TRAC* factors" are no more applicable here than in this Court's above-cited decisions granting motions to dismiss, but they have continued to be occasionally considered in certain other contexts. *See, e.g.*, *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016); *In re: Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004).

Whatever ongoing utility the *TRAC* factors offer following *Norton*, they clearly do not support Plaintiff here.  Cases applying the *TRAC* factors to a plaintiff's benefit generally involve two circumstances.  The first occurs where "the statute imposes a clear duty on the Secretary to comply with statutory deadlines" while empowering a claimant "with a corresponding right to demand that compliance."  *Am. Hosp. Ass'n*, 812 F.3d at 192.  The other involves unusually long delay.  *Am. Rivers*, 372 F.3d at 420 (concluding the agency's "six-year-plus delay is nothing less than egregious").  There are no deadlines imposed by any statute or regulation here.  The absence of such a deadline carries significant weight, under any *TRAC* factor analysis as well as *Norton*'s "discreteness" requirement.

Nor does any formulation of the delay here approach the threshold of a plausible claim.  Even in *TRAC* itself, which involved a delay of roughly five years in addressing allegedly improper rates across an entire telecommunication user network, the D.C. Circuit did not conclude "these delays would justify mandamus" but instead found "they clearly warrant retaining jurisdiction."  *TRAC*, 750 F.2d at 81.  The situation here is markedly different.  This case does not involve a petition or equivalent request that an agency promulgate a rule or initiate some proceeding, but instead the premise that an agency's duty to adjudicate a contested matter can be compelled via APA § 706(1), or mandamus.  Unlike the above-cited cases, Plaintiff does not identify a single submission, the inaction upon which approaches agency abdication of a mandatory duty to act.  Rather, Plaintiff is a party to multiple contested cases which have arisen at different times involving separate agency decisions and their separate administrative records.  This case therefore involves a spectrum of alleged delay, and it is noteworthy that the "2018 Cost Appeal proceeding is still relatively new" and even Plaintiff concedes could not form the basis for a "failure to act" claim "at this time . . . ."  Compl. ¶ 63.  So any delay in acting on the appeal

filed in 2019 (challenging determinations for the 2018 event) is not actionable, even under Plaintiff's interpretation.  This prompts an inquiry as to whether the lack of a decision on the appeal filed in 2018, thus now pending for almost two years, could ever be actionable.  This process of inquiry continues, ending with the longest-pending appeal, which would be the appeal of the 2015 event determinations, filed in 2016 and thus "under review" for about four years.[3] Again, Plaintiff has not brought a plausible "failure to act" claim under any available theory.

The remaining *TRAC* factors do not support Plaintiff's request.  Under the third factor, this case does not involve human health and welfare, or even foreseeable environmental effects, but rather whether Plaintiff will receive a refund for past payments it has made in the annual conduct of its unique and popular event.  The fourth factor considers the effect that expediting action on Plaintiff's matter(s) will have on other competing agency activities.  This raises another important point—the IBLA's "pending appeals" list shows that Plaintiff occupies a place in line alongside other appellants, whose matters have been pending for the same (or longer) amount of time.  *See* https://www.doi.gov/oha/organization/ibla/IBLA-Pending-Appeals (referred to in Compl. ¶ 68) (last visited May 22, 2020).  These appellants include mining, livestock grazing, oil and gas, and rights of way matters submitted by individuals, preservationist organizations, commercial interests and the State of Alaska.  This list rebuts any suggestion that Plaintiff is being singled out or subjected to "institutional[ ] biasing" in a manner that would justify judicial intervention.

---

[3]     The cases repeatedly make clear that these factors "are hardly ironclad and that each case must be analyzed according to its own unique circumstances."  *Am. Hospital*, 812 F.3d at 189 (internal quotation marks and citations omitted).  Thus, the cases do not turn on some bright line or specify the precise time that a matter has been pending.  The Complaint indicates the time that the appeals at issue were filed, but does not indicate when they were fully briefed, which would represent a more appropriate starting point for calculating the time each appeal has been under review.

The fifth factor also does not support Plaintiff's request, because Plaintiff need not wait

for the IBLA to act before seeking judicial review of BLM's decisions in this Court and,

accordingly, Plaintiff's financial interests are not significantly prejudiced by the alleged delay.

The appeal regulations do not make an IBLA decision a prerequisite to district court review

under the circumstances of this case.  Entitled "Exhaustion of administrative remedies," the

relevant regulation provides in pertinent part:

> No decision which at the time of its rendition is subject to appeal to the Director
> or an Appeals Board shall be considered final so as to be agency action subject to
> judicial review under 5 U.S.C. § 704, unless a petition for a stay of decision has
> been timely filed and the decision being appealed has been made effective in the
> manner provided in paragraphs (a)(3) or (b)(4) of this section [i.e., by denial of a
> stay petition] or a decision has been made effective pending appeal . . . pursuant
> to other pertinent regulation.

43 C.F.R. § 4.21(c).  As noted throughout the Complaint, the BLM decisions on appeal to the

IBLA have been made effective "pursuant to other pertinent regulation," triggering the last

clause of § 4.21(c).  The Supreme Court has clarified that "an appeal to 'superior agency

authority' is a prerequisite to judicial review *only* when expressly required by statute or when an

agency rule requires appeal before review and the administrative action is made inoperative

pending that review."  *Darby v. Cisneros*, 509 U.S. 137, 154 (1993) (quoting 5 U.S.C. § 704,

italics in original).  Thus, the regulation does not impose an exhaustion requirement when—as

here—the administrative action has been made effective pending administrative appeal.  *Farrell-

Cooper Mining Co. v. U.S. Dep't of the Interior*, 864 F.3d 1105, 1113 (10th Cir. 2017) (adopting

"the majority view, which has also been adopted by DOI outside of this lawsuit" that when

agency decision has become effective pending appeal to the IBLA "the aggrieved party is

entitled to judicial review." (quoting *Darby*, 509 U.S. at 152)).

Even under Rule 12 where review focuses on the Complaint's presumably truthful factual allegations, the trajectory of a claimant's effort is often cast by "the nub of their grievance . . . ." *Anglers Conservation Network*, 809 F.3d at 670.  Properly understood, that "nub" here is a request to this Court to perform docket management for the IBLA.  This characterization brings us back to *Norton*, which counsels "[t]he principal purpose of the APA limitations we have discussed—and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion . . . ."  *Norton*, 542 U.S. at 67.  Plaintiff essentially asks the Court to declare that its unresolved appeals be elevated above those of other appellants, and threatens "that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the [APA § 555(b)'s] broad statutory mandate, injecting the judge into day-to-day agency management."  *Id*. The Court should decline that invitation.

## CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6).

Respectfully submitted this 22nd day of May, 2020.

/s/ *Paul A. Turcke*
PAUL A. TURCKE (Idaho Bar # 4759)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Div.
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
(202) 353-1389
paul.turcke@usdoj.gov

*Attorney for Defendants*