**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BLACK ROCK CITY LLC;

and

BURNING MAN PROJECT

      Plaintiffs,

v.                                                                    Civ. Action No. 1:19-cv-03729-DLF

DAVID L. BERNHARDT, in his
official capacity as Secretary of the
United States Department of the Interior; and

UNITED STATES DEPARTMENT
OF THE INTERIOR; and

WINNEMUCCA DISTRICT OFFICE FOR
THE BUREAU OF LAND MANAGEMENT

      Defendants.

---

**PLAINTIFFS' AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**


**<u>INTRODUCTION</u>**

1.     Plaintiffs Black Rock City LLC and Burning Man Project (collectively, "BMP")

bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, to seek

relief from Defendants' ongoing, unlawful, and prejudicial conduct towards BMP.  This conduct

threatens the viability of the iconic Burning Man Event ("Burning Man Event" or the "Event")

held annually on public lands in Nevada's Black Rock Desert.  Defendants' conduct over the

course of issuing permits for the past several Events include, but is not limited to: imposition of

excessive, unjustified and unreasonable permit costs; delays in issuing decisions; and refusing to

refund unreasonable and unjustified charges.  These actions have severely hampered BMP's ability to make critical plans and budget adequately for its lawful, permitted assembly on public lands. These actions have also impermissibly denied BMP's access to and use of financial resources. Defendants' oversight of the Event has had the effect of institutionally biasing the administrative decision-making process against BMP, thereby causing damage to BMP and threatening the rights of BMP and its over 70,000 BMP community participants to use public lands, as well as the viability of the Burning Man Event on a year-to-year basis.  Judicial intervention is necessary to remedy these injuries to BMP and to reimburse BMP for the excessive and unjustified costs that BMP was required to pay to BLM through the cost recovery process.

2.  BMP is challenging the burdensome, unjustified, and excessive costs and other unlawful practices imposed upon BMP by BLM through the Special Recreation Permit ("SRP") process, which BMP must undergo each year in order to hold the Burning Man Event on public lands. Specifically, BMP challenges the unreasonable costs imposed by Defendant Winnemucca District Office for the Bureau of Land Management ("BLM"), the process by which those costs have been demanded, and the inadequate justification for the costs imposed.

3.  Using the SRP process, BLM annually imposes inflated and unnecessary costs on BMP without providing the adequate justification required by federal regulations. Furthermore, BLM typically provides its final Cost Recovery Estimate Agreement to BMP within weeks of each Event, and requires that BMP sign the agreement and pay all of the estimated costs as a condition of receiving the SRP. Given the dilatory timing and manner in which BLM presents the Cost Recovery Estimate Agreement and demands payment, BMP is unable, as a practical matter, to effectively object to BLM's estimated and inflated costs for a pending SRP or to refuse to pay these costs. Indeed, objecting to the costs would effectively ensure that the SRP could not be

processed in time for that year's Event.  On a year-to-year basis, BMP therefore has no choice but to pay BLM's onerous demand and accede to any additional imposed requirements for the pending permit.

4.      As a result, BMP must pay BLM an inflated annual assessed cost recovery charge, which presently amounts to approximately $3 million per year, and adhere to BLM decisions that are unreasonable and contrary to law.

5.      Through this practice, Defendant BLM has established a position of virtually unfettered and unchecked control over BMP that is both impermissible and highly damaging to the interests, culture, and long-term viability of the Burning Man Event, and on an annual basis, affects tens of thousands of users of public lands.

6.      BMP therefore seeks declaratory and injunctive relief from this institutional pattern and practice of unlawful abuse of discretion. Accordingly, BMP requests a declaration from this Court that BLM's cost recovery process, including impermissible withholding of cost-recovery funds, constitutes agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; an order setting aside BLM's inclusion of unreasonable and unjustified costs in its cost recovery charges for the annual Events held from 2015 through 2019; an order compelling BLM to remit payment of such unlawful costs that are owed back to BMP; and an injunction prohibiting BLM from assessing unlawful and unjustified cost recovery charges for future Burning Man Events.

## JURISDICTION AND VENUE

7.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Federal Land Policy and Management Act, 43

U.S.C. § 1301 *et seq.* ("FLPMA"), the Federal Lands Recreation Enhancement Act, 16 U.S.C. § 6801 *et seq.* ("FLREA"), and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA").

8.      An actual, justiciable controversy now exists between Plaintiffs and Defendants. The requested relief would redress the actual, concrete injuries to Plaintiffs caused by the federal agency's failure to comply with duties mandated by FLPMA, FLREA, APA, and the relevant implementing regulations. The requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

9.      The decisions that are the subject of this appeal are final agency actions that have been made effective pending administrative appeal and are therefore entitled to judicial review. 5 U.S.C. § 704; 43 C.F.R. § 4.21(c). As stated in Defendants' Memorandum in Support of Motion to Dismiss, Plaintiffs "need not wait for the IBLA to act before seeking judicial review of BLM's decisions in this Court" because "the appeal regulations do not make an IBLA decision a prerequisite to district court review under the circumstances of the case." Defs' Mem. in Support of Mot. to Dismiss at 16 (Dkt No. 16-1) (citations omitted).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants maintain offices in this judicial district and a substantial part of the events or omissions giving rise to this claim occurred in this district.

11.     The federal government has waived sovereign immunity from suit, by operation of the APA, pursuant to 5 U.S.C. § 701.

## PARTIES

12.     Plaintiff BLACK ROCK CITY LLC is a Nevada limited liability company headquartered in San Francisco, California. Originally incorporated in 1997 by members of the community who created the Burning Man Event, Black Rock City LLC was the operational body responsible for production of the Event, held annually in the Black Rock Desert of Northwestern

Nevada, through 2018.  Since 2014, Black Rock City LLC has been wholly owned by Plaintiff Burning Man Project. Black Rock City LLC  retains no profits and all earnings are dedicated to the charitable activities of Burning Man Project.

13.    Plaintiff BURNING MAN PROJECT is a California nonprofit public benefit corporation recognized as exempt under section 501(c)(3) of the Internal Revenue Code, and headquartered in San Francisco, California. Burning Man Project assumed responsibility for producing the Burning Man Event in 2019, and is therefore the SRP permittee for the 2019 Burning Man Event. Burning Man Project retains no profits and all earnings are dedicated to furthering its charitable activities.

14.    Plaintiffs (individually and collectively referred to herein as "BMP"), along with their predecessors, are now, and have been at all relevant times since 1992, permittees of Department-administered public lands located within the Black Rock Desert National Conservation Area in Pershing County, Nevada (the "Black Rock NCA"), for the purposes of conducting the annual Burning Man Event.

15.    Defendant DAVID L. BERNHARDT ("Secretary") is the Secretary of the United States Department of the Interior and is sued in his official capacity.

16.    Defendant   UNITED   STATES   DEPARTMENT   OF   THE   INTERIOR ("Department") is a federal executive department of the United States government charged by law with administering public lands, including the Black Rock NCA, in accordance with FLPMA, FLREA, and other federal laws and regulations.

17.    Defendant WINNEMUCCA DISTRICT OFFICE FOR THE BUREAU OF LAND MANAGEMENT ("BLM") is an office of the administrative body to which the Department has delegated management of these public lands.

## **STATUTORY FRAMEWORK**

The Administrative Procedure Act

18.     The Administrative Procedure Act, 5 U.S.C. §§ 701–706, authorizes courts to review final agency actions and hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; or which are in excess of statutory jurisdiction, authority, or limitation; or without observance of procedure required by law. 5 U.S.C. § 706(2)(A)-(D). The APA provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. 5 U.S.C. § 704.

The Federal Land Policy and Management Act

19.     The Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq*. ("FLPMA"), gives the Secretary the authority to manage public lands and regulate the use of public lands, such as a recreational use, through permits, leases, licenses, and other approval instruments. 43 U.S.C. § 1732(b). FLPMA also provides the Secretary with the authority to establish reasonable fees and charges, including those intended to reimburse the federal Government for *reasonable* costs associated with applications and other documents relating to the use of public lands. 43 U.S.C. § 1734. When setting such reasonable costs, the Secretary must consider certain criteria such as: actual costs (exclusive of management overhead); monetary value of the rights or privileges sought by the permit applicant; efficiency of the government processing involved; the portion of the cost that benefits the general public rather than for the exclusive benefit of the applicant; any public service provided; and other factors relevant to determining reasonableness. 43 U.S.C. § 1734(b).

The Federal Lands Recreation Enhancement Act

20.     The Federal Lands Recreation Enhancement Act, 16 U.S.C. § 6801 *et seq.* ("FLREA"), delegates BLM with the authority to issue and administer special recreation permits ("SRPs"), and to collect fees in connection with issuance of the permit, "for specialized recreation uses" of public lands, including recreation events. 16 U.S.C. § 6802(h). The FLREA sets forth certain criteria that must be considered when establishing SRP fees, including: benefits and services provided to the permittee; the aggregate effect of recreation fees on recreation users and recreation service providers; comparable fees charged elsewhere by other public agencies and nearby by private sector operators; and the public policy or management objectives served by the recreation fee. 16 U.S.C. § 6802(b).

Federal Public Lands Permitting Regulations

21.     The regulations at 43 C.F.R. Part 2920 set forth general provisions and procedures relating to leases, permits, and easements for non-federal use of public lands, including SRPs. These regulations allow reimbursement from permit applicants for "reasonable administrative and other costs incurred" by the agency in processing an application and conducting associated monitoring activity. 43 C.F.R. § 2920.6(b). The regulations require that a permit applicant be furnished with a statement of costs before a fee can be assessed and collected. 43 C.F.R. § 2920.6(c).

22.     The regulations at 43 C.F.R. Part 2930 (the "SRP Regulations") provide BLM with the authority to issue and administer SRPs, as well as establish and charge SRP fees, including fees for recovery of BLM's processing costs ("Cost Recovery Charge"). 43 C.F.R. §§ 2931.2(a), 2932.31. The Cost Recovery Charge must be limited to the costs incurred by BLM for issuing the

permit, which include "necessary environmental documentation, on-site monitoring, and permit enforcement." 43 C.F.R. § 2932.31(e)(3).

BLM Agency Guidance

23.     The BLM Recreation Permit and Fee Administration Handbook, H-2930-1 ("SRP Handbook"), provides guidance for BLM's administration of recreation permits, including SRP application processing, issuance, permit stipulations, and fees. With respect to the Cost Recovery Charge, the SRP Handbook articulates that "[c]ost recovery covers all federal activities that convey special benefits to recipients beyond those accruing to the general public." SRP Handbook at 1-20. All of the costs included in the Cost Recovery Charge must be for services that not only directly relate to the proposed activity, but that also do not broadly benefit the general public. SRP Handbook at 1-28. Such costs must be based upon the "*actual* personnel, vehicle, travel, and material costs required to issue, administer, and monitor the SRP." SRP Handbook at 1-22 (emphasis added).

24.     The SRP Handbook specifies the kind of information that BLM must provide in support of its Cost Recovery Charge, stating:

> *[T]he applicant is entitled to a thorough accounting of the use of cost recovery funds.* Staff who charge time to the [Cost Recovery Charge] must document their time and describe their activity on BLM Form 1323-1, Reimbursable Project Log. The project manager must maintain time logs, copies of receipts, vehicle reports, etc., that reflect charges to the project.

SRP Handbook at 1-30, 1-31 (emphasis added).

25.     The SRP Handbook further requires that BLM must "notify the applicant of potential charges in writing within 30 calendar days of receipt of the application," SRP Handbook at 1-22, and that all of these estimated costs must be reviewed with the permit applicant. Specifically, BLM must provide a decision letter that contains an estimate of all direct and indirect

8

costs to the permit applicant and an outline of the cost recovery agreement that both parties would execute. SRP Handbook at 1-28.

26.     BLM's Manual MS-1323 – Cost Recovery for Reimbursable Projects/Activities ("1323 Manual") sets forth the agency's policy and procedures relating to cost recovery. Like the SRP Handbook, the 1323 Manual expressly requires BLM to record in detail any costs and activities for which it seeks reimbursement through a Cost Recovery Charge, stating:

> A*ll direct costs must be supported by documentation to establish that the costs were accurately determined and properly recorded.* Supporting documentation may include time and attendance reports, invoices, authorizations, certifications, computations, agreements, and other evidential matter. Duty time coded to these projects must be supported by daily log entries which describe the work performed.

1323 Manual at .18B2 (emphasis added).

27.     Moreover, the 1323 Manual requires that BLM must, among other things, develop preliminary plans that estimate the costs that will be incurred from application processing and monitoring permitted activities, and provide the applicant with a written decision of estimated reasonable costs. 1323 Manual at .15E4, .15F3.

## FACTUAL ALLEGATIONS

## I.     The Burning Man Event

28.     The Burning Man Event currently attracts more than 70,000 participants who, over the course of eight days, camp and participate in a unique experimental community on the public lands managed by BLM in northern Nevada. Each year since 1990 (except for 1997, when the Event was held on private land), the Burning Man Event has taken place on the public lands located in what is now the Black Rock Desert—High Rock Canyon Emigrant Trails National Conservation Area ("Black Rock NCA") in northern Nevada.[1]

---

[1] Plaintiffs note that, for the first time in thirty-five years, the annual Event has been cancelled for 2020 due to both the uncertainty regarding the coronavirus ("COVID-19") pandemic and the

29.     Congress established the Black Rock NCA in 2000 and included express findings that large-scale, permitted recreational activities, such as the Burning Man Event, are expected to continue on the site. The Event was specifically made a part of the Resource Management Plan for the Black Rock NCA.

30.     Over the past 27 years, the Event has grown in size, popularity, and complexity. Tickets for the Event have sold out every year since 2011, and tickets offered in the main sale sell out within minutes. The Event generates an estimated $75 million per year for the local Nevada economy and represents more than 560,000 visitor days to the public lands.

31.     The Event has been managed and executed by Black Rock City LLC and its successor Burning Man Project since 1997. The Event's ethos and culture are rooted in the 10 Principles of Burning Man: Radical Inclusion, Gifting, Decommodification, Radical Self-reliance, Radical Self-expression, Communal Effort, Civic Responsibility, Leaving No Trace, Participation, and Immediacy.[2] These concepts are central to the Event participants' experience at Burning Man, and they are also reflected in the Event's commitment to and record of health, safety, and environmental compliance.

32.     Event operations are organized into and implemented by over fifty year-round departments and teams dedicated to ensuring the Event is properly permitted and run in a manner that promotes environmental compliance and public health and safety for all persons on location. BMP engages thousands of competent and highly trained health and safety employees, contractors, and volunteers, many of whom have supported the Burning Man Event for well over a decade in

---

onerous new requirements that BLM has imposed through its Decision Letters and other recent demands.

[2] See Burning Man Project, *The 10 Principles of Burning Man*, https://burningman.org/culture/philosophical-center/10-principles/ (last visited July 6, 2020).

their respective fields of expertise. These health and safety personnel include the Black Rock Rangers, which is an internal BMP department tasked with helping ensure the safety of all participants by, among other activities, providing security at the perimeter of scheduled artwork burns and engaging in 24-hour patrols on foot and bicycle for the duration of the Event. The BMP Emergency Services Department deploys hundreds of licensed, professional medical, fire protection, hazardous materials response, and crisis intervention personnel who staff multiple first-aid and fire stations and provide triage to the Nevada-licensed emergency care facility onsite. BMP ensures the availability of ground and air ambulance services and a dedicated runway for nighttime medivac needs. Hundreds of trained staff provide management and security at the entrance gates, airport, and perimeter of the Event, utilizing state-of-the-art means and methods. BMP also engages over six hundred trained employees, contractors, and volunteers to safely construct and manage the Event's infrastructure, and several hundred more to ensure environmental compliance and to provide Event-related communications and information to participants. BLM has active knowledge of BMP's operational and implementation plans on a year-to-year basis. BMP involves BLM in all levels of environmental compliance planning and execution. Moreover, BMP has a robust team that utilizes state-of-the-art GPS technology to prevent, remediate, and track potential environmental impacts, and BMP provides this information to BLM.

33. Consistent with Burning Man's 10 Principles, BMP and BLM have developed and refined a "Leave No Trace" standard for the Event. The standard governs BMP's installation, operation, and deconstruction of the Burning Man Event, so that the portion of the Black Rock Desert utilized by the Event is returned to its natural desert state in the weeks following the Event. Over the approximately 35 days leading up to the Burning Man Event, BMP constructs and installs complex infrastructure to help ensure that the Burning Man Event runs in a manner that prioritizes

safety and environmental protection. Following the conclusion of the Burning Man Event, such infrastructure is deconstructed and removed from the site within 35 days so that there is effectively no trace of the Event. BLM typically inspects the Burning Man Event site approximately four to five weeks after the Event's completion to ensure that BMP is in compliance with the rigorous "Leave No Trace" requirements of its SRP. To date, BMP has passed every inspection following the annual Event, including its most recent inspection for the 2019 Event.

## II.     BLM Administration of the SRP for the Burning Man Event

34.     Pursuant to the requirements of FLPMA and FLREA, BMP must apply for a Special Recreation Permit ("SRP") to allow the Event to take place on the public lands within the Black Rock NCA. Planning for each event is a multi-year process. Before one Event is over, BMP has already begun planning for the next year's Event, which includes preparing and submitting an SRP application to BLM.

35.     BLM charges BMP annually for its costs to administer the Burning Man SRP pursuant to FLPMA, FLREA, the SRP regulations, and the BLM guidance documents as described above (collectively, the "Cost Recovery Requirements"). Under this cost recovery scheme, BLM charges BMP for all of BLM's direct and indirect costs (collectively, "Cost Recovery Charge"), in addition to 3% of BMP's gross receipts as a commercial use fee.

36.     Pursuant to the Cost Recovery Requirements, as described above, BLM is only permitted to assess reasonable costs necessary for the administration of the SRP, including the costs of issuing the SRP and conducting necessary documentation, on-site monitoring, and permit enforcement. This does not include costs that convey benefits to the general public. *See* SRP Handbook at 1-20.

37.     In accordance with these requirements, BLM must provide the permittee with a reasoned, written explanation for all assessed costs supported by the facts of record to demonstrate that such costs are not arbitrary, capricious, or an abuse of discretion.  Stated simply in BLM's SRP Handbook, "[t]he applicant is entitled to a *thorough accounting* of the use of cost recovery funds." SRP Handbook at 1-30; *see also* 1323 Manual at .18B2 (emphasis added).

38.     The Cost Recovery Charge is estimated by BLM on an annual basis prior to that year's Event. The Cost Recovery Charge is provided to BMP in the form of a Cost Recovery Estimate Agreement, and BMP must sign the agreement and pay the estimated amount in full as a condition of receiving the SRP for that year's Event. As of 2017, the Cost Recovery Estimate Agreement has been provided to BMP in two phases.

39.     After the Event, BLM inspects the site to ensure that BMP is in compliance with the terms of its SRP.  BLM then issues a Final Decision on the Cost Recovery Charge, typically in late January of the following year. This Final Decision on the Cost Recovery Charge assesses to BMP all costs that BLM alleges it incurred for the prior year's Event. The final total is generally slightly lower than the estimated total that BMP was required to pay prior to the Event, and BLM sends BMP a refund for any overage along with the Final Decision.

40.     Between 2007 and 2011, BLM increased its Cost Recovery Charge by about 10% per year. During this time, population at the Burning Man Event increased by about 4% per year.

41.     Since 2011, however, BLM has significantly increased its Cost Recovery Charges while failing to provide any reasoned, written basis for such cost escalation, as is required by law.

42.     Specifically, BLM has consistently limited the documentation it provides BMP to summary spreadsheets that contain minimal information and copies of BLM's receipts and contracting documents each year, without any explanation that would enable BMP to confirm how

these cost were related to the Burning Man event, much less whether the expenses were reasonably necessary for BLM's administration of the Burning Man SRP.

43.     Although BMP, as permittee, is entitled to receive a "thorough accounting" of BLM's Cost Recovery Charge without request, BMP has nevertheless requested on multiple occasions that BLM explain in writing why various costs were necessary for the administration of the Burning Man SRP.

44.     Despite the Cost Recovery Requirements, and BMP's requests, BLM has never provided a sufficient level of detail to ascertain the basis, accuracy, or reasonableness of the costs it alleges to have incurred each year from administration of the Burning Man SRP.

45.     Even though BLM has consistently failed each year to provide a reasoned explanation for its assessed costs, BMP has been able to identify instances of unreasonable, excessive and unnecessary expenditures.

46.     BLM's aggressive demands even caught the attention of the press several years ago, when BLM personnel insisted BMP provide "outlandishly unnecessary" amenities such as 24-hour access to certain snack foods and a luxury compound for BLM guests.[3]

47.     As described below, the largest and fastest-growing category of BLM costs is law enforcement. The scale of BLM's law enforcement program far exceeds what is reasonably necessary for the Event, with BLM's own data confirming that officers are only engaged in law enforcement activities about one-third of their time, on shifts for which they are paid at premium

---

[3] *See* Jenny Kane, *BLM Demands Burning Man Provide 24-hour Access to Ice Cream*, RENO GAZETTE JOURNAL, June 26, 2015, https://www.rgj.com/story/_news/2015/06/26/blm-demands-burning-man-provide-hour-access-ice-cream/29357065/, as well as State congressional representatives, *see* Benjamin Siegel, *How Harry Reid is Fighting for Burning Man*, ABC News, Jul. 1, 2015, https://abcnews.go.com/Politics/harry-reid-fighting-burning-man/story?id=32161151.

overtime rates due to a "mission-critical work" designation that BLM has applied to the Event without justification.  In 2018, BLM charged BMP nearly $1 million for the direct costs of law enforcement labor alone.

48.     Likewise, each year, labor costs make up a significant percentage of total BLM expenditures, but the documentation that BLM provides to BMP to substantiate these costs merely lists each employee's name, title, and total hours worked, along with a few words to generally describe their duties.  Such scant information is insufficient to allow BMP to meaningfully assess whether any of BLM's labor charges (and other expenses for such personnel, including the costs of travel and technology) were reasonably incurred in connection with the Burning Man SRP, such that they could appropriately be charged to BMP through cost recovery.

49.     Furthermore, for the past several years, BLM required that BMP pay for superfluous medical services, a bloated communications and technology program, unexplained travel, and equipment and supplies for which there was no meaningful explanation.  For instance, BLM requires that BMP pay for a separate medical facility solely for BLM personnel, despite the comprehensive patient care and state-of-the-art medical infrastructure that BMP already provides onsite which is fully equipped to handle *all* onsite personnel including BMP staff, Event participants, Event contractors, and BLM personnel. These expenses greatly exceed BLM's reasonable needs for a two-week operation. BMP should not be forced to pay for BLM's equipment upgrades that are either superfluous, redundant, or benefit the general public.

50.     In addition to these escalated and unjustified costs, BLM presents its Phase 2 Cost Recovery Estimate Agreement for each year's Event just a few weeks before BMP must begin onsite work for the Event, and at a date after BMP has sold thousands of tickets and incurred significant Event production expenses. BMP must sign this Cost Recovery Estimate Agreement

before BLM will issue an SRP for the forthcoming Event, leaving BMP with no reasonable time to review, consider, or appeal the terms of the Cost Recovery Estimate Agreement.

51.     If BMP were to object to the Cost Recovery Charge set forth in the annual Cost Recovery Estimate Agreement and decline to pay it, then, as consistent with the Cost Recovery Requirements, BLM would refuse to issue the SRP, and the forthcoming Event would be jeopardized. Due to the unreasonably and unnecessarily late date that BLM sets forth its Cost Recovery Charge, BMP must make significant investments in the Event prior to receiving the cost estimate. Moreover, by the time BLM provides its cost estimate to BMP, tens of thousands of Event participants from around the world have purchased tickets and made plans to assemble at the Event.  In short, whether by design or practice, the late date that BMP receives the Cost Recovery Charge makes objection to BLM's estimate essentially infeasible.

52.     Therefore, BMP has no choice but to pay BLM's unreasonable Cost Recovery Charges, despite the lack of sufficient supporting information or time for BMP to review or engage in discussion with BLM regarding the estimated costs.  By delaying issuance of the Cost Recovery Charges until the last minute and providing scant supporting information and opportunity for objection, BLM deprives BMP of its due process rights under FLPMA, as a practical matter, by effectively denying BMP the ability to assess the legitimacy of any of the charges prior to payment. This abusive pattern and practice results in an administrative "Hobson's choice" for BMP to either accept BLM's charges and conditions, however unreasonable, or cancel the already-scheduled Burning Man Event.

53.     BLM's pattern and practice of delay is also not limited to the Cost Recovery Charges. BLM often delays providing BMP with the annual SRP stipulations until so close to the upcoming Event — when BMP has already planned operations, expended significant sums, and

entered into contractual agreements for the Event — that BLM claims there is no time for negotiation of the proposed stipulations. Like the Cost Recovery Charges, BLM's delay in providing the proposed stipulations effectively leaves BMP no choice but to agree to the stipulations, however unreasonable they may be, or cancel the Event.

54.     For these reasons, Defendants' control over and abuse of the SRP process, assessment of costs, and decisions on appeals of those costs, gives Defendants considerable leverage over a permit applicant such as BMP, resulting in economic injury to BMP as permittee.

**III. Specific Circumstances Giving Rise to Need for Judicial Intervention** [4]

55.     In 2012, BLM's Cost Recovery Charge increased to a total of $1,371,731, equating to a 60% increase from 2011. The Burning Man Event's participant population increased by only 4% that year. This increase was due in large part to BLM's requirement to increase BLM law enforcement staffing levels by 37%, from 51 officers in 2011 to 70 officers in 2012.  As a result of this decision, BLM's labor costs shot up, as did all related costs from staff lodging, meals, and travel to technology services and equipment. Yet, BLM has never adequately explained the substantial increases, and BMP is not aware of any safety or other issues that warranted such an increase.

56.     Another notable distinction from prior years that arose in 2012 is BLM's designation of the Burning Man Event as an "emergency special event." Pursuant to 5 C.F.R. §

---

[4] Although BMP focuses primarily on the Cost Recovery Charges for Events held in 2015 through 2019, BMP notes that BLM's practice of assessing unreasonable costs and burdensome requirements on BMP through the SRP process began as early as 2012. The previous BLM leadership personnel responsible for initiating these cost increases also threatened to delay or deny BMP's SRP altogether if BMP exercised its right to appeal. Only after these personnel were reassigned in 2015, due to ethical violations and other misconduct, did BMP believe that it could viably exercise its right to appeal without automatically jeopardizing the Event. Thus, BMP filed its first appeal following the BLM personnel reassignment in 2015, after new BLM leadership indicated it would rectify the wrongs that had been done, but then failed to do so.

550.103, *"[E]mergency* means a temporary condition posing a direct threat to human life or property, including a forest wildfire *emergency*" (emphasis added).

57.     This "emergency" designation entitled all BLM employees involved with the Burning Man Event to premium pay under the annual maximum earning limitations, thereby further increasing BLM's labor and related costs charged to BMP through the Cost Recovery Charge. To justify this designation, BLM informed BMP that the designation was intended to facilitate assignment of officers from other regions to assist in administration of the Burning Man Event, rather than to address an emergent condition to "a direct threat to human life or property." BLM has never provided documentation to BMP indicating any difficulty in securing a sufficient number of staff to reasonably meet the needs of the Burning Man Event. This designation also remained in place and continued contributing to increased costs from 2012 through 2016, even though BLM's sparse labor summaries did not confirm the designation's existence, basis, or effects.  In fact, BLM declined BMP's repeated requests between 2012 through 2016 to provide written documentation of the "emergency" designation or BLM's basis for applying this designation to the Event. BMP only learned of the designation in early 2017 through its own inspection of BLM's Burning Man Event files at the Winnemucca District Office.

58.     Despite BLM's representation that its costs would remain flat in 2013, BLM's Cost Recovery Charge more than doubled in 2013 to a total of over $2.93 million. When BMP requested an explanation as to the increased costs, BLM officials claimed that the increase was due in part to a one-time upgrade of BLM's infrastructure for "safety" reasons, including implementation of a new computer-aided dispatch ("CAD") system. BLM assured BMP that the CAD system would provide data about BLM's law enforcement activities that would justify, explain, and reduce the costs that BLM charged BMP through cost recovery. However, when BMP requested such

18

information, BLM officials informed BMP that BLM's requirement to provide an explanation did

not apply to law enforcement costs, which, according to one BLM official, "costs what it costs."

59.     BLM's 2014 Cost Recovery Charge further increased by $700,000, representing a

total increase of over 291% (over $2.8 million) in just three years. This nearly threefold increase

in costs assessed by BLM is entirely disproportionate to the 39% increase in attendance at the

Burning Man Event over the same timeframe. Like in 2012 and 2013, BLM did not furnish BMP

with any data or other evidence to justify BLM's cost increase from the prior year. Instead, BLM

offered to sign a memorandum of understanding ("MOU"), under which BMP would fulfill certain

contracts (*i.e.*, BLM requirements) directly, rather than BLM fulfilling those services and charging

those costs back to BMP through the Cost Recovery Charge. Because such an arrangement would

prevent BMP from having to pay the indirect administrative cost rate for these contracts, which

BLM applies to all direct expenditures charged through cost recovery,[5] execution of the MOU was

expected to reduce BMP's overall costs for the Event.  In practice, however, in addition to the

$700,000 increase in BLM's Cost Recovery Charge, BMP spent approximately $670,000 in MOU-

related activities, thereby inflating BMP's costs for the 2014 Burning Man Event even further.

60.     The planning process for the 2015 Burning Man SRP was marred by delays and

friction resulting from BLM's unprecedented demands of BMP, including a luxury compound to

accommodate "VIP" personnel and 24-hour access to Choco Taco ice cream bars. These demands

became the subject of a public outcry and criticism by elected officials, with then-Senator Harry

Reid admonishing then-Interior Secretary Sally Jewell that such facilities "should be beyond the

---

[5] Plaintiffs note that BLM has the authority to waive the indirect administrative cost rate pursuant
to 43 C.F.R. §§ 2932.31(d)(2), 2932.34. BMP has made several requests for a waiver over the
years, which BLM has denied.

scope of the permitting requirements." BLM ultimately withdrew its demands for the VIP compound.

61.     Moreover, BMP did not receive the 2015 Cost Recovery Estimate Agreement until just a few weeks before the start of the 2015 Burning Man Event, days before site work was scheduled to begin. Like prior years 2012 through 2014, BLM's 2015 Cost Recovery Charge estimate, totaling over $2.9 million, included only minimal, summary information that was insufficient to satisfy the regulatory requirement of a written, reasoned explanation in accordance with the Cost Recovery Requirements. *See* 43 U.S.C. § 1734, 16 U.S.C. § 6802, and 43 C.F.R. § 2932.31. Yet, BMP was pressured into signing the unsupported estimate without adequate review or sufficient documentation, with BLM advising that the SRP for the 2015 Event would not be issued until BMP had signed the Cost Recovery Estimate Agreement and paid the estimate to BLM.

62.     On January 27, 2016, BLM issued a Final Decision on the Cost Recovery Charge for the 2015 Event. Like the Cost Recovery Charge estimate, the Final Decision included only minimal, summary information that was insufficient to satisfy the regulatory requirement of a written, reasoned explanation in accordance with the Cost Recovery Requirements.

63.     On January 30, 2016, and again on February 22, 2016, BMP requested written explanations for why each of BLM's costs were necessary for the administration of the Burning Man SRP, to which BMP, as permittee, was legally entitled.  BLM declined to provide information sufficient for BMP to assess the reasonableness of all of the costs assessed in the 2015 Cost Recovery Charge.[6]

---

[6] BMP timely filed a Notice of Appeal of BLM's 2015 Cost Recovery Charge to the IBLA on February 24, 2016 (Case No. IBLA 2016-115), requesting that IBLA determine BLM's 2015 Cost

64.     The BLM personnel primarily responsible for these unnecessary demands and escalated cost increases for the administration of the Burning Man SRP were ultimately reassigned to other positions in late 2015, following investigation into at least one of the BLM personnel's actions at the Burning Man Event. Yet, despite apparent violations of their duties as agency officials, and promises by BLM to rectify the unreasonable and unjustified cost recovery scheme that had originated with these officials, BLM has continued with these abusive practices.

65.     While collaboration between BLM and BMP did improve in planning for the 2016 Event, BLM did not reduce any of the programs or costs that were initially escalated without justification under the prior leadership, including the excessive expenditures on labor, support, and infrastructure for law enforcement and technology services and equipment.

66.     BLM issued a Final Decision on the Cost Recovery Charge for the 2016 Event on January 30, 2017, reflecting a slight overall reduction in its costs. However, much of the year-over-year reduction was attributable to BMP directly taking on certain of BLM's responsibilities and costs that were formerly managed by BLM and paid through cost recovery — including several government contracts for the Joint Operations Center.  Taking these "in kind" costs into account, the total amount BMP paid BLM to administer the 2016 SRP decreased by 7% from 2015, but the 2016 costs were 274% higher than just five years earlier in 2011.

67.     Again, BLM's Final Decision on the Cost Recovery Charge for the 2016 Event lacked the sufficient explanation of the apparently unreasonable charges assessed by BLM that BMP, as permittee, was legally entitled to receive under the Cost Recovery Requirements.[7]

---

Recovery to be deficient and unreasonable; disallow BLM's 2015 cost recovery; and remand to BLM for proper refund to BMP accordingly.

[7] BMP timely filed a Notice of Appeal of BLM's 2016 Cost Recovery Charge to the IBLA on February 28, 2017 (Case No. IBLA 2017-0126), seeking dismissal of BLM's unjustified costs included in the 2016 Cost Recovery Charge and remand to BLM for refund to BMP accordingly.

68.     The following year, BLM likewise failed to adequately justify the 2017 Cost Recovery Charge, which remained about the same as the previous year, and the minimal evidence available to BMP indicated that many of these costs were objectively unreasonable.[8]

69.     Notably in 2017, upon BMP's objection, BLM stopped its practice of designating the Burning Man Event as an "emergency" event, which was contributing to the inflated Cost Recovery Charge by permitting all BLM employees involved with the Burning Man Event to receive premium pay. However, in exchange, BLM designated the Event as "mission-critical" to permit deployment of additional BLM personnel from other regions for the Event, thereby contributing to increased labor costs charged to BMP through the Cost Recovery Charge. BLM never provided any justification for either the "mission-critical" designation or the need for additional personnel to reasonably meet the needs of the Burning Man Event.

70.     In 2018, BLM continued its pattern of assessing unreasonable, substantial costs against BMP through the 2018 Cost Recovery Charge process without providing a sufficient explanation that such costs were reasonably necessary for the administration of the Burning Man SRP.

71.     On March 29, 2019, BLM issued its Final Decision on the 2018 Cost Recovery Charge totaling $2,578,065, which was an increase of approximately 10% from 2017. This increase was in addition to the "contract" costs that BMP was now directly responsible for, outside of the Cost Recovery Charge.

---

[8] BMP timely filed a Notice of Appeal of BLM's 2017 Cost Recovery Charge to the IBLA on February 22, 2018 (Case No. IBLA 2018-0086), seeking a determination that BLM's 2017 Cost Recovery Charge was unjustified and unreasonable; requesting that IBLA order BLM to comply with cost recovery requirements and provide reasoned explanations to justify all charges assessed against BMP; and requesting a refund to BMP for the charges not reasonably incurred in connection with the Burning Man SRP.

72.     Like the Cost Recovery Charges for the preceding six Events, BLM's 2018 Cost Recovery Charge lacked sufficient explanation of the apparently unreasonable charges assessed by BLM that BMP, as permittee, was legally entitled to receive under the Cost Recovery Requirements.[9]

73.     The Burning Man Event underwent an administrative transition in 2019 in which the non-profit Burning Man Project took over responsibility of the Burning Man Event from its wholly owned subsidiary Black Rock City LLC, including the SRP process and event production. BLM, however, remained consistent in its assessment of unreasonable and unsubstantiated costs. In the same manner as it had abused the cost recovery process against Black Rock City LLC for the years preceding, BLM charged BMP excessive costs through its Cost Recovery Charge without providing sufficient explanation as to the reasonable necessity of such costs for administration of the 2019 Event's SRP.[10]

74.     From 2015 through 2019, BMP paid BLM a total of more than $18 million for BLM's fees and costs to administer the annual Burning Man SRP. Of these total costs, BMP paid BLM more than $12.5 million in Cost Recovery Charges, which were assessed without adequate justification. BMP remitted over $2.9 million to BLM as the Cost Recovery Charge estimate for the 2019 Event alone, much of which BLM spent on labor and equipment that was unsupported by any reasoned explanation.

---

[9] BMP timely filed a Notice of Appeal of BLM's 2018 Cost Recovery Charge to the IBLA on April 26, 2019 (Case No. IBLA 2019-0109), requesting that IBLA order BLM to comply with cost recovery requirements and grant a refund for unreasonable costs assessed against BMP through the cost recovery charge process.

[10] BMP timely filed a Notice of Appeal of BLM's 2019 Cost Recovery Charge to the IBLA on April 6, 2020 (Case No. IBLA 2020-0302), requesting that IBLA order BLM to comply with Cost Recovery Requirements and grant a refund for unreasonable costs assessed against BMP through the Cost Recovery Charge process.

75.     These unreasonable and unjustified costs imposed upon BMP for these annual Events have been made final and operative through BLM's collection and retention of the Cost Recovery Charge, despite BLM's unlawful practice of failing to provide adequate justification as required by the Cost Recovery Requirements.

76.     BLM's pattern of annually imposing unreasonable and excessive costs through the Cost Recovery Charge process has persisted, up to and including the Cost Recovery Charge for the 2020 Burning Man Event. BLM's estimate for only Phase 1 of the 2020 Cost Recovery Charge was over $1.8 million. Despite BMP's objections to the inflated Phase 1 estimate, BMP was required to pay this amount before BLM even provided the Phase 2 estimate, which BMP would also be required to pay to BLM before the 2020 Event. Although the 2020 Event has been cancelled for the reasons described in Note 1 *supra*, the Phase 1 estimate for the 2020 Cost Recovery Charge makes clear BLM's intent to continue its pattern of imposing unreasonable costs without any justification. It is unreasonable to expect BMP to continue carrying the enormous expense of BLM's ongoing failure to follow cost recovery regulations each year.

77.     BLM continues to unlawfully interpret and apply the SRP regulations to the Burning Man Event. Each year, BMP must continue to request that BLM authorize the annual Event and to pay the requested costs. During this process, BMP always risks cancellation of the Event if it does not accept BLM's costs and SRP conditions, regardless of whether they are unnecessarily onerous, impractical, unexpected, unjustified, or excessive in nature.

78.     The Department's combination of sole authority over permit issuance, cost recovery, and cost recovery appeals places it in a position of largely unchecked power over permittees of public lands such as BMP. BLM's abuse of that authority creates an institutional bias

against BMP that not only unreasonably burdens BMP, but also threatens the very future of the Burning Man Event and lawful recreation activities on public lands in general.

79.     Absent intervention, Defendants are free to continue assessing unjustified costs and engaging in other prejudicial conduct towards BMP with no regard for the Cost Recovery Requirements, as cumulative damage to BMP only continues to increase, thereby effectively eliminating BMP's ability to obtain warranted relief and threatening access to the public lands.

**CAUSE OF ACTION: DEFENDANT BUREAU OF LAND MANAGEMENT'S ASSESSMENT OF EXCESSIVE AND UNJUSTIFIED COSTS THROUGH THE BURNING MAN SRP FOR THE EVENTS HELD FROM 2015 THROUGH 2019 CONSTITUTE AN UNLAWFUL ABUSE OF AGENCY DISCRETION THAT IS ARBITRARY, CAPRICIOUS, AND IN EXCESS OF BLM'S STATUTORY AUTHORITY.**

80.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

81.     Defendant BLM has exceeded its statutory authority to seek reimbursement for administrative costs that are reasonably necessary for administration of the Burning Man SRP through the Cost Recovery Charges because it has imposed excessive costs and has not provided adequate justification.

82.     For the annual Events held from 2012 through 2019, BLM assessed Cost Recovery Charges against BMP that included inflated and excessive costs that are unreasonable and unwarranted. Despite BMP's numerous requests for further explanation and supporting documentation for such costs, BLM failed to provide a "thorough accounting" of requested funds, as is required by the Cost Recovery Requirements, and has, therefore, failed to provide adequate justification for costs imposed.

83.     Defendant BLM has made clear its intent to continue this unlawful practice of charging excessive costs and failing to provide adequate justification for the costs imposed upon BMP through the Cost Recovery Charges for future Burning Man Events.

84.     Defendant's unlawful practice has resulted in severe economic injury to BMP, threatens the continued viability of the Burning Man Event, and threatens to impressible deprive BMP and participants of the Event access to the public lands.

85.     Defendant BLM's Cost Recovery Charges for the 2015, 2016, 2017, 2018, and 2019 Burning Man Events are final agency actions that are subject to review, given that these Cost Recovery Charges have been made effective pursuant to the Cost Recovery Requirements. 43 C.F.R. § 4.21(c).

86.     Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; short of statutory right; or otherwise in violation of the APA, 5 U.S.C. § 706(2); and they should therefore be declared unlawful and set aside by this Court.

87.     Defendant BLM's Cost Recovery Charges for the 2015, 2016, 2017, 2018, and 2019 Burning Man Event constitute an unlawful abuse of agency discretion, in excess of statutory authority, that has caused BMP serious prejudice and injury for which BMP is entitled to re-compensation.

88.     Moreover, absent judicial intervention, this unlawful pattern of institutional bias and imposition of excessive costs will continue year-after-year with each annual Burning Man Event, for which BMP will be forced to suffer economic injury and seek judicial resolution after-the-fact.

89.     BLM's practice of failing to provide a reasonable accounting of costs as applied to the Burning Man Event should be declared unlawful and set aside by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Hold unlawful and set aside BLM's assessment of unreasonable and unjustified costs in the Cost Recovery Charges for the annual Burning Man Events held in each year from 2015 to 2019;

B. Compel BLM to reimburse BMP for such unreasonable and unjustified costs that BMP was required to pay BLM through the Cost Recovery Charges;

C. Issue an injunction to prohibit BLM from unlawfully assessing unreasonable or unjustified through Cost Recovery Charges for future Burning Man Events by requiring the agency to charge only reasonable costs and to provide sufficient detail and justification for all costs;

D. Award Plaintiffs their costs and reasonable attorney's fees; and,

E. Grant such other relief as may be appropriate in the circumstances.


Respectfully submitted this 6th day of July, 2020.

HOLLAND & KNIGHT LLP

By:  ___/s/ Rafe Petersen
       Bar ID Number: 465542

       Rafe Petersen
       Nicholas W. Targ
       Alexandra E. Dobles
       800 17th Street NW, #1100
       Washington, D.C. 2006
       (202) 419-2481

*Attorneys for Plaintiffs Black Rock City LLC and Burning Man Project*