**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BLACK ROCK CITY LLC, *et al.*

      Plaintiffs,

v.                                                                    Civ. Action No. 1:19-cv-03729-DLF

DAVID L. BERNHARDT, *et al.*

      Defendants.

_____

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiffs Black Rock

City LLC and Burning Man Project move for summary judgment on the grounds that Defendants

have exceeded their statutory authority under the Federal Land Policy and Management Act, the

Federal Lands Recreation Enhancement Act, and federal lands permitting regulations by seeking

reimbursement for unreasonable costs in connection with their administration of the special

recreation permits for the 2015 through 2019 Burning Man Events; and that Defendants' actions

were arbitrary and capricious and not in accordance with law pursuant to the Administrative

Procedure Act, 5 U.S.C. §§ 701-706.   In support of this motion, Plaintiffs rely upon the attached

memorandum of points and authorities. A proposed order is also enclosed.

Respectfully submitted this 19th day of February, 2021.

HOLLAND & KNIGHT LLP

By: ___/s/ Rafe Petersen

Rafe Petersen (Bar ID Number: 465542)
Nicholas W. Targ
Alexandra E. Dobles

800 17th Street NW, #1100
Washington, D.C. 2006
(202) 419-2481

David S. Levin (CA Bar No. 156336)
admitted *pro hac vice*
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
(650) 858-8500

*Attorneys for Plaintiffs Black Rock City LLC and
Burning Man Project*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BLACK ROCK CITY LLC, *et al.*

      Plaintiffs,

v.                                        Civ. Action No. 1:19-cv-03729-DLF

DAVID L. BERNHARDT, *et al.*

      Defendants.

_____

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

HOLLAND & KNIGHT LLP

Rafe Petersen (Bar ID Number: 465542)
Nicholas W. Targ
Alexandra E. Dobles
800 17th Street NW, #1100
Washington, D.C. 2006
(202) 419-2481

LEVIN LAW FIRM

David S. Levin (CA Bar No. 156336)
*Admitted pro hac vice*
405 Sherman Ave
Palo Alto, CA 94306-1827
(650) 858-8500

*Attorneys for Plaintiffs Black Rock City LLC and Burning Man Project*

## <u>TABLE OF CONTENTS</u>

<strong>Page</strong>

I.   INTRODUCTION ............................................................................................... 1

II.  FACTUAL BACKGROUND .......................................................................... 3

   A.  Overview Of The Burning Man Special Recreation Permit. ............................... 3

   B.  Burning Man's Record Of Safety And Environmental Compliance Is Exceptional. ......... 4

   C.  BLM's Costs To Administer The SRP Soared Nearly 300% From 2011 To 2014. ........... 4

     1.  In 2012, BLM's costs increased by 60% without justification when Special Agent Love took charge of BLM's law enforcement operation. ...................... 4

     2.  Instead of stabilizing in 2013, BLM's costs more than doubled again. ......................... 5

   D.  In 2015, BMP Began To Seek Relief From BLM's Unreasonable Costs. ......................... 6

   E.  Multiple Investigations Found That Special Agent Love Committed Misconduct While Overseeing BLM's Burning Man Law Enforcement Detail. ........................ 6

   F.  From 2016 Through 2019, BLM Costs Remained Unreasonably Inflated. ....................... 8

III. LEGAL STANDARD ..................................................................................... 9

IV.  ARGUMENT ................................................................................................. 14

   A.  BLM's Decisions Failed To Explain Its Costs To Administer BMP's SRPs. .................. 14

     1.  "Labor Log" attachments. ..................................................................... 15

     2.  "Travel Per Person" attachments. ............................................................ 17

     3.  "Vehicle Utilization" attachments. ........................................................... 18

     4.  "Misc. Supplies and Equipment" attachments. ............................................ 18

   B.  BLM's Labor Costs For Law Enforcement Staffing Were Unreasonable. ....................... 19

     1.  The Administrative Record fails to support and often outright contradicts BLM's staffing levels for law enforcement personnel. ....................... 21

     2.  BLM law enforcement officers spent most of their time at the Events on "general public interest" activities like outreach and drug enforcement. ....................... 25

     3.  BLM law enforcement responded to only a tiny number of calls for service .............. 29

     4.  BLM law enforcement personnel sat idle over two-thirds of the time. ........................ 31

     5.  BLM unreasonably charged BMP for senior-level law enforcement "investigators" and a "sexual assault unit" who worked for the local sheriff. ........................ 32

     6.  BLM unreasonably charged BMP for internal investigations of its officers. ............... 34

     7.  BLM unreasonably charged BMP for its law enforcement "substation." ................... 35

   G.  BLM Improperly Charged BMP Premium Pay Rates Based On Unsupported "Emergency" And "Mission-Critical Work" Designations. ....................... 36

H.  BLM's Massive IT-Related Expenditures Far Exceeded What Was Reasonable. ........... 38

    1.  BLM personnel spent excessive hours on technology and logistical services............. 38

    2.  BLM continued to charge BMP for unneeded equipment and dispatchers. ................. 39

I.  BLM's Superfluous Medical Unit For Its Personnel Was Not A Reasonable Cost. ........ 42

J.  BLM Unreasonably Charged BMP For Costs Associated With Third-Party SRPs. ........ 44

V.  CONCLUSION.................................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bookcliff Rattlers Motorcycle Club*,
  IBLA 2004-151, 171 IBLA 6 (2006) ........................................................12, 13, 14

*Butte Cty, Cal. v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010) ...........................................................................10

*Citizens for Responsibility & Ethics in Wash. v. U.S. SEC*,
  916 F. Supp. 2d 141 (D.D.C. 2013) .....................................................................9

*City of Indianapolis v. Edmond*,
  531 U.S. 32 (2000) ..............................................................................................27

*James R. Stacy*,
  IBLA 2014-216, 188 IBLA 134 (2016) ..............................................................10

*Judulang v. Holder*,
  565 U.S. 42 (2011) ..............................................................................................10

* *Koi Nation of N. Cal. v. U.S. Dep't of Interior*,
  361 F. Supp. 3d 14 (D.D.C. 2019) ................................................................10, 14

*Mark Patrick Heath*,
  IBLA 2010-34, 181 IBLA 114 (2011) .................................................................13

*Michael Voegele*,
  IBLA 2007-255, 174 IBLA 313 (2008) ..........................................................13, 14

*Nevada Power Co. v. Watt*,
  711 F.2d 913 (10th Cir. 1983) .....................................................................11, 12, 14

*Select Specialty Hosp.-Bloomington, Inc. v. Burwell*,
  757 F.3d 308 (D.C. Cir. 2014) ...........................................................................10

*WildEarth Guardians v. Bernhardt*,
  2020 WL 6701317 (D.D.C. Nov. 13, 2020) ........................................................9

**Statutes**

5 C.F.R. § 550.103 ..................................................................................................5

5 C.F.R. § 550.106(b)(1) .........................................................................................9

43 C.F.R. § 2932.11 ................................................................................................43

43 C.F.R. § 2932.31(e)..............................................................................................11, 35

43 C.F.R. § 2932.31(e)(2)-(3)................................................................................44

5 U.S.C. § 706(2)(A)-(D).......................................................................................10

43 U.S.C. § 1734(b).......................................................................................... *passim*

43 U.S.C. § 1734(b)-(c)...........................................................................................14

43 U.S.C. § 1734(c)...................................................................................13, 14, 45

Federal Land Policy and Management Act.......................................................... *passim*

National Environmental Policy Act.........................................................................3

**Other Authorities**

BLM General Order 4.............................................................................13, 25, 26, 35

BLM General Order 33...............................................................................20, 21, 29

Fed. R. Civ. P. 56(a)..................................................................................................9

## TABLE OF ACRONYMS

APA          Administrative Procedure Act

AR           Administrative Record

AAR          After Action Review

ALS          Advanced Life Support

BLM          U.S. Bureau of Land Management

BMP          Burning Man Project

CAD          Computer-Aided Dispatch

FLPMA        Federal Land Policy and Management Act

IACP         International Association of Chiefs of Police

IBLA         Interior Board of Land Appeals

IM           Instruction Memoranda

IMARS        Incident Management Systems

LEO          Law Enforcement Officer

NCA          High Rock Canyon Emigrant Trails National Conservation Area of Northern

             Nevada

NEPA         National Environmental Policy Act

OLES         BLM's Office of Law Enforcement and Security

OPR          Office of Professional Responsibility

SRP          Special Recreation Permit

# I.  INTRODUCTION

Plaintiffs Burning Man Project and its wholly owned subsidiary Black Rock City LLC (collectively, "BMP") seek relief from unreasonable costs imposed by the U.S. Bureau of Land Management ("BLM") in connection with its special recreation permits ("SRPs") for the annual Burning Man event ("Burning Man" or "Event").[1] BLM issued cost recovery decisions ("Decisions") following the 2015-2019 Events,[2] and Plaintiffs timely challenged the Decisions via administrative appeals ("Agency Appeals") to the Interior Board of Land Appeals ("IBLA"). After IBLA failed to adjudicate any of these Agency Appeals, Plaintiffs filed the present action.

Since 2011, the Event's participant population increased by 30%, while BLM's costs to administer the Event permit went up an unreasonable 294%. By far the largest and fastest-growing category of BLM costs was its law enforcement apparatus, both labor and technology. Excessive law enforcement spending is an unfortunate legacy that BMP has borne since former BLM Special Agent Daniel P. Love ("Love") managed BLM's law enforcement operations at the Event. The Department of the Interior ("DOI") ultimately found that Love violated ethics rules and committed other misconduct, including misuse of personnel and other resources at the Event for which BMP paid through cost recovery. While BLM removed Love from work on the Event's SRP after the 2015 Event, and terminated him from the agency in 2017, BLM maintained law enforcement staffing at the same inflated level and continued to increase the bloated operation that was Love's legacy, all at BMP's expense.

From 2015 through 2019, the scale of BLM's law enforcement program far exceeded what

---

[1] Burning Man Project is a 501(c)(3) nonprofit public benefit corporation. Its mission is to facilitate and extend the culture that has issued from the Event into the larger world, and it has been the Event producer and SRP applicant since 2019. References to "BMP" herein mean "Black Rock City LLC" to the extent they refer to activities from 1997 through 2018.

[2] BLM's 2015-2019 Decisions at issue in the Agency Appeals and this Motion appear at A.R. Document Nos. 70-76 (2015); 156-163 (2016); 223-229 (2017); 310-312 (2018); and 365 (2019).

was reasonably necessary for the Event. BLM's Administrative Record confirms that the Events were overstaffed and that law enforcement officers sat idle two-thirds of the time. Yet BLM personnel were paid at premium overtime rates due to improper "emergency" and "mission-critical work" designations that BLM applied to the Events. BLM also continued to demand needlessly elaborate technology programs to support its law enforcement apparatus and insisted on top-dollar equipment it would not have deemed necessary if taxpayers were footing the bill instead of BMP. And BLM continued to require that BMP pay for superfluous medical services, unexplained travel, and unnecessary equipment and supplies.

Year after year, BLM personnel spent thousands of hours and millions of BMP dollars supporting BLM's two-week operation at each eight-day Event, ignoring the basic tenets of cost recovery regulations that required the agency to (1) only charge BMP for ***reasonable costs***, excluding costs related to serving the "general public interest"; and (2) provide sufficient information regarding the costs charged to enable BMP to assess their reasonableness. When BMP filed Agency Appeals to challenge BLM's costs, BLM effectively claimed that its decisions were above review. According to BLM, its staff are vested with the exclusive discretion to determine the reasonableness of any cost. BLM's position can be summarized as follows: "If we incurred a cost, that cost was *de facto* reasonable." Notwithstanding BLM's aspirations, the cost recovery regulations do not vest the agency with such absolute discretion.

As detailed below, BLM ignored the "reasonableness" requirement for costs charged to BMP to administer the 2015 through 2019 SRPs. BLM's costly practices have continued to sharply diverge from DOI's refocusing of BLM priorities on land management and away from heavy-handed law enforcement, while also easing restrictions and costs on other users of federal lands. As a result, Burning Man — a temporary, recreational event known for its Leave No Trace

ethos — may be the most heavily regulated activity on BLM-managed lands. BMP contends that a substantial portion of the costs BLM charged through cost recovery over these five years was unexplained, unsupported, and unreasonable according to BLM's own Administrative Record. BMP asks the Court to reject BLM's illegal "if we spent it, it was reasonable" practices by ordering BLM to provide a reasoned explanation of its costs and to refund those costs that were not "reasonable" as required by applicable law.

## II.  FACTUAL BACKGROUND

### A.    <u>Overview Of The Burning Man Special Recreation Permit.</u>

Since 1990, the Burning Man Event has been held over and around Labor Day weekend on public lands managed by BLM in what is now the Black Rock Desert—High Rock Canyon Emigrant Trails National Conservation Area of northern Nevada (the "NCA"). (AR11747 ¶ 3.) The Event location, also known as Black Rock City, is currently situated within Pershing County. (*Id*.) Burning Man began its tenure in the NCA as an expressive weekend camping trip for a small group of people. (*Id*. ¶ 4.) Over nearly 30 years, the Event has grown in size, popularity, and complexity, and its peak population in 2019 was 78,850. (*Id*. ¶ 4.)[3]

BLM issues annual SRPs for the Events pursuant to the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA"). (AR11748 ¶ 6.) BMP and BLM have cooperated over the years to develop and refine a "Leave No Trace" standard for the Event that BLM has adopted for use with other events on BLM-managed public lands. (*Id*. ¶ 8.) BLM has inspected the Event site at the end of the SRP period, and BMP has passed every inspection to date. (*Id*. ¶ 9; AR11754 ¶ 27.)

---

[3] In 2019, BLM and BMP changed the definition of the Event's "peak population." The 2019 "peak population" included both Event participants and BMP staff, while references herein to the "peak population" in years prior to 2019 include participants only. (*Id.*)

**B.**   **Burning Man's Record Of Safety And Environmental Compliance Is Exceptional.**

Safety and environmental stewardship are paramount to BMP and the members of the Burning Man community. (AR11749 ¶ 11.) BMP's commitments to public safety and the environment are evidenced by the Event's decades-long record of compliance and year-round work with cooperating federal, state and local agencies. BMP's Event operations comprise more than 50 departments and teams with several thousand trained and certified health and safety employees, contractors, and volunteers. (*Id*.)

BMP has built these departments, protocols, and best practices over the course of nearly 30 years in the NCA, and many of its staff have more than 20 years of experience, both with managing Event safety operations and in their respective fields of expertise. (*Id*.) BMP's extensive operational expertise, developed over decades, has resulted in an outstanding record of public safety and environmental compliance for the Event. (AR11748 ¶ 9; AR11754 ¶ 27.)

**C.**   **BLM's Costs To Administer The SRP Soared Nearly 300% From 2011 To 2014.**

**1.   In 2012, BLM's costs increased by 60% without justification when Special Agent Love took charge of BLM's law enforcement operation.**

Since 2007, BLM has charged BMP for the costs of administering the Burning Man SRP under cost recovery regulations that require BMP to pay all of BLM's direct and indirect costs, plus 3% of BMP's gross receipts as a commercial use fee. (AR11850 ¶ 3.) Between 2007 and 2011, BLM increased its costs to manage the SRP by about 10% annually — from approximately $626,000 to $859,000. (*Id*. ¶ 4.) During this same period, Burning Man's population increased from 47,097 to 53,963, or about 4% per year. (*Id*.)

In 2012, Daniel P. Love became the BLM Special Agent in Charge for Region 3 of BLM's Office of Law Enforcement and Security ("OLES") and assumed leadership of law enforcement operations for the Event. (AR11851 ¶ 5.) That year, BMP's population increased by just 4%, while

BLM's costs soared by 62%. (*Id*. ¶ 6.) Love increased BLM law enforcement staffing levels by 37%, from 51 officers in 2011 to 70 in 2012. (*Id*.) As a result, BLM's labor costs shot up, along with all associated costs. (*Id*.) BLM has never adequately explained the substantial increases, and BMP knows of no safety or other issues that warranted them. (*Id*. ¶ 7.)

Also in 2012, BLM began improperly designating the Event as an "emergency" pursuant to 5 C.F.R. § 550.103. (AR11851 ¶ 8.) The memorandum authorizing the "emergency" designation did not provide a reason or basis except to state that it would allow BLM to increase compensation, including "premium pay" to its personnel. (AR00083.) BMP understands BLM continued to apply the "emergency" designation to Events through 2016. (AR11750-51 ¶ 16.)

### 2. Instead of stabilizing in 2013, BLM's costs more than doubled again.

After the substantial increases in 2012, BLM represented that its costs would remain flat the following year. (AR11852 ¶ 11.) But that spring, BLM advised that its costs to administer the 2013 SRP would more than double, resulting in an extraordinary increase of 241% in just two years. (*Id.* ¶ 12.) When BMP requested the reasoned, factual explanation for these increases to which it was entitled under cost recovery regulations, Special Agent Love contended that these regulations did not apply to law enforcement, which "costs what it costs." (AR11853 ¶ 14.) BLM's Winnemucca District Manager Seidlitz claimed BMP was not entitled to an explanation, but would need to pay the costs in order to secure an SRP. (*Id*.) Mr. Seidlitz also advised that the Winnemucca District Office could not function without the Burning Man SRP money, suggesting these funds were used to backfill the District's budget shortfalls. (*Id*. ¶ 15.)

For the 2014 Event, BLM's costs increased by another 15% (AR11765), despite BLM's promise that the technology infrastructure upgrades BMP had funded in 2013 would lead to cost decreases (AR11852 ¶ 13), and despite that Event's population being 5% smaller. (AR11765.) BLM's 2014 costs were a whopping 291% higher than the last pre-Love year of 2011. (*Id*.)

Plaintiffs' Motion for Summary Judgment          5

**D.** __In 2015, BMP Began To Seek Relief From BLM's Unreasonable Costs.__

The planning process for the 2015 Event was marred by delays and friction resulting from BLM's outlandish demands for a luxury compound, dubbed the "Blue Pit," to accommodate "VIP" personnel who could enjoy "24-hour access to ice cream," according to the headline of one news article picked up by the national media. (AR11751 ¶ 18; AR11767-84.) BLM's demands became the subject of a public outcry and criticism by elected officials, with Nevada Senator Harry Reid admonishing DOI Secretary Sally Jewell that such facilities "should be beyond the scope of the permitting requirements." (AR11783-84.) BLM ultimately withdrew its demands for the VIP compound under this pressure. (AR11751 ¶ 18.)

Likely due to the negative publicity this extravagant request had garnered, BLM reassigned both District Manager Seidlitz and Special Agent Love from work on the Burning Man SRP. (*Id*. ¶ 18.) 2015 was the last year that Love worked at an Event. Even without the luxury compound, BLM's costs increased in 2015. (AR11765.) With no reasoned explanation for BLM's ever-increasing costs, and none of its promised efficiencies, BMP appealed the 2015 Decision to IBLA in early 2016. (AR04747-48.)

**E.** __Multiple Investigations Found That Special Agent Love Committed Misconduct While Overseeing BLM's Burning Man Law Enforcement Detail.__

While BMP was all too familiar with Special Agent Love's mismanagement and corrupt practices, his abuse of the cost recovery regulations in connection with the 2012-2015 Events was just the tip of the iceberg. In January 2017, DOI's Inspector General released a public version of a report entitled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials" (the "Ethics Report"). (AR11855 ¶ 21; AR11865-80.) The Ethics Report detailed the results of an investigation into Love's conduct during his tenure as head of OLES Region 3, including conduct related to the 2015 Event. (AR11865-80.) The investigators found

that Love violated federal ethics rules and misused BLM resources in many ways, including by directing on-duty officers to escort his family on a several-hour tour of Burning Man using official vehicles, all at BMP's expense. (AR11866; AR11871.)

In response to the Ethics Report, the U.S. House Oversight and Reform Committee requested further investigation of numerous documented incidents of Love's "troubling behavior."[4] (AR11882-84.) These included allegations of tampering with email evidence and attempting to influence witness testimony. (*Id*.) The report of a second investigation into Love, issued in August 2017, concluded that he had committed several other ethical violations, including ordering the destruction of emails in which he had been "inappropriate," despite the messages' relevance to the investigation into his conduct at the 2015 Event. (AR11893-95.)

The following month, BLM confirmed that it had terminated Special Agent Love's employment. (AR11898-903.) Shortly after this announcement, BLM Special Agent Larry C. Wooten released a whistleblower memorandum that detailed his separate investigation into Love. That investigation "revealed a widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal violations among senior and supervisory staff at the BLM's [OLES]." (AR11918.)

Special Agent Wooten's investigation also exposed "an improper cover-up in virtually every matter that [Love] participated in or oversaw," and an office culture in which "any disagreement with [Love], or any reporting of his many likely embarrassing, unethical/ unprofessional actions and misconduct was thought to be career destroying." (AR11928.) Per Special Agent Wooten, Love's "subordinates and peers were afraid to correct him or properly

---

[4] Though the published Ethics Report does not name the investigated officer, the Committee's request confirmed that Special Agent Love was the investigation's target. (AR11882.)

report his misconduct (despite a duty to act) out of fear for their own jobs and reputation[s]" because the OLES Director not only gave him "complete autonomy and discretion, but also likely provided no oversight and even contributed to an atmosphere of cover-ups, harassment and retaliation for anyone that questioned or reported ... Love's misconduct." (AR11924-28.)

F.      **From 2016 Through 2019, BLM Costs Remained Unreasonably Inflated.**

Following the departure of both Special Agent Love and District Manager Seidlitz, BMP observed certain improvements in its collaboration with BLM. (AR11752 ¶ 21.) BMP did not, however, see material reductions to the programs and costs that had escalated without justification under BLM's prior leadership. BLM's 2016 overall costs declined by 7% from the prior year, but were still 274% higher than 2011 levels. (AR11765.) Meanwhile, the size of the Event, measured by the total number of participants, had only increased by 41%. (*Id*.)

In 2017, BLM's costs started creeping up again, with labor costs increasing by 7% over 2016 levels. (*Id.*) BMP had hoped BLM would revisit and reduce the cost of its law enforcement and technology programs following Love's departure, but the agency refused. As a result, BMP filed Agency Appeals challenging BLM's 2016 and 2017 Decisions. (AR09980; AR10730.)

In 2018, BLM's overall costs increased again by 7%, despite no material change in the Event's population. (AR11765.) In 2019, the Event's population again remained flat, but BLM's labor costs increased another 7%. (*Id.*) Overall, BLM's total 2019 costs were 294% percent higher than 2011, the year before Love assumed leadership of its Event-related law enforcement operations. By contrast, the Event's population had only increased 46% over 2011 levels. (*Id.*)

One notable change in BLM's practices during this period is that in 2017, it stopped designating the Event an "emergency," as it had since 2012. (AR11753 ¶ 24.) After BMP challenged the "emergency" designation in its 2015 and 2016 Agency Appeals, BLM conceded it was not "appropriate to the event." (AR06507.) For the 2017 Event, BLM changed tactics and

instead designated the deployment of personnel to support the Event as "mission-critical work" under 5 C.F.R. § 550.106(b)(1). (AR01457.) Like its previous "emergency" designation, BLM's authorizing memorandum lacked any reasoned explanation. (*Id.*) BLM made the "mission-critical work" designation perpetual prior to the 2018 Event with a Permanent Instruction Memorandum. (AR08049.) The Memorandum claimed the Event "required a substantial percentage of the Bureau's nationwide staffing" but did not explain why a "mission-critical work" designation was required. (*Id.*) It said only that the permanent designation would create "efficiencies" by eliminating the need for annual requests. (*Id.*)

BMP continued its efforts to require BLM to explain its increasing costs and stop charging BMP for unreasonable costs, filing Agency Appeals to challenge BLM's 2018 and 2019 Decisions. (AR11423-24; AR11702.) But as the years passed, IBLA did not adjudicate any of the Agency Appeals, despite the oldest having been fully briefed since July 2016. Meanwhile, BLM continued to charge BMP unexplained and unreasonable costs every year, and it continued to retain the funds improperly collected in violation of the cost recovery regulations. Since IBLA failed to provide any relief, or even a ruling, on BMP's Agency Appeals, BMP's only option was to seek judicial review by commencing the present action.

## III.   LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a court may grant summary judgment when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the administrative appeal context, the court is "limited to determining whether, as a matter of law, the evidence in the administrative record supports the agency's decision." *WildEarth Guardians v. Bernhardt*, 2020 WL 6701317 at *5 (D.D.C. Nov. 13, 2020); *Citizens for Responsibility & Ethics in Wash. v. U.S. SEC,* 916 F. Supp. 2d 141, 145 (D.D.C. 2013). Accordingly, this Court must grant summary judgment if it

determines that the agency's actions were not supported by the Administrative Record or were otherwise inconsistent with the Administrative Procedure Act ("APA").

A court may set aside an action pursuant to the APA if it determines that the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitation; or without observance of procedure required by law. 5 U.S.C. § 706(2)(A)-(D). In making this determination, a court may not impose its own judgment or consider post hoc rationalizations to support the agency's decision. *Judulang v. Holder,* 565 U.S. 42, 53 (2011). Rather, the court must determine whether the agency's decision was reasonable based upon the administrative record available to it at the time of the decision. *Koi Nation of N. Cal. v. U.S. Dep't of Interior,* 361 F. Supp. 3d 14, 33-34 (D.D.C. 2019). Moreover, while an agency is afforded deference in interpreting its own regulations under the APA, such deference must be adequately supported by the record before it. Thus, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decision making . . . . That task involves examining the reasons for agency decisions — or, as the case may be, the absence of such reasons." *Judulang,* 565 U.S. 42 at 53; *Butte Cty, Cal. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010). A court may determine that an agency's decision is arbitrary and capricious and set the decision aside if the agency failed to reasonably explain its decision. *Koi Nation,* 361 F. Supp. 3d at 35; *Select Specialty Hosp.-Bloomington, Inc. v. Burwell,* 757 F.3d 308, 312-313 (D.C. Cir. 2014). Accordingly, this Court must grant summary judgment if it finds BLM has failed to provide a reasoned explanation for its Decisions.

BLM issues SRPs under the general authority of the Secretary of the Interior to administer use of public lands under section 302(b) of the FLPMA. *James R. Stacy*, IBLA 2014-216, 188

IBLA 134, 137 (2016). Under section 304(b) (codified as 43 U.S.C. § 1734(b)), the agency may require a deposit of any payments intended to reimburse the agency for "reasonable costs" with respect to issuing and administering an SRP. FLPMA defines "reasonable costs" to include "the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities." (*Id.*) Congress, through FLPMA, has made clear that an agency may not force the permittee to fund general costs, or costs that benefit "the general public interest" rather than being for the applicant's "exclusive benefit":

> In determining whether costs are reasonable under this section, the Secretary may take into consideration actual costs (exclusive of management overhead), . . . the efficiency to the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs.

43 U.S.C. § 1734(b). Similarly, 43 CFR § 2932.31(e) limits BLM's cost recovery authority:

> *(3) Limitations on cost recovery.* Cost recovery charges will be limited to BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement. Programmatic or general land use plan NEPA documentation are not subject to cost recovery charges, except if the documentation work done was done for or provides special benefits or services to an identifiable individual applicant.

Thus, costs unrelated to BLM's administration of BMP's permit are not recoverable.

As appellate courts and the agency's own appeals Board applying FLPMA Section 304(b) have affirmed, Congress deliberately used the modifier "reasonable" to limit the agency's discretion on which costs can be recovered from an applicant like BMP. For example, in *Nevada Power Co. v. Watt*, 711 F.2d 913 (10th Cir. 1983), when DOI "[took] the position that for right of way applications, 'reasonable costs' equal[ed] actual costs" (*id.* at 920), the appellate court rejected the agency's interpretation of Section 304(b) as follows:

> Our review of this unusually abundant legislative history reinforces our conclusion

that the reasonableness factors were intended to limit the Secretary's authorization to charge reasonable costs. The factors were added to ensure that applicants would not as a matter of course bear all of the costs occasioned by their application. On the other hand, private enterprises were not to be subsidized by requiring the government to shoulder all of the costs. The conferees sought to draw a line between the two extremes; the reasonableness factors constitute that line. To suggest that the Secretary may completely disregard that line flouts the clear expression of congressional intent contained in the legislative history.

(*Id.* at 925.) (footnotes omitted); accord *Bookcliff Rattlers Motorcycle Club*, IBLA 2004-151, 171 IBLA 6, 17 (2006) ("The Court in *Nevada Power* held that the Secretary cannot disregard the 'reasonableness factors' set forth in section 304(b) of the FLPMA in determining costs to be recovered."). Thus, Congress intended "reasonableness" to be a limiting term and declined to deem actual costs synonymous with reasonable costs under the FLPMA.

By contrast, in its administration of the Event SRPs, BLM has disregarded the word "reasonable" and claimed that all of its "actual" costs are recoverable from BMP.  BLM has ignored the statutory definition of "reasonable," the qualifier that "actual costs (exclusive of management and overhead)" are only a "consideration" for determining whether an agency's costs are reasonable, and the requirement imposed by Congress that the agency review its actual costs and apportion "general public interest" costs. 43 U.S.C. § 1734(b).

In this case, BLM made no attempt to apportion its costs between those that served the "general public interest" and those that were incurred for the "exclusive benefit of the applicant." According to BLM, all of its actual costs related to a Burning Man Event were *de facto* reasonable, even those that were neither for BMP's "exclusive benefit" nor related to permit administration. Each time BLM attempted, in responding to BMP's Agency Appeals, to justify a particular cost by citing to BLM's General Law Enforcement Orders or other "general public interest" laws or regulations, BLM conceded that at least part of that cost was not for the "exclusive benefit of the

applicant" and was therefore not recoverable through cost recovery.[5]

Another important feature of cost recovery is the requirement that the agency give the permittee a reasoned explanation for all costs charged that is "supported by the facts of record demonstrating that [BLM's] action is not arbitrary, capricious, or an abuse of discretion." *Michael Voegele,* IBLA 2007-255, 174 IBLA 313, 318 (2008). This explanation must provide the permittee with "a basis for understanding and accepting the decision or, alternatively, for appealing and disputing it before the Board." *Bookcliff Rattlers*, 171 IBLA at 21. To that end:

> Where BLM makes use of computer spreadsheets to accumulate data upon which a cost estimate for an SRP is based, it must reveal underlying data sufficient for the applicant being charged to ascertain the justification for its conclusions; otherwise, the applicant has no basis upon which to understand and accept the decision or, in the alternative, to appeal and dispute it.

(*Id.*) Thus, summary spreadsheets do not satisfy BLM's obligation to provide a rational explanation of its costs, and internal memoranda do not shield its cost decisions from review. The Court must still examine these decisions for reasonableness and abuse of discretion. *Mark Patrick Heath*, IBLA 2010-34, 181 IBLA 114, 137 (2011).

BMP has the burden of proof to demonstrate that BLM failed to meet these statutory requirements. *See Michael Voegele*, 174 IBLA at 323. And on showing that BLM's 2015-2019 Decisions charged BMP for unreasonable costs under Section 304(b), BMP has a clear remedy: to the extent BMP "has made a payment . . . not required or in excess of the amount required by applicable law and regulations," BMP is entitled to a refund under 43 U.S.C. § 1734(c).

In this case, BLM has failed to provide the requisite reasoned and factual explanation of the costs it incurred to administer the 2015 through 2019 Event SRPs. Absent that explanation,

---

[5] *See, e.g.*, AR03606 ¶ 25 ("Law Enforcement General Order 33 directs BLM to make public lands drug-free . . . ."); AR03620 ¶ 28 ("Per General Order 4, public contact on public land is a job duty of [Law Enforcement] Rangers.").

BLM's Decisions were arbitrary and unsupported by the Administrative Record. *See Koi Nation,* 361 F. Supp. 3d at 35. Even with the deficient explanations in BLM's Decisions and Administrative Record, the Court can determine, as a matter of law, that many of the costs BLM charged BMP were unreasonable and order the agency to refund all unreasonable costs pursuant to 43 U.SC. § 1734(c). *See Bookcliff Rattlers*, 171 IBLA at 21; *Michael Voegele*, 174 IBLA at 318.

## IV.     ARGUMENT

### A.     BLM's Decisions Failed To Explain Its Costs To Administer BMP's SRPs.

Over the five years of BMP's Agency Appeals, and continuing in this case, BLM has ignored the legal requirement that it provide a reasoned explanation for its costs, deeming it sufficient to simply disclose <u>what</u> it spent. As a result, BMP and the Court cannot effectively assess whether many of the costs charged were "reasonable" as required by 43 U.S.C. § 1734(b).

In answering the Agency Appeals, BLM rejected BMP's concerns about BLM's enormous, unjustified costs by claiming the agency need only prove that it spent those amounts on the Event. (*See, e.g*., AR03577-81.) The cost recovery regulations make clear, however, that BLM must also show that all of its expenditures were <u>reasonable</u>, and a cost is not reasonable just because it was incurred. *See* 43 U.S.C. § 1734(b). "Reasonable costs" are not a synonym for "actual costs." *Nevada Power*, 711 F.2d at 925. BLM's conclusory pronouncements of necessity did not fulfill its obligation to provide a reasoned explanation for the costs it charged to BMP, nor does the Administrative Record "demonstrate[e] that [BLM's] action is not arbitrary, capricious, or an abuse of discretion." S*ee Michael Voegele,* 174 IBLA at 318; 43 U.S.C. § 1734(b)-(c). BLM has proffered no explanation for many of the costs in its Decisions.

In some years, BLM prepared an After Action Review ("AAR") that purported to explain BLM's work on the Event SRP but failed to meaningfully do so recently. For example, BLM's

2019 AAR (AR03671-84) was a scant 13-page overview of BLM's activities at the 2019 Event that contained little detail about how it administered the Burning Man SRP and why it needed to incur nearly $3 million in costs. The document amounted to an executive summary of a smattering of tasks it performed at the 2019 Event. In 2018, BLM did not even prepare an AAR. In an internal memorandum, BLM claimed it was not "appropriate" to do so, noting that "[i]tems from the previous procedures of the AAR process continue to arise in the permitee's [Agency Appeals]." (AR04819.) To avoid that, BLM decided that "Governmental AAR items will be formatted in an internal document to inform the 2019 BLM Burning Man Planning Team." (*Id*.) This memorandum confirms BLM was dismayed by BMP's use of prior AARs to bolster its Agency Appeals. Rather than changing its practices to comply with cost recovery regulations, BLM deprived BMP of information that would demonstrate BLM's continued misconduct.[6]

Without consistent or informative AARs, BMP was left with the cost recovery decisions themselves as BLM's only explanation for its permit administration costs. As noted, these Decisions contained only cryptic summaries of <u>what</u> BLM spent without any indication of <u>why</u> such costs were incurred, such that BMP could assess their reasonableness. The attachments to each Decision contained only threadbare summaries and lists of the money BLM spent.

**1. "Labor Log" attachments.**

BLM labor costs consistently accounted for nearly two-thirds of all costs BLM charged

---

[6] AARs are just one example of the inconsistencies in the incomplete administrative records BLM has chosen to provide in connection with BMP's legal challenges of the Decisions. Another example is BLM's Incident Action Plan. The Administrative Record includes BLM's 2016, 2017, and 2019 Plans (*see* AR04402-18, AR04419-34, AR03261-66), but no Plans for 2015 or 2018. Similarly, the Administrative Record included numerous internal memoranda reflecting BLM's planning and decision-making processes for 2018. No such memoranda appear in the 2019 Record, even though the chief permit authorizing officer (Mark Hall) was the same in both years. Either BLM refused to share this documentation with BMP in 2019, or BLM decided not to document its internal planning discussions for 2019. Either possibility would violate BLM's statutory obligation to provide a reasoned explanation for its cost recovery Decisions.

BMP during an Event year. (*See, e.g.*, AR03646-54.) BLM summarizes these costs in a "Labor Log" attached to each Decision that contains only the employee's last name, title, a few words about their work, a range of dates worked, total number of hours, and total amount charged.  These summaries are almost worthless, since they lack corresponding time sheets with details about the specific dates, daily hours, rates of pay, and assigned tasks for each employee. Without the underlying time, pay rate, and work details, BMP is unable to assess the accuracy of the labor summary and determine whether all of BLM's labor charges were reasonable costs.

The limited "Description of Work" field also does not allow BMP to determine whether an employee's purported work was commensurate with that employee's seniority, rank, or rate of pay. For example, BMP has long questioned in its Agency Appeals why BLM chose to utilize law enforcement and other personnel who have a higher pay grade than necessary. Despite the fact that Burning Man is a recreation-oriented event, BLM's Administrative Record reveals that BLM law enforcement officers spent the bulk of their time on public outreach and drug enforcement, as detailed below in Section IV.B.2. Based on the nature of such work, patrol-level rangers, who are generally paid at a lower rate than special agents or state chief rangers, were the reasonable choice for nearly all law enforcement assignments at the Events. (*See* AR11940.)

Yet, BLM's labor summaries confirm that a substantial portion of law enforcement personnel positions were filled by highly paid senior BLM staff. In 2019, for example, these included at least four Chief State Rangers, five Special Agents in Charge, 11 Special Agents or Senior Special Agents, and four Supervisory Rangers. (AR03647-54.) BLM failed to justify the large percentage of highly compensated senior law enforcement officers. It was not reasonable to charge BMP for staffing the Event with the agency's highest paid personnel when the work could have been performed by lower-ranking and less expensive law enforcement personnel.

The same is true for BLM's information technology ("IT") personnel. BLM consistently assigned multiple "specialists" and senior-level employees to serve as IT personnel. For example, for the 2015-2018 Events, BLM assigned its Region 5 State Chief Law Enforcement Ranger, Jon Young, to work as the "Comm Chief." In 2018 alone, Chief State Ranger Young billed BMP for more hours than nearly any other BLM employee: 542 hours totaling almost $53,000. (AR11415.) Since the date field was blank for Young's entry on the 2018 labor log, BMP has no idea when he worked all these hours in connection with the eight-day Event.

BLM labor costs for law enforcement and communications are discussed in greater detail in Sections IV.B. and IV.D. BMP has highlighted just a few entries from BLM's labor summaries here to demonstrate the agency's failure to provide a reasoned explanation for labor costs charged throughout all five cost recovery Decisions at issue in this case.

### 2. "Travel Per Person" attachments.

Each Decision includes an attachment titled, "Travel Per Person" that consists of a summary spreadsheet with columns for last name, amount and trip purpose. (*See, e.g.*, AR11417-18.) Since 2016, the trip purposes have been the same for everyone: "Travel for related assigned duties at Burning Man event." (*Id.*) Above the columns was the note, "Travel Expenses include (Not all personnel have each item): Airfare, Lodging, Per Diem and Travel Incidentals, and rental car." Due to the lack of any detail in this summary, BMP cannot tell whether BLM personnel charged for rooms at a Ritz Carlton or a Holiday Inn. Similarly, BMP has no way of determining the amount of the "Per Diem" or the number of days charged. Also, what were "Travel Incidentals"? Were they meals or gift shop novelties? BMP recognizes that BLM employees had to travel to and from the Event and does not object to paying their reasonable travel costs. But without sufficient detail, BMP has no basis to assess whether the travel costs charged were, in fact, reasonable costs.

BMP believes BLM collects detailed travel cost information that it chooses not to share with BMP, as such information was included in cost recovery decisions several years ago. For example, for the 2012 Event, BLM prepared a "Travel" spreadsheet with granular detail for each expense by vendor and amount. (AR07782) In its 2015 Decision, BLM provided at least some detail about personnel's travel to particular meetings (AR00529-31), and BMP objected to some of these costs in its 2015 Agency Appeal. (AR08784.) BLM then stopped providing any detail. Its 2016-2019 Decisions list the same generic description for all employees, intentionally frustrating BMP's ability to judge the reasonableness of the travel-related costs it is charged.

### 3. "Vehicle Utilization" attachments.

Each BLM Decision also includes an attachment labeled "Vehicle Utilization" that is as threadbare as the travel costs summary. The single page contains two columns labeled "Plate Number" and "Utilization Amount." For 2019, the "Utilization Amounts" varied from $92.80 to $1,862.38. (AR03659.) BMP recognizes that BLM uses government vehicles in administering Burning Man SRPs and does not object to paying reasonable costs for vehicle use. But the limited information furnished does not enable a reasonableness assessment. BMP cannot tell whether the "utilization" is based on mileage, hours used, or some other metric. BLM gave no explanation of the methodology it used to determine the "utilization" of a particular vehicle for the Event. BLM must provide sufficient detail to enable BMP to understand how it determined each vehicle "utilization" amount. Without an explanation, the lump sum numbers contained in this attachment were arbitrary and not adequately supported by the Administrative Record.

### 4. "Misc. Supplies and Equipment" attachments.

Another attachment to Decision is titled "Misc. Supplies and Equipment" and consists of a summary spreadsheet with columns for the "Card Holder," "Vendor," "Amount," and "Description." (*See, e.g.*, AR03660-61.) The "Description" column has little value, since it

overwhelmingly consists of generic text like "evidence supplies" and "logistics supplies" that reveals no useful information about the purchase.

For example, BMP has no idea what "medical" and "safety" supplies BLM employee Andres purchased in 2019 for $7,241. (*Id.*) Likewise, employee Ferguson spent $940 for "Uniform for Civilian Ops," but BLM did not explain why its "civilian" employees needed new "uniforms" solely for the 2019 Event. (*Id.*) BLM also did not explain why employee Appold spent $1,872 for "JOC Watering" or why employee Rosoff spent $2,290 at FedEx. (*Id.*) Neither individual appears to have worked at the 2019 Event, as their names are not listed on BLM's labor summary. (AR03647-54.) For some years, the Administrative Record contains copies of receipts, but the receipts often do not describe the items purchased and never explain why the items or their costs were reasonable, as required by the cost recovery regulations. (*See, e.g.*, AR02120.) And the Administrative Record lacks any receipts for 2019.

The mysterious 2019 purchases are just some of the hundreds of BLM charges contained in its 2015-2019 Decisions. BMP lacks the space to describe every dubious charge, but the cited purchases are examples of BLM's consistent practice of only describing <u>what</u> it charged BMP, while perennially failing to describe <u>why</u> it needed to make these purchases. Absent any information about why such charges were incurred, and or even often what was purchased, the Administrative Record does not support a conclusion that the charges were "reasonable" costs.

**B.**     <u>**BLM's Labor Costs For Law Enforcement Staffing Were Unreasonable.**</u>

Law enforcement labor was by far the largest single cost item in every Decision from 2015 through 2019, comprising between 41% and 52% of the total costs charged to BMP each year. (AR00523-28; AR00713-19; AR01157-64; AR11161-84; AR11638-84.) The Burning Man Event has been taking place for nearly three decades in the NCA, and BLM should have learned lessons over this long period that allow for considerable efficiencies, even as the Event has grown in size.

(AR11747 ¶ 4; AR11940 ¶ 4.) Instead, as the Event's participant population remained mostly static from 2015 through 2019, BLM's law enforcement staffing costs continued to increase disproportionately and unreasonably. (*See, e.g.*, AR11765.)

By contrast, BLM lessened the policing and regulatory requirements on virtually every other user of public lands in that time period, from mining companies to livestock operators to off-highway vehicle enthusiasts. In its dealings with BMP, a nonprofit organization that organizes a recreational event founded on "Leave No Trace" principles, BLM increased its economic and regulatory demands. (AR11942-43.) The absurd result is that Burning Man may now be the most policed and regulated activity on BLM-managed public lands, despite far fewer impacts associated with this temporary gathering than with most other uses permitted by BLM. (*Id*.) BMP believes this disconnect principally resulted from BLM's unwillingness to rectify the unreasonable demands of its prior leadership team for the Burning Man SRP, particularly the law enforcement demands of former Special Agent Love, even after numerous investigations found Love liable for serious misconduct and BLM terminated him. (AR11866-80.)

In past Agency Appeals, BLM falsely asserted that BLM had complete "discretion to determine the nature and extent of its law enforcement operations" and that BMP sought the right to "approve of agency law enforcement practices on public lands." (*See, e.g.*, AR02888-89.) BMP has never attempted to dictate law enforcement practices at the Event. For example, BMP does not question BLM's authority to conduct "aggressive[] drug enforcement" operations pursuant to BLM General Order 33. (AR02908 ¶ 25.) BMP does, however, object to paying BLM's costs to further these "general public interest" law enforcement objectives for public lands, since they were not for BMP's "exclusive benefit." *See* 43 U.S.C. § 1734(b).

Law enforcement priorities and practices are necessarily a function of available resources.

If law enforcement resources were limitless — as BLM seems to think they are when BMP is footing the bill — then BLM could treat every general law enforcement goal as an absolute priority and staff the public lands with thousands of officers. Instead, resources are typically limited by an elected legislative body with the power of the purse and public oversight, and the agency must make compromises based on its budget and funding. (AR11975-76 ¶ 29.) BLM has acted as though no such checks apply to its administration of BMP's SRP. When it comes to the Event, BMP is BLM's purse, and BLM believes it can exploit the cost recovery regulations to make BMP pay for any law enforcement activity that BLM chooses to undertake.

As detailed below, BLM has improperly spent vast BMP resources on its efforts to make public lands "drug free," activities BLM claimed were mandated by its General Order 33. (AR02908.) Funding for serving this "general public interest" should have come from the agency's general operating budget, where it would have been subject to appropriate public scrutiny. BMP is not telling BLM to stop devoting thousands of personnel hours and other resources to "aggressive enforcement" of federal drug laws. BMP is simply asking this Court to order BLM to follow the law and stop charging BMP for "general public interest" costs that Congress deemed unreasonable under cost recovery. *See* 43 U.S.C. § 1734(b).

**1.  The Administrative Record fails to support and often outright contradicts BLM's staffing levels for law enforcement personnel.**

Despite producing Events in the same place for nearly 30 years and briefing five Agency Appeals, BMP still lacks a clear understanding of how BLM sets staffing levels for the Events. Although law enforcement staffing accounts for almost half of all BLM costs, the Administrative Record is rife with confusing and contradictory information. According to some BLM witnesses, law enforcement staffing for each Event was set based on "mandates" in Instruction Memoranda ("IM") from the national BLM OLES. (*See* AR07707; AR11614 ("The IM mandates 53

uniformed rangers to work the event."); *accord* AR02918-19 ¶ 9.) These national IMs established

the following staffing levels for law enforcement at Burning Man Events:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| IM No. | 2014-149 | 2015-133 | 2016-146 | 2018-015 | 2019-003 |
| A.R. Doc. # | 397; 412 | 65 | 133 | 246 | 406 |
| No. of law enforcement | 53 | 53 | 53 | 53 | None specified |
| Additional staffing details | 6 cage-equipped vehicles; 3 females; 6 supervisors; 10 K9 teams | 3 females; 6 supervisors; 10 K9 teams | 3 females; 6 supervisors; 10 K9 teams | 3 females; 6 supervisors; 10 K9 teams; 22 support positions | None specified |

While these national IMs contained granular detail about the number of officers, including their

gender and duties, the Administrative Record is completely devoid of information about how

BLM's national OLES determined these staffing levels.[7]

Moreover, it appears that BLM regularly disregarded the "mandates" contained in the IMs.

For example, Planning and Law Enforcement Branch Chief Logan Briscoe stated, "BLM

determined 75 law enforcement officers . . . were required . . . at the 2017 Event." (AR02918-19

¶ 9), while IM 2016-146 set law enforcement staffing for that Event at 53. By contrast, Briscoe's

successor as BLM's "lead planner for law enforcement operations" in 2018, Rebecca Andres

(AR03601 ¶ 5), claimed the Event's law enforcement staffing was determined by the local BLM

---

[7] For example, how did BLM determine that it needed 53 law enforcement officers, including three females and ten K9 units, for each Event? Why did BLM determine that it needed an additional 22 support positions starting in 2018? Were these staffing levels based on Event population, criminal activity, or numbers of service calls from previous Events? Did the IMs incorporate information from its local District Office, and if so, what? Adding to the confusion, IM 2019-003 had no staffing detail. (*See* AR11159-60.)

District Office.[8] Andres' Declaration did not even mention the so-called staffing "mandates" contained in IM 2018-015 as the basis for setting 2018 law enforcement staffing levels.

Regardless of the unexplained and unsupported national IMs, BLM cannot ignore how the explosion in its law enforcement costs coincided with the tenure of its disgraced former Special Agent in Charge. The year before Special Agent Love's arrival, BLM charged BMP $843,998 for <u>all labor</u> including law enforcement. For 2013, the year after Love assumed management over law enforcement operations, BLM charged $958,106 <u>just for law enforcement labor</u>.  (AR11765.) Except for a small decrease between 2015 and 2016, the year Love was reassigned from the Event, BLM's law enforcement staffing costs continued to explode. In 2019, law enforcement labor costs ballooned to $1,237,911 — 45.56% of all costs in the Decision. (*Id.*) BLM has never produced data to justify such a disproportionate increase in its law enforcement costs relative to the Event's population growth, nor has it documented any meaningful improvement to public safety as a result. (AR11851.)

Through 2019, BMP continued to bear the financial burden of Love's unjustified inflation of BLM's law enforcement apparatus at the Event. (*Id.*) His improper decisions have never been rectified, despite his documented misconduct and termination from BLM. (AR11865-880, 11886-96, 11918-33.)[9] In addition to direct and indirect labor costs, BMP has continued to pay for

---

[8] "The BLM planning team reevaluated reasonableness and efficiencies before determining 75 federal law enforcement officers were needed for the 2018 Burning Man Event .   .   .   . BLM determines staffing levels to ensure the four main objectives identified in the operations plan are met." (AR03601-04 ¶¶ 7, 18.)

[9] Per one BLM investigation, "BLM Law Enforcement Supervisors" accused Love of "[d]irecting [s]ubordinates to [e]rase [o]fficial [g]overnment [f]iles in order to impede the efforts of rival civilian BLM employees in preparation for the 'Burning Man' Special Event, unlawfully removing evidence, bragging about the number of OIG and internal investigations on him and indicating that he is untouchable, [and] encouraging subordinates not to cooperate with internal and OIG investigations[.]" (AR11923-24.) Collectively, the investigations found that Love committed misconduct and lacked sufficient oversight throughout the time he led BLM's law enforcement

housing, meals, vehicles, and equipment for all these unnecessary officers.

After Love was exposed as an unethical, rogue manager, BMP expected BLM to reassess and reduce the number of law enforcement officers assigned to the Event. But despite DOI's own findings of abuse by Special Agent Love, BLM claimed that a "2016 Operational Assessment recommended no change in law enforcement staffing." (AR03585.) This assessment was never provided to BMP and is not part of the Administrative Record. Instead, as explained herein, the Record shows that Love's unreasonable and improper demands related to the Event's law enforcement apparatus infected every Decision at issue in this case.

Aside from the unsupported "mandates" in national IMs, the only basis in the Administrative Record for the agency's law enforcement staffing decisions are officer-to-population ratios purportedly "recommended" by the International Association of Chiefs of Police ("IACP"). (AR02905 ¶ 14.) In fact, the IACP expressly recommends against using "[r]atios, such as officers-per-thousand population as a basis for staffing decision," noting that this would be "totally inappropriate" and such ratios have "no place in the IACP methodology." (AR12033.) Instead, the IACP advises agencies to consider "an extensive series of factors and a sizeable body of reliable, current data" that reflect a locality's unique needs. (*Id.*)[10] Even BLM's own "expert" Declarant (Rebecca Andres) conceded that IACP comparisons are inapt.[11] This admission, coupled with the fact that the law enforcement staffing levels for the 2015 through 2019 Events

---

operations the Event and that he also demanded unwarranted increases in the scale, intrusiveness, and associated costs of other operations. (*See, e.g.*, AR11921.)

[10] Underscoring BLM's failure to consider the unique needs of Burning Man, the Administrative Record lacks any acknowledgement that the Event benefits from BMP's thousands of health and safety staff, who serve as force multipliers for law enforcement. (AR11970-71 ¶ 14.)

[11] Agent Andres declared that "IACP standards are imperfect when applied to the event[,] as are traditional industry standards" and that "[t]here is no comparable environment for municipalities and enforcement models. . . ." (AR03603, ¶ 14.)

were first mandated by a disgraced former Special Agent in Charge, confirms that BLM's law enforcement staffing decisions for the Events were arbitrary, capricious, and unreasonable under any objective metric.

### 2. BLM law enforcement officers spent most of their time at the Events on "general public interest" activities like outreach and drug enforcement.

Whatever the basis for the law enforcement staffing levels set by BLM, the Administrative Record confirms that staffing was bloated and the associated costs unreasonable. The Record contains BLM-generated reports based on data from its computer-aided dispatch ("CAD") and incident management ("IMARS") systems. This annual "Statistical Summary" of "Law Enforcement Events by Type"[12] shows that BLM's most common law enforcement "events" were self-directed actions that furthered "the general public interest rather than [being] for the exclusive benefit of the applicant," in violation of 43 U.S.C. § 1734(b).

a.   Public outreach.

"Public Contact" was consistently the most common law enforcement event by far:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| No. of law enforcement events | 5,168 | 9,114 | 735 | 3,720 | 4,264 |
| No. of "public contact" events | 1,595 | 6,903 | NA | 1,218 | 1,525 |
| % public contact vs. total events | 30% | 75% | NA | 32% | 35% |

(AR12030-31.) BMP understands that BLM law enforcement officers recorded a "public contact" whenever they communicated with an Event participant, even if they were just providing directions to the porta-potties or distributing BLM logo items as gifts. (AR11969-70 ¶ 11.) BLM acknowledged that these public contacts served the "general public interest" and were not for

---

[12] BLM's 2015-2019 Statistical Summaries are compiled in AR12030-31. The Declarant notes that in 2016, BLM treated every substation interaction at its substation as a "public contact." BLM changed its recording practices after the 2016 Event.

BMP's "exclusive benefit." (*See, e.g.*, AR03620 ¶ 28 ("Per General Order 4, public contact on public land is a job duty of [BLM Law Enforcement] Rangers.").)

While BMP appreciates that BLM officers wanted to engage with BMP's Event participants, BLM was not permitted to fund its public relation "contacts" through cost recovery. BLM's self-directed public outreach was unnecessary and largely duplicative of the extensive infrastructure and support services that BMP provided through its thousands of personnel. (AR11749-50 ¶¶ 11-13.) And the fact that BLM law enforcement could devote so much time to public relations outreach proves that BLM overstaffed the Event. BLM was welcome to engage in public outreach to Event participants at its own expense. It was unreasonable and an abuse of discretion, however, for BLM to charge BMP for the costs of fulfilling its "General Order 4."

   b.   <u>Traffic stops for drug enforcement.</u>

"Traffic stop" was consistently the second or third most common law enforcement event:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| No. of law enforcement events | 5,168 | 9,114 | 735 | 3,720 | 4,264 |
| No. of "traffic stop" events | 899 | 1,254 | N/A | 783 | 1,072 |
| No. of motor vehicle citations | 137 | 145 | 115 | 109 | 125 |
| % traffic stop events vs. total events | 17% | 13% | - | 21% | 25% |
| % public contact plus traffic stop events vs. total events | 48% | 89% | - | 53% | 60% |

(AR12030-31.) BMP understands the vast majority of BLM's "traffic stops" occurred near and on "Gate Road," which is not a federal, state, or county road, but a temporary path of ingress and egress on the playa surface that BMP creates for its private Events. (AR11755 ¶ 31.) BMP sets the speed limit on Gate Road at 10 miles per hour, and accidents of any kind are extraordinarily rare, with collisions and injury-causing accidents even less common. (*Id.*)

Plaintiffs' Motion for Summary Judgment          26

Yet BLM has devoted substantial law enforcement resources to conducting an average of 1,000 "traffic stops" every year. Despite the massive number of stops, BLM issued only a small number of motor vehicle-related citations, primarily for minor violations of the Closure Order, like a missing tail-light or registration or slightly exceeding BMP's speed limit. (AR12030-31.) Given the overwhelmingly safe conditions on Gate Road, it was unreasonable for BLM to devote such extensive resources to traffic stops in that area, all at BMP's expense.

BLM has acknowledged that the real purpose for these "traffic stops," especially against vehicles entering the Event, was that BLM conducted massive drug enforcement operations on Gate Road each year. BLM admitted in past Agency Appeals that the extensive motor vehicle stops were a means to enforce drug possession laws, which BLM purportedly considers a general law enforcement priority. (AR03605-06 ¶ 23; AR02908 ¶ 24.) Once a vehicle was stopped for a minor or manufactured traffic infraction, BLM deployed a K9 team to search the vehicle and its passengers for illicit drugs. (*See* AR11742-43 ¶ 6.)

BLM has claimed the expense of multiple K9 teams was necessary for public safety, alleging that "[r]emoving [controlled] substances before they enter the [Event] help[ed] reduce the potential for harm to members of the visiting public and employees," so "BLM law enforcement conducted a traffic stop on [an] average of less than 5% of the vehicles entering the [Event]." (AR03605-06 ¶¶ 22-23.) This argument fails to justify BLM's traffic-stop practices. While removing illegal drugs from society can certainly reduce the "potential for harm," no law enforcement agency in the country stops one of every 20 vehicles entering its jurisdiction to detect evidence of "ordinary criminal wrongdoing" like drug possession. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 41-42 (2000) (finding that warrantless searches at police checkpoints for this purpose are unconstitutional). Not only would blanket warrantless searches of this nature be

illegal, the costs would be staggering.

Similarly, extensive and indiscriminate vehicle searches by federal law enforcement do not occur at the entrances to national parks or any other public lands managed by any agency of the U.S. government. Among other BLM-permitted activities, no other permittee is forced to pay the costs for extensive use of K9 units to fund a general drug prevention goal. (AR11942 ¶ 8.) This is because the primary responsibilities of BLM's law enforcement program are to provide visitor assistance and to protect sensitive natural and cultural resources, in the officers' capacity as land managers more than law enforcers. (AR11942-43 ¶ 9; AR11946-51.)

Despite the enormous amount of resources spent on K9-assisted traffic stops, BLM's Statistical Summaries reflected relatively few citations for "possession of a controlled substance" and no arrests from 2015 through 2019:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|------|
| No. of drug possession citations | 116 | 82 | 181 | 86 | 130 |
| No. of drug-related arrests | 0 | 0 | 0 | 0 | 0 |

(AR12030-31.) Further evidence of the unreasonableness of charging BMP for these costs is found in the prosecution results from BLM drug enforcement activity at the Event, which have remained remarkably consistent. Since the 2010 Event, every participant challenging a drug-related BLM citation has had the drug offense dismissed. (AR11742 ¶¶ 4, 5.) In every negotiated case, the citation was dismissed or the defendant was allowed to plead guilty to a minor motor vehicle infraction or a general Closure Order violation. (*Id*.) BMP understands that the outcome of BLM's extensive drug enforcement efforts from 2015 through 2019 was essentially the same as in each of the several preceding years: BLM agreed to dismiss the drug-related charges for all Burning Man participants who negotiated their BLM citations. (*Id*.) BMP believes that the only

drug possession convictions BLM obtained were from participants who plead guilty to an infraction and paid a $500 base fine. (*Id.*)

The Administrative Record in this case demonstrates that BLM spent massive resources on aggressive drug enforcement activities under the guise of "public safety" in furtherance of BLM's General Order 33 mandate to keep the public lands "drug-free."  In past Agency Appeals, BLM has disingenuously mischaracterized BMP's critique of the agency's over-policing as an effort to "direct BLM's law enforcement activities on public lands." (*See* AR03586.) Of course, BMP has never told BLM how to police the public lands. Instead, BMP is showing the Court what BLM law enforcement actually did at the Events (mostly public outreach and drug enforcement) and noting that, per BLM, such law enforcement activities served the "general public interest" with no "exclusive benefit" to BMP. As such, the bulk of BLM's law enforcement labor costs were not "reasonable" costs under 43 U.S.C. § 1734(b).

### 3. BLM law enforcement responded to only a tiny number of calls for service.

BLM's Statistical Summaries show that its officers spent the bulk of their time at the Events on self-directed activities for the general public interest. Its CAD data show how little time they spent responding to calls based on community need for law enforcement services:

| Year | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| Total dispatch events | 8,763[13] | 2,374 | 2,510 | 3,120 |
| Dispatch events for community need | 114 | 147 | 173 | 136 |
| % of dispatch events based on community need | 1.30% | 6.19% | 6.89% | 4.36% |

(ER00001-166.)[14]

---

[13] As noted above, after 2016, BLM stopped recording every interaction at its law enforcement substation as a "public contact" and a dispatch event, which explains the variance in 2016 data.
[14] CAD system reports are compiled at each event by a third-party contractor and available to BMP and to BLM. BMP contends this information is relevant and addresses BLM's law enforcement

Service calls based on law enforcement needs from the Event community made up a tiny fraction of the total events recorded in BLM's dispatch system. The CAD data starkly illustrate how few calls for service BLM law enforcement fielded from BMP or its Event participants. In 2019, for example, BLM fielded 136 calls where someone requested help or something happened that required a law enforcement response during BLM's nine-day enforcement period. This equates to 15.1 such service calls per 24-hour period. (*Id.*) Despite receiving only about one service call every two hours from the Event community, BLM deployed 18 patrol law enforcement officers per shift. (AR03317.) One of those shifts was a "swing shift," which overlapped the day and night shifts for 13 hours a day. (AR03603 ¶ 15.) Thus, BLM staffed the Event with 36 patrol officers for over half the time, and with 18 patrol officers for the rest of the time. (These figures do not include BLM command staff and the 20 total additional officers typically deployed by the local sheriff's office. (AR03602 ¶¶ 10-11.)) BLM's use of so many patrol officers at the 2019 Event was objectively unreasonable, as the community law enforcement need in 2019, as in prior years, resulted in just one service call every two hours or so.

BLM's CAD data prove that it could have assigned substantially fewer law enforcement officers with no compromise to public safety at the Events, and BMP therefore overpaid for thousands of hours of unnecessary labor and associated supplies, equipment, and support services every year. (AR11974-75 ¶¶ 25-27; AR11940 ¶ 4.) As the Administrative Record fails to support the scale of BLM's law enforcement apparatus, BMP is entitled to a refund of the costs paid for any officers deployed in excess of the Event's reasonable public safety needs.

---

activities at individual Events. Defendants contend the CAD reports are not part of the Administrative Record because BLM did not directly or indirectly consider them in making any of the cost-recovery decisions that BMP challenges in this litigation. The Parties have agreed that BMP may cite the CAD reports as extra-record material. For 2015, BLM used a separate dispatch system, and this CAD data is not in the Administrative Record or extra-record material.

### 4. BLM law enforcement personnel sat idle over two-thirds of the time.

As discussed above, BLM's CAD data confirm that BLM spent substantial law enforcement resources serving its "general public interest" law enforcement goals, while responding to about one service call every two hours based on community need. The CAD data also reveal a startling fact about BLM law enforcement patrol officers: every year, they spend the vast majority of their time on duty sitting idle and waiting for a service call. This is the conclusion of former Nevada Highway Patrol Lieutenant Roger Vind, who managed traffic enforcement for his agency during the Event ingress and egress periods from 2003 to 2005 and from 2007 to 2010. (*See* AR11534 ¶ 3.) Lieutenant Vind reviewed BLM's 2016 and 2017 CAD data and After Action Reviews and concluded that BLM officers spent about two-thirds of their overall on-duty time in an "available" status. (AR11541 ¶ 23.)

After BMP challenged the idleness of BLMs officers in the 2017 Agency Appeal, BLM deleted the "available" status category from its CAD system in 2018. (*Id.* ¶ 24). Instead of decreasing staffing to comport with the Event's actual law enforcement needs, BLM simply changed the optics. In place of "available," BLM created a new category of "engaged." (*Id.*) The CAD data for 2018 and 2019 reported that patrol officers were now "engaged" while they sat waiting for a call. BLM's change in nomenclature could not, however, mask the fact that its law enforcement officers were still only responding to service calls about one-third of the time in 2018. Within the "engaged" status category, Lieutenant Vind examined the number of hours BLM law enforcement reported being "on scene" at a service call. Based on the number of "on scene" hours, Lieutenant Vind confirmed that in 2018, BLM officers again spent roughly one-third of their time on service calls and two-thirds of their time idle. (AR11542 ¶ 25.) In 2019, Lieutenant Vind again analyzed BLM's CAD data and reached the same conclusions. Whether reported as "available" in 2016 and 2017 or "engaged" in 2018 and 2019, the data showed BLM law

enforcement officers spent over two-thirds of their time idle. (AR11541 ¶ 23.) In fact, the number of hours BLM law enforcement officers spent "on scene" at service calls actually declined in 2019. (AR11542 ¶ 25.)

According to Lieutenant Vind, the nationally recognized best-practice standard for law enforcement agency staffing is the opposite of BLM's Event practices: law enforcement agencies are efficiently staffed when 25% to 30% of their officers are waiting for service calls, and 70% to 75% of officers are responding to service calls. (*Id.* ¶¶ 26-27.) In prior Agency Appeals, BLM never refuted Lieutenant's Vind's analysis and conclusions.[15] Again, BLM's CAD data provide objective evidence that BLM law enforcement staffing was inefficient, excessive and unreasonable, in violation of 43 U.S.C. § 1734(b).

### 5. BLM unreasonably charged BMP for senior-level law enforcement "investigators" and a "sexual assault unit" who worked for the local sheriff.

Further glaring examples of law enforcement costs that BLM unreasonably foisted on BMP were the costs associated with the following "investigators" who, per BLM's labor log, "work[ed] for Pershing County Sheriffs [sic] to assist in investigations of state [law] violations":

| Year | 2018 | 2019 |
|------|------|------|
| Personnel | Allen, Duhresen, Hauk, Huegerich, Knisley, Wilson | Gentzel, Hauck, Hawkins, Hill, Swanson, Torres |
| Recorded hours | 949 | 767.25 |
| Labor costs (excl. lodging, meals, equipment) | $107,421 | $82,366 |

---

[15] BLM's law enforcement witness, Rebecca Andres, acknowledged that "BLM officers were not engaged in active calls 70% of the time" but claimed this fact was "misleading" because officers were allotted time for "report writing, evidence processing, travel … and meal breaks within their tours of duty." (*See* AR03607 ¶ 30.) BLM's critique is misplaced. All law enforcement officers everywhere spend on-duty time performing administrative tasks and taking breaks. Even with "report writing," "evidence processing" and "meal breaks," industry standards still dictate that at least 70% of an officer's shift should be spent on service calls. (*See* AR11973-74 ¶ 24.)

| Travel costs | $3,728 | $4,279 |
|---|---|---|

(AR11410-15; AR11794-801.) Each BLM "investigator" held the rank of "Special Agent" or "Special Agent in Charge," making their pay among the highest of all BLM law enforcement.

In 2019, BLM also charged BMP for a "medical unit" organized by the local sheriff's office to assist Event participants who reported a sexual assault. Although the medical unit personnel were hired and managed by the local sheriff and assisted exclusively with alleged violations of state law, BLM charged BMP $40,737 for this work. Robert Abbey, a former BLM National Director and former Nevada State Director who oversaw the Burning Man SRP for seven years, has affirmed that "it is not typical for the BLM to use the cost recovery process to provide law enforcement investigators to another agency or to force an SRP applicant to pay for the cost of a state agency's medical personnel." (AR11941 ¶ 6.) Over his long career in BLM leadership, Abbey is aware of no other instance where BLM charged an SRP applicant for the cost of augmenting staffing by a state agency to address state law matters. (*Id.*)

Moreover, BMP has a separate, 10-year funding agreement with Pershing County, Nevada, which established a formula for calculating the "maximum payment" to the County "for all services of any kind supplied by the County or an of its officers, employees or contractors in connection with the Event, whether directly or indirectly." (AR11857 ¶ 30.)[16] BLM's own labor summaries acknowledged that the work of federal "investigators" had nothing to do with permit

---

[16] BLM's internal memorandum dated May 25, 2018, acknowledged that its investigators' scheme was a deliberate attempt to circumvent BMP's agreement with Pershing County. According to Field Manager Hall, "the new sheriff was hamstrung by an inability to contract enough officers for the event due to . . . a settlement agreement with [BMP] in 2013 setting the reimbursable limit for the county in costs associated with the event." (AR08588.) Manager Hall's speculation that Pershing County was "hamstrung" and lacked "enough" officers evidenced an improper bias against BMP and an improper intent to meddle in Pershing County's relationship with BMP, which is outside BLM's jurisdiction.

administration, public land administration, or enforcement of federal law. Likewise, the local sheriff's medical unit had nothing to do with federal law and circumvented BMP's negotiated agreement with Pershing County. Since BLM has not shown and cannot show that any of these costs were reasonably incurred in connection with its administration of the Burning Man SRPs, BMP requests a refund of all costs related to BLM's improper attempts to augment Pershing County's staffing in contravention of BMP's agreement with the County.

### 6. BLM unreasonably charged BMP for internal investigations of its officers.

BMP objects to paying BLM's costs related to Office of Professional Responsibility ("OPR") personnel who performed internal affairs oversight of BLM law enforcement assigned to the Events. Assigned OPR officers and the associated costs charged to BMP were as follows:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Personnel | None assigned | Huegerich | Huegerich | Van Airsdale | Hone, Stevens |
| Hours | - | 70 | 162 | 143 | 148 |
| Labor costs (excl. lodging, meals, equipment) | - | $8,905 | $18,892 | $18,484 | $14,699 |
| Travel costs | - | $260 | $1,061 | $442 | $299 |

(AR00523-28, AR00713-19, AR011557-64, AR11161-84, AR11638-84.) According to BLM's labor summaries, OPR personnel held the senior rank of "Special Agent" and served as "event on-site Internal Affairs component[s] and Use of Force reports reviewer[s]." BMP understands that BLM OPR personnel conducted onsite internal affairs investigations and liability assessments related to alleged misconduct against BLM law enforcement personnel, including allegations of improper use of force. (AR11971 ¶ 15.)

It was unreasonable for BLM to charge BMP for costs related to the internal management and investigation of BLM law enforcement personnel who were accused of wrongdoing or to the

agency's work in anticipation of potential third-party liability claims. Managing potential misconduct claims against BLM law enforcement officers was not a cost for the "exclusive benefit" of BMP as required by 43 U.S.C. § 1734(b), nor was this activity related to permit issuance or enforcement under 43 CFR § 2932.31(e). Furthermore, such oversight constituted "management overhead," the costs of which are expressly excluded from the cost recovery regulations. *See* 43 U.S.C § 1734(b). Therefore, BLM abused its discretion by charging BMP for the costs incurred by BLM's national OPR.

### 7. BLM unreasonably charged BMP for its law enforcement "substation."

Yet another unreasonable demand made by Special Agent Love was that BMP pay for a law enforcement "substation" manned by BLM officers near the center of the Event. (AR11858 ¶ 32.) BMP has been forced to bear these costs, without adequate justification, every year since 2013. (*Id*.) BMP understands that BLM staffed this substation with at least one law enforcement officer at all times during each Event and that BLM officers spent their time at the substation engaging with the public in an outreach capacity. (AR11970 ¶ 12; AR03609 ¶ 38.)[17] BLM has never shown that these activities led to any improvement in public safety at an Event or that their costs were reasonably incurred in connection with BMP's permit. (AR11970 ¶ 12.)

Any Event participants needing law enforcement services could easily reach one of the dozens of BLM officers and sheriff deputies, or one of the hundreds of BMP Black Rock Rangers and other health and safety staff patrolling the Event with radios. (*See, e.g.*, AR11749-50 ¶¶ 12-13.) The substation served BLM's general outreach objectives and was therefore not a reasonable cost that could be charged back to BMP. (*See* AR03620 ¶ 28 ("Per General Order 4, public contact

---

[17] In past Agency Appeals, BLM claimed that the substation provided "participant access to law enforcement and allow[ed] for more efficient reporting with a secondary function of community interaction" like "looking for directions" and "engaging with the visiting public as part integration with the community." (AR03609 ¶ 38.)

on public land is a job duty of [Law Enforcement] Rangers.").)

**G.    BLM Improperly Charged BMP Premium Pay Rates Based On Unsupported "Emergency" And "Mission-Critical Work" Designations.**

As first mandated by Special Agent Love, BLM designated the Event as an "emergency" under federal labor regulations every year from 2012 to 2016 so that BLM personnel could receive additional "premium pay." (AR00083.) After BMP objected to the designation in its first two Agency Appeals, noting that a meticulously planned event occurring every year for decades was clearly not an "emergency" under the statute, BLM changed tactics. Starting in 2017, BLM replaced the "emergency" designation with a "mission-critical work" designation that also allowed BLM personnel to receive extra pay. (AR01457.) As the Administrative Record contains no documentation of the rationale for either designation, BMP submits that both were improper attempts to enrich BLM personnel at BMP's expense.

In further violation of cost recovery regulations, BLM's national OLES created a "Burning Man exception" for the payment of law enforcement officers assigned to national details. For every national detail except Burning Man, the assigned officer's home District paid the officer's base pay, while the District office that received the assigned officer's services paid the officer's premium pay. With no justification, BLM created a unique and arbitrary rule that relieved the officer's home District from having to pay its employee's base pay and transferred that burden to BMP.[18] This created an incentive for Districts nationwide to send their law enforcement officers to Burning Man so the District could enjoy a two-week payroll holiday for these officers. This local payroll holiday likely explains, in part, the excessive law enforcement staffing at Events.

---

[18] According to the relevant instruction memoranda, "The [Law Enforcement Officer ("LEO")]'s home office is responsible for paying the detailed LEO's base labor charges for up to 14 days of National or State/Local Detail support per year. The receiving office will pay premium pay, mileage and per diem for the detailed LEO. The one exception is the Burning Man Event where all labor is paid by the permittee." (AR08763-4; AR04352-53; AR07705-6; AR11160.)

Nothing in the Administrative Record provides a reasoned explanation for this exception and the corresponding financial burden on BMP.

When BMP challenged the premium pay designations in the Agency Appeals, BLM claimed, with no supporting evidence, that it could not staff the Events with employees at their regular rates of pay and "was required to assign officers" to work at Events "because there were insufficient volunteers."[19] BLM failed to explain how having "insufficient volunteers" was a basis for a "mission-critical" work designation, as BLM law enforcement is not a volunteer force.[20] BLM also made the straw-man argument that "without the designation lifting the pay cap, some BLM employees working at the Event would be compensated at less than their normal pay rate, which would not be fair or reasonable." (AR03582.) BMP has never argued that any BLM employee deserves less than "normal pay," and nothing in the Administrative Record explains how that could even occur. As discussed above, BLM law enforcement staffing was bloated every year with officers who overwhelmingly engaged in self-directed "general public interest" activities or were improperly loaned to local law enforcement. Assuming *arguendo* that BLM had difficulty staffing the Event despite the payroll holiday enjoyed by the local Districts, BLM could have shed its self-imposed personnel excesses.

Separate from whether BLM's premium pay designations are supported by the Administrative Record, BLM has never quantified their cost. In its 2018 Answer, BLM asserted that "this designation only applied to 25 of the 75 assigned law enforcement positions at the 2018

---

[19] AR03581; *see also* AR02882 (paying staff at regular rates "would make it difficult for the BLM to fully staff the [E]vent").

[20] BLM also noted that it has elected to accommodate "religious or moral" objections from local Winnemucca employees who were "reluctant to work the event," so a "mission critical" designation facilitates the District's access to employees from other districts. (*See* AR03617 ¶ 9.) This statement confirms the designation had nothing to do with need, and everything to do with BLM's arbitrary decision-making about who and how many personnel it assigns to the Event.

event." (AR03581) BMP could not verify that statement, however, as BLM failed to explain which law enforcement officers received extra pay or how much each officer received. The Administrative Record in this case fails to justify BLM's decision to charge BMP for this additional "premium pay," and all such costs should be refunded to BMP.

**H.**   **BLM's Massive IT-Related Expenditures Far Exceeded What Was Reasonable.**

Another improper legacy cost from the tenure of former Special Agent Love is a bloated technology program that primarily supports BLM law enforcement at the Events and has grown more expensive every year. From 2015 through 2019, BLM demanded equipment, services, and staffing that greatly exceeded the reasonable needs of its on-site operations.

**1.**   **BLM personnel spent excessive hours on technology and logistical services.**

Every year, BLM employed an extensive technology team in connection with the Event, comprising eight to more than a dozen individuals. According to BLM's 2015-2019 labor summaries, those individuals and their related costs charged to BMP were as follows:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|------|
| Personnel | Black Carter Grimes Harness Iaguilli Nichols Schwirian Young | Black Carter Grimes Harris Iagulli King Long Nicols Schetzle Schwirian Weaver Wisemore Young | Black, Carter, Grimes Iagulli King Nichols Schwirian Weaver D. Young J. Young | Carter Dahl Grimes Iagulli J. Young King Lannen-Littlefield Nichols Rich Schwirian Suminski Weaver Wisemore | Allen Carter Grimes Iagulli King Lannen-Littlefield Nichols Northrup Pincus Schwirian Weaver Wisemore |
| Hours | 2,606 | 3,128 | 3,115 | 3,370 | 3,010 |
| Labor costs (excl. lodging, meals, | $207,943 | $246,111 | $240,299 | $278,003 | $224,680 |

| equipment) | | | | | |
|---|---|---|---|---|---|
| Travel costs | $6,923 | $13,461 | $12,186 | $9,895 | $7,821 |

(AR00523-28, AR00713-19, AR011557-64, AR11161-84, AR11638-84)

The labor summaries provided scant detail regarding what any of these employees did, with descriptions of work consisting of no more than a few words. Absent sufficient information about their work, BMP cannot assess whether the costs were reasonable. There is simply no evidence in the Administrative Record that BLM's 16-day on-site operation required several thousand dedicated personnel hours each year.[21] BMP understands that BLM required some personnel to provide radios, dispatch services, internet service, and IT equipment and security for its operations at the Event. But the fact that these services may be generally needed does not mean BLM can assign an unlimited number of personnel to log an unlimited number of hours in providing them, including senior staff like Jon Young who are paid at the highest rates.

## 2. BLM continued to charge BMP for unneeded equipment and dispatchers.

BLM does not have discretion to require that a permittee purchase new equipment simply because agency employees want the latest gadgets or because the agency prefers not to spend its own money on the equipment it uses for everyday operations. (AR11943-44 ¶ 11.) As former BLM National Director Abbey explained, requests to purchase new equipment or implement new technology in connection with an SRP should be negotiated with the permittee, who should have a substantial role in assessing whether these added costs were likely to measurably improve public

---

[21] The Administrative Record indicates that communication costs are another BLM double standard for Burning Man Events. According to the Instruction Memoranda for national law enforcement details described in Section IV.B.1. *infra.*, at the four national details overseeing recreation events at the Imperial Sand Dunes, "LEOs must bring a portable radio." (AR07703 n.1; AR07707 n.1.). This shows that for events attended by twice as many people who engaged in much more dangerous activities (dune buggy racing), BLM made due with far less communication infrastructure (and officers) than it claimed to need for Burning Man Events.

safety or enjoyment, or the protection of the public lands. (*Id.*) This was especially true for the 2015-2019 Burning Man SRPs, as the Event experienced little population growth over these five years and should not have required extensive annual technology upgrades. (*Id.*; *see also* AR11765.) As explained below, many of BLM's contracting decisions were unsupported by the Administrative Record and improper for cost recovery.

> a.      BLM contracts for satellite tracking were unreasonable.

During the contentious negotiations over the 2013 Burning Man SRP, Special Agent Love demanded that BMP purchase, at a cost of $72,000, a slew of satellite tracking devices so that BLM could identify the precise location of law enforcement within the Event site at any time. (AR11857 ¶ 31.) For the 2015-2019 Events, BLM entered into annual service contracts with Alvarez & Associates (2015 and 2016) and Stroman Enterprises (2017 through 2019) to support these devices, at a cost to BMP of over $266,000 over five years, excluding the indirect cost rate. (AR11971-72 ¶ 18.) The Administrative Record contains no support for these charges. All law enforcement officers at the Event carried radios for communication and dispatch purposes, and they often worked in pairs that enabled one officer to radio a location if their partner was otherwise engaged. (AR11972 ¶ 19.) The mere fact that BLM has employed satellite tracking at the last few Events does not confirm the reasonableness of this expense. BMP contends that Love only deemed these devices "necessary" in the first place because he could order BMP to pay for them, and BLM has presented no evidence to the contrary.

> b.      BLM's "network services" contracts were rife with unnecessary components.

Since at least 2015, BLM has contracted for network services that cost BMP more than $100,000 each year. (*See, e.g.*, AR01165.) BLM has failed to provide any explanation for

requiring such extensive services at the Event.[22] Many components of these contracts were unnecessary and not even used by BLM. For example, BLM failed to justify the expense of an HD camera, dedicated computer workstation, large LCD display monitors, and extensive networking equipment for its public outreach substation. (AR11755-56 ¶ 32; AR11813-27.) Given that the substation was staffed around the clock with at least one BLM officer (*see* AR03609 ¶ 38), and the Event was patrolled by dozens of officers — all with radios if they needed to report information or request personnel — BLM's insistence on this lavish monitoring technology was unreasonable. BLM has admitted the substation camera was often obscured by dust (AR11972 ¶ 20), and BMP understands that it was not regularly monitored and has never proven useful for any purpose. (*Id*.) BLM would not have required such redundant and costly technology if it were spending its own money instead of BMP's. (AR11943-44 ¶ 11.)

BLM also has demonstrated no need for the array of fancy IP cameras and huge monitors that it obtained for viewing the temporary holding facility within its command compound and which was used exclusively by the local Sheriff since BLM did not arrest anyone at any Event at issue. (AR11975 ¶ 27.) Likewise, the Administrative Record fails to explain BLM's purported need for internet phone service for 200 devices and 20 separate voice-over IP lines. (*See, e.g.*, AR11813-27.) BLM has made no showing that such extensive communications infrastructure for so many devices and lines was a reasonable expense, especially when its personnel already have

---

[22] According to the statement of work for this contract in 2019, BLM required, among other items, (i) a Wi-Fi network "capable of simultaneously supporting a minimum of 200 devices; (ii) "augmented Verizon LTE cell service at BLM JOC . . . capable of 40 simultaneous cellular telephone calls"; (iii) "Verizon LTE augmentation at the law enforcement substation . . . capable of at least 5 simultaneous calls"; (iv) "Pan Tilt Zoom IP camera at the Law Enforcement substation near center camp"; (v) "a minimum of six (6) IP Cameras in the jail and two (2) cameras outside the jail at the BLM JOC; and (vi) "a minimum of 20 VOIP telephone circuits or independent phone lines." (AR11755-56 ¶ 32; AR11813-27.)

both radios and cell phones. (AR11972 ¶ 19.)

> c.  BLM charged BMP for excessive dispatch personnel and supplies.

For the 2015-2019 Events, BLM contracted with a vendor to provide dispatch personnel and equipment that were unnecessary and unreasonable. For example, in 2018 and 2019, BLM entered into a dispatcher contract at an annual cost of $199,870 plus the indirect cost rate. (AR02765; AR03655.) While BMP understands that BLM required some dispatch personnel, the Administrative Record does not support BLM's decision to hire so many dispatchers. According to BLM's 2019 After Action Review, BLM hired 17 personnel working shifts such that five dispatchers and one manager were on duty at all times. (AR03674.) Those staffing levels were objectively unreasonable. It was arbitrary and capricious for BLM to charge BMP for six dispatch personnel to be on duty at all times when BLM's CAD data shows that BLM handled about one service call every two hours from the community. (AR11974-75 ¶ 26.) In addition, in 2019 alone, BLM unreasonably charged BMP nearly $10,000 for "Communication Supplies" without explaining what items were purchased or why. (AR03661.)

## I.  BLM's Superfluous Medical Unit For Its Personnel Was Not A Reasonable Cost.

Yet another legacy cost of disgraced former Special Agent Love has been a redundant and unnecessary BLM medical unit for the exclusive use of on-site government personnel. The costs of BLM's private medical unit charged to BMP from 2015 through 2019 were as follows:

| Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Personnel | Marsoobian, Templeton | Templeton | Templeton, Hone | Templeton, Hone | Curry, Templeton |
| Hours | 396 | 217 | 349 | 346 | 351 |
| Labor costs (excl. lodging, meals, equipment) | $37,803 | $23,370 | $39,679 | $41,353 | $41,452 |

| Travel costs | $1,550 | $612 | $600 | $447 | $822 |

(AR00523-28, AR00713-19, AR011557-64, AR11161-84, AR11638-84.) As with other roles, BLM unreasonably staffed its medical unit with its highest-cost personnel, including senior Special Agents and even an Assistant Special Agent in Charge (Templeton).

The Administrative Record does not explain why the medical unit was deemed necessary given the comprehensive medical services that BMP provided for everyone at the Event. These included a state of the art, licensed emergency care facility, emergency transportation, several first-aid stations, and a communications system — all fully equipped to handle the historic and reasonably anticipated medical needs of tens of thousands of Event participants and staff, plus the government personnel on site. (AR11756 ¶ 34.) Each year, BMP also contracted with a specialized provider to provide advanced life support ("ALS") services, including board-certified emergency physician care and an extensive array of medical services ranging from X-ray and sonography to a comprehensive pharmacy formulary and an onsite fixed-wing air ambulance. (*Id*.) BMP also deployed a vast number of response and transport vehicles, including ALS-capable ambulances and quick response vehicles, and engaged hundreds of licensed medical professionals to provide care at first-aid stations throughout the Event site. (*Id*.)

Without justification, BLM charged BMP hundreds of thousands of dollars over five years for senior personnel to provide basic medical care exclusively to agency staff, duplicating the services already available onsite.[23] BLM's medical unit has been an unreasonable expense since

---

[23] For example, BLM's 2019 AAR stated only that its medical unit "provided medical care for federal employees working the event." (AR03678.) Its 2017 AAR stated, "Medical assistance included sinus infection, gastrointestinal illness, heat mitigation for humans and K9s, one case of officer exposure to controlled substance and prescription medication administered." (AR07165.) And its 2015 AAR acknowledged, "An overwhelming majority of those patients were seen for routine medical care such as eye wash, minor wound care, over the counter pain relief, and other over the counter medicine." (AR00334.)

Love first demanded it, and all associated costs should be refunded to BMP.

**J.      BLM Unreasonably Charged BMP For Costs Associated With Third-Party SRPs.**

For the 2015-2019 Events, BMP obtained an annual SRP as required by 43 C.F.R. § 2932.11 and paid BLM 3% of its Event-related gross revenue for its commercial use of federal land. (AR11850 ¶ 3.) BLM also required each of the dozens of third-party vendors that supplied goods and services exclusively to Event attendees (not to BMP) to obtain separate, individual SRPs and pay their associated commercial use fees to BLM. (AR11858 ¶ 33.)

With no justification, BLM charged BMP for the costs associated with administering and enforcing BLM's SRP requirements on these third-party vendors. Each year, BLM assigned two to five personnel to engage in "Vending Compliance" or "Event GIS Compliance," with their work described to include "assist[ing] with . . . vending monitoring teams":

| Year | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Personnel | Jones, Marquez | Freiberg, Matthews, McKinnon | Kurtz, McKinny, Rorex, Sears | Cadigan, Freiberg, McKinnon, Rorex, Welty | Amar, Cadigan, Gates, Rorex, Welty |
| Hours | 278 | 524 | 1,334 | 1,221 | 1,264 |
| Labor cost (excl. lodging, meals, equipment) | $17,431 | $38,061 | $87,318 | $82,882 | $83,625 |
| Travel costs | $529 | $204 | $747 | $933 | $1,993 |

(AR00523-28, AR00713-19, AR011557-64, AR11161-84, AR11638-84,) BLM improperly charged BMP for the costs of monitoring these third parties' compliance with their separate SRPs. While BLM may charge a permittee for the reasonable costs associated with <u>its own permit</u>, nothing in the regulations allows BLM to charge one permittee for the costs of administering permits to <u>separate parties</u>. 43 C.F.R. § 2932.31(e)(2)-(3). (*See also* AR11860.) BLM collected

hundreds of thousands of dollars in commercial use fees from these third-party permittees each year. (AR11858 ¶ 33.) The revenues generated from these third-party SRPs should have been to cover BLM's costs for administering them, or BLM should have sought cost recovery from those permittees. Charging BMP to administer these third-party permits, just because BMP had an open cost recovery account with BLM, was a clear abuse of discretion.

## V.    CONCLUSION

BMP has met its burden under Rule 56 and established that BLM's Administrative Record does not contain reasoned explanations for its 2015-2019 cost recovery Decisions. As a result, BMP requests that the Court remand the Decisions and order BLM to provide BMP with the explanations to which it is entitled. In addition, BMP has established that certain costs, regardless of further explanation, were unreasonable and not recoverable under 43 U.S.C. § 1734(b). BLM's decisions to charge BMP for unreasonable costs were arbitrary, capricious and contrary to law. Therefore, pursuant to 43 U.S.C. § 1734(c), BMP seeks a refund of:

- All costs associated with BLM law enforcement personnel who were not reasonably necessary for the administration of BMP's permit, whose work served "the general public interest" rather than being for BMP's "exclusive benefit," who were assigned to support the local sheriff with state law matters, and/or who provided "internal affairs" services;

- All costs associated with BLM's law enforcement substation;

- All costs due to the erroneous "emergency" and "mission critical" designations;

- All costs related to BLM's unnecessary technology equipment and personnel;

- All costs related to BLM's duplicative medical unit; and

- All costs associated with BLM monitoring the SRP compliance of third parties.

Respectfully submitted this 19th day of February, 2021.

HOLLAND & KNIGHT LLP

By:  ___/s/ Rafe Petersen

Rafe Petersen (Bar ID Number: 465542)
Nicholas W. Targ
Alexandra E. Dobles
800 17th Street NW, #1100
Washington, D.C. 2006
(202) 419-2481

David S. Levin (CA Bar No. 156336)
(admitted *pro hac vice*)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
(650) 858-8500

*Attorneys for Plaintiffs Black Rock City LLC and
Burning Man Project*