## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BLACK ROCK CITY LLC, and BURNING MAN PROJECT, )<br><br>Plaintiffs, )<br><br>v. )<br><br>DEBRA HAALAND, SECRETARY OF THE INTERIOR, *et al.*, )<br><br>Defendants. ) | Civil Action No. 19-cv-03729-DLF |

### DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants Debra Haaland, in her official capacity as Secretary of the Interior, *et al.*, hereby move this Court under Rule 56 of the Federal Rules of Civil Procedure, and for the reasons stated in Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment filed herewith, to grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

DATE: April 9, 2021

Respectfully submitted,

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

 /s/ Paul A. Turcke
PAUL A. TURCKE, Trial Attorney
Natural Resources Section
P.O. Box 7611, Washington, D.C. 20044
Telephone: 202-353-1389
E-mail: paul.turcke@usdoj.gov

*Counsel for Defendants*

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

PAUL A. TURCKE
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
(202) 353-1389
paul.turcke@usdoj.gov

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ) | |
| BLACK ROCK CITY LLC, and ) | |
| BURNING MAN PROJECT, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 19-cv-03729-DLF |
| ) | |
| DEBRA HAALAND, ) | |
| SECRETARY OF THE INTERIOR *et al*., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ..................................................................................................... 3

      A.      The Burning Man Event.................................................................................. 3

      B.      Special Recreation Permit Cost Recovery .................................................... 6

      C.      Cost Recovery Decisions 2015-2019.............................................................. 9

            1.      The 2015 Event .................................................................................. 10

            2.      The 2016 Event .................................................................................. 12

            3.      Subsequent Event Years 2017, 2018 and 2019............................... 14

      D.      District Court Proceedings ........................................................................... 17

III.    LEGAL STANDARDS ......................................................................................... 17

IV.     ARGUMENT ......................................................................................................... 19

      A.      Plaintiffs Misapprehend the Timing and Nature of Cost Recovery
            Decisions........................................................................................................ 19

            1.      Plaintiffs Fail to Target Discrete Final Agency Action. ......................... 20

            2.      The Substantial Evidence Standard Governs Judicial Review. ............... 24

      B.      BLM Appropriately Presented its Costs. .................................................... 29

      C.      BLM's Discretionary Choices are Supported by the Record.............................. 33

            1.      Law Enforcement........................................................................................ 33

            2.      Work Status Designations.......................................................................... 37

            3.      Technology and Information Systems. ...................................................... 39

            4.      Government Employee Medical Facility. ................................................. 40

            5.      Vendor Monitoring. ................................................................................... 42

      D.      Plaintiffs Improperly Seek a Refund from the Court........................................... 43

V.      CONCLUSION...................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Abington Mem'l Hosp. v. Burwell*,
   216 F. Supp. 3d 110 (D.D.C. 2016) ....................................................................... 22

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ............................................................................. 45

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ............................................................... 26, 44, 45

*Banner Health v. Sebelius*,
   797 F. Supp. 2d 97 (D.D.C. 2011) ................................................................ 17, 22

*Bark v. U.S. Forest Serv.*,
   37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................................ 7

*Bender v. Clark*,
   744 F.2d 1424 (10th Cir. 1984) ........................................................................... 27

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................................. 20

*Bookcliff Rattlers Motorcycle Club*,
   171 IBLA 6, 2006 WL 4072646 (Dec. 20, 2006) ................................... 9, 27, 30, 32

*Citizens Ass'n of Georgetown v. Fed. Aviation Admin.*,
   896 F.3d 425 (D.C. Cir. 2018) ............................................................................. 24

*City of Williams v. Dombeck*,
   151 F. Supp. 2d 9 (D.D.C. 2001) ........................................................................... 8

*Coal. for the High Rock*,
   147 IBLA 92, 1998 WL 988900 (Dec. 21, 1998) .................................................... 4

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
   637 F.3d 408 (D.C. Cir. 2011) ............................................................................. 20

*Def's of Wildlife v. Jewell*,
   815 F.3d 1 (D.C. Cir. 2016) ................................................................................. 18

*Dickinson v. Zurko*,
   527 U.S. 150 (1999) ................................................................................. 18, 25, 26

*Dillmon v. Nat'l Transp. Safety Bd.*,
   588 F.3d 1085 (D.C. Cir. 2009) ........................................................................... 19

*Everett v. United States*,
   158 F.3d 1364 (D.C. Cir. 1998) ............................................................................. 8

*Fox v. Clinton*,
   684 F.3d 67 (D.C. Cir. 2012) ............................................................................... 18

*Hells Canyon All. v. U.S. Forest Serv.*,
   227 F.3d 1170 (9th Cir. 2000) ................................................. 34

*Kappos v. Hyatt*,
   566 U.S. 431 (2012).............................................................. 18

*Larry Amos*,
   163 IBLA 181, 2004 WL 2968227 (Sept. 29, 2004) ............................ 27

*\*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990).................................................... 20, 22, 23

*Mark Patrick Heath*,
   181 IBLA 114, 2011 WL 3364980 (May 16, 2011) ........................... 24

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989).............................................................. 33

*Marshall Cnty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ................................................. 26

*Maryland v. Fed. Aviation Admin.*,
   952 F.3d 288 (D.C. Cir. 2020) ................................................. 24

*Michael Voegele*,
   174 IBLA 313, 2008 WL 4117172 (May 29, 2008) ............................. 9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..................................................... 17, 18, 45

*Nat'l Wildlife Fed'n v. Burford*,
   835 F.2d 305 (D.C. Cir. 1987) .................................................. 6

*Nev. Power Co. v. Watt*,
   711 F.2d 913 (10th Cir. 1983) ......................................... 26, 29, 30

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004)........................................................ 22, 23

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
   625 F.3d 1092 (9th Cir. 2010) ................................................. 25

*Pierce v. SEC*,
   786 F.3d 1027 (D.C. Cir. 2015) ................................................ 18

*Reed ex rel. Allen v. U.S. Dep't of the Interior*,
   231 F.3d 501 (9th Cir. 2000) ................................................... 3

*Rempfer v. Sharfstein*,
   583 F.3d 860 (D.C. Cir. 2009) ................................................. 17

*Sierra Club v. EPA*,
   955 F.3d 56 (D.C. Cir. 2020)................................................... 20

*Sierra Club v. Mainella*,
  459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................................ 17, 26

*\*Stand Up for Cal.! v. U.S. Dep't of the Interior*,
  204 F. Supp. 3d 212 (D.D.C. 2016) ...................................................................... 18, 26

*Steadman v. SEC*,
  450 U.S. 91 (1981) ........................................................................................................ 25

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) .............................................................................................. 20, 23

*United States Sugar Corp. v. EPA*,
  830 F.3d 579 (D.C. Cir. 2016) ...................................................................................... 18

*W. Radio Servs. Co. v. Espy*,
  79 F.3d 896 (9th Cir. 1996) ............................................................................................. 8

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
  435 F.3d 989 (9th Cir. 2006) ......................................................................................... 22

*WildEarth Guardians v. Bernhardt*,
  No. 16-cv-1724 (RC), 2020 WL 6701317 (D.D.C. Nov. 13, 2020) ......................... 45

**Statutes**

16 U.S.C. § 6801 .................................................................................................................. 1

16 U.S.C. § 6802(a)-(c) ...................................................................................................... 7

16 U.S.C. § 6802(h) ............................................................................................................ 7

43 U.S.C. § 1301 ................................................................................................................. 2

43 U.S.C. § 1701(a)(8) ....................................................................................................... 6

43 U.S.C. § 1732(b) ............................................................................................................ 6

43 U.S.C. § 1734(a) ............................................................................................................ 7

43 U.S.C. § 1734(b) ...................................................................................................... 26, 30

43 U.SC. § 1734(c) ............................................................................................................ 44

5 U.S.C. § 551 ..................................................................................................................... 2

5 U.S.C. § 554 ................................................................................................................... 25

5 U.S.C. § 702 ............................................................................................................... 6, 20

5 U.S.C. § 704 ................................................................................................................... 24

5 U.S.C. § 706 ................................................................................................................... 25

5 U.S.C. § 706(2)(A) ........................................................................................................ 17

5 U.S.C. § 706(2)(C) ........................................................................................................ 17

5 U.S.C. § 706(2)(E) ................................................................................................ 17, 25, 26

Pub. L. No. 104-134, § 315, 110 Stat. 1321 (1996) ................................................................ 7

Pub. L. No. 106-554, 114 Stat. 2763 ................................................................................. 4

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................... 17

**Regulations**

41 C.F.R. § 301-11.11 ..................................................................................................... 32

41 C.F.R. § 301-11.12 ..................................................................................................... 32

43 C.F.R. § 1734(c) ......................................................................................................... 44

43 C.F.R. § 2931.2 ............................................................................................................ 8

43 C.F.R. § 2931.2(a) ...................................................................................................... 22

43 C.F.R. § 2931.3 ............................................................................................................ 8

43 C.F.R. § 2931.8 ............................................................................................... 10, 21, 23

43 C.F.R. § 2931.8(a) ........................................................................................................ 9

43 C.F.R. § 2931.8(b) ........................................................................................................ 9

43 C.F.R. § 2932.26 ........................................................................................................... 8

43 C.F.R. § 2932.26(e)(1)-(2) .......................................................................................... 9

43 C.F.R. § 2932.26(e)(3) ................................................................................................. 9

43 C.F.R. § 2932.31 ..................................................................................................... 9, 22

43 C.F.R. § 2932.31(e) ...................................................................................................... 9

43 C.F.R. § 2932.31(e)(3) ................................................................................... 10, 22, 30

43 C.F.R. § 2932.31(f) ............................................................................................... 10, 23

43 C.F.R. § 2932.32 ................................................................................................ 9, 10, 23

43 C.F.R. § 2932.33 ......................................................................................................... 23

43 C.F.R. § 2933.33 ......................................................................................................... 10

43 C.F.R. § 2933.33(a) ..................................................................................................... 10

43 C.F.R. Part 2930 ........................................................................................................ 1, 8

5 C.F.R. § 550.106(b)(1) ................................................................................................. 38

5 C.F.R. § 550.107 ........................................................................................................... 39

**Other Authorities**

67 Fed. Reg. 61,732 (Oct. 1, 2002) ................................................................................................. 7

72 Fed. Reg. 7,832 (Feb. 21, 2007) ................................................................................................ 7

*Building Burning Man,* the Journal of the Burning Man Project, Spring 1997, at 1 ...................... 3

Michael Dugan, *"Guerilla artists"[sic] blast away,* San Francisco Examiner, Oct. 10, 1995 ...... 3

**TABLE OF ACRONYMS**

**AAR**          **After Action Review**

**APA**          **Administrative Procedure Act**

**AR**           **Administrative Record**

**BLM**          **Bureau of Land Management**

**BMP**          **Burning Man Project**

**CAD**          **Computer Aided Dispatch**

**CRA**          **Cost Recovery Agreement**

**DNA**          **Determination of NEPA Adequacy**

**EA**           **Environmental Assessment**

**EIS**          **Environmental Impact Statement**

**FLPMA**        **Federal Land Policy and Management Act**

**FLREA**        **Federal Lands Recreation Enhancement Act**

**IBLA**         **Interior Board of Land Appeals**

**IACP**         **International Association of Chiefs of Police**

**IM**           **Instruction Memorandum**

**MOU**          **Memorandum of Understanding**

**NEPA**         **National Environmental Policy Act**

**SRP**          **Special Recreation Permit**

## I.  INTRODUCTION

Plaintiffs challenge the legality of costs imposed by Defendants to administer a recurring event that Plaintiffs have chosen to conduct on public lands.  Hundreds of permits are annually issued for such events, for activities such as outfitter/guide operations and races between human, equine or vehicle-powered entrants.  This Event is unlike any other – the "iconic" Burning Man Event bringing "over 70,000 community participants" to remote public lands in Nevada's Black Rock Desert.  Am. Compl. ¶ 1, ECF No. 21.  Plaintiffs are Black Rock City LLC, a Nevada limited liability company, and the Burning Man Project, a "California nonprofit public benefit corporation recognized as exempt under section 501(c)(3) of the Internal Revenue Code" (collectively, "BMP").  Id. ¶¶ 12, 13.[1]  BMP's primary purpose is to annually conduct the Event, which "generates an estimated $75 million per year for the local Nevada economy and represents more than 560,000 visitor days to the public lands."  Id. ¶ 30.

Defendant Bureau of Land Management ("BLM") is the bureau within the U.S. Department of the Interior that manages these public lands.  BLM's duties include administration of special recreation permits under the Federal Lands Recreation Enhancement Act, 16 U.S.C. § 6801, et seq. ("FLREA") and implementing regulations, codified at 43 C.F.R. Part 2930 (the "SRP Regulations").  The Event is the largest special recreation permit administered by BLM – classified as a "commercial use" generating tens of millions of dollars in annual revenues, with commensurate investment of time and resources by BLM, and costs payable by BMP.

Plaintiffs allege that BLM charged excessive costs for the 2015-2019 Events.  They ask the Court to declare that BLM has violated the law, and to specify the amount of a refund that

---

[1]    The LLC was acquired in 2019 by the nonprofit corporation, so Plaintiffs use the acronym "BMP" to be inclusive of Black Rock City LLC's activities from 1997 through 2018. Am. Compl. ¶¶ 12-14.  The record thus refers in many instances to "BRC" but Defendants will refer to "BMP" to maintain consistency with Plaintiffs' terminology.

BLM must provide them from these already-paid event costs.  This outcome would result in a public subsidy of the Event, and a present-year budget impact to the agency.  Plaintiffs further contend that BLM has delayed its decision-making and required "excessive, unjustified and unreasonable permit costs" which results in  "damage to BMP and threaten[s] the rights of BMP and its over 70,000 BMP community participants to use public lands, as well as the viability of the Burning Man Event on a year-to-year basis."  Am. Compl. ¶ 1.  These theories cannot be squared with FLREA, the Federal Land Policy and Management Act, 43 U.S.C. § 1301, *et seq*. ("FLPMA"), or the Administrative Procedure Act, 5 U.S.C. § 551, *et seq*. (the "APA").

Plaintiffs' case is conceptually flawed. They have repeatedly chosen to ask BLM for permission to conduct their one-of-a-kind event on public lands.  They do not challenge the validity of the law and regulations creating BLM's cost-recovery obligations.  They have received for each year in question an advance estimate of the applicable costs.  Neither the formulation nor amount of these estimates comes as any surprise given the parties' long-running collaborative relationship.  The purpose of this estimate is to allow an event proponent to decide whether to forego the event and responsibility for payment of BLM's costs, or to pay the estimated costs so BLM can proceed toward permit issuance.  BMP has chosen to pay the estimate for each year in dispute, foregoing the opportunity to administratively appeal, and seek a stay of, any of those decisions.  The Event was conducted in each of those years and might be characterized as a multiple-use management success story.  BMP has passionately held views about how BLM might perform its duties differently, but BLM's decisions are thoroughly reasoned and supported by substantial evidence.  The Court should grant Defendants' motion, deny Plaintiffs' motion, and dismiss this case with prejudice.

## II.  BACKGROUND

### A.  The Burning Man Event

"The Burning Man event is a combination art festival, social event, and experiment in community living."  AR04847.[2]  The event reputedly "began on a beach in San Francisco in 1986, but in 1990 was moved to the 'vast and oceanic space' of the Black Rock Desert of Nevada near Gerlach."  *Reed ex rel. Allen v. U.S. Dep't of the Interior*, 231 F.3d 501, 503 (9th Cir. 2000) (quoting *Building Burning Man,* the Journal of the Burning Man Project, Spring 1997, at 1).  One account "described the event as 'based loosely on European pagan straw man festivals at which people gather to erect and burn a large human effigy as dedication to the earth's fertility.'"  *Id*.  (quoting Michael Dugan, *"Guerilla artists"[sic]blast away,* San Francisco Examiner, Oct. 10, 1995, at A3).  Plaintiffs have "describe[d] the event as 'ritualistic . . . anarchic . . . primal . . . a radical communal experiment . . . .art . . . the death of art . . . dream-like . . . surreal . . . creative . . . destructive . . . absurd . . . spiritual'" and "real."  *Reed*, 231 F.3d at 503 (quoting Burning Man 1996 *Events & Attractions* handout) (ellipses in *Reed*).  The Event's "ethos and culture are rooted in the 10 Principles of Burning Man: Radical Inclusion, Gifting, Decommodification, Radical Self-reliance, Radical Self-expression, Communal Effort, Civic Responsibility, Leaving No Trace, Participation, and Immediacy."  Am. Compl. ¶ 31.

Following its initial move there in 1990, the Event was conducted annually on the Black Rock Desert through 1996.  AR04847.  In 1997, the Event "was held on private land on Hualapai Flat in Washoe County," but starting in 1998 "was moved back onto public lands at the southern end of the Black Rock Desert playa" north of Gerlach.  *Id*.; *see also* AR05208 (explaining the 1997 Event included "a partial SRP for the Man and artwork on BLM-administered land").  The

---

[2]      Administrative Record citations are to "AR" and the applicable Bates-numbered pages.

Event "has grown in size, popularity, and complexity.  Tickets for the Event have sold out every year since 2011, and tickets offered in the main sale sell out within minutes."  Am. Compl. ¶ 30.  Conservation groups expressed concerns about BLM's analysis of environmental impacts attributable to anticipated attendance of 6,000 people at the 1996 Event.  *Coal. for the High Rock*, 147 IBLA 92, 1998 WL 988900, at *6 (Dec. 21, 1998).  "In 2019, the event had a cumulative peak population at 78,850[.]"  AR03672.

BLM must comply with an array of laws and corresponding agency duties in evaluating, approving, and administering the Burning Man Event.  These include National Environmental Policy Act ("NEPA") procedures to evaluate whether the event will have a possible significant impact on the human environment.  Congress in December 2000 passed The Black Rock Desert–High Rock Canyon Emigrant Trails National Conservation Area ("NCA") Act (Pub. L. No. 106-554, 114 Stat. 2763).  "This legislation designated almost 800,000 acres of public land as part of the NCA [including the Burning Man site] and approximately 752,000 acres as Wilderness areas."  AR04847.  Congress recognized the existence of "large-scale events" within the NCA and expressed intent "that such permitted events will continue to be administered in accordance with the management plan for the conservation area and other applicable laws and regulations."  *Id*.  BLM has variously addressed its NEPA obligations over the years, for the timeframe in question by issuing an Environmental Assessment ("EA") for the 2012-2016 Events (AR04835-5177), and then an Environmental Impact Statement ("EIS") for the 2019-2028 Events (AR05518-6443).[3]  Plaintiffs have indicated their dissatisfaction with these efforts (AR06372),

---

[3]     For the intervening Event years BLM addressed NEPA through a Determination of NEPA Adequacy ("DNA").  *See e.g*. AR01311-40 (2017 Event).

but do not raise NEPA claims in this action.  However, these documents reflect BLM's consideration of the spectrum of Event issues, including those raised by Plaintiffs' motion.

The Event also involves planning and economic issues.  The parties periodically negotiate and execute a Memorandum of Understanding ("MOU") whereby they address certain tasks, equipment and responsibilities.  *See e.g.* AR03398-418 (MOUs for 2019 Event). Additionally, the parties annually address cost recovery under the SRP Regulations.  The Regulations allow an event proponent to receive an estimate outlining the cost recovery obligations associated with the permit.  If the proponent agrees to pay these estimated costs, BLM proceeds in the specified manner toward permit issuance.  Following the event, BLM performs an accounting which compares the actual costs incurred to the estimate, and presents the outcome of this analysis in a separate decision.  For both MOUs and cost recovery decisions, the parties' obligations are memorialized in a Cost Recovery Agreement ("CRA").  *See e.g.* AR00770-77 (2016 Event).  BLM's applicable national policy for these determinations provides:

> [C]ost recovery of direct expenses related to permit administration will be charged consistently when the conditions for requiring cost recovery, as established in the subject regulations and handbook, are met.  Cost recovery covers all federal activities that convey special benefits to recipients beyond those accruing to the general public.  Cost recovery is intended to ensure that individuals or groups who clearly benefit from an SRP authorization for an activity or event on BLM public lands and related waters shoulder the costs associated with providing, administering, and monitoring that activity or event.

AR07380.  Finally, BLM performs parallel efforts in issuing and administering the actual Event permit.  *See e.g.* AR07273-94 (planning), AR07268-72 (NEPA compliance), AR00704-06 (permit), AR01072-77, AR01081-101 (post-event monitoring).  One or both parties often prepare an After Action Review ("AAR"), which is a holistic reflection on the particular Event, as well as recommendations for ongoing improvement in the parties' collaborative efforts.  *See e.g.* 2016 AARs by BMP (AR04648-97) and BLM (AR04296-336).

Event planning is essentially a year round effort for all involved, with overlap between event years, and longstanding interaction between BMP and BLM on the full array of the aforementioned issues, including cost recovery.  *See* AR00544 (BMP 2015 AAR referring to "bi-weekly planning meetings" starting on January 8, and "weekly coordination calls" starting on May 1"); AR04492 ¶ 10 (explaining the Event "is a year round workload" for two full-time positions in the BLM Black Rock Field Office).  Notwithstanding this case, BMP has repeatedly expressed its mutual appreciation and has generally characterized the Event as a successful collaborative effort.  *See* AR01367.

### B.  Special Recreation Permit Cost Recovery

The APA waives the sovereign immunity of the United States for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute[.]" 5 U.S.C. § 702.  The first such relevant statute is FLPMA, which was enacted in 1976 and "provides [BLM], the subagency of the Department [of the Interior] charged with land management responsibilities, with permanent, comprehensive guidelines for carrying out its mandate." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 308 (D.C. Cir. 1987).  FLPMA "requires land use planning for public lands under BLM's jurisdiction and outlines procedures for the development, maintenance, and revision of land use plans." *Id*. Recognized uses to be addressed in such plans include "outdoor recreation and human occupancy and use" in concert with "scientific, scenic, historical, ecological, environmental" and other recognized values.  43 U.S.C. § 1701(a)(8).  Management agencies, "subject to [FLPMA] and other applicable law," may "regulate, through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, the use, occupancy, and development of the public lands . . . ." *Id*. § 1732(b).  FLPMA authorizes the Secretary to

"establish reasonable filing and service fees and reasonable charges . . . relating to the public lands[.]"  *Id*. § 1734(a).  Reasonable charges and costs:

> include, but are not limited to, the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities. In determining whether costs are reasonable under this section, the Secretary may take into consideration actual costs (exclusive of management overhead), the monetary value of the rights or privileges sought by the applicant, the efficiency to the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs.

*Id*. at (b).

Congress has further addressed the manner in which federal agencies can assess and collect fees relating to certain uses of our public lands.  This started with the Recreational Fee Demonstration Program, Pub. L. No. 104-134, § 315, 110 Stat. 1321, 1321-200 to -202 (1996), "whose purpose was 'to demonstrate the feasibility of user-generated cost recovery for the operation and maintenance of recreation areas or sites and habitat enhancement projects on Federal lands."  *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 45 (D.D.C. 2014) (quoting 16 U.S.C § 315(a)).  This "fee demo" program was replaced in 2004 by FLREA, which outlines general authority of the Secretaries of Agriculture and Interior to establish recreation fees.  16 U.S.C. § 6802(a)-(c).  This includes charging "a special recreation permit fee . . . for specialized recreation uses of Federal recreational lands and waters, such as group activities, recreation events, motorized recreational vehicle use."  *Id*. § 6802(h).

BLM has promulgated regulations interpreting this authority.  Permits for Recreation on Public Lands, 67 Fed. Reg. 61,732 (Oct. 1, 2002), as amended, 72 Fed. Reg. 7,832 (Feb. 21,

2007) (published at 43 C.F.R. part 2930) (the "SRP Regulations").[4]  Permit and fee systems may
be created in association with special recreation permits "for commercial use, organized group
activities or events, competitive use, and for use of special areas" and "for use of fee areas such
as campgrounds and day use areas."  43 C.F.R. § 2931.2.  The above-described provisions of
FLPMA and FLREA are cited as the legal authority for these regulations.  *Id.* § 2931.3.  Since
they were produced in accordance with the APA's notice-and-comment rulemaking procedure,
the SRP Regulations carry the force and effect of law.[5]

      Special recreation permits are more specifically covered in subpart 2932, which provides
definitions, identifies activities for which one must obtain a permit, and prescribes application
procedures.  Upon receipt of a proper application, "BLM has discretion over whether to issue"
any permit and will base its decision on prescribed factors, including conformance with laws and
land use plans, public safety, conflicts with other uses, resource protection, the public interest
served, the applicant's past compliance with permit terms, and "[s]uch other information that
BLM finds appropriate."  43 C.F.R. § 2932.26.  A fee structure is established by the BLM
Director and each BLM State Director, which may be adjusted due to direct or indirect costs to
the government, the types of services or facilities provided, comparable fees in other settings, or

---

[4]      The originally-published SRP Regulations are included at AR08043-48.

[5]      BLM has additionally issued guidance and agency policy on cost recovery.  *See e.g.*
BLM Manual 1323 (AR07783-837); BLM Handbook H-2930-1 (AR07352-598).  These
documents can "establish[] 'guidelines for the exercise of the [BLM's] prosecutorial discretion'"
such as by prescribing criteria for the agency to consider when interpreting the SRP Regulations,
but the Handbook "does 'not have the independent force and effect of law'" which a regulated
party can use offensively to allege agency noncompliance.  *Everett v. United States*, 158 F.3d
1364, 1369 (D.C. Cir. 1998) (quoting *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir.
1996); *see also City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 22-23 (D.D.C. 2001).

other factors.  *Id*. § 2932.31.  For commercial or competitive/organized group event uses, BLM

charges a fee and may impose an additional charge for cost recovery if more than 50 hours of

staff time is required to process the permit.  *Id*. at (e)(1)-(2) .  However, cost recovery charges

"will be limited to BLM's costs of issuing the permit, including necessary environmental

documentation, on-site monitoring, and permit enforcement."  *Id*. at  (e)(3).  These fees and

charges will be estimated and must be paid before BLM will fully process and authorize the

proposed use.  *Id*. § 2932.32.

A party "adversely affected by a decision under this part [2930] may appeal the decision

under parts 4 and 1840 of this title [43]."  *Id*. § 2931.8(a).  While a decision under appeal will

"go into effect immediately and will remain in effect while appeals are pending" an appellant is

afforded the opportunity to seek and obtain a stay of the decision "under §4.21(b) of this title."

*Id*. at (b).  Thus, at the cost estimate stage, an applicant faces a choice to "understand and accept

the decision or, in the alternative, to appeal and dispute it."  *Bookcliff Rattlers Motorcycle Club*,

171 IBLA 6, 21, 2006 WL 4072646, at *11 (Dec. 20, 2006); *see also Michael Voegele*, 174

IBLA 313, 316-18, 2008 WL 4117172, at *3 (May 29, 2008) (applicant declined to pay

estimated costs and event was cancelled, but IBLA decided the subsequent appeal because the

issues raised would be likely to recur).

### C.  Cost Recovery Decisions 2015-2019

Each year in question, BLM followed the SRP Regulations to determine cost recovery.

BLM initially determines whether the permit would be for "commercial" or "competitive or

organized group/event use" that will require more than 50 hours of staff processing time.  *See* 43

C.F.R. § 2932.31(e).   If so, and BLM seeks cost recovery charges, BLM conducts two phases,

each culminating in a discrete agency decision.  The first occurs prior to permit issuance, where

9

BLM calculates such charges that "will be limited to BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement." *Id*. at (e)(3).  BLM notifies the proponent in writing of the amount of "actual costs" that must be paid "before processing" the application.  *Id*. at (f) (the "Estimate Decision").  The Estimate Decision will specify the "required fees" and may allow "periodic payments for commercial use" but will further provide that BLM "will not process or continue processing [the] application until [the applicant] ha[s] paid the required fees or installments."  *Id*. § 2932.32.  The second phase occurs after event occurrence, in which BLM provides an accounting for actual costs incurred. *See id*. § 2932.33.  This accounting allows BLM to determine if the "actual fees paid" are more or less that the "estimated fees . . . paid in advance."  *Id*. at (a).  Overpayments "[f]or multi-year commercial permits . . . will [be] credit[ed] . . . to the following year or season" while for "other permits" the permittee will have the "option whether to receive refunds or credit overpayments to future permits[.]"  *Id*.  BLM summarizes this analysis in a separate written decision (the "Closeout Decision").  Again, a proponent may choose to appeal, and petition for a stay of, an Estimate Decision and/or a Closeout Decision.  43 C.F.R. § 2931.8.

    1.  <u>The 2015 Event</u>

    The 2015 Event illustrates these procedures.  BLM received BMP's application for the 2015 Event on December 18, 2014.  The application was submitted shortly after BMP's AAR for the 2014 Event, which presented BRC's annual reflections on the event and forward-looking recommendations.  AR04760-806.[6]  The AAR reflects a commitment to "further improving the event's overall compliance with the [SRP] requirements" and "to continued detailed planning for

---

[6]    The application itself is not included in the administrative record, but is referenced in the 2015 Estimate Decision.  AR00692.

the Burning Man event where all parties bring knowledge and experience to the table for
delivery of a world class event." AR04763.  In early 2015 the parties met and exchanged
correspondence on numerous topics.  *See* AR04750-58 (March 12 BLM letter seeking to
improve safety, health and security issues); AR00692 (meeting in San Francisco at which BLM
provided draft Preliminary Cost Recovery Estimate).[7]  Ongoing discussions apparently occurred
on cost recovery issues.  AR07273-94 (entitled "A Fresh Look at the Initial Proposals for the
2015 Burning Man Event" referencing a BMP-BLM meeting on July 9).  On July 30, BLM
provided the 2015 Cost Recovery Agreement to BMP, and on August 3, that Agreement and
itemized cost detail was memorialized in the 2015 Estimate Decision.  AR00691-702.  The
Estimate Decision incorporates the Cost Recovery Agreement, signed by BMP, which outlines
an installment payment schedule (AR00695) totaling $ 2,944,827 (AR00698) in estimated costs.
The Estimate Decision further describes BMP's rights to file an administrative appeal and to
petition for a stay.  AR00692.  The permit was issued on August 7.  AR08024-25.  BMP did not
file an appeal, and the 2015 Event was conducted from August 30 through September 7.
AR06532-36.

    BLM followed established procedures following the 2015 Event.  These included the
January 26, 2016, transmittal to BMP of the Closeout Decision for the 2015 Event.  AR00688-
90.  That Decision announces that "BLM's actual direct and indirect costs for the Burning Man
2015 Event total $2,793,722.27" while BLM received $2,944,827 under the Cost Recovery
Agreement, resulting in "a refund of $151,104.73."  AR00688.  The Closeout Decision provides

---

[7]     BLM and BMP communicated throughout 2015, including "bi-weekly planning
meetings" starting on January 8, and "weekly coordination calls" starting on May 1.  AR00544.

a series of attachments to "provide a detailed breakdown of all direct and indirect costs." *Id*.

These attachments include:

> 1 – Cost Recovery Closeout Summary [AR004645]
> 2 – Project Log [AR00523-28]
> 3 – BLM Contracts [AR00343-464]
> 4 – Travel Expenses [AR00529-31]
> 5 – Vehicle Utilization Expenses [AR00532]
> 6 – Miscellaneous Supplies and Equipment [AR00466-521].

AR00690.  As for the Estimate Decision, the Closeout Decision advises of BMP's rights to

appeal and petition for a stay.  AR00689-90.  Unlike the Estimate Decision, BMP did on

February 24, 2016, file an appeal from the Closeout Decision.  AR04745-49.

> 2.  The 2016 Event

The 2016 Event reflected the same procedural steps, with BLM modifications designed,

in part, to address points raised by BMP.  Again, the parties' dialogue reflected transition and

overlap from evaluating the past year's event to planning for the current year's event.  *See*

AR04729-44 (BRC request for indirect cost waiver); AR01103-06 (BLM e-mail); AR00533

(March 25 cover letter to BMP AAR "serious concerns about the extensive lists of

recommendations and the additional costs they represent"); AR00539-41 (BMP AAR summary

of cost recovery concerns).  In particular, Field Office staff briefed the BLM State Director and

made efforts to address various issues, including some raised by BMP.  *See* AR01029-34.  BLM

provided an initial Cost Recovery Agreement to address an estimated $184,244 in planning

costs, which BMP signed on April 4.  AR04708-17.  On April 25, along with filing its Statement

of Reasons in support of its appeal from the Closeout Decision for the 2015 Event, BMP sent a

letter to BLM expressing "deep[ ] concern[s] that many of the items in this appeal (summarized

below) seem to be potential issues for 2016."  AR04519-22.  BMP acknowledged the 2015 Event

appeal would not be decided before planning for the 2016 Event, and suggested that absent some

12

unspecified response by BLM, "[BMP] will likely appeal the 2016 costs as well."  AR04519.

BLM responded on May 5, addressing the relationship between the pending appeal of the 2015

Closeout Decision and BLM's duties in processing the 2016 Event application.  AR04355-56.  In

part, that letter clarifies that "a CRA estimate for an SRP serves to inform an applicant's decision

on whether to hold an event on public lands or not."  AR04356.

      BLM issued an Estimate Decision on June 23, which incorporated the earlier CRA for

planning.  AR01078-80.  A contemporaneous series of briefing papers to the BLM Nevada State

Director address some of the changes to the 2016 CRA in response to BMP's concerns.

AR01016-17 (Dispatch reporting); AR01018-28 ("emergency" designation and labor costs);

AR01029-34 (comparison of 2015 and 2016 CRAs).  BMP paid the first installment of $315,000

on June 27, but reiterated some of its concerns and did not sign the CRA, which estimated total

cost recovery at $2,227,041.  AR04640-43.  BLM issued a revised CRA on July 22, providing

for total estimated costs of $2,199,959.  AR00778-85.  BMP signed this CRA (AR00770-77), but

in an accompanying cover letter stated that "[BMP] signs this CRA reserving all rights to appeal

BLM's final decision on cost recovery for the 2016 SRP" with the "hope . . . that the final

decision will reflect only BLM's reasonable costs . . . and will include a reasoned, thorough

explanation for each cost."  AR01126.  BLM sent a letter to BMP on August 2 (AR01132-33)

chronicling the parties' efforts, attaching the fully executed CRA (AR04367-74), and expressing

BLM's appreciation of the parties' ongoing collaborative relationship, including BMP's

objections, while stating "the agency's actions are consistent with its statutory and regulatory

authority."  AR01133.  BMP did not file an appeal from the 2016 Estimate Decision.  The 2016

Event proceeded from August 28 through September 5.  AR00707-11.

BLM issued the Closeout Decision for the 2016 Event on January 31, 2017.  AR00786-88.  BLM determined that actual direct and indirect costs for the 2016 Event totaled $2,166,127.41, resulting in a refund to BRC of $33,831.59.  AR00786.  The 2016 Closeout Decision follows the same format as prior Closeout Decisions, providing a detailed summary of actual costs through attached reports entitled Closeout Summary (AR00720), Project Labor Log (AR00713-19), BLM Contracts (AR00712), Travel Expenses (AR00721-22), Vehicle Utilization Expenses (AR00724-25), and Miscellaneous Supplies and Equipment (AR00724-25; AR00789-862).  On March 2, 2017, BMP filed an appeal from the 2016 Closeout Decision with the IBLA. *See* AR09980.

3.  Subsequent Event Years 2017, 2018 and 2019

Cost recovery proceeded for the remaining Event Years in dispute in a similar pattern, in which the parties continued their longstanding dialogue on event debriefing/pre-planning, and BLM issued Estimate and Closeout Decisions within the timeframe necessitated by the complexities and recurrent nature of the event.

For the 2017 Event the parties executed the Phase 1 CRA for Planning in mid-April.  AR01438-45.  On July 2 BLM sent BMP the proposed Phase 2 CRA and Estimate Decision, with a cost estimate of $2,503,453.  AR01454-55; AR01460-87.  Leading up to this point, the parties discussed various topics.  *See* AR entries dated March 17 to June 30.  These included the possibility of government personnel being treated in the BMP-operated medical facility, instead of separate facilities as had occurred for past events.  AR04720-28 (BMP proposal); AR01358-61 (BLM white paper); AR04359-61 (BLM responses).  On July 27 BMP signed the CRA and made the last payment on the full amount of BLM's cost estimate, again purporting to "reserve[e] all rights to appeal BLM's final decision on cost recovery for the 2017 SRP."

14

AR01458.  BMP did not appeal the Estimate Decision.  Following the 2017 Event, BLM on January 16, 2018, issued the Closeout Decision.  AR01243-45.  The Closeout Decision indicated that BLM's actual direct and indirect recoverable costs for the 2017 Event were $2,341,705.34, resulting in a refund to BRC of $161,747.66.  AR01243.  As for prior years, these costs were detailed in attached documents consisting of a Closeout Summary (AR01242), Project Labor Log (AR01157-64), BLM Contracts (AR01165-233), Travel Expenses (AR01234-36), Vehicle Utilization Expenses (AR01237), and Miscellaneous Supplies and Equipment (AR01238-41; AR08314-453).  On or about February 22, 2018, BMP filed an appeal from the Closeout Decision with the IBLA.  *See* AR10730.

For the 2018 Event BLM sent BMP the Phase 1 CRA for Planning on January 19 (AR02847) and BMP returned the signed document in early February.  AR02848-55.  BMP shortly thereafter provided detailed questions about staffing and cost recovery issues (AR06564-70), which BLM answered.  AR01420-34.  In this timeframe, BLM continued to evaluate the issues raised, as reflected in various briefings to the BLM State Director.  AR00655-57 (2017 versus 2018 comparisons); AR08585-86 (employee safety); AR08587-88 (law enforcement staffing).  On June 1 BLM sent BMP the proposed Phase 2 CRA and Estimate Decision.  AR02779-67.  The cost estimate was $2,850,825.25, and BLM attributed increases over 2017 to increases in labor cost, operational cost, and indirect costs.  AR02886.  BMP returned the signed CRA along with a letter dated July 6, posing additional questions.  AR02945-46.  The CRA was fully executed on July 11.  AR02772-75.  Again, BMP did not appeal the Estimate Decision/CRA.  Navigating the longest U.S. government shutdown, BLM on March 29, 2019, issued the Closeout Decision.  AR02755-57.  The Closeout Decision indicated that BLM's actual direct and indirect recoverable costs for the 2017 Event were $2,578,065.61, resulting in a refund

to BRC of $272,759.64.  AR02755.  As for prior years, these costs were detailed in attached

documents consisting of a Closeout Summary (AR02758), Project Labor Log (AR02759-64),

BLM Contracts (AR02765; AR02130-754), Travel Expenses (AR02766-67), Vehicle Utilization

Expenses (AR02768), and Miscellaneous Supplies and Equipment (AR02769-71; AR02029-

129).  Again, BMP filed an appeal from the 2018 Event Closeout Decision on April 29, 2019.

*See* AR11202.

    For the 2019 Event BLM sent BMP the Phase 1 CRA for Planning on February 6

(AR03422-29), which was fully executed on February 25.  AR03440-44.  On June 25 BLM sent

BMP the proposed Phase 2 CRA and Estimate Decision.  AR03459-67.  The cost estimate was

$2,953,966.79, with BLM attributing increases over 2018 to additional operational costs and a

1.9 percent increase to the pay scale for all federal employees.  AR03459.  BMP posed several

questions in an e-mail dated July 5 (AR03468-69), and returned the signed CRA on July 11.

AR03475.  Again, BMP did not appeal the Estimate Decision.  The CRA was fully executed on

August 19.  AR03495-503.  Of note in this timeframe for 2019 Event planning, BLM also

released the Event EIS (AR05598 et seq.), and associated Record of Decision.  AR04375-92.

Following the 2019 Event, BLM on February 13, 2019, issued the Closeout Decision.  AR03643-

45.  The Closeout Decision indicated that BLM's actual direct and indirect recoverable costs for

the 2019 Event were $2,717,129.02, resulting in a refund to BRC of $236,836.77.  AR03643.  As

for prior years, these costs were detailed in attached documents consisting of a Closeout

Summary (AR03646), Project Labor Log (AR03647-54), BLM Contracts (AR03655), Travel

Expenses (AR03656-58), Vehicle Utilization Expenses (AR03659), and Miscellaneous Supplies

and Equipment (AR03660-61).  BMP filed an appeal from the 2019 Event Closeout Decision on

March 17, 2020.  *See* AR11702.

### D. District Court Proceedings

The original complaint was filed on December 13, 2019, and sought to compel the IBLA to issue decisions on the pending intra-agency appeals, or an order from this Court declaring the "constructive denial" of those appeals.  *See* Compl. 22-24, ECF No. 1.  Defendants moved to dismiss (ECF No. 16), and Plaintiffs responded by filing an Amended Complaint (ECF No. 21) which named both Plaintiffs, removed the IBLA as a Defendant, and added claims relating to the 2019 Event.  The parties now present cross-motions for summary judgment.

## III.  LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citations omitted).  The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).  "Therefore, the question is not whether the plaintiff has 'raised genuine issues of material fact,' but whether, 'based on the agency record[,] . . . the agency acted arbitrarily or capriciously.'"  *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 112 (D.D.C. 2011) (quoting *Rempfer v. Sharfstein,* 583 F.3d 860, 865 (D.C. Cir. 2009)).

Under the APA's arbitrary and capricious standard, the Court determines whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  Such review is

"fundamentally deferential – especially with respect to matters relating to an agency's areas of technical expertise." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted).  The court "is not to substitute its judgment for that of the agency" but "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks and citation omitted).  An agency decision may be found to be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*; *United States Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016).  The party challenging an agency's action as arbitrary and capricious bears the burden of proof. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

Under APA section 706 "when review of an agency's action is 'bound up with a record-based factual conclusion,' the reviewing court must determine whether that conclusion 'is supported by substantial evidence.'"  *Stand Up for Cal.! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 246 (D.D.C. 2016) (quoting *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999)), *aff'd*, 879 F.3d 1177, 1181 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 786 (2019); *see also Kappos v. Hyatt*, 566 U.S. 431, 435 (2012).  Again, this standard is deferential – substantial evidence is "enough evidence to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury." *Defs. of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  The party challenging the agency's factual conclusions cannot simply argue that some other conclusion would be

preferable.  *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (an agency's factual findings are adopted "as conclusive if supported by substantial evidence . . . even though a plausible alternative interpretation of the evidence would support a contrary view") (internal quotation marks and citation omitted).

## IV.  ARGUMENT

Plaintiffs misconstrue the legal framework, rendering their case fundamentally flawed. BLM has discretion to grant, deny, or condition permitted uses of public lands.  The Event does not occur in conjunction with other multiple-uses of the Black Rock Desert – it displaces those uses so that Plaintiffs can conduct their grand-scale experiment in community living.  BLM is authorized to recover the costs associated with this permitted use, has reasonably exercised its discretion in accommodating Plaintiffs' annual requests, and has actively communicated with BMP on all of the issues raised in the Amended Complaint.  Plaintiffs think they should be charged less for recovery of BLM's costs, but their disagreement fails as a matter of law to demonstrate an APA violation.  The Court should deny Plaintiffs' motion, grant Defendants' motion, and dismiss this case.

### A.  Plaintiffs Misapprehend the Timing and Nature of Cost Recovery Decisions.

Plaintiffs' case is erroneously built upon the notion that the Court will conduct some generalized "reasonableness" inquiry, through which Plaintiffs can prevail if the Court deems their views on cost recovery to be more reasonable than BLM's views.  Plaintiffs contend they have suffered "serious prejudice and injury" for which they are "entitled to recompensation" and seek "judicial intervention" to address an alleged "unlawful pattern of institutional bias" and "practice of failing to provide a reasonable accounting of costs[.]"  Am. Compl. ¶¶ 87-89; *see*

*also* Mem. in Supp. of Pls.' Mot. for Summ. J., ECF No. 28 ("Pls.' Mem.").[8]  This approach is antithetical to properly-formulated APA review.

      1.  <u>Plaintiffs Fail to Target Discrete Final Agency Action</u>.

      The APA's waiver of sovereign immunity provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  This requires a plaintiff to "identify some 'agency action' that affects him in the specified fashion[,]" and "the 'agency action' in question must be 'final agency action.'"  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990).  A final agency action "must mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow[.]"  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citation omitted); *see also Sierra Club v. EPA*, 955 F.3d 56, 61 (D.C. Cir. 2020).

      Finality requirements can dictate the structure, even the outcome, of many APA cases. The APA does not sanction attempts at "programmatic improvements" but requires a plaintiff to "direct its attack against some particular 'agency action' that causes it harm."  *Lujan*, 497 U.S. at 891.  Whether a particular action sufficiently determines legal consequences for finality purposes is a pragmatic inquiry, for an otherwise definitive position couched informally, such as through a letter, can be a "reviewable final agency action" when the agency's action "impose[s] an immediate and significant practical burden on" a regulated party.  *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 411-12 (D.C. Cir. 2011).  For example, in *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016), the Supreme Court analyzed "jurisdictional

---

[8]     Cites to Plaintiffs' opening brief are to the page numbering in the ECF-stamped header.

determinations" (JDs) issued to property owners addressing whether "waters of the United States" are found on their property.  *Id.* at 1812.  While a "preliminary" JD only goes so far as to indicate that such waters "may exist," an "approved" JD "definitively states" the presence or absence of such waters and is defined by regulation to be "final agency action" and subject to administrative appeal.  *Id.*  An "approved JD clearly marks the consummation of the Corps' decisionmaking process *on that question*[.]"  *Id.* at 1813 (emphasis added) (internal quotation marks and citation omitted).  That decision "is typically not revisited if the permitting process moves forward[.]"  *Id.*  While regulations allow revision of an approved JD "based on 'new information' . . . [t]hat possibility, however, is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal."  *Id.* at 1814 (citations omitted).

BLM's exercise of authority under the SRP Regulations results in multiple final agency actions – an Estimate Decision(s)[9] and a Closeout Decision.  *See e.g.* AR00691-702 (2015 Event Estimate Decision); AR00688-90 (2015 Event Closeout Decision); AR02847 (2018 Event Phase 1 Estimate Decision); AR02866-67 (2018 Event Phase 2 Estimate Decision); AR02755-71 (2018 Event Closeout Decision).  Each of these decisions is subject to administrative appeal.  *See* 43 C.F.R. § 2931.8; AR01078-80 (2016 Event Estimate Decision advising of appeal rights).  However, Plaintiffs' Amended Complaint pleads a single cause of action generically addressing BLM's "Cost Recovery Charges" for the 2015-2019 Events, advising those "Charges" constitute final agency action in violation of the APA's "arbitrary and capricious" standard.  Am. Compl. ¶¶ 85-87.  "Cost Recovery Charge" as used in the Amended Complaint refers to BLM's

---

[9]      Starting with the 2016 Event, BLM began issuing a "Phase 1" Estimate and proposed CRA early in the annual Event cycle to cover planning costs and protect against the possibility of funding shortfalls to cover such costs, followed by a second "Phase 2" Estimate and proposed CRA to address remaining costs.  *See* AR01304.

"authority to issue and administer SRPs, as well as establish and charge SRP fees, including fees for recovery of BLM's processing costs." *Id.* ¶ 22 (citing 43 C.F.R. §§ 2931.2(a), 2932.31). This framing ignores APA pleading standards. An unspecified challenge to BLM's "authority" is not the same as a challenge to a discrete final agency action.

These shortcomings reflect more than mere formality – Plaintiffs have failed to "direct [their] attack" with requisite specificity to any final agency action, let alone the "particular 'agency action'" causing their alleged injury. *See Lujan*, 497 U.S. at 891. "[T]he APA does not permit a 'blunderbuss' complaint about 'general deficiencies in compliance with broad statutory mandates[.]" *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 141 (D.D.C. 2016) (quoting *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 110-11 (D.D.C. 2011)). Rather, "a specific agency action must be challenged" since "the APA contemplates review of 'discrete' agency actions, [and] a plaintiff must identify 'some particular agency action that causes it harm' and may not complain of '[g]eneral deficiencies in compliance.'" *Id.* (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64-66 (2004) (internal quotation marks and citations omitted)); *see also Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." (internal quotation marks and citation omitted)).

The importance of these requirements is amplified by the difference between an Estimate Decision and a Closeout Decision. An Estimate Decision will reflect "BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement." 43 C.F.R. § 2932.31(e)(3) (AR08046). This provides an itemized calculation of permit-related costs, along with an evaluation of whether some of the aforementioned documentation addresses "[p]rogrammatic or general land use plan NEPA documentation" since

22

the latter are "not subject to cost recovery charges, except if the documentation work done was done for or provides special benefits or services to an identifiable individual applicant." *Id*. BLM must identify these costs in writing, and they must be paid before BLM takes further action to process the permit. *Id*. at (f); § 2932.32. This decision is subject to administrative appeal. *Id*. § 2931.8; AR07544-46 (BLM Handbook H-2930-1 sample Estimate Decision). With regard to the types/amount of BLM's cost recovery charges, the Estimate Decision "clearly marks the consummation of [BLM's] decisionmaking process *on that question*[.]" *Hawkes*, 136 S. Ct. at 1813 (emphasis added). The Closeout Decision is a post-event (or end-of-season) documentation of BLM's actual costs, so that BLM can determine whether "actual fees due are less [or more] that the estimated fees [the proponent] paid in advance[.]" 43 C.F.R. § 2932.33. Depending on the type of permit, BLM may credit overpayments, or provide a refund. *Id*. Thus, a Closeout Decision is an accounting exercise, not an occasion for BLM to revisit the type or amount of fees required to be paid in the Estimate Decision and associated CRA.

Plaintiffs' failure to appreciate these distinctions has consequences under the APA. If their challenge is interpreted as seeking "wholesale improvement" of Defendants' approach to cost recovery, so as to rectify "institutional bias" or other allegedly prejudicial treatment underlying Plaintiffs' case, it does not state a viable claim under the APA. *Lujan*, 497 U.S. at 891; *Norton*, 542 U.S. at 64-66. Even if their challenge can be more sympathetically viewed as "directing attack" at some discrete agency action(s), the only such action(s) they identify are Closeout Decisions. *See* Am. Compl. ¶ 38 (stating "[t]he Cost Recovery Charge is provided to BMP in the form of a Cost Recovery Estimate Agreement"); ¶ 39 (referring to Closeout Decision as the "Final Decision on the Cost Recovery Charge"); AR04747 (2015 Event appeal challenging "Cost Recovery Decision" dated Jan. 27, 2016); AR11702 (2019 Event appeal

challenging "Cost Recovery Decision" dated Feb. 13, 2020).  These Closeout Decisions are final agency action subject to review under the APA, but only to address BLM's accounting of actual costs incurred for a subject Event, and reconciliation against BMP's prior payments.  Even construing BMP's challenges in this favorable light forecloses the bulk of their argument to the Court, seeking to revisit Estimate Decisions that were neither administratively appealed nor specifically targeted in BMP's complaint.[10]

If judicial review here is best performed with maximum clarity and efficiency, the above-described inquiry should resolve the case.  Plaintiffs have failed to plead a challenge to the final agency action(s) which give rise to their alleged injuries.

2.  The Substantial Evidence Standard Governs Judicial Review.

In addition to their failure to plead any viable claim under the APA, Plaintiffs mistakenly believe the Court should gauge BLM's actions under a ubiquitous "reasonableness" standard.  *See* Pls.' Mem. at 18-22.  Plaintiffs' approach confuses judicial and intra-agency review, juxtaposes terminology across these contexts, and contradicts governing law.

Plaintiffs' case is premised on the notion that the Court will "examine these [BLM] decisions for reasonableness and abuse of discretion."  Pls.' Mem. at 21 (citing *Mark Patrick Heath*, 181 IBLA 114, 137, 2011 WL 3364980, at *16 (May 16, 2011)).  But the IBLA's

---

[10]    The APA does state that "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."  5 U.S.C. § 704.  However, this provision does not save an attempt to fold review of an Estimate Decision into challenge of a Closeout Decision.  An Estimate Decision is final agency action, not a "preliminary, procedural, or intermediate agency action[.]"  *Id.* As such, an Estimate Decision is "directly reviewable" and thus not addressed by the cited provision in APA Section 704.  *See Citizens Ass'n of Georgetown v. Fed. Aviation Admin.*, 896 F.3d 425, 434 (D.C. Cir. 2018) (holding that claims which accrued in prior agency proceedings must be brought within statutory deadline of the agency decision in which said claims "crystallized" rather than being included in review of subsequent agency action); *see also Maryland v. Fed. Aviation Admin.*, 952 F.3d 288 (D.C. Cir. 2020).

24

evaluation in an intra-agency appeal does not carry precedential weight in this Court's judicial review under the APA.  *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1115 n.19 (9th Cir. 2010) (IBLA decisions on matters outside the scope of its jurisdiction "have, at most, limited persuasive authority.").

APA Section 706 requires a reviewing court to determine if agency factual conclusions are supported by substantial evidence.  5 U.S.C. § 706(2)(E).  The Supreme Court has clarified this analysis.  In short, it depends whether a court is reviewing the outcome of a "hearing" under APA Section 7 (5 U.S.C. § 554), or conducting "judicial review" under APA Section 10 (5 U.S.C. § 706).  *See Steadman v. SEC*, 450 U.S. 91, 100 (1981) (concluding "in view of the entirely different purposes of § 7(c) and § 10(e), that Congress intended the words 'substantial evidence' to have different meanings in context").  *Steadman* involved disciplinary proceedings brought by the SEC, and in that context the Court found "that § 7(c) was intended to establish a standard of proof and that the standard adopted is the traditional preponderance-of-the-evidence standard."  *Id*. at 102.  But when a court is conducting judicial review of agency action, "[s]ection 10(e), by contrast, does not permit the reviewing court to weigh the evidence, but only to determine that there is in the record such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]"  *Id*. at 99 (internal quotation marks and citations omitted).  The Court subsequently instructed that when reviewing agency action under APA Section 10 (706) "a reviewing court must apply the APA's court/agency review standards in the absence of an exception."  *Zurko*, 527 U.S. at 154.  That standard, for a "record-based factual conclusion[,]" is substantial evidence.  *Id*. at 164.

These conclusions resonate with established tenets of APA review within the D.C. Circuit.  When performing "review of agency action under the APA, the district judge sits as an

appellate tribunal.  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)

Thus, "[t]he entire case on review is a question of law."  *Marshall Cnty. Health Care Auth. v.*

*Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  "Under the APA, it is the role of *the agency* to

resolve factual issues to arrive at a decision that is supported by the administrative record,

whereas the function of the district court is to determine whether or not as a matter of law the

evidence in the administrative record permitted the agency to make the decision it did."

*Mainella*, 459 F. Supp. 2d at 90 (emphasis added).  The quantum of evidence necessary to

support the agency's decision is substantial evidence.  5 U.S.C. § 706(2)(E); *Stand Up for Cal.!*,

204 F. Supp. 3d at 246.

      FLPMA's inclusion of the word "reasonable" in describing the Secretary's cost-recovery

authority does not change this analysis.  *See* 43 U.S.C. § 1734(b).  Plaintiffs mistakenly suggest

"reasonableness" is a "limiting term" which precludes charging BLM's actual costs

administering a permit or otherwise imposes substantive constraints on agency discretion (Pls.'

Mem. 19-20), relying on *Nev. Power Co. v. Watt*, 711 F.2d 913 (10th Cir. 1983).  But that case

turned on a procedural error, for the Tenth Circuit's holding was based on the agency's failure to

address the FLPMA-enumerated factors, finding that "there is no showing in the record that the

factors other than actual costs were considered at all."  *Id*. at 927 (citation omitted).  The panel

acknowledged "the Secretary is thus vested with considerable discretion in performing the

weighing mandated by section 304(b)," but in doing so "*must* provide a reasonably articulate

record showing the basis of the determination so that a reviewing court might determine whether

the action is in accordance with FLPMA."  *Id*. at 927-28.  Nor does *Nevada Power* support an

argument that Congress in FLPMA created an exception to the APA standard of review.

*Compare id*. at 919-25 *with Zurko*, 527 U.S. at 154-61.  *Nevada Power* is properly understood as

turning on the agency's failure to consider Congressionally-prescribed factors, rather than a basis for a district court's application of a reasonableness standard in APA review.[11]

The flaws in Plaintiffs' conception of the case are exemplified by the fact-based themes underlying their arguments.  BMP's case is largely built upon the premise that "[s]ince 2011, the Event's participant population increased by 30%, while BLM's costs to administer the Event permit went up an unreasonable 294%."  Pls.' Mem. 9.  Additionally, BMP focuses on BLM's "law enforcement apparatus" as "the largest and fastest-growing category of BLM costs" which is allegedly "an unfortunate legacy that BMP has borne" through the involvement of "former BLM Special Agent Daniel P. Love[.]"  *Id*.

First, judicial review under the arbitrary and capricious standard is not reducible to percentages or some arithmetic calculation of "unreasonableness."  BMP seems to argue that it is unreasonable *per se* for permit costs to more than double when the "participant population" increased by thirty percent.  There is no legal foundation for this argument – these comparisons are a non-sequitur to the Court's duties in evaluating whether BLM's actions were rational or supported by substantial evidence.  Even if one engages BMP's approach, comparing participant population to permit costs is misleading.  Instead, one might consider BMP's annual revenues in the same timeframe, which for tax year 2012 were $591,672, and for tax years 2016-2019 have exceeded $44 million.  *See* https://burningman.org/network/about-us/public-documents/ (last

---

[11]     This Court is not bound by any IBLA suggestion that BLM's factual conclusions will be evaluated under a preponderance of evidence standard.  *See Bookcliff Rattlers*, 171 IBLA at 13, 2006 WL 4072646 at *5 ("An appellant appearing before the Department bears the burden of proof to show, by a preponderance of the evidence, that a challenged decision is in error.").  The *Bookcliff Rattlers* reference to the preponderance of the evidence relies upon the IBLA's decision in *Larry Amos*, 163 IBLA 181, 190, 2004 WL 2968227, at *8 (Sept. 29, 2004), and *Amos* relies upon *Bender v. Clark*, 744 F.2d 1424 (10th Cir. 1984), which involves an SEC investigation.  *Id*. at 1429.  This analysis is directly refuted by the *Zurko* line of authority.

visited April 8, 2021).  These revenues may partly reflect BMP's adaptations in structure and pricing of Event tickets, with 2012 ticket prices ranging from $240 to $420, and 2019 ticket prices ranging from $425 to $1,200, along with vehicle passes (introduced in 2014) at $100 each.  *See* https://www.trippingly.net/burning-man-musings/2019/2/11/the-history-of-burning-man-tickets-and-entry-fees (last visited April 8, 2021).  Plaintiffs' reliance on tabular summaries of their preferred metrics of reasonableness is misplaced in APA review.  *See e.g.* Pls.' Mem. 34, 36, 37.

The retrospective attack on the "legacy cost of disgraced former Special Agent Love" is similarly misplaced.  *See* Pls.' Mem. 50.  Special Agent Love was never the Authorized Officer overseeing the Event.  In fact, BMP recognizes that "2015 was the last year that Love worked at an Event."  *Id*. at 14.  Yet, a word search of the text of Plaintiffs' brief results in 45 hits for "Love," permeating Plaintiffs' arguments.  *See e.g.* Pls.' Mem. 28 (asserting BLM's "unreasonable demands . . . particularly the law enforcement demands of former Special Agent Love"); 32 ("Love's unreasonable and improper demands related to the Event's law enforcement apparatus infected every Decision at issue in this case."); 44 (premium pay rates); 46 (IT-related expenditures); 50 ("superfluous" medical facility).  These arguments are wholly based on Love's misconduct.  *Id*. 14-16; AR11853, AR11855-57, AR11864-933.  This is little more than a propensity evidence-driven tactic, whereby BMP believes highlighting Love's misconduct somehow allows the Court to declare BLM's Event-related costs to be "excessive and unreasonable."  The APA does not countenance this approach.  Furthermore, any findings of misconduct did not relate to any Estimate Decision, Closeout Decision, or other cost recovery actions overseen by the Authorized Officer for any of the Events.  AR11866.  If anything, the investigation suggests that perhaps Special Agent Love had an affinity for the Event, for the only

Event-related misconduct involved Love treating the 2015 Event as a working vacation, where "he used his influence with Burning Man officials to obtain three sold-out tickets and special passes for his father, girlfriend, and a family friend[,]" and allowed them to use government-furnished equipment and lodging.  *Id.*

Plaintiffs cannot now prevail by inviting the Court to engage in fact-finding or by leveraging unrelated allegations of misconduct by former Special Agent Love.  The APA does not empower the Court to compare the reasonableness of Plaintiffs' views against BLM's, or to measure BLM's decisions against a reasonableness standard.  The Court's role is to determine whether BLM's decisions are rational and supported by substantial evidence.  Properly viewed under those principles, Plaintiffs' motion should be denied, and their case dismissed.

## B.  BLM Appropriately Presented its Costs.

Defendants properly applied the law and employed suitable procedures in rendering the challenged cost recovery decisions.  The closest thing to a procedural argument attempted by BMP is found in the first subsection of their Argument.  Pls.' Mem. 22 ("BLM has ignored the legal requirement that it provide a reasoned explanation for its costs, deeming it sufficient to simply disclose *what* it spent.").  Where Plaintiffs raise specific concerns, they are addressed by substantial evidence in the administrative record.  BMP overlooks the long-standing relationship between the parties and year-round communications on the full spectrum of Event-related topics, including BLM's costs to administer the permit.  BLM has followed prescribed procedures, and BMP's mere disagreement with BLM charges fails to show any violation of FLPMA or the SRP Regulations.

BMP first argues that BLM has illegally assumed that "actual costs" are "synonymous" with "reasonable costs.  Pls.' Mem. 22 (citing *Nev. Power*, 711 F.2d at 925).  However, *Nevada Power* does not preclude charging actual costs, noting that "the [FLPMA] reasonableness factors

29

. . . were added to ensure that applicants would not *as a matter of course* bear all of the costs occasioned by their application." *Id*. (emphasis added).  The Tenth Circuit emphasized this limitation on its holding, advising "[w]e do not imply that Interior may never require an applicant to bear all of the costs of processing an application." *Id*. n.6.[12]  Moreover, *Nevada Power* specifically addressed a different set of "cost-reimbursement regulations" and held those particular regulations to be "invalid as inconsistent with and in excess of the authority granted by FLPMA." *Id*. at 933.  Plaintiffs do not challenge the validity of the SRP Regulations, which prescribe the manner in which BLM will effectuate FLPMA's "reasonableness factors." *See Bookcliff Rattlers*, 171 IBLA at 17-18, 2006 WL 4072646 at *9 ("We find that the limiting language in 43 C.F.R. § 2932.31(e)(3) is consistent with [FLPMA] section 304(b), and that its inclusion in the SRP cost recovery regulation meets the 'reasonableness' test set forth by the Court in *Nevada Power Co. v. Watt*, 711 F.2d at 927.").  Plaintiffs on this point are incorrect. BLM did not charge BMP "actual costs" as a matter of course.

BLM proceeded under the SRP Regulations, which provide that cost recovery charges consist of BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement.  43 C.F.R. § 2932.31(e)(3).  BLM's Estimate Decisions follow applicable agency guidance. *See* BLM Handbook H-2930-1; AR07380-83;

---

[12]     A key element of this inquiry is to determine "that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant[.]"  43 U.S.C. § 1734(b).  In some contexts there is a clear basis for this apportionment, such as a BLM Law Enforcement Officer attending the start/finish of a SRP-authorized competitive motorcycle race, and then making routine patrols in the remaining portion of her workday.  However, BMP cannot analogize to these situations, given the fact that Black Rock City temporarily becomes one of the largest cities in Nevada and is located solely on BLM-managed public lands.  BLM would not incur the disputed costs, but for the Event.  The event actually detracts from the general public interest in that law enforcement resources in the local area and on BLM lands nationwide are depleted during the Event.

AR07387-94.  BLM's Closeout Decisions amply explain the actual costs incurred.  *See e.g.*
AR02755-71 (2018 Event).  Each Closeout Decision includes 1) a summary of BLM's total
costs, breaking out labor costs, equipment charges, travel costs, and the indirect cost recovery
rate; 2) a project log naming each person working on the Event, the dates they worked, their
position, their duties before, during, and after the Event, and the amount charged for that work
(AR02759-64); 3) a summary sheet showing each contract entered into by the BLM for the
Event and the purpose and cost of that contract (AR02765), as well as copies of the contracts
themselves (AR02130-754); 4) travel expenses incurred by each person working on the Event
(AR02766-67); 5) vehicle utilization for each vehicle used for the Event (AR02768); and 6) a list
of the supplies and equipment used for the Event (AR02769-71), as well as the receipts
supporting each expense (AR02029-129).  BLM also provided BMP with comparisons between
the Estimate and Closeout Decisions.  AR02755.

BMP raises several instances where BLM allegedly failed to provide sufficiently detailed
descriptions of BLM's costs.  For example, BMP argues it "cannot tell whether BLM personnel
charged for rooms at a Ritz Carlton or a Holiday Inn" or logged "meals or gift shop novelties" as
"travel incidentals."  Pls.' Mem. 25; *see also id*. 26 (alleging failure to document
"misc[ellaneous] supplies" purchases).  BMP provides no legal authority identifying the amount
of detail required.  In fact, these arguments improperly shift the burden to BLM to prove each
expense was reasonable, when the law requires BMP to show BLM's conclusions were not
rational, or not supported by substantial evidence.  Regardless, BLM has provided these details

to Plaintiffs. *See e.g.* AR02769-71 (table identifying supplies purchased); AR02029-129 (actual

receipts for every item in table).[13]

      Plaintiffs' arguments fail to credit the parties' relationship, and ongoing communications

about all of these issues.  It is appropriate to look beyond the decision documents themselves,

where additional materials "provide the underlying rationale for BLM's cost estimates" and

BLM's process provides the event proponent "a projection of expenses upon which it could

make an informed decision to go forward." *Bookcliff Rattlers*, 171 IBLA at 23, 2006 WL

4072646 at *13.  Again, the parties conduct regular meetings throughout the year, and BMP

freely raises a host of concerns or suggestions for improvements.  *See e.g.* AR03447-52

(addressing BMP and BLM "planning teams" for 2019 Event).  These include dialogue about

scope of operations, changes from the prior year, and any associated cost ramifications.  For

example, after receiving the 2017 Event Closeout Decision, BMP sent BLM a six-page list of

questions.  AR06564-70.  BLM provided answers to all of these questions.  AR01420-34.

Furthermore, BMP raised its concerns in its IBLA appeal to the 2015 Event charges.  *See*

AR04610-11 (asserting labor and travel logs are deficient and provide only "nominal

information").  BLM's response included multiple declarations providing significant explanation

and additional detail addressing BMP's concerns.  *See e.g.* AR04489 (GPS cameras); AR04501-

03 (contracting, supplies, staffing); AR4508-09 (description of "logistical support assets" to aid

Command Post operations); AR04516-17 (satellite tracking and communication devices).

---

[13]    BMP's concerns about excessive or fraudulent accommodations are misplaced.  Federal
government employees are subject to the Federal Travel Regulation System.  *See* 41 C.F.R.
Subtitle F.  As such, they must comply with applicable procedures and guidance to properly
report duty-related expenses.  *See e.g.* 41 C.F.R. § 301-11.11 and .12 (lodging expenses).

Plaintiffs dispute the legitimacy of these costs, but cannot claim to be surprised at their recurrent inclusion in Estimate Decisions.

Plaintiffs point to no violation or omission of a legally-required BLM procedural duty. BLM and BMP have significant engagement on all Event issues, and BLM provides BMP with voluminous information and documentation on cost recovery issues. The Court should reject Plaintiffs' argument that BLM has failed to properly present or document any Estimate or Closeout Decision.

### C.  BLM's Discretionary Choices are Supported by the Record.

Plaintiffs' remaining claims ubiquitously assert that BLM has "unreasonably" escalated certain costs. *See* Pls.' Mem. 28. Such a tactic is particularly disfavored in APA review, as it devolves into mere disagreement over the agency's exercise of discretion. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive"). BLM's choices on particular Event costs are well documented in the record, as are BMP's disagreement with them. Plaintiffs have not provided a basis for the Court to overturn the substance of BLM's cost recovery decisions.

1. Law Enforcement.

A governmental entity has particularly broad discretion in discharging law enforcement functions. Yet, second-guessing the Event law enforcement structure is BMP's primary thrust in bringing this action. *See* Pls.' Mem. 27 ("Law enforcement labor was by far the largest single cost item in every Decision from 2015 through 2019, comprising between 41% and 52% of the total costs charged to BMP each year."). The record demonstrates BLM's substantial attention to these issues, and reasoned consideration of any points that BMP raises.

Much of Plaintiffs' briefing addresses their own views about the legitimacy of BLM's emphasis on public contacts and traffic stops, provides their conclusion that BLM LEOs are spending too much time "sitting idle," and posits the purportedly superior views of their own consultant. *See* Pls.' Mem. 33-40.  Plaintiffs initially suggest that actions like public contacts and traffic stops advance the "general public interest" and are therefore not chargeable to BMP under FLPMA. *Id*. 33.  This argument is easily rejected – the Event is not being held at the outskirts of Lovelock (population 2,000) in the presence of "general public" with whom BLM LEOs might interact.  Indeed, BLM issues a closure order excluding the general public from the Event site.  *See e.g*. AR00765 (2016 Event).  The upshot of Plaintiffs' argument is that BLM's law enforcement effort is "inefficient, excessive[,] and unreasonable."  Pls.' Mem. 40.  Even finding that BMP's attack "raises reasonable questions" would not provide a basis for the Court to declare BLM's choices to be arbitrary and capricious.  *Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170, 1184 (9th Cir. 2000).  Again, Plaintiffs' strategy is not formulated to address their heavy burden.

Plaintiffs emphasize law enforcement staffing levels, arguing "BMP still lacks a clear understanding of how BLM sets staffing levels for the Events."  Pls. Mem.  29.  However, the record adequately explains BLM's decisions about law enforcement staffing.  While industry-wide standards cannot be inflexibly imposed upon the unique locale at Black Rock City, BLM's staffing levels comport with those standards.  AR03603 at ¶¶ 13-14 (law enforcement staffing "ratios fall short of the IACP staffing recommendations"); *see also* AR07644 at ¶¶ 10-11.  BLM has determined that "a large component of achieving compliance with rules and regulations on public lands is through proactively contacting members of the public by BLM law enforcement rangers" (*id*. ¶16) and therefore prioritizes "educat[ing] the visiting public on rules and

regulations that govern the event" in order to "capitalize[ ] on positive interactions with the public in helping achieve compliance at the lowest level."  AR03604 at ¶17.

While BLM has legitimately chosen to emphasize community policing techniques and prevention, there are instances of significant criminal misconduct requiring a state-of-the-art law enforcement presence.  Controlled substance investigation and enforcement requires continual attention by law enforcement officers.  AR03605-06.  At the 2018 Event, an individual was cited for assaulting a federal officer, and eventually found guilty.  *Id*. ¶ 24.  Similar incidents have occurred that require law enforcement presence and force.  AR04325.  BMP acknowledges challenges in addressing "combative participants" and sought to add to its own security staff.  AR07645 at ¶ 16.  BMP was cited for noncompliance at the 2018 event for failing to report a suicide attempt and a sexual assault.  AR02956; *see also* AR02808, AR02776, and AR02782.  "Since 2014, an average of 12 sexual assaults are investigated by law enforcement over the course of the 8-day event."  AR08158.  Such concerns prompted discussions prior to the 2018 Event.  *See* AR04450 (reporting of sexual assault); AR02941, AR08312.  There have been deaths at the Event, which are generally not crime-related but still involve law enforcement.  *See* https://www.rgj.com/story/life/arts/burning-man/2019/08/30/burning-man-2019-death-updates-black-rock-city-nevada/2165395001/ (last visited April 8, 2021).

Plaintiffs also question the "mandates" in nation-wide BLM Instruction Memoranda ("IMs").  *See* Pls.' Mem 30.  However, Plaintiffs' arguments are misplaced, as they misunderstand the function of these IMs.  The BLM Event planning team determines law enforcement staffing levels, in consultation with the Pershing County Sheriff's Office.  AR07643 at ¶¶ 6-8.  The IMs primarily address the level of federal employee *details* necessitated by specified events.  *See* AR07700 (2016 IM stating "specific special events and high use

recreation areas which require a level of law enforcement support that exceeds the staffing

capacity of the State or office where the event is occurring" such that "law enforcement officers

(LEOs) from outside the area must be temporarily detailed to provide support.").[14]  The purpose

of the IMs is not to "mandate" a particular level of staffing, but "[t]o ensure this detail-related

workload is distributed equitably" and that "each State has a designated annual quota of LEOs it

must make available for detail deployment" to the specified events.  AR07701.  In other words,

the IMs are intended to create an orderly means by which BLM specialists from throughout the

agency will temporarily serve at the Event, and other specified occasions, that disproportionately

affect nationwide LEO staffing.

BLM has thoroughly examined all of these issues.  Public health and safety, including

law enforcement, were analyzed in the Event EIS.  *See* AR05645-50.[15]  This discussion was

based upon BLM's report "Public Health and Safety at the Burning Man Event."  AR08167-96.

The report thoroughly explains law enforcement staffing challenges, AR08174-78, and the

reasoning behind BLM's decision to staff the 2016-2018 Events with 75 BLM LEOs.  AR08174-

78.  This "represents approximately a 40 percent drawdown on BLM national law enforcement

resources for 258 million acres of public lands administered by the BLM."  AR08175.  The

report includes a table summarizing staffing levels, citations and arrests from 2001-2017.

AR08179.  BLM has regularly compiled similar information throughout the course of the Event.

---

[14]     A "detail" in relevant parlance for the federal workforce is a temporary assignment of an
employee to a different position for a specified period, with the employee returning to regular
duties at the conclusion of the detail.  *See* https://www.opm.gov/policy-data-oversight/data-
analysis-documentation/personnel-documentation/processing-personnel-actions/gppa14.pdf (last
visited April 8, 2021)

[15]     The Final EIS contains shading and strikethrough of applicable text to reflect changes to
the Draft EIS.  *See* AR05601.

AR04335; AR04340; AR08587; AR01601.  These materials are frequently shared with BMP.

AR01120 (CAD system).  Law enforcement is a featured topic in the parties' communications

and Event planning.  AR01108; AR03679.  BMP disagrees with some of BLM's strategies and

decisions regarding law enforcement, but such disagreement does not establish a violation under

the APA.

Finally, Plaintiffs object to BLM's decision to utilize a centrally-located "substation" to

direct its law enforcement effort.  Pls.' Mem. 43.  BMP contends it is illegal to charge

substation-related costs because "BLM has never shown that these activities led to any

improvement in public safety at an Event or that their costs were reasonably incurred in

connection with BMP's permit."  *Id*.  Yet again, the burden is on BMP to show BLM's actions

violate the arbitrary and capricious standard, not on BLM to show "improvement" or to engage

BMP in a dialogue about whose strategy is superior.  Having a "police station" in a city of

70,000 people hardly seems irrational.  BLM has amply explained the need for a substation and

for its chosen configuration.  *See* AR07645; AR07648; AR07663; AR04816; AR07163;

AR03604; AR 03609-10.

Government authority is particularly broad relating to law enforcement.  BMP's opinions

that BLM could be more efficient or provide some lesser degree of law enforcement

staffing/capability do not establish legal error.  BLM's decisions conducting Event law

enforcement are thoroughly reasoned and supported by substantial evidence.

2.  Work Status Designations.

Plaintiffs attack BLM's designation of the Event as an "emergency" and then "mission

critical" work status, claiming BLM is creating "an incentive for Districts nationwide to send

their law enforcement officers to Burning Man so the District could enjoy a two-week payroll

holiday for these officers." Pls.' Mem. 44. Plaintiffs are mistaken; these designations afford the agency needed flexibility to address the Event's unique demands.

Contrary to BMP's argument, these designations merely lift the bi-weekly pay cap and allow BLM employees that are exempt from the Fair Labor Standards Act to receive overtime, so that they are fairly compensated for their work. AR03610 at ¶¶ 40-43; AR03616-17 at ¶¶ 4-11. This designation is not universal. For example, it only applied to 25 of the 75 assigned law enforcement positions at the 2018 Event. *Id*. Plaintiffs provide no support for the claim that BLM's designations are in error, and instead allege that the mission critical designation was a decision of past BLM managers and that the BLM has not shown that it could not staff the Event without such a designation. *Id*. In fact, the record shows that current BLM managers made the decision and that the BLM was required to assign officers to work at the 2018 Event because there were insufficient volunteers. *See* AR02904; AR03679. The BLM's emergency and mission-critical determinations were reasonable and appropriately documented in the record.

By regulation, BLM may determine that an employee is needed to perform work that is critical to the mission of the agency and, once that designation is made, the agency must pay premium pay even if the pay-period cap is reached. 5 C.F.R. §550.106(b)(1); AR03610 at ¶¶ 40-43. BLM's Deputy Director for Operations determined that the Event necessitates mission-critical work, allowing those BLM employees working at the event to earn premium pay for their overtime work. AR08049-50; *see also* AR01457 (2017 Event). As BMP notes, BLM in 2012-2016 adopted an "emergency" designation for the Event. *See* AR00703 (2015 Event). Both of these designations are necessary given the Event's remote location, the substantial and rapid population growth to over 70,000 people, and the limited nature of local resources. AR01018. Both the mission-critical designation and the emergency designation allow the

agency to pay the overtime rate as a true time-and-a-half rate and remove the per-period pay cap of paid regular hours and overtime hours combined.  5 C.F.R. § 550.107; *see also* AR01019. Without these designations lifting the pay cap, some BLM employees working at the Event would be compensated at less than their normal pay rate, which would not be fair or reasonable. AR03617 at ¶ 10.  Relatedly, the Event's national detail status exists to address the limitations on staffing that BLM Nevada can provide.  AR03610 at ¶ 43.  Even with these mechanisms, BLM regularly faces difficulties fully staffing the Event.  *Id*.

BMP has only shown that it disagrees with the BLM's emergency and mission-critical designations, rather than agency error.  BMP's mere opinion that the BLM should have administered the Event differently is insufficient as a matter of law.  BLM's decisions are rational and supported by the record.

3.  Technology and Information Systems.

Plaintiffs further complain of the "bloated technology program that primarily supports BLM law enforcement at the Events" consisting of "equipment, services, and staffing that greatly exceeded the reasonable needs of [BLM's] on-site operations."  Pls.' Mem. 46.  For largely the same reasons as its attacks on the law enforcement program in general, these arguments must fail.

Plaintiffs generally dispute the amounts charged, claiming they have not been sufficiently apprised of the need for the equipment purchased, or the related duties of agency employees providing technology-related services.  But other than speculating that BLM employees worked too many hours on setting up the systems, BMP provides no objective evidence of error.

The record provides a reasoned basis for BLM's choices configuring and administering its Event technology systems.  For example, BMP complains about the hours logged by BLM's

39

Communications Branch Chief for the 2018 Burning Man Event.  *Id*.  However, that particular BLM employee has extensive experience planning for the Event and was heavily involved in the communications planning aspects over several years of the Event.  *See* AR07660-64; AR02931-36 (Declarations of Jon Young regarding 2016 and 2017 Events).  BLM utilized an experienced employee to set up and administer a critical piece of infrastructure, and BMP fails to articulate, let alone prove, error in any Estimate or Closeout Decision for such work.  The other communications staff highlighted by BMP were also necessary to set up and maintain the infrastructure necessary for the 2018 Event, even performing work related to BMP's separate communications systems.  AR03629-31.  BMP suggests there should exist some "least qualified employee" requirement in the SRP Regulations, but aside from lacking any legal support, this defies common sense in the information technology context.

Plaintiffs cannot plausibly contend that any of these charges came as a surprise in any given Event year.  These topics are regularly discussed by the parties, and featured in various reports and agreed-upon statements of work.  AR01064; AR01134 (2016 Event); AR07205 (2017 CAD); AR07217 (2017 internet); AR03476 (2019 Event).  BMP has repeatedly posed the questions raised in their brief, and BLM has answered them.  AR01420.

Plaintiffs provide neither a legal nor factual basis to find BLM error.  Instead, BMP acknowledges that the BLM requires these critical infrastructure systems but argues that it should take less money and time to provide them.  Pls.' Mem. 47.  Such an argument does not support BMP's burden under the arbitrary and capricious standard.

4.  Government Employee Medical Facility.

Plaintiffs voice further disagreement over a "BLM medical unit for the exclusive use of on-site government personnel" unnecessarily "duplicating the services" that "BMP provide[s] for

everyone at the Event." Pls.' Mem. 50-51. Once again, BLM has thoroughly vetted these issues with BMP, and explained why BLM's medical facility is necessary for BLM to administer the Event SRP.

The U.S. Department of Health and Human Services prepared a medical threat assessment which outlined the unique health risks to federal employees working at the Event. AR08518-39. That report concluded that BLM's medical unit addresses BLM's mission at the Event. AR08520, AR08538. BLM's facility provides a federal patient advocate, providing personalized medical care for federal employees working at the Event and maintaining a sealed medical history on each person. AR03611 at ¶ 45; AR03620 at ¶ 30. The unit provides specialized services capability such as stress management, tactical medicine, and can act as a force multiplier in active shooter and mass casualty environments. AR03611 at ¶ 46. These services are invaluable in keeping over 100 federal employees healthy in the Event's austere environment. *Id.*

BLM's overviews of the facility further document its necessity. AR04438-40. The medical unit provides several services that are not available through BMP's medical facilities. AR04438. Its availability provides a savings of at least 128 staff hours, by offering treatment that would otherwise require transport to Fernley or Reno to be seen by a physician. AR04439. For example, a BLM employee presented with chest pains at the 2018 Event. BMP's medical facility did not have the diagnostic capability to sufficiently rule out a possible heart attack. *Id.* Additionally, there have been occasions when BLM's facility has provided medical supplies and equipment to BMP's medical staff. *Id.*; *see also* AR03620.

Plaintiffs would prefer that federal employees use the first aid stations and the medical facility available for Event participants. *See* Pls.' Mem. 51. BLM has fully considered this

option.  Prior to the 2017 Event, BMP formally made this proposal.  AR04720.  BLM carefully

considered the proposal, briefing it to the BLM State Director.  AR01358-60.  Ultimately, BLM

declined BMP's proposal.  AR04359-61.  Due to the specialized needs of BLM's operations at

the Event, including care to uniformed law enforcement officers, BLM appropriately determined

that a medical facility dedicated to federal employees is not a redundant function when compared

to the medical services BMP provides for Event participants.  *Id*.  The services provided by the

BLM medical unit uniquely address health and safety for those federal employees working at the

Event.  BMP offers only unsubstantiated opinion otherwise.

The record provides a sufficient rationale for BLM's determination that its medical

facility is needed to properly administer the Event SRP.  BMP has not shown error, and their

arguments claiming that BLM has arbitrarily and capriciously charged for a medical facility

should be denied.

5.  Vendor Monitoring.

BMP further complains that it should not be required to pay costs related to BLM's

monitoring of vendors providing services to Event participants.  Pls.' Mem. 52-53.  Again,

BMP's argument is incorrect, as those services are necessitated by the Event and appropriately

included in cost recovery.

Approved Event vendors may provide needed services to participants including bus and

air transportation to the event, RV/trailer rentals, greywater/black water pumping, or generators.

Since these vendors are working on public lands, they are required to obtain a permit.  Some

vendors are covered under the Event SRP but others are not.  While all vendors could be covered

under the Event SRP, that option would require BMP's oversight of each vendor because any

violation of permit terms by one of those vendors could constitute an SRP violation.  AR03623

at ¶ 7; AR03621 at ¶ 36.  As an alternative, BLM has allowed vendors to obtain their own permits, so that compliance with permit terms can be monitored individually.  *Id*.  For example, at the 2018 Event there were 63 vendors who provided services to Event participants and the associated BLM permit-related labor is therefore charged to BMP's cost recovery account. AR03623 at ¶ 5; AR03620-21 at ¶¶ 33-34.

BMP argues these costs should borne by BLM, or charged to the individual vendors. Pls.' Mem. 53.  Neither argument has merit.  The vendors would not be providing their services, but for the Event.  Again, these services are for BMP's exclusive benefit, as the Event closure order forecloses any possibility of there being "general public" recipients of such services. AR03623 at ¶ 7; AR03620-21 at ¶ 33.  BMP actually controls which vendors may be present and issues its own authorizations for vendors.  *See* AR04825 (outlining the process for BMP to recommend/authorize vendors so that BLM can determine if it will issue an SRP).  BLM's labor costs for vendor compliance are included in each Estimate Decision, to which BMP has never objected.  *See e.g.* AR02779 (including "vending compliance" charges).  Accordingly, it is appropriate and reasonable for the BLM to monitor vendor compliance at the Event, and to include those costs in its Estimate Decisions.  Once again, Plaintiffs' effort falls far short of their burden.

### D.  Plaintiffs Improperly Seek a Refund from the Court.

Plaintiffs should not prevail on any of their claims, but even if they were to prevail they erroneously assume the Court will provide them a "refund" of Estimate Decision costs previously paid to BLM.  They argue that "the Court can determine, as a matter of law, that many of the costs BLM charged BMP were unreasonable and order the agency to refund all

unreasonable costs pursuant to 43 U.SC. § 1734(c)."  Pls.' Mem 22.[16]  More specifically, BMP

requests that the Court order a refund of things like "[a]ll costs associated with BLM law

enforcement personnel who were not reasonably necessary . . . [a]ll costs associated with BLM's

law enforcement substation . . . [a]ll costs related to BLM's unnecessary technology equipment

and personnel" and similar categories addressed in their briefing.  *Id*. at 53.  Plaintiffs' requests

lack legal support, ignore proper APA remedy analysis, and misconstrue the Court's role on

review of agency action.

The cited provision in FLPMA does not support Plaintiffs' requested remedy.  That

provision states:

> In any case where it shall appear *to the satisfaction of the Secretary* that any
> person has made a payment under any statute relating to the sale, lease, use, or
> other disposition of public lands which is not required or is in excess of the
> amount required by applicable law and the regulations issued by the Secretary, the
> Secretary, upon application or otherwise, *may cause a refund to be made* from
> applicable funds.

43 C.F.R. § 1734(c) (emphasis added).  This language makes payment of a refund discretionary

with the agency.  It does not authorize a reviewing court to engage a claimant's proffered

balancing of "reasonableness."

These observations are amplified by established APA remedy principles.  If a claimant

prevails under the APA "it is entitled to relief under that statute, which normally will be a

vacatur of the agency's order."  *Am. Bioscience*, 269 F.3d at 1084 (citations omitted).  However,

vacatur is not a presumptive remedy, and "depends on the seriousness of the order's deficiencies

(and thus the extent of doubt whether the agency chose correctly) and the disruptive

---

[16]     To support this proposition, Plaintiffs cite "*Bookcliff Rattlers*, 171 IBLA at 21; *Michael Voegele*, 174 IBLA at 318."  Pls.' Mem. 22.  Aside from being IBLA decisions of limited authority before this Court, the cited passages do not discuss, let alone approve, refunds of previously-paid estimate costs as Plaintiffs suggest.

consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks and citation omitted); *see also Am. Bioscience*, 269 F.3d at 1086 (recognizing "our practice of remanding without vacating when we are unsure of the grounds the agency asserts to defend its action (and, perhaps, where we perceive that a ground poorly articulated might be sufficient to sustain the action" (citations omitted)).  Even where the reviewing court finds "a serious failing" leads to "doubt as to whether the agency chose correctly" in the decisions at issue, remand without vacatur is appropriate when "nothing suggests that the agency would not be able to substantiate its prior conclusions[.]" *WildEarth Guardians v. Bernhardt*, No. 16-cv-1724 (RC), 2020 WL 6701317, at *15 (D.D.C. Nov. 13, 2020) (internal quotation marks and citation omitted).

Plaintiffs invite the Court to stray far beyond its proper role in APA review.  It would defy common sense for the Court to decide that "all costs associated with BLM's law enforcement substation" should be refunded, lest the Court decide, as a matter of law, that Black Rock City should not have any law enforcement substation.  Plaintiffs' requests necessitate fact-finding, in which the Court would be distinguishing costs "reasonably necessary" from those that were not.  This analytical approach is deeply flawed, as it necessitates the Court substituting its judgment for that of the agency, in violation of fundamental principles of APA review.  *See State Farm*, 463 U.S. at 43.  The Court need not evaluate remedy because Plaintiffs' claims should be rejected, but any relief available to BMP under the APA is limited to a remand to BLM.

## V.  CONCLUSION

Defendants respectfully request that the Court grant Defendants' cross-motion for summary judgment, deny Plaintiffs' motion, and dismiss this case with prejudice.

Respectfully submitted this 9th day of April, 2021.

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources Div.
United States Department of Justice

/s/ *Paul A. Turcke*
PAUL A. TURCKE (Idaho Bar # 4759)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
(202) 353-1389
paul.turcke@usdoj.gov

*Attorneys for Defendants*