# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLACK ROCK CITY LLC, *et al.*

      Plaintiffs,

v.

                                      Civ. Action No. 1:19-cv-03729-DLF

DAVID L. BERNHARDT, *et al.*

      Defendants.

_____

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

HOLLAND & KNIGHT LLP

Rafe Petersen (Bar ID Number: 465542)
Nicholas W. Targ
Alexandra E. Dobles
800 17th Street NW, #1100
Washington, D.C. 20006
(202) 419-2481

LEVIN LAW FIRM

David S. Levin (CA Bar No. 156336)
*Admitted pro hac vice*
405 Sherman Ave
Palo Alto, CA 94306-1827
(650) 858-8500

*Attorneys for Plaintiffs Black Rock City LLC and Burning Man Project*

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ..................................................................................................... 2

    A.  BMP Challenged The Correct Agency Action. .............................................. 2

        1.  BLM creates a false dichotomy by attempting to distinguish between an "Estimate Decision" and a "Closeout Decision." ........................................................................ 4

        2.  The cost recovery Closeout Decision marks the consummation of BLM's cost recovery process for each Event. .......................................................................... 6

        3.  Permittees such as BMP should not be forced to choose between accepting estimated fees and forgoing their recreation events. ............................................ 11

        4.  IBLA's treatment of an appeal concerning regulation of Event Contractors undermines BLM's arguments on jurisdiction. ....................................................... 13

    B.  BLM Distorts BMP's Arguments That Only "Reasonable" Fees May Be Recovered..... 15

    C.  BLM's Repeated References To The Parties' Collaborative "Meetings" Ignore the Underlying Record And Are Irrelevant To The Issues Before The Court............................... 18

    D.  The Administrative Record Fails to Support BLM's Argument That Its   "Discretionary Choices" Constituted Reasonable Costs. .................................................................. 21

    E.  Law Enforcement Staffing Costs Were Unreasonable And Remain Unexplained........... 24

        1.  BLM fails to adequately support its law enforcement staffing decisions. .................... 26

        2.  BLM fails to dispute BMP's compelling evidence that BLM's law enforcement staffing costs were unreasonable. ........................................................................ 29

        3.  BLM's Memorandum contradicts statements from its own leadership. ....................... 30

        4.  The actions and influence of Special Agent Love are indefensible and undeniable. ... 31

    F.  BLM Cannot Justify Its "Emergency" And "Mission-Critical Work" Designations. ...... 33

    G.  BLM Has Failed To Justify Its Unnecessary Costs For IT Personnel And Equipment.... 35

    H.  BLM's Exclusive Medical Unit Was Not Necessary And Not Justified. ........................ 38

    I.  BLM Lacks Authority To Shift To BMP The Cost Of Overseeing Third-party SRPs..... 40

    J.  The Remedies Plaintiffs Seek Are Proper. ...................................................................... 43

III.  CONCLUSION.............................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) ................................................................45

*Bennett v. Spear,*
520 U.S. 154 (1997) ...........................................................................7, 14

*Bowen v. Mass.,*
487 U.S. 879 (1988) ................................................................................44

*Brown v. Plata,*
563 U.S. 493 (2011) ................................................................................44

*Burning Man Project,*
197 IBLA 66, 2021 WL 1713214 (IBLA 2020-303) (April 23, 2021)...................................14

*Checkosky v. SEC,*
23 F.3d 452 (D.C. Cir. 1994) ..................................................................44

*Citizens Ass'n of Georgetown v. Fed. Aviation Admin.,*
896 F.3d 425 (D.C. Cir. 2018) ................................................................10

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.,*
846 F.3d 1235 (D.C. Cir. 2017) ..............................................................44

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971) ................................................................................16

*Judulang v. Holder,*
565 U.S. 42 (2011) ..................................................................................24

*Kaltenbach v. Richards,*
464 F .3d 524, 528 (5th Cir. 2006) ...........................................................18

*Koi Nation of N. Cal. v. U.S. Dep't of Interior,*
361 F. Supp. 3d 14 (D.D.C. 2019) ......................................................24, 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ..................................................................................24

*Nevada Power Co. v. Watt,*
711 F.2d 913 (10th Cir. 1983) ........................................................ *passim*

*POET Biorefining, LLC v. Envtl. Prot. Agency,*
   970 F.3d 392 (2020)..................................................................................7

*Select Specialty Hosp.-Bloomington, Inc. v. Burwell,*
   757 F.3d 308 (D.C. Cir. 2014) .............................................................34

**Statutes**

5 U.S.C. § 704......................................................................................................10

5 U.S.C. § 706................................................................................................ *passim*

16 U.S.C. § 460ppp (8)........................................................................................13

16 U.S.C. § 6802(c) .............................................................................................42

16 U.S.C. § 6802(h) .............................................................................................40

43 U.S.C. § 1734............................................................................................ *passim*

Administrative Procedure Act........................................................................ *passim*

Federal Land Policy and Management Act..............................................3, 13, 17, 43

Federal Land Recreation Enhancement Act .......................................................42

Rule 56..................................................................................................................45

## I.     INTRODUCTION

Plaintiffs Burning Man Project and its wholly owned subsidiary Black Rock City LLC (collectively, "BMP") seek review of the final decisions on cost recovery for the Burning Man Event (the "Event") for the years 2015 through 2019.   Despite the U.S. Bureau of Land Management's ("BLM's") protestations to the contrary, BMP challenged the correct "final" agency actions.   BMP was not required to challenge the preliminary cost estimates, and BLM is well aware that such challenges would have only resulted in cancellation of the Events.   Moreover, at no time in the past five years of litigation has BLM suggested that its determination of the actual direct and indirect costs is a mere accounting process subject to limited review.   Yet, BLM's contention to this Court that a permittee is entitled to no justification of the agency's actual costs of permit administration is consistent with the fact that the Administrative Record wholly fails to support a conclusion that BLM charged BMP only for "reasonable" costs, as required by applicable law.

While BLM recites the very statute upon which BMP primarily relies, 43 U.S.C. § 1734(b) (*see* Dfs.' Mem. at 7 (Dkt. No. 29)), the agency then improperly attempts to read the word "reasonable" right out of the statute.   Despite BLM's assertions, the reasonableness factors clearly limit BLM's discretion to require reimbursement.   Moreover, under the Administrative Procedure Act, this Court is empowered to decide relevant questions of law, interpret statutory provisions, and determine the meaning or applicability of the terms of an agency action.   5 U.S.C. § 706. BLM's efforts to avoid judicial review should be rejected.

The fact that an overcharge does not "come as any surprise" to the permittee does not make it proper.   By paying BLM's estimated costs before each Event, BMP did not "forego" the right to challenge the final decision BLM later issued.   As BLM recognizes, Event planning is essentially a year-round undertaking, with the cost estimate often delivered to BMP mere weeks before the

Event.  Indeed, as BLM notes, BMP never had any choice but to pay the estimate for an Event to be held, BMP reserved its right to challenge the final decisions, and BMP filed a timely appeal of each final decision.

The Administrative Record does not justify BLM's cost recovery decisions.  Since 2013, BLM's spending related to the Events has been uninhibited, and BLM has sought recovery from BMP for any and all "actual" expenses it decided to incur.  BLM has improperly failed to exclude the costs that serve the "general public interest" or to demonstrate the reasonableness of the costs charged to BMP.  Every attempt by BMP to change these practices has been ignored or rebuffed.

BLM has likewise failed to cite substantial evidence in the Administrative Record to support what it refers to as "discretionary choices," such as law enforcement staffing, its public relations substation, IT equipment and personnel, and an exclusive medical unit.  The same deficiency applies to BLM's "emergency" and "mission-critical work" designations.  In nearly every instance, BLM's "evidence" consists of documents created after BLM made its decision to charge the costs, including witness declarations prepared by counsel to defend against BMP's Agency Appeals.  Finally, BLM ignores or fails to refute BMP's objective evidence that BLM's "discretionary choices" have resulted in BMP being extensively charged for unreasonable costs.

## II.    ARGUMENT

### A.    BMP Challenged The Correct Agency Action.

BLM's core argument is that Plaintiffs have failed to target the correct agency action. (Dfs.' Mem. at 28-32.)  This amounts to a desperate attempt to avoid judicial review.  After six years of nearly continuous litigation over the cost recovery for the Burning Man Special Recreation Permits ("SRP"), BLM now purports to be confused about what actions are being challenged. Despite having fully briefed these issues before the agency's own Interior Board of Land Appeals ("IBLA"), BLM asserts to this Court the new and novel argument that "Plaintiffs have failed to

'direct [their] attack' with requisite specificity to any final agency action" (Dfs.' Mem. at 22), and "Plaintiffs have failed to plead a challenge to the final agency action(s) which give rise to their alleged injuries." (*Id.* at 24.) In fact, BMP has clearly articulated that it seeks review of the final cost recovery decisions for each Event starting in 2015. BLM's contention that the cost recovery decisions are mere "accounting[s] of costs" (*id.* at 19) that cannot be challenged is both legally and factually erroneous. As explained further below, BLM's apparent belief that all it must do after an Event is list what the agency "actually" spent underscores why the decision documents and Administrative Record in this case are so devoid of detail.

BMP's Amended Complaint confirms that it is "challenging the burdensome, unjustified, and excessive costs and other unlawful practices imposed upon BMP by BLM through the Special Recreation Permit ('SRP') process" and, more specifically, "the unreasonable costs imposed by" BLM, "the process by which those costs have been demanded, and the inadequate justification for the costs imposed." (Pfs.' Am. Compl. ¶ 2 (Dkt. No. 21).) Consistent with the regulations, BMP challenged the reasonableness of the "Cost Recovery Charges" related to the SRPs for five different Events. (*Id.* ¶ 4 (citing 43 C.F.R. § 2932.31).)[1] As explained in the Amended Complaint, each year BLM issues a final decision on the Cost Recovery Charge that "assesses to BMP all costs that BLM alleges it incurred for the prior year's Event." (Pfs.' Am. Compl. ¶ 31.) Only at this point does BMP know the full extent of BLM's charges. In contrast, the cost "estimate" is just that: a rough placeholder, subject to change, upon which BMP must make a deposit in order for the agency to process the permit application.[2]

---

[1] Contrary to BLM's allegation, BMP does not seek "wholesale improvement" of BLM's process (Dfs.' Mem. at 23), but BLM's adherence to applicable law.

[2] The payment made with the cost recovery estimate agreement is essentially a security deposit enabling the agency to do the work. "The Federal Land Policy and Management Act (FLPMA) section 304(b) provides that the Secretary of the Interior is authorized to require a deposit of

BMP's allegations are hardly a "blunderbuss" complaint as alleged by BLM.  (Dfs.' Mem. at 22.)  To the contrary, the interrelation of the various steps in the SRP process for each Event is obvious, and in BLM's own words, the process is a year-round effort for all involved (Dfs.' Mem. at 6), with constant changes.  Nevertheless, each year since 2015, the subject of BMP's appeals has been very straightforward: BMP has appealed BLM's final cost recovery decisions, and BLM has attempted to defend those final decisions.[3]

### 1. BLM creates a false dichotomy by attempting to distinguish between an "Estimate Decision" and a "Closeout Decision."

At issue in this case are cost recovery fees for commercial use related to issuance of a BLM permit.  The relevant statutory provision makes clear that BLM may only seek repayment for "reasonable costs."   43 U.S.C. § 1734(b).  Under the "organized group/event use" provision of the regulations, BLM may "charge a fee for recovery of costs to the agency of analyses and permit processing instead of the Special Recreation Permit fee" if BLM needs more than 50 hours of staff time to process the SRP.  43 CFR § 2932.31(e)(2).  BLM's authority on cost recovery is expressly "limited to BLM's costs of issuing the permit including necessary environmental documentation, on-site monitoring, and permit enforcement."  43 CFR § 2932.31(e)(3).  After the permitted event is over, BLM determines the actual fees it incurred and may charge the permittee through cost recovery, and if that total exceeds its prior estimate, it issues a refund from the deposit it collected in advance of the event.  43 CFR § 2932.33.  Hence, regardless of what BLM chooses to call the steps in the process, the fact remains that the final costs of any SRP (which includes the costs of

---

payments intended to reimburse the United States for costs incurred in processing and administering applications for use of the public lands. 43 U.S.C. § 1734(b)."   (AR00689.)

[3] While BLM attempts to apply its own nomenclature to distinguish between the estimates and the final decisions, there is no dispute that each of the five IBLA appeals addressed what BLM would refer to as the "Closeout Decision," which sets forth the final cost recovery decision for that Event.

onsite monitoring and enforcement during the Event) are not known until after that Event is over. 43 CFR § 2932.33.

BLM devotes several paragraphs of its brief to its contention that there is a significant difference between what the agency defines as an "Estimate Decision" and a "Closeout Decision." (Dfs.' Mem. at 9-10, 22-23.)  In fact, neither of these terms are used in the regulations cited by BLM, which lend no support to their argument.  BLM provides no citation for its definition of "Closeout Decision" and misleadingly cites to 43 CFR § 2932.31(f) for its definition of "Estimate Decision." (Dfs.' Mem. at 10.)  The regulations establishing "how" BLM sets the fees for SRPs (43 CFR § 2932.31), and "when" those fees must be paid (43 CFR § 2932.32), cannot logically be interpreted as a bar to review of the final cost recovery decision.  Indeed, the regulation cited by BLM (Dfs.' Mem. at 10) simply states that the agency "will notify you in writing if you need to pay actual costs before processing your application."  *See* 43 CFR § 2932.31(f).  Thus, this step is optional.  Despite intimating that the agency's "Estimate Decision" is somehow a "final" action, BLM concedes that it started splitting its estimates into multiple phases after 2016.  (Dfs.' Mem. at 21 n.9.)  It is unclear what BLM contends is its "final" decision that is subject to challenge under the agency's unsupported "Estimate Decision" rubric – Phase I, Phase II, the two phases combined, or a separate challenge to each – especially given that each estimate agreement states that the attached estimate "will be amended" should actual expenses exceed the amounts identified. (*See, e.g.,* 2015 Cost Recovery Agreement (AR 00695).)   Regardless, the interlocutory nature of the cost estimate process demonstrates the fatal flaws in BLM's finality argument.

BLM argues that the "Estimate Decision" is where the agency justifies the cost recovery amounts being charged, and that the "Closeout Decision" is simply an "accounting exercise," which "is not an occasion for BLM to revisit the type or amount of fees required to be paid in the

Estimate Decision and associated [estimate agreement]." (Dfs.' Mem. at 23 (citing 43 CFR § 2932.31(e)(3)).)  At the same time, BLM characterizes its "Closeout Decision" as indicating the "actual direct and indirect recoverable costs" for an Event.  (Dfs.' Mem. at 15.)  Ignoring the plain language of the federal regulation it cites, BLM contends that its "actual costs incurred" require no justification, despite admitting that at this point, BLM determines if a refund to BMP is warranted.  (Dfs.' Mem. at 10 (citing 43 CFR § 2932.33).)  There can be no doubt that the "Closeout Decision" represents BLM's final determination concerning the costs of the Event, and that this final decision was subject to challenge by BMP.

After admitting that either the estimate or the final decision may be appealed (Dfs.' Mem. at 10), the agency contradicts itself by asserting that the "actual costs incurred," as set forth in the Closeout Decision, can only be reviewed for the purpose of "reconciliation against BMP's prior payments."  (Dfs.' Mem. at 24.)  BLM fails to account for the fact that the "Closeout Decision" is actually the point at which BLM would "revisit" the fees due from the permittee based on what actually happened with that SRP.  It is only after an Event that the parties can ascertain whether the costs charged are "reasonable" costs that can properly be charged to the applicant, or whether some of these costs were for the general public's benefit and therefore not subject to cost recovery.  There is no logic to BLM's argument that a permit applicant must challenge an estimate of costs, issued prior to issuance of the permit itself, and prior to completion of the agency's work on that SRP, and forfeit any right to object to the reasonableness of the costs actually reflected in the agency's "Closeout Decision" on the SRP.  BLM's shell game attempts to debase judicial review to a meaningless math exercise.

## 2. The cost recovery Closeout Decision marks the consummation of BLM's cost recovery process for each Event.

The parties agree that for an action to be "final" it must "mark the 'consummation' of the

agency's decision making process." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); (Dfs.' Mem. at 20.) BLM nevertheless attempts to avoid judicial review of its final cost recovery decisions for the Event SRPs by suggesting that BMP should have filed appeals of the preliminary estimates issued prior to each Event. Even setting aside the fact that (as BLM admits) this would have led to the cancellation of the Event each year, and effectively precluded BMP from making lawful use of public lands BLM stewards for precisely such use, BLM's argument is cynical and specious.[4]

BLM does not reach a final decision on what it will charge BMP until well after the Event is over and the agency has taken the time to determine its actual costs. This determination is memorialized in the "Cost Recovery Closeout Decision" sent to BMP several months later. Consistent with the Administrative Procedure Act, the Closeout Decision for each year's Event: (1) marks "the consummation of the agency's decision-making process," and on the interpretation of the cost recovery requirements, is not "of a merely tentative or interlocutory nature"; and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78. This is inherently a "pragmatic" inquiry that focuses on the concrete consequences that the agency action has or does not have as a result of the specific statutes and regulations that govern it. *See POET Biorefining, LLC v. Envtl. Prot. Agency*, 970 F.3d 392, 405 (2020). The relevant decision documents lend no support to BLM's argument that the Closeout Decisions are not final agency actions subject to challenge.

---

[4] While BLM touts BMP's theoretical right to appeal the preliminary cost estimate, BLM ignores the fact that its appeal board has never adjudicated any of BMP's five cost appeals to date and has rejected BMP's motions for stay. (Pfs.' Compl. ¶¶ 5, 47, 67-69 (Dkt. No. 1).) Given the IBLA's inaction, the 2014 Burning Man Event would have been the very last Event to take place if BMP had been required to appeal the 2015 cost estimate and wait for the IBLA to adjudicate the reasonableness of BLM's estimated costs. While BLM may desire to shield its final decisions from scrutiny for reasonableness, that desire directly conflicts with the cost recovery statute. *See* 43 U.S.C. § 1734(b).

For example, in August 2015, the cost recovery estimate that BLM sent BMP included a "Decision" letter (AR00692-94) that established the procedures to reimburse BLM for its costs "incurred to preplan, plan, process, implement, monitor, and administer" the Event (AR00692), with an attached "Cost Recovery Agreement" (AR00695-697).  The August 2015 letter specifically notes that cost recovery charges "will be limited to BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement." (AR00693 (citing 43 C.F.R. § 2932.31(e)(3).)   The letter further states that the parties "shall continue to work together to identify cost savings through efficiency in business practices" and explains that there "could possibly be adjustments to the [cost recovery] Estimate based on market research, MOU's and efficiencies in business practices." (AR00693.)

The Cost Recovery Agreement is a seven-page document that includes only the most basic summary of costs by category.  (AR00695-701.)  The simple chart includes a "Labor Detail" breakdown by "Position," "Estimated Hours," and "Estimated Amount," with a total number at the end.  (AR00698-701.)  The "Operational Costs" are accompanied by a basic "Operations Detail" with "Descriptions" such as "travel," "misc. Supplies/Equip." and gross amounts. (AR00701.)  There is no further detail or explanation to support the raw cost estimates.  Thus, by its own terms, the estimate comprised nothing more than a rough projection of expenses in broad categories and subject to change.  The agency action was tentative and interlocutory by nature, despite BLM's demand that BMP pay the estimate in full by August 10, 2015, as a condition of receiving the SRP for the 2015 Event.  (AR00695.)

Well after the 2015 Event, in January 2016, BLM sent BMP its "Closeout Decision." (AR00688-690.)  In BLM's own words, the Closeout Decision "provides a series of attachments to 'provide a detailed breakdown of all actual direct and indirect costs.'"  (Dfs.' Mem. at 11-12

(citing AR00688).)[5]   In 2015, BMP was due a refund, as it generally is; BLM inevitably overestimates the amount it will actually spend, which underscores the lack of certainty and rigor surrounding its estimate decisions.  (AR00688.)  The Closeout Decision states that the "2015 [cost recovery agreement] and the 2015 actuals justify the refund amount BRC will receive." (AR00689.)[6]  The six attachments – Cost Recovery Closeout Summary (AR00465), Project Log (AR00523-28), BLM Contracts (AR00343-464), Travel Expenses (AR00529-31), Vehicle Utilization Expense (AR00532), and Miscellaneous Supplies and Equipment (AR00466-521) – reflected the final, actual costs that BLM charged for this Event and that BMP appealed. (AR04745-49.)

Given that BMP does not even know the total amount it will ultimately be charged until BLM calculates the "actuals" (43 CFR § 2932.33), the harm to BMP does not crystalize until the Cost Recovery Closeout Decision is issued.[7]  Thus, for five consecutive years, BMP appropriately waited until the Event was over and it had received BLM's Closeout Decision to assess the reasonableness of the costs charged, and to challenge those final decisions to the extent they included unreasonable or insufficiently justified costs.  In none of the five appeals before the IBLA did BLM ever argue that the Cost Recovery Closeout Decision was merely an accounting exercise that could not be challenged by the permittee or that the role of the IBLA was merely to double-check BLM's math.[8]

---

[5] BMP disputes BLM's contention that these attachments provided a "detailed breakdown," as discussed in its Memorandum.  (Pfs.' Mem. at 14-19.)

[6] This statement directly contradicts BLM's assertion that the Court cannot review a final closeout decision and that only an estimate decision may be challenged.  (Dfs.' Mem. at 23-24.)

[7] For example, the final decision included the costs of permit compliance, post-use reports and closeout — work that largely depends on how the Event actually proceeds.

[8] If the final Closeout Decision amounted only to an accounting exercise, it would likely take BLM far less time than the average of five months to complete.

BLM offers no support for its contention that there are "multiple final agency actions" related to the Event that must be challenged seriatim. (Dfs.' Mem. at 21.) Pragmatically, a deposit is provisional and cost recovery is subject to negotiation upon the final factual developments. BLM's own documents state that the estimate decisions are preliminary and subject to change, while the final Closeout Decisions reflect the agency's actual direct and indirect costs. (AR00689.) While BLM does attempt to "foreshadow" total costs in the estimate (AR00688), such "preliminary, procedural or intermediate" agency decisions become reviewable only on review of the final agency action under the APA. 5 U.S.C. § 704.[9] BLM admits as much (Dfs.' Mem. at 24, n.10), and the decisions themselves discuss their interrelation. (AR00689.) Thus, the estimates are relevant to BMP's challenges of the final cost recovery decisions to the extent BLM relied on these estimates in making the final determination of costs charged to BMP. Finally, BLM's citation to *Citizens Ass'n of Georgetown v. Fed. Aviation Admin.*, 896 F.3d 425, 434 (D.C. Cir. 2018), is misplaced, as that case is clearly distinguished on its facts.[10] Here, the agency engages in a clear path of decision-making leading to one final cost recovery decision for each Event.

Finally, BLM's purported confusion after six years rings hollow. As noted in BLM's own Motion to Dismiss, "[BMP] disputes BLM's cost recovery determinations and notices of non-compliance for the events conducted in 2015, 2016, 2017, and 2018, and has availed itself of the opportunity to appeal and seek further administrative review of each of those BLM decisions."

---

[9] BMP has little doubt that if it had challenged any so-called "estimate decision," BLM would have argued that the decision was not ripe for agency review, and that BMP would need to wait until BLM issued a final decision on its actual costs several months after the Event. This is what happened when BMP challenged the contractor letters discussed below. The Court should reject BLM's repeated position that its final decisions are not subject to meaningful review by anyone.

[10] *Citizens Ass'n of Georgetown* addressed whether the plaintiffs were time-barred from challenging approval of flight routes after they missed a 60-day deadline. Here, each of BMP's appeals was timely filed with the IBLA and challenged discrete agency actions.

(Dfs.' Motion to Dismiss at 1 (Dkt. No. 16-1).)  The IBLA took no action on BMP's myriad appeals spanning several years, and BMP filed suit in this Court challenging the Board's intransigence. With the apparent goal of avoiding an adverse decision on BMP's APA argument that the IBLA decisions were "unlawfully withheld or unreasonably delayed," BLM argued that BMP should have appealed the Closeout Decisions directly to this Court, under the theory that  IBLA appeal was not a prerequisite to review and BLM's actions were effective pending administrative appeal. (*Id.* at 16.)  BMP therefore amended its Complaint to remove the counts against the IBLA (Dkt. No. 21), and BLM filed an Answer.  (Dkt. No. 22.)  Now BLM takes the opposite stance with the Court and claims that the cost recovery decisions cannot be reviewed.  The Court should not countenance BLM's wholesale reversal of its position.

### 3.  Permittees such as BMP should not be forced to choose between accepting estimated fees and forgoing their recreation events.

BLM repeatedly takes the disingenuous position that BMP has the choice to accept the cost estimate decisions or appeal them and "forego the [E]vent." (Dfs.' Mem. at 2.)[11]  As BLM admits, BMP must pay the estimated fees before the agency will issue a permit for the Event (Dfs.' Mem. at 2, 9-10), and these estimates often are not furnished until mere weeks before the Event.[12]   This is long after all the tickets have been sold and millions of dollars have been invested in reliance on permit issuance – with the closure order taking effect just days later to enable onsite preparations

---

[11]  BLM further claims that "a proponent may choose to appeal, and petition for a stay of, an Estimate Decision and/or a Closeout Decision" (*id.* at 10), despite then arguing that BMP cannot challenge the Closeout Decisions at issue in this case.  (*Id.* at 22-23.)

[12]  For example, BMP received BLM's 2015 Event cost estimate on July 24, 2015, days before site work had to commence, which forced BMP to "sign[] the [cost recovery] agreement — despite our questions and concerns being unanswered" on August 1.  (AR09731; AR11752 ¶ 19; AR00695-697.)  The SRP was issued on August 7 (AR06532), with the Event starting August 30, 2015 (AR06533).  As outlined by BLM, the cost recovery estimate for the 2016 Event was similarly issued in the same month as the Event.  (Dfs.' Mem. at 13.)

before the Event begins.  If BMP were to appeal the estimate, BLM will not issue a permit for the Event, and the Event would have to be canceled, causing BMP to lose everything it had invested to produce the Event and likely go bankrupt.  Indeed, in the very case relied on by BLM, the permittee had to cancel its event.  (Dfs.' Mem. at 9 (citing *Michael Voegele*, 174 IBLA 313 (May 29, 2008).)  Thus, BMP would have to sacrifice the Event and its solvency in order to avail itself of its right to challenge BLM's cost recovery estimate.[13]  Yet BLM argues that without such an appeal, BMP has no right to challenge the reasonableness of BLM's final cost recovery decision because the final decision is based on the estimate.  This is the "Hobson's choice" alluded to in BMP's Complaint: each year, it must either pay BLM's unreasonable costs or go out of business. (Pfs.' Am. Compl. ¶ 52.)  BMP therefore pays BLM's estimated costs under duress, informing BLM in its cover letter that its "acceptance of the terms [of the Cost Recovery Agreement and Cost Recovery Estimate] is being made with a reservation of all of [BMP's] rights available by law and in equity" to appeal any unreasonable fees charged in the final decision.  (*See, e.g.*, AR09731.)

As BLM acknowledges, since 2016 BMP has objected to BLM's continually overinflated estimates in the hopes of resolving issues that were the subject of ongoing IBLA appeals (Dfs.' Mem. at 12 (citing AR04519-22)), but to no avail.  BLM's flippant response was that the cost estimate "serves to inform an applicant's decision on whether to hold an event on public lands or not." (Dfs.' Mem. at 13.)  In other words, BLM threatens BMP to either sign the agreement or forget about using the public lands for its Events.  BLM relies on this oppressive leverage to force BMP to "take it or leave it" each time BMP applies for a permit.  The fact that the final overcharge

---

[13] The unspoken suggestion that the IBLA would rule on any appeal in a timely manner is belied by the fact that BMP's 2015 cost appeal remains unresolved, after languishing on the docket for five years, and also by IBLA's interpretation of its authority to issue a stay, as discussed below.

is "no surprise" to BMP certainly does not render BLM's overcharging proper. [14]

### 4. IBLA's treatment of an appeal concerning regulation of Event Contractors undermines BLM's arguments on jurisdiction.

A recent IBLA appeal relating to the cancelled 2020 Event highlights the faults in BLM's jurisdictional arguments.  On April 1, 2020, BMP challenged two letters issued by the District Manager of BLM's Winnemucca District Office pertaining to the regulation of service providers at the 2020 Event.  (IBLA 2020-303.)  BMP's Notice of Appeal and Request for a Stay sought review of these letters, which set forth BLM's new requirement that BMP's Event production contractors ("EPCs") must each apply for and obtain their own SRP from BLM, or must be expressly designated under the Event SRP.  These contractors work for BMP by providing critical infrastructure, goods, and services frequently associated with a large-scale event, ranging from sanitation to medical care and security.  If the EPCs are expressly designated under the Event SRP, BLM specified that BMP must include the EPCs' gross receipts in the calculation of the Event's 3% commercial use fee.  BLM made clear that if BMP did not ensure compliance with this new requirement, BLM would not process the Event SRP. [15]  The IBLA's orders on this appeal are

---

[14] BLM repeatedly suggests that BMP should simply hold the Event in a different location, despite BMP's annual use of the public lands for these purposes for the past thirty years.  When Congress established the Black Rock National Conservation Area in 2000, it included express findings that large-scale, permitted recreational activities (*i.e.*, Burning Man Events) were expected to continue on the site. 16 U.S.C. § 460ppp (8).  The Event was specifically made a part of the Resource Management Plan for the Black Rock NCA.  In June 2019, BLM issued an Environmental Impact Statement and Record of Decision in support of a 10-year SRP for the Event.  Thus, BMP's expectations of continuing the Event are eminently reasonable, and BLM's extortionate "management" of the NCA should not be countenanced by this Court.

[15] BMP challenged this novel interpretation of the FLPMA regulations under the theory that an EPC that provides services directly to BMP (*e.g.*, rentals of golf carts for BMP staff) should be treated as an expense (i.e., "money spent directly on the permitted activity," 43 C.F.R. § 2932.5) as opposed to income received from participants. Mischaracterizing the cost of a service as an increase in gross revenue would artificially inflate the commercial use fee owed to BLM and is inconsistent with basic accounting principles.

instructive to the matter before this Court.

On April 10, 2020, the IBLA denied BMP's request for a stay, reasoning that if a stay were issued. BLM "would lack jurisdiction to approve the [Event's] SRP without compliance," as the appeal would transfer jurisdiction over to the Board.  The IBLA further explained:

> [I]n this case a stay would prevent BLM from processing the SRP application because to do so BLM would in effect need to vacate its existing decision requiring EPCs to have permits. But it has no jurisdiction to vacate its decision pending appeal. In practical effect, BLM could not act on the SRP application until the appeal was resolved. Thus, the stay BMP seeks would not alleviate its harm.

(Order, Petition for Stay Denied; Briefing on Jurisdiction Ordered at 4 (Apr. 10, 2020) (citing *Cimarex Energy Co.*, 193 IBLA 6, 9 (2018).)  Thus, by granting a stay, the IBLA would ensure that the Event would not happen.  Again, this demonstrates that BMP would never be in a position to challenge an interim decision such as a cost estimate unless it were willing to forego obtaining an SRP.  BLM cannot rationally pretend that this is a viable choice.

In its April 10 Order, the Board requested further briefing on whether the two letters were appealable decisions (*i.e.* final agency actions).  On April 23, 2021, the IBLA issued a second order dismissing BMP's appeal upon concluding that the letters are interlocutory, and not subject to administrative appeal, rather than final agency decisions.  *Burning Man Project*, 197 IBLA 66, 2021 WL 1713214 (IBLA 2020-30) (April 23, 2021).  Relying on *Bennett*, the IBLA held that the letters did not mark the consummation of BLM's decision-making on whether to grant or deny BMP's application for an SRP.  *Id.* at 74.   "[W]hile the [l]etters do require action from BMP to continue the application process," the Board reasoned, "they do not deny any SRP application, mandate that any EPC file an SRP application, or otherwise take any final action related to BMP or its contractors." *Id.* at 74.  The Board went on to clarify that "[e]ven when a decision is 'final' for purposes of an issue in an ongoing adjudicative process, the challenge to it must ordinarily await the final adjudication decision." *Id.* at 76.

Thus, as BMP has shown, BLM's estimate decisions are not "final" because they are mere estimates, subject to change and not necessarily reflecting costs BLM will actually incur and charge to BMP through cost recovery; such actual costs are reflected only in BLM's final Closeout Decisions issued months later.  Until the agency has calculated its actual costs, and decided whether more or less money is owed than paid under the estimate agreement, BLM has not "issued a final decision" on cost recovery.  197 IBLA at 78.[16]  Hence, under the IBLA's interpretation of finality and elementary principles of logic, BLM's final cost recovery decisions are reviewable.

**B.    BLM Distorts BMP's Arguments That Only "Reasonable" Fees May Be Recovered.**

A core contention in BLM's Memorandum is that BMP misapprehends the timing and nature of cost recovery decisions (Dfs.' Mem. at 19), but this argument both distorts BMP's allegations and ignores the plain language of the statute.  BLM claims that "Plaintiffs' case is erroneously built upon the notion that the Court will conduct some generalized 'reasonableness' inquiry" (Dfs.' Mem. at 19) and argues that "Plaintiffs mistakenly believe the Court should gauge BLM's actions under a ubiquitous 'reasonableness' standard."  (Dfs.' Mem. at 24.)  This "straw man" argument was created by the agency's counsel merely to strike down.

As BLM knows, BMP brought this action pursuant to the Administrative Procedure Act ("APA"), which allows for judicial review of agency action and the setting aside of actions that exceed statutory authority or do not observe a statutory procedure.  *See* 5 U.S.C. § 706(2)(C)-(D).

---

[16] The IBLA took pains at the conclusion of the April 23 Order to point out that there are two cost recovery decisions that may be appealed, and that the Board's decision is unrelated to cost recovery.  *Id.* at 80.  This is notable in that the various steps in a cost recovery decision were not briefed by either party in that appeal, so this constituted an improper advisory opinion.  *See Statoil Oil & Gas, LP* (On Reconsideration), 192 IBLA 241, 253 (2018) ("It is not within the province of the Board to render advisory opinions, since it requires us to address hypothetical questions not properly presented by the appeal.")  Nonetheless, the Board's treatment of BMP's EPC appeal illustrates the pragmatic reality of the SRP process and IBLA appeals.

Courts are specifically empowered to "determine all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. In reviewing an agency action, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Here, BMP seeks review of whether the costs assessed for the Events reflect "reasonable" costs as required by statute or whether, as BMP alleges, they are burdensome, unjustified, excessive, and lacking explanation. Such review falls squarely within the parameters of the APA.

At no point has BMP argued for a "generalized 'reasonableness' inquiry." (Dfs.' Mem. at 19.) As BMP has explained, the statutory provision at issue authorizes BLM to require a deposit for reimbursement of "reasonable costs," which along with the regulations, explicitly limits BLM's authority. (Pfs.' Mem. at 11 (citing 43 U.S.C. § 1734(b); 43 CFR § 2932.31(e)).) The statute provides that "reasonable costs" include, but are not limited to, the costs of monitoring and operation, and in "determining whether costs are reasonable," the Secretary may take into consideration the actual costs (exclusive of management overhead), "and other factors relevant to determining the reasonableness of the cost" but must exclude any portion of the costs related to serving the "general public interest." 43 U.S.C. § 1734(b). Thus, contrary to BLM's argument, the term "reasonable" does impose "substantive constraints" on agency discretion. (Dfs.' Mem. at 26.) Congress included a clear mandate to "determin[e] the reasonableness of the cost." Indeed, in *Nevada Power Co. v. Watt*, 711 F.2d 913, 915 (10th Cir. 1983), the central issue was whether the Secretary adequately considered the "reasonableness factors" in assessing the "reasonable costs" of processing a permit. The court rejected the agency's argument that "'reasonable costs' equals *actual* costs." *Id.* at 920 (emphasis in original). Instead, the court held that the

"reasonableness factors" were intended to place a "limit" on the agency and to "ensure that applicants would not as a matter of course bear all of the costs occasioned by their application." *Id.* at 925.[17] "The context and design of the statute indicate that section 304(b) was devised to restrict the Secretary's discretion." *Nevada Power*, 711 F.2d at 921. BLM's argument on the substantial evidence standard both misstates BMP's claims and attempts to write the word "reasonable" right out of the statute, despite its plain meaning and the intent of the Congress.

The term "reasonable" cannot be interpreted so as to be rendered unnecessary or insignificant. *Id.* at 920. Congress clearly included the reasonableness factors to establish the outer boundaries of BLM's ability to assess fees and to "restrict the Secretary's discretion." *Id.* at 921. The 10th Circuit's deep dive into the legislative history demonstrates that the Secretary must take into consideration the extent to which the permitted activity and federal programs to which the proposal relates "are mutually beneficial to the [f]ederal government and provide significant public benefit." *Id.* at 921-22 (noting Congress "expects collection of such costs only when the amounts are substantial and failure to collect would amount to an unwarranted subsidy by the [f]ederal taxpayer"). Thus, BLM <u>must</u> consider the reasonableness of the costs it incurs in processing applications and <u>must</u> exclude those costs that are not reasonable, such as any part of the costs that serves the general public interest. *Id.* at 925. The decision to ignore those prescribed standards is not entitled to deference. *Id.* at 927 n.12.

---

[17] BLM attempts to avoid the implications of the *Nevada Power* decision to this case by mischaracterizing BMP's citations. (Dfs.' Mem. at 26-27.) BMP has never asserted that the *Nevada Power* case alters APA review. Rather, BMP has asserted that this case demonstrates that the Secretary cannot disregard the reasonableness factors in determining the costs to be recovered. (Pfs.' Mem. at 12.) This is consistent with BLM's own argument concerning an agency's failure to consider congressionally prescribed factors. (Dfs.' Mem. at 27.) The question of whether there is record support for the agency's decision is a separate inquiry. (Pfs.' Mem. at 10 (citing *Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 33-34 (D.D.C. 2019)).

The fact that BLM argues it has unlimited discretion to charge permittees for whatever costs the agency actually incurs is a surprising admission that at least partially explains its profligate spending of BMP's money.[18]  Operating under the misapprehension that "reasonable" is a superfluous addition to the statute, BLM has never undertaken this analysis with respect to the Event SRPs.  Because BLM utterly failed to acknowledge this fundamental aspect of statutory construction, BMP is entitled to summary judgment on this issue.  *See Nevada Power*, 711 F.2d at 927 (noting that there was no showing in the record that the factors other than actual costs were considered at all); *see also Kaltenbach v. Richards*, 464 F .3d 524, 528 (5th Cir. 2006) ("a statute ought, upon the whole, to be so construed that. .. no clause, sentence, or word shall be superfluous, void, or insignificant").  Thus, BLM must demonstrate that it actually engaged in an analysis of the reasonableness factors for each Event. and the Court may then review the record for evidence of that analysis.  As explained below, BLM has not made any such showing.

C.   **BLM's Repeated References To The Parties' Collaborative "Meetings" Ignore The Underlying Record And Are Irrelevant To The Issues Before The Court.**

BMP acknowledges that the parties "conduct regular meetings throughout the year, and BMP freely raises a host of concerns or suggestions for improvements." (Dfs.' Mem. at 32.)  BMP further acknowledges that BLM sometimes responds to BMP's questions about final cost recovery decisions such as following the 2017 Event.  (*Id.*)  BMP appreciates these exchanges.  For its part,

---

[18] BLM argues that "*Nevada Power* does not preclude charging actual costs," while agreeing that the "reasonableness factors . . . were added to ensure that applicants would not *as a matter of course* bear all of the costs occasioned by their application." (Dfs.' Mem. at 30-31.)  (BLM's emphasis). This is exactly what BLM is imposing on BMP: actual costs "as a matter of course" for any and every spending decision the agency makes with respect to the Event.  The *Nevada Power* court rejected BLM's argument that the term "may" gives the agency unfettered discretion to equate actual costs with reasonable costs.  *Nevada Power*, 711 F.2d at 920-21.  Here, BLM makes no effort to distinguish between its actual costs and those that were reasonable.  The fact that BLM may be able to recoup what it actually spent, upon a showing of reasonableness, does not render all its expenditures automatically reasonable.  Merely producing a receipt is not enough.

BMP aspires for more and greater collaboration with the agency, so that the general public can continue to use and enjoy the public lands through their participation in future Burning Man Events.  But the fact that the parties meet regularly cannot obscure the fact that BLM has routinely ignored BMP's feedback and concerns.

The Administrative Record is replete with examples of meetings where BLM completely disregarded BMP's concerns over escalating costs.  For example, during a meeting on March 26, 2013, BLM informed BMP that 2013 SRP costs would more than double from the previous year. (AR11852 ¶ 12.)[19]  When BMP questioned the stratospheric increase, Special Agent Dan Love stated that cost recovery regulations did not apply to law enforcement, which "costs what it costs." (AR11853 ¶ 14.)  At the same meeting, the local BLM District Manager (Gene Seidlitz) stated that BMP was not entitled to any explanation of BMP's costs and that BMP must pay the estimated costs before BLM would issue the SRP.  (*Id*.)

Similarly, during a meeting on August 1, 2015, with the local BLM District Manager (Robert Towne), BLM required BMP to sign the 2015 Cost Recovery Agreement (AR00695 - 97) and pay BLM its estimated costs after site work had already begun and less than a month before the 2015 Event, but BLM failed to provide copies of the government procurement contracts for which BMP was required to pay.  (AR09731.)  At that meeting, BLM refused to add a term to the Agreement that would require BLM to provide copies of the contracts after the 2015 Event.  (*Id*.)

Prior to the 2019 Event, BMP followed up a planning meeting with a written request on July 9, 2019, that BLM identify "[what] specific purchases will be included in [2019] Misc. Supplies and Equipment?" (AR03468.)  BMP also requested that BLM add a provision to the 2019

---

[19] Per BMP's calculations, BLM's costs actually increased 241% over two years from 2011 to 2013.  (*Id.*)

Cost Recovery Agreement acknowledging that BMP does not concede that BLM's estimated costs are reasonable costs under Section 1734(b) and that nothing in the Agreement constituted a waiver of BMP's right to appeal the costs. (AR03473.)   BLM refused both requests, responding as follows: (1) "a full accounting of these purchases will be provided during the cost recovery close-out" (AR03470); and (2) "it is a proponents [sic] right to appeal the close out cost recovery. Adding the suggested language is redundant.  BLM will not edit the Cost Recovery Agreement to include your additional term."  (AR03471.)  This refusal underscores the speciousness of BLM's arguments that the cost estimates were final decisions, and it illustrates BLM's general strategy of trying to avoid review of its decisions by arguing that BMP waived the right to challenge unreasonable costs.

Overall, planning meetings with BLM prior to each Event followed this same pattern. BMP attended meetings with BLM leadership, raised concerns over BLM's ever-increasing costs, and questioned why BMP had not benefited from any "efficiency to the government processing involved" under 43 U.S.C. § 1734(b), despite nearly 30 years of Events taking place in BLM's Black Rock NCA.  But BLM's cost recovery practices never improved.  They actually deteriorated. After BLM began filing Agency Appeals in 2015, BLM used the Appeals to calcify its practices and refused any changes while the Appeals were pending.  (AR11753 ¶ 22.)  During planning meetings for the 2019 Event, BLM leadership informed BMP that it would change none of its cost practices unless compelled to do so by the agency's appeal Board.  (AR11754 ¶ 26.)  As we know, that never happened.

Again, BMP appreciates that BLM held regular, year-round planning meetings with BMP prior to each Event.  But just like BMP's lack of "surprise" over the costs in BLM's final cost recovery decisions does not validate BLM's decision to charge for unreasonable costs, BLM's

regular planning meetings with BMP do not excuse BLM's failure to follow cost recovery statutes and regulations.  While meetings with BLM are welcome, the substance of those meetings is far more important than the fact that they occurred.  Given that the meetings consisted of the same "take it or leave it" Hobson's choice for BMP, the fact that the parties met has no relevance to the legal and factual issues before this Court.

D.    **The Administrative Record Fails to Support BLM's Argument That Its "Discretionary Choices" Constituted Reasonable Costs.**

BMP agrees that BLM's 2015–2019 cost recovery Closeout Decisions are "bound up with [] record based factual conclusion[s]" which this Court reviews for "substantial evidence."  (Dfs.' Mem. at 18 (citing *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999).)  BMP also has no reason to question that the Closeout Decisions are "post-event . . . documentation of BLM's actual costs." (Dfs.' Mem. at  23.)[20]   But as BMP explains above, actual costs are not synonymous with reasonable costs.  *Nevada Power*, 711 F.2d at 925.  According to 43 U.S.C. § 1734(b), the agency "may take into consideration actual costs."  Congress made clear, however, that actual costs are merely one factor in judging whether costs are "reasonable."  *Id.*   BLM's claim that it has an unlimited ability to charge through cost recovery, as long as it accounts for what was spent, is fundamentally wrong.  This wrong was by no means righted when BLM compelled BMP to sign

---

[20] BLM's repeated argument that it is not precluded from charging actual costs is a red herring. While BLM may charge for the "actual" cost of an item (*i.e.* what the agency paid for it) (Dfs.' Mem. at 29), that does not mean that every "actual" cost is a "reasonable" cost.  If BLM purchased gold toilet seats and showed BMP a receipt for $5,000 (the "actual" cost of the seats), the gold toilet seats would not become a reasonable cost just because it was documented.  This hypothetical is not that far-fetched.  Prior to the 2015 Event, BLM told BMP that it would have to pay for the construction and operation of a luxury "Blue Pit Compound" with flush toilets and laundry service for the exclusive use of BLM personnel and their VIP guests.  (AR11751 ¶ 18.)  Had BLM not scrapped its "Blue Pit" plans after being embarrassed by media coverage about these absurd and extravagant demands (AR11775-84), BLM would be arguing to the Court that the actual cost of flush toilets in the desert is recoverable and that the Court has no authority to judge whether even such a patently unnecessary cost is reasonable.

a Cost Recovery Agreement in order to avoid cancellation of the Event.

Ironically, BLM's assertion that its Closeout Decisions were mere "accounting exercises" whose sole function was to tabulate actual costs related to each Event (Dfs.' Mem. at 23) actually sinks its defense of the agency's decisions. The decision documents and Administrative Record are devoid of any evidence that BLM even attempted to follow the legal requirement to charge only "reasonable" costs through cost recovery. While repeatedly citing to the "year round" communications between the parties (Dfs.' Mem. at 29), BLM is unable to point to any specific evidence that BLM adhered to the cost recovery statute. Nothing in the Administrative Record indicates that BLM assessed "the efficiency to the government processing involved." 43 U.S.C. § 1734(b). Nothing in the Administrative Record demonstrates that BLM even attempted to allocate costs according to whether they benefited the "general public interest" or were for the "exclusive benefit of the applicant." *Id.* Instead, the Administrative Record establishes that BLM used cost recovery to reflexively charge BMP for every penny of actual costs between 2015–2019 "as a matter of course." This practice amounted to an improper abuse of discretion. *See Nevada Power Co.*, 711 F.2d at 925.

Lacking any substantial evidence in the Administrative Record that explains or justifies specific costs or categories of costs, BLM resorts to attacking and mischaracterizing BMP's evidence and the "fact-based themes underlying [its] arguments." (Dfs.' Mem. at 27.) For example, BLM criticizes BMP's observation that while the population of the Events grew by only 30% since 2011 (and Event population was static or decreased in the years following 2014), BLM's costs increased a whopping 294% since 2011. To be clear, BMP does not claim BLM's costs must be tied to the Event population. Rather, the population-to-cost metric is one of several facts supporting BMP's argument that BLM's costs have disproportionately and unreasonably increased

over time.  Event population is a shorthand way to measure changes in the size and complexity of

BMP's annual Event, which has an obvious relationship to costs, such as the number of law

enforcement officers needed.  BMP is not arguing for a *per se* rule that BLM's costs must correlate

to the population of the Event.  Instead, BMP's population/cost metric is an example of the

unreasonable disconnect between BLM's cost recovery practices and the needs of the Event.

Similarly, BLM attempts to distract the Court by citing increases in BMP's Event-related

revenue growth to justify BLM's tripling of costs.  BLM's "evidence" on this point consists of

citations to extra-Record sources from websites. (Dfs.' Mem 27-28.)  But Trippingly.net is not

substantial evidence found in the Administrative Record, and BMP objects to the inclusion of such

extra-Record citations to falsely insinuate that BMP is not a non-profit entity.  Moreover, the

reference to BMP's revenue is another of BLM's strawman arguments.[21]

Ironically, BLM is the party advocating "percentages or some arithmetic calculation" as a

"per se" rule governing its costs.  As explained below, the only objective evidence in the

Administrative Record that BLM relied on to set its law enforcement staffing levels is an unreliable

municipal population-to-officer metric promulgated by a law enforcement trade association.  (*See*

---

[21] BLM's references to BMP revenue growth actually highlight a separate illegal BLM practice that is related to its abuse of cost recovery.  In addition to requiring BMP to pay for all of BLM's actual costs between 2015 and 2019, BLM charged BMP a use fee of 3% of BMP's Event-related gross revenue.  (AR11850 ¶ 3.)  For the 2015 – 2019 Events, BMP paid $5,953,956 in use fees on top of the many millions of dollars it was charged through cost recovery.  (AR11765.)  According to BLM's Recreation Permit and Fee Handbook, BLM's Winnemucca District Office was required to allocate 85% of these fees to its operating costs and reduce the costs it charged BMP through cost recovery.  The Handbook notes that, "each BLM office is allocated 100 percent of recreation fee receipts for use at the site of collection.  At least 85 percent of these funds must be used directly for recreation facilities, services and programs . . . such as . . . . (5) Law enforcement directly related to public use and recreation. (6) Direct (operating or capital) costs and expenses. . . ." (AR07439.)  Nowhere in the Administrative Record does BLM account for how it spent the nearly $6 million in use fees collected from BMP, or why it did not apply those fees to the massive public outreach and drug enforcement campaigns it conducted at BMP's expense.  As the great American patriot Mel Brooks observed, "It's good to be the king."

Pfs.' Mem. at 24.)

While BLM argues that its "discretionary choices" are supported by the Administrative Record (Dfs.' Mem. at 33-43), nearly all of BLM's evidentiary citations are to witness declarations filed in opposition to BMP's past IBLA appeals.  These lawyer-drafted declarations were prepared months or years after BLM charged the underlying costs.  As such, the declarations are not evidence that the cost recovery decisions were "the product of reasoned decision making."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  Instead, the declarations are *post hoc* justifications, which courts have routinely rejected as evidence supporting an agency's decision.  *See Judulang v. Holder,* 565 U.S. 42, 53 (2011) (courts may not consider *post hoc* rationalizations to support the agency's decision); *Koi Nation of N. Cal.,* 361 F. Supp. 3d at 33-34 (courts must determine whether the agency's decision was reasonable based on the administrative record available to it at the time of the decision).  BLM's witness declarations did not exist at the time BLM took the actions at issue.  Indeed, had BMP never appealed BLM's 2015–2019 Cost Decisions, the witness declarations cited as substantial evidence would not even exist, and the Administrative Record would contain no evidence of the agency's decision making, let alone the requisite "reasoned decision making."  BLM cannot cite the advocacy of its attorneys as evidence when such evidence did not exist at the time BLM made its decision.  After the Court properly disregards BLM's witness declarations, BLM's "discretionary choices" stand naked as arbitrary and capricious actions unsupported by substantial evidence.

E.      **Law Enforcement Staffing Costs Were Unreasonable And Remain Unexplained.**

BLM begins its defense of law enforcement costs with the unsupported assertion that "[a] governmental entity has particularly broad discretion in discharging law enforcement functions." (Dfs.' Mem. at 33.)  Despite the lack of evidentiary support, BMP does not dispute the general validity of BLM's statement.  That being said, BLM's discretionary authority does not excuse

BLM from its obligation to charge through cost recovery only its *reasonable* costs for administering BMP's permits.  43 C.F.R. § 2932.31(e)(3).

BMP's Memorandum showed that BLM's law enforcement staffing decisions are not supported by substantial evidence and are arbitrary on several levels.  (Pfs.' Mem. at 19-38).  Unable to counter this showing, BLM instead falsely and misleadingly accuses BMP of: (1) "second-guessing the Event law enforcement structure" (Dfs.' Mem. at 33); (2) superimposing its "own view about the legitimacy of BLM's [law enforcement] emphasis" (*id.* at 34); and (3) "disagree[ing] with some of BLM strategies and decisions regarding law enforcement."  (*Id.* at 37.).  As BMP explained,  it does not question BLM's "broad discretion" to make decisions about policing the public lands or applying its law enforcement General Orders.  (Pfs.' Mem. at 12-13.)  Instead, BMP points out that the cost recovery statute prohibits BLM from reflexively forcing BMP to pay for every law enforcement expenditure "as a matter of course."  *See Nevada Power*, 711 F.2d at 925.  In its decisions and this litigation, BLM has refused to even consider justifying the number of officers detailed to the Event, their pay grade, or the scope of their activities.

By including the word "reasonable" as a limiting term on all costs, including law enforcement costs, Congress limited BLM's discretion over cost recovery.  For example, 43 U.S.C. § 1734(b) distinguishes between "general public interest costs" and costs "for the exclusive benefit of the [permit] applicant."  Nothing in the Administrative Record indicates that BLM made any effort to comply with the plain meaning of the statute and segregate costs on this basis.  Given that BLM failed to follow the cost recovery statute, the Court should set aside these decisions as "not in accordance with law" under 5 U.S.C. § 706(2)(A).  *See Nevada Power*, 711 F.2d at 927 (the Secretary must examine and weigh each of the statutory reasonableness factors, as well as whatever other factors she finds relevant, in determining the "reasonable costs" that FLMPA

allows to be assessed).

Nowhere does BLM dispute BMP's analysis that "general public interest" costs are not reasonable costs according to law.  Instead, BLM "easily reject[s]" and avoids the plain meaning of the statute by claiming, without authority, that BLM "issues a closure order excluding the general public from the Event site." (Dfs.' Mem. at 34.)  Under BLM's proffered interpretation, however, the statute's limitation of the agency's cost recovery authority would have no meaning whatsoever.   Indeed, all SRPs are subject to some level of restriction.

This is one of several examples of BLM erroneously citing the closure order covering the Event site to "support" an irrational result. The closure order is a necessary prerequisite for the Event that serves the interests of both BLM and BMP.   It allows BLM to enforce its population cap on the Event and limit the Event's impact on the natural environment.  The closure order also allows BMP to manage its Event by limiting attendance to paying ticket holders.  BMP sells its Event tickets to the general public, however, and ticket holders do not lose their status as members of the general public when they enter the closure order area.  Moreover, every SRP-holding commercial user of the public lands restricts use of that land by those who are not customers of the SRP holder.  For example, a camping outfitter that facilitates the use of a campsite by customers prevents a noncustomer from using that campsite, but the outfitter's customers are still members of the general public.  BLM's restrictive definition of "the general public interest" would improperly render meaningless the statutory distinction between costs serving the public interest and costs for the permittee's exclusive benefit.  *See Nevada Power*, 711 F.2d at 920 (rejecting BLM's interpretation).

### 1.   BLM fails to adequately support its law enforcement staffing decisions.

Putting aside BLM's irrational mischaracterizations of BMP's Memorandum and the import of the closure order, BLM's only citations to the Administrative Record that purport to

justify its massive law enforcement costs consist of the following:

1.  a single citation to a law enforcement trade analysis of population-to-officer ratios in municipalities (Dfs.' Mem at 34);

2.  a self-authored March 2019 document titled *Public Health and Safety at the Burning Man Event* (*id.* at 36); and

3.  anecdotal references to a handful of misdeeds committed at the Event.  (*Id.* at 35).

These few citations to the Administrative Record are not substantial evidence that explains or justifies BLM's law enforcement costs, which exceeded $1 million every year between 2015 and 2019.  Moreover, upon review, none of this evidence stands up to scrutiny.

What BLM claims to be an "industry-wide standard" of population-to-officer ratios promulgated by the IACP trade association (Dfs.' Mem at 34) is not credible evidence to support BLM's law enforcement staffing levels.  The IACP expressly recommends <u>against</u> using "[r]atios, such as officers-per-thousand population," noting that this would be "totally inappropriate as a basis for staffing decisions." (AR12033.)  Instead, the IACP advises agencies to consider "an extensive series of factors and a sizeable body of reliable, current data" that reflect a locality's unique needs. (*Id.*)  Even BLM's own "expert" declarant (Rebecca Andres) conceded that IACP comparisons are inapt.  (AR03603 ¶ 14.)

BLM's self-authored *Public Health and Safety* document (Dfs.' Mem at 36) was not created until March 2019, and therefore, cannot constitute evidence supporting BLM's 2015–2018 Cost Decisions.  The report also does not provide evidentiary support for BLM's 2019 law enforcement staffing decisions.  It merely recites that "BLM determined 75 officers were required for the 2016 – 2018 Burning Man Events" (AR08149), ignoring the fact that BLM staffed the 2015 Event with 97 officers. (AR08152, Table 1.)  The document does not explain why the number of

officers decreased from 97 to 75 between 2015 and 2016 or why the number of officers increased

from 51 to 70 between 2011 and 2012.[22]  Again, the only objective evidence in the document that

explains BLM's law enforcement staffing levels is the inapplicable alleged "industry standard of

1.8 per 1,000 population."[23]  (AR08151.)

Finally, BLM's anecdotal claims of "significant criminal misconduct requiring a state-of-

the-art law enforcement presence" (Dfs.' Mem. at 35) is not substantial evidence supporting

BLM's staffing levels.  BMP does not dispute that violations of criminal laws occurred during the

2015–2019 Events.  Crimes occur at recreation events of all sizes.  But, the anecdotes BLM

highlights in its Memorandum are not evidence that BLM engaged in reasoned decision making

when it set law enforcement staffing.[24]  As BMP documented in the 2019 Vind Declaration, the

number of citations issued by BLM between 2015 – 2019 varied widely, and the number of person-

---

[22] As BMP explained in its Memorandum (Pfs.' Mem. at 23-24), the staffing spike from 2011 to 2015 correlates exactly with the tenure of disgraced Special Agent in Charge, Dan Love, who demanded the increases without justification.  The size of the Event actually decreased between 2011 and 2012 when Love increased law enforcement staffing from 51 to 75 officers in 2012. Similarly, the size of the Event was nearly the same between 2015 and 2016 when law enforcement staffing decreased from 97 officers to 75 in 2016.  (AR08152, Table 1.)  Nothing changed about the size and complexity of the Event between 2015 and 2016, but this was when Special Agent Love was removed.

[23] And again, BLM itself concedes that population-to-officer staffing ratios are not reliable evidence.  Curiously, the footnote to Table 1 in the document states, "This participant/officer ratio is for general information only and does not reflect actual operations within the Event." (AR08152.)  But if the ratios are only for "general information" and not reflective of BLM's staffing decisions, why does BLM repeatedly cite the ratios as evidence?  The answer is clear: without the ratios, BLM's record would contain no evidence the agency could cite to support staffing levels beyond the bare assertions of a single, junior-level BLM ranger, Rebecca Andres, and the admission of a more senior BLM ranger, Logan Briscoe, that 2015 law enforcement staffing was based on his "gut instinct." (AR08817 ¶ 8.)

[24] BLM cites an extra-record newspaper article that reported on the four people who died at Events between 2014 and 2019, all of causes unrelated to criminal activity.  (Dfs.' Mem. at 35.)  The article is not part of the Record, and it could not have constituted evidence upon which BLM relied to set staffing levels for any Event in this case.  The article was published on August 30, 2019, during the 2019 Event and after its staffing levels had been set.

on-person crimes of any kind was always exceedingly low.  (AR12030-31; AR11968-69.)

      **2.  BLM fails to dispute BMP's compelling evidence that BLM's law enforcement staffing costs were unreasonable.**

BLM does not and cannot dispute the accuracy of BMP's myriad evidence that BLM law enforcement staffing levels and associated costs were unreasonable, which includes the following facts from the Administrative Record:

1.      BLM officers sat idle two-thirds of the time, which is the opposite of industry standards for efficient law enforcement staffing (Pfs. Mem. at 31-32);

2.      BLM law enforcement overwhelmingly engaged in self-directed activity with service calls based on community need constituting a tiny number of dispatch events (*id.* at 37);

3.      BLM had a surplus of law enforcement officers in 2018 and 2019 that allowed it to assign six officers both years full-time to the local sheriff's office to assist local law enforcement with investigating alleged violations of state law (*id.* at 32-34);  and

4.      BLM forced BMP to pay for "management overhead" costs related to senior level internal affairs officers between 2016 and 2019 (*id.* at 34-35).

In addition, BLM does not address the testimony in the Administrative Record of its own former national director, Robert Abbey, who himself administered the Burning Man SRP for seven years while he was the Nevada State Director.  In his Declarations supporting BMP's 2017–2019 IBLA Appeals, Director Abbey lamented how current BLM leadership failed to develop efficiencies from its nearly 30 years of administering BMP's permit, including: "(1) a reduction in the number of agency personnel at the event; (2) a reduction in the number of hours these personnel must devote to the Burning Man SRP; and (3) the assignment of lower-graded personnel . . . law enforcement rangers – instead of special agents, who typically receive much higher pay – [as] the preferred choice for all law enforcement assignments." (AR10958 ¶ 4.)

### 3.  BLM's Memorandum contradicts statements from its own leadership.

Although BLM claims that its "Event planning team determines law enforcement staffing levels, in consultation with the Pershing County Sheriff's Office," (Dfs.' Mem. at 35), the Administrative Record contains no work product from its local planning team that shows how the team reached its staffing-level conclusions or that it otherwise engaged in reasoned decision making.

Instead, the Administrative Record contains a contradictory account from BLM Field Manager Mark Hall, the Authorizing Officer for the 2017–2019 Event SRPs who purports to have been BLM's "overall manager of event operations."  (*See* AR03649.)  Hall claimed that law enforcement staffing was set according to "mandates" contained in Instruction Memoranda ("IM") from the national BLM OLES.  According to Hall, "The IM mandates 53 uniformed rangers to work the event, even though 75 LEOs are required for the operation.  The additional 22 support positions have been typically filled by OLES personnel, although OLES employees are not mandated to work the event through the IM." (AR04462.)[25]  Despite the granular detail in the national IMs about the number of officers, including their gender and duties, the Administrative Record contains no information about how the national OLES determined these staffing levels.

BLM attempts to sidestep these contradictory accounts in the Administrative Record and the complete absence of support for the OLES staffing mandates by arguing that BMP "misunderstand[s] the function of these IMs."  (Dfs.' Mem 35.)  According to BLM, "the purpose of the IMs is not to 'mandate' a particular level of staffing."  (*Id.* at 36.)  But if the national IMs do not mandate law enforcement staffing levels, why did BLM's most senior event manager use

---

[25] Hall's statement raises an additional discrepancy.  Why did BLM fill the "additional 22 support positions" with uniformed officers, some with the highest rate of pay within the entire agency, when they could have been filled with lower-paid employees?

the word "mandate" twice?   Despite the contrary statements of the agency's attorneys, the Administrative Record establishes that BLM set law enforcement staffing according to the national IMs, which themselves are unexplained and unsupported in the Administrative Record.   This disconnect between the Record evidence and BLM's argument to this Court confirms that the Closeout Decisions were arbitrary, capricious, and not supported by evidence.

### 4.   The actions and influence of Special Agent Love are indefensible and undeniable.

Disgraced former Special Agent Dan Love is a poster child for government corruption. According to the agency's own investigators, Love tampered with evidence, intimidated witnesses and routinely abused subordinates and peers.   (AR11019-20.)   He even raided a BLM evidence room to remove illegally collected mineral samples that he displayed on his desk and gave away to friends as souvenirs.   (AR11024.)   While serving as chief law enforcement officer for all of Nevada and Utah, Love is most infamous for leading BLM's botched 2014 seizure of militant Nevada rancher Cliven Bundy's cattle that nearly resulted in a range war.   The agency's own investigator concluded that Love "purposely ignored U.S. Attorney's Office and BLM civilian management direction .  .  .  in order to command the most intrusive, oppressive, large scale and militaristic trespass cattle impound possible."   (AR11921.)

During this same period, Love was the "Special Agent-in-Charge," "Command Staff" or "Agency Administrator" for BLM's law enforcement at the 2012 – 2015 Events, and BLM's labor summaries describe his work as "Operations Plan Preparation Law Enforcement Management (direct event support on playa)."   (AR00525, AR00273, AR04031, AR08139.)   BLM attempts to avoid the import of Special Agent's Love's corruption, arguing that his misconduct and criminal acts are not relevant because they "did not relate to any .  .  .  cost recovery actions .  .  .  for any of the Events."   (Dfs.' Mem 28.)   Instead, BLM claims "that perhaps Special Agent Love had an

affinity for the Event . . . treating the 2015 Event as a working vacation." (*Id*. at 28-29.)  In other words, BLM seeks to recast Love's misconduct as simply loving Burning Man too much.

But BLM cannot minimize Love's primary role in the 241% cost increase that occurred during his first two years as its law enforcement lead for the Events.  (AR11852 ¶ 12.)  While it is accurate that he was never the Event's "Authorizing Officer" (who has always been a civilian BLM employee), BLM's 2015 labor summary states that Love prepared BLM's "Operations Plan" that set law enforcement staffing at the Event.  (AR00525.)

Given that Love's primary role in setting law enforcement staffing at the 2012–2015 Events is undeniable, BLM has no basis for its claim that Love's misconduct "did not relate to . . . cost recovery actions."  (Dfs.' Mem. at 28.)  In fact, the agency's January 30, 2017 *Report of Ethical Violations and Misconduct* devotes almost seven pages to Love's corrupt actions at the 2015 Event.  (AR11868-74.)  In addition to using BMP-funded resources on equipment and lodging for his family and girlfriend, as BLM concedes (Dfs.' Mem. at 29), the Report found that Love recorded an impossible "24 hours of official work time" on each of three consecutive days during the Event and that Love "directed five on duty BLM law enforcement officials to drive, escort and provide security for his family at the 2015 Event."  (AR11870.)  BMP paid for all of the costs associated with this misconduct.  And the fact that surplus vehicles and five separate on-duty law enforcement officers were available to escort Love's family and girlfriend is further objective evidence that Love's law enforcement staffing levels were excessive and unreasonable.

Moreover, as BMP has explained, the injury to BMP is not just that Love overspent BMP's money when he commanded law enforcement during the 2012–2015 Events.  The greater harm to BMP is that Love's successors have continued his inflated spending practices to this day.  (Pfs.' Mem. at 23).  While law enforcement labor costs decreased by $17,648 (a scant 1.87%) from 2015

to 2016, following Love's removal from the Event, BLM's 2017 law enforcement labor costs exceeded 2015 levels and increased further in 2018 and 2019.  (AR11765.)  The size of the Event, however, barely changed between 2015 and 2019.  (*Id.*)  BLM leadership acknowledged to BMP that it would not change the cost practices instituted by Love unless the change was mandated by the IBLA.  (AR11753-54 ¶¶ 22, 26.)  Given that BLM has hid behind the shield of the appeals Board for over 6 years, BMP now looks to the Court to compel BLM to comply with the governing statute and charge only "reasonable" costs as mandated by 43 U.S.C. § 1734.

**F.      BLM Cannot Justify Its "Emergency" And "Mission-Critical Work" Designations.**

As BMP noted in its Memorandum (Pfs.' Mem. at 35-37), the Administrative Record contains no contemporary evidence to support BLM's designation of the Event as an "emergency" from 2012–2016 so that its personnel could receive additional "premium pay." (AR00083.)[26] BLM reversed itself in 2017, acknowledging the absurdity of its claim that a meticulously planned recreation event held annually in the Black Rock NCA since 1991 suddenly became an "emergency" in 2012,.  Since the 2017 Event, BLM has instead claimed that Event-related work is "mission critical," a designation that has enabled it to continue paying additional and unjustified "premium pay" to its personnel.  (AR01457.)  BLM's change of position is proof that its "emergency" designation for the 2012–2016 Events was arbitrary and capricious.  And BLM's subsequent "mission-critical work" designation is equally defficient.

BLM's Memorandum claims, with no citation to authority, that "these designations afford the agency needed flexibility to address the Event's unique demands."  (Dfs.' Mem. at 38.)  BLM also makes the unsupported assertion that the designations were needed "so that [its employees]

---

[26] While the 2012 Event was not an emergency (except from the perspective of BMP's bank account), the "emergency" designations began in 2012 with the arrival of Special Agent Love.

are fairly compensated for their work." (*Id.*)  BMP of course supports the fair compensation of all government employees, but nothing in the Administrative Record explains how BLM employees would not be "fairly compensated" without these designations.  In fact, the Administrative Record contains no contemporary evidence of any kind to explain or support either extraordinary work status designation.  The only contemporary evidence in the Administrative Record are the 2012 and 2017 one-page memoranda approving the designations.  (AR00083; AR01457.)  Both memoranda, however, are devoid of any rationale for the designations.

The only other material in the Administrative Record regarding work status designations is a memorandum BLM prepared after the fact in 2018 (one version is dated February 9, 2018 (AR08589-90), and a second is dated April 3, 2018 (AR06507-08)) in connection with its request to make the "mission-critical work" designation permanent.  The 2018 memorandum notes a desire to "ensure employees are fairly compensated for their work at the event." (AR06507.) The memorandum does not, however, explain how employees would be unfairly compensated without the designation and therefore cannot be deemed "substantial evidence" in support of the designation.

Lacking this required support, BLM attempts to shift its responsibility to the permittee, claiming that BMP "provide[s] no support for the claim that BLM's designations are in error." (Dfs.' Mem 38.)  BLM cannot ignore well-established legal principles that an agency action not explained or supported in the Administrative Record is arbitrary and capricious, and a reviewing court must grant summary judgment when it finds that the agency failed to provide a reasoned explanation for its decision.  *See Koi Nation,* 361 F. Supp. 3d at 35; *Select Specialty Hosp.-Bloomington, Inc. v. Burwell,* 757 F.3d 308, 312-313 (D.C. Cir. 2014).

BLM cannot meet its burden by backfilling the empty Record with witness declarations that it filed in the 2018 Agency Appeal.  BMP already addressed the unsupported assertions by BLM

witnesses in its Memorandum (Pfs.' Mem. at 36-38), pointing out that: (1) BLM failed to explain how it could not staff the Events without offering premium pay; (2) a purported lack of "volunteers" is irrelevant given that BLM law enforcement is not a "volunteer" force; (3) local employees' "religious or moral" objections to the Event is not grounds for paying extra compensation; (4) the "remote" location of the Event is meaningless, given that most work assignments on BLM lands involve remote locations; (5) nothing in the Administrative Record supports BLM's claim that the 2018 designation applied to only 25 of the 75 law enforcement officers, and even if such evidence existed, it would not justify the practice for that Event, let alone for the 2015-2017 and 2019 Events, which BLM does not address; and (6) any purported staffing difficulties could easily be remedied by cutting unnecessary law enforcement personnel.

BLM's witness declarations fall apart when scrutinized, and nothing BLM wrote in 2019 in response to BMP's 2018 Agency Appeal constitutes substantial evidence supporting work status designations made for any previous Event.  As BMP notes above, an agency's *post hoc* rationalization of an earlier decision is not substantial evidence of reasoned decision making by the agency.  Given that BLM's "emergency" and "mission-critical work" designations were not supported in the Administrative Record at the time they were made, or after, the agency's decisions were arbitrary, capricious, and an abuse of BLM's discretion.

**G.    BLM Has Failed To Justify Its Unnecessary Costs For IT Personnel And Equipment.**

BLM responds to BMP's challenge to the agency's unnecessary and unreasonable IT personnel and equipment costs with its familiar refrain:  "BMP provides no objective evidence of error," and the costs were no "surprise" because the "topics are regularly discussed by the parties, and featured in various reports and agreed-upon statements of work."  (Dfs.' Mem. at 39-40.)  It may be true that BMP is no longer surprised when BLM charges for thousands of personnel hours and hundreds of thousands of dollars for IT costs for every Event.  It is demonstrably false,

however, that BMP accepted these grossly inflated costs, and BLM ignores BMP's objective evidence that such costs were not necessary, and therefore, not reasonable.

BLM's extensive statements of work for IT infrastructure, like everything else from BLM, were presented to BMP on a take-it-or-leave-it basis.   BMP did not agree and could not contemporaneously object to BLM's excessive statements of work for IT equipment and services. When BMP tried to insert a caveat in the 2019 cost recovery agreement that it did not agree that such costs were reasonable, BLM refused even this request.  (AR03471.)  Thus, BMP never had any real choice but to pay for BLM's IT statements of work and to seek relief from their unreasonableness after the fact.

BLM's annual IT shopping lists included such unnecessary items as satellite tracking devices for its personnel, despite the fact that they all worked in pairs, carried radios and operated in a limited geographic area surrounded by tens of thousands of people. (AR11857 ¶ 31; AR11972 ¶ 19.)  BLM also forced BMP to fund a $100,000 cellular network each year to support two hundred telephones for government personnel, who could already communicate by radio, as well as cameras for facilities that BLM did not operate or that did not function properly under Event conditions.  (*See e.g.* AR01165; AR11975 ¶ 27; AR11972 ¶ 20.)  BLM does not dispute any of these facts.

BLM also cannot dispute that it spent almost $200,000 of BMP's money every year for a private contractor to operate its dispatch system.  (*See e.g.* AR02765; AR03655.) While dispatchers are obviously necessary, it was objectively unreasonable for the dispatch contractor to deploy five individuals at all times, when BLM's own CAD data shows that BLM officers responded to less than two hundred <u>total</u> calls for service from the community during an entire

Event, or less than one call every two hours.  (ER00001-166.)[27]   Again, BLM does not dispute this objective evidence of its unnecessary contracting costs.

BLM's only substantive response to BMP's challenge to the IT personnel costs was to defend its communications lead, Jon Young.  BMP objected to being charged for nearly 600 hours of Young's time each year from 2015 through 2018.  BMP pointed out that BLM's labor summaries provided no detail about what Young did during all of those hours, save for the threadbare description in the labor summaries: "Communication Function, Chief of program which includes radio network, dispatch IT Equipment and IT Security."  (AR00719; AR01164; AR02764.)[28]  BLM never explained why Young spent nearly 600 hours to set up and operate the same equipment every year, or why it needed Young – the Arizona State Chief Ranger, whose salary was near the top of the agency's pay scale – to work year-round as its IT tech for the Burning Man SRPs.  Similarly, BLM never explained why it needed up to a dozen additional personnel devoted to this function every year for an eight-day Event.

Nothing in the Administrative Record explains such extensive and costly staffing decisions.  BLM attempts to defend using a State Chief Ranger and as many as 12 additional personnel by claiming that Young had "extensive experience planning for the Event" and that "other communication staff highlighted by BMP were also necessary to set up and maintain the system." (Dfs.' Mem. at 40.)  These are empty words.  The Administrative Record shows that BLM failed to create any "efficiency to the government processing involved" for IT-related costs and it therefore acted unreasonably under 43 U.S.C.  § 1734(b) in charging those costs to BMP.

---

[27] In 2016, the number of service calls was only 114. (ER00001- 85.)
[28] In BLM's 2015 labor summary, Young's title was "Technology Chief" and the description of his work was "CAD Development [sic] Joint Dispatch Planning Network needs on playa Internet, Dispatch, and CAD contact."  (AR00528.)

**H.**   **BLM's Exclusive Medical Unit Was Not Necessary And Not Justified.**

Every year, BMP provides over 100 licensed doctors, nurses, and emergency medical professionals to respond to medical and healthcare needs that may arise during an Event. (AR11749 ¶ 12.)  BMP's Emergency Services Department includes nearly 800 trained personnel who staff mobile response teams and six different first-aid stations located throughout the Event site. (*Id*.)  Every year, BMP contracts with a nationally recognized event medical provider that operates an on-site hospital staffed by board-certified emergency physicians who are able to render advanced life support services as well as x-ray, sonography, electrocardiogram, and orthopedic care to anyone in need at the Event. (AR11756 ¶ 34.)  Ground and air ambulances stand ready to transport patients who require additional off-site care. (*Id*.)  Despite this extensive network of medical services, BLM has elected since 2012 to deploy its own medical personnel for the exclusive use of the approximately 100 federal employees working inside the Event. (AR01358.)[29]

In a misguided effort to justify the cost of a parallel medical function exclusively for the small number of on-site federal employees, BLM (Dfs.' Mem. at 40-42), refers to a Briefing Memorandum dated April 19, 2017 (AR01358-60), a "Medical Threat Assessment" dated July 12, 2017 (AR08518-39), and two witness declarations signed in September 2019 after the 2019 Event had concluded.  As BMP has repeatedly pointed out, *post-hoc* documentation created years later in response to BMP's IBLA Appeals is not substantial evidence of reasoned decision making by the agency.   Nothing in the Administrative Record explains BLM's decision to provide exclusive medical services for its staff at the 2012 through 2016 Events.

---

[29] Again, it is no coincidence that BLM's decision to provide these extraneous medical services, at BMP's expense, coincided with the arrival of Special Agent Dan Love.  Prior to Love's tenure, federal personnel (like BMP's personnel) relied on the same medical resources as everyone else at the Event.

And BLM's 2017 Memorandum and Assessment fail to justify the cost of BLM's exclusive medical personnel at any Event.  The Assessment's "recommendations" actually bolster BMP's position that its existing Event medical services are extensive and more than adequate to meet the needs of BLM personnel. (AR08538.)  While the Assessment states that a "tactical medical element is recommended to contribute to critical incident response" (*id.*), nothing in that document contradicts BMP's contention that BMP already delivers "critical incident response" through the broad range of medical resources it provides at the Event.

A close reading of the Assessment identifies a single possible concern with BLM personnel accessing BMP-provided medical facilities: "the civilian medical infrastructure, particularly [BMP's onsite] Rampart General Hospital, was not felt secure for routine use by [law enforcement officers]" due to "complications for weapon security." (AR08535.) But the Assessment does not address how BLM's exclusive medical function alleviates any such security concern.  To the contrary, the Assessment acknowledges that BMP's "x-ray and laboratory capability onsite may have value for the medical care of LEO personnel in select situations, unless similar parallel provisions are set up elsewhere on-scene." (*Id.*)  BLM fails to explain why a sick or injured officer's weapon cannot simply be secured by a fellow officer prior to a visit to BMP's facility. The "weapon security" reference is another red herring, as the Administrative Record cites no instance where "weapon security" was ever an issue at any Event.[30]

BLM's contention that its exclusive medical unit was needed for "specialized services . . .

---

[30] Another unsupported rationale is BLM's claim that its two-person medical unit is a "force multiplier in active shooter and mass casualty environments." (Dfs.' Mem. at 41.)  No such incident has ever occurred at an Event. Moreover, the real "force multipliers" are BMP's 800 Black Rock Rangers who assist with security inside the Event; 800 Gate, Perimeter and Exodus staff who manage traffic and perimeter security; and nearly 800 Emergency Service Department staff who provide medical care.  (*See* AR11749-50 ¶ 12.)

that are not available through BMP's medical facilities" (Dfs.' Mem 41) is belied by its own After Action Reviews, which admitted the following: "An overwhelming majority of those patients were seen for routine medical care such as eye wash, minor wound care, over the counter pain relief, and other over the counter medicine." (AR00334.) Each of BMP's several first-aid stations provided such services. The Administrative Record shows that BLM's insistence on exclusive medical personnel is based on nothing more than preference and convenience, neither of which renders the associated cost "reasonable" for cost recovery purposes.

**I.      BLM Lacks Authority To Shift To BMP The Cost Of Overseeing Third-party SRPs.**

The parties agree that the Event is a highly complex and organized operation, carefully overseen by BMP, and requiring the services of hundreds of contractors to enable BMP's commitment to and record of health, safety, and environmental compliance. Two broad categories of contractors support the Event, as discussed above: Outside Services ("OSS") Contractors and Event Production Contractors ("EPCs"). Depending on their role, they may obtain their own SRP or operate under BMP's SRP. As discussed in BMP's Memorandum (Pfs.' Mem. at 44-45), BLM has improperly inflated BMP's costs by charging BMP for the costs of the separate SRPs it issues to third-party OSS Contractors. BLM's response cites to no authority that allows it to charge one permittee for the costs of overseeing another. (*See* Dfs.' Mem. at 42-43.)

The SRP regulations expressly delegate to BLM the authority to issue and administer SRPs for commercial use, organized group activities or events, and use of special areas on public lands. 43 C.F.R. § 2931.2(a); *see also* 16 U.S.C. § 6802(h). Under the regulations, the term "commercial use" means recreational use of the public lands and related waters for business or financial gain. 43 C.F.R. § 2932.5 (definitions). The SRP regulations further explain, in relevant part, that an activity is a "commercial use" if (1) any person, group or organization makes, or attempts to make a profit, receive money, or obtain goods and services "as compensation from participants in

recreational activities on public lands led, sponsored, or organized by that person, group, or organization"; or (2) "anyone collects a fee or receives other compensation that is not strictly a sharing of actual expenses, or exceeds actual expenses, incurred for the purposes of the activity, service, or use." *Id.*

In order to produce an Event, BMP relies on EPCs for certain services, including such Event necessities as port-a-potties, potable water, and the field hospital. EPCs also provide electrical and communications equipment such as generators, internet services, CAD, two-way radios, fire suppression and fuel station infrastructure, and staff vehicles. The EPCs are paid directly by BMP and do not transact with Event participants – they are a cost to BMP of producing an Event. Therefore, consistent with the SRP regulations, EPC services are not considered "commercial use" and these contractors are not required to obtain their own SRPs. *See* 43 C.F.R. § 2932.5 (sharing of actual expenses is not considered a commercial use).

While BMP generally prohibits vending at its Events, OSS Contractors are permitted to provide certain essential, prearranged services directly to ticketholders ("participants") on site. These services include those that are typically associated with recreational events, such as potable water and RV pumping. BMP's OSS Program supports participants by facilitating access to the Event site by OSS Contractors. (AR11757 ¶ 35.) In contrast to the EPCs (who deal only with BMP), OSS Contractors have direct commercial interactions with participants within the NCA. As a result, each OSS Contractor has always been required to obtain its own SRP for its commercial activities on public land and to pay BLM the required fees. (AR11858 ¶ 33.) Applicants invited to participate in the OSS Program must sign a contract with BMP agreeing to its terms and restrictions, including the requirement that they obtain their own SRP from BLM. For each SRP, BLM assesses a commercial use fee equal to three percent (3%) of the permittee's

gross receipts, or revenues, from the permitted event.  43 C.F.R. § 2932.31(e)(1).

BLM has been improperly charging two different parties for the fees associated with each SRP it issues to an OSS Contractor: an application and commercial use fee from the OSS Contractor and then a further reimbursement from BMP for all of BLM's costs of administering and overseeing the OSS Contractor's SRP.  This double-dipping is expressly prohibited by the Federal Land Recreation Enhancement Act ("FLREA"), which provides that "[t]he Secretary shall establish the minimum number of recreation fees and shall avoid the collection of multiple or layered recreation fees for similar uses, activities, or programs."  16 U.S.C. § 6802(c).   Indeed, nothing in the regulations allows BLM to charge one permittee for the costs of administering a different SRP to a separate permittee.  *Contra* 43 C.F.R. § 2932.31(e)(2)-(3).

Lacking any support in the regulations, BLM contends that because the services "are for BMP's exclusive benefit" and the "vendors would not be providing their services, but for the Event," BMP should be forced to pay for BLM's costs to oversee these separate SRPs.  (Dfs.' Mem. at 43.)   There is no support in the Record or applicable law for BLM's novel "but-for causation" argument.   Moreover, the fact that BMP manages the ingress and egress of OSS Contractors at the Event gate does not mean that they are providing any services for BMP's exclusive benefit.  OSS Contractors are providing services to Event participants, not BMP, and they obtain their SRPs for this purpose.  43 C.F.R. § 2932.5 (definition of commercial use).  BLM may inspect their activities for compliance, 43 CFR § 2932.55, and the OSS Contractor would be liable for failing to comply with any permit term.  43 CFR § 2932.57(a).  BLM has the right to charge these SRP holders for the costs associated with their SRPs, 43 C.F.R. § 2932.31(e)(1), but BLM cannot shift these costs to BMP simply because BMP has an open cost-recovery account with the agency.

Finally, contrary to BLM's claim (Dfs.' Mem. at 43), the agency may not properly shift the costs for one SRP to a separate SRP by simply noting those costs in an estimate decision for the separate SRP. The fact that BLM may be able to force BMP to temporarily accept such fees, under threat of cancellation of its Event, does not make BLM's conduct proper. BLM should be prohibited from charging BMP to administer other parties' SRPs and ordered to refund all such costs already paid by BMP.

## J.      The Remedies Plaintiffs Seek Are Proper.

In alleging that BMP's request for relief lacks legal support, BLM misconstrues the Court's role in reviewing agency action. (Dfs.' Mem. at 43-46.) BMP's Complaint requests that the Court (1) declare unlawful and set aside BLM's assessment of unreasonable and unjustified costs in the final cost recovery decisions for the 2015 through 2019 Events; (2) compel BLM to reimburse BMP for all unreasonable and unjustified costs that BMP was required to pay BLM through theses final decisions; and (3) require BLM in the future to charge only reasonable costs and to adequately explain its charges. (Pfs.' Am. Compl. 27.)   These remedies are completely consistent with remedies under the APA. In contrast, BLM's fallback argument of remand without vacatur is an uncommon remedy reserved for circumstances not applicable here.

Citing to FLPMA, BLM claims that the Secretary of Interior has exclusive authority to consider whether a cost is "reasonable" and that the statute "does not authorize a reviewing court to engage a claimant's proffered balancing of 'reasonableness.'"[31]  (Dfs.' Mem. at 44 (citing 43 C.F.R. § 1734(c)).) The Court's review of this agency's decisions is pursuant to the APA, which states as follows:

---

[31] BMP has never asserted that the Court should engage in a "balancing" of reasonableness. That being said, the court in the *Nevada Power* case remanded the decision back to BLM to examine and "weigh each of the factors listed in section 304(b)." 711 F.2d at 927.

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall (1) compel agency action unlawfully withheld or unreasonably delayed; and  (2) hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . .(C) in excess of statutory jurisdiction, authority or limitations. . .(D) without observance or procedure required by law; (E) unsupported by substantial evidence . . .

5 U.S.C. § 706.  Hence, it is not within the exclusive authority of the Secretary to interpret statutory terms, and BMP's requested relief parallels the APA: set aside the cost recovery decisions not based on the reasonableness factors, and compel reimbursement of any costs unlawfully withheld.

BLM erroneously contends that it would "defy common sense" for the Court to decide, for example, that "all costs associated with BLM's law enforcement substation" should be refunded. (Dfs.' Mem. at 45.)  If such costs were not reasonable, then the agency's decision to charge for those costs should be set aside.  Indeed, "[o]nce a reviewing court determines that the agency has not adequately explained its decision, the Administrative Procedure Act requires the court – in the absence of any contrary statute – to vacate the agency's action." *Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (Randolph, J., concurring).   In turn, the Court has broad discretion in fashioning equitable relief.  *Brown v. Plata*, 563 U.S. 493, 538 (2011).  Refunding improperly withheld monies is an equitable remedy long recognized as appropriately within a court's broad equitable powers.  *Bowen v. Mass.*, 487 U.S. 879, 893-901 (1988) (holding that reimbursing Maryland for funds the state was statutorily entitled to receive was "specific relief, not relief in the form of damages"); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) ("[T]he scope of a district court's equitable powers ... is broad, for breadth and flexibility are inherent in equitable remedies," particularly when "federal law is at issue and 'the public interest is involved.'").  Here, there is no logical reason to allow an incorrect decision on cost recovery to remain in place.  If a cost was not "reasonable," there is no remedy other than

to refund that amount to BMP.

Finally, BLM argues for remand without vacatur under the theory that nothing suggests the agency would not be able to substantiate its prior conclusions.  (Dfs.' Mem. at 45.)  As BLM itself admits, the normal course is to vacate the agency decision.  (*Id.* at 44.)  Remand without vacatur is reserved for those narrow situations where the decision-making deficiencies are not serious, and it is necessary to avoid severely disruptive consequences of setting aside the agency decision.  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).  Here, the deficiencies in BLM's decisions are substantial, and the consequences of refunding BMP can hardly be called disruptive.  The Administrative Record does not support BLM's claim that the agency will be able to substantiate its decisions given an opportunity to do so, given that BLM has had myriad opportunities to do so for several years, has refused, and has instead taken such improper positions as law enforcement "costs what it costs." (AR11853 ¶ 14.)

## III.    CONCLUSION

BMP has met its burden under Rule 56 and established that the Administrative Record does not contain reasoned explanations for BLM's 2015 through 2019 final cost recovery decisions and that many of the costs charged were not reasonable costs.  For all of the reasons set forth herein and in its Memorandum, BMP respectfully requests that the Court grant the relief requested in BMP's Memorandum.

Respectfully submitted this 28th day of May, 2021.

HOLLAND & KNIGHT LLP

By: /s/ Rafe Petersen

Rafe Petersen (Bar ID Number: 465542)
Nicholas W. Targ
Alexandra E. Dobles
800 17th Street NW, #1100
Washington, D.C. 20006
(202) 419-2481

David S. Levin (CA Bar No. 156336)
(admitted *pro hac vice*)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
(650) 858-8500

*Attorneys for Plaintiffs Black Rock City LLC and Burning Man Project*