David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone:  (650) 858-8500
david@levinlawfirm.com

Attorneys for Appellant,
Burning Man Project

## UNITED STATES DEPARTMENT OF THE INTERIOR

## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BURNING MAN PROJECT,<br><br>　　　　　Appellant,<br><br>　　v.<br><br>BUREAU OF LAND MANAGEMENT,<br><br>　　　　　Appellee. | Case Identification No.:  IBLA-2020-0302<br><br>Special Recreation Permit<br>LLNVW03500-19-01<br>2930 (NV030.10)<br><br>**Statement of Reasons Supporting Appeal** |

AR11685

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................1

II.  FACTUAL BACKGROUND ....................................................................3

    A.   Overview of the Burning Man Special Recreation Permit ....................3

    B.   Burning Man Has an Established and Exceptional Record of Safety and Environmental Compliance ......................................................................4

    C.   BLM's Cost to Administer the SRP Soared Nearly 300% From 2011 To 2014 ...........................................................................................................5

        1.   In 2012, BLM's costs increased by 60% without justification when Special Agent Love took charge of BLM's law enforcement operation ......................................................................5

        2.   Instead of stabilizing in 2013, BLM's costs more than doubled again ............................................................................................6

        3.   In 2014, BLM's costs rose by another 15%, while Burning Man's participant population fell 5% ..........................................7

    D.   Following BLM's Unreasonable Cost Increases in 2015, BMP Began to Seek Relief from This Board ......................................................................8

    E.   Multiple Investigations Found That Special Agent Love Committed Misconduct While Overseeing BLM's Burning Man Law Enforcement Detail ..........................................................................................................9

    F.   From 2016 Through 2019, BLM Costs Have Remained Unreasonably Inflated ......................................................................................................11

III. LEGAL STANDARD ..............................................................................12

IV.  ARGUMENT ............................................................................................16

    A.   BLM Has Not Sufficiently Explained Its Costs for the 2019 Burning Man SRP .....................................................................................................16

    B.   BLM's 2019 Law Enforcement Costs Were Unreasonably High ..........19

        1.   BLM law enforcement staffing continued to exceed the needs of the Event ..............................................................................22

        2.   BLM law enforcement officers spent the bulk of their time addressing non-criminal activity and drug possession ..............25

i

AR11686

          a.     "Public [relations] contacts" .........................................26

          b.     Traffic enforcement upon entering and exiting the Event ......................................................................................27

          c.     Drug enforcement through traffic stops ........................27

     3.     BLM law enforcement personnel sat idle two-thirds of the time ......................................................................................31

     4.     Only 8% of BLM law enforcement service calls came from community need, while 92% of service calls were self-initiated by the officer ...............................................................32

     5.     BLM unreasonably charged BMP for six senior level "investigators" assigned to work exclusively for Pershing County on state law matters ..............................................34

     6.     BLM again unreasonably charged BMP for internal management and oversight of its law enforcement officers .........................35

     7.     BMP should not be required to pay any costs associated with BLM's law enforcement "substation"..........................36

     8.     BMP should not be charged premium pay rates for BLM's unjustified designation of Burning Man work as "mission critical"................................................................37

C.     BLM's Soaring Communications and Information Technology Costs Far Exceed What Is "Reasonable" for the Event .................................39

     1.     BLM personnel spent excessive hours on BLM communications, technology, and logistical services for the 2019 Event ............40

     2.     BLM continued to charge BMP for unneeded equipment and dispatchers.................................................................41

          a.     BLM expenditures on satellite tracking were unreasonable..................................................................41

          b.     BLM's "Network Services" contract with Lyman Communications included numerous unnecessary and unreasonable items.........................................................42

          c.     BLM again contracted for needlessly expensive and unnecessary dispatch personnel and supplies ...............44

D.     Costs Associated With BLM's Superfluous and Unnecessary Medical Unit For Its Personnel Were Not "Reasonable"....................................45

E.     BLM Unreasonably Charged BMP For Costs Associated With SRPs That BLM Issued to Third Parties................................................46

ii

AR11687

F.    BLM Charged BMP For Unreasonable "Misc. Supplies and Equipment" Costs ....................................................................................48

V.    CONCLUSION ................................................................................49

iii

AR11688

1
2

# TABLE OF AUTHORITIES

3

**Federal Court Cases**

4
5

*Nevada Power Co. v. Watt,*
   711 F.2d 913 (10th Cir. 1983)................................................................ 13, 14, 19, 49

6

*City of Indianapolis v. Edmond,* 531 U.S. 32, 41-42 (2000)
   531 U.S. 32,41-42 .......................................................................................... 28

7

8

**Federal Statutory Authorities**

9

42 U.S.C. § 4321 ........................................................................................................ 3

10

43 U.S.C. § 1434(a) .................................................................................................. 17

11

43 U.S.C. § 1701 ........................................................................................................ 3

12

43 U.S.C. § 1734(b) .................................................... 12, 13, 14, 16, 19, 21, 22, 36, 50

13

43 U.S.C. § 1734(b)-(c)...................................................................................... 19, 20

14

43 U.S.C. § 1734(c) .......................................................................................... 15, 50

15

16

**Federal Rules and Regulations**

17

5 C.F.R. § 550.103 ..................................................................................................... 5

18

5 C.F.R. § 550.106 ..................................................................................................... 6

19

5 C.F.R. § 550.106(b)(1) ...................................................................................... 6, 12

5 C.F.R. § 551.2110 ................................................................................................... 6

20

43 C.F.R. § 2932.11 ................................................................................................. 47

21

43 C.F.R. § 2932.31(d)(2)......................................................................................... 8

22

43 C.F.R. §2932.31(e)............................................................................... 13, 36, 48

23

43 C.F.R. § 2932.34 ................................................................................................. 8

24

25

**Additional Authorities**

26

*Bookcliff Rattlers Motorcycle Club,* IBLA 2004-151, 171 IBLA 6 (2006)... ....... Passim

27

*James R. Stacy*, IBLA 2014-216, 188 IBLA 134, 137 (2016). ..................................... 12

28

iv

AR11689

*Mark Patrick Heath*, IBLA 2010-34, 181 IBLA 137 (2011) ........................................ 15

*Michael Voegele,* IBLA 2007-255, 174 IBLA 313 (2008) ............................. 15, 19, 20

National Special Recreation Permit Fee Schedule IM 2014-055 …………………… 47

v

AR11690

# I.  INTRODUCTION

Appellant Burning Man Project ("BMP") comes before this Board to seek relief from unreasonable costs imposed by the U.S. Bureau of Land Management ("BLM") in connection with the special recreation permit ("SRP") for the annual Burning Man event ("Event").  This is the fifth consecutive year that the applicant has filed such an appeal.  The four previous actions were brought by BMP's wholly owned subsidiary, Black Rock City LLC, which produced the Event through 2018.  Starting in 2019, BMP became the Event producer and SRP applicant and brings this appeal in its name. References to "BMP" herein are inclusive of Black Rock City LLC to the extent they refer to activities from 1997 through 2018.

Since 2011, the Event's participant population has increased by 30%, while BLM's costs to administer the Event permit have gone up an unreasonable 294%.  By far the largest and fastest-growing category of BLM costs is law enforcement labor and technology. Excessive law enforcement spending is an unfortunate legacy that BMP has borne since former BLM Special Agent Daniel P. Love managed BLM's law enforcement operations at the Event.  The Department of the Interior ultimately found that Special Agent Love had violated ethics rules and committed other misconduct, including the misuse of personnel and other resources at the Event for which Burning Man paid through cost recovery.  While BLM removed Special Agent Love from work on the Event's SRP in 2015, and terminated him in 2017, the local field office has maintained law enforcement staffing at the same inflated level and has continued to increase the bloated operation that is a legacy of Special Agent Love, all at BMP's expense.

The scale of BLM's law enforcement program still far exceeds what is reasonably necessary for the Event, with BLM's own data confirming that the Event is overstaffed and law enforcement officers are idle two-thirds of the time.  Yet BLM personnel continue to be paid at premium overtime rates due to a "mission-critical work" designation that the agency applies to the Event without justification.  In 2019, BLM charged BMP $1,237,911 including the indirect cost rate for law enforcement labor alone.  BLM also continues to demand a needlessly elaborate technology program to support its law enforcement apparatus, led by

1

1  senior command personnel from the Office of Law Enforcement and Security and staffed with

2  dozens of additional BLM employees and contractors, and to insist on top-dollar equipment it

3  would never deem necessary if the taxpayers were footing the bill instead of BMP.  And BLM

4  continues to require that BMP pay for superfluous medical services, unexplained travel, and

5  unnecessary equipment and supplies.

6       Year after year, BLM personnel spend thousands of hours and hundreds of thousands

7  of dollars supporting BLM's two-week operation at the eight-day Event.  Year after year,

8  BLM ignores the basic tenets of cost recovery regulations that require the agency to (1) only

9  charge BMP for ***reasonable costs***, excluding costs related to serving the "general public

10  interest"; and (2) provide sufficient information regarding the costs charged to enable BMP to

11  assess their reasonableness.  Whenever BMP has challenged BLM's costs, BLM has

12  effectively claimed that its decisions are above review.  According to BLM, its staff are

13  experts in the field with the sole discretion to determine whether costs are reasonable.  BLM's

14  position can be summarized as follows:  "If we incurred a cost, that cost was reasonable."  In

15  its Answers to BMP's previous cost appeals, BLM has even claimed that not even this Board

16  can assess the reasonableness of BLM's permit administration costs.  Despite BLM's wishes,

17  federal cost recovery regulations do not actually vest the agency with such absolute discretion.

18       As detailed below, BLM again ignored the "reasonableness" requirement for costs

19  charged to BMP to administer the 2019 Burning Man SRP.  BLM's costly practices have

20  continued to sharply diverge from the Interior Department's refocusing of BLM priorities on

21  land management, and away from heavy-handed law enforcement, while also easing

22  restrictions and costs on other users of federal lands.  As a result, Burning Man — a

23  temporary, recreational event known for its Leave No Trace ethos — may be the most heavily

24  regulated activity on BLM-managed lands.  BMP contends that a substantial portion of the

25  $2,717,129 BLM charged through cost recovery to administer the 2019 Burning Man SRP are

26  not "reasonable costs" according to controlling authority.  BMP asks the Board to reject

27  BLM's improper "if we spent it, it was reasonable" posturing and order BLM to refund those

28  unreasonable costs identified below.

2

## II.   FACTUAL BACKGROUND[1]

### A.   Overview of the Burning Man Special Recreation Permit.

Since 1990, the Burning Man Event has been held over and around Labor Day weekend on public lands managed by BLM in what is now the Black Rock Desert—High Rock Canyon Emigrant Trails National Conservation Area of northern Nevada (the "Black Rock NCA").  (Declaration of Marnee Benson ("Benson Decl.") ¶ 3.)  The Event location, commonly called Black Rock City, has been situated within Pershing County for most of these years.  (*Id.*)  Burning Man began its tenure in the Black Rock NCA as an expressive weekend camping trip for a small group of people.  (*Id.* ¶ 4.)  Over nearly 30 years, the Event has grown in size, popularity, and complexity, and the peak population at the 2019 Event was 78,850 people [2]  (*Id.* ¶ 4.)

Burning Man has been produced by BMP and its predecessors since 1986.  (*Id.* ¶ 5.)  BMP is a California nonprofit public benefit corporation, recognized as exempt under section 501(c)(3) of the Internal Revenue Code, whose mission is to facilitate and extend the culture of the Burning Man Event in the larger world.  (*Id.*)  BLM issues the SRP for Burning Man each year pursuant to the requirements of the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA").  (*Id.* ¶ 6; 42 U.S.C. § 4321, *et seq.* (1969); 43 U.S.C. § 1701, *et seq.* (1976)).  The permitting process has included several environmental assessments over the years, and most recently a 10-year Environmental Impact Statement that was completed in July 2019.  (Benson Decl. ¶ 7).

BMP and BLM have cooperated over the years to develop and refine a "Leave No Trace" standard for the Event that BLM has adopted for use with other events on BLM-

---

[1] Most of this background information was provided in the Statements of Reasons submitted in support of the appeals of BLM's 2015-2018 cost decisions for the Event.  BMP includes an abbreviated version here, focusing on those issues most relevant to BLM's 2019 Decision.

[2] In 2019, BLM and BMP changed the method for counting the allowed "peak population" at the Event.  Instead of separate categories for paid participants and staff/volunteers, the 2019 allowed "peak population" was 80,000 people total excluding government personnel and vendors.  References to the "peak population" in years prior to 2019 refers to paid participants. Benson Decl., ¶ 4, Ex. C)

3

AR11693

managed public lands.  (*Id.* ¶ 8.)  BLM has inspected the Event site at the end of the SRP

period, and BMP has passed every inspection to date.[3]  (*Id.* ¶ 9, 27.)

**B.      Burning Man Has an Established and Exceptional Record of Safety and Environmental Compliance.**

Safety and environmental stewardship are paramount to the Burning Man organization

and to the members of the Burning Man community.  (*Id.* ¶ 11.)  BMP's commitments to

public safety and the environment are evidenced by the Event's decades-long record of

compliance and year-round work with cooperating agencies at the federal, state, and local

levels.  (*Id.*)  Burning Man is guided by Ten Principles, including communal effort, civic

responsibility, leaving no trace, participation, and radical self-reliance, all of which are

reflected in daily life in Black Rock City and in the Event's extraordinary historical

record.  (*Id.* ¶ 10, Ex. A.)

In 2019, BMP's Event operations comprised more than 50 departments and teams, and

BMP engaged several thousand trained and certified health and safety employees, contractors,

and volunteers to produce Burning Man.  (*Id.* ¶ 11.)  BMP has built these departments,

protocols, and best practices over the course of nearly 30 years in the Black Rock NCA, and

many of these individuals have more than 20 years of experience, both with managing safety

operations and infrastructure at Burning Man and in their respective fields of

expertise.  (*Id.*)  These BMP departments were engaged year-round in planning all aspects of

the 2019 Event and their onsite operations, including providing emergency medical and fire

services; surveying the streets, roads, and airport; building infrastructure; ensuring sanitation;

managing air and bus transportation services; managing participant arrival and processing;

placing more than 1,000 camps; licensing nearly 1,000 vehicles; and educating participants

about staying safe, protecting the environment, and being good citizens of Black Rock

City.  (*Id.*)

---

[3] BLM has not provided BMP with its 2019 Post-Event Site Inspection Report, but the initial results and analysis show that BMP passed with the highest score ever recorded.  (Benson Decl. ¶ 27)

BMP's extensive operational expertise, developed over decades of experience, has resulted in an outstanding record of public safety and environmental compliance for the Event over the years, and BMP has passed BLM's meticulous post-Event site inspection each year.  (*Id*. ¶ 9, 27.)

**C.**     **BLM's Costs to Administer the SRP Soared Nearly 300% From 2011 To 2014.**

> **1.**     **In 2012, BLM's costs increased by 60% without justification when Special Agent Love took charge of BLM's law enforcement operation.**

Since 2007, BLM has charged BMP for the costs of administering the Burning Man SRP under cost recovery regulations that require a permittee to pay all of BLM's direct and indirect costs, plus 3% of BMP's gross receipts as a commercial use fee.  (Declaration of Raymond Allen ("Allen Decl.") ¶ 3.)  Between 2007 and 2011, BLM increased its costs to manage the SRP by about 10% annually — from approximately $626,000 to $859,000.  (*Id*. ¶ 4.)  During this same period, Burning Man's population increased from 47,097 to 53,963, or about 4% per year.  (*Id*.)

In 2012, Daniel P. Love became the BLM Special Agent in Charge for Region 3 of BLM's Office of Law Enforcement and Security ("OLES") and assumed leadership of law enforcement operations for the Burning Man SRP.  (*Id*. ¶ 5.)  That year, BMP's population increased by just 4%, while BLM's costs for administering the Burning Man SRP soared by 62% and totaled almost $1.4 million.  (*Id*. ¶ 6.)  This was in part due to Special Agent Love's decision to increase BLM law enforcement staffing levels by 37%, from 51 officers in 2011 to 70 in 2012.  (*Id*.)  As a result, BLM's labor costs shot up, as did all related costs, from staff lodging, meals, and travel to technology services and equipment.  (*Id*.)  BLM has never adequately explained the substantial increases, and BMP is aware of no safety or other issues that warranted them.  (*Id*. ¶ 7.)

Also, in 2012, BLM designated Burning Man as an "emergency special event" pursuant to 5 C.F.R. § 550.103, for the first time to BMP's knowledge.  (*Id*. ¶ 8.)  Special Agent Love informed BMP that the designation was intended to facilitate assignment of officers from other regions to Burning Man, despite BLM never documenting any difficulty in

5

1    securing a sufficient number of staff for the reasonable needs of the Event.  (*Id.*)  The

2    authorizing memorandum signed by then-OLES Director Salvatore Lauro gave only one

3    reason for imposing the emergency designation: it "would allow for lifting the bi-weekly pay

4    cap as authorized by 5 C.F.R. § 550.106 and the ... overtime requirements under 5 C.F.R. §

5    551.2110, for law enforcement personnel participating in direct support of this

6    event."  (Benson Decl., Ex. B.)[4]  As a result, these employees would "be entitled to premium

7    pay under the annual maximum earning limitations while performing the emergency

8    work."  (*Id.*)  BMP understands BLM applied the "emergency" designation to every Event

9    from 2012 through 2016, though BLM's sparse labor summaries did not confirm the

10   designation's existence, basis, or effects.  (*Id.* ¶ 16.)[5]

11            Despite all its concerns with BLM's 2012 expenses, BMP had no choice but to agree

12   to them.  BLM's Winnemucca District Manager, Gene Seidlitz, warned that if BMP appealed

13   the 2012 costs, BLM might not have enough time to both answer the appeal and process

14   BMP's 2013 SRP application, which would have caused BMP disastrous financial

15   losses.  (Allen Decl. ¶ 10.)

16            **2.      Instead of stabilizing in 2013, BLM's costs more than doubled again.**

17            Given the substantial increases in 2012, BMP expected BLM's costs would remain flat

18   in 2013, and BLM represented that this would be the case.  (*Id.* ¶ 11.)  But in the spring of

19   2013, BLM advised BMP that its costs for administering the Burning Man SRP would more

20   than double that year.  (*Id.* ¶ 12.)  They ultimately totaled over $2.93 million, an extraordinary

21   increase of 241% in just two years.  (*Id.*)  Special Agent Love claimed that the 2013 increase

22   ─────────────────────────

23   [4] BLM declined BMP's repeated requests from 2012 through 2016 to provide written
     documentation of the emergency designation and BLM's basis for applying it to the
24   Event.  (Allen Decl. ¶ 9.)  In early 2017, BMP personnel visited BLM's Winnemucca District
     Office to inspect BLM's Burning Man files and found the 2012 memorandum.  (Benson Decl.
25   ¶ 14.)

26   [5] As discussed below, after BMP objected to this unjustified designation in the 2015 and 2016
     Cost Recovery Appeals, BLM retreated from past "emergency" declarations and instead
27   designated work related to the 2017, 2018, and 2019 Events as "mission-critical" under 5
     C.F.R. § 550.106(b)(1). This has enabled BLM to continue paying premium pay and additional
28   overtime pay to its personnel at BMP's expense.

                                        6

1  was due in part to a one-time upgrade of BLM's infrastructure for "safety" reasons, including

2  implementation of a new computer-aided dispatch ("CAD") system.  (*Id.* ¶ 13.)  BLM assured

3  BMP the CAD system would provide data about BLM's law enforcement activities that would

4  justify, explain, and reduce the costs BLM charged BMP through cost recovery.  (*Id.*)

5  When BMP requested the reasoned, factual explanation for these cost increases to

6  which it was entitled under cost recovery regulations, Special Agent Love contended that

7  these regulations did not apply to law enforcement, which "costs what it costs."  (*Id.* ¶

8  14.)  District Manager Seidlitz claimed that BMP was not entitled to any explanation of these

9  costs, but would simply need to pay them in order to secure an SRP.  (*Id.*)  Mr. Seidlitz also

10  informed BMP that BLM's Winnemucca District Office could not function without the money

11  from the Burning Man SRP, suggesting that these funds were being used to backfill the

12  District's budget shortfalls.  (*Id.* ¶ 15.)

13  When BMP was informed of the 2013 cost increase, the Event was just five months

14  away, and BMP had already sold thousands of tickets and incurred significant production

15  expenses based on BLM's assurances that its costs had stabilized.  (*Id.* ¶ 16.)  BMP again felt

16  compelled to sign the cost recovery agreement, acquiesce to BLM's unjustified price hike, and

17  continue to seek an adequate explanation from BLM.  (*Id.* ¶ 18.)[6]  BLM has still not justified

18  this astronomical cost increase, and the data that would supposedly have confirmed the

19  reasonableness of BLM's costs never materialized.  (*Id.*)

20  **3.  In 2014, BLM's costs rose by another 15%, while Burning Man's**
   **participant population fell 5%.**

21

22  In planning for the 2014 Event, BMP again relied on BLM's assurances that costs

23  would not substantially increase for a while, and that the 2012 and 2013 cost increases would

24  ─────────────────────

25  [6] BMP could not afford to pay the additional $1.5 million BLM was suddenly requiring.  (*Id.* ¶
   17.)  During a meeting on March 26, 2013, BMP staff explained that BMP could only finance the

26  cost increase if BLM allowed the Event's population to increase, enabling BMP to sell more
   tickets.  (*Id.*)  BLM had always refused to allow Burning Man to grow proportionally to BLM's

27  costs, but within minutes of BMP making this request at the March 26 meeting, BLM approved a
   substantial population increase in order to secure BMP's agreement to pay the agency's doubled

28  costs in 2013.  (*Id.*)

7

1   improve communications and data collection, finally enabling an objective assessment of

2   BLM's costs.  (*Id.* ¶ 19.)  But BLM did not furnish BMP with any additional data, and no

3   health and safety improvements resulted from the agency's $1.5 million cost increase for the

4   2013 SRP.  (*Id.*)

5        Incredibly, BLM's cost recovery proposal for the 2014 Burning Man SRP estimated

6   that BLM's costs would increase by another $700,000, to around $3.7 million.  (*Id.* ¶

7   20.)  When BMP objected to yet another cost hike, BLM offered BMP an opportunity to "save

8   money" by signing a memorandum of understanding ("MOU"), under which BMP would

9   fulfill certain contracts instead of BLM.  This way, BMP would avoid paying the indirect

10  administrative cost rate ("IACR"), which BLM applies to all direct expenditures charged

11  through cost recovery, on these contracts.  (*Id.*)[7]  In 2014, BMP spent about $600,000

12  fulfilling the statements of work ("SOWs") under the MOU and another $70,000 to fund two

13  proffer accounts for BLM personnel who allegedly worked year-round on the Burning Man

14  SRP.  (*Id.*)  In total, BLM charged BMP more than $3.4 million to administer the 2014 SRP,

15  which was about $500,000 more than in 2013 and $2.5 million more than in 2011.  (Benson

16  Decl., Ex. C.)  BLM has never adequately explained the further escalation of its costs and

17  requirements in 2014.  (Allen Decl. ¶ 14.)

18  **D.    Following BLM's Unreasonable Cost Increases In 2015, BMP Began to Seek
        Relief from This Board.**

19

20       The planning process for the 2015 Burning Man SRP was marred by delays and

21  friction resulting from BLM's unprecedented demands of BMP, including a luxury compound

22  to accommodate VIP personnel and "24-hour access to ice cream," according to the headline

23  of one article picked up by the national media.  (Benson Decl. ¶ 18; Exs. D, E.)  BLM's

24  demands became the subject of a public outcry and criticism by elected officials, with Senator

25  

26  [7] BLM can waive the IACR, and it does so for other users of public lands. (*See* 43 C.F.R. §§
    2932.31(d)(2), 2932.34.)  BMP has made several requests for a waiver over the years, which

27  BLM has denied.  (*See, e.g.,* Allen Decl. ¶ 20.)  Via the MOU process, BLM effectively agreed
    to waive the IACR for these costs, but in exchange, BMP gave up its right to challenge the

28  costs via a cost recovery appeal.  (*Id.*)

Harry Reid admonishing Interior Secretary Sally Jewell that such facilities "should be beyond the scope of the permitting requirements." (*Id.*, Ex. E.)  BLM ultimately withdrew the SOW for the VIP compound under this pressure, and both District Manager Seidlitz and Special Agent Love were reassigned from work on the Burning Man SRP. (*Id.* ¶ 18.)

BMP did not receive the 2015 cost recovery estimate and agreement until just a few weeks before the start of the 2015 Event, days before site work was scheduled to begin. (*Id.* ¶ 19.)  BLM then pressured BMP to sign the $2.9 million estimate without adequate review or sufficient documentation, advising that the SRP could not issue until BMP had signed and paid. (*Id.*)  BMP was again effectively forced to accept BLM's cost estimate despite its reservations. (*Id.*)

In January 2016, BLM issued its final cost recovery decision for the 2015 SRP, totaling about $2.8 million. (*Id.* ¶ 20.)[8]  As the decision failed to sufficiently explain the basis for BLM's costs, and many costs were objectively unreasonable, BMP exercised its right to appeal.  That appeal remains pending before the Board as Case No. IBLA 2016-115 ("the 2015 Appeal").

**E.    Multiple Investigations Found That Special Agent Love Committed Misconduct While Overseeing BLM's Burning Man Law Enforcement Detail.**

In January 2017, the Office of the Inspector General ("OIG") for the Interior Department released a public version of a report entitled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials" (the "Ethics Report").  (Allen Decl. ¶ 21; Ex. B.)  The Ethics Report detailed the OIG's investigation into the conduct of Special Agent Love during his tenure as head of OLES Region 3, including conduct related to the 2015 Event.  (*Id.*, Ex. B.)  The investigators found that Special Agent Love violated federal ethics rules and misused BLM resources in many ways, including by directing on-duty officers to escort his family on a several-hour tour of Burning Man using

---

[8] Including the amounts paid for the SOWs and a proffer account that funded BLM's Burning Man Project Manager position, BMP paid a total of more than $3.5 million for costs incurred by BLM to administer the 2015 Burning Man SRP.  (Benson Decl. ¶ 20.)

9

1   official vehicles.  (*Id*. Ex. B at 1, 6.)  BMP understands that it paid for all of the time logged

2   by these officers, including Special Agent Love, while they engaged in activities that the

3   Ethics Report confirmed were both wholly unrelated to BLM's management of the Burning

4   Man SRP and in violation of BLM policy.  (*Id*.)

5          After reviewing an unredacted version of the Ethics Report, the Chair of the U.S.

6   House Oversight and Reform Committee requested that the OIG separately investigate the

7   numerous documented incidents of "troubling behavior" by Special Agent Love.[9]  (*Id*., Ex. C

8   at 1-2.)  These included allegations of tampering with email evidence, attempting to influence

9   witness testimony, and directing another employee to destroy hundreds of federal records

10  relevant to a congressional request.  (*Id*.)  The report of the OIG's second investigation, issued

11  in August 2017, concluded that Special Agent Love had committed several other ethical

12  violations, including ordering the destruction of emails in which he had been "inappropriate,"

13  despite the messages' relevance to the OIG's investigation into his conduct at the 2015

14  Event.  (*See, e.g.*, *Id.*, Ex. D at 7-9.)

15         The following month, BLM confirmed that it had terminated Special Agent Love's

16  employment.  (*Id*., Exs. E, F.)  In a message to all Interior employees, the present Secretary,

17  David Bernhardt, cited Special Agent Love's removal from federal service as evidence that

18  the Department's leadership was committed to holding employees accountable when

19  "informed that they have failed in their duties and obligations."  (*Id*., Ex. G.)

20         Shortly after this announcement, BLM Special Agent Larry C. Wooten released a

21  whistleblower memorandum that detailed his separate investigation into Special Agent Love

22  in connection with a case against a Nevada rancher.  (*Id*., Ex. I.)  That investigation "revealed

23  a widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism

24  and misconduct, as well as likely policy, ethical, and legal violations among senior and

25  supervisory staff at the BLM's Office of Law Enforcement and Security," and in particular by

26

27  _____

28  [9] Though the published Ethics Report does not name the investigated officer, the Committee's
    letter confirmed Special Agent Love was the investigation's target.  (Allen Decl., Ex. C at 1.)

Special Agent Love.  (*Id.*, Ex. I at 1.)  On multiple occasions, Special Agent Love "specifically and purposely ignored U.S. Attorney's Office and BLM civilian management direction and intent as well as Nevada State Official recommendations in order to command the most intrusive, oppressive, large-scale, and militaristic trespass cattle impound possible."  (*Id.* at 5.)

Special Agent Wooten's investigation also revealed that Special Agent Love's misconduct was shielded and even sanctioned by previous OLES Director Salvatore Lauro, resulting in "an improper cover-up in virtually every matter that [Special Agent Love] participated in or oversaw," and an office culture in which "any disagreement with [Special Agent Love], or any reporting of his many likely embarrassing, unethical/unprofessional actions and misconduct was thought to be career destroying."  (*Id.* at 12.)  Special Agent Wooten found that Special Agent Love's "subordinates and peers were afraid to correct him or properly report his misconduct (despite a duty to act) out of fear for their own jobs and reputation[s]" because Director Lauro not only gave him "complete autonomy and discretion, but also likely provided no oversight and even contributed to an atmosphere of cover-ups, harassment and retaliation for anyone that questioned or reported former [Special Agent] Love's misconduct."  (*Id.* at 8, 12.)

**F.      From 2016 Through 2019, BLM Costs Have Remained Unreasonably Inflated.**

Following the 2015 departure of both Special Agent Love and District Manager Seidlitz from BLM's leadership team for the Burning Man SRP, BMP's planning for the 2016 and 2017 Events saw certain improvements in collaboration with BLM.  (Benson Decl. ¶ 21.) BLM did not, however, reduce a number of programs and costs that were initially escalated without justification under the prior leadership, including the excessive expenditures on labor, support and infrastructure for the law enforcement Joint Operations Center ("JOC"), and technology services and equipment.  (*Id.*)  BMP therefore filed a second and then a third appeal to the Board, challenging BLM's 2016 and 2017 cost recovery decisions (respectively, the "2016 Appeal," docketed as Case No. IBLA 2017-126, and the "2017 Appeal," docketed as Case No. IBLA 2018-086).  The parties completed briefing on the these appeals in July

1    2017 and August 2018, respectively, and the parties await decisions from the Board.

2         One notable change in 2017 was that BLM stopped seeking to have Burning Man

3    designated an "emergency" event, as it had since 2012.  (Benson Decl. ¶ 24.)  After BMP

4    objected to this designation in its 2015 and 2016 Appeals, BLM changed tactics and instead

5    began to designate the deployment of personnel to Nevada to support the Event as "mission-

6    critical work" under 5 C.F.R. § 550.106(b)(1).  (*Id.* ¶ 24; Exs. F, G.)  A BLM deputy assistant

7    director approved the designation, notwithstanding the lack of any explanation or justification

8    for it.  (*Id.*, Ex. G.)  BLM made the "mission critical work" designation permanent prior to the

9    2018 Event.  (*See*, Permanent Instruction Memorandum 2018-010, A. R. Document # 251.)

10        Negotiations for the 2019 Burning Man SRP were similar to the prior three

11   years.  Again, BLM declined to change or even reevaluate cost practices that were instituted

12   by Mr. Seidlitz and Special Agent Love, intimating that it would not do so unless required by

13   the Board in connection with BMP's pending cost appeals.  (Benson Decl. ¶ 26.)  As a

14   consequence, BLM continues to pass unjustified costs on to BMP year after year while the

15   parties await the decisions of this Board.

16        The 2019 Event took place from Sunday, August 25, through Monday, September

17   2.  (*Id.* ¶ 27.)  On February 13, 2020, BLM issued its 2019 Cost Recovery Decision, with

18   direct and indirect costs totaling $2,717,129 — an increase of approximately 5.3% from

19   2018.  (*Id.*, Exs. C, H.)  Factoring in the additional BLM mandated costs, which BMP paid in

20   addition to the costs reflected in BLM's 2019 Cost Recovery Decision, BMP paid the total of

21   $3,466,551 for BLM to administer the 2019 Burning Man SRP.  (Benson Decl. Ex. C.)  To

22   obtain relief from the unreasonable costs BLM charged by BLM, BMP timely filed its Notice

23   of Appeal on March 17, 2020.

24                      **III.    LEGAL STANDARD**

25        BLM issues SRPs under the general authority of the Secretary of the Interior to

26   administer use of public lands under section 302(b) of the Federal Land Policy and

27   Management Act ("FLPMA").  *James R. Stacy*, IBLA 2014-216, 188 IBLA 134, 137

28   (2016).  Under section 304(b) (codified as 43 U.S.C. § 1734(b)), the agency is permitted to

                                            12

1  require a deposit of any payments intended to reimburse the agency for "reasonable costs" with

2  respect to issuing and administering an SRP.  The FLPMA defines "reasonable costs" to

3  include "the costs of special studies; environmental impact statements; monitoring

4  construction, operation, maintenance, and termination of any authorized facility; or other

5  special activities." *Id.*

6    Congress, through the FLPMA, has made clear that an agency may not use cost

7  recovery to force the permittee to fund general costs or costs that are for the "benefit of the

8  general public interest":

9    In determining whether costs are reasonable under this section, the
   Secretary may take into consideration actual costs (exclusive of
10   management overhead ..., that portion of the cost incurred for the
   benefit of the general public interest rather than for the exclusive
11   benefit of the applicant, the public service provided, and other
   factors relevant to determining the reasonableness of the costs.
12

13  43 U.S.C. § 1734(b).  BLM costs, or portions of costs, which serve "the general public interest"

14  and are not "for the exclusive benefit of the applicant" are not recoverable from the permittee

15  under 43 U.S.C. § 1734(b).

16    Similarly, 43 CFR § 2932.31(e) limits BLM's ability to charge the applicant through cost

17  recovery as follows:

18    *(3) Limitations on cost recovery.* Cost recovery charges will be
   limited to BLM's costs of issuing the permit, including necessary
19   environmental documentation, on-site monitoring, and permit
   enforcement. Programmatic or general land use plan NEPA
20   documentation are not subject to cost recovery charges, except if the
   documentation work done was done for or provides special benefits
21   or services to an identifiable individual applicant.
22

23  Thus, costs not related to BLM's issuance of BMP's permit are excluded from cost

24  recovery.

25    As this Board and courts applying FLPMA Section 304(b) have affirmed, Congress

26  deliberately used the modifier "reasonable" to limit the agency's discretion on which costs can

27  be recovered from an applicant like BMP.  For example, in *Nevada Power Co. v. Watt*, 711

28  F.2d 913 (10th Cir. 1983), when the Department of the Interior "[took] the position that for

13

right of way applications, 'reasonable costs' equal[ed] actual costs" (*id.* at 920), the appellate

court rejected the agency's interpretation of Section 304(b) as follows:

> Our review of this unusually abundant legislative history reinforces our conclusion that the reasonableness factors were intended to limit the Secretary's authorization to charge reasonable costs. The factors were added to ensure that applicants would not as a matter of course bear all of the costs occasioned by their application. On the other hand, private enterprises were not to be subsidized by requiring the government to shoulder all of the costs. The conferees sought to draw a line between the two extremes; the reasonableness factors constitute that line. To suggest that the Secretary may completely disregard that line flouts the clear expression of congressional intent contained in the legislative history.

(*Id.* at 925) (footnotes omitted); accord *Bookcliff Rattlers Motorcycle Club*, IBLA 2004-151,

171 IBLA 6, 17 (2006) ("The Court in *Nevada Power* held that the Secretary cannot disregard

the 'reasonableness factors' set forth in section 304(b) of the FLPMA in determining costs to

be recovered.").  Thus, Congress intended "reasonableness" to be a limiting term and declined

to deem *actual* costs synonymous with *reasonable* costs under the FLPMA.

In its administration of the Event SRPs, however, BLM has completely disregarded

the word "reasonable" and claimed that all of its "actual" costs are recoverable from

BMP.   BLM has also ignored the statutory definition of "reasonable" and the qualifier that

"actual costs (exclusive of management and overhead)" are only a "consideration" for

determining whether an agency's costs are reasonable.  Congress requires the agency to

review its actual costs and apportion "general public interest" costs. 43 U.S.C. § 1734(b)

In this case, BLM made no attempt to apportion any of its costs between those that

served the "general public interest" and those that were incurred for the "exclusive benefit of

the applicant."  According to BLM, any of its actual costs related to a Burning Man Event are

*de facto* reasonable, even those costs that are neither for BMP's "exclusive benefit" nor

related to permit administration.   Each time BLM attempts to justify a particular cost by

citing to BLM's General Law Enforcement Orders or other "general public interest" laws or

regulations, BLM is admitting that at least part of that cost was not for the "exclusive benefit

14

1    of the applicant" and therefore not recoverable through cost recovery.[10]

2            Another important feature of cost recovery under Section 304(b) is the requirement

3    that the agency give the permittee a rational explanation for all costs charged that is

4    "supported by the facts of record demonstrating that [BLM's] action is not arbitrary,

5    capricious, or an abuse of discretion." *Michael Voegele,* IBLA 2007-255, 174 IBLA 313, 318

6    (2008).  It is not sufficient for BLM simply to list its costs.  "The recipient of a BLM decision

7    is entitled to a reasoned and factual explanation providing a basis for understanding and

8    accepting the decision or, alternatively, for appealing and disputing it before the

9    Board." *Bookcliff Rattlers*, 171 IBLA at 21.  In *Bookcliff Rattlers*, the Board confirmed that

10   "[w]here BLM makes use of computer spreadsheets to accumulate data upon which a cost

11   estimate for an SRP is based, it must reveal underlying data sufficient for the applicant being

12   charged to ascertain the justification for its conclusions; otherwise, the applicant has no basis

13   upon which to understand and accept the decision or, in the alternative, to appeal and dispute

14   it." *Id.*  Thus, threadbare summary spreadsheets do not satisfy BLM's obligation to provide a

15   reasoned explanation of its costs, and BLM's internal instruction memoranda do not shield its

16   cost decisions from appellate review.  The Board must still examine these decisions for

17   reasonableness and abuse of discretion.  *Mark Patrick Heath*, IBLA 2010-34, 181 IBLA 137

18   (2011).

19           BMP acknowledges that it has the burden of proof to demonstrate that BLM failed to

20   meet these statutory requirements.  *See Michael Voegele*, 174 IBLA 323.  And upon showing

21   that BLM's 2019 Cost Recovery Decision charged BMP for unreasonable costs under Section

22   304(b), BMP has a clear statutory remedy: To the extent BMP "has made a payment . . . not

23   required or in excess of the amount required by applicable law and regulations," BMP is

24   entitled to a refund of the overpayment under 43 U.SC. § 1734(c).

25   _____

26   [10] *See, e.g.*, Declaration of Rebecca Andres in Support of BLM's Answer to 2018 Appeal
     ("2018 Andres Decl.") ¶ 25 ("Law Enforcement General Order 33 directs BLM to make public

27   lands drug-free . . . ."); Declaration of Mark E. Hall in Support of BLM's Answer to 2018
     Appeal ("2018 Hall Decl.") ¶ 28 ("Per General Order 4, public contact on public land is a job

28   duty of [Law Enforcement] Rangers.").

1

## IV.    ARGUMENT

2

### A.    BLM Has Not Sufficiently Explained Its Costs for the 2019 Burning Man SRP.

3     Over the five years since BMP began appealing BLM's cost decisions, BLM has

4 become expert at explaining *what* it spends to administer BMP's permit, but it has continued

5 to ignore the legal requirement that it also explain *why* it spent the permittee's funds under

6 cost recovery.  As a result, BMP and this Board have no basis to judge whether the cost

7 decisions are "reasonable" as required by 43 U.S.C. § 1734(b).

8     Following the 2019 Event, BLM prepared an After Action Review (A.R. Document #

9 368; Declaration of Roger Vind ("Vind Decl.") Ex. C), after failing to prepare one in 2018.

10 BLM's 2019 document was a scant 13 pages, with little detail about how it administered the

11 Burning Man SRP and why it needed to incur just under $3 million in costs, and represented a

12 significant departure from previous After Action Reviews that were much more thorough.

13 BLM's 2019 Review provides nothing more than an executive summary of a smattering of

14 tasks performed by BLM in connection with the 2019 SRP.

15     As BMP has come to expect, BLM's failure to comply with its cost recovery

16 obligations is particularly notable with respect to its labor costs, which again account for

17 nearly two-thirds of the total expenditures.  (Benson Decl., Ex. H, Att. 1.)  According to

18 BLM's labor summary, the number of BLM personnel swelled to 147 individuals in 2019, as

19 compared with 119 personnel in 2018.  (*See* 2018 Benson Decl., Ex. H, Att.1.)  As always,

20 this year's summary lists only the last name, title, a few words or short phrases summarizing

21 general duties, the range of dates in which the employee worked, total number of hours

22 worked, and total pay received.  (Benson Decl., Ex. H, Att. 1.)

23     From the labor summary, BMP can surmise that most of BLM's labor costs relate to

24 law enforcement personnel.  BLM's After Action Review describes how law enforcement

25 personnel was divided into "three overlapping 13-hour shifts (day, swing and night).  Each

26 shift had a lieutenant and two sergeants."  (A.R. Document # 368 at 6.)  But nowhere does

27 BLM state how many officers staffed each shift, why there was so much "overlap" among

28 shifts, or what law enforcement which justified the staffing levels reported.

16

1    BLM's labor summary is almost worthless, since it lacks any corresponding time

2  sheets with rate of pay details for the hours, dates and rates of pay for each employee.

3  Without the underlying time and pay rate details, BMP is unable to assess the accuracy of the

4  labor summary and determine whether all of BLM's labor charges were reasonably incurred

5  in connection with the Burning Man SRP.  BMP cannot assess BLM's labor summary without

6  understanding the amount of time each employee spent on the Burning Man SRP, what he/she

7  did, and at what rate of pay.  BMP is entitled to review the underlying data from which BLM

8  derived its threadbare summation, and the agency does not satisfy its cost recovery obligations

9  without providing them.

10    BMP knows that detailed time records exist because BLM has included more detailed

11  documents in past administrative records.  For example, A.R. Document #69 is an Excel

12  spreadsheet from the 2015 Event that contains granular detail for each BLM employee's hours

13  worked and rates of pay.  The rates of pay are broken down by regular, overtime, premium

14  and holiday/Sunday pay rates.[11]

15    BLM's failure to disclose its rates of pay undermines BMP's ability to assess whether

16  BLM's labor costs are reasonable, as required by law.  *See* 43 U.S.C. § 1434(a), (b); *Bookcliff*

17  *Rattlers*, 171 IBLA 17.  For example, BMP has long questioned why BLM chooses to utilize

18  law enforcement and other personnel who have a higher pay grade than necessary.  Despite

19  the fact that Burning Man is a recreation-oriented event, BLM's 2018 and 2019 labor

20  summaries and 2018 witness Declarations reveal that BLM law enforcement officers spent the

21  bulk of their time patrolling the Event and conducting traffic stops.  (A.R. #368 at 5-8).  Based

22

23  _____

24  [11] The disappearance of this labor detail spreadsheet is just one example of the selective and
inconsistent administrative records BLM chooses to provide BMP in a given year.  Another

25  example is BLM's Incident Action Plan.  In 2016, 2017, and 2019, the administrative record
included BLM's Incident Action Plan.  In 2015 and 2018, no such document was provided.

26  Similarly, BLM's 2018 administrative record included numerous internal memoranda
reflecting BLM's planning and decision-making processes.  No such memoranda were

27  included in 2019.  Either BLM refused to share this documentation with BMP in 2019, or
BLM decided not to document its internal planning discussions last year.  Both alternatives are

28  disturbing and violative of BLM's duty to explain its costs.

1  on the nature of this work, patrol-level rangers, who are generally paid at a lower rate than

2  special agents or state chief rangers, are the reasonable choice for nearly all law enforcement

3  assignments.  (Declaration of Robert Abbey ("Abbey Decl.") ¶ 4.)

4  　　　　Yet BLM's 2019 labor summary again confirms that a substantial portion of law

5  enforcement personnel positions were filled by highly paid senior BLM staff, including at

6  least 4 Chief State Rangers, 5 Special Agents in Charge, 11 Special Agents or Senior Special

7  Agents, and 4 Supervisory Rangers.  (Benson Decl., Ex. H, Att. 1.)  BLM has failed to justify

8  the large percentage of highly compensated senior law enforcement officers.  BLM cannot

9  reasonably charge BMP for the costs associated with overstaffing the Event with its highest

10 paid personnel.  *Bookcliff Rattlers*, 171 IBLA at 21.  (*See* Abbey Decl. ¶ 4.)

11 　　　　In 2019, BLM also continued its practice, without justification, of assigning multiple

12 "specialists" to perform information technology ("IT") work in connection with the SRP, plus

13 senior-level employees to serve as IT personnel.  (Benson Decl. ¶ 29.)  BMP cannot be

14 required to shoulder the burden of BLM's astronomical labor costs without evidence showing

15 these costs are reasonable.  *See, e.g., Bookcliff Rattlers*, 171 IBLA 21.

16 　　　　Likewise, BLM's 2019 "Travel Per Person" spreadsheet fails to provide BMP with

17 any explanation for more than $46,581 in costs (an increase of nearly $8,500 from 2018),

18 giving the same generic statement for each of the 112 individuals listed, regardless of the

19 amount claimed:  "Travel for related assigned duties at Event."  (Benson Decl., Ex. H, Att. 3.)

20 This statement provides no basis for BMP to comprehend BLM's justification for charging

21 these costs.  BMP recognizes that BLM employees must travel to and from the Event and does

22 not object to paying their reasonable travel costs.  But BLM must provide sufficient detail to

23 enable BMP to understand what the travel costs were and whether they were reasonable, as

24 BLM has done in the past.

25 　　　　BLM's administrative record for 2015 Cost Recovery Appeal included a travel

26 spreadsheet for the 2012 Event that itemized all claimed travel expenses of all assigned

27 employees.  (*Id.*, Ex. K.)  During the leadership of Special Agent Love and District Manager

28 Seidlitz, BLM's travel expenditures increased and its explanations for this travel became

18

1  obscured.  Notably, BMP's 2015 Appeal argued against certain specific travel expenses based

2  on the descriptions provided.  (*See* 2015 Appeal at 20.)  Ever since, BLM has frustrated

3  BMP's ability to challenge BLM's travel costs in the same manner by providing no detail at

4  all.  (*See* 2016 Appeal at 17-18.)  BMP asks that the Board reject BLM's transparent effort to

5  withhold material information in order to frustrate BMP's appeals and require BLM to

6  provide sufficient information to confirm the reasonableness of its travel costs.  *See Bookcliff*

7  *Rattlers*, 171 IBLA 21; *Michael Voegele,* 174 IBLA 318 (2008).

8         BLM's failure to provide the necessary detail in these and other areas cannot be

9  inadvertent, given BMP's appeal of BLM's last four cost recovery decisions for the same

10  deficiencies.  (*See generally* 2015-2018 Statement of Reasons.)  Year after year, BLM has

11  responded to BMP's concerns about the agency's enormous and unjustified overhead for the

12  Burning Man SRP by claiming that it need only prove that it spent these amounts on the

13  Event.  (*See, e.g.*, 2018 BLM Answer at 10-14.)  The cost recovery regulations make clear,

14  however, that BLM must also show that all of its expenditures were <u>reasonable,</u> and a cost is

15  not reasonable just because it is incurred.  *See* 43 U.S.C. § 1734(b).  "Reasonable costs" are

16  not a synonym for "actual costs."  *Nevada Power*, 711 F.2d at 925.

17         Since BLM has failed to provide the requisite reasoned and factual explanation of the

18  costs it incurred to administer the 2019 Event SRP, BMP respectfully requests that the Board

19  order a refund of all unreasonable costs charged.  *See Bookcliff Rattlers*, 171 IBLA 21.  BLM's

20  conclusory pronouncements of necessity do not fulfill its obligation to provide a reasoned

21  explanation for the costs it charged to a permittee.  *See, e.g.*, 43 U.S.C. § 1734(b)-(c); *Michael*

22  *Voegele*, 174 IBLA 318; *Bookcliff Rattlers*, 171 IBLA 13.  As BLM's 2019 law enforcement

23  staffing decisions continued to be unexplained and apparently arbitrary, the associated costs

24  were not "reasonable" and BMP deserves a refund under 43 U.S.C. § 1734(b)-(c).

25  **B.**     **BLM's 2019 Law Enforcement Costs Were Unreasonably High.**

26         BMP seeks relief from all BLM law enforcement costs that are not adequately

27  explained, are unreasonable under any rational assessment of the Event's public safety needs,

28  and therefore violate BLM's obligation to only charge a permittee for reasonable costs.  *See*

19

43 U.S.C. § 1734(b)-(c); *Michael Voegele*, 174 IBLA 318; *Bookcliff Rattlers*, 171 IBLA 13.  The Burning Man Event has been taking place for nearly three decades in the Black Rock NCA, and BLM should have learned lessons over this long period that allow for tremendous efficiencies, even as the Event has grown in size.  (Benson Decl. ¶ 4; Abbey Decl. ¶ 4.)  Instead, as the Event's participant population has remained mostly static for several years, BLM's costs have disproportionally and unreasonably increased.  (Benson Decl., Ex. C.)

By contrast, BLM has lately lessened the financial burdens and regulatory requirements on virtually every other user of public lands, from oil, gas, and mining companies to livestock operators to off-highway vehicle enthusiasts.  In its dealings with BMP, a nonprofit public benefit corporation that organizes a recreational event founded on "Leave No Trace" principles, BLM has only increased its economic and regulatory demands.  (Abbey Decl. ¶¶ 8-9.)  The absurd result is that Burning Man may now be the most regulated activity on BLM-managed public lands, despite far fewer impacts being associated with this temporary gathering than with most of the other uses permitted by BLM.  (*Id.*)

BMP believes this disconnect has principally resulted from BLM's unwillingness to revisit the unreasonable demands of its prior leadership team for the Burning Man SRP, particularly the demands of Special Agent Love related to Event law enforcement.  (Benson Decl. ¶ 22.)  This reticence has always conflicted with BLM's duty to charge a permittee only for "reasonable" costs, and the Board's oversight is appropriate, considering that numerous official investigations found Special Agent Love liable for serious misconduct, specifically at the Event, and the agency terminated his employment.  (Allen Decl., Exs. B-I.)  The Board must finally require BLM to revisit and correct all aspects of its Burning Man operation that were mandated by Special Agent Love without justification, especially the costs discussed below.

BMP expects BLM to again discount references to Special Agent Love and his established abuses by claiming that "[BMP] attempts to blame BLM employees that were not even involved" in the 2019 event.  (*See* 2018 BLM Answer at 17:23-24.)  While Special Agent Love may have been fired for his unethical practices and documented abuses, including

20

1   misuse of staff at the 2015 Event (*See* Allen Decl. Ex. B), the over 300% increase in overall

2   costs mandated by Special Agent Love and other former BLM personnel remain in BLM's

3   cost decisions to this day.  While BLM terminated Love long before the 2019 Event, his 2019

4   successors continued these same legacy costs, like the bloated law enforcement staffing

5   described in this section and the satellite tracking and redundant medical resources described

6   below.  BLM cannot credibly argue that Special Agent Love's abuses of discretion are

7   irrelevant to the 2019 costs when subsequent BLM management staff have built on the corrupt

8   foundation he laid.

9       Based on BLM's responses to BMP's four prior appeals, BMP expects that BLM will

10   try to justify its ever-increasing law enforcement costs by: (1) downplaying the seriousness of

11   BMP's concerns by referring to them as a mere "difference of opinion" over staffing (*See*

12   2018 BLM Answer at 9:15-16); (2) speciously arguing that BMP is improperly "attempt[ing]

13   to direct BLM's law enforcement activities on public lands" (*See* 2018 BLM Answer at 9:14);

14   (3) falsely contending that BLM's only obligation is to explain "how it enforces public land

15   laws" and it need make no other showing of the reasonableness of its costs (*See* 2018 BLM

16   Answer at 19:16); and, (4) disputing this Board's authority to  order a refund because it lacks

17   "general supervisory authority over the BLM" (*See* 2018 BLM Answer at 9:26-27).

18       BMP will refute each of these points below, but would like to address at the outset an

19   outrageous argument that permeated past Answers.  Previously, BLM has claimed that it has

20   complete "discretion to determine the nature and extent of its law enforcement operations"

21   and that BMP is seeking the right to "approve of agency law enforcement practices on public

22   lands."  (*See e.g.* 2017 BLM Answer at 20:8-9.)

23       This is patently false.  BMP has never attempted to dictate law enforcement practices

24   or priorities at the Event.  For example, BMP is not questioning BLM's authority to conduct

25   "aggressive[]" drug enforcement operations pursuant to BLM General Order 33 and General

26   Orders 1-32.  (*See* 2018 Andres Decl. ¶ 25.)  BMP appropriately objects to paying the <u>costs</u> of

27   BLM's fulfillment of general law enforcement objectives for the public lands, as such general

28   objectives are not for the "exclusive benefit" of an applicant like BMP. (43 U.S.C. § 1734(b)).

21

1       Law enforcement priorities and practices are, by necessity, a function of available

2   resources.  If law enforcement resources were limitless, BLM could treat every general law

3   enforcement goal as an absolute priority and staff the public lands with thousands of officers

4   and substations.  Law enforcement resources are typically limited by an elected legislative

5   body with the power of the purse and public oversight, and the agency must make

6   compromises based on legislative funding and the agency's budget.  (Vind Decl. ¶ 29) The

7   nation is currently grappling with this very issue as legislatures everywhere revisit funding

8   levels for law enforcement agencies.

9       Yet according to BLM, none of these checks applies to BLM's administration of

10  BMP's SRP.  During the week-long Burning Man Event, BMP is BLM's purse, and BLM

11  believes it can use the cost recovery regulations to open BMP's purse and pay for any BLM

12  law enforcement activity that BLM chooses to undertake.  As detailed below, BLM spends

13  vast BMP resources on making public lands "drug free," which BLM claims is mandated by

14  its General Order 33.  (*See* 2018 Andres Decl. ¶ 25.)  But funding for law enforcement that

15  serves the "general public interest" should come from the agency's general operating budget,

16  where it would be subject to public scrutiny for those law enforcement priorities BLM chose

17  to address.

18      Congress expressly excluded such "general public interest" costs — costs not for the

19  "exclusive benefit of the applicant" — from the definition of reasonable costs that are subject

20  to cost recovery.  *See* 43 U.S.C. § 1734(b).  Thus, BMP is not telling BLM that it cannot

21  devote thousands of personnel hours and other resources to "aggressive enforcement" of

22  federal drug laws.  Instead, BMP is asking this Board to require BLM to follow the law and

23  stop abusing the statutory cost recovery system by charging BMP for "general public interest"

24  costs that Congress deemed unreasonable under cost recovery.

25      **1.**    **BLM law enforcement staffing continued to exceed the needs of the Event.**

26      BLM cannot ignore the fact that its staffing demands have increased

27  disproportionately to the size of the Event and that an explosion in BLM law enforcement

28  costs coincided with the tenure of its disgraced former Special Agent in Charge.  Before

1   Special Agent Love's arrival, BLM charged BMP about $500,000 in labor costs.  (Benson

2   Decl., Ex. C.)  After Special Agent Love assumed full charge of BLM's law enforcement

3   operations in 2013, the agency's costs for law enforcement labor soared to nearly $1 million

4   and topped $1.1 million in 2014 and 2015.  (*Id.*).  In 2016, law enforcement staffing costs fell

5   slightly after Special Agent Love stopped working on the Burning Man SRP.  (*Id.*)  But costs

6   started to rise again in 2017 and continued to increase in 2018 and 2019.  (*Id.*)

7          In 2019, BLM charged BMP $1,237,911 including the indirect cost rate for law

8   enforcement labor alone.  (*Id.*, Ex. H, Att. 1.)  Overall, BLM's total labor costs were 230%

9   higher in 2019 than in 2011, and about 7% higher than in 2018.[12]  (*Id.*, Ex. C.).  Meanwhile,

10  Burning Man's peak participant population increased by 30% from 2011 to 2013 and by

11  effectively zero percent from 2013 to 2019.  (*Id.*, Ex. C.)  BLM has never produced data to

12  justify such a disproportionate increase in its law enforcement costs relative to the Event's

13  population growth, nor has it documented any meaningful improvement to public safety as a

14  result.  (Allen Decl. ¶ 7.)

15         Absent such evidence, BMP believes it is continuing to suffer the financial and

16  cultural consequences of Special Agent Love's unjustified inflation of BLM's law

17  enforcement operations, particularly his 37% increase in the number of officers staffing the

18  Event and assignment of an unprecedented number of highly paid senior staff to these

19  roles.  (*Id*. ¶ 6.)  These improper decisions have never been rectified, despite Special Agent

20  Love's documented misconduct and termination from the agency.  (*See, e.g.*, Allen Decl., Exs.

21  B, D, I.)  BMP has also borne the costs of providing housing, meals, vehicles, and equipment

22  for all these additional officers, as well as the cost of increasingly elaborate and expensive

23  technology.  (*See* Section IV.C. *infra.*)

24         As noted above, Special Agent Love was the subject of several investigations and

25  findings of illegal and unethical conduct.  (Allen Decl., Exs. B, D, I.)  Although one

26  _____

27  [12] This total includes $1,568,259 for the labor of BLM law enforcement and civilian personnel,
    and $23,0000 another $39,740.02 to hire additional personnel from the U.S. Forest Service.
28  Adding the indirect cost rate of 21.6%, BLM charged BMP $1,907,003 for labor in 2019.

1    investigation did not relate specifically to Burning Man, it found that "BLM Law

2    Enforcement Supervisors" accused Special Agent Love of misconduct connected to the Event,

3    including "[d]irecting [s]ubordinates to [e]rase [o]fficial [g]overnment [f]iles in order to

4    impede the efforts of rival civilian BLM employees in preparation for the 'Burning Man'

5    Special Event, unlawfully removing evidence, bragging about the number of OIG and internal

6    investigations on him and indicating that he is untouchable, [and] encouraging subordinates

7    not to cooperate with internal and OIG investigations[.]" (*Id.*, Ex. I at 8.)  Collectively, the

8    investigations found that Special Agent Love committed misconduct and lacked sufficient

9    oversight throughout the period during which he oversaw BLM's law enforcement operations

10   at Burning Man and that he demanded unwarranted increases in their scale, intrusiveness, and

11   associated costs, as he had done with other operations.  (*See, e.g., id.*, Ex. I at 5.)

12        After Special Love was exposed as an unethical, rogue manager, BMP expected BLM

13   to reassess and reduce the number of law enforcement officers assigned to the Event.  But

14   despite the Department of the Interior's own findings of abuse by Special Agent Love, BLM

15   claims that a "2016 Operational Assessment recommended no change in law enforcement

16   staffing." (2018 BLM Answer at 18:14-15.)   This assessment, which has never been provided

17   to BMP, apparently affirmed Special Agent Love's purported need for 70+ law enforcement

18   officers, and BLM has reflexively applied the same staffing levels for subsequent Events.

19   Thus, Special Agent Love's excessive staffing and corrupt judgment remain the baseline for

20   BLM's staffing decisions in 2019.[13]

21        BMP expects BLM to continue deflecting any challenge to law enforcement staffing

22   levels by declaring that its employees (including Special Agent Love) are "experts in their

23   areas of work" and by citing this Board's holdings that an agency can rely on its staff of

24   "technical experts."  (*See* 2018 BLM Answer at 9:12-21.)  According to BLM, it has the

25   discretion to decide reasonable staffing levels based on whatever its employees say because

26

27   [13]  BLM never told BMP the actual number of law enforcement officers it assigned to the 2019
     Event.  Based on BLM's labor summary attached to its 2019 Cost Recovery Decision, BMP
28   believes that at least 70 uniformed law enforcement officers worked the 2019 Event.

1   whatever its employees say is reasonable.  Thus, BLM believes it can continue to implement

2   Special Agent Love's playbook and charge BMP for unjustified law enforcement costs in

3   2019.  (Abbey Decl. ¶ 4.)

4       And if history is a guide, the only objective authority BLM will cite to justify its law

5   enforcement staffing levels are the officer-to-population ratios purportedly "recommended" by

6   the International Association of Chiefs of Police ("IACP").  (*See, e.g.*, 2018 Andres Decl. ¶

7   13.)  As BMP has explained in previous appeals, the IACP expressly recommends *against*

8   using "[r]atios, such as officers-per-thousand population as a basis for staffing decision,"

9   noting that this would be "totally inappropriate" and that such ratios have "no place in the

10  IACP methodology."  (*See* IACP Patrol Staffing and Deployment Study (2004); Vind Decl.,

11  Ex. F.)  Instead of generic ratios, the IACP advises agencies to consider "an extensive series of

12  factors and a sizeable body of reliable, current data" that reflect the unique needs of the

13  locality.  (*Id.*)[14]

14      BLM's own "expert" Declarant, Staff Ranger Rebecca Andres, concedes that IACP

15  comparisons are inapt, noting "that the IACP standards are imperfect when applied to the

16  event[,] as are traditional industry standards" and that "[t]here is no comparable environment

17  for municipalities and enforcement models. . . ."  (2018 Andres Decl. ¶ 13.)  Thus, BLM

18  admits that it relied on no relevant evidence to make its staffing decisions for Burning Man.

19  This admission, coupled with the fact that the law enforcement staffing levels for the 2016

20  though 2019 Events were established by a disgraced former Special Agent in Charge,

21  demonstrates that BLM's 2019 law enforcement staffing decisions were arbitrary, capricious,

22  and unreasonable under any objective metric.

23      **2.   BLM law enforcement officers spent the bulk of their time addressing
            non-criminal activity and drug possession.**

24

25      As explained in Section IV.C.2. *infra.*, BLM demanded that BMP pay for a new

26

27  _____

28  [14] The Event benefits from the thousands of BMP staff and contractors who serve as force
    multipliers for law enforcement.  (Vind Decl. ¶ 14.)

1    computer assisted dispatch ("CAD") system in 2013 and claimed it would eventually save

2    BMP money.  (Allen Decl. ¶ 13.)  BLM's claim was false:  the costs charged to BMP have

3    continued to rise, especially in the realm of law enforcement-related technology as described

4    below in Section IV.C.  But BLM's CAD data, along with its Incident Management, Analysis

5    and Reporting System ("IMARS"), do confirm that BLM is overstaffing the Event and

6    charging BMP for costs not allowed through cost recovery.  According to BLM's own CAD

7    and IMARS data, the vast majority of BLM law enforcement consisted of the three categories

8    of self-directed activities described below.

9                    a.    "Public [relations] contacts."

10          According to BLM's 2019 Statistical Summary, BLM's CAD system recorded 3,920

11   "Law Enforcement Events," a 22 % increase from the 3,205 events recorded in 2018.  (Vind

12   Decl. ¶ 6; Ex. D.)  Of these "Events," 1,525 (39%) were assigned the service call of "public

13   contact."  (*Id*. ¶ 11; Ex. D.)  BMP understands that BLM law enforcement officers record a

14   "public contact" whenever they communicate with an Event participant, even if they are just

15   providing directions to the porta-potties or handing out BLM logo items as gifts.  (Vind Decl.

16   ¶ 11.)

17          BMP appreciates that officers are interested in engaging with Event participants, but

18   the costs of these activities are not reasonable costs under cost recovery regulations.[15]  This

19   public outreach activity is both entirely discretionary and duplicative of the extensive

20   infrastructure and support services that BMP provides, including thousands of staff and

21   volunteers to assist with providing directions and information.  (Benson Decl. ¶¶ 11-12.)  And

22   the fact that BLM has the personnel to devote so much time to these activities every year is

23   evidence that BLM overstaffs the Event.  (Vind Decl. ¶ 11.)  BLM is, of course, welcome to

24   engage in public outreach to Event participants at its own expense.

25

26   _____

27   [15] BLM has acknowledged that these public contacts serve the "general public interest" and are
     not related to permit administration.  *See, e.g.*, 2018 Hall Decl. ¶ 28 ("Per General Order 4,
28   public contact on public land is a job duty of [Law Enforcement] Rangers.").

26

STATEMENT OF REASONS                                              AR11716

b.     <u>Traffic enforcement upon entering and exiting the Event.</u>

Excluding "public contacts," BLM's Statistical Summary indicate that its officers recorded 2,395 law enforcement "Events" over 16 days in 2019.  (Vind Decl. ¶ 11; Ex D.)  Of these "Events," 1,072 — almost 45% — were self-initiated traffic stops.  (*Id*. ¶ 25.)  BMP understands that many of these stops occurred near and on "Gate Road," which is not a BLM, state, or county road, but a temporary path of ingress and egress on the playa surface that BMP creates for its private Event.  (*Id*., Ex. D; Benson Decl. ¶ 31.)

BMP sets the speed limit at 10 miles per hour and accidents of any kind are extraordinarily rare, with vehicle collisions and accidents causing injury even less common.  (Benson Decl. ¶ 31.)  Despite spending thousands of hours on traffic stops, and initiating 1,072 vehicle stops for purported safety issues, BLM issued just 134 citations for motor vehicle-related offenses, primarily for minor violations of the Closure Order, like a missing tail-light or registration or slightly exceeding the 10 mile per hour speed limit.  (Vind Decl., Ex. D)  Given Gate Road's exceptional safety record, it is unreasonable for BLM to devote such extensive resources to traffic stops in that location, all at BMP's expense.

c.     <u>Drug enforcement through traffic stops.</u>

The real reason BLM initiated these traffic stops, especially against vehicles entering the Event, was that BLM was conducting a drug enforcement operation.  BLM admitted in past Answers that motor vehicle stops are its primary means to enforce drug possession laws, which BLM purportedly considers a primary law enforcement priority.  (2018 Andres Decl. ¶ 23; 2017 Andres Decl. ¶ 24.)  Once a vehicle is stopped for a minor or manufactured traffic infraction, BLM deploys a K9 team to create probably cause to search the vehicle and its passengers for illicit drugs.  (Declaration of Marc Picker ("Picker Decl.") ¶ 6.)

According to its 2019 After Action Review, BLM requested nine K9 teams at the Event but made due with three K9 teams.[16]  BLM again required BMP to fund and construct

---

[16] BLM's purported need for nine K9 teams is one of numerous staffing decisions that lack any reasonable foundation.  In 2018, BLM used six K9 teams (2018 Andres Decl. ¶ 25) and

1   shade structures outside BLM's compound so that K9 agents could park their idling, air-

2   conditioned vehicles beneath it and ensure that K9 teams could be deployed to any traffic

3   stop.  (Vind Decl. ¶ 17.)  In past Answers, BLM claimed to need K9 teams for public safety

4   reasons, alleging that "[r]emoving [controlled] substances before they enter the [Event] helps

5   reduce the potential for harm to members of the visiting public and employees." (2018 Andres

6   Decl. ¶ 23.)  To this end, "BLM law enforcement conducted a traffic stop on [an] average of

7   less than 5% of the vehicles entering the [Event]."  (2018 Andres Decl. ¶ 23.)

8       Of course, removing illicit drugs from a society reduces the "potential for harm."  But

9   no municipality in America stops 5% of the vehicles entering its borders to detect evidence of

10  "ordinary criminal wrongdoing" like simple drug possession.  *See City of Indianapolis v.*

11  *Edmond*, 531 U.S. 32, 41-42 (2000) (holding that warrantless searches for such purposes at

12  police checkpoints are unconstitutional).  Not only would such blanket warrantless searches

13  be illegal, the cost would be staggering.

14      By contrast, extensive and indiscriminate vehicle searches by federal personnel do not

15  occur at the entrances to national parks or any other public lands managed by any agency of

16  the U.S. government.  Among other BLM-permitted activities, no other permittee is forced to

17  pay the costs for extensive use of K9 units to fund a general drug prevention goal.  (Abbey

18  Decl. ¶ 8.)  This is understandable, given that the primary responsibility of BLM's law

19  enforcement program is to provide visitor assistance and protect sensitive natural and cultural

20  resources.  (*Id*. ¶ 9.)  Moreover, the law enforcement strategy BLM deploys at the Event is in

21  conflict with directives from former U.S. Secretary of the Interior Ryan Zinke "to refocus on

22  Interior's long-standing but recently forgotten recreation mission" (Allen Decl. ¶ 29, Ex. J),

23  and for BLM personnel in particular to emphasize their role as land managers more than law

24  enforcers.  (Abbey Decl. ¶ 9; Exs. A, B.)

25      Despite the enormous amount of resources spent on K9-assisted traffic stops, BLM's

26  _____

27  generated 94 drug-related citations (2018 Vind Decl. Ex C).  In 2019, BLM acknowledged that
    it only used three K9 teams, yet it issued 148 drug-related citations (Vind Decl. Exs C, D),

28  underscoring the arbitrary and capricious nature of BLM's K9-related staffing decisions.

1   drug enforcement activities yielded few drug citations in 2019.  BLM issued a total of 148

2   citations for drug-related offenses in 2019: 130 for possession of a controlled substance

3   including marijuana, and 18 for "drug paraphernalia" (which BMP believes were for

4   marijuana paraphernalia).  (Vind. Decl., Ex D.)  For comparison, BLM issued 94 drug-related

5   citations in 2018, 196 drug-related citations in 2017, and 85 drug-related citations in 2016.

6   (*Id*., Ex. E.)

7          The number of BLM drug-related citations has gone up and down from year to year,

8   seemingly at random, despite no material change in the number of Event participants from

9   2016 to 2019 and a steady increase in BLM law enforcement costs during that time.  (Benson

10  Decl., Ex. C.)  The wild variance in the annual number of BLM-issued drug-related citations,

11  generated by inconsistent numbers of K9 units, is proof that BLM's law drug enforcement

12  efforts are not grounded in any public safety needs for the Event.

13         Further evidence is found in the prosecution results from BLM drug enforcement

14  activity at the Event, which have remained remarkably consistent.  Since the 2010 Event,

15  every participant challenging a drug-related BLM citation has had the drug offense dismissed.

16  (Picker Decl. ¶¶ 4, 5.)  In every negotiated case, the citation was dismissed or the defendant

17  was allowed to plead guilty to a minor motor vehicle infraction or a general Closure Order

18  violation.  (*Id*.)  The outcome of BLM's extensive drug enforcement efforts was essentially

19  the same in 2019 as in each of the last nine years: BMP understands that BLM agreed to

20  dismiss the drug-related charges for all Burning Man participants who negotiated their BLM

21  citations.  (*Id*.)  BMP believes that the only drug possession convictions BLM obtained were

22  from participants who elected to plead guilty to an infraction and pay a $500 base

23  fine.  (*Id*.)[17]

24         Citation and prosecution data confirm that BLM's drug enforcement efforts do not

25

26  _____

27  [17] In its 2018 Answer, BLM reports that it received "either payment or guilty pleas" in 42 of
    the 94 drug-related cases, meaning that 42 participants did not contest their citation.  (2018
    Andres Decl. ¶ 29.)  Of these uncontested "convictions," over half were for marijuana
28  possession, which is legal for adults under Nevada law.

1    justify its exorbitant expenditures on law enforcement at the Event.  It is unreasonable for

2    BLM to continue to charge BMP for the substantial costs of self-directed drug enforcement

3    activities when these drug charges are universally dismissed when challenged in court.

4         Outside of citations for minor motor vehicle violations (134) and drug possession

5    infractions (148), BLM officers issued only 122 citations and made no arrests.  (Vind Decl. ¶

6    8; Ex D.)  The bulk of these 122 citations were for infractions related to environmental

7    compliance.[18]  Excluding the 106 citations for environmental issues and the variable number

8    of motor vehicle/drug-related citations, BLM issued only 37 citations in 2019, 21 of which

9    were for violating the Closure Order.  (*Id*.)  Overall, BLM's extensive law enforcement

10   operations resulted in an extremely small number of low-level law enforcement actions for an

11   eight-day Event with a peak population of almost 80,000 people.  (*Id.*)  The number, nature,

12   and outcome of BLM's 2019 citations confirm that the agency continued to unreasonably

13   over-police the Event. (*Id.* ¶ 13.)

14        Results from the state law enforcement agency with jurisdiction over the Event, the

15   Pershing County Sheriff's Office ("PCSO"), confirm the extremely low-level public safety

16   needs of the Event.  According to official 2019 reporting provided by Pershing County, PCSO

17   made 60 arrests and issued 95 citations at the 2019 Event.  (Vind Decl. ¶ 9.)  The vast

18   majority of PCSO citations and arrests were drug-related.  In 2019, PCSO made just six

19   arrests for battery or assault, five arrests for domestic violence, and one arrest for sexual

20   assault.  (*Id*.)  Given that serious criminal activity of any kind is rare at Burning Man year

21   after year, and person-on-person crime extraordinarily so, the massive scale of BLM's law

22   enforcement operations continues to be objectively unreasonable.  (Vind Decl. ¶ 13.)

23        Overall, the above analysis of CAD, IMARS, citation and arrest data proves that the

24   level of serious crime at the 2019 Event was extremely low and that BLM law enforcement

25   busied itself mostly with public contacts, motor vehicle stops and drug possession citations,

26   _____

27   [18] In 2019, BLM issued 106 citations for environmental compliance-related offenses, including
     one for littering, five for improper fuel storage, 38 for "waste water," and 62 for
28   urinating.  (Vind Decl. ¶ 8.)

30

1   which the U.S. Attorney's office routinely dismissed.

2         **3.**      **BLM law enforcement personnel sat idle two-thirds of the time.**

3         In previous appeals to this Board, BMP demonstrated how BLM overstaffed law

4   enforcement at the Event by establishing that BLM officers sat idle almost two-thirds of the

5   time while on duty.  BMP enlisted the expert analysis of former Nevada Highway Patrol

6   ("NHP") Lieutenant Roger Vind, who managed traffic enforcement for NHP during the Event

7   ingress and egress periods from 2003 to 2005 and from 2007 to 2010.  (Vind Decl. ¶ 3.)

8         Lieutenant Vind reviewed BLM's 2017 CAD data and After Action Review and

9   concluded that in 2017, BLM officers spent about two-thirds of their overall time in an

10  "available" status while on duty.  (*See* 2018 Vind Decl. ¶ 23.)  Apparently embarrassed by

11  data showing that BLM officers were idle most of the time, BLM deleted the "available"

12  status from its CAD system in 2018.  (*Id.* ¶ 22).  Instead of lowering to its staffing levels to

13  address the Event's actual law enforcement needs, BLM simply changed the optics.  In place

14  of "Available," BLM created a new CAD status category for 2018: "Engaged."  (*Id.*)

15        But BLM's change in nomenclature did not mask the fact that BLM law enforcement

16  officers were still only active and responding to service calls about one-third of the time in

17  2018.  Within the "engaged" status category, Lieutenant Vind examined the number of hours

18  BLM law enforcement reported being "on scene" at a service call.  Based on the number of

19  "on scene" hours, Lieutenant Vind confirmed that in 2018, BLM officers again spent roughly

20  one-third of their time on service calls and two-thirds of their time idle and waiting to respond

21  to a service call.  (*Id.* ¶ 25.)

22        Following the 2019 Event, Lieutenant Vind analyzed BLM's 2019 CAD data and

23  reached the same conclusions.  Whether reported as "Available" in 2017 or "Engaged" in

24  2018 and 2019, BLM's CAD data showed that BLM law enforcement officers spent

25  approximately two-thirds of their time waiting for service calls and only one-third of their

26  time on actual calls for service.  (Vind Decl. ¶ 23.)  In fact, the number of hours BLM law

27  enforcement officers spent "on scene" at service calls actually fell in 2019.  In 2019, BLM

28  officers reported being "on scene" for a total of 2,821 hours.  In 2018, BLM officers were "on

31

1    scene" for 3,366 hours.  (Vind Decl. ¶ 25).  Thus, BLM law enforcement actually spent less

2    time in 2019 on service calls and more time idle than in 2018.

3         According to Lieutenant Vind, the nationally recognized, best-practice standard for

4    law enforcement agency staffing is the opposite of BLM's practices at the Event.  Law

5    enforcement agencies are efficiently staffed when 25% to 30% of their officers are waiting for

6    service calls, and 70% to 75% of officers are responding to service calls.  (*Id*. ¶ 27),

7         BLM has never refuted Lieutenant's Vind's analysis and conclusions.  BLM's law

8    enforcement witness has acknowledged that "BLM officers were not engaged in active calls

9    70% of the time" but called this fact "misleading" because officers are allotted time for

10   "report writing, evidence processing, travel … and meal breaks within their tours of

11   duty." (*See* 2018 Andres Decl. ¶ 30.)  BLM's criticism of Lieutenant Vind's analysis is

12   misplaced.  All law enforcement officers spend on-duty time performing administrative tasks

13   and taking meal breaks during shifts.  Even with "report writing," "evidence processing" and

14   "meal breaks," industry standard still dictates that at least two-thirds of an officer's shift

15   should be spent on service calls.   (*See* 2018 Vind Decl. ¶ 26; Vind Decl. ¶27.)  BLM's CAD

16   data shows the opposite and provides objective evidence that BLM law enforcement staffing

17   is inefficient and excessive. (Vind Decl. ¶27.)

18   **4.    Only 8% of BLM law enforcement service calls came from community
              need, while 92% of service calls were self-initiated by the officer.**

19

20        In addition to showing that BLM law enforcement officers sat mostly idle, BLM CAD

21   data proves that BLM officers spent little time responding to calls based a need for service.  In

22   2019, 92% of BLM law enforcement service calls were officer-initiated actions like traffic

23   enforcement.  Conversely, only 8% of BLM's service calls came from a dispatched call for

24   service where someone requested help or something happened that required a law

25   enforcement response.  (Vind Decl. ¶ 26.)  Thus, BLM law enforcement spent the vast

26   majority of its time on self-directed, "general public interest" law enforcement.  Service calls

27   based on the Event community's need for law enforcement made up less than 10% of all

28   service calls.  This fact affirms that BLM could easily satisfy the Event's law enforcement

1    need with far fewer patrol officers.

2        According to CAD reports, BLM officers were dispatched to only 177 calls, mostly

3    generated from or at the request of BMP's Emergency Services Department.  Over BLM's

4    nine-day "main event" staffing period, the 177 calls for service equated to 19 calls per 24-hour

5    period, or less than one call per hour. (Vind Decl. ¶ 26)   BLM's 2019 CAD data comports

6    with the data in BLM's 2019 Statistical Summary.  (*See id.*, Ex. D.)  BLM's 1,072 self-

7    initiated traffic stops constituted 27% of all "Law Enforcement Events."  (Vind Decl. Ex. D.)

8    BLM's 1,525 "public contacts" outreach constituted 39% of all "Law Enforcement Events."

9    (*Id.*)  BLM CAD data confirms that 76% of all BLM law enforcement time is spent on traffic

10    stops and public outreach.  (Vind Decl. ¶ 26) By all metrics, BLM law enforcement officers

11    create their own workload at the Event; the Event itself generates far fewer law enforcement

12    service calls than self-directed calls by officers.

13        Thus, BLM's own data shows that BLM could assign substantially fewer law

14    enforcement officers with no compromise to public safety at the Event.  (Vind Decl. ¶¶ 25-27;

15    Abbey Decl. ¶ 4.)  It is unreasonable for BLM to charge BMP for law enforcement labor in

16    excess of what is needed to respond to service calls generated by the Event.  BLM, not BMP,

17    should pay for BLM's self-initiated law enforcement activities like "public contacts" and drug

18    enforcement, which serve the "general public interest."

19        For several years now, BLM has been wedded to the profligate overstaffing of the

20    Event that Special Agent Love began mandating without justification in 2012.  As a direct

21    result, BMP has been overpaying for potentially thousands of hours of unnecessary labor,

22    supplies, equipment, and support services every year.  Based on the low numbers of calls for

23    service, the minimal incidence of person-on-person crime, and the substantial amount of time

24    BLM officers spend idle, this Board should conclude that BLM overstaffs its law enforcement

25    ranks and that BLM law enforcement staffing costs are not reasonable.  As BLM's own data

26    wholly fail to support the size of BLM's law enforcement apparatus, BMP is entitled to a

27    refund of the labor and other costs paid for those officers deployed in excess of the Event's

28    reasonable public safety needs.

1

**5.**     **BLM unreasonably charged BMP for six senior level "investigators" assigned to work exclusively for Pershing County on state law matters.**

2

3      Another glaring example of an unreasonable law enforcement cost that BLM foisted

4   on BMP again in 2019 was the cost of six "investigators" who, according to BLM's labor

5   summary, "work[ed] for Pershing County Sheriffs [sic] to assist in investigations of <u>state</u>

6   <u>[law] violations</u>."  (Benson Decl., Ex. H, Att. 1.)  (emphasis added).  These six "investigators"

7   (Gentzel, Hauck, Hawkins, Hill, Swanson and Torres) spent 767.25 hours exclusively

8   supporting the local Sheriff's Office, and all held the rank of "Special Agent" or "Special

9   Agent in Charge," making their pay rates among the highest of all BLM law enforcement in

10   the country.  (*Id.*)  For their labor, which had nothing to do with protecting public lands or

11   enforcing federal law, BLM charged BMP $82,366 plus $4,279 for their travel, including the

12   indirect administrative cost rate.  BMP also paid the lodging, meal, and equipment costs for

13   these six agents.

14      New in 2019, BLM charged BMP for a medical unit organized by the Pershing County

15   Sheriff Office's to assist Event participants who victims of sexual assault.  Although the

16   medical unit personnel were hired and managed by the Pershing County Sheriff and assisted

17   exclusively with investigating alleged violations of state law, BLM charged BMP $40,737

18   including indirect cost rate though cost recovery.

19      Robert Abbey, a former BLM National Director and former Nevada State Director

20   who oversaw the Burning Man SRP for seven years, states in his Declaration, "it is not typical

21   for the BLM to use cost the cost recovery process to provide law enforcement investigators to

22   another agency or to force an SRP applicant to pay for the cost of a state agency's medical

23   personnel." (Abbey Decl. ¶ 6.)  Over his long career in BLM leadership, Abbey is aware of no

24   other instance where BLM charged an SRP applicant for the cost of augmenting staffing by a

25   state agency handling state law matters.  (*Id.*)

26      Moreover, BMP has a separate, 10-year funding agreement with Pershing County,

27   Nevada, which contains a formula for all of Pershing County County's services related to the

28   Event.  (Allen Decl. ¶ 30.)  The funding Agreement negotiated between BMP and Pershing

34

1  County established a "maximum payment" to the County "for all services of any kind

2  supplied by the County or an of its officers, employees or contractors in connection with the

3  Event, whether directly or indirectly." (*Id.*)

4        BLM has ignored BMP's repeated objection that BLM is interfered with BMP's

5  private funding agreement with Pershing County by padding the County's staffing at BMP's

6  expense.[19]  BLM's own documents acknowledge that the work of its six investigators have

7  nothing to do with permit administration, public land administration, or enforcement of

8  federal law.  (*See* Benson Decl., Ex. H, Att. 1.)   Likewise, the 2019 additional costs related to

9  Pershing County's medical unit had nothing to do with federal law and circumvented of

10  BMP's negotiated agreement with Pershing County.  (Allen Decl. ¶ 30.)  Since BLM cannot

11  demonstrate that any of these costs were reasonably necessary for its administration of the

12  Burning Man SRP, BMP requests a refund of all costs related to BLM's improper attempt to

13  backfill staffing by the Pershing County Sheriff's Office in contravention of BMP's funding

14  agreement with the County

15        **6.**     **BLM again unreasonably charged BMP for internal management and**
16               **oversight of its law enforcement officers.**

17        BMP challenges BLM's decision to charge BMP again in 2019 for costs related to

18  management and oversight of BLM law enforcement personnel.  BLM's labor summary

19  reflects 148 hours and $14,693 including the indirect cost rate for OPR Special Agents Hone

20  and Stevens.  Special Agents Hone and Steven's duties are listed as "OPR function officer,

21  event on-site Internal Affairs component and Use of Force reports reviewer."  (Benson Decl.,

22  Ex. H, Att. 1.)  BMP is informed and believes that "OPR" is a reference to the Office of

23  Professional Responsibility within BLM's Office of Law Enforcement and Security ("OLES")

24  —————————————————————

25  [19]  BLM's May 25, 2018 internal memorandum acknowledges that its investigators scheme is a
deliberate attempt to circumvent BMP's agreement with Pershing County.  According to Field
26  Manager Hall, "the new sheriff was hamstrung by an inability to contract enough officers for
the event due to . . . a settlement agreement with [BMP] in 2013 setting the reimbursable
27  limit for the county in costs associated with the event."  A.R. Document #324 p. 2.  Field
Manager Hall's speculation that Pershing County lacks "enough" officers reveals a bias
28  against BMP and an intent to meddle in Pershing County's relationship with BMP.

35

1  and that Agents Hone and Stevens conducted onsite internal affairs investigations and liability

2  assessments related to alleged misconduct by BLM law enforcement personnel, including

3  proper or improper use of force.  (Vind Decl. ¶ 15.)

4      It is entirely unreasonable for BLM to charge BMP for costs related to the internal

5  management and investigation of BLM law enforcement personnel who have been accused of

6  wrongdoing, including excessive use of force, or for the agency's work in anticipation of

7  potential third-party misconduct claims.  Overseeing potential misconduct claims against

8  BLM law enforcement officers is not related to permit enforcement under 43 CFR §

9  2932.31(e).

10     Furthermore, such costs constitute "management overhead," which is expressly

11  excluded from cost recovery.  *See* 43 U.S.C § 1734(b) ("In determining whether costs are

12  reasonable under this section, the Secretary may take into consideration actual costs

13  (<u>exclusive of management overhead</u>) . . . .")  (emphasis added).  Therefore, BLM abused its

14  discretion by charging BMP through cost recovery for the expenses incurred by BLM's

15  national Office of Professional Responsibility to oversee and investigate the conduct and

16  possible misconduct of its law enforcement officers

17        **7.**      **BMP should not be required to pay any costs associated with BLM's law enforcement "substation."**

18

19     Yet another unreasonable demand made by Special Agent Love in 2013 was that BMP

20  pay the costs associated with a new law enforcement "substation" manned by BLM officers in

21  the center of Black Rock City.  (Allen Decl. ¶ 32.)  BMP has been forced to bear these costs,

22  without adequate justification, ever since.  (*Id*.)  Again in 2019, BMP understands that BLM

23  staffed this substation with at least one officer at all times during the Event, and that BLM

24  officers spent time at the substation engaging with the public in an outreach capacity, much

25  like BLM staff do at their nearby interpretive camp.  (Vind Decl. ¶ 12.)

26     BLM claims that the substation provided "participant access to law enforcement and

27  allow[ed] for more efficient reporting with a secondary function of community interaction"

28  like "looking for directions" and "engaging with the visiting public as part integration with the

36

1  community." (2018 Andres Decl. ¶ 38.)  But the agency has never shown that these activities

2  lead to any improvement in public safety at Burning Man, or that the associated costs are

3  reasonable to the administration of BMP's permit.  (Vind Decl. ¶ 12.)

4       Instead BLM has attempted to justify the expense of a substation by vaguely

5  referencing participants who visited the substation and BLM's "informal interaction with

6  member[s] of the public."  (2018 Andres Decl. ¶ 38.)  Anecdotal evidence that a resource was

7  utilized a handful of times does not, however, confirm the necessity of that resource.  If Event

8  participants need law enforcement services, there are dozens of BLM law enforcement

9  officers and PCSO deputies, as well as hundreds of BMP's Black Rock Rangers and other

10  community service volunteers, patrolling the Event with radios.  (*See, e.g.*, Benson Decl. ¶¶

11  12-13.)  The substation serves BLM's general public interest outreach objectives and is not a

12  reasonable cost to administer BMP's permit.  (*See* Hall Decl. ¶ 28 ("Per General Order 4,

13  public contact on public land is a job duty of [Law Enforcement] Rangers").

**8.  BMP should not be charged premium pay rates for BLM's unjustified designation of Burning Man work as "mission critical."**

16       Under the direction of Special Agent Love, BLM designated the Event as an

17  "emergency event" under federal labor regulations every year from 2012 to 2016 so that BLM

18  personnel could receive additional pay.  (Benson Decl. ¶ 14, 16.)  In 2012, BLM requested the

19  "emergency" designation in a one-page memorandum that alleged its purpose was to ensure

20  BLM staff received "premium pay" and extra overtime for their work at the Event. (Benson

21  Decl., Ex. B.)

22       In 2017, BLM apparently realized the "emergency" designation was an error and

23  found a new way to overcompensate its personnel at BMP's expense.  Starting in 2017 and

24  continuing through 2019, BLM designated work at the Event as "mission critical."  (Benson

25  Decl., Ex. G.)  In 2018, BLM made the "mission critical" designation perpetual with

26  Permanent Instruction Memorandum 2018-010.   (*See* A. R. Document # 251.)  Nowhere in

27  the 2012 "emergency" memorandum, the 2017 "mission-critical work" memorandum, or the

28  2018 Permanent Memorandum does BLM provide any justification for either

1    designation.  (*See* Benson Decl. Exs. B, G; A.R. Document #251).  None of the documents

2    explain why work by BLM employees on the Burning Man SRP must be deemed "mission-

3    critical."[20]

4         Likewise, BLM's past answers and administrative records wholly fail to explain why

5    BLM could not staff the 2019 Event with employees who were compensated at their regular

6    rates of pay.  In its 2017 Answer, BLM speculates that paying staff at their regular rates

7    "would make it difficult for the BLM to fully staff the [E]vent." (2017 BLM Answer at 14:23-

8    24.)  In its 2018 Answer, BLM makes the entirely unsubstantiated claim that "[the] record

9    shows clearly that current BLM managers made the decision and that the BLM was required to

10   assign officers to work at the 2018 event because there were insufficient volunteers." (2018

11   Answer at 14:17-18.)  BLM not only failed to cite any evidence for this assertion, but

12   neglected even to explain how having "insufficient volunteers" can serve as a basis for a

13   mission-critical work designation.  BLM law enforcement is not a "volunteer" force.[21]

14        BLM has also made the straw-man argument that "without the designation lifting the

15   pay cap, some BLM employees working at the event would be compensated at less than their

16   normal pay rate, which would not be fair or reasonable." (2018 Answer at 15:9-11.)  BLM

17   does explain how this could occur, and BMP has never argued nor does it believe that any

18   BLM employee deserves less than "normal pay."  BMP has, however, established that BLM

19

20   ─────────────────

21   [20] In its 2018 Answer, BLM claimed, "By regulation, the BLM may determine that an
     employee is needed to perform work that is critical to the mission of the agency and once that
     designation is made, the agency must pay premium pay. . . ." (2018 Answer at 14:21-23.)

22   BLM's justification is deceptive.  Yes, BLM "may" (and in this instance did) designate the
     work "mission critical."  And once it makes the "mission critical" designation, BLM "must

23   pay premium pay."  But BMP disputes whether BLM's "mission critical" designation was

24   justified and reasonable in the first place.

25   [21] BLM notes that it chooses to accommodate "religious or moral" objections from local

26   Winnemucca District Office employees who are "reluctant to work the event," and a "mission
     critical" designation helps facilitate the District's access to employees from other districts.

27   (*See* 2018 Hall Decl. ¶ 9.)  Thus, the "mission" critical designation has nothing to do with
     "volunteers" and everything to do with BLM's own decision process about who and how

28   many personnel it assigns to work at the Event.

38

1    overstaffs the Event year after year, a fact that contradicts BLM's unsupported allegations of

2    staffing shortages.

3        As explained above, BLM law enforcement staffing is bloated with too many patrol

4    officers who sit idle two-thirds of the time.  And when they are engaged in calls for service,

5    the service calls consist mostly of public relation outreach contacts and self-directed

6    "aggressive" drug law enforcement through traffic enforcement.  BLM officers are also

7    improperly loaned out to the local Sheriff to assist with his investigations of state law matters.

8    Forcing BMP cover the costs of premium pay for unnecessary officers is objectively

9    unreasonable.  If BLM were to shed its self-imposed excesses, it would need fewer employees

10   and could staff the Event without resorting to an improper "mission-critical" designation, even

11   assuming that it does have difficulty staffing the event at current levels — a claim that BLM

12   has never backed up.

13       Regardless of the propriety of BLM's mission-critical designation, BLM has

14   never described the amount of additional labor costs associated with the "mission critical"

15   designation.  In its 2018 Answer, BLM asserts, "It is important to note that this designation

16   only applied to 25 of the 75 assigned law enforcement positions at the 2018 event."  (2018

17   Answer at 14:12-14.)  But this statement is unverifiable because BLM fails to explain which

18   law enforcement officers received extra pay, how many of these were highly compensated

19   special agents, and how much overtime or premium pay was actually distributed.  BLM's lack

20   of transparency and failure to produce a breakdown of its labor costs (which it has previously

21   provided to both BMP and this Board) is itself sufficient grounds for a remand and

22   instructions for BLM to explain these costs in much greater detail.

23

24   **C.    BLM's Soaring Communications and Information Technology Costs Far Exceed
         What Is "Reasonable" For the Event.**

25       Another legacy cost from the failed leadership of former Special Agent Love is a

26   bloated communications and technology program that primarily supports BLM law

27   enforcement and grows more expensive every year.  BLM continues to demand equipment,

28   services, and staffing that greatly exceed the reasonable needs for its 16-day on-site

                                          39

1   operation.

2      **1.      BLM personnel spent excessive hours on BLM communications,
             technology, and logistical services for the 2019 Event.**

3

4      BLM's abbreviated 2019 After Action Review devotes a little over half a page to

5   describing the support contracts for its communications and information technology program,

6   which totaled over half a million dollars in 2019.  (Vind Decl. Ex. C.)  From BLM's labor

7   summary, it appears that BLM employed a technology team that consisted of 12 individuals.[22]

8   In total, these 12 individuals logged 3,010 hours, and BLM charged BMP $224,680 including

9   the indirect cost rate for the cost of their labor alone.  (Benson Decl. Ex. H, Att. 1.)

10      BLM's labor summary provided scant detail regarding what any of these employees

11   did for several thousand hours, with descriptions of work consisting of no more than a few

12   words.  (*Id.*)  For example, three "Comm Techs" billed a combined 945 hours, costing BMP

13   over $75,000, yet BLM provided just a three-word description of their work:

14   "Communications network support."  (*Id.*, Ex. H, Att. 1.)  Absent any information about what

15   these individuals did, BMP cannot possibly assess whether all 945 of these hours were spent

16   on tasks that were reasonable to BLM's administration of the 2019 SRP.  The same

17   deficiencies exist for the other team members.  It is difficult to understand the need for so

18   many BLM IT personnel roles, given the extensive technical support personnel that BLM

19   required in its technology contracts, including two contracts with Lyman Communications

20   LLC for internet and network services for which BMP paid $214,444 including the indirect

21   administrative cost rate.  (*Id.*, Ex. H, Att. 2.)  There is simply no evidence that BLM's 16-day

22   on-site operation required such a massive communications/technology operation and over

23

24   _____

    [22]  The names, hours billed, and titles of these individuals were as follows:  (1) Wisemore,
25   455.25 hours as "Comm Lead"; (2) D. Carter, 391 hours as "Comm Tech"; (3) Iagulli, 310
     hours as "Comm Tech"; (4) Northrup, 244 hours as "Comm Tech"; (5) Schwirian, 310 hours
26   as "Comm Tech, Day Shift"; (6) Lannen-Littlefield, 269.5 hours as "Dispatch Center
     Manager"; (7) Grimes, 318 hours as "Event IT Equipment Specialist, Day Shift"; (8) Pincus,
27   23 hours as "Event IT Equipment Specialist, Day Shift"; (9) King, 445.5 hours as "Event IT
     Security"; (10) Weaver, 164.5 hours as "IMARS"; (11) Nichols, 40 hours as "IT Specialist,
28   Day Shift"; (12) Allen, 39.25 hours as "Technical Support"  (Benson Decl. ¶ 29.)

1    3,000 personnel hours devoted to supporting and growing this function.

2         BLM's communications and technology program continues to be an expensive

3    boondoggle.  BMP understands that BLM requires the services of some personnel to provide

4    radios, dispatch services, internet service, and IT equipment and security in connection with

5    its operations at the Event.  But the fact that these services may be generally needed does not

6    mean BLM can assign an unchecked number of personnel to log an unlimited number of

7    hours in providing them, including senior BLM staff at the highest pay rates in the

8    agency.  *See Bookcliff Rattlers*, 171 IBLA 21.  BLM cannot discharge its cost recovery

9    obligation with the same tired mantra that it has the sole and absolute discretion to determine

10   what technology costs are "reasonable."

11        **2.      BLM continued to charge BMP for unneeded equipment and dispatchers.**

12        BLM does not have discretion to require that a permittee purchase new equipment or

13   technology simply because agency employees would like to have access to the latest gadgets

14   or because the agency prefers not to spend its own money on the equipment it uses for

15   everyday operations.  (Abbey Decl. ¶ 10.)  Requests to purchase new equipment or implement

16   new technology in connection with an SRP should be negotiated with the permittee, who

17   should have a substantial role in assessing whether these added costs are likely to measurably

18   improve public safety or enjoyment, or the protection of the public lands.  (*Id*.)  This is

19   especially true for the recent Burning Man SRPs, as the Event has experienced little

20   population growth over the past five years and should not require extensive technology

21   upgrades.  (*Id*.; *See also* Benson Decl., Ex. C.)  As explained below, several 2019 technology

22   contracts contained unreasonable provisions.

23

24             a.      BLM expenditures on satellite tracking were unreasonable.

25        During the contentious negotiations over the 2013 Burning Man SRP, which resulted

26   in a doubling of BLM's costs in a single year, Special Agent Love demanded that BMP

27   purchase satellite tracking devices so that BLM could identify the precise location of law

28   enforcement within the Event site at any given time.  (Allen Decl. ¶ 31.)  The claimed "one-

1  time" purchase in 2013 cost BMP over $72,000, and every year since, these handheld devices

2  — which can readily be purchased at athletic recreation stores and updated online — have

3  allegedly "required" more than $50,000 in maintenance and programming.  (*Id.* ¶ 31.)  In

4  2019, BLM again awarded this contract to Strohman Enterprises, at a cost to BMP of

5  $50,640.  (Benson Decl., Ex. H, Att. 2.)  BMP's six-year bill for this equipment is well over

6  $350,000 (excluding the administrative cost rate) plus the unspecified costs of the BLM staff

7  who negotiate this contract and deploy the trackers every year.  (Vind Decl. ¶ 18.)

8      BLM's current leadership team has essentially argued that these devices must be

9  necessary, regardless of cost, since they have been used "since 2013."  (*See, e.g.*, 2017

10  Answer at 23-24.)  According to BLM's logic, because Special Agent Love and Mr. Seidlitz

11  coerced BMP into paying for unjustified technology several years ago, BMP must continue to

12  swallow these unnecessary expenses forever.  The mere fact that BLM has employed satellite

13  tracking at the last few Events does not confirm the reasonableness of this expense.  BMP

14  contends that Special Agent Love only deemed these devices "necessary" in the first place

15  because he could order BMP to pay for them.

16      As BMP has noted in its prior Appeals, BLM has never demonstrated a legitimate

17  need for this equipment in its operations at the Event.  (Vind Decl. ¶ 19.)  All law enforcement

18  officers at the Event have radios for communication and dispatch purposes, and they often

19  work in pairs that enable one officer to radio a location if his or her partner is otherwise

20  engaged.  (*Id.*)  Thus, BLM has made no showing that this $50,000+ annual contract is a

21  reasonable cost.

22          b.    BLM's "Network Services" contract with Lyman Communications
                  included numerous unnecessary and unreasonable items.
23

24      Every year since at least 2015, BLM has entered into contracts for network services

25  which exceeded $100,000.  In 2019, BLM awarded a contract to Lyman Communications that

26  cost BMP $125,824 including the indirect administrative cost rate (Benson Decl., Ex. H, Att.

27  2.)  As in past years, BLM failed to provide any explanation for requiring such extensive

28

STATEMENT OF REASONS

AR11732

1    services for its 16-day operation at the eight-day Event.[23]   Many of these items were

2    unnecessary and were not even used by BLM.

3        For example, BLM has wholly failed to justify the expense of an HD camera (mounted

4    on its own tower), dedicated computer workstation, large LCD display monitor, and extensive

5    networking equipment for its public outreach substation. (Benson Decl. ¶ 32; Ex. J.)  Given

6    that the substation is staffed 24 hours per day with at least one BLM officer (2018 Andres

7    Decl.  ¶ 38), and the Event is patrolled by dozens of officers around the clock — all with

8    radios if they need to report information to the JOC or request personnel — BLM's insistence

9    on this lavish monitoring technology is unreasonable.  BLM has admitted the substation

10    camera often obscured by dust.  (Vind Decl. ¶ 20.)  BMP understand that the camera at the

11    substation is not regularly monitored and has never proven useful for any purpose.  (*Id.*)  The

12    agency would not be requiring such redundant and costly technology if it were spending its

13    own money instead of BMP's.  (*See* Abbey Decl. ¶ 11.)

14        BLM also has demonstrated no need for the slew of fancy IP cameras and huge

15    monitors that it obtained for viewing the temporary holding facility at the JOC, which is used

16    exclusively by the Pershing County Sheriff's Office, as BLM has not arrested anyone at the

17    Event for many years.  (Vind Decl. ¶ 27.)  BLM's SOW for the Lyman Communications

18    contract required no fewer than six cameras at the holding facility and three 55-inch monitors.

19    (Benson Decl., ¶ 32, Ex. J.)  BMP understands that this holding facility is not even used by

20    BLM as BLM has not reported a single arrest in the last six years.   (Vind Decl. ¶ 27.)

21        Finally, BMP objects to paying for excessive internet phone service via the Lyman

22    SOW to support 200 devices and 20 separate voice-over IP lines.  (Benson Decl., Ex. J.)

23

---

24    [23] According to BLM's Statement of Work ("SOW"), the vendor was required to provide,
among other items, (i) a Wi-Fi network "capable of simultaneously supporting a minimum of

25    200 devices; (ii) "augmented Verizon LTE cell service at BLM JOC . . . capable of 40
simultaneous cellular telephone calls"; (iii) "Verizon LTE augmentation at the law

26    enforcement substation  . . . capable of at least 5 simultaneous calls"; (iv) "Pan Tilt Zoom IP
camera at the Law Enforcement substation near center camp"; (v) "a minimum of six (6) IP

27    Cameras in the jail and two (2) cameras outside the jail at the BLM JOC; and (vi) "a minimum
of 20 VOIP telephone circuits or independent phone lines."  (Benson Decl. ¶ 33; Ex. J.)

28

1    BLM has never demonstrated a need for anywhere near this many devices or phone lines. The

2    SOW states that these phone lines will facilitate calls within the JOC and substation, despite

3    all personnel in these buildings already having radios and cell phones.  (Vind Decl. ¶ 19.)

4                      c.    BLM again contracted for needlessly expensive and unnecessary dispatch
                             personnel and supplies.
5

6         In 2019, BLM continued its practice of charging BMP for dispatch equipment and

7    personnel that were unnecessary and unreasonable.  In 2019, BLM entered into a dispatcher

8    contract with Law Enforcement Temporary Placement Service ("LETPS") that cost BMP

9    $243,041 including the indirect administrative cost rate.  (Benson Decl., Ex. H, Att. 3.)  Of

10   course, BMP understands that BLM requires dispatcher services.  BLM has not, however,

11   shown that it needs such extensive services in this regard.  According to the 2019 After Action

12   Review, LETPS employed a total of 15 dispatchers, plus two managers, and five dispatchers

13   were on duty at all times.  (Vind Decl., Ex. C at 3.; Benson Decl. Ex. K.)  Like in past years,

14   BLM has again made no showing that so many dispatchers were needed.  The number of

15   dispatch personnel is objectively unreasonable given the fact that BLM's CAD data reflects

16   that there were only 177 dispatched calls for service during the 16-day period of BLM law

17   enforcement operations.  (Vind Decl., ¶ 26.)

18        In addition, BLM spent a total of $11,585 inclusive of the indirect administrative cost

19   rate) on miscellaneous "Communication Supplies."   (Benson Decl., Ex. H, Att. 5.)  BLM

20   does not even explain what these "Supplies" were, let alone why they were necessary for

21   BLM's administration of the 2019 SRP.  All BLM provided were the receipts showing that

22   the money was spent.  Most of these receipts do not even clearly specify what was purchased.

23   The receipts also do not explain why these "Supplies" were needed or provide any

24   information enabling BMP to assess the reasonableness of the charges.  BLM should not be

25   allowed to purchase unlimited "Communication Supplies" for every iteration of the Event,

26   with no showing of need or budgetary oversight, simply because BMP is footing the bill

27   through cost recovery.  (Abbey Decl. ¶ 11.)

28

STATEMENT OF REASONS                                        AR11734

**D.** **Costs Associated With BLM's Superfluous and Unnecessary Medical Unit For Its Personnel Were Not "Reasonable."**

As it has since 2012, BLM again elected to make redundant and unnecessary medical services available to its staff at the 2019 Event and charge BMP for all associated costs.  BMP again objects to paying these costs, as superfluous costs are not "reasonable" costs.

BMP has long provided comprehensive patient care onsite at the Event, including a state of the art, licensed emergency care facility, emergency transportation, several first-aid stations, and a communications system — all fully equipped to handle the historic and reasonably anticipated medical needs of tens of thousands of Event participants and staff, plus the government personnel on site.  (Benson Decl. ¶ 34.)  As in prior years, for the 2019 Event, BMP contracted with a specialized provider to provide advanced life support ("ALS") services, including board-certified emergency physician care and an extensive array of medical services, including X-ray, radiology, sonography, electrocardiogram services, orthopedic treatment, a comprehensive pharmacy formulary, and an onsite fixed wing air ambulance.  (*Id.*)  BMP also deployed a large number of response and transport vehicles, including ALS-capable ambulances and quick response vehicles, and provided basic medical services at six first-aid stations located throughout the Event site and staffed by licensed medical professionals.  (*Id.*)

Although BLM is well aware that BMP provides these comprehensive, state-of-the-art medical services, it has continued to insist on a separate medical facility for its personnel at BMP's expense.  BLM's medical program has been staffed as part of the agency's law enforcement operation since 2012 and is another legacy cost of Special Agent Love's abuse of the cost recovery process for BMP's SRP and the continued escalation of BLM's staffing at the Event.  (Allen Decl. ¶ 6; Benson Decl. Ex. C.)  Special Agent Love insisted these medical services had become necessary, but he never documented any such need. (Benson Decl., ¶ 12, 34.)  Instead of reassessing the need for a separate medical program and eliminating these superfluous expenditures after it terminated Special Agent Love, BLM has maintained and even increased these costs without an adequate explanation.

According to its 2019 labor and travel summaries, BLM staffed two "Medical Unit

45

AR11735

1  Leader" positions (Curry and Templeton), who hold the titles Senior Special Agent and

2  Assistant Special Agent in Charge, respectively.  Collectively, these most senior-level

3  personnel spent 351 hours and BLM charged BMP $41,452 for their labor and $822 for travel

4  including the administrative cost rate.  (Benson Decl., Ex. H, Att. 1.)  BLM has provided no

5  details about what these two personnel did for the hundreds of hours they logged.  The labor

6  summary states only that both acted as "[m]edical function officer [and] served as lead of

7  BLM's medical unit." (*Id.*)

8       BLM's 2019 After Action Review simply states that they "provided medical care for

9  federal employees working the event."  (Vind Decl. Ex. C at 7.)  BLM fails to detail the

10  nature of the medical care provided or why BMP's extensive medical operation and

11  professional services vendor (CrowdRx) could not have serviced BLM's needs.  Prior BLM

12  After Action Reviews noted that BLM's medical unit primarily provided routine care to

13  officers and K9 units.  (Vind Decl., Ex. A at 12 (2017 After Action Review, noting that

14  services included "heat mitigation for humans and K9s"); Ex. B at 31 (2015 After Action

15  Review, stating that "[a]n overwhelming majority" of medical unit visits were "for routine

16  medical care such as eye wash, minor wound care, over the counter pain relief, and other over

17  the counter medicine.").)

18       If BLM desired a duplicative medical facility for its personnel and dogs, it could have

19  provided such services at its own expense.  BLM has never shown that this facility is

20  necessary or reasonable, however, and thus continues to abuse its discretion by charging the

21  associated costs to BMP.  BLM's annual inclusion of these medical costs in the cost recovery

22  closeout is yet another decision made by Special Agent Love that does not withstand scrutiny

23  in light of BLM's obligation to charge BMP only for its reasonable costs.

24  **E.    BLM Unreasonably Charged BMP For Costs Associated With SRPs That BLM
       Issued to Third Parties.**

25

26       In 2019, BLM continued its practice of improperly charging BMP for the costs of

27  monitoring the compliance of independent third-parties who sold goods and services to Event

28  participants, but not to BMP.  Since these third-parties engaged in separate commercial

46

1   activities on the public lands, BLM required each third-party vendor to obtain its own

2   individual SRP under 43 C.F.R. § 2932.11.  Each of these third-party vendors paid BLM a

3   separate 3% commercial use fee.  (Allen Decl. ¶ 33.)

4          According to its labor summary, three BLM staff (Amar, Cadigan and Gates) worked

5   exclusively on "vending compliance," and the only description BLM provided for their labor

6   was "worked with [BMP] vending teams on SRP compliance.  (Benson Decl., Ex. H, Att.

7   1.)  These three personnel billed a total of 651.75 hours, and BLM charged BMP $43,845 for

8   their labor and $1,409 for travel including the administrative cost rate.  (*Id.*)  Two additional

9   BLM personnel (Rorex and Welty) served as "compliance function specialists" and assisted

10  "vendor monitoring teams with GIS needs."  These two additional personnel billed a total of

11  613 hours.  BLM charged BMP $39,780 for their labor and $584 for travel including the

12  indirect administrative cost rate.  (*Id.*)

13         BLM again abused its discretion by charging BMP for the costs BLM incurred to

14  monitor the compliance of third parties with their separate SRPs.  While BLM may charge a

15  permittee for the reasonable costs associated with its own permit, nothing in the law allows

16  BLM to charge one permittee for the costs of administering permits to another party.  43

17  C.F.R. § 2932.31(e)(2)-(3); *See also* National Special Recreation Permit Fee Schedule,

18  available at https://www.blm.gov/policy/im-2014-055.

19         BLM continues to disregard its own regulations by charging its costs related to third-

20  party permits to the cost recovery account for BMP's SRP.  In its Answers to BMP's prior

21  Appeals, BLM has argued that these costs are appropriately charged to BMP because these

22  vendors are providing services to attendees of BMP's Event.  (*See, e.g.*, 2018 Hall Decl. ¶¶

23  33-37.)  That argument lacks any support in the cost recovery regulations, however, and BLM

24  cites no authority for this attenuated "but for" causation theory.  The agency may find it

25  convenient to hold BMP responsible for the costs of all the other SRPs that BLM issues for

26  activities within the Closure Order area for the Burning Man Event, but that does not mean

27  BLM has the authority to do so. The statute and regulation make clear it does not.

28

STATEMENT OF REASONS                                                    AR11737

1   BMP notes that BLM collects hundreds of thousands of dollars in commercial use fees

2   from these permittees each year.  (Allen Decl. ¶ 34.)  BLM is clearly generating revenue from

3   third-party vendor SRPs and should budget and pay the costs of monitoring their compliance

4   with their permits. Instead, BLM again abused its discretion and the cost recovery system in

5   2019 by unreasonably charging BMP for the monitoring of these third-party SRPs

6   **F.**    **BLM Charged BMP for Unreasonable "Misc. Supplies and Equipment" Costs.**

7   In 2019, BLM charged BMP $44,281inclusive of the indirect administrative cost rate

8   for equipment and supplies that were purportedly purchased in connection with the Burning

9   Man SRP.  (Benson Decl., Ex. H, Att. 5.)  As usual, BLM declined to explain the reason that

10  it incurred any of the 70 separate charges listed on the "Misc. Supplies and Equipment"

11  attachment that accompanied its 2019 Cost Recovery Decision, depriving BMP of the

12  opportunity to meaningfully assess the reasonableness of any of these charges.  (*Id*.)

13  BMP objects to all BLM supplies and equipment charges that have not been

14  sufficiently explained and shown to be reasonable costs.  For example, BLM's summary

15  contains only generic descriptions like "safety supplies," "logistical supplies," and "evidence

16  supplies," and though BLM provided receipts showing how much money was spent, most of

17  the receipts do not even specify what was purchased.  The receipts also do not explain why

18  these "Misc. Supplies and Equipment" were needed or provide any information enabling BMP

19  to assess the reasonableness of the charges.

20  BLM continues to act as though its only obligation is to show that it actually incurred

21  a given cost in connection with administering the Burning Man SRP.  If so, BLM insists that

22  the cost was *de facto* reasonable and that BMP is entitled to no further explanation.  As

23  explained above, however, this position lacks any support in the cost recovery regulations and

24  decisions of this Board, which require that BLM demonstrate the necessity and reasonableness

25  of all charges passed on to a permittee. *See, e.g.*, 43 C.F.R. § 2932.31(e)(3) ("Cost recovery

26  charges will be limited to BLM's costs of issuing the permit, including ***necessary***

27  environmental documentation, on-site monitoring, and permit enforcement.") (emphasis

28  added); *Bookcliff Rattlers*, 171 IBLA 17 (the Department of Interior must "give thorough

48

1   consideration" to the reasonableness factors set forth in section 304(b) of the FLPMA "before

2   assessing any costs") (*quoting Nevada Power Co.,* 711 F.2d at 925 n.6).

3       BMP's overarching concern with BLM's charges for supplies and equipment

4   continues to be the apparent lack of oversight for including these charges in the cost recovery

5   final decision.  Any BLM employee assigned to the Burning Man SRP seems to have the

6   ability to charge any expense to BMP's cost recovery account, and BLM includes all such

7   charges in its Cost Recovery Decision without assessing the reasonableness of passing these

8   expenses on to BMP.  Certainly, no such assessment has ever been provided to BMP, despite

9   its repeated requests.  (Allen Decl. ¶¶ 14, 18, 19.)  Year after year, BLM only confirms that it

10  actually incurred these costs, forcing an appeal to compel an understanding of why.

11      The mere fact that a BLM staff member purchased something to use at the Event does

12  not automatically render that purchase a necessary item or a reasonable cost.  If the cost

13  recovery regulations were so expansive, BLM's budget would know no bounds; it could

14  purchase literally anything — no matter how exorbitantly priced or superfluous to the

15  agency's administration of a permit — and force the permittee to provide

16  reimbursement.  Fortunately, and rationally, the cost recovery regulations do not give BLM

17  such unfettered discretion to charge costs to a permittee.  (Abbey Decl. ¶¶ 4, 11.)

18                          **V.    CONCLUSION**

19      This appeal marks the fifth consecutive year that BMP has identified significant

20  deficiencies in BLM's imposition of costs associated with the annual Burning Man

21  SRP.  Despite BMP's several pending Appeals, BLM has failed to conduct a meaningful

22  assessment of its costs, including the extraordinary cost increases mandated by former Special

23  Agent Love, to confirm whether they are justified, necessary, and reasonable.  Instead, BLM

24  has amplified his misconduct by using his unjustified demands as the baseline for future cost

25  decisions and has provided BMP with even less information about BLM's activities and

26  expenditures in connection with the Burning Man SRP.

27      When the Board finds that BLM committed an error of law, as in this case, the

28  appropriate statutory remedy is for BLM to refund the unlawfully charged costs:

49

> In any case where it shall appear to the satisfaction of the **Secretary** that any person has made a payment under any statute relating to the sale, lease, use, or other disposition of public lands which is not required **or is in excess of the amount required by applicable law and the regulations** issued by the Secretary, the Secretary, upon application or otherwise, **may cause a refund to be made from applicable funds**.

43 U.S.C. § 1734(c) (emphases added).  Contrary to BLM's assertion in prior appeals (*See, e.g.*, 2018 Answer at 9:27), the remedy of ordering a refund for BLM's violation of the cost recovery system is "within the scope of the Board's jurisdiction."

Therefore, BMP respectfully requests a refund of the following specific BLM cost items that were not "reasonable costs" under 43 U.S.C. § 1734(b):

➤ Labor, travel and lodging costs for BLM law enforcement staffing not reasonably necessary for the administration of BMP's permit or whose work served "the general public interest," rather than being for BMP's "exclusive benefit";

➤ Labor, travel and lodging costs for the six senior BLM law enforcement officers who were assigned to "investigate" state law matters for the local sheriff;

➤ Labor, travel and lodging costs for all BLM "internal affairs" officers;

➤ Unnecessary costs associated with BLM's law enforcement substation;

➤ All "premium pay" and other additional compensation paid to BLM employees based on the erroneous "mission critical" designation;

➤ Unnecessary costs associated with BLM's communication and information technology program;

➤ Labor, travel, and lodging costs for BLM's duplicative medical services for the exclusive use of BLM personnel;

➤ Labor, travel, and lodging costs associated with BLM's enforcement of SRP compliance by third-party vendors; and,

➤ Unexplained and unreasonable costs for "Misc. Supplies and Equipment."

Dated:  July 6, 2020                                    LEVIN LAW FIRM

                                                            /s/ David S. Levin
                                                      By: _____

                                                            David S. Levin
                                                            Attorneys for Appellant,
                                                            Burning Man Project

50

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone:  (650) 858-8500
david@levinlawfirm.com

Attorneys for Appellant,
Burning Man Project

## UNITED STATES DEPARTMENT OF THE INTERIOR

## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BURNING MAN PROJECT,<br><br>          Appellant,<br><br>     v.<br><br>BUREAU OF LAND MANAGEMENT,<br><br>          Appellee. | Case Identification No.: IBLA-2020-0302<br><br>Special Recreation Permit<br>LLNVW03500-19-01<br>2930 (NV030.10)<br><br>**Declaration of Marc P. Picker in Support of Appeal** |

I, Marc P. Picker, declare as follows:

1.       I am an attorney licensed to practice law in the state of Nevada.  I am over 18

years old, of sound mind, and capable of making this declaration. I have personal knowledge

of the facts set forth herein, or, if so stated, am informed and believe of their truth and

accuracy and, if called to testify, I could and would do so competently and under oath.

2.       Since 2008, I have worked with a group called "Lawyers for Burners," which

has been assisting participants who were cited by the U.S. Bureau of Land Management

("BLM") at the annual Burning Man event ("Burning Man" or the "Event").  I have served as

AR11741

counsel of record for dozens of Burning Man participants who were cited by BLM law enforcement at the Event.

3.       Since 2008, I have worked directly with numerous BLM law enforcement agency representatives who appear on behalf of BLM in the U.S. District Court in Reno, Nevada, and I have similarly worked with every Assistant U.S. Attorney who prosecuted BLM citations issued at the Event during that time period.

4.       In 2010, I negotiated a protocol agreement with the U.S. Attorney's office regarding the resolution of drug possession citations issued by BLM at Burning Man.  Under the arrangement, BLM agreed to dismiss drug possession or drug paraphernalia charges in exchange for a defendant's agreement to plead guilty to a non-drug related offense — such as trespassing or a motor vehicle infraction — and pay an adjusted fine.  The fine for certain drugs like cocaine and ecstasy was slightly higher than the base fine of $500.  The fine for cases involving marijuana was actually lower than the base fine.  In every negotiated case, the BLM and U.S. Attorney's Office agreed to dismiss the entire citation, or at least the drug-related charge.

5.        I am informed and believe that this 2010 protocol for dismissing drug-related offenses from BLM citations at Burning Man continues to date and applied to citations issued at the 2019 Event.  Between 2010 and 2019, the only drug offense convictions I am aware of from the Event are cases where the defendant did not contest the citation and paid the base fine of $500 by mail.

6.       Based on my 12 years of experience defending BLM citations, my attendance at numerous Burning Man Events, and my review of other Declarations and Exhibits submitted

Declaration of Marc P. Picker

as evidence by BMP in this appeal, I observe that BLM continued to devote substantial law enforcement resources to self-initiated drug enforcement actions in 2019.   I understand that BLM continued in 2019 its past practice of conducting motor vehicle stops in conjunction with K9 narcotics dogs and handlers.  From my years of experience as a criminal defense attorney in Nevada, I understand that the purpose of conducting traffic stops with a K9 team at the ready is to use the K9 to create probable cause to search vehicles for drugs.  Thus, I believe that the vast majority of the motor vehicle stops of participants at the 2019 Event were likely pretexts for BLM to search for drugs.

7.      BLM has admitted that it relies on motor vehicle stops to enforce drug laws.  I reviewed the 2017 Declaration of BLM law enforcement ranger Rebecca Andres in which she acknowledges that BLM self-initiates traffic stops to "uncover[]" drugs and "reduce the potential for harm to members of the visiting public."  (2018 Andres Declaration ¶ 23).  Ranger Andres states, "Part of the strategy was to use BLM K9 units as a tool for narcotic detection.  During the 2018 event, 6 K9 units were deployed across the three shifts to further the drug enforcement strategy." (*Id*. at ¶ 25.)

8.      To justify the high cost of deploying three shifts of K9s and their handlers, Ranger Andres opines that "BLM's enforcement of controlled substance laws and regulations is mandated by BLM policy."  (2018 Andres Declaration ¶ 25.)  Ranger Andres goes on to cite "General Order 33," which directs BLM to "counter illegal drug activity on public lands by aggressively seeking to detect and investigate drug activity."  (*Id*.)

9.      In past BLM Answers, the agency defended its "drug enforcement strategy" as a legitimate law enforcement priority.  That may be true, and BMP makes clear in the

Statement of Reasons that BMP is not attempting to direct BLM's operations.  But BLM's

general "drug enforcement strategy" to fight the social ills of drug use on the public lands is

not a reasonable cost to be imposed on an SRP applicant according to applicable statutes.

10.     Congress made it clear that agencies cannot use cost recovery to fund costs for

"management overhead" or the "benefit of the general public."   *See* 43 U.S.C. § 1734(b).

Costs which benefit the general public welfare, as opposed to conferring a private benefit on a

permittee, cannot be charged to a permittee under cost recovery.  Thus, BLM cannot use cost

recovery to fund general public benefits that are beyond the scope of permit administration.

11.     Similarly, 43 CFR § 2932.31(e) limits cost recovery to "BLM's costs of issuing

the permit, including necessary environmental documentation, on-site monitoring,

and permit enforcement."  None of BLM's extensive drug enforcement through motor vehicle

stops in 2019 constituted "on site monitoring" or "permit enforcement."  BLM did not stop

motor vehicles to detect whether BMP was complying with its permit.  BLM admitted in the

past that it stopped vehicles in order to enforce drug laws against the public during their use of

public lands.  Such general drug enforcement is for "general public benefit" in furtherance of

BLM's general law enforcement objectives.  As such, BLM drug enforcement costs are not

"reasonable" costs that may be collected under cost recovery, and these costs should be

refunded to BMP under 43 U.S.C. § 1734(b).

12.     BLM's 2019 After Action Review does not state how many law enforcement

personnel worked the 2019 Event.  According to BLM's 2019 Cost Recovery Decision and the

attached labor summary, BLM deployed 70 law enforcement officers and charged BMP

$1,018,019 for law enforcement labor at the 2019 Event.  Including BLM's 21.6% indirect

cost, BLM charged BMP a total of $1,237,911 for law enforcement labor in 2019.

13.     According to its 2019 After Action Review, BLM "requested" nine K9 teams but only used three K9 teams at the Event.  And according to the Declaration of Roger Vind filed herewith, BLM self-initiated 1,072 motor vehicle stops in 2019, representing almost 45% of all law enforcement events, excluding "public contacts."  Thus, BLM assigned substantial law enforcement resources and officers, who devoted much of their time to enforcing drug possession laws at the 2019 Event, only to then dismiss the drug related offenses after brief negotiations pursuant to the agreed upon protocol which has been in place since 2010.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 3rd day of July, 2020, at Reno, Nevada.

*Marc Picker*

Marc P. Picker

Declaration of Marc P. Picker

AR11745

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone:  (650) 858-8500
david@levinlawfirm.com
Attorneys for Appellant,
Burning Man Project

## UNITED STATES DEPARTMENT OF THE INTERIOR
## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BURNING MAN PROJECT, | Case Identification No.:  IBLA-2020-0302 |
| Appellant, | Special Recreation Permit |
| | LLNVW03500-19-01 |
| v. | 2930 (NV030.10) |
| BUREAU OF LAND MANAGEMENT, | **Declaration of Marnee Benson In Support of Appeal** |
| Appellee. | |

I, Marnee Benson, declare as follows:

1.      I am over 18 years old, of sound mind, and capable of making this declaration.  I am the Director of Government Affairs for appellant, Burning Man Project ("BMP").  I have personal knowledge of the facts set forth herein, or, if so stated, am informed and believe of their truth and accuracy and, if called to testify, I could and would do so competently and under oath.

2.      I joined BMP in 2014 after five years at Black Rock Solar doing public policy, education, and renewable energy project management in Nevada.  I hold a Master's degree in

1

AR11746

Public Policy and a Master's degree in Environmental Science and Natural Resource

Management, both from the University of Nevada, Reno.  I obtained my Bachelor's degree in

Mathematics and have extensive academic experience in statistical analysis.

3.      Since 1990, the Burning Man event ("Burning Man" or the "Event") has been

held over and around Labor Day weekend on public lands managed by the Bureau of Land

Management ("BLM") in what is now called the Black Rock Desert – High Rock Canyon

Emigrant Trails National Conservation Area of northern Nevada ("Black Rock NCA").  The

Event location, commonly called Black Rock City (or "the City"), has been situated within

Pershing County most years.

4.      Burning Man began its tenure in the Black Rock NCA as a weekend camping trip

for a small group of people.  Over nearly 30 years, the event has grown in size, popularity, and

complexity. In 2019, the peak population — meaning the highest number of people in attendance

at any given moment in time over the course of the Event — was 78,850[1] .  The Event's

"population cap" in 2019 was 80,000 people excluding government personnel, and vendors.

Actual population varies significantly over the course of each Event.

5.      In 2013, BMP was created as a California nonprofit public benefit corporation

recognized as exempt under section 501(c)(3) of the Internal Revenue Code.  BMP's mission is

to facilitate and extend the culture of the Event in the larger world.  BMP's subsidiary, Black

Rock City LLC ("BRC"), produced the Event from 1997 through 2018.  Between 1986 and

1996, Burning Man was produced by the Event's individual founders.  In 2019, BMP took over

---

[1] In 2019, BLM and BMP changed the method for counting the population at the Event.  Instead of separate categories for Paid Participants and Staff/Volunteers, the new population count now includes all bodies within the Event site.  The peak population for 2019 was 78,850 and the comparable peak population for 2018 was 78,134.

AR11747

production of the Event and obtained a special recreation permit ("SRP") in BMP's name. Throughout this Declaration, references to "BMP" shall include the predecessor/subsidiary entity, BRC.

6.     BLM has issued an SRP for the Event every year pursuant to the requirements of the National Environmental Policy Act and Federal Land Policy and Management Act ("FLPMA").

7.     The permitting process has included several environmental assessments over the years and most recently, a 10-year Environmental Impact Statement that was completed in July 2019, just days before the 2019 Temporary Closure Order went into effect..

8.     BMP and BLM have cooperated over the years to develop and refine a Leave No Trace standard for the Burning Man event that BLM has adopted for use with other events on BLM-managed public lands.

9.     BLM inspects the Burning Man Event site at the end of the SRP period, and BMP has passed every inspection.

10.     Burning Man is guided by Ten Principles, which co-founder Larry Harvey authored in 2004 "as a reflection of the Burning Man community's ethos and culture as it had organically developed since the event's inception."  Among these Principles are Communal Effort, Civic Responsibility, Participation, and Radical Self-Reliance, all of which are reflected in BMP's dedication to health, safety, and environmental issues at Burning Man; year-round work with cooperating agencies at the federal, state, and local levels; and the event's resulting 25-year record of compliance.  Attached hereto as **Exhibit A** is a true and correct copy of Burning Man's Ten Principles.

AR11748

11.     In 2019, BMP's event operations comprised more than 50 departments and teams, and BMP engaged several thousand competent, trained, licensed, and certified health and safety employees, contractors, and volunteers in the production of Burning Man.  BMP has built these departments and best practices over the last 30 years, and many of these individuals have more than 20 years of experience with managing safety operations and infrastructure at Burning Man and in their respective fields of expertise.  These BMP departments were engaged year-round in planning all aspects of the 2019 event and on-site operations, including providing emergency medical and fire services; surveying the streets, roads, and airport; building City infrastructure; ensuring sanitation; managing air and bus transportation services; managing participant arrival and processing; placing more than 1,000 camps; licensing 1,000 vehicles; and educating participants about staying safe, protecting the environment, and being good citizens of Black Rock City.

12.     In 2019, BMP engaged many thousand volunteers and employees to provide services to Burning Man participants including:  800 Black Rock Rangers, who provided security at the perimeter of scheduled artwork burns and patrolled the City on foot and bicycle 24 hours per day for the duration of the event; nearly 800 licensed, professional emergency services personnel from a variety of medical and emergency services backgrounds, who staffed six first aid stations located throughout the event and are responsible for responding to fires, hazardous waste incidents, and medical calls for service; over 100 licensed doctors, nurses, and emergency medical personnel employed by BMP's contracted provider of advanced life support services, CrowdRx, who staffed the City's fully licensed emergency care facility and ambulances; and 800

AR11749

Gate, Perimeter and Exodus staff, who provided traffic management and security at the entrance gates, airport and event perimeter.

13.     BMP engaged more than 5,000 Community Services staff and volunteers to interface with Burning Man participants, including at BMP's "Playa Info" facility, where they assisted participants with information and directions.  BMP disseminated information to participants 24 hours per day through its radio station, BMIR, as well as via detailed City maps and a detailed Survival Guide distributed to all participants and available online.

14.     In February 2017, I traveled to BLM's District Office in Winnemucca, Nevada, to manually inspect BLM's historical Burning Man files.  In the files for the 2012 Burning Man event, I discovered a memorandum dated August 19, 2012, from Salvatore Lauro, the national Director of BLM's Office of Law Enforcement and Security, to Carole Carter-Pfisterer, Assistant Director of Human Capital Management, with the subject line "Lifting of Pay Cap for Law Enforcement Deployment to Interior Lands in Nevada in Support of 2012 Burning Man event." The memorandum was approved on August 7, 2012.  A true and correct copy of the memorandum is attached hereto as **Exhibit B**.

15.     Neither I nor anyone else at BMP, to the best of my knowledge, has located any other documents addressing the designation of Burning Man as an "emergency," nor has BLM provided any.

16.     I am informed and believe that BLM continued to apply the "emergency" designation requested in the 2012 Lauro memorandum to all subsequent Burning Man events through 2016.  The data that BLM supplied to BMP about its labor costs each year included only

5

the total number of hours worked and total pay received by each staff member; it did not indicate

whether any overtime or premium pay was received or how much.

17.     Attached hereto as **Exhibit C** is a true and correct copy of a spreadsheet that I

have compiled and maintained, detailing costs and fees paid to BLM by BMP from 2011 through

2019, as well as Burning Man's population in those years.  The data in this spreadsheet was

obtained from BLM cost recovery documents, Burning Man revenue and expenditure records,

memoranda of understanding between BLM and BMP, BLM proffer account records, Burning

Man population reports, and official correspondence between BLM and BMP.

18.     The 2015 SRP planning process was impacted by various delays, including those

resulting from BLM's unprecedented request for a luxury "Blue Pit Compound" for its personnel

and VIP guests — a request that was met with media exposure, public outcry, and universal

criticism.  Attached hereto as **Exhibit D**  are true and correct copies of two articles by Jenny

Kane, published in the *Reno Gazette-Journal* on June 26, 2015, and titled "BLM wants $1

million VIP compound from Burning Man" and "BLM demands Burning Man provide 24-hour

access to ice cream."  Attached hereto as **Exhibit E** is a true and correct copy of an article by

Jenny Kane, published in the *Reno Gazette-Journal* on June 29, 2015, and titled "Reid to BLM:

You want flush toilets at Burning Man? Go to Gerlach," which transcribes a letter sent from

Senator Harry Reid to Secretary of the Interior Sally Jewell, pointing out that such facilities

"should be beyond the scope of the permitting requirements."  BLM withdrew the Blue Pit

request, and both District Manager Seidlitz and Special Agent Love were subsequently

reassigned from working on the Burning Man SRP.

AR11751

19.     On July 24, 2015, just one month before the 2015 Event and days before site work was scheduled to begin, BMP received BLM's 2015 cost recovery agreement, which estimated BLM's total costs would come to approximately $2.9 million that year.  Included in the estimate were a number of contracts to which BLM had already committed, although BMP had never had the opportunity to review, discuss, or agree to the contracted services or amounts.  BMP did not receive sufficient documentation of all the costs reflected in the agreement, nor did it have time to conduct an adequate review of the agreement, as BLM staff advised BMP staff that the SRP could not issue until BMP had signed.  BMP again had no practical choice but to accept BLM's cost estimate, and hope that BLM would substantiate the basis for the costs reflected within it after the event.

20.     On January 27, 2016, BLM issued its final decision on cost recovery for the 2015 Burning Man SRP, which totaled approximately $2.8 million.  Including the amounts paid for BLM's statements of work and a proffer account which funded BLM's Burning Man project manager, BMP paid a total of more than $3.5 million for costs incurred by BLM in administering the 2015 Burning Man SRP.

21.     Following the 2015 departure of both Special Agent Love and District Manager Seidlitz from BLM's leadership team for the Burning Man SRP, BMP's planning for the event saw improvements in collaboration and cooperation between BLM and BMP.  BLM did not, however, reduce various other programs and costs which had dramatically escalated without justification under the prior leadership of Special Agent Love and District Manager Seidlitz, including various expenditures for labor and BLM's Joint Operations Center ("JOC") equipped with extensive infrastructure, communications and IT services equipment.

AR11752

22.     I attended meetings with BLM's planning team to discuss the terms of the 2016 and 2017 Burning Man SRPs.  In some of these meetings, BLM representatives have intimated that the agency is reluctant to change certain cost practices instituted by District Manager Seidlitz and Special Agent Love until the Board has decided BMP pending cost appeals.

23.     Negotiations for the 2017 Burning Man SRP were generally unchanged from 2016. One notable difference was that BLM, for the first time since 2012, did not seek to have the Burning Man event designated an "emergency" event.

24.     In February 2017, I was informed by Nevada State Director John Ruhs that BLM would not be seeking an "emergency" designation for the 2017 Burning Man event.  Then, on April 26, 2017, I received an email from Black Rock Field Manager Mark Hall, advising that instead of seeking an emergency designation for the event this year, BLM had requested and obtained a "mission-critical work" designation for BLM personnel at the 2017 Event.  A copy of BLM's authorizing memorandum was attached to Mr. Hall's email.  Attached hereto as **Exhibits F and G**, respectively, are true and correct copies of that email and memorandum.

25.     For the 2018 Event, I am informed and believe that BLM permanently designated work performed by BLM personnel at Burning Man as "mission critical work."  A copy of BLM's Permanent Instruction Memorandum No. 2018-010 making work at the Event "mission critical" appears as Document No. 251 in BLM's Administrative Record.  According to the Memorandum, the bi-weekly pay cap and overtime rules are permanently lifted for the Event, and "Employees are entitled to premium pay under the annual maximum earning limitations while performing the mission critical work . . . ."

8

26.     Negotiations for the 2019 Burning Man SRP were similar to 2016 through 2018. Again in 2019, BLM refused BMP's request to change and reduce cost practices instituted by former District Manager Seidlitz and former Special Agent Love, intimating that BLM would not do so unless required by this Board in connection with one or more of BMP's pending cost appeals.

27.     The 2019 Burning Man event took place from Sunday, August 25, through Monday, September 2, 2019.   Although BLM still has not submitted the 2019 Post-Event Site Inspection Report to BMP, the initial results and analysis show that BMP passed with the highest score ever recorded.

28.     Attached hereto as **Exhibit H** is a true and correct copy of BLM's 2019 Burning Man Cost Recovery Closeout Decision, which BMP received via certified mail on February 17, 2020, including the following attachments: (0) Cost Recovery Closeout Summary; (1) Project Labor Log; (2) BLM Contracts; (3) Travel Expenses; (4) Vehicle Utilization Expenses; and (5) Miscellaneous Supplies and Equipment (the "2019 Cost Recovery Decision").  BLM also sent BMP a package of documentation related to the 2019 Cost Recovery Decision, including copies of the contracts and receipts for equipment and supply purchases reflected therein.

29.     According to BMP's review of the Project Labor Log provided as Attachment 1 to BLM's 2018 Cost Recovery Decision, at least 12 BLM employees appear to have had some role in BLM's communications and information technology operations at the 2019 Burning Man event. Following is a list of these 12 employees identified by BMP, along with the total number of hours they logged to the Burning Man SRP and their role title:

    1)     Wisemore: 455.25 hours, "Comm Lead"
    2)     D. Carter: 391 hours, "Comm Tech"
    3)     Iagulli: 310 hours, "Comm Tech"

AR11754

4)     Northrup: 244 hours, "Comm Tech"

5)     Schwirian: 310 hours, "Comm Tech, Day Shift"

6)     Lannen-Littlefield: 269.50 hours, "Dispatch Center Manager"

7)     Grimes: 318 hours, "Event IT Equipment Specialist, Day Shift"

8)     Pincus: 23 hours, "Event IT Equipment Specialist, Day Shift"

9)     King: 445.50 hours, "Event IT Security"

10)    Weaver: 164.50 hours, "IMARS"

11)    Nichols: 40 hours, "IT Specialist, Day Shift"

12)    Allen: 39.25 hours, "Technical Support"

30.     As part of BLM's Administrative Record for BMP's appeal of BLM's 2015 cost recovery decision, BLM supplied a travel spreadsheet for the 2012 Burning Man event. Attached hereto as **Exhibit I** is a true and correct copy of that spreadsheet.

31.     BMP sets the motor vehicle driving and speed restrictions for participants and staff inside the Burning Man Closure Order area.  During the event, these restrictions are 5 miles per hour within the City, and 10 miles per hour on Gate Road, the access roadway that BMP creates on the playa for event ingress and egress off County Road 34.  Only authorized staff, disabled, and mutant vehicles are operated inside the City; participants are not otherwise permitted to drive, except to and from their campsites upon arrival and departure.  The vast majority of participants travel around the City on foot or by bike.  Vehicle accidents of any kind are very rare at Burning Man, and vehicle collisions and accidents causing injury are even less common.

32.     Attached hereto as **Exhibit J** is a true and correct copy of BLM's 15 page Statement of Work ("SOW") "For providing IP Network, technical services and support to BLM in the Gerlach, NV area for the 2019 Burning Man Event" fulfilled by Lyman Communications,

AR11755

LLC.   BLM's SOW required, among other items,  (i) a Wi-Fi network "capable of simultaneously supporting a minimum of 200 devices; ( ii) "augmented Verizon LTE cell service at BLM JOC  . . capable of 40 simultaneous cellular telephone calls"; (iii) "Verizon LTE augmentation at the law enforcement substation  . . . capable of at least 5 simultaneous calls"; (iv) "Pan Tilt Zoom IP camera at the Law Enforcement substation near center camp"; (v) "a minimum of six (6) IP Cameras in the jail and two (2) cameras outside the jail at the BLM JOC; and (vi) "a minimum of 20 VOIP telephone circuits or independent phone lines".  BLM charged BMP $103,474, plus its indirect cost rate of 21.6%, for a total cost of $125,824 for "Network Services and Support."

33.     During a post-event debrief meeting on December 5, 2017, BLM representatives advised me and other BMP representatives that the dedicated workstation at the Joint Operations Center ("JOC"), ostensibly used for monitoring the camera at BLM's law enforcement substation, was unmanned.

34.     For more than a decade, BMP has been providing comprehensive patient care onsite at the Burning Man event.  BMP contracts with a specialized provider to provide advanced life support ("ALS") services, including board-certified emergency physician care and an extensive array of medical services, including X-ray, radiology, sonography, electrocardiogram services, orthopedic treatment, a comprehensive pharmacy formulary, and an onsite fixed wing air ambulance.  BMP also deploys a large number of response and transport vehicles, including ALS-capable ambulances and quick response vehicles, and provides basic medical services at six first-aid stations located throughout the Event site and staffed by licensed medical professionals.

AR11756

35.     BMP's Outside Services ("OSS") team oversees the BMP program under which providers of fee-based services to Burning Man participants can register for authorization to provide those services on-site at the event.  These providers are subject to a variety of restrictions and must sign an agreement with BMP and show proof that they have obtained their own SRPs from BLM.

36.     Attached  as **Exhibit K** is a true and correct copy of BLM's 20 page Statement of Work for "Mission Support Technician (MST) services and support in the Gerlach, NV area for the 2019 Burning Man Event" fulfilled by Law Enforcement Temporary Placement Service. MSTs served as radio dispatchers.  BLM's SOW required 17 individual dispatchers to work a total of 4,896 hours over a total of 21 days.   BLM charged BMP $199,870, plus its indirect cost rate of 21.6%, for a total cost of $243,041 for "Dispatch Services."


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 2nd day of July, 2020, at San Francisco, California.



_____
                    Marnee Benson

AR11757

# EXHIBIT A

AR11758



# The 10 Principles of Burning Man

Burning Man co-founder Larry Harvey wrote the Ten Principles in 2004 as guidelines for the newly-formed Regional Network (http://regionals.burningman.com). They were crafted not as a dictate of how people should be and act, but as a reflection of the community's ethos and culture as it had organically developed since the event's inception.

### Radical Inclusion
Anyone may be a part of Burning Man. We welcome and respect the stranger. No prerequisites exist for participation in our community.

### Gifting
Burning Man is devoted to acts of gift giving. The value of a gift is unconditional. Gifting does not contemplate a return or an exchange for something of equal value.

### Decommodification
In order to preserve the spirit of gifting, our community seeks to create social environments that are unmediated by commercial sponsorships, transactions, or advertising. We stand ready to protect our culture from such exploitation. We resist the substitution of consumption for participatory experience.

### Radical Self-reliance
Burning Man encourages the individual to discover, exercise and rely on his or her inner resources.



([http://blog.burningman.com/10principles](http://blog.burningman.com/10principles))

*Join the conversation in the 10 Principles blog series.*

### Radical Self-expression

Radical self-expression arises from the unique gifts of the individual. No one other than the individual or a collaborating group can determine its content. It is offered as a gift to others. In this spirit, the giver should respect the rights and liberties of the recipient.

### Communal Effort

Our community values creative cooperation and collaboration. We strive to produce, promote and protect social networks, public spaces, works of art, and methods of communication that support such interaction.

### Civic Responsibility

We value civil society. Community members who organize events should assume responsibility for public welfare and endeavor to communicate civic responsibilities to participants. They must also assume responsibility for conducting events in accordance with local, state and federal laws.

### Leaving No Trace

Our community respects the environment. We are committed to leaving no physical trace of our activities wherever we gather. We clean up after ourselves and endeavor, whenever possible, to leave such places in a better state than when we found them.

### Participation

Our community is committed to a radically participatory ethic. We believe that transformative change, whether in the individual or in society, can occur only through the medium of deeply personal participation. We achieve being through doing. Everyone is invited to work. Everyone is invited to play. We make the world real through actions that open the heart.

### Immediacy

Immediate experience is, in many ways, the most important touchstone of value in our culture. We seek to overcome barriers that stand between us and a recognition of our inner selves, the reality of

AR11760

those around us, participation in society, and contact with a natural world exceeding human powers. No idea can substitute for this experience.

## « Philosophical Center (https://burningman.org/culture/philosophical-center/)

The 10 Principles of Burning Man (https://burningman.org/culture/philosophical-center/10-principles/)

Founders' Voices (https://burningman.org/culture/philosophical-center/founders-voices/)

Burning Academics (https://burningman.org/culture/philosophical-center/academics/)

Historical Archives (https://burningman.org/culture/philosophical-center/history/)

Stories (https://burningman.org/culture/philosophical-center/stories/)

Show Us Your Stuff (https://burningman.org/culture/philosophical-center/show-us-your-stuff/)

I am lost in a dust storm!

🔍 Search

## Stuff & Things

About Us (https://burningman.org/network/about_us/)

Timeline (https://burningman.org/timeline)

Donate (https://donate.burningman.org)

Connect (https://burningman.org/network/get_involved/connect_with_burners)

Help & FAQ (https://help.burningman.org)

Gallery (https://gallery.burningman.org)

Burner Profiles (http://profiles.burningman.org)

Spark Collaboration (http://spark.burningman.org)

ePlaya (http://eplaya.burningman.com)

Marketplace (http://marketplace.burningman.org)

privacy (https://burningman.org/privacy-policy/)     credits (https://burningman.org/credits/)

©1989-2020 burning man project

AR11761

# EXHIBIT B

AR11762



# U.S. Department of the Interior
# Bureau of Land Management

Office of Law Enforcement and Security
1849 C Street NW, Washington, DC 20240



**August 19, 2012**

Memorandum

To:        Carole Carter-Pfisterer, Assistant Director, Human Capital Management

From:     Salvatore Lauro, Director, Office of Law Enforcement and Security

Subject:  Lifting of Pay Cap for Law Enforcement Deployment to Interior Lands in Nevada in
          Support of the 2012 Burning Man Event

I request that the law enforcement deployment to Public Lands in Nevada, in support of the 2012
Burning Man Event, be designated as an emergency special event as stated in 5 CFR 550.103. If
you approve of this request that would allow for lifting the bi-weekly pay cap as authorized by 5
CFR 550.106 and the Fair Labor Standards Act (FLSA) overtime requirements under 5 CFR
551.211 (f), for law enforcement personnel participating in direct support of this event. These
employees would then be entitled to premium pay under the annual maximum earning limitations
while performing the emergency work.

The FLSA status of law enforcement employees assigned to the 2012 Burning Man Event shall be
reviewed and administered in accordance with previously cited Federal regulations. If approved,
the temporary waiver of the bi-weekly pay cap as well as the emergency determination for deciding
FLSA designations shall continue until the conclusion of the 2012 Burning Man Event,
approximately September 8, 2012.

The Office of Law Enforcement and Security will designate a point of contact to keep a record of
this situation, including the date the emergency began, an estimate of the number of employees
affected, track the hours expended for the specific mission, and the type of premium pay involved.

[✓] Approved        [  ] Disapproved

Carole Carter-Pfisterer                                    Date: 8/7/12

AR11763

# EXHIBIT C

AR11764

**BLM FEES & COSTS: 2011-2019**

**LABOR COSTS**

| YEAR | TOTAL LABOR W/O INDIRECT COST | LAW ENFORCMENT (LE) LABOR* | NON-LE LABOR | % INCREASE BLM LABOR FROM PREVIOUS YEAR | % INCREASE BLM LABOR LABOR FROM 2011 | COST RECOVERY FINAL (INCLUDES LABOR & INDIRECT COSTS) | INDIRECT COST RATE % SURCHARGE | % INCREASE COST RECOVERY FROM PREVIOUS YEAR | % INCREASE COST RECOVERY FROM 2011 |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | $509,206.50 | - | - | - | - | $858,788.68 | 17.10% | - | - |
| 2012 | $712,836.65 | - | - | 40% | 40% | $1,371,731.24 | 18.40% | 60% | 60% |
| 2013 | $1,427,997.31 | $799,755.35 | $490,981.95 | 100% | 180% | $2,932,079.60 | 19.80% | 114% | 241% |
| 2014 | $1,780,080.07 | $908,757.94 | $622,974.53 | 25% | 250% | $2,765,935.61 | 22.90% | -6% | 222% |
| 2015 | $1,620,552.05 | $939,888.55 | $510,635.31 | -9% | 218% | $2,793,722.27 | 22.90% | 1% | 225% |
| 2016 | $1,419,657.02 | $922,240.56 | | -12% | 179% | $2,166,127.41 | 23.10% | -22% | 152% |
| 2017 | $1,515,598.67 | $945,610.22 | | 7% | 198% | $2,341,705.34 | 23.40% | 8% | 173% |
| 2018 | $1,566,880.69 | $971,787.29 | $555,353 | 3% | 208% | $2,578,065.61 | 21.80% | 10% | 200% |
| 2019 | $1,679,748.95 | $1,018,019.14 | $661,730 | 7% | 230% | $2,717,129.95 | 21.60% | 5% | 216% |
| | | * BLM LE Labor allocated based on labor summary descriptions provided by BLM | | | | | | | |

**SUPPORT CONTRACTS + LABOR**

| YEAR | BMP PAID SOW/MOU | FINAL COST RECOVERY CLOSEOUT (ACTUAL DIRECT + INDIRECT COSTS) | FINAL COST RECOVERY CLOSEOUT + BMP PAID SOW/MOU + BMP PAID PROFFER ACCOUNT | % INCREASE COST RECOVERY + SOW/MOU + PROFFER ACCOUNT FROM PREVIOUS YEAR | % INCREASE COST RECOVERY + SOW/MOU + PROFFER ACCOUNT FROM 2011 | # TIMES 2011 |
|---|---|---|---|---|---|---|
| 2011 | $0.00 | $858,788.68 | $878,788.68 | - | - | |
| 2012 | $0.00 | $1,371,731.24 | $1,410,499.82 | 61% | 61% | 1.61 |
| 2013 | $0.00 | $2,932,079.60 | $2,932,079.60 | 108% | 234% | 3.34 |
| 2014 | $600,000 | $2,765,935.61 | $3,435,389.36 | 17% | 291% | 3.91 |
| 2015 | $648,282 | $2,793,722.27 | $3,544,392.29 | 3% | 303% | 4.03 |
| 2016 | $972,133 | $2,166,127.41 | $3,286,621.18 | -7% | 274% | 3.74 |
| 2017 | $912,496 | $2,341,705.34 | $3,254,201.34 | -1% | 270% | 3.7 |
| 2018 | $919,626 | $2,578,065.61 | $3,497,691.61 | 7% | 298% | 3.98 |
| 2019 | $749,421.24 | $2,717,129.95 | $3,466,551.19 | -1% | 294% | 3.94 |

**COMMERCIAL USE FEES**

| YEAR | COMMERCIAL USE FEES 3% OF GROSS REVENUE | % INCREASE COMMERCIAL USE FEES FROM PREVIOUS YEAR | % INCREASE COMMERCIAL USE FEES FROM 2011 | GRAND TOTAL ALL COSTS AND USE FEES | % INCREASE GRAND TOTAL FROM PREVIOUS YEARS | % INCREASE GRAND TOTAL FROM 2011 |
|---|---|---|---|---|---|---|
| 2011 | $575,523 | - | - | $1,454,312.00 | - | - |
| 2012 | $693,792 | 21% | 21% | $2,104,291.37 | 45% | 45% |
| 2013 | $860,437 | 24% | 50% | $3,792,516.99 | 80% | 161% |
| 2014 | $906,439 | 5% | 57% | $4,341,828.33 | 14% | 199% |
| 2015 | $1,011,216 | 12% | 76% | $4,555,608.20 | 5% | 213% |
| 2016 | $1,114,522 | 10% | 94% | $4,401,143.18 | -3% | 203% |
| 2017 | $1,254,778 | 13% | 118% | $4,508,979.34 | 2% | 210% |
| 2018 | $1,275,801 | 2% | 122% | $4,773,492.61 | 6% | 228% |
| 2019 | $1,297,639 | 2% | 125% | $4,764,190.19 | 0% | 228% |

**BURNING MAN POPULATION: 2011-2019**

| YEAR | PEAK POPULATION ALLOWED | PEAK PARTICIPANT POPULATION | % INCREASE PEAK PARTICIPANT POPULATION OVER PREVIOUS YEAR | % INCREASE PEAK PARTICIPANT POPULATION OVER 2011 | TOTAL POPULATION/ BODIES ON PLAYA | % TOTAL POPULATION INCREASE OVER PREVIOUS YEAR | % TOTAL POPULATION INCREASE OVER 2011 |
|---|---|---|---|---|---|---|---|
| 2011 | 50,000 | 53,963 | - | - | 53,963 | - | - |
| 2012 | 60,900 | 56,149 | 4% | 4% | 56,149 | 4% | 4% |
| 2013 | 68,000 | 69,613 | 24% | 29% | 69,613 | 24% | 29% |
| 2014 | 70,000 | 65,922 | -5% | 22% | 75,234 | 8% | 39% |
| 2015 | 70,000 | 67,564 | 2% | 25% | 77,219 | 3% | 43% |
| 2016 | 70,000 | 67,290 | 0% | 25% | 76,156 | -1% | 41% |
| 2017 | 70,000 | 69,493 | 3% | 29% | 79,379 | 4% | 47% |
| 2018 | 70,000 | 70,248 | 1% | 30% | 78,134 | -2% | 45% |
| 2019 | 80,000 | N/A | N/A | N/A | 78,850 | 1% | 46% |

AR11765

# EXHIBIT D

AR11766

# reno gazette journal

---

**NEWS**

# BLM demands Burning Man provide 24-hour access to ice cream

**Jenny Kane** jkane@rgj.com

Published 2:13 p.m. PT Jun. 26, 2015 | Updated 7:35 a.m. PT Jun. 29, 2015

Choco Tacos, M&Ms, licorice and Chobani Greek Yogurt are just a few of the food items officials for the U.S. Bureau of Land Management are demanding Burning Man organizers provide them at this year's festival, according to documents obtained by the Reno Gazette-Journal.

Those demands by the BLM, unprecedented in Burning Man's history, have turned into a point of contention as organizers negotiate with the agency for their annual permit to stage the event in the Black Rock Desert this summer.

Burning Man officials have pushed back against the BLM, saying the demands are excessive and that they cannot meet all of them.

"BLM is not significantly increasing its staffing this year and it appears to (Black Rock City) that some of these additional requests are above and beyond what is needed under regulatory requirements for BLM to administer to permit," Burning Man wrote in a response to the BLM requests obtained by the RGJ.

Here is the unedited list of food demands that BLM delivered to Burning Man organizers earlier this month:

**Mandatory Items for Breakfast**

• Butter and margarine, instant hot cereal, jelly or jam, peanut butter, salt, pepper, sugar, cream (or substitute). These items shall be individually packaged. Mustard, ketchup, steak sauce, salt and pepper shall be provided in approved dispensers or original bottles in the dining trailer area.

• Salsa, hot peppers, brown sugar and raisins or other dried fruit shall also be made available, in appropriate serving containers, not individually packaged.

AR11767

## MandatoryItems for Hot Lunch/ Dinners

• Butter and margarine, jelly or jam, peanut butter, mustard, ketchup, steak sauce, salt, pepper, sugar, cream (or substitute), tea and hot chocolate. These items shall be individually packaged. Mustard, ketchup, steak sauce, salt, and pepper and other large scale condiments shall be provided in approved dispensers or original bottles in the dining tent area.

• Salsa and hot peppers shall also be made available, in appropriate serving containers, not individually packaged.

• A variety of dessert will need to be served with each dinner.

• Salad bar should be available for both lunch and dinner.

## Hot meals between scheduled meal hours (These items are only available during non-meal hours. Please see Attachment 3 for meal times and more details)

• Grilled Cheese Sandwich

• Quesadilla

• Deli Sandwiches

• Hamburger

• Hot dogs

• Grilled chicken

• Chicken fingers

• Veggies

## Mandatory items for 24 Hour Service Bar

• Hot Regular Brewed Coffee (regular and decaffeinated). Flavored coffee may be served in addition to regular coffee at the Contractor's option.

• Hot Water

• Hot Chocolate

• Chilled 100% Fruit Juice

• Brewed Coffee

AR11768

• Tea Bags (regular and decaffeinated)

• Cold Drinks (Coke Products)

• Iced Tea (regular and decaffeinated)

• Assortment of Dry Cereal (Golden Grahams, Fruit loops, Raisin Bran and 1 other flavor)

• Oatmeal

• Chobani Greek Yogurt

• Yogurt

• Bread both white and wheat

• English muffins

• Milk - Both white and chocolate milk shall be available

• Milk alternative (almond, vanilla, and soy)

• Including but not limited to the following: Personal pizzas, Hot Pockets, burritos, noodle cups, M&Ms, Snickers, Payday, Skittles, licorice, jerky, meat and cheese snacks, cookies, brownies, protein bars, nuts, chips, popcorn, fresh fruit, apples, oranges, bananas, etc.

**Ice Cream: This needs to be in a standalone freezer for ice cream available all day long**

• Drumstick

• Choco Taco

• Individual served ice cream assorted flavors

• Popsicles

• Ice cream sandwiches

*And here's a list of meal suggestions by BLM:*

**Hot/Cold Breakfast**

• Eggs - 2 fresh eggs (3 when scrambled) or 6 oz. of liquid eggs (no egg product).

• Meat - 4 oz. (raw uncooked weight).

AR11769

JLM Documents being provided to Ideal Weekend Life creation

• Bread or Hot cakes or French toast or Waffles - or equivalent starch (equal to 3 (1 to 1½ oz.) slices of bread.

• Potatoes - 6 oz. or equivalent starch

• Fresh Fruit

• Muffin(s) or equivalent - 3 oz.

## Lunch and Hot Dinners

• Steak -10 oz. (boneless) or 14 oz. (bone-in), or Beef - 10 oz. (boneless) or 14 oz. (bone-in), or

• Beef and Pork Ribs - 10 oz. (boneless) or 18 oz. (bone-in), or Pork - 10 oz. (boneless) or 14 oz. (bone-in),, or Poultry - 8 oz. (boneless) or 14 oz. (bone-in), or Ham - 8 oz. (boneless) or 12 oz. (bone-in), or Fish - 8 oz.

Non Meat Protein - 4 oz.

• Vegetables - 4 oz.

• Potatoes - 6 oz. or equivalent starch.

• Bread - Two 1 to 1½ oz. slices or equivalent starch.

• Dessert - 4 oz.

Self-Service Salad Bar shall contain:

• Five salad toppings

• One tossed green salad with equal amounts of three types of leafy vegetables

• Three types of salad dressings (regular and/or low/non-fat)

• Three salad condiments.

## Sack Lunch

• Regular and vegetarian sack lunches shall be provided as ordered by AJ Ramos. Vegetarian sack lunches shall be prepared for the Ovo-Lacto vegetarian classification level and shall consist of the same quantities and items as regular sack lunches.

• Definition: Ovo-Lacto Vegetarian - This is the most common form of vegetarianism. Ovo-Lacto vegetarians do not eat meat, chicken, fish or flesh of any kind, but do eat eggs and dairy

products. Sub categories are Ovo vegetarians that eat eggs but not dairy products, while Lacto vegetarians eat dairy products but not eggs.

• NOTE: Pre-prepared sandwiches shall not be frozen. Sack lunches shall consist of the following items:

Entree 1 - One Meat Sandwich (or Sandwich with Non-meatSubstitute for Vegetarian)

• The sandwich shall be wrapped in plastic wrap or plastic bags.

• The sandwich shall contain two 1 to 1½ oz. slices of bread.

• The meat sandwich shall contain 3½ oz. sliced whole muscle meat or a combination of sliced whole muscle meat and cheese or equivalent vegetarian substitute.

• Appropriate individually packaged condiments shall be provided and not be put directly on the sandwich.

Entree 2 - Variety Item

• Fruit - The fruit shall be one apple or one orange or other fresh fruit of comparable size.

• Factory-Wrapped or Resealable Individually Wrapped Snack - Two (2) or more snacks with a combined minimum nutritional value of at least 600 calories. It is preferred that these snacks be high in complex carbohydrate content. All ingredients shall be identified and attached to the product for easy identification.

• Condiments - Four individual factory-wrapped packets of condiments appropriate for the entrees being served.

• Paper Napkin and Pre-Moistened Towelette

## Menu Variety

Menu items shall provide variety on a daily basis as to the types of meat and bread used in sandwiches, other sack lunch entrees, snacks, juices and other meal items served. Menus may include a wide variety of recipes. The following are examples of variety options.

• Meat

• Beef

• Steaks - rib, loin, T-bone, New York, sirloin, cubed, filet and pepper steak.

• Roast - Prime rib and sliced roast.

• Short Ribs - baked, broiled and barbecued.

• Ground Beef - lasagna, meat loaf, meatballs in spaghetti sauce and ground beef patties.

• Pork

• Chops - loin cut, spare-ribs, country style ribs and barbecued.

• Roast - sliced and tenderloin.

• Ham - sliced.

• Sausage

• Chops - grilled and barbecued.

• Roast - sliced.

• Poultry

• Sliced, or whole pieces or parts (such as breast, thigh or leg).

• Fish - grilled, baked fillets or steaks.

• Processed Meat Items - pastrami, Polish/Italian sausage and corned beef.

• Breakfast Meat - ham, bacon, sausage, steak and pork chops.

• Eggs - Fried, hard-boiled, poached, omelets or scrambled.

• Bread and Equivalent Starches - wheat, white, 7-grain, rye, pumpernickel, French, garlic, biscuits, muffins, rolls, croissants, bagels, cornbread, donuts, sourdough, tortilla and pita pocket.

• Dry Cereal - Varieties of flaked, toasted, or baked cold cereals and granola.

• Hot Cereal - Oatmeal or grits, Cream of Wheat®, etc.

• Fruit - oranges, tangerines, apples, bananas, grapes, pears, peaches, plums, nectarines, grapefruit, or melons.

• Dried Fruit - apricots, cherries, dates, mango, pineapple, pears, banana chips, peaches, prunes, raisins or other dried fruit.

AR11772

IFLM Dough Racing 30 providing a loow wiss/1ee creme

• Vegetables - broccoli, cauliflower, asparagus, corn, peas, green beans, mixed vegetables, etc.

• Non Meat Protein - BBQ beans, vegetarian patty, vegetarian hot dog, Tofu, beans, soybean product, bean burritos, peanut butter, cheese, tempeh, quinoa, hummus.

• Potatoes and Equivalent Starches - baked, mashed, fried, boiled, scalloped, rice, stuffing, pasta, sweet potatoes, or yams.

• Juice - orange, tomato, grape, V8☐☐type, apple, cranberry, or pineapple.

• Sandwich Meat and/or Cheese - ham, corned beef, roast beef, turkey, pork, beef pastrami, chicken, cheddar, Swiss, or other natural cheese, excluding American processed cheese.

## Salad Bar

• Salad Toppings - kidney, garbanzo or pinto beans; carrots, mushrooms, celery, cauliflower, green/red bell peppers, broccoli, cheese, cottage cheese, beets, peas, tomatoes, eggs, cucumbers.

• Prepared Salads - macaroni, carrot and raisin, potato, pea, gelatin, coleslaw, fruit, rice or pasta salads.

• Tossed Salad Greens - romaine, endive, iceberg, green leaf, red leaf, butter, spinach, or cabbage.

• Fruit - melons, peaches, grapes, bananas, strawberries, pears, applesauce or seasonal fruit.

• Salad Dressings - regular and low/non-fat French, Ranch, Italian, vinaigrette, Thousand Island, Blue Cheese, etc.

• Salad Condiments - croutons, wheat nuts, sunflower seeds, crackers and taco chips, bread sticks, olives, pickles, or other fresh pickled or marinated vegetables.

• Dessert - cakes, cookies, pies, cobblers, puddings, pastries or ice cream.

• Tea - black, herbal, green, and spiced. Flavored tea may be served in addition to regular tea at the Contractor's option

• Milk - white, (Whole, 2%, Skim), and Chocolate.

• Milk alternative

• Snack Varieties - Candy bars, bagged candy, trail mix, cookies, and brownies. Granola bars, energy bars, fresh vegetables, pretzels, shelled nuts. Factory packaged meats such as dried

BLM demands Burning Man provide hour access to ice cream

meats, sausage, pepperoni, jerky, etc., are acceptable. Processed cheese and cheese food products are allowed for this item only. The Government retains its full right to reject any product offered under this paragraph if the quality of the product is rejected by users. For variety two different products shall be used each day.

AR11774

# reno gazette journal

NEWS

# RGJ Exclusive: BLM wants $1 million VIP compound from Burning Man

**Jenny Kane** jkane@rgj.com
Published 6:00 a.m. PT Jun. 25, 2015 | Updated 7:36 a.m. PT Jun. 29, 2015

*Editor's note: This story has been updated since its original publication on Friday morning to reflect additional reporting from the weekend.*

The U.S. Bureau of Land Management is asking Burning Man organizers to build a separate compound with amenities such as flushing toilets, washers and dryers, and 24-hour access to ice cream for government officials staying in Black Rock City.

A Burning Man spokesman estimated the compound would cost the event more than $1 million, bringing its 2015 permit fees to about $5 million. The renderings of the compound obtained by the RGJ show various accommodations set aside for VIP visitors but don't indicate who the visiting dignitaries will be.

The request, unprecedented in Burning Man's history, has turned into a point of contention as organizers negotiate with the agency for their annual permit to stage the event in the Black Rock Desert. No permit has been issued for this year's event, which runs Aug. 30 to Sept. 7. Typically permits are issued in early August.

Both U.S. Sen. Harry Reid and Rep. Mark Amodei reacted strongly Friday to the BLM requests. Amodei set a meeting next week with a Nevada BLM official. Reid wrote a critical letter to Interior Secretary Sally Jewell.

"Part of Burning Man's philosophy is self-reliance, and living with the elements is part of the experience," Reid wrote. "Flush toilets and laundry facilities can be found about ten miles away in Gerlach, Nevada, if BLM's employees need such amenities."

Burning Man has refused to comply with the BLM's request, which the federal agency submitted on June 1, according to Burning Man spokesman Jim Graham. In its response, Burning Man gave the BLM until Monday to set a meeting to hash out their differences.

"We want to work this out. We're getting close to the event, but we feel that there are more common-sense and cost-effective solutions," Graham said.

Burning Man declined to comment on whether its refusal to comply with BLM's requests would interfere with the permit's approval.

The BLM has said it needs the elaborate encampment to support staff at the event. The agency is raising concerns about safety after a woman was run over and killed by a vehicle last year, and says the additional staff will attend to assess security conditions.

Among the amenities included in the request are flushing toilets to be cleaned daily by Burning Man staff, a laundry with washers and dryers, on-demand hot water, air conditioning, vanity mirrors, refrigerators and couches. The event, known for its emphasis on self-reliance in harsh conditions, provides only basic amenities such as nonflushable portable toilets, for ticketed attendees.

"These are not extravagant facilities," Craig Leff, a spokesman for the BLM's Washington, D.C., office said in a phone call Saturday about the accommodations at compound. "We would like to offer basic amenities for staff that will be on hand."

BLM officials contend that their staff can no longer stay in the "primitive" accommodations available in Gerlach, which is about 20 minutes from the event location.

"We're very concerned about where we put people that are part of our staff and that are part of the support and permitting," BLM Winnemucca District Manager Gene Seidlitz said on Thursday.

"It's safe to say that if you were working 14 to 16 hours a day in white-out conditions on the hot playa, you don't want them to be unrested. Safety, security and health is paramount. That, I will not forgo."

Another BLM spokesman said the amenities were similar to what the U.S. military provides overseas.

"This is the same stuff they have for deployments in Afghanistan," Stephen Clutter, with the Nevada state BLM office, said Saturday.

Details of the BLM's request were included in an email exchange obtained by the RGJ between a Burning Man official and Bob Abbey, the former BLM director who is now a consultant for Burning Man organizers.

AR11776

"Having been a career BLM employee, I expect agency employees to behave competently and professionally in their interactions with the public," Abbey said in his email. "I don't see these traits being applied in their dealings with (Black Rock City)."

Abbey went on to say that BLM won't "change their strategy of threatening your permit until you agree to everything they are demanding including the latest BS proposal for providing VIP facilities for law enforcement and (Department of Interior) officials."

BLM Special Agent Dan Love of Salt Lake City was cited multiple times as the person behind many of the BLM requests, according to the emails. Love will have a personal bathroom trailer to be shared with only one other official, according to documents.

Love also led the BLM operation against Nevada rancher Cliven Bundy that ended in a standoff with Bundy's armed supporters. He did not return requests for comment this week.

The VIP encampment, called the Blue Pit, is a new request this year. It is in addition to the more bare-bones accommodations for the employees who will be staying at the BLM's headquarters, which houses up to 150 working staff during the main event.

The headquarters also are expected to have trailers with flushable toilets and sinks, though no showers or washers and dryers are requested. The headquarters will be located at the end of the 12-mile playa entry road, 12 miles north of Gerlach. The Blue Pit compound is about two miles past the playa on County Road 34 near an old gravel pit.

Amodei, R-Carson City, is investigating where the BLM's directions are coming from, he said Friday from Washington, D.C.

"My primary concern in this is from a government and ethics standpoint. This is the first time this has come up. This didn't happen last year, or the year before," Amodei said.

Amodei is meeting Thursday with Seidlitz at the Winnemucca office. While Amodei initially intended the meeting to be about the Nevada sage grouse, the main topic now will be Burning Man, he said.

"We're sure as hell going to want to know who's sleeping there," Amodei said of the exclusive compound. "If you love Burning Man, buy a ticket, take leave and go have a blast."

Amodei's office does not believe that the demands are coming from the BLM's Winnemucca or Nevada state offices.

AR11777

Instead, Amodei said he thinks higher level officials with the U.S. Department of Interior or the BLM's Washington, D.C., office are giving directions.

Leff said he thought the request came from the bureau's Winnemucca office, but was likely a collaboration among several personnel.

BLM acting state director John Ruhs didn't return phone calls to the RGJ on Friday for comment.

Reid, D-Nev., also reacted Friday to the RGJ report that appeared the same day online. Reid wrote to Department of Interior Secretary Sally Jewell.

"I read today the account in the Reno Gazette-Journal of the unprecedented and extravagant requests allegedly being made by the Bureau of Land Management (BLM) as conditions for permitting Burning Man for their annual event in September 2015," he wrote. "Burning Man has been held in the Black Rock Desert for 23 years and, in addition to the untold cultural benefits that the annual festival brings to Nevada, the event contributes an estimated $35 million to Nevada's economy each year."

Reid went on in the letter to question the necessity of the BLM's request.

"While I agree that the BLM should take its permitting duties seriously and work with Burning Man to both guarantee the safety of its participants and the protection of the environment, providing outlandishly unnecessary facilities for the BLM and its guests should be beyond the scope of the permitting requirements," Reid wrote.

"Part of Burning Man's philosophy is self-reliance, and living with the elements is part of the experience. Flush toilets and laundry facilities can be found about ten miles away in Gerlach, Nevada, if BLM's employees need such amenities."

While one map names some of the government officials who will be staying at the compound, it does not name the dozen or so "VIPs."

The RGJ has filed a Freedom of Information Act request for the schedules of federal officials who could be at the event.

In years past, visiting government officials have stayed in Gerlach or at BLM's barracks nearby.

Most of the VIPs will be state and federal BLM officials who are concerned with the safety and security of Burning Man based on a BLM assessment of the 2014 event, Seidlitz said.

AR11778

The assessment includes a critical review of the handling of Alicia Louise Cipicchio's death in 2014. Cipicchio, 29, was hit by a vehicle during the early morning hours of Aug. 28.

Burning Man and BLM officials traveled to Washington, D.C., in April to discuss officials' concerns and also Burning Man's proposed growth to a 100,000-person event in the future. About 70,000 are expected to attend this year.

As to who will be included in the VIP crew making its way to Burning Man this year, Seidlitz said that he likely will not know until the day of the event.

"Right now, I don't have the exact names. But there are those in upper leadership at the state level of BLM and the national level of BLM," Seidlitz said. "Based on the issues and concerns of last year, it does have the interest of the Department of Interior."

Seidlitz said that Washington officials are concerned about upholding the standards of the "American public" and they will be coordinating visits to Burning Man while making other stops in the West.

"Burning Man is on everyone's list. They come out to see the event, and to meet with everyone from BLM," Seidlitz said, adding that officials also will be watching Seidlitz to ensure that he is addressing Burning Man's safety concerns from last year.

None of the VIPs will be staying the entire period that the Blue Pit compound will be set up, from Aug. 27 through Sept. 11. Many will be popping in for a day, maybe a half-day, Seidlitz said.

Burning Man would need more time to comply with the BLM's requests as is, Graham said. Some of the staff already are preparing to go to the playa to begin setup of the event.

BLM is "asking for services and amenities that seem to be beyond what should be required to administer the permit," Graham said.

"Every year, it's an ongoing negotiation. Every year, we reach an agreement and consensus, but these things were kind of big," Graham said.

Seidlitz said that the BLM is willing to compromise on its list of requirements. He said Burning Man officials haven't outlined their issues with the request to him yet.

Last year, Burning Man paid the BLM more than $4 million for the special recreation permit, which allows the event to have up to 70,000 people each year.

AR11779

Burning Man detailed the costs paid to the BLM annually in a letter sent Wednesday. Among the dues that Burning Man paid BLM last year were: $2.75 million for cost recovery, $700,000 for land use permit fees and $600,000 for headquarters infrastructure.

The permitting cost has gone up substantially over the past four years, despite the unchanged population cap.

In 2011, Burning Man paid $858,000; in 2012, $1.4 million and in 2013, $2.9 million.

This year, Burning Man expects the additional requirements alone to cost between $1 million and $1.2 million, which would bring total dues paid to the BLM to nearly $5 million, Graham said. Burning Man's special recreation permit is the largest in the country.

"There's always something. Every year, we work through it," Graham said.

BLM spokesman Clutter was optimistic an agreement could be reached.

"We've been working for 22 years with (Black Rock City). It's complex; we all do want to make it successful," he said Saturday. "We're confident that we're going to be able to work through these."

The exclusive compound for officials and VIPs would significantly increase Burning Man's cost this year.

Burning Man estimated in its letter that it would cost an additional $250,000 "just in plumbing and sanitation for this facility" and another $50,000 for the washers and dryers. For the first time, BLM is also asking Burning Man to cover the $253,000 cost of new radios.

More routine costs include the $120,000 for portable buildings and stages and $109,300 for the rental of Bruno's Motel in Gerlach for BLM administration and law enforcement personnel.

The BLM insists that it needs the "assets and services," according to 13 pages of "statement of work" documents. Statement of work documents detail the work that Burning Man is supposed to contract out.

The memorandum of understanding is a 2014 agreement between BLM and Burning Man that outlines the BLM's general expectations through 2016.

Included in the documents are two brochures for Portable Restroom Trailers LLC, a company that provides "luxury" service trailers. The restroom trailers include ceramic urinals and flush toilets as well as "on-demand hot water tanks for endless hot water."

AR11780

BLM Exclusive: Documents reveal information on proposed VIP compound area at Burning Man

Also included are documents that insist Burning Man contact two Utah-based food vendors, Houston's Catering and Meier's Catering. Burning Man stated that it would prefer to use the local, Gerlach-based Empire Store as a food vendor.

"(The proposal) is very, very preliminary," Seidlitz said Thursday. "Nothing has been signed. It's just one step in a very long dance of what we do with them per the (memorandum of understanding)."

*Jenny Kane is RGJ Media's Burning Man reporter. She has been covering the beat since January. Prior to joining the RGJ, she worked at the Virgin Islands Daily News and the Daily Times in Farmington, N.M. Follow her on Twitter @jenny_kane.*

AR11781

# EXHIBIT E

AR11782

7/1/2020
Case 1:19-cv-03729-DLF   Document 35-4   Filed 07/12/21   Page 99 of 354
Reid to BLM: You want flush toilets at Burning Man? Go to Gerlach

# reno gazette journal

NEWS

# Reid to BLM: You want flush toilets at Burning Man? Go to Gerlach

**Jenny Kane** jkane@rgj.com
Published 2:25 p.m. PT Jun. 26, 2015 | Updated 7:35 a.m. PT Jun. 29, 2015

Senate Minority Leader Harry Reid, D-Nev., sent a letter Friday to Secretary of the Interior Sally Jewell following the Reno Gazette-Journal's investigation into lavish demands the U.S. Bureau of Land Management made to Burning Man organizers.

Rep. Mark Amodei, R-Nev., also reacted to the news that BLM is demanding Burning Man provide a $1 million encampment for federal agents at the event this summer. He said he's concerned about the ethics of BLM's request.

"I don't think it was driven out of Nevada. I think it was driven out of Utah, or D.C., or both," Amodei said in an interview with the RGJ on Friday. "We have a big problem. 15 VIP accommodations, and soft-serve ice cream 24-hours a day. With all due respect, those dots do not connect."

Here's Reid's letter to Jewell in full:

"Dear Secretary Jewell:

"I read today the account in the *Reno Gazette-Journal* of the unprecedented and extravagant requests allegedly being made by the Bureau of Land Management (BLM) as conditions for permitting Burning Man for their annual event in September 2015. Burning Man has been held in the Black Rock Desert for 23 years and, in addition to the untold cultural benefits that the annual festival brings to Nevada, the event contributes an estimated $35 million to Nevada's Economy each year.

"I care strongly about the environment in the Black Rock Desert and was glad to author the legislation that created the Black Rock Desert-High Rock Canyon-Emigrant Trails National Conservation Area where Burning Man is held. While I agree that the BLM should take its permitting duties seriously and work with Burning Man to both guarantee the safety of its

AR11783

Reid to BLM: We want flush toilets for Burning Man, go to Gerlach

participants and the protection of the environment, providing outlandishly unnecessary facilities for the BLM and its guests should be beyond the scope of the permitting requirements. Part of Burning Man's philosophy is self-reliance and living with the elements is part of the experience. Flush toilets and laundry facilities can be found about ten miles away in Gerlach, Nevada, if BLM's employees need such amenities.

"I appreciate your attention to this matter. If you have any questions please feel free to contact me or have your staff contact Sara Moffat of my staff."

AR11784

# EXHIBIT F

AR11785

From: **Hall, Mark** <mehall@blm.gov>
Date: Wed, Apr 26, 2017 at 1:45 PM
Subject: Emergency status changed to mission critical work status
To: Marnee Benson <marnee.benson@burningman.org>, Rosalie Barnes <rosalie@burningman.org>

Hi Marnee, Hi Rosalie,

Sorry I forgot to send this to you two when it cam ein originally.  The emergency status of the event has been changed; LEO and others will be getting their fair overtime via the "mission-critical work" clause (instead of the emergency clause).

Let me know if you have any questions, etc.

Best, MEH

Mark E. Hall, PhD
Field Manager
Black Rock Field Office
Winnemucca District Office
775-623-1529.

# EXHIBIT G

AR11787



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Nevada State Office
1340 Financial Boulevard
Reno, Nevada 89502-7147
http://www.blm.gov/nv



In Reply Refer To:
8312 (NV910/WNDO)

APR 1 3 2017

Memorandum

To:        Assistant Director (W0700)
           Attn: Anzanette Randall, Deputy Assistant Director, Human Capital Management

From:      John F. Ruhs
           State Director

Subject:   Lifting of Pay Cap for personnel deployment to Public Lands in Nevada in support of the
           2017 Burning Man Event

I respectfully request that the BLM designate personnel deployment to public lands in Nevada to support the 2017 Burning Man Event as *"mission critical work"* in accordance with 5 CFR 550.106(b)(1). My request allows lifting the bi-weekly pay cap authorized by 5 CFR 550.106 and the Fair Labor Standards Act (FLSA) overtime under 5 CFR 551.211(f) for personnel participating in direct support of the 2017 Burning Man Event. Employees would be entitled to premium pay under the annual maximum earning limitations while performing the mission critical work under the limitations described in 550.106(c) and 550.107.

The FLSA status of the employees assigned to the 2017 Burning Man Event shall be reviewed and administered in accordance with the previously cited federal regulations. The temporary waiver of the biweekly pay cap, as well as the mission critical work for deciding FLSA designations, will begin pay period 18 (August 20, 2017), and continue until the conclusion of the 2017 Burning Man Event, at the end of pay period 19 (September 16, 2017).

The BLM, Winnemucca District, Black Rock Field Office will designate a point of contact to keep the records, including the date(s) that the mission critical work is conducted, the number of employees affected, hours expended for the specific mission, and the type of premium pay involved.

[N] Approved        [ ] Disapproved

Anzanette Randall                              4-13-17
                                               Date

# EXHIBIT H

AR11789



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
https://www.blm.gov/office/winnemucca-district-office





RECEIVED
FEB 17 2020
*CC*

In Reply Refer To:
LLNVW03500-19-01
2930 (NVW030.15)

**FEB 1 3 2020**

FedEx Tracking No. 8145 8624 1595
RETURN RECEIPT REQUESTED

Charlie Dolman
Event Operations Director
Burning Man Project
660 Alabama St, 4th Floor
San Francisco, CA 94110

Burning Man 2019 Event
Special Recreation Permit

## DECISION

Dear Mr. Dolman,

### INTRODUCTION

On February 25, 2019, the Bureau of Land Management (BLM) and Burning Man Project (BMP) entered into a Cost Recovery Agreement (CRA) for the Burning Man 2019 event. That CRA included an estimate for the BLM's cost to process and administer the Special Recreation Permit (SRP) for the Burning Man 2019 event. The original CRA Phase 1 was in the amount of $745,008 and Phase 2 was in the amount of $2,208,958.79 for a total of $2,953,966.79 for the 2019 event.

The BLM makes every attempt to develop a CRA cost estimate that foreshadows all direct and indirect costs, as accurately as possible, projected expenses for planning, issuing and administering the Burning Man SRP.

### DECISION

The BLM's actual direct and indirect costs for the Burning Man 2019 event total $2,717,129.02. The attached documents provide a detailed breakdown of all actual direct and indirect costs. To date the BLM has received all payments for the CRA, for a total of $2,953,966.79.

Based on those actual costs and the estimate already paid by BMP, the BLM has identified BMP is owed a refund of $236,836.77.

**RATIONALE**

The Federal Land Policy and Management Act (FLPMA) section 304(b) provides that the Secretary of the Interior is authorized to require a deposit of payments intended to reimburse the United States for costs incurred in processing and administering applications for use of the public lands, 43 U.S.C. § 1734(b).

The BLM's SRP regulations state that the BLM may refund any cost recovery overpayments, 43 C.F.R. § 2932.33(a). Further, the BLM's Recreation Permit Administration Handbook (H-2930-1) directs the BLM to refund to the applicant the remaining balance in a cost recovery account at the end of the project.

The 2019 CRA and the 2019 actuals totals justify the refund amount BMP will receive. An electronic funds transfer (EFT) sheet has been provided and will need to be returned to the BLM to process BMPs refund.

**AUTHORITY**

The statutory authorities underlying the regulations in this part are FLPMA, 43 U.S.C. 1701 et seq., and the Federal Land Recreation Enhancement Act (REA), 16 U.S.C. 6801 et seq.

a) FLPMA contains the BLM's general land use management authority over the public lands and establishes outdoor recreation as one of the principal uses of those lands (43 U.S.C. 1701(a)(8)). Section 302(b) of FLPMA directs the Secretary of the Interior to regulate through permits or other instruments the use of the public lands, which includes commercial recreation use. Section 303 of FLPMA authorizes the BLM to promulgate and enforce regulations, and establishes the penalties for violations of the regulations.

b) REA authorizes the BLM to collect fees for recreational use in areas meeting certain criteria (16 U.S.C. 6802(t) and (g) (2)), and to issue special recreation permits for group activities and recreation events (16 U.S.C. 6802(h)).

43 C.F.R. § 2932.33(a), *Overpayments*. For multi-year commercial permits, if your actual fees due are less than the estimated fees you paid in advance, BLM will credit overpayments to the following year or season. For other permits, BLM will give you the option whether to receive refunds or credit overpayments to future permits, less processing costs.

**APPEAL PROVISIONS**

A person who wishes to appeal to the Interior Board of Land Appeals must do so under 43 C.F.R. § 4.411 and must file in the office of the officer who made the decision (not the board), in writing to Mark E. Hall Ph.D., Field Manager, Black Rock Field Office, 5100 East Winnemucca Boulevard, Winnemucca, Nevada 89445. A person served with the decision being appealed must transmit the notice of appeal in time to be filed in the office where it is required to be filed within thirty (30) days after the date of service.

The notice of appeal must give the serial number or other identification of the case and may include a statement of reasons for the appeal, a statement of standing if required by § 4.412 (b), and any arguments the appellant wishes to make. Attached Form 1842-1 provides additional information regarding filing an appeal.

No extension of time will be granted for filing a notice of appeal. If a notice of appeal is filed after the grace period provided in §4.401(a), the notice of appeal will not be considered, and the case will be closed

AR11791

by the officer from whose decision the appeal is taken. If the appeal is filed during the grace period provided in §4.401(a) and the delay in filing is not waived, as provided in that section, the notice of appeal will not be considered and the appeal will be dismissed by the Board.

The appellant shall serve a copy of the notice of appeal and any statements of reason, written arguments, or briefs under §4.413 on each adverse party named in the decision from which the appeal is taken and on the Office of the Solicitor, Pacific Southwest Regional Solicitor, U.S. Department of the Interior, 2800 Cottage Way, Room E-1712, Sacramento, California 95825-1890.

Service must be accompanied by personally serving a copy to the party or by sending the document by registered or certified mail, return receipt requested, to the address of record in the bureau, no later than 15 days after filing the document.

In addition, within thirty (30) days of receipt of this decision you have the right to file a petition for a stay together with your appeal in accordance with the regulations at 43 C.F.R. § 4.21. The petition must be served upon the same parties specified above.

Pursuant to 43 C.F.R. § 4.21(b), a petition for stay, if filed, must show sufficient justification based on the following standards:

   1) The relative harm to the parties if the stay is granted or denied;
   2) The likelihood of the appellant's success on the merits;
   3) The likelihood of immediate and irreparable harm if the stay is not granted; and,
   4) Whether the public interest favors granting the stay.

43 C.F.R. § 4.21(b)(2) provides that the appellant requesting a stay bears the burden of proof to demonstrate that a stay should be granted.

If you have any questions on this decision please contact Chelsea McKinney, Burning Man Project Manager at 775-623-1500.

Sincerely,

Julie McKinna Acting
for

Mark E. Hall, Ph.D.
Field Manager
Black Rock Field Office

Enclosures
Cost Recovery Closeout Summary
Attachment 1 - Project Labor Log
Attachment 2 - BLM Contracts
Attachment 3 - Travel Expenses
Attachment 4 - Vehicle Utilization Expenses
Attachment 5 - Miscellaneous Supplies and Equipment
IBLA Appeal Form 1842-1
EFT Enrollment Form SF-3881

AR11792

| 2019 BURNING MAN EVENT COST RECOVERY CLOSE OUT SUMMARY | | | | |
|---|---|---|---|---|
| **ITEM** | **Estimated Costs (per CRA EST.)** | **Actual Costs (per FBMS Reports)** | **Balance Due** | **Description/Comment** | **Detail Located On:** |
| **LABOR** | $ 1,679,748.95 | $ 1,568,259.90 | $ (111,489.05) | | Labor Report + IAAs |
| BLM Labor | $1,619,748.95 | $1,542,258.95 | $ (77,490.00) | | Labor Report |
| Forest Service Labor | $40,000.00 | $23,000.95 | $ (16,999.05) | Via IAA Contract | Contracting Report |
| HHS Labor | $20,000.00 | $ - | $ (20,000.00) | Via IAA Contract | Contracting Report |
| Department of Inerior - Industrial Hygienist | | $ 3,000.00 | | Via IAA Contract | Misc Purchase Report |
| **SUPPORT CONTRACTS** | $ 594,500.00 | $ 509,955.70 | ($84,544.30) | Contracts | Contracting Report |
| **Federal Register Posting Fee** | $2,000.00 | $1,963.00 | ($37.00) | Direct Internal Billing | Contracting Report |
| **Microwave/Internet** | $70,000.00 | $72,878.00 | $2,878.00 | Contract | Contracting Report |
| **Communications** | | | | | |
| Satellite Tracking (Strohman Enterprises) | $55,000.00 | $50,640.00 | ($4,360.00) | Contract | Contracting Report |
| CAD Server Licensing (SHI International) | $12,000.00 | $0.00 | ($12,000.00) | Contract | Contracting Report |
| IT Equipment Rental | $17,000.00 | $17,578.13 | $578.13 | Contract | Contracting Report |
| Network Services and Support | $130,000.00 | $103,474.00 | ($26,526.00) | Contract | Contracting Report |
| GSA Rental Vehicles | $16,500.00 | $15,099.02 | ($1,400.98) | Contract - under existing agrement | Contracting Report |
| Air Monitoring Weather Station | $20,000.00 | $0.00 | ($20,000.00) | Contract | Contracting Report |
| Dumpster Rentals | $5,500.00 | $5,700.00 | $200.00 | Micro-purchase Contract | Contracting Report |
| Dispatch Console Repairs | $20,000.00 | $19,140.00 | ($860.00) | Contract | Contracting Report |
| LE Substation Support Facilities and JOC Decon | $16,500.00 | $14,613.55 | ($1,886.45) | Contract | Contracting Report |
| Generator Rentals | $10,000.00 | $9,000.00 | ($1,000.00) | Contract | Contracting Report |
| Dispatch Services | $220,000.00 | $199,870.00 | ($20,130.00) | Contract | Contracting Report |
| **TRAVEL** | $ 65,000.00 | $ 46,581.21 | $ (18,418.79) | | Travel Report |
| **VEHICLE UTILIZATION** | $ 50,000.00 | $ 39,768.23 | $ (10,231.77) | | Vehicle Utilization Report |
| **MISC SUPPLIES, EQUIPMENT & SERVICES PURCHASE (CREDIT CARD/CONTRACT/DIRECT BILLING)** | $ 40,000.00 | $36,415.40 | -$3,584.60 | | Misc Purchase Report |
| Pershing County SO SART | | $33,501.43 | $33,501.43 | Contract | |
| | | | | | |
| | | | | | |
| **DIRECT COST TOTAL** | $ 2,429,248.95 | $ 2,234,481.87 | $ (194,767.08) | | |
| **INDIRECT COST TOTAL (RATE 21.6%)** | $ 524,717.77 | $482,648.08 | ($42,069.69) | | |
| **TOTAL** | $2,953,966.72 | $2,717,129.95 | ($236,836.77) | | |

AR11793

| | UNITED STATES DEPARTMENT OF INTERIOR BUREAU OF LAND MANAGEMENT | Functional Area / WBS |
|---|---|---|
| | | L51050000 / LVRCF1906740 |

**2019 BURNING MAN EVENT COST RECOVERY PROJECT LABOR LOG (ATT # 1)**

| DATE | PLANNING | PRE-EVENT SET UP | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/11/19-9/7/19 | | | X | X | | | 201917-201919 | ALBRIGHT | CA Field Staff Ranger, K9 Handler | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. Additional duties of K9 Handler | 142.50 | $10,082.47 |
| 8/11/19-9/03/19 | | X | X | | | | 201917-201918 | ALLEN | NV Special Agent | Technical Support | Connect contract dispatchers to Nevada Justice Link. | 39.25 | $2,798.99 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201920 | AMAR | NV Outdoor Recreation Planner | Vending Compliance, Day Shift | Vending Compliance Monitoring function, worked with BRC vending  teams on SRP compliance | 216.00 | $12,699.81 |
| 4/08/19-01/03/20 | X | X | X | X | X | X | 201908-201926 | ANDRES | NV Staff Ranger | LE Planner/LE Ops Chief | LE Planner of event operations; Supervisor of  LE program during event operations | 618.00 | $55,921.89 |
| 6/11/19-6/23/19 | X | | | | | | 201914-201915 | ARBONIES | NV Range Technician | Range Specialist | Provide deconfliction between grazing permittees and SRP holders. | 1.50 | $85.01 |
| 8/5/19-9/7/19 | | | X | | | | 201918-201919 | ASSELIN | NV Public Affairs | Event Public Affairs | Provided public affairs support and coordination for the event. | 174.50 | $11,299.98 |
| 8/18/19-9/7/19 | | | X | | | | 201918-201919 | AZAR | AZ District Ranger | Shift Supervisor, Swing Shift | Shift Supervisor function officer, field supervisor of one half of Shift city patrol officers | 174.50 | $15,134.15 |
| 8/18/19-9/7/19 | | | X | | | | 201918-201919 | BACA | CA Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 157.00 | $9,951.71 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | BALDWIN | Winnemucca Geologist | Event Safety Officer, Day Shift | Safety function Specialist, served as BLM's event safety officer for JOC and BRC | 177.00 | $9,745.35 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | BOIK | OLES Region 3 State Chief Ranger | LE Patrol Chief, Day Shift | Patrol Chief function officer, supervises all patrol operations during their assigned shift | 206.00 | $21,803.30 |
| 7/7/19-9/7/19 | X | | X | X | | | 201916-201919 | BORGREEN | BRFO Assistant Field Manager | BRFO Assistant Field Manager | Provide oversight of event management. | 284.50 | $17,826.47 |
| 8/18/19-9/7/19 | | | X | | | | 201918-201919 | BOWEN, T. | OR Planning and Environmental Specialist | Monitor | Assure compliance in BRC Event Operations - Conduct Point Surveys. | 168.50 | $8,931.80 |
| 8/18/19-9/7/19 | | | X | | | | 201918-201919 | BOWEN, A. | OR Geologist | Monitor | Assure compliance in BRC Event Operations - Conduct Point Surveys. | 162.00 | $8,681.95 |
| 8/18/19-9/7/19 | | | X | X | X | | 201918-201919 | BRISCOE | NV Zone 1 Supervisor | LE Branch Chief | LE Planner of event operations; Supervisor of  LE program during event operations | 198.75 | $19,738.28 |
| 8/18/19-9/7/19 | | | X | | | | 201918-201920 | BROWN, J. | ID Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 149.75 | $11,628.80 |
| 8/18/19-9/7/19 | | | X | | | | 201918-201919 | BROWN, C. | CO Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 167.50 | $14,200.40 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | BUCHANAN | ID District Ranger | Shift Supervisor, Night Shift | Shift Supervisor function officer, field supervisor of one half of Shift city patrol officers | 193.50 | $18,461.47 |

AR11794

| DATE | PLANNING | PRE-EVENT SET UP | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | BULKLEY | UT Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 168.00 | $12,421.95 |
| 8/18/19-9/7/19 | | | | X | X | | 201918-201919 | BURGESS | AZ Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 184.25 | $13,423.84 |
| 7/8/19-9/29/19 | X | | X | X | X | | 201916-201921 | CADIGAN | NV/BRFO Wildlife Biologist | Vending Compliance, Day Shift | Vending Compliance Monitoring function, worked with BRC vending teams on SRP compliance | 231.75 | $12,962.84 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | CARTER, C. | Investitgative Technician | Administrative Support | Administrative Support Services on playa. | 145.00 | $8,443.71 |
| 8/11/19-9/7/19 | | | | X | | | 201917-201920 | CARTER, D. | CA Radio Tech | Comm Tech | Communications network support | 391.00 | $30,603.37 |
| 8/18/19-9/7/19 | | | | X | | | 201819-201820 | CASTRO | OR Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 146.00 | $10,395.11 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | COOPER | UT Park Ranger | Monitor | Assure compliance with BRC Event Operations - Conduct Point Surveys. | 159.50 | $6,297.00 |
| 8/18/19-9/7/19 | | | | X | | | 201919 | COPPLE | Air Specialist | Air Specialist | Monitor Air Quality and Weather and provide Employee Safety Alerts as conditions warrant. | 202.50 | $7,533.00 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | CULVER | NV Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 181.00 | $13,828.77 |
| 8/11/19-9/7/19 | | | X | X | | | 201917-201919 | CUNNINGHAM | CO Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 215.00 | $18,083.32 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | CURRY | OLES Senior Special Agent | Medical Unit Leader, Day Shift | Medical function officer, served as lead of BLM's medical unit | 161.00 | $15,055.72 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | DAVIS | AZ Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 162.50 | $13,026.54 |
| 7/8/19-7/21/19 | | X | | | | | 201916 | DEASY | Range Tech (Fire) | Pre-Event Logistics | Site preparation for pre-event operations. | 10.00 | $460.58 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | DOLLARD | UT Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 167.25 | $11,831.84 |
| 8/18/19-9/7/19 | | | X | X | X | | 201918-201919 | DUE | OLES Equipment Specialist | Logistics | Logistics support function specialist, provides logistical needs to JOC facility, Sub-station and to detailers | 244.00 | $15,427.48 |
| 7/22/19-8/4/19 | | X | | | | | 201917 | EDMUNDSON | Range Tech (Fire) | Pre-Event Logistics | Site preparation for pre-event operations. | 12.00 | $548.53 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | EDWARDS | MT Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 151.50 | $12,091.95 |
| 8/18/19-9/7/19 | | | | X | X | | 201918-201919 | ENTRICAN | CA Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 169.50 | $12,794.98 |

AR11795

| DATE | PLANNING | PRE-EVENT SET UP | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/8/19-7/21/19 | | X | | | | | 201916 | ETCHEVERRY | NV Lead Engineer Equip. Operator | Pre-Event Logistics | Site preparation for pre-event operations. | 10.00 | $571.60 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | FELIX | CA District Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 147.00 | $14,589.80 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | FINCHER | CA Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 165.00 | $10,313.27 |
| 8/11/19-9/7/19 | | X | X | X | | | 201916-201919 | FISCHER | NV Field Staff Ranger | Evidence Technician, Day Shift | LE Evidence function, serves as evidence officer for all event cases with logged evidence | 188.00 | $15,149.74 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-21919 | FONKEN | CA Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 197.00 | $16,849.69 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | FREIDANK | WY Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 158.50 | $8,902.08 |
| 5/13/19-7/21/19 | X | X | | | | | 201912-201916 | GAARD | WDO Outdoor Recreation Planner | N/A | Assist in planning and site preparation for pre-event operations. | 28.00 | $1,151.49 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | GARCIA | CO Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 176.00 | $14,092.23 |
| 8/11/19-9/7/19 | X | X | X | X | X | X | 201917-201919 | GARSIDE | OR Outdoor Recreation Planner | Environmental Compliance | Environmental Compliance Monitoring function, worked with BRC environmental teams on environmental SRP compliance | 152.00 | $6,060.94 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | GATES | WA Recreation Technician | Vending Compliance, Day Shift | Vending Compliance Monitoring function, worked with BRC vending teams on SRP compliance | 204.00 | $10,397.94 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | GENTZEL | AK Special Agent | Investigations, Night Shift | Integrated Investigations function officer, works for Pershing County Sheriffs to assist in investigations of state violations | 84.75 | $7,206.27 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | GOCHIS | UT LE Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 191.00 | $10,793.24 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | GONZALEZ | NM Field Staff Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 169.00 | $10,149.57 |
| 9/16/19-9/30/19 | | | | | | X | 201921 | GOOCH | NV Wild Horse and Burro | N/A | Assist in post-site inspection/closeout. | 12.00 | $588.93 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | GRAHAM | WA Suport Services Technician | Environmental Compliance | Environmental Compliance Monitoring function, worked with BRC environmental teams on environmental SRP compliance | 208.00 | $8,677.65 |
| 8/11/19-9/7/19 | X | X | X | X | X | | 201917-201919 | GRIMES | NV IT Specialist | Event IT Equipment Specialist, Day Shift | IT Equipment Specialist function, installs/maintains all IT equipment at JOC and sub-station | 318.00 | $19,177.27 |
| 4/08/19-01/03/20 | X | X | X | X | X | X | 201902-201924 | HALL | NV/BRFO Field Manager | Authorized Officer | Event Management function, served as overall manager of event operations | 264.25 | $20,139.69 |

AR11796

| DATE | PLANNING | PRE-EVENT SET UP | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/18/19-9/7/19 | | | | X | | | 201918 | HALLETT | ID Electronics Technician | N/A | Assist with Air Quality equipment. | 26.00 | $1,625.09 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | HARDING | ID Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 140.00 | $7,919.97 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | HAUCK | AZ Special Agent | Investigations (Integrated Investigations), Day Shift | Integrated Investigations function officer, works for Pershing County Sheriffs to assist in investigations of state violations | 133.00 | $11,853.77 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | HAWKINS | UT Special Agent | Investigations (Integrated Investigations), Day Shift | Integrated Investigations function officer, works for Pershing County Sheriffs to assist in investigations of state violations | 146.00 | $10,403.17 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | HILL | WY Special Agent | Investigations (Integrated Investigations), Night Shift | Integrated Investigations function officer, works for Pershing County Sheriffs to assist in investigations of state violations | 143.50 | $10,993.95 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | HOEPER | UT Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 135.00 | $9,684.47 |
| 8/18/19-9/7/19 | | | X | X | | | 201918 | HONE | OPR Special Agent in Charge | OPR Agent | OPR function officer, event on-site Internal Affairs component and Use of Force reports reviewer, Support Orientation Day. | 50.00 | $4,361.61 |
| 8/11/19-9/7/19 | | | X | X | | | 201917-201919 | HUSTON | SD Field Staff Ranger, K9 Handler | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. Additional duties of K9 Handler | 260.25 | $21,595.01 |
| 8/11/19-9/7/19 | | X | X | X | X | | 201917-201919 | IAGULLI | NV Comms Specialist | Comm Tech | Communications network  support | 310.00 | $22,140.13 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | JENSEN | AZ Special Agent | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 137.00 | $11,120.28 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | JOHNSON | NV Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 188.00 | $14,153.81 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | JONES, B. | WY District Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 162.00 | $12,772.58 |
| 8/18/19-9/7/19 | X | | X | X | X | | 201910-201919 | JONES, J. | UT Assistant Field Manager | CivOps | Event Management function, served as planning lead during planning operations, served as operational chief of civilian operations during event, served as close-out lead during close-out operations (AAR, CRA) | 239.25 | $15,251.30 |
| 8/18/19-9/7/19 | | | | X | | | 201918 | KEACH | WDO Archaeologist | Compliance | Responded to event for additional compliance during population overage. Assisted in SRP Close-out. | 36.00 | $1,876.14 |
| 4/1/19-9/7/19 | X | X | X | X | X | | 201909-201919 | KING | AZ IT Specialist | Event IT Security | IT Security function specialist, ensures the security of event technology and data, including CAD servers, DPS Justice Link, IMARS etc | 445.50 | $28,787.22 |

| DATE | PLANNING | PRE-EVENT SET UP | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/22/19-9/7/19 | X | X | X | X | | | 201917-201919 | LANNEN-LITTLEFIELD | AZ Comm Center Manager | Dispatch Center Manager | Dispatch function Specialist, served as dispatch center manager and first line supervisor of contract dispatchers | 269.50 | $13,240.86 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | R. LLOYD | UT District Ranger | Patrol Supervisor, Day Shift | Shift Supervisor function officer, field supervisor of one half of Shift city patrol officers | 159.25 | $13,985.72 |
| 7/22/19-8/4/19 | | | X | | | | 201917 | LODA | NV Geologist | N/A | Assited with transport of rental vehicles | 10.00 | $662.53 |
| 4/15/19-5/26/19 | X | | | | | | 201910-201912 | LONTOC | NV Cadastral | Closure Order | Contribute to geographic description for new phased closure order. | 1.00 | $40.12 |
| 7/22/19-8/4/19 | | | X | | | | 201917 | LUKINS | NV Outdoor Recreation Planner | N/A | Asssted with transport of rental vehicles | 11.50 | $1,057.57 |
| 8/18/19-9/7/19 | | | | X | X | | 201918-201919 | MARTIN, A. | WY Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 183.00 | $12,940.14 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | MATOS-PAGAN | CA LE Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 149.00 | $9,071.74 |
| 8/13/18-10/01/18 | X | X | X | X | | | 201917-201919 | MATTHEWS | NV GIS Specialist | Logistic Supervisor, Day Shift | Logistics function Specialist, served as lead of logistic team | 339.00 | $21,190.05 |
| 4/08/19-01/03/20 | X | | | X | | X | 201911-201918 | MCCULLOUGH | Winnemucca District Manager | Winnemucca District Manager | Provide oversight of event management. | 51.00 | $4,534.55 |
| 8/18/19-9/7/19 | | | | X | X | | 201918-201919 | MCDONALD | CA Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 186.00 | $12,383.84 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | MCGRATH | ID State Chief Ranger | Patrol Commander, Night Shift | Patrol Commander function officer, supervises patrol officers assigned to his shift | 197.00 | $22,588.55 |
| 4/08/19-01/03/20 | X | X | X | X | X | X | 201909-201924 | MCKINNEY | Burning Man Project Manager | Project Manager/SRP Monitor | Event Management function, served as planning lead during planning operations, served as SRP monitor during event, served as close-out lead during close-out operations | 837.00 | $49,263.95 |
| 5/27/19-8/4/19 | X | | | | | | 201913-201917 | MCKINNON | WDO Realty Specialist | N/A | Permitting Support Operations. | 35.25 | $2,039.99 |
| 7/22/19-9/29/19 | | | X | X | | X | 201917-201921 | MCMILLAN | WDO Land Health Inspection Specialist | Compliance | Responded to event for additional compliance during population overage. | 45.50 | $1,652.39 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | MEUTH | WA Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 209.00 | $16,959.78 |
| 6/24/19-7/7/19 | X | | | | | | 201915 | MIERS | NV Cadastral | Closure Order | Contribute to geographic description for new phased closure order. | 2.50 | $122.34 |
| 8/18/19-9/7/19 | | | | X | X | | 201918-201919 | MITSUYASU | OR Field Staff Ranger | Investigation (Patrol Investigative Support), Day Shift | Patrol Investigative Support function officer, works in patrol function in uniform to conduct any patrol cases that require follow-up investigation | 168.00 | $16,853.27 |
| 9/16/19-9/30/19 | | | | | | X | 201921 | MODELSKI | NV Archaeologist | N/A | Post site inspection | 21.25 | $841.06 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | MOORE | OLES Region 3 State Chief Ranger | LE Day Shift Commander | Patrol Commander function officer, supervises patrol officers assigned to his shift | 198.00 | $20,645.89 |

| DATE | PLANNING | PRE-EVENT SET UP | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/18/19- 9/7/19 | | | | X | | | 201918- 201919 | NARDINGER | OLES Senior Special Agent | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 78.00 | $6,351.31 |
| 7/22/19- 8/18/19 | | X | X | | | | 201917- 201918 | NICHOLS | NV TeleComm Specialist | IT Specialist,  Day Shift | IT Specialist function Specialist, assisted in set-up of IT equipment during Set Up and Pre Event | 40.00 | $2,895.63 |
| 7/22/19- 9/1/19 | | X | X | X | | | 201917- 201919 | NORTHRUP | NV Comms Specialist | Comm Tech | Communications network  support | 244.00 | $9,280.74 |
| 8/20/18- 09/5/18 | | | X | X | | | 201917- 201918 | PINCUS | NV IT Specialist | Event IT Equipment Specialist, Day Shift | IT Equipment Specialist function, installs/maintains all IT equipment at JOC and sub-station | 23.00 | $1,025.31 |
| 4/08/19- 01/03/20 | X | X | X | X | X | X | 201918- 201924 | PIRTLE | NV/WDO Re-Employed Annuitant - Burning Man Project | Planning Lead,IC,  Close-out Lead | Event Management function, served as planning lead during planning operations, served as operational chief of civilian operations during event, served as close-out lead during close-out operations (AAR, CRA) | 809.00 | $34,926.34 |
| 4/15/19- 5/12/19 | X | | | | | | 201910- 201911 | PRICE | NV Cadestral | Closure Order | Redefine geotechnical area description for new phased CO. | 15.00 | $1,149.33 |
| 8/18/19- 9/7/19 | | | | X | | | 201918- 201919 | PURDY | CA Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 150.00 | $8,724.94 |
| 8/18/19- 9/7/19 | | | | X | | | 201918- 201919 | REGNELL | CA Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 162.50 | $12,727.58 |
| 8/18/19- 9/7/19 | | | | X | | | 201918- 201919 | RICHARDS | Region 3 SAC | LE Night Ops Chief | Patrol Chief function officer, supervises all patrol operations during their assigned shift | 141.00 | $14,402.70 |
| 8/18/19- 9/7/19 | | | | X | | | 201918- 201919 | ROBERTS | ID Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 151.00 | $11,582.38 |
| 8/18/19- 9/7/19 | | | X | X | X | | 201917- 201919 | ROBINSON | MT Ranger, K9 Handler | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. Additional duties of K9 Handler | 247.50 | $19,563.72 |
| 8/18/19- 9/7/19 | | | | X | | | 201918- 201919 | ROMERO | AZ Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 160.75 | $10,154.83 |
| 8/18/19- 9/7/19 | | | X | X | | | 201918- 201919 | ROOP | OR State Chief Ranger | Patrol Commander, Swing Shift | Patrol Commander function officer, supervises patrol officers assigned to his shift | 191.75 | $22,806.64 |
| 3/18/19- 10/12/19 | | X | X | X | X | X | 201908- 201922 | ROREX | NV BRFO GIS | Event GIS/Compliance | Compliance Specialist, assist environment, vending monitoring teams with GIS needs; assisted LE and CivOps with GPS programming needs | 374.00 | $21,225.00 |
| 8/18/19- 9/7/19 | | | | X | | | 201918- 201919 | RUSSELL | UT Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 162.00 | $12,140.91 |

| DATE | PLANNING | PRE-EVENT SET UP | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/18/19-9/7/19 | | | | X | X | | 201918-201919 | SARCINELLA | CA Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 169.75 | $10,883.01 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | SAWTELL | CA Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 147.75 | $9,357.56 |
| 8/11/19-9/7/19 | | X | X | X | X | | 201917-201919 | SCHWIRIAN | NV IT Specialist | Comm Tech, Day Shift | Communications function specialist, works on radio/dispatch communications network | 310.00 | $17,574.52 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | SHAARDA | NV Land Law Examiner | Environmental Compliance | Environmental Compliance Monitoring function, worked with BRC environmental  teams on environmental SRP compliance | 94.00 | $3,094.96 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | SHARKEY | NV ASAC | Invesitgations Lead | Investigations function officer, served as supervisor of investigators in both investigative components | 119.00 | $10,593.28 |
| 8/20/18-09/5/18 | | X | | | | | 201918 | SHEDDEN | NV Outdoor Recreation Planner | N/A | Support Air Quality Equipment. | 24.00 | $1,250.43 |
| 8/18/19-9/7/19 | | | X | X | | | 201918-201919 | SOLIS | CA Evidence Technician | Evidence Technician, Swing Shift | Evidence function, serves as evidence officer for all event cases with logged evidence | 169.25 | $6,347.58 |
| 8/11/19-9/7/19 | | X | X | X | X | | 201917-201919 | SPENCER | CCDO - Equipment Specialist | Logistics, Day Shift | Logistics support function specialist, provides logistical needs to JOC facility, Sub-station and to detailers | 250.00 | $9,672.00 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | STEPLETON | CO Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 162.25 | $10,575.55 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | STEVENS | OPR Special Agent | OPR Agent | OPR function officer, event on-site Internal Affairs component and Use of Force reports reviewer | 98.00 | $7,726.52 |
| 8/18/19-9/7/19 | | | | X | X | | 201918-201919 | STOLTS | NV Supervisory Ranger | Shift Supervisor, Swing Shift | Shift Supervisor function officer, field supervisor of one half of Shift city patrol officers | 181.50 | $15,015.28 |
| 8/18/19-9/7/19 | | | X | X | X | | 201918-201919 | STORLA | NV | Logistics, Night Shift | Logistics support function specialist, provides logistical needs to JOC facility, Sub-station and to detailers | 270.00 | $12,843.79 |
| 4/29/19-5/12/19 | X | | | | | | 201911 | STRICKLAND | NV Supervisory Land Surveyor | N/A | Assist in closure order preparation for FRN Posting. | 3.00 | $229.39 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | SULLINS | AZ Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 145.50 | $11,111.04 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | SUTTON | CA Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 150.00 | $11,453.56 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | SWANSON | MT ASAC | Investigations (Integrated Investigations), Swing Shift | Integrated Investigations function officer, works for Pershing County Sheriffs to assist in investigations of state violations | 133.00 | $12,242.25 |
| 8/20/18-09/5/18 | | | | X | | | 201918 | SWISHER | BRFO Wild Horse and Burro | Logistics Runner | Logistics support function specialist, served as purchase/delivery of logistics needs. Part-time, not on playa | 22.00 | $1,214.17 |
| 9/16/19-10/12/19 | | | | | | X | 201921-201922 | TAYLOR | Administrative Support Assistant | Administrative Support | Administrative Support Services on playa. | 36.00 | $1,472.05 |

AR11800

| DATE | PLANNING | PRE-EVENT SET UP | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/18/19-9/7/19 | X | | X | X | X | | 201918-201919 | TEMPLETON | OLES Region 5 ASAC | Medical Unit Leader, Day Shift | Medical function officer, served as lead of BLM's medical unit | 190.00 | $19,033.44 |
| 8/18/19-9/7/19 | | | | X | X | | 201918-201919 | TITUS | CA Supervisory Ranger | Shift Supervisor, Night Shift | Shift Supervisor function officer, field supervisor of one half of Shift city patrol officers | 187.00 | $19,943.36 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | TORRES | NV Special Agent | Investigations (Integrated Investigations), Swing Shift | Integrated Investigations function officer, works for Pershing County Sheriffs to assist in investigations of state violations | 127.00 | $10,035.14 |
| 8/18/19-9/7/19 | | | | X | X | | 201918-201919 | WAGGONER | CO Special Agent | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 181.00 | $14,515.51 |
| 8/18/19-9/7/19 | | | X | X | X | | 201918-201919 | WEAVER | ID LE IT Specialist | IMARS | IMARS Support function officer, coordinates event IMARS program | 164.50 | $12,060.55 |
| 8/11/19-9/7/19 | X | X | X | X | | | 201917-201919 | WELTY | CCDO - GIS Specialist | GIS | Compliance function Specialist, assist environment, vending monitoring teams with GIS needs; assisted LE and CivOps with GPS programming needs | 239.00 | $11,488.95 |
| 01/05/20-01/19/20 | | | | | | X | 202002 | WHETSTONE | WDO - Archaeologist | N/A | Post event Tribal Consultation with the Pyramid Lake Paiute Tribe | 3.00 | $168.39 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | WILCOX, J.R. | NV Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 141.00 | $9,585.67 |
| 4/08/19-01/03/20 | | X | X | X | X | | 201908-201920 | WISEMORE | Ely Telecommunications | Comm Lead | Communications function, supervisor of radio/dispatch communications network program | 455.25 | $25,186.13 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | WOOD | OR Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 140.00 | $10,154.29 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | WOSTAL | AZ Field Staff Ranger | City Patrol | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 153.00 | $12,333.82 |
| 8/18/19-9/7/19 | | | | X | X | | 201918-21919 | ZOHOVETZ | AZ Field Staff Ranger | City Patrol. Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 151.50 | $10,977.27 |
| 8/18/19-9/7/19 | | | | X | | | 201918-201919 | ZURFLUH | ID Electronics Technician | N/A | Assist with Air Quality and weather station equipment. | 26.00 | $1,515.53 |
| | | | | | | | | | | | **LABOR TOTAL:** | 22,196.00 | 1,542,258.95 |

| NO. | CONTRACTOR | PURPOSE | AMOUNT OBLIGATED | AMOUNT INVOICED | SOLE SOURCE | ONE-TIME vs. ANNUAL | CONTRACT DOCUMENT (see Attached) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | 2019 BURNING MAN - BLM CONTRACTS/AGREEMENTS (ATT#2) | | | | | |
| | | SUPPORT LABOR AGREEMENTS | | | | | |
| 1 | IAA USDA (Forest Service) Labor | LE Patrols | $40,000.00 | $23,000.95 | Yes | Annual | L19PG00168 |
| | | SUPPORT SERVICES/EQUIPMENT PLANNED CONTRACTS | | | | | |
| 2 | Burning Man VHF Digital Base Station | Dispatch | $20,000.00 | $19,140.00 | Yes | Base + Option year | L3919P0044 |
| 3 | Lyman | Microwave Internet Bandwith | $70,000.00 | $72,878.00 | No | Annual | L3919P0060 |
| 4 | Law Enforcement Temporary Placement | Dispatch | $220,000.00 | $199,870.00 | No | Annual | L3919P0057 |
| 4 | Lyman | Network Services | $130,000.00 | $103,474.00 | No | Annual | L3919P0062 |
| 5 | United Site Services | JOC facilities | $16,500.00 | $14,613.55 | No | One-Time | L3919P0074 |
| 6 | Strohman Enterprises | Satellite tracking updates & service | $55,000.00 | $50,640.00 | Yes | One-Time | L3919P0055 |
| 7 | Aggreko, LLC | Rental and Services of Generators | $10,000.00 | $9,000.00 | No | Annual | L3919P0067 |
| 8 | Federal Register | Posting Fee of Closure Order in Federal Registor | $2,000.00 | $1,963.00 | Yes | Annual | N/A |
| 9 | Hartford Technology | IT Equipment Rentals | $17,000.00 | $17,578.13 | No | Annual | L3919F0060 |
| 10 | GSA Vehicles | Vehicle Rentals | $16,500.00 | $15,099.02 | Existing Agreement | Annual | N/A |
| 11 | Walker Lake Disposal | Dumpster Rentals | $5,000.00 | $5,700.00 | Micro-purchase contract | Annual | N/A |
| | | SUPPORT SERVICES/EQUIPMENT MISC CONTRACT | | | | | |
| 12 | Pershing County | Sexual Assault Response Team | $ 40,000.00 | $33,501.43 | Yes | One-Time | L3919P0087 |

|   |   |
|---|---|
| Total Labor (Agreements): | $ 23,000.95 |
| Total (Planned Contracts): | $509,955.70 |
| Total (Misc Contract): | $33,501.43 |
| **All Total:** | **$566,458.08** |

AR11802

## 2019 BURNING MAN - VEHICLE UTILIZATION (ATT#4)

| Plate Number | Utilization Amount |   | Plate Number | Utilization Amount |
|---|---|---|---|---|
| 110 | $618.93 |   | 282 | $645.42 |
| 293 | $1,564.92 |   | 399 | $1,279.48 |
| 553 | $235.48 |   | 703M | $257.27 |
| 585 | $709.34 |   | 366M | $593.49 |
| 700 | $859.56 |   | 667S | $141.17 |
| 777 | $1,417.52 |   | 829R | $263.11 |
| 885 | $1,302.00 |   | 829R | $149.66 |
| 973 | $261.00 |   | 521 | $125.00 |
| 977 | $1,610.66 |   | **TOTAL** | **$39,768.23** |
| 980 | $904.80 |   |   |   |
| 981 | $1,353.24 |   |   |   |
| 038 | $1,165.60 |   |   |   |
| 072 | $481.40 |   |   |   |
| 073 | $336.40 |   |   |   |
| 135 | $619.76 |   |   |   |
| 150 | $1,577.34 |   |   |   |
| 560 | $906.54 |   |   |   |
| 689 | $1,179.21 |   |   |   |
| 717 | $1,455.30 |   |   |   |
| 727 | $281.34 |   |   |   |
| 779 | $1,451.16 |   |   |   |
| 919 | $983.25 |   |   |   |
| 010 | $895.28 |   |   |   |
| 043 | $507.84 |   |   |   |
| 084 | $682.00 |   |   |   |
| 134 | $1,054.44 |   |   |   |
| 191 | $556.22 |   |   |   |
| 235 | $783.84 |   |   |   |
| 281 | $802.90 |   |   |   |
| 469 | $984.40 |   |   |   |
| 591 | $1,551.12 |   |   |   |
| 636 | $1,517.28 |   |   |   |
| 643 | $1,862.38 |   |   |   |
| 644 | $345.00 |   |   |   |
| 702 | $641.01 |   |   |   |
| 914 | $214.55 |   |   |   |
| 928 | $145.08 |   |   |   |
| 932 | $395.56 |   |   |   |
| 031 | $92.80 |   |   |   |
| 098 | $956.58 |   |   |   |
| 154 | $1,050.60 |   |   |   |

AR11803

| 2019 BURNING MAN - MISC. SUPPLIES AND EQUIPMENT (ATT#5) | | | | |
|---|---|---|---|---|
| RECEIPT # | CARD HOLDER | VENDOR | AMOUNT | DESCRIPTION |
| R-1 | ALLEN | Washoe County | $ 475.00 | Nevada Criminal Justice Access |
| R-2 | ANDRES | ANALYTICAL & PRECISION | $ 418.54 | Evidence Supplies |
| R-3 | ANDRES | COLONIAL SUPPLIES LLC | $ 1,379.73 | Employee Safety Supplies |
| R-4 | ANDRES | MX MEGASTORE | $ 3,512.00 | Employee Safety Supplies |
| R-5 | ANDRES | RPS PRINTING | $ 278.50 | Copying/Printing |
| R-6 | ANDRES | SCRIP COMPANIES | $ 850.36 | Medical Supplies |
| R-7 | ANDRES | SUPPLY CHIMP | $ 1,499.14 | Employee Safety Supplies |
| R-8 | APPOLD | PRIVATE VENDOR | $ 1,500.00 | Space Rental |
| R-9 | APPOLD | GERLACH IMPROVEMENT DISTRICT | $ 175.00 | Space Rental |
| R-10 | APPOLD | RV RENTAL | $ 1,500.00 | Space Rental |
| R-11 | APPOLD | CHECK FEE | $ 3.00 | Check Fee |
| R-12 | APPOLD | CHECK FEE | $ 3.00 | Check Fee |
| R-13 | APPOLD | CHECK FEE | $ 3.00 | Check Fee |
| R-14 | APPOLD | BRUNO'S | $ 1,872.00 | JOC Watering |
| R-15 | APPOLD | BRUNO'S | $ 660.00 | Generator Hookups |
| R-16 | ARBONIES | HUMBOLDT PRINTERS LLC | $ 62.25 | Printing |
| R-17 | CADIGAN | PURCELL | $ 204.75 | Tire Replacement |
| R-18 | CADIGAN | PURCELL | $ 21.40 | Tire Repair |
| R-19 | CADIGAN | BERNARDO ESTRADA DETAIL | $ 480.00 | Vehicle Cleaning |
| R-20 | CADIGAN | FEDEX | $ 116.80 | Postage |
| R-21 | CADIGAN | LOWES | $ 352.73 | Logistical Supplies |
| R-22 | CADIGAN | LOWES | $ -43.42 | Return unused items |
| R-23 | CADIGAN | WALGREENS | $ 686.17 | Medical Supplies |
| R-24 | CADIGAN | WALMART | $ 58.02 | Logistical Supplies |
| R-25 | CADIGAN | WALMART | $ 313.32 | Logistical Supplies |
| R-26 | DEASY | WALMART | $ 105.80 | Logistical Supplies |
| R-27 | DUE | BRUNO'S | $ 120.00 | Logistical Supplies |
| R-28 | DUE | HOME DEPOT | $ 507.87 | Logistical Supplies |
| R-29 | DUE | HOME DEPOT | $ 748.57 | Logistical Supplies |
| R-30 | DUE | WALMART | $ 45.16 | Logistical Supplies |
| R-31 | FERGUSON | VF IMAGEWEAR INC | $ 940.00 | Uniform for Civilian Ops |
| R-32 | FISCHER | AMAZON | $ 34.98 | Evidence Supplies |
| R-33 | FISCHER | GRAINGER | $ 7.40 | Evidence Supplies |
| R-34 | FISCHER | GSA/FAS | $ 8.05 | Evidence Supplies |
| R-35 | FISCHER | MSC | $ 9.94 | Evidence Supplies |
| R-36 | FISCHER | NOBLE SUPPLY & LOGISTIC | $ 20.80 | Evidence Supplies |
| R-37 | FISCHER | PREMIER & COMPANIES, I | $ 139.75 | Evidence Supplies |
| R-38 | FISCHER | SAFARILAND, LLC | $ 787.00 | Evidence Supplies |
| R-39 | FISCHER | SIRCHIE | $ 336.73 | Evidence Supplies |
| R-40 | FISCHER | SUMMIT MEASUREMENT | $ 147.95 | Evidence Supplies |
| R-41 | FISCHER | THE SUPPLIES GUYS | $ 43.96 | Evidence Supplies |
| R-42 | FISCHER | WRIGGLESWORTH ENTERPRISE | $ 35.10 | Evidence Supplies |

AR11804

| R-43 | KIZOREK | BIG R | $ 32.69 | Logistical Supplies |
|------|---------|-------|---------|---------------------|
| R-44 | KIZOREK | WALMART | $ 180.04 | Logistical Supplies |
| R-45 | LANNEN | WALMART | $ 82.90 | Logistical Supplies |
| R-46 | LANNEN | WALMART | $ 56.57 | Logistical Supplies |
| R-47 | ROSOFF | FEDEX | $ 175.61 | Postage |
| R-48 | ROSOFF | FEDEX | $ 1,626.47 | Postage |
| R-49 | ROSOFF | FEDEX | $ 488.36 | Postage |
| R-50 | SHAARDA | DOLLAR TREE | $ 34.00 | Logistic Supplies |
| R-51 | SHEDDEN | MET ONE INSTRUMENTS | $ 586.00 | Air Quality Supplies |
| R-52 | SHEDDEN | WALMART | $ 27.24 | Air Quality Supplies |
| R-53 | SPENCER | BIG R | $ 23.73 | Logistical Supplies |
| R-54 | SPENCER | BRUNO'S | $ 35.00 | Logistical Supplies |
| R-55 | SPENCER | LOVES | $ 35.98 | Logistical Supplies |
| R-56 | SPENCER | LOWES | $ 1,390.55 | Logistical Supplies |
| R-57 | SPENCER | LOWES | $ 302.44 | Logistical Supplies |
| R-58 | SPENCER | THE PARTS HOUSE | $ 120.24 | Logistical Supplies |
| R-59 | SPENCER | WALMART | $ 163.08 | Logistical Supplies |
| R-60 | SPENCER | WALMART | $ 182.72 | Logistical Supplies |
| R-61 | SWISHER | LES SCHWAB | $ 393.48 | Equipment repair |
| R-62 | SWISHER | SONOMA CYCLE | $ 357.98 | Equipment repair |
| R-63 | SWISHER | WALMART | $ 123.15 | Logistical Supplies |
| R-64 | SWISHER | WALMART | $ 49.44 | Logistical Supplies |
| R-65 | TAYLOR | FIELD ENVIRONMENTAL INSTR | $ 2,527.45 | Communications Supplies |
| R-66 | TAYLOR | HARTFORD TECHNOLOGY RENTAL | $ 141.17 | Communications Supplies |
| R-67 | TAYLOR | LOWES | $ 27.72 | Communications Supplies |
| R-68 | TAYLOR | SGS | $ 4,703.50 | Communications Supplies |
| R-69 | WISEMORE | HOME DEPOT | $ 66.31 | Communications Supplies |
| R-70 | WISEMORE | TESSCO | $ 2,061.23 | Communications Supplies |
| **TOTAL** | | | $36,415.40 | |

AR11805

# EXHIBIT I

AR11806

| BURNING MAN - 2012 TRAVEL | | | |
|---|---|---|---|
| Albright, Calvin | 433.50 | SLC Int Aiport parking | 21.00 |
| Albright - travel fee | 15.00 | Courtyard by Marriott | 212.44 |
| Allen, Christopher | 382.50 | Texaco | 17.39 |
| Allen - travel fee | 15.00 | Dollar Rent A Car | 91.93 |
| Allen - Sato fee | 4.35 | Boik, Eric | 127.50 |
| Southwest Airlines | 359.60 | Boik - travel fee | 15.00 |
| Southwest Airlines baggage fee | 5.00 | Delta Airlines | 357.60 |
| 7-Eleven Gas | 20.27 | Airline booking fee | 28.50 |
| Silver State Food Mart | 34.99 | Homewood Suites | 212.44 |
| Mccarran Int Airport | 101.00 | Texaco | 15.79 |
| Hyatt Place - Reno | 957.11 | Holiday Inn Express - Reno | 94.00 |
| Dollar Rent A Car | 277.32 | Dollar Rent A Car | 126.03 |
| Arries, Jay | 768.50 | Boik, Eric | 1,045.50 |
| Arries - travel fee | 15.00 | Boik - travel fee | 15.00 |
| Renaissance Hotel - Las Vegas | 99.68 | Delta Airlines | 357.60 |
| Courtyard - Reno | 109.00 | Airline booking fee | 28.50 |
| Renaissance Hotel - Las Vegas | 99.68 | Delta Airlines baggage fee | 25.00 |
| August, Randolph | 1,831.23 | Enterprise | 154.37 |
| August - travel fee | 15.00 | Courtyard - Reno | 273.46 |
| Ausema, Michael | 600.25 | Southwest Airlines | 259.30 |
| Ausema - travel fee | 15.00 | Texaco | 10.70 |
| High Country Inn - Susanville | 77.00 | Duds N Suds | 10.00 |
| Fairfield - Redding | 96.57 | Courtyard - Reno | 793.25 |
| Barnes, Daniel | 574.00 | Courtyard - Reno | 531.10 |
| Barnes - travel fee | 15.00 | Boone, Antonio | 497.25 |
| Holiday Inn Express - Fallon | 84.85 | Boone - travel fee | 15.00 |
| Holiday Inn Express - Fallon | 84.85 | Holiday Inn Express - Reno | 135.59 |
| Barrios, Kynan | 484.50 | Holiday Inn Express - Reno | 300.30 |
| Barrios - travel fee | 15.00 | Bradford, Terrell | 648.75 |
| Bell, Jenna | 669.70 | Bradford - travel fee | 15.00 |
| Southwest Airlines | 541.60 | Marriott - Las Vegas | 110.88 |
| Bell - Sato fee | 4.35 | Holiday Inn Express - Reno | 104.00 |
| Bell - travel fee | 15.00 | Bishop Holiday Spa | 86.52 |
| Southwest Airlines - baggage fee | 100.00 | Brasington, Patrick | 658.75 |
| Southwest Airlines - baggage fee | 50.00 | Brasington - travel fee | 15.00 |
| Southwest Airlines - booking chg | 3.80 | Best Western - Fernley | 154.00 |
| Rainbow Market 4 | 61.52 | Bruse, Rachelle | 1,036.75 |
| Hertz | 1,520.86 | Bruse - travel fee | 15.00 |
| Staybridge Suites - Reno | 268.94 | Courtyard - Reno | 804.65 |
| Holiday Inn express - Reno | 129.99 | 7-Eleven Gas | 38.15 |
| Boik, Eric | 266.25 | Courtyard - Reno | 376.00 |
| Boik - travel fee | 15.00 | Holiday Inn Express - Elko | 77.00 |
| United Airlines | 281.60 | Bulkley, Jason | 671.00 |
| Airline booking fee | 28.50 | Bulkley - travel fee | 15.00 |
| Hertz Rent-A-Car | 229.47 | LaQuinta - Ely | 85.47 |
| Fairfield Inn - Milbrake | 335.50 | Holiday Inn Express - Fallon | 84.85 |
| Hearst Parking Center | 20.00 | Holiday Inn Express - Cedar Cty | 84.93 |
| Taxi Cab Service | 56.40 | Bunkall, Robert | 374.00 |
| SLC Int Aiport parking | 35.00 | Bunkall - travel fee | 15.00 |
| Millbrake Market & Gaso | 15.79 | Burke, Alexandra | 625.00 |
| Boik, Eric | 127.50 | Burke - travel fee | 15.00 |
| Boik - travel fee | 15.00 | Travelodge - Elko | 58.99 |
| Delta Airlines | 357.60 | Courtyard - Reno | 121.00 |
| Airline booking fee | 28.50 | Courtyard - Reno | 94.00 |

AR11807

| BURNING MAN - 2012 TRAVEL | | | |
|---|---|---|---|
| Fairfield - Idaho Falls | 81.00 | Holiday Inn Express - Carson Cty | 91.00 |
| **Cadigan, Kathleen** | 340.00 | Bruno's - Gerlach | 71.80 |
| Cadigan - travel fee | 15.00 | Residence Inn - Reno | 212.44 |
| **Caffey, Jason** | 484.50 | **Garcia, Brian** | 657.50 |
| Caffey - travel fee | 15.00 | Garcia - travel fee | 15.00 |
| **Caffey, Jason** | 331.50 | Marriott - Salt Lake | 126.10 |
| Caffey - travel fee | 15.00 | Comfort Suites - Fernley | 77.00 |
| **Carmosino, Vito** | 442.00 | Hilton - Salt Lake | 88.95 |
| Carmosino - travel fee | 15.00 | **Gerald, Kenneth** | 768.50 |
| **Carpenter, Michael** | 738.50 | Gerald - travel fee | 15.00 |
| Carpenter - travel fee | 15.00 | Renaissance - Las Vegas | 99.68 |
| Marriott - Las Vegas | 110.88 | Courtyard - Reno | 109.00 |
| Holiday Inn Express - Reno | 94.00 | Renaissance - Las Vegas | 99.68 |
| Holiday Inn Express - Reno | 94.00 | **Gibbons, David** | 777.00 |
| **Carter, Douglas** | 822.50 | Gibbons - travel fee | 15.00 |
| Carter - travel fee | 15.00 | Skyline Motor Lodge - Lakeview | 77.00 |
| Eldorado - Reno | 85.22 | Bruno's - Gerlach | 45.00 |
| Comfort Suites - Fernley | 251.79 | John Day Inn | 83.93 |
| Comfort Suites - Fernley | 83.93 | **Gjoraas, Rhonda** | 644.70 |
| Comfort Suites - Fernley | 251.79 | Gjoraas - travel fee | 15.00 |
| Comfort Suites - Fernley | 587.51 | Peppermill - Reno | 300.58 |
| Hotels.com | 132.90 | Peppermill - Reno | 100.56 |
| Silver Legacy | 22.16 | **Good, Loren** | 490.80 |
| **Cary, Jason** | 1,003.75 | Good - travel fee | 15.00 |
| Cary - travel fee | 15.00 | Residence Inn - Reno | 136.73 |
| Hilton Garden Inn - Reno | 136.73 | **Graham, Werner** | 69.00 |
| Embassy Suites - Las Vegas | 110.88 | Graham - travel fee | 15.00 |
| Sturgeon's Inn - Lovelock | 53.50 | Graham - Sato fee | 4.00 |
| Embassy Suites - Las Vegas | 110.88 | Comfort Suites - Fernley | 83.93 |
| **Crane, Joseph** | 786.75 | **Hart, William** | 580.00 |
| Crane - travel fee | 15.00 | Hart - travel fee | 15.00 |
| Best Western - Fernley | 77.00 | Holiday Inn Express - Fallon | 84.85 |
| Bruno's - Gerlach | 276.00 | Holiday Inn Express - Fallon | 84.85 |
| **Cunningham, Steve** | 561.00 | **Hastey, Robert** | 344.25 |
| Cunningham - travel fee | 15.00 | Hastey - travel fee | 15.00 |
| Marriott - Salt Lake | 126.10 | Roseberry House - Susanville | 254.10 |
| Comfort Suites - Fernley | 77.00 | **Herriford, Jeff** | 263.00 |
| Marriott - Salt Lake | 120.10 | Herriford - travel fee | 15.00 |
| **Curry, Jason** | 535.50 | Cactus Pete's - Jackpot | 65.00 |
| Curry - travel fee | 15.00 | Cactus Pete's - Jackpot | 65.00 |
| Courtyard - Reno | 121.00 | Motel T - Winnemucca | 78.40 |
| Courtyard - Reno | 94.00 | **Hill, Thomas** | 633.75 |
| **Dixon, Gerald** | 69.00 | Hill - travel fee | 15.00 |
| Dixon - travel fee | 15.00 | Fernley Inn | 77.00 |
| Dixon - Sato fee | 4.00 | **Howell, Thomas** | 651.25 |
| Comfort Suites - Fernley | 83.93 | Howell - travel fee | 15.00 |
| **Finch, William** | 531.75 | Town House - Winnemucca | 72.80 |
| Finch - travel fee | 15.00 | Comfort Inn - Tooele | 105.36 |
| Comfort Suites - Fernley | 83.93 | **Huegerich, Thomas** | 544.38 |
| **Fonken, Peter** | 594.50 | Heugerich - travel fee | 15.00 |
| Fonken - travel fee | 15.00 | Marriott - Reno | 268.00 |
| Holiday Inn Express - Reno | 99.00 | **Hyrons, Sean** | 229.50 |
| **Funk, Joseph** | 758.50 | Hyrons - travel fee | 15.00 |
| Funk - travel fee | 15.00 | **Hyrons, Sean** | 178.50 |

AR11808

| BURNING MAN - 2012 TRAVEL | | | |
|---|---|---|---|
| Hyrons - travel fee | 15.00 | **Lovelady, Jerry** | 724.50 |
| River's Edge RV Park - Sparks | 10.00 | Lovelady - travel fee | 15.00 |
| **Jones, Karol** | 484.50 | Comfort Suites - Fernley | 167.86 |
| Jones - travel fee | 15.00 | Homewood Suites - Reno | 136.73 |
| Eureka Inn | 77.00 | Comfort Suites - Fernley | 251.79 |
| **Kizorek, Michael** | 331.50 | **Marquart, Michael** | 297.12 |
| Kizorek - travel fee | 15.00 | Marquart -travel fee | 15.00 |
| **Knisley, Jeffrey** | 582.75 | Intercontinental Mark | 1,083.62 |
| Kinsley - travel fee | 15.00 | **Marquart, Michael** | 749.00 |
| High Country Inn - Susanville | 82.50 | Marquart -travel fee | 15.00 |
| **Kozar, Daniel** | 374.00 | Bruno's - Gerlach | 79.00 |
| Kozar - travel fee | 15.00 | **Marsoobian, Jason** | 738.50 |
| **Laswell, Daniel** | 739.50 | Marsoobian - travel fee | 15.00 |
| Laswell - travel fee | 15.00 | Renaissance - Las Vegas | 110.88 |
| Comfort Suites - Fernley | 251.79 | Courtyard - Reno | 109.00 |
| **Lloyd, Kenneth** | 563.81 | Sturgeon's Inn - Lovelock | 53.50 |
| Lloyd - travel fee | 15.00 | Renaissance - Las Vegas | 110.88 |
| Comfort Suites - Fernley | 77.00 | **Maurer, John** | 484.50 |
| **Lloyd, Richard** | 586.50 | Maurer - travel fee | 15.00 |
| Lloyd - travel fee | 15.00 | **McGrath, Keith** | 484.50 |
| Lloyd - Sato fee | 4.00 | McGrath - travel fee | 15.00 |
| Holiday Inn Express - Reno | 111.87 | **Meuth, Gregory** | 625.00 |
| **Logsdon, John** | 757.00 | Meuth - travel fee | 15.00 |
| Logsdon - travel fee | 15.00 | Holiday Inn Express - Fallon | 84.85 |
| Holiday Inn Express - Moab | 108.98 | LaQuinta Inn - Ely | 91.02 |
| Courtyard - Reno | 106.22 | **Miller, Jeffery** | 731.00 |
| Residence Inn - Salt Lake | 96.00 | Miller - travel fee | 15.00 |
| Drury Hotels - Albuquerque | 91.53 | Candlewood Suites - Salt Lake | 91.20 |
| **Love, Dan** | 177.50 | Homewood Suites - Reno | 136.73 |
| Love - travel fee | 15.00 | Homewood Suites - Reno | 106.22 |
| United Airlines | 347.60 | Homewood Suites - Reno | 110.88 |
| Airline booking fee | 28.50 | **Million, Zach** | 476.00 |
| Delta - baggage fee | 25.00 | Million - travel fee | 15.00 |
| Fairfield Inn - Millbrae | 317.60 | **Moe, Theodore** | 657.50 |
| Rabhe Taxi | 58.00 | Moe - travel fee | 15.00 |
| **Love, Dan** | 127.50 | Marriott - Salt Lake | 126.10 |
| Love - travel fee | 15.00 | Comfort Suites - Fernley | 83.93 |
| Delta Airlines | 357.60 | **Moore, Jason** | 855.25 |
| Airline booking fee | 28.50 | Moore - travel fee | 15.00 |
| Delta - baggage fee | 25.00 | Shilo Inn - Elko | 86.24 |
| Delta - baggage fee | 25.00 | Courtyard - Reno | 121.00 |
| Courtyard - Reno | 273.46 | Bruno's - Gerlach | 44.00 |
| Courtyard - Reno | 212.44 | Courtyard - Salt Lake | 107.45 |
| **Love, Dan** | 127.50 | Courtyard - Reno | 188.00 |
| Love - travel fee | 15.00 | **Nieman, Sandra** | 725.30 |
| SLC Int Aiport | 74.00 | Nieman - travel fee | 15.00 |
| Delta Airlines | 357.60 | Hotel reservation fee | 4.35 |
| Airline booking fee | 28.50 | Grand Sierra Resort - Reno | 111.87 |
| **Love, Dan** | 258.00 | Grand Sierra Resort - Reno | 134.47 |
| Love - travel fee | 15.00 | Southwest Airlines | 422.20 |
| **Love, Dan** | 994.50 | Hertz | 1,223.35 |
| Love - travel fee | 15.00 | **Olthoff, John** | 484.50 |
| Courtyard - Reno | 804.65 | Oldhott - travel fee | 15.00 |
| Courtyard - Reno | 531.10 | **Oper, Zachary** | 218.50 |

AR11809

| BURNING MAN – 2012 TRAVEL | | | |
|---|---|---|---|
| Oper - travel fee | 15.00 | Courtyard – Reno | 106.22 |
| **Oper, Zachary** | 484.50 | **Sharkey, Thomas** | 535.50 |
| Oper - travel fee | 15.00 | Sharkey - travel fee | 15.00 |
| **Oper, Zachary** | 34.50 | **Shilaikis, Robert** | 600.25 |
| Oper - travel fee | 15.00 | Shilaikis - travel fee | 15.00 |
| Intercontinental Mark Hopkins | 474.34 | Comfort Inn - Fernley | 77.00 |
| **Page, Gregory** | 272.00 | Courtyard – Reno | 94.00 |
| Page - travel fee | 15.00 | Hilton - Salt Lake | 96.00 |
| **Page, Gregory** | 68.00 | **Spain, David** | 773.50 |
| Page - travel fee | 15.00 | Spain - travel fee | 15.00 |
| **Paiva, George** | 280.50 | Holiday Inn Express - Reno | 123.17 |
| Paive - travel fee | 15.00 | **Stewien, Melody** | 625.00 |
| **Pirtle, Mark** | 537.80 | Stewien - travel fee | 15.00 |
| Pirtle - travel fee | 15.00 | Hotel reservation fee | 4.00 |
| **Pirtle, Mark** | 994.50 | Fernley Inn | 83.93 |
| Pirtle - travel fee | 15.00 | **Stover, Rand** | 127.50 |
| Town House - | 72.80 | Stover - travel fee | 15.00 |
| **Prado, Douglas** | 582.75 | Delta Airlines | 357.60 |
| Prado - travel fee | 15.00 | Airline booking fee | 28.50 |
| Comfort Suites - Fernley | 83.93 | Courtyard – Reno | 273.46 |
| John Ascuagas Nugget-Sparks | 53.30 | **Stover, Rand** | 1,045.50 |
| **Prisco, Carman** | 484.50 | Stover - travel fee | 15.00 |
| Prisco - travel fee | 15.00 | Courtyard – Reno | 784.50 |
| **Regnell, Ryan** | 628.75 | Courtyard – Reno | 531.10 |
| Regnell - travel fee | 15.00 | **Struck, Kristine** | 340.00 |
| Holiday Inn – Reno | 141.86 | Struck - travel fee | 15.00 |
| Holiday Inn – Reno | 84.85 | **Sullivan, Deborah** | 676.00 |
| **Roegner, Cory** | 182.50 | Sullivan - travel fee | 15.00 |
| Roegner - travel fee | 15.00 | Holiday Inn Express - Fallon | 84.85 |
| Intercontinental Mark Hopkins | 520.54 | Courtyard – Reno | 121.00 |
| **Roegner, Cory** | 76.50 | Comfort Inn - Fallon | 83.93 |
| Roegner - travel fee | 15.00 | **Swanson, Scott** | 535.50 |
| BW Airport Plaza | 77.00 | Swanson - travel fee | 15.00 |
| **Roegner, Cory** | 442.00 | Courtyard – Reno | 121.00 |
| Roegner - travel fee | 15.00 | Courtyard – Reno | 94.00 |
| **Romer, Robert** | 633.75 | **Templeton, Warren** | 554.40 |
| Romer - travel fee | 15.00 | Templeton - travel fee | 15.00 |
| Fernley Inn | 83.93 | Residence Inns - Salt Lake | 77.70 |
| Bruno's - Gerlach | 69.00 | Holiday Inn Express - Fallon | 84.85 |
| **Schumacher, John** | 633.75 | **Tuma, Lisa** | 601.50 |
| Schumacher - travel fee | 15.00 | Tuma - travel fee | 15.00 |
| John Ascuagas Nugget-Sparks | 112.35 | Budget Rental | 523.40 |
| John Ascuagas Nugget-Sparks | 126.35 | Hilton Garden Inn - Las Vegas | 110.88 |
| Tonopah Station | 64.86 | Courtyard – Reno | 98.10 |
| **Seidlitz, Joseph** | 196.50 | Courtyard – Reno | 117.36 |
| Seidlitz - travel fee | 15.00 | **Vigness, Jarrod** | 637.50 |
| Intercontinental Mark Hopkins | 404.26 | Vigness - travel fee | 15.00 |
| **Seidlitz, Joseph** | 69.00 | Holiday Inn Express - Reno | 99.00 |
| Seidlitz - travel fee | 15.00 | **Waggoner, Sean** | 625.25 |
| Seidlitz - Sato fee | 4.00 | Waggoner - travel fee | 15.00 |
| Comfort Suites - Fernley | 83.93 | Comfort Suites - Fernley | 77.00 |
| **Sharkey, Anne-Marie** | 521.50 | Hilton - Salt Lake | 96.00 |
| Sharkey - travel fee | 15.00 | **Wostal, Carrie** | 336.50 |
| Courtyard – Reno | 135.44 | Wostal - travel fee | 15.00 |

AR11810

| BURNING MAN - 2012 TRAVEL | |
|---|---|
| Super 8 - Fernley | 79.97 |
| Courtyard - Medford | 82.00 |
| **Young, Jon** | 809.00 |
| Young - travel fee | 15.00 |
| Hampton Inn - Las Vegas | 89.00 |
| Homewood Suites - Reno | 242.00 |
| Homewood Suites - Reno | 94.00 |
| Homewood Suites - Reno | 106.22 |
| **Zuber, Stanley** | 636.02 |
| Zuber - travel fee | 15.00 |
| **TOTAL:** | **95,884.69** |

AR11811

# EXHIBIT J

AR11812

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

For providing IP Network, technical services and support to BLM in the Gerlach, NV area
for the 2019 Burning Man Event

PROJECT TITLE:

2019 Burning Man Event BLM Network Services & Support

BACKGROUND:

The Burning Man Recreational Event is an international art festival and an experiment in a
"temporary community dedicated to radical self-expression and self-reliance". The temporary
community of Black Rock City is created for eight days and becomes the seventh largest city in
Nevada. The event takes place on the Black Rock Desert within the Black Rock/High Rock
NCA, managed by the Winnemucca District Office. A Special Recreation Permit (SRP) is
issued to Black Rock City LLC, which is responsible for all activities within Black Rock City.
The SRP has approximately 13 general stipulations and 60 special stipulations. The BLM also
generates a Closure Order for the event that is announced in the Federal Register, which
designates the event area as a temporary closure and documents temporary restriction of certain
activities within the temporary closure.

The BLM's operational mission is to ensure public safety and resource protection through the
enforcement of the event closure order, the SRP stipulations, Federal laws/regulations and
Nevada state laws/regulations at the event. To accomplish this mission the BLM has adopted the
Incident Command System (ICS) and integrated multiple agencies into one operation. The ICS
operation will be a combination of overhead, operational and support positions. The ICS
operation will cover all three event periods of the detail: Pre-Event; Main Event; Post-Event
(8/19 - 9/4: 17 days).

SCOPE OF WORK:

The Contractor shall provide a fully functional computer network, technical services, technical
support, software applications and hardware to ensure a fully functional, operational and reliable
Law Enforcement Data network and Incident network at the BLM Headquarters (BLM JOC) and
other nearby locations in "Black Rock City, Nevada."

AR11813

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

**REQUIREMENTS:**

Required equipment, services, tasks and responsibilities of the contractor shall consist of the following:

1. **Network design, configuration, routing and switching**
   Contractor must provide layer 2 and/or layer 3 network design, configuration and hardware, which will allow for configuration and creation of multiple simultaneous Local Area Network (LAN) segments. The contractor must then implement this network. The contractor must provide all necessary private IP addressing, unless otherwise provided. Public IP addressing will be Government Furnished Equipment (GFE). A multiple VLAN configuration with trunked switches in each building is a desirable configuration. Switch size is dependent on the number of VLANS proposed and used; however, 48 port switches would be sufficient. 24 port switches could be sufficient, but would likely be fully utilized. Each building uses between 10 and 20 Ethernet "drops" to connect devices from the switch, such as computers, printers, etc. Adding additional switches in a building is possible and allowable, but is not preferred due to added complexity and added points of failure.

2. **Quality of Service (QoS)**
   Contractor must be able to configure and provide Quality of Service, to achieve maximum bandwidth utilization, protect real-time and high priority data applications and deal with other network performance elements such as latency, error rate and uptime. Contractor must be able to handle Quality of Service (QoS) on all network traffic over various technologies, Ethernet and 802.1 networks, and IP-routed networks that may use any or all of these underlying technologies, including bandwidth reservation and prioritization of network traffic. The contractor in collaboration with the government will develop a QoS priority list.

   QoS Prioritization Examples:
   - Criminal Justice Point to Point IP Secure Virtual Private Network
   - Voice over Internet Protocol (VoIP)
   - Geospatial Information Systems (GIS) Applications
   - DNS Applications
   - SSH Applications
   - www Applications
   - Streaming Video Applications

3. **Cabling at BLM JOC.**
   Contractor must provide, run, install, bury, secure and terminate Category 5e (cat 5e) or higher cabling and/or fiber optic cable at the BLM JOC to the "critical" buildings identified by the government. The contractor must provide, run, install, secure and terminate Category 5e (cat 5e) or higher cabling and/or fiber optic cable at the BLM JOC

AR11814

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

inside the "critical" buildings as identified by the government for all BLM furnished
devices i.e. laptops, printers, fax machines, as-well-as the contractor supplied VOIP
phones. Each building will require access to multiple VLANs and will require multiple
network drops to connect computers, phones, printers, faxes, copiers, cameras, etc. A
trenching machine is available on site to assist with long or difficult cable runs as needed
and will be coordinated on-site through the Burning Man / BLM Facilities Manager. The
"critical" buildings are shown on an attached map, but this is a highly dynamic event and
the contractor should account for unplanned changes and adjustments. The Government
will furnish a drawing of all buildings and all building layouts. At the end of the event,
the contractor must remove all cabling. All cabling must adhere to the American National
Standards Institute (ANSI) Telecommunications Industry Association (TIA) ANSI/TIA-
568.

Critical Buildings for wired Ethernet:
- Integrated Command
- Event Support
- Emergency Dispatch Center (EDC) aka "Dispatch"
- Jail
- Medical
- Investigations
- Report writing
- Radio Trailer

4. **GOVERNMENT only Wi-Fi access at BLM JOC:**
Contractor must provide robust, reliable, Wi-Fi network to provide coverage of the entire
BLM JOC, both indoor and outdoor. Hidden and password protected SSID allows only
BLM and other authorized personnel to access the Wi-Fi network. Wi-Fi network may or
may not use MAC address control. MAC address control is not desirable due to the
temporary nature of this network and event. Wi-Fi network must be capable of
simultaneously supporting a minimum of 200 devices with independent leases and
configurable leases. Wi-Fi frequency coordination with other parties will need to take
place pre-event and onsite to ensure deconfliction takes place.

5. **Verizon Wireless LTE augmentation over IP:**
Contractor must provide robust, reliable solution to provide coverage of the entire BLM
JOC, both indoor and outdoor. Contractor to provide a solution for augmented Verizon
LTE cell service at BLM JOC over the IP network for added capabilities and failover /
backup. Must be capable of 40 simultaneous cellular telephone calls. Must be capable of
using all available IP network bandwidth for LTE service, if needed. Contractor must be
able to manage access list of cellular device subscribers from BLM, if needed. Contractor
must be able to manage and adjust access list during event to add cellular device
subscribers as needed throughout the event duration.

AR11815

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

6. **GOVERNMENT only access network and Wi-Fi extended to center camp:**
   Contractor shall extend the network, the internet and the Verizon LTE augmentation from
   BLM JOC to the law enforcement substation near center camp. Contractor must provide
   an Ethernet connection to the Sub-Station. Wi-Fi speed and connection will be subject to
   the end user's device antenna gain. Contractor must provide robust, reliable solution to
   provide Verizon LTE augmentation at the law enforcement substation. This service must
   be capable of at least five (5) simultaneous calls and all bandwidth allocated for the LTE.
   Wi-Fi frequency coordination with other parties will need to take place pre-event and
   onsite to ensure deconfliction takes place.

7. **Pan Tilt Zoom (PTZ) IP Camera**
   Contractor must provide a Pan Tilt Zoom (PTZ) IP Camera at the Law Enforcement
   substation near center camp. The PTZ camera must be able to be controllable over the
   extended microwave network from the BLM JOC. The contractor must provide at least
   one PTZ controller at BLM JOC with a large flat screen high definition television for
   monitoring (42" minimum diagonal.) The contractor must install, setup and configure all
   related equipment at all locations.

8. **Microwave Tower at JOC**
   Contractor must provide, install and setup a tower at the JOC for mounting network
   hardware to support microwave connectivity to the BLM LE Substation in Black Rock
   City. This tower may be self-supporting or may be attached to one of the BLM assigned
   JOC buildings.

9. **Microwave Tower at Substation**
   Contractor must provide, install and setup a self-supporting tower at the BLM LE
   Substation for mounting network hardware to support microwave connectivity to the
   JOC.

10. **IP Cameras for "In-Custody" suspect monitoring at jail**
    Contractor must provide, install, configure and test a minimum of six (6) IP Cameras in
    the jail and two (2) cameras outside the jail at the BLM JOC. The cameras must be able
    to be monitored over the network at the BLM JOC in the Investigations Building or
    where best determined during setup on-site. The cameras will be placed in opposite
    corners of the jail and should be wide view cameras to ensure the entirety of the jail is
    seen through the use of all cameras. The cameras must record video and audio. The
    contractor must provide, install configure and test a monitor, controller (if needed) and
    Network Video Recorder (NVR) in a building to be determined on-site, this will be used
    to monitor the cameras inside and outside the jail. The cameras must be able to be
    monitored on a single display screen in a split view format. The monitor must be a large
    flat screen high definition television for monitoring (42" minimum diagonal.) The
    contractor must provide a wall mount for the display. The Network Video Recorder
    (NVR) must be capable of recording all camera feeds for 24 hours continuously. The

AR11816

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

NVR must have the ability to easily extract the video through a USB port or SD Card for case information. The NVR should have the ability to simultaneously record the video to multiple recording devices, such as a Network Accessible Storage (NAS). The contractor must provide a minimum of two (2) signs which state "Warning Audio and Video Surveillance In Progress" or similar. The contractor must provide, install, setup and configure all related equipment at all locations. This segment of the network must be on its own LAN segment and isolated from all other LAN segments. The IP Cameras and NVR must be compatible with the following GFE:

https://www.synology.com/en-us/products/RS815

**11. Voice Over Internet Protocol (VOIP) telephone lines and telephones**
Contractor must provide a minimum of 20 VOIP telephone circuits or independent phone lines, which must be capable of operating simultaneously and have individually assigned numbers. Each phone must allow for long distance calling through standard dialing procedures. International dialing capabilities are not needed and may be restricted. The contractor will be responsible for any and all charges associated with this service. The contractor will furnish a list of phone numbers to the government POC, as soon as possible before the event. The contractor shall provide a minimum of twenty (20) telephone handsets, setup installed and maintained. These handsets must include a speakerphone function. Due to the dynamic nature of event setup, additional VOIP telephone circuits and handsets should be easily available.

**12. Voice Over Internet Protocol (VOIP) Facsimile (FAX) lines**
Contractor must provide a minimum of two (2) VOIP fax circuits or independent fax lines, which must be capable of operating simultaneously and have individually assigned numbers. Each fax must allow for long distance calling through standard dialing procedures. International dialing capabilities are not needed and may be restricted. The contractor will be responsible for any and all charges associated with this service. The contractor will furnish a list of fax numbers to the government POC, as soon as possible before the event. Fax machines are Government Furnished Equipment (GFE) and will support VOIP transmission.

13. Contract personnel must arrive on site at the location on Wednesday, August 14, 2019 and begin set-up and no later than 17:00 hours.

14. Network and Internet access to the Emergency Dispatch Center (EDC) will be a priority and must be delivered NLT Friday, August 16, at 23:59 hours.

15. System must be fully built, deployed, tested and operational by Monday, August 19, 2019 at 23:59 hours.

AR11817

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

16. Contractor must have dedicated technical support on-site, at the JOC, during the entire "Service Period." Contractor must have dedicated technical support personnel available to respond within 15 minutes in the event of network failure to technical support requests.

17. Contractor must provide a "High Availability Network" (5-9's or 99.999% per year / or 99.5% per 24 hours). System "High Availability" is required from 08/21/2019 00:01 hours through 09/07/2019 23:59 hours.

18. Contractor must provide a network, which is dedicated and must not be shared with other clients. Unless approved by the government in writing, the contractor will not provide any network services and support, bandwidth or internet access to any entity other than the government.

19. Contractor must provide a microwave system on the routes from the BLM JOC to the LE Substation. To prevent interference / interception the contractor will be required to do frequency coordination with other microwave users. Should there be any; contractor is responsible for any, and all costs, and/or fees for licensing.

20. Weather including wind, dust and rain are common at the location. The network must be capable of operation regardless of weather conditions.

21. Contractor should plan for and provide for a full contingency / failover option at the location. Contingency / failover must be readily deployed during the performance period. Contingency / failover must be automatically deployed by the contractor in the event of known primary system outage or failure. Automatically is defined as: "If the contractor is aware of an outage or failure, they should take immediate action to correct the outage or failure without a request from the government." This does not mean the "Contingency/Failover" happens through machine automation. Any machine automation to reduce potential downtime is preferred.

22. It is a requirement for this contractor to work collaboratively and cooperatively with additional contractors, vendors, federal, state, local agencies during the performance period both at the location and at off-site locations if necessary.

23. The contractor shall provide all system design and pre-event engineering. The contractor shall provide a detailed written plan and technical drawing and furnish it to the BLM Project Lead as soon as possible after contract award, but no later than Wednesday, July 31, 2019 17:00 hours.

24. The contractor shall provide a temperature-controlled environment for all indoor system electronics.

May 28, 2019
Page 6 of 15

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

25. The contractor shall provide a "relatively" dust free / dust controlled environment for all indoor system electronics.

26. The contractor shall be responsible for lodging of contractor personnel on-site, at the JOC, through the use of a contractor furnished RV or camper trailer. The government will provide space for parking, power, potable water and sewage service.

27. The contractor shall be responsible for food and beverages for contractor personnel from August 14 through August 21. Catering service will begin on August 21, 2019. Catering service will conclude on September 4, 2019. The contractor shall be responsible for food and beverages for contractor personnel from September 5 to 7, 2019.

28. The contractor shall provide any on-site transportation needed for contractor personnel and contractor equipment at the location during the performance period.

29. The contractor shall be responsible for all transportation of all contractor personnel and contractor equipment to and from the event.

30. The contractor shall be responsible for all power for remote repeater locations and/or any part of the network, which is not at the BLM JOC or in Black Rock City.

31. If the contractor chooses to use solar power at remote repeater locations, the system must be engineered to include an uninterruptible power supply (UPS) capable of maintaining the system at "High Availability."

32. The contractor is encouraged to engineer the network to include an uninterruptible power supply (UPS) at the BLM JOC and the substation.

33. The contractor shall be available to participate in pre-coordination meetings by telephone and/or video teleconference.

34. The contractor shall provide network monitoring and network / web content filtering to increase productivity, regulate bandwidth usage, and prevent risky behavior through enforcement of granular policies on user activities. The contractor shall provide network hardware and/or software to control access to web sites, applications, and Web 2.0 platforms based on users, groups, time, bandwidth, and other criteria. The contractor will conduct these activities at the direction of the Project Inspector.

35. The contractor shall provide reports on network utilization and monitoring for the duration of the "Service Period." Daily, Weekly and Service Period Reports will be provided at the request of the Project Inspector. Proactive delivery of reports through electronic delivery by email is desired.

AR11819

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

## OCCUPATION / OCCUPATION CODE(s):

http://www.bls.gov/soc/
15-1152 Computer Network Support Specialists
49-2021 Radio, Cellular, and Tower Equipment Installers and Repairers

## GOVERNMENT FURNISHED REQUIREMENTS:

The tasks and responsibilities of the government shall consist of the following:

1. Provide through third party service provider(s) microwave internet transport, bandwidth and public IP addressing for use by the contractor.
2. Provide indoor workspace for contractor personnel.
3. Provide onsite parking for contractor furnished RV or camper trailer.
4. Provide electrical power to the contractor furnished RV or camper trailer.
5. Provide electrical power to the contractor electrical equipment for the IP network at the BLM JOC and the Sub-Station.
6. Provide food and beverages for the contractor through catering service from August 21 through September 4, 2019.
   a. Meals will be served three times per day at regular intervals.
   b. Meals will be provided for no more than five contractor personnel.
7. Provide water fill service through an on-site contractor.
8. Provide sewage pump out service through an on-site contractor.
9. Provide a government Project Lead for coordination and direction pre-event and on-site.
10. Provide a shipping address in Gerlach, Nevada to the contractor may ship small and urgent packages necessary to the project.

## RESTRICTIONS:

Unless approved by the government in writing, the Contractor is restricted from providing any network services and support, bandwidth or internet access to any entity other than the government.

AR11820

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

**ACKNOWLEDGEMENTS:**

The government acknowledges the network at the BLM JOC and within Black Rock City is dependent on power provided by the government and/or another contractor to the government. The contractor will not be responsible for system outages or failures, which are caused by lack of power or power inadequacies, which are outside of their control. Diverse power feeds will be made available at the Emergency Dispatch Center (EDC) and the shared network building. Diverse power feeds may be made available at other locations as needed through coordination with Black Rock City. The contractor is responsible for documenting, in writing, and immediately reporting any issues with power to the government project lead. The contractor is responsible for providing contractor power requirements for the location to the government in advance of the performance period, but not later than July 31, 2019.

The government acknowledges the network at the BLM JOC and within Black Rock City is dependent on transport provided by the government and/or another contractor to the government. The contractor will not be responsible for system outages or failures, which are caused by lack of transport or transport inadequacies. The contractor is responsible for documenting, in writing, and immediately reporting any issues with transport to the government project lead.

This Statement of Work and the response to the Bureau of Land Management's solicitation is for work to be provided to the Government only. Potential contractors are hereby notified, Black Rock City (BRC) aka Burning Man, LLC., has expressed interest in using the Government selected contractor to provide additional network service and support for BRC / Burning Man. A separate Statement of Work would be provided by BRC, after the government's award is made. Potential contractors would have the opportunity to bid on this work directly with BRC, provided it does not interfere with the government network service and support and specifically does not degrade the network service and support provided to the government. There is no guarantee for this work or opportunity. It is, however, in the best interest of the government and BRC to leverage this opportunity to work together for network service and support.

DELIVERABLES:

The tasks and responsibilities identified in the Statement of Work shall fall into the following categories:

1. Technical Services
2. Network Services
3. Data Services
4. System Administration Services
5. Network Administration Services
6. Accounting of Billable Activities

The contractor shall provide a detailed accounting of all billable services following the period for which the services were performed.

AR11821

### UNITED STATES DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT
### BLM BURNING MAN OPERATION 2019

## STATEMENT OF WORK (SOW)

### LOCATION:

BLM 2019 Burning Man BLM Headquarters (BLM JOC)

Black Rock Desert near Gerlach, NV (Pershing County, Nevada)

2017 City location(s):

| | |
|---|---|
| The Man | N40.78630, W-119.20650 |
| Perimeter Point 1 | N40.78300, W -119.23562 |
| Perimeter Point 2 | N40.80598, W -119.21944 |
| Perimeter Point 3 | N40.80221, W -119.18559 |
| Perimeter Point 4 | N40.77628, W -119.18008 |

Perimeter Point 5/BLM JOC  N40.76436, W -119.21094 (*subject to minor shift)

It is expected that the network will require infrastructure placement in multiple locations possibly in multiple counties, in order to deliver service to the above location.

### PERIOD OF SERVICE:

August 14, 2019 through September 7, 2019. (25 Days)

08/14/2019 – Contractor must arrive at BLM JOC begin "setup"

08/20/2019 – Provided Services at BLM JOC fully operational at or before 23:59 hours

09/5/2019 – "Post Patrol" portion of event ends, contractor begins "break down"

09/7/2019 – Contractor may depart when "break down" complete.

AR11822

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

### STATEMENT OF WORK (SOW)

**SYSTEM STANDARDS COMPLIANCE:**

DOI may conduct an Assessment & Authorization (A&A) of the CAD/MDT system before the
COR issues an Authority to Operate (ATO) on the DOI Network. If this assessment is
conducted, the contractor will be required to answer questions, participate in the A&A process
and potentially implement any information security changes necessary to facilitate receiving the
ATO for this system. The system may undergo continuous monitoring as set forth in NIST SP
800-37 rev. 4.

The system shall be fully compliant with the U.S Department of Justice (USDOJ), Federal
Bureau of Investigation (FBI) Criminal Justice Information Services (CJIS) Security Policy. An
electronic copy of this policy will be provided at the contractor's request.

The system shall be fully compliant with the Nevada Criminal Justice Information System
(NCJIS), which is the Nevada State Criminal Justice Interface. NCJIS Compliance is
MANDATORY.

The system and any/all electronic and information technology procured through this effort must
be compliant with 29 U.S.C § 794d - Electronic and information technology (Section 508
Compliance Amendment to the Rehabilitation Act of 1973) the applicable accessibility standards
at 36 CFR 1194. 36 CFR 1194 implements Section 508 of the Rehabilitation Act of 1973, as
amended, and is viewable at http://www.section508.gov. Standards applicable to this
requirement include: Functional Performance Criteria 1194.31 and Information, Documentation,
and Support 1194.41.

AR11823

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

**INTERNET PROTOCOL VERSION 6:**

Any system hardware, software, firmware and/or networked component (voice, video or data) developed, procured, or acquired in support and/or performance of this contract shall be capable of transmitting, receiving, processing, forwarding and storing digital information across system boundaries utilizing system packets that are formatted in accordance with commercial standards of Internet Protocol (IP) version 6 (IPv6) as set forth in the USGv6 Profile (NIST Special Publication 500-267) and corresponding declarations of conformance defined in the USGv6 Test Program.

Systems and Services shall be accessible from the Internet and DOI's computer network using Internet Protocol version 6. Services accessible via IPv6 shall be equivalent to services provided via IPv4; Systems and services must interoperate with both IPv6 and IPv4 systems and products.

In addition, this system shall maintain interoperability with IPv4 systems and provide at least the same level of performance and reliability capabilities of IPv4 products.

The system shall be fully compliant with National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 140-2, Security Requirements for Cryptographic Modules.

The system shall be fully compliant with National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 197, Advanced Encryption Standard (AES) 256-bit cypher.

The system shall be fully compliant with National Institute of Standards and Technology (NIST), Special Publication 800-82, Guide to Industrial Control Systems (ICS) Security (Revision 2 Initial Public Draft).

National Institute of Standards and Technology (NIST) Special Publication 500-267, A Profile for IPv6 in the U.S. Government – Version 1.0.  Reference: NIST Link:
http://www.nist.gov/information-technology-portal.cfm

*NOTE: For the CJIS VPN tunnel, IPv4 will be utilized. At this time "NO Known" network segments will require IPv6. The United States Department of the Interior requires the IPv6 statement to be included in all Requests for Proposal (RFP), Requests for Quote (RFQ) and Contract Awards. Any equipment or solutions must be IPv6 complaint, however, at this time it is not anticipated any IPv6 will be utilized.*

AR11824

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

**LEGAL AUTHORITIES AND REGULATORY REQUIREMENTS:**

The design, construction and operation of the network and transmission of all data must comply with all commonly accepted commercial network standard and regulations and with the following legal and regulatory requirements:

- 44 U.S.C. § 3541 – Federal Information Security Management Act (FISMA) of 2002
- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 140-2, Security Requirements for Cryptographic Modules
- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 197, Advanced Encryption Standard (AES) 256 bit cypher.
- 28 C.F.R. § 20 - Criminal Justice Information Systems
- 43 C.F.R. Public Lands: Interior
- 16 U.S.C. § 470 – National Historic Preservation Act
- 29 U.S.C § 794d - Electronic and Information Technology (Section 508 Compliance Amendment to the Rehabilitation Act of 1973)
- FBI CJIS Security Policy
- Department of the Interior Acquisition Policy Release (DIAPR) 2012-09 – IPv6
- Department of the Interior Request and Risk Acceptance for Permanent Opening of Social Media and Web 2.0 Technology Websites

All work shall be performed in accordance with NIST SP 800-37 rev. 4, 800-18, 800-30, 800-60, 800-53, 800-53A, Federal Information Processing Standard (FIPS) 199 & 200, DOI guides & templates, and the DOI Privacy Impact Assessment.

Guides and other references related to standards within this SOW may be found at:
NIST: http://csrc.nist.gov/publications/PubsSPs.html
NIST Checklist: http://checklists.nist.gov
FIPS: http://www.nist.gov/itl/fips.cfm
DOI Privacy Impact Assessment Guide:
https://www.doi.gov/sites/doi.gov/files/migrated/ocio/information_assurance/privacy/upload/DOI-PIA-Guide-09-30-2014.pdf
NIBRS: https://www.fbi.gov/about-us/cjis/ucr/nibrs.
DOJ Information Sharing: https://it.ojp.gov/2417
EDXL: https://en.wikipedia.org/wiki/EDXL
*Any other guides and templates shall be provided at time of award by the CO

The quoted solution may undergo Assessment & Authorization activities, and the quoted solution may undergo continuous monitoring as set forth in NIST SP 800-37 rev. 4. The contractor will take appropriate and timely action to correct or mitigate any weaknesses discovered during such activities.

AR11825

### UNITED STATES DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT
### BLM BURNING MAN OPERATION 2019

### STATEMENT OF WORK (SOW)

## WEB CONTENT CATEGORIES TO LIMIT:

- Streaming Media
- Streaming Radio/TV
- Advertisements & Popups
- Media Downloads
- Media Sharing
- Auctions & Classifieds
- Stock Trading
- Peer-to-Peer
- Web-based Telephony
- Adult Content
- Alcohol & Tobacco
- Gambling
- Intolerance & Hate
- Pornography
- Tasteless & Offensive
- Violence & Terrorism
- Extremely Offensive
- Gambling Related
- Game/Cartoon Violence
- Profanity
- Hacking
- Phishing & Fraud
- Proxies
- Spam
- Spyware
- Proxy Utilities
- Malicious Sites
- Suspicious Sites

AR11826

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

## U.S. DEPARTMENT OF THE INTERIOR ALLOWED MEETING SITES:

http://connectnow.acrobat.com
http://gotomeeting.com
http://gotowebinar.com
http://gotoassist.com
http://www.webex.com/
http://www.govloop.com/
http://office.microsoft.com/en-us/liveemeeting/ default.aspx

## U.S. DEPARTMENT OF THE INTERIOR ALLOWED SOCIAL MEDIA SITES:

http://www. facebook.com/SecretarySalazar http://www.facebook.com/nationalparkservice
http://www.flickr.com/photos/US Interior http://www.twitter.com/NatlParkService http://www.t
witter.com/US GS
http://www.twitter.com/USinteriorNews
http://www.youtube.com/user/esritv
http://www.youtube.com/user/FEMA
http://www. youtube.com/user/oceanexplorergov http://www.youtube.com/user/CDCStreamingH
ealthhttp://www.youtube.com/NationalParkService
http://www.youtube.com/USGS
http://www.youtube.com/USinterior
http://www.youtube.com/RecoveryBoard#play http://www.youtube.com/user/irsvideos
http://www.youtube.com/user/NationalParkService
http://www. youtube.com/user/oceanexplorergov http://www.youtube.com/user/usgs#play/all
http://www.youtube.com/user/USEPAgov
http://www.youtube.com/user/USGovernment
http://www.youtube.com/user/USFoodandDrugAdmin
http://www. youtube.com/user/ushomelandsecurity
http://www. youtube.com/user/usnistgov
http://www.youtube.com/user/whitehouse


Other sites as directed by the Project Inspector

AR11827

# EXHIBIT K

AR11828

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

**Mission Support Technician (MST) services and support in the Gerlach, NV area for the 2019 Burning Man Event**

**PROJECT TITLE:**

2019 Burning Man Event BLM Mission Support. Dispatch Technician Support Services for the 2019 Burning Man Event with an Option Period for the 2020 Burning Man Event.

**BACKGROUND:**

The Burning Man Recreational Event is an international art festival and an experiment in a "temporary community dedicated to radical self-expression and self-reliance". The temporary community of Black Rock City is created for eight days and becomes the seventh largest city in Nevada. The event takes place on the Black Rock Desert within the Black Rock/High Rock NCA, managed by the Winnemucca District Office. A Special Recreation Permit (SRP) is issued to Black Rock City LLC, which is responsible for all activities within Black Rock City. The SRP has approximately 13 general stipulations and 60 special stipulations. The BLM also generates a Closure Order for the event that is announced in the Federal Register, which designates the event area as a temporary closure and documents temporary restriction of certain activities within the temporary closure.

The BLM's operational mission is to ensure public safety and resource protection through the enforcement of the event closure order, the SRP stipulations, Federal laws/regulations and Nevada state laws/regulations at the event. To accomplish this mission the BLM has adopted the Incident Command System (ICS) and integrated multiple agencies into one operation. The ICS operation will be a combination of overhead, operational and support positions. The ICS operation will cover all three event periods of the detail: Pre-Event; Main Event; Post-Event (8/20 - 9/5: 17 days).

**SCOPE OF WORK:**

The Contractor shall provide experienced and trained personnel to staff and operate the BLM portion of the Emergency Dispatch Center (EDC), 24 hours per day in support of the event. The Contractor shall provide services in the form of experienced and trained professional **"Mission Support Technicians,"** also known as "Telecommunicators" or "Dispatchers." The Contractor shall also provide services in the form of experienced and trained professional **"Lead Mission Support Technicians"** also known as "Lead Public Safety Telecommunicators" or "Lead Dispatchers." The Contractor shall also provide services in the form of experienced and trained professional **"Assistant Center Managers"** also known as "Supervisory Public Safety Telecommunicators" or "Supervisory Dispatchers."

AR11829

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

**REQUIREMENTS:**

Required equipment, services, tasks and responsibilities of the contractor shall consist of the following:

1. Provide (2) Assistant Center Managers (meeting attached minimum criteria)

2. Provide (3) Lead Mission Support Technicians (meeting attached minimum criteria)

3. Provide (12) Mission Support Technicians (meeting attached minimum criteria)

4. Provide criminal justice information to law enforcement officers, communicate and coordinate emergency responses, track resources and personnel and maintain statistical data for reporting to executive and command leadership.

5. Perform law enforcement communication operations in compliance with the Federal Bureau of Investigation (FBI), Criminal Justice Information Systems (CJIS) Security Policy; Nevada Criminal Justice Information System (NCJIS) and the National Crime Information Center (NCIC) laws, regulations, policies and procedures.

6. Provide all personnel meeting all "Special Requirements" in addition to minimum criteria.

7. Arrive on site at the location on Saturday, August 17, 2019 and begin on-site event training and complete any testing, no later than 13:00 hours, Pacific Daylight Time (UTC-08:00).

8. Have all personnel trained, certified and fully prepared to work by Monday, August 19, 2019 at 12:00 hours, Pacific Daylight Time (UTC-08:00).

9. Have personnel on-site during the entire "Service Period." Contractor must have a process in place to cover for sick, injured or temporarily unavailable personnel.

10. Provide a "Full Shift Coverage" from 08/20/2019 00:01 hours through 09/05/2019 23:59 hours, Pacific Daylight Time (UTC-08:00).

11. Provide a "uniform" appearance of all personnel on shift, such as a "Polo" type uniform shirt and standard color of pants, accessories. This provides for a professional appearance and alleviates personnel identity security concerns at the headquarters/ Joint Operations Center (JOC) / Emergency Dispatch Center (EDC).

12. It is a requirement for this contractor to work collaboratively and cooperatively with additional contractors, federal, state and local agencies during the Performance period both at the location and at off- site locations if necessary.

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

13. The contractor shall be responsible for food and beverages for contractor personnel from August 16th, 2019 through August 20th, 2019. BRC provided catering service will begin on August 21, 2019 and will conclude on September 04, 2019.

14. The contractor shall provide any on-site transportation needed for contractor personnel and contractor equipment at the location during the performance period.

15. The contractor shall be responsible for all transportation of all contractor personnel and contractor equipment to and from the event.

16. The contractor shall be available to participate in pre-coordination meetings by telephone and/or video teleconference.

17. Beginning with Post-Patrol, the contractor shall release two Mission Support Technicians per shift from the event. Based on the reduced activity at the event during post-patrol, fewer personnel are needed to provide Mission Support. The contractor shall make necessary travel arrangements for these departing personnel, to depart from Reno, NV on September 3rd, 2019. This allows for appropriate work / rest guidelines prior to travel.

18. The Contractor shall primarily provide services to BLM, but must also be prepared to support cooperating agencies including, but not limited to, Black Rock City (BRC) Emergency Services Department (ESD), Pershing County Sheriff's Office (PCSO), Washoe County Sheriff's Office (WCSO), Nevada Department of Public Safety (NVDPS).

19. The Contractor shall provide the services and support outlined in this statement of work to approximately 140 event personnel.

20. The contractor shall be responsible for training their personnel to use the iNet CAD system. Any "extra" or "additional" training needed by contractor employees is the responsibility of the contractor. The CAD system will be available for any "extra" or "additional" training needed.

AR11831

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

**WORK ENVIRONMENT:**

The EDC is in a modular trailer that is located on site of the Black Rock Desert Playa. Shifts are typically 12 hours including drive time to and from site. Shifts may be extended due to activity.
Mission support technicians will work/report to their respective Lead Mission Support Technicians. Lead Mission Support technicians will work/report to their respective Assistant Center Manager. Assistant Center Managers will coordinate with, and report daily status to, the Contracting Officers Representative and the Communication Center Manager, who are full-time government employees.

The physical environment is extreme with high wind and extreme dust being very common. High daytime temperatures and low nighttime temperatures are common in the desert at this time of year.

The BLM side of the EDC, call sign "CONTROL" will provide 24 hours of mission support to the event over three shifts. Day Shift (0500-1700), Swing Shift (1500-0300) and Night Shift (1900-0700). These are typical shift times, SHIFT TIMES ARE SUBJECT TO CHANGE.

Mission Support responsibilities of "CONTROL" will include:
- Track officers and non-law enforcement personnel to provide for employee safety. Track special resources, such as K-9 teams, Investigative Teams, Evidence Personnel. Provide investigative services and support and criminal justice information to officers.
- Provide statistical data to the Plans (GIS) Unit. Provide specific workload reports as requested.
- Accurately and completely enter data for events to comply with requirements of records management system.

**iNet Public Safety CAD**

"CONTROL" will be utilizing a computer aided dispatch system provided by iNet Public Safety. The CAD has many capabilities, including resource tracking, event creation and tracking, criminal justice queries, satellite and road map GIS, automatic vehicle location through GPS/AVL interface and custom reporting. MST's will be provided a username, password, an overview and documentation upon arrival. There will be 24hr on-site support for the CAD. After award, the contractor will be granted access to an online instance of the CAD System, which will be available for familiarization and training, by contractor personnel.

**JusticeLink (JLINK/JLCLIENT)**

JLink/JLClient is a secondary query system similar to CLETS, or CLIPS in other states. Through JLink, MST's will be able to run queries that are not necessarily standard. MST's will be provided a username and password for this system as well.

AR11832

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

### STATEMENT OF WORK (SOW)

#### ANTICIPATED / ESTIMATED WORK REQUIREMENTS:

The detail provided below is an "estimate" and is by no means a guarantee of the minimum or maximum hours, which may be needed to support this event. This is a dynamic event with constantly adjusting operational needs. This is provided only as a guide for planning. The contractor is expected and required to provide all needed services and support for a Firm Fixed Price.

**Pre-Event Training Hours** (Actual training time spent on iNet and the Nevada Department of Public Safety. No meeting times are included.)

17 (personnel) x 40 (Hours each) = ~680 hours

**On-Site Training** (Actual time spent on introductions, on-site training, conducting area familiarization, meetings, travel, meals, etc.)

17(personnel) x 10 (Hours each) x 4 (Days of on-site training) = ~ 680 hours

**Event Hours** (Actual time for travel, meals, and providing dispatch services).

2 (ACM's) x 14 (Hours each / 12 @ site) x 17 (Days of providing dispatch services) = ~476 hours.
3 (LMST's) x 12 (Hours each / 10 @ site) x 17 (Days of providing dispatch services) = ~612 hours.
12 (MST's) x 12 (Hours Each / 10 @site) x 17 (Days of providing dispatch services) = ~2448 hours.

Total Event Hours = ~3536

Pre-Event Training:  ~680 hours (40 hours per person)
On Site Training:  ~680 hours (40 hours per person)
Event hours:  ~3536 hours (17 days providing services)

#### Total: ~4896 hours (All hours combined)*

*Travel time from Contractor location(s) to the event and from the event are not included in this estimate as they may vary substantially.

AR11833

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

**TRAVEL:**

Approximate travel dates arriving in Gerlach, Nevada August 16, 2019 leaving Gerlach, Nevada September 6, 2019. Need to account for training with BLM Terminal Agency Coordinator (TAC) for the NCJIS requirements. DATES ARE SUBJECT TO CHANGE

Reno, Nevada is the closest airport to the event. Drive time from Reno to Gerlach is about two hours.

Housing for all contractor personnel will be provided by BRC. Housing is typically provided in a trailer park in Gerlach, Nevada. Two to Four Contractor personnel are typically sharing a trailer with individual or shared bedrooms, shared bathroom and shared kitchen and living area. Laundry facilities are available in or near the housing area.

**OCCUPATION / OCCUPATION CODE(s):**
   http://www.bls.gov/soc/
   43-5031  Public Safety Telecommunicators

**GOVERNMENT FURNISHED REQUIREMENTS:**
The tasks and responsibilities of the government shall consist of the following:
1. Provide appropriate workspace and working conditions.
2. Provide a government Project Lead and project contacts for coordination and direction pre-event, event and post-event.
3. Provide direction and leadership for all contractor personnel.
4. Pay for background clearance fees through Nevada Department of Public Safety
5. Provide training and training resources on iNet CAD and JLink
6. Provide a shipping address in Gerlach, Nevada so the contractor may ship small and urgent packages necessary to the project, or for contractor employee personal needs.
7. Provide food and beverages for the contractor through catering service from August 21 through September 4, 2019.
   a. Meals will be served three times per day at regular intervals.
   b. All contractor personnel will be provided three meals per working shift based on standard caterer schedule, similar to previous events. Any meals while off-duty away from the event site are not provided by BRC, i.e. meals at local establishments in Gerlach.

AR11834

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

**SPECIAL REQUIREMENTS:**

All contractor personnel need a favorable background investigation meeting or exceeding NCJIS screening standards.

The contractor is required to provide the following documentation to BLM by July 1, 2019 to initiate the NCJIS background check and security clearance process. Failure to submit the documentation will result in the inability of contractor personnel to work the event.

Applicant Requirements:

1. A list of the contractor personnel assigned to work the event. Please include name, date of birth, place of birth, current address, and social security number. It is helpful if this is delivered in spreadsheet format.

2. Contractor employees will need their fingerprints taken. They agency administering the fingerprints is required to sign the fingerprint card in the appropriate box. The contractor employee is also required to sign the fingerprint card. *Specific detailed instructions regarding the forms and processes will be provided at the time of award.*

3. Each contractor employee will need to fill out the Nevada Department of Public Safety (NVDPS) Fingerprint Background Waiver Form. Put "Bureau of Land Management" as the requesting agency. *Specific detailed instructions regarding the forms and processes will be provided at the time of award.*

4. Submit items 1-3 to:

   **R. Andres C/O**
   BLM Nevada State Office
   1340 Financial Blvd.
   Reno, NV, 89502.

   (Sending by a trackable method, such as Federal Express or U.S. Postal Service Express Mail is recommended.)

5. Any previous felony convictions may preclude contractor personnel from being authorized to work this event.

Once the above is received, BLM will complete the following.

BLM Responsibilities:

1. Submits the fingerprint cards to NVDPS in Carson City, Nevada.

AR11835

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

2. BLM will notify the contractor, as soon as possible, of any issues with the background process such as, Forms, which cannot be accepted, by NVDPS and/or background clearance issues with specific personnel, etc.

3. BLM will notify the contractor, as soon as possible, once all personnel have been "background cleared."

4. Once favorable background investigation is complete, BLM Terminal Agency Coordinator (TAC) will request a new operator ID for each contractor employee.

5. The BLM TAC will conduct a criminal history check for each MST assigned to the operation.

6. The BLM TAC will coordinate training prior to the start of the operation. This may require earlier arrival.

5. The BLM will coordinate with the NVDPS to conduct and onsite criminal justice security inspection.

**RESTRICTIONS:**

None

**DELIVERABLES:**

The tasks and responsibilities identified in the Statement of Work shall fall into the following categories:
1. Dispatch Technician Support Services
2. Travel
3. User Training
4. Letter certifying qualifications of all assigned event support personnel **(Due July 31st, 2019)**

Regular meetings with the contractor shall be held to track all work being performed.
1. Prior to the event: Meetings will be scheduled as needed to provide status of contractor personnel or as requested by the Contractor or Government.
2. At event: Meetings will be daily, or as needed, for the contractor to provide status to the government.

AR11836

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

**ACKNOWLEDGEMENTS:**

For the purposes of this statement of work, the job title of "Mission Support Technician" and "Dispatcher" are considered to be one and the same and also the same as "Public Safety Telecommunicator"

**LOCATION:**

2019 Burning Man BLM Joint Operations Center (BLM JOC)
Black Rock Desert near Gerlach, NV (Pershing County, Nevada)
2018 City location(s):
The Man                N40.78630, W-119.20650
Perimeter Point 1      N40.78300, W -119.23562
Perimeter Point 2      N40.80598, W -119.21944
Perimeter Point 3      N40.80221, W -119.18559
Perimeter Point 4      N40.77628, W -119.18008
Perimeter Point 5/BLM JOC  N40.76436, W -119.21094 (*subject to small shift)

**PERIOD OF PERFORMANCE:**

PERIOD OF SERVICE AT EVENT:
*2019 Burning Man Event:*
August 20, 2019 through September 5, 2019. (17 Days)
08/17/2019 – Contractor must arrive at Black Rock Desert to begin "on-site training"
08/20/2019 – Provided Services fully operational at or before 12:00 hours 08/20/2019 – "Pre-Patrol" portion of event begins
09/05/2019 – "Post Patrol" portion of event ends, contractor begins "break down" 09/05/2019 – Contractor may depart when "break down" complete.

*2020 Burning Man Event:*
Dates for 2020 Burning Man Event are not defined at this time however the period of service is expected to be the same.  Contractor should assume 17 days overall as outlined above.  The SOW will be updated as soon as the exact dates are known.

OVERALL CONTRACT PERIOD OF PERFORMANCE:
From Contract Award through completion. July 1, 2019 (estimated) through December 31, 2020 if the option period is exercised.

AR11837

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

## LEGAL AUTHORITIES AND REGULATORY REQUIREMENTS:

The operation of the CAD System and transmission and handling of all data must comply with all commonly accepted standards, laws and regulations.

- 44 U.S.C. § 3541– Federal Information Security Management Act (FISMA) of 2002
- 28 C.F.R. § 20 - Criminal Justice Information Systems
- 43 C.F.R. Public Lands: Interior
- 16 U.S.C. § 470 – National Historic Preservation Act
- FBI CJIS Security Policy

Guides and other references related to standards within this SOW may be found at:
NIST: http://csrc.nist.gov/publications/PubsSPs.html
NIST Checklist: http://checklists.nist.gov
FIPS: http://www.nist.gov/itl/fips.cfm
DOI Privacy Impact Assessment Guide:
https://www.doi.gov/sites/doi.gov/files/migrated/ocio/information_assurance/privacy/upload/DOI-PIA-Guide-09-30-2014.pdf
NIBRS: https://www.fbi.gov/about-us/cjis/ucr/nibrs.
DOJ Information Sharing: https://it.ojp.gov/2417
EDXL: https://en.wikipedia.org/wiki/EDXL
*Any other guides and templates shall be provided at time of award by the CO

AR11838

## UNITED STATES DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## BLM BURNING MAN OPERATION 2019

## STATEMENT OF WORK (SOW)

**CONTACTS:**

**BLM Project Lead/Technical Point of Contact/Project Inspector (PI)**
Becky Andres
Staff Law Enforcement Ranger
Bureau of Land Management
1340 Financial Blvd
Reno, NV 89502
(O): 775-861-6444
(C): 775-315-3497
randres@blm.gov

**BLM Contracting Specialist**
Kim Ferguson, Contract Specialist
BLM Nevada State Office
(Ely District Office)
702 No Industrial Way, Ely, NV 89301
Ph: 775-861-6441
Cell: 775-861-6443
Fx: 775-549-9827
k1fergus@blm.gov

**BLM Procurement Analyst**
David W. Appold
Supervisory Procurement Analyst
Division of Support Services
BLM Nevada
(775) 861-6417 (Phone)
(775) 861-6634 (Fax)
dappold@blm.gov

AR11839

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

## ATTACHMENT #1

Law Enforcement **Mission Support Technician** Required Certifications & Experience

**Required State & Federal Certifications:**

1: State 911 Public Safety Telecommunicator Certificate & Certification.

2: Nevada Department of Public Safety Telecommunicator Certificate & Certification.

**Required Training Certificates & Certifications:**

1: National Incident Command System Certificate & Certification (FEMA IS100).

2: Telecommunicator Emergency Response Taskforce Certificate & Certification (FEMA IS144).

3: Emergency Communications Certificate & Certification (FEMA IS250A).

4: Human Diversity Certificate & Certification (FEMA IS 20.17)

5: Active Shooter Incidents for Public Safety Communications Course Certificate (FEMA IS907)

6: FBI CJIS Security Training

**Required Experience:**

1: Minimum of three years as a law enforcement dispatcher with a city, county, state, tribal or federal law enforcement agency.

2: Must currently be employed, previously employed, or retired, as a law enforcement dispatcher whose license and certifications are current.

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

### STATEMENT OF WORK (SOW)

**Minimum Qualifications:**

**Abilities:**

1: Properly communicate well with others in a clear, concise and professional manner.

2: Work within a very dynamic work environment in an efficient and productive manner, where at any time the situation can change and with significant criticality.

3: Take direction and constructive criticism from supervisors and implement any required changes in a positive and constructive manner.

4: Ability to problem solve and make decisions independently of supervision being present.

5: Ability to handle multiple law enforcement events simultaneously, analyze calls for service and determine the appropriate response.

**Knowledge & Understanding:**

1: Knowledge and understanding of the proper operation of VHF, High Band, Low Band, repeater and 800mhz radios systems.

2: Knowledge and understanding of different computer aided dispatch systems.

3: Knowledge and understanding of state and federal crime information centers and the rules that govern access, privacy and dissemination of this information.

4: Knowledge and understanding of the "Standard Operating Procedures" that govern law enforcement dispatch operations.

5: Knowledge and understanding of applicable city, county, state, federal and tribal laws including jurisdictional responsibilities for each.

**Skills:**

1: Properly use computers, two-way radio system, computer aided dispatch system and phone / intercom systems.

2: Properly analyze incoming calls for service and determine the appropriate response and necessary resources required to safely handle the call in the most efficient and productive manner possible.

AR11841

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

3: Properly create incidents and dispatch calls for service, assign the appropriate resources and monitor the call for officer safety and any additional request for resources.

4: Properly manage incidents within a CAD system, ensuring that all required information is entered accurately to include officer comments, location, persons, property, offense and the proper disposition of the call.

5: Properly run, read and disseminate pertinent information obtained from federal & state criminal justice information systems, to officers in the field in an accurate and timely manner.

**Reference:**

APCO training and standards can be located at **www.apcointl.org**

FEMA training and standards can be located at **www.training.fema.gov**
1) Independent Study Program (located at top of page).
2) I.S. Course List (located on left side of page).
3) View all (at bottom of page) select appropriate courses.
4) All students must register for an SID Number in order to take exam and obtain a certificate.

AR11842

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

## STATEMENT OF WORK (SOW)

## ATTACHMENT #2

Law Enforcement **Lead Mission Support Technician** Required Certifications &
Experience

## Required State & Federal Certifications:

1: State 911 Public Safety Telecommunicator Certificate & Certification.

2: Nevada Department of Public Safety Telecommunicator Certificate & Certification.

## Required Training Certificates & Certifications:

1: All training certificates and certifications required for the position of Mission Support
Technician.

2: Leadership & Supervision (APCO, IPTM, or equivalent course)

3: Communications Training Officer / Field Training Officer Certificate & Certification (APCO,
IPTM, or equivalent).

4: National Incident Management System NIMMS (FEMA 700)

5: Leadership & Influence (FEMA IS240)

6: Decision Making & Problem Solving (FEMA IS241)

7: Initial Ethics Course (FEMA IS33.16)

8: Effective Communications (FEMA IS242)

## Required Experience:

1: Minimum of five years as a law enforcement dispatcher with a city, county, state, tribal or
federal law enforcement agency.

2: At least two of these five years, the applicant must have held the position of "Lead
Dispatcher" with a city, county, state, tribal or federal law enforcement agency.

3: At least two of these five years, the applicant must have held the position of "Communications
Training Officer" with a city, county, state, tribal or federal law enforcement agency.

AR11843

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

**Minimum Qualifications:**

**Abilities:**

1: Manage, supervise and provide leadership to Mission Support Technicians assigned to a shift within a high stress law enforcement communications center.

2: Recognize potential operational problems and concerns within the communications center that may have a negative impact on law enforcement or dispatch operations, personnel, or staff; identify solutions to these issues and bring to the attention of the Assistant Center Manager.

3: Recognize individual strengths and weaknesses of dispatch personnel, properly assign tasks and provide additional assistance to individual dispatchers when necessary.

4: Recognize possible personnel issues to include negative attitudes, conflict between dispatchers / supervisors and stress related issues caused by internal / external sources.

5: Critically think, problem solve and initiate changes independent of additional supervision when necessary.

6: All abilities noted under the Mission Support Technician.

**Knowledge & Understanding:**

1: Knowledge and understanding of how to properly supervise law enforcement dispatchers assigned to a shift to include, personnel and work flow management.

2: Knowledge and understanding of the laws and legal requirements that govern state crime information centers, National Crime Information Center, NLETS, etc. Additionally, understanding of the laws and legal requirements that govern information dissemination to the public, officers, staff and private sector organizations and individuals.

3: Knowledge and understanding of information required to properly investigate criminal, non-criminal and missing person complaints received in the dispatch center by both inside and outside sources.

4: Knowledge and understanding of dispatching "High Liability Issues" to include officer involved shootings, officer involved physical encounters, vehicle & foot pursuits and other "High Liability Issues".

5: Knowledge and understanding of the local geographic area to include streets, roads, highways

AR11844

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

and trails.

6: All knowledge and understanding noted under "Mission Support Technician".

**Skills:**

1: Possess the skills to successfully perform all aspects of the job to include supervision, personnel management, providing dispatch services, working knowledge of multiple CAD systems and the proper use of a two-way radio system.

2: Shall possess the skills to properly supervise a shift consisting of multiple dispatchers, who are handling multiple law enforcement events simultaneously.

3: Possess the skills to teach, train and instruct personnel on all issues related to the use of radios, CAD, case management systems and the communications center SOP's.

4: Possess the skills to build a knowledgeable, productive and efficient law enforcement dispatch team, tending to the needs of all team members both on and off duty.

5: Possess the skills to successfully communicate with staff, personnel and outside organizations, ensuring that messaging is properly delivered, explained and understood by all.

6: All skills noted under "Mission Support Technician".

**Reference:**

APCO training and standards can be located at **www.apcointl.org**

FEMA training and standards can be located at **www.training.fema.gov**
1) Independent Study Program (located at top of page).
2) I.S. Course List (located on left side of page).
3) View all (at bottom of page) select appropriate courses.
4) All students must register for an SID Number in order to take exam and obtain a certificate.

AR11845

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

## ATTACHMENT #3

Law Enforcement **Assistant Center Manager** Required Certifications & Experience

**Required State & Federal Certifications:**

1: State 911 Public Safety Telecommunicator Certificate & Certification.

2: Nevada Department of Public Safety Telecommunicator Certificate & Certification.

**Required Training Certificates & Certifications:**

1: All training certificates and certifications required for the position of Lead Mission Support
   Technician.

2: Communications Center Manager (APCO, IPTM or equivalent course)

3: Leadership & Supervision (APCO, IPTM, or equivalent course)

**Experience:**

1: Minimum of ten years' experience providing law enforcement dispatch services with a city,
   county, state, tribal or federal law enforcement agency.

2: At least five of the ten years, must have held the position of a law enforcement dispatch
   supervisor, or as a law enforcement field supervisor, with a city, county, state, tribal or federal
   law enforcement agency.

3: Five of these ten years, must be a "Communications Training Officer" or as a law enforcement
   "Field Training Officer" with a city, county, state, tribal or federal law enforcement agency.

4: Experience supervising within an "Emergency Operations Center" during an actual / declared
   "State of Emergency", to include mass fatality incidents, active shooter incidents, civil unrest,
   or natural disasters.

AR11846

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2019

STATEMENT OF WORK (SOW)

**Minimum Qualifications:**

**Abilities:**

1: Ability to lead by example, both on and off duty, identifying problems concerns within the team, developing solutions to these problems and ensuring that all dispatch personnel needs are addressed.

2: Ability to communicate properly with dispatch personnel & staff, law enforcement personnel & staff, and outside organizations & individuals, any issues, problems or concerns that affect dispatch or law enforcement operations and do so in a in a professional and productive manner.

3: Ability to teach, train and instruct dispatch personnel as a team, developing individual abilities, knowledge and skills so that individuals and the dispatch team as a whole, can reach their fullest potential in a short amount of time.

4: Ability to critically think, recognize problems, initiate solutions and communicate any required changes in dispatch protocol to civilian and law enforcement staff as needed.

5: Ability to plan, organize and conduct meetings and briefings with civilian and law enforcement command staffs on issues that may affect operations, communications, or personnel safety.

6: All abilities noted under "Lead Mission Support Technician".

**Knowledge & Understanding:**

1: Knowledge and understanding of how to properly manage a law enforcement communications center to include staffing, workflow management and the development and implementing of law enforcement Operational Plans.

2: Knowledge and understanding of leadership principles and how to manage personnel with in a law enforcement communications center, with the understanding that proper leadership requires the ability to accomplish the tasks at hand through others.

3: Knowledge and understanding of how to properly plan, organize and staff the communications center during emergencies or special events.

4: Knowledge and understanding of how to identify and properly deal with personnel issues that arise within the communications center that include individual dispatchers, supervisors or outside sources.

AR11847

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2019**

**STATEMENT OF WORK (SOW)**

5: All knowledge and understanding noted under "Lead Mission Support Technician".

**Skills:**

1: Possess the skills necessary to provide the proper leadership and direction to all personnel assigned to the communications center and to do so in a positive and constructive manner.

2: Possess the skills necessary to properly analyze all available information and make sound rational decisions when needed, drawing from training, knowledge and experience as a law enforcement dispatch supervisor.

3: Possess the necessary skills to quickly identify personnel problems that occur within the dispatch center and to immediately initiate solutions to address these problems in a professional, positive and productive manner.

4: Possess the necessary skills to prepare and conduct meetings and briefings with civilian and law enforcement staff on issues that may affect communications, operations or personnel.

5: Possess the necessary skills required to recognize and properly manage high liability calls for service to include officer-involved shootings, vehicle & foot pursuits, assaults, missing persons and mass casualty events.

6: All skills noted under Lead Mission Support technician.

**Reference:**

APCO training and standards can be located at **www.apcointl.org**

FEMA training and standards can be located at **www.training.fema.gov**
5) Independent Study Program (located at top of page).
6) I.S. Course List (located on left side of page).
7) View all (at bottom of page) select appropriate courses.
8) All students must register for an SID Number in order to take exam and obtain a certificate.

June 8, 2019
Page 20 of 20

AR11848

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone:  (650) 858-8500
david@levinlawfirm.com
Attorneys for Appellant,
Burning Man Project

## UNITED STATES DEPARTMENT OF THE INTERIOR
## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BURNING MAN PROJECT, | Case Identification No.:  IBLA-2020-0302 |
| Appellant, | Special Recreation Permit |
| | LLNVW03500-19-01 |
| v. | 2930 (NV030.10) |
| BUREAU OF LAND MANAGEMENT, | **Declaration of Raymond Allen In Support of Appeal** |
| Appellee. | |

I, Raymond Allen, declare as follows:

1.      I am over 18 years old, of sound mind, and capable of making this declaration.  I

am General Counsel for appellant Burning Man Project ("BMP").  BMP produces the annual

Burning Man Event ("Event").  I have personal knowledge of the facts set forth herein, or, if so

stated, am informed and believe of their truth and accuracy and, if called to testify, I could and

would do so competently and under oath.

2.      I am an attorney licensed to practice in the State of California since 2002.  I joined

BMP in 2004 as Executive Project Manager.  In 2007, my title was changed to Legal and

1

AR11849

Government Affairs Manager.  In 2014, I became General Counsel.  In 2019, Black Rock City LLC transferred the Burning Man SRP to BMP, Black Rock City LLC's parent corporation. References to "BMP" herein are inclusive of Black Rock City LLC to the extent they refer to activities from 1997 through 2018.  For the past fifteen years, I have negotiated and cooperated with the U.S. Bureau of Land Management ("BLM") and Pershing County on behalf of BMP for all issues related to the Burning Man Event, including permitting, compliance, fees, cost recovery, growth, law enforcement, public health and safety, and public relations.

3.       Attached hereto as **Exhibit A** is a true and correct copy of excerpts from BLM Handbook number H-2930-1, titled "Recreation Permit and Fee Administration 2014" (the "BLM Handbook"),  available at

https://www.blm.gov/sites/blm.gov/files/uploads/IM2014-055_att1.pdf and updated by

https://www.blm.gov/policy/im-2018-011.  Chapter 1, Section III.G., of the BLM Handbook sets forth BLM's policy and guidelines for charging fees in connection with administering a special recreation permit ("SRP").  Since 2007, pursuant to the fee guidelines in the Handbook and federal regulations, the Burning Man SRP has been subject to cost recovery.  *See* BLM Handbook at 1-20 - 1-27; 43 C.F.R. 2932.31.  BMP pays all of BLM's direct and indirect costs for administering the SRP, plus 3% of BMP's Event-related gross receipts as a commercial use fee.

4.       Between 2007 and 2011, BLM's costs to manage the SRP increased by about 10% every year, from about $626,000 to $858,788.68.  During this same period, the population of the Burning Man Event increased from 47,097 to 53,963, indicating average annual growth around 4%.

AR11850

5.      In 2012, Daniel P. Love became BLM's Special Agent in Charge for Region 3,

which includes the Black Rock National Conservation Area ("NCA") where the Burning Man

Event takes place.  Special Agent Love assumed leadership of law enforcement operations for

the Burning Man SRP.

6.      In 2012, the Event's population again increased by just 4%, while BLM's costs for

administering the Burning Man SRP increased by 62%, to a total of almost $1.4 million.  This

was in part due to BLM's decision to raise its law enforcement staffing levels by 37%, from 51

officers in 2011 to 70 officers in 2012.  This rise in staffing levels was tied to an escalation in

many of BLM's other costs, from employee meals, accommodations, vehicles, and travel, to

technical services and equipment.

7.      BLM did not provide BMP with an adequate explanation for the substantial

increases in 2012, and costs continued to rise in subsequent years.  I am aware of no safety or

other issues that warranted these increases.

8.      In 2012, BLM designated Burning Man as an "emergency special event" for the

first time, to my knowledge.  Special Agent Love informed me and other BMP staff that the

purpose of the designation was to facilitate the assignment of officers from other regions to

Burning Man.  BLM had never documented to BMP any difficulties in securing sufficient

numbers of staff for the reasonable needs of the Event.

9.      To the best of my knowledge, the Event has no history of "emergencies" as that

term is defined under federal regulations.  *See* 5 CFR § 550.103.  Burning Man is a recreational

event that is carefully planned for months in advance, as a collaborative effort among BMP,

BLM, and all cooperating agencies.  The Event has occurred in the same location within the

3

Black Rock NCA for each of the past 30 years.  BMP's understanding is that BLM applied the emergency designation to the Burning Man events every year from 2012 through 2016, but BLM declined BMP's repeated requests to provide written documentation of the designation and BLM's basis for applying it to the Event.

10.     Despite all of its concerns with BLM's 2012 expenses, BMP had no choice but to acquiesce to the 2012 final cost decision.  BLM's Winnemucca District Manager, Gene Seidlitz, and Special Agent Dan Love warned that if BMP appealed the 2012 costs, BLM might not have enough time to both respond to the appeal and process BMP's 2013 SRP, which would have resulted in disastrous financial losses to BMP.

11.      Given the substantial cost increases in 2012, BMP expected BLM's costs would remain flat in 2013, and BLM represented to BMP that this would be the case.  BMP successfully produced the 2012 Event, and BLM's After Action Report for that year identified no significant infrastructural, administrative, or health and safety deficiencies.

12.     During a meeting on March 26, 2013, BLM advised BMP that its costs for administering the Burning Man SRP would more than double that year.  BLM's costs ended up totaling over $2.93 million, an increase of 241% in two years.

13.     At the time, BLM represented to BMP that the 2013 increase would be due to a one-time upgrade of BLM's infrastructure for "safety" reasons, including implementation of a new computer-aided dispatch ("CAD") system.  BLM also assured BMP that this upgrade would allow BLM to provide data after the Event that would justify and explain the costs BLM charged through cost recovery, and would ultimately reduce those costs, providing BMP with tangible benefits and cost savings for years to come.

AR11852

14.     I reminded BLM staff that cost recovery guidelines require that BLM provide a reasoned, written explanation for all costs charged to the permittee, and that all costs be justified. In response, Special Agent Love asserted that these guidelines did not apply to law enforcement, which "costs what it costs."  District Manager Seidlitz informed me that BMP, as a private organization, was not entitled to any explanation of these costs but would need to pay them before BLM would issue the SRP.

15.     District Manager Seidlitz also informed me that BLM's Winnemucca District Office could not function without the money that the Burning Man SRP provides, which BMP understood to mean that the Burning Man SRP funds was being used to backfill general funding for the Winnemucca District Office.

16.     When BMP was informed of this anticipated increase, the 2013 Burning Man Event was just five months away, and BMP had already sold thousands of tickets and incurred significant event production expenses based on BLM's assurances that it would issue the SRP and that its costs had stabilized.

17.     BMP actually could not afford to pay the additional $1.5 million that BLM was suddenly and unexpectedly requiring.  During the March 26 meeting, BMP staff explained that BMP would only be able to finance the cost increase if BLM allowed the Event's population to increase, enabling BMP to sell more tickets.  In prior years, BMP had requested permission to increase the Event's population so that it could afford to pay BLM's increasing costs.  BLM had always refused to allow Burning Man to grow proportionally, but within minutes of BMP making this same request at the March 26 meeting, BLM approved a substantial population increase to ensure that BMP would agree to BLM's doubling of costs in 2013.

AR11853

18.      Due to the lack of time and BLM's unwillingness to negotiate or explain the reason for the additional cost increases, BMP again had no choice but to sign the cost recovery agreement and acquiesce to BLM's unjustified price hike and hope that BLM would provide an adequate explanation eventually.  Five years later, BLM still has not justified these cost increases, and the data that would supposedly have confirmed the reasonableness of BLM's costs has never materialized.

19.      In planning for the 2014 Burning Man Event, BMP again relied on BLM's assurances that costs would not substantially increase for the foreseeable future, and that the 2012 and 2013 cost increases would facilitate improved service, communications, planning, and data collection.  This in turn, would finally enable BLM to provide BMP with an objective assessment of BLM's staffing levels and rising costs, which had never been done in the Event's history, to my knowledge.  BLM did not, however, furnish BMP with any of the data that it promised and for which it required BMP to pay.   To the best of my knowledge, no documented increase in public health and safety resulted from the more than $1.5 million in additional costs that BLM incurred to administer the 2013 SRP.

20.      In January 2014, BLM provided BMP with a cost recovery proposal for the 2014 Burning Man SRP that estimated BLM's costs would increase by $700,000, as compared with 2013, to a total of approximately $3.7 million.  When BMP staff questioned these increases, BLM staff advised us that these estimated operational costs could not be reduced.  Instead, BLM offered BMP an opportunity to "save money" by signing a memorandum of understanding ("MOU"), under which BMP would fulfill certain contracts instead of BLM, and funding two proffer accounts to directly compensate two BLM employees, a project manager and an outdoor

AR11854

recreation planner, for their alleged year-round work on the Burning Man SRP.  This way, BMP would avoid paying the indirect administrative cost rate ("IACR") on these contracts and labor. BLM applies the IACR to all of its direct expenditures that are charged through cost recovery, although it can waive the IACR, it does so for other users of public lands, and BMP has made several requests for a waiver over the years, which BLM has denied.  As BLM presented the MOU and proffer accounts as the only means of limiting its costs, BMP accepted the arrangement. The statements of work ("SOWs") under the MOU cost BMP about $600,000 in 2014, plus an additional $70,000 to fund the proffer accounts. These costs were in addition to the costs BMP paid that year under the cost recovery process pursuant to 43 U.S.C. § 1734(b).

21.      On January 30, 2017, the Office of the Inspector General ("OIG") for the U.S. Department of the Interior released a public, redacted version of a report entitled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials" (the "Ethics Report").  A true and correct copy of the Ethics Report is attached hereto as **Exhibit B**.

22.      I have independently confirmed that Special Agent Love is the subject of the Ethics Report.  On February 14, 2017, U.S. Representative Jason Chaffetz sent a letter in his capacity as Chair of the U.S. House Oversight and Reform Committee to the OIG (the "Chaffetz letter"), explaining that the Committee had received an unredacted version of the Ethics Report, and the agent under investigation was Special Agent Dan Love.  A true and correct copy of the Chaffetz letter is attached hereto as **Exhibit C**.

23.      Attached hereto as **Exhibit D** is a true and correct copy of a report from the Office of the Inspector General for the U.S. Department of the Interior, entitled "Investigative Report of Misconduct by a Senior BLM Law Enforcement Manager," and released on August 24, 2017.

7

This report was retrieved on April 16, 2018, from:

https://www.doioig.gov/reports/investigative-report-misconduct-senior-blm-law-enforcement-manager.

24.      Attached hereto as **Exhibit E** is a true and correct copy of a news article by Scott Streater entitled "Agent in charge at 2014 Bundy standoff gone from BLM," and published in *E&E News* on September 18, 2017.

25.      Attached hereto as **Exhibit F** is a true and correct copy of a memorandum by David L. Bernhardt, Deputy Secretary for the U.S. Department of the Interior entitled "Month Two Message," released to employees on September 22, 2017.

26.       Attached hereto as **Exhibit G** is a true and correct copy of a news article by Brian Maffly entitled "Interior boss blasts fired Utah BLM law enforcement agent," and published in *The Salt Lake Tribune* on September 25, 2017.

27.      Attached hereto as **Exhibit H** is a true and correct copy of a news article by Maxine Bernstein entitled "BLM investigator alleges misconduct by feds in Bundy ranch standoff," and published in *The Oregonian* on December 14, 2017.

28.      Attached hereto as **Exhibit I** is a true and correct copy of a memorandum from BLM Special Agent Larry C. Wooten entitled "Disclosure and Complaint Narrative in Regard to Bureau of Land Management Law Enforcement Supervisory Misconduct and Associated Cover-ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by United States Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in Reference to the Cliven Bundy Investigation." This report was retrieved from:

https://www.scribd.com/document/367279332/Larry-Wooten-Communication-77PI#from_embe

AR11856

d (last checked June 25, 2019).  Although the memorandum is undated, the article cited in

paragraph 28 states that it was released on November 27, 2017.

29.     Attached hereto as **Exhibit J** is a true and correct copy of a press release from the

Department of the Interior dated April 18, 2018, and titled "Zinke Signs Secretarial Orders to

Increase Recreational Opportunities on Public Lands and Waters," which quotes Secretary of the

Interior Ryan Zinke as saying, "From my first day on the job, I have made it abundantly clear

that we are going to refocus on Interior's long-standing but recently forgotten recreation

mission."

30.     In 2013, BMP and Pershing County entered into a 10-year agreement for the

provision of law enforcement services at Burning Man Events.  The agreement sets forth the

"maximum payment by BMP" to Pershing County each year, based on the peak participant

population of that year's Burning Man Event, "for all services of any kind supplied by the

County or any of its officers, employees or contractors in connection with the Event, whether

directly or indirectly."  The agreement also requires the Sheriff to provide to BMP, within 14

days after the Event or else as soon as the information becomes available, a written After Action

Report providing "all information in County possession relating to warnings and citations issued

to, and arrests or detentions of, attendants at the Burning Man Event[.]"

31.     Every year since 2013, BLM has insisted that BMP pay more than $50,000 on a

services contract for these satellite tracking devices used by BLM and Pershing County

personnel as they patrol the Event.  This demand was first made by Special Agent Love.  I am

informed and believe that since 2013, BMP has paid more than $350,000 for these tracking

devices and associated service costs.

AR11857

32.     Every year since 2013, BLM has required that BMP pay for labor, technology, and facility costs associated with a law enforcement "substation" that BLM has insisted on maintaining near the center of the Event.  This demand was first made by Special Agent Love, who advised me in 2013 that BMP had no choice but to accept this new facility and pay all associated costs.

33.     I am informed and believe that BLM issued separate Special Recreation Permits to over 80 independent vendors who sell or rent equipment and services to participants attending the 2017 Event.  These independent vendors pay BLM a commercial use fee of 3% of their gross receipts, and that BLM collects several hundred thousand dollars each year in total commercial use fees from these vendors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 6th day of July, 2020 at San Francisco, California.

_____

Raymond Allen

10

# EXHIBIT A

AR11859

## NATIONAL SPECIAL RECREATION PERMIT FEE SCHEDULE

| Permit Type | Type of Recreation Fee | | |
|---|---|---|---|
| | Minimum | Use | Cost Recovery |
| Commercial or vending | $105, adjusted every three (3) years based on the IPDI* | Three (3) percent of gross revenue | |
| Commercial assignment of a nonexclusive site | $210, adjusted every three (3) years based on the IPDI* | | |
| Commercial assignment of an exclusive site | $210, adjusted every three (3) years based on the IPDI* | | |
| Commercial, competitive, or organized group activities or events | | | If more than 50 hours of staff time is required to process and administer the permit, cost recovery charges begin with the first hour |
| Competitive | $105, adjusted every three (3) years based on the IPDI* | Three (3) percent of gross revenue or $5 per participant per day, whichever is greater | |
| Organized group or event | $105 or $5 per person per day, whichever is greater based on the IPDI* | | |

*IPDI = implicit price deflator index

The fee schedule shown above will be effective on March 1, 2014, and will remain in effect until March 1, 2017.

This table supersedes Appendix A-1 in the H-2930-1, Recreation Permit Administration Handbook; Rel. 2-295 dated August 7, 2006.

AR11860

Automatic Adjustment of Minimum Special Recreation Permit Fees and Assigned Site Fees | Bureau of Land Management
Case 1:19-cv-03729-DLF   Document 35-4   Filed 07/12/21   Page 177 of 354
6/25/19, 2:28 PM



### U.S. DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT (/)

**VISIT**   **ABOUT**   **LEARN**   **SERVICES**   **GET INVOLVED**   **PROGRAMS**   **STATES**

Home (/)

# AUTOMATIC ADJUSTMENT OF MINIMUM SPECIAL RECREATION PERMIT FEES AND ASSIGNED SITE FEES

**Return to the Policies (/media/blm-policy/Instruction%20Memo**

*IM 2018-011*
Instruction Memorandum

National Office

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
Washington, D.C. 20240
**http://www.blm.gov (/)**
November 21, 2017

2018

In Reply Refer To:

2930 (250) P

EMS TRANSMISSION 12/20/2017

Instruction Memorandum No. 2018-011

Expires: 09/30/2020

To:          All Washington Office and Field Office Officials

             Attn: State Recreation Leads and Outdoor Recreation Planners

From:      Assistant Director, Resources and Planning

AR11861

Case 1:19-cv-03729-DLF   Document 35-4   Filed 07/12/21   Page 178 of 354

Subject:        Automatic Adjustment of Minimum Special Recreation
Permit Fees and Assigned Site Fees

**Program Area:**  Recreation and Visitor Services

**Purpose:** The purpose of this Instruction Memorandum (IM) is to
establish the minimum commercial, competitive and organized group
Special Recreation Permit (SRP) fees, and the minimum assigned site fee
effective November 20, 2017.  These fees constitute the Director's
minimum fee schedule and are in effect through February 29, 2020.

**Policy/Action:** The following minimum SRP and assigned site fees will
take effect on November 20, 2017:

- The minimum annual SRP fee will increase from $105, to $110.
- The minimum assigned site fee will increase from $210, to $220.
- The "per person per day" fee for competitive events and
  organized groups will increase from $5, to $6 per day.

The Bureau of Land Management (BLM) field offices will use November
20, 2017, as the effective date for the new minimum fees, and adjust
their billing statements according to their calendar or fiscal year time
frames.  All permits issued prior to November 20, 2017, with an effective
duration extending beyond that date must contain the new provisions.
 Field offices must insert this provision in all new permits meeting these
criteria, and amend all permits extending beyond November 20, 2017, to
include the applicable fees.

**Timeframe:** The new fee schedule is effective November 20, 2017, and
remains in effect unless amended until March 1, 2020.

**Budget Impact:** The application of this policy will have no impact on
the budget.  The BLM expects this increase to be budget-neutral.

**Background:** The BLM, in concert with the U.S. Forest Service,
automatically adjusts the minimum commercial and assigned site fee
every 3 years.  Normally this is done in March for the BLM, however in
2017 the adjustment is being made in November.  In addition, the BLM
adjusts the individual competitive and organized group SRP fees on the
same schedule.  The automatic 3-year fee adjustment policies and fee
calculation methodologies were published in the Federal Register on
October 19, 1989 (54 FR 42998) and July 29, 1999 (64 FR 41133).
 Individual state directors also have the authority to impose application
fees and/or to establish higher minimum fees for SRPs as a matter of
cost recovery.  The minimum SRP and assigned site fees are recalculated
every 3 years, using the fees for 1993 as the base year, and compounding

AR11862

Case 1:19-cv-03729-DLF   Document 35-4   Filed 07/12/21   Page 179 of 354

them annually using the Gross National Product Implicit Price Deflator Index. The minimum commercial SRP fee and assigned site fee are rounded to the nearest $5. The "per person per day" fee for competitive events and group events is rounded to the nearest $1.

**Manual/Handbook Sections Affected:** This IM updates the Director's Fee Schedule, Figure 2, contained in H-2930-1, BLM Recreation Permit and Fee Administration Handbook, Rel. 2-300 dated November 17, 2014, and replaces stated minimum SRP fees throughout the Handbook.

**Coordination:** The fee adjustment was coordinated with the U.S. Forest Service, and will be published in the Federal Register.

**Contact:** If there are any questions concerning the content of this IM, please contact Andy Tenney, Division Chief, Recreation and Visitor Services, at **atenney@blm.gov (mailto:atenney@blm.gov)**, or by telephone at: 202-208-4201, or David Ballenger, Recreation Permit and Fee Program Manager, at **dballeng@blm.gov (mailto:dballeng@blm.gov)**, or by telephone at: 202-912-7642.

Signed by:                          Authenticated by:

Kristin Bail                         Ambyr Fowler
Assistant Director                   Division of IT Policy and
Planning (WO-870)
Resources and Planning

AR11863

# EXHIBIT B

AR11864



# Investigative Report of
# Ethical Violations and Misconduct
# by
# Bureau of Land Management Officials

Date Posted to Web: January 30, 2017

This is a version of the report prepared for public release.

AR11865

## SYNOPSIS

We initiated an investigation in October 2015, after receiving two anonymous complaints concerning a Supervisory Agent, Bureau of Land Management (BLM) Office of Law Enforcement and Security (OLES), Salt Lake City, UT.

The first complaint, received in September 2015, concerned the 2015 Burning Man event held annually in northwestern Nevada. The complaint alleged that—

- the Supervisory Agent used his official position to provide preferential treatment to his family members while attending the event;
- the Supervisory Agent directed five on-duty BLM law enforcement officers to escort his family and provide security for them at the event;
- the Supervisory Agent's family received unauthorized access to the Incident Command Post (ICP); and
- the Supervisory Agent's family received overnight lodging in BLM-leased facilities.

The second complaint, also received in September 2015, alleged that the Supervisory Agent improperly intervened in the April 2015 hiring process for a BLM special agent position after he learned that a friend did not make the initial list of candidates to be interviewed.

During our investigation, we received an additional complaint in September 2016, alleging that the Supervisory Agent drove around with his girlfriend in his BLM vehicle while working at the 2015 Burning Man event. The employees who provided details of the misuse stated that they had not fully disclosed this in prior interviews because they feared reprisal from the Supervisory Agent.

We substantiated all but one of the allegations associated with the 2015 Burning Man event.

We found that the Supervisory Agent violated Federal ethics rules when he used his influence with Burning Man officials to obtain three sold-out tickets and special passes for his father, girlfriend, and a family friend. In addition, we confirmed that he directed on-duty BLM law enforcement employees to drive and escort his family during the event with BLM-procured, all-terrain and utility type vehicles (ATVs/UTVs). Regarding the allegation of improper access to ICP by the Supervisory Agent's family, we found that was not against BLM policy. We confirmed that the Supervisory Agent's girlfriend stayed overnight with him in his BLM assigned trailer, contrary to restrictions in the operations plan for the event. The Supervisory Agent also violated Federal ethics regulations by having a subordinate employee make a hotel reservation for his guests. On at least one occasion, he misused his BLM official vehicle when he transported his girlfriend while at the event.

We interviewed BLM OLES Director Salvatore Lauro who stated that he took no action when he saw the Supervisory Agent use ATVs and BLM personnel to transport his (the Supervisory Agent's) family. In addition, Lauro knew the Supervisory Agent allowed his girlfriend to share his BLM overnight lodging accommodations during the event.

1

AR11866

We also confirmed that the Supervisory Agent intervened in the hiring process by increasing the number of candidates that would be interviewed. As a result, the Supervisory Agent's friend, who had worked with the Supervisory Agent as a Federal air marshal received an interview and was ultimately hired as a BLM special agent.

During our investigation, the Supervisory Agent displayed a lack of candor when interviewed and tried to influence an employee's comments prior to an interview.

## BACKGROUND

Burning Man, an annual gathering attended by thousands of people on BLM-managed Black Rock Desert, is organized by the Burning Man Project, a nonprofit organization, and its for-profit subsidiary, Black Rock City LLC (BRC). The permit issued by BLM to BRC showed the event was held from August 30 to September 7, 2015, and was limited to 70,000 paid participants. Interviewees stated that event attendees actually totaled about 80,000 individuals when vendors and support personnel were also counted.

OLES Director Salvatore Lauro identified OLES' major concern at Burning Man as potential mass casualty from fire-related artwork. He also referred to past BLM enforcement actions that resulted in crowd behavior and the need for tasers. The BLM OLES Official said that Burning Man had a history of illegal drugs, assaults, violence, and other criminal activity, in spite of its largely peaceful reputation. As a result, approximately 70 BLM law enforcement officers were assigned to the event. The BLM OLES Official also said that the Supervisory Agent prepared the operational plan, then briefed the BLM OLES Official and Lauro. He also said that the Supervisory Agent remained in command of operations, although Lauro attended the event.

## DETAILS OF INVESTIGATION

On October 7, 2015, we initiated this investigation after receiving two anonymous complaints.

The first complaint, sent by email to BLM Director Neil Kornze on September 9, 2015, and copying the Office of Inspector General (OIG), came from the private email address of an unidentified BLM employee. The complaint stated that a Supervisory Agent had engaged in misconduct and ethical violations at the 2015 Burning Man event. Specifically, the Supervisory Agent used his influence to obtain tickets to the event for family members; he also permitted his family members to visit the ICP and receive overnight lodging at BLM-leased facilities. The complaint also alleged that he directed five BLM law enforcement personnel to provide his family members with an escort and tour through BRC, using BLM-procured all-terrain and utility type vehicles while the officers were on official duty at the event.

The second complaint, also submitted on September 9, 2015, alleged that the Supervisory Agent committed an unfair hiring practice in April 2015 when he intervened on behalf of a friend applying for a BLM special agent position.

A third complaint, received in September 2016 near the end of our investigation, alleged that the Supervisory Agent misused his Government vehicle when he used it to drive around with his girlfriend during the 2015 Burning Man event.

2

AR11867

**Supervisory Agent's Misconduct at Burning Man**

*Supervisory Agent Seeks Favor from Prohibited Source*

During our investigation, we found that the Supervisory Agent obtained three full-event Burning Man tickets for "family" members identified as his father, a family friend, and the Supervisory Agent's girlfriend. At the time he bought the tickets, those available to the public had been sold out. The Supervisory Agent used his contacts and relationships with Burning Man officials to obtain the tickets. Federal ethics regulations prohibit soliciting gifts from a prohibited source. See 5 C.F.R. § 2635.202(a). Ethics regulations also prohibit Federal employees from using any authority associated with their public position for the private gain of friends and relatives. See 5 C.F.R. § 2635.702.

As part of our email review, we found that, as early as February 27, 2015, the Supervisory Agent told a BRC Attorney that he was considering bringing his parents to the 2015 event to honor a relative's passing at the Burning Man temple ceremony. He wrote that he might bring his parents with the BRC Attorney's help and approval.

We also found that the Supervisory Agent had discussed obtaining tickets with a former BLM Special Agent serving as a current reemployed annuitant hired as a special project manager for the event. The former BLM Special Agent reported three conversations with the Supervisory Agent:

- The Supervisory Agent asked if he could purchase tickets for $50 each through a program offered to locals, but the former BLM Special Agent informed him that his family members did not qualify.
- The Supervisory Agent then informed him that he intended to purchase the tickets from BRC officials at a discount; the former BLM Special Agent urged him not to do this because of the Supervisory Agent's bad publicity concerning demands for expensive items purchased by BRC for BLM's use at the event.

*Agent's Note: In 2015, a newspaper published an article stating that a letter [went] to Secretary Jewell, expressing concerns with "providing outlandishly unnecessary facilities for BLM and its guests" at the 2015 event. The article also stated that the Supervisory Agent had been citied multiple times as the person behind many of the BLM requests, and further stated that BLM wanted Burning Man to provide a $1 million luxury compound.*

- During his third conversation with the Supervisory Agent, the Supervisory Agent informed the former BLM Special Agent that he had purchased full price tickets from the BRC Attorney, with whom the Supervisory Agent had a good relationship.

A September 3, 2015 email from the BRC Attorney to the Supervisory Agent at the time of the event cited the BRC Attorney's willingness to offer four regularly priced tickets as a courtesy to the Supervisory Agent's family. The BRC Attorney further stated that BRC held tickets at the Box Office for unique situations that arose after tickets were sold out and that he was happy to offer the tickets to the Supervisory Agent.

3

AR11868

During his interview, the BRC Attorney said that the Supervisory Agent had either telephoned or sent him a text message asking for three tickets for his family members just before he sent the Supervisory Agent the September 3, 2015 email. The Supervisory Agent knew that regular tickets for the event were sold out but that BRC also held back about 100 tickets for special requests and needs. The Supervisory Agent approached the BRC Attorney to purchase tickets for his family, but wanted the tickets at the regular price because of scrutiny surrounding his role in BLM's request for the luxury compound. The BRC Attorney forwarded OIG investigators an email dated September 5, 2015, showing three tickets charged to the Supervisory Agent's personal credit card at $390 each, with a processing fee of $19 each, for a total of $1,227.

Lauro also reported that the Supervisory Agent showed him a receipt for approximately $1,200 paid on his personal credit card so that his family could attend the event. Lauro told the Supervisory Agent it was "probably the best $1,200 you've ever spent because it's going to turn, we know it's going to turn into a complaint." He said the Supervisory Agent was upfront with him regarding his family's attendance, having tried to make sure he did not violate any policies. Lauro knew that the Supervisory Agent had purchased tickets at full price with personal funds, and said that the Supervisory Agent "knows people are looking." We also found that the Supervisory Agent had discussed the ticket purchase with several BLM law enforcement personnel, who each felt that the Supervisory Agent wanted to make them aware that he had paid full price for the tickets.

Lauro and a BLM OLES Official both indicated that no policy prohibited OLES personnel from having family members attend the event. Lauro said that he attended the event and knew that the Supervisory Agent's family also attended. The family specifically visited the temple, which the Supervisory Agent helped to construct. He said that the Supervisory Agent was allowed to cut a piece of wood and place it in the temple in memory of a family member. The BLM OLES Official confirmed that two of the Supervisory Agent's family members, as well as his girlfriend, had attended a portion of the event for which the Supervisory Agent had placed a board in the temple in his family member's memory.

The Supervisory Agent also sent an earlier email to the BRC Attorney on August 26, 2015, in which he attached photographs depicting his significant temple construction efforts. In the photo, the Supervisory Agent wears his law enforcement equipment and firearm, and a shirt identifying him as a Federal agent.

The Supervisory Agent's account of his conversations with the former BLM Special Agent and the BRC Attorney differed from their accounts, however. He said the former Special Agent told him he was an "idiot" to pay full price. The Supervisory Agent said that when he went to the BRC Attorney to find a ticket option that would bring less scrutiny, he generally knew that tickets available for public attendance had been sold out, but he did not know that the BRC Attorney had extra tickets. He said that he told the BRC Attorney he did not want special treatment because of his position.

*Supervisory Agent Seeks Favor from BRC for Special Passes to Man Burn*

During our investigation, we learned that the Supervisory Agent had asked a BRC Official for three special passes so that his family could watch the Man Burn, the high point of the Burning

4

AR11869

Man event when an effigy is burned at the temple. The passes, which have no face value but which are not available to the public, gave access to the inner perimeter on the night of September 5, 2015. Our interviews of BRC officials revealed that the inner perimeter was considered a privileged location, reserved primarily for BRC, pyrotechnics, and emergency services staff. The BRC Attorney told us that a BRC Official controlled the special passes and that they had never before been provided to a BLM employee's family members.

When interviewed, the BRC Official said that the Supervisory Agent had asked on Saturday afternoon, September 5, for three passes so that his family could attend the 10:00 p.m. Man Burn that night. The BRC Official confirmed that access to the inner perimeter was a special privilege and never previously requested by or given to a BLM official or law enforcement official. When asked if the Supervisory Agent's position had influenced the availability of the passes, the BRC Official said that there had been apprehension at first because it seemed "a little strange." The BRC Official still gave the Supervisory Agent the passes because being gracious was part of the Burning Man culture. Federal ethics regulations prohibit soliciting gifts from a prohibited source. See 5 C.F.R. § 2635.202(a). Ethics regulations also prohibit Federal employees from using any authority associated with their public position for the private gain of friends and relatives. See 5 C.F.R. § 2635.702.

The Supervisory Agent said that the BRC Official had given him special laminated passes so that his family could watch from the inner perimeter, but he did not necessarily consider it a special privilege.

During the interview, the BRC Official indicated that the Supervisory Agent was on official duty while in the inner perimeter with his family, as were all law enforcement officers who were on official business while present at the event. A review of the Supervisory Agent's time and attendance records showed that he was on official duty while at the Man Burn during the night of September 5, 2015. The review showed that he claimed 24 hours of official work time for Saturday, September 5, the day of the Man Burn. He also claimed 24 hours of official work time for Sunday, September 6, and again on Monday, September 7.

*Supervisory Agent's Misuse of OLES Personnel and BLM-Procured, All-Terrain and Utility Type Vehicles*

OLES personnel confirmed that the Supervisory Agent directed five on duty BLM law enforcement officials to drive, escort, and provide security for his family at the 2015 Burning Man event. A BLM Subordinate Supervisory Agent said the Supervisory Agent asked him to take the Supervisory Agent's family with him on his daily route around the event's playa. He transported the Supervisory Agent's father, family friend, and girlfriend on a BLM-procured Kubota utility vehicle while also performing his official duties. BLM Special Agents confirmed that they saw a BLM Subordinate Supervisory Agent transporting the Supervisory Agent's family in a utility vehicle at the event.

A BLM OLES Contracting Officer confirmed seeing the Supervisory Agent's father, girlfriend, and another man getting out of a Kubota utility vehicle, which she had procured for OLES to use during the event. A BLM OLES Contracting Officer provided a copy of a

5

"Solicitation/Contract/Order for Commercial Items," dated August 8, 2015, confirming the Federal procurement. Federal law prohibits the use of Government owned or leased passenger vehicles for unofficial purposes. See 31 U.S.C. §§ 1344(a) and 1349(b).

A BLM Special Agent further stated that the Supervisory Agent had directed him and another BLM Special Agent, as well as two BLM law enforcement officers to accompany his family around the event. They drove in separate all-terrain vehicles known as Razors. At one point, they all met up with the Supervisory Agent, BLM OLES Director Lauro, and former Department of the Interior OLES Director Harry Humbert.

A BLM Supervisory Law Enforcement Ranger also stated that at about 2:00 p.m. on September 5, 2015, the Supervisory Agent asked him to accompany Lauro, Humbert, and himself on a tour of the event. The four of them met up with another BLM Subordinate Supervisory Agent, who drove a Kubota utility vehicle with the Supervisory Agent's father, family friend, and girlfriend as passengers. A BLM Supervisory Law Enforcement Ranger said that the vehicles stopped at the temple, then drove around the playa looking at the art. They also went to an area known as the District, where several thousand people gathered to listen to and provide music. He said that the tour lasted 3 to 4 hours.

The BLM Supervisory Law Enforcement Ranger noted that the utility vehicles had been used to transport Government officials (e.g., a U.S. attorney, a BLM Official, and a DOI Solicitor Official), but that the vehicles had never been used to transport BLM OLES family members on a tour with a law enforcement escort. He said a tie to the Government always occurred when the utility vehicles were used for transportation. A BLM Subordinate Supervisory Agent informed us, however, that the former BLM Special Agent's wife had routinely attended the event and received a tour on a utility vehicle.

A BLM OLES Budget Analyst said the Supervisory Agent's father, family friend, and girlfriend toured the Burning Man event with Lauro and Humbert. She also said that other law enforcement personnel had their family members visit the event and that it was a common practice; however, the Supervisory Agent's family were the only non-law enforcement personnel provided a tour that day.

During his interview, the Supervisory Agent confirmed that he oversaw all BLM law enforcement personnel assigned to the event, while also confirming that another BLM Supervisory Agent, a BLM Supervisory Law Enforcement Ranger, a BLM Law Enforcement Officer and BLM Special Agents had been his subordinates during that time. The Supervisory Agent confirmed that he had asked a BLM Subordinate Supervisory Agent and other BLM law enforcement personnel to accompany his family on a tour of the event and that all OLES law enforcement officers were on official duty and in uniform when this occurred. The Supervisory Agent also said that the Kubota utility vehicle had been used routinely to transport the public because it had been rented, rather than owned by BLM.

Contrary to the Supervisory Agent, a BLM Subordinate Supervisory Agent did say that law enforcement officers typically did not escort or transport the public in the utility vehicles. He said that the Supervisory Agent's family received transportation, as well as preferential

AR11871

treatment, because of the Supervisory Agent.

*Lauro's Knowledge of the Supervisory Agent's Actions*

We questioned Lauro about the Supervisory Agent's use of BLM's law enforcement officials and Government procured vehicles to transport the Supervisory Agent's family and give them a tour of the Burning Man event. Lauro acknowledged that he saw a BLM Subordinate Supervisory Agent driving the Supervisory Agent's family members during the event and stated that the Supervisory Agent told him his family was coming and that his girlfriend was staying in the trailer. He denied knowing that the BLM law enforcement officers riding nearby were a security escort, as well as whether the vehicle that a BLM Subordinate Supervisory Agent drove was a leased BLM ATV or belonged to the Sheriff's department. He said the use of ATVs and BLM personnel to transport the Supervisory Agent's family, in addition to the use of BLM lodging might be considered "technical" violations, especially since, as the Supervisory Agent's second level supervisor, he did not see anything that led him to tell the Supervisory Agent to stop. He explained the "reality" is we "regularly" drive non-government people. He stated he did not feel that the Supervisory Agent's family received preferential treatment. He also said he would not have let a BLM law enforcement officer's family who had lost a loved one travel around the event on their own. Lauro added, however, that he and the Supervisory Agent had discussed the potential for an IG complaint, saying "in fact we probably could have written it before it happened because he's had like eight anonymous complaints in the last two years."

When interviewed, Humbert said he did not know that the utility vehicles used to transport the Supervisory Agent's family belonged to the Government. He added that, if they did, then Government vehicle use policies applied. When asked if he felt the Supervisory Agent's family members had received preferential treatment because of the Supervisory Agent's position, Humbert said, "I don't think there is any other way you can look at it."

*Supervisory Agent's Disregard for the Accommodations Directive and Allegations of Meals at BLM's Expense*

The "Law Enforcement Operations Plan - Duties, Procedures, Protocols, and Rules Specific to the 2015 Burning Man Event, dated August 11, 2015," signed and approved by the Supervisory Agent, stated: "Since many law enforcement officers will be sharing a room with another officer during the Burning Man event, rooms are only for those persons assigned to the event."

**Agent's Note:** *The operations plan is not provided as an attachment due to its sensitivity.*

A BLM Subordinate Supervisory Agent had been assigned to a BLM lodging trailer with the Supervisory Agent. He confirmed that the Supervisory Agent's girlfriend stayed 1 or 2 nights with the Supervisory Agent in the trailer. She also shared meals prepared with food he and the Supervisory Agent had purchased for the trailer. The BLM Subordinate Supervisory Agent did not know if the Supervisory Agent's girlfriend received meals from the dining facility provided for BLM employees.

When interviewed, the Supervisory Agent stated that his girlfriend stayed overnight with him in

7

his assigned lodging trailer, and that his father stayed the first night at a Marriott in Reno. He said that on the second night his father stayed with his family's friend. Regarding the lodging rules cited in the Law Enforcement Operations Plan, the Supervisory Agent said ". . . it's to keep people from jumping rooms or moving rooms or trading rooms."

During Lauro's interview, he stated that the Supervisory Agent informed him his (the Supervisory Agent's) girlfriend would stay the night with him in the trailer. The Supervisory Agent told him that he had checked with contracting and travel personnel and that there was no violation since it was the same as staying in a hotel room together.

### The Supervisory Agent's Misuse of a Government-owned Vehicle

A BLM OLES Budget Analyst and a BLM OLES Contracting Officer contacted OIG near the completion of our investigation to request additional interviews regarding information they had not provided due to fear of retaliation.

Both provided details regarding the Supervisory Agent's misuse of his assigned Government vehicle, a silver Chevrolet Tahoe, while at the 2015 Burning Man event. According to an OLES Budget Analyst, she and a Contracting Officer learned from the Supervisory Agent that his girlfriend needed directions to the event. The Supervisory Agent told them that he might meet her in his Government vehicle at a nearby community, then transport her to the event. The OLES Budget Analyst and the OLES Contracting Officer warned the Supervisory Agent against his plan, but the Supervisory Agent only appeared frustrated when he left.

Later that night, according to the OLES Budget Analyst and the OLES Contracting Officer, the Supervisory Agent drove up to them in the Government Tahoe when they were near a mobile substation. They observed the Supervisory Agent's girlfriend in the Tahoe's front passenger seat, when the Supervisory Agent told them to get into his vehicle. They refused. The Supervisory Agent drove away when he saw someone approaching and became concerned that he would be seen.

The next day, the Contracting Officer asked the Supervisory Agent why he had driven his girlfriend in his Government vehicle. He responded to her, "You will forget that you saw that."

During our investigation, we learned that a retired police officer and paramedic assigned to the event had transported the Supervisory Agent's family from the nearby community, although we could not confirm the date or time. The retired police officer told us that, based upon a request from the Supervisory Agent, he had met the Supervisory Agent's family, then transported them in his personal vehicle. He took them through the main entrance where he thought their tickets were scanned, then dropped them off at the ICP where the Supervisory Agent waited for them.

During his interview on May 24, 2016, we asked the Supervisory Agent if he had transported his girlfriend or other family members in his Government vehicle while at the event. He said he had not, and that he had given orders not to transport his family in a Government vehicle.

8

AR11873

*Additional Statements by OLES Employees Regarding Lodging for the Supervisory Agent's Family*

The BLM OLES Budget Analyst and the BLM OLES Contracting Officer provided additional details about the Supervisory Agent's intent to secure BLM lodging for his family. The BLM OLES Budget Analyst stated that she had observed a phone conversation in which the Supervisory Agent asked the former BLM Special Agent to reserve a travel trailer for overnight use by his father and family friend. The conversation occurred while she, the Supervisory Agent, and the BLM OLES Contracting Officer were outside the BLM State Office before they left for Burning Man. The BLM OLES Budget Analyst did not know if the Supervisory Agent's father and family friend stayed overnight in the trailer, but the BLM OLES Contracting Officer said that she used the Supervisory Agent's Marriott rewards number to reserve a hotel room for his father and family friend. The BLM OLES Contracting Officer did not know if they stayed overnight in one of the lodging trailers. Federal ethics regulations prohibit supervisors from encouraging or requesting subordinates to use their official time to perform unofficial duties such as personal errands. See 5 C.F.R. § 2635.705(b).

## Supervisory Agent's Improper Influence in a Hiring Process

According to the second complaint, the Supervisory Agent increased the number of candidates interviewed for a hiring action, which enabled a friend to be interviewed and later selected for the job instead of other more qualified candidates. The complaint further stated that the interviews were short, that the Supervisory Agent's friend who had applied for the position apparently received the questions in advance, and that he was hired immediately after the interviews concluded.

We found that the BLM OLES vacancy announcement resulted in two applicants being hired: a BLM Special Agent, formerly employed as a special agent for the U.S. Secret Service, and the Supervisory Agent's friend, formerly employed as an air marshal for the Supervisory Agent's previous employer, the Federal Air Marshals Service (FAMS).

*Hiring for a BLM Special Agent Position*

The BLM OLES Official said he had little involvement in the hiring process for the BLM special agent position. He said the Supervisory Agent would have handled the hiring locally from a single announcement that filled two positions in the Supervisory Agent's office. He subsequently discussed the hiring with the Supervisory Agent, who identified a "natural break" of 5 percent in the resume scores at the 32nd candidate, which meant that a gap greater than one or two percentage points between the scores occurred at this point. He said he was not concerned if a friend of the Supervisory Agent applied for the position, as long as the Supervisory Agent followed the human resources process.

The BLM OLES Official further stated that, while gathering documents for OIG's investigation, he learned from the Supervisory Agent that the Supervisory Agent's friend had worked previously with him as a Federal air marshal. The Supervisory Agent told him that their working relationship had occurred years earlier, that he had not had contact with his friend (and special agent job applicant) since they worked together, and that the two of them were not friends.

9

Our review of documents gathered by the BLM OLES Official revealed a schedule titled "Resume Summary," signed by the Supervisory Agent and dated April 16, 2015, showing the combined scores of 121 unnamed applicants. This schedule also contained a handwritten notation, citing a 5-percent break at the 32nd applicant. A separate schedule, also titled "Resume Summary" but containing the names of the 121 applicants and their combined scores and ranking, showed that the Supervisory Agent's friend ranked 23rd out of 121 applicants.

Lauro stated that he did not know if the Supervisory Agent and the individual hired as a BLM Special Agent were friends when the man was hired, but he assumed that the Supervisory Agent probably knew the applicant since both worked for FAMS. He also did not know if the Supervisory Agent halted the hiring process so that the individual would receive an interview. When shown the Resume Summary and the various other hiring documents that the BLM OLES Official provided, Lauro said that he would never interview 30 people for a position and hoped that the Supervisory Agent had a good reason for his decision.

*The Supervisory Agent's Influence On the Hiring Process*

A BLM Subordinate Supervisory Agent said that he was designated as the selecting official for the two BLM special agent positions, for which more than 200 applicants applied. The Supervisory Agent had told him that an identified applicant's skills, as well as his personality, would fit well with the team and that he would like to give him a chance at the job. The BLM Subordinate Supervisory Agent said that the applicant should not have been hired because he was not as qualified as the top candidates.

A BLM Special Agent who was on both the resume review and interview panels said the Supervisory Agent tasked him to oversee the hiring process for the BLM special agent positions. He also said that the identified applicant had been discussed long before the applicant resumes had been ranked. The Supervisory Agent previously asked him to speak with the identified applicant on the telephone to discuss the hiring process, and the Supervisory Agent brought him into the office to meet with the BLM Special Agent to discuss the job.

The BLM Special Agent said that when he and a BLM State Ranger scored the applicant resumes, the identified applicant had ranked low, somewhere "in the forties" or lower. He further stated that, although the BLM Subordinate Supervisory Agent had intended to include only the top 10 to 15 candidates in the interview cut-off, the Supervisory Agent intervened, moving the cut-off to about the 30th applicant, which gave his friend, the identified applicant, an interview and made it clear to the BLM Special Agent that the Supervisory Agent had moved the cut-off for that purpose. He had concerns about the identified applicant's law enforcement qualifications, which did not match those of most criminal investigators.

The BLM State Ranger said that, while on assignment with other OLES employees, he and the BLM Special Agent scored and ranked the applicant resumes, finding a natural break at a 3- to 5-percent difference in the scoring after about the 13th applicant. He said that the identified applicant ranked at about 30 among approximately 120 resumes. Since he and other OLES employees had discussed the identified applicant, he knew the Supervisory Agent would not be happy if the identified applicant did not receive an interview. He said the BLM Subordinate

10

AR11875

Supervisory Agent later told him that the Supervisory Agent had interfered with and suspended the process to ensure interviews for the top 30 candidates.

We also found that a BLM OLES Budget Analyst was assigned to handle certain administrative tasks pertaining to the hiring process. These included preparing spreadsheets to reflect applicant scores and rankings, and contacting applicants to arrange interviews. The BLM OLES Budget Analyst confirmed that the Supervisory Agent had discussed his friend, the identified applicant, with her and the other OLES employees many times to sell his qualifications. The Supervisory Agent's friend had visited the OLES office on several occasions, and the Supervisory Agent required her and other OLES employees to accompany them to lunch. The Supervisory Agent also told employees that everyone would like his friend, mentioning common interests his friend shared with OLES employees. The BLM OLES Contracting Officer reported that, in March 2015, the Supervisory Agent sent a text saying that his friend would be visiting the office that day. The Supervisory Agent wanted them all to go to lunch together. The BLM OLES Contracting Officer complied because the Supervisory Agent was her immediate supervisor and she feared he might retaliate if she refused.

The BLM Subordinate Supervisory Agent felt that a definitive interview cut-off occurred about the 12th or 13th applicant. He had several conversations with the Supervisory Agent about his friend, the identified applicant; he said the Supervisory Agent knew that his friend did not rank among the top 13. The BLM Subordinate Supervisory Agent told the Supervisory Agent that his friend was not the best candidate, but the Supervisory Agent disagreed. Eventually, the Supervisory Agent suspended the hiring process because, the BLM Subordinate Supervisory Agent believed, the Supervisory Agent wanted his friend hired. The BLM Subordinate Supervisory Agent provided a series of emails, dated April 13, 2015, in which the Supervisory Agent said he was going to suspend the hiring process until he could conduct a review. BLM's Subordinate Supervisory Agent said the Supervisory Agent suspended the process because he wanted to hire his friend.

During our second interview with the BLM OLES Budget Analyst, she denied she told the Supervisory Agent his friend's rank in the resume scoring. She told us during her final interview, however, that she met with the Supervisory Agent after returning from the Las Vegas assignment, and he looked at the rankings list without any names attached. The Supervisory Agent marked and signed the list, establishing the interview cut-off. He then told the BLM OLES Budget Analyst to let him know before proceeding with the interviews if the cut-off was not low enough. The BLM OLES Budget Analyst said she understood that he wanted to know if his friend did not make the cut-off because the Supervisory Agent had previously told her that he wanted his friend to be interviewed.

The Supervisory Agent acknowledged his role as the approving official for the hiring process. He said he stopped the process so that he could evaluate the rationale for selecting interview candidates. He expressed concern because only 12 applicants had been selected out of a pool of 130, using only their scored resumes as justification.

The Supervisory Agent further stated that he increased the number of candidates because the 32nd candidate marked the first 5-percent difference in scores and was the first natural break in the

11

AR11876

list. He denied knowing where his friend ranked and that increasing the number of candidates meant his friend received an interview.

*Interviews of Applicants*

The documents that the BLM OLES Official provided included one titled "First Round Interview Schedule – Monday, April 20." It showed that 28 applicants had been scheduled for interviews at 20-minute intervals. The document also included each applicant's scores in response to four questions asked during interviews with the BLM Special Agent and the Special Agent Panel Member for Interviews. An interview rating summary showed that the Supervisory Agent's friend ranked fourth.

The BLM Subordinate Supervisory Agent said that the Supervisory Agent had wanted short applicant interviews with a definitive number of questions asked of all the candidates so that they could demonstrate their verbal skills.

The BLM Special Agent and the Special Agent Panel Member for Interviews conducted the interviews by telephone. Both indicated that the Supervisory Agent's friend appeared to know the questions in advance. When interviewed, the BLM Special Agent said that he, the Supervisory Agent, and the Special Agent Panel Member for Interviews had developed the questions, but that he no longer had them. The Special Agent Panel Member for Interviews said the same.

The Special Agent Panel Member for Interviews further stated that the Supervisory Agent's friend interviewed well and correctly answered the "zinger" question, which asked what percentage of the state was public land. She sensed that the Supervisory Agent's friend had been given the questions ahead of time, based on the way he responded. She also said that everyone knew the Supervisory Agent and the applicant he had identified for the position previously had worked together.

The Supervisory Agent said that 10 questions had always been asked during previous interviews. He did not know why only 4 questions were asked or if they were sufficient to consider hiring an applicant. He denied that he provided the questions to his friend for his interview. When interviewed, the Supervisory Agent's friend said he had not received interview questions beforehand.

*Reference Checks for the Supervisory Agent's Friend*

The BLM Subordinate Supervisory Agent said that he had contacted two individuals not listed as references on the resume of the Supervisory Agent's friend, both of whom had worked with the friend on a Joint Terrorism Task Force (JTTF) assignment. After speaking with them, the BLM Subordinate Supervisory Agent reported to the Supervisory Agent that he had received unfavorable feedback. The Supervisory Agent then contacted a FAM supervisor, who gave his friend a favorable recommendation.

12

An intelligence analyst who had worked with the Supervisory Agent's friend at JTTF told the BLM Subordinate Supervisory Agent that the Supervisory Agent's friend did not respond to requests for assistance or carry through with assigned tasks. A Federal Bureau of Investigation special agent also assigned to JTTF did not recall being contacted by the BLM Subordinate Supervisory Agent, but had talked with the Supervisory Agent's friend about the Supervisory Agent, whom she had known at JTTF. She also had seen both of them together. She said that they appeared to be good friends.

A FAMS Special Agent  reported that the Supervisory Agent had contacted him during his friend's reference check. He gave the Supervisory Agent's friend a favorable recommendation. He also said that the Supervisory Agent's friend was a good employee with great character. He said being a good employee had been required for the Supervisory Agent's friend to be considered for the JTTF assignment.

When interviewed, the Supervisory Agent's friend said that he had known the Supervisory Agent since April or May 2002 and that they had worked together at FAMS. At that time, he and the Supervisory Agent also socialized periodically after business hours and on weekends with a group of friends. This continued until the Supervisory Agent transferred to JTTF. He said that the Supervisory Agent eventually transferred to BLM OLES in 2005 or 2006 and that they had no further contact until the Supervisory Agent's friend transferred to JTTF in 2012.

While with JTTF, the Supervisory Agent's friend reached out to the Supervisory Agent to discuss schools and homes in the area. He later pursued the BLM special agent position as his JTTF assignment neared an end and as his wife chose to remain in the area with their son. The Supervisory Agent contacted him 3 ½ weeks after his BLM interview to inform him that he had been selected for the position.

In a May 5, 2015, email, the BLM Subordinate Supervisory Agent notified the BLM OLES Official that he and the Supervisory Agent had selected the Supervisory Agent's friend for the position. The email reflected that the BLM OLES Official subsequently notified OLES Director Lauro of the selection.

The Supervisory Agent said that the BLM Subordinate Supervisory Agent never told him that his friend should not be hired or that he had concerns about his friend. The BLM Subordinate Supervisory Agent also never told him why his friend was not the best person for the job. He said the BLM Subordinate Supervisory Agent also had every opportunity to tell the BLM OLES Official if he thought hiring his friend was inappropriate.

The BLM Subordinate Supervisory Agent said that although he disagreed with the Supervisory Agent over hiring his friend, he ultimately selected the Supervisory Agent's friend for the position because "that's how life is and... it's his program."

13

AR11878

*The Supervisory Agent's Attempts to Influence Employee Testimony and Employee Concerns of Retaliation*

Several employees informed us that the Supervisory Agent had contacted them prior to and after their interviews with OIG to influence them and to learn interview details. These employees feared the Supervisory Agent would retaliate because of information they had provided.

A BLM State Ranger and a BLM Subordinate Supervisory Agent both stated that the Supervisory Agent contacted them before their interviews with OIG. The BLM State Ranger said that the Supervisory Agent told him that saying "I don't recall" was a valid answer when responding to OIG's questions. The BLM State Ranger said that the Supervisory Agent contacted him after his interview. The Supervisory Agent asked him, "So do I still have a job or did you get me fired?" He said the Supervisory Agent's comments made him uncomfortable and were an attempt to influence his testimony.

The BLM Subordinate Supervisory Agent said that the Supervisory Agent gave him "stuff" to say. For instance, he said that the Supervisory Agent told him to tell OIG investigators that wives of sheriff's department officers had also attended the Burning Man event and eaten at the commissary, and that they had entered the event without paying. He further said that the Supervisory Agent told him to tell OIG about ticket types that could be purchased and that the former BLM Special Agent's wife attended the event.

Following his interview, the Supervisory Agent sent the BLM Subordinate Supervisory Agent a text message concerning a news article about a local sheriff transporting his wife and son by helicopter to the Burning Man event. In his text, the Supervisory Agent wrote, "Email that [article] to [OIG]! . . . Jesus! I look like a choir boy!"

When interviewed, the Supervisory Agent acknowledged that he had conversations with the BLM State Ranger, the former BLM Special Agent, the BLM Subordinate Supervisory Agent, and another BLM State Ranger about OIG's interview, but he denied that he attempted to influence anyone's testimony.

During her final interview, the BLM OLES Contracting Officer said that when she returned from the Burning Man event, the Supervisory Agent informed her that two complaints had been filed with OIG against him. She said the Supervisory Agent blamed her for the complaints and told her that she needed to do damage control. She said he threatened to ruin her career if she did anything against him.

The BLM OLES Contracting Officer also stated that during the return trip from Burning Man, the Supervisory Agent had a copy of a complaint sent to OIG. She said that he accused another BLM State Ranger of filing the complaint, and threatened to retaliate against the BLM Supervisory Law Enforcement Ranger, as well as an additional BLM State Ranger for providing OIG with information. She also stated that the Supervisory Agent later told her, "If you're not on my ship, you're going to sink . . . . So I suggest you get on my ship." As a result, she feared the Supervisory Agent and kept her office door locked.

14

The BLM OLES Budget Analyst said the Supervisory Agent told her that he was going to ruin the BLM Law Enforcement Ranger's career. He bragged about ruining a BLM State Ranger's reputation with BLM State Directors and other managers. She said that shortly after the Supervisory Agent changed positions, he had bragged to her that "he owned" Lauro and the BLM OLES Official and that, as a result, no action could be taken against him.

The BLM OLES Budget Analyst further stated that a few weeks after the Supervisory Agent's removal from his position in the office, he sensed that she no longer wanted to interact with him. She said he had called her into his office. The Supervisory Agent said, "You know, if you don't side with me, grenades are going to go off and you'll get hit."

### SUBJECT(S)

1. Supervisory Agent, BLM OLES
2. Salvatore Lauro, Director, BLM OLES

### DISPOSITION

We are forwarding our report of investigation to the Assistant Secretary for Land and Minerals Management for any action deemed appropriate.

15

# EXHIBIT C

AR11881

JASON CHAFFETZ UTAH
CHAIRMAN

ONE HUNDRED FIFTEENTH CONGRESS

ELIJAH E CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6143

Majority    (202) 225-5074
Minority    (202) 225-5051
www.oversight.house.gov

February 14, 2017

Ms. Mary L. Kendall
Deputy Inspector General
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

Dear Ms. Kendall:

We received the unredacted report from your office titled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials" dated January 30, 2017.[1] I understand your office initiated this investigation in October of 2015 after receiving numerous complaints concerning Bureau of Land Management (BLM) employee Daniel Paul Love. The report documents numerous instances of troubling behavior exhibited by Love.[2]

One such instance involved the intentional withholding of documents responsive to a congressional inquiry.[3] Your report documents that a witness told your investigators that after receiving a congressional request for documents, the witness heard Dan Love "say to [another BLM employee] that [said BLM employee] needed to make sure that he scrubbed the emails before he sent them, you know, flagging anything that looked inappropriate so that [Dan Love] could remove them if needed."[4] In another part of the report, a witness testifies about how a BLM employee accessed and "deleted hundreds of documents" from a shared network.[5] The deleted documents were "team documents" which served as the "historical record or administrative record" for a BLM authorized event.[6] The witness stated the deleted documents were subject to the Federal Records Act, and were required, under the law not to be destroyed.[7] If substantiated, these attempts to conceal documents and destroy federal records responsive to a congressional inquiry are unlawful, as it is a federal crime to obstruct a congressional investigation or falsify, conceal or cover up a material fact in one.[8]

---

[1] U.S. Department of Interior Office of Inspector General, OI-PI-15-0768-I, Ethical Violations and Misconduct by Bureau of Land Management Officials (2017).
[2] *Id.* at attachments 18 and 48.
[3] *Id.* at attachment 18.
[4] *Id.* at attachment 48.
[5] *Id.* at attachment 18.
[6] *Id.*
[7] *Id.*
[8] 18 U.S.C. § 1505 states, in relevant part:

Ms. Mary L. Kendall
February 14, 2017
Page 2

The timing of the deletion of federal records raises questions. In your report, a witness notes a BLM employee "deleted hundreds of documents" on February 3, 2016, only to receive a congressional request for those same documents the very next day.[9] The witness states that "it just seemed odd to [her] that on February 3rd a lot of documents were removed or deleted from the Google drive, and then the next day [BLM is] hit with th[e] congressional" inquiry.[10] It also raises questions that former BLM Director Neil Kornze was provided, as a courtesy, advance notice of the congressional document request prior to February 3rd. We must find out which BLM employees were aware of an impending congressional inquiry when they set about deleting potentially responsive federal records.

Your report documents that Love allegedly attempted to influence the outcome of your investigation by coaching a witness in advance of an interview with your investigators.[11] In your investigative report, you state a specific occasion when "Dan Love called [a BLM employee] and...essentially gave [said BLM employee] talking points for any questions that may come up during his interview" with your office.[12] The report states Love provided that same BLM employee with "rationalizations," leading the employee to believe Love was essentially telling them what to say in the interview.[13] This allegation is problematic as it occurred after you had already initiated your investigation into Love's behavior.

As a federal law enforcement officer, Love's actions have the potential to not only taint your investigation, but to seriously undermine the trust in BLM's law enforcement office and

---

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—

Shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

Similarly, 18 U.S.C. § 1001 states, in relevant part:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
    (2) makes any materially false, fictitious, or fraudulent statement or representation; or
    (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
shall be fined under this title [or] imprisoned not more than 5 years . . . .

[9] Id. at attachment 18.
[10] Id.
[11] Id. at attachment 18.
[12] Id.
[13] Id.

Ms. Mary L. Kendall
February 14, 2017
Page 3

thwart congressional oversight of the Bureau. As such, I request that you investigate the specific allegations raised in your interviews of destruction of federal records, witness tampering, and obstruction of a congressional investigation.

The Committee on Oversight and Government Reform is the principal investigative committee in the U.S. House of Representatives. Pursuant to House Rule X, the Committee has authority to investigate "any matter" at "any time."

Please have your staff contact Chris Esparza of Chairman Chaffetz' staff at (202) 225-5074 with any questions about this request. Thank you for your attention to this matter.

Sincerely,

Jason Chaffetz
Chairman

Blake Farenthold
Chairman
Subcommittee on the Interior,
Energy, and Environment

cc:     The Honorable Elijah E. Cummings, Ranking Minority Member

        The Honorable Stacey E. Plaskett, Ranking Minority Member
        Subcommittee on the Interior, Energy, and Environment

# EXHIBIT D

AR11885



# Investigative Report of Misconduct by a Senior BLM Law Enforcement Manager

Date Posted to Web: August 24, 2017

This is a version of the report prepared for public release.

## SYNOPSIS

We initiated an investigation in November 2016 into allegations concerning a senior law enforcement manager with the Office of Law Enforcement and Security (OLES), Bureau of Land Management (BLM). An OLES official forwarded allegations to us that the senior manager had mishandled evidence from a criminal case by having a subordinate improperly remove several moqui marbles from the OLES evidence room and give them to the senior manager. The senior manager also allegedly gave marbles as gifts to several people. In addition, the OLES official alleged that after the BLM received requests for emails concerning various matters under official inquiry, the senior manager directed his subordinate to review the senior manager's BLM emails and delete any that depicted him unfavorably.

During our investigation, we received an additional allegation that in February 2016, OLES documents related to a congressional request were intentionally deleted from a BLM shared Google drive the day before the request for the documents was received.

We substantiated all but one of the allegations. We found that the senior law enforcement manager instructed his subordinate to remove four moqui marbles from the evidence room and give them to him, which violated BLM and U.S. Department of the Interior (DOI) evidence policy. We also confirmed that the senior manager had his subordinate use the senior manager's computer, personal identity verification (PIV) card, and personal identification number (PIN) to search the senior manager's emails for messages related to the official requests, and to "scrub" any messages that could harm the senior manager or any in which he used demeaning or derogatory language. The senior manager's actions violated Federal security and records management policy as well as various regulations and guidance related to the conduct of Federal employees.

Regarding the final allegation, an OLES budget analyst told us she deleted documents from the Google drive the day before the congressional request, but we did not find that she had intended to obstruct the inquiry. We also did not find that the senior manager or anyone from BLM leadership ordered the documents deleted.

The senior manager declined to be interviewed for this investigation.

We provided this report to the Acting Assistant Secretary for Land and Minerals Management for any action deemed appropriate.

1

## DETAILS OF INVESTIGATION

On November 18, 2016, we initiated this investigation after receiving allegations from an OLES official about a senior OLES law enforcement manager. The OLES official provided a written summary of the allegations, which stated that in late March or early April 2016, the senior manager directed a subordinate employee to take moqui marbles (accumulated masses of iron oxide, often spheroidal, that form in sedimentary rock), which had been seized as evidence in an OLES criminal case, out of the OLES evidence room. The senior manager allegedly had his subordinate remove the marbles so the manager could give them as a personal gift to a contractor who had done work on the OLES evidence room and Salt Lake City offices.

The OLES official also provided a record of an interview of the subordinate concerning an allegation that the senior manager had directed the subordinate to use the senior manager's PIV card and PIN to log on to the senior manager's BLM computer. After the BLM received official requests for documents as part of an employment-related matter and a congressional inquiry, the senior manager allegedly instructed his subordinate to search the senior manager's BLM email account for relevant emails. As part of this search, the senior manager allegedly told his subordinate to flag or "scrub," which the subordinate took to mean "delete," any negative emails that could harm the senior manager or any in which he used demeaning or derogatory language.

We attempted to interview the senior manager for this investigation, but a BLM official informed us that the senior manager's attorney said he was not able to participate in an interview.

### Mishandling of Moqui Marble Evidence

*Seizure of the Marbles by the OLES*

In 2012, BLM OLES special agents seized thousands of moqui marbles as evidence during an investigation into allegations that the marbles had been collected illegally from a national park. These marbles were eventually stored in the OLES evidence room, located in the BLM State Office in Salt Lake City.

After the marbles were seized, the BLM asked a University of Utah professor who has studied the moqui marbles (see Figure) at the park to inspect the seized marbles, determine whether they were unique to the park, and estimate their dollar value.

2

AR11888



Figure: Assorted moqui marbles in a variety of sizes and shapes. Source: Shutterstock.

We interviewed the professor and reviewed her February 2013 report on the seized marbles as part of our investigation. The report concluded that, based on their physical characteristics (golf-ball size, shapes, patina, etc.) and abundance, the seized marbles did come from the park. The report estimated the total wholesale value of the seized marbles at between $80,000 and $260,000, with a total retail value of $160,000 to $520,000.

*The Senior Law Enforcement Manager Directed the Unauthorized Removal of Moqui Marbles From the Evidence Room*

We interviewed the senior manager's subordinate, who said that in late April 2016, he was in the OLES evidence room with an OLES budget analyst and an OLES contract specialist counting the moqui marbles, which were stored in 5-gallon buckets. (He confirmed during his interview that the marbles were kept in more than 80 buckets.) He said the senior manager told the three of them while they were doing this that they could each take a marble from the evidence room and display them on their desks. The subordinate said he did not take a marble, but he later saw marbles on the desks of the other two employees. He was certain that the marbles had come from the evidence room and stated, "They were clearly evidence."

When interviewed, both the budget analyst and the contract specialist confirmed that, based on the senior manager's offer, they each took a marble from the evidence room and displayed them in their offices. The budget analyst said she had believed it was all right to take a marble because she had seen marbles on display in the senior manager's office, and the contract specialist said she had assumed it was all right because a senior law enforcement manager said it was. They returned the marbles during our investigation.

3

AR11889

The senior manager's subordinate stated that the senior manager also told him while he was counting the marbles to remove three or four of the "best" marbles from evidence and give them to the senior manager. He said the senior manager did not tell him why he wanted the marbles; nevertheless, the subordinate selected two spheroidal marbles and two "Saturn-type" marbles (which have additional mass around their middles, resembling rings), and gave them to the senior manager. The subordinate told us he "had a bad feeling" about removing the marbles from evidence, but he did not question the instructions because the senior manager was a law enforcement official and was "scary." The subordinate said he knew at the time the marbles were evidence in an ongoing criminal prosecution.

The budget analyst confirmed that while they were counting marbles she heard the senior manager tell his subordinate to bring him "a few" or "a couple" of marbles from the evidence room. The contract specialist stated she saw the subordinate give the senior manager four or five marbles while he was in the senior manager's office.

A review of the evidence room's access log showed the subordinate accessed the evidence room for the moqui marble case, but it did not show that marbles were removed. He said there was no evidence control sheet or evidence receipt attached to the buckets of marbles where he could document the removal.

We also reviewed the BLM OLES evidence policy and the *Departmental Manual*'s chapter on evidence handling and storage. Neither policy provides for the display of evidence, in employee offices or elsewhere, and both state that law enforcement officers are responsible for safeguarding all property taken into custody as evidence.

*The Senior Law Enforcement Manager Gave Moqui Marbles as Gifts on at Least Four Occasions*

The budget analyst stated that in April 2016 she had a conversation with the senior manager and a contractor who was doing work on the OLES' new evidence room and offices at the BLM State Office. She said that during the conversation the senior manager told the contractor about the buckets of moqui marbles and said that it would take time to relocate them to the new evidence room. She said the senior manager described the marbles to the contractor after the contractor expressed an interest in them.

The budget analyst said that a week later she saw the contractor in the OLES office. She said the contractor excitedly showed her two or three marbles he was holding and said to her, "Hey, I'm not supposed to say anything, but . . . look at what [the senior manager] gave me." He told her that the senior manager had also given him a business card and said he could use it like a "get-out-of-jail-free card" if he ever got into trouble.

The budget analyst said that a couple of days later, she asked the senior manager if he had given the contractor some marbles. She said he responded, "Shh! Don't say anything. If you say it too loud, [a BLM State ranger whose office was nearby] will hear, and he'll call OIG."

4

We interviewed the contractor, who said he had chatted often with the senior manager about various matters. He said that near the end of the project, he was in the OLES office space and saw a moqui marble on the senior manager's desk, and the senior manager explained to him how the marbles formed. He said either the senior manager or the budget analyst told him that thousands of marbles had been seized during an investigation.

About 2 weeks later, the contractor said, he was working in the OLES office when the senior manager called him into his (the senior manager's) office and gave him five or six moqui marbles, a business card, a BLM law enforcement coin, and other items. He said the senior manager told him these things were in appreciation for a job well done and that he should contact the senior manager if he ever got into trouble with law enforcement because the senior manager "knew a lot of people in a lot of places." He said he was later contacted by a BLM special agent, who had him return the marbles.

We spoke to this BLM special agent, who said that sometime around October 2016, after he learned the senior manager had given marbles to the contractor and others, he called the contractor into the office and took custody of the marbles. The special agent said that while meeting with the contractor, the contractor told him he understood that if the marbles had been removed from the evidence room, this could constitute "tampering with evidence." The special agent said the contractor asked him, "Is [the senior manager] going to get in trouble for this?"

The BLM special agent also said that in the fall of 2015, the senior manager gave him a marble from a handful on his desk. The special agent said he did not ask whether the marble was evidence; he told us that he "would certainly hope" a senior law enforcement manager "would know acceptable evidence practices"

Sal Lauro, the former OLES director, told us that shortly after he briefed his then-supervisor, BLM Deputy Director Steven Ellis, about the OLES moqui marble case, he received three marbles. He was certain the senior manager gave them to him but could not recall whether he did so in person, by mail, or via a coworker. He said he had no reason to believe that the senior manager would have removed these marbles from evidence, and he assumed they had been obtained from a university for educational purposes. During our investigation, we took custody of these marbles and placed them in our evidence room.

We interviewed another former OLES official, who said that he saw three marbles on Lauro's desk one day and asked what they were. The official said he later said to the senior manager, "Oh yeah, great. So you give the boss [Lauro] gifts, but you don't give any to me." According to the official, a few months later the senior manager gave him three marbles. We took custody of these marbles and placed them in our evidence room as well.

*Other BLM Law Enforcement Officials and Employees Also Had Moqui Marbles*

During our investigation, we learned of other BLM OLES employees and individuals who reportedly had moqui marbles that may have originally been seized as evidence during the OLES investigation. We contacted and interviewed the following individuals:

5

AR11891

- A BLM special agent said she found a marble in a cubicle she moved into in 2014. She said that another special agent had previously occupied the cubicle. She recalled asking the senior manager and others about the marble, and being told that she was allowed to have it and that the marbles could be collected in small numbers for personal use. She said another BLM special agent had already taken custody of the marble.

- A BLM State ranger gave us one marble during his interview, saying that he found it in a box in his home. He said a BLM special agent had already taken custody of a second marble, which had been left on his desk. He did not know who gave him either of the two marbles, but stated that other employees in the office had marbles and the senior manager was "giving them out like candy."

- A former administrative employee said that when she worked at the OLES she found marbles in her office. She did not know whether the senior manager had put them there, but she left them behind when she left the OLES. We took custody of three marbles provided by an employee who later occupied the office.

Another BLM special agent who had been assigned to the OLES moqui marble investigation said it was improper for a BLM employee to have a marble that had been seized pursuant to a Federal warrant. He also said BLM law enforcement officers had no authority to give evidence from an ongoing investigation to other employees for their personal use or to display in their offices.

Regarding the senior manager's possession of moqui marbles, this special agent said he believed that the senior manager could only have acquired the marbles from those that had been seized as evidence. He said he had no knowledge of the senior manager ever obtaining marbles from anywhere else.

The first BLM special agent said he learned in late 2016 that marbles seized during that investigation might have been taken from the OLES evidence room. He confirmed that he collected one marble each from four employees, plus the five marbles from the contractor, and returned them—along with the one the senior manager had given him—to the evidence room.

**The Senior Law Enforcement Manager Violated Federal Information Security Policy and DOI Rules of Behavior While Providing Documentation in Response to Official Requests**

*Emails Pertaining to an Employment-Related Matter*

A BLM State official provided information about two document requests the BLM received in 2015. Per these requests, the senior manager and other OLES personnel were ordered to provide documents, including emails sent during a specified period, concerning an employment-related matter.

During his interviews, the senior manager's subordinate provided details about two email searches he conducted in response to this document request. He said that in 2015, the senior manager directed him to sit at the senior manager's Dell computer, access the senior manager's BLM email account using the senior manager's PIV card, and search for emails related to the

6

AR11892

employment matter. The subordinate said the senior manager was logged on to his (the senior manager's) computer at the time and showed him what to search for. He said the senior manager also said to show him any emails "that could be bad" for the senior manager so that the senior manager could review them before they were included in the response. He understood these instructions to mean any email where the senior manager wrote anything demeaning or inappropriate. The subordinate said he deleted a few emails from the search results, printed the rest and put them in a binder, and flagged some of them with sticky notes for the senior manager to review.

About a week or two later, the subordinate said, a second request for emails was received, this time with a longer date range, and the senior manager again had him sit at the senior manager's Dell computer and review his email. The subordinate said he reviewed the senior manager's emails and had his PIV card and PIN for about 4 days. He said the senior manager told him to "scrub" the emails; based on the previous email search, the subordinate understood this to mean he was to delete inappropriate emails. He said he again deleted some emails from the search results, then printed and flagged others and placed them in a binder for the senior manager to review.

The OLES contract specialist explained to us that the senior manager instructed her and the subordinate to go through the senior manager's email account and flag emails "that could get him [the senior manager] in trouble." She and the subordinate searched for and printed copies of all pertinent emails and placed them into binders to provide to the BLM official. She said the subordinate did most of the flagging and she did not recall any specific emails flagged.

The OLES budget analyst also confirmed during her interview that she heard the senior manager tell his subordinate to search the senior manager's email for anything related to the employment matter, and to print and flag emails the subordinate thought were "inappropriate."

*Emails Pertaining to a Congressional Inquiry*

On February 4, 2016, Congressman Jason Chaffetz (R-UT), Chairman of the Committee on Oversight and Government Reform, and Congresswoman Cynthia M. Lummis (R-WY), Chairwoman of the Subcommittee on the Interior, wrote to then-BLM Director Neil Kornze requesting documents and information related to various matters.

The senior manager's subordinate said that in 2016, he left the OLES. He was asked to continue working there temporarily, however, so he returned and worked for over a week. During that time, the senior manager had him again sit at the senior manager's Dell computer with the senior manager's PIV card and PIN and review the senior manager's email to identify anything pertaining to one of the matters Congress had inquired into. The subordinate said the senior manager told him he only had a week to respond to the request, but the subordinate was to use the same process as before. He understood this to mean he should conduct the email search per the senior manager's previous instructions, then review the resulting emails and delete or show the senior manager any that would be inappropriate, prior to submitting them as the senior manager's response to the inquiry.

7

The subordinate stated that when he did his review, he created folders on the senior manager's computer desktop and labeled them "keep," "sensitive," and either "delete" or "discard" (he could not remember which). He then converted the emails he found to PDFs and placed them in the folders. He also deleted multiple emails. He said the search took him about a week to complete.

The subordinate told us he felt morally wrong about deleting the emails, but he did not discuss his feelings with the senior manager. He stated that he was "not going to tell a senior law enforcement [manager] no" because he felt that doing so might jeopardize his employment. He also said the senior manager was very intimidating, manipulative, and controlling, and he did not believe he could report the matter to Lauro or other OLES officials because the senior manager was "very, very close" to them.

The OLES budget analyst and contract specialist confirmed during their interviews that the senior manager was fully aware his subordinate was deleting emails. The budget analyst said the senior manager told her that BLM Deputy Director Steve Ellis had been disgusted by "unprofessional" emails from the senior manager about one of the matters under congressional inquiry. She said the senior manager asked her, "Do you know if [my subordinate] has gone through everything? Do you know if he's gotten rid of what he should [have]?" In addition, the contract specialist confirmed that she had heard the senior manager use the word "scrub" when telling the subordinate to go through his email. She said that, to her, this meant the subordinate should not include certain emails in the senior manager's response to the request.

On May 6, 2016, Chaffetz and Lummis sent a second letter to Kornze stating they had not received an official response to the February 4 letter or any documents. They demanded that the BLM provide a response, or a subpoena would be issued.

The senior manager's subordinate said that by May 2016, he was reemployed by the OLES. He said that after the second letter from Congress arrived, the senior manager directed him to use the same process to "scrub" his email for any related to the matter under inquiry. He said he first worked at the senior manager's computer and converted the emails he found to PDFs, and then later used a thumb drive to transfer the folders he created to his own computer to finish the review.

The subordinate said he placed many emails into a "discard" folder but did not show them to the senior manager. He said, however, that he did discuss the emails with the senior manager and described the ones he had placed in the folder. He uploaded the emails in the "keep" folder to a shared Google drive for final submission and did not upload the emails in the "discard" folder.

We reviewed the senior manager's emails and found many that appeared to coincide with ones that his subordinate said he either deleted or flagged for review during his searches. In particular, we showed the subordinate four emails related to one of the searches, and the subordinate said he recalled three of them; he said he had flagged two of these emails and "probably would have deleted" the third. We then compared these four emails to those that had been uploaded to the Google drive for submission to Congress; we did not find any of the four emails among the uploaded emails. In addition, we showed the subordinate approximately 40 emails related to another inquiry, and he indicated that he would have deleted 11 of those emails. The OLES

AR11894

budget analyst informed us the documents pertaining to the inquiry were no longer on the Google drive; therefore, we could not compare any with those that we showed the subordinate. As a result, we were not able to identify all emails that had been deleted or that the senior manager might have intentionally withheld from submission.

We also examined the senior manager's Dell computer and the thumb drive the subordinate used to transfer folders to his own computer. On the computer, we found no "delete" or "discard" folder containing emails added by the subordinate. Although we did locate a "discard" folder on the thumb drive, the subordinate said he was "carelessly grabbing files" and transferring them to the drive. Therefore, we were unable to rely on the contents of the thumb drive's "discard" folder for our investigation.

Finally, we reviewed the senior manager's training records, which disclosed that he completed annual Federal Information Systems Security Awareness + Privacy and Records Management (FISSA+) policy training in 2015 and 2016. The training required him to certify that he knew he should not share his PINs or his PIV card, and that Government equipment and PIV cards must not be used for illegal or inappropriate activities.

### No Evidence That the Senior Law Enforcement Manager or BLM Leadership Directed Deletion of Documents from Shared Google Drive

In a February 14, 2017 letter to our office, Chaffetz and Congressman Blake Farenthold (R-TX), Chairman of the Subcommittee on the Interior, Energy, and Environment, alleged that relevant documents had been deleted from a shared Google drive the day before Chaffetz sent his February 4, 2016 request to the BLM.

During this investigation, the OLES budget analyst contacted us, told us that she was aware of Chaffetz's February 2017 letter, and said she wanted to provide information about what had happened. She explained that on February 3, 2016, she deleted outdated documents from the Google drive, but stated she did so only to free up space. She said she deleted drafts and duplicate copies of documents from 2012 and 2013, but no originals.

The budget analyst stated that she and the other OLES employees were not notified of Chaffetz's document request until on or about February 26, 2016. She provided emails showing that a BLM employee in Washington, DC, forwarded Chaffetz's request to an OLES official on February 23, 2016, and it was not provided to the budget analyst until February 26, 2016. She stated that no one instructed her to delete the documents.

### The Senior Law Enforcement Manager Failed To Safeguard Sensitive IT Equipment

Our review of OLES property receipts showed that the senior manager had been issued two MacBook computers. We contacted him in order to secure his Government-owned computer equipment for our investigation, but he informed us that he was unable to locate either of the MacBooks. The OLES budget analyst, the contract specialist, and a BLM special agent subsequently informed us that the senior manager had stated to them on several occasions that

9

AR11895

the MacBook he used would "disappear" or be reported as broken if "things ever get bad" or if anyone "comes after" him or his job.

We learned that the BLM reviewed the matter and found in early 2017 that both of the MacBooks assigned to the senior manager had been lost due to his negligence. The BLM made multiple attempts to contact the senior manager to return the MacBooks, but he did not respond. Contact attempts sent to him via certified mail were returned unclaimed.

An OLES official informed us that the missing MacBooks had been used for law enforcement purposes and were not traceable to the BLM. Our Computer Crimes Unit confirmed that the senior manager's MacBooks never accessed the DOI or BLM networks.

## SUBJECTS

1. Senior law enforcement manager, OLES, BLM.

2. Senior law enforcement manager's subordinate, OLES, BLM.

## DISPOSITION

We presented our findings with regard to the evidence mishandling to the U.S. Attorney's Office for Utah, which declined to prosecute this case. We provided this report to the Acting Assistant Secretary for Land and Minerals Management for any action deemed appropriate.

As of the date of this report, we still have custody of a quantity of moqui marbles that BLM employees gave us during our investigation. We will return these marbles to the BLM when this investigation is closed.

10

AR11896

# EXHIBIT E

AR11897

INTERIOR

## Agent in charge at 2014 Bundy standoff gone from BLM

**Scott Streater, E&E News reporter**

*Published: Monday, September 18, 2017*



BLM Special Agent in Charge Dan Love speaks during a September 2015 radio interview. BLM Nevada/Flickr

A senior Bureau of Land Management law enforcement official who was found to have violated federal ethics rules at the Burning Man festival and to have mishandled criminal evidence in a separate case is no longer with the agency.

BLM confirmed to E&E News that Dan Love, who also oversaw security during the agency's failed 2014 roundup of Nevada rancher Cliven Bundy's illegally grazing cattle, is no longer a BLM employee following an Interior Department inspector general's report last month that found Love mishandled evidence in a criminal case and directed agency staff to delete incriminating emails in a separate matter.

The Associated Press first reported that Love is no longer with the agency.

It's not clear whether Love quit, was fired or negotiated a settlement to leave the agency. It's also not clear when Love left BLM.

BLM spokeswoman Megan Crandall confirmed in an email that Love "is no longer an employee" at the agency but said she could say little else due to privacy law.

"I am not able to provide additional details," Crandall said. "I cannot confirm the circumstances of the change in status or the timing of that change. Only that he is no longer an employee."

She added, "It's possible that the [Interior Department] might have more to offer in the coming weeks, but I don't at this point due to privacy law."

Lisa Kleine, a Washington-based attorney who sources said is representing Love, could not be reached for comment.

But pressure has been building on BLM and Interior to take action after an inspector general's **report** released last month found Love removed ancient moqui marbles from evidence storage and gave them away "as gifts to several people" (*E&E News PM*, Aug. 24).

The moqui marbles — compacted sandstone balls millions of years old that are primarily found in Utah and parts of Arizona, Colorado and Nevada — had been "taken illegally" by poachers from an undisclosed park site and later seized by BLM as part of a criminal investigation into their theft, the inspector general's report says.

The report quoted a BLM state ranger who told investigators that Love was giving the marbles "out like candy" to employees, and even to a contractor working on a new evidence room and offices.

7/6/2020    INTERIOR: Agency unclear at 2016 Bundy standoff grew from illed Jan. 6 attempt — Monday, September 21, 2020 — www.eenews.net

Case 1:19-cv-03729-DLF Document 35-4 Filed 07/12/21 Page 215 of 354

The inspector general's report did not name Love. But House Natural Resources Chairman Rob Bishop (R-Utah) confirmed in a statement that Love was the focus of the investigation after requesting that the inspector general send his committee an unredacted copy of the report.

A BLM spokeswoman told E&E News at the time the report was released last month that Love was still employed at the agency.

Bishop issued a statement after the report was released saying, "I expect Interior to hold Dan Love accountable."

Love had become a lightning rod for criticism, clashing with sheriff's deputies and congressional leaders in Utah, earning the scorn of former House Oversight and Government Reform Chairman Jason Chaffetz (R-Utah).

In addition to the moqui marble investigation, Love was the target of an inspector general probe that earlier this year that found he violated federal ethics laws by abusing his position to obtain special access to the Burning Man festival for his family and pressured subordinates to hire his friend (*E&E News PM*, Jan. 30).

Though the inspector general's report in January did not identify the supervisory agent at issue, E&E News later confirmed it was Love (*Greenwire*, Feb. 2).

Among other things, the inspector general found that during the investigation, the supervisor later tried to influence his employees and learn details of their interviews with investigators.

He told one contracting officer that "if you're not on my ship you're going to sink ... so I suggest you get on my ship," the inspector general report said.

And a BLM state ranger "said that the Supervisory Agent told him that saying 'I don't recall' was a valid answer," the report said. The same ranger said the supervisor called him after he spoke with the inspector general and asked, "Do I still have a job or did you get me fired?"

Love, who oversaw security during the Bundy cattle roundup that ended in the armed standoff with ranchers and militia members, stood near the gun-wielding crowd.

Federal prosecutors have not used Love's testimony in their mostly unsuccessful attempts to prosecute those involved in the armed standoff, in large part, sources said, because of the inspector general's investigations.

Email: **sstreater@eenews.net**

## Like what you see?
## **We thought you might.**

Start a free trial now.

Get access to our comprehensive, daily coverage of energy and environmental politics and policy.

| SIGN UP TODAY! |

*Advertisement*

# EXHIBIT F

AR11900



U.S. Department of the Interior

For Employees



# Month Two Message

By David L. Bernhardt, Deputy Secretary                                    9/22/2017

To: All Department of the Interior Employees

A little over a month ago, I wrote to all of you on my first day as Deputy Secretary. Shortly thereafter we established an electronic "ideas" box, and the comments, ideas, and suggestions came rolling in. I want to thank you for your willingness to be thoughtful and candid with your input. Some of the ideas have already served to trigger action.

Many of your comments have educated me on particular issues that I might not have fully appreciated without them. For example, I was a couple steps behind the Secretary in recognizing that it is time for the uniforms to be updated. Your comments have reinforced the very real need of doing so. In addition, I am working to find a realistic means to raise the purchase card limits. I am undeterred, but I expect that we will need to rely on help from Congress. Consequently, that will require more steps to accomplish than I initially hoped.

In my first message to you, I reiterated the basic principle that public service is a public trust and to remind everyone of the basic premise of our Federal service and to confirm my expectation that employees abide by it.

After my first month as Deputy Secretary, and after reading certain comments I am troubled that there is not a universal sense in the Department of the Interior (Department) that those few employees who have failed to uphold these standards are appropriately being held accountable. Please be assured, that I am committed to ensuring that leaders at all levels of

the Department are themselves ensuring that legally sound, measured, and decisive action is
being taken. I want this message to be clear: it is the duty of managers to promptly and
effectively take the necessary steps to resolve such issues when they arise.

I also want to convey that we can only take action when we are aware of misconduct. Such
awareness often ultimately depends on an employee's willingness to come forward. Despite
the official duty articulated in the principles of ethical conduct that "[e]mployees shall disclose
waste, fraud, abuse, and corruption to appropriate authorities," many might find it difficult to
report misconduct because of a belief that nothing will be done or perhaps due to a fear of
retaliation.

Therefore, it is important for you to know that reports of misconduct are taken seriously and
that action is taken in a timely manner when appropriate. To that end, I will share the results
of two Inspector General investigations that began with a report of employee misconduct and
which resulted in accountability. In one case, the allegations concerned former Bureau of
Land Management Office of Law Enforcement Supervisory Agent Dan Love's misuse of his
position for personal gain, securing privileges for both himself and family members, and
misuse of Government equipment for personal purposes. The Department recently removed
Mr. Love from Federal service. In the other, the allegations involved reports that former
National Park Service Chief Ranger at Canaveral National Seashore, Edwin Correa, made
unwanted sexual advances and inappropriate comments towards subordinates. The
Department removed Mr. Correa as well.

I share these examples because you need to know that your leadership is listening. We will
hold people accountable when we are informed that they have failed in their duties and
obligations.

Although the law in large part prevents dissemination of the details of actions taken, I am
sharing these examples because you need to know that the Department has taken concrete
disciplinary action in cases of serious misconduct, including those involving senior officials.
This message is part of our commitment to be vigilant and tireless in its pursuit of an
environment in which employees treat each other in a manner that is consistent with the law
and in which there are consequences for failing to do so.

Finally, as it is vitally important for the health of the Department that employees disclose misconduct they witness or experience, the Department is committed to protecting those who step forward from retaliation. Therefore, I will also make this clear: the Department must be free from any retaliation or reprisal for reports of misconduct and I expect every leader to ensure this.

Moreover, it goes without saying that we must remember to treat each other, as well as members of the public, with dignity and fairness. Supervisors should recognize the contributions of deserving employees and have the courage to address the failings of those that fall short of meeting expectations.

I look forward to continuing to work with all of you to further improve the Department and fulfill its important missions. Please keep sending me "ideas;" I will continue to review them.

Sincerely,
Deputy Secretary David Bernhardt

## Check out the latest on DOI.gov

In First Raid, New Opioid Task Force Seizes $2.5 Million worth of Meth and $22,000 in Marijuana, Heroin and Other Narcotics

BLOG POST



Strengthening and Expanding the Department of the

AR11903

# EXHIBIT G

AR11904

Case 1:19-cv-03729-DLF   Document 85-4   Filed 07/12/21   Page 221 of 354

# The Salt Lake Tribune

SUBSCRIBE      DONATE      NEWSLETTERS

# Interior boss blasts fired Utah BLM law enforcement agent

*In memo to Interior employees, deputy secretary makes example of controversial ex-Utah BLM lawman Dan Love, vow to clean up land agencies and protect those who report abuse.*



(Al Hartmann | Tribune file photo) Former BLM special agent Dan Love (center).

 By Brian Maffly    •    Published: September 25, 2017
Updated: September 25, 2017

A top Interior Department official has singled out the recent firing of a controversial Bureau of Land Management agent over Utah to illustrate a renewed commitment to hold accountable senior employees who misuse their official positions and to protect those who report such abuse.

Dan Love, who once led law enforcement for the BLM's Nevada and Utah state offices, was fired not long after an Aug. 24 report from Interior's Office of Inspector General (OIG) faulting him a second time for official misconduct, according to a memo circulated Friday by Deputy Secretary of the Interior David Bernhardt.

AR11905

Interior boss blasts fired Utah BLM law enforcement agent - The Salt Lake Tribune

SUBSCRIBE     DONATE     NEWSLETTERS

The memo to Interior employees also mentioned another supervisory lawman recently fired in the wake of another OIG probe. That report concluded Edwin Correa engaged in sexual harassment while serving as chief ranger at Canaveral National Seashore in Florida.

"We will hold people accountable when we are informed that they have failed in their duties and obligations," Bernhardt wrote. "Although the law in large part prevents dissemination of the details of actions taken, I am sharing these examples because you need to know that the Department has taken concrete disciplinary action in cases of serious misconduct, including those involving senior officials."

For years, Utah political leaders have been demanding Love's removal, citing what they say was the BLM's unwillingness under his leadership to coordinate with local law enforcement. But what cost Love his job turned on pilfering of evidence, wringing coveted access at the Burning Man arts festival for friends and family, pressuring underlings to conceal evidence of wrongdoing and other examples of misconduct documented in two reports released this year by Interior's OIG.

It was Love's alleged arrogance toward local law enforcement that rankled Utah leaders. Complaints against his leadership were instrumental in motivating both federal and state legislation that sought to strip federal land agencies of law enforcement authority, including a bill most recently filed by former Utah Rep. Jason Chaffetz before he left office this year.

While chairing the House Oversight Committee, the Utah Republican lambasted then-National Park Service director Jonathan Jarvis for his handling of the Correa matter and other reports of sexual harassment made by parks staff.

Utah's Rep. Rob Bishop said he welcomed Love's exit from federal service.

"The previous administration turned a blind eye to corruption and promoted a culture of mismanagement at the Department of the Interior," said Bishop, taking aim at the leadership of former Interior Secretary Sally Jewell. "I applaud Interior for taking a

AR11906

SUBSCRIBE          DONATE          NEWSLETTERS

strong stand and reasserting the basic principle that there are consequences for federal employees who blatantly disregard the law and steamroll elected officials and public trust."

Perhaps the most telling part of Bernhardt's memo was his pronouncement that Interior will listen to staffers who come forward with reports of wrongdoing at supervisory levels. The accusations affirmed by the OIG were brought to light by employees who did not confront Love directly or report his alleged misconduct to superiors out of fear of retribution or loss of their jobs.

Bernhardt, a former energy-industry lobbyist recently picked by President Donald Trump to serve as No. 2 at Interior, said such employees no longer have to worry.

"As it is vitally important for the health of the [Interior] Department that employees disclose misconduct they witness or experience, the Department is committed to protecting those who step forward from retaliation," Bernhardt's memo said. "Therefore, I will also make this clear: the Department must be free from any retaliation or reprisal for reports of misconduct and I expect every leader to ensure this."

---



bmaffly@sltrib.com

🐦 Follow @brianmaffly

**Donate to the newsroom now.**



THIS DAY IN HISTORY

AR11907

# EXHIBIT H

AR11908

BURNS OREGON STANDOFF

# BLM investigator alleges misconduct by feds in Bundy ranch standoff

Updated Dec 15, 1:27 AM;
Posted Dec 14, 11:36 PM

Comment

**By Maxine Bernstein,** mbernstein@oregonian.com
The Oregonian/OregonLive

A scathing memo from the lead investigator who assessed how federal officers handled the 2014 armed standoff with Nevada rancher Cliven Bundy accuses agents of far-reaching misconduct, recklessness and unrestrained antipathy toward the family.

The 18-page document, obtained Thursday by The Oregonian/OregonLive, is dated Nov. 27.

Prosecutors shared it last week with defense lawyers for Bundy, his two sons and co-defendant Ryan Payne as they were in the midst of their conspiracy trial, but it's not part of the public court record.

AR11909

The memo prompted Cliven Bundy's lawyer to file a motion early Monday to dismiss the case, already in disarray over concerns raised previously about the government's failure to promptly share evidence with the defense.

The judge sent the jury home for more than a week as she tries to sort out the claims and prosecutors scramble to save their case.

The memo comes from Larry Wooten, who had been the lead case agent and investigator for the U.S. Bureau of Land Management after the tense confrontation outside the patriarch's ranch near Bunkerville. Wooten also testified before a federal grand jury that returned indictments against the Bundys. He said he was removed from the investigation last February after he complained to the U.S. Attorney's Office in Nevada.

Then last month he sent a whistleblower email to the U.S. Department of Justice, alleging a "widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical and legal violations among senior and supervisory staff'' at the Bureau of Land Management's Office of Law Enforcement and Security.

Wooten wrote that supervisory agents with the bureau repeatedly

AR11910

mocked the defendants in an "amateurish carnival atmosphere'' that
resembled something out of middle school, displayed "clear prejudice''
against the Bundys, their supporters and Mormons, and prominently
displayed degrading altered booking photos of Cliven Bundy and other
defendants in a federal office and in an office presentation.

The memo described "heavy handedness'' by government officers as
they prepared to impound Cliven Bundy's cattle. He said some officers
"bragged about roughing up Dave Bundy, grinding his face into the
ground and Dave Bundy having little bits of gravel stuck in his face.''
Dave Bundy, one of Cliven Bundy's sons, was arrested April 6, 2014,
while videotaping men he suspected were federal agents near his
father's ranch.

Wooten contends that supervisory agents failed to turn over required
discovery evidence to the prosecution team that could help the defense
or be used to question the credibility of a witness, as required by law.

The top agents also "instigated'' the monitoring of jail phone calls
between defendants and their wives without consent from the U.S.
Attorney's Office or the FBI, Wooten wrote, though the memo noted that
Steven Myhre, Nevada's acting U.S. attorney who is leading the
prosecution of the Bundys, stopped the practice.

AR11911

Myhre couldn't be reached for comment late Thursday.

Cliven Bundy, sons Ammon and Ryan Bundy and Payne are accused of conspiring to block federal agents from enforcing court orders to confiscate family cattle on public land after Cliven Bundy failed to pay grazing fees and fines for years.

They're also accused of using or carrying a firearm in a crime of violence, threatening a federal law enforcement officer, obstruction of justice and extortion. Their trial began Nov. 14 in Las Vegas.

Wooten accused Dan Love, the former special agent-in-charge of the cattle roundup for the Bureau of Land Management, of intentionally ignoring direction from the U.S. Attorney's Office and his superiors "in order to command the most intrusive, oppressive, large scale and militaristic trespass cattle impound possible.'' He described Love as immune from discipline, though Love eventually was fired from the bureau for misconduct in an unrelated case.

Wooten said he learned from other agency supervisors that Love had a "Kill Book'' as a "trophy,'' in which he essentially bragged about "getting three individuals in Utah to commit suicide,'' following a joint FBI-BLM investigation into the alleged trafficking of stolen artifacts.

AR11912

Wooten said his supervisor took photos in a secure command post at FBI

headquarters in Las Vegas of an "Arrest Tracking Wall,'' where photos of
Cliven Bundy and co-defendant Eric Parker were marked with an "X''
over them, and emailed out the photos, although no photos were allowed
to be taken in that area.

Wooten called prosecutors in the Bundy case and told Myhre and
Assistant U.S. Attorney Nadia Ahmed, as well as FBI special agent Joel
Willis, of his fears that his supervisors weren't sharing key witness
statements with them.

On Feb. 16, Wooten said he asked Myhre if statements that Love made,
such as "Go out there and kick Cliven Bundy in the mouth (or teeth) and
take his cattle'' or "I need you to get the troops fired up to go get those
cows and not take any crap from anyone'' would be considered evidence
that must be shared with the defense. He said that Myhre replied, saying
something like "we do now'' or "it is now.''

Two days later, Wooten said his supervisor took him off the investigation
and another Bureau of Land Management agent confiscated files from
his office and from a safe in his office.

The material included computer hard drives, collected emails, text
messages, case notes and "lessons learned,'' Wooten wrote.

"These items were taken because they contained significant evidence of

AR11913

misconduct and items that would potentially embarrass BLM Law
Enforcement Supervision,'' the memo said. "I am convinced that I was
removed to prevent the ethical and proper further disclosure of the
severe misconduct.''

Wooten said his supervisor told him that Myhre "furiously demanded''
that he be removed and that Myhre had mentioned something about the
bureau's failure to turn over all crucial evidence to his office.

Wooten noted that he was ordered not to contact the Nevada U.S.
Attorney's Office.

He said he believed Myhre "adopted an attitude of 'don't ask, don't tell'''
or "preferred ignorance'' when it came to potential information from the
federal land management agency that would have been helpful to the
Bundy defense.

He also said prosecutors relied on inaccurate talking points, particularly
not disclosing at previous trials the fact there were government snipers
on surveillance outside the Bundy Ranch before the April 12, 2014,
showdown.

"Not only did Mr. Myhre in my opinion not want to know or seek out
evidence favorable to the accused, he and my supervisor discouraged
the reporting of such issues,'' Wooten wrote.

Wooten said he had held Myhre in the highest regard, but believes his judgment is "clouded'' by personal bias and a "desire to win the case at all costs.''

Wooten, now working as a bureau agent in Idaho, sent the memo to an associate deputy U.S. attorney general who serves as the U.S. Department of Justice's national criminal discovery coordinator. He obtained the lawyer's contact information during a training by the U.S. Attorney's Office in Boise, Idaho.

"I have tried to resolve these issues through my chain of command but I have failed,'' he wrote in the memo.

But he felt it was "his obligation'' to report his findings, describing his memo as a "last resort.''

He didn't return phone calls or messages Thursday night.

Cliven Bundy's lawyer Bret O. Whipple declined any comment on the memo, and would only describe the new information received as "quite a development,'' one he hadn't seen in his 20-plus years of legal work.

"In my mind, I think the case should be dismissed by next Tuesday,'' Whipple said. "I think I can get my client home for Christmas.''

U.S. District Judge Gloria M. Navarro has dismissed the jury until next Wednesday. She said she has at least seven to eight concerns about evidence or material that the government didn't share with defense lawyers in a timely manner. She indicated she would consider potential remedies if she found violations under the Brady disclosure law, ranging from striking testimony of a witness to delaying the trial or declaring a mistrial.

She gave both sides deadlines to file responses and is expected to reconvene court Wednesday with the lawyers from both sides and defendants at 8 a.m.

-- Maxine Bernstein

mbernstein@oregonian.com
503-221-8212
@maxoregonian

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**).

© 2017 Oregon Live LLC. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Oregon Live LLC.

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷ **Ad Choices**

AR11916

# EXHIBIT I

AR11917

Larry "Clint" Wooten

---

**From:** Larry C. Wooten
　　　　Special Agent
　　　　U.S. Department of Interior, Bureau of Land Management
　　　　1387 S. Vinnell Way, Boise, ID 83709
　　　　Office Phone▓▓▓▓▓▓▓▓▓ Gov't Cell Phone: ▓▓▓▓▓▓▓▓,
Email:▓▓▓▓▓▓▓▓▓▓
　　　　Personal Cell Phone▓▓▓▓▓▓▓ Personal Email▓▓▓▓▓▓▓▓▓

**To:** Andrew D. Goldsmith
　　　Associate Deputy Attorney General
　　　National Criminal Discovery Coordinator
　　　Email: ▓▓▓▓▓▓▓▓▓▓▓▓▓

**Subject:** Disclosure and Complaint Narrative in Regard to Bureau of Land Management Law Enforcement Supervisory Misconduct and Associated Cover-ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by United States Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in Reference to the Cliven Bundy Investigation

**Reference:** DI-17-2830, MA-17-2863, LM14015035, District of Nevada Case 2:16-cr-00046-GMN-PAL (United States of America v. Cliven Bundy, et al)

**Issue:** As a U.S. Department of Interior (DOI), Bureau of Land Management (BLM), Office of Law Enforcement and Security (OLES) Special Agent (SA) and Case Agent/Lead Investigator for the Cliven Bundy/2014 Gold Butte Trespass Cattle Impound Case out of the District of Nevada in Las Vegas (Case 2:16-cr-00046-GMN-PAL-United States of America v. Cliven Bundy, et al), I routinely observed, and the investigation revealed a widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal violations among senior and supervisory staff at the BLM's Office of Law Enforcement and Security. The investigation indicated that these issues amongst law enforcement supervisors in our agency made a mockery of our position of special trust and confidence, portrayed extreme unprofessional bias, adversely affected our agency's mission and likely the trial regarding Cliven Bundy and his alleged co-conspirators and ignored the letter and intent of the law. The issues I uncovered in my opinion also likely put our agency and specific law enforcement supervisors in potential legal, civil, and administrative jeopardy.

When I discovered these issues, I promptly reported them to my supervisor (a BLM Assistant Special Agent-in-Charge, but also my subordinate co-case agent). Often, I realized that my supervisor was already aware of the issues, participated in, or instigated

2

AR11918

the misconduct himself, was present when the issues were reported to both of us, or was the reporting party himself. When I reported these issues, my supervisor seemed generally unsurprised and uninterested and was dismissive, and seemed unconcerned.

I tried to respectfully and discretely urge and influence my supervision to stop the misconduct themselves, correct and/or further report the issues as appropriate and remind other employees that their use of electronic communications was likely subject to Federal Records Protections, the case Litigation Hold, the Freedom of Information Act (FOIA) and Case/Trial Discovery. I also tried to convey to my supervisor that the openly made statements and actions could also potentially could be considered bias, used in witness impeachment and considered exculpatory and subject to trial discovery.

As the Case Agent and Lead Investigator for the DOI/BLM (for approximately 2 years and 10 months), I found myself in an unusual situation. I was specifically asked to lead a comprehensive, professional, thorough, unbiased and independent investigation into the largest and most expansive and important investigation ever within the Department of Interior. Instead of having a normal investigative team and chain of command, a BLM Assistant Special Agent-in-Charge (ASAC) decided to act as a subordinate co-case agent, but also as my supervisor. Agent's senior to me acted as my helpers. I was basically the paper work, organizational and research guy. I did all the stuff that the senior and supervisory agents didn't want to do, but they called me the "Case Agent" and "Lead Investigator." They often publicly recognized and thanked me, and nominated me for many awards, but their lack of effort and dependability led to numerous case issues. During this timeframe, my supervisor (but subordinate), a BLM ASAC specifically wanted and had the responsibility of liaison and coordinator for interaction with higher agency officials, cooperating/assisting agencies and with the U.S. Attorney's Office. Although the BLM ASAC was generally uninterested in the mundane day to day work, he specifically took on assignments that were potentially questionable and damaging (such as document shredding research, discovery email search documentation and as the affiant for the Dave Bundy iPad Search Warrant) and attended coordination and staff meetings. Sometimes, I felt like he wanted to steer the investigation away from misconduct discovery by refusing to get case assistance, dismissing my concerns and participating in the misconduct himself. In February of 2017, it became clear to me that keeping quite became an unofficial condition of my future employment with the BLM, future awards, promotions, and a good future job reference.

The longer the investigation went on, the more extremely unprofessional, familiar, racy, vulgar and bias filled actions, open comments, and inappropriate electronic communications I was made aware of, or I personally witnessed. In my opinion, these issues would likely undermine the investigation, cast considerable doubt on the professionalism of our agency and be possibly used to claim investigator bias/unprofessionalism and to impeach and undermine key witness credibility. The ridiculousness of the conduct, unprofessional amateurish carnival atmosphere, openly made statements, and electronic communications tended to mitigate the defendant's culpability and cast a shadow of doubt of inexcusable bias, unprofessionalism and embarrassment on our agency. These actions and comments were in my opinion offensive in a professional federal law enforcement work environment and were a clear

3

AR11919

violation of professional workplace norms, our code of conduct, policy, and possibly even law. The misconduct caused considerable disruption in our workplace, was discriminatory, harassing and showed clear prejudice against the defendants, their supporters and Mormons. Often times this misconduct centered on being sexually inappropriate, profanity, appearance/body shaming and likely violated privacy and civil rights.

Many times, these open unprofessional and disrespectful comments and name calling (often by law enforcement supervisors who are potential witnesses and investigative team supervisors) reminded me of middle school. At any given time, you could hear subjects of this investigation openly referred to as "ret*rds," "r*d-necks," "Overweight woman with the big jowls," "d*uche bags," "tractor-face," "idiots," "in-br*d," etc., etc., etc. Also, it was common to receive or have electronic communications reported to me during the course of the investigation in which senior investigators and law enforcement supervisors (some are potential witnesses and investigative team members) specifically made fun of suspects and referenced "Cliven Bundy felony…just kind of rolls off the tongue, doesn't it?," dildos, western themed g@y bars, odors of sweat, playing chess with menstru*ting women, Cliven Bundy sh1tthing on cold stainless steel, personal lubricant and Ryan Bundy holding a giant pen1s (on April 12, 2014). Extremely bias and degrading fliers were also openly displayed and passed around the office, a booking photo of Cliven Bundy was (and is) inappropriately, openly, prominently and proudly displayed in the office of a potential trial witness and my supervisor and an altered and degrading suspect photos were put in an office presentation by my supervisor. Additionally, this investigation also indicated that former BLM SAC Dan Love sent photographs of his own feces and his girl-friend's vag1na to coworkers and subordinates. It was also reported by another BLM SAC that former BLM SAC Dan Love told him that there is no way he gets more pu$$y than him. Furthermore, I became aware of potentially captured comments in which our own law enforcement officers allegedly bragged about roughing up Dave Bundy, grinding his face into the ground, and Dave Bundy having little bits of gravel stuck in his face (from April 6, 2014). On two occasions, I also overheard a BLM SAC tell a BLM ASAC that another/other BLM employee(s) and potential trial witnesses didn't properly turn in the required discovery material (likely exculpatory evidence). My supervisor even instigated the unprofessional monitoring of jail calls between defendants and their wives, without prosecutor or FBI consent, for the apparent purpose of making fun of post arrest telephone calls between Idaho defendants/FBI targets (not subjects of BLM's investigation). Thankfully, AUSA Steven Myhre stopped this issue. I even had a BLM ASAC tell me that he tried to report the misconduct, but no one listened to him. I had my own supervisor tell me that former BLM SAC Dan Love is the BLM OLES "Directors boy" and they indicated they were going to hide and protect him. The BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs indicated to me the former BLM OLES Director protected former BLM SAC Love and shut the Office of Professional Responsibility out when misconduct allegations were reported about Love and that the former BLM OLES Director personally (inappropriately) investigated misconduct allegations about Love. Another former BLM ASAC indicated to me that former BLM SAC Love was a liability to our agency and the Cliven Bundy Case. I was even told of threats of physical harm that this former BLM SAC made to his subordinate employee and his family.

4

Also, more and more it was becoming apparent that the numerous statements made by potential trial witnesses and victims (even by good officers under duress), could potentially cast an unfavorable light on the BLM. (See openly available video/audio footage titled "The Bundy Trial 2017 Leaked Fed Body Cam Evidence," or a video posted on You Tube titled "Leaked Body Cams from the Bundy Ranch!" published by Gavin Seim.) Some of these statements included the following: "Jack-up Hage" (Wayne Hage Jr.), "Are you fucXXXX people stupid or what," "Fat dude, right behind the tree has a long gun," "MotherFuXXXX, you come find me and you're gonna have hell to pay," "FatAsX slid down," "Pretty much a shoot first, ask questions later," "No gun there. He's just holding his back standing like a sissy," "She must not be married," "Shoot his fucXXXX dog first," "We gotta have fucXXXX fire discipline," and "I'm recording by the way guys, so..." Additional Note: *In this timeframe, a key witness deactivated his body camera.* Further Note: *It became clear to me a serious public and professional image problem had developed within the BLM Office of Law Enforcement and Security. I felt I needed to work to correct this and mitigate the damage it no doubt had already done.*

This carnival, inappropriate and childish behavior didn't stop with the directed bias and degradation of subjects of investigations. The childish misconduct extended to citizens, cooperators from other agencies and even our own employees. BLM Law Enforcement Supervisors also openly talked about and gossiped about private employee personnel matters such as medical conditions (to include mental illness), work performance, marriage issues, religion, punishments, internal investigations and derogatory opinions of higher level BLM supervisors. Some of these open comments centered on Blow J0bs, Ma$terbation in the office closet, Addiction to P0rn, a Disgusting Butt Crack, a "Weak Sister," high self-opinions, crying and scared women, "Leather Face," "Mormons (little Mormon Girl)," "he has mental problems and that he had some sort of mental breakdown," "PTSD," etc., etc., etc.

Additionally, it should be noted that there was a "religious test" of sorts. On two occasions, I was asked "You're not a Mormon are you" and I was told "I bet you think I am going to hell, don't you." (I can explain these and other related incidents later.)

The investigation also indicated that on multiple occasions, former BLM Special Agent-in-Charge (SAC) Love specifically and purposely ignored U.S. Attorney's Office and BLM civilian management direction and intent as well as Nevada State Official recommendations in order to command the most intrusive, oppressive, large scale, and militaristic trespass cattle impound possible. Additionally, this investigation also indicated excessive use of force, civil rights and policy violations. The investigation indicated that there was little doubt there was an improper cover-up in virtually every matter that a particular BLM SAC participated in, or oversaw and that the BLM SAC was immune from discipline and the consequences of his actions. (I can further explain these issues later. These instances are widely documented.)

As the investigation went on, it became clear to me that my supervisor wasn't keeping the U.S. Attorney's Office up to date on substantive and exculpatory case findings and

AR11921

unacceptable bias indications. Therefore, I personally informed Acting United States Attorney Steven Myhre and Assistant United States Attorney (AUSA) Nadia Ahmed, as well as Federal Bureau of Investigation (FBI) Special Agent Joel Willis by telephone of these issues. When I did, my supervisor in my opinion deceptively acted ignorant and surprised. As the case continued, it became clear to me that once again, my supervisor failed to inform the U.S. Attorney's Office Prosecution Team about exculpatory key witness statements. Note: *During this investigation, my supervisor would also deceptively indicate to the Prosecution Team that no one else was in the room when he was on speakerphone. Thereby, allowing potential trial witnesses and his friends to inappropriately hear the contents of the discussion.*

My supervisor even took photographs in the secure command post area of the Las Vegas FBI Headquarters and even after he was told that no photographs were allowed, he recklessly emailed out photographs of the "Arrest Tracking Wall" in which Eric Parker and Cliven Bundy had "X's" through their face and body (indicating prejudice and bias). Thereby, making this electronic communication subject to Federal Records Protections, the Litigation Hold, Discovery, and the FOIA.

On February 16, 2017, I personally informed then AUSA (First Assistant and Lead Prosecutor) Steven Myhre of those specific comments (which I had previously disclosed to, and discussed with my supervisor) and reminded Special Assistant United States Attorney (SAUSA) Erin Creegan about an email chain by a particular BLM SAC in reference to the Arrest of David Bundy on April 6, 2014, in which prior to Dave Bundy's arrest, the BLM SAC and others were told not to make any arrests. When I asked Mr. Myhre if the former BLM SAC's statements like "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" and "I need you to get the troops fired up to go get those cows and not take any crap from anyone" would be exculpatory or if we would have to inform the defense counsel, he said something like "we do now," or "it is now."

On February 18, 2017, I was removed from my position as the Case Agent/Lead Investigator for the Cliven Bundy/Gold Butte Nevada Case by my supervisor despite my recently documented and awarded hard work and excellent and often praised performance. Additionally, a BLM ASAC (my supervisor, but also my co-case agent) violated my privacy and conducted a search of my individually occupied secured office and secured safe within that office. During this search, the BLM ASAC without notification or permission seized the Cliven Bundy/Gold Butte Nevada Investigative "hard copy" Case File, notes (to include specific notes on issues I uncovered during the 2014 Gold Butte Nevada Trespass Cattle Impound and "lessons learned") and several computer hard drives that contained case material, collected emails, text messages, instant messages, and other information. Following this seizure outside of my presence and without my permission, the BLM ASAC didn't provide any property receipt documentation (DI-105/Form 9260-43) or other chain of custody documentation (reasonably needed for trial) on what was seized. The BLM ASAC also directed me to turn over all my personal case related notes on my personal calendars and aggressively questioned me to determine if I had ever audio recorded him or a BLM SAC. I was also aggressively questioned about who I had told about the case related issues and other severe issues uncovered in reference to the case and Dan Love (see Congressional

6

AR11922

Subpoena by former Congressman Jason Chaffetz and the February 14, 2017, letter that Congressman Jason Chaffetz and Congressman Blake Farenthold sent the U.S. Department of Interior's Deputy Inspector General, Ms. Mary L. Kendall regarding Dan Love allegedly directing the deletion of official documents). Also after this, I believe I overheard part of a conversation in an open office space where my supervisor was speaking to a BLM SAC as they discussed getting access to my government email account. Note: *The personal notes that I was directed to turn in and the items seized from my office and safe wasn't for discovery, because I was transferring to another agency, because I was the subject of an investigation, or because my supervisor simply needed to reference a file. These items were taken because they contained significant evidence of misconduct and items that would potentially embarrass BLM Law Enforcement Supervision.* Additional Note: *The BLM ASAC also ordered me not to contact the U.S. Attorney's Office, even on my own time and with my personal phone. Later, when I repeatedly asked to speak with the BLM OLES Director, my requests went unanswered until April 26, 2017. The BLM ASAC simply told me it is clear no one wants to speak with me and that no one is going to apologize to me.* Further Note: *In this same secured individual office space and safe, I kept copies of my important personal documents such as medical records, military records, family personal papers, computer passwords, personal property serial numbers, etc., as a precaution in case for some reason my house is destroyed and personal papers are lost/destroyed. It was clear to me the BLM ASAC didn't know what he seized and when I told him about my personal papers, the BLM ASAC just told me "no one is interested in your medical records." It is unknown what unrelated case materials, notes, and personal documents were actually taken and it is impossible for me, any misconduct investigator, or any attorney to prove to a court or Congress what case information was taken. I still haven't heard back what (if any) personal items were in the seized materials and I don't know where the seized materials are being stored. It should be noted that I am missing personal medical physical results that I previously has stored in my office. Additionally, I believe if the BLM ASAC found my accidently seized medical records, instead of giving them back to me, he would shred them just like I have seen him shred other items from an agent that he didn't like. (I can elaborate on this.)*

Please Note: *This seized case related material (to include the hard drives) contains evidence that directly relates to a BLM SAC's heavy handedness during the 2014 Gold Butte Nevada Trespass Cattle Impound, the BLM SAC ignoring U.S. Attorney's Office and higher level BLM direction, documentation of the BLM SAC's alleged gross supervisory misconduct, potential misconduct and violation of rights issues during the 2014 Gold Butte Nevada Trespass Cattle Impound, as well as potential emails that were possibly identified and captured before they could have been deleted (as identified as an issue in the Office of Inspector General Report and possibly concerning a Congressional subpoena). I believe this information would likely be considered substantive exculpatory/jencks material in reference to the Cliven Bundy Nevada Series of Trials and would be greatly discrediting and embarrassing, as well as possibly indicate liability on the BLM and the BLM SAC.*

I am convinced that I was removed to prevent the ethical and proper further disclosure of the severe misconduct, failure to correct and report, and cover-ups by BLM OLES

7

supervision. My supervisor told me that AUSA Steven Myhre "furiously demanded" that I be removed from the case and mentioned something about us (the BLM, specifically my supervisor) not turning over (or disclosing) discovery related material (which is true), issues I had with the BLM not following its own enabling statute (which is true, I can elaborate on that later), and a personal issue they thought I had with former BLM SAC Dan Love. Note: *Prior to taking the assignment as Bundy/Gold Butte Investigation Case Agent/Lead Investigator for the BLM/DOI, I didn't know and had never spoken to former BLM SAC Dan Love. I was new to the agency and I was also specifically directed to lead an unbiased, professional, and independent investigation, which I tried to do, despite supervisory misconduct. Time after time, I was told of former BLM SAC Love's misconduct. I was told by BLM Law Enforcement Supervisors that he had a Kill Book" as a trophy and in essence bragged about getting three individuals in Utah to commit suicide (see Operation Cerberus Action out of Blanding, Utah and the death of Dr. Redd), the "Failure Rock," Directing Subordinates to Erase Official Government Files in order to impede the efforts of rival civilian BLM employees in preparation for the "Burning Man" Special Event, unlawfully removing evidence, bragging about the number of OIG and internal investigations on him and indicating that he is untouchable, encouraging subordinates not to cooperate with internal and OIG investigations, his harassment of a female Native American subordinate employee where Mr. Love allegedly had a doll that he referred to by the employees name and called her his drunk little Indian, etc., etc., etc. (I can further explain these many issues.)*

Following this, I became convinced that my supervisor failed to properly disclose substantive and exculpatory case and witness bias related issues to the U.S. Attorney's Office. Also, after speaking with the BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs and two former BLM ASAC's, I became convinced that the previous BLM OLES Director Salvatore Lauro not only allowed former BLM SAC Dan Love complete autonomy and discretion, but also likely provided no oversight and even contributed to an atmosphere of cover-ups, harassment and retaliation for anyone that questioned or reported former BLM SAC Dan Love's misconduct.

In time, I also became convinced (based on my supervisor and Mr. Myhre's statements) that although the U.S. Attorney's Office was generally aware of former BLM SAC Dan Love's misconduct and likely civil rights and excessive force issues, the lead prosecutor (currently the Acting Nevada United States Attorney) Steven Myhre adopted an attitude of "don't ask, don't tell," in reference to BLM Law Enforcement Supervisory Misconduct that was of a substantive, exculpatory and incredible biased nature. Not only did Mr. Myhre in my opinion not want to know or seek out evidence favorable to the accused, he and my supervisor discouraged the reporting of such issues and even likely covered up the misconduct. Furthermore, when I did report the misconduct, ethical, professional, and legal issues, I also became a victim of whistleblower retaliation.

Additionally, AUSA Steven Myhre adopted a few troubling policies in reference to this case. When we became aware that Dave Bundy's seized iPad likely contained remarks from BLM Law Enforcement Officers that is potentially evidence of civil rights violations and excessive use of force, Mr. Myhre and my supervisor not only apparently failed initiate the appropriate follow-on actions, Mr. Myhre apparently failed to notify the

8

AR11924

Defense Counsel and also decided not to return the iPad back to Dave Bundy, even though the iPad wasn't going to be searched pursuant to a search warrant or used as evidence in trial and Dave Bundy claimed he needed the iPad for his business. Mr. Myhre also adopted a policy of not giving a jury the option or ability to convict on lesser offenses and instead relied on a hard to prove, complicated prosecution theory in order to achieve maximum punishments (which has generally failed to this point). Also, the government relied on factually incorrect talking points and on (or about) February 15, 2017, misrepresented the case facts about government snipers during trial (it is unknown if this misrepresentation was on purpose or accidental, I can explain this in detail). Note: *The investigation indicated that there was at least one school trained Federal Sniper equipped with a scoped/magnified optic bolt action precision rifle, another Federal Officer equipped with a scoped/magnified optic large frame (308 caliber) AR style rifle, and many officers that utilized magnified optics with long range graduated reticles (out to 1,000 meters-approximately 500 meters on issued rifles depending on environmental conditions) on standard law enforcement issued AR (223 caliber/5.56mm) and that often officers were in "over watch" positions. Additionally, the investigation also indicated the possibility that the FBI and the Las Vegas Metropolitan Police Department had law enforcement snipers/designated marksmen on hand for possible deployment.*

The reporting of these severe issues and associated cover-ups are a last resort. I tried continually to respectfully and discretely influence my chain of command to do the right thing and I made every effort to make sure the Prosecution Team had the information they needed and were accurate in their talking points. I just wanted the misconduct to stop, the necessary and required actions be taken and I wanted to be sure these issues wouldn't create a fatal error in the case and further undermine our agency's mission. I also needed to be convinced that I was correct. If I was wrong, or errors were simply mistakes or simple errors in professional judgement or discretion, I didn't want to create more problems or embarrass anyone. However, my personal experience and investigation indicated that not only did my management fail to correct and report the misconduct, they made every effort to cover it up, dismiss the concerns, discourage its reporting and retaliate against the reporting party. I also tried to make sure that despite my supervisor's failings, the Prosecution Team had the most accurate information in terms of case facts, Discovery, and witness liability.

The Whistleblower Retaliation and agency wrongdoing is being investigated by the U.S. Office of Special Counsel and is also being looked at by the House Committee on Natural Resources (Subcommittee on Oversight & Investigations) and the House Oversight and Government Reform Committee (Subcommittee on the Interior, Energy, and the Environment). Additionally, a formal complaint has been filed with my agency in reference to the religious, sexually vulgar, and the other workplace harassment. Furthermore, there have been several investigations by the DOI Office of Inspector General (OIG) that at least in part contributed to the recent firing of BLM Special Agent-in-Charge Dan Love (which I wasn't a part of).

I ask that your office ensure that Acting United States Attorney Steven Myhre and the rest of the Cliven Bundy/Gold Butte Nevada Prosecution and Investigative Team is

9

AR11925

conducting the prosecution in an ethical, appropriate, and professional matter. I also specifically ask that your office provide oversight to Mr. Myhre and his team regarding the affirmative responsibility to seek out evidence favorable to the accused, not to discourage the reporting of case issues and suspected misconduct, to report/act on suspected civil rights violations and not to retaliate against an agent that does his required duty. I also ask that your office ensure that the Prosecution Team is free of bias and has ethically and correctly turned over exculpatory evidence to the Defense. I ask that as appropriate, prosecution team bias (by Mr. Myhre and possibly by AUSA Daniel Schiess) and factually incorrect talking points (by AUSA Nadia Ahmed and Mr. Myhre) be disclosed and corrected. Note: *Mr. Myhre previously referred to the defendants as a cult and Mr. Schiess said let's get these "shall we say Deplorables." I was also asked "You're not a Mormon are you." (I can explain these and similar issues in detail.)*

I don't make this complaint lightly. I do this with a heavy heart and I hope that at least in some ways I am mistaken. However, I know that is extremely unlikely. When we speak I can identify subjects, witnesses, and the location of evidence and corroborating information.

I believe this case closely mirrors the circumstances of former Alaska Senator Ted Stevens trial. As you may notice from the trials and several defense cross-examinations, very little of the impeachment and exculpatory issues were brought up by the defense. I believe this is most likely because the defense counsel was unethically not made aware of them and the severe issues were covered up. Additionally, I believe I can easily show that both my supervision and possibly Mr. Myhre entered into an unethical agreement to remove me from being the lead investigator and case agent for the BLM/DOI due to my objection to, and disclosure of outrageous misconduct, the belief that my testimony under oath would embarrass supervisory law enforcement officials in our agency and negatively affect the prosecution, my insistence that my supervisor stop his individual misconduct, correct the misconduct of other employees and report the misconduct as appropriate (for counseling, correction, discipline and the possible required internal investigations) and my belief that my agency is violating the letter and intent of the law.

In regard to prosecution team misconduct, I believe some of it may be attributable to simple mistakes and simple poor judgement. However, I believe it is unlikely (if my supervisor's statements to me are true) that Mr. Myhre wasn't himself acting unethically and inappropriately. Prior to the last few weeks of the investigation, I held Mr. Myhre in the highest of regards. He is an extremely hard worker and very intelligent. However, I feel that his judgement is likely clouded by extreme personal and religious bias and a desire to win the case at all costs. I feel he is likely willing to ignore and fail to report exculpatory material, extreme bias and act unethically and possibly deceptively to win.

All in all, it is my assessment and the investigation showed that the 2014 Gold Butte Trespass Cattle Impound was in part a punitive and ego driven expedition by a Senior BLM Law Enforcement Supervisor (former BLM Special Agent-in-Charge Dan Love) that was only in part focused on the intent of the associated Federal Court Orders and the mission of our agency (to sustain the health, diversity, and productivity of America's public lands for the multiple use and enjoyment of present and future generations). My

AR11926

investigation also indicated that the involved officers and protestors were themselves pawns in what was almost a great American tragedy on April 12, 2014, in which law enforcement officers (Federal, State, and Local), protestors, and the motoring public were caught in the danger area. This investigation also indicated, the primary reasons for the escalation was due to the recklessness, lack of oversight, and arrogance of a BLM Special Agent-in-Charge and the recklessness, failure to adhere to Federal Court Orders and lack of recognition of the Federal Government in matters related to land management within Nevada, by Rancher Cliven Bundy.

The investigation further indicated that the BLM SAC's peers didn't likely attempt to properly influence or counsel the BLM SAC into more appropriate courses of action and conduct or were unsuccessful in their attempts. The investigation indicated that it was likely that the BLM SAC's peers failed to report the BLM SAC's unethical/unprofessional actions, misconduct, and potential crimes up the chain of command and/or to the appropriate authorities, or that the chain of command simply ignored and dismissed these reports. The investigation further indicated when individuals did report issues with the BLM SAC, the reports were likely ignored or marginalized by higher BLM OLES officials. The investigation also indicated that former BLM OLES Director Salvatore Lauro likely gave the former BLM SAC complete autonomy and discretion without oversight or supervision. The investigation further indicated that it was unlikely that the BLM OLES Director wasn't aware of the BLM SAC's unethical/unprofessional actions, poor decisions, misconduct, and potential crimes. My investigation and personal observations in the investigation further revealed a likely unethical/unlawful "cover-up" of this BLM SAC's actions, by very senior law enforcement management within BLM OLES. This investigation indicated that on numerous occasions, senior BLM OLES management broke their own policies and overlooked ethical, professional, and conduct violations and likely provided cover and protection for the BLM SAC and any activity or operation this BLM SAC was associated with. My investigation further indicated that the BLM's civilian leadership didn't condone and/or was likely unaware of the BLM SAC's actions and the associated cover-ups, at least until it was too late.

During the investigation, I also came to believe that the case prosecution team at United States Attorney's Office out of Las Vegas in the District of Nevada wasn't being kept up to date on important investigative findings about the BLM SAC's likely alleged misconduct. I also came to believe that discovery related and possibly relevant and substantive trial, impeachment, and biased related and/or exculpatory information wasn't likely turned over to, or properly disclosed to the prosecution team by my supervisor.

I also came to believe there were such serious case findings that an outside investigation was warranted on several issues to include misconduct, ethics/code of conduct issues, use of force issues (to include civil rights violations), non-adherence to law, and the loss/destruction of, or purposeful non-recording of key evidentiary items (Unknown Items 1 & 2, Video/Audio, April 6, 2014, April 9, 2014, April 12, 2014-the most important and critical times in the operation). I believe these issues would shock the conscious of the public and greatly embarrass our agency if they were disclosed.

AR11927

Ultimately, I believe I was removed from my position as Case Agent/Lead Investigator for the Cliven Bundy/Gold Butte, Nevada Investigation because my management and possibly the prosecution team believed I would properly disclose these embarrassing and substantive issues on the stand and under oath at trial (if I was asked), because my supervision believed I had contacted others about this misconduct (Congress, possibly the defense and press) and possibly audio recorded them, because I had uncovered, reported, and objected to suspected violations of law, ethics directives, policy, and the code of conduct, and because I was critical of the misconduct of a particular BLM SAC. This is despite having already testified in Federal Grand Jury and being on the trial witness list.

The purpose of this narrative is not to take up for or defend the actions of the subjects of this investigation. To get an idea of the relevant historical facts, conduct of the subjects of the investigation and contributing factors, you may consider familiarizing yourself with the 2014 Gold Butte Timeline (which I authored) and the uncovered facts of this investigation. The investigation revealed that many of the subjects likely knowingly and willingly ignored, obstructed, and/or attempted to unlawfully thwart the associated Federal Court Orders through their specific actions and veiled threats, and that many of the subjects also likely violated several laws. This investigation also showed that subjects of the investigation in part adopted an aggressive and bully type strategy that ultimately led to the shutdown of I-15, where many armed followers of Cliven Bundy brandished and pointed weapons at Federal Officers and Agents in the Toquop Wash near Bunkerville, Nevada, on April 12, 2014, in a dangerous, high risk, high profile national incident. This investigation further indicated that instead of Cliven Bundy properly using the court system or other avenues to properly address his grievances, he chose an illegal, uncivilized, and dangerous strategy in which a tragedy was narrowly and thankfully avoided.

Additionally, it should be noted that I was also personally subjected to Whistleblowing Discouragement, Retaliation, and Intimidation. Threatening and questionable behaviors included the following: Invasion of Privacy, Search and Seizure, Harassment, Intimidation, Bullying, Blacklisting, Religious "tests," and Rude and Condescending Language. Simply put, I believe I was expected to keep quiet as a condition of my continued employment, any future promotions, future awards, or a favorable recommendation to another employer.

During the course of the investigation, I determined that any disagreement with the BLM SAC, or any reporting of his many likely embarrassing, unethical/unprofessional actions and misconduct was thought to be career destroying. Time and time again, I came to believe that the BLM SAC's subordinates and peers were afraid to correct him or properly report his misconduct (despite a duty to act) out of fear for their own jobs and reputation.

Sometimes, I felt these issues (described in depth below) were reported to me by senior BLM OLES management and line Rangers/Agents/employees because they personally didn't like a particular BLM SAC (although, some of these same people seemed to flatter, buddy up to, openly like, and protect the BLM SAC). Sometimes, I thought BLM OLES management wanted to talk about these actions because they thought these blatant

AR11928

inappropriate acts by a BLM SAC and others were funny. Sometimes, I thought the reporting parties wanted the misconduct corrected and the truth to come to light, but they were afraid/unwilling to report and correct the misconduct themselves. Sometimes, I thought the reporting parties just wanted to get the issues off their chest. Sometimes, I thought supervisors wanted to report the misconduct to me, so they could later say they did report it (since I was the Case Agent/Lead Investigator). Therefore, in their mind limit their liability to correct and report the misconduct and issues. However, it was confusing that at the same time, I thought some of these reporting parties (particularly in management) sought deniability and didn't want to go "on the record." These same reporting/witnessing parties in most cases apparently refused to correct the misconduct and further report it to higher level supervision, the Office of Inspector General, and the U.S. Attorney's Office (as required/necessary) and even discouraged me from further reporting and correcting the issues. When I did try to correct and further report the issues as I believed appropriate and necessary, these same supervisors (who were reporting/witnessing parties) acted confused and unaware. Ultimately, I became an outcast and was retaliated against.

I also feel there are likely a great many other issues that even I am not aware of, that were likely disclosed or known to my supervisor, at least two other BLM SACs, the former BLM SAC's subordinates, and the former BLM OLES Director. In addition to the witnesses I identify, I would also recommend interviews with the BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs and I would recommend reviews of my chain of command's emails and text messages.

Unfortunately, I also believe that the U.S. Attorney's Office Prosecution Team may have adopted an inappropriate under the table/unofficial policy of "preferred ignorance" in regard to the likely gross misconduct on the part of senior management from the BLM Office of Law Enforcement and Security and Discovery/Exculpatory related trial issues.

What indicated to me there was likely deception and a failure to act on the part of my supervision was the actions, comments, and questions of senior BLM Law Enforcement Officials, comments by the BLM's Chief of the Office of Professional Responsibility (Internal Affairs), and the pretrial Giglio/Henthorn Review.

Additionally, actions, comments, and questions by the U.S. Attorney's Office Lead Prosecutor, the strategy to deny the Dave Bundy iPad evidence from coming to light, the direction by a BLM ASAC for me not to speak with any member of the Prosecution Team, and factually deceptive/incorrect talking points (snipers, Bundy property, Bundy cattle overall health, etc.), indicated to me the Prosecution Team wanted to possibly and purposefully remain ignorant of some of the case facts and possibly use unethical legal tricks to prevent the appropriate release of substantive/exculpatory and bias/impeachment material. I believe that it is more likely than not, that there was not only a lack of due diligence by the Prosecution Team in identifying and locating exculpatory material, but there was also a desire to purposely stay ignorant (which my chain of command was happy to go along with) of some of the issues and likely an inappropriate strategy to not disclose substantive material to the Defense Counsel and initiate any necessary civil rights related or internal investigations. Furthermore, I was surprised about the lack of

13

AR11929

Defense Counsel questions about critical vulnerabilities in the case that should have been disclosed to the Defense in a timely manner. It is my belief that the Defense Counsel was simply ignorant of these issues.

Also, please keep in mind that I am not an "Internal Affairs," "Inspector General," or "Office of Professional Responsibility Investigator." Therefore, I couldn't, and can't independently conduct investigations into government law enforcement personnel. Additionally, I haven't been formally trained on internal investigations. Therefore, my perception, the opinions I offer, and the fact pattern that I found relevant was gained from my experience as a regular line investigator and former uniformed patrol and Field Training Officer (FTO).

Each, and every time I came across any potential criminal, ethical, or policy related issue, in the course of my duties as the DOI/BLM Case Agent/Lead Investigator for the Gold Butte/Cliven Bundy Nevada Investigation, I reported the issues up my chain of command with the intent to run an independent and unbiased, professional investigation, as I was instructed. Later, I determined my chain of command was likely already aware of many of these issues and were likely not reporting those issues to the prosecution team and higher headquarters. Later, I also was informed by the BLM Office of Professional Responsibility (OPR) Chief that any issues that had anything to do with a particular favored BLM SAC, the BLM OLES Director looked at himself instead of OPR. The OPR Chief told me he was shut out of those types of inquiries. I noted in the pre-trial Giglio/Henthorn Review that this appeared to be accurate. I also noted that these types of issues I discovered apparently weren't properly investigated as required. The bad joke I heard around the office was that the BLM SAC knew where the BLM OLES Director had buried the pr0stitutes body and that is why the BLM OLES Director protects him.

I know good people make mistakes, are sometimes immature and use bad judgement. I do it all the time. I am not addressing simple issues here. However, some simple issues are included to indicate a wide spread pattern, openly condoned prohibited/unprofessional conduct and an inappropriate familiar and carnival atmosphere. Additionally, the refusal to correct these simple issues and conduct discrepancies, harassment, and ultimately cover-ups and retaliation are indicated and explained throughout this document.

Since I wasn't a supervisor and since I was one of the most junior criminal investigators in our agency, I tried to positively influence those above me by my example and discrete one on one mentoring and urging. I simply wanted the offensive and case/agency destructive conduct to stop, to correct the record where appropriate, and inform those who we had a duty to inform of the potential wrong-doing. I attempted to positively influence my management in the most respectful and least visible way possible. In order to accomplish this, I adopted a praise in public and counsel in private approach. When that failed to work for the long term, I had to become more "matter of fact" (but always respectful), when that failed to work I resorted to documenting the instances and discussions. Later, I resorted to official government email to make a permanent record of the issues. When this failed to deter the offensive conduct or instigate appropriate action by my supervision, I had to notify others and identify witnesses. I respected and stayed

AR11930

within my chain of command until I was expressly forbidden from contacting the U.S. Attorney's Office and my requests to speak with the BLM OLES Director went unanswered.

Simply put, as a law enforcement officer, I can't allow injustices and cover-ups to go unreported or half-truths and skewed narratives go unopposed. I have learned that when conduct of this sort isn't corrected, then by default it is condoned, and it becomes unofficial policy. When I determined there were severe issues that hurt more than just me, and I determined that my supervision apparently lacked the character to correct the situation, I knew that duty fell to me. I still felt I could accomplish this duty without embarrassing my supervision, bringing shame on our agency, or creating a fatal flaw in our investigation.

Initially, I felt I could simply mentor and properly influence my supervision to do the right thing. Time and time again, I urged my supervision to correct actions and counsel individuals who participate in conduct damaging to our agency and possibly destructive to the integrity of our case or future investigations. I attempted to urge my supervision to report certain information to senior BLM management and the U.S. Attorney's Office. Note: *Evidence of some of this offensive conduct is potentially available through Freedom of Information Act (FOIA) requests and subject to a Litigation Hold, may be considered Exculpatory Material in trial discovery process, and may be subject to federal records protections. Additionally, in many instances, I can provide evidence, identify the location of evidence and identify witnesses.*

Ultimately, in addition to discovering crimes likely committed by those targeted in the investigation, I found that likely a BLM Special Agent-in-Charge recklessly and against advisement from the U.S. Attorney's Office and apparent direction from the BLM Deputy Director set in motion a chain of events that nearly resulted in an American tragedy and mass loss of life. Additionally, I determined that reckless and unprofessional conduct within BLM Law Enforcement supervisory staff was apparently widespread, widely known and even likely "covered up." I also found that in virtually every case, BLM senior law enforcement management knew of the suspected issues with this BLM SAC, but were either too afraid of retaliation, or lacked the character to report and/or correct the suspected issues.

**Note:** *This entire document was constructed without the aid of my original notes due to their seizure by a BLM Assistant Special Agent-in-Charge outside of my presence and without my knowledge or permission. Additionally, I was aggressively questioned regarding the belief that I may have audio recorded BLM OLES management regarding their answers concerning this and other issues. All dates, times, and quotes are approximate and made to the best of my ability and memory. I'm sure there are more noteworthy items that I can't recall at the time I constructed this document.* Also Note: *The other likely report worthy items were seized from me on February 18, 2017, and are believed to be in the possession of a BLM ASAC. I recommend these items be safeguarded and reviewed.*

AR11931

As the case agent/lead investigator for the DOI in the Cliven Bundy investigation out of the District of Nevada, I became aware of a great number of instances when senior BLM OLES leadership were likely involved in **Gross Mismanagement** and **Abuse of Authority** (which may have posed a substantial and specific threat to employee and public safety as well as wrongfully denied the public Constitutionally protected rights). The BLM OLES leadership and others may have also violated **Merit System Principles** (Fair/Equitable Treatment, High Standards of Conduct, Failing to Manage Employee Performance by Failing to Address Poor Performance and Unprofessional Conduct, Potential Unjust Political Influence, and Whistleblower Retaliation), **Prohibited Personnel Practices** (Retaliation Against Whistleblowers, Retaliation Against Employees that Exercise Their Rights, Violation of Rules that Support the Merit System Principles, Enforcement of Policies (unwritten) that Don't Allow Whistleblowing), **Ethics Rules** (Putting Forth an Honest Effort in the Performance of Duties, the Obligation to Disclose Waste, Fraud, Abuse, and Corruption, Endeavoring to Avoid Any Action that Creates the Appearance that there is a Violation of the Law, and Standards of Ethical Conduct for Employees), **BLM OLES Code of Conduct** (Faithfully Striving to Abide by all Laws, Rules, Regulations, and Customs Governing the Performance of Duties, Potentially Violating Laws and Regulations in a Unique Position of High Pubic Trust and Integrity of Profession and Confidence of the Public, Peers, Supervisors, and Society in General, Knowingly Committing Acts in the Conduct of Official Business and/or in Personal Life that Subjects the Department of Interior to Public Censure and/or Adverse Criticism, Conducting all Investigations and Law Enforcement Functions Impartially and Thoroughly and Reporting the Results Thereof Fully, Objectively, and Accurately, and Potentially Using Greater Force than Necessary in Accomplishing the Mission of the Department), **BLM Values** (To serve with honesty, integrity, accountability, respect, courage and commitment to make a difference), **BLM Guiding Principles** (to respect, value, and support our employees. To pursue excellence in business practices, improve accountability to our stake holders and deliver better service to our customers), **BLM OLES General Order 38** (Internal Affairs Investigations), **Departmental and Agency Policies** (BLM Director Neil Komze Policy on Equal Opportunity and the Prevention of Harassment dated January 19, 2016, DOI Secretary Sally Jewell Policy on Promoting an Ethical Culture dated June 15, 2016, DOI Secretary Sally Jewell Policy on Equal Opportunity in the Workplace dated September 14, 2016, DOI Deputy Secretary of Interior Michael Connor Policy on Workplace Conduct dated October 4, 2016, DOI Secretary Ryan Zinke Policy on Strengthening the Department's Ethical Culture dated March 2, 2017, DOI Secretary Ryan Zinke Policy on Harassment dated April 12, 2017, Memorandum dated December 12, 2013, from Acting DOI Deputy Assistant Secretary for Human Capital and Diversity Mary F. Pletcher titled "The Whistleblower Protection Enhancement Act of 2012 and Non-Disclosure Policies, Forms, Agreements, and Acknowledgements, Email Guidance by Deputy Secretary of Interior David Bernhardt titled "Month One Message," dated August 1, 2017, Email Guidance by Deputy Secretary of Interior David Bernhardt titled "Month Two Message," dated September 22, 2017, BLM Acting Deputy Director of Operations John Ruhs guidance contained in an Email titled "Thank You for Making a Difference," dated September 29, 2017, which referenced BLM Values and Guiding Principles, BLM/DOI Email and Computer Ethical Rules of Behavior, BLM "Zero Tolerance" Policy Regarding Inappropriate Use of the Internet, 18 USC 1663 Protection of Public Records

16

and Documents, 18 USC 4 Misprison of a Felony, 18 USC 1519 Destruction, Alteration, or Falsification of Records in Federal Investigations, 18 USC 241 Conspiracy Against Rights, 18 USC 242 Deprivation of Rights Under Color of Law, 43 USC 1733 (c) (1) Federal Land Policy Management Act, 43 USC 315 (a) Taylor Grazing Act, 5 USC 2302 Whistleblower Protections-Prohibited Personnel Practices/Whistleblower Protection/Enhancement Acts, 5 CFR 2635 Gifts Between Employees, 5 USC 7211 Employees Rights to Petition Congress, and Public Law 112-199 of November 27, 2012.

Additionally, the BLM Criminal Investigator/Special Agent Position Description (LE140) in part states the following: "Comprehensive and professional knowledge of the laws, rules, and regulations which govern the protection of public lands under jurisdiction of the Bureau of land Management, and their applicability on a national basis,"(under Factor 1, Knowledge Required by the Position), "Knowledge of the various methods, procedures, and techniques applicable to complex investigations and other law enforcement activities required in the protection of natural resources on public land. The applicable methods, procedures, and techniques selected require a high degree of judgement that recognizes sensitivity to the violations, as alleged, discretion in the manner that evidence and facts are developed, and an awareness of all ramifications of a criminal investigation. The incumbent must have the ability to establish the interrelationship of facts and evidence and to present findings in reports that are clear, concise, accurate, and timely submitted for appropriate review and action." (under Factor 1, Knowledge Required by the Position), "Comprehensive knowledge of current and present court decisions, criminal rules of evidence, constitutional law, and court procedures to be followed in criminal matters, formal hearings and administrative matters in order to apply court and constitutional requirements during the conduct of an investigation and to effectively testify on behalf of the Government." (under Factor 1, Knowledge Required by the Position), "great discretion must be taken to avoid entrapment of suspects and to protect the integrity of the investigation" (under Factor 4, Complexity), and "The incumbent must be able to safely utilize firearms…." (Factor 8, Physical Demands)

Please also note the potential Constitutional issues regarding "religious tests," search and seizure, and speech/assembly protections.

Please further note the following Rules of Criminal Procedure/Evidence: Memorandum of Department Prosecutors dated January 4, 2010, from David W. Ogden to the Deputy Attorney General, Rule 16, 18 USC 3500-the Jencks Act, the Brady Rule, Giglio, U.S. Attorney's Manuel 9-5.001 Policy Regarding Disclosure of Exculpatory and Impeachment Information, 9-5.100 Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses, American Bar Association Standards 3-1.2 The Function of the Prosecutor, 3-2.8 Relations with the Courts and Bar, 3-3.1 Conflict of Interest, 3-3.11 Disclosure of Evidence by the Prosecutor, 3-5.6 Presentation of Evidence, and 3-6.2 Information Relevant to Sentencing.

---

**Case Details:** 2-year/10-month case, approximately 570 DOI Exhibits/Follow-on Turn-in Items, approximately 508 DOI Identified Individuals-19 Defendants

AR11933

# EXHIBIT J

AR11934



U.S. Department of the Interior

# Press Releases

Share

# Zinke Signs Secretarial Orders to Increase Recreational Opportunities on Public Lands and Waters

Establishes Position of Senior National Advisor for Recreation



## 4/18/2018
Last edited 4/19/2018

AR11935

Case 1:19-cv-03729-DLF Document 35-4 Filed 07/12/21 Page 252 of 354

Date: April 18, 2018

Contact: Interior_Press@ios.doi.gov

**WASHINGTON** – U.S. Secretary of the Interior Ryan Zinke today signed two secretarial orders continuing his efforts to prioritize the Department of Interior's recreation mission and increase access to public lands.

Secretarial Order 3366 directs certain Interior bureaus to create and deliver plans to the Department within 90 days that focus on developing or expanding recreational opportunities on public lands and waterways. This order also directs bureau heads to designate one full-time employee charged to oversee recreational opportunities.

"From my first day on the job, I have made it abundantly clear that we are going to refocus on Interior's long-standing but recently forgotten recreation mission," **said Secretary Zinke.** "We are incredibly fortunate, as Americans, to have amazing public lands and waters to carry out our tradition of outdoor recreation but the Department must continue to create opportunities to increase access for these pursuits."

"We are delighted by the Secretary's actions to put in place what he has pledged: a system that will elevate the priority of outdoor recreation on public lands and waters managed by the Department of Interior," **said Thom Dammrich, the President of the National Marine Manufacturers Association.** "The Secretary's action recognizes the importance of outdoor recreation for our economy, particularly rural economies, and for the physical and mental health of all Americans. His actions today will help grow outdoor recreation and ensure that fun in the outdoors remains central to the American lifestyle. The Outdoor Recreation Roundtable pledges our support to the Secretary in his efforts to elevate the Department's commitment to outdoor recreation."

"Outdoor recreation is an economic engine that produces 2% of the U.S. GDP and is growing at a faster rate than the U.S. economy as a whole," **said Frank Hugelmeyer, the President of the RV Industry Association.** "With the right public policies, outdoor recreation will continue to be an American economic

AR11936

engine for years to come. Which is why the Outdoor Recreation Roundtable and its member associations applaud today's announcements by Secretary Zinke as a common sense plan to elevate the importance of outdoor recreation on public lands and waters throughout the Department of the Interior. This is an important step towards improving the visitor experience on public lands and waters across the country."

"The recreation industry looks forward to cooperating with the department to offer visitors to parks, refuges and other special places great experiences," **said Derrick Crandall, President of the Outdoor Recreation Roundtable.** "The result of better and modernized visitor infrastructure which will contribute to a renaissance of rural communities and a renewed commitment by all Americans to the strong conservation ethic our nation has shared with the world. We thank Secretary Zinke for putting a new emphasis on welcoming enjoyment of our public lands and waters and embracing new skills and new ideas to make visits compatible with protecting our natural and historic resources."

The bureaus are also asked to provide recommendations for improving and streamlining relevant permitting requirements for guides and outfitters and facilitated outdoor recreation providers and to improve contracting processes for recreation-specific concessioners.

"Whether your favorite activity is kayaking on a river, riding an ATV on sand dunes, jogging on a trail or hunting on a refuge—recreating on public lands and waters is good for the mind, body and soul," **said Secretary Zinke.** "And it is also incredibly vital to local economies who rely on recreation spending to help create jobs."

Secretarial Order 3365 establishes the position of Senior National Advisor to the Secretary for Recreation to ensure deliberate and active coordination of recreational policy in the U.S. Department of the Interior. The position will be filled by Rick May, who currently serves as a Senior Advisor to the Secretary.

May, who joined Interior in November 2017, is a retired U.S. Navy SEAL Captain and decorated veteran who served in the Iraq War. Since his departure from active duty in 2010, he has worked with wounded Veterans in various types of recreational activities, helping them to reintegrate back into mainstream America. May is a

AR11937

graduate of Sonoma State University with a Bachelor of Arts in Biology and he also holds a Master of Arts in Human Resource Management.

"Rick is the absolute best person for this job," **said Secretary Zinke.** "The work he has done in helping disabled veterans connect with the outdoors through recreation opportunities speaks for itself. As a former SEAL, he has the leadership needed to help the Department chart its course in making recreation a priority again."

"First, I'm truly honored and grateful for the confidence that Secretary Zinke has placed in me to hold this position," **said Rick May.** "The power of recreation can not be overstated, and its ties to overall health and well-being are undeniable. It is my mission to get more Americans out to enjoy our great public lands, and I look forward to increasing access and opportunity for each and every one of them."

The Secretarial Orders come on the heels of <u>Secretary Zinke selecting members</u> of the newly created "Made In America" Outdoor Recreation Advisory Committee. A primary charge to the committee is to advise the Secretary on public-private partnerships across all public lands, with the goal of expanding access to and improving the infrastructure on public lands and waters.

PRESS RELEASE



Interior Presents the 2020 Independence Day Celebration in the Nation's Capital

AR11938

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone:  (650) 858-8500
david@levinlawfirm.com
Attorneys for Appellant,
Burning Man Project

## UNITED STATES DEPARTMENT OF THE INTERIOR

## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BURNING MAN PROJECT, | Case Identification No.:  IBLA-2020-0302 |
| Appellant, | Special Recreation Permit |
| | LLNVW03500-19-01 |
| v. | 2930 (NV030.10) |
| BUREAU OF LAND MANAGEMENT, | **DECLARATION OF ROBERT ABBEY** |
| | **IN SUPPORT OF APPEAL** |
| Appellee. | |

I, Robert Abbey, declare as follows:

1.      I am over 18 years old, of sound mind, and capable of making this declaration.  I am

currently a partner with Abbey, Stubbs, & Ford, LLC in Las Vegas, Nevada, and serve as a consultant for

appellant Burning Man Project ("BMP").  I have personal knowledge of the facts set forth herein, or, if so

stated, am informed and believe of their truth and accuracy, and, if called to testify, I could and would do

so competently and under oath.

AR11939

2.       I held numerous positions throughout my 30-year career with the U.S. Government, including 28 years with the Bureau of Land Management ("BLM").  Some key positions include:

- BLM Colorado Associate State Director from 1995 to 1997;

- BLM Nevada State Director From 1997 to 2005; and

- BLM National Director from 2009 to 2012.

3.       I oversaw the administration of the Burning Man Special Recreation Permit ("SRP") for seven years while I was the BLM Nevada State Director.  The SRP was also under my responsibility when I was the National Director.  I have extensive knowledge about the Burning Man SRP.  I am also well-versed in the policies, procedures, and practices of the BLM, specifically for SRPs and cost recovery.

4.       To comply with BLM regulations and best practices for SRPs, the agency should manage its staffing at the Burning Man event to achieve the greatest efficiencies and ensure that it is only charging the proponent for reasonable costs.  Burning Man has now been taking place for nearly 30 years in the Black Rock Desert, and the BLM should have learned lessons during this time that allow for such efficiencies as (1) a reduction in the number of agency personnel at the event; (2) a reduction in the number of hours these personnel must devote to the Burning Man SRP; and (3) the assignment of lower-graded personnel to work at Burning Man.  For example, as Burning Man is a recreation-oriented event, BLM law enforcement rangers — instead of special agents, who typically receive much higher pay — should be the preferred choice for all law enforcement assignments.

5.       I am informed and believe the BLM has asserted to BMP over the years that the agency's law enforcement staffing levels at the Burning Man event are so high because the BLM has an obligation to enforce drug laws.  In my experience, however, the primary responsibility of the BLM's law

enforcement program is to provide visitor assistance and to protect sensitive natural and cultural resources from illegal activities.  The BLM has historically focused its law enforcement activities on trafficking across the southern borders of the United States and on cultivation and drug manufacturing occurring on BLM-managed public lands.  Given the broad and diverse mission of the BLM, and the priority the agency has assigned to meeting its natural and mineral resource management mandate, the BLM has routinely relied on local law enforcement agencies, including local sheriff's departments, to enforce laws related to illegal drugs on public lands.

6.      I am informed and believe that the BLM's cost recovery decision for the 2019 Burning Man SRP, like the cost recovery decision for the 2018 Burning Man SRP, included the costs of six special agents who were assigned to the Pershing County Sheriff's Office to assist with investigations of state law violations. In addition, the BLM's 2019 After Action Review states that BLM "partnered" with the Pershing County Sheriff's Office who employed a sexual assault exam nurse at the 2019 Event.  But BLM charged the $33,501 cost of Pershing County's nurse to BMP through cost recovery.  In my experience, it is not typical for the BLM to use the cost recovery process to provide law enforcement investigators to another agency or to force an SRP applicant to pay for the cost of a state agency's medical personnel.  I am not aware of any other instance where a proponent has been required to pay for BLM investigators to assist with county law enforcement or required to pay for county medical services provided to the proponent's attendees.

7.      BLM's use of its cost recovery process to supplement the Pershing County Sheriff's budget appears to be an attempt by BLM to circumvent the existing legal agreement between BMP and Pershing County regarding the County's provision of law enforcement services at the Burning Man event. Should Pershing County feel the need to employ additional law enforcement or medical personnel,

Pershing County should revise its existing agreement with BMP and not rely upon the BLM to assess these additional costs.

8.     Both the BLM's emphasis on drug law enforcement and the law enforcement strategy deployed at the Burning Man event are unprecedented and are not replicated elsewhere at other BLM-permitted activities.  For example, I am not aware of any instance where the BLM has assigned a contingent of law enforcement personnel assisted by drug-sniffing dogs to monitor for and enforce drug laws at BLM-permitted oil and gas drilling sites or mining operations, despite the known use and trafficking of illegal drugs on public lands by personnel working in these industries.  The same is true of other recreation events permitted by the BLM, such as off-highway vehicle competitive events and popular campground sites.

9.     The current law enforcement strategy at the Burning Man event is inconsistent with the vision articulated by Ryan Zinke, the former Secretary of the Department of the Interior (the "Department") that BLM personnel should be emphasizing their role as land managers more than law enforcement. In public remarks in 2017, Secretary Zinke urged a change in the BLM's culture of the prior few years and stated that he is trying to change the image of Department agencies with heavy-handed law enforcement officers, noting that "[w]hen you see a BLM truck you should think land managers and not law enforcement, which we work with through our local sheriffs."   Attached hereto as **Exhibits A and B**, respectively, are true and correct copies, with highlighting added for clarity, of the following news articles quoting Secretary Zinke's remarks: "Zinke refuses to discuss Bundy cattle at monument site," by Jennifer Yachnin, published in E&E News on July 31, 2017, and  "Zinke caps review of Nevada monuments with Bunkerville visit," by Keith Rogers, published in the Las Vegas Review-Journal on July 30, 2017.  The Secretary's comments reflect a strong preference for the BLM's historic law enforcement role, which has

been one of assisting with visitor services and protecting sensitive natural and cultural resources, rather

than one of police actions like the enforcement of drug laws. He has routinely urged the BLM to look at

new ways to manage land and restore public trust.

10.      I am informed and believe that during Secretary Zinke's tenure at the Department and

under the leadership of his successor, Secretary David Bernhardt, the BLM has been lessening the

financial burdens and regulatory requirements on other users of public lands, including oil, gas, and

mining companies; livestock operators; and off-highway vehicle enthusiasts.  As a result, Burning Man

currently appears to be one of the most regulated operations taking place on BLM-managed public lands,

although there are fewer impacts associated with this temporary special event than with many of the other

uses permitted by the BLM.  Attached hereto as **Exhibit C** is a true and correct copy of a press release

from the Department dated April 16, 2018, and titled "Quarter 1 in Review: Interior Releases

Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary Zinke,"

in which the Secretary states, "The Department is doing a tremendous job of breaking down regulatory

barriers and cutting red tape to create economic prosperity that will benefit our nation."  Attached hereto

as **Exhibit D** is a true and correct copy, with highlighting added for clarity, of a press release from the

Department dated December 28, 2017, and titled "Promises Made, Promises Kept: Interior Releases

Comprehensive List of Accomplishments under President Trump & Secretary Zinke," which notes that

"[u]nder Secretary Zinke's leadership, the Department reduced the semi-annual regulatory agenda by

more than 50-percent [and] initiated 21 deregulatory actions[.]"

11.      The BLM does not have the discretion to require that a proponent purchase new equipment

or technology simply because agency employees would like to use it or have access to the latest gadgets.

The BLM would not be purchasing such non-essentials if the agency were paying for them directly.

Requests to purchase new equipment or implement new technology in connection with an SRP should be negotiated with the proponent. The proponent should have a substantial role in assessing whether these added costs are reasonable, and whether they are likely to measurably improve public safety or enjoyment, or the protection of the public lands. These discussions should occur prior to the BLM making final demands on the proponent. This is especially true for the recent Burning Man SRPs, as the event has experienced little growth over the past several years and should not be requiring extensive technology upgrades.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this **2ⁿᵈ** day of July, 2020, in **BRANdon, MS** .

Robert Abbey

# EXHIBIT A

AR11945

8/13/2019   Zinke refuses to discuss Bundy cattle at monument site -- Monday, July 31, 2017 -- www.eenews.net

THE LEADER IN ENERGY AND ENVIRONMENT NEWS

### NEVADA STANDOFF
## Zinke refuses to discuss Bundy cattle at monument site

Jennifer Yachnin, E&E News reporter
*Published: Monday, July 31, 2017*



During a visit to the site of the 2014 armed standoff between federal agents and Nevada rancher Cliven Bundy and his supporters, Interior Secretary Ryan Zinke refused to address questions about Bundy's cat le, which were at he heart of he dispute. Jennifer Yachnin/E&E News

BUNKERVILLE, Nev. — More than three years after the armed standoff that took place here between rancher Cliven Bundy and his family and federal agents, the Bundy patriarch sits across the state in the Nevada Southern Detention Center as he awaits trial.

But the Bundy-owned cattle that are at the heart of the dispute — Bureau of Land Management agents were trying to seize Bundy's cattle over more than $1 million in unpaid grazing fees when the standoff began — continue to roam free on Gold Butte National Monument.

BLM officials told the *Reno Gazette-Journal* earlier this year that two court orders could allow the roundup of the cattle but said there are no plans to do so, pending approval from Washington, D.C.

Interior Secretary Ryan Zinke didn't rule out a future roundup when asked about the issue yesterday — but he also didn't offer any indications of what his agency plans to do.

"I'm not going to address that issue," Zinke when asked whether he planned to remove the cattle. He spoke at a news conference staged with the Gold Butte monument as a backdrop during his visit to the state to decide whether to rescind or reduce the 297,000-acre site (*see related story*).

During his 2014 congressional campaign, just a few weeks after the Bunkerville standoff, Zinke expressed sympathy for the Bundys, arguing that "not only was the government wrong, the rancher was wrong, but he was wronged."

At the time, he questioned BLM's and the National Park Service's ownership of "brand-new SUVs with blackened windows, weapons, Tasers and guard dogs" (*Greenwire*, July 13).

Zinke has since asserted that the "war is over" with anti-government advocates like the Bundys — pointing to both Bunkerville and the occupation of the Malheur National Wildlife Refuge in Oregon — under the Trump administration.

In particular, Zinke has pushed for a cultural change at the agencies under his supervision that would call on local law enforcement to defuse situations, and move federal agents into strict roles as land managers.

AR11946

"We should be the happy department. When you see a BLM truck, you should think 'land manager' and not 'law enforcement.' We should work with our local sheriffs," Zinke said when asked whether he continued to question arming BLM or NPS officials.

"Our people are embedded in the communities, and it's important — we're the team, the volunteer coaches and stuff like that — it's important that we're a part of the community, and when you see BLM, you should think about land manager and a happy guy, and if you see the lights go on, you should think about maybe he's looking for a lost hiker or something rather than getting a ticket on the country road, and so we're working on that," he added. "That's, to a degree, a little change in culture."

Nonetheless, Zinke added that with unspecified illegal activity on some remote public lands, federal officials must be equipped to protect themselves.

"We have to make sure that our law enforcement officers, too, can defend themselves," he said.

### Trial plans

Federal prosecutors began a retrial in the first Bunkerville-related case earlier this month after a jury deadlocked in April over charges against four defendants (*Greenwire*, July 10).

Federal prosecutors are trying to prove defendants Richard Lovelien, Scott Drexler, Eric Parker and Steven Stewart conspired with Bundy and others "to threaten, and use, force and violence to interfere with the officers while they executed their duties to enforce the court orders," court documents say.

Charges against participants in the Bunkerville incident were divided into three separate trials, with Cliven Bundy and his sons, Ammon, Melvin and David, slated to face trial 30 days after the retrial is concluded.

The Bundys' trial is expected to begin in October or September, followed by the third and final trial in the case.

Neither Bundy family representatives nor their attorneys answered requests for interviews.

Twitter: **@jenniferyachnin** | Email: **jyachnin@eenews.net**

*Advertisement*

*The essential news for energy & environment professionals*

© 1996-2020 Environment & Energy Publishing, LLC   Privacy and Data Practices Policy   Site Map   Contact Us

# EXHIBIT B

AR11948

Home (/) >> News (https://www.reviewjournal.com/./news/)
>> Politics and Government (https://www.reviewjournal.com/./news/politics-and-government/)

## Zinke caps review of Nevada monuments with Bunkerville visit

**Interior Secretary visits to review national monuments**

Interior Secretary Ryan Zinke spoke to members of the media Sunday in Bunkerville during his trip of the West to review the status of national monume....



▶ 🔟 00:00                                      02:43 ▶| ◀)) ⤢

Interior Secretary visits to review national monuments (Rachel Aston/Las Vegas Review-Journal)



By Keith Rogers Las Vegas Review-Journal
July 30, 2017 - 6:25 pm

✉
(ma
&su
[Sha
Pos
Zink
cap
revi
of
Nev
mor
with
Bun
visit
may
be
inte
in
the
f ▼ follc
(htt;bstl:p/oox
u=httpsAttpe

Updated July 31, 2017 – 12:09 am

BUNKERVILLE — Interior Secretary Ryan Zinke spoke to reporters early Sunday evening in this rural Clark County community as he wrapped up a much-anticipated visit to Southern Nevada (https://www.reviewjournal.com/news/politics-and-government/nevada/interior-secretary-zinke-to-visit-bunkerville-on-sunday/) that included a hike at Gold Butte National Monument and stops in Basin and Range National Monument to see American Indian rock art.

"As a steward of our greatest treasures, it's good to get out," Zinke said as he stood in the sun against a backdrop of the Gold Butte range. "As a former Navy SEAL, I think it's important to go out on the front line and actually meet people because the view from the Potomac is a lot different than the Virgin River."

The interior secretary visited the monuments as part of President Donald Trump's executive order mandating a review of 22 national monuments and five marine national monuments created by presidential decree since Jan. 1, 1996, to determine whether the designations should be scaled back or eliminated.

"What I've learned in the monument review is every monument is unique," said Zinke, who wore a cowboy hat as he answered reporters' questions.

"In a lot of cases people are afraid public land is going to be sold so they feel like a monument is a tool to make sure that public land stays in public hands," he said, adding, "Out front, I am an advocate to never sell or transfer public land. So is the president."

Zinke is expected to present Trump with his final recommendations by the end of August.

Speaking outside Brian Haviland's residence near Gold Butte, Zinke offered insight into criteria for downsizing.

"Again, the definition (of a national monument) is fairly loose so we're going through and evaluating," he said. "What's the object? Is the protection in the smallest area compatible with protection of that object?"

And, he said, "If we're going to protect those objects that the monument is intended to do, then you have to have things like a bathroom there so people hiking up a trail can use the restroom before they look at the petroglyphs or dwellings."

Based on his tours Sunday, he said Nevada's monuments need better road maintenance so public access is not interrupted.

"The good thing is, I haven't met anybody on either side that doesn't love the land," and they agree it's worth protecting, he said. "So there's more in common on the monuments than there are opposites."

Before Zinke's arrival, Russ Graves voiced concern about the size of the Gold Butte monument.

"I'd just like to see the size reduced," said Graves, 73, who owns an orchard that is part of a 220-acre ranch.

Whitney Pocket, the Devil's Throat sinkhole and a few other locations on Gold Butte should be part of the monument, but other parts don't have antiquities value, he said.

Zinke had planned to stay in Mesquite through Monday to meet with U.S. Rep. Dina Titus, D-Nev., and stakeholders there and in Overton on the last leg of a swing through the West. But he canceled those plans to return to Washington, D.C., for the first Cabinet meeting with new White House Chief of Staff John Kelly.



While the Monday meeting was scuttled, Zinke did meet with some stakeholders Sunday and has scheduled phone meetings with others, including the Moapa Band of Paiute Indians, according to his staff.

The Riverside Road location where Zinke spoke is within three miles of the April 2014 armed standoff on the Virgin River between federal agents from his department and militia supporters of defiant rancher Cliven Bundy — the subject of a high-visibility trial in federal court in Las Vegas.

Asked by the Las Vegas Review-Journal if the Interior Department plans to round up Bundy's stray cattle from the Gold Butte monument, Zinke said: "I'm not going to address that issue."

Regarding ranching on public land, he said, "As we look at the rancher, that's as much a part of the culture of a lot of these monuments as some of the objects."

**Feeling forgotten**

Bundy's wife, Carol, said she was disappointed Zinke didn't meet with her on his way to Gold Butte despite her efforts to reach him through emails, certified letters and phone calls to staff.



"We have not received one phone call back," she said, sitting in the living room of the Bundy ranch house Sunday. "We feel like we're forgotten. Yet my husband and four of our sons, a total of 19 men, sit in prison under the guise of charges of the Department of Interior, which Mr. Zinke is in control over, and they have committed no crime."

"Why would you come to my front yard and not reach out to my family and hear our pleas so that I could hear his as well?" she said.

to                                      Butte        now

  01.00                                                                           ▶|  ◀))  ⟋⟍

Zinke said he's trying to change the image of Interior Department agencies with heavy-handed law enforcement officers.

"We should be the happy department," he said.

"When you see a BLM truck you should think land manager and not law enforcement, which we work with through our local sheriffs."

Zinke's visit to Nevada started early. After his flight landed in Las Vegas at about 7:30 a.m., Zinke flew by helicopter to Gold Butte's Whitney Pocket, where he hiked with several local officials.

Other stops included White River Narrows, a Basin and Range petroglyph site; artist Michael Heiser's "City" project where he met with Los Angeles County Museum of Art staff members; and the Mount Irish petroglyph site in Basin and Range, where he met with Friends of Gold Butte.

Earlier Sunday, U.S. Sen. Catherine Cortez Masto, D-Nev., released a video of her support for the national monuments.

"Our outdoor recreation in Nevada is a boon to our economy, 148,000 jobs, billions of dollars in revenue to the economy," she said in the video. "And that's worth fighting for."

Contact Keith Rogers at krogers@reviewjournal.com or 702-383-0308. Follow @KeithRogers2 (http://www.twitter.com/KeithRogers2) on Twitter.

### About the monuments

In his proclamation designating **Gold Butte National Monument**, President Barack Obama called the region "a landscape of contrast and transition, where dramatically chiseled red sandstone, twisting canyons, and tree-clad mountains punctuate flat stretches of the Mojave Desert."

Gold Butte encompasses nearly 300,000 and was created Dec. 28, 2016.

**Basin and Range National Monument** was designated in July 2015 and covers 704,000 acres in Lincoln and Nye counties.

Obama's proclamation said, "The vast, rugged landscape redefines our notions of distance and space and brings into sharp focus the will and resolve of the people who have lived here. The unbroken expanse is an invaluable treasure for our Nation and will continue to serve as an irreplaceable resource for archaeologists, historians, and ecologists for generations to come."

### Related

Review of Nevada's national monuments chills legislator (https://www.reviewjournal.com/news/politics-and-government/review-of-nevadas-national-monuments-chills-legislator/)

Congressional Republicans want Nevada monuments cut back (https://www.reviewjournal.com/news/nation-and-world/congressional-republicans-want-nevada-monuments-cut-back/)

Groups, Senate Democrats urge Trump to keep monuments intact (https://www.reviewjournal.com/news/politics-and-government/groups-senate-democrats-urge-trump-to-keep-monuments-intact/)

Comments pour in about review of national monuments in Nevada (https://www.reviewjournal.com/local/local-nevada/comments-pour-in-about-review-of-national-monuments-in-nevada/)

# EXHIBIT C

AR11952

Case 1:19-cv-03729-DLF   Document 35-4   Filed 07/12/21   Page 269 of 354

4/16/2018          Quarter 1 in Review: Interior Releases Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary …

# Quarter 1 in Review: Interior Releases Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary Zinke

4/16/2018
Last edited 4/16/2018

Date: April 16, 2018
Contact: Interior_Press@ios.doi.gov

**WASHINGTON** –Today, the U.S. Department of the Interior released a comprehensive list of 2018 first quarter accomplishments that the Department has achieved under the leadership of President Donald J. Trump and U.S. Secretary of the Interior Ryan Zinke.

"Under the Trump Administration, Interior has made incredible strides in creating a conservation stewardship legacy, modernizing our infrastructure, helping combat opioid addiction, securing the southern border, and so much more," **said Secretary Zinke**. "The Department is doing a tremendous job of breaking down regulatory barriers and cutting red tape to create economic prosperity that will benefit our nation. I signed an historic initiative to protect the migration corridors of North American big game species, we got to work opening the 1002 section in Alaska for responsible energy development, we partnered with BIA and other groups to form opioid task forces to crack down on drug abuse in Indian Country, and we introduced a bipartisan solution to fix the aging infrastructure in National Parks. The President and I look forward to keeping the pace and moving the country forward with America First policies."

"Under Secretary Zinke's leadership, we continue to make significant progress on a wide array of priorities for western states and insular areas," **said Alaska Senator Lisa Murkowski, Chairman of the Energy and Natural Resources Committee**. "From opening the 1002 Area, to responsible energy development, to a long-overdue agreement for a life-saving road for the people of King Cove, to the nomination of good Alaskans to serve in high-ranking key positions, the Department of the Interior is once again a true partner for us, and our future is much brighter for it."

"I have known Secretary Zinke since we attended Boys State together in 1979," **said Montana Senator Steve Daines**. "Being from Montana, Ryan's Western values have guided his leadership at

Case 1:19-cv-03729-DLF   Document 35-4   Filed 07/12/21   Page 270 of 354

4/16/2018        Quarter 1 in Review: Interior Releases Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary ...

the Department of the Interior and brought responsible federal land stewardship and strengthened the government-to-government relationship with Indian tribes. He has done a great job."

"Idahoans continue to tell me they are pleased with Secretary Zinke's work at Interior," **said Idaho Congressman Mike Simpson**. "I am particularly pleased with his dedication to fixing our National Parks and his commitment to keeping public lands accessible. I look forward to working with him on these and many other issues."

"DOI's innovative policies on ESA, Outcome-based grazing, wildfire fuels reduction and the Migratory Bird Treaty Act are providing ranchers with operational certainty that is critical to ensuring a future for rural communities throughout the West," **said Ethan L. Lane, Executive Director Public Lands Council & NCBA Federal Lands**.

"The Trump Administration took a big step in opening energy access with its draft OCS oil and gas leasing program, initiating a welcome departure from the Obama Administration's 2017–2022 plan. The United States is the only country in the world that has placed a majority of its territorial waters off-limits to natural resources extraction," **said Nick Loris Herbert, Fellow in Energy and Environmental Policy at The Heritage Foundation**. "Interior Secretary Ryan Zinke's draft plan would change that. As the U.S. improves access to its energy resources, the economy will grow, and federal and state governments would benefit immensely from the increased revenues from royalties, rents, bonus bids, and overall economic activity."

"Prioritizing the deferred maintenance backlog of our National Parks, engaging with private landowners on creating big-game migration corridors, putting more authority in the hands of regional and local managers, and reconsidering approaches for recovering threatened species such as the Louisiana pinesnake are all positive moves for conservation," **said Brian Yablonski, Executive Director of Property and Environment Research Center**. "These efforts by the Department look for creative conservation solutions to environmental problems and promote stewardship of our many natural resources."

"Under Secretary Ryan Zinke's leadership, the Department of the Interior is leading the way in making America more competitive in the global energy marketplace," **said Grover Norquist, President of Americans for Tax Reform**. "If the efforts to finally tap into our abundant natural resources succeed, taxpayers will reap the benefits for decades to come. Secretary Zinke's work at DOI will lead to more high-paying jobs and significant economic growth."

"Secretary Ryan Zinke is building off of a 2017 that saw the Department of the Interior as a frontrunner in terms of executing President Trump's historic regulatory reform agenda," **said Patrick Hedger, Director of Policy FreedomWorks**. "Under Zinke's watch, DOI rolled back the excesses of the previous administration—shrinking unnecessarily enormous national monuments that infuriated state governments and rescinding onerous restrictions on domestic energy production that duplicated existing state standards. There is clearly a strong pattern of cooperative federalism in Zinke's work. These trends look to continue into 2018, with plans underway to collaborate with states to liberate America's offshore oil, gas, and renewable energy resources and reorganize the Department to better serve, not subjugate, the states and the American people. FreedomWorks looks forward to continued support of these efforts and more."

Below is a summary of accomplishments during the first quarter of the year according to Secretary Zinke's Top Ten Priorities at the Department:

**Create a conservation stewardship legacy, second only to Teddy Roosevelt**

- **FISH AND WILDLIFE SERVICE:** Secretary Zinke signed Secretarial Order 3362, prioritizing conservation and big-game migration corridors.
- **FISH AND WILDLIFE SERVICE:** Issued a final delisting of the Eureka Valley evening primrose.

- **FISH AND WILDLIFE SERVICE:** Downlisted the Eureka dune grass from endangered to threatened.
- **FISH AND WILDLIFE SERVICE:** Announced more than $1.1 billion in grants to state wildlife agencies from revenues generated by the Pittman-Robertson Wildlife Restoration and Dingell-Johnson Sport Fish Restoration (PDRJ) Acts.
- **FISH AND WILDLIFE SERVICE:** Held the first meeting of the Secretary's International Wildlife Conservation Commission (IWCC).
- **FISH AND WILDLIFE SERVICE:** Held a meeting of the Sport Fishing and Boating Partnership Council Meeting with new guidance under Secretary Zinke's priorities.
- **BUREAU OF LAND MANAGEMENT:** Acquired 648 acres of land in the Rio Grande del Norte National Monument to facilitate traditional and recreation access.
- **BUREAU OF LAND MANAGEMENT:** Completed the latest in a series of improvements at off-highway vehicle recreation areas in northeast California and far northwest Nevada.
- **BUREAU OF LAND MANAGEMENT:** Decided to expand Phil's World, a nationally recognized mountain bike trail system six miles east of Cortez, Colorado.
- **DEPARTMENT OF THE INTERIOR:** Created a Hunting and Shooting Sports Conservation Council.
- **NATIONAL PARK SERVICE**: Secretary Zinke announced the Trump administration's support for grizzly bear restoration efforts in the North Cascades Ecosystem.

**Responsibly develop our energy & natural resources**

- **BUREAU OF OCEAN ENERGY MANAGEMENT:** Announced a slate of major wind initiatives.
  - Proposed a sale for 390,000 acres of wind energy development off of the Massachusetts coast.
  - Sought information and industry interest in offshore wind development within the New York Bight Region.
  - Put out a Request for Feedback on future offshore wind energy leasing in the Atlantic.
- **BUREAU OF LAND MANAGEMENT:** Canceled a withdrawal application and the Department's proposed withdrawal of 1.3 million acres of federal lands from location and entry under the mining laws in the California Desert Conservation Area.
- **BUREAU OF OCEAN ENERGY MANAGEMENT:** Announced a Draft Proposed Five-Year Program for oil and gas leasing on the National Outer Continental Shelf.
- **INSULAR AFFAIRS:** Requested proposals for FY2018 Energizing Insular Communities Program funding (due May 31) to produce American energy in the territories.

**Restore trust & be a good neighbor**

- **INSULAR AFFAIRS:** Assistant Secretary Doug Domenech traveled to the Virgin Islands to provide $2.8 million in grants for rebuilding infrastructure and utilities after the hurricanes.
- **INSULAR AFFAIRS:** Supported President Trump's signing of the Palau Compact in the 2018 Omnibus Funding Agreement, including $123 million of funding through 2024.
- **FISH AND WILDLIFE SERVICE:** Worked out a state-federal partnership to link the conservation of the endangered red-cockaded woodpecker with the U.S. Marine Corps mission at Lejeune.
- **FISH AND WILDLIFE SERVICE:** Proposed Rule 4d protections for the Louisiana pinesnake, protecting the species while being a good neighbor.
- **FISH AND WILDLIFE SERVICE:** Announced a $60 million cooperative agreement with the Recreational Boating and Fishing Foundation (RBFF) to help retain and recruit recreational anglers and boaters.
- **FISH AND WILDLIFE SERVICE:** Announced $14 million in Boating Infrastructure Grants.
- **FISH AND WILDLIFE SERVICE:** Launched the Nature's Good Neighbors campaign to highlight public partners who are acting as conservationists across the country.

Case 1:19-cv-03729-DLF   Document 35-4   Filed 07/12/21   Page 272 of 354

4/16/2018        Quarter 1 in Review: Interior Releases Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary …

- **DEPARTMENT OF THE INTERIOR:**  Announced $18 million in "Anvil Points" energy payment funds to the state of Colorado after nearly a decade of the funds being withheld by the federal government.
- **BUREAU OF LAND MANAGEMENT:** Released a decision to allow the Riley Ridge Development Project to begin in Wyoming.
- **BUREAU OF LAND MANAGEMENT:** Issued decision on Environmental Assessment for Phase III McGinness Hills Geothermal Project in Lander County, Nevada.
- **BUREAU OF LAND MANAGEMENT:** Distributed almost $300,000 in timber payments to two counties in western Oregon.
- **BUREAU OF LAND MANAGEMENT:** Announced outcome-based grazing projects for 2018, to give greater flexibility in the management of permitted livestock.
- **DEPARTMENT OF THE INTERIOR:**  Signed an agreement with the Alaska Native King Cove Native Corp. to build a life-saving road between the Native village and a nearby all-weather airport in Cold Bay.

**Ensure Tribal and Insular sovereignty means something**

- **INSULAR AFFAIRS:** Held meetings between the United States and the Republic of the Marshall Islands to discuss policy and funding issues.
- **INDIAN AFFAIRS:** Secretary Zinke authorized the first funds transfer for the Blackfeet Water Settlement.
- **BUREAU OF LAND MANAGEMENT:** Approved a proposed land exchange between the Bureau and the Agua Caliente Band of Cahuilla Indians.
- **INDIAN AFFAIRS:** Approved the Shawnee Tribe's Fee-to-Trust application for a gaming facility.
- **INDIAN AFFAIRS:** Signed an agreement with the Confederated Tribes of the Umatilla Indian Reservation to implement the Land Buy-Back Program for Tribal Nations.
- **BUREAU OF RECLAMATION:** Resolved longstanding rights-of-way issues, approving rights-of-way to the Pueblos of Nambe, Pojoaque, San Ildefonso and Tesuque.

**Increase revenues to support DOI and national interests**

- **BUREAU OF LAND MANAGEMENT:** Held numerous Spring 2018 oil and gas lease sales across the country, including: Eastern States,  Wyoming, Montana, Nevada, Utah, Colorado.
- **OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT:** Provided more than $300 million in Abandoned Mine Lands grants to states and tribes.
- **BUREAU OF OCEAN ENERGY MANAGEMENT:** Held a region-wide oil and gas lease sale in the Gulf of Mexico, yielding $124.7 million in high bids on 815,403 acres.
- **BUREAU OF LAND MANAGEMENT:** Generated nearly $360 million from oil and gas lease sales in 2017, an 86-percent increase from the previous year and the highest in nearly a decade.

**Protect our people and the border**

- **INDIAN AFFAIRS:** Formed an opioid task force, bringing together Bureau of Indian Affairs drug agents and other partners, to work with tribes and address the opioid crisis in Indian Country.
- **INDIAN AFFAIRS:** Conducted a successful drug interdiction operation in New Mexico, netting millions of dollars in illegal drugs confiscated.
- **BUREAU OF LAND MANAGEMENT:** Began targeted, experimental grazing efforts to prevent wildfires.
- **U.S. GEOLOGICAL SURVEY:** Published a list of minerals critical to U.S. economic and national security, starting implementation of President Trump's Executive Order 13817 on Critical Minerals.
- **DEPARTMENT OF THE INTERIOR:**  Published the 2017 Drone Mission Report, which noted that drone flights to support natural resource management across Interior (including support to firefighters suppressing wildfires) increased 82-percent from 2016 to 2017.

- **DEPARTMENT OF THE INTERIOR:** Released a report <u>highlighting progress</u> made in the fight against invasive zebra and quagga mussels.

## Strike a regulatory balance

- **FISH AND WILDLIFE SERVICE:** Revised the previous administration's <u>M-Opinion</u> on the Migratory Bird Treaty Act and modified policies to ensure consistency with the new Opinion.
- **BUREAU OF LAND MANAGEMENT:** <u>Rescinded</u> the 2015 Hydraulic Fracturing Rule.
- **BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT:**Announced a <u>series of new initiatives</u> to strengthen the federal offshore oil and gas inspection program.

## Modernize our infrastructure

- **DEPARTMENT OF THE INTERIOR:** Supported <u>the inclusion</u> of a Public Lands Infrastructure Fund in the President's FY19 budget request – the Fund would help pay for repairs and improvements in national parks, national wildlife refuges, and Bureau of Indian Education schools.
- **DEPARTMENT OF THE INTERIOR:** Began <u>implementation</u> of President Trump's executive order and presidential memorandum on rural broadband availability.
- **NATIONAL PARK SERVICE:** Secretary Zinke partnered with Congress on a bipartisan bill to <u>address the maintenance backlog</u> in our National Park System.
- **DEPARTMENT OF THE INTERIOR:** Selected members of Secretary Zinke's newly created <u>"Made in America" Outdoor Recreation</u> Advisory Committee.
- **BUREAU OF RECLAMATION:** $50,000 awarded for five <u>arsenic sensor solutions</u> selected through a prize competition.
- **BUREAU OF RECLAMATION:** Launched prize competition looking for <u>new ways</u> to detect leaks and flaws in large buried pipelines.

## Reorganize DOI for the next 100 years

- **INSULAR AFFAIRS:** Secretary Zinke <u>announced an expanded role</u> for the Assistant Secretary for Insular Affairs, expanding the role to include ocean activities and international affairs.
- **DEPARTMENT OF THE INTERIOR:** Moved forward on <u>major initiative</u> to reorganize the Department.

# EXHIBIT D

AR11958

7/2/2020     Promises Made, Promises Kept: Interior Releases Comprehensive List of Accomplishments under President Trump & Secretary Zinke | U.S. Department ...

Case 1:19-cv-03729-DLF Document 35-4 Filed 07/12/21 Page 275 of 354

 U.S. Department of the Interior

# Press Releases

Share

# Promises Made, Promises Kept: Interior Releases Comprehensive List of Accomplishments under President Trump & Secretary Zinke

## 12/28/2017

Date: December 28, 2017

Contact: Interior_Press@ios.doi.gov

**WASHINGTON** – Today, the U.S. Department of the Interior released a list of accomplishments that the Department has achieved under the leadership of President Donald J. Trump and U.S. Secretary of the Interior Ryan Zinke. The accomplishments represent the unique balance of development, conservation, and preservation that the Department is charged with overseeing, including leading in American Energy Dominance, restoring public access to public lands, and providing regulatory relief for hard working American citizens.

"The President promised the American people that their voices would be heard and that we would prioritize American interests, and I'm proud to say that this year the Department of the Interior has made good on those promises," **said Secretary Zinke.** "Across the Department we are striking the right balance to protect our greatest treasures and also generate the revenue and energy our country needs.

AR11959

7/2/2020    Promises Made, Promises Kept: Interior Releases Comprehensive List of Accomplishments under President Trump, Secretary Zinke | U.S. Department …

Case 1:19-cv-03729-DLF   Document 35-4   Filed 07/12/21   Page 276 of 354

We ended the war on coal, and we restored millions of acres of public land for traditional multiple use. We expanded access for recreation, hunting and fishing on public lands, and also started looking at new ways to rebuild our National Parks. This is just the tip of the iceberg. Next year will be an exciting year for the Department and the American people."

Throughout Secretary Zinke's Senate confirmation process, he made many promises to the American tax payer, and the list of accomplishments shows how the Department is keeping the promises that were made. Additionally, Zinke fulfilled confirmation promises to Senators to visit DOI holdings in their home states, including Florida, New Mexico, Utah, Alaska, Idaho, Louisiana, Tennessee, Maine, Colorado, Arizona, and Texas.

Below is a summary of major accomplishments according to Secretary Zinke's Top Ten Priorities at the Department:

# 1. Create a conservation stewardship legacy, second only to Teddy Roosevelt

Under Secretary Zinke's leadership, the Department opened public access to the Sabinoso Wilderness which contains some of the most pristine sportsmen opportunities in the country, expanded hunting and fishing access on 10 National Wildlife Refuges, and successfully defended a mineral withdrawal near the Grand Canyon and supports a withdrawal north of Yellowstone.

# 2. Sustainably develop our energy & natural resources

Under Secretary Zinke's leadership, the Department held the second largest offshore wind lease sale, ended the Obama-era ban on coal mining on federal lands, and increased energy revenues to states and Tribes by more than a billion dollars.

# 3. Restore trust & be a good neighbor

AR11960

Case 1:19-cv-03729-DLF Document 35-4 Filed 07/12/21 Page 277 of 354

At Secretary Zinke's recommendation, the President restored traditional multiple-use public access to over a million acres of land in Utah while creating five distinct monument units at Grand Staircase-Escalante and Bears Ears National Monuments. Under Zinke's leadership, the Department also opened up the Charles M. Russell National Wildlife Refuge for emergency cattle grazing after a wildfire, and reopened U.S. Virgin Islands National Park ahead of the busy Christmas tourism season, helping the Islands' economic recovery.

## 4. Ensure Tribal sovereignty means something

President Trump nominated the first Alaska Native woman to serve as the Assistant Secretary for Indian Affairs and issued the first-ever Presidential Emergency Declaration for a Tribe. Secretary Zinke signed the Pechanga water rights settlement, restored the rights of Alaska Natives to sell handicrafts, and asked Congress to formally designate Tribal co-management of Shash-Jaa area of Bears Ears National Monument.

## 5. Increase revenues to support DOI and national interests

Under Secretary Zinke's leadership, the Department increased energy revenues to states by more than a billion dollars over the previous year.

## 6. Protect our people and the border

President Trump and Secretary Zinke began the process of working with Congress to authorize full funding of the compact with Palau in order to strengthen the United States strategic defense in the Pacific. Hundreds of DOI law enforcement officers deployed to evacuate, prepare and respond to hurricanes in Texas, Florida, Puerto Rico, and the U.S. Virgin Islands.

## 7. Strike a regulatory balance

Under Secretary Zinke's leadership, the Department reduced the semi-annual regulatory agenda by more than 50-percent, initiated 21 deregulatory actions, saving the economy $3.8 billion over time.

AR11961

Case 1:19-cv-03729-DLF Document 35-4 Filed 07/12/21 Page 278 of 354

## 8. Modernize our infrastructure

Secretary Zinke announced repairs to the historic Arlington Memorial Bridge, which carries 68,000 vehicles a day, will be completed under budget and ahead of schedule. The Secretary approved important infrastructure projects like the Boardman/Hemingway Transmission Line and the Mountain Valley Pipeline while also approving more than $80 million for parks and recreation grants.

## 9. Reorganize DOI for the next 100 years

The Secretary is crafting a plan to reorganize the Department of the Interior in a way that better manages our federal lands and pushes more assets to the field. The philosophy has earned bipartisan support in Congress and among governors.

## 10. Achieving our goals, leading our team forward

Partnership for Public Service announced in its "The Best Places to Work" survey the Department of the Interior (DOI) has improved from 11th place to 9th place among all the large agencies. Secretary Zinke has made improving the work experience a priority while at the Department, and the numbers from the report show a significant jump towards reaching that goal. Additionally, the Secretary announced the Department would be dog friendly in an effort to boost morale and attract top candidates.

PRESS RELEASE



AR11962

Case 1:19-cv-03729-DLF Document 35-4 Filed 07/12/21 Page 279 of 354

Interior Presents the 2020 Independence Day
Celebration in the Nation's Capital

PRESS RELEASE



WTAS: Interior Distributes More Than $514 Million to
Communities, Supports Critical Local Services

PRESS RELEASE



Interior Distributes More Than $514 Million to
Communities, Supports Critical Local Services

AR11963

Case 1:19-cv-03729-DLF　Document 35-4　Filed 07/12/21　Page 280 of 354



# U.S. Department of the Interior

Stewarding Conservation and Powering Our Future

---

AGENCY FINANCIAL REPORT   GUIDANCE DOCUMENTS   BUDGET & PERFORMANCE   BUSINESSUSA

COBELL / LAND BUY-BACK   DEEPWATER HORIZON   FOIA   HURRICANE SANDY   INSPECTOR GENERAL

INTEGRITY OF SCIENTIFIC & SCHOLARLY ACTIVITIES   NO FEAR ACT   OPEN GOVERNMENT INITIATIVE

POLICY LIBRARY: DEPARTMENTAL MANUAL, HR, SECRETARY'S ORDERS, WILDLAND FIRE MANAGEMENT   STRATEGIC PLAN

TRIBAL LEADERS DIRECTORY   USA.GOV   WHITE HOUSE

---

DOI.gov   Accessibility   Accommodations   Contact Us   Copyright   Digital Media Guide   Disclaimer

Information Quality   Notices   Privacy Policy   Site Map

U.S. Department of the Interior, 1849 C Street NW, Washington, DC 20240. feedback@ios.doi.gov

AR11964

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone:  (650) 858-8500
david@levinlawfirm.com
Attorneys for Appellant,
Burning Man Project


## UNITED STATES DEPARTMENT OF THE INTERIOR
## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BURNING MAN PROJECT<br><br>　　　　Appellant,<br><br>　v.<br><br>BUREAU OF LAND MANAGEMENT,<br><br>　　　　Appellee. | Case Identification No.:  IBLA-2020-0302<br><br>Special Recreation Permit<br>LLNVW03500-19-01<br>2930 (NV030.10)<br><br>**Declaration of Roger Vind In Support of Appeal** |

I, Roger Vind, declare as follows:

1.　　　I am over 18 years old, of sound mind, and capable of making this declaration.

Since March 2014, I have been working for appellant Burning Man Project ("BMP") and

currently serve as Associate Director of Public Safety.  My duties include representing BMP in

official planning meetings with both the U.S. Bureau of Land Management ("BLM") and the

Pershing County Sheriff's Office ("PCSO") about public health and safety at the Burning Man

event ("Burning Man" or the "Event").  I have personal knowledge of the facts set forth herein,

1

AR11965

or if so stated, I am informed and believe of their truth and accuracy and, if called to testify, I could and would do so competently and under oath to the following.

2.      I have 25 years of experience working in law enforcement. I joined the Nevada Highway Patrol ("NHP") on October 10, 1988.  I retired from the NHP on October 10, 2013, holding the rank of Lieutenant.

3.      From 2003 to 2005, and again from 2007 to 2010, I oversaw NHP's law enforcement of the traffic going into and out of the Event.  During this time, I was also the official liaison from NHP who cooperated with both BLM and BMP on public health and safety issues of the Event.

4.      In prior years, BLM has prepared and provided BMP with an After Action Review ("AAR") which contained some information about BLM's administration of BMP's Special Recreation Permit ("SRP").  True and correct copies of BLM's 2017 AAR and excerpts of BLM's 2015 AAR (with highlighting added for clarity) are attached hereto as **Exhibit A** and **Exhibit B**, respectively.  Without explanation, BLM failed to prepare an AAR following the 2018 Event or provide any other formal reporting about BLM's operations at or in connection with the 2018 Event.  Following the 2019 Event, BLM prepared an AAR document, but the 2019 version contained only one-third the number of pages as previous AARs and almost no details about BLM's staffing at the 2019 Event.  A copy of BLM's 2019 AAR is attached hereto as **Exhibit C**.  BMP received no substantive explanation for why BLM personnel logged 22,196 hours on the 2019 Event at a total cost to BMP of $1,542,258, beyond the eight-page labor summary spreadsheet appended to BLM's 2019 Cost Recovery Decision.

2

5.      In addition to BLM's law enforcement operations, BMP separately contracts with the local sheriff's office to provide law enforcement services at the Burning Man Event each year.  Pershing County Sheriff's Office ("PCSO") deputies are on site at the Event to enforce Nevada laws, including those relating to motor vehicle operation and controlled substances.

6.      Following the 2019 Event, BLM provided BMP with a summary of the data captured by its computer assisted dispatch ("CAD") system.   I am informed and believe that the CAD system data recorded BLM's 2019 Event operations over a 16-day period:  4 days pre-event, nine days main-event, and 3 days post-event.  A true and correct copy of  BLM's "2019 Burning Man - Statistical Summary" is attached hereto as **Exhibit D.**  The summary reflects a total of 3,920 "law enforcement events" during BLM's 2019 Event operations.

7.      BLM's Statistical Summary (Exhibit D) also reflects the number of law enforcement citations BLM issued in 2019 according to the category of infraction.  I am informed and believe that the citation data is drawn from the Department of the Interior's Incident Management, Analysis and Reporting System ("IMARS") for BLM's 2019 Event operations.

8.      According to the Statistical Summary, BLM issued 425 citations in 2019 and made no arrests.  This represents eight fewer citations than BLM issued in 2018.  Like it did in 2018, BLM included a law enforcement infraction for "Fuel Storage" violation.  My understanding is that "Fuel Storage" is an environmental compliance infraction not traditionally considered to be a violation of criminal or motor vehicle laws.  BLM 2019 IMARS data reflects two additional environmental compliance-related citation categories:  "Waste Water" (38 citations) and "Depositing Human Waste" (62 citations).  I believe the latter category of offenses

3

were for urinating on the playa.  If these additional environmental compliance-related citations are subtracted, the number of 2019 BLM law enforcement citations drops to 321.  Overall, non-drug related citations have averaged 323 per year over the past five years, with 2019 falling below averages at 295.  The vast majority of violations are the result of very minor motor vehicle infractions primarily during participant ingress and egress.  Traffic stops increased 37% from 783 in 2018 to 1072 in 2019, however citations issued increased only 16.5% from the previous year.

9.      The low number of BLM-issued citations, particularly citations involving crimes against persons and property, is matched by a similar declining number of citations issued at the Event by state law enforcement officers.  In 2015 and 2016, PCSO issued 241 and 252 citations, respectively, for violations of state law.  In 2017, the number of state law citations dropped to 124.  In 2018, the number dropped further to only 85 state law citations issued by PCSO.  PSCO made 44 arrests at the 2018 Event and the vast majority of those arrests were drug enforcement related.  In 2019, PSCO made 60 arrests and issued 95 citations.  Again, the vast majority of the arrests and citations were drug enforcement related.  Only 6 of the arrests by PCSO were for assault/battery and only 5 arrests were for domestic violence.  PCSO made one arrest for sexual assault in 2019.  I have reviewed arrest statistics for past Events from data as reported by PCSO.  These statistics show an extremely low incidence of person-on-person crime at the Event, despite substantial increases in law enforcement staffing and costs during this time period.  The following table summarizes the arrests for person-on-person crimes at the last nine Burning Man Events:

AR11968

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016[1] | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| Assault with deadly weapon | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 |
| Battery | 1 | 2 | 0 | 0 | 3 | 4 | 2 | 1 | 3 |
| Battery on a peace officer | 0 | 0 | 0 | 0 | 1 | 5 | 3 | 0 | 2 |
| Domestic battery/assault | 3 | 4 | 3 | 2 | 2 | 2 | 5 | 3 | 5 |
| Sexual assault | 0 | 1 | 1 | 1 | 0 | 1 | 2 | 0 | 1 |

10.     Based on the information BLM has reported to BMP for the 2014 through 2019 Events, I have prepared a spreadsheet that summarizes BLM's "law enforcement events" collected from CAD data and BLM citations recorded in IMARS.  The citations are also broken down by infraction type as reported by BLM.   A true and correct copy of this summary is attached hereto as **Exhibit E**.

11.     According to BLM's Statistical Summaries and the CAD data I have reviewed, the most commonly occurring "law enforcement event" in 2019 (as in 2015 through 2018) was "public contacts."  In 2019, BLM recorded 1,525 "public contacts."  BLM Branch Chief Law Enforcement Ranger Logan Briscoe explained to me that "public contacts" are instances when BLM law enforcement officers make a contact with a member of the general public.  For example, when an Event participant asks a law enforcement officer for directions to the porta-potties, he or she records the encounter as a "public contact."   Based on my professional

---

[1] Nine individuals were arrested for commission of a person-on-person crime at the 2016 event, one of whom was charged with two such offenses.

AR11969

experience, the fact that law enforcement officers are able to spend so much of their time engaging in and recording these activities year after year is evidence that BLM has more officers at the Event than needed.  If the 1,525 "public contacts" are subtracted, the total number of "law enforcement events" at the 2019 Event drops to 2,395.

12.     I am informed and believe that BLM law enforcement officers spend numerous hours at their "substation" inside the Event interacting with the public in an outreach or public relations capacity.  In 2019, I understand that BLM law enforcement officers stood in front of the "substation" handing out BLM logo swag, such as bandanas, to Event participants.  I cannot tell from the CAD data whether any of these marketing giveaways were counted as "public contacts."  Again, based on my professional experience, BLM's ability to staff the "substation" with law enforcement officers to hand out BLM merchandise indicates that BLM has more officers at the Event than needed.

13.     BLM's law enforcement Statistical Summaries consistently report very few citations for property crimes and crimes of violence against people.  Based on my professional experience, the number of BLM law enforcement officers at Burning Man and the number of hours they work are not justified in light of the very low number of property and violence crimes that have occurred at the Event over its long history.

14.     Based on my observations, BLM is not adequately taking into consideration the thousands of professional BMP staff, volunteers, and contractors in assessing how many law enforcement officers are needed for the Burning Man Event.  In my professional opinion, BMP's public health and safety staff are a significant force multiplier.  In the law enforcement realm, a

AR11970

force multiplier is anything that multiplies the overall effectiveness of law enforcement to promote public health and safety.

15.     BLM's 2019 labor summary reflects 148 hours and $12,088 ($14,694 including indirect cost) for OPR Special Agents Hone and Stevens.  "OPR" is a reference to the Office of Professional Responsibility ("OPR") within BLM's Office of Law Enforcement and Security ("OLES").  Special Agents Hone and Stevens' duties are listed as "OPR function officer, event on-site Internal Affairs component and Use of Force reports reviewer."  I am informed and believe that Agents Hone and Stevens conducted onsite internal affairs investigations and liability assessments related to alleged misconduct by BLM law enforcement personnel, including proper or improper use of force.  In my professional opinion, these are "management overhead" functions that are not "reasonable" costs under federal cost recovery regulations.

16.     Based on my professional experience, K9 units are typically used by law enforcement agencies when there is known or suspected trafficking of narcotics.  But over the last five Burning Man Events, I am informed and believe that BLM has issued a total of two citations (both in 2015) for trafficking in a controlled substance.  Given these low numbers of trafficking citations, and based on my professional experience, BLM's use of K9 units at Burning Man exceeds the reasonable requirements of the Event.

17.     I am informed and believe that in 2019, BLM again required BMP to construct, at BMP's expense outside of cost recovery, a shade structure beside the JOC so that the K9 agents could park their air-conditioned vehicles beneath it.

18.     I am informed and believe that BLM continued to use satellite tracking devices to identify the precise location of BLM personnel within the 2019 Event site at any given time, and

AR11971

that BLM distributed a number of these tracking devices to PCSO in 2019 for the tracking of its deputies.  I am further informed and believe that BLM required BMP to purchase these tracking devices in 2013 and has charged BMP more than $50,000 each year through cost recovery for associated service, software upgrades, air time, and support, such that BMP has paid more than $350,000 in connection with these devices since 2013.

19.     Based on my knowledge and experience, these satellite trackers are not necessary equipment for law enforcement operations at the Event.  Moreover, I am informed and believe that many BLM law enforcement officers do not even know how to fully use the tracking equipment issued to them.  I understand that all BLM employees and PCSO deputies have radios with which to communicate their location and circumstances to each other and to dispatch personnel.  Law enforcement personnel usually work in pairs at the Event for personal safety reasons and to enable one officer to radio a location if his or her partner is otherwise engaged.

20.     Another unnecessary and unreasonable BLM expense is a camera operating 24/7 at the law enforcement "substation."  From discussions I have had with BLM law enforcement representatives, I understand that the camera is not regularly monitored by personnel in the Joint Operations Command center and that, due to the dusty conditions of the Event site, clear imagery from the substation's camera is only available some of the time.  I am aware of no instances when this monitoring equipment proved useful for any purpose.

21.     In 2018, BLM changed how it recorded the status of its on-duty law enforcement officers in its CAD system.  Prior to 2018, BLM dispatchers tracked on-duty officers according to three basic status categories:  i) "Available" for service calls; ii) "Dispatched" or "Enroute" to a service call; and, iii) "At Scene" of a service call.  In its 2016 and 2017 Appeals to this Board,

8

BMP highlighted how BLM law enforcement officers, according to BLM's own CAD data, spent approximately two-thirds of their time idling in "Available" status, which was grossly inefficient and proof of over-staffing.

22.     Apparently embarrassed by CAD data reporting that its officers were idle most of the time, BLM deleted the "Available" status from its CAD system in 2018 and 2019.  Instead of making substantive changes to address law enforcement over-staffing, BLM simply changed the optics.  Starting in 2018, BLM created a new CAD status category:  "Engaged."  Thus, an officer assigned to patrol the 2019 Event was reported in CAD as "Engaged" when he or she would previously have been reported as "Available."  The officer's true status did not change: he or she was still simply driving around the Event, waiting and "available" to respond to a service call.

23.     Despite changing the optics, BLM's 2019 CAD data showed that BLM law enforcement officers continued to spend approximately two-thirds of their time waiting and "available" for a service call, while spending only one-third of their time on an actual call for service.  To reach this conclusion, I reviewed the total amount of time BLM's CAD system reported officers "on scene" at a service call.  BLM law enforcement officers spent 2,821 total hours "on scene" at service calls in 2018.  Thus, the number of hours BLM law enforcement officers spent "on scene" at service calls fell in 2019 which makes me conclude that the number of  hours spent idle and waiting to engage in service actually increased in 2019.

24.     Such staffing utilization rates by BLM are grossly inefficient according to national law enforcement standards.  The law enforcement staffing model taught by the Northwestern University Police Staff and Command School, as a matter of best practices

AR11973

nationwide, provides that law enforcement agencies are efficiently staffed when 25% to 30% of their units are <u>available</u> for service calls, and 70% to 75% of their units are <u>on</u> service calls.

25.     According to BLM's 2019 CAD data, BLM continues to achieve the opposite ratio with its law enforcement staffing.  On average, approximately two-thirds of its officers were available, and only one-third were engaged in service calls ("On Scene," "Dispatched," or "EnRoute").  The number of hours BLM law enforcement officers spent "on scene" at service calls actually fell in 2019.  In 2019, BLM officers reported being "on scene" for a total of 2,821 hours.  In 2018, BLM officers were "on scene" for 3,366 hours. Furthermore, I understand that this "on scene" time included the 1,072 traffic stops initiated by BLM officers in 2019.  Law enforcement industry standard does not consider a traffic stop to be a call for service; rather, it is a self-initiated activity. So the actual call for service demand for BLM law enforcement appears to be much less than one-third of the time.  The data indicate that BLM is continually overstaffing Burning Man with law enforcement officers.

26.     Based on my review of 2019 BLM's CAD data, I determined that 92% of BLM law enforcement source of calls are field generated or officer initiated leaving only 8% of their calls that are dispatched calls for service, where someone needs help or something has happened that requires law enforcement response. These remaining 8% are true calls for service, which indicates that the Burning Man event does not generate much need for law enforcement services. According to 2019 CAD data, BLM was dispatched to 177 calls, mostly generated from or at the request of Burning Man's emergency services department dispatch. Over BLM's nine day enforcement period, the 177 calls for service calculate out to 19 calls per 24 hours period or less than one call per hour. BLM CAD reports that 76% of BLM law enforcement time is actually

AR11974

Case 1:19-cv-03729-DLF   Document 35-4   Filed 07/12/21   Page 291 of 354

spent on traffic stops and public contacts. All of these statistics are key indicators that BLM law enforcement is excessively staffed.

27.     Most cities the size of Black Rock City would expect to see an average of 25% to 30% officers time available for field generated work, and 70% to 75% of their time is utilized for dispatched calls for service. Another good staffing indicator is in the number of persons arrested for person on person crime and are there ample personnel to process these arrests. Over the past 12 years, there has been an average one person arrested per day for any person on person crime, per 24 hour period in a city of 80,000 plus population. The BLM hasn't reported a single arrest in the last six years.  Based on the number calls for service, the minimal number of person on person crime, and how law enforcement utilizes their time, I conclude that BLM law enforcement was over staffed at the 2019 Event and should have been reduced in size and scope.

28.     I reviewed BLM's 2017 and 2018 Answers and supporting Declarations, which state that BLM bases its law enforcement staffing levels for the Event on population ratios "in accordance with the recommendations of the International Association of Chiefs of Police (IACP)." (2017 Decl. of Rebecca Andres ¶ 14; 2018 Decl. of Rebecca Andres ¶ 13. )  From my years of experience in law enforcement leadership, I know that the population-to-officer ratio is a poor metric on which to base staffing levels.  In fact the IACP's own publications plainly state, "Ready-made, universally applicable patrol staffing standards do not exist.  Ratios, such as officers-per-thousand population, are totally inappropriate as a basis for staffing decisions." A true and correct copy of current IACP material is attached hereto as **Exhibit F**.

29.     Throughout my career in law enforcement leadership, I observed that law enforcement priorities and practices are, by necessity, a function of available resources.  If law

11

AR11975

enforcement resources were limitless, law enforcement agencies could treat every possible law

enforcement goal as an absolute priority and would staff its ranks with unlimited personnel and

resources. But law enforcement resources are typically limited by an elected legislative body

with the power of the purse and public oversight. As a result, law enforcement agencies must

make compromises based on legislative funding and the agency's budget.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed this 3rd day of July, 2020 at Sparks, Nevada.

Roger Vind

12

AR11976

# EXHIBIT A

AR11977

# Bureau of Land Management

# Winnemucca District – Black Rock Field Office



# 2017 Burning Man After Action Review

AR11978

**BLM**
**AFTER ACTION REVIEW**
**2017 BURNING MAN EVENT**

## Introduction

The Burning Man Event is a Bureau of Land Management (BLM) Special Recreation Permit (SRP) permitted gathering of participants who engage in an "experiment in temporary community dedicated to radical self-expression and self-reliance". Burning Man is the largest and most complicated special recreation event on BLM administered lands. The event is produced by the permittee, Black Rock City, LLC (BRC).

Since 1990, the event has been held annually in the Black Rock Desert – High Rock Canyon – Emigrant Trails National Conservation Area within the Winnemucca District's Black Rock Field Office (BRFO). The Black Rock Desert is a remote rural area approximately two hours from the nearest city. During the week preceding Labor Day, participants convene to create Black Rock City. During the event, the city becomes the eighth largest city in Nevada. In 2017, the event reached a peak participant population of 69,493, on Friday, September 1, 2017, at approximately 12 noon. BRC staff numbers reached approximately 10,000. This resulted in a total population of approximately 79,500 bodies on the playa during the event at the population peak.

This document serves as the After Action Review (AAR) of the event operations of the BLM and other cooperators and aspects of event production by BRC. The items documented in this AAR will be considered in the planning of the 2018 event.

## 2017 BLM Event Planning

The BLM's 2017 planning team was approved by the Nevada State Director in January 2017, at which time the planning began in conjunction with the 2017 BRC and Pershing County Sheriff's Office (PCSO) planning teams. The BLM's team consisted of: the Acting Black Rock Field Office Manager, who also served as the Authorizing Official (AO) for the event SRP; a BRFO planning coordinator, the Zone 1 Supervisory Law Enforcement Ranger, the Zone 1 Staff Law Enforcement Ranger, the BRFO SRP Project Manager, the Nevada State Office (NSO) Communications Lead, a NSO event contracting officer, a Carson City District Office (CCDO) finance lead, the Nevada State Chief Ranger, and an Office of Law Enforcement and Security (OLES) employee who served as the technology lead. Most of the planning team members held operational positions during the execution of the event operations.

At the start of the 2017 planning phase, in furtherance of capturing all planning costs in the SRP Cost Recovery Agreement (CRA), the CRA was executed in two phases. The first phase being the initiation of the CRA with the BLM's estimated planning costs, and the second phase being the final overall CRA that encompassed the BLM's operational costs. This resulted in funding

2

the event CR account earlier which ensured the planning team labor expenses were covered by the event CRA.

The BLM planning team initiated planning for the 2017 event by reviewing the BLM's 2016 event Operational Plan, the 2016 After Action Review document and the 2016 Contracting Plan. Multiple discussions between BLM and BRC were conducted on respective roles and responsibilities.  Following the reviews and discussions, the 2017 BLM planning team developed the following components of the 2017 Operational Plan:

2017 BLM Planned Event Table of Organization (TO):

The 2017 BLM planned event operation consisted of the following 136 positions: Seven positions in event management, Fifty-three positions in the Civilian Operations and seventy-six positions in the Law Enforcement Operations.

Event Management Positions (7):
- Authorized Officer
- Incident Commander
- Civilian Operations Chief
- LE Operations Chief
- Deputy LE Operations Chief
- Public Information Officer
- Administration Assistant

Civilian Operations Positions (53):
- Communications Chief
- Communications Unit Leader
- 5 Communication Technicians (1 Pre & Post Only)
- IT Equipment Specialist
- IT Security Specialist
- GIS Coordinator
- 3 IMARS Coordinators (1 Part-Time, Off-Site)
- Dispatch Center Manager
- 17 Contract Dispatchers
- Compliance Supervisor
- 3 Environmental Compliance (1 Pre & Post Only)
- 2 Vending Compliance (1 Pre & Post Only)
- Logistic Supervisor
- 4 Logistic Specialist (1 Part-time, Off-Site Runner)
- Safety Officer

3

- 5 Contract CAD Technicians (2 Pre & Post Only)
- 5 Contract Network Technicians (2 Pre & Post Only)

Law Enforcement Operations Positions (76):
- 2 Patrol Operations Chiefs
- 3 Patrol Commanders
- 6 Shift Supervisors
- 45 Patrol Officers (Includes 4 USFS Officers on IAA)
- Investigative Chief
- 6 Investigative Support Investigators
- 6 Integrated Investigators
- OPR Investigator
- 2 Evidence Technicians
- Medical Team Leader
- 3 Tactical Medics (Includes 2 HHS Medics on IAA)

The planned TO resulted in 103 positions funded by CRA Labor Detail, 27 positions funded by CRA Contracting, 6 positions funded by CRA Interagency Agreements (IAA).

<u>2017 BLM Planned Event Contracting Plan:</u>

Each year the BLM planning team must identify what support contracts will be needed to conduct the BLM event operation and decided whether the contracted services are obtained as a government contract or through the Memorandum of Understanding (MOU) with BRC.  The 2017 event contracting plan consisted of ten (10) contracts presented to BRC through MOU and five (5) contracts retained by BLM as government contracts. The BLM planning team prepared the statements of work (SOW) for both the MOU and government contracts. BRC accepted nine of the ten support contracts offered by the BLM planning team:

- Joint Operation Center (JOC) compound build-out and services contract
- IT Equipment Rental contract
- Fueling services contract
- Meal Services contract (including ice and bottled drinks)
- Lodging contract
- UTV/Golf Cart Rental contract
- Computer Aided Dispatch (CAD) services contract
- Dispatch services contract
- Microwave internet bandwidth purchase contract

4

The substation build-out & services contract was refused by BRC and therefore resulted in BLM issuing two government contracts for electricity and portable toilet rental/services for the LE Substation.

The 5 support contracts retained by the BLM planning team for government contracting were:
- CAD Server(s) purchase (replace outdated servers)
- Radio repeater purchase (replace analog with digital)
- Dispatch CAD server licensing contract
- Satellite tracking services contract (Delorme Trackers)
- Network services contract

Additional components of the 2017 BLM operation developed by the planning team:

- 2017 JOC compound design
- 2017 permit stipulations
- 2017 Event Closure Order and Restrictions
- 2017 Event Environmental Compliance Protocols
- 2017 Event Vending Compliance Protocols
- 2017 Incident Action Plan (IAP)
- 2017 LE Operational Plan
- Review of BRC Operations Plans
- Issuance of the Special Recreation Permit (SRP) and Determination of NEPA Adequacy (DNA)
- Vending DNA.

## 2017 BLM Event Operations

The following section will speak to the configurations and duties of the 2017 BLM operational divisions.  It will also document any changes from initial BLM event operations planning.  At the end of the 2017 event, each operational division lead was asked to evaluate their program and submit internal recommendations for consideration/evaluation by the 2018 planning team.  Recommendations will be determined to have merit by the 2018 planning team and will be forwarded to the AO for discussed with the affected cooperators during the 2018 planning phase.

2017 ICS Management Team (7 Positions):

Two BLM event management team changes occurred in 2017.  The Incident Commander (IC) and AO positions were separated.  Additionally, a Staff Law Enforcement Ranger position was created to serve as the law enforcement project manager for the event; the position also served as

5

the Deputy Law Enforcement Branch Chief during the event.  These changes resulted in seven (7) positions in the BLM's ICS Event Team.

2017 Civilian Operations (53 Positions)

The 2017 Civilian Operation was supervised by the Civilian Operations Chief.  It was divided into four programs (Safety, Communications, Compliance, and Logistics).

1. Safety (1 Position)

One BLM safety officer was assigned to work with BRC's safety and ESD staff in order to evaluate, identify, and remediate safety issues during the event.  In addition, the safety officer monitored BRC and participant compliance with safety regulations and stipulations.  The BLM safety officer also ensured the safety of the BLM's operation, including the Joint Operations Center (JOC).  This was the third year BLM assigned a safety officer to the event.

2. Communications (41 Positions)

The Communication division consisted of a program Chief, a radio Communications Lead, an IT security specialist, an IT equipment specialist, a dispatch center manager, a GIS Specialist, 2 IMARS coordinators, 1 off-site IMARS reviewer, 5 radio communication technicians, 17 contract dispatchers, 5 contract CAD technicians and 5 contract Network technicians. New to the 2017 event, the IT equipment specialist, GIS specialist, and all 27 contracted positions reported directly to the communication chief in order to streamline the communications program.  The following breakdown lists specific functions provided by each division of the communication program:

Radio Network & Equipment

The BLM radio program consisted of one lead and 5 technicians (one of which was used for set-up and break-down only).

IT Security

The BLM's IT Security program was coordinated by the event IT security specialist; the IT equipment specialist assisted as needed.

6

IT Equipment Specialist

The IT equipment program consisted of two parts: oversight and accounting of the BRC MOU rental contract items and installation and service of said equipment.

GIS

The BLM's GIS function was provided by a single GIS specialist.  This was a result of BRC performing some of the GIS-related tasks associated with collecting and processing information related to environmental and vending compliance issues discovered during the event.

IMARS

The Incident Management and Reporting System (IMARS) is utilized by the BLM as the official law enforcement reporting system.  Two IMARS support technicians were utilized during the event to provide 24-hour, on-playa IMARS support to BLM officers.  A third IMARS position, located off-site, functioned as a reviewer to ensure reports were documented in accordance with the event protocols.

CAD Program

In 2017, BRC accepted the CAD Services contract through the MOU, selecting iNET Public Safety for both the BRC and BLM CAD provider (same provider as 2016).  iNET provided 5 technicians (3 full time and 2 for set-up and break-down).

Dispatch Contract

In 2017 BRC accepted dispatch services as an MOU contract.  LE Temporary Placement Services (LETPS) was BLM's preferred vendor based on acceptable service the previous three years.  LETPS was selected as the dispatch provider for the 2017 event.  A total of 15 dispatchers (divided into three shifts of 5) were required, in addition to two assistant center managers.

7

<u>Microwave Internet Network Services Contract</u>

In 2017, the Microwave Internet Network Services program was contracted by government contract through an open and competitive bid process.  High Desert was selected as a first-time contractor.  In addition, BRC selected High Desert under the MOU to provide bandwidth both for BRC and BLM.  High Desert provided 5 technicians (3 full time and 2 for set-up and break-down).

<u>Other Communications Division Contracts</u>

The communications division procured additional equipment and/or services through government contracts.  This included purchase of an updated CAD servers; purchase of a digital repeater (to replace analog repeater); the CAD server licensing fee; and the satellite tracking services contract for the Delorme trackers.

3.  <u>Compliance Division (6 Positions)</u>

In 2017, the Compliance division was streamlined to include a supervisor, 3 environmental compliance team members (1 for Pre & Post only) and 2 vending compliance team members (1 for Pre & Post only).  This reduction resulted from a planning discussion between BLM and BRC whereas BRC requested to take the lead in identifying and remediating environmental and vending issues, reducing BLM's role to monitoring BRC's performance.  BLM and BRC worked together to modify the event's environmental and vending protocols to reflect the change as part of the BRC Operation Plan and BLM's Incident Action Plan (IAP).

<u>Environmental Compliance</u>

The BLM's environmental compliance monitoring team was staffed by 3 BLM specialists, one being Pre & Post only.  The team successfully coordinated with BRC's environmental compliance teams in identifying and remediating concerns.  The combination of the Earth Guardians, Playa Restoration, Black Rock Rangers, ESD, and Hazmat worked out very well.  Direct radio communication with BRC's compliance teams coupled with BRC's immediate response to environmental issues, the program resulted in excellent compliance and remediation during the event.

AR11985

Vending/Commercial Compliance

The BLM vendor compliance monitoring team was staffed by 2 BLM specialists, one being Pre & Post only.  The BLM vending team coordinated with BRC's Outside Services (OSS) department to ensure commercial operators maintained all necessary BLM and BRC authorizations.  The majority of the issues were identified at Point One, the vendor access point.

At Point One, OSS staff stopped vendors, checked for credentials, and issued equipment stickers.  OSS and BLM made contact with the majority of vendors by Friday, August 25, 2017.

4. Logistics Division (5 Positions)

The logistics division consisted of a logistic lead, two day shift personnel, one night shift personnel, and an off-site logistic runner.  Two members of the team arrived on August 14th with the two additional team members arriving one week later on August 21st.  The first two employees spent the first week setting up modular office buildings, outside trash facilities, and transporting items from Black Rock Station (BRS) to the Joint Operation Center (JOC).  For the remainder of the first week, the employees finished setting up the JOC.

This was the second year for the off-site runner, which again proved to be a very effective way to save travel time for procurement and delivery of off-site items required for BLM's event operation.

The general breakdown and packaging procedure went smoothly, and all items were returned to Black Rock Station cleaned, organized, and inventoried for future years. The two connex boxes procured several years ago are still serving as the storage location for the items in the off-season.

2017 Law Enforcement Operations (76 Positions)

The 2017 law enforcement operational component was divided among three divisions: Uniformed Patrol, Investigations, and Medical.  Law enforcement event orientation remained in 2017 to ensure objectives, protocols, and expectations for the event were clearly demonstrated and understood; an emphasis was placed on professionalism.  The orientation occurred Friday, August 25, 2017 and consisted of an operational overview, legal updates from the Assistant United States Attorney's Office and Pershing County District Attorney's Office, overview of BRC operations from BRC's Law Enforcement advisor, an Office of Professional Responsibility (OPR) presentation, followed by JOC orientation covering event specific protocols and

9

procedures.  With this orientation occurring on Friday, main event patrol operations began Saturday during the early arrival influx.

1.  <u>Uniformed Patrol Division (56 Positions)</u>

The uniformed patrol division consisted of 2 Patrol Chiefs (day/night), 3 Patrol Commanders, 6 Shift Supervisors, and 45 Patrol Officers.  Three officers assigned to the event were demobilized for a variety of reasons and only one could be replaced, leaving the event staffed with 43 patrol officers by Monday, August 28, 2017.  A total of 9 K9 teams were assigned to the event.  All K9 teams were certified by the District Court Judge for Pershing County prior to the event to further Unified Command's mission.  One of the K9 teams was demobilized from the event, leaving swing shift with just 2 K9 teams.

The uniformed patrol division operated during three event phases:

<u>Pre-Event (August 22 – August 25, 2017) (11 Officers):</u> 5 officers were assigned to a 13-hour day shift and 6 officers were assigned to a 13-hour night shift.  Each shift had a shift supervisor.

<u>Main Event (August 26 – September 3, 2017) (53 Officers):</u> 17 officers were assigned to one of three overlapping 13-hour shifts (day, swing, and night).  Each shift had a patrol commander and two supervisors.  During the main event, there were two patrol operations chiefs assigned to day and night overlapping shifts.

<u>Post-Event (September 4 – September 7, 2017) (10 Officers):</u> 5 officers were assigned to one of two 13-hour shifts.  Each shift had a shift supervisor.  In direct response to the decline of the city population, the total number of officers was reduced accordingly throughout the post-event period.

BLM law enforcement staffed a law enforcement substation at "5:15 and Esplanade".  The station was staffed by at least one BLM law enforcement officer 24 hours a day during the main event.  The presence of the station allowed BLM to provide LE presence at a predictable location during the event for participants to ask questions, receive information, and report illegal activity directly to law enforcement.  Several participants in an altered mental state stayed at the substation for a duration of time until they were comfortable leaving, indicating they only felt at ease around law enforcement at the substation.

AR11987

<u>Law Enforcement Outreach Ranger</u>

One BLM law enforcement ranger served in an outreach role as a direct point of contact between event participants and BLM law enforcement for questions about BLM's law enforcement program.  This position was funded by the Black Rock Field Office and was not on the planned TO or in the operational numbers for this document. As such, the expenses were not funded by the CRA.

The outreach ranger made 1,112 public contacts from August 26 – September 3, 2017, spreading information about the National Conservation Area, recreation, cultural resources, and BLM Law Enforcement to participants. The ranger outreach program was considered a success by the BLM and will be carried forward in 2018, funded by BLM.

2.  <u>Investigative Division (16 Positions)</u>

The investigative division reported to the investigations chief.  The chief provided supervision over 4 subdivisions: Investigative Support (uniformed patrol), Integrated Investigations, Office of Professional Responsibility (OPR), and Evidence.  This division provided coverage August 26 – September 3, with the exception of evidence.  One evidence technician provided coverage pre (August 23 – 25) and post (September 4 – 6, 2017) event.

<u>Investigative Support (6 positions)</u>

Six uniformed investigators worked directly for their respective patrol commanders.  There were 2 investigators assigned to each of the three main event shifts.  These teams were utilized to investigate complex violations of federal laws, such as SRP violations.

<u>Integrated Investigations (6 positions)</u>

Six investigators worked directly with the Pershing County Sheriff's Office under Integrated Command.  A total of 9 investigators (3 PCSO detectives and 6 BLM investigators) were split into three shifts (day, swing, and night) to ensure 24-hour coverage.  Their primary duties involved investigating complex or felony level state and federal cases.  Due to PCSO staffing limitations, some BLM investigators conducted initial investigations involving person on person crimes without PCSO support.

11

Integrated Investigators assisted with assault cases, weapons cases, a serious medical, multiple missing juveniles, and an ongoing drug case referred to another federal agency as well as public assists and contacts.  The units also supported multiple sexual assault investigations.

OPR Program (1 position)

The OPR program is the internal affairs function for the BLM.  Due to the reporting and review requirements of BLM's Use of Force (UOF) policy, coupled with the numerous UOF incidents during the event, this position reviewed UOF reports for completeness while ensuring applications of force were being applied within policy.  In addition, OPR investigated reports of misconduct by BLM law enforcement staff.

Evidence (2 positions)

The Evidence program consisted of 2 evidence technicians, one sworn and one unsworn, to provide nearly 24-hour coverage.  In addition to processing evidence, the evidence technicians compiled and organized all BLM case documentation for prosecutors and case agents.

3. Medical Division (4 positions)

The 2017 BLM medical unit was operational during the main event.  For the 6th year, BLM contracted with the U.S. Department of Health and Human Services (DHHS) Center for Tactical Medicine (CTM) to provide medical care for federal employees working the event.  The unit consisted of a BLM medical unit lead and 3 tactical medics.

Two of the tactical medics were from DHHS CTM, and two were from the BLM.  The program treated 195 humans and 9 K9s, saving an estimated minimum of 136 work hours in preventative care.  Office of Workman's Compensation paperwork was initiated onsite, providing efficiencies in care.

Medical assistance included sinus infection, gastrointestinal illness, heat mitigation for humans and K9s, one case of officer exposure to controlled substance, and prescription medication administered.

AR11989

**2017 Integrated Command**

During the 2017 event, the BLM and PCSO operated under an integrated command structure. The Integrated Command model was a success in a seamless transition of cases between agencies. Integrated patrols increased efficiencies in operations and allowed for case resolution as quickly as possible. In 2017, as in 2016, the PCSO program at the event was understaffed resulting again in more BLM law enforcement officers at the event to assist in PCSO cases involving person on person crimes. In the patrol division, there were approximately three times more BLM officers than PCSO (53 BLM, 19 PCSO) working the event. In the integrated investigations unit, there were twice as many BLM investigators compared to PCSO investigators (6 BLM, 3 PCSO). This disparity in numbers was even more problematic in integrated investigations because BLM officers have limited training in investigating person on person crimes falling under the Nevada Revised Statute (NRS). BLM officers are only able to conduct a basic preliminary investigation until a PCSO investigator arrives. PCSO needs appropriate staffing to fully investigate person on person crimes from start to finish to reduce impacts on victims and witnesses of these sensitive crimes. Adequate PCSO staffing would allow BLM investigators to focus on federal violations.

As also stated in the BLM's 2016 AAR, the responsibility to ensure an effective law enforcement and public health and safety program exists during the Burning Man event lies with the BLM because the Burning Man event is held on federal public lands administered by the BLM under the SRP program. The BLM SRP administration responsibility creates fundamental liabilities to the government. Federal public lands administered by the BLM is proprietary jurisdiction, which means the state and local law enforcement agencies, PCSO, also have the authority and responsibility for ensuring public safety. PCSO is the lead investigating agency for person on person crimes, including but not limited to domestic violence, assault and battery, theft, sexual assaults, and missing juveniles. BLM must ensure affected state and/or local law enforcement agencies are involved in the event of response and investigation into person on person crimes, whether they are integrated with BLM's LE Operation or not.

PCSO needs to be afforded the opportunity to increase staffing in the patrol and investigative programs at the event to fulfill both agencies obligations to event participants and to respond to respective jurisdictional obligations in a timely manner. BLM, as the permitter of the event, has a responsibility to ensure adequate staffing is obtained and encourages BRC to make sufficient funds available to PCSO allowing for adequate staffing. BLM's planning team cannot make final decisions on BLM law enforcement staffing for the 2018 event until PCSO is able to determine if BRC provided funds adequately staff the PCSO program. BLM acknowledges this falls under a settlement agreement between Pershing County and BRC. Regardless of BLM and PCSO's unified command structure, BLM and PCSO will continue to jointly plan event law enforcement operations at the event. BLM's primary concern is that PCSO is staffed at the

AR11990

appropriate level to meet BLM's responsibility to ensure adequate public safety for all participants at the event.

**2017 BRC Event Production**

As per the SRP program, BRC submitted their 2017 Event Operations Plan to BLM during the planning phase of the 2017 event. The document was approximately 300 pages long and fairly comprehensive. BRC had approximately 37 programs involved in the production of the event. BRC deployed approximately 13 event departments to manage the event operations. All of the event production programs and departments were documented in the operational plan and reviewed by BLM. During the planning phase, BRC had a planning team that worked jointly with the BLM planning team. BRC's planning team consisted of representatives from the Event Operations desk (Director and/or Deputy Director), a representative from the Governmental Affairs desk and a BRC LE Liaison position. In addition, subject matter experts participated when needed on a given subject.

One of the underlying missions of the joint planning team is to decide the roles and responsibilities of each entity for the upcoming event. There were many early planning team discussions on roles and responsibility in 2017. These discussions resulted in changes reflected in BRC's 2017 Event Operations Plan. BLM needs more time in 2018 to review BRC's final operational plan pre-event.

On playa, most of these program departments' ran independently of BLM event operations. However, some of these program departments coordinate directly with or involve BLM event operations.

The following are comments on those BRC programs and departments that run independently of BLM event operations:

      BRC Medical Program (NES & BRC ESD)

            This was the third year of BRC contracting National Event Services (NES), formerly known as Crowd Rx, as the event ALS provider. NES has proved to be an effective ALS provider to meet the demanding and complex medical needs of the event. Overall BLM believes that NES provided excellent medical coverage and incident reporting throughout the 2017 event for BRC and the event participants.

            On one occasion, the BRC Medical air ambulance resources on playa for off-site patient transport were exhausted and additional resources were called in from Careflight, as outlined in the BRC Patient Transport Plan.

AR11991

During pre-event, BLM asked BRC about the capacity of Rampart to handle a mass casualty incident.

BRC communicated Rampart had the capacity to handle medical events on the playa. Once during the event BRC required air resources in addition to onsite air ambulance resources to transport patients off playa. A patient in renal failure was bumped from the air medical evacuation for a patient experiencing cardiac arrest. In both cases, Careflight was called in to supplement contracted air ambulance resources.  Careflight is listed in BRC's Operational Plan as a secondary air ambulance resource.  The 2017 event had 53 off-site transports relative to 39 in 2016 and 26 in 2015.

Post-event there were two separate cases of individuals requiring mental health evaluation remaining at the event site and BRC staffing onsite required law enforcement assistance to resolve the incidents.

## BRC Media Program

During the event, BLM required commercial film permits for any entity that conducted commercial filming, photography, and other media productions at the event, as required by law.  This was a new program instituted by the AO.  BLM and BRC will need to work further to develop this program for future events.  The development of the media management program is needed to ensure the Burning Man event and its media-related attendees are in compliance with the BLM's film permitting regulations for public lands.

## BRC Airport Operation

BLM believes that BRC provided excellent airport management throughout the 2017 event for BRC.  Operations ran smoothly during the event with the continuing BRC airline program.  During the event, a wildland fire enacted a Temporary Flight Restriction (TFR) south/southwest of the event.  The aerial fire support staff reported three violations of the TFR forcing aerial fire support to ground aircraft for safety concerns.  BLM and BRC attempted to ascertain if the TFR violations were related to event aircraft and were unable to confirm or deny where the TFR violations originated.  The fire impacts delayed travel for participants and BLM recommends BRC implement a backup plan for air travelers moving forward.

15

Because single charter flights are not covered by the SRP, nor the insurance, they could create problems and liabilities for BLM and BRC. BLM and BRC need to discuss potential solutions if these flights are allowed to continue in future events.

BRC Gate/Exodus/Perimeter Operations

BLM believes that gate operations ran smoothly throughout the 2017 event for BRC and the event participants.  Traffic was managed well and very few issues occurred during ingress or egress.

BLM law enforcement has concerns regarding gate inspections.  An AR-15 was located by law enforcement in a motorhome after the motorhome gained entry to the event during build week.  Law enforcement located firearms in vehicles on two other incidents during the event, to include a large amount of ammunition.  It is challenging to understand why gate inspections do not result in referrals to law enforcement at the event.

During another incident, an individual arrived at the main gate claiming they could not find their ticket and were a threat to themselves.  BRC called law enforcement and rangers responded to speak with the individual.  The individual was in distress but made no statements regarding harming themselves while in the presence of law enforcement. Law enforcement cleared the scene and was called back.  BRC denied the individual mental health services, available inside the event, simply because the individual could not locate their ticket.  BRC did dispatch ESD to the gate in an attempt to assist.  This delay prolonged the exposure of all involved and created undue risk.  The individual eventually located a ticket and was treated by ESD within the event.

Three known incidents occurred (one each during pre-event, main event, and post-event) where BRC perimeter units chased vehicles off playa and into Empire, NV, onto County Road 34, and into Gerlach, NV.  This behavior is unacceptable and creates safety concerns for all involved.  In the incident involving County Road 34, a BRC employee chased a PCSO employee off playa, drove erratically onto County Road 34, passing other vehicles on the unpaved shoulder before eventually placing the BRC vehicle in the path of the PCSO employee's vehicle. The BRC employee giving chase did not possess a valid driver's license. BRC rectified the incident occurring on CR34 by removing the perimeter unit from service. The individual was cited by PCSO.  These careless and reckless acts by

16

BRC employees were fortunate to not have more severe consequences. BLM strongly encourages BRC to reassess hiring and supervisory protocols to reduce these interactions in the future.

BRC needs to update "Driving Info Sheet" with regards to exit route designations (i.e. 8 mile as only egress route for non-burner express/vendors).  An on-playa operational shift was planned but later abandoned by BRC, to have vendor traffic piloted to the 8-mile entrance to blend with outgoing traffic. Logistical concerns prevented implementation. BRC needs to incorporate these changes into the Driving Information Sheet prior to implementation.

The following are comments on those important BRC programs and departments that impact and/or assist BLM's event operations.

<u>MOU Contracting Program</u>

The fourth year of the BRC/BLM contracting MOU program was successful from the perspective of BLM with regards to JOC related service contracts.  BLM recognizes the work involved for BRC in this program and hopes the cost savings to BRC is beneficial to BRC.  It is a complicated program requiring coordination between BRC and BLM in the submission and acceptance of SOWs and in the coordination with BRC contractors.  The BLM planning team will continue to analyze contracting needs early on during the event planning phase to determine whether a contract can be offered to BRC through the MOU program or needs to be procured through a government contract.

The dispatch contract was delayed and not issued by BRC until July 27, 2017.  This was due to both a delay in BLM providing BRC a timely SOW and BRC's delay in their contract issuance. It is imperative both the BLM and BRC agree to deadlines and hold each other accountable to avoid unnecessary delays in this process.

Due to the wildfire-related power outage in Gerlach during the main event period, the BLM lodging sites (Bruno Facilities) were without power for a significate period of time which interfered with the BLM event detailers ability to shower and sleep between their work shifts. BRC needs to develop a power back-up plan for the Bruno lodging sites during the event period. This requirement will be reflected in the 2018 MOU SOW for BLM lodging.

17

<u>BRC's JOC Logistics Team</u>

This was the fourth year of BRC's Joint Operation Center (JOC) construction and service logistic team.  Every year the program gets better and BLM is very pleased with this program and feels that this program goes a long way in making BLM's event successful.

The JOC logistics team created three unplanned shaded parking structures for the K9 vehicle to mitigate the above average temperatures on the playa.  Several BLM K9 vehicles broke down during the event due to the heat.  The shade structures were utilized throughout the remainder of the event to mitigate the heat and were critical to the officer and K9 safety and vehicle operations.  BLM recommends construction of these shade structures as a part of the JOC build out in future events to mitigate the harmful impacts of the heat on K9 vehicles.

<u>Event Sit Stat Program</u>

This was the third year of the current Sit Stat program during event operations.  Over the last two years it has been refined and in 2017 it was a very valuable tool used by the Tier 1 team while managing the event programs and resources.

One suggestion that was brought up in the on-playa event close-out meeting concerning the Sit Stat program was to add a third page to the 2018 sit stat document to show a comparison to last year's event stats to show trend changes.  Additionally, a column for missing juveniles needs to be added to events tracked.  It is also recommended the event summary tables provided during the final Tier 1 meeting be included in future events.

<u>Event Tier 1 Program</u>

BLM and BRC continue to stay committed to the Tier 1 Program and it becomes more effective every year.  This group worked well together through difficult challenges, to include the wildland fire impacts and man burn incident.  One setback occurred when the AO ordered a Tier 1 Notification and the Tier 1 Notification was not received by BRC Tier 1 Members.  A Tier 1 Activation was performed and the issue was resolved.

AR11995

The Tier One notification and alert system needs to be seamless between BLM and BRC. The only way alerts from both agencies were successful was when a BLM employee carried a BRC pager and a cell phone with BLM alerts. Today's technology allows opportunities beyond pager systems for notifications and alerts.

BRC Population Reporting Program

For the third year in a row, BRC contracted Ticketfly to assist in selling the event tickets and tracking the participants entering the event. The population of the city during the event was counted through the Ticketfly scanning system. The data collected through Ticketfly was reported to the BLM through BRC's PRAM system, satisfying the stipulation requirement. The PRAM reports broke out staff, kids, and paid participants.

BLM/BRC Joint CAD Program

For the second consecutive year, BLM and BRC ESD used the same CAD services contractor, iNET. This program was successful. During the 2017 on playa closeout meeting, there was an item for consideration by and for BRC to have BRC's Black Rock Ranger CAD program brought into the iNET CAD system. If this was done it could increase the communication and cooperation between the BRR's and BLM/PCSO LE calls for service dispatching.

BRC Ranger Department

Communication and coordination between BRC Law Enforcement Advisor and Black Rock Ranger (BRR) leadership with BLM planners during the planning phase of the event led to effective and efficient communication during the event. This level of cooperation allowed for issues to be conveyed and resolved in a timely manner.

During the event, the BLM Patrol Chief and a representative of PCSO attended every 0900 BRR meeting to discuss any issues or concerns from the previous day's activities with BRR leadership. This continues to be a valuable method through which issues can be resolved. Overall, officers reported positive interactions with BRRs, noting timely responses and a willingness to help BLM LE and PCSO. Officers continue to report

19

successes with using specialty units such as LEAL and Green Dots with resolving situations.

BRC Safety Department

For the third year in a row, the BLM safety officer coordinated and worked closely with BRC's safety program.  BRC's safety program is a proactive and vibrant program but is very busy evaluating and remediating safety issues identified during the event. BRC Safety also ensures BRC staff and participant compliance with regulations and stipulations related to safety during the event.

Public health and safety were jeopardized when a BRC employee ran over a tent, serious injuries to the person in the tent, off playa transport and weeks of hospitalization followed. The employee was issued multiple violations notices by BLM law enforcement.

BRC and BLM need to work together to define structure collapse pertaining to Tier One activations with limits on scope and scale.  A Tier One activation is not needed when a small scale art piece collapses but is needed when structures collapse resulting in injury.  Tier One notifications of structure collapse need to conclude with a notification of resolution.

Open Fire Safety Program

Due to the unfortunate incident that occurred during the Man Burn in 2017, resulting in a participant death, and almost resulted in the cancellation of the Temple Burn, BRC needs to revamp the security requirements of open fire burns at the event.  Some method must be developed by BRC that would prohibit any participant from running into an open burn and harm themselves or others.  In future events, the BLM AO needs to approve individual burn safety plans. This method would be documented in the BRC event Operations Plan and in individual burn safety plans.  Anything short of this could result in a stipulation from BLM preventing open burn events.

Vendor/Commercial Compliance Program (OSS)

In 2017, BRC continued to take over the duties of being the event lead in commercial compliance, with their Outside Services (OSS) department, with BLM primary role being to monitor BRC's performance.  BLM's monitoring in 2017 showed that BRC was again successful in fulfilling

AR11997

this role and meeting the vending event protocol requirements in reducing commercial issues during the 2017 event.

BLM's Vending Compliance found that BRC did a good job notifying BLM on situations needing immediate assistance.  Once BLM evaluated the situation jointly with BRC OSS, BLM effectively obtained the necessary resources to remediate the situation.  This allowed for BRC and BLM to work closely on resource protection and stipulation violations.  This program should continue to be refined and updated for the 2018 event, with consideration of the following improvements:

- BRC and BLM need to continue to work towards not permitting SRPs on playa unless penalties are in order.  This on-playa practice is time-consuming, difficult in the location, and not fair to those who properly apply.

- BRC and BLM need to continue in their efforts to develop and implement strategies for large commercial camps.  BRC and BLM must work towards identifying large theme/sound camps that retain a multitude of vendor support, a situation where it is not always clear if a particular vendor is permitted or not.

- The Vending Compliance team need to have tablets, like the Environmental Compliance team.  This would assist with reporting issues of faulty vendor equipment with the environmental teams and assist BLM vending compliance with auditing.  It would also assist in the tracking of what compliance teams (BLM/BRC) have made contact with a camp and for what reason, related to either vending or environmental issues.

- The single entry vending program through main gate was abused by vendors utilizing a single entry pass multiple times with little tracking.

- The airplane single entry vending program through the airport should be monitored for abuse.

- Press releases informing the public of open seasons for vending permit applications through the BLM needs to be issued prior to when the open season begins.

21

Environmental Compliance Program (Earth Guardians, BRRs, Hazmat, Playa
Restoration, ESD)

In 2016, BRC took over the duties of being the event lead in identifying
and remediating environmental compliance issues with BLM primary role
being to monitor BRC's performance.  BLM's monitoring in 2017 showed
that BRC was highly successful in fulfilling this role and meeting the
environmental event protocol requirements in reducing environmental
issues during the 2017 event.  Much of the credit for this goes to BRC's
outreach and messaging to participants prior to the event.

This program should be refined and continued in 2018, with consideration
of the following improvements:

- During this event, there was an issue of who is doing what between
  BLM and BRC.  The BLM AO asked the BLM GIS Specialist to
  generate numbers from the Fulcrum data.  Initially, the request was for
  general numbers (i.e. the total number of incidents, the total number of
  issues adjudicated).  These numbers were reported to the compliance
  supervisor who in turn entered the numbers into a Google document
  for the SITSTAT report.  The first time the data was exported from
  Fulcrum to Excel there where filters used to calculate the general
  numbers.  BRC submitted their results and the numbers were vastly
  different.  There may be several reasons for the discrepancies between
  Fulcrum reports and between the Fulcrum numbers and the SITSTAT
  reports.  After the BLM GIS Specialist spoke with BRC's
  Environmental Compliance lead, coordinated occurred on reporting
  methodology; however, discrepancies in the final numbers still existed.
  The final numbers in Fulcrum should be similar to those exported into
  Excel and they are not.  Trying to figure out the methodology for
  summarizing the monitoring data on the fly, and trying to resolve
  discrepancies during the event is nearly impossible.  By the end of the
  week, it was decided to just use BRC's numbers.  The
  recommendation to avoid these issues in the future is to derive
  methodology and reporting procedures that are agreed upon between
  BRC and BLM, prior to the 2018 event, how the numbers for the
  SITSTAT report will be generated and by whom.  BLM recommends
  investigating the use of Collector versus the Fulcrum App.  As
  Collector may be easier to use and provide consistent results.

22

- Also, the way the SITSTAT reports present the numbers it appears that the total number of issues adjudicated plus the number of issues needing to follow up should equal the total number of issues. Part of the problem is that the SITSTAT reports do not account for all types of records.  For example, there is no category for the number of issues where BLM confirmed adjudication.  Also, what is reported on the SITSTAT is a snapshot at a particular moment in time.  The status of each individual issue changes over time.  For these reasons, the numbers reported on the SITSTAT report may not be legally defensible and those using the SITSTAT report numbers should be aware of this.  In order to address this issue, BRC should develop a monitoring plan, which includes determining statistically valid sample sizes of the city area sufficient to meet the needs of the environmental compliance portions of the SRP.

- During the 2017 event, there were several issues with the tablets used to collect environmental compliance data.  BLM figured out a temporary workaround for the issue of connecting BRC's tablets to BLM's wireless network.  For the 2018 event, the BLM Environmental compliance staff will need BLM issued tablets to efficiently and effectively monitor environmental compliance issues on the playa. The tablet's screen visibility and GPS antenna connectivity made it difficult for BLM and volunteers to collect data efficiently.  BRC should provide screen/lens cleaner for each team.  The tablets ability to pick up a GPS signal and the length of time needed to record all required fields in Fulcrum delayed teams and made data gathering efforts more difficult.  BRC needs to include the BLM Compliance trailer in the JOC to the BRC service coverage for Fulcrum utilization on tablets. BLM recommends reducing the strength of GPS required to set a point.  Auto-populated fields can be added to the Fulcrum form to speed with data collection.

- It was difficult to determine if an issue was appropriately adjudicated and a number of issues were discovered late in the event that could not be followed up on because of lack of time.  BLM recommends a status for late-in-the-event issues that were not adjudicated and will be adjudicated by Playa Restoration during September.  To assist with confirming adjudications, the Fulcrum form should require mandatory fields for before and after photos when documenting adjudications.  The before and after photos should be taken prior setting the issue status to adjudicated.  Other photo fields to include would be a follow-

23

up photo field and a location photo field (photo of a license plate or another photo to determine the location in relation to the street).

- What does environmental compliance success look like?  What is the purpose of collecting fulcrum data and how is it used?  During the 2017 event, there was confusion amongst environmental compliance teams regarding what constituted secondary containment for fuel storage.  It is important for all environmental compliance teams (BLM, Earth Guardians, and Black Rock Rangers) to understand the Burning Man SRP stipulations and monitoring not only as the event builds, but also after the man burn occurs.   BLM recommends holding joint compliance training between BLM (including law enforcement) and BRC (Earth Guardians and Black Rock Rangers) before the event in order to ensure that both BLM and BRC are on the same page regarding stipulations, stipulation violations, messaging, and remediation.  BLM Compliance Team can be used to help with training.  BLM and BRC should increase pre-event coordination on training materials and topics.  Recommend using 2017 photos as examples for 2018 training, i.e. what does grey and black water look like, RV valves and caps, etc.  The training should include the rationale for contacting visitors during the event to address fuel, black and grey water spills and how post-event monitoring is conducted and how it relates to the permit.  Spills are of particular concern as several factors play into the detection of spill incidents during the post-event monitoring.  It is important to document all spills and leaks during the event and prevent and/or address large spills.

- In addition to training, BLM and BRC should ensure consistent messaging between Federal Register Closure Order, SRP stipulations, and publicity materials (e.g. fuel containment).

AR12001



*Based on raw data from exported Fulcrum data into Excel.

- As demonstrated in the above graph, incidents are being discovered prior to the actual event starting.  BRC and BLM needs to improve the procedures in the Compliance Protocol so that the communication between BLM and BRC's Playa Restoration department is improved to ensure BRC's availability to identify and remediate issues from the time BRC occupies the playa until the Playa Restoration department begins their work after the event. This would include that Playa Restoration would be available during nighttime hours to respond to issues that BLM decides can't wait until the next day.

- The graph also shows the number of incidents increase as the event kick off, as would be expected.  However, there is a dramatic decrease in incidents after August 30th.  BRC and BLM need to discuss this decrease to determine the cause, i.e. participants leaving early or improvements on behalf of participant compliance or a decrease in the number of BRC staff looking for incidents or is it because BRC staff turned their focus to following up on issues already discovered? Based on observations by BLM environmental compliance staff, it appeared that Earth Guardian/Black Rock Ranger efforts to identify and remediate compliance issues slowed down later in the event week. There should be a full effort during the entire main and post event.  The number of incidents discovered by the four BLM staff increased on the 30th and the 31st to ten incidents each day and twelve incidents on the 1st.  In order to assist in answering these questions, BLM is requesting BRC provide BLM with the number of volunteers and Black Rock

25

Rangers that are doing compliance every day. Compliance work and meeting schedules should be clear prior to the event.  BRC should make a general timeline that shows how work and messaging will change during the event (i.e. transitioning from finding new incidents to following up on unresolved incidents).

- During and after the event litter and abandoned vehicles between Gerlach and Reno were present.  Impacts along travel routes need to be mitigated for a successful event.  BRC should continue their very effective outreach and messaging program in order to continue to prevent environmental issues from occurring.  Increase the "Pack it In/Pack it Out" message.

- There was confusion regarding Secondary Fuel Containment resulting from misunderstanding and multiple messages.  Apply the fuel storage stipulation consistently to all amounts rather than based on volume as it is confusing to participants and subject to interpretation especially as fuel amounts decrease over the event.  If the standard is to require all gas cans have secondary containment per the FRN Closure Order, then prior to event provide this message on BRC website/information package, update brochure and photo i.e. 2-3 5-gallon gas cans in a tote. Provide photos of what is not acceptable, i.e. gas can on the tarp that has no sides.  BRC Operating Plan, SRP Stipulations, and Closure Order must all state the same requirements for fuel, black/grey water, trash, etc.  There is no reason to hold vendors and participants to different standards because the issues are the same.  On that note, fuel spills were identified at the JOC, which can be mitigated through the use of splash pads at JOC fueling station.

- Compliance issues at the JOC pertaining to the catering service's camp behind the Dining trailer were discovered.  To address this, include environmental compliance remedies in food vendor contract.

- RV breakdowns, mechanical issues and wait times for RV pumping issues continue, leading to continued incidents of black and grey water spills.  BRC could consider an RV mechanical service to be part of the BRC SRP or issue an individual SRP for this type of service.  Require all RV's to have a catchment basin container below their grey/black water valves.  This is where a high percentage of leaks occur and almost all can be addressed with this type of stipulation.  RV rentals are required to have the proper tools to mitigate spills.  Define what is

26

required in a spill kit, i.e. 5-gallon bucket, small shovel, tarp, secondary containment for fuel.  Include instructions on how to use these items and what to look for, i.e. leaky black and grey water valves.  Inspect RV's for spill kits.  Urge United Site Services (USS) to accept text messaging orders for service from permitted and contracted grey/black water and potable water service providers could help alleviate violations, wait times and uncertainty.  This would allow burners to text where and when they need pump and refill services.  This would also provide stats to burners on the amount of human waste generated.  Require USS to put catch basin below valve if one is not present when pumping to eliminate or minimize spills during pumping.  Allow an additional wastewater pumping operator(s) and consider limiting the number of RVs on the playa.

- Target BRC participant messaging on human waste issues in 2018, increasing emphasis on preventing human waste incidents in deep playa during mobile raves is needed.  Park mobile raves closer to port-a-potty banks and put signs in mobile dance zones to remind burners to use the port-a-potties.  BRC should continue to dispatch approximate units to search for and quickly clean up human waste deposited during deep playa music events.  Hand out or ask burners to bring pee bottles and poop bags for camp and deep playa events.

- There seem to be inconsistencies regarding playa surface impacts.  BRC needs to be specific on when it is and is not permissible to dig and how much (i.e. maximum depth to dig up playa for the purposes of installing posts, trenching electrical wires, tent poles, and anchors).  BRC needs to make it clear to participants that playa digging is restricted to casual use regulation of one square meter of disturbance.

- BLM noted issues with theme camps complying with environmental stipulations.  BRC should continue to have mandatory pre-event meeting/web-ex with camp managers to review stipulations, remediation techniques, requirements, and timelines.  Include/highlight what's changed for 2018.

- Large/complex plug-in-play camps seem to have more environmental compliance issues.  Limit the size of plug-in-play camps or have them provide to BRC an operating plan detailing how they break out duties/responsibilities.  If they are providing all their own infrastructure or hiring parts of it out, i.e. kitchen, showers, etc.  Explain how the

27

"gifting" is being conducted as opposed to hiring/paying for a service such as hiring an individual to cook solely for the camp.

- Increase creativity/humor in LNT education outreach.  Make LNT or outreach swag stamped with BLM and BRC logos, highlight the partnership and outreach message.  Consider different types of media/social media outreach and reminders/PSAs on BRC radio.

In the above BLM comments on individual BRC programs/departments, all comments including considerations for improvements will be reviewed by the BLM 2018 planning team to discuss with BRC during 2018 planning.

28

# EXHIBIT B

AR12006



U.S. Department of the Interior
Bureau of Land Management



# 2015 BLM Burning Man Event
# After Action Review (AAR)

## Contents

Introduction ................................................................................................................................... 2

Civilian Operations ......................................................................................................................... 3

  Unified Command/ICS .................................................................................................................. 3

    Summary ................................................................................................................................... 3

    Recommendations .................................................................................................................... 4

  Environmental Compliance ......................................................................................................... 4

    Summary: ................................................................................................................................. 4

    Recommendations .................................................................................................................... 5

  Vending and Commercial Compliance ........................................................................................ 5

    Summary: ............................................................................................................................... 10

    Recommendations .................................................................................................................. 10

  Public Information ..................................................................................................................... 11

    Summary ................................................................................................................................ 11

    Recommendations .................................................................................................................. 12

  Safety ........................................................................................................................................ 13

    Summary ................................................................................................................................ 13

    Recommendations .................................................................................................................. 13

  Logistics .................................................................................................................................... 14

    Summary ................................................................................................................................ 14

    Recommendations .................................................................................................................. 15

  Facilities .................................................................................................................................... 16

1

Summary ...................................................................................................................................... 16

Recommendations ...................................................................................................................... 16

Communications, Dispatch and Information Technology ................................................................ 17

Summary ...................................................................................................................................... 17

Recommendations ...................................................................................................................... 17

Geographic Information Systems (GIS) ............................................................................................ 20

Summary ...................................................................................................................................... 20

Recommendations ...................................................................................................................... 20

Law Enforcement .............................................................................................................................. 22

Event Planning .............................................................................................................................. 22

Summary ...................................................................................................................................... 22

Recommendations ...................................................................................................................... 23

Law Enforcement Operations ...................................................................................................... 23

Integration ................................................................................................................................... 23

Community Policing ..................................................................................................................... 25

Staffing ........................................................................................................................................ 27

BLM Medical ................................................................................................................................ 30

Communications Center .............................................................................................................. 33

Incident Reporting ...................................................................................................................... 35

Evidence ...................................................................................................................................... 36

Statistics ...................................................................................................................................... 36

## Introduction

The Burning Man Event is a Bureau of Land Management (BLM) permitted gathering of participants who engage in an "experiment in temporary community dedicated to radical self-expression and self-reliance". Burning Man is the largest and most complicated special recreation event on BLM administered lands.

Since 1990, the event has been held annually in the Black Rock Desert -- High Rock Canyon – Emigrant Trails National Conservation Area within the Winnemucca District Office. The Black Rock Desert is a remote rural area approximately two hours from the nearest city with law enforcement and emergency medical services. During the week prior to Labor Day, participants convene to create Black Rock City. During the event, the city becomes the fifth largest city in Nevada. In 2015, the event reached a peak

2

**Recommended Additions (8):**

Staffing levels of uniformed patrol and investigations are appropriate. It is important to note the overall number of law enforcement officers staffing the event should not change in 2016, but the TO can be reorganized to better meet the needs of the event.

- **OPR Agent (1):** In order to ensure timely, thorough, and consistent investigation into formal complaints, as well as to review Use of Force reporting to ensure compliance with reporting requirements and policy, it is recommended this position be added back to the 2016 Table of Organization

- **Evidence Technician (2):** Due to the large amount of evidence collected during the event, coupled with the report documentation requirements from the U.S. Attorney's Office, evidentiary and case documentation procedures established in 2015 streamlined and standardized evidence collection and case documentation. It is recommended two evidence technician positions be added to the 2016 Table of Organization, fully funded out of the cost recovery account.

- **Environmental Compliance and Enforcement Team (4):** These positions would teamed up with a civilian compliance team member to conduct patrols throughout the city, identifying and addressing environmental compliance issues such as dumping of gray/black water, oil leaks, fuel leaks or spills, etc. This concept is being driven by an increased emphasis of environmental compliance and enforcement by event management to protect the NCA. The main objective of the compliance/law enforcement team is to address the intentional, blatant, and egregious compliance violations. During the 2015 event, a single day shift patrol Ranger was utilized in this fashion. As a result of the increased focus by law enforcement on these issues, the number of environmental compliance citations increased 17-fold (2 in 2014 compared to 34 in 2015). It is also recommended all environmental compliance stipulations provided to BRC need to be included as closure order regulations (such as oil spills) to provide BLM law enforcement the option to issue violation notices for participants who refuse to voluntarily comply. Any additional environmental issues not currently addressed through stipulations, but commonly observed by the compliance teams as environmental hazards, should be considered for inclusion in the closure order for future events (i.e. fuel spills, fuel storage, etc.).

- **Operational Chief-Night (1):** Based on the organizational needs observed over the last two years, the TO should include a LE Branch Chief (part of UC) that serves as a planning lead, as well as a Day Operations and Night Operations Chief, both of which will be supported by shift commanders and patrol supervisors.

### BLM Medical

#### Summary
For the 4th year in a row, BLM has partnered with the U.S. Department of Health and Human Services (DHHS) Center for Tactical Medicine (CTM) to provide premier medical care for federal employees

30

working at Burning Man. Often referred to as Tactical Emergency Medical Support (TEMS), the fundamental goal is to "protect the protectors" by providing a full spectrum of on-site medical care federal employees so they remain healthy and fully engaged.

## Staffing

Four tactical medics (2 BLM, 2 DHHS) were assigned to the 2015 event. New to 2015 event, a designated medical unit leader led the medical team, reporting directly to the LE Operations Chief. This ensured the Operations Chief was aware of unit status and available assets at all times; it also provided an opportunity to address concerns or pass on intel of upcoming events that may redirect medical unit posture. The medical unit was operational 24-hours/day, but only during the main event. In order to ensure 24-hour staffing of the medical trailer, two medics would sleep in the medical trailer and remain on site until shift change. Upon shift change,  they would relocate to the Black Rock station to catch some sleep and use shower facilities. This configuration was effective for coverage and access to medical care on a 24 hour basis; however, it was sometimes difficult for unit personnel to get adequate sleep.

## Operational Summary

During the main event, the medical unit logged approximately 240 patient visits were 18 law enforcement K-9 treatments. An overwhelming majority of those patients were seen for routine medical care such as eye wash, minor wound care, over the counter pain relief, and other over the counter medicine. Additionally, the medical team provided a "medical minute" during shift briefings, designed to brief law enforcement officers on specific trends, conditions, or health issues pertinent to the event. Several times during the 2015 event, law enforcement staff was exposed to bodily fluids, controlled substances, and chemicals. In order to properly decontaminate them, the officers had to strip down at HQ and be driven into Gerlach for a shower and change of clothes because there was not a decontamination unit or extra clothing available at HQ.

## Coordination with Cooperating Agencies

PCSO assigned four deputies to patrol who were also certified as paramedics (2 swing, 2 night).   The integration of the PCSO medics with the BLM medical staff served as a major force multiplier by providing advanced life support capabilities within the city.   Additionally, PCSO maintained transport capabilities and a small medical tent in Gerlach to provide after-hours medical care for personnel. BRC's medical provider for the 2015 event, Crowd RX, was also very welcoming to BLM medical personnel and forthcoming with trends and issues they observed during the event.  Coordination between the BLM medical Unit Leader and Crowd RX management staff occurred twice daily at either Rampart or the HQ Med unit.

31

# EXHIBIT C

AR12011



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
https://www.blm.gov/office/winnemucca-district-office

In Reply Refer To:                    FEB 2 8 2020
LLNVW03500-19-01
2930 (NVW030.10)

9171 9690 0935 0211 8629 75

CERTIFIED MAIL NO. 9171 9690 0935 0211 8629 75
Return Receipt Requested

Ms. Marnee Benson
Associate Director of Government Affairs
Burning Man Project
660 Alabama St., 4th Floor
San Francisco, CA 94110

## 2019 After Action Review

Dear Ms. Benson:

Please find enclosed the Bureau of Land Management's (BLM) 2019 After Action Review
(AAR).

The enclosed AAR covers Civilian and Law Enforcement Operations for the 2019 event. During
planning for the 2020 Burning Man event, we will use this document and any other AARs to
continue to work together to ensure a safe and successful event on public lands.

Should you have any questions please coordinate with Chelsea McKinney, Burning Man Project
Manager for the BLM, at 775-623-1771.

Sincerely,

**Mark E. Hall**

Mark E. Hall Ph.D.
Field Manager
Black Rock Field Office

Official Record Copy

Enclosure:
BLM 2019 After Action Review

INTERIOR REGION 10 • CALIFORNIA-GREAT BASIN
CALIFORNIA*, NEVADA*, OREGON*
* PARTIAL



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
https://www.blm.gov/office/winnemucca-district-office

In Reply Refer To:
LLNVW03500-19-01
2930 (NVW030.10)

## BLM
## AFTER ACTION REPORT
## 2019 BURNING MAN EVENT

### Introduction

The Burning Man Event is a Bureau of Land Management (BLM) Special Recreation Permit (SRP) permitted gathering of participants who engage in an "experiment in temporary community dedicated to radical self-expression and self-reliance". Burning Man is the largest and most complex special recreation event on BLM administered lands. The event is produced by the permittee, Burning Man Project (BMP).

Since 1990, the event has been held annually in the Black Rock Desert – High Rock Canyon – Emigrant Trails National Conservation Area within the Winnemucca District's Black Rock Field Office (BRFO). The Black Rock Desert is a remote rural area approximately two hours from the nearest city. During the week preceding Labor Day, participants convene to create Black Rock City. During the event, the city becomes the eighth largest city in Nevada. In 2019, the event had a cumulative peak population at 78,850 on Friday, August 30, 2019.

This document serves as the After Action Review (AAR) for the Burning Man event operations of the BLM and other cooperators. The items documented in this review will be considered in the planning of the 2020 event.

### 2019 BLM Event Planning

The BLM's 2019 planning team was approved by the Nevada State Director in February 2019, at which time the planning began in conjunction with the 2019 BMP and Pershing County Sheriff's Office (PCSO) planning teams.

At the start of the 2019 planning phase, in furtherance of capturing all planning costs in the SRP Cost Recovery Agreement (CRA), the CRA was executed in two phases. The first phase included the initiation of the CRA with the BLM's estimated planning costs, and the second phase was the final CRA that encompassed the BLM's total operational costs. This resulted in

funding the event CR account earlier which ensured the planning team labor expenses were covered by the event CRA.

The planned Table of Operations (TO) for 2019 resulted in 103 positions funded by CRA Labor Detail, 27 positions funded by CRA Contracting, 6 positions funded by CRA Interagency Agreements (IAA), totaling 136 operational personnel. Further positions were added once the Record of Decision (ROD) for the Burning Man Environmental Impact Statement (Burning Man EIS) was signed in July 2019.

### 2019 BLM Planned Event Contracting Plan

Each year the BLM planning team must identify what support contracts will be needed to conduct the BLM event operation and decided whether the contracted services are obtained as a government contract or through the Memorandum of Understanding (MOU) with BMP. The 2019 event contracting plan consisted of five contracts presented to BMP through MOU and seven contracts retained by BLM as government contracts. The BLM planning team prepared the statements of work (SOW) for both the MOU and government contracts. BMP accepted five support contracts offered by the BLM planning team:

- Joint Operation Center (JOC) compound build-out and services contract

- Fueling services contract

- Meal Services contract (including ice and bottle drinks)

- BLM Lodging contract

- Computer Aided Dispatch (CAD) services contract

The seven support contracts retained by the BLM planning team for government contracting were:

- Dispatch CAD server licensing contract

- Satellite tracking services contract (Delorme Trackers)

- Network services contract

- Dispatch services contract

- Microwave internet bandwidth purchase contract

- IT Equipment rentals

- Air Monitoring with weather station

Additional components of the 2019 BLM operation developed by the planning team:

- 2019 JOC compound design

- 2019 permit stipulations

- 2019 Event Closure Order and Restrictions

- 2019 Event Environmental Compliance Protocols
- 2019 Event Vending Protocols
- 2019 Incident Action Plan (IAP)
- 2019 LE Operational Plan
- Review and Audit of BMP Operations Plans
- Issuance of the Special Recreation Permit (SRP) and Record of Decision on Final EIS.

## 2019 BLM Event Operations

At the end of the 2019 event, each operational division was asked to evaluate their program and submit recommendations for consideration/evaluation by the 2019 planning team. Recommendations determined to have merit by the 2019 planning are provided below.

### CAD Program

In 2019, BMP accepted the CAD Services contract through the MOU, selecting iNET Public Safety for both the BMP and BLM CAD provider. iNET provided 5 technicians (3 full time and 2 for set-up and break-down).

### Dispatch Contract

In 2019, LE Temporary Placement Services (LEOTEMPS) was BLM's selected vendor through a competitive government contracting process. LEOTEMPS was also selected as the dispatch provider for the 2018 event. A total of 15 dispatchers (divided into three shifts of 5) were required, in addition to two assistant center managers.

### Microwave Internet Network Services Contract

In 2019, the Microwave Internet Network Services program was contracted by government contract through an open and competitive bid process. Lyman was selected. Lyman provided 5 technicians (3 full time and 2 for set-up and break-down).

### Other Communications Division Contracts

The communications division procured additional equipment and/or services through government contracts. This included purchase of an updated CAD servers; the CAD server licensing fee; and the satellite tracking services contract for the Delorme trackers.

### 2019 BLM Civilian Operations Considerations

### Staffing Event TO

The 2019 TO was initially planned in the early part of 2019. As the ROD for the Burning Man EIS was signed in July 2019, this caused last minute additions to the event TO. Three additional monitors were added to assist with monitoring and mitigation evaluations. These positions should be added to future TOs.

### Contracting Plan

3

AR12015

In 2019, logistical support services contracts were conducted by BMP for BLM under the MOU program (See list above under 2019 Contracting Plan). BLM has told BMP that due to BLM permitting the event, the BLM should not receive services from the permittee (BMP) and begin to separate services from BMP beginning in 2020. This will assist with any misconceptions from the public.

### Vendor/Commercial Compliance Program

Vending compliance worked successfully with BMPs Outside Services. 2019 was the second year that SRPs were not issued at the event. Improvement that could be made to benefit the program in 2020 include:

1. BLM staff will man Point One with staff as in 2015 and 2016. This allows the BLM to meet SRP/OSS staff and be ready to address any unauthorized activities at the event.
2. BLM staff will be available to assist at Main Gate should the OSS person need assistance. In 2019, BMP had an OSS representative at Main Gate. BLM applauds this effort and steps taken to notify OSS should commercial activities be suspected earlier than previous years (went from 6 in and out passes to 3 in 2019). Having a person available should main gate require assistance is essential and was needed in 2019 on a few occasions.
3. BMP has taken steps to keep SRP/OSS faulty equipment out of the event. It was noted by BLM staff on a few separate occasions that items in McKinley Park did have environmental issues (missing caps, leaking). BLM believes that working with BMP staff at Point One, in the future, will keep more faulty equipment out of the event.
4. BLM recommends having clear rules for Main Gate – In and Out, Single Entry. This was the first year BLM noticed that during "Build Week" an in and out fee was not charged. Just clear information that could be provided to BLM staff ahead of time would be appreciated. Also, BLM staff came across single entries that reported different amounts paid to come and drop off items when coming through main gate (prices varied from $1100 -$1800). Please ensure that there is only one price for these type of entries.
5. Flights with single entry are still being noted. This is a liability issue and needs to end.
6. Contractors/Vendors for BMP and drivers for performers(Cirque de Soliel) and equipment being brought in for art builds need an SRP per regulations and for liability reasons.
7. Per the EIS ROD, all applicants for SRPs (New, Returning) will need to apply 194 days before Labor Day.

### Environmental Compliance Program

Environmental compliance continues to work successfully with BMPs Leave No Trace (LNT) Teams. Improvements that could be made to benefit the program include:

1. Increase Earth Guardian training on taking before and after photo evidence. At the 2019 event, LNT Teams provided photos of adjudicated examples that had LNT members and not proof that the environmental compliance issue had been resolved. Example: Gas Can with no secondary containment was the environmental issue, photo presented to BLM,

when the adjudicated photo was presented it was a LNT member smiling, not a photo of the gas can in secondary containment.

2. Increase Earth guardian staff through Exodus. BMP did keep LNT on longer but the BLM feels that more cases are presented after "The Man" burns. BLM wishes to see more LNT on longer to address issues.

3. Hugzilla was a camp that required many different visitations from BMP and BLM. A strategy needs to be determined moving forward with large scale camps and how to proceed if they get so many visitations or issues identified. Hugzilla was visited twice by LNT, and items were identified as adjudicated but in reality Hugzilla was having new issues, and it was not brought to BLMs attention until a Random Point Inspection (Audit) was done near the camp. Hugzilla also had issues with camp members using facilities after they had been closed. BLM expects BMP to address the situation of camps like Hugzilla that are major repeat offenders year after year. It is BLM's expectation that a procedure gets developed by BMP to prevent this happening in a third consecutive year.

4. In the Fulcrum application, BLM recommends adding an additional information box to include if BLM Environmental Compliance or BLM Law Enforcement is called. This would improve information and tracking of certain camps.

5. BLM staff noticed that Hot Springs Monitors from BMP were being dropped off to monitor hot springs without communication methods (radios, SAT Phone) or transportation. Per the EIS Record of Decision (ROD), the BLM will patrol the Hot Springs beginning in 2020.

6. BMP provided a SPCC (Spill Prevention Control and Countermeasure) Plan. This plan should continue to be present in BMP's Operating Plan from here forward.

7. BLM staff noticed that the trash fence is deteriorating and breaking down into smaller pieces of trash that is littering and scattering the area via wind.

## 2019 Law Enforcement Operations

The 2019 law enforcement operational component was divided among three divisions: Uniformed Patrol, Investigations, and Medical. Law enforcement event orientation remained in 2019 to ensure objectives, protocols, and expectations for the event were clearly demonstrated and understood; an emphasis was placed on professionalism. The orientation occurred Friday, August 23, 2019 and consisted of an operational overview, legal updates from the Assistant United States Attorney's Office and Pershing County District Attorney's Office, overview of BMP operations from BMP's Law Enforcement advisor, followed by JOC orientation covering event specific protocols and procedures. With this orientation occurring on Friday, main event patrol operations began Saturday during the early arrival influx.

## Uniformed Patrol Division

The uniformed patrol division consisted of Patrol Chiefs (day/night), Patrol Commanders, Shift Supervisors, and Patrol Officers. A total of 3 K9 teams were assigned to the event. The Planning Team requested nine K9 teams, falling short by six teams. All K9 teams were certified by the District Court Judge for Pershing County prior to the event to further Unified Command's mission.

Operational Periods: The uniformed patrol division operated during three event phases:

Pre-Event (August 20 – August 23, 2019) Officers were assigned to a 13-hour day shift and other officers were assigned to a 13-hour night shift. Each shift had a shift supervisor.

Main Event (August 24 – September 1, 2019): Officers were assigned to one of three overlapping 13-hour shifts (day, swing, and night). Each shift had a lieutenant and two sergeants. During main event, there were two patrol captains assigned to day and night overlapping shifts.

Post-Event (September 2 – September 4, 2019): Officers were assigned to one of two 13-hour shifts. Each shift had a shift sergeant. In direct response to the decline of the city population, the total number of officers was reduced accordingly throughout the post-event period.

Law enforcement Substation: BLM law enforcement staffed a law enforcement substation at "5:15 and Esplanade". The station was staffed by at least one BLM law enforcement officer 24 hours a day during main event. The presence of the station allowed BLM to provide LE presence at a predictable location during the event for participants to ask questions, receive information, and report illegal activity directly to law enforcement.

## Law Enforcement Outreach Ranger

Staffing shortages did not allow for staffing the BLM funded Outreach Ranger in 2019. BLM is committed to this position and will continue to fill as staffing allows in future event years.

## Investigative Division

The investigative division reported to the investigations chief. The chief provided supervision over subdivisions: Integrated Investigations, Office of Professional Responsibility (OPR), and Evidence. This division provided coverage during main event, with the exception of evidence. One evidence technician provided coverage pre (August 21 – 23) and post (September 2 – 3, 2019) event.

## Integrated Investigations

Investigators worked directly with the Pershing County Sheriff's Office under Integrated Command. Investigators (PCSO detectives and BLM investigators) were split into three shifts (day, swing, and night) to ensure 24-hour coverage. Their primary duties involved investigating complex or felony level state and federal cases.

## OPR Program

The OPR program is the internal affairs function for the BLM. Due to the reporting and review requirements of BLM's Use of Force (UOF) policy, coupled with the numerous UOF incidents during the event, this position reviewed UOF reports for completeness while ensuring applications of force were being applied within policy.

## Evidence

The Evidence program consisted of evidence technicians to provide nearly 24-hour coverage. In addition to processing evidence, the evidence technicians compiled and organized all BLM case documentation for prosecutors and case agents.

**Medical Division**

The 2019 BLM medical unit was operational during main event. For the 8th year, BLM contracted with the U.S. Department of Health and Human Services (DHHS) Center for Tactical Medicine (CTM) to provide medical care for federal employees working the event. The unit consisted of a BLM medical unit lead and tactical medics.

Two of the tactical medics were from DHHS CTM, the other one was from the BLM.

**2019 Integrated Command**

During the 2019 event, the BLM and PCSO operated under an integrated command structure. The Integrated Command model was a success in seamless transition of cases between agencies. Integrated patrols increased efficiencies in operations and allowed case resolution as quickly as possible. In 2019, as in previous years, the PCSO program at the event was understaffed resulting again in more BLM law enforcement officers at the event to assist in PCSO cases involving person on person crimes. In the patrol division, there were approximately three times more BLM officers than PCSO working the event. In the integrated investigations unit there were twice as many BLM investigators compared to PCSO investigators (6 BLM, 3 PCSO).

The responsibility to ensure an effective law enforcement and public health and safety program exists during the Burning Man event lies with the BLM because the Burning Man event is held on federal public lands administered by the BLM under the SRP program. The BLM SRP administration responsibility creates fundamental liabilities to the government. Federal public lands administered by the BLM is proprietary jurisdiction, which means the state and local law enforcement agencies, PCSO, also have the authority and responsibility for ensuring public safety. PCSO is the lead investigating agency for person on person crimes, including but not limited to domestic violence, assault and battery, theft, sexual assaults, and missing juveniles. BLM must ensure affected state and/or local law enforcement agencies are involved in the event for response and investigation into person on person crimes, whether they are integrated with BLM's law enforcement operation or not.

PCSO needs to be afforded the opportunity to increase staffing in the patrol and investigative programs at the event to fulfill both agencies obligations to event participants and to respond to respective jurisdictional obligations in a timely manner. BLM, as the regulating agency of the event, has responsibility to ensure adequate staffing is obtained and encourages BMP to make sufficient funds available to PCSO allowing for adequate staffing. BLM's planning team cannot make final decisions on BLM law enforcement staffing for future events until PCSO is able to determine if BMP provided funds adequately staff the PCSO program. BLM acknowledges this falls under a settlement agreement between Pershing County and BMP. Regardless of BLM and PCSO's unified command structure, BLM and PCSO will continue to jointly plan event law enforcement operations at the event. BLM's primary concern is that PCSO be staffed at the

appropriate level to meet BLM's responsibility to ensure adequate public safety for all participants at the event.

## 2019 BLM Law Enforcement Operations Considerations

At the end of the 2019 event operations, each LE operational component's Chief/Supervisor/Lead was asked to evaluate their program and submit internal recommendations for consideration/evaluation by the 2019 planning team that may be forwarded to the AO. Recommendations for consideration/evaluation determined to have merit by the 2019 planning team and are forwarded to the AO, will be discussed with BMP or other affected cooperators during the 2020 planning phase.

### Staffing

The hurricanes and requisite ESF-13 (Emergency Support Function) response threatened staffing resources at the event. Two BLM ESF-13 teams were activated and deployed during the event. The second deployment left post patrol short staffed and searching for last minute volunteers.

Staffing the event with nearly 40% of the BLM's entire workforce continues to present challenges with lack of law enforcement coverage and presence on public lands throughout the country on Labor Day weekend, as well as organizational burnout.

Staffing for the event continues to be a challenge. The agency suffers from drawdown in law enforcement staffing during the event.

### Safety

Two rangers were involved in a vehicle accident caused by a departing event participant on Hwy 447. Both were on day shift during the event and were demobilized during the heavy exodus the morning of Labor Day. One ranger suffered minor injuries and property damage while the other is presumed to have several months lost time at work due to substantial injuries and that officer's patrol vehicle was totaled, resulting in a lengthy process for replacement. Due to the accident, it is recommended for consideration to hold day shift over one day to demobilize on Tuesday following Labor Day when exodus traffic has subsided.

### Uniformed Patrol Operations

BLM will consider a separate pre-patrol operations plan and analyze earlier deployment of pre-patrol.

K9 Training at Pershing County Sheriff's Office (PCSO) was mandatory for any K9 team not certified within the last two years.

Event Orientation Day was a success and professional standards and expectations were clearly laid out. During Orientation Day, command staff need to review closure order specifics and examples with detailed officers to avoid misinterpretation in the field.

All units assigned to work the event perimeter recommended adding a second perimeter unit per shift for the second year in a row. Prior to 2012, BLM deployed two perimeter units per shift. The recommendation is to increase the number of perimeter patrol units to two per shift.

8

Report writing needs a room dedicated to detailed reports requiring more concentration from officers. Officers utilized the option to plug their own computers into the network at report writing and more network drops will be maintained for future events.

Unified Command between PCSO and BLM was smooth and improvements were noted with the duration of PCSO deputies assigned to the event.

Trash fence points should be placed on digital maps to improve navigation ability and one quick reference guide for all detailers.

There were two separate "man with a gun" calls for service from reporting parties under the influence in which one incident was two uniformed officers near a rave and the other incident was a man with a massage tool in a shoulder holster. The reporting parties are appreciated for saying something when they were concerned but their reporting while under the influence created a large law enforcement response. The recommendation is to work with dispatch to inquire about sobriety of reporting parties when call is unique and represents an unique threat and law enforcement response.

## Investigative Function

### Integrated Investigations

Integrated investigations agents continued to assist PCSO with person on person crimes due to calls for service exceeding PCSO staffing levels. BLM investigators extended their shifts to complete initial investigations of person on person crimes.

### Sexual Assault Response Team (SART)

BLM partnered with PCSO to provide space for a sexual assault exam nurse to begin instituting Public Health and Safety Mitigation PHS-2 from the Burning Man Event EIS ROD. The early implementation was deemed a success by BLM and PCSO as it was utilized with beneficial results to the victim and increased potential for successful prosecution.

### Evidence

Improvements were noted for evidence processing by unified command. Future work is needed to streamline and clarify PCSO reporting and paperwork, processing violation notices procedures, and roles and responsibilities of evidence staff.

The last two events have utilized investigative technicians for evidence support. Each technician was enthusiastic and learned processes and procedures quickly. Evidence staff recommend retaining repeat technicians or utilizing a ranger well versed in IMARS evidence entry. Evidence staff also recommended adjusting staffing hours for 24-hour coverage with increased overlap on Man Burn and Temple Burn nights.

### Medical

The medical program ran smoothly and provided expedient care to government personnel and contractors. Three critical care responses were initiated at the JOC and many preventative treatments were provided to staff on site. The continued ability for government personnel to

9

AR12021

receive preventative care while on extended detail results in savings of lost time and better care for employees and contractors.

## 2019 Event Planning Considerations Concerning BMP Operations

As per the SRP program, BMP submitted their 2018 Event Operations Plan to BLM during the planning phase of the 2019 event. The document was approximately 300 pages long and fairly comprehensive. BMP had approximately 37 programs involved in the production of the event. BMP deployed approximately 13 event departments to manage the event operations. All of the event production programs and departments were documented in the operational plan and reviewed by BLM. During the planning phase, BMP had a planning team that worked jointly with the BLM planning team. BMP's planning team consisted of representatives from the Event Operations desk (Director and/or Deputy Director), a representative from the Governmental Affairs desk and a BMP LE Liaison position. In addition, subject matter experts participated when needed on a given subject.

One of the underlying missions of the joint planning team is to decide the roles and responsibilities of each entity for the upcoming event. These discussions resulted in changes reflected in BMP's 2019 Event Operations Plan. BLM needs more time in 2019 to review BMP's final operational plan pre-event. Per the EIS ROD, BMPs final Operations Plan must be submitted 45 calendar days prior to the Closure Order beginning.

On playa most of these program departments ran independently of BLM event operations. However, some of these program departments coordinate directly with or involve BLM event operations.

The following are comments on those BMP programs and departments that run independently of BLM event operations:

## BMP Medical Program (CrowdRx & BMP ESD)

This was the second year of BMP contracting CrowdRx, under new organization, as the event ALS provider. CrowdRx provided improved medical coverage and incident reporting throughout the 2019 event for BMP and the event participants.

BMP representatives stated rigor was noted by medical staff on an individual brought to Rampart but that resuscitation was attempted anyways. This is not a standard medical practice and led to questions from the Washoe County Medical Examiner's Office.

## BMP Media Program

During the event, BLM required commercial film permits for any entity that conducted commercial filming, photography, and other media productions at the event, as required by law. Projects were not provided to BLM in a timely manner and projects were not authorized. BMPs media group does not believe they can bump up the timeframe of when they can accept media proposals (stated on a planning call in 2019), which impacts the sharing of potential commercial filming with BLM. Without advanced notification, the BLM can not authorize potential film projects before the event. Discussions as to how best address this issue will need to be

10

determined well before the 2020 event. Per the EIS ROD, people seeking film permits will need to apply 194 days before Labor Day.

## BMP Airport Operation

BLM believes that BMP provided acceptable airport management throughout the 2019 event for BMP. Operations ran smoothly during the event with the continuing BMP airline program.

BLM continued to work diligently with BMP airport staff to deconflict runway crossings. Improvements made in 2019 included BMP adding clear designation of runway termination and this should be repeated to reduce conflict and increase safety. BLM is unaware of any incidents of conflict at the airport in 2019 and credits improvements made by all parties.

Single charter flights are not covered by the SRP nor the insurance and creates hazards and liabilities for BLM and BMP. This use creates the potential for airspace conflicts with permitted flight operations. The BLM does not believe these single entry flights comply with SRP regulation and wishes to work with BMP to end this practice.

The BLM does wish to have more insight and coordination into sky diving events. Some of the jumps were in the evening and questions were raised about whether these aircrafts may have operated outside of airport hours identified in the Closure Order.

## BMP Gate/Exodus/Perimeter Operations

BLM believes that gate operations ran smoothly throughout the 2019 event for BMP and the event participants other than the gate closure due to an accident/fatality on CR 34. During the gate closure BMP worked well with BLM and PCSO in a Tier One activation and produced timely notifications to incoming event participants.

BLM Law Enforcement has concerns regarding gate inspections. It is challenging to understand why gate inspections do not result in referrals to law enforcement at the event.

BLM has concerns that perimeter continues to stop vehicles traversing the playa.

During exodus, the BLM noted loads that had fallen or were left on the side of the road. The BLM understands the safety component of picking up these items when traffic has reduced and the applicable permits from other entities (NDOT and/or County) allows BMP to retrieve these items. The BLM asks that BMP work with participants while they await exiting the event to secure loads and ensure participants items do not fall off vehicles when traveling to their next destination.

Another item from the loads that had fallen off vehicles upon exit was drugs. BLM staff monitoring County Road 34 for trash, discovered drugs. The BLM monitor reported the items discovered to Law Enforcement.

The following are comments on those important BMP programs and departments that impact and/or assist BLM's event operations.

## MOU Contracting Program

The sixth year of the BMP/BLM contracting MOU program was not fully successful from the perspective of BLM because BMP parted out the JOC SOW by refusing certain assets requested by BLM in the SOW i.e. the JOC Modular Buildings, the JOC Cleaning Team, the JOC Dumpsters and the JOC Decon Facility. This parting out was a violation of the MOU document between BLM and BMP. BLM had to transfer the JOC cleaning responsibilities to the BLM logistical team. The JOC Dumpsters and Decon Facility had to be obtained through last minute government contracts. BLM began the government contracting process to obtain the JOC Modular Building. BLM was able to find and reserve a contractor for the seven BLM modular buildings needed when BMP changed their minds and decided to retain the BLM modular building as part of the MOU program at the last minute. All this back and forth caused confusion and extra work for both parties.

## BMP's JOC Logistics Team

This was the sixth year of BMP's Joint Operation Center (JOC) construction and service logistic team. For the JOC assets that BMP did accept under the MOU program, the construction and services program went well. The only on-site problem was the fuel program, due to a shortage of fuel by the BMP fuel contractor. JOC fuel tanks were not kept full but BLM never ran out of fuel due to the hard work of BMP's JOC Logistical Team.

## Event Sit Stat Program

This was the fifth year of the current Sit Stat program during event operations. Over the last two previous years it has been refined and in 2019 it was a very valuable tool used by the Tier 1 team while managing the event programs and resources.

One suggestion that was brought up in the on playa event close-out meeting concerning the Sit Stat program was to add a third page to the 2018 sit stat document to show a comparison to last year's event stats to show trend changes. It is also recommended the event summary tables provided during the final Tier 1 meeting be included in future events.

## Event Tier 1 Program

The Tier One notification and alert system needs to be seamless between BLM and BMP. The only way alerts from both agencies were successful was when a BLM employee carried a BMP pager and a cell phone with BLM alerts. Today's technology allows opportunities beyond pager systems for notifications and alerts.

## BMP Population Reporting Program

BMP contracted Showclix to assist in selling the event tickets and tracking the participants entering the event. The population of the city during the event was counted through the scanning system. The data collected, was reported to the BLM through BMP's PRAM system, satisfying the stipulation requirement. The PRAM reports for 2019 provided only one total number. BLM and BMP discussed on playa how a potential breakdown should proceed in the future.

## BLM/BMP Joint CAD Program

For the third fourth consecutive year, BLM and BMP ESD used the same CAD services contractor, iNET. This program was successful. During the 2017 on playa closeout meeting, there was an item for consideration by and for BMP to have BMP's Black Rock Ranger CAD program brought into the iNET CAD system. During the 2018 event, a representative from Black Rock Rangers sat in ESD dispatch to see how the system functioned and observe what consolidation would look like. If this was done it could increase the communication and cooperation between the BRR's and BLM/PCSO LE calls for service dispatching.

## BMP Ranger Department

Communication and coordination between BMP Law Enforcement Advisor and Black Rock Ranger (BRR) leadership with BLM planners during the planning phase of the event led to effective and efficient communication during the event. This level of cooperation allowed for issues to be conveyed and resolved in a timely manner.

During the event, the BLM Patrol Captain and a representative of PCSO attended daily BRR meeting to discuss any issues or concerns from the previous day's activities with BRR leadership. This continues to be a valuable method through which issues can be resolved.

Officers continue to report successes with using specialty units such as LEAL and Green Dots with resolving situations. BRR were utilized by the organization to reduce interactions between victims of sexual assault and law enforcement. This created tension and was extended by BRR to include a victim of reported domestic battery. The Pershing County Sheriff issued a letter warning BMP for obstructing law enforcement in the event and tensions escalated.

BMP instituted a limited scope private security detail for the safety of BRRs. BLM is unaware if the organization feels this program is a success. BLM did not have substantive interaction with this new program.

## BMP Safety Department

For the fourth fifth year in a row the BLM safety officer coordinated and worked closely with BMP's safety program. BMP's safety program is a proactive and vibrant program but is very busy evaluating and remediating safety issues identified during the event. BMP Safety also ensures BMP staff and participant compliance with regulations and stipulations related to safety during the event.

BLM would like to note that the steps taken to have BRRs as the perimeter for large scale burns was very effective in 2019, and both the BMP Safety (FAST) and BRR did an excellent job with these burns.

## Miscellaneous

The BLM SRP Monitor noted that during the final walk through of the Temple, before it burned, had many items that were or appeared to be vessels that held human remains or cremains. The Burning Man EIS stipulates that the disposal of human remains at the event is forbidden. BMP will need to inform participants of this stipulation moving forward.

# EXHIBIT D

AR12026

## 2019 BURNING MAN - STATISTICAL SUMMARY

### BLM LAW ENFORCEMENT

#### BLM/USFS LAW ENFORCEMENT EVENTS BY TYPE

| | |
|---|---|
| ASSAULT ON OFFICER | 2 |
| ASSIST LAW ENFORCEMENT AGENCY | 88 |
| ASSIST OTHER | 6 |
| ASSIST PUBLIC | 827 |
| COMPLIANCE CHECK (RESOURCES) | 83 |
| FIRE | 2 |
| HAZMAT | 8 |
| INVESTIGATION | 28 |
| MEDICAL | 4 |
| MISSING PERSON | 5 |
| PATROL CHECK | 232 |
| PUBLIC CONTACT | 1525 |
| STOLEN | 3 |
| BLM Evictions | 34 |
| TRAFFIC STOPS | 1072 |
| TRANSPORTS | 1 |
| **TOTAL LAW ENFORCEMENT EVENTS** | **3920** |

#### BLM/USFS LAW ENFORCEMENT ACTIONS TAKEN

#### CITATIONS

| | |
|---|---|
| DEPOSITING HUMAN WASTE | 62 |
| DRUG PARAPHERNALIA | 18 |
| DUI | 1 |
| FUEL STORAGE | 4 |
| CREATING A HAZARD/NUISANCE | 5 |
| IN A CLOSED AREA | 21 |
| INTERFERENCE/RESISTING | 1 |
| LITTERING | 1 |
| MOTOR VEHICLE IN CLOSURE | 3 |
| MOTOR VEHICLE NO DRIVERS LICENSE | 5 |
| MOTOR VEHICLE NO INSURANCE | 3 |
| MOTOR VEHICLE NO TAILLIGHTS | 13 |
| MOTOR VEHICLE NO REGISTRATION | 29 |
| MOTOR VEHICLE NO HEADLIGHTS | 11 |
| MOTOR VEHICLE SPEEDING | 55 |
| MOTOR VEHICLE CARELESS | 2 |
| MOTOR VEHICLE MISC | 4 |
| OPEN CONTAINER | 8 |
| POSSESSION OF A CONTROLLED SUBSTANCE | 130 |
| WASTE WATER | 38 |
| MISC | 11 |
| **TOTAL CITATIONS** | **425** |

#### Warnings

| | |
|---|---|
| DISORDERLY CONDUCT | 11 |
| DRUG PARAPHERNALIA | 33 |

AR12027

| | |
|---|---|
| CREATING A HAZARD/NUISANCE | 11 |
| IN A CLOSED AREA | 7 |
| FUEL STORAGE | 12 |
| INTERFERENCE/RESISTING | 7 |
| LITTERING | 1 |
| MOTOR VEHICLE IN CLOSURE | 4 |
| MOTOR VEHICLE NO DRIVERS LICENSE | 4 |
| MOTOR VEHICLE HEADLIGHTS | 16 |
| MOTOR VEHICLE NO INSURANCE | 7 |
| MOTOR VEHICLE NO REGISTRATION | 20 |
| MOTOR VEHICLE NO TAILLIGHTS | 54 |
| MOTOR VEHICLE SPEEDING | 90 |
| MOTOR VEHICLE CARELESS | 1 |
| MOTOR VEHICLE MISC | 3 |
| POSSESSION OF A CONTROLLED SUBSTANCE | 42 |
| OPEN CONTAINER | 6 |
| WASTE WATER | 3 |
| **TOTAL VERBAL WARNINGS** | **332** |

AR12028

# EXHIBIT E

AR12029

# 2014 - 2019 BURNING MAN - STATISTICAL SUMMARY

## BLM LAW ENFORCEMENT

### BLM/USFS LAW ENFORCEMENT ACTIONS TAKEN

### EVENT BY TYPE

|                           | 2014 | 2015 | 2016   | 2017 | 2018 | 2019 |
|---------------------------|------|------|--------|------|------|------|
| PUBLIC ASSIST             | 450  | 1474 | 213    | NR   | 827  | 827  |
| PUBLICE CONTACTS          | 166  | 1595 | 6903** | NR   | 1218 | 1525 |
| TRAFFIC STOPS             | 860  | 899  | 1254   | NR   | 783  | 1072 |
| VERBAL WARNINGS           | 520  | 548  | 317    | 322  | 290  | 332  |
| CITATIONS ***             | 392  | 534  | 407    | 413  | 433  | 425  |
| RESOURCE COMPLAINACE CHECKS | 17 | 118  | 20     | NR   | 169  | 83   |

### CITATIONS

|                                  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|----------------------------------|------|------|------|------|------|------|
| AIRCRAFT LANDING                 | 0    | 1    | 1    | 1    | 0    | 0    |
| DEPOSITING HUMAN WASTE           | 7    | 128  | 81   | 23   | 88   | 62   |
| DISORDERLY CONDUCT               | 8    | 7    | 3    | 1    | 10   | 0    |
| DRUG PARAPHERNALIA               | 29   | 35   | 3    | 15   | 8    | 18   |
| DUI                              | 3    | 2    | 1    | 1    | 3    | 1    |
| FIREWORKS                        | 2    | 2    | 0    | 2    | 0    | 0    |
| FUEL STORAGE*                    | N/A  | N/A  | N/A  | 0    | 40*  | 4    |
| CREATING A HAZARD/NUISANCE       | 10   | 26   | 35   | 7    | 11   | 5    |
| IN A CLOSED AREA                 | 44   | 15   | 0    | 19   | 25   | 21   |
| INTERFERENCE                     | 4    | 3    | 1    | 2    | 7    | 1    |
| LITTERING                        | 0    | 0    | 0    | 0    | 3    | 1    |
| MOTOR VEHICLE IN CLOSURE         | 11   | 5    | 11   | 7    | 1    | 3    |
| MOTOR VEHICLE NO DRIVERS LICENSE | 14   | 12   | 9    | 8    | 7    | 5    |
| MOTOR VEHICLE NO INSURANCE       | 3    | 1    | 3    | 3    | 5    | 3    |
| MOTOR VEHICLE NO TAILLIGHTS      | 1    | 16   | 17   | 24   | 21   | 13   |
| MOTOR VEHICLE LICENSE PLATE      | 1    | 1    | 2    | 3    | 0    | 0    |
| MOTOR VEHICLE NO REGISTRATION    | 12   | 16   | 29   | 28   | 25   | 29   |
| MOTOR VEHICLE NO HEADLIGHTS      | 0    | 0    | 0    | 4    | 7    | 11   |
| MOTOR VEHICLE SPEEDING           | 3    | 77   | 58   | 31   | 37   | 55   |
| MOTOR VEHICLE CARELESS           | 2    | 5    | 0    | 6    | 2    | 2    |
| MOTOR VEHICLE MISC               | 0    | 4    | 16   | 1    | 4    | 4    |
| OPEN CONTAINER                   | 5    | 7    | 2    | 7    | 3    | 8    |
| POSSESSION OF A CONTROLLED SUBSTANCE | 205 | 116 | 82 | 181  | 86   | 130  |
| RESISTING                        | 1    | 4    | 2    | 2    | 0    | 0    |
| TRESPASS NOTICE REQUESTS         | 6    | 8    | 5    | 23   | 0    | 0    |
| WASTE WATER                      | 2    | 34   | 2    | 4    | 38   | 38   |
| MISC                             | 0    | 3    | 40   | 4    | 0    | 11   |
| WEAPONS                          | 4    | 3    | 3    | 6    | 2    | 0    |

\* Improper "Fuel Storage" became a violation in 2017 and the first citations were issued in 2018. Of the 433 total citation minus the 40 new violations equals 393 total citation for a decrease in citations comparitively

| | | | | | | |
|---|---|---|---|---|---|---|
| ** In 2016 BLM added their esplanade substation outreach program contacts to LE public contacts which was discontnued in subsequent years | | | | | | |
| *** Total number of citations reported although not all caputed below due to mistake or dropped violations tracking | | | | | | |
| "NR" - Not reported by BLM | | | | | | |

# EXHIBIT F

AR12032



MENU

English

# Technical Assistance

## MANAGEMENT SURVEYS

The IACP offers comprehensive Management and Operations surveys to help agencies determine their level of accountability, community satisfaction, cost-effectiveness, compliance with professional standards, and success in crime control.

## PATROL STAFFING AND DEPLOYMENT

Ready-made, universally applicable patrol staffing standards do not exist. Ratios, such as officers-per-thousand population, are totally inappropriate as a basis for staffing decisions. Defining patrol staffing allocations and deployment requirements is a complex endeavor which requires consideration of an extensive series of factors and a sizeable body of reliable, current data.

## TECHNICAL ASSISTANCE SERVICES

TA focuses on one problem/issue or a limited set of connected problems and issues. Designed to provide immediate, low cost diagnostic and problem solving services.

## TRAINING KEYS

Concise, authoritative sources of law enforcement information, these six-page, loose-leaf

AR12033

MENU

# NATIONAL LAW ENFORCEMENT POLICY CENTER

Organized under the direction of a broad-based advisory board of recognized law enforcement professionals, the center has carried out its mission through the development of a wide variety of model law enforcement policies.

## EXECUTIVE SEARCH

The IACP offers the most comprehensive police executive search service available. Our experienced team recognizes the significance of selecting the new executive leadership and works in partnership with the jurisdiction through all stages of the planning, selection, and transition processes.

## ASSESSMENT CENTERS

A powerful tool for making promotional decisions, an assessment center uses a series of simulated on-the-job challenges to gauge a candidate's ability to perform the target job.

## PROMOTIONAL TESTING

The IACP recognizes the importance of selecting and advancing the right candidates into leadership positions, understanding that each agency has its own set of challenges and circumstances.

To obtain more information about these services please email professionalservices@theiacp.org or call 703.836.6767.

Privacy Policy

Contact Us



AR12034



MENU

1.800.THE IACP

AR12035

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone:  (650) 858-8500
david@levinlawfirm.com

Attorneys for Appellant,
Burning Man Project

## UNITED STATES DEPARTMENT OF THE INTERIOR

## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BURNING MAN PROJECT,<br><br>        Appellant,<br><br>   v.<br><br>BUREAU OF LAND MANAGEMENT,<br><br>        Appellee. | Case Identification No.:  IBLA-2020-0302<br><br>Special Recreation Permit<br>LLNVW03500-19-01<br>2930 (NV030.10)<br><br>**Certificate of Service** |

I am a resident of the state of California and am over the age of eighteen years old.  I am not a party to the within action.  My business address is 405 Sherman Avenue; Palo Alto, California  94306-1827.   On July 6, 2020, I served the foregoing document(s) described as:

**Statement of Reasons Supporting Appeal**

**Declaration of Raymond Allen Supporting Appeal**

**Declaration of Marnee Benson Supporting Appeal**

**Declaration of Robert Abbey Supporting Appeal**

**Declaration of Marc P. Picker Supporting Appeal**

**Declaration of Roger Vind Supporting Appeal**

on the following interested parties:

Janell Bogue                                           Attorney for Bureau of Land Management
Assistant Regional Solicitor
U.S. Dept. of the Interior
2800 Cottage Way, Room E-1712
Sacramento, CA 95825

[ ]   **VIA MAIL**:

Service was accomplished by placing the document(s) listed above in a
sealed envelope with postage thereon fully prepaid, in the United States Mail at Palo Alto,
California, addressed as set forth above.  I am readily familiar with this Firm's business
practice of collection and processing of material for mailing by U.S. Mail, and any material
placed for collection for mailing would, in the ordinary course of business, be deposited with
the U.S. Postal service on that same day.

[ XX ] **VIA ELECTRONIC TRANSMISSION**:

Service was accomplished by arranging for electronic transmission of the documents
listed above to **janell.bogue@sol.doi.gov** prior to close of business.  I am readily familiar with
this firm's business practice of collection and processing of correspondence via electronic
transmission(s) and any such correspondence would be transmitted in the ordinary course of
business.

[ XX]  **VIA EXPRESS MAIL/OVERNIGHT DELIVERY**:

Service was accomplished by placing the document(s) listed above in a sealed
envelope(s), addressed as above, and placing each for collection by overnight mail service or
overnight courier service. I am readily familiar with this Firm's business practice of collection
and processing material for overnight mail or overnight courier service, and any material
placed for collection for overnight delivery would, in the ordinary course of business, be
delivered to an authorized courier or driver authorized by the overnight mail carrier to receive
documents, with delivery fees paid, for delivery on the following business day.

I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct and that this Certificate of Service was executed on July 6,

2020 at Palo Alto, California.

Adisa McKenzie

2



# U.S. Department of the Interior
# Bureau of Land Management

Office of Law Enforcement and Security
1849 C Street NW, Washington, DC 20240



August 19, 2012

Memorandum

To:       Carole Carter-Pfisterer, Assistant Director, Human Capital Management

From:     Salvatore Lauro, Director, Office of Law Enforcement and Security

Subject:  Lifting of Pay Cap for Law Enforcement Deployment to Interior Lands in Nevada in
          Support of the 2012 Burning Man Event

I request that the law enforcement deployment to Public Lands in Nevada, in support of the 2012
Burning Man Event, be designated as an emergency special event as stated in 5 CFR 550.103. If
you approve of this request that would allow for lifting the bi-weekly pay cap as authorized by 5
CFR 550.106 and the Fair Labor Standards Act (FLSA) overtime requirements under 5 CFR
551.211 (f), for law enforcement personnel participating in direct support of this event. These
employees would then be entitled to premium pay under the annual maximum earning limitations
while performing the emergency work.

The FLSA status of law enforcement employees assigned to the 2012 Burning Man Event shall be
reviewed and administered in accordance with previously cited Federal regulations. If approved,
the temporary waiver of the bi-weekly pay cap as well as the emergency determination for deciding
FLSA designations shall continue until the conclusion of the 2012 Burning Man Event,
approximately September 8, 2012.

The Office of Law Enforcement and Security will designate a point of contact to keep a record of
this situation, including the date the emergency began, an estimate of the number of employees
affected, track the hours expended for the specific mission, and the type of premium pay involved.

[ ✓ ] Approved        [   ] Disapproved

Carole Carter-Pfisterer                                    Date: 8/7/12

AR00083