DOWNEY BRAND LLP
ELIZABETH B. STALLARD (Bar No. 221445)
621 Capitol Mall, 18th Floor
Sacramento, CA  95814-4731
Telephone: 916.444.1000
Facsimile: 916.444.2100

Attorneys for Appellant

# UNITED STATES DEPARTMENT OF INTERIOR

# INTERIOR BOARD OF LAND APPEALS

BLACK ROCK CITY LLC,

        Appellant,

   v.

BUREAU OF LAND MANAGEMENT,

        Appellee.

Case Identification No.:  IBLA 2017-126

Special Recreation Permit
LLNVW03500-16-01
2930 (NV030.12)

**APPELLANT BLACK ROCK CITY LLC'S STATEMENT OF REASONS IN SUPPORT OF APPEAL**

1481341.2

AR09963

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND .............................................................................. 3

    A.  Overview Of The Burning Man Special Recreation Permit ...................... 3

    B.  Burning Man's Exceptional Record Of Safety And Environmental
        Compliance ................................................................................................ 4

    C.  Between 2011 and 2014, BLM Increased its Costs to Administer the
        Burning Man SRP By Nearly 300%. .......................................................... 5

        1.  In 2012, Concurrent With a Change in BLM Regional Law
            Enforcement Leadership, BLM's Burning Man-Related Costs Rose
            60% in a Single Year .......................................................................... 5

        2.  In 2013, BLM's Costs More than Doubled from 2012 ....................... 7

        3.  In 2014, BLM's Costs Increased by Another Half-Million Dollars .......... 9

    D.  BLM's 2015 Costs Retained the Dramatic Increases from Prior Years,
        Causing BRC to Appeal to this Board for Relief. .................................... 10

    E.  A Federal Investigation Revealed Ethical Violations by BLM's Law
        Enforcement Supervisor at the 2015 Burning Man Event. ...................... 11

    F.  While the SRP Process Improved in 2016, BLM's Costs Remained Inflated
        by Requirements Imposed by Prior BLM Leadership. ............................. 13

III. LEGAL STANDARD ........................................................................................ 14

IV. ARGUMENT ..................................................................................................... 15

    A.  BLM Has Not Met Its Obligation Under Cost Recovery Guidelines To
        Sufficiently Explain Its Costs For The 2016 Burning Man SRP. .......... 15

    B.  Based On The Available Information, A Number Of BLM's Costs For The
        2016 Burning Man SRP Were Improperly Charged To BRC ................. 18

        1.  Many of BLM's Labor Costs Were Unjustified and Unreasonable ......... 18

            a.  BRC Should Not be Charged any Costs Associated with
                BLM'S Unjustified Designation of Burning Man as an
                "Emergency." ............................................................................ 20

            b.  BLM Has Not Justified its Law Enforcement Officer
                Staffing Levels ........................................................................ 21

            c.  BRC Should Not be Required to Pay Any Labor Costs
                Associated with BLM Community Relations or Public
                Outreach Efforts. .................................................................... 26

            d.  BRC Should Not be Required to Pay the Excessive Labor
                Costs Associated with BLM's Communications and IT
                Functions at the Burning Man Event. .................................... 28

            e.  BRC Should Not be Required to Pay any Labor Costs
                Associated with BLM's Provision of Superfluous Medical
                Services for its Personnel. ...................................................... 29

DOWNEY BRAND LLP

1481341.2

i

**TABLE OF CONTENTS**
(continued)

Page

f.   BRC Should Not be Required to Pay any Labor Costs Associated with BLM's Monitoring of Third-Party Vendors....... 30

2.   BLM'S Contracting Practices with Respect to the 2016 SRP Were Unjustified and Unreasonable.................................................. 30

   a.   BLM's Contract with Midland Radio Corporation....................... 31

   b.   BLM's Contract with Alvarez & Associates, LLC....................... 31

   c.   BLM's Contract with Lyman Communications, LLC ................. 32

   d.   BLM's Contract with High Desert Internet Services................... 33

   e.   BLM's Contract with Modular Space Corporation....................... 34

3.   BRC Should Not be Required to Reimburse BLM'S Costs for Unnecessary Equipment and Supplies ....................................... 35

   a.   Costs Related to BLM's Unnecessary Medical Facility .............. 35

   b.   BLM Giveaway Materials.......................................................... 36

   c.   Oakley Goggles ........................................................................ 36

   d.   Radio Accessories ................................................................... 37

C.   BLM Violated Cost Recovery Guidelines By Charging BRC Multiple Times For The Same Costs. ..................................................... 37

1.   BLM Improperly Charged BRC Directly for Costs Already Captured by the Indirect Administrative Cost Rate ................................. 37

2.   Charging the IACR on Costs Incurred During the Burning Man Event Amounted to Impermissible Overcharging.................................. 39

V.   CONCLUSION .......................................................................... 40

DOWNEY BRAND LLP

1481341.2

ii

# TABLE OF AUTHORITIES

Page

**IBLA Decisions**

*Bookcliff Rattlers Motorcycle Club*, IBLA 2004-151, 171 IBLA 6 (2006)...1,14, 17, 18, 19, 29, 38
*James R. Stacy*, IBLA 2014-216, 188 IBLA 134 (2016)…………………………………14
*Mark Patrick Heath*, IBLA 2010-34, 181 IBLA 137 (2011)……………………………14
*Michael Voegele*, IBLA 2007-255, 174 IBLA 313 (2008)………………………………1, 14

**Federal Statutory Authorities**

42 U.S.C. § 4321 ……………………………………………………………………………… 4
43 U.S.C. § 1701 ……………………………………………………………………………… 4
43 U.S.C. § 1734(a) …………………………………………………………………………… 16
43 U.S.C. § 1734(b) ………………………………………………………………… 1, 14, 19
43 U.S.C. § 1734(c) …………………………………………………………………………… 15
I.R.C. (26 U.S.C.) § 501(c)(3)………………………………………………………………… 3

**Federal Rules and Regulations**

5 C.F.R. § 550.103 …………………………………………………………………………… 6
5 C.F.R. § 550.103 …………………………………………………………………………… 20
5 C.F.R. § 550.106 …………………………………………………………………………… 7
5 C.F.R. § 550.106(a)(2) …………………………………………………………………… 20
5 C.F.R. § 551.211(f) ………………………………………………………………………… 7
43 C.F.R. § 2932.11 ………………………………………………………………………… 30
43 C.F.R. § 2932.31(d)(2)…………………………………………………………………… 9
43 C.F.R. § 2923.31(e)(2)-(3) ……………………………………………………………… 30

DOWNEY BRAND LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1481341.2

iii

## I.   INTRODUCTION

Burning Man is one of the largest events held on the public lands of the United States, and the Burning Man special recreation permit ("SRP") is the largest SRP administered by the U.S. Bureau of Land Management ("BLM").  But Burning Man's scale does not mean that BLM can take advantage of the permittee, Black Rock City LLC ("BRC") to engage in activities that are not reasonably required and should be funded, if at all, out of BLM's regular budget.

The law permits BLM to recover its reasonable costs for administering the Burning Man SRP.  43 U.S.C. § 1734(b).  As a corollary, BRC cannot be required to reimburse BLM for costs that are not reasonably necessary to the permit's administration.  BRC is entitled to information sufficient to assess whether the costs BLM imposes in connection with the Burning Man SRP are reasonable: an explanation that has a rational basis and is "supported by the facts of record demonstrating that [BLM's] action is not arbitrary, capricious, or an abuse of discretion" under the law. *Michael Voegele*, IBLA 2007-255, 174 IBLA 313, 318 (2008); *see also Bookcliff Rattlers Motorcycle Club*, IBLA 2004-151, 171 IBLA 6, 13 (2006).

Unfortunately, BLM's documentation of its costs, and their nexus to the Burning Man SRP, has fallen far short of the agency's obligations.  For the 2016 Burning Man SRP, BLM charged BRC nearly $2.2 million through cost recovery, and its 2016 Cost Recovery Decision was comprised of a cover letter, seven summary spreadsheets, and copies of BLM's receipts and contracting documents.  More than half of BLM's total costs — nearly $1.4 million — were for the labor of BLM employees, and yet BLM summarized all of this work in a mere seven pages, providing no detail whatsoever about the tasks performed by any particular employee, and no information about the shifts any employees worked or the rates at which they were paid.  It is simply not possible from this limited information for BRC to ascertain whether these costs were reasonable.

BLM's consistent failure to provide the necessary level of detail regarding all of the costs imposed with respect to the Burning Man SRP has an inevitable consequence: BRC is effectively unable to assess the legitimacy of the charges imposed by BLM.  BLM withholds — from both BRC and this Board — the detail necessary to determine whether the costs it imposes are

DOWNEY BRAND LLP

1   reasonable with respect to the administration of BRC's permit.  Thus, regardless of whether any

2   particular category of charge is theoretically justifiable (such as the need for some level of law

3   enforcement), BLM has not met its obligations under the applicable legal standards to show that

4   the specific charges it imposed in 2016 are actually justified.

5       As set forth in this Statement of Reasons, despite BLM's failure to provide sufficient

6   information regarding all of its 2016 Burning Man SRP costs to date, BRC has identified

7   numerous areas in which the costs imposed by BLM were unreasonable and must therefore be

8   refunded.  Chief among these were BLM's excessive expenditures on labor, particularly law

9   enforcement labor, which cost BRC more than a million dollars in 2016.  BLM's law enforcement

10  operations greatly exceeded what was reasonably necessary for Burning Man in light of its safety

11  record, a conclusion confirmed by law enforcement's own records of activity at the event over the

12  years.  Unfortunately, the agency's outsized law enforcement cost and staffing increases between

13  2012 and 2014, which were demanded by prior BLM law enforcement leadership, appear to have

14  become entrenched in BLM's planning for all subsequent Burning Man events.  BRC is entitled

15  to a reevaluation of all these costs, and an alignment of BLM's law enforcement operations with

16  the reasonable and documented health and safety needs of the Burning Man event.

17      BLM's overall labor costs were also inflated by its improper designation of Burning Man

18  as an "emergency" event for the purpose of enabling employees to obtain premium pay, and by

19  the time spent by law enforcement and civilian personnel on community outreach activities that

20  bore no nexus to BLM's administration of the SRP.  In addition, the services of a number of

21  specific employees were unreasonably excessive, such as BLM's 11-person information

22  technology team; unnecessary, such as BLM's medical unit leader; or improperly charged to

23  BRC, such as the BLM law enforcement officer from the Office of Professional Responsibility.

24      BRC has also identified provisions in several BLM contracts that were not reasonably

25  required for the event, as well as various supplies and equipment purchased by BLM that were

26  either redundant or wholly unnecessary.  There is no rational basis for imposing any of these costs

27  on BRC.

28      BLM's costs are not reasonable simply because they were incurred in relation to the

AR09968

1  Burning Man event, and BLM cannot spend limitless amounts on administering the SRP simply

2  because BRC is footing the bill.  Rather, BRC is entitled to a reasoned and documented

3  explanation for all of BLM's 2016 costs that the agency has yet to provide.  Thus, as explained

4  herein, BRC respectfully requests that the Board disallow BLM's 2016 cost recovery for the

5  Burning Man SRP.

**II.     FACTUAL BACKGROUND[1]**

**A.     <u>Overview of The Burning Man Special Recreation Permit.</u>**

8         Since 1990, the Burning Man event ("Burning Man" or "the event") has been held over

9  and around Labor Day weekend on public lands managed by BLM in what is now the Black Rock

10  Desert—High Rock Canyon Emigrant Trails National Conservation Area of northern Nevada (the

11  "Black Rock NCA").  (Declaration of Marnee Benson ("Benson Decl.") ¶ 3.)  The event location,

12  commonly called Black Rock City (or "the City"), has been situated within Pershing County for

13  the past 20 years.  (*Id.*)  Burning Man began its tenure in the Black Rock NCA as a weekend

14  camping trip for a small group of people.  (*Id.* ¶ 4.)  Over the past 25 years, the event has grown

15  in size, popularity, and complexity, and the peak population[2] of the 2016 event was 67,290

16  participants.  (*Id.*)

17         Burning Man has been produced by BRC since 1997.  (*Id.* ¶ 5.)  In 2013, BRC became a

18  wholly owned subsidiary of Burning Man Project ("BMP"), a California nonprofit public benefit

19  corporation recognized as exempt under section 501(c)(3) of the Internal Revenue Code.  (*Id.*)

20  BMP's mission is to facilitate and extend the culture of the Burning Man event in the larger

21  world.  (*Id.*)

22         BLM issues the SRP for Burning Man every year.  (Declaration of Rosalie Barnes

23  ("Barnes Decl.") ¶ 2.)  Each SRP has been issued pursuant to the requirements of the National

---

[1] Nearly all of this background information was provided in the Statement of Reasons in support of BRC's appeal of the 2015 cost decision (the "2015 Cost Recovery Appeal").  BRC has included an abbreviated version here, focusing on those issues most relevant to BLM's 2016 cost decision.

[2] All references herein to Burning Man's population are to the peak number of paid participants at a single time during the event.  (Declaration of Rosalie Barnes ("Barnes Decl."), Ex. A (Stipulation 1).)  Population varies significantly over the course of the event.

AR09969

DOWNEY BRAND LLP

1    Environmental Policy Act ("NEPA") and Federal Land Policy and Management Act ("FLPMA").

2    42 U.S.C. § 4321, *et seq*. (1969); 43 U.S.C. § 1701, *et seq*. (1976).  The permitting process has

3    included several environmental assessments over the years, the most recent of which covers the

4    period 2012 to 2016, and as with previous assessments, resulted in BLM issuing a mitigated

5    Finding of No Significant Impact ("FONSI").  (Barnes Decl. ¶ 3.)

6            BRC and BLM have cooperated over the years to develop and refine a Leave No Trace

7    standard for the event that BLM has since adopted for use with other events on BLM-managed

8    public lands.  (*Id*. ¶ 4.)  BLM typically inspects the Burning Man event site approximately six

9    weeks after the end of the event.  (*Id*. ¶ 5.)  BRC has passed every inspection.  (*Id*.)

10           Each year, the Burning Man SRP contains special stipulations ("Stipulations") designed

11   for the uniqueness of the event and intended to address impacts and issues identified in the

12   mitigated FONSI that would require additional regulation by BLM beyond existing federal, state,

13   and county laws and regulations.  (*Id*. ¶ 6; *see also id*., Ex. A (2016 Burning Man Stipulations).)

14   The Stipulations address event population, public health and safety, environmental compliance,

15   and traffic management in surrounding areas.  (*Id*. ¶ 6.)  Burning Man has been compliant with all

16   Stipulations each year except 2011 and 2013, when population slightly and inadvertently

17   exceeded the set limit during a portion of the event.  (*Id*.)

18   **B.      Burning Man's Exceptional Record of Safety and Environmental Compliance.**

19           Safety and environmental stewardship are paramount to the Burning Man organization

20   and to the members of the Burning Man community.  BRC's commitment to public safety and the

21   environment are evidenced by its 25-year record of compliance and year-round work with

22   cooperating agencies at the federal, state, and local levels.  (Benson Decl. ¶ 6.)  Burning Man is

23   guided by Ten Principles, including communal effort, civic responsibility, participation, and

24   radical self-reliance, all of which are reflected in daily life in Black Rock City and in the event's

25   extraordinary historical record.  (*Id*., Ex. A.)

26           In 2016, BRC's event operations comprised more than 50 departments and teams, and

27   BRC engaged several thousand competent, trained, licensed, and certified health and safety

28   employees, contractors, and volunteers in the production of Burning Man.  (*Id*. ¶ 7.)  BRC has

DOWNEY BRAND LLP

1481341.2                                        4

1  built these departments, protocols, and best practices over the course of more than 25 years, and

2  many of these individuals have 10 to 20 years of experience both with managing safety operations

3  and infrastructure at Burning Man and in their respective fields of expertise.  (*Id.*)  These BRC

4  departments were engaged year-round in planning all aspects of the 2016 event and their onsite

5  operations, including providing emergency medical and fire services; surveying the streets, roads,

6  and airport; building City infrastructure; ensuring sanitation; managing air and bus transportation

7  services; managing participant arrival and processing; placing 1,200 camps; licensing 1,000

8  vehicles; and educating participants about staying safe, protecting the environment, and being

9  good citizens of Black Rock City.  (*Id.*)

10      It is true that the Burning Man SRP is a significant undertaking.  It is equally true that

11  BRC's extensive operational expertise, developed over decades of experience, has resulted in an

12  outstanding record of public safety and environmental compliance for the Burning Man event

13  each year.  (*See e.g.*, *id.*, Ex. J at 1 (Letter from BLM's Black Rock Field Office Manager

14  thanking BRC "for working with BLM to ensure that the 2016 Burning Man Event was safe and

15  successful").)

16  **C.**   **Between 2011 and 2014, BLM Increased its Costs to Administer the Burning Man**
        **SRP by Nearly 300%.**
17

18      **1.**   **In 2012, Concurrent With a Change in BLM Regional Law Enforcement**
            **Leadership, BLM's Burning Man-Related Costs Rose 60% in a Single Year.**

19      Since 2007, BLM has charged BRC for the costs of administering the Burning Man SRP

20  under cost recovery regulations and guidelines, which require that BRC pay all of BLM's direct

21  and indirect costs, plus 3% of BRC's gross receipts as a commercial use fee.  (Declaration of

22  Raymond Allen ("Allen Decl.") ¶ 3; Nat'l Special Recreation Permit Fee Schedule, available at

23  http://www.blm.gov/style/medialib/blm/co/programs/recreation/srp_state_page.Par.80235.File.dat

24  /IM2011-041_att1[1].pdf.)  Between 2007 and 2011, BLM's costs increased by about 10% every

25  year, from approximately $626,000 to $859,000.  (*Id.* ¶ 4.)  During this same period, BRC's

26  population increased from 47,097 to 53,963, indicating average annual growth around 4%.  (*Id.*)

27      In 2012, Daniel P. Love became the BLM Special Agent in Charge for Region 3, which

28  includes the Black Rock NCA, and assumed leadership of law enforcement operations for the

1481341.2

5

AR09971

1   Burning Man SRP. (*Id.* ¶ 5.)  That year, BRC's population again increased by just 4%, but

2   BLM's costs for administering the Burning Man SRP soared by 60%, to a total of almost $1.4

3   million. (*Id.* ¶ 6.)  This was in part due to BLM's decision to raise its law enforcement staffing

4   levels by 37% — from 51 officers in 2011 to 70 officers in 2012. (*Id.*)  In conjunction with this

5   increase in staffing levels, all other BLM costs increased, from meals, travel, and

6   accommodations to technical services and equipment. (*Id.*)  BLM failed to provide BRC with an

7   adequate explanation for the substantial increases, and BRC is aware of no safety or other issues

8   that warranted them. (*Id.* ¶ 7.)

9           Also in 2012, BLM designated Burning Man as an "emergency special event" for the first

10  time, to BRC's knowledge. (*Id.* ¶ 8.)  BLM informed BRC that the purpose of the designation

11  was to facilitate the assignment of officers from other regions to Burning Man, even though BLM

12  had never documented any difficulties in securing sufficient numbers of staff. (*Id.*)  In a

13  memorandum dated August 19, 2012, yet approved August 7, 2012,[3] the Director of BLM's

14  Office of Law Enforcement and Security requested that the 2012 Burning Man event, which was

15  scheduled to begin later that month, be designated an "emergency" pursuant to 5 C.F.R. §

16  550.103. (Benson Decl., Ex. B.)  Notably, although the memorandum refers to a "special event

17  designation," the cited regulation only uses the single term "emergency," defined as: "a

18  temporary condition posing a direct threat to human life or property, including a forest wildfire

19  emergency." 5 C.F.R. § 550.103.  Neither the memorandum nor any other documentation

20  provided to BRC explains how the pre-planned and permitted Burning Man event can

21  appropriately be designated an "emergency" under the cited regulation or any other federal law.

22          In fact, the only reason given in the 2012 memorandum for imposing the emergency

23

24  [3] BRC was not made aware of this memorandum at the time. BLM staff only advised BRC staff
    that the designation had been applied to Burning Man each year since 2012. (Benson Decl. ¶ 12.)

25  BLM has declined BRC's repeated requests over the years to provide written documentation of
    the emergency designation and BLM's basis for applying it to Burning Man.  Finally, in early

26  2017, BRC personnel visited BLM's Winnemucca District Office to manually inspect BLM's
    historical Burning Man files, and they uncovered the 2012 memorandum in the course of that

27  review. (*Id.* ¶ 10.)  BRC has not located, and BLM has not provided, any other documents
    addressing the Burning Man emergency designation. (*Id.* ¶ 11.)

28

DOWNEY BRAND LLP

6

APPELLANT'S STATEMENT OF REASONS

1   designation was that it "would allow for lifting the bi-weekly pay cap as authorized by 5 C.F.R.

2   550.106 and the … overtime requirements under 5 C.F.R. 551.211(f), for law enforcement

3   personnel participating in direct support of this event." (Benson Decl., Ex. B.)  As a result, these

4   employees would "be entitled to premium pay under the annual maximum earning limitations

5   while performing the emergency work."  (*Id.*)  Thus, according to the authorizing memorandum,

6   BLM obtained the emergency designation for the sole purpose of securing higher pay for its

7   personnel, the costs of which would be passed on to BRC.

8          BRC understands that BLM continued to apply the "emergency" designation to Burning

9   Man each year, including for the 2016 event, although BLM's labor documentation lacks

10   sufficient detail to confirm the existence of the designation or its effects.  (*Id.* ¶¶ 11-12.)  The data

11   that BLM supplies to BRC about its labor costs each year includes only the total number of hours

12   worked and total pay received by each staff member; it does not indicate whether any overtime or

13   premium pay was received or how much.[4]  (*Id.*, Ex. K, Attachment 2.)

14          Despite all of its concerns with BLM's 2012 expenses, BRC felt it had no choice but to

15   acquiesce to the 2012 final cost decision.  BLM's Winnemucca District Manager, Gene Seidlitz,

16   warned that if BRC appealed the 2012 costs, BLM might not have enough time to both respond to

17   the appeal and process BRC's 2013 SRP, which would have resulted in disastrous financial losses

18   to BRC.  (Allen Decl. ¶ 11.)

19          **2.    In 2013, BLM's Costs More than Doubled from 2012.**

20          Given the substantial increases in 2012, BRC expected BLM's costs would stabilize in

21   2013, and BLM represented to BRC that this would be the case.  (Allen Decl. ¶ 12.)  BRC

22   successfully produced the 2012 event, and BLM's After Action Review identified no significant

23   infrastructural, administrative, health, or safety deficiencies.  (*Id.*)  But in the spring of 2013,

24   BLM advised BRC that its costs for administering the Burning Man SRP would more than double

25   _____

26   [4] BLM does possess more detailed records of the precise number of hours logged and pay
received by each employee according to a variety of "Pay Codes" — including regular time,
27   overtime, premium, and holiday.  It included a spreadsheet with such details for the 2015 event,
titled "YTD Labor Detail," in its Administrative Record for BRC's 2015 Cost Recovery Appeal.
28   (Benson Decl. ¶ 16, Ex. H.)

DOWNEY BRAND LLP

1   that year. (*Id.* ¶ 13.)  BLM's costs ended up totaling over $2.93 million, a 234% increase since

2   2011. (*Id.*)  At the time, BLM represented to BRC that the 2013 increase was due to a one-time

3   upgrade of BLM's infrastructure and personnel for "safety" reasons, including:  a doubling in size

4   of BLM's Incident Command Post; increases in the number of BLM staff and hours; and

5   implementation of a new computer-aided dispatch ("CAD") system. (*Id.* ¶ 14.)  BLM assured

6   BRC that this upgrade would provide data after the event that would justify and explain the costs

7   BLM charged through cost recovery, ultimately reducing those costs and providing BRC with

8   tangible benefits and cost savings for years to come. (*Id.*)

9         BRC reminded BLM that cost recovery guidelines require BLM to provide a reasoned,

10  written explanation for all costs charged to the permittee. (*Id.* ¶ 15.)  In response, Special Agent

11  Love remarkably asserted that these guidelines did not apply to law enforcement, which "costs

12  what it costs." (*Id.*)  District Manager Seidlitz proclaimed that BRC, as a private organization,

13  was not entitled to any explanation of these costs, but nonetheless would need to pay them before

14  BLM would issue the SRP. (*Id.*)  Mr. Seidlitz also informed BRC that BLM's Winnemucca

15  District Office could not function without the money that the Burning Man SRP provides, which

16  BRC understood to mean that the Burning Man SRP was perhaps being used to cover the costs of

17  other BLM programs or general budget shortfalls for his office. (*Id.* ¶ 16.)

18        When BRC was informed of this anticipated increase, the 2013 Burning Man event was

19  just five months away, and BRC had already sold thousands of tickets and incurred significant

20  event production expenses based on BLM's prior assurances that its costs had stabilized. (*Id.* ¶

21  17.)  Due to the lack of time and BLM's unwillingness to negotiate or explain the reasons for the

22  additional cost increases, BRC had no choice but to sign the cost recovery agreement and

23  acquiesce to BLM's unjustified price hike in hope that an adequate explanation would come from

24  BLM after the event. (*Id.* ¶ 19.)[5]  BLM never provided any such explanation.

25  _____

26  [5] BRC actually could not afford to pay the additional $1.5 million that BLM was suddenly and
    unexpectedly requiring.  (Allen Decl. ¶ 18.)  During the March 26 meeting, BRC staff explained

27  that BRC would only be able to finance the cost increase if BLM allowed the event's population
    to increase, enabling BRC to sell more tickets. (*Id.*)  In prior years, BRC had requested

28  permission to increase the event's population so that it could afford to pay BLM's increasing

1481341.2                                    8

AR09974

### 3.     In 2014, BLM's Costs Increased by Another Half-Million Dollars.

In planning for the 2014 Burning Man event, BRC again relied on BLM's assurances that costs would not substantially increase for the foreseeable future, and that the 2012 and 2013 cost increases would facilitate improved service, communications, planning, and data collection. (Allen Decl. ¶ 20.)  This, in turn, would finally enable BLM to provide BRC with an objective assessment of BLM's staffing levels and rising costs, which had never been done in the event's history, to BRC's knowledge.  (*Id.*)  BLM did not, however, furnish BRC with any of the data that it promised and for which it required BRC to pay.  (*Id.*)  Nor did any documented increase in public health and safety result from the more than $1.5 million in additional costs that BLM incurred to administer the SRP in 2013.  (*Id.*)

Then, in January 2014, BLM provided BRC with a cost recovery proposal for the 2014 Burning Man SRP predicting that BLM's costs would increase by another $700,000, to a new high of approximately $3.7 million.  (Barnes Decl. ¶ 8.)  When BRC questioned these additional increases, BLM advised that these estimated operational costs were not subject to reduction.  (*Id.*)  Instead, it offered BRC an opportunity to "save money" by agreeing to a memorandum of understanding ("MOU"), whereby BRC would fulfill certain contracts instead of BLM, and thereby avoid paying the indirect administrative cost rate ("IACR") which BLM applies to all of its direct expenditures charged through cost recovery.  (*Id.*)[6]  Seeking to curb BLM's skyrocketing costs in the only way it apparently could, BRC agreed to the MOU and associated statements of work ("SOWs"), which totaled about $600,000.  (*Id.*)

In 2014, BLM also required BRC to establish two proffer accounts to directly compensate two BLM employees for their alleged year-round work on Burning Man's SRP: a project

---

costs.  (*Id.*)  BLM had always refused to allow Burning Man to grow proportionally, but within minutes of BRC making this same request at the March 26 meeting, BLM approved a substantial population increase to ensure that BRC would agree to BLM's doubling of costs in 2013.  (*Id.*)

[6] BLM had the option of waiving the IACR (*see* 43 C.F.R. § 2932.31(d)(2), 2932.34), and BRC had made several formal requests for a waiver over the years, which BLM denied.  In 2014, BLM effectively agreed to a partial waiver of the IACR for certain contracting costs, but in exchange, BRC gave up its right to challenge the costs through an appeal of BLM's cost recovery decision. (*See, e.g.,* Barnes Decl. ¶ 14.)

AR09975

DOWNEY BRAND LLP

1   manager and an outdoor recreation planner.  (*Id.* ¶ 9.)  BLM presented this as another cost-saving

2   opportunity, both because BRC would avoid paying the IACR on this labor and because BLM

3   would not need to hire seasonal employees for every Burning Man event, thereby ostensibly

4   improving the efficiency of BLM's management of the Burning Man SRP.  (*Id.*)  BRC paid

5   almost $70,000 to fund these two proffer accounts in 2014.  (*Id.*)

6          BLM's costs to administer the 2014 Burning Man SRP — including the amounts paid by

7   BRC through the cost recovery agreement, MOU, and the proffer accounts — totaled more than

8   $3.4 million. (Benson Decl., Ex. L.)  That total was $500,000 more than BLM's total costs in

9   2013, and about $2.5 million more than in 2011.  As with the huge increases in the two previous

10  years, BRC did not receive an adequate justification for the further escalation of BLM's costs in

11  2014. (Barnes Decl. ¶ 10.)

12  **D.     BLM's 2015 Costs Retained the Dramatic Increases from Prior Years, Causing BRC**
13          **to Appeal to This Board for Relief.**

14         The 2015 SRP planning process was impacted by various delays, including those that

15  resulted from BLM's unprecedented request for a luxury "Blue Pit Compound" for its personnel

16  and VIP guests — a request that was met with media exposure, public outcry, and universal

17  criticism. (Benson Decl. ¶ 14.)  Senator Harry Reid pointed out in a letter to Interior Secretary

18  Sally Jewell that such facilities "should be beyond the scope of the permitting requirements."

19  (*Id.*, Ex. E.)  BLM ultimately withdrew the Blue Pit SOW under intense public and political

20  pressure, and both District Manager Seidlitz and Special Agent Love were subsequently

21  reassigned. (*Id.* ¶ 14.)

22         As a result of these delays, BRC did not receive the 2015 cost recovery estimate and

23  agreement until July 24, 2015, just one month before the start of the 2015 event and just days

24  before site work was scheduled to begin.  (Barnes Decl. ¶ 11.)  BLM then pressured BRC to sign

25  the $2.9 million estimate without adequate review and without sufficient documentation, advising

26  that the SRP could not issue until BRC had signed.  (*Id.*)  Included in the estimate were a number

27  of contracts to which BLM had already committed, although BRC had not had the opportunity to

28  review, discuss, or agree to the contracted services or amounts.  (*Id.*)  BRC was again left with no

DOWNEY BRAND LLP

APPELLANT'S STATEMENT OF REASONS

AR09976

1  practical choice but to accept BLM's cost estimate, and hope that BLM would substantiate the

2  basis for the costs reflected within it after the event as BLM had previously promised. (*Id.*)

3  On January 27, 2016, BLM issued its final decision on cost recovery for the 2015 Burning

4  Man SRP, which totaled approximately $2.8 million.[7] (*Id.* ¶ 12.) Despite BLM's obligations

5  under cost recovery guidelines, and BRC's requests for information sufficient to understand the

6  basis for BLM's resource requirements and cost determinations, the final decision contained

7  insufficient explanatory information. BRC exercised its right to appeal that decision, and its

8  appeal is now pending before the Board. (Case No. IBLA 2016-115.)

9  **E.    A Federal Investigation Revealed Ethical Violations by BLM's Law Enforcement**
   **Supervisor at the 2015 Burning Man Event.**

10

11  On January 30, 2017, several months after BRC and BLM had submitted their briefing

12  with respect to BRC's 2015 Cost Recovery Appeal, the Office of the Inspector General ("OIG")

13  for the U.S. Department of the Interior released a public, redacted version of a report entitled

14  "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management

15  Officials" (the "Ethics Report"). (Allen Decl. ¶ 21, Ex. C.) The Ethics Report details the OIG's

16  investigation of anonymous complaints concerning a Supervisory Agent for BLM's Office of

17  Law Enforcement and Security ("OLES") in Salt Lake City, Utah. (*Id.*, Ex. C.) Although the

18  agent is not named in the public version of the Ethics Report, a letter from the Chair of the U.S.

19  House Oversight and Reform Committee to the OIG, dated February 14, 2017, explained that the

20  Committee received an unredacted version, and confirmed that the agent under investigation was

21  Special Agent Dan Love. (*Id.* ¶ 22, Ex. D.) The letter expresses the Committee's grave concerns

22  with reports that Agent Love tampered with email evidence in the investigation, attempted to

23  influence investigation witness testimony, and directed another employee to destroy hundreds of

24  federal records "only to receive a congressional request for those same documents the very next

25  day." (*Id.*, Ex. D at 1-2.) The Committee requested that the OIG investigate these allegations due

26

27  [7] Including the amounts paid for the SOWs and the proffer account funding BLM's Burning Man
   Project Manager, BRC paid a total of more than $3.5 million for costs incurred by BLM to

28  administer the 2015 Burning Man SRP. (Barnes Decl. ¶ 12.)

DOWNEY BRAND LLP

1    to their potential to "seriously undermine the trust in BLM's law enforcement office and thwart

2    congressional oversight of the Bureau." (*Id.* at 2-3.)  BRC does not know whether any of the

3    allegedly destroyed documents were relevant to BRC's pending 2015 Cost Recovery Appeal, or

4    relevant to BLM practices that were carried into 2016 – and therefore relevant to the instant

5    appeal.

6            A significant portion of the Ethics Report details violations of federal ethics and

7    procurement rules stemming from Agent Love's misuse of BLM resources at the 2015 Burning

8    Man event.  (*Id.*, Ex. C.)  For example, Agent Love used on-duty BLM law enforcement

9    personnel and official vehicles to provide a several-hour tour of Burning Man for his girlfriend

10   and family, the OLES Director, and a former Director.  (*Id.* at 6.)  These labor and resource costs

11   were incurred for time spent "[driving] around the playa looking at the art," and visiting a theme

12   camp "where several thousand people gathered to listen to and provide music."  (*Id.*)  Although

13   these activities bore no relation to BLM's management of BRC's SRP, the associated labor costs

14   of on-duty staff were charged to BRC through cost recovery.  The Ethics Report also found that

15   Special Agent Love engaged in personal and non-work activities during days where he claimed

16   24 hours of official work time, time that would have been included in BLM's 2015 cost recovery

17   labor log.  (*Id.* at 5.)  In addition, the investigators note that Agent Love "displayed a lack of

18   candor when interviewed and tried to influence an employee's comments prior to an interview,"

19   and the investigation revealed that several employees feared that Agent Love would retaliate

20   against them because of information they provided in connection with the investigation.  (*Id.* at 2,

21   8, 11, 14.)

22           Because the report confirmed BLM misconduct associated with the 2015 Burning Man

23   event, and the misconduct was related to the issues at stake in the 2015 Cost Recovery Appeal,

24   BRC filed a request with the Board to have the Ethics Report included in the record of that

25   proceeding.  (*Id.* ¶ 23.)  On March 31, 2017, the Board accepted BRC's request, and BRC hopes

26   that at least any costs it paid in 2015 as a result of Love's ethical violations will be separated out

27   and ultimately refunded.  (*Id.*)

28

APPELLANT'S STATEMENT OF REASONS

DOWNEY BRAND LLP

AR09978

F.   **While the SRP Process Improved in 2016, BLM's Costs Remained Inflated by Requirements Imposed by Prior BLM Leadership.**

The 2016 SRP planning process went smoother than it ever had, with improved collaboration and communication between BRC and BLM. (Benson Decl. ¶ 18.)  BLM agreed to let BRC manage its environmental compliance program, reducing BLM's costs (although increasing BRC's own costs), and both parties deemed the program a success. (Barnes Decl. ¶ 13.)  Certain BLM costs that BRC had questioned in its 2015 Cost Recovery Appeal were reduced or eliminated in 2016, perhaps due at least in part to the concerns raised by BRC in the appeal. (*Id.* ¶ 14.)  BRC accepted BLM's offer to take on three additional contracts in 2016 that had previously been managed by BLM, thereby enabling BRC to avoid paying BLM's indirect administrative cost rate on these contract costs.[8] (*Id.*)  BLM did not, however, reduce various programs and costs that were initially escalated without justification under the prior leadership of Special Agent Love and District Manager Seidlitz, including the expenditures on labor, Joint Operations Center ("JOC") support and infrastructure, and communications and IT service and equipment that are the subject of the instant appeal.

BRC produced yet another safe and successful Burning Man event from Sunday, August 28, through Monday, September 5, 2016. (*Id.* ¶ 15.)  BLM advised that BRC was in compliance with the 2016 SRP and Special Stipulations on December 15, 2016, and that it passed BLM's environmental inspection on December 22, 2016. (*Id.*)

On January 30, 2017, BLM issued its 2016 Cost Recovery Decision. (Benson Decl., Ex. K.)  BLM's direct and indirect costs totaled $2,166,127.41, representing a reduction of approximately $627,595 from 2015. (*Id.*)  However, after factoring in the BLM contracts and personnel for which BRC paid directly, BLM's total costs in 2016 were $3,286,621, or only $257,771 less than 2015. (*Id.*)  This figure also does not include the additional costs BRC incurred by taking on management of the environmental compliance program.  BRC appreciates that BLM trimmed its costs, but expects that far greater cost reductions would result if BLM

---

[8] In exchange, as noted above, BRC lost the right to appeal those contract costs in this appeal of BLM's 2016 Cost Recovery Decision. (Barnes Decl. ¶ 14.)

AR09979

DOWNEY BRAND LLP

1   revisited the decisions made by its prior leadership about the extent of its operations at the

2   Burning Man event.

3       BLM's 2016 Cost Recovery Decision again provided less information than BRC is legally

4   entitled to receive.  As in 2015, the Decision consisted of a cover letter and six spreadsheets,

5   along with copies of the contracts, SOWs, and receipts for the equipment and supplies.  (*Id.*, Ex.

6   K.)  The spreadsheets consisted of a one-page "Cost Recovery Close Out Summary" and one

7   spreadsheet each listing BLM's expenditures on labor, travel, contracts, vehicle utilization, and

8   miscellaneous supplies and equipment.  (*Id.*)  BLM's nearly $1.38 million in direct labor costs

9   and more than $40,000 in travel costs were summarized in two tables, which provided only

10  summary information regarding the costs incurred.  (*Id.*, Attachments 2, 4.)

11      On March 2, 2017, BRC timely filed its Notice of Appeal of BLM's 2016 Cost Recovery

12  Decision to this Board.

13                        **III.    LEGAL STANDARD**

14      BLM issues SRPs under the general authority of the Secretary of the Interior to administer

15  use of public lands under section 302(b) of the Federal Land Policy and Management Act

16  ("FLPMA").  *James R. Stacy*, IBLA 2014-216, 188 IBLA 134, 137 (2016).  Under section

17  304(b), the agency is permitted to require a deposit of any payments intended to reimburse the

18  agency for "reasonable costs" with respect to applications and other documents relating to the

19  public lands.  43 U.S.C. § 1734(b).

20      The FLPMA defines "reasonable costs" to include "the costs of special studies;

21  environmental impact statements; monitoring construction, operation, maintenance, and

22  termination of any authorized facility; or other special activities."  *Id.*  The determination of

23  whether a cost is reasonable "may take into consideration actual costs (exclusive of management

24  overhead), the monetary value of the rights or privileges sought by the applicant, the efficiency to

25  the government processing involved, that portion of the cost incurred for the benefit of the

26  general public interest rather than for the exclusive benefit of the applicant, the public service

27  provided, and other factors relevant to determining the reasonableness of the costs."  *Id.*  Thus, a

28  given cost is not reasonable simply because it is incurred by BLM in connection with an

AR09980

*(left margin)* DOWNEY BRAND LLP

1   application for an SRP; rather, the agency must conduct an assessment of the cost and conclude

2   that the cost is required and does not exceed the amount authorized by applicable law and

3   regulation. *Id.*; *see also* 43 U.S.C. § 1734(c) (providing for refunds of any payments relating to

4   the use of public lands that are found to be unnecessary or excessive).

5        To ensure that BLM is charging only its reasonable costs for administering the 2016

6   Burning Man SRP, BLM must provide an explanation that has a rational basis and is "supported

7   by the facts of record demonstrating that [BLM's] action is not arbitrary, capricious, or an abuse

8   of discretion" under the law. *Michael Voegele*, 174 IBLA 318; *see also Bookcliff Rattlers*

9   *Motorcycle Club*, 171 IBLA 13. The Board has previously confirmed that in cases of SRP cost

10   recovery, BLM cannot rely solely on spreadsheets to meet its obligation of providing a reasoned

11   and factual explanation of costs. Instead, "[w]here BLM makes use of computer spreadsheets to

12   accumulate data upon which a cost [recovery decision] for an SRP is based, it must reveal

13   underlying data sufficient for the applicant being charged to ascertain the justification for its

14   conclusions; otherwise, the applicant has no basis upon which to understand and accept the

15   decision or, in the alternative, to appeal and dispute it." *Bookcliff Rattlers*, 171 IBLA 21.

16        The fact that BLM's fee calculations may derive from internal documentation such as an

17   instruction memorandum does not mean they are entitled to greater deference. The Board must

18   examine BLM's cost determinations for reasonableness. *See Mark Patrick Heath*, IBLA 2010-

19   34, 181 IBLA 137 (2011). The burden of proof is on the appellant to demonstrate that BLM

20   failed to meet these requirements. *See Michael Voegele*, 174 IBLA 323.

21              **IV.    ARGUMENT**

22   **A.**    **BLM Has Not Met Its Obligation Under Cost Recovery Guidelines To Sufficiently**

23        **Explain Its Costs For The 2016 Burning Man SRP.**

24        BLM has provided insufficient information to explain the nearly $2.2 million that it

25   charged to BRC through cost recovery in connection with the 2016 Burning Man SRP. Based on

26   the limited data provided, it is not reasonably possible for BRC — or anyone else — to ascertain

27   BLM's justification for charging these costs to BRC.

28        BLM's failure to comply with its cost recovery obligations is particularly notable with

*DOWNEY BRAND LLP*

DOWNEY BRAND LLP

1   respect to its labor costs, which account for nearly two-thirds of BLM's total expenditures, and

2   for which the only documentation furnished to BRC was a seven-page spreadsheet called "Cost

3   Recovery Project Log." (Benson Decl., Ex. K, Attachment 2.)  While the log is slightly improved

4   over 2015, for each of the 109 employees listed, BLM listed only the last name, title, a few short

5   phrases summarizing general duties (10-15 words per person, versus the 3-5 word descriptions

6   provided in 2015), range of dates in which the work was performed, total number of hours

7   worked, and total pay received.  (*Id.*)  Missing from the spreadsheet are critical details like the

8   pay level of these employees; whether they received overtime or premium pay for their work, and

9   if so, how much; and what portion of their pay resulted from the inappropriate "emergency"

10   designation of the Burning Man event.  To ensure that the permittee is not charged unreasonably

11   high costs for labor, BLM should use the lowest pay level required for each position that it staffs

12   in connection with the SRP, and it should minimize premium pay and overtime.  *See* 43 U.S.C. §

13   1734(a), (b); *Bookcliff Rattlers*, 171 IBLA at 21.  BLM has provided no documentation showing

14   that it engaged in this exercise for each of its 109 employees utilized with respect to the Burning

15   Man SRP.

16       Even more significant, BLM fails to provide detail about the tasks these employees

17   performed and when they were performed, thereby precluding a meaningful assessment of

18   whether these tasks were reasonable for the Burning Man SRP and whether the associated costs

19   were reasonable, such that they can be charged to BRC through cost recovery.  BLM surely

20   possesses this data and used it to derive this summary project log, as BLM presumably tracks the

21   specific time each employee spends working on Burning Man for its own internal purposes.

22   Indeed, the Administrative Record that BLM supplied in connection with BRC's 2015 Cost

23   Recovery Appeal provided more detailed information about BLM labor costs:  a spreadsheet that

24   at least included a breakdown of various types of pay received by each employee, although BLM

25   still neglected to provide the requisite detail about what these employees were doing during their

26   shifts, or why the work was necessary.  (Benson Decl., Ex. H.)  Despite possessing more detailed

27   pay records, BLM again in 2016 chose to provide only a summary table, leaving BRC to guess at

28   BLM's justification for more than $1.4 million in labor costs.

1    Moreover, the OIG's Ethics Report confirms that BLM maintains detailed time records in

2    which staff record the number of on-duty hours they are claiming for each calendar day. After all,

3    investigators apparently reviewed such records in confirming that Special Agent Love had

4    recorded on-duty hours for time during which he was not working at the 2015 Burning Man

5    event. (Allen Decl., Ex. C at 5.) It should be a simple matter for BLM to provide such

6    information for all BLM staff working the 2016 event to BRC and this Board, and BLM had an

7    obligation to do so. *See Bookcliff Rattlers*, 171 IBLA 21.

8    BLM's "Travel Per Person" spreadsheet is equally deficient, summarizing more than

9    $40,000 in costs with the identical generic statement for each of the 93 individuals listed, whether

10   they are claiming more than a thousand dollars of expenses or under a hundred dollars: "Travel

11   for related assigned duties at Burning Man event." (Benson Decl., Ex. K, Attachment 4.) This

12   statement simply does not make it possible for BRC to comprehend BLM's justification for

13   charging these costs, or to determine whether these are reasonable costs. Notably, in its 2015

14   Cost Recovery Appeal, *BRC argued against certain specific travel expenses based on the*

15   *description of the travel indicated.* (Benson Decl., ¶ 15, Ex. F.) BLM has apparently decided to

16   frustrate any anticipated efforts by BRC to challenge 2016 travel costs in the same manner by

17   simply copying and pasting the same vague phrase for each travel entry. BLM's transparent

18   effort to withhold material information in order to frustrate BRC's appeal — and oversight by this

19   Board — underscores the agency's failure to provide sufficient information to support its costs.

20   BRC expects that if BLM personnel had to seek reimbursement for such costs from BLM itself,

21   these personnel would not be able to do so simply by providing a total amount spent and a generic

22   reference to "travel." BRC simply asks for the same information that BLM would itself require to

23   support a claim for reimbursement.[9] Again, BLM's decision to withhold this information does not

24   satisfy its legal obligations. *See Bookcliff Rattlers*, 171 IBLA 21.

[9] Indeed, BLM has prepared more detailed travel logs in the past. In its administrative record for BRC's 2015 Cost Recovery Appeal, BLM included a travel spreadsheet for the 2012 Burning Man event that itemized all of the claimed travel expenses of each employee. (Benson Decl., Ex. I.) It was during the leadership of Special Agent Love and District Manager Seidlitz that BLM's travel expenditures increased, and its explanations of this travel became obscured.

DOWNEY BRAND LLP

1481341.2

17

AR09983

1   BLM's failure to provide the necessary detail in these and other areas is difficult to see as

2   inadvertent, given that BRC repeatedly reminded BLM of its cost recovery obligations in its

3   communications leading up to and following the 2016 Burning Man Event, and even filed an

4   appeal of BLM's 2015 cost recovery decision citing the same deficiencies.  Unfortunately, BLM

5   decided to provide essentially the same deficient level of detail in 2016 as it did in 2015.

6   Absent the requisite reasoned and factual explanation of the costs attributable to BLM's

7   administration of the SRP for the 2016 Burning Man event, the Board must conclude that the

8   allocation of these costs to BRC was arbitrary and capricious.  *See Bookcliff Rattlers*, 171 IBLA

9   21.  Since BLM has not provided the data necessary to justify its cost recovery conclusions in the

10  2016 Cost Recovery Decision, BRC respectfully requests that the Board refund the full amount it

11  paid.

12  **B.      Based on the Available Information, A Number Of BLM's Costs For The 2016**
13  **Burning Man SRP Were Improperly Charged To BRC.**

14  Should the Board find that a full refund is not appropriate, BRC asks for a refund of each

15  of the specific improper charges set forth below.  BRC further asks that the Board remand the

16  2016 Cost Recovery Decision and require BLM to provide the information necessary for BRC to

17  evaluate the reasonableness of all costs charged, including documentation sufficient to show that

18  the activities carried out by each member of BLM's Burning Man staff were reasonable in

19  relation to the 2016 Burning Man SRP.

20  **1.      Many of BLM's Labor Costs Were Unjustified and Unreasonable.**

21  For the 2011 Burning Man SRP, BLM charged BRC just over $500,000 in labor costs.

22  (Benson Decl., Ex. L.)  In 2016, BLM's labor costs totaled $1.42 million, an increase of 171% in

23  just five years.[10]  (*Id.*, Ex. K, Attachment 2.)  Burning Man's peak population increased by just

24  40% in this same time period.  (*Id.*, Ex. L.)  BLM has not provided BRC with evidence of any

25  public safety or environmental compliance issues that would have warranted this disproportionate

26  _____

27  [10] This total includes $1,381,718.17 for the labor of BLM law enforcement and civilian personnel
    and another $37,938.35 to hire additional law enforcement personnel from the U.S. Forest

28  Service.

AR09984

DOWNEY BRAND LLP

1  increase in its costs, or any evidence that public safety or environmental compliance has been

2  improved in any substantial, meaningful way as a result.

3        Absent such evidence, BRC is concerned that it is paying for BLM's inefficient use of

4  labor, including employing an excessive number of law enforcement officers and other personnel

5  and assigning them duties that are superfluous, unnecessary, or beyond the scope of what BLM is

6  authorized to charge through cost recovery.  BLM's unjustified decision to double its labor costs

7  in 2013 appears to have established a new baseline that far exceeds what is reasonable or legally

8  appropriate for the Burning Man SRP.

9        Notwithstanding BRC's requests and BLM's obligations under cost recovery regulations,

10  BLM has failed to provide adequate detail to substantiate its labor costs.  As discussed above,

11  BLM's only documentation of its labor expenditures for the 2016 Burning Man SRP was a seven-

12  page Project Labor Log spreadsheet that lists minimal information about the duties performed and

13  hours worked by BLM staff members assigned to the Burning Man SRP.  (*Id.*, Ex. K, Attachment

14  2.)  The scant information in this spreadsheet does not suffice under cost recovery guidelines to

15  show the reasonableness of BLM's $1.4 million in labor costs.  *See* 43 U.S.C. § 1734(b);

16  *Bookcliff Rattlers*, 171 IBLA 21.

17        BRC has never contended that it is unnecessary for BLM to staff the Burning Man event

18  in order to properly administer the SRP.  To the contrary, BRC could not produce Burning Man

19  without BLM's collaboration, and BRC understands that some BLM staff and certain duties are

20  integral to the event's safety and success.  Yet in 2016, as in prior years, BLM has failed to

21  provide the "reasoned and factual explanation" of its labor costs to which BRC is entitled.  *See*

22  *Bookcliff Rattlers*, 171 IBLA 21.  Based on the limited information provided by BLM, BRC

23  submits that many of BLM's labor costs were unjustified and unreasonably high, as described in

24  more detail below, and were therefore improperly charged to BRC through cost recovery.

25            a.    BRC Should Not Be Charged Costs Associated with BLM's Unjustified
26                 Designation of Burning Man as an "Emergency."

27        As discussed above, BRC understands that 2012 was the first year BLM applied an

28  emergency designation to the Burning Man SRP under federal labor regulations.  (Allen Decl. ¶

DOWNEY BRAND LLP

1481341.2

19

AR09985

1    8; *see also* Section II.C.1.)  At the time, BLM gave BRC no explanation for this decision, except

2    to note that it would facilitate the assignment of BLM officers from other regions to the Burning

3    Man SRP, even though BLM had never documented a problem getting officers.  (Allen Decl. ¶

4    8.)  Earlier this year, BRC finally obtained a copy of the 2012 BLM memorandum requesting the

5    designation, and the only stated reason was that it would enable BLM staff to be paid more for

6    their time working at Burning Man.  (Benson Decl., Ex. B.)

7            Under the regulations cited by the 2012 memorandum, the emergency designation cannot

8    properly be applied to the Burning Man SRP or Burning Man.  In 5 C.F.R. § 550.103,

9    "emergency" is defined as "a temporary condition posing a direct threat to human life or property,

10   including a forest wildfire emergency."  The regulation also confirms that an emergency

11   declaration must be made only by the agency head, and only "after the work in connection with

12   the emergency or its aftermath begins."  5 C.F.R. § 550.106(a)(2).  First, BLM's 2012

13   memorandum is dated a few weeks before the Burning Man event started, despite the fact that the

14   language of the regulation is unequivocal that the designation cannot be applied preemptively: An

15   emergency only exists when a direct threat is occurring or has already occurred.  *Id*.  No language

16   supports BLM's apparent conclusion that the mere possibility of an emergency taking place is

17   sufficient to invoke this designation before — or regardless of whether — an emergency actually

18   happens.  Second, and just as important, BLM's 2012 memorandum misrepresents the text of the

19   regulations, referring to an "emergency special event" designation, when in fact the regulations

20   use only the term "emergency."  This further confirms that the emergency designation is not

21   intended to be applied to pre-planned special events like Burning Man.

22           Far from "posing a direct threat to human life or property," like a wildfire or natural

23   disaster, Burning Man is a recreational event that is carefully planned for months (and in some

24   respects, years[11]) in advance, as a collaborative effort among BRC, BLM, and all cooperating

25   agencies.  (Allen Decl. ¶ 9.)  In more than 25 years in the Black Rock Desert, Burning Man has

26   

27   [11] BRC and BLM work together on environmental assessments many years in advance of the
     annual SRPs.  Currently BRC and BLM are jointly working on an environmental impact

28   statement and planning for the next ten years of Burning Man events.  (Barnes Decl. ¶ 7.)

1481341.2                                          20

AR09986

DOWNEY BRAND LLP

1   no history of "emergencies" as defined under applicable law. (*Id.*)  The playa on which the event

2   is staged is a flat, dry lakebed covering about 200 square miles, hardly posing a risk of a fire

3   emergency or other natural disaster. (*Id.*)  BRC is aware of no other recreational activities

4   permitted by the BLM that receive this "emergency" designation, including major off-highway

5   vehicle races and campouts attended by thousands of people. (*Id.* ¶ 10.)

6          BLM has no credible justification for determining that Burning Man poses so

7   extraordinary a risk to the public that BLM can appropriately deem the event an emergency on a

8   preemptive basis year after year.  The emergency designation is yet another unjustified vestige of

9   the era in which the Burning Man SRP was managed by Special Agent Love and District

10  Manager Seidlitz.  BLM's arbitrary designation of any Burning Man SRP as an "emergency," and

11  the charges to BRC for the resulting unwarranted increase in BLM labor costs, violate BLM's

12  obligation to charge BRC only for reasonable costs.[12]

13         Due to BLM's failure to provide sufficient documentation of its labor costs, BRC can only

14  rely on the statements of BLM's staff that the emergency designation was applied to every

15  Burning Man event after 2012, including the 2016 event.  (Benson Decl. ¶ 12.)  If the designation

16  was applied in 2016, BRC requests that the Board require BLM to document which of its 2016

17  labor costs constituted premium pay that resulted from the unlawful emergency designation.

18  BLM certainly possesses this information, as it was needed to calculate the wage payments owed

19  to BLM personnel.  All such costs must then be excluded from the cost recovery total and the

20  associated amounts refunded to BRC.

21         b.      BLM Has Not Justified its Law Enforcement Officer Staffing Levels.

22         In 2012, the number of BLM law enforcement officers working at the Burning Man event

23  _____

[12] BRC recently learned that BLM did not request an "emergency" designation for the Burning
24  Man 2017 event, following BRC's challenge of the designation in its 2015 Cost Recovery
    Appeal.  (Benson Decl. ¶ 13.)  Instead, BLM has decided that it can achieve the same goal of
25  securing premium pay for its personnel by designating their work in support of the 2017 Burning
    Man Event to be "mission critical work."  (*Id.*, Ex. D.)  As with its "emergency" designation
26  memorandum in 2012, BLM's "mission critical work" designation memorandum fails to provide
    any justification for requesting the designation.  And regardless of the designation selected by
27  BLM for 2017, BLM's decision to designate the 2016 Burning Man event as an "emergency" was
28  improper under federal law.

DOWNEY BRAND LLP

1   jumped by 37%, while Burning Man's participant population grew by just 4%.  (Allen Decl. ¶ 6.)

2   BLM failed to adequately justify its outsized increases in law enforcement staffing and the

3   resulting costs, which continued to rise in subsequent years.  (*Id.* ¶ 7.)  In 2016, BLM charged

4   BRC approximately $1.1 million for law enforcement labor — 78% of BLM's total labor

5   expenditures.  (Benson Decl., Ex. K, Attachments 1, 3.)

6        BLM has never provided BRC with documentation sufficient to show that a particular

7   number of federal law enforcement officers or a particular level of staffing is reasonably

8   necessary for the Burning Man event.  (Allen Decl. ¶ 24.)  Indeed, to BRC's knowledge, BLM

9   has never conducted an objective assessment of the number of law enforcement officers needed to

10   ensure a reasonable level of public health and safety at the event.  (*Id.* ¶ 25.)  Instead, the

11   unjustified staffing and cost increases that were orchestrated by past BLM law enforcement

12   leadership appear to have become entrenched in BLM's planning for the Burning Man event.  As

13   explained above, Special Agent Love's unjustified demands of BRC escalated until 2015, when

14   he sought a VIP compound at the event and was the subject of both an ethics investigation into

15   his conduct that year and a subsequent congressional inquiry into allegations that he had

16   intimidated witnesses and destroyed evidence in connection with that investigation.  (Allen Decl.

17   Ex. C; Benson Decl. Ex. E.)  Although Agent Love was reassigned in 2015 and not directly

18   involved with the 2016 Burning Man SRP, his prior behavior calls into question any of his

19   decisions and demands with respect to prior SRPs that have been carried into the present,

20   including the astronomical and unjustified increases in BLM's law enforcement costs.  BRC

21   should not continue to be required to pay these labor costs unless and until an objective

22   assessment, aligned with cost recovery regulations, determines that BLM's law enforcement

23   staffing model is truly justified for the Burning Man event.

24        The need for such an assessment is further underscored by the statistical information

25   available to BRC, which indicates that BLM's law enforcement staffing over the last several

26   years far exceeded what was reasonably required.  According to the 2016 data provided by BLM,

27   the number one "law enforcement event" by type was "public contacts," which totaled more than

28   6,900 and constituted 76% of the total number of law enforcement events in 2016.  (Declaration

DOWNEY BRAND LLP

1    of Roger Vind ("Vind Decl."), Ex. A.)  This report count was up 4,056% from a total of 166 in

2    2014, and 332% from 1,595 in 2015.  (*Id.*)  It is BRC's understanding that BLM law enforcement

3    record a public contact every time they communicate with a Burning Man participant, even if

4    they are just handing out marketing bracelets at the substation or exchanging greetings with

5    participants as they drive by on the playa.  (*Id.* ¶ 5.)

6        While BRC appreciates a friendly and helpful police force, none of these activities — and

7    certainly not the recording or reporting of these activities — are reasonably necessary to the

8    administration of BRC's permit.  Initially, the fact that law enforcement had time to engage in

9    these activities indicates that BLM is overstaffing the event.  (Vind Decl. ¶ 6.) Moreover, these

10   activities are entirely discretionary, unnecessary, and duplicative of the extensive infrastructure

11   and support services that BRC already provides through its thousands of volunteers and

12   employees.  BRC should not be charged for BLM law enforcement time spent on these public

13   contacts or time spent logging such efforts for BLM public relations or staffing justification

14   purposes.[13]

15       Meanwhile, nearly every other category of BLM law enforcement event decreased in 2016

16   as compared to the previous year, including public assists (down to 213 from 1,474), verbal

17   warnings (down to 317 from 548), written warnings (down to 45 from 211), citations (down to

18   326 from 534), and resource compliance checks (down to 20 from 118).  (Vind Decl., Ex. A.)

19   The only other event category that rose in 2016 was "traffic stops," which increased from 860 in

20   2014 and 899 in 2015 to 1,254 in 2016.  (*Id.*)  However, BLM's data show that for more than

21   1,200 traffic stops, they issued only 145 motor vehicle-related citations, including 53 for minor

22   vehicle infractions, such as not having operational brake lights, a visible license plate, or a valid

23   registration or insurance (some of which are not even required in all states).  (*Id.*)  These kinds of

24   offenses hardly pose a serious threat to public safety, and the roads of Black Rock City are

25

26   ───────────────
     [13] Because BLM has not provided adequate information, BRC is also unclear as to how the
27   recording and reporting of these public contacts might increase BLM's expenditures for other
     SRP categories, such as CAD servers, dispatcher workload, satellite tracking air time, LAN
28   requirements, report writing time, computers and printer needed, or bandwidth used.

DOWNEY BRAND LLP

1481341.2                              23

AR09989

1   exceedingly, if not incomparably, safe.  BRC sets the motor vehicle driving and speed restrictions

2   for participants and staff inside the Burning Man Closure Order area, and they are very low: 10

3   miles per hour on Gate Road, which BRC uses for event ingress and egress off of County Road

4   34, and 5 miles per hour within the City.  (Benson Decl. ¶ 22.)  Only authorized staff, disabled,

5   and mutant vehicles are operated inside the City; participants are not otherwise permitted to drive,

6   except to and from their campsites upon arrival and departure, and the vast majority of

7   participants travel the City on foot or by bicycle.  (*Id.*)  Vehicle accidents of any kind are

8   exceedingly rare, and vehicle collisions and accidents causing injury are rarer still.  (*Id.*)  Yet

9   BLM continues to devote a tremendous amount of law enforcement labor, and BRC's money, to

10   conducting "traffic stops" each year.  These activities are unreasonable in light of BRC's safety

11   record, as well as the presence of dozens of deputies from the Pershing County Sheriff's Office

12   ("PCSO"), who have primary responsibility for enforcing state traffic laws at the event.  (Vind

13   Decl. ¶ 7.)

14        Furthermore, the incidence of criminal activity at the Burning Man event is remarkably

15   low, and the nature of that activity overwhelmingly minor, as shown by comparisons with the

16   crime statistics for Nevada overall.  For example, in 2015, a violent crime took place in Nevada

17   every 26 minutes, including a murder every 2 days, a rape every 5 hours, and an aggravated

18   assault every 44 minutes.  (*Id.*, Ex. C at 37.)  By contrast, the historical data for Burning Man

19   show a per-event average of about six arrests for assaults of any kind, no more than one per-event

20   for sexual assault, and just two arrests in the past ten years for assault with a deadly weapon.

21   (Benson Decl. ¶¶ 23-24, Ex. M.)  Year after year, the overwhelming number of criminal citations

22   and arrests at Burning Man relate to the simple possession of small amounts of controlled

23   substances and other non-violent offenses.  (Vind Decl., Exs. A, B.)

24        BLM turns over most of the drug possession cases to PCSO, with whom BRC separately

25   contracts for the enforcement of state laws at the event, and PCSO's own statistics likewise show

26   that serious crimes of any type are uncommon at Burning Man.  (*Id.* ¶ 7.)  In 2016, PCSO issued

27   152 citations in connection with the Burning Man event, almost all of which were for possession

28   of less than one ounce of marijuana (42%) or for possession of small quantities of "drugs which

DOWNEY BRAND LLP

APPELLANT'S STATEMENT OF REASONS

AR09990

1  may not be introduced into interstate commerce." (Vind Decl., Ex. B.)  Both of these offenses are

2  misdemeanors.

3       For its part, BLM cited 82 Burning Man participants for possession of a controlled

4  substance, three for possession of drug paraphernalia, and one for driving under the influence —

5  over the course of more than a week at an event attended by nearly 70,000 participants, and at a

6  total cost to BRC of more than a million dollars for the labor alone.  (Vind Decl., Ex. A.)  This

7  included approximately $117,000 for the labor associated with the K-9 units that BLM used to

8  detect illicit substances, principally during its hundreds of traffic stops on Gate Road.  (Benson

9  Decl., Ex. K, Attachment 2.)  BLM has provided no justification for spending so much on this

10 optional law enforcement tool, particularly since PCSO is the primary enforcer of controlled

11 substance laws at the event.  (Vind Decl. ¶¶ 7, 11.)  And as in the last several years, virtually

12 every BLM citation issued for these drug-related offenses was either dismissed or reduced to a

13 much lesser charge, like lack of working taillights, if the participant challenged the citation in

14 court.  (Allen Decl. ¶ 27.)  It is unreasonable for BLM to require BRC to fund its massive law

15 enforcement operation year after year, when the data continue to demonstrate a lack of serious

16 criminal activity of any kind at Burning Man.  (Vind Decl. ¶ 12.)  This is particularly true given

17 that BRC engages thousands of professional staff, volunteers, and contractors to provide health,

18 safety, and community services, a significant force multiplier for which BLM has not adequately

19 accounted in its staffing models.  (*Id.* ¶ 13; *see also* Benson Decl. ¶ 8.)

20      Finally, BLM charged BRC more than $7,200 for 70 hours of labor by the chief of BLM's

21 OLES Office of Professional Responsibility.  (Benson Decl., Ex. K, Attachment 2 at 3.)  The

22 apparent purpose of this individual was to conduct onsite internal affairs investigations and

23 liability assessments related to the conduct of BLM law enforcement personnel, such as

24 allegations of improper use of force or violations of federal ethics laws.  (Vind Decl. ¶ 8; *see also*

25 Allen Decl., Ex. C.)  It is not reasonable for BLM to charge BRC for costs related to the internal

26 investigation and discipline of BLM staff, or the agency's work in anticipation of potential third-

27 party misconduct claims.

28      Given the public safety and crime statistics at Burning Man, BLM's determination that the

DOWNEY BRAND LLP

1481341.2

25

1   event requires more than a million dollars' worth of law enforcement labor has no rational basis.

2   Inflated law enforcement costs are not reasonable costs, and they should not be imposed on BRC

3   through cost recovery.  BRC therefore requests that the Board require BLM to provide

4   documentation sufficient to show that its 2016 law enforcement labor costs were appropriate for

5   the Burning Man event, and order a refund to BRC of any such costs not shown to be reasonable.

6              c.      BRC Should Not Be Required to Pay Any Labor Costs Associated with
                       BLM Community Relations or Public Outreach Efforts.
7

8          The 2016 Cost Recovery Decision includes a number of costs that are not related to the

9   administration of BRC's permit, but rather to BLM's separate interest in public relations activities

10  directed towards attendees of the Burning Man event.  For example, BLM charged BRC

11  approximately $2,400 dollars for junior ranger badges and law enforcement wristbands, and an

12  unknown amount for an unknown number of hours of patrol officer time as they handed out these

13  materials to Burning Man participants, and otherwise engaged in public outreach efforts on behalf

14  of their employer.  (Benson Decl., Ex. K, Attachments 2, 6.)  BLM also staffed its law

15  enforcement substation near the center of the City with at least one officer at all times.  (*Id.*, Ex. J

16  at 18.)  BLM explained in its 2016 AAR that this "allowed BLM law enforcement the opportunity

17  to informally engage with participants" (*id.*), but made no showing that these activities had any

18  effect on public safety at Burning Man, or were even intended to, or that their costs were

19  reasonable to the administration of BRC's permit.  BRC understands that BLM law enforcement

20  officers spend two hours of every shift at the event staffing BLM's law enforcement substation.

21  (Vind Decl. ¶ 6.)

22         While BRC does not object to BLM handing out promotional gift items or informally

23  engaging with Burning Man participants, these public relations activities serve no essential

24  purpose related to the administration of the SRP.  From the limited information provided by BLM

25  on its Project Labor Log spreadsheet, BRC cannot ascertain how many of the recorded hours

26  were spent performing these functions.  (Benson Decl., Ex. K, Attachment 2.)  BRC therefore

27  requests that the Board require BLM to provide an accounting of law enforcement time and

28  require BLM to refund to BRC any labor charges that are associated with BLM public relations

DOWNEY BRAND LLP

1481341.2

26

AR09992

1   activities.

2      BRC is concerned that BLM is engaging in public relations efforts in order to justify the

3   presence of so many law enforcement personnel on site — and also to justify charging their time

4   to BRC.  As noted above, more than three-quarters of BLM's recorded law enforcement events

5   were "public contacts," indicating that these officers had excess time on their hands and that their

6   numbers unreasonably exceeded what was necessary to ensure public health and safety at Burning

7   Man.  (Vind Decl. ¶ 5, Ex. A.)  Even if these law enforcement personnel did provide directions

8   and engage in other community service activities, these activities were entirely discretionary,

9   unnecessary, and duplicative of the extensive infrastructure and support services that BRC

10  already provides through its thousands of volunteers and employees.  (Benson Decl. ¶ 8.)  It is

11  also not unreasonable to think that Burning Man participants can fend for themselves and help

12  one another locate restrooms or other City services, including by using the maps that BRC

13  provides to all participants.  What *is* unreasonable is BLM's decision to charge BRC for services

14  that are unneeded or redundant to what BRC already provides.

15      In addition, BLM appears to have charged BRC for the labor of various personnel who

16  were involved with setting up, operating, and taking down BLM's interpretive camp at the event.

17  (Benson Decl., Ex. J at 16.)  BLM has explained that this camp is designed to "expose Burning

18  Man participants to multiple aspects of BLM's public land management" related to the Black

19  Rock Desert NCA, and that it "enables the BLM to inform the event participants about public

20  lands, the meaning of the NCA designation and the importance of preserving the natural and

21  cultural history found within the NCA."  (Barnes Decl., Ex. B.)  As the interpretative camp has

22  nothing to do with the administration of the SRP, BLM must fund this program out of its own

23  budget.  The Project Labor Log spreadsheet provides no detail regarding the tasks performed by

24  any personnel or the time spent on those tasks, but it does indicate that BRC was charged

25  approximately $50,000 for the labor of five "logistics" personnel utilized by BLM in 2016.

26  (Benson Decl., Ex. K, Attachment 2.)  BLM's AAR suggests that these logistics personnel may

27  have spent significant amounts of their time performing work related to the interpretive camp.

28  (*Id.*, Ex. J, at 16.)  Prior to the Burning Man event, two personnel spent some time staging

DOWNEY BRAND LLP

1481341.2

27

AR09993

1   materials for the camp, four personnel then spent several days setting up the camp, and BLM then

2   staffed the interpretive camp with personnel during the event, including a night shift employee.

3   (*Id.*) Again, BRC does not object to BLM engaging in educational outreach at the event, but any

4   labor or other costs associated with its operation are not reasonably required to administer the

5   Burning Man SRP, and they should not be charged to BRC.

6          Finally, and to the extent BLM argues that any labor costs associated with public outreach

7   were *de minimus* or incidental to other legitimate BLM activities, such a claim is unsupported by

8   BLM's own documentation. BLM has not provided the detail necessary to assess exactly what its

9   extensive staff does at the event. Absent that information, and in light of the facts currently

10  available, including BLM's own records of law enforcement activity at the event, BRC and this

11  Board can only conclude that BLM's law enforcement costs are improperly inflated by

12  community outreach activities. BRC therefore requests that the Board require BLM to account

13  for any of its 2016 labor hours that were spent on agency public outreach efforts, and refund those

14  costs to BRC.

15         d.      BRC Should Not Be Required to Pay the Excessive Labor Costs
                   Associated with BLM's Communications and IT Functions at the Burning
16                 Man Event.

17         BLM's Project Labor Log spreadsheet lists a total of 11 employees who had some sort of

18  role in BLM's communications and information technology operations at the 2016 Burning Man

19  event. (Benson Decl., Ex. K, Attachment 2.) But as with all other entries, BLM provides scant

20  information about what these personnel did. Among them was Jon Young, whose title is listed as

21  "Comms Chief, Day Shift" and who logged a total of 557.75 hours working on or at the 2016

22  Burning Man event, at a cost to BRC of more than $50,000. If this time is considered in the

23  context of a 40-hour week, Mr. Young worked the equivalent of 14 weeks or three and a half

24  months on the Burning Man SRP. Yet BLM's explanation for these months of labor consists of a

25  mere 15 words: "Communication Function, Chief of program which includes radio network,

26  dispatch, IT Equipment and IT Security." (*Id.*)

27         BLM has offered no more detail about the work of the other ten individuals identified on

28  the Labor Log as having a communications role. Notably, BLM separately entered into a contract

DOWNEY BRAND LLP

1    with a communications company that included network support (*see* Section IV.B.2.c, below),

2    which suggests that any similar functions provided by BLM personnel were redundant.

3           BRC does not deny that BLM requires radios, a dispatch function, internet, IT equipment

4    and IT security in connection with its management of the Burning Man SRP, but even if these

5    services are generally reasonable, BLM is not permitted to log an unreasonable number of hours

6    performing them. *See Bookcliff Rattlers*, 171 IBLA 21.  BLM must provide sufficient detail

7    about the tasks performed by its team of communications personnel to enable BRC and this Board

8    to assess whether all of those hours, and the associated costs, were reasonable to BLM's

9    administration of the Burning Man SRP.  Any labor costs not shown to be reasonable costs must

10   be refunded to BRC.

11          e.      BRC Should Not be Required to Pay Any Labor Costs Associated with
12                  BLM's Provision of Superfluous Medical Services for its Personnel.

13          In 2016, BLM charged BRC approximately $19,000 for an officer Templeton to spend

14   217 hours leading BLM's medical unit at the Burning Man event, an unnecessary function.

15   (Benson Decl., Ex. K, Attachment 2 at 7.)  As explained in greater detail below, BRC provides

16   multiple first-aid stations throughout the event site; a fully equipped, professionally staffed, state

17   of the art emergency care facility; emergency transportation; and a communications system that is

18   thoroughly prepared to handle the historic and potential medical needs of BLM personnel.  (*See*

19   Section IV.B.2.e.)  BLM's decision to nonetheless provide separate, redundant, and less robust

20   medical services for its personnel was not reasonable, and the associated costs, including all of

21   this individual's labor charges, should not be borne by BRC.

22          BRC has also recently learned from BLM staff that BLM wants to have its own medical

23   contractor at the event in order to enable its staff to obtain CPR certification while they are on site

24   at Burning Man.  (Vind Decl. ¶ 9.)  This indicates that BLM is using the Burning Man SRP to

25   fund its general agency obligation to have CPR-certified staff.   BRC is not responsible for

26   funding general BLM operations or expenses, and to the extent any time recorded on BLM's

27   labor spreadsheet was spent giving or receiving CPR instruction, the associated costs should be

28   refunded to BRC.

DOWNEY BRAND LLP

1481341.2

29

AR09995

f.   <u>BRC Should Not be Required to Pay Any Labor Costs Associated with BLM's Monitoring of Third-Party Vendors.</u>

In 2016, BLM charged BRC for almost 100 hours of personnel time, totaling more than $5,000, spent on monitoring the compliance of the various third-party vendors that have contracts with BLM and provide a variety of commercial services to Burning Man participants.  (Benson Decl., Ex. K, Attachment 2.)  This cost should not have been borne by BRC.  Any entity that conducts commercial activities on the public lands is required to obtain an SRP from BLM.  43 C.F.R. § 2932.11.  Per BLM regulations, if a particular SRP requires more than 50 hours of BLM time, BLM is authorized to charge its costs to administer that SRP through cost recovery; if it requires less time, BLM charges a flat minimum of $105, and any BLM time over the $105 is paid for by taxpayers out of BLM's general fund.  43 C.F.R. 2923.31(e)(2)-(3); National Special Recreation Permit Fee Schedule, available at https://www.blm.gov/policy/im-2014-055.  While BLM can charge a permittee for the reasonable costs associated with its own permit, the regulations do not allow BLM to charge one permittee for the costs of administering permits to another party. BLM therefore inappropriately charged its third-party permit compliance costs to BRC via the cost recovery decision for BRC's separate permit.

Moreover, all vendors operating at Burning Man pay BLM 3% of their gross receipts as a commercial use fee, an amount that totaled approximately $350,000 in 2016, and an amount that should have been more than sufficient for BLM to cover any of its costs associated with their permits.  (Barnes Decl. ¶ 17)  Finally, BRC helps to address vendor compliance issues through its own compliance team, which manages on-playa vending operations and requires vendors operating at Burning Man to provide evidence of a BLM SRP in advance.  (*Id.* ¶ 18.)  BRC should not have been charged an additional $5,000 for BLM's own compliance efforts with respect to these independent permittees.

**2.   BLM'S Contracting Practices with Respect to the 2016 SRP were Unjustified and Unreasonable.**

Like all of BLM's other costs charged through cost recovery, BLM is obligated to provide sufficient information about its contracts to justify the requirements and enable BRC to ascertain

AR09996

DOWNEY BRAND LLP

1   whether the costs of the services and goods these contracts provide are reasonable costs in

2   relation to the Burning Man SRP. In 2016, a number of BLM contracts contained provisions that

3   were unjustified and/or unreasonable, as explained below, and their corresponding costs should

4   accordingly be refunded to BRC.

a.      BLM's Contract with Midland Radio Corporation.

6          In 2015, BLM required BRC to purchase over $101,000 worth of radios and accessories.

7   (Vind Decl. ¶ 14.) After the 2015 event, BLM told BRC it did not need these items. (*Id.*) Then,

8   the very next year, BLM entered into a contract with Midland Radio Corporation for the stated

9   purpose of obtaining "radio encryption and accessories," resulting in additional charges of nearly

10  $22,000 to BRC. (Benson Decl., Ex. K, Attachment 3.)

11         BLM has no reasonable basis for charging BRC again for this kind of equipment. It

12  should either be held to its prior determination that these items were unnecessary, or if BLM

13  decided that the items were necessary after all, BLM should at least be required to reuse the

14  expensive equipment that it had BRC purchase just a year earlier. BLM cannot treat equipment

15  as though it were disposable and eligible for replacement each year simply because BRC is

16  footing the bill. If certain accessories require replacement annually or after a certain amount of

17  use, then BLM should specify what those accessories are, during the planning season, so that

18  BRC is properly informed and has the opportunity to ask questions if needed.

19         As BLM's 2016 contract with Midland Radio appears to have resulted from unjustified

20  waste on BLM's part, these costs should be refunded to BRC.

b.      BLM's Contract with Alvarez & Associates, LLC.

22         As in 2015, BLM contracted with Alvarez & Associates, at a cost to BRC of more than

23  $55,000 in 2016, for the purpose of obtaining "satellite tracking updates and service." (Benson

24  Decl., Ex. K, Attachment 3.) BRC understands that BLM uses tracking devices to identify the

25  precise location of its personnel within the Burning Man event site at any given time, and that a

26  number of the devices were distributed to PCSO in 2016 for the tracking of its deputies. (Vind

27  Decl. ¶¶ 15-16.) BLM required BRC to purchase these devices for BLM in 2013 and has charged

28  BRC $50,000 each year since for associated service, software upgrades, air time, and support, and

DOWNEY BRAND LLP

1481341.2

31

1  yet it has demonstrated no legitimate need for requiring this equipment as part of its

2  administration of the SRP. (*Id.*)  All BLM employees and Pershing deputies have radios with

3  which to communicate their location and circumstances to each other and to dispatch personnel.

4  (*Id.* ¶ 16.)  All law enforcement officers also work in pairs for personal safety reasons and to

5  enable one officer to radio a location if his or her partner is otherwise engaged.  (*Id.*)  BRC should

6  not be charged for expensive equipment that BLM only deemed "necessary" because BRC was

7  footing the bill.

8              c.    BLM's Contract with Lyman Communications, LLC.

9              BRC objects to several portions of BLM's 2016 contract with Lyman Communications,

10  including the following provisions relating to service to or from BLM's law enforcement

11  substation: network and internet to the substation; the pan tilt zoom IP camera at the substation;

12  the 42" (minimum) flat-screen, high-definition TV at the Joint Operations Command Center

13  ("JOC") used to monitor for the Pan Tilt Zoom IP camera; and the microwave system from the

14  JOC to the substation.  (Benson Decl., Ex. K, Attachment 3 (Lyman Communications contract

15  SOW).)

16              BRC's overall objection is that the law enforcement substation is unnecessary to BLM's

17  administration of the SRP, so it is unreasonable for BLM to charge BRC for any costs associated

18  with it.  As noted above, BRC understands that BLM principally utilizes the substation, located

19  near the center of the City, to enable its law enforcement personnel "to informally engage with

20  participants," an activity that that has no reasonable nexus to the administration of BRC's permit.

21  (*See* Section IV.A.1.c; Barnes Decl., Ex. B.)  But even if the substation's existence were

22  reasonable, the expensive camera at the substation and large TV screen at the JOC would be

23  unnecessary extravagances.  The Closure Order covers 14,000 acres, and BLM has staff on patrol

24  throughout the event 24 hours per day, all of whom have radios at their disposal if they need to

25  report information to the JOC or request personnel.  (Vind Decl. ¶ 16.)  BRC understands that the

26  screen at the JOC was not specifically monitored 24 hours a day and that, due to the dusty

27  conditions of the event site, clear imagery from this camera was only available some of the time.

28  (*Id.* ¶ 19.)  BLM has not reported a single incident where this camera and big screen proved

1481341.2

32

AR09998

DOWNEY BRAND LLP

1  critical for any purpose. (*Id.*) In addition, BLM required BRC to provide, via a separate SOW, a

2  50" screen for the exact same purpose — to view the camera at the substation — so it was

3  particularly unreasonable for BLM to require BRC to pay for this second screen to monitor this

4  unnecessary camera. (*Id.* ¶ 18.)

5       With respect to the Lyman contract's provisions for a microwave network and internet

6  system, BLM has not demonstrated a public health and safety need for these services either. The

7  JOC's expensive and sophisticated infrastructure serves all needs of law enforcement. (*Id.* ¶ 20.)

8  To duplicate those services at another location is both unnecessary and unreasonable. Personnel

9  at the substation are supposed to be manning the substation, not using the internet. If they have

10  reports to write, they can use the report-writing trailer that BLM requires BRC to provide for this

11  precise purpose. (*Id.* ¶ 21.) Requiring BRC to pay for an additional, expensive law enforcement

12  facility, along with its associated equipment and services, is unreasonable.

13       BRC also objects to the Lyman contract's provision for IP cameras at the temporary

14  holding facility at the JOC. (Benson Decl., Ex. K, Attachment 6.) This building is used, in lieu

15  of a patrol car, for PCSO deputies to temporarily hold people under arrest before they are

16  transported to Lovelock for booking. (Vind Decl. ¶ 22.) The building is staffed 24 hours per day

17  by PCSO and is only 12x40 feet in size, so it can be monitored — at no cost — by simply looking

18  inside. (*Id.*) BRC should not be responsible for paying for BLM or PCSO to monitor this facility

19  via camera or to help BLM or PCSO conduct video or audio surveillance for evidentiary

20  purposes. The costs of this excessive equipment were improperly charged to BRC.

21       Finally, BRC objects to the Lyman contract's provision for 17 VOIP lines and phones.

22  (Benson Decl., Ex. K, Attachment 6.) BLM has demonstrated no need for this large number of

23  landlines, especially given that BLM personnel generally use their cell phones. (*Id.*; *see also*

24  Vind Decl. ¶ 23.) To BRC's knowledge, BLM has never needed to use 17 landlines at one time.

25  (Vind Decl. ¶ 23.) Charging BRC for this excess was unreasonable.

26           d.    BLM's Contract with High Desert Internet Services.

27       BRC objects to BLM's contract with High Desert Internet Services to the extent it calls

28  for microwave wireless internet service at the JOC with 30 megabytes-per-second ("Mpbs") bi-

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1    directional capabilities (Benson Decl., Ex. K, Attachment 3 (BLM SOW for High Desert Internet

2    Services).)  In 2014, BLM's required speed was half that at 15 Mbps, and both Burning Man's

3    population and BLM's staffing levels have stayed essentially static from 2014 to 2016.  (Vind

4    Decl. ¶ 24.)  There is no acceptable justification for this extraordinary doubling of bandwidth.

5    Moreover, BLM has not provided BRC with the network utilization reports that this vendor was

6    required to provide, per the BLM contract.  (*Id.* ¶ 26.)

7          In 2017, BLM told BRC that part of this internet bandwidth was used to support PCSO's

8    connection back to Lovelock — essentially to create a bridge from Lovelock to the Burning Man

9    event site and back.  (*Id.* ¶ 25.)  It is not BRC's responsibility to provide separate infrastructure to

10   Pershing County through its cost recovery agreement with BLM, and BRC is entitled to a refund

11   of these amounts.

12            e.     <u>BLM's contract with Modular Space Corporation.</u>

13         In 2016, BLM contracted with Modular Space Corporation to rent a modular building for

14   BLM''s medical program at a cost of more than $5,400.  (Benson Decl., Ex. K, Attachment 3.)

15   This cost, like all other costs associated with BLM's medical program, should not be paid by

16   BRC.

17         For many years, BRC has provided comprehensive patient care onsite at the Burning Man

18   event.  (Benson Decl. ¶ 8.)  Since 2015, BRC has contracted with CrowdRx to provide advanced

19   life support ("ALS") services at the event.  (*Id.*)  CrowdRx delivers board-certified emergency

20   physician care and an extensive array of medical services, including X-ray, radiology,

21   sonography, electrocardiogram services, orthopedic treatment, a comprehensive pharmacy

22   formulary, and an onsite fixed wing air ambulance. (*Id. See also* "Our Services-CrowdRx,"

23   available at http://crowdrx.org/event-medical services.) In recent years, BRC has also increased

24   its number of response and transport vehicles, which includes ALS-capable ambulances and quick

25   response vehicles.  (Id.) And in addition to the comprehensive medical care available at Crowd

26   Rx's onsite hospital facility, BRC provides basic medical services at six first aid stations located

27   throughout the City and staffed by licensed medical professionals. (Benson Decl. ¶ 8.)

28         Despite the known availability of these comprehensive and superior services located at the

1481341.2

34

AR10000

1    City center and throughout the City, BLM decided to provide a separate, redundant, and less

2    robust set of medical services for agency personnel at the JOC.  There is no justification for

3    imposing the costs of this decision on BRC, as BRC's facilities are far more capable of

4    addressing any of BLM's reasonably anticipated needs.  (*Id.*)  BLM's 2016 AAR provides scant

5    information about its medical program, but according to its 2015 AAR, the medical services

6    utilized at BLM's facility were overwhelming minor, such as eye washes.  (Vind Decl. Ex. D at

7    31 (noting that "[a]n overwhelming majority" of the personnel who visited BLM's medical unit

8    "were seen for routine medical care such as eye wash, minor wound care, over the counter pain

9    relief, and other over the counter medicine").)

10        If BLM desires an additional medical facility for its personnel, it is welcome to provide

11   one at its own expense.  But BLM has not shown that this facility is necessary or reasonable, so

12   the associated costs cannot be charged to BRC, including the costs of the Modular Space

13   Corporation contract.

14        **3.        BRC Should Not Be Required to Reimburse BLM'S Costs for Unnecessary**

15        **Equipment and Supplies.**

16        In 2016, BLM charged BRC more than $50,000 for equipment and supplies purchased in

17   conjunction with the Burning Man SRP.  (Benson Decl., Ex. K, Attachments 3, 6.)  BRC should

18   not be charged for any items that are not accounted for on a final inventory, and BLM has not

19   provided a complete accounting of the items purchased through cost recovery that are stored for

20   the following year's event.  This information is necessary for BRC to evaluate the validity of

21   equipment costs and determine whether BLM is using the cost recovery process to acquire

22   superfluous supplies.

23        Despite the incomplete information BLM has provided, BRC has been able to identify

24   numerous improprieties in BLM's equipment purchases, and believes that at least the following

25   costs were improperly charged to BRC.

26                    a.        Costs Related to BLM's Unnecessary Medical Facility.

27        As explained above, BLM's provision of its own separate medical facility is wasteful and

28   redundant, and as a result, its costs cannot reasonably be imposed on BRC through cost recovery.

DOWNEY BRAND LLP

1481341.2                                            35

APPELLANT'S STATEMENT OF REASONS

1    (*See* Section II.B.2.e.)  In addition to charging BRC for the redundant labor of a BLM medical

2    employee and the rental of a building to house its redundant facility, BLM's Supplies and

3    Equipment spreadsheet confirms that BRC was also charged about $350 for medical supplies;

4    $2,500 for services rendered by HHS contractor James Roberts, identified as a "medical unit team

5    member"; and another $47.50 for the cost of issuing a government check to Mr. Roberts, despite

6    the fact that he is a federal employee and BLM is a federal agency.  (Benson Decl., Ex. K,

7    Attachment 6.)  As with the other charges related to BLM's decision to provide an unnecessary

8    separate medical facility for its personnel, all of these costs were unreasonable and should be

9    refunded to BRC.

10                    b.    BLM Giveaway Materials.

11         As noted above, BLM charged BRC nearly $2,400 to purchase junior ranger badges

12   (described as "education materials") and "BLM/LE wristbands" that BLM personnel distributed

13   to participants at the Burning Man event.  (Benson Decl., Ex. K, Attachment 6.)  It is

14   unreasonable for BLM to require BRC to pay for these discretionary items, as they are simply

15   unnecessary to the administration of the SRP.  The associated costs should be refunded to BRC.

16                    c.    Oakley Goggles.

17         In 2015, BLM charged BRC more than $4,200 for 170 pairs of goggles it purchased from

18   Botach Technical, although BLM apparently had only 104 employees on site at the 2015 event.

19   (Benson Decl. ¶ 15, Ex. G.)  Moreover, many BLM staff return to work at the event each year,

20   which would enable them to reuse equipment such as goggles from prior years.  Yet in 2016,

21   BLM charged BRC another $2,500 to purchase yet more goggles, this time from Oakley.  (*Id.*,

22   Ex. K, Attachment 6.)  There is no justification for BLM's wasteful behavior.  Returning BLM

23   personnel could surely have reused at least some of the goggles BLM had purchased last year, or

24   the year before that, just as the majority of returning BRC staff and Burning Man participants

25   reuse their own goggles.  Alternatively, BLM could have at least given the previous years'

26   goggles to BRC for repurposing, as BRC paid for them, and there is no reason to believe that all

27   pairs became unusable after their brief use by BLM personnel at the event.  BRC should not be

28   forced to pay for BLM's wasteful practice of using designer equipment for a couple of weeks and

DOWNEY BRAND LLP

1481341.2

36

AR10002

1   then throwing it away — or perhaps allowing its employees to keep such equipment for personal

2   use — without regard for reuse or repurposing, and without ensuring that the equipment paid for

3   by BRC is actually used only to administer the SRP.  The costs of any goggles unnecessarily

4   purchased by BLM for 2016 Burning Man event should be refunded to BRC.

5                           d.      Radio Accessories.

6        As noted above with respect to the Midland Radio Corporation contract, BLM charged

7   BRC more than $101,000 for radios and accessories in 2015 and later told BRC it did not need

8   those items, only to purchase more radio equipment in 2016 and charge the costs to BRC.  (Vind

9   Decl. ¶ 14.)  In light of BLM's wasteful practices, BRC objects to paying more than $3,000 for

10  the following radio equipment listed on BLM's 2016 Supplies and Equipment spreadsheet:

11  $1,140.48 for four Pelican radio cases; $516.64 for radio harnesses; $1,425 for radio batteries;

12  and $128.16 to ship those batteries.  (Benson Decl., Ex. K, Attachment 6.)  These costs were

13  unreasonable and should be refunded to BRC.

14  **C.   BLM Violated Cost Recovery Guidelines By Charging BRC Multiple Times For The Same Costs.**

15

16       **1.   BLM Improperly Charged BRC Directly for Costs Already Captured by the Indirect Administrative Cost Rate.**

17       Each year, BLM requires BRC to pay an indirect administrative cost rate ("IACR") — up

18  from 22.9% in 2015 to 23.1% in 2016 — on all direct costs charged through cost recovery,

19  including labor on the event site, year-round and event-specific travel, vehicle utilization,

20  contracts, accounting, radios and other supplies and equipment, fuel and mileage, public

21  communications, law enforcement, dispatch, and contracts.  (Benson Decl., Ex. K, Attachment 1.)

22  Per BLM SRP guidelines, indirect costs represent "those administrative and program costs that

23  may be attributed to processing the application, including a portion of the costs of equipment,

24  space rental, telephone services, postage, personnel transfer costs, administrative and clerical

25  support, training, safety, public information, cartography and basic series mapping, aviation

26  management, telecommunications, equipment maintenance, and systems design and

27  implementation."  (Allen Decl. ¶ 3, Ex. A, at 1-29 – 1-30.)  BLM's rationale for applying the

28  IACR is to allow BLM to recover costs that cannot be accurately or readily determined with

DOWNEY BRAND LLP

1481341.2

37

1   respect to an SRP, and thus cannot be captured by the direct costs charged to the permittee.  (*Id.*,

2   ¶ 28, Ex. F at 3.)

3        In 2014, BLM issued an instructional memorandum to provide further guidance to BLM

4   employees in application of the IACR.  (*Id.*)  The memorandum explained that indirect costs were

5   "those <u>costs that cannot be directly identified</u> with producing a specific product or service, but

6   can be shown to bear some relationship to result from or be in support of the product or service."

7   (*Id.*, Ex. F at 3 (emphasis added).)  Examples of indirect costs listed in the memorandum include:

8        *      Administrative support related to the BLM's overall mission. This area represents

9               the largest portion of indirect costs and includes such costs as procurement,

10              contracting, finance, office services, property management, vehicle management,

11              supply, payroll, voucher processing, personnel services, records management, and

12              document controls.

13       *      Public information and inquiries.

14       *      Budget development and program planning, coordination, and direction.

15       *      Training, employee development, and personnel transfers, including costs of travel

16              and time in transit.

17   (*Id.*)  The Board has further confirmed that if BLM uses the IACR for management overhead,

18   BLM must reduce its cost recovery estimates accordingly.  *Bookcliff Rattlers*, 171 IBLA 26.

19        BLM's application of the IACR resulted in an approximately $405,000 charge to BRC in

20   2016.  (Benson Decl., Ex. K, Attachment 1.)  BLM also charged BRC <u>directly</u> for a great many of

21   the functions and services that are included in the IACR.  BRC is therefore effectively being

22   forced to pay BLM multiple times for the same expense: first in full as a direct cost, and then

23   again because BLM adds an additional 23.1% on top of this direct cost (and every other direct

24   cost), which is intended to cover the very same item or service.  BLM's practice violates cost

25   recovery guidelines, and there is no rational basis for the amounts levied as a result.

26        Direct costs BLM improperly charged to BRC in 2016 include:

27       *      $40,727 for travel expenses incurred by BLM staff, as "personnel transfers,

28              including costs of travel and time in transit" are included within the definition of

DOWNEY BRAND LLP

1481341.2

38

AR10004

1     indirect costs (*id.*, Ex. K, Attachment 4);

2     \*     $10,681.79 for the labor of BLM's event Public Information Officer, as public

3          information and inquiries are also considered indirect costs (*id.*, Ex. K, Attachment

4          2); and

5     \*     Several thousand dollars for various office equipment and equipment maintenance

6          costs — including $1,789.23 for communications equipment, $248.69 for a

7          laminator, $50.97 for printer cables, $102.21 for a replacement holster, $388.97 to

8          clean a government vehicle and purchase an air filter, $510.96 for a new tire for a

9          BLM vehicle, and $128.16 in postage costs to ship handheld radio batteries — as

10         office services, supplies, and vehicle maintenance are likewise considered indirect

11         costs.  (*Id.*, Ex. K, Attachment 6.)

12    Even if all of these expenses were reasonably related to the Burning Man SRP, which

13    BRC disputes, it was nonetheless improper for BLM to charge BRC for them directly, as they

14    were already intended to be covered by the 23.1% IACR that BLM levied on all of its direct

15    costs.  Accordingly, all of these costs should be refunded, and the IACR amount adjusted

16    downward in keeping with the reduced direct cost amount.

17    **2.     Charging the IACR on Costs Incurred During the Burning Man Event**
             **Amounted to Impermissible Overcharging.**

18

19    BRC also objects to BLM's assessment of any IACR on BLM's labor or other costs

20    incurred during the Burning Man event, whether in the nearby town of Gerlach, Nevada, or at the

21    event site.  For the duration of BLM's 2016 event operations, BRC provided and paid for most of

22    BLM's infrastructure and support services in both of these locations, including fuel,

23    transportation, equipment, technology, and supplies.  (Allen Decl. ¶ 29.)  The other costs intended

24    to be addressed by the IACR were similarly covered by BRC, assuming that they are incurred at

25    all during this period.  Since BLM incurred minimal indirect costs to administer the Burning Man

26    SRP, its assessment of the full IACR on any of its direct costs during the Closure Order period

27    constitutes impermissible overcharging, and therefore lacks a reasonable basis.

28    According to the 2016 Project Log, thirteen BLM staff members were engaged in

DOWNEY BRAND LLP

1481341.2

39

AR10005

1   activities related to the Burning Man SRP on dates outside the Closure Order.  (Benson Decl., Ex.

2   K, Attachment 2.)  Based on the limited information provided by BLM regarding its labor

3   expenditures, BRC is unable to estimate the total cost of such labor. BLM has provided no

4   documentation that it incurred indirect costs in connection with any of its other labor or direct

5   costs. BRC therefore maintains that the difference that results from deducting labor and other

6   costs incurred during the closure period from the total costs use to calculate the IACR should be

7   refunded to BRC.

### V.    CONCLUSION

9       For more than 25 years, BRC has successfully produced the Burning Man event in the

10   Black Rock Desert.  Evidencing its commitment to public health and safety, each year BRC

11   cooperates with BLM and dozens of other federal, state, and local agencies; engages thousands of

12   professional and experienced staff and volunteers in event operations; and fosters a community of

13   participants who value principles like leave no trace, self-reliance and communal effort.

14       BRC has long understood and complied with its obligation to reimburse BLM for its

15   reasonable and necessary expenses incurred in administering the Burning Man SRP.  For the last

16   several years, however, BLM's claimed expenses have skyrocketed without sufficient

17   justification and beyond any demonstrated need.

18       BRC finally appealed these improper costs in 2015, following the reassignment of the

19   BLM leadership personnel who had ordered these cost increases and threatened to delay or deny

20   BRC's permit if it exercised its right to appeal.  While BLM has become significantly more

21   cooperative and collaborative, and reduced its overall costs in 2016 for the first time in history,

22   BRC still feels that many of BLM's SRP requirements are unnecessary or insufficiently

23   documented.  While BRC's 2015 Cost Recovery Appeal may have motivated BLM to be more

24   thoughtful about some of its expenditures, BLM has resisted conducting the kind of

25   comprehensive reassessment of its costs that BRC believes is required to comply with costs

26   recovery regulations.  Moreover, BLM's reduction of overall costs in 2016 came after several

27   years of astronomical cost increases in the prior four years, and therefore still left BRC paying far

28   more for administration of the 2016 SRP than is reasonable given the history of the Burning Man

DOWNEY BRAND LLP

1481341.2

40

AR10006

1   event.

2       BRC is entitled to detailed information about costs and detailed explanations for resource

3   requirements, and BLM is obligated to require only what is reasonable to administer the SRP.

4   BRC is also entitled to a cost recovery decision with sufficient detail to enable it to evaluate the

5   costs being charged, and to challenge with specificity any costs that appear to be unreasonable.

6       BLM's 2016 Cost Recovery Decision failed to fulfill the agency's obligations to provide

7   BRC with a reasoned and factual explanation for BLM's claimed costs.  BRC respectfully

8   requests that the Board disallow all unjustified costs included in the Cost Recovery Decision, and

9   remand this appeal as necessary for BLM to itemize those costs and refund them to BRC.

10

11

12  DATED:  April 29, 2017                DOWNEY BRAND LLP

13

14                                       By: _____

15                                           ELIZABETH B. STALLARD
                                             Attorney for Appellant
16                                           BLACK ROCK CITY LLC

17

18

19

20

21

22

23

24

25

26

27

28

1481341.2

41

APPELLANT'S STATEMENT OF REASONS

AR10007

DOWNEY BRAND LLP

DOWNEY BRAND LLP
ELIZABETH B. STALLARD (Bar No. 221445)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone:   916.444.1000
estallard@downeybrand.com

Attorneys for Appellant
BLACK ROCK CITY LLC

# UNITED STATES DEPARTMENT OF INTERIOR

## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BLACK ROCK CITY LLC, | Case Identification No.:  IBLA 2017-126 |
| Appellant, | Special Recreation Permit LLNVW03500-16-01 2930 (NV030.12) |
| v. | |
| BUREAU OF LAND MANAGEMENT, | **DECLARATION OF ROSALIE BARNES IN SUPPORT OF APPEAL** |
| Appellee. | |

1481155.1

1

AR10008

DOWNEY BRAND LLP

I, Rosalie Barnes, declare as follows:

1.      I am over 18 years old, of sound mind, and capable of making this declaration.  I am the Government Relations Manager for appellant Black Rock City LLC ("BRC").  I have personal knowledge of the facts set forth herein, or, if so stated, am informed and believe of their truth and accuracy and, if called to testify, I could and would do so competently and under oath.

2.      The U.S. Bureau of Land Management ("BLM") issues the special recreation permit ("SRP") for the Burning Man event every year pursuant to the requirements of the National Environmental Policy Act and Federal Land Policy and Management Act.

3.      The permitting process has included several environmental assessments over the years, the most recent of which covers the period 2012 to 2016, and as with previous assessments, resulted in BLM issuing a mitigated Finding of No Significant Impact ("FONSI").

4.      BRC and BLM have cooperated over the years to develop and refine a Leave No Trace standard for the Burning Man event that, to my understanding, BLM has adopted for use with all events on BLM-managed public lands.

5.      BLM typically inspects the Burning Man event site six weeks after the end of the SRP period, and BRC has passed every inspection.

6.      Each year, the Burning Man SRP contains special stipulations ("Stipulations") designed specifically for the uniqueness of the event and intended to address impacts and issues identified in the mitigated FONSI that would require additional regulation by BLM beyond existing federal, state, and county laws and regulations.  The Stipulations address event population, public health and safety, environmental compliance, and traffic management in surrounding areas.  Burning Man has been compliant with all Stipulations each year except 2011 and 2013, when population slightly and inadvertently exceeded the set limit during a portion of the event.  Attached hereto as **Exhibit A** is a true and correct copy of the Stipulations for the 2016 Burning Man event.

7.      BRC and BLM work together on environmental assessments many years in advance of the annual SRPs.  Currently BRC and BLM are jointly working on an environmental impact statement and planning for the next ten years of Burning Man events.

DECLARATION OF ROSALIE BARNES IN SUPPORT OF APPEAL

AR10009

8.     In January 2014, BLM provided BRC with a cost recovery proposal for the 2014 Burning Man SRP that predicted BLM's costs would increase by $700,000 as compared with 2013, to a total of approximately $3.7 million.  When I and other BRC staff questioned these increases, BLM staff advised us that these estimated operational costs were not subject to reduction.  Instead, BLM offered BRC an opportunity to "save money" by agreeing to a memorandum of understanding ("MOU"), whereby BRC would fulfill certain contracts for BLM and avoid paying the indirect administrative cost rate ("IACR"), which BLM applies to all of its direct expenditures that are charged through cost recovery.  Seeking to curb BLM's costs, BRC agreed to the MOU and associated statements of work ("SOWs"), which totaled about $600,000.

9.     Also in 2014, BLM required BRC to establish two proffer accounts to directly compensate two BLM employees for their year-round work in connection with Burning Man's SRP: a Project Manager and an Outdoor Recreation Planner.  BLM staff presented this as another cost-saving opportunity for BRC, both because BRC would avoid paying the IACR on this labor and because BLM would not need to hire seasonal employees for every Burning Man event, thereby ostensibly improving the efficiency of BLM's Management of the Burning Man SRP. BRC paid almost $70,000 to fund those two proffer accounts in 2014.

10.    BRC did not receive an adequate justification for the further escalation of BLM's costs in 2014.

11.    On July 24, 2015, just one month before the 2015 event, BRC received the 2015 cost recovery agreement, which estimated BLM's total costs would come to approximately $2.9 million that year.  Included in the estimate were a number of contracts to which BLM had already committed, although BRC had never had the opportunity to review, discuss, or agree to the contracted services or amounts.  BRC did not receive sufficient documentation of all the costs reflected in the agreement, nor did it have time to conduct an adequate review of the agreement, as BLM staffed advised BRC staff that the SRP could not issue until BRC had signed.  As a result, BRC accepted BLM's cost estimate.

12.    On January 27, 2016, BLM issued its final decision on cost recovery for the 2015 Burning Man SRP, which totaled approximately $2.8 million.  Including the amounts paid for the

DOWNEY BRAND LLP

AR10010

1    SOWs and the proffer account funding BLM's Burning Man Project Manager, BRC paid a total

2    of more than $3.5 million for costs incurred by BLM in administering the 2015 Burning Man

3    SRP.

4         13.    For the 2016 Burning Man event, BLM agreed to let BRC manage its

5    environmental compliance program, reducing BLM's costs, although increasing BRC's own

6    costs. Both BRC and, to my understanding, BLM deemed the program a success.

7         14.    Certain BLM costs that BRC questioned in its 2015 Cost Recovery Appeal, which

8    is still pending before the Interior Board of Land Appeals, were reduced or eliminated in 2016.

9    BRC accepted BLM's offer to take on three additional contracts in 2016 that had previously been

10   managed by BLM. This enabled BRC to avoid paying BLM's IACR on these contract costs,

11   although we lost the right to appeal those contract costs in the present appeal of BLM's 2016 Cost

12   Recovery Decision.

13        15.    BRC produced another safe and successful Burning Man event from Sunday,

14   August 28, through Monday, September 5, 2016. BLM advised that BRC was in compliance

15   with the 2016 SRP and Special Stipulations on December 15, 2016, and that it passed BLM's

16   environmental inspection on December 22, 2016.

17        16.    On April 17, 2017, I emailed Michael Vermeys, BLM's current Burning Man

18   Project Manager, to request information on the interpretative camp that BLM sets up at the

19   Burning Man event each year, including what the camp's purpose is. Mr. Vermeys emailed a

20   response to my questions the following day. Attached hereto as **Exhibit B** is a true and correct

21   copy of that email exchange.

22        17.    To the best of my knowledge, all vendors operating inside the Burning Man event

23   site pay BLM 3% of their gross receipts, an amount that totaled approximately $350,000 in 2016.

24        18.    BRC helps BLM to address vendor compliance issues through our own

25   compliance team, which manages on-playa vending operations and requires vendors operating at

26   Burning Man to provide evidence of a BLM SRP in advance.

27   ///

28   ///

DOWNEY BRAND LLP

1481155.1

4

DECLARATION OF ROSALIE BARNES IN SUPPORT OF APPEAL

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 27th day of April, 2017, at San Francisco, California.



ROSALIE BARNES

DOWNEY BRAND LLP

5

DECLARATION OF ROSALIE BARNES IN SUPPORT OF APPEAL

AR10012

# EXHIBIT A

# EXHIBIT A

AR10013

# BURNING MAN 2016
## SPECIAL RECREATION PERMIT STIPULATIONS



AR10014

## TABLE OF CONTENTS

# Contents

PERMIT ADMINISTRATION.................................................................................................1

GENERAL......................................................................................................................1

COORDINATION ...........................................................................................................6

FEE SCHEDULE .............................................................................................................9

SANITATION................................................................................................................ 10

TRAFFIC MANAGEMENT............................................................................................ 10

COMPLIANCE INSPECTIONS ...................................................................................... 12

# PERMIT ADMINISTRATION

**In addition to the 13 general terms and conditions listed on the back of the Special Recreation Permit Form 2930-2, the following Special Stipulations shall apply to the 2015 Burning Man Event.**

# GENERAL

1. The maximum authorized population (also referred to as the "population cap") at any point in time during the 2016 event is 70,000 paid participants. The population cap does not include volunteers, government personnel, emergency service providers, vendors, and contractors. Black Rock City LLC ("BRC") is required to keep the maximum population of the event from exceeding this population cap. Consequences to BRC for exceeding the population cap may include, but are not limited to, a finding of non-compliance; suspension or cancellation of this permit per 43 C.F.R. § 2932.56; a monetary or other penalty per 43 C.F.R. § 2932.57; denial of subsequent application(s) for a SRP per 43 C.F.R. § 2932.26; and/or imposition of additional terms and conditions in subsequent years' permits (if granted) that are designed to keep the event population within the maximum authorized population, consistent with 43 C.F.R. §§ 2932.26 and 2932.41. The Bureau of Land Management ("BLM") reserves the right to assess additional cost recovery for any costs the BLM incurs as a result of any population exceedances, per 43 C.F.R. § 2932.31.

2. If during the event it appears that the number of participants is likely to exceed the population cap, then BRC must promptly notify the BLM of the projected event population and provide a detailed Contingency Plan explaining how it plans to accommodate the additional participants. The BLM's acceptance of such a contingency plan does not constitute approval for BRC to exceed the population cap under Special Stipulation 1, nor does it constitute any form of cure for noncompliance with Special Stipulation 1. The purpose of this Special Stipulation 2 is to ensure that BRC will follow specific procedures to address the safety and health of additional participants, should noncompliance with Special Stipulation 1 occur. Procedures and protocols of main gate and airport closure/arrival/exodus pulsing program for population control will be outlined in BRC 2016 Burning Man Event Operations Plan, their contingency plans and BLM's Incident Action plan.

3. BRC shall provide the BLM at the event site with information on participant arrivals, ticket scanning,

1

AR10015

and the number of participant departures. These event population statistics will include and break out separately, the number of participants, volunteers, and total persons on site. BRC will provide the BLM, at times pre-determined between BRC and BLM, with data regarding the entry and exodus population numbers, as well as 2016 Burning Man event population statistics from all entities on the playa including but not limited to paid participants, "early arrival" passes and volunteers entering the Main Gate, the Airport, and all other access points in Black Rock City. In addition, BRC must provide the BLM with event population statistics at any other time upon request. BRC will notify the BLM immediately if the population exceeds 67,000 paid participants, at which time the BLM may require more frequent population statistic updates. If the population of the Burning Man event approaches the 70,000 paid participant population cap, the BLM may direct BRC to close both the Main Gate and the airport entrances to new participant arrivals. If that occurs, BRC, in coordination and consultation with BLM, shall then institute an arrival/exodus pulsing program to ensure that the 2016 Burning Man event does not exceed the 70,000 population cap.

4. During the period of site occupancy (August 5, 2016 through September 21, 2016), BRC shall provide the BLM with the BRC population numbers within the event site each day, according to an agreed-upon reporting standard with the BLM. For historical purposes and press inquiries, BRC shall also provide the BLM with the recorded maximum population for the entire event (otherwise known as peak population). The BLM may request population data at any time during the event, and BRC shall provide that data immediately. Within 60 days after the event, BRC shall provide the BLM with detailed information regarding the number of staff and participants at the event site for the period of site occupancy (August 5, 2016 through September 21, 2016). This information shall include daily counts for both the non-event and event period. Starting May 9, 2016, and continuing on the fifth business day of every subsequent month thereafter, BRC will provide BLM with a 2016 Burning Man paid participant documentation report. This report will include but not be limited to the total number of tickets sold to paid participants, whether at pre-sale, group sale, individual sale, OMG sale, low income sale and miscellaneous sales. In addition, starting on August 22, 2016, BRC will provide a separate population documentation report for the total number of government personnel, emergency service providers, vendors, "early arrival" passes and contractors (e.g., service providers, staff, infrastructure contractors, art contractors, maintenance and operations personnel). The BLM may request additional paid participant data at any time prior to, during, and after the 2016 event.

5. These Special Stipulations incorporate, by reference, information included in the 2016 Burning Man Event Operations Plan (Operations Plan). If there is a conflict between the Operations Plan and the Special Stipulations, the Stipulations shall control. BRC shall provide its latest version of the Operations Plan to the BLM before the BLM will issue the permit for the 2016 event. The Operations Plan may be modified by BRC before, during and after the event, as needed. Changes to the Operations Plan will be coordinated with BLM.

6. The location of the 2016 Burning Man Event Area is limited to the public closure area, with ingress and egress from the 8-Mile or Event playa entrance, the 12-mile or Vendor playa entrance, and the playa Airport. The specific location of the event site will be identified and requested by BRC and approved by the BLM prior to the commencement of event setup.

AR10016

7. The event is authorized to last 192 hours starting on the Sunday that falls eight days before Labor Day and ending on Labor Day. Event activities may officially commence at 6:00 PM on Sunday, August 28, 2016 and shall end at 6:00 PM on Monday, September 6, 2016 (Labor Day). For the purposes of participant ingress, the main gate may be opened as early as 12:01 AM on Sunday, August 28th, 2016. For the purposes of participant egress the main gate will be opened until 12:00 PM on Tuesday, September 6. During the extended ingress and egress hours, participants are required to focus their activities on camp location setup and breakdown. Pre-event surveys and site layout (including use of the communications tower) may begin on Friday, July 29, 2016. Site occupancy, including construction of facilities and structures, may occur no earlier than Friday, August 5, 2016 (the start of the event closure order). Removal of all above-ground material (i.e., items that could pose a hazard to other playa users) will be completed no later than Monday, September 21, 2015 (the end of the event closure orders). The exception to this requirement is the communications tower, which may remain on-playa throughout the cleanup period for safety purposes. The dates, calendar and procedures for event set up and cleanup will be outlined in the 2016 BRC Operations Plan.

8. The final phase of cleanup and restoration will be completed no later than Friday, October 7, 2016. If unforeseen weather conditions arise, minor adjustments to the post-event cleanup deadlines may be granted by the BLM authorized officer.

9. Upon advance notice to BRC, the BLM reserves the right to alter the terms, conditions, and stipulations of the permit for significant changes in BLM policy or administrative procedure, to prevent use conflicts, prevent resource damage, or protect public safety as provided in 43 C.F.R. § 2932.56.

10. BRC shall post a copy of its permit, these Special Stipulations, and the Federal Register Closure and Restriction Orders in prominent view at Center Camp Playa Info where cooperators and participants have an opportunity to read them. Additionally, the documents referenced above shall also be available for participants and staff on the Burning Man website within 15 days of the BLM's issuance of the permit.

11. Except as otherwise noted in Special Stipulation 1, violation of the permit terms, conditions and stipulations may be subject to penalties prescribed in 43 C.F.R. Part 2930. Additionally, such violations may result in permit revocation, suspension, or probation. Violations may also be cause for the BLM to deny approval of a subsequent Permit or Operating Authorization (43 C.F.R. § 2932).

12. BRC personnel shall meet with BLM staff and representatives from the various cooperators during the event period at such other times and places as needed. At these meetings, BRC shall provide daily attendance figures (as required in Special Stipulation 1) and exchange other information necessary to allow all parties to effectively administer and assess the event daily. BRC and BLM will have a daily meeting plan for the purposes of communication and exchange of information. Details will be included in the 2016 BRC Operations Plan.

13. Commercial use is prohibited within the Black Rock City closure area unless specifically authorized by BRC and the BLM. Commercial use is defined by 43 C.F.R. § 2932.5, and includes, but is not limited to, commercial film production, food services, waste disposal, recreational/trailer rental and/or air carrier services. BRC and/or the BLM will monitor the compliance of all commercial operators entering the event

3

via the Point 1 Gate and the Airport.

A. Prior to the event:

    i. BRC shall notify potential vendors and air carrier services in writing that they must obtain a BLM Special Recreation Permit (SRP) in order to enter into contract with BRC.

    ii. BRC shall also provide the BLM with a list of potential vendors and air carrier services that BRC recommends be granted a BLM SRP to operate at the event.

    iii. The BLM will immediately notify BRC if any recommended vendors and air operators do not meet the BLM's SRP requirements at 43 C.F.R. § 2932 and cannot be authorized to operate on public lands during the event.

    iv. BRC will immediately notify the BLM if BRC terminates any authorized vendors or air carrier services contract/agreement.

    v. BRC will describe the procedure for BRC and BLM coordination of authorizing vendors and air carrier services in the 2015 BRC Operating Plan.

B. During the event:

    i. BRC shall require all authorized vendors and air carrier services to display identification as proof of their authorization to operate at the event by BRC and the BLM.

    ii. Any vendors and air carrier services must show proof of their SRP within a reasonable amount of time when asked by authorized BLM and BRC personnel, as required by the Closure Order(s) and BRC's OSS or Air Carrier contracts.

    iii. BRC will inform the BLM's Vendor Compliance Lead of unauthorized vendors and air carrier services discovered at the event.

    iv. Any vendors and air carrier services found operating without a contract with BRC and unpermitted by BLM at the event, will be found to be in noncompliance and may face eviction, and/or receive citations for noncompliance with 43 C.F.R. § 2932, or be required to obtain a BRC contract and a BLM SRP, if required.

    v. BRC will provide a copy of the 2016 Closure Orders to all vendors and air carrier services prior to the start of the event.

14. BRC shall comply with all applicable supplemental regulations as promulgated in the Closure Order(s) published in the Federal Register prior to the 2016 event.

15. In regard to historical and archeological resources:

4

A. All participants and support staff will be informed that collection, excavation or vandalism of historical and archaeological artifacts or sites is illegal on public land. If BRC learns of the discovery of archaeological artifacts (objects greater than 50 years old) or human remains, BRC shall notify the BLM immediately.

B. BRC shall comply with 43 C.F.R. § 7.18 and shall not make available to the public any information concerning the nature and location of any archaeological resource.

C. Should BRC discover an archaeological resource, it must stop all activities in the discovery vicinity and protect the site until event completion or until notified otherwise by the BLM authorized officer.

16. BRC shall provide the appropriate identification to its authorized personnel (i.e. staff ID, decals, designated camping areas, etc.) and will inform the BLM of the nature and appearance of such identification prior to the event.

17. All mounted lasers on registered mutant vehicles, placed art projects and placed theme camps must be inspected and approved by BRC.

18. The use of unmanned aircraft systems (UAS) is prohibited, unless the operator is registered through and complies with the Remote Control BRC program (RCBRC) and operates the UAS in accordance with Federal laws and regulations.

19. With regard to mutant vehicles and art cars:

A. Mutant Vehicles more than 13 feet wide are issued "Playa Only" driving licenses, restricting operation within the city streets. BRC shall locate known "Playa Only" car camps on the outside streets of the city.

B. Art cars with flame effects shall not carry additional gasoline or diesel fuel tanks when in operation. Propane tanks are allowed on art cars with flame effects upon inspection from the Fire Art Safety Team (FAST) team at the Department of Mutant Vehicles (DMV) registration.

C. For vehicles with limited visibility as determined by BRC DMV, easily identifiable walkers and/or spotters are required. Examples of easily identifiable clothing include: reflective safety vests, brightly colored or reflective hats, bandanas or shirts.

D. BRC shall notify BLM promptly when there is an art car related injury requiring medical treatment and transport to Rampart.

20. BRC's propane shall be dispensed at identified refueling stations, or by a licensed professional.

21. BRC shall cooperate with the BLM when requested, to assist in removing individuals from the event

AR10019

as provided in 43 C.F.R. § 2932.57(a)(7). If BRC evicts anyone under BRC's internal procedures BRC will notify the BLM of the eviction and identify the evicted individuals. BRC will work with BLM to develop a protocol for evictions which will be documented in the 2016 BRC Operations Plan.

22. BRC shall promptly notify the BLM Dispatch when additional BRC resources are required to reduce the intensity of a potential conflict or developing situation involving BRC Participants, in accordance with BRC's "Situation Escalation Policy".

23. Regarding burns:

    A. BRC shall include BLM at the 1600 briefing on the Thursday before the Man Burn.

    B. BRC shall provide BLM a "Daily Burn Sheet" that shall include information on each burn, the perimeter size, the FAST Lead for the burn, image and location of the perimeter.

    C. At large scale burns, participants who are stopped by BRC Rangers for violating established burn perimeters shall be promptly turned over to BLM Law Enforcement.

    D. All structures to be burned must meet BRC engineering standards for burnable structures, or they shall not be burned.

24. BRC shall maintain an evacuation plan and include it in the BRC Operations Plan.

25. BRC shall provide forward deployment of ESD during planned mass gatherings.

# COORDINATION

26. BRC shall make a member of its Board, or authorized representative(s), available to the BLM prior to the event for planning coordination. This member of its Board, or authorized representative(s) will also be available to the BLM after the event for After Action Review coordination. BRC's Board member or authorized representative(s) must be authorized to represent and act on BRC's behalf to coordinate as needed with the BLM, law enforcement, and other event cooperators on issues requiring action. BRC must provide BLM with its authorized representative(s)/point of contact(s) by 08/01/2016.

The BLM's representatives are the following;

William Mack – Authorized Officer
Logan Briscoe – Law Enforcement

27. BRC and BLM, and other agencies as shall be mutually deemed appropriate, shall cooperate in the development of a Unified Command (UC) structure, including designation of "Tier 1" leadership positions, for the management of available safety, security and infrastructure resources in the event of an emergency incident. During the event, Tier 1 members will coordinate daily, as well as during the immediate pre and post operating period, (at a time to be determined) with regard to all daily operating procedures as well as in the event of an emergency threshold event as defined in the Standard Operating

6

Procedure (SOP). BRC will ensure there is appropriate representation from BRC in the Tier 1 leadership, available 24 hours a day, and 7 days a week during the event and will provide the name(s) of BRC representation to BLM by July 30, 2016. All UC operations will be managed from the Joint Operations Center (JOC) unless it is deemed more appropriate by the Tier 1 leadership to have an incident specific UC location.

28. Meetings required with affected parties:

    A. BRC shall confer with the following entities prior to the event to address local issues and concerns: Washoe County Sheriff's Office, NDOT, Federal Aviation Administration, Washoe County Roads Department, Nevada Highway Patrol and the Gerlach Volunteer Fire Department.

    B. A representative from BRC will meet with representatives from the BLM prior to the event to coordinate logistics for operation of the communication compound.

    C. BRC shall meet with the Pyramid Lake Paiute Tribe to address concerns and impacts to Tribal reservation resources anticipated from the Burning Man event.

    D. BRC shall keep the BLM informed regarding progress on formal agreements/MOUs with affected Parties.

29. As described in the 2016 Operations Plan, BRC shall develop procedures and plans for sanitation, emergency medical facilities and services, fire protection, security, participant camping, traffic, access and parking control, illumination, water supply, food supply, communication services, drones, lasers, burn perimeters and safety for the event.

30. BRC will develop and implement a plan to address and prevent the exposure of minors to adult activities at the event. The plan should include measures such as educating and requiring parents/guardians to supervise their children, zoning the city, and making every effort to educate adult related theme camps about the need for having a gatekeeper during hours when the camp might not be suitable for minors. BRC will make a diligent effort to enforce actions identified in the plan. A copy of the plan shall be provided to the BLM and the Pershing County Sheriff's Department within 10 days of the BLM's grant of the permit.

31. BRC shall develop and cooperate in the implementation of contingency plans for operations of critical health and safety services under adverse conditions, including those that could cause cancellation or temporary suspension of the event. Such causes may include adverse weather, natural or human caused disaster, or social unrest. This effort shall apply to participants within the event area and en route to and leaving the event.

A. Prior to the event, BRC shall disseminate emergency information to participants via the Burning Man Website, the Burning Man Survival Guide, and any other appropriate media.

B. During the event:

7

i. Should event cancellation be necessary, critical health and safety systems must be as operational as reasonably possible during the duration of any temporary suspension, or until participants are able to leave the event site and the Gerlach/Empire area.

ii. BRC and the BLM will monitor forecast weather conditions. If weather forecasts suggest a high probability of adverse weather conditions that may result in disruptions to the event, both parties in conjunction with other appropriate agencies and cooperators will follow response plans and maintain appropriate strategies and actions to deal with potential impacts on participants. In the event of natural disaster or civil unrest, response plans, appropriate strategies and actions will be initiated immediately after any disaster or unrest occurs.

iii. BRC shall cooperate with the BLM and county law enforcement to warn participants headed into the event of event closure or other restrictions.

iv. BRC shall provide participants with current and projected conditions, allowed and prohibited actions deemed necessary for public health and safety as well as protection of the environment, and other appropriate public service announcements via BMIR, flyers, or loud speaker broadcasts as needed.

v. If event termination is required, an appropriate time frame will be established by the Tier 1 group and other cooperators to facilitate safe removal of people and property.

32. In cooperation with emergency services providers and law enforcement agencies, BRC shall within a reasonable time after learning of them, notify the BLM and appropriate agencies of all accidents related to the event that occur before, during, and after the event that result in death or personal injury requiring hospitalization. Accident reports involving death or injury will be coordinated with the Pershing County Sheriff's Office and the BLM.

33. BRC's medical contractor shall report daily to the BLM, and the Nevada Division of Public and Behavioral Health, providing a numerical breakdown of patient categories and transports, including a breakdown of reasons for transport; and no later than 60 days after the event shall provide to the BLM a written final statistical report of such medical cases.

34. Within 12 hours upon learning of any incident that occurs before, during or after the event that could possibly result in a liability claim, BRC shall confer with the BLM and as deemed necessary by either party, submit a written incident report to the BLM.

35. BRC shall provide a minimum of two structural/brush-type fire engines, National Wildfire Coordinating Group (NWCG) type 3-6. Engines and staff must meet NWCG or NWSA (National Wildfire Suppression Association) standards for personnel and equipment. These fire engines will be strategically placed within BRC as determined necessary by the BRC fire contractor. BRC shall station a specialized emergency firefighting vehicle at the airport during all times that the airport is open. BRC shall provide modern industry-standard technical rescue, extrication and high-angle rescue capabilities

8

AR10022

and equipment throughout pre- during- and post-event.

## FEE SCHEDULE

36. The BLM shall collect a commercial use fee from BRC for the use of public lands for the event. The fee, as set by regulation 43 C.F.R. § 2930, will be equal to 3% of the adjusted gross income derived from the use authorized under the SRP. Payment equal to at least 25% of the estimated commercial use fee (3% of estimated gross receipts) must be received by the BLM prior to the start of the event. Determination of gross income will be based on all payments received by BRC and its employees or agents for goods or services provided in connection with commercial activities authorized by the SRP. BRC shall provide BLM with an itemized detailed gross revenue report including, but is not limited to, ticket sales, coffee and ice sales, fees associated with outside services and private donations received by BRC for management of the event on public lands.

The following schedule for payments will be used:

| Payment | Due Date | Amount Due |
|---------|----------|------------|
| 1. | 10 days after permit is issued by BLM | 25% of estimated commercial use fees |
| 2. | January 31st, 2016 | The remaining balance of commercial use fees |

37. BRC shall provide BLM with an itemized detailed gross revenue report for all ticket sales, which will be itemized by category according to the BRC "2016 Ticket Structure." This includes, but is not limited to each of the below identified categories:

• PRE-SALE

• DIRECTED GROUP SALE

• INDIVIDUAL SALE

• OMG SALE

• LOW INCOME SALE

• MISCELLANEOUS SALE (any other ticket sales/entrance fees/re-entry fees or other forms of generated revenue for entry into the event).

38. BRC is responsible for the cost recovery payment, consisting of the actual costs of administering the Special Recreation Permit, including all direct and indirect costs, in addition to the commercial use fees. BRC must sign a Cost Recovery Agreement (CRA) within 10 days of the issuance of the permit. 100% of the cost recovery fee estimate shall be received prior to the start of the event as provided in the 2016

9

AR10023

CRA.

## SANITATION

39. BRC shall ensure there are an adequate number and suitable placement of toilets as needed throughout Black Rock City according to BRC's Operating Plan and the Nevada Division of Public and Behavioral Health's Mass Gathering permit requirements, in conjunction with the Nevada Revised Statute sanitation requirements. Due to the increase in population anticipated in the Environmental Analysis for this event, sufficient portable toilets must be supplied at areas likely to be used after dark. BRC shall ensure the toilets in the open playa are adequately lit and visible during nighttime activities. In conjunction with Mutant Vehicle mass gathering producers, BRC will stage sanitation resources in the deep playa.

40. Throughout the event, restrooms shall be placed in in strategic locations to accommodate participant's needs.

41. BRC will educate participants about pumping limits, portable toilet locations, and best practices in desert camping.

42. BRC shall continue to educate the event participants regarding the importance of appropriate disposal of human waste prior to release of information regarding the 2016 Burning Man event. BRC shall include a page on the Burning Man website that specifies the appropriate disposal of human waste for participants using personal portable toilets and provides information regarding the risks to human health of improperly disposed of human wastes. BRC shall inform the event participants on the legal ramifications to the individual and to the applicant of inappropriately disposed human waste including the possible revocation of permits, see NAC 444.5466 Disposal of sewage; plumbing (for Camping) and NAC 444.5492 (regarding provision of toilet facilities for mass gatherings).

## TRAFFIC MANAGEMENT

43. BRC's Traffic Management Plan will include detail on Burning Man's traffic controls during ingress and egress. This plan will be approved by the BLM authorized officer.

44. No more than 1,000 vehicles per hour shall be released from Black Rock City during the exodus period to avoid deterioration of the external roadway system to an unacceptable level of service (LOS E or F) (Note: Transportation engineers and planners commonly use the term level of serve (LOS) to measure and describe the operational status of a roadway network. The Nevada Department of Transportation (NDOT) strives to maintain LOS D or better on all of its roadways. LOS levels E and F are considered unacceptable by NDOT).

45. BRC shall allow any dispatched tow truck that is licensed to operate in the State of Nevada to access the event through the 12-mile access vendor's gate for the purpose of removing vehicles in need of repair, and/or to carry out minor repairs to allow inoperable vehicles to be driven away from the event.

46. BRC shall provide a minimum of two post-event roadside crews to clean up litter and debris along the roads and highways surrounding the event with a focus on County Road 34 from the "8-Mile" entrance to State Road (SR) 447, SR 447 from the intersection with County Road 34 to Wadsworth, from Gerlach to

10

AR10024

the California state line, and SR 446 from Nixon to SR 445 near Sutcliffe. Weather, traffic and other safety concerns permitting, BRC will begin this cleanup effort on Wednesday post- event, and complete the effort by October 1, 2016. BRC representatives will also meet and confer with local entities that have reported concerns about event participants leaving trash, and BRC will work to mitigate these issues in order to prevent a reoccurrence of complaints, and to promote Leave No Trace ethics outside of the event.

47. BRC shall coordinate with NDOT and the Freeway Service Patrol to ensure that debris removal is conducted according to NDOT standards and protocols. Off-site clean-up will occur after the event to gather trash discarded during the entire event period. BRC shall make best efforts to collect all trash that can be safely collected and will notify and coordinate with the appropriate agencies for any remaining items in accordance with all NDOT encroachments permits. Clean-up staff must wear appropriate safety vests and hats and drive vehicles with flashing lights to ensure safety during trash collection.

48. In addition to patrolling SR-446 and SR-447 for event-related trash, BRC shall coordinate with NDOT to compile a list of any other roadways or rest areas that need to be cleared of event-related trash. Additionally, BRC shall coordinate with Washoe County to patrol County Road 34 and Jackson Lane from the event site to the "Black Rock City Work Ranch" in the Hualapai Valley, approximately 10 miles north of the event site.

49. Prior to the event, BRC shall coordinate with NDOT and the Washoe County Roads Department regarding the type of traffic control devices and shall use such devices in accordance with both agencies requirements. A copy of all necessary permits for encroachment within NDOT and Washoe County Roads Department right-of-ways for temporary traffic control measures (i.e. speed limit trailers, etc.) shall be provided to the BLM and to appropriate agencies/jurisdictions by BRC 30 days prior to the start of the event.

50. Flaggers shall be used at the intersection of SR-447 and SR-427 to provide for greater public safety within the Pyramid Lake Paiute Reservation.

51. BRC shall cooperate with Washoe County Sheriff's Office and NDOT to request a temporary speed limit reduction through the town of Empire. The BLM recommends a posted maximum speed limit of 25 mph. A reduced speed limit would improve the safety of parking along SR-447 through Empire and pedestrians crossing the roadway.

52. BRC shall provide traffic control, using traffic control devices as determined by Washoe County Roads Department and NDOT, at County Road 34 entrances/exits to the Burning Man event, the "Y" intersection of SR-447/County Road 34 and in the towns of Gerlach and Empire during heavy traffic periods.

53. To reduce impacts to the Pyramid Lake Paiute reservation located along the access routes, BRC shall coordinate with the Pyramid Lake Paiute Tribe. BRC shall work with the Pyramid Lake Tribe in developing the applicant's plan to increase public awareness and educational campaigns about Leave No Trace® on tribal land, including for example, signage on roads, Public Service Announcements on BMIR, blog-posts, etc. Also, BRC shall continue to support and promote tribal enterprises that are setup to

AR10025



collect participant trash and recycling for a fee, which also helps with economic benefits of the region.

54. Event speed limits shall be posted on both Gate Road and the 12-Mile/Point 1 Road. BRC will provide clearly identifiable mileage markers on Gate Road to facilitate emergency response. Will-call area shall have an organized layout including signage.

## COMPLIANCE INSPECTIONS

55. BRC's operation and compliance with the terms, conditions and stipulations of the Special Recreation Permit, Form 2930-2 will be evaluated through performance inspections before, during, and following the event. All campsites, vendor operating areas, and permittee operating areas are subject to compliance checks to monitor environmental compliance-related stipulations. This includes the Department of Public Works, First Camp, Heavy Equipment Yards, and the United Site Services Operation Area, among others.

56. BRC shall coordinate with the BLM and any other relevant agency to monitor environmental protection measures identified in these Special Stipulations, the temporary closure order, and BRC's Operations Plan. BRC personnel shall participate in a combined Environmental Compliance Team, which will be responsible for monitoring environmental protection measures within the closure area during the entire event. The Environmental Compliance Team is a between the BLM, BRC's Earth Guardians, BR Rangers, ESD/Fire Safety, and Playa Restoration Crew. Each of these BRC departments will work through a central point person to document and mitigate all violations of environmental protection measures within 24 hours of the violation being brought to BRC's attention. The 2016 BRC Operations Plan shall describe the monitoring, communication, and mitigation protocols for the Environmental Compliance Team that will include, but are not limited to:

    A. Trash fence integrity;

    B. Appropriate campfire containment measures and prohibitions;

    C. Protection of archaeological resources;

    D. Camping within designated areas only;

    E. Grey and black water dumping prohibitions;

    F. Proper trash removal and cleanup;

    G. Mitigation of vehicle oil dripping;

    H. Promotion of Leave No Trace ethics;

    I. Motorized vehicle, motorcycle and ATV limitations and prohibitions as they relate to environmental compliance and possible impacts;

    J. Appropriate disposal of human waste; and

12

AR10026



K. Burn containers raised off the playa.

57. BRC shall make personnel available immediately after the end of the post-event cleanup period, and if deemed appropriate by the BLM, during the spring following the event, to inspect the site with the BLM to determine any latent adverse impacts, such as pit depressions, bumps, depressions from roadways, ruts from vehicular traffic, or surfacing buried materials, to ensure that the site is returned to pre-event condition.

58. Inspections of the event site, in the fall post event, will be coordinated by the BLM using randomly placed transects on the site and a measurable cleaning standard. The inspecting party will intensively collect debris found on the ground within each transect. A follow-up spring inspection will be conducted only when deemed necessary by the BLM. The Post-Event Cleanup Standard shall be the average total surface area of debris collected from either the fall or spring transects will not exceed the equivalent of an average of 1 square foot per acre from identified inspection areas.

59. BRC may make a written request for an extension of time for the completion of the cleanup if weather or some other catastrophic event interferes with access to the site for cleanup purposes. The BLM authorized officer may consider such a request.

60. If cleanup studies indicate the Post-Event Cleanup Standard has been or is likely to be exceeded, the permit will be suspended until the site has been cleaned up to a level not to exceed 50% of the standard and the Operations Plan includes reasonable measures to assure that the Post-Event Cleanup Standard will not be exceeded during the life of the permit.

Permittee Signature: _____   _____
                        BRC Authorized Officer              Date

13

AR10027

# EXHIBIT B

# EXHIBIT B

AR10028

4/18/2017

Burning Man Mail - question about the BLM interp camp



Rosalie Barnes <rosalie@burningman.org>

---

## question about the BLM interp camp
5 messages

---

**Rosalie Barnes** <rosalie@burningman.org>                                            Mon, Apr 17, 2017 at 2:27 PM
To: Michael Vermeys <mvermeys@blm.gov>, "Hall, Mark" <mehall@blm.gov>

Hi Mike, do you have any language about the interp camp? Like, what it does and why BLM has it? I'm looking for a little description. Thanks, R

--
Rosalie Fay Barnes
Government Relations Manager
Black Rock City - Burning Man
www.Burningman.org

(c) 617-285-2867
(o) 415-865-3800 ext.163

---

**Vermeys, Michael** <mvermeys@blm.gov>                                              Mon, Apr 17, 2017 at 2:41 PM
To: Rosalie Barnes <rosalie@burningman.org>
Cc: "Hall, Mark" <mehall@blm.gov>

On it!

## Michael Vermeys

## Project Manager – Burning Man

## Black Rock Field Office

## BLM-NV- Winnemucca District

## Desk 775.623.1582 – Mobile 775.315.5547

---

AR10029

4/18/2017                                    Burning Man Mail - question about the BLM interp camp

[Quoted text hidden]

---

**Vermeys, Michael** <mvermeys@blm.gov>                           Tue, Apr 18, 2017 at 9:20 AM
To: Rosalie Barnes <rosalie@burningman.org>
Cc: "Hall, Mark" <mehall@blm.gov>

BLM Interpretive Camp


The BLM Interpretive Camp at the Burning Man event is designed to expose Burning Man participants, from all over the world, to multiple aspects of BLM's public land management, specifically at the Black Rock Desert National Conservation Area (NCA). BLM Interpretive Camp is staffed with subject matter experts providing guests with interactive activities specifically related to the NCA and public lands. BLM Interpretive Camp staff meet and greet with between 5,000-10,000 Burning Man participants during event week. Participants walk through BLM Interpretive Camp reading from many informational kiosks, touching rocks, animal furs and cultural items collected locally. Activities range from lectures on Leave No Trace® and National Historic Trails to participating in Interpretive bicycle tours along the perimeter fence overlooking the vast Playa. Live fairy shrimp and a working Western wagon are typically on display, as are table top presentations of the local plants, wildlife, human history of the area, archaeology and the geologic origins of the Black Rock Playa formation and unique, endemic ecology. Interpretive Camp enables the BLM to inform the event participants about public lands, the meaning of the NCA designation and the importance of preserving the natural and cultural history found within the NCA.

## Michael Vermeys

## Project Manager - Burning Man

## Black Rock Field Office

## BLM-NV- Winnemucca District

## Desk 775.623.1582 - Mobile 775.315.5547


On Mon, Apr 17, 2017 at 2:27 PM, Rosalie Barnes <rosalie@burningman.org> wrote:
[Quoted text hidden]

---

AR10030

4/18/2017                                          Burning Man Mail - question about the BLM interp camp

**Rosalie Barnes** <rosalie@burningman.org>                                            Tue, Apr 18, 2017 at 9:47 AM
To: "Vermeys, Michael" <mvermeys@blm.gov>
Cc: "Hall, Mark" <mehall@blm.gov>

Thank you!
[Quoted text hidden]

---

**Vermeys, Michael** <mvermeys@blm.gov>                                            Tue, Apr 18, 2017 at 2:52 PM
To: Rosalie Barnes <rosalie@burningman.org>

Absolutely, hope it helps. THX

### Michael Vermeys

### Project Manager - Burning Man

### Black Rock Field Office

### BLM-NV- Winnemucca District

### Desk 775.623.1582 - Mobile 775.315.5547

[Quoted text hidden]

AR10031

1  DOWNEY BRAND LLP
   ELIZABETH B. STALLARD (Bar No. 221445)
2  621 Capitol Mall, 18th Floor
   Sacramento, CA 95814
3  Telephone:    916.444.1000
   estallard@downeybrand.com
4
   Attorneys for Appellant
5  BLACK ROCK CITY LLC

6

7

8              UNITED STATES DEPARTMENT OF INTERIOR

9                 INTERIOR BOARD OF LAND APPEALS

10

11  BLACK ROCK CITY LLC,            Case Identification No.:  IBLA 2017-126

12            Appellant,            Special Recreation Permit
                                    LLNVW03500-16-01
13       v.                         2930 (NV030.12)

14  BUREAU OF LAND MANAGEMENT,      **DECLARATION OF ROGER VIND IN
                                    SUPPORT OF APPEAL**
15            Appellee.

16

17

18       I, Roger Vind, declare as follows:

19       1.     I am over 18 years old, of sound mind, and capable of making this declaration.

20  Since March 2014, I have been working for appellant Black Rock City LLC ("BRC") as Law

21  Enforcement Advisor.  My duties include representing BRC in official planning meetings with

22  both the U.S. Bureau of Land Management ("BLM") and the Pershing County Sheriff's Office

23  ("PCSO") about public health and safety at the Burning Man event.  I have personal knowledge

24  of the facts set forth herein, or, if so stated, am informed and believe of their truth and accuracy

25  and, if called to testify, I could and would do so competently and under oath.

26       2.     I have 25 years of experience working in law enforcement.  I joined the Nevada

27  Highway Patrol ("NHP") on October 10, 1988, and retired as a Lieutenant on October 10, 2013.

28       3.     From 2003 to 2005, and again from 2007 to 2010, I oversaw NHP's law

DOWNEY BRAND LLP

1481218.1                                1

1   enforcement of the traffic going into and out of the Burning Man event ("Burning Man" or the

2   "event"). During this time, I was also the official liaison from NHP who cooperated with both

3   BLM and BRC on public health and safety issues for the event.

4       4.      Attached hereto as **Exhibit A** is a true and correct copy of a document that BLM

5   provided to BRC in December 2016, summarizing BLM's computer assisted data ("CAD")

6   collection for the 2014, 2015, and 2016 Burning Man events. The CAD summary lists the

7   number of BLM law enforcement events recorded and citations issued each year across various

8   categories.

9       5.      According to BLM's 2016 data, the number one type of "law enforcement event"

10  was "public contacts." My understanding from discussions with BLM staff is that BLM law

11  enforcement officers record a public contact every time they engage with a Burning Man

12  participant, including recording as "public contacts" any casual conversations at BLM's law

13  enforcement substation and elsewhere on the event site.

14      6.      I am informed and believe that BLM law enforcement officers spend two hours of

15  every shift at Burning Man staffing BLM's law enforcement substation, which BLM uses for

16  community relations purposes. Based on my professional experience, their ability to do so

17  indicates that BLM has more officers at the event than needed.

18      7.      In addition to BLM's law enforcement operations, BRC separately contracts with

19  PCSO to provide law enforcement services at the Burning Man event each year. PCSO deputies

20  are on site at the Burning Man event to enforce Nevada laws, including those relating to motor

21  vehicle operation and controlled substances. Following the 2016 event, Pershing County Sheriff

22  Jerry Allen issued a report titled "2016 Pershing County Post Mission Synopsis," which included

23  as appendices the citation log and case log for PCSO's operations on the Burning Man event site

24  from August 23 through September 6, 2016. Attached hereto as **Exhibit B** are true and correct

25  copies of those two appendices.

26      8.      I understand that BLM's Project Labor Log spreadsheet attached to its 2016 Cost

27  Recovery Decision includes 70 hours of recorded labor by Officer Huegerich, the chief of the

28  Office of Professional Responsibility within BLM's Office of Law Enforcement and Security. I

DOWNEY BRAND LLP

1481218.1                                        2

AR10033

1  am informed and believe that Officer Huegerich was responsible for conducting onsite internal

2  affairs investigations and liability assessments related to the conduct of BLM law enforcement

3  personnel, such as allegations of improper use of force or violations of federal ethics laws at the

4  Burning Man event.

5        9.     On August 22, 2016, while we were on a tour of BLM's medical trailer at the

6  Burning Man event, BLM's medical unit leader Warren Templeton advised me that one of the

7  reasons BLM provides a separate medical facility for its personnel is that BLM's medical

8  contractor can provide CPR certification to BLM staff while they are on-site.  I understand that

9  BLM staff are required by BLM to have current CPR certifications as part of their regular

10  employment qualifications.

11        10.    Attached hereto as **Exhibit C** is a true and correct copy of excerpts from a report

12  by the Nevada Department of Public Safety titled "2015 Crime in Nevada."  The complete report

13  is publicly available on the website of the Nevada Department of Health and Safety's General

14  Services Division, at http://gsd.nv.gov/uploadedFiles/gsdnvgov/content/About

15  /UCR/2015%20Crime%20In%20Nevada.pdf (last visited April 26, 2017).

16        11.    Based on my professional experience, K-9 units are typically used by law

17  enforcement agencies when there is known or suspected trafficking of narcotics.  At the 2014,

18  2015, and 2016 Burning Man events, I am informed and believe that BLM issued a total of two

19  citations (both in 2015) for trafficking in a controlled substance.  Given these low numbers, and

20  based on my professional experience, BLM's use of canine units at Burning Man exceeds the

21  reasonable requirements of the event.

22        12.    Based on my professional experience, the number of BLM law enforcement

23  officers at Burning Man and the number of hours they work are not justified in light of the very

24  low number of violent crimes that have taken place at the event over its long history.

25        13.    Based on my observations and knowledge, BLM is not adequately taking into

26  consideration the thousands of professional BRC staff, volunteers, and contractors in assessing

27  how many law enforcement officers are needed for the Burning Man event.  In my professional

28  opinion, BRC's public health and safety staff are a significant force multiplier.  In the law

DOWNEY BRAND LLP

1    enforcement realm, a force multiplier is anything that multiplies the overall effectiveness of law

2    enforcement to promote public health and safety.

3        14.    In 2015, I understand that BLM required BRC to pay over $101,000 for radios and

4    accessories via a statement of work outside of the cost recovery process.  After the 2015 event,

5    BLM staff told BRC staff that BLM actually did not need these items.

6        15.    I am informed and believe that BLM uses satellite tracking devices to identify the

7    precise location of BLM personnel within the Burning Man event site at any given time, and that

8    BLM distributed a number of these tracking devices to PCSO in 2016 for the tracking of its

9    deputies.  I am further informed and believe that BLM required BRC to purchase these tracking

10   devices in 2013 and has charged BRC $50,000 each year since, via the cost recovery process, for

11   associated service, software upgrades, air time, and support.

12       16.    Based on my knowledge and experience, these satellite trackers are not essential

13   equipment for law enforcement operations at the Burning Man event.  I understand that all BLM

14   employees and PCSO deputies have radios with which to communicate their location and

15   circumstances to each other and to dispatch personnel.  Moreover, law enforcement personnel

16   work in pairs at the event for personal safety reasons and to enable one officer to radio a location

17   if his or her partner is otherwise engaged.

18       17.    Attached hereto as **Exhibit D** is a true and correct copy of BLM's After Action

19   Review for the 2015 Burning Man event.

20       18.    I am informed and believe that the requirements in BLM's 2016 contract with

21   Lyman Communications, LLC included a pan tilt zoom IP camera for use at BLM's law

22   enforcement substation at the Burning Event, and a minimum 42-inch, flat-screen, high-definition

23   TV at the law enforcement Joint Operations Command Center ("JOC") that was used to monitor

24   that camera.  This TV was in addition to the 50-inch TV that BLM required BRC to provide, via a

25   statement of work, for the same purpose.

26       19.    My understanding is that the TV screens at the JOC are not monitored 24 hours a

27   day and that, due to the dusty conditions of the event site, clear imagery from the substation's

28   camera is only available some of the time.  To the best of my knowledge, BLM has not reported

DOWNEY BRAND LLP

1481218.1                                    4

1    any incidents where this camera and screen proved critical for any purpose.

2         20.    In my professional experience, the sophisticated infrastructure at the JOC serves

3    all reasonably foreseeable needs of law enforcement at the Burning Man event.

4         21.    I understand that BLM requires BRC to provide and pay for a trailer at the JOC for

5    BLM law enforcement personnel to use to write reports.

6         22.    I am informed and believe that the temporary holding facility that BLM requires

7    BRC to provide at the JOC, via a separate statement of work, is used by PCSO to temporarily

8    hold people under arrest before they are transported to PCSO's headquarters in Lovelock,

9    Nevada, for booking.  I am further informed and believe that this temporary holding facility,

10   which is only about 12x40 feet in size, is staffed 24 hours a day by PCSO deputies.

11        23.    I understand that the requirements in BLM's contract with Lyman

12   Communications, LLC included cellular telephone service, as well as 17 voice-over IP ("VOIP")

13   telephone lines and associated equipment.  I understand that BLM has never used all VOIP lines

14   at one time.  I am informed and believe that BLM personnel generally use their cell phones to

15   place and receive calls at the event.

16        24.    I understand that the requirements in BLM's contract with High Desert Internet

17   Services include the provision of microwave wireless internet service at the JOC with 30

18   megabytes-per-second ("Mbps") bi-directional capabilities.  I am informed and believe that

19   BLM's required internet speed was 15 Mbps and that both Burning Man's participant population

20   and BLM's staffing levels were about the same in 2016 as they were in 2014.

21        25.    In 2017, BLM staff informed me that part of this internet bandwidth was used to

22   support PCSO's connection back to Lovelock, by essentially creating a bridge from Lovelock to

23   the Burning Man event site and back.

24        26.    To date, BLM has not provided BRC with a copy of the network utilization reports

25   that High Desert Internet Services was required to provide, per its contract with BLM.

26   / / /

27   / / /

28   / / /

DOWNEY BRAND LLP

1481218.1

5

DECLARATION OF ROGER VIND IN SUPPORT OF APPEAL

AR10036



I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 28th day of April, 2017, at Sparks, Nevada.

ROGER VIND

DOWNEY BRAND LLP

1481218.1

6

DECLARATION OF ROGER VIND IN SUPPORT OF APPEAL

# EXHIBIT A

# EXHIBIT A

AR10038

| BLM LAW ENFORCEMENT EVENTS BY TYPE* | | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| PUBLIC ASSISTS | 450 | 1474 | 213 |
| PUBLIC CONTACTS | 166 | 1595 | 6903 |
| TRAFFIC STOPS | 860 | 899 | 1254 |
| VERBAL WARNINGS | 520 | 548 | 317 |
| WRITTEN WARNINGS | 230 | 211 | 45 |
| CITATIONS | 392 | 534 | 326 |
| RESOURCE COMPLIANCE CHECKS | 17 | 118 | 20 |

| BLM CITATIONS BY TYPE* | | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| AIRCRAFT LANDING | 0 | 1 | 1 |
| DISORDERLY CONDUCT | 8 | 7 | 3 |
| DRUG PARAPHERNALIA | 29 | 35 | 3 |
| DUI ALCOHOL | 1 | 1 | 0 |
| DUI DRUGS | 2 | 1 | 1 |
| FIRE | 0 | 1 | 1 |
| FIREWORKS | 2 | 2 | 0 |
| ALCOHOL/FURNISH TO MINOR | 1 | 0 | 0 |
| CREATING A HAZARD | 10 | 26 | 35 |
| IN A CLOSED AREA | 44 | 15 | 0 |
| INTERFERENCE | 4 | 3 | 1 |
| MOTOR VEHICLE IN CLOSURE | 11 | 5 | 11 |
| MOTOR VEHICLE NO DRIVERS LICENSE | 14 | 12 | 9 |
| MOTOR VEHICLE NO INSURANCE | 3 | 1 | 3 |
| MOTOR VEHICLE NO PERMIT | 2 | 0 | 0 |
| MOTOR VEHICLE NO PLATE | 1 | 1 | 2 |
| MOTOR VEHICLE NO REGISTRATION | 12 | 16 | 29 |
| MOTOR VEHICLE NO BRAKE LIGHTS | 0 | 6 | 10 |
| MOTOR VEHICLE NO TAILLIGHTS | 1 | 10 | 7 |
| MOTOR VEHICLE OBSTRUCTED PLATE | 1 | 0 | 0 |
| MOTOR VEHICLE SPEEDING | 3 | 77 | 58 |
| MOTOR VEHICLE CARELESS DRIVING | 1 | 5 | 0 |
| MOTOR VEHICLE WRECKLESS | 1 | 0 | 0 |
| MOTOR VEHICLE MISCELLANEOUS | 0 | 4 | 16 |

AR10039

| OPEN CONTAINER | 5 | 7 | 2 |
|---|---|---|---|
| POSSESSION OF A CONTROLLED SUBSTANCE | 205 | 116 | 82 |
| TRAFFICKING | 0 | 2 | 0 |
| PUBLIC USE | 11 | 0 | 0 |
| RESISTING | 1 | 4 | 2 |
| TRESPASS | 6 | 8 | 5 |
| WASTE WATER | 2 | 34 | 2 |
| WEAPONS | 4 | 3 | 3 |
| MISC | 0 | 3 | 40 |
| DEPOSIT OF HUMAN WASTE** | 7 | 128 | 81 |
| **TOTAL** | **392** | **534** | **407** |

*NOTE - The statistics represent a summary of the final 2016 Law Enforcement CAD report. These statistics reflect radio traffic recorded through the dispatch center. ***

**It is estimated 40 citations coded as MISC in CAD were issued for Depositing Human Waste on Playa

AR10040

# EXHIBIT B

# EXHIBIT B

AR10041



# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                    JERRY ALLEN, Sheriff

---

## 2016 Pershing County
## Post Mission Synopsis

### INTRODUCTION AND BACKGROUND

The Burning Man Festival is a unique 'counterculture' event that is held annually in the Black Rock Desert portion of Pershing County, on land managed by the Bureau of Land Management (BLM). This event was started in San Francisco in 1986 and was attended by 20 people. This event quickly outgrew the venue of Baker Beach in the San Francisco area and by 1990, they were no longer allowed to burn the man on the beach, nor perform some of the activities they were openly performing. In the same year, the event was moved from San Francisco to the remote area of the Black Rock Desert, which is partially located in three (3) separate counties within Nevada. The first several years of the event being held in the Black Rock Desert had the event located within the boundary of Washoe County. Over the years the festival has progressed north and is now wholly within the boundaries and jurisdiction of Pershing County. As far back as 1991, the event was such a large size as to require a permit to be issued by the BLM.

BLM issues a Special Recreation Permit for the Festival, which creates a temporary city, Black Rock City (BRC). As such, they are the regulatory agency for the Permit as well as any stipulations that are included therein. BLM also has a Law Enforcement branch that is tasked with investigating and enforcing laws regarding the use and abuse of the land itself. The Pershing County Sheriff's Office is tasked as the ultimate authority in providing Law Enforcement to the participants of the Festival. We investigate all manner of crimes from Trespassing to Homicide and anything in between.

Pershing County normally has a population of approximately 6,800 people within the County. This population includes approximately 1,600 inmates incarcerated at the Lovelock Correctional Center. For this population, the Pershing County Sheriff's Office has 13 full time Sworn Law Enforcement Deputies, including the Sheriff, to perform all of the duties statutorily mandated for the Sheriff's Office. This equates to approximately 1 Deputy for every 400 persons permanently residing in Pershing County, minus those incarcerated.

During the approximate 10-12 days of the active portion of the Burning Man Festival, the population of just the Festival balloons to upwards of 80,000+ persons. Still with only the 13 Sworn Full-Time Deputies within the Pershing County Sheriff's Office. Based on this population, it would appear the Pershing County Sheriff's Office would need to have approximately 200 Deputies to provide similar staffing for the visitors to the Burning Man Festival. However, Burning Man provides approximately 800+ 'Black Rock Rangers'. These employees of Burning Man are mostly made up of volunteers, some of whom have very limited training, to interact with the population and attempt to mitigate issues before they rise to the level of a Law Enforcement Response. Some of the Rangers are trained enough to provide a force multiplication, to a limited extent, for Law Enforcement.

---

AR10042

 

# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                                    JERRY ALLEN, Sheriff

Additionally, there are several thousand people on the Black Rock Desert for approximately two months, providing for set up and clean-up of the Burning Man Festival. While many of these people are there to truly assist in the mission of Burning Man, there have been those that have required an additional response from Law Enforcement, to such a remote area of Pershing County that outside of the Festival, it is only responded to a couple of times a year.

The Burning Man Festival has, for several years, far exceeded the resources of not only Pershing County, but the Law Enforcement resources of Northern Nevada as a whole.

Being as this Festival is a temporary assignment on the actual playa, I deem this to be a 'mission' of the Pershing County Sheriff's Office and not a standard patrol duty. This Festival requires numerous resources that are not always available to Pershing County on a daily basis. This Festival has, however been increasing in magnitude to the extent that Pershing County needs to hire someone to provide for planning and execution of the plan for this Festival.

 

# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                    JERRY ALLEN, Sheriff

## OPERATIONAL PLANNING

There were several meetings with various entities with interest in the Burning Man event throughout the year preceding the event, although there were fewer meetings than the 2015 Festival planning season. Some of these meetings were beneficial to the success of the operation of this years' event. However, some of the meetings were not beneficial, and were in fact a waste of resources. These lackluster meetings need to be revisited to ascertain if they are needed going forward.

In these meetings, I advised I would attempt to go separate command for the 2016 Festival. After several meetings and an inability to provide for the infrastructure needed to separate the commands, due to budgetary constraints, I agreed to integrate the command structure again for 2016.

We again ran into issues with the procurement of many of the infrastructure items we would need to provide for personnel who were going to work the event. There was again, a discussion and delay in providing for a food vendor, which was rectified much earlier than the previous year. This earlier rectification essentially saved PCSO monies that were expended the previous year.

One of the largest issues we ran into was our ability to provide for radios for effective communication with the on-site dispatch on the playa. Radios had been purchased by BRC the previous year. This purchase, according to BRC was strictly at the urging of BLM, to meet the needs of the personnel on-site. This year, BLM advised they had gained access to a bank of radios and as such, they would not need the radios procured from the previous year. This became a major area of contention between BRC and BLM and as such spilled over to PCSO. When things were settled, BRC agreed to allow PCSO to 'borrow' or 'use' the radios for the 2016 Festival at no cost to Pershing County. However, BRC advised that for 2017 and beyond, PCSO may have to either rent or purchase the radios from BRC in order to continue to use them. BRC also advised they may attempt to sell the radios on the open market. While this decision made it possible to provide for communication at the 2016 event, it has already begun to strain relations for the 2017 Festival and beyond.

In the planning meetings, we were advised that BRC would again allow PCSO to use what they refer to as the 'shower property' to house our trailers for bunk space for personnel. I was further advised we may have access to another building known as the 'bunkhouse'. Sgt. Carmichael and I went to look at this building and it appeared to be sufficient to provide bunk space for several persons. However, the building was severely lacking in proper bathroom facilities, as it only had one. This building was also in need of some repair and maintenance. I advised BRC that I would provide for staffing and inmate labor to come and provide for repairs to the building and general cleaning around the property. PCSO was able to provide staffing and inmate labor on at least three occasions to provide for work to be performed on the bunkhouse and the shower property. Due to lack of staffing, not all of the requested labor could be completed prior to the start of the 2016 Festival.

I again advised I would be supplying active duty Category I officers and Deputies to provide a professional Law Enforcement service. I originally planned to provide a day of training to the staff we hired, to acclimate them to the environment and Festival, as well as go over our policies and procedures. This mission was impossible to accomplish as I was advised by several agencies that they could not allow their staff an additional day off, to get everyone together to attend said training. I was also again advised that there are still

AR10044

 

# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                                    JERRY ALLEN, Sheriff

---

agencies within Nevada that will not provide staffing for the Festival due to the fact Pershing County Sheriff's Office cannot provide for adequate enough coverage to keep their officers safe. Additionally, due to an attempted escape from our temporary jail during the 2015 Festival, I wanted to increase each detention shift by one Deputy so there would always be a minimum of two Deputies in the jail at all times.

We were finally able to provide staffing, including detention staffing, to minimally cover the event, within the budgetary constraints provided. However, I was not able to find enough staffing or funding to provide the type of coverage I had previously advised BLM and BRC I would hope to have at the event. This is an issue that going forward may not be able to be rectified with the amount of Law Enforcement Officers located within the State of Nevada.

There were additionally conversations with several different entities within Northern Nevada to see what their response would be if there was a critical incident to happen at the Festival. The results of these conversations provided extremely dismal results, meaning that whatever staffing was actually at the Festival would be all we would have to rely on for quite an extended period of time. Based on this deficiency in staffing and additional response, I advised BLM and BRC that I could not in good conscience provide for adequate safety for the participants of the Festival.

---

AR10045

AR10046

AR10047

 

# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                          JERRY ALLEN, Sheriff

## OPERATIONS

The 2016 Burning Man event started, as many of them do, prior to the opening of the gates to allow paid participants to enter. We received a call of a motorcycle accident which had allegedly occurred on the playa. We were not advised until after the accident was alleged to have happened. BRC advised dispatch that they did not know how to properly advise dispatch of events that happened out on the playa. I received several calls from Kate Gunnella as well as other representatives of Burning Man. These personal calls further delayed any response that may have happened, due to me having to take the information and then passing that information to dispatch to be properly disseminated. There were also two other medical calls we were advised of prior to the opening of the actual Festival. The first contact was made on August 5, 2016, approximately 23 days prior to the actual start of the event.

We also affected nine arrests prior to the 'official' opening of the paid participant gates. This number is almost double the arrests we made in 2015 pre-Festival. This number is important because Burning Man continually approaches BLM with requests to either open the gates early or allow for more 'early entry passes' to access the Festival prior to the paid participants to access the Festival. The arrests we affected were either on people who were allowed to come to the Festival early to set up art structures, or they are employees of the Burning Man Festival. Although I am aware that BRC cannot be responsible for every individual person who attends the Festival, this statistic shows that the more people who are allowed to enter early has the potential of having more negative interaction with Law Enforcement. The more concerning issue is that of the nine arrests made, ALL of those arrested were for some type of possession of illegal narcotics; eight for trafficking levels of illegal narcotics and the other for possession of illegal narcotics for sales. This behavior continues to concern me as the Sheriff of Pershing County due to the fact that when the numbers come out for our Uniform Crime Reporting, it would appear that Pershing County is the most violent and Drug infested County within Nevada during the end of the summer. This statistic is wholly due to the Burning Man Festival being allowed to be held within Pershing County. And it is held with very few regulations from the County as a whole.

These issues coupled with the numerous medical incidents and set up of our equipment required us to be on the playa and actively providing for Law Enforcement services outside of the 2013 Settlement Agreement. I would like to say that this is isolated, however history speaks for itself. We have to provide for more services earlier in the Festival. For the Pershing County Sheriff's Office to continue to provide these services, the Settlement Agreement will need to be revisited. It is important to restate that if it were not for the Burning Man Festival, the Pershing County Sheriff's Office would only respond to that portion of the County on a couple of different occasions throughout the remainder of the year. It is due to the Festival that we are obligated to be on the playa during the time when there is a large population on the playa, and we have to provide for a far greater response just to provide for some type of safety for the participants.

We took possession of the shower property and found that it would be sufficient for us to use for our personnel to bunk at. We had to perform some minor cleaning of the facilities before we could use them, but the property was made available prior to us moving trailers onto the property. We did not need to use the bunkhouse, which worked out well for BRC, as they had personnel who could use that building.

AR10048

 

# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                                        JERRY ALLEN, Sheriff

Through discussions with a local internet provider, Pershing County Sheriff's Office was able to work with BLM to enhance our microwave and internet traffic to our home Office in Lovelock. This service was provided to Pershing County at no charge for the 2016 Festival, as they were not sure the equipment would work. After the necessary equipment was in place, our systems worked almost well enough to almost be in Lovelock. This was a vast improvement over any previous year. This enhancement allowed for our reporting process to be handled in more real time. We also had CAD services in an more timely manner. Additionally, our booking process for those who were incarcerated at our temporary jail, were enhanced to the point we could perform bookings at the temporary jail and lessen the burden on the jail staff at the home Office in Lovelock. Based on the fact this solution worked so well this year, I imagine we will be charged for this service next and subsequent years, although I am not sure what the cost will be.

Again this year, we were unable to integrate with BLM's CAD system. There have been meetings since the Festival to attempt to rectify this issue and things are looking promising.

This year the jail building was enhanced due to an attempted escape during the 2015 Festival. This allowed for greater separation of inmates as well as more security. However, one deficiency was revealed. We had attorneys attempt to meet with inmates while still at the temporary jail on the playa. For these meetings, we did not have a separate room within the jail that would allow for a secure meeting place that would also allow for a level of privacy to protect the attorney/client interaction. A solution will need to be found for following years to allow for this Constitutional interaction to be performed on the playa.

AR10049




# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                              JERRY ALLEN, Sheriff

## ENFORCEMENT STATISTICS

During the 2016 event we were able to capture information on the following incidents:

- There were 46 arrests at the Festival. This is 3 more arrests than in 2015-These arrests ranged from FTA warrants, Sex Offenders failing to register, possession of Illegal Controlled Substances to Trespassing.
  - Refer to Appendix A for specifics
  - Per previous planning and agreements with BRC, those persons arrested for committing a criminal act on the playa were also served with No Trespass Warnings. Thereby relieving Law Enforcement from having to deal with the same persons repeatedly.
    - During the 2016 operational period, there were those representatives of BRC who did not think it necessary to continue to issue No Trespass Warnings to participants who had been arrested. BLM was willing to take over as the permitting entity to sign any warnings to prevent arrestees from returning and continuing their criminal enterprise.
- There were 152 citations[1] issued for various offenses-mainly drug charges not amounting to sales or trafficking. This represents 9 more citations than 2015. While not a significant increase, this enforcement was provided with less staffing than 2015.
- We had a huge spike in the number of cases generated during this year's Festival.
  - We had 197 cases[2] this year
  - That increase was due to CAD issues.
  - Our CAD system is not able to attach property to a citation record, so if property or contraband was seized and only a citation was issued, the Deputy still had to pull a case to have somewhere to document the property and provide for proper chain of custody.
- We had 11 reports of Sexual Assault from the event.
  - There was one arrest made on playa involving a sexual assault as well as other charges.
  - There are currently four active reports which are under investigation regarding Sexual Assault.
    - Two of these reports were made after the Festival and after the victim had returned to Reno and went to an area hospital for treatment.
    - These reports were started by Reno Police Department and have subsequently been transferred to NDI for continued investigation
- We received several reports of missing or lost children
  - All children were located and returned to their respective parents with education being provided on children at the BM festival.
  - One of these missing children reports substantially effected exodus.
    - There was a report of a missing juvenile.
    - The juvenile ended up being a 17 year old female.
    - The exit road was closed, pursuant to the lost child protocol created by BRC.
    - The exit road was closed for an extended period of time due to a lack of Law Enforcement resources.
    - The juvenile was subsequently found still within the Festival and was reunited with her guardian.

---

[1] Appendix A
[2] Appendix B

 

# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                                       JERRY ALLEN, Sheriff

- Our enforcement action was 0.000037 at the peak of our enforcement. Meaning that we had negative enforcement with far less than one (1) % of the population at any given time.
- We continue to receive calls for service even after the event.
  - Many of these calls after the fact are for reports of either damage or theft of personal property.

AR10051

 

# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                                    JERRY ALLEN, Sheriff

## FINANCIALS

As of November 1, 2016 the Pershing County Sheriff's Office has put in over 3,852.75 man hours to accommodate the 2016 Burning Man Festival. This does not include all of the numerous hours which were put in prior to the event for planning.

- o This allocation includes payment of:
  - $2,500 for housing above what BRC could provide
  - 3,852.75 man hours at an approximate cost of $165,629.73[3]. (This final cost may change when we receive the final payroll numbers from the payroll dept.)
  - $8,993.45 for equipment and supplies consumed during the event[4].
- o It does not include:
  - The additional expense of $39, 959.20 for Law Enforcement Services provided both pre and post Festival. This time was necessary due to Law Enforcement interaction-arrests or citations-outside of the 2013 Festival Agreement.[5]
    - This breakdown is 749.5 hours pre-Festival and 180 hours post-Festival.
  - The over $10,000, by my estimation, of supplies BLM provided for my staff
  - The cost of housing and waste removal from the Shower Property, provided by BRC.
  - The cost of meals provided through BLM.
  - The cost of Dispatch provided through BLM.
    - These amounts have not yet been provided to me, prior to the issuance of this report.

This makes a total, so far, of $174623.18 expended by the Pershing County Sheriff's Office for the 2016 Burning Man Festival. Portions of this overage are due to the fact that the festival populated at a rate that not even Burning man was prepared for.

This total however is not a final number as we plan to expend more money as the continued reports and investigations come in and further investigations are performed and meetings are attended.

---

[3] Appendix C
[4] Appendix D
[5] Appendix E

AR10052



# PERSHING COUNTY SHERIFF'S OFFICE
*"To Serve and Protect"*                                    JERRY ALLEN, Sheriff

## ISSUES NEEDING SOLUTIONS PRIOR TO THE 2017 BM FESTIVAL

1. A solution needs to be made regarding radio connectivity to Lovelock.
    a. This will entail a permanent mountaintop repeater within reach of the Black Rock Desert.
    b. This may be rectified this spring with the addition of a repeater in the Selenites.
2. The integration of PCSO radios with BLM radios.
    a. Due to the fact both entities use different encryption, a viable solution needs to be made so we can integrate our everyday radios.
    b. If we had this information prior to the festival, I may have been able to have our vehicle radios programmed as well as our handhelds, and may have been able to save money on radios
3. Blue Pit still needs to be reevaluated as a staging area for Law Enforcement.
    a. This area is within 2 minutes response time from the Pit to the Command Post.
        i. This close proximity would allow for extremely rapid response of the personnel who will be responsible for making important decision relating to the safety of all of the participants.
    b. This area is separated enough from the event to provide some quiet time for the staff.
    c. This area would not require any other special permitting.
    d. The proximity of the Blue Pit would also be closer to the event which would allow for:
        i. Less distance for providing sanitary services and fresh water.
        ii. Less travel time during the major influx of traffic.
            1. This alone could save upwards of 45 minutes to an hour of travel time-a timeframe that is unacceptable at a planned event.
4. Funding will need to be secured to provide for a minimum of 40 Deputies per shift.
    a. The shifts will need to start earlier in the event.
    b. Some of these shifts will need to extend past the end of the event, due to the influx of calls and the lingering paperwork and evidence that needs to be secured after every event.
    c. We also need more personnel available after the event to assist in 'break down' of our infrastructure.
5. Burning Man and the Commissioners need to dispose of the 2013 Settlement Agreement and either a new agreement needs to be worked out, or a system of cost recovery needs to be put into effect.
    a. Cost recovery has been in place for BLM for several years and allows for a realistic opportunity to provide necessary response and coverage for an event of this magnitude.
    b. The agreement only allows for funding for eight days, when in reality the participant portion of the event for 2016 was 10 days, by BRC's own admissions, due to a 'side agreement' with BRC and BLM to allow for early ingress and egress to alleviate traffic.
    c. There are people on the Playa for well over the nine days of the actual event, and these are people that PCSO regularly has to have interaction with.
6. Burning Man has become a year round event for the Pershing County Sheriff's Office.
    a. Due to the extra burden placed on this Office for just this event, the County needs to find a solution, possibly through cost recovery, to provide the Pershing County Sheriff's Office with a full-time sworn person to accommodate this event.
        i. This position needs to be sworn due to the fact that even up to 12 months after a BM festival has concluded, this Office commonly receives reports of criminal activity.

AR10053



# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                                         JERRY ALLEN, Sheriff



      ii. These reports will sometimes need further investigation, which can only be performed by a Sworn Deputy.

    b. The County has already realized this is an additional burden to the County and has already funded a position within another office with the funding provided it by BRC.

7. Pershing County needs to formulate a plan to oversee the population count of this city. There were too many glitches with the system they had this year, especially when it comes to reporting a population that would put the County into another funding bracket, only to be ruled out as a simple 'glitch'.

    a. The numbers provided by BRC cannot be fully relied upon especially as they are now allowing traffic to come in through 'Burner Express' buses and "Burner Air' a commercial flight option bringing upwards of 30-40 persons to the playa per plane.

      i. During the 2016 event I observed and reported to BRC that I had made personal observations of buses arriving at the Festival and not being thoroughly·inspected or having an accurate count provided for regarding possible participants on the buses.

       I believe it is also important to state that BRC allows for several vendors to set up in and around the immediate area of the Festival. Burning Man ensures that there are mechanisms in place for them to regulate these vendors within the Festival. There however is no mechanism for the County to provide the same oversight. This needs to be rectified, as the County is ultimately responsible for the licensing of some of the vendors within the Festival. It is ludicrous to have entities such as the Health Department from the State of Nevada on site without also having the equivalent from Pershing County looking for violations of our licensing laws, especially when service of alcoholic beverages is concerned.

AR10054



# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                    JERRY ALLEN, Sheriff

# APPENDIX A

AR10055

AR10056

## PERSHING COUNTY SHERIFF'S OFFICE

| | |
|---|---|
| **Citation Log for 08/23/2016 - 09/06/2016** | Page 1 |
| | 12/07/2016 |

| Cite # | Date | Violation | Person Cited | Deputy |
|---|---|---|---|---|
| S 04352 | 08/23/2016 | 453.336 -Possess Marijauna <1oz. | Acosta, Garcia | Thornhill, Shawn |
| S 04919 | 08/25/2016 | 454.351 -Drugs not to be introduced | Stratton, Michael | Flanagan, Jason |
| S 04353 | 08/25/2016 | 454.351 -Drugs not to be introduced | Pennock, Lucy | Thornhill, Shawn |
| S 04627 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Dennock, Jordan | Boyer, Daniel |
| S 04451 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Clements, Tucker | Wright, Robert |
| S 04532 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Hearn, Peter | Mitchell, Earl |
| S 04401 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Subbaraman Saraswathi | Baty, Keegan |
| S 04402 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Goody, Jonathan Jay | Baty, Keegan |
| S 04403 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Asbury, Luc | Baty, Keegan |
| S 04533 | 08/26/2016 | 453.336 -Possess Marijauna <1oz. | Greenwood Iv, William | Mitchell, Earl |
| S 04404 | 08/26/2016 | 453.336 -Possess Marijauna <1oz. | Oneal, Charles Edwin | Baty, Keegan |
| S 04405 | 08/26/2016 | 453.336 -Possess Marijauna <1oz. | Wilhite Milo John | Baty, Keegan |
| S 04501 | 08/26/2016 | 453.336 -Possess Marijauna <1oz. | Guynes, Seth, Gabriel | Knaak, Alexander |
| S 03552 | 08/27/2016 | 453.336 -Possess Marijauna <1oz. | Buescher, John Daniel | Thornhill, Shawn |
| S 04354 | 08/27/2016 | 453.336 -Possess Marijauna <1oz. | Ray, Lindsey | Thornhill, Shawn |
| S 04452 | 08/27/2016 | 453.336 -Possess Marijauna <1oz. | Stockfleth, Sandor | Wright, Robert |
| S 04406 | 08/27/2016 | 453.336 -Possess Marijauna <1oz. | Swanson Grant Michael | Baty, Keegan |
| S 04407 | 08/27/2016 | 454.351 -Drugs not to be introduced | Gruber Lyle Julien | Baty, Keegan |
| S 04605 | 08/27/2016 | 454.351 -Drugs not to be introduced | Massie, Stephen Paul | Shampang, Boone |
| S 04606 | 08/27/2016 | 454.351 -Drugs not to be introduced | Williams, Micah | Shampang, Boone |
| S 04355 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Chitwood, Justin Paul | Thornhill, Shawn |
| S 04852 | 08/28/2016 | 453.566 -Unlawful Possession of Dru | Kistner, Matthew Jarrett | Pulley, Robert |
| S 04853 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Fuller, Alexis Teresa | Pulley, Robert |
| S 04534 | 08/28/2016 | 454.351 -Drugs not to be introduced | Webb, Ryder Chapman | Mitchell, Earl |
| S 04535 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Pritchard, Jesse | Mitchell, Earl |
| S 01617 | 08/28/2016 | 454.351 -Drugs not to be introduced | Haas, Devin Christopher | Puckett, Chris |
| S 04410 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Knoepfler, Kenton | Baty, Keegan |
| S 04408 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Colbert Patrick Flaherty | Baty, Keegan |
| S 04409 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Morham, Sean Diedrik | Baty, Keegan |
| S 04607 | 08/28/2016 | 51366 -Drugs not to be introduced t | Melpiguano, Francesco | Shampang, Boone |
| S 03553 | 08/28/2016 | 454.351 -Drugs not to be introduced | Digiorgio, James Damian | Loup, Michael |
| S 03554 | 08/28/2016 | 454.351 -Drugs not to be introduced | Morgan, Jayson D | Loup, Michael |
| S 04183 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Edwards, Samuel Erik | Loup, Michael |
| S 03555 | 08/28/2016 | 454.351 -Drugs not to be introduced | Littooy, Jeanne Marie | Loup, Michael |
| S 04705 | 08/28/2016 | 453.566 -Unlawful Possession of Dru | Finnegan, Martin | Keller, Richard |
| S 04703 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Finnegan, Brittany Grace | Keller, Richard |
| S 04704 | 08/28/2016 | 454.351 -Drugs not to be introduced | Finnegan, Ryan Alex | Keller, Richard |
| S 04706 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Stinson, Tamlyn Mary | Keller, Richard |
| S 04236 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Oakden, James Michael | Carmichael, Nathan |
| S 04920 | 08/29/2016 | 454.351 -Drugs not to be introduced | Alvra, Legna Mari | Flanagan, Jason |
| S 04356 | 08/29/2016 | 454.351 -Drugs not to be introduced | Laswell, Tara Rose | Thornhill, Shawn |
| S 04505 | 08/29/2016 | 454.351 -Drugs not to be introduced | Kramer, Curtis William | Pascual, Philipp |
| S 04117 | 08/29/2016 | 454.351 -Drugs not to be introduced | Carter, Cornelius Mathew | Pascual, Philipp |
| S 04506 | 08/29/2016 | 454.351 -Drugs not to be introduced | Brown, Carvel Richard | Pascual, Philipp |

*CONTROLLED DOCUMENT-ORIGINAL IN RED*

PERSHING COUNTY SHERIFF'S OFFICE

**Page 2**

Citation Log for 08/23/2016 - 09/06/2016

**12/07/2016**

| Cite # | Date | Violation | Person Cited | Deputy |
|---|---|---|---|---|
| S 04507 | 08/29/2016 | 454.351 -Drugs not to be introduced | Bullen, David William Hersch | Pascual, Philipp |
| S 04510 | 08/29/2016 | 200.481 -Battery | Paul, Eugene Narcisse | Leahy, Matt |
| S 04854 | 08/29/2016 | 454.351 -Drugs not to be introduced | Ross, Laurenne Avril Purvis | Morgan, Allison |
| S 04855 | 08/29/2016 | 453.566 -Unlawful Possession of Dru | Plotner, Stacee | Morgan, Allison |
| S 04417 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Gaubert Gael Robert | Baty, Keegan |
| S 04411 | 08/29/2016 | 454.351 -Drugs not to be introduced | Goff Jordan E | Baty, Keegan |
| S 04412 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Bosco Alexander Shaffer | Baty, Keegan |
| S 04413 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Washington Darrius Wayne | Baty, Keegan |
| S 04414 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Zabaglio Antonella Adh | Baty, Keegan |
| S 04415 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Rodriguez, Mariann Mateo | Baty, Keegan |
| S 04416 | 08/29/2016 | 454.351 -Drugs not to be introduced | Gaubert Gael Robert | Baty, Keegan |
| S 04608 | 08/29/2016 | 454.351 -Drugs not to be introduced | Kaplan, Nathan | Shampang, Boone |
| S 03557 | 08/29/2016 | 453.566 -Unlawful Possession of Dru | Headlee, Jonathan David | Loup, Michael |
| S 04509 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Davis, Leah Estrada | Knaak, Alexander |
| S 04707 | 08/29/2016 | 454.351 -Drugs not to be introduced | McManus, Edmund Theodore | Keller, Richard |
| S 04357 | 08/30/2016 | 454.351 -Drugs not to be introduced | Grange, Jennifer Anne | Thornhill, Shawn |
| S 04115 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Hairston, Donishis King | Pascual, Philipp |
| S 04116 | 08/30/2016 | 454.351 -Drugs not to be introduced | Houde, Ashton A | Pascual, Philipp |
| S 04118 | 08/30/2016 | 454.351 -Drugs not to be introduced | Harbour, Christopher Simon | Pascual, Philipp |
| S 04119 | 08/30/2016 | 454.351 -Drugs not to be introduced | Novak, Jeffery Wade | Pascual, Philipp |
| S 04628 | 08/30/2016 | 454.351 -Drugs not to be introduced | Carney, Mary Jean | Boyer, Daniel |
| S 04184 | 08/30/2016 | 200.481 -Battery | | Leahy, Matt |
| S 04856 | 08/30/2016 | 454.351 -Drugs not to be introduced | Dosal, Diego | Morgan, Allison |
| S 04857 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Stanger, Michael, Terence | Morgan, Allison |
| S 04531 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Hock, Jessica | Mitchell, Earl |
| S 04536 | 08/30/2016 | 453.566 -Unlawful Possession of Dru | Chrastka, James Vincent | Mitchell, Earl |
| S 01618 | 08/30/2016 | 454.351 -Drugs not to be introduced | Sasson, Sam Maurice | Puckett, Chris |
| S 01619 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Arnold, Rebecca Mercedes | Puckett, Chris |
| S 04604 | 08/30/2016 | 454.351 -Drugs not to be introduced | Davila, David Dean | Shampang, Boone |
| S 04302 | 08/30/2016 | 454.351 -Drugs not to be introduced | Weiss, Michael J | Tolle, John |
| S 04303 | 08/30/2016 | 454.351 -Drugs not to be introduced | Jacklin, Marcus | Tolle, John |
| S 04304 | 08/30/2016 | 454.351 -Drugs not to be introduced | Mkhallati, Deaja Joy | Tolle, John |
| S 04305 | 08/30/2016 | 453.566 -Unlawful Possession of Dru | Grey, Allyson R | Tolle, John |
| S 04504 | 08/30/2016 | 454.351 -Drugs not to be introduced | Roach, Hope Kasandra | Knaak, Alexander |
| S 04708 | 08/30/2016 | 454.351 -Drugs not to be introduced | Rebollar, Gonzalo Hernandez | Keller, Richard |
| S 04709 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Zeller, Dean Robert | Keller, Richard |
| S 04710 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Waters, Kameron Gary Alan | Keller, Richard |
| S 04358 | 08/31/2016 | 454.351 -Drugs not to be introduced | Burford, Evan Scott | Thornhill, Shawn |
| S 04359 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Chen, William Hao | Thornhill, Shawn |
| S 04360 | 08/31/2016 | 454.351 -Drugs not to be introduced | Radojicic, Nikola | Thornhill, Shawn |
| S 04120 | 08/31/2016 | 454.351 -Drugs not to be introduced | Doogan, Michael E | Pascual, Philipp |
| S 04121 | 08/31/2016 | 454.351 -Drugs not to be introduced | Laboy, Leoner A | Pascual, Philipp |
| S 04455 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Gontard, Thomas R | Cornfield, Steven |
| S 04456 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Davis, Wayne Anthony | Cornfield, Steven |

CONTROLLED DOCUMENT-ORIGINAL IN RED

AR10058

**PERSHING COUNTY SHERIFF'S OFFICE**

| | Page 3 |
|---|---|
| Citation Log for 08/23/2016 - 09/06/2016 | 12/07/2016 |

| Cite # | Date | Violation | Person Cited | Deputy |
|---|---|---|---|---|
| S 04457 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Weight, Brian | Cornfield, Steven |
| S 04537 | 08/31/2016 | 453.566 -Unlawful Possession of Dru | Connelly, James Patrick | Mitchell, Earl |
| S 04418 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Emsaki, Pourya | Baty, Keegan |
| S 04420 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Palmer, Kevin Andrew | Baty, Keegan |
| S 04419 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Suhuparra Mark G | Baty, Keegan |
| S 04306 | 08/31/2016 | 453.566 -Unlawful Possession of Dru | Sommers, Matthew Ryan | Tolle, John |
| S 04307 | 08/31/2016 | 454.351 -Drugs not to be introduced | Reed, Nathan Everett | Tolle, John |
| S 04308 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Morrone, William Anthony | Tolle, John |
| S 04237 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Lear, Melissa | Carmichael, Nathan |
| S 16254 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Chitwood, Justin Paul | Thornhill, Shawn |
| S 04122 | 09/01/2016 | 6.08.030 -animal restrictions | Richardson, Joanne Mae | Pascual, Philipp |
| S 04458 | 09/01/2016 | 454.351 -Drugs not to be introduced | Frankel, Arielle | Cornfield, Steven |
| S 04186 | 09/01/2016 | 454.351 -Drugs not to be introduced | Mayer, Alexis L | Leahy, Matt |
| S 04859 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Keck, Philip Steven | Morgan, Allison |
| S 04860 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Cason, Caley Bridger | Morgan, Allison |
| S 04858 | 09/01/2016 | 453.566 -Unlawful Possession of Dru | Carretero, Henry D | Morgan, Allison |
| S 04309 | 09/01/2016 | 454.351 -Drugs not to be introduced | Greenwell, Elisha Nichole | Tolle, John |
| S 04310 | 09/01/2016 | 454.351 -Drugs not to be introduced | Ding, Anthony Shyn | Tolle, John |
| S 04311 | 09/01/2016 | 454.351 -Drugs not to be introduced | Hall, Alexander Martin | Tolle, John |
| S 04312 | 09/01/2016 | 454.351 -Drugs not to be introduced | Waier, Charles Jarryd | Tolle, John |
| S 04313 | 09/01/2016 | 454.351 -Drugs not to be introduced | Eccles, David | Tolle, John |
| S 04254 | 09/01/2016 | 454.351 -Drugs not to be introduced | Marengo, David | Woolridge, Allen |
| S 04255 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | McGoon, Douglas Osbourne | Woolridge, Allen |
| S 04253 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Wong, Vince | Woolridge, Allen |
| S 04490 | 09/02/2016 | 454.351 -Drugs not to be introduced | Byer, Michael Thomas | Reed, Glenn Alan |
| S 04449 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Shuartz, Liron | Larkin, Brad |
| S 04861 | 09/02/2016 | 453.566 -Unlawful Possession of Dru | Gorniak, Dewey Charles | Morgan, Allison |
| S 04862 | 09/02/2016 | 453.566 -Unlawful Possession of Dru | Meyer, Rachel Lyn | Morgan, Allison |
| S 04863 | 09/02/2016 | 454.351 -Drugs not to be introduced | Gupte, Rachel Catherine | Morgan, Allison |
| S 04424 | 09/02/2016 | 454.351 -Drugs not to be introduced | Herak, Cassondra Lee | Baty, Keegan |
| S 04425 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Rios, Christopher | Baty, Keegan |
| S 04610 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Silvia, Aaron Arthur | Baty, Keegan |
| S 04611 | 09/02/2016 | 454.351 -Drugs not to be introduced | Butler, Sean Michael | Baty, Keegan |
| S 04421 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Taylor, Nicholas A | Baty, Keegan |
| S 04422 | 09/02/2016 | 454.351 -Drugs not to be introduced | Sierra, Evilio Stephan | Baty, Keegan |
| S 04423 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Newcombe, Britney Helen | Baty, Keegan |
| S 04609 | 09/02/2016 | 454.351 -Drugs not to be introduced | Hinson, Jesse | Shampang, Boone |
| S 04314 | 09/02/2016 | 454.351 -Drugs not to be introduced | Wali, Alec H | Tolle, John |
| S 04238 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Anderson, Cheryl Lenee | Carmichael, Nathan |
| S 04149 | 09/03/2016 | 485.187 -unlawful acts (proof requi | Portman, Cynthia | Dickerman, Phillip |
| S 04361 | 09/03/2016 | 454.351 -Drugs not to be introduced | Frankel, Nicholas Joseph | Thornhill, Shawn |
| S 04362 | 09/03/2016 | 454.351 -Drugs not to be introduced | Russell, Ryan Dallas | Thornhill, Shawn |
| S 04491 | 09/03/2016 | 453.566 -Unlawful Possession of Dru | Brannen, Grayson B | Reed, Glenn Alan |
| S 04492 | 09/03/2016 | 453.566 -Unlawful Possession of Dru | Grimes, Joshua Michael | Reed, Glenn Alan |

CONTROLLED DOCUMENT–ORIGINAL IN RED



**PERSHING COUNTY SHERIFF'S OFFICE**

**Citation Log for 08/23/2016 - 09/06/2016**

Page 4

12/07/2016

| Cite # | Date | Violation | Person Cited | Deputy |
|---|---|---|---|---|
| S 04629 | 09/03/2016 | 454.351 -Drugs not to be introduced | Murphy, Seamus Patrick | Boyer, Daniel |
| S 04460 | 09/03/2016 | 454.351 -Drugs not to be introduced | Cromer, Jens Remington | Cornfield, Steven |
| S 04459 | 09/03/2016 | 454.351 -Drugs not to be introduced | Daniel, William A | Cornfield, Steven |
| S 04256 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Vinogray, Olga | Moore, Dennis |
| S 04187 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Hudson, Meghan Elizabeth | Leahy, Matt |
| S 04315 | 09/03/2016 | 454.351 -Drugs not to be introduced | Bacho, Thomas D | Pulley, Robert |
| S 04538 | 09/03/2016 | 454.351 -Drugs not to be introduced | Gallucci, Brandi | Mitchell, Earl |
| S 04539 | 09/03/2016 | 453.566 -Unlawful Possession of Dru | Nguyen, Thi Khac Lam | Mitchell, Earl |
| S 04612 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Turner, Michael Edward | Baty, Keegan |
| S 04613 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Pratt, Orrin S | Baty, Keegan |
| S 04614 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Hawley, Brien D | Baty, Keegan |
| S 02148 | 09/04/2016 | 453.566 -Unlawful Possession of Dru | Happy, Edward Gene II | Blondheim, Eric |
| S 04150 | 09/04/2016 | 453.336 -Possess Marijauna <1oz. | Franks, Thomas Pomaikai | Blondheim, Eric |
| S 04461 | 09/04/2016 | 454.351 -Drugs not to be introduced | Dulla, Jeffrey | Cornfield, Steven |
| S 04462 | 09/04/2016 | 454.351 -Drugs not to be introduced | Selemenev, Alexei Victorovic | Cornfield, Steven |
| S 04864 | 09/04/2016 | 453.566 -Unlawful Possession of Dru | West, Gerald Laurence | Morgan, Allison |
| S 04630 | 09/05/2016 | 200.481 -Battery | Sloan, Michael G | Boyer, Daniel |
| S 04188 | 09/05/2016 | 200.481 -Battery | Bonney, Rio L | Leahy, Matt |
| S 04363 | 09/06/2016 | 454.351 -Drugs not to be introduced | Iordache, Mirela Daniela | Thornhill, Shawn |
| S 04364 | 09/06/2016 | 454.351 -Drugs not to be introduced | Ribeiro Tavares, Alex | Thornhill, Shawn |

CONTROLLED DOCUMENT-ORIGINAL IN RED

AR10060

# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                                           JERRY ALLEN, Sheriff

# APPENDIX B

| | | PERSHING COUNTY SHERIFF'S OFFICE | | | Page 1 |
|---|---|---|---|---|---|
| | | **CASE LOG FOR 08/23/2016 - 09/07/2016** | | | 12/07/2016 |

| Case # | Date | Offenses | Victim/Assoc Person | Deputy | Turned In |
|---|---|---|---|---|---|
| 16-225 | 08/23/2016 | 51137: Possession of Marijuana <1 | | Thornhill, Shawn | Yes |
| 16-226 | 08/24/2016 | 51156, 51137, 51339 | Passey, Mary E. | Thornhill, Shawn | Yes |
| 16-227 | 08/24/2016 | 51156, 51158, 51160 | | Reed, Glenn Alan | Yes |
| 16-228 | 08/25/2016 | 03818, 51137 | | Boyer, Daniel | Yes |
| 16-229 | 08/25/2016 | 02116: Drugs Not Introduced Inter | Stratton, Michael | Flanagan, Jason | Yes |
| 16-230 | 08/25/2016 | 51137: Possession of Marijuana <1 | | Wright, Robert | Yes |
| 16-231 | 08/25/2016 | 51137, 51339 | | Mitchell, Earl | Yes |
| 16-232 | 08/25/2016 | 51137: Possession of Marijuana <1 | Subbaraman Saraswathi | Baty, Keegan | Yes |
| 16-233 | 08/25/2016 | 51137: Possession of Marijuana <1 | Goody Jonathan Jay | Baty, Keegan | Yes |
| 16-234 | 08/26/2016 | 03818, 51137 | | Knaak, Alexander | Yes |
| 16-235 | 08/26/2016 | 51137: Possession of Marijuana <1 | Oneal Charles Edwin | Baty, Keegan | Yes |
| 16-236 | 08/26/2016 | 51137, 51366 | Wilhite Milo John | Baty, Keegan | Yes |
| 16-237 | 08/26/2016 | 51139, 51127, 51141 | | Wright, Robert | Yes |
| 16-238 | 08/26/2016 | 51137, 51366, 51339 | | Mitchell, Earl | Yes |
| 16-240 | 08/26/2016 | 51156, 51127, 51137 | | Thornhill, Shawn | Yes |
| 16-241 | 08/26/2016 | 51160: Trafficking C/S Sched I-ov | Bert, Michelle Lynn | Reed, Glenn Alan | Yes |
| 16-242 | 08/26/2016 | 51366, 51366 | | Shampang, Boone | Yes |
| 16-243 | 08/27/2016 | 51137, 51366, 51339 | Swanson Grant Michael | Baty, Keegan | Yes |
| 16-244 | 08/27/2016 | 01971: Accident Reports | Bonnie Morgan | Leahy, Matt | Yes |
| 16-245 | 08/27/2016 | 51366: Drugs not to be introduced | Gruber Lyle Julien | Baty, Keegan | Yes |
| 16-246 | 08/27/2016 | 51158, 51137, 51339 | | Thornhill, Shawn | Yes |
| 16-247 | 08/27/2016 | 51158, 51127, 51129 | | Knaak, Alexander | Yes |
| 16-248 | 08/27/2016 | 51127: Unlawful Poss-Not for Sale | | Wright, Robert | Yes |
| 16-250 | 08/27/2016 | ASST | | Puckett, Chris | |
| 16-251 | 08/27/2016 | 51366: Drugs not to be introduced | | Shampang, Boone | Yes |
| 16-252 | 08/27/2016 | 51366: Drugs not to be introduced | | Shampang, Boone | Yes |
| 16-253 | 08/28/2016 | 51366: Drugs not to be introduced | Raoch, Hope, Kasandra | Knaak, Alexander | Yes |
| 16-254 | 08/28/2016 | 02513: Poss Marijuana <1oz.-Not f | | Thornhill, Shawn | Yes |
| 16-255 | 08/28/2016 | 51156, 51366, 51366 | | Shampang, Boone | Yes |
| 16-256 | 08/28/2016 | 51156, 51156 | McQueen, Beau Andrew | Knaak, Alexander | Yes |
| 16-257 | 08/28/2016 | 51137, 51339 | | Pulley, Robert | Yes |
| 16-258 | 08/28/2016 | 51366, 51339, 51156 | | Puckett, Chris | |
| 16-259 | 08/28/2016 | 51137, 51366 | Colbert Patrick Flaherty | Baty, Keegan | Yes |
| 16-260 | 08/28/2016 | 00142: Assault | Aaron McCray-Goldsmitgh | Leahy, Matt | Yes |
| 16-261 | 08/28/2016 | 51366, 51339 | Webb, Ryder Chapman | Mitchell, Earl | Yes |
| 16-262 | 08/28/2016 | 51158, 51339, 51141 | | Morgan, Allison | Yes |
| 16-263 | 08/28/2016 | 51366, 51137 | | Mitchell, Earl | Yes |
| 16-264 | 08/28/2016 | 51366, 51339, 51137 | | Keller, Richard | |
| 16-265 | 08/28/2016 | 51137, 51366 | | Pascual, Philipp | Yes |
| 16-266 | 08/28/2016 | 51366: Drugs not to be introduced | | Morgan, Allison | Yes |
| 16-267 | 08/28/2016 | 00142: Assault, 00479 | Braden Leeds | Leahy, Matt | Yes |
| 16-268 | 08/28/2016 | 51137, 51339, 51366 | | Loup, Michael | |

**CONTROLLED DOCUMENT-ORIGINAL IN RED**

AR10062

| | | PERSHING COUNTY SHERIFF'S OFFICE | | | Page 2 |
|---|---|---|---|---|---|
| | | **CASE LOG FOR 08/23/2016 - 09/07/2016** | | | 12/07/2016 |

| Case # | Date | Offenses | Victim/Assoc Person | Deputy | Turned In |
|---|---|---|---|---|---|
| 16-269 | 08/29/2016 | 51366: Drugs not to be introduced | | Tolle, John | Yes |
| 16-270 | 08/29/2016 | 51366, 51137, 51339 | | Baty, Keegan | Yes |
| 16-271 | 08/29/2016 | 51366: Drugs not to be introduced | | Morgan, Allison | Yes |
| 16-272 | 08/29/2016 | 51156, 51156, 51137 | | Keller, Richard | Yes |
| 16-273 | 08/29/2016 | 51366, 51156, 51127 | | Flanagan, Jason | |
| 16-274 | 08/29/2016 | 02513, 51339 | | Carmichael, Nathan | Yes |
| 16-275 | 08/29/2016 | 51339, 51366 | | Morgan, Allison | Yes |
| 16-276 | 08/29/2016 | 51141, 51339, 51358 | | Morgan, Allison | Yes |
| 16-277 | 08/29/2016 | CORONER: Death Investigation | Sherman, Mary Margret | Dickerman, Phillip | Yes |
| 16-278 | 08/29/2016 | 00332: Petit Larceny | Yuhas, Dustin Michael | Blondheim, Eric | Yes |
| 16-279 | 08/29/2016 | 51366: Drugs not to be introduced | | Keller, Richard | Yes |
| 16-280 | 08/29/2016 | BATERY | | Mitchell, Earl | |
| 16-281 | 08/29/2016 | 51156, 51358, 04425 | | Thornhill, Shawn | Yes |
| 16-282 | 08/29/2016 | 51366, 51339, 51137 | | Knaak, Alexander | Yes |
| 16-283 | 08/29/2016 | BATERY | Xiong, William | Leahy, Matt | |
| 16-284 | 08/29/2016 | 51137: Possession of Marijuana <1 | | Baty, Keegan | Yes |
| 16-285 | 08/29/2016 | 51366: Drugs not to be introduced | | Cornfield, Steven | Yes |
| 16-286 | 08/29/2016 | 51366, 51366, 51366 | | Baty, Keegan | Yes |
| 16-287 | 08/29/2016 | 03818: Drugs Which Maynot Be Intr | | Thornhill, Shawn | Yes |
| 16-288 | 08/29/2016 | 51366, 51366, 51366 | | Pascual, Philipp | Yes |
| 16-289 | 08/29/2016 | 51339: Unlawful Use/Possession of | | Loup, Michael | Yes |
| 16-290 | 08/30/2016 | 51127, 51141, 51306 | | Baty, Keegan | Yes |
| 16-291 | 08/30/2016 | 00145: Battery | Finton, Daniel Wade | Cornfield, Steven | |
| 16-292 | 08/30/2016 | 51366: Drugs not to be introduced | Motto, Anthony Frank | Loup, Michael | Yes |
| 16-293 | 08/30/2016 | 51141: POSSESSION OF C/S FOR SALE | | Thornhill, Shawn | Yes |
| 16-294 | 08/30/2016 | THEFT | | Leahy, Matt | Yes |
| 16-295 | 08/30/2016 | 51137: Possession of Marijuana <1 | | Puckett, Chris | Yes |
| 16-296 | 08/30/2016 | 51366: Drugs not to be introduced | | Puckett, Chris | Yes |
| 16-297 | 08/30/2016 | 51366, 51339, 51137 | | Keller, Richard | |
| 16-298 | 08/30/2016 | 51366: Drugs not to be introduced | | Morgan, Allison | Yes |
| 16-299 | 08/30/2016 | 51137: Possession of Marijuana <1 | | Morgan, Allison | Yes |
| 16-300 | 08/30/2016 | 51366, 51339, 51137 | | Keller, Richard | |
| 16-301 | 08/30/2016 | 04355: Destruction Of Property | Schack, Joseph | Keller, Richard | Yes |
| 16-302 | 08/30/2016 | 51339, 51137 | Chrastka, James Vincent | Mitchell, Earl | Yes |
| 16-303 | 08/30/2016 | 51366: Drugs not to be introduced | | Pascual, Philipp | Yes |
| 16-304 | 08/30/2016 | 51366: Drugs not to be introduced | | Pascual, Philipp | Yes |
| 16-305 | 08/30/2016 | 00145: Battery | Murphy, Michael | Leahy, Matt | |
| 16-306 | 08/30/2016 | 51366, 51339 | | Tolle, John | Yes |
| 16-307 | 08/30/2016 | 51366: Drugs not to be introduced | | Boyer, Daniel | Yes |
| 16-308 | 08/30/2016 | 03818: Drugs Which Maynot Be Intr | | Thornhill, Shawn | Yes |
| 16-309 | 08/31/2016 | 51366: Drugs not to be introduced | | Pascual, Philipp | Yes |
| 16-310 | 08/31/2016 | 51127, 51137 | | Baty, Keegan | Yes |
| 16-311 | 08/31/2016 | 51137: Possession of Marijuana <1 | | Cornfield, Steven | Yes |
| 16-312 | 08/31/2016 | 00328: Grand Larceny Auto | Nacif, Gazi | Thornhill, Shawn | Yes |

**CONTROLLED DOCUMENT–ORIGINAL IN RED**

AR10063

| | | PERSHING COUNTY SHERIFF'S OFFICE | | | Page 3 |
|---|---|---|---|---|---|
| | | CASE LOG FOR 08/23/2016 - 09/07/2016 | | | 12/07/2016 |

| Case # | Date | Offenses | Victim/Assoc Person | Deputy | Turned In |
|---|---|---|---|---|---|
| 16-313 | 08/31/2016 | 51366, 51339 | | Tolle, John | Yes |
| 16-314 | 08/31/2016 | 00142: Assault | Navin, Richard | Loup, Michael | Yes |
| 16-315 | 08/31/2016 | 51158, 51339, 51366 | | Cornfield, Steven | Yes |
| 16-316 | 08/31/2016 | 51137, 51339 | | Baty, Keegan | Yes |
| 16-317 | 08/31/2016 | 51137: Possession of Marijuana <1 | | Baty, Keegan | Yes |
| 16-318 | 08/31/2016 | THEFT | | Pascual, Philipp | Yes |
| 16-319 | 08/31/2016 | 51160, 51127 | | Morgan, Allison | Yes |
| 16-320 | 08/31/2016 | 00332: Petit Larceny | Seeger, Jon | Flanagan, Jason | Yes |
| 16-321 | 08/31/2016 | 51339, 51137 | | Mitchell, Earl | Yes |
| 16-322 | 08/31/2016 | 00148, 02304, 00145 | Morelle, Marion | Rogers, John Lee | Yes |
| 16-323 | 08/31/2016 | CORONER, 50029 | Bauman, Edward | Dickerman, Phillip | Yes |
| 16-324 | 08/31/2016 | 03818: Drugs Which Maynot Be Intr | | Thornhill, Shawn | Yes |
| 16-325 | 08/31/2016 | 00145: Battery | | Loup, Michael | Yes |
| 16-326 | 08/31/2016 | 51137: Possession of Marijuana <1 | | Tolle, John | Yes |
| 16-327 | 08/31/2016 | 50095: Sexual Assault w/No Substa | Ryon, Roger | Pascual, Philipp | Yes |
| 16-328 | 08/31/2016 | 51137: Possession of Marijuana <1 | | Thornhill, Shawn | Yes |
| 16-329 | 08/31/2016 | 51137, 51339 | | Baty, Keegan | Yes |
| 16-330 | 08/31/2016 | 51366: Drugs not to be introduced | | Thornhill, Shawn | Yes |
| 16-331 | 08/31/2016 | 51137: Possession of Marijuana <1 | | Cornfield, Steven | Yes |
| 16-332 | 09/01/2016 | 51127, 51137, 51158 | | Baty, Keegan | Yes |
| 16-333 | 09/01/2016 | 51366: Drugs not to be introduced | | Leahy, Matt | Yes |
| 16-334 | 09/01/2016 | 51366: Drugs not to be introduced | | Tolle, John | Yes |
| 16-335 | 09/01/2016 | 51156, 51127, 51137 | | Thornhill, Shawn | Yes |
| 16-336 | 09/01/2016 | 51366: Drugs not to be introduced | | Tolle, John | Yes |
| 16-337 | 09/01/2016 | 51366: Drugs not to be introduced | | Tolle, John | Yes |
| 16-338 | 09/01/2016 | 51137, 51366, 51339 | | Woolridge, Allen | Yes |
| 16-339 | 09/01/2016 | 51366, 51339 | | Morgan, Allison | Yes |
| 16-340 | 09/01/2016 | 51137, 51137 | | Morgan, Allison | Yes |
| 16-341 | 09/01/2016 | LEGAL: LEGAL 2000 | | Dickerman, Phillip | Yes |
| 16-342 | 09/01/2016 | 50235: Domestic Battery-1st Offen | | Rogers, John Lee | Yes |
| 16-343 | 09/01/2016 | 50454: Theft-$2,500 or More | Weber, Adam | Rogers, John Lee | Yes |
| 16-345 | 09/01/2016 | 50029, 50235, 50183 | Kerr, Lindsey | Rogers, John Lee | Yes |
| 16-346 | 09/01/2016 | 51160, 51339, 51127 | | Morgan, Allison | Yes |
| 16-347 | 09/01/2016 | TSTOP | | Mitchell, Earl | |
| 16-348 | 09/01/2016 | 00145: Battery | Wladislawa, Oleinik | Leahy, Matt | Yes |
| 16-349 | 09/01/2016 | 51366, 51339 | | Tolle, John | Yes |
| 16-350 | 09/01/2016 | 04355: Destruction Of Property | | Thornhill, Shawn | Yes |
| 16-351 | 09/01/2016 | MEDAID | | Reed, Glenn Alan | Yes |
| 16-352 | 09/01/2016 | 51366: Drugs not to be introduced | Frankel, Arielle | Cornfield, Steven | Yes |
| 16-353 | 09/01/2016 | 51141, 51339, 51366 | | Cornfield, Steven | Yes |
| 16-354 | 09/01/2016 | 51366: Drugs not to be introduced | | Tolle, John | Yes |
| 16-355 | 09/01/2016 | 51137, 51339 | | Woolridge, Allen | Yes |
| 16-356 | 09/02/2016 | NARC | | Carmichael, Nathan | |

# CONTROLLED DOCUMENT-ORIGINAL IN RED

AR10064

PERSHING COUNTY SHERIFF'S OFFICE

| | | | | | Page 4 |
| --- | --- | --- | --- | --- | --- |

CASE LOG FOR 08/23/2016 - 09/07/2016

12/07/2016

| Case # | Date | Offenses | Victim/Assoc Person | Deputy | Turned In |
| --- | --- | --- | --- | --- | --- |
| 16-357 | 09/02/2016 | 51137: Possession of Marijuana <1 | | Larkin, Brad | Yes |
| 16-358 | 09/02/2016 | 51366: Drugs not to be introduced | | Shampang, Boone | Yes |
| 16-359 | 09/02/2016 | 51137: Possession of Marijuana <1 | | Baty, Keegan | Yes |
| 16-360 | 09/02/2016 | 51366, 51339 | | Tolle, John | Yes |
| 16-361 | 09/02/2016 | 51366: Drugs not to be introduced | | Reed, Glenn Alan | Yes |
| 16-362 | 09/02/2016 | 51366: Drugs not to be introduced | | Baty, Keegan | Yes |
| 16-363 | 09/02/2016 | 50221, 50221, 05069 | Parr, Ryan | Leahy, Matt | |
| 16-364 | 09/02/2016 | 51366, 51339 | | Morgan, Allison | Yes |
| 16-365 | 09/02/2016 | 04397: Violation Of Restraining O | Sherron, Bryce | Blondheim, Eric | Yes |
| 16-366 | 09/02/2016 | MISSP | | Wagner, Darren | Yes |
| 16-367 | 09/02/2016 | 50095: Sexual Assault w/No Substa | Newth, Oliver Edward | Thornhill, Shawn | Yes |
| 16-368 | 09/02/2016 | 51366, 51137 | | Baty, Keegan | Yes |
| 16-369 | 09/02/2016 | ACCINJ | | Allen, Jerry | |
| 16-370 | 09/02/2016 | 51137: Possession of Marijuana <1 | | Baty, Keegan | Yes |
| 16-371 | 09/02/2016 | 51127, 51158, 51160 | Delossantos, Francie | Reed, Glenn Alan | Yes |
| 16-372 | 09/03/2016 | 51366: Drugs not to be introduced | | Baty, Keegan | Yes |
| 16-373 | 09/03/2016 | 51366: Drugs not to be introduced | | Boyer, Daniel | Yes |
| 16-374 | 09/03/2016 | 07979: Sexual Offenses | Haller, Heather L | Loup, Michael | Yes |
| 16-375 | 09/03/2016 | 51366, 51137 | | Thornhill, Shawn | Yes |
| 16-376 | 09/03/2016 | warrant service | | Tolle, John | Yes |
| 16-377 | 09/03/2016 | 51366: Drugs not to be introduced | | Cornfield, Steven | Yes |
| 16-378 | 09/03/2016 | 51137, 51339 | | Baty, Keegan | Yes |
| 16-379 | 09/03/2016 | 51137, 51339 | | Baty, Keegan | Yes |
| 16-380 | 09/03/2016 | 50221: Battery on Public Official | | Cornfield, Steven | Yes |
| 16-381 | 09/03/2016 | 51137: Possession of Marijuana <1 | | Leahy, Matt | Yes |
| 16-382 | 09/03/2016 | 50235, 50183 | Hough, Heather | Rogers, John Lee | Yes |
| 16-383 | 09/03/2016 | 51366, 51339 | | Mitchell, Earl | Yes |
| 16-384 | 09/03/2016 | 51339, 51137 | | Mitchell, Earl | Yes |
| 16-385 | 09/03/2016 | 50424: Burglary | Lika, Lukas | Morgan, Allison | Yes |
| 16-386 | 09/03/2016 | 50519: Grand Larceny-$650-$3,500 | Johnson, Paul Mathew | Morgan, Allison | Yes |
| 16-387 | 09/03/2016 | 51137, 51366, 51339 | Vinogray, Loga | Moore, Dennis | Yes |
| 16-388 | 09/03/2016 | 50200: Assault | Moore, Mary-Frances | Morgan, Allison | Yes |
| 16-389 | 09/03/2016 | 51092, 51127, 51137 | Nevada | Carmichael, Nathan | Yes |
| 16-390 | 09/03/2016 | 00468: Trespass, 51339 | | Mitchell, Earl | Yes |
| 16-391 | 09/03/2016 | 51366: Drugs not to be introduced | Nevada | Thornhill, Shawn | Yes |
| 16-392 | 09/03/2016 | 03038: Unlawful Use/Possess Drug | Brannen, Grayson B | Reed, Glenn Alan | |
| 16-393 | 09/03/2016 | 50519: Grand Larceny-$650-$3,500 | | Rogers, John Lee | Yes |
| 16-394 | 09/03/2016 | DISTURB | Siegmund, Christian | Cornfield, Steven | Yes |
| 16-395 | 09/03/2016 | 51137: Possession of Marijuana <1 | | Baty, Keegan | Yes |
| 16-396 | 09/03/2016 | 51366: Drugs not to be introduced | | Cornfield, Steven | |
| 16-397 | 09/03/2016 | MISS-JUV | Sheridan, Reed | Allen, Jerry | |
| 16-398 | 09/03/2016 | 51366: Drugs not to be introduced | | Pulley, Robert | Yes |
| 16-399 | 09/04/2016 | 50235, 50183 | Henry, Elise | Rogers, John Lee | Yes |
| 16-400 | 09/04/2016 | 51366: Drugs not to be introduced | | Cornfield, Steven | Yes |

CONTROLLED DOCUMENT–ORIGINAL IN RED

AR10065

# PERSHING COUNTY SHERIFF'S OFFICE

**CASE LOG FOR 08/23/2016 - 09/07/2016**

Page 5

12/07/2016

| Case # | Date | Offenses | Victim/Assoc Person | Deputy | Turned In |
|---|---|---|---|---|---|
| 16-401 | 09/04/2016 | 51156, 51129, 51137 | | Baty, Keegan | Yes |
| 16-402 | 09/04/2016 | 51366: Drugs not to be introduced | | Cornfield, Steven | Yes |
| 16-403 | 09/04/2016 | 58009: Battery W/Intent to Commit | Pike, Nina | Leahy, Matt | Yes |
| 16-404 | 09/04/2016 | 50212: Battery | Yvanes, Marc | Morgan, Allison | Yes |
| 16-405 | 09/04/2016 | 51366, 51339, 51360 | Stakem, Tiffany | Flanagan, Jason | Yes |
| 16-406 | 09/04/2016 | MISSP | | Moore, Dennis | Yes |
| 16-407 | 09/04/2016 | 50221, 50492 | Fonken, Peter | Mitchell, Earl | Yes |
| 16-408 | 09/04/2016 | LARPET | | Allen, Jerry | |
| 16-409 | 09/04/2016 | 51339, 51366 | | Morgan, Allison | Yes |
| 16-410 | 09/04/2016 | 50535: Petit Larceny | Silva, Marcio Roberto | Morgan, Allison | Yes |
| 16-411 | 09/04/2016 | 51127, 03041, 02197 | Happy Franks Gilkison | Blondheim, Eric | Yes |
| 16-412 | 09/04/2016 | 50212, 50212, 50212 | | Morgan, Allison | Yes |
| 16-413 | 09/04/2016 | 00145: Battery | Rossel, Mariah | Mitchell, Earl | Yes |
| 16-414 | 09/04/2016 | 04014: Indecent Behavior | Morganti, Felice | Pascual, Philipp | Yes |
| 16-415 | 09/04/2016 | MISSING | | Thornhill, Shawn | |
| 16-416 | 09/05/2016 | 50212: Battery | | Boyer, Daniel | Yes |
| 16-417 | 09/05/2016 | 02971: Theft | Roett, Carl | Leahy, Matt | Yes |
| 16-418 | 09/05/2016 | 50235: Domestic Battery-1st Offen | | Rogers, John Lee | Yes |
| 16-419 | 09/05/2016 | 50095: Sexual Assault w/No Substa | Setliff, Briana Dawn | Morgan, Allison | |
| 16-420 | 09/05/2016 | 00327: Grand Larceny | Heyning, J Evonne | Mitchell, Earl | |
| 16-421 | 09/05/2016 | 50200: Assault | Hale, Morgan | Rogers, John Lee | Yes |
| 16-423 | 09/05/2016 | LARPET | | Carmichael, Nathan | |
| 16-424 | 09/05/2016 | 00145: Battery, 02353 | Hemein, Brittany | Leahy, Matt | Yes |
| 16-425 | 09/05/2016 | 02037: Drugs Not To Be Introduced | Tom Green | Pascual, Philipp | Yes |
| 16-426 | 09/06/2016 | NARC | | Thornhill, Shawn | |
| 16-427 | 09/06/2016 | 51156, 02197, 00775 | Gonzalez/Colombo | Pascual, Philipp | Yes |
| 16-428 | 09/06/2016 | 51156, 51127, 51339 | Nevada | Thornhill, Shawn | Yes |
| 16-429 | 09/06/2016 | 51366: Drugs not to be introduced | | Thornhill, Shawn | |
| 16-430 | 09/07/2016 | SEXAS | | Carmichael, Nathan | |

**CONTROLLED DOCUMENT-ORIGINAL IN RED**

# APPENDIX C

AR10067

**List of 2016 Burning Man Employees**

| | | | | | |
|---|---|---|---|---|---|
| 1. | Abernathy, Robert | NDOC | X | | 63 |
| 2. | Allen, Jerry | PCSO | X | | 204 |
| 3. | Ayala, Reynaldo | NDOC | | X | 27.5 |
| 4. | Bartel, Tamara | NDOC | X | | 121 |
| 5. | Baty, Keegan | CPD | | | 160 |
| 6. | Bautista, Fransico | NDOC | | X | 12 |
| 7. | Boyer, Daniel | CCSO | X | | 117 |
| 8. | Carmichael, Nathan | PCSO | X | | 217.5 |
| 9. | Cartier, Chris | NDOC | | X | 48 |
| 10. | Cornfield, Steven | CCSO | X | | 95.5 |
| 11. | Davis, Tammy | ECSO | | X | 82 |
| 12. | Etcheberry, Myles | NDOC | | X | 48 |
| 13. | Few, Robert | NDOC | | X | 27.5 |
| 14. | Flanagan, Jason | PCSO | X | | 221 |
| 15. | Gault, Jason | NDI | Worked for NDI | | 0 |
| 16. | Gonzales, Adrian | NDOC | X | | 111 |
| 17. | Horn, Ben | NDOC | X | | 120 |
| 18. | Jones, Jordan | NDOC | | | 48 |
| 19. | Knaak, Alexander | NSP | Working for NSP while on Playa | | 0 |
| 20. | Keller, Richard | NSP | Working for NSP while on Playa | | 0 |
| 21. | Kudlata, Robert | NDOC | X | | 49 |
| 22. | Larkin, Brett | NSP | Working for NSP while on Playa | | 0 |
| 23. | Leahy, Matt | ECSO | X | | 144 |
| 24. | Loup, Michael | ECSO | | X | 151 |
| 25. | McCann, Coley | NDI | Worked for NDI | | 0 |
| 26. | Miester, Andrew | NDOC | | X | 48 |
| 27. | Mitchell, Earl | Henderson Constable Office | | | 178.25 |
| 28. | Moore, Dennis | CCSO | X | | 30.5 |
| 29. | Morgan, Allison | YTPD | X | | 137 |
| 30. | Moseley, Jessica | NDOC | X | | 80 |
| 31. | Nickelson, Robert | NDOC | X | | 60 |
| 32. | Pace, Guy | NDOC | X | | 48 |
| 33. | Pascual, Phil | PCSO | X | | 82 |
| 34. | Pucket, Chris | NCSO | X | | 92 |
| 35. | Pulley, Robert | MCSO | X | | 76 |
| 36. | Presto, Greg | NDI | Worked for NDI | | 0 |
| 37. | Reed, Glen | PCSO | X | | 97 |
| 38. | Rogers, John | CCSO | X | | 103 |
| 39. | Shampang, Boone | NCSO | X | | 92 |
| 40. | Stephens, Michael | PCSO | X | | 140 |
| 41. | Thornhill, Shawn | PCSO | X | | 178 |
| 42. | Tolle, John | NCSO | X | | 78 |
| 43. | Wagner, Darren | YPD | X | | 177.5 |
| 44. | Wake, Nathan | NDOC | X | | 60 |
| 45. | Wooldridge, Allen | NSP | Working for NSP while on Playa | | 0 |
| 46. | Wright, Robert | Carson City Alternative Sentencing | | | 38.5 |

AR10068



# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                                    JERRY ALLEN, Sheriff

# APPENDIX D

AR10069

## 2016-2017 Services and Supplies (Sheriff)

**BURNING MAN 2016**                                    ACCT.# 014-020-52370-000
                                        **$0.00**

| Date: | Name: | | Amount: | INVOICE # | |
|-------|-------|---|---------|-----------|---|
| 8/17/2016 | SETH SCHRENZEL | $ | 2,500.00 | 3 | |
| 8/23/2016 | MALLORY SAFETY & SUPPLY LLC | $ | 122.54 | 4130277 | 24 3V LITHIUM BATTERIES |
| 8/23/2016 | MALLORY SAFETY & SUPPLY LLC | $ | 258.92 | 4130754 | BATTERIES & NEMESIS GLASSES |
| 8/23/2016 | ITS MY COMMUNITY STORE | $ | 138.10 | 7975 | DYMO LABELS, PENS, BINDERS, PER |
| 9/7/2016 | LYNN PEAVEY COMPANY | $ | 507.25 | 322005 | DRUG KITS |
| 9/7/2016 | MALLORY SAFETY & SUPPLY LLC | $ | 89.32 | 4134689 | NEMESIS GLASSES |
| 9/8/2016 | MILLER'S JACKETS | $ | 1,086.00 | 16044 | SHIRTS & PATCHES |
| 9/8/2016 | ALBERTSONS/SAFEWAY | $ | 167.16 | 438762-082016-4160 | WATER |
| 9/8/2016 | ALBERTSONS/SAFEWAY | $ | 213.60 | 725238-082016-4160 | GATORADES |
| 9/8/2016 | ALBERTSONS/SAFEWAY | $ | 213.60 | 805038-082016-4160 | GATORADES |
| 9/12/2016 | UNIFORMITY | $ | 36.50 | 69402-3 | 1 SLVR CLIPBOARD |
| 9/12/2016 | GORDONS PHOTO SERVICE | $ | 35.90 | 171532 | SD CARD & MULTIREADER |
| 9/12/2016 | ADVERTISING SPECIALTIES | $ | 380.00 | 6019 | SIGNS & DECALS |
| 9/22/2016 | NSB - TWITCO DISTRIBUTING | $ | 498.52 | 406052 | EAR MOLDS |
| 9/22/2016 | NSB - SAMS CLUB | $ | 103.92 | 16G ULTRAS | |
| 9/22/2016 | NSB - LOWES | $ | 138.77 | SUPPLIES | |
| 10/6/2016 | BIG R | $ | 49.85 | 10048 | KEYS & PADLOCK |
| 10/10/2016 | WASHOE CO DA  CARES/SART PR | $ | 500.00 | 93611740 | ANDREA METIL |
| 10/10/2016 | WASHOE CO DA  CARES/SART PR | $ | 500.00 | 93611744 | BRIANA SETLIFF  16-419 |
| 11/30/2016 | SIERRA ELECTRONICS | $ | 1,453.50 | 219694 | UPGRADE EXISTING DISPATC |

**Total**                          $    8,993.45

**Grand Total**                        ($8,993.45)

AR10070

AR10071

# PERSHING COUNTY SHERIFF'S OFFICE

*"To Serve and Protect"*                                    JERRY ALLEN, Sheriff

# APPENDIX E

AR10072

# INVOICE

Date: December 7, 2016
Invoice # [BM16-001]

Pershing County Sheriff's Office
395 9th St/Box 147
Lovelock, NV 89419
775-273-2641
Fax 775-273-5052
jallen@pershingcounty.net

TO:

Chairman
Pershing County Board of
County Commissioners
C/O BRC LLC
Drawer E
Lovelock, NV 89419
775-273-2342

| JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|
| BURNING MAN 2016 | Due on Receipt | |

| QUANTITY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| 749.5/hrs | Pre-Event Patrol and Setup | 42.99/hr | $32,221.00 |
| 180/hrs | Post-Event Patrol and Tear down | 42.99/hr | $7,738.20 |

For services rendered outside of the 2013 Settlement

Agreement and outside of the 'Default World'

| | | Subtotal | |
|---|---|---|---|
| | | **Total** | **$39,959.20** |



*Serving the Residents of Pershing County*

Make all checks payable to Pershing County

THANK YOU FOR YOUR BUSINESS!

AR10073

| | | |
|---|---|---|
| Ayala | 21.5 pre | |
| Bartel | 12 pre | |
| Baty | 32/9 | |
| Bautista | 18 pre | |
| Boyer | 26/7 | |
| Carmichael | 90.5/27 | |
| Few | 21.5 pre | |
| Flanagan | 90/32.5 | |
| Horn | 18 pre | |
| Leahy | 19/7 | |
| Loup | 53 pre | |
| Mitchell | 40/13 | |
| Morgan | 8.5 post | |
| Moseley | 12 pre | |
| Nickelson | 12 pre | |
| Pascual | 26.5 post | |
| Pucket | 18 pre | |
| Pully | 33 pre | |
| Reed | 47 pre | |
| Shampang | 18 pre | |
| Stephens | 18 pre | |
| Thomhill | 66/29.5 | |
| Wagner | 45.5/20 | |
| Wright | 38.5 pre | |
| Total | 749.5/180 | Total 929.5 hours pre/post event. |

At $43.00 an hours it cost an extra $39,968.50 outside the scheduled 2016 Burning Man Event.

AR10074

AR10075

# PERSHING COUNTY SHERIFF'S OFFICE

**Page 1**

## Citation Log for 08/23/2016 - 09/06/2016

12/07/2016

| Cite # | Date | Violation | Person Cited | Deputy |
|--------|------|-----------|--------------|--------|
| S 04352 | 08/23/2016 | 453.336 -Possess Marijauna <1oz. | Acosta, Garcia | Thornhill, Shawn |
| S 04919 | 08/25/2016 | 454.351 -Drugs not to be introduced | Stratton, Michael | Flanagan, Jason |
| S 04353 | 08/25/2016 | 454.351 -Drugs not to be introduced | Pennock, Lucy | Thornhill, Shawn |
| S 04627 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Dennock, Jordan | Boyer, Daniel |
| S 04451 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Clements, Tucker | Wright, Robert |
| S 04532 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Hearn, Peter | Mitchell, Earl |
| S 04401 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Subbaraman Saraswathi | Baty, Keegan |
| S 04402 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Goody, Jonathan Jay | Baty, Keegan |
| S 04403 | 08/25/2016 | 453.336 -Possess Marijauna <1oz. | Asbury, Luc | Baty, Keegan |
| S 04533 | 08/26/2016 | 453.336 -Possess Marijauna <1oz. | Greenwood Iv, William | Mitchell, Earl |
| S 04404 | 08/26/2016 | 453.336 -Possess Marijauna <1oz. | Oneal, Charles Edwin | Baty, Keegan |
| S 04405 | 08/26/2016 | 453.336 -Possess Marijauna <1oz. | Wilhite Milo John | Baty, Keegan |
| S 04501 | 08/26/2016 | 453.336 -Possess Marijauna <1oz. | Guynes, Seth, Gabriel | Knaak, Alexander |
| S 03552 | 08/27/2016 | 453.336 -Possess Marijauna <1oz. | Buescher, John Daniel | Thornhill, Shawn |
| S 04354 | 08/27/2016 | 453.336 -Possess Marijauna <1oz. | Ray, Lindsey | Thornhill, Shawn |
| S 04452 | 08/27/2016 | 453.336 -Possess Marijauna <1oz. | Stockfleth, Sandor | Wright, Robert |
| S 04406 | 08/27/2016 | 453.336 -Possess Marijauna <1oz. | Swanson Grant Michael | Baty, Keegan |
| S 04407 | 08/27/2016 | 454.351 -Drugs not to be introduced | Gruber Lyle Julien | Baty, Keegan |
| S 04605 | 08/27/2016 | 454.351 -Drugs not to be introduced | Massie, Stephen Paul | Shampang, Boone |
| S 04606 | 08/27/2016 | 454.351 -Drugs not to be introduced | Williams, Micah | Shampang, Boone |
| S 04355 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Chitwood, Justin Paul | Thornhill, Shawn |
| S 04852 | 08/28/2016 | 453.566 -Unlawful Possession of Dru | Kistner, Matthew Jarrett | Pulley, Robert |
| S 04853 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Fuller, Alexis Teresa | Pulley, Robert |
| S 04534 | 08/28/2016 | 454.351 -Drugs not to be introduced | Webb, Ryder Chapman | Mitchell, Earl |
| S 04535 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Pritchard, Jesse | Mitchell, Earl |
| S 01617 | 08/28/2016 | 454.351 -Drugs not to be introduced | Haas, Devin Christopher | Puckett, Chris |
| S 04410 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Knoepfler, Kenton | Baty, Keegan |
| S 04408 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Colbert Patrick Flaherty | Baty, Keegan |
| S 04409 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Morham, Sean Diedrik | Baty, Keegan |
| S 04607 | 08/28/2016 | 51366 -Drugs not to be introduced t | Melpiguano, Francesco | Shampang, Boone |
| S 03553 | 08/28/2016 | 454.351 -Drugs not to be introduced | Digiorgio, James Damian | Loup, Michael |
| S 03554 | 08/28/2016 | 454.351 -Drugs not to be introduced | Morgan, Jayson D | Loup, Michael |
| S 04183 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Edwards, Samuel Erik | Loup, Michael |
| S 03555 | 08/28/2016 | 454.351 -Drugs not to be introduced | Littooy, Jeanne Marie | Loup, Michael |
| S 04705 | 08/28/2016 | 453.566 -Unlawful Possession of Dru | Finnegan, Martin | Keller, Richard |
| S 04703 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Finnegan, Brittany Grace | Keller, Richard |
| S 04704 | 08/28/2016 | 454.351 -Drugs not to be introduced | Finnegan, Ryan Alex | Keller, Richard |
| S 04706 | 08/28/2016 | 453.336 -Possess Marijauna <1oz. | Stinson, Tamlyn Mary | Keller, Richard |
| S 04236 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Oakden, James Michael | Carmichael, Nathan |
| S 04920 | 08/29/2016 | 454.351 -Drugs not to be introduced | Alvra, Legna Mari | Flanagan, Jason |
| S 04356 | 08/29/2016 | 454.351 -Drugs not to be introduced | Laswell, Tara Rose | Thornhill, Shawn |
| S 04505 | 08/29/2016 | 454.351 -Drugs not to be introduced | Kramer, Curtis William | Pascual, Philipp |
| S 04117 | 08/29/2016 | 454.351 -Drugs not to be introduced | Carter, Cornelius Mathew | Pascual, Philipp |
| S 04506 | 08/29/2016 | 454.351 -Drugs not to be introduced | Brown, Carvel Richard | Pascual, Philipp |

CONTROLLED DOCUMENT-ORIGINAL IN RED

AR10076

PERSHING COUNTY SHERIFF'S OFFICE

| | | |
|---|---|---|
| | **Citation Log for 08/23/2016 - 09/06/2016** | Page 2 |
| | | 12/07/2016 |

| Cite # | Date | Violation | Person Cited | Deputy |
|---|---|---|---|---|
| S 04507 | 08/29/2016 | 454.351 -Drugs not to be introduced | Bullen, David William Hersch | Pascual, Philipp |
| S 04510 | 08/29/2016 | 200.481 -Battery | Paul, Eugene Narcisse | Leahy, Matt |
| S 04854 | 08/29/2016 | 454.351 -Drugs not to be introduced | Ross, Laurenne Avril Purvis | Morgan, Allison |
| S 04855 | 08/29/2016 | 453.566 -Unlawful Possession of Dru | Plotner, Stacee | Morgan, Allison |
| S 04417 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Gaubert Gael Robert | Baty, Keegan |
| S 04411 | 08/29/2016 | 454.351 -Drugs not to be introduced | Goff Jordan E | Baty, Keegan |
| S 04412 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Bosco Alexander Shaffer | Baty, Keegan |
| S 04413 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Washington Darrius Wayne | Baty, Keegan |
| S 04414 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Zabaglio Antonella Adh | Baty, Keegan |
| S 04415 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Rodriguez, Mariann Mateo | Baty, Keegan |
| S 04416 | 08/29/2016 | 454.351 -Drugs not to be introduced | Gaubert Gael Robert | Baty, Keegan |
| S 04608 | 08/29/2016 | 454.351 -Drugs not to be introduced | Kaplan, Nathan | Shampang, Boone |
| S 03557 | 08/29/2016 | 453.566 -Unlawful Possession of Dru | Headlee, Jonathan David | Loup, Michael |
| S 04509 | 08/29/2016 | 453.336 -Possess Marijauna <1oz. | Davis, Leah Estrada | Knaak, Alexander |
| S 04707 | 08/29/2016 | 454.351 -Drugs not to be introduced | McManus, Edmund Theodore | Keller, Richard |
| S 04357 | 08/30/2016 | 454.351 -Drugs not to be introduced | Grange, Jennifer Anne | Thornhill, Shawn |
| S 04115 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Hairston, Donishis King | Pascual, Philipp |
| S 04116 | 08/30/2016 | 454.351 -Drugs not to be introduced | Houde, Ashton A | Pascual, Philipp |
| S 04118 | 08/30/2016 | 454.351 -Drugs not to be introduced | Harbour, Christopher Simon | Pascual, Philipp |
| S 04119 | 08/30/2016 | 454.351 -Drugs not to be introduced | Novak, Jeffery Wade | Pascual, Philipp |
| S 04628 | 08/30/2016 | 454.351 -Drugs not to be introduced | Carney, Mary Jean | Boyer, Daniel |
| S 04184 | 08/30/2016 | 200.481 -Battery | Dosal, Diego | Leahy, Matt |
| S 04856 | 08/30/2016 | 454.351 -Drugs not to be introduced | Dosal, Diego | Morgan, Allison |
| S 04857 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Stanger, Michael, Terence | Morgan, Allison |
| S 04531 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Hock, Jessica | Mitchell, Earl |
| S 04536 | 08/30/2016 | 453.566 -Unlawful Possession of Dru | Chrastka, James Vincent | Mitchell, Earl |
| S 01618 | 08/30/2016 | 454.351 -Drugs not to be introduced | Sasson, Sam Maurice | Puckett, Chris |
| S 01619 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Arnold, Rebecca Mercedes | Puckett, Chris |
| S 04604 | 08/30/2016 | 454.351 -Drugs not to be introduced | Davila, David Dean | Shampang, Boone |
| S 04302 | 08/30/2016 | 454.351 -Drugs not to be introduced | Weiss, Michael J | Tolle, John |
| S 04303 | 08/30/2016 | 454.351 -Drugs not to be introduced | Jacklin, Marcus | Tolle, John |
| S 04304 | 08/30/2016 | 454.351 -Drugs not to be introduced | Mkhallati, Deaja Joy | Tolle, John |
| S 04305 | 08/30/2016 | 453.566 -Unlawful Possession of Dru | Grey, Allyson R | Tolle, John |
| S 04504 | 08/30/2016 | 454.351 -Drugs not to be introduced | Roach, Hope Kasandra | Knaak, Alexander |
| S 04708 | 08/30/2016 | 454.351 -Drugs not to be introduced | Rebollar, Gonzalo Hernandez | Keller, Richard |
| S 04709 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Zeller, Dean Robert | Keller, Richard |
| S 04710 | 08/30/2016 | 453.336 -Possess Marijauna <1oz. | Waters, Kameron Gary Alan | Keller, Richard |
| S 04358 | 08/31/2016 | 454.351 -Drugs not to be introduced | Burford, Evan Scott | Thornhill, Shawn |
| S 04359 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Chen, William Hao | Thornhill, Shawn |
| S 04360 | 08/31/2016 | 454.351 -Drugs not to be introduced | Radojicic, Nikola | Thornhill, Shawn |
| S 04120 | 08/31/2016 | 454.351 -Drugs not to be introduced | Doogan, Michael E | Pascual, Philipp |
| S 04121 | 08/31/2016 | 454.351 -Drugs not to be introduced | Laboy, Leoner A | Pascual, Philipp |
| S 04455 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Gontard, Thomas R | Cornfield, Steven |
| S 04456 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Davis, Wayne Anthony | Cornfield, Steven |

CONTROLLED DOCUMENT-ORIGINAL IN RED

AR10077

PERSHING COUNTY SHERIFF'S OFFICE | Page 3

**Citation Log for 08/23/2016 - 09/06/2016**

12/07/2016

| Cite # | Date | Violation | Person Cited | Deputy |
|--------|------|-----------|--------------|--------|
| S 04457 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Weight, Brian | Cornfield, Steven |
| S 04537 | 08/31/2016 | 453.566 -Unlawful Possession of Dru | Connelly, James Patrick | Mitchell, Earl |
| S 04418 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Emsaki, Pourya | Baty, Keegan |
| S 04420 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Palmer, Kevin Andrew | Baty, Keegan |
| S 04419 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Suhuparra Mark G | Baty, Keegan |
| S 04306 | 08/31/2016 | 453.566 -Unlawful Possession of Dru | Sommers, Matthew Ryan | Tolle, John |
| S 04307 | 08/31/2016 | 454.351 -Drugs not to be introduced | Reed, Nathan Everett | Tolle, John |
| S 04308 | 08/31/2016 | 453.336 -Possess Marijauna <1oz. | Morrone, William Anthony | Tolle, John |
| S 04237 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Lear, Melissa | Carmichael, Nathan |
| S 16254 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Chitwood, Justin Paul | Thornhill, Shawn |
| S 04122 | 09/01/2016 | 6.08.030 -animal restrictions | Richardson, Joanne Mac | Pascual, Philipp |
| S 04458 | 09/01/2016 | 454.351 -Drugs not to be introduced | Frankel, Arielle | Cornfield, Steven |
| S 04186 | 09/01/2016 | 454.351 -Drugs not to be introduced | Mayer, Alexis L | Leahy, Matt |
| S 04859 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Keck, Philip Steven | Morgan, Allison |
| S 04860 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Cason, Caley Bridger | Morgan, Allison |
| S 04858 | 09/01/2016 | 453.566 -Unlawful Possession of Dru | Carretero, Henry D | Morgan, Allison |
| S 04309 | 09/01/2016 | 454.351 -Drugs not to be introduced | Greenwell, Elisha Nichole | Tolle, John |
| S 04310 | 09/01/2016 | 454.351 -Drugs not to be introduced | Ding, Anthony Shyn | Tolle, John |
| S 04311 | 09/01/2016 | 454.351 -Drugs not to be introduced | Hall, Alexander Martin | Tolle, John |
| S 04312 | 09/01/2016 | 454.351 -Drugs not to be introduced | Waier, Charles Jarryd | Tolle, John |
| S 04313 | 09/01/2016 | 454.351 -Drugs not to be introduced | Eccles, David | Tolle, John |
| S 04254 | 09/01/2016 | 454.351 -Drugs not to be introduced | Marengo, David | Woolridge, Allen |
| S 04255 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | McGoon, Douglas Osbourne | Woolridge, Allen |
| S 04253 | 09/01/2016 | 453.336 -Possess Marijauna <1oz. | Wong, Vince | Woolridge, Allen |
| S 04490 | 09/02/2016 | 454.351 -Drugs not to be introduced | Byer, Michael Thomas | Reed, Glenn Alan |
| S 04449 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Shuartz, Liron | Larkin, Brad |
| S 04861 | 09/02/2016 | 453.566 -Unlawful Possession of Dru | Gorniak, Dewey Charles | Morgan, Allison |
| S 04862 | 09/02/2016 | 453.566 -Unlawful Possession of Dru | Meyer, Rachel Lyn | Morgan, Allison |
| S 04863 | 09/02/2016 | 454.351 -Drugs not to be introduced | Gupte, Rachel Catherine | Morgan, Allison |
| S 04424 | 09/02/2016 | 454.351 -Drugs not to be introduced | Herak, Cassondra Lee | Baty, Keegan |
| S 04425 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Rios, Christopher | Baty, Keegan |
| S 04610 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Silvia, Aaron Arthur | Baty, Keegan |
| S 04611 | 09/02/2016 | 454.351 -Drugs not to be introduced | Butler, Sean Michael | Baty, Keegan |
| S 04421 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Taylor, Nicholas A | Baty, Keegan |
| S 04422 | 09/02/2016 | 454.351 -Drugs not to be introduced | Sierra, Evilio Stephan | Baty, Keegan |
| S 04423 | 09/02/2016 | 453.336 -Possess Marijauna <1oz. | Newcombe, Britney Helen | Baty, Keegan |
| S 04609 | 09/02/2016 | 454.351 -Drugs not to be introduced | Hinson, Jesse | Shampang, Boone |
| S 04314 | 09/02/2016 | 454.351 -Drugs not to be introduced | Wali, Alec H | Tolle, John |
| S 04238 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Anderson, Cheryl Lenee | Carmichael, Nathan |
| S 04149 | 09/03/2016 | 485.187 -unlawful acts (proof requi | Portman, Cynthia | Dickerman, Phillip |
| S 04361 | 09/03/2016 | 454.351 -Drugs not to be introduced | Frankel, Nicholas Joseph | Thornhill, Shawn |
| S 04362 | 09/03/2016 | 454.351 -Drugs not to be introduced | Russell, Ryan Dallas | Thornhill, Shawn |
| S 04491 | 09/03/2016 | 453.566 -Unlawful Possession of Dru | Brannen, Grayson B | Reed, Glenn Alan |
| S 04492 | 09/03/2016 | 453.566 -Unlawful Possession of Dru | Grimes, Joshua Michael | Reed, Glenn Alan |

CONTROLLED DOCUMENT-ORIGINAL IN RED

AR10078



PERSHING COUNTY SHERIFF'S OFFICE

**Citation Log for 08/23/2016 - 09/06/2016**

Page 4

12/07/2016

| Cite # | Date | Violation | Person Cited | Deputy |
|--------|------|-----------|--------------|--------|
| S 04629 | 09/03/2016 | 454.351 -Drugs not to be introduced | Murphy, Seamus Patrick | Boyer, Daniel |
| S 04460 | 09/03/2016 | 454.351 -Drugs not to be introduced | Cromer, Jens Remington | Cornfield, Steven |
| S 04459 | 09/03/2016 | 454.351 -Drugs not to be introduced | Daniel, William A | Cornfield, Steven |
| S 04256 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Vinogray, Olga | Moore, Dennis |
| S 04187 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Hudson, Meghan Elizabeth | Leahy, Matt |
| S 04315 | 09/03/2016 | 454.351 -Drugs not to be introduced | Bacho, Thomas D | Pulley, Robert |
| S 04538 | 09/03/2016 | 454.351 -Drugs not to be introduced | Gallucci, Brandi | Mitchell, Earl |
| S 04539 | 09/03/2016 | 453.566 -Unlawful Possession of Dru | Nguyen, Thi Khac Lam | Mitchell, Earl |
| S 04612 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Turner, Michael Edward | Baty, Keegan |
| S 04613 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Pratt, Orrin S | Baty, Keegan |
| S 04614 | 09/03/2016 | 453.336 -Possess Marijauna <1oz. | Hawley, Brien D | Baty, Keegan |
| S 02148 | 09/04/2016 | 453.566 -Unlawful Possession of Dru | Happy, Edward Gene II | Blondheim, Eric |
| S 04150 | 09/04/2016 | 453.336 -Possess Marijauna <1oz. | Franks, Thomas Pomaikai | Blondheim, Eric |
| S 04461 | 09/04/2016 | 454.351 -Drugs not to be introduced | Dulla, Jeffrey | Cornfield, Steven |
| S 04462 | 09/04/2016 | 454.351 -Drugs not to be introduced | Selemenev, Alexei Victorovic | Cornfield, Steven |
| S 04864 | 09/04/2016 | 453.566 -Unlawful Possession of Dru | West, Gerald Laurence | Morgan, Allison |
| S 04630 | 09/05/2016 | 200.481 -Battery | Sloan, Michael G | Boyer, Daniel |
| S 04188 | 09/05/2016 | 200.481 -Battery | Bonney, Rio L | Leahy, Matt |
| S 04363 | 09/06/2016 | 454.351 -Drugs not to be introduced | Iordache, Mirela Daniela | Thornhill, Shawn |
| S 04364 | 09/06/2016 | 454.351 -Drugs not to be introduced | Ribeiro Tavares, Alex | Thornhill, Shawn |

CONTROLLED DOCUMENT-ORIGINAL IN RED

AR10079

# EXHIBIT C

# EXHIBIT C

AR10080

# 2015 Crime In Nevada



THE GREAT SEAL OF THE STATE OF

ALL FOR OUR COUNTRY

NEVADA

Nevada Department of
Public Safety

AR10081

THIS PAGE WAS LEFT INTENTIONALLY BLANK

AR10082



# UNIFORM CRIME
# REPORTING

# 2015 REPORT



AR10083



# STATE OF NEVADA
## DEPARTMENT OF PUBLIC SAFETY

**Brian Sandoval, Governor**

James M. Wright, Director
Department of Public Safety

Julie Butler, Division Administrator
General Services Division

Erica Hall, Uniform Crime Reporting Program Manager
General Services Division

Matthew West, Graduate Student Intern
University of Nevada, Reno



AR10084





Director James M. Wright

**VISION:** To be the premiere public safety agency and provide advanced law enforcement services to the citizens of Nevada. To support and empower Department of Public Safety employees by encouraging diversity in the workforce, results oriented service, productivity and meaningful career growth.

The Department of Public Safety is committed to achieving the highest standards of excellence through the use of comprehensive training programs, progressive technology, federal, state and local government partnerships with interagency cooperation to ensure the safety of all citizens and visitors in Nevada.

**MISSION STATEMENT:** In partnership with the people of Nevada, the Department of Public Safety provides services in support of protecting our citizens and visitors by promoting safer communities through prevention, preparedness, response, recovery, education and enforcement.

AR10085

THIS PAGE WAS LEFT INTENTIONALLY BLANK

AR10086



# TABLE OF CONTENTS

Forward from Division Administrator Julie Butler ............................................................... 9

Appreciation to Nevada Law Enforcement Agencies ........................................................ 11

Nevada Counties ............................................................................................... 13

Authority ........................................................................................................ 15

Introduction .................................................................................................... 17

Classification of Offenses ..................................................................................... 23

Explanation of the Calculation of Rates ...................................................................... 32

Statement of Policy for Release of UCR Statistical Information ............................................ 33

Profile of the State of Nevada ................................................................................ 35

2015 Nevada Crime Clock ..................................................................................... 37

2015 *Crime In Nevada* Highlights ............................................................................ 39

Index Crimes and Clearance Rates ............................................................................ 41

Murder Statistics ............................................................................................... 63

Rape Statistics ................................................................................................. 71

Robbery Statistics .............................................................................................. 77

Aggravated Assault Statistics ................................................................................. 83

Human Trafficking Statistics .................................................................................. 89

Burglary Statistics ............................................................................................. 93

Larceny Statistics .............................................................................................. 99

Motor Vehicle Theft Statistics ................................................................................ 105

Arson Statistics ................................................................................................ 111

Simple Assault Statistics ...................................................................................... 117

Hate Crime ..................................................................................................... 121

Stolen and Recovered Property Values ...................................................................... 127

Law Enforcement Personnel .................................................................................. 137

Arrest Data ..................................................................................................... 143

Protection Order Data ......................................................................................... 225

Domestic Violence Data ....................................................................................... 235

Crimes Committed Against Older Persons Data ............................................................. 395

Justifiable Homicide Data ..................................................................................... 483

AR10087

# 2015 Nevada Crime Clock

One **Index Crime Offense** every 5 minutes, 23 seconds

One **Violent Crime** every 25 minutes, 55 seconds

One **Property Crime** every 6 minutes, 48 seconds

One **Murder** every 2 days, 1 hour, 12 minutes

One **Burglary** every 23 minutes, 33 seconds

One **Rape** every 5 hours, 11 minutes

One **Larceny** every 12 minutes, 11 seconds

One **Robbery** every 1 hour, 23 minutes

One **Motor Vehicle Theft** every 46 minutes, 21 seconds

One **Aggravated Assault** every 44 minutes, 8 seconds

One **Arson** every 19 hours, 10 minutes

One **Human Trafficking** every 1 day, 16 minutes

This crime clock should be viewed with care. This is the most aggregate representation of Nevada's 2015 UCR data and it is designed to convey the annual reported crime experience by showing the relative frequency of occurrence of the Index Offenses. This mode of display should not be taken to imply regularity in the commission of the offenses, but rather, it represents the annual ratio of crime to fixed time intervals.

AR10088

THIS PAGE WAS LEFT INTENTIONALLY BLANK

AR10089

## *2015 Crime In Nevada* Highlights

**CRIME RATE**

The Nevada Crime Rate is based on the occurrence of an index offense per 1,000 residents of the state. The crime rate for 2015 was 33.94 per 1,000. The comparable rate for 2014 was 32.49. The state population for 2015 was 2,871,934 per the Nevada State Demographer.

**INDEX OFFENSES**

Law enforcement reported 97,485 index offenses in 2015, versus the 92,376 reported in 2014. That is an increase of 5,109 (5.53%). Nevada's four-year average for index offenses is 94,844 (2012-2015).

**VIOLENT CRIMES**

Murder, rape, robbery, aggravated assault and human trafficking make up the violent crimes category. Violent crimes as a group increased by 2,337 offenses (13.03%), to 20,273 in 2015, up from 17,936 in 2014. Violent crimes accounted for 20.80% of all reported index crimes (19.42% in 2014). 2015 had a violent crime rate of 7.06 per 1,000 population. Nevada's four-year average for violent crimes is 17,770 (2012-2015).

**PROPERTY CRIMES**

Burglary, larceny, motor vehicle theft and arson make up the property crimes category. Property crimes as a group increased by 2,772 offenses (3.72%) to 77,212 in 2015, up from 74,440 in 2014. Property crimes accounted for 79.2% of all reported index crimes (80.58% in 2014). 2015 had a property crimes rate of 26.88 per 1,000 population. Nevada's four-year average for property crimes is 77,073 (2012-2015).

**MURDER**

There were 178 murders committed in Nevada in 2015. That is an increase of 10 (5.95%) from 168 reported in 2014. Law enforcement cleared 127 murders in 2015 (71.35%). Nevada's five-year average for homicide offenses is 155 (2011-2015).

**RAPE**

There were 1,686 rapes and attempted rapes committed in Nevada in 2015. That is an increase of 335 (24.80%) from 2014 when there were 1,351. There were 1,517 committed rapes and 169 attempted rapes in 2015. Law enforcement cleared 305 incidents of rape in 2015 (18.09%). Nevada's five-year average for rape offenses is 1,187 (2011-2015).

**ROBBERY**

There were 6,287 robberies in Nevada in 2015. That is an increase of 336 (5.65%) from 2014 when there were 5,951. Law enforcement cleared 1,447 incidents of robbery in 2015 (23.02%). Nevada's five-year average for robbery offenses is 5,393 (2011-2015).

**AGGRAVATED ASSAULT**

There were 11,906 aggravated assaults in Nevada in 2015. That is an increase of 1,440 (13.76%) from 2014 when there were 10,466. Law enforcement cleared 5,037 incidents of aggravated assault in 2015 (42.31%). Nevada's five-year average for aggravated assault offenses is 10,571 (2011-2015).

**HUMAN TRAFFICKING**

There were 216 incidents of human trafficking in Nevada in 2015. Law enforcement cleared 49 incidents of human trafficking in 2015 (22.69%).

AR10090

**BURGLARY**

There were 22,315 burglaries in Nevada in 2015. That is an increase of 528 (2.42%) from 2014 when there were 21,787. Law enforcement cleared 1,806 incidents of burglary in 2015 (8.09%). Nevada's five-year average for burglaries is 21,870. $113,196,758 in property was stolen during burglaries in Nevada in 2015.

**LARCENY**

There were 43,104 larcenies in Nevada in 2015. That is an increase of 982 (2.33%) from 2014 when there were 42,122. Law enforcement cleared 8,209 incidents of larceny in 2015 (19.04%). Nevada's five-year average for larceny is 43,286 (2011-2015). $77,567,598 in property was stolen during larcenies in Nevada in 2015.

**MOTOR VEHICLE THEFT**

There were 11,336 motor vehicle thefts in Nevada in 2015. That is an increase of 1,208 (11.93%) from 2014 when there was 10,128. Law enforcement cleared 682 incidents of motor vehicle theft in 2015 (6.02%). Nevada's five-year average for motor vehicle theft is 10,178 (2011-2015). The value of stolen motor vehicles in Nevada in 2015 totaled $93,653,854.

**ARSON**

There were 457 arsons in Nevada in 2015. That is an increase of 54 (13.40%) from 2014 when there were 403. Law enforcement cleared 141 incidents of arson in 2015 (30.85%). Nevada's five-year average for arson is 426 (2011-2015). $14,320,197 in property was destroyed in arsons in Nevada in 2015.

**SIMPLE ASSAULT**

There were 34,894 simple assaults in Nevada in 2015. That is an increase of 202 (0.58%) from 2014 when there were 34,692. Law enforcement cleared 15,627 incidents of simple assault in 2015 (44.78%). Nevada's five-year average for simple assault is 35,811 (2011-2015).

**HATE CRIME**

There were 58 reported hate crimes in Nevada in 2015. That is an increase of 33 (132%) from 2014 when there were 25. Nevada's four-year average for hate crime is 65 (2012-2015).

**STOLEN & RECOVERED PROPERTY**

In 2015 Nevada law enforcement agencies reported $283,769,142 worth of property stolen during the commission of index crimes. $73,908,004 in property was recovered (26.05%).

**CLEARANCE RATE**

Nevada law enforcement agencies cleared 18.26% of all index crimes in 2015, a decrease from the 2014 clearance rate of 21.07%.

**ARRESTS**

116,121 persons were arrested, summoned or cited in Nevada in 2015. That is a decrease of 6,776 (-5.51%) from 2014 when the total was 122,895. Nevada's arrest rate per 1,000 population in 2015 was 40.43.

**POLICE EMPLOYMENT DATA**

Statewide there were 6,253 full-time sworn law enforcement officers in Nevada in 2015. That is an increase of 821 from 2014 when there were 5,432. This is a ratio of 2.18 officers per 1,000 population.

**OFFICER ASSAULTS**

There were 431 assaults on Nevada law enforcement officers in 2015. That is an increase of 66 over 2014 when there were 365 (18.08%). Law enforcement cleared 369 (85.61%) of these assaults.

AR10091

# EXHIBIT D

# EXHIBIT D

AR10092



U.S. Department of the Interior
Bureau of Land Management



# 2015 BLM Burning Man Event
# After Action Review (AAR)

## Contents

Introduction .................................................................................................................................. 2

Civilian Operations ....................................................................................................................... 3

  Unified Command/ICS ................................................................................................................ 3

    Summary ................................................................................................................................. 3

    Recommendations ................................................................................................................. 4

  Environmental Compliance ....................................................................................................... 4

    Summary: ............................................................................................................................... 4

    Recommendations ................................................................................................................. 5

  Vending and Commercial Compliance ...................................................................................... 5

    Summary: ............................................................................................................................. 10

    Recommendations ............................................................................................................... 10

  Public Information .................................................................................................................... 11

    Summary ............................................................................................................................... 11

    Recommendations ............................................................................................................... 12

  Safety ....................................................................................................................................... 13

    Summary ............................................................................................................................... 13

    Recommendations ............................................................................................................... 13

  Logistics ................................................................................................................................... 14

    Summary ............................................................................................................................... 14

    Recommendations ............................................................................................................... 15

  Facilities ................................................................................................................................... 16

1

Summary ............................................................................................................... 16

Recommendations ................................................................................................ 16

Communications, Dispatch and Information Technology ............................................ 17

Summary ............................................................................................................... 17

Recommendations ................................................................................................ 17

Geographic Information Systems (GIS) ......................................................................... 20

Summary ............................................................................................................... 20

Recommendations ................................................................................................ 20

Law Enforcement ............................................................................................................... 22

Event Planning ............................................................................................................. 22

Summary ............................................................................................................... 22

Recommendations ................................................................................................ 23

Law Enforcement Operations ..................................................................................... 23

Integration ............................................................................................................ 23

Community Policing .............................................................................................. 25

Staffing .................................................................................................................. 27

BLM Medical .......................................................................................................... 30

Communications Center ....................................................................................... 33

Incident Reporting ............................................................................................... 35

Evidence ................................................................................................................ 36

Statistics ................................................................................................................ 36

## Introduction

The Burning Man Event is a Bureau of Land Management (BLM) permitted gathering of participants who engage in an "experiment in temporary community dedicated to radical self-expression and self-reliance". Burning Man is the largest and most complicated special recreation event on BLM administered lands.

Since 1990, the event has been held annually in the Black Rock Desert – High Rock Canyon – Emigrant Trails National Conservation Area within the Winnemucca District Office. The Black Rock Desert is a remote rural area approximately two hours from the nearest city with law enforcement and emergency medical services. During the week prior to Labor Day, participants convene to create Black Rock City. During the event, the city becomes the fifth largest city in Nevada. In 2015, the event reached a peak

2

participant population of 67,564. Event gates opened at 10:00 a.m. on Sunday, August 30, 2015 and closed at 12:00 p.m. on Tuesday, September 8, 2015.

This document serves as the post event operational assessment of the management of the event and BLM. During planning for the 2016 Burning Man event operation, a variety of creative and cost-effective solutions to issues identified in this document, and other issues as they may arise, could be considered in lieu of specific recommendations identified here.

## Civilian Operations

### Unified Command/ICS

Summary
The ICS organization for 2015 Burning Man event was a hybrid of a Unified Command System with three Incident Commanders (IC) (BLM Civilian Operations; Robert Towne, BLM Law Enforcement (LE); Dan Love, and Pershing County Sheriff; Jerry Allen), as well as a Black Rock City, LLC(BRC) representative, Charlie Dolman, Event Operations Director for BRC. Unified Command is the right organizational structure for this event but the personnel filling the roles as IC determines the success of the organization.

At the start of the 2015 event Mr. Towne was the Civilian Incident Commander and the Authorizing Official for the Special Recreation Permit (SRP) and the event. It was quickly recognized that there was a need for a Civilian Incident Commander that was responsible for day to day operations of the civilian staff that was not focused on all the external communications with the Washington Office, Nevada State Office, media and BRC. Chris Delaney (Civilian Operations) was identified as the person that would fulfill the Civilian Incident Commander role, this move was not effectively communicated to all Section Chiefs or BRC due to extenuating circumstances but did improve how the Civilian side functioned. Mr. Towne's leadership was effective as the Agency Administrator. He held people accountable and provided direction to ensure the success of the event, despite all of the controversy in the weeks leading up to the event.

During the 2015 event not all Section Chiefs worked directly for the Unified Command, instead working directly for the Law Enforcement IC or Civilian IC. This presented challenges in making decisions as a Unified Command that effected the entire organization working the event. In several situations, either the LE IC or Civilian IC had to go through their counterpart to deliver messages or get permission to have things brought to the Section Chief's attention. This delayed or complicated decisions that did not require IC approval. The organization was not properly structured for efficiency and in some instances Unit Leaders supervised Section Chief Positions.  For instance, the Facilities Unit Leader supervised and provided direction to the Logistics Section Chief. The Facilities Unit Leader also supervised the Communications Unit Leader and this created disconnect with the Dispatch Center and the event communications.  The only reason this was as successful as it was is because of the leadership of Mr. Mark Pirtle and his knowledge of the event.

3

During the last few days of the event, between main event and post patrol, the command staff was unclear regarding the demobilization dates and times. OLES or the LE IC Staff left the event prior to the majority of the Civilian Staff. This led to issues and confusion regarding timekeeping and documentation needed to complete payroll.

Recommendations

- The Authorized Officer (AO) should have a separate role than the Incident Commander to ensure there are clear, delineated roles and responsibilities to ensure the success of the ICS organization for the event.
- All Section Chiefs should work for the Unified Command rather than having certain Section Chiefs work for certain ICs.
- BLM Staff that fill critical Section Chief roles should be appropriately qualified.
- All personnel and processes at the event should follow those rules/policies within the Incident Business Management Handbook (PMS 902) to ensure that well establish and accepted business management practices support event operations.
- The Point of Contact (POC) for the Dispatch Center and the Communication Unit Leader need to be the same person. It is extremely difficult for the Communications Unit Leader that is responsible for communications at the event to ensure all needs are being met if there is not a connection between the two groups.
- One benefit of ICS is the ability to scale up or scale down based on complexity and need, this should include the Command Organization as well. In future year's events, it is recommended that all the Command Staff stays at the event and demobilize together for continuity of operations.

## Environmental Compliance

Summary:

The 2015 Environmental Compliance Team again had a very successful and productive year. As in previous years, partnering with the BRC's Earth Guardians was a successful strategy, although some issues did arise regarding the efficacy of follow-up mitigation. In 2015, 5584 Leave No Trace contacts were initiated with participants, 446 environmental violations were adjudicated and approximately 128 environmental compliance-related citations were issued, including 12 which were coordinated between law enforcement and the Environmental Compliance Team. This included about 30 citations for gray/black water and other environmental issues and approximately 80 citations for defecation/urination on the playa.

Another notable issue from the 2015 Environmental Compliance Team effort was the apparent large increase in the number of recreational vehicles with self-contained water and black and greywater waste systems being used or rented by participants. This appeared to be the genesis for the Team discovering numerous issues of leaking grey and blackwater from RVs during the pre-, main and post-event periods.

4

AR10096

As in 2014, "Plug and Play" camps appeared to continue to proliferate and the Team noted that in several cases, environmental compliance and Leave No Trace ethics appeared to be lacking, leading to a number of compliance violations. This was also true for some large theme and sound camps.

Two BLM Environmental Compliance teams were paired with BLM Law Enforcement Officers and completed routine monitoring throughout the city together. This was widely viewed internally as a successful BLM strategy, but the practice also generated controversy as it was seen by BRC and the Burning Man community as too invasive.

It was noted that BRC's messaging and enforcement of stored fuel containers was very successful, but Team members noted that there were still a number of issues identified.

Recommendations
- 4 additional compliance (teamed w/LE Ranger).
- 13 total non LE compliance positions. (1 lead, 12 positions).
- Lead and 5 positions staffed for Pre and Post event.
- The closure order should be reviewed and modified so it clearly provides BLM Law Enforcement Officers with the ability to sufficiently enforce some of the most common environmental issues that are encountered during the event.  Environmental Compliance Lead, Project Manager and LE lead should work together to ensure these changes are effective.
- In the future the Environmental and Vending Compliance Teams should consider combining into a single Compliance Team with two divisions.
- Recommend a renewed emphasis by BRC to educate and enforce environmental compliance issues associated with the use of RV self-contained water systems, and the responsibility of theme camps to keep a clean camp during the event, not just cleaning up after the event.
- Recommend a renewed emphasis by BRC to educate first time attendees of the LNT ethics shared by everyone at the event.
- If Environmental Compliance Teams continue to pair up with BLM LE, consideration should be given to finding strategies for reducing the resulting controversy.
- The joint BLM and BRC efforts to educate participants regarding safe fuel storage were highly successful during the 2015 event, with over 400 camps contacted.  The motor home fire during the week emphasized the importance of enabling agency law enforcement to enforce proper fuel storage methods during the event.
- If an environmental violation is not solved by the time a third notification has occurred, a citation should be issued if possible, and a firm timeline for remediation should be established. If the required remediation does not take place, BLM and BRC should work together to evict the person or persons responsible.
- To avoid misinformation regarding existing environmental regulations and temporary restrictions in place under the Closure Order, a single document should be created that provides the event organizers and participants an easy reference outlining the BLM's environmental protection expectations.
- The temporary restrictions in the 2017 Closure Order related to environmental protection should be revised as below.  While redundant, all applicable Federal and State laws and regulations related to environmental protection should also be included in the Closure Order to provide event participants with a single reference regarding Leave No Trace expectations.  The environmental regulations and restrictions should all be placed together in one subsection of

5

the Order to facilitate the ability to more effectively communicate playa-specific environmental protection measures to event participants. Existing regulations should be referenced in the Closure Order's temporary restrictions to provide Law Enforcement Officers with increased flexibility to issue citations for violations.

(a) Environmental Protection Measures

(1) Protection of Public Land Resources within the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area:

In conformance with 43 CFR 8365.1-5(a)(1), no person may deface, disturb, remove, or destroy any natural object.

(2) Campfires:

Burning fires on the playa surface is prohibited. Campfires may only be burned in containers that are stably elevated above the playa surface and in a manner that do not pose a risk of fire debris falling onto the playa surface. In conformance with 43 CFR 8365.1-1(b)(1), plastic and other nonflammable materials may not be burned in campfires. In conformance with 43 CFR 9212.1(h), the ignition of fires other than a campfire is prohibited. This restriction does not apply to event-sanctioned and regulated art burns during the event.

(3) Grey and Black Water Discharge:

The discharge and dumping of grey water onto the playa surface is prohibited. Grey water is defined as water that has been used for cooking, washing, dishwashing, or bathing and/or contains soap, detergent, food scraps, or food residue, regardless of whether such products are biodegradable or have been filtered or disinfected. Black water is defined as waste water containing feces, urine, and/or flush water. This restriction does not apply to water trucks contracted by the event organizer to provide dust abatement measures.

(4) Human Waste:

The depositing of human waste on the playa surface is prohibited.

(5) Trash:

In conformance with 43 CFR 8365.1-1(b)(1), the discharge of any and all trash/litter/Matter Out Of Place (MOOP) onto the playa surface is prohibited. In conformance 43 CFR 8365.1-1(a), all event participants must pack out and properly dispose of all trash at an appropriate facility off playa.

(6) Hazardous Materials

In conformance with 43 CFR 8365.1-1(b)(3) and (4), the dumping or discharge of vehicle oil, petroleum products, or other hazardous household, commercial, or industrial refuse or waste onto the playa surface is prohibited.

(7) Fuel Storage

If necessary, each camp must establish a designated fuel storage area located at least ten feet away from any flammable materials, including vehicles and camping trailers. Fuel storage areas must be provided with shade to prevent fuel containers from bloating, leaking, or spilling. The storage of more than 110 gallons of fuel in a single camp is prohibited. Storage areas for over 20 gallons of fuel must include a secondary containment measure capable of holding 110% of the fuel being stored to prevent leaks and spills onto the playa surface. Storage areas for less than 20 gallons of fuel must include a tarp, plywood, or other measure to prevent leaks and spills onto the playa surface.

(8) Camp Placement and Organization

All recreational vehicles, trailers, motorhomes, port-a-potties, generators, and other camp infrastructure must be placed and organized in a manner that facilitates the event participants' ability to immediately and adequately resolve any potential issues related to the discharge of grey water, black water, vehicle oil, and other hazardous materials onto the playa surface.

6

(9) Potable Water Discharge:
In conformance with 43 CFR 8365.1-4(a)(2), the dumping or discharge of potable water onto the playa surface onto city streets and/or other public areas or onto camp electric systems in a manner that creates a hazard or nuisance is prohibited.  Potable water is defined as water that meets applicable water quality standards for safe drinking and food preparation.

- Add a new stipulation to BRC's Special Recreation Permit, or other effective measure, that requires them to provide all ticket purchasers with a list of the Closure Order's temporary restrictions.
- Public Affairs staff should collaborate with BRC, Earth Guardians, Friends of Black Rock, and other organizations to jointly promote consistent pre-event environmental outreach and education as much as possible via social media and other forums that are likely to reach participants.
- The *Burning Man 2015 Violation Notice – Quick Reference (08/07/2015)* provided to all Law Enforcement Officers working at the event should be modified to sufficiently identify all environmental compliance issues commonly encountered during the event. The 2016 *Quick Reference* should be updated to correspond to the updated temporary restrictions in the 2016 Closure Order.
- BLM Special Recreation Permits for commercial activities during the event do not contain sufficient stipulations to ensure that the permitted vendors are responsible for remediating all identified environmental issues associated with their vehicles, generators, and other rented equipment. As appropriate, Special Recreation Permits for vendors providing goods and services should include the following stipulations: ·
  - The permittee shall provide all clients with a copy of the temporary restrictions established under the BLM's Closure Order for the Burning Man event.
  - The permittee shall be responsible for immediately repairing or replacing any faulty property that is causing environmental degradation to public land resources, including but not limited to, black water, grey water, oil, fuel, and other hazardous materials leaking or spilling onto the playa surface.  In situations where violations of the Burning Man Closure Order's temporary restrictions are clearly the result of client negligence, agency law enforcement officials will issue citations to the client. In situations where violations of the Burning Man Closure Order's temporary restrictions are the result of the permittee's faulty property and/or where violations have occurred at abandoned camps, agency law enforcement officials shall issue citations to the permittee.
  - While pumping waste water from participant vehicles, permittees shall place spill pads under the pump connection.  In situations where waste water or other hazardous materials leak or spill onto the playa surface while pumping services are being provided, United Site Services shall immediately remedy the situation by removing the contaminated soil, placing it in a heavy duty garbage bag or container, refilling the hole with surrounding playa dust until level, and properly disposing of the contaminated soil in an appropriate off-playa facility.
  - The permitted fuel vendor must work with each client to establish a designated fuel storage area within their Black Rock City camp that is located at least ten feet away from any flammable materials, including vehicles and camping trailers.  Fuel storage areas must be provided with shade to prevent fuel containers from bloating, leaking, or spilling.  Providing clients with more than 110 gallons of fuel in a single camp is prohibited.  Storage areas for over 20 gallons of fuel must include a secondary containment measure capable of holding 110% of the fuel being stored

7

to prevent leaks and spills onto the playa surface.  Storage areas for less than 20 gallons of fuel must include a tarp, plywood, or other measure to prevent leaks and spills onto the playa surface.

- o  After the Environmental Compliance Team's third event, BLM Park Rangers, River Rangers, Backcountry Rangers, and Outdoor Recreation Planners have clearly demonstrated that they are the best suited to complete the Environmental Compliance Team's dual mission of identifying environmental issues associated with recreational vehicles and equipment and public outreach regarding Leave No Trace principles.  In addition, these positions are typically working at lower grade levels and provide BRC with the best return on their investment of cost recovery dollars to implement the Environmental Monitoring Protocol.

- The Environmental Compliance Team Lead essentially functions as a Supervisory Park Ranger or Outdoor Recreation Planner during the event.  The 2016 Environmental Compliance Team Lead can be recruited at a grade level below the GS-13 who has served in the position during the last three events.
- Having the Investigations team serve as the law enforcement point of contact for the Environmental Compliance Team has not been efficient over the last two events.  Each of these two teams have divergent missions during the event, and coordination between the two entities' competing priorities have resulted in very few law enforcement citations being issued in the final phase of the Environmental Monitoring Protocol.  Dedicating a team of law enforcement officers to assist the Environmental Compliance Team's mission during the second half of the 2015 event was highly effective, resulting in more immediate adjudication of environmental violations.
- A team of four law enforcement officers should join the Environmental Compliance Team for the entire 2016 event.  The officers could assist the team in various capacities throughout the week and to better address environmental issues.  The BLM should remain sensitive to partner and participant concerns that law enforcement involvement in the Environmental Monitoring Protocol would be a proxy for addressing non-environmental issues during the event.  If law enforcement officers are paired with team members throughout the entire week, shift assignments should be arranged well in advance of the event and/or the size of the Compliance Team should be expanded to ensure that the BLM can continue to meet its commitment to partner with eight Earth Guardian volunteers every morning.
- The Environmental Compliance Team Lead should develop a Risk Assessment for the team that would be reviewed and approved by the appropriate Winnemucca District manager.
- The Environmental Compliance Team's partners the Earth Guardians and Black Rock Rangers have provided the agency and the event with tremendous service over the past three years to mitigate environmental impacts taking place during the event and to educate participants about playa-specific Leave No Trace practices.  To date, these entities and individuals have received little BLM recognition of their efforts from the agency other than the thanks of the Compliance Team members. The Winnemucca District Manager should consider writing a letter of thanks for the partners' contributions to promoting Leave No Trace.  The partnership should also be nominated for the annual BLM Making a Difference Volunteer Award.  Winnemucca District leadership should attend at least one of the volunteer trainings held early during the event, and team partners should be invited to some type of thank you event at the BLM Interpretive Camp at the end of the event.

8

AR10100

- Multiple environmental and vending issues at numerous "Plug and Play" camps drained the Environmental Compliance and GIS Team's time and resources throughout the week, and reduced their capacity to address environmental issues throughout the rest city.  For example, BLM Environmental Compliance Team members, BLM Law Enforcement Officers, Earth Guardian volunteers, and Black Rock Rangers visited the White Ocean camp approximately 20 times throughout the week, and some of these issues posed serious public safety risks.  Documenting and compiling all of these issues at each camp in turn required the BLM GIS Team's resources to develop and update monitoring reports and updates.  BRC also had to mobilize staff and resources to address environmental and vending issues at the camp.  BLM law enforcement citations for environmental and/or vending violations typically range from $100 to $250, and since these theme camp organizers spend tremendous sums of money every year, the citations are not an effective tool to increase these camps' compliance.
- Given the severity and frequency of environmental and vending issues at the Plug-and-Play camps, BLM should continue to scrutinize their conformance with the agency's long-standing laws and regulations regarding the protection of the environment and providing commercial services on the public lands.  More regular coordination meetings should be held pre-event and throughout the event between the BLM Compliance and Vending Team Leads and their BRC counterparts to strategize and collectively pool documented issues and better enable BLM and BRC decision makers with relevant information regarding the camps.
- Collaborate with BRC to develop a mutually agreeable stipulation in their Special Recreation Permit for the event that will ensure that the documented Environmental and Vending Compliance issues are considered when considering theme camp applications and placements for future events, similar to and/or in conjunction with the annual MOOP Map.  If necessary, add an additional stipulation to BRC's Special Recreation Permit requiring BRC to provide the BLM with the names of all Leave No Trace Coordinators identified for each theme camp.
- The Ricoh GPS cameras and Geo-Jot geodatabase software used by the Environmental Compliance Team is time and labor-intensive, confusing and counter-intuitive, and is not an efficient tool for the BLM Compliance and GIS Teams, Earth Guardians, and Black Rock Rangers to implement the Environmental Monitoring Protocol.  The decision to provide the Black Rock Ranger partners with GPS units to navigate back to violations documented on the previous day was the primary reason that the Environmental Monitoring Protocol succeeded during the 2015 event.
- Since the Environmental Monitoring Protocol was originally developed in 2013, there are now numerous apps for tablet devices that could potentially replace the outdated GPS cameras and geodatabase software and drastically increase the efficiency of all phases of the Protocol.  There will likely be substantial challenges associated with agency IT and purchasing processes to ensure that an app-based Protocol is ready for the 2016 event, as well as the need to coordinate with team partners, which is another reason that the 2016 Environmental Compliance and GIS Team Leads should be selected as soon as possible in fiscal year 2016.

9

## Vending and Commercial Compliance

Summary:
The BLM Vendor Compliance Team coordinated with BRC counterparts to ensure that commercial operations on BLM-administered public lands maintained all necessary BLM and BRC authorizations, and identified issues and violations in need of adjudication. Violations were documented to monitor adjudication effort effectiveness. The Team promotes compliance with all permit stipulations, with a focus on those that are in place to protect the natural and cultural resources in the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area.

The 2015 Vending Compliance Team again had a successful and productive year, and coordinated with BRC's Outside Services (OSS) on a number of Vending and SRP related issues. 70 Vending SRPs were issued and monitored during the 2015 Burning Man event. The decrease from 2014 is attributable to some consolidation and subcontracting among permittees both in camp services and air carriers. Several permitees from 2014 elected not to apply for the 2015 event.

The Vending Team worked directly with OSS and BLM LE to identify and adjudicate a significant case wherein a participant was found to be charging participants for unpermitted "concierge" services.

In 2014, for the first time, BLM began the successful practice of offering vendors who are found to be in need of an SRP an opportunity to apply for and receive on on-playa. This practice continued in 2015, and was again successful. In cases where a well-intentioned participant is found to be in need of an SRP, they may be granted on at the discretion of the Authorized Official.

In 2015 BLM made a stronger effort to collect the locations of equipment and RVs in use by permitted vendors, as stipulated. While many vendors did comply, a number did not, or did so late or reluctantly.

There was an apparent large increase in the number of RVs being rented and/or used by participants in 2015. The number of RVs in the city led to an increase in the amount of time the Vending team had to spend completing compliance duties, ranging from identifying and monitoring vendor SRPs, to collecting and verifying equipment numbers and locations.

"Plug and Play" camps continued to proliferate in 2015. The BLM Vending Team spent considerable time discussing the need for SRPs for Plug and Play camps that appeared to be operating for a profit. Another item of discussion was the possibility that may of the service providers being employed by these camps are not participants themselves, and as such, may require additional scrutiny to determine if an SRP is needed.

Recommendations
- Need to develop and implement strategies to react to apparent large increase in RVs in 2015.
- Need to continue to work with BRC to develop and implement strategies to assess Plug and Play camps, and possible for-profit Plug and Play camps.
- Recommend 2 additional positions for vending compared to 2015, total 1 lead and 4 positions. All staffed for pre-event.

AR10102

- Consider bring SRP trainees (paid w/BLM as career development) for pre-event only.
- In the future the Environmental and Vending Compliance Teams should consider combining into a single Compliance Team with two divisions.
- Continue the practice of issuing on-playa SRPs, in appropriate cases.
- Continue and improve the practice of requiring Vendors to provide city addresses and location for RVs, campers, generators and other equipment in order to facilitate both environmental and commercial compliance.
- Coordinate with BRC to identify those Plug and Play camps in needs of SRPs, as well as identify "concierge" services in need of an SRP.
- The stipulations for Air Carriers, Camp Services and RV vendors should be reviewed and updated by the BLM Burning Man outdoor recreation planner, in coordination with BRC.

## Public Information

### Summary

The Bureau of Land Management (BLM) information function was staffed by a single public information officer (PIO) with NWCG PIO1 qualification beginning Thursday, August 27 (travel and inbrief) and ending Monday, September 7 (demobilization and travel out.) The Winnemucca district public affairs specialist was also available to assist remotely.

Overall, this year's event was quiet and uneventful.  There were no fatalities during the event and approximately 40 to 50 arrests, none of which were controversial. Relations among BLM, Pershing County Sheriff's Office (PCSO), Black Rock City (BRC), and other cooperators remained positive, productive, and cordial.

Media coverage of this year's event was largely neutral, focusing on BRC's putative plans to acquire private property for future events. This was a significant success given the large amount of negative media coverage leading up to the event. This success was particularly crucial given two other very high-profile BLM events happening in Nevada this week: a wild horse gather in the Southern Nevada district and an appearance by the Secretary of the Interior on Wednesday at Red Rock Canyon National Conservation Area to promote the President's "Every Kid in a Park" initiative.

The information function consisted of the following tasks:

- Produce a daily written update for the BLM Nevada state directorate by 10 a.m. Inputs for this product included CAD reports from BLM law enforcement and verbal reports from PCSO, as well as the daily situation/status report (209) from BRC.
  - A total of 11 daily updates were produced, with the first update sent Friday, August 28, and the final one sent on Monday, September 7.
- Meet daily with the BRC public information officer, Jim Graham, to coordinate information distribution for emergent situations and responses to media inquiries.  These meetings also provide daily face-to-face availability for meeting with media covering the event on-site, which is crucial given the lack of cell and internet connectivity on the playa.
- Arrange BMIR Burning Man radio interviews for BLM staff.

11

- o Interp camp and environmental compliance staff were interviewed at 6 p.m. on Wednesday, September 2.
- o Law enforcement leadership was interviewed at 6 p.m. on Friday, September 4.
- Provide BLM responses to incoming media responses.  Responses were provided to the following reporters:
  - o Ed Fletcher, Sacramento Bee, efletcher@sacbee.com, cell 916-524-0775, regarding law enforcement at Burning Man.  As of Sept. 7, the paper had not run his story.
  - o Kelsey McCutcheon Fitzgerald, Reno News & Review, kelseymccutcheon@gmail.com, tel 775-741-0496, regarding Environmental Assessment requirements for dust abatement.
- Advise BLM and PCSO officials on media responses.
  - o Developed talking points for BMIR radio interview for Special Agent In Charge Dan Love and Pershing County Sheriff Jerry Allen.
  - o Accompanied Sheriff Allen on ride-along with French video documentarian on Saturday, September 5.
- Produce BLM social media updates on the incident, including a Flickr photo album, YouTube videos covering various aspects of BLM operations, Facebook posts, and tweets as necessary to distribute emergent information.  The following YouTube videos were produced and promoted on Facebook:
  - o Safety Officer Ride-Along: https://youtu.be/TUCR3XXJs2Y
  - o Leave No Trace-Earth Guardian Compliance Ride-Along:  https://youtu.be/OpVLvXSuL0Q
  - o Center Camp Talk With William Mack and Rosalie Barnes: https://youtu.be/7DiB6RdBzso
  - o Interp Camp Tour:  https://youtu.be/k-8ghz05Gjw
  - o Vending Compliance Ride-Along (BRC Airport):  https://youtu.be/edUvPogGhqg
  - o Earth Guardians Training: https://youtu.be/kKPwmkKKys0

The Flickr photo album with 31 photos from the event is located at: https://www.flickr.com/photos/blmnevada/albums

Recommendations

- Internet connectivity at the PIO work station was uninterrupted and there were no problems with the event-issued laptop.  It is impossible to overstate the importance of this factor in the success of the function, allowing the PIO to communicate with the state office and external parties by email, as well as keeping social media platforms updated.
- The Winnemucca District Office provided a pickup truck for the duration of the assignment. This was an excellent asset for field documentation, providing a raised platform for photography and video on the playa.
- Locating the information function in the civilian operations trailer made it easy to stay updated on daily activities.
- CAD statistics were efficiently processed and delivered each morning by evidence technician Matt Gochis, greatly facilitating the production of the morning update.  The project manager and civ ops leadership were always available for consultation.

12

- The BRC PIO was collaborative, cooperative, and timely in responding to inquiries and issues. The working relationship at the individual level was excellent.
- One BLM PIO is probably sufficient staffing on-scene, but a busier or more controversial incident would have required much more coordination and support from the backup PIO in the Winnemucca district office. In addition to regularly scheduled daily face-to-face meetings with the BRC PIO, the on-site BLM PIO should also have regularly scheduled daily phone conferences with the off-site Winnemucca district office PIO. Responsibility to schedule and initiate these conferences rests with the on-scene PIO.  This would provide greater situational awareness for the district PIO and a more resilient information function in case of a disaster.
- Although YouTube online video editing was sufficient for this year's relatively calm event, the on-site BLM PIO needs to bring a laptop equipped with video editing software in order to speed up the process of producing and editing videos.
- The on-site PIO should also bring a GoPro camera.

## Safety

### Summary

On March 12, 2015 BLM shared with Black Rock City LLC a letter describing 20 safety, health and security concerns identified during the 2014 Burning Man event. BRC responded by planning for and implementing a variety of safety improvements in order to address those identified issues. In order to evaluate those efforts, and to ensure that BLM's own SRP administrative operation were operating at a high standard of safety, a new position was added to the BLM TO for the 2015 event. A BLM safety officer was detailed to provide safety input and solutions to BLM while evaluating some of BRC's safety improvements and making safety observations and recommendations.

The safety officer spent a majority of time within Black Rock City and integrating with BRC safety personnel and departments including Fire Arts Safety Team, The Department of Mutant Vehicles, the Emergency Services Department, Department of Public Works, and others. The safety officers also participated in evaluating the specific on-the-ground changes made by BRC to address BLM 2014 safety concerns, accomplished in part by attending three "safety tours" organized and presented by BRC. Finding specifically related to the 20 identified safety issues and concerns are addressed in document separate from this AAR.

### Recommendations

- Due to the size and scale of Black Rock City and the complexity of the event, recommend an additional safety officer in order to more thoroughly evaluate and mitigate safety of both the BLM operation and Black Rock City. Safety is a paramount consideration when authorizing any SRP.
- The BLM Safety Officer was unable to communicate via radio with BRC Safety.  Between the three combined BRC radios carried between us, there were no common channels or radio groups capable of communicating directly. This hindered sharing of safety information between the two organizations.  While planning the next event's radio groups, BLM and BRC staff should

13

work together have the tools needed to property communicate.  Optimally staff should be able to carry one radio capably of accomplishing this.

- Delorme InReach Devices are a great tool for tracking our employees at this event. If used fully, they provide an alternate means of two way text communications.  The one constant negative seen / heard was that employees did not understand how these devices function. Prior to next year's event, a WebEx or PowerPoint should be developed that instructs employees on features and functions of these devices.  Highlight the fact these devices are updating location every 30 seconds, batteries deplete quickly, they must be recharged nightly to stay operational.
- BRC Airport should notify BRC dispatch simultaneously with Unicom in the event of an emergency.
- The quantities of fuel being stored at the BLM dispensing station may require a Spill Prevention, Control and Countermeasure (SPCC) plan in addition to the already developed Spill Response Plan.  Recommend addressing in the 2016 SRP.  Consult with a Subject Matter Expert to develop guidance to this matter.  Fuel quantities and EPA definitions and regulations need to be researched further.
- Of 5 drones unpermitted drones seen flying, all but one was located and confiscated. Very few drones were seen flying overall, showing a high degree of compliance.
- Throughout the event few readily recognizable fire lanes were identified, even fewer were signed as such. Fire lanes should be properly signed per BRC Plan of Operations.
- Mutant vehicles and art cars with trailers were observed using everything from bungee straps to bed sheets a barricade between the vehicle and trailer.  Trailer barricade needs to be better defined.  The barrier must be sufficiently strong as to stop the forward motion of a person who may unintentionally walk into it.  BLM staff also witnessed barricades missing during event. This was brought to DMV and BRC Safety attention, better compliance was seen thereafter.  Ground guides for "large" moving art cars were not readily seen, and may need to wear more visible and identifiable clothing.

## Logistics

### Summary

During the 2015 event the logistics team consisted of four civilian BLM employees including a Logistics Supervisor. The team was supervised by the Facilities Supervisor. The team was divided into a four person day shift and a one person night shift with the team lead overlapping during the pre, main and post events for 24 hour coverage. A subset of the team was deployed during the set-up and breakdown weeks. The BLM event management team considered the logistics team a major success due to their outstanding attitudes, efficiency, timeliness, and excellent personal communication skills.

Black Rock Station continues to be a valuable resource for BLM during the pre-event, event and post event. The barracks and trailers continue to serve the purpose and need of those who lodge and use the barracks or interp center.

14

Recommendations

- 4 positions (1 night) was adequate other than support for vehicles. 2 positions working the week before pre-patrol begins is adequate.
- Fueling schedule was sufficient for the event needs.
- BLM Logistics Team should continue to staff the fueling station.
- Consider adding a night position at the start of pre-event, since all 4 regular positions are needed during the day for pre-event .
- Recommend staging a "runner" in Reno to accomplish purchasing, logistics and other for main-event only.
- Add 1 additional logistics position for designated ground support (vehicles).
- Possibly have WDO employees available for post tear down.
- Justin (Sweet Ride) and his crew should be available to help coordinate with BRC on logistics with set-up, lighting, trailers, and other issues.  It was beneficial for the operation to have the two additional BRC crew members (new this year) to help. Last year, Justin was clearly stretched thin responding to work load.
- We had much better communication with BRC staff by having Motorola radios with BRC frequencies.
- The ICP was ready much sooner than the previous year. By having the buildings ready when Facilities and Logistics started work, the ICP was functional much sooner. It also allowed us more time to make adjustments to smooth operations.
- Selected logistics staff members should continue to have qualifications and skills to perform logistical work (e.g., heavy equipment and maintenance staff employees).
- Continue having Logistics and Communications working for Facilities Lead rather than for an overall Civilian Operations Chief as Mark already coordinates and helps direct these functions prior to and during the SRP. In previous years, some issues arose when direction from supervisors and Mark did not comport.
- There were multiple persons ordering supplies for the operation without any communication or coordination. In some cases there were insufficient supplies and in other cases a large surplus. A single individual should be put in charge of ordering supplies for the event. Have section chiefs submit supply orders to that person. Communicate with the procurement position as to what supplies we already have. A plan should be developed for procuring items during the event as they arise. This could be a person in Reno or another Logistics person dedicated to that task.
- There was insufficient information flow to section chiefs - e.g., meal schedule, ICP layout, patrol dates. Planning logistical needs is difficult without this type of information.
- There should be an overall briefing by management to deliver our purpose and strategy for the event. This was lacking in 2015.
- A dedicated BLM Station Manager should be hired at Black Rock Station to maintain rooms and trailers, order supplies, perform basic maintenance, garbage removal, etc.
- Prepare and provide a schedule/map of BLM operations to section chiefs at a reasonable date prior to the event. Have the web briefing before people start working on the playa.
- Have an in-depth briefing to all personnel met with at least some basic information – protocols for driving/parking, trash disposal/recycling, fueling times, etc. Talk with law enforcement about the Black Rock NCA and what an NCA is. Having this information will better allow them to answer questions from the public.

15

- Hold people accountable for bad behavior, specifically detailers driving too fast on the playa and around the ICP in accordance with our agreement with BRC. All employees are representatives of the Bureau and serve the public participating in the event.
- Have a manager on-playa at an earlier date to approve the building and camp layout. We should strive to reduce wasted effort.
- Eliminate the Hycroft tent in the center of ICP. The tent is difficult to erect and takes 5-6 hours to complete by four people. There is little air flow through the tent. It is hot inside and seldom used.
- Purchase a tool kit for the Logistics team that is solely for use at Burning Man.
- The Logistics crew should requisition supplies prior to the event which are commonly used – hardware, timber (2x4s, 4x4s, plywood), work gloves, etc.
- Include a fuel spill pallet into the contract for gas and diesel to prevent accidental contamination.

## Facilities

### Summary

The facilities manager was a new position created for the 2015 event to supervise the construction of the BLM Headquarters compound, the implementation of the BRC contracts for BLM, and to supervise the Logistics and Communications teams. An important aspect of this position was also to interface with the logistics crew hired by BRC to oversee the construction and maintenance of the BLM headquarters compound.

Mark Pirtle, project manager for the 2014 BLM Burning Man Operation did an outstanding job fulfilling this role in 2015.

### Recommendations

- Increase size of HQ footprint (2015 HQ was 500ft long by 300ft deep) by another 50 to 75ft on north end to give more space for contractor lodging area and UTV/Comms/Medical parking. This would make 2016 footprint 550 to 575ft long by 300ft deep.
- Retain Mark Pirtle to fulfill Facilities Manager role in 2016.
- Install all steps to modular buildings doors straight out.
- Move modular buildings shade structures (BRC provided 12'x12') to between doors, not over steps.
- Provide shade structures (12'x12') to more of the modular buildings. In 2015 we had one at Dining, EOC and Medical. Add additional to PCSO/INV, Communications, Compliance and Report Writing for a total of 7. BLM can add the additional shade structures to the BRC MOU SOW for HQ construction or make our own pre-fab ones just like BRC's (12'x12').
- Discontinue use of the Hycroft tent at HQ, nobody uses it.
- Add single port-a-pottie behind jail for custodies.
- Add single shower unit behind Medical for Decon of exposed detailers.
- EOC Double Wide: 4 office set-up, two on each side.

16

- PCSO/INV Double Wide: 4 office set-up, two on each side.
- Compliance Double Wide: 4 office set-up, two on each side. Back door which opens to center compound.
- Report Writing: Change to double wide, open space-no offices.
- 40' single wide Jail: Plexiglas covers on inside over all windows.
- Communications: 60' single wide just for communications, with lockable rooms at each end.
- Add a 40' single wide modular building just for logistics.
- Get 4000 gallon BLM owned water truck to use at event (LV program has one) or request BRC provide a 4000 gal truck instead of a 200 gal truck.
- Build four more trailer pads in back lot of Black Rock Station with water, electricity and sewer and install 3000 gal septic tank under pads.
- Buy one additional lodging trailer for Black Rock Station. That will give us 8 to use during the event.

## Communications, Dispatch and Information Technology

### Summary

The communications lead was an integral member of the planning team with responsibilities for developing the communications network, i.e. repeaters, and the procurement and programming of individual radios.

During the 2015 event the communications team consisted of six civilian BLM employees including a team lead and an IT specialist. The team was divided into a three person day shift and a two person night shift with the team lead overlapping during the pre, main and post events for 24 hour coverage. A subset of the team was deployed during the set-up and break-down weeks. The communication team worked well in 2015, however several recommendations for improvement were put forward by the team for the 2016 event.

The 2015 event included an onsite law enforcement and civilian communication center which for the first time was co-located with BRC's dispatch center. The BLM communication center was staffed by contracted dispatchers and managed by a lead contract dispatcher, overseen by BLM's lead investigations chief. The communication center was located at BLM Headquarters and operated out of a double wide 60 foot trailer. The communication center provided 24 hour dispatch services to approximately 150 law enforcement and civilian employees during the 2015 event.

The pre-planning team consisted of a lead mission support technician, Arizona State Chief Ranger, two Burning Man project managers, supervisory telecommunications specialist, Nevada State Office telecommunications specialist, OLES special agent, and the Nevada Assistant Special Agent in Charge (SAC).

### Recommendations
- 50 purchased radios should go to PCSO.

17

- 2 recommended options for rest of radios needed: 1) 200 encrypted from NV permanently assigned to Burning Man (Midland). 2) BRC puts BLM on their system with separate encryption channels and IP tracking instead of using Delormes (Motorolas).
- Need crossband for vehicles.
- 4 Comm techs and 1 IT position was adequate.
- IT setup was slightly delayed due to lack of admin rights for IT position.
- Need Comm Chief as bottleneck between logistical communications (Dalton) and operational communications (Dispatch).
- Comm Chief positions should be redefined as the overall POC for all communications with technology and operational decision authority, equivalent to Red's position in BRC. This position should also: Recommend a project inspector for dispatch contract; Direct workload year round for both logistical and operational communications. Be involved in command/core planning team; Make decisions over radio channel usage.
- The Comm Center Manager should be an agency position, rather than a contract position.
- Translate operation direction to comm center.
- Need night comm tech position at the start of pre-patrol .
- Recommend adding 1 position to cover pre-patrol nights.
- Interference generated in the City by generators, metal RVs, and other  equipment interfered with LE, tactical, and Civ Ops radio frequencies.
- Several times at the 2015 event, the civilian radio channel was not being answered by the Dispatch Center (Control) due to competing priorities between law enforcement and civilian operations. The dispatch contract did not require all the command frequencies to be monitored with a dispatcher. Due to a lack of tac frequencies that worked in the city, the Civilian command frequency used for tactical discussions and was prioritized lower so that all the LE command frequencies could be monitored. This presented a significant employee safety issue with the civilian staff only having one frequency that was designated for their use but not being reliably monitored.
- It was determined that the reason for unreliable monitoring was due to radio traffic. The Dispatch Center Manager asked that all personnel stop calling in/out of service over the radio and start using an analog method of paper checklists. This should be avoided in the future.
- In future years, the Civilian Operations or Incident Commander needs to be present when contracts are being developed to ensure that all needs of the organization are going to be met.
- For the 2015 Burning Man event, the placement of repeaters helped coverage of the event.  The Moducom rental dispatch consoles were solid platforms for the dispatch center but did have some issues due to the system adding the sixth position.  Nevada's purchase of the Pepro mobile antenna mast and radio cabinet greatly improved the clarity of the base stations.
- The programming at Black Rock with the LE rangers showing up in rotations of 8-10 per hour greatly improved the organization and made it easier to get everyone programmed in a timely manner and it provided organizational control.  With the Nevada Telecommunication Program performing preventive maintenance and tuning of the Burning Man repeaters this year there was 100% coverage this year to all locations of the playa and Gerlach with zero outages.

18

AR10110

- Communications should adhere to a typical ICS structure, and procurement should be handled through a central point, as with all other procurement. Regular and overtime hours should be considered in next year's budget to accommodate proper planning of radio communications. 200 hours of time was spent working on planning prior to arriving out to the playa for 2015.
- A full time Communications Unit Leader position needs to be created to support this event. The added workload this puts on the Telecommunications Manager for Nevada takes away from a lot of important issues The Nevada Telecommunications program needs to complete.
- The COML should be involved in decisions related to communications as early as possible to facilitate solutions to the expectations set forth by the command staff.
- The Communication Unit should be provided a refrigerator in the command trailer in order to keep food the week before catering begins. Communications also needs a dedicated shade structure suitable for working on vehicle radios. Also, consider moving communication unit to the edge of the playa by the 12 mile entrance where there isn't as much dust or to the Blue Pit location, in order to protect sensitive equipment from playa dust.
- Communications Unit should be made aware of all planned power outages, in order to prevent damage to sensitive equipment.
- A change of lodging should be considered for the Communication Unit. During the event the heavy traffic through the Black Rock Station at all hours affected the ability for Communication Unit staff to sleep. The night shift was the most effected with people coming through doing laundry and making a lot of noise.
- Prior to arrival, officers and civilian operations should be provided training on the capabilities of their radios to better troubleshoot issues. A user guide for the radios should be added to the Operations Plan that shows people not familiar with the radio how to call into the Control Center.
- Radio Techs need to know how to program Motorola APX 7000 and XTS 5000. There are very few Telecommunications Specialists in the BLM that have the training and technical ability to program the Motorola APX radios.
- Dispatchers should receive training on the dispatch consoles and the radio system. Arriving prior to pre- patrol enabled testing and deployment of radio communications equipment. In order to utilize this time efficiently, other staffing (camp crew) for set up is required to allow for duties and responsibilities of the COML and staff to be met.
- The purchasing of the Midland radios by Black Rock and the Midland Radios provided by BLM Nevada created a good cache of radios that made programming and issuing radios very easy. A radio cache needs to continue to be built so Nevada doesn't have to supply fire radios to the event.
- The 50' trail Communication had this year was adequate space. The issue with is COMSEC security. For security reasons, Communication should be put into its own 60' trailer with the additional 10' being for their storage. This will free up space for Logistics in their storage container.
- COML, four techs, and one IT person is sufficient staffing for set up and main event. If the staffing for LE or civilians increases then the increase of staffing for Communications will also

19

AR10111

need to increase.   A ComT should be added to pre- patrol to allow for night shift to function during that time and still allow for enough people to program radios.  Also a night IT person should be considered.

- The Logistics Team this year was a great resource this year for the Communication Unit. Logistics Team setting up the trailers instead of the Communication Unit doing it in years past freed up the Comm personnel to setup their equipment in a timely manner.
- Increase the cache of radios to 120 P25 VHF AES encrypted radios.  Black Rock purchased 60 radios this year and Nevada will work on adding radios to the Cache for next year's event.
- Reserve the 50 Midlands BRC purchased for the PCSO.
- Adopt up to 100 excess Midland radios from NV ComL program for BM Ops, have Midland turn on the encryption function of the 100 radios, at a reduced cost.
- Nevada is still providing one of the temporary repeaters for the event a new repeater and new portable solar needs to be purchased for the event.  Having repeaters directly tuned for this event provides a better system that will last longer due to not getting changed back and forth between Burning Man frequencies and BLM Nevada frequencies.
- Officers who wish to use own radios will need to come pre-programmed.  If it is not pre-programmed a radio should be checked out from the pool radios.
- When a resource demobs, it is imperative that they check in with communications to ensure all equipment has been returned.
- Renting computers is the best option.  Buying computers for this environment wouldn't be cost effective due to the dust damaging these computers.  It is recommended to continue to rent computers and have the IT staff wipe the systems after the event.  In future events if the IT staff can continue to receive the layout ahead of setup in order to properly install equipment.
- Test VPN hardware boxes in dispatch with rented equipment prior to start up.  It is recommended replacement ASAs be purchased for this event.  The current ASAs or over capacity and need to be upgraded.
- If we grow in size more bandwidth will be needed.  The addition of the cellular network took more people off of the network this year so that sped up the system.  Lyman's network was a lot more reliable this year but we should still explore which option for internet providers best meet our needs for the event.

## Geographic Information Systems (GIS)

### Summary
The GIS Team consisted of two GIS Staff, including a GIS Supervisor a GIS Specialist.  The GIS Team successfully provided GIS support to Law Enforcement and Civilian Operations including mapping, staff tracking, vending and environmental compliance support, hardware and software support and responded to numerous requests for related information. The GIS Team

### Recommendations
- Significant workload during planning, 50 planning hours between 2 positions was not enough.
- Additional workload converting BRC data to BLM useable format.

20

- Both GIS positions need to be staffed pre/main/post.
- GIS equipment used for the event should be consolidated in one location and used exclusively for the event.
- The GIS Team uses a wide variety of software for Burning Man. In addition to ArcGIS and its suite of tools there is reporting software, third party software to load GPS devices, and apps that were being tested. Compiling the software (some of which had to be done on playa) results in a large workload for both GIS and IT staff.
- During the event there is a huge rush when LE reports to load their Vehicle GPS Navigation units. It is stressful to have LE standing in the Civ Ops HQ waiting for their units to be loaded and impedes the GIS team's efficiency.
- The 2015 GIS Team needs to create a continuity book to explain the expectations of the GIS Team as well as the demands that will be put on the team. This book should include the following: An outline of expectations prior to reporting to the event, a description of daily duties for the three phases of the event (pre, main, and post), and lessons learned. This continuity book should leave very little guesswork for an incoming GIS Specialist/Team for the BM event. Also this book should be considered a living document that can be amended as necessary by future teams.
- A list of hardware requirements needs to be developed. This checklist needs to be an A-Z, itemized, GIS Specific, and all inclusive. It should include not only the hardware that is already available from the WMDO specifically for BM, but hardware that needs to be brought from home station if the team is travelling from another office. Examples include: Laptop, monitors, cables and accessories, mobile phones, tablets etc.
- A comprehensive list of software needed for BM needs to be put into place. During the 2015 event there were many times that a third party software had to be downloaded and installed during the event. This created a workload not only for GIS Staff but also the IT staff that could have been avoided. It is also appropriate to note here that with variations in internet speed on playa that having to do this during the event resulted in multiple crashes creating even more time loss.
- During the main report dates for LE during the 2015 event the GIS Team had shifts drop off their GPS units at Black Rock Station during check in. LEOs were instructed to label their device with name and cell phone number. The GIS Team then loaded all the units and then sent out a mass text message informing LE Personnel that their devices were uploaded and ready for their next shift. This was very effective and should be a practice that is not only continued but become the standard for the event. It is a major time saver and much more convenient for all parties involved.

AR10113

# Law Enforcement

## Event Planning

### Summary

While the planning and coordination for law enforcement operations is a year round process, formal planning for the 2015 event began in March 2015. A BLM law enforcement planning lead was established early on to provide a singular point of contact for all cooperating agencies with regards to BLM law enforcement. While this is important to ensure consistency throughout the planning efforts, it is important to note this role is carried out as a collateral duty. The workload that accompanied the lead planning position was a full time job for five months in 2015, making it extremely difficult for the planning chief to conduct the normal requirements of their job. As a result, the BLM law enforcement planning lead relied heavily on collateral duty support from the BLM law enforcement planning team to relieve the planning burden. In 2015, this planning team consisted of numerous Office of Law Enforcement and Security (OLES) LEOs and rangers from Zone 1 (Carson City and Winnemucca District). These team members attended numerous planning meetings and provided subject matter expertise throughout the planning process.

Due to the complexities of the event, coupled with the fact most of the law enforcement detailers are drawn from multiple federal agencies and offices across the country, it is imperative that refresher training is provided every year to cover objectives, protocols, and expectations for the event. Historically, this training was provided on-playa the Saturday before the official gate opening; in addition to providing training, detailed officers were also provided orientation of headquarters (HQ) and Black Rock City. In 2015, this on-playa training day was not offered to law enforcement officers. In order to fulfill the some of the training needs for the event, a series of four WebEx presentations were utilized to provide training. The presentations included Burning Man 101 (designed as a broad overview of the event for first time detailers), LE Supervisor Brief (overview of expectations and procedures to event supervisors), Law Enforcement Operations Briefing (designed as an operational overview for all law enforcement officers), and the All Employee Webinar (designed as an operational overview for all event staff). Sections of the All Employee Webinar were also covered in LE Operations Briefing. As a result, a portion of the All Employee Webinar was duplicative for law enforcement staff.

In order to provide orientation and on-site training not covered through the webinars, the first two hours of each main event shift were utilized to provide detailed officers a HQ orientation. The training was based on the more technical aspects of the event, such as IMARS, evidence processing, radio/dispatch protocols, and medical. In addition, command staff and shift supervisors provided clear expectations to each shift.

22

Recommendations

- A law enforcement planning lead should be designated by January 1, 2016. In absence of funding for a full time, permanent planning lead, this will have to continue to be fulfilled as a collateral duty and will require broad support from a law enforcement planning team. The expectations, roles, timelines, and authorities for the team should be clearly identified once the planning lead is determined. As part of the planning process for the 2016 event, shift commanders should be identified early on and be more involved in the planning process
- In 2015, none of the law enforcement command staff charged planning hours to the cost recovery agreement. BLM should determine whether law enforcement planning time should be charged against the cost recovery agreement in 2016.
- The WebEx training sessions should continue to be utilized to decrease the amount of time spent briefing and training on-playa, except for the "All Employee WebEx". This WebEx should be replaced with a "Civilian Operations Brief" to provide a presentation better tailored to meet the operational needs of civilian staff.
- Two hours should be set aside prior to each main event shift during the 2016 event to cover report writing, radio/dispatch communications, IMARS, evidence, and medical. After the training is completed, officers new to the event should be paired with a more experienced officer for Black Rock City orientation.
- BRC should continue to strengthen their outreach program to inform participants of the potential consequences of possessing illegal drugs and drug paraphernalia.

## Law Enforcement Operations

### Integration

*Summary*

The Pershing County Sheriff's Office (PCSO) and BLM law enforcement were fully integrated during the 2015 event. The integrated, collaborative model proved to be the most efficient way to provide for public safety and the protection of natural resources. Integration allowed each agency access to a common dispatch center and jointly manage and allocate law enforcement resources throughout the city. The Pershing County Sheriff's Office was responsible for enforcing Nevada state laws, statutes, and county ordinances while the BLM enforced agency regulations and federal statutes.

Under the leadership of the new Pershing County Sheriff and command staff, effective coordination, communication, and cooperation during the planning and execution phases of the event were markedly better. The professionalism of the PCSO command staff and deputies was a noticeable change during the event, largely due to the fact the event was staffed with active Nevada peace officers who had current training and experience conducting law enforcement activities. The professional, strategic approach to the managing the event led improved overall efficiency and effectiveness of law enforcement activities during the event.

**Patrol**

23

During the 2015 event, each shift (day, swing, night) consisted of multiple integrated patrol units.   Each unit was staffed by a BLM Ranger and a Pershing County Deputy in a marked BLM patrol vehicle, reporting directly to a Pershing County Shift Supervisor. These two-man units were able to address both state and federal violations in a collaborative manner.  BLM patrol commanders recognized the exceptional communication and support with their counterpart PCSO supervisors throughout the event when it came to coordinating patrols and providing adequate law enforcement patrols throughout the city.

**Adoption of Cases**

Prior to the 2015 event, the PCSO did not have clear guidelines for adoption of cases initiated by a BLM officer.  Without these guidelines, officers would waste valuable patrol time detaining individuals and waiting for the integrated units to arrive on scene without any certainty PCSO will adopt the case. During the 2015 event, PCSO established clear guidelines for adoption of controlled substance cases for prosecution, which were applied consistently throughout the event. Procedurally, when a federal officer discovered controlled substances during a contact, a PCSO deputy was called to the scene to determine if the incident met thresholds for state prosecution.  In 2015, PCSO adopted dozens of cases for prosecution that were initiated by BLM law enforcement officers.

**Jail/Correctional Officers**

New to the 2015 event, PCSO provided four correctional officers per shift to provide 24/7 coverage at the jail, which was located at Headquarters.  This eliminated the need for patrol resources to be removed from the city to provide for prisoner care and transport, which was identified as an issue in 2014.

**Eviction/Trespass**

In 2015, BRC worked collaboratively with the BLM and PCSO to establish a standardized process for dealing with evictions that occurred during the event, clearly identifying roles and responsibilities when an eviction occurred in the city.  Additionally, BLM law enforcement adhered to standard operating procedures (SOPs) for evictions that clearly identify the steps and procedures for evictions. The BLM evicted the same number of people (seven) during the 2015 event as in the 2014 event.  Evictions were based on authority granted within Title 43 of the Code of Federal Regulations.  All evicted persons were issued formal trespass notices and forfeited all privileges to be present within the public closure area.  Some reasons for evictions included smuggling participants into the event, operating without a Special Recreation Permit (SRP), or disorderly conduct.

Prior to the 2015 event, PCSO agreed to issue trespass notices for individuals found to be within the closure area without authorization.  During the event, PCSO was very responsive to trespass requests from BLM officers. The integrated units handled most of these requests. This was a positive aspect of integration and it was a great example of PCSO providing support to the BLM.

**K-9**

24

Prior to the 2014 event, BLM and Forest Service K-9 teams were certified by the District Court Judge for Pershing County prior to the event; this was in response to the State of Nevada recognizing the Carroll Doctrine for the 2014. These certifications were valid for a two-year period of time.  As a result, K-9 teams certified in 2014 did not have to re-certify in 2015.  Through coordination with PCSO, the three BLM K-9 units not certified in 2014 conducted a certification in Lovelock for the District Court Judge on the Monday before pre-event started.

A total of 8 BLM/USFS K-9 teams worked the event (three on day shift, two on swing shift, and four on night shift); PCSO also staffed the event with a K-9 team.  During the event, K-9 teams were used as part of patrol operations (protection of handler and others, apprehension of suspects, and location of hidden evidence) as well as narcotic detection.  During the 2015 event, both BLM and PCSO utilized K-9 teams for both patrol support and narcotic detection.  Often times, PCSO deputies patrolled with BLM K-9 teams as two-man patrol teams.  This increased the ability for PCSO to address criminal acts involving the possession of controlled substances in a timely manner.

*Recommendations*
- Continue to utilize integration of patrol, investigations, dispatch, and communications to ensure efficiency of law enforcement operations during the event
- Continue to support PCSO's use of correctional officers for prisoner care and transport during the event, keeping patrol assets in the city
- For criminal acts involving the possession of controlled substances, continue to follow guidelines established in 2015 for PCSO case adoption
- Continue to request PCSO assistance with issuing trespass notices to participants who are in the closure area without authorization, or as part of the formal eviction process
- Continue to use K-9 teams as part of patrol operations and narcotic detection
- For those teams needing certification or re-certification, it would be helpful if the certification could be conducted in Gerlach or on-playa, versus Lovelock, prior to the event to eliminate the need for extra travel.

## Community Policing

*Summary*
The objective of community policing during the event is to build collaborative relationships between law enforcement, Burning Man staff, and participants to develop common solutions to problems and increase trust in law enforcement, which has become a central tenet to ensuring the success of the BLM mission during the event.

**Black Rock Rangers**

During the 2015 event, BLM law enforcement took steps to increase communication and collaboration with the Black Rock Rangers to identify ways in which law enforcement and the BRR could collaboratively solve problems.  New to the 2015 event, BLM Law Enforcement assigned a Liaison Officer (LO) to the command staff.  This position served as the point of contact for BRC's Black Rock Rangers in

AR10117

an effort to enhance the working relationships between both organizations. By providing BRR with a singular point of contact, issues were easily recognized and resolved in a timely manner. The liaison officer, along with the day shift patrol commander, attended every 0900 BRR meeting to discuss any issues or concerns from the previous day's activities. BLM law enforcement commends the BRR command staff for continuing to enhance their program and provide a valuable tool to BLM law enforcement by resolving issues in the city that did not require the attention of BLM law enforcement. This collaboration illustrates the ability of law enforcement and BRC to collaborate and implement common solutions.

## BMIR

For the third year in a row, law enforcement participated in a live radio show with Burning Man Information Radio (BMIR). For the 2015 event, the BLM Special Agent-in-Charge and the Pershing County Sheriff participated in the live show. The intent behind participation in the BMIR show is to provide facts, dispel rumors, encourage and promote participant interaction with law enforcement, and educate participants to achieve compliance at the lowest possible level.

## Educational Outreach

New to the 2015 event, BLM law enforcement provided a presentation at HQ for the Black Rock Scouts, a program is for burner kids that "aim to teach them how to sustain life in BRC." The program highlighted the mission of BLM law enforcement, provided a tour of the HQ jail and communications center, as well as a K-9 demonstration. At the conclusion of the presentation, the kids were sworn in as junior rangers.

## Mobile Command Trailer

Headquarters (HQ) is located outside of Black Rock City proper, and as such, participants do not have direct, easy access to law enforcement services like one would expect in a city. In order to provide participants with direct access to law enforcement services within the city limits, PCSO and BLM law enforcement continued to provide a mobile command trailer staged at "5:15 and Esplanade" during the 2015 event. The trailer was staffed by a combination of PCSO and BLM integrated units, as well as non-integrated BLM units, through assigned, rotating shifts. The location of the trailer along the Esplanade allows law enforcement to engage with participants in an interactive and positive manner. The mobile command served also fulfilled the role of a contact station, providing participants a location to report illegal activity or request information from law enforcement.

## Participant Interactions

Public interactions are the most common method through which BLM law enforcement builds trust and creating an environment of mutual respect amongst the participants. During the 2015 event, BLM law enforcement recorded 1,595 public contacts (Note: not every contact made by patrol units are recorded with dispatch). In addition to the thousands of public contacts with participants, a total of 1,474 public assists were documented. Public assists ranged from providing medical aid to providing directions or escorting lost individuals to their campsites.

26

*Recommendations*
- Continue to build on cooperation and collaboration with Black Rock Rangers by assigning a BLM law enforcement liaison officer during the event
- Continue to attend the 0900 BRR daily meeting during the event
- Utilize BMIR to educate, inform, and connect with participants
- Continue to find ways to connect with children at the event through outreach programs (i.e. presentations at Kids Camp)
- Staff the Mobile Command trailer on a 24/7 basis during the main event
- Continue to encourage officers to find creative, informal and positive ways to connect with members of the community while conducting patrols of assigned sectors

## Staffing

*Summary*
## COMMAND STAFF

The law enforcement Command Staff was comprised of the BLM Special Agent in Charge (Region 3), a Planning Chief, an Operations Chief and an Investigative Chief. The Command Staff provided oversight for all law enforcement components of the event through coordination with the BLM Winnemucca District Manager, performed liaison duties with cooperating agencies, and assisted with the emergency medical function through coordination with the CrowdRx Medical Chief.

During the 2014 event, the Day Operations Chief was integrated with the UC structure. As a result, the Day Operations Chief attended numerous meetings throughout the day, to include internal meetings, UC meetings, the Black Rock Ranger meetings, and various other coordination meetings between BRC and BLM. The position was often times unavailable for meeting the operational needs of the day and swing shift patrol functions. In an attempt to alleviate the inability for the Day Operations Chief to lead planning efforts as well as provide support and oversight to the patrol function, a single Law Enforcement Planning Chief and an Operations Chief were designated for the 2015 event. As a result of the reorganization, the Night Operations Chief was eliminated. The Planning Chief focused on operational planning and coordination with BRC and cooperators. The Operations Chief provided direct supervision and guidance to the three patrol commanders and coordinated patrol activities with PCSO command staff. Because planning and operations are critically linked, both positions worked a 1000-0200 shift to ensure proper coordination. This left a gap of 8-hours with no Operations Chief. During this 8-hour period, the night patrol commander and day patrol commander assumed Operational Chief duties. Due to the different functions of a patrol commander and an Operational Chief, this task proved to be burdensome on the two patrol commanders and was an ineffective model.

## UNIFORMED PATROL

*Pre-event: (August 25-August 30),* a total of 16 officers worked two 13-hour shifts (day, night). The extra hour allowed for a period of overlap during shift change, ensuring adequate law enforcement services for the city. BRC allowed a high volume of paid participants into the city through their "early arrival

27

program." As such, the reported population of 14,773 people on Friday and 22,859 on Saturday prior to the official gate opening. The reported population at the BLM approved "soft opening" at 1000 hours on Sunday, August 30 was 23,163.

*Main event: (August 30-September 7)*: the uniformed patrol division consisted of 73 total uniformed officers (57 working as single units and 12 BLM working as integrated units with PCSO). The uniformed patrol division was divided into 3 overlapping 14-hour shifts to ensure adequate patrol coverage throughout the main event. Each shift consisted of a shift commander and two patrol supervisors. This model provided direct oversight and command of field operations and personnel assignments. Patrol officers were assigned to one of three overlapping 13-hour shifts (day, swing, night). Each shift had up to four integrated units (BLM and PCSO deputies) that were responsible for staffing the mobile command post, delivering trespass notices, and investigating crimes in which Pershing County had jurisdiction. Due to staffing limitations, PCSO was not able to provide four deputies for integration during all main event shifts. Each shift had one unit specifically assigned to perimeter security. These units were responsible for coordinating with the Burning Man gate and perimeter shift leads and served as a liaison between BLM law enforcement and the Burning Man perimeter function.

*Post-event (September 7-September 10)*: a total of 15 patrol officers worked overlapping 13-hr shifts (day/night). The command staff structure was demobilized on Tuesday, September 8th. In direct response to the decline of the city population, the total number of officers was reduced accordingly throughout the post event period.

## INVESTIGATIONS

The Investigative Division consisted of 24 total officers including 14 BLM Special Agents, 3 U.S. Park Police detectives/officers, and 3 U.S. Park Police ID Techs. Investigators provided support to the uniformed patrol division by supplementing patrol activities and assuming control of complex investigations. Special Investigation Teams (consisting of a BLM Special Agent, a U.S. Park Police Detective, a U.S. Park Police ID Tech, and a Pershing County Deputy) were assigned to investigate major person-on-person crimes such as sexual assaults, battery, rape, etc. The Investigative Division was divided into 2 overlapping 14-hour shifts.

## STAFFING REDUCTIONS/IMPACTS FOR 2015:

Due to budget constraints, the following six positions were eliminated from the proposed 2015 Table of Organization:

- **Office of Professional Responsibility (OPR) Agent (1):** By having a designated OPR Agent assigned to the event, all formal complaints can be followed up on in a timely manner, allowing designated patrol and investigative positions to focus on field operations. During the 2015 event, a formal complaint was filed, and two investigative units were pulled out of their normal operations to conduct interviews as part of the formal complaint process. Additionally, a designated OPR Agent ensures all Use of Force (UOF) incidents are reported in a correct and timely manner, for ensuring compliance with agency policy. During the 2015 event, the

28

Investigations Chief fulfilled this role as a collateral duty, taking him away from his primary responsibilities of overseeing the investigations units.

- **Evidence Technician (1):** During the 2015 event, major changes were made to the evidentiary process to increase efficiency and accuracy.   The changes were successful, but required 24/7 coverage to meet the demands of the 24-hour patrol operation.   The 24/7 coverage was fulfilled through a student intern and a Special Agent (neither of these positions were paid for by the cost recovery agreement).   In addition to processing evidence, the evidence custodians compiled and organized all case documentation (reports, video, photographs, etc.) for prosecutors and case agents.

- **Investigative Positions (4):** During previous Burning Man events, BLM law enforcement investigated many of the complex, felony level drug and person on person investigations due to limited staffing and integration with the Pershing County Sheriff's Office.  As a result, an additional four investigators were proposed for the 2015 Table of Organization.  During the 2015 event, PCSO increased staffing and provided investigative support through full integration with BLM; as a result, they were responsible for conducting the majority of the person on person or felony drug cases.

*Recommendations*

The draft 2016 Table of Organization should be in place by January 2016 as part of the cost recovery estimate.  The event is staffed through a combination of volunteers as well as the BLM's national detail list; as such, the table of organization (TO) constantly changes up until the event due to conflicting personal and professional issues.  As such, a waitlist is maintained to provide additional resources at a moment's notice.  It is important to note that Officers who do not want to participate in the detail should not be forced to do so as their attitude can affect the attitude of other detailers assigned to the event.

**UNIFORM:**

- *Pre-Patrol:*  In 2016, it is recommended a similar staffing model be utilized to ensure adequate levels of law enforcement resources are available during pre-patrol.  It is recommended BRC disclose the number of early arrival passes issued early on in the planning process to assist LE with developing a staffing model.

- *Main Event Staffing:* In 2016, it is recommended a similar staffing model be utilized to provide for adequate law enforcement services throughout the city.  It is recommended the cost recovery estimate includes law enforcement patrols for the entirety of the main event in 2016 (gate open to gate close).

- *Post Event Staffing:* In 2016, it is recommended the sliding scale approach be continued for staffing the post patrol, whereby the population of the city and activity levels dictates the level of law enforcement staffing.

29

**Recommended Additions (8):**

Staffing levels of uniformed patrol and investigations are appropriate. It is important to note the overall number of law enforcement officers staffing the event should not change in 2016, but the TO can be reorganized to better meet the needs of the event.

- **OPR Agent (1):** In order to ensure timely, thorough, and consistent investigation into formal complaints, as well as to review Use of Force reporting to ensure compliance with reporting requirements and policy, it is recommended this position be added back to the 2016 Table of Organization

- **Evidence Technician (2):** Due to the large amount of evidence collected during the event, coupled with the report documentation requirements from the U.S. Attorney's Office, evidentiary and case documentation procedures established in 2015 streamlined and standardized evidence collection and case documentation. It is recommended two evidence technician positions be added to the 2016 Table of Organization, fully funded out of the cost recovery account.

- **Environmental Compliance and Enforcement Team (4):** These positions would teamed up with a civilian compliance team member to conduct patrols throughout the city, identifying and addressing environmental compliance issues such as dumping of gray/black water, oil leaks, fuel leaks or spills, etc. This concept is being driven by an increased emphasis of environmental compliance and enforcement by event management to protect the NCA. The main objective of the compliance/law enforcement team is to address the intentional, blatant, and egregious compliance violations. During the 2015 event, a single day shift patrol Ranger was utilized in this fashion. As a result of the increased focus by law enforcement on these issues, the number of environmental compliance citations increased 17-fold (2 in 2014 compared to 34 in 2015). It is also recommended all environmental compliance stipulations provided to BRC need to be included as closure order regulations (such as oil spills) to provide BLM law enforcement the option to issue violation notices for participants who refuse to voluntarily comply. Any additional environmental issues not currently addressed through stipulations, but commonly observed by the compliance teams as environmental hazards, should be considered for inclusion in the closure order for future events (i.e. fuel spills, fuel storage, etc.).

- **Operational Chief-Night (1):** Based on the organizational needs observed over the last two years, the TO should include a LE Branch Chief (part of UC) that serves as a planning lead, as well as a Day Operations and Night Operations Chief, both of which will be supported by shift commanders and patrol supervisors.

BLM Medical

*Summary*
For the 4th year in a row, BLM has partnered with the U.S. Department of Health and Human Services (DHHS) Center for Tactical Medicine (CTM) to provide premier medical care for federal employees

30

working at Burning Man.  Often referred to as Tactical Emergency Medical Support (TEMS), the fundamental goal is to "protect the protectors" by providing a full spectrum of on-site medical care federal employees so they remain healthy and fully engaged.

### Staffing

Four tactical medics (2 BLM, 2 DHHS) were assigned to the 2015 event.  New to 2015 event, a designated medical unit leader led the medical team, reporting directly to the LE Operations Chief.  This ensured the Operations Chief was aware of unit status and available assets at all times; it also provided an opportunity to address concerns or pass on intel of upcoming events that may redirect medical unit posture.  The medical unit was operational 24-hours/day, but only during the main event.  In order to ensure 24-hour staffing of the medical trailer, two medics would sleep in the medical trailer and remain on site until shift change.  Upon shift change,  they would relocate to the Black Rock station to catch some sleep and use shower facilities.  This configuration was effective for coverage and access to medical care on a 24 hour basis; however, it was sometimes difficult for unit personnel to get adequate sleep.

### Operational Summary

During the main event, the medical unit logged approximately 240 patient visits were 18 law enforcement K-9 treatments.  An overwhelming majority of those patients were seen for routine medical care such as eye wash, minor wound care, over the counter pain relief, and other over the counter medicine.  Additionally, the medical team provided a "medical minute" during shift briefings, designed to brief law enforcement officers on specific trends, conditions, or health issues pertinent to the event.  Several times during the 2015 event, law enforcement staff was exposed to bodily fluids, controlled substances, and chemicals.  In order to properly decontaminate them, the officers had to strip down at HQ and be driven into Gerlach for a shower and change of clothes because there was not a decontamination unit or extra clothing available at HQ.

### Coordination with Cooperating Agencies

PCSO assigned four deputies to patrol who were also certified as paramedics (2 swing, 2 night).   The integration of the PCSO medics with the BLM medical staff served as a major force multiplier by providing advanced life support capabilities within the city.   Additionally, PCSO maintained transport capabilities and a small medical tent in Gerlach to provide after-hours medical care for personnel. BRC's medical provider for the 2015 event, Crowd RX, was also very welcoming to BLM medical personnel and forthcoming with trends and issues they observed during the event.   Coordination between the BLM medical Unit Leader and Crowd RX management staff occurred twice daily at either Rampart or the HQ Med unit.

AR10123

*Recommendations*

**Staffing:**

- Continue using a medical unit leader who will be responsible for managing assets and ensuring 24-hour medical coverage at HQ

- Continue to use four medics to staff the medic trailer.  Consider using pre-identified BLM law enforcement EMTs to supplement the medical unit.  This would accomplish two goals. 1) Provide patrol with a quick medical response in the field and 2) supplementing the medical staff, allowing them the opportunity to rotate off playa for showers, rest, etc.

- Consider providing employees access to on site 24-hour medical care while working the event, regardless of whether the gates to the event are open.  This can be accomplished by using BLM medics who are part of the newly established national law enforcement medical program to staff the medical unit during pre and post patrol.

- All patrol assets who will be tasked with providing collateral duty medical responsibilities should arrive a day early for integrated training and scenarios to ensure operational effectiveness.

**Operations:**

- The medical unit needs access to a designated quick response vehicle (QRV) that can be used for patient access/evacuation from a dynamic scene, as well as staging during high use events

- Purchase scrub tops for unit personnel to decrease uniform contamination with biohazards, allowing patrol assets that come in contact with hazardous material the ability to decontaminate before retrieving fresh uniforms

- Research the possibility of having a decontamination unit at HQ to immediately decontaminate staff who have been exposed to harmful or hazardous materials

- Review past year supply orders and trends to ensure adequate and appropriate supply purchasing.

**Coordination:**

- Recommend that Medical Unit Leader be involved in planning meetings to be able to forecast potential staffing needs.

- Continue integration and coordination with PCSO to develop more cohesive medical response capabilities

- Recommend that BLM Medical Unit Leader maintain periodic contact with CrowdRx management throughout the year and increase coordination leading up to the event to ensure a cohesive relationship.

32

AR10124

Communications Center

*Summary*

During the 2015 event, BRC dispatch was fully integrated with BLM dispatch operations at Headquarters (in 2014 BLM and BRC dispatch operations were housed in separate single wide trailers). The BLM and BRC mutually agreed to consolidate dispatch functions to allow for increased communication, improved emergency response times, and more timely notification of significant events. As a result, dispatching of 911, medical, fire, and police calls were originated from the same center. This proved to be successful and allowed for immediate coordination to ensure proper resources were dispatched to emergency situations in a timely manner.

## Operations

In 2015, dispatch services for the BLM were provided by a contract company through a federal contract. This was in response to the 2014 event in which the BLM was not able to obtain a full complement of qualified, highly skilled federal law enforcement dispatchers due staffing shortages throughout the federal government. The contract was awarded to a company who provided a highly skilled and professional law enforcement dispatch workforce. During the event, a total of 9 Mission Support Technicians (MSTs), 3 Lead MSTs, and a Center Manager were responsible for providing criminal justice information to law enforcement officers, communicating and coordinating emergency responses, and maintaining statistical data for reporting to executive and command leadership. The communication center provided 24-hour dispatch services to approximately 150 law enforcement and civilian employees during the 2015 event.

## Technical Requirements

All law enforcement communication operations in Nevada are required to be compliant with the Nevada Criminal Justice Information System (NCJIS) and National Crime Information Center policies and procedures. The Nevada Criminal Justice Information System (NCJIS) is the primary link for providing criminal history information. NCJIS is managed by the Nevada Department of Public Safety. In order to link into NCJIS, the BLM must provide a justice link test server, firewall, internet connection, cisco connection, and computer aided design (CAD) database server. Each these connection links requires NCJIS coordination and approval. Due to the law enforcement communication center being operated at a temporary location, NCJIS must also conduct an audit, which occurred during the 2015 event. Each Mission Support Technician (MST) requires a favorable background investigation meeting or exceeding NCJIS screening standards. Once a favorable background investigation was completed, the BLM Terminal Agency Coordinator (TAC) must request a new operator ID for each MST assigned to the operation.

## Planning

The technical expertise required to plan and execute the requirements of the communication center is a year-round process performed as a collateral duty of planning team members. Because of the technical expertise and skillset required for these positions, the loss of any one has the potential to weaken the effectiveness and functionality of the communication center unless a competent back-up has been identified.

33

**Additional Staffing Needs (5)**

*BLM Communications Chief (1):*

Due to the complexities of planning communications at the event, coupled with the technical skillset required, it is recommended a single point of contact be established to provide oversight and coordinate planning between logistical communications (radios, consoles) and operational communications (dispatch). This position would have decision authority over the technological aspects of the event, would serve as the Project Inspector for dispatch contract, as well as direct the year round workload for both logistical and operational communications. Additionally, the position would be more involved as a member of the core law enforcement planning team.

*BLM Communications Center Manager(1):*

During the 2015 event, BLM recognized the need to have a BLM Communications Center Manager, replacing the equivalent contractor Communication Center Manager. As an agency representative, the center manager would coordinate with Black Rock City (BRC) Emergency Services Division (ESD) Communication and Pershing County Sheriff's Office (PCSO) by fostering a collaborative, team oriented work environment. Additionally, they would serve as a conduit between the contractor Lead MSTs and the provide feedback to law enforcement command staff in an effort to reduce tensions between the communication center and the field personnel with the goal of improving overall service. The actual supervision and direction of MSTs would continue to be the responsibility of the Lead MST, who works directly for the contractor. The Lead MST would supervise, direct and lead MSTs on the shifts, accounting for stress and workload management and ensuring professional and courteous conduct.

*Mission Support Technicians(3):*

During the 2015 event, the BLM communications center was staffed through three shifts in each 24-hr period. Each shift consisted of a Lead MST and three MSTs. The BLM Communications Center was responsible for providing dispatch services for four primary channels (3 law enforcement, 1 command). Numerous times throughout the event, radio calls on command staff were unanswered by the Communications Center because of the amount of traffic on the 3 law enforcement channels. This posed a safety risk to civilian personnel who are working in the city by eliminating their access to dispatch. In an effort to remedy the problem, the Lead MST would often times have to monitor a console, leaving them unable to perform their supervisory functions. By adding one additional MST to each shift, all four primary communications channels could be monitored, and the Lead MST could perform their normal supervisory functions.

*Recommendations*

- Continue to co-locate with the ESD Communication Center to ensure adequate resources can be dispatched to emergencies in a timely and effective manner.
- Consider adding a BLM Communications Chief and a Communications Center Manager to the 2016 Table of Organization
- Consider adding an additional MST to each shift (total of 3 additional)

34

AR10126

- Explore the possibility of linking the BLM CAD with the PCSO CAD to alleviate the need for MSTs to perform duplicate data entry
- Continue to utilize a contractor to provide professional, high quality dispatching services

## Incident Reporting

### *Summary*
### IMARS

During the 2015 event, a DOI IMARS administrator was on hand before and during pre-patrol to ensure the CAD to IMARS interface was working properly.   Starting the first shift of pre-patrol and continuing through the main event, a BLM IMARS administrator provided IMARS support and troubleshooting.   This position was critical for ensuring proper network connectivity with the DNS, ensuring proper automated routing of data from CAD to IMARS, and providing technical support to officers entering reports in IMARS.  New to the 2015 event, an off-site IMARS reviewer was used to provide a level of oversight to ensure officers were capturing all required information in their individual IMARS reports.   When a report lacked required information, the reports were returned to the primary officer for rework and corrections.   The IMARS reviewer position was not covered using the cost recovery funds.

### PC Statements
The Probable Cause statement review process worked well in 2015.  All citations and probable statements were uploaded in IMARS during the 2015 event.  This was effective and will allow easier access to case files for officers representing cases in court.  The patrol supervisors and commanders reviewed probable cause statement and returned them to the originating officer if incomplete.  The citation log was used again in 2015; this allows all citations issued to be manually tracked should the CAD system go down.

### *Recommendations*
- It is recommended all three IMARS positions (DOI administrator, BLM administrator, IMARS reviewer) be used to support the reporting requirements of Burning Man during the 2016 event.
- Continue to staff the event with 24/7 IMARS support staff and to ensure quality control and troubleshooting for technical issues (network, CAD, etc.)
- Prior to the event, ensure the CAD contractor has a complete roster of officer to pre-load into the CAD interface. Additionally, ensure all possible violations are included in the CAD disposition list to accurately capture dispositions in the field.  As an example, during the 2015 event, over 128 violation notices were reported in CAD as "miscellaneous".  It is estimated 80 of these were issued for depositing human waste, a violation of the closure order, but because the CAD system did not have a disposition category for depositing human waste, they were not accurately captured within CAD.
- Ensure officers from all agencies are provided better training on the protocol for clearing incidents with dispatch.  This will prevent duplication of entries into IMARS or incorrect case assignments.

35

AR10127

It is recommended the citation log format be changed for the 2016 event to capture all applicable information for the event (suspect name, officer name, reason for violation, etc.)

## Evidence

### *Summary*
**Staffing**
During the 2015 event, major changes were made to the evidentiary process to increase efficiency and accuracy; these changes required two evidence technicians to provide 24/7 coverage.   The Evidence Technician(s) were responsible for ensuring the evidence is properly marked and properly documented within the Incident Management and Reporting System (IMARS) as part of the electronic evidence tracking system.   Additionally, the United States Attorney's Office requested BLM provide a more consolidated case documentation system (to include reports, video, photographs, etc.) to streamline the court process and reducing the burden placed on the officers who represent Burning Man cases in U.S. District Court.   The evidence technicians were responsible for creating a case management system and ensure all video, photographs, and supporting documents were included for each case.

**Evidence Testing**
During previous Burning Man event, field testing of evidence requires officers to handle the unknown substances and place them into field testing kits, causing possible exposure to potentially harmful substances.  During the 2015 event, while an officer was using an NIK Kit for field testing of an unknown substance, it exploded and the acid damaged his clothing.  Following this incident, BLM LE became aware of specialized equipment possessed by BRC's HAZMAT division that could be utilized to identify unknown substances with minimal handling by the officer.   One of the staff members of HAZMAT provided his equipment and expertise to BLM LE to test unknown controlled substances.  This proved to be very beneficial to law enforcement at the event in reducing risks to employees and improving accuracy of testing.

### *Recommendations*
- Through implementation of the new evidentiary procedures performed by the evidence technicians, evidence processing became more efficient, reducing the amount of time officers had to spend entering evidence into the system, allowing them to return to patrol.  It is recommend two evidence custodians be included on the 2016 TO.
- To mitigate the risks of officer exposure to unknown substances, it is highly recommended that BRC HAZMAT and BLM continue to work cooperatively to utilize safer equipment for testing such substances

## Statistics

### *Breakdown*
BLM law enforcement utilized dispatch and the CAD system to record incidents during the 2015 event. The following is a breakdown of these incidents compared to 2014:

36

| BLM LAW ENFORCEMENT EVENTS BY TYPE* | | |
|---|---|---|
| | 2014 | 2015 |
| PUBLIC ASSISTS** | 450 | 1,474 |
| PUBLIC CONTACTS** | 166 | 1,595 |
| TRAFFIC STOPS | 860 | 899 |
| VERBAL WARNINGS | 520 | 548 |
| WRITTEN WARNINGS | 230 | 211 |
| CITATIONS | 392 | 534 |
| RESOURCE COMPLIANCE CHECKS | 17 | 118 |

*Numbers based on final CAD Report

**In order to capture a more complete picture of what BLM law enforcement officers do during the event, an emphasis was placed on recording all public assist and visitor contacts during the 2015 event.  These contacts have always occurred, but they were not always reported to dispatch and documented through the CAD.

37

AR10129

| BLM CITATIONS BY TYPE | | |
|---|---|---|
| | **2014** | **2015** |
| AIRCRAFT LANDING | 0 | 1 |
| DISORDERLY CONDUCT | 8 | 7 |
| DRUG PARAPHERNALIA | 29 | 35 |
| DUI ALCOHOL | 1 | 1 |
| DUI DRUGS | 2 | 1 |
| FIRE | 0 | 1 |
| FIREWORKS | 2 | 2 |
| ALCOHOL/FURNISH TO MINOR | 1 | 0 |
| CREATING A HAZARD | 10 | 26 |
| IN A CLOSED AREA | 44 | 15 |
| INTERFERENCE | 4 | 3 |
| MOTOR VEHICLE IN CLOSURE | 11 | 5 |
| MOTOR VEHICLE NO DRIVERS LICENSE | 14 | 12 |
| MOTOR VEHICLE NO INSURANCE | 3 | 1 |
| MOTOR VEHICLE NO PERMIT | 2 | 0 |
| MOTOR VEHICLE NO PLATE | 1 | 1 |
| MOTOR VEHICLE NO REGISTRATION | 12 | 16 |
| MOTOR VEHICLE NO BRAKE LIGHTS | 0 | 6 |
| MOTOR VEHICLE NO TAILLIGHTS | 1 | 10 |
| MOTOR VEHICLE OBSTRUCTED PLATE | 1 | 0 |
| MOTOR VEHICLE SPEEDING | 3 | 77 |
| MOTOR VEHICLE CARELESS DRIVING | 1 | 5 |
| MOTOR VEHICLE WRECKLESS | 1 | 0 |
| MOTOR VEHICLE MISCELLANEOUS | 0 | 4 |
| OPEN CONTAINER | 5 | 7 |
| POSSESSION OF A CONTROLLED SUBSTANCE | 205 | 116 |
| TRAFFICKING | 0 | 2 |
| PUBLIC USE | 11 | 0 |
| RESISTING | 1 | 4 |
| TRESPASS | 6 | 8 |
| WASTE WATER | 2 | 34 |
| WEAPONS | 4 | 3 |
| NOT CATEGORIZED | 0 | 3 |
| DEPOSIT OF HUMAN WASTE | 7 | *128 |
| **TOTAL** | **392** | **534** |

*It is estimated 80 citations coded as MISC in CAD were issued for Depositing Human Waste on Playa

38

*Summary*

According to BRC's count, the peak population of Black Rock City was 76,412 (participants and staffs/volunteers). Using this number, only 0.6% of participants at the event received a citation, and only 1.2% of the city's population was contacted as the result of a traffic stop; conversely, 4% of the population was contacted by a BLM officer in a non-law enforcement capacity (many more of which were not officially documented). Officers continue to exercise a great deal of discretion throughout the event with the ultimate goal of achieving compliance with federal rules and regulations.

## TRENDS

Several trends were observed when viewing citations issued during the 2014 and 2015 events, which are discussed below:

1. Possession of Controlled Substance:  During the 2015 event, the Pershing County Sheriff's Office (PCSO) took a more proactive approach to patrolling the event, which led to more self-initiation of drug possession cases.  Additionally, PCSO adopted numerous cases for state prosecution that were originated by the BLM, decreasing the number of citations issued by the BLM.

2.  Environmental Compliance:  Due to the increased focus PCSO placed on possession of controlled substance cases during the 2015 event, BLM command staff shifted more focus to environmental compliance education and enforcement by BLM law enforcement officers to protect the values of the National Conservation Area (NCA).  As a result, the number of citations issued for waste water dumping drastically increased, as did the number of citations issued for depositing of human waste.

3. Speeding violations:  BLM management emphasized safety violations within the closure order as a priority for the 2015 event, while de-emphasizing non-safety related violations (i.e. obstructed license plates, no license plate light).  Additionally, BLM law enforcement received several complaints from BRC Gate staff and management with regards to participants grossly exceeding the speed limit along the entrance road.  As a result, the number of citations issued for speeding increased in 2015.

*Recommendations*
N/A

AR10131

1  DOWNEY BRAND LLP
   ELIZABETH B. STALLARD (Bar No. 221445)
2  621 Capitol Mall, 18th Floor
   Sacramento, CA 95814
3  Telephone:     916.444.1000
   estallard@downeybrand.com
4
   Attorneys for Appellant
5  BLACK ROCK CITY LLC

6

7

8               UNITED STATES DEPARTMENT OF INTERIOR

9                  INTERIOR BOARD OF LAND APPEALS

10

11  BLACK ROCK CITY LLC,            | Case Identification No.:  IBLA 2017-126

12              Appellant,          | Special Recreation Permit
                                    | LLNVW03500-16-01
13      v.                          | 2930 (NV030.12)

14  BUREAU OF LAND MANAGEMENT,      | **DECLARATION OF RAYMOND ALLEN**
                                    | **IN SUPPORT OF APPEAL**
15              Appellee.

16

17

18      I, Raymond Allen, declare as follows:

19      1.      I am over 18 years old, of sound mind, and capable of making this declaration.  I

20  am General Counsel for appellant Black Rock City LLC ("BRC") and its parent corporation

21  Burning Man Project.  I have personal knowledge of the facts set forth herein, or, if so stated, am

22  informed and believe of their truth and accuracy and, if called to testify, I could and would do so

23  competently and under oath.

24      2.      I am an attorney licensed to practice in the State of California since 2002.  I joined

25  BRC in 2004 as Executive Project Manager.  In 2007, my title was changed to Legal and

26  Government Affairs Manager.  For the past twelve years, I have negotiated and cooperated with

27  the U.S. Bureau of Land Management ("BLM") and Pershing County on behalf of BRC for all

28  issues related to the Burning Man event, including permitting, compliance, fees, cost recovery,

DOWNEY BRAND LLP

1481226.1                                    1

1    growth, law enforcement, public health and safety, and public relations.

2         3.    Attached hereto as **Exhibit A** is a true and correct copy of excerpts from BLM

3    Handbook number H-2930-1, titled "Recreation Permit and Fee Administration 2014" (the "BLM

4    Handbook").   Chapter 1, Section III.G., of the BLM Handbook sets forth BLM's policy and

5    guidelines for charging fees in connection with administering a special recreation permit ("SRP").

6    Since 2007, pursuant to the fee guidelines in the Handbook and federal regulations, the Burning

7    Man SRP has been subject to cost recovery.  *See* BLM Handbook at 1-20 - 1-27; 43 C.F.R.

8    2932.31.   BRC pays all of BLM's direct and indirect costs for administering the SRP, plus 3% of

9    BRC's event-related gross receipts as a commercial use fee.

10        4.    Between 2007 and 2011, BLM's costs increased by about 10% every year, from

11   about $626,000 to $858,788.68.  During this same period, the population of the Burning Man

12   event increased from 47,097 to 53,963, indicating average annual growth around 4%.

13        5.    In 2012, Daniel P. Love became BLM's Special Agent in Charge for Region 3,

14   which includes the Black Rock National Conservation Area where the Burning Man event takes

15   place.  Agent Love assumed leadership of law enforcement operations for the Burning Man SRP.

16        6.    In 2012, BRC's population again increased by just 4%, while BLM's costs for

17   administering the Burning Man SRP increased by 60%, to a total of almost $1.4 million.  This

18   was in part due to BLM's decision to raise its law enforcement staffing levels by 37%, from 51

19   officers in 2011 to 70 officers in 2012.  In conjunction with this increase in staffing levels, all

20   other BLM costs increased as well, from meals, travel, and accommodations to technical services

21   equipment.

22        7.    BLM did not provide BRC with an adequate explanation for the substantial

23   increases in 2012, which continued to rise in subsequent years.  I am aware of no safety or other

24   issues that warranted these increases.

25        8.    In 2012, BLM designated Burning Man as an "emergency special event" for the

26   first time, to my knowledge.  BLM staff informed me and other BRC staff that the purpose of the

27   designation was to facilitate the assignment of officers from other regions to Burning Man.  BLM

28   had never documented to BRC any difficulties in securing sufficient numbers of staff to work the

DOWNEY BRAND LLP

1481226.1

2

DECLARATION OF RAYMOND ALLEN IN SUPPORT OF APPEAL

AR10133

1    Burning Man event.

2         9.    To the best of my knowledge, Burning Man has no history of "emergencies" as

3    that term is defined under federal regulations. *See* 5 C.F.R. § 550.103. Burning Man is a

4    recreational event that is carefully planned for months in advance, as a collaborative effort among

5    BRC, BLM, and all cooperating agencies, and the playa on which the event is staged is a flat, dry

6    lakebed covering about 200 square miles.

7         10.   I am informed and believe that no other recreational activities permitted by the

8    BLM receive this "emergency" designation, including major off-highway vehicle races and

9    campouts attended by thousands of people.

10        11.   Despite all of its concerns with BLM's 2012 expenses, BRC felt it had no choice

11   but to acquiesce to the 2012 final cost decision. BLM's Winnemucca District Manager, Gene

12   Seidlitz, warned that if BRC appealed the 2012 costs, and BLM consequently had to respond to

13   that appeal, BLM might not have enough time to process BRC's 2013 SRP, which would have

14   resulted in disastrous financial losses to BRC.

15        12.   Given the substantial increases in 2012, BRC expected that BLM's costs would

16   stabilize the following year. BRC successfully produced the 2012 event, and BLM's 2012 After

17   Action Report identified no significant infrastructural, administrative, or health and safety

18   deficiencies. Attached hereto as **Exhibit B** is a true and correct copy of BLM's 2012 After

19   Action Report.

20        13.   But during a meeting on March 26, 2013, BLM advised BRC that its costs for

21   administering the 2013 Burning Man SRP would more than double that year. BLM's costs for

22   the 2013 Burning Man SRP ended up totaling over $2.93 million, a 234% increase since 2011.

23        14.   At the time, BLM represented to BRC that the 2013 increase would be due to a

24   one-time upgrade of BLM's infrastructure and personnel for "safety" reasons, including a

25   doubling in size of BLM's Incident Command Post, increases in the number of BLM's staff and

26   hours, and implementation of a new computer-aided dispatch ("CAD") system. BLM also

27   assured BRC that this upgrade would provide data that would justify and explain the costs BLM

28   charged through cost recovery, ultimately reducing those costs and providing BRC with tangible

1481226.1                                        3

DOWNEY BRAND LLP

1    benefits and cost savings for years to come.

2         15.    I reminded BLM staff that cost recovery guidelines require BLM to provide a

3    reasoned, written explanation for all costs charged to the permittee.  In response, Special Agent

4    Love asserted that these guidelines did not apply to law enforcement, which "costs what it costs."

5    District Manager Seidlitz further informed me that BRC, as a private organization, was not

6    entitled to any explanation of these costs, but would need to pay them before BLM would issue

7    the SRP.

8         16.    District Manager Seidlitz also informed me that BLM's Winnemucca District

9    Office could not function without the money that the Burning Man SRP provides, which BRC

10   understood to mean that BRC was perhaps responsible for covering budget shortfalls for his

11   office.

12        17.    When BRC was informed of this anticipated increase, the 2013 Burning Man event

13   was just five months away, and BRC had already sold thousands of tickets and incurred

14   significant event production expenses based on BLM's assurances that it would issue the SRP and

15   that its costs had stabilized.

16        18.    BRC actually could not afford to pay the additional $1.5 million that BLM was

17   suddenly and unexpectedly requiring.  During the March 26 meeting, BRC staff explained that

18   BRC would only be able to finance the cost increase if BLM allowed the event's population to

19   increase, enabling BRC to sell more tickets.  In prior years, BRC had requested permission to

20   increase the event's population so that it could afford to pay BLM's increasing costs.  BLM had

21   always refused to allow Burning Man to grow proportionally, but within minutes of BRC making

22   this same request at the March 26 meeting, BLM approved a substantial population increase to

23   ensure that BRC would agree to BLM's doubling of costs in 2013.

24        19.    Due to the lack of time and BLM's unwillingness to negotiate its costs, BRC had

25   no choice but to sign the cost recovery agreement and acquiesce to BLM's unjustified price hike,

26   with the hope that an adequate explanation would come after the event as BLM had promised.

27        20.    In planning for the 2014 Burning Man event, BRC again relied on BLM's

28   assurances that costs would not substantially increase for the foreseeable future, and that the 2012

1481226.1                                              4

DOWNEY BRAND LLP

AR10135

1  and 2013 cost increases would enable improved service, communications, planning, and data

2  collection.  This in turn, would finally enable BLM to provide BRC with an objective assessment

3  of BLM's staffing levels and rising costs, which had never been done in the event's history.

4  BLM did not, however, furnish BRC with any of the data that it promised and for which it

5  required BRC to pay.   To the best of my knowledge, no documented increase in public health

6  and safety resulted from BLM's cost increases.

7       21.    On January 30, 2017, the Office of the Inspector General ("OIG") for the U.S.

8  Department of the Interior released a public, redacted version of its report entitled "Investigative

9  Report of Ethical Violations and Misconduct by Bureau of Land Management Officials" (the

10  "Ethics Report").  A true and correct copy of the Ethics Report is attached hereto as **Exhibit C**.

11       22.    On February 14, 2017, U.S. Representative Jason Chaffetz sent a letter in his

12  capacity as Chair of the U.S. House Oversight and Reform Committee to the OIG (the "Chaffetz

13  letter"), explaining that the Committee had received an unredacted version of the Ethics Report,

14  and confirming that the agent under investigation was Special Agent Dan Love.  A true and

15  correct copy of the Chaffetz letter is attached hereto as **Exhibit D**.

16       23.    As both the Ethics Report and the Chaffetz letter discussed misconduct by Agent

17  Love related to the 2015 Burning Man event, and that misconduct was relevant to the issues at

18  stake in BRC's appeal of BLM's 2015 cost recovery decision, BRC requested that the Board

19  include both of these documents in the record of that proceeding.  The Board granted that request

20  on March 31, 2017.

21       24.    BLM has never provided BRC with documentation sufficient to justify that a

22  particular number of federal law enforcement officers or a particular level of staffing is

23  reasonable for the Burning Man event.

24       25.    To BRC's knowledge, BLM has never conducted an objective assessment of the

25  number of law enforcement officers needed to ensure public health and safety at the event.

26       26.    In the fall and winter of 2015, BLM conducted a review of the Burning Man SRP.

27  The review included surveys collected from several BRC staff.  Attached hereto as **Exhibit E** are

28  true and correct copies of the responses to BLM's 2015 SRP review survey that were submitted

*DOWNEY BRAND LLP*

1481226.1

5

AR10136

DOWNEY BRAND LLP

1  by me, Event Operations Director Charles Dolman, Government Relations Manager Rosalie

2  Barnes, and Burning Man co-Founder Will Roger Peterson.

3       27.    I am informed and believe that in 2016, BLM law enforcement personnel cited 82

4  Burning Man participants for possession of a controlled substance, three for possession of drug

5  paraphernalia, and one for driving under the influence.  As in the last several years, virtually

6  every BLM citation issued for these offenses was either dismissed or reduced to a much lesser

7  charge, like lack of working taillights, if the participant challenged the citation in court.

8       28.    In 2014, BLM issued an instructional memorandum to provide further guidance to

9  BLM employees in application of the indirect administrative cost rate ("IACR").  A true and

10  correct copy of that memorandum is attached hereto as **Exhibit F**.

11       29.    I am informed and believe that for the duration of BLM's 2016 event operations,

12  BRC provided and paid for most of BLM's infrastructure and support services, both at the

13  Burning Man event site and in the nearby town of Gerlach, including fuel, transportation,

14  equipment, technology, and supplies.

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

1481226.1

6

DECLARATION OF RAYMOND ALLEN IN SUPPORT OF APPEAL

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.  Executed this 28th day of April, 2017, at San Francisco, California.



RAYMOND ALLEN

DOWNEY BRAND LLP

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF RAYMOND ALLEN IN SUPPORT OF APPEAL

AR10138

# EXHIBIT A

# EXHIBIT A

AR10139

Form 1221-2
(June 1969)



| | UNITED STATES | |
|---|---|---|
| | DEPARTMENT OF THE INTERIOR | Release |
| | BUREAU OF LAND MANAGEMENT | 2-300 |
| | | Date |
| | MANUAL TRANSMITTAL SHEET | 11/17/2014 |

Subject

H-2930-1 Recreation Permit and Fee Administration Handbook

1. **Explanation of Material Transmitted:** This release transmits a revised Recreation Permit Administration Handbook which replaces Handbook 2930-1, Release 2-295 in its entirety. This Handbook revision provides general policy, direction, and guidance for administering recreation permits on the public lands and associated waters under the administration of the Bureau of Land Management.

   This revised Handbook provides recreation and visitor services policy direction to supplement the Permits for Recreation on Public Lands Regulations set forth in 43 CFR Part 2930.

2. **Reports Required:** None.

3. **Material superseded:** The material superseded by this release is listed under "REMOVE" below. No other directives are superseded.

4. **Filing Information:** File as directed below.

   **REMOVE**

   All of H-2930-1 (Rel. 2-295)
   (Total 302 pages)

   **INSERT**

   All of the Revised H-2930-1
   (Total 246 pages)

   *Edwin L. Roberson*

   Assistant Director, Resources and Planning



BLM Recreation Permit and
Fee Administration Handbook

BLM

BLM Handbook H-2930-1 / Recreation Permit and Fee Administration 2014

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

i

# TABLE OF CONTENTS

**Guidelines for Using This Handbook** ...................................................................vii

## CHAPTER 1.  SPECIAL RECREATION PERMITS .................................................1-1

I.  **TYPES OF PERMITS** ...........................................................................................1-1
    A.  Commercial Use ...............................................................................................1-1
    B.  Competitive Use ...............................................................................................1-2
    C.  Vending ............................................................................................................1-2
    D.  Special Area Use ..............................................................................................1-4
    E.  Organized Group Activity or Event Use .........................................................1-4
    F.  Relationship with Other BLM Permits ...........................................................1-5

II.  **WAIVING THE REQUIREMENT TO OBTAIN A PERMIT** ...........................1-7

III.  **RECREATION PERMIT ADMINISTRATION** .................................................1-9
    A.  Permit Availability ..........................................................................................1-9
    B.  Processing the Application .............................................................................1-10
    C.  Award of Permits ...........................................................................................1-15
    D.  Permit Duration ..............................................................................................1-16
    E.  Renewal of Permits ........................................................................................1-18
    F.  Transfer of Permits ........................................................................................1-18
    G.  Fees .................................................................................................................1-20
    H.  Fee Payment and Calculation ........................................................................1-27
    I.  Fee Collections ...............................................................................................1-39
    J.  Refunds ...........................................................................................................1-40
    K.  Approval To Vary or Waive Fees ..................................................................1-41
    L.  Terms and Stipulations ..................................................................................1-42
    M.  Bonds .............................................................................................................1-42
    N.  Insurance and Liability ..................................................................................1-49
    O.  Permit Monitoring, Performance Evaluation, and Compliance .....................1-52
    P.  Coordination and Joint Permits .....................................................................1-57
    Q.  Special Considerations for Selected Programs and Activities .......................1-58

## CHAPTER 2.  RECREATION USE PERMITS ........................................................2-1

I.  **ISSUANCE OF PERMITS** ...................................................................................2-1
    A.  Purpose .............................................................................................................2-1
    B.  Availability .......................................................................................................2-1
    C.  Procedures .........................................................................................................2-1
    D.  Duration ............................................................................................................2-1

AR10142

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

ii

| II. | **FEES** | 2-2 |
| | A. General Fee Policy and Guiding Parameters | 2-2 |
| | B. Establishment of New Fee Sites and Modification of Existing Fees | 2-3 |
| | C. Fee Categories | 2-10 |
| | D. Fee Structure (Passes) | 2-14 |
| | E. Fee Rates | 2-15 |
| | F. Payment | 2-17 |
| | G. Refunds | 2-17 |
| | H. Posting of Sites and Projects | 2-17 |
| | I. Fee Suspensions and Fee-Free Days | 2-18 |
| III. | **EXPENDITURES** | 2-19 |
| | A. Field Office Expenditures | 2-19 |
| | B. Administration, Overhead, and Indirect Costs | 2-20 |
| | C. Limitation on Use of Fees | 2-20 |
| | D. State Expenditures | 2-20 |
| IV. | **ALLOCATION OF USE** | 2-21 |
| | A. Fee Site Capacity | 2-21 |
| | B. Reservation Systems | 2-21 |
| V. | **TERMS AND CONDITIONS OF USE** | 2-22 |
| VI. | **RENEWAL AND TRANSFER OF PERMITS** | 2-22 |
| VII. | **PERMIT SUSPENSION AND REVOCATION** | 2-22 |
| VIII. | **RECORDKEEPING AND STORAGE** | 2-23 |
| IX. | **FINANCIAL CONTROLS** | 2-23 |
| | A. Collection Personnel | 2-23 |
| | B. Liabilities and Responsibilities | 2-25 |
| | C. Collection Sites | 2-27 |
| | D. Collection Activities | 2-30 |
| X. | **FEE MANAGEMENT AGREEMENTS AND CONTRACTS FOR FEE COLLECTION SERVICES** | 2-32 |
| | A. Selecting the Type of Instrument | 2-32 |
| | B. Fee Management Agreements | 2-32 |
| | C. Fee Collection Contracts | 2-33 |
| XI. | **NATIONAL CONSISTENCY/LOCAL FLEXIBILITY** | 2-35 |

AR10143

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

iii

**CHAPTER 3.   AMERICA THE BEAUTIFUL – THE NATIONAL PARKS AND FEDERAL RECREATIONAL LANDS PASS PROGRAM** .............3-1

**I.      USE OF INTERAGENCY PASSES** ........................................................3-1

**II.     DESIGN OF INTERAGENCY PASSES** ..................................................3-1

**III.    INTERAGENCY ANNUAL PASSES** .....................................................3-2
    A.  Price and Availability .........................................................................3-2
    B.  Validation of the Pass .........................................................................3-2
    C.  Confirmation Notices ..........................................................................3-3

**IV.     INTERAGENCY SENIOR PASSES** ......................................................3-3
    A.  Exchange of Golden Age Passports for the Interagency Senior Pass .................3-3
    B.  Price and Availability .........................................................................3-3
    C.  Proof of Residency and Age .................................................................3-4
    D.  Validation of the Pass .........................................................................3-4
    E.  Senior Passes Issued to Ineligible Persons ...........................................3-4

**V.      INTERAGENCY ACCESS PASSES** .....................................................3-5
    A.  Exchange of Golden Access Passports for the Interagency Access Pass ..........3-5
    B.  Price and Availability .........................................................................3-5
    C.  Proof of Residency and Permanent Disability ......................................3-5
    D.  Validation of the Pass .........................................................................3-7

**VI.     INTERAGENCY VOLUNTEER PASSES** ..............................................3-7
    A.  Price and Availability .........................................................................3-7
    B.  Proof of Eligibility .............................................................................3-8
    C.  Validation of the Pass .........................................................................3-8

**VII.    SUPPLEMENTAL MATERIALS** ..........................................................3-8
    A.  Hangtags ...........................................................................................3-8
    B.  Decals ...............................................................................................3-9
    C.  Brochures ..........................................................................................3-10
    D.  Hole Punches .....................................................................................3-11

**VIII.   ORDERING** ........................................................................................3-11

**IX.     ACCOUNTING AND REPORTING REQUIREMENTS** ......................3-11

**X.      EXPENDITURE OF PASS REVENUES** ................................................3-12

**XI.     AGREEMENTS FOR SALE OF THE INTERAGENCY ANNUAL PASS** .....3-12
    A.  Interagency Agreements with Other Federal Agencies ........................3-12
    B.  Supplemental Cooperating Association Agreements ............................3-12

AR10144

**CHAPTER 4.   RECREATION COMMERCIAL SERVICES** ..................................4-1
*[Reserved – Guidance Forthcoming]*

**CHAPTER 5.   DECISIONS, ALTERNATIVE DISPUTE RESOLUTION, PROTESTS, AND APPEALS** .......................................................5-1

**I.   COLLABORATIVE STAKEHOLDER ENGAGEMENT AND ALTERNATIVE DISPUTE RESOLUTION** .......................................5-1

**II.   DECISIONS OF THE AUTHORIZED OFFICER** ...........................................5-1
   A. Protests   ...................................................................................5-2
   B. Appeals   ...................................................................................5-3

**CHAPTER 6.   RECORDKEEPING** ........................................................6-1

**I.   GENERAL POLICY** .......................................................................6-1

**II.   ESTABLISHMENT AND MAINTENANCE OF CASE RECORDS** ...............6-1
   A. Commercial and Competitive SRPs and Organized Group SRPs ...................6-1
   B. Special Area SRPs .......................................................................6-1
   C. RUPs   ......................................................................................6-1

**III.   PUBLIC LAND STATISTICS AND BUDGETARY RECORDS** .....................6-3

**IV.   PRIVACY ACT CONSIDERATIONS** .................................................6-3
   A. Commercial SRPs .......................................................................6-3
   B. RUPs and Noncommercial SRPs ....................................................6-3

**GLOSSARY** ...............................................................................G-1

**REFERENCES AND AUTHORITY** .................................................R-1

**FIGURES**
1.   Steps for Issuing Commercial, Competitive, and Organized Group Special Recreation Permits ...................................................................1-13
2.   Fees Established under the BLM Director's Special Recreation Permit Authority ..1-21
3.   State Director's Special Recreation Permit Fee Authority .........................1-21
4.   Example of Cost Recovery for a Competitive Event...............................1-24
5.   Discount for Use of Nonpublic Lands and Related Waters ......................1-33
6.   Example of Minimum Fee (Using 2014 Minimum Fee) .........................1-35
7.   Example of No Deductions or Discounts .........................................1-36
8.   Example of Eligible Deductions and Discounts ..................................1-37
9.   Example of Deductions, Discounts, and Periodic Payments ...................1-38

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

v

10.    Example of Bonding for a Commercial Activity .......................................1-45
11.    General Guidelines for Minimum Insurance Requirements .........................1-51
12.    BLM Recreation Fee Proposals: Step-by-Step Review and Approval Process ........2-5
13.    Standard Amenity Sites ..............................................................2-12
14.    Examples of Special Recreation Permit File Organization .........................6-2

**APPENDIXES**
**Appendix A – Fee Structure**
A1 Recreation Permit Fee Service Structure ...............................................A1-1

**Appendix B – Special Recreation Permits**
B1     Brief History of BLM Special Recreation Permit Fees and Actions .......................B1-1
B2     Decision Tree for Special Recreation Permitting ....................................B2-1
B3a    Using a Letter of Agreement for Organized Groups Where a Special Recreation
       Permit Is Not Required ...........................................................B3a-1
B3b    Sample Letter of Agreement .......................................................B3b-1
B4     Special Recreation Permit Application ............................................B4-1
B5     Special Recreation Permit ........................................................B5-1
B6     Sample Business Plan Requirements ................................................B6-1
B7a    Sample Operating Plan for a Commercial Special Recreation Permit ..............B7a-1
B7b    Sample Operating Plan for an Organized Group or Competitive Event .............B7b-1
B8     Sample Decision Approving Application ............................................B8-1
B9     Sample Decision Denying Application ..............................................B9-1
B10    Sample Decision Terminating a Special Recreation Permit ..........................B10-1
B11a   Sample Stipulations for a Commercial Land-based Special Recreation Permit .......B11a-1
B11b   Sample Stipulations for a Commercial River Running Special Recreation Permit..B11b-1
B11c   Sample Stipulations for an Organized Group Special Recreation Permit ............B11c-1
B12    Sample Annual Operating Authorization ...........................................B12-1
B13    National Special Recreation Permit Fee Schedule .................................B13-1
B14    Sample Letter with Estimated Cost Recovery ......................................B14-1
B15    OMB Circular No. A-25 ............................................................B15-1
B16    Sample Letter Combining Preseason Bill, Outfitter Evaluation, and
       Annual Operating Authorization ..................................................B16-1
B17    Sample Bond Determination Letter ................................................B17-1
B18    Sample Certificate of Insurance .................................................B18-1
B19    Sample Outfitter Evaluation .....................................................B19-1
B20    Sample Post-Use Report ..........................................................B20-1
B21    Sample Memorandum of Understanding for a Multijurisdictional Permit ............B21-1

**Appendix C – Recreation Use Permits**
C1     Sample Federal Register Notice for Establishing a Fee Area ................................C1-1
C2     Recreation Fee Collection Affidavit .............................................C2-1
C3     Collections Officer Notice of Designation .......................................C3-1
C4     Sample Fee Management Agreement .................................................C4-1

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

vii

## GUIDELINES FOR USING THIS HANDBOOK

The Bureau of Land Management (BLM) authorizes recreation use of the public lands and related waters through the issuance of special recreation permits and recreation use permits. The BLM's authority to issue permits is described in the Federal Land Policy and Management Act of 1976 and 43 Code of Federal Regulations (CFR) 2930. The authority to collect and retain recreation fees is specified in the Federal Lands Recreation Enhancement Act (REA) of 2004.

This handbook provides policy and guidance for administering key elements of the BLM Recreation Fee Program as follows:

Special Recreation Permits (SRPs) (Chapter 1). SRPs are authorizations that allow for commercial, competitive, and group recreation uses of the public lands and related waters. They are issued as a means to control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. The BLM usually issues noncommercial group permits and SRPs in high-use areas or where recreation use requires special BLM management. It also issues SRPs as a mechanism to provide fair market value to the United States for the recreational use of public lands.

Recreation Use Permits (RUPs) (Chapter 2). RUPs are authorizations for the use of developed facilities that meet the fee criteria established by REA. The BLM issues RUPs to ensure that the people of the United States receive a fair and equitable return for the use of these facilities to help recover construction, operation, maintenance, administration, and permit management costs.

America the Beautiful – The National Parks and Federal Recreational Lands Pass Program (Chapter 3). This pass is the national pass for units of the BLM, the National Park Service, the U.S. Forest Service, and the U.S. Fish and Wildlife Service. This interagency pass is accepted at all sites and areas for standard amenity fees and is accepted for some discounts at expanded amenity sites and for expanded amenity services.

Recreation Commercial Services (Chapter 4). Reserved (guidance forthcoming).

Decisions, Alternative Dispute Resolution, Protests, and Appeals (Chapter 5). Processes are in place so that the decisions of the authorized officer regarding SRPs may be protested to the authorized officer and/or appealed to the Interior Board of Land Appeals.

Recordkeeping (Chapter 6). Documents related to the issuance and administration of SRPs and RUPs are created, maintained, and safeguarded as official government records.

A Glossary immediately follows Chapter 6 and defines commonly used terms in the context of the BLM Recreation Fee Program.

A major feature of this handbook is the Appendixes section presented at the back of the book, which provides additional guidance and examples and, in some cases, sample documents to assist the reader in issuing and/or administering permits. It is important to note that state-specific

AR10147

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

material is contained in some appendix samples and that this material is appropriate for addressing only the unique resource or procedural factors of the field office in which the material was developed.  <u>Therefore, care should be used when copying stipulations or other material that contains state-specific text, to ensure that the full text is appropriate to, or else modified to fit, the situation for which it is being used.</u>   In addition, some states have issued state-specific supplemental guidance that should be consulted and applied as appropriate.

Sample documents and job aids for recreation permit administration are also posted on the BLM National Training Center's Knowledge Resource Center at http://www.ntc.blm.gov/krc/resource.php?type=byProgramArea&programAreaId=70.  Field office or state office recreation leads should be consulted if questions arise.

**NOTE:**      The complex nature of the material in this handbook required the use of multiple levels of headings and subheadings and the inclusion of many lists.  Readers may navigate the material more easily by remembering that lists are distinguished from headings and subheadings by the use of parentheses, always starting with (1), (2), (3), etc., followed by a), b), c), then (i), (ii), (iii).

AR10148

# CHAPTER 1.   SPECIAL RECREATION PERMITS

## I.   TYPES OF PERMITS

Special recreation permits (SRPs) are authorizations that allow specified recreation use of the public lands and related waters.  (An overview of how SRPs and other types of permits figure into the BLM's fee service structure appears in Appendix A1, Recreation Permit Fee Service Structure.  See Appendix B1, Brief History of BLM Special Recreation Permit Fees and Actions, for a historical overview of significant decisions affecting SRP fee and permit administration.) SRPs are issued to manage visitor use, protect natural and cultural resources, achieve the goals and objectives of the field office recreation program as outlined in a land use plan, and authorize the types of recreation uses described here.  The five major types of SRPs are discussed in this section.  Guidance in determining the appropriate permit may be found in Appendix B2, Decision Tree for Special Recreation Permitting.

### A. Commercial Use

Commercial use means recreation use of the public lands and related waters for business or financial gain.  The activity, service, or use is commercial if any of these conditions is present:

> (1) Any person, group, or organization makes or attempts to make a profit, receives money, amortizes equipment, or obtains goods or services as compensation from participants in recreation activities occurring on public lands and led, sponsored by, or organized by that person, group, or organization.  Compensation for recreation services may come from participants and/or other sources.

> (2) Anyone collects a fee or receives other compensation that is not strictly a sharing of actual expenses, or exceeds actual expenses, incurred for the purposes of the activity, service, or use.  (See Glossary definition of **Actual Expenses**.)

> (3) There is paid, public advertising to seek participants.  (See Glossary definition of **Public Advertising**.)

> (4) Participants pay for a duty of care, i.e., an expectation of safety.  (See Glossary definition of **Duty of Care**.)

As noted, paid public advertising qualifies a use as commercial.  Paid public advertising includes, for example, newspaper ads, Internet banners, and radio and television air time (43 CFR 2932.5(1) (iii)).

Use by scientific, educational, and therapeutic institutions or nonprofit organizations is commercial and subject to a permit requirement when any of the preceding criteria is present. The nonprofit status of any group or organization, alone, does not determine that an event or

AR10149

activity arranged by such a group or organization is noncommercial. By contrast, profitmaking organizations are automatically classified as commercial, even if that part of their activity covered by the permit is not profitmaking (43 CFR 2932.5).

Commercial use can be either public or nonpublic. Public commercial use is characterized by efforts to promote the activity as available for general public participation. Nonpublic commercial uses are those that are available only to a limited group of participants (e.g., members of a club). Examples of commercial activity include, but are not limited to, fundraising, outfitter/guide services, guided backpacking, courses with a recreation component, outdoor skills workshops, motorized tours, and guided horse rides.

An activity may be deemed noncommercial where no compensation is received for the activity, the activity leaders' positions are not established to organize and/or conduct recreation activities, no fees other than cost sharing of actual expenses are paid by participants, the activity is not publicly advertised, and the organizers share trip expenses equally with participants. (See Glossary definition of **Financial Gain,** and Chapter 1, Section II., Waiving the Requirement To Obtain a Permit.)

## B. Competitive Use

Competitive use means any organized, sanctioned, or structured use, event, or activity on public lands and related waters in which two or more contestants compete and either or both of the following elements apply:

(1) Participants register, enter, or complete an application for the event.

(2) A predetermined course or area is designated.

(See Glossary definition of **Participant**.)

One or more contestants challenging an established record (e.g., speed or endurance) is also a competitive use. Examples of competitive events include off-highway vehicle (OHV) races, horse endurance rides, mountain bike races, rodeos, poker runs/rides, orienteering, land speed records, and multi-element adventure events.

Competitive events may also be commercial. (See Chapter 1, Section III.G.2.b., Competitive Use Fees.)

## C. Vending

Vending is a type of commercial use defined as a temporary, short-term, nonexclusive, revocable authorization to sell goods or services on public lands and related waters in conjunction with a recreation activity or at a recreation site. Vending permits are nonexclusive in that the permittee has no expectation of exclusive use; the Bureau of Land Management (BLM), nevertheless, retains the ability to limit the number of vendors. Vendor permits do not authorize permanent

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-3

structures and do not grant preferential rights for renewal or any possessory interests in real property on the public lands and related waters.  The authorized officer (AO) must place stipulations on the SRP to provide for the health and safety of visitors and the protection of natural resources.  (See Glossary definition of **Authorized Officer**.)

(1) Vending in association with a permitted event.  Vending is typically associated with a permitted event.  Examples of vendor permits include tee shirt sales for a race, a food or souvenir stand at a motocross event, vehicle fuel sales, or vehicle repair at an OHV event.  If the permittee for the event will control the vending, the vending may be included in the event SRP.  In that case, revenue from vending is included in the permittee's gross receipts.  If the permittee is not responsible for the vending, each vendor must acquire its own permit and provide its own insurance, if required.  (See Glossary definition of **Gross Receipts**.)

(2) Vending not associated with permitted events.  Vendors may apply to vend at developed recreation sites or recreation management areas apart from an event.  The need for these vendor services must be identified in the resource management plan, recreation area management plan, or environmental assessment before vending permits at attraction sites are issued.  The potential impact of vendors on established businesses in surrounding communities should be considered as part of the permit evaluation.  The vending must directly support or enhance the recreation objectives identified in planning and must be appropriate for the character of the recreation site's setting.  Vending at attraction sites may change the physical, social, and managerial settings of the site and should occur only when recreation planning indicates that such sales or services are necessary and desirable—e.g., equipment rentals and repairs, shuttle services, and firewood sales.  Permits for the sale of food, souvenirs, clothing, and convenience items are usually not appropriate.

**NOTE:**    Shuttle services may be authorized under a commercial SRP.  For example, a shuttle business that operates all summer may be authorized under a commercial SRP, in contrast with a shuttle business that provides services at a BLM site over a single high-use weekend, in which case a vending SRP would be appropriate.  (See Glossary definitions of **Shuttle** and **Vend**.)

(3) Other considerations for vending permits.  To support the application, all vendors must provide a complete list of the goods to be sold and the services to be provided.  Field office staff should review these lists carefully to ensure that all items are appropriate and legal.  Sales of single-use, disposable items that translate into litter or other management problems, such as confetti poppers or blowers, fireworks,

AR10151

and similar products, should not be allowed.  If the items sold would generate waste (e.g., napkins, wrapping, packaging), the permit must stipulate that the vendor is required to provide and maintain adequate waste containers and is responsible for cleanup of a reasonable area around the vending site.  Vendors must comply with applicable federal, state, and local regulations and must be able to demonstrate compliance with them.

### D.  Special Area Use

Individual special recreation permits (ISRPs) may be required for individual (i.e., private, noncommercial) recreation use in Special Areas.  Special Areas are defined as areas officially designated by statute, Presidential decree, or Secretarial order and include components of the National Trails System; the National Wild and Scenic Rivers System; the National Wilderness Preservation System; national conservation areas, national monuments, or national recreation areas; an area covered by joint agreement between the BLM and a state government, as provided for in Title II of the Sikes Act (16 U.S.C. 670a et seq.); or any area where the AO determines that resources need to be protected by special management and control measures and that a permit system for individual use would achieve management objectives.

**NOTE:**   A Special Recreation Management Area (SRMA) is not a Special Area in this context because a SRMA is designated only through a land use plan.  In addition, the SRP Categorical Exclusion (516 DM 11.9H(1)) may not be used in Special Areas but may be applied in SRMAs.

When a field office determines that an ISRP system to manage individual use of a Special Area is desirable, implementation of the permit system requires public notification with a Federal Register notice (43 CFR 2932.13).  If fees will be charged for the Special Area ISRP, the public participation requirements of the Federal Lands Recreation Enhancement Act (REA) (Public Law 108.447) must also be met.  The field office should also issue supplementary rules by the state director for the fee area if they are deemed necessary to protect people, property, or public lands and resources (43 CFR 8365.1-6).  Public notification of the fee area could be included with the issuance of supplementary rules to simplify the process.  Examples of individual permits for Special Areas include camping in long-term visitor areas in California and Arizona, floating many BLM-managed rivers, hiking in the Aravaipa Canyon Wilderness, and OHV use in the Imperial Sand Dunes Recreation Area.  (See Chapter 2, Recreation Use Permits, for fee-specific information related to ISRP administration.)

### E.  Organized Group Activity or Event Use

Organized group or event permits are intended for group outdoor recreation activities or events that are neither commercial nor competitive.  The AO determines when a permit is required based on planning decisions, resource concerns, potential user conflicts, or public health and safety issues.  A group is defined as more than one person participating in a recreation activity or event.  The threshold size of a group requiring a permit is not established on a national basis.

AR10152

The threshold, if any, must be determined for each area (e.g., 10 people in a sensitive riparian area may constitute a need for a permit, but a very resistant or resilient site may be able to handle 200 people without the need for special management). Field offices are encouraged to develop, through land use planning efforts, thresholds for requiring permits for organized groups and events for specific types of recreation activities, land areas, or resource settings.

Examples of groups or events that may require a permit include a large scout campout, fraternity activity, OHV gathering, retreat, family reunion held at a BLM recreation site or involving participation in recreation activities on public lands and related waters, a historic reenactment, or a noncompetitive, dual-sport motorcycle event. Before issuing an SRP for an activity or group event, the field office should consider if the activity or event is primarily recreational in nature. If not, it may be more appropriate to authorize the activity or event with a land use permit. (See also Chapter 1, Section I.F., Relationship with Other BLM Permits, and 43 CFR 2920).

### F. Relationship with Other BLM Permits

1. <u>Commercial Filming Permits Issued with an SRP</u>.

Commercial photography or filming may be authorized under the SRP guidelines; however, these activities are usually more appropriately handled by the BLM Division of Lands, Realty and Cadastral Survey under the authorities of 43 CFR 2920 – Leases, Permits, and Easements (hereinafter referred to as a "2920 film permit"). Per regulation (43 CFR 2920.8), fair market rental is collected for filming projects. Per regulation (43 CFR 5.4), news-gathering activities do not require a permit except in certain circumstances. Any permit that may be issued for news-gathering activities is not subject to location fees or cost recovery charges.

Multiple rental schedules have been developed, by state, through appraisals. Field office staff should refer to the filming fee schedule for the state where the permit is being issued. If commercial filming or photography is permitted under 43 CFR 2920, that authorization should take precedence over, and remove the need for, authorizing commercial photography or filming under the 43 CFR 2930 regulations, although stipulations may be added to the SRP as appropriate. Each field office determines, on a case-by-case basis, which authorization is appropriate. A 2920 film permit may be issued in conjunction with any commercial, competitive, vending, Special Area, or group SRP. The standards and requirements for issuing film permits under either 43 CFR 2920 or 43 CFR 2930 are set forth in 43 CFR 5, Commercial Filming and Similar Projects and Still Photography on Certain Areas Under Department Jurisdiction. (See Glossary definitions of **Commercial Filming** and **Commercial Photography**.)

As intended by Congress, most still photographers are not required to obtain a permit. The permitting of commercial still photography is subject to the criteria in Public Law 106-206, which outline several circumstances where a permit either is required or may be required, in recognition of the agency's responsibility to protect the resources.

AR10153

For commercial still photography to require a permit, either the recreation activity being photographed or the photographer must be located on public lands and related waters, and at least one of the following criteria must be met:

    (1) the photographer uses models, sets, or props that are not a part of a site's natural or cultural resources, or administrative facilities, as defined. (See Glossary definitions of **Model** and **Sets and Props**.)

    (2) the photography takes place at a location where or a time when members of the public are generally not allowed.

    (3) the agency would incur costs for providing onsite management or oversight to protect agency resources or minimize visitor use conflicts.

    (4) additional administrative costs are likely to be incurred for management oversight or onsite monitoring of the activity.

Visitors do not have to obtain a permit for filming or still photography activities unless the filming is commercial filming, as defined, or the still photography involves one or more of the criteria listed above.

The BLM will reject an application for commercial filming or still photography when it is determined that the activity is likely to cause resource damage; unreasonably disrupt or conflict with the public's use or enjoyment of the site; pose health or safety risks to the public; cause unnecessary or undue degradation of BLM lands; or violate the Wilderness Act or any other applicable federal, state, or local law or regulation.

Commercial filming may be authorized in the SRP whenever it is being produced and takes place in association with the activity permitted under the SRP, occurring at the same time and in the same location as the permitted activity. In such instances, both the SRP fee (43 CFR 2930) and the commercial filming fee (43 CFR 2920) should be charged. A 2920 film permit covering all commercial filming, including the filming of permitted actions, must be obtained when the filming is done by an entity or company other than the SRP holder, or when an SRP holder plans to film at times and locations that are not part of a commercial recreation activity. The BLM may require a 2920 film permittee to acquire an SRP or contract with an SRP holder when commercially filming a recreation activity, such as guided hunters pursuing game on public lands.

When commercial photography or filming is authorized in an SRP, the following stipulations are added to the SRP:

    Filming is limited to the use of handheld and tripod mounted cameras. Use of dollies, tracks, cranes, high lines, aircraft and other camera support devices is not allowed, unless the camera support device is part of the recreation activity authorized under the SRP. Construction or removal of vegetation for the creation

AR10154

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-7

of a camera platform or to clear a shot is not allowed.  Filming is generally done using only ambient light sources.  No more than two, battery-powered, auxiliary lighting sources may be used.

If the filming project is more complex than allowed for under this stipulation, then a separate permit under 43 CFR 2920 is required.

Film permits are not required for any photography taken by the SRP holder while conducting operations under the SRP, for use in the permittee's own promotional material, given to guests as a memento of the trip, or for any motion or still picture photography done by guests or using a guest's camera equipment for noncommercial purposes.

The most current information on filming and photography may be found in 43 CFR Part 2920 and 43 CFR Part 5 regulations, and in Public Law 106-206 (May 26, 2000).

  2. <u>Recreation Permits Issued with Other Programs</u>.

If a use authorized by another program has a commercial recreation component (e.g., dudes rounding up cattle on a grazing allotment), the BLM requires an SRP in addition to the other program authorization.

## II. WAIVING THE REQUIREMENT TO OBTAIN A PERMIT

The AO may waive permit requirements under the conditions described below.

<u>NOTE</u>: These exceptions must not apply to Special Areas where ISRPs are required or in areas where carrying capacity has been reached and use is allocated.  Further, the BLM does not waive SRP requirements or SRP fees in exchange for volunteer work.

 (1) The use or event begins and ends on nonpublic lands or waters, traverses less than a total of 1 mile of public lands or 1 shoreline mile, and poses no threat of significant damage to public land or water resource values (43 CFR 2932.12) (e.g., an outfitter crosses 40 acres of BLM-managed land on an existing trail to access his/her hunting camp on state land).

  a) Events and activities that occur entirely on county or state roads generally do not require an SRP.  When the roads are located on, or adjacent to, public lands, however, the BLM may require an SRP when there are potential impacts to public lands, in order to protect public land resources, ensure public health and safety, and avoid conflicts with other public land

AR10155

users.  The BLM must require an SRP if the event will involve monitoring, insurance, or bonding or if it will include other permit stipulations.

b) Most rights-of-way (ROWs) issued under Title V of the Federal Land Policy and Management Act are nonexclusive. The BLM may permit any activity not provided for in the ROW grant.  The BLM has the authority to permit activities occurring on roads claimed under RS 2477 that have not been adjudicated or issued to another entity through a ROW. Coordination with staff in the Division of Lands, Realty and Cadastral Survey may be necessary to determine the status of a ROW.

(2) The use is sponsored or cosponsored by the BLM.  The BLM cosponsors an event only when there is a clear benefit to the public lands and related waters managed by the BLM and when there is a direct association to the accomplishment of a management objective consistent with the land use plan. Sponsorship may increase agency liability and, therefore, should not be taken lightly or used as a means to avoid issuing a permit.  If a decision is made to sponsor an activity or event, a written agreement must spell out the purpose, terms, and conditions of the sponsorship and the responsibilities of each party (e.g., insurance requirements, health and safety requirements, or environmental stipulations).  Examples of activities that may be appropriately cosponsored include service work associated with a National Public Lands Day event, National Trails Day project, or National River Cleanup Week project.  (See Glossary definition of **BLM Cosponsored Recreation Activity or Event**.)

(3) A noncommercial, competitive event complies with land use plan decisions and designations, does not award cash prizes, has no paid public advertising, poses no risk for damage to public land or related water resource values, and requires no management or monitoring. (See Glossary definition of **Public Advertising**.)  Examples include a fun run held on county roads and crossing BLM-managed lands, where the participants do not leave the road ROW, or an orienteering event in which one scout troop challenges another.

(4) An organized group activity or event is not commercial, has no paid public advertising, poses no appreciable risk for damage to public land or related water resource values, and requires no specific management or monitoring.  Examples include a family reunion held in a nonfee BLM recreation site, a free birdwatching outing on BLM-managed lands sponsored by the local Audubon Society, or an environmental

AR10156

education field trip conducted by a public elementary or secondary school.  The AO may choose to issue a letter of agreement to document the determination that the proposed activity does not require a permit.  (See Appendix B3a, Using a Letter of Agreement for Organized Groups Where a Special Recreation Permit Is Not Required, and Appendix B3b, Sample Letter of Agreement.)  A letter of agreement is not an authorization and is not binding for legal purposes in the same way as an SRP.

## III.   RECREATION PERMIT ADMINISTRATION

### A.  Permit Availability

(1) Issuance of an SRP is a discretionary action.  Applications for an SRP may be denied based on many factors, including nonconformance with land use plans or designations; a moratorium on permits issued as part of a planning process; state licensing requirements; the results of an environmental analysis; other resource values, including the environment and endangered species or antiquities; an allocation system; public health and safety concerns; the applicant's past performance, including previous convictions for violating federal or state laws or regulations concerning the conservation or protection of natural resources; or the inability of the managing office to issue, manage, and monitor the proposed use.  <u>If the field office is unable to fulfill or complete all the necessary steps of issuing and managing an SRP authorization, then an SRP must not be issued.</u>

Other factors that may determine whether or not the AO approves an SRP application include recreation conflicts in the proposed area of operations, diversity of services provided to the public, number of similar services already offered, and whether the public land area available is sufficient to accommodate the proposed use.

**NOTE**:    If an application for an SRP is denied, the BLM must notify the applicant in writing of the reason(s) for denial.  The decision to deny a permit is appealable.  (See Chapter 5, Decisions, Alternative Dispute Resolution, Protests, and Appeals.)

(2) SRPs may be issued on a first-come-first-served basis until the affected area's desired use level is reached.  The desired use level is determined in resource management plans, recreation area management plans, or in their absence, through analysis of resources and visitor use for each area using the recreation setting's character,

AR10157

limits of acceptable change, or other valid methods.  (See Glossary definition of **Desired Use Level**.)

When an area's desired use level is reached, no additional permits are issued.  New permits may be made available only when:

a)  An area's desired use level is increased; for example, by changing management objectives to increase the number of allowable users within a use season or by lengthening the use season.

b)  A permit is revoked or not renewed because of noncompliance.

c)  A permittee voluntarily relinquishes a permit.

d)  New areas for use become available.

(3)  In some situations, commercial or competitive SRPs may be issued on a competitive basis.  Use allocation systems and use limits are generally determined in resource management plans or activity plans. When new opportunities for obtaining a permit become available and the AO determines there is enough interest, interested parties may be invited to submit proposals for obtaining the available permits.  Field offices should develop their own SRP authorization criteria by which to award the permit to the applicant best serving the public's needs (including improved access for people with disabilities and the needs of other underserved populations) and meeting resource management objectives.

(4)  Competitive events and motorized events may not be authorized in a designated wilderness area.

## B.  Processing the Application

1.  <u>Pre-Application Consultation</u>.

While not mandatory, a pre-application consultation is recommended.  A pre-application consultation helps the BLM fully understand the nature and scope of the applicant's proposal, and it gives the applicant the opportunity to ask and answer questions and to identify and develop suitable alternatives to problems in the proposal with regard to timing, location, and other factors.  Working out issues in pre-application consultation, rather than through a lengthy, formal analysis, can save the agency time and the applicant money.  Also, if during the pre-application stage the BLM appears unlikely to issue the permit, the applicant may better assess whether to invest more time and money.  Known mitigation requirements (e.g., post-event trail maintenance to be performed by the permittee) should be incorporated into the applicant's operating plan and

AR10158

stipulations. For commercial applicants, this is an ideal time to review the entire revenue stream for the proposed activity. The permit administrator should ask questions about all sources of revenue for the event or activity, including direct charges, grants, gifts, donations, sponsorships, advertising revenue, filming and broadcast rights, etc. The applicability of any deductions or nonpublic land use discounts (commercial SRPs only) to the SRP fee should also be discussed. (See Chapter 1, Section III.H.5., Discounts.)

    2.  <u>Application Processing Overview</u>.

Applicants for commercial use (including vending), competitive use, and organized group event or activity permits must use BLM Form 2930-1, Special Recreation Permit Application (Appendix B4, Special Recreation Permit Application). (See also Appendix B5, Special Recreation Permit.) The BLM processes applications for Special Area permits issued to individuals according to the area-specific land use and/or business plan, or guidelines approved by the state director. BLM offices may also use application forms used by other agencies where permits are jointly administered. Applications must be submitted at least 180 calendar days before the intended use unless the AO approves a shorter period. In addition, the BLM may, with public notice in the local media and onsite posting as necessary, require that applications for specific types of activities be submitted earlier than 180 calendar days if more time is needed for environmental assessments, threatened and endangered species consultation, event coordination, etc. For example, the BLM's Moab Field Office requires event applications for the coming year to be filed by September 1 of the current year so that the office may work with applicants to avoid multiple events occurring in the same area at the same time. Applications must be received early enough for the AO to complete the processing, environmental analysis, and consultation with other agencies and to determine whether cost recovery fees apply before the start of the event or use. The applicant must include maps or coordinates of the area to be used in sufficient detail for the AO to evaluate the proposed use. (See Figure 1, Steps for Issuing Commercial, Competitive, and Organized Group Special Recreation Permits.)

    3.  <u>Supplemental Information</u>.

For any permit application (other than Special Area permits issued to individuals), the AO may require the applicant to submit supplemental information in sufficient detail to evaluate the extent and impact of the proposed activity and to determine the viability and qualifications of the applicant to provide the proposed services. For example, the AO may require:

        (1)  Statements of financial capability or a business plan to conduct the proposed activity, including, for example, documentation of the business or organization, description of past business experience related to the type of services being offered, and a statement of financial resources. For applications from corporate entities, the BLM may request a copy of the corporate charter filed with the state. (See Appendix B6, Sample Business Plan Requirements.) (See Glossary definition of **Statement of Financial Capability**.)

AR10159

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-12

(2)     A signed, detailed, operating plan.  (See Appendix B7a, Sample
        Operating Plan for a Commercial Special Recreation Permit, and
        Appendix B7b, Sample Operating Plan for an Organized Group or
        Competitive Event.)  An operating plan must contain specific
        information relevant to the submitted application; implementation of
        the operating plan becomes a condition of the permit.  Operating
        plans must include detailed information, such as the structure of the
        event/activity, maps, equipment, resource protection measures,
        participant and spectator safety, event monitoring personnel, hazard
        identification and mitigation measures, parking areas, pit area
        procedures, sanitation, communications, fire, emergency procedures,
        or other elements, depending on the type of activity.  (See Glossary
        definition of **Operating Plan**.)

(3)     Technical skill training of guides (safety, rescue, first aid, or activity
        specific).

(4)     List and condition of equipment or livestock that will be used.

(5)     Layout and description of facilities (site plan) that will be used at
        requested sites.

(6)     Samples of proposed advertising, brochures, entrance fees, prizes,
        and customer rates.

(7)     Arrangements to cross or access private or other agency land in
        conjunction with public lands.

(8)     Experience relating to the activity, and references.

(9)     Identification of other required federal, state, or local licenses.

(10)    Documentation of business agreements or contracts, such as names
        of owners, partnership agreements, or articles of incorporation, and
        documentation of all sources of revenue.

(11)    Demonstration of ability to obtain insurance or bonding.

AR10160

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-13

| Figure 1. | STEPS FOR ISSUING COMMERCIAL, COMPETITIVE, AND ORGANIZED GROUP SPECIAL RECREATION PERMITS | | |
|---|---|---|---|
| **Step** | **Responsible Person** | **Schedule** | **Action** |
| 1 | Authorized Officer | As appropriate. | Provides information and pre-application consultation with affected users about permit requirements. |
| 2 | Authorized Officer | 180 days or more before the desired use date. | Provides SRP applications, other information (maps, pamphlets, stipulations), and requirements for operating plans and other supplemental information, on request. |
| 3 | Applicant | At least 180 days before the desired use date, unless a shorter period is approved or a longer period is required. | Contacts local BLM office regarding requirement for and availability of permits before making use of the public lands and related waters.  Submits completed application and required supplemental information to the appropriate BLM office. |
| 4 | Authorized Officer | Within 30 days of receipt of application. | Reviews application.  Determines completeness, consistency with planning, level of monitoring required, past performance, or bills due.  May involve interdisciplinary team.  May reject the application at this stage or require additional materials. |
| 5 | Authorized Officer | Within 30 days of receipt of all required application materials. | Notifies applicant if substantial processing work is involved owing to extensive NEPA consultation, monitoring, or other requirements, and if cost recovery charges will apply. |
| 6 | Authorized Officer and Applicant | As appropriate. | Coordinate on any problems with the application, discuss monitoring strategy, and discuss permittee coordination with other landowners and managers.  Agency conducts environmental analysis, tribal consultation, and public involvement as necessary. |
| 7 | Authorized Officer | Upon completion of permit processing, or at least 31 days before desired use date. | Provides written notification of approval/ disapproval, requests additional documents, such as certificate of insurance or performance bond, and requests full or partial payment of estimated fees. |
| 8 | Applicant | At least 10 business days before desired use date. | Provides policy or certificate of insurance (as appropriate), bond (if required), other requested information, and full or partial payment of fees. |
| 9 | Authorized Officer | As appropriate before desired use date. | Issues the approved permit with any special stipulations; also issues the required reporting forms (daily trip logs and post-use report). |
| 10 | Permittee | As established in permit stipulations (generally within 30 days after use). | Provides post-use report. |
| 11 | Authorized Officer | No later than 90 days after operating season, or at end of permit term. | Calculates total fees due and provides a final billing statement, as applicable.  Provides written performance evaluation to permittee. |

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-14

4.  <u>National Environmental Policy Act Requirements for Permit</u>.

The issuance of an SRP is a federal action and subject to National Environmental Policy Act (NEPA) compliance, although some permitted activities may qualify as a categorical exclusion (CX).  (See 516 DM 11 for a list of categorically excluded activities.)  If existing NEPA documentation is adequate to describe the impacts of issuing the SRP, a Determination of NEPA Adequacy may be prepared.

When issuing SRPs that qualify for a CX, field offices should use the language found at H-1790-1, National Environmental Policy Act Handbook, Appendix 4, BLM Categorical Exclusions, "H. Recreation Management":

1.  Issuance of Special Recreation Permits for day use or overnight use up to 14 consecutive nights; that impacts no more than 3 staging area acres; and/or for recreational travel along roads, trails, or in areas authorized in a land use plan. This CX cannot be used for commercial boating permits along Wild and Scenic Rivers. This CX cannot be used for the establishment or issuance of Special Recreation Permits for "Special Area" management (43 CFR 2932.5).

If neither a CX nor a Determination of NEPA Adequacy is available, the BLM typically prepares an environmental assessment (EA).  An applicant may fund a third-party contractor approved by the Department of the Interior (DOI) to work directly with the BLM to prepare an EA.

a.  Commercial Permits.

The issuance of commercial permits must include appropriate NEPA compliance.

(1) If desired use levels are set in land use or recreation management plans, issuance of permits should have been analyzed in the related environmental document, and any further environmental assessment of individual permits would tier to the prior analysis, as appropriate.

(2) Programmatic EAs may be prepared for a geographic area to cover similar uses.  For example, a programmatic EA might cover land tours and campsites for jeep and mountain bike tour operations or river running within a recreation area. A programmatic EA eliminates the need for redundant analysis.  If the analysis conducted in the programmatic EA is still adequate, the BLM may prepare a Determination of NEPA Adequacy for the permit.

(3) If the permit is to be issued for a new or additional use beyond the uses covered in a management plan, or if the permit is for a use or area not covered in a land use plan, NEPA compliance commensurate with the amount of use and anticipated impact must be completed.  The level of analysis may range from a CX to an environmental impact statement.

AR10162