b.   Competitive Permits.

Unless an event is recurring and covered in a land use plan, a competitive permit requires NEPA compliance commensurate with the level of use and potential environmental and social impact. The level of analysis may range from a CX to an environmental impact statement.  Field offices should consider developing a programmatic EA for areas where competitive uses take place on a recurring basis.

c.   Vending Permits.

The analysis required for vending permits should be covered in the analysis for the recreation event or use with which the vending is associated.  For vending use not associated with another permitted use, the required level of analysis may range from a CX to an EA.

d.   Special Area Permits.

The analysis for issuing Special Area permits is normally completed through the Bureau planning process.  In circumstances where control measures are needed immediately but have not been addressed in the land use plan, an EA may be completed.  (See Chapter 1, Section I.D., Special Area Use, for additional requirements.)

e.   Organized Group Use or Event Permits.

Field offices should consider developing a programmatic EA for recurring group use or events. Such events should also be covered to the extent possible in land use plans or recreation area management plans.  (See also the requirements for competitive permits described in Chapter 1, Section III.B.4.b., Competitive Permits.)

**C.  Award of Permits**

After processing the application and completing the necessary NEPA compliance, the AO makes a final decision to approve or deny the permit application and notifies the applicant of that decision.  (See Appendix B8, Sample Decision Approving Application; Appendix B9, Sample Decision Denying Application; and Appendix B10, Sample Decision Terminating a Special Recreation Permit.)  An SRP must not be issued for an area larger than the AO determines is necessary for the contemplated use.  (See Chapter 1, Section III.P., Coordination and Joint Permits, for details on multijurisdictional permit areas.)  The AO may also approve an activity under different conditions or terms than those proposed in the application.  (See Appendix B11a, Sample Stipulations for a Commercial Land-based Special Recreation Permit; Appendix B11b, Sample Stipulations for a Commercial River Running Special Recreation Permit; and Appendix B11c, Sample Stipulations for an Organized Group Special Recreation Permit.)

In the case of corporations and limited liability companies, the BLM issues the permit to the organization as the permittee (not to a specific individual) and names an individual as the authorized representative on the permit.  When a permit is issued to a sole proprietorship

AR10163

company, a partnership, or an incorporated organized group, the SRP shows the name of the individual responsible for the permit as the permittee (e.g., Jane Doe d.b.a. Far Western Adventures).

Before issuing a commercial or competitive permit, the AO ensures that the applicant has accomplished all of the following:

    (1) Submitted a signed operating plan.

    (2) Provided a copy of an appropriate insurance policy for new permits or a valid certificate of insurance. (See Chapter 1, Section III.N., Insurance and Liability.)

    (3) Demonstrated financial capability to complete and maintain the proposed project or carry out the activity, as required.

    (4) Complied with terms/stipulations and public safety requirements of past permits issued by the BLM, other land-management agencies, or state agencies for like activities.

    (5) Paid estimated fees in advance. (See Chapter 1, Section III.H.2., Estimated Fees.)

    (6) Obtained necessary federal, state, or local licenses.

    (7) Obtained bonds or a cash deposit, if required. (See Chapter 1, Section III.M., Bonds.)

    (8) Submitted other information required by the AO. This may include a list of names (employees or others) authorized to do business on behalf of the applicant, and any limitations on their authority. (See Chapter 1, Section III.B.3, Supplemental Information.)

**NOTE:**    The above-required items may also apply to vending uses and organized group use and event permits as appropriate.

### D. Permit Duration

1. <u>Commercial SRPs</u>.

Commercial SRPs may be issued for a term not to exceed 10 years. The AO may issue one or more 1-year permits before issuing a longer-term permit to allow time to become familiar with operators and activities, to determine that permittees have demonstrated the ability to meet the permit terms and stipulations, and to ensure that the terms and stipulations are appropriate before issuing a multiyear permit.

AR10164

A multiyear permit must be validated annually.  (See Appendix B12, Sample Annual Operating Authorization.)  Validation requires that the permittee has paid annual fees, forwarded post-use reports, and submitted bonds if required, provided copies of any necessary insurance policies and licenses, and received an acceptable annual performance rating.  The AO may modify a multiyear permit during the term of the permit, including adjustments to authorized use levels.  The permittee may also request changes to a multiyear permit through submission of an updated operating plan or other material.

The BLM considers the following criteria when determining permit duration:

> (1) The previous track record or performance record of the permittee in the area and in other jurisdictions.  <u>A permittee must be able to demonstrate success in a similar business venture to be considered for a 10-year term.</u>  New applicants are generally not issued a multiyear permit.

> (2) How well the proposed activity supports land use planning goals for the specific area, and the predicted effective timeframe of the current land use plan.

> (3) The type, complexity, and extent of the proposed activity.  Races, festivals, or other events that occur annually are authorized under annual permits if there are (or may be) substantive changes from year to year (e.g., different sponsors, changes in routes or course, changes in event location, or changes in types of vehicles or activities).

> (4) Existing and future resource conditions and geographic location.  Potential conflicts, such as threatened and endangered species, other resource development projects, or changing recreation use patterns, must be considered.

> (5) Anticipated changes in timeframes in land use allocations or planning decisions that may conflict with the permitted activity.

> (6) The level of permittee investment in relation to the activity conducted on public lands and related waters.  Permittees without an established track record and with business capital of less than $100,000 should be granted an initial term of no more than 5 years.

2.  <u>Special Area Permits</u>.

ISRPs for use of Special Areas may be issued for a single trip, or for a specified length of time up to 1 year, to achieve management objectives and public service.  ISRPs are nonrenewable and are transferrable only in special cases, as when an alternate trip leader has been assigned in advance.  An ISRP may not be sold or reassigned by the holder.  Examples of ISRPs include a

AR10165

weekly or seasonal permit for camping in a long-term visitor area, one trip through Westwater Canyon, and/or an annual permit to use the Little Sahara Recreation Area.

3. <u>SRPs for Vending, Competitive Events, and Organized Group Use or Events</u>.

These permits are issued for the period of time required to complete the use or event (including setup and breakdown time). If an event recurs annually, with no changes in use, area, or participants, the AO may issue a permit for as long as 10 years, with annual validation.

**E. Renewal of Permits**

The AO considers the following when determining if a permit may be renewed:

(1) Whether the permittee has satisfactorily met the requirements of the previous permit and has received an acceptable performance evaluation. (See Chapter 1, Section III.O.2., Performance Evaluation.) The AO may also consider conformance with applicable laws and regulations on all other federal, state, or county-administered lands or related waters.

(2) Whether the continued use is consistent with the resource management plan, recreation area management plan, or other plans, and with the desired use level.

(3) The amount of use that is available in allocated areas.

The application procedures for renewals are similar to those for a new permit. The AO may establish application deadlines for permit renewal. Multiyear permits are typically not issued until the permittee has demonstrated the ability to meet annual permit terms. Permit stipulations should be reviewed and modified as appropriate before renewal. (See Chapter 1, Section III.L., Terms and Stipulations.)

In allocated areas, the AO may consider preference to a permittee seeking renewal when the permittee is in full compliance under the current terms of the permit. When expired permits are renewed or reissued, the amount of use allocated in the new permit is at the discretion of the AO and is in accordance with resource planning or recreation management plans. The objective is to allocate an amount consistent with available capacity and/or the level of use the permittee was able to use effectively under the previous permit.

**F. Transfer of Permits**

1. <u>Commercial Permits</u>.

If an existing commercial permittee wishes to sell or otherwise terminate his or her business and desires that permit privileges be transferred to a new owner, the permittee must notify the AO in

AR10166

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-19

advance, in writing, and must receive written approval from the AO for the permit transfer in advance of the transfer.  Failure to follow these steps may be grounds for a denial of the permit transfer.  Similarly, the existing permittee must advise the AO in advance of any action that would ultimately result in a change in ownership or controlling business interest.  The proposed permittee must apply for the permit using standard application procedures.  Approval of a transfer request is at the AO's discretion.

The AO may allow the permit transfer only if <u>all</u> of the following conditions have been met:

    (1) Adequate documentation has been provided that a bona fide business transfer or sale is intended.  The transfer or sale must include a substantial portion of the equipment and other tangible assets needed to conduct the business.  No value may be attached to a permit.  Permit value, if any, is included as part of the business' intangible assets.  Any attempted transfer or sale of authorized use alone is not allowed.  The BLM uses standard business valuation methods to assess whether the transaction is an actual sale of a business rather than a sale of a permit.

    (2) The current permittee has operated at an acceptable standard for at least a full year before the transfer request.  The permit must be in good standing, with all fees paid and no issues or concerns unresolved.

    (3) The proposed permittee has provided the AO with a written operating plan, which describes any anticipated operational changes from the operations of the current permittee.

Transfer of permit allocation is limited to no more than the historical use of the previous 5 years.  A permit that is transferred may contain terms and conditions and/or allocations that are different from the original permit.  (See Glossary definition of **Historical Use**.)

**NOTE:**    If the permittee's business enters bankruptcy under the provisions of chapter 11 of the federal bankruptcy laws for the purpose of reorganizing, the permittee may make use of the permit during the period the company is under the protection of the Bankruptcy Court, provided that all terms of the permit continue to be met.  During the period of bankruptcy, the permit may not be transferred to the control of a new individual or business entity, except in the following circumstance:  if, before completion of the entire bankruptcy proceeding, a Bankruptcy Court authorizes the sale of the portion of the business related to the permitted operations, then the BLM may consider transferring permit privileges to the new owner of that portion of the business provided that the court finds the sale free and clear of all liens claims and encumbrances.  It is the permittee's responsibility to provide supporting Bankruptcy Court documents to the BLM, such as an order that approves of a business sale free of liens and encumbrances or an order confirming successful completion of chapter 11 bankruptcy proceedings.  If the

AR10167

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-20

permittee's business enters bankruptcy under chapter 7 of the bankruptcy laws, the SRP must be terminated. No permit transfers may be approved for permittees entering chapter 7.

2. Noncommercial Permits.

Permits issued for noncommercial use of Special Areas where use is allocated are transferred only with the AO's approval. The procedures for transfer of commercial use permits (described in Chapter 1, Section III.F.1., Commercial Permits) are not required for transfer of noncommercial permits. Field offices anticipating permit transfers should establish a transfer policy consistent with this section.

### G. Fees

All minimum fees associated with commercial use, competitive use, and organized group use or events are established by the BLM Director; updated every 3 years in coordination with the U.S. Forest Service (most recently, effective March 2014) based on the implicit price deflator index; and announced internally by instruction memorandum and externally by publication in the Federal Register. (See Figure 2, Fees Established under the BLM Director's Special Recreation Permit Authority.) SRP fees established by the BLM Director are also described in the National Special Recreation Permit Fee Schedule (hereinafter referred to as the national recreation fee schedule). (See Appendix B13, National Special Recreation Permit Fee Schedule.) Fees associated with individual use of Special Areas are set by the state director and are published in the Federal Register 6 months before the fee area is established. In many states ISRP fee proposals are reviewed by a Recreation Resource Advisory Committee (R/RAC). ISRP fees may be adjusted to reflect changes in costs and to ensure a fair return for the use of the public lands and related waters. The BLM publishes announcements in local newspapers and publications near the site when implementing ISRP fee adjustments. (See Figure 3, State Director's Special Recreation Permit Fee Authority.)

1. Cost Recovery.

The BLM, per 43 CFR 2932.31, "may charge a fee for recovery of costs to the agency of analysis and permit processing...." The BLM has established a national policy that cost recovery of direct expenses related to permit administration will be charged consistently when the conditions for requiring cost recovery, as established in the subject regulations and handbook, are met. Cost recovery covers all federal activities that convey special benefits to recipients beyond those accruing to the general public. Cost recovery is intended to ensure that individuals or groups who clearly benefit from an SRP authorization for an activity or event on BLM public lands and related waters shoulder the costs associated with providing, administering, and monitoring that activity or event. (See Glossary definition of **Cost Recovery**.) (See Appendix B14, Sample Letter with Estimated Cost Recovery.)

AR10168

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-21

---

**Figure 2. FEES ESTABLISHED UNDER THE BLM DIRECTOR'S SPECIAL RECREATION PERMIT AUTHORITY**

Minimum annual fee is the greater of $105 (adjusted every 3 years) or the following:

| | |
|---|---|
| Commercial (including vending) | 3 percent of adjusted gross receipts, plus any applicable assigned site fee and/or exclusive use fee, plus any applicable Special Area fee, plus cost recovery, including application fees. |
| Competitive | $5/participant/day, plus any applicable exclusive use fee, plus any applicable Special Area fees, plus any applicable application fees.  If cost recovery applies, the BLM charges the greater of the SRP fees or cost recovery. |
| Commercial and competitive | The greater of the commercial fee or the competitive SRP fee, plus any applicable assigned site fee and/or exclusive use fee, application fees, and Special Area fee.  If cost recovery applies, the BLM charges cost recovery plus the SRP fees. |
| Organized group | $5/person/day, plus any applicable exclusive use fee, plus any applicable Special Area fee, plus any applicable application fees.  If cost recovery applies, the BLM charges the greater of the SRP fees or cost recovery. |
| Assigned site fee (commercial only) | $210/site/year. |
| Cost recovery | Full cost recovery is required if the permit involves more than 50 hours of staff time. |
| Modification authority | Only the BLM Director may modify or vary the method of computation of these fees. |

---

**Figure 3. STATE DIRECTOR'S SPECIAL RECREATION PERMIT FEE AUTHORITY**

| | |
|---|---|
| Special Area fee | The state director may establish fees for Special Areas.  Such a fee applies to recreation users of the Special Area, including those covered by another type of SRP as well as private, noncommercial users. |
| Application fee | The state director may establish application fees, as a matter of cost recovery, for any permit type, provided the permit requires 50 hours or less to process and administer.  Actual cost recovery applies when the 50-hour threshold is exceeded. |
| Exclusive use fee | The state director may set an exclusive use fee based on fair market value, as long as the fee is higher than the BLM Director's assigned site fee. |
| Late payment, late report, and cancellation fee | The state director may set these fees. |
| Waiver authority | The state director may waive any fees previously established by the state director. |

AR10169

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-22

OMB Circular No. A-25, Revised 7/8/1993 (Appendix B15, OMB Circular No. A-25) establishes federal policy regarding fees assessed for government services.  There is no charge for services when the identification of a specific beneficiary is obscure and the service can primarily be considered to benefit the public broadly (section 6.A.1.c. of the circular).  Cost recovery charges may be applied, however, when the government supplies a service that provides a special benefit to an identifiable recipient and that also provides a benefit to the general public.  If the public obtains benefits as a necessary consequence of an agency's provision of special benefits to an identifiable recipient, the identifiable recipient is charged for the service (section 6.A.1.b. of the circular).

(1) If more than 50 hours of staff time are required for processing, administering, and monitoring a permit, the BLM charges cost recovery of direct expenses related to the permit.  If the 50-hour cost recovery threshold is exceeded, recovery of costs begins with the first hour.  The cost recovery charge is based on the actual personnel, vehicle, travel, and materials costs required to issue, administer, and monitor the SRP.

(2) For commercial permits that exceed the 50-hour threshold, the BLM charges cost recovery in addition to fees arising from the national recreation fee schedule.  For noncommercial, competitive or organized group permits that exceed the 50-hour threshold, the BLM charges cost recovery <u>unless</u> anticipated fees in the national recreation fee schedule exceed the cost recovery charge.  In that case, the BLM charges use fees rather than cost recovery.  When cost recovery is required, the AO notifies the applicant of potential charges in writing within 30 calendar days of receipt of the application.  Further work on the project, e.g., an environmental assessment, may not begin until the BLM receives cost recovery fees.

(3) Cost recovery charges are often associated with new or substantially different activities or events and are levied to compensate the government for the costs of authorizing and administering the new use.  Cost recovery fees are also likely to be applicable to short-term uses that require environmental analysis or monitoring.  For example, a cross-country race may require an environmental analysis team, field trips to assess the potential route, law enforcement, and monitoring at specific sites along the route.  Cost recovery charges are not assessed for conducting routine business with permittees or for long-term monitoring.

(4) The BLM may also charge cost recovery, including application fees, when necessary to cover the costs of a permit lottery system, site reservation systems, or other special services for use of Special Areas.  When establishing application fees for cost recovery purposes, field

AR10170

offices should compare the fees charged by similar Special Areas and/or land management agencies and the fairness and equity of the fee levels among all users. (See Chapter 1, Section III.H., Fee Payment and Calculation, for further directions on cost recovery, and Figure 4, Example of Cost Recovery for a Competitive Event, for an example of cost recovery calculations.)

2. Recreation Fees.

The BLM charges fees for recreation use of public lands and related waters to commercial users, competitive event participants, vendors, and participants in organized group use and events that require a permit. It may also charge recreation fees for individual use of Special Areas, reservation or assignment of sites, and livestock grazing when associated with recreation use.

a. Commercial Use Fees.

These are fees that are due in excess of the minimum annual fee and that are based on a percentage of the adjusted gross receipts derived from the use authorized under the SRP. Fees for commercial use permits are intended to provide a fair return to the government for the opportunity to make a profit by using public lands and related waters. Although commercial permittees normally pass this cost of doing business on to their guests, commercial use fees are not use fees on guests.

(1) The minimum annual fee for any commercial SRP is established by the BLM Director and is $105 as of March 2014. All commercial permittees must pay the minimum annual fee or 3 percent of their adjusted gross receipts, whichever is greater.

(2) For some university, school, and community recreation programs, it may be difficult to determine the gross receipts, as enrollees are paying for tuition, room and board, lab fees, and activity fees and there is revenue from other sources, such as trust funds, endowments, and tax revenue. In these cases, the BLM may charge the organized group fee. This approach should not be used in situations where there is a clear fee for service being charged by the permittee.

(3) When use takes place in a Special Area where Special Area fees are required, the Special Area fee is due in addition to the commercial use fee. Commercial fees may also include an assigned site fee and/or an exclusive use fee.

AR10171

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-24

### Figure 4.  EXAMPLE OF COST RECOVERY FOR A COMPETITIVE EVENT

Soaring Cliffs Resource Area has received an application for a new permit for a rim-to-rim competitive race across Gravel Gulch Canyon from the local chapter of Iron Men.  The Iron Men estimate that 100 individuals will enter the contest, which is expected to last 3 days.  The canyon is known habitat for the six-toed lizard and an endangered species of the toadflax genus.  The local office needs six individuals for an interdisciplinary team to conduct field surveys, write an EA, and monitor the race.  The team estimates that it needs 147 hours to process, administer, and monitor the event.  The event has been deemed noncommercial.

FEE CALCULATION

Step 1  Create a spreadsheet like the one below outlining all the estimated costs of administering the permit.  (Note: The spreadsheet assumes that all hourly costs are paid at regular time rate.  If overtime or differentials are involved, they should be calculated separately.  Hourly rate includes leave surcharge and benefits.  The BLM's cost percent for indirect costs may change annually.)

Proposed Action for Iron Men Race

| Staffing Costs | | | | | | | |
|---|---|---|---|---|---|---|---|
| Employee | Hourly Salary Rate | Application Review | EA Development, Site-Specific Survey, Baseline Monitoring | Event Monitoring | Post-event Monitoring | Total Hours | Salary Cost |
| Rec. Planner | $38.93 | 16 | 16 | 16 | 4 | 52 | $2,024.36 |
| Rec. Tech. | $22.36 | | 8 | 16 | 12 | 36 | $804.96 |
| Archaeologist | $37.62 | 1 | 8 | | 8 | 17 | $639.54 |
| Wildlife Biologist | $38.93 | | 8 | | 8 | 16 | $622.88 |
| Botanist | $36.45 | 1 | 8 | | 5 | 14 | $510.30 |
| GIS Specialist | $38.93 | | 12 | | | 12 | $467.16 |
| Subtotal | | 18 | 60 | 32 | 37 | 147 | $5,069.20 |
| Other Costs | | | | | | | Totals |
| Vehicles @$36/trip | | 1 | 10 | 4 | 6 | | $756 |
| Plotter | | $25 | $50 | | $25 | | $100 |
| Supplies/Lab Analysis | | | $30 | | $30 | | $60 |
| Copying | | $15 | $85 | | | | $100 |
| Postage | | | $30 | | | | $30 |
| Subtotal | | | | | | | $1,046 |
| Estimated Cost Recovery | | $6,115.20 Direct Costs | $1,400.38 Indirect Costs (22.9%) | $7,515.58 Total Cost Estimate | | | |

AR10172

Step 2   Estimate the use fees at the current rate for competitive events of $5/participant/day. 100 participants x 3 days = 300 user days x $5/person/day = $1,500.

Step 3   Compare the estimated cost recovery to the estimated special recreation permit fee.  In this case, since the cost recovery is more than the permit fee, you would charge the cost recovery fee of $7,515.58.  If this event were commercial as well as competitive, you would charge both the cost recovery fee and the commercial use fee ($7,515.58 + $1,500.00 = $9,015.58).

Step 4   Review all the estimated costs with the applicant, and inform the applicant that a total payment of $7,515.58 is necessary for the BLM to process the application and monitor the event.  This amount must be received before the BLM invests any more time or effort on this event.

    b.   Competitive Use Fees.

As previously noted, competitive use fees, including minimum annual fees, are set by the BLM Director and published in the national recreation fee schedule and the Federal Register. Fees are charged on a per user-day basis for participants ($5/person/day as of March 2014).  Assigned site and/or exclusive use fees may be applied.  When use is both commercial and competitive, the BLM applies the higher fee rate schedule.  When use occurs in a Special Area where Special Area fees are required, the Special Area fee is due for all event attendees (spectators, event staff, and others).  Participants entered in the competition are subject to both the Special Area fee and the competitive use fee.

    c.   Vendor Use Fees.

Vendor use fees are the same as commercial use fees, including the minimum annual fee.  The BLM calculates vendor use fees based on gross receipts of onsite sales associated with the permitted activity.  Vendor fees may also include an assigned site fee ($210 as of March 2014) in addition to the percentage of gross receipts.

    d.   Organized Group Activity or Event Fees.

The BLM Director sets organized group fees, including minimum annual fees.  The BLM charges organized group activity or event fees on a per person basis ($5/person/day as of March 2014).  All organized group permittees must pay the minimum annual fee or $5/person/day, whichever is greater.  Fees may also include an exclusive use fee.  State directors may establish a higher fee when warranted by circumstances.  Factors that the BLM considers when setting fees include the costs of operating permit systems, special management costs related to the area, and comparability with what other agencies charge.  In Special Areas where permits and fees are required, the BLM charges the Special Area fee in addition to the organized group SRP fee.

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-26

e.   Special Area Permit Fees.

The state director sets Special Area permit fees for individuals.  Factors that are considered include the costs of operating the permit system, special management costs related to the Special Area, comparability with what other agencies or similar Special Areas charge, and fairness and equity among all users.

(1) Special Area fees may not be imposed or changed without appropriate public notice.  Fees charged in a Special Area apply to all users of the area, including private, noncommercial visitors, clients or guests of commercial permittees, and/or participants or spectators in a competitive event.  Fees collected for the use of Special Areas are credited to the collecting office and are available to cover management costs only.

(2) The AO may require commercial operators or the holder of a competitive permit to collect Special Area or other recreation site fees from their guests, spectators, or participants.  When Special Area fees are applicable, a commercial permittee's trip invoices may reflect that fee as a separate item assessed by the BLM.  At the end of each use season, the permittees using a Special Area must include a trip-by-trip accounting of the number of guests using the Special Areas in their yearend report.  The BLM must reconcile its records with the permittee's records and include the Special Area fee payment as a separate line item in its postseason billing statement for the permittee.  The Special Area fee and other recreation site fees (e.g., assigned site fee) are not included as part of a permittee's gross receipts in the commercial use fee determination.

(3) Special Area fees collected by commercial permittees are due at the end of the use or permit season, or per permit requirements.  When calculating the standard commercial use fee, commercial permittees should not count collected Special Area fee revenues as part of their regular total customer payments, since these fees are not revenue.

f.   Other Fees Associated with an SRP.

(1) Application Fees.  The state director sets application fees, which are used to offset the cost of processing SRP applications.  Application fees may be charged in addition to the fees set in the BLM Director's national recreation fee schedule.  These fees may be assessed, for instance, for processing permit renewals or transfers, for lottery or reservation systems, or for any other special service rendered to process the SRP.

AR10174

(2) <u>Assigned Site Fees</u>.  The BLM may charge an assigned site fee for exclusive commercial use of a site.  Assignment of a site for commercial use does not preclude public use.  The fee for assigned sites is specified in the BLM Director's national recreation fee schedule ($210 as of March 2014) and is revised every 3 years using the implicit price deflator index.  Assigned site fees are in addition to commercial use fees.  Use of assigned sites is temporary in nature, and any temporary structures or improvements must be removed immediately upon the conclusion of the event or activity.

(3) <u>Exclusive Use Fees</u>.  Normally, the BLM issues SRPs for nonexclusive use of an area.  On occasion, the BLM may determine that to protect public health or safety or to eliminate user and resource conflicts, permittees require exclusive recreation use of a site to conduct their activity.  In such a case the BLM charges an annual or per occurrence exclusive use fee in addition to other permit fees.  The exclusive use fee must be equal to or higher than the assigned site fee in the BLM Director's national recreation fee schedule.  The state director may establish fees based on fair market value for exclusive use.  Exclusive use fees are in addition to commercial, competitive, Special Area, or organized group use fees.  Exclusive use of sites related to an SRP is temporary in nature, and any temporary structures or improvements must be removed immediately upon the conclusion of the event or activity.  To ensure that exclusive use may be enforceable by law enforcement personnel, field offices should implement procedures for developing a closure notice and publishing a Federal Register notice about the exclusive use.

(4) <u>Late Fees</u>.  States may establish a fee schedule for late payment of SRP fees, late use reports, and cancellations.

(5) <u>Grazing Fees</u>.  The BLM calculates fees for livestock grazing or trailing associated with an SRP based on the national grazing fee formula in effect at the time the SRP is issued.  Livestock use associated with an SRP does not supersede an existing grazing lease or permit; the BLM's approval of the use is reflected in the SRP.

## H.  Fee Payment and Calculation

1.  <u>Cost Recovery Procedures</u>.

When the estimated time for processing, administering, and monitoring a permit exceeds 50 hours, cost recovery procedures must be followed.  The recreation program uses the same cost recovery procedures as the BLM Division of Lands, Realty and Cadastral Survey.  The regulations at 43 CFR 2920.6(b) require the reimbursement of costs for land use authorizations

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-28

using the provisions contained in the right-of-way regulations.  See also 43 CFR 2804.14(c), 2805.16(b), 2884.12(c), and 2885.24(b).  For billing and collections procedures and other instructions, see BLM Manual MS-1323, Cost Recovery for Reimbursable Projects/Activities.  Cost recovery for SRPs falls under the authority of Section 304(b) of the Federal Land Policy and Management Act and is considered a full, reasonable cost recovery (category 6).  It is important to remember that the correct term is "cost recovery," not "cost reimbursable."  The BLM does not process a cost recovery project unless and until sufficient funds are on deposit in the cost recovery account.  If a balance remains upon completion of permit administration, that amount is returned to the applicant.

Once the BLM determines that a proposal will take more than 50 hours of staff time, a decision letter with the estimate of direct and indirect costs must be provided to the applicant.  The letter should also include an outline of the cost recovery agreement that both parties would later sign if the applicant chooses to participate in cost recovery.  (See Appendix B14, Sample Letter with Estimated Cost Recovery.)

   a.   Included Costs.

Cost recovery charges are limited to the BLM's costs of issuing the permit, including necessary environmental documentation, onsite monitoring, and permit enforcement (43 CFR 2932.31(e) (3).  In determining what to include as costs, field offices are limited to those costs that not only are directly related to the proposed activity but also do not broadly benefit the general public.  For example:

   (1)  If the BLM is unable to process the permit in a timely manner, or to expedite the permit process, or to reduce or avoid cost recovery, applicants may themselves provide required products, such as environmental analyses, clearances, global positioning system (GPS) or geographic information system (GIS) maps, or other required products.  Applicants may also hire qualified, DOI-approved contractors to complete necessary clearances when it is clearly in their interest to have these efforts completed more quickly than the BLM is able to do; however, BLM staff time will still be necessary to review contractor-provided work.

   (2)  Law enforcement directly related to the activity or event is an appropriate cost recovery charge.

   (3)  Development of clearances and reasonable mitigation measures required in the decision record are legitimate cost recovery charges.

   (4)  Monitoring of an event for damage to inventoried resources or permit compliance that might occur as a direct result of the permitted event is an appropriate charge, but routine monitoring of resources as required by law or policy is not an appropriate cost recovery charge.

AR10176

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-29

(5) Inventories required under the Endangered Species Act and Natural Historic Preservation Act will generally not be a cost recovery charge; however, clearances and reasonable mitigation measures required in the decision record are appropriate cost recovery charges.

(6) Where the BLM has a duty to inventory public land resources, inventories generally benefit the public and not just the applicant. Baseline inventories for natural and cultural resources are not paid for under cost recovery. For example, if existing areas, roads, and trails are designated as open for public use, the BLM would not charge the applicant for these same roads and trails to be inventoried for cultural or heritage resources, or special status species. (See Chapter 1, Section III.G.1., Cost Recovery.)

(7) The pre-application consultation process is not a cost recovery charge; cost recovery starts upon receipt of a completed application.

(8) Programmatic EAs are not charged to cost recovery.

b. Factors To Consider in Estimating Costs.

The BLM may exercise considerable discretion in allowing an applicant to provide products rather than doing so itself. For example, on a cost recovery OHV event, the applicant could choose to provide GPS or GIS products instead of relying on the agency to gather the information. Instead of relying on BLM archaeologists to perform cultural resources surveys, an applicant could hire qualified, DOI-approved contractors to do so. BLM Manual MS-1323, Cost Recovery for Reimbursable Projects/Activities, provides additional guidance on estimating direct and indirect costs. (See Figure 4 for a spreadsheet used to estimate costs.)

(1) Direct costs. Direct costs include personnel costs in the form of compensation to BLM personnel working on the project, along with the BLM's leave surcharge rate and any overtime associated with processing the application. Labor costs are determined by each individual's salary rate. Direct costs include travel expenses (e.g., vehicle rental costs or fleet vehicle mileage costs); any necessary purchased services (e.g., printing, automated data product services, or copying); and miscellaneous supplies and equipment of a specialized nature, the use of which applies directly to processing the application.

(2) Indirect costs. Indirect costs represent those administrative and program costs that may be attributed to processing the application, including a portion of the costs of equipment, space rental, telephone services, postage, personnel transfer costs, administrative and clerical support, training, safety, public information, cartography and basic series mapping, aviation management, telecommunications, equipment

AR10177

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-30

maintenance, and systems design and implementation.  Excluded from indirect costs are management overhead, managerial work, evaluations of office activities, program coordination, technical program direction, environmental education and interpretation, interagency planning, studies and research, preparation of NEPA documents relating to general program planning, law enforcement, and firefighting. Nominal indirect costs are recovered through the indirect cost rate, determined annually by the BLM's budget office in consultation with the Interior Business Center (IBC) (22.9 percent of total direct costs as of 2014), as part of the administration of cost recovery accounts.

c.  Establishing the Cost Recovery Account.

Once the applicant agrees to cost recovery, both parties must sign the cost recovery agreement (CRA).  To establish the cost recovery account, these general procedures are followed:

(1) Both parties sign the CRA.

(2) The applicant makes cost recovery payment.

(3) The BLM deposits payment into a suspense account in its Collections and Billings System (CBS).

(4) The field office requests a WBS (project) code from the state budget office.

(5) The field office prepares Form 1310-20, Project/Subproject Number Assignment and Information Form.

(6) The field office requests a 5105 account to be established in the Federal Financial System by sending the following to the National Operations Center:  Form 1310-20, copy of CBS receipt, and copy of CRA.

(7) The National Operations Center notifies the state office when it establishes the account in the Federal Financial System.

(8) The field office transfers funds from the suspense account to the project account.

d.  Monitoring Cost Recovery.

The applicant is entitled to a thorough accounting of the use of cost recovery funds.  Staff who charge time to the CRA must document their time and describe their activity on BLM Form

AR10178

1323-1, Reimbursable Project Log.  The project manager must maintain time logs, copies of receipts, vehicle reports, etc., that reflect charges to the project.

    2.  <u>Estimated Fees</u>.

For commercial use, base the fee estimates on either the amount of fees paid the previous year or an annual revenue estimate that is agreed to by the permittee and the AO before any use occurs. When revenues are uncertain (e.g., for the first year of a new operation), the minimum annual fee or an estimate agreed to by both parties is appropriate.  For competitive use, the BLM bases the fee estimates on projected adjusted gross receipts or on the number of participants as agreed to by the permittee and the AO.  In any case, the prepaid fee must not be less than the minimum annual fee.

    3.  <u>Fee Payments</u>.

Recreation fees due the government must be paid in advance of any authorized use to ensure that the government receives payment.  For commercial use, when the total estimated fee is $1,000 or greater, the BLM may allow periodic payments as long as the permittee pays at least 25 percent of the estimated fee in advance of commencing use.  For example, a permittee whose estimated annual fee is $1,000 must pay at least $250 at the beginning of the season and may schedule the remainder of the payments over the rest of the season.  The BLM establishes specific payment dates before issuing the permit.  For multiyear permits, the BLM may consider scheduling a final payment after the use season ends, so it may reconcile the estimated payment with the final total of payments due for the season.  This practice reduces the need to carry over payments to the following season through a yearend settlement process.

    4.  <u>Deductions</u>.

For commercial use, deductions from gross receipts are allowed for actual transportation and lodging costs incurred by the permittee before the client's arrival at the beginning of a trip, and after departure at the end of a trip.  For example, airplane travel from a gateway airport to the permittee's headquarters and lodging in a motel the night before the start of the trip are allowable deductions.  Claims for deductions must be supported by itemized receipts.  Transportation and lodging deductions are not allowed for competitive uses, vendors, or organized groups.

        (1)  Transportation cost adjustments.  Deductions are allowed to provide transportation for clients to and from the local community or the permittee's headquarters.  Allowable transportation adjustments apply to both single-day and multiple-day trips.  The intent is to allow adjustments for costs paid or borne by commercial permittees in bringing their clients to local communities or the permittee's headquarters before the trip, and returning them from such points after the trip (as opposed to transportation costs between the local community or permittee's headquarters and the public lands or related waters).  Costs incurred between the permittee's headquarters or local

AR10179

community and the beginning of the advertised use, or costs incurred during the permitted activity or trip, regardless of public or private land status, may not be deducted. (Note: Adjustments for the percent of time spent off public lands—discussed further under Chapter 1, Section III.H.5., Discounts—do not apply to pre-trip and post-trip transportation, as doing so would create a double deduction.)

Permittees should report the actual amount paid to others or the current mileage rate allowance that the General Services Administration (GSA) allows for advantageous use of a privately owned vehicle (or aircraft) for government travel. The GSA privately owned vehicle rate is used for consistency purposes.

(2) Lodging cost adjustments. As noted, pre-trip and post pre-trip requests for lodging deductions require substantiation with lodging receipts, as specified by the AO. Costs incurred for lodging on nonpublic land during the trip may not be deducted; however, time spent on nonpublic lands may be applied to the discount for nonpublic land use. (See Figure 5, Discount for Use of Nonpublic Lands and Related Waters.)

5. Discounts.

A discount of SRP fees for time off public lands and related waters may be appropriate for commercial, competitive, or group events. A discount is allowed for time spent off public lands and related waters from the time and date of entry to the time and date of exit from public lands (Figure 5). To determine the time off public lands successfully, the BLM should reach agreement with the permittee, before issuing the permit, when and where the trip or event starts and ends. A trip is considered to be the time the client or participant spent with the permittee that starts either after the first night's lodging or when the client begins participating in the advertised use. For example, if the permittee advertises the trip as a 5-day hunt or a 3-day river trip, the trip is considered one 5-day hunt or one 3-day river trip. A trip ends when the client returns to the permittee's headquarters or lodge for the last night's lodging. For time spent on nonpublic lands, the AO may require the permittee to submit a signed trip log or operating plan specifying this nonpublic land use. When equitable, miles or acres may be used as a substitute for time in determining the discount. When time off public lands occurs on land administered by another federal agency that uses similar fee and discount schedules, fee calculations should be coordinated so that duplicate fees or overcharges do not occur.

Example: If a commercial outfitter operates equally on BLM and U.S. Forest Service (USFS) lands (50 percent each of the total trip time), BLM staff should coordinate with the USFS to split the 3 percent fee 50/50, ensuring as well that each agency does not apply the 60 percent (40 percent discount) fee calculation that would result in a combined overcharge of 120 percent. Note: This guidance applies only to other agencies with similar policies.

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-33

Commercial permittees who rent equipment, shuttle vehicles, or deliver and pick up customers on public lands and related waters are not eligible for this nonpublic lands use discount. The discount fee adjustment is typically based on the percent of total time on public lands, as shown in Figure 5. (See also Chapter 1, Section III.P., Coordination and Joint Permits.)

**Figure 5. DISCOUNT FOR USE OF NONPUBLIC LANDS AND RELATED WATERS**

| Percent of Total Time on Public Lands or Related Waters | Fee Reduction | Multiplication Factor |
|---|---|---|
| Less than 6% | 80% | .20 |
| 6-60% | 40% | .60 |
| 61-100% | None | None |



Eligible Deductions and Discounts

6.  <u>Commercial SRP Fee Calculation</u>.

The BLM takes the following actions when calculating fees:

    (1) Determines gross receipts by totaling <u>all</u> payments received, regardless of source, by the permittee and its employees or agents for goods or services provided in connection with SRP-authorized commercial activities on public lands and related waters (including booking fees, nonrefunded deposits, and cancellation fees).

    (2) Adjusts the total gross revenue by subtracting allowable deductions for transportation and lodging, if any. (See Chapter 1, Section III.H.4. Deductions.)

    (3) Multiplies the adjusted total by 0.03 (3 percent of adjusted gross receipts is the commercial SRP fee as of March 2014).

    (4) Adjusts the SRP fee derived in Step (3) above by applying any appropriate discount for nonpublic land use. (See Chapter 1, Section

AR10181

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-34

III.H.5., Discounts, and Figure 5).  The BLM ensures that there is no overlap or double deduction with transportation costs described in Chapter 1, Section III.H.4., Deductions.

(5) Subtracts any prepaid fees from the total amount of fees due to arrive at the balance due the BLM.

(See Figure 4 and the following figures for examples of fee calculations for commercial fees: Figure 6, Example of Minimum Fee (Using 2014 Minimum Fee); Figure 7, Example of No Deductions or Discounts; Figure 8, Example with Eligible Deductions and Discounts; and Figure 9, Example of Deductions, Discounts, and Periodic Payments.)  (See also Appendix B16, Sample Letter Combining Preseason Bill, Outfitter Evaluation, and Annual Operating Authorization.)

AR10182

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-35

---

**Figure 6.  EXAMPLE OF MINIMUM FEE (Using 2014 Minimum Fee)**

Before the start of its use season, Petite Tours informed the BLM that it expected to have total customer payments of $2,200 for commercial activities authorized by its special recreation permit.  Based on this estimate of total customer payments, the BLM first calculated the annual fee by following the percentage of customer payment method and arrived at an estimated payment of $66 ($2,200 x 0.03 = $66).  The BLM then determined that the appropriate amount due before permit authorization was the $105 minimum annual fee, as the minimum annual fee was greater than the calculated fee.

Petite Tours paid the minimum annual fee.  At yearend, in its post-use report, Petite Tours reported its actual total of all customer payments as $1,710.  As part of its closeout procedure for the year for the permit, the BLM found that no additional fees were due.

FEE CALCULATION

<u>Step 1</u>    Total the permittee's gross receipts = $1,710

<u>Step 2</u>    Multiply gross receipts by the commercial use fee percentage (3 percent)
$1,710
<u>x    .03</u>
$ 51.30  fee due based on commercial use percentage

$105   minimum fee prepaid
$ 0    balance due BLM
$105   amount retained by BLM

**NOTE**:   If the product of the total customer payments received and the commercial use percentage is less than the minimum fee, no additional payments are due and no further calculations are necessary.

---

AR10183

---

**Figure 7.  EXAMPLE OF NO DEDUCTIONS OR DISCOUNTS**

---

Before the start of its use season, Bigger Tours, an established land tour company with a multiyear permit, informed the BLM that it expected to have total customer payments of $10,000, for a series of 1-day commercial trips authorized by its special recreation permit.  The BLM, in its discussions with the permittee and its review of Bigger Tours' operating plan and brochure, determined that all authorized trips were planned to begin and end at Bigger Tours' office in County Seat, Utah, and that 85 percent of the time spent on trips would be on public lands.  Based on the estimated amount for total customer payments and the likelihood of no allowable deductions for transportation and lodging or a discount for nonpublic land use, the BLM calculated the prepayment of fees to be $300 ($10,000 x 0.03).  In its postseason use report, the company reported its actual total of all customer payments as $8,850 and did not claim any discounts or deductions.  At yearend the owner of Bigger Tours informed the BLM that he intended to continue operations the following year.  As part of its post-use closeout procedure, the BLM reviewed the post-use report submitted by the company and credited Bigger Tours $34.50 toward the next season's use fee prepayment.

FEE CALCULATION

Step 1    Total the permittee's gross receipts = $8,850

Step 2    Multiply gross receipts by the commercial use fee percentage (3 percent)

        $8,850
        x  .03
        $ 265.50 fee due based on commercial use percentage

Step 3    Subtract prepaid fees

        $ 265.50
        -  300.00 (prepaid fees)
Step 4    $ (34.50)  (overpayment, credited to Bigger Tours toward next season's fees)

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-37

---

**Figure 8.  EXAMPLE OF ELIGIBLE DEDUCTIONS AND DISCOUNTS**

Big Joe Outfitter and Guide Company has a hunting guide business.  It had 90 customers who paid $1,000 each for a guided hunting trip.  It also rented camping supplies and equipment to its customers, charged game processing fees, and sold customers souvenir clothing.  Total receipts came to $100,000.  The company paid an estimated fee of $1,600 before the season.  Part of the $90,000 collected in trip fees (i.e., $5,000) were costs associated with transportation and lodging at the beginning and end of the trip.  The group traversed public lands 55 percent of the time; the remainder of the trip was on private land.  Using Figure 5, Discount for Use of Nonpublic Lands and Related Waters, the BLM determined that 55 percent use on public lands and related waters entitled the company to a 40 percent discount for use of nonpublic lands and related waters.

FEE CALCULATION

Step 1   Total the permittee's gross receipts = $100,000

Step 2   Subtract from gross receipts the allowable transportation and lodging deductions claimed
         by the permittee and reported as part of total payments
              $100,000
              -   5,000
              $ 95,000

Step 3   Multiply the amount derived in Step 2 by the commercial use fee percentage (3 percent)
         to derive the amount due the BLM
              $95,000
              x    .03
              $ 2,850 = fee due for permitted activity based on commercial use percentage

Step 4   To the amount derived in Step 3, apply any appropriate discounts for use of nonpublic
         lands and related waters
              $2,850
              x    .60   (reflects 40 percent discount)
              $ 1,710   (adjusted amount due the BLM)

Step 5   Subtract any prepaid fees from the amount due the BLM (as derived in Step 4) to
         determine the balance due
              $ 1,710
              -  1,600   (prepaid fees)
              $   110   (balance due the BLM)

**NOTE**:   Deductions and discounts must be documented by the permittee and approved by the
          BLM before the use occurs.  Permittees are required to provide trip duration, itinerary,
          or other such information as may be specified by the BLM to support requests for fee
          reductions based on use of nonpublic lands and related waters.

---

AR10185

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-38

---

**Figure 9.  EXAMPLE OF DEDUCTIONS, DISCOUNTS, AND PERIODIC PAYMENTS**

Mega River Tours, Inc., runs trips on the Green, San Juan, and Colorado Rivers in areas administered by the BLM.  Over the past several seasons, Mega River Tours has averaged $100,000 in total customer payments for activities authorized under its permit.  Considering this past use, as well as the company's previous deductions and nonpublic lands discount, the BLM determined that the estimated fee was greater than $1,000 and that a periodic payment could be made.  The BLM and Mega River Tours agreed that the company would pay 50 percent of its estimated use fee before the season and the remaining 50 percent at midseason.

River flows were good, and Mega River Tours had a better year than expected.  In its post-use report, the company showed total customer payments of $110,650.  As part of its closeout procedure for the year for the permit, the BLM allowed documented deductions of $5,150 for pre-trip and post-trip transportation and lodging expenses that had been included as part of total customer payments.  Mega River Tours also demonstrated through trip itineraries that customers spent an average of 55 percent of their time on public lands and related waters during their trips.  Using Figure 5, Discount for Use of Nonpublic Lands and Related Waters, the BLM determined that 55 percent use on public lands and related waters entitled Mega River Tours to a 40 percent discount for use of nonpublic lands and related waters.

FEE CALCULATION

Step 1  Total the permittee's gross receipts = $110,650

Step 2  Subtract from gross receipts the allowable transportation and lodging deductions claimed by the permittee and reported as part of total payments
      $110,650
      -    5,150
      $105,500

Step 3  Multiply the amount derived in Step 2 by the commercial use fee percentage (3 percent) to derive the amount due the BLM
      $ 105,500
      x     .03
      $   3,165 = fee due for permitted activity based on commercial use percentage

Step 4  To the amount derived in Step 3, apply any appropriate discounts for use of nonpublic lands and related waters
      $ 3,165
      x   .60   (reflects 40 percent discount)
      $ 1,899   (adjusted amount due the BLM)

---

AR10186

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-39

---

**Figure 9.  EXAMPLE OF DEDUCTIONS, DISCOUNTS, AND PERIODIC PAYMENTS**

Step 5  Subtract any prepaid fees from the adjusted amount due the BLM (as derived in Step 4)
to determine the balance due

```
  $ 1,899  (fee for the season)
  -   855  (prepaid fees, beginning the season)
  -   855  (fees paid, midseason)
  $   189  (balance due the BLM)
```

---

### I.  Fee Collections

The field office deposits all recreation fees, excluding cost recovery collections, into a 1232 Treasury account for that recreation site or area, for use at that site or area.  This account is a separate account for deposits of SRP recreation fees in that site or area.  The fees deposited in this account are strictly limited to SRP revenue from the area; no other fees (e.g., recreation use permits) are deposited into this account.

The BLM uses its Collections and Billings System (CBS) (http://cbs.blm.gov/) to issue bills and track received payments that are related to SRPs.

1.  Minimum Annual Use Fees – Advance Bill Notice.

The minimum annual use fees are due before operations begin.  The BLM creates an Advance Bill Notice representing the minimum annual use fee and sends this to the applicant.  The due date on the Advance Bill Notice should reflect a reasonable amount of lead time for the permitting office to process and issue the permit.  (An Advance Bill Notice is not a Bill of Collection and does not incur interest, administrative penalties, or late fees if not paid by the due date.)

2.  Post-Use Fees – Bill of Collection.

Once the AO receives the post-use report and the use fees are calculated, a Bill of Collection is created in CBS for the outstanding balance owed to the government.  If the amount owed exceeds $1,000, the bill may be broken into payment installments.  CBS guidance should be followed in this case, and may require that the permittee complete and sign a promissory note (Form 1372-1) for the file.  A separate Bill of Collection is issued for each installment.  Payment of the Bill of Collection is due within 30 calendar days from the date of issuance.

If payment is not received by the due date, the issuing office shall pursue collections by all appropriate methods.  Collection efforts may include the assessment of interest, administrative charges, penalties on past due amounts, late fees, and potentially civil penalties.  Once the bill is 31 calendar days delinquent, the issuing office should take the following progressive steps until payment is received:

AR10187

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-40

    (1) Send an initial demand letter requiring payment, including interest, within 30 calendar days.

    (2) Send one or two additional demand letters as deemed appropriate by the AO, based on the amount owed and past payment performance.

    (3) Turn the delinquent account over to the Department of the Treasury via the National Operations Center, for collection. Note that a penalty of 6 percent per year is assessed on any portion of the debt more than 90 calendar days past due.

  3. <u>Cancellation of Bills</u>.

To request cancellation of a bill, the AO sends an email to the collections officer with the rationale supporting the request.

**J. Refunds**

    (1) Application fees (in states where application fees have been established) are nonrefundable.

    (2) After a permit authorization has been issued, the minimum annual use fees are nonrefundable.

    (3) For multiyear permits, overpayment of fees is generally applied to the following year's use. Refunds are granted for overpayment of permit fees for single-year or one-time permits.

    (4) Commercial use fees; fees for vending, competitive use, or organized group event use; assigned site fees; and exclusive use fees may be refunded, less the direct cost of processing the permit, if the estimated use is less than calculated or the event or activity is canceled. If the event or activity is in an area where the number of permits is strictly limited, and a cancellation occurs without sufficient time for the AO to reallocate the use, the fees are nonrefundable. The field office determines this timeframe.

    (5) The BLM does not make refunds for Special Area permits issued to individuals in allocated use areas except when its actions prevent the permittee's use of the permit. Alternatively, credit toward future use may be authorized where use was canceled by the permittee in sufficient time for the BLM to reallocate it to others.

    (6) When cost recovery is charged, all cost recovery incurred up to the time of cancellation is nonrefundable.

AR10188

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-41

(7) Refunds are issued through CBS, and the process varies, depending on the method of payment.

   a) Generating a refund for checks or cash payments.

      (i)   the AO initiates a request for a refund in CBS
      (ii)  the collections officer receives the refund request
      (iii) the collections officer passes the request to the manager with the authority to approve refunds or to issue final approval, and the refund is issued as a check and delivered by mail

   b) Generating a refund for credit card payment.

      (i)   the AO sends an email to the collections officer requesting a refund
      (ii)  the collections officer issues the refund as a credit to the credit card

## K. Approval To Vary or Waive Fees

(1) Approval must be obtained in writing from the BLM Director to vary fees, or the method of determining them, from those prescribed in the BLM National Special Recreation Permit Fee Schedule for commercial, competitive, group, or assigned site fees (Figure 2). Approval must be obtained in writing from the state director to vary fees for applications, Special Area fees, and other fees over which the state director has fee authority, such as exclusive use (Figure 3).

(2) The AO may waive fees only if the event or activity is cosponsored by the BLM. Although fees may be waived, applicants must compete for use allocations where applicable. Nonprofit, educational, or public agency status is not, on its own, a basis for waiving fees.

(3) The BLM does not waive SRP requirements or fees in exchange for volunteer work. Local managers may reward volunteer work by a group or individual with a local or regional recreation pass (recreation use permit), Special Area permit, Interagency Volunteer Recreation Pass, or other recognition.

AR10189

### L. Terms and Stipulations

1.  General Terms.

General terms are included on the Special Recreation Permit Application (Appendix B4) and on the Special Recreation Permit (Appendix B5). General terms are applicable to and made a part of all SRPs except permits for individual use of Special Areas. State directors should develop stipulations for Special Area permits.

2.  Special Stipulations.

The AO may require the permittee to comply not only with the general terms described on BLM Form 2930-1 and BLM Form 2930-2 but also with any reasonable stipulations or conditions necessary to protect the lands or resources involved (e.g., required compliance with applicable Leave No Trace, Tread Lightly! and other practices, or required rehabilitation of lands damaged by the permitted event), to reduce user conflicts, or to minimize health and safety hazards. The AO is responsible for developing the permit's special stipulations. When appropriate, the AO will consult with the permittee and others, including state and federal land managing agencies, state outfitter licensing boards, outfitter/guide associations, state fish and game agencies, and advisory councils. Any resulting stipulations are made part of the permit and are used in the evaluation process. The BLM, however, may not additionally stipulate or otherwise regulate matters that are the responsibility of other federal, state, or local agencies. The BLM's stipulations must not conflict with other agency regulations and requirements where other agencies have clear jurisdiction. The BLM may amend permit stipulations if necessary to protect public health, safety, or the environment. (For examples of stipulations, see Appendix B11a, Sample Stipulations for a Commercial Land-based Special Recreation Permit; Appendix B11b, Sample Stipulations for a Commercial River Running Special Recreation Permit; and Appendix B11c, Sample Stipulations for an Organized Group Special Recreation Permit.)

### M. Bonds

Bonding is a type of guarantee that protects the United States against financial loss resulting from defaulted obligations associated with special use authorizations. The requirement to post a bond is written into the authorization and performance-related permit stipulations. A bond ensures obligations or payments associated with these authorizations, guaranteeing that adequate funds will be available for the rehabilitation of resource damage or repair of damaged government facilities (43 CFR 2932.44). The BLM may require bonds to protect its interests in the public lands, resources, and BLM-owned or BLM-managed facilities against damage caused by the permittee's actions. Considerations for requiring a bond may include the nature or size of the proposed activity, impacts of prior events, and the potential for resource damage. The BLM does not use bonding to protect third-party interests (e.g., those of landowners, other BLM permitted users, counties). (See Appendix B11a, Sample Stipulations for a Commercial Land-based Special Recreation Permit, for sample bond stipulations.)

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-43

Bonds are not used to enforce the general terms of an SRP. Rather, bonds are used to guarantee the performance of readily identifiable requirements specified in an authorization. Bonds are appropriate for uses with authorized or potential surface disturbance. Bonds may be associated with stipulations for maintenance, construction, stabilization, grading, removal, etc., and for post-event mitigation measures, such as reclamation or implementation of treatment plans. Bonding is used, as necessary, to protect the United States from a default under the authorization. Such use may also include payment of anticipated SRP fees due to the BLM. A bond is not a substitute for proper and timely administration of an SRP's terms and conditions. The SRP holder must fulfill the requirements of the authorization, and the BLM must monitor, document, and enforce compliance, regardless of whether there is a bond. Bonds are not a substitute for suspension or revocation of an authorization or for recreation use fee requirements, since recreation use fees must be paid in advance of the authorized use and occupancy. Inconsistent or lax administration may prejudice the BLM's ability to obtain recourse from the bonding company.

1.  <u>Types of Bonds</u>.

    (1) <u>Cash bond</u>. A cash bond is an amount of money deposited with the government that can be drawn on to defray the costs of restoration and rehabilitation of the public lands and related waters affected by a permitted use. This is the preferred type of bond for SRPs because it provides a readily available cash deposit if the funds are needed, and there is no third-party (bank or bonding company) involvement. Payment of a cash bond may be made by check or credit card.

    (2) <u>Surety bond</u>. A surety bond is the promise of a financial institution to pay an amount of money to defray the costs of restoration of the public lands and related waters affected by the permitted use upon the default of the permittee. Surety bonds may also be used to guarantee the payment of fees due under a permit. Surety bonds are more typical for long-term land use authorizations, such as a right-of-way with road construction, rather than for SRPs. Surety bonds for SRPs are rare. BLM Minerals and Realty Management staff may be consulted about whether a surety bond will be required for an SRP.

2.  <u>Acceptable Securities for Bonds</u>.

The following are acceptable forms of security for bonds:
- cash deposits (preferred method for SRPs)
- irrevocable letters of credit
- U.S. Treasury bills
- notes, bonds, or other negotiable securities
- certificates of deposit
- surety bonds

AR10191

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-44

3. Bond Requirements.

(1) The AO may require the posting of any of the above types of securities for bonds or guarantees in such form and in such amount as the AO determines is sufficient to defray the costs of restoration, reclamation, or rehabilitation of the public lands and related waters affected by the permitted use. The AO must require the posting of a bond sufficient to defray these costs if the AO expects such damage to be caused by the permittee's actions. The AO bases the amount of the bond on the estimated cost to the BLM to perform or to have others perform the defaulted obligations of the SRP holder. In addition, the AO should consider inflation, availability of BLM personnel and other resources, technical aspects and other characteristics of the site and improvements, and the cost to the SRP holder. If multiple authorizations are covered by a blanket bond, the AO ensures that the bond is sufficient to cover the anticipated loss under all authorizations covered by the bond. The BLM bonds to protect federal lands only.

(2) The bond must be sufficient to cover damage, loss, or complete default under the SRP. The bond may be used to pay the BLM's direct and indirect costs to complete the remediation, or the BLM may use the proceeds of the bond to hire a third party to perform the necessary remediation or reclamation.

(3) Failure to provide adequate bonding as required is grounds for denying an SRP application. If, after sufficient notice and opportunity to comply, the holder of a multi-event SRP fails to provide adequate bonding as required for an individual event, the BLM should suspend or revoke the authorization.

(4) Bonding is required only for the period and in the amount needed to satisfy the SRP requirements. The BLM should specify the parameters and conditions that are necessary for successful compliance with the permit stipulations and that will result in the BLM releasing the bond. If specific parameters exist for the partial return of the bond, the BLM should include specific language in the permit stipulations to reflect these parameters.

(5) If approved by the AO and permittee in advance, a payment bond or other guarantee may be used to secure the fee payments in lieu of advanced fees in excess of the minimum annual permit fee.

AR10192

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-45

## Figure 10.   EXAMPLE OF BONDING FOR A COMMERCIAL ACTIVITY

Aloha Field Office has received an SRP application from an outfitter/guide requesting to conduct commercial hunting outfitter/guide activities in a remote location.  Access to BLM lands will be from the closest town of Weaverton via an existing trail to a base camp using two Argo all-terrain vehicles with tracks.  Access may also include dropoff by aircraft from the same local town.  Four canvas wall tents on temporary plywood tent platforms, measuring 8 feet by 8 feet, will be used for sleeping and cooking at the base camp.  Overnight camping will be less than 14 consecutive days for a maximum of eight total clients for the season.  The applicant will remove and properly dispose of litter and human waste.  The applicant is requesting to store the tent platforms, gear, and equipment directly related to the guiding activities, and the Argo vehicles, at the base camp on a long-term basis.  Platforms will be completely disassembled at the end of the approved use season.  BLM access to the site is via helicopter from the nearest town of Weaverton, a distance of 65 air miles.

Sample Stipulation:  "At the conclusion of the authorized use, permittee shall remove from public lands all stored items and restore the site to its original condition, as determined by the AO.  In addition to removal, restoration shall include picking up loose trash and litter and raking the footprint of the base camp."

Determine a bond amount for the above stipulation sufficient to defray the costs of removal and site restoration affected by the permitted use.

BOND CALCULATION
Step 1 Invite applicant to submit an appropriate bond amount approved by the AO, with review and input by other staff, such as an engineer; otherwise, go to Step 2

Step 2 Create a detailed list such as the one below outlining all authorized stored items

| Item | Dimensions | Quantity | Total Weight (lbs.) | Comments |
|---|---|---|---|---|
| Plywood sheet | 4' x 8' x ½" | 8 | 8 x 50 lbs. = 400 | 1 sheet of fir: 50 lbs. |
| Framing lumber | 4" x 4" x 8' | 5 | 5 x 24.5 lbs. = 122.5 | White Pine: 24.5 lbs./8' |
| Framing lumber | 2" x 4" x 8' | 24 | 24 x 10.9 lbs. = 261.6 | Red Cedar: 10.9 lbs./8' |
| Wall tent | 8' x 8' x 8' | 4 | 4 x 35 lbs. = 140 | 1 tent: 35 lbs. |
| Wall tent frame | 8' x 8' x 8' | 4 | 4 x 50 lbs. = 200 | 1 frame: 50 lbs. |
| Coleman Stove | 2-burner | 2 | 2 x 14.5 lbs. = 29 | 1 stove: 14.5 lbs. |
| Camp Chair | folding | 8 | 8 x 5 lbs. = 40 | 1 chair: 5 lbs. |
| Argo vehicle | 8-wheeled | 2 | 2 x 1,410 lbs. = 2,820 | 1 Argo: 1,410 lbs. |
| Poly tarp. | 12' x 16' | 2 | 2 x 9 lbs. = 18 | 1 earth-tone tarp: 9 lbs. |
| | | | 4,031.1 lbs. | |

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

Step 3 Create another list based on the estimated cost to the BLM to perform or have others perform removal and disposal of items and any potential site restoration (include all anticipated staff, operations, and administrative costs)

**Direct Costs**

| | |
|---|---|
| Vehicles:  2 @ $200/day for 3 days | $1,200 |
| Personnel: 72 hours @ $33/hr. | $2,376 |
| Personnel Food & Lodging:  3 @ $140/day for 3 days | $1,260 |
| Personnel Commercial Air:  3 @ $550 | $1,650 |
| Equipment & Gear | $300 |
| Helicopter Availability:  1 day @ 2,571/day for 1 day | $2,571 |
| Helicopter Hours (sling load):  4 hours @ $564/hr. | $2,256 |
| Helicopter Crew Travel: 2 @ $140/day for 2 days | $560 |
| Landfill Fees: | $350 |
| **Subtotal** | **$12,523** |

**Contract Preparation and Administration Costs**

| | |
|---|---|
| Procurement Specialist: 32 hours @ $35/hr. | $1,120 |
| Helicopter Manager: 4 hours @ $33/hr. | $132 |
| Engineer: 2 hours @ $ 40/hr. | $80 |
| **Subtotal** | **$1,332** |

| | |
|---|---|
| **Indirect Costs (22.9% of total [IBC rate]) Subtotal** | **$3,173** |

**Calculations**

| | |
|---|---|
| Total Direct Costs | $12,523 |
| Total Contract Preparation and Administration Costs | $1,332 |
| Total Indirect Costs | $3,173 |
| **Estimated Bond for Sample Stipulation** | **$17,028** |

Step 4 Inform the applicant of the estimated bond amount and determine if the applicant wishes to continue with the request for long-term storage of equipment and gear

Step 5 If the applicant wishes to proceed with a bond, calculate the amount of bond (Chapter 1, Section III.M.4.a, Steps for Calculating the Amount of an SRP Bond.) and include in permit decision, authorization, and stipulations the requirement to post a bond.

---

4.   Bond Processing.

a.   Steps for Calculating the Amount of an SRP Bond.

The BLM prepares a bond letter.  (See Appendix B17, Sample Bond Determination Letter).  To determine a reasonable bond amount, the BLM:

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-47

(1) Creates a detailed list of authorized facilities, site improvements or alterations, stored items, etc. (See Figure 10, Example of Bonding for a Commercial Activity.)

(2) Considers requiring the applicant to submit an acceptable bond estimate, approved by the AO. (See Appendix B11a, Sample Stipulations for a Commercial Land-based Special Recreation Permit).

(3) If the BLM is preparing the bond estimate, it determines the cost to the BLM to complete the work or to hire a third party to perform remediation or reclamation, including:

    a) Direct costs, such as equipment and gear; printing; labor; vehicles and mileage; personnel travel, meals, and lodging; aviation services; seed and fertilizer; fill and burying; constructing and stabilizing; removal; grading; or post-event mitigation measures, such as treatment plans; and fee payments in lieu of advance SRP fees.

    b) Contract costs, such as preparation and administration by Procurement and Engineering.

    c) Indirect costs to the agency, such as telephone services; office equipment and space rental; clerical support; personnel benefits and leave; cartography and mapping; and equipment maintenance. (Indirect costs are calculated at the current IBC rate, which, as of 2014, is 22.9 percent of total cost.) As with cost recovery, indirect costs for bonding would be charged when the event or activity is large enough that the indirect costs can easily be attributed to the support of the activity or event.

(4) Develops a spreadsheet to calculate the amount of the bond.

(5) Discusses cost estimates for potential reclamation or restoration with a local BLM engineer. (See Figure 10, Example of Bonding for a Commercial Activity.)

(6) References the *RSMeans Facilities, Construction, and Cost Data* guide to help determine reliable cost estimates for materials, labor, landscaping, or environmental remediation, and arranges costs alphabetically by state and postal zip code numbers.

(7) For third-party contracts exceeding $2,000, bases labor costs on Davis-Bacon Act wages.

AR10195

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-48

       (8) Notes that certificate of liability insurance can require emergency response for any fuel cleanup.

  b. Steps for Accepting and Processing an SRP Bond.

If the applicant agrees to the bond amount, the applicant must sign the required document as determined by the AO.  The BLM:

       (1) Includes the rationale for requiring the bond in the decision record.

       (2) Determines which stipulation(s) require bonding and for how long.

       (3) Includes bonding requirements as a stipulation of the SRP authorization. (See Appendix B11a, Sample Stipulations for a Commercial Land-based Special Recreation Permit.)

       (4) Works with qualified staff in Lands, Realty and Cadastral Survey, if a surety bond is necessary.

       (5) For cash bonds, deposits payment into a suspense account in CBS.

       (6) Establishes a case file for the bond in LR2000 or in the Alaska Land Information System (ALIS).

       (7) Ensures the bond is in place before authorizing an SRP.

       (8) Prepares a decision letter notifying the applicant of bond acceptance, and issues SRP authorization.

       (9) When a cash bond is no longer required, prepares a decision letter terminating the bond.

**NOTE:**    Termination should occur only after a thorough inspection determines that all activity requiring the bonding has been completed and that any mitigation/cleanup related to that activity has also been completed.

       (10) Completes the accounting procedures to authorize refund of the bond to the permittee.

       (11) Updates the agency accounting system to note that the bond has been terminated.

       (12) Files evidence of proof of refund in the appropriate case file.

AR10196

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-49

c.   Steps for Use or Collection of an SRP Bond.

The BLM:

(1) Sends permittee a Notice of Noncompliance via certified mail, which includes the work that the permittee is required to perform; the timeframe in which the work must begin; the timeframe in which the work must be completed; and notice that failure to meet these requirements will result in forfeiture of the bond.

(2) If appropriate, immediately suspends activities under the SRP.

(3) If further discussions with permittee are unproductive, sends a second letter via certified mail, informing the permittee of a bond attachment (including a cost estimate of the work to be performed).

(4) Instructs Accounting to collect on the bond.

(5) Performs specified work, charging all costs incurred against bond. Permittee remains liable for costs in excess of the bond.

(6) If authorization is terminated, refunds any money remaining or unused.

(7) If authorization is reinstated, notifies the permittee of bonding required before resumption of activities.

**N. Insurance and Liability**

(1) An insurance policy covering property damage—including third-party damage (damage to property other than that owned by the permittee or the United States)—personal injury, or loss of life that arises in any way from activities connected with the authorized use and occupancy is required of all commercial and competitive use permittees unless the BLM waives the insurance requirement (e.g., as with self-insured federal and state government agencies).  At the BLM's discretion, such a policy may also be required for vending or organized group use and events, depending on the kind of activity and risk to the government.

(2) The insurance policy must provide restitution for damage or injury to participants, spectators, or both, and to any privately owned resources. The insurance policy must name the U.S. Department of the Interior, Bureau of Land Management, as additionally insured and include specific coverage for the permittee's contractually assumed obligation to indemnify the United States for damage, loss, or injury resulting

AR10197

from actions taken or caused by the permittee or participants in a permitted use. The BLM does not require any third party to be covered as additionally insured.

(3) At a minimum, the commercial or competitive use permittee—and any vendor or organized group that the BLM determines must obtain insurance—must have in force public liability insurance covering all of the following:

   a) Damage to property in the amount of $30,000 (may be included in an annual aggregate).

   b) Damage per occurrence (property damage, bodily injury, or death) in the amount of $300,000 (minimum).

**NOTE:** A certificate of insurance that shows only an "annual aggregate" and not "per occurrence" is acceptable as long as it meets the minimum annual aggregate requirement.

   c) A minimum annual aggregate limit of $600,000. The coverage must extend to property damage, bodily injury, or death arising out of the permittee's operations under the permit, including, but not limited to, the occupancy or use of the public lands and related waters, structures, facilities, or equipment authorized by the permit.

The BLM should require additional coverage if it determines that the activity or event poses an unusually high risk, or for other compelling reasons. (See Figure 11, General Guidelines for Minimum Insurance Requirements, for examples of risk-based coverage.)

(4) Authorized uses are considered low risk when injuries generally associated with authorized activities are unlikely to result in death or permanent disability. Authorized uses are considered high risk when injuries generally associated with authorized activities may result in death or permanent disability.

(5) The permittee must submit a valid certificate of insurance covering the authorized activity before initiating operations. (See Appendix B18, Sample Certificate of Insurance.) The AO may require the permittee to furnish a copy of the insurance policy.

   a) Depending on the state in which the policy is issued, the policy may or may not include the statement that the insurer will

AR10198

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-51

notify the AO at least 30 days before terminating or modifying the policy.

**NOTE:**   If the policy does not include this statement, the permit stipulations must contain a specific provision that the permittee will notify the AO at least 30 days before termination or modifications to the policy will take effect.

b) The name of the insured on the certificate of insurance must be the same as the name of the permittee on the permit.

c) Those permittees holding insurance policies that insure only the permittee and not the permittee's employees must ensure that their employees also have the required insurance in effect and that a certificate of such insurance is furnished to the AO. The insurance need only be valid during periods of actual use.

**Figure 11.  GENERAL GUIDELINES FOR MINIMUM INSURANCE REQUIREMENTS**

| Example of SRP Event or Activity | Per Occurrence | Per Annual Aggregate |
|---|---|---|
| Low Risk: general noncompetitive and noncommercial activities, such as group camping, group activities, mounted orienteering, backpacking, or dog trials. | $300,000 | $600,000 |
| Moderate Risk: whitewater boating, horse endurance rides, mountain bike races, rock climbing (with ropes), rodeos, or commercial hunting. | $500,000 | $1,000,000 |
| High Risk: bungee jumping, speed record events, competitive OHV events, unaided rock climbing, heli-skiing, or aerial or aviation-assisted activities. | $1,000,000 | $2,000,000 – $10,000,000 |

(6) Federal and state government agencies that are self-insured are not required to obtain private insurance.  In lieu of insurance, the BLM requires a written statement from the permittee's risk manager or authorizing official that the SRP activity is in fact agency-sponsored and the sponsoring federal or state agency accepts liability.  If a state or state subdivision, or quasi-governmental agency, is not self-insured, all insurance requirements apply.

AR10199

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-52

The reviewing BLM office should consult with the state government insurance authority in determining the acceptability of standard or unique policy provisions, clauses, and industry practices.

### O.  Permit Monitoring, Performance Evaluation, and Compliance

1.   Monitoring.

Permits are monitored for compliance with stipulations, terms, and conditions.  The amount of such monitoring is commensurate with the resource values at risk and the permittee's past record of compliance.  The Bureau's capability to monitor terms and conditions may be a determining factor in deciding whether to issue a permit.  Failure to comply with stipulations or conditions may result in administrative penalties, civil suits, or criminal sanctions.  (See Chapter 5, Decisions, Alternative Dispute Resolution, Protests, and Appeals.)

Field offices should consider having the permittee or a representative of the permittee present during informal compliance evaluations.  With respect to formal compliance inspections of operations or facilities, the BLM should always invite the permittee to be present.  Inspections are limited to the business records, operations, and facilities related to the permittee's use of public lands and related waters.

Permittees must be given written notice of conduct or conditions that, if not corrected, could lead to an unacceptable or probationary performance rating.  This notice should explain what corrections are needed and should provide the permittee with a reasonable timeframe in which to make the corrections and avoid any penalty.  The BLM documents the permittee's file with a copy of this notice.  Severe permit deficiencies may require immediate suspension, termination, or other disciplinary action.

2.   Performance Evaluation.

All commercial and competitive event permittees must undergo a performance evaluation; performance evaluations for vendors and organized groups are at the discretion of the AO.  (See Appendix B19, Sample Outfitter Evaluation.)  The purpose of a performance evaluation is to evaluate a permittee's performance and compliance with the stipulations and terms of the permit. At a minimum, the BLM completes these evaluations annually.  Performance evaluations may also be conducted at the end of the permit term, when operating plans or procedures change, when permit violations occur, before a new use authorization is issued to an existing permittee, or before permit renewal.

(1) Written performance evaluations are provided to the permittee after the conclusion of the permittee's operating season or permitted use. The evaluation should include the level of performance and corrections required to retain a multiyear permit, if appropriate.

AR10200

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-53

(2) Although compliance with other federal, state, and local laws or regulations is a key consideration in performance evaluations, the BLM may not conduct detailed inspections or evaluations to ensure compliance with other agencies' regulations as part of the SRP administration process. The BLM's role is to request or arrange for, as necessary, the other agency to carry out its responsibility. (Certain exceptions may be outlined and provided for in cooperative agreements or memorandums of understanding.)

Important evaluation considerations include the degree of compliance with conditions of the permit and operating plans, the protection of resource values, and the quality of services rendered to the public. There is no standard format for evaluations.

(3) Three performance levels are recognized: acceptable, probationary, and unacceptable. The BLM may give the permittee an opportunity to address probationary or unacceptable performance items (consistent with other stipulations in the permit) before any decision regarding cancellation or other disciplinary measures. The BLM maintains a copy of the completed evaluation in the permittee's file.

**NOTE**:       Ratings between the BLM and the permittee may contain sensitive information. Third-party requests for performance ratings must be processed under the Freedom of Information Act (FOIA). BLM staff should contact the BLM's FOIA officer when in receipt of such a request. Document release determinations are made on a case-by-case basis, in accordance with the regulations. Nevertheless, if a permittee receives a probationary or unacceptable summary rating, the BLM may forward notification of such rating to the state outfitter licensing board.

a) Acceptable performance means that the permittee has operated in accordance with the terms and conditions established for the permit. This rating may also be given when minor deficiencies exist and need correction. If, however, such deficiencies persist after a reasonable time period following notification, the rating may be changed to probationary.

Permittees with acceptable ratings are eligible for permit renewal and transfer where continued use is consistent with planning and other appropriate factors.

b) Probationary performance means that the permittee has not operated in full accordance with the terms and conditions of the permit; however, performance does not pose an immediate threat to the safety of guests or others, is not in violation of law, and does not pose a threat of significant resource damage.

AR10201

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-54

Corrective action by the permittee is mandatory, and continued operation at this level of performance is unacceptable. Examples of performance that could lead to a probationary rating include: repeatedly delinquent submission of required reports and fee payments; failure to follow approved itineraries or schedules; failure to communicate with the AO about changes to camp layout or operating plans; or activities that exceed allocation limits. The BLM should clearly document the basis for the rating on the rating form or attachments.

A permittee given a probationary performance rating qualifies for a permit not to exceed 1 year, and permits with remaining periods of more than 1 year will be amended. If the permittee receives a probationary performance rating for 2 consecutive years, the AO may suspend or terminate the permit and/or deny future permit applications. Permits in probationary status may not be transferred.

c)   Unacceptable performance means that the permittee has not operated in accordance with the terms and conditions of the permit and may not be allowed to continue. The level of performance is a threat to the safety of guests or others or involves a violation of law that leads to a citation or record, significant resource damage, or major violation of administrative or financial obligations. Examples include: failure to obtain necessary licenses or registrations; recurrent or serious violations of fish and game laws or outfitter/guide laws and regulations; failure to pay fees; failure to comply with insurance requirements; falsification of records; and public endangerment.

For multiyear permits, an unacceptable performance rating may result in suspension, termination, or revocation of permit privileges as the AO deems appropriate to the circumstances.

For one-time event permits, the evaluation is documented in the file and may be used by the AO as the basis for determining whether to issue or reject future permit applications.

3.   Compliance.

a.   Reporting Requirements.

The AO establishes reasonable reporting requirements for permittees. Post-use reports should include all information necessary for the AO to calculate use numbers and permit fees. (See

AR10202

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-55

Appendix B20, Sample Post-Use Report.)  Information may be requested on the number of clients served, number of participants or spectators, entrance fees collected, gross receipts per trip or client, and related matters.  The AO also establishes reasonable time requirements for the submission of these reports (e.g., on a daily basis, within 10 business days after an event, monthly, seasonally, or annually).

    (1) The AO ensures that information collected from permittees is sufficiently detailed to allow for preparation and submission of the BLM's Recreation Management Information System (RMIS) annual reports.

    (2) The permittee must notify the AO of any accident that occurs while involved in activities authorized by the permit that resulted in death, or in personal injury requiring hospitalization or emergency evacuation, or in property damage greater than $2,500 (or lesser amounts if established by state law).  Reports should be submitted within 24 hours.  The AO reports accidents to the local BLM safety officer, following current reporting procedures.

  b.  Inspection of Records and Audits.

The AO, or other duly authorized BLM representative, may examine any of the records or other documents related to the permit, and belonging to the permittee or the permittee's operator, employee, or agent, for as many as 3 years after the permit's expiration.  The BLM should regularly conduct random audits of a sampling of permittees across the state.  Such reviews should include, at a minimum, an audit of revenues, including bank statements and Internal Revenue Service income tax returns, and visitor use.  Independent auditors may be contracted to conduct such work.  If payment or other discrepancies are found, the BLM follows up to ensure proper payment or permit compliance.

  c.  Violations and Penalties.

    (1) The AO may issue penalties against a permittee for any violation of the operating plan requirements, permit terms and stipulations, or other federal, state, or local laws or regulations committed by a permittee, or a permittee's employees or agents, on any federally administered lands or related waters.

    a) Minor administrative penalties in the form of service charges may be identified as part of the terms and conditions of the permit.  BLM state offices may establish their own charges for late payments, late reports, failure to cancel reservations, etc., through state recreation fee schedules.  Interest is also charged at the Federal Reserve's current prime interest rate.  These

AR10203

administrative penalties may be imposed in addition to civil and criminal charges that the BLM brings against a permittee.

b) Other administrative penalties may include probation, suspension, or termination actions. A permittee who loses permit privileges on other federal or state lands or related waters owing to permit violations may also be denied permit privileges on BLM-administered lands or related waters. Administrative penalties (such as denying or limiting permit rights) should be reciprocal, whenever possible, between or among BLM offices and between or among the BLM and other federal, state, or local administering agencies. In other words, if an administrative penalty is imposed by one agency, the other agencies should do likewise as appropriate.

c) Criminal penalties, as provided for in 43 CFR 2932.57 and 43 CFR Subpart 8365, are a third type of action that the AO may take to rectify violations.

d) Both criminal and administrative penalties may be pursued; however, the pursuit of a criminal investigation may preempt administrative action. Permittees serving court-ordered probation for violation of federal regulations pertaining to public lands and resources may have permit privileges denied for the duration of the probation period.

(2) The AO brings the alleged violation(s) to the attention of the permittee by telephone, personal contact, or in writing. Based on available information, the AO also notifies the permittee of the alleged violation(s) in writing (by registered mail as necessary), explaining the nature of the violation(s) and any steps the permittee must take to remedy the situation. If an adverse administrative penalty is to be assessed, the AO should follow the procedures outlined in Chapter 5, Decisions, Alternative Dispute Resolution, Protests, and Appeals. The BLM:

a) Requires the permittee(s) to take immediate steps to rectify the situation to the satisfaction of the AO. Depending on the severity of the violation and/or a permittee's ability to rectify the violation, the AO has the discretionary authority to impose specific penalties on the permittee, including but not limited to permit privilege denial and probation, suspension, or revocation, in whole or in part, and without compensation.

AR10204

    b) Documents all communications in the permittee's file.
Information on violations must be made part of a permittee's
annual performance evaluation.

**P. Coordination and Joint Permits**

Permitted recreation activities occurring in more than one jurisdiction (e.g., two BLM offices,
other agency-managed lands, private lands) may require the development of joint permits. Joint
permits must be worked out ahead of time between or among participating offices/agencies
before the BLM processes any type of recreation permit. Local or state governing bodies or
private property owners may also require separate permits or authorizations. Should separate
authorizations be necessary, the permittee is responsible for securing appropriate agency
clearances and/or permits, and must provide proof on demand by the BLM. If a joint permit is
issued between BLM offices, participating offices should be certain the total SRP fee does not
exceed that of a permit for a single office.

Blanket statewide permits are not issued for commercial, competitive, or organized group use or
events held on public lands and related waters. Joint permits are appropriate only in cases where
a permitted, individual activity crosses jurisdictional boundaries (e.g., linear events, bicycle tours
and races, historical trail reenactments, point-to-point races, endurance events) or when the
permitted activity occurs in more than one jurisdiction (e.g., when a guide is hunting on a big
game hunting unit that crosses a field office boundary). In such cases, joint permits are used
when it is a benefit to the BLM in the proper and orderly administration of the permit.

    1. <u>Coordination between or among BLM Field Offices/State Offices.</u>

AOs should consider whether issuance of a joint permit would improve public service and reduce
administrative costs for the BLM and the permittee. Normally, the office having the most
significant portion of the activity (i.e., river mileage or acreage) issues the permit. The office
issuing the permit coordinates with other affected offices on SRP administration, and that
coordination is documented in a memorandum of understanding. Coordination includes
documentation of NEPA, permit stipulations, distribution of fees, and concurrence of the AO of
each affected office. (See Appendix B21, Sample Memorandum of Understanding for a
Multijurisdictional Permit.)

    2. <u>Coordination with Other Federal Agencies.</u>

Permits for multijurisdictional, linear events require special attention and coordination.
Although the authorities that apply to lands managed by one agency cannot be applied to lands
managed by another agency, the respective agencies' permit stipulations and fees should be as
consistent as possible. If a large fee discrepancy exists between agencies, the state director may
request a variance from the BLM Director, citing 43 CFR 2932.31 (b) (3).

Permitted activities involving multiple agencies may require the development of interagency
agreements or joint permit administration. Under Service First (Public Law 112-74), the BLM

AR10205

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

1-58

can administer joint permits with the U.S. Forest Service, U.S. Fish and Wildlife Service, and the National Park Service.  (See http://www.fs.fed.us/servicefirst/ and Service First MOU: BLM-SFA-2014-001.)  If the agencies choose to use a single joint permit administrator, they will need to develop a work plan and agreed upon accounting system to track agencies' costs and revenues.  Use of a joint administrator should be considered only when such use will improve efficiency and cost-effectiveness, and when it will not negatively impact the monitoring of permitted activities, including effects on resource values.

## Q. Special Considerations for Selected Programs and Activities

1. <u>Youth Wilderness Therapy Programs or Residential Treatment Programs</u>.

The BLM has special requirements for wilderness therapy programs or residential treatment programs.  Youth wilderness therapy or residential treatment programs for troubled youth operating under SRPs must adequately provide for the protection, health, and safety of children participating in the programs, and must be in compliance with state licensing or registration requirements.  Given the sensitive nature of these programs, it is imperative that adequate monitoring and performance evaluations are conducted to ensure compliance with all permit stipulations.  (See Glossary definition of **Wilderness Therapy Programs.**)

The BLM permits wilderness therapy programs or residential treatment programs to use public lands only in states that assume primacy in the regulation and oversight of treatment plans, living conditions, and health and safety of the participants and that oversee the programs through periodic inspections in the field.  Because of the wide variation of state requirements for these programs, each state office is responsible for determining how its respective state licensing requirements and regulations relate to the BLM's SRP process.  <u>In states without state licensure and regulations for wilderness therapy programs or residential treatment programs, or where state oversight is either unavailable or inadequate, the BLM office should deny the application on the basis that the BLM has neither the personnel nor expertise to provide adequate oversight of residential treatment and wilderness therapy programs</u>.

Wilderness therapy programs or residential treatment programs currently operating under permit in states without state licensure and regulations for wilderness therapy programs or residential treatment programs or where states do not provide for periodic inspections should be notified that existing permits will not be renewed upon expiration.  <u>Furthermore, when feasible, these permits should be terminated before their expiration</u>.

Each BLM state office with jurisdiction over BLM lands where wilderness therapy programs or residential treatment programs are either operating on or planned for these lands should issue a protocol for field offices to follow in dealing with permits for wilderness therapy or residential treatment programs for troubled youth.

Wilderness therapy programs or residential treatment programs must be licensed by the state where the program will be operating.  The applicant must provide documentation that all state requirements have been met and that it is in good standing before the BLM office may issue the

AR10206

permit. The permit must further stipulate that the operator will remain in compliance with all state licensing requirements and regulations while operating wilderness therapy programs or residential treatment programs on public lands and related waters.

The applicant must also provide records and references relative to prior experience and similar operations. The AO reviews this information to determine if any circumstances exist that would recommend against granting a permit.

The applicant must provide a complete description of the scope and duration of the proposed program, including venues, dates, group size, staffing, and other operational details pertaining to licensing requirements. When issuing a permit, the AO provides this information in writing to appropriate state and local authorities having jurisdiction over wilderness therapy programs or residential treatment programs with a request that all operations be monitored for compliance with their regulations and licensing requirements.

The AO should request that state and local authorities having jurisdiction over licensed wilderness therapy programs or residential treatment programs provide immediate notification to the authorizing BLM office concerning any incidents that might indicate the advisability of suspending or terminating a permit for operation on public lands. If a state suspends or revokes the license or orders operations to cease, the SRP must be suspended or revoked.

Every BLM employee must provide timely notification of any suspected incident of child abuse or neglect of which he or she has knowledge to the appropriate state and local authorities. Soon after this notification, the office consults with these authorities to determine if the program should be suspended to prevent further incidents and/or to protect the health and safety of the participants. If the program is stopped based on substantiated incidents of child abuse or neglect, the permit must be suspended or revoked. In addition, the AO should timely notify other BLM offices working with the same permittee, as recorded in RMIS.

Each office permitting wilderness therapy or residential treatment programs for troubled youth records the information in the RMIS and takes other steps necessary to ensure adequate tracking. Wilderness therapy program SRPs are entered in the RMIS database with the SRP primary purpose listed as "wilderness therapeutic programs – youth." In addition, the notes section may be used to record information regarding state licenses and other relevant data. If requested, the BLM provides this information to responsible state and local officials and other organizations and entities having oversight and the need to determine performance of the program.

Wilderness therapy programs or residential treatment programs for troubled youth operating primarily off public lands are exempt from these program-specific SRP requirements when they make short-term (e.g., 1-day, overnight) visits to public lands and related waters, recreation areas, sites, and attractions.

2.  Dispersal of Cremated Remains.

The BLM does not issue SRPs or other land use authorizations for commercial services providing for the disposal of cremated remains on public lands and related waters. Noncommercial requests for group use for memorial ceremonies or services associated with individual scattering of cremated remains are evaluated as group use activities.  For additional guidance, see Chapter 1, Section II, Waiving the Requirement To Obtain a Permit, and Appendix B2, Decision Tree for Special Recreation Permitting.

3.  Military Exercises.

Requests to conduct military exercises on public lands and related waters should be referred to the BLM Division of Lands, Realty and Cadastral Survey for current guidance.  Formal military exercises are not authorized through an SRP.

## CHAPTER 2.    RECREATION USE PERMITS

## I.    ISSUANCE OF PERMITS

### A.  Purpose

Recreation use permits (RUPs) are issued for short-term recreation use of specialized sites, facilities, equipment, or services furnished at federal expense. Most often, the BLM uses RUPs to authorize individual and group use of recreation facilities, also known as fee sites. RUPs are the fee envelopes (BLM Form 1370-036) used at campgrounds to collect day-use fees. RUPs may also be used at such facilities as group shelters or boat launch areas to collect any day-use fees charged. RUPs may be issued without an associated fee, as a way of allocating use of an area.

### B.  Availability

RUPs are normally available on a first-come-first-served basis from fee envelope dispensers at fee stations. In some cases it may be appropriate, instead, to distribute permit envelopes directly to visitors or from an offsite location. Where advance reservation systems are in place, visitors may be required to reserve a site and pay in advance of their arrival (e.g., for the use of group sites). The BLM will inform visitors about the location of any offsite distribution facility by means appropriate to the situation.

### C.  Procedures

Standard procedures are described on the fee envelope and may be supplemented by instructions posted at the fee station. Supplemental instructions might include, for example, a request that permittees clip the envelope stub on a site number post instead of on their vehicle, or directions to pay camp hosts in person. If alternate procedures are available for obtaining a permit, the BLM posts the RUP onsite or makes it available to the public by other appropriate means.

### D.  Duration

RUPs are issued for a day, season of use, year, or any other period the BLM deems appropriate for the particular use. Most RUPs are short term in nature. For example, many offices limit the use of developed sites to 14 calendar days. Sites and facilities in high demand may have shorter use limits (e.g., use of a day-use picnic shelter might be limited to 1 day). Information about allowed length of stay should be posted at sites where appropriate.

The requirement to obtain an RUP and pay fees may be suspended during periods of low public use, when services such as water systems and garbage collection are not provided, or for other reasons approved by the authorized officer.

AR10209

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-2

## II.   FEES

### A.   General Fee Policy and Guiding Parameters

1.   Guidance and Purpose.

The BLM collects fees at all recreation sites that meet the fee collection guidelines of the Federal Lands Recreation Enhancement Act.  The intent of the BLM Recreation Fee Program is not to maximize revenue but to help protect natural resources, provide for public health and safety, and facilitate access to public lands and related waters.  Fees should be balanced and affordable for all members of the public, rather than an impediment.  Fees are a way of ensuring that those who actively use recreation opportunities make a greater, but reasonable, contribution toward protecting and enhancing these opportunities than those who do not.

Fees are only one part of the BLM's comprehensive funding strategy to support recreation sites and services.  Other parts of the strategy include appropriated funding, volunteer assistance, interagency cooperation, grants, partnerships with the private sector, commercial operations, and leveraged funding.

2.   Fee Guidelines.

(1)   In determining fees, the BLM designs and implements fees with the visitor's convenience in mind, allowing payment options where appropriate (e.g., credit card and Internet purchases and offsite sales).

(2)   Fees must be similar among agencies and private providers.

(3)   Fee revenues are not used to supplant appropriations (i.e., the fee revenue generated by sites that collect fees is not offset by reductions in appropriations or a redirection of base funds).

(4)   Each BLM field office must provide a range of outdoor recreation opportunities, including areas where no fee is charged for participating in recreation activities.

(5)   The BLM bases decisions about whether to charge a fee on the criteria set forth in Federal Lands Recreation Enhancement Act of 2004 (REA), Public Law 108-447, Section 3(b).  Fees may be necessary to support the services and amenities required at recreation sites to protect the health and safety of the visiting public in addition to protecting natural and cultural resources. (See also Chapter 1, Section II. E., Fee Rates.)

AR10210

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-3

(6)   The BLM retains recreation fee revenue for use at the recreation site where the fees are collected, and it uses these funds to provide benefits visible to and desired by visitors.

(7)   The BLM's goal is to use 100 percent of fee revenue at the site of collection, provided the funds can be used efficiently and effectively. The priorities for use of fee revenue are, first, to provide benefits at the site of collection; second, to establish new recreation sites on lands managed by the same field office that manages the site of collection; and, third, to offset existing and new BLM recreation site costs within the same state as the site of collection.

(8)   The BLM deposits RUP fee revenue and SRP fee revenue in separate 1232 Treasury accounts.

(9)   The BLM bases determinations about the appropriateness and level of fees on business plans. These plans must include, at a minimum, the level and type of development; cost and security of collection; type, season, duration, and intensity of visitor use; compliance and enforcement capability; partnerships; stakeholder input; impacts to underserved communities and local businesses; the planned expenditures of fees collected; private sector alternatives; and a communication and marketing plan. The Recreation Fee Program manager at the Washington Office must review all business plans before they are released to the public.

(10)  The BLM field offices and districts involve the public in decisions about fee project design and allocation of fee revenue.

(11)  The BLM, at all levels, is accountable for monitoring fiscal integrity and efficiency and for implementing national policy, revenue distribution, and evaluation of the fee program.

(12)  The BLM provides the public with annual reports on revenue collected, expenditures, projects completed, and priority projects for the previous fiscal year. Reports take the form of an accountability statement posted at the recreation site where the revenue was collected. Reporting may also include use of the Internet, brochures, newspaper articles, radio, and oral presentations.

## B. Establishment of New Fee Sites and Modification of Existing Fees

Each state director is responsible for implementing a recreation fee policy that is consistent with REA requirements and with the guidelines in this section for establishing new fees and modifying existing fees. In addition, the state director reviews recreation areas to identify those

AR10211

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-4

that can be designated as fee sites and to analyze the potential for permits and/or fees at those sites; performs biennial reviews of all recreation fee sites and services for fee comparability; and ensures accountability for money collected from recreation fee sites.

1.   BLM Recreation Fee Proposals Step-by-Step Review and Approval Process.

The following is a general outline of the BLM's recreation fee review and approval process.  The process is also depicted in Figure 12, BLM Recreation Fee Proposals: Step-by-Step Review and Approval Process.  This process applies to new fee proposals as well as to adjustments of existing fees.  State directors and members of Resource Advisory Committees (RACs) and Recreation Resource Advisory Committees (R/RACs) develop the details of state-specific processes.  As a preliminary matter, the field office prepares an internal conceptual proposal and informally shares it with the state director and Washington Office before initiating the development of the fee proposal, business plan, and public involvement, as described below.

(1) The field office develops a proposal to present to the R/RAC.  The proposal may include a comprehensive business and communication plan that thoroughly discusses and explains how fees are consistent with the criteria set forth in the REA, Section 3(b)(1-6), Basis for Recreation Fees, and Section 3(c), Special Considerations.  The fee proposal is subject to protest, but the other elements of the proposal package are not (such as the business plan or the communication plan).

a)  Business plan.

- description of new recreation fee area or proposed fee change
- financial analysis, including projected development, operating, and maintenance costs and projected income for the fee area, including how field offices propose to use fees in 5-year increments and/or a percentage of annual revenue
- analysis of existing private and public facilities or services, including fees charged
- description of how the BLM unit will inform the public about expenditures of fees collected

b)  Public notice.

- fee proposal notice (general public outreach)
- notice in the Federal Register at least 6 months before establishment of new recreation fee area or site
- news stories or paid ads in local media notifying the public of a new recreation fee or change to an existing recreation fee

AR10212

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-5

**Figure 12. BLM RECREATION FEE PROPOSALS:**
**STEP-BY-STEP REVIEW AND APPROVAL PROCESS**



AR10213

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-6

(2) The field office presents the proposal to the state director, or designee, for review.

(3) If the state director, or designee, approves the proposal, the state office sends it to the BLM Division of Recreation & Visitor Services (WO-250) for review.

(4) WO-250 reviews the proposal and, in consultation with the field, decides whether to send the proposal to the R/RAC for recommendation.

(5) The R/RAC makes recommendation on proposals received.

(6) If the R/RAC recommendation matches or affirms the proposal, the proposal may then be implemented.

(7) If the R/RAC recommends a modification to the proposal and the state director, or designee, agrees with the recommended modification, the proposal may then be implemented; alternatively, the proposal may be withdrawn.

(8) If the R/RAC recommendation does not affirm the proposal, the state director, or designee, determines if the field office still wishes to move forward with the original proposal.  If the field office wishes to proceed, and the state director, or designee, agrees, then WO-250 coordinates with the field and the Department to issue the REA-required written notification to Congress for rejecting the R/RAC recommendation.

2.  <u>Public Participation Guidelines</u>.

Section 804 of REA requires the Secretary of the Interior to provide the public with an opportunity to participate in the establishment and implementation of recreation fees. In addition to ensuring compliance with REA, the BLM has the following objectives in the public participation process:

- identifying key individuals, groups, and communities of interest concerned with the Recreation Fee Program
- providing the public with an understanding of the needs and benefits of the Recreation Fee Program
- ensuring that public issues and concerns are heard, understood, and addressed in an open setting
- establishing positive relationships with public users and gateway communities to build support for and encourage participation in public lands recreation

AR10214

Guidelines for implementing the BLM's approach and procedures for meeting the public participation requirements of REA are presented below.  The BLM applies the guidelines when:

    (1) Establishing a new fee site.

    (2) Establishing a fee for an existing site that is currently free.

    (3) Establishing any fee for a Special Area SRP.

    (4) Changing the fee established in any of the situations described above in items (1)–(3).

    (5) Establishing or changing fees for the BLM standard and/or enhanced amenity sites when issuing or renewing a management agreement or contract for site management.

The BLM does not apply the guidelines to the following:

    (1) Cost recovery on an SRP.

    (2) SRPs issued for commercial use, competitive use, vending, or organized group activity and event use.

    (3) Establishment of an application fee or minimum fee for commercial SRPs (including assigned site fees), competitive SRPs, and organized group SRPs (whether established by the BLM Director or a state director).

    (4) Placement of a site into the National Recreation Reservation Service when there is no change to the area fee.

    (5) Reservation fees and administrative costs charged by the National Recreation Reservation Service.

    (6) The addition of more camping or picnic units to an existing fee site where the fee is unchanged.

    (7) Actions that do not affect the fee paid by the public, such as changing the location or method of collection or changing accounting codes or procedures.

Although the above-described actions are not covered by REA, other public participation or notification requirements may apply.  Even when public participation is not mandatory, the recreation program is well-served by other types of public outreach and communication.

AR10215

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-8

   a.   Public Outreach for New Fee Sites and Changes to Existing Fees.

The proposing BLM office identifies outreach efforts to encourage public involvement in the
establishment of new recreation fee areas or modification of existing fees.  Outreach efforts may
include recreation fee site visits, public meetings, focus groups, newsletters, and websites.
Along with providing opportunities for public involvement, the BLM should share with the
public any plans developed by cooperating agencies for establishing a recreation fee area.

   b.   Public Notification of Fee Program Accomplishments.

Fees and fee programs enjoy their best support when the public understands that the fees are
spent onsite and directly benefit the site.  All fee areas must display the required U.S. Fee Area
sign.  (See Chapter 2, Section II.H., Posting of Sites and Projects.)  The BLM will continue to
report fee program accomplishments in a report to Congress. Fee proposals and accomplishments
must be posted onsite to the extent practicable and on local office websites.  Periodic reports to
state and local tourism officials and local governments may be useful as well.  News releases and
dedication ceremonies are appropriate for major projects involving fee revenues.

   c.   Other Public Outreach.

Beyond the minimum statutory requirements under REA, the BLM will use additional
techniques to ensure that the public is informed and involved.  When a large percentage of
recreation users come from a neighboring area, it is important to publish a notice in a newspaper
serving the neighboring area as well as in the local paper.  If the users are an identifiable group,
such as river runners, mountain bikers, ATV riders, cavers, etc., it is important to reach those
groups through their publications, message boards, and other networks.

Preferably, field offices and state offices will package fee proposals to reduce workload and
foster public understanding of the program.  Field offices should consider using these techniques:

       (1) Packaging all routine fee increases for consideration at one time.

       (2) Scheduling public participation for the planning phase rather than the
           implementation phase when the field office intends to incorporate new
           fee areas into resource management plans or activity plans.

       (3) Using an index for routine adjustments to fees; using public
           participation to establish the method and index, rather than reviewing
           each individual adjustment.

   3.   R/RAC Involvement.

Section 804 of REA also provides for the establishment of R/RACs or the use of an existing
BLM-chartered RAC.  These entities must be consulted and given opportunities to provide
recommendations to the BLM on:

AR10216

     (1) The implementation of a standard amenity recreation fee or an expanded amenity recreation fee, or establishment of a fee site.

     (2) The elimination of a standard or expanded amenity recreation fee.

     (3) The expansion or limitation of a recreation fee program.

REA Section 4(d)(9) requires that "general public support" for recreation fee proposals be documented before the R/RACs can provide a recommendation on the proposal. The measure of "general public support" will be determined by the local R/RAC and the state director. It should be noted that the act of gathering comments from the public was never meant to be a referendum on any proposal, implying that the position with the most comments will be adopted. Rather, comments are gathered to inform the decisionmakers of possible issues or findings that were not previously considered. Comments are very valuable to the BLM, and considerations in favor, against, and neutral to any proposal should be fully evaluated. In the end, however, it is the substance of the comments that matters most, not the volume. To ensure that the R/RACs are able to make an informed decision on whether general public support for a proposal exists, it is critical that field offices first complete the appropriate level of public outreach and involvement that is commensurate with each project proposal. The results of each proposal's public outreach efforts should be presented to the R/RACs with contextual information about what types of public outreach were conducted, the number of annual visitors to the particular recreation site, conformance with existing planning decisions, and the anticipated benefits that improvements to recreation amenities and services will bring to visitors to the public lands and related waters.

With respect to meetings of the existing BLM RACs, the new Forest Service–chartered R/RACs, and any subcommittee meetings to consider recreation fees, the BLM must announce such meetings at least 1 week in advance in a local newspaper of record (as required by REA) and at least 15 days in advance in the Federal Register (as required by the Federal Advisory Committee Act). The meetings must be open to the public and identify a clear process for public participation. Records of the meetings must be maintained and available for public inspection.

     4.  <u>Washington Office Review of All New Fee Areas and Fee Change Proposals</u>.

BLM state offices must send all proposals for new fee areas and fee changes to WO-250, which will respond to the proposals within 2 weeks. This review and approval must occur before the proposals are presented to the RACs and R/RACs.

     5.  <u>Federal Register Notice for New Fee Areas</u>.

Only the establishment of a new fee area requires a notice of proposal in the Federal Register; such notice must be published at least 6 months before establishing any new fee area. (See Appendix C1, Sample Federal Register Notice for Establishing a Fee Area.) (Use of the Federal Register to announce changes to the fees at existing fee areas is optional.) This notice may be published before, during, or after the other public participation requirements, depending on the public participation strategy for a given project. In any case, the notice must provide an

AR10217

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-10

opportunity for public participation.  This notice may not be combined with the required Federal Register announcement of a RAC or R/RAC meeting.

6. <u>Documentation Requirements</u>.

It is important for the BLM to keep records of all public participation in recreation fee issues.  At a minimum, the BLM maintains the following records subject to the records schedules published in BLM Manual MS-1220, Records and Information Management:

- Federal Register notices
- news releases and legal notices
- written public comments and responses (whether paper or electronic)
- records of R/RAC meetings or any other public meeting where recreation fees were on the agenda (e.g., meeting minutes or video tapes) (these are permanent retention records)
- the R/RAC documentation of general public support for the committee's recreation fee recommendations (these are permanent retention records)

## C. Fee Categories

1. <u>Category 1:  Free Recreation Sites and Services</u>.

A portion of all BLM-administered public lands and related waters are available free of charge to the public.  Specifically, the BLM <u>does not</u> charge fees for Category 1 sites and services, which include:

(1) General access to BLM public lands and related waters.

(2) General travel through an area without using the facilities and services, unless a fee is specifically authorized under separate authority.  For example, there is separate fee authority for special uses of public lands and related waters including commercial, competitive, and group SRPs and for SRPs for individual use of Special Areas.  (See Chapter 1, Special Recreation Permits.)

(3) Parking that does not immediately support and/or adjoin a fee site or area, undesignated parking, or picnicking along roadsides.

(4) Overlooks, scenic pullouts, or interpretive waysides.

(5) Dispersed areas with minimal or no facilities or services.

AR10218

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-11

(6) Information offices and small centers that provide general area information, regulations, orientation, and limited services and/or interpretive exhibits (as distinguished from the BLM's larger interpretive or visitor centers).

(7) Camping at undeveloped sites that do not provide a minimum number of facilities and services as outlined in Chapter 2, Section II.C.3., Category 3: Expanded Amenity Recreation Sites and Services.

(8) Hunting, fishing, or gathering privileges for any person who has a right of access under a specific provision of law or treaty.

(9) Extra services necessary to meet the needs of the disabled.

2. <u>Category 2:  Standard Amenity Recreation Sites and Services.</u>

This category applies where it is appropriate for users to share in some of the costs.  Fees for standard amenity recreation sites and services are usually assessed through a system of passes.  The passes are RUPs for single-day or multiple-day uses of standard amenity recreation sites or services.  These passes are generally accepted for all passengers in a private vehicle, singly as walkups, or for mandatory transportation systems.  See also Chapter 2, Section II.D., Fee Structure (Passes).

Standard amenity fees may be assessed for sites and services that meet one of the following descriptions:

(1) Designated national conservation areas and national volcanic monuments.

(2) Destination visitor or interpretive centers providing a broad range of interpretive services, programs, and media.

(3) Area or developed day-use recreation sites and services as defined in Figure 13, Standard Amenity Sites.  These areas provide significant opportunities for outdoor recreation, entail substantial federal investment, and require intensive management to enhance visitor experiences, address environmental needs, and manage conflicting uses.  To be considered a standard amenity site, a site must contain all of the amenities listed in Figure 13.

Prohibitions:  The BLM will not charge a standard amenity fee for (1) persons under 16 years of age; (2) outings conducted for noncommercial educational purposes by schools or bona fide academic institutions; or (3) any person engaged in a nonrecreational activity authorized under a valid permit issued under any act other than REA.

AR10219

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-12

**Figure 13.  STANDARD AMENITY SITES**

| Sites and Services Category | Sites and Services Descriptors |
|---|---|
| Developed day-use sites | All standard amenity recreation sites and services must:<br>• facilitate day-use recreation or serve day-use recreationists<br>• include features that protect resources and provide for public health and safety<br>• be a well-defined recreation site<br>• allow for fees to be collected conveniently and efficiently<br>• have permanent toilet facilities<br>• have designated parking (paved or well-surfaced)<br>• have identification and informational signs<br>• provide picnic tables<br>• provide security services<br>• have interpretive sign(s), exhibit(s), or kiosk(s)<br>• have permanent trash receptacle(s)<br>Examples: National monuments, national conservation areas, and recreation areas; trailheads for cross-country ski (nonlift), hiking, biking, horseback riding, or multiple-use trails; and interpretive, river, lake, or reservoir parking sites, swimming beaches, boat launches, or developed picnic sites. |
| Destination visitor/interpretive/discovery centers | Sites and facilities designed and managed to provide a broad range of information and interpretive programs.  These facilities may have a natural or cultural attraction as a major theme, and they provide basic interpretive services, such as short interpretive talks at campgrounds and visitor centers for which there is no separate charge. |
| Special recreation management areas; travel and waterway corridors | A collection of developed recreation sites situated along heavily used and contiguous travel, waterway, or canyon corridors that support concentrated recreation use directly associated with a natural, geographical, or cultural feature. The use of the corridor, including the associated complex of sites, requires intensive management and expenditures of significant federal funds.  Fees are not charged for the use of roads or waterways to access private lands or businesses. Example:  The owner of an inholding traveling on an access road through a recreation fee site would not pay for access. |

AR10220

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-13

3.   Category 3:  Expanded Amenity Recreation Sites and Services.

This category includes sites and services that provide direct benefits to individuals or groups.  It is appropriate that the individual or group receiving a direct service or using a specialized facility should bear a greater share of the direct costs of providing the service or facility.

Expanded amenity fees cover specialized outdoor recreation sites and services.  When deciding whether to charge a standard amenity fee (Category 2) or an expanded amenity fee (Category 3), the BLM weighs local considerations described in the business plan analysis, including fees charged at nearby sites that are similar in nature, in addition to considering the value received for fee paid and the degree of development.

Expanded amenity recreation sites and services include the following:

(1)   Developed campgrounds with at least five of the following nine amenities: tent or trailer spaces, picnic tables, drinking water, access road, refuse containers (trash receptacles), toilet facilities, fee collection by an employee or agent of the BLM, reasonable visitor protection, and (if campfires are permitted in the campground) simple devices for containing a campfire.

(2)   Highly developed boat launches with specialized facilities or services, such as mechanical or hydraulic boatlifts or facilities, multilane paved ramps, paved parking, refuse containers, restrooms, and other improvements (e.g., boarding floats or docks, loading ramps, fish cleaning stations).  Highly developed boat launches may feature ramp or parking lighting, security services, changing rooms, mooring floats, picnic areas, or playground areas.

(3)   Developed swimming or hot spring sites with at least four of these amenities: bathhouse with plumbing (showers and/or flush toilets), changing rooms, refuse containers, picnic areas, paved parking, attendants (including lifeguards), and swimming floats and decks.

(4)   Rental cabins, boats, stock animals, lookout towers, historic structures, trail shelters, audio tour devices, portable sanitation devices, or any equipment.

(5)   Group day-use sites.

(6)   Group overnight sites.

(7)   Use of hookups for electricity, cable, or sewer.

(8)   Use of sanitary dump stations.

AR10221

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-14

(9) Participation in an enhanced interpretive program, such as guided tours, movies, and seminars.

(10) Use of reservation services.

(11) Use of transportation services.

(12) Use of areas where emergency medical or first-aid services are administered from facilities staffed by public employees under a contract or reciprocal agreement with the federal government.

**D. Fee Structure (Passes)**

1. <u>Standard Amenity Fees</u>.

Consistent with the principle of a single fee for standard recreation sites and services, a pass system may also be used for standard amenity sites. (See Chapter 2, Section II.C.2., Category 2: Standard Amenity Recreation Sites and Services.) The pass system minimizes fee layering and avoids multiple fees at nearby sites. Even as new passes are developed, agreements of previous pass/passport programs are honored. A visitor may purchase the passes described below.

a. The BLM Site-Specific Recreation Pass.

A BLM recreation pass may be developed and purchased, per an agreement (e.g., with a vendor or with the state), for basic recreation sites and services at a specific BLM recreation site. This pass may be valid for a single day, for as long as 12 months from the date of purchase, or for the calendar year, consistent with the business plan.

b. BLM Multi-Entity Pass, Interagency Pass, or State Pass.

These passes may be developed by travel region or state and may apply to lands managed by multiple federal, state, and county agencies.

c. National Passes.

The interagency America the Beautiful – The National Parks and Federal Recreational Lands Pass is the national pass for all units of the BLM, the National Park Service, the U.S. Forest Service, and the Fish and Wildlife Service. The America the Beautiful Pass is accepted as the national pass for all sites and areas that meet the criteria for standard amenity fees, and it affords some discounts at expanded amenity sites and services.

2. <u>Expanded Amenity Fees</u>.

Expanded amenity fees are assessed on an individual, point-of-service basis. They apply to expanded amenity sites. (See Chapter 2, Section II.C.3., Category 3: Expanded Amenity

AR10222

Recreation Sites and Services.)  A multivisit annual pass may be developed to provide value where expanded amenity fees are charged.

**NOTE:**    Golden Age and Golden Access passports will continue to provide benefits as currently authorized for standard amenity and expanded amenity recreation fee sites until they are replaced.  (See Chapter 3, Section IV.A., Exchange of Golden Age Passports for the Interagency Senior Pass, and Chapter 3, Section V.A., Exchange of Golden Access Passports for the Interagency Access Pass).

### E. Fee Rates

The BLM establishes RUP fees based on the following considerations.

   1.  Direct and Indirect Costs to the Government.

Direct costs are those costs that would not exist if the program was not offered, such as salaries and benefits for time actually involved in fee collection, patrol, maintenance, and resource management of the site and/or activity; equipment, such as iron rangers, honor vaults, lock boxes, safes, and money bags used in the collection of fees; transportation costs and vehicle mileage charges required for travel to and from the collection sites and banks or post offices; supplies and materials needed to operate a fee collection program, including tickets, forms, collection boxes, etc.; maintenance and utilities for the site; and capital improvements, such as signs and roads.

Indirect costs are sometimes referred to as overhead.  These costs (which are normally much less than direct costs) are not directly incurred by the program or facility but may be charged to it. Indirect costs usually benefit multiple programs or services in the area, and a portion may be charged to each program or service.  Indirect costs include an estimated percentage of expendable materials and administrative staff time needed for supervising, accounting, reporting, and auditing functions—and for employing additional personnel.

   2.  Fairness Based on the Level of Benefit and Services Provided.

Fees should be reasonable and fair with respect to the services received and amenities available. For example, a visitor in a minimally developed campground should expect to pay less than a visitor in a highly developed campground with individual campsite utility hookups.  A walk-in tent camp should be less costly than a campground with amenities.  Similarly, a site with a paved access road could have a higher fee than one with a graveled access road where other features are similar.  A visitor might expect to pay to see a professional film of the area but would not likely pay for a short slide show of the area.  Simple guided-tour maps that are copied may be offered for free, but a professionally developed, detailed map printed in color would likely be sold. Visitors might expect to pay if they take a professional BLM-guided tour, but not for a walk on the nature trail around the visitor center.

AR10223

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

3.  Public Policy, Interest, or Management Objective Served.

When assessing the public policy or interest served by fees, the BLM considers who the beneficiaries of the current or proposed services are and what their share of the cost should be. Such assessments are consistent with REA, which established that persons using federal facilities and services should pay a greater share of the associated costs than should the public as a whole.

Apart from cost recovery, fee collection may achieve other management objectives, such as improving security for all visitors through controlled access, thereby reducing crime, vandalism, wildlife poaching, and other unauthorized or undesirable activities; spreading usage more evenly over time and place to improve protection of the resource; and increasing visitor contact at staffed fee stations.  Fee collection can also help prevent problems before they happen, since collection stations are convenient places to remind visitors about area rules; it may also discourage visits for unauthorized uses or purposes.

4.  Comparability with Recreation Fees Charged by Other Federal Agencies, Nonfederal Public Agencies, and the Private Sector Located within the Service Area.

When setting a recreation fee under REA, the BLM must consider fees that other federal agencies, nonfederal public agencies, and private sector organizations within the service area are charging for the use of similar sites, services, facilities, and equipment, in order to avoid creating unfair competition with the private sector.  This comparability analysis should serve as the primary basis for any proposed changes in fee rates or the implementation of a fee program. In conducting this analysis, the basic objective is to determine whether differences exist in an area's current or proposed recreation fee schedule when compared with similar facilities and programs in the area or region.  Comparability studies should attempt to compare like facilities and activities, making adjustments for differences in the quality and kind of sites, services, equipment, and facilities.  The analysis need not be complicated or time-consuming; a few phone calls to nearby areas can provide the information needed.  To ensure a reasonable degree of comparability, field offices should apply consistent criteria.  If multiple services are available within the service area, field offices should evaluate a minimum of three comparable services.

5.  Economic and Administrative Feasibility of Fee Collection.

Fee collection is administratively feasible if the collection method is workable and cost-effective. At a minimum, it is economically feasible if the anticipated revenue is greater than the cost of collection.  When determining the feasibility and cost-effectiveness of initiating or raising fees, the BLM considers such factors as the effect on visitation, collection procedures, enforcement capability, availability of staff, and overall revenue potential.

The question of feasibility should be decided only after considering all reasonable methods of collection.  Field offices should consider also the feasibility of using more than one method of collection, such as closing fee access stations/areas during the off-season and directing visitors to pay their fees at a center or using a replaceable locked box fee tube.  Common collection methods include: staffed fee stations, various honor systems, reservation systems, permit

AR10224

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-17

systems, and automated devices, such as tollgates or coin-operated ticketing machines. The collection method chosen should relate to the type of fee being collected. For example, a site where visitor fees can be collected at a central access point should probably charge a per vehicle fee rather than a per person fee.

6. Input from the R/RAC.

The BLM considers recommendation(s) from the appropriate advisory committee, and input from friends groups, county commissioners, and the public when establishing fees for the recreation area.

7. Other.

The BLM reevaluates fees at least every 2 years to determine appropriate rates. Public notification and coordination, as appropriate under REA, regarding the establishment and subsequent modification of fee rates is an integral part of the evaluation process. In particular, the BLM reviews the cost of providing the service or facility and considers charges assessed elsewhere within the service area by other public and private providers for similar services or facilities.

**F. Payment**

Permittees may pay onsite by cash, check, or money order. Payment by credit card may be made where arrangements for such payments have been established. Offices operating advance reservation systems or collecting for other services may also take payment by credit card either in person or over the telephone. Fees are paid upon occupying a fee site, when services are received, or when reservations are made.

Failure to pay the RUP fee may result in a citation and resulting penalties. BLM law enforcement may issue a citation to any person or group who fails to pay the required RUP fee. Each field office will develop a policy for when citations will be used to enforce the fee collection program before the start of the peak use period.

**G. Refunds**

RUP fees may be refunded when the AO determines it is appropriate owing to extenuating circumstances (e.g., fire, flood, or a dispute over campsite assignment).

**H. Posting of Sites and Projects**

The BLM must post clear notice of any standard amenity or expanded amenity fee, and the passes that are accepted, at appropriate locations in each unit or area where the fee is charged. The BLM identifies recreation fee sites by posting signs notifying the public that federal recreation fees are charged. (See 36 CFR Part 71 for U.S. Fee Area sign specifications.) These signs may be obtained from the BLM National Sign Center located in Rawlins, Wyoming; the

AR10225

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-18

standard form poster may be requested from the BLM Printed Material Distribution Services. The BLM, to the extent practicable, also posts clear notice of locations or projects where work is funded by recreation fees. These locations or projects should display the BLM Recreation Permit and Fee Program logo. An electronic version of this logo may be obtained by contacting the Recreation Permit and Fee Program manager.

### I. Fee Suspensions and Fee-Free Days

1. Fee Suspensions.

The field office manager may suspend fees in an emergency, natural disaster, planned event, or whenever it is not feasible to collect fees. Procedures for suspending fees are developed by the field office manager. In the event of emergencies or natural disasters, field office managers must notify their state director why the suspension is, or was, necessary. Notification precedes, or promptly follows, the event. The notification must state the nature of the event or emergency; the reasons for suspending the fee(s); the type of fee(s) involved; the duration of suspension (number of days, date(s)); and an estimate of fee revenues lost as a result of the suspension. Fee suspension procedures must be included in operating plans covering site-specific fees.

2. Fee-Free Days.

a. National Public Lands Day (typically celebrated the last Saturday in September).

Standard amenity fees are suspended for all visitors.

b. Veterans Day, November 11.

Standard amenity fees are suspended for all veterans, members of the U.S. Armed Forces, and their families. To provide for smooth operations and positive customer service, fee collections officers should simply state who is eligible for free admission. Documentation is not required, and personnel should not question any visitor's claim to a connection with the military or right to qualify for free entry.

c. Other Fee-Free days.

Other fee-free days may occur through Presidential or Departmental declaration. Instruction memorandums communicate notice of such days to the field. Field office managers may implement additional fee-free days (e.g., for planned events) by a written decision for the administrative record.

3. Types of Fees Suspended.

In general, only standard amenity fees are suspended. Expanded amenity fees (such as group day use, overnight camping, and cabin rentals, or individual SRPs, such as river permits) are generally not waived; however, the field office manager may waive them through a written record of decision.

BLM HANDBOOK                                                    Rel. 2-300
Supersedes Rel. 2-295                                           11/17/14

AR10226

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-19

## III.   EXPENDITURES

### A.  Field Office Expenditures

Unless the procedures described in Chapter 2, Section III.D., State Expenditures, are followed, each BLM office is allocated 100 percent of recreation fee receipts for use at the site of collection.  At least 85 percent of these funds must be used directly for recreation facilities, services, and programs that impact visitor enjoyment, visitor access, and health and safety, such as:

(1) Backlogged repair, maintenance, and enhancement projects.

(2) Current repair, maintenance, and enhancement projects.  (See Guidelines for a Quality Built Environment, dated December 2010, or subsequent revision.)

(3) Interpretation, visitor information, visitor services, visitor needs assessments, and signs (including printed materials, such as maps).

(4) Habitat restoration directly related to the wildlife-dependent recreation activities of hunting, fishing, wildlife observation, or photography.

(5) Law enforcement directly related to public use and recreation.

(6) Direct (operating or capital) costs and expenses associated with recreation fee collection (i.e., the cost of collection).

   a) Direct costs.  The direct operating or capital costs associated with the Recreation Fee Program are the costs that result from collecting, remitting, transporting, protecting, storing, or securing fee revenue at a collection site.

   b) Expenses.  These expenses may include:

   - salaries, benefits, and training
   - fee collection equipment and upkeep
   - security services and equipment
   - communication needs, such as signage and phones
   - audits and evaluations

(7) Support of volunteer and Challenge Cost Share projects, and similar partnership authorities related to recreation.  (See Glossary definition of **Challenge Cost Share Authority**.)

AR10227

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-20

## B. Administration, Overhead, and Indirect Costs

The BLM may use no more than an average of 15 percent of total recreation revenues collected under REA for administration, overhead, and indirect costs related to the Recreation Fee Program.  (See Glossary definition of **Administration and Overhead Costs** and **Indirect Costs**.)  These costs do not include the costs that can be directly attributed to providing a specific service or executing a specific project, such as a campground rehabilitation project.

## C. Limitation on Use of Fees

The BLM may <u>not</u> use any revenue from the collection of recreation fees for:

(1) Biological monitoring of listed or candidate species under the Endangered Species Act of 1973 on federal recreation lands and waters.  The act defines "monitoring" as a distinct action with an established frequency or repetition; monitoring is associated with recovery activities for listed or candidate species.

**NOTE:**   The BLM may, however, use recreation fees to complete a required one-time survey, clearance, or inventory as a part of the NEPA compliance process.  These one-time actions are not considered monitoring as defined by the Endangered Species Act.  Recreation fees may be used for NEPA analysis of events or projects funded by recreation fees, consistent with REA Section 8(a)(3).  Thus, agencies may use recreation fees for completing NEPA-required clearances for recreation-related projects, such as campgrounds, playgrounds, or parking facilities associated with recreation areas.

(2) Employee awards and bonuses.  A one-time payment of performance-based awards to an employee is considered a bonus, and REA revenue may not be used for that purpose.  By contrast, a quality step increase for an employee whose job is directly tied to the Recreation Fee Program is an allowable use of recreation revenues, since it is not considered an award or bonus but, rather, recurring salary.

As an additional prohibition, the BLM may not use recreation fees to finance significant expenditures related to mitigation efforts for a listed or candidate under the Endangered Species Act.

## D. State Expenditures

If a state elects to allocate any portion of recreation fees to the state level, a committee of state recreation personnel, line management, and other appropriate state office representatives must develop guidelines for the retention and distribution of funds.  Statewide expenditures of recreation fees must be used to reduce deferred recreation maintenance; to supplement a revolving fund targeted for recreation projects that legislation has authorized and that provide a

AR10228

demonstrable improvement to BLM-managed recreation sites and services, and that would otherwise take years to realize; or to fund recreation enhancements through volunteer projects and the BLM Challenge Cost Share Program.

## IV.    ALLOCATION OF USE

### A.  Fee Site Capacity

The BLM may establish capacities for the number of people, vehicles, tents, etc., that may use an area, in order to protect resources, facilities, or other values.  For example, campsite use may be limited to two vehicles and 10 people to keep vehicles from parking on campground roads and to prevent overcrowding at sites.  Notice of any such restrictions must be posted at fee access stations/areas or other appropriate areas.

### B.  Reservation Systems

1.  Onsite.

Field offices may establish or participate in advance reservation systems for the use of fee sites. Separate, nonrefundable fees may be charged for reservation services, i.e., a site reservation fee may be assessed in addition to site use fees.

2.  Online.

The National Recreation Reservation Service (NRRS) contract provides fee collection services by offering advance reservation services for campgrounds, tours, picnic pavilions, and other facilities on behalf of the BLM and other agencies.  Reservations are available through:

- the Internet at www.Recreation.gov
- the toll-free NRRS call center at 1-877-444-6777
- participating field locations

In addition, Recreation.gov provides an enhanced recreation portal and trip planning information for many federal recreation facilities and activities as part of the Recreation-One-Stop initiative. For areas participating in the NRRS, an Operating Procedures Manual is available through the agency sign-in page of Recreation.gov or by contacting the BLM Washington Office's reservation services coordinator.

3.  Benefits of Online Reservations.

Recreation fee site managers are encouraged to participate in a reservation service for campgrounds, facilities, tours, or other services operated or provided by the BLM, when doing so will better serve visitors, ensure the protection of resources, increase public awareness of lesser-known or underused facilities and programs, improve the efficiency of operations or

AR10229

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-22

administration, allow visitors a guaranteed space in advance for facilities and use in high-demand visitor areas, or reassure visitors that space will be available for them at areas where first-come-first-served availability is not usually a problem.

    4.   <u>BLM Participation in the NRRS</u>.

The NRRS is the BLM's preferred reservation service provider.  The contractor's services may be expanded, or new services may be developed, based on the BLM's needs and the contractor's capacity to accommodate those needs.  If an area manager wishes to participate in a different reservation system, a determination must be made through the competitive process, or an existing BLM vendor must be used consistent with the Federal Acquisition Regulation.

    5.   <u>Prohibition against Resale or Auction of Advance Reservations or Tickets</u>.

Resale, advertisement for sale, or auction of advance reservations made through the NRRS, regardless of price, is prohibited.  Individuals who make advance reservations through the NRRS and who are unable to use the reservation may request a refund through the NRRS contractor. Service charges may apply for cancellations or refund requests.

## V.     TERMS AND CONDITIONS OF USE

RUP holders must abide by the standard rules for the use of developed sites as published in 43 CFR 8365.  These standard rules of conduct must be posted at developed recreation sites.

Permittees may also be subject to published supplementary rules applicable to the site.  The authority for developing supplementary rules is provided in 43 CFR 8365.1-6.  Developing supplementary rules is an informal rulemaking process subject to the notice and comment provisions of the Administrative Procedure Act.  General guidance for developing supplementary rules is found at http://web.blm.gov/wo600/regulations/rulemaking.php.  Supplementary rules must be posted at the developed recreation site.

## VI.     RENEWAL AND TRANSFER OF PERMITS

RUPs are not renewable or transferable.

## VII.     PERMIT SUSPENSION AND REVOCATION

RUPs may be suspended to protect public health, public safety, the environment, or permittees. RUPs may be revoked if permittees commit any of the acts prohibited in 43 CFR 8365 or in applicable supplementary rules.

AR10230

## VIII.   RECORDKEEPING AND STORAGE

See Appendix C2, Recreation Fee Collection Affidavit.


## IX.   FINANCIAL CONTROLS

### A. Collection Personnel

1.   <u>BLM Employees (including seasonal employees)</u>.

a.   Collections Officer.

Any employee who collects funds as a routine job duty must be designated as a collections officer. Based on a request by the employee's supervisor, the state director designates the employee as a collections officer. (See Appendix C3, Collections officer Notice of Designation, for a sample memorandum.)  Any designation must include all elements listed in BLM Manual MS-1384, Accountable Officers and Agents, Section 23.A., Notice of Designation.

b.   Class D Cashier.

Any employee who is responsible for accepting money and making change must be designated as a Class D cashier (in addition to being designated as a collections officer).  Supervisors must submit a memorandum to the National Operations Center requesting that the employee be designated as a cashier.  The memorandum authorizing that designation is then returned to the supervisor to be countersigned by the employee.

2.   <u>Other Federal Employees</u>.

In general, employees of other agencies who are designated as collections officers with their own agency do not need to be designated as a collections officer with the BLM; however, if they are to have a BLM change-making fund, they must be designated as both a collections officer and Class D cashier with the BLM.  Collection duties must be addressed in intra- or interagency agreements, which must state who is designated and responsible for collections for each agency.

3.   <u>Volunteers</u>.

a.   Bonding.

Volunteers collecting federal fees are covered by a surety bond that the Washington Office contracts for on a yearly basis. The bond covers a loss of $10,000 per incident with a $250 deductible.  The BLM may grant relief to volunteer collections officers.  The office to which the volunteer is assigned must provide a funding source for relieved losses.  If a claim is filed for loss, field office staff should follow the instructions of their administrative officer, since

AR10231

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-24

administrative officers retain responsibility for the collection of government fees. (See BLM Manual MS-1114, Volunteers.)

    b.   Designation of Volunteers as Collections Officers (Volunteer Agreement)

Authorization for a volunteer to collect fees is a two-part process. First, volunteers must complete and sign a Volunteer Services Agreement for Natural Resources Agencies. The form is countersigned by an agency representative. Second, the volunteer must be designated as a collections officer. Volunteers who require a change-making fund must also be designated as cashier, as further described in Chapter 2, Section IX.A.3.c., Designation of Volunteers as Cashiers.

A volunteer who collects fees must also receive a separate notice of liability that clearly informs the volunteer of the risk that he or she assumes for federal funds when accepting the duties of a collections officer. The notice, which must be signed by the volunteer and retained in the office files, must contain the clause:

> I certify that I have received adequate training on the proper handling and safeguarding of government funds in my possession and understand that I am automatically liable for any loss or shortage of such funds. However, I may be relieved of such liability if the loss occurred without fault or negligence on my part and while I was acting in the discharge of my official duties.

Each state office must maintain a list of all volunteers authorized to collect federal fees. Volunteers may not make deposits of federal funds.

    c.   Designation of Volunteers as Cashiers.

Volunteers are designated as cashiers through the National Operations Center. See Chapter 2, Section IX.A.1., BLM Employees (including seasonal employees) for procedures.

    4.   Contractors.

The contract must detail procedures and responsibilities for the collection of federal fees by any contractors. The contractor must purchase a bond and show proof of bonding. Contractors who collect fees must be given a notice of liability that clearly informs the contractors of the risk they assume for federal funds when they assume the duties of collections officers. The notice, which must be signed by the contractor and retained in the official files of the contract maintained by the contracting officer, must include the clause:

> I certify that I have received adequate training on the proper handling and safeguarding of government funds in my possession and understand that I am automatically liable for any loss or shortage of such funds.

AR10232

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-25

For further information, see Chapter 2, Section X, Fee Management Agreements and Contracts for Fee Collection Services.

    5.  Associations.

Procedures and responsibilities for associations intending to collect federal fees must be detailed in an agreement. The association must be bonded. Associations that collect fees must be given a notice of liability that clearly informs the association of the risk it assumes for federal funds when it assumes the duties of collections officer. The notice, which must be signed by an authorized representative of the association and retained in BLM field office files, must include the clause:

> I certify that I have received adequate training on the proper handling and safeguarding of government funds in my possession and understand that I am automatically liable for any loss or shortage of such funds.

For further information, see Chapter 2, Section X, Fee Management Agreements and Contracts for Fee Collection Services.

**B.  Liabilities and Responsibilities**

    1.  Protection of Personnel.

Field offices must take all precautions to protect personnel as well as visitors who might be threatened incidentally by a robbery attempt. All employees who handle money should be considered at risk. The primary threats are robbery or attempted robbery, or assault in the course of a robbery attempt. Managers must develop a robbery response plan in coordination with the appropriate division(s) (e.g., law enforcement) or the administrative officer, conduct drills to practice the plan, and adjust the plan or operations as needed. Telephones, radios, silent-alarm tripping devices, or other communications tools must be made available at fee areas and should be tested routinely. (See Chapter 2, Section IX.C, Collection Sites.)

    2.  Safeguarding of Funds.

Collections officers must follow procedures outlined in BLM Manual MS-1372, Collections, Section 1.12, Collection Officer Responsibilities, to safeguard funds. For example, collections officers should:

> (1) Keep undeposited collections in a fireproof safe or file with an adequate locking device; never leave money in a locked desk drawer or other inadequate container where it is readily susceptible to theft (e.g., a locked car).

> (2) Limit access to those designated employees with direct responsibility for collections.

AR10233

(3) Separate the duties of receiving (collecting), receipting, and depositing recreation funds among different employees.

Line managers must:

(1) Ensure that procedures for safeguarding funds are in place and that staff members receive training in these procedures.

(2) Provide adequate safeguarding facilities.

(3) Investigate incidents to determine if a problem exists. If a loss occurs, it must be documented and reported to the field manager, law enforcement, and the National Operations Center.  Line managers are responsible and liable for taking subsequent action.  Procedures for loss of funds and employee relief are addressed in BLM Manual MS-1372, Collections, Section 13.E., Irregularities, Losses, and Thefts. Proper documentation includes a detailed explanation of any procedures that were not followed and why, and any recommendations to strengthen administrative control over the funds to prevent recurrence of the irregularity or deficiency.

In the event of a loss of funds involving volunteers, BLM staff should contact the national Volunteer Program (at www.blm.gov/volunteer or 202-208-3516) for assistance in filing with the insurance company under the terms and conditions of the surety bond.

3.  <u>Employee Response During a Robbery Attempt</u>.

Fee collection officers can minimize risk to themselves, other employees, and visitors by following these guidelines:

(1) Do not resist.  Cooperate fully with the robber's demands and do whatever is asked of you.  Do not do anything to place you, other employees, or visitors in danger.

(2) Give the robber all the money demanded.  Do not attempt to hold back money or otherwise outsmart the robber.

(3) Never attempt to thwart a robbery.  This applies within the building as well as within a vehicle.  Only armed, commissioned law enforcement personnel may elect to prevent a robbery if, in their professional judgment, doing so can be accomplished without undue risk to other employees or bystanders.

(4) Make detailed mental notes of the physical description of the robber, his/her clothing, tone of voice, name (if used), distinguishing marks, vehicle description, license number, weapon, and anything else that

AR10234

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-27

may be of importance.  If there is more than one robber, concentrate on the description (eyes, hair color and length, height, weight, scars, etc.) of the one actually demanding and receiving the money.

(5) When the robber has left, immediately secure the station or area, suspend fee collection activities, and protect the scene of the crime. Do not let anyone who witnessed the robbery, whether staff or visitors, leave the area.  If there is any possibility that the robber left fingerprints, do not let anyone touch anything in the area, particularly the door, doorway, and fee collection counter or window.

(6) Immediately report the crime via telephone or radio, or dial 911.  Be sure to relay information about any injuries that have occurred.  Give as much information as possible about the robbery: a description of the robber(s), the vehicle description and license number, the direction the vehicle headed, and whether or not the robber is armed or should be considered dangerous.  Remain calm, and speak clearly and distinctly.

### C. Collection Sites

Most recreation areas present very few options for the location of staffed fee collection facilities. Typically, fees are collected at an existing fee station or in an existing visitor center or a simple iron ranger.  When new facilities are constructed, however, they should be located, designed, and built with security of money and personnel in mind.

1. Cost-Benefit Analysis for Developing New Fee Collection Stations or Upgrading Existing Stations.

When is it practical to develop a new collection station?  Analysis of visitation patterns can provide information on peak visitation periods, including peak visitation days and hours.  This information may help determine whether the benefits of developing a fee collection operation outweigh the overall costs.  Determining maximum visitation periods and scheduling operating hours accordingly assists in providing a cost-effective fee collection operation.

The initial cost to establish a fee collection operation can be significant.  Design and construction of a kiosk, for example, can cost thousands of dollars.  Additional costs may arise for environmental and cultural compliance studies, architectural and engineering services, safety and ergonomic design considerations, site studies, materials and labor, road realignments and consideration of queuing patterns, new parking lots and turnaround areas, new utility systems, landscaping, armored glass, alarm and security systems, collection equipment (e.g., cash register systems, safes, chairs, currency counters, computers, facsimile machines, radios, signs), and such recurring operational costs as materials, supplies, and personnel costs.  The cost of protective barriers, speed bumps, rumble strips, or other devices must be considered, as well as the cost to add or upgrade utility lines.

AR10235

Field office staff should check with the facility maintenance and procurement divisions, in addition to checking the GSA schedule of approved vendors, before contacting design or construction vendors for estimates. In addition, staff are encouraged to contact other recreation areas for ideas, information, and lessons learned.

   2.   Fee Collection Site Design Considerations for Employee Safety, Security, and Comfort.

Collection stations may take a variety of design forms. Stations should blend aesthetically with the surroundings and settings and should use sound ergonomic interior and exterior design principles that promote safety and comfort. Drive-up kiosks should be designed for ease of the transaction between the driver and the fee collections officer.

Any building design should plan for current as well as future operational needs, ensuring also that utility connections will meet future needs and uses. For example, a building may need a private, secure money-counting area as well as areas for telephone and Internet use by employees or the public. Temporary structures are an alternative to permanent buildings and may be more cost-effective for seasonal operations.

To ensure the effectiveness of security, field office staff should arrange for a complete, professional assessment of their security equipment needs. When designing or upgrading a kiosk, field office staff should consider implementing these design guidelines and security features:

   (1)   A design that places the fee collection station where it can be observed from other occupied buildings or where it is fully visible to passersby or users in the area.

   (2)   A self-contained design (i.e., the kiosk is well-ventilated, heated/cooled, or otherwise climate controlled to avoid the need to open windows; furnished with toilet facilities when isolated from other buildings; and protected against carbon monoxide buildup).

   (3)   High-security doors and locks to protect against easy breaking and entering.

   (4)   Bullet-resistant glazing and cashier window(s) with a remote communication system; protective window bars; or bandit barrier systems.

   (5)   Ample lighting if fees will be collected at night or if funds will be kept in the building overnight.

   (6)   A telephone for regular and emergency use and a radio. A portable radio in a charger stand is usually sufficient.

AR10236

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-29

    (7)   A safe incorporated into the kiosk design, preferably not visible to the public and bolted to the floor/ground.

    (8)   Protective barriers in the front and rear of the structure (mandatory). Barriers may be boulders, large rocks, wood bollards, or steel posts set in concrete. Speed bumps, rumble strips, or other devices are recommended on the approach to the facility to reduce speed.

    (9)   A complete burglar and alarm system. Alarm systems can protect personnel in a remote fee collection location. Radio-transmitter alarms can be especially effective because they function without any overt action by the attendant. The attendant wears a small radio transmitter, which continuously transmits a low-power radio signal to a receiver in the kiosk or fee station. As long as the receiver continues to receive a signal from the transmitter, the system is quiet. If the employee leaves the building, however, and the transmitter is approximately 50 feet away, the receiver stops receiving the signal and transmits an alarm over the phone or radio.

  (10)   A video/digital monitoring system or closed-circuit television. These systems deter robbery attempts and may assist law enforcement during criminal investigations by providing a record of a robbery. Recording devices should be located in an inconspicuous and secure location. A basic system should record vehicle license plates, the employee's cash management at the register, and individuals entering the fee collection station. In larger fee programs, the daily remittance process should also be recorded. Most systems will record and store images onsite. Larger site operations may have a video or digital feed direct to a dispatch center or office. The use of hard-drive storage systems should be considered. Although the initial costs may be higher than other systems, these systems generally prove to be more cost-effective in the long term.

  (11)   A complete fire detection and suppression system. The use of automatic fire suppression should be considered; handheld extinguishers are required at a minimum.

Some of these features, such as robbery surveillance cameras, are warranted wherever fee collections occur and should be considered regardless of whether fees will be collected from a kiosk. Similarly, locating fee collections where they are visible to others is a design strategy that applies inside a visitor center or other building as well, with the fee collection point preferably located near other offices or personnel and within their line of sight (without intervening and blocking exhibit panels, furniture, plants, or other obstacles).

AR10237

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-30

When fee collection occurs in a remote location, field offices should also consider:

(1) Providing robbery alarm buttons, foot rails at the cashier position, and cash register money clip alarm-activating devices.

(2) Placing the cash register so that the money drawer is not visible to visitors.

(3) Installing an under-the-counter drop safe to hold excess monies when frequent pickups are not possible, to minimize the amount of money that can be taken at any one time.

### D. Collection Activities

It is critical to follow internal controls when collecting, reconciling, transporting, and depositing fees. As described further below, controls may include such measures as the use of an iron ranger with double fee boxes and two individuals to collect fees, or bonded individuals to handle fees. Staff should comply with all procedures in the most up-to-date version of the BLM Collections Reference Guide, as well as instruction memorandums regarding collections.

The BLM should post signs instructing customers to make checks payable in U.S. funds and payable to BLM, or the Bureau of Land Management.

1. Fee Reconciliation.

BLM funds should be kept separate from all personal or nonfederal funds. Staff should never mix personal and government funds, make change out of fee envelopes, or mix association funds with BLM funds.

At staffed sites, reconciliation must be performed on a daily basis, balancing collections to receipts. Reconciling collections daily helps prevent staff from forgetting, misplacing, or losing the funds and ensures collections are available for deposit when they reach $5,000. At unstaffed sites, campground envelopes (the nationally approved campground fee envelopes) must be used. Two people must open envelopes, count remittances, and document collections on the Recreation Fee Collection Affidavit (Appendix C2). The affidavit information must be entered into the BLM Collections and Billings System. A copy of the affidavit and the envelopes are returned to the recreation specialist. Fee collection envelopes are retained until the end of the fiscal year, by which time the visitor use information should have been entered into RMIS.

2. Transport and Delivery of Funds.

Employees who transport funds—either from a collection point to an accumulation point or from a collection point to a bank (or post office if the site converts cash to a postal money order)—risk robbery or assault. The risk rises in proportion to the amount of money transported, the distance traveled, and the remoteness of the collection point. Note that the greatest risk occurs when

AR10238

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-31

funds are being removed from the deposit safe. Field office staff should consider using a bonded courier service for regular transport of large sums. Other options for increasing security include being escorted by a BLM law enforcement ranger; hiring an armed, uniformed guard from a security agency to accompany staff; or arranging for an escort from the local police or sheriff's department.

When collecting money from fee collection kiosks, the BLM uses two-person teams if possible. Iron rangers must have dual-control locks. A two-person team is required both for safety and as an internal control when opening the internal component of iron rangers and when counting the funds. When possible, at least one person should be an armed law enforcement officer.

The best option is to transport funds taken from kiosks and the contents of iron rangers in locked canisters (known as hopper safes) bolted to the transport vehicle. These locked canisters are available in a variety of sizes to accommodate coins, bills, deposit envelopes, and money bags. When it is not possible to use a locked canister or hopper safe, it may be possible to devise some sort of portable lockbox into which the collected containers can be placed.

Staff should follow these guidelines, at least, when transporting funds (whether escorted or not):

    (1) Go directly to the bank or post office. Do not stop along the way to conduct other business.

    (2) Conceal the money being transported if possible. Periodically change the container in which the money is carried. For example, use a briefcase for one trip, a lunchbox for the next, and a paper bag for the trip after that.

    (3) Do not leave the money unattended in an automobile.

    (4) When possible, have two people make the trip.

    (5) Vary the time and route of the trips to the bank or post office; do not get into a set routine.

    (6) If possible, make deposits during daylight and normal working hours. Avoid making deposits at night.

    (7) The person and vehicle assigned to transport the money should be changed frequently but randomly.

    (8) If a police or other armed escort is late, do not go alone. Wait for the escort.

AR10239

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-32

3. Deposits.

Deposit procedures are covered in the BLM Collections Reference Guide.  Staff should deposit fees daily if possible (especially during high peak season) to meet Treasury depositing regulations.  At a minimum, staff should deposit fees once a week or when collections total $5,000, whichever occurs first.  All fees collected are deposited into field office 1232 accounts.

## X.   FEE MANAGEMENT AGREEMENTS AND CONTRACTS FOR FEE COLLECTION SERVICES

The BLM uses a separate fee management agreement or contract to obtain collection services, rather than adding to or amending a cooperating agreement.  A variety of agreement and contractual instruments may be used, depending on the scope and complexity of the arrangement and whether or not the government compensates the third party for the services provided.

### A.   Selecting the Type of Instrument

Anytime a third party collects fees or sells passes, a written agreement or contract between that party and the BLM is required.  If the government is paying a third party to collect fees (including payment of commissions), a contract is required and a contracting officer must sign the contract.  A contracting officer will know, for example, whether full and open competition under the Federal Acquisition Regulation (FAR) is required, as in the case of a large fee collection operation likely to attract interest from more than one business.  (If the fee collection operation is smaller and there is less likely to be interest from numerous businesses, then less than full and open competition may be justified.)  When the government is not providing monetary compensation for the collection services, an agreement signed by the field office manager or designee may be appropriate.

Areas considering any agreement or contract should work closely with the state recreation lead to ensure that the proper instrument is selected and that proper controls are in place.

### B.  Fee Management Agreements

A fee management agreement (under REA, Section 6) must be used when the government is not offering any monetary compensation for the collection services.  These agreements may be used with existing cooperating associations or with an organization that does not have an existing agreement, such as a local business.  The field office is responsible for all aspects of managing the agreement—providing training and support to the third party, tracking income, handling deposits, and conducting audits to ensure accountability.  Because the government is not providing monetary compensation for the services, the field office manager, or his or her designee, may sign the agreement; a procurement contract signed by a contracting officer is not required.  (See Appendix C4, Sample Fee Management Agreement.)

AR10240

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-33

**NOTE:**   If a cooperating association agrees to provide collection services, the parties must sign a fee management agreement rather than modifying the cooperating association agreement.  The Washington Office is developing a fee management agreement template for this purpose.  Field office staff should contact their state recreation lead for more information.

Examples of when the BLM <u>may</u> use a fee management agreement:

(1) A cooperating association at a remote location has an established store and agrees to sell passes and perform certain fee collection services at no cost to the site.

(2) A cooperating association collects a fee at the same time it sells other services (e.g., boat, train transportation, guided trip), with no additional cost to or compensation from the site.

(3) A business near the site wants to prepurchase and sell annual passes from its store and will receive no commission/payment for its services.

Examples of when the BLM <u>may not</u> use a fee management agreement:

(1) A cooperating association agrees to collect standard amenity fees but would like a 10 percent commission.

(2) A Chamber of Commerce just outside the site would like to sell passes and collect fees for a small fee of $500 per year for these services.

**C. Fee Collection Contracts**

If government funds are being expended to pay for fee collection services or if a commission is being paid, the BLM must use a contract to commit the government to pay for the services.  The scope and complexity of the requirement and the potential for interest from prospective competitors will determine how the contract is awarded.  Before entering into any fee collection contract or agreement, field offices should contact their state recreation lead for assistance.

1. <u>Simplified Fee Management Contract</u> (REA, Section 6, Cooperative Agreements).

Recreation areas may use a simplified acquisition process to obtain fee collection services for a small collection operation when monetary compensation or commissions are offered, even where opportunities exist for more than one local business to collect fees and/or sell passes.  Simplified fee management contracts supplement BLM collection activities; they do not replace them.

AR10241

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

2-34

Examples of when the BLM <u>may</u> use a simplified fee management contract:

    (1) A cooperating association with an established facility in a remote area is paid to perform fee collection services.

    (2) Local businesses, such as a motels or stores in a gateway community, are offered the opportunity to sell site-specific passes and collect fees and to receive a small commission for each sale.

Examples of when the BLM <u>may not</u> use a simplified fee management contract:

    (1) A site with collections of $750,000 a year wants its cooperating association to handle its entire fee collection operation. Because of the high dollar amount of collections and the complexity of accounting for those funds, a more detailed contract is required.

    (2) A contractor contacts a site and offers to install, maintain, and collect fees by automated fee machines. Because there are potentially multiple providers of the service, full and open competition must be provided before a contract is awarded.

  2. <u>Fee Collection Services Contract</u> (under the FAR).

When the government offers monetary compensation for collection services for larger and more complex collection operations, a contract must be issued according to the FAR. A fee collection services contract must be used if a site has a third party manage all or most of the site's collection operations and there is the possibility that more than one business may have an interest in providing the service.

Examples of when the BLM <u>may</u> use a fee collection services contract:

    (1) A site contracts with an armored courier service or automated fee machine company to pick up fee revenue from a location and deliver it to a bank.

    (2) A site contracts with a local bank to provide campground fee envelope processing services.

    (3) A site with collections of more than $500,000 per year contracts the collection operation to another entity.

AR10242

## XI.        NATIONAL CONSISTENCY/LOCAL FLEXIBILITY

Adherence to these guidelines will help achieve national consistency.  Major exceptions to respond to local situations must comply with legal authority and must have demonstrated local support.  Consideration should be given to the R/RAC and special interest groups (as appropriate).  Finally, major exceptions must be reviewed and recommended to the local field office, district managers, and the state director before final approval by the BLM Director.

AR10243

AR10244

## CHAPTER 3. AMERICA THE BEAUTIFUL – THE NATIONAL PARKS AND FEDERAL RECREATIONAL LANDS PASS PROGRAM

As mentioned earlier, the America the Beautiful – The National Parks and Federal Recreational Lands Pass is the national pass for all units managed by the BLM, the National Park Service, the U.S. Forest Service (USFS), the U.S. Fish and Wildlife Service, and the Bureau of Reclamation. It is also honored by the U.S. Corps of Engineers and the Tennessee Valley Authority. It is accepted as the national pass for all sites and areas that meet the criteria for standard amenity fees, and it affords some discounts for use of expanded amenity sites and services as well.

REA established the America the Beautiful – The National Parks and Federal Recreational Lands Pass Program (also referred to as the Interagency Pass Program) and trademarked the name of the new pass. Accordingly, formal references to the pass must use the full name and not "America the Beautiful" or an acronym such as ATB. The passes available through the program, however, may be referred to informally as the Interagency Annual Pass, Interagency Senior Pass, Interagency Access Pass, and Interagency Volunteer Pass.

Given that the agencies participating in the Interagency Pass Program cross departments, the U.S. Department of the Interior and the U.S. Department of Agriculture cooperatively develop and approve the policies and procedures of the Interagency Pass Program. Their primary guidance is published in "America the Beautiful – The National Parks and Federal Recreational Lands Pass Interagency Standard Operating Procedures." The guidance in this chapter only summarizes that guidance; fee collection personnel should familiarize themselves with the more complete, detailed publication as well.

## I.    USE OF INTERAGENCY PASSES

As indicated above, members of the public have potentially four pass options under the Interagency Pass Program: the Interagency Annual Pass, Interagency Senior Pass, Interagency Access Pass, and Interagency Volunteer Pass. These passes may be used at federal recreation sites charging entrance fees or standard amenity fees. Passes may not be used to waive expanded amenity fees except in limited circumstances where such a waiver is warranted to improve customer service or to meet other needs, as established through planning. Passes issued under former pass programs (i.e., Golden Eagle, Golden Eagle Hologram, Golden Age, and Golden Access passports and the National Parks Pass) are no longer sold or issued but will be honored as long as they are valid (i.e., during the lifetime of the passholder, or until lost or stolen).

## II.    DESIGN OF INTERAGENCY PASSES

All interagency passes consist of a four-color, 3¼ x 2¼ inches and .3-millimeter-thick plastic card with a pass title and serial number on the front, and a magnetic strip, signature line(s), and bar code on the back. The Interagency Annual Pass and the Interagency Volunteer Pass also display an expiration date on the back.

AR10245

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

3-2

The front of each pass depicts a scenic image. Because the Interagency Annual Pass image is chosen through the annual Share the Experience Official Federal Recreation Lands Photo Contest, the image changes each year. The Interagency Volunteer Pass depicts the same image as the Interagency Annual Pass. The Interagency Senior Pass and the Interagency Access Pass images do not change.

The passes have a nine-digit serial number sequence. The first two digits correspond to the year, the third digit corresponds to the type of pass, and the remaining six digits are the unique sequential pass number. For example:

      071000001 = Interagency Annual Pass
      072000001 = Interagency Senior Pass
      073000001 = Interagency Access Pass
      074000001 = Interagency Volunteer Pass
      075000001 = Interagency Decal

The serial number is encoded in track two of the magnetic stripe and through Code 39 formatting in the bar code.

## III.   INTERAGENCY ANNUAL PASSES

### A. Price and Availability

The Interagency Annual Pass costs $80 and is available for purchase by the general public. The pass is valid for 1 year from the month of purchase (for example, a pass bought on June 15, 2012, would remain valid through June 30, 2013). The pass is available for purchase at federal recreation sites that charge an entrance or standard amenity fee and that employ fee collection personnel. Passes may also be available at staffed locations that do not charge an entrance or standard amenity fee, if deemed appropriate by site managers; visitors should be encouraged to call for availability. The pass is also available for public purchase online at The USGS Store and may be sold by third parties, such as cooperating associations and select national retailers.

### B. Validation of the Pass

The Interagency Annual Pass has two signature lines, and either of the two people who sign the card may use it. The pass is not valid until it is signed. The purchaser must sign the pass with first and last name in the presence of the seller at the point of sale unless the pass is being purchased to use at another time or to be given later as a gift. Any two individuals may sign the pass regardless of their relationship to one another. The second signature may be added at any time during the period for which the pass was issued. Valid photo identification must be shown when using the pass at staffed sites.

The Interagency Annual Pass, including passes purchased as gifts, must be validated at the time of purchase and must be hole-punched to expire 12 months from the month of purchase. A pass

BLM HANDBOOK                                  Rel. 2-300
Supersedes Rel. 2-295                         11/17/14

AR10246

Case 1:19-cv-03729-DLF   Document 35-6   Filed 07/12/21   Page 85 of 200

purchased on June 15, therefore, would be hole-punched on the month of June, and the pass would remain valid through the end of June the following year.  Fee collections officers/issuing officers must not punch passes for later months, even on the last day of a month, because doing so would result in 13 or more months of use.  Passes sold over the Internet are hole-punched with an expiration date before shipment.

**NOTE:**   The practice of hole-punching the card at the time of purchase differs from how some passes were validated under former pass programs.  The change arose primarily because of the large number of unstaffed recreation sites being managed by the BLM and the USFS.

### C.  Confirmation Notices

A purchase confirmation letter from an Internet call center sale is <u>not valid</u> for entry, nor is a credit card statement or receipt showing purchase of a pass.  Visitors who order a pass through The USGS Store, but who do not receive it by the time they arrive at a recreation site, may choose to purchase another pass at the first site visited; they may then arrange to return the pass purchased online to The USGS Store.  As long as the pass has not been used, The USGS Store will refund the full purchase price of the pass to the passholder.

## IV.   INTERAGENCY SENIOR PASSES

### A.  Exchange of Golden Age Passports for the Interagency Senior Pass

A <u>paper</u> Golden Age Passport should be exchanged for the new Interagency Senior Pass free of charge to facilitate future data collection.  If individuals do not wish to give up their old pass, however, they are not required to do so.  For accountability purposes, individuals may not obtain a new pass based on their possession of a paper Golden Age Passport unless they give up their old pass.  A <u>plastic</u> Golden Age Passport is valid for a lifetime and should not be exchanged.  If visitors ask to trade in a <u>plastic</u> Golden Age Passport, explain that the pass is still valid.  If they insist on a new pass, they may purchase one at full price and may keep their existing pass.

### B.  Price and Availability

The Interagency Senior Pass is a lifetime pass available to U.S. citizens or permanent residents of the United States who are 62 years of age or older.  The pass costs $10.  Given the eligibility requirements, the Interagency Senior Pass must be purchased <u>in person</u> at federal recreation sites that charge an entrance or standard amenity fee and that employ fee collection personnel.  These passes may also be sold at staffed locations that do not charge an entrance or standard amenity fee; however, determinations whether to do so are made by individual sites and vary widely.

AR10247

### C. Proof of Residency and Age

To enable fee collection personnel to verify age and residency, the visitor must show a U.S. driver's license, passport, birth certificate, or permanent resident card (green card). A permanent resident is one who is domiciled in the United States. A person may have more than one residence, but only one domicile. A domicile is defined as "the permanent residence of a person or the place to which he or she intends to return even though he or she may reside elsewhere." As a rule of thumb, the country in which a person is eligible to draw health and retirement benefits is usually the country in which he or she is domiciled.

**NOTE:**   It would be rare for an Interagency Senior Pass applicant to arrive at a site without proof of age. Therefore, there is no longer a Statement of Age Form (equivalent to the Statement of Disability Form associated with the Interagency Access Pass) to sign in lieu of showing proof of age. Do not issue a pass to applicants who do not have proof of age. Instead, ask them to bring proof with them and apply for the pass the next time they visit a federal fee area. (An optional Interagency Senior Pass sales log is available for sites that choose to track sales of this pass manually, but it is not to be used in lieu of proof of age.)

### D. Validation of the Pass

The Interagency Senior Pass has one signature line. The pass is not valid until it is signed, so the purchaser must sign the pass with first and last name in the presence of the seller.

### E. Senior Passes Issued to Ineligible Persons

Occasionally, a visitor presents an Interagency Senior Pass or Golden Age Passport, or an Interagency Access Pass or a Golden Access Passport, and the fee collections officer determines the visitor is not eligible to have the pass (e.g., an ID check of a driver's license indicates that the passholder of an Interagency Senior Pass is not yet 62 years old). If this happens, the employee should explain the eligibility requirements and politely ask the person to surrender the pass.

Because in this case the issuance of the pass was a BLM error, the fee collections officer should apply the $10 value of the Interagency Senior Pass toward the regular site fee or toward an Interagency Annual Pass as long as the passholder surrenders the improperly issued pass. If the passholder refuses to surrender the pass, the fee collections officer must not confiscate the suspect pass. Using a permanent marker, the fee collections officer writes "VOID" in red ink on the signature line of the pass, then returns the voided pass to the visitor and collects the appropriate entry fee.

AR10248

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

3-5

## V.   INTERAGENCY ACCESS PASSES

### A.  Exchange of Golden Access Passports for the Interagency Access Pass

A <u>paper</u> Golden Access Passport should be exchanged for the new Interagency Access Pass free of charge to facilitate future data collection.  If individuals do not wish to give up their old pass, however, they are not required to do so.  For accountability purposes, individuals may not be issued a new pass unless they give up their old one.  A <u>plastic</u> Golden Access Passport is valid for a lifetime and should not be exchanged.  If visitors ask to trade in a <u>plastic</u> Golden Access Passport, explain that their pass is still valid, and allow them to exchange only if they insist.

### B.  Price and Availability

The Interagency Access Pass is a lifetime pass issued free of charge to U.S. citizens or permanent residents of the United States who are permanently disabled, regardless of age.  A permanent disability is a permanent physical, mental, or sensory impairment that <u>substantially limits</u> one or more major life activities, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working (7 CFR 15e.103; 29 U.S.C. 705(20)).

The Interagency Access Pass may be obtained either by mail application or in person at federal recreation sites that charge an entrance or standard amenity fee and that employ fee collection personnel.  Passes may also be available at staffed locations that do not charge an entrance or standard amenity fee, if deemed appropriate by individual site managers; visitors should be encouraged to call for availability.  Mail applications must be accompanied by documentation establishing the applicant's permanent disability, as described further in Chapter 3, Section V.C.2., Proof of Permanent Disability.

### C.  Proof of Residency and Permanent Disability

1.  <u>Proof of Residency</u>.

To verify residency, the visitor must show a U.S. driver's license, passport, birth certificate, or permanent resident card (green card).  Remember, a permanent resident is one who is domiciled in the United States.  (See Chapter 3, Section IV.C., Proof of Residency and Age, for guidance on determining where a person is domiciled.)

2.  <u>Proof of Permanent Disability</u>.

a.  Required Documentation.

To be eligible for the Interagency Access Pass, an applicant must present documentation of permanent disability as listed below, or, if the applicant cannot produce such documentation, he or she may self-certify the disability by reading, signing, and dating a Statement of Permanent Disability, <u>in the presence of the staff member issuing the pass</u>.  (Note that the form for mail

AR10249

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

3-6

order applications for an Interagency Access Pass has the same OMB control number but is a different form.)  In general, the issuing officer should offer the Statement of Permanent Disability only when documentation is unavailable.  If the applicant cannot read, someone else accompanying the individual may read, date, and sign the Statement of Permanent Disability on the individual's behalf in the presence of the applicant and the issuing officer.

The BLM does not keep copies of any documentation presented, since the document contains sensitive personal information.  Instead, all documentation is returned to the applicant.  The completed Statement of Permanent Disability, however, must be retained for 6 years plus 3 months, along with other fee collection forms.

To obtain the Interagency Access Pass, an applicant must submit <u>one</u> of the following documents, <u>or</u> the applicant may apply in person and simply complete a Statement of Permanent Disability Form:

> (1) A statement signed by a licensed physician attesting that the applicant has a permanent physical, mental, or sensory impairment that substantially limits one or more major life activities, and stating the nature of the impairment.

OR

> (2) A document issued by a federal agency, such as the Department of Veterans Affairs, attesting that the applicant has been medically determined to be eligible to receive federal benefits as a result of blindness or permanent disability.  Other acceptable federal agency documents include proof of receipt of Social Security Disability Insurance (SSDI) or Supplemental Security Income (SSI).

OR

> (3) A document issued by a state agency, such as the Vocational Rehabilitation Agency, attesting that the applicant has been medically determined to be permanently disabled.

b.  Common Questions about Verifying Disability for the Interagency Access Pass.

(1) Should I ask applicants if they are eligible for federal benefits?

No.  Do not ask applicants claiming eligibility for the pass if they are "eligible for" or "receiving" federal benefits as proof of their eligibility for the pass.  Ask applicants only to present documentation (see Chapter 3, Section V.C.2.a., Required Documentation) or to sign a Statement of Permanent Disability.

AR10250

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

3-7

(2) Should I require documentation or a signed Statement of Permanent Disability if an applicant has an "obvious" disability?

Yes. Keep in mind that only about 15 percent of people have an "obvious" disability. Many permanent disabilities are not obvious. Employees who issue the Interagency Access Pass must not evaluate an applicant's disability. The issuing employee may assess only whether adequate documentation or signature has been submitted. Whether or not the disability is obvious, the issuing officer must rely on the Statement of Permanent Disability if documentation is unavailable.

c.  Purpose and History of the Statement of Permanent Disability Form.

The purpose of the Statement of Permanent Disability is to assist the issuing officer in providing a reasonable response (one demonstrating good customer service and respect) when an applicant arrives at a site without documented proof of a permanent disability. The form was developed for use with the Golden Access Passport and was revised in 2007 for use with the Interagency Access Pass. The decision to continue using the form was affirmed jointly between the Department of the Interior and the Department of Agriculture at the Secretarial level and in consultation with numerous stakeholders, including field personnel, advocacy groups for persons with disabilities, Interagency Fee and Accessibility Program managers, and others. The Statement of Permanent Disability is not advertised to the public on websites, brochures, or other handouts that describe the application process for obtaining the Interagency Access Pass.

**D. Validation of the Pass**

The Interagency Access Pass has one signature line. The pass is not valid until it is signed, so the eligible passholder obtaining the pass in person must sign the pass with first and last name in the presence of the issuer. If he or she is unable to sign, a parent, guardian, or caretaker may sign it for the passholder.

## VI.  INTERAGENCY VOLUNTEER PASSES

**A. Price and Availability**

The Interagency Volunteer Pass is available free to volunteers who accrue 250 volunteer hours, subject to the following rules:

(1) The pass is not a required award—that is, if the pass is not a suitable award for an individual volunteer (for example, the volunteer already owns a lifetime pass), the site may choose an appropriate alternative.

AR10251

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

3-8

(2) The timeframe for accruing hours officially as a volunteer began January 1, 2007.

(3) The pass is valid for 1 year from the month of issuance (e.g., a pass issued June 15, 2012, would remain valid through June 30, 2013).

(4) There is no specific timeframe in which the volunteer hours must have been accrued. Once the 250-hour requirement is reached and a pass is issued, the volunteer's hours are reset to zero, and the count begins again. Only one pass may be issued per volunteer per year.

(5) Passes are not transferable and must be signed by the recipient immediately upon award.

**B. Proof of Eligibility**

Each site or office must designate someone, such as a volunteer coordinator, to track hours and issue the Interagency Volunteer Pass. This individual must also track and crosscheck hours that a volunteer has worked at other sites or agencies. Site volunteer coordinators (or other designated individuals) must also coordinate with the site's designated point of contact for the Interagency Pass Program to ensure that sufficient quantities of the Interagency Volunteer Pass are maintained. Outdoor recreation planners should check with their site or state volunteer coordinator for more information.

**C. Validation of the Pass**

The Interagency Volunteer Pass has one signature line. The pass is not valid until it is signed, so the volunteer must sign the pass when it is issued. All volunteer passes must be validated when issued and must be hole-punched to expire 12 months from the month of issuance. A pass issued on June 15, therefore, would be hole-punched on the month of June, and the pass would remain valid through the end of June the following year. Passes must not be punched for later months, even on the last day of a month, because doing so would result in 13 or more months of use.

**VII.   SUPPLEMENTAL MATERIALS**

**A. Hangtags**

Many agency sites are not regularly staffed by fee collection or law enforcement personnel. Even at unstaffed sites, however, passholders must display proof of payment—for example, by leaving their pass visible inside their vehicle windshield. Alternatively, passholders may attach a hangtag to their rearview mirror to hold and display their pass. Hangtags are designed to display the Interagency Annual Pass or the Interagency Volunteer Pass on one side, and a lifetime pass (the Interagency Senior Pass or the Interagency Access Pass) on the reverse side. All sites that

AR10252

issue the new interagency passes must carry a small supply of hangtags. Hangtags are not considered accountable property.

1. <u>Price and Availability</u>.

Hangtags are issued free of charge to passholders of any Interagency Pass wherever the passes are sold. The issuing officer of an Interagency Pass should ask passholders if they anticipate visiting unstaffed BLM or USFS sites. If they do, a hangtag should be issued.

2. <u>Validation</u>.

The issuing officer writes the pass serial numbers on the front of the hangtag in the space provided. When issuing a hangtag for the Interagency Annual Pass or Interagency Volunteer Pass, the officer also marks the hangtag with the same expiration date as the pass. Hangtags issued for the Interagency Senior Pass and Interagency Access Pass do not require an expiration date, as these are lifetime passes.

3. <u>Use</u>.

The issuing officer should explain to visitors that the hangtag serves only to display the pass at unstaffed federal recreation sites. At staffed federal recreation sites, the hangtag alone will not be sufficient for entrance or use; a valid Interagency Pass must be shown.

**B. Decals**

Decals are designed to display (only) the <u>Interagency Annual Pass</u> or the <u>Interagency Volunteer Pass</u> for passholders who drive open-topped vehicles (convertibles, motorcycles, etc.), since they could not otherwise display a pass without inviting theft. Decals bear the same image as the Interagency Annual Pass. All sites that issue the new interagency passes must carry a small supply of decals. Decals are considered accountable property.

1. <u>Availability</u>.

Decals are available free of charge, only to passholders of an Interagency Annual Pass or an Interagency Volunteer Pass. Decals may be obtained at federal recreation sites that charge an entrance or standard amenity fee and that are staffed by fee collection personnel. They are also available at most federal agency offices. The issuing officer for an Interagency Annual Pass or an Interagency Volunteer Pass should ask people driving open-topped vehicles if they anticipate visiting unstaffed fee sites. If they do, a decal should be issued.

**NOTE:**     <u>Only one decal</u> may be issued per <u>Interagency Volunteer Pass</u>. <u>Up to two decals</u> may be issued per <u>Interagency Annual Pass</u> (to allow two individuals who sign the same annual pass to have a decal for separate vehicles).

AR10253

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

3-10

2.  Validation.

(1) The issuing officer verifies that passholders have presented vehicle registration(s) matching their name(s).  The issuing officer writes the license plate number on the face of the decal(s) in the space provided under "Vehicle Tag Number."

**NOTE:**   Decals are essentially nontransferable, since they are designed to self-destruct if tampered with.

(2) The issuing officer, using waterproof ink, marks the decal(s) with the same expiration date as the pass, regardless of when the decals are issued.

(3) The issuing officer punches the Interagency Annual Pass to indicate whether one or both available decals have been issued, punching one star (to the left of the signature line) for each decal issued.

(4) The issuing officer punches the Interagency Volunteer Pass to indicate that the one available decal has been issued, punching the star to the left of the signature line.

(5) For open-topped automobiles, the decal is correctly placed on the lower right (passenger) side of the windshield; for motorcycles, the decal is correctly placed on the front anywhere it is clearly visible.

3.  Use of Decals.

The issuing officer should explain that the decal serves only to display the pass at unstaffed federal recreation sites.  At staffed federal recreation sites, the decal alone will be insufficient for entrance or use; a valid Interagency Annual Pass or Interagency Volunteer Pass must be shown.

**C. Brochures**

The Interagency Pass brochure ("America the Beautiful – The National Parks and Federal Recreational Lands Pass") includes information about the Interagency Annual Pass and the federal agencies involved, stewardship principles for federal land areas, and volunteer opportunities.  It also provides agency contact information (phone numbers and websites). Another brochure, "Federal Recreation Pass Programs," describes all recreation passes and is available from the BLM's Printed Material Distribution Services (PMDS).  The issuing officer who sells or issues an Interagency Pass should offer the relevant brochure(s) to visitors.

AR10254

### D.  Hole Punches

Because the new Interagency Annual Pass and Interagency Volunteer Pass are printed on plastic card stock, a special hole punch is required; a standard paper hole punch is inadequate. Field locations are responsible for ordering and maintaining a supply of hole punches. The USGS has some available, free of charge, on a first-come-first-served basis. When the USGS supply is depleted, sites may order the hole punches (part# MCG301C) through GSA Advantage.

## VIII.   ORDERING

All products for the new pass program must be ordered through the PMDS. Most pass program products are accountable property and are (with few exceptions) issued only to state offices for further distribution. Field office staff should refer their requirements to the employee at the state office who is assigned the duty of ordering forms and publications from PMDS. The stock numbers for the Interagency Pass program are as follows:

PMDS Stock

| Number | Description |
| --- | --- |
| B-01 | Annual Pass |
| B-01A | Annual Pass Instruction Card |
| B-01D | Decal (for open-roofed vehicles, such as jeeps or motorcycles) |
| B-01H | Hangtag |
| B-02 | Senior Pass |
| B-03 | Access Pass |
| B-04 | Volunteer Pass |
| P-333 | America the Beautiful – The National Parks and Federal Recreational Lands Pass (brochure) |

## IX.   ACCOUNTING AND REPORTING REQUIREMENTS

Because the Interagency Pass Program is a component of the Recreation Fee Program, pass sales are accounted for as funds collected at fee sites. State offices may either assign the Interagency Pass Program collections as a separate project number or use the project number of a site in their state. If a state has more than one recreation fee site, then additional project numbers may be used and the funds distributed according to priority.

RMIS tracks the number of permits issued, but the BLM's Collections and Billings System tracks the revenues associated with the permits. These databases serve as the BLM's official accounting of the Interagency Pass Program. Recreation staff should coordinate with their collections officer to ensure that passport revenues are credited to the proper office, permit type, fund account, fee project, and database site.

AR10255

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

3-12

## X.      EXPENDITURE OF PASS REVENUES

The BLM uses all fees from the Interagency Pass Program to maintain and improve BLM recreation sites in the area of collection.

## XI.     AGREEMENTS FOR SALE OF THE INTERAGENCY ANNUAL PASS

Sites may not enter into agreements with third parties to resell interagency passes over the Internet.  Internet pass sales are handled by the Washington Office through a central fulfillment provider.  Internet sales are available at http://store.usgs.gov/pass.

### A.  Interagency Agreements with Other Federal Agencies

Interagency agreements govern an arrangement where one federal agency (servicing agency) provides goods, property, or services to another federal agency (ordering agency).  Interagency agreements outline operational protocol and may include revenue-sharing arrangements.  These agreements must be coordinated, reviewed, and approved by the state recreation leads and by the Recreation Permit and Fee Program in the Washington Office before they are completed and approved by a contracting officer.

An interagency agreement may be used when:

- a nearby federal agency agrees to sell BLM site passes and collect BLM standard amenity fees at a location where it is impractical for the BLM to do so
- thematically or geographically linked federal sites or other federal sites choose to sell and accept passes or fees of the other(s)

### B.  Supplemental Cooperating Association Agreements

A fee management agreement is generally the correct instrument to use when a cooperating association sells BLM site passes.  (See Appendix C4, Sample Fee Management Agreement.)

AR10256

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

4-1

## CHAPTER 4.    RECREATION COMMERCIAL SERVICES

[Reserved – Guidance Forthcoming]

AR10257

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

5-1

## CHAPTER 5.  DECISIONS, ALTERNATIVE DISPUTE RESOLUTION, PROTESTS, AND APPEALS

## I.      COLLABORATIVE STAKEHOLDER ENGAGEMENT AND ALTERNATIVE DISPUTE RESOLUTION

The BLM'S policy is to seek collaborative stakeholder engagement in its decisionmaking with respect to natural resources and to resolve disputes informally, through alternative dispute resolution (ADR) processes, whenever possible.  BLM offices should consider using ADR when a dispute arises in the context of an SRP, as this process may improve relationships with permittees/lessees and reduce protests, appeals, and litigation.  Before beginning an ADR process, field office staff should ensure that all parties have agreed to specific practices and timeframes to be followed.   If informal resolution is not possible, the formal process involving a protest and/or appeal (described more fully below) may ensue.  ADR may still occur once the formal process has begun, however.  If, for example, a party who has appealed a final decision chooses to begin or re-engage in ADR while the final decision is pending before the Interior Board of Land Appeals (IBLA), the parties need only notify the IBLA that they are discussing settlement and request a stay of the proceedings; the BLM may not proceed with ADR in this situation until after receiving notice from IBLA that it may do so.  Offices should contact the Solicitor's Office for guidance for any particular situation.  Note:  if the parties enter into ADR after the BLM has issued a final decision, the 30-day appeal period applies, and no additional time is available to file an appeal.  For questions about, or assistance with, collaborative stakeholder engagement, field office staff should contact the BLM's ADR Program in Washington, DC, or the local Solicitor's Office.

## II.     DECISIONS OF THE AUTHORIZED OFFICER

The decision of an AO to approve, modify, cancel, or deny a commercial, competitive or organized group SRP, or to take action against a permittee/lessee, may be protested (before the decision is final) or appealed (after the decision is signed and delivered to the permittee/lessee). Protests allow the BLM to request more information from the permittee/lessee and possibly resolve issues outside of the more formalized IBLA process.  In these instances an AO issues a proposed decision, which is not yet considered a final determination and therefore not subject to appeal.  A proposed decision, for example, could be one prepared as an "if, then" statement, such as notice that if a deficiency is not corrected, then a permit will be canceled:  "If you do not provide proof of insurance within the next 30 calendar days, the BLM will cancel your permit [cancel your lease]."  If the permittee/lessee does not comply, a final decision would then be issued canceling the permit.

Failure to comply with stipulations or conditions of an ISRP or RUP may result in an adverse decision on a subsequent ISRP or RUP request.  If an AO refuses to issue an ISRP or RUP based on a previous adverse decision, the party being denied the permit or lease may protest the proposed decision or appeal the AO's final decision.

AR10258

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

5-2

**NOTE:**    The issuance of a citation for failing to pay an established ISRP or RUP fee is a
decision that is not subject to protest or appeal.  The Recreation Fee Program does
not have authority to waive, cancel, or modify a law enforcement citation.  The
recourse for challenging a BLM law enforcement citation is through the federal
judicial system.  Work with the BLM's Office of Law Enforcement and Security,
the local Solicitor's Office, and the Department of Justice's U.S. Attorney's
Office if further advice or counsel regarding a BLM law enforcement citation is
necessary.

### A. Protests

(1) Proposed decisions of the AO may be protested (including published
proposed decisions in the Federal Register or in newspapers for the
establishment or modification of amenity fees).  Because there are no
program-specific protest regulations for recreation, the general
regulation found at 43 CFR 4.450-2 applies.

(2) Protests must be filed with the AO.  There is no standard format for
protest of a recreation permit or fee.

(3) Protests must be received by the AO within 15 calendar days of: (a)
receipt of the proposed decision by the affected party, or (b) the
published proposed decision in the Federal Register or a newspaper of
general circulation.  Protests received more than 15 calendar days after
notification of the proposed decision do not have to be considered.

(4) Upon receipt of a protest, the AO reconsiders the decision in light of
the evidence submitted by the protestor, and all other information
pertinent to the case.  At the conclusion of this review, the AO
prepares a recommended decision on the protest, which is reviewed by
the next higher level authority (e.g., if the AO is a field manager, the
next higher-level authority is the district manager). The decision of the
higher level authority is the final decision of the BLM.  This decision,
however, may be appealed.  Final decisions on protests should be
made within 15 calendar days of receipt of protests, but this timeframe
is not a regulatory requirement.

(5) Once a decision has been made final (signed and delivered), protests
are no longer possible.  Rather, the permittee/lessee must use the
appeals process, as described in 43 CFR Part 4.

AR10259

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

5-3

### B.  Appeals

Final decisions are appealable.  When issued, final decisions should include language about how to file an appeal (e.g., by enclosing a copy of Form 1842-1, Information on Taking Appeals to the Interior Board of Land Appeals, with the decision).

(1) Individuals who believe they are adversely affected by a BLM decision to issue or deny an SRP may appeal the decision to the IBLA under 43 CFR Part 4.

(2) The Notice of Appeal must be received by the AO within 30 calendar days of (a) receipt of the final decision, or (b) the published final decision in the Federal Register or a newspaper of general circulation (whichever applies).  Refer to 43 CFR 4.20, Action on an appeal and petition for a stay.

(3) The AO has 10 calendar days to forward the Notice of Appeal, the decision being appealed, and the case file to the IBLA, copying the BLM's regional solicitor.

(4) Within 30 calendar days after filing the Notice of Appeal with the AO, the appellant must file a complete statement of reasons for the appeal with the IBLA, copying the BLM's regional solicitor.

(5) Notwithstanding any appeal, if the BLM determines that the proposed use conforms with BLM plans, policies, and programs, local zoning ordinances, and any other requirements and that it will not cause appreciable damage or disturbance to the public lands, resources, or improvements, the AO can issue the permit to the applicant.  All decisions that the BLM makes under this part (43 CFR 2931.8) will go into effect immediately and will remain in effect while appeals are pending unless a stay is granted under 43 CFR 4.21 by the Director or the Office of Hearings and Appeals.

AR10260

AR10261

## CHAPTER 6.   RECORDKEEPING

### I.   GENERAL POLICY

Documents relating to the issuance and administration of SRPs and RUPs are official federal government records.  They may be used in a variety of ways.  Records related to SRPs, for example, may be used to administer the permits, to report recreation use for the BLM's annual publication, *Public Land Statistics,* and to help meet budgetary planning and reporting requirements.  It is imperative that the BLM properly create, maintain, and safeguard these records.  BLM staff must treat inventory case files and records as part of the office's central files.

### II.   ESTABLISHMENT AND MAINTENANCE OF CASE RECORDS

#### A.  Commercial and Competitive SRPs and Organized Group SRPs

Each commercial SRP should be established as an individual case file.  For simple, single-use SRP records, single-fold file folders are used.  More complex and multiyear permits employ a six- or eight-way file organization structure.  (See Figure 16, Examples of Special Recreation Permit File Organization.)  Official SRP file documents include a copy of the permit and stipulations, insurance certificate, fee payment records, correspondence, telephone conversation logs, maps, NEPA documentation, operating plan, business license, state guide license, hunt unit map, advertisements, monitoring, post-use annual reports, and performance evaluations, as appropriate based on the type of permit.  Case files must be kept in a neat and current condition and secured in a central location when not in use.  All information in the file may be released under the Freedom of Information Act (FOIA) except copies of money/checks, financial information, material containing personally identifiable information, operating plans, and law enforcement incident reports may be released only after consultation with the Regional Solicitor's Office, providing all procedures listed in 43 CFR 2.7 through 43 CFR 2.27 are followed.  Confidential business information is subject to exemption 4 under FOIA.  BLM staff should coordinate with the FOIA representative at the field office or state office level before responding to FOIA requests.

#### B.  Special Area SRPs

ISRPs may be filed individually or as a collective record.

#### C.  RUPs

Before disposing of RUP envelopes, field office staff extract and summarize visitor use and fee information (e.g., number of visitors, length of stay, and fees collected) for reporting through RMIS.  RUP envelopes must be kept until the end of the fiscal year, by which time all fee and visitor use information should have been recorded.  The BLM records total fees collected for each fee area on the Recreation Fee Collection Affidavit (Appendix C2) whenever funds are collected and counted.

AR10262

## Figure 14.  EXAMPLES OF SPECIAL RECREATION PERMIT FILE ORGANIZATION

| Six-Way Case File | Eight-Way Case File |
|---|---|
| **Section 1**<br>Permit application<br>Permit(s)<br>Operating plan<br>Maps<br>NEPA documentation | **Section 1**<br>Correspondence (letters, evaluations, billings)<br>Letters/emails sent to applicants/permittee |
| **Section 2**<br>Bills and receipts<br>Post-use reports<br>Pre-trip itinerary<br>Trip logs/affidavits<br>Cost recovery | **Section2**<br>Permit application<br>Permit(s)<br>Authorizations<br>NEPA documents, including BLM maps |
| **Section 3**<br>Evaluations<br>Incident reports<br>Field inspections | **Section 3**<br>Operating plan<br>Business plan<br>Maps from outfitters |
| **Section 4**<br>Insurance certificates<br>Bonds and bond information<br>Prebond and postbond inspections | **Section 4**<br>Special stipulations<br>Field office policy signature |
| **Section 5**<br>Customer information<br>Brochures, price lists<br>Waivers, acknowledgment of risk | **Section 5**<br>Money receipts<br>Cost recovery |
| **Section 6**<br>General correspondence | **Section 6**<br>Insurance certificates |
|  | **Section 7**<br>Post-use forms<br>Correspondence related to post-use |
|  | **Section 8**<br>Brochures<br>Price lists<br>Waivers, acknowledgment of risk<br>Guide lists<br>Licenses |

AR10263

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

6-3

### III.    PUBLIC LAND STATISTICS AND BUDGETARY RECORDS

The number of SRPs and RUPs issued, and the recreation use made under these permits, is reported in the BLM's annual publication, *Public Land Statistics*. Since the data for *Public Land Statistics* are taken from RMIS, BLM field offices must enter data about the issuance of SRPs and RUPs, and the recreation use associated with these permits, into RMIS. RMIS also relates to the BLM's Financial and Business Management System (FBMS) and Collections and Billings System. There are, however, reportable units (e.g., PE codes) under FBMS related to recreation permits that are not reported through RMIS. It is important that field office staff work with budget and collections staff to ensure that they account correctly for fees and report units of accomplishment accurately.

### IV.    PRIVACY ACT CONSIDERATIONS

#### A.  Commercial SRPs

The identity of a commercial SRP holder may be released to the public, published on lists, or posted on websites. The BLM discloses information in accordance with the regulations at 43 CFR 2.56(d). Field office staff should check with the Privacy Act officer for guidance before releasing information.

#### B.  RUPs and Noncommercial SRPs

Information that the permittee of an SRP or RUP provides to the BLM in response to requests or requirements is subject to the Privacy Act. The BLM discloses information in accordance with the regulations at 43 CFR 2.56(d). Personally identifiable information (including, but not limited to, names, addresses, and other personal contact information) is generally not made available to the public. The BLM may receive requests for lists of noncommercial SRP holders from people who want to send solicitations or retail sales information to these permittees; however, the BLM may not provide such lists unless the permittees have specifically been informed and have given permission for the release of the information. Expired ISRPs may be destroyed after 3 years.

AR10264

# GLOSSARY

### -A-

Acceptable Performance - a rating denoting that a permittee has generally operated in accordance with the terms and conditions established for the permit. This rating may include situations where some minor deficiencies needing correction exist; however, if deficiencies persist after a reasonable period following notification, they may result in a probationary rating.

Actual Expenses - expenses directly related to the permitted activity. These expenses may include the costs of such items as food, rentals, transportation, and permit or use fees. Actual expenses do not include the rental or purchase of personal equipment, amortization of equipment, salaries or other payments to participants, or profit.

Administration and Overhead Costs - costs that are necessary for the administration of the BLM Recreation Fee Program, that are associated with the general operation of the program, and that cannot be directly attributed to a specific recreation service (e.g., the provision of campgrounds or special recreation permits) or project execution (e.g., campground rehabilitation or trail construction). Examples include:

- Budget development and program planning, including the administration of regional and national recreation fee programs
- Administrative support (e.g., procurement, contracting, office services, personnel, property management, preparation and distribution of reports, and document control)
- Managerial support (e.g., general management and supervision of programs and staff, program evaluations and reviews)
- Public notification and informational services (e.g., providing office reception and responses to general information requests and phone inquiries)

Affiliate - any entity or person that controls, is controlled by, or is under common control with an applicant or permittee.

Allocation of Use - the assignment of use between, and rationed among, competing users for a particular area of public lands and related waters. Allocation includes both direct and indirect methods. Examples of direct allocations include restrictions on the number of permits, type of permits, or number of visitors. Indirect allocation may be viewed as a strategy to reduce use. Examples include the design of facilities at a trailhead or education to redistribute use to offpeak times. See also Common Pool.

Applicant - any individual age 18 or as appropriate; a government entity; or a partnership, corporation, association, or other business entity subject to the laws of any state, or of the United States, that applies for a permit or lease. On public lands and related waters in the State of Alaska, the applicant includes the U.S. Department of Defense and its agencies or the Commandant of the Coast Guard.

AR10265

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

G-2

Area: Recreation Area/Site - a site, complex of sites, or a special recreation management area that, at a minimum, meets all of the conditions in REA Section 3(f)(4)(A–D).

Assignment (subletting) - the generally prohibited practice whereby a permittee assigns, subleases, sells, or otherwise transfers authorized use to another individual, group, or business. In some circumstances, contracting of no more than half the equipment or services may be allowed if authorized ahead of time.

Authorized Officer - an employee of the BLM to whom authority has been delegated to perform the duties described. BLM Manual MS-1203, Delegation of Authority (Internal), and local, written delegations of authority determine who may be authorized to perform particular actions or issue particular decisions.

**-B-**

BLM Business Plan - a written document that describes the objectives of the BLM fee program and how management intends to achieve them. A business plan is tailored to address the complexity of the venture described and the major features of the financial and environmental surroundings within which it will be implemented.

BLM Cosponsored Recreation Activity or Event - an activity or event with another entity or organization that the BLM is involved in organizing and hosting, which is arranged through authorizing letters or written agreements.

Bond - a contractual arrangement among the U.S. government, the permittee, and a financial institution that provides monetary protection for the public in connection with the permitted use of the public lands and related waters.

Cash bond - An amount of money deposited with the U.S. government that can be drawn upon to defray the cost of restoration and rehabilitation of the lands affected by a permitted use should the permittee fail to complete the restoration or rehabilitation.

Surety bond - A surety bond ensures payment to the BLM in the event of permittee default. The permittee obtains a surety bond from a Department of the Treasury–approved surety company (http://www.fms.treas.gov/c570/c570_a-z.html). If the permittee defaults, the surety company is obligated to pay the BLM for the financial loss incurred. (See 31 CFR 231.)

**-C-**

Certificate of Insurance - an official documentation from a licensed insurance company that proves the applicant/permittee has a valid, current insurance policy covering the activity or event specified in the special recreation permit, and that the U.S. Department of the Interior, Bureau of Land Management is listed as an additional insured.

AR10266

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

G-3

Challenge Cost Share Authority - under 31 U.S.C. 6306, the BLM implements a Challenge Cost Share Program that enables the BLM to provide payments to public and private agencies, organizations, institutions, and individuals who provide cash, materials, or in-kind work in furtherance of a public purpose. Activities of partners under this program include resource monitoring, habitat improvement, and enhancement of recreation experiences.

Commercial Filming - the film, electronic, magnetic, digital, or other recording of a moving image by a person, business, or other entity for a market audience with the intent of generating income. Examples include but are not limited to feature film, videography, television broadcast, or documentary, or similar projects. Commercial filming activities may include the advertisement of a product or service or the use of actors, models, sets, or props. (See 43 CFR Part 5.)

Commercial Photography - any motion picture filming intended for sale or commercial broadcast; any still photography that uses models or props and that is intended for commercial sale or commercial broadcast. (See 43 CFR Part 5.)

Commercial Use - recreation use of the public lands and related waters for business or financial gain. When any person, group, or organization makes or attempts to make a profit, receive money, amortize equipment, or obtain goods or services as compensation from participants in recreation activities occurring on public lands and related waters, the use is considered commercial. An activity, service, or use is commercial if anyone collects a fee or receives other compensation that is not strictly a sharing of, or is in excess of, actual expenses incurred for the purposes of the activity, service, or use. Commercial use is also characterized by situations when a duty of care or expectation of safety is owed participants as a result of compensation. It may also be characterized by public advertising for participants.

Common Pool - a method or mechanism to reallocate user days from those who cannot use previously assigned user days to those who desire new or additional user days.

Competitive Use - any organized, sanctioned, or structured use, event, or activity on public lands and related waters in which one or more individuals contest an established record (e.g., speed or endurance) or in which two or more contestants compete and either of the following elements apply:

(1) Participants register, enter, or complete an application for the event; or

(2) A predetermined course or area is designated.

Cost of Collection - the total cost that occurs as a direct result of collecting, remitting, transporting, protecting, storing, and/or securing fee funds at a site (e.g., salaries, benefits, and training; fee collection equipment and upkeep; security services and equipment; and communication needs, such as signage and phones). If an activity or position would continue even if no fees were collected, then it is not considered part of the cost of collection.

AR10267

Cost Recovery - fees charged by the BLM to pay the costs of processing a special recreation permit.  Processing charges may include the cost of environmental analysis, consultation with other agencies, and efforts toward public participation.  Processing costs may also include monitoring, use supervision, permit compliance, and post-use reports and closeout.  Application fees, set by state directors, are also considered a form of cost recovery.

**-D-**

Designated Developed Parking - a parking area that has a graded surface, and clear, delineated boundaries, and natural or constructed surfacing.

Desired Use Level - the amount and type of recreation use an area can accommodate without altering either the environment or the user's experience beyond the degree of change deemed acceptable by management objectives for the area (also known as the maximum allowable use level).  Desired use levels are developed through the use of a carrying capacity determination, such as the Limits of Acceptable Change system or a Recreation Opportunity Spectrum.

Destination Visitor or Interpretive Center - a central location for communicating a specific theme and introducing important stories to the public as well as a direct visual or physical link to the resources.  It often contains a variety of interpretive media, such as exhibits, audiovisual programs, resources libraries, observation areas, and trailheads, and it often provides basic public services, such as an emergency telephone.

Dock or Boarding Float - any floating or fixed facility such as a dock, deck, quay, or pier designed to allow people to transfer from land or shore onto a vessel.

Duty of Care - an expectation of safety owed to participants by service providers as a result of compensation or because the trip leader has a legal obligation to provide for the safety of the participants.

**-E-**

Emergency Medical or First Aid Services - services where at least one certified emergency medical person is onsite during hours of operation, an emergency vehicle is available for transportation to an emergency facility, and there are reliable communications to an emergency facility.

Enhanced Interpretive Program - presentations or special field trips/tours conducted by BLM personnel (or agents) that are in-depth, detailed, and/or highly specialized in nature.  These programs and tours provide activities, services, or information that are clearly beyond the basic level of information and services provided to the public for free.

Event - a single, structured, organized, consolidated, scheduled meeting or occurrence for recreation use of public land and water resources; may be composed of several related activities.

AR10268

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

G-5

**-F-**

Fee Access Station/Area - a place, such as a fee booth, where entry is gained to a recreation site/area and where fees are paid.

Fee Area - a BLM-administered site that contains or provides specialized facilities, equipment, or services for or related to outdoor recreation.

Fee Collections Officer - a federal employee or an agent of the agency (e.g., a campground host, volunteer, or recreation technician) who personally collects fees from the user and/or routinely collects fees from automated self-service fee stations (e.g., drop boxes or iron rangers).

Fee Layering - a fee structure that includes multiple fees for similar facilities or services (e.g., charging a fee to access an area and another fee for the area visitor center).

Financial Gain - gain as a result of an individual or entity receiving or attempting to receive money, donations, gratuities, or gifts; amortizing equipment; or bartering for goods or services. Financial gain includes payments of money; revenue from the sale of images or broadcast rights; onsite sales or rentals; and gratuities, donations, gifts, bartering, trophy fees, etc., regardless of source, associated with the use of public lands and related waters.

**-G-**

Gross Receipts - the total of all financial gains received by the permittee, its employees, and/or its agents for goods or services provided in connection with commercial activities authorized by a special recreation permit on public lands and related waters. Nonrefunded deposits or cancellation fees for an activity on public lands and related waters are also included in gross receipts for the activity. See also Financial Gain.

**-H-**

Historical Use - the average of the highest two use seasons in the preceding 5-year period.

Holder - the party who has received a permit or lease.

**-I-**

Indirect Costs - costs of equipment, space rental, telephone services, postage, cartography and basic series mapping, aviation management, telecommunications, equipment maintenance, and systems design/implementation. Excluded are administration and overhead costs, environmental education and interpretation, planning, studies and research, preparation of NEPA documents, law enforcement, and firefighting. Nominal indirect costs are recovered through the indirect cost rate assessed by the BLM in administering the cost recovery program.

Individual Special Recreation Permit - permit issued for individual use of a Special Area.

AR10269

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

G-6

Interpretive Center - see Destination Visitor or Interpretive Center.

Interpretive Sign, Exhibit, or Kiosk - a public display designed to develop a visitor's interest, enjoyment, and understanding of the natural or cultural environment.

**-L-**

Land Use Authorization - a permit or a lease issued under 43 CFR 2920.

Limits of Acceptable Change - the amount of human-caused change to biological, physical, or social components that are tolerable within an acceptable level without degrading the recreational experience.

Livery - a business that delivers spare parts or such equipment as a canoe, horse, mountain bike, vehicle, camping equipment, or OHV to public lands and related waters. The item being delivered or picked up from public lands may belong to the individual that is hiring the livery service, or the item may be rented. A livery service may deliver an item to public lands and related waters so that recreationists may continue or complete their adventure. A "recovery service" that is hired to bring parts or equipment to public lands and related waters to perform repairs that will enable a vehicle to be driven off the public lands is classified as a livery. Tow services that retrieve broken or abandoned vehicles from public lands and businesses that rent, deliver, and pick up portable toilets and dumpsters do not require a permit, as they are assisting with management of the public lands.

Long-Term Visitor Area - a designated special area where visitors pay a fee to camp for a designated period in excess of the usual occupancy limits, as authorized by permit.

**-M-**

Model – a person or object that serves as the subject for commercial filming or still photography for the purpose of promoting the sale or use of a product or service. Models include, but are not limited to, individuals, animals, or inanimate objects, such as vehicles, boats, articles of clothing, and food and beverage products, placed on agency lands so that they may be filmed or photographed to promote the sale or use of a product or service. Portrait subjects such as wedding parties and high school graduates are not considered models, if the image will not be used to promote or sell a product or service.

**-N-**

National Recreation Reservation Service - an organization offering advance reservation services (and fee collection) for campgrounds, tours, picnic pavilions, and other facilities on behalf of the BLM, the Bureau of Reclamation, the National Park Service, the U.S. Army Corps of Engineers, and the U.S. Forest Service. Reservations are available through the Internet at Recreation.gov; toll-free at 1-877-444-6777; and participating field office locations.

AR10270

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

G-7

Noncommercial Use - a recreation activity on public lands and related waters where actual expenses are shared among all members or participants and no financial or business gain will be derived from the proposed use.  Fundraising, for any purpose, renders an activity a commercial use.

**-O-**

Off-Highway or Off-Road Vehicle - any motorized vehicle capable of or designed for travel on or immediately over land, water, or other natural terrain, excluding any non-amphibious registered motorboat and any military, fire, emergency, or law enforcement vehicle while it is being used for emergency purposes.

Operating Plan - an applicant's or permittee's plan to conduct an activity or event on public lands and related waters in conjunction with a special recreation permit.  An operating plan describes how the permittee or applicant will deliver services, will conduct the activity or event, and will implement measures to protect resources and provide for public health and safety.

Organized Group Activity or Event - a structured, ordered, consolidated, or scheduled event or occupation of public lands and related waters for recreation use that is not commercial or competitive, and that the BLM has determined needs a special recreation permit based on planning decisions, resource concerns, potential user conflicts, and/or public health and safety.

Overhead Costs - see Administration and Overhead Costs.

**-P-**

Participant - an individual directly involved in an activity.  A participant may be considered essential to completing the activity, for example a pit crew member or spotter who directly supports a competitor in a four-wheel drive event.

Permanent Toilet Facility - a toilet building that is permanently affixed or that is available year after year during the primary season of use, but that may be moved during the off-season because of environmental or weather concerns.

Permanent Trash Receptacle - a garbage container of durable design and construction that is permanently available (year after year) in locations that serve visitors during the primary season of use, but that may be moved during the off-season because of environmental or weather concerns.

Permit - (as used in this handbook) an authorization, revocable by, or at the discretion of, the BLM to use public lands and related waters for a fixed period.  A permit does not convey possessory interest in the land.

Permittee - an individual, group, or organization that has fulfilled all the requirements for, and has been awarded, a permit.

AR10271

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

G-8

Permittee's Representative - any person(s) authorized by a permittee to conduct permit-related business with the BLM.

Portable Sanitation Device - a self-contained, portable toilet.

Probationary Performance - a rating denoting that a permittee has not operated in full accordance with the terms and conditions of its permit; however, performance does not pose an immediate threat to the safety of guests or others, is not in violation of law, and does not pose a threat of significant resource damage. Corrective actions are mandatory, and failure by the permittee to take those actions within a reasonable time after notification may result in an unacceptable performance rating.

Public Advertising - any written, oral, or graphic statement or representation made by any person or event representative to the general public for the purpose of soliciting participants for a recreational activity or event (e.g., television, radio, Internet/social media sites available to the general public, listing on public event calendars, printed brochures, newspapers, billboards, banners, and signs). Advertising is considered public if it is an inducement for anybody to participate, as opposed to an invitation or communication to members of an identifiable membership such as a church or club. The posting of information on an organization's website would not, on its own, be considered public advertising. If paid public advertising is present, a commercial SRP is required.

Public Lands - any lands or interests in land owned by the United States and administered by the Secretary through the Bureau of Land Management, without regard to how the United States acquired ownership, except: (1) lands located on the Outer Continental Shelf; and (2) lands held for the benefit of Indians, Aleuts, or Eskimos.

**-R-**

Reasonable Visitor Protection - see Security Services.

Recreation.gov - a federal website that provides an enhanced recreation portal and trip-planning information for many federal agency recreation facilities and activities as part of the Recreation-One-Stop initiative.

Recreation Management Information System - the official database for outdoor recreation information on public lands managed by the BLM. This Intranet-based program allows recreation planners to record local recreation information, query the database, and prepare reports based on recreation data for each field office.

Recreation Use Permit - a permit issued to individuals or groups for the short-term recreation use of specialized sites, facilities, equipment, or services furnished at federal expense. Recreation use permits are commonly used at campgrounds and other fee areas and are often self-issued onsite by the visitor (e.g., as campground envelopes).

AR10272

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

G-9

Related Waters - waters that lie directly over or adjacent to public lands and require some management control to protect federally administered resources and/or to provide for enhanced visitor safety.

-S-

Security Services - public safety services routinely provided by designated security personnel (e.g., federal employee, campground host, volunteer on site; routine scheduled visits by law enforcement or other federal employee; a reliable communication to a law enforcement officer, federal employee, or an after-hours emergency call service).

Sets and props - items constructed or placed on agency lands to facilitate commercial filming or still photography, including, but not limited to, backdrops, generators, microphones, stages, lighting banks, camera tracks, vehicles specifically designed to accommodate camera or recording equipment, rope and pulley systems, and rigging for climbers and structures.  Sets and props also include trained animals and inanimate objects, such as camping equipment, campfires, wagons, and so forth, when used to stage a specific scene.  A camera on a tripod, without the use of any other equipment, is not considered a prop.  (See 43 CFR Part 5.)

Shuttle - a business that provides transportation services to and from public lands.  The service may be for an individual or for an individual plus gear.  Shuttle operations are typically short in duration (e.g., dropping off hikers, mountain bikes, and bikers to a trailhead).  Shuttle drivers, by definition, are not commercial guides.  The shuttle driver has no obligation to the individual once the transportation aspect is complete.  A shuttle business could be authorized under a commercial or vending permit depending on the circumstances.

Special Area - an area officially designated by statute or by Presidential or Secretarial order, an area that the BLM determines requires special management and control measures for the protection of resources, or an area covered by joint agreement between the BLM and a state under Title II of the Sikes Act (16 U.S.C. 670a et seq.).

Special Recreation Permit - an authorization that allows specified recreational uses of the public lands and related waters.  Special recreation permits are issued as a means to manage visitor use and to protect natural and cultural resources and as a mechanism to authorize commercial, competitive, and vending use; organized group use and events; and individual or group use of special areas.

Sponsor - a person or entity that assumes or shares responsibility for a permitted recreation activity or event.

Statement of Financial Capability - documentation that an applicant has the unencumbered assets or the ability to acquire the necessary goods and services (such as gear, guides, staff, equipment) to conduct a proposed activity.  May include information about prior operational experience related to the proposed activity.

AR10273

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

G-10

Sublease - the prohibited practice whereby the lease holder or permittee allows another party to exercise the rights authorized under a lease.

Suspension - withdrawal of authority to operate a permitted activity for a specified period.

**-T-**

Termination - revocation of authorization to conduct or operate a permitted activity.

Transportation Services - services that shuttle visitors between a parking lot and the destination recreation area and/or that shuttle visitors from one location to another.

**-U-**

Unacceptable Performance - a rating denoting that the permittee has not operated in accordance with the terms and conditions of the permit and cannot be allowed to continue. This level of performance signifies a threat to the safety of guests or others or involves a serious violation of law, significant resource damage, or major violation of administrative requirements or financial obligations. Unacceptable performance may be grounds for permit termination.

**-V-**

Vend - sell or rent recreation-related goods or services, such as firewood, equipment repair, shuttles, and rentals, on public lands and related waters.

Visitor Center - see Destination Visitor or Interpretive Center.

**-W-**

Wilderness Therapy Programs - residential treatment programs for youth under age 18. The programs provide a range of services, including drug and alcohol treatment, confidence building, military-style discipline, and psychological counseling for youth with a variety of addiction, behavioral, and emotional problems. These programs refer to themselves as wilderness therapy programs, boot camps, and academies, among other names. They are intended to provide a less restrictive alternative to incarceration or hospitalization for youth who may require intervention to address emotional or behavioral challenges. The programs incorporate individualized treatment plans with specific behavioral and emotional goals.

AR10274

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

R-1

**REFERENCES AND AUTHORITY**

Bureau of Land Management, Guidelines for a Quality Built Environment, December 2010.
Available online at
http://www.blm.gov/pgdata/etc/medialib/blm/wo/Planning_and_Renewable_Resources/recreatio
n_images/national_programs/VRM.Par.62809.File.dat/GQBE_WEB.pdf)

Federal Land Policy and Management Act of 1976 (Public Law 94-579; 43 U.S.C. 1701–1781).
Available online at http://www.blm.gov/flpma

Federal Lands Recreation Enhancement Act of 2004 (Public Law 108-447; Title VIII, Section
801; 16 U.S.C. 6801–6814.).
Available online at http://www.fs.fed.us/recreation/programs/feedemo/fee_legislation.html

Land and Water Conservation Fund Act of 1965, as amended (Public Law 88-578).
Available online at http://www.nps.gov/lwcf/lwcf_act.pdf

Sikes Act of 1974 (16 U.S.C. 670, Sec. 201).
Available online at http://www.fws.gov/laws/lawsdigest/sikes.html

**The following documents are available on the BLM Knowledge Resource Center (available
through the National Training Center website):**

BLM Manual MS-2930-1.  Recreation Permits and Fees.
Available online at
http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_m
anual.Par.45352.File.dat/2930.pdf

Interior Board of Land Appeals (IBLA) decisions related to permit and fee administration.

Permits for Recreation on Public Lands: Proposed Rule (proposing changes to permit
procedures, including reorganization of regulations, cost recovery, and new procedures for
developed recreation sites), Federal Register, vol. 65, no. 95 (Tuesday, May 16, 2000): 31234
(43 CFR 2930).
Available online at http://www.gpo.gov/fdsys/pkg/FR-2000-05-16/pdf/00-12124.pdf

Permits for Recreation on Public Lands: Final Rule (referencing a proposed change in the
maximum term of a special recreation permit, from 5 years to l0 years), Federal Register, vol. 67,
no. 190 (Tuesday, October 1, 2002): 61732 (43 CFR 2930).
Available online at http://www.gpo.gov/fdsys/pkg/FR-2002-10-01/pdf/02-24748.pdf

Permits for Recreation on Public Lands: Proposed Rule (proposing a change in the maximum
term of a special recreation permit, from 5 years to 10 years), Federal Register, vol. 67, no. 190
(Tuesday, October 1, 2002): 61746 (43 CFR 2930).
Available online at http://www.gpo.gov/fdsys/pkg/FR-2002-10-01/html/02-24749.htm

AR10275

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

R-2

Permits for Recreation on Public Lands: Final Rule (establishing a 10-year permit, and updating and clarifying prohibited acts), Federal Register, vol. 69, no. 25 (Friday, February 6, 2004): 5702 (43 CFR 2930).
    Available online at http://www.gpo.gov/fdsys/pkg/FR-2004-02-06/html/04-2545.htm

Permits for Recreation on Public Lands: Proposed Rule (changing fee authority from the Land and Water Conservation Fund Act to the Federal Lands Recreation Enhancement Act, and updating prohibited acts and penalties to conform to the REA), Federal Register, vol. 70, no. 224 (Tuesday, November 22, 2005): 70570 (43 CFR 2930).
    Available online at http://www.gpo.gov/fdsys/pkg/FR-2005-11-22/pdf/05-23113.pdf

Permits for Recreation on Public Lands: Final Rule (updating regulations to be consistent with the Federal Lands Recreation Enhancement Act), Federal Register, vol. 72, no. 34 (Wednesday, February 21, 2007): 7832 (43 CFR 2930).
    Available online at http://www.gpo.gov/fdsys/pkg/FR-2007-02-21/pdf/E7-2876.pdf

Recreation Fees (Title 36 CFR Subpart 71).
    Available online at http://www.gpo.gov/fdsys/pkg/CFR-2002-title36-vol1/pdf/CFR-2002-title36-vol1-part71.pdf

*See also Appendix B1, Brief History of BLM Special Recreation Permit Fees and Actions, for additional references and authorities related specifically to SRP fees.

AR10276

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

A1-1

**Appendix A1**
**RECREATION PERMIT FEE SERVICE STRUCTURE**

| Permit/Authorization | Fee | Sample Service |
|---|---|---|
| Special Recreation Permit (SRP) | Special Recreation Permit Fee | • commercial use:  outfitted hunt, college backpack course<br>• competitive use:  motorcycle race, endurance ride<br>• vending:  food stand at motorcycle race, firewood sales at campground<br>• Special Area use:  river permit for noncommercial use<br>• group activity and event use: fraternity event, scout jamboree |
| Recreation Use Permit (RUP) | Standard Amenity Fee | • nationally designated area<br>• visitor or interpretive center<br>• developed site for day use<br>• America the Beautiful – The National Parks and Federal Recreational Lands Pass |
|  | Expanded Amenity Fee | • campground<br>• developed boat launch<br>• developed swim/hot spring site<br>• rental of cabin, boat, historic structure, audio tour device<br>• hookup and dump station<br>• enhanced interpretive program<br>• reservation service, transportation service<br>• medical or first aid service |

AR10277

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B1-1

## Appendix B1
## BRIEF HISTORY OF BLM SPECIAL RECREATION PERMIT FEES AND ACTIONS

**September 12, 1978:** Federal Register, vol. 43, no. 177. Final Rulemaking. Recodification of Recreation Regulations.

- commercial: $10 nonrefundable filing fee; use fee minimum of $25 for up to 100 user days, and $25 for each additional 100 user days or fraction thereof
- competitive: $10 nonrefundable filing fee; use fee set at 5 percent of gross receipts, $1/user/day or $10, whichever is greater
- Special Area: use fee and off-road vehicle use fee set at a minimum of $1

**October 1, 1978:** 43 CFR Subpart 8372 codified the final rule that was published in the Federal Register on September 12, 1978, and established a permit and fee system for certain recreation uses of lands and waters administered by the BLM.

**November 12, 1982:** WO Instruction Memorandum (IM) 1983-092.

- commercial: fee set at $2/user/day
- competitive: fee set at $2/user/day or 5 percent of gross receipts
- Special Area: fee set at $2/user/day

**November 24, 1982:** IM 1983-092, change 1. Delayed implementation of the fee increase.

**April 27, 1983:** IM 1983-092, change 2. Delayed implementation of the fee increase pending publication of a Federal Register notice.

**May 6, 1983:** Federal Register, vol. 48, no. 89: 20630. Notice of Proposed Rulemaking.

- commercial: fee will be determined from a table that approximates 3 percent of gross for outfitters who receive $300/person/day or less for their services; outfitters receiving more than $300/person/day will pay 3 percent of gross
- competitive: fee will be $2/user/day or 3 percent of gross, whichever is greater
- all other SRPs: fees are $1.50/user/day

**NOTE:** The 3 percent of gross figure seems to trace its origin to the franchise fee that the BLM charged concessioners and that is referenced in BLM Manual MS-1368, Concession Contract & Permit Procedures, dated 7/7/1969. Since established in this Federal Register, the 3 percent of gross revenue fee has not changed.

**February 10, 1984:** Federal Register, vol. 49, no. 29: 5302. Special Recreation Permit Policy. Reiterated the Notice of Proposed Rulemaking of May 6, 1983, with provisions for a 3-year phase-in of fee schedule.

AR10278

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B1-2

**August 29, 1984:**  Federal Register, vol. 49, no. 169: 34332.  Notice of Final Rulemaking.

- commercial: fee is determined from a table that approximates 3 percent of gross for outfitters who receive $300/person/day or less for their services; outfitters receiving more than $300/person/day will pay 3 percent of gross; minimum fee for commercial use is set at $100 for the term of the permit or the use amount from a table; the table phased in 3 percent of adjusted daily charge per participant over the February 10, 1984 – January 1, 1986 period.
- competitive: fee is $2/user/day or 3 percent of gross, whichever is greater
- all other SRPs:  fees are $1.50/user/day

**September 9, 1987:**  BLM Handbook 8372-1, Recreation Use Permits, set the commercial fee at 3 percent per year, to be consistent with the U.S. Forest Service.

**October 19, 1989:**  Federal Register, vol. 54, no. 201: 42998.  Public Notice.  Established the policy of updating commercial SRP fees every 3 years using the implicit price deflator index, with the 1984 fee schedule serving as the base year.

- minimum SRP:  fee set at $60
- assigned site:  fee set at $120

**February 28, 1996:**  IM 1996-059.

- commercial:  fee set at  3 percent of gross, with a $75 minimum
- competitive:  minimum fee set at  $75
- assigned site:  fee increased to $150

**January 29, 1999:**  IM 1999-052.

- commercial:  fee set at 3 percent of gross, with an $80 minimum
- assigned site:  fee increased to $155

**July 29, 1999:**  Federal Register, vol. 64, no. 145: 41133.  Public Notice.  Raised fee for competitive and organized group SRPs to $4/person/day.  Fee adjustments for competitive and organized group use or events will occur automatically every 3 years, calculated and adjusted based on change in the implicit price deflator index, and rounded up to the nearest $1.

**March 20, 2002:**  IM 2002-119.

- commercial:  minimum fee remains at $80
- competitive:  minimum fee remains at $80
- assigned site:  fee increased to $160

AR10279

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B1-3

**November 3, 2004:** IM 2005-017.

- commercial:  minimum fee increased to $90
- competitive:  minimum fee increased to $90
- organized group:  minimum fee increased to $90
- assigned site:  fee increased to $180

**April 7, 2008:** IM 2008-106.

- commercial:  minimum fee increased to $95
- competitive:  minimum fee increased to $95; fee increased to $5/person/day
- organized group:  minimum fee increased to $95; fee increased to $5/person/day
- assigned site:  fee increased to $190

**November 19, 2010:** IM 2011-019.  Re-emphasized the agency requirements for administration of SRPs, including cost recovery.

**December 21, 2010:** IM 2011-041, effective March 1, 2011.

- commercial:  minimum fee increased to $100
- competitive:  minimum fee increased to $100; fee remains at $5/person/day
- organized group:  minimum fee increased to $100; fee remains at $5/person/day
- assigned site:  fee increased to $200

**February 28, 2011:** Federal Register, vol. 76, no. 39: 10915.  Notice, effective March 1, 2011.

- commercial:  minimum fee increased to $100
- competitive:  minimum fee increased to $100; fee remains at $5/person/day
- organized group:  minimum fee increased to $100; fee remains at $5/person/day
- assigned site:  fee increased to $200

**March 3, 2014:** Federal Register, vol. 79, no. 41: 11819.  Notice, effective March 1, 2014.

- commercial:  minimum fee increased to $105
- competitive:  minimum fee increased to $105; fee remains at $5/person/day
- organized group:  minimum fee increased to $105; fee remains at $5/person/day
- assigned site:  fee increased to $210

AR10280

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

## Appendix B2
## DECISION TREE FOR SPECIAL RECREATION PERMITTING

### I.  Determine land use plan conformance.

(1)  Does the proposed activity conform to the land use plan?
(2)  Is the use appropriate for the site or area?
(3)  Would the proposed activity be consistent with the recreation outcomes you are managing for in the area proposed?
(4)  Would the proposed activity affect the desired physical, social, or operational recreation setting characteristics?
(5)  Is the proposed activity consistent with the goals and objectives of your recreation program?

If you answered "yes" to all of the above questions, proceed with the decision tree.  If you answered "no" to any of the above questions, do not authorize the activity.

### II.  Determine if a special recreation permit (SRP) is required.

#### A.  Is the activity commercial in nature?

(1)  Does the activity raise money for any purpose, including charity?
(2)  Does any person or organization increase their net worth (e.g., by amortizing equipment or obtaining goods or services as a result of conducting the activity)?
(3)  Is there a business or financial gain?
(4)  Is there any vending?
(5)  Do participants pay a fee?
(6)  Does any entity receive fees, donations, or other compensation for the activity?
(7)  Do participants pay for a duty of care or expectation of safety?
(8)  Is there paid public advertising to seek participants?  Paid public advertising is one indicator of commercial use; however, advertising alone is not definitive of a commercial activity. (See Glossary definition of **Public Advertising**.)

If you answered "yes" to any of the above questions, a commercial permit is required for the activity. If you answered "no" to all the questions, proceed with the decision tree.

#### B.  Is the activity competitive?

First, refer to your determination about whether the activity is commercial, as most of the competitive events that the BLM authorizes are also commercial (e.g., motorcycle races, Eco-Challenge).  An SRP can be both commercial and competitive.

(1)  Is the event sanctioned, organized, or structured?
(2)  Do participants register, enter, or complete an application to participate?
(3)  Does the activity use a predetermined course or area?

AR10281

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B2-2

(4) Does the activity involve two or more contestants competing against each other or a solo contestant competing for a record?

If you answered "yes" to all of the above questions, the use requires a competitive use SRP.

## C.  Is a vending permit necessary and appropriate?

Vending permits are typically temporary, short-term, nonexclusive, revocable authorizations to sell goods or services on public lands and related waters in conjunction with a recreation activity. (See Chapter 1, Section I.C., Vending, for further guidance.)  A vending permit at a recreation attraction or developed site should directly support the recreation experience and be appropriate for the ROS (Recreation Opportunity Spectrum) class of the area.  Sales of food, souvenirs, clothing, jewelry, and convenience items are usually not appropriate, since they are not necessary for most outdoor recreation experiences.

If you answered "yes" to the question, a vending permit is required.

## D.  Is a Special Area permit required?

See Chapter 1, Section I.D., Special Area Use, for guidance.

## E.  Is an organized group permit required?

Organized group permits are not subject to any BLM-wide or statewide thresholds.  Such thresholds or other criteria for organized group permits should be established through land use planning.  Plans should identify areas or sites where large, organized groups are appropriate and where they are not.  In the absence of site-specific direction in your land use plan, you should use the Matrix for Evaluating a Proposed Organized Group Activity (shown below) when deciding whether to require a permit.  If, after reviewing the activity and location with the organizers, you determine that a permit is not necessary, consider documenting your determination in the form of a letter of agreement.  (See Appendix B3a, Using a Letter of Agreement for Organized Groups Where a Special Recreation Permit Is Not Required, and Appendix B3b, Sample Letter of Agreement.)

AR10282

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B2-3

## Matrix for Evaluating a Proposed Organized Group Activity

| Criteria | Letter of Agreement More Likely | Special Recreation Permit More Likely | Deny As Proposed |
|---|---|---|---|
| Is the proposed use appropriate to the site? | Yes, the site is very conducive to the proposed use, and the use is provided for in land use plan. | The site is appropriate for the proposed group size and activity, but land use plan does not specifically provide for it. | No, the site is not appropriate for the use as proposed. The proposed use does not support recreation planning goals, objectives, and desired settings. |
| Does the proposed use further recreation program goals and objectives? | Yes. | Yes. | No. |
| Does the proposed use require monitoring? | Only one simple site visit is required. | Monitoring beyond a one-time site visit is required. | Long-term monitoring of one or more resources is required. |
| Does the proposed use raise health and safety concerns? | No. | Concerns exist for event participants or public land users. | The use poses an unmitigated, high risk to human health and safety.  There is an unreasonable risk, especially to nonparticipants. |
| Is bonding desirable to cover reclamation and damage to government property or resources? | No. | Bonding is desirable or required. | |
| Is insurance desirable to protect the U.S. government from claims by group participants or third parties? | No liability exists; exposure is negligible. | Insurance is desirable owing to possible claims for personal injury or property damage. | |

AR10283

### Appendix B3a
## USING A LETTER OF AGREEMENT FOR ORGANIZED GROUPS
## WHERE A SPECIAL RECREATION PERMIT IS NOT REQUIRED

The Bureau of Land Management (BLM) has broad discretion to determine whether an organized group needs a special recreation permit (SRP). Generally, the BLM requires an SRP for organized groups if:

(1) There is a concern for health and safety.

(2) There is a management concern for cultural or natural resources or for facilities on public lands.

(3) The organized group requires services, such as law enforcement, fire protection, or onsite monitoring of resources or activities, or if it requires exclusive use or other specialized management.

Some offices have identified areas where most organized groups may be accommodated most easily. When organized group use occurs in an area that is appropriate and there are no major concerns about the activity, consider preparing a letter of agreement instead of requiring a permit.

A letter of agreement is:

- documentation of the BLM's determination that a permit is not required
- an opportunity for the organized group to plan its activity in a manner that does not require permit issuance and oversight
- documentation that the organized group contacted and worked with the BLM in planning its activity
- an opportunity to obtain information about the activity and attribute the use in RMIS

A letter of agreement is not:

- an authorization to use public lands
- an enforceable document (if the group fails to adhere to the agreement, the agency has no administrative recourse; however, law enforcement action may be taken if the group violates laws or regulations)

A sample letter of agreement is provided in Appendix B3b. This example may be modified to account for specific management situations. In no case should the letter of agreement be constructed as an authorization to use public lands. If an authorization is required, issuance of a special recreation permit or a recreation use permit (developed sites only) is the proper method of authorizing use.

AR10284

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B3b-1

**Appendix B3b**
**SAMPLE LETTER OF AGREEMENT**

**LETTER OF AGREEMENT**
**FOR ORGANIZED GROUP RECREATION USE**
**between**
**FIELD MANAGER**
**PRICE FIELD OFFICE**
**BUREAU OF LAND MANAGEMENT**
**and**
**CARBON COUNTY BSA DISTRICT**

Welcome to the Public Lands!  We hope you enjoy your visit.

The Bureau of Land Management (BLM) is responsible for the balanced management of your public lands and resources.  Management is based on the principles of multiple use and sustained yield, a combination of uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources.  These resources include recreation, range, timber, minerals, watershed, fish and wildlife, wilderness, and natural, scenic, scientific, and cultural values.

Special recreation permits may be required for recreation activities by organized groups using public lands and related waters.  Criteria used to determine whether a permit is necessary include: concern for health and safety, the need to manage lands and resources properly, and the need to coordinate with other public land users.  Based on our evaluation of your planned activity, such a permit does not appear to be necessary.

Type of Activity: Boy Scouts of America District Camporee; camping, day loop hikes

Place: Hidden Splendor

Date and Time: August 23–24, 2004; all day

Estimated Number of Participants: 200

Activity Contact Person: J. Audubon Woodlore
    Phone: (555) 555-5000

BLM Contact Person: Ira Planner
    Phone: (555) 555-5501

Certain actions help ensure safe and successful outings.  The signatories to this letter of agreement agree that:

(1)   All sites are filled on a first-come-first-served basis.  (Plan ahead to ensure that your group can secure a spot without interfering with other visitors.)

AR10285

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B3b-2

(2) Fire prevention requires that participants avoid building new fire rings. Participants will USE A FIRE PAN to eliminate scars on the soil. NO GATHERING WOOD for campfires is allowed. Participants will burn wood to ashes and douse with water, making sure that the fire is DEAD OUT and that the area is restored to a natural condition before leaving. For vehicle-based camps, all charcoal and ash from the fire pan must be hauled away.

(3) Proper disposal of human waste is critical. At your activity this will be accomplished by: PROVIDING TEMPORARY TOILET FACILITIES OR USING TOILETS AT THE CAMPGROUND. One toilet for every 25 persons attending will be required at all sites serviced by vehicles.

(4) Participants will REMOVE ALL TRASH to help keep public lands clean. (Picking up trash left by less thoughtful people helps maintain the scenic beauty of your public lands.)

(5) If any directional signs are erected as part of this activity, they will be removed at the completion of the activity.

(6) The participants assume all risks for natural phenomena that may be encountered. (Advise all participants of conditions they may encounter.)

(7) Nothing in this agreement shall be construed to imply permission to build any structure or conduct any activity not specifically named.

(8) Disorderly or otherwise objectionable conduct such as harassment of wildlife, livestock, or other lawful users of public lands and related waters will not be tolerated and could be the basis for denial of similar agreements in the future.

(9) Participants must take reasonable precautions to protect natural resource values, cultural or historic objects, aesthetic values, and any improvement on public lands.

(10) If participants have any questions concerning regulations on public lands and related waters, they should contact the BLM immediately.

*This agreement is not an authorization to use public lands. Failure to abide by all activity parameters in this agreement may result in permits being required for future activities.*

Activity Organizer's Signature _____
Date _____

BLM Authorized Officer's Signature _____
Date _____

AR10286

# Appendix B4  SPECIAL RECREATION PERMIT APPLICATION

AR10287

Form 2930-1
(January 2014)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**SPECIAL RECREATION PERMIT APPLICATION**
(43 U.S.C. 1201; 43 U.S.C. 1701; 16 U.S.C. 460L-6(a); and 43 CFR 2930)

FORM APPROVED
OMB NO. 1004-0119
Expires: December 31, 2016

Permit No.

Instructions: Complete and return to appropriate BLM Office.  *(Use additional sheets, as necessary.)* | **Type or Print Plainly in Ink**

1. ☐ New Application  ☐ Permit Renewal

2. Name of Business or Organization

3. First Name | Last Name | Middle Initial

4. Address

5. Phone No. *(include area code)* _____

6. FAX No. *(include area code)* _____

7. Email Address

8. Website

9. Applicant is: ☐ Individual  ☐ Corporation  ☐ Government Agency
*(If corporation, attach copy of Articles of Incorporation and Certificate unless already on file.)*

10. Name(s) and phone number(s) *(include area code(s))* of person(s) authorized to conduct business with BLM concerning the permit:

11. Application is for *(check all that apply)*: ☐ Commercial  ☐ Competitive Event  ☐ Organized Group  ☐ Vending
*(Definitions of these permit types are provided on page 3 of this form.)*

12. To use the following public lands/related waters *(provide name, legal description and/or attach map or GIS data file as required by BLM)*:

13. For the following purpose *(attach a complete Operations Plan as required by the issuing BLM Office)*:

14. Dates of proposed use
Beginning Date: | Ending Date:

☐ Check if applying for a multiple year permit, subject to annual authorization. | Other schedule:

| | | | | | |
|---|---|---|---|---|---|
| 15. | Do you have a permit with BLM/USFS/NPS? | ☐ Yes ☐ No | 15a. | Have you had a permit previously? | ☐ Yes ☐ No |
| 15b. | Have you ever been denied or had a permit revoked? | ☐ Yes ☐ No | 15c. | Have you forfeited a bond or other security? | ☐ Yes ☐ No |
| 15d. | Do you have any unresolved, criminal, civil or administrative actions related to a permit or the activities you plan to conduct under this permit? | ☐ Yes ☐ No | 15e. | Have you been convicted, or paid a fine, or forfeited a bond, for violations regarding natural resources, cultural resources or any activity related to your proposal? | ☐ Yes ☐ No |

*If the answers to any of the above questions are, "Yes:" Provide a detailed explanation on a separate piece of paper.*

16. Certification of Information:  I CERTIFY the information in this application and supporting documents is true, complete, and correct to the best of my knowledge and belief and is given in good faith.

I acknowledge that I (we) am (are) required to comply with any conditions or stipulations required by the BLM, including but not limited to the General Terms listed on page 2 of this form.

_____ | _____
(Signature of Applicant) | (Date)

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212 makes it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

(Continued on page 2)

AR10288

## GENERAL TERMS

a.   The permittee shall comply with all Federal, State, and local laws; ordinances; regulations; orders; postings; or written requirements applicable to the area or operations covered by the Special Recreation Permit (SRP). The permittee shall ensure that all persons operating under the authorization have obtained all required Federal, State, and local licenses or registrations. The permittee shall make every reasonable effort to ensure compliance with these requirements by all agents of the permittee and by all clients, customers, participants, and spectators under the permittee's supervision.

b.   An SRP authorizes special uses of the public lands and related waters and, should circumstances warrant, the permit may be modified by the BLM at any time, including modification of the amount of use. The authorized officer may suspend or terminate an SRP if necessary to protect public resources, health, safety, the environment, or because of non-compliance with permit stipulations. Actions by the BLM to suspend or terminate an SRP are appealable.

c.   No value shall be assigned to or claimed for the permit, or for the occupancy or use of Federal lands or related waters granted thereupon. The permit privileges are not to be considered property on which the permittee shall be entitled to earn or receive any return, income, price, or compensation. The use of a permit as collateral is not recognized by the BLM.

d.   Unless expressly stated, the SRP does not create an exclusive right of use of an area by the permittee. The permittee shall not interfere with other valid uses of the federal land by other users. The United States reserves the right to use any part of the area for any purpose.

e.   The permittee or permittee's representative may not assign, contract, or sublease any portion of the permit authorization or interest therein, directly or indirectly, voluntarily or involuntarily. However, contracting of equipment or services may be approved by the authorized officer in advance, if necessary to supplement a permittee's operations. Such contracting should not constitute more than half the required equipment or services for any one trip or activity and the permittee must retain operational control of the permitted activity. If equipment or services are contracted, the permittee shall continue to be responsible for compliance with all stipulations and conditions of the permit.

f.   All advertising and representations made to the public and the authorized officer must be accurate. Although the addresses and telephone numbers of the BLM may be included in advertising materials, official agency symbols may not be used. The permittee shall not use advertising that attempts to portray or represent the activities as being conducted by the BLM. The permittee may not portray or represent the permit fee as a special federal user's tax. The permittee must furnish the authorized officer with any current brochure and price list if requested by the authorized officer.

g.   The permittee assumes responsibility for inspecting the permitted area for any existing or new hazardous conditions, e.g., trail and route conditions, landslides, avalanches, rocks, changing water or weather conditions, falling limbs or trees, submerged objects, hazardous flora/fauna, abandoned mines, or other hazards that present risks for which the permittee assumes responsibility.

h.   In the event of default on any mortgage or other indebtedness, such as bankruptcy, creditors shall not succeed to the operating rights or privileges of the permittee's SRP.

i.   The permittee cannot, unless specifically authorized, erect, construct, or place any building, structure, or other fixture on public lands. Upon leaving, the lands must be restored as nearly as possible to pre-existing conditions.

j.   The permittee must present or display a copy of the SRP to an authorized officer's representative, or law enforcement personnel upon request. If required, the permittee must display a copy of the permit or other identification tag on equipment used during the period of authorized use.

k.   The authorized officer, or other duly authorized representative of the BLM, may examine any of the records or other documents related to the permit, the permittee or the permittee's operator, employee, or agent for up to three years after expiration of the permit.

l.   The permittee must submit a post-use report to the authorized officer according to the due dates shown on the permit. If the post-use report is not received by the established deadline, the permit will be suspended and/or late fees assessed.

m.   The permittee shall notify the authorized officer of any incident that occurs while involved in activities authorized by this permit, which result in death, personal injury requiring hospitalization or emergency evacuation, or in property damage greater than $2,500 (lesser amounts if established by State law). Reports should be submitted within 24 hours.

(Continued on page 3)                                                                                                      (Form 2930-1, page 2)

AR10289

## DEFINITIONS

**Commercial use** is defined as recreational use of the public lands and related waters for business or financial gain. The activity, service, or use is commercial if any person, group or organization makes or attempts to make a profit, receive money, amortize equipment, or obtain goods or services, as compensation from participants in recreational activities occurring on public lands led, sponsored, or organized by that person, group, or organization. An activity, service, or use is commercial if anyone collects a fee or receives other compensation that is not strictly a sharing of, or exceeds, actual expenses incurred for the purposes of the activity, service or use. Commercial use is also characterized by situations where there is paid public advertising to seek participants or participants pay for a duty of care or an expectation of safety. Profit-making organizations and organizations seeking to make a profit are automatically classified as commercial, even if that part of their activity covered by the permit is not profit-making or the business as a whole is not profitable. Use of the public lands by scientific, educational, and therapeutic institutions or non-profit organizations is commercial and subject to a permit requirement when it meets any of the threshold criteria above. The non-profit status of any group or organization does not alone determine that an event or activity arranged by such a group or organization is noncommercial.

**Financial Gain** occurs when an individual or entity receives or attempts to receive money, donations, gratuities, or gifts, amortizes equipment, or barters for goods or services.

**Competitive Use** means any organized, sanctioned, or structured use, event, or activity on public land in which two or more contestants compete and any of the following elements apply: (1) Participants register, enter, or complete an application for the event; or (2) A predetermined course or area is designated. It also means one or more individuals contesting an established record such as speed or endurance.

**Organized Group Activity or Event** means a structured, ordered, consolidated, or scheduled event on, or occupation of, public lands for the purpose of recreational use that is not commercial or competitive, and which BLM has determined needs a special recreation permit based on planning decisions, resource concerns, potential user conflicts, or public health and safety.

**Vending** means selling or renting recreation related goods or services such as firewood, equipment repair, shuttles, rentals, etc. on the public lands or related waters.

## NOTICES

**The Privacy Act** and 43 CFR 2.48(d) require that you be furnished the following information in connection with the information requested by this form.

**AUTHORITY:** 43 U.S.C. 1201; 43 CFR Group 2930

**PRINCIPAL PURPOSE:** BLM will use your information to determine whether or not to issue you a Special Recreation Permit. BLM will use some of the information to determine your qualifications for the permit and other information to determine the merits of your proposal.

**ROUTINE USES:** BLM will disclose the information in accordance with the regulations at 43 CFR 2.56(d).

**EFFECT OF NOT PROVIDING INFORMATION:** Disclosing the information is necessary to receive a benefit. Not disclosing the information may result in BLM rejecting your application.

**The Paperwork Reduction Act requires us to inform you that:**

BLM will use the information to determine whether or not to issue you a Special Recreation Permit. Response to this request is required to obtain the benefit of receiving a Special Recreation Permit.

You do not have to respond to this or any other Federal agency-sponsored information collection unless it displays a valid OMB control number.

## BURDEN HOURS STATEMENT

Public reporting burden for this form is estimated to average 30 minutes per response and 3 hours and 30 minutes for accompanying information. You may submit comments regarding the burden estimate or any other aspect of this form to:
U.S. Department of the Interior, Bureau of Land Management (1004-0119), Bureau Information Collection Clearance Officer (WO-630), Mail Stop 401 LS, 1849 C St., N.W., Washington , D.C. 20240.

(Form 2930-1, page 3)

AR10290

## Appendix B5
## SPECIAL RECREATION PERMIT

(BLM employees may access this internal form at the following web address)

https://blmspace.blm.doi.net/oc/intra/dbs/eForms%20Library/2930-002.pdf

AR10291

**Appendix B6**
**SAMPLE BUSINESS PLAN REQUIREMENTS**

A business plan is essential to start a business, improve a business, and provide a detailed view of a business. The Bureau of Land Management (BLM) requires prospective permittees to provide a business plan before a permit will be authorized. Low-cost assistance and training in preparing a business plan is available from Small Business Development Centers located throughout the United States. The U.S. Small Business Administration (www.sba.gov) can also provide information on developing a business plan.

Although a complete business plan as described by the SBA is recommended, the minimum requirements for the business plan being requested are as follows:

- documentation of the business, company, or organization
- description of past business experience related to proposed activity (or, if none, any business experience)
- a statement of financial resources

## I. DOCUMENTATION OF THE BUSINESS, COMPANY, OR ORGANIZATION

Applicants need to include information about the business, including its purpose and goals, and a description of the business, including its legal structure, its location, and its marketing strategy. At a minimum, answer and/or address the following statements:

(1) What is the purpose in pursuing this business (i.e., what is your mission statement)?

(2) Define your business goals for the next year and what you foresee as your goals 5 years from now.

(3) Briefly describe the business, your knowledge, and the services you will provide.

(4) Identify the designated permit agent and provide contact information.

(5) Describe how your company is legally organized (sole proprietorship, partnership, corporation, LLC).

(6) Include any appropriate information, including shareholder or partnership agreements, and a complete list of the owners.

(7) Describe the location of your business, and if not local, describe what your process would be in overcoming local problems that might arise (e.g., with respect to a day-to-day river operations business, the loss of a head guide, or equipment issues).

AR10292

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B6-2

(8) Describe your anticipated target market (e.g., age, income, hobbies, regional, national, international).

(9) Discuss your advertising campaign in terms of how, when, and where you will advertise, and estimate your annual advertising cost.

## II. DESCRIPTION OF PAST BUSINESS EXPERIENCE RELATED TO PROPOSED SERVICES

Applicants must provide a detailed description of their experience as it relates to the proposed services. If no experience in the proposed services exists, then describe any past business experience. At a minimum, applicants must describe/provide the following:

- dates of your business experience
- location of the business experience
- services provided
- customers served
- number of employees supervised
- volume of business
- business references

## III. STATEMENT OF FINANCIAL RESOURCES

A critical component of a business plan is a financial statement. Any financial information submitted by applicants should conform to generally accepted accounting principles or other comprehensive bases of accounting. The business plan and all financial information and projections are confidential information and may not be released by the BLM, except to the extent allowed in the Freedom of Information Act and the Privacy Act, 5 U.S.C. 552 and 552a, respectively. At a minimum, applicants need to answer and/or address the following statements:

(1) List startup expenses.

(2) List sources of financing (cash, noncash assets, loans, etc.) and uses of financing (working capital needs, such as buildings, equipment, salary).

(3) Develop a monthly cash flow projection (income-debt) for the first year.

AR10293

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B7a-1

**Appendix B7a**
**SAMPLE OPERATING PLAN FOR A**
**COMMERCIAL SPECIAL RECREATION PERMIT**

SRP #
(Agency Use Only)

*The operating plan must accurately identify the use and activities, the use area, and the use seasons of the operations proposed on public lands and related waters. Make sure the information is complete and that you describe all proposed services, facilities, and dates of use. Failure to respond to any of the items, or inaccurate disclosures, may result in delays in processing or rejection of the application. This outline is provided for convenience only; it is not a required form, and other formats are acceptable. Attach additional pages as necessary.*


**I.    COMPANY INFORMATION**

(1) Company Name and Address: _____

(2) Type of Company: ____Sole Proprietorship ___Partnership ___Gov. Agency

___Corporation

*Attach copies of Articles of Incorporation, Corporate Certificate from the Utah Secretary of State, and any other business license issued by the State of Utah or its political subdivisions.*

(3) Date Company Established: _____

Number of Years with Current Owner(s): _____

(4) Name of Owner(s)/Partners: _____

Telephone:_____        Emergency Telephone: _____
Fax: _____        Email: _____
Website: _____

Name of person authorized to conduct business with the Bureau of Land Management (BLM) concerning this permit:

_____


**II.   PURPOSE OF AND NEED FOR THE PERMIT**

(1) Describe the need for the service or activity to be offered.

BLM HANDBOOK                                           Rel. 2-300
Supersedes Rel. 2-295                                  11/17/14

AR10294

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B7a-2

(2) How will the service or activity offered enhance the opportunity for visitors to enjoy public lands and related waters and the visitors' recreation experience?

(3) How will the service or activity offered help the BLM meet its management objectives?

(4) Explain why the proposed use area is suitable and is not in excess of the size needed to accomplish the purpose.

## III.  CONDUCT OF YOUR SERVICE OR ACTIVITY

### A.  Activity Parameters

(1) Maximum and minimum group size: _____

(2) Number of staff and ratio of staff to customer: _____

(3) Trip length and/or dates of activity: _____

(4) Activities to be engaged in; the equipment, vehicles, or livestock to be used; and the services/activities to be offered.

(5) Methods and means of transportation, including the numbers and types of vehicles, including street legal vehicles, all-terrain vehicles, boats, aircraft, and livestock.

(6) Describe any vending, rentals, or sales of consumer products or services.  If none, check here [ ].

### B.  Operations Area

*(1) Provide a map at a scale of 1:100,000 of the operations area on public lands.  Additional maps may be required.*

*(2) Note on the map all staging areas, camping locations, attraction sites, and routes of travel.*

AR10295

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B7a-3

## C. Environmental Protection and Conservation of Natural Resources

(1) How will your operations comply with the environmental protection stipulations of the permit?

(2) How will your operations incorporate Leave No Trace and Tread Lightly! Principles?

## D. Health, Safety, and Sanitation

(1) What first aid (including universal precautions) and evacuation equipment will be present during your operations?

(2) What emergency communications will be available?

(3) What is your emergency evacuation plan?

(4) What environmental hazards exist (e.g., exposure, flash flood, avalanche, weather, fauna, terrain)? How will you manage these hazards?

(5) What hazards are inherent to the activity? How will they be managed?

(6) What safety equipment will be used, and how is it inspected and maintained?

(7) What toilet facilities will you provide, how will you dispose of human waste, and how will you provide for washing? How will you contain and remove trash?

(8) Demonstrate how you will comply with other federal, state, and local laws pertaining to your activity, including but not limited to:

    a) If your activity will serve any food or beverage to a customer, show how you will comply with Utah state law regarding food service sanitation.

    b) If your activity will involve more than 500 people at a single activity or event, show how you will comply with Utah state law regarding mass gatherings.

    c) If your activity involves the use of watercraft, show how you will comply with Utah state boating laws.

AR10296

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B7a-4

    d) If you are providing inpatient or residential wilderness therapy for persons under age 18, show how you will comply with Utah state law regarding wilderness therapy programs or residential treatment programs.

(9) If your activity will involve firearms, what provisions will you make for safe storage, transportation, and use?

(10)    If your activity uses livestock for riding or packing, identify the kind and number of animals you will use. Also, identify how the animals will be fed, watered, and confined when not being used.

## E. Staff Experience and Training

(1) What level of first aid training is required?

(2) What level of training or experience for the specific activity is required?

(3) What knowledge and experience do you have with the operations area?

(4) If your activity involves visits to cultural sites, prehistoric, and/or historic sites, demonstrate a basic knowledge of the laws and regulations dealing with protection and preservation of antiquities, objects of historical interest, and graves. Demonstrate a factual knowledge of the site(s) to be visited.

(5) Have any of your company owners/partners or employees been convicted of a federal, state, or local violation regarding guiding, outfitting, resources protection, or the activity proposed for this permit? If so, provide details.

(6) Has your company or its owner/operators ever been denied a permit, had a permit revoked, or surrendered a bond related to a permit for operations on lands administered by the Bureau of Land Management, the National Park Service, the U.S. Forest Service, or other federal or state agency? If so, provide details.

AR10297

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B7a-5

### F. Customer Information

*(1) Attach a copy of the customer contract, including any risk acknowledgment and/or waivers.*

*(2) Attach a price list.*

### G. Other Required Permits

(1)  List any permits required by other federal, state, or local agencies to conduct your activity.

(2)  List any permissions or contracts required to use private lands that you do not own or control.

## IV.  CERTIFICATION

I certify that the information given by me in this proposed operating plan is true, accurate, and complete to the best of my knowledge.  I acknowledge that I (we) must comply with the requirements and stipulations on Form 2930-2, Special Recreation Permit, and any additional stipulations that the field manager may deem necessary.  I (we) further understand that providing false information, or failure to keep this operating plan or other permit requirements up-to-date, is grounds for probation, suspension, or revocation of the permit.

Signature  _____     Date  _____

Name  _____

Signature  _____     Date  _____

Name  _____

AR10298

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B7b-1

**Appendix B7b**
**SAMPLE OPERATING PLAN FOR AN ORGANIZED GROUP**
**OR COMPETITIVE EVENT**

*The operating plan must accurately identify the use and activities, the use area, and the dates of the proposed use on public lands and related waters. The information must be complete and all proposed services and, facilities, described in detail. Failure to respond to any of the items, or inaccurate disclosures, may result in processing delays or rejection of the application. This outline is provided for convenience only; it is not a required form, and other formats are acceptable. Attach additional pages as necessary.*

## I.  EVENT ORGANIZER INFORMATION

(1)    Organizer Name and Address: _____

_____

(2)    Type of Organization:

___ Family  _____Partnership  _____Corporation  ___ Social Club

*Attach copies of Articles of Incorporation, Corporate Certificates, and any other business license issued by the appropriate state or its political subdivisions.*

(3)    Date Established: _____

(4)      Name of the insured as it will appear on the certificate of liability insurance:

_____

(5)    Name of Primary Contact: _____

Telephone: _____    Emergency Telephone: _____
Fax: _____    Email: _____
Website: _____

## II.  PURPOSE AND NEED FOR THE PERMIT

(1) Describe the need for the event or activity to be offered.

(2) Describe how the event or activity enhances the opportunity for visitors to enjoy public lands and related waters and the visitors' recreation experience.

AR10299

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B7b-2

(3) Describe how the proposed use area is suitable for the proposed activity and is the optimal size needed to accomplish the activity.

(4) Is the event   (check <u>all</u> that apply)

_____   **Competitive**:   Participants compete against each other or against the clock.  If entry fees are charged, the event may also be commercial.

_____   **Commercial:**   An event is commercial if it raises funds for any purpose, including donations to nonprofit or charitable organizations.  An event is commercial if fees are charged in excess of cost sharing for actual expenses incurred during the event.  If any organization or people make a profit, make money, or increase their net worth, the event is commercial.  If paid staff conduct the event, the event is classified as commercial.

_____   **Organized Group:**   An event that is neither competitive nor commercial.

(5) If your event is competitive, describe any prizes to be awarded.

(6) If your event is competitive, describe how the start and finish will be delineated and conducted.


## III.  CONDUCT OF EVENT

### A. Event Parameters

(1) Maximum and minimum group size, including expected number of competitors or other participants, spectators (e.g., pit crews, camp followers) and event staff (those people with defined roles in operations and the conduct of the event).

(2) Date(s) of activity: _____

(3) Activities to be engaged in; equipment, vehicles, or livestock to be used; and services/activities to be offered.  If applicable, describe temporary structures, use of generators, amplified sound devices, timekeeping equipment, etc.

(4) Describe any vending, rentals, or sales of food, beverages, or consumer products, or services.   If none, check here [ ].

(5) Will there be any paid entertainment?  If so, describe.

AR10300

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B7b-3

(6) Will people involved in the event camp in the area either before or after the event?  If so, describe.

(7) Is the event sanctioned by another organization?  If so, identify the sanctioning body and provide the name, address, and phone number of the contact person.

## B.  Operations Area

*(1) Provide a scaled map of the public lands, identifying the proposed operations area.*

*(2) Note on the map all staging areas, parking and camping locations, vending locations, attraction sites and routes, pit stops, and direction of travel.*

## C.  Environmental Protection and Conservation of Natural Resources

(1) Describe how the proposed operations would minimize impacts to the course and adjacent areas.

(2) How will your operations incorporate Leave No Trace and Tread Lightly! principles?

(3) How will race participants be informed of proper trail rules and requirements?

## D.  Health, Safety, and Sanitation

(1) Describe the number, type, and location of emergency medical staff and evacuation equipment that will be present during your operations.

(2) What emergency communications will be available, and where will they be located?

(3) What is your emergency evacuation plan?

(4) What environmental hazards exist (e.g., exposure, flash flood, avalanche, weather, fauna, terrain)?  How will these hazards be managed during the proposed activity?

(5) What other hazards are inherent to the activity?  How will they be managed?

(6) What safety equipment will be used by staff and participants, and how is it inspected and maintained?

(7) Describe the number and type of toilet and hand-washing facilities that will be available during the event and where they will be located.  How will event-related trash and garbage be contained and removed?

AR10301

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B7b-4

(8) If applicable, demonstrate how you will comply with other federal, state, and local laws pertaining to your activity, including but not limited to:

    a) If your activity will serve any food or beverage to a customer, show how you will comply with state or county law regarding food service preparation and sanitation.

    b) If your activity will involve more than 500 people at a single activity or event, show how you will comply with state or county law regarding mass gatherings.

    c) If your activity involves the use of watercraft, show how you will comply with state boating laws.

(9) If your activity will involve firearms, what provisions will you make for safe storage, transportation, and use?

### E. Staff Experience and Training

(1) What level of first aid training is required of staff?

(2) What level of training or experience for the specific activity is required?

(3) Have you, members of your organization, company owners, or employees received a citation for violation(s) regarding resource protection or the activity proposed for this permit?  If so, provide details.

(4) Have you, your organization, or your organization's employees ever been denied a permit, had a permit revoked, or surrendered a bond related to a permit for operations on lands administered by the Bureau of Land Management, the National Park Service, or the U.S. Forest Service?  If so, provide details.

### F. Participant Information

*(1) Attach a copy of the customer contract, including any risk acknowledgment and/or waivers.*

*(2) Attach a copy of the registration form or event price list.*

### G. Other Required Permits

(1) List any permits required by other federal, state, or local agencies to conduct your activity.

AR10302

(2)  List any permissions or contracts required to use private lands that you do not own or control.

**H. Filming**

(1)  Will video, movie, or still photography of the event be produced for a commercial purpose?

_____Yes        _____No

(2)  If yes, describe how filming will occur (e.g., number and types of crew and equipment).

## IV.  CERTIFICATION

I certify that the information given by me in this proposed operating plan is true, accurate, and complete to the best of my knowledge.  I acknowledge that I (we) am (are) required to comply with the requirements and stipulations on Form 2930-2, Special Recreation Permit, and any additional permit stipulations identified by the authorized officer.  I (we) further understand that providing false information or failure to operate in accordance with this operating plan or other permit requirements is grounds for probation, suspension, or revocation of the permit.

Signature  _____        Date _____

Name  _____

Signature  _____        Date _____

Name  _____

AR10303

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B8-1

## Appendix B8
## SAMPLE DECISION APPROVING APPLICATION

Itty Bitty Field Office
32 Main Street
Itty Bitty, NV 89704

8372-SRUP
NV-030-9619
(NV-03300)

**Certified Mail**
**Return Receipt Required**

### DECISION

August 11, 2014

Ropin' and Ridin' Adventures                                                                Special
Recreation Use Permit
Wild Bill Hickok, Manager
220 Cheyenne Road
Itty Bitty, NV 89704

### Permit Application Approved

The Outdoor Recreation program, Itty Bitty Field Office, has received and evaluated special recreation permit application #NV-030-9619.  The permit will be issued for a 1-year term, renewable upon written request annually from the permittee and following successful compliance by the permittee with Bureau management stipulations.

Ropin' and Ridin' Adventures based in Itty Bitty, Nevada, shall be authorized to conduct occasional guided hiking and horseback excursions of 2–8 participants along existing roads and trails in the vicinity of Eldorado Canyon near Dayton, Nevada.

The permit shall be issued pending conclusion of the 30-day appeal notification period.  An annual permit fee of $105 and proof-of-insurance certificate naming the Department of the Interior, Bureau of Land Management, as additional insured shall be required of the applicant before permit authorization.

**APPEALS:** This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR Part 4, and the enclosed Form 1842-1, Information on Taking Appeals to the Interior Board of Land Appeals.  If you appeal this decision, your Notice of Appeal must be filed in this office (at the above address) within 30 days from your receipt of this decision.  The appellant has the burden of showing that the decision under appeal is in error.

/s/
Lois Lane
Field Manager

Enclosure:
Form 1842-1

cc:
County Commission
Friends of the Forbs

BLM HANDBOOK                                                                Rel. 2-300
Supersedes Rel. 2-295                                                         11/17/14

AR10304

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B9-1

## Appendix B9
## SAMPLE DECISION DENYING APPLICATION
Itty Bitty Field Office
32 Main Street
Itty Bitty, NV  89704

8372-SRP
NV-030-9619
(NV-03300)

July 15, 2012

Diana Prince
495 North 500 West
Atlantis, Nevada 85692

### NOTICE OF FIELD MANAGER'S DECISION

On June 16, 2012, we received your application for an SRP (special recreation permit) to conduct commercially guided hunts in the Itty Bitty Field Office Area, between September 1, 2012, and September 1, 2017.  Based on information obtained while reviewing your application, the Bureau of Land Management (BLM) has determined that approving your application would conflict with the BLM's objectives, responsibilities, and programs for management of the public lands involved.  For the reasons outlined below, your application is rejected and permit denied.

(1)  The regulations found at 43 CFR 2932.22 state the application shall be filed a minimum of 180 days in advance of the intended use.  Your application is rejected as untimely.

(2)  You provided false information in your application.  On Form 2930-1, item 7b, you did not disclose that you hold an SRP in the Lowman Field Office.  Upon contacting Lowman, we learned that your SRP is in probationary status, indicating you have not operated the permit in compliance with its terms and conditions.  In your operating plan you stated you had never been convicted of a federal, state, or local violation regarding guiding, outfitting, resources protection, or the activity proposed under the permit.  In 2006, however, you pleaded guilty to a third degree felony:  wanton destruction of wildlife, poaching a cow elk out of season.  In 2005 you paid three criminal citations issued by the BLM for:  guiding without a permit, providing false statements, and for grazing livestock without a permit.

(3)  In addition to the above adjudicated violations, in 1998 you guided hunters to the taking of a bison within Capitol Reef National Park, an area where hunting is prohibited.

In its recreation programs the BLM seeks to provide for public health and safety, environmental protection, and a high-quality recreation experience available to the public.  Given your long history of disregard for BLM regulations and to laws related to natural resources, issuance of this SRP would not serve the public interest or contribute to the achievement of program objectives.

Your application is rejected.  Your request for a permit is denied.  This decision is effective immediately and shall remain effective pending the outcome of any appeals.  If you are adversely affected by this decision, you may file an appeal with the Interior Board of Land Appeals under 43 CFR Part 4.  Information on how to appeal is attached to this decision as Form 1842-1, Information on Taking Appeals to the Interior Board of Land Appeals.

/s/
Clark Kent
Field Manager

Attachment:  Form 1842-1

AR10305

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B10-1

## Appendix B10
## SAMPLE DECISION TERMINATING A SPECIAL RECREATION PERMIT

October 31, 2012

Permittee Ltd.
Attn:  Darth Vader
100 Colorado River Road
Silt, Colorado  81652

Dear Mr. Vader:

This is to inform you and all staff of Permittee, Ltd., that the special recreation permit (SRP) number SFO-2012-022 that was issued on February 1, 2010, has been terminated by the Bureau of Land Management (BLM), Silt Field Office.  Permittee, Ltd., is no longer authorized to conduct commercial tours or activities on lands or waters managed by the BLM's Silt Field Office.

In making the decision as to whether to suspend or cancel a commercial SRP, BLM field offices consider the regulations governing SRPs at 43 CFR Subpart 2932.  Specifically, 43 CFR 2932.56 (b)(1) provides that the BLM may suspend or cancel an SRP if the permittee violates permit stipulations.

The BLM did not receive the signed Annual Permit that was sent to you on April 30, 2012, for signature and return to the BLM, nor any of the additional documents required from all permittees as part of the permit stipulations to fulfill the issuance of an Annual Operating Authorization.  These requirements are as follows:

Annual Operating Authorization Requirements

- copy of current Colorado River Outfitter License
- copy of current Colorado Outfitters Registration
- estimated Use Fees
- assigned Site Fees
- copy of current insurance certificate, with the "U.S. Department of the Interior, Bureau of Land Management" identified as additional insured
- copy of all current advertising (brochure, webpage, etc.) and price list itemized for all of the services offered.

Our office contacted you in writing on May 30, 2012, and August 30, 2012, to inform you of the overdue documents and fees and to request that you contact the office.  The BLM received no response.  Kimberly Miller, Outdoor Recreation Planner, also spoke with you on September 30, 2012, to inform you that your permit would be canceled if Permittee, Ltd., did not comply with the permit requirements.

AR10306

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B10-2

If Permittee, Ltd., feels it is adversely affected by this decision, you may file an appeal to the Interior Board of Land Appeals under 43 CFR Part 4.

Process for Appealing at the Interior Board of Land Appeals:

An appeal is an opportunity for a qualified party to obtain a review of a BLM decision by an independent board of administrative judges within the Department of the Interior's Board of Land Appeals (IBLA). The IBLA determines whether the BLM followed applicable laws and regulations, adhered to established policies and procedures, and considered relevant information in reaching a decision.

Individuals who believe they are adversely affected by a BLM decision to deny, modify, or cancel a special recreation permit may appeal the decision. Appeals are made to the IBLA under Title 43 CFR Part 4, pursuant to 43 CFR 4.411. A person who wishes to appeal to the IBLA must file a notice that he or she wishes to appeal in the office of the officer who made the decision. Form 1842-1, "Information on Taking Appeals to the Interior Board of Land Appeals," is enclosed for your convenience.

If you have any questions, please feel free to contact Kimberly Miller, Outdoor Recreation Planner, at (910) 876-9975.

/s/
Steve G. Bennett
Field Office Manager

Enclosure:
Form 1842-1

AR10307

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11a-1

## Appendix B11a
## SAMPLE STIPULATIONS FOR A COMMERCIAL LAND-BASED SPECIAL RECREATION PERMIT

**Name of Company**:
**Special Recreation Permit Number**:
**SRP Valid** from:                to:
**Activities Authorized by This SRP**:
**Operation Areas**:
**Pre-trip Itineraries Required?**
**Post-Use Report Due**:
**Minimum Insurance Requirements**:
**Fee Formula**:
**Deductions and/or Discounts Applicable**:

## A. General

(1) Permits issued for more than 1 year are subject to annual validation.  To secure validation, the permittee must:

    a)  have performed satisfactorily under the terms and conditions of this permit and be in conformance with applicable federal, state, and local laws, ordinances, regulations, orders, postings, and written requirements applicable to the area and operation covered by the permit;

    b)  ensure that all persons operating under the permit have obtained all required federal, state, and local licenses or registrations;

    c)  have on file, with the office issuing the permit, current insurance identifying the U.S. Department of the Interior, Bureau of Land Management, as additional insured as specified in stipulation C;

    d)  have no outstanding, past due, or unpaid billing notices.

(2) Permittees may not leave personal property unattended on public lands administered by the Bureau of Land Management (BLM) for more than 48 hours without written permission of the authorized officer, with the exception that vehicles may be parked in designated parking areas for as many as 14 consecutive days.  Unattended personal property is subject to disposition under the Federal Property and Administrative Services Act of 1949, as amended.

AR10308

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11a-2

(3) The permit authorizes the use only for the activity, the time(s), and in the area(s) specifically described above.

(4) The permittee must maintain, on file with the BLM, a current and correct list of employees who will be conducting services for the company on public lands. Persons providing services under this permit must be employees of the permittee.

(5) Placement of caches of supplies and food or equipment for future trips is not allowed unless specifically authorized.

(6) The permittee must allow BLM representatives to complete permit checks to determine the validity of the permit, to ascertain the group has a copy of the permit and all required equipment, and to orient trip participants about the use of public lands and related waters and safety.

## B. Financial

(1) The permittee must submit a post-use report **[SEE APPENDIX B20, SAMPLE POST-USE REPORT]** 30 calendar days after the last use of the permit in a calendar year, or as agreed upon with the field office administering the permit. Alternative reporting arrangements may be established by written agreement with the authorized officer. The issuing office may approve extensions of this due date on a case-by-case basis. The report must contain a trip-by-trip log of: trip location, beginning and ending dates of each trip, number of clients, number of guides, and gross receipts for the trip. In reporting gross receipts, the outfitter will report all payments made by the customer, with the only exception being retail sales of durable goods that remain the property of the customer and have an expected service life extending beyond the guided activity. The request for deductions based on pre-trip/post-trip transportation and lodging expenses and percentage of time on public land, if being claimed, must also be submitted at this time. Requests for transportation and lodging deductions must be accompanied by copies of supporting receipts documenting proof of payment.

(2) The permittee must submit a post-use report to the authorized officer for every year the permit is in effect. If the post-use report is not received by the established deadline (see above), the following late fee schedule will be initiated:

- more than 15 calendar days but no more than 30 calendar days after the due date: $125
- more than 30 calendar days but no more than 45 calendar days after the due date: $250

Post-use reports submitted 45 calendar days or more after the due date may result in criminal, civil, and/or administrative action to protect the interest of the United States.

(3) The permittee must maintain the following internal accounting records pertaining to the permit:

AR10309

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11a-3

a) W-2 records or a similar record of employment for all employees conducting trips under the permit

b) a record of all financial relationships with booking agents or advertisers

c) a record of all receipts or compensation including payments, gratuities, donations, gifts, bartering, etc., received from any source on trips conducted under the permit

d) a record of all payments made by the permittee and claimed as a deduction in the permittee's fee submission

The BLM retains the right to verify permit compliance from the books, correspondence, memorandums, and other records of the permittee, and from the records pertaining thereto of a proprietary or affiliated company during the period of the permit and for 3 years thereafter regardless of physical location.

## C. Insurance

(1) At a minimum, the permittee must have in force public liability insurance in the appropriate amount as shown on the permit.

(2) The policy must state that the insurance company shall have no right of subrogation against the United States of America.

(3) Such insurance must name the U.S. Department of the Interior, Bureau of Land Management, as additional insured and provide for specific coverage of the permittee's contractually assumed obligation to indemnify the United States.

(4) The permittee must notify the authorized officer of the Bureau of Land Management 30 calendar days in advance of the termination or modification of the policy.

(5) The permit is not valid unless the permittee maintains a current authenticated certificate of the required insurance on file with the office issuing the permit.

(6) The permittee must indemnify and hold harmless the United States against any responsibility or liability for damage, death, injury, or loss to persons and property that may occur during the permitted use period or as a result of such use.

(7) The permittee must furnish a copy of the insurance policy directly to the authorized officer.

(8) The name of the insured on the insurance policy must be the same as the name on the permit. Those permittees holding insurance policies that insure only the permittee and not the permittee's employees must ensure that their employees also have the required insurance in effect and that a certificate of insurance is furnished to the authorized officer.

(9) For multiyear permits, the insurance policy must be provided the first year, but on each subsequent year the authorized officer may accept a valid certificate of insurance.

(10) Valid insurance is necessary only during periods of actual use.

AR10310

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11a-4

**D. Marking of Outfitter Vehicles**

Every street-legal motor vehicle used to transport clients or equipment must be marked with at least one sign, decal, or placard on each side of the vehicle. The sign must at a minimum include the company name and the city and state where the permittee is headquartered. Information must be readable from a distance of 50 feet.

**E. Pre-trip Itinerary**

Before each trip the permittee will file a notice of intent in writing with the BLM. The notice of intent must specify the intended dates of the trip, number of clients, number of guides, name of the lead guide and the area(s) to be visited, including the location of camps. Alternative reporting arrangements may be specified in writing by the authorized officer.

**F. Environmental and Resource Protection**

All trips must conform to Leave No Trace principles.

(1) For all trips and at all base camps with locations served by a motorized vehicle, the permittee must have a toilet system that allows for the proper carry-out and disposal of solid human body waste that is adequate for the size of the group and length of the trip. Toilets must be accessible for use by passengers and crew at all sites where a company motorized vehicle is present, except in developed locations where public restrooms are provided. In locations remote from a permittee's vehicle, solid human waste must be buried in a sunny location in bare soil or carried out (unless otherwise stipulated). Toilet paper must be carried out and not buried or burned.

(2) Cans, rubbish, and other trash must not be discarded, buried, or dumped on public lands and related waters. Wet garbage such as eggshells, orange peels, leftover solid food, bones, melon rinds, etc., must be carried out. Trash cleanup at campsites and day-use areas will include all litter or discarded items, including small items such as bottle caps and cigarette butts.

(3) Washing or bathing with soap is not permitted in tributary streams, springs, or other natural water sources. Dishwater must be strained before dispersal. Dishwater and bathwater may not be dumped within 100 feet of streams, springs, or other natural water sources. Only biodegradable soap may be used.

(4) The permittee will be responsible to ensure that historical, archaeological, cultural, or ecological resources are not damaged, destroyed, or removed by any participants on authorized trips.

(5) The permittee must conduct operations authorized by the permit in accordance with applicable BLM management plans and the permittee's own operating plan submitted to the BLM in support of this permit.

(6) The number of participants on any trip, including guides, may not exceed the number specified in the permittee's operating plan and approved permit. The exception to this

AR10311

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11a-5

requirement is over-the-road bus tours using state and federal highways and class B county roads.

(7) No camping is permitted within 300 feet of a known prehistoric or historic site.

(8) No camping is permitted within 300 feet of a water source other than perennial streams unless prior authorization is received from the authorizing officer.

## G. Fires

This permit does not waive any applicable restrictions that may affect the use of campfires or cooking fires. The following stipulations apply unless specifically waived by the authorized officer:

(1) At sites accessed by the permittee's motor vehicle(s), the permittee must provide its own fuel wood.

(2) At sites accessed by the permittee's motor vehicle(s), the permittee must use a fire pan to contain the fires, ash, and charcoal. Charcoal and ash from the fire pan must be hauled out.

(3) Gathering wood from standing trees, live or dead, is prohibited.

(4) Use of dead and down wood is permitted only at backcountry sites not accessed by the permittee's motor vehicle(s). In such cases, if a fire pan is not used, the permittee must ensure that all wood is burned to ash and that the area is naturalized before leaving.

(5) The permittee must ensure that fuel wood piles are scattered before leaving the site.

(6) The permittee must ensure that all employees and participants comply with all fire restrictions and orders.

## H. Safety and Equipment

(1) The permittee must provide the equipment necessary to serve the public in a safe manner. The permittee will ensure that trips are conducted in compliance with all laws and regulations relating to vehicle operations, land use restrictions, food handling, and any other applicable regulations.

(2) Every person serving as a guide on public lands and related waters must, at a minimum, be trained and currently certified in basic first aid and cardiopulmonary resuscitation (CPR). Each guide must have legible copies of certification cards in his/her possession while operating under a BLM special recreation permit in Utah. In addition, certification cards must be filed at the permittee's headquarters and available for BLM review if necessary.

(3) The following equipment must be carried on all commercial trips:

   a)  A first aid kit adequate to accommodate each activity, group, or subgroup

   b)  Adequate repair kits and spare supplies appropriate for the trip and activity

AR10312

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11a-6

(4) The following procedures must be followed on all commercial trips:

a) Unless specifically authorized in the permit, discharge of firearms is allowed only for legal pursuit of game animals by a licensed hunter.

b) Use of explosives and fireworks is prohibited.

## I.  Bonds

Items permitted for long-term storage at your base camp are listed on *Attachment 1*.  **[INCLUDE AN ATTACHMENT 1 IF USING THE BOND STIPULATION.]**  A partial or complete forfeiture of the bond may be used by the BLM to defray the cost of any necessary removal or restoration by the BLM.  The bond shall be fully refunded only upon satisfactory compliance with this permit stipulation, involving removal and restoration requirements, when the permit is terminated by the BLM, the permittee wishes to cancel the permit, or the permittees no longer requests storage of personal items on BLM-managed lands.  The bond may be periodically adjusted by the authorized officer when, in his/her sole determination, conditions warrant such a change.

Sample Bonding Stipulation Requiring the SRP Applicant To Prepare Bond Estimate:

*The special recreation permit (SRP) applicant shall furnish a report to the authorized officer (AO) of the Bureau of Land Management (BLM) estimating all costs for the BLM to fulfill the terms and conditions of the SRP in the event the permittee was unable to do so.  An independent state-certified engineer who is approved in advance by the AO shall include detailed estimated information, including but not limited to Davis-Bacon wages potentially incurred by the BLM.  All costs of preparing and submitting this report shall be borne by the applicant.  This report, along with BLM administrative costs and inflationary estimates, shall be the basis of a bond after review and approval by the BLM, and shall remain in effect until such time that the AO determines that conditions warrant a review of the bond.  The AO may require the permittee to submit a new estimate at any time during the term of the SRP.  The bond, in a form acceptable to the AO, shall be furnished by the permittee before any permitted activities.  The amount of the bond may be adjusted periodically by the AO when, in his/her determination, conditions warrant such a change.  Should the bond furnished under this authorization become unsatisfactory to the AO, the permittee must furnish a new bond satisfactory to the AO within 30 calendar days of demand.*

## SUPPLEMENTAL STIPULATIONS FOR GUIDING HUNTERS

The permittee must ensure the hunt is conducted in full compliance with State of Utah and federal wildlife laws and regulations and the rules of fair chase.

AR10313

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11a-7

## SUPPLEMENTAL STIPULATIONS FOR OUTFITTERS USING RIDING OR PACK STOCK

(1) Livestock use must be specifically provided for in the permit and operating plan.

(2) All riding and pack animals must be fed certified weed-free feed for 48 hours in advance of and for the duration of the trip on public lands.

(3) Riding and pack animals may not be tied for more than 1 hour to live trees.

(4) Livestock must not be tied, hobbled, or picketed for more than 1 hour within 300 feet of a natural water source other than perennial streams.

(5) Permittees may not clean out stock trucks or trailers onto public lands.

(6) All animals will be under control en route and in camp to protect wildlife, other livestock, and range forage.

(7) Corrals located on public lands may not be available for public or permittee use. Prior authorization is required for the use of such corrals.

(8) Lost or dead animals must be reported within 48 hours of end of trip. An appropriate response will be determined by the authorized officer.

## SUPPLEMENTAL STIPULATIONS FOR PERMITTEES USING OFF-HIGHWAY VEHICLES (OHVs) OR MOUNTAIN BIKES

(1) Any OHV or mountain bike use must be specifically provided for in the permit and operating plan.

(2) Only routes specifically approved in the permittee's operating plan may be used.

(3) Permittee will be familiar and comply with State of Utah OHV laws. All trips and trip participants must follow state regulations and manufacturers' recommendations regarding operations.

(4) Any OHV operator must be familiar and comply with the BLM's OHV designations whether posted on the ground or not.

(5) Permittees will operate in accordance with 43 CFR 8340 concerning OHV use on public lands.

(6) All OHV operators must yield to nonmotorized users. Mountain bikers must yield to pedestrians and riding or pack animals.

(7) Operators must not intentionally chase or harass wildlife.

The permittee shall be responsible for cleanup and remediation in the event of accident or mechanical failure resulting in the spillage of fuels, lubricants, coolants, hydraulic fluids, or other petroleum-based or synthetic organic compounds.

AR10314

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11b-1

**Appendix B11b**
**SAMPLE STIPULATIONS FOR A COMMERCIAL RIVER RUNNING**
**SPECIAL RECREATION PERMIT**

**RIVER OUTFITTING IN DESOLATION, GRAY, AND LABYRINTH CANYONS**
**SPECIAL RECREATION PERMIT STIPULATIONS**

---

**Name of Company**:  Adventure River Trips
**Special Recreation Permit Number**: UT-070-09-000
**SRP Valid** from: March 1, 2009, to February 28, 2019
**Activities Authorized by This SRP**:  River running, camping, hiking
**Areas of Authorization**: Desolation, Gray, and Labyrinth canyons
**Post-Use Report Due**:  November 15 each year
**Minimum Insurance Requirements**:  $500,000 per occurrence/$1,000,000 annual aggregate
**Fee Formula**: The greater of $95 or 3 percent of gross revenue
**Deductions and/or Discounts Applicable**:  None

---

(1) The permittee must comply with all federal, state, and local laws, ordinances, regulations, orders, postings, or written requirements applicable to the area or operations covered by the special recreation permit (SRP).  The permittee must ensure that all persons operating under the authorization have obtained all required federal, state, and local licenses or registrations. The permittee must make every reasonable effort to ensure compliance with these requirements by all agents of the permittee and by all clients, customers, participants, or spectators under the permittee's supervision.

(2) A special recreation permit authorizes special uses of the public lands and related waters as specified in the permit.  Should circumstances warrant, the permit may be modified by the Bureau of Land Management (BLM) at any time, including modification of the amount of use.  The authorized officer may suspend or terminate an SRP if necessary to protect public resources, health, safety, the environment, or because of noncompliance with permit stipulations.  Failure to comply may result in criminal, civil, and/or administrative actions (probation, suspension, or cancellation).  Administrative actions by the BLM to suspend or terminate an SRP may be appealed.

(3) No value must be assigned to or claimed for the permit, or for the occupancy or use of federal lands or related waters granted thereupon.  The permit privileges are not to be considered property on which the permittee must be entitled to earn or receive any return, income, price, or compensation.  The use of a permit as collateral is not recognized by the BLM.

AR10315

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11b-2

(4) Unless expressly stated, the SRP does not create an exclusive right of use of an area by the permittee. The permittee must not interfere with other valid uses of the federal land or related waters by other users. The United States reserves the right to use any part of the area for any purpose.

(5) The permittee or permittee's representative may not assign, contract, or sublease any portion of the permit authorization or interest therein, directly or indirectly, voluntarily or involuntarily. However, the authorized officer may approve contracting of equipment or services in advance, if necessary to supplement a permittee's operations. Such contracting should not constitute more than half the required equipment or services for any one trip, and the permittee must retain operational control of the permitted activity. If equipment or services are contracted, the permittee must continue to be responsible for compliance with all stipulations and conditions of the permit. The following indicate a violation of this stipulation:

a) A third party advertisement used to book a trip does not clearly indicate that the trip will be operated by the company holding the permit.

b) The booking agent or advertiser provides both passenger transportation to the launch point and equipment used on the river.

c) The booking agent or advertiser provides more than half of the rafts, dories, or pontoon boats used on the river.

d) More than two (2) representatives or employees of the booking agent or advertiser (employed during the same calendar year) act as guides or crew on the river during a trip (such representatives or employees must constitute less than 50 percent of the crew).

e) A trip is represented to the participants as being conducted by other than the permittee.

f) Equipment (to be used on the river), vehicle, or guide clothing at the launch site carries the name, markings, or logo of the booking agent or advertiser involved with the trip (this does not apply to booking agents who are permitted outfitters on the river segment).

g) The passengers and crew are not covered by the insurance carried by the permittee.

(6) All advertising and representations made to the public and the authorized officer must be accurate. Although the addresses and telephone numbers of the BLM may be included in advertising materials, official agency symbols may not be used. The permittee must not use advertising that attempts to portray or represent the activities as being conducted by the BLM. The permittee may not portray or represent the commercial SRP fee as a special

AR10316

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11b-3

federal use tax; this amount must be included in the trip price. The permittee must furnish the authorized officer with any current brochure and price list if requested by the authorized officer.

(7)   The permittee must assume responsibility for inspecting the permitted area for any existing or new hazardous conditions, e.g., trail and route conditions, abandoned mines, landslides, avalanches, rocks, changing water or weather conditions, falling limbs or trees, submerged objects, hazardous wildlife, or other hazards that present risks for which the permittee assumes responsibility.

(8)   In the event of default on any mortgage or other indebtedness, such as bankruptcy, creditors must not succeed to the operating rights or privileges of the permittee's SRP.

(9)   The permittee may not, unless specifically authorized, erect, construct, or place any building, structure, or other fixture on public lands. Upon leaving, the lands must be restored as nearly as possible to pre-existing conditions.

(10)  The permittee, or a representative thereof, must present or display a copy of the SRP to an authorized officer's representative or law enforcement personnel upon request. If required, the permittee, or a representative thereof, must display a copy of the permit or other identification tag on equipment used during the period of authorized use.

(11)  The permittee must notify the authorized officer of any accident that occurs while involved in activities authorized by this permit and that results in: death, personal injury requiring hospitalization or emergency evacuation, or property damage $2,500 or greater (lesser amounts if established by state law). Reports should be submitted within 24 hours.

## BLM Utah Terms and Stipulations

### A. General

(1) Permits issued for more than 1 year are subject to annual validation. To secure validation, the permittee must:

   a)  have performed satisfactorily under the terms and conditions of this permit and be in conformance with applicable federal, state, and local laws, ordinances, regulations, orders, postings, and written requirements applicable to the area and operation covered by the permit;

   b)  ensure that all persons operating under the permit have obtained all required federal, state, and local licenses or registrations;

   c)  have on file, with the office issuing the permit, current insurance identifying the U.S. Department of the Interior, Bureau of Land Management, as additional insured, as specified in stipulation C;

AR10317

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11b-4

d)  have no outstanding, past due, or unpaid billing notices.

(2) Permittees may not leave unattended personal property on public lands administered by the BLM for more than 48 hours without written permission of the authorized officer, with the exception that vehicles may be parked in designated parking areas for as many as 14 consecutive days.  Unattended personal property is subject to disposition under the Federal Property and Administrative Services Act of 1949, as amended.

(3) The permit authorizes the use only for the activity, the time(s), and in the area(s) specifically described above.

(4) The permittee must maintain on file with the BLM a current and correct list of employees who will be conducting services for the company on public lands and related waters.  Persons providing services under this permit must be employees of the permittee.

(5) Placement of caches of supplies and food or equipment for future trips is not allowed unless specifically authorized.

(6) The permittee must allow BLM representatives to complete permit checks to determine the validity of the permit, to ascertain the group has a copy of the permit and all required equipment, and to orient trip participants about the use of public lands and related waters and safety.

(7) The permittee, in its advertisements, signs, statements, circulars, brochures, letterhead, and like materials, oral, electronic, and written, must not misrepresent in any way either the services provided, the status of the permit, or the area covered by the permit.  Review of advertising may be required by the BLM.  The permittee must not use advertising that attempts to portray or represent its activities as being conducted by the BLM.  The permittee may not portray or represent the permit fee as a federal use tax in an itemized customer billing.  Advertised and actual rates will represent the total cost of trips, including permit fees.  Special Area fees may be shown as a separate fee on customer billings.

**B. Financial**

(1) The permittee must submit a post-use report **[SEE APPENDIX B20, SAMPLE POST-USE REPORT]** 30 calendar days after the last use of the permit in a calendar year, or as agreed upon with the field office administering the permit.  Alternative reporting arrangements may be established by written agreement with the authorized officer.  The issuing office may approve extensions of this due date on a case-by-case basis.  The report must contain a trip-by-trip log of: trip location, beginning and ending dates of each trip, number of clients, number of guides, and gross receipts for the trip.  In reporting gross receipts, the outfitter will

AR10318

report all payments made by the customer, with the only exception being retail sales of durable goods that remain the property of the customer and have an expected service life extending beyond the guided activity.  The request for deductions based on pre/post trip transportation and lodging expenses and percentage of time on public lands, if being claimed, must also be submitted at this time.  Requests for transportation and lodging deductions must be accompanied by copies of supporting receipts documenting proof of payment.

(2) The permittee must submit a post-use report to the authorized officer for every year the permit is in effect.  If the post-use report is not received by the established deadline (see above), the following late fee schedule will be initiated:

- more than 15 calendar days but no more than 30 calendar days after the due date: $125
- more than 30 calendar days but no more than 45 calendar days after the due date: $250

Post-use reports submitted more than 45 calendar days after the due date may result in criminal, civil, and/or administrative action to protect the interest of the United States.

(3) The permittee must maintain the following internal accounting records pertaining to the permit:

   a) W-2 records or similar records of employment for all employees conducting trips under the permit

   b) Records of all financial relationships with booking agents or advertisers

   c) Records of all receipts or compensation including payments, gratuities, donations, gifts, bartering, etc., received from any source on trips conducted under the permit

   d) Records of all payments made by the permittee and claimed as a deduction in the permittee's fee submission

The BLM retains the right to verify permit compliance from the books, correspondence, memorandums, and other records of the permittee, and from the records pertaining thereto of a proprietary or affiliated company during the period of the permit and for 3 years thereafter regardless of physical location.

## C. Insurance

(1) At a minimum, the permittee must have in force public liability insurance in the appropriate amount, as shown on page 1 of these stipulations.

(2) The policy must state that the insurance company must have no right of subrogation against the United States of America.

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11b-6

(3)  Such insurance must name the U.S. Department of the Interior, Bureau of Land Management, as additional insured and provide for specific coverage of the permittee's contractually assumed obligation to indemnify the United States.

(4)  The policy must stipulate that the authorized officer of the BLM must be notified 30 calendar days in advance of the termination or modification of the policy.

(5)  The permit is not valid unless the permittee maintains a current, authenticated certificate of the required insurance on file with the office issuing the permit.

(6)  The permittee must indemnify and hold harmless the United States against any responsibility or liability for damage, death, injury, or loss to persons and property that may occur during the permitted use period or as a result of such use.

(7)  The permittee must furnish a copy of the insurance policy directly to the authorized officer.

(8)  The name of the insured on the insurance policy must be the same as the name on the permit. Those permittees holding insurance policies that insure only the permittee and not the permittee's employees must ensure that their employees also have the required insurance in effect and that a certificate of insurance is furnished to the authorized officer.

(9)  For multiyear permits, the insurance policy must be provided the first year, but on each subsequent year the authorized officer may accept a valid certificate of insurance.

(10)  The insurance need be valid only during periods of actual use.

## D.  Marking of Outfitter Equipment

Every street-legal motor vehicle used to transport clients or equipment must be marked with at least one sign, decal, or placard on each side of the vehicle. The sign must, at a minimum, include the company name and the city and state where the permittee is headquartered. Information must be readable from a distance of 50 feet.

Written notice of intent to use vehicles and boats with outfitter markings (company names, logos, etc.) other than those of the permittee (or another outfitter permitted on the river segment) must be made to the BLM office administering the river segment at least 1 day before the scheduled launch date. If the markings are those of an outfitter not permitted on the river segment, the markings of equipment used on the river must not be visible while on the river.

## E.  Pre-trip Itinerary

The Notification of Proposed River Trip and Affidavit of River Use must be filed with the BLM launch representative. If a BLM representative is not present, the completed affidavit must be submitted to the *Price Field Office* within 15 calendar days of the launch date. The affidavit will serve as the official record of river trips.

## F.  Environmental and Resource Protection

All trips must conform to Leave No Trace principles.

AR10320

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11b-7

(1) For all trips, the permittee must have a toilet system that allows for the proper carry-out and disposal of solid human body waste that is adequate for the size of the group and length of the trip. Toilets must be accessible for use by passengers and crew at all sites except in developed locations where public restrooms are provided. In locations remote from a permittee's boat, solid human waste must be buried in a sunny location in bare soil or carried out (unless otherwise stipulated). Toilet paper must be carried out and not buried or burned.

(2) Cans, rubbish, and other trash must not be discarded, buried, or dumped on public lands and related waters. Wet garbage such as eggshells, orange peels, leftover solid food, bones, melon rinds, etc., must be carried out. Trash cleanup at campsites and day-use areas will include all litter or discarded items, including small items such as bottle caps and cigarette butts.

(3) Washing or bathing with soap is not permitted in tributary streams, springs, or other natural water sources. Dishwater must be strained before dispersal. Dishwater and bathwater may not be dumped within 200 feet of streams, springs, or other natural water sources. Only biodegradable soap may be used. All water-based wastes (urine, dishwater, etc.), if not hauled out for disposal, must be deposited into the main current of the _Green River_.

(4) The permittee will be responsible to ensure that historical, archaeological, cultural, or ecological resources are not damaged, destroyed, or removed by any participants on authorized trips.

(5) The permittee must conduct operations authorized by the permit in accordance with applicable BLM management plans and the permittee's own operating plan submitted to the BLM in support of this permit.

(6) The number of participants on any trip, including guides, may not exceed the number specified in the permittee's operating plan and approved permit. The exception to this requirement is over-the-road bus tours using state and federal highway and class B county roads. Maximum trip sizes are as follows:

    a) Desolation Canyon, 25 passengers plus crew, with the following limitations:

        (i) You may have as many as 1 crew per passenger-carrying craft.

        (ii) You may have as many as 2 additional crew (includes individuals who provide specialized client instruction, such as an archaeologist, geologist, ecologist, or instructor in outdoor skills, or who provide interpretation, training, or other paid services, and who must be involved in providing outfitter services).

**NOTE:**    Musicians, booking agents accompanying tours, leaders of organized groups, guests of the crew, splimichen, and other similar individuals not providing outfitting services are passengers.

        (iii) Additional crew, above those allowed under number (i) and (ii) above, on nontraining trips may be added only by reducing the number of passengers below 25 on a 1 crew per passenger basis.

AR10321

(iv) Permittees may request additional crew for training purposes for trips with fewer than 25 passengers; employees being trained will not be counted toward passenger day ceilings.

b) Labyrinth Canyon, 25 persons per trip, including crew

c) Lower Gray Canyon (Green River Daily, Nefertiti to Swasey's Beach), no limit

(7) No camping is permitted within 300 feet of a known prehistoric or historic site.

(8) No camping is permitted within 300 feet of a water source other than perennial streams unless prior authorization is received from the authorizing officer.

## G. Fires

This permit does not waive any applicable fire restrictions or orders that may affect the use of campfires or cooking fires. The following stipulations apply:

(1) At sites accessed by the permittee's motor vehicle(s), the permittee must provide its own fuel wood.

(2) At sites accessed by the permittee's motor vehicle(s), the permittee must use a fire pan to contain the fires, ash, and charcoal. Charcoal and ash from the fire pan must be hauled out. A fire pan must be carried on all overnight trips.

(3) Fuel wood gathering is limited to river driftwood only.

(4) Fuel wood piles must be scattered before the permittee leaves the site.

## H. Safety and Equipment

(1) The permittee must provide the equipment necessary to serve the public in a safe manner. The permittee will ensure that trips are conducted in compliance with all laws and regulations relating to vehicle operations, land use restrictions, food handling, and any other applicable regulations.

(2) Every trip must be in compliance with Utah State Boating Regulations.

(3) The following equipment must be carried on all commercial trips:

a) A first aid kit adequate to accommodate each activity, group, or subgroup

b) Adequate repair kits and spare supplies appropriate for the trip and activity

(4) The following procedures must be followed on all commercial trips:

a) Unless specifically authorized in the permit, discharge of firearms is allowed only for legal pursuit of game animals by a licensed hunter.

b) Use of explosives and fireworks is prohibited.

AR10322

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11b-9

(5) The permittee must allow rangers to complete permit checks to determine the validity of the permit, ascertain the trip has all the required equipment, and orient trip participants about river safety, etiquette, and natural history.

## SUPPLEMENTAL STIPULATIONS FOR GUIDING HUNTERS

The permittee must ensure the hunt is conducted in full compliance with State of Utah and federal wildlife laws and regulations and the rules of fair chase.

## SUPPLEMENTAL STIPULATIONS SPECIFIC TO DESOLATION CANYON

(1) Trips between Sand Wash and Nefertiti Rapids must be a minimum of 3 calendar days and a maximum of 9 calendar days. Trips longer than 9 calendar days may be approved upon request from August 15 to May 15.

(2) Public lands within one-half mile of the confluence of Rock Creek and the Green River are closed to overnight use and fires.

(3) Motorized boats between Sand Wash and Swasey's Rapid are limited to downstream travel only at a slow, wakeless speed.

(4) Minimum use requirement is 200 passenger days (not including crew days or training trips). Failure to meet minimum use for 2 consecutive years is grounds for permit termination.

(5) A launch date, for river areas with group size limits, authorizes the permittee to launch one group with a maximum number of 25 passengers, who must launch, travel, and camp together as a group. No separate groups may camp together if the result would be a larger number than that allowed to launch as a single group. Split launches and other deviations from this requirement must be authorized in advance through the appropriate BLM office. Launch reservations will be based on a commercial launch calendar supplied to the outfitter no later than September 1 of the preceding year. The permittee will follow the established launch calendar with the following exceptions:

    a) Launch dates may be exchanged with other permitted outfitters on the same river segments with their concurrence. The permittee must notify the BLM office administering the river segment of any exchange by telephone or in writing at least 1 working day before the launch date. If telephone notice is used, the permittee acquiring the launch date must follow up the telephone notice with a written notice.

    b) Permittees desiring additional launch dates must make a request for additional dates to the BLM office administering the river segment. Additional launch dates will be granted on an as-available basis.

    c) The _Price Field Office_ must receive notification from the permittee of launch dates that are not going to be used 45 calendar days in advance of the launch date. Permittees canceling a reserved launch with fewer than 45 calendar days' notice must pay a reservation fee if another outfitter or private group does not rebook the launch.

AR10323

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11b-10

The reservation fee is also charged when the permittee does not utilize a reserved launch.  The reservation fee is as follows:

(i)  $75 for trips canceled fewer than 45 but more than 29 calendar days from the launch date

(ii)  $150 for trips canceled fewer than 29 calendar days from the launch date

(iii)  $300 for trips not canceled but that fail to show up and launch

(6) The permittee must collect from each passenger, the Special Area fee for Desolation Canyon (currently $18/person, subject to change).  All passengers, whether paying or not, are required to pay this fee.  Employees of the permittee working on the trip are exempt from this fee.  Special Area fees must be remitted to the BLM with the end of the season payment.

AR10324

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11c-1

**Appendix B11c**
**SAMPLE STIPULATIONS FOR AN ORGANIZED GROUP**
**SPECIAL RECREATION PERMIT**

**Name of Event**:  Windy Stake Youth Trip
**Special Recreation Permit Number**: UT-070-07-000
**SRP Valid** from:   June 8, 2007, to June 10, 2007
**Activities Authorized by This SRP**:   Camping, hiking
**Areas of Authorization**:  Cedar Mountain area, Staker Springs, Cedar Mtn. Rec. Site
**Post-Use Report Due**: June 21, 2007
**Insurance Required**?  No
**Minimum Insurance Requirements**: N/A

**BLM Utah Terms and Stipulations**

**A. General**

(1) Permits issued for more than 1 year are subject to annual validation.  To secure validation, the permittee must:

    a)  have performed satisfactorily under the terms and conditions of this permit and be in conformance with applicable federal, state, and local laws, ordinances, regulations, orders, postings, and written requirements applicable to the area and operation covered by the permit;

    b)  have on file, with the office issuing the permit, current insurance identifying the U.S. Department of the Interior, Bureau of Land Management, as additional insured, as specified in stipulation C;

    c)  have no outstanding, past due, or unpaid billing notices.

(2) Permittees may not leave unattended personal property on public lands administered by the BLM for more than 48 hours without written permission of the authorized officer, with the exception that vehicles may be parked in designated parking areas for as many as 14 consecutive days.  Unattended personal property is subject to disposition under the Federal Property and Administrative Services Act of 1949, as amended.

(3) The permit authorizes the use only for the activity, the time(s), and in the area(s) specifically described above.

(4) The permittee must submit a post-use report to the authorized officer for every year the permit is in effect. If the post-use report is not received by the established deadline (see above), the following late fee schedule will be initiated:

BLM HANDBOOK                                            Rel. 2-300
Supersedes Rel. 2-295                                      11/17/14

AR10325

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11c-2

- more than 15 calendar days but less than 30 calendar days after the due date: $125
- more than 30 calendar days no more than 45 calendar days after the due date: $250

Post-use reports submitted more than 45 calendar days after the due date may result in criminal, civil, and/or administrative action to protect the interest of the United States.

**B. Use Fees**

Use fees are due within 30 calendar days of the billing date.

**C. Insurance** (insurance requirement may be waived by written order of the authorized officer)

(1) At a minimum, the permittee must have in force public liability insurance in the appropriate amount, as shown on page 1 of these stipulations.

(2) The policy must state that the insurance company must have no right of subornation against the United States of America.

(3) Such insurance must name the U.S. Department of the Interior, Bureau of Land Management, as additional insured and provide for specific coverage of the permittee's contractually assumed obligation to indemnify the United States.

(4) The policy must stipulate that the authorized officer of the BLM must be notified 30 calendar days in advance of the termination or modification of the policy.

(5) The permit is not valid unless the permittee maintains a current, authenticated certificate of the required insurance on file with the office issuing the permit.

(6) The permittee must indemnify and hold harmless the United States against any responsibility or liability for damage, death, injury, or loss to persons and property that may occur during the permitted use period or as a result of such use.

(7) The permittee must furnish a copy of the insurance policy directly to the authorized officer.

(8) The name of the insured on the insurance policy must be the same as the name on the permit. Those permittees holding insurance policies that insure only the permittee and not the permittee's employees must ensure that their employees also have the required insurance in effect and that a certificate of insurance is furnished to the authorized officer.

(9) For multiyear permits, the insurance policy must be provided the first year, but on each subsequent year the authorized officer may accept a valid certificate of insurance.

(10) The insurance need be valid only during periods of actual use.

AR10326

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11c-3

### D. Environmental and Resource Protection

All trips must conform to Leave No Trace principles.

(1) For all trips and at all base camps with locations served by a motorized vehicle, the permittee must have a toilet system that allows for the proper carry-out and disposal of solid human body waste that is adequate for the size of the group and length of the trip. Toilets must be accessible for use by passengers and crew at all sites where a company motorized vehicle is present, except in developed locations where public restrooms are provided. In locations remote from a permittee's vehicle, solid human waste must be buried in a sunny location in bare soil or carried out (unless otherwise stipulated). Toilet paper must be carried out and not buried or burned.

(2) Cans, rubbish, and other trash must not be discarded, buried, or dumped on public lands and related waters. Wet garbage such as eggshells, orange peels, leftover solid food, bones, melon rinds, etc., must be carried out. Trash cleanup at campsites and day-use areas will include all litter or discarded items, including small items such as bottle caps and cigarette butts.

(3) Washing or bathing with soap is not permitted in tributary streams, springs, or other natural water sources. Dishwater must be strained before dispersal. Dishwater and bathwater may not be dumped within 200 feet of streams, springs, or other natural water sources. Only biodegradable soap may be used.

(4) The permittee will be responsible to ensure that historical, archaeological, cultural, or ecological resources are not damaged, destroyed, or removed by any participants on authorized trips.

(5) The permittee must conduct operations authorized by the permit in accordance with applicable BLM management plans and the permittee's own operating plan submitted to the BLM in support of this permit.

(6) The number of participants on any trip, including guides, may not exceed the number specified in the permittee's operating plan and approved permit. The exception to this requirement is over-the-road bus tours using state and federal highway and class B county roads.

(7) No camping is permitted within 300 feet of a known prehistoric or historic site.

(8) No camping is permitted within 300 feet of a water source other than perennial streams unless prior authorization is received from the authorizing officer.

### E. Fires

This permit does not waive any applicable restrictions that may affect the use of campfires or cooking fires. The following stipulations apply unless specifically waived by the authorized officer:

AR10327

(1) At sites accessed by the permittee's motor vehicle(s), the permittee must provide its own fuel wood.

(2) At sites accessed by the permittee's motor vehicle(s), the permittee must use a fire pan to contain the fires, ash, and charcoal. Charcoal and ash from the fire pan must be hauled out.

(3) Gathering wood from standing trees, live or dead, is prohibited.

(4) Use of dead and down wood is permitted only at backcountry sites not accessed by the permittee's motor vehicle(s). In such cases, if a fire pan is not used, the permittee must ensure that all wood is burned to ash and that the area is naturalized before leaving.

(5) The permittee must ensure that fuel wood piles are scattered before leaving the site.

(6) The permittee must ensure that all employees and participants comply with all fire restrictions and orders.

## F.  Safety and Equipment

(1) The permittee must provide the equipment necessary to serve the public in a safe manner. The permittee will ensure that trips are conducted in compliance with all laws and regulations relating to vehicle operation, land use restrictions, food handling, and any other applicable regulations.

(2) The following equipment must be carried on all trips:

    a)  A first aid kit adequate to accommodate each activity, group, or subgroup

    b)  Adequate repair kits and spare supplies appropriate for the trip and activity

(3) The following procedures must be followed on all commercial trips:

    a)  Unless specifically authorized in the permit, discharge of firearms is allowed only for legal pursuit of game animals by a licensed hunter.

    b)  Use of explosives and fireworks is prohibited.

## SUPPLEMENTAL STIPULATIONS FOR USING RIDING OR PACK STOCK

(1) Livestock use must be specifically provided for in the permit and operating plan.

(2) All riding and pack animals must be fed certified weed-free feed for 48 hours in advance of and for the duration of the trip on public lands.

(3) Riding and pack animals may not be tied for more than 1 hour to live trees.

(4) Livestock must not be tied, hobbled, or picketed for more than 1 hour within 300 feet of a natural water source other than perennial streams.

(5) Permittees may not clean out stock trucks or trailers onto public lands.

(6) All animals will be under control en route and in camp to protect wildlife, other livestock, and range forage.

AR10328

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B11c-5

(7) Corrals located on public lands may not be available for public or permittee use.  Prior authorization is required for the use of such corrals.

(8) Lost or dead animals must be reported within 48 hours of end of trip.  An appropriate response will be determined by the authorized officer.

## SUPPLEMENTAL STIPULATIONS FOR PERMITTEES USING OFF-HIGHWAY VEHICLES (OHVs) OR MOUNTAIN BIKES

(1) Any OHV or mountain bike use must be specifically provided for in the permit and operating plan.

(2) Only routes specifically approved in the permittee's operating plan may be used.

(3) Permittee will be familiar and comply with State of Utah OHV laws.  All trips and trip participants must follow state regulations and manufacturers' recommendations regarding operations.

(4) Any OHV operators must be familiar and comply with BLM's OHV designations whether posted on the ground or not.

(5) Permittees will operate in accordance with 43 CFR 8340 concerning OHV use on public lands.

(6) All OHV operators must yield to nonmotorized users.  Mountain bikers must yield to pedestrians and riding or pack animals.

(7) Operators must not intentionally chase or harass wildlife.

(8) The permittee must be responsible for cleanup and remediation in the event of accident or mechanical failure resulting in the spillage of fuels, lubricants, coolants, hydraulic fluids, or other petroleum-based or synthetic organic compounds.

AR10329

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B12-1

### Appendix B12
### SAMPLE ANNUAL OPERATING AUTHORIZATION

In Reply Refer To:
8372 (CON-020)

## 2013 Annual Operating Authorization

**Disaster Bound Rafting Company LLC**

**Special Recreation Permit #:  CO-120-CO66-12-153**

Your annual information has been received and your commercial float boating and fishing operations as described in your permit have been updated and are valid for the 2013 season.  All guides and employees must carry a copy of the Permit and the Annual Operating Authorization while operating on public lands and must be familiar with the permit terms, conditions, and stipulations attached to your permit.

Post-use reports are due November 30 of each year.


David Stout
Field Manager
Kremmling Field Office

AR10330

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B13-1

## Appendix B13
## NATIONAL SPECIAL RECREATION PERMIT FEE SCHEDULE

| Permit Type | Minimum Recreation Fee | Use Recreation Fee | Cost Recovery Recreation Fee |
|---|---|---|---|
| Commercial or vending | $105, adjusted every 3 years based on the IPDI* | 3 percent of gross revenue | |
| Commercial assignment of a nonexclusive site | $210, adjusted every 3 years based on the IPDI | | |
| Commercial assignment of an exclusive site | $210; adjusted every 3 years based on the IPDI | | |
| Commercial, competitive, or organized group use or events | | | If more than 50 hours of staff time is required to process and administer the permit, cost recovery charges begin with the first hour |
| Competitive | $105, adjusted every 3 years based on the IPDI* | 3 percent of gross revenue or $5/participant/day, whichever is greater | |
| Organized group or event | $105 or $5/person/ day, whichever is greater | | |

*IPDI = implicit price deflator index

The fee schedule shown above will be effective on March 1, 2014, and will remain in effect until March 1, 2017.

BLM HANDBOOK                                         Rel. 2-300
Supersedes Rel. 2-295                                11/17/14

AR10331

**Appendix B14**
**SAMPLE LETTER WITH ESTIMATED COST RECOVERY**

DECISION
January 2, 2014

Iron Men, Vinegaroon Chapter
Fred Marcel
1110 South West Street
Vinegaroon, NM  80192

COST RECOVERY CATEGORY

Dear Mr. Marcel:

Upon review of your application for a special recreation permit (SRP) for a rim-to-rim race across Gravel Gulch Canyon, we have determined that it will take this office [actual estimated number] work hours to process this application.  Gravel Gulch Canyon is an Area of Critical Environmental Concern with several special resource concerns, including rare plants, an unusual lizard, and numerous archaeological sites.  Since the review and processing of this permit will require more than 50 hours, it is subject to cost recovery under 43 CFR 2932.31(e).  This places your application in category 6 and requires that BLM recover the full reasonable costs of processing the application.  The method and procedures for the payment of these costs will be covered in a required cost recovery agreement.  An outline of such an agreement is enclosed.

Enclosure 1 is a table representing our best estimate of the costs associated with processing and issuing you an SRP.  Our estimate of the total cost recovery for your event is $7,515.58.  Since your event is both competitive and commercial, the cost recovery would be in addition to your estimated SRP fees of $3,750.00.

Please contact this office to schedule a meeting to discuss your application in detail, develop tentative work plans, and review estimated costs and development of the cost recovery agreement (Enclosure 2).  No action to process your application will be undertaken until the cost recovery agreement is in effect.  We may reject your application if you have not contacted this office within 30 calendar days to provide this additional information.

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR Part 4 and the enclosed Form 1842-1, Information on Taking Appeals to the Interior Board of Land Appeals.  If an appeal is taken, your notice of appeal must be filed in this office (at the above address), within 30 days from receipt of this decision.  The appellant has the burden of showing that the decision appealed from is in error.

Please contact Sue Smith, Outdoor Recreation Planner, at (410) 555-0123, if you have any questions.
/s/
Josie Wales
Field Manager

AR10332

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B14-2

Enclosures:
Cost Estimate Table
Cost Recovery Agreement
Form 1842-1

Enclosure 1 – Cost Estimate Table

### Cost Estimate Table

**STAFFING COSTS**

| Employee | Hourly Salary Rate | Application Review | EA* Development, Site Specific Survey, Baseline Monitoring | Event Monitoring | Post-event Monitoring | Total Hours | Salary Cost |
|---|---|---|---|---|---|---|---|
| Rec. Planner | $38.93 | 16 | 16 | 16 | 4 | 52 | $2,024.36 |
| Rec. Tech | $22.36 | | 8 | 16 | 12 | 36 | $804.96 |
| Archaeologist | $37.62 | 1 | 8 | | 8 | 17 | $639.54 |
| Wildlife Biologist | $38.93 | | 8 | | 8 | 16 | $622.88 |
| Botanist | $36.45 | 1 | 8 | | 5 | 14 | $510.30 |
| GIS Specialist | $38.93 | | 12 | | | 12 | $467.16 |
| Subtotal | | 18 | 60 | 32 | 37 | 147 | $5,069.20 Totals |
| **OTHER COSTS** | | | | | | | |
| Vehicles @$36/trip | | 1 | 10 | 4 | 6 | | $756 |
| Plotter | | $25 | $50 | | $25 | | $100 |
| Supplies/Lab Analysis | | | $30 | | $30 | | $60 |
| Copying | | $15 | $85 | | | | $100 |
| Postage | | | $30 | | | | $30 |
| Subtotal | | | | | | | $1,046 |

| *Estimated Cost Recovery* | $6,115.20 Direct costs | $1,400.38 Indirect costs (22.9%) | $7,515.58 Total cost estimate |
|---|---|---|---|

\* EA = environmental assessment

AR10333

Enclosure 2 – Cost Recovery Agreement

John Doe
Four Wheel Drive Club
P.O. Box 1234
Las Vegas, NV 89999

## **Cost Recovery Agreement**

This agreement is between the Bureau of Land Management (BLM) and the Four Wheel Drive Club. The Four Wheel Drive Club has agreed to contribute the sum of **$6,000** dollars to the BLM, Las Vegas Field Office, for processing special recreation permit application NV-050-12-001, which includes monitoring for compliance of the special recreation permit stipulations, and the United States Fish and Wildlife Service's Terms and Conditions of the Biological Opinion, 1-5-12-F-011.

Should the cost of processing this special recreation permit exceed the sum contributed, the BLM will request more funds to cover the costs. The BLM will notify the Four Wheel Drive Club when the balance of the contributed funds is within 20 percent expended. Work shall not proceed until receipt of the additional funds.

An itemized account will be available upon request to Lee Kirk, Las Vegas Field Office Outdoor Recreation Planner, at (602) 515-5227.

The unexpected balance, if any, remaining after completion of work described in the paragraph above (except administration fees) shall be refundable.


| | |
|---|---|
| Signature of Contributor | Date |


| | |
|---|---|
| Assistant Field Manager<br>Division of Recreation and Renewable Resources | Date |


| | |
|---|---|
| Las Vegas Field Office Manager | Date |

AR10334

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B15-1

## Appendix B15
## OMB CIRCULAR NO. A-25

**OMB Circular No. A-25 Revised 7/8/1993**

(Transmittal Memorandum No. 1)

**MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND ESTABLISHMENTS**

**SUBJECT:** User Charges

1. **Purpose:** The Circular establishes Federal policy regarding fees assessed for Government services and for sale or use of Government goods or resources. It provides information on the scope and types of activities subject to user charges and on the basis upon which user charges are to be set. Finally, it provides guidance for agency implementation of charges and the disposition of collections.

2. **Rescission:** This rescinds Office of Management and Budget Circular No. A-25, dated September 23, 1959, and Transmittal Memoranda 1 and 2.

3. **Authority:** Title V of the Independent Offices Appropriations Act of 1952 (31 U.S.C. 9701); 31 U.S.C. 1111; and Executive Orders No. 8248 and No. 11,541.

4. **Coverage:**

   a. The provisions of this Circular cover all Federal activities that convey special benefits to recipients beyond those accruing to the general public. The Circular does not apply to the activities of the legislative and judicial branches of Government, or to mixed-ownership Government corporations, as defined in 31 U.S.C. 9701.

   b. The provisions of the Circular must be applied by agencies in their assessment of user charges under the IOAA. In addition, this Circular provides guidance to agencies regarding their assessment of user charges under other statutes. This guidance is intended to be applied only to the extent permitted by law. Thus, where a statute prohibits the assessment of a user charge on a service or addresses an aspect of the user charge (e.g., who pays the charge; how much is the charge; where collections are deposited), the statute must take precedence over the Circular. In such cases (e.g., sale or disposal under Federal surplus property statutes; or fringe benefits for military personnel and civilian employees), the guidance provided by the Circular would apply to the extent that it is not inconsistent with the statute. The same analysis would apply with regard to executive orders that address user charges.

   c. In any case where an Office of Management and Budget circular provides guidance concerning a specific user charge area, the guidance of that circular must be deemed to meet the requirements of this Circular. Examples of such guidance include the following: OMB Circular No. A-45, concerning charges for rental quarters; OMB Circular No. A-130,

AR10335

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B15-2

concerning management of Federal information resources; and OMB Circular No. A-97, concerning provision of specialized technical services to State and Local governments.

5. **Objectives:** It is the objective of the United States Government to:

   a. ensure that each service, sale, or use of Government goods or resources provided by an agency to specific recipients be self-sustaining;

   b. promote efficient allocation of the Nation's resources by establishing charges for special benefits provided to the recipient that are at least as great as costs to the Government of providing the special benefits; and

   c. allow the private sector to compete with the Government without disadvantage in supplying comparable services, resources, or goods where appropriate.

6. **General policy:** A user charge, as described below, will be assessed against each identifiable recipient for special benefits derived from Federal activities beyond those received by the general public. When the imposition of user charges is prohibited or restricted by existing law, agencies will review activities periodically and recommend legislative changes when appropriate. Section 7 gives guidance on drafting legislation to implement user charges.

   a. Special Benefits

      1. Determining when special benefits exist. When a service (or privilege) provides special benefits to an identifiable recipient beyond those that accrue to the general public, a charge will be imposed (to recover the full cost to the Federal Government for providing the special benefit, or the market price). For example, a special benefit will be considered to accrue and a user charge will be imposed when a Government service:

         (a) enables the beneficiary to obtain more immediate or substantial gains or values (which may or may not be measurable in monetary terms) than those that accrue to the general public (e.g., receiving a patent, insurance, or guarantee provision, or a license to carry on a specific activity or business or various kinds of public land use); or

         (b) provides business stability or contributes to public confidence in the business activity of the beneficiary (e.g., insuring deposits in commercial banks); or

         (c) is performed at the request of or for the convenience of the recipient, and is beyond the services regularly received by other members of the same industry or group or by the general public (e.g., receiving a passport, visa, airman's certificate, or a Custom's inspection after regular duty hours).

AR10336

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B15-3

2. Determining the amount of user charges to assess.

(a) Except as provided in Section 6c, user charges will be sufficient to recover the full cost to the Federal Government (as defined in Section 6d) of providing the service, resource, or good when the Government is acting in its capacity as sovereign.

(b) Except as provided in Section 6c, user charges will be based on market prices (as defined in Section 6d) when the Government, not acting in its capacity as sovereign, is leasing or selling goods or resources, or is providing a service (e.g., leasing space in federally owned buildings). Under these business-type conditions, user charges need not be limited to the recovery of full cost and may yield net revenues.

(c) User charges will be collected in advance of, or simultaneously with, the rendering of services unless appropriations and authority are provided in advance to allow reimbursable services.

(d) Whenever possible, charges should be set as rates rather than fixed dollar amounts in order to adjust for changes in costs to the Government or changes in market prices of the good, resource, or service provided (as defined in Section 6d).

3. In cases where the Government is supplying services, goods, or resources that provide a special benefit to an identifiable recipient and that also provide a benefit to the general public, charges should be set in accordance with paragraph (2) of Section 6a. Therefore, when the public obtains benefits as a necessary consequence of an agency's provision of special benefits to an identifiable recipient (i.e., the public benefits are not independent of, but merely incidental to, the special benefits), an agency need not allocate any costs to the public and should seek to recover from the identifiable recipient either the full cost to the Federal Government of providing the special benefit or the market price, whichever applies.

4. No charge should be made for a service when the identification of the specific beneficiary is obscure, and the service can be considered primarily as benefiting broadly the general public.

b. Charges to the direct recipient. Charges will be made to the direct recipient of the special benefit even though all or part of the special benefits may then be passed to others.

c. Exceptions

1. Agency heads or their designee may make exceptions to the general policy if the provision of a free service is an appropriate courtesy to a foreign government or international organization; or comparable fees are set on a reciprocal basis with a foreign country.

2. Agency heads or their designee may recommend to the Office of Management and Budget that exceptions to the general policy be made when:

BLM HANDBOOK                                           Rel. 2-300
Supersedes Rel. 2-295                                  11/17/14

AR10337

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B15-4

> (a) the cost of collecting the fees would represent an unduly large part of the fee for the activity; or
>
> (b) any other condition exists that, in the opinion of the agency head or his designee, justifies an exception.

3. All exceptions must be for a period of no more than four years unless renewed by the agency heads or their designee for exceptions granted under Section 6c (1) or the Office of Management and Budget for exceptions granted under Section 6c (2) after a review to determine whether conditions warrant their continuation.

4. Requests for exceptions and extensions under paragraphs (2) and (3) of Section 6c must be submitted to the Director of the Office of Management and Budget.

d. Determining Full Cost and Market Price

1. "Full cost" includes all direct and indirect costs to any part of the Federal Government of providing a good, resource, or service. These costs include, but are not limited to, an appropriate share of:

> (a) Direct and indirect personnel costs, including salaries and fringe benefits such as medical insurance and retirement. Retirement costs should include all (funded or unfunded) accrued costs not covered by employee contributions as specified in Circular No. A-11.
>
> (b) Physical overhead, consulting, and other indirect costs including material and supply costs, utilities, insurance, travel, and rents or imputed rents on land, buildings, and equipment. If imputed rental costs are applied, they should include:
>
>> (i) depreciation of structures and equipment, based on official Internal Revenue Service depreciation guidelines unless better estimates are available; and
>>
>> (ii) an annual rate of return (equal to the average long- term Treasury bond rate) on land, structures, equipment and other capital resources used.
>
> (c) The management and supervisory costs.
>
> (d) The costs of enforcement, collection, research, establishment of standards, and regulation, including any required environmental impact statements.
>
> (e) Full cost must be determined or estimated from the best available records of the agency, and new cost accounting systems need not be established solely for this purpose.

AR10338

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B15-5

2. "Market price" means the price for a good, resource, or service that is based on competition in open markets, and creates neither a shortage nor a surplus of the good, resource, or service.

   (a) When a substantial competitive demand exists for a good, resource, or service, its market price will be determined using commercial practices, for example:

      (i) by competitive bidding; or

      (ii) by reference to prevailing prices in competitive markets for goods, resources, or services that are the same or similar to those provided by the Government (e.g., campsites or grazing lands in the general vicinity of private ones) with adjustments as appropriate that reflect demand, level of service, and quality of the good or service.

   (b) In the absence of substantial competitive demand, market price will be determined by taking into account the prevailing prices for goods, resources, or services that are the same or substantially similar to those provided by the Government, and then adjusting the supply made available and/or price of the good, resource, or service so that there will be neither a shortage nor a surplus (e.g., campsites in remote areas).

**7. Implementation:**

a. The general policy is that user charges will be instituted through the promulgation of regulations.

b. When there are statutory prohibitions or limitations on charges, legislation to permit charges to be established should be proposed. In general, legislation should seek to remove restraints on user charges and permit their establishment under the guidelines provided in this Circular. When passage of this general authority seems unlikely, more restrictive authority should be sought. The level of charges proposed should be based on the guidelines in Section 6. When necessary, legislation should:

   1. define in general terms the services for which charges will be assessed and the pricing mechanism that will be used;

   2. specify fees will be collected in advance of, or simultaneously with, the provision of service unless appropriations and authority are provided in advance to allow reimbursable services; and

   3. specify where collections will be credited (see Section 9). Legislative proposals should not normally specify precise charges. The user charge schedule should be set by regulation. This will allow administrative updating of fees to reflect changing costs and market values. Where it is not considered feasible to collect charges at a level specified in Section 6, charges should be set as close to that level as is practical.

AR10339

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B15-6

c. Excise taxes are another means of charging specific beneficiaries for the Government services they receive. New user charges should not be proposed in cases where an excise tax currently finances the Government services that benefit specific individuals. Agencies may consider proposing a new excise tax when it would be significantly cheaper to administer than fees, and the burden of the excise tax would rest almost entirely on the user population (e.g., gasoline tax to finance highway construction). Excise taxes cannot be imposed through administrative action but rather require legislation. Legislation should meet the same criteria as in Section 7b; however, it is necessary to state explicitly the rate of the tax. Agency review of these taxes must be performed periodically and new legislation should be proposed, as appropriate, to update the tax based on changes in cost. Any excise tax proposals must be approved by the Assistant Secretary for Tax Policy at the Department of the Treasury.

d. When developing options to institute user charges administratively, agencies should review all sources of statutory authority in addition to the Independent Offices Appropriations Act that may authorize implementation of such charges.

e. In proposing new charges or modifications to existing ones, managers of other programs that provide special benefits to the same or similar user populations should be consulted. Joint legislative proposals should be made, and joint collection efforts designed to ease the burden on the users should be used, whenever possible.

f. Every effort should be made to keep the costs of collection to a minimum. The principles embodied in Circular No. A-76 (Performance of Commercial Activities) should be considered in designing the collection effort.

g. Legislative proposals must be submitted to the Office of Management and Budget in accordance with the requirements of Circular No. A-19. To ensure the proper placement of user fee initiatives in the budget account structure, agencies are encouraged to discuss proposals with OMB at an early stage of development.

8. **Agency responsibility:** Agencies are responsible for the initiation and adoption of user charge schedules consistent with the policies in this Circular. Each agency will:

a. Identify the services and activities covered by this Circular;

b. Determine the extent of the special benefits provided;

c. Apply the principles specified in Section 6 in determining full cost or market price, as appropriate;

d. Apply the guidance in Section 7 either to institute charges through the promulgation of regulations or submit legislation as appropriate;

e. Review the user charges for agency programs biennially, to include: (1) assurance that existing charges are adjusted to reflect unanticipated changes in costs or market values; and (2) a review of all other agency programs to determine whether fees should be assessed for Government services or the user of Government goods or services. Agencies should discuss the results of the biennial review of user fees and any resultant proposals in the Chief Financial Officers Annual Report required by the Chief Financial Officers Act of 1990;

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B15-7

f.  Ensure that the requirements of OMB Circular No. A-123 (Internal Control Systems) and appropriate audit standards are applied to collection;

g.  Maintain readily accessible records of:

- the services or activities covered by this Circular;
- the extent of special benefits provided;
- the exceptions to the general policy of this Circular;
- the information used to establish charges and the specific method(s) used to determine them; and
- the collections from each user charge imposed.
- Maintain adequate records of the information used to establish charges and provide them upon request to OMB for the evaluation of the schedules and provide data on user charges to OMB in accordance with the requirements in Circular No. A-11.

9.  **Disposition of collections:**

a.  Unless a statute provides otherwise, user charge collections will be credited to the general fund of the Treasury as miscellaneous receipts, as required by 31 U.S.C. 3302.

b.  Legislative proposals to permit the collections to be retained by the agency may be appropriate in certain circumstances.  Proposals should meet the guidelines in Section 7b.

Proposals that allow agency retention of collections may be appropriate when a fee is levied in order to finance a service that is intended to be provided on a substantially self-sustaining basis and thus is dependent upon adequate collections.

1.  Generally, the authority to use fees credited to an agency's appropriations should be subject to limits set in annual appropriations language. However, it may be appropriate to request exemption from annual appropriations control, if provision of the service depends on demand that is irregular or unpredictable (e.g., a fee to reimburse an agency for the cost of overtime pay of inspectors for services performed after regular duty hours).

2.  As a normal rule, legislative proposals that permit fees to be credited to accounts should also be consistent with the full-cost recovery guidelines contained in this Circular. Any fees in excess of full-cost recovery and any increase in fees to recover the portion of retirement costs which recoups all (funded or unfunded) accrual costs not covered by employee contributions should be credited to the general fund of the Treasury as miscellaneous receipts.

10. **New activities:** Whenever agencies prepare legislative proposals for new or expanded Federal activities that would provide special benefits, the policies and criteria set forth in this Circular will apply.

11. **Inquiries:** For information concerning this Circular, consult the Office of Management and Budget examiner responsible for the agency's budget estimates.

AR10341

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B16-1

## Appendix B16
## SAMPLE LETTER COMBINING PRESEASON BILL, OUTFITTER EVALUATION, AND ANNUAL OPERATING AUTHORIZATION

August 10, 2012

Big Jake's Outfitting and Guide Service
Jake Thomas
1110 South West Street
Vinegaroon, NM  80192

Dear Mr. Thomas:

This letter contains several important items for your upcoming season.

Preseason bill

Enclosed is a bill of collection in the amount of $875.  This was calculated as 50 percent of last year's total special recreation permit (SRP) fees.  A final payment will be based on your post-use report (enclosed).  The preseason bill must be paid before commencing 2013 operations.

2012 Outfitter Evaluation

Your evaluation for the 2012 season is:  Acceptable.   There were no incidents of concern.

Insurance

Your current insurance expires on December 31, 2012.  Please provide a new insurance certificate before that date.  Your permit is valid only if there is a current insurance certificate on file with this office.

2013 Annual Operating Authorization

You are authorized to conduct operations under SRP #NM-060-2005-017 during the 2013 season.  The permittee's season of use will be from January 1, 2013, through June 1, 2013.  This authorization is contingent on the enclosed preseason bill being paid and proper documentation of insurance.

/s/
Roy Bean
Field Office Manager

Enclosure:
Post-Use Report

BLM HANDBOOK                                          Rel. 2-300
Supersedes Rel. 2-295                                 11/17/14

AR10342

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B17-1

## Appendix B17
## SAMPLE BOND DETERMINATION LETTER

### DECISION

| | | |
|---|---|---|
| Judi Smith – Registered Outfitter/Guide | : | Special Recreation Permit |
| Guides & Outfitters LLC | : | No. AK-099999 |
| 1234 Woodchuck Road | : | Type:  Commercial Outfitting |
| Anchorage, Alaska 99999 | | |

### BOND DETERMINATION

On May 23, 2011, the Bureau of Land Management (BLM) received your special recreation permit (SRP) application to conduct commercial outfitter/guide activities within the Smith River area.  The proposed action affects the following described public lands:

Kateel River Meridian, Alaska

T. 8 S., R. 9 W.,
sec. 33.

T. 3 S., R. 3 W.,
sec. 28.

T. 1 S., R. 13 W.,
sec. 14.

The area involved contains approximately 1,920 acres.

The application was filed under the Federal Lands Recreation Enhancement Act of 2004 (REA) (Public Law 108-447).  In future correspondence with this office, we ask that you refer to BLM case number AK-099999, which has been assigned to this SRP application.

In accordance with 43 CFR 2932.44, the BLM may require you to submit a bond in an amount sufficient to cover your fees or defray the costs of restoration and rehabilitation of the lands affected by the permitted use.  We will return the bond when you have complied with all permit stipulations.  The BLM may waive the bonding requirement if we find that your activity will not cause appreciable environmental degradation or risk to human health and safety.

We have determined that your activities require a bond in the amount of $4,250, per the attached Bond Calculation Form.  This payment must be paid before issuance of the SRP.

AR10343

Enclosed is an unsigned copy of the conditions and stipulations of your SRP.  Please review the attached terms and if they meet your approval, sign and date the copy and return it to the BLM Anchorage District Office.

You may make your payment by bank-certified check, cash, or credit card (American Express, Discover, MasterCard, or Visa).  Make checks payable to <u>USDI – Bureau of Land Management</u> and mail it to our letterhead address.  Please refer to your case file number AA-099999, on your check.  Make credit card payments over the phone at (908) 267-1203 or toll free at (800) 479-1263.

Please be advised that your SRP will not be authorized until signed by the authorized officer of the BLM.  Once you have signed the enclosed document and pay the bond described above, we will issue a decision authorizing the SRP, absent any unresolved issues.

## <u>How To Appeal This Decision</u>

This decision may be appealed to the Interior Board of Land Appeals (Board), Office of the Secretary, in accordance with the regulations contained in 43 CFR Part 4 and the enclosed Form 1842-1, Information on Taking Appeals to the Interior Board of Land Appeals.  If an appeal is taken, your notice of appeal must be filed in this office at the above address within 30 days from your receipt of this decision.  In deciding whether or not to file an appeal, you have the burden of showing this decision is in error.

If you decide to file an appeal, you must carefully follow the procedure described in 43 CFR Parts 4 and 4.413 and the enclosed Form 1842-1.  If you do not file your appeal at the locations specified on the form within 30 days, the Board may dismiss your appeal as untimely filed without considering it merits.  Notices of appeal transmitted by electronic means, such as facsimile or email, will not be accepted as timely filed.  To avoid dismissal of the appeal, there must be strict compliance with the regulations.  Be sure to send a copy of your notice of appeal to each party named in this decision and to all of the addresses on the enclosed Form 1842-1.

## <u>How To Obtain a Stay of This Decision While Your Appeal Is Pending</u>

In accordance with regulations found at 43 CFR 4.21, you may also ask the Board to stay or suspend the effect of this decision while your appeal is pending.  If you desire a stay, you must enclose your request for a stay with your notice of appeal.  Copies of the notice of appeal and the petition for a stay must also be submitted to each party named in this decision and to the Board, and to the appropriate Office of the Solicitor at the same time the original documents are filed with this office.  You have the burden of showing a stay is justified.

AR10344

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B17-3

The Board will grant a stay only if you provide sufficient justification based on the following standards:

- the relative harm to the parties if the stay is granted or denied
- the likelihood of the success of your appeal on the merits
- the likelihood of immediate and irreparable harm if the stay is not granted
- whether the public interest favors granting the stay

**If You Have Any Questions**

If you have any questions about this decision, please contact Linda Cobbs, Outdoor Recreation Planner, at (208) 267-1210, or by email at lcobbs@blm.gov.  You may also write to us at our letterhead address.

/s/
Michael R. Smith
Field Manager


Enclosure

AR10345

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B18-1

## Appendix B18.  SAMPLE CERTIFICATE OF INSURANCE

| CERTIFICATE OF INSURANCE (Example) | | |
|---|---|---|
| For Training Purposes Only | | |

| Broker or Agent | Companies Affording Coverage | |
|---|---|---|
| Fred's Insurance Co.<br>600 Sunny Lane<br>Reno, NV 90000 | Company A | **XXX Insurance and Indemnity of America 123 E Main Street, Any City, AZ 85000** |
| | Company B | |
| Insured: | Company C | |
| **Thomas J. Henry Guide Service LLC<br>1000 S Street<br>Crystal, Nevada 80000** | Company D | |

**Coverage**

This is to certify that policies of insurance listed below have been issued to the insured named above for the policy period indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions, and conditions of such policies.  Limits shown may have been reduced by paid claims.

| Type of Insurance | Policy Number | Policy Effective Date (M/D/YYYY) | Policy Expiration Date (M/D/YYYY) | Type of Coverage | Limits |
|---|---|---|---|---|---|
| **General Liability** Commercial Form Claims Made  Occurrence Severality of Interest Clause Cross Liability Clause | 123456 | 1/1/2012 | 12/31/2012 | General Aggregate | **$2,000,000** |
| | | | | Products/Completed Operations Aggregate | **$2,000,000** |
| | | | | Personal & Advertising Injury | **$1,000,000** |
| | | | | Each Occurrence | **$1,000,000** |
| | | | | Fire Damage (any one fire) | **$100,000** |
| | | | | Medical Expense (any one person) | **$10,000** |
| **Automobile Liability** Any Auto All Owned Autos  Scheduled Autos  Hired Autos  Non–owned Autos  Other | | | | | |
| **Excess Liability** Umbrella Form Other  Claims Made   Occurrence | | | | | |
| **Professional Liability** Claims Made  Occurrence | | | | | |
| **Workers' Compensation and Employers' Liability** | | | | | |

**Description of Operations/Locations/Vehicles/Special Items**
U.S. Department of the Interior, Bureau of Land Management, as additional insured.

| Certificate Holder: | **Cancellation** Should any of the above policies be cancelled before the expiration date thereof, the issuing company will endeavor to mail 30 days written notice to the certificate holder.  But, failure to mail such notice must impose no obligation or liability of any kind upon the company, its agents, or representatives. |
|---|---|
| **Bureau of Land Management<br>125 W River Drive<br>Crystal, NV 80000** | |

AR10346

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B19-1

**Appendix B19**
**SAMPLE OUTFITTER EVALUATION**



**United States Department of the Interior**
**Bureau of Land Management**
Wyoming State Office

**Special Recreation Permit**

**Annual Evaluation**

Outfitter: _____

Year: _____

Business Name: _____

Evaluation Period:

_____


(1) Insurance: Expiration Date: _____   Current?   ☐Yes  ☐No
Acceptable Limits, Liability: _____
U.S. Department of the Interior,
Bureau of Land Management named additional insured?   ☐Yes  ☐No


(2) Fees Paid?          **Date**      **Amount**
Credit Forward                              ☐Yes  ☐No
Previous Balance Due     _____   _____   ☐Yes  ☐No
Minimum Annual Fee       _____   _____   ☐Yes  ☐No
Campsite Reservation Fee _____   _____   ☐Yes  ☐No


(3) Operations conform to operating plan? _____   ☐Yes  ☐No


(4) Performance bond status effective?  Expires: _____   ☐Yes  ☐No


(5) Post-Use Report received on *[date]*:_____   Timely?   ☐Yes  ☐No


(6) Wyoming State Board of Outfitters & Professional Guide license in file?   ☐Yes  ☐No


BLM HANDBOOK                                   Rel. 2-300
Supersedes Rel. 2-295                          11/17/14

AR10347

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B19-2

(7) Number of days on BLM land: _____     Number of participants: _____

(8) Free of violations or public complaints? _____ ☐Yes  ☐No

(9) On-the-ground inspection completed for overnight camps? _____ ☐Yes  ☐No

(10) Outfitter performance rating:

       ☐ Acceptable     ☐ Probationary     ☐ Unacceptable

Comments:

_____

_____

_____

_____

_____

_____

Annual Evaluation Completed by: _____

Date: _____

Annual Evaluation Approved by: _____

Date: _____

*[Attach any incident reports, violations, or other concerns]*

AR10348

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B20-1

**Appendix B20**
**SAMPLE POST-USE REPORT**

BUSINESS NAME: _____

| Trip Start Date mm/dd/yr | Trip End Date mm/dd/yr | # of Guests | # of Guides | Area or routes used | Gross Receipts $ | Pre-trip/ Post-trip lodging deductions $ | Pre-trip/ Post-trip transportation deduction $ |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

(1)  Gross receipts include all payments received by the permittee, regardless of source, such as reservation and trip fees, special rentals, trip add-ons, photographic services, and trophy fees. The only exceptions are state and local sales tax and sales of durable retail items that would have utility and use after the trip.

(2)  Pre-trip/post-trip lodging deductions must be supported by copies of receipts.

I certify the above report is a true, correct, and complete accounting of all commercial activities conducted in conjunction with my special recreation permit.

_____        _____
Signature, company representative                              Date

> **NOTE:**      This represents the minimum requirements for a commercial SRP post-use report.  It is important that data, including gross revenue, be collected for each trip, activity, or event.  Additional reporting, such as use of specific sites, areas, trails, entry points, etc., may be appropriate and required.  If the permit qualifies for deductions or discounts, these should be documented in the case file before the use occurs.  Only commercial permits are eligible for deductions, so you may want to eliminate the deduction column for other SRP types.

AR10349

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

B21-1

**Appendix B21**
**SAMPLE MEMORANDUM OF UNDERSTANDING FOR A**
**MULTIJURISDICTIONAL PERMIT**

**MEMORANDUM OF UNDERSTANDING**
**Between**
**VINEGAROON FIELD OFFICE AND SOARING CLIFFS FIELD OFFICE**

## Purpose

The Iron Men, Vinegaroon Chapter, has applied for a special recreation permit (SRP) to conduct a rim-to-rim race across the Gravel Gulch Canyon. The south rim of the canyon is administered by the Vinegaroon Field Office, and the north rim is managed by the Soaring Cliffs Field Office. This memorandum of understanding outlines each office's responsibilities in administering a multijurisdictional permit. Because the Soaring Cliffs Field Office manages the Gravel Gulch Area of Critical Environmental Concern and has superior staff resources, it will take the lead on this project.

## Provisions

Soaring Cliffs Field Office must:
- assume the lead for all aspects of permit application processing
- conduct NEPA analysis
- provide cultural resources, wildlife, and staff
- establish, maintain, and manage the cost recovery account
- issue one permit covering the entire event
- collect all SRP fees and deposit fees in the 1232 accounts of the respective field offices based on the percent of course mileage
- coordinate all activities with the Vinegaroon Field Office
- monitor the course within the Soaring Cliffs area
- compile a monitoring report on the whole event

Vinegaroon Field Office must:
- provide input into the NEPA documentation as requested
- provide an outdoor recreation planner and botanist to the NEPA interdisciplinary team
- conduct monitoring for rare plants over the entire course before, during, and after the event
- monitor the course and staging area within the Vinegaroon Field Office
- submit all monitoring to Soaring Cliffs Field Office for compilation
- delegate authority to the Soaring Cliffs Field Manager to issue the permit for the Vinegaroon Field Office

## Term
This agreement is valid from April 14, 2009, through April 14, 2010.

_____          _____
Soaring Cliffs Field Office Manager          Vinegaroon Field Office Manager

BLM HANDBOOK                                         Rel. 2-300
Supersedes Rel. 2-295                                11/17/14

AR10350

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C1-1

## Appendix C1
## SAMPLE FEDERAL REGISTER NOTICE FOR ESTABLISHING A FEE AREA

DEPARTMENT OF THE INTERIOR

Bureau of Land Management

Notice of Intent to Collect Fees on Public Land in Grand County, Utah, Moab Field Office, under the Federal Lands Recreation Enhancement Act

**AGENCY:** Bureau of Land Management, Department of the Interior

**ACTION:** Notice of Intent

**SUMMARY:** Pursuant to applicable provisions of the Federal Lands Recreation Enhancement Act (REA), the Moab Field Office of the Bureau of Land Management (BLM) is proposing to begin collecting fees for one group site and three camping areas. These proposed sites are located in Grand County, Utah.

**EFFECTIVE DATE:** There will be a 30-day public comment period that will expire on September 4, 2009. The public is urged to participate in the public comment period. Effective 6 months after the publication of this notice, the Bureau of Land Management, Moab Field Office would initiate fee collection at the Moab Skyway Group Site, and the Entrada Bluffs, Bartlett Wash, and Courthouse Rock camping areas, as construction work is completed, unless BLM publishes a **Federal Register** notice to the contrary. The Utah Resource Advisory Committee (RAC), functioning as a Recreation Resource Advisory Committee (R/RAC), will review the proposal to charge fees at the sites mentioned above. Future adjustments in the fee amount will be made in accordance with the Moab Field Office's recreation fee business plan covering the sites. Fee adjustments will be made after consultation with the Utah R/RAC and other appropriate advance public notice.

**ADDRESSES:** Mail: Field Manager, Moab Field Office, 82 East Dogwood, Moab, UT 84532, or *momail@ut.blm.gov.*

**FOR FURTHER INFORMATION CONTACT:** Sue Smith, Recreation Branch Chief, Moab Field Office, Bureau of Land Management, 82 East Dogwood, Moab, UT 84532 (235) 259-2100.

**SUPPLEMENTARY INFORMATION:** The group site and three camping areas are: Moab Skyway Group Site (T. 26 S., R. 21 E., Sec. 2, within, SLM), Entrada Bluffs camping area (T. 23 S., R. 24 E., Sec. 8, within, SLM), Bartlett Wash camping area (T. 24 S., R. 19 E., Section 14, within, SLM), and Courthouse Rock camping area (T. 24 S., R. 20 E., Sections 17 and 20, within, SLM). Under Section 3(g) of REA, the Moab Skyway Group Site, and the Entrada Bluffs, Bartlett Wash, and Courthouse Rock camping areas will qualify, upon completion, as sites wherein visitors can be charged an "Expanded Amenity Recreation Fee." Visitors wishing

BLM HANDBOOK                                                          Rel. 2-300
Supersedes Rel. 2-295                                                11/17/14

AR10351

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C1-2

to use the expanded amenities BLM is developing at the four sites would purchase a recreation use permit as described at 43 CFR Part 2930. Pursuant to REA and implementing regulations at 43 CFR Subpart 2933, fees may be charged for overnight camping and group use reservations where specific amenities and services are provided. Specific visitor fees will be identified and posted at the site. Fees must be paid at the self-service pay station located at the camping areas. Fees for the Moab Skyway Group Site must be paid for in advance with the Moab Field Office. People holding the America The Beautiful—The National Parks and Federal Recreational Lands—Senior Pass (i.e., Interagency Senior Pass), a Golden Age Passport, the America the Beautiful—The National Parks and Federal Recreational Lands—Access Pass (i.e., Interagency Access Pass), or a Golden Access Passport will be entitled to a 50 percent fee reduction on all fees except those associated with group reservations. Fees charged for use of the group sites would include a nonrefundable site reservation fee and a per person use fee.

The Moab Skyway Group Site and the Entrada Bluffs camping area are within the Colorado Riverway Special Recreation Management Area (SRMA). Within this SRMA, there are twelve similar camping fee sites. The Moab Skyway Group Site, which is within the Moab city limits, would include special developed facilities available for day-use only. The Entrada Bluffs site has individual campsites only. Bartlett Wash and Courthouse Rock would have only individual sites. These two areas are located within the Gemini Bridges/Labyrinth Rims Special Recreation Management Area, which has three similar camping fee sites.

The BLM is committed to provide, and receive fair value, for the use of developed recreation facilities and services in a manner that meets public use demands, provides quality experiences, and protects important resources. The BLM's policy is to collect fees at all specialized recreation sites, or where the BLM provides facilities, equipment or services, at federal expense, in connection with outdoor use as authorized by REA. In an effort to meet increasing demands for services and maintenance of developed facilities, the BLM would implement a fee program for the camping areas. The BLM's mission for the camping areas is to ensure that funding is available to maintain facilities and recreation opportunities, to provide for law enforcement presence, to develop additional services, and to protect resources. This mission entails communication with those who will be most directly affected by the camping areas, for example recreationists, other recreation providers, partners, neighbors, and those who will have a stake in solving concerns that may arise throughout the life of the camping areas, including elected officials, and other agencies.

Development of the Moab Skyway Group Site and the Entrada Bluffs, Bartlett Wash, and Courthouse camping areas is consistent with the 2008 Moab resource management plan and was analyzed in the environmental impact statement accompanying the plan (EIS UT–060–2007–04). Camping and group use fees would be consistent with other established fee sites in the area including other BLM-administered sites in the area and those managed by the U.S. Forest Service, the National Park Service, and Utah State Parks and Recreation. Future adjustments in the fee amount will be made following the Moab Field Office's recreation fee business plan covering the sites, consultation with the Utah R/RAC and other public notice before a fee adjustment.

AR10352

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C1-3

In December 2004 REA was signed into law.  REA provides authority for 10 years for the Secretaries of the U.S. Department of the Interior and the U.S. Department of Agriculture to establish, modify, charge, and collect recreation fees for use of some federal recreation lands and waters, and contains specific provisions addressing public involvement in the establishment of recreation fees, including a requirement that Recreation Resource Advisory Committees or Councils have the opportunity to make recommendations regarding establishment of such fees. REA also directed the Secretaries to publish advance notice in the **Federal Register** whenever new recreation fee areas are established under their respective jurisdictions.  In accordance with the BLM recreation fee program policy, the Moab Field Office's recreation fee business plan explains both the fee collection process and how the fees will be used at the four sites.  The BLM will notify and involve the public at each stage of the planning process, including the proposal to collect fees.  The Utah R/RAC will review the fee proposals at its next meeting, following REA guidelines.  Fee amounts will be posted onsite, and at the Moab Field Office, and copies of the business plan will be available at the Moab Field Office and the BLM Utah State Office.

The BLM welcomes public comments on this proposal.  Before including your address, phone number, email address, or other personally identifiable information in your comment, be advised that your entire comment—including your personally identifiable information—may be made publicly available at any time.  While you can ask us in your comment to withhold from public review your personally identifiable information, we cannot guarantee that we will be able to do so.

**AUTHORITY:** 16 U.S.C. 6803(b).

Approved:
**Selma Sierra,**
*State Director.*

[FR Doc. E9–18720 Filed 8–4–09; 8:45 am]
**BILLING CODE 4310–DQ–P**

AR10353

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C2-1

**Appendix C2**
**RECREATION FEE COLLECTION AFFIDAVIT**

---

**RECREATION FEE COLLECTION AFFIDAVIT**

CAMPGROUND NAME _____

TOTAL COLLECTIONS RECEIVED FROM PERMIT FEE ENVELOPES (1370-6)
ON _____
    Date

We, the following two employees, hereby certify that we opened the envelopes and
counted, taped, and reconciled the collections:

_____
Signature                        Date

_____
Signature                        Date

CASH       $ _____

CHECKS   $ _____

TOTAL COLLECTIONS  $ _____

OTHER (List unacceptable forms of payment received, e.g., stamps, lottery tickets)

---

AR10354

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C3-1

**Appendix C3**
**COLLECTIONS OFFICER NOTICE OF DESIGNATION**

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

In Reply Refer To:

1384 (   )
Memorandum

To:          (*State Director*)

Through:  (*Field Manager*)

From:       (*Supervisor*)

Subject:    Notice of Designation

In accordance with the Bureau's recommendation, (*employee name*) has been designated as a collections officer effective (___*date*___). A general description of the functions of officers and agents who are accountable are contained in BLM Manual MS-1384, Accountable Officers and Agents, and in the Collections Reference Guide. The specific responsibilities of collections officers are described in BLM Manual MS-1372, Collections.

(*Employee name*) is familiar with the contents of BLM Manual MS-1372, Collections, concerning the responsibilities/liabilities of his or her duties. Also, since the federal government no longer provides surety bond coverage for employees (as distinguished from volunteers), the employee is aware that, if found responsible, employees may be held liable for irregularities, shortages, or losses of public funds. Accountable officers and agents who desire to do so may obtain a personal bond at their own expense; however, there is no requirement for such a bond.

Signing this memorandum certifies that the employee has been advised of his or her duties/ responsibilities; accepts the responsibilities/liabilities; has been trained in collection procedures; and has been furnished adequate facilities for safeguarding public funds.

Employee _____ Date_____

Supervisor _____ Date_____

State Director Approval _____ Date_____

AR10355

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C4-1

**Appendix C4**
**SAMPLE FEE MANAGEMENT AGREEMENT**

## I.   STATEMENT OF JOINT OBJECTIVES

This Cooperative Agreement (hereinafter, "agreement") is between the U.S. Department of the Interior, Bureau of Land Management, El Centro Field Office (hereinafter, "BLM") and the Imperial County Sheriff's Office, 328 Applestill Road, El Centro, CA  92243 (hereinafter, "COUNTY").

### A.  Purpose

This agreement is made and entered into by the U.S. Department of the Interior, Bureau of Land Management (BLM), California, and the COUNTY to improve the Fee Collection and Compliance Project for the Imperial Sand Dunes Recreation Area (ISDRA).  The responsible division is referred to as the Sheriff's Recreation Permit Enforcement Team (S.R.P.E.T.) within Imperial County, in the State of California, and will provide the following services: develop community educational programs, collect noncommercial special recreation permit fees, ensure noncommercial special recreation permit compliance, enforce pertinent state, county, and applicable federal law as it relates to fee collection and compliance, and maintain/service fee equipment for the COUNTY, Fee Collection and Compliance Project.

### B.  Objective

This agreement sets out the terms and conditions for the COUNTY to market, collect, and enforce noncommercial special recreation permits related to ISDRA efficiently and as more fully described and shown on a map in Exhibit A.

- Marketing Objective – The COUNTY will work with the BLM, and other groups as mutually agreed to, in order to develop and implement a marketing plan before September 1, 2006.  One goal to be accomplished by the end of this agreement will be to inform and educate 80 percent of all visitors where they can purchase their permits before they get to the dunes.

- Collection Objective – The COUNTY will provide a means to allow all visitors a reasonable way to purchase a permit, at any time, before a visitor's arrival or in the dunes to allow visitors to be compliant with the BLM supplemental fee rule and the COUNTY fee ordinance.  The COUNTY's goal will be to accomplish 80 percent of all permit sales offsite by the end of this agreement.

- Enforcement Objective – The COUNTY will use its best efforts to enforce the fee ordinance to maintain fee compliance at a minimum level of 80 percent at any time.  The COUNTY and the BLM will develop, and agree to, a specific method for measuring compliance.

AR10356

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C4-2

When services are ordered, the BLM will allow the COUNTY to retain a percentage of the gross revenues for those services, which may include, but not be limited to, the sales and collection of noncommercial special recreation permits as defined and established under the Federal Lands Recreation Enhancement Act (Public Law 108-477) and as set forth under 16 USCS 6801 et seq. This program is undertaken in furtherance of the BLM's mission.

## C.  Authority

(1) Federal Land Policy and Management Act of 1976 (Public Law 94 579, Section 303 (d)). United States Code (U.S.C.) 43 U.S.C., Section 1733 (d), states "In connection with the administration and regulation of the use and occupancy of the public lands, the Secretary is authorized to cooperate with the regulatory and law enforcement officials of any State or political subdivision thereof in the enforcement of the laws or ordinances of such State or subdivision.  Such cooperation may include reimbursement to a State or its subdivision for expenditures incurred by it in connection with activities which assist in the administration and regulation of use and occupancy of the public lands."

(2) Federal Lands Recreation Enhancement Act (REA) (Public Law 108-477) and as set forth under 16 U.S.C.S. 6801 et seq., and Section 6 (a) Chapter 63 of Title 31, U.S.C., the Secretary may enter into a fee management agreement, including a contract, which may provide for a reasonable commission, reimbursement, or discount, with the following entities for the following purposes: (1) with any governmental or nongovernmental entity, including those in a gateway community, to obtain fee collection and processing services, including visitor reservation services; (2) with any governmental or nongovernmental entity, including those in a gateway community, to obtaining emergency medical services; (3) with any governmental entity, including those in a gateway community, to obtain law enforcement services.  In addition, with respect to revenue sharing, a state or legal subdivision of a state that enters into an agreement with the Secretary under subsection 6(a) of REA may share in a percentage of the revenues collected at the site in accordance with that fee management agreement.

## D.  Benefits

(1) The COUNTY has the authority to enforce the state and local laws of California on public lands administered by the BLM that lie within the confines of Imperial County, California; and the COUNTY is limited by level of financing as to the amount of assistance that can be provided on the public lands administered by the BLM within Imperial County.  The financial limitation of this project is normally the amount of revenue the COUNTY receives from fee collections.

(2) The COUNTY and the BLM mutually agree that it is desirable to collaborate in better using the resources of both agencies for the efficient marketing, fee collection, and enforcement of noncommercial special recreation permits for ISDRA.

AR10357

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C4-3

## II. DEFINITIONS

**A. Agreement**: This cooperative agreement.

**B. Authorized Officer (AO)**: The BLM's authorized officer. The AO is the only individual authorized to obligate funds, award, modify, or terminate the agreement. The AO is responsible for monitoring the agreement for compliance, enforcing the agreement provisions, issuing timely performance and payment approvals, terminating the agreement, and closing out the agreement.

**C. Assistance Representative (AR)**: The BLM's assistance representative. The AR will be designated for administering the technical aspect of the agreement. The AR is authorized to clarify technical requirements, review and approve work that is clearly within the scope of the work specified in this agreement, review reports, and verify itemized billings. The AR is not authorized to issue changes or in any other way modify this agreement.

**D. BLM**: The Bureau of Land Management (may also be referred to as "Bureau.")

**E. BLM Law Enforcement Officers**: Special agents and law enforcement rangers employed by the BLM who have been delegated law enforcement authority by the Director of the BLM.

**F. CFR**: The Code of Federal Regulations.

**G. Fiscal Year (FY)**: The federal fiscal year that extends from October 1 of one year through September 30 of the following year.

**H. Field Manager**: The manager responsible for the BLM's El Centro Field Office, El Centro, CA.

**I. Not To Exceed (NTE) Amount**: The maximum federal funding amount.

**J. OMB**: The Office of Management and Budget.

**K. Project Manager**: The Imperial County Sheriff's Office project manager. This individual is responsible for the day-to-day operations of the agreement.

**L. Public Lands**: Any land and interest in land owned by the United States within the several states and administered by the Secretary of the Interior through the BLM, without regard to how the United States acquired ownership, except:

- lands located on the outer Continental Shelf
- lands held for the benefit of Indians, Aleuts, and Eskimos

AR10358

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C4-4

**M. Reimbursable Services**: Those services requested by the BLM through this agreement by the BLM's AO or AR that are services of an extraordinary nature outside the normal scope of the local law enforcement agency's activities on public lands, including, but not limited to the BLM requirements for certain support services, such as marketing, sales, enforcement, and collection of noncommercial special recreation permits for ISDRA.

**N. Responsible Official**: The Imperial County Sheriff's Office's responsible official. The responsible official is the individual who is authorized to act for the recipient's organization and commit the recipient to compliance with the terms and conditions of this agreement.

**O. Secretary:** The Secretary of the Department of Interior.

**P. Sheriff:** Imperial County Sheriff's Office, the County of Imperial.

## III.   PROJECT MANAGEMENT PLAN AND OPERATIONS

### A. Imperial County Sheriff's Office agrees to:

(1) The COUNTY must perform and be responsible for providing the services described in Exhibit B, which is attached hereto and incorporated herein by reference as though fully set forth herein.

(2) Said work must be completed in a lawful, professional, expeditious, and timely manner.

(3) The COUNTY must collect BLM noncommercial special recreation permit fees that are authorized to be collected hereunder. Thereafter, and on a monthly basis, no later than the 14th of each month, the COUNTY must issue to the BLM its share of the federal noncommercial special recreation permit fees collected and accompany the same with an itemized and seasonal cumulative report that would begin on October 1 of each year through the end of September the following calendar year. Said statements must be sent to the BLM via email no later than the 14th day of every month following that for which the subject work was performed. Statement will be in a Microsoft Excel format usable to the BLM, and include, at a minimum, gross and net revenues, quantities and types of permits sold from each distribution site, and any other item that would result in a difference of the entire net amount to be paid to the BLM each month, such as credit card transaction costs, stolen funds, etc.

(4) The COUNTY must make financial reports in person and in writing at scheduled Imperial Sand Dunes Technical Review Team meetings and conference calls as notified by the BLM.

(5) The COUNTY is not an employee of the BLM and is responsible for only the requirements and results specified by this agreement or any other agreement.

AR10359

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C4-5

(6) The COUNTY must be responsible to the BLM only for the requirements and results specified by this agreement, and except as specifically provided in this agreement, must not be subject to the BLM's control with respect to the physical actions or activities of the COUNTY in fulfillment of the requirements of this agreement. It is the COUNTY's decision as to how operations are conducted, provided they meet the terms and conditions of this agreement.

(7) The COUNTY is not, must not be, entitled to receive from, or through, the BLM, and the BLM must not provide, or be obligated to provide, the COUNTY with workers' compensation coverage or any other type of employment or work insurance or benefit coverage required or provided by any federal, state, or local law or regulation for, or normally afforded to, an employee of the BLM.

(8) The COUNTY must not be entitled to have BLM withhold or pay, and the BLM must not withhold or pay, on behalf of the COUNTY, any tax or money relating to the Social Security Old Age Pension Program, Social Security Disability Program, or any other type of pension, annuity, or disability program required or provided by any federal, state, or local law or regulation.

(9) The COUNTY must not be entitled to participate in, or receive any benefit from, or make any claim against any the BLM fringe benefit program, including, but not limited to, the BLM's pension plan, medical and health care plan, dental and eye care plan, life insurance plan, or any other type of benefit program, plan, or coverage designated for, provided to, or offered to the BLM's employees.

(10) The BLM must not withhold or pay, on behalf of the COUNTY, any federal, state, or local tax, including, but not limited to, any personal income tax, owed by the COUNTY.

(11) The COUNTY is, and at all times during the term of this agreement, must represent and conduct itself as, an independent contractor, not as an employee of the BLM.

(12) The COUNTY must not have the authority, express or implied, to act on behalf of, bind, or obligate the BLM in any way without the written consent of the BLM.

(13) Provide reimbursable services as listed below, for the collection of noncommercial special recreation permit fees for ISDRA. The lack of a specific request by the BLM will not limit the authority of the Sheriff to respond to any situation in a fashion seen fit under state or local law.

   a) The BLM must pay the COUNTY compensation for the services to be performed under this agreement by authorizing the COUNTY to retain as much as 30 percent of all 16 U.S.C.S. 681 et seq. federal fees collected in relation to the premises and under this Agreement.

AR10360

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C4-6

b) Except as otherwise provided herein, the BLM must not be responsible to pay the COUNTY any compensation, out-of-pocket expenses, fees or other remuneration.

c) Said compensation and out-of-pocket expenses must be paid to the COUNTY in accordance with agreement Section III.A. (Imperial County Sheriff's Office agrees to).

(14) Rate Schedule for Services.

a) Except as provided under Paragraph III (A) 14(b) of this agreement, the BLM and the COUNTY agree that the COUNTY will retain 30 percent of the revenues collected by the COUNTY and reimburse the BLM the remaining amount of 70 percent.

b) The BLM and the COUNTY agree that the COUNTY will retain 25 percent of the revenues collected by a third party (vendors). The third party will retain 10 percent of the revenue, and the BLM will be reimbursed 65 percent. It is understood and mutually agreed to that the 10 percent revenue to the third party will be a shared cost between the BLM and the COUNTY.

**B. The BLM agrees to:**

Within the availability of funds and established federal regulations and policies:

(1) It is further mutually agreed that the sum of 30 percent represents the maximum dollar amount for which the BLM will be responsible under the terms of this agreement during the federal fiscal year. The federal government is not obligated to pay, nor is the Imperial COUNTY Sheriff's Office obligated to perform, any effort that will require the expenditure of federal funds above the total dollar amount set forth above. If at any time the Imperial COUNTY Sheriff's Department anticipates that additional federal funds will be required to perform the work set forth in this agreement, it must notify the AO, except in emergencies, at least 30 days before the anticipated date funds will be depleted.

(2) To enforce the authorized federal laws and regulations pertaining to the public lands administered by the BLM.

(3) Payments will be made in accordance with agreement Section V, Financial Support, and Section VI, Payments, and applicable OMB and Treasury regulations.

**C. The COUNTY and the BLM mutually agree to:**

(1) The COUNTY and the BLM understand and agree that each is relying upon the other's representations that it will provide services provided herein to the standard of care ordinarily exercised in the COUNTY's profession.

AR10361

H-2930-1 BLM Recreation Permit and Fee Administration Handbook (Public)

C4-7

(2) The COUNTY and the BLM represent and warrant to each other that they are a lawful entity possessing all required licenses and authorities to do business in the State of California and perform all aspects of this agreement.

(3) The COUNTY and the BLM represent and warrant that any employee, contractor, or agent who will be performing any of the duties and obligations on their respective behalf herein possess all required licenses and authorities, as well as the experience and training, to perform such tasks.

(4) The COUNTY and the BLM represent and warrant that the subject services must, except as otherwise provided herein, be performed exclusively by their respective agency. Any agreements to the contrary, pursuant to Paragraphs 10 and 14, must be consented to in writing by each of the parties.

(5) The COUNTY and the BLM each represent that the services provided herein must be performed in a professional and lawful manner.

(6) The COUNTY and the BLM each represent and warrant that the information contained in the exhibits attached hereto are true and correct.

(7) The COUNTY and the BLM each understand that the presentations made herein and by each party are material and the parties would not enter into this agreement if such representations were not made.

(8) The COUNTY and the BLM represent and warrant that any and all work that is performed under this agreement and which is exempted from production under the California Public Records Act and/or federal Freedom of Information Act must be treated as confidential and not released and/or distributed without the consent of both parties.

(9) The COUNTY and the BLM represent and warrant that all reports, analysis, or other documents developed under this agreement and that are exempted from production under the California Public Records Act and/or federal Freedom of Information Act must become the exclusive property of both parties and must not be released and/or distributed without the consent of both parties.

(10) The COUNTY and the BLM represent and warrant that any negligent errors in their services provided hereunder must be corrected at no additional charge to the other party.

(11) Except as otherwise provided herein, the COUNTY represents and warrants that it must supply all of the tools, equipment, and other supplies required to perform the services under this agreement in a professional manner. Notwithstanding, the BLM must at its sole cost and expense make its *Cahuilla Ranger Station and soon to be constructed Buttercup Ranger Station* available to the COUNTY for purposes of meeting its

AR10362