*Internal Working Document*

**INFORMATION MEMORANDUM FOR THE DEPUTY DIRECTOR OPS**

DATE:             April 3, 2018

TO:               Michael D. Nedd, Deputy Director Operations

FROM:             John F. Ruhs, BLM Nevada State Director

SUBJECT:          Briefing regarding the Mission Critical designation for the Burning Man Event
                  and utilization of Permanent Instruction Memorandum (IM).

## I.    INTRODUCTION

This memorandum is for information and subsequent decision on how to proceed regarding the
use of a Permanent IM (P-IM) for the Burning Man Event Mission Critical designation.

## II.    BACKGROUND

The biweekly pay cap for employees assigned to the Burning Man Event has been lifted from
2012 through present.  In 2017, the decision was made to use the Mission Critical authority
under §550.106(b)(1) rather than the previously utilized authority of Emergency designation
under §550.106(a)(1).  The Mission Critical designation authority is appropriate to the event and
is supported by the Burning Man planning team.

Memorandums from the Washington Office have annually enacted these authorities to lift the
pay cap.  Preparation, tracking, and posting of the memorandums is a large time commitment for
the planning team during an already busy time of year.

## III.    POSITIONS OF INTERESTED PARTIES

The planning team continues to support lifting the biweekly pay cap under the Mission Critical
authority, §550.106(b)(1).  A return to Emergency authority was analyzed and abandoned by the
2018 planning team because the Mission Critical authority is the most applicable to this unique
event.

Enacting the authority through an IM or P-IM will reduce the annual paperwork burden for the
planning team, State Director, and Washington Office staff.  An IM would require in-house
tracking to ensure it was renewed appropriately.  A P-IM resolves the tracking issue and will
remain in place until rescinded.

The 2018 planning team recommends enacting the Mission Critical authority to lift the biweekly
pay cap and ensure employees are fairly compensated for their work at the event through a P-IM
to increase efficiencies in planning and operations.

Holly Vinall, Nevada Deputy State Director Support Services, and Marguerite Adams, Nevada
State Records Administrator, were consulted in this path and they concurred this is a reasonable
and appropriate path to pursue.

1

AR06507

*Internal Working Document*

**IV.    NEXT STEPS**

A decision from the Nevada State Director is needed on how best to proceed.

**V.    ATTACHMENTS**

    1.  Draft P-IM Designating Mission Critical authority for the Burning Man Event.

PREPARED BY:  Becky Andres, Staff Law Enforcement Ranger, 775-315-3497

2

AR06508

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
https://www.blm.gov

May 21, 2018

In Reply Refer To:
1400-550 (700) I

EMS TRANSMISSION 5/23/2018
Permanent Instruction Memorandum No. 2018-010

**To:**      All Employees, Attn: Personnel Officers

**From:**    Deputy Director, Operations

**Subject:** Mission Critical designation for personnel deployed to Public Lands in Nevada in
Support of the Burning Man Event, lifting pay cap requirements

**Program Areas:** Human Capital Management and Pay Administration

**Purpose:** The Bureau of Land Management (BLM) personnel deployed to public lands in
Nevada to support the annual Burning Man Event are designated as "mission critical work" in
accordance with 5 CFR 550.106(b)(I). This allows lifting the bi-weekly pay cap authorized by 5
CFR 550.106 and the Fair Labor Standards Act (FLSA) overtime under 5 CFR 551.21 l(f) for
personnel participating in direct support of the annual Burning Man Event. Employees are
entitled to premium pay under the annual maximum earning limitations while performing the
mission critical work under the limitation s described in 550. l06(c) and 550.107 and in
accordance with BLM's Pay Administration Manual found at 1400-550.

**Policy/Action:** The FLSA status of the employees assigned to the annual Burning Man Event
shall be reviewed and administered in accordance with the previously cited Federal regulations.
The temporary waiver of the biweekly pay cap, as well as the mission critical work for deciding
FLSA designations, will begin the pay period prior to Labor Day, and continue until the
conclusion of the annual Burning Man Event, at the end of the pay period including Labor Day.
In some cases, personnel involved in operational set-up may be authorized additional days
included in the waiver while present on the desert playa, the site of the Burning Man Event,
outside of the identified pay periods. These situations will be determined and approved on a
case-by-case basis by the Authorized Officer.

**Timeframe:** This Instruction Memorandum is effective immediately upon signature.

**Budget Impact:** Minimal impact. Savings will be due to the elimination of the need to prepare,
track and post annual memorandums.

AR08049

**Background:** The Burning Man Event requires a substantial percentage of the Bureau's nationwide staffing to administer the permit and account for public health and safety of participants and staff. The BLM Washington Office staff has annually lifted the pay cap for employees deployed in support of the Burning Man Event since 2012 via memorandum. The authority used from 2012-2016 was §550.106(a)(1), Emergency Designation. After review of §550.106(b)(1), the Mission Critical Designation was utilized in 2017 and found to be the appropriate authority for the personnel deployed to the Burning Man Event.

This Permanent IM increases efficiencies in program management by eliminating the need for annual memorandums and designates the Burning Man Event as Mission Critical per §550.106(b)(1) due to the inherent requirement to safeguard and protect public health and safety within an approved special recreation permit. The statute states "For any pay period in which the head of an agency (or designee), in his or her sole discretion, determines than an employee is needed to perform work that is critical to the mission of the agency, the agency may pay premium pay under the limitation described in paragraph (c) of this section and §550.107 instead of the biweekly limitation described in §550.105(a)."

**Manual/Handbook Section Affected:**None.

**Instruction Memorandum(s) Affected:**None.

**Coordination:**This Instruction Memorandum was coordinated with WO 700, and the Office of Law Enforcement and Security.

**Contact::**Please contact Michael Courtney, Acting BLM Nevada State Director, at (775) 861-6590 for further clarification on these procedures, or for any general questions.

Signed by:                                  Authenticated by:
Michael D. Nedd                        Catherine Emmett
Deputy Director                         WO-870, IT Policy and Planning
Operations



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Nevada State Office
1340 Financial Boulevard
Reno, Nevada 89502-7147
http://www.blm.gov/nv

In Reply Refer To:
8312 (NV910/WNDO)

**APR 1 3 2017**

Memorandum

To:       Assistant Director (W0700)
          Attn: Anzanette Randall, Deputy Assistant Director, Human Capital Management

From:     John F. Ruhs
          State Director

Subject:  Lifting of Pay Cap for personnel deployment to Public Lands in Nevada in support of the
          2017 Burning Man Event

I respectfully request that the BLM designate personnel deployment to public lands in Nevada to support
the 2017 Burning Man Event as "*mission critical work*" in accordance with 5 CFR 550.106(b)(1). My
request allows lifting the bi-weekly pay cap authorized by 5 CFR 550.106 and the Fair Labor Standards
Act (FLSA) overtime under 5 CFR 551.211(f) for personnel participating in direct support of the 2017
Burning Man Event. Employees would be entitled to premium pay under the annual maximum earning
limitations while performing the mission critical work under the limitations described in 550.106(c) and
550.107.

The FLSA status of the employees assigned to the 2017 Burning Man Event shall be reviewed and
administered in accordance with the previously cited federal regulations. The temporary waiver of the
biweekly pay cap, as well as the mission critical work for deciding FLSA designations, will begin pay
period 18 (August 20, 2017), and continue until the conclusion of the 2017 Burning Man Event, at the end
of pay period 19 (September 16, 2017).

The BLM, Winnemucca District, Black Rock Field Office will designate a point of contact to keep the
records, including the date(s) that the mission critical work is conducted, the number of employees
affected, hours expended for the specific mission, and the type of premium pay involved.

[N] Approved          [  ] Disapproved

Anzanette Randall                    4-13-17
                                     Date

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone:  (650) 858-8500
david@levinlawfirm.com

Attorneys for Appellant,
Black Rock City LLC

## UNITED STATES DEPARTMENT OF INTERIOR

## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BLACK ROCK CITY LLC,<br><br>　　　　　Appellant,<br><br>　　　v.<br><br>BUREAU OF LAND MANAGEMENT,<br><br>　　　　　Appellee. | Case Identification No.:  IBLA-2019-0109<br><br>Special Recreation Permit<br>LLNVW03500-18-01<br>2930 (NV030.10)<br><br>**Statement of Reasons Supporting Appeal** |

1

2

**TABLE OF CONTENTS**

3

I.      INTRODUCTION ............................................................................................1

4

5

II.     FACTUAL BACKGROUND ..........................................................................3

6

        A.      Overview Of The Burning Man Special Recreation Permit ...................3

7

        B.      Burning Man Has An Established And Exceptional Record Of Safety

8               And Environmental Compliance .............................................................4

9

10      C.      Under The Leadership Of Special Agent Love And District Manager
                Seidlitz, BLM Increased Its Costs to Administer The Burning Man SRP

11              By Nearly 300% From 2011 To 2014 ......................................................5

12              1.      In 2012, concurrent with a change in BLM regional law
                        enforcement leadership, BLM's Burning Man-related costs

13                      increased by 60% without justification .......................................5

14              2.      Instead of stabilizing in 2013, BLM's costs more than doubled

15                      again .............................................................................................6

16              3.      In 2014, BLM's costs rose by another 15%, while Burning
                        Man's participant population fell 5%............................................7

17

18      D.      BLM Continued To Increase Its Demands in 2015, Causing BRC To

19              Appeal To The Board For Relief .............................................................8

20

        E.      Multiple Federal Investigations Found That Special Agent Love

21              Violated Ethics Rules And Committed Other Misconduct While
                Overseeing BLM's Law Enforcement Operations For Burning Man......9

22

23

        F.      While The SRP Planning Process Improved In 2016 And 2017, BLM's

24              Costs Remained Inflated Due To The Demands Of Prior BLM

25              Leadership ...........................................................................................11

26

        III.    LEGAL STANDARD.................................................................................13

27

28

i

AR11186

IV.   ARGUMENT ...........................................................................................15

   A.   BLM Has Not Sufficiently Explained Its Costs For The 2018 Burning Man SRP ..................................................................................15

   B.   BLM's 2018 Law Enforcement Costs Were Unreasonably High In 2017 ......................................................................................18

      1.   BLM law enforcement staffing continues to exceed the needs of the Event ..........................................................................20

      2.   BLM's Own Data Confirm that BLM is Over-Policing the Event Through Self-Directed Enforcement Activities ........................23

         a.   "Public [relations] contacts." .........................................23

         b.   Traffic enforcement upon entering the Event ...............24

         c.   Drug enforcement through traffic stops ........................24

      3.   BLM deployed twice the number of officers needed for every shift and these officers were idle two-thirds of the time............28

      4.   BLM unreasonably charged BRC for six senior level "investigators" assigned to work exclusively for Pershing County on state law matters  ..............................................30

      5.   BLM again unreasonably charged BRC for internal investigations ...........................................................................32

      6.   BRC should not be required to pay any costs associated with BLM's law enforcement " ..............................................33

      7.   BRC should not be charged premium pay rates for BLM's unjustified designation of Burning Man work as "mission critical................................................................................34

   C.   BLM's Soaring Communications and Information Technology Costs Far Exceed What Is "Reasonable" for the Event ....................................36

      1.   BLM personnel spent excessive hours on BLM communications, technology, and logistical services for the 2018 Event ............36

      2.   BLM continued to charge BRC for unjustified technology.......38

         a.   BLM expenditures on satellite tracking were unreasonable..............................................................38

         b.   BLM's expenditures on network services were unreasonable..............................................................40

ii

c.   BLM again contracted for needlessly expensive and unnecessary communications equipment and upgrades..................................................................................41

D.   The Costs Associated With BLM's Provision of Superfluous And Unnecessary Medical Services For Its Personnel Were Not "Reasonable" Costs................................................................44

E.   BLM Unreasonably Charged BRC For The Costs Associated With The SRPs That BLM Issued To Third Parties................................................46

F.   BLM Charged BRC For Unreasonable Equipment And Supply Costs..................................................................................47

V.   CONCLUSION................................................................49

iii

AR11188

1

2

# TABLE OF AUTHORITIES

3

4

5 **Federal Court Cases**

6 *Nevada Power Co. v. Watt,*
    711 F.2d 913 (10th Cir. 1983)................................................................ 13, 14, 17, 48

7
    *City of Indianapolis v. Edmond,* 531 U.S. 32, 41-42 (2000)
8    531 U.S. 32,41-42 .................................................................................... 25

9

10 **Federal Statutory Authorities**

11 42 U.S.C. § 4321 ........................................................................................ 3

12 43 U.S.C. § 1434(a) .................................................................................. 16

13 43 U.S.C. § 1701 ........................................................................................ 3

14 43 U.S.C. § 1734(b) .......................................................... 13, 15, 18, 20, 45

15 43 U.S.C. § 1734(b)-(c)........................................................................ 18, 22

16 43 U.S.C. § 1734(c) .................................................................................. 15

17

18 **Federal Rules and Regulations**

19 5 C.F.R. § 550.103 ...................................................................................... 5

20 5 C.F.R. § 550.105 .................................................................................... 35

21 5 C.F.R. § 550.106 ...................................................................................... 6

22 5 C.F.R. § 550.106(b)(1) ........................................................................ 6, 12

23 5 C.F.R. § 551.2110 .................................................................................... 6

24 43 C.F.R. §2923.31(e)(2)-(3) .................................................................... 46

25 43 C.F.R. §2932.31(e)(3) .......................................................................... 47

26 43 C.F.R. § 2932.11 .................................................................................. 46

27 43 C.F.R. § 2932.31(d)(2)............................................................................ 8

28 43 C.F.R. § 2932.34 .................................................................................... 8

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Additional Authorities**

*Bookcliff Rattlers Motorcycle Club,* IBLA 2004-151, 171 IBLA 6 (2006)... ....... Passim

*James R. Stacy*, IBLA 2014-216, 188 IBLA 134, 137 (2016). .................................... 13

*Mark Patrick Heath*, IBLA 2010-34, 181 IBLA 137 (2011)...................................... 15

*Michael Voegele,* IBLA 2007-255, 174 IBLA 313 (2008) ................. 14, 15, 18, 22, 45

## I.  INTRODUCTION

Appellant Black Rock City LLC ("BRC") comes before this Board for the fourth consecutive year to seek relief from unreasonable costs imposed by the U.S. Bureau of Land Management ("BLM") in connection with the special recreation permit ("SRP") for the annual Burning Man event ("Event").  Since 2011, the Event's participant population has increased by 30%, while BLM's costs to administer the Event permit have gone up an unreasonable 298%.

The largest and fastest-growing category of BLM costs is law enforcement activities.  Excessive law enforcement spending is an unfortunate legacy that BRC has borne since former BLM Special Agent Daniel P. Love managed BLM's law enforcement operations at the Event.  The Department of Interior ultimately found that Special Agent Love had violated ethics rules and committed other misconduct, including the misuse of personnel and other resources at Burning Man (all of which BRC was charged for).  While BLM removed Special Agent Love from the Burning Man detail in 2015, and terminated him in 2017, the local field office has maintained law enforcement staffing at the same inflated level and has continued to increase the bloated operation that is a legacy of Special Agent Love, all at BRC's expense.

The scale of BLM's law enforcement program still far exceeds what is reasonably necessary for the Event, with BLM's own data confirming that officers are only engaged in law enforcement activities about one-third of their time, on shifts for which they are paid at premium overtime rates due to a "mission-critical work" designation that the agency has applied to the Event without justification.  In 2018, BLM charged BRC nearly $1 million for the direct costs of law enforcement labor alone.  BLM also continues to demand a needlessly elaborate technology program to support its law enforcement apparatus, led by senior command personnel from the Office of Law Enforcement and Security and staffed with dozens of additional BLM employees and contractors, and to insist on top-dollar equipment it would never deem necessary if the taxpayers were footing the bill instead of BRC.  And BLM continues to require that BRC pay for superfluous medical services, unexplained travel, and

1

1   unnecessary equipment and supplies.

2         Year after year, BLM personnel spend thousands of hours and hundreds of thousands

3   of dollars supporting BLM's two-week operation at the eight-day Event.  Year after year,

4   BLM ignores the basic tenets of cost recovery regulations that require the agency to (1) only

5   charge BRC for ***reasonable costs***; and (2) provide sufficient information regarding the costs

6   charged to enable BRC to assess their reasonableness.  Whenever BRC has challenged BLM's

7   costs, BLM has effectively claimed that its decisions are above review.  According to BLM,

8   its staff are experts in the field with the sole discretion to determine whether costs are

9   reasonable.  BLM's position can be summarized as follows:  "If we incurred a cost, that cost

10  was reasonable."  In its Answers to BRC's previous cost appeals, BLM has even claimed that

11  not even this Board can assess the reasonableness of BLM's permit administration

12  costs.  Despite BLM wishing it were so, federal cost recovery regulations do not vest the

13  agency with such absolute discretion.

14        As detailed below, BLM again ignored the "reasonableness" requirement for costs

15  charged to BRC to administer the 2018 Burning Man SRP.  BLM's costly practices have

16  continued to sharply diverge from the Interior Department's refocusing of BLM priorities on

17  land management, and away from heavy-handed law enforcement, while also easing

18  restrictions and costs on other users of federal lands.  As a result, Burning Man — a

19  temporary, recreational event known for its Leave No Trace ethos — may be the most heavily

20  regulated activity on BLM-managed lands.  BRC contends that a substantial portion of the

21  $2,578,065 BLM charged through cost recovery to administer the 2018 Burning Man SRP are

22  not "reasonable costs" according to controlling authority.  BRC asks the Board to reject

23  BLM's improper "if we spent it, it was reasonable" analysis and order BLM to refund those

24  unreasonable costs identified herein.

25

26

27

28

<div align="center">2</div>

## II.   FACTUAL BACKGROUND[1]

### A.   Overview Of The Burning Man Special Recreation Permit

Since 1990, the Burning Man Event has been held over and around Labor Day weekend on public lands managed by BLM in what is now the Black Rock Desert—High Rock Canyon Emigrant Trails National Conservation Area of northern Nevada (the "Black Rock NCA").  (Declaration of Marnee Benson ("Benson Decl.") ¶ 3.)  The Event location, commonly called Black Rock City, has been situated within Pershing County for about the last 20 years.  (*Id*.)  Burning Man began its tenure in the Black Rock NCA as an expressive weekend camping trip for a small group of people.  (*Id*. ¶ 4.)  Over nearly 30 years, the Event has grown in size, popularity, and complexity, and the peak population[2] of the 2018 Event was 70,248 participants.  (*Id*. ¶ 4.)

Burning Man has been produced by BRC since 1997.  (*Id*. ¶ 5.)  In 2013, BRC became a wholly owned subsidiary of Burning Man Project ("BMP"), a California nonprofit public benefit corporation recognized as exempt under section 501(c)(3) of the Internal Revenue Code.  (*Id*.)  BMP's mission is to facilitate and extend the culture of the Burning Man Event in the larger world.  (*Id*.)  BLM issues the SRP for Burning Man each year pursuant to the requirements of the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA").  (*Id*. ¶ 6; 42 U.S.C. § 4321, *et seq*. (1969); 43 U.S.C. § 1701, *et seq*. (1976).)  The permitting process has included several environmental assessments over the years, the most recent of which covered the period 2012 to 2016,[3] and as with previous assessments, resulted in BLM issuing a mitigated Finding of No Significant

---

[1] Most of this background information was provided in the Statements of Reasons submitted in support of BRC's appeals of BLM's 2015, 2016, and 2017 cost decisions.  BRC includes an abbreviated version here, focusing on those issues most relevant to BLM's 2018 cost decision.

[2] All references to Burning Man's population are to the peak number of paid participants at any one time during the Event, as defined by the BLM special stipulations governing the Event.  (Benson Decl. ¶ 4.)  Actual population varies significantly over the course of each Event.  (*Id*.)

[3] BLM issued a Determination of NEPA Adequacy for the 2017 and 2018 Event SRPs, based on the 2012-2016 assessment.

3

1   Impact.  (Benson Decl. ¶ 7.)

2       BRC and BLM have cooperated over the years to develop and refine a "Leave No

3   Trace" standard for the Event that BLM has adopted for use with other events on BLM-

4   managed public lands.  (*Id*. ¶ 8.)  BLM typically inspects the Event site at the end of the SRP

5   period, and BRC has passed every inspection to date.  (*Id*. ¶ 9.)

6   **B.**     **Burning Man Has An Established And Exceptional Record Of Safety And Environmental Compliance.**

7

8       Safety and environmental stewardship are paramount to the Burning Man organization

9   and to the members of the Burning Man community.  (*Id*. ¶ 11.)  BRC's commitments to

10  public safety and the environment are evidenced by its decades-long record of compliance and

11  year-round work with cooperating agencies at the federal, state, and local

12  levels.  (*Id*.)  Burning Man is guided by Ten Principles, including communal effort, civic

13  responsibility, leaving no trace, participation, and radical self-reliance, all of which are

14  reflected in daily life in Black Rock City and in the Event's extraordinary historical

15  record.  (*Id*., Ex. B.)

16      In 2018, BRC's Event operations comprised more than 50 departments and teams, and

17  BRC engaged several thousand trained and certified health and safety employees, contractors,

18  and volunteers to produce Burning Man.  (*Id*. ¶ 12.)  BRC has built these departments,

19  protocols, and best practices over the course of nearly 30 years in the Black Rock NCA, and

20  many of these individuals have more than 20 years of experience, both with managing safety

21  operations and infrastructure at Burning Man and in their respective fields of

22  expertise.  (*Id*.)  These BRC departments were engaged year-round in planning all aspects of

23  the 2018 Event and their onsite operations, including providing emergency medical and fire

24  services; surveying the streets, roads, and airport; building infrastructure; ensuring sanitation;

25  managing air and bus transportation services; managing participant arrival and processing;

26  placing more than 1,000 camps; licensing nearly 1,000 vehicles; and educating participants

27  about staying safe, protecting the environment, and being good citizens of Black Rock

28  City.  (*Id*.)

BRC's extensive operational expertise, developed over decades of experience, has resulted in an outstanding record of public safety and environmental compliance for the Event over the years, and BRC has passed BLM's meticulous post-Event site inspection each year.  (*Id.* ¶ 9.)

## C.  **BLM's Costs To Administer The SRP Soared Nearly 300% From 2011 To 2014.**

### 1.  **In 2012, BLM's costs increased by 60% without justification when Special Agent Love took charge of BLM's law enforcement operation.**

Since 2007, BLM has charged BRC for the costs of administering the Burning Man SRP under cost recovery regulations that require a permittee to pay all of BLM's direct and indirect costs, plus 3% of BRC's gross receipts as a commercial use fee.  (Declaration of Raymond Allen ("Allen Decl.") ¶ 3.)  Between 2007 and 2011, BLM increased its costs to manage the SRP by about 10% annually — from approximately $626,000 to $859,000.  (*Id.* ¶ 4.)  During this same period, Burning Man's population increased from 47,097 to 53,963, or about 4% per year.  (*Id.*)

In 2012, Daniel P. Love became the BLM Special Agent in Charge for Region 3 of BLM's Office of Law Enforcement and Security ("OLES") and assumed leadership of law enforcement operations for the Burning Man SRP.  (*Id.* ¶ 5.)  That year, BRC's population again increased by just 4%, while BLM's costs for administering the Burning Man SRP soared by 62% and totaled almost $1.4 million.  (*Id.* ¶ 6.)  This was in part due to Special Agent Love's decision to increase BLM law enforcement staffing levels by 37%, from 51 officers in 2011 to 70 in 2012.  (*Id.*)  As a result, BLM's labor costs shot up, as did all related costs from staff lodging, meals, and travel to technology services and equipment.  (*Id.*)  BLM has never adequately explained the substantial increases, and BRC is aware of no safety or other issues that warranted them.  (*Id.* ¶ 7.)

Also in 2012, BLM designated Burning Man as an "emergency special event" pursuant to 5 C.F.R. § 550.103, for the first time to BRC's knowledge.  (*Id.* ¶ 8.)  Special Agent Love informed BRC that the designation was intended to facilitate assignment of officers from other regions to Burning Man, despite BLM never documenting any difficulty in

5

1   securing a sufficient number of staff for the reasonable needs of the Event.  (*Id.*)  The

2   authorizing memorandum signed by then-OLES Director Salvatore Lauro gave only one

3   reason for imposing the emergency designation: it "would allow for lifting the bi-weekly pay

4   cap as authorized by 5 C.F.R. § 550.106 and the ... overtime requirements under 5 C.F.R. §

5   551.2110, for law enforcement personnel participating in direct support of this

6   event."  (Benson Decl., Ex. B.)[4]  As a result, these employees would "be entitled to premium

7   pay under the annual maximum earning limitations while performing the emergency

8   work."  (*Id.*)  BRC understands BLM applied the "emergency" designation to every Event

9   from 2012 through 2016, though BLM's sparse labor summaries did not confirm the

10  designation's existence, basis, or effects.  (*Id.* ¶¶ 16-17.)[5]

11       Despite all its concerns with BLM's 2012 expenses, BRC felt it had no choice but to

12  agree to them.  BLM's Winnemucca District Manager, Gene Seidlitz, warned that if BRC

13  appealed the 2012 costs, BLM might not have enough time to both answer the appeal and

14  process BRC's 2013 SRP application, which would have caused BRC disastrous financial

15  losses.  (Allen Decl. ¶ 10.)

16       **2.      Instead of stabilizing in 2013, BLM's costs more than doubled again.**

17       Given the substantial increases in 2012, BRC expected BLM's costs would remain flat

18  in 2013, and BLM represented that this would be the case.  (*Id.* ¶ 11.)  But in the spring of

19  2013, BLM advised BRC that its costs for administering the Burning Man SRP would more

20  than double that year.  (*Id.* ¶ 12.)  They ultimately totaled over $2.93 million, an extraordinary

21  increase of 241% in just two years.  (*Id.*)  Special Agent Love claimed that the 2013 increase

22

23  [4] BLM declined BRC's repeated requests from 2012 through 2016 to provide written
    documentation of the emergency designation and BLM's basis for applying it to the
24  Event.  (Allen Decl. ¶ 9.)  In early 2017, BRC personnel visited BLM's Winnemucca District
    Office to inspect BLM's Burning Man files and found the 2012 memorandum.  (Benson Decl.
25  ¶ 15.)

26  [5] As discussed below, after BRC objected to this unjustified designation in the 2015 and 2016
    Cost Recovery Appeals, BLM retreated from past "emergency" declarations and instead
27  designated work related to the 2017 and 2018 Events as "mission-critical" under 5 C.F.R. §
    550.106(b)(1). This has enabled BLM to continue paying bonus pay at BRC's expense.

28

was due in part to a one-time upgrade of BLM's infrastructure for "safety" reasons, including implementation of a new computer-aided dispatch ("CAD") system.  (*Id.* ¶ 13.)  BLM assured BRC the CAD system would provide data about BLM's law enforcement activities that would justify, explain, and reduce the costs BLM charged BRC through cost recovery.  (*Id.*)

When BRC requested the reasoned, factual explanation for these cost increases to which it was entitled under cost recovery regulations, Special Agent Love contended that these regulations did not apply to law enforcement, which "costs what it costs."  (*Id.* ¶ 14.)  District Manager Seidlitz claimed that BRC was not entitled to any explanation of these costs, but would simply need to pay them in order to secure an SRP.  (*Id.*)  Mr. Seidlitz also informed BRC that BLM's Winnemucca District Office could not function without the money from the Burning Man SRP, suggesting that these funds were being used to backfill the District's budget shortfalls.  (*Id.* ¶ 15.)

When BRC was informed of the 2013 cost increase, the Event was just five months away, and BRC had already sold thousands of tickets and incurred significant production expenses based on BLM's assurances that its costs had stabilized.  (*Id.* ¶ 16.)  BRC again felt compelled to sign the cost recovery agreement, acquiesce to BLM's unjustified price hike, and continue to seek an adequate explanation from BLM.  (*Id.* ¶ 18.)[6]  BLM has still not justified this astronomical cost increase, and the data that would supposedly have confirmed the reasonableness of BLM's costs never materialized.  (*Id.*)

3.    **In 2014, BLM's costs rose by another 15%, while Burning Man's participant population fell 5%.**

In planning for the 2014 Event, BRC again relied on BLM's assurances that costs would not substantially increase for a while, and that the 2012 and 2013 cost increases would

---

[6] BRC could not afford to pay the additional $1.5 million BLM was suddenly requiring.  (*Id.* ¶ 17.)  During the meeting on March 26, BRC staff explained that BRC could only able finance the cost increase if BLM allowed the Event's population to increase, enabling BRC to sell more tickets.  (*Id.*)  BLM had always refused to allow Burning Man to grow proportionally to BLM's costs, but within minutes of BRC making this request at the March 26 meeting, BLM approved a substantial population increase to secure BRC's agreement to pay the agency's doubled costs in 2013.  (*Id.*)

7

improve communications and data collection, finally enabling an objective assessment of BLM's costs. (*Id.* ¶ 19.) But BLM did not furnish BRC with any additional data, and no health and safety improvements resulted from the agency's $1.5 million cost increase for the 2013 SRP. (*Id.*)

Incredibly, BLM's cost recovery proposal for the 2014 Burning Man SRP estimated that BLM's costs would increase by another $700,000, to around $3.7 million. (*Id.* ¶ 20.) When BRC objected to yet another cost hike, BLM offered BRC an opportunity to "save money" by signing a memorandum of understanding ("MOU"), under which BRC would fulfill certain contracts instead of BLM. This way, BRC would avoid paying the indirect administrative cost rate ("IACR"), which BLM applies to all direct expenditures charged through cost recovery, on these contracts. (*Id.*)[7] In 2014, BRC spent about $600,000 fulfilling the statements of work ("SOWs") under the MOU and another $70,000 to fund two proffer accounts for BLM personnel who allegedly worked year-round on the Burning Man SRP. (*Id.*)

In total, BLM charged BRC more than $3.4 million to administer the 2014 SRP — about $500,000 more than in 2013 and $2.5 million more than in 2011. (Benson Decl., Ex. C.) BLM never adequately explained the further escalation of its costs and requirements in 2014. (*Id.*)

**D.     Following BLM's Unreasonable Cost Increases In 2015, BRC Began To Seek Relief From This Board.**

The planning process for the 2015 Burning Man SRP was marred by delays and friction resulting from BLM's unprecedented demands of BRC, including a luxury compound to accommodate VIP personnel and "24-hour access to ice cream," according to the headline of one article picked up by the national media. (Benson Decl. ¶ 19; Exs. D, E.) BLM's

---

[7] BLM can waive the IACR, and it does so for other users of public lands. (*See* 43 C.F.R. §§ 2932.31(d)(2), 2932.34.) BRC has made several requests for a waiver over the years, which BLM has denied. (*See, e.g.,* Allen Decl. ¶ 20.) Via the MOU process, BLM effectively agreed to waive the IACR for these costs, but in exchange, BRC gave up its right to challenge the costs via a cost recovery appeal. (*Id.*)

1  demands became the subject of a public outcry and criticism by elected officials, with Senator

2  Harry Reid admonishing Interior Secretary Sally Jewell that such facilities "should be beyond

3  the scope of the permitting requirements." (*Id.*, Ex. E.)  BLM ultimately withdrew the SOW

4  for the VIP compound under this pressure, and both District Manager Seidlitz and Special

5  Agent Love were reassigned from work on the Burning Man SRP.  (*Id.* ¶ 19.)

6  BRC did not receive the 2015 cost recovery estimate and agreement until just a few

7  weeks before the start of the 2015 Event, days before site work was scheduled to begin.  (*Id.* ¶

8  20.)  BLM then pressured BRC to sign the $2.9 million estimate without adequate review or

9  sufficient documentation, advising that the SRP could not issue until BRC had signed and

10  paid.  (*Id.*)  BRC was again effectively forced to accept BLM's cost estimate despite its

11  reservations.  (*Id.*)

12  In January 2016, BLM issued its final cost recovery decision for the 2015 SRP,

13  totaling about $2.8 million.  (*Id.* ¶ 21.)[8]  As the decision failed to sufficiently explain the basis

14  for BLM's costs, and many costs were objectively unreasonable, BRC exercised its right to

15  appeal.  That appeal remains pending before the Board as Case No. IBLA 2016-115 ("the

16  2015 Appeal").

17  **E.**  **Multiple Investigations Found That Special Agent Love Committed Misconduct**

18  **While Overseeing BLM's Burning Man Law Enforcement Detail.**

19  In January 2017, the Office of the Inspector General ("OIG") for the Interior

20  Department released a public version of a report entitled "Investigative Report of Ethical

21  Violations and Misconduct by Bureau of Land Management Officials" (the "Ethics

22  Report").  (Allen Decl. ¶ 21; Ex. B.)  The Ethics Report detailed the OIG's investigation into

23  the conduct of Special Agent Love during his tenure as head of OLES Region 3, including

24  conduct related to the 2015 Event.  (*Id.*, Ex. B.)  The investigators found that Special Agent

25  Love violated federal ethics rules and misused BLM resources in many ways, including by

26  _____

27  [8] Including the amounts paid for the SOWs and a proffer account that funded BLM's Burning
Man Project Manager position, BRC paid a total of more than $3.5 million for costs incurred

28  by BLM to administer the 2015 Burning Man SRP.  (Benson Decl. ¶ 21.)

<center>9</center>

directing on-duty officers to escort his family on a several-hour tour of Burning Man using official vehicles.  (*Id*. Ex. B at 1, 6.)  BRC understands that it paid for all of the time logged by these officers, including Special Agent Love, while they engaged in activities that the Ethics Report confirmed were both wholly unrelated to BLM's management of the Burning Man SRP and in violation of BLM policy.  (*Id*. ¶ 21.)

After reviewing an unredacted version of the Ethics Report, the Chair of the U.S. House Oversight and Reform Committee requested that the OIG separately investigate the numerous documented incidents of "troubling behavior" by Special Agent Love. [9]  (*Id*., Ex. C at 1-2.)  These included allegations of tampering with email evidence, attempting to influence witness testimony, and directing another employee to destroy hundreds of federal records relevant to a congressional request.  (*Id*.)  The report of the OIG's second investigation, issued in August 2017, concluded that Special Agent Love had committed several other ethical violations, including ordering the destruction of emails in which he had been "inappropriate," despite the messages' relevance to the OIG's investigation into his conduct at the 2015 Event.  (*See, e.g*., *id*., Ex. D at 7-9.)

The following month, BLM confirmed that it had terminated Special Agent Love's employment.  (*Id*., Exs. E, F.)  In a message to all Interior employees, the present Secretary, David Bernhardt, cited Special Agent Love's removal from federal service as evidence that the Department's leadership was committed to holding employees accountable when "informed that they have failed in their duties and obligations."  (*Id*., Ex. G.)

Shortly after this announcement, BLM Special Agent Larry C. Wooten released a whistleblower memorandum that detailed his separate investigation into Special Agent Love in connection with a case against a Nevada rancher.  (*Id*., Ex. I.)  That investigation "revealed a widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal violations among senior and

---

[9] Though the published Ethics Report does not name the investigated officer, the Committee's letter confirmed Special Agent Love was the investigation's target.  (Allen Decl., Ex. C at 1.)

1   supervisory staff at the BLM's Office of Law Enforcement and Security," and in particular by

2   Special Agent Love.  (*Id.*, Ex. I at 1.)  On multiple occasions, Special Agent Love

3   "specifically and purposely ignored U.S. Attorney's Office and BLM civilian management

4   direction and intent as well as Nevada State Official recommendations in order to command

5   the most intrusive, oppressive, large-scale, and militaristic trespass cattle impound

6   possible." (*Id.* at 5.)

7        Special Agent Wooten's investigation also revealed that Special Agent Love's

8   misconduct was shielded and even sanctioned by previous OLES Director Salvatore Lauro,

9   resulting in "an improper cover-up in virtually every matter that [Special Agent Love]

10  participated in or oversaw," and an office culture in which "any disagreement with [Special

11  Agent Love], or any reporting of his many likely embarrassing, unethical/unprofessional

12  actions and misconduct was thought to be career destroying."  (*Id.* at 12.)  Special Agent

13  Wooten found that Special Agent Love's "subordinates and peers were afraid to correct him

14  or properly report his misconduct (despite a duty to act) out of fear for their own jobs and

15  reputation[s]" because Director Lauro not only gave him "complete autonomy and discretion,

16  but also likely provided no oversight and even contributed to an atmosphere of cover-ups,

17  harassment and retaliation for anyone that questioned or reported former [Special Agent]

18  Love's misconduct."  (*Id.* at 8, 12.)

19  **F.**   **From 2016 Through Today, BLM Costs Have Remained Unreasonably Inflated.**

20       Following the 2015 departure of both Special Agent Love and District Manager

21  Seidlitz from BLM's leadership team for the Burning Man SRP, BRC's planning for the 2016

22  and 2017 Events saw certain improvements in collaboration with BLM.  (Benson Decl. ¶ 22.)

23  BLM did not, however, reduce a number of programs and costs that were initially escalated

24  without justification under the prior leadership, including the excessive expenditures on labor,

25  support and infrastructure for the law enforcement Joint Operations Center ("JOC"), and

26  technology services and equipment.  (*Id.*)  BRC therefore filed a second and then a third

27  appeal to the Board, challenging BLM's 2016 and 2017 cost recovery decisions (respectively,

28  the "2016 Appeal," docketed as Case No. IBLA 2017-126, and the "2017 Appeal, docketed as

1    Case No. IBLA 2018-086).  The parties completed briefing on the these appeals in July 2017

2    and August 2018, respectively, and the parties await decisions from the Board.

3         One notable change in 2017 was that BLM stopped seeking to have Burning Man

4    designated an "emergency" event, as it had since 2012.  (Benson Decl. ¶ 24.)  After BRC

5    objected to this designation in its 2015 and 2016 Appeals, BLM decided to instead designate

6    the deployment of personnel to Nevada to support the 2017 Event as "mission-critical work"

7    under 5 C.F.R. § 550.106(b)(1).  (*Id.* ¶  25; Exs. F, G.)  A BLM deputy assistant director

8    approved the designation, notwithstanding the lack of any explanation or justification for

9    it.  (*Id.*, Ex. G.)  BRC understands BLM likewise applied the "mission critical" designation to

10   work at the 2018 Event, although BLM has not provided any documentation to confirm

11   this.  (*Id.* ¶ 26.)

12        Negotiations for the 2018 Burning Man SRP were similar to 2016 and 2017.  Again,

13   BLM declined to change cost practices instituted by Mr. Seidlitz and Special Agent Love,

14   intimating that it would not do so unless required by the Board in connection with BRC's

15   pending cost appeals.  (Benson Decl. ¶ 28.)  As a consequence, BLM continues to pass

16   unjustified costs on to BRC year after year while the parties await the decisions of this

17   Board.

18        The 2018 Event took place from Sunday, August 26, through Monday, September

19   3.  (*Id.* ¶ 29.)  BLM notified BRC that it had passed BLM's environmental inspection on

20   December 12, 2018.  (*Id.*)  On March 29, 2019, BLM issued its 2018 Cost Recovery Final

21   Decision, with direct and indirect costs totaling $2,578,065 — an increase of approximately

22   10% from 2017.  (*Id.*, Exs. C, H.)  Factoring in the BLM contracts for which BRC directly

23   paid, BLM's total costs to administer the 2018 SRP were $3,497,692.  (*Id.*, Ex. C.)  BLM's

24   Decision again provided BRC with insufficient detail to enable a determination of the

25   necessity and reasonableness of the charges.  To obtain relief from the unjustified costs that

26   BLM assessed in connection with the 2018 Burning Man SRP, BRC timely filed its Notice of

27   Appeal in this action on April 29, 2019.

28

### III.     LEGAL STANDARD

BLM issues SRPs under the general authority of the Secretary of the Interior to administer use of public lands under section 302(b) of the Federal Land Policy and Management Act ("FLPMA"). *James R. Stacy*, IBLA 2014-216, 188 IBLA 134, 137 (2016).  Under section 304(b) (codified as 43 U.S.C. § 1734(b)), the agency is permitted to require a deposit of any payments intended to reimburse the agency for "reasonable costs" with respect to issuing and administering an SRP.  The FLPMA defines "reasonable costs" to include "the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities." *Id*.

Congress, through the FLPMA, has made clear that an agency may not use cost recovery to force the permittee to fund general costs or costs for the "benefit of the general public":

> In determining whether costs are reasonable under this section, the Secretary may take into consideration actual costs (exclusive of management overhead ..., that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs.

43 U.S.C. § 1734(b).  Similarly, 43 CFR § 2932.31(e) limits cost recovery as follows:

> *(3) Limitations on cost recovery.* Cost recovery charges will be limited to BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement. Programmatic or general land use plan NEPA documentation are not subject to cost recovery charges, except if the documentation work done was done for or provides special benefits or services to an identifiable individual applicant.

In its Answers to BRC's 2015, 2016, and 2017 Appeals, BLM ignored the word "reasonable" and claimed that all of its "actual" costs are recoverable from BRC.  As this Board and courts applying FLPMA Section 304(b) have affirmed, however, Congress deliberately used the modifier "reasonable" to limit the agency's discretion.  For example, in *Nevada Power Co. v. Watt*, 711 F.2d 913 (10th Cir. 1983), when the Department of the Interior "[took] the position that for right of way applications, 'reasonable costs' equal[ed] actual

13

1  costs" (*id.* at 920), the appellate court rejected the agency's interpretation of Section 304(b) as

2  follows:

3  Our review of this unusually abundant legislative history reinforces
   our conclusion that the reasonableness factors were intended to limit

4  the Secretary's authorization to charge reasonable costs. The factors
   were added to ensure that applicants would not as a matter of course

5  bear all of the costs occasioned by their application.  On the other
   hand, private enterprises were not to be subsidized by requiring the

6  government to shoulder all of the costs. The conferees sought to draw
   a line between the two extremes; the reasonableness factors

7  constitute that line. To suggest that the Secretary may completely
   disregard that line flouts the clear expression of congressional intent

8  contained in the legislative history.

9

10  (*Id.* at 925) (footnotes omitted); accord *Bookcliff Rattlers Motorcycle Club*, IBLA 2004-151,

11  171 IBLA 6, 17 (2006) ("The Court in *Nevada Power* held that the Secretary cannot disregard

12  the 'reasonableness factors' set forth in section 304(b) of the FLPMA in determining costs to

13  be recovered.").  Thus, Congress intended "reasonableness" to be a limiting term and rejected

14  BLM's position that *actual* costs are synonymous with *reasonable* costs under the FLPMA.

15  Another important feature of cost recovery under Section 304(b) is the

16  requirement that the agency must give the permittee a rational explanation for all costs

17  charged that is "supported by the facts of record demonstrating that [BLM's] action is not

18  arbitrary, capricious, or an abuse of discretion."  *Michael Voegele,* IBLA 2007-255, 174 IBLA

19  313, 318 (2008).  It is not sufficient for BLM simply to describe what it spent.  "The recipient

20  of a BLM decision is entitled to a reasoned and factual explanation providing a basis for

21  understanding and accepting the decision or, alternatively, for appealing and disputing it

22  before the Board." *Bookcliff Rattlers*, 171 IBLA at 21.  In *Bookcliff Rattlers*, the Board made

23  clear that BLM cannot base its SRP cost recovery decision on summary spreadsheets.

24  The rationale for requiring disclosure of the underlying facts and
   assumptions BLM used to obtain the results reached is equally

25  applicable here. Where BLM makes use of computer spreadsheets to
   accumulate data upon which a cost estimate for an SRP is based, it

26  must reveal underlying data sufficient for the applicant being charged
   to ascertain the justification for its conclusions; otherwise, the

27  applicant has no basis upon which to understand and accept the
   decision or, in the alternative, to appeal and dispute it.

28

14

1    *Id.*  Thus, threadbare summary spreadsheets do not satisfy BLM's obligation to provide a

2    reasoned explanation of its costs, and BLM's internal instruction memoranda do not shield its

3    cost decisions from appellate review.  The Board must still examine them for reasonableness

4    and abuse of discretion.  *Mark Patrick Heath*, IBLA 2010-34, 181 IBLA 137 (2011).

5           BRC acknowledges that it has the burden of proof to demonstrate that BLM failed to

6    meet these statutory requirements.  *See Michael Voegele*, 174 IBLA 323.  And upon showing

7    that BLM's 2018 Cost Recovery Decision charged BRC for unreasonable costs under Section

8    304(b), BRC has a clear statutory remedy: To the extent BRC "has made a payment . . . not

9    required or in excess of the amount required by applicable law and regulations," BRC is

10   entitled to a refund of the overpayment under 43 U.SC. §1734(c).

11                                    **IV.    ARGUMENT**

12   **A.      BLM Has Not Sufficiently Explained Its Costs For The 2018 Burning Man SRP.**

13          Over the four years since BRC began appealing BLM's cost decisions, BLM has

14   become expert at explaining *what* it spends to administer BRC's permit, and it has continued

15   to ignore the legal requirement that it also explain *why* it spent the permittee's funds under

16   cost recovery.  Otherwise, BRC and this Board have no basis to judge whether the funds are

17   "reasonable" as required by 43 U.S.C. § 1734(b).

18          Following the 2018 Event, BLM became even more opaque.  Until 2017, BLM

19   prepared and distributed an annual After Action Review describing how it administered the

20   Burning Man SRP and giving BRC at least some information about its use of the several

21   million dollars charged to BRC each year through cost recovery.  (Vind Decl. ¶ 4; Exs. A, B.)

22   Without explanation, BLM failed to prepare a 2018 After Action Report and limited its

23   assessment of the Event to BRC's compliance with BLM restrictions in an SRP Annual

24   Evaluation, which Field Manager Hall issued in draft form in December 2018 and never

25   finalized.  (*Id.* ¶ 4.)  BRC has even less information about what BLM did to administer the

26   2018 SRP and whether its costs totaling $2,578,065 were "reasonable."  BRC's only recourse

27   is another appeal to this Board for information about and relief from BLM's 2018 costs.

28

1    As BRC has come to expect, BLM's failure to comply with its cost recovery

2  obligations is particularly notable with respect to its labor costs, which again account for

3  nearly two-thirds of the total expenditures.  (Benson Decl., Ex. H, Att. 1.)  For each of the 119

4  employees listed, BLM's Project Log lists only the last name, title, a few words or short

5  phrases summarizing general duties, the range of dates in which the employee worked, total

6  number of hours worked, and total pay received.  (*Id.*)  BRC has therefore been unable to

7  meaningfully assess whether any of BLM's labor charges were reasonably incurred in

8  connection with the Burning Man SRP, such that they could appropriately be charged to BRC

9  through cost recovery.  BRC still disputes that BLM could effectively manage its staff, or

10  even create the summary Project Log, without precisely tracking the time each employee

11  spends on the Burning Man SRP and what they are doing.  BRC is entitled to review the

12  underlying data on which BLM has based its bare summation, and the agency does not satisfy

13  its cost recovery obligations without providing it.

14    Despite BLM's continued refusal to supply the pay grade of any of its assigned

15  personnel, the limited information in the labor summary indicates that BLM is still choosing

16  to utilize law enforcement and other personnel who have a higher pay grade than necessary, in

17  conflict with its obligation to charge a permittee only for its reasonable costs.  *See* 43 U.S.C. §

18  1434(a), (b); *Bookcliff Rattlers*, 171 IBLA 17.  Burning Man is a recreation-oriented event,

19  and according to BLM's 2017 witness Declarations, BLM law enforcement spends the bulk of

20  their time patrolling the Event and conducting traffic stops.  (*See, e.g.*, 2017 Andres Decl. ¶

21  7).  Based on the nature of this work, patrol-level rangers, who are generally paid at a lower

22  rate than special agents or State Chief Rangers, are the reasonable choice for nearly all law

23  enforcement assignments.  (Declaration of Robert Abbey ("Abbey Decl.") ¶ 4.)  Yet BLM's

24  2018 labor summary again confirms that nearly one-third of the total law enforcement

25  positions were held by highly paid senior BLM staff, including at least six State Chief

26  Rangers, nine special agents, and four supervisory rangers.  (Benson Decl., Ex. H, Att. 1.)

27  BLM has failed to justify the assignment of 27% of its entire national force of law

28  enforcement officers to the Event, including numerous highly compensated senior officers.

STATEMENT OF REASONS

1   (2017 Briscoe Decl. ¶ 10).  The agency cannot reasonably charge BRC for the costs associated

2   with unsupported staffing levels.  *Bookcliff Rattlers*, 171 IBLA at 21.  (*See* Abbey Decl. ¶

3   4.)[10]

4          BLM also again, and without justification, assigned several specialists to perform

5   information technology work in connection with the SRP, plus another State Chief Ranger to

6   serve as Communications Chief.  (Benson Decl., Ex. H, Att. 1.)  BRC cannot be required to

7   shoulder the burden of BLM's astronomical labor costs without evidence showing these costs

8   are reasonable.  *See, e.g., Bookcliff Rattlers*, 171 IBLA 21.

9          And again in 2018, BLM's "Travel Per Person" spreadsheet fails to provide BRC with

10  any explanation for more than $38,000 in costs, giving the same generic statement for each of

11  the 119 individuals listed, regardless of the amount claimed:  "Travel for related assigned

12  duties at Event."  (Benson Decl., Ex. H, Att. 3.)  This statement provides no basis for BRC to

13  comprehend BLM's justification for charging these costs.  BRC recognizes that BLM

14  employees must travel to and from the Event and does not object to paying their reasonable

15  travel costs, but BLM must provide the detail required for any understanding of what the

16  travel was and whether it was reasonable, as BLM has done in the past.  In the administrative

17  record for 2015 Cost Recovery Appeal, BLM included a travel spreadsheet for the 2012 Event

18  that itemized all claimed travel expenses of all assigned employees.  (*Id.*, Ex. K.)  It was

19  during the leadership of Special Agent Love and District Manager Seidlitz that BLM's travel

20  expenditures increased and its explanations for this travel became obscured.  Notably, BRC's

21  2015 Appeal argued against certain specific travel expenses based on the description

22  provided.  (2015 Appeal at 20.)  Ever since, BLM has frustrated BRC's ability to challenge

23  BLM's travel costs in the same manner by providing no detail at all.  (2016 Appeal at 17-18.)

24  BRC asks that the Board reject BLM's transparent effort to withhold material information in

25  _____

26  [10] Field Manager Mark Hall declared that the ratio of command staff to non-command staff
    needed at the 2017 Event was one to thirty-six (1:36), or 2.7%.  (2017 Hall Decl. ¶ 6 ("BLM

27  requires a minimum of 75 officers to safely fulfill the law enforcement portion of
    administering the Burning Man event permit, 2 officers in the command staff and 73 officers

28  in the support, patrol and investigative operation.").)

1    order to frustrate BRC's appeals and require BLM to provide sufficient information to

2    confirm the reasonableness of its travel costs.  *See Bookcliff Rattlers*, 171 IBLA 21; *Michael*

3    *Voegele,* 174 IBLA 318 (2008).

4         BLM's failure to provide the necessary detail in these and other areas cannot be

5    inadvertent, given BRC's appeal of BLM's last three cost recovery decisions for the same

6    deficiencies.  (*See generally* 2015-2017 Statement of Reasons.)  Year after year, BLM has

7    responded to BRC's concerns about the agency's enormous and unjustified overhead for the

8    Burning Man SRP by claiming that it need only prove that it spent these amounts on the

9    Event.  (*See, e.g*., 2017 BLM Answer at 10-13.)  The cost recovery regulations make clear,

10   however, that BLM must also show all of its expenditures were <u>reasonable</u>, and a cost is not

11   reasonable just because it is incurred.  *See* 43 U.S.C. § 1734(b).  "Reasonable costs" are not a

12   synonym for "actual costs."  *Nevada Power*, 711 F.2d at 925.  As BLM has failed to provide

13   the requisite reasoned and factual explanation of the costs it incurred to administer the 2018

14   Event SRP, respectfully requests that the Board order a refund of all amounts charged.  *See*

15   *Bookcliff Rattlers*, 171 IBLA 21.

16   **B.**     **<u>BLM's 2018 Law Enforcement Costs Were Unreasonably High.</u>**

17        BRC seeks relief from all BLM law enforcement costs that have not been adequately

18   explained, are unreasonable under any rational assessment of the Event's public safety needs,

19   and therefore violate BLM's obligation to only charge a permittee for reasonable costs.  *See*

20   43 U.S.C. § 1734(b)-(c); *Michael Voegele*, 174 IBLA 318; *Bookcliff Rattlers*, 171 IBLA

21   13.  Burning Man has been taking place for nearly three decades in the Black Rock NCA, and

22   BLM should have learned lessons over this long period that allow for tremendous efficiencies,

23   even as the Event has grown in size.  (Benson Decl. ¶ 3; Abbey Decl. ¶ 4.)  Instead, as the

24   Event's participant population has remained mostly static for several years, BLM's costs have

25   disproportionally and unreasonably increased.  (Benson Decl., Ex. C.)

26        By contrast, for other permittees, BLM has lately lessened the financial burdens and

27   regulatory requirements on virtually every other user of public lands, from oil, gas, and

28   mining companies to livestock operators to off-highway vehicle enthusiasts.  For BRC, the

18

1    subsidiary of a non-profit organization, BLM has maintained and increased its economic and

2    regulatory demands.  (Abbey Decl. ¶ 9.)  The absurd result is that Burning Man may now be

3    the most regulated activity on BLM-managed public lands, despite far fewer impacts being

4    associated with this temporary special event than with most of the other uses permitted by

5    BLM.  (*Id*.)

6         BRC believes this disconnect has principally resulted from BLM's unwillingness to

7    revisit the unreasonable demands of its prior leadership team for the Burning Man SRP,

8    particularly the demands of Special Agent Love related to Event law enforcement.  (Benson

9    Decl. ¶ 28.)  While this reticence always conflicted with BLM's duty to charge a permittee

10   only for "reasonable" costs, it is all the more inappropriate in 2018, after numerous official

11   investigations found that Special Agent Love committed serious misconduct, specifically at

12   the Event, and the agency terminated his employment.  (Allen Decl., Exs. B-I.)  The Board

13   must finally require BLM to revisit and correct all aspects of its Burning Man operation that

14   were mandated by Special Agent Love without justification, especially the costs discussed

15   below.

16        Based on BLM's responses to BRC's three prior appeals, BLM will try to justify its

17   ever-increasing law enforcement costs by: (1) downplaying the seriousness of BRC's

18   concerns by referring to them as a "mere disagreement" over staffing (2017 BLM Answer at

19   16:25); (2) contending that BLM has sole "authority and discretion" to conduct law

20   enforcement and anything it decides and spends in this area is irrefutably reasonable (*id.* at

21   16:7); (3) claiming that BLM's only obligation is to explain "how it enforces public land

22   laws" and it need make no other showing of the reasonableness of its costs (*id.* at 19:15-24);

23   and (4) arguing that this Board cannot order a refund because it lacks "general supervisory

24   authority over the BLM" (*id.* at 9:26-27).

25        BRC will refute each of these points below, but would like to address at the outset an

26   outrageous argument that permeated past Answers.  Previously, BLM has claimed that it has

27   complete "discretion to determine the nature and extent of its law enforcement operations"

28   and that BRC is seeking the right to "approve of agency law enforcement practices on public

19

1   lands." (*Id.* 20:8-9.)  This is patently false.  BRC is not trying to dictate law enforcement

2   practices or priorities at the Event.  BRC merely objects, as is its right, to paying for law

3   enforcement costs that are not necessary to the SRP and not subject to reasonable fiscal

4   oversight.

5       Law enforcement priorities and practices are, by necessity, a function of available

6   resources.  If law enforcement resources were limitless, BLM could treat every law

7   enforcement goal as an absolute priority and staff the public lands with thousands of officers

8   and substations.  Law enforcement resources are typically limited by an elected legislative

9   body with the power of the purse and public oversight, and the agency must make

10  compromises based on legislative funding and the agency's budget.  None of these limitations

11  apply to BLM's administration of BRC's SRP, however.  Here, BRC is the purse, and BLM

12  believes that it can manipulate the cost recovery regulations to force BRC pay for any demand

13  BLM law enforcement may make.  BRC's only check on BLM's spending is the limitation

14  under 43 U.S.C. § 1734(b) that agency costs must be "reasonable."  BRC is appealing BLM

15  law enforcement costs that appear to be unreasonable and an abuse of the cost recovery

16  system created by Congress.

17      **1.      BLM law enforcement staffing continues to exceed the needs of the Event.**

18      BLM cannot ignore the fact that its staffing demands have increased

19  disproportionately to the size of the Event and that an explosion in BLM law enforcement

20  costs coincided with the tenure of its disgraced former special agent in charge.  Before Special

21  Agent Love's arrival, BLM charged BRC about $500,000 in labor costs.  (Benson Decl., Ex.

22  C.)  After Special Agent Love assumed full charge of BLM's law enforcement operations in

23  2013, the agency's costs for law enforcement labor soared to nearly $1 million and topped

24  $1.1 million in 2014 and 2015.  (*Id.*)

25      In 2016, law enforcement staffing costs fell slightly after Special Agent Love stopped

26  working on the Burning Man SRP.  (*Id.*)  But costs started to rise again in 2017 and the

27  increases continued in 2018.  (*Id.*)  In 2018, BLM charged BRC $971,787 for law

28  enforcement labor alone.  (*Id.*, Ex. H, Att. 1.)  Overall, BLM's labor costs were 208% higher

<div align="center">20</div>

in 2018 than in 2011, and about 3% higher than in 2017.[11]  (*Id*.; *see also id*., Ex. C.)

Meanwhile, Burning Man's peak participant population increased by 30% from 2011 to 2018 and by effectively zero percent from 2013 to 2018.  (*Id*., Ex. C.)  BLM has never produced data to justify such a disproportionate increase in its law enforcement costs relative to the Event's population growth, nor has it documented any meaningful improvement to public safety as a result.  (Allen Decl. ¶ 7.)  Absent such evidence, BRC believes it is continuing to suffer the financial and cultural consequences of Special Agent Love's unjustified inflation of BLM's law enforcement operations, particularly his 37% increase in the number of officers staffing the Event and assignment of an unprecedented number of highly paid senior staff to these roles.  (*Id*. ¶ 6.)  These improper decisions have never been rectified or even reviewed, despite Special Agent Love's documented misconduct and termination from the agency.  (*See, e.g*., Allen Decl., Exs. B, D, I.)  BRC has also borne the costs of providing housing, meals, vehicles, and equipment for all these additional officers, and meeting the demands of law enforcement leadership for increasingly elaborate and expensive technology.  (*See* Section IV.C.)

As noted above, Special Agent Love was the subject of several investigations and findings of illegal and unethical conduct.  (Allen Decl., Exs. B, D, I.)  Although Special Agent Wooten's investigation did not relate to Burning Man, he reported that "BLM Law Enforcement Supervisors" had accused Special Agent Love of misconduct connected to the Event, including "[d]irecting [s]ubordinates to [e]rase [o]fficial [g]overnment [f]iles in order to impede the efforts of rival civilian BLM employees in preparation for the 'Burning Man' Special Event, unlawfully removing evidence, bragging about the number of OIG and internal investigations on him and indicating that he is untouchable, [and] encouraging subordinates not to cooperate with internal and OIG investigations[.]"  (*Id*., Ex. I at 8.)  Thus, the agency's independent investigations have found Special Agent Love committed misconduct and lacked

---

[11] This total includes $1,527,140 for the labor of BLM law enforcement and civilian personnel, and another $39,740.02 to hire additional law enforcement personnel from the U.S. Forest Service.

STATEMENT OF REASONS

AR11211

1    sufficient oversight throughout the period during which he oversaw BLM's law enforcement

2    operations at Burning Man and demanded unwarranted increases in their scale, intrusiveness,

3    and associated costs, as he had done with other operations. (*See, e.g., id.*, Ex. I at

4    5.)  Following the release of these reports, BRC reasonably expected BLM to reassess and

5    reduce the number of law enforcement officers assigned to the Event, as Special Agent Love

6    had never justified the increase he demanded.

7            Instead, BLM has continued to insist that BRC bear the costs of this unjustified

8    expansion.  (Abbey Decl. ¶ 4.)  Special Agent Love's excessive staffing has unreasonably

9    remained the baseline for BLM's Event staffing decisions, and BLM's officer headcount

10   continues to rise without justification. At the 2018 Event, as in 2017, BLM deployed again 73

11   officers, and its law enforcement labor costs increased by more than $26,000 over

12   2017.  (Benson Decl., Ex. H, Att. 2; Ex. C.)  BLM has not shown that it required four more

13   officers at the 2017 and 2018 Events than at the 2016 Event, when there was no substantive

14   increase in the Event's size.  (*Id.*, Ex. C.)  Conclusory pronouncements of necessity do not

15   fulfill BLM's obligation to provide a reasoned explanation for the costs it charged to a

16   permittee.  *See, e.g.*, 43 U.S.C. § 1734(b)-(c); *Michael Voegele*, 174 IBLA 318; *Bookcliff*

17   *Rattlers*, 171 IBLA 13.  As BLM's 2018 law enforcement staffing decisions continued to be

18   unexplained and apparently arbitrary, the associated costs were not "reasonable" and BRC

19   deserves a refund under 43 U.S.C. § 1734(b)-(c).

20           In past Answers, BLM attacked "the implication that BLM's [law enforcement] costs

21   must correspond to the population size" (2017 BLM Answer at 12-13), but offered no

22   alternative for determining what is "reasonable," other than the words of its purported internal

23   "experts."[12]  BRC contends that spiraling law enforcement costs to police a stable Event

24   _____

25   [12] BLM itself claims to use Event population to determine law enforcement staffing levels.  In
     its 2017 Answer, BLM cites purported "recommendations" of the International Association of
26   Chiefs of Police ("IACP") as the basis for setting its law enforcement staffing levels at the
     Event.  (2017 Answer at 18:10-12.)  As BRC noted in its 2017 Reply, the population ratios in
27   the IACP report relate to municipalities and are wholly inapplicable to a temporary recreation

28

population, with no explanation, are *per se* unreasonable.

## 2. BLM's Own Data Confirm that BLM is Over-Policing the Event Through Self-Directed Enforcement Activities.

In 2013, BLM demanded that BRC pay for a new computer assisted dispatch ("CAD") system, claiming it would provide data justifying the extent of BLM's law enforcement operations at the Event, and eventually save BRC money. (Allen Decl. ¶ 13.) Since then, however, BLM's costs have continued to rise, especially in the realm of law enforcement-related technology,[13] and the CAD data has failed to justify these costs. For the 2018 Event, the data recorded by BLM's CAD system and the Department of the Interior's Incident Management, Analysis and Reporting System ("IMARS") confirm that BLM again assigned far more law enforcement officers to Burning Man than were reasonably required for public safety.

### a. "Public [relations] contacts."

According to BLM's 2018 Statistical Summary, BLM's CAD system recorded 3,205 "Law Enforcement Events," a 65% decrease from 2016, the last year that BLM provided BRC with a CAD data report. (Vind Decl. ¶ 6; Exs. C, D.) Of these law enforcement events, more than a third (1,218) were assigned the service call type of "public contact." (*Id.* ¶ 11; Ex. C.) BRC understands that BLM law enforcement officers have made it a practice to record a public contact whenever they communicate with a Burning Man participant, even if they are just providing directions to the porta-potties or handing out BLM logo items as gifts. (Vind

---

event like Burning Man. (2017 Reply at 9:27-10:20.) Moreover, the IACP expressly recommends *against* using "[r]atios, such as officers-per-thousand population as a basis for staffing decision," noting that this would be "totally inappropriate" and that such ratios have "no place in the IACP methodology." (*Id.* (quoting IACP Patrol Staffing and Deployment Study (2004)).) Instead, the IACP advises agencies to consider "an extensive series of factors and a sizeable body of reliable, current data" that reflect the unique needs of the locality. (*Id.*; *see also* Vind Decl., Ex. F.) BLM has no rational basis for using these ratios to make staffing decisions for a special event like Burning Man, which enjoys lower levels of criminal activity than any Nevada city and benefits from thousands of BRC staff and volunteers who serve as force multipliers for law enforcement. (Vind Decl. ¶¶ 16, 28.) Thus, BLM's law enforcement staffing is arbitrary, capricious, and unreasonable under cost recovery regulations.

[13] BRC's objections to the costs of BLM's technology program are set forth in Section IV.B.3.

23

1   Decl. ¶ 11.)

2        BRC appreciates the officers' interest in engaging with Event participants, but the

3   costs of these activities are not reasonable costs under cost recovery regulations.  These

4   outreach and assistance activities are both entirely discretionary and duplicative of the

5   extensive infrastructure and support services that BRC provides, including thousands of staff

6   and volunteers to assist with directions and information.  (Benson Decl. ¶¶ 12-13.)  And the

7   fact that law enforcement officers can devote so much time to these activities every year is

8   evidence that BLM overstaffs the Event.  (Vind Decl. ¶ 11.)  BLM is, of course, welcome to

9   engage in public outreach to participants, but it should not be charging BRC for this time,

10  including any time spent logging such efforts.

11              b.      Traffic enforcement upon entering the Event.

12        Excluding the "public contacts," BLM's data indicate that its officers recorded

13  1,987 law enforcement service calls over 15 days in 2018.  (Vind Decl. ¶ 11.)  Of these, 783

14  — almost 40% — were self-initiated traffic stops.  (*Id*. ¶ 27.)  BRC understands that many of

15  these stops occurred near and on "Gate Road," which is not a BLM, state, or county road, but

16  a temporary path of ingress and egress on the playa surface that BRC creates for its private

17  Event.  (*Id*., Ex. D; Benson Decl. ¶ 35.)  BRC sets the speed limit at 10 miles per hour and

18  accidents of any kind are extraordinarily rare, with vehicle collisions and accidents causing

19  injury even less common.  (Benson Decl. ¶ 35.)  Despite spending thousands of hours on

20  traffic stops, and pulling 783 vehicles over for purported safety issues, BLM issued just 115

21  citations for motor vehicle-related offenses, primarily for minor violations of the Closure

22  Order, like a missing tail-light or registration.  (Vind Decl., Ex. C.)  Given Gate Road's

23  exceptional safety record, it is unreasonable for BLM to devote such extensive resources to

24  traffic stops in that location, all at BRC's expense.

25              c.      Drug enforcement through traffic stops.

26        The real reason BLM initiated these traffic stops, especially against vehicles entering

27  the Event, was that BLM was conducting a drug enforcement operation.  BLM admitted in

28  past Answers that motor vehicle stops are its primary means to enforce drug possession laws,

1   which BLM purportedly considers a primary law enforcement priority.  (2017 Andres Decl. ¶

2   24.)  Once a vehicle is stopped for a minor or manufactured traffic infraction, a second team

3   of BLM officers with drug sniffing K-9 dogs searches the perimeter of the vehicle and its

4   passengers for drugs.

5        BLM failed to tell BRC how many K9 units it deployed at the 2018 Event, but BRC

6   believes that BLM used at least as many as it did in 2017: eight separate teams with at least

7   two on-shift at all times.  (*Id*. ¶ 25.)  BLM even required BRC to fund and construct a shade

8   structure outside the JOC, so that K9 agents could park their idling, air-conditioned vehicles

9   beneath it and ensure that K9 teams could be deployed to any traffic stop.  (Vind Decl. ¶ 22.)

10  In past Answers, BLM claimed to need all this K9 support for public safety reasons, alleging

11  that "[r]emoving [controlled] substances before they enter the city helps reduce the potential

12  for harm to members of the visiting public and employees … BLM conducted a traffic stop on

13  average of less than 5% of the vehicles entering the city."  (2017 Andres Decl. ¶ 24.)  Of

14  course, removing controlled substances from society reduces the "potential for harm."  But no

15  city in America stops 5% of the vehicles entering its borders to detect evidence of "ordinary

16  criminal wrongdoing" like simple drug possession.  *See City of Indianapolis v. Edmond*, 531

17  U.S. 32, 41-42 (2000) (holding that warrantless searches for such purposes at police

18  checkpoints are unconstitutional).  Not only would such blanket warrantless searches be

19  illegal, their cost would be staggering.

20       Likewise, BLM's extensive and indiscriminate searches do not occur at the entrances

21  to national parks or any other public lands managed by the U.S. government.  Among other

22  BLM-permitted activities, no other permittee is forced to pay the costs for extensive use of K9

23  units to fund a general drug prevention goal.  (Abbey Decl. ¶ 5.)  This is understandable,

24  given that the primary responsibility of BLM's law enforcement program is to provide visitor

25  assistance and protect sensitive natural and cultural resources.  (*Id*. ¶ 9.)  Moreover, the law

26  enforcement strategy BLM deploys at the Event is in conflict with directives from U.S.

27  Secretary of the Interior Ryan Zinke "to refocus on Interior's long-standing but recently

28  forgotten recreation mission" (Allen Decl. ¶ 29, Ex. J), and for BLM personnel in particular to

1    emphasize their role as land managers more than law enforcers.  (Abbey Decl. ¶ 9; Exs. A, B.)

2           Despite the enormous amount of resources expended on K9-assisted traffic stops,

3    BLM's drug enforcement activities again yielded few drug citations in 2018.  BLM issued a

4    total of 94 citations for drug-related offenses in 2018: 86 for possession of a controlled

5    substance including marijuana, and eight for "drug paraphernalia" (which BRC believes were

6    for marijuana paraphernalia).  (Vind. Decl., Ex C.)  For comparison, BLM issued 196 drug-

7    related citations in 2017, including 15 for "drug paraphernalia," and 85 drug-related citations

8    in 2016, including 3 for "drug paraphernalia."  (*Id*., Ex. D.)  The number of BLM drug-related

9    citations has gone up and down from year to year seemingly at random.  Despite no material

10   change in the number of Event participants from 2016 to 2018 and a steady increase in BLM

11   law enforcement costs during that time (Benson Decl., Ex. C), BLM issued 48% fewer drug-

12   related citations in 2018 than 2017.  (Vind Decl. Ex. D.)  The wild variance in the annual

13   number of BLM-issued drug citations is proof that BLM's law enforcement activities are not

14   connected to the safety needs of the Event.

15          Further evidence is found in the prosecution results from BLM drug enforcement

16   activity at the Event, which have remained remarkably consistent.  Since the 2010 Event,

17   every participant challenging a drug-related BLM citation has had the drug offense dismissed.

18   (Declaration of Marc Picker ("Picker Decl.") ¶¶ 4, 5.)  In every negotiated case, the citation

19   was dismissed or the defendant was allowed to plead guilty to a minor motor vehicle

20   infraction or a general Closure Order violation.  (*Id*.)  The outcome of BLM's extensive drug

21   enforcement efforts was essentially the same in 2018 as in each of the last nine years: BRC

22   understands that BLM agreed to dismiss the drug-related charges for all Burning Man

23   participants who negotiated  their BLM citations.  (*Id*.)  BRC believes that the only drug

24   possession convictions BLM obtained were from participants who elected to plead guilty to an

25   infraction and pay a $530 fine.  (*Id*.)[14]

26   _____

27   [14] In its 2017 Answer, BLM reports that it received "either payment or guilty pleas" in a total
     of 105 "cases."  (Andres Decl. ¶ 27.)  This "testimony" lacks foundation and is not supported

28

1   Citation and prosecution data confirm that BLM's drug enforcement efforts do not

2   justify its exorbitant expenditures on law enforcement at the Event.  It is unreasonable for

3   BLM to continue to charge BRC for the substantial costs of self-directed drug enforcement

4   activities when these drug charges are universally dismissed when challenged in court.

5   Outside of motor vehicle and drug possession infractions, BLM officers issued only

6   224 citations (none of which appear to have been for serious offenses) and made no

7   arrests.  (Vind Decl., Ex C.)  Moreover, the bulk of BLM's non-drug related citations were for

8   environmental compliance-related infractions and not serious crimes.[15]  Excluding the 166

9   citations for environmental issues and the variable number of motor vehicle/drug-related

10   citations, BLM issued only 58 citations in 2018, an extremely low number of enforcement

11   actions for an eight-day Event with almost 80,000 attendees and staff.  (*Id.*)  BLM will likely

12   argue that this number would be higher if only they had more officers.  That argument is

13   absurd, however, as their officers are idle and/or engaged in public contacts for an

14   overwhelming amount of time as it is.  (*Id.* ¶¶ 11, 25.)  The number, nature and results of

15   BLM's 2018 citations confirm that the agency continued to unreasonably over-police the

16   Event.

17   Results from the state law enforcement agency with jurisdiction over the Event, the

18   Pershing County Sheriff's Office ("PCSO"), confirm the extremely low-level public safety

19   threat at the Event.  According to official reporting provided by Sheriff Allen during the

20   Event, PCSO made 44 arrests and issued 85 citations.  (Vind Decl. ¶ 9.)  The vast majority of

21   PCSO citations and arrests were drug-related.  In 2018, PCSO made just five arrests for

22   battery or assault of any kind, including three for domestic violence and zero for sexual

23   assault.  (*Id.*)  Given that serious criminal activity of any kind is rare at Burning Man year

24   _____

25   by any court records.  If this number is accurate, it means over 82% of BLM's drug

26   enforcement activity consisted of writing citations for marijuana possession, which is legal
   under Nevada law.

27   [15] In 2018, BLM issued 166 citations for environmental compliance-related offenses, including

28   40 citations for improper fuel storage, 38 citations for "waste water," and 88 for "depositing
   human waste."  (Vind Decl. ¶ 8.)

AR11217

after year, and person-on-person crime extraordinarily so, the massive scale of BLM's law enforcement operations is objectively unreasonable.  (Vind Decl. ¶ 15.)

     **3.**     **BLM deployed twice the number of officers needed for every shift and these officers were idle two-thirds of the time.**

As it has in each of the last several years, BLM over-staffed every law enforcement shift at the 2018 Event, as confirmed by an objective assessment of BLM's CAD and IMARS data.  Though BLM failed to prepare a 2018 After Action Review ("AAR"), its 2017 AAR, Answer to BRC's 2017 Appeal, and sparse 2018 labor summary indicate that BLM assigned at least 73 law enforcement officers to work three round-the-clock, overlapping 13-hour shifts.  (2017 Andres Decl. ¶ 7; Vind Decl. ¶ 4, Ex. A; Benson Decl., Ex. H, Att. 1.)  As noted above, BLM's CAD system recorded 1,987 "law enforcement events" (excluding public contacts) during the entirety of BLM's 2018 Event operations — a 17-day period covering the eight-day Event, six days pre-Event, and three days post-Event.  (Vind Decl. ¶ 6, Ex. C.)  BRC understands that some law enforcement responses are more involved and require more officer time than others.  It is nonetheless unreasonable for BLM to assign so many officers to Burning Man that each appears to be responding to no more than a handful of law enforcement events in a 13-hour shift.  BLM's own data show that each officer sits idle almost two-thirds of the time.

To assist in its assessment of the reasonableness of BLM's law enforcement staffing, BRC enlisted the expert analysis of former Nevada Highway Patrol ("NHP") Lieutenant Roger Vind, who managed traffic enforcement for NHP during the Event ingress and egress periods from 2003 to 2005 and from 2007 to 2010.  (*Id.* ¶ 3.)  His analysis of the 2018 CAD data and BLM's 2017 AAR indicated that BLM officers again spent about two-thirds of their overall time in an "available" status while on duty.  (*Id.* ¶ 20.)  Lieutenant Vind had reached the same conclusion in 2017 by examining the CAD data and calculating the amount of time each officer was classified as "Available." (*Id.* ¶ 26.)  Apparently embarrassed by the data showing that BLM officers were idle most of the time, BLM deleted the "Available" status from its CAD system in 2018.  (*Id.* ¶ 24.)  Instead of making substantive changes to address

<div align="center">28</div>

1   law enforcement over-staffing, BLM simply changed the optics.  In place of "Available,"

2   BLM created a new CAD status category: "Engaged."  (*Id.*)  But the actual status of the

3   officers on patrol did not change: whether reported as "Available" in 2017 or "Engaged" in

4   2018, the officer was still simply driving around the Event, on call and available to respond to

5   a service call.  (*Id.*)  Despite the terminology tweak, BLM's 2018 CAD data showed that

6   BLM law enforcement officers continued to spend approximately two-thirds of their time

7   waiting and "available" for service calls, while spending only one-third of their time on actual

8   calls for service.  (*Id.* ¶ 25.)

9         According to Lieutenant Vind, the nationally recognized, best-practice standard for

10  law enforcement agency staffing is the opposite of BLM's practice:  agencies are efficiently

11  staffed when only 25% to 30% of officers are "available" for service calls, and 70% to 75% of

12  officers are "on" service calls.  (*Id.* ¶ 26.)  Furthermore, Lieutenant Vind notes that traffic

13  stops are not really service calls but self-initiated activities, and the officers engaged in these

14  activities should be considered "available" law enforcement resources.  (*Id.* ¶ 27.)  The 2018

15  CAD data show that almost 40% of all BLM law enforcement events, excluding "public

16  contacts," were for traffic stops (783).  (*Id.* ¶ 6; Ex. C.)  If BLM stopped devoting an

17  inordinate amount of resources to traffic stops (at a special event with a 5 mph speed limit)

18  and conceded that these officers are available for service calls, the true number of BLM

19  officers available at any given time would skyrocket.  BLM cannot claim that paying

20  overlapping shifts of dozens of officers to self-initiate traffic stops, or else sit idle for hours

21  awaiting service calls, is a reasonable cost.[16]

22

23  _____

24  [16] In past Answers, BLM argued that its staffing levels are actually insufficient based on a
    generic ratio of law enforcement officers to a city's population size, according to a police
25  industry trade group.  (*See* 2017 Andres Decl. ¶ 14) BLM then produces a series of ratios,
    based on population size, to claim that the Event is understaffed. (Id.) But abstract ratios that
26  are based on metropolises nothing like the Event prove nothing.  The better metric is the actual
    CAD data from 2018 which recorded the real activity by BLM law enforcement at the Event.
27  When the CAD data proves that two-thirds of BLM officers were waiting for a service call,
    BLM's reference to a staffing shortage is ludicrous.
28
                                         29

1       In past Answers, BLM acknowledged that "BLM officers were not engaged in active

2   calls 70% of the time" but called this fact "misleading" because officers are allotted time for

3   "report writing, evidence processing, travel … and meal breaks within their tours of

4   duty." (2017 Andres Decl. ¶ 28).  This argument is unavailing, however: every law

5   enforcement agency accounts for administrative tasks and meal breaks in making staffing

6   determinations, and industry standard nevertheless dictates that two-thirds of an officer's shift

7   should be spent on service calls.  (Vind Decl. ¶ 26.)  BLM should be no different and yet its

8   officers spent just one-third of their time on service calls.  The only difference is that BLM

9   does not believe it is accountable to any budgetary constraints and can force BRC to pay the

10  costs associated with its inefficient staffing.

11      In fact, BRC is only responsible for paying BLM's ***reasonable*** costs, and BLM's data

12  show that a number of law enforcement agents could be removed from BLM's table of

13  organization entirely, with no compromise to public safety.  (*Id*.; Abbey Decl. ¶ 4.)  It is

14  therefore unreasonable for BLM to charge BRC for the costs of their labor.  For several years

15  now, BLM has been wedded to the profligate overstaffing of the Event that Special Agent

16  Love began mandating without justification in 2012.  And as a direct result, BRC has been

17  overpaying for potentially thousands of hours of unnecessary labor, supplies, equipment, and

18  support services every year.  As the available data wholly fail to support the size of BLM's

19  law enforcement apparatus, BRC is entitled to a refund of all costs paid for all officers

20  deployed in excess of the Event's reasonable public safety needs.

21      **4.      BLM unreasonably charged BRC for six senior level "investigators"
            assigned to work exclusively for Pershing County on state law matters.**
22

23      Another glaring example of an unreasonable law enforcement cost that BLM foisted

24  on BRC again in 2018 was the cost of six "investigators" who, according to BLM's labor

25  summary, "work[ed] for Pershing County Sheriffs [sic] to assist in investigations of state

26  violations." (Benson Decl., Ex. H, Att. 1.)  These six "investigators" (Allen, Duhresen, Hauk,

27  Huegerich, Knisley, Wilson) billed a total of 949 hours exclusively supporting the local

28  Sheriff's Office, and all held the rank of "Special Agent" or "Senior Special Agent," making

1   their pay rates among the highest of all BLM law enforcement in the country.  (*Id.*)  For their

2   labor, which had nothing to do with protecting public lands or enforcing federal law, BLM

3   charged BRC $88,195, plus $3,061 for their travel.  BRC also paid the lodging, meal, and

4   equipment costs for these six agents.

5   BRC is not aware of any other instance in which a permittee is required to pay for

6   BLM investigators to conduct county law enforcement (Abbey Decl. ¶ 6), and it has received

7   no explanation for why any BLM investigators — let alone six of them — were provided to

8   Pershing County.  Indeed, BLM appears to have no rationale for this decision.  Last year,

9   BRC asked BLM about the work performed by the six senior investigative officers who billed

10  BRC nearly 1000 hours to work for PCSO at the 2017 Event.  Incredibly, BLM responded

11  that "[t]his is a question that needs to be answered by the PCSO and is unrelated to the BLM

12  Cost Recovery" — despite having charged BRC through cost recovery for all their

13  time.  (Benson Decl. ¶ 26; Ex. K at 1.)

14  In its 2017 Answer, BLM attempted to justify loaning six of its most senior law

15  enforcement officers to Pershing County by citing a 2016 report in which the Sheriff claimed

16  to be understaffed.  BLM alleged that it "provided assistance to PCSO as requested in the

17  interest of public safety."  (2017 Andres Decl. ¶¶ 12-13.)  In other words, BLM backfilled a

18  purported need expressed by local law enforcement to address state law issues at BRC's

19  expense.  Charging BRC for these costs was clearly unreasonable, as BRC has a separate 10-

20  year funding agreement, negotiated with the commissioners of Pershing County, for the

21  Sheriff's provision of law enforcement services related to the Event.  (Allen Decl. ¶ 30.)  This

22  2013 agreement established the "maximum payment by BRC" to Pershing County, based on

23  the Event's population, "for all services of any kind supplied by the County or any of its

24  officers, employees or contractors in connection with the Event, whether directly or

25  indirectly."  (*Id.*)  BLM annually interferes with the Pershing-BRC contract and abuses the

26  cost recovery process by forcing BRC to pay for BLM officers to augment PCSO staffing,

27  when BLM purports not even to know what these officers were tasked with doing.  (*Id.*; *see*

28  *also* Benson Decl., Ex. K.)

31

1   According to BLM's own labor summary, these six senior officers "assist[ed] in

2   investigations of state violations."  Thus, BLM admits that these officers spent no time

3   working on any federal, environmental or permit administration tasks.  And there is no

4   evidence that their services were required for public safety.  Since BLM has not shown that

5   any of the work of these senior officers was reasonably necessary for its administration of the

6   Burning Man SRP, BRC requests a refund of $88,195 for labor and $3,061 for travel costs, as

7   well as a refund for all lodging, meal, and equipment costs for Special Agents Allen,

8   Duhresen, Hauk, Huegerich, Knisley, and Wilson.

9       **5.      BLM again unreasonably charged BRC for internal investigations.**

10   As in previous years, BRC objects to funding the costs for BLM to investigate

11   allegations of wrongdoing by its own personnel, as this exceeds BLM's obligation to charge

12   BRC only for reasonable costs.  In 2018, BLM charged BRC $15,176 for 143 hours of labor

13   by a special agent in BLM's Office of Professional Responsibility ("OPR"), a division of

14   OLES.  (Benson Decl., Ex. H, Att. 1.)  The labor summary indicates that this individual

15   served as the "OPR function officer" and the only description provided for the work is "event

16   on-site Internal Affairs component and Use of Force reports."  (*Id.*)  It is entirely unreasonable

17   for BLM to charge BRC for costs related to the internal investigation and discipline of BLM

18   staff who have been accused of excessive use of force or other wrongdoing, or for the

19   agency's work in anticipation of potential third-party misconduct claims.  (Vind Decl. ¶ 13.)

20   Misconduct by a BLM law enforcement officer is clearly not a necessary component

21   of the Burning Man SRP, and BLM's investigations into any such alleged misconduct

22   likewise should not be charged to the permittee.  These charges are another unfortunate relic

23   of the era in which Special Agent Love oversaw BLM's law enforcement operations at

24   Burning Man, and demanded that BRC pay for a host of unnecessary personnel.  (*See, e.g.*,

25   Allen Decl. ¶ 14.)  BRC therefore asks that the Board require BLM to refund all amounts paid

26   for the labor, travel, lodging, meals, and any other costs incurred by Special Agent

27   Vanairsdale.

28

32

6.     **BRC should not be required to pay any costs associated with BLM's law enforcement "substation."**

Yet another unreasonable demand made by Special Agent Love in 2013 was that BRC pay the costs associated with a new law enforcement "substation" manned by BLM officers in the center of Black Rock City.  (Allen Decl. ¶ 32.)  BRC has been forced to bear these costs, without adequate justification, ever since.  (*Id.*)  Again in 2018, BRC understands that BLM staffed this substation with at least one officer at all times during the Event, and that BLM officers spent time at the substation engaging with the public in an outreach capacity, much like BLM staff do at their nearby interpretive camp.  (Vind Decl. ¶ 12)

BLM claims that the substation provided "participant access to law enforcement and allow for more efficient reporting with a secondary function of community interaction" like "looking for directions" and "engaging with the visiting public as part integration with the community."  (2017 Andres Decl. ¶ 35.)  But the agency has never shown that these activities lead to any improvement in public safety at Burning Man, or that the associated costs are reasonable to the administration of BRC's permit.  (Vind Decl. ¶ 12.)  Instead BLM justified the expense of a substation by vaguely referencing participants who visited the substation.  (2017 Andres Decl. ¶ 36.)  Anecdotal evidence that a resource was utilized a handful of times does not, however, confirm the necessity of that resource.

A dedicated law enforcement station in the center of Black Rock City is also unnecessary in light of the many resources provided by BLM, other cooperating agencies, and BRC.  Throughout the Event, dozens of BLM law enforcement officers and PCSO deputies are engaged in round-the-clock patrols of the site.  (2017 Andres Decl. ¶ 7.)  For its part, BRC provides a vast array of health and safety resources, from several medical facilities to hundreds of Black Rock Rangers and other community service volunteers who are dedicated to answering questions and providing information, and who have radios enabling them to call for immediate law enforcement assistance should it ever be needed.  (*See, e.g.*, Benson Decl. ¶¶ 12-13.)

33

AR11223

1    The substation is a cost that benefits general agency objectives and the general public,

2    instead of the specific needs of the permittee and permit enforcement.  As BLM has not

3    shown that it is reasonable for the permittee to pay for a dedicated law enforcement

4    "substation" in Black Rock City, BRC requests a refund of all costs associated with this

5    operation.

6    **7.       BRC should not be charged premium pay rates for BLM's unjustified
             designation of Burning Man work as "mission critical."**

7

8    BRC understands that BLM designated the Event as an "emergency event" under

9    federal labor regulations every year from 2012 to 2016, at the request of Special Agent

10   Love.  (*See* Allen Decl. ¶ 9.)  In 2017, BRC finally obtained a copy of the 2012 BLM

11   memorandum requesting the designation which alleged that its purpose was to ensure BLM

12   staff were paid more for their time working at Burning Man.  (Benson Decl., Ex. B.)

13   In the 2015 and 2016 Cost Recovery Appeals, BRC objected to BLM's designation of

14   the pre-planned Event as an "emergency" every year and pointed out that the regulations cited

15   in BLM's memorandum wholly failed to support this decision.  Finally, in 2017, BLM

16   apparently realized the designation had been made in error.[17]  That year, BLM found a new

17   way to over-compensate its personnel at BRC's expense: it began designating their work as

18   "mission critical."  (Benson Decl., Ex. G.)  Like the 2012 "emergency" memorandum,

19   however, BLM's 2017 "mission-critical work" memorandum failed to provide any

20   justification for the designation.  It did not even attempt to explain why the deployment of any

21   personnel to the Event should be considered "mission-critical work," and only cited the

22   changes to employees' premium pay that would result from the designation.  (*Id.*, Ex.

23   G.)  Despite the lack of any stated rationale for the request, it was approved by a BLM deputy

24   assistant director.  (*Id.*)  BRC understands the designation applied to the 2018 Event, too, but

25   BLM has not confirmed this.  (Benson Decl. ¶ 25.)

26   In 2017 correspondence, BLM claimed that law enforcement officers and others

27

28   [17] BLM's concession is compelling proof of the merits of BRC's 2015 and 2016 Appeals.

working at the Event would "be getting their fair overtime via the 'mission-critical work' clause (instead of the emergency clause)." (*Id.*, Ex. F.)  This statement is misleading, however, as BRC has never objected to BLM personnel receiving <u>fair</u> pay for their work on the Burning Man SRP.  What BRC objects to is BLM's continued inability to justify its desire to give extra premium pay to these employees — regardless of whether that extra pay results from an improper "emergency" designation or an improper "mission-critical work" designation.

BRC challenged the "mission-critical designation" in its 2017 Appeal, and BLM tried to justify the extra cost as "reasonable" through witness speculation that lacked foundation or reliability.  The crux of BLM's argument was that paying staff at their regular rates "would make it difficult for the BLM to fully staff the [E]vent." (2017 BLM Answer at 14:23-24.) But it offered nothing to support that claim beyond the conclusory statements of its staff, who continue to benefit from receiving the premium pay themselves.  BLM has still never shown that it would have any difficulty assigning an adequate number of personnel to the Event if it paid these employees using the standard premium pay limitations in 5 C.F.R. § 550.105. (Allen Decl. ¶ 8.)  BLM has never even attempted to make that showing.  Instead, BLM has contended that the designation saves BRC money because without it, BLM would need to add "a three wave rotation of 73 officers or a combined total of 219 officers," 146 officers more than the current total.  (Hall Decl. ¶ 6; 2017 BLM Answer at 15:8.)  Again, no supporting evidence was provided, nor any explanation of the logical fallacy of BLM claiming both that it needs to pay premium rates to find enough officers and that it would have to hire 146 extra officers if it didn't pay premium rates.

Finally, BLM claimed it needed to overpay because "without the designation lifting the pay cap, BLM employees working at the [E]vent would be compensated at less than their normal pay rate, which would not be fair or reasonable." (2017 BLM Answer at 14:21-23.) This is nonsensical.  The failure to pay overtime rates does not mean a worker receives less than their regular pay rate or make that regular rate unfair.  Is BLM not being "fair and reasonable" when it pays employees their regular pay the rest of the year?  Of course not.

1   As detailed above, BLM staffs every law enforcement shift with twice as many

2   officers as it should, and those officers sit idle waiting for service calls for two-thirds of their

3   shifts.  BLM can remedy its perceived shortage of personnel by assigning only the number

4   actually needed and by better utilizing the officers it deploys.  Instead of conducting nearly

5   800 traffic stops in the hopes of issuing drug citations that will be dismissed if challenged in

6   court, BLM officers could be redeployed to protect public safety and the public lands inside

7   the Event.  BLM's decision to apply the "mission critical" designation to work performed at

8   the Event was unjustified, arbitrary and constituted an abuse of discretion by the agency.

9   BRC therefore asks that the Board require BLM to refund all amounts attributed to so-called

10  "mission critical" premium pay.

11  **C.**    **BLM's Soaring Communications and Information Technology Costs Far Exceed**
12          **What Is "Reasonable" for the Event.**

13  Another legacy cost from the failed leadership of former Special Agent Love is a

14  bloated communications and technology program that primarily supports BLM law

15  enforcement, and grows more expensive every year.  BLM continues to demand equipment,

16  services and staffing that greatly exceed the agency's reasonable needs for a two-week on-site

17  operation.

18  **1.**    **BLM personnel spent excessive hours on BLM communications,**
19          **technology, and logistical services for the 2018 Event.**

20  As noted above, BLM did not provide an After Action Review for its 2018 Event

21  operations, and the only information BRC has received regarding BLM's Communications

22  staff for the 2018 Burning Man SRP is contained in the scant labor summary attached to

23  BLM's cost recovery decision. (Vind Decl. ¶ 4; Benson Decl., Ex. H, Att. 1.)  BRC's review

24  of this summary indicates that BLM's Communications team for the 2018 Event consisted of

25  at least 13 employees: a Comm Chief, a separate Comm Lead, two dispatch center managers,

26  an IT security specialist, three IT equipment specialists, a law enforcement IT specialist, three

27  IT network specialists, and one radio technician.  (*Id.*, Ex. H, Att. 1.)

28  As in prior years, the program was managed by the OLES Region 5 State Chief

36

1  Ranger Jon Young, a former colleague of Special Agent Love, who served as "Comm Chief"

2  and billed more hours to the 2018 Burning Man SRP than nearly any other BLM employee:

3  542 hours totaling almost $53,000.  (*Id.*)  "Comm Lead" Wisemore charged BRC more than

4  $21,700 for an additional 381 hours.  (*Id*.)  The remaining employees on BLM's

5  Communications team logged almost 2,500 more hours.  (*Id.* ¶ 29.)  In all, BRC paid nearly

6  $225,000 for the labor alone of these 13 BLM personnel, plus the 21.8% IACR, and the

7  additional amounts charged to BRC for these employees' travel and other Event-related

8  expenses.  (*Id.*, Ex. H.)

9        BLM's labor summary provided scant detail regarding what any of these employees

10  did for several thousand hours, with descriptions of work consisting of no more than a few

11  words.  (*Id.*)  For example, a "Telecoms Specialist," an "IT Specialist," and a "Radio Tech"

12  billed a combined 820 hours, costing BRC nearly $58,000, and BLM has provided a three-

13  word description of their work: "Communications network support."  (*Id.*, Ex. H, Att.

14  1.)  Absent any information about what these individuals did, BRC cannot possibly assess

15  whether all 820 of these hours were spent on tasks that were reasonable to BLM's

16  administration of the 2018 SRP.  The same deficiencies exist for the other team members.

17  (*Id.*)  It is especially difficult to understand the need for so many BLM IT personnel roles,

18  given the extensive technical support personnel that BLM required in its technology contracts,

19  including its $130,618 contract with High Desert Internet for network services and support,

20  and the $226,314 contract BRC executed with iNet Public Safety for CAD services and

21  support.  (Allen Decl. ¶ 34; Benson Decl. Ex. J.)

22        There is simply no evidence that BLM's two-week operation at the Event, involving

23  around 100 on-site employees, requires such a massive communications/technology operation,

24  with many thousands of personnel hours devoted to supporting and growing this function each

25  year.  For example, BLM still has never shown that it needs both a Comm Chief and a Comm

26  Lead to ensure a reasonably sufficient communications operation at the Event, or that it needs

27  to assign so many expensive IT specialists to Event-related roles, rather than technicians at

28  lower pay grades.  (*See* Benson Decl., Ex. H, Att. 1; Abbey Decl. ¶ 4.)

1   BLM's communications and technology program continues to be an expensive

2   boondoggle.  BRC understands that BLM requires the services of some personnel to provide

3   radios, dispatch services, internet service, and IT equipment and security in connection with

4   its operations at the Event.  But the fact that these services may be generally needed does not

5   mean BLM can assign an unchecked number of personnel to log an unlimited number of

6   hours in providing them, including senior BLM staff at the highest pay rates in the

7   agency.  *See Bookcliff Rattlers*, 171 IBLA 21.  BLM cannot discharge its cost recovery

8   obligation with the same tired mantra that it has the sole and absolute discretion to determine

9   what technology costs are "reasonable."  BRC is entitled to a refund of all the costs associated

10  with unjustified or needlessly specialized communications personnel.

11       **2.       BLM continued to charge BRC for unjustified technology.**

12       BLM does not have discretion to require that a permittee purchase new equipment or

13  technology simply because agency employees would like to have access to the latest gadgets

14  or because the agency prefers not to spend its own money on the equipment it uses for

15  everyday operations.  (Abbey Decl. ¶ 10.)  Requests to purchase new equipment or implement

16  new technology in connection with an SRP should be negotiated with the permittee, who

17  should have a substantial role in assessing whether these added costs are likely to measurably

18  improve public safety or enjoyment, or the protection of the public lands.  (*Id.*)  This is

19  especially true for the recent Burning Man SRPs, as the Event has experienced little

20  population growth over the past five years and should not require extensive technology

21  upgrades.  (*Id.*; *see also* Benson Decl., Ex. C.)  As explained below, several 2018 technology

22  contracts contained unreasonable provisions.

23       a.       BLM expenditures on satellite tracking were unreasonable.

24       During the contentious negotiations over the 2013 Burning Man SRP, which resulted

25  in a doubling of BLM's costs in a single year, Special Agent Love demanded that BRC

26  purchase satellite tracking devices so that BLM could identify the precise location of law

27  enforcement within the Event site at any given time.  (Allen Decl. ¶ 13.)  The claimed "one-

28

1   time" purchase in 2013 cost BRC over $72,000, and every year since, these handheld devices

2   — which can readily be purchased at athletic recreation stores and updated online — have

3   allegedly "required" more than $50,000 in maintenance and programming.  (*Id.* ¶ 31.)  In

4   2018, BLM again awarded this contract to Strohman Enterprises, at a cost to BRC of

5   $50,640.  (Benson Decl., Ex. H, Att. 2.)  BRC's six-year bill for this equipment is well over

6   $300,000, plus the unspecified costs of the BLM staff who negotiate this contract and deploy

7   the trackers every year.  (Vind Decl. ¶ 17.)

8          BLM's current leadership team has essentially argued that these devices must be

9   necessary, regardless of cost, since they have been used "since 2013."  (*See, e.g.*, 2017

10   Answer at 23-24.)  According to BLM's logic, because Special Agent Love and Mr. Seidlitz

11   coerced BRC into paying for unjustified technology, BRC must continue to swallow these

12   unnecessary expenses forever.  The mere fact that BLM has employed satellite tracking at the

13   last few Events does not confirm the reasonableness of this expense.  BRC believes that

14   Special Agent Love only deemed these devices "necessary" in the first place because he could

15   order BRC to pay for them.

16          As BRC has noted in its prior Appeals, BLM has never demonstrated a legitimate need

17   for this equipment in its operations at the Event.  (Vind Decl. ¶ 18.)  All law enforcement

18   officers at the Event have radios for communication and dispatch purposes, and they work in

19   pairs that enable one officer to radio a location if his or her partner is otherwise

20   engaged.  (*Id.*)  Moreover, BRC understands that many BLM officers do not even know how

21   to use the devices.  (*Id.* ¶ 19.)

22          In its Answers to BRC's 2015, 2016, and 2017 Appeals, BLM has declined three

23   opportunities to explain its insistence on using this expensive satellite tracking equipment,

24   claiming only that the devices fill a need that nothing else could.  (*See, e.g.,* BLM 2017

25   Answer at 23-24.)  As BLM has made no showing that this $50,000+ annual contract is a

26   reasonable cost, BRC asks the Board for a refund of all amounts paid in 2018, and relief from

27   future charges related to these unnecessary devices.

28

STATEMENT OF REASONS

AR11229

1

2      b.      BLM's expenditures on network services were unreasonable.

3      Every year since at least 2015, BLM has entered into contracts for network services

4  totaling more than $100,000.  (Benson Decl., Exs. N, O.)  In 2018, BLM again awarded this

5  contract to High Desert Internet Services ("High Desert") at a cost to BRC of $130,618.  (*Id.*,

6  Ex. H, Att. 2 (High Desert contract).)  While BLM has provided BRC with a copy of the

7  contract — and BRC does not question whether BLM actually spent this amount — the

8  agency has declined to provide any explanation for requiring such extensive services for its

9  15-day operation at the eight-day Event.  The elaborate and unnecessary requirements of this

10  annual network services contract were unreasonably charged to BRC through cost recovery.

11      The networking costs include the provision of numerous services related to BLM's

12  law enforcement substation.  As discussed above, BLM should not be charging BRC for any

13  costs related to the substation, as BLM has not demonstrated that their reasonableness.  (*See*

14  Section IV.B.6.)  Even if BLM could reasonably charge BRC to staff a law enforcement

15  office in the middle of the Event, it would be unreasonable to charge BRC for the costs of

16  extravagant and unnecessary technology at this location.

17      For example, BLM has wholly failed to justify the expense of a fancy HD camera

18  (mounted on its own tower), dedicated computer workstation, large LCD display monitor, and

19  extensive networking equipment — all to enable monitoring of the substation by personnel at

20  the JOC.  (Benson Decl., Ex. J.)  Given that the substation is staffed 24 hours per day with at

21  least one BLM officer (2017 Andres Decl.  ¶ 35), and the Event is patrolled by dozens of

22  officers around the clock — all with radios if they need to report information to the JOC or

23  request personnel — BLM's insistence on this lavish monitoring technology is an abuse of

24  discretion.  BLM has admitted the dedicated JOC workstation is not even manned during the

25  Event.  (Benson Decl. ¶ 38; Vind Decl. ¶ 19.)  The agency would not be requiring such

26  redundant and costly technology if it were spending its own money instead of BRC's.  (*See*

27  Abbey Decl. ¶ 10.)

28      BLM also has demonstrated no need for the slew of fancy IP cameras and huge

40

1    monitors that it obtained for viewing the temporary holding facility at the JOC.  (Benson

2    Decl., Ex. J.)  This facility is a small building that PCSO uses, in lieu of a patrol car, to

3    temporarily hold people under arrest before they are transported to Lovelock for

4    booking.  (Vind Decl. ¶ 20.)  BLM's SOW for the High Desert contract required no fewer

5    than eight cameras at the holding facility and three 55-inch monitors.  (Benson Decl., Ex. J at

6    18.)  As this holding facility is staffed 24 hours per day by PCSO, and only 12x40 feet in size,

7    it can be monitored by simply looking inside, and it is BRC's understanding that the screen is

8    not manned.  (Vind Decl. ¶ 20.)  BRC should not be responsible for the costs incurred by

9    BLM or PSCO to conduct video or audio surveillance for evidentiary purposes.  The costs of

10   this excessive equipment were improperly charged to BRC.

11        Finally, BRC objects to paying for excessive internet phone service via the High

12   Desert contract, including 20 separate voice-over IP lines, three more than in years

13   past.  (Benson Decl., Ex. J at 14.)  BLM has never demonstrated a need for anywhere near this

14   many phone lines, especially as its personnel typically use their cell phones for calls.  (Vind

15   Decl. ¶ 21.)  The contract states that all these phone lines will facilitate calls within the JOC

16   and substation, despite all personnel in these buildings already having radios and cell phones

17   and contract also calling for cell service at the JOC.  (*Id.*; Benson Decl., Ex. J at 5-6.)  All

18   unreasonable costs in this contract must be refunded to BRC.

19        c.    BLM again contracted for needlessly expensive and unnecessary
               communications equipment and upgrades.
20

21        In its 2016 and 2017 Appeals, BRC objected to paying the costs that BLM incurred to

22   replace and upgrade a host of technology equipment, pointing out that BLM had failed to

23   show these expenditures were reasonable and that more cost-effective alternatives could

24   address any demonstrated need.  (*See, e.g.*, 2017 Appeal 36:18 – 43:14)  In 2018, BLM

25   continued its practice of charging BRC for technology upgrades without showing that the

26   upgrade was necessary, and despite BRC's evidence to the contrary.

27        BLM's IT-related costs included a $13,118 contract with RELM for unjustified

28   upgrades to its radio dispatch service equipment and a $199,870 contract with Law

1   Enforcement Temporary Placement Service ("LETPS") for an excessive number of

2   dispatchers.  (Benson Decl., Ex. H, Att. 3.)  Of course BRC understands that BLM requires

3   dispatcher services and equipment, but as in so many other areas of its operations, BLM has

4   failed to show that the number of dispatchers it engages or the type of equipment its personnel

5   elected to use in 2018 were necessary and that no less expensive alternative would suffice.

6        For example, BRC understands that the digital base stations BLM purchased from

7   RELM could have been rented at a much lower cost, and renting would have been a far more

8   reasonable choice for this expensive equipment that will be used only for the Event.  (*Id.* ¶

9   41.)  It is unreasonable for BLM to charge BRC to purchase technology whose useful lifespan

10   is inherently limited.  If the technology requires replacing in, say, 10 years, the equipment will

11   have had less than 10 months of use.  (*Id.*)  The cost of BLM's wasteful decision making

12   cannot reasonably be charged to BRC.  Likewise, BLM has not shown it was reasonable to

13   purchase six of these stations, a decision linked to BLM's insistence on using an unreasonably

14   high number of dispatchers.  (*Id.*, Exs. L, M.)  This has resulted in excessive and unreasonable

15   costs charged to BRC in the LETPS contract.  (*Id.*, Ex. M.)  BLM's contractor staffs five

16   dispatchers at all times, but BLM has not made any showing that this number is reasonable

17   and that three or four would not be sufficient to manage the volume of radio traffic, or that

18   eliminating the superfluous "public contact" records would decrease the need for dispatcher

19   hours.  (*Id.*)  BRC should not be overcharged as a result of inefficiencies in BLM's dispatch

20   operations.

21        BLM cannot continue to purchase expensive equipment and technology upgrades for

22   every iteration of the Event, with no showing of need or budgetary oversight, simply because

23   BRC is footing the bill through cost recovery.  (Abbey Decl. ¶ 10.)  If certain accessories or

24   services require replacement or upgrading in a given year, BLM should discuss these needs

25   with BRC during the planning season, so that BRC is has the opportunity to budget, offer

26   alternatives, and ask clarifying questions.  (*See id.*)  As BLM's 2018 contracts with RELM

27   and LETPS included unjustified expenses, these costs should be refunded to BRC.

28        BLM also unreasonably charged BRC for a $17,000 contract for wiring services at

42

1    Bruno's Country Club, an off-site property in the town of Gerlach that is owned by a third

2    party and used to house BLM personnel during Event periods.  (*Id.*, Ex. H, Att. 3;  ¶ 43.)

3    BLM has used this property for years with no power issues, but it claimed a change to the

4    property's wiring was essential in 2018 because a wildland fire had caused the town to lose

5    power for a short time in 2017.  (*Id.* ¶ 43.)  BLM claimed its employees must have

6    uninterrupted access to air conditioning at all times, necessitating a rewiring of the hotel and

7    multiple generators on standby for the duration of the BLM operational period, just in case the

8    electricity was to ever go out again.  (*Id.*)  BLM claimed it could not issue the SRP unless

9    BRC paid these costs (*id.*), but BLM has no rational basis for demanding that BRC pay for

10   these services and a private business's property upgrades.  If BLM desired this upgrade, it

11   should have funded it directly.  Given that the expense was unnecessary, charging it to BRC

12   through cost recovery was unreasonable.

13        BRC also objects to BLM's charges of $6,276.09 in 2018 for various

14   "communications supplies" listed on BLM's "Misc. Supplies and Equipment" spreadsheet,

15   none of which has been explained to BRC.  (*Id.*, Ex. H, Att. 5.)  All BLM has provided are the

16   receipts showing that the money was spent.  Most of these receipts do not even clearly specify

17   what was purchased; they certainly do not explain why these supplies were needed or provide

18   any information enabling BRC to assess the reasonableness of the charges.  Absent a

19   sufficient showing that BLM acted reasonably in passing these costs on to BRC, they must be

20   refunded.

21        The failure to show a reasonable need any of these equipment expenditures

22   underscores BRC's concerns with the unchecked expansion of BLM's Burning Man

23   technology program over the past few years.  BRC respectfully requests that the Board

24   provide relief from BLM's mounting costs in this area, and order a refund of all amounts

25   charged for unjustified technology services and equipment, including as identified above.

26

27

28

STATEMENT OF REASONS

AR11233

**D.    The Costs Associated With BLM's Provision of Superfluous And Unnecessary Medical Services For Its Personnel Were Not "Reasonable" Costs.**

As it has since 2012, BLM again elected to make redundant and unnecessary medical services available to its staff at the 2018 Event and to charge BRC for all associated costs.  BRC again objects to paying these costs, as superfluous costs are not "reasonable" costs.

BRC has long provided comprehensive patient care onsite at the Event, including a state of the art, licensed emergency care facility, emergency transportation, several first-aid stations, and a communications system - all fully equipped to handle the historic and reasonably anticipated medical needs of tens of thousands of Event participants and staff, plus the government personnel on site.  (Benson Decl. ¶ 44.)  As in prior years, for the 2018 Event, BRC contracted with a specialized provider to provide advanced life support ("ALS") services, including board-certified emergency physician care and an extensive array of medical services, including X-ray, radiology, sonography, electrocardiogram services, orthopedic treatment, a comprehensive pharmacy formulary, and an onsite fixed wing air ambulance.  (*Id*.)  BRC also deployed a large number of response and transport vehicles, including ALS-capable ambulances and quick response vehicles, and provided basic medical services at six first-aid stations located throughout the Event site and staffed by licensed medical professionals.  (*Id*.)

Although BLM is well aware that BRC provides these comprehensive, state-of-the-art medical services, it has continued to insist on a separate medical facility for its personnel at BRC's expense.  BLM's medical program has been staffed as part of the agency's law enforcement operation since 2012 and is another legacy of Special Agent Love's abuse of the cost recovery process for BRC's permit and unjustified escalation of BLM's law enforcement operation at the Event.  (Allen Decl. ¶ 6; Benson Decl. ¶¶ 12, 39, 44.)  Special Agent Love insisted these medical services had become necessary, but he never documented any such need.  (*Id*.)  Instead of reassessing the need for a separate medical program and eliminating these superfluous expenditures after terminating Special Agent Love, BLM has maintained

44

AR11234

1   and even increased these costs without an adequate explanation.

2        According to its 2018 labor and travel logs, BLM staffed two "Medical Unit Leader"

3   positions (Hone and Templeton), and charged BRC a total of $34,008 for their labor and $367

4   for their travel costs.  (Benson Decl., Ex. H, Atts. 1, 3.)[18]  BLM has provided no details about

5   what these two personnel did for the combined 346 hours they logged.  The labor summary

6   states only that one was a "[m]edical function officer [who] served as lead of BLM's medical

7   unit," while the other was "[m]edical unit staff  [who] provide[d] care to employees."  (*Id.*,

8   Ex. H, Att. 1.)  As noted above, BLM has not released an AAR or any other report about its

9   operations at the 2018 Event.  Prior BLM AARs have confirmed, however, that the medical

10  unit primarily provides routine care to officers and K9 units.  (Vind Decl., Ex. A at 12 (2017

11  AAR, noting that services included "heat mitigation for humans and K9s" ); Ex. B at 31 (2015

12  AAR, stating that "[a]n overwhelming majority" of medical unit visits were "for routine

13  medical care such as eye wash, minor wound care, over the counter pain relief, and other over

14  the counter medicine.").)

15       If BLM desires an additional medical facility for its personnel and dogs, it can provide

16  one at its own expense.  BLM has never shown that this facility is necessary or reasonable,

17  however, and thus continues to abuse its discretion by charging the associated costs to

18  BRC.  BLM's annual inclusion of these medical costs in the cost recovery closeout is yet

19  another decision made by Special Agent Love that does not withstand scrutiny in light of

20  BLM's obligation to charge BRC only for its reasonable costs.  43 U.S.C. § 1734(b); *Michael*

21  *Voegele*, 174 IBLA 318; *see also Bookcliff Rattlers*, 171 IBLA 13.  BRC is entitled to a

22  refund of all amounts charged to supply this unnecessary function, including at least the

23  $36,769 outlined above.

24

25  _____

26  [18] BLM also again contracted with the U.S. Department of Health and Human Services
    ("HHS") to provide medical services, as it has since 2012, but for the first time in 2018, HHS

27  invoiced BLM for travel costs totaling $2,394.88, and BLM passed these costs on to BRC
    through cost recovery.  (*Id.* ¶ 44; Ex. N.)  As with all other costs associated with BLM's

28  medical program, these costs were unreasonably passed on to BRC and must be refunded.

1

**E.    BLM Unreasonably Charged BRC For The Costs Associated With The SRPs That BLM Issued To Third Parties.**

2

3       For the 2018 SRP, BLM maintained its practice of improperly charging BRC for the

4   costs of monitoring the compliance of third parties with the separate SRPs that these third

5   parties obtain from BLM.  As it has since its 2015 Appeal, BRC objects to paying for these

6   costs, as it is patently unreasonable to charge one permittee for costs incurred to administer

7   the permit issued to a different permittee.

8       In 2018, BLM charged BRC $29,297 for the labor and travel costs of three personnel

9   assigned to perform a "Vending Compliance Monitoring function" (Cadigan, Freiberg,

10  McKinnon), plus another $39,218 for two "compliance function specialists" (Rorex, Welty) to

11  assist BLM's vending and environmental teams with technological equipment.  (Benson

12  Decl., Ex. H, Att. 1.)  BLM's labor summary says only that its three compliance monitors

13  "worked with BRC vending teams on SRP compliance" or "worked with BRC OSS team on

14  SRP compliance" — a reference to BRC's Outside Services program, which facilitates and

15  regulates third-party vendors doing business with participants at the Event.  (*Id.*; *see also id.* ¶

16  45.)  As these third parties are engaged in commercial activities on the public lands, they

17  require their own SRPs from BLM.  43 C.F.R. § 2932.11.  To assist BLM, BRC requires that

18  each third-party vendor obtain a separate SRP as a condition of participating in the OSS

19  program.  (Benson Decl. ¶ 40.)

20      BLM cannot, however, appropriately charge BRC for the costs BLM incurs to monitor

21  the compliance of these third parties with their BLM permits.  While BLM can charge a

22  permittee for the reasonable costs associated with its own permit, the regulations do not allow

23  BLM to charge one permittee for the costs of administering permits to another party.  43

24  C.F.R. § 2923.31(e)(2)-(3); National Special Recreation Permit Fee Schedule, available at

25  https://www.blm.gov/policy/im-2014-055.

26      BLM continues to disregard its own regulations by charging its costs related to third-

27  party permits to BRC through the cost recovery account for BRC's separate permit. In its

28  Answers to BRC's prior Appeals, BLM has argued that these costs are appropriately charged

1   to BRC because these vendors are providing services to attendees of BRC's Event.  (*See, e.g.*,

2   2016 Answer at 24-25.)  That argument lacks any support in the cost recovery regulations,

3   however, and BLM cites no authority for this attenuated "but for" causation theory.  Simply

4   because the agency finds it convenient to hold BRC responsible for the costs of all the other

5   SRPs that BLM issues for activities in the Closure Order area does not mean that BLM has the

6   authority to do so.

7      BRC also notes, as it has in its prior Appeals, that BLM collects hundreds of thousands

8   of dollars in commercial use fees from these permittees each year.  (Allen Decl. ¶ 34.)  BLM

9   is clearly generating revenue from third-party vendor SRPs and should budget and pay the

10  costs of monitoring their compliance. As BLM again abused its discretion by unreasonably

11  charging BRC for the monitoring of these third-party SRPs, BRC respectfully requests that

12  the IBLA order a refund of these costs, amounting to at least $29,297.92 as described above.

13  **F.   BLM Charged BRC For Unreasonable Equipment And Supply Costs.**

14     In 2018, BLM charged BRC $22,258.30 for equipment and supplies that were

15  purportedly purchased in connection with the Burning Man SRP.  (Benson Decl., Ex. H, Att.

16  5.)  As usual, BLM declined to explain the reason that it incurred any of the 75 separate

17  charges listed on the "Misc. Supplies and Equipment" attachment that accompanied its 2018

18  Cost Recovery Decision, depriving BRC of the opportunity to meaningfully assess the

19  reasonableness of any of these charges.  (*Id*.)  BRC objects to all BLM equipment and supply

20  charges that have not been sufficiently explained and shown to be reasonable costs.

21     BLM continues to act as though its only obligation were to show that it actually

22  incurred a given cost in connection with administering the Burning Man SRP.  (*Id*., Ex. I.)  If

23  so, BLM insists that the cost was *de facto* reasonable and that BRC is entitled to no further

24  explanation.  As explained above, however, this position lacks any support in the cost

25  recovery regulations and decisions of this Board, which require that BLM demonstrate the

26  necessity and reasonableness of all charges passed on to a permittee.  *See, e.g.*, 43 C.F.R. §

27  2932.31(e)(3) ("Cost recovery charges will be limited to BLM's costs of issuing the permit,

28  including **necessary** environmental documentation, on-site monitoring, and permit

1   enforcement.") (emphasis added); *Bookcliff Rattlers*, 171 IBLA 17 (the Department of Interior

2   must "give thorough consideration" to the reasonableness factors set forth in section 304(b) of

3   the FLPMA "before assessing any costs") (*quoting Nevada Power Co. v. Watt*, 711 F.2d 913,

4   925 n.6 (10th Cir. 1983)).

5          BRC's objections to paying for BLM's unnecessary technology equipment and

6   medical supplies are explained in Sections IV.C. and IV.D, respectively.  BRC has identified a

7   number of other improprieties in BLM's charges for equipment and supplies. For example,

8   BRC also objects to BLM's insistence on purchasing a slew of new protective goggles and

9   face scarves (referred to as "employee safety supplies" on BLM's spreadsheet) for its

10  personnel each year, regardless of actual need.  These charges totaled approximately $2700

11  each year - $2768.67 in 2018.  (*Id.*, Ex. H, Att. 5 at R-63-66, 75.)  BLM has admitted that all

12  its personnel have the option of requesting a new pair of goggles and a new scarf every year,

13  so the agency purchases enough for all its personnel each year, plus some extra just in case

14  they're needed.  (*Id.*, Ex. J.)  And if any BLM personnel opt not to take a new shemagh or

15  goggles, BLM offers this unused equipment — at BRC's expense — to non-BLM personnel

16  working at the Event.  (*Id.*)  BLM has no right to dispose of its unused equipment in this

17  manner, nor should it be permitted to charge BRC for the agency's wasteful practices with

18  respect to personal protective equipment.  BLM has no rationale for annually replacing

19  goggles and scarves that have been used for only a few days by returning personnel, and it is

20  an abuse of discretion for BLM to continue to pass these costs on to BRC.

21         BRC's overarching concern with BLM's charges for supplies and equipment continues

22  to be the apparent lack of oversight for including these charges in the cost recovery final

23  decision.  Any BLM employee assigned to the Burning Man SRP seems to have the ability to

24  charge any expense to BRC's cost recovery account, and BLM includes all such charges in

25  the final decision, without assessing the reasonableness of passing these expenses on to

26  BRC.  Certainly, no such assessment has ever been provided to BRC, despite its repeated

27  requests.  (Allen Decl. ¶ 19.)  Year after year, BLM will only confirm that it actually incurred

28  these costs, forcing BRC to appeal to this Board to seek an understanding of why.

48

1        As for all previous Events, BLM documentation of the thousands of dollars it spent on

2   equipment and supplies for the 2018 Event was limited to a summary table and stack of

3   photocopied receipts.  The latter confirm only that the amounts listed on the table were spent;

4   in many cases, it is not even possible to identify the items or services purchased, let alone why

5   they were deemed essential for BLM's administration of the SRP.  The mere fact that a BLM

6   staff member purchased something to use at the Event does not automatically render that

7   purchase a necessary item or a reasonable cost.  If the cost recovery regulations were so

8   expansive, BLM's budget would know no bounds; it could purchase literally anything — no

9   matter how exorbitantly priced or superfluous to the agency's administration of a permit —

10   and force the permittee to provide reimbursement.  Fortunately, and rationally, the cost

11   recovery regulations do not give BLM such unfettered discretion to charge costs to a

12   permittee.  (Abbey Decl. ¶ 14.)

13        BRC therefore asks that the Board (1) require BLM to provide the necessary reasoned

14   and factual explanation for all charges reflected in the Supplies and Equipment spreadsheet;

15   and (2) refund to BRC any such charges for all items that are not shown to be necessary and

16   for all costs that are not shown to be reasonable.

17
## V.    CONCLUSION

18        This appeal marks the fourth consecutive year that BRC has identified significant

19   deficiencies in BLM's imposition of costs associated with the annual Burning Man SRP.  In

20   response to BRC's pending Appeals, BLM has failed to conduct a meaningful assessment of

21   its costs, including the extraordinary cost increases mandated by former Special Agent Love,

22   to confirm whether they are justified, necessary, and reasonable.  Instead, BLM has amplified

23   his misconduct by using his unjustified demands as the baseline for future cost decisions. and

24   has begun providing BRC with even less information about the agency's activities and

25   expenditures in connection with the SRP.   BLM must comply with cost recovery

26   requirements for every SRP, and must refund unreasonable costs as described in BRC's prior

27   year appeals.

28

STATEMENT OF REASONS          AR11239

1    Therefore, and for all the reasons stated herein, BRC respectfully requests relief from

2  all unreasonable costs in BLM's 2018 Cost Recovery Decision.

3

4    DATED:  June 27, 2019                    LEVIN LAW FIRM

5

6

7                                            By:  /s/ David S. Levin

8                                            _____
                                             Davis S. Levin
9                                            Attorneys for Appellant,
                                             BLACK ROCK CITY LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

50

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone: (650) 858-8500
david@levinlawfirm.com
Attorneys for Appellant,
Black Rock City LLC

## UNITED STATES DEPARTMENT OF INTERIOR
## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BLACK ROCK CITY LLC, | Case Identification No.: IBLA-2019-0109 |
| Appellant, | Special Recreation Permit<br>LLNVW03500-18-01 |
| v. | 2930 (NV030.10) |
| BUREAU OF LAND MANAGEMENT, | **Declaration of Robert Abbey in Support of Appeal** |
| Appellee. | |

I, Robert Abbey, declare as follows:

1.      I am over 18 years old, of sound mind, and capable of making this declaration.  I am currently a partner with Abbey, Stubbs, & Ford, LLC in Las Vegas, Nevada, and serve as a consultant for appellant Black Rock City LLC ("BRC").  I have personal knowledge of the facts set forth herein, or, if so stated, am informed and believe of their truth and accuracy, and, if called to testify, I could and would do so competently and under oath.

1

AR11241

2.     I held numerous positions throughout my 30-year career with the U.S. Government, including 28 years with the Bureau of Land Management ("BLM"). Some key positions include:

- BLM Colorado Associate State Director from 1995 to 1997;
- BLM Nevada State Director From 1997 to 2005; and
- BLM National Director from 2009 to 2012.

3.     I oversaw the administration of the Burning Man Special Recreation Permit ("SRP") for seven years while I was the BLM Nevada State Director. The SRP was also under my responsibility when I was the National Director. I have extensive knowledge about the Burning Man SRP. I am also well-versed in the policies, procedures, and practices of the BLM, specifically for SRPs and cost recovery.

4.     To comply with BLM regulations and best practices for SRPs, the agency should manage its staffing at the Burning Man event to achieve the greatest efficiencies and ensure that it is only charging the proponent for reasonable costs. Burning Man has now been taking place for nearly 30 years in the Black Rock Desert, and the BLM should have learned lessons during this time that allow for such efficiencies as (1) a reduction in the number of agency personnel at the event; (2) a reduction in the number of hours these personnel must devote to the Burning Man SRP; and (3) the assignment of lower-graded personnel to work at Burning Man. For example, as Burning Man is a recreation-oriented event, BLM law enforcement rangers — instead of special agents, who typically receive much higher pay — should be the preferred choice for all law enforcement assignments.

2

5.     I am informed and believe the BLM has asserted to BRC over the years that the agency's law enforcement staffing levels at the Burning Man event are so high because the BLM has an obligation to enforce drug laws. In my experience, however, the primary responsibility of the BLM's law enforcement program is to provide visitor assistance and to protect sensitive natural and cultural resources from illegal activities. The BLM has historically focused its law enforcement activities on trafficking across the southern borders of the United States and on cultivation and drug manufacturing occurring on BLM-managed public lands. Given the broad and diverse mission of the BLM, and the priority the agency has assigned to meeting its natural and mineral resource management mandate, the BLM has routinely relied on local law enforcement agencies, including local sheriff's departments, to enforce laws related to illegal drugs on public lands.

6.     I am informed and believe that the BLM's cost recovery decision for the 2018 Burning Man SRP, like the cost recovery decision for the 2017 Burning Man SRP, included the costs of six special agents who were assigned to the Pershing County Sheriff's Office to assist with investigations of state law violations. In my experience, it is not typical for the BLM to use the cost recovery process to provide law enforcement investigators to another agency. I am not aware of any other instance where a proponent has been required to pay for BLM investigators to assist with county law enforcement.

7.     BLM's use of its cost recovery process to supplement the Pershing County Sheriff's budget appears to be an attempt by BLM to circumvent the existing legal agreement between BRC and Pershing County regarding the County's provision of law enforcement services at the Burning Man event. Should Pershing County feel the need to employ additional

3

law enforcement personnel, Pershing County should revise its existing agreement with BRC and not rely upon the BLM to assess these additional costs.

8.      Both the BLM's emphasis on drug law enforcement and the law enforcement strategy deployed at the Burning Man event are unprecedented and are not replicated elsewhere at other BLM-permitted activities. For example, I am not aware of any instance where the BLM has assigned a contingent of law enforcement personnel assisted by drug-sniffing dogs to monitor for and enforce drug laws at BLM-permitted oil and gas drilling sites or mining operations, despite the known use and trafficking of illegal drugs on public lands by personnel working in these industries. The same is true of other recreation events permitted by the BLM, such as off-highway vehicle competitive events and popular campground sites.

9.      The current law enforcement strategy at the Burning Man event is inconsistent with the vision articulated by Ryan Zinke, the current Secretary of the Department of the Interior (the "Department") that BLM personnel should be emphasizing their role as land managers more than law enforcement. In public remarks last year, Secretary Zinke urged a change in the BLM's culture of the prior few years and stated that he is trying to change the image of Department agencies with heavy-handed law enforcement officers, noting that "[w]hen you see a BLM truck you should think land managers and not law enforcement, which we work with through our local sheriffs." Attached hereto as **Exhibits A and B**, respectively, are true and correct copies, with highlighting added for clarity, of the following news articles quoting Secretary Zinke's remarks: "Zinke refuses to discuss Bundy cattle at monument site," by Jennifer Yachnin, published in E&E News on July 31, 2017, and "Zinke caps review of Nevada monuments with Bunkerville visit," by Keith Rogers, published in the Las Vegas Review-Journal on July 30, 2017. The

4

Secretary's comments reflect a strong preference for the BLM's historic law enforcement role, which has been one of assisting with visitor services and protecting sensitive natural and cultural resources, rather than one of police actions like the enforcement of drug laws. He has routinely urged the BLM to look at new ways to manage land and restore public trust.

10.     I am informed and believe that during Secretary Zinke's tenure at the Department and under the leadership of his successor, Secretary David Bernhardt, the BLM has been lessening the financial burdens and regulatory requirements on other users of public lands, including oil, gas, and mining companies; livestock operators; and off-highway vehicle enthusiasts. As a result, Burning Man currently appears to be one of the most regulated operations taking place on BLM-managed public lands, although there are fewer impacts associated with this temporary special event than with many of the other uses permitted by the BLM.

11.     Attached hereto as **Exhibit C** is a true and correct copy of a press release from the Department dated April 16, 2018, and titled "Quarter 1 in Review: Interior Releases Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary Zinke," in which the Secretary states, "The Department is doing a tremendous job of breaking down regulatory barriers and cutting red tape to create economic prosperity that will benefit our nation."

12.     Attached hereto as **Exhibit D** is a true and correct copy, with highlighting added for clarity, of a press release from the Department dated December 28, 2017, and titled "Promises Made, Promises Kept: Interior Releases Comprehensive List of Accomplishments under President Trump & Secretary Zinke," which notes that "[u]nder Secretary Zinke's

5

leadership, the Department reduced the semi-annual regulatory agenda by more than 50-percent [and] initiated 21 deregulatory actions[.]"

13.    Attached hereto as **Exhibit E** is a true and correct copy of Secretarial Order 3366 issued by then-Secretary Zinke on April 18, 2018, that directs bureaus within the Department of Interior to develop and expand recreation opportunities on public lands and waterways and address the need to increase access for these pursuits. The Secretarial Order requires bureaus to identify administrative actions for improving and streamlining relevant requirements for guides/outfitters and facilitated outdoor recreation providers, etc. As a recipient of a special recreation use permit, BRC qualifies as a facilitated outdoor recreation provider. The BLM's escalating, costly, and unnecessary requirements to administer the Burning Man permit appear to be in direct conflict with the directives contained in Secretarial Order 3366.

14.    The BLM does not have the discretion to require that a proponent purchase new equipment or technology simply because agency employees would like to use it or have access to the latest gadgets. The BLM would not be purchasing such non-essentials if the agency were paying for them directly. Requests to purchase new equipment or implement new technology in connection with an SRP should be negotiated with the proponent. The proponent should have a substantial role in assessing whether these added costs are reasonable, and whether they are likely to measurably improve public safety or enjoyment, or the protection of the public lands. These discussions should occur prior to the BLM making final demands on the proponent. This is especially true for the recent Burning Man SRPs, as the event has experienced little growth over the past several years and should not be requiring extensive technology upgrades.

///

6

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed this 26th day of June. 2019, in _Brandon, MS._

Robert Abbey

Exhibit " A "

Exhibit " A "
AR11248

## NEVADA STANDO...
## Zinke refuses to discuss Bundy cattle at monument site

Jennifer Yachnin, E&E News reporter
Published: Monday, July 31, 2017



During a visit to the site of the 2014 armed standoff between federal agents and Nevada rancher Cliven Bundy and his supporters, Interior Secretary Ryan Zinke refused to address questions about Bundy's cattle, which were at the heart of the dispute. Jennifer Yachnin/E&E News

BUNKERVILLE, Nev. — More than three years after the armed standoff that took place here between rancher Cliven Bundy and his family and federal agents, the Bundy patriarch sits across the state in the Nevada Southern Detention Center as he awaits trial.

But the Bundy-owned cattle that are at the heart of the dispute — Bureau of Land Management agents were trying to seize Bundy's cattle over more than $1 million in unpaid grazing fees when the standoff began — continue to roam free on Gold Butte National Monument.

BLM officials told the *Reno Gazette-Journal* earlier this year that two court orders could allow the roundup of the cattle but said there are no plans to do so, pending approval from Washington, D.C.

Interior Secretary Ryan Zinke didn't rule out a future roundup when asked about the issue yesterday — but he also didn't offer any indications of what his agency plans to do.

"I'm not going to address that issue," Zinke when asked whether he planned to remove the cattle. He spoke at a news conference staged with the Gold Butte monument as a backdrop during his visit to the state to decide whether to rescind or reduce the 297,000-acre site (*see related story*).

During his 2014 congressional campaign, just a few weeks after the Bunkerville standoff, Zinke expressed sympathy for the Bundys, arguing that "not only was the government wrong, the rancher was wrong, but he was wronged."

At the time, he questioned BLM's and the National Park Service's ownership of "brand-new SUVs with blackened windows, weapons, Tasers and guard dogs" (*Greenwire*, July 13).

Zinke has since asserted that the "war is over" with anti-government advocates like the Bundys — pointing to both Bunkerville and the occupation of the Malheur National Wildlife Refuge in Oregon — under the Trump administration.

In particular, Zinke has pushed for a cultural change at the agencies under his supervision that would call on local law enforcement to defuse situations, and move federal agents into strict roles as land managers.

AR11249

"We should be the happy department. When you see a BLM truck, you should think 'land manager' and not 'law enforcement.' We should work with our local sheriffs," Zinke said when asked whether he continued to question arming BLM or NPS officials.

"Our people are embedded in the communities, and it's important — we're the team, the volunteer coaches and stuff like that — it's important that we're a part of the community, and when you see BLM, you should think about land manager and a happy guy, and if you see the lights go on, you should think about maybe he's looking for a lost hiker or something rather than getting a ticket on the country road, and so we're working on that," he added. "That's, to a degree, a little change in culture."

Nonetheless, Zinke added that with unspecified illegal activity on some remote public lands, federal officials must be equipped to protect themselves.

"We have to make sure that our law enforcement officers, too, can defend themselves," he said.

## Trial plans

Federal prosecutors began a retrial in the first Bunkerville-related case earlier this month after a jury deadlocked in April over charges against four defendants (*Greenwire*, July 10).

Federal prosecutors are trying to prove defendants Richard Lovelien, Scott Drexler, Eric Parker and Steven Stewart conspired with Bundy and others "to threaten, and use, force and violence to interfere with the officers while they executed their duties to enforce the court orders," court documents say.

Charges against participants in the Bunkerville incident were divided into three separate trials, with Cliven Bundy and his sons, Ammon, Melvin and David, slated to face trial 30 days after the retrial is concluded.

The Bundys' trial is expected to begin in October or September, followed by the third and final trial in the case.

Neither Bundy family representatives nor their attorneys answered requests for interviews.

Exhibit "_ß_"

Exhibit "_ß_"

Home (/) >> News (https://www.reviewjournal.com/./news/)
>> Politics and Government (https://www.reviewjournal.com/./news/politics-and-government/)

# Zinke caps review of Nevada monuments with Bunkerville visit

Interior Secretary visits to review national monuments

Interior Secretary Ryan Zinke spoke to members of the media Sunday in Bunkerville during his trip of the West to review the status of national monume..



▶  🔟  00:00                                                                02:43  ▶❙  ◀))  ⌄²

Interior Secretary visits to review national monuments (Rachel Aston/Las Vegas Review-Journal)



By Keith Rogers Las Vegas Review-Journal
July 30, 2017 - 6:25 pm


✉
(ma
&su
lSha
Pos
Zink
cap
revi
of
Nev
mor
with
Bun
visit
may
be
inte
in
the
f  ✔  foll
(htt(dst:ljoox
u=httpshttje

Updated July 31, 2017 - 12:09 am

BUNKERVILLE — Interior Secretary Ryan Zinke spoke to reporters early Sunday evening in this rural Clark County community as he wrapped up a much-anticipated visit to Southern Nevada (https://www.reviewjournal.com/news/politics-and-government/nevada/interior-secretary-zinke-to-visit-bunkerville-on-sunday/) that included a hike at Gold Butte National Monument and stops in Basin and Range National Monument to see American Indian rock art.

"As a steward of our greatest treasures. it's good to get out." Zinke said as he stood in the sun against a backdrop of the Gold Butte range. "As a former Navy SEAL, I think it's important to go out on the front line and actually meet people because the view from the Potomac is a lot different than the Virgin River."

The interior secretary visited the monuments as part of President Donald Trump's executive order mandating a review of 22 national monuments and five marine national monuments created by presidential decree since Jan. 1, 1996, to determine whether the designations should be scaled back or eliminated.

"What I've learned in the monument review is every monument is unique," said Zinke, who wore a cowboy hat as he answered reporters' questions.

"In a lot of cases people are afraid public land is going to be sold so they feel like a monument is a tool to make sure that public land stays in public hands," he said, adding, "Out front, I am an advocate to never sell or transfer public land. So is the president."

Zinke is expected to present Trump with his final recommendations by the end of August.

Speaking outside Brian Haviland's residence near Gold Butte. Zinke offered insight into criteria for downsizing.

"Again, the definition (of a national monument) is fairly loose so we're going through and evaluating." he said. "What's the object? Is the protection in the smallest area compatible with protection of that object?"

And, he said. "If we're going to protect those objects that the monument is intended to do. then you have to have things like a bathroom there so people hiking up a trail can use the restroom before they look at the petroglyphs or dwellings."

Based on his tours Sunday, he said Nevada's monuments need better road maintenance so public access is not interrupted.

"The good thing is, I haven't met anybody on either side that doesn't love the land," and they agree it's worth protecting. he said. "So there's more in common on the monuments than there are opposites."

Before Zinke's arrival, Russ Graves voiced concern about the size of the Gold Butte monument.

"I'd just like to see the size reduced," said Graves, 73, who owns an orchard that is part of a 220-acre ranch.

Whitney Pocket, the Devil's Throat sinkhole and a few other locations on Gold Butte should be part of the monument, but other parts don't have antiquities value, he said.

Zinke had planned to stay in Mesquite through Monday to meet with U.S. Rep. Dina Titus, D-Nev., and stakeholders there and in Overton on the last leg of a swing through the West. But he canceled those plans to return to Washington, D.C., for the first Cabinet meeting with new White House Chief of Staff John Kelly.



While the Monday meeting was scuttled, Zinke did meet with some stakeholders Sunday and has scheduled phone meetings with others, including the Moapa Band of Paiute Indians, according to his staff

The Riverside Road location where Zinke spoke is within three miles of the April 2014 armed standoff on the Virgin River between federal agents from his department and militia supporters of defiant rancher Cliven Bundy — the subject of a high-visibility trial in federal court in Las Vegas.

Asked by the Las Vegas Review-Journal if the Interior Department plans to round up Bundy's stray cattle from the Gold Butte monument, Zinke said: "I'm not going to address that issue."

Regarding ranching on public land, he said, "As we look at the rancher, that's as much a part of the culture of a lot of these monuments as some of the objects."

### Feeling forgotten

Bundy's wife Carol, said she was disappointed Zinke didn't meet with her on his way to Gold Butte despite her efforts to reach him through emails, certified letters and phone calls to staff.

"We have not received one phone call back," she said, sitting in the living room of the Bundy ranch house Sunday. "We feel like we're forgotten. Yet my husband and four of our sons, a total of 19 men, sit in prison under the guise of charges of the Department of Interior, which Mr Zinke is in control over, and they have committed no crime.

"Why would you come to my front yard and not reach out to my family and hear our pleas so that I could hear his as well?" she said.

**Carol Bundy responds to visit of Interior Secretary Zinke**

Interior Secretary Zinke was in the area of Bunkerville Sunday to review national monuments, one of which is Gold Butte. Gold Butte now encompasses



 ⟲ 00:00                                                                                                            02:31 ▶❙ ◀ʼ) ⤢ 

Zinke said he's trying to change the image of Interior Department agencies with heavy-handed law enforcement officers.

"We should be the happy department," he said.

"When you see a BLM truck you should think land manager and not law enforcement, which we work with through our local sheriffs."

Zinke's visit to Nevada started early. After his flight landed in Las Vegas at about 7:30 a.m., Zinke flew by helicopter to Gold Butte's Whitney Pocket, where he hiked with several local officials.

Other stops included White River Narrows, a Basin and Range petroglyph site; artist Michael Heizer's "City" project where he met with Los Angeles County Museum of Art staff members; and the Mount Irish petroglyph site in Basin and Range, where he met with Friends of Gold Butte.

Earlier Sunday, U.S. Sen. Catherine Cortez Masto, D-Nev., released a video of her support for the national monuments.

"Our outdoor recreation in Nevada is a boon to our economy, 148,000 jobs, billions of dollars in revenue to the economy," she said in the video. "And that's worth fighting for."

Contact Keith Rogers at krogers@reviewjournal.com or 702-383-0308. Follow @KeithRogers2 (http://www.twitter.com/KeithRogers2) on Twitter

**About the monuments**

In his proclamation designating **Gold Butte National Monument**, President Barack Obama called the region "a landscape of contrast and transition, where dramatically chiseled red sandstone, twisting canyons, and tree-clad mountains punctuate flat stretches of the Mojave Desert."

Gold Butte encompasses nearly 300,000 and was created Dec. 28, 2016.

**Basin and Range National Monument** was designated in July 2015 and covers 704,000 acres in Lincoln and Nye counties.

Obama's proclamation said, "The vast, rugged landscape redefines our notions of distance and space and brings into sharp focus the will and resolve of the people who have lived here. The unbroken expanse is an invaluable treasure for our Nation and will continue to serve as an irreplaceable resource for archaeologists, historians, and ecologists for generations to come."

**Related**

Review of Nevada's national monuments chills legislator (https://www.reviewjournal.com/news/politics-and-government/review-of-nevadas-national-monuments-chills-legislator/)

Congressional Republicans want Nevada monuments cut back (https://www.reviewjournal.com/news/nation-and-world/congressional-republicans-want-nevada-monuments-cut-back/)

Groups, Senate Democrats urge Trump to keep monuments intact (https://www.reviewjournal.com/news/politics-and-government/groups-senate-democrats-urge-trump-to-keep-monuments-intact/)

Comments pour in about review of national monuments in Nevada (https://www.reviewjournal.com/local/local-nevada/comments-pour-in-about-review-of-national-monuments-in-nevada/)

Exhibit " _C_ "

4/16/2018

Case 1:19-cv-03729-DLF   Document 35-9   Filed 07/12/21   Page 77 of 422

Quarter 1 in Review  Interior Releases Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary . .

# Quarter 1 in Review: Interior Releases Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary Zinke

4/16/2018
Last edited 4/16/2018

Date: April 16, 2018
Contact: Interior_Press@ios.doi.gov

**WASHINGTON** --Today, the U.S. Department of the Interior released a comprehensive list of 2018 first quarter accomplishments that the Department has achieved under the leadership of President Donald J. Trump and U.S. Secretary of the Interior Ryan Zinke.

"Under the Trump Administration, Interior has made incredible strides in creating a conservation stewardship legacy, modernizing our infrastructure, helping combat opioid addiction, securing the southern border, and so much more," said Secretary Zinke. "The Department is doing a tremendous job of breaking down regulatory barriers and cutting red tape to create economic prosperity that will benefit our nation. I signed an historic initiative to protect the migration corridors of North American big game species, we got to work opening the 1002 section in Alaska for responsible energy development, we partnered with BIA and other groups to form opioid task forces to crack down on drug abuse in Indian Country, and we introduced a bipartisan solution to fix the aging infrastructure in National Parks. The President and I look forward to keeping the pace and moving the country forward with America First policies."

"Under Secretary Zinke's leadership, we continue to make significant progress on a wide array of priorities for western states and insular areas," **said Alaska Senator Lisa Murkowski, Chairman of the Energy and Natural Resources Committee.** "From opening the 1002 Area, to responsible energy development, to a long-overdue agreement for a life-saving road for the people of King Cove, to the nomination of good Alaskans to serve in high-ranking key positions, the Department of the Interior is once again a true partner for us, and our future is much brighter for it."

"I have known Secretary Zinke since we attended Boys State together in 1979," **said Montana Senator Steve Daines.** "Being from Montana, Ryan's Western values have guided his leadership at

Case 1:19-cv-03729-DLF   Document 35-9   Filed 07/12/21   Page 78 of 422

4/16/2018       Quarter 1 in Review: Interior Releases Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary ..

the Department of the Interior and brought responsible federal land stewardship and strengthened the government-to-government relationship with Indian tribes. He has done a great job."

"Idahoans continue to tell me they are pleased with Secretary Zinke's work at Interior," **said Idaho Congressman Mike Simpson**. "I am particularly pleased with his dedication to fixing our National Parks and his commitment to keeping public lands accessible. I look forward to working with him on these and many other issues."

"DOI's innovative policies on ESA, Outcome-based grazing, wildfire fuels reduction and the Migratory Bird Treaty Act are providing ranchers with operational certainty that is critical to ensuring a future for rural communities throughout the West," **said Ethan L. Lane, Executive Director Public Lands Council & NCBA Federal Lands**.

"The Trump Administration took a big step in opening energy access with its draft OCS oil and gas leasing program, initiating a welcome departure from the Obama Administration's 2017–2022 plan. The United States is the only country in the world that has placed a majority of its territorial waters off-limits to natural resources extraction," **said Nick Loris Herbert, Fellow in Energy and Environmental Policy at The Heritage Foundation**. "Interior Secretary Ryan Zinke's draft plan would change that. As the U.S. improves access to its energy resources, the economy will grow, and federal and state governments would benefit immensely from the increased revenues from royalties, rents, bonus bids, and overall economic activity."

"Prioritizing the deferred maintenance backlog of our National Parks, engaging with private landowners on creating big-game migration corridors, putting more authority in the hands of regional and local managers, and reconsidering approaches for recovering threatened species such as the Louisiana pinesnake are all positive moves for conservation," **said Brian Yablonski, Executive Director of Property and Environment Research Center**. "These efforts by the Department look for creative conservation solutions to environmental problems and promote stewardship of our many natural resources."

"Under Secretary Ryan Zinke's leadership, the Department of the Interior is leading the way in making America more competitive in the global energy marketplace," **said Grover Norquist, President of Americans for Tax Reform**. "If the efforts to finally tap into our abundant natural resources succeed, taxpayers will reap the benefits for decades to come. Secretary Zinke's work at DOI will lead to more high-paying jobs and significant economic growth."

"Secretary Ryan Zinke is building off of a 2017 that saw the Department of the Interior as a frontrunner in terms of executing President Trump's historic regulatory reform agenda," **said Patrick Hedger, Director of Policy FreedomWorks**. "Under Zinke's watch, DOI rolled back the excesses of the previous administration—shrinking unnecessarily enormous national monuments that infuriated state governments and rescinding onerous restrictions on domestic energy production that duplicated existing state standards. There is clearly a strong pattern of cooperative federalism in Zinke's work. These trends look to continue into 2018, with plans underway to collaborate with states to liberate America's offshore oil, gas, and renewable energy resources and reorganize the Department to better serve, not subjugate, the states and the American people. FreedomWorks looks forward to continued support of these efforts and more."

Below is a summary of accomplishments during the first quarter of the year according to Secretary Zinke's Top Ten Priorities at the Department:

**Create a conservation stewardship legacy, second only to Teddy Roosevelt**

- **FISH AND WILDLIFE SERVICE:** Secretary Zinke signed <u>Secretarial Order 3362</u>, prioritizing conservation and big-game migration corridors.
- **FISH AND WILDLIFE SERVICE:** Issued a <u>final delisting</u> of the Eureka Valley evening primrose.

Case 1:19-cv-03729-DLF   Document 35-9   Filed 07/12/21   Page 79 of 422

4/16/2018          Quarter 1 in Review: Interior Releases Comprehensive List of First Quarter 2018 Accomplishments Under President Trump & Secretary ...

- **FISH AND WILDLIFE SERVICE:** Downlisted the Eureka dune grass from endangered to threatened.
- **FISH AND WILDLIFE SERVICE:** Announced more than $1.1 billion in grants to state wildlife agencies from revenues generated by the Pittman-Robertson Wildlife Restoration and Dingell-Johnson Sport Fish Restoration (PDRJ) Acts.
- **FISH AND WILDLIFE SERVICE:** Held the first meeting of the Secretary's International Wildlife Conservation Commission (IWCC).
- **FISH AND WILDLIFE SERVICE:** Held a meeting of the Sport Fishing and Boating Partnership Council Meeting with new guidance under Secretary Zinke's priorities.
- **BUREAU OF LAND MANAGEMENT:** Acquired 648 acres of land in the Rio Grande del Norte National Monument to facilitate traditional and recreation access.
- **BUREAU OF LAND MANAGEMENT:** Completed the latest in a series of improvements at off-highway vehicle recreation areas in northeast California and far northwest Nevada.
- **BUREAU OF LAND MANAGEMENT:** Decided to expand Phil's World, a nationally recognized mountain bike trail system six miles east of Cortez, Colorado.
- **DEPARTMENT OF THE INTERIOR:** Created a Hunting and Shooting Sports Conservation Council.
- **NATIONAL PARK SERVICE:** Secretary Zinke announced the Trump administration's support for grizzly bear restoration efforts in the North Cascades Ecosystem.

## Responsibly develop our energy & natural resources

- **BUREAU OF OCEAN ENERGY MANAGEMENT:** Announced a slate of major wind initiatives.
  - Proposed a sale for 390,000 acres of wind energy development off of the Massachusetts coast.
  - Sought information and industry interest in offshore wind development within the New York Bight Region.
  - Put out a Request for Feedback on future offshore wind energy leasing in the Atlantic.
- **BUREAU OF LAND MANAGEMENT:** Canceled a withdrawal application and the Department's proposed withdrawal of 1.3 million acres of federal lands from location and entry under the mining laws in the California Desert Conservation Area.
- **BUREAU OF OCEAN ENERGY MANAGEMENT:** Announced a Draft Proposed Five-Year Program for oil and gas leasing on the National Outer Continental Shelf.
- **INSULAR AFFAIRS:** Requested proposals for FY2018 Energizing Insular Communities Program funding (due May 31) to produce American energy in the territories.

## Restore trust & be a good neighbor

- **INSULAR AFFAIRS:** Assistant Secretary Doug Domenech traveled to the Virgin Islands to provide $2.8 million in grants for rebuilding infrastructure and utilities after the hurricanes.
- **INSULAR AFFAIRS:** Supported President Trump's signing of the Palau Compact in the 2018 Omnibus Funding Agreement, including $123 million of funding through 2024.
- **FISH AND WILDLIFE SERVICE:** Worked out a state-federal partnership to link the conservation of the endangered red-cockaded woodpecker with the U.S. Marine Corps mission at Lejeune.
- **FISH AND WILDLIFE SERVICE:** Proposed Rule 4d protections for the Louisiana pinesnake, protecting the species while being a good neighbor.
- **FISH AND WILDLIFE SERVICE:** Announced a $60 million cooperative agreement with the Recreational Boating and Fishing Foundation (RBFF) to help retain and recruit recreational anglers and boaters.
- **FISH AND WILDLIFE SERVICE:** Announced $14 million in Boating Infrastructure Grants.
- **FISH AND WILDLIFE SERVICE:** Launched the Nature's Good Neighbors campaign to highlight public partners who are acting as conservationists across the country.

- **DEPARTMENT OF THE INTERIOR:** Announced $18 million in "Anvil Points" energy payment funds to the state of Colorado after nearly a decade of the funds being withheld by the federal government.
- **BUREAU OF LAND MANAGEMENT:** Released a decision to allow the Riley Ridge Development Project to begin in Wyoming.
- **BUREAU OF LAND MANAGEMENT:** Issued decision on Environmental Assessment for Phase III McGinness Hills Geothermal Project in Lander County, Nevada.
- **BUREAU OF LAND MANAGEMENT:** Distributed almost $300,000 in timber payments to two counties in western Oregon.
- **BUREAU OF LAND MANAGEMENT:** Announced outcome-based grazing projects for 2018, to give greater flexibility in the management of permitted livestock.
- **DEPARTMENT OF THE INTERIOR:** Signed an agreement with the Alaska Native King Cove Native Corp. to build a life-saving road between the Native village and a nearby all-weather airport in Cold Bay.

## Ensure Tribal and Insular sovereignty means something

- **INSULAR AFFAIRS:** Held meetings between the United States and the Republic of the Marshall Islands to discuss policy and funding issues.
- **INDIAN AFFAIRS:** Secretary Zinke authorized the first funds transfer for the Blackfeet Water Settlement.
- **BUREAU OF LAND MANAGEMENT:** Approved a proposed land exchange between the Bureau and the Agua Caliente Band of Cahuilla Indians.
- **INDIAN AFFAIRS:** Approved the Shawnee Tribe's Fee-to-Trust application for a gaming facility.
- **INDIAN AFFAIRS:** Signed an agreement with the Confederated Tribes of the Umatilla Indian Reservation to implement the Land Buy-Back Program for Tribal Nations.
- **BUREAU OF RECLAMATION:** Resolved longstanding rights-of-way issues, approving rights-of-way to the Pueblos of Nambe, Pojoaque, San Ildefonso and Tesuque.

## Increase revenues to support DOI and national interests

- **BUREAU OF LAND MANAGEMENT:** Held numerous Spring 2018 oil and gas lease sales across the country, including: Eastern States, Wyoming, Montana, Nevada, Utah, Colorado.
- **OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT:** Provided more than $300 million in Abandoned Mine Lands grants to states and tribes.
- **BUREAU OF OCEAN ENERGY MANAGEMENT:** Held a region-wide oil and gas lease sale in the Gulf of Mexico, yielding $124.7 million in high bids on 815,403 acres.
- **BUREAU OF LAND MANAGEMENT:** Generated nearly $360 million from oil and gas lease sales in 2017, an 86-percent increase from the previous year and the highest in nearly a decade.

## Protect our people and the border

- **INDIAN AFFAIRS:** Formed an opioid task force, bringing together Bureau of Indian Affairs drug agents and other partners, to work with tribes and address the opioid crisis in Indian Country.
- **INDIAN AFFAIRS:** Conducted a successful drug interdiction operation in New Mexico, netting millions of dollars in illegal drugs confiscated.
- **BUREAU OF LAND MANAGEMENT:** Began targeted, experimental grazing efforts to prevent wildfires.
- **U.S. GEOLOGICAL SURVEY:** Published a list of minerals critical to U.S. economic and national security, starting implementation of President Trump's Executive Order 13817 on Critical Minerals.
- **DEPARTMENT OF THE INTERIOR:** Published the 2017 Drone Mission Report, which noted that drone flights to support natural resource management across Interior (including support to firefighters suppressing wildfires) increased 82-percent from 2016 to 2017.

- **DEPARTMENT OF THE INTERIOR:** Released a report highlighting progress made in the fight against invasive zebra and quagga mussels.

## Strike a regulatory balance

- **FISH AND WILDLIFE SERVICE:** Revised the previous administration's M-Opinion on the Migratory Bird Treaty Act and modified policies to ensure consistency with the new Opinion.
- **BUREAU OF LAND MANAGEMENT:** Rescinded the 2015 Hydraulic Fracturing Rule.
- **BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT:** Announced a series of new initiatives to strengthen the federal offshore oil and gas inspection program.

## Modernize our infrastructure

- **DEPARTMENT OF THE INTERIOR:** Supported the inclusion of a Public Lands Infrastructure Fund in the President's FY19 budget request – the Fund would help pay for repairs and improvements in national parks, national wildlife refuges, and Bureau of Indian Education schools.
- **DEPARTMENT OF THE INTERIOR:** Began implementation of President Trump's executive order and presidential memorandum on rural broadband availability.
- **NATIONAL PARK SERVICE:** Secretary Zinke partnered with Congress on a bipartisan bill to address the maintenance backlog in our National Park System.
- **DEPARTMENT OF THE INTERIOR:** Selected members of Secretary Zinke's newly created "Made in America" Outdoor Recreation Advisory Committee.
- **BUREAU OF RECLAMATION:** $50,000 awarded for five arsenic sensor solutions selected through a prize competition.
- **BUREAU OF RECLAMATION:** Launched prize competition looking for new ways to detect leaks and flaws in large buried pipelines.

## Reorganize DOI for the next 100 years

- **INSULAR AFFAIRS:** Secretary Zinke announced an expanded role for the Assistant Secretary for Insular Affairs, expanding the role to include ocean activities and international affairs.
- **DEPARTMENT OF THE INTERIOR:** Moved forward on major initiative to reorganize the Department.

Exhibit "_D_"

Exhibit "_D_"

AR11261

Case 1:19-cv-03729-DLF   Document 35-9   Filed 07/12/21   Page 83 of 422

4/16/2018      Promises Made, Promises Kept: Interior Releases Comprehensive List of Accomplishments under President Trump & Secretary Zinke | .

# Promises Made, Promises Kept: Interior Releases Comprehensive List of Accomplishments under President Trump & Secretary Zinke

12/28/2017

Date: December 28, 2017
Contact: Interior_Press@ios.doi.gov

**WASHINGTON** – Today, the U.S. Department of the Interior released a list of accomplishments that the Department has achieved under the leadership of President Donald J. Trump and U.S. Secretary of the Interior Ryan Zinke. The accomplishments represent the unique balance of development, conservation, and preservation that the Department is charged with overseeing, including leading in American Energy Dominance, restoring public access to public lands, and providing regulatory relief for hard working American citizens.

"The President promised the American people that their voices would be heard and that we would prioritize American interests, and I'm proud to say that this year the Department of the Interior has made good on those promises," **said Secretary Zinke.** "Across the Department we are striking the right balance to protect our greatest treasures and also generate the revenue and energy our country needs. We ended the war on coal, and we restored millions of acres of public land for traditional multiple use. We expanded access for recreation, hunting and fishing on public lands, and also started looking at new ways to rebuild our National Parks. This is just the tip of the iceberg. Next year will be an exciting year for the Department and the American people."

Throughout Secretary Zinke's Senate confirmation process, he made many promises to the American tax payer, and the list of accomplishments shows how the Department is keeping the promises that were made. Additionally, Zinke fulfilled confirmation promises to Senators to visit DOI holdings in their home states, including Florida, New Mexico, Utah, Alaska, Idaho, Louisiana, Tennessee, Maine, Colorado, Arizona, and Texas.

Below is a summary of major accomplishments according to Secretary Zinke's Top Ten Priorities at the Department:

# 1. Create a conservation stewardship legacy, second only to Teddy Roosevelt

4/16/2018

Case 1:19-cv-03729-DLF   Document 35-9   Filed 07/12/21   Page 84 of 422
Promises Made, Promises Kept: Interior Releases Comprehensive List of Accomplishments under President Trump & Secretary Zinke | ..

Under Secretary Zinke's leadership, the Department opened public access to the Sabinoso Wilderness which contains some of the most pristine sportsmen opportunities in the country, expanded hunting and fishing access on 10 National Wildlife Refuges, and successfully defended a mineral withdrawal near the Grand Canyon and supports a withdrawal north of Yellowstone.

## 2. Sustainably develop our energy & natural resources

Under Secretary Zinke's leadership, the Department held the second largest offshore wind lease sale, ended the Obama-era ban on coal mining on federal lands, and increased energy revenues to states and Tribes by more than a billion dollars.

## 3. Restore trust & be a good neighbor

At Secretary Zinke's recommendation, the President restored traditional multiple-use public access to over a million acres of land in Utah while creating five distinct monument units at Grand Staircase-Escalante and Bears Ears National Monuments. Under Zinke's leadership, the Department also opened up the Charles M. Russell National Wildlife Refuge for emergency cattle grazing after a wildfire, and reopened U.S. Virgin Islands National Park ahead of the busy Christmas tourism season, helping the Islands' economic recovery.

## 4. Ensure Tribal sovereignty means something

President Trump nominated the first Alaska Native woman to serve as the Assistant Secretary for Indian Affairs and issued the first-ever Presidential Emergency Declaration for a Tribe. Secretary Zinke signed the Pechanga water rights settlement, restored the rights of Alaska Natives to sell handicrafts, and asked Congress to formally designate Tribal co-management of Shash-Jaa area of Bears Ears National Monument.

## 5. Increase revenues to support DOI and national interests

Under Secretary Zinke's leadership, the Department increased energy revenues to states by more than a billion dollars over the previous year.

## 6. Protect our people and the border

President Trump and Secretary Zinke began the process of working with Congress to authorize full funding of the compact with Palau in order to strengthen the United States strategic defense in the Pacific. Hundreds of DOI law enforcement officers deployed to evacuate, prepare and respond to hurricanes in Texas, Florida, Puerto Rico, and the U.S. Virgin Islands.

## 7. Strike a regulatory balance

Under Secretary Zinke's leadership, the Department reduced the semi-annual regulatory agenda by more than 50-percent, initiated 21 deregulatory actions, saving the economy $3.8 billion over time.

## 8. Modernize our infrastructure

Secretary Zinke announced repairs to the historic Arlington Memorial Bridge, which carries 68,000 vehicles a day, will be completed under budget and ahead of schedule. The Secretary approved important infrastructure projects like the Boardman/Hemingway Transmission Line and the Mountain Valley Pipeline while also approving more than $80 million for parks and recreation grants.

## 9. Reorganize DOI for the next 100 years

The Secretary is crafting a plan to reorganize the Department of the Interior in a way that better manages our federal lands and pushes more assets to the field. The philosophy has earned bipartisan support in Congress and among governors.

## 10. Achieving our goals, leading our team forward

Partnership for Public Service announced in its"The Best Places to Work" survey the Department of the Interior (DOI) has improved from 11th place to 9th place among all the large agencies. Secretary Zinke has made improving the work experience a priority while at the Department, and the numbers from the report show a significant jump towards reaching that goal. Additionally, the Secretary announced the Department would be dog friendly in an effort to boost morale and attract top candidates.

Exhibit " _E_ "

6/26/2019          Zinke Signs Secretarial Orders to Increase Recreational Opportunities on Public Lands and Waters| U.S. Department of the Interior

Case 1:19-cv-03729-DLF   Document 35-9   Filed 07/12/21   Page 87 of 422


U.S. Department of the Interior

## Press Releases

Share

# Zinke Signs Secretarial Orders to Increase Recreational Opportunities on Public Lands and Waters

Establishes Position of Senior National Advisor for Recreation



4/18/2018

Last edited 4/19/2018

AR11266

6/26/2019　Zinke Signs Secretarial Orders to Increase Recreational Opportunities on Public Lands and Waters | U.S. Department of the Interior

Case 1:19-cv-05729-DLF   Document 95-9   Filed 07/12/21   Page 88 of 422

Date: April 18, 2018

Contact: Interior_Press@ios.doi.gov

**WASHINGTON** – U.S. Secretary of the Interior Ryan Zinke today signed two secretarial orders continuing his efforts to prioritize the Department of Interior's recreation mission and increase access to public lands.

Secretarial Order 3366 directs certain Interior bureaus to create and deliver plans to the Department within 90 days that focus on developing or expanding recreational opportunities on public lands and waterways. This order also directs bureau heads to designate one full-time employee charged to oversee recreational opportunities.

"From my first day on the job, I have made it abundantly clear that we are going to refocus on Interior's long-standing but recently forgotten recreation mission," **said Secretary Zinke.** "We are incredibly fortunate, as Americans, to have amazing public lands and waters to carry out our tradition of outdoor recreation but the Department must continue to create opportunities to increase access for these pursuits."

"We are delighted by the Secretary's actions to put in place what he has pledged: a system that will elevate the priority of outdoor recreation on public lands and waters managed by the Department of Interior," **said Thom Dammrich, the President of the National Marine Manufacturers Association.** "The Secretary's action recognizes the importance of outdoor recreation for our economy, particularly rural economies, and for the physical and mental health of all Americans. His actions today will help grow outdoor recreation and ensure that fun in the outdoors remains central to the American lifestyle. The Outdoor Recreation Roundtable pledges our support to the Secretary in his efforts to elevate the Department's commitment to outdoor recreation."

"Outdoor recreation is an economic engine that produces 2% of the U.S. GDP and is growing at a faster rate than the U.S. economy as a whole," **said Frank Hugelmeyer, the President of the RV Industry Association.** "With the right public policies, outdoor recreation will continue to be an American economic engine for years to come. Which is why the Outdoor Recreation Roundtable and its member associations applaud today's announcements by Secretary Zinke as a common sense plan to elevate the importance of outdoor recreation on

AR11267

public lands and waters throughout the Department of the Interior. This is an important step towards improving the visitor experience on public lands and waters across the country."

"The recreation industry looks forward to cooperating with the department to offer visitors to parks, refuges and other special places great experiences," **said Derrick Crandall, President of the Outdoor Recreation Roundtable.** "The result of better and modernized visitor infrastructure which will contribute to a renaissance of rural communities and a renewed commitment by all Americans to the strong conservation ethic our nation has shared with the world. We thank Secretary Zinke for putting a new emphasis on welcoming enjoyment of our public lands and waters and embracing new skills and new ideas to make visits compatible with protecting our natural and historic resources."

The bureaus are also asked to provide recommendations for improving and streamlining relevant permitting requirements for guides and outfitters and facilitated outdoor recreation providers and to improve contracting processes for recreation-specific concessioners.

"Whether your favorite activity is kayaking on a river, riding an ATV on sand dunes, jogging on a trail or hunting on a refuge—recreating on public lands and waters is good for the mind, body and soul," **said Secretary Zinke.** "And it is also incredibly vital to local economies who rely on recreation spending to help create jobs."

Secretarial Order 3365 establishes the position of Senior National Advisor to the Secretary for Recreation to ensure deliberate and active coordination of recreational policy in the U.S. Department of the Interior. The position will be filled by Rick May, who currently serves as a Senior Advisor to the Secretary.

May, who joined Interior in November 2017, is a retired U.S. Navy SEAL Captain and decorated veteran who served in the Iraq War. Since his departure from active duty in 2010, he has worked with wounded Veterans in various types of recreational activities, helping them to reintegrate back into mainstream America. May is a graduate of Sonoma State University with a Bachelor of Arts in Biology and he also holds a Master of Arts in Human Resource Management.

"Rick is the absolute best person for this job," **said Secretary Zinke.** "The work he has done in helping disabled veterans connect with the outdoors through recreation opportunities speaks for itself. As a former SEAL, he has the leadership needed to help the Department chart its course in making recreation a priority again."

AR11268

"First, I'm truly honored and grateful for the confidence that Secretary Zinke has placed in me to hold this position," **said Rick May.** "The power of recreation can not be overstated, and its ties to overall health and well-being are undeniable. It is my mission to get more Americans out to enjoy our great public lands, and I look forward to increasing access and opportunity for each and every one of them."

The Secretarial Orders come on the heels of <u>Secretary Zinke selecting members</u> of the newly created "Made In America" Outdoor Recreation Advisory Committee. A primary charge to the committee is to advise the Secretary on public-private partnerships across all public lands, with the goal of expanding access to and improving the infrastructure on public lands and waters.

PRESS RELEASE



Secretary Bernhardt Applauds Nomination of Sequoyah Simermeyer for Chair of the National Indian Gaming Commission

PRESS RELEASE

AR11269

6/26/2019   Zinke Signs Secretarial Orders to Increase Recreational Opportunities on Public Lands and Waters | U.S. Department of the Interior

Case 2:19-cv-03729-DLR   Document 95-6   Filed 05/12/21   Page 91 of 422



U.S. Department of the Interior's Opioid Reduction Task
Force Cracks Down on Illicit Drug Trade in Indian Country

PRESS RELEASE



Interior's BLM analyzes 11,000 miles of Fuel Breaks in the
Great Basin to Combat Wildfires

AR11270



# U.S. Department of the Interior

Protecting America's Great Outdoors and Powering Our Future

## About

Meet the Secretary

History of the Interior

For Employees

Past Secretaries

Browse the Library

## Bureaus

Bureau of Indian Affairs

Bureau of Indian Education

Bureau of Land Management

Bureau of Ocean Energy Management

Bureau of Reclamation

Bureau of Safety and Environmental Enforcement

National Park Service

Office of Surface Mining Reclamation and Enforcement

U.S. Fish and Wildlife Service

U.S. Geological Survey

## Our Priorities

American Energy

Jobs

Regulatory Reform

Stewardship

Tribal Nations

## Join US

Jobs

Pathways Program

Veterans Employment

Volunteer

## Contact Us

| FOIA | OPEN GOVERNMENT INITIATIVE | INTEGRITY OF SCIENTIFIC & SCHOLARLY ACTIVITIES | USA.GOV | BUSINESSUSA |

| WHITE HOUSE | NO FEAR ACT | INSPECTOR GENERAL | AGENCY FINANCIAL REPORT | BUDGET & PERFORMANCE |

| STRATEGIC PLAN | TRIBAL LEADERS DIRECTORY | COBELL / LAND BUY-BACK | DEEPWATER HORIZON | HURRICANE SANDY |

| POLICY LIBRARY; DEPARTMENTAL MANUAL, HR, SECRETARY'S ORDERS, WILDLAND FIRE MANAGEMENT |

AR11271

| DOI gov | | Contact Us | | Privacy Policy | | Disclaimer | | Notices | | Accessibility | | Accommodations | | Copyright |

| Digital Media Guide | | Site Map |

U.S. Department of the Interior, 1849 C Street NW, Washington, DC 20240. feedback@ios.doi.gov

AR11272

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone: (650) 858-8500
david@levinlawfirm.com
Attorneys for Appellant,
Black Rock City LLC

## UNITED STATES DEPARTMENT OF INTERIOR
## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BLACK ROCK CITY LLC, | Case Identification No.: IBLA-2019-0109 |
| Appellant, | Special Recreation Permit LLNVW03500-18-01 |
| v. | 2930 (NV030.10) |
| BUREAU OF LAND MANAGEMENT, | **Declaration of Raymond Allen In Support of Appeal** |
| Appellee. | |

I, Raymond Allen, declare as follows:

1.      I am over 18 years old, of sound mind, and capable of making this declaration. I am General Counsel for appellant Black Rock City LLC ("BRC") and its parent corporation Burning Man Project. BRC produces the annual Burning Man Event ("Event"). I have personal knowledge of the facts set forth herein, or, if so stated, am informed and believe of their truth and accuracy and, if called to testify, I could and would do so competently and under oath.

2.      I am an attorney licensed to practice in the State of California since 2002. I joined BRC in 2004 as Executive Project Manager. In 2007, my title was changed to Legal and

1

Government Affairs Manager. In 2014, I became General Counsel. For the past fourteen years, I have negotiated and cooperated with the U.S. Bureau of Land Management ("BLM") and Pershing County on behalf of BRC for all issues related to the Burning Man Event, including permitting, compliance, fees, cost recovery, growth, law enforcement, public health and safety, and public relations.

3.      Attached hereto as **Exhibit A** is a true and correct copy of excerpts from BLM Handbook number H-2930-1, titled "Recreation Permit and Fee Administration 2014" (the "BLM Handbook"), available at https://www.blm.gov/sites/blm.gov/files/uploads/IM2014-055_att1.pdf and updated by https://www.blm.gov/policy/im-2018-011. Chapter 1, Section III.G., of the BLM Handbook sets forth BLM's policy and guidelines for charging fees in connection with administering a special recreation permit ("SRP"). Since 2007, pursuant to the fee guidelines in the Handbook and federal regulations, the Burning Man SRP has been subject to cost recovery. *See* BLM Handbook at 1-20 - 1-27; 43 C.F.R. 2932.31. BRC pays all of BLM's direct and indirect costs for administering the SRP, plus 3% of BRC's Event-related gross receipts as a commercial use fee.

4.      Between 2007 and 2011, BLM's costs to manage the SRP increased by about 10% every year, from about $626,000 to $858,788.68. During this same period, the population of the Burning Man Event increased from 47,097 to 53,963, indicating average annual growth around 4%.

5.      In 2012, Daniel P. Love became BLM's Special Agent in Charge for Region 3, which includes the Black Rock National Conservation Area ("NCA") where the Burning Man

2

Event takes place. Special Agent Love assumed leadership of law enforcement operations for the Burning Man SRP.

6.      In 2012, the Event's population again increased by just 4%, while BLM's costs for administering the Burning Man SRP increased by 62%, to a total of almost $1.4 million. This was in part due to BLM's decision to raise its law enforcement staffing levels by 37%, from 51 officers in 2011 to 70 officers in 2012. This rise in staffing levels was tied to an escalation in many of BLM's other costs, from employee meals, accommodations, vehicles, and travel, to technical services and equipment.

7.      BLM did not provide BRC with an adequate explanation for the substantial increases in 2012, and costs continued to rise in subsequent years. I am aware of no safety or other issues that warranted these increases.

8.      In 2012, BLM designated Burning Man as an "emergency special event" for the first time, to my knowledge. Special Agent Love informed me and other BRC staff that the purpose of the designation was to facilitate the assignment of officers from other regions to Burning Man. BLM had never documented to BRC any difficulties in securing sufficient numbers of staff for the reasonable needs of the Event.

9.      To the best of my knowledge, the Event has no history of "emergencies" as that term is defined under federal regulations. *See* 5 CFR § 550.103. Burning Man is a recreational event that is carefully planned for months in advance, as a collaborative effort among BRC, BLM, and all cooperating agencies. The Event has occurred in the same location within the Black Rock NCA for each of the past 29 years. BRC's understanding is that BLM applied the emergency designation to the Burning Man events every year from 2012 through 2016, but BLM

3

declined BRC's repeated requests to provide written documentation of the designation and
BLM's basis for applying it to the Event.

10.     Despite all of its concerns with BLM's 2012 expenses, BRC felt it had no choice
but to acquiesce to the 2012 final cost decision. BLM's Winnemucca District Manager, Gene
Seidlitz, and Special Agent Dan Love warned that if BRC appealed the 2012 costs, BLM might
not have enough time to both respond to the appeal and process BRC's 2013 SRP, which would
have resulted in disastrous financial losses to BRC.

11.     Given the substantial cost increases in 2012, BRC expected BLM's costs would
remain flat in 2013, and BLM represented to BRC that this would be the case. BRC successfully
produced the 2012 Event, and BLM's After Action Report for that year identified no significant
infrastructural, administrative, or health and safety deficiencies.

12.     During a meeting on March 26, 2013, BLM advised BRC that its costs for
administering the Burning Man SRP would more than double that year. BLM's costs ended up
totaling over $2.93 million, an increase of 241% in two years.

13.     At the time, BLM represented to BRC that the 2013 increase would be due to a
one-time upgrade of BLM's infrastructure for "safety" reasons, including implementation of a
new computer-aided dispatch ("CAD") system. BLM also assured BRC that this upgrade would
allow BLM to provide data after the Event that would justify and explain the costs BLM charged
through cost recovery, and would ultimately reduce those costs, providing BRC with tangible
benefits and cost savings for years to come.

14.     I reminded BLM staff that cost recovery guidelines require that BLM provide a
reasoned, written explanation for all costs charged to the permittee, and that all costs be justified.

4

In response, Special Agent Love asserted that these guidelines did not apply to law enforcement, which "costs what it costs." District Manager Seidlitz informed me that BRC, as a private organization, was not entitled to any explanation of these costs but would need to pay them before BLM would issue the SRP.

15.     District Manager Seidlitz also informed me that BLM's Winnemucca District Office could not function without the money that the Burning Man SRP provides, which BRC understood to mean that the Burning Man SRP funds was being used to backfill general funding for the Winnemucca District Office.

16.     When BRC was informed of this anticipated increase, the 2013 Burning Man Event was just five months away, and BRC had already sold thousands of tickets and incurred significant event production expenses based on BLM's assurances that it would issue the SRP and that its costs had stabilized.

17.     BRC actually could not afford to pay the additional $1.5 million that BLM was suddenly and unexpectedly requiring. During the March 26 meeting, BRC staff explained that BRC would only be able to finance the cost increase if BLM allowed the Event's population to increase, enabling BRC to sell more tickets. In prior years, BRC had requested permission to increase the Event's population so that it could afford to pay BLM's increasing costs. BLM had always refused to allow Burning Man to grow proportionally, but within minutes of BRC making this same request at the March 26 meeting, BLM approved a substantial population increase to ensure that BRC would agree to BLM's doubling of costs in 2013.

18.     Due to the lack of time and BLM's unwillingness to negotiate or explain the reason for the additional cost increases, BRC again had no choice but to sign the cost recovery

5

agreement and acquiesce to BLM's unjustified price hike and hope that BLM would provide an adequate explanation eventually. Five years later, BLM still has not justified these cost increases, and the data that would supposedly have confirmed the reasonableness of BLM's costs has never materialized.

19.     In planning for the 2014 Burning Man Event, BRC again relied on BLM's assurances that costs would not substantially increase for the foreseeable future, and that the 2012 and 2013 cost increases would facilitate improved service, communications, planning, and data collection. This in turn, would finally enable BLM to provide BRC with an objective assessment of BLM's staffing levels and rising costs, which had never been done in the Event's history, to my knowledge. BLM did not, however, furnish BRC with any of the data that it promised and for which it required BRC to pay. To the best of my knowledge, no documented increase in public health and safety resulted from the more than $1.5 million in additional costs that BLM incurred to administer the 2013 SRP.

20.     In January 2014, BLM provided BRC with a cost recovery proposal for the 2014 Burning Man SRP that estimated BLM's costs would increase by $700,000, as compared with 2013, to a total of approximately $3.7 million. When BRC staff questioned these increases, BLM staff advised us that these estimated operational costs could not be reduced. Instead, BLM offered BRC an opportunity to "save money" by signing a memorandum of understanding ("MOU"), under which BRC would fulfill certain contracts instead of BLM, and funding two proffer accounts to directly compensate two BLM employees, a project manager and an outdoor recreation planner, for their alleged year-round work on the Burning Man SRP. This way, BRC would avoid paying the indirect administrative cost rate ("IACR") on these contracts and labor.

6

BLM applies the IACR to all of its direct expenditures that are charged through cost recovery, although it can waive the IACR, it does so for other users of public lands, and BRC has made several requests for a waiver over the years, which BLM has denied. As BLM presented the MOU and proffer accounts as the only means of limiting its costs, BRC accepted the arrangement. The statements of work ("SOWs") under the MOU cost BRC about $600,000 in 2014, plus an additional $70,000 to fund the proffer accounts. These costs were in addition to the costs BRC paid that year under the cost recovery process pursuant to 43 U.S.C. § 1734(b).

21.     On January 30, 2017, the Office of the Inspector General ("OIG") for the U.S. Department of the Interior released a public, redacted version of a report entitled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials" (the "Ethics Report"). A true and correct copy of the Ethics Report is attached hereto as **Exhibit B**.

22.     I have independently confirmed that Special Agent Love is the subject of the Ethics Report. On February 14, 2017, U.S. Representative Jason Chaffetz sent a letter in his capacity as Chair of the U.S. House Oversight and Reform Committee to the OIG (the "Chaffetz letter"), explaining that the Committee had received an unredacted version of the Ethics Report, and the agent under investigation was Special Agent Dan Love. A true and correct copy of the Chaffetz letter is attached hereto as **Exhibit C**.

23.     Attached hereto as **Exhibit D** is a true and correct copy of a report from the Office of the Inspector General for the U.S. Department of the Interior, entitled "Investigative Report of Misconduct by a Senior BLM Law Enforcement Manager," and released on August 24, 2017. This report was retrieved on April 16, 2018, from:

7

AR11279

https://www.doioig.gov/reports/investigative-report-misconduct-senior-blm-law-enforcement-ma
nager.

24.     Attached hereto as **Exhibit E** is a true and correct copy of a news article by Scott
Streater entitled "Agent in charge at 2014 Bundy standoff gone from BLM," and published in
*E&E News*on September 18, 2017.

25.     Attached hereto as **Exhibit F** is a true and correct copy of a memorandum by
David L. Bernhardt, Deputy Secretary for the U.S. Department of the Interior entitled "Month
Two Message," released to employees on September 22, 2017.

26.     Attached hereto as **Exhibit G** is a true and correct copy of a news article by Brian
Maffly entitled "Interior boss blasts fired Utah BLM law enforcement agent," and published in
*The Salt Lake Tribune* on September 25, 2017.

27.     Attached hereto as **Exhibit H** is a true and correct copy of a news article by
Maxine Bernstein entitled "BLM investigator alleges misconduct by feds in Bundy ranch
standoff," and published in *The Oregonian* on December 14, 2017.

28.     Attached hereto as **Exhibit I** is a true and correct copy of a memorandum from
BLM Special Agent Larry C. Wooten entitled "Disclosure and Complaint Narrative in Regard to
Bureau of Land Management Law Enforcement Supervisory Misconduct and Associated
Cover-ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by United States
Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in Reference to the
Cliven Bundy Investigation." This report was retrieved from:
https://www.scribd.com/document/367279332/Larry-Wooten-Communication-77PI#from_embe

8

AR11280

d (last checked June 25, 2019). Although the memorandum is undated, the article cited in paragraph 28 states that it was released on November 27, 2017.

29.     Attached hereto as **Exhibit J** is a true and correct copy of a press release from the Department of the Interior dated April 18, 2018, and titled "Zinke Signs Secretarial Orders to Increase Recreational Opportunities on Public Lands and Waters," which quotes Secretary of the Interior Ryan Zinke as saying, "From my first day on the job, I have made it abundantly clear that we are going to refocus on Interior's long-standing but recently forgotten recreation mission."

30.     In 2013, BRC and Pershing County entered into a 10-year agreement for the provision of law enforcement services at Burning Man Events. The agreement sets forth the "maximum payment by BRC" to Pershing County each year, based on the peak participant population of that year's Burning Man Event, "for all services of any kind supplied by the County or any of its officers, employees or contractors in connection with the Event, whether directly or indirectly." The agreement also requires the Sheriff to provide to BRC, within 14 days after the Event or else as soon as the information becomes available, a written After Action Report providing "all information in County possession relating to warnings and citations issued to, and arrests or detentions of, attendants at the Burning Man Event[.]"

31.     Every year since 2013, BLM has insisted that BRC pay more than $50,000 on a services contract for these satellite tracking devices used by BLM and Pershing County personnel as they patrol the Event. This demand was first made by Special Agent Love. I am informed and believe that since 2013, BRC has paid more than $300,000 for these tracking devices and associated service costs.

9

32.     Every year since 2013, BLM has required that BRC pay for labor, technology, and facility costs associated with a law enforcement "substation" that BLM has insisted on maintaining near the center of the Event. This demand was first made by Special Agent Love, who advised me in 2013 that BRC had no choice but to accept this new facility and pay all associated costs.

33.     In 2017, BRC contracted directly for BLM's CAD system under the MOU/SOW program discussed in paragraph 20. BRC executed a contract with the CAD provider, iNet Public Safety, under which BRC paid a total of $228,964 for the CAD services provided pursuant to BLM's SOW.

34.     I am informed and believe that BLM issued separate Special Recreation Permits to over 80 independent vendors who sell or rent equipment and services to participants attending the 2017 Event. These independent vendors pay BLM a commercial use fee of 3% of their gross receipts, and that BLM collects several hundred thousand dollars each year in total commercial use fees from these vendors.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 25th day of June, 2019, at San Francisco, California.

Raymond Allen

10

Exhibit " A "

Exhibit " A "

AR11283

## NATIONAL SPECIAL RECREATION PERMIT FEE SCHEDULE

| Permit Type | Type of Recreation Fee | | |
|---|---|---|---|
| | Minimum | Use | Cost Recovery |
| Commercial or vending | $105, adjusted every three (3) years based on the IPDI* | Three (3) percent of gross revenue | |
| Commercial assignment of a nonexclusive site | $210, adjusted every three (3) years based on the IPDI* | | |
| Commercial assignment of an exclusive site | $210, adjusted every three (3) years based on the IPDI* | | |
| Commercial, competitive, or organized group activities or events | | | If more than 50 hours of staff time is required to process and administer the permit, cost recovery charges begin with the first hour |
| Competitive | $105, adjusted every three (3) years based on the IPDI* | Three (3) percent of gross revenue or $5 per participant per day, whichever is greater | |
| Organized group or event | $105 or $5 per person per day, whichever is greater based on the IPDI* | | |

*IPDI = implicit price deflator index

The fee schedule shown above will be effective on March 1, 2014, and will remain in effect until March 1, 2017.

This table supersedes Appendix A-1 in the H-2930-1, Recreation Permit Administration Handbook; Rel. 2-295 dated August 7, 2006.

AR11284

Case 1:19-cv-03729-DLF   Document 35-9   Filed 07/12/21   Page 106 of 422



U.S. DEPARTMENT OF THE INTERIOR

# BUREAU OF LAND MANAGEMENT (/)

VISIT     ABOUT     LEARN     SERVICES     GET INVOLVED     PROGRAMS     STATES

Home (/)

# AUTOMATIC ADJUSTMENT OF MINIMUM SPECIAL RECREATION PERMIT FEES AND ASSIGNED SITE FEES

**Return to the Policies (/media/blm-policy/Instruction%20Memo**

*IM 2018-011*
Instruction Memorandum

National Office

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
Washington, D.C. 20240
**http://www.blm.gov (/)**
November 21, 2017

2018

In Reply Refer To:

2930 (250) P

EMS TRANSMISSION 12/20/2017

Instruction Memorandum No. 2018-011

Expires: 09/30/2020

To:          All Washington Office and Field Office Officials

             Attn: State Recreation Leads and Outdoor Recreation Planners

From:        Assistant Director, Resources and Planning

AR11285

Automatic Adjustment of Minimum Special Recreation Permit Fees and Assigned Site Fees | Bureau of Land Management    6/25/19, 2:28 PM

Case 1:19-cv-03729-DLF    Document 35-9    Filed 07/12/21    Page 107 of 422

Subject:     Automatic Adjustment of Minimum Special Recreation
Permit Fees and Assigned Site Fees

**Program Area:** Recreation and Visitor Services

**Purpose:** The purpose of this Instruction Memorandum (IM) is to
establish the minimum commercial, competitive and organized group
Special Recreation Permit (SRP) fees, and the minimum assigned site fee
effective November 20, 2017.  These fees constitute the Director's
minimum fee schedule and are in effect through February 29, 2020.

**Policy/Action:** The following minimum SRP and assigned site fees will
take effect on November 20, 2017:

- The minimum annual SRP fee will increase from $105, to $110.
- The minimum assigned site fee will increase from $210, to $220.
- The "per person per day" fee for competitive events and
  organized groups will increase from $5, to $6 per day.

The Bureau of Land Management (BLM) field offices will use November
20, 2017, as the effective date for the new minimum fees, and adjust
their billing statements according to their calendar or fiscal year time
frames.  All permits issued prior to November 20, 2017, with an effective
duration extending beyond that date must contain the new provisions.
 Field offices must insert this provision in all new permits meeting these
criteria, and amend all permits extending beyond November 20, 2017, to
include the applicable fees.

**Timeframe:** The new fee schedule is effective November 20, 2017, and
remains in effect unless amended until March 1, 2020.

**Budget Impact:** The application of this policy will have no impact on
the budget.  The BLM expects this increase to be budget-neutral.

**Background:** The BLM, in concert with the U.S. Forest Service,
automatically adjusts the minimum commercial and assigned site fee
every 3 years.  Normally this is done in March for the BLM, however in
2017 the adjustment is being made in November.  In addition, the BLM
adjusts the individual competitive and organized group SRP fees on the
same schedule.  The automatic 3-year fee adjustment policies and fee
calculation methodologies were published in the Federal Register on
October 19, 1989 (54 FR 42998) and July 29, 1999 (64 FR 41133).
 Individual state directors also have the authority to impose application
fees and/or to establish higher minimum fees for SRPs as a matter of
cost recovery.  The minimum SRP and assigned site fees are recalculated
every 3 years, using the fees for 1993 as the base year, and compounding

Automatic Adjustment of Minimum Special Recreation Permit Fees and Assigned Site Fees | Bureau of Land Management          6/25/19, 2:28 PM

Case 1:19-cv-03729-DLF   Document 35-9   Filed 07/12/21   Page 108 of 422

them annually using the Gross National Product Implicit Price Deflator Index. The minimum commercial SRP fee and assigned site fee are rounded to the nearest $5. The "per person per day" fee for competitive events and group events is rounded to the nearest $1.

**Manual/Handbook Sections Affected:** This IM updates the Director's Fee Schedule, Figure 2, contained in H-2930-1, BLM Recreation Permit and Fee Administration Handbook, Rel. 2-300 dated November 17, 2014, and replaces stated minimum SRP fees throughout the Handbook.

**Coordination:** The fee adjustment was coordinated with the U.S. Forest Service, and will be published in the Federal Register.

**Contact:** If there are any questions concerning the content of this IM, please contact Andy Tenney, Division Chief, Recreation and Visitor Services, at **atenney@blm.gov (mailto:atenney@blm.gov)**, or by telephone at: 202-208-4201, or David Ballenger, Recreation Permit and Fee Program Manager, at **dballeng@blm.gov (mailto:dballeng@blm.gov)**, or by telephone at: 202-912-7642.

Signed by:                          Authenticated by:

Kristin Bail                        Ambyr Fowler
Assistant Director                   Division of IT Policy and
Planning (WO-870)
Resources and Planning

AR11287

Exhibit " _B_ "

Exhibit " _B_ "



# Investigative Report of
# Ethical Violations and Misconduct
# by
# Bureau of Land Management Officials

Date Posted to Web: January 30, 2017

This is a version of the report prepared for public release.

AR11289

## SYNOPSIS

We initiated an investigation in October 2015, after receiving two anonymous complaints concerning a Supervisory Agent, Bureau of Land Management (BLM) Office of Law Enforcement and Security (OLES), Salt Lake City, UT.

The first complaint, received in September 2015, concerned the 2015 Burning Man event held annually in northwestern Nevada. The complaint alleged that—

- the Supervisory Agent used his official position to provide preferential treatment to his family members while attending the event;
- the Supervisory Agent directed five on-duty BLM law enforcement officers to escort his family and provide security for them at the event;
- the Supervisory Agent's family received unauthorized access to the Incident Command Post (ICP); and
- the Supervisory Agent's family received overnight lodging in BLM-leased facilities.

The second complaint, also received in September 2015, alleged that the Supervisory Agent improperly intervened in the April 2015 hiring process for a BLM special agent position after he learned that a friend did not make the initial list of candidates to be interviewed.

During our investigation, we received an additional complaint in September 2016, alleging that the Supervisory Agent drove around with his girlfriend in his BLM vehicle while working at the 2015 Burning Man event. The employees who provided details of the misuse stated that they had not fully disclosed this in prior interviews because they feared reprisal from the Supervisory Agent.

We substantiated all but one of the allegations associated with the 2015 Burning Man event.

We found that the Supervisory Agent violated Federal ethics rules when he used his influence with Burning Man officials to obtain three sold-out tickets and special passes for his father, girlfriend, and a family friend. In addition, we confirmed that he directed on-duty BLM law enforcement employees to drive and escort his family during the event with BLM-procured, all-terrain and utility type vehicles (ATVs/UTVs). Regarding the allegation of improper access to ICP by the Supervisory Agent's family, we found that was not against BLM policy. We confirmed that the Supervisory Agent's girlfriend stayed overnight with him in his BLM assigned trailer, contrary to restrictions in the operations plan for the event. The Supervisory Agent also violated Federal ethics regulations by having a subordinate employee make a hotel reservation for his guests. On at least one occasion, he misused his BLM official vehicle when he transported his girlfriend while at the event.

We interviewed BLM OLES Director Salvatore Lauro who stated that he took no action when he saw the Supervisory Agent use ATVs and BLM personnel to transport his (the Supervisory Agent's) family. In addition, Lauro knew the Supervisory Agent allowed his girlfriend to share his BLM overnight lodging accommodations during the event.

AR11290

We also confirmed that the Supervisory Agent intervened in the hiring process by increasing the number of candidates that would be interviewed. As a result, the Supervisory Agent's friend, who had worked with the Supervisory Agent as a Federal air marshal received an interview and was ultimately hired as a BLM special agent.

During our investigation, the Supervisory Agent displayed a lack of candor when interviewed and tried to influence an employee's comments prior to an interview.

## BACKGROUND

Burning Man, an annual gathering attended by thousands of people on BLM-managed Black Rock Desert, is organized by the Burning Man Project, a nonprofit organization, and its for-profit subsidiary, Black Rock City LLC (BRC). The permit issued by BLM to BRC showed the event was held from August 30 to September 7, 2015, and was limited to 70,000 paid participants. Interviewees stated that event attendees actually totaled about 80,000 individuals when vendors and support personnel were also counted.

OLES Director Salvatore Lauro identified OLES' major concern at Burning Man as potential mass casualty from fire-related artwork. He also referred to past BLM enforcement actions that resulted in crowd behavior and the need for tasers. The BLM OLES Official said that Burning Man had a history of illegal drugs, assaults, violence, and other criminal activity, in spite of its largely peaceful reputation. As a result, approximately 70 BLM law enforcement officers were assigned to the event. The BLM OLES Official also said that the Supervisory Agent prepared the operational plan, then briefed the BLM OLES Official and Lauro. He also said that the Supervisory Agent remained in command of operations, although Lauro attended the event.

## DETAILS OF INVESTIGATION

On October 7, 2015, we initiated this investigation after receiving two anonymous complaints.

The first complaint, sent by email to BLM Director Neil Kornze on September 9, 2015, and copying the Office of Inspector General (OIG), came from the private email address of an unidentified BLM employee. The complaint stated that a Supervisory Agent had engaged in misconduct and ethical violations at the 2015 Burning Man event. Specifically, the Supervisory Agent used his influence to obtain tickets to the event for family members; he also permitted his family members to visit the ICP and receive overnight lodging at BLM-leased facilities. The complaint also alleged that he directed five BLM law enforcement personnel to provide his family members with an escort and tour through BRC, using BLM-procured all-terrain and utility type vehicles while the officers were on official duty at the event.

The second complaint, also submitted on September 9, 2015, alleged that the Supervisory Agent committed an unfair hiring practice in April 2015 when he intervened on behalf of a friend applying for a BLM special agent position.

A third complaint, received in September 2016 near the end of our investigation, alleged that the Supervisory Agent misused his Government vehicle when he used it to drive around with his girlfriend during the 2015 Burning Man event.

2

AR11291

**Supervisory Agent's Misconduct at Burning Man**

*Supervisory Agent Seeks Favor from Prohibited Source*

During our investigation, we found that the Supervisory Agent obtained three full-event Burning Man tickets for "family" members identified as his father, a family friend, and the Supervisory Agent's girlfriend. At the time he bought the tickets, those available to the public had been sold out. The Supervisory Agent used his contacts and relationships with Burning Man officials to obtain the tickets. Federal ethics regulations prohibit soliciting gifts from a prohibited source. See 5 C.F.R. § 2635.202(a). Ethics regulations also prohibit Federal employees from using any authority associated with their public position for the private gain of friends and relatives. See 5 C.F.R. § 2635.702.

As part of our email review, we found that, as early as February 27, 2015, the Supervisory Agent told a BRC Attorney that he was considering bringing his parents to the 2015 event to honor a relative's passing at the Burning Man temple ceremony. He wrote that he might bring his parents with the BRC Attorney's help and approval.

We also found that the Supervisory Agent had discussed obtaining tickets with a former BLM Special Agent serving as a current reemployed annuitant hired as a special project manager for the event. The former BLM Special Agent reported three conversations with the Supervisory Agent:

- The Supervisory Agent asked if he could purchase tickets for $50 each through a program offered to locals, but the former BLM Special Agent informed him that his family members did not qualify.
- The Supervisory Agent then informed him that he intended to purchase the tickets from BRC officials at a discount; the former BLM Special Agent urged him not to do this because of the Supervisory Agent's bad publicity concerning demands for expensive items purchased by BRC for BLM's use at the event.

*Agent's Note: In 2015, a newspaper published an article stating that a letter [went] to Secretary Jewell, expressing concerns with "providing outlandishly unnecessary facilities for BLM and its guests" at the 2015 event. The article also stated that the Supervisory Agent had been citied multiple times as the person behind many of the BLM requests, and further stated that BLM wanted Burning Man to provide a $1 million luxury compound.*

- During his third conversation with the Supervisory Agent, the Supervisory Agent informed the former BLM Special Agent that he had purchased full price tickets from the BRC Attorney, with whom the Supervisory Agent had a good relationship.

A September 3, 2015 email from the BRC Attorney to the Supervisory Agent at the time of the event cited the BRC Attorney's willingness to offer four regularly priced tickets as a courtesy to the Supervisory Agent's family. The BRC Attorney further stated that BRC held tickets at the Box Office for unique situations that arose after tickets were sold out and that he was happy to offer the tickets to the Supervisory Agent.

AR11292

During his interview, the BRC Attorney said that the Supervisory Agent had either telephoned or sent him a text message asking for three tickets for his family members just before he sent the Supervisory Agent the September 3, 2015 email. The Supervisory Agent knew that regular tickets for the event were sold out but that BRC also held back about 100 tickets for special requests and needs. The Supervisory Agent approached the BRC Attorney to purchase tickets for his family, but wanted the tickets at the regular price because of scrutiny surrounding his role in BLM's request for the luxury compound. The BRC Attorney forwarded OIG investigators an email dated September 5, 2015, showing three tickets charged to the Supervisory Agent's personal credit card at $390 each, with a processing fee of $19 each, for a total of $1,227.

Lauro also reported that the Supervisory Agent showed him a receipt for approximately $1,200 paid on his personal credit card so that his family could attend the event. Lauro told the Supervisory Agent it was "probably the best $1,200 you've ever spent because it's going to turn, we know it's going to turn into a complaint." He said the Supervisory Agent was upfront with him regarding his family's attendance, having tried to make sure he did not violate any policies. Lauro knew that the Supervisory Agent had purchased tickets at full price with personal funds, and said that the Supervisory Agent "knows people are looking." We also found that the Supervisory Agent had discussed the ticket purchase with several BLM law enforcement personnel, who each felt that the Supervisory Agent wanted to make them aware that he had paid full price for the tickets.

Lauro and a BLM OLES Official both indicated that no policy prohibited OLES personnel from having family members attend the event. Lauro said that he attended the event and knew that the Supervisory Agent's family also attended. The family specifically visited the temple, which the Supervisory Agent helped to construct. He said that the Supervisory Agent was allowed to cut a piece of wood and place it in the temple in memory of a family member. The BLM OLES Official confirmed that two of the Supervisory Agent's family members, as well as his girlfriend, had attended a portion of the event for which the Supervisory Agent had placed a board in the temple in his family member's memory.

The Supervisory Agent also sent an earlier email to the BRC Attorney on August 26, 2015, in which he attached photographs depicting his significant temple construction efforts. In the photo, the Supervisory Agent wears his law enforcement equipment and firearm, and a shirt identifying him as a Federal agent.

The Supervisory Agent's account of his conversations with the former BLM Special Agent and the BRC Attorney differed from their accounts, however. He said the former Special Agent told him he was an "idiot" to pay full price. The Supervisory Agent said that when he went to the BRC Attorney to find a ticket option that would bring less scrutiny, he generally knew that tickets available for public attendance had been sold out, but he did not know that the BRC Attorney had extra tickets. He said that he told the BRC Attorney he did not want special treatment because of his position.

*Supervisory Agent Seeks Favor from BRC for Special Passes to Man Burn*

During our investigation, we learned that the Supervisory Agent had asked a BRC Official for three special passes so that his family could watch the Man Burn, the high point of the Burning

4

AR11293

Man event when an effigy is burned at the temple. The passes, which have no face value but which are not available to the public, gave access to the inner perimeter on the night of September 5, 2015. Our interviews of BRC officials revealed that the inner perimeter was considered a privileged location, reserved primarily for BRC, pyrotechnics, and emergency services staff. The BRC Attorney told us that a BRC Official controlled the special passes and that they had never before been provided to a BLM employee's family members.

When interviewed, the BRC Official said that the Supervisory Agent had asked on Saturday afternoon, September 5, for three passes so that his family could attend the 10:00 p.m. Man Burn that night. The BRC Official confirmed that access to the inner perimeter was a special privilege and never previously requested by or given to a BLM official or law enforcement official. When asked if the Supervisory Agent's position had influenced the availability of the passes, the BRC Official said that there had been apprehension at first because it seemed "a little strange." The BRC Official still gave the Supervisory Agent the passes because being gracious was part of the Burning Man culture. Federal ethics regulations prohibit soliciting gifts from a prohibited source. See 5 C.F.R. § 2635.202(a). Ethics regulations also prohibit Federal employees from using any authority associated with their public position for the private gain of friends and relatives. See 5 C.F.R. § 2635.702.

The Supervisory Agent said that the BRC Official had given him special laminated passes so that his family could watch from the inner perimeter, but he did not necessarily consider it a special privilege.

During the interview, the BRC Official indicated that the Supervisory Agent was on official duty while in the inner perimeter with his family, as were all law enforcement officers who were on official business while present at the event. A review of the Supervisory Agent's time and attendance records showed that he was on official duty while at the Man Burn during the night of September 5, 2015. The review showed that he claimed 24 hours of official work time for Saturday, September 5, the day of the Man Burn. He also claimed 24 hours of official work time for Sunday, September 6, and again on Monday, September 7.

*Supervisory Agent's Misuse of OLES Personnel and BLM-Procured, All-Terrain and Utility Type Vehicles*

OLES personnel confirmed that the Supervisory Agent directed five on duty BLM law enforcement officials to drive, escort, and provide security for his family at the 2015 Burning Man event. A BLM Subordinate Supervisory Agent said the Supervisory Agent asked him to take the Supervisory Agent's family with him on his daily route around the event's playa. He transported the Supervisory Agent's father, family friend, and girlfriend on a BLM-procured Kubota utility vehicle while also performing his official duties. BLM Special Agents confirmed that they saw a BLM Subordinate Supervisory Agent transporting the Supervisory Agent's family in a utility vehicle at the event.

A BLM OLES Contracting Officer confirmed seeing the Supervisory Agent's father, girlfriend, and another man getting out of a Kubota utility vehicle, which she had procured for OLES to use during the event. A BLM OLES Contracting Officer provided a copy of a

5

"Solicitation/Contract/Order for Commercial Items," dated August 8, 2015, confirming the Federal procurement. Federal law prohibits the use of Government owned or leased passenger vehicles for unofficial purposes. See 31 U.S.C. §§ 1344(a) and 1349(b).

A BLM Special Agent further stated that the Supervisory Agent had directed him and another BLM Special Agent, as well as two BLM law enforcement officers to accompany his family around the event. They drove in separate all-terrain vehicles known as Razors. At one point, they all met up with the Supervisory Agent, BLM OLES Director Lauro, and former Department of the Interior OLES Director Harry Humbert.

A BLM Supervisory Law Enforcement Ranger also stated that at about 2:00 p.m. on September 5, 2015, the Supervisory Agent asked him to accompany Lauro, Humbert, and himself on a tour of the event. The four of them met up with another BLM Subordinate Supervisory Agent, who drove a Kubota utility vehicle with the Supervisory Agent's father, family friend, and girlfriend as passengers. A BLM Supervisory Law Enforcement Ranger said that the vehicles stopped at the temple, then drove around the playa looking at the art. They also went to an area known as the District, where several thousand people gathered to listen to and provide music. He said that the tour lasted 3 to 4 hours.

The BLM Supervisory Law Enforcement Ranger noted that the utility vehicles had been used to transport Government officials (e.g., a U.S. attorney, a BLM Official, and a DOI Solicitor Official), but that the vehicles had never been used to transport BLM OLES family members on a tour with a law enforcement escort. He said a tie to the Government always occurred when the utility vehicles were used for transportation. A BLM Subordinate Supervisory Agent informed us, however, that the former BLM Special Agent's wife had routinely attended the event and received a tour on a utility vehicle.

A BLM OLES Budget Analyst said the Supervisory Agent's father, family friend, and girlfriend toured the Burning Man event with Lauro and Humbert. She also said that other law enforcement personnel had their family members visit the event and that it was a common practice; however, the Supervisory Agent's family were the only non-law enforcement personnel provided a tour that day.

During his interview, the Supervisory Agent confirmed that he oversaw all BLM law enforcement personnel assigned to the event, while also confirming that another BLM Supervisory Agent, a BLM Supervisory Law Enforcement Ranger, a BLM Law Enforcement Officer and BLM Special Agents had been his subordinates during that time. The Supervisory Agent confirmed that he had asked a BLM Subordinate Supervisory Agent and other BLM law enforcement personnel to accompany his family on a tour of the event and that all OLES law enforcement officers were on official duty and in uniform when this occurred. The Supervisory Agent also said that the Kubota utility vehicle had been used routinely to transport the public because it had been rented, rather than owned by BLM.

Contrary to the Supervisory Agent, a BLM Subordinate Supervisory Agent did say that law enforcement officers typically did not escort or transport the public in the utility vehicles. He said that the Supervisory Agent's family received transportation, as well as preferential

6

treatment, because of the Supervisory Agent.

*Lauro's Knowledge of the Supervisory Agent's Actions*

We questioned Lauro about the Supervisory Agent's use of BLM's law enforcement officials and Government procured vehicles to transport the Supervisory Agent's family and give them a tour of the Burning Man event. Lauro acknowledged that he saw a BLM Subordinate Supervisory Agent driving the Supervisory Agent's family members during the event and stated that the Supervisory Agent told him his family was coming and that his girlfriend was staying in the trailer. He denied knowing that the BLM law enforcement officers riding nearby were a security escort, as well as whether the vehicle that a BLM Subordinate Supervisory Agent drove was a leased BLM ATV or belonged to the Sheriff's department. He said the use of ATVs and BLM personnel to transport the Supervisory Agent's family, in addition to the use of BLM lodging might be considered "technical" violations, especially since, as the Supervisory Agent's second level supervisor, he did not see anything that led him to tell the Supervisory Agent to stop. He explained the "reality" is we "regularly" drive non-government people. He stated he did not feel that the Supervisory Agent's family received preferential treatment. He also said he would not have let a BLM law enforcement officer's family who had lost a loved one travel around the event on their own. Lauro added, however, that he and the Supervisory Agent had discussed the potential for an IG complaint, saying "in fact we probably could have written it before it happened because he's had like eight anonymous complaints in the last two years."

When interviewed, Humbert said he did not know that the utility vehicles used to transport the Supervisory Agent's family belonged to the Government. He added that, if they did, then Government vehicle use policies applied. When asked if he felt the Supervisory Agent's family members had received preferential treatment because of the Supervisory Agent's position, Humbert said, "I don't think there is any other way you can look at it."

*Supervisory Agent's Disregard for the Accommodations Directive and Allegations of Meals at BLM's Expense*

The "Law Enforcement Operations Plan - Duties, Procedures, Protocols, and Rules Specific to the 2015 Burning Man Event, dated August 11, 2015," signed and approved by the Supervisory Agent, stated: "Since many law enforcement officers will be sharing a room with another officer during the Burning Man event, rooms are only for those persons assigned to the event."

**Agent's Note: *The operations plan is not provided as an attachment due to its sensitivity.***

A BLM Subordinate Supervisory Agent had been assigned to a BLM lodging trailer with the Supervisory Agent. He confirmed that the Supervisory Agent's girlfriend stayed 1 or 2 nights with the Supervisory Agent in the trailer. She also shared meals prepared with food he and the Supervisory Agent had purchased for the trailer. The BLM Subordinate Supervisory Agent did not know if the Supervisory Agent's girlfriend received meals from the dining facility provided for BLM employees.

When interviewed, the Supervisory Agent stated that his girlfriend stayed overnight with him in

7

his assigned lodging trailer, and that his father stayed the first night at a Marriott in Reno. He said that on the second night his father stayed with his family's friend. Regarding the lodging rules cited in the Law Enforcement Operations Plan, the Supervisory Agent said "... it's to keep people from jumping rooms or moving rooms or trading rooms."

During Lauro's interview, he stated that the Supervisory Agent informed him his (the Supervisory Agent's) girlfriend would stay the night with him in the trailer. The Supervisory Agent told him that he had checked with contracting and travel personnel and that there was no violation since it was the same as staying in a hotel room together.

*The Supervisory Agent's Misuse of a Government-owned Vehicle*

A BLM OLES Budget Analyst and a BLM OLES Contracting Officer contacted OIG near the completion of our investigation to request additional interviews regarding information they had not provided due to fear of retaliation.

Both provided details regarding the Supervisory Agent's misuse of his assigned Government vehicle, a silver Chevrolet Tahoe, while at the 2015 Burning Man event. According to an OLES Budget Analyst, she and a Contracting Officer learned from the Supervisory Agent that his girlfriend needed directions to the event. The Supervisory Agent told them that he might meet her in his Government vehicle at a nearby community, then transport her to the event. The OLES Budget Analyst and the OLES Contracting Officer warned the Supervisory Agent against his plan, but the Supervisory Agent only appeared frustrated when he left.

Later that night, according to the OLES Budget Analyst and the OLES Contracting Officer, the Supervisory Agent drove up to them in the Government Tahoe when they were near a mobile substation. They observed the Supervisory Agent's girlfriend in the Tahoe's front passenger seat, when the Supervisory Agent told them to get into his vehicle. They refused. The Supervisory Agent drove away when he saw someone approaching and became concerned that he would be seen.

The next day, the Contracting Officer asked the Supervisory Agent why he had driven his girlfriend in his Government vehicle. He responded to her, "You will forget that you saw that."

During our investigation, we learned that a retired police officer and paramedic assigned to the event had transported the Supervisory Agent's family from the nearby community, although we could not confirm the date or time. The retired police officer told us that, based upon a request from the Supervisory Agent, he had met the Supervisory Agent's family, then transported them in his personal vehicle. He took them through the main entrance where he thought their tickets were scanned, then dropped them off at the ICP where the Supervisory Agent waited for them.

During his interview on May 24, 2016, we asked the Supervisory Agent if he had transported his girlfriend or other family members in his Government vehicle while at the event. He said he had not, and that he had given orders not to transport his family in a Government vehicle.

8

*Additional Statements by OLES Employees Regarding Lodging for the Supervisory Agent's Family*

The BLM OLES Budget Analyst and the BLM OLES Contracting Officer provided additional details about the Supervisory Agent's intent to secure BLM lodging for his family. The BLM OLES Budget Analyst stated that she had observed a phone conversation in which the Supervisory Agent asked the former BLM Special Agent to reserve a travel trailer for overnight use by his father and family friend. The conversation occurred while she, the Supervisory Agent, and the BLM OLES Contracting Officer were outside the BLM State Office before they left for Burning Man. The BLM OLES Budget Analyst did not know if the Supervisory Agent's father and family friend stayed overnight in the trailer, but the BLM OLES Contracting Officer said that she used the Supervisory Agent's Marriott rewards number to reserve a hotel room for his father and family friend. The BLM OLES Contracting Officer did not know if they stayed overnight in one of the lodging trailers. Federal ethics regulations prohibit supervisors from encouraging or requesting subordinates to use their official time to perform unofficial duties such as personal errands. See 5 C.F.R. § 2635.705(b).

## Supervisory Agent's Improper Influence in a Hiring Process

According to the second complaint, the Supervisory Agent increased the number of candidates interviewed for a hiring action, which enabled a friend to be interviewed and later selected for the job instead of other more qualified candidates. The complaint further stated that the interviews were short, that the Supervisory Agent's friend who had applied for the position apparently received the questions in advance, and that he was hired immediately after the interviews concluded.

We found that the BLM OLES vacancy announcement resulted in two applicants being hired: a BLM Special Agent, formerly employed as a special agent for the U.S. Secret Service, and the Supervisory Agent's friend, formerly employed as an air marshal for the Supervisory Agent's previous employer, the Federal Air Marshals Service (FAMS).

*Hiring for a BLM Special Agent Position*

The BLM OLES Official said he had little involvement in the hiring process for the BLM special agent position. He said the Supervisory Agent would have handled the hiring locally from a single announcement that filled two positions in the Supervisory Agent's office. He subsequently discussed the hiring with the Supervisory Agent, who identified a "natural break" of 5 percent in the resume scores at the 32nd candidate, which meant that a gap greater than one or two percentage points between the scores occurred at this point. He said he was not concerned if a friend of the Supervisory Agent applied for the position, as long as the Supervisory Agent followed the human resources process.

The BLM OLES Official further stated that, while gathering documents for OIG's investigation, he learned from the Supervisory Agent that the Supervisory Agent's friend had worked previously with him as a Federal air marshal. The Supervisory Agent told him that their working relationship had occurred years earlier, that he had not had contact with his friend (and special agent job applicant) since they worked together, and that the two of them were not friends.

9

AR11298

Our review of documents gathered by the BLM OLES Official revealed a schedule titled "Resume Summary," signed by the Supervisory Agent and dated April 16, 2015, showing the combined scores of 121 unnamed applicants. This schedule also contained a handwritten notation, citing a 5-percent break at the 32nd applicant. A separate schedule, also titled "Resume Summary" but containing the names of the 121 applicants and their combined scores and ranking, showed that the Supervisory Agent's friend ranked 23rd out of 121 applicants.

Lauro stated that he did not know if the Supervisory Agent and the individual hired as a BLM Special Agent were friends when the man was hired, but he assumed that the Supervisory Agent probably knew the applicant since both worked for FAMS. He also did not know if the Supervisory Agent halted the hiring process so that the individual would receive an interview. When shown the Resume Summary and the various other hiring documents that the BLM OLES Official provided, Lauro said that he would never interview 30 people for a position and hoped that the Supervisory Agent had a good reason for his decision.

*The Supervisory Agent's Influence On the Hiring Process*

A BLM Subordinate Supervisory Agent said that he was designated as the selecting official for the two BLM special agent positions, for which more than 200 applicants applied. The Supervisory Agent had told him that an identified applicant's skills, as well as his personality, would fit well with the team and that he would like to give him a chance at the job. The BLM Subordinate Supervisory Agent said that the applicant should not have been hired because he was not as qualified as the top candidates.

A BLM Special Agent who was on both the resume review and interview panels said the Supervisory Agent tasked him to oversee the hiring process for the BLM special agent positions. He also said that the identified applicant had been discussed long before the applicant resumes had been ranked. The Supervisory Agent previously asked him to speak with the identified applicant on the telephone to discuss the hiring process, and the Supervisory Agent brought him into the office to meet with the BLM Special Agent to discuss the job.

The BLM Special Agent said that when he and a BLM State Ranger scored the applicant resumes, the identified applicant had ranked low, somewhere "in the forties" or lower. He further stated that, although the BLM Subordinate Supervisory Agent had intended to include only the top 10 to 15 candidates in the interview cut-off, the Supervisory Agent intervened, moving the cut-off to about the 30th applicant, which gave his friend, the identified applicant, an interview and made it clear to the BLM Special Agent that the Supervisory Agent had moved the cut-off for that purpose. He had concerns about the identified applicant's law enforcement qualifications, which did not match those of most criminal investigators.

The BLM State Ranger said that, while on assignment with other OLES employees, he and the BLM Special Agent scored and ranked the applicant resumes, finding a natural break at a 3- to 5-percent difference in the scoring after about the 13th applicant. He said that the identified applicant ranked at about 30 among approximately 120 resumes. Since he and other OLES employees had discussed the identified applicant, he knew the Supervisory Agent would not be happy if the identified applicant did not receive an interview. He said the BLM Subordinate

10

AR11299

Supervisory Agent later told him that the Supervisory Agent had interfered with and suspended the process to ensure interviews for the top 30 candidates.

We also found that a BLM OLES Budget Analyst was assigned to handle certain administrative tasks pertaining to the hiring process. These included preparing spreadsheets to reflect applicant scores and rankings, and contacting applicants to arrange interviews. The BLM OLES Budget Analyst confirmed that the Supervisory Agent had discussed his friend, the identified applicant, with her and the other OLES employees many times to sell his qualifications. The Supervisory Agent's friend had visited the OLES office on several occasions, and the Supervisory Agent required her and other OLES employees to accompany them to lunch. The Supervisory Agent also told employees that everyone would like his friend, mentioning common interests his friend shared with OLES employees. The BLM OLES Contracting Officer reported that, in March 2015, the Supervisory Agent sent a text saying that his friend would be visiting the office that day. The Supervisory Agent wanted them all to go to lunch together. The BLM OLES Contracting Officer complied because the Supervisory Agent was her immediate supervisor and she feared he might retaliate if she refused.

The BLM Subordinate Supervisory Agent felt that a definitive interview cut-off occurred about the 12th or 13th applicant. He had several conversations with the Supervisory Agent about his friend, the identified applicant; he said the Supervisory Agent knew that his friend did not rank among the top 13. The BLM Subordinate Supervisory Agent told the Supervisory Agent that his friend was not the best candidate, but the Supervisory Agent disagreed. Eventually, the Supervisory Agent suspended the hiring process because, the BLM Subordinate Supervisory Agent believed, the Supervisory Agent wanted his friend hired. The BLM Subordinate Supervisory Agent provided a series of emails, dated April 13, 2015, in which the Supervisory Agent said he was going to suspend the hiring process until he could conduct a review. BLM's Subordinate Supervisory Agent said the Supervisory Agent suspended the process because he wanted to hire his friend.

During our second interview with the BLM OLES Budget Analyst, she denied she told the Supervisory Agent his friend's rank in the resume scoring. She told us during her final interview, however, that she met with the Supervisory Agent after returning from the Las Vegas assignment, and he looked at the rankings list without any names attached. The Supervisory Agent marked and signed the list, establishing the interview cut-off. He then told the BLM OLES Budget Analyst to let him know before proceeding with the interviews if the cut-off was not low enough. The BLM OLES Budget Analyst said she understood that he wanted to know if his friend did not make the cut-off because the Supervisory Agent had previously told her that he wanted his friend to be interviewed.

The Supervisory Agent acknowledged his role as the approving official for the hiring process. He said he stopped the process so that he could evaluate the rationale for selecting interview candidates. He expressed concern because only 12 applicants had been selected out of a pool of 130, using only their scored resumes as justification.

The Supervisory Agent further stated that he increased the number of candidates because the 32nd candidate marked the first 5-percent difference in scores and was the first natural break in the

11

AR11300

list. He denied knowing where his friend ranked and that increasing the number of candidates meant his friend received an interview.

*Interviews of Applicants*

The documents that the BLM OLES Official provided included one titled "First Round Interview Schedule – Monday, April 20." It showed that 28 applicants had been scheduled for interviews at 20-minute intervals. The document also included each applicant's scores in response to four questions asked during interviews with the BLM Special Agent and the Special Agent Panel Member for Interviews. An interview rating summary showed that the Supervisory Agent's friend ranked fourth.

The BLM Subordinate Supervisory Agent said that the Supervisory Agent had wanted short applicant interviews with a definitive number of questions asked of all the candidates so that they could demonstrate their verbal skills.

The BLM Special Agent and the Special Agent Panel Member for Interviews conducted the interviews by telephone. Both indicated that the Supervisory Agent's friend appeared to know the questions in advance. When interviewed, the BLM Special Agent said that he, the Supervisory Agent, and the Special Agent Panel Member for Interviews had developed the questions, but that he no longer had them. The Special Agent Panel Member for Interviews said the same.

The Special Agent Panel Member for Interviews further stated that the Supervisory Agent's friend interviewed well and correctly answered the "zinger" question, which asked what percentage of the state was public land. She sensed that the Supervisory Agent's friend had been given the questions ahead of time, based on the way he responded. She also said that everyone knew the Supervisory Agent and the applicant he had identified for the position previously had worked together.

The Supervisory Agent said that 10 questions had always been asked during previous interviews. He did not know why only 4 questions were asked or if they were sufficient to consider hiring an applicant. He denied that he provided the questions to his friend for his interview. When interviewed, the Supervisory Agent's friend said he had not received interview questions beforehand.

*Reference Checks for the Supervisory Agent's Friend*

The BLM Subordinate Supervisory Agent said that he had contacted two individuals not listed as references on the resume of the Supervisory Agent's friend, both of whom had worked with the friend on a Joint Terrorism Task Force (JTTF) assignment. After speaking with them, the BLM Subordinate Supervisory Agent reported to the Supervisory Agent that he had received unfavorable feedback. The Supervisory Agent then contacted a FAM supervisor, who gave his friend a favorable recommendation.

12

An intelligence analyst who had worked with the Supervisory Agent's friend at JTTF told the BLM Subordinate Supervisory Agent that the Supervisory Agent's friend did not respond to requests for assistance or carry through with assigned tasks. A Federal Bureau of Investigation special agent also assigned to JTTF did not recall being contacted by the BLM Subordinate Supervisory Agent, but had talked with the Supervisory Agent's friend about the Supervisory Agent, whom she had known at JTTF. She also had seen both of them together. She said that they appeared to be good friends.

A FAMS Special Agent reported that the Supervisory Agent had contacted him during his friend's reference check. He gave the Supervisory Agent's friend a favorable recommendation. He also said that the Supervisory Agent's friend was a good employee with great character. He said being a good employee had been required for the Supervisory Agent's friend to be considered for the JTTF assignment.

When interviewed, the Supervisory Agent's friend said that he had known the Supervisory Agent since April or May 2002 and that they had worked together at FAMS. At that time, he and the Supervisory Agent socialized periodically after business hours and on weekends with a group of friends. This continued until the Supervisory Agent transferred to JTTF. He said that the Supervisory Agent eventually transferred to BLM OLES in 2005 or 2006 and that they had no further contact until the Supervisory Agent's friend transferred to JTTF in 2012.

While with JTTF, the Supervisory Agent's friend reached out to the Supervisory Agent to discuss schools and homes in the area. He later pursued the BLM special agent position as his JTTF assignment neared an end and as his wife chose to remain in the area with their son. The Supervisory Agent contacted him 3 ½ weeks after his BLM interview to inform him that he had been selected for the position.

In a May 5, 2015, email, the BLM Subordinate Supervisory Agent notified the BLM OLES Official that he and the Supervisory Agent had selected the Supervisory Agent's friend for the position. The email reflected that the BLM OLES Official subsequently notified OLES Director Lauro of the selection.

The Supervisory Agent said that the BLM Subordinate Supervisory Agent never told him that his friend should not be hired or that he had concerns about his friend. The BLM Subordinate Supervisory Agent also never told him why his friend was not the best person for the job. He said the BLM Subordinate Supervisory Agent also had every opportunity to tell the BLM OLES Official if he thought hiring his friend was inappropriate.

The BLM Subordinate Supervisory Agent said that although he disagreed with the Supervisory Agent over hiring his friend, he ultimately selected the Supervisory Agent's friend for the position because "that's how life is and… it's his program."

13

AR11302

*The Supervisory Agent's Attempts to Influence Employee Testimony and Employee Concerns of Retaliation*

Several employees informed us that the Supervisory Agent had contacted them prior to and after their interviews with OIG to influence them and to learn interview details. These employees feared the Supervisory Agent would retaliate because of information they had provided.

A BLM State Ranger and a BLM Subordinate Supervisory Agent both stated that the Supervisory Agent contacted them before their interviews with OIG. The BLM State Ranger said that the Supervisory Agent told him that saying "I don't recall" was a valid answer when responding to OIG's questions. The BLM State Ranger said that the Supervisory Agent contacted him after his interview. The Supervisory Agent asked him, "So do I still have a job or did you get me fired?" He said the Supervisory Agent's comments made him uncomfortable and were an attempt to influence his testimony.

The BLM Subordinate Supervisory Agent said that the Supervisory Agent gave him "stuff" to say. For instance, he said that the Supervisory Agent told him to tell OIG investigators that wives of sheriff's department officers had also attended the Burning Man event and eaten at the commissary, and that they had entered the event without paying. He further said that the Supervisory Agent told him to tell OIG about ticket types that could be purchased and that the former BLM Special Agent's wife attended the event.

Following his interview, the Supervisory Agent sent the BLM Subordinate Supervisory Agent a text message concerning a news article about a local sheriff transporting his wife and son by helicopter to the Burning Man event. In his text, the Supervisory Agent wrote, "Email that [article] to [OIG]! . . . Jesus! I look like a choir boy!"

When interviewed, the Supervisory Agent acknowledged that he had conversations with the BLM State Ranger, the former BLM Special Agent, the BLM Subordinate Supervisory Agent, and another BLM State Ranger about OIG's interview, but he denied that he attempted to influence anyone's testimony.

During her final interview, the BLM OLES Contracting Officer said that when she returned from the Burning Man event, the Supervisory Agent informed her that two complaints had been filed with OIG against him. She said the Supervisory Agent blamed her for the complaints and told her that she needed to do damage control. She said he threatened to ruin her career if she did anything against him.

The BLM OLES Contracting Officer also stated that during the return trip from Burning Man, the Supervisory Agent had a copy of a complaint sent to OIG. She said that he accused another BLM State Ranger of filing the complaint, and threatened to retaliate against the BLM Supervisory Law Enforcement Ranger, as well as an additional BLM State Ranger for providing OIG with information. She also stated that the Supervisory Agent later told her, "If you're not on my ship, you're going to sink . . . . So I suggest you get on my ship." As a result, she feared the Supervisory Agent and kept her office door locked.

14

AR11303

The BLM OLES Budget Analyst said the Supervisory Agent told her that he was going to ruin the BLM Law Enforcement Ranger's career. He bragged about ruining a BLM State Ranger's reputation with BLM State Directors and other managers. She said that shortly after the Supervisory Agent changed positions, he had bragged to her that "he owned" Lauro and the BLM OLES Official and that, as a result, no action could be taken against him.

The BLM OLES Budget Analyst further stated that a few weeks after the Supervisory Agent's removal from his position in the office, he sensed that she no longer wanted to interact with him. She said he had called her into his office. The Supervisory Agent said, "You know, if you don't side with me, grenades are going to go off and you'll get hit."

## SUBJECT(S)

1. Supervisory Agent, BLM OLES
2. Salvatore Lauro, Director, BLM OLES

## DISPOSITION

We are forwarding our report of investigation to the Assistant Secretary for Land and Minerals Management for any action deemed appropriate.

15

Exhibit "_C_"

Exhibit "_C_"

JASON CHAFFETZ UTAH
CHAIRMAN

ONE HUNDRED FIFTEENTH CONGRESS

ELIJAH E. CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

## Congress of the United States
### House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

Majority  (202) 225-5074
Minority  (202) 225-5051
www.oversight.house.gov

February 14, 2017

Ms. Mary L. Kendall
Deputy Inspector General
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

Dear Ms. Kendall:

We received the unredacted report from your office titled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials" dated January 30, 2017.[1] I understand your office initiated this investigation in October of 2015 after receiving numerous complaints concerning Bureau of Land Management (BLM) employee Daniel Paul Love. The report documents numerous instances of troubling behavior exhibited by Love.[2]

One such instance involved the intentional withholding of documents responsive to a congressional inquiry.[3] Your report documents that a witness told your investigators that after receiving a congressional request for documents, the witness heard Dan Love "say to [another BLM employee] that [said BLM employee] needed to make sure that he scrubbed the emails before he sent them, you know, flagging anything that looked inappropriate so that [Dan Love] could remove them if needed."[4] In another part of the report, a witness testifies about how a BLM employee accessed and "deleted hundreds of documents" from a shared network.[5] The deleted documents were "team documents" which served as the "historical record or administrative record" for a BLM authorized event.[6] The witness stated the deleted documents were subject to the Federal Records Act, and were required, under the law not to be destroyed.[7] If substantiated, these attempts to conceal documents and destroy federal records responsive to a congressional inquiry are unlawful, as it is a federal crime to obstruct a congressional investigation or falsify, conceal or cover up a material fact in one.[8]

---

[1] U.S. Department of Interior Office of Inspector General, OI-PI-15-0768-I, Ethical Violations and Misconduct by Bureau of Land Management Officials (2017).
[2] *Id.* at attachments 18 and 48.
[3] *Id.* at attachment 18.
[4] *Id.* at attachment 48.
[5] *Id.* at attachment 18.
[6] *Id.*
[7] *Id.*
[8] 18 U.S.C. § 1505 states, in relevant part:

AR11306

Ms. Mary L. Kendall
February 14, 2017
Page 2

The timing of the deletion of federal records raises questions.  In your report, a witness notes a BLM employee "deleted hundreds of documents" on February 3, 2016, only to receive a congressional request for those same documents the very next day.[9]  The witness states that "it just seemed odd to [her] that on February 3rd a lot of documents were removed or deleted from the Google drive, and then the next day [BLM is] hit with th[e] congressional" inquiry.[10]  It also raises questions that former BLM Director Neil Kornze was provided, as a courtesy, advance notice of the congressional document request prior to February 3rd.  We must find out which BLM employees were aware of an impending congressional inquiry when they set about deleting potentially responsive federal records.

Your report documents that Love allegedly attempted to influence the outcome of your investigation by coaching a witness in advance of an interview with your investigators.[11]  In your investigative report, you state a specific occasion when "Dan Love called [a BLM employee] and…essentially gave [said BLM employee] talking points for any questions that may come up during his interview" with your office.[12]  The report states Love provided that same BLM employee with "rationalizations," leading the employee to believe Love was essentially telling them what to say in the interview.[13]  This allegation is problematic as it occurred after you had already initiated your investigation into Love's behavior.

As a federal law enforcement officer, Love's actions have the potential to not only taint your investigation, but to seriously undermine the trust in BLM's law enforcement office and

---

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—

Shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

Similarly, 18 U.S.C. § 1001 states, in relevant part:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
(2) makes any materially false, fictitious, or fraudulent statement or representation; or
(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title [or] imprisoned not more than 5 years . . . .

[9] Id. at attachment 18.
[10] Id.
[11] Id. at attachment 18.
[12] Id.
[13] Id.

Ms. Mary L. Kendall
February 14, 2017
Page 3

thwart congressional oversight of the Bureau. As such, I request that you investigate the specific allegations raised in your interviews of destruction of federal records, witness tampering, and obstruction of a congressional investigation.

The Committee on Oversight and Government Reform is the principal investigative committee in the U.S. House of Representatives. Pursuant to House Rule X, the Committee has authority to investigate "any matter" at "any time."

Please have your staff contact Chris Esparza of Chairman Chaffetz' staff at (202) 225-5074 with any questions about this request. Thank you for your attention to this matter.

Sincerely,

Jason Chaffetz
Chairman

Blake Farenthold
Chairman
Subcommittee on the Interior,
Energy, and Environment


cc:     The Honorable Elijah E. Cummings, Ranking Minority Member

        The Honorable Stacey E. Plaskett, Ranking Minority Member
        Subcommittee on the Interior, Energy, and Environment

AR11308

Exhibit " $\underline{D}$ "

Exhibit " $\underline{D}$ "

AR11309



# Investigative Report of Misconduct by a Senior BLM Law Enforcement Manager

Date Posted to Web: August 24, 2017

This is a version of the report prepared for public release.

## SYNOPSIS

We initiated an investigation in November 2016 into allegations concerning a senior law enforcement manager with the Office of Law Enforcement and Security (OLES), Bureau of Land Management (BLM). An OLES official forwarded allegations to us that the senior manager had mishandled evidence from a criminal case by having a subordinate improperly remove several moqui marbles from the OLES evidence room and give them to the senior manager. The senior manager also allegedly gave marbles as gifts to several people. In addition, the OLES official alleged that after the BLM received requests for emails concerning various matters under official inquiry, the senior manager directed his subordinate to review the senior manager's BLM emails and delete any that depicted him unfavorably.

During our investigation, we received an additional allegation that in February 2016, OLES documents related to a congressional request were intentionally deleted from a BLM shared Google drive the day before the request for the documents was received.

We substantiated all but one of the allegations. We found that the senior law enforcement manager instructed his subordinate to remove four moqui marbles from the evidence room and give them to him, which violated BLM and U.S. Department of the Interior (DOI) evidence policy. We also confirmed that the senior manager had his subordinate use the senior manager's computer, personal identity verification (PIV) card, and personal identification number (PIN) to search the senior manager's emails for messages related to the official requests, and to "scrub" any messages that could harm the senior manager or any in which he used demeaning or derogatory language. The senior manager's actions violated Federal security and records management policy as well as various regulations and guidance related to the conduct of Federal employees.

Regarding the final allegation, an OLES budget analyst told us she deleted documents from the Google drive the day before the congressional request, but we did not find that she had intended to obstruct the inquiry. We also did not find that the senior manager or anyone from BLM leadership ordered the documents deleted.

The senior manager declined to be interviewed for this investigation.

We provided this report to the Acting Assistant Secretary for Land and Minerals Management for any action deemed appropriate.

1

AR11311

## DETAILS OF INVESTIGATION

On November 18, 2016, we initiated this investigation after receiving allegations from an OLES official about a senior OLES law enforcement manager. The OLES official provided a written summary of the allegations, which stated that in late March or early April 2016, the senior manager directed a subordinate employee to take moqui marbles (accumulated masses of iron oxide, often spheroidal, that form in sedimentary rock), which had been seized as evidence in an OLES criminal case, out of the OLES evidence room. The senior manager allegedly had his subordinate remove the marbles so the manager could give them as a personal gift to a contractor who had done work on the OLES evidence room and Salt Lake City offices.

The OLES official also provided a record of an interview of the subordinate concerning an allegation that the senior manager had directed the subordinate to use the senior manager's PIV card and PIN to log on to the senior manager's BLM computer. After the BLM received official requests for documents as part of an employment-related matter and a congressional inquiry, the senior manager allegedly instructed his subordinate to search the senior manager's BLM email account for relevant emails. As part of this search, the senior manager allegedly told his subordinate to flag or "scrub," which the subordinate took to mean "delete," any negative emails that could harm the senior manager or any in which he used demeaning or derogatory language.

We attempted to interview the senior manager for this investigation, but a BLM official informed us that the senior manager's attorney said he was not able to participate in an interview.

### Mishandling of Moqui Marble Evidence

*Seizure of the Marbles by the OLES*

In 2012, BLM OLES special agents seized thousands of moqui marbles as evidence during an investigation into allegations that the marbles had been collected illegally from a national park. These marbles were eventually stored in the OLES evidence room, located in the BLM State Office in Salt Lake City.

After the marbles were seized, the BLM asked a University of Utah professor who has studied the moqui marbles (see Figure) at the park to inspect the seized marbles, determine whether they were unique to the park, and estimate their dollar value.

2



Figure: Assorted moqui marbles in a variety of sizes and shapes. Source: Shutterstock.

We interviewed the professor and reviewed her February 2013 report on the seized marbles as part of our investigation. The report concluded that, based on their physical characteristics (golf-ball size, shapes, patina, etc.) and abundance, the seized marbles did come from the park. The report estimated the total wholesale value of the seized marbles at between $80,000 and $260,000, with a total retail value of $160,000 to $520,000.

*The Senior Law Enforcement Manager Directed the Unauthorized Removal of Moqui Marbles From the Evidence Room*

We interviewed the senior manager's subordinate, who said that in late April 2016, he was in the OLES evidence room with an OLES budget analyst and an OLES contract specialist counting the moqui marbles, which were stored in 5-gallon buckets. (He confirmed during his interview that the marbles were kept in more than 80 buckets.) He said the senior manager told the three of them while they were doing this that they could each take a marble from the evidence room and display them on their desks. The subordinate said he did not take a marble, but he later saw marbles on the desks of the other two employees. He was certain that the marbles had come from the evidence room and stated, "They were clearly evidence."

When interviewed, both the budget analyst and the contract specialist confirmed that, based on the senior manager's offer, they each took a marble from the evidence room and displayed them in their offices. The budget analyst said she had believed it was all right to take a marble because she had seen marbles on display in the senior manager's office, and the contract specialist said she had assumed it was all right because a senior law enforcement manager said it was. They returned the marbles during our investigation.

3

AR11313

The senior manager's subordinate stated that the senior manager also told him while he was counting the marbles to remove three or four of the "best" marbles from evidence and give them to the senior manager. He said the senior manager did not tell him why he wanted the marbles; nevertheless, the subordinate selected two spheroidal marbles and two "Saturn-type" marbles (which have additional mass around their middles, resembling rings), and gave them to the senior manager. The subordinate told us he "had a bad feeling" about removing the marbles from evidence, but he did not question the instructions because the senior manager was a law enforcement official and was "scary." The subordinate said he knew at the time the marbles were evidence in an ongoing criminal prosecution.

The budget analyst confirmed that while they were counting marbles she heard the senior manager tell his subordinate to bring him "a few" or "a couple" of marbles from the evidence room. The contract specialist stated she saw the subordinate give the senior manager four or five marbles while he was in the senior manager's office.

A review of the evidence room's access log showed the subordinate accessed the evidence room for the moqui marble case, but it did not show that marbles were removed. He said there was no evidence control sheet or evidence receipt attached to the buckets of marbles where he could document the removal.

We also reviewed the BLM OLES evidence policy and the *Departmental Manual*'s chapter on evidence handling and storage. Neither policy provides for the display of evidence, in employee offices or elsewhere, and both state that law enforcement officers are responsible for safeguarding all property taken into custody as evidence.

*The Senior Law Enforcement Manager Gave Moqui Marbles as Gifts on at Least Four Occasions*

The budget analyst stated that in April 2016 she had a conversation with the senior manager and a contractor who was doing work on the OLES' new evidence room and offices at the BLM State Office. She said that during the conversation the senior manager told the contractor about the buckets of moqui marbles and said that it would take time to relocate them to the new evidence room. She said the senior manager described the marbles to the contractor after the contractor expressed an interest in them.

The budget analyst said that a week later she saw the contractor in the OLES office. She said the contractor excitedly showed her two or three marbles he was holding and said to her, "Hey, I'm not supposed to say anything, but . . . look at what [the senior manager] gave me." He told her that the senior manager had also given him a business card and said he could use it like a "get-out-of-jail-free card" if he ever got into trouble.

The budget analyst said that a couple of days later, she asked the senior manager if he had given the contractor some marbles. She said he responded, "Shh! Don't say anything. If you say it too loud, [a BLM State ranger whose office was nearby] will hear, and he'll call OIG."

4

We interviewed the contractor, who said he had chatted often with the senior manager about various matters. He said that near the end of the project, he was in the OLES office space and saw a moqui marble on the senior manager's desk, and the senior manager explained to him how the marbles formed. He said either the senior manager or the budget analyst told him that thousands of marbles had been seized during an investigation.

About 2 weeks later, the contractor said, he was working in the OLES office when the senior manager called him into his (the senior manager's) office and gave him five or six moqui marbles, a business card, a BLM law enforcement coin, and other items. He said the senior manager told him these things were in appreciation for a job well done and that he should contact the senior manager if he ever got into trouble with law enforcement because the senior manager "knew a lot of people in a lot of places." He said he was later contacted by a BLM special agent, who had him return the marbles.

We spoke to this BLM special agent, who said that sometime around October 2016, after he learned the senior manager had given marbles to the contractor and others, he called the contractor into the office and took custody of the marbles. The special agent said that while meeting with the contractor, the contractor told him he understood that if the marbles had been removed from the evidence room, this could constitute "tampering with evidence." The special agent said the contractor asked him, "Is [the senior manager] going to get in trouble for this?"

The BLM special agent also said that in the fall of 2015, the senior manager gave him a marble from a handful on his desk. The special agent said he did not ask whether the marble was evidence; he told us that he "would certainly hope" a senior law enforcement manager "would know acceptable evidence practices"

Sal Lauro, the former OLES director, told us that shortly after he briefed his then-supervisor, BLM Deputy Director Steven Ellis, about the OLES moqui marble case, he received three marbles. He was certain the senior manager gave them to him but could not recall whether he did so in person, by mail, or via a coworker. He said he had no reason to believe that the senior manager would have removed these marbles from evidence, and he assumed they had been obtained from a university for educational purposes. During our investigation, we took custody of these marbles and placed them in our evidence room.

We interviewed another former OLES official, who said that he saw three marbles on Lauro's desk one day and asked what they were. The official said he later said to the senior manager, "Oh yeah, great. So you give the boss [Lauro] gifts, but you don't give any to me." According to the official, a few months later the senior manager gave him three marbles. We took custody of these marbles and placed them in our evidence room as well.

*Other BLM Law Enforcement Officials and Employees Also Had Moqui Marbles*

During our investigation, we learned of other BLM OLES employees and individuals who reportedly had moqui marbles that may have originally been seized as evidence during the OLES investigation. We contacted and interviewed the following individuals:

5

AR11315

- A BLM special agent said she found a marble in a cubicle she moved into in 2014. She said that another special agent had previously occupied the cubicle. She recalled asking the senior manager and others about the marble, and being told that she was allowed to have it and that the marbles could be collected in small numbers for personal use. She said another BLM special agent had already taken custody of the marble.

- A BLM State ranger gave us one marble during his interview, saying that he found it in a box in his home. He said a BLM special agent had already taken custody of a second marble, which had been left on his desk. He did not know who gave him either of the two marbles, but stated that other employees in the office had marbles and the senior manager was "giving them out like candy."

- A former administrative employee said that when she worked at the OLES she found marbles in her office. She did not know whether the senior manager had put them there, but she left them behind when she left the OLES. We took custody of three marbles provided by an employee who later occupied the office.

Another BLM special agent who had been assigned to the OLES moqui marble investigation said it was improper for a BLM employee to have a marble that had been seized pursuant to a Federal warrant. He also said BLM law enforcement officers had no authority to give evidence from an ongoing investigation to other employees for their personal use or to display in their offices.

Regarding the senior manager's possession of moqui marbles, this special agent said he believed that the senior manager could only have acquired the marbles from those that had been seized as evidence. He said he had no knowledge of the senior manager ever obtaining marbles from anywhere else.

The first BLM special agent said he learned in late 2016 that marbles seized during that investigation might have been taken from the OLES evidence room. He confirmed that he collected one marble each from four employees, plus the five marbles from the contractor, and returned them—along with the one the senior manager had given him—to the evidence room.

**The Senior Law Enforcement Manager Violated Federal Information Security Policy and DOI Rules of Behavior While Providing Documentation in Response to Official Requests**

*Emails Pertaining to an Employment-Related Matter*

A BLM State official provided information about two document requests the BLM received in 2015. Per these requests, the senior manager and other OLES personnel were ordered to provide documents, including emails sent during a specified period, concerning an employment-related matter.

During his interviews, the senior manager's subordinate provided details about two email searches he conducted in response to this document request. He said that in 2015, the senior manager directed him to sit at the senior manager's Dell computer, access the senior manager's BLM email account using the senior manager's PIV card, and search for emails related to the

6

employment matter. The subordinate said the senior manager was logged on to his (the senior manager's) computer at the time and showed him what to search for. He said the senior manager also said to show him any emails "that could be bad" for the senior manager so that the senior manager could review them before they were included in the response. He understood these instructions to mean any email where the senior manager wrote anything demeaning or inappropriate. The subordinate said he deleted a few emails from the search results, printed the rest and put them in a binder, and flagged some of them with sticky notes for the senior manager to review.

About a week or two later, the subordinate said, a second request for emails was received, this time with a longer date range, and the senior manager again had him sit at the senior manager's Dell computer and review his email. The subordinate said he reviewed the senior manager's emails and had his PIV card and PIN for about 4 days. He said the senior manager told him to "scrub" the emails; based on the previous email search, the subordinate understood this to mean he was to delete inappropriate emails. He said he again deleted some emails from the search results, then printed and flagged others and placed them in a binder for the senior manager to review.

The OLES contract specialist explained to us that the senior manager instructed her and the subordinate to go through the senior manager's email account and flag emails "that could get him [the senior manager] in trouble." She and the subordinate searched for and printed copies of all pertinent emails and placed them into binders to provide to the BLM official. She said the subordinate did most of the flagging and she did not recall any specific emails flagged.

The OLES budget analyst also confirmed during her interview that she heard the senior manager tell his subordinate to search the senior manager's email for anything related to the employment matter, and to print and flag emails the subordinate thought were "inappropriate."

*Emails Pertaining to a Congressional Inquiry*

On February 4, 2016, Congressman Jason Chaffetz (R-UT), Chairman of the Committee on Oversight and Government Reform, and Congresswoman Cynthia M. Lummis (R-WY), Chairwoman of the Subcommittee on the Interior, wrote to then-BLM Director Neil Kornze requesting documents and information related to various matters.

The senior manager's subordinate said that in 2016, he left the OLES. He was asked to continue working there temporarily, however, so he returned and worked for over a week. During that time, the senior manager had him again sit at the senior manager's Dell computer with the senior manager's PIV card and PIN and review the senior manager's email to identify anything pertaining to one of the matters Congress had inquired into. The subordinate said the senior manager told him he only had a week to respond to the request, but the subordinate was to use the same process as before. He understood this to mean he should conduct the email search per the senior manager's previous instructions, then review the resulting emails and delete or show the senior manager any that would be inappropriate, prior to submitting them as the senior manager's response to the inquiry.

7

The subordinate stated that when he did his review, he created folders on the senior manager's computer desktop and labeled them "keep," "sensitive," and either "delete" or "discard" (he could not remember which). He then converted the emails he found to PDFs and placed them in the folders. He also deleted multiple emails. He said the search took him about a week to complete.

The subordinate told us he felt morally wrong about deleting the emails, but he did not discuss his feelings with the senior manager. He stated that he was "not going to tell a senior law enforcement [manager] no" because he felt that doing so might jeopardize his employment. He also said the senior manager was very intimidating, manipulative, and controlling, and he did not believe he could report the matter to Lauro or other OLES officials because the senior manager was "very, very close" to them.

The OLES budget analyst and contract specialist confirmed during their interviews that the senior manager was fully aware his subordinate was deleting emails. The budget analyst said the senior manager told her that BLM Deputy Director Steve Ellis had been disgusted by "unprofessional" emails from the senior manager about one of the matters under congressional inquiry. She said the senior manager asked her, "Do you know if [my subordinate] has gone through everything? Do you know if he's gotten rid of what he should [have]?" In addition, the contract specialist confirmed that she had heard the senior manager use the word "scrub" when telling the subordinate to go through his email. She said that, to her, this meant the subordinate should not include certain emails in the senior manager's response to the request.

On May 6, 2016, Chaffetz and Lummis sent a second letter to Kornze stating they had not received an official response to the February 4 letter or any documents. They demanded that the BLM provide a response, or a subpoena would be issued.

The senior manager's subordinate said that by May 2016, he was reemployed by the OLES. He said that after the second letter from Congress arrived, the senior manager directed him to use the same process to "scrub" his email for any related to the matter under inquiry. He said he first worked at the senior manager's computer and converted the emails he found to PDFs, and later used a thumb drive to transfer the folders he created to his own computer to finish the review.

The subordinate said he placed many emails into a "discard" folder but did not show them to the senior manager. He said, however, that he did discuss the emails with the senior manager and described the ones he had placed in the folder. He uploaded the emails in the "keep" folder to a shared Google drive for final submission and did not upload the emails in the "discard" folder.

We reviewed the senior manager's emails and found many that appeared to coincide with ones that his subordinate said he either deleted or flagged for review during his searches. In particular, we showed the subordinate four emails related to one of the searches, and the subordinate said he recalled three of them; he said he had flagged two of these emails and "probably would have deleted" the third. We then compared these four emails to those that had been uploaded to the Google drive for submission to Congress; we did not find any of the four emails among the uploaded emails. In addition, we showed the subordinate approximately 40 emails related to another inquiry, and he indicated that he would have deleted 11 of those emails. The OLES

AR11318

budget analyst informed us the documents pertaining to the inquiry were no longer on the Google drive; therefore, we could not compare any with those that we showed the subordinate. As a result, we were not able to identify all emails that had been deleted or that the senior manager might have intentionally withheld from submission.

We also examined the senior manager's Dell computer and the thumb drive the subordinate used to transfer folders to his own computer. On the computer, we found no "delete" or "discard" folder containing emails added by the subordinate. Although we did locate a "discard" folder on the thumb drive, the subordinate said he was "carelessly grabbing files" and transferring them to the drive. Therefore, we were unable to rely on the contents of the thumb drive's "discard" folder for our investigation.

Finally, we reviewed the senior manager's training records, which disclosed that he completed annual Federal Information Systems Security Awareness + Privacy and Records Management (FISSA+) policy training in 2015 and 2016. The training required him to certify that he knew he should not share his PINs or his PIV card, and that Government equipment and PIV cards must not be used for illegal or inappropriate activities.

### No Evidence That the Senior Law Enforcement Manager or BLM Leadership Directed Deletion of Documents from Shared Google Drive

In a February 14, 2017 letter to our office, Chaffetz and Congressman Blake Farenthold (R-TX), Chairman of the Subcommittee on the Interior, Energy, and Environment, alleged that relevant documents had been deleted from a shared Google drive the day before Chaffetz sent his February 4, 2016 request to the BLM.

During this investigation, the OLES budget analyst contacted us, told us that she was aware of Chaffetz's February 2017 letter, and said she wanted to provide information about what had happened. She explained that on February 3, 2016, she deleted outdated documents from the Google drive, but stated she did so only to free up space. She said she deleted drafts and duplicate copies of documents from 2012 and 2013, but no originals.

The budget analyst stated that she and the other OLES employees were not notified of Chaffetz's document request until on or about February 26, 2016. She provided emails showing that a BLM employee in Washington, DC, forwarded Chaffetz's request to an OLES official on February 23, 2016, and it was not provided to the budget analyst until February 26, 2016. She stated that no one instructed her to delete the documents.

### The Senior Law Enforcement Manager Failed To Safeguard Sensitive IT Equipment

Our review of OLES property receipts showed that the senior manager had been issued two MacBook computers. We contacted him in order to secure his Government-owned computer equipment for our investigation, but he informed us that he was unable to locate either of the MacBooks. The OLES budget analyst, the contract specialist, and a BLM special agent subsequently informed us that the senior manager had stated to them on several occasions that

9

AR11319

the MacBook he used would "disappear" or be reported as broken if "things ever get bad" or if anyone "comes after" him or his job.

We learned that the BLM reviewed the matter and found in early 2017 that both of the MacBooks assigned to the senior manager had been lost due to his negligence. The BLM made multiple attempts to contact the senior manager to return the MacBooks, but he did not respond. Contact attempts sent to him via certified mail were returned unclaimed.

An OLES official informed us that the missing MacBooks had been used for law enforcement purposes and were not traceable to the BLM. Our Computer Crimes Unit confirmed that the senior manager's MacBooks never accessed the DOI or BLM networks.

## SUBJECTS

1. Senior law enforcement manager, OLES, BLM.

2. Senior law enforcement manager's subordinate, OLES, BLM.

## DISPOSITION

We presented our findings with regard to the evidence mishandling to the U.S. Attorney's Office for Utah, which declined to prosecute this case. We provided this report to the Acting Assistant Secretary for Land and Minerals Management for any action deemed appropriate.

As of the date of this report, we still have custody of a quantity of moqui marbles that BLM employees gave us during our investigation. We will return these marbles to the BLM when this investigation is closed.

10

AR11320

Exhibit " $E$ "

Exhibit " $E$ "

AR11321

# E&E NEWS

**INTERIOR**

## Agent in charge at 2014 Bundy standoff gone from BLM

Scott Streater, E&E News reporter
*Greenwire. Monday, September 18, 2017*



BLM Special Agent in Charge Dan Love speaks during a September 2015 radio interview. BLM Nevada/Flickr

A senior Bureau of Land Management law enforcement official who was found to have violated federal ethics rules at the Burning Man festival and to have mishandled criminal evidence in a separate case is no longer with the agency.

BLM confirmed to E&E News that Dan Love, who also oversaw security during the agency's failed 2014 roundup of Nevada rancher Cliven Bundy's illegally grazing cattle, is no longer a BLM employee following an Interior Department inspector general's report last month that found Love mishandled evidence in a criminal case and directed agency staff to delete incriminating emails in a separate matter.

The Associated Press first reported that Love is no longer with the agency

It's not clear whether Love quit, was fired or negotiated a settlement to leave the agency. It's also not clear when Love left BLM.

BLM spokeswoman Megan Crandall confirmed in an email that Love "is no longer an employee" at the agency but said she could say little else due to privacy law.

"I am not able to provide additional details," Crandall said. "I cannot confirm the circumstances of the change in status or the timing of that change. Only that he is no longer an employee."

She added, "It's possible that the [Interior Department] might have more to offer in the coming weeks, but I don't at this point due to privacy law."

Lisa Kleine, a Washington-based attorney who sources said is representing Love, could not be reached for comment.

But pressure has been building on BLM and Interior to take action after an inspector general's report released last month found Love removed ancient moqui marbles from evidence storage and gave them away "as gifts to several people" (*E&E News PM*, Aug. 24).

The moqui marbles — compacted sandstone balls millions of years old that are primarily found in Utah and parts of Arizona, Colorado and Nevada — had been "taken illegally" by poachers from an undisclosed park site and later seized by BLM as part of a criminal investigation into their theft, the inspector general's report says.

AR11322

The report quoted a BLM state ranger who told investigators that Love was giving the marbles "out like candy" to employees, and even to a contractor working on a new evidence room and offices.

The inspector general's report did not name Love. But House Natural Resources Chairman Rob Bishop (R-Utah) confirmed in a statement that Love was the focus of the investigation after requesting that the inspector general send his committee an unredacted copy of the report.

A BLM spokeswoman told E&E News at the time the report was released last month that Love was still employed at the agency.

Bishop issued a statement after the report was released saying, "I expect Interior to hold Dan Love accountable."

Love had become a lightning rod for criticism, clashing with sheriff's deputies and congressional leaders in Utah, earning the scorn of former House Oversight and Government Reform Chairman Jason Chaffetz (R-Utah).

In addition to the moqui marble investigation, Love was the target of an inspector general probe that earlier this year found he violated federal ethics laws by abusing his position to obtain special access to the Burning Man festival for his family and pressured subordinates to hire his friend (*E&E News PM*, Jan. 30).

Though the inspector general's report in January did not identify the supervisory agent at issue, E&E News later confirmed it was Love (*Greenwire*, Feb  2).

Among other things, the inspector general found that during the investigation, the supervisor later tried to influence his employees and learn details of their interviews with investigators.

He told one contracting officer that "if you're not on my ship you're going to sink ... so I suggest you get on my ship," the inspector general report said

And a BLM state ranger "said that the Supervisory Agent told him that saying 'I don't recall' was a valid answer," the report said. The same ranger said the supervisor called him after he spoke with the inspector general and asked, "Do I still have a job or did you get me fired?"

Love, who oversaw security during the Bundy cattle roundup that ended in the armed standoff with ranchers and militia members, stood near the gun-wielding crowd

Federal prosecutors have not used Love's testimony in their mostly unsuccessful attempts to prosecute those involved in the armed standoff, in large part, sources said, because of the inspector general's investigations.

Email: **sstroater@eenews.net**

## Like what you see?
## **We thought you might.**

Start a free trial now.

Get access to our comprehensive, daily coverage of energy and environmental politics and policy.



E&ENEWS   ENERGYWIRE   CLIMATEWIRE   E&EDAILY   GREENWIRE

AR11323

Exhibit "_F_"

Exhibit "_F_"

AR11324



For Employees



# Month Two Message

By David L. Bernhardt, Deputy Secretary                          9/22/2017

To: All Department of the Interior Employees

A little over a month ago, I wrote to all of you on my first day as Deputy Secretary. Shortly thereafter we established an electronic "ideas" box, and the comments, ideas, and suggestions came rolling in. I want to thank you for your willingness to be thoughtful and candid with your input. Some of the ideas have already served to trigger action.

Many of your comments have educated me on particular issues that I might not have fully appreciated without them. For example, I was a couple steps behind the Secretary in recognizing that it is time for the uniforms to be updated. Your comments have reinforced the very real need of doing so. In addition, I am working to find a realistic means to raise the purchase card limits. I am undeterred, but I expect that we will need to rely on help from Congress. Consequently, that will require more steps to accomplish than I initially hoped.

In my first message to you, I reiterated the basic principle that public service is a public trust and to remind everyone of the basic premise of our Federal service and to confirm my expectation that employees abide by it.

After my first month as Deputy Secretary, and after reading certain comments I am troubled that there is not a universal sense in the Department of the Interior (Department) that those few employees who have failed to uphold these standards are appropriately being held accountable. Please be assured, that I am committed to ensuring that leaders at all levels of

AR11325

the Department are, therefore, ensuring that issues are found, measured, and decisive action is
being taken. I want this message to be clear: it is the duty of managers to promptly and
effectively take the necessary steps to resolve such issues when they arise.

I also want to convey that we can only take action when we are aware of misconduct. Such
awareness often ultimately depends on an employee's willingness to come forward. Despite
the official duty articulated in the principles of ethical conduct that "[e]mployees shall disclose
waste, fraud, abuse, and corruption to appropriate authorities," many might find it difficult to
report misconduct because of a belief that nothing will be done or perhaps due to a fear of
retaliation.

Therefore, it is important for you to know that reports of misconduct are taken seriously and
that action is taken in a timely manner when appropriate. To that end, I will share the results
of two Inspector General investigations that began with a report of employee misconduct and
which resulted in accountability. In one case, the allegations concerned former Bureau of
Land Management Office of Law Enforcement Supervisory Agent Dan Love's misuse of his
position for personal gain, securing privileges for both himself and family members, and
misuse of Government equipment for personal purposes. The Department recently removed
Mr. Love from Federal service. In the other, the allegations involved reports that former
National Park Service Chief Ranger at Canaveral National Seashore, Edwin Correa, made
unwanted sexual advances and inappropriate comments towards subordinates. The
Department removed Mr. Correa as well.

I share these examples because you need to know that your leadership is listening. We will
hold people accountable when we are informed that they have failed in their duties and
obligations.

Although the law in large part prevents dissemination of the details of actions taken, I am
sharing these examples because you need to know that the Department has taken concrete
disciplinary action in cases of serious misconduct, including those involving senior officials.
This message is part of our commitment to be vigilant and tireless in its pursuit of an
environment in which employees treat each other in a manner that is consistent with the law
and in which there are consequences for failing to do so.

AR11326

Finally, as it is vitally important for the health of the Department that employees disclose misconduct they witness or experience, the Department is committed to protecting those who step forward from retaliation. Therefore, I will also make this clear: the Department must be free from any retaliation or reprisal for reports of misconduct and I expect every leader to ensure this.

Moreover, it goes without saying that we must remember to treat each other, as well as members of the public, with dignity and fairness. Supervisors should recognize the contributions of deserving employees and have the courage to address the failings of those that fall short of meeting expectations.

I look forward to continuing to work with all of you to further improve the Department and fulfill its important missions. Please keep sending me "ideas;" I will continue to review them.

Sincerely,
Deputy Secretary David Bernhardt

## Check out the latest on DOI.gov

In First Raid, New Opioid Task Force Seizes $2.5 Million worth of Meth and $22,000 in Marijuana, Heroin and Other Narcotics

BLOG POST



Strengthening and Expanding the Department of the

Exhibit "G"

Exhibit "G"

AR11328

# The Salt Lake Tribune

# Interior boss blasts fired Utah BLM law enforcement agent

*In memo to Interior employees, deputy secretary makes example of controversial ex-Utah BLM lawman Dan Love, vow to clean up land agencies and protect those who report abuse.*



(Al Hartmann | Tribune file photo) Former BLM special agent Dan Love (center).



By Brian Maffly   •   Published: September 25, 2017
Updated: September 25, 2017

A top Interior Department official has singled out the recent firing of a controversial Bureau of Land Management agent over Utah to illustrate a renewed commitment to hold accountable senior employees who misuse their official positions and to protect those who report such abuse.

Dan Love, who once led law enforcement for the BLM's Nevada and Utah state offices, was fired not long after an Aug. 24 report from Interior's Office of Inspector General (OIG) faulting him a second time for official misconduct,

AR11329

according to a memo circulated Friday by Deputy Secretary of the Interior David Bernhardt.

The memo to Interior employees also mentioned another supervisory lawman recently fired in the wake of another OIG probe. That report concluded Edwin Correa engaged in sexual harassment while serving as chief ranger at Canaveral National Seashore in Florida.

"We will hold people accountable when we are informed that they have failed in their duties and obligations," Bernhardt wrote. "Although the law in large part prevents dissemination of the details of actions taken, I am sharing these examples because you need to know that the Department has taken concrete disciplinary action in cases of serious misconduct, including those involving senior officials."

For years, Utah political leaders have been demanding Love's removal, citing what they say was the BLM's unwillingness under his leadership to coordinate with local law enforcement. But what cost Love his job turned on pilfering of evidence, wringing coveted access at the Burning Man arts festival for friends and family, pressuring underlings to conceal evidence of wrongdoing and other examples of misconduct documented in two reports released this year by Interior's OIG.

It was Love's alleged arrogance toward local law enforcement that rankled Utah leaders. Complaints against his leadership were instrumental in motivating both federal and state legislation that sought to strip federal land agencies of law enforcement authority, including a bill most recently filed by former Utah Rep. Jason Chaffetz before he left office this year.

While chairing the House Oversight Committee, the Utah Republican lambasted then-National Park Service director Jonathan Jarvis for his handling of the Correa matter and other reports of sexual harassment made by parks staff.

AR11330

"The previous administration turned a blind eye to corruption and promoted a culture of mismanagement at the Department of the Interior," said Bishop, taking aim at the leadership of former Interior Secretary Sally Jewell. "I applaud Interior for taking a strong stand and reasserting the basic principle that there are consequences for federal employees who blatantly disregard the law and steamroll elected officials and public trust."

Perhaps the most telling part of Bernhardt's memo was his pronouncement that Interior will listen to staffers who come forward with reports of wrongdoing at supervisory levels. The accusations affirmed by the OIG were brought to light by employees who did not confront Love directly or report his alleged misconduct to superiors out of fear of retribution or loss of their jobs.

Bernhardt, a former energy-industry lobbyist recently picked by President Donald Trump to serve as No. 2 at Interior, said such employees no longer have to worry.

"As it is vitally important for the health of the [Interior] Department that employees disclose misconduct they witness or experience, the Department is committed to protecting those who step forward from retaliation," Bernhardt's memo said. "Therefore, I will also make this clear: the Department must be free from any retaliation or reprisal for reports of misconduct and I expect every leader to ensure this."



bmaffly@sltrib.com

𝕐 Follow @brianmaffly

Exhibit " H "

Exhibit " H "

AR11332

**Unlimited Digital Access for Less than 22¢ a day**

The Oregonian
Limited time offer
JOIN NOW

BURNS OREGON STANDOFF

# BLM investigator alleges misconduct by feds in Bundy ranch standoff

Updated Dec 15, 2017;
Posted Dec 14, 2017

784

7.2k
shares

**By Maxine Bernstein,** mbernstein@oregonian.com
The Oregonian/OregonLive

A scathing memo from the lead investigator who assessed how federal officers handled the 2014 armed standoff with Nevada rancher Cliven Bundy accuses agents of far-reaching misconduct, recklessness and unrestrained antipathy toward the family.

The 18-page document, obtained Thursday by The Oregonian/OregonLive, is dated Nov. 27.

Prosecutors shared it last week with defense lawyers for Bundy, his two sons and co-defendant Ryan Payne as they were in the midst of their conspiracy trial, but it's not part of the public court record.

AR11333

The memo prompted Cliven Bundy's lawyer to file a motion early Monday to dismiss the case, already in disarray over concerns raised previously about the government's failure to promptly share evidence with the defense.

The judge sent the jury home for more than a week as she tries to sort out the claims and prosecutors scramble to save their case.

---

The memo comes from Larry Wooten, who had been the lead case agent and investigator for the U.S. Bureau of Land Management after the tense confrontation outside the patriarch's ranch near Bunkerville. Wooten also testified before a federal grand jury that returned indictments against the Bundys. He said he was removed from the investigation last February after he complained to the U.S. Attorney's Office in Nevada.

Then last month he sent a whistleblower email to the U.S. Department of Justice, alleging a "widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical and legal violations among senior and supervisory staff" at the Bureau of Land Management's Office of Law Enforcement and Security.

Wooten wrote that supervisory agents with the bureau repeatedly mocked the defendants in an "amateurish carnival atmosphere" that resembled something out of middle school, displayed "clear

AR11334

prejudice" against the Bundys, their supporters and Mormons, and prominently displayed degrading altered booking photos of Cliven Bundy and other defendants in a federal office and in an office presentation.

The memo described "heavy handedness" by government officers as they prepared to impound Cliven Bundy's cattle. He said some officers "bragged about roughing up Dave Bundy, grinding his face into the ground and Dave Bundy having little bits of gravel stuck in his face." Dave Bundy, one of Cliven Bundy's sons, was arrested April 6, 2014, while videotaping men he suspected were federal agents near his father's ranch.

Wooten contends that supervisory agents failed to turn over required discovery evidence to the prosecution team that could help the defense or be used to question the credibility of a witness, as required by law.

The top agents also "instigated" the monitoring of jail phone calls between defendants and their wives without consent from the U.S. Attorney's Office or the FBI, Wooten wrote, though the memo noted that Steven Myhre, Nevada's acting U.S. attorney who is leading the prosecution of the Bundys, stopped the practice.

AR11335

Myhre couldn't be reached for comment late Thursday. On Friday morning, Trisha Young, a spokeswoman for the Nevada U.S. Attorney's Office, said the office declined to comment.

Cliven Bundy, sons Ammon and Ryan Bundy and Payne are accused of conspiring to block federal agents from enforcing court orders to confiscate family cattle on public land after Cliven Bundy failed to pay grazing fees and fines for years.

They're also accused of using or carrying a firearm in a crime of violence, threatening a federal law enforcement officer, obstruction of justice and extortion. Their trial began Nov. 14 in Las Vegas.

Wooten accused Dan Love, the former special agent-in-charge of the cattle roundup for the Bureau of Land Management, of intentionally ignoring direction from the U.S. Attorney's Office and his superiors "in order to command the most intrusive, oppressive, large scale and militaristic trespass cattle impound possible." He described Love as immune from discipline, though Love eventually was fired from the bureau for misconduct in an unrelated case.

Wooten said he learned from other agency supervisors that Love had a "Kill Book" as a "trophy," in which he essentially bragged about "getting three individuals in Utah to commit suicide," following a joint

AR11336

FBI-BLM investigation into the alleged trafficking of stolen artifacts.

Wooten said his supervisor took photos in a secure command post at FBI headquarters in Las Vegas of an "Arrest Tracking Wall," where photos of Cliven Bundy and co-defendant Eric Parker were marked with an "X" over them, and emailed out the photos, although no photos were allowed to be taken in that area.

Wooten called prosecutors in the Bundy case and told Myhre and Assistant U.S. Attorney Nadia Ahmed, as well as FBI special agent Joel Willis, of his fears that his supervisors weren't sharing key witness statements with them.

On Feb. 16, Wooten said he asked Myhre if statements that Love made, such as "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" or "I need you to get the troops fired up to go get those cows and not take any crap from anyone" would be considered evidence that must be shared with the defense. He said that Myhre replied, saying something like "we do now" or "it is now."

Two days later, Wooten said his supervisor took him off the investigation and another Bureau of Land Management agent confiscated files from his office and from a safe in his office.

The material included computer hard drives, collected emails, text messages, case notes and "lessons learned," Wooten wrote.

AR11337

"These items were taken because they contained significant evidence of misconduct and items that would potentially embarrass BLM Law Enforcement Supervision," the memo said. "I am convinced that I was removed to prevent the ethical and proper further disclosure of the severe misconduct."

Wooten said his supervisor told him that Myhre "furiously demanded" that he be removed and that Myhre had mentioned something about the bureau's failure to turn over all crucial evidence to his office.

Wooten noted that he was ordered not to contact the Nevada U.S. Attorney's Office.

He said he believed Myhre "adopted an attitude of 'don't ask, don't tell'" or "preferred ignorance" when it came to potential information from the federal land management agency that would have been helpful to the Bundy defense.

He also said prosecutors relied on inaccurate talking points, particularly not disclosing at previous trials the fact there were government snipers on surveillance outside the Bundy Ranch before the April 12, 2014, showdown.

"Not only did Mr. Myhre in my opinion not want to know or seek out evidence favorable to the accused, he and my supervisor discouraged the reporting of such issues," Wooten wrote.

AR11338

Case 1:19-cv-03729-DLF   Document 35-9   Filed 07/12/21   Page 160 of 422

Wooten said he had held Myhre in the highest regard, but believes his judgment is "clouded" by personal bias and a "desire to win the case at all costs."

Wooten, now working as a bureau agent in Idaho, sent the memo to an associate deputy U.S. attorney general who serves as the U.S. Department of Justice's national criminal discovery coordinator. He obtained the lawyer's contact information during a training by the U.S. Attorney's Office in Boise, Idaho.

"I have tried to resolve these issues through my chain of command but I have failed," he wrote in the memo.

But he felt it was "his obligation" to report his findings, describing his memo as a "last resort."

He didn't return phone calls or messages Thursday night.

Cliven Bundy's lawyer Bret O. Whipple declined any comment on the memo, and would only describe the new information received as "quite a development," one he hadn't seen in his 20-plus years of legal work.

AR11339

"In my mind, I think the case should be dismissed by next Tuesday," Whipple said. "I think I can get my client home for Christmas."

U.S. District Judge Gloria M. Navarro has dismissed the jury until next Wednesday. She said she has at least seven to eight concerns about evidence or material that the government didn't share with defense lawyers in a timely manner. She indicated she would consider potential remedies if she found violations under the Brady disclosure law, ranging from striking testimony of a witness to delaying the trial or declaring a mistrial.

She gave both sides deadlines to file responses and is expected to reconvene court Wednesday with the lawyers from both sides and defendants at 8 a.m.

-- Maxine Bernstein

mbernstein@oregonian.com
503-221-8212
@maxoregonian

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**

© 2018 Oregon Live LLC. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Oregon Live LLC.

**Community Rules** apply to all content you upload or otherwise submit to this site.



Here to help life go right.    StateFarm

Exhibit "I"

Exhibit "I"

AR11341

Larry "Clint" Wooten

---

**From:** Larry C. Wooten
　　　Special Agent
　　　U.S. Department of Interior, Bureau of Land Management
　　　1387 S. Vinnell Way, Boise, ID 83709
　　　Office Phone▓▓▓▓▓▓▓▓ Gov't Cell Phone: ▓▓▓▓▓▓▓,
Email:▓▓▓▓▓▓▓▓▓▓
　　　Personal Cell Phone▓▓▓▓▓▓▓▓ Personal Email▓▓▓▓▓▓▓▓

**To:** Andrew D. Goldsmith
　　　Associate Deputy Attorney General
　　　National Criminal Discovery Coordinator
　　　Email: ▓▓▓▓▓▓▓▓▓▓▓▓

**Subject:** Disclosure and Complaint Narrative in Regard to Bureau of Land Management Law Enforcement Supervisory Misconduct and Associated Cover-ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by United States Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in Reference to the Cliven Bundy Investigation

**Reference:** DI-17-2830, MA-17-2863, LM14015035, District of Nevada Case 2:16-cr-00046-GMN-PAL (United States of America v. Cliven Bundy, et al)

**Issue:** As a U.S. Department of Interior (DOI), Bureau of Land Management (BLM), Office of Law Enforcement and Security (OLES) Special Agent (SA) and Case Agent/Lead Investigator for the Cliven Bundy/2014 Gold Butte Trespass Cattle Impound Case out of the District of Nevada in Las Vegas (Case 2:16-cr-00046-GMN-PAL-United States of America v. Cliven Bundy, et al), I routinely observed, and the investigation revealed a widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal violations among senior and supervisory staff at the BLM's Office of Law Enforcement and Security. The investigation indicated that these issues amongst law enforcement supervisors in our agency made a mockery of our position of special trust and confidence, portrayed extreme unprofessional bias, adversely affected our agency's mission and likely the trial regarding Cliven Bundy and his alleged co-conspirators and ignored the letter and intent of the law. The issues I uncovered in my opinion also likely put our agency and specific law enforcement supervisors in potential legal, civil, and administrative jeopardy.

When I discovered these issues, I promptly reported them to my supervisor (a BLM Assistant Special Agent-in-Charge, but also my subordinate co-case agent). Often, I realized that my supervisor was already aware of the issues, participated in, or instigated

2

the misconduct himself, was present when the issues were reported to both of us, or was the reporting party himself. When I reported these issues, my supervisor seemed generally unsurprised and uninterested and was dismissive, and seemed unconcerned.

I tried to respectfully and discretely urge and influence my supervision to stop the misconduct themselves, correct and/or further report the issues as appropriate and remind other employees that their use of electronic communications was likely subject to Federal Records Protections, the case Litigation Hold, the Freedom of Information Act (FOIA) and Case/Trial Discovery. I also tried to convey to my supervisor that the openly made statements and actions could also potentially could be considered bias, used in witness impeachment and considered exculpatory and subject to trial discovery.

As the Case Agent and Lead Investigator for the DOI/BLM (for approximately 2 years and 10 months), I found myself in an unusual situation. I was specifically asked to lead a comprehensive, professional, thorough, unbiased and independent investigation into the largest and most expansive and important investigation ever within the Department of Interior. Instead of having a normal investigative team and chain of command, a BLM Assistant Special Agent-in-Charge (ASAC) decided to act as a subordinate co-case agent, but also as my supervisor. Agent's senior to me acted as my helpers. I was basically the paper work, organizational and research guy. I did all the stuff that the senior and supervisory agents didn't want to do, but they called me the "Case Agent" and "Lead Investigator." They often publicly recognized and thanked me, and nominated me for many awards, but their lack of effort and dependability led to numerous case issues. During this timeframe, my supervisor (but subordinate), a BLM ASAC specifically wanted and had the responsibility of liaison and coordinator for interaction with higher agency officials, cooperating/assisting agencies and with the U.S. Attorney's Office. Although the BLM ASAC was generally uninterested in the mundane day to day work, he specifically took on assignments that were potentially questionable and damaging (such as document shredding research, discovery email search documentation and as the affiant for the Dave Bundy iPad Search Warrant) and attended coordination and staff meetings. Sometimes, I felt like he wanted to steer the investigation away from misconduct discovery by refusing to get case assistance, dismissing my concerns and participating in the misconduct himself. In February of 2017, it became clear to me that keeping quite became an unofficial condition of my future employment with the BLM, future awards, promotions, and a good future job reference.

The longer the investigation went on, the more extremely unprofessional, familiar, racy, vulgar and bias filled actions, open comments, and inappropriate electronic communications I was made aware of, or I personally witnessed. In my opinion, these issues would likely undermine the investigation, cast considerable doubt on the professionalism of our agency and be possibly used to claim investigator bias/unprofessionalism and to impeach and undermine key witness credibility. The ridiculousness of the conduct, unprofessional amateurish carnival atmosphere, openly made statements, and electronic communications tended to mitigate the defendant's culpability and cast a shadow of doubt of inexcusable bias, unprofessionalism and embarrassment on our agency. These actions and comments were in my opinion offensive in a professional federal law enforcement work environment and were a clear

3

violation of professional workplace norms, our code of conduct, policy, and possibly even law. The misconduct caused considerable disruption in our workplace, was discriminatory, harassing and showed clear prejudice against the defendants, their supporters and Mormons. Often times this misconduct centered on being sexually inappropriate, profanity, appearance/body shaming and likely violated privacy and civil rights.

Many times, these open unprofessional and disrespectful comments and name calling (often by law enforcement supervisors who are potential witnesses and investigative team supervisors) reminded me of middle school. At any given time, you could hear subjects of this investigation openly referred to as "ret*rds," "r*d-necks," "Overweight woman with the big jowls," "d*uche bags," "tractor-face," "idiots," "in-br*d," etc., etc., etc. Also, it was common to receive or have electronic communications reported to me during the course of the investigation in which senior investigators and law enforcement supervisors (some are potential witnesses and investigative team members) specifically made fun of suspects and referenced "Cliven Bundy felony...just kind of rolls off the tongue, doesn't it?," dildos, western themed g@y bars, odors of sweat, playing chess with menstru*ting women, Cliven Bundy sh1thing on cold stainless steel, personal lubricant and Ryan Bundy holding a giant pen1s (on April 12, 2014). Extremely bias and degrading fliers were also openly displayed and passed around the office, a booking photo of Cliven Bundy was (and is) inappropriately, openly, prominently and proudly displayed in the office of a potential trial witness and my supervisor and an altered and degrading suspect photos were put in an office presentation by my supervisor. Additionally, this investigation also indicated that former BLM SAC Dan Love sent photographs of his own feces and his girl-friend's vag1na to coworkers and subordinates. It was also reported by another BLM SAC that former BLM SAC Dan Love told him that there is no way he gets more pu$$y than him. Furthermore, I became aware of potentially captured comments in which our own law enforcement officers allegedly bragged about roughing up Dave Bundy, grinding his face into the ground, and Dave Bundy having little bits of gravel stuck in his face (from April 6, 2014). On two occasions, I also overheard a BLM SAC tell a BLM ASAC that another/other BLM employee(s) and potential trial witnesses didn't properly turn in the required discovery material (likely exculpatory evidence). My supervisor even instigated the unprofessional monitoring of jail calls between defendants and their wives, without prosecutor or FBI consent, for the apparent purpose of making fun of post arrest telephone calls between Idaho defendants/FBI targets (not subjects of BLM's investigation). Thankfully, AUSA Steven Myhre stopped this issue. I even had a BLM ASAC tell me that he tried to report the misconduct, but no one listened to him. I had my own supervisor tell me that former BLM SAC Dan Love is the BLM OLES "Directors boy" and they indicated they were going to hide and protect him. The BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs indicated to me the former BLM OLES Director protected former BLM SAC Love and shut the Office of Professional Responsibility out when misconduct allegations were reported about Love and that the former BLM OLES Director personally (inappropriately) investigated misconduct allegations about Love. Another former BLM ASAC indicated to me that former BLM SAC Love was a liability to our agency and the Cliven Bundy Case. I was even told of threats of physical harm that this former BLM SAC made to his subordinate employee and his family.

4

Also, more and more it was becoming apparent that the numerous statements made by potential trial witnesses and victims (even by good officers under duress), could potentially cast an unfavorable light on the BLM. (See openly available video/audio footage titled "The Bundy Trial 2017 Leaked Fed Body Cam Evidence," or a video posted on You Tube titled "Leaked Body Cams from the Bundy Ranch!" published by Gavin Seim.) Some of these statements included the following: "Jack-up Hage" (Wayne Hage Jr.), "Are you fucXXXX people stupid or what," "Fat dude, right behind the tree has a long gun," "MotherFuXXXX, you come find me and you're gonna have hell to pay," "FatAsX slid down," "Pretty much a shoot first, ask questions later," "No gun there. He's just holding his back standing like a sissy," "She must not be married," "Shoot his fucXXXX dog first," "We gotta have fucXXXX fire discipline," and "I'm recording by the way guys, so…" Additional Note: *In this timeframe, a key witness deactivated his body camera.* Further Note: *It became clear to me a serious public and professional image problem had developed within the BLM Office of Law Enforcement and Security. I felt I needed to work to correct this and mitigate the damage it no doubt had already done.*

This carnival, inappropriate and childish behavior didn't stop with the directed bias and degradation of subjects of investigations. The childish misconduct extended to citizens, cooperators from other agencies and even our own employees. BLM Law Enforcement Supervisors also openly talked about and gossiped about private employee personnel matters such as medical conditions (to include mental illness), work performance, marriage issues, religion, punishments, internal investigations and derogatory opinions of higher level BLM supervisors. Some of these open comments centered on Blow J0bs, Ma$terbation in the office closet, Addiction to P0rn, a Disgusting Butt Crack, a "Weak Sister," high self-opinions, crying and scared women, "Leather Face," "Mormons (little Mormon Girl)," "he has mental problems and that he had some sort of mental breakdown," "PTSD," etc., etc., etc.

Additionally, it should be noted that there was a "religious test" of sorts. On two occasions, I was asked "You're not a Mormon are you" and I was told "I bet you think I am going to hell, don't you." (I can explain these and other related incidents later.)

The investigation also indicated that on multiple occasions, former BLM Special Agent-in-Charge (SAC) Love specifically and purposely ignored U.S. Attorney's Office and BLM civilian management direction and intent as well as Nevada State Official recommendations in order to command the most intrusive, oppressive, large scale, and militaristic trespass cattle impound possible. Additionally, this investigation also indicated excessive use of force, civil rights and policy violations. The investigation indicated that there was little doubt there was an improper cover-up in virtually every matter that a particular BLM SAC participated in, or oversaw and that the BLM SAC was immune from discipline and the consequences of his actions. (I can further explain these issues later. These instances are widely documented.)

As the investigation went on, it became clear to me that my supervisor wasn't keeping the U.S. Attorney's Office up to date on substantive and exculpatory case findings and

5

unacceptable bias indications. Therefore, I personally informed Acting United States Attorney Steven Myhre and Assistant United States Attorney (AUSA) Nadia Ahmed, as well as Federal Bureau of Investigation (FBI) Special Agent Joel Willis by telephone of these issues. When I did, my supervisor in my opinion deceptively acted ignorant and surprised. As the case continued, it became clear to me that once again, my supervisor failed to inform the U.S. Attorney's Office Prosecution Team about exculpatory key witness statements. Note: *During this investigation, my supervisor would also deceptively indicate to the Prosecution Team that no one else was in the room when he was on speakerphone. Thereby, allowing potential trial witnesses and his friends to inappropriately hear the contents of the discussion.*

My supervisor even took photographs in the secure command post area of the Las Vegas FBI Headquarters and even after he was told that no photographs were allowed, he recklessly emailed out photographs of the "Arrest Tracking Wall" in which Eric Parker and Cliven Bundy had "X's" through their face and body (indicating prejudice and bias). Thereby, making this electronic communication subject to Federal Records Protections, the Litigation Hold, Discovery, and the FOIA.

On February 16, 2017, I personally informed then AUSA (First Assistant and Lead Prosecutor) Steven Myhre of those specific comments (which I had previously disclosed to, and discussed with my supervisor) and reminded Special Assistant United States Attorney (SAUSA) Erin Creegan about an email chain by a particular BLM SAC in reference to the Arrest of David Bundy on April 6, 2014, in which prior to Dave Bundy's arrest, the BLM SAC and others were told not to make any arrests. When I asked Mr. Myhre if the former BLM SAC's statements like "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" and "I need you to get the troops fired up to go get those cows and not take any crap from anyone" would be exculpatory or if we would have to inform the defense counsel, he said something like "we do now," or "it is now."

On February 18, 2017, I was removed from my position as the Case Agent/Lead Investigator for the Cliven Bundy/Gold Butte Nevada Case by my supervisor despite my recently documented and awarded hard work and excellent and often praised performance. Additionally, a BLM ASAC (my supervisor, but also my co-case agent) violated my privacy and conducted a search of my individually occupied secured office and secured safe within that office. During this search, the BLM ASAC without notification or permission seized the Cliven Bundy/Gold Butte Nevada Investigative "hard-copy" Case File, notes (to include specific notes on issues I uncovered during the 2014 Gold Butte Nevada Trespass Cattle Impound and "lessons learned") and several computer hard drives that contained case material, collected emails, text messages, instant messages, and other information. Following this seizure outside of my presence and without my permission, the BLM ASAC didn't provide any property receipt documentation (DI-105/Form 9260-43) or other chain of custody documentation (reasonably needed for trial) on what was seized. The BLM ASAC also directed me to turn over all my personal case related notes on my personal calendars and aggressively questioned me to determine if I had ever audio recorded him or a BLM SAC. I was also aggressively questioned about who I had told about the case related issues and other severe issues uncovered in reference to the case and Dan Love (see Congressional

6

AR11346

Subpoena by former Congressman Jason Chaffetz and the February 14, 2017, letter that Congressman Jason Chaffetz and Congressman Blake Farenthold sent the U.S. Department of Interior's Deputy Inspector General, Ms. Mary L. Kendall regarding Dan Love allegedly directing the deletion of official documents). Also after this, I believe I overheard part of a conversation in an open office space where my supervisor was speaking to a BLM SAC as they discussed getting access to my government email account. Note: *The personal notes that I was directed to turn in and the items seized from my office and safe wasn't for discovery, because I was transferring to another agency, because I was the subject of an investigation, or because my supervisor simply needed to reference a file. These items were taken because they contained significant evidence of misconduct and items that would potentially embarrass BLM Law Enforcement Supervision.* Additional Note: *The BLM ASAC also ordered me not to contact the U.S. Attorney's Office, even on my own time and with my personal phone. Later, when I repeatedly asked to speak with the BLM OLES Director, my requests went unanswered until April 26, 2017. The BLM ASAC simply told me it is clear no one wants to speak with me and that no one is going to apologize to me.* Further Note: *In this same secured individual office space and safe, I kept copies of my important personal documents such as medical records, military records, family personal papers, computer passwords, personal property serial numbers, etc., as a precaution in case for some reason my house is destroyed and personal papers are lost/destroyed. It was clear to me the BLM ASAC didn't know what he seized and when I told him about my personal papers, the BLM ASAC just told me "no one is interested in your medical records." It is unknown what unrelated case materials, notes, and personal documents were actually taken and it is impossible for me, any misconduct investigator, or any attorney to prove to a court or Congress what case information was taken. I still haven't heard back what (if any) personal items were in the seized materials and I don't know where the seized materials are being stored. It should be noted that I am missing personal medical physical results that I previously has stored in my office. Additionally, I believe if the BLM ASAC found my accidently seized medical records, instead of giving them back to me, he would shred them just like I have seen him shred other items from an agent that he didn't like. (I can elaborate on this.)*

Please Note: *This seized case related material (to include the hard drives) contains evidence that directly relates to a BLM SAC's heavy-handedness during the 2014 Gold Butte Nevada Trespass Cattle Impound, the BLM SAC ignoring U.S. Attorney's Office and higher level BLM direction, documentation of the BLM SAC's alleged gross supervisory misconduct, potential misconduct and violation of rights issues during the 2014 Gold Butte Nevada Trespass Cattle Impound, as well as potential emails that were possibly identified and captured before they could have been deleted (as identified as an issue in the Office of Inspector General Report and possibly concerning a Congressional subpoena). I believe this information would likely be considered substantive exculpatory/jencks material in reference to the Cliven Bundy Nevada Series of Trials and would be greatly discrediting and embarrassing, as well as possibly indicate liability on the BLM and the BLM SAC.*

I am convinced that I was removed to prevent the ethical and proper further disclosure of the severe misconduct, failure to correct and report, and cover-ups by BLM OLES

supervision. My supervisor told me that AUSA Steven Myhre "furiously demanded" that I be removed from the case and mentioned something about us (the BLM, specifically my supervisor) not turning over (or disclosing) discovery related material (which is true), issues I had with the BLM not following its own enabling statute (which is true, I can elaborate on that later), and a personal issue they thought I had with former BLM SAC Dan Love. Note: *Prior to taking the assignment as Bundy/Gold Butte Investigation Case Agent/Lead Investigator for the BLM/DOI, I didn't know and had never spoken to former BLM SAC Dan Love. I was new to the agency and I was also specifically directed to lead an unbiased, professional, and independent investigation, which I tried to do, despite supervisory misconduct. Time after time, I was told of former BLM SAC Love's misconduct. I was told by BLM Law Enforcement Supervisors that he had a Kill Book" as a trophy and in essence bragged about getting three individuals in Utah to commit suicide (see Operation Cerberus Action out of Blanding, Utah and the death of Dr. Redd), the "Failure Rock," Directing Subordinates to Erase Official Government Files in order to impede the efforts of rival civilian BLM employees in preparation for the "Burning Man" Special Event, unlawfully removing evidence, bragging about the number of OIG and internal investigations on him and indicating that he is untouchable, encouraging subordinates not to cooperate with internal and OIG investigations, his harassment of a female Native American subordinate employee where Mr. Love allegedly had a doll that he referred to by the employees name and called her his drunk little Indian, etc., etc., etc. (I can further explain these many issues.)*

Following this, I became convinced that my supervisor failed to properly disclose substantive and exculpatory case and witness bias related issues to the U.S. Attorney's Office. Also, after speaking with the BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs and two former BLM ASAC's, I became convinced that the previous BLM OLES Director Salvatore Lauro not only allowed former BLM SAC Dan Love complete autonomy and discretion, but also likely provided no oversight and even contributed to an atmosphere of cover-ups, harassment and retaliation for anyone that questioned or reported former BLM SAC Dan Love's misconduct.

In time, I also became convinced (based on my supervisor and Mr. Myhre's statements) that although the U.S. Attorney's Office was generally aware of former BLM SAC Dan Love's misconduct and likely civil rights and excessive force issues, the lead prosecutor (currently the Acting Nevada United States Attorney) Steven Myhre adopted an attitude of "don't ask, don't tell," in reference to BLM Law Enforcement Supervisory Misconduct that was of a substantive, exculpatory and incredible biased nature. Not only did Mr. Myhre in my opinion not want to know or seek out evidence favorable to the accused, he and my supervisor discouraged the reporting of such issues and even likely covered up the misconduct. Furthermore, when I did report the misconduct, ethical, professional, and legal issues, I also became a victim of whistleblower retaliation.

Additionally, AUSA Steven Myhre adopted a few troubling policies in reference to this case. When we became aware that Dave Bundy's seized iPad likely contained remarks from BLM Law Enforcement Officers that is potentially evidence of civil rights violations and excessive use of force, Mr. Myhre and my supervisor not only apparently failed initiate the appropriate follow-on actions, Mr. Myhre apparently failed to notify the

8

Defense Counsel and also decided not to return the iPad back to Dave Bundy, even though the iPad wasn't going to be searched pursuant to a search warrant or used as evidence in trial and Dave Bundy claimed he needed the iPad for his business. Mr. Myhre also adopted a policy of not giving a jury the option or ability to convict on lesser offenses and instead relied on a hard to prove, complicated prosecution theory in order to achieve maximum punishments (which has generally failed to this point). Also, the government relied on factually incorrect talking points and on (or about) February 15, 2017, misrepresented the case facts about government snipers during trial (it is unknown if this misrepresentation was on purpose or accidental, I can explain this in detail). Note: *The investigation indicated that there was at least one school trained Federal Sniper equipped with a scoped/magnified optic bolt action precision rifle, another Federal Officer equipped with a scoped/magnified optic large frame (308 caliber) AR style rifle, and many officers that utilized magnified optics with long range graduated reticles (out to 1,000 meters-approximately 500 meters on issued rifles depending on environmental conditions) on standard law enforcement issued AR (223 caliber/5.56mm) and that often officers were in "over watch" positions. Additionally, the investigation also indicated the possibility that the FBI and the Las Vegas Metropolitan Police Department had law enforcement snipers/designated marksmen on hand for possible deployment.*

The reporting of these severe issues and associated cover-ups are a last resort. I tried continually to respectfully and discretely influence my chain of command to do the right thing and I made every effort to make sure the Prosecution Team had the information they needed and were accurate in their talking points. I just wanted the misconduct to stop, the necessary and required actions be taken and I wanted to be sure these issues wouldn't create a fatal error in the case and further undermine our agency's mission. I also needed to be convinced that I was correct. If I was wrong, or errors were simply mistakes or simple errors in professional judgement or discretion, I didn't want to create more problems or embarrass anyone. However, my personal experience and investigation indicated that not only did my management fail to correct and report the misconduct, they made every effort to cover it up, dismiss the concerns, discourage its reporting and retaliate against the reporting party. I also tried to make sure that despite my supervisor's failings, the Prosecution Team had the most accurate information in terms of case facts, Discovery, and witness liability.

The Whistleblower Retaliation and agency wrongdoing is being investigated by the U.S. Office of Special Counsel and is also being looked at by the House Committee on Natural Resources (Subcommittee on Oversight & Investigations) and the House Oversight and Government Reform Committee (Subcommittee on the Interior, Energy, and the Environment). Additionally, a formal complaint has been filed with my agency in reference to the religious, sexually vulgar, and the other workplace harassment. Furthermore, there have been several investigations by the DOI Office of Inspector General (OIG) that at least in part contributed to the recent firing of BLM Special Agent-in-Charge Dan Love (which I wasn't a part of).

I ask that your office ensure that Acting United States Attorney Steven Myhre and the rest of the Cliven Bundy/Gold Butte Nevada Prosecution and Investigative Team is

9

AR11349

conducting the prosecution in an ethical, appropriate, and professional matter. I also specifically ask that your office provide oversight to Mr. Myhre and his team regarding the affirmative responsibility to seek out evidence favorable to the accused, not to discourage the reporting of case issues and suspected misconduct, to report/act on suspected civil rights violations and not to retaliate against an agent that does his required duty. I also ask that your office ensure that the Prosecution Team is free of bias and has ethically and correctly turned over exculpatory evidence to the Defense. I ask that as appropriate, prosecution team bias (by Mr. Myhre and possibly by AUSA Daniel Schiess) and factually incorrect talking points (by AUSA Nadia Ahmed and Mr. Myhre) be disclosed and corrected. Note: *Mr. Myhre previously referred to the defendants as a cult and Mr. Schiess said let's get these "shall we say Deplorables." I was also asked "You're not a Mormon are you." (I can explain these and similar issues in detail.)*

I don't make this complaint lightly. I do this with a heavy heart and I hope that at least in some ways I am mistaken. However, I know that is extremely unlikely. When we speak I can identify subjects, witnesses, and the location of evidence and corroborating information.

I believe this case closely mirrors the circumstances of former Alaska Senator Ted Stevens trial. As you may notice from the trials and several defense cross-examinations, very little of the impeachment and exculpatory issues were brought up by the defense. I believe this is most likely because the defense counsel was unethically not made aware of them and the severe issues were covered up. Additionally, I believe I can easily show that both my supervision and possibly Mr. Myhre entered into an unethical agreement to remove me from being the lead investigator and case agent for the BLM/DOI due to my objection to, and disclosure of outrageous misconduct, the belief that my testimony under oath would embarrass supervisory law enforcement officials in our agency and negatively affect the prosecution, my insistence that my supervisor stop his individual misconduct, correct the misconduct of other employees and report the misconduct as appropriate (for counseling, correction, discipline and the possible required internal investigations) and my belief that my agency is violating the letter and intent of the law.

In regard to prosecution team misconduct, I believe some of it may be attributable to simple mistakes and simple poor judgement. However, I believe it is unlikely (if my supervisor's statements to me are true) that Mr. Myhre wasn't himself acting unethically and inappropriately. Prior to the last few weeks of the investigation, I held Mr. Myhre in the highest of regards. He is an extremely hard worker and very intelligent. However, I feel that his judgement is likely clouded by extreme personal and religious bias and a desire to win the case at all costs. I feel he is likely willing to ignore and fail to report exculpatory material, extreme bias and act unethically and possibly deceptively to win.

All in all, it is my assessment and the investigation showed that the 2014 Gold Butte Trespass Cattle Impound was in part a punitive and ego driven expedition by a Senior BLM Law Enforcement Supervisor (former BLM Special Agent-in-Charge Dan Love) that was only in part focused on the intent of the associated Federal Court Orders and the mission of our agency (to sustain the health, diversity, and productivity of America's public lands for the multiple use and enjoyment of present and future generations). My

10

AR11350

investigation also indicated that the involved officers and protestors were themselves pawns in what was almost a great American tragedy on April 12, 2014, in which law enforcement officers (Federal, State, and Local), protestors, and the motoring public were caught in the danger area. This investigation also indicated, the primary reasons for the escalation was due to the recklessness, lack of oversight, and arrogance of a BLM Special Agent-in-Charge and the recklessness, failure to adhere to Federal Court Orders and lack of recognition of the Federal Government in matters related to land management within Nevada, by Rancher Cliven Bundy.

The investigation further indicated that the BLM SAC's peers didn't likely attempt to properly influence or counsel the BLM SAC into more appropriate courses of action and conduct or were unsuccessful in their attempts. The investigation indicated that it was likely that the BLM SAC's peers failed to report the BLM SAC's unethical/unprofessional actions, misconduct, and potential crimes up the chain of command and/or to the appropriate authorities, or that the chain of command simply ignored and dismissed these reports. The investigation further indicated when individuals did report issues with the BLM SAC, the reports were likely ignored or marginalized by higher BLM OLES officials. The investigation also indicated that former BLM OLES Director Salvatore Lauro likely gave the former BLM SAC complete autonomy and discretion without oversight or supervision. The investigation further indicated that it was unlikely that the BLM OLES Director wasn't aware of the BLM SAC's unethical/unprofessional actions, poor decisions, misconduct, and potential crimes. My investigation and personal observations in the investigation further revealed a likely unethical/unlawful "cover-up" of this BLM SAC's actions, by very senior law enforcement management within BLM OLES. This investigation indicated that on numerous occasions, senior BLM OLES management broke their own policies and overlooked ethical, professional, and conduct violations and likely provided cover and protection for the BLM SAC and any activity or operation this BLM SAC was associated with. My investigation further indicated that the BLM's civilian leadership didn't condone and/or was likely unaware of the BLM SAC's actions and the associated cover-ups, at least until it was too late.

During the investigation, I also came to believe that the case prosecution team at United States Attorney's Office out of Las Vegas in the District of Nevada wasn't being kept up to date on important investigative findings about the BLM SAC's likely alleged misconduct. I also came to believe that discovery related and possibly relevant and substantive trial, impeachment, and biased related and/or exculpatory information wasn't likely turned over to, or properly disclosed to the prosecution team by my supervisor.

I also came to believe there were such serious case findings that an outside investigation was warranted on several issues to include misconduct, ethics/code of conduct issues, use of force issues (to include civil rights violations), non-adherence to law, and the loss/destruction of, or purposeful non-recording of key evidentiary items (Unknown Items 1 & 2, Video/Audio, April 6, 2014, April 9, 2014, April 12, 2014-the most important and critical times in the operation). I believe these issues would shock the conscious of the public and greatly embarrass our agency if they were disclosed.

11

Ultimately, I believe I was removed from my position as Case Agent/Lead Investigator for the Cliven Bundy/Gold Butte, Nevada Investigation because my management and possibly the prosecution team believed I would properly disclose these embarrassing and substantive issues on the stand and under oath at trial (if I was asked), because my supervision believed I had contacted others about this misconduct (Congress, possibly the defense and press) and possibly audio recorded them, because I had uncovered, reported, and objected to suspected violations of law, ethics directives, policy, and the code of conduct, and because I was critical of the misconduct of a particular BLM SAC. This is despite having already testified in Federal Grand Jury and being on the trial witness list.

The purpose of this narrative is not to take up for or defend the actions of the subjects of this investigation. To get an idea of the relevant historical facts, conduct of the subjects of the investigation and contributing factors, you may consider familiarizing yourself with the 2014 Gold Butte Timeline (which I authored) and the uncovered facts of this investigation. The investigation revealed that many of the subjects likely knowingly and willingly ignored, obstructed, and/or attempted to unlawfully thwart the associated Federal Court Orders through their specific actions and veiled threats, and that many of the subjects also likely violated several laws. This investigation also showed that subjects of the investigation in part adopted an aggressive and bully type strategy that ultimately led to the shutdown of I-15, where many armed followers of Cliven Bundy brandished and pointed weapons at Federal Officers and Agents in the Toquop Wash near Bunkerville, Nevada, on April 12, 2014, in a dangerous, high risk, high profile national incident. This investigation further indicated that instead of Cliven Bundy properly using the court system or other avenues to properly address his grievances, he chose an illegal, uncivilized, and dangerous strategy in which a tragedy was narrowly and thankfully avoided.

Additionally, it should be noted that I was also personally subjected to Whistleblowing Discouragement, Retaliation, and Intimidation. Threatening and questionable behaviors included the following: Invasion of Privacy, Search and Seizure, Harassment, Intimidation, Bullying, Blacklisting, Religious "tests," and Rude and Condescending Language. Simply put, I believe I was expected to keep quiet as a condition of my continued employment, any future promotions, future awards, or a favorable recommendation to another employer.

During the course of the investigation, I determined that any disagreement with the BLM SAC, or any reporting of his many likely embarrassing, unethical/unprofessional actions and misconduct was thought to be career destroying. Time and time again, I came to believe that the BLM SAC's subordinates and peers were afraid to correct him or properly report his misconduct (despite a duty to act) out of fear for their own jobs and reputation.

Sometimes, I felt these issues (described in depth below) were reported to me by senior BLM OLES management and line Rangers/Agents/employees because they personally didn't like a particular BLM SAC (although, some of these same people seemed to flatter, buddy up to, openly like, and protect the BLM SAC). Sometimes, I thought BLM OLES management wanted to talk about these actions because they thought these blatant

12

AR11352

inappropriate acts by a BLM SAC and others were funny. Sometimes, I thought the reporting parties wanted the misconduct corrected and the truth to come to light, but they were afraid/unwilling to report and correct the misconduct themselves. Sometimes, I thought the reporting parties just wanted to get the issues off their chest. Sometimes, I thought supervisors wanted to report the misconduct to me, so they could later say they did report it (since I was the Case Agent/Lead Investigator). Therefore, in their mind limit their liability to correct and report the misconduct and issues. However, it was confusing that at the same time, I thought some of these reporting parties (particularly in management) sought deniability and didn't want to go "on the record." These same reporting/witnessing parties in most cases apparently refused to correct the misconduct and further report it to higher level supervision, the Office of Inspector General, and the U.S. Attorney's Office (as required/necessary) and even discouraged me from further reporting and correcting the issues. When I did try to correct and further report the issues as I believed appropriate and necessary, these same supervisors (who were reporting/witnessing parties) acted confused and unaware. Ultimately, I became an outcast and was retaliated against.

I also feel there are likely a great many other issues that even I am not aware of, that were likely disclosed or known to my supervisor, at least two other BLM SACs, the former BLM SAC's subordinates, and the former BLM OLES Director. In addition to the witnesses I identify, I would also recommend interviews with the BLM OLES Chief of the Office of Professional Responsibility/Internal Affairs and I would recommend reviews of my chain of command's emails and text messages.

Unfortunately, I also believe that the U.S. Attorney's Office Prosecution Team may have adopted an inappropriate under the table/unofficial policy of "preferred ignorance" in regard to the likely gross misconduct on the part of senior management from the BLM Office of Law Enforcement and Security and Discovery/Exculpatory related trial issues.

What indicated to me there was likely deception and a failure to act on the part of my supervision was the actions, comments, and questions of senior BLM Law Enforcement Officials, comments by the BLM's Chief of the Office of Professional Responsibility (Internal Affairs), and the pretrial Giglio/Henthorn Review.

Additionally, actions, comments, and questions by the U.S. Attorney's Office Lead Prosecutor, the strategy to deny the Dave Bundy iPad evidence from coming to light, the direction by a BLM ASAC for me not to speak with any member of the Prosecution Team, and factually deceptive/incorrect talking points (snipers, Bundy property, Bundy cattle overall health, etc.), indicated to me the Prosecution Team wanted to possibly and purposefully remain ignorant of some of the case facts and possibly use unethical legal tricks to prevent the appropriate release of substantive/exculpatory and bias/impeachment material. I believe that it is more likely than not, that there was not only a lack of due diligence by the Prosecution Team in identifying and locating exculpatory material, but there was also a desire to purposely stay ignorant (which my chain of command was happy to go along with) of some of the issues and likely an inappropriate strategy to not disclose substantive material to the Defense Counsel and initiate any necessary civil rights related or internal investigations. Furthermore, I was surprised about the lack of

AR11353

Defense Counsel questions about critical vulnerabilities in the case that should have been disclosed to the Defense in a timely manner. It is my belief that the Defense Counsel was simply ignorant of these issues.

Also, please keep in mind that I am not an "Internal Affairs," "Inspector General," or "Office of Professional Responsibility Investigator." Therefore, I couldn't, and can't independently conduct investigations into government law enforcement personnel. Additionally, I haven't been formally trained on internal investigations. Therefore, my perception, the opinions I offer, and the fact pattern that I found relevant was gained from my experience as a regular line investigator and former uniformed patrol and Field Training Officer (FTO).

Each, and every time I came across any potential criminal, ethical, or policy related issue, in the course of my duties as the DOI/BLM Case Agent/Lead Investigator for the Gold Butte/Cliven Bundy Nevada Investigation, I reported the issues up my chain of command with the intent to run an independent and unbiased, professional investigation, as I was instructed. Later, I determined my chain of command was likely already aware of many of these issues and were likely not reporting those issues to the prosecution team and higher headquarters. Later, I also was informed by the BLM Office of Professional Responsibility (OPR) Chief that any issues that had anything to do with a particular favored BLM SAC, the BLM OLES Director looked at himself instead of OPR. The OPR Chief told me he was shut out of those types of inquiries. I noted in the pre-trial Giglio/Henthorn Review that this appeared to be accurate. I also noted that these types of issues I discovered apparently weren't properly investigated as required. The bad joke I heard around the office was that the BLM SAC knew where the BLM OLES Director had buried the pr0stitutes body and that is why the BLM OLES Director protects him.

I know good people make mistakes, are sometimes immature and use bad judgement. I do it all the time. I am not addressing simple issues here. However, some simple issues are included to indicate a wide spread pattern, openly condoned prohibited/unprofessional conduct and an inappropriate familiar and carnival atmosphere. Additionally, the refusal to correct these simple issues and conduct discrepancies, harassment, and ultimately cover-ups and retaliation are indicated and explained throughout this document.

Since I wasn't a supervisor and since I was one of the most junior criminal investigators in our agency, I tried to positively influence those above me by my example and discrete one on one mentoring and urging. I simply wanted the offensive and case/agency destructive conduct to stop, to correct the record where appropriate, and inform those who we had a duty to inform of the potential wrong-doing. I attempted to positively influence my management in the most respectful and least visible way possible. In order to accomplish this, I adopted a praise in public and counsel in private approach. When that failed to work for the long term, I had to become more "matter of fact" (but always respectful), when that failed to work I resorted to documenting the instances and discussions. Later, I resorted to official government email to make a permanent record of the issues. When this failed to deter the offensive conduct or instigate appropriate action by my supervision, I had to notify others and identify witnesses. I respected and stayed

14

within my chain of command until I was expressly forbidden from contacting the U.S. Attorney's Office and my requests to speak with the BLM OLES Director went unanswered.

Simply put, as a law enforcement officer, I can't allow injustices and cover-ups to go unreported or half-truths and skewed narratives go unopposed. I have learned that when conduct of this sort isn't corrected, then by default it is condoned, and it becomes unofficial policy. When I determined there were severe issues that hurt more than just me, and I determined that my supervision apparently lacked the character to correct the situation, I knew that duty fell to me. I still felt I could accomplish this duty without embarrassing my supervision, bringing shame on our agency, or creating a fatal flaw in our investigation.

Initially, I felt I could simply mentor and properly influence my supervision to do the right thing. Time and time again, I urged my supervision to correct actions and counsel individuals who participate in conduct damaging to our agency and possibly destructive to the integrity of our case or future investigations. I attempted to urge my supervision to report certain information to senior BLM management and the U.S. Attorney's Office. Note: *Evidence of some of this offensive conduct is potentially available through Freedom of Information Act (FOIA) requests and subject to a Litigation Hold, may be considered Exculpatory Material in trial discovery process, and may be subject to federal records protections. Additionally, in many instances, I can provide evidence, identify the location of evidence and identify witnesses.*

Ultimately, in addition to discovering crimes likely committed by those targeted in the investigation, I found that likely a BLM Special Agent-in-Charge recklessly and against advisement from the U.S. Attorney's Office and apparent direction from the BLM Deputy Director set in motion a chain of events that nearly resulted in an American tragedy and mass loss of life. Additionally, I determined that reckless and unprofessional conduct within BLM Law Enforcement supervisory staff was apparently widespread, widely known and even likely "covered up." I also found that in virtually every case, BLM senior law enforcement management knew of the suspected issues with this BLM SAC, but were either too afraid of retaliation, or lacked the character to report and/or correct the suspected issues.

**Note:** *This entire document was constructed without the aid of my original notes due to their seizure by a BLM Assistant Special Agent-in-Charge outside of my presence and without my knowledge or permission. Additionally, I was aggressively questioned regarding the belief that I may have audio recorded BLM OLES management regarding their answers concerning this and other issues. All dates, times, and quotes are approximate and made to the best of my ability and memory. I'm sure there are more noteworthy items that I can't recall at the time I constructed this document.* Also Note: *The other likely report worthy items were seized from me on February 18, 2017, and are believed to be in the possession of a BLM ASAC. I recommend these items be safeguarded and reviewed.*

15

AR11355

As the case agent/lead investigator for the DOI in the Cliven Bundy investigation out of the District of Nevada, I became aware of a great number of instances when senior BLM OLES leadership were likely involved in **Gross Mismanagement** and **Abuse of Authority** (which may have posed a substantial and specific threat to employee and public safety as well as wrongfully denied the public Constitutionally protected rights). The BLM OLES leadership and others may have also violated **Merit System Principles** (Fair/Equitable Treatment, High Standards of Conduct, Failing to Manage Employee Performance by Failing to Address Poor Performance and Unprofessional Conduct, Potential Unjust Political Influence, and Whistleblower Retaliation), **Prohibited Personnel Practices** (Retaliation Against Whistleblowers, Retaliation Against Employees that Exercise Their Rights, Violation of Rules that Support the Merit System Principles, Enforcement of Policies (unwritten) that Don't Allow Whistleblowing), **Ethics Rules** (Putting Forth an Honest Effort in the Performance of Duties, the Obligation to Disclose Waste, Fraud, Abuse, and Corruption, Endeavoring to Avoid Any Action that Creates the Appearance that there is a Violation of the Law, and Standards of Ethical Conduct for Employees), **BLM OLES Code of Conduct** (Faithfully Striving to Abide by all Laws, Rules, Regulations, and Customs Governing the Performance of Duties, Potentially Violating Laws and Regulations in a Unique Position of High Pubic Trust and Integrity of Profession and Confidence of the Public, Peers, Supervisors, and Society in General, Knowingly Committing Acts in the Conduct of Official Business and/or in Personal Life that Subjects the Department of Interior to Public Censure and/or Adverse Criticism, Conducting all Investigations and Law Enforcement Functions Impartially and Thoroughly and Reporting the Results Thereof Fully, Objectively, and Accurately, and Potentially Using Greater Force than Necessary in Accomplishing the Mission of the Department), **BLM Values** (To serve with honesty, integrity, accountability, respect, courage and commitment to make a difference), **BLM Guiding Principles** (to respect, value, and support our employees. To pursue excellence in business practices, improve accountability to our stake holders and deliver better service to our customers), **BLM OLES General Order 38** (Internal Affairs Investigations), **Departmental and Agency Policies** (BLM Director Neil Kornze Policy on Equal Opportunity and the Prevention of Harassment dated January 19, 2016, DOI Secretary Sally Jewell Policy on Promoting an Ethical Culture dated June 15, 2016, DOI Secretary Sally Jewell Policy on Equal Opportunity in the Workplace dated September 14, 2016, DOI Deputy Secretary of Interior Michael Connor Policy on Workplace Conduct dated October 4, 2016, DOI Secretary Ryan Zinke Policy on Strengthening the Department's Ethical Culture dated March 2, 2017, DOI Secretary Ryan Zinke Policy on Harassment dated April 12, 2017, Memorandum dated December 12, 2013, from Acting DOI Deputy Assistant Secretary for Human Capital and Diversity Mary F. Pletcher titled "The Whistleblower Protection Enhancement Act of 2012 and Non-Disclosure Policies, Forms, Agreements, and Acknowledgements, Email Guidance by Deputy Secretary of Interior David Bernhardt titled "Month One Message," dated August 1, 2017, Email Guidance by Deputy Secretary of Interior David Bernhardt titled "Month Two Message," dated September 22, 2017, BLM Acting Deputy Director of Operations John Ruhs guidance contained in an Email titled "Thank You for Making a Difference," dated September 29, 2017, which referenced BLM Values and Guiding Principles, BLM/DOI Email and Computer Ethical Rules of Behavior, BLM "Zero Tolerance" Policy Regarding Inappropriate Use of the Internet, 18 USC 1663 Protection of Public Records

16

AR11356

and Documents, 18 USC 4 Misprison of a Felony, 18 USC 1519 Destruction, Alteration, or Falsification of Records in Federal Investigations, 18 USC 241 Conspiracy Against Rights, 18 USC 242 Deprivation of Rights Under Color of Law, 43 USC 1733 (c) (1) Federal Land Policy Management Act, 43 USC 315 (a) Taylor Grazing Act, 5 USC 2302 Whistleblower Protections-Prohibited Personnel Practices/Whistleblower Protection/Enhancement Acts, 5 CFR 2635 Gifts Between Employees, 5 USC 7211 Employees Rights to Petition Congress, and Public Law 112-199 of November 27, 2012.

Additionally, the BLM Criminal Investigator/Special Agent Position Description (LE140) in part states the following: "Comprehensive and professional knowledge of the laws, rules, and regulations which govern the protection of public lands under jurisdiction of the Bureau of land Management, and their applicability on a national basis,"(under Factor 1, Knowledge Required by the Position), "Knowledge of the various methods, procedures, and techniques applicable to complex investigations and other law enforcement activities required in the protection of natural resources on public land. The applicable methods, procedures, and techniques selected require a high degree of judgement that recognizes sensitivity to the violations, as alleged, discretion in the manner that evidence and facts are developed, and an awareness of all ramifications of a criminal investigation. The incumbent must have the ability to establish the interrelationship of facts and evidence and to present findings in reports that are clear, concise, accurate, and timely submitted for appropriate review and action." (under Factor 1, Knowledge Required by the Position), "Comprehensive knowledge of current and present court decisions, criminal rules of evidence, constitutional law, and court procedures to be followed in criminal matters, formal hearings and administrative matters in order to apply court and constitutional requirements during the conduct of an investigation and to effectively testify on behalf of the Government." (under Factor 1, Knowledge Required by the Position), "great discretion must be taken to avoid entrapment of suspects and to protect the integrity of the investigation" (under Factor 4, Complexity), and "The incumbent must be able to safely utilize firearms...." (Factor 8, Physical Demands)

Please also note the potential Constitutional issues regarding "religious tests," search and seizure, and speech/assembly protections.

Please further note the following Rules of Criminal Procedure/Evidence: Memorandum of Department Prosecutors dated January 4, 2010, from David W. Ogden to the Deputy Attorney General, Rule 16, 18 USC 3500-the Jencks Act, the Brady Rule, Giglio, U.S. Attorney's Manuel 9-5.001 Policy Regarding Disclosure of Exculpatory and Impeachment Information, 9-5.100 Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses, American Bar Association Standards 3-1.2 The Function of the Prosecutor, 3-2.8 Relations with the Courts and Bar, 3-3.1 Conflict of Interest, 3-3.11 Disclosure of Evidence by the Prosecutor, 3-5.6 Presentation of Evidence, and 3-6.2 Information Relevant to Sentencing.

---

**Case Details:** 2-year/10-month case, approximately 570 DOI Exhibits/Follow-on Turn-in Items, approximately 508 DOI Identified Individuals-19 Defendants

AR11357

Exhibit "_J_"

Exhibit "_J_"

 

Press Releases



# Zinke Signs Secretarial Orders to Increase Recreational Opportunities on Public Lands and Waters

Establishes Position of Senior National Advisor for Recreation



# 4/18/2018
Last edited 4/19/2018

Date: April 18, 2018
Contact: Interior_Press@ios.doi.gov

**WASHINGTON** – U.S. Secretary of the Interior Ryan Zinke today signed two secretarial orders continuing his efforts to prioritize the Department of Interior's recreation mission and increase access to public lands.

Secretarial Order 3366 directs certain Interior bureaus to create and deliver plans to the Department within 90 days that focus on developing or expanding recreational opportunities on public lands and waterways. This order also directs bureau heads to designate one full-time employee charged to oversee recreational opportunities.

"From my first day on the job, I have made it abundantly clear that we are going to refocus on Interior's long-standing but recently forgotten recreation mission," **said Secretary Zinke.** "We

are incredibly fortunate, as Americans, to have amazing public lands and waters to carry out our tradition of outdoor recreation but the Department must continue to create opportunities to increase access for these pursuits."

"We are delighted by the Secretary's actions to put in place what he has pledged: a system that will elevate the priority of outdoor recreation on public lands and waters managed by the Department of Interior," **said Thom Dammrich, the President of the National Marine Manufacturers Association.** "The Secretary's action recognizes the importance of outdoor recreation for our economy, particularly rural economies, and for the physical and mental health of all Americans. His actions today will help grow outdoor recreation and ensure that fun in the outdoors remains central to the American lifestyle. The Outdoor Recreation Roundtable pledges our support to the Secretary in his efforts to elevate the Department's commitment to outdoor recreation."

"Outdoor recreation is an economic engine that produces 2% of the U.S. GDP and is growing at a faster rate than the U.S. economy as a whole," **said Frank Hugelmeyer, the President of the RV Industry Association.** "With the right public policies, outdoor recreation will continue to be an American economic engine for years to come. Which is why the Outdoor Recreation Roundtable and its member associations applaud today's announcements by Secretary Zinke as a common sense plan to elevate the importance of outdoor recreation on public lands and waters throughout the Department of the Interior. This is an important step towards improving the visitor experience on public lands and waters across the country."

"The recreation industry looks forward to cooperating with the department to offer visitors to parks, refuges and other special places great experiences," **said Derrick Crandall, President of the Outdoor Recreation Roundtable.** "The result of better and modernized visitor infrastructure which will contribute to a renaissance of rural communities and a renewed commitment by all Americans to the strong conservation ethic our nation has shared with the world. We thank Secretary Zinke for putting a new emphasis on welcoming enjoyment of our public lands and waters and embracing new skills and new ideas to make visits compatible with protecting our natural and historic resources."

The bureaus are also asked to provide recommendations for improving and streamlining relevant permitting requirements for guides and outfitters and facilitated outdoor recreation

providers and to improve contracting processes for recreation-specific concessioners.

"Whether your favorite activity is kayaking on a river, riding an ATV on sand dunes, jogging on a trail or hunting on a refuge—recreating on public lands and waters is good for the mind, body and soul," **said Secretary Zinke.** "And it is also incredibly vital to local economies who rely on recreation spending to help create jobs."

Secretarial Order 3365 establishes the position of Senior National Advisor to the Secretary for Recreation to ensure deliberate and active coordination of recreational policy in the U.S. Department of the Interior. The position will be filled by Rick May, who currently serves as a Senior Advisor to the Secretary.

May, who joined Interior in November 2017, is a retired U.S. Navy SEAL Captain and decorated veteran who served in the Iraq War. Since his departure from active duty in 2010, he has worked with wounded Veterans in various types of recreational activities, helping them to reintegrate back into mainstream America. May is a graduate of Sonoma State University with a Bachelor of Arts in Biology and he also holds a Master of Arts in Human Resource Management.

"Rick is the absolute best person for this job," **said Secretary Zinke.** "The work he has done in helping disabled veterans connect with the outdoors through recreation opportunities speaks for itself. As a former SEAL, he has the leadership needed to help the Department chart its course in making recreation a priority again."

"First, I'm truly honored and grateful for the confidence that Secretary Zinke has placed in me to hold this position," **said Rick May.** "The power of recreation can not be overstated, and its ties to overall health and well-being are undeniable. It is my mission to get more Americans out to enjoy our great public lands, and I look forward to increasing access and opportunity for each and every one of them."

The Secretarial Orders come on the heels of Secretary Zinke selecting members of the newly created "Made In America" Outdoor Recreation Advisory Committee. A primary charge to the committee is to advise the Secretary on public-private partnerships across all public lands, with the goal of expanding access to and improving the infrastructure on public lands and waters.

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone: (650) 858-8500
david@levinlawfirm.com
Attorneys for Appellant,
Black Rock City LLC

## UNITED STATES DEPARTMENT OF INTERIOR
## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BLACK ROCK CITY LLC, | Case Identification No.: IBLA-2019-0109 |
| Appellant, | Special Recreation Permit LLNVW03500-18-01 |
| v. | 2930 (NV030.10) |
| BUREAU OF LAND MANAGEMENT, | **Declaration of Marnee Benson In Support of Appeal** |
| Appellee. | |

I, Marnee Benson, declare as follows:

1.      I am over 18 years old, of sound mind, and capable of making this declaration.  I am the Political Affairs Manager for appellant Black Rock City LLC ("BRC").  I have personal knowledge of the facts set forth herein, or, if so stated, am informed and believe of their truth and accuracy and, if called to testify, I could and would do so competently and under oath.

2.      I joined BRC in 2014 after five years at Black Rock Solar doing public policy, education, and renewable energy project management in Nevada.  I hold a Master's degree in

1

AR11363

Public Policy and a Master's degree in Environmental Science and Natural Resource Management, both from the University of Nevada, Reno. I obtained my Bachelor's degree in Mathematics and have extensive academic experience in statistical analysis.

3.      Since 1990, the Burning Man event ("Burning Man" or the "Event") has been held over and around Labor Day weekend on public lands managed by the Bureau of Land Management ("BLM") in what is now called the Black Rock Desert – High Rock Canyon Emigrant Trails National Conservation Area of northern Nevada ("Black Rock NCA"). The Event location, commonly called Black Rock City (or "the City"), has been situated within Pershing County for about the past 20 years.

4.      Burning Man began its tenure in the Black Rock NCA as a weekend camping trip for a small group of people. Over nearly 30 years, the event has grown in size, popularity, and complexity, and its peak population in 2018 — meaning the peak number of paid participants in attendance — was 70,248 participants. The Event's "population cap" is defined in the BLM-issued "Special Stipulations" for the 2018 Event and "does not include volunteers, government personnel, emergency service providers, vendors, and contractors." Actual population varies significantly over the course of each Event.

5.      Burning Man was produced by BRC from 1997 through 2018. In 2013, BRC became a wholly owned subsidiary of Burning Man Project ("BMP"), a California nonprofit public benefit corporation recognized as exempt under section 501(c)(3) of the Internal Revenue Code. BMP's mission is to facilitate and extend the culture of the Burning Man Event in the larger world. Beginning in 2019, BMP is producing the Burning Man Event.

2

AR11364

6.     BLM issues a special recreation permit ("SRP") for the Burning Man event every year pursuant to the requirements of the National Environmental Policy Act and Federal Land Policy and Management Act ("FLPMA").

7.     The permitting process has included several environmental assessments over the years, the most recent of which covers the period 2012 to 2016, and as with previous assessments, resulted in BLM issuing a mitigated Finding of No Significant Impact.

8.     BRC and BLM have cooperated over the years to develop and refine a Leave No Trace standard for the Burning Man event that BLM has adopted for use with other events on BLM-managed public lands.

9.     BLM typically inspects the Burning Man Event site at the end of the SRP period, and BRC has passed every inspection.

10.     Burning Man is guided by Ten Principles, which co-founder Larry Harvey authored in 2004 "as a reflection of the Burning Man community's ethos and culture as it had organically developed since the event's inception." Among these Principles are Communal Effort, Civic Responsibility, Participation, and Radical Self-Reliance, all of which are reflected in BRC's dedication to health, safety, and environmental issues at Burning Man; year-round work with cooperating agencies at the federal, state, and local levels; and the event's resulting 25-year record of compliance. Attached hereto as **Exhibit A** is a true and correct copy of Burning Man's Ten Principles.

11.     In 2018, BRC's event operations comprised more than 50 departments and teams, and BRC engaged several thousand competent, trained, licensed, and certified health and safety employees, contractors, and volunteers in the production of Burning Man. BRC has built these

3

AR11365

departments and best practices over the last 30 years, and many of these individuals have more than 20 years of experience with managing safety operations and infrastructure at Burning Man and in their respective fields of expertise. These BRC departments were engaged year-round in planning all aspects of the 2018 event and on-site operations, including providing emergency medical and fire services; surveying the streets, roads, and airport; building City infrastructure; ensuring sanitation; managing air and bus transportation services; managing participant arrival and processing; placing more than 1,000 camps; licensing 1,000 vehicles; and educating participants about staying safe, protecting the environment, and being good citizens of Black Rock City.

12.     In 2018, BRC engaged many thousand volunteers and employees to provide services to Burning Man participants, including 800 Black Rock Rangers, who provided security at the perimeter of scheduled artwork burns and patrolled the City on foot and bicycle 24 hours per day for the duration of the event; 700 licensed, professional Emergency Services personnel from a variety of medical and emergency services backgrounds, who staffed six first aid stations located throughout the event and are responsible for responding to fires, hazardous waste incidents, and medical calls for service; over 100 licensed doctors, nurses, and emergency medical personnel employed by BRC's contracted provider of advanced life support services, National Event Services, who staffed the City's fully licensed emergency care facility and ambulances; and 700 Gate, Perimeter and Exodus staff, who provided traffic management and security at the entrance gates, airport and event perimeter.

13.     BRC engaged more than 5,000 Community Services staff and volunteers to interface with Burning Man participants, including at BRC's "Playa Info" facility, where they

4

assisted participants with information and directions. BRC disseminated information to participants 24 hours per day through its radio station, BMIR, as well as via detailed City maps and a detailed Survival Guide distributed to all participants and available online.

14.     In February 2017, I traveled to BLM's District Office in Winnemucca, Nevada, to manually inspect BLM's historical Burning Man files. In the files for the 2012 Burning Man event, I discovered a memorandum dated August 19, 2012, from Salvatore Lauro, the national Director of BLM's Office of Law Enforcement and Security, to Carole Carter-Pfisterer, Assistant Director of Human Capital Management, with the subject line "Lifting of Pay Cap for Law Enforcement Deployment to Interior Lands in Nevada in Support of 2012 Burning Man event." The memorandum was approved on August 7, 2012. A true and correct copy of the memorandum is attached hereto as **Exhibit B**.

15.     Neither I nor anyone else at BRC, to the best of my knowledge, has located any other documents addressing the designation of Burning Man as an "emergency," nor has BLM provided any.

16.     I am informed and believe that BLM continued to apply the "emergency" designation requested in the 2012 Lauro memorandum to all subsequent Burning Man events through 2016. The data that BLM supplied to BRC about its labor costs each year included only the total number of hours worked and total pay received by each staff member; it did not indicate whether any overtime or premium pay was received or how much.

17.     Attached hereto as **Exhibit C** is a true and correct copy of a spreadsheet that I compiled, detailing costs and fees paid to BLM by BRC from 2011 through 2018, as well as Burning Man's population in those years. The data in this spreadsheet was obtained from BLM

5

AR11367

cost recovery documents, Burning Man revenue and expenditure records, memoranda of understanding between BLM and BRC, BLM proffer account records, Burning Man population reports, and official correspondence between BLM and BRC.

18.     The 2015 SRP planning process was impacted by various delays, including those resulting from BLM's unprecedented request for a luxury "Blue Pit Compound" for its personnel and VIP guests — a request that was met with media exposure, public outcry, and universal criticism. Attached hereto as **Exhibit D** are true and correct copies of two articles by Jenny Kane, published in the *Reno Gazette-Journal* on June 26, 2015, and titled "BLM wants $1 million VIP compound from Burning Man" and "BLM demands Burning Man provide 24-hour access to ice cream." Attached hereto as **Exhibit E** is a true and correct copy of an article by Jenny Kane, published in the *Reno Gazette-Journal* on June 29, 2015, and titled "Reid to BLM: You want flush toilets at Burning Man? Go to Gerlach," which transcribes a letter sent from Senator Harry Reid to Secretary of the Interior Sally Jewell, pointing out that such facilities "should be beyond the scope of the permitting requirements." BLM withdrew the Blue Pit request, and both District Manager Seidlitz and Special Agent Love were subsequently reassigned from working on the Burning Man SRP.

19.     On July 24, 2015, just one month before the 2015 event and days before site work was scheduled to begin, BRC received the 2015 cost recovery agreement, which estimated BLM's total costs would come to approximately $2.9 million that year. Included in the estimate were a number of contracts to which BLM had already committed, although BRC had never had the opportunity to review, discuss, or agree to the contracted services or amounts. BRC did not receive sufficient documentation of all the costs reflected in the agreement, nor did it have time

AR11368

to conduct an adequate review of the agreement, as BLM staffed advised BRC staff that the SRP could not issue until BRC had signed.  BRC again had no practical choice but to accept BLM's cost estimate, and hope that BLM would substantiate the basis for the costs reflected within it after the event.

20.     On January 27, 2016, BLM issued its final decision on cost recovery for the 2015 Burning Man SRP, which totaled approximately $2.8 million.  Including the amounts paid for the SOWs and the proffer account funding BLM's Burning Man Project Manager, BRC paid a total of more than $3.5 million for costs incurred by BLM in administering the 2015 Burning Man SRP.

21.     Following the 2015 departure of both Special Agent Love and District Manager Seidlitz from BLM's leadership team for the Burning Man SRP, BRC's planning for the event saw improvements in collaboration and cooperation with BLM.  BLM did not, however, reduce various other programs and costs that were initially escalated without justification under the prior leadership of Special Agent Love and District Manager Seidlitz, including various expenditures on labor, Joint Operations Center ("JOC") support and infrastructure, and communications and IT services and equipment.

22.     I attended meetings with BLM's planning team to discuss the terms of the 2016 and 2017 Burning Man SRPs.  In some of these meetings, BLM representatives have intimated that the agency is reluctant to change certain cost practices instituted by District Manager Seidlitz and Special Agent Love until the Board has decided BRC pending cost appeals.

AR11369

23.     Negotiations for the 2017 Burning Man SRP were generally unchanged from 2016. One notable difference was that BLM, for the first time since 2012, did not seek to have the Burning Man event designated an "emergency" event.

24.     In February 2017, I was informed by Nevada State Director John Ruhs that BLM would not be seeking an "emergency" designation for the 2017 Burning Man event. Then, on April 26, 2017, I received an email from Black Rock Field Manager Mark Hall, advising that instead of seeking an emergency designation for the event this year, BLM had requested and obtained a "mission-critical work" designation for the labor of BLM personnel at the 2017 Burning Man event. A copy of BLM's authorizing memorandum was attached to Mr. Hall's email. Attached hereto as **Exhibits F and G**, respectively, are true and correct copies of that email and memorandum.

25.     To the best of my knowledge, BRC did not receive any information from BLM regarding whether or not the "mission-critical work" designation was requested by BLM for work related to the 2018 Burning Man event. BRC's understanding is that the designation was applied to the work of all BLM personnel in connection with the 2018 Burning Man SRP.

26.     Negotiations for the 2018 Burning Man SRP were similar to 2016 and 2017. Again, BLM declined to change cost practices instituted by former District Manager Seidlitz and former Special Agent Love, intimating that BLM would not do so unless required by this Board in connection with one or more of BRC's pending cost appeals.

27.     The 2018 Burning Man event took place from Sunday, August 26, through Monday, September 3. BLM notified BRC that it had passed BLM's environmental inspection on December 12, 2018.

8

28.     Attached hereto as **Exhibit H** is a true and correct copy of BLM's 2018 Burning

Man Cost Recovery Closeout Decision, which BRC received via certified mail on April 3, 2019,

including the following attachments: (0) Cost Recovery Closeout Summary; (1) Project Labor

Log; (2) BLM Contracts; (3) Travel Expenses; (4) Vehicle Utilization Expenses; and (5)

Miscellaneous Supplies and Equipment (the "2018 Cost Recovery Decision").  BLM also sent

BRC a package of documentation related to the 2018 Cost Recovery Decision, including copies

of the contracts and receipts for equipment and supply purchases reflected therein.

29.     According to BRC's review of the Project Labor Log provided as Attachment 1 to

BLM's 2018 Cost Recovery Decision, at least 13 BLM employees appear to have had some role

in BLM's communications and information technology operations at the 2018 Burning Man

event. Following is a list of these 13 employees identified by BRC, along with the total number

of hours they logged to the Burning Man SRP and their role title:

1)     J. Young: 542 hours, "Comm Chief"
2)     Wisemore: 381 hours, "Comm Lead"
3)     Carter: 310 hours, "Communications network support"
4)     Dahl: 5 hours, "IT Specialist"
5)     Grimes: 322 hours, "Event IT Equipment Specialist"
6)     Iagulli: 328 hours, "Communications network support"
7)     King: 438.5 hours, "Event IT security"
8)     Lannen-Littlefield: 298 hours, "Dispatch Center Manager"
9)     Nichols: 92 hours, "IT Specialist"
10)    Rich: 182 hours, "Communications network support"
11)    Schwirian: 274 hours, "Communications function specialist"
12)    Suminski: 59.50 hours, "Dispatch Center Manager"
13)    Weaver: 149.75 hours, "IMARS Support function officer"

9

34.     As part of BLM's Administrative Record for BRC's appeal of BLM's 2015 cost recovery decision, BLM supplied a travel spreadsheet for the 2012 Burning Man event. Attached hereto as **Exhibit I** is a true and correct copy of that spreadsheet.

35.     BRC sets the motor vehicle driving and speed restrictions for participants and staff inside the Burning Man Closure Order area. During the event, these restrictions are 5 miles per hour within the City, and 10 miles per hour on Gate Road, the access roadway that BRC creates on the playa for event ingress and egress off County Road 34. Only authorized staff, disabled, and mutant vehicles are operated inside the City; participants are not otherwise permitted to drive, except to and from their campsites upon arrival and departure. The vast majority of participants travel around the City on foot or by bike. Vehicle accidents of any kind are very rare at Burning Man, and vehicle collisions and accidents causing injury are even less common.

36.     Attached hereto as **Exhibit J** is a true and correct copy of the Statement of Work for "2018 Burning Man BLM Network & Support" that BLM produced to BRC as part of the documentation of its contract with High Desert Internet Services.

37.     After receiving BLM's 2017 Burning Man Cost Recovery Closeout Decision and supporting documentation, I asked BRC's IT Operations Manager and Network Team Lead to review BLM's technology-related contracts, and I compiled their analyses, along with additional questions from BRC regarding BLM's labor charges and other costs, into a document that I sent to BLM on February 15, 2018, titled "BRC Questions to BLM Concerning 2017 Burning Man Event SRP Cost Recovery Closeout Documents." On March 2 and 29, 2018, I received parts one and two, respectively, of BLM's responses to these questions, attached to emails sent by Black

AR11372

Rock Field Manager Mark Hall.  Attached hereto as **Exhibit K** is a true and correct copy of the part one and part two responses I received from BLM.

38.     During a post-event debrief meeting on December 5, 2017, BLM representatives advised me and other BRC representatives that the dedicated workstation at the Joint Operations Center ("JOC"), ostensibly used for monitoring the camera at BLM's law enforcement substation, was unmanned.

39.     For more than a decade, BRC has been providing comprehensive patient care onsite at the Burning Man event.  It contracts with a specialized provider to provide advanced life support ("ALS") services, including board-certified emergency physician care and an extensive array of medical services, including X-ray, radiology, sonography, electrocardiogram services, orthopedic treatment, a comprehensive pharmacy formulary, and an onsite fixed wing air ambulance.  BRC also deploys a large number of response and transport vehicles, including ALS-capable ambulances and quick response vehicles, and provides basic medical services at six first-aid stations located throughout the City and staffed by licensed medical professionals.

40.     BRC's Outside Services ("OSS") team oversees the BRC program under which providers of fee-based services to Burning Man participants can register for authorization to provide those services on-site at the event.  These providers are subject to a variety of restrictions and must sign an agreement with BRC and show proof that they have obtained their own SRPs from BLM.

41.     Attached hereto as **Exhibit L** is a true and correct copy of an excerpt from BLM's contracting documentation with RELM Wireless Corporation, provided to BRC with BLM's final cost recovery decision for 2018. On information and belief from BRC's Radio Systems

11

Administrator, who reviewed BLM's RELM contract, these digital base stations could have been rented at a much lower cost, and renting would have been more cost-efficient in the long-term, given that this equipment will be used only for the Event and its useful lifespan is limited: if the technology needs replacing in 10 years, for example, the equipment will have had less than 10 months of use.

42.     Attached hereto as **Exhibit M** is a true and correct copy of the proposal produced to BRC as part of the documentation of its contract with Law Enforcement Temporary Placement Service, whom BLM engaged to provide dispatch services at the 2018 Event.

43.     Bruno's Country Club is a property in Gerlach, Nevada, that is owned by a third party unaffiliated with BRC and is used to house BLM personnel during Event periods. BLM has used this property for years with no power issues. A wildland fire in the vicinity of State Highway 447 had caused the town of Gerlach, including the Bruno's property, to lose power for several hours. During the planning season for the 2018 Event, BLM representatives advised me and other BRC representatives that a change to the property's wiring was essential in 2018 because BLM must ensure that its employees have uninterrupted access to air conditioning at all times.  For the same reason, BLM advised that it would now require a backup generator system for all rooms in this privately owned hotel, including BRC-provided generators standing by on-site for the duration of the BLM operational period, just in case the power ever goes out again.  BLM objected to BLM's demand that BRC fund electrical upgrades to a third-party property over which BRC has control.

44.     I am informed and believe from my review of BLM's final cost recovery decisions for the 2018 and prior Burning Man Events that (1) BLM annually engages the U.S.

AR11374

Department of Health and Human Services ("HHS") to provide medical support for BLM

personnel on-site at the Burning Man Event; and (2) in recent years, the costs associated with

HHS's provision of services have been estimated at $20,000 but HHS has not invoiced BLM for

any amount through 2017; and (3) in 2018, HHS's services were again estimated to cost $20,000

and HHS ultimately charged $2,394.88 in travel costs against its agreement with BLM, which

BLM passed on to BRC in the final cost recovery decision. Attached hereto as **Exhibit N** are

true and correct copies of the contracting documents with HHS that BLM attached to its

decision.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed this 26th day of June, 2019, at San Francisco, California.


Marnee Benson

AR11375

Exhibit " A "



# The 10 Principles of Burning Man

Burning Man co-founder Larry Harvey wrote the Ten Principles in 2004 as guidelines for the newly-formed Regional Network (http://regionals.burningman.com). They were crafted not as a dictate of how people should be and act, but as a reflection of the community's ethos and culture as it had organically developed since the event's inception.

### Radical Inclusion
Anyone may be a part of Burning Man. We welcome and respect the stranger. No prerequisites exist for participation in our community.

### Gifting
Burning Man is devoted to acts of gift giving. The value of a gift is unconditional. Gifting does not contemplate a return or an exchange for something of equal value.

### Decommodification
In order to preserve the spirit of gifting, our community seeks to create social environments that are unmediated by commercial sponsorships, transactions, or advertising. We stand ready to protect our culture from such exploitation. We resist the substitution of consumption for participatory experience.

### Radical Self-reliance
Burning Man encourages the individual to discover, exercise and rely on his or her inner resources.

AR11377



(http://blog.burningman.com/10principles)

*Join the conversation in the 10 Principles
blog series.*

## Radical Self-expression

Radical self-expression arises from the unique gifts of the individual. No one other than the individual or a collaborating group can determine its content. It is offered as a gift to others. In this spirit, the giver should respect the rights and liberties of the recipient.

## Communal Effort

Our community values creative cooperation and collaboration. We strive to produce, promote and protect social networks, public spaces, works of art, and methods of communication that support such interaction.

## Civic Responsibility

We value civil society. Community members who organize events should assume responsibility for public welfare and endeavor to communicate civic responsibilities to participants. They must also assume responsibility for conducting events in accordance with local, state and federal laws.

## Leaving No Trace

Our community respects the environment. We are committed to leaving no physical trace of our activities wherever we gather. We clean up after ourselves and endeavor, whenever possible, to leave such places in a better state than when we found them.

AR11378

## Participation

Our community is committed to a radically participatory ethic. We believe that transformative change, whether in the individual or in society, can occur only through the medium of deeply personal participation. We achieve being through doing. Everyone is invited to work. Everyone is invited to play. We make the world real through actions that open the heart.

## Immediacy

Immediate experience is, in many ways, the most important touchstone of value in our culture. We seek to overcome barriers that stand between us and a recognition of our inner selves, the reality of those around us, participation in society, and contact with a natural world exceeding human powers. No idea can substitute for this experience.

---

« PHILOSOPHICAL CENTER
(HTTPS://BURNINGMAN.ORG/CULTURE/PHILOSOPHICAL-CENTER/)
THE 10 PRINCIPLES OF BURNING MAN
(HTTPS://BURNINGMAN.ORG/CULTURE/PHILOSOPHICAL-CENTER/10-PRINCIPLES/)
FOUNDERS' VOICES (HTTPS://BURNINGMAN.ORG/CULTURE/PHILOSOPHICAL-CENTER/FOUNDERS-VOICES/)
BURNING ACADEMICS (HTTPS://BURNINGMAN.ORG/CULTURE/PHILOSOPHICAL-CENTER/ACADEMICS/)

---

I am lost in a dust storm!

Q Search

# Stuff & Things

AR11379

Exhibit " _B_ "




# U.S. Department of the Interior
# Bureau of Land Management

Office of Law Enforcement and Security
1849 C Street NW, Washington, DC 20240

August 19, 2012

Memorandum

To:        Carole Carter-Pfisterer, Assistant Director, Human Capital Management

From:      Salvatore Lauro, Director, Office of Law Enforcement and Security

Subject:   Lifting of Pay Cap for Law Enforcement Deployment to Interior Lands in Nevada in
           Support of the 2012 Burning Man Event

I request that the law enforcement deployment to Public Lands in Nevada, in support of the 2012
Burning Man Event, be designated as an emergency special event as stated in 5 CFR 550.103. If
you approve of this request that would allow for lifting the bi-weekly pay cap as authorized by 5
CFR 550.106 and the Fair Labor Standards Act (FLSA) overtime requirements under 5 CFR
551.211 (f), for law enforcement personnel participating in direct support of this event. These
employees would then be entitled to premium pay under the annual maximum earning limitations
while performing the emergency work.

The FLSA status of law enforcement employees assigned to the 2012 Burning Man Event shall be
reviewed and administered in accordance with previously cited Federal regulations. If approved,
the temporary waiver of the bi-weekly pay cap as well as the emergency determination for deciding
FLSA designations shall continue until the conclusion of the 2012 Burning Man Event,
approximately September 8, 2012.

The Office of Law Enforcement and Security will designate a point of contact to keep a record of
this situation, including the date the emergency began, an estimate of the number of employees
affected, track the hours expended for the specific mission, and the type of premium pay involved.

[✓] Approved      [ ] Disapproved

Carole Carter-Pfisterer                                   Date: 8/7/12

AR11381

Exhibit " _C_ "

| BLM FEES & COSTS: 2011-2018 | | | | | | | | |
|------|------|------|------|------|------|------|------|------|
| YEAR | LABOR | LABOR FROM | LABOR FROM | RECOVERY | RECOVERY | RATE % | COST | COST |
| 2011 | $509,206.50 | - | - | $767,730.58 | $858,788.68 | 17.10% | - | - |
| 2012 | $712,836.65 | 40% | 40% | $1,129,527.61 | $1,371,731.24 | 18.40% | 60% | 60% |
| 2013 | $1,427,997.31 | 100% | 180% | $3,007,801.00 | $2,932,079.60 | 19.80% | 114% | 241% |
| 2014 | $1,780,080.07 | 25% | 250% | $2,962,610.00 | $2,765,935.61 | 22.90% | -6% | 222% |
| 2015 | $1,620,552.05 | -9% | 218% | $2,944,827.00 | $2,793,722.27 | 22.90% | 1% | 225% |
| 2016 | $1,419,657.02 | -12% | 179% | $2,199,954.94 | $2,166,127.41 | 23.10% | -22% | 152% |
| 2017 | $1,515,598.67 | 7% | 198% | $2,503,451.59 | $2,341,705.34 | 23.40% | 8% | 173% |
| 2018 | $1,566,880.69 | 3% | 208% | $2,850,825.25 | $2,578,065.61 | 21.80% | 10% | 200% |
| YEAR | SOW / MOU | ACCOUNT | ACCOUNT | ACCOUNT NEPA | RECOVERY + | COST RECOVERY | COST | # TIMES 2011 |
| 2011 | $0.00 | $0.00 | $0.00 | $20,000.00 | $878,788.68 | - | - | - |
| 2012 | $0.00 | $0.00 | $0.00 | $38,768.58 | $1,410,499.82 | 61% | 61% | 1.61 |
| 2013 | $0.00 | $0.00 | $0.00 | $0.00 | $2,932,079.60 | 108% | 234% | 3.34 |
| 2014 | $600,000 | $35,597.75 | $33,856.00 | $0.00 | $3,435,389.36 | 17% | 291% | 3.91 |
| 2015 | $648,282 | $102,388.00 | $0.00 | $0.00 | $3,544,392.29 | 3% | 303% | 4.03 |
| 2016 | $972,133 | $76,791.00 | $71,570.25 | $0.00 | $3,286,621.18 | -7% | 274% | 3.74 |
| 2017 | $912,496 | $0.00 | $0.00 | $0.00 | $3,254,201.34 | -1% | 270% | 3.70 |
| 2018 | $919,626 | $0.00 | $0.00 | $0.00 | $3,497,691.61 | 7% | 298% | 3.98 |
| YEAR | USE FEES 3% | COMMERCIAL | COMMERCIAL | ALL BLM COSTS | GRAND TOTAL | GRAND TOTAL ALL | | |
| 2011 | $575,523 | - | - | $1,454,312.00 | - | - | | |
| 2012 | $693,792 | 21% | 21% | $2,104,291.37 | 45% | 45% | | |
| 2013 | $860,437 | 24% | 50% | $3,792,516.99 | 80% | 161% | | |
| 2014 | $906,439 | 5% | 57% | $4,341,828.33 | 14% | 199% | | |
| 2015 | $1,011,216 | 12% | 76% | $4,555,608.20 | 5% | 213% | | |
| 2016 | $1,114,522 | 10% | 94% | $4,401,143.18 | -3% | 203% | | |
| 2017 | $1,254,778 | 13% | 118% | $4,508,979.34 | 2% | 210% | | |
| 2018 | $1,275,801 | 2% | 122% | $4,773,492.61 | 6% | 228% | | |

| BURNING MAN POPULATION: 2011-2018 | | | | | | |
|------|------|------|------|------|------|------|
| YEAR | PEAK ALLOWED | PARTICIPANT | PPP OVER | PPP OVER 2011 | POPULATION/ | INCREASE OVER | INCREASE |
| 2011 | 50,000 | 53,963 | - | -% | 53,963 | | |
| 2012 | 60,900 | 56,149 | 4% | 4% | 56,149 | 4% | 4% |
| 2013 | 68,000 | 69,613 | 24% | 29% | 69,613 | 24% | 29% |
| 2014 | 68,000 | 65,922 | -5% | 22% | 75,234 | 8% | 39% |
| 2015 | 70,000 | 67,564 | 2% | 25% | 77,219 | 3% | 43% |
| 2016 | 70,000 | 67,290 | 0% | 25% | 76,156 | -1% | 41% |
| 2017 | 70,000 | 69,493 | 3% | 29% | 79,379 | 4% | 47% |
| 2018 | 70,000 | 70,248 | 1% | 30% | 78,134 | -2% | 45% |

AR11383

Exhibit " D "

Exhibit " D "

AR11384

# RGJ Exclusive: BLM wants $1 million VIP compound from Burning Man

BURNING MAN OFFICIALS PUSH BACK AGAINST BLM'S DEMANDS FOR A VIP COMPOUND ON THE PLAYA.

Jenny Kane (/staff/34917/jenny-kane), jkane@rgj.com

## 'Excessive' comforts

UNPRECEDENTED REQUEST BY BLM

SHARE THIS STORY

CHAPTERS

SHARE

AR11385

Pin
[//www.pinterest.com/pin/create/button/?
url=https%3A//www.rgj.com/story/news/2015/06/26/blm-
wants-
vip-
compound-
burning-
man/29318493/&media=https%3A%2F%2Fwww.gannett-
cdn.com%2F-
mm-
%2F42b80cd3ab159d387d3efd8fd17dc5da9360507f%2Fc%3D0-
89-
2000-
1717%26r%3Dx633%26c%3D1600x800%2Flocal%2F-
%2Fmedia%2F2015%2F06%2F29%2FRenoGroup%2FRGJ%2F635711678973328983-
rends5-
6f4vw4l7ppu4h16ge34-
original.jpg&description=Burning
Man
officials
push
back
against
BLM's
demands
for a
million

[http://www.facebook.com/share.php?
u=https%3A//www.rgj.com/story/news/2015/06/26/blm-
wants-
vip-
compound-
burning-
man/29318493/&image=https%3A%2F%2Fwww.gannett-
cdn.com%2F-
mm-/f4492219841ac7a0b944bf4ffab633328983-rends5-6f4vw4l7ppu4h16ge34.../media/2015/06/26/blm-
0-147-            wants-       wants-       million
1308%26r%3Dx63%26c%3D60x8...local/-/media/2015/06/29/RenoGroup/RGJ/635711678973328983-
rends5-    Tweet    compound-  compound-  compound
6f4vw4l7ppu4h16ge34.../twitter.com/intent/tweet?img=     on
original.jpg&title=BLM%20wants...

*Editor's note. This story has been updated since its original publication on Friday morning to reflect additional reporting from the weekend.*

The U.S. Bureau of Land Management is asking Burning Man organizers to build a separate compound with amenities such as flushing toilets, washers and dryers, and 24-hour access to ice cream for government officials staying in Black Rock City

A Burning Man spokesman estimated the compound would cost the event more than $1 million, bringing its 2015 permit fees to about $5 million. The renderings of the compound obtained by the RGJ show various accommodations set aside for VIP visitors but don't indicate who the visiting dignitaries will be.

BLM demands Burning Man provide 24-hour access to ice cream
(https://www.rgj.com/story/news/2015/06/26/blm-demands-burning-man-provide-
hour-access-ice-cream/29357065/)

Reid: You want flush toilets at Burning Man? Go to Gerlach
(https://www.rgj.com/story/news/2015/06/26/reid-want-toilets-burning-man-go-
gerlach/29357821/)

The request, unprecedented in Burning Man's history, has turned into a point of contention as organizers negotiate with the agency for their annual permit to stage the event in the Black Rock Desert. No permit has been issued for this year's event, which runs Aug. 30 to Sept. 7. Typically permits are issued in early August.

Both U.S. Sen. Harry Reid and Rep. Mark Amodei reacted strongly Friday to the BLM requests. Amodei set a meeting next week with a Nevada BLM official. Reid wrote a critical letter to Interior Secretary Sally Jewell.

"Part of Burning Man's philosophy is self-reliance, and living with the elements is part of the experience," Reid wrote. "Flush toilets and laundry facilities can be found about ten miles away in Gerlach, Nevada, if BLM's employees need such amenities."

Burning Man has refused to comply with the BLM's request, which the federal agency submitted on June 1, according to Burning Man spokesman Jim Graham. In its response, Burning Man gave the BLM until Monday to set a meeting to hash out their differences.

AR11386

4/20/2018

RGJ Exclusive: BLM wants $1 million VIP compound from Burning Man

"We want to work this out. We're getting close to the event, but we feel that there are more common-sense and cost-effective solutions," Graham said.

Burning Man declined to comment on whether its refusal to comply with BLM's requests would interfere with the permit's approval.

The BLM has said it needs the elaborate encampment to support staff at the event. The agency is raising concerns about safety after a woman was run over and killed by a vehicle last year, and says the additional staff will attend to assess security conditions.

Among the amenities included in the request are flushing toilets to be cleaned daily by Burning Man staff, a laundry with washers and dryers, on-demand hot water, air conditioning, vanity mirrors, refrigerators and couches. The event, known for its emphasis on self-reliance in harsh conditions, provides only basic amenities such as nonflushable portable toilets, for ticketed attendees.



The proposed Blue Pit compound will be an exclusive set-up reserved for BLM officials and VIP guests.
*(Photo: Documents obtained by the Reno Gazette-Journal)*

"These are not extravagant facilities," Craig Leff, a spokesman for the BLM's Washington, D.C., office said in a phone call Saturday about the accommodations at compound. "We would like to offer basic amenities for staff that will be on hand."

BLM officials contend that their staff can no longer stay in the "primitive" accommodations available in Gerlach, which is about 20 minutes from the event location.

"We're very concerned about where we put people that are part of our staff and that are part of the support and permitting," BLM Winnemucca District Manager Gene Seidlitz said on Thursday

"It's safe to say that if you were working 14 to 16 hours a day in white-out conditions on the hot playa, you don't want them to be unrested. Safety, security and health is paramount. That, I will not forgo."

Another BLM spokesman said the amenities were similar to what the U.S. military provides overseas.

"This is the same stuff they have for deployments in Afghanistan," Stephen Clutter, with the Nevada state BLM office, said Saturday



A brochure featuring a layout for Portable Restroom Trailers LLC was featured in documents obtained by the Reno Gazette-Journal.
*(Photo: Documents obtained by the Reno Gazette-Journal)*

Details of the BLM's request were included in an email exchange obtained by the RGJ between a Burning Man official and Bob Abbey, the former BLM director who is now a consultant for Burning Man organizers.

"Having been a career BLM employee, I expect agency employees to behave competently and professionally in their interactions with the public," Abbey said in his email. "I don't see these traits being applied in their dealings with (Black Rock City)."

Abbey went on to say that BLM won't "change their strategy of threatening your permit until you agree to everything they are demanding including the latest BS proposal for providing VIP facilities for law enforcement and (Department of Interior) officials."

AR11387

BLM Special Agent Dan Love of Salt Lake City was cited multiple times as the person behind many of the BLM requests, according to the emails. Love will have a personal bathroom trailer to be shared with only one other official, according to documents.

Love also led the BLM operation against Nevada rancher Cliven Bundy that ended in a standoff with Bundy's armed supporters. He did not return requests for comment this week.

The VIP encampment, called the Blue Pit, is a new request this year. It is in addition to the more bare-bones accommodations for the employees who will be staying at the BLM's headquarters, which houses up to 150 working staff during the main event.

The headquarters also are expected to have trailers with flushable toilets and sinks, though no showers or washers and dryers are requested. The headquarters will be located at the end of the 12-mile playa entry road, 12 miles north of Gerlach. The Blue Pit compound is about two miles past the playa on County Road 34 near an old gravel pit.



*(Photo: AP)*

# Congressional action

### IN YEARS PAST, VISITING GOVERNMENT
### OFFICIALS HAVE STAYED IN GERLACH

Amodei, R-Carson City, is investigating where the BLM's directions are coming from, he said Friday from Washington, D.C.

"My primary concern in this is from a government and ethics standpoint. This is the first time this has come up. This didn't happen last year, or the year before," Amodei said.

Amodei is meeting Thursday with Seidlitz at the Winnemucca office. While Amodei initially intended the meeting to be about the Nevada sage grouse, the main topic now will be Burning Man, he said.

"We're sure as hell going to want to know who's sleeping there," Amodei said of the exclusive compound. "If you love Burning Man, buy a ticket, take leave and go have a blast."

Amodei's office does not believe that the demands are coming from the BLM's Winnemucca or Nevada state offices.

Instead, Amodei said he thinks higher level officials with the U.S. Department of Interior or the BLM's Washington, D.C., office are giving directions.

Leff said he thought the request came from the bureau's Winnemucca office, but was likely a collaboration among several personnel.

## HERE ARE THE DOCUMENTS BEHIND BLM'S 'BLUE PIT' CAMP

These are the proposed designs for the BLM's encampment at this year's Burning Man in the Black Rock Desert.

AR11388

BLM acting state director John Ruhs didn't return phone calls to the RGJ on Friday for comment.

Reid, D-Nev., also reacted Friday to the RGJ report that appeared the same day online. Reid wrote to Department of Interior Secretary Sally Jewell.

"I read today the account in the Reno Gazette-Journal of the unprecedented and extravagant requests allegedly being made by the Bureau of Land Management (BLM) as conditions for permitting Burning Man for their annual event in September 2015," he wrote. "Burning Man has been held in the Black Rock Desert for 23 years and, in addition to the untold cultural benefits that the annual festival brings to Nevada, the event contributes an estimated $35 million to Nevada's economy each year."

Reid went on in the letter to question the necessity of the BLM's request.

"While I agree that the BLM should take its permitting duties seriously and work with Burning Man to both guarantee the safety of its participants and the protection of the environment, providing outlandishly unnecessary facilities for the BLM and its guests should be beyond the scope of the permitting requirements," Reid wrote.

"Part of Burning Man's philosophy is self-reliance, and living with the elements is part of the experience. Flush toilets and laundry facilities can be found about ten miles away in Gerlach, Nevada, if BLM's employees need such amenities."

AR11389

# Who are the VIPs?

### "IT DOES HAVE THE INTEREST OF THE DEPARTMENT OF INTERIOR '

While one map names some of the government officials who will be staying at the compound, it does not name the dozen or so "VIPs."

The RGJ has filed a Freedom of Information Act request for the schedules of federal officials who could be at the event.

In years past, visiting government officials have stayed in Gerlach or at BLM's barracks nearby

Most of the VIPs will be state and federal BLM officials who are concerned with the safety and security of Burning Man based on a BLM assessment of the 2014 event, Seidlitz said.

The assessment includes a critical review of the handling of Alicia Louise Cipicchio's death in 2014  Cipicchio, 29, was hit by a vehicle during the early morning hours of Aug 28.

Burning Man and BLM officials traveled to Washington, D.C , in April to discuss officials' concerns and also Burning Man's proposed growth to a 100,000-person event in the future  About 70,000 are expected to attend this year

As to who will be included in the VIP crew making its way to Burning Man this year, Seidlitz said that he likely will not know until the day of the event.

"Right now, I don't have the exact names. But there are those in upper leadership at the state level of BLM and the national level of BLM," Seidlitz said. "Based on the issues and concerns of last year, it does have the interest of the Department of Interior "

Seidlitz said that Washington officials are concerned about upholding the standards of the "American public" and they will be coordinating visits to Burning Man while making other stops in the West.

"Burning Man is on everyone's list. They come out to see the event, and to meet with everyone from BLM," Seidlitz said, adding that officials also will be watching Seidlitz to ensure that he is addressing Burning Man's safety concerns from last year



A blueprint of the proposed BLM headquarters is pictured in this image obtained by the Reno Gazette-Journal.
(Photo: Documents obtained by the Reno Gazette-Journal)

None of the VIPs will be staying the entire period that the Blue Pit compound will be set up, from Aug  27 through Sept. 11  Many will be popping in for a day, maybe a half-day, Seidlitz said

# What about the permit?

CHAPTERS

SHARE

AR11390

4/20/2018

RGJ Exclusive: BLM wants $1 million VIP compound from Burning Man

## BURNING MAN PERMIT COULD COST NEARLY $5
MILLION.

Burning Man would need more time to comply with the BLM's requests as is, Graham said. Some of the staff already are preparing to go to the playa to begin setup of the event.

BLM is "asking for services and amenities that seem to be beyond what should be required to administer the permit," Graham said.

"Every year, it's an ongoing negotiation. Every year, we reach an agreement and consensus, but these things were kind of big," Graham said.

Seidlitz said that the BLM is willing to compromise on its list of requirements. He said Burning Man officials haven't outlined their issues with the request to him yet.

Last year, Burning Man paid the BLM more than $4 million for the special recreation permit, which allows the event to have up to 70,000 people each year.

Burning Man detailed the costs paid to the BLM annually in a letter sent Wednesday. Among the dues that Burning Man paid BLM last year were: $2.75 million for cost recovery, $700,000 for land use permit fees and $600,000 for headquarters infrastructure.

The permitting cost has gone up substantially over the past four years, despite the unchanged population cap.

In 2011, Burning Man paid $858,000, in 2012, $1.4 million and in 2013, $2.9 million.



A brochure featuring a proposed shower trailer layout was featured in documents obtained by the Reno Gazette-Journal.

*(Photo: Documents obtained by the Reno Gazette-Journal)*

This year, Burning Man expects the additional requirements alone to cost between $1 million and $1.2 million, which would bring total dues paid to the BLM to nearly $5 million, Graham said. Burning Man's special recreation permit is the largest in the country.

"There's always something. Every year, we work through it," Graham said.

BLM spokesman Clutter was optimistic an agreement could be reached.

"We've been working for 22 years with (Black Rock City). It's complex; we all do want to make it successful," he said Saturday. "We're confident that we're going to be able to work through these."

CHAPTERS

SHARE

AR11391



A blueprint of the proposed BLM dining area is pictured in this image
obtained by the Reno Gazette-Journal.
*(Photo: Documents obtained by the Reno Gazette-Journal)*

# Pricey assets and services

### "THE BLM INSISTS THAT IT NEEDS THE "ASSETS
AND SERVICES."

The exclusive compound for officials and VIPs would significantly increase Burning Man's
cost this year.

Burning Man estimated in its letter that it would cost an additional $250,000 "just in
plumbing and sanitation for this facility" and another $50,000 for the washers and dryers.
For the first time, BLM is also asking Burning Man to cover the $253,000 cost of new
radios.

More routine costs include the $120,000 for portable buildings and stages and $109,300
for the rental of Bruno's Motel in Gerlach for BLM administration and law enforcement
personnel.

The BLM insists that it needs the "assets and services," according to 13 pages of
"statement of work" documents. Statement of work documents detail the work that Burning
Man is supposed to contract out.

The memorandum of understanding is a 2014 agreement between BLM and Burning Man
that outlines the BLM's general expectations through 2016.

Included in the documents are two brochures for Portable Restroom Trailers LLC, a
company that provides "luxury" service trailers. The restroom trailers include ceramic
urinals and flush toilets as well as "on-demand hot water tanks for endless hot water."

Also included are documents that insist Burning Man contact two Utah-based food
vendors, Houston's Catering and Meier's Catering. Burning Man stated that it would prefer
to use the local, Gerlach-based Empire Store as a food vendor.

"(The proposal) is very, very preliminary," Seidlitz said Thursday. "Nothing has been
signed. It's just one step in a very long dance of what we do with them per the
(memorandum of understanding)."

*Jenny Kane is RGJ Media's Burning Man reporter. She has been covering the beat since
January. Prior to joining the RGJ, she worked at the Virgin Islands Daily News and the
Daily Times in Farmington, N.M. Follow her on Twitter @jenny_kane.*

CHAPTERS

SHARE

AR11392

*In 2002. The sun rises behind a wood and neon statue, the centerpiece of the annual Burning Man festival.*
*(Photo: Debra Reid)*

*SHARE THIS STORY*

Pin
(//www.pinterest.com/pin/create/button/?url=https%3A//www.rgj.com/story/news/2015/06/26/blm-wants-vip-compound-burning-man/29318493/&media=https%3A%2F%2Fwww.gannett-cdn.com%2F-mm-%2F42b80cd3eb159d387c3efd8fd17dc5da9360507f%2Fc%3D0-89-2000-1219%26r%3Dx803%26c%3D1600x800%2Flocal%2F-%2Fmedia%2F2015%2F06%2F29%2FRenoGroup%2FRGJ%2F635711678973328983-rendc5-5f4vv4l7ppu4hl6ge34-original.jpg&description=Burning Man officials push back against BLM's demands for a million compound on

(http://www.facebook.com/share.php?u=https%3A//www.rgj.com/story/news/2015/06/26/blm-wants-vip-compound-burning-man/29318493/&image=https%3A//www.gannett-cdn.com/-mm-/ae22fb1a417977607... 89-2000-1219%26r%3Dx1683%26c%3D3200x1680/local/-/media/2015/06/29/RenoGroup/RGJ/635711678973328983-rendc5-5f4vv4l7ppu4hl6... original.jpg&title=...

Share Share Tweet
...com/shareArticle?url=https%3A//...2015/06/26/blm-wants-compound- wants-compound-
...twitter.com/intent/tweet...
...compound%20from%20B

CHAPTERS

SHARE



# BLM demands Burning Man provide 24-hour access to ice cream

Jenny Kane, jkane@rgj.com     Published 2:13 p.m. PT June 26, 2015 | Updated 7:35 a.m. PT June 29, 2015



*(Photo: unalozmen / Getty Images/iStockphoto)*

Choco Tacos, M&Ms, licorice and Chobani Greek Yogurt are just a few of the food items officials for the U.S. Bureau of Land Management are demanding Burning Man organizers provide them at this year's festival, according to documents obtained by the Reno Gazette-Journal.

Those demands by the BLM, unprecedented in Burning Man's history, have turned into a point of contention as organizers negotiate with the agency for their annual permit to stage the event in the Black Rock Desert this summer.

Burning Man officials have pushed back against the BLM, saying the demands are excessive and that they cannot meet all of them

"BLM is not significantly increasing its staffing this year and it appears to (Black Rock City) that some of these additional requests are above and beyond what is needed under regulatory requirements for BLM to administer to permit," Burning Man wrote in a response to the BLM requests obtained by the RGJ

RGJ Exclusive: BLM wants $1 million VIP compound from Burning Man
(https://www.rgj.com/longform/news/2015/06/26/blm-wants-vip-compound-burning-man/29318493/)

Reid, You want flush toilets at Burning Man? Go to Gerlach
(https://www.rgj.com/story/news/2015/06/26/reid-want-toilets-burning-man-go-gerlach/29357821/)

Here is the unedited list of food demands that BLM delivered to Burning Man organizers earlier this month:

**Mandatory Items for Breakfast**

• Butter and margarine, instant hot cereal, jelly or jam, peanut butter, salt, pepper, sugar, cream (or substitute)  These items shall be individually packaged  Mustard, ketchup, steak sauce, salt and pepper shall be provided in approved dispensers or original bottles in the dining trailer area.

• Salsa, hot peppers, brown sugar and raisins or other dried fruit shall also be made available, in appropriate serving containers, not individually packaged.

**Mandatory Items for Hot Lunch/ Dinners**

• Butter and margarine, jelly or jam, peanut butter, mustard, ketchup, steak sauce, salt, pepper, sugar, cream (or substitute), tea and hot chocolate. These items shall be individually packaged  Mustard, ketchup, steak sauce, salt, and pepper and other large scale condiments shall be provided in approved dispensers or original bottles in the dining tent area

• Salsa and hot peppers shall also be made available, in appropriate serving containers, not individually packaged.

• A variety of dessert will need to be served with each dinner

• Salad bar should be available for both lunch and dinner.

**Hot meals between scheduled meal hours** (These items are only available during non-meal hours. Please see Attachment 3 for meal times and more details)

• Grilled Cheese Sandwich

• Quesadilla

• Deli Sandwiches

• Hamburger

• Hot dogs

• Grilled chicken

• Chicken fingers

• Veggies

**Mandatory items for 24 Hour Service Bar**

• Hot Regular Brewed Coffee (regular and decaffeinated). Flavored coffee may be served in addition to regular coffee at the Contractor's option

• Hot Water

• Hot Chocolate

• Chilled 100% Fruit Juice

• Brewed Coffee

• Tea Bags (regular and decaffeinated)

• Cold Drinks (Coke Products)

• Iced Tea (regular and decaffeinated)

• Assortment of Dry Cereal (Golden Grahams, Fruit loops, Raisin Bran and 1 other flavor)

• Oatmeal

• Chobani Greek Yogurt

• Yogurt

• Bread both white and wheat

• English muffins

• Milk - Both white and chocolate milk shall be available

• Milk alternative (almond, vanilla, and soy)

• Including but not limited to the following: Personal pizzas, Hot Pockets, burritos, noodle cups, M&Ms, Snickers, Payday, Skittles, licorice, jerky, meat and cheese snacks, cookies, brownies, protein bars, nuts, chips, popcorn, fresh fruit, apples, oranges, bananas, etc.

**Ice Cream: This needs to be in a standalone freezer for ice cream available all day long**

• Drumstick

• Choco Taco

• Individual served ice cream assorted flavors

• Popsicles

• Ice cream sandwiches

***And here's a list of meal suggestions by BLM:***

**Hot/Cold Breakfast**

• Eggs - 2 fresh eggs (3 when scrambled) or 6 oz. of liquid eggs (no egg product).

• Meat - 4 oz. (raw uncooked weight)

• Bread or Hot cakes or French toast or Waffles - or equivalent starch (equal to 3 (1 to 1½ oz.) slices of bread.

• Potatoes - 6 oz. or equivalent starch

• Fresh Fruit

• Muffin(s) or equivalent - 3 oz.

**Lunch and Hot Dinners**

• Steak -10 oz. (boneless) or 14 oz. (bone-in), or Beef - 10 oz. (boneless) or 14 oz. (bone-in), or

• Beef and Pork Ribs - 10 oz. (boneless) or 18 oz. (bone-in), or Pork - 10 oz. (boneless) or 14 oz. (bone-in),, or Poultry - 8 oz. (boneless) or 14 oz. (bone-in), or Ham - 8 oz. (boneless) or 12 oz. (bone-in), or Fish - 8 oz.

Non Meat Protein - 4 oz

• Vegetables - 4 oz.

• Potatoes - 6 oz. or equivalent starch

• Bread - Two 1 to 1½ oz. slices or equivalent starch

• Dessert - 4 oz

Self-Service Salad Bar shall contain:

• Five salad toppings

• One tossed green salad with equal amounts of three types of leafy vegetables

• Three types of salad dressings (regular and/or low/non-fat)

• Three salad condiments

**Sack Lunch**

• Regular and vegetarian sack lunches shall be provided as ordered by AJ Ramos. Vegetarian sack lunches shall be prepared for the Ovo-Lacto vegetarian classification level and shall consist of the same quantities and items as regular sack lunches.

• Definition. Ovo-Lacto Vegetarian - This is the most common form of vegetarianism. Ovo-Lacto vegetarians do not eat meat, chicken, fish or flesh of any kind, but do eat eggs and dairy products  Sub categories are Ovo vegetarians that eat eggs but not dairy products, while Lacto vegetarians eat dairy products but not eggs.

• NOTE. Pre-prepared sandwiches shall not be frozen. Sack lunches shall consist of the following items.

Entree 1 - One Meat Sandwich (or Sandwich with Non-meatSubstitute for Vegetarian)

• The sandwich shall be wrapped in plastic wrap or plastic bags.

• The sandwich shall contain two 1 to 1½ oz. slices of bread.

• The meat sandwich shall contain 3½ oz. sliced whole muscle meat or a combination of sliced whole muscle meat and cheese or equivalent vegetarian substitute

• Appropriate individually packaged condiments shall be provided and not be put directly on the sandwich.

Entree 2 - Variety Item

• Fruit - The fruit shall be one apple or one orange or other fresh fruit of comparable size.

• Factory-Wrapped or Resealable Individually Wrapped Snack - Two (2) or more snacks with a combined minimum nutritional value of at least 600 calories. It is preferred that these snacks be high in complex carbohydrate content. All ingredients shall be identified and attached to the product for easy identification.

• Condiments - Four individual factory-wrapped packets of condiments appropriate for the entrees being served.

• Paper Napkin and Pre-Moistened Towelette

**Menu Variety**

Menu items shall provide variety on a daily basis as to the types of meat and bread used in sandwiches, other sack lunch entrees, snacks, juices and other meal items served. Menus may include a wide variety of recipes. The following are examples of variety options.

• Meat

• Beef

• Steaks – rib, loin, T-bone, New York, sirloin, cubed, filet and pepper steak

• Roast - Prime rib and sliced roast.

• Short Ribs - baked, broiled and barbecued

• Ground Beef - lasagna, meat loaf, meatballs in spaghetti sauce and ground beef patties.

• Pork

• Chops - loin cut, spare-ribs, country style ribs and barbecued.

• Roast - sliced and tenderloin

• Ham - sliced.

• Sausage

• Chops - grilled and barbecued

• Roast - sliced

• Poultry

• Sliced, or whole pieces or parts (such as breast, thigh or leg).

• Fish - grilled, baked fillets or steaks.

• Processed Meat Items - pastrami, Polish/Italian sausage and corned beef.

• Breakfast Meat - ham, bacon, sausage, steak and pork chops.

• Eggs - Fried, hard-boiled, poached, omelets or scrambled

• Bread and Equivalent Starches - wheat, white, 7-grain, rye, pumpernickel, French, garlic, biscuits, muffins, rolls, croissants, bagels, cornbread, donuts, sourdough, tortilla and pita pocket.

• Dry Cereal - Varieties of flaked, toasted, or baked cold cereals and granola.

• Hot Cereal - Oatmeal or grits, Cream of Wheat®, etc.

• Fruit - oranges, tangerines, apples, bananas, grapes, pears, peaches, plums, nectarines, grapefruit, or melons.

• Dried Fruit - apricots, cherries, dates, mango, pineapple, pears, banana chips, peaches, prunes, raisins or other dried fruit.

• Vegetables - broccoli, cauliflower, asparagus, corn, peas, green beans, mixed vegetables, etc.

• Non Meat Protein - BBQ beans, vegetarian patty, vegetarian hot dog, Tofu, beans, soybean product, bean burritos, peanut butter, cheese, tempeh, quinoa, hummus.

• Potatoes and Equivalent Starches - baked, mashed, fried, boiled, scalloped, rice, stuffing, pasta, sweet potatoes, or yams.

• Juice - orange, tomato, grape, V8□□type, apple, cranberry, or pineapple.

• Sandwich Meat and/or Cheese - ham, corned beef, roast beef, turkey, pork, beef pastrami, chicken, cheddar, Swiss, or other natural cheese, excluding American processed cheese.

**Salad Bar**

• Salad Toppings - kidney, garbanzo or pinto beans, carrots, mushrooms, celery, cauliflower, green/red bell peppers, broccoli, cheese, cottage cheese, beets, peas, tomatoes, eggs, cucumbers.

• Prepared Salads - macaroni, carrot and raisin, potato, pea, gelatin, coleslaw, fruit, rice or pasta salads.

• Tossed Salad Greens - romaine, endive, iceberg, green leaf, red leaf, butter, spinach, or cabbage.

• Fruit - melons, peaches, grapes, bananas, strawberries, pears, applesauce or seasonal fruit.

• Salad Dressings - regular and low/non-fat French, Ranch, Italian, vinaigrette, Thousand Island, Blue Cheese, etc.

• Salad Condiments - croutons, wheat nuts, sunflower seeds, crackers and taco chips, bread sticks, olives, pickles, or other fresh pickled or marinated vegetables.

• Dessert - cakes, cookies, pies, cobblers, puddings, pastries or ice cream.

• Tea - black, herbal, green, and spiced. Flavored tea may be served in addition to regular tea at the Contractor's option

• Milk - white, (Whole, 2%, Skim), and Chocolate.

• Milk alternative

• Snack Varieties - Candy bars, bagged candy, trail mix, cookies, and brownies. Granola bars, energy bars, fresh vegetables, pretzels, shelled nuts. Factory packaged meats such as dried meats, sausage, pepperoni, jerky, etc., are acceptable. Processed cheese and cheese food products are allowed for this item only  The Government retains its full right to reject any product offered under this paragraph if the quality of the product is rejected by users. For variety two different products shall be used each day.

Read or Share this story: http://on.rgj.com/1BTmtFr


CALL 1.877.804.7716 OR CLICK HERE TO GET A QUOTE

Exhibit " E "

Exhibit " E "
AR11399

# Reid to BLM: You want flush toilets at Burning Man? Go to Gerlach

 Jenny Kane, jkane@rgj.com    7:35 a.m PDT June 29, 2015



*(Photo: AP)*

Senate Minority Leader Harry Reid, D-Nev., sent a letter Friday to Secretary of the Interior Sally Jewell following the Reno Gazette-Journal's investigation into lavish demands the U.S. Bureau of Land Management made to Burning Man organizers.

Rep. Mark Amodei, R-Nev., also reacted to the news that BLM is demanding Burning Man provide a $1 million encampment for federal agents at the event this summer. He said he's concerned about the ethics of BLM's request.

"I don't think it was driven out of Nevada. I think it was driven out of Utah, or D.C., or both," Amodei said in an interview with the RGJ on Friday. "We have a big problem. 15 VIP accommodations, and soft-serve ice cream 24-hours a day. With all due respect, those dots do not connect."

Here's Reid's letter to Jewell in full:

"Dear Secretary Jewell:

"I read today the account in the *Reno Gazette-Journal* of the unprecedented and extravagant requests allegedly being made by the Bureau of Land Management (BLM) as conditions for permitting Burning Man for their annual event in September 2015. Burning Man has been held in the Black Rock Desert for 23 years and, in addition to the untold cultural benefits that the annual festival brings to Nevada, the event contributes an estimated $35 million to Nevada's Economy each year.

"I care strongly about the environment in the Black Rock Desert and was glad to author the legislation that created the Black Rock Desert-High Rock Canyon-Emigrant Trails National Conservation Area where Burning Man is held. While I agree that the BLM should take its permitting duties seriously and work with Burning Man to both guarantee the safety of its participants and the protection of the environment, providing outlandishly unnecessary facilities for the BLM and its guests should be beyond the scope of the permitting requirements. Part of Burning Man's philosophy is self-reliance and living with the elements is part of the experience. Flush toilets and laundry facilities can be found about ten miles away in Gerlach, Nevada, if BLM's employees need such amenities.

"I appreciate your attention to this matter. If you have any questions please feel free to contact me or have your staff contact Sara Moffat of my staff."

Read or Share this story: http://on.rgj.com/1LB6nmB


XFINITY X1 Triple Play


AR11400

Exhibit " F "

Exhibit " F "

From: **Hall, Mark** <mehall@blm.gov>
Date: Wed, Apr 26, 2017 at 1:45 PM
Subject: Emergency status changed to mission critical work status
To: Marnee Benson <marnee.benson@burningman.org>, Rosalie Barnes <rosalie@burningman.org>

Hi Marnee, Hi Rosalie,

Sorry I forgot to send this to you two when it cam ein originally.  The emergency status of the event has been changed; LEO and others will be getting their fair overtime via the "mission-critical work" clause (instead of the emergency clause).

Let me know if you have any questions, etc.

Best, MEH

Mark E. Hall, PhD
Field Manager
Black Rock Field Office
Winnemucca District Office
775-623-1529.

Exhibit " G "

Exhibit " G "
AR11493



## United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Nevada State Office
1340 Financial Boulevard
Reno, Nevada 89502-7147
http://www.blm.gov/nv



In Reply Refer To:
8312 (NV910/WNDO)

**APR 1 3 2017**

Memorandum

To:         Assistant Director (W0700)
            Attn: Anzanette Randall, Deputy Assistant Director, Human Capital Management

From:       John F. Ruhs
            State Director

Subject·    Lifting of Pay Cap for personnel deployment to Public Lands in Nevada in support of the
            2017 Burning Man Event

I respectfully request that the BLM designate personnel deployment to public lands in Nevada to support
the 2017 Burning Man Event as *"mission critical work"* in accordance with 5 CFR 550.106(b)(1). My
request allows lifting the bi-weekly pay cap authorized by 5 CFR 550.106 and the Fair Labor Standards
Act (FLSA) overtime under 5 CFR 551.211(f) for personnel participating in direct support of the 2017
Burning Man Event. Employees would be entitled to premium pay under the annual maximum earning
limitations while performing the mission critical work under the limitations described in 550.106(c) and
550.107.

The FLSA status of the employees assigned to the 2017 Burning Man Event shall be reviewed and
administered in accordance with the previously cited federal regulations. The temporary waiver of the
biweekly pay cap, as well as the mission critical work for deciding FLSA designations, will begin pay
period 18 (August 20, 2017), and continue until the conclusion of the 2017 Burning Man Event, at the end
of pay period 19 (September 16, 2017).

The BLM, Winnemucca District, Black Rock Field Office will designate a point of contact to keep the
records, including the date(s) that the mission critical work is conducted, the number of employees
affected, hours expended for the specific mission, and the type of premium pay involved.

[X] Approved          [ ] Disapproved

Anzanette Randall                    4-13-17
                                     Date

Exhibit " H "



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
LLNVW03500-18-01
2930 (NVW030.00)

March 29, 2019

Charlie Dolman
Event Operations Director
Black Rock City, LLC 660
Alabama St.
San Francisco, CA. 94110-2008

Burning Man 2018 Event
Special Recreation Permit

## DECISION



Dear Mr. Dolman:

## INTRODUCTION

On June 25, 2018, the Bureau of Land Management (BLM) and Black Rock City, LLC (BRC) entered into a Cost Recovery Agreement (CRA) for the Burning Man 2018 event. That CRA included an estimate for the BLM's cost to process and administer the Special Recreation Permit (SRP) for the Burning Man 2018 event. The original CRA Phase 1 was in the amount of $707,866 and Phase 2 was in the amount of $2,142,959.25 for a grand total of $2,850,825.25 for the 2018 event.

The BLM makes every attempt to develop a CRA cost estimate that foreshadows all direct and indirect costs, as accurately as possible, projected expenses for planning, issuing and administering the Burning Man SRP.

## DECISION

The BLM's actual direct and indirect costs for the Burning Man 2018 event total **$2,578,065.61**. The attached documents provide a detailed breakdown of all actual direct and indirect costs. To date the BLM has received all payments for the CRA, for a total of $2,850,825.25.

Based on those actual costs and the estimate already paid by BRC, the BLM has identified BRC is owed a refund of **$272,759.64**.

## RATIONALE

The Federal Land Policy and Management Act (FLPMA) section 304(b) provides that the Secretary of the Interior is authorized to require a deposit of payments intended to reimburse the United States for costs incurred in processing and administering applications for use of the public lands, 43 U.S.C. § 1734(b).

The BLM's SRP regulations state that the BLM may refund any cost recovery overpayments, 43 C.F.R. § 2932.33(a). Further, the BLM's Recreation Permit Administration Handbook (H-2930-1) directs the BLM to refund to the applicant the remaining balance in a cost recovery account at the end of the project.

The 2018 CRA and the 2018 actuals totals justify the refund amount BRC will receive.

## AUTHORITY

The statutory authorities underlying the regulations in this part are FLPMA, 43 U.S.C. 1701 et seq., and the Federal Land Recreation Enhancement Act (REA), 16 U.S.C. 6801 et seq.

a)   FLPMA contains the BLM's general land use management authority over the public lands, and establishes outdoor recreation as one of the principal uses of those lands (43 U.S.C. 1701(a)(8)). Section 302(b) of FLPMA directs the Secretary of the Interior to regulate through permits or other instruments the use of the public lands, which includes commercial recreation use. Section 303 of FLPMA authorizes the BLM to promulgate and enforce regulations, and establishes the penalties for violations of the regulations.

b)   REA authorizes the BLM to collect fees for recreational use in areas meeting certain criteria (16 U.S.C. 6802(f) and (g) (2)), and to issue special recreation permits for group activities and recreation events (16 U.S.C. 6802(h).

43 C.F.R. § 2932.33(a), *Overpayments.* For multi-year commercial permits, if your actual fees due are less than the estimated fees you paid in advance, BLM will credit overpayments to the following year or season. For other permits, BLM will give you the option whether to receive refunds or credit overpayments to future permits, less processing costs.

## APPEAL PROVISIONS

A person who wishes to appeal to the Interior Board of Land Appeals must do so under 43 C.F.R. § 4.411 and must file in the office of the officer who made the decision (not the board), in writing to Mark E. Hall PhD., Field Manager, Black Rock Field Office, 5100 East Winnemucca Boulevard, Winnemucca, Nevada 89445. A person served with the decision being appealed must transmit the notice of appeal in time to be filed in the office where it is required to be filed within thirty (30) days after the date of service.

The notice of appeal must give the serial number or other identification of the case and may include a statement of reasons for the appeal, a statement of standing if required by § 4.412 (b), and any arguments the appellant wishes to make. Attached Form 1842-1 provides additional information regarding filing an appeal.

No extension of time will be granted for filing a notice of appeal. If a notice of appeal is filed after the grace period provided in §4.401(a), the notice of appeal will not be considered and the case will be closed

AR11407

by the officer from whose decision the appeal is taken. If the appeal is filed during the grace period provided in §4.401(a) and the delay in filing is not waived, as provided in that section, the notice of appeal will not be considered and the appeal will be dismissed by the Board.

The appellant shall serve a copy of the notice of appeal and any statements of reason, written arguments, or briefs under §4.413 on each adverse party named in the decision from which the appeal is taken and on the Office of the Solicitor, Pacific Southwest Regional Solicitor, U.S. Department of the Interior, 2800 Cottage Way, Room E-1712, Sacramento, California 95825-1890

Service must be accompanied by personally serving a copy to the party or by sending the document by registered or certified mail, return receipt requested, to the address of record in the bureau, no later than 15 days after filing the document.

In addition, within thirty (30) days of receipt of this decision you have the right to file a petition for a stay together with your appeal in accordance with the regulations at 43 C.F.R. § 4.21. The petition must be served upon the same parties specified above.

Pursuant to 43 C.F.R. § 4.21(b), a petition for stay, if filed, must show sufficient justification based on the following standards:

1) The relative harm to the parties if the stay is granted or denied;
2) The likelihood of the appellant's success on the merits;
3) The likelihood of immediate and irreparable harm if the stay is not granted; and,
4) Whether the public interest favors granting the stay.

43 C.F.R. § 4.21(b)(2) provides that the appellant requesting a stay bears the burden of proof to demonstrate that a stay should be granted.

If you have any questions on this decision please contact Mark Pirtle, BLM Burning Man Planner at 775-861-6674.

Sincerely,

Mark E. Hall, PhD.
Field Manager
Black Rock Field Office

Enclosures
Cost Recovery Closeout Summary
Attachment 1 - Project Labor Log
Attachment 2 - BLM Contracts
Attachment 3 - Travel Expenses
Attachment 4 - Vehicle Utilization Expenses
Attachment 5 - Miscellaneous Supplies and Equipment

2018 BM Close Out Doc  dm

AR11408

## 2018 BURNING MAN EVENT COST RECOVERY CLOSEOUT SUMMARY

| ITEM | Estimated Costs (per CRA EST.) | Actual Costs (per FBMS Reports) | Balance Due | Description/Comment | Detail Located On: |
|---|---|---|---|---|---|
| **LABOR** | | | | | |
|  | $1,729,579.25 | $1,566,880.69 | $ (162,698.56) | | Labor Report + IAAs |
| BLM Labor | $1,669,579.25 | $1,527,140.67 | $ (142,438.58) | | Labor Report |
| Forest Service Labor | $40,000.00 | $37,345.14 | $ (2,654.86) | Via IAA Contract | Contracting Report |
| HHS Labor | $20,000.00 | $ 2,394.88 | $ (17,605.12) | Via IAA Contract | Contracting Report |
| **SUPPORT-CONTRACTS** | $3,931,000.00 | $3,418,209.78 | $ (512,790.22) | Contracts | Contracting Report |
| Federal Register Posting Fee | $2,000.00 | $1,963.00 | $ (37.00) | Direct Internal Billing | Contracting Report |
| Microwave/Internet (High Desert) | $20,000.00 | $22,000.00 | $2,000.00 | Contract | Contracting Report |
| **Communications** | | | | | |
| Satellite Tracking (Strohman Enterprises) | $55,000.00 | $50,640.00 | $ (4,360.00) | Contract | Contracting Report |
| CAD Server Licensing (SHI International) | $4,000.00 | $0.00 | $ (4,000.00) | Contract | Contracting Report |
| Radio Base Station Digital Upgrade | $25,000.00 | $13,118.78 | $ (11,881.22) | Contract | Contracting Report |
| Network Services and Support | $110,000.00 | $130,618.00 | $20,618.00 | Contract | Contracting Report |
| Dispatch Services | $215,000.00 | $199,870.00 | $ (15,130.00) | Contract | Contracting Report |
| **TRAVEL** | $395,000.00 | $ 338,107.92 | $ (56,892.08) | | Travel Report |
| **VEHICLE UTILIZATION** | $50,000.00 | $45,116.72 | $ (4,883.28) | | Vehicle Utilization Report |
| **MISC SUPPLIES, EQUIPMENT & SERVICES PURCHASE** (CREDIT CARD/CONTRACT/DIRECT BILLING) | $35,000.00 | $ 48,323.30 | $ 13,323.30 | | Misc Purchase Report |
| Bruno's Wiring | N/A | $17,000.00 | | | |
| Water Septic Tank Service | N/A | $9,065.00 | | | |
| Miscellaneous Credit Card Purchases | N/A | $22,258.30 | | Purchased via Credit Card or Check | Credit Card Receipts |
| **DIRECT COST TOTAL** | $2,340,579.25 | $2,116,638.41 | $ (223,940.84) | | |
| **INDIRECT COST TOTAL (RATE 21.68%)** | $ 510,246.00 | $461,427.20 | $ (48,818.80) | | |
| **TOTAL** | $2,850,825.25 | $2,578,065.61 | $ (272,759.64) | | |



**UNITED STATES DEPARTMENT OF INTERIOR**
**BUREAU OF LAND MANAGEMENT**

Functional Area / WBS: LS1050000 / LVRCFI805990

| PLANNING | SET UP PRE-EVENT | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | DATE | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | x | | 8/23/18-09/05/18 | 201819-201820 | ABITU | CA Law Enforcement Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 179.00 | $10,427.01 |
| | | | x | x | | 8/23/18-9/7/18 | 201819-201820 | ALBRIGHT | CA Field Staff Ranger, K9 Handler | City Patrol, K9 Handler Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations Additional duties of K9 Handler | 127.00 | $9,188.70 |
| | x | x | | | | 8/15/18-9/03/18 | 201818-201820 | ALLEN | NV Special Agent | Investigations (Integrated Investigations), Night Shift | Integrated Investigations function officer, works for Pershing County Sheriffs to assist in investigation of state violation | 142.00 | $11,344.90 |
| x | | x | x | x | x | 4/03/18-12/19/18 | 201809-201826 | ANDRES | NV Staff Ranger | LE Planner/LE Ops Chief | LE Planner of event operations; Supervisor of LE program during event operations | 772.00 | $62,651.60 |
| x | | | x | | | 7/22/18-201820 | 201817-201820 | ARBONTES | NV Range Technician | Range Specialist | Provide deconfliction between grazing permittees and SRP holders | 7.00 | $400.11 |
| | | | x | x | | 8/23/18-09/05/18 | 201819-201820 | BALDWIN | Wilmenesca Geologist | Event Safety Officer, Day Shift | Safety function Specialist, served as BLM's event safety officer for JOC and BRC | 178.50 | $9,609.60 |
| | | | x | | | 8/23/18-09/05/18 | 201819-201820 | BENAVIDEZ | CA Law Enforcement Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 151.50 | $8,733.77 |
| | | x | x | x | | 8/23/18-09/05/18 | 201819-201820 | BOIK | OLES Region 3 State Chief Ranger | LE Patrol Chief, Day Shift | Patrol Chief function officer, supervises all patrol operations during their assigned shift | 217.00 | $22,206.75 |
| | | | x | | | 8/23/18-09/05/18 | 201819-201820 | BOXX | CA Patrol Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 178.00 | $9,744.41 |
| | | | x | | | 8/20/18-09/05/18 | 201819-201820 | BRIDGES | OR Park Ranger | Logistics, Night Shift | Logistics support function specialist, provides logistical needs to JOC facility, Sub-station and to vendors | 248.00 | $6,556.39 |
| | x | x | | x | | 8/20/18-09/05/18 | 201815-201820 | BRISCOE | NV Zone 1 Supervisor | LE Branch Chief | LE Planner of event operations; Supervisor of LE program during event operations | 219.00 | $21,542.43 |
| | | x | x | x | | 8/20/18-201821 | 201819-201821 | BROWN | ID Field Staff Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 146.50 | $11,383.79 |
| | | | x | x | | 8/20/18-201821 | 201819-201821 | BUCHANAN | ID District Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 156.75 | $14,283.79 |
| | | | x | | | 8/20/18-201821 | 201819-201821 | BULKLEY | UT Field Staff Ranger | Investigation (Patrol Investigative Support), Night Shift | Patrol Investigative Support function officer, works in patrol function in uniform to conduct any patrol cases that require follow-up investigation | 157.00 | $11,919.38 |
| | | | x | | | 8/20/18-201821 | 201819-201821 | BURGESS | AZ Field Staff Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 149.50 | $10,626.61 |
| x | | x | | x | | 7/9/18-10/1/18 | 201816-201822 | CADIGAN | NV/BRFO Wildlife Biologist | Vending Compliance, Day Shift | Vending Compliance Monitoring function, worked with BRC vending teams on SRP compliance | 169.00 | $8,932.52 |
| | | | x | | | 8/07/18-09/08/18 | 201818-201820 | CARTER, D. | CA Radio Tech | Comm Tech | Communications network support | 310.00 | $24,010.14 |
| | | | x | | | 8/20/18-09/05/18 | 201819-201820 | CASTRO | CA Field Staff Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 185.00 | $13,660.60 |
| | | | x | | | 08/23/18-08/25/18 | 201819 | CHAIDEZ | CA Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 40.00 | $2,978.06 |

| DATE | PLANNING | SET UP PRE-EVENT | PRE-EVENT | MAIN EVENT | POST-EVENT | EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT/TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/20/18-09/05/18 | | | x | x | | | | 201819-201820 | CHODOROWSKI | CO Field Staff Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 190.00 | $15,345.60 |
| 8/20/18-09/05/18 | | | x | x | | | | 201819-201820 | CULVER | NV Field Staff Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 186.00 | $13,986.76 |
| 8/20/18-09/05/18 | | | x | x | | | | 201819-201820 | CUNNINGHAM | CO Field Staff Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 213.00 | $17,449.05 |
| 8/20/18-09/05/18 | | | x | x | x | | | 201819 | DAHL | CO IT Specialist | Communications | IT Specialist, assisted in set-up of IT equipment during Set Up and Pre Event | 5.00 | $233.13 |
| 8/20/18-09/05/18 | | | x | x | | | | 201819-201820 | DAVIS | AZ Field Staff Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 171.00 | $13,230.78 |
| 8/20/18-09/05/18 | | | | x | x | | | 201819-201820 | DUE | OLES Equipment Specialist | Logistics | Logistics support function specialist, provides logistical needs to JOC facility, Sub-station and to detailers | 203.00 | $10,176.85 |
| 8/20/18-09/05/18 | | | x | x | | | | 201819-201820 | DUHRESSEN | AK Special Agent | Investigations (Integrated Investigation), Day Shift | Integrated Investigations function officer, works for Perking County Sheriff to assist in investigations of case violation | 141.00 | $14,985.88 |
| 8/20/18-09/05/18 | | | | x | | | | 201819-201820 | FELIX | NV District Ranger | City Patrol Supervisor, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 148.00 | $8,356.85 |
| 8/20/18-09/05/18 | | | x | x | | | | 201819-201820 | FINCHER | CA Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 160.00 | $9,365.55 |
| 8/15/18-09/05/18 | | x | x | x | | | | 201818-201820 | FISCHER | NV Field Staff Ranger | Evidence Technician, Day Shift | LE Evidence function, serves as evidence officer for all event cases with logged evidence | 201.00 | $16,145.23 |
| 8/20/18-09/05/18 | | | x | x | | | x | 201815-201825 | FONKEN | CA Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 204.00 | $12,837.17 |
| 8/20/18-09/05/18 | | | | x | | x | | 201819-201820 | FREIBERG | ID | Vending Compliance, Day Shift | Vending Compliance Monitoring function, worked with BRC OSS team on vendor SRP compliance | 139.00 | $9,213.62 |
| 8/20/18-09/05/18 | | | x | x | | | x | 201817-201826 | GAARD | WDO Outdoor Recreation Planner | Logistics, Compliance, Close-out | Supported Pre-event build-out and logistical support, logistical and compliance support during the event, and assisted with SRP close-out, the mitigation, facilities office, served as supervisor of investigators in both investigative | 177.00 | $6,740.87 |
| 8/20/18-09/05/18 | | | | x | | | | 201819-201820 | GANDIAGA | OLES Senior Special Agent | Investigations Chief | Logistics support function specialist, provides logistical needs to JOC facility, Sub-station and to detailers | 140.00 | $13,128.58 |
| 6/11/18-11/01/18 | | | | x | | | x | 201814-201822 | GARSIDE | Black Rock Station Manager | Logistics | Logistics support function specialist, provides logistical needs to JOC facility, Sub-station and to detailers | 115.50 | $4,083.86 |
| 8/20/18-09/05/18 | | | | x | | | | 201819-201820 | COCHIS | UT LE Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 141.00 | $7,243.85 |
| 8/20/18-09/05/18 | | | x | x | | | | 201819-201820 | GONZALEZ | Arizona Field Staff Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 171.00 | $10,769.50 |
| 8/20/18-09/05/18 | | | | x | | | | 201819-201820 | GRAHAM | WA Suport Services Technician | Environmental Compliance | Environmental Compliance Monitoring function, worked with BRC environmental teams on environmental SRP compliance | 208.50 | $8,451.24 |
| 8/06/18-09/05/18 | | x | x | x | x | | x | 201818-201820 | GRIMES | NV IT Specialist | Event IT Equipment Specialist, Day Shift | IT Equipment Specialist function, install/maintains all IT equipment at JOC and detailers | 322.00 | $16,515.53 |
| 6/03/18-12/19/18 | | x | x | x | x | x | x | 201817-201826 | HALL | NV/BPRO Field Manager | Authorized Officer | Event Management function, served as overall manager of event operations | 392.00 | $26,401.83 |
| 8/20/18-09/05/18 | | | x | x | | | | 201819-201820 | HARPER | ID Field Staff Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 144.50 | $8,043.14 |
| 8/20/18-09/05/18 | | | | x | | | | 201819-201820 | HARRISON | CA Field Staff Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 111.00 | $9,745.41 |

| DATE | PLANNING | SET UP PRE-EVENT | PRE-EVENT | MAIN EVENT | POST-EVENT | EVENT CLOSE OUT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/20/18-09/05/18 | X | | | X | | | | 201819-201820 | HAUCK | AZ Special Agent | Investigations (Integrated Investigations), Day Shift | Integrated Investigations function officer, works for Pershing County Sheriff to assist in Investigations of state violations | 137.00 | $11,995.16 |
| 8/20/18-09/05/18 | | | X | X | X | | X | 201819-201820 | HENDRIX | Battle Mountain Public Affairs | Event Public Affairs | Provided public affairs support and coordination for the event. | 216.00 | $13,494.27 |
| 8/20/18-09/05/18 | | | | X | | | | 201819-201820 | HONE | UT Special Agent | Medical Unit Leader, Day Shift | Medical unit staff, provide care to employees. | 138.00 | $13,191.32 |
| 8/20/18-09/05/18 | | | | X | | | | 201819-201820 | HUESCERICH | OLES Senior Special Agent | Investigations (Integrated Investigations), Swing Shift | Integrated Investigations function officer, works for Pershing County Sheriff to assist in investigation of state violations | 133.00 | $13,610.16 |
| 8/20/18-09/05/18 | | | | X | X | | | 201819-201820 | HUSTON | SD Field Staff Ranger, K9 Handler | City Patrol, K9 Handler, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. Additional duties of K9 Handler. | 237.75 | $18,277.19 |
| 8/5/18 - 9/8/18 | | | | X | X | | | 201818-201820 | IAGULLI | NV IT Specialist | Comm Tech | Communications network support | 328.00 | $22,452.63 |
| 8/20/18-09/05/18 | X | X | | X | | | | 201811-201823 | JONES | UT Assistant Field Manager | ChOps | Event Management function, served as planning lead during planning operations, served as operations chief of ChiefOps operations during event, served as close out lead during close-out operations (AAR, CPA). | 264.25 | $13,918.07 |
| 8/26/18-12/19/18 | | | | X | | | | 201820-201826 | KEACH | WDO Archeologist | Compliance | Responded to over for additional compliance during population coverage. Assisted in SRP Closure | 22.25 | $1,013.55 |
| 8/20/18-09/05/18 | | | | X | | | | 201819-201820 | KEREKES | AZ Field Staff Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 159.00 | $9,311.97 |
| 4/1/18-9/09/18 | X | X | X | X | X | | | 201808-201820 | KING | AZ IT Specialist | Event IT Security | IT Security function specialist, ensures the security of event technology and data, including CAD servers, DPS Justice Link, IMARS etc | 428.50 | $26,606.80 |
| 8/20/18-09/05/18 | | | | X | X | | | 201819-201820 | KNISLEY | ID Special Agent | Investigations (Integrated Investigations), Swing Shift | Integrated Investigations function officer, works for Pershing County Sheriff to assist in investigations of state violations | 130.00 | $11,461.59 |
| | X | | | X | | | | 201810-201820 | LACA | WDO Natural Resource Specialist | Environmental Compliance | Environmental Compliance Monitoring function, worked with BRC environmental teams on environmental SRP compliance | 95.50 | $4,997.43 |
| 6/4/18-9/09/18 | X | | X | X | X | | | 201812-201820 | LANNEN-LITTLEFIELD | AZ Comm Center Manager | Dispatch Center Manager | Dispatch Center Manager, served as dispatch center manager and first line supervisor of contract dispatchers | 288.00 | $17,083.76 |
| 8/20/18-09/05/18 | | | | X | X | | | 201819-201820 | R. LLOYD | UT District Ranger | Patrol Supervisor, Day Shift | Shift Supervisor function officer, field supervisor of one half of Shift city patrol officers | 194.75 | $13,720.49 |
| 8/20/18-09/05/18 | | | | X | X | | | 201819-201820 | K. LLOYD | UT District Ranger | Investigation (Patrol Investigative Support), Swing Shift | Patrol Investigative Support function officer, works in patrol function in uniform to conduct any patrol cases that require follow-on investigation | 185.50 | $14,134.10 |
| | | | | X | | | | 201809 | LOAN | NV Unit Aviation Manager | Aviation Contact | Served as point of contact for aircraft | 6.00 | $358.81 |
| | | | | X | | | | 201811 | LONTOC | NV Cadastral | Closure Order | Contribute to geographic description for new phased closure order. | 1.00 | $59.46 |
| 8/20/18-09/05/18 | | | | X | X | | | 201819-201820 | MARSOOBIAN | AZ Field Staff Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 183.50 | $14,271.80 |
| 8/20/18-09/05/18 | | | | X | | | | 201819-201820 | MARTIN, A. | WV Field Staff Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 159.00 | $11,100.10 |
| 04/30/18-11/20/18 | | | | | | | X | 201821-201824 | MARTIN, J. | BRFO Assistant Field Manager | BRFO Assistant Field Manager | Provide oversight of event management. | 45.00 | $2,549.40 |
| 8/20/18-09/05/18 | | | | X | X | | | 201819-201820 | MATOS-PAGAN | CA LE Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 146.50 | $8,465.43 |
| 9/17/18-10/01/18 | X | X | | X | X | | | 201818-201824 | MATTHEWS | NV GIS Specialist | Logistic Supervisor, Day Shift | Logistics function Specialist, served as lead of logistic team | 313.00 | $18,630.88 |

| DATE | PLANNING | SET UP PRE-EVENT | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/20/18-09/05/18 | x | | | | | x | 201811-201825 | MCCULLOUGH | Winnemucca District Manager | Winnemucca District Manager | Provide oversight of event management. | 34.00 | $2,674.20 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | MCDANIEL | AZ K9 Handler | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restriction, permit stipulations | 188.50 | $12,309.43 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | MCDERMOTT | NV Field Staff Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restriction, permit stipulations | 146.00 | $10,409.40 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | MCDONALD | CA Field Staff Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restriction, permit stipulations | 173.00 | $12,880.56 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | MCCRATH | ID State Chief Ranger | Patrol Commander, Night Shift | Patrol Commander function officer, supervises patrol officers assigned to his shift | 193.00 | $21,383.21 |
| | | | | x | | | 201809-201826 | MCKINNEY | NV/BIFO ORP | Acting Project Manager/SRP Monitor | Event Management function, served as planning lead during planning operations, served as SRP monitor during event, served as close-out lead during close-out operations | 1,036.50 | $55,449.24 |
| 8/20/18-09/05/18 | x | | | | x | x | 201818-201824 | MCKINNON | WDO Realty Specialist | Vending Compliance, Day Shift | Vending Compliance Monitoring function, worked with BLM vending team on SRP compliance | 188.50 | $10,683.53 |
| | | | | | x | x | 201822 | MCMILLAN | WDO Land Health Inspection Specialist | Compliance | Responded to event for additional compliance during population increase. | 12.00 | $474.11 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | MEUTH | WA Field Staff Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restriction, permit stipulations | 198.00 | $14,220.48 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | MILLER | OLES Region 5, State Chief Ranger | Shift Supervisor, Day Shift | Shift Supervisor function officer, field supervisor of one-half of Shift city patrol officers | 172.50 | $18,216.63 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | MITSUIYASU | OR Field Staff Ranger | Investigation (Patrol Investigative Support), Day Shift | Patrol Investigative Support function officer, works in patrol function in uniform to conduct any patrol case that require follow-on investigation | 187.00 | $18,580.89 |
| 8/20/18-09/05/18 | | | | x | | | 201819-201820 | MOORE | OLES Region 3 State Chief Ranger | LE Day Shift Commander | Patrol Commander function officer, supervises patrol officers assigned to his shift | 196.00 | $19,700.18 |
| 8/20/18-09/05/18 | | | | x | | | 201819-201820 | NEEL | NV LE Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restriction, permit stipulations | 153.75 | $9,855.07 |
| 8/06/18-9/5/18 | | x | x | | | | 201816-201820 | NICHOLS | NV Tele-Comm Specialist | IT Specialist, Day Shift | IT Specialist function Specialist, enlisted in set-up of IT equipment during Set Up and Pre Event | 92.00 | $6,995.59 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | PAIVA | NV Field Staff Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restriction, permit stipulations | 63.00 | $5,183.73 |
| 8/20/18-09/05/18 | | | | x | | | 201819-201820 | PHILIPP | UT Investigative Assistant | Evidence Technician, Swing Shift | LE Evidence function, serves as evidence officer for all event cases with logged evidence | 157.00 | $8,100.40 |
| x | x | x | x | x | x | | 201807-201826 | PIRTLE | NV/WDO Re-Employed Annuitant - Burning Man Project | Planning Lead,IC, Close-out Lead | Event Management function, served as planning lead during planning operations, served as lead during event, served as close-out lead during close-out operations (IAP, CPA) | 864.00 | $33,903.42 |
| 8/20/18-09/05/18 | | | | x | | | 201819-201820 | PRESLEY | OR Field Staff Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restriction, permit stipulations | 140.25 | $9,633.26 |
| | x | | | | | | 201809-201811 | PRICE | NV Cadastral | Closure Order | Redefine geotechnical area description for new phased CO. | 65.00 | $4,950.44 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | PURDY | CA Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restriction, permit stipulations | 158.00 | $9,793.45 |
| 8/20/18-09/05/18 | | | x | x | | | 201819-201820 | REGNELL | CA Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restriction, permit stipulations | 176.50 | $13,004.40 |
| | x | | | | | | 201811 | RICCI | NV NEPA Coordinator | NEPA Coordinator | DNA review. | 1.00 | $90.82 |
| | | x | x | | | | 201816-201819 | RICH | UT Telecoms Specialist | Comm Tech | Communications network support | 182.00 | $11,128.96 |

| DATE | PLANNING | SET UP PRE-EVENT | PRE-EVENT | MAIN EVENT | POST-EVENT | EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/20/18–09/05/18 | | | X | X | | | | 201819-201820 | ROBINSON | MT Ranger, K9 Handler | City Patrol, K9 Handler Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. Additional duties of K9 Handler | 191.00 | $14,501.16 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | ROMERO | AZ Ranger | Investigation (Patrol Investigative Support), Night Shift | Patrol Investigative Support function officer, works in patrol function in uniform to conduct any patrol duties that require following an investigation | 160.75 | $10,302.63 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | ROOP | OR State Chief Ranger | Patrol Commander, Swing Shift | Patrol Commander function officer, supervises patrol officers assigned to his shift | 191.50 | $21,970.65 |
| 8/20/18–09/05/18 | | X | | X | | | X | 201810-201826 | ROREX | NV BRFO GIS | Event GIS/Compliance | Compliance function Specialist, assist environment, vending monitoring teams with GIS tools, assist LE and CivCon with GPS | 469.00 | $27,303.12 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | RUSSELL | UT Field Staff Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 194.50 | $14,132.33 |
| 8/20/18–09/05/18 | | | X | X | | | | 201819-201820 | SAKAHARA | MT State Chief Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 152.00 | $13,959.64 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | SARCINELLA | CA Field Staff Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 138.50 | $7,885.97 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | SAWTELL | CA Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 153.75 | $8,937.30 |
| 8/20/18–09/05/18 | X | | | X | X | | | 201819-201820 | SCHWIRIAN | NV IT Specialist | Comm Tech, Day Shift | Communications function specialist, works on radio/dispatch communication network | 274.00 | $15,631.42 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | SHARKEY | NV BRFO ORP | LE Night ORP Chief | Patrol Chief function officer, supervises all patrol operations during their assigned shift | 150.00 | $16,228.32 |
| | | | | | | | X | 201826 | SHEDDEN | WDO Range Technician | ORP Close-out Support | SRP Close-out | 18.00 | $492.09 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | SMITH | AZ Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 160.00 | $10,797.94 |
| 8/20/18–09/05/18 | X | | | X | | X | | 201818-201820 | SPENCER | CCDO - Equipment Specialist | Logistics, Day Shift | Shift Supervisor function officer, field supervisor of one half of Shift city patrol officers | 321.00 | $12,168.25 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | STOLTS | NV Supervisory Ranger | Shift Supervisor, Swing Shift | Shift Supervisor function officer, field supervisor of one half of Shift city patrol officers | 205.50 | $11,596.52 |
| | | X | | X | | | | 201817-201818 | SUMINSKI | AZ Comm Center Manager | Dispatch Center Manager | Dispatch function Specialist, served as dispatch center manager and first line supervisor of control dispatchers | 99.50 | $3,293.56 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | SUTTON | CA Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 151.75 | $8,014.00 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | SWISHER | BRFO Wild Horse and Burro | Logistics Runner | Logistics support function specialist, served as purchase/delivery of logistics needs. Part-time, not on shift | 73.00 | $4,163.66 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | SZYMPRUCH | AZ District Ranger | City Patrol, Day Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations | 156.25 | $10,722.10 |
| | | | | X | | | | 201819-201821 | TAYLOR | Administrative Support Assistant | Administrative Support | Administrative Support Services on phone. | 129.50 | $5,285.13 |
| 8/18/18–09/05/18 | X | | X | X | | | | 201818-201820 | TEMPLETON | OLES Region 5 ASAC | Medical Unit Leader, Day Shift | Medical function officer, served as lead of BLM's medical unit | 208.00 | $20,816.68 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | TITUS | CA Supervisory Ranger | Shift Supervisor, Night Shift | Shift Supervisor function officer, field supervisor of one half of Shift city patrol officers | 205.50 | $17,333.56 |
| 8/20/18–09/05/18 | | | | | | | X | 201822 | TRIPP | WDO Range Technician | Compliance | Assisted in pre-use inspection and SRP close-out | 12.50 | $272.48 |
| 8/20/18–09/05/18 | | | | X | | | | 201819-201820 | VANAIRSDALE | OPR Special Agent | OPR Agent | OPR function officer, event on-site Internal Affairs component and the Office of Force reports | 143.00 | $15,176.28 |
| 8/20/18–09/05/18 | | X | | X | X | | | 201819-201820 | WEAVER | ID LE IT Specialist | IMARS | IMARS Support function officer, coordinates event IMARS program | 149.75 | $10,914.40 |
| 8/20/18–09/05/18 | X | | X | X | | | | 201816-201820 | WELTY | CCDO - GIS Specialist | GIS | Compliance function Specialist, assist environment, vending monitoring teams with GIS tools, assisted LE and CivCon with GPS | 256.00 | $11,915.16 |

AR11414

| DATE | PLANNING | SET UP PRE-EVENT | PRE-EVENT | MAIN EVENT | POST-EVENT | CLOSE OUT | PAY PERIOD | LAST NAME | YEAR ROUND TITLE | PROJECT COMPONENT / TITLE | DESCRIPTION OF WORK | TOTAL HOURS | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/20/18-201820 | x | | | x | | | 201810-201820 | WHETSTONE | Winnemucca Archaeologist | Compliance | Responded to event for additional compliance during negotiation process. | 15.50 | $780.84 |
| 8/20/18-091518 | | | x | x | | | 201819-201820 | WHITWORTH | ID Field Staff Ranger, K9 | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 164.00 | $11,988.97 |
| 8/20/18-091518 | | | x | x | | | 201819-201820 | WILCOX, J. | OR Supervisory Ranger | Investigation (Patrol Investigative Support), Day Shift | Patrol Investigative Support function officer, works in patrol function in uniform to conduct any patrol cases that require follow-up investigation. | 175.25 | $15,861.94 |
| 8/20/18-091518 | | x | | x | | | 201819-201820 | WILCOX, J.R. | NV Field Staff Ranger | City Patrol, Night Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 186.75 | $12,115.14 |
| 8/20/18-091518 | x | | | | | | 201819-201820 | WILSON | NV Special Agent | Investigations (Integrated Investigations), Night Shift | Integrated Investigations function officer, works for Pershing County Sheriffs to assist in investigations of state violations. | 126.00 | $11,172.88 |
| 7/23/18-091518 | | x | x | x | x | | 201817-201820 | WISEMORE | Ely Telecommunications | Comm Lead | Communications function, supervisor of radio/dispatch communications network program. | 381.00 | $20,701.08 |
| | x | x | x | x | x | | 201809-201821 | J. YOUNG | OLES Region 5 State Chief Ranger | Comm Chief, Day Shift | Communication Function, Chief of program which includes radio network, dispatch, IT Equipment and IT Security. | 542.00 | $32,679.88 |
| 03/05/18-091518 | x | | x | x | x | | 201818-201820 | ZOHOVETZ | NV Resident Ranger | City Patrol, Swing Shift | City Patrol function officer, works patrol in the city/closure area to enforce federal laws, CFR regulations, CO restrictions, permit stipulations. | 175.50 | $12,169.89 |
| | | | | | | | | | | | LABOR TOTAL: | 22,310.50 | 1,857,140.67 |

AR11415

## OTHER RUNNING MANAGEMENT CONTRACTS/AGREEMENTS (YFP23)

| NO. | CONTRACTOR | PURPOSE | AMOUNT OBLIGATED | AMOUNT INVOICED | SOLE SOURCE | ONE-TIME vs. ANNUAL (see Attached) | CONTRACT DOCUMENT (see Attached) |
|---|---|---|---|---|---|---|---|
| | | SUPPORT LABOR AGREEMENTS | | | | | |
| 1 | IAA USDA (Forest Service) Labor | LE Parols | $40,000.00 | $37,345.14 | Yes | Annual | L18PG00106 |
| 2 | IAA HHS Labor | Medical Support | $20,000.00 | $2,394.88 | Yes | Annual | L18PG00086 |
| | | SUPPORT SERVICES/EQUIPMENT PLANNED CONTRACTS | | | | | |
| 3 | High Desert Internet Services | Network services | $130,618.00 | $130,618.00 | No | Annual | L3918P0122 |
| 4 | High Desert Internet Services | Microwave Internet Bandwith | $22,000.00 | $22,000.00 | No | Annual | L3918P0119 |
| 4 | Strohman Enterprises | Satellite tracking updates & service | $50,640.00 | $50,640.00 | Yes | Annual | L3918P0161 |
| 5 | Bruno's Country Club | Wiring | $17,000.00 | $17,000.00 | | One-Time | L3918P0163 |
| 6 | Waters Septic Tank Service | Septic | $12,740.00 | $9,065.00 | Yes | One-Time | L3918P0135 |
| 7 | Law Enforcement Temporary Placement | Dispatch | $199,870.00 | $199,870.00 | No | Annual | L3918P0120 |
| 8 | Federal Registor | Posting Fee of Closure Order in Federal Registor | $2,000.00 | $1,963.00 | Yes | Annual | N/A |
| | | SUPPORT SERVICES/EQUIPMENT MISC CONTRACT | | | | | |
| 9 | Relm Communications | Base Station Upgrade | $13,118.78 | $13,118.78 | Yes | One-Time | L3918F0018 |

Total Labor (Agreements):  $39,740.02  
Total (Planned Contracts):  $431,156.00  
Total (Misc Contract):  $13,118.78  
All Total:  $484,014.80

AR11416

## 2018 BURNING MAN - TRAVEL PER PERSON (ATT #3)

*Travel Expenses include (Not all personnel have each item): Airfare, Lodging, Per Diem and Travel Incidentals, and Rental Car*

| LAST NAME | AMOUNT | TRIP PURPOSE |
|---|---|---|
| ALBRIGHT | $161.00 | Travel for related assigned duties at Burning Man event. |
| ALLEN | $367.75 | Travel for related assigned duties at Burning Man event. |
| ANDRES | $154.75 | Travel for related assigned duties at Burning Man event. |
| BALDWIN | $309.74 | Travel for related assigned duties at Burning Man event. |
| BOIK | $185.75 | Travel for related assigned duties at Burning Man event. |
| BOXX | $230.00 | Travel for related assigned duties at Burning Man event. |
| BRIDGES | $427.00 | Travel for related assigned duties at Burning Man event. |
| BRISCOE | $171.00 | Travel for related assigned duties at Burning Man event. |
| BROWN | $245.25 | Travel for related assigned duties at Burning Man event. |
| BUCHANAN | $175.50 | Travel for related assigned duties at Burning Man event. |
| BULKLEY | $388.03 | Travel for related assigned duties at Burning Man event. |
| BURGESS | $450.62 | Travel for related assigned duties at Burning Man event. |
| CADIGAN | $285.75 | Travel for related assigned duties at Burning Man event. |
| CARTER, D. | $776.89 | Travel for related assigned duties at Burning Man event. |
| CASTRO | $202.25 | Travel for related assigned duties at Burning Man event. |
| CASTRO-ESCOBAR | $69.75 | Travel for related assigned duties at Burning Man event. |
| CHAIDEZ | $194.66 | Travel for related assigned duties at Burning Man event. |
| CHODOROWSKI | $782.38 | Travel for related assigned duties at Burning Man event. |
| CULVER | $190.75 | Travel for related assigned duties at Burning Man event. |
| CUNNINGHAM | $557.50 | Travel for related assigned duties at Burning Man event. |
| DAVIS | $634.12 | Travel for related assigned duties at Burning Man event. |
| DUE | $308.75 | Travel for related assigned duties at Burning Man event. |
| DUHRSEN | $2,039.35 | Travel for related assigned duties at Burning Man event. |
| FELIX | $146.00 | Travel for related assigned duties at Burning Man event. |
| FINCHER | $543.75 | Travel for related assigned duties at Burning Man event. |
| FISCHER | $94.75 | Travel for related assigned duties at Burning Man event. |
| FONKEN | $419.30 | Travel for related assigned duties at Burning Man event. |
| FREIBERG | $69.75 | Travel for related assigned duties at Burning Man event. |
| GAARD | $424.25 | Travel for related assigned duties at Burning Man event. |
| GANDIAGA | $210.75 | Travel for related assigned duties at Burning Man event. |
| GRAHAM | $1,031.58 | Travel for related assigned duties at Burning Man event. |
| GOCHIS | $160.75 | Travel for related assigned duties at Burning Man event. |
| GONZALEZ | $402.00 | Travel for related assigned duties at Burning Man event. |
| GRIMES | $543.75 | Travel for related assigned duties at Burning Man event. |
| HARPER | $209.75 | Travel for related assigned duties at Burning Man event. |
| HARRISON | $146.00 | Travel for related assigned duties at Burning Man event. |
| HAUCK | $160.75 | Travel for related assigned duties at Burning Man event. |
| HONE | $19.75 | Travel for related assigned duties at Burning Man event. |
| HUEGERICH | $146.00 | Travel for related assigned duties at Burning Man event. |
| HUSTON | $1,183.54 | Travel for related assigned duties at Burning Man event. |
| IAGULLI | $531.75 | Travel for related assigned duties at Burning Man event. |
| JONES | $548.02 | Travel for related assigned duties at Burning Man event. |
| KEREKES | $564.30 | Travel for related assigned duties at Burning Man event. |
| KING | $801.00 | Travel for related assigned duties at Burning Man event. |
| KNISLEY | $145.75 | Travel for related assigned duties at Burning Man event. |
| LACA | $82.75 | Travel for related assigned duties at Burning Man event. |
| LLOYD, K. | $384.36 | Travel for related assigned duties at Burning Man event. |
| LLOYD, R. | $338.00 | Travel for related assigned duties at Burning Man event. |

AR11417

| | | |
|---|---|---|
| MARSOOBIAN | $606.80 | Travel for related assigned duties at Burning Man event. |
| MARTIN | $255.50 | Travel for related assigned duties at Burning Man event. |
| MATOS-PAGAN | $175.75 | Travel for related assigned duties at Burning Man event. |
| MATTHEWS | $404.00 | Travel for related assigned duties at Burning Man event. |
| MCDANIEL | $355.37 | Travel for related assigned duties at Burning Man event. |
| MCDERMOTT | $160.75 | Travel for related assigned duties at Burning Man event. |
| MCDONALD | $475.59 | Travel for related assigned duties at Burning Man event. |
| MCGRATH | $176.00 | Travel for related assigned duties at Burning Man event. |
| MCKINNEY | $294.50 | Travel for related assigned duties at Burning Man event. |
| MCKINNON | $112.75 | Travel for related assigned duties at Burning Man event. |
| MEUTH | $422.66 | Travel for related assigned duties at Burning Man event. |
| MILLER | $539.93 | Travel for related assigned duties at Burning Man event. |
| MITSUYASU | $203.75 | Travel for related assigned duties at Burning Man event. |
| MOORE | $175.75 | Travel for related assigned duties at Burning Man event. |
| NEEL | $175.75 | Travel for related assigned duties at Burning Man event. |
| NICHOLS | $466.46 | Travel for related assigned duties at Burning Man event. |
| PAIVA | $219.31 | Travel for related assigned duties at Burning Man event. |
| PHILIPP | $165.75 | Travel for related assigned duties at Burning Man event. |
| PIRTLE | $947.76 | Travel for related assigned duties at Burning Man event. |
| PRESLEY | $175.75 | Travel for related assigned duties at Burning Man event. |
| PURDY | $400.75 | Travel for related assigned duties at Burning Man event. |
| REGNELL | $483.95 | Travel for related assigned duties at Burning Man event. |
| RICH | $719.23 | Travel for related assigned duties at Burning Man event. |
| ROBINSON | $473.16 | Travel for related assigned duties at Burning Man event. |
| ROMERO | $302.75 | Travel for related assigned duties at Burning Man event. |
| ROOP | $175.75 | Travel for related assigned duties at Burning Man event. |
| ROREX | $127.75 | Travel for related assigned duties at Burning Man event. |
| RUSSELL | $138.84 | Travel for related assigned duties at Burning Man event. |
| SAKAHARA | $461.25 | Travel for related assigned duties at Burning Man event. |
| SARCINELLA | $176.75 | Travel for related assigned duties at Burning Man event. |
| SAWTELL | $288.75 | Travel for related assigned duties at Burning Man event. |
| SCHWIRIAN | $977.24 | Travel for related assigned duties at Burning Man event. |
| SHARKEY | $731.19 | Travel for related assigned duties at Burning Man event. |
| SMITH | $497.53 | Travel for related assigned duties at Burning Man event. |
| SPENCER | $407.75 | Travel for related assigned duties at Burning Man event. |
| STOLTS | $190.75 | Travel for related assigned duties at Burning Man event. |
| SUTTON | $151.00 | Travel for related assigned duties at Burning Man event. |
| SZYMPRUCH | $484.37 | Travel for related assigned duties at Burning Man event. |
| TAYLOR | $44.75 | Travel for related assigned duties at Burning Man event. |
| TEMPLETON | $347.49 | Travel for related assigned duties at Burning Man event. |
| TITUS | $591.20 | Travel for related assigned duties at Burning Man event. |
| VAN AIRSDALE | $363.25 | Travel for related assigned duties at Burning Man event. |
| WEAVER | $160.75 | Travel for related assigned duties at Burning Man event. |
| WELTY | $170.75 | Travel for related assigned duties at Burning Man event. |
| WHITWORTH | $375.91 | Travel for related assigned duties at Burning Man event. |
| WILCOX | $175.75 | Travel for related assigned duties at Burning Man event. |
| WILSON | $204.75 | Travel for related assigned duties at Burning Man event. |
| WISEMORE | $1,641.80 | Travel for related assigned duties at Burning Man event. |
| YOUNG | $1,505.49 | Travel for related assigned duties at Burning Man event. |
| ZOHOVETZ | $195.75 | Travel for related assigned duties at Burning Man event. |
| WINNEMUCA | $14.75 | Travel for related assigned duties at Burning Man event. |
| TOTAL | $38,107.92 | |

AR11418

## 2018 BURNING MAN - VEHICLE UTILIZATION (ATT#4)

| Plate Number | Utilization Amount | | Plate Number | Utilization Amount |
|---|---|---|---|---|
| 933 | $524.17 | | 768 | $1,290.64 |
| 304 | $420.66 | | 779 | $1,197.27 |
| 272 | $142.68 | | 862 | $1,373.13 |
| 173 | $605.15 | | 867 | $665.15 |
| 280 | $236.40 | | 919 | $851.14 |
| 436 | $476.47 | | 024 | $574.20 |
| 993 | $1,425.60 | | 043 | $551.25 |
| 098 | $920.00 | | 098 | $626.46 |
| 109 | $535.30 | | 141 | $1,846.00 |
| 110 | $465.96 | | 191 | $1,163.01 |
| 304 | $373.10 | | 194 | $811.65 |
| 316 | $1,254.12 | | 235 | $642.84 |
| 318 | $349.12 | | 296 | $499.26 |
| 355 | $86.92 | | 469 | $965.61 |
| 585 | $547.84 | | 881 | $915.00 |
| 668 | $621.40 | | 703M | $5.11 |
| 678 | $1,047.28 | | 127R | $728.78 |
| 730 | $1,054.70 | | 317S | $1,195.36 |
| 736 | $517.28 | | 366M | $475.76 |
| 781 | $1,106.36 | | 665S | $437.93 |
| 782 | $556.24 | | 829R | $212.99 |
| 808 | $376.72 | | TOTAL | $45,116.72 |
| 884 | $1,569.48 | | | |
| 977 | $602.61 | | | |
| 980 | $988.90 | | | |
| 030 | $768.42 | | | |
| 072 | $458.20 | | | |
| 073 | $1,144.64 | | | |
| 075 | $995.96 | | | |
| 095 | $729.95 | | | |
| 239 | $655.61 | | | |
| 267 | $288.50 | | | |
| 299 | $1,457.54 | | | |
| 428 | $452.62 | | | |
| 447 | $317.85 | | | |
| 448 | $279.50 | | | |
| 560 | $527.88 | | | |
| 561 | $407.04 | | | |
| 566 | $922.70 | | | |
| 696 | $1,728.89 | | | |
| 707 | $148.42 | | | |

AR11419

## 2018 BURNING MAN MISC. SUPPLIES AND EQUIPMENT (ATT. 5)

| RECEIPT # | CARD HOLDER | VENDOR | AMOUNT | DESCRIPTION |
|---|---|---|---|---|
| R-1 | ANDRES | OFFICE DEPOT 3252 | $ 30.95 | Office Supplies |
| R-2 | ANDRES | R & S ARMY-NAVY STORE | $ 1,499.50 | Employee Safety Supplies |
| R-3 | ANDRES | RPS PRINTING | $ 266.25 | Copying/Printing |
| R-4 | ANDRES | HIGH DESERT MOBILE DETAIL | $ 475.00 | Trailer cleaning |
| R-5 | ANDRES | TACTICALGEAR.COM | $ 963.79 | Employee Safety Supplies |
| R-6 | ANDRES | WWW.IBSUPPLY.COM | $ 63.27 | Office Supplies |
| R-7 | APPOLD | CC 1052 GERLACH IMPROVEME | $ 175.00 | Space Rental |
| R-8 | APPOLD | CONVENIENCE CHECK FEE | $ 3.33 | Space Rental |
| R-9 | APPOLD | SPORTS DEN CORPORAT | $ 1,562.91 | Uniform for Civilian Ops |
| R-10 | ARBONIES | HUMBOLDT PRINTERS LLC | $ 86.20 | Printing |
| R-11 | CADIGAN | BERNARDO ESTRADA DETAI | $ 160.00 | Vehicle Cleaning |
| R-12 | CADIGAN | BERNARDO ESTRADA DETAI | $ 160.00 | Vehicle Cleaning |
| R-13 | CADIGAN | BIG R | $ 173.41 | Field Supplies |
| R-14 | CADIGAN | USPS PO 3197600445 | $ 3.95 | Postage |
| R-15 | DUE | BRUNOS GAS & TOWING | $ 36.00 | Logistical Supplies |
| R-16 | DUE | LOWES 02661* | $ 55.45 | Logistical Supplies |
| R-17 | DUE | LOWES 02661* | $ 125.03 | Logistical Supplies |
| R-18 | DUE | PEPBOYS STORE 708 | $ 100.37 | Logistical Supplies |
| R-19 | DUE | WM SUPERCENTER 4370 | $ 1,040.77 | Medical Supplies |
| R-20 | DUHRSEN | BEARCO SINCLAIR | $ 24.00 | Rental Car Fuel |
| R-21 | FERGUSON | VF IMAGEWEAR INC | $ 1,995.00 | Uniform for Civilian Ops |
| R-22 | FERGUSON | VF IMAGEWEAR INC | $ 95.00 | Uniform for Civilian Ops |
| R-23 | FERGUSON | VF IMAGEWEAR INC | $ 95.00 | Uniform for Civilian Ops |
| R-24 | FERGUSON | VF IMAGEWEAR INC | $ 95.00 | Uniform for Civilian Ops |
| R-25 | FISCHER | ADORAMA INC | $ 132.79 | Evidence Supplies |
| R-26 | FISCHER | CAPRICE ELECTRONICS | $ 204.98 | Evidence Supplies |
| R-27 | FISCHER | EVIDENT INC | $ 293.22 | Evidence Supplies |
| R-28 | FISCHER | EVIDENT INC | $ 164.40 | Evidence Supplies |
| R-29 | FISCHER | PREMIER & COMPANIES, I | $ 39.06 | Evidence Supplies |
| R-30 | FISCHER | PREMIER & COMPANIES, I | $ 112.88 | Evidence Supplies |
| R-31 | FISCHER | THE LAB DEPOT | $ 421.50 | Evidence Supplies |
| R-32 | GARSIDE | AMZN MKTP US AMZN.COM/ | $ 140.34 | Logistical Supplies |
| R-33 | GARSIDE | AUTOZONE 3742 | $ 53.55 | Logistical Supplies |
| R-34 | GARSIDE | BIG R OF FERNLEY 5 | $ 14.77 | Logistical Supplies |
| R-35 | GARSIDE | HOMEDEPOT COM | $ 159.60 | Logistical Supplies |
| R-36 | GARSIDE | PREMIER & COMPANIES, I | $ 192.00 | Logistical Supplies |
| R-37 | GARSIDE | TALLMAN LUMBER COMPANY | $ 26.89 | Logistical Supplies |
| R-38 | GARSIDE | WM SUPERCENTER 2617 | $ 105.90 | Logistical Supplies |

AR11420

| R-39 | GARSIDE | WWW.IBSUPPLY.COM | $ 175.43 | Logistical Supplies |
|---|---|---|---|---|
| R-40 | GARSIDE | WWW.IBSUPPLY.COM | $ 308.47 | Logistical Supplies |
| R-41 | GRAHAM | SQU*SQ *APPLE VALLEY A | $ 200.00 | Vehicle Cleaning |
| R-42 | LEFLAR | BERNARDO ESTRADA DETAI | $ 160.00 | Vehicle Cleaning |
| R-43 | LEFLAR | BERNARDO ESTRADA DETAI | $ 160.00 | Vehicle Cleaning |
| R-44 | LEFLAR | BERNARDO ESTRADA DETAI | $ 160.00 | Vehicle Cleaning |
| R-45 | LEFLAR | BERNARDO ESTRADA DETAI | $ 320.00 | Vehicle Cleaning |
| R-46 | NIEMAN | AMZN MKTP US AMZN.COM/ | $ 305.38 | Employee Safety Supplies |
| R-47 | NIEMAN | STAPLES    00101196 | $ 132.88 | Office Supplies |
| R-48 | SHAARDA | FEDEX 98714397 | $ 5.37 | Postage |
| R-49 | SHAARDA | FEDEX 99819350 | $ 999.93 | Postage |
| R-50 | SPENCER | CVS/PHARMACY 09981 | $ 98.21 | Logistical Supplies |
| R-51 | SPENCER | LOWES 01024* | $ 222.89 | Logistical Supplies |
| R-52 | SPENCER | NAPA AUTO TRUCK PARTS | $ 92.02 | Logistical Supplies |
| R-53 | SPENCER | SAVEMART 552 CARSON | $ 33.46 | Logistical Supplies |
| R-54 | VERMEYS | SKY MOBILE DETAILING | $ 300.00 | Vehicle Cleaning |
| R-55 | WALKAMA | FEDEX 30164372 | $ 277.00 | Postage |
| R-56 | WISEMORE | AMAZON MKTPLACE PMTS W | $ 132.93 | Communications Supplies |
| R-57 | WISEMORE | AMZN MKTP US | $ 701.94 | Communications Supplies |
| R-58 | WISEMORE | AMZN MKTP US AMZN.COM/ | $ 22.98 | Communications Supplies |
| R-59 | WISEMORE | AMZN MKTP US AMZN.COM/ | $ 93.84 | Communications Supplies |
| R-60 | WISEMORE | FACTORYOUTLETSTORE LLC | $ 715.00 | Communications Supplies |
| R-61 | WISEMORE | LOWES 03034* | $ 156.85 | Communications Supplies |
| R-62 | WISEMORE | LTS*LOGO&TEAM SPORTSW | $ 287.23 | Communications Supplies |
| R-63 | WISEMORE | OREILLY AUTO 3600 | $ 69.95 | Communications Supplies |
| R-64 | YOUNG | AMZN MKTP US | $ 200.10 | Communications Supplies |
| R-65 | YOUNG | AMZN MKTP US AMZN COM/ | $ 852.76 | Communications Supplies |
| R-66 | YOUNG | BEST BUY    00001289 | $ 1,183.80 | Communications Supplies |
| R-67 | YOUNG | ELITE MOBILE AUTO DETA | $ 248.40 | Vehicle Cleaning |
| R-68 | YOUNG | INREACH INC | $ 81.45 | Communications Service |

AR11421

| R-69 | YOUNG | OFFICEMAX/DEPOT 6692 | | $ 372.79 | Communications Supplies |
|------|-------|----------------------|--|----------|--------------------------|
| R-70 | YOUNG | PARAMOUNT RV STORE | | $ 430.84 | Communications Supplies |
| R-71 | YOUNG | THE HOME DEPOT 3310 | | $ 22.23 | Employee Safety Supplies |
| R-72 | YOUNG | THE HOME DEPOT 488 | | $ 526.05 | Communications Supplies |
| R-73 | YOUNG | THE HOME DEPOT 488 | | $ 506.80 | Communications Supplies |
| R-74 | YOUNG | WAL-MART 2189 | | $ 42.84 | Medical Supplies |
| R-75 | YOUNG | WM SUPERCENTER 2189 | | $ 311.42 | Medical Supplies |
| TOTAL | | | $22,258.30 | | |

1   David S. Levin (CA Bar No. 156336)
    LEVIN LAW FIRM
2   405 Sherman Ave
    Palo Alto, CA 94306-1827
3   Telephone: (650) 858-8500
    david@levinlawfirm.com
4
    Attorneys for Appellant,
5   Black Rock City LLC

6

7

8              UNITED STATES DEPARTMENT OF INTERIOR

9               INTERIOR BOARD OF LAND APPEALS

10

11  BLACK ROCK CITY LLC,                Case Identification No. ·

12          Appellant,                  Special Recreation Permit
                                        LLNVW03500-18-01
13          v.                          2930 (NV030.10)

14  BUREAU OF LAND MANAGEMENT,

15          Appellee.                   **Notice of Appeal to the Interior Board of
                                        Land Appeals**

16

17

18          Appellant Black Rock City LLC ("BRC") hereby appeals to the Interior Board of Land

19  Appeals, the Bureau of Land Management's Final Cost Recovery Decision for the Burning

20  Man 2018 Event Special Recreation dated March 29, 2019 ("Decision"), a copy of which is

21  attached as Exhibit A.  BRC is informed and believes that the Decision was transmitted by

22  Federal Express delivery service, and BRC received a copy of the Decision on April 3, 2019.

23          This Appeal is filed pursuant to 43 C.F.R. § 4.411.  A Statement of Reasons will be

24  filed separately and within the timeframe described in 43 C.F.R. § 4.412.  This Notice of

25  Appeal is being served by delivery service in accordance with 43 C.F.R. § 4.401(c) and 4.413

26  concurrently on:

27

28

                                    1
                            NOTICE OF APPEAL                        AR11423

1.    Mark E. Hall
      Field Manager, Black Rock Field Office
      Bureau of Land Management, Winnemucca District Office
      5100 E. Winnemucca Blvd
      Winnemucca, NV 89445; and,

2.    The Office of the Solicitor
      Pacific Southwest Regional Solicitor
      U.S. Dept. of the Interior
      2800 Cottage Way, Room E-1712
      Sacramento, CA 95825-1890


        A Certificate of Service will be filed with the Office of Hearings and Appeals within 15 days after service.


DATED:  April 26, 2019                    LEVIN LAW FIRM


                                          By: _____
                                              Davis S. Levin
                                              Attorneys for Appellant,
                                              BLACK ROCK CITY LLC

1   David S. Levin (CA Bar No. 156336)
    LEVIN LAW FIRM
2   405 Sherman Ave
    Palo Alto, CA 94301-1827
3   Telephone: (650) 858-8500
    david@levinlawfirm.com
4
    Attorneys for Appellant,
5   Black Rock City LLC

6

7

8                    UNITED STATES DEPARTMENT OF INTERIOR

9                       INTERIOR BOARD OF LAND APPEALS

10

11  BLACK ROCK CITY LLC,                    Case Identification No.:

12              Appellant,                  Special Recreation Permit
                                            LLNVW03500-18-01
13          v.                              2930 (NV030.10)

14  BUREAU OF LAND MANAGEMENT,
                                            **Certificate of Service**
15              Appellee.

16

17

18          I am a resident of the state of California and am over the age of eighteen years.  I am

19  not a party to the within action.  My business address is 405 Sherman Avenue; Palo Alto,

20  California  94306-1827.   On April 26, 2019, I served the foregoing document(s) described as:

21          **Notice of Appeal to the Interior Board of Land Appeals**

22  on the following interested parties:

23          1.      ORIGINAL:
                    Mark E. Hall
24                  Field Manager, Black Rock Field Office
                    Bureau of Land Management, Winnemucca District Office
25                  5100 E. Winnemucca Blvd
                    Winnemucca, NV 89445; and,
26

27

28

2.   COPY:
     The Office of the Solicitor
     Pacific Southwest Regional Solicitor
     U.S. Dept. of the Interior
     2800 Cottage Way, Room E-1712
     Sacramento, CA 95825-1890

[ ]   **VIA MAIL**:

Service was accomplished by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Palo Alto, California, addressed as set forth above.  I am readily familiar with this Firm's business practice of collection and processing of material for mailing by U.S. Mail, and any material placed for collection for mailing would, in the ordinary course of business, be deposited with the U.S. Postal service on that same day.

[XX]   **VIA EXPRESS MAIL/OVERNIGHT DELIVERY**:

Service was accomplished by placing the document(s) listed above in a sealed envelope(s), addressed as above, and placing each for collection by overnight mail service or overnight courier service. I am readily familiar with this Firm's business practice of collection and processing material for overnight mail or overnight courier service, and any material placed for collection for overnight delivery would, in the ordinary course of business, be delivered to an authorized courier or driver authorized by the overnight mail carrier to receive documents, with delivery fees paid, for delivery on the following business day.

[ ]   **BY E-MAIL/NEF:**

Service was accomplished through the Notice of Electronic Filing ("NEF") for parties and counsel who are registered ECF Users.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Certificate of Service was executed on April 26, 2019 at Palo Alto, California.

Chris Gaither

CERTIFICATE OF SERVICE                                              AR11426

Exhibit "工 "

.

Exhibit "工"
AR11427

  **BUDGET OBJECT CLASS 21 / TRAVEL**

| WBS Element | Budget Object Class | Document type | Last Name | First Name | CC Vendor Name | Created by | Posting Date (Per SPL) | FI Line Items (Invoice/Pay ments) |
|---|---|---|---|---|---|---|---|---|
| LV.RC.F1201420 | 211D | Travel Invoice | ALBRIGHT | # | # | XI2SAP | 09/13/2012 | -433.50 |
| LV.RC.F1201420 | 211D | Travel Invoice | ALBRIGHT | CALVIN J | GOVTRIP | | | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | ALLEN | # | # | XI2SAP | 09/10/2012 | -362.50 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | ALLEN | CHRISTOPHER A | SOUTHWES 5262461585125 | CSANDBER | 09/19/2012 | -359.60 |
| LV.RC.F1201420 | 211I | Ch.Card Reallocation | ALLEN | CHRISTOPHER A | MCCARRAN INT L AIRPORT | CSANDBER | 09/19/2012 | -110.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | ALLEN | CHRISTOPHER A | GOVTRIPTAV 0SSWAR | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | ALLEN | CHRISTOPHER A | SATOFEE 52624615851251 | CSANDBER | 09/19/2012 | -4.35 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | ALLEN | CHRISTOPHER A | SOUTHWES 6282463871722 | CSANDBER | 09/19/2012 | -5.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | ALLEN | CHRISTOPHER A | HYATT HOTELS | CSANDBER | 09/19/2012 | -957.11 |
| LV.RC.F1201420 | 211R | Ch.Card Reallocation | ALLEN | CHRISTOPHER A | DOLLAR RAC RNO | CSANDBER | 09/19/2012 | -277.32 |
| LV.RC.F1201420 | 211D | Travel Invoice | ARRIES | # | # | XI2SAP | 08/11/2012 | -768.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | ARRIES | JAY W | GOVTRIPTAV 0SS84F | JMOHAN | 08/30/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | ARRIES | JAY W | RENAISSANCE HOTELS LAS | JMOHAN | 09/11/2012 | -99.68 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | ARRIES | JAY W | COURTYARD BY MARRIOTT | JMOHAN | 08/30/2012 | -109.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | ARRIES | JAY W | RENAISSANCE HOTELS LAS | JMOHAN | 09/11/2012 | -99.68 |
| LV.RC.F1201420 | 211D | Travel Invoice | AUGUST | # | # | XI2SAP | 12/07/2012 | -1,846.23 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | AUGUST | RANDALL | GOVTRIPTAV | | | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | AUSEMA | # | # | XI2SAP | 09/10/2012 | -800.25 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | AUSEMA | MICHAEL P | GOVTRIPTAV 0STKHJ | CKILLING | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | AUSEMA | MICHAEL P | HIGH COUNTRY INN | CKILLING | 09/18/2012 | -77.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | AUSEMA | MICHAEL P | FAIRFIELD INN & STES R | CKILLING | 09/18/2012 | -96.57 |
| LV.RC.F1201420 | 211D | Travel Invoice | BARNES | # | # | XI2SAP | 09/07/2012 | -574.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BARNES | DANIEL L | GOVTRIPTAV 0SRFM7 | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BARNES | DANIEL L | HOLIDAY INN EXPRESS | CSANDBER | 09/14/2012 | -84.85 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BARNES | DANIEL L | HOLIDAY INN EXPRESS | CSANDBER | 09/19/2012 | -84.85 |
| LV.RC.F1201420 | 211D | Travel Invoice | BARRIOS | # | # | XI2SAP | 09/12/2012 | -484.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BARRIOS | KYNAN L | GOVTRIP | | 09/12/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | BELL | # | # | XI2SAP | 11/07/2012 | -607.50 |
| LV.RC.F1201420 | 211I | Travel Invoice | BELL | # | LAUNDRY | XI2SAP | 11/07/2012 | -10.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | BELL | JENNA L | GOVTRIP | | 09/06/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BELL | JENNA L | SATOFEE 52624627607101 | JMOHAN | 09/06/2012 | -4.35 |
| LV.RC.F1201420 | 211P | Travel Invoice | BELL | # | POV MILEAGE | XI2SAP | 11/07/2012 | -22.20 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BELL | JENNA L | SOUTHWES 5262602249365 | JMOHAN | 09/20/2012 | -50.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BELL | JENNA L | SOUTHWES 5262602249363 | JMOHAN | 09/20/2012 | -100.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BELL | JENNA L | SOUTHWES 5262465268081 | JMOHAN | 09/06/2012 | -3.80 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BELL | JENNA L | SOUTHWES 5262462760710 | JMOHAN | 09/06/2012 | -541.60 |
| LV.RC.F1201420 | 211R | Ch.Card Reallocation | BELL | JENNA L | HERTZ RENT-A-CAR | JMOHAN | 09/20/2012 | -1,520.66 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BELL | JENNA L | STAYBRIDGE SUITES | JMOHAN | 09/06/2012 | -268.94 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BELL | JENNA L | HOLIDAY INN RENO | JMOHAN | 09/20/2012 | -129.99 |
| LV.RC.F1201420 | 211D | Travel Invoice | BOIK | # | # | XI2SAP | 03/12/2012 | -269.25 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | GOVTRIPTAV 0SC1ML | CSANDBER | 05/10/2012 | -15.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BOIK | ERIC R | UNITED 01670369738931 | CSANDBER | 05/10/2012 | -281.60 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | ISATOFEE 01670389738931 | CSANDBER | 05/10/2012 | -28.50 |
| LV.RC.F1201420 | 211R | Ch.Card Reallocation | BOIK | ERIC R | HERTZ RENT-A-CAR | CSANDBER | 05/10/2012 | -229.47 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BOIK | ERIC R | FAIRFIELD INN & SUITE | CSANDBER | 05/10/2012 | -335.50 |
| LV.RC.F1201420 | 211I | Ch.Card Reallocation | BOIK | ERIC R | HEARST PARKING CENTER | CSANDBER | 05/10/2012 | -20.00 |
| LV.RC.F1201420 | 211T | Ch.Card Reallocation | BOIK | ERIC R | TAXI CAB SERVICE | CSANDBER | 05/10/2012 | -56.40 |
| LV.RC.F1201420 | 211I | Ch.Card Reallocation | BOIK | ERIC R | SLC INTERNATIONAL AIRP | CSANDBER | 05/10/2012 | -35.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | BOIK | # | # | XI2SAP | 05/09/2012 | -127.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | GOVTRIPTAV 0SIZJK | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BOIK | ERIC R | COURTYARD BY MARRIOTT | CSANDBER | 06/11/2012 | -212.44 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BOIK | ERIC R | DELTA 00870581684776 | CSANDBER | 06/11/2012 | -357.60 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | SATOFEE 00870581684771 | CSANDBER | 06/11/2012 | -28.50 |
| LV.RC.F1201420 | 211I | Ch.Card Reallocation | BOIK | ERIC R | SLC INTERNATIONAL AIRP | CSANDBER | 06/11/2012 | -21.00 |
| LV.RC.F1201420 | 211R | Ch.Card Reallocation | BOIK | ERIC R | DOLLAR RAC RNO | CSANDBER | 06/11/2012 | -91.93 |
| LV.RC.F1201420 | 211D | Travel Invoice | BOIK | # | # | XI2SAP | 07/10/2012 | -127.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | GOVTRIPTAV 0SNTQX | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BOIK | ERIC R | DELTA 00670714539902 | CSANDBER | 09/14/2012 | -357.60 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | SATOFEE 00670714539901 | CSANDBER | 09/14/2012 | -28.50 |

AR11428

 

## BUDGET OBJECT CLASS 21 / TRAVEL

| WBS Element | Budget Object Class | Document type | Last Name | First Name | CC Vendor Name | Created by | Posting Date (Per SPL) | FI Line Items (Invoice/Pay ments) |
|---|---|---|---|---|---|---|---|---|
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BOIK | ERIC R | HOMEWOOD SUITES RENO | CSANDBER | 08/14/2012 | -212.44 |
| LV.RC.F1201420 | 211R | Ch.Card Reallocation | BOIK | ERIC R | DOLLAR RAC RNO | CSANDBER | 08/14/2012 | -126.03 |
| LV.RC.F1201420 | 211D | Travel Invoice | BOIK | # | OSSEZD | XI2SAP | 09/20/2012 | -1,045.50 |
| LV.RC F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | GOVTRIPTAV OSOSSEZD | CSANDBER | 09/20/2012 | -15.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BOIK | ERIC R | DELTA  00671183526582 | CSANDBER | 08/14/2012 | -357.80 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | GOVTRIPTAV OSOSSEZD | CSANDBER | 09/20/2012 | -4.35 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BOIK | ERIC R | DELTA  00682752695483 | CSANDBER | 08/14/2012 | -25.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BOIK | ERIC R | ENTERPRISE RENT-A-CAR | CSANDBER | 08/14/2012 | -154.37 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | BOIK | ERIC R | COURTYARD BY MARRIOTT | CSANDBER | 08/14/2012 | -273.48 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | SOUTHWES 5262456621075 | CSANDBER | 08/14/2012 | -259.30 |
| LV.RC.F1201420 | 211I | Ch.Card Reallocation | BOIK | ERIC R | CWTSATOTR 92624566210761 | CSANDBER | 08/14/2012 | -28.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOIK | ERIC R | DUDS N SUDS | CSANDBER | 09/20/2012 | 10.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BOIK | ERIC R | COURTYARD BY MARRIOTT | CSANDBER | 09/20/2012 | -793.25 |
| LV.RC.F1201420 | 211D | Travel Invoice | BOIK | ERIC R | COURTYARD BY MARRIOTT | CSANDBER | 09/20/2012 | -531.10 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BOONE | # | X12SAP | | 09/13/2012 | -497.25 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BOONE | ANTONIO D | GOVTRIPTAV 0STG6W | MCHATTER | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BOONE | ANTONIO D | HOLIDAY INN EXPRESS | MCHATTER | 09/18/2012 | -300.30 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BOONE | ANTONIO D | HOLIDAY INN RENO | MCHATTER | 09/18/2012 | -135.59 |
| LV.RC.F1201420 | 211D | Travel Invoice | BRADFORD | # | X12SAP | | 09/07/2012 | -848.75 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BRADFORD | TERRELL R | GOVTRIPTAV OSSEVO | TBACA | 09/10/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BRADFORD | TERRELL R | MARRIOTT JW LAS VEGAS | TBACA | 08/01/2012 | -110.88 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BRADFORD | TERRELL R | HOLIDAY INN RENO | TBACA | 08/01/2012 | -104.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | BRADFORD | TERRELL R | BEST WESTERN HOLIDAY S | TBACA | 09/11/2012 | -66.52 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BRASINGTON | # | X12SAP | | 09/20/2012 | -658.75 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BRASINGTON | PATRICK E | GOVTRIPTAV 0SPVA0 | JMOHAN | 11/29/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BRASINGTON | PATRICK E | BEST WESTERN HOTEL FER | JMOHAN | 08/30/2012 | -154.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | BRUSE | # | X12SAP | | 09/19/2012 | -1,036.75 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BRUSE | RACHELLE D | GOVTRIPTAV 0STF56 | CSANDBER | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BRUSE | RACHELLE D | COURTYARD BY MARRIOTT | CSANDBER | 09/13/2012 | -604.65 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BRUSE | RACHELLE D | COURTYARD BY MARRIOTT | CSANDBER | 09/13/2012 | -376.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | BRUSE | RACHELLE D | HOLIDAY INNS | CSANDBER | 09/13/2012 | -77.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BULKLEY | # | X12SAP | | 09/11/2012 | -871.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BULKLEY | JASON R | GOVTRIPTAV 0SSM/BV | JMOHRN | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BULKLEY | JASON R | ELY LA QUINTA | DHANCOCK | 09/10/2012 | -85.47 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BULKLEY | JASON R | HOLIDAY INN EXPRESS | DHANCOCK | 09/10/2012 | -84.85 |
| LV.RC.F1201420 | 211D | Travel Invoice | BULKLEY | JASON R | CEDAR CITY HOLIDAY INN | JMOHRN | 09/18/2012 | -84.93 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | BUNKALL | # | X12SAP | | 09/11/2012 | -374.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | BUNKALL | ROBERT | GOVTRIPTAV 0SU09C | ASOTOMIL | 09/24/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | BURKE | # | X12SAP | | 09/10/2012 | -625.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BURKE | ALEXANDRA L | GOVTRIPTAV 0SS3N9 | | | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BURKE | ALEXANDRA L | TRAVELODGE ELKO | | | -56.99 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BURKE | ALEXANDRA L | COURTYARD BY MARRIOTT | | | -121.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BURKE | ALEXANDRA L | COURTYARD BY MARRIOTT | | | -94.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | BURKE | ALEXANDRA L | FAIRFIELD INN & SUITES | | | -61.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | CADIGAN | # | | X12SAP | 09/11/2012 | -340.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CADIGAN | # | GOVTRIPTAV | | | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | CAFFEY | # | | X12SAP | 09/07/2012 | -484.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CAFFEY | JASON R | GOVTRIPTAV 0SS2AK | | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | CAFFEY | # | | X12SAP | 12/04/2012 | -331.50 |
| LV.RC.F1201420 | | | CAFFEY | | LODGING? | | | |
| LV.RC.F1201420 | 211D | Travel Invoice | CARMOSINO | # | | X12SAP | 09/11/2012 | -442.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CARMOSINO | VITO J | GOVTRIPTAV 0STTM0 | ASOTOMIL | 09/24/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | CARPENTER | Michael | # | X12SAP | 09/13/2012 | -738.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CARPENTER | MICHAEL | GOVTRIPTAV OSTUSE | | | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CARPENTER | MICHAEL | MARRIOTT LAS VEGAS | | | 110.88 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CARPENTER | MICHAEL | HOLIDAY INN EXPRESS | | | -106.22 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CARPENTER | MICHAEL | HOLIDAY INN | | | -94.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | CARTER | | # | X12SAP | 09/14/2012 | 622.50 |

AR11429

## BUDGET OBJECT CLASS 21 / TRAVEL

| WBS Element | Budget Object Class | Document type | Last Name | First Name | CC Vendor Name | Created by | Posting Date (Per SPL) | FI Line Items (Invoice/Payments) |
|---|---|---|---|---|---|---|---|---|
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CARTER JR | DOUGLAS R | GOVTRIPTAV 0SVZ1L | BLEONGUE | 09/24/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARTER JR | DOUGLAS R | ELDORADO FRONT DESK | BLEONGUE | 10/24/2012 | -85.22 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARTER JR | DOUGLAS R | COMFORT SUITES FERNLEY | BLEONGUE | 10/24/2012 | -251.79 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARTER JR | DOUGLAS R | COMFORT SUITES FERNLEY | BLEONGUE | 10/24/2012 | -83.93 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARTER JR | DOUGLAS R | COMFORT SUITES FERNLEY | BLEONGUE | 10/24/2012 | -567.51 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARTER JR | DOUGLAS R | COMFORT SUITES FERNLEY | BLEONGUE | 10/24/2012 | -251.79 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARTER JR | DOUGLAS R | HOTELS.COM US | BLEONGUE | 10/24/2012 | -132.90 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CARTER JR | DOUGLAS R | SILVER LEGACY HOTEL FR | BLEONGUE | 10/24/2012 | -22.16 |
| LV.RC.F1201420 | 211B | Travel Invoice | CARY | # | # | XI2SAP | 09/12/2012 | -1,003.76 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CARY | JASON | GOVTRIPTAV 0SSICM | MMATTY | 09/21/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARY | JASON | HILTON GARDEN INN RENO | MMATTY | 09/10/2012 | -138.73 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARY | JASON | EMBASSY SUITES CONV CT | MMATTY | 09/10/2012 | -110.88 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARY | JASON | STURGEONS CASINO HOTEL | MMATTY | 09/10/2012 | -53.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CARY | JASON | EMBASSY SUITES CONV CT | MMATTY | 09/10/2012 | -110.88 |
| LV.RC.F1201420 | 211D | Travel Invoice | CRANE | # | # | XI2SAP | 09/20/2012 | -788.75 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CRANE | JOSEPH A | GOVTRIPTAV 0STGXM | ALELOUP | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | CRANE | JOSEPH A | BEST WESTERN HOTEL FER | ALELOUP | 09/13/2012 | -77.00 |
| LV.RC.F1201420 | 211L | Ch.Card Reallocation | CRANE | JOSEPH A | BRUNOS COUNTRY CLUB | ALELOUP | 01/02/2013 | -278.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | CUNNINGHAM | # | # | XI2SAP | 09/11/2012 | -561.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CUNNINGHAM | STEVE | GOVTRIPTAV 0SSJH4 | | 09/21/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CUNNINGHAM | STEVE | MARRIOTT SLC | | 09/21/2012 | -120.10 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CUNNINGHAM | STEVE | COMFORT SUITES | | 09/21/2012 | -77.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CUNNINGHAM | STEVE | MARRIOTT SLC | | 09/21/2012 | -120.10 |
| LV.RC.F1201420 | 211D | Travel Invoice | CURRY | # | # | XI2SAP | 09/11/2012 | -535.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CURRY | JASON A | GOVTRIPTAV 0STFFG | | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CURRY | JASON A | COURTYARD BY MARRIOTT | | | -121.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | CURRY | JASON A | COURTYARD BY MARRIOTT | | | -94.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | DIXON | GERALD | GOVTRIPTAV 0SUT5I | ETAYLOR | 11/29/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | DIXON | GERALD | SATOFEE 6903S276317550 | ETAYLOR | 09/13/2012 | -4.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | DIXON | GERALD | COMFORT SUITES FERNLEY | ETAYLOR | 09/13/2012 | -83.93 |
| LV.RC.F1201420 | 211D | Travel Invoice | DIXON | # | # | XI2SAP | 09/21/2012 | -69.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | FINCH | # | # | XI2SAP | 09/09/2012 | -591.75 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | FINCH | WILLIAM P | GOVTRIPTAV 0SP7H2 | ETAYLOR | 11/29/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | FINCH | WILLIAM P | COMFORT SUITES FERNLEY | | | -83.93 |
| LV.RC.F1201420 | 211B | Travel Invoice | FONKEN | # | # | XI2SAP | 09/10/2012 | -594.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | FONKEN | PETER J | GOVTRIPTAV 0SOO060 | LAVILAPI | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | FONKEN | PETER J | HOLIDAY INN RENO | LAVILAPI | 09/05/2012 | -99.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | FUNK | # | # | XI2SAP | 09/13/2012 | -758.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | FUNK | JOSEPH C | GOVTRIPTAV 0SSY66 | LROBERTS | 10/24/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | FUNK | JOSEPH C | HOLIDAY INN EXPRESS | LROBERTS | 10/24/2012 | -91.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | FUNK | JOSEPH C | BRUNOS COUNTRY CLUB | | | -71.80 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | FUNK | JOSEPH C | RESIDENCE INNS-RENO | LROBERTS | 10/24/2012 | -212.44 |
| LV.RC.F1201420 | 211D | Travel Invoice | GARCIA | # | # | XI2SAP | 09/10/2012 | -657.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GARCIA | BRIAN KEITH | GOVTRIPTAV 0STG9K | MESPINOZ | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GARCIA | BRIAN KEITH | MARRIOTT 33758 SLC | MESPINOZ | 09/07/2012 | -120.10 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GARCIA | BRIAN KEITH | COMFORT SUITES FERNLEY | MESPINOZ | 09/07/2012 | -77.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GARCIA | BRIAN KEITH | HILTON HOTEL SALT LAKE | MESPINOZ | 09/07/2012 | -83.95 |
| LV.RC.F1201420 | 211D | Travel Invoice | GERALD | # | # | XI2SAP | 09/11/2012 | -788.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GERALD | KENNETH D | GOVTRIPTAV 0STGGG | JMOHAN | 08/29/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GERALD | KENNETH D | RENAISSANCE HOTELS LAS | JMOHAN | 08/29/2012 | -99.68 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GERALD | KENNETH D | COURTYARD BY MARRIOTT | JMOHAN | 08/29/2012 | -109.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GERALD | KENNETH D | RENAISSANCE HOTELS LAS | JMOHAN | 08/29/2012 | -99.68 |
| LV.RC.F1201420 | 211D | Travel Invoice | GIBBINS | # | # | XI2SAP | 09/12/2012 | -777.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GIBBINS | KENNETH D | GOVTRIPTAV 0SRI48 | DVICENA | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GIBBINS | DAVID E | BEST WESTERN SKYLINE | DVICENA | 09/10/2012 | -77.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GIBBINS | DAVID E | X5812  X56126BRUNOS COUNT | DVICENA | 12/04/2012 | -45.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GIBBINS | DAVID E | BEST WESTERN JOHN DAY | DVICENA | 09/13/2012 | -83.93 |
| LV.RC.F1201420 | 211D | Travel Invoice | GJORAAS | # | # | XI2SAP | 09/07/2012 | -844.70 |

AR11430



## BUDGET OBJECT CLASS 21 / TRAVEL

| WBS Element | Budget Object Class | Document type | Last Name | First Name | CC Vendor Name | Created by | Posting Date (Per SPL) | FI Line Items (Invoice/Pay ments) |
|---|---|---|---|---|---|---|---|---|
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GJORAAS | RHONDA H | GOVTRIPTAV OSRVEV | DVICENA | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GJORAAS | RHONDA H | PEPPERMILL RENO | DVICENA | 09/13/2012 | -300.58 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GJORAAS | RHONDA H | PEPPERMILL RENO | DVICENA | 09/13/2012 | -100.58 |
| LV.RC.F1201420 | 211D | Travel Invoice | GOOD | # | # | XI2SAP | 09/06/2012 | -490.80 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GOOD | LOREN R | GOVTRIPTAV 0STRP3 | TATKINSO | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | GOOD | LOREN R | RESIDENCE INNS-RENO | TATKINSO | 09/13/2012 | -136.73 |
| LV.RC.F1201420 | 211D | Travel Invoice | GRAHAM | # | # | XI2SAP | 09/11/2012 | -59.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GRAHAM | WERNER E | GOVTRIPTAV 0SU77S | ETAYLOR | 09/25/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GRAHAM | WERNER E | SATOFEE 69035276317890 | ASOTOMIL | 09/18/2012 | -4.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | GRAHAM | WERNER E | COMFORT SUITES FERNLEY | ASOTOMIL | 09/18/2012 | -83.93 |
| LV.RC.F1201420 | 211D | Travel Invoice | HART | # | # | XI2SAP | 09/12/2012 | -580.00 |
| LV.RC.F1201420 | 211B | MM Ch.Card Realloc | HART | WILLIAM J | GOVTRIPTAV 0STGLN | JROGAN1 | 09/20/2012 | -15.00 |
| LV.RC.F1201420 | 211D | MM Ch.Card Realloc | HART | WILLIAM J | HOLIDAY INN EXPRESS | JROGAN1 | 09/14/2012 | -84.85 |
| LV.RC.F1201420 | 211D | MM Ch.Card Realloc | HART | WILLIAM J | HOLIDAY INN EXPRESS | JROGAN1 | 09/14/2012 | -84.85 |
| LV.RC.F1201420 | 211D | Travel Invoice | HASTEY | # | # | XI2SAP | 09/12/2012 | -344.25 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | HASTEY | ROBERT E | GOVTRIPTAV 0SR7J1 | DFLORES | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | HASTEY | ROBERT E | ROSEBERRY HOUSE B AND | DFLORES | 09/18/2012 | -254.10 |
| LV.RC.F1201420 | 211D | Travel Invoice | HERRIFORD | # | # | XI2SAP | 09/16/2012 | -203.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | HERRIFORD | JEFFREY L | GOVTRIPTAV 0STTDT | SZEMKE | 09/22/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | HERRIFORD | JEFFREY L | CACTUS PETESHORSESHU | SZEMKE | 09/10/2012 | -65.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | HERRIFORD | JEFFREY L | CACTUS PETESHORSESHU | SZEMKE | 09/10/2012 | -65.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | HERRIFORD | JEFFREY L | PARKER S MODEL T Q | SZEMKE | 09/10/2012 | -78.40 |
| LV.RC.F1201420 | 211D | Travel Invoice | HILL | # | # | XI2SAP | 09/10/2012 | -633.75 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | HILL | THOMAS M | GOVTRIPTAV 0SRVYC | PRENEER | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | HILL | THOMAS M | BEST WESTERN HOTEL FER | PRENEER | 08/30/2012 | -77.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | HOWELL | # | # | XI2SAP | 09/14/2012 | -851.25 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | HOWELL | THOMAS L | GOVTRIPTAV 0SSU63 | CDENNIST | 10/29/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | HOWELL | THOMAS L | COMFORT SUITES TOOELE | CDENNIST | 10/29/2012 | -98.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | HOWELL | THOMAS L | TOWN HOUSE MOTEL | CDENNIST | 10/29/2012 | -72.80 |
| LV.RC.F1201420 | 211D | Travel Invoice | HUEGERICH | # | # | XI2SAP | 09/07/2012 | -544.38 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | HUEGERICH | THOMAS E | GOVTRIPTAV 0SSIOW | | | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | HUEGERICH | THOMAS E | MARRIOTT RENO | | | -268.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | HYRONS | # | # | XI2SAP | 09/10/2012 | -229.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | HYRONS | SEAN W | GOVTRIPTAV 0SV2UT | CSANDBER | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | HYRONS | # | # | XI2SAP | 09/19/2012 | -178.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | HYRONS | SEAN W | GOVTRIPTAV 0SV30L | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | HYRONS | SEAN W | RIVERS EDGE RV PARK | CSANDBER | 09/19/2012 | -10.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | JONES | # | # | XI2SAP | 09/10/2012 | -484.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | JONES | KAROL M | GOVTRIPTAV 0SSMP3 | CSANDBER | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | JONES | KAROL M | BEST WESTERN EUREKA IN | GMANGUM | 09/18/2012 | -77.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | KIZOREK | # | # | XI2SAP | 09/09/2012 | -331.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | KIZOREK | MICHAEL R | GOVTRIPTAV 0STBFD | ASOTOMIL | 09/25/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | KNISLEY | # | # | XI2SAP | 09/12/2012 | -582.75 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | KNISLEY | JEFFREY A | GOVTRIPTAV 0STJTM | CKILLING | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | KNISLEY | JEFFREY A | HIGH COUNTRY INN | CKILLING | 09/18/2012 | -82.50 |
| LV.RC.F1201420 | 211D | Travel Invoice | KOZAR | # | # | XI2SAP | 09/12/2012 | -374.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | KOZAR | DANIEL J | GOVTRIPTAV 0SU07U | ASOTOMIL | 09/24/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | LASWELL | # | # | XI2SAP | 09/11/2012 | -739.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LASWELL | DANIEL T | GOVTRIPTAV 0STJ2R | RSAXTON | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LASWELL | DANIEL T | COMFORT SUITES FERNLEY | RSAXTON | 09/24/2012 | -251.79 |
| LV.RC.F1201420 | 211B | Travel Invoice | LLOYD | # | # | XI2SAP | 09/11/2012 | -563.81 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LLOYD | KENNETH D | GOVTRIPTAV 0SGJDI | | 09/24/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LLOYD | KENNETH D | COMFORT SUITES FERNLEY | | | -77.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | LLOYD | # | # | XI2SAP | 09/11/2012 | -588.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LLOYD | RICHARD T | GOVTRIPTAV 0STCCJ | CVANCE | 09/24/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LLOYD | RICHARD T | HOLIDAY INN RENO | CVANCE | 09/13/2012 | -111.87 |
| LV.RC.F1201420 | 211D | Travel Invoice | LOGSDON | # | # | XI2SAP | 09/10/2012 | 757.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LOGSDON | JOHN A | GOVTRIPTAV 0STRWL | | | -15.00 |

AR11431

 BUDGET OBJECT CLASS 21 / TRAVEL 

| WBS Element | Budget Object Class | Document type | Last Name | First Name | CC Vendor Name | Created by | Posting Date (Per SPL) | FI Line Items (Invoice/Payments) |
|---|---|---|---|---|---|---|---|---|
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOGSDON | JOHN A | HOLIDAY INN EXPRESS | | | -108.98 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOGSDON | JOHN A | MARRIOTT RENO | | | 108.23 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOGSDON | JOHN A | RESIDENCE INNS-SLC | | | -99.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | LOGSDON | JOHN A | DRURY HOTELS | XI2SAP | 03/12/2012 | -91.53 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LOVE | DANIEL P | GOVTRIPTAV 0SC10L | | | -177.50 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | LOVE | DANIEL P | UNITED 01670406528759 | CSANDBER | 04/30/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LOVE | DANIEL P | CWTSATOTR 01670417241901 | CSANDBER | 04/30/2012 | -347.60 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | LOVE | DANIEL P | DELTA 0065264043734 | CSANDBER | 04/30/2012 | -28.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOVE | DANIEL P | FAIRFIELD INN & SUITE | CSANDBER | 04/30/2012 | -25.00 |
| LV.RC.F1201420 | 211T | Ch.Card Reallocation | LOVE | DANIEL P | RABHE TAXI | CSANDBER | 04/30/2012 | -317.60 |
| LV.RC.F1201420 | 211D | Travel Invoice | LOVE | # | # | XI2SAP | 07/27/2012 | -58.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LOVE | DANIEL P | GOVTRIPTAV 0SNTNJ | CSANDBER | 08/14/2012 | -127.50 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | LOVE | DANIEL P | DELTA 00670714539843 | CSANDBER | 08/14/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LOVE | DANIEL P | SATOFEE 0067014539841 | CSANDBER | 08/14/2012 | -357.60 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | LOVE | DANIEL P | DELTA 00682732046778 | CSANDBER | 08/14/2012 | -28.50 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | LOVE | DANIEL P | DELTA 00682732421851 | CSANDBER | 08/14/2012 | -25.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOVE | DANIEL P | COURTYARD BY MARRIOTT | CSANDBER | 08/14/2012 | -25.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOVE | DANIEL P | COURTYARD BY MARRIOTT | CSANDBER | 08/14/2012 | -273.48 |
| LV.RC.F1201420 | 211D | Travel Invoice | LOVE | # | # | XI2SAP | 08/24/2012 | -212.44 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LOVE | DANIEL P | GOVTRIPTAV 0SQZH5 | CSANDBER | 09/13/2012 | -127.50 |
| LV.RC.F1201420 | 211I | Ch.Card Reallocation | LOVE | DANIEL P | SLC INTERNATIONAL AIRP | CSANDBER | 08/14/2012 | -15.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | LOVE | DANIEL P | DELTA 00671187775983 | CSANDBER | 08/14/2012 | -74.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | LOVE | DANIEL P | SATOFEE 00671187775961 | CSANDBER | 08/14/2012 | -357.60 |
| LV.RC.F1201420 | 211D | Travel Invoice | LOVE | # | # | XI2SAP | 08/15/2012 | -28.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LOVE | DANIEL P | GOVTRIPTAV 0SP6W6 | CSANDBER | 09/13/2012 | 258.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | LOVE | # | # | XI2SAP | 09/12/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LOVE | DANIEL P | GOVTRIPTAV 0SSEUI | CSANDBER | 09/22/2012 | -994.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOVE | DANIEL P | COURTYARD BY MARRIOTT | CSANDBER | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOVE | DANIEL P | COURTYARD BY MARRIOTT | CSANDBER | 09/13/2012 | -904.65 |
| LV.RC.F1201420 | 211D | Travel Invoice | LOVELADY | # | # | XI2SAP | 10/24/2012 | -531.10 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | LOVELADY | JERRY | GOVTRIPTAV | RSAXTON | 11/13/2012 | -724.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOVELADY | JERRY D | COMFORT SUITES FERNLEY | RSAXTON | 11/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOVELADY | JERRY D | HOMEWOOD SUITES RENO | RSAXTON | 11/13/2012 | -167.88 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | LOVELADY | JERRY D | COMFORT SUITES FERNLEY | RSAXTON | 11/13/2012 | -138.73 |
| | | | | | | | | -251.79 |
| LV.RC.F1201420 | 211D | Travel Invoice | MARQUART | # | # | XI2SAP | 03/10/2012 | -297.12 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MARQUART | MICHAEL C | GOVTRIPTAV 0SC26Y (FY11) | CSANDBER | 05/10/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | MARQUART | # | # | XI2SAP | 09/07/2012 | -749.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MARQUART | MICHAEL C | GOVTRIPTAV 0SSFNI | CSANDBER | 09/20/2012 | -15.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | MARQUART | MICHAEL C | SOUTHWES 5262601974909 | CSANDBER | 05/10/2012 | -50.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | MARQUART | MICHAEL C | SOUTHWES 5262427000248 | CSANDBER | 05/10/2012 | -965.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MARQUART | MICHAEL C | INTERCONTINENTAL MARK | CSANDBER | 05/10/2012 | -1,083.92 |
| LV.RC.F1201420 | 211I | Ch.Card Reallocation | MARQUART | MICHAEL C | RENO-TAHOE AIRPORT AUT | CSANDBER | 05/10/2012 | -60.00 |
| LV.RC.F1201420 | 211R | Ch.Card Reallocation | MARQUART | MICHAEL C | AVIS RENT-A-CAR 1 | CSANDBER | 05/10/2012 | -356.13 |
| LV.RC.F1201420 | 211R | Ch.Card Reallocation | MARQUART | MICHAEL C | BRUNOS COUNTRY CLUB | CSANDBER | 09/20/2012 | 78.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | MARSOOBIAN | # | # | XI2SAP | 10/24/2012 | -736.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MARSOOBIAN | JASON A | GOVTRIPTAV 0STRD4 | JMOHAN | 12/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MARSOOBIAN | JASON A | RENAISSANCE HOTELS LAS | JMOHAN | 08/30/2012 | -110.88 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MARSOOBIAN | JASON A | COURTYARD BY MARRIOTT | JMOHAN | 08/30/2012 | -109.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MARSOOBIAN | JASON A | STURGEONS CASINO HOTEL | JMOHAN | 09/13/2012 | 53.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MARSOOBIAN | JASON A | RENAISSANCE HOTELS LAS | JMOHAN | 09/13/2012 | -110.86 |
| LV.RC.F1201420 | 211D | Travel Invoice | MAURER | # | # | XI2SAP | | -484.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MAURER | JOHN K | GOVTRIPTAV 0SV0TO | ASOTOMIL | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | MCGRATH | # | # | XI2SAP | 09/06/2012 | -484.50 |

AR11432

BUDGET OBJECT CLASS 21 / TRAVEL

| WBS Element | Budget Object Class | Document type | Last Name | First Name | CC Vendor Name | Created by | Posting Date (Per SPL) | FI Line Items (Invoice/Pay ments) |
|---|---|---|---|---|---|---|---|---|
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MCGRATH | KEITH A | GOVTRIPTAV 0SSN3R | TATKINSO | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | MEUTH | | | XI2SAP | 09/11/2012 | -525.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MEUTH | GREGORY D | GOVTRIPTAV 0ST149 | DJORDAN | 09/14/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MEUTH | GREGORY D | HOLIDAY INN EXPRESS | DJORDAN | 09/07/2012 | -84.85 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MEUTH | GREGORY D | ELY LA QUINTA | DJORDAN | 09/12/2012 | -91.02 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MEUTH | GREGORY D | HOLIDAY INN EXPRESS | DJORDAN | 09/07/2012 | -84.85 |
| LV.RC.F1201420 | 211D | Travel Invoice | MILLER | | | XI2SAP | 09/13/2012 | -731.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MILLER | JEFFERY G | GOVTRIPTAV 033J70 | | | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MILLER | JEFFERY G | CANDLEWOOD SUITES | | | -91.20 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MILLER | JEFFERY G | HOMEWOOD SUITES RENO | | | -138.73 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MILLER | JEFFERY G | HOMEWOOD SUITES RENO | | | -108.22 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MILLER | JEFFERY G | HOMEWOOD SUITES RENO | | | -110.88 |
| LV.RC.F1201420 | 211D | Travel Invoice | MILLION | # | # | XI2SAP | 09/11/2012 | -478.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MILLION | ZACH B | GOVTRIPTAV 0STYJ9 | ETAYLOR | 09/20/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | MOE | # | # | XI25AP | 09/10/2012 | -657.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MOE | THEODORE J | MARRIOTT 33758 SLC | CSPERLIN | 09/07/2012 | -126.10 |
| LV.RC.F1201420 | 211D | Travel Invoice | MOORE | # | # | XI2SAP | 09/12/2012 | -855.25 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | MOORE | JASON D | GOVTRIPTAV 0STEBD | DJORDAN | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MOORE | JASON D | SHILO INN ELKO | DJORDAN | 09/07/2012 | -56.24 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MOORE | JASON D | COURTYARD BY MARRIOTT | DJORDAN | 09/07/2012 | -121.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MOORE | JASON D | X5612  X5612BRUNOS COUNT | DJORDAN | 11/14/2012 | -44.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MOORE | JASON D | COURTYARD BY MARRIOTT | DJORDAN | 09/13/2012 | -107.45 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | MOORE | JASON D | COURTYARD BY MARRIOTT | DJORDAN | 09/13/2012 | -188.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | NIEMAN | # | # | XI2SAP | 09/12/2012 | -725.30 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | NIEMAN | SANDRA M | GOVTRIPTAV 0SSWK5 | BLEONGUE | 09/24/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | NIEMAN | SANDRA M | SATOFEE  5262462760670 1 | BLEONGUE | 09/12/2012 | -4.35 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | NIEMAN | SANDRA M | GRAND SIERRA ADV DEP | BLEONGUE | 09/12/2012 | -141.87 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | NIEMAN | SANDRA M | GRAND SIERRA RSRT&CASI | BLEONGUE | 09/12/2012 | -134.47 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | NIEMAN | SANDRA M | SOUTHWES 5262462760670 | BLEONGUE | 09/12/2012 | -422.20 |
| LV.RC.F1201420 | 211R | Ch.Card Reallocation | NIEMAN | SANDRA M | HERTZ RENT-A-CAR | BLEONGUE | 09/12/2012 | -1,223.35 |
| LV.RC.F1201420 | 211D | Travel Invoice | OLTHOFF | # | # | XI2SAP | 09/12/2012 | -484.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | OLTHOFF | JOHN F | GOVTRIPTAV 0STH5G | EGRUBER | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | OPER | # | # | XI2SAP | 03/22/2012 | -218.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | OPER | ZACHARY J | GOVTRIPTAV 0STVEA | CSANDBER | 05/10/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | OPER | # | # | XI2SAP | 09/12/2012 | -484.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | OPER | ZACHARY J | GOVTRIPTAV 0SSP62 | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | OPER | # | # | XI2SAP | 11/03/2012 | -34.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | OPER | ZACHARY J | GOVTRIPTAV OTO840 | CSANDBER | 09/10/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | OPER | ZACHARY J | INTERCONTINENTAL MARK | CSANDBER | 05/10/2012 | -474.34 |
| LV.RC.F1201420 | 211D | Travel Invoice | PAGE | # | # | XI2SAP | 09/21/2012 | -272.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | PAGE | GREGORY D | GOVTRIPTAV 0SVJQK | | | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | PAGE | # | # | XI2SAP | 09/20/2012 | -68.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | PAGE | GREGORY D | GOVTRIPTAV 0STWNS | | | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | PAIVA | # | # | XI2SAP | 08/29/2012 | -280.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | PAIVA | GEORGE B | GOVTRIPTAV 0STH7L | DKINKEAD | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | PIRTLE | # | # | XI2SAP | 08/20/2012 | -537.60 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | WINNEMUCCA OFC | BLM NV | GOVTRIPTAV 0SSP7E | ETAYLOR | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | PIRTLE | # | # | XI2SAP | 09/10/2012 | -904.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | WINNEMUCCA OFC | BLM NV | GOVTRIPTAV 0SSP7Q | ETAYLOR | 09/13/2012 | -15.00 |
| LV.RC.F1201420 | 2522 | Ch.Card Reallocation | TWOMBLY | LINDA | TOWN HOUSE MOTEL | LTWOMBLY | 11/28/2012 | -72.80 |
| LV.RC.F1201420 | 211D | Travel Invoice | PRADO | # | # | XI2SAP | 09/13/2012 | -582.75 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | PRADO | DOUGLAS | GOVTRIPTAV 0STGWM | BLEFEBVR | 09/21/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | PRADO | DOUGLAS | COMFORT SUITES FERNLEY | ALELOUP | 09/13/2012 | -63.93 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | PRADO | DOUGLAS | JOHN ASCUAGAS NUGGET H | ALELOUP | 09/13/2012 | -59.30 |
| LV.RC.F1201420 | 211B | Travel Invoice | PRISCO | # | # | XI2SAP | 09/13/2012 | -484.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | PRISCO | CARMAN J | GOVTRIPTAV 0STJYM | AENDERLE | 09/20/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | REGNELL | # | # | XI2SAP | 09/13/2012 | -526.75 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | REGNELL | RYAN R | GOVTRIPTAV 0ST9K2 | KPOULSON | 01/08/2013 | -15.00 |

AR11433

 

## BUDGET OBJECT CLASS 21 / TRAVEL

| WBS Element | Budget Object Class | Document type | Last Name | First Name | CC Vendor Name | Created by | Posting Date (Per SPL) | FI Line Items (Invoice/Pay ments) |
|---|---|---|---|---|---|---|---|---|
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | REGNELL | RYAN R | HOLIDAY INN RENO-SPARK | KPOULSON | 09/12/2012 | -141.86 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | REGNELL | RYAN R | HOLIDAY INN EXPRESS | KPOULSON | 08/12/2012 | -64.65 |
| LV.RC.F1201420 | 211A | Travel Invoice | RICHARDSON | ERIC L | | XI2SAP | 09/20/2012 | -6.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | RICHARDSON | # | # | XI2SAP | 09/20/2012 | -738.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | RICHARDSON | ERIC L | GOVTRIPTAV 0STV6Q | LMONTANO | 11/29/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | ROEGNER | # | # | XI2SAP | 03/23/2012 | -182.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | ROEGNER | CORY J | GOVTRIPTAV OSDLDF | ASOTOMIL | 04/12/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | ROEGNER | CORY J | INTERCONTINENTAL MARK | ASOTOMIL | 04/12/2012 | -520.54 |
| LV.RC.F1201420 | 211D | Travel Invoice | ROEGNER | # | # | XI2SAP | 03/23/2012 | -76.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | ROEGNER | CORY J | GOVTRIPTAV OSED6R | ASOTOMIL | 04/12/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | ROEGNER | CORY J | BW AIRPORT PLAZA | ASOTOMIL | 09/26/2012 | -77.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | ROEGNER | # | # | XI2SAP | 09/11/2012 | -442.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | ROEGNER | CORY J | GOVTRIPTAV 0ST17A | ASOTOMIL | 09/26/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | ROMER | # | # | XI2SAP | 09/20/2012 | -633.75 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | ROMER | ROBERT C | GOVTRIPTAV 0SUJBA | KBERTALO | 11/21/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | ROMER | ROBERT C | BW FERNLEY INN | KBERTALO | 11/21/2012 | -83.93 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | ROMER | ROBERT C | BRUNOS COUNTRY CLUB | KBERTALO | 11/21/2012 | -09.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | SCHUMACHER | # | # | XI2SAP | 09/10/2012 | -633.75 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SCHUMACHER | JOHN M | GOVTRIPTAV 0ST6Z1 | MCHATTER | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SCHUMACHER | JOHN M | JOHN ASCUAGAS NUGGET H | MCHATTER | 09/18/2012 | -112.35 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SCHUMACHER | JOHN M | JOHN ASCUAGAS NUGGET H | MCHATTER | 09/18/2012 | -126.35 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SCHUMACHER | JOHN M | STATION HOTEL | MCHATTER | 09/16/2012 | -64.86 |
| LV.RC.F1201420 | 211D | Travel Invoice | SEIDLITZ | # | # | XI2SAP | 03/12/2012 | -186.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SEIDLITZ | JOSEPH E | GOVTRIPTAV 0SDL5X | ASOTOMIL | 03/28/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SEIDLITZ | JOSEPH E | INTERCONTINENTAL MARK | ASOTOMIL | 03/28/2012 | -404.28 |
| LV.RC.F1201420 | 211D | Exp/Exp JV | SEIDLITZ | # | # | CSANDBER | 09/22/2012 | -324.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | SEIDLITZ | # | # | XI2SAP | 09/08/2012 | -69.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SEIDLITZ | JOSEPH E | GOVTRIPTAV 0SU77A | ETAYLOR | 09/28/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SEIDLITZ | JOSEPH E | SATOFEE 89035276317520 | ASOTOMIL | 09/14/2012 | -4.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SEIDLITZ | JOSEPH E | COMFORT SUITES FERNLEY | ASOTOMIL | 09/14/2012 | -83.93 |
| LV.RC.F1201420 | 211D | Travel Invoice | SHARKEY | # | # | XI2SAP | 09/08/2012 | -521.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SHARKEY | ANNE MARIE | GOVTRIPTAV 0SS29M | | | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SHARKEY | ANNE MARIE | COURTYARD BY MARRIOTT | TLLOYD | 09/22/2012 | -121.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SHARKEY | ANNE MARIE | COURTYARD BY MARRIOTT | TLLOYD | 09/22/2012 | -106.22 |
| LV.RC.F1201420 | 211D | Travel Invoice | SHARKEY | # | # | XI2SAP | 09/10/2012 | -535.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SHARKEY | THOMAS D | GOVTRIPTAV 0XTYWQ | | | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | SHILAIKIS | # | # | XI2SAP | 09/07/2012 | -600.25 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SHILAIKIS | ROBERT H | GOVTRIPTAV 0SSOJF | JSCHOLLA | 09/14/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SHILAIKIS | ROBERT H | COMFORT SUITES FERNLEY | JSCHOLLA | 09/14/2012 | -77.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SHILAIKIS | ROBERT H | COURTYARD BY MARRIOTT | JSCHOLLA | 09/14/2012 | -94.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SHILAIKIS | ROBERT H | HILTON SALT LAKE CITY | JSCHOLLA | 09/14/2012 | -98.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | SPAIN | # | # | XI2SAP | 09/13/2012 | -773.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SPAIN | DAVID A | GOVTRIPTAV 0SSQIT | | | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SPAIN | DAVID A | HOLIDAY INN RENO | ICAPPS | 11/27/2012 | -123.17 |
| LV.RC.F1201420 | 211D | Travel Invoice | STEHWIEN | # | # | XI2SAP | 09/08/2012 | -625.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | STEHWIEN | MELODY A | GOVTRIPTAV 0STBVF | DPERKIN1 | 09/11/2012 | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | STEHWIEN | MELODY A | SATOFEE 89035275864790 | DPERKIN1 | 09/11/2012 | -4.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | STEHWIEN | MELODY A | BEST WESTERN HOTEL FER | DPERKIN1 | 09/11/2012 | -83.93 |
| LV.RC.F1201420 | 211D | Travel Invoice | STOVER | # | # | XI2SAP | 07/27/2012 | -127.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | STOVER | RAND A | GOVTRIPTAV 0SPWJB | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211C | Ch.Card Reallocation | STOVER | RAND A | DELTA  00671180526573 | CSANDBER | 08/14/2012 | -357.60 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | STOVER | RAND A | SATOFEE 00671183528571 | CSANDBER | 08/14/2012 | -28.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | STOVER | RAND A | COURTYARD BY MARRIOTT | CSANDBER | 08/14/2012 | 273.46 |
| LV.RC.F1201420 | 211D | Travel Invoice | STOVER | # | # | XI2SAP | 09/22/2012 | -1,045.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | STOVER | RAND A | GOVTRIPTAV 0SS8E2 | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | STOVER | RAND A | COURTYARD BY MARRIOTT | CSANDBER | 09/19/2012 | -784.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | STOVER | RAND A | COURTYARD BY MARRIOTT | CSANDBER | 09/19/2012 | -531.10 |

AR11434

  BUDGET OBJECT CLASS 21 / TRAVEL

| WBS Element | Budget Object Class | Document type | Last Name | First Name | CC Vendor Name | Created by | Posting Date (Per SPL) | FI Line Items (Invoice/Pay ments) |
|---|---|---|---|---|---|---|---|---|
| LV.RC.F1201420 | 211D | Travel Invoice | STRUCK | # | # | XI2SAP | 09/07/2012 | -484.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | STRUCK | KRISTINE | GOVTRIPTAV ORXQEL | | | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | SULLIVAN | # | # | XI2SAP | 09/10/2012 | -678.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | SULLIVAN | DEBORAH J | GOVTRIPTAV 0SSVKA | MCHATTER | 09/18/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SULLIVAN | DEBORAH J | HOLIDAY INN EXPRESS | MCHATTER | 09/18/2012 | -84.85 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SULLIVAN | DEBORAH J | COURTYARD BY MARRIOTT | MCHATTER | 09/18/2012 | -121.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SULLIVAN | DEBORAH J | COMFORT INN FALLON | MCHATTER | 09/18/2012 | -83.93 |
| LV.RC.F1201420 | 211D | Travel Invoice | SWANSON | # | # | XI2SAP | 09/20/2012 | -535.50 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SWANSON | SCOTT A | GOVTRIPTAV 0SR6FB | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SWANSON | SCOTT A | COURTYARD BY MARRIOTT | CSANDBER | 09/19/2012 | -121.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | SWANSON | SCOTT A | COURTYARD BY MARRIOTT | CSANDBER | 09/19/2012 | -94.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | TEMPLETON | # | # | XI2SAP | 09/13/2012 | -554.40 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | TEMPLETON | WARREN L | GOVTRIPTAV 0ST4EX | CSANDBER | 09/19/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | TEMPLETON | WARREN L | RESIDENCE INNS SALT LK | CSANDBER | 09/19/2012 | -77.70 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | TEMPLETON | WARREN L | HOLIDAY INN EXPRESS | CSANDBER | 09/19/2012 | -84.85 |
| LV.RC.F1201420 | 211D | Travel Invoice | TUMA | # | # | XI2SAP | 09/07/2012 | -601.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | TUMA | LISA KAY | GOVTRIPTAV 0SUWY2 | | | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | TUMA | LISA KAY | BUDGET RENTAL | | | -523.40 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | TUMA | LISA KAY | HILTON GARDEN INN LV | | | -110.88 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | TUMA | LISA KAY | COURTYARD BY MARRIOTT | | | -98.10 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | TUMA | LISA KAY | COURTYARD BY MARRIOTT | | | -121.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | VIGNESS | # | # | XI2SAP | 09/13/2012 | -637.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | VIGNESS | JARROD W | GOVTRIPTAV 0STG9N | | | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | VIGNESS | JARROD W | HOLIDAY INN EXPRESS | | | 111.87 |
| LV.RC.F1201420 | 211D | Travel Invoice | VONHELF | # | # | XI2SAP | 08/29/2012 | -331.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | VONHELF | DARRIN B | GOVTRIPTAV 0SR7J4 | NMILLER1 | 09/10/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | WAGGONER | # | # | XI2SAP | 09/20/2012 | -825.25 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | WAGGONER | SEAN F | GOVTRIPTAV 0SQ73V | MSANMIG | 11/13/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | WAGGONER | SEAN F | COMFORT SUITES FERNLEY | MSANMIG | 09/18/2012 | -77.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | WAGGONER | SEAN F | HILTON SALT LAKE CITY | MSANMIG | 09/18/2012 | -98.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | WOSTAL | # | # | XI2SAP | 09/13/2012 | -336.50 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | WOSTAL | CARRIE | GOVTRIPTAV 0SSFNV | RELLIGOT | 09/21/2012 | -15.00 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | WOSTAL | CARRIE | SUPER 8 MOTEL | RELLIGOT | 09/13/2012 | -79.97 |
| LV.RC.F1201420 | 211D | Ch.Card Reallocation | WOSTAL | CARRIE | COURTYARD BY MARRIOTT | RELLIGOT | 09/13/2012 | -62.00 |
| LV.RC.F1201420 | 211D | Travel Invoice | YOUNG | # | # | XI2SAP | 09/13/2012 | -809.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | YOUNG | JON K | GOVTRIPTAV 0STUQY | | | -15.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | YOUNG | JON K | HAMPTON INN LAS VEGAS | | | -89.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | YOUNG | JON K | HOMEWOOD SUITES RENO | | | -242.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | YOUNG | JON K | HOMEWOOD SUITES RENO | | | -94.00 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | YOUNG | JON K | HOMEWOOD SUITES RENO | | | -108.22 |
| LV.RC.F1201420 | 211D | Travel Invoice | ZUBER | # | # | XI2SAP | 12/06/2012 | -636.02 |
| LV.RC.F1201420 | 211B | Ch.Card Reallocation | NEVADA STATE OFC | BLM NV | GOVTRIPTAV 0SST9K | RSAXTON | 01/16/2013 | -15.00 |
| | | | | | | | | -95,520.74 |

☐ Items with receipts/supporting documentation

⬚ No supporting documentation - Items will not be submitted for cost recovery

Exhibit " J "

# 2018 Burning Man

# BLM Network & Support

Prepared for




Offered by




Prime: High Desert Internet Services
Sub: Two P LLC

| | |
|---|---|
| Version | 0.3 |
| . Quote ID | BM-BLM-2018.03 |
| Last Modified | May 29th, 2018 |
| Representatives | Matt Peterson<br>matt@twop.co<br>+1 (510) 432-3528 |
| | Doug Dawson<br>doug@hdiss.com<br>+1 (775) 771-5750 |

AR11437

# Table of Contents

Section 1, Technical Quote

Overview

Quote

Wireless Infrastructure

Audio/Video Systems

Server Architecture

Compliance & Regulatory Requirements

Appendix 1: Technical Assumptions, Conditions, Or Exceptions

Appendix 2: Staffing Plan

Appendix 3: Personnel

Doug Dawson

Matt Peterson

Tim Pozar

Appendix 4: Subcontractors

Two P

Appendix 5: Hardware

Appendix 6: System Architecture

Appendix 7: Network Monitoring

Appendix 8: Past Performance

Section 2: Price Quote

Physical Hardware

Other Direct Costs

Labor

Appendix 1: Price Assumptions

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11438

# Section 1: Technical Quote

## Overview

The Bureau of Land Management (BLM) requests network implementation and support services at the Burning Man 2018 event. These services will cover a network LAN deployment, WiFi 802.11 connectivity, infrastructure monitoring, IP cameras, and personnel support. This proposal addresses RFP #L3918Q0055.

## Quote

It is High Desert Internet Services' (HDIS) intention with this deployment to create a high performance, modern, and "highly available" network for BLM. The network will be built in close collaboration with Two P as a subcontractor.

High Desert and Two P successfully implemented the 2017 BLM network deployment with generally very positive feedback. The 2018 proposal incorporates a modest increase in total cost to address higher redundancy, availability, and labor. This proposal incorporates requested revisions that were not possible in the previous year. The most significant upgrades include BGP capable routers for increased network availability, migrating the majority of JOC building connections to fiber optic based cabling, and additional post-event staffing for equipment cleaning/refurbishment.

The design incorporates redundancy mechanisms to mitigate typical single points of failure - where logistically and technically feasible. Much of this will be a HOT/HOT or HOT/WARM design. The first design (HOT/HOT) would have both sets of devices, circuits, etc., active and working at all times. If one device fails, the second would seamlessly take over the full load. HOT/WARM would have one device, circuit, etc., in use and the second device, circuit, etc., would take the over the load only if the primary failed. An example of this would be the use of a network ring architecture where a single cut or cable break would automatically route to a backup path autonomously. Additionally, High Desert Internet Services & Two P will also bring spare equipment (HOT/COLD).

### Network Architecture

A pair of edge routers (Juniper MX150, virtual MX on bare metal, or equivalent) with BGP signalling will be used to facilitate HOT/HOT internet connectivity with two (or more) ISP transit providers. This configuration will allow a common public IP address

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11439

block to be highly available. The prior year's arrangement had two unique IP blocks with no gateway signaling protocol, thus failover between providers was a manual process. A BGP setup will provide unattended failover between the providers for public IP space.

A pair of Juniper SRX300 security appliances will act as firewalls facing the edge router pair. The firewalls will be configured in a cluster mode that synchronizes data & control plane traffic. Control and data plane traffic is automatically synchronized between both firewalls. The BGP edge routers and SRX firewalls will be cabled and configured in a full mesh topology.

The Juniper firewalls will perform standard NAT, DHCP, etc., segmentation between LAN segments - each unique VLAN offers stateful firewall capabilities between each other, as well as the "outside world" Internet. VLAN to VLAN policies can be defined to accept or block traffic, and an initial secure configuration will be implemented which prevents cross-VLAN communication. Finally, an additional licensed option, known as "Application Firewall", will be configured to block identified web content categories. This categorization is done with a combination of application signature identifiers and/or IP header information (such as destination IP address & port). The license includes frequent updates of these signatures, for both specific sites (i.e.: YouTube) and more generic categories (i.e.: streaming video).

A small pool of public IP addresses will be routed between the edge routers and firewalls, allowing each unique NAT'd VLAN to egress from a specific public IP address in a highly available fashion.

The SRX Chassis Cluster will utilize Redundant Ethernet Interface Link Aggregation Groups between two core Juniper EX switches. This configuration allows for either a firewall or core switch to fail, while still preserving network connectivity. The SRX routers and EX switches both have QoS (Quality of Service) capabilities, though more detailed information (i.e.: matching ToS/DSCP bits, destination IP addresses, etc.) is required to configure QoS functionality. The BGP edge routers and firewall appliances will be cabled in a similar fashion to maximize physical and route signalling redundancy.

In addition to the BGP transit provider connections, High Desert will provide an Out Of Band (OOB) wireless link, on a seperate band, to be used to access the management network through a firewall. This would be utilized if there is a problem with the transit links preventing access to the core network.

Juniper EX series switches will be placed in the SoW identified building locations (due

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11440

to WiFi coverage needs, switches may be placed in the Dining building, RV parking, and other BLM staff areas). Various models of Juniper EX switches will be available: EX2300-C-12P (fanless, 12 ports PoE+), EX2300-24P (24 ports PoE+), EX2300-48P (48 ports PoE+), and EX4300-32F (32 fiber SFP ports). Based on the provided information, two 32 port switches would be anchored at the EOC building. A mixture of the 12, 24, and 48 port versions would be used at the remaining JOC buildings. Switches will be installed in a 2U "road case" and paired with a Cyberpower 300W rated UPS. Based on advertised power draw, each UPS should support running the 2300-C-12P switches in excess of a 1 hour runtime. Larger port capacity switches will have significantly less runtime based on a more aggressive power draw. VoIP phones and WiFi access points will plug into these switches to take advantage of the backed power source. Spare switches and UPSs will be stocked on-site in all port configurations.

The wired EX switches will support servers, VoIP phones, WiFi access points, and general wired network access. Port based VLANs will be used for L2 segmentation. The PoE nature of the switches will facilitate powering VoIP phones & WiFi access points without the use of "brick" power supplies. An LLDP configuration will be used to match the VoIP & WiFi devices to the appropriate VLAN(s).

Link Aggregation will be used for two 1Gbps fiber links between each JOC building switch. This configuration effectively load shares packets between two links, and in the case of a cut or malfunctioning cable, traffic will be automatically migrated to the remaining link. Tactical rated SM fiber will be utilized for strength and to avoid power related concerns. A backup copper cable would also be run between each JOC building.

The edge BGP router pair, SRX firewalls pair, core EX switches, servers, WiFi controllers, and other related equipment shall be placed in a BRC provided air conditioned secure room. Approximately 20U of rack space is desired for mounting this equipment. The pool of switches can be adjusted as needed on-site; for example, smaller VLAN capable switches could be used in a server room, while larger PoE switches can be used for heavy VoIP buildings. Larger runtime online rated UPSs will be utilized for this core infrastructure.

All network configuration will be driven by Ansible, an automation and configuration management suite that enables consistent templated configuration files to be pushed to network routers & switches. Configuration changes will be noted in a version control system, and each switch & the router cluster will be polled by Oxidized for configuration

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11441

backup. Such a system facilitates rapid changes in a known good sandbox environment, where "typo" incidents are minimized. No virtual chassis or stacking will be utilized on switches; each switch will be managed autonomously. A dedicated management VLAN will be used to address each switch or managed device, and management will run in-band. Management IP space will be within RFC1918 or RFC6598 allocations.

## Wireless Infrastructure

WiFi will be provided by a mixture of indoor and outdoor Aruba access points. The access points will terminate on a pair of controllers which connect to the wired network. The controllers facilitate a redundant control plane mechanism, along with roaming and firewall policy support. Networks can be made available in a mixture of 2.4Ghz & 5Ghz spectrum. WPA2 security is assumed as a password mechanism. The network design is geared for coverage primarily in stationary building workstations, not for mobile clients, based on assumed usage patterns.

A robust enterprise grade WiFi system is crucial due to the heavy BRC wireless spectrum utilization. A small portion of access points will be configured in a RF "spectrum analysis" mode to facilitate the best RF spectrum and power usage.

A wireless (4.9, 3.65Ghz, or mutually agreed frequency) point to point link will be built from the JOC to the center camp substation. High Desert Internet Services regularly installs this equipment throughout their normal service area. Such equipment will be rated to sustain the bandwidth needs as specified in the SoW (facilitating VLAN wired backhaul, LTE, and PTZ IP camera).

Verizon LTE 4G support will be made possible with "Enterprise Network Extender" (Samsung P/N SLS-BU102) units at the JOC and center camp substation. Currently Verizon does not offer "safelist" (sometimes known as "whitelist") priority functionality for the 4G units (such "managed" or "priority mode" is, however, available for 3G EVDO units). The BLM will need to pre-negotiate any frequency issues and coordination concerns with Commnet Wireless (Onsite Cellular Carrier).

## Audio/Video Systems

Polycom SIP IP phones will be utilized with a local SIP server. This will allow internal (within JOC & center camp) calls to be conducted without external internet connectivity, should the need arise. A sequential set of 775 area code DIDs will be provisioned to

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11442

phones, and each will be labeled with the complete phone number. The on-prem SIP server may also facilitate VoIP Interconnection to other entities, such as BRC ESD. A "cheat sheet" or laminated documentation will be available as a reference for common phone functionality. Different ring tones would be made available to distinguish BLM phones from other users.

An Axis HD resolution camera will be installed at the center camp substation and the camera will have PTZ capability from a remote workstation located at the JOC. A temporary or tower trailer will be utilized to increase elevation of the PTZ camera. These units are regularly used in outdoor environments and Two P has used such units on remote island deployments.

Ubiquiti Unifi IP cameras will serve the JOC jail location, with an on-site Network Video Recorder unit. The NVR will be placed within the JOC jail building, which will allow continuous recording should a network failure occur. Additional storage will be added to the NVR to increase archived video capacity. Cameras will be configured with a watermarked timestamp & room/location identifier. IR filters and/or LED's will be added for externally placed cameras. Video files will be transferred via NFS in a batch fashion and/or in real-time via RTMP stream archiving. High Desert and Two P have experience with these systems from prior deployments.

## Server Architecture

Server needs will be supported via virtual machines deployed on two separate Hypervisors. The Hypervisors are two Supermicro X10SDV-TP8F based boxes. These motherboards support 4 cores / 8 threads. Two systems will be built to support a cluster for HOT/WARM failover. VMs will be distributed over the two boxes with backup snapshots to the opposite hypervisors. If the hardware or software for a Hypervisor fails, it is just a matter of clicking on a couple of buttons to bring up a snapshot to a full running VM to replace the VM that failed. Additionally, each application will not impact other applications as they will be running on their own VMs. If other applications are needed, it is trivial to spin up another dedicated VM that is isolated from the current production VMs. The latest stable OS versions and software builds will be used.

Known applications identified that will be running on these VMs are:

- Phone Switch - FreePBX / Asterisk PBX
  This is the soft PBX that will terminate DIDs and extensions on site. This will reduce voice traffic from going out and back to a PSTN if the traffic is just

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11443

between extensions, etc. The PBX will also support FAX as required in the RFP.
- Monitoring - LibreNMS, Weathermap, Oxidized, etc.
  See "Appendix 7: Network Monitoring"
- Deployment software - Ansible
  Ansible is the deployment system to push out changes to the network. In this way we have the network programmatically configured and documented. Changes can be deployed with speed,ease, and confidence.

## Compliance & Regulatory Requirements

As requested in the SoW, the network design and operation of the infrastructure will follow guidelines from specified legal authorities & regulatory requirements. Quoter has reviewed the specific guidelines of CJIS security requirements. Management interaction will occur over SSH (secure shell) or approved secure protocols and no plain-text protocols will be used for management of the network. ACL's (access control lists) will be in place for SNMP and related telemetry access to prevent rogue remote access.

## Planning Logistics

In addition to the event schedule, frequent phone conference calls pre-event and a post-event wrap-up are included in the labor budget. Documentation, such as IP address / VLAN assignments, Phone DID's, staff contact information, etc., will be facilitated over shared Google Docs/Sheets.

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11444

# Appendix 1: Technical Assumptions, Conditions, Or Exceptions

Physical

- BLM and/or Burning Man will make available a trencher and suitable operator to provide trenching between JOC buildings.
- Contractor will not be held liable for damage caused by cable penetrations into temporary buildings; existing egress or entrance points will be utilized where possible.
- BLM will provide a location for the "co-location" building, which houses core network equipment in redundant configuration. Sufficient air conditioning will be made available for at least 2000W power draw of equipment. Diverse power will be made available within this location (A & B separate generator sources). Two L5-30R power connections are required for online rated UPS units. Minimum 20U of rack space (ideally split between two diverse relay racks or cabinets) to mount core network equipment within this location.
- BLM will confirm desired lengths of fiber optic & copper cabling at least 60 days in advance of the work start date.

Network routing

- ISP transit providers to exchange BGP (version 4) routing with full table "DFZ" (default free zone) routes, along with originating default 0.0.0.0/0 routes. BLM will be responsible for requiring all contractual ISP requirements to their selected ISP partners. Quoter will be responsible for all ISP technical implementation.
- ISP's may choose to advertise High Desert or Two P provided IP space, shell neither provider offer an available IPv4 /24 allocation.
- In the case where BGP support is not capable between two (or more) ISP transit providers, each shell provide at least /29 of usable IP space (either as a link local or static routed assignment).
- Web content category filters will be selected from the Juniper JunOS SRX "dynamic application" available categories and/or specific listed site names. Quoter will defer to Juniper's existing database for this categorization and lists.
- Specific per-channel YouTube safelisting (sometimes known as whitelisting) isn't technically feasible (due to HTTPS and inline include elements for CSS/Javascript/etc). As an alternative, per-VLAN filtering for this content category may be considered (i.e.: YouTube fully blocked on wireless segment but allowed on wired segments).
- All specified network equipment is IPv6 capable, however, this routing family will be disabled unless explicitly requested.

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11445

Center Camp PTZ camera
- BLM will provide a Windows workstation which is compatible with the Axis T8311 Joystick (USB based device with relevant drivers to control PTZ camera).

Jail IP cameras
- Video archiving will occur over RTSP encoding streams. Replication may not occur in real time depending on network lag.

Verizon LTE 4G
- Available network extender units from Verizon do not currently offer "safelist" (sometimes known as "whitelist") priority functionality (to give priority to specific numbers or IMEI), and as a result, any such service will be available only as FIFO (first in first out) queued. See "Management & Security Question #1" for SLS-BU102 unit (marketed as "Verizon 4G LTE Network Extender for Enterprise") that confirms the lack of safelist priority support.
- Network Extender units may each consume up to 50Mbps of IP network capacity, BLM will need to provision sufficient capacity with their ISP connection partners.
- BLM to coordinate with cellular providers (such as Commnet Wireless) about mutual frequency coordination for Verizon LTE Network Extender units.

## Appendix 2: Staffing Plan

Our technical & project management approach is rooted in staging equipment several weeks prior to the pre-event time frame at an offsite location. This will allow us to pre-configure network elements such as IP cameras, WiFi access points, switches, etc. This staging not only provides a high confidence in the technical capabilities of the overall architecture, but also allows for redundancy & monitoring systems to be tested (and adjusted as needed) in advance. Components are then labeled and packaged for rapid field deployment.

| Name | Organization | Titles | Duration |
|------|--------------|--------|----------|
| Doug Dawson | High Desert | Owner/Principal | Pre-Event, Main, & Post-Event |
| Onsite primary administrative contact – covering physical & backbone wireless infrastructure, IP cameras | | | |
| Matt Peterson | Two P | Network Engineer | Pre-Event, Main, & Post-Event |

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11446

| Onsite primary technical contact - covering all network aspects starting at Layer 2 and above (VLAN network segments, firewall/web filtering/routing, WiFi 802.11, etc.) along with technical support escalation |||||
|---|---|---|---|
| Tim Pozar | Two P | Systems Engineer | Pre-Event, Off-site |
| On and off-site resource covering server infrastructure (VoIP, monitoring, cluster/backups), technical support escalation resource |||||
| Keith Wiseman | High Desert | Technician | Pre-Event & Post-Event |
| Hugh Heath | High Desert | Technician | Pre-Event & Post-Event |
| (tbd) | High Desert | Technician | Pre-Event & Post-Event |
| Cabling installation/removal (Cat5e copper & fiber optic), deployment/return network infrastructure (VoIP phones, WiFi access points, network switches, etc.) |||||

High Desert Internet will have 3 - 4 technical staff onsite for Pre Event setup and Post event breakdown (See High Desert Internet Services technical staff below for description), and will have at least 1 staff member remain onsite 24/7 during the main event for technical support. Two P will have 1 technical staff member onsite for all event stages, and 1 off-site resource for all stages. All resources will be available for support escalations.

High Desert personnel are employees, Two P personnel are sub-contractors.

## Appendix 3: Personnel

Quoter specifies the following personnel as key personnel.

### Doug Dawson

Doug Dawson founded High Desert Internet Services in mid 2002. The company provides wired and wireless IP networking throughout the Reno-Tahoe / Northern Nevada region. Services are available in over 6 counties throughout the state. High Desert uses a combination of licensed microwave, WiMax, and fiber optic backbone infrastructure. The network has grown to include connectivity to major carrier hotels in Silicon Valley & Los Angeles. High Desert is one of two service providers in the region with a fully redundant backbone & network egress to multiple upstream transit providers.

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11447

Mr. Dawson began High Desert initially as a secondary service to a computer repair shop. The company now services over 1,500 consumer subscribers, along with 150 businesses or enterprises. Mr. Dawson has been providing Internet connectivity to the Black Rock region since 2007. He is a licensed radio operator (KC7MSX) and actively pursuing a private pilot license.

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11448

# Matt Peterson

Oakland, CA | +1.510.432.3528 | matt@peterson.org

SKILLS PROFILE

| | |
|---|---|
| *OS* | Linux, FreeBSD, OpenBSD, OSx, Windows |
| *Languages* | Bash/zsh/sh shell, Python, PHP |
| *DB/Store* | MySQL, Postgres; Redis, memcache |
| *Daemons* | Apache, Nginx, BIND, Samba, Netatalk, NFS |
| *Mail* | Postfix, Qmail, Sendmail, Dovecot, Courier, vpopmail, SpamAssassin |
| *Monitoring* | Nagios/Icinga, rrdtool-based frontends, collectd, Graphite, Net-SNMP, WebSitePulse/Keynote |
| *Tracking* | Jira, Request Tracker, FogBugs, PMwiki/mediawiki, Confluence |
| *VCS* | Git, Subversion, CVS |
| *Systems* | Puppet, Ansible, cfengine, kickstart, preseed, iPXE/pxelinux |
| *AAA* | FreeRADIUS, MIT Kerberos, 802.1x/EAP, OpenLDAP/OpenDirectory, Yubikey, Duo |
| *Network* | Juniper JunOS, Cisco IOS, Cumulus, F5, A10, Foundry, Arista EOS, MRV *WDM |
| *Wireless* | 802.11x, RF engineering |
| *Storage* | NetApp, EMC, BlueArc, DRDB, NFS |

EMPLOYMENT HISTORY

**Principal**                                                                                      04/2016 — Current

*Two P | Emeryville, CA*

Network service provider consultancy, focused on audit and implementation services. Surveyed operational best practices and industry norms for building owner acquired IXP property. Implementation of GPON network for greenfield ISP, including all L1–L3 networking equipment. Reworked routing policies for existing FTTH ISP, added public peering, updated IRR entries, basic security clean-up. Taught network automation tutorials utilizing Ansible.

**Office of The CTO**                                                                              02/2013 — 03/2016

*Cumulus Networks | Mountain View, CA*

Founded Customer Engineering team, recruiting 'DevOps' oriented network engineers. Promoted to Office of the CTO in mid 2014. Crafted strategy around key product initiatives: software update repositories, documentation, ONIE boot loader, unattended zero-touch provisioning, optic transceiver inter-operability, and Puppet/Ansible integration. Identified product gaps from industry norms and provided fixes and/or bug submission. Represented Cumulus at numerous industry events, including Network Field Day, DevOps Days, DevOps4Networks, Open Compute Project, OpenStack, and NANOG. SME for key financial, cloud, and other major accounts.

**Director of Infrastructure**                                                                     04/2011 — 10/2012

*Tumblr | New York, NY*

Founded infrastructure team of 6 engineers — managing network, datacenter and IT engineers across multiple timezones. Responsible for a budget in excess of $15M. Primary negotiator on wholesale 568KW datacenter suite, transit connectivity, server & network hardware. Principal network architect utilizing Juniper MX, EX & SRX routers, with justified ARIN /20 & /44 address allocations. Built DWDM fiber network spanning 115 km with 8x10Gbps channels. Prototyped systems trending using collectd & graphite to replace under performing rrdtool-based solution. Deployed Icinga based monitoring against network & site availability. Managed major refactor of Puppet configuration management, utilized environments, custom ENC and reusable modules.

**Member of Technical Staff**                                                                      10/2009 — 04/2011

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11449

*e | San Francisco, CA*

Employee #8; first dedicated Ops hire. Lead on Square's first successful PCI-DSS & PA-DSS certification. Migrated production environment from cloud to private datacenter. Automated server installation with Puppet, kickstart & git-backed repositories. Built IP network on OpenBSD firewalls, Juniper routers/switches with /21 & /48 ARIN allocations. Setup Trixbox PBX w/ Cisco & Polycom VoIP phones. Prototyped Yubikey OTP deployment. Configuration of internal and external monitoring systems. Maintainer of Ops & IT budget in excess of $1.5M; negotiated all OpEx & CapEx purchases (ie: colo, bandwidth, network equipment). Daily Ops & IT project management using Jira. Hiring manager for Ops & IT.

**Network Deployment Engineer**                                    02/2009 – 09/2009

*Packet Clearing House | Berkeley, CA*

Continuation of contract work performed between 06 – 08/2008 to full time employment. Hands on coordination and installation of ccTLD/gTLD name server instances in various Internet Exchanges – geographical focused in North America and Europe. Maintenance of internal Asterisk PBX. Peering coordination.

ADDITIONAL EMPLOYMENT HISTORY

**Senior Operations Architect**                                    09/2008 – 02/2009

*ZillionTV | Sunnyvale, CA*

**Site-Ops Manager**                                                01/2006 – 05/2008

*Meta Interfaces | San Francisco, CA*

**Senior System Administrator**                                    12/2004 – 01/2006

*Six Apart | San Francisco, CA*

**:ms Architect**                                                  10/2000 – 01/2004

*Surf and Sip | San Francisco, CA*

**NOC Specialist**                                                 01/2000 – 07/2001

*Critical Path | San Francisco, CA*

**System Administrator**                                            1997 – 12/1999

*Acorn Product Development | Fremont, CA*

VOLUNTEER EXPERIENCE

**Founder / President**                                            07/2006 – Present

*San Francisco Metropolitan Internet Exchange | San Francisco, CA*

**Playa Network Team Engineer**                                    08/2009 – 09/2014

*Burning Man | Gerlach, NV*

**Founder**                                                        09/2000 – 08/2004

*Bay Area Wireless User Group | San Francisco, CA*

SPEAKING ENGAGEMENTS

| | |
|---|---|
| *Domestic* | NANOG, Asilomar, ToorCon, O'Reilly Emerging Technology, BSDcon, WiFi Planet |
| *International* | RIPE, SANOG, APRICOT, PuppetCamp, O'Reilly Velocity |

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

**13 of 29**

AR11450

Tim Pozar

Timothy (Tim) Pozar
423 Durant Way
Mill Valley, CA 94941

+1 415 637-8512
pozar@twop.co
https://www.linkedin.com/in/timpozar/

Skills

Startups, network engineering, wireless/RF engineering

Experience

**TwoP LLC /** Managing Principal
Oct 2016 - PRESENT,  Mill Valley  CA
Two P is a specialized consultancy in the fine arts of IP Networks,
RF engineering, "DevOps", and all things Infrastructure. Two P has
provided technical guidance on remote video surveillance,
fiber-to-the-home deployments, AWS cloud architecture, and a
variety of other engagements.

**San Francisco Metropolitan Internet eXchange (SFMIX) /**
**Vice President**
2006 - PRESENT,  San Francisco,  CA
Co-Founded SFMIX which is the only non-profit cooperative
Internet Exchange based in the San Francisco Bay Area. The fabric
covers all major non-incumbent data centers buildings within the
region.

John Markoff for the NY Times covered our work in the following
article...
http://www.nytimes.com/2010/03/02/science/02topo.html

**US Fish and Wildlife Service /** Consultant / Contractor for the
Farallons Broadband Project
 2009 - Present,  South East Farallon Island, San Francisco CA

Designed, procured and deployed a 200Mb/s symmetrical
broadband connection to the South East Farallon Island (SEFI)
in order to support staff and systems on SEFI.  This deployment
met budget and met the requirements of applications such as an
HD streaming camera, VoIP, uptime, etc.

**City and County of San Francisco /** Network architect and

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

14 of 29

AR11451

consultant for the Community Broadband Project
2008 - Present, San Francisco CA

Designed and deployed a 1 and 10GE fiber and wireless network
to support the housing developments for the San Francisco
Housing Authority (SFHA). The network supplies free Internet
access to residents in SFHA developments and various SROs. It
also provides backhaul and Internet access to various non-profits
(Cal Academy of Sciences, Exploratorium, etc.)

**Fandor / VP of Operations**
Jan  2012 - Sep 2016, San Francisco CA

Fandor is a subscription based video streaming company specializing in
cinephile, documentary, art and foreign films. My role was to provide
seamless playback. Through metrics, network tuning, vendor
management, I increased playback performance over 7 times. I also
established and directed the customer service department keeping churn
down and providing feedback to product on features and bugs. In my last
year at Fandor, I was directing the content ingest department in order to
productized our content for delivery to other partners including Amazon
Prime, etc. This meant captioning a significant portion of our library and
standardizing the format of our content.

**North American Network Operators' Group (NANOG) /**
Co-Director of Event Technology
June  2012 - Oct 2013, Various sites

NANOG produces three primary events a year. As attendees are the
folks that run the Internet backbones in North America, event broadband
has to meet high standards. We brokered donations of routers, designed
and deployed highly redundant network architecture for these events
that meant multiple 10GE upstream providers providing bandwidth for
the site.

**UnitedLayer / Co-owner and VP Engineering**
2004 - 2009, San Francisco CA

Invested in the company in 2004, Negotiated, moved and upgraded the
data center from a storefront at 6th and Mission to a fully conditioned
and N+1 space at DRT's 200 Paul building. Profitable in the first year of
moving the customers.

**Brightmail / Co-founder and Director of Operations**
1998 - 2000, San Francisco CA
The first commercial anti-spam company. Customers included AT&T,
CriticalPath, etc. Build out the operations center (NOC). Build out mail
and data back end. Co-inventor on two patents for spam blocking
(6,654,787 and 7,882,193). Company was sold to Symantec.

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11452

## Appendix 4: Subcontractors

### Two P

Two P was founded by Tim Pozar and Matt Peterson. The consultancy includes networking, data center, and systems management. Two P's work has ranged from starting the first public Internet Service Provider in San Francisco to the buildout of a data center to support a top 15 global web property.

Tim Pozar co-founded and was the network engineer for TLGnet, the first commercial ISP in San Francisco. He was later the Network Architect and Director of Operations for Alexa and Internet Archive. In 1998, he was co-founder and Director of Operations for the anti-spam company Brightmail, and in 2004 he was the first investor, as well as VP of Engineering and COO, of UnitedLayer. Recently Mr. Pozar was the VP of Operations of Fandor, a subscription based streaming video company.

Matt Peterson was the first Operations hire at Square, and later served as the Director of Infrastructure for Tumblr and led the Customer Engineering team at Cumulus Networks. His work spans data center deployment, network engineering, and systems management. He has a particular interest in challenging network builds, which has led him to deserts, islands, and connectivity-stranded countries for deployments. In addition to his Two P engagements, Mr. Peterson currently serves as CTO at PAXIO, a fiber-based ISP.

Two P has deployed or been instrumental in a number of event based temporary networks in the past. These include Apple's WWDC (SF), Techcrunch / The Crunchies Awards (SF and NYC), SFMusicTech, SXSW, Strawberry Music Festival, and Burning Man. Two P has supported the Farallon Islands National Wildlife Refuge connectivity requirements since 2009 as an example of long distance networks over challenging environments. The island is managed by U.S. Fish and Wildlife Service.

Mr. Peterson was a member of the Burning Man "PlayaTech" team between 2009 to 2014 event seasons. During his tenure, Mr. Peterson re-architected the event network to utilize L3 routing redundancies, converted the backbone wireless microwaves to licensed radios, built an extensive training guidebook, and co-implemented configuration automation systems.

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

16 of 29

AR11453

Two P will provide the overall network design, deployment, and operation for this project.

The following references are available on behalf of Two P:

**Jonathan Shore**
Wildlife Refuge Specialist, Farallon National Wildlife Refuge
U.S. Fish and Wildlife Service (government agency)
Phone: 510-792-0222, ext. 224, cell: 510-377-5926
Jonathan_Shore@fws.gov

**Phil Clark**
CEO & Founder
PAXIO (regional fiber ISP)
Phone: 408-693-8630
pclark@paxio.com

**Gary Morrell**
CEO
LMi.net (regional DSL/wireless ISP)
Phone: 510-542-2843
gary@lmi.net

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11454

# Appendix 5: Hardware

| Qty | Description | Part number | Role |
|-----|-------------|-------------|------|
| 2 | MX150 routers | MX150-R | Edge WAN routers |
| 2 | Juniper SRX firewall appliances | SRX300 | Core LAN routers |
| 2 | Supermicro Xeon-D servers | | VM servers |
| 2 | Juniper 32x gigE SFP 4x SFP+ | EX4300-32F | Core LAN switches |
| 2 | Juniper 48x gigE PoE+ 4x SFP+ | EX2300-48P | LAN switches |
| 4 | Juniper 24x gigE PoE+ 4x SFP+ | EX2300-24P | LAN switches |
| 10 | Juniper 12x gigE PoE+ 2x SFP+ | EX2300-C-12P | LAN switches |
| 30 | copper 1G SFP's | T.C12.02.A | LAN switch optics |
| 20 | 1G BiDi | S.B1312.10.DL | LAN switch optics |
| 20 | 1G BiDi | S.B1512.10.DL | LAN switch optics |
| 2 | CyberPower 3000W 2U UPS w/ net | OL3000RTXL2U | EOC - battery backup |
| 2 | CyberPower 1500W 2U UPS w/ net | PR1500LCDRTXL2UN | JOC - battery backup |
| 10 | CyberPower 300W 1U UPS w/ net | OR500LCDRM1U | JOC - battery backup |
| 2 | Aruba WiFi controllers | 7510-US | WiFi controllers |
| 12 | Aruba indoor AP's | AP-225 | WiFi access points |
| 2 | Aruba outdoor AP's | AP-275 | WiFi access points |
| 2 | Aruba outdoor AP's | AP-277 | WiFi access points |
| 20 | Polycom 321 VoIP phones | 2200-12360-025 | VoIP phones |
| 3 | T.38 Fax VoIP adapters | VIP-156PE | VoIP Fax adapters |
| 1 | Radwin 3.65/4.9 PtP wireless radio | | Substation PtP wireless |
| 2 | Verizon 4G LTE network extenders | SLS-BU102 | 4G LTE femtocell |
| 1 | Axis PTZ HD Camera | Q6055-E | Substation IP camera |
| 3 | 55" Monitors (jail, PTZ, & monitoring) | | Substation IP camera |
| 1 | Axis Communications T8311 Joystick | | Substation IP camera |
| 8 | Ubnt video cameras - in & outdoor | | Jail IP cameras |
| 1 | Ubnt UniFi NVR | | Jail IP cameras |
| 15 | 4 ct SMF 250' fiber cables | | LAN switches |
| 1 | 12 ct SMF 500' fiber cable | | Core LAN switches |

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11455

Consumables such as Cat5e cable spools (backup), Cat5e patch cables, RJ45 plugs, labeler tapes, velcro/cable management, fiber cleaning materials, etc. are omitted from the hardware list.

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11456

## Appendix 6: System Architecture

The following diagrams provide a high-level overview of the overall system design.

As noted, all critical functions (routing, switching, WiFi controllers, etc.) are built in a redundant configuration - generally HOT/HOT or HOT/WARM arrangements. The exact number of switches, WiFi access points, VoIP phones, and IP cameras are not representative on these diagrams. Quantities of these components will meet the minimums as stated in the SoW, with additional units available as needed (for unplanned growth or spares).

Power infrastructure is not visualized in these diagrams due to space constraints and the likelihood that such systems will be a mixture of BRC, BLM, and Quoter infrastructure that needs further planning. At a minimum, all the network, server, and related infrastructure components that are diagrammed will be backed by Quoter provided UPS systems.



CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

20 of 29

AR11457

Detailed diagrams will be made available Pre-Event, detailing IP address, interfaces, and specific cable routing. An example of such a diagram (enlarged view) is presented below. The 2018 design would be a similar ring topology, however it would utilize fiber for primary connectivity, with a copper failover.



CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

21 of 29

AR11458

## Appendix 7: Network Monitoring

Monitoring infrastructure will be hosted on a Proxmox Hypervisor cluster. This high availability setup facilitates virtual machine (VM) automatic failover between two unique servers. VM disk images are replicated between hosts as part of this configuration.

A monitoring specific VM will be built prior to the event, and the configuration will be tested prior to the event deployment. The monitoring VM will host various monitoring software, including (but not limited to): LibreNMS, Network Weathermap, and Oxidizied.

LibreNMS provides a graphical network management interface to common infrastructure elements, such as network routers, switches, UPS units, and related equipment. All of the proposed hardware is fully supported by LibreNMS, and both Weathermap and Oxidized integrate into the LibreNMS interface.



LibreNMS will cover the following infrastructure components (at a minimum):
- Port utilization of physical & logical network interfaces (of routers & switches)
- System (servers, routers, switches) environmentals: temperature and fan RPM
- UPS voltage current, amperage draw, and (if supported) temperature

Common thresholds (ie: >80% port capacity, link down, temperature exceeded, etc.) will

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11459

be configured for alerting via email. A login to the LibreNMS instance will be made available to BLM staff, and alerting (via SMTP email) may also be shared as requested.

"Real-time" (~5 min delay, depending on the polling interval) network utilization, throughput, etc., information will be available in a self-serve web interface for BLM staff.

The Weathermap functionality will present a physical layer map of switches and related metadata, such as throughput in percentage of interface capacity or actual Mbps. Such throughput data can be visualized with a color coded legend.



Oxidized provides automatic backup of router & switch configurations, and any change in configuration will be noted in a version control system. This mechanism provides a "snapshot" of a prior known configuration - should such a configuration rollback be needed.

Finally, a dedicated syslog VM will capture infrastructure logging data from routers, switches, UPS's, and related infrastructure. Such logs are useful in debugging scenarios and/or incident review activities.

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11460

## Appendix 8: Past Performance

High Desert Internet Services (High Desert or HDIS) was started in 2002 as a regional wireless Internet service provider. We have built out several high capacity microwave networks as well as supported several events with temporary Internet connections, and various network services.  current projects include:

**Name of Project**: Night in the Country Music Festival
**Location of Project**: Yerington, NV
**Order Reference Number**: Same as "Name of Project"
**Total cost for Project**: $20,000
**Name of Agency/Entity**: Mason Valley Boys And Girls Club
**Point of Contact (including Phone Numbers)**: Justin Aguilar (Event Coordinator) 775-750-2052, justin@nightinthecountry.org
**Description of services performed (to show relevance to this project)**:
Network build out to key entry points on grounds for ticket scanners as well as fulfilling vendor requests for network access for credit card billing, administration trailers and musician trailers, and multiple WIFI hotspots in VIP venues. All locations must be broken into separate VLANS for security purposes.

**Name of Project**: Burning Man Primary Internet
**Location of Project**: BRC
**Order Reference Number**: Same as "Name of Project"
**Total cost for Project**: $10,000
**Name of Agency/Entity**: Burning Man
**Point of Contact (including Phone Numbers)**: Chris Petrell (Gerlach IT) 408-718-1016 taz@burningman.org
**Description of services performed (to show relevance to this project)**: High Desert hasprovided the primary Internet connection for the Burning Man Event for the last 10 years, and as of last year an Internet connection for the JOC at Burning Man. We also constructed a Layer 2 tunnel for Pershing County Sheriff to access their office network in Lovelock, NV from their office trailer at the JOC Burning Man across a multihop microwave network.

Additional references on behalf of High Desert Internet Services:

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11461

**Allan Mederos**
Lyon County School District
IT Administrator
775-316-0442
amedeiros@lyoncsd.org

**Justin Aguilar**
Mason Valley Boys and Girls Club
NITC Event Coordinator
775-750-2052
justin@nightinthecountry.org

**Michael Yepez**
Ormat Geothermal
Nevada Network Administrator
775-434-9825
myepez@ORMAT.COM

**Introduction**: Two P LLC provides consultation on both  traditional and temporary networks, from data centers to remote locations. As mentioned in Appendix 4, Two P has deployed or been instrumental in a number of event based temporary networks in the past. These range from smaller events like SFMusicTech Summit[1] (Producer: Brian Zisk) and The Future of Money and Technology Summit[2] (Producer: Brian Zisk), to larger events such as The Strawberry Music Festival[3] and Burning Man.

**Name of Project**: Internet Network for South East Farallon Island (SEFI)
**Location of Project**: SEFI, 50 Km due west of San Francisco.
**Order Reference Number**: Same as "Name of Project"
**Total cost for Project**: Over time it has been approximately $50K for labor, capex, and in-kind donations.
**Name of Agency/Entity**: Three parties: US Fish and Wildlife, Point Blue, California Academy of Science
**Point of Contact (including Phone Numbers)**: US Fish and Wildlife is Jonathan Shore, Jonathan_Shore@fws.gov, Phone: 510-792-0222, ext. 224, cell: 510-377-5926.
**Description of services performed (to show relevance to this project)**:
As an example of working in challenging environments, Two P has supported the Farallon Islands National Wildlife Refuge connectivity requirements since 2009. The

---

[1] http://www.sfmusictech.com
[2] http://www.futureofmoney.com
[3] http://strawberrymusic.com

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11462

island is managed by U.S. Fish and Wildlife Service[4] and Point Blue[5]. This includes two 50Km paths (main and backup) from Twin Peaks (aka City and County of San Francisco Central Radio Site) in San Francisco to the lighthouse on South East Farallon Island. This network is critical infrastructure for the half dozen to two dozen scientists and support staff that are located on this remote island. The network carries infrastructure monitoring (gensets, water treatment, etc.), phone and email service, and other day-to-day work back to the mainland. In addition, AIS (marine vessel) & ADS-B (flight) tracking receiver data is also relayed over the network to public archives. The network hosts a HD PTZ public webcam on behalf of the California Academy of Sciences.

For the Farallon Islands project, Two P provided the initial network architecture, vendor relations (equipment suppliers), application deployment (VoIP, webcam, life safety remote monitoring), and continues to provide ongoing maintenance.

**Name of Project**: Internet Network for Strawberry Music Festival
**Location of Project**: Grass Valley CA Fairgrounds (Spring) and Westside Lumber Event Site Tuolumne City CA (Fall)
**Order Reference Number**: Same as "Name of Project"
**Total cost for Project**: Private
**Name of Agency/Entity**: Strawberry Music Festival
**Point of Contact (including Phone Numbers)**: Stephanie Saracini, General Manager of Strawberry Music Festival, stephanie@strawberrymusic.com, 209-206-0256
**Description of services performed (to show relevance to this project)**:
This large scale network deployment for the Strawberry Music Festival (SMF) is a yearly project. SMF faces the ongoing challenge of their venues having little or no phone service to support credit card machines or even voice calls. Two P has installed and deployed Internet infrastructure and VoIP services to support their applications on a yearly basis.

---

[4] https://www.fws.gov/refuge/farallon_islands
[5] http://www.pointblue.org

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11463

# Section 2: Price Quote

All hardware is rented out for the period of August 15 through September 7, 2018 – equipment will remain property of High Desert and/or Two P.

## Physical Hardware

| Qty | Description | Per unit | Sub Total |
|---|---|---|---|
| 2 | Juniper MX150 BGP routers | $3,000.00 | $6,000.00 |
| 2 | Juniper SRX firewalls w/ web filtering licenses | $1,057.00 | $2,114.00 |
| 2 | Supermicro Xeon-D servers | $750.00 | $1,500.00 |
| 2 | Juniper 32x gigE SFP 4x SFP+ | $2,622.00 | $5,244.00 |
| 2 | Juniper 48x gigE PoE+ 4x SFP+ | $1,080.00 | $2,160.00 |
| 4 | Juniper 24x gigE PoE+ 4x SFP+ | $540.00 | $2,160.00 |
| 10 | Juniper 12x gigE PoE+ 2x SFP+ | $540.00 | $5,400.00 |
| 30 | copper 1G SFP's | $26.40 | $792.00 |
| 20 | fiber 1G BiDi SFP's (1550/1310) | $26.40 | $528.00 |
| 20 | fiber 1G BiDi SFP's (1310/1550) | $24.00 | $480.00 |
| 2 | CyberPower 3000W 2U UPS w/ net | $1,200.00 | $2,400.00 |
| 2 | CyberPower 1500W 2U UPS w/ net | $750.00 | $1,500.00 |
| 10 | CyberPower 300W 1U UPS w/ net | $300.00 | $3,000.00 |
| 2 | Aruba WiFi controllers w/ RFprotect & PAF licenses | $2,500.00 | $5,000.00 |
| 12 | Aruba indoor AP's (AP-225) | $127.50 | $1,530.00 |
| 2 | Aruba outdoor AP's (AP-275) | $450.00 | $900.00 |
| 2 | Aruba outdoor AP's (AP-277) | $236.25 | $472.50 |
| 20 | Polycom 321 VoIP phones | $45.00 | $900.00 |
| 2 | T.38 Fax VoIP adapters | $50.00 | $100.00 |
| 1 | Radwin 3.65/4.9 PtP wireless radio | $3,500.00 | $3,500.00 |
| 2 | Verizon 4G LTE network extenders | $3,000.00 | $6,000.00 |
| 1 | Axis PTZ HD Camera | $3,000.00 | $3,000.00 |

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11464

| | | |
|---|---|---|
| 3 55" Monitors (jail, PTZ, & monitoring) | $500.00 | $1,500.00 |
| 1 Axis Communications T8311 Joystick | $300.00 | $300.00 |
| 6 Ubnt video cameras - indoor | $175.00 | $1,050.00 |
| 2 Ubnt video cameras - outdoor | $175.00 | $350.00 |
| 1 Ubnt UniFi NVR | $300.00 | $300.00 |
| 15 4 ct SMF 250' fiber cables | $187.50 | $2,812.50 |
| 1 12 ct SMF 500' fiber cable | $1,125.00 | $1,125.00 |
| 1 Tower rental (center camp sub-station PTZ) | $1,000.00 | $1,000.00 |
| | | **$63,118.00** |

## Other Direct Costs

| Description | Sub Total |
|---|---|
| Consumables - Cat5e cabling, RJ45 plugs, tape labels, velcro, screws, zipties, fiber cleaning materials, etc | $2,000.00 |
| VoIP minutes, 20x 775 area code DID SIP accounts (assumes similar usage patterns as 2017) | $500.00 |
| Travel (gas, insurance, rental vechices) and subsistence (lodging, food) | $7,000.00 |
| | **$9,500.00** |

## Labor

Costs include allocation for staging activities prior to pre-event phase, during event, and post event cleanup activities.

| Description | Sub Total |
|---|---|
| Project management & staging facilitation - diagrams, conf calls, emails, documentation, IP network planning, pre-configure network equipment, etc. provided by High Desert & Two P 3x personnel | $9,000.00 |
| Off-site systems administration (VM server build, SIP VoIP, monitoring infrastructure, etc) provided by Two P 1x personnel | $9,000.00 |

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11465

| | |
|---|---|
| On-site network engineer (for pre, main, & post event; primary network architecture & technical support) by Two P 1x personnel | $21,000.00 |
| On-site infrastructure foreman (for pre, main & post event; main administrative management, equipment deployment/removal); 1x personnel provided by High Desert | $9,000.00 |
| On-site network technicians (equipment installation/removal, cabling deployment, etc for pre & post event; equipment cleanup); 3x personnel provided by High Desert | $10,000.00 |
| | **$58,000.00** |

**GRAND TOTAL for all items quoted: $130,618.00**

## Appendix 1: Price Assumptions

Price assumes Quoter will be notified 30 days post submission that contract has been awarded. Additionally, only minor SoW changes (ie: additional buildings for networking, change in qty of VoIP phones, etc) are assumed during pre-event and main event - major changes (ie: new network deployment location, >100Mbps increase in bandwidth, etc) are not covered by the grand total price.

CONFIDENTIAL AND PROPRIETARY INFORMATION
Unauthorized use, duplication, or dissemination is prohibited.

AR11466

Exhibit " K "

.

Exhibit " K "
AR11467

**BRC QUESTIONS TO BLM CONCERNING 2017 BURNING MAN EVENT SRP COST RECOVERY CLOSEOUT DOCUMENTS (Received Feb 15, 2018)**
**PART 1**
**(BLM Answers in Red)**

## LABOR COSTS

1. Please provide more details about what the DNA people did? Was this a new function in 2017?

*In 2017 the labor of the WDO employees assigned to work on the BM SRP related DNA's are captured in the Phase 1 labor table as "Event NEPA Planning" They worked on two BM SRP related DNA's: SRP/Permit DNA (includes SRP stipulations) & Vending DNA This was done in 2016, also with labor identified in the 2016 Phase 1 labor table*

2. Please provide the pay period dates for the column "Processed Pay Period."

*The "Processed Pay Period" column on the labor FBMS spread sheets refers to the gov't pay period the labor was charged in Example, in column it shows 201719, that means the labor charge was for labor worked in pay period 19 in fiscal year 2017. See attached 2017 GSA Pay Period Calendar to assign dates to a particular pay period Example, PP 201719 is for dates September 3 to September 16*

3. How many and what types of cases did the PCSO investigators work on?

*This is a question that needs to be answered by the PCSO and is unrelated to the BLM Cost Recovery*

4. Please provide details about the work done by Jon Young (595 hours) and Dalton Black (407 hours).

*(4a): In 2017, during the planning phase, Jon Young was a collateral planning team member of the BLM's 2017 BM SRP Planning Team His responsibilities were to lead in the technology planning, which included the CAD program, the Dispatch program, the Internet Network program, the IT program, the Satellite Tracking program, the IMARS program and the GIS program Additionally, he was responsible for the writing of four Government contracts SOWs and three MOU contract SOWs related to technology planning i e Government - CAD Servers purchase, CAD Servers Licensing, Satellite Tracking, Network Services ; MOU -- CAD Services, Dispatch Services, Internet Bandwidth purchase In 2017, during the operational phase, Jon Young served as the BLM's Communications Chief and was supervisor of the Radio Communication operation, the CAD operation, the Dispatch operation, the Internet Network operation, the IT operation, the Satellite Tracking operation, the IMARs operations, and the GIS operation He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week Additionally, while on playa, he was contracting COR for two Government service contracts and BLM Representative to three MOU contracts In the 2017 Phase 1 CRA Est labor table, Young shared in the 150 hours of the Communication Planning for his initial planning labor In the 2017 Phase 2 CRA Est. labor table, Young's estimated hours (continuing planning & operational) was 530 hours The total 2017 estimated hours for Young's labor to complete*

1

his assigned 2017 BM SRP duties was approximately 580 hours. His total labor charge to the final 2017 BM SRP CRA was 595 hours.

(4b): In 2017, during the planning phase, Dalton Black was a collateral planning team member of the BLM's 2017 BM SRP Planning Team. His responsibilities were to lead in the radio communications planning, which included the radio repeater network, the dispatch radio system and the detailer's handheld and mobile radio equipment. Additionally, he was responsible for the writing of two Government contracts SOWs i.e  radio repeater purchase and detailer's radio accessories purchase  In 2017, during the operational phase, Dalton Black served as the BLM's Radio Communications Lead in the Communications operation and was supervisor of the Radio Communication team  He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 1 CRA Est. labor table, Black's shared in the 150 hours of the Communication Planning for his initial planning labor. In the 2017 Phase 2 CRA Est. labor table, Black's estimated hours (continuing planning & operational) was 346 hours. The total 2017 estimated hours for Black's labor to complete his assigned 2017 BM SRP duties was approximately 396 hours. His total labor charge to the final 2017 BM SRP CRA was 407 hours.

5.  Please provide details about the work done by Ryan King (386 hours), Douglas Carter (346 hours), Michael Grimes (343 hours), James Iaguilli (328 hours), Douglas Young (291 hours), and Toni Suminski (287 hours).

(5a): In 2017, during the operational phase, Ryan King served as the BLM's IT Security Technician in the Communications operation. He assisted in the set-up of the BLM's IT equipment operation to ensure all BLM network security regulations/protocols were followed and maintained throughout the event operation. He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 2 CRA Est. labor table, King's estimated hours (planning & operational) was 384 hours. His total labor charge to the final 2017 BM SRP CRA was 386 hours.

(5b): In 2017, during the operational phase, Douglas Carter served as one of BLM's radio communications technician in the Communications operation (night shift). He assisted in the set-up, maintaining and break-down of the BLM's radio repeater network, the dispatch radio system and the detailer's handheld and mobile radio equipment  He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week  In the 2017 Phase 2 CRA Est. labor table, Carter's estimated operational hours was 316 hours. His total labor charge to the final 2017 BM SRP CRA was 346 hours

(5c): In 2017, during the planning phase, Michael Grimes was a collateral planning team member of the BLM's 2017 BM SRP Planning Team. His responsibilities were to plan for the BLM's and PCSO's IT equipment needs and their deployment during the event operation Additionally, he was responsible for the writing of the MOU contract SOW for the renting of the IT equipment. In 2017, during the operational phase, Michael Grimes served as the BLM's IT technician in charge of the IT equipment deployment, operational maintenance

2

*and break-down   He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week   In the 2017 Phase 1 CRA Est  labor table. Grimes shared in the 150 hours of the Communication Planning for his initial planning labor. In the 2017 Phase 2 CRA Est. labor table, Grimes's estimated hours (continuing planning & operational) was 408 hours   The total 2017 estimated hours for Grimes's labor to complete his assigned 2017 BM SRP duties was approximately 458 hours. His total labor charge to the final 2017 BM SRP CRA was 343 hours.*

*(5d). In 2017, during the operational phase, James Iaguilli served as one of BLM's radio communications technician in the Communications operation. He assisted in the set-up, maintenance and break-down of the BLM's radio repeater network, the dispatch radio system and the detailer's handheld and mobile radio equipment. He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 2 CRA Est. labor table, Iaguilli's estimated operational hours was 316 hours. His total labor charge to the final 2017 BM SRP CRA was 328 hours.*

*(5e): In 2017, during the operational phase, Douglas Young served as one of BLM's radio communications technician in the Communications operation. He assisted in the set-up, maintaining and break-down of the BLM's radio repeater network, the dispatch radio system and the detailer's handheld and mobile radio equipment  He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 2 CRA Est  labor table, Young's estimated operational hours was 316 hours  His total labor charge to the final 2017 BM SRP CRA was 291 hours.*

*(5f): In 2017, during the operational phase, Toni Suminski served as the BLM's Dispatch Center Manager in the Communications operation  During the planning phase she assisted in the training of the contract dispatchers and the set-up of the BLM's dispatch center. During the operational phase she managed the dispatch center and supervised the work of the contract dispatchers. She was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week  In the 2017 Phase 2 CRA Est. labor table, Suminski's estimated hours (planning & operational) was 310 hours. Her total labor charge to the final 2017 BM SRP CRA was 287 hours*

## TRAVEL COSTS

1. What do the codes in the Commitment Item column mean?
*211EOO is the FBMS funding code for Non Foreign Employee Travel "Meals per diem" cost in a gov't travel voucher.*
*211DOO is the FBMS funding code for Non Foreign Employee Travel "Lodging" cost in a gov't travel voucher.*
*211BOO is the FBMS funding code for Non Foreign Employee Travel "fees charged by DOI Travel Management Company" in a gov't travel voucher*
*211IOO is the FBMS funding code for Non Foreign Employee Travel "Miscellaneous Expenses" cost in a gov't travel voucher*

3

211POO is the FBMS funding code for Non Foreign Employee Travel "Use of a POV (Personally Owned Vehicle)" in a Gov't travel voucher.

211TOO is the FBMS funding code for Non Foreign Employee Travel "Taxi Charges" cost in a Gov't travel voucher.

211ROO is the FBMS funding code for Non Foreign Employee Travel "Vehicle Rental" cost in a Gov't travel voucher.

211COO is the FBMS funding code for Non Foreign Employee Travel "Airline Ticket" cost in a Gov't travel voucher.

269FOO is the FBMS funding code for Non Foreign Employee Travel "Fuel for Rental Vehicle" cost in a Gov't travel voucher.

2.  What was Dalton Black's trip purpose and destination on June 10 and June 13?

During the planning phase in June, Black was assigned to come to Reno and go out to Winnemucca Lake to evaluate whether the BLM could set up a communication center close to Winnemucca Lake in case the event had to be moved to Winnemucca Lake instead of the Black Rock.

3.  What was Joseph Lazzaro's $1,022 charge and purpose on 9/6?

Lazzaro was assigned to the BLM LE operation. Lazzaro flew from his duty station in Alaska to support the Burning Man event. The charge date listed on the Travel Costs worksheet reflects the date the charge posted to his government card, not necessarily the date of purchase. The $1,022 posted to Lazzaro's credit card on 9/6 is for the rental vehicle he required for transport from the airport to the event, performance of duties at the event, and the return to the airport after the event.

4.  What was Michael Vermeys $1,148 charge and purpose on 7/31?

Vermeys reported to Gerlach from Battle Mountain, NV (his residency) on 7/31 to start his duties as CivOps Chief during the event operation. Part of those duties was to assist BRC in the survey flagging of the JOC site and thereafter assist BRC in the building of the JOC compound. This travel voucher was his main travel voucher for his travel to Gerlach, his assignment at the event and his travel home after the event

5.  What was Jon Young's $729 charge and purpose on 7/11?

In July, as part of planning duties of the Communication Chief, Young traveled to Reno for Mandatory Nevada Civil Applicant Account training from Nevada Department of Public Safety. This training was necessary to ensure compliance with Nevada Department of Public Safety in obtaining criminal history record information checks for event contract dispatch employees working in the state of Nevada for the 2017 Burning Man Event. Nevada Department of Public Safety held this training session in Reno, NV, for BLM

4

AR11471

**GOVERNMENT CONTRACTS**

OVERALL

1. It is our understanding that BLM requires an evaluation of each contract after the fact. Has BLM performed these reviews for 2017? Can they be provided to BRC?

Answer from David Appold (NSO). Lead Contracting Officer for BM SRP Gov't Contracts. *An evaluation/review of any government contract is only conducted as part of a BLM requested contract audit  As of today, no contract audits of BM SRP related contacts has been requested, and if any audits had been completed, they could not be provided to BRC.*

5

**BRC QUESTIONS TO BLM CONCERNING 2017 BURNING MAN EVENT SRP COST RECOVERY CLOSEOUT DOCUMENTS (Received Feb 15, 2018)**
**PART 2**
**(BLM Answers in Red)**

**GOVERNMENT CONTRACTS**

STERLING COMPUTERS 1.1

1. Is BLM allowed to rent servers instead of purchasing?
*No*

2. Is BLM allowed to use the cloud?
*Yes, however, the remote temporary nature of the event makes using the cloud undesirable Also, Federal Government use of the cloud is extremely restrictive and complicated in regards to Information Security. Based on those restrictions, the process to host this application in the cloud would be more expensive than the purchase of servers and licensing*

3. Were there other, less costly servers available for BLM to purchase?
*Yes, but not with equivalent functionality. The chosen server configuration has an integrated chassis with four blade servers and an integrated management console and integrated switch. This configuration is much smaller, lighter and easier to deploy to the "temporary" Burning Man Event. This configuration also precludes the need for separate switch hardware.*

4. Please respond to the following statements by BRC's analyst. The BRC analyst is a technical expert but not an expert in Government regulations.
   a. BRC rejects the "Requirement Information" by BLM IT Specialist Raymond Cananaugh, in its entirety and sections VII a) i, iii and v specifically.
   b. BRC asserts:
      i. The notion that a CAD package, Microsoft SQL server or other software can only be run one particular server model, made one manufacturer is prima face ridiculous. PC servers are the textbook example of commercial off-the-shelf hardware ("COTS"), commodities available from many vendors.
      ii. Comparable all-inclusive solutions are readily available from many manufacturers, including HP, Oracle, Cisco, Supermicro and others. They also provide a "modular chassis which integrates servers, storage, and network components all into a single chassis configuration." E.g.
         1. https://www.hpe.com/us/en/product-catalog/servers/bladesystem-enclosures.hits-12.html
         2. https://www.cisco.com/c/en/us/products/servers-unified-computing/ucs-b-series-blade-servers/index.html
      iii. A blade server is not cost-effective. The chosen option consists for four blade server in a chassis. Four individual rack servers from Dell with the same or better specifications would have cost about $29,500. For a quantity of four, the "superior management from a single point" does not justify an 85% premium.
      iv. A blade server is not a robust solution for the harsh environment of Black Rock Desert (heat, dust, dirty power, transportation). Blade servers are

AR11473

       high density, difficult to cool and are designed to live in clean, climate controlled data centers. This particular model has a single point of failure in its network switch. Four separate servers would provide a more robust solution.

v.    The specifications are excessive: a total of 128 CPU cores, 256 GB of RAM, 3.2 TB of Solid State Disks.

vi.   In addition to the $54,449.55 in this section, the chosen solution triggered avoidable follow-on expenses of one-time $2,058.65 (receipts R-52 and R-54) and annual licensing costs of $3,737.40 in section 3.1

vii.  Instead of buying the hardware out right, it could have been rented for the short period needed.

viii. Renting the equivalent servers in the cloud for a month would have cost $2.500. In BM's experience servers used in Black Rock City last about 3-4 years due the stresses of the environment and transportation. For the equivalent lifetime, the cloud solution would have cost $7,500.

ix.  Quoting the government:

    - "Can an Agency be compliant with the Criminal Justice Information Services Security Policy and also cloud compute? [...] the answer is yes". Page G-16 of the Criminal Justice Information Services Security Policy in section 5.1

    - BLM requires its Internet contractor to provide a "High Availability Network" with 99.999% uptime. (This means in a year, the Internet can only down for 5 minutes.) Page 5 of the Statement of Work in section 5.1
    - "The servers that it is loaded on are used only during the event and shelved for the remainder of the year." - William Mack Jr, e-mail in section 3.1

x.   So according to the government's own statements. the cloud is secure, the network is contracted to be highly available and the solution is only needed during the event. A cloud solution would have cost at most 13% of the chosen solution.

xi.  By issuing this factually incorrect Requirement Information document, BLM failed to consider different manufacturers, different server models, renting and cloud options, all of which offered substantial cost reductions.

*#4 a & b (i through xi ) are the opinions of unnamed BRC analyst, which BLM will not address. BLM plans and executes its communications-related technical program at the event with 20 plus years of experience and expertise of its staff. BLM must follow federal regulations and Interior policy concerning its event operational programs but always considers cost efficiencies in its programs when possible.*

## DANIEL'S ELECTRONICS 2.1

1.  Is an 8W repeater and a 30W amplifier, combined with the high gain antennas on the handsets from section 7.1, necessary to cover a distance of 2 miles on licensed (exclusive) frequencies?

*BLM needs to cover an area of approximately 30 miles around the event site for LE and safety communications, so the equipment highlighted here by BRC is necessary for that purpose.*

## MIDLAND RADIO CORP 7.1

1. Why did BLM need 70 lithium ion rechargeable batteries in 2017?

*BLM purchased 70 rechargeable lithium batteries for the event Midland handheld radios. When the last of the excessed Midland radios (35) came from the Fire program to the BM event operations, at no charge to BRC, they came without batteries because the Fire program uses clamshell batteries.*

2. Why does BLM need 260 lithium ion rechargeable batteries altogether? This is the number you have required BRC to purchase since 2015.

*The first 120 lithium rechargeable batteries for Midland handheld radios purchased by BLM with BRC cost recovery funds were for the 60 Midland radios that BRC purchased for BLM in 2016  Those radios were retained by BRC and were later sold to PCSO by BRC in 2017. Those 120 batteries were also retained by BRC and were sold with the radios BRC sold to PCSO  Subsequently in 2017, BLM event operations was given 70 free Midland radios from BLM's fire program through the excess program  Those radios came without batteries, so BLM needed 140 rechargeable batteries, 2 per radio, for the event operations radio program  These radios and their associated batteries are only used for the Burning Man event.*

3. Why did BLM need (2) 6-bank chargers in 2017?

*BLM purchased 4 6-bank Midland radio battery chargers using CR funds after it received the excessed Midland radios from the fire program in 2016  In 2017 BLM purchased 2 more 6-bank chargers to complete the event operations radio package*

4. Why did BLM need (65) radio microphones in 2017?

*To complete the event operations radio package for 2017. The excessed Midland radios from fire did not come with microphones.*

5. Why did BLM need (40) radio antennas in 2017?

*To complete the event operations radio package for 2017  The excessed Midland radios from fire did not come with antennas.*

## SHI INTERNATIONAL CORP. 3.1

1. BLM bought 20 Microsoft SQL Server licenses. These are NOT workstation licenses for, say, 20 CAD operators, but 20 DATABASE SERVER licenses. Note that one database server can securely hold for multiple databases. Why are 20 servers licenses needed when there are only 4 servers in section 1.1?

*The licenses are "SQL Server Device CAL's" to allow up to 20 workstations to connect to the database(s). CAL stands for "Client Access Licenses."*

2. There seems to be some confusion and inconsistencies regarding the length of the licenses. Different, and sometimes the same, BLM personnel claimed variously that they are needed "only during the event", 9 days, 4 months, or "the whole year". What actually got purchased were licenses for not quite 8 months. One wonders how the "services are available the whole year" when the servers are "shelved for the remainder of the year" (meaning the time not during the event) and the licenses expire  Could you help us understand this?

*The servers are only used for the Burning Man event, but the servers need to be plugged into the network all year to have software and security patches applied  The licenses are purchased from a United States Department of the Interior "mandatory source" Blanket Purchase Agreement (BPA )  When the licenses are purchased the payment is for the balance of "Software Assurance" remaining on the BPA  In this case when the 20 "SQL*

Server Device CAL's" were purchased on 6/7/2018, the licensing is valid through 02/28/2019, which is the end date of the DOI BPA. In short the licensing is valid for approximately 21 months.

## HIGH DESERT INTERNET 5.1

1. The RFP was for a "firm fixed price," and a "Firm Fixed Price Purchase Order" for $107,810 was issued. But $108,710 was paid. What does "firm fixed price" mean?
The Firm Fixed Price Purchase Order was for $108,710. BLM does not know where BRC got the $107,810 number. *The below description is from the Federal Acquisition Regulations (FAR). The FAR is the principle set of rules in the Federal Acquisition Regulations System regarding government procurement and is codified at Chapter 1 of Title 48 of the Code of Federal Regulations. 48 C.F.R. 31*

*16.202-1 Description*
*A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties.*

2. The RFP requires a wide range of skills and services that only few companies can provide. If the contract were split in network services and IT support services, more companies might be able to bid. Is this a consideration or possibility for BLM?
*No, this is not a consideration for BLM. There are many companies registered in the Federal Contractor Registry who provide all of these services. In the past years very few companies bid on the project due to the very short timeline of the solicitation pre-event, which is dictated by the cost recovery process. The title of this "RFP" / contract is "Network Services and Support." The selected contractor does not provide "General IT support" to BLM, but only provides "IT Support" related to the wired and wireless networks they are supplying. BLM keeps these services together because they are "like services" and are best handled by a single contractor. Supervision of multiple contractors is also a concern for the BLM. Increasing the number of individual contractors, increases the complexity of the systems and the complexity of the supervision*

3. Last year BRC and BLM met and discussed this contract and these services. NOTES from that meeting:
    a. BRC is interested in taking on what we can from this contract. The issue for BLM is security. Based on Jon Young's advice, Mark Hall decided not to parse out this contract for 2017. BLM wants to look forward to 2018 for possible changes but let's start the conversation in May 2017. BLM wants a proposal from BRC.

4. Will this contract be parsed out for 2018?
*While this question does not pertain to the 2017 event and cost recovery decision, the referenced contract was not offered to BRC under the BRC-BLM MOU Program for 2018*

5. Would BLM consider and potentially approve a proposal from BRC for 2018?
*While this question does not pertain to the 2017 event and cost recovery decision, the referenced contract was not offered to BRC under the BRC-BLM MOU Program for 2018*
*No, this contract was not offered under the BRC-BLM MOU Program to BRC.*

**MISC SUPPLIES & EQUIPMENT**

1. Is anything on this list used by BLM at any time of the year other than Burning Man?
*If you are referring to the items listed in the MISC SUPPLIES & EQUIPMENT purchase table of the Cost Recovery Closeout package, the answer is no. All items purchased with the Burning Man cost recovery account funds that are needed for BLM's event operation are used only at the BLM's Burning Man operation. All items that can be used for multiple events are stored until the next year's event*

2. Where are the items on this list stored?
*The items are stored under the supervision of the lead of the program the items are associated with. Many of the items are stored in the connex containers at BLM's Black Rock Station facility in Gerlach, NV. All other items are stored in BLM facilities*

3. Were any of the items listed thrown away after use? Which ones?
*Personal protective equipment specific to the event is not collected following the event. These items are not required to be used more than one season and detailers may dispose of personal protective equipment if it is deemed unserviceable following the event*

4. Were any of the items on this list purchased for use by PCSO? Which ones?
*Due to some BLM detailers opting not to take a new shemagh or goggles, unused personal protective equipment purchased for BLM detailers was provided to unified command partners if needed.  All other unused/unassigned personal protective equipment is stored to reduce needs the following year*

5. Why does Burning Man have to pay for BLM's uniforms? R-1, R-4, R-5
*These are uniforms for the BLM's CivOps program. These uniforms are purchased only for the Burning Man operation  BLM stores these uniforms for future event use and these uniforms are not used outside of the Burning Man operation.*

6. Why did BLM need 6 Ebtech Hum X Voltage Hum Filters? R-6
*They were purchased for the BLM's dispatch program to filter out the static noise over the dispatch console headsets.*

7. Why did BLM need:
   a. (9) MaximalPower RHF 617-1N X3 3.5mm Receiver/Listen Only Surveillance Headset Earpiece 3 Packs   R-7
   b. (16) MaximalPower RHF 617-1N X3 3.5mm Receiver/Listen Only Surveillance Headset Earpiece 2 Packs   R-8
   c. (6) MaximalPower RHF 617-1N X3 3.5mm Receiver/Listen Only Surveillance Headset Earpiece 2 Packs  R-10
   *BLM purchased 38 3.5mm Receiver/Listen Only Surveillance Headset Earpieces for the Midland radio microphones that use the 3.5mm connector. These enable the BLM detailers to hear their radios in a very noisy environment like the Burning Man event*

8. Why did BLM need:
   a. (33) 2.5mm Listen/Receive Only Covert Acoustic Tube Earpiece Headset for Two Way Radio Speaker Mic Microphone RLN4941? R-9
   b. (56) Zeadio ZP-AR169-All Pin 2.5mm Receiver/Listen Only Surveillance Acoustic Earpiece with Warmould for Ham Radio, Two-way Radios, Transceivers and Radio Speaker Mics Jacks. R-9
   *BLM purchased 69 2.5mm Receiver/Listen Only Surveillance Headset Earpieces for the Midland radio microphones that use the 2.5mm connectors. Two kinds of the 2 5*

connectors were purchased (Listen/Receive Only Covert Acoustic Tube Earpiece Headset & Zeadio ZP-AR169-All Pin 2 5mm Receiver/Listen Only Surveillance Acoustic Earpiece) to complete the order. These enable the BLM detailers to hear their radios in a very noisy environment like the Burning Man event

9. Why did BLM need (10) Plantronics EncorePro HW540 Mono Corded Headsets "for Dispatch?" R-11

BLM purchased 10 dispatch console headsets for the 2017 dispatch operation of 6 console stations, which included 4 extra in case of equipment failure. These items usually only last for one event cycle at the Burning Man event due to the harsh dust conditions.

    a. What were the dispatchers using in 2016 and 2015?

    b. Where are these headsets now?

    In 2015 & 2016 the event dispatch operation used BLM purchased headsets that were disposed of after they stopped working

10. Why did BLM need a Big Alarm SentrySafe 1.19-cu ft Electronic/Keypad Commercial/Residential Floor Safe? R-12

BLM communications program purchased the floor safe to store the radio encryption devices on playa to meet the agency regulations for encryption equipment security.

    a. Why was this item necessary for BLM to be able to administer the Burning Man SRP?

    b. How did BLM manage without this safe in past years?

    BLM was non-compliant with regulations in past years by not storing the encryption equipment in a secure safe during non-use on playa.

11. Who are the Polo shirts for?  R-13

These were the operational uniform shirts for the radio communications team (ComL and Communications Technicians).

    a. Why should Burning Man pay for shirts for BLM?

    These uniform shirts are only used at the Burning Man event

12. Why did BLM need 2 Cable Entry Gland STDs? R-14

BLM communication program purchased the Entry Glands for the radio gateway RF cables to enable BLM to cross band a BRC frequency during the 2017 event.

13. Why did BLM need a Powerwerx 30 Amp Redundant Rack Mount Switching Power Supply and RIGrunner 4007U with Digital Display and USB output? R-15

BLM communication program purchased the Power Supply to power the radios used in the gateway system

14. Why did BLM need (6) DC Line Noise Filter (20 Amps max) with Powerpole connectors? R-16

They were purchased for the BLM's dispatch program to filter out the power hum over the dispatch console headsets. This was in conjunction to the filters purchased to filter out the static noise over the dispatch console headsets addressed in answer 6 of this section.

15. What vehicle was detailed? R-17

Gov't vehicle G62 2406K was detailed after the event. This vehicle was a vehicle assigned to the radio communications team and carries sensitive electronic equipment which required all playa dust to be removed.

16. Why did BLM approve a $1,430 travel charge for Arellano Heating & Air Conditioning? R-18

Arellano Heating & Air was contracted by BLM to come to playa to service the BLM radio antenna/base station communication tower trailer when the cooling system failed.

   a. Did BLM ask BRC for help fixing the thermostat on the Communications tower before calling Arellano Heating & Air Conditioning?
      *No.*
   b. Was the repair of this AC unit essential to BLM's operations at Burning Man?
      *Critical to BLM's radio communication operation.*
   c. Did BLM try to find a repair person in Fernley before agreeing to hire a company in Yerington?
      *Yes, no alternative contractor could be found.*
   d. Why did Arellano Heating & Air Conditioning charge $1,430 for travel? What does this amount cover?
      *It was after hours and the contractor charged extra for travel to the playa*

17. Why did BLM need (8) RIOS Standard Interface Cables? R-19

*BLM communications program purchased 8 Interface cables for the gateway radio program. Four cables were for the four BLM provided radios and four cables were purchased for the four BRC provided radios for the radio gateway system. These cables were required to allow cross-band communication between BLM and BRC. BRC was briefed on the requirement before and agreed before the purchases were made.*

18. Please provide page 1 of R-20

*Page 1 was a duplicate of page 2.*

19. Why did BLM need (2) Inverted Fiberglass Omni Antennas? R-21

*BLM communications program purchased one antenna for the new digital event repeater and one for the BLM owned temporary repeater used for Overhead Frequency in 2017. One Antenna was for the New Burning Man repeater to replace the command channel   The other antenna was for the Civilian Ops repeater.*

20. Why did BLM need 400 feet of ½" Foam Heliax Cable? R-21, R-22

*BLM purchased the cable for the 14 communication program antennas, 5 base stations, 5 repeaters and 4 gateway radios. RF cable was needed for 14 antennas with cable runs ranging from 40' to 20' with the total cable used ended up being 360'.*

21. Why did BLM need the Compact Duplexer? R-22

*BLM purchased the duplexer for the new digital repeater.*

22. Why did BLM need (4) 19" Sliding Heavy Duty Shelves? R-22

*BLM purchased the shelves for the gateway radio program equipment, which is installed into the BLM communication tower trailer when used at the Burning Man event.*

23. How many potties were located at the substation? R-24

*One ADA restroom*

   a. Why did the restroom(s) at the Substation need to be serviced every day?
      *So they could remain sanitary every day.*
   b. How many people were using the substation during each shift?
      *Every BLM detailer working in the city had access to the substation restroom for use.*

24. Why did BLM purchase another compressor in 2017? R-28

*One of the two Burning Man event compressors (purchased in a previous years with CR funds) failed and could not be repaired. A new compressor was purchased to replace it.*

   a. What happened to the compressors from previous years?
      *The failed compressor was excessed through the gov't system and the other one remains serviceable for future events.*

25. Why should Burning Man be required to pay for BLM's car wax? R-33

*The car wax purchased with CR funds was used at the vehicle cleaning station at the Black Rock Station so detailers could clean and wax their vehicles periodically during the event and at the end of the event before they go back to home station.*

26. Please confirm that BLM 30 gallons of wiper fluid at Burning Man. R-34

*BLM purchased 30 1 gallon bottles of wiper fluid to be used by detailers for their assigned event vehicles during the event. Wiper fluid not used in 2017 is being stored at the BRS for future event years by future event detailers only.*

27. Please explain why BLM required 15 squeegees. R-35

*These squeegees were purchased with CR funds to be used by the detailers on their assigned event vehicles at the BRS cleaning station. As long as they remain intact, the squeegees will be used in future event years by detailers only. They are being stored at the BRS.*

28. Why did this vehicle get stuck in the playa mud? R-40
*Because they were wet spots on the playa*

    a. Where exactly was this located?
    *Somewhere in route to 3-mile exit.*
    b. What was the date of the incident?
    *August 31, 2017 (Thursday of main event)*
    c. Whose vehicle was this?
    *The vehicle was assigned to the BLM's event Admin Support person*
    d. Was this incident caused by driver error?
    *The vehicle incident was not caused by driver error, but instead was caused by the condition of the playa*
    e. Why should Burning Man have to pay for this auto detail?
    *The vehicle was loaned to the WDO for the event use by another BLM office and had to be detailed before returning to BLM home office. Because the need to detail occurred because of event operations. If this vehicle was not deployed to the Burning Man event, it would not require this maintenance*

29. Why did BLM require a SoundOff Signal Speaker w/ Universal Bail Bracket? R-41
*One of the LE Ranger detailers' siren speaker became unserviceable while in performance of his duties on playa at the event. The siren was damaged due to the harsh environment working the event. It was purchased on-line by the Admin Support person and delivered to BRS and installed by the logistic team*

30. Why did BLM require a Ridgid 9 Gallon Wet/Dry Vac? R-43
*This was purchased by the BLM's Medical Unit to be used in the BLM's Medical Trailer at the JOC to keep the patient area clean. This will be stored for future event use.*

31. Why is Burning Man being charged for this Jeep detail? R-46
    *R-46 refers to two vehicles being detailed (I426844 & I620516). Both vehicles were loaned to the WDO for the event use by another BLM office and had to be detailed before returning to BLM home office*
    a. Whose vehicle is this?
    *One vehicle was assigned to one of the Logistic team members, the other was assigned to one of the Environmental team members.*

32. Why were the items on R-52 needed in addition to the $54,449.55 Midland contract?
*R-52 had nothing to do with the Midland contract, which was the gov't contract for Midland radio's encryption services and radio accessories. R-52 was the purchase of racks for*

*technical equipment used at the event by BLM  See Misc purchase table, R-52 for description.*

33. Which camera was this for: Synology CLP4 Camera License Pack. We are only aware of the PTZ camera at the esplanade station and the jail cameras, all provided by the internet contractor. R-53

*This License Pack was for BLM owned recorders that interfaced with the internet contractor's camera's which allowed BLM to record and save what the cameras captured.*

34. Why were the items on R-54 needed in addition to the $54,449.55 Midland contract? *R-54 had nothing to do with the Midland contract, which was the gov't contract for Midland radio's encryption services and radio accessories.  R-54 was the purchase of a Harsh Environment Enclosure Cabinet for technical equipment used at the event by BLM.  See Misc purchase table, R-54 for description.*

35. Really? BRC is being charged for someone's luggage cart? R-55

*Government travel regulations allow for airport luggage cart reimbursement during official travel and this expense was incurred by a detailer traveling to the event*

36. Wow. Why did BLM require (6) Lieutenant Bars, Gold Plated, Small, Pair Double Clutch Pins, (6) 2-Pack ¾" Mini Gold Lieutenant Officers Rank With Double Clutch Back, and (3) Lieutenant Bars Gold in order to administer the Burning Man SRP? R-57, R-58, R-59
   a. Where are these items now?

*This is collar brass used specifically for the Burning Man event and not used outside of the Burning Man event  All serviceable pieces are stored in BLM facilities for future event use.*

37. Why did BLM require (4) Encrypted external 2TB hard drives; Fortress FIPS Portable? R-60

*The encrypted hard drives were procured for criminal case tracking originating from the Burning Man event and are compliant with BLM policy for protecting personally identifiable information.*

38. Why did BLM require the items on R-61?

*The fume hood was required for officer safety in evidence handling*

39. Do returning BLM personnel get a new pair of goggles to use every year at Burning Man? R-66

*Yes, if they request new goggles  They are considered Safety personal protective equipment (PPE) and BLM must have new ones available upon request. If a detailer wants to use their own or ones from a previous year, they are allowed, but BLM must have sufficient PPE for all detailers*

40. Why is BRC required to pay for BLM's pepper spray? Will we also be required to pay for BLM's bullets? R-70

*BLM is required to have spare OC canisters on hand in the event an officer deploys it and needs replenished  Due to the remote location of the event, spares were ordered to have on hand  None were needed and all are stored for future events*

41. What were the LED Glow in the dark armbands used for? R-72

*The LED armbands are for officer safety while working in the dark at the Burning Man event*

42. Why is BRC required to pay for scarves for BLM personnel? R-75

*Shemaghs are PPE for detailers unique to the environment at the Burning Man event*

   a. Where are these scarves now?
   b. Why are these personal apparel items being charged to the proponent?
   c. Do returning BLM personnel receive a new scarf each year?

*Shemaghs are not personal apparel but are PPE. Once issued, this PPE is not reused at future events or inventoried. If a BLM employee requests a shemagh at the start of an event, they are issued one. All unused shemaghs are stored for the following year.*

### 43. What are the batteries used for? R-77

*Batteries are needed in miscellaneous equipment used on playa, including GPS units, cameras, etc that may exhaust batteries while on playa*

### 44. Why did BLM need 26 (more?) bottles of eye drops? R-82

*This purchase was made at the beginning of post-event after BLM ran out and personnel remained on playa requesting this safety item.*

### 45. Why did BLM need a Hush Bagless Upright Vacuum? R-83

*BRC was not charged for the purchase of the 2 Hush Baglee Upright Vacuums  On the same receipt BRC was charged for 10 flash drives for $93.60 that were used by BLM at the event  Because both items (Vacuums & Flash Drives) were purchased at the same time by the same person, both show up on receipt. If BRC checks third page of receipt they will see that only the flash drives were charge to the CR account. Also if BRC checks the Misc Purchase table under R-83, they will see only the $93.60 was recorded in the funds charged to the CR account.*

   a.  Why did BLM need 2?
   *N/A*

### 46. What were these additional LED armbands used for? R-87

*They were used by CivOps detailers for safety during night duties.*

### 47. What are these (30) items and what were they used for? R-89

*These are plastic signs providing government event information for the general public deemed necessary by BLM staff for the administration of the Burning Man event.*

Exhibit " $\underline{L}$ "

Exhibit "$\underline{L}$"

AR11483



**RELM Wireless Corporation**
7100 Technology Drive
West Melbourne, FL 32904
Sales: 800-821-2900  Fax: 800-704-3177



PLEASE USE THIS ESTIMATE NUMBER ON ALL CORRESPONDENCE
Estimate Number:____WS180227-4____

Date ___27-Feb-18___

To. Dalton Black
Telecommunications Manager
Nevada BLM
775-861-6409 - office
775-296-1542 - cell
702-515-5152 -fax

Prepared by   Wayne Stephenson
Phone   321-953-7893
Fax.   321-953-7890
Cell   321-698-0400
Email.   wstephenson@relm.com
Terms   NET 30 days
Delivery   FOB Destination
BLM BPA   L16PA00013
DUNS·   006418933
Federal ID·   35-0827418-V

Shipment within _____30_____ days after receipt of order (ARO)
Estimate valid until_____27-Apr-18_____

| Item | Quantity | Manufacturer's Model Number | Description | List Unit Price | BLM BPA Unit Price | Extended BLM BPA Pricing USD |
|------|----------|------|-------------|------|------|------|
| 1 | 6 | KNG-M150 | KNG VHF 136-174 MHz, DVSI™ AMBE +2 Enhanced Dual Rate Vocoder (Ver. 1.8),  P25 Dash Mount Digital Mobile Radio. 50 Watts, 2048 Channels - Includes KAA0630 Install Kit & KAA0261 external Speaker (w/KAA0647 speaker cable) - for 110 Watt operation, order KZA0154 110W option | 3,658.34 | 1,682.83 | 10,096.98 |
| 2 | 6 | KZA0576 | Factory Installed, DES / AES Encryption Option - KNG-M/B | 288.00 | 172.80 | 1,036.80 |
| 3 | 6 | KAA0521M | DFSI Interface Option, DB-25 Interface cable for IP connectivity  KNG-M and KNG-B | 275.00 | 165.00 | 990.00 |
| 4 | 3 | MISCPARTS | Rack Shelf, Sliding, vented | 275.00 | 165.00 | 495.00 |
| 5 | 1 | ASSEMBLYCHG | Programming and Integration (required for any cabinet duplexer  or custom configurations) | 833.33 | 500.00 | 500.00 |
| | | | | | ORDER TOTAL | 13,118.78 |

& pages are based upon packing suitable for domestic shipment or overseas air shipment unless otherwise noted.
& deliveries subject to any necessary United States Government Authorization

APPROVED ____W. Stephenson____

AR11484



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Nevada State Office
1340 Financial Boulevard
Reno, Nevada 89502-7147
http://www.blm.gov/nv

In Reply Refer To:
NV955

## DETERMINATION AND FINDINGS

### Purchase Requisition 0040385014 RELM Radio Accessories

The nature of this action is to place a Call Order against a BLM Single-Award BPA on a Brand Name basis limiting full and open competition.

## FINDINGS

Extensive market research shows the validity of brand name components required for integration into the existing RELM manufactured P25 Radios currently used by BLM. The BPA (L16PA00013) is more advantageous than open market or GSA. A Brand Name Justification for Excepting Full and Open Competition was prepared in accordance with FAR 13.501 with a Brand Name limiting to one awardee who is capable of providing the supplies or services required at the level of quality required because the supplies or services ordered are unique of highly specialized.

## DETERMINATION

Based on the findings, I have determined to place a direct call order against the BLM BPA to RELM Communications, Inc.

_Gregory Kothman_

Gregory Kothman
Contracts Specialist

27 March 2018
Date

Exhibit " M "

June 11, 2018

Gregory Kothman
Contract Specialist
Bureau of Land Management
1340 Financial Blvd
Reno, NV 89502

Mr. Kothman:

On behalf of Law Enforcement Temporary Placement Service (LETPS) and our employees, it is with great pleasure that I submit this proposal to you for providing Mission Support Technicians and Communication Support Services, to the Bureau of Land Management, during the 2018 Burning Man Festival to be held outside of Gerlach, Nevada.

The following is an introduction the LETPS Law Enforcement / 911 Emergency Dispatch Team and provides an overview of our technical capabilities and personnel.   The following information is included:

1)    Introduction to LETPS Law Enforcement / 911 Emergency Dispatch Services
2)    Company Qualifications
3)    Personnel Qualifications
4)    Staffing Model
5)    Leadership, Management & Supervision
6)    Contingency Planning
7)    Past Performance
8)    Pricing Evaluation
9)    Contract Summary
10)   Bid Proposal Worksheet
11)   Benefits to contracting with LETPS (Flyer)

I look forward to discussing Law Enforcement Temporary Placement 911 Service L.L.C., Law Enforcement Dispatch / 911 Emergency Dispatch Team's experience and qualifications with you and the Bureau of Land Management for providing Mission Support Technicians and Communication Support Services during this year's 2018 Burning Man Festival.

Sincerely,

*Douglas L. Berryman*

Douglas L. Berryman
Owner, Law Enforcement Temporary Placement Service L.L.C.

# TECHNICAL CAPABILITIES STATEMENT
## Law Enforcement / 911 Emergency Dispatch Team

**Introduction:**

Law Enforcement Temporary Placement Service L.L.C. (LETPS) created their Law Enforcement / 911 Emergency Dispatch Team in 2014 to aid City, County, State and Federal Law Enforcement Agencies with providing law enforcement / 911 emergency dispatch services during peak times of service and large scale / special events. Specifically, LETPS Law Enforcement / 911 Emergency Dispatch Team was developed as a mobile dispatch team that can deploy to any location in the country with little, or no, preparation and provide center management, supervision and staffing. LETPS Law Enforcement / 911 Emergency Dispatch Team is designed to augment their customers exiting dispatch operations and to provide professional law enforcement / 911 emergency dispatch services on a temporary, short term basis. LETPS is committed to providing their customers with quality law enforcement / 911 emergency dispatch services in the most efficient, productive and cost-effective manner possible.

Law Enforcement Temporary Placement Service L.L.C. (LETPS), law enforcement / 911 Emergency Dispatch Team is similar in designed to that of traditional law enforcement agencies but is structured with built in redundancies to deal with unexpected emergencies. In most cases, no additional personnel or assets are required to address unexpected issues that may arise, other than those personnel and assets that are currently being utilized. LETPS Law Enforcement / 911 Emergency Dispatch Team consists of multiple layers of supervision to include: Communication Center Managers, Shift Supervisors and Lead Dispatchers. LETPS dispatch team is designed to provide 24 / 7 coverage utilizing a 3-shift configuration with each shift consisting of (1) Shift Supervisor, (1) Lead Dispatcher and (4) law enforcement dispatch personnel. LETPS offers their customers a single dispatcher who can temporarily fill a vacant position, or a complete emergency dispatch team that can manage the Communications Center and provide the necessary emergency dispatch services in times of need. Regardless of the size, or scope of the event, LETPS can provide an emergency dispatch team that meets, or exceeds their customers' expectations.

To ensure quality personnel are available at all times, Law Enforcement Temporary Placement Service L.L.C. (LETPS) utilizes only dispatchers who are currently employed with, or recently retired from, a city, county, state or federal law enforcement agency. LETPS maintains a directory of qualified emergency dispatch personnel, with a background in law enforcement communications to fill their dispatch positions. All dispatch personnel utilized by LETPS have passed a law enforcement sensitive criminal background check, have a satisfactory, or higher evaluation for the past year from their primary employer and meet all the training requirements required by their primary employer for the position of law enforcement dispatcher. Additionally, all dispatch personnel utilized by LETPS must submit, a recommendation letter from their current employer, a resume stating their qualifications and meet the LETPS minimum training requirements for their position. By utilizing this approach in hiring, LETPS can ensure that all dispatch personnel have the ability, knowledge, skills and experience necessary to meet, or exceed their customers' expectations.

Law Enforcement Temporary Placement Service L.L.C. (LETPS) is a customer service-based company that understands the pitfalls and complexities of providing law enforcement / 91 emergency dispatch services during large scale and complex, special events. Since 2015, LETPS has provided the law enforcement dispatch services for the Bureau of Land Management, Pershing County Sheriff's Department and the citizens of Black Rock City during the annual Burning Man Festival held outside of Gerlach, Nevada. During this period, LETPS staffed and managed the law enforcement dispatch center, provided 24 / 7 law enforcement dispatch services, operated multiple CAD Systems (INET CAD & Pershing County CAD) and successfully dispatched thousands of calls for service for both sworn and non-sworn personnel assigned to work the event. Additionally, LETPS has always met, or exceeded the contract specifications, as outlined in the statement of work and has never failed to meet any of their contractual obligations. However, more importantly than meeting contract obligations, all law enforcement and civilian personnel assigned to work these events, have always returned home safely.

AR11488

# CAPABILITY STATEMENT

## {LAW ENFORCEMENT DISPATCH SERVICES}



### INTRODUCTION:

Law Enforcement Temporary Placement Service L.L.C. (LETPS), Law Enforcement Dispatch Team was created in 2014 to aid city, county, state and federal law enforcement agencies with providing law enforcement dispatch services during peak times of service, or large scale special events. Specifically, LETPS Law Enforcement Dispatch Team was developed as a mobile dispatch team that can deploy to any location in the country with little, or no preparation and training. LETPS Law Enforcement Dispatch Team is designed to deliver their customers the most efficient, productive and cost-effective law enforcement dispatch services available on the market today.

### BUSINESS SUMMARY:

Law Enforcement Temporary Placement Service L.L.C.(LETPS) business plan calls for utilizing only dispatch personnel with a background in providing law enforcement dispatch services and who are currently employed with, or recently retired from, a a city, county state or federal law enforcement t agency All dispatch personnel utilized by LETPS have passed law enforcement sensitive back ground investigation, provide a satisfactory or higher evaluation from their primary employer and meet the training requirements of their state to conduct law enforcement dispatch services. Additionally, dispatch personnel must provide LETPS with a recommendation letter from their primary employer, submit an application stating their qualifications and meet the minimum training requirements for their position with LETPS.

### DISPATCH TEAM CAPABILITIES:

1) Provide 24 /7 law enforcement / 911 dispatch services.
2) Travel to any location in the country with little or no preparation.
3) Trained & experienced LEO / 911 dispatchers and dispatch teams
4) Trained & experienced LEO / 911 Communication Center Managers.
5) Trained & experienced LEO / 911 Shift Supervisors.
6) Trained & experienced LEO / 911 Lead Dispatchers.
7) Trained & experienced law enforcement / 911 dispatch personnel.
8) Trained & Experienced on multiple CAD Systems to include INET CAD.
9) Trained / experienced on multiple radio systems include 800mhz/high/low band.
10) Trained & experienced law enforcement / 911 call takers.
11) Trained & experienced in Critical Incident Managers.
12) Trained / Experienced Mass Casualty Incident Managers.
13) Trained / Experienced Emergency Operation Center Managers.
14) Communication Center Consulting Services.
15) Communication Center Security
16) Evidence Custodians & Technicians
17) Terminal Agency Coordinators, Communication Training Officers, CISM Officers
18) Law Enforcement / 911 / Communication Training & Consulting Services.

### COMPANY:
Law Enforcement Temporary Placement Service LLC

### ADDRESS:
5360 Stafford Circle
Pace, FL 32571

### Phone:
850-382-3898

### E-mail:
douglas.berryman@leotemps.com

### WEB-SITE:
ww.leotemps.com

### NAICS CODES:
541990
561612
561990

### CAGE CODE:
77ES7

### D & B:
79486520

### BUSINESS CLASSIFICATION:
Small Business (-$1,000,000.00)

### YEARS IN OPERATION:
4

### FEDERAL CONTRACTS AWARDED:
Law Enforcement Dispatch Services (3)

### FEDERAL AGENCIES CONTRACTED WITH:
Bureau of Land Management (3)



# CAPABILITY STATEMENT

## LAW ENFORCEMENT DISPATCH SERVICES PAST PERFORMANCE:

Bureau of Land Management (2015)
440 West 200 South, Suite 500
Salt Lake City, UT  84101
801-539-4001

Pershing County Sheriff's Department (2015)
395 9th Street
Lovelock, NV 89419
775-273-2641

Burning Man Emergency Services Department (Post Event Dispatch 2015)
660 Alabama Street
San Frisco, CA  94110
415-865-3800

**REFERENCES:**

**Bureau of Land Management**
Mark Pirtle(Incident Commander)
775-455-6947 (Cell)
775-861-6500 (Work)
mpirtle@blm.gov

**Bureau of Land Management**
Jon Young (Communications Supervisor)
623-826-1286 (Cell)
602-417-9319 (Work)
jsyoung@blm.gov

Bureau of Land Management (2016)
440 West 200 South, Suite 500
Salt Lake City, UT  84101
801-539-4001

**Bureau of Land Management**
Logan Briscoe (Law Enforcement Supervisor)
775-434-5124 (Cell)
775-885-6002 (Work)
lbriscoe@blm.gov

Pershing County Sheriff's Department (2016)
395 9th Street
Lovelock, NV 89419
775-273-2641

**Pershing County Sheriff's Department**
Sheriff Jerry Allen
775-741-7276 ( C )
775-273-2641(W)
jallen@pershingcounty.net

Burning Man Emergency Services Department (Post Event Dispatch 2016)
660 Alabama Street
San Frisco, CA  94110
415-865-3800

**Pershing County Sheriff's Department**
Nathan Carmichael (Chief Deputy)
775-225-1643 ( C )
775-273-2641 (Work)
ncarmichael@pershingcounty.net

Bureau of Land Management (2017)
440 West 200 South, Suite 500
Salt Lake City, UT  84101
801-539-4001

**INET Public Safety**
C.O.O. INET Dispatch Tom Marquis
623-277-4397 ( C )
905-820-9917 (F)
tmarquis@inetpublicsafety.com

Pershing County Sheriff's Department (2017)
395 9th Street
Lovelock, NV 89419
775-273-2641

**Escambia County Emergency Operations**
Jon Dosh ( Escambia County EOC Director)
850-393-4944 ( C )
850-471-6409 (W)
jdosh@co.escambia.fl.us

Burning Man Emergency Services Department (Post Event Dispatch 2017)
660 Alabama Street
San Frisco, CA  94110
415-865-3800

AR11490

## Company Qualifications:

Years of Operation: 4 years

Total Contracts: 15

Total Federal Contracts: 7

Total Law enforcement / 911 Emergency Dispatch Contracts: 3

Main Categories: Security, Contracted Law Enforcement Services, Contracted Law Enforcement Support Services, Security Management

Core Services: Armed, Unarmed & VIP Security Services, Traditional Law Enforcement, Rural Lands Enforcement & Public Lands Enforcement Services, Law Enforcement / 911 Emergency Dispatch, Waterborne Security / Enforcement, K9 Training & Deployment.

Law Enforcement / 911 Emergency Dispatch Services: Specifically designed as a mobile law enforcement / 911 emergency dispatch team that can travel to any location in the country with little, or no preparation, to assist city, county, state and federal agencies during times of increased services, declared emergencies or special events.

*Law Enforcement Temporary Placement Service L.L.C. was created by law enforcement officers and law enforcement support personnel to offer government agencies, businesses and individuals alike, an alternative to managing their security, contracted law enforcement and contracted law enforcement support services and to do so in the most efficient, productive and cost-effective manner possible.*

## Personnel Qualifications:

Law Enforcement Temporary Placement L.L.C. utilizes only law enforcement / 911 emergency dispatch personnel who are currently employed with, or recently retired from a city, county or state law enforcement agency. Utilizing this hiring practice ensures that all dispatch personnel have the necessary skills & abilities, knowledge, training and experience to successfully fulfill the position in which they currently hold on the LETPS Law Enforcement Dispatch Team.

All dispatch personnel hired by LETPS must submit the following prior to being considered by LETPS for a position:

1)    LETPS Application
2)    Recommendation letter from their current employer / supervisor.
3)    Must meet or exceed, their primary employer performance standards for the previous year.
4)    Must submit a resume stating their qualifications for the position in which they are applying for with LETPS.
5)    Employee fingerprint card for the purpose of a law enforcement sensitive background investigation.
6)    Copy of a current & valid driver's license

All dispatch personnel utilized by LETPS must meet the following minimum criteria for the position in which they hold with LETPS:

Assistant Center Managers.  Must meet the minimum requirements for the position of Lead Mission Specialist Technician and the following:

1)    Communication Center Manager training & certification.
2)    Terminal Agency Coordinator (TAC)
3)    Ten years of experience providing law enforcement dispatch services with a city, county, state, or federal agency.
4)    Five of these ten years must be in a leadership, management and supervisory role.
5)    Five of these ten years must have been as a Field Training Officer / Communication Training Officer.
6)    Must have actual / practical experience supervising within an "Emergency Operations Center" during an actual / declared "State of Emergency" that may include mass fatality incidents, active shooter incidents, civil unrest, or natural disasters.

Lead Mission Support Technicians: Must meet the minimum requirements for the position of Mission Support Technician and the following

1)   Leadership and Supervision training & certification
2)   Communication Training Officer / Field Training Officer training & certification.
3)   National incident training & certification.
4)   Leadership & Influence training & certification.
5)   Decision Making & Problem-Solving training & Certification
6)   Ethics training & certification.
7)   Effective Communications training & certification.
8)   Five years as a law enforcement dispatcher.
9)   Two of these five years must have been as a Law Enforcement Dispatch Supervisor
10)  Two of these five years must have been as a Communications Training Officer / Field Training Officer.

Mission Support Technician: Must meet the minimum requirements for the position as noted below:

1)   Incident Command training & certification
2)   Emergency Response training & certification
3)   Emergency Communication training & certification
4)   Human Diversity training & certification
5)   Active shooter training & certification.
6)   Three years as a law enforcement dispatcher.

*Law Enforcement Temporary Placement Service LLC's Law Enforcement / 911 Emergency Dispatch Team, exceeds all of the requirements of the 2018 Burning Man Mission Support Technicians Contract.*

## Staffing Model:

Law Enforcement Temporary Placement Service L.L.C. Law Enforcement / 911 Emergency Dispatch Team is staffed similar to that of any city, county, state or federal law enforcement dispatch center. A 3-shift configuration is utilized with each shift consisting of 1 Shift Supervisor, 1 Lead dispatcher, 1 Certified Instructor, 1 Communication Training Officer, 1 Crisis Intervention Officer. Additionally LETPS Assistant Center Managers work a "Alpha Shift (0600-1800)" and a "Bravo Shift (1800-0600)" to provide consistent leadership and support throughout the 24-hour period.

Team Composition (21)

LETPS Representative (1)
Assistant Center Manager (2)
Lead Mission Support Technician's (3)
Mission Support Technician (12)
Alternate Mission Support Technicians (3)

Shift Composition (5)

Assistant Center Manager: (1)
Lead Mission Support Technician (1)
Mission Support Technicians: (4)

Official Positions:

Terminal Agency Coordinators: (2)
Lead Dispatchers (3)
Certified Instructors: (4)
Certified Communication Training Officer: (4)
Crisis Intervention Team: (4)
Public Information Officer: (1)
Law Enforcement & Security: (2)

AR11492

*"Law Enforcement Temporary Placement Service L.L.C.'s, Law Enforcement / 911 Emergency Dispatch Team, is currently staffed and meets the requirements of the 2018 Burning Man Mission Support Technicians Contract. Additionally, 9 out of 17 dispatchers have dispatched for LETPS during past Burning Man Festivals."*

## Leadership, Management & Supervision:

Law Enforcement Temporary Placement Service L.L.C. Leadership & Management Team consist of the owner of the company, two Assistant Center Managers and 3 Lead Mission Support Technicians. The LETPS Leadership & Management Team work together to ensure that the dispatch team is properly staffed, dispatch personnel meet the LETPS minimum requirements and that the proper training & guidance are given throughout the contract period. The following is synopsis of the LETPS Leadership & Management Team's personnel.

**Douglas L. Berryman**
Owner, Law Enforcement Temporary Placement Service L.L.C.
Center Manager / Assistant Center Manager
Burning Man (3 years)

Primary Employer:  Florida Fish & Wildlife Conservation Commission (FWC)

Title:  State Law Enforcement Officer, Federal Officer (NOAA), Federal Officer (USFWS)

Position:  Uniform Patrol Supervisor

Rank:  Lieutenant

Years of service:  35 years (Reserve Officer 2 years, Officer 12 years, Supervisor 21 years)

Positions Held: Law Enforcement Officer, Field Training Officer, Investigator, K9 Officer, Boating & Hunting Accident Fatality Investigator, Uniform Patrol Supervisor, Field Training Officer Supervisor, Investigations Supervisor, Covert Investigations Supervisor, Evidence Custodian.

**Mark Burke**
Assistant Center Manager
Burning Man (3 years)

Primary Employer:  Florida Department of Agriculture & Consumer Services / City of Gulf Breeze

Title:  State law Enforcement Officer / 911-Law Enforcement Telecommunicator

Position:  Regional Law Enforcement Supervisor / 911-Law Enforcement Telecommunicator

Rank:  Lieutenant / 911-Telecommunicator

Years of Service: 30 / 12

Positions Held: Law Enforcement  Lieutenant, Training Lieutenant, Law Enforcement Sergeant, Special Operations Officer, Law Enforcement Officer, Medical Examiner Senior Investigator, Crime Scene Investigator, Emergency-911 Telecommunicator, Terminal Agency Coordinator.

**Lucy Gowdy**
**Assistant Center Manager**
**Burning Man (2 Years)**

AR11493

Primary Employer: Wakulla County Sheriff's Department

Title: Communication Center Supervisor

Years of service: 30

Positions Held:  Law Enforcement Dispatcher, Lead Dispatcher, Communications Training Officer, CPR Instructor, Shift Supervisor, Communications Center Supervisor, Terminal Agency Coordinator

Cassandra Ford
Lead Mission Support Technician
Burning Man: (3 years)

Primary Employer: Florida Fish & Wildlife Conservation Commission (Retired)

Title: FWC Communication Center Manager, Miami / Dade County

Years of service: 35

Positions Held:  Law Enforcement Dispatcher, Lead Dispatcher, Communications Training Officer, Shift Supervisor, Communications Center Supervisor, Terminal Agency Coordinator

Donna Strickland
Lead Mission Support Technician
Burning Man: (2 years)

Primary Employer: Leon County Sheriff's Department

Title: Communication Center Supervisor (Retired)

Years of service: 21

Positions Held:  Law Enforcement Dispatcher, Lead Dispatcher, Communications Training Officer, Shift Supervisor, Communications Center Supervisor

Rachel Love
Lead Mission Support Technician
Burning Man: (2 years)

Primary Employer: Wakulla County Sheriff's Department

Title: Communications Supervisor

Years of service: 18

Positions Held:  Law Enforcement Dispatcher, Lead Dispatcher, Communications Training Officer, Shift Supervisor, County 911 Coordinator, Accreditation Manager

*"All members of the Law Enforcement Temporary Placement Service L.L.C. "Leadership & Management Team" have provided law enforcement / 911 emergency dispatch services for the Bureau of Land Management, Pershing County Sheriff's Department and the citizens of Black Rock City during the annual Burning Man Festival during the past 3 years"*

## Contingency Planning:

Law Enforcement Temporary Placement Service L.L.C. has structured their Law Enforcement / 911 Emergency Dispatch Team with multiple layers of supervision to ensure that both personnel and customers have access to leadership and management at all times 24 /7. Additionally, with built in redundancies at each position, the LETPS Law Enforcement / 911 Emergency Dispatch Team is

AR11494

prepared to handle unforeseen circumstances and emergencies without any additional personnel required. The design of the LETPS Law Enforcement / 911 Emergency Dispatch Team, along with individual dispatchers training and experience, allows LETPS to reassign personnel and positions as needed.

Law Enforcement Temporary Placement Service L.L.C. utilizes an 8-hour, 3 shift configuration, with 5 dispatchers assigned to each shift (1 Lead Mission Support Technician, 1 Lead Dispatcher, 3 Mission Support Technicians). Additionally, LETPS utilizes a 12-hour, 2 shift configuration for their Assistant Center Managers. This ensures a proper chain of command is in place at all times and provides dispatch personnel and LETPS' customers with 24-hour access to the LETPS leadership & Management Team. Depending on the situation at hand, this shift configuration can be easily adjusted to meet the needs of their customers and the needs of the communications center at any time. If additional personnel are required, LETPS has multiple dispatchers on reserve who can be called upon at any time to assist.

## Past Performance Evaluation:

Federal Contracts (Law Enforcement / 911 Dispatch Services):

2015 Burning Man Mission Support Technicians (Reference #L15PX00961 )
Location: Gerlach, NV

Costs: $166,520.00
Agency: Bureau of Land Management
POC #1: John Young ( Cell: 623-826-1286 Work: 602-417-9319)
POC #2: Mark Pirtle (Cell:775-455-6947 Work: 775-861-6500)
POC #3: Logan Briscoe (Cell: 775-434-5124 Work: 775-885-6002)
Agency: Pershing County Sheriff's Department
POC #1: Jerry Allen (Cell:775-741-7276 Work: 775-273-2641)
POC #2: Nathan Carmichael (Cell: 775-225-1643 Work: 775-263-2641)

Services Performed:

Law Enforcement Temporary Placement Service L.L.C. provided experienced, trained and knowledgeable Assistant Center Mangers (ACM's), Lead Mission Support Technicians (LMST's), Mission Support Technicians (MST's) and LETPS Staff, to the Bureau of Land Management and the Pershing County Sheriff's Department During the 2015 Burning Man Festival held outside of Gerlach Nevada. Monitoring 5 channels and operating 2 distinct Computer Aided Dispatch systems, the LETPS Law Enforcement / 911 Emergency Dispatch Team provide 17 days of 24/7 dispatch services to sworn and now-sworn personnel working the event. LETPS Dispatch Team provided management, supervision and staffing of the BLM portion of the Emergency Dispatch Center (EDC) and consisted of (2) ACM's, (3) LMST's and (9) MST'S. All dispatch personnel certified by the Nevada Department of Public Safety (CJIS) and received training on the Computer Aided Dispatch system (INET & Pershing County CAD) and the BLM Case Management System (IMARS).

Relevancy: Law Enforcement / 911 Emergency Dispatch Services; Managing Federal Contracts; Supervising, Staffing & Planning; Invoicing & Documentation; Customer Service & Quality Control; Ability to successfully complete contract obligations.

2016 Burning Man Mission Support Technicians (Reference #NA, Direct Contracting with Burning Man)

Location: Gerlach, NV
Costs: $202,815.88
Agency: Bureau of Land Management
POC #1: John Young ( Cell: 623-826-1286 Work: 602-417-9319)
POC #2: Toni Suminski (Cell: 480-364-6306 Work: 623-434-4599)
POC #2: Mark Pirtle (Cell:775-455-6947 Work: 775-861-6500)
POC #3: Logan Briscoe (Cell: 775-434-5124 Work: 775-885-6002)
Agency: Pershing County Sheriff's Department
POC #1: Jerry Allen (Cell: 775-741-7276 Work: 775-273-2641)
POC #2: Nathan Carmichael (Cell: 775-225-1643 Work: 775-263-2641)

Services Performed:

Relevancy: Managing Federal Contracts; Supervising, Staffing & Planning; Invoicing & Documentation; Customer Service & Quality Control; Ability to successfully complete contract obligations.

**Additional Relevant References:**

Tom Marquis
INET Public Safety
Work 888-949-9911 x226
Jon Dosh
Escambia County Emergency Operations Center
Cell: 850-393-4944 Work: 850-471-6409

## Price Evaluation:

**2015 Burning Man Dispatch Technician Services:**

| | |
|---|---|
| Total Personnel: | 14 |
| Total Days: | 25 |
| Travel Days: | 4 |
| Training Days: | 4 |
| Dispatch Days: | 17 |
| Total Hours: | 2940 (Includes Pre-Training) |
| Cost Per Hour: | $56.64 |
| Total Cost: | $166,520.00 |

**2016 Burning Man Dispatch Technician Services:**

| | |
|---|---|
| Total Personnel: | 17 |
| Total Days: | 24 |
| Travel Days: | 4 |
| Training Days: | 4 |
| Dispatch Days: | 17 |
| Total Hours: | 3570 (Includes Pre-Training) |
| Cost Per Hour: | $56.81 |
| Total Cost: | $202,815.88 |

**2017 Burning Man Dispatch Technician Services:**

| | |
|---|---|
| Total Personnel: | 17 |
| Total Days: | 24 |
| Travel Days: | 4 |
| Training Days: | 4 |
| Dispatch Days: | 17 |
| Total Hours: | 4268 (Includes Pre-Training) |
| Cost Per Hour: | $48.69 |
| Total Cost: | $207,815.88 |

**2018 Burning Man Dispatch Technician Services:**

| | |
|---|---|
| Total Personnel: | 17 |
| Total Days: | 23 |
| Travel Days: | 4 |
| Training Days: | 4 |
| Dispatch Days: | 17 |
| Total Hours: | 4036 (Estimated Minimum Hours, Includes Pre-Training) |
| Cost Per Hour: | $49.52 |
| Total Cost: | $199,870.00 |

Law Enforcement Temporary Placement Service L.L.C. Leadership & Management Team consist of the owner of the company, two Assistant Center Managers and 3 Lead Mission Support Technicians. The LETPS Leadership & Management Team work together to ensure that the dispatch team is properly staffed, dispatch personnel meet the LETPS minimum requirements and that the proper training & guidance are given throughout the contract period. The LETPS Leadership & Management Team has over 170 years of combined experience in the field of law enforcement / 911 emergency communications and response.

**Planning & Quality Control:**

Law Enforcement Temporary Placement Service L.L.C. has structured their Law Enforcement / 911 Emergency Dispatch Team with multiple layers of supervision to ensure that both personnel and customers have access to leadership and management at all times 24/7. Additionally, with built-in redundancies at each position, the LETPS Law Enforcement / 911 Emergency Dispatch Team is prepared to handle unforeseen circumstances and emergencies without any additional personnel required. The design of the LETPS Law Enforcement / 911 Emergency Dispatch Team, along with individual dispatchers training and experience, allows LETPS to reassign personnel and positions as needed.

Law Enforcement Temporary Placement Service L.L.C. ensures quality control through a three step process:  1) The LETPS Leadership & Management Team meet daily to discuss any problems issues, or concerns that need to be addressed in regards to personnel & operations; 2) Assistant Center Managers attend the daily law enforcement shift briefings  to obtain input directly from field personnel on issues that may affect patrol efforts; 3) LETPS representative (Owner) meets a minimum of twice a week with senior leadership and staff to obtain input from a leadership perspective on how the dispatch services are being provided and what needs to be improved

**Past Performance:**

Since 2015, Law Enforcement Temporary Placement Service L.L.C. (LETPS) has successfully provided the Law Enforcement / 911 Emergency Dispatch Services for the Bureau of Land Management, the Pershing County Sheriff's Department and the citizens of Black Rock City during the annual Burning Man Festival. During this time, LETPS dispatch personnel have dispatched thousands of calls for service and have entered thousands of incidents into the INET Computer Aided Dispatch System (CAD).   During this period, LETPS dispatch personnel have been certified through the Nevada Department of Public Safety and have received training on the INET Computer Aided Dispatch System and the IMARS Case Management System.  LETPS has always met, or exceeded, the requirements of the contract and the expectations of the sworn and non-sworn personnel assigned to work this event.  In 2015, LETPS received an above satisfactory / exceptional evaluation in the Federal CPARS System (2016 & 2017 no evaluation was completed due to direct contracting with BRC).

**Cost Evaluation:**

Law Enforcement Temporary Placement Service L.L.C. (LETPS) exceeds all of the specification requirements for this solicitation as noted in the Statement of Work and the solicitation itself. LETPS offers significant advantages to the Bureau of Land Management as noted below:

**Technical Capabilities:**

1) Law Enforcement  / 911 Emergency Dispatch Team that is already in place and exceeds all the technical requirements of this solicitation and the Statement of Work.

2)   Law Enforcement / 911 Emergency Dispatch Team utilizes only dispatch personnel who are currently employed with, or recently retired from, a city, county or state law enforcement agency with the ability, knowledge and experience necessary to handle all essential duties and responsibilities of the position.

3) LETPS Law Enforcement / 911 Emergency Dispatch Team has over 400 years of combined experience providing law Enforcement / 911 Emergency Dispatch Services.

4) LETPS Leadership & Management Team consists of career law enforcement supervisors, Center Managers and Shift supervisors who have all provided Law Enforcement Dispatch / 911 Emergency Dispatch Services for to the Bureau of Land Management, Pershing County Sheriff's Department and the citizens of Black Rock City since 2015.  This combination of law enforcement and dispatch personnel allows LETPS to offer a 360-degree perspective on all issues affecting the communications center.

5) LETPS Leadership & Management Team has over 170 years of combined experience providing law enforcement  / 911 Emergency Dispatch Services

6) LETPS Law Enforcement / 911 Emergency Dispatch Team have knowledge and experience on multiple computer aided dispatch (CAD) systems  to include INET CAD, the CAD system utilized by the Bureau of Land Management during the Burning Man Festival.

Additionally, the LETPS Law Enforcement / 911 Emergency Dispatch Team has knowledge and experience with the radio system, Delorme Officer Tracking System and the IMARS Case Management System utilized by the Bureau of Land Management.

Past Performance:

1) Since 2015, LETPS has a proven record of performance for providing Law Enforcement / 911 Emergency Dispatch Services to the Bureau of Land Management, the Pershing County Sheriff's Department and the citizens of Black Rock City during the annual Burning Man Festival.

2) LETPS received an "Exceptional Rating" for providing the Law Enforcement / 911 Emergency Dispatch Services to the Bureau of Land Management, Pershing County Sheriff's Department and the citizens of Black Rock City during the 2015 / 2016 Burning Man Festival, as noted in the "Contractor Performance Assessment Report" (CPAR). (No evaluation was completed for 2016 or 2017, due to direct contracting with BRC.

3) 2015-2017 LETPS has always exceeded the contract specifications and requirements as noted in the Statement of Work.

4) Any problems or concerns with personnel or services, were addressed and resolved immediately in a satisfactory manner.

5) LETPS record of performance on all company contracts (security, contracted law enforcement services, law enforcement support services and security management services) both in the government and private sectors, indicates that LETPS "Performance Risks Rating" is Very Low.

6) Excellent customer service and quality control.

*WARNING: This "Technical Capabilities Statement" contains proprietary information and therefore this document and all information contained herein, is strictly prohibited by law from release to any person, company, firm, corporation or to any organization for any reason, or by any method to include verbal, text, email or in writing, without the expressed written consent and approval of Law Enforcement Temporary Placement Service L.L.C.*

# LAW ENFORCEMENT TEMPORARY PLACEMENT SERVICE
## *Benefits of utilizing LETPS Law Enforcement Dispatch Services.*
### *(INFORMATION FLYER)*

**Business Model:**

1) Specifically designed as a mobile emergency dispatch team that provides on-site emergency dispatch services for their customers regardless of location, venue or jurisdiction.

2) Members of the LETPS Law Enforcement Dispatch team are currently employed, or recently retired, as emergency dispatch personnel with a city, county or state law enforcement agency.

3) Members of the LETPS Law Enforcement Dispatch Team are governed by their primary employer's policies & procedures manual that govern emergency dispatch operations. This eliminates confusion in times of emergencies.

4) LETPS only contracts with those dispatchers who primary employing agency and dispatch centers are accredited or currently seeking accreditation.

5) LETPS Business Model is designed to offer their customers superior services, provided by exceptional personnel and to do so in the most efficient, productive and cost-effective manner possible.

**Management Team:**

1) Are currently employed by a city, county or state law enforcement agency and currently hold a leadership / supervisory position within that agency.

2) Consists of career law enforcement dispatch supervisors and career law enforcement supervisors with approximately 170 years of combined experience in their respective fields, to include leadership & Management.

3) Consist of dispatch supervisors who are "Terminal Agency Coordinators" for their respective agencies with an understanding of the legal requirements of providing law enforcement dispatch services.

4) Are Communication Training Officers (CTO) or Field Training Officers (FTO) with actual experience in training dispatch and law enforcement personnel on multiple radio and CAD systems to include INET CAD.

5) Have actual and practical experience working under the Incident Command System (ICS) during actual declared state of emergencies and large-scale events.

6) Have actual and practical experience supervising under the Incident Command System (ICS) within an established Incident Command Post during actual declared state of emergencies and large-scale events.

7) Have actual and practical experience with creating and implementing "Operational Plans" dealing with large scale events, declared state of emergencies and natural disasters.

8) Have actual and practical experience with planning, organizing, managing and supervising large scale events with over 250,000 people in attendance that involve multiple agencies, jurisdictions and locations

9) Have actual and practical experience with managing a mobile law enforcement dispatch team that is designed to assist city, county, state or federal agencies with law enforcement dispatch services during large scale events or declared emergencies regardless of location or venue.

10) Have worked as a MST, LMST or ACM's during the annual Burning Man Festival held in Gerlach Nevada for the Bureau of Land Management and the Pershing County Sheriff's Department.

**Dispatch Personnel:**

1) Are Currently employed by a city, county or state law enforcement agency and hold a law enforcement dispatch position within that agency.

2) Consists of career law enforcement dispatchers with approximately 130 years of combined experience providing law enforcement / 911 emergency dispatch services.

3) Consists of law enforcement dispatchers who possess the training, knowledge and experience necessary to conduct law enforcement / 911 emergency dispatch operations for city, county, state and federal law enforcement agencies.

4) Experienced in providing law enforcement dispatch services during large scale events and declared state of emergencies.

5) Come recommended by other LETPS dispatch personnel and their immediate supervisor of their primary employer.

**Other:**



1) LETPS Law Enforcement Dispatch Team is currently in place and consists of (1) LETPS Representative; (2) Assistant Center Managers; (3) Lead Mission Support Technicians; (12) Mission Support Technicians; (3) Alternates.

2) LETPS law enforcement dispatchers have had "law enforcement sensitive" criminal background investigation conducted on them, allowing them to work with and access, sensitive law enforcement information.

3) LETPS dispatch personnel are currently licensed and certified as law enforcement dispatchers by their state of employment and hold current federal and state, limited access certification certificates, that enable them to access federal and state crime information centers (Retired personnel excluded).

4) LETPS certifies that each individual dispatcher and dispatch supervisor utilized by LETPS meets the minimum criteria, as set forth by LETPS and have provided a certificate of training for each training course that is required (see minimum standards)

5) LETPS received an "Exceptional Rating", by the Bureau of Land Management as noted in CPARS/FAPIIS, for providing law enforcement dispatch services during the annual Burning Man Festival in 2015.

# BID PROPOSAL WORKSHEET

### Fixed Firm Price (Not Itemized Billing / Invoicing)
### Mission Support Technicians for the 2018 Burning Man Festival

**Detail Personnel (18):**

(1) L.E.T.P.S.  Representative
(2) Center Manager
(3) Dispatch Supervisors
(12) Dispatchers

**Salaries ($140,000.00):**

| | | |
|---|---|---|
| L.E.T.P.S. Representative (1): | $12,000.00 | ($12,000.00) |
| Center Manager (2): | $10,000.00 | ($20,000.00) |
| Dispatch Supervisors (3) | $8,000.00 | ($24,000.00) |
| Dispatchers: (12) | $7,000.00 | ($84,000.00) |

**Airfare ($13,500.00):**

18 (employees) x $750.00 = $$13,500.00

**Rental Vehicles ($10,000.00):**

6 (Full Size Cars) x $1500.00 + $1,000.00 (Fuel)

**Lodging ($2000.00):**

$100.00 (lodging) x 10 (double occupancy rooms) x 2 (nights) = $2000.00

**Meals ($6300.00):**

$50.00 (Perdium) x 18 (Employees) x 7 (Days) = $6300.00

**Incidental Expenses ($2000.00):**

**TOTAL Expenses:**
$173,800.00

| | |
|---|---|
| **L.E.T.P.S. (15%)** | $26,070.00 |
| **BID TOTAL:** | $199,870.00 |

---

*WARNING: This "Bid proposal Worksheet" contains proprietary information and therefore this document and all information contained herein, is strictly prohibited by law from release to any person, company, firm, corporation or to any organization for any reason, or by any method to include verbal, text, email or in writing, without the expressed written consent of Law Enforcement Temporary Placement Service L.L.C.*

---

AR11501

Exhibit "_N_"

.

.

Exhibit "_N_"

AR11502

   

# UNITED STATES DEPARTMENT OF THE INTERIOR
### INTER/INTRA-AGENCY AGREEMENT (IAA)

| | 1 Period of Performance | |
| --- | --- | --- |
| | START | END |
| | 08/19/17 | 09/30/18 |

Buyer has work performed for them by the Seller named in item 6b.

Seller to perform work as described herein for the agency named in item 6a.

**SEE INSTRUCTIONS ON PAGE 2**

| 2. Common Document Number (Agreement Number) | 3. Check appropriate box |
| --- | --- |
| L18PG00086    Page 1 of 3 | ☐ Original   ☒ Modification No. P000-1 ☐ Severable ☐ Non-Severable |

**4. Under the authority of (Cite authorities):**

☐ 43 U.S.C. 1701 et seq., (FLPMA)      ☐ Working Capital Fund (WCF)

☐ Department of the Interior Appropriation Act for FY      ☐ Other: 46 USC 1701 Service First Agreement

☒ 31 U.S.C. 1535 (Economy Act)      Bridgeport Helitack Crew

| 5. Description of Work:  See Articles | PROJECT TITLE:   Burning Man 2016 medical Support |
| --- | --- |

| | **Seller** |
| --- | --- |
| **6a.** Agency:  Bureau of Land Management , Carson City District<br>Address:  1340 Financial Blvd<br>Address:  Reno, NV 89502<br>Administrative POC  David Appold  dappold@blm.gov<br><br>Email:        Phone  775-861-6417   Fax<br>Technical Point of Contact:   Warren Templeton  Email: wtemplet@blm.gov<br>         Phone  602-417-9318   Fax | Agency:   HHS<br>Address:   200 Independence Ave, SW<br>Address:   Washington DC 20201<br>Administrative POC:   David Dolinsky , David.dulinsky@hhs.gov<br><br>Email:       Phone  **(202)205-0499**  Fax:<br>Technical Point of Contact   Denis Fitzgerald, Denis.Fitgerald@hhs.gov<br>         Phone  (202)205-0499   Fax: |

| ACCOUNT DATA | **BUYER** | **SELLER** |
| --- | --- | --- |
| 7. Agency Location Code | 7a  14-11-008 | 7b  75030030 |
| BPN Number (DUNS #) FSN | 8a.  084359236 | 8b.  024199981 |
| 9. Treasury Account Symbol (TAS) | 9a.  014X5017 | 9b.  ~~75X4552.00114X1039~~  75-18-0140 (AtL&#x2091;) |
| 10. Standard General Ledger | 10a. | 10b. |
| 11. Cost Structure/Account  CC/FA/WBS | 11a  LLNVW03500 L51050000 EA0000 LV.RC,F1805950 18XL5017AP ($17,605.12) | 11b. |
| 12. Business Event Type Code | 12a  DISB | 12b  COLL |
| 13. Requisition Number for Buyer<br>Project Account for Seller  WBS | 13a  N/A | 13b. |
| 14. Contract Line Number for Buyer/<br>Proposal Number or Sales Order # for Seller | 14a.0010 | 14b. |
| 15 Buyer provide Expiration of Funding<br>Source (Date or Indefinite) | 15a.09/30/2018 | 15b. NOTE: Seller, ensure project completion by this date<br>(Seller must not incur additional costs) See Block 15a |

| 16. Amount Obligated by Buyer | | 17. Bill To (Name and Address, including zip code of **Finance Office**) |
| --- | --- | --- |
| a. Initial or current obligation: | $20,000.00 | Name:   OC622-Payments Section, Bureau of Land Management |
| b. Modification Amount (check one)<br>☐ Increase  ☒ Decrease | ($17,650.12) | Address:   Denver Federal Center, Bldg. 50, POB 25047<br>Address:   Denver, CO 80225 |
| c. Total obligation: | $ 2,394.88 | |

| 18. Billing for Federal Agencies and DOD will be processed via IPAC. (billing will be done  ☐ bi-weekly ☒ monthly ☐ quarterly ☐ in advance) |
| --- |

Upon Approval, this agreement constitutes an obligation against Buyer requesting the work, or authority to proceed with work by Seller for the herein named agency in anticipation of reimbursement.

| 19. Approved for Buyer  DAVID APPOLD  *Digitally signed* | 20. Approved by Seller:  Veronica A. Hill -S ... |
| --- | --- |
| *Contracting Officer or other Authorized Signature* *other only for WCF | (Seller's Authorizing Signature) |
| a. Name (Type):   David W. Appold | 20a. Name (Type):  Veronica Hill for David Dolinsky |
| 19b. Title:<br>**Contracting Officer** | 19c. Date: | 20b. Title:<br>**Branch Chief for Administration and Finance** | 20c. Date: 02/12/2019 |

## INSTRUCTIONS FOR INTER/INTRA-AGENCY AGREEMENT (IAA)
*NOTE. Information highlighted is to be completed by, or obtained from, the Seller Agency*

### IAA – BUYER TO HAVE WORK PERFORMED BY A PARTICIPATING (SELLER) AGENCY

*Note: Complete items below for a single funding line – continuation page is required for multiple lines of funding
The Buyer executes this form, completes and obligates information under Buyer data elements.

1. Enter the start and end date (period of performance) in which work will be completed.
2. Enter the Common Document Number (Inter/Intra Agency Agreement number).
3. Check "Original" if first submission, "Modification" and enter modification number if modification.
4. Check 31 U.S.C. 1535" unless another specific legislative authority exists, in which case that authority is shown under "other". If 31 U.S.C. 1535 is checked, an Economy Act Determination must be prepared by the project manager and approved by a warranted Contracting Officer with delegated authority
5. Provide a Project Title and description of the work to be performed in accordance with Acquisition, Section 1510-17.5.
6. Enter the Buyer Agency office name, city, state, zip code, Buyer technical and administrative contact names and phone nos. with area code, also include fax and Email address.
6a. Enter the Seller Agency office name, city, State, Buyer technical and administrative contact names and phone nos. with area code, also include fax and Email address. These fields can be completed by the Seller if unknown to the Buyer.
This data will be referenced on your Treasury IPAC bill
7a.  Provide your 8 digit Agency Location Code (ALC) assigned by Treasury.
8a.  Type your Business Partner Network Number (DUNS No.) as registered in Federal Register, this is also referred to as the FSN for Dept. of Defense.
9a.  Provide the Treasury Account Symbol (TAS) for this funding line.
10a. Determine the Treasury Standard General Ledger accounts (SGL) for this funding request.
11a  Enter the account cost structure for your Agency. This may include an office identifier, program and budget object class.
12a  Provide the Business Event Type Code (BETC) for this action.
13a  Type the Requisition Number referenced to support this Agreement.
14a  Contract Line Number for this funding.
15a. Provide the Fund Expiration date, or type 'Indefinite' (for no year funds).
*Items 9a – 14a are specific for each line of funding on the obligation document. See * above.
7b-14b: Seller Agency completes these items.
This data will be used to cross-reference the IA with the Seller's reimbursable account.
16.  For an original IA; enter the amount to complete items a, c, and d.  For modification; complete items a, b, c, and d.
16a. Enter the Initial or current obligation amount
16b. Enter the Modification Amount
16c. Check appropriate box to indicate if the funding is being increased or decreased by this action.
17.  Enter the Buyer Agency, Bill To - Finance Office address, include office name, city, state, and zip code.
Forward a copy of this draft Agreement for completion of the Seller Agency account data.
Obtain a signed, accepted copy of this Agreement from the Buyer Agency.
Ensure that the data elements in 7b-14b have been completed.
18.  Check the preferred billing schedule for the Buyer Agency and ensure that the term is acceptable for both Buyer and Seller.
19.  IA must be signed by a warranted Contracting Officer with delegated authority. IA is not signed by the Buyer until approved in block 20 by the participating agency.
20.  Signature of approving official for the participating agency.
Send a fully executed copy of this Agreement to the Seller Agency after obligation is recorded in the Financial System via the IDEAS/PRISM system.

### PARTICIPATING SELLER AGENCY TO SUPPORT THE BUYER AGENCY

The Draft IAA is received for completion by the Seller Agency.
This data will be used to cross-reference the IAA with the Seller Agency's reimbursable account in FFS or SAP.

6b. Enter the Seller Agency office name, city, State, Buyer technical and administrative contact names and phone nos. with area code, also include fax and Email address.  These fields can be completed by the Buyer
7b.  Provide your 8 digit Agency Location Code (ALC) assigned by Treasury.
8b.  Type your Business Partner Network Number (DUNS No.) as registered in Federal Register, this is also referred to as the FSN for Dept. of Defense.
9b.  Provide the Treasury Account Symbol (TAS) for this funding line.
10b. Determine the Treasury Standard General Ledger accounts (SGL) for your reimbursable account.
11b. Enter the cost structure / account classification for your Agency 's reimbursable.  This may include an office identifier, program and budget object class.  (Note: This cost structure must be charged with time or expenditures for billing to occur.)
12b. Provide the Business Event Type Code (BETC) for this action.
13b. Type the Project or Job Number assigned to track expenses for completing the work requested in Agreement.
14b. Enter any additional Seller account reference data.  (Project code assigned: Proposal number, sub-agreement contract reference)
15b. Seller to ensure completion by this date (No additional costs may be incurred).
16.  To be completed by Buyer
17.  Ensure that the billing term is acceptable by Seller Agency.
20.  Ensure that the approval signature is an agent authorized to accept or behalf of the Seller Agency.
Return the IAA copy to the Contracting Officer for execution and obligation.
After Receipt of the fully executed copy of this Agreement, create a reimbursable account in FFS, PCAS or SAP, SD to track expenses that will be IPAC billed against this Obligation.



# UNITED STATES DEPARTMENT OF THE INTERIOR
### INTER-INTRA-AGENCY AGREEMENT (IAA)

  

| 1. Period of Performance | |
|---|---|
| START | END |
| 08/19/17 | 09/30/18 |

Buyer has work performed for them by the Seller named in item 6b.   Seller to perform work as described herein for the agency named in item 6a.

**SEE INSTRUCTIONS ON PAGE 2**

| 2. Common Document Number (Agreement Number) | 3. Check appropriate box | | | |
|---|---|---|---|---|
| L18PG00086   Page 1 of 5 | ☒ Original | ☐ Modification No | ☐ Severable | ☐ Non-Severable |

| 4 Under the authority of (Cite authorities): | |
|---|---|
| ☐ 43 U.S.C. 1701 et seq. (FLPMA) | ☐ Working Capital Fund (WCF) |
| ☐ Department of the Interior Appropriation Act for FY | ☐ Other. 46 USC 1701 Service First Agreement |
| ☒ 31 U.S.C 1535 (Economy Act) | Bridgeport Hotshack Crew |

| 5. Description of Work: See Articles | PROJECT TITLE   Burning Man 2016 medical Support |
|---|---|

|  | Seller |
|---|---|
| 6a. Agency:   Bureau of Land Management , Carson City District | Agency:   HHS |
| Address:   1340 Financial Blvd | Address:   200 Independence Ave, SW |
| Address:   Reno, NV 89502 | Address:   Washington DC 20201 |
| Administrative POC   David Appold   dappold@blm.gov | Administrative POC:   David Dolinsky , David.dolinsky@hhs.gov |
| Email:   Phone   775-861-6417   Fax | Email:   Phone   (202)205-0499   Fax. |
| Technical Point of Contact:   Warren Templeton   Email: wtemplet@blm.gov | Technical Point of Contact:   Denis Fitzgerald, Denis.Fitzgerald@hhs.gov |
| Phone   602-417-9318   Fax | Phone   (202)205-0499   Fax: |

| ACCOUNT DATA | BUYER | SELLER |
|---|---|---|
| 7. Agency Location Code | 7a  14-11-008 | 7b  75030030 |
| BPN Number (DUNS #) FSN | 8a. 084359236 | 8b. 024199981 |
| Treasury Account Symbol (TAS) | 9a. 014X5017 | 9b. 75X4552.00114X1039 |
| 10  Standard General Ledger | 10a. | 10b. |
| 11  Cost Structure/Account CC/FA/WBS | 11a  LLNVWU3500 L51050000.EA0000 LV.RC.F1805950 18XL5017AP | 11b. |
| 12. Business Event Type Code | 12a  DISB | 12b  COLL |
| 13  Requisition Number for Buyer Project Account for Seller   WBS | 13a  40394154 | 13b. |
| 14. Contract Line Number for Buyer Proposal Number or Sales Order # for Seller | 14a.0010 | 14b. |
| 15. Buyer  provide Expiration of Funding Source  (Date or indefinite) | 15a.09/30/2018 | 15b. NOTE: Seller, ensure project completion by this date (Seller must not incur additional costs) See Block 15a |

| 16. Amount Obligated by Buyer | | 17. Bill To (Name and Address, including zip code of **Finance Office**). |
|---|---|---|
| a.  Initial or current  obligation: | $20,000.00 | Name:   OC622-Payments Section, Bureau of Land Management |
| b.  Modification Amount (check one)   ☐ Increase   ☐ Decrease | $ | Address:   Denver Federal Center, Bldg. 50, POB 25047 |
| c.  Total obligation: | $20,000.00 | Address:   Denver, CO 80225 |

18. Billing for Federal Agencies and DOD will be processed via IPAC. (billing will be done ☐ bi-weekly ☒ monthly ☐ quarterly ☐ in advance)

Upon Approval, this agreement constitutes an obligation against Buyer requesting the work; or authority to proceed with work by Seller for the herein named agency in anticipation of reimbursement.

| 19  Approved for Buyer:  DAVID APPOLD   Digitally signed by DAVID APPOLD  Date: 2018.05.29 16:16:57 -07'00' (Contracting Officer or other Authorized Signature) *other only for WCF | 20. Approved by Seller Warren T. Jenkins -S |
|---|---|
| | (Seller's Authorizing Signature ) |
| Name (Type).   David W Appold | 20a. Name (Type): |
| 19b. Title: | 19c. Date· | 20b  Title: Budget Analyst | 20c. Date. |

AR11505

## INSTRUCTIONS FOR INTER/INTRA-AGENCY AGREEMENT (IAA)
*NOTE· Information highlighted is to be completed by, or obtained from, the Seller Agency*

### IAA -- BUYER TO HAVE WORK PERFORMED BY A PARTICIPATING (SELLER) AGENCY

*Note:  Complete Items below for a single funding line -- continuation page is required for multiple lines of funding
The Buyer executes this form, completes and obligates information under Buyer data elements.

1. Enter the start and end date (period of performance) in which work will be completed.
2. Enter the Common Document Number (Inter/Intra Agency Agreement number).
3. Check "Original" if first submission, "Modification" and enter modification number if modification.
4. Check 31 U.S.C. 1535" unless another specific legislative authority exists, in which case that authority is shown under "other".  If 31 U.S.C. 1535 is checked, an Economy Act Determination must be prepared by the project manager and approved by a warranted Contracting Officer with delegated authority.
5. Provide a Project Title and description of the work to be performed in accordance with Acquisition, Section 1510-17.5.
6. Enter the Buyer Agency office name, city, state, zip code, Buyer technical and administrative contact names and phone nos. with area code, also include fax and Email address.
6a. Enter the Seller Agency office name, city, State, Buyer technical and administrative contact names and phone nos. with area code, also include fax and Email address.  These fields can be completed by the Seller if unknown to the Buyer.
This data will be referenced on your Treasury IPAC bill
7a. Provide your 8 digit Agency Location Code (ALC) assigned by Treasury.
8a. Type your Business Partner Network Number (DUNS No.) as registered in Federal Register, this is also referred to as the FSN for Dept. of Defense.
9a. Provide the Treasury Account Symbol (TAS) for this funding line.
10a. Determine the Treasury Standard General Ledger accounts (SGL) for this funding request.
11a Enter the account cost structure for your Agency.  This may include an office identifier, program and budget object class.
12a Provide the Business Event Type Code (BETC) for this action.
13a Type the Requisition Number referenced to support this Agreement.
14a Contract Line Number for this funding.
15a. Provide the Fund Expiration date, or type 'Indefinite' (for no year funds).
*Items 9a – 14a are specific for each line of funding on the obligation document. See * above.
7b-14b. Seller Agency completes these items.
This data will be used to cross-reference the IA with the Seller's reimbursable account.
16.  For an original IA; enter the amount to complete items a, c, and d.  For modification; complete items a, b, c, and d.
16a. Enter the Initial or current obligation amount
16b. Enter the Modification Amount
16c. Check appropriate box to indicate if the funding is being increased or decreased by this action.
17.  Enter the Buyer Agency, Bill To - Finance Office address, include office name, city, state, and zip code.
Forward a copy of this draft Agreement for completion of the Seller Agency account data.
Obtain a signed, accepted copy of this Agreement from the Buyer Agency.
Ensure that the data elements in 7b-14b have been completed.
18.  Check the preferred billing schedule for the Buyer Agency and ensure that the term is acceptable for both Buyer and Seller.
19.  IA must be signed by a warranted Contracting Officer with delegated authority.  IA is not signed by the Buyer until approved in block 20 by the participating agency.
20.  Signature of approving official for the participating agency.
Send a fully executed copy of this Agreement to the Seller Agency after obligation is recorded in the Financial System via the IDEAS/PRISM system.

### PARTICIPATING SELLER AGENCY TO SUPPORT THE BUYER AGENCY

The Draft IAA is received for completion by the Seller Agency.
This data will be used to cross-reference the IAA with the Seller Agency's reimbursable account in FFS or SAP.

6b. Enter the Seller Agency office name, city, State, Buyer technical and administrative contact names and phone nos. with area code, also include fax and Email address.  These fields can be completed by the Buyer
7b.  Provide your 8 digit Agency Location Code (ALC) assigned by Treasury
8b.  Type your Business Partner Network Number (DUNS No.) as registered in Federal Register, this is also referred to as the FSN for Dept. of Defense.
9b.  Provide the Treasury Account Symbol (TAS) for this funding line.
10b. Determine the Treasury Standard General Ledger accounts (SGL) for your reimbursable account.
11b. Enter the cost structure / account classification for your Agency's reimbursable.  This may include an office identifier, program and budget object class.  (Note:  This cost structure must be charged with time or expenditures for billing to occur.)
12b. Provide the Business Event Type Code (BETC) for this action.
13b. Type the Project or Job Number assigned to track expenses for completing the work requested in Agreement.
14b. Enter any additional Seller account reference data.  (Project code assigned, Proposal number, sub-agreement contract reference)
15b. Seller to ensure completion by this date (No additional costs may be incurred).
16.  To be completed by Buyer
17.  Ensure that the billing term is acceptable by Seller Agency.
20.  Ensure that the approval signature is an agent authorized to accept or behalf of the Seller Agency.
Return the IAA copy to the Contracting Officer for execution and obligation.
After Receipt of the fully executed copy of this Agreement, create a reimbursable account in FFS, PCAS or SAP, SD to track expenses that will be IPAC billed against this Obligation.

AR11506

IAA # L18PG00086- ARTICLES

I.   PROJECT TITLE:

Medical Support from Health and Human Services (HHS) for the 2018 Burning Man Event.

II.   OBJECTIVE:

To provide necessary medical oversight, response and assessment to Bureau of Land Management employees and contractors in a harsh, remote, and tactical environment during the 2018 Burning Man Event.

III.   STATEMENT OF WORK:

The United States Department of Health and Human Services (HHS) agrees to provide the following services to the Bureau of Land Management, Winnemucca District Office for the 2017 Burning Man event, with an operational period between 8/21/18-9/08/18:

a)   Medical Support Services: HHS will provide medical support services to meet BLM requirements, which may include, but are not limited to, mission-specific training, mission planning, and medical intelligence, specifically the development of a Medical Threat Assessment specific to the event.

b)   Needs Assessment: Prior to the event, HHS will conduct a needs assessment for the BLM to make recommendations and to determine how best to develop, implement and maintain the emergency medical support requirements for the event. These recommendations will include, but are not limited to: training, procedures, protocols, processes, equipment, resources and oversight, which will enhance successful mission accomplishment.

c)   Medical Equipment Selection: HHS will provide BLM with guidance and recommendations regarding the equipment and supplies required by the BLM for the 2018 Burning Man event. When appropriate, the Medical Director may authorize the procurement of controlled substances and prescription medical devices and will ensure that appropriate records of use, storage and administration are maintained in accordance with applicable federal standards.

d)   Medical Direction and Consultation: HHS will designate a physician who would serve as medical director for BLM Emergency Medical Technicians (EMTs) and ensure 24-hour access to the medical director (or his designee) during the operational period. The medical director would provide medical oversight for BLM certified medical providers. This medical oversight may include standing orders, real-time medical consultation, development of customized and mission-specific protocols for treatment, and supervision of a quality improvement program.

e)   Direct Operational Support: HHS will provide a Medical Support Team (MST), which usually consists of an independent duty medic and a physician/midlevel provider, to supplement the BLM medical unit. Additional providers or MSTs may be supplied, as needed. HHS will ensure that all personnel directly involved in supporting BLM have at least a Secret clearance. Pursuant to 42 U.S.C. 215, HHS personnel will be detailed to BLM during the operational period to provide direct field medical support and extended mission support. Such support may include onsite consultation, patient advocacy,

providing personnel on the scene, assessment of individuals at the scene for medical conditions, and provision of medical care to individuals as necessary.

f) <u>Ongoing Assessments and Quality Improvement</u>: HHS will conduct a post operation assessment of the medical component of the event, recommending to BLM any training, procedures, equipment and resources that will enhance future events. This may include a medical record review for quality improvement. Except as required by law and in accordance with the Privacy Act, HHS will not disclose or disseminate these records outside USHHS without prior BLM approval.

IV.   REPORTS:

The HHS will provide assessment and operational reports to the BLM both on paper and electronically. Reports will coordinate with designee and need to be complete during event if needed and October 31, 2018.

V.   AVAILABILITY OF FUNDS

Funds in the amount of $20,000 are obligated by execution of this IAA. Once IAA is signed funds will be available. The ability of the parties to carry out their responsibilities under this IAA is subject to their respective funding procedures and the availability of appropriate funds. Should either party encounter budgetary problems in the course of its respective internal procedures which may affect the activities to be carried out under this IAA, that party will notify the other party in writing in a timely manner.

VI.   SETTLEMENT OF DISPUTES:

The parties under this IAA are responsible for resolving any disputes that may arise within 30 business days of the billing date. If a resolution cannot be achieved during this 30-day period, the matter will then be referred to the Department of Interior Financial Management Office (PFM) http://www.doi.gov/pfm/.

VII.   FINANCIAL ARRANGEMENTS (PAYMENT):

This IAA is not to exceed the amount as stated herein [inclusive of all Modifications.]. The charges for goods/services will include both direct and indirect costs applicable to this IAA  For (WO800) time and materials based IAAs, the final charge for the work will be based on the actual costs incurred. For fixed price IAAs, the final charge will be the charge negotiated between the BLM and the HHS. When advance payment has been made on a reimbursable based IAA and the actual costs are less than the estimate, the difference will be refunded.

The HHS will submit their billing through the Intra-Governmental Payment and Collection (IPAC) system or the Intra-Governmental Transaction Portal, whichever is applicable.  The bill will reference the BLM's Dunn and Bradstreet Number, the Requesting Agency Location Code, The Treasury Account Symbol, the Accounting Classification Reference Code(s), the Obligating Document Number, a brief description of the services performed, and the Accounts Payable point-of-contact name and phone number.

A copy of the supporting documentation will be forwarded to the BLM initiating office when the bill is prepared.

IAA # L18PG00086- ARTICLES

The BLM shall not be obligated to pay for, nor will the USHHS be obligated to perform any effort that will require the expenditure of funds above the obligated amount.

VIII.   TERM OF IAA:
This IAA shall become effective upon signature by both parties. Unless completed early, or terminated in accordance with paragraph IX, this IAA expires September 30, 2018. If extended by bilateral modification through coordinated with the BLM Contracting Office duration shall not exceed September 30, 2018. The L18PG00086, Articles and Statement of Work included in this package are all part of the agreement that is being entered into.

IX.   TERMINATION:
This IAA may be terminated by either party upon 30 days written notice. If the IAA is cancelled by the BLM, the HHS will be reimbursed for costs incurred prior to cancellation, plus any termination costs. All costs claimed by the HHS must be itemized and furnished to the BLM.

X.   MODIFYING THE IAA:
Either party under this IAA may propose to make changes under this IAA by notifying the other party in writing. All changes under this IAA must be modified and agreed upon by both parties in writing.

XI.   POINTS OF CONTACT:
Changes to the Points of Contact identified below may be made by written notification to each of the parties under this IAA.

REQUESTING AGENCY (BLM)

Technical Contact
Name:  Warren Templeton
Title:   Assistant Special Agent-in-Charge
          BLM-OLES (AZ)
   Address: One North Central Avenue, Ste 800
          Phoenix, AZ 85004
Phone: (602) 417-9318
Email:  wtemplet@blm.gov

Contracting Contact:
Name: Dave Appold
Title: Supervisory Procurement Analyst

Operations
Address: 1340 Financial Blvd
          Reno, NV 89502
Phone: (775) 861-6417
Email: dappold@blm.gov

**Billing Contact**
OC622- Payments Section
Bureau of Land Management
Denver Federal Center, Bldg. 50
P.O. Box 25047
Denver, CO 80225

SERVICING AGENCY (HHS)

Technical Contact
Name:       Denis Fitzgerald
Title:       Medical Director, Tactical
             Medicine Program
Address:    200 Independence Ave, SW
             Washington, DC 20201
Phone:      (202) 657-8125
Email:      Denis.Fitzgerald@hhs.gov

Contracting Contact:
Name:       David Dolinsky
Title:       Deputy Director for
             Administration and Finance

Address:    200 Independence Ave, SW
             Washington, DC 20201
Phone:      (202) 205-0499
Email:      david.dolinsky@hhs.gov

**Billing Contact**
Same as Technical Contact.

AR11509

## Dawn Crowder

| | |
|---|---|
| From: | Dolinsky, David (OS/ASPR/MFHC) |
| nt: | Tuesday, February 12, 2019 9:12 AM |
| .o: | OS EMGAFO (HHS/ASPR) |
| Cc: | David Appold |
| Subject: | RE: [EXTERNAL] RE: L18PG00086 2018 Burning Man DEOB |
| Attachments: | L18PG000086 Cover MOD P00001.doc; G17 L18PG000086 Articles MOD P00001.docx |

Veronica,

Please sign on my behalf and work through BEM on our end. I'll send you the IPAC stuff separately.

Thanks,

David A. Dolinsky, CPA
Branch Chief for Administration and Finance Operations
ASPR / Office of Management Finance & Human Capital
U.S Department of Health and Human Services
202-205-0499
david.dolinsky@hhs.gov

**A+F delivers value by providing Stafford Act expertise, financial tracking, and emergency administrative functions that directly support HHS responders and stakeholders.**

ım: David Appold <dappold@blm.gov>
_ent: Monday, February 11, 2019 5:50 PM
**To:** Dolinsky, David (OS/ASPR/MFHC) <David.Dolinsky@hhs.gov>; Fitzgerald, Denis (OS/ASPR/EMMO) <Denis.Fitzgerald@hhs.gov>
**Cc:** Dawn Crowder <dcrowder@blm.gov>; Mark Pirtle <mpirtle@blm.gov>; Rebecca Andres <randres@blm.gov>; OS EMGAFO (HHS/ASPR) <EMGAFO@hhs.gov>
**Subject:** RE: [EXTERNAL] RE: L18PG00086 2018 Burning Man DEOB

David,

Attached are the revised cover and articles for mod P00001.

Thanks,

Dave

**From:** Dolinsky, David (OS/ASPR/MFHC) <David.Dolinsky@hhs.gov>
**Sent:** Monday, February 11, 2019 11:42 AM
**To:** David Appold <dappold@blm.gov>; Fitzgerald, Denis (OS/ASPR/EMMO) <Denis.Fitzgerald@hhs.gov>
**Cc:** Dawn Crowder <dcrowder@blm.gov>; Mark Pirtle <mpirtle@blm.gov>; Rebecca Andres <randres@blm.gov>; OS EMGAFO (HHS/ASPR) <EMGAFO@hhs.gov>
**Subject:** RE: [EXTERNAL] RE: L18PG00086 2018 Burning Man DEOB

..nmediately, no.

1

AR11510

Maybe next week.

David A. Dolinsky, CPA
Branch Chief for Administration and Finance Operations
ASPR / Office of Management Finance & Human Capital
U.S Department of Health and Human Services
202-205-0499
david.dolinsky@hhs.gov



**A+F delivers value by providing Stafford Act expertise, financial tracking, and emergency administrative functions that directly support HHS responders and stakeholders.**

**From:** David Appold <dappold@blm.gov>
**Sent:** Monday, February 11, 2019 1:41 PM
**To:** Dolinsky, David (OS/ASPR/MFHC) <David.Dolinsky@hhs.gov>; Fitzgerald, Denis (OS/ASPR/EMMO) <Denis.Fitzgerald@hhs.gov>
**Cc:** Dawn Crowder <dcrowder@blm.gov>; Mark Pirtle <mpirtle@blm.gov>; Rebecca Andres <randres@blm.gov>; OS EMGAFO (HHS/ASPR) <EMGAFO@hhs.gov>
**Subject:** RE: [EXTERNAL] RE: L18PG00086 2018 Burning Man DEOB

David,

Thanks for the update.  Any chance you can IPAC immediately?

Dave

**From:** Dolinsky, David (OS/ASPR/MFHC) <David.Dolinsky@hhs.gov>
**Sent:** Monday, February 11, 2019 10:35 AM
**To:** David Appold <dappold@blm.gov>; Fitzgerald, Denis (OS/ASPR/EMMO) <Denis.Fitzgerald@hhs.gov>
**Cc:** Dawn Crowder <dcrowder@blm.gov>; Mark Pirtle <mpirtle@blm.gov>; Rebecca Andres <randres@blm.gov>; OS EMGAFO (HHS/ASPR) <EMGAFO@hhs.gov>
**Subject:** [EXTERNAL] RE: L18PG00086 2018 Burning Man DEOB

Good Afternoon,

HHS incurred $2,394.88 of travel costs against the L18PG00086 2018 Burning Man agreement. Please adjust your document accordingly.

An IPAC for the $2,394.88 will be initiated on or before March 20th.

David A. Dolinsky, CPA
Branch Chief for Administration and Finance Operations
ASPR / Office of Management Finance & Human Capital
U.S Department of Health and Human Services
202-205-0499
david.dolinsky@hhs.gov

**A+F delivers value by providing Stafford Act expertise, financial tracking, and emergency administrative functions that directly support HHS responders and stakeholders.**

2

**From:** Dolinsky, David (OS/ASPR/MFHC)
**Sent:** Thursday, February 7, 2019 4:28 PM
**To:** 'David Appold' <dappold@blm.gov>; Fitzgerald, Denis (OS/ASPR/EMMO) <Denis.Fitzgerald@hhs.gov>
**Cc:** 'Dawn Crowder' <dcrowder@blm.gov>; 'Mark Pirtle' <mpirtle@blm.gov>; 'Rebecca Andres' <randres@blm.gov>; OS
    IGAFO (HHS/ASPR) <EMGAFO@hhs.gov>
**Subject:** RE: L18PG00086 2018 Burning Man DEOB

Disregard about the copy. I just found it. Will review and reply Monday.

David A. Dolinsky, CPA
Branch Chief for Administration and Finance Operations
ASPR / Office of Management Finance & Human Capital
U.S Department of Health and Human Services
202-205-0499
david.dolinsky@hhs.gov

**A+F delivers value by providing Stafford Act expertise, financial tracking, and emergency administrative functions that directly support HHS responders and stakeholders.**

**From:** Dolinsky, David (OS/ASPR/MFHC)
**Sent:** Thursday, February 7, 2019 5:26 PM
**To:** 'David Appold' <dappold@blm.gov>; Denis.Fitgerald@hhs.gov
**Cc:** Dawn Crowder <dcrowder@blm.gov>; Mark Pirtle <mpirtle@blm.gov>; Rebecca Andres <randres@blm.gov>; OS
EMGAFO (HHS/ASPR) <EMGAFO@hhs.gov>
**Subject:** RE: L18PG00086 2018 Burning Man DEOB

Please forward a copy of the original agreement. Will then review on Monday when I get back to the office. Thanks.

David A. Dolinsky, CPA
Branch Chief for Administration and Finance Operations
ASPR / Office of Management Finance & Human Capital
U.S Department of Health and Human Services
202-205-0499
david.dolinsky@hhs.gov

**A+F delivers value by providing Stafford Act expertise, financial tracking, and emergency administrative functions that directly support HHS responders and stakeholders.**

**From:** David Appold <dappold@blm.gov>
**Sent:** Wednesday, February 6, 2019 5:19 PM
**To:** Dolinsky, David (OS/ASPR/MFHC) <David.Dolinsky@hhs.gov>; Denis.Fitgerald@hhs.gov
**Cc:** Acquisition and AA <dappold@blm.gov>; Dawn Crowder <dcrowder@blm.gov>; Mark Pirtle <mpirtle@blm.gov>;
Rebecca Andres <randres@blm.gov>
**Subject:** L18PG00086 2018 Burning Man DEOB

David,

Please see the attached MOD P00001 for your review an signature.

Thanks,

3

AR11512

Dave

David W. Appold
Supervisory Procurement Analyst/Contracting Officer
BLM Nevada State Office
(O) 775-861-6417
(F) 775-861-6634
dappold@blm.gov

4

AR11513

## Dawn Crowder

| | |
|---|---|
| **From:** | Dolinsky, David (OS/ASPR/MFHC) |
| **nt:** | Monday, February 11, 2019 10:35 AM |
| **J:** | David Appold; Fitzgerald, Denis (OS/ASPR/EMMO) |
| **Cc:** | Dawn Crowder; Mark Pirtle; Rebecca Andres; OS EMGAFO (HHS/ASPR) |
| **Subject:** | [EXTERNAL] RE: L18PG00086 2018 Burning Man DEOB |

Good Afternoon,

HHS incurred $2,394.88 of travel costs against the L18PG00086 2018 Burning Man agreement. Please adjust your document accordingly.

An IPAC for the $2,394.88 will be initiated on or before March 20th.

David A. Dolinsky, CPA
Branch Chief for Administration and Finance Operations
ASPR / Office of Management Finance & Human Capital
U.S Department of Health and Human Services
202-205-0499
david.dolinsky@hhs.gov

**A+F delivers value by providing Stafford Act expertise, financial tracking, and emergency administrative functions that directly support HHS responders and stakeholders.**

·m: Dolinsky, David (OS/ASPR/MFHC)
_nt: Thursday, February 7, 2019 4:28 PM
**To:** 'David Appold' <dappold@blm.gov>; Fitzgerald, Denis (OS/ASPR/EMMO) <Denis.Fitzgerald@hhs.gov>
**Cc:** 'Dawn Crowder' <dcrowder@blm.gov>; 'Mark Pirtle' <mpirtle@blm.gov>; 'Rebecca Andres' <randres@blm.gov>; OS EMGAFO (HHS/ASPR) <EMGAFO@hhs.gov>
**Subject:** RE: L18PG00086 2018 Burning Man DEOB

Disregard about the copy. I just found it. Will review and reply Monday.

David A. Dolinsky, CPA
Branch Chief for Administration and Finance Operations
ASPR / Office of Management Finance & Human Capital
U.S Department of Health and Human Services
202-205-0499
david.dolinsky@hhs.gov

**A+F delivers value by providing Stafford Act expertise, financial tracking, and emergency administrative functions that directly support HHS responders and stakeholders.**

**From:** Dolinsky, David (OS/ASPR/MFHC)
**Sent:** Thursday, February 7, 2019 5:26 PM
**To:** 'David Appold' <dappold@blm.gov>; Denis.Fitgerald@hhs.gov
    Dawn Crowder <dcrowder@blm.gov>; Mark Pirtle <mpirtle@blm.gov>; Rebecca Andres <randres@blm.gov>; OS
    ыlGAFO (HHS/ASPR) <EMGAFO@hhs.gov>
**Subject:** RE: L18PG00086 2018 Burning Man DEOB

1

AR11514

Please forward a copy of the original agreement. Will then review on Monday when I get back to the office. Thanks.

David A. Dolinsky, CPA
Branch Chief for Administration and Finance Operations
ASPR / Office of Management Finance & Human Capital
U.S Department of Health and Human Services
202-205-0499
david.dolinsky@hhs.gov


**A+F delivers value by providing Stafford Act expertise, financial tracking, and emergency administrative functions that directly support HHS responders and stakeholders.**

**From:** David Appold <dappold@blm.gov>
**Sent:** Wednesday, February 6, 2019 5:19 PM
**To:** Dolinsky, David (OS/ASPR/MFHC) <David.Dolinsky@hhs.gov>; Denis.Fitgerald@hhs.gov
**Cc:** Acquisition and AA <dappold@blm.gov>; Dawn Crowder <dcrowder@blm.gov>; Mark Pirtle <mpirtle@blm.gov>; Rebecca Andres <randres@blm.gov>
**Subject:** L18PG00086 2018 Burning Man DEOB

David,

Please see the attached MOD P00001 for your review an signature.

Thanks,

Dave

David W. Appold
Supervisory Procurement Analyst/Contracting Officer
BLM Nevada State Office
(O) 775-861-6417
(F) 775-861-6634
dappold@blm.gov

2

AR11515

**Dawn Crowder**

| | |
|---|---|
| **From:** | Dolinsky, David (OS/ASPR/OFPA) |
| **nt:** | Thursday, May 24, 2018 10:06 AM |
| **J:** | David Appold |
| **Cc:** | Mark Pirtle; Rebecca Andres; Fitzgerald, Denis (OS/ASPR/OEM); Smith, Gregory (OS/ASPR/OEM); OS EMGAFO (HHS/ASPR) |
| **Subject:** | {EXTERNAL] RE: 2018 Burning Man HHS IAA |
| **Attachments:** | L18PG000086 Cover.doc; L18PG000086 Articles.docx |
| **Importance:** | High |

David (A),

Karren Jenkins on my team will sign the agreement on my behalf, get an account set up internally here for the amount provided, and serve as your POC. Please use EMGAFO@hhs.gov when communicating with the finance team here.

Also, please note that Denis Fitzgerald's correct email is on the cc line to this email.

David A. Dolinsky, CPA
Deputy Director for Administration and Finance Operations
ASPR / Office of Financial Planning and Analysis
U.S Department of Health and Human Services
202-205-0499
david.dolinsky@hhs.gov

   F delivers value by providing Stafford Act expertise, financial tracking, and emergency administrative functions that directly support HHS responders and stakeholders.

**From:** David Appold [mailto:dappold@blm.gov]
**Sent:** Friday, May 18, 2018 7:04 PM
**To:** Dolinsky, David (OS/ASPR/OFPA); Denis.Fitgerald@hhs.gov
**Cc:** Mark Pirtle; Rebecca Andres
**Subject:** RE: 2018 Burning Man HHS IAA

David,

Please see the attached cover and articles for your review and signature.

Dave

David W. Appold
Supervisory Procurement Analyst/Contracting Officer
BLM Nevada State Office
(O) 775-861-6417
(F) 775-861-6634
dappold@blm.gov

1

AR11516

## Dawn Crowder

| | |
|---|---|
| **From:** | David Appold |
| **·nt:** | Friday, May 18, 2018 5·04 PM |
| **J:** | 'Dolinsky, David (OS/ASPR/OFPA)'; 'Denis.Fitgerald@hhs.gov' |
| **Cc:** | Mark Pirtle; Rebecca Andres |
| **Subject:** | RE: 2018 Burning Man HHS IAA |
| **Attachments:** | L18PG000086 Cover.doc, L18PG000086 Articles.docx |

David,

Please see the attached cover and articles for your review and signature.

Dave

David W. Appold
Supervisory Procurement Analyst/Contracting Officer
BLM Nevada State Office
(O) 775-861-6417
(F) 775-861-6634
dappold@blm.gov

1

AR11517

## Dawn Crowder

| | |
|---|---|
| **From:** | Russell, Sarah - FS |
| **nt:** | Friday, May 18, 2018 7.22 AM |
| **J:** | David Appold |
| **Cc:** | Rebecca Andres |
| **Subject:** | [EXTERNAL] RE: 2018 USFS Burning Man IAA |

Hi David,

I reached out to our Regional Office since more LEO's are involved than just those on the Humboldt-Toiyabe. Carla Pickering said that she would process it at the Regional Office level. I'm not sure if she has reached out to you or not – but I did forward your entire email (attachments and all).

Here is her email address: carlapickering@fs.fed.us

Thank you.



**Sarah Russell**
**Detail - Supervisory Grants Management Specialist**
**Forest Service**
Region 4 Acquisition Management
Southwest Idaho Nevada Acquisition Center

**p: 208-373-4272**
**sarahrussell@fs.fed.us**
1249 S. Vinnell Way, Suite 200
Boise, ID 83709
www.fs.fed.us
📧💙📷

Caring for the land and serving people

**G&A SharePoint Site: https://ems-team.usda.gov/sites/fs-niat-aqm-mgmt/GandA/SitePages/swinasb.aspx**


**From:** David Appold [mailto:dappold@blm.gov]
**Sent:** Thursday, May 17, 2018 12:05 PM
**To:** Russell, Sarah - FS <sarahrussell@fs.fed.us>
**Cc:** Rebecca Andres <randres@blm.gov>
**Subject:** FW: 2018 USFS Burning Man IAA

Sarah

Will this IAA go through your office?

Dave

**From:** Andres, Rebecca <randres@blm.gov>
**nt:** Thursday, May 17, 2018 10:34 AM
       David Appold <dappold@blm.gov>
**subject:** 2018 USFS Burning Man IAA

1

AR11518

Dave

Here is the paperwork I have completed for the USFS IAA. Ragan Hall was the administrative POC I was
provided and her contact information is in the attachments.

USFS has an existing IAA with BLM Utah and one option proposed by USFS would be to mod that with our
funding but I felt a separate IAA would be cleaner. I am definitely open to your thoughts.

b

--
Becky Andres
Staff Law Enforcement Ranger
BLM Nevada - Zone 1 Law Enforcement
775-315-3497 (cell)

This electronic message contains information generated by the USDA solely for the intended recipients. Any
unauthorized interception of this message or the use or disclosure of the information it contains may violate the
law and subject the violator to civil or criminal penalties. If you believe you have received this message in error,
please notify the sender and delete the email immediately.

AR11519

## Dawn Crowder

| | |
|---|---|
| **From:** | Qu, May (OS/ASA/PSC/FMP) (CTR) |
| **nt:** | Wednesday, March 13, 2019 12:09 PM |
| **:** | dappold@blm.gov |
| **Cc:** | Hill, Veronica (OS/ASPR/MFHC); Dolinsky, David (OS/ASPR/MFHC) |
| **Subject:** | [EXTERNAL] BLM L18PG00086 Modification of HHS/ASPR TAS 75-18-0140 (not 75x4552.001 |
| **Attachments:** | SKMBT_C65219031116360.pdf; RE BLM (276 KB) |
| **Importance:** | High |

Good afternoon David,

I am going to do IPAC collection for this case soon,
but  BLM L18PG00086 obligation Partner TAS need to change to **075-20182018-0140** instead of *75x4552.001*.

| L18PG00086     Page 1 of 3 | | | ☐ Original | ☒ Modification No. P000-1 ☐ Severable ☐ Non-Severable | |
|---|---|---|---|---|---|
| 4. Under the authority of (Cite authorities): | | | | | |
| ☐ 31 U.S.C 1701 et seq. (FFPMA) | | | ☐ Working Capital Fund (WCF) | | |
| ☐ Department of the Interior Appropriation Act for FY | | | ☐ Other 46 USC 1701 Service  First Agreement | | |
| ☒ 31 U.S.C 1535 (Economy Act) | | | Bridgeport Heiltack Crew | | |
| 5. Description of Work.  See Articles | | | PROJECT TITLE.    Burning Man 2016 medical Support | | |
| | | | | **Seller** | |
| . Agency    Bureau of Land Management , Carson City District | | | Agency         HHS | | |
| Address     1340 Financial Blvd | | | Address        200 Independence Ave, SW | | |
| Address     Reno, NV 89502 | | | Address        Washington DC 20201 | | |
| Administrative POC     David Appold  dappold@blm.gov | | | Administrative POC:    David Dolinsky  David.dolinsky@hhs.gov | | |
| Email                        Phone    775-861-6417        Fax | | | Email.                       Phone    (202)205-0499        Fax | | |
| Technical Point of Contact     Warren Templeton  Email: wtempleto@blm.gov | | | Technical Point of Contact:    Denis Fitzgerald, Denis Fitzgerald@hhs.gov | | |
| Phone   602-417-9318     Fax | | | Phone    (202)205-0499        Fax: | | |
| ACCOUNT DATA | | BUYER | SELLER | | |
| 7 Agency Location Code | 7a  14-11-001 | | 7b  75010010 | | |
| 1. DPN Number (DUNS #) FSN | 8a  084159236 | | 8b.  024199981 | | |
| 3. Treasury Account Symbol (TAS) | 9a.  014X5017 | | 9b.  75X4552.00114X1039  75-18-0140 (different c.c.) | | |
| 0  Standard General Ledger | 10a | | 10b | | |
| 1  Cost Structure/Account  COF.I/WBS | 11a  11.NVW03590 L31050000 KA0080 LV RC  F1E05950  18XL5017AP ($17,605 12) | | 11b | | |
| 2  Business Event Type Code | 12a DISB | | 12b COLL | | |
| 3  Requisition Number for Buyer Project Account for Seller  WBS | 13a N/A | | 13b | | |
| 4  Contract Line Number for Buyer Proposal Number or Sales Order # for Seller | 14a 0010 | | 14b | | |
| 5  Buyer  provide Expiration of Funding Source (Date or Indefinite) | 15a 09/30/2018 | | 15b NOTE: Seller, ensure project completion by this date (Seller must not incur additional costs) See Block 15a | | |
| 6  Amount Obligated by Buyer | | 17  Bill To (Name and Address, including zip code of **Finance Office**) | | | |
| . Initial or current  obligation. | $20,000 00 | Name        OC622-Payments Section, Bureau of Land Management | | | |
| . Modification Amount (check one) | ($17,650.12) | Address     Denver Federal Center, Bldg. 50, POD 25047 | | | |
| ☐ Increase      ☒ Decrease | | Address     Denver, CO 80225 | | | |
| al obligation | $  2,394.88 | | | | |

AR11520

Regards,
May Qu
Accounts Receivable Accountant, Accounting Services
Program Support Center
U.S. Department of Health and Human Services
7700 Wisconsin Avenue, 8th Floor
Bethesda, MD 20814

Office: (301) 492-4633

in | website | comments



**From:** Hill, Veronica (OS/ASPR/MFHC) <Veronica.Hill@hhs.gov>
**Sent:** Tuesday, March 12, 2019 9:58 AM
**To:** Qu, May (OS/ASA/PSC/FMP) (CTR) <Rui.Qu@psc.hhs.gov>
**Cc:** Dolinsky, David (OS/ASPR/MFHC) <David.Dolinsky@hhs.gov>
**Subject:** RE: BLM

May,

Per our phone discussion yesterday, here is the updated document showing the correct appropriation number. Hopefully we can get this processed and closed out soon.  Thanks

*Thanks,*
*Veronica A. Hill*

Department of Health and Human Services
Office of the Assisant Secretary for Preparedness & Response
Mangement Finance and Human Capital/Administration and Finance Operations
Office: (202) 401-2305
Email: Veronica.Hill@hhs.gov

*Preparedness is the only way we can combat a natural disaster. ~John Quinlan*

**From:** Qu, May (OS/ASA/PSC/FMP) (CTR)
**Sent:** Monday, March 11, 2019 3:53 PM
**To:** Hill, Veronica (OS/ASPR/MFHC)
**Subject:** BLM

<< OLE Object: Picture (Device Independent Bitmap) >>

2

May Qu
Accounts Receivable Accountant, Accounting Services
Program Support Center
U.S. Department of Health and Human Services
'00 Wisconsin Avenue, 8th Floor
.thesda, MD 20814

Office: (301) 492-4633

<< OLE Object: Picture (Device Independent Bitmap) >> | website | comments

<< OLE Object: Picture (Device Independent Bitmap) >>

3

# INTER-AGENCY/INTRA-AGENCY AGREEMENT
# DETERMINATION AND FINDINGS
Revised 4/7/00

*As outlined in the Economy Act (31 U.S.C. 1535), BLM can only place orders with other federal agencies for goods or services if the following specific information is contained the Determinations and Findings, to authorize the action:*

1. The proposed Agreement between the Bureau of Land Management,  *(US Department of Health and Human Services)*  is justified under the authority of the Economy Act (31 U.S.C. 1535 and 48 CFR 17-503).

2. The Bureau of Land Management has a requirement to provide for the health and safety of federal employees assigned to the work the Burning Man event, to include a medical response and assessment team, complete with necessary supplies to cover medical in a remote setting and harsh environment.  The estimated total cost of the supplies and services is $20,000.  Funding in the amount of $20,000 is available, and legal authority exists for this acquisition.

3. This order is in the best interest of the United States Government.

4. The US Department of Health and Human Services is able to provide the required services and supplies.

5. It is more convenient and least costly to acquire the services and supplies from the US Department of Health and Human Services than from a commercial firm.  The US Department of Health and Human Services is a federal agency that provides medical oversight and services to other federal agencies in the support of various missions and are not bound by geographic boundaries.  This makes the US Department of Health and Human Services especially suited and available to provide services requested by the Bureau of Land Management (BLM).

6. This action does not conflict with any other Federal Agency's authority or responsibility.


Signature of Requester and Date
*/s/ Becky Andres 5/1/18*

Approval of Contracting Officer and Date

**DAVID APPOLD** Digitally signed by DAVID APPOLD
Date: 2018.05.29 16:47.13 -07'00'
Approval of Chief of the Contracting Office and Date

**DAVID APPOLD** Digitally signed by DAVID APPOLD
Date: 2018.05.29 16:47;36 -07'00'

**Formatted address:**

PROGRAM SUPPORT CENTER
FEDERAL OCCUPATIONAL HEALTH
7700 WISCONSIN AVE
BETHESDA MD   20814-3578

| INTERAGENCY AGREEMENT | | 1 IAA NO<br>L18PG00086 | | | PAGE<br>1 | OF<br>2 |
|---|---|---|---|---|---|---|
| 2. ORDER NO | | 3 REQUISITION NO<br>0040394154 | | 4 SOLICITATION NO | | |

| 5 EFFECTIVE DATE<br>'19/2018 | 6 AWARD DATE<br>05/30/2018 | 7 PERIOD OF PERFORMANCE<br>08/19/2018 TO 09/30/2018 |
|---|---|---|

| VICING AGENCY<br>PROGRAM SUPPORT CENTER<br>ALC: 75030030<br>DUNS: 024199981 +4:<br>7700 WISCONSIN AVE<br>BETHESDA MD 20814-3578 | 9. DELIVER TO<br>BLM-NV WINNEMUCCA DISTRICT OFFICE<br>5100 E WINNEMUCCA BLVD<br>WINNEMUCCA NV 89445<br>US |
|---|---|

POC      DAVID DOLINSKY

TELEPHONE NO  202-205-0499

| 10 REQUESTING AGENCY<br>L NV-STATE OFC BDGT&FIN SVCS(NV955)<br>ALC:<br>DUNS:  +4:<br>1340 FINANCIAL BLVD.<br>RENO NV 89502 | 11 INVOICE OFFICE<br>OC622 - PAYMENTS SECTION<br>BUREAU OF LAND MANAGEMENT<br>DENVER FEDERAL CENTER, BLDG. 50<br>MS OC-620 Payments<br>PO BOX 25047<br>DENVER CO 80225 |
|---|---|

POC

TELEPHONE NO.

| 12 ISSUING OFFICE<br>BLM NV-STATE OFC BGT&FIN SVC(NV955)<br>1340 FINANCIAL BLVD.<br>NO NV 89502 | 13 LEGISLATIVE AUTHORITY<br>31 USC 1535 Economy Act of 1932, as amended |
|---|---|
| | 14 PROJECT ID |
| | 15. PROJECT TITLE<br>BURNING MAN 2018 MEDICAL SUPPORT |

16. ACCOUNTING DATA

01

| 17<br>ITEM NO. | 18<br>SUPPLIES/SERVICES | 19<br>QUANTITY | 20.<br>UNIT | 21<br>UNIT PRICE | 22<br>AMOUNT |
|---|---|---|---|---|---|
| | INTERAGENCY AGREEMENT WITH HHS FOR MEDICAL<br>SERVICES DURING THE BURNING MAN 2018 EVENT<br>Legacy Doc #: BLM CO Invoice Review Required: Y<br>Delivery: 09/09/2018<br>Account Assignm: K G/L Account: 6100.256M0<br>Business Area: L000 Commitment Item: 256M00 Cost<br>Center: LLNVW03500 Functional Area:<br>L51050000.EA0000 Fund: 18XL5017AP Fund Center:<br>LLNVW03500 Project/WBS: LV.RC.F1805950 PR Acct<br>Assign: 01<br><br><br>Continued ... | | | | |

| 23 PAYMENT PROVISIONS | 24. TOTAL AMOUNT<br>$20,000.00 | | | |
|---|---|---|---|---|
| SIGNATURE OF GOVERNMENT REPRESENTATIVE (SERVICING) | 26a. SIGNATURE OF GOVERNMENT REPRESENTATIVE (REQUESTING)<br>DAVID APPOLD  Digitally signed by DAVID APPOLD<br>Date: 2018.05.29 10:58:37 -07'00' | | | |
| NAME AND TITLE | 25c. DATE | 26b. CONTRACTING OFFICER<br>David Appold | | 26g DATE |

| IAA NO | ORDER NO | | PAGE | OF |
|--------|----------|---|------|-----|
| L18PG00086 | | | 2 | 2 |

| 00010 | Burning Man 2018 Event Medical Support | | | | | | | 20,000.00 |
|-------|----------------------------------------|---|---|---|---|---|---|----------|

Period of Performance: 08/19/2018 to 09/09/2018

The total amount of award: $20,000.00. The
obligation for this award is shown in box 24.

```
PR: 40-'54  Doc Type: FP Funded Purch Req    Titl/ ~~TER-AGENCY AGREEMENT  HHS
Run D    05/29/2018   Run Time: 17:54:39  User ID:DAPF      Version Number:  00

Header ..ext:    INTERAGENCY AGREEMENT WITH HHS FOR MED..AL SERVICES DURING THE BURNING MAN 2018 EVENT.POC
                 BECKY ANDRES 775-315-3497 (CELL)

**********  Header Details  **********              **********  Approval/Status  **********
Requisitioner:              Eleanor Taylor          Release Group AA
Cog/Receiving:              ETAYLOR                  Release Strategy S1   Release Status:
GSA Contract Number:                                 Transmission Status:  03   Successfully Trans
Originating Office POC:     BANDRES
Issuing Office:            LVA                       CO Description       Approved By     Date        Time
Ratification Indicator:                             SP Supervisor        JMCKINNO        05/15/2018   09:40:25
Total Price:               20,000.00      USD       CF Certifying Funds App RLANGE1      05/15/2018   10:16:59
Supervisory Approver:      JMCKINNO
A-Host Approver:           RLANGE1
Certifying Funds Approver: 3000000956
Originating Office:        BLM-NV WINNEMUCCA FIELD OFFICE*
Address:                   5100 E WINNEMUCCA BLVD
                           WINNEMUCCA NV  89445

**********  Item 00010  **********
Item   ItemCat   Short Text                              Quantity / Unit    Val Price /     Total Price / Curr
00010  Service   Burning Man 2018 Event Medical Support  1.000    AU        20000.00        20000.00    USD

UPC        /Description                                  Mat.Grp   Plant    Deliv.Date      Delivery Address
Q2010000   GENERAL HEALTH CARE SERVICES                  Q201      L000     09/09/2018      0004276794

GSA/FEDSTRIP Number  CPO Number   Agency Order Number    Per.of Perf.  Start  Per.of Perf.  End
                                                         08/19/2018           09/09/2018

Responsible Cost Center   Action Type      Post Awd Smart Number         IT Approval/Tracking Number  Closed
                          1 Add new line                                                              No

**********  Accounting Details  **********
SeqNum  Acct Assign      Distr%    DistType                Quantity / Unit    Amount /  Currency   G/L Account
01      K Cost center    0.0       Single                  1.000    AU        20000.00  USD         6100.256M0

BusArea  CommitItem      Cost Center    FuncArea           Fund           Funds Center  WBS Element
L000     256M00          LLNVW03500     151050000.EA0000   1BXLS017AP     LLNVW03500    LV.RC.F1805950

Asset    Sub Asset       Order          Funded Program     TAS                   BETC   SAF Indic Trade in  UPC Override
                                        LVRCF1805950       14X5017

Bus.Entity  Building     Property       Rental Unit  Contract

**********  Delivery Address  **********
Address No.:  0004276794
Address:      BLM-NV WINNEMUCCA DISTRICT OFFICE
              5100 E WINNEMUCCA BLVD
              WINNEMUCCA NV  89445
              USA
```

AR11527

PR: 40394154  Doc Type: FP Funded Purch Req          Title: INTER-AGENCY AGREEMENT HHS
Run Date: 05/29/2018   Run Time: 17:54:39  User ID:DAPPOLD    Version Number: 00

********** Additional Status Data **********
Purchase Order          Smart Number          PO Line          PO Data

********** End of Report **********

AR11528

1   David S. Levin (CA Bar No. 156336)
    LEVIN LAW FIRM
2   405 Sherman Ave
    Palo Alto, CA 94306-1827
3   Telephone: (650) 858-8500
    david@levinlawfirm.com
4
    Attorneys for Appellant,
5   Black Rock City LLC

6

7

8              **UNITED STATES DEPARTMENT OF INTERIOR**

9               **INTERIOR BOARD OF LAND APPEALS**

10

11  BLACK ROCK CITY LLC,                Case Identification No.:  IBLA-2019-0109

12          Appellant,                  Special Recreation Permit
                                        LLNVW03500-18-01
13      v.                              2930 (NV030.10)

14  BUREAU OF LAND MANAGEMENT,
                                        **Declaration of Marc P. Picker in Support of**
15          Appellee.                   **Appeal**

16

17

18  I, Marc P. Picker, declare as follows:

19          1.      I am an attorney licensed to practice law in the state of Nevada.  I am over 18

20  years old, of sound mind, and capable of making this declaration. I have personal knowledge

21  of the facts set forth herein, or, if so stated, am informed and believe of their truth and

22  accuracy and, if called to testify, I could and would do so competently and under oath.

23          2.      Since 2008, I have worked with a group called "Lawyers for Burners," which

24  has been assisting participants who were cited by the U.S. Bureau of Land Management

25  ("BLM") at the annual Burning Man event ("Burning Man" or the "Event").  I have served as

26  counsel of record for dozens of Burning Man participants who were cited by BLM law

27  enforcement at the Event.

28

                                        1

AR11529

3.    Since 2008, I have worked directly with numerous BLM law enforcement agency representatives who appear on behalf of BLM in the U.S. District Court in Reno, Nevada, and I have similarly worked with every Assistant U.S. Attorney who prosecuted BLM citations issued at the Event during that time period.

4.    In 2010, I negotiated a protocol agreement with the U.S. Attorney's office regarding the resolution of drug possession citations issued by BLM at Burning Man. Under the arrangement, BLM agreed to dismiss drug possession or drug paraphernalia charges in exchange for a defendant's agreement to plead guilty to a non-drug related offense — such as trespassing or a motor vehicle infraction — and pay an adjusted fine. The fine for certain drugs like cocaine and ecstasy was slightly higher than the base fine of $500. The fine for cases involving marijuana was actually lower than the base fine. In every negotiated case, the BLM and U.S. Attorney's Office agreed to dismiss the entire citation, or at least the drug-related charge.

5.    I am informed and believe that this 2010 protocol for dismissing drug-related offenses from BLM citations at Burning Man continues to date and applied to citations issued at the 2018 Event. Between 2010 and 2018, the only drug offense convictions I am aware of from the Event are cases where the defendant did not contest the citation and paid the base fine of $500 by mail.

6.    Based on my 11 years of experience defending BLM citations, my attendance at the 2018 Event, and my review of other Declarations and Exhibits submitted as evidence by BRC in this appeal, I observe that BLM continued to devote substantial law enforcement resources to self-initiated drug enforcement actions in 2018. I understand that BLM continued in 2018 its past practice of conducting motor vehicle stops in conjunction with K9 narcotics dogs and handlers. From my years of experience as a criminal defense attorney in Nevada, I understand that the purpose of conducting traffic stops with a K9 team at the ready is to use the K9 to create probable cause to search vehicles for drugs. Thus, I believe that the vast majority of the motor vehicle stops of participants at the 2018 Event were likely pretexts for BLM to search for drugs.

2

Declaration of Marc P. Picker

AR11530

1      7.     BLM has admitted that it relies on motor vehicle stops to enforce drug laws.  I

2  reviewed the 2017 Declaration of BLM law enforcement ranger Rebecca Andres in which she

3  acknowledges that BLM self-initiates traffic stops to "uncover" drugs and "reduce the

4  potential for harm to members of the visiting public." (2017 Andres Declaration ¶ 24).

5  Ranger Andres states, "Part of the strategy was to use BLM K9 units as a tool for narcotic

6  detection.  During the 2017 event, 8 K9 units were deployed across the three shifts to further

7  the drug enforcement strategy." (*Id.* at ¶ 25.)

8      8.     To justify the high cost of deploying three shifts of K9s and their handlers,

9  Ranger Andres opines that "BLM's enforcement of controlled substance laws and regulations

10  is mandated by BLM policy." (2017 Andres Declaration ¶ 25.) Ranger Andres goes on to cite

11  "General Order 33," which directs BLM to "counter illegal drug activity on public lands by

12  aggressively seeking to detect and investigate drug activity." (*Id.*)

13      9.     In past BLM Answers, the agency defended its "drug enforcement strategy" as

14  a legitimate law enforcement priority.  That may be true, and BRC makes clear in the

15  Statement of Reasons that BRC is not attempting to direct BLM's operations.  But BLM's

16  general "drug enforcement strategy" to fight the social ills of drug use on the public lands is

17  not a reasonable cost to be imposed on an SRP applicant according to applicable statutes.

18     10.     Congress made it clear that agencies cannot use cost recovery to fund costs for

19  "management overhead" or the "benefit of the general public."  *See* 43 U.S.C. § 1734(b).

20  Costs which benefit the general public welfare, as opposed to conferring a private benefit on a

21  permittee, cannot be charged to a permittee under cost recover.  Thus, BLM cannot use cost

22  recovery to fund general public benefits that are beyond the scope of permit administration.

23     11.     Similarly, 43 CRF § 2932.31(e) limits cost recovery to "BLM's costs of issuing

24  the permit, including necessary environmental documentation, on-site monitoring,

25  and permit enforcement."  None of BLM's extensive drug enforcement through motor vehicle

26  stops in 2018 constituted "on site monitoring" or "permit enforcement."  BLM did not stop

27  motor vehicles to detect whether BRC was complying with its permit.  BLM admitted in the

28  past that it stopped vehicles in order to enforce drug laws against the public during their use of

AR11531

1     public lands. Such general drug enforcement is for "general public benefit" in furtherance of

2     BLM's general law enforcement objectives. As such, BLM drug enforcement costs are not

3     "reasonable" costs that may be collected under cost recovery, and these costs should be

4     refunded to BRC under 43 U.S.C. § 1734(b).

5         12.     I understand that BLM did not prepare an After Action Review for 2018 and

6     never told BRC how many law enforcement officers or K9 teams it actually used at the 2018

7     Event. It appears from BLM's 2018 Cost Recovery Decision and the attached labor summary

8     that BLM deployed 73 law enforcement officers and charged BRC $971,787 for law

9     enforcement staffing at the 2018 Event. And according to the Declaration of Roger Vind filed

10     herewith, BLM self-initiated 783 motor vehicle stops in 2018, representing almost 40% of all

11     law enforcement events, excluding "public contacts." Thus, BLM assigned substantial law

12     enforcement resources and officers, who devoted much of their time to enforcing drug

13     possession laws at the 2018 Event, only to then dismiss the drug related offenses after brief

14     negotiations pursuant to the agreed upon protocol which has been in place since 2010.

15

16        I declare under penalty of perjury under the laws of the United States of America that

17     the foregoing is true and correct. Executed this 26 day of June, 2019, at Reno, Nevada.

18

19                                             Marc P. Picker

20

21

22

23

24

25

26

27

28

David S. Levin (CA Bar No. 156336)
LEVIN LAW FIRM
405 Sherman Ave
Palo Alto, CA 94306-1827
Telephone: (650) 858-8500
david@levinlawfirm.com
Attorneys for Appellant,
Black Rock City LLC

## UNITED STATES DEPARTMENT OF INTERIOR
## INTERIOR BOARD OF LAND APPEALS

| | |
|---|---|
| BLACK ROCK CITY LLC, | Case Identification No.: IBLA-2019-0109 |
| Appellant, | Special Recreation Permit<br>LLNVW03500-18-01 |
| v. | 2930 (NV030.10) |
| BUREAU OF LAND MANAGEMENT, | **Declaration of Roger Vind In Support of Appeal** |
| Appellee. | |

I, Roger Vind, declare as follows:

1.      I am over 18 years old, of sound mind, and capable of making this declaration.

Since March 2014, I have been working for appellant Black Rock City LLC ("BRC") as Law

Enforcement Advisor.  My duties include representing BRC in official planning meetings with

both the U.S. Bureau of Land Management ("BLM") and the Pershing County Sheriff's Office

("PCSO"") about public health and safety at the Burning Man event (""Burning Man" or the

"Event").  I have personal knowledge of the facts set forth herein, or if so stated, I am informed

1

AR11533

and believe of their truth and accuracy and, if called to testify, I could and would do so competently and under oath to the following.

2.      I have 25 years of experience working in law enforcement. I joined the Nevada Highway Patrol ("NHP") on October 10, 1988.  I retired from the NHP on October 10, 2013, holding the rank of Lieutenant.

3.      From 2003 to 2005, and again from 2007 to 2010, I oversaw NHP's law enforcement of the traffic going into and out of the Event.  During this time, I was also the official liaison from NHP who cooperated with both BLM and BRC on public health and safety issues of the Event.

4.      In prior years, BLM has prepared and provided BRC with an After Action Review ("AAR") which contained some information about BLM's administration of BRC's Special Recreation Permit ("SRP").  True and correct copies of BLM's 2017 AAR and excerpts of BLM's 2015 AAR (with highlighting added for clarity) are attached hereto as **Exhibit A** and **Exhibit B,** respectively.  Without explanation, BLM failed to prepare an AAR following the 2018 Event or provide any other formal reporting about BLM's operations at or in connection with the 2018 Event.  Instead BLM limited its assessment of the 2018 Event to BRC's compliance with BLM's restrictions in an SRP Annual Evaluation, which was issued in draft form by Field Manager Hall in December 2018 and never finalized.  BLM's decision not to provide an AAR left BRC with substantially less information about BLM's costs in 2018 than in years past.  BRC received no substantive explanation for why BLM personnel logged 22,310 hours on the 2018 SRP at a total cost to BRC of $1,527,140, beyond the six-page labor summary spreadsheet appended to BLM's 2018 Cost Recovery Decision.  From its review of the labor

<div align="center">2</div>

summary, BRC believes that BLM assigned 73 law enforcement officers and charged BRC $971,787 for law enforcement staffing.  (See Benson Decl. Ex. H).

5.       In addition to BLM's law enforcement operations, BRC separately contracts with the local sheriff's office to provide law enforcement services at the Burning Man Event each year.  Pershing County Sheriff's Office ("PCSO") deputies are on site at the Event to enforce Nevada laws, including those relating to motor vehicle operation and controlled substances.

6.       Following the 2018 Event, BLM provided BRC with a summary of the data captured by its computer assisted dispatch ("CAD") system.  I am informed and believe that the CAD system data recorded BLM's 2018 Event operations over a 17-day period covering the eight-day Event, six days pre-Event, and three days post-Event.  A true and correct copy of BLM's "2018 Burning Man - Statistical Summary" is attached hereto as **Exhibit C.**  The summary reflects a total of 3,205 "law enforcement events" during BLM's 2018 Event operations.

7.       BLM's Statistical Summary (Exhibit C) also reflects the number of law enforcement citations BLM issued in 2018 according to the category of infraction.  I am informed and believe that the citation data is drawn from the Department of the Interior's Incident Management, Analysis and Reporting System ("IMARS") for BLM's 2018 Event operations.

8.       According to the Statistical Summary, BLM issued 433 citations in 2018.  This represents a slight increase over the 413 citations issued in 2017, which appears to be attributable to a new category of law enforcement infraction that BLM began issuing in 2018: "Fuel Storage" violation.  If the 40 BLM citations for improper fuel storage are subtracted, the number

3

of 2018 citations drops to 393. My understanding is that "Fuel Storage" is an environmental compliance infraction not traditionally considered to be a violation of criminal or motor vehicle laws. BLM 2018 IMARS data reflects two additional environmental compliance-related citation categories: "Waste Water" (38 citations) and "Depositing Human Waste" (88 citations). If these additional environmental compliance-related citations are subtracted, the number of 2018 BLM law enforcement citations drops to 267.

9.      The declining number BLM-issued citations, particularly citations regarding crimes against persons and property, is matched by a similar decrease in citations issued at the Event by state law enforcement officers. In 2015 and 2016, PCSO issued 241 and 252 citations, respectively, for violations of state law. In 2017, the number of state law citations dropped to 124. In 2018, the number dropped further to only 85 state law citations issued by PCSO. PSCO made 44 arrests at the 2018 Event. The vast majority of those arrests were drug-related. Only five of the arrests were for assault/battery and only three arrests were for domestic violence. PCSO made no arrests for sexual assault. I have reviewed arrest statistics for past Events from data as reported by PCSO. These statistics show an extremely low incidence of person-on-person crime at the Event, despite substantial increases in law enforcement staffing and costs during this time period. The following table summarizes the arrests for person-on-person crimes at the last eight Burning Man Events:

4

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016[1] | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|
| Assault with deadly weapon | | | | | 1 | 1 | 0 | 1 |
| Battery | 1 | 2 | | | 3 | 4 | 2 | 1 |
| Battery on a peace officer | | | | | 1 | 2 | 3 | 0 |
| Domestic battery/assault | 3 | 4 | 3 | 2 | 2 | 2 | 5 | 3 |
| Sexual assault | | 1 | 1 | 1 | | 1 | 2 | 0 |

10.     Based on the information BLM has reported to BRC for the 2014 through 2018 Events, I have prepared a spreadsheet that summarizes BLM's "law enforcement events" collected from CAD data and BLM citations recorded in IMARS. The citations are also broken down by infraction type as reported by BLM. A true and correct copy of this summary is attached hereto as **Exhibit D**.

11.     According to BLM's Statistical Summaries and the CAD data I have reviewed, the most commonly occurring "law enforcement event" in 2018 (as in 2015 through 2017) was "public contacts." In 2018, BLM recorded 1,218 "public contacts." BLM Supervisory Law Enforcement Ranger Logan Briscoe explained to me that "public contacts" are instances when BLM law enforcement officers make a contact with a member of the general public. For example, when an Event participant asks a law enforcement officer for directions to the porta-potties, he or she records the encounter as a "public contact." Based on my professional

---

[1] Nine individuals were arrested for commission of a person-on-person crime at the 2016 event, one of whom was charged with two such offenses.

5

AR11537

experience, the fact that law enforcement officers are able to spend so much of their time engaging in and recording these activities year after year is evidence that BLM has more officers at the Event than needed. If the 1,218 "public contacts" are subtracted, the total number of "law enforcement events" at the 2018 Event is drops to 1,987.

12.     I am informed and believe that BLM law enforcement officers spend numerous hours at their "substation" inside the Event interacting with the public in an outreach or public relations capacity. In 2018, I understand that BLM law enforcement officers stood in front of the "substation" handing out BLM logo swag, such as bandanas, to Event participants. I cannot tell from the CAD data whether any of these marketing giveaways were counted as "public contacts." Again, based on my professional experience, BLM's ability to staff the "substation" with law enforcement officers to hand out BLM merchandise indicates that BLM has more officers at the Event than needed.

13.     BLM's 2018 labor summary reflects 143 hours and $15,176 in charges for OPR Special Agent Vanairsdale. "OPR" is a reference to the Office of Professional Responsibility ("OPR") within BLM's Office of Law Enforcement and Security ("OLES"). Agent Vanairsdale duties are listed as "OPR function officer, event on-site Internal Affairs component and Use of Force reports." I am informed and believe that Agent Vanairsdale conducted onsite internal affairs investigations and liability assessments related to alleged misconduct by BLM law enforcement personnel, including proper or improper use of force. In my professional opinion, these are "management overhead" functions that are not "reasonable" costs under federal cost recovery regulations.

6

14.     Based on my professional experience, K9 units are typically used by law enforcement agencies when there is known or suspected trafficking of narcotics. But over the last four Burning Man Events, I am informed and believe that BLM has issued a total of two citations (both in 2015) for trafficking in a controlled substance. Given these low numbers of trafficking citations, and based on my professional experience, BLM's use of K9 units at Burning Man exceeds the reasonable requirements of the Event.

15.     BLM's law enforcement Statistical Summaries consistently report very few citations for property crimes and crimes of violence against people. Based on my professional experience, the number of BLM law enforcement officers at Burning Man and the number of hours they work are not justified in light of the very low number of property and violence crimes that have occurred at the Event over its long history.

16.     Based on my observations, BLM is not adequately taking into consideration the thousands of professional BRC staff, volunteers, and contractors in assessing how many law enforcement officers are needed for the Burning Man Event. In my professional opinion, BRC's public health and safety staff are a significant force multiplier. In the law enforcement realm, a force multiplier is anything that multiplies the overall effectiveness of law enforcement to promote public health and safety.

17.     I am informed and believe that BLM continued to use satellite tracking devices to identify the precise location of BLM personnel within the 2018 Event site at any given time, and that BLM distributed a number of these tracking devices to PCSO in 2018 for the tracking of its deputies. I am further informed and believe that BLM required BRC to purchase these tracking devices in 2013 and has charged BRC more than $50,000 each year through cost recovery for

7

AR11539

associated service, software upgrades, air time, and support, such that BRC has paid more than $300,000 in connection with these devices since 2013.

18.     Based on my knowledge and experience, these satellite trackers are not necessary equipment for law enforcement operations at the Event. Moreover, I am informed and believe that many BLM law enforcement officers do not even know how to use the tracking equipment issued to them. I understand that all BLM employees and PCSO deputies have radios with which to communicate their location and circumstances to each other and to dispatch personnel. Law enforcement personnel also work in pairs at the Event for personal safety reasons and to enable one officer to radio a location if his or her partner is otherwise engaged.

19.     Another unnecessary and unreasonable BLM expense is a camera operating 24/7 at the law enforcement "substation." From discussions I have had with BLM law enforcement representatives, I understand that the camera is not regularly monitored by personnel in the Joint Operations Command center and that, due to the dusty conditions of the Event site, clear imagery from the substation's camera is only available some of the time. I am aware of no instances when this monitoring equipment proved useful for any purpose.

20.     Similarly, in 2018, BLM again required BRC to construct and maintain a temporary holding facility at the Joint Operations Command Center ("JOC"). The holding facility, however, is used exclusively by PCSO to temporarily hold people under arrest by Pershing County before they are transported to PCSO's headquarters in Lovelock, Nevada, for booking. I am further informed and believe that this temporary holding facility, which is about 12x40 feet in size, is staffed 24 hours a day by PCSO personnel. To the best of my knowledge, BLM never detained anyone in the temporary holding facility in 2018, or in 2017 or 2016.

8

21.     I understand that the requirements in BLM's 2018 contract with High Desert Internet Services included cellular telephone service, as well as 20 voice-over IP ("VOiP") telephone lines and associated equipment. I understand that BLM has never used all VOiP lines at one time. I am informed and believe that BLM personnel generally use their cell phones to place and receive calls at the Event.

22.     I am informed and believe that in 2018, BLM again required BRC to construct, at BRC's expense outside of cost recovery, a shade structure beside the JOC so that the K9 agents could park their air-conditioned vehicles beneath it.

23.     In 2018, BLM changed how it recorded the status of its on-duty law enforcement officers in its CAD system. Prior to 2018, BLM dispatchers tracked on-duty officers according to three basic status categories: i) "Available" for service calls; ii) "Dispatched" or "Enroute" to a service call; and, iii) "At Scene" of a service call. In its 2016 and 2017 Appeals to this Board, BRC highlighted how BLM law enforcement officers, according to BLM's own CAD data, spent approximately two-thirds of their time idling in "Available" status, which was grossly inefficient and proof of over-staffing.

24.     Apparently embarrassed by CAD data reporting that its officers were idle most of the time, BLM deleted the "Available" status from its CAD system in 2018. Instead of making substantive changes to address law enforcement over-staffing, BLM simply changed the optics. Starting in 2018, BLM created a new CAD status category: "Engaged." An officer assigned to patrol the 2018 Event was reported in CAD as "Engaged" when he or she would previously have been reported as "Available." The officer's true status did not change: he or she was still simply driving around the Event, waiting and "available" to respond to a service call.

9

25.     Despite changing the optics, BLM's 2018 CAD data showed that BLM law enforcement officers continued to spend approximately two-thirds of their time waiting and "available" for a service call, while spending only one-third of their time on an actual call for service.  To reach this conclusion, I reviewed the total amount of time BLM's CAD system reported officers "At Scene" on a service call.  BLM law enforcement officers spent 3,413 total hours "At Scene" on service calls in 2018, which is comparable to the 3,366 hours spent "At Scene" in 2016.  In 2017, however, the number of "At Scene" hours reflected in the CAD data was somewhat lower:  2090 hours.

26.     Such staffing utilization rates by BLM are grossly inefficient according to national law enforcement standards.  The law enforcement staffing model taught by the Northwestern University Police Staff and Command School, as a matter of best practices nationwide, provides that law enforcement agencies are efficiently staffed when 25% to 30% of their units are available for service calls, and 70% to 75% of their units are on service calls.

27.     According to BLM's 2018 CAD data, BLM achieved the opposite ratio with its law enforcement staffing at the 2016 through 2018 Events.  On average, approximately two-thirds of its officers were available, and only one-third were engaged in service calls ("AtScene," "Dispatched," or "EnRoute").  Furthermore, I understand that this engagement percentage included the 783 traffic stops initiated by BLM officers in 2018.  Law enforcement industry standard does not consider a traffic stop to be a call for service; rather, it is a self-initiated activity.  So the actual call for service demand for BLM law enforcement appears to be much less than one-third of the time.  The data indicate that BLM is continually overstaffing Burning Man with law enforcement officers.

AR11542

28.    Attached hereto as **Exhibit E** is a true and correct copy of an excerpt from the 2015 Nevada Department of Public Safety's Uniform Crime Reporting Report. The Report summarizes the levels and frequency of crimes committed generally in the State of Nevada. A comparison between the number of crimes committed at the Event, particularly violent crime as summarized in paragraphs 8 and 9 above, and crime levels in the State of Nevada confirms that there is less crime committed at the Event than in the state generally.

29.    I reviewed BLM's 2017 Answer at 18:10-12 and supporting Declarations, which state that BLM bases its law enforcement staffing levels for the Event on population ratios "in accordance with the recommendations of the International Association of Chiefs of Police (IACP)." (2017 Declaration of Rebecca Andres ¶ 14.) From my years of experience in law enforcement leadership, I know that the population-to-officer ratio is a poor metric on which to base staffing levels. In fact the IACP's own publications plainly state, "Ready-made, universally applicable patrol staffing standards do not exist. Ratios, such as officers-per-thousand population, are totally inappropriate as a basis for staffing decisions." A true and correct copy of current IACP material from its website is attached hereto as **Exhibit F.**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 27th day of June, 2019, at Sparks, Nevada.

Roger Vind

11

https://mail.google.com/mail/u/0/#inbox/CllgCHrgmVXwwBBxqFHNDhDRDbZWnvdVLlcQCxLtrgNvtrvDnjHXfrlhDVLrfHCfClcDTqNVvTL?projector=1&amp;     1/1

Exhibit " $\underline{A}$ "

Exhibit " $A$ "
AR11544

# Bureau of Land Management

# Winnemucca District – Black Rock Field Office



# 2017 Burning Man After Action Review

1

AR11545

**BLM**
**AFTER ACTION REVIEW**
**2017 BURNING MAN EVENT**

## Introduction

The Burning Man Event is a Bureau of Land Management (BLM) Special Recreation Permit (SRP) permitted gathering of participants who engage in an "experiment in temporary community dedicated to radical self-expression and self-reliance". Burning Man is the largest and most complicated special recreation event on BLM administered lands. The event is produced by the permittee, Black Rock City, LLC (BRC).

Since 1990, the event has been held annually in the Black Rock Desert – High Rock Canyon – Emigrant Trails National Conservation Area within the Winnemucca District's Black Rock Field Office (BRFO). The Black Rock Desert is a remote rural area approximately two hours from the nearest city. During the week preceding Labor Day, participants convene to create Black Rock City. During the event, the city becomes the eighth largest city in Nevada. In 2017, the event reached a peak participant population of 69,493, on Friday, September 1, 2017, at approximately 12 noon. BRC staff numbers reached approximately 10,000. This resulted in a total population of approximately 79,500 bodies on the playa during the event at the population peak.

This document serves as the After Action Review (AAR) of the event operations of the BLM and other cooperators and aspects of event production by BRC. The items documented in this AAR will be considered in the planning of the 2018 event.

## 2017 BLM Event Planning

The BLM's 2017 planning team was approved by the Nevada State Director in January 2017, at which time the planning began in conjunction with the 2017 BRC and Pershing County Sheriff's Office (PCSO) planning teams  The BLM's team consisted of  the Acting Black Rock Field Office Manager, who also served as the Authorizing Official (AO) for the event SRP; a BRFO planning coordinator, the Zone 1 Supervisory Law Enforcement Ranger, the Zone 1 Staff Law Enforcement Ranger, the BRFO SRP Project Manager, the Nevada State Office (NSO) Communications Lead, a NSO event contracting officer, a Carson City District Office (CCDO) finance lead, the Nevada State Chief Ranger, and an Office of Law Enforcement and Security (OLES) employee who served as the technology lead. Most of the planning team members held operational positions during the execution of the event operations.

At the start of the 2017 planning phase, in furtherance of capturing all planning costs in the SRP Cost Recovery Agreement (CRA), the CRA was executed in two phases. The first phase being the initiation of the CRA with the BLM's estimated planning costs, and the second phase being the final overall CRA that encompassed the BLM's operational costs. This resulted in funding

2

the event CR account earlier which ensured the planning team labor expenses were covered by the event CRA.

The BLM planning team initiated planning for the 2017 event by reviewing the BLM's 2016 event Operational Plan, the 2016 After Action Review document and the 2016 Contracting Plan. Multiple discussions between BLM and BRC were conducted on respective roles and responsibilities. Following the reviews and discussions, the 2017 BLM planning team developed the following components of the 2017 Operational Plan:

## 2017 BLM Planned Event Table of Organization (TO):

The 2017 BLM planned event operation consisted of the following 136 positions: Seven positions in event management, Fifty-three positions in the Civilian Operations and seventy-six positions in the Law Enforcement Operations.

Event Management Positions (7):
- Authorized Officer
- Incident Commander
- Civilian Operations Chief
- LE Operations Chief
- Deputy LE Operations Chief
- Public Information Officer
- Administration Assistant

Civilian Operations Positions (53):
- Communications Chief
- Communications Unit Leader
- 5 Communication Technicians (1 Pre & Post Only)
- IT Equipment Specialist
- IT Security Specialist
- GIS Coordinator
- 3 IMARS Coordinators (1 Part-Time, Off-Site)
- Dispatch Center Manager
- 17 Contract Dispatchers
- Compliance Supervisor
- 3 Environmental Compliance (1 Pre & Post Only)
- 2 Vending Compliance (1 Pre & Post Only)
- Logistic Supervisor
- 4 Logistic Specialist (1 Part-time, Off-Site Runner)
- Safety Officer

3

- 5 Contract CAD Technicians (2 Pre & Post Only)
- 5 Contract Network Technicians (2 Pre & Post Only)

Law Enforcement Operations Positions (76):
- 2 Patrol Operations Chiefs
- 3 Patrol Commanders
- 6 Shift Supervisors
- 45 Patrol Officers (Includes 4 USFS Officers on IAA)
- Investigative Chief
- 6 Investigative Support Investigators
- 6 Integrated Investigators
- OPR Investigator
- 2 Evidence Technicians
- Medical Team Leader
- 3 Tactical Medics (Includes 2 HHS Medics on IAA)

The planned TO resulted in 103 positions funded by CRA Labor Detail, 27 positions funded by CRA Contracting, 6 positions funded by CRA Interagency Agreements (IAA).

## 2017 BLM Planned Event Contracting Plan:

Each year the BLM planning team must identify what support contracts will be needed to conduct the BLM event operation and decided whether the contracted services are obtained as a government contract or through the Memorandum of Understanding (MOU) with BRC. The 2017 event contracting plan consisted of ten (10) contracts presented to BRC through MOU and five (5) contracts retained by BLM as government contracts. The BLM planning team prepared the statements of work (SOW) for both the MOU and government contracts  BRC accepted nine of the ten support contracts offered by the BLM planning team:

- Joint Operation Center (JOC) compound build-out and services contract
- IT Equipment Rental contract
- Fueling services contract
- Meal Services contract (including ice and bottled drinks)
- Lodging contract
- UTV/Golf Cart Rental contract
- Computer Aided Dispatch (CAD) services contract
- Dispatch services contract
- Microwave internet bandwidth purchase contract

4

The substation build-out & services contract was refused by BRC and therefore resulted in BLM issuing two government contracts for electricity and portable toilet rental/services for the LE Substation.

The 5 support contracts retained by the BLM planning team for government contracting were:

- CAD Server(s) purchase (replace outdated servers)
- Radio repeater purchase (replace analog with digital)
- Dispatch CAD server licensing contract
- Satellite tracking services contract (Delorme Trackers)
- Network services contract

Additional components of the 2017 BLM operation developed by the planning team:

- 2017 JOC compound design
- 2017 permit stipulations
- 2017 Event Closure Order and Restrictions
- 2017 Event Environmental Compliance Protocols
- 2017 Event Vending Compliance Protocols
- 2017 Incident Action Plan (IAP)
- 2017 LE Operational Plan
- Review of BRC Operations Plans
- Issuance of the Special Recreation Permit (SRP) and Determination of NEPA Adequacy (DNA)
- Vending DNA.

## 2017 BLM Event Operations

The following section will speak to the configurations and duties of the 2017 BLM operational divisions. It will also document any changes from initial BLM event operations planning. At the end of the 2017 event, each operational division lead was asked to evaluate their program and submit internal recommendations for consideration/evaluation by the 2018 planning team. Recommendations will be determined to have merit by the 2018 planning team and will be forwarded to the AO for discussed with the affected cooperators during the 2018 planning phase.

### 2017 ICS Management Team (7 Positions):

Two BLM event management team changes occurred in 2017. The Incident Commander (IC) and AO positions were separated. Additionally, a Staff Law Enforcement Ranger position was created to serve as the law enforcement project manager for the event; the position also served as

5

AR11549

the Deputy Law Enforcement Branch Chief during the event. These changes resulted in seven (7) positions in the BLM's ICS Event Team.

2017 Civilian Operations (53 Positions)

The 2017 Civilian Operation was supervised by the Civilian Operations Chief. It was divided into four programs (Safety, Communications, Compliance, and Logistics).

1. Safety (1 Position)

One BLM safety officer was assigned to work with BRC's safety and ESD staff in order to evaluate, identify, and remediate safety issues during the event. In addition, the safety officer monitored BRC and participant compliance with safety regulations and stipulations. The BLM safety officer also ensured the safety of the BLM's operation, including the Joint Operations Center (JOC). This was the third year BLM assigned a safety officer to the event.

2. Communications (41 Positions)

The Communication division consisted of a program Chief, a radio Communications Lead, an IT security specialist, an IT equipment specialist, a dispatch center manager, a GIS Specialist, 2 IMARS coordinators, 1 off-site IMARS reviewer, 5 radio communication technicians, 17 contract dispatchers, 5 contract CAD technicians and 5 contract Network technicians. New to the 2017 event, the IT equipment specialist, GIS specialist, and all 27 contracted positions reported directly to the communication chief in order to streamline the communications program. The following breakdown lists specific functions provided by each division of the communication program:

Radio Network & Equipment

The BLM radio program consisted of one lead and 5 technicians (one of which was used for set-up and break-down only).

IT Security

The BLM's IT Security program was coordinated by the event IT security specialist; the IT equipment specialist assisted as needed.

6

IT Equipment Specialist

> The IT equipment program consisted of two parts: oversight and accounting of the BRC MOU rental contract items and installation and service of said equipment.

GIS

> The BLM's GIS function was provided by a single GIS specialist. This was a result of BRC performing some of the GIS-related tasks associated with collecting and processing information related to environmental and vending compliance issues discovered during the event

IMARS

> The Incident Management and Reporting System (IMARS) is utilized by the BLM as the official law enforcement reporting system. Two IMARS support technicians were utilized during the event to provide 24-hour, on-playa IMARS support to BLM officers. A third IMARS position, located off-site, functioned as a reviewer to ensure reports were documented in accordance with the event protocols.

CAD Program

> In 2017, BRC accepted the CAD Services contract through the MOU, selecting iNET Public Safety for both the BRC and BLM CAD provider (same provider as 2016). iNET provided 5 technicians (3 full time and 2 for set-up and break-down).

Dispatch Contract

> In 2017 BRC accepted dispatch services as an MOU contract. LE Temporary Placement Services (LETPS) was BLM's preferred vendor based on acceptable service the previous three years. LETPS was selected as the dispatch provider for the 2017 event. A total of 15 dispatchers (divided into three shifts of 5) were required, in addition to two assistant center managers.

7

AR11551

### Microwave Internet Network Services Contract

In 2017, the Microwave Internet Network Services program was contracted by government contract through an open and competitive bid process. High Desert was selected as a first-time contractor. In addition, BRC selected High Desert under the MOU to provide bandwidth both for BRC and BLM. High Desert provided 5 technicians (3 full time and 2 for set-up and break-down).

### Other Communications Division Contracts

The communications division procured additional equipment and/or services through government contracts. This included purchase of an updated CAD servers; purchase of a digital repeater (to replace analog repeater); the CAD server licensing fee; and the satellite tracking services contract for the Delorme trackers.

## 3. Compliance Division (6 Positions)

In 2017, the Compliance division was streamlined to include a supervisor, 3 environmental compliance team members (1 for Pre & Post only) and 2 vending compliance team members (1 for Pre & Post only). This reduction resulted from a planning discussion between BLM and BRC whereas BRC requested to take the lead in identifying and remediating environmental and vending issues, reducing BLM's role to monitoring BRC's performance. BLM and BRC worked together to modify the event's environmental and vending protocols to reflect the change as part of the BRC Operation Plan and BLM's Incident Action Plan (IAP).

### Environmental Compliance

The BLM's environmental compliance monitoring team was staffed by 3 BLM specialists, one being Pre & Post only. The team successfully coordinated with BRC's environmental compliance teams in identifying and remediating concerns. The combination of the Earth Guardians, Playa Restoration, Black Rock Rangers, ESD, and Hazmat worked out very well Direct radio communication with BRC's compliance teams coupled with BRC's immediate response to environmental issues, the program resulted in excellent compliance and remediation during the event.

8

AR11552

### Vending/Commercial Compliance

The BLM vendor compliance monitoring team was staffed by 2 BLM specialists, one being Pre & Post only. The BLM vending team coordinated with BRC's Outside Services (OSS) department to ensure commercial operators maintained all necessary BLM and BRC authorizations. The majority of the issues were identified at Point One, the vendor access point.

At Point One, OSS staff stopped vendors, checked for credentials, and issued equipment stickers. OSS and BLM made contact with the majority of vendors by Friday, August 25, 2017.

### 4. Logistics Division (5 Positions)

The logistics division consisted of a logistic lead, two day shift personnel, one night shift personnel, and an off-site logistic runner. Two members of the team arrived on August 14th with the two additional team members arriving one week later on August 21st. The first two employees spent the first week setting up modular office buildings, outside trash facilities, and transporting items from Black Rock Station (BRS) to the Joint Operation Center (JOC). For the remainder of the first week, the employees finished setting up the JOC.

This was the second year for the off-site runner, which again proved to be a very effective way to save travel time for procurement and delivery of off-site items required for BLM's event operation.

The general breakdown and packaging procedure went smoothly, and all items were returned to Black Rock Station cleaned, organized, and inventoried for future years. The two connex boxes procured several years ago are still serving as the storage location for the items in the off-season.

## 2017 Law Enforcement Operations (76 Positions)

The 2017 law enforcement operational component was divided among three divisions: Uniformed Patrol, Investigations, and Medical. Law enforcement event orientation remained in 2017 to ensure objectives, protocols, and expectations for the event were clearly demonstrated and understood; an emphasis was placed on professionalism. The orientation occurred Friday, August 25, 2017 and consisted of an operational overview, legal updates from the Assistant United States Attorney's Office and Pershing County District Attorney's Office, overview of BRC operations from BRC's Law Enforcement advisor, an Office of Professional Responsibility (OPR) presentation, followed by JOC orientation covering event specific protocols and

AR11553

procedures. With this orientation occurring on Friday, main event patrol operations began Saturday during the early arrival influx.

1. Uniformed Patrol Division (56 Positions)

The uniformed patrol division consisted of 2 Patrol Chiefs (day/night), 3 Patrol Commanders, 6 Shift Supervisors, and 45 Patrol Officers. Three officers assigned to the event were demobilized for a variety of reasons and only one could be replaced, leaving the event staffed with 43 patrol officers by Monday, August 28, 2017. A total of 9 K9 teams were assigned to the event. All K9 teams were certified by the District Court Judge for Pershing County prior to the event to further Unified Command's mission. One of the K9 teams was demobilized from the event, leaving swing shift with just 2 K9 teams.

The uniformed patrol division operated during three event phases:

Pre-Event (August 22 – August 25, 2017) (11 Officers): 5 officers were assigned to a 13-hour day shift and 6 officers were assigned to a 13-hour night shift. Each shift had a shift supervisor.

Main Event (August 26 – September 3, 2017) (53 Officers). 17 officers were assigned to one of three overlapping 13-hour shifts (day, swing, and night). Each shift had a patrol commander and two supervisors. During the main event, there were two patrol operations chiefs assigned to day and night overlapping shifts.

Post-Event (September 4 – September 7, 2017) (10 Officers): 5 officers were assigned to one of two 13-hour shifts. Each shift had a shift supervisor. In direct response to the decline of the city population, the total number of officers was reduced accordingly throughout the post-event period

BLM law enforcement staffed a law enforcement substation at "5:15 and Esplanade". The station was staffed by at least one BLM law enforcement officer 24 hours a day during the main event. The presence of the station allowed BLM to provide LE presence at a predictable location during the event for participants to ask questions, receive information, and report illegal activity directly to law enforcement. Several participants in an altered mental state stayed at the substation for a duration of time until they were comfortable leaving, indicating they only felt at ease around law enforcement at the substation.

10

Law Enforcement Outreach Ranger

One BLM law enforcement ranger served in an outreach role as a direct point of contact between event participants and BLM law enforcement for questions about BLM's law enforcement program. This position was funded by the Black Rock Field Office and was not on the planned TO or in the operational numbers for this document. As such, the expenses were not funded by the CRA.

The outreach ranger made 1,112 public contacts from August 26 – September 3, 2017, spreading information about the National Conservation Area, recreation, cultural resources, and BLM Law Enforcement to participants. The ranger outreach program was considered a success by the BLM and will be carried forward in 2018, funded by BLM.

2. Investigative Division (16 Positions)

The investigative division reported to the investigations chief. The chief provided supervision over 4 subdivisions: Investigative Support (uniformed patrol), Integrated Investigations, Office of Professional Responsibility (OPR), and Evidence. This division provided coverage August 26 – September 3, with the exception of evidence. One evidence technician provided coverage pre (August 23 – 25) and post (September 4 – 6, 2017) event.

Investigative Support (6 positions)

Six uniformed investigators worked directly for their respective patrol commanders. There were 2 investigators assigned to each of the three main event shifts  These teams were utilized to investigate complex violations of federal laws, such as SRP violations.

Integrated Investigations (6 positions)

Six investigators worked directly with the Pershing County Sheriff's Office under Integrated Command. A total of 9 investigators (3 PCSO detectives and 6 BLM investigators) were split into three shifts (day, swing, and night) to ensure 24-hour coverage. Their primary duties involved investigating complex or felony level state and federal cases. Due to PCSO staffing limitations, some BLM investigators conducted initial investigations involving person on person crimes without PCSO support.

AR11555

Integrated Investigators assisted with assault cases, weapons cases, a serious medical, multiple missing juveniles, and an ongoing drug case referred to another federal agency as well as public assists and contacts. The units also supported multiple sexual assault investigations.

<u>OPR Program (1 position)</u>

The OPR program is the internal affairs function for the BLM. Due to the reporting and review requirements of BLM's Use of Force (UOF) policy, coupled with the numerous UOF incidents during the event, this position reviewed UOF reports for completeness while ensuring applications of force were being applied within policy. In addition, OPR investigated reports of misconduct by BLM law enforcement staff.

<u>Evidence (2 positions)</u>

The Evidence program consisted of 2 evidence technicians, one sworn and one unsworn, to provide nearly 24-hour coverage. In addition to processing evidence, the evidence technicians compiled and organized all BLM case documentation for prosecutors and case agents.

3   <u>Medical Division (4 positions)</u>

The 2017 BLM medical unit was operational during the main event. For the 6th year, BLM contracted with the U.S. Department of Health and Human Services (DHHS) Center for Tactical Medicine (CTM) to provide medical care for federal employees working the event. The unit consisted of a BLM medical unit lead and 3 tactical medics.

Two of the tactical medics were from DHHS CTM, and two were from the BLM. The program treated 195 humans and 9 K9s, saving an estimated minimum of 136 work hours in preventative care. Office of Workman's Compensation paperwork was initiated onsite, providing efficiencies in care.

Medical assistance included sinus infection, gastrointestinal illness, heat mitigation for humans and K9s, one case of officer exposure to controlled substance, and prescription medication administered.

12

## 2017 Integrated Command

During the 2017 event, the BLM and PCSO operated under an integrated command structure. The Integrated Command model was a success in a seamless transition of cases between agencies. Integrated patrols increased efficiencies in operations and allowed for case resolution as quickly as possible. In 2017, as in 2016, the PCSO program at the event was understaffed resulting again in more BLM law enforcement officers at the event to assist in PCSO cases involving person on person crimes. In the patrol division, there were approximately three times more BLM officers than PCSO (53 BLM, 19 PCSO) working the event. In the integrated investigations unit, there were twice as many BLM investigators compared to PCSO investigators (6 BLM, 3 PCSO). This disparity in numbers was even more problematic in integrated investigations because BLM officers have limited training in investigating person on person crimes falling under the Nevada Revised Statute (NRS). BLM officers are only able to conduct a basic preliminary investigation until a PCSO investigator arrives   PCSO needs appropriate staffing to fully investigate person on person crimes from start to finish to reduce .impacts on victims and witnesses of these sensitive crimes. Adequate PCSO staffing would allow BLM investigators to focus on federal violations.

As also stated in the BLM's 2016 AAR, the responsibility to ensure an effective law enforcement and public health and safety program exists during the Burning Man event lies with the BLM because the Burning Man event is held on federal public lands administered by the BLM under the SRP program. The BLM SRP administration responsibility creates fundamental liabilities to the government. Federal public lands administered by the BLM is proprietary jurisdiction, which means the state and local law enforcement agencies, PCSO, also have the authority and responsibility for ensuring public safety. PCSO is the lead investigating agency for person on person crimes, including but not limited to domestic violence, assault and battery, theft, sexual assaults, and missing juveniles. BLM must ensure affected state and/or local law enforcement agencies are involved in the event of response and investigation into person on person crimes, whether they are integrated with BLM's LE Operation or not.

PCSO needs to be afforded the opportunity to increase staffing in the patrol and investigative programs at the event to fulfill both agencies obligations to event participants and to respond to respective jurisdictional obligations in a timely manner. BLM, as the permitter of the event, has a responsibility to ensure adequate staffing is obtained and encourages BRC to make sufficient funds available to PCSO allowing for adequate staffing. BLM's planning team cannot make final decisions on BLM law enforcement staffing for the 2018 event until PCSO is able to determine if BRC provided funds adequately staff the PCSO program. BLM acknowledges this falls under a settlement agreement between Pershing County and BRC. Regardless of BLM and PCSO's unified command structure, BLM and PCSO will continue to jointly plan event law enforcement operations at the event. BLM's primary concern is that PCSO is staffed at the

13

appropriate level to meet BLM's responsibility to ensure adequate public safety for all participants at the event.

## 2017 BRC Event Production

As per the SRP program, BRC submitted their 2017 Event Operations Plan to BLM during the planning phase of the 2017 event. The document was approximately 300 pages long and fairly comprehensive  BRC had approximately 37 programs involved in the production of the event. BRC deployed approximately 13 event departments to manage the event operations. All of the event production programs and departments were documented in the operational plan and reviewed by BLM. During the planning phase, BRC had a planning team that worked jointly with the BLM planning team. BRC's planning team consisted of representatives from the Event Operations desk (Director and/or Deputy Director), a representative from the Governmental Affairs desk and a BRC LE Liaison position. In addition, subject matter experts participated when needed on a given subject.

One of the underlying missions of the joint planning team is to decide the roles and responsibilities of each entity for the upcoming event. There were many early planning team discussions on roles and responsibility in 2017. These discussions resulted in changes reflected in BRC's 2017 Event Operations Plan. BLM needs more time in 2018 to review BRC's final operational plan pre-event.

On playa, most of these program departments' ran independently of BLM event operations. However, some of these program departments coordinate directly with or involve BLM event operations.

The following are comments on those BRC programs and departments that run independently of BLM event operations:

### BRC Medical Program (NES & BRC ESD)

This was the third year of BRC contracting National Event Services (NES), formerly known as Crowd Rx, as the event ALS provider. NES has proved to be an effective ALS provider to meet the demanding and complex medical needs of the event. Overall BLM believes that NES provided excellent medical coverage and incident reporting throughout the 2017 event for BRC and the event participants.

On one occasion, the BRC Medical air ambulance resources on playa for off-site patient transport were exhausted and additional resources were called in from Careflight, as outlined in the BRC Patient Transport Plan.

14

During pre-event, BLM asked BRC about the capacity of Rampart to handle a mass casualty incident.

BRC communicated Rampart had the capacity to handle medical events on the playa. Once during the event BRC required air resources in addition to onsite air ambulance resources to transport patients off playa. A patient in renal failure was bumped from the air medical evacuation for a patient experiencing cardiac arrest. In both cases, Careflight was called in to supplement contracted air ambulance resources. Careflight is listed in BRC's Operational Plan as a secondary air ambulance resource. The 2017 event had 53 off-site transports relative to 39 in 2016 and 26 in 2015.

Post-event there were two separate cases of individuals requiring mental health evaluation remaining at the event site and BRC staffing onsite required law enforcement assistance to resolve the incidents.

## BRC Media Program

During the event, BLM required commercial film permits for any entity that conducted commercial filming, photography, and other media productions at the event, as required by law. This was a new program instituted by the AO. BLM and BRC will need to work further to develop this program for future events. The development of the media management program is needed to ensure the Burning Man event and its media-related attendees are in compliance with the BLM's film permitting regulations for public lands.

## BRC Airport Operation

BLM believes that BRC provided excellent airport management throughout the 2017 event for BRC. Operations ran smoothly during the event with the continuing BRC airline program. During the event, a wildland fire enacted a Temporary Flight Restriction (TFR) south/southwest of the event. The aerial fire support staff reported three violations of the TFR forcing aerial fire support to ground aircraft for safety concerns. BLM and BRC attempted to ascertain if the TFR violations were related to event aircraft and were unable to confirm or deny where the TFR violations originated. The fire impacts delayed travel for participants and BLM recommends BRC implement a backup plan for air travelers moving forward.

15

AR11559

Because single charter flights are not covered by the SRP, nor the insurance, they could create problems and liabilities for BLM and BRC. BLM and BRC need to discuss potential solutions if these flights are allowed to continue in future events.

### BRC Gate/Exodus/Perimeter Operations

BLM believes that gate operations ran smoothly throughout the 2017 event for BRC and the event participants. Traffic was managed well and very few issues occurred during ingress or egress.

BLM law enforcement has concerns regarding gate inspections. An AR-15 was located by law enforcement in a motorhome after the motorhome gained entry to the event during build week. Law enforcement located firearms in vehicles on two other incidents during the event, to include a large amount of ammunition. It is challenging to understand why gate inspections do not result in referrals to law enforcement at the event

During another incident, an individual arrived at the main gate claiming they could not find their ticket and were a threat to themselves. BRC called law enforcement and rangers responded to speak with the individual. The individual was in distress but made no statements regarding harming themselves while in the presence of law enforcement. Law enforcement cleared the scene and was called back. BRC denied the individual mental health services, available inside the event, simply because the individual could not locate their ticket. BRC did dispatch ESD to the gate in an attempt to assist  This delay prolonged the exposure of all involved and created undue risk. The individual eventually located a ticket and was treated by ESD within the event.

Three known incidents occurred (one each during pre-event, main event, and post-event) where BRC perimeter units chased vehicles off playa and into Empire, NV, onto County Road 34, and into Gerlach, NV. This behavior is unacceptable and creates safety concerns for all involved. In the incident involving County Road 34, a BRC employee chased a PCSO employee off playa, drove erratically onto County Road 34, passing other vehicles on the unpaved shoulder before eventually placing the BRC vehicle in the path of the PCSO employee's vehicle. The BRC employee giving chase did not possess a valid driver's license. BRC rectified the incident occurring on CR34 by removing the perimeter unit from service. The individual was cited by PCSO. These careless and reckless acts by

16

BRC employees were fortunate to not have more severe consequences. BLM strongly encourages BRC to reassess hiring and supervisory protocols to reduce these interactions in the future.

BRC needs to update "Driving Info Sheet" with regards to exit route designations (i.e. 8 mile as only egress route for non-burner express/vendors). An on-playa operational shift was planned but later abandoned by BRC, to have vendor traffic piloted to the 8-mile entrance to blend with outgoing traffic. Logistical concerns prevented implementation. BRC needs to incorporate these changes into the Driving Information Sheet prior to implementation.

The following are comments on those important BRC programs and departments that impact and/or assist BLM's event operations.

### MOU Contracting Program

The fourth year of the BRC/BLM contracting MOU program was successful from the perspective of BLM with regards to JOC related service contracts. BLM recognizes the work involved for BRC in this program and hopes the cost savings to BRC is beneficial to BRC. It is a complicated program requiring coordination between BRC and BLM in the submission and acceptance of SOWs and in the coordination with BRC contractors. The BLM planning team will continue to analyze contracting needs early on during the event planning phase to determine whether a contract can be offered to BRC through the MOU program or needs to be procured through a government contract.

The dispatch contract was delayed and not issued by BRC until July 27, 2017. This was due to both a delay in BLM providing BRC a timely SOW and BRC's delay in their contract issuance. It is imperative both the BLM and BRC agree to deadlines and hold each other accountable to avoid unnecessary delays in this process.

Due to the wildfire-related power outage in Gerlach during the main event period, the BLM lodging sites (Bruno Facilities) were without power for a significate period of time which interfered with the BLM event detailers ability to shower and sleep between their work shifts. BRC needs to develop a power back-up plan for the Bruno lodging sites during the event period. This requirement will be reflected in the 2018 MOU SOW for BLM lodging.

17

AR11561

<u>BRC's JOC Logistics Team</u>

This was the fourth year of BRC's Joint Operation Center (JOC) construction and service logistic team. Every year the program gets better and BLM is very pleased with this program and feels that this program goes a long way in making BLM's event successful.

The JOC logistics team created three unplanned shaded parking structures for the K9 vehicle to mitigate the above average temperatures on the playa. Several BLM K9 vehicles broke down during the event due to the heat. The shade structures were utilized throughout the remainder of the event to mitigate the heat and were critical to the officer and K9 safety and vehicle operations. BLM recommends construction of these shade structures as a part of the JOC build out in future events to mitigate the harmful impacts of the heat on K9 vehicles.

<u>Event Sit Stat Program</u>

This was the third year of the current Sit Stat program during event operations. Over the last two years it has been refined and in 2017 it was a very valuable tool used by the Tier 1 team while managing the event programs and resources.

One suggestion that was brought up in the on-playa event close-out meeting concerning the Sit Stat program was to add a third page to the 2018 sit stat document to show a comparison to last year's event stats to show trend changes. Additionally, a column for missing juveniles needs to be added to events tracked. It is also recommended the event summary tables provided during the final Tier 1 meeting be included in future events.

<u>Event Tier 1 Program</u>

BLM and BRC continue to stay committed to the Tier 1 Program and it becomes more effective every year. This group worked well together through difficult challenges, to include the wildland fire impacts and man burn incident. One setback occurred when the AO ordered a Tier 1 Notification and the Tier 1 Notification was not received by BRC Tier 1 Members. A Tier 1 Activation was performed and the issue was resolved.

18

The Tier One notification and alert system needs to be seamless between BLM and BRC. The only way alerts from both agencies were successful was when a BLM employee carried a BRC pager and a cell phone with BLM alerts Today's technology allows opportunities beyond pager systems for notifications and alerts.

## BRC Population Reporting Program

For the third year in a row, BRC contracted Ticketfly to assist in selling the event tickets and tracking the participants entering the event The population of the city during the event was counted through the Ticketfly scanning system. The data collected through Ticketfly was reported to the BLM through BRC's PRAM system, satisfying the stipulation requirement The PRAM reports broke out staff, kids, and paid participants.

## BLM/BRC Joint CAD Program

For the second consecutive year, BLM and BRC ESD used the same CAD services contractor, iNET. This program was successful. During the 2017 on playa closeout meeting, there was an item for consideration by and for BRC to have BRC's Black Rock Ranger CAD program brought into the iNET CAD system. If this was done it could increase the communication and cooperation between the BRR's and BLM/PCSO LE calls for service dispatching.

## BRC Ranger Department

Communication and coordination between BRC Law Enforcement Advisor and Black Rock Ranger (BRR) leadership with BLM planners during the planning phase of the event led to effective and efficient communication during the event. This level of cooperation allowed for issues to be conveyed and resolved in a timely manner.

During the event, the BLM Patrol Chief and a representative of PCSO attended every 0900 BRR meeting to discuss any issues or concerns from the previous day's activities with BRR leadership. This continues to be a valuable method through which issues can be resolved. Overall, officers reported positive interactions with BRRs, noting timely responses and a willingness to help BLM LE and PCSO. Officers continue to report

19

AR11563

successes with using specialty units such as LEAL and Green Dots with resolving situations.

BRC Safety Department

For the third year in a row, the BLM safety officer coordinated and worked closely with BRC's safety program. BRC's safety program is a proactive and vibrant program but is very busy evaluating and remediating safety issues identified during the event. BRC Safety also ensures BRC staff and participant compliance with regulations and stipulations related to safety during the event.

Public health and safety were jeopardized when a BRC employee ran over a tent, serious injuries to the person in the tent, off playa transport and weeks of hospitalization followed. The employee was issued multiple violations notices by BLM law enforcement.

BRC and BLM need to work together to define structure collapse pertaining to Tier One activations with limits on scope and scale. A Tier One activation is not needed when a small scale art piece collapses but is needed when structures collapse resulting in injury. Tier One notifications of structure collapse need to conclude with a notification of resolution.

Open Fire Safety Program

Due to the unfortunate incident that occurred during the Man Burn in 2017, resulting in a participant death, and almost resulted in the cancellation of the Temple Burn, BRC needs to revamp the security requirements of open fire burns at the event. Some method must be developed by BRC that would prohibit any participant from running into an open burn and harm themselves or others. In future events, the BLM AO needs to approve individual burn safety plans. This method would be documented in the BRC event Operations Plan and in individual burn safety plans. Anything short of this could result in a stipulation from BLM preventing open burn events.

Vendor/Commercial Compliance Program (OSS)

In 2017, BRC continued to take over the duties of being the event lead in commercial compliance, with their Outside Services (OSS) department, with BLM primary role being to monitor BRC's performance. BLM's monitoring in 2017 showed that BRC was again successful in fulfilling

20

AR11564

this role and meeting the vending event protocol requirements in reducing commercial issues during the 2017 event.

BLM's Vending Compliance found that BRC did a good job notifying BLM on situations needing immediate assistance. Once BLM evaluated the situation jointly with BRC OSS, BLM effectively obtained the necessary resources to remediate the situation. This allowed for BRC and BLM to work closely on resource protection and stipulation violations. This program should continue to be refined and updated for the 2018 event, with consideration of the following improvements:

- BRC and BLM need to continue to work towards not permitting SRPs on playa unless penalties are in order. This on-playa practice is time-consuming, difficult in the location, and not fair to those who properly apply.

- BRC and BLM need to continue in their efforts to develop and implement strategies for large commercial camps. BRC and BLM must work towards identifying large theme/sound camps that retain a multitude of vendor support, a situation where it is not always clear if a particular vendor is permitted or not.

- The Vending Compliance team need to have tablets, like the Environmental Compliance team. This would assist with reporting issues of faulty vendor equipment with the environmental teams and assist BLM vending compliance with auditing. It would also assist in the tracking of what compliance teams (BLM/BRC) have made contact with a camp and for what reason, related to either vending or environmental issues.

- The single entry vending program through main gate was abused by vendors utilizing a single entry pass multiple times with little tracking.

- The airplane single entry vending program through the airport should be monitored for abuse.

- Press releases informing the public of open seasons for vending permit applications through the BLM needs to be issued prior to when the open season begins.

21

Environmental Compliance Program (Earth Guardians, BRRs, Hazmat, Playa Restoration, ESD)

In 2016, BRC took over the duties of being the event lead in identifying and remediating environmental compliance issues with BLM primary role being to monitor BRC's performance. BLM's monitoring in 2017 showed that BRC was highly successful in fulfilling this role and meeting the environmental event protocol requirements in reducing environmental issues during the 2017 event. Much of the credit for this goes to BRC's outreach and messaging to participants prior to the event.

This program should be refined and continued in 2018, with consideration of the following improvements:

- During this event, there was an issue of who is doing what between BLM and BRC. The BLM AO asked the BLM GIS Specialist to generate numbers from the Fulcrum data. Initially, the request was for general numbers (i.e. the total number of incidents, the total number of issues adjudicated). These numbers were reported to the compliance supervisor who in turn entered the numbers into a Google document for the SITSTAT report. The first time the data was exported from Fulcrum to Excel there where filters used to calculate the general numbers BRC submitted their results and the numbers were vastly different There may be several reasons for the discrepancies between Fulcrum reports and between the Fulcrum numbers and the SITSTAT reports. After the BLM GIS Specialist spoke with BRC's Environmental Compliance lead, coordinated occurred on reporting methodology; however, discrepancies in the final numbers still existed. The final numbers in Fulcrum should be similar to those exported into Excel and they are not. Trying to figure out the methodology for summarizing the monitoring data on the fly, and trying to resolve discrepancies during the event is nearly impossible. By the end of the week, it was decided to just use BRC's numbers. The recommendation to avoid these issues in the future is to derive methodology and reporting procedures that are agreed upon between BRC and BLM, prior to the 2018 event, how the numbers for the SITSTAT report will be generated and by whom. BLM recommends investigating the use of Collector versus the Fulcrum App. As Collector may be easier to use and provide consistent results.

22

- Also, the way the SITSTAT reports present the numbers it appears that the total number of issues adjudicated plus the number of issues needing to follow up should equal the total number of issues. Part of the problem is that the SITSTAT reports do not account for all types of records. For example, there is no category for the number of issues where BLM confirmed adjudication. Also, what is reported on the SITSTAT is a snapshot at a particular moment in time. The status of each individual issue changes over time. For these reasons, the numbers reported on the SITSTAT report may not be legally defensible and those using the SITSTAT report numbers should be aware of this. In order to address this issue, BRC should develop a monitoring plan, which includes determining statistically valid sample sizes of the city area sufficient to meet the needs of the environmental compliance portions of the SRP.

- During the 2017 event, there were several issues with the tablets used to collect environmental compliance data. BLM figured out a temporary workaround for the issue of connecting BRC's tablets to BLM's wireless network. For the 2018 event, the BLM Environmental compliance staff will need BLM issued tablets to efficiently and effectively monitor environmental compliance issues on the playa. The tablet's screen visibility and GPS antenna connectivity made it difficult for BLM and volunteers to collect data efficiently. BRC should provide screen/lens cleaner for each team. The tablets ability to pick up a GPS signal and the length of time needed to record all required fields in Fulcrum delayed teams and made data gathering efforts more difficult. BRC needs to include the BLM Compliance trailer in the JOC to the BRC service coverage for Fulcrum utilization on tablets. BLM recommends reducing the strength of GPS required to set a point. Auto-populated fields can be added to the Fulcrum form to speed with data collection.

- It was difficult to determine if an issue was appropriately adjudicated and a number of issues were discovered late in the event that could not be followed up on because of lack of time. BLM recommends a status for late-in-the-event issues that were not adjudicated and will be adjudicated by Playa Restoration during September  To assist with confirming adjudications, the Fulcrum form should require mandatory fields for before and after photos when documenting adjudications. The before and after photos should be taken prior setting the issue status to adjudicated. Other photo fields to include would be a follow-

23

up photo field and a location photo field (photo of a license plate or another photo to determine the location in relation to the street).

- What does environmental compliance success look like? What is the purpose of collecting fulcrum data and how is it used? During the 2017 event, there was confusion amongst environmental compliance teams regarding what constituted secondary containment for fuel storage. It is important for all environmental compliance teams (BLM, Earth Guardians, and Black Rock Rangers) to understand the Burning Man SRP stipulations and monitoring not only as the event builds, but also after the man burn occurs. BLM recommends holding joint compliance training between BLM (including law enforcement) and BRC (Earth Guardians and Black Rock Rangers) before the event in order to ensure that both BLM and BRC are on the same page regarding stipulations, stipulation violations, messaging, and remediation. BLM Compliance Team can be used to help with training. BLM and BRC should increase pre-event coordination on training materials and topics. Recommend using 2017 photos as examples for 2018 training, i.e. what does grey and black water look like, RV valves and caps, etc. The training should include the rationale for contacting visitors during the event to address fuel, black and grey water spills and how post-event monitoring is conducted and how it relates to the permit. Spills are of particular concern as several factors play into the detection of spill incidents during the post-event monitoring. It is important to document all spills and leaks during the event and prevent and/or address large spills.

- In addition to training, BLM and BRC should ensure consistent messaging between Federal Register Closure Order, SRP stipulations, and publicity materials (e.g. fuel containment).

24



*Based on raw data from exported Fulcrum data into Excel.

- As demonstrated in the above graph, incidents are being discovered prior to the actual event starting. BRC and BLM needs to improve the procedures in the Compliance Protocol so that the communication between BLM and BRC's Playa Restoration department is improved to ensure BRC's availability to identify and remediate issues from the time BRC occupies the playa until the Playa Restoration department begins their work after the event. This would include that Playa Restoration would be available during nighttime hours to respond to issues that BLM decides can't wait until the next day.

- The graph also shows the number of incidents increase as the event kick off, as would be expected. However, there is a dramatic decrease in incidents after August 30th. BRC and BLM need to discuss this decrease to determine the cause, i.e. participants leaving early or improvements on behalf of participant compliance or a decrease in the number of BRC staff looking for incidents or is it because BRC staff turned their focus to following up on issues already discovered? Based on observations by BLM environmental compliance staff, it appeared that Earth Guardian/Black Rock Ranger efforts to identify and remediate compliance issues slowed down later in the event week. There should be a full effort during the entire main and post event. The number of incidents discovered by the four BLM staff increased on the 30th and the 31st to ten incidents each day and twelve incidents on the 1st. In order to assist in answering these questions, BLM is requesting BRC provide BLM with the number of volunteers and Black Rock

25

AR11569

Rangers that are doing compliance every day. Compliance work and meeting schedules should be clear prior to the event   BRC should make a general timeline that shows how work and messaging will change during the event (i.e. transitioning from finding new incidents to following up on unresolved incidents).

- During and after the event litter and abandoned vehicles between Gerlach and Reno were present. Impacts along travel routes need to be mitigated for a successful event. BRC should continue their very effective outreach and messaging program in order to continue to prevent environmental issues from occurring. Increase the "Pack it In/Pack it Out" message.

- There was confusion regarding Secondary Fuel Containment resulting from misunderstanding and multiple messages. Apply the fuel storage stipulation consistently to all amounts rather than based on volume as it is confusing to participants and subject to interpretation especially as fuel amounts decrease over the event. If the standard is to require all gas cans have secondary containment per the FRN Closure Order, then prior to event provide this message on BRC website/information package, update brochure and photo i.e. 2-3 5-gallon gas cans in a tote. Provide photos of what is not acceptable, i.e. gas can on the tarp that has no sides. BRC Operating Plan, SRP Stipulations, and Closure Order must all state the same requirements for fuel, black/grey water, trash, etc. There is no reason to hold vendors and participants to different standards because the issues are the same. On that note, fuel spills were identified at the JOC, which can be mitigated through the use of splash pads at JOC fueling station.

- Compliance issues at the JOC pertaining to the catering service's camp behind the Dining trailer were discovered. To address this, include environmental compliance remedies in food vendor contract.

- RV breakdowns, mechanical issues and wait times for RV pumping issues continue, leading to continued incidents of black and grey water spills. BRC could consider an RV mechanical service to be part of the BRC SRP or issue an individual SRP for this type of service. Require all RV's to have a catchment basin container below their grey/black water valves. This is where a high percentage of leaks occur and almost all can be addressed with this type of stipulation. RV rentals are required to have the proper tools to mitigate spills. Define what is

26

required in a spill kit, i.e. 5-gallon bucket, small shovel, tarp, secondary containment for fuel. Include instructions on how to use these items and what to look for, i.e. leaky black and grey water valves. Inspect RV's for spill kits. Urge United Site Services (USS) to accept text messaging orders for service from permitted and contracted grey/black water and potable water service providers could help alleviate violations, wait times and uncertainty. This would allow burners to text where and when they need pump and refill services. This would also provide stats to burners on the amount of human waste generated. Require USS to put catch basin below valve if one is not present when pumping to eliminate or minimize spills during pumping. Allow an additional wastewater pumping operator(s) and consider limiting the number of RVs on the playa.

- Target BRC participant messaging on human waste issues in 2018, increasing emphasis on preventing human waste incidents in deep playa during mobile raves is needed. Park mobile raves closer to port-a-potty banks and put signs in mobile dance zones to remind burners to use the port-a-potties. BRC should continue to dispatch approximate units to search for and quickly clean up human waste deposited during deep playa music events. Hand out or ask burners to bring pee bottles and poop bags for camp and deep playa events.

- There seem to be inconsistencies regarding playa surface impacts. BRC needs to be specific on when it is and is not permissible to dig and how much (i.e. maximum depth to dig up playa for the purposes of installing posts, trenching electrical wires, tent poles, and anchors). BRC needs to make it clear to participants that playa digging is restricted to casual use regulation of one square meter of disturbance.

- BLM noted issues with theme camps complying with environmental stipulations. BRC should continue to have mandatory pre-event meeting/web-ex with camp managers to review stipulations, remediation techniques, requirements, and timelines. Include/highlight what's changed for 2018.

- Large/complex plug-in-play camps seem to have more environmental compliance issues. Limit the size of plug-in-play camps or have them provide to BRC an operating plan detailing how they break out duties/responsibilities. If they are providing all their own infrastructure or hiring parts of it out, i.e. kitchen, showers, etc. Explain how the

27

AR11571

"gifting" is being conducted as opposed to hiring/paying for a service such as hiring an individual to cook solely for the camp.

- Increase creativity/humor in LNT education outreach. Make LNT or outreach swag stamped with BLM and BRC logos, highlight the partnership and outreach message. Consider different types of media/social media outreach and reminders/PSAs on BRC radio.

In the above BLM comments on individual BRC programs/departments, all comments including considerations for improvements will be reviewed by the BLM 2018 planning team to discuss with BRC during 2018 planning.

28

AR11572

Exhibit " $\beta$ "

Exhibit " $\beta$ "
AR11573



U.S. Department of the Interior
Bureau of Land Management



# 2015 BLM Burning Man Event
# After Action Review (AAR)

## Contents

Introduction ................................................................................................................................. 2

Civilian Operations ....................................................................................................................... 3

  Unified Command/ICS ................................................................................................................. 3

    Summary ................................................................................................................................. 3

    Recommendations .................................................................................................................. 4

  Environmental Compliance ........................................................................................................ 4

    Summary: ................................................................................................................................ 4

    Recommendations .................................................................................................................. 5

  Vending and Commercial Compliance ....................................................................................... 5

    Summary: .............................................................................................................................. 10

    Recommendations ................................................................................................................ 10

  Public Information ..................................................................................................................... 11

    Summary ............................................................................................................................... 11

    Recommendations ................................................................................................................ 12

  Safety ....................................................................................................................................... 13

    Summary ............................................................................................................................... 13

    Recommendations ................................................................................................................ 13

  Logistics .................................................................................................................................... 14

    Summary ............................................................................................................................... 14

    Recommendations ................................................................................................................ 15

  Facilities ................................................................................................................................... 16

AR11574

Summary ........................................................................................................................... 16

Recommendations ........................................................................................................... 16

Communications, Dispatch and Information Technology ........................................................ 17

Summary ........................................................................................................................... 17

Recommendations ........................................................................................................... 17

Geographic Information Systems (GIS) ................................................................................... 20

Summary ........................................................................................................................... 20

Recommendations ........................................................................................................... 20

Law Enforcement ...................................................................................................................... 22

Event Planning ......................................................................................................................... 22

Summary ........................................................................................................................... 22

Recommendations ........................................................................................................... 23

Law Enforcement Operations ................................................................................................. 23

Integration ........................................................................................................................ 23

Community Policing .......................................................................................................... 25

Staffing .............................................................................................................................. 27

BLM Medical ...................................................................................................................... 30

Communications Center .................................................................................................... 33

Incident Reporting ............................................................................................................ 35

Evidence ............................................................................................................................ 36

Statistics ............................................................................................................................ 36

## Introduction

The Burning Man Event is a Bureau of Land Management (BLM) permitted gathering of participants who engage in an "experiment in temporary community dedicated to radical self-expression and self-reliance". Burning Man is the largest and most complicated special recreation event on BLM administered lands.

Since 1990, the event has been held annually in the Black Rock Desert -- High Rock Canyon – Emigrant Trails National Conservation Area within the Winnemucca District Office. The Black Rock Desert is a remote rural area approximately two hours from the nearest city with law enforcement and emergency medical services. During the week prior to Labor Day, participants convene to create Black Rock City. During the event, the city becomes the fifth largest city in Nevada. In 2015, the event reached a peak

2

**Recommended Additions (8):**

Staffing levels of uniformed patrol and investigations are appropriate. It is important to note the overall number of law enforcement officers staffing the event should not change in 2016, but the TO can be reorganized to better meet the needs of the event.

- **OPR Agent (1):** In order to ensure timely, thorough, and consistent investigation into formal complaints, as well as to review Use of Force reporting to ensure compliance with reporting requirements and policy, it is recommended this position be added back to the 2016 Table of Organization

- **Evidence Technician (2):** Due to the large amount of evidence collected during the event, coupled with the report documentation requirements from the U.S. Attorney's Office, evidentiary and case documentation procedures established in 2015 streamlined and standardized evidence collection and case documentation. It is recommended two evidence technician positions be added to the 2016 Table of Organization, fully funded out of the cost recovery account.

- **Environmental Compliance and Enforcement Team (4):** These positions would teamed up with a civilian compliance team member to conduct patrols throughout the city, identifying and addressing environmental compliance issues such as dumping of gray/black water, oil leaks, fuel leaks or spills, etc. This concept is being driven by an increased emphasis of environmental compliance and enforcement by event management to protect the NCA. The main objective of the compliance/law enforcement team is to address the intentional, blatant, and egregious compliance violations. During the 2015 event, a single day shift patrol Ranger was utilized in this fashion. As a result of the increased focus by law enforcement on these issues, the number of environmental compliance citations increased 17-fold (2 in 2014 compared to 34 in 2015). It is also recommended all environmental compliance stipulations provided to BRC need to be included as closure order regulations (such as oil spills) to provide BLM law enforcement the option to issue violation notices for participants who refuse to voluntarily comply. Any additional environmental issues not currently addressed through stipulations, but commonly observed by the compliance teams as environmental hazards, should be considered for inclusion in the closure order for future events (i.e. fuel spills, fuel storage, etc.).

- **Operational Chief-Night (1):** Based on the organizational needs observed over the last two years, the TO should include a LE Branch Chief (part of UC) that serves as a planning lead, as well as a Day Operations and Night Operations Chief, both of which will be supported by shift commanders and patrol supervisors.

## BLM Medical

### Summary
For the 4th year in a row, BLM has partnered with the U.S. Department of Health and Human Services (DHHS) Center for Tactical Medicine (CTM) to provide premier medical care for federal employees

AR11576

working at Burning Man. Often referred to as Tactical Emergency Medical Support (TEMS), the fundamental goal is to "protect the protectors" by providing a full spectrum of on-site medical care federal employees so they remain healthy and fully engaged.

## Staffing

Four tactical medics (2 BLM, 2 DHHS) were assigned to the 2015 event. New to 2015 event, a designated medical unit leader led the medical team, reporting directly to the LE Operations Chief. This ensured the Operations Chief was aware of unit status and available assets at all times; it also provided an opportunity to address concerns or pass on intel of upcoming events that may redirect medical unit posture. The medical unit was operational 24-hours/day, but only during the main event. In order to ensure 24-hour staffing of the medical trailer, two medics would sleep in the medical trailer and remain on site until shift change. Upon shift change,  they would relocate to the Black Rock station to catch some sleep and use shower facilities. This configuration was effective for coverage and access to medical care on a 24 hour basis; however, it was sometimes difficult for unit personnel to get adequate sleep.

## Operational Summary

During the main event, the medical unit logged approximately 240 patient visits were 18 law enforcement K-9 treatments. An overwhelming majority of those patients were seen for routine medical care such as eye wash, minor wound care, over the counter pain relief, and other over the counter medicine. Additionally, the medical team provided a "medical minute" during shift briefings, designed to brief law enforcement officers on specific trends, conditions, or health issues pertinent to the event. Several times during the 2015 event, law enforcement staff was exposed to bodily fluids, controlled substances, and chemicals. In order to properly decontaminate them, the officers had to strip down at HQ and be driven into Gerlach for a shower and change of clothes because there was not a decontamination unit or extra clothing available at HQ.

## Coordination with Cooperating Agencies

PCSO assigned four deputies to patrol who were also certified as paramedics (2 swing, 2 night).   The integration of the PCSO medics with the BLM medical staff served as a major force multiplier by providing advanced life support capabilities within the city.   Additionally, PCSO maintained transport capabilities and a small medical tent in Gerlach to provide after-hours medical care for personnel. BRC's medical provider for the 2015 event, Crowd RX, was also very welcoming to BLM medical personnel and forthcoming with trends and issues they observed during the event.  Coordination between the BLM medical Unit Leader and Crowd RX management staff occurred twice daily at either Rampart or the HQ Med unit.

Exhibit " _C_ "

.

Exhibit " _C_ "
AR11578

# 2018 BURNING MAN - STATISTICAL SUMMARY

## BLM LAW ENFORCEMENT

### BLM/USFS LAW ENFORCEMENT EVENTS BY TYPE

| | |
|---|---|
| ASSAULT ON OFFICER | 2 |
| ASSIST LAW ENFORCEMENT AGENCY | 75 |
| ASSIST OTHER | 7 |
| ASSIST PUBLIC | 827 |
| COMPLIANCE CHECK (RESOURCES) | 169 |
| FIRE | 4 |
| HAZMAT | 7 |
| INVESTIGATION | 7 |
| MEDICAL | 44 |
| MISSING PERSON | 13 |
| PATROL CHECK | 29 |
| PUBLIC CONTACT | 1218 |
| STOLEN | 14 |
| TRAFFIC STOPS | 783 |
| TRANSPORTS | 6 |
| TOTAL LAW ENFORCEMENT EVENTS | 3205 |

### BLM/USFS LAW ENFORCEMENT ACTIONS TAKEN

#### CITATIONS

| | |
|---|---|
| AIRCRAFT LANDING | 0 |
| DEPOSITING HUMAN WASTE | 88 |
| DISORDERLY CONDUCT | 10 |
| DRUG PARAPHERNALIA | 8 |
| DUI | 3 |
| FIREWORKS | 0 |
| FUEL STORAGE | 40 |
| CREATING A HAZARD/NUISANCE | 11 |
| IN A CLOSED AREA | 25 |
| INTERFERENCE/RESISTING | 7 |
| LITTERING | 3 |
| MOTOR VEHICLE IN CLOSURE | 1 |
| MOTOR VEHICLE NO DRIVERS LICENSE | 7 |
| MOTOR VEHICLE NO INSURANCE | 5 |
| MOTOR VEHICLE NO TAILLIGHTS | 21 |
| MOTOR VEHICLE NO REGISTRATION | 25 |
| MOTOR VEHICLE NO HEADLIGHTS | 7 |
| MOTOR VEHICLE SPEEDING | 37 |
| MOTOR VEHICLE CARELESS | 2 |
| MOTOR VEHICLE MISC | 4 |
| OPEN CONTAINER | 3 |
| POSSESSION OF A CONTROLLED SUBSTANCE | 86 |
| WASTE WATER | 38 |
| MISC | 0 |
| WEAPONS | 2 |
| TOTAL CITATIONS | 433 |

#### Warnings

| | |
|---|---|
| AIRCRAFT | 1 |
| DEPOSITING HUMAN WASTE | 6 |
| DISORDERLY CONDUCT | 8 |
| DRUG PARAPHERNALIA | 1 |
| DUI | 0 |
| CREATING A HAZARD/NUISANCE | 8 |
| IN A CLOSED AREA | 13 |
| FIREWORKS | 2 |
| FUEL STORAGE | 74 |
| INTERFERENCE/RESISTING | 4 |
| LITTERING | 2 |
| MOTOR VEHICLE IN CLOSURE | 2 |
| MOTOR VEHICLE NO DRIVERS LICENSE | 4 |
| MOTOR VEHICLE HEADLIGHTS | 7 |
| MOTOR VEHICLE NO INSURANCE | 6 |
| MOTOR VEHICLE NO REGISTRATION | 20 |
| MOTOR VEHICLE NO TAILLIGHTS | 30 |
| MOTOR VEHICLE SPEEDING | 42 |
| MOTOR VEHICLE CARELESS | 6 |
| MOTOR VEHICLE MISC | 2 |
| POSSESSION OF A CONTROLLED SUBSTANCE | 44 |
| OPEN CONTAINER | 5 |
| WASTE WATER | 3 |
| WEAPONS | 0 |
| **TOTAL VERBAL WARNINGS** | **290** |

Exhibit " $\mathcal{D}$ "

Exhibit " $\mathcal{D}$ "

AR11581

# 2014 - 2018 BURNING MAN - STATISTICAL SUMMARY

## BLM LAW ENFORCEMENT

### BLM/USFS LAW ENFORCEMENT ACTIONS TAKEN

## EVENT BY TYPE

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| PUBLIC ASSIST | 450 | 1474 | 213 | NR | 827 |
| PUBLICE CONTACTS | 166 | 1595 | 6903** | NR | 1218 |
| TRAFFIC STOPS | 860 | 899 | 1254 | NR | 783 |
| VERBAL WARNINGS | 520 | 548 | 317 | 322 | 290 |
| CITATIONS *** | 392 | 534 | 407 | 413 | 433 |
| RESOURCE COMPLAINACE CHECKS | 17 | 118 | 20 | NR | 169 |

## CITATIONS

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| AIRCRAFT LANDING | 0 | 1 | 1 | 1 | 0 |
| DEPOSITING HUMAN WASTE | 7 | 128 | 81 | 23 | 88 |
| DISORDERLY CONDUCT | 8 | 7 | 3 | 1 | 10 |
| DRUG PARAPHERNALIA | 29 | 35 | 3 | 15 | 8 |
| DUI | 3 | 2 | 1 | 1 | 3 |
| FIREWORKS | 2 | 2 | 0 | 2 | 0 |
| FUEL STORAGE* | N/A | N/A | N/A | 0 | 40* |
| CREATING A HAZARD/NUISANCE | 10 | 26 | 35 | 7 | 11 |
| IN A CLOSED AREA | 44 | 15 | 0 | 19 | 25 |
| INTERFERENCE | 4 | 3 | 1 | 2 | 7 |
| LITTERING | 0 | 0 | 0 | 0 | 3 |
| MOTOR VEHICLE IN CLOSURE | 11 | 5 | 11 | 7 | 1 |
| MOTOR VEHICLE NO DRIVERS LICENSE | 14 | 12 | 9 | 8 | 7 |
| MOTOR VEHICLE NO INSURANCE | 3 | 1 | 3 | 3 | 5 |
| MOTOR VEHICLE NO TAILLIGHTS | 1 | 16 | 17 | 24 | 21 |
| MOTOR VEHICLE LICENSE PLATE | 1 | 1 | 2 | 3 | 0 |
| MOTOR VEHICLE NO REGISTRATION | 12 | 16 | 29 | 28 | 25 |
| MOTOR VEHICLE NO HEADLIGHTS | 0 | 0 | 0 | 4 | 7 |
| MOTOR VEHICLE SPEEDING | 3 | 77 | 58 | 31 | 37 |
| MOTOR VEHICLE CARELESS | 2 | 5 | 0 | 6 | 2 |
| MOTOR VEHICLE MISC | 0 | 4 | 16 | 1 | 4 |
| OPEN CONTAINER | 5 | 7 | 2 | 7 | 3 |
| POSSESSION OF A CONTROLLED SUBSTANCE | 205 | 116 | 82 | 181 | 86 |
| RESISTING | 1 | 4 | 2 | 2 | 0 |
| TRESPASS NOTICE REQUESTS | 6 | 8 | 5 | 23 | 0 |
| WASTE WATER | 2 | 34 | 2 | 4 | 38 |
| MISC | 0 | 3 | 40 | 4 | 0 |
| WEAPONS | 4 | 3 | 3 | 6 | 2 |

AR11582

* Improper "Fuel Storage" became a violation in 2017 and the first citations
were issued in 2018. Of the 433 total citation minus the 40 new violations
equals 393 total citation for a decrease in citations comparitively

** In 2016 BLM added their esplanade substation outreach program
contacts to LE public contacts which was discontnued in subsequent years

*** Total number of citations reported although not all caputed below
due to mistake or dropped violations tracking

"NR" - Not reported by BLM

AR11583

Exhibit "_E_"

Exhibit "_E_"



# 2015 Crime In Nevada

Nevada Department of Public Safety

AR11585

THIS PAGE WAS LEFT INTENTIONALLY BLANK

2

AR11586



# UNIFORM CRIME
# REPORTING

# 2015 REPORT



3

AR11587



# STATE OF NEVADA
## DEPARTMENT OF PUBLIC SAFETY

**Brian Sandoval, Governor**

James M. Wright, Director
Department of Public Safety

Julie Butler, Division Administrator
General Services Division

Erica Hall, Uniform Crime Reporting Program Manager
General Services Division

Matthew West, Graduate Student Intern
University of Nevada, Reno



4

AR11588



Nevada Department of Public Safety



Director James M. Wright

**VISION:** To be the premiere public safety agency and provide advanced law enforcement services to the citizens of Nevada. To support and empower Department of Public Safety employees by encouraging diversity in the workforce, results oriented service, productivity and meaningful career growth.

The Department of Public Safety is committed to achieving the highest standards of excellence through the use of comprehensive training programs, progressive technology, federal, state and local government partnerships with interagency cooperation to ensure the safety of all citizens and visitors in Nevada.

**MISSION STATEMENT:** In partnership with the people of Nevada, the Department of Public Safety provides services in support of protecting our citizens and visitors by promoting safer communities through prevention, preparedness, response, recovery, education and enforcement.

AR11589

THIS PAGE WAS LEFT INTENTIONALLY BLANK

6

AR11590



# TABLE OF CONTENTS

| | |
|---|---|
| Forward from Division Administrator Julie Butler | 9 |
| Appreciation to Nevada Law Enforcement Agencies | 11 |
| Nevada Counties | 13 |
| Authority | 15 |
| Introduction | 17 |
| Classification of Offenses | 23 |
| Explanation of the Calculation of Rates | 32 |
| Statement of Policy for Release of UCR Statistical Information | 33 |
| Profile of the State of Nevada | 35 |
| 2015 Nevada Crime Clock | 37 |
| 2015 *Crime in Nevada* Highlights | 39 |
| Index Crimes and Clearance Rates | 41 |
| Murder Statistics | 63 |
| Rape Statistics | 71 |
| Robbery Statistics | 77 |
| Aggravated Assault Statistics | 83 |
| Human Trafficking Statistics | 89 |
| Burglary Statistics | 93 |
| Larceny Statistics | 99 |
| Motor Vehicle Theft Statistics | 105 |
| Arson Statistics | 111 |
| Simple Assault Statistics | 117 |
| Hate Crime | 121 |
| Stolen and Recovered Property Values | 127 |
| Law Enforcement Personnel | 137 |
| Arrest Data | 143 |
| Protection Order Data | 225 |
| Domestic Violence Data | 235 |
| Crimes Committed Against Older Persons Data | 395 |
| Justifiable Homicide Data | 483 |

AR11591

## 2015 Nevada Crime Clock

One **Index Crime Offense** every 5 minutes, 23 seconds

One **Violent Crime** every 25 minutes, 55 seconds

One **Property Crime** every 6 minutes, 48 seconds

One **Murder** every 2 days, 1 hour, 12 minutes

One **Burglary** every 23 minutes, 33 seconds

One **Rape** every 5 hours, 11 minutes

One **Larceny** every 12 minutes, 11 seconds

One **Robbery** every 1 hour, 23 minutes

One **Motor Vehicle Theft** every 46 minutes, 21 seconds

One **Aggravated Assault** every 44 minutes, 8 seconds

One **Arson** every 19 hours, 10 minutes

One **Human Trafficking** every 1 day, 16 minutes

This crime clock should be viewed with care. This is the most aggregate representation of Nevada's 2015 UCR data and it is designed to convey the annual reported crime experience by showing the relative frequency of occurrence of the Index Offenses. This mode of display should not be taken to imply regularity in the commission of the offenses, but rather, it represents the annual ratio of crime to fixed time intervals.

AR11592

THIS PAGE WAS LEFT INTENTIONALLY BLANK

AR11593

## *2015 Crime in Nevada Highlights*

**CRIME RATE**

The Nevada Crime Rate is based on the occurrence of an index offense per 1,000 residents of the state. The crime rate for 2015 was 33.94 per 1,000. The comparable rate for 2014 was 32.49. The state population for 2015 was 2,871,934 per the Nevada State Demographer.

**INDEX OFFENSES**

Law enforcement reported 97,485 index offenses in 2015, versus the 92,376 reported in 2014. That is an increase of 5,109 (5.53%). Nevada's four-year average for index offenses is 94,844 (2012-2015).

**VIOLENT CRIMES**

Murder, rape, robbery, aggravated assault and human trafficking make up the violent crimes category. Violent crimes as a group increased by 2,337 offenses (13.03%), to 20,273 in 2015, up from 17,936 in 2014. Violent crimes accounted for 20.60% of all reported index crimes (19.42% in 2014). 2015 had a violent crime rate of 7.06 per 1,000 population. Nevada's four-year average for violent crimes is 17,770 (2012-2015).

**PROPERTY CRIMES**

Burglary, larceny, motor vehicle theft and arson make up the property crimes category. Property crimes as a group increased by 2,772 offenses (3.72%) to 77,212 in 2015, up from 74,440 in 2014. Property crimes accounted for 79.2% of all reported index crimes (80.58% in 2014). 2015 had a property crimes rate of 26.88 per 1,000 population. Nevada's four-year average for property crimes is 77,073 (2012-2015).

**MURDER**

There were 178 murders committed in Nevada in 2015. That is an increase of 10 (5.95%) from 168 reported in 2014. Law enforcement cleared 127 murders in 2015 (71.35%). Nevada's five-year average for homicide offenses is 155 (2011-2015).

**RAPE**

There were 1,686 rapes and attempted rapes committed in Nevada in 2015. That is an increase of 335 (24.80%) from 2014 when there were 1,351. There were 1,517 committed rapes and 169 attempted rapes in 2015. Law enforcement cleared 305 incidents of rape in 2015 (18.09%). Nevada's five-year average for rape offenses is 1,187 (2011-2015).

**ROBBERY**

There were 6,287 robberies in Nevada in 2015. That is an increase of 336 (5.65%) from 2014 when there were 5,951. Law enforcement cleared 1,447 incidents of robbery in 2015 (23.02%). Nevada's five-year average for robbery offenses is 5,393 (2011-2015).

**AGGRAVATED ASSAULT**

There were 11,906 aggravated assaults in Nevada in 2015 That is an increase of 1,440 (13.76%) from 2014 when there were 10,466. Law enforcement cleared 5,037 incidents of aggravated assault in 2015 (42.31%). Nevada's five-year average for aggravated assault offenses is 10,571 (2011-2015).

**HUMAN TRAFFICKING**

There were 216 incidents of human trafficking in Nevada in 2015. Law enforcement cleared 49 incidents of human trafficking in 2015 (22.69%).

AR11594

**BURGLARY**

There were 22,315 burglaries in Nevada in 2015. That is an increase of 528 (2.42%) from 2014 when there were 21,787. Law enforcement cleared 1,806 incidents of burglary in 2015 (8.09%). Nevada's five-year average for burglaries is 21,870. $113,196,758 in property was stolen during burglaries in Nevada in 2015.

**LARCENY**

There were 43,104 larcenies in Nevada in 2015. That is an increase of 982 (2.33%) from 2014 when there were 42,122. Law enforcement cleared 8,209 incidents of larceny in 2015 (19.04%). Nevada's five-year average for larceny is 43,286 (2011-2015). $77,567,598 in property was stolen during larcenies in Nevada in 2015.

**MOTOR VEHICLE THEFT**

There were 11,336 motor vehicle thefts in Nevada in 2015. That is an increase of 1,208 (11.93%) from 2014 when there was 10,128. Law enforcement cleared 682 incidents of motor vehicle theft in 2015 (6.02%). Nevada's five-year average for motor vehicle theft is 10,178 (2011-2015). The value of stolen motor vehicles in Nevada in 2015 totaled $93,653,854.

**ARSON**

There were 457 arsons in Nevada in 2015. That is an increase of 54 (13.40%) from 2014 when there were 403. Law enforcement cleared 141 incidents of arson in 2015 (30.85%). Nevada's five-year average for arson is 426 (2011-2015). $14,320,197 in property was destroyed in arsons in Nevada in 2015.

**SIMPLE ASSAULT**

There were 34,894 simple assaults in Nevada in 2015. That is an increase of 202 (0.58%) from 2014 when there were 34,692. Law enforcement cleared 15,627 incidents of simple assault in 2015 (44.78%). Nevada's five-year average for simple assault is 35,811 (2011-2015).

**HATE CRIME**

There were 58 reported hate crimes in Nevada in 2015. That is an increase of 33 (132%) from 2014 when there were 25. Nevada's four-year average for hate crime is 65 (2012-2015).

**STOLEN & RECOVERED PROPERTY**

In 2015 Nevada law enforcement agencies reported $283,769,142 worth of property stolen during the commission of index crimes. $73,908,004 in property was recovered (26.05%).

**CLEARANCE RATE**

Nevada law enforcement agencies cleared 18.26% of all index crimes in 2015, a decrease from the 2014 clearance rate of 21.07%.

**ARRESTS**

116,121 persons were arrested, summoned or cited in Nevada in 2015. That is a decrease of 6,776 (-5.51%) from 2014 when the total was 122,895. Nevada's arrest rate per 1,000 population in 2015 was 40.43.

**POLICE EMPLOYMENT DATA**

Statewide there were 6,253 full-time sworn law enforcement officers in Nevada in 2015. That is an increase of 821 from 2014 when there were 5,432. This is a ratio of 2.18 officers per 1,000 population.

**OFFICER ASSAULTS**

There were 431 assaults on Nevada law enforcement officers in 2015. That is an increase of 66 over 2014 when there were 365 (18.08%). Law enforcement cleared 369 (85.61%) of these assaults.

AR11595

Exhibit " F "

.

MENU
Select Language ▼

# Technical Assistance

## MANAGEMENT SURVEYS

The IACP offers comprehensive Management and Operations surveys to help agencies determine their level of accountability, community satisfaction, cost-effectiveness, compliance with professional standards, and success in crime control.

## PATROL STAFFING AND DEPLOYMENT

Ready-made, universally applicable patrol staffing standards do not exist. Ratios, such as officers-per-thousand population, are totally inappropriate as a basis for staffing decisions. Defining patrol staffing allocations and deployment requirements is a complex endeavor which requires consideration of an extensive series of factors and a sizeable body of reliable, current data.

## TECHNICAL ASSISTANCE SERVICES

TA focuses on one problem/issue or a limited set of connected problems and issues. Designed to provide immediate, low cost diagnostic and problem solving services.

## TRAINING KEYS

Concise, authoritative sources of law enforcement information, these six-page, loose-leaf monographs allow law enforcement officers to expand or sharpen their knowledge while

AR11597

MENU

# NATIONAL LAW ENFORCEMENT POLICY CENTER

Organized under the direction of a broad-based advisory board of recognized law enforcement professionals, the center has carried out its mission through the development of a wide variety of model law enforcement policies.

# EXECUTIVE SEARCH

The IACP offers the most comprehensive police executive search service available. Our experienced team recognizes the significance of selecting the new executive leadership and works in partnership with the jurisdiction through all stages of the planning, selection, and transition processes.

# ASSESSMENT CENTERS

A powerful tool for making promotional decisions, an assessment center uses a series of simulated on-the-job challenges to gauge a candidate's ability to perform the target job.

# PROMOTIONAL TESTING

The IACP recognizes the importance of selecting and advancing the right candidates into leadership positions, understanding that each agency has its own set of challenges and circumstances.

To obtain more information about these services please email professionalservices@theiacp.org or call 703.836.6767.

AR11598

MENU

Learn More!

Privacy Policy
Contact Us



1.800.THE IACP

AR11599

1    David S. Levin (CA Bar No. 156336)
     LEVIN LAW FIRM
2    405 Sherman Ave
     Palo Alto, CA 94306-1827
3    Telephone:  (650) 858-8500
     david@levinlawfirm.com
4
     Attorneys for Appellant,
5    Black Rock City LLC

6

7

8              UNITED STATES DEPARTMENT OF INTERIOR

9                INTERIOR BOARD OF LAND APPEALS

10

11   BLACK ROCK CITY LLC,              Case Identification No.:  IBLA-2019-0109

12          Appellant,                 Special Recreation Permit
                                       LLNVW03500-18-01
13          v.                         2930 (NV030.10)

14   BUREAU OF LAND MANAGEMENT,

15          Appellee.                  **Certificate of Service**

16

17

18          I am a resident of the state of California and am over the age of eighteen years old.  I

19   am not a party to the within action.  My business address is 405 Sherman Avenue; Palo Alto,

20   California  94306-1827.   On June 28, 2019, I served the foregoing document(s) described as:

21   **Statement of Reasons Supporting Appeal**

22   **Declaration of Raymond Allen Supporting Appeal**

23   **Declaration of Marnee Benson Supporting Appeal**

24   **Declaration of Robert Abbey Supporting Appeal**

25   **Declaration of Marc P. Picker Supporting Appeal**

26   **Declaration of Roger Vind Supporting Appeal**

27

28

                                        1

1   on the following interested parties:

2       Janell Bogue                            Attorney for Bureau of Land Management
3       Assistant Regional Solicitor
        U.S. Dept. of the Interior
4       2800 Cottage Way, Room E-1712
5       Sacramento, CA 95825

6   [ ]   **VIA MAIL**:

7           Service was accomplished by placing the document(s) listed above in a
8   sealed envelope with postage thereon fully prepaid, in the United States Mail at Palo Alto,
    California, addressed as set forth above.  I am readily familiar with this Firm's business
9   practice of collection and processing of material for mailing by U.S. Mail, and any material
10  placed for collection for mailing would, in the ordinary course of business, be deposited with
    the U.S. Postal service on that same day.

11  **[ XX ] VIA ELECTRONIC TRANSMISSION**:

12
            Service was accomplished by arranging for electronic transmission of the documents
13  listed above to **janell.bogue@sol.doi.gov** prior to close of business.  I am readily familiar with
14  this firm's business practice of collection and processing of correspondence via electronic
    transmission(s) and any such correspondence would be transmitted in the ordinary course of
15  business.

16
17  **[ XX ]  VIA EXPRESS MAIL/OVERNIGHT DELIVERY**:

18          Service was accomplished by placing the document(s) listed above in a sealed
    envelope(s), addressed as above, and placing each for collection by overnight mail service or
19  overnight courier service. I am readily familiar with this Firm's business practice of collection
    and processing material for overnight mail or overnight courier service, and any material
20  placed for collection for overnight delivery would, in the ordinary course of business, be
    delivered to an authorized courier or driver authorized by the overnight mail carrier to receive
21  documents, with delivery fees paid, for delivery on the following business day.

22

23          I declare under penalty of perjury under the laws of the United States of America that
24
    the foregoing is true and correct and that this Certificate of Service was executed on June 28,
25
    2019 at Palo Alto, California.
26
27
                                                    Chris Gaither
28
                                        2