

U.S. Department of the Interior
Bureau of Land Management
Black Rock Field Office

March 2019

# Burning Man Event Special Recreation Permit

## Draft Environmental Impact Statement: Volume 2









Costs
BLM: $280,000
Proponent: $922,468



**Key Observation Point: Applegate-Lassen**
**(During Burning Man Event)**



**Key Observation Point: Applegate-Lassen**
**(Without Burning Man Event)**



**Mckinney, Chelsea <cmmckinney@blm.gov>**

## [EXTERNAL] 2019 MOU for CAD Service for BLM & PCSO
1 message

**Playground** <playground@burningman.org>                                  Wed, Mar 20, 2019 at 5:48 PM
To: Mark Hall <mehall@blm.gov>
Cc: Marnee Benson <marnee.benson@burningman.org>, "Mckinney, Chelsea" <cmmckinney@blm.gov>, Charlie Dolman
<charlie@burningman.org>, Mark Pirtle <mpirtle@blm.gov>, Rebecca Andres <randres@blm.gov>, Emma Weisman
<emma.weisman@burningman.org>

Mark-

BMP will accept this MOU after removal of the following item:

pg. 8 #2 under The tasks and responsibilities of BMP shall consist of the following:

    2. Provide dedicated, access controlled, secure workspace for three (3) contractor personnel.

Please send the revised version for our review so we can accept.

---

**2 attachments**

 **2019 BMP-BLM MOU Program_BM Event CAD Service_for BLM and PCSO_ SOW to BMP.pdf**
434K

**ATT00001**
1K

**2019 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

**Providing Computer Aided Dispatch (CAD) technical services and support in the Gerlach, NV area for the 2019 Burning Man Event**

# PROJECT TITLE:

Black Rock City Computer Aided Dispatch (CAD)

# BACKGROUND:

The US Department of Interior, Bureau of Land Management (BLM) and Burning Man Project (BMP), formerly Black Rock City, LLC, through its Emergency Services Department (ESD), operate a joint Emergency Dispatch Center (EDC) in which each agency handles Calls For Service (CFS) in a coordinated operation during the annual Burning Man Event. While the space in the dispatch center is shared, each agency is able to remain operationally segregated due to federal law, state law, agency restrictions and operational integrity.

In previous years, BLM and ESD operated their own CAD systems and information was communicated verbally between dispatchers. Both agencies desire to share a CAD platform in order to share information more efficiently and effectively thus improving officer safety, decreasing emergency response times, strengthening public safety at the event, and providing such data for post event analysis to help shape future plans.

# SCOPE OF WORK:

The Contractor shall provide a fully functional Computer Aided Dispatch (CAD) System, technical services, onsite and remote technical support, software applications and hardware to ensure a fully functional, operational and reliable Public Safety CAD at the Emergency Dispatch Center in "Black Rock City, Nevada." The Contractor shall provide services to both BLM and ESD, if BMP concurs.

# REQUIREMENTS:

The Contractor shall provide technical services, onsite and remote technical support, software applications and hardware to ensure a functional and operational CAD in the EDC.

The Contractor shall provide Client/Server Support Engineering Services for the EDC, which includes a variety of System, Database, Network, GIS and Computer Aided Dispatch (CAD) Database Administration and Support Services relating specifically to the CAD network operations of the communication center.

## 2019 BURNING MAN EVENT

## STATEMENT OF WORK (SOW)

Required tasks and responsibilities of the contractor shall consist of the following:

1. Provide two (2) On-Site Server License, for iNetCAD/AVL, (primary and failover)
2. Provide fourteen (14) client subscription licenses for browser-based computer aided dispatch software, for 3 months each license, for iNetCAD Client. (Each client is only needed for 1-month onsite, but is needed for training in advance of the event and reporting post event.) Contractor is encouraged to offer any suggestions for efficient licensing for a temporary event such as this.
   a. License Breakout (BMP licenses are only if optioned by BMP)
      i. BMP – 5 licenses (5 EDC)
      ii. BMP – 1 GIS license (1 EDC)
      iii. BLM – 6 licenses (6 EDC)
      iv. BLM/BMP Shared  - 2 HA iNet CAD Server Licenses
      v. BLM – 10 iNetMobile Client Licensed

3. Provide two (2) iNetCAD Dashboards Data Explorer Licenses*
   a. BMP – 3 licenses (if optioned by BMP)
   b. BLM – 2 licenses
   * It is not possible to get Dashboard Data Explorer with any less than (5) licenses.

4. Provision and maintain a High Availability CAD environment on site, which includes at minimum:
   a. Application Servers
   b. Database Servers
   c. GIS Servers
   d. State of Nevada Criminal Justice Interface (NCJIS/ JusticeLink)
   e. IMARS Interface

5. **Database, ArcGIS Server**
   Integrate customer provided Geospatial information to display relevant data as it pertains to the Burning Man Event to include Geographic Information Systems (GIS) Maps, layer files, shape files, geodatabases and imagery. This includes actively identifying a response area based on the Global Positioning Satellite (GPS) / Automated Vehicle Location (AVL) Tracking device data, accurate utilization and display of intersection mapping, and ability to provide reports and maps based on this data.

6. **Database, Data segregation plan and database security architecture** Develop, deploy and integrate into the CAD system a data segregation plan and database security architecture to allow for simultaneous independent operation of multiple "Dispatch Groups" with full data and database security. Must prevent the storage, access, viewing, and display of any "Criminal Justice Information," in any non- law enforcement "Dispatch Group." Criminal Justice Information includes, but is not limited to  Controlled Unclassified Information (CUI), Personally Identifiable Information (PII) and any information defined in 28 C.F.R. § 20 - Criminal Justice Information Systems. Must prevent the storage, access, viewing, and display of any "Health Insurance Portability and Accountability Act (HIPPA) Information," in any non-emergency medical

## 2019 BURNING MAN EVENT

## STATEMENT OF WORK (SOW)

"Dispatch Group." Security permissions must be both role based and agency based at minimum.

**7. Alphanumeric Paging Interface (Software Maintenance)**

Work with ESD to create an automated interface with Alphanumeric Paging infrastructure. The event relies on brief incident information automatically provided by CAD to the paging system in order to alert units/individuals of certain events.  Contractor will work with ESD to support basic call data, such as, but not limited to Incident Type, Incident Location, and Incident Number to be automatically sent in an mutually agreed upon format to the paging system.

**8. GPS/AVL Interface (Software Maintenance)**

Integrate Global Positioning Satellite Tracking device data through an open source or contractor provided application interface (API) to depict locations real time on the CAD GIS map layers. Contractor will be provided test devices on site at the event to ensure accuracy.

**9. GPS/AVL Interface (Database Maintenance)**

Integrate Global Positioning Satellite Tracking device data through an open source or contractor provided application interface (API) to capture locations into the CAD database in the coordinate fields. Clear previous years' device IMEI Information and User information out of the CAD Database and populate with current information. Error and validation check to ensure no duplication of IMEI information, which is known to cause interruptions in the API. Contractor will be provided test devices on site at the event to ensure accuracy.

**10. NCJIS State/NCIC Interface (Software Maintenance)**

Integrate criminal justice interface via a Nevada State Switch with the CAD to run the specific queries through Nevada to determine wanted and driver's license checks, stolen vehicle and vehicle registration check, Canadian persons wanted and driver's license check, Canadian vehicle registration and stolen check, probation, protection order files, sex offender registration, NCIC wanted files, NLETS transactions for above checks and additional as defined by the needs of the customer.

**11. IMARS Interface (Niche Interface – DOI Records Management System) (Software Maintenance)**

Create a database source for exporting event data from the CAD Database to IMARS through XML Schema and XSLT transformation and/or Representational State Transfer (REST) Application Program Interface (API). If a connection cannot be sustained by the customer, the contractor will be required to provide batch data to be pushed to IMARS in a non-automated procedure on a per hour, per day or per event basis. If a connection can be sustained, the IMARS data will be pushed to IMARS at the close of each Law Enforcement event and queried during each query (if REST)

**12. Shared Statistical Reporting**

Develop a shared reporting environment within the CAD System "Dispatch Group" and/or "Agency." ESD and BLM will, in writing to the contractor and the other agency, designate a single CAD System User from each agency who will be allowed Report Access to the other "Dispatch Group" and/or "Agency." Contractor will provide security recommendations and implement controls, through development of security item(s), to limit report access to only the two designated

**2019 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

users. ESD and BLM will notify the contractor in writing of any changes to designated personnel and will include the other agency-authorized personnel on any change notifications. Any request to change designated "Report Access" personnel, will not be considered valid unless notification to the other agency personnel is contemporaneous. The "Center Manager" position for ESD and BLM is the recommended position to have this access.

**13.** Display all relative information as it pertains to a person or place that has already been assigned to a previous incident in CAD.

**14.** Allow for and provide a user interface for feedback to improve CAD workflow, query return clarity, use of the command line, report output, and GIS integration.

**15.** The Contractor is **NOT** expected to fulfill the primary role of Information Technology (IT) Support in the EDC, as both ESD and BLM will have IT Support Personnel on site. Because of the critical need to provide emergency services, the contractor is however, anticipated to have a high degree of expertise and skill in IT Support. As such, the contractor should be empowered to work to provide IT support and assistance in the temporary absence of IT personnel or as needed to solve problems. The contractor is expected, when necessary, where possible and appropriate to:

   a. Provide technical support for additional Law Enforcement software applications on the CAD Network in the absence of IT personnel.

   b. Perform System Administration functions for Microsoft Windows environment, in the absence of IT personnel.

   c. Perform System Administration functions for Group Policy environment, in the absence of IT personnel.

   d. Perform Database Administration (DBA) functions for Microsoft SQL Server or equivalent.

   e. Perform Network Administration functions for CISCO environments, in the absence of IT personnel.

   f. Develop test cases and performs functional quality tests for Law Enforcement Applications in the absence of IT personnel.

   g. Write automation scripts for Microsoft Windows and SQL Server database application packages or similar.

   h. Solve product, operating system, hardware, network and database problems of low to moderate complexity and scope.

   i. Understand and communicate end user requirements to BRC and BLM.

## 2019 BURNING MAN EVENT

## STATEMENT OF WORK (SOW)

     j.  Provide technical and help desk support for end-users.

**16.** Database Source Creation for exporting event data from the CAD Database to reporting tools such as Microsoft Access and/or Sequel Server Crystal Reports and/or Jasper. Provide at least ten custom reports for given parameters provided by the customer, within 30 days of customer request.

**17.** Contractor personnel must arrive on site at the location on Thursday, August 15, 2019 and begin set-up and testing, no later than 13:00 hours, Pacific Daylight Time (UTC- 08:00).

**18.** System must be built, deployed, tested and operational by Monday, August 19, 2019 at 23:59 hours, Pacific Daylight Time (UTC-08:00).

**19.** Contractor must have dedicated technical support on-site during the entire "Service Period." Contractor must have dedicated technical support personnel available to respond within 15 minutes in the event of CAD System failure.

**20.** Contractor must provide a "High Availability" CAD System" required from 08/20/2019 00:01 hours through 09/05/2019 23:59 hours, Pacific Daylight Time (UTC-08:00), for BMP-ESD.  ESD intends to "Go Live" on 8/21/2019.

**21.** Contractor must provide a "High Availability" CAD System" required from 08/20/2019 00:01 hours through 09/05/2019 23:59 hours, Pacific Daylight Time (UTC-08:00), for BLM.  BLM intends to "Go Live" on 8/20/2019.

**22.** It is a requirement for this contractor to work collaboratively and cooperatively with additional contractors, contractors, federal, state, local agencies during the performance period both at the location and at off-site locations if necessary.

**23.** The contractor shall be responsible for lodging of contractor personnel on-site using a contractor furnished RV or camper trailer. BMP will provide space for parking and power, potable water and sewage service.

**24.** The contractor shall be responsible for food and beverages for contractor personnel from August 15 through August 21.  BMP catering service will begin on August 21, 2019 and will conclude on September 5, 2019.

**25.** The contractor shall provide any on-site transportation needed for contractor personnel and contractor equipment at the location during the performance period.

**26.** The contractor shall be responsible for all transportation of all contractor personnel and contractor equipment to and from the event.

**27.** The contractor shall be available to participate in pre-coordination meetings by telephone and/or video teleconference.

**28. Pre-Event System Implementation - Engineering Services (6/13 – 8/11/2019)** Project Management,

**2019 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

Core CAD Software Upgrade & Certification, Map Assessment/Integration, Interfaces Upgrade & Certification, Interfaces Feature Modification Development, Report Review & Custom Report Development, CAD Feature Modification/Development, Training.

29. Provide pre-event training documentation and electronic based training in the format of a webinar for 2-3 people for ESD and 2-3 people for BLM on iNetCAD Dashboards Data Explorer. Provide a licensed Demo product users may utilize during training. (if optioned by BMP.)

30. Assist BLM with pre-event training documentation and electronic based training in the format of a webinar for 15-20 people for BLM. Provide a licensed Demo product users may utilize during training. The BLM training will be conducted by BLM personnel.

31. **Event (on-site) Engineering Services (Support & Engineering)**
Project Management, Core CAD Software Development & Maintenance, Map Assessment/Integration, Interfaces Upgrade & Certification, Interfaces Feature Modification Development, Report Review & Custom Report Development, CAD Feature Modification/Development, Training

32. Provide on-site training for BLM and ESD IT Support. Training will consist of an overview of the system so IT personnel can competently check the system's functionality.

33. Provide on-site support for set up and/or take down of all contractor provided equipment.

34. **Post Event Engineering Services**
For BLM, participate in meetings, move system/Install/Setup Server and system on hosted network during the off-season, conduct closeout, and issue final reports. Ensure database, data availability and user access during off-season. Contractor shall provide BMP and BLM post event recommendations and feedback on what went well with the implementation and operation of the cad along with recommendations for future improvement.

If Optioned by BMP by October 14th:
For BMP, participate in meetings, move system/Install/Setup Server and system on hosted network during the off-season, conduct closeout, issue final reports. Ensure database, data availability and user access during off-season.

# SPECIAL REQUIREMENTS:

Automated Parsing of Data:

Parse specific fields from the Department of Motor Vehicle return through Nevada Criminal Justice Information System (NCJIS) and/or the International Justice and Public Safety Network (NLETS). Automate population of fields from the person and vehicle returns to automatically run the registered owner of a vehicle and create a local file.

IMARS Automation- Automation of data being pushed from the computer-aided dispatch to IMARS is dependent upon a network connection that is set up and maintained by the Customer and the Nevada Department of Public Safety. If a connection can be made and sustained, the customer requests data to

**2019 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

be pushed at the time of each event's conclusion and queried during each query, in Representational State Transfer (REST) for the Government's IMAR program.

# SPECIAL REQUIREMENTS:

Background Investigation:

Contractor employees shall hold or be able to obtain, at minimum, a current National Agency Check with Inquiries (NACI) background investigation with a favorable adjudication and if needed Criminal Justice Investigative System certification. These must be in place prior to commencement of any technical work and live operation of the criminal justice portion of the system.

Contractor employees needs a favorable background investigation meeting or exceeding NCJIS screening standards.

The contractor is required to provide the following documentation to BLM by June 14, 2019 to initiate the NCJIS background check and security clearance process.

**Applicant Requirements:**
1. A list of the employees assigned to work the event. Please include name, date of birth, place of birth, current address, and social security number.
2. Employees will need their fingerprints taken (see attached recording legible fingerprints document). They agency administering the fingerprints is required to sign the fingerprint card in the appropriate box. The employee is also required to sign the fingerprint card.
3. Each employee will need to fill out the Nevada Department of Public Safety (NVDPS) Fingerprint Background Waiver Form. Put "*Bureau of Land Management*" as the requesting agency.
4. Submit items 1-3 to **Becky Andres** at the BLM Nevada State Office, 1340 Financial Blvd., Reno, NV, 89502.
5. Any previous felony convictions may preclude the employee from being authorized to work this event.

Once the above is received, BLM will complete the following.

**BLM Requirements:**
1. Submits the fingerprint cards to NVDPS in Carson City, Nevada.
2. Once favorable background investigation is complete, BLM Terminal Agency Coordinator (TAC) will request a new operator ID for each employee, as appropriate.
3. The BLM TAC will conduct a criminal history check for each employee assigned to the operation.
4. The BLM TAC will coordinate training prior to the start of the operation. This may require earlier arrival.
5. The BLM will coordinate with the NVDPS to conduct and onsite criminal justice security inspection.

# BMP FURNISHED REQUIREMENTS:

**2019 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

The tasks and responsibilities of BMP shall consist of the following:
1. Provide CAD workstation hardware and non-CAD software.
2. Provide dedicated, access controlled, secure workspace for three (3) contractor personnel.
3. Provide onsite parking for contractor furnished RV or camper trailer.
4. Provide electrical power to the contractor furnished RV or camper trailer.
5. Provide electrical power for the contractor supplied equipment.
6. Provide food and beverages for the contractor through catering service from August 21 through September 06.
   a. Meals will be served three times per day at regular intervals.
   b. Meals will be provided for no more than five contractor personnel.
7. Provide water fill service through an on-site contractor.
8. Provide sewage pump out service through an on-site contractor.
9. Provide project contacts for coordination and direction pre-event, event and post-event.
9. Provide a shipping address in Gerlach, Nevada to the contractor may ship small and urgent packages necessary to the project.

# GOVERNMENT FURNISHED REQUIREMENTS:

The tasks and responsibilities of BLM shall consist of the following:
1. Provide CAD workstation hardware and non-CAD software.
2. Provide government owned CAD Server Hardware (1 Server)
3. Provide government owned Microsoft SQL Server Operating System (OS)
4. Provide government owned ESRI ArcGIS Enterprise License (if needed)
5. Provide government owned ESRI ArcGIS Workstation License
6. Provide government owned network hardware: Adaptive Security Appliances (2 ASA's)
7. Provide government owned network hardware: Switches (2 switches)

**2019 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

# ACKNOWLEDGEMENTS:

The government acknowledges the network at the BLM JOC and within Black Rock City is dependent on power provided by the government and/or another contractor to the government. The CAD contractor will not be responsible for system outages or failures, which are caused by lack of power or power inadequacies. The contractor is responsible for providing contractor power requirements for the location to the government in advance of the performance period, but not later than August 1, 2019.

# DELIVERABLES:

Categories for tasks and responsibilities identified in the Statement of Work may fall into the following categories:
1. Project Management
2. Systems Architecture
3. Systems Engineering
4. Database Administration Services
5. System Administration Services
6. Network Administration Services
7. CAD Application Support Services
8. User Training
9. Recommendations
10. Accounting of Billable Activities

Weekly meetings with the contractor shall be held to track all work being performed.

The contractor may provide a detailed accounting of billable services following the period for which the services were performed.

# LOCATION:

Black Rock Desert near Gerlach, NV (Pershing County, Nevada)

**PERIOD OF PERFORMANCE**
July 1, 2019 to December 31, 2019. This will account for the configuration prior to deployment as well as support post event for database maintenance.

**PERIOD OF SERVICE:**
August 15, 2019 through September 6, 2019. (23 Days)
08/15/2019 – Contractor must arrive at Black Rock Desert to begin "setup"

08/20/2019 – Provided Services fully operational at or before 00:01 hours

09/06/2019 – "Post Patrol" portion of event ends, contractor begins "break down"

09/07/2019 – Contractor may depart when "break down" complete.

**AR03376**

### 2019 BURNING MAN EVENT

### STATEMENT OF WORK (SOW)

# LEGAL AUTHORITIES AND REGULATORY REQUIREMENTS:

Because this CAD system is jointly operated by the US Department of Interior, Bureau of Land Management (BLM) and Burning Man Project (BMP), formerly Black Rock City, LLC, Emergency Services Department (ESD), the operation of the CAD System and transmission of all data must comply with all commonly accepted standards, laws and regulations. Most of these standards, laws and regulations pertain specifically to government information security; however, they are also "best business practices" for Burning Man Project.

- 44 U.S.C. § 3541– Federal Information Security Management Act (FISMA) of 2002

- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 140-2, Security Requirements for Cryptographic Modules

- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 197, Advanced Encryption Standard (AES) 256 bit cypher

- National Institute of Standards and Technology (NIST), Special Publication SP 800-53A, Assessing Security and Privacy Controls in Federal Information Systems and Organizations: Building Effective Assessment Plans

- 28 C.F.R. § 20 - Criminal Justice Information Systems

- 5 U.S.C. § 552a - The Privacy Act of 1974

## 2019 BURNING MAN EVENT

## STATEMENT OF WORK (SOW)

# CONTACTS:

**BMP Contracting Signatory**

Charlie Dolman
Director, Event Operations
Burning Man
Black Rock City, LLC.
(415) 865-3800 x164
charlie.dolman@burningman.org

**BLM Project Contact/Technical Point of Contact**

Andrea Littlefield

Communications Center Manager

Federal Interagency Communications Center

BLM - California Desert District

Cell: (951) 269-9021
Desk: (909)382-2917
alannenlittlefield@blm.gov

**BMP Project Contact**

Bryan Anderson

Dispatch Chief
Emergency Service Department Black
Rock City, LLC.
(C): 541-619-0794
bryan.anderson@burningman.org

**FINALIZATION**

If BMP accepts this SOW under the MOU Program, please send written confirmation (E-Mail) of the acceptance to Mark Hall, Mark Pirtle and Becky Andres by March 22, 2019.

AR03378





**Mckinney, Chelsea <cmmckinney@blm.gov>**

## [EXTERNAL] 2019 MOU Fuel Service for BLM & PCSO
1 message

**Playground** <playground@burningman.org>         Wed, Mar 20, 2019 at 5:12 PM
To: Mark Hall <mehall@blm.gov>
Cc: Marnee Benson <marnee.benson@burningman.org>, "Mckinney, Chelsea" <cmmckinney@blm.gov>, Charlie Dolman
<charlie@burningman.org>, Mark Pirtle <mpirtle@blm.gov>, Rebecca Andres <randres@blm.gov>, Emma Weisman
<emma.weisman@burningman.org>

Mark-

BMP agrees to fulfill the attached MOU for 2019 Fuel Service.

---

**2 attachments**

 **2019 BMP-BLM MOU Program_BM Event Contracted Fuel Services_for BLM and PCSO_SOW to BRC.pdf**
118K

**ATT00001**
1K

**AR03379**

BURNING MAN OPERATION 2019

# MOU STATEMENT OF WORK TO BMP
# FOR BLM/PCSO FUEL SERVICES AT JOC COMPOUND

Per a Memorandum of Understanding (MOU) between Burning Man Project, formerly Black Rock City (BRC) LLC, and the Bureau of Land Management (BLM), BMP will be utilizing their internal procurement process to obtain shared services needed by the BLM and PCSO in their operational missions at the 2019 Burning Man Event.  This document will serve as the Statement of Work for the BLM and PCSO shared asset of contracted fuel services at the JOC compound.

The BLM 2019 Planning Team Member Mark Pirtle (Cell: 775-455-6947/E-mail: mpirtle@blm.gov) will be available to BMP and their contractor during the pre-award, award and deployment planning periods for question/concerns.  During the event, Pirtle will be on site to coordinate with BMP and the contractor representatives for Fuel Service's coordination.

## REQUIRED SERVICES

Fuel requirements will be adjusted by BMP, with BLM concurrence, if necessary according to the final BLM and final PCSO Table of Organizations.

Rental of 2 fuel Storage Tanks (1 gasoline, 1 diesel) with electric dispensary:

1) Set-up of Temporary Fuel Services facility at the JOC by August 19, 2019 (Monday) to dispense fuel (gasoline and diesel) for BLM/PCSO vehicles (trucks, cars, UTVs, equipment, refrigerated trailers).  Tanks can/should be a 2000 gal Gasoline tank and a 1000 gal Diesel tank.  Ensure fueling facility is marked. Ensure safe guards are in place to prevent fuel from hitting playa ground.

Service of:

1) Service of Temporary Fuel Services Facility by re-filling fuel tanks as needed.  Provide service call contractor personnel if facility equipment breaks down within 2 hours of call out.  BMP will do everything within their power to ensure fuel is available at all times

2) Break-down and removal of Temporary Fuel Services facility on or after Friday, September 6, 2019.

BLM will assign the BLM logistic team to operate the fueling facility once the facility is set-up by BMP's contractor. Per BMP management request, a use log will be maintained by the operating team to show gallons used by BLM units, gallons used by PCSO units and gallons used by BMP units. BMP can develop and provide the fueling log documents they would like BLM to use. BLM will provide them to BMP at the end of the operation (BLM will retain copies for BLM and PCSO).

## LOCATION

Delivery and Pick-up to the JOC, off County Road 34, 12 miles north of Gerlach, NV.


**PERIOD OF PERFORMANCE**

Contractor or BMP will set-up fuel service facility and be operational by August 20 (Tuesday), 2019.  Contractor or BMP will break-down facility items on or after September 6 (Friday), 2019.


**FINALIZATION**

If BMP accepts this SOW under the MOU Program, please send written confirmation (E-Mail) of the acceptance to Mark Pirtle by <mark>March 22, 2019</mark>.

| | |
|---|---|
| **From:** | Playground |
| **To:** | Hall, Mark E; Pirtle, Mark O |
| **Cc:** | Matt Morgan; Marnee Benson; Mckinney, Chelsea M; Andres, Rebecca L; Charlie Dolman |
| **Subject:** | [EXTERNAL] JOC buildings |
| **Date:** | Thursday, May 9, 2019 12:18:01 PM |
| **Importance:** | High |

Mark,

BMP will accept the buildings under the MOU to facilitate having joint dispatch in order to keep

public health and safety a priority as BLM set up several years ago.

erin

-------------------------------------------------

Erin MacCool aka Playground
Associate Director, Event Operations
playground@burningman.org
415-865-3800 ext 122
www.burningman.org

AR03382

| | |
|---|---|
| **From:** | Pirtle, Mark O |
| **To:** | Playground MacCool |
| **Cc:** | Charlie Dolman; Marnee Benson; Mckinney, Chelsea M; Andres, Rebecca L; Hall, Mark E |
| **Subject:** | 2019 BLM Rented Modular Buildings for JOC |
| **Date:** | Wednesday, May 1, 2019 2:39:58 PM |
| **Importance:** | High |

## Background:

In February 2019 BLM learned that ModSpace, the contractor that has provided the modular buildings for BLM's and BMP's JOC operation for the last five years through the BLM/BMP MOU program, had been bought out by another company, Willscot. When BLM initially contracted Wilscot about continuing to contract modular building for the Burning Man operation, BLM was told Wiliscot was not interested in short term special event rentals.  I believe initially BMP was told the same thing. When BLM submitted the JOC MOU SOW to BMP, BMP told BLM they were not going to accept the modular building component of the JOC SOW because they had no contractor to provide them. BMP advised BLM to try to find what they needed for the JOC through a government contract.

In April 2019 Willscot contacted BLM and said they had changed their minds and would consider short term contracts for BLM and BMP at the Burning Man event.  BLM Mark Pirtle met with Robin Wilde of Willscot and provided the numbers, sizes, floor plans and build out reqirements of the 7 modular buildings that would be needed for the 2019 BLM JOC operation.

On April 30, 2019 Robin Wilde of Willscot contacted Mark Pirtle and stated they would rent short term to BLM and BMP.  Wilscot stated they had located 7 modular buildings in their inventory that would serve the requirements of the 7 BLM modular buildings (3 singlewides & 4 doublewides) and they would do the build outs that are needed (for Dispatch and Dining Mods). Willscot stated they are also working with BMP to provide the modular building they required for their Burning Man operation.

## Proposal to BMP:

Given that Willscot is now willing to contract with both BLM and BMP for Burning Man event modular buildings, BLM is asking BMP to accept the 7 BLM modular buildings on their contract with Willscot using the MOU program. If BMP agrees, BLM would modify the JOC SOW to reflect that and send back to BMP.  Given the late date we are now both facing for planning, this would speed up the process for contracting the JOC modular buildings and go back to saving BMP the indirect cost of renting BLM's modular buildings.

Please consider this proposal and get back to BLM via e-mail by noon on Monday, May 6, 2019.
If you have any questions, please call Pirtle. We can also talk about it on tomorrow's call at 11 if you want.



550 ft.
G
G
Trash
Recycling
Gate
Gate
COMMAND PARKING ENTRANCE GATE
Gate
Light Tower w/ Spill Bin
Gate
Food Caterer Set-up Area
CONEX
CONEX
H
H
HW
COMMS PARKING
COMMAND PARKING
RV
Dining - DW
2 HW
Shade
Event Operations-DW
Unified LE Operations-SW
Evidence-SW
JAIL-SW
BLM/PCSO JOC SIDE
BRC/ESD JOC SIDE
Vehicle Access Gate
300 ft.
Gate / Water Tender Access
Report Writing-DW
Medical-SW
DC
K-9 PARKING
POOL VEHICLE PARKING
BLM RADIO TRAILER
BLM
BRC
Dispatch - DW
Security Walk-In Gate
Pool Vehicle Gate
BRC PARKING
ESD PARKING
GENERAL STAFF PARKING
250 Feet
FUEL STATION
GATE
Cell Site-Site / COW
Approximate
W
S
N
E
BLACK ROCK CITY
BLM/PSCO SIDE OF JOC COMPOUND
2019
2019 Burning Man Event
Black Rock Desert NCA
AR03384
SHEET
1 OF 1

 **DEPARTMENT OF THE INTERIOR** Mail

**Mckinney, Chelsea <cmmckinney@blm.gov>**

---

# [EXTERNAL] JOC MOU
1 message

---

**Playground** <playground@burningman.org>                    Fri, May 10, 2019 at 3:12 PM
To: "Pirtle, Mark" <mpirtle@blm.gov>, Mark Hall <mehall@blm.gov>
Cc: "Mckinney, Chelsea" <cmmckinney@blm.gov>, Rebecca Andres <randres@blm.gov>, Charlie Dolman
<charlie@burningman.org>, Marnee Benson <marnee.benson@burningman.org>, Matt Morgan <hazmatt@burningman.org>

Mark,

BMP accepts the MOU for the JOC as attached below.

pg

---

**2 attachments**

 **Revised Final 2019 BMP-BLM MOU Program_BM Event Contracted JOC Facility Assets-Services_for BLM
and PCSO_SOW to BRC_5-09-19 (2).pdf**
244K

**ATT00001**
1K

**AR03385**

BLM BURNING MAN OPERATION 2019

# MOU STATEMENT OF WORK TO BMP
# FOR BLM/PCSO JOC COMPOUND FACILITY ASSETS AND SERVICES

Per a Memorandum of Understanding (MOU) between Burning Man Project (BMP), formerly Black Rock City LLC (BRC), and the Bureau of Land Management (BLM), BMP will be utilizing their internal procurement process to obtain assets and services needed by the BLM and PCSO in their operational missions at the 2019 Burning Man (BM) Event.  This document will serve as a Statement of Work for potential BMP contractors and BMP support staff concerning items and services needed by the BLM/PCSO at the JOC Compound.

The BLM 2019 Planning Team Member Mark Pirtle (Cell: 775-455-6947/E-mail: mpirtle@blm.gov) will be available to BMP and their contractor(s) during the pre-award, award and deployment planning periods for question/concerns.  The BMP planning team members assigned to the JOC will be available to BLM and their contractor(s) during the pre-award, award and deployment planning periods for questions/concerns.  During the event, Mark Pirtle will be on site to coordinate with BMP and the contractor(s) for the delivery, set-up and any issues of these items, 24/7.  All BLM JOC contractors will need to work with BMP planning team to ensure the BLM contracted assets and equipment are compatible with BMP contracted assets and equipment.  The attached JOC layout diagram will show the required set-up/configuration and location placement of all items.  BMP will take the BLM/PCSO side of the JOC compound layout diagram, add in the ESD/DPW side and convert it to a scaled version with measurements which will be used to measure and flag the locations of each item in the compound during measure week, starting on July 29, 2019.

The following rental equipment and on-site services have been identified by BLM for the BLM/PCSO side of JOC Compound.

*In 2019 PCSO's event operation will be designated as an "Integrated" operation with BLM. BLM agrees to provide PCSO with "Shared Assets/Services" under this MOU SOW. Please note the percentages of use by PCSO under these assets that would be shared with BLM. The percentages can be used to calculate the contracting cost applied towards PCSO by BMP.*

**REQUIRED ASSETS/SERVICES**

### A.  BMP Logistic Team to work and lodge at JOC site

BMP will provide a JOC logistic team responsible for the set-up, servicing and breakdown of the JOC compound in coordination with the BLM.

### B.  <u>Rental and Service of Modular Buildings Component</u>

<u>Rental</u> of 7 Modular Buildings (4-60' Double-wide's & 3-60' Single-wide's) with lights, AC, heater, <u>hard floors (no carpet)</u>, and <u>temporary covers/shades</u> for the windows.  Some build-

1

AR03386

outs/modifications may be required to certain Mods as described below:

1) **BLM/PCSO Dining Mod:**
   24ft Wide x 60ft Long Modular Building (Double-wide), with two doors to outside at each end of front of Mod. Interior: One open room, no interior walls. <u>Build-out requirement:</u> Additional outside door - 1 door to outside on left side for food vendor access.
   (See depiction of Dining Mod)

   *A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

2) **BLM/ESD Combined Dispatch Mod:**
   24ft Wide x60ft Long Modular Building, (Double-wide), with two doors to outside at left end of Mod (facing BLM side which faces into center of JOC compound), one on BLM side and one on ESD side, both opening from outside to small room. Interior: walls dividing into two spaces, a 24ftW x 50ftL large room (right side of Mod) and a 24ftW x 10ftL small room (left side of Mod) with interior doors connecting small room to large room on BLM and ESD sides. <u>Build-out requirement:</u> Half wall dividing BLM and BMP side of large room.
   (See depiction of Dispatch Mod)

   *A ESD/BLM/PCSO Shared Asset: 20% of BLM's 50% charged to PCSO (Based on BLM & PCSO Dispatcher numbers in contract).*

3) **BLM Event Operations Mod:**
   24ft Wide x 60ft Long Modular Building (Double-wide), with two doors to outside at each end of front of Mod. Interior: walls dividing into 5 rooms: one 24ftW x 40ftL common-area large room in center of Mod, two 12ftW x 10ftL offices on left side of Mod, two 12ftW x 10ftL offices on right side of Mod. The four office rooms have interior doors opening into common room.
   (See depiction of Event Operations Mod).

   *A BLM asset only.*

4) **BLM/PCSO Report Writing Mod:**
   24ft Wide x 60ft Long Modular Building (Double-Wide), with two doors to outside at each end of front of Mod. Interior: walls dividing into 5 rooms: one 24ftW x 40ftL common-area large room in center of Mod, two 12ftW x 10ftL offices on left side of Mod, two 12ftW x 10ftL offices on right side of Mod. The four office rooms have interior door opening into common room.
   (See depiction of Report Writing Mod).

   *A BLM/PCSO Shared Asset: 25% charged to PCSO (Based on one-quarter space assigned to PCSO).*

5) **BLM/PCSO LE Operations Mod:**
   12ft Wide x 60ft Long Modular Building (Single-Wide), with two doors to outside at

2

each end of front of Mod. Interior: walls dividing into three rooms (10ft room/40ft room/10ft room) with doors between interior rooms.
(See depiction of Unified LE Mod).

*A BLM/PCSO Shared Asset: 50% charged to PCSO (Based on one-half space assigned to PCSO).*

6) **BLM/PCSO Evidence Processing/Evidence Storage Mod:**
12ft Wide x 60ft Long Modular Building (Single-Wide), two doors to outside at each end of front of Mod. Interior: walls dividing into three rooms (10ft room/40ft room/10ft room) with doors between interior rooms. <u>A safety ventilation system must be installed in the 40ft center room to vent out noxious fumes from the illegal narcotic's seized and processed for evidence.</u>
(See depiction of Evidence Mod).

*A BLM/PCSO Shared Asset: 50% charged to PCSO (Based on one-half space assigned to PCSO).*

7) **BLM Medical Mod:**
12ft Wide x 60ft Long Modular Building (Single-Wide), two doors at one end of front of Mod. Interior: walls dividing into three rooms (10ft room/40ft room/10ft room) with doors between interior rooms.
(See depiction of Medical LE Mod).

*A BLM asset only.*

<u>On-Site Service of 7 Modular buildings:</u>

The Service of the 7 modular buildings includes: mobilization of the 7 modular buildings by delivery to the JOC site, set-up in configuration outlined in set-up layout; anchoring to the ground; and constructing steps/rails (straight out instead of to the side for Mods with Shade Structures: Dining, Event Operations, LE Operations). BMP will coordinate all inspections and certifications by the state. Service shall also include the complete breakdown and demobilization of the modular buildings.

The BLM and BMP will flag the location of building placement at the playa site (in accordance with the BMP scaled playa site layout) during "Measure Week" (7/29 – 8/2/2019). The contractor or BMP will be responsible for providing any equipment required on site to move, setup, and breakdown the buildings as configured in the JOC site layout.

*A BLM/PCSO Shared Service: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

C. **Construction of Shade Structures of Designated Mods and K-9 Vehicles Bay by DPW Component**
(See attached JOC Layout for Placement of the Shade Structures)

1) DPW Shade Structure (12'x 12' shade structure) on front between doors of BLM Event Operations Mod.

3

2) DPW Shade Structure (12'x 12' shade structure) on front between doors of BLM/PCSO Unified LE Operations Mod.
3) DPW Shade Structure (12' x 12" shade structure) on front between doors of BLM/PCSO Dining Mod.
4) If deemed necessary by BLM at the event due to hot temperatures, DPW will construct a shade structure (3 bay drive in structure) along north compound fence line (behind Medical Mod), east of vehicle access gate (Same as in 2018).

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO use of Mods with shade structures and K-9 bay structure).*

**D. Placement and Service of Furniture for Modular Buildings Component:**
(See attached furniture placement table for placement of furniture in Mods)

Providing the following Furniture items:

1) 75 rectangular tables (6ft long/3ft wide/30in tall, folding)
2) 2 Conference tables (10ft long/4ft wide/30in tall, non-folding)
3) 162 Folding chairs
4) 64 high-back roller-chairs
5) 9 refrigerators (large side by side/approximately 6ft tall-3ft wide)
6) 3 couches (8ft)
7) 6 Desks (approximately 5ft long with drawers on right side)
8) 2 Large Dry Erase Boards (approximately 6'x 4')
9) 1 Small Dry Erase Board (approximately 3'x 2')

On-Site Service of the Furniture:

The Service of the furniture includes: mobilization of the furniture by delivery to JOC site and placement of furniture into Mods as depicted in attached furniture placement diagrams of each Mod.  BLM will have logistic crew on site to assist.

The furniture shall also be demobilization (break-down/ pick-up).

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on PCSO use of Mod furniture).*

**E. Rental, Placement and Service of Temporary Power for JOC Component:**
(See attached JOC Layout for Placement of the Generators)

Rental of Temporary Power equipment to power approximately 8 modular buildings, Food Vendor kitchen complex and approximately 8 RV/camping trailers at JOC site

1) Two (2) 200 KW Generators (minimum).
2) All needed distribution (50 amp) cords, spider boxes, whips, etc.
3) Re-fueling (diesel) and maintenance (oil) service throughout operational period.

On-Site Service of the Temporary Power equipment:

The Service of the temporary power includes: mobilization of the generators/equipment

AR03389

by delivery to JOC site, set generators (one as main and the second as back-up if main fails), lay all cords and connect power to the 8 Modular buildings (direct hook-ups), Food Vender kitchen complex and 8 RVs/camping style trailers; after all hook-ups, test power to all facilities; on-site re-fueling of generators with diesel fuel throughout operation and any needed servicing (oil) and needed maintenance.

Generators will be operational 24 hours a day for the entire rental period.  Contractor is to provide fuel and service as needed.  All costs should be included in the rental costs.

The Service of the temporary power also includes complete demobilization.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**F. Rental, Placement and Service of Portable Restrooms for BLM side of JOC Component:**
(See attached JOC Layout for Placement of Portable Restrooms & Hand wash stations)

Rental of Portable Restrooms and Hand Wash Stations, including all supplies (toilet paper, paper towels, soap, hand sanitizer, etc.).

1) 22 (10 Handicap & 12 Standard) Portable Restrooms.
2) 12 Hand Wash Stations.
3) Service of Portable Restrooms (dumping back-water/cleaning/re-supply paper) and service of Hand washing stations (dumping of gray water, re-fill potable water)

| | |
|---|---|
| Along front fence/gate of JOC - | 2 handicap toilet units / 3 Standard toilet units / 2 HWS |
| Right side of JOC - | 2 handicap toilet unit / 3 Standard toilet units / 2 HWS |
| Left side of JOC - | 2 handicap toilet unit / 3 Standard toilet units / 2 HWS |
| Rear of JOC - | 2 handicap toilet unit / 3 Standard toilet units / 2 HWS |
| Rear/Right side of JOC - | 1 handicap toilet unit / 1 HWS (For Spectrum) |
| Behind Jail Mod - | 1 handicap toilet unit / 1 HWS (For Custody's) |
| Front of Dining Mod - | 2 HWS (For Dining Use) |

Service of Portable Restrooms and Hand Wash Stations:

In addition to the delivery, the set-up of the portable toilets will included the anchoring of the units. The contractor is responsible for cleaning the inside of the portable toilets, pumping as necessary, refilling handwash stations potable water and cleaning washing bowls.  The units must be checked daily.  It is the contractor's responsibility to establish and coordinate the servicing schedule with the on-site BLM and BRC Logistics Managers. The units will need to be serviced and supplies stocked accordingly.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**G. Sewer and Potable Water Service to Camping Trailers/RVs at JOC Component:**

Service of JOC Camping Trailers/RVs:

5

1) On-site service (pump gray/black water and refill potable water) of RVs/camping trailers, approximately 8. (2 lodging trailers of food vendor- left rear of compound; 6 lodging trailers/RVs of BLM Contractors - right rear of compound)

*A BLM/Spectrum asset only.*

**H. Rental, Placement and Service of Lighting Equipment at JOC Component:**
    (See attached JOC Layout for Placement of the Light Towers)

Rental of Diesel Powered Light Towers for JOC:

1) Placement of approximately 11 Light Towers for JOC compound (diesel powered light towers with environmental spill basins (Not counting ESD side). Re-fueling light towers throughout operational period (Same as 2018).

On-Site Service of Lighting Equipment:

The Service of the light towers includes: delivery and placement at compound in designated locations, re-fueling diesel throughout operational period, servicing any maintenance problems, turning on/off of the light towers daily and demobilization (break down/pick-up) of light towers.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**I. Placement of 2 Connex boxes, one for BLM Logistic and one for BLM Comms at JOC Component:**

Rental of two 20 ft connex box for BLM logistic storage and BLM communications storage at JOC.  Service includes placement of the boxes, starting on August 14 and removal of the boxes on September 7. Placement locations will be displayed on JOC layout. Deployment days will be same as modular buildings.

*A BLM asset only.*

**J. Fencing at JOC Component:**

Construction of litter fence (orange plastic fencing that is used as perimeter fence) around and within JOC, per JOC layout diagram.  BLM will have logistic crew on site to assist.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**LOCATION**

The JOC site will be located at a mutually agreed upon site to be determined later, off County Road 34, 12 miles north of Gerlach, NV.

6

**PERIOD OF PERFORMANCE**

All BLM/PCSO JOC assets/equipment must be in place (mobilized) and operational at the compound site by the end of the day on Tuesday August 13, 2019 and run through Friday September 6, 2019.  All services required at JOC will start on Thursday August 15, 2019 and run through Friday September 6, 2019.  The JOC equipment can be demobilized (break-down/pick-up) beginning on Saturday September 7, 2019.

**FINALIZATION**

If BRC accepts this SOW under the MOU Program, please send written confirmation (E-Mail) of the acceptance to Mark Pirtle by May 9, 2019.

AR03392



**Mckinney, Chelsea <cmmckinney@blm.gov>**

---

## [EXTERNAL] 2019 MOU for JOC Assets for BLM & PCSO
1 message

---

**Playground** <playground@burningman.org>      Wed, Mar 20, 2019 at 6:11 PM
To: Mark Hall <mehall@blm.gov>
Cc: Marnee Benson <marnee.benson@burningman.org>, "Mckinney, Chelsea" <cmmckinney@blm.gov>, Charlie Dolman <charlie@burningman.org>, Mark Pirtle <mpirtle@blm.gov>, Rebecca Andres <randres@blm.gov>, Emma Weisman <emma.weisman@burningman.org>

Mark-

BMP will accept this MOU after removal of the following items:

pgs 1-4 Remove all of Section B pertaining to Modular Buildings, including the last paragraph of "BMP will provide private work area (Office) for the on playa iNET CAD contractors in one of their ESD side Mods, due to PII law enforcement sensitive data on their work screens."

pg 7 Remove all of section I pertaining to Trash Dumpsters

pg 7 Remove all of section K pertaining to Dust Abatement

pg 8 Remove all of section M pertaining to Decon System

In light of this, please add the following highlighted sections to paragraph 2 on page 1: The BLM 2019 Planning Team Member Mark Pirtle (Cell: 775-455-6947/E-mail: mpirtle@blm.gov) will be available to BMP and their contractor(s) during the pre-award, award and deployment planning periods for question/concerns. The BRC planning team member assigned to the JOC will be available to BLM and their contractor(s) during the pre-award, award and deployment planning periods for questions/concerns. During the event, Mark Pirtle will be on site to coordinate with BMP and the contractor(s) for the delivery, set-up and any issues of these items, 24/7. All BLM JOC contractors will need to work with BMP planning team to ensure the BLM contracted assets and equipment are compatible with BMP contracted assets and equipment. The attached JOC layout diagram will show the required set-up/configuration and location placement of all items. BMP will take the BLM/PCSO side of the JOC compound layout diagram, add in the ESD/DPW side and convert it to a scaled version with measurements which will be used to measure and flag the locations of each item in the compound during measure week, starting on July 29, 2019.

Please send the revised version for our review so we can accept.

---

**2 attachments**

 **2019 BMP-BLM MOU Program_BM Event Contracted JOC Facility Assets-Services_for BLM and PCSO_SOW to BRC.pdf**
274K

 **ATT00001**
1K

BLM BURNING MAN OPERATION 2019

# MOU STATEMENT OF WORK TO BMP FOR BLM/PCSO JOC COMPOUND FACILITY ASSETS AND SERVICES

Per a Memorandum of Understanding (MOU) between Burning Man Project (BMP), formerly Black Rock City LLC (BRC), and the Bureau of Land Management (BLM), BMP will be utilizing their internal procurement process to obtain assets and services needed by the BLM and PCSO in their operational missions at the 2019 Burning Man (BM) Event.  This document will serve as a Statement of Work for potential BMP contractors and BMP support staff concerning items and services needed by the BLM/PCSO at the JOC Compound.

The BLM 2019 Planning Team Member Mark Pirtle (Cell: 775-455-6947/E-mail: mpirtle@blm.gov) will be available to BMP and their contractor(s) during the pre-award, award and deployment planning periods for question/concerns.  During the event, Mark Pirtle will be on site to coordinate with BMP and the contractor(s) for the delivery, set-up and any issues of these items, 24/7.  The attached JOC layout diagram will show the required set-up/configuration and location placement of all items.  BMP will take the BLM/PCSO side of the JOC compound layout diagram, add in the ESD/DPW side and convert it to a scaled version with measurements which will be used to measure and flag the locations of each item in the compound during measure week, starting on July 29, 2019.

The following rental equipment and on-site services have been identified by BLM for the BLM/PCSO side of JOC Compound.

*In 2019 PCSO's event operation will be designated as an "Integrated" operation with BLM. BLM agrees to provide PCSO with "Shared Assets/Services" under this MOU SOW. Please note the percentages of use by PCSO under these assets that would be shared with BLM. The percentages can be used to calculate the contracting cost applied towards PCSO by BMP.*

## REQUIRED ASSETS/SERVICES

### A.  BMP Logistic Team to work and lodge at JOC site

BMP will provide a JOC logistic team responsible for the set-up, servicing and breakdown of the JOC compound in coordination with the BLM.

### B.  Rental and Service of Modular Buildings Component
   (See attached BLM/PCSO Side JOC Layout for Placement of the Mods)

Rental of 8 Modular Buildings (4-60' Double-wide's / 3-60' Single-wide's / 1-40' single-wide) with lights, AC, heater, hard floors (no carpet), and temporary covers/shades for the windows.  Some build-outs/modifications may be required to certain Mods as described below:

1

1) **BLM/PCSO Dining Mod:**

24ft Wide x 60ft Long Modular Building (Double-wide), with two doors to outside at each end of front of Mod. One open room, no interior temp walls. Build-out requirement: Additional outside door - 1 door to outside on left side for food vendor access. BMP or Spectrum needs to provide an outside refrigerator or coolers to store cold/clean bottles/cases of water/sport drink next to the storage of the ice bags, so detailers can stock their individual coolers with the drinks, that are already cold and clean from dust. The location can be determined by the JOC Logistic Team or Spectrum Staff.

(See depiction of Dining Mod)

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

2) **BLM/ESD Combined Dispatch Mod:**

24ft Wide x60ft Long Modular Building, (Double-wide), with two doors to outside at left end of Mod (facing BLM side which faces into center of JOC compound), one on BLM side and one on ESD side, both opening from outside to small room. Also, one door one right side of Mod on ESD side opening from outside to large room for ESD ADA ramp. Interior build-out requirements: Interior walls- Interior walls dividing into two spaces, a 24ftW x 50ftL large room (right side of Mod) and a 24ftW x 10ftL small room (left side of Mod) with interior doors connecting small room to large room on BLM and ESD sides. Counters-BLM side of Mod with wall Counters.

(See depiction of Dispatch Mod)

*A ESD/BLM/PCSO Shared Asset: 20% of BLM's 50% charged to PCSO (Based on BLM & PCSO Dispatcher numbers in contract).*

3) **BLM Event Operations Mod:**

24ft Wide x 60ft Long Modular Building (Double-wide), with two doors to outside at each end of front of Mod. Interior build-out requirements: Interior walls-4 rooms: one 24ftW x 30ftL common-area large room in center of Mod, one 24ftW x 20ftL ComL room on left side of Mod, two 12ftW x 10ftL offices on right side of Mod. The two offices and the ComL room have interior doors opening into common room.

(See depiction of Integrated Command Mod).

*A BLM asset only.*

4) **BLM/PCSO Report Writing Mod:**

24ft Wide x 60ft Long Modular Building (Double-Wide), with two doors to outside at each end of front of Mod. Interior build-out requirements:  Interior walls-5 rooms: one 24ftW x 40ftL common-area large room in center of Mod, two 12ftW x 10ftL offices on one end of Mod, two 12ftW x 10ftL offices on one other end of Mod  Each of the four offices has interior door opening into common large room.

(See depiction of Report Writing Mod).

*A BLM/PCSO Shared Asset: 25% charged to PCSO (Based on one-quarter space assigned to PCSO).*

2

AR03395

5) **BLM/PCSO Unified LE Operations Mod:**
12ft Wide x 60ft Long Modular Building (Single-Wide), with two doors to outside at each end of front of Mod. <u>Interior build-out requirements:</u>  Interior space divided into three rooms (10ft room/40ft room/10ft room) with doors between interior rooms. (See depiction of Unified LE Mod).

*A BLM/PCSO Shared Asset: 50% charged to PCSO (Based on one-half space assigned to PCSO).*

6) **BLM/PCSO Evidence Processing/Evidence Storage Mod:**
12ft Wide x 60ft Long Modular Building (Single-Wide), <u>with no windows or boarded windows</u>, two doors to outside at each end of front of Mod. <u>Interior build-out requirements:</u> Interior space divided into three rooms (10ft room/40ft room/10ft room) with doors between interior rooms. <u>A safety ventilation system must be installed in the 40ft center room to vent out noxious fumes from the illegal narcotic's seized and processed for evidence.</u>
(See depiction of Evidence Mod).

*A BLM/PCSO Shared Asset: 50% charged to PCSO (Based on one-half space assigned to PCSO).*

7) **BLM Medical Mod:**
12ft Wide x 60ft Long Modular Building (Single-Wide), one or two doors at one end of front of Mod (only need one). <u>Interior build-out requirements:</u>  Interior space divided into three rooms (10ft room/40ft room/10ft room) with doors between interior rooms.
(See depiction of Medical LE Mod).

*A BLM asset only.*

8) **PCSO/BLM Jail-Detention Mod:** 12ft Wide x 40ft Long Modular Building (Single-wide), with <u>no windows</u> and two doors, one to outside in front and one in back of Mod, in center of Mod. <u>Interior build-out requirements:</u> Interior walls-five rooms: one 12ftW x 20ftL room in center of Mod for processing and guard room, and four 6ftW x 10ftL detention cell rooms-two at each end of Mod. Each detention cell room has interior door to center room. On three of the detention cell rooms, interior walls facing center room of detention cell rooms will be bar walls and interior walls dividing cells will be solid walls. One detention cell room (first on right side) will have a solid wall in front so it can serve the dual purpose of being a detention cell and a semi-private interview room. Interior doors of the three detention cell only rooms will be <u>bar doors</u> that can be locked with pad-locks. The dual purpose room will have a see through solid screen door that is lockable.
(See depiction of Jail Mod).

*A BLM/PCSO Shared Asset: 90% charged to PCSO (Based on BLM's limited need to temporary detain or arrest subjects).*

<u>On-Site Service of 8 Modular buildings:</u>

The Service of the 8 modular buildings includes: mobilization of the 8 modular buildings

3

by delivery to the JOC site, set-up in configuration outlined in set-up layout; anchoring to the ground; and constructing steps/rails (straight out instead of to the side for Mods with Shade Structures: Dining, Event Operations, Unified LE). BMP will coordinate all inspections and certifications by the state. BMP will provide a cleaning crew to clean the Mods daily. The schedule for cleaning will be decided on site by the BLM Logistics Lead and the BMP JOC Team Lead. Service shall also include the complete breakdown and demobilization of the modular buildings.

The BLM and BMP will flag the location of building placement at the playa site (in accordance with the BMP scaled playa site layout) during "Measure Week" (7/29 – 8/2/2019). The contractor or BMP will be responsible for providing any equipment required on site (ie: forklift) to move, setup, and breakdown the buildings as configured in the JOC site layout. The BLM will not have any heavy equipment available for use on site for set-up or break-down.

*A BLM/PCSO Shared Service: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

BMP will provide private work area (Office) for the on playa iNET CAD contractors in one of their ESD side Mods, due to PII law enforcement sensitive data on their work screens.

**C. Construction of Shade Structures of Designated Mods and K-9 Vehicles Bay by DPW Component**
   (See attached JOC Layout for Placement of the Shade Structures)

   1) DPW Shade Structure (12'x 12' shade structure) on front between doors of BLM Event Operations Mod.
   2) DPW Shade Structure (12'x 12' shade structure) on front between doors of BLM/PCSO Unified LE Operations Mod.
   3) DPW Shade Structure (12' x 12" shade structure) on front between doors of BLM/PCSO Dining Mod.
   4) If deemed necessary by BLM at the event due to hot temperatures, DPW will construct a shade structure (3 bay drive in structure) along north compound fence line (behind Medical Mod), east of vehicle access gate (Same as in 2018).

   *A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO use of Mods with shade structures and K-9 bay structure).*

**D. Placement and Service of Furniture for Modular Buildings Component:**
   (See attached furniture placement table for placement of furniture in Mods)

   Providing the following Furniture items:

   1) 75 rectangular tables (6ft long/3ft wide/30in tall, folding)
   2) 2 Conference tables (10ft long/4ft wide/30in tall, non-folding)
   3) 162 Folding chairs
   4) 64 high-back roller-chairs
   5) 9 refrigerators (large side by side/approximately 6ft tall-3ft wide)
   6) 3 couches (8ft)

4

7) <u>6</u> Desks (approximately 5ft long with drawers on right side)
8) <u>2</u> Large Dry Erase Boards (approximately 6'x 4')
9) <u>1</u> Small Dry Erase Board (approximately 3'x 2')

<u>On-Site Service of the Furniture:</u>

The Service of the furniture includes: mobilization of the furniture by delivery to JOC site and placement of furniture into Mods as depicted in attached furniture placement diagrams of each Mod.  BLM will have logistic crew on site to assist.

The furniture shall also be demobilization (break-down/ pick-up).

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on PCSO use of Mod furniture).*

**E.  Rental, Placement and Service of Temporary Power for JOC Component:**
     (See attached JOC Layout for Placement of the Generators)

<u>Rental of Temporary Power equipment</u> to power approximately 8 modular buildings, Food Vendor kitchen complex and approximately 8 RV/camping trailers at JOC site

1) Two (2) 200 KW Generators (minimum).
2) All needed distribution (50 amp) cords, spider boxes, whips, etc.
3) Re-fueling (diesel) and maintenance (oil) service throughout operational period.

<u>On-Site Service of the Temporary Power equipment:</u>

The Service of the temporary power includes: mobilization of the generators/equipment by delivery to JOC site, set generators (one as main and the second as back-up if main fails), lay all cords and connect power to the 8 Modular buildings (direct hook-ups), Food Vender kitchen complex and 8 RVs/camping style trailers; after all hook-ups, test power to all facilities; on-site re-fueling of generators with diesel fuel throughout operation and any needed servicing (oil) and needed maintenance.

Generators will be operational 24 hours a day for the entire rental period.  Contractor is to provide fuel and service as needed.  All costs should be included in the rental costs.

The Service of the temporary power also includes complete demobilization.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**F. Rental, Placement and Service of Portable Restrooms for BLM side of JOC Component:**
    (See attached JOC Layout for Placement of Portable Restrooms & Hand wash stations)

<u>Rental of Portable Restrooms and Hand Wash Stations</u>, including all supplies (toilet paper, paper towels, soap, hand sanitizer, etc.).

1) 22 (10 Handicap & 12 Standard) Portable Restrooms.

AR03398

    2) 12 Hand Wash Stations.
    3) Service of Portable Restrooms (dumping back-water/cleaning/re-supply paper) and
        service of Hand washing stations (dumping of gray water, re-fill potable water)

| | |
|---|---|
| Along front fence/gate of JOC - | 2 handicap toilet units / 3 Standard toilet units / 2 HWS |
| Right side of JOC - | 2 handicap toilet unit / 3 Standard toilet units / 2 HWS |
| Left side of JOC - | 2 handicap toilet unit / 3 Standard toilet units / 2 HWS |
| Rear of JOC - | 2 handicap toilet unit / 3 Standard toilet units / 2 HWS |
| Rear/Right side of JOC - | 1 handicap toilet unit / 1 HWS (For Spectrum) |
| Behind Jail Mod - | 1 handicap toilet unit / 1 HWS (For Custody's) |
| Front of Dining Mod - | 2 HWS (For Dining Use) |

<u>Service of Portable Restrooms and Hand Wash Stations:</u>

In addition to the delivery, the set-up of the portable toilets will included the anchoring of
the units. The contractor is responsible for cleaning the inside of the portable toilets,
pumping as necessary, refilling handwash stations potable water and cleaning washing
bowls.  The units must be checked daily.  It is the contractor's responsibility to establish
and coordinate the servicing schedule with the on-site BLM and BRC Logistics
Managers. The units will need to be serviced and supplies stocked accordingly.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO
position numbers working event and at JOC).*

**G. Sewer and Potable Water Service to Camping Trailers/RVs at JOC Component:**

    <u>Service of JOC Camping Trailers/RVs:</u>

    1) On-site service (pump gray/black water and refill potable water) of RVs/camping
        trailers, approximately 8. (2 lodging trailers of food vendor- left rear of compound; 6
        lodging trailers/RVs of BLM Contractors - right rear of compound)

    *A BLM/Spectrum asset only.*

**H. Rental, Placement and Service of Lighting Equipment at JOC Component:**
    (See attached JOC Layout for Placement of the Light Towers)

    <u>Rental of Diesel Powered Light Towers for JOC:</u>

    1) Placement of approximately 11 Light Towers for JOC compound (diesel powered
        light towers with environmental spill basins (Not counting ESD side). Re-fueling
        light towers throughout operational period (Same as 2018).

    <u>On-Site Service of Lighting Equipment:</u>

The Service of the light towers includes: delivery and placement at compound in
designated locations, re-fueling diesel throughout operational period, servicing any
maintenance problems, turning on/off of the light towers daily and demobilization (break
down/pick-up) of light towers.

AR03399

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**I. Rental and Service of Roll-Off Trash Dumpsters Component:**
   (See attached JOC Layout for Placement of the Dumpsters)

   Rental of Roll-Off Dumpsters:

   1) 1 30-Yard roll-off dumpsters for compost (BLM/PCSO side)
   2) 1 20-yard roll-off dumpster for landfill trash (BLM/PCSO side)
   3) 1 10-yard bin for BRC recycle station (BLM/PCSO side)
   4) 1 20-yard bin for ESD (ESD side)

   (Or same as 2018 if it worked for BMP recycling program)

   On-Site Service of Roll-Off Dumpsters:

   • Mobilization of the roll-off dumpsters by delivery to JOC site
   • Place dumpsters in locations for compost and trash collection, per JOC layout
   • Monitor and check the dumpsters every other day after deployment
   • Schedule servicing (swap for an empty) if over half full
   • Set-up recycling collection station
   • Monitor and check the recycling station every other day after deployment
   • Transport recycling to the transfer station as needed

   *A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**J. Placement of 2 Connex boxes, one for BLM Logistic and one for BLM Comms at JOC Component:**

   Rental of two 20 ft connex box for BLM logistic storage and BLM communications storage at JOC. Service includes placement of the boxes, starting on August 14 and removal of the boxes on September 7. Placement locations will be displayed on JOC layout. Deployment days will be same as modular buildings.

   *A BLM asset only.*

**K. Dust Abatement Water Truck Component:**

   Provide a 1000 to 2000gal water truck set-up for dust abatement with sprayer, class C driver capable, hydrant fill capable with screw type hydrant hose. This water truck will be stationed and for use at the JOC compound only, it will be operated by the BLM logistic staff. It will be re-filled by BMP contractor. BMP must make re-fill arrangements with their water operation at Fly Ranch. The water truck BMP provided in 2018 worked well and this truck would be acceptable again in 2019. Deployment days will be same as modular buildings.

   *A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO*

7

AR03400

*position numbers working event and at JOC).*

**L.  Fencing at JOC Component:**

Construction of litter fence (orange plastic fencing that is used as perimeter fence) around and within JOC, per JOC layout diagram.  BLM will have logistic crew on site to assist.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**M.  Decon System at JOC Component:**

BMP will provide a Decon capability at the JOC compound for BLM and PCSO employees.  They will also provide response with their HMR3 unit to the JOC Compound when requested by BLM and PCSO. The following decontamination equipment will be provided at the JOC:

- Decon containment units (Shower and Clothes Changing Facility)
- Assorted hoses/wands for water supply
- Cleaning solutions
- Pressurized water
- trash/isolation bags
- red/pathogen bags
- HazMat gloves and boots
- Disposable coveralls (tyvek)
- Disposable replacement clothing (all sizes of paper products scrubs)
- Eye protection (not for over prescription glasses)
- N-95 masks
- Self contained breathing apparatus (SCBA)
- Cavicide with smaller spray bottles for decon of equipment.

The same decon structure BMP provided in 2018 will not be acceptable in 2019, must be upgraded to a newer structure.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**LOCATION**

The JOC site will be located at a mutually agreed upon site to be determined later, off County Road 34, 12 miles north of Gerlach, NV.

**PERIOD OF PERFORMANCE**

All BLM/PCSO JOC assets/equipment must be in place (mobilized) and operational at the compound site by the end of the day on Tuesday August 13, 2019 and run through Friday September 6, 2019.  All services required at JOC will start on Thursday August 15, 2019 and run through Friday September 6, 2019.  The JOC equipment can be demobilized (break-down/pick-up) beginning on Saturday September 7, 2019.

AR03401

**FINALIZATION**

If BRC accepts this SOW under the MOU Program, please send written confirmation (E-Mail) of the acceptance to Mark Pirtle by <mark>March 22, 2019</mark>.

AR03402

BLM BURNING MAN OPERATION 2019

# MOU STATEMENT OF WORK TO BMP
# FOR BLM/PCSO JOC COMPOUND FACILITY ASSETS AND SERVICES

Per a Memorandum of Understanding (MOU) between Burning Man Project (BMP), formerly Black Rock City LLC (BRC), and the Bureau of Land Management (BLM), BMP will be utilizing their internal procurement process to obtain assets and services needed by the BLM and PCSO in their operational missions at the 2019 Burning Man (BM) Event.  This document will serve as a Statement of Work for potential BMP contractors and BMP support staff concerning items and services needed by the BLM/PCSO at the JOC Compound.

The BLM 2019 Planning Team Member Mark Pirtle (Cell: 775-455-6947/E-mail: mpirtle@blm.gov) will be available to BMP and their contractor(s) during the pre-award, award and deployment planning periods for question/concerns.  The BMP planning team members assigned to the JOC will be available to BLM and their contractor(s) during the pre-award, award and deployment planning periods for questions/concerns.  During the event, Mark Pirtle will be on site to coordinate with BMP and the contractor(s) for the delivery, set-up and any issues of these items, 24/7.  All BLM JOC contractors will need to work with BMP planning team to ensure the BLM contracted assets and equipment are compatible with BMP contracted assets and equipment.  The attached JOC layout diagram will show the required set-up/configuration and location placement of all items.  BMP will take the BLM/PCSO side of the JOC compound layout diagram, add in the ESD/DPW side and convert it to a scaled version with measurements which will be used to measure and flag the locations of each item in the compound during measure week, starting on July 29, 2019.

The following rental equipment and on-site services have been identified by BLM for the BLM/PCSO side of JOC Compound.

*In 2019 PCSO's event operation will be designated as an "Integrated" operation with BLM. BLM agrees to provide PCSO with "Shared Assets/Services" under this MOU SOW. Please note the percentages of use by PCSO under these assets that would be shared with BLM. The percentages can be used to calculate the contracting cost applied towards PCSO by BMP.*

**REQUIRED ASSETS/SERVICES**

    **A.  BMP Logistic Team to work and lodge at JOC site**

    BMP will provide a JOC logistic team responsible for the set-up, servicing and breakdown of the JOC compound in coordination with the BLM.

    **B.  <u>Rental and Service of Modular Buildings Component</u>**

    <u>Rental</u> of 7 Modular Buildings (4-60' Double-wide's & 3-60' Single-wide's) with lights, AC, heater, <u>hard floors (no carpet)</u>, and <u>temporary covers/shades</u> for the windows.  Some build-

1

outs/modifications may be required to certain Mods as described below:

1) **BLM/PCSO Dining Mod:**
   24ft Wide x 60ft Long Modular Building (Double-wide), with two doors to outside at each end of front of Mod. Interior: One open room, no interior walls. Build-out requirement: Additional outside door - 1 door to outside on left side for food vendor access.
   (See depiction of Dining Mod)

   *A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

2) **BLM/ESD Combined Dispatch Mod:**
   24ft Wide x60ft Long Modular Building, (Double-wide), with two doors to outside at left end of Mod (facing BLM side which faces into center of JOC compound), one on BLM side and one on ESD side, both opening from outside to small room. Interior: walls dividing into two spaces, a 24ftW x 50ftL large room (right side of Mod) and a 24ftW x 10ftL small room (left side of Mod) with interior doors connecting small room to large room on BLM and ESD sides. Build-out requirement: Half wall dividing BLM and BMP side of large room.
   (See depiction of Dispatch Mod)

   *A ESD/BLM/PCSO Shared Asset: 20% of BLM's 50% charged to PCSO (Based on BLM & PCSO Dispatcher numbers in contract).*

3) **BLM Event Operations Mod:**
   24ft Wide x 60ft Long Modular Building (Double-wide), with two doors to outside at each end of front of Mod. Interior: walls dividing into 5 rooms: one 24ftW x 40ftL common-area large room in center of Mod, two 12ftW x 10ftL offices on left side of Mod, two 12ftW x 10ftL offices on right side of Mod. The four office rooms have interior doors opening into common room.
   (See depiction of Event Operations Mod).

   *A BLM asset only.*

4) **BLM/PCSO Report Writing Mod:**
   24ft Wide x 60ft Long Modular Building (Double-Wide), with two doors to outside at each end of front of Mod. Interior: walls dividing into 5 rooms: one 24ftW x 40ftL common-area large room in center of Mod, two 12ftW x 10ftL offices on left side of Mod, two 12ftW x 10ftL offices on right side of Mod. The four office rooms have interior door opening into common room.
   (See depiction of Report Writing Mod).

   *A BLM/PCSO Shared Asset: 25% charged to PCSO (Based on one-quarter space assigned to PCSO).*

5) **BLM/PCSO LE Operations Mod:**
   12ft Wide x 60ft Long Modular Building (Single-Wide), with two doors to outside at

2

each end of front of Mod. Interior: walls dividing into three rooms (10ft room/40ft room/10ft room) with doors between interior rooms.
(See depiction of Unified LE Mod).

*A BLM/PCSO Shared Asset: 50% charged to PCSO (Based on one-half space assigned to PCSO).*

6) **BLM/PCSO Evidence Processing/Evidence Storage Mod:**
12ft Wide x 60ft Long Modular Building (Single-Wide), two doors to outside at each end of front of Mod. Interior: walls dividing into three rooms (10ft room/40ft room/10ft room) with doors between interior rooms. <u>A safety ventilation system must be installed in the 40ft center room to vent out noxious fumes from the illegal narcotic's seized and processed for evidence.</u>
(See depiction of Evidence Mod).

*A BLM/PCSO Shared Asset: 50% charged to PCSO (Based on one-half space assigned to PCSO).*

7) **BLM Medical Mod:**
12ft Wide x 60ft Long Modular Building (Single-Wide), two doors at one end of front of Mod. Interior: walls dividing into three rooms (10ft room/40ft room/10ft room) with doors between interior rooms.
(See depiction of Medical LE Mod).

*A BLM asset only.*

<u>On-Site Service of 7 Modular buildings:</u>

The Service of the 7 modular buildings includes: mobilization of the 7 modular buildings by delivery to the JOC site, set-up in configuration outlined in set-up layout; anchoring to the ground; and constructing steps/rails (straight out instead of to the side for Mods with Shade Structures: Dining, Event Operations, LE Operations). BMP will coordinate all inspections and certifications by the state. Service shall also include the complete breakdown and demobilization of the modular buildings.

The BLM and BMP will flag the location of building placement at the playa site (in accordance with the BMP scaled playa site layout) during "Measure Week" (7/29 – 8/2/2019).  The contractor or BMP will be responsible for providing any equipment required on site to move, setup, and breakdown the buildings as configured in the JOC site layout.

*A BLM/PCSO Shared Service: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**C. Construction of Shade Structures of Designated Mods and K-9 Vehicles Bay by DPW Component**
(See attached JOC Layout for Placement of the Shade Structures)

1) DPW Shade Structure (12'x 12' shade structure) on front between doors of BLM Event Operations Mod.

3

2)  DPW Shade Structure (12'x 12' shade structure) on front between doors of BLM/PCSO Unified LE Operations Mod.
3)  DPW Shade Structure (12' x 12" shade structure) on front between doors of BLM/PCSO Dining Mod.
4)  If deemed necessary by BLM at the event due to hot temperatures, DPW will construct a shade structure (3 bay drive in structure) along north compound fence line (behind Medical Mod), east of vehicle access gate (Same as in 2018).

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO use of Mods with shade structures and K-9 bay structure).*

**D.  Placement and Service of Furniture for Modular Buildings Component:**
(See attached furniture placement table for placement of furniture in Mods)

Providing the following Furniture items:

1)  75 rectangular tables (6ft long/3ft wide/30in tall, folding)
2)  2 Conference tables (10ft long/4ft wide/30in tall, non-folding)
3)  162 Folding chairs
4)  64 high-back roller-chairs
5)  9 refrigerators (large side by side/approximately 6ft tall-3ft wide)
6)  3 couches (8ft)
7)  6 Desks (approximately 5ft long with drawers on right side)
8)  2 Large Dry Erase Boards (approximately 6'x 4')
9)  1 Small Dry Erase Board (approximately 3'x 2')

On-Site Service of the Furniture:

The Service of the furniture includes: mobilization of the furniture by delivery to JOC site and placement of furniture into Mods as depicted in attached furniture placement diagrams of each Mod.  BLM will have logistic crew on site to assist.

The furniture shall also be demobilization (break-down/ pick-up).

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on PCSO use of Mod furniture).*

**E.  Rental, Placement and Service of Temporary Power for JOC Component:**
(See attached JOC Layout for Placement of the Generators)

Rental of Temporary Power equipment to power approximately 8 modular buildings, Food Vendor kitchen complex and approximately 8 RV/camping trailers at JOC site

1)  Two (2) 200 KW Generators (minimum).
2)  All needed distribution (50 amp) cords, spider boxes, whips, etc.
3)  Re-fueling (diesel) and maintenance (oil) service throughout operational period.

On-Site Service of the Temporary Power equipment:

The Service of the temporary power includes: mobilization of the generators/equipment

4

by delivery to JOC site, set generators (one as main and the second as back-up if main fails), lay all cords and connect power to the 8 Modular buildings (direct hook-ups), Food Vender kitchen complex and 8 RVs/camping style trailers; after all hook-ups, test power to all facilities; on-site re-fueling of generators with diesel fuel throughout operation and any needed servicing (oil) and needed maintenance.

Generators will be operational 24 hours a day for the entire rental period.  Contractor is to provide fuel and service as needed.  All costs should be included in the rental costs.

The Service of the temporary power also includes complete demobilization.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**F. Rental, Placement and Service of Portable Restrooms for BLM side of JOC Component:**
(See attached JOC Layout for Placement of Portable Restrooms & Hand wash stations)

Rental of Portable Restrooms and Hand Wash Stations, including all supplies (toilet paper, paper towels, soap, hand sanitizer, etc.).

1) 22 (10 Handicap & 12 Standard) Portable Restrooms.
2) 12 Hand Wash Stations.
3) Service of Portable Restrooms (dumping back-water/cleaning/re-supply paper) and service of Hand washing stations (dumping of gray water, re-fill potable water)

| | |
|---|---|
| Along front fence/gate of JOC - | 2 handicap toilet units / 3 Standard toilet units / 2 HWS |
| Right side of JOC - | 2 handicap toilet unit / 3 Standard toilet units / 2 HWS |
| Left side of JOC - | 2 handicap toilet unit / 3 Standard toilet units / 2 HWS |
| Rear of JOC - | 2 handicap toilet unit / 3 Standard toilet units / 2 HWS |
| Rear/Right side of JOC - | 1 handicap toilet unit / 1 HWS (For Spectrum) |
| Behind Jail Mod - | 1 handicap toilet unit / 1 HWS (For Custody's) |
| Front of Dining Mod - | 2 HWS (For Dining Use) |

Service of Portable Restrooms and Hand Wash Stations:

In addition to the delivery, the set-up of the portable toilets will included the anchoring of the units. The contractor is responsible for cleaning the inside of the portable toilets, pumping as necessary, refilling handwash stations potable water and cleaning washing bowls.  The units must be checked daily.  It is the contractor's responsibility to establish and coordinate the servicing schedule with the on-site BLM and BRC Logistics Managers. The units will need to be serviced and supplies stocked accordingly.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**G. Sewer and Potable Water Service to Camping Trailers/RVs at JOC Component:**

Service of JOC Camping Trailers/RVs:

AR03407

1) On-site service (pump gray/black water and refill potable water) of RVs/camping trailers, approximately 8. (2 lodging trailers of food vendor- left rear of compound; 6 lodging trailers/RVs of BLM Contractors - right rear of compound)

*A BLM/Spectrum asset only.*

**H. Rental, Placement and Service of Lighting Equipment at JOC Component:**
(See attached JOC Layout for Placement of the Light Towers)

Rental of Diesel Powered Light Towers for JOC:

1) Placement of approximately 11 Light Towers for JOC compound (diesel powered light towers with environmental spill basins (Not counting ESD side). Re-fueling light towers throughout operational period (Same as 2018).

On-Site Service of Lighting Equipment:

The Service of the light towers includes: delivery and placement at compound in designated locations, re-fueling diesel throughout operational period, servicing any maintenance problems, turning on/off of the light towers daily and demobilization (break down/pick-up) of light towers.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**I. Placement of 2 Connex boxes, one for BLM Logistic and one for BLM Comms at JOC Component:**

Rental of two 20 ft connex box for BLM logistic storage and BLM communications storage at JOC.  Service includes placement of the boxes, starting on August 14 and removal of the boxes on September 7. Placement locations will be displayed on JOC layout. Deployment days will be same as modular buildings.

*A BLM asset only.*

**J. Fencing at JOC Component:**

Construction of litter fence (orange plastic fencing that is used as perimeter fence) around and within JOC, per JOC layout diagram.  BLM will have logistic crew on site to assist.

*A BLM/PCSO Shared Asset: 15% charged to PCSO (Based on BLM & PCSO TO position numbers working event and at JOC).*

**LOCATION**

The JOC site will be located at a mutually agreed upon site to be determined later, off County Road 34, 12 miles north of Gerlach, NV.

6

AR03408

**PERIOD OF PERFORMANCE**

All BLM/PCSO JOC assets/equipment must be in place (mobilized) and operational at the compound site by the end of the day on Tuesday August 13, 2019 and run through Friday September 6, 2019.  All services required at JOC will start on Thursday August 15, 2019 and run through Friday September 6, 2019.  The JOC equipment can be demobilized (break-down/pick-up) beginning on Saturday September 7, 2019.

**FINALIZATION**

If BRC accepts this SOW under the MOU Program, please send written confirmation (E-Mail) of the acceptance to Mark Pirtle by May 9, 2019.

AR03409



**Mckinney, Chelsea <cmmckinney@blm.gov>**

---

# [EXTERNAL] 2019 MOU for BLM Lodging
1 message

---

**Playground** <playground@burningman.org>                    Wed, Mar 20, 2019 at 5:44 PM
To: Mark Hall <mehall@blm.gov>
Cc: Marnee Benson <marnee.benson@burningman.org>, "Mckinney, Chelsea" <cmmckinney@blm.gov>, Charlie Dolman
<charlie@burningman.org>, Mark Pirtle <mpirtle@blm.gov>, Rebecca Andres <randres@blm.gov>, Emma Weisman
<emma.weisman@burningman.org>

Mark-

BMP will accept this MOU after removal of the following item:

pg. 2 under Additional Requirement - BMP must provide standby electrical power assets i.e. portable generators to power
the BLM's MOU assigned lodging facilities at the Bruno facilities in case of a power outage that is predicted to last 24
hours or more.

We are willing to provide power at the Trailer Park.

Please send the revised version for our review so we can accept.

---

**2 attachments**

 **2019 BMP-BLM MOU Program_BM Event Contracted BLM Lodging_for BLM only_SOW to BMP.pdf**
143K

 **ATT00001**
1K

BURNING MAN OPERATION 2019

# MOU STATEMENT OF WORK TO BMP
# FOR BLM CONTRACTED LODGING IN GERLACH

Per a Memorandum of Understanding (MOU) between Burning Man Project (BMP), formerly Black Rock City (BRC) LLC and the Bureau of Land Management (BLM), BMP will be utilizing their internal procurement process to obtain services needed by the BLM in their operational mission at the 2019 Burning Man Event.  This document will serve as the Statement of Work for the lodging contract at Bruno's Country Club and BMP facilities.

The BLM 2019 Planning team Member Mark Pirtle (Cell: 775-455-6947/E-mail: mpirtle@blm.gov) will be available to BMP and their contractor during the pre-award, award and deployment planning periods for question/concerns.  During the event, Pirtle will be on site to coordinate with BMP and the contractor representative for the lodging facilities. Pirtle will coordinate with BMP and Bruno representatives to obtain the lodging keys. BMP must identify a BMP POC for lodging issues to BLM, for both contracted facilities and BMP owned facilities.

BMP must ensure that there are facility cleaning and maintenance crews for all BLM SOW lodging facilities, whether contracted from Bruno's or BMP provided facilities.  Cleaning (new towels & linen) must be offered to detailers every day even though many detailers may not request it. BLM will provide door "Hang Tags" that say "Do Not Disturb" for every room for BLM detailers to use when they don't want to be woken up or don't want anybody going into their room.

## REQUIRED SERVICES

BMP must provide Bruno facilities in the following form:

1) 41 Motel Rooms/49 Beds
   (The Room #s are subject to change depending on possible construction changes to Building 2 by Bruno's in the coming months. Bed configuration will be determined and provided at a later date)
   - Building 1 - 20 Rooms/20 Beds
   - Building 2 - 21 Rooms/29 Beds

2) 10 Motel Apartments/13 Beds
   (The Apt #s are subject to change depending on availability by Bruno's)
   - Apt#1 (Single)
   - Apt#2 (Double)
   - Apt#3 (Single)
   - Apt#4 (Single)
   - Apt#30 (Single)
   - Apt#37 (Single)
   - Apt#38 (Single)
   - Apt#40 (Single)
   - Apt#41 (Single)

1

AR03411

- Apt #46 (Triple)

BMP must provide BMP facilities in the following form:

3) Trailer Park: 1 House (Sunset), 9 Trailer Houses
   (The Trailer Houses #s are subject to change depending on possible construction changes to Trailer Houses by BMP in the coming months. Bed configuration will be determined and provided at a later date)
   - Sunset House
   - Trailer#5
   - Trailer#6
   - Trailer#7
   - Trailer#8
   - Trailer#9
   - Trailer#11
   - Trailer#12
   - Trailer#13
   - Trailer#14

4) 7 Trailer pads with 2 trailers at each pad for a total of 14 trailers
   - Space #1 a&b
   - Space #2 a&b
   - Space #3 a&b
   - Space #4 a&b
   - Space # 16 a&b
   - Space # 17 a&b
   - Space # 18 a&b

   BRC must assure that they provide the Y adapters for water & sewer hook-ups and the water hoses and sewer hoses for maximum of 16 trailers.

**ADDITIONAL REQUIREMENT**

BMP must provide standby electrical power assets i.e. portable generators to power the BLM's MOU assigned lodging facilities at the Trailer Park and at the Bruno facilities in case of a power outage that is predicted to last 24 hours or more. The deployment of generators and their hook ups will take no more than 2 hours after requested by BLM.

**LOCATION**

The lodging facilities must be in Gerlach, NV, which is the only community with lodging facility within 75 mile of the event location.  Gerlach is 8 miles from the Black Rock City location.

AR03412

**PERIOD OF PERFORMANCE**

All lodging facilities must be available starting Monday, August 19, 2019, except for BMP Trailer Park Houses (5, 6, 7, 8, 9, 11, 12, 13, 14) & Sunset House, which need to be available Wednesday, August 14, 2019 for contract dispatchers and BLM set-up detailers.  The Trailer Park Houses will be vacated by BLM mid-day on Thursday, September 5. All Bruno facilities must be available through Friday, September 6, 2019 (Check-out of last rooms on Saturday 9/7/19, barring any unforeseen requirement to keep detailers longer).

**FINALIZATION**

If BRC accepts this SOW under the MOU program, please send written confirmation (E-Mail) of the acceptance to Mark Pirtle by March 22, 2019.

3



**Mckinney, Chelsea <cmmckinney@blm.gov>**

---

## [EXTERNAL] 2019 MOU for Meal Services for BLM & PCSO
1 message

---

**Playground** <playground@burningman.org>        Wed, Mar 20, 2019 at 5:53 PM
To: Mark Hall <mehall@blm.gov>
Cc: Marnee Benson <marnee.benson@burningman.org>, Charlie Dolman <charlie@burningman.org>, Mark Pirtle
<mpirtle@blm.gov>, Rebecca Andres <randres@blm.gov>, "Mckinney, Chelsea" <cmmckinney@blm.gov>, Emma Weisman
<emma.weisman@burningman.org>

Mark-

BMP will accept this MOU after removal of the following items:

pg. 2 #5 and #8 under BMP/BLM (through other SOWs) will provide:

     5)  Trash containers and removal

     8)  Dining hall (double-wide modular building)

Please send the revised version for our review so we can accept.

---

**2 attachments**

 **2019 BMP-BLM MOU Program_BM Event Contracted Meal Services_ for BLM and PCSO_SOW to BMP.pdf**
289K

 **ATT00001**
1K

# BURNING MAN OPERATION 2019

## MOU STATEMENT OF WORK TO BMP
## FOR BLM/PCSO CONTRACTED MEALS SERVICES AT JOC

Per a Memorandum of Understanding (MOU) between Burning Man Project (BMP), formerly Black Rock City (BRC) LLC, and the Bureau of Land Management (BLM), BMP will be utilizing their internal procurement process to obtain shared services needed by the BLM and PCSO in their operational missions at the 2019 Burning Man Event.  This document will serve as the Statement of Work for the BLM and PCSO shared asset of contracted meal services at the JOC Compound.

The BLM 2019 Planning Team Member Mark Pirtle (Cell: 775-455-6947/E-mail: mpirtle@blm.gov) will be available to BMP and their contractor during the pre-award, award and deployment planning periods for question/concerns.  During the event, Pirtle will be on site to coordinate with BMP and the contractor representatives for the contracted meal services.

**REQUIRED SERVICES**

Meal requirements will be adjusted by BMP, with BLM concurrence, if necessary according to the final BLM and PCSO Table of Organizations.

Food Service

1. <u>3 Days:</u> Pre-Patrol Event Days:  8/20 (Tuesday) through 8/22 (Thursday) -  63 detailers
   Based on food service to BLM (55) detailers and PCSO (8) detailers

2. <u>10 Days:</u> Training Day plus 9 Main Event Days:  8/23 (Friday) through 9/1 (Sunday) - 136 detailers
   Based on food service to BLM (106) and PCSO (30) detailers

3. <u>3 Days:</u> Post-Patrol Days: 9/2 (Monday) through 9/5 (Thursday) - 58 detailers
   Based on food service to BLM (50) and PCSO (8) detailers

   ***Dairy-free, Gluten-free, and Vegetarian meal options must be available.

The following services must be provided by the food service contractor:
1) Set-up food kitchen and service facility at the JOC location on the playa at the Burning Man event.
2) Provide three hot meals a day for each of the detailer in a 24 hour period.  **(See attachment 1, Hot-Meal Time Schedules,** based on event week detailer numbers and work shift hours of detailers).
3) Have a 24 hour Missed Meal Service to accommodate detailers who miss a scheduled meal time (same food as scheduled meals).
4) Have ability to make "sack lunches" to issue to detailers not able to make scheduled meals or miss-meal services (cold sandwiches).

5) Purchase of approximately 250 20lbs bags of ice (may have to be re-supplied depending on use).
6) Purchase of approximately 280 cases of bottled water, 24/16oz per case (may have to be re-supplied depending on use).
7) Purchase of approximately 120 cases of Gatorade Sport Drinks/Assorted Flavors, 24/20oz per case (may have to be re-supplied depending on use).

Food Service Provider will provide the following equipment:
1) Dedicated Food staff for JOC to provide the food service (No BMP volunteer staff helpers, all must be Contractor employees).
2) Commercial kitchen facility at JOC, behind dining hall.
3) Servicing facility set up in dining hall.
4) Refrigerated truck/trailer at JOC for cold food storage.
5) Food Supply storage trailer at JOC.
6) All equipment to serve meals
7) Hot holding equipment.
8) Cold holding equipment.
9) On site lodging facilities for food service staff at JOC (Motor homes and/or Camper trailers)

BMP/BLM (through other SOWs) will provide:
1) Dedicated area at JOC for food kitchen facility and food staff lodging
2) Power to kitchen facility and food staff lodging facility at JOC
3) Potable water refill
4) Gray water removal
5) Trash containers and removal
6) Lighting to food service and lodging area at JOC
7) Portable restrooms and hand washing stations for food service staff at JOC
8) Dining hall (double-wide modular building)
9) Table and chairs for dining hall

**MANDATORY ITEMS**

**Mandatory Items for Breakfast**

- Butter and margarine, instant hot cereal, jelly or jam, peanut butter, salt, pepper, sugar, cream (or substitute),. These items shall be individually packaged.  Mustard, ketchup, steak sauce, salt, and pepper shall be provided in approved dispensers or original bottles in the dining trailer area.

- Salsa, hot peppers, brown sugar and raisins or other dried fruit shall also be made available, in appropriate serving containers, not individually packaged.

**Mandatory Items for Hot Lunch/ Dinners**

- Butter and margarine, jelly or jam, peanut butter, mustard, ketchup, steak sauce, salt, pepper, sugar, cream (or substitute), tea and hot chocolate.  These items shall be

AR03416

individually packaged.  Mustard, ketchup, steak sauce, salt, and pepper and other large scale condiments shall be provided in approved dispensers or original bottles in the dining tent area.

- Salsa and hot peppers shall also be made available, in appropriate serving containers, not individually packaged.

- A variety of dessert will need to be served with each dinner.

- Salad bar should be available for both lunch and dinner.

## Mandatory items for 24 Hour Service Bar

- Hot Regular Brewed Coffee (regular and decaffeinated).  Flavored coffee may be served in addition to regular coffee at the Contractor's option.

- Hot Water

- Hot Chocolate

- Chilled 100% Fruit Juice

- Brewed Coffee

- Tea Bags (regular and decaffeinated)

- Cold Drinks (variety of soda options)

- Iced Tea (regular and decaffeinated)

- Assortment of Dry Cereal

- Greek Yogurt

- Yogurt

- Bread both white and wheat, English muffins

- Milk - Both white and chocolate milk shall be available along with a Milk alternative (almond, soy and rice)

- Snacks – suggested items: Personal pizzas, hot pockets, burritos, noodle cups, small candy items, Jerky, meat and cheese snacks, cookies, brownies, protein bars, nuts, chips,

popcorn, fresh fruit, apples, oranges, bananas, etc.

- Ice Cream

**Missed Meals items between scheduled meal hours** (These items are only available during non-meal hours)

- Grilled Cheese Sandwich
- Quesadilla
- Deli Sandwiches
- Hamburger
- Hot dogs
- Grilled chicken
- Chicken fingers
- veggies

**(See Attachment 2, for additional Meal Food Suggestions)**

**ADDITIONAL REQUIREMENT**

The food service provider must ensure, through the BMP JOC Team, that all areas/equipment with a potential for spills/drips occurring onto the playa are remedied with spill/drip containers/pads at the JOC facility.

**LOCATION**

The food service provider will locate their facility at the JOC location off County Road 34, 12 miles north of Gerlach, NV.

**PERIOD OF PERFORMANCE**

The food service contractor will start providing the hot-meal services and the 24 hour missed hot meal service on August 20 (Tuesday), 2019 and run until breakfast September 5 (Thursday), 2019.  The food service contractor will arrive at the JOC location prior to 8/20 to allow themselves enough time for set-up of all facilities needed to start the service of the first meal. The food service contractor can start breaking down after the last meal of service.

**FINALIZATION**

If BMP accepts this SOW under the MOU Program, please send written confirmation (E-Mail) of the acceptance to Mark Pirtle by March 22, 2019.

AR03418

## COST RECOVERY AGREEMENT

**BURNING MAN SPECIAL RECREATION PERMIT:** NVW03500-16-01
**APPLICANT:** Black Rock City, LLC.
**LEAD BLM OFFICE:** Winnemucca District, Black Rock Field Office

I.      **AUTHORITY:** Section 304(b) of the Federal Land Policy and Management Act (FLPMA) [43 U.S.C. 1734(b), as amended and 43 CFR Subpart 2932.

II.     **PURPOSE:** This Agreement between the above referenced Applicant and the Bureau of Land Management (BLM) establishes procedures to reimburse BLM for costs incurred to process a Special Recreation Permit (SRP) NVW03500-16-01. If the BLM decides to authorize an SRP, this Agreement shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred to administer the 2016 Burning Man SRP.

III.    **PROVISIONS OF AGREEMENT**

A.      In accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31, Applicant agrees to reimburse BLM for the costs incurred by BLM for processing the Application, and should a SRP be issued, costs for issuing a SRP and monitoring the SRP.

B.      This Agreement is subject to the Reimbursable Cost Provisions and the Direct and Indirect Costs to the government outlined in OMB Circular A-25, Treasury Account: 14X5017, Service Charges, Deposits, and Forfeitures, and 43 CFR Subpart 2932. The Cost Estimate is included, and it will be amended should actual expenses exceed the amounts identified in Attachment 1.

C.      A cost recovery account will be established for the SRP. The BLM requires you to remit 100% of the estimated cost recovery costs before the start of the 2016 Event. Please refer to the payment schedule below. After the permit is complete and all work is finished, the BLM will notify you if additional funds are required or if you are entitled to a refund.

The following schedule for payments has been developed to allow for the amount due from the estimate to be paid in two (2) installments and have 100% of the cost recovery estimate paid prior to the start of the event:

| Payment | Date | Amount Due |
|---------|------|-----------|
| #1 | (Received) | $184,224 |
| #2 | (Received) | $315,000 |
| #3 | August 10, 2016 | $1,700,735 |
| **Total Cost Estimate** | | **$2,199,959** |

Following the close-out of the event permit, an accounting of the cost recovery funds will be provided to Black Rock City, LLC by January 31, 2017.

IV.     **REIMBURSABLE COST PROVISIONS**

A.      BLM agrees to process the Application to the extent funding under the Agreement permits. Processing will include, but not be limited to, the following: coordination, administration and approval

of any necessary NEPA compliance; consultation with appropriate Federal, State, Tribal, and local officials; preparation of the administrative record and resolving any protests, appeals and litigation that might result from the proposal, preparation of all decisions, monitoring the construction, operation and termination of any resultant authorization; and other necessary processing actions consistent with a final decision.

B.      BLM agrees to timely notify the Applicant, in writing, of any changes to the indirect rate. Refer to the Definition of Direct and Indirect Costs in Section V. Applicant shall have the right to conduct, at its own expense, reasonable audits of the books, records, and documents of BLM relating to the items on any particular accounting statement provided by BLM.

C.      Cost Recovery funds, once obligated by BLM, are not refundable and will not be made refundable by termination of the Project, withdrawal of the Application, or non-issuance of a SRP.

D.      In accordance with 43 CFR 2932.31, 2932.32, and 2932.33(c), if BLM denies the Application, Applicant must reimburse BLM for all costs BLM incurred in processing the Application. If the Applicant withdraws the application, Applicant will reimburse BLM for processing costs incurred by BLM in closing its review of the Application and which cannot reasonably be avoided after BLM receives written notice of withdrawal of the Application.

E.      Nothing herein shall be deemed to require BLM to maintain books, records, or documents other than those usually maintained by them, provided that such books, records, and documents reasonably segregate and identify the costs for which reimbursement is required and comply with generally accepted accounting practices for such documentation.

The designated points of contact with whom each party to this Agreement will communicate concerning any aspect of this Agreement are as follows:

Bureau of Land Management                    Black Rock City, LLC
William Mack, Jr                             Charlie Dolman
Black Rock Field Manager                     Event Operations Director
5100 E. Winnemucca Blvd                      660 Alabama St
Winnemucca, NV 89445                         San Francisco, CA 94110-2008
775-623-1578                                 415-865-3800
wmack@blm.gov                                Charlie.dolman@burningman.org

## V.      DEFINITION OF DIRECT AND INDIRECT COSTS

Direct costs are those costs which can be specifically identified with the Application and which are incurred for the benefit of said applicant in that the costs would not have been incurred but for the Application and are appropriate in order for BLM to process the Application. Examples of direct costs include, but are not limited to, personnel costs in the form of wages paid to BLM personnel working on the Application, with allowances provided for fringe benefits and leave surcharge rate and any overtime associated with processing the Application; travel expenses; purchased services, if necessary, such as printing, automated data processing services and photographic reproduction; and any miscellaneous supplies and equipment of a specialized nature, the use of which is directly applicable to processing the Application.

Indirect costs are those which cannot be specifically identified with the Application. These indirect costs have been calculated at a rate of 23.1 percent of direct costs. The indirect costs are subject to

AR00771

change annually. This percentage figure has been developed in accordance with Department of the Interior procedures and represents those administrative and program costs, excluding management overhead, which can be attributed to processing the Application. Indirect costs include a portion of the costs for capitalized and non-capitalized equipment; space rental; telephone services; postage; personnel transfer costs; budget and program development; administrative and clerical support; training; safety management; public information, inquiries and reports; cartography and basic series mapping; aviation management; telecommunications; maintenance of equipment and tools; and systems design and implementation.

**Treasury Account 14X5017,** Service Charges, Deposits, and Forfeitures further described as BLM Recreation Cost Recovery is defined in the table below:

| Treasury Account | 14X5017, Service Charges, Deposits, and Forfeitures |
|---|---|
| BLM Fund Code, Subactivity, and Title | XXXL5017AP, Fund 341, L51050000, Recreation Cost Recovery |
| Source of collections/appropriations | Cost recovery charges are associated with recreation activities or events and shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. As such, this Subactivity covers revenues and expenditures associated with any Special Recreation Permit that has been determined to be Cost Recovery by BLM personnel as outlined in 43 CFR 2930-1 Permits for Recreation on Public Lands and H-2930-1, Recreation Permit Administration Handbook. Project codes are mandatory and will be assigned and administered by the State Office from their block of unassigned project numbers. They are used to differentiate revenues and obligations for each specific permit. Fees are collected in advance for specified tasks that must be carried out before significant recreation events can be permitted to occur on public lands, and BLM is expected to account to each applicant on the cost of all aspects of the work BLM performs. |

As noted in the definition in the table, this account stipulates cost recovery charges shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. Because Burning Man is a full cost recovery event, indirect costs will apply as they would for all other commercial permits that require full cost recovery.

## VI.    EFFECTIVE DATE:

This Agreement shall be effective, as of the latter date of its execution by both parties. Unless terminated earlier, it shall continue until the BLM authorized officer deems the agreement provisions have been satisfied.

Please sign the agreement below, and return to the BLM, Winnemucca District Black Rock Field Office Manager by June 27, 2016.

AR00772

## VII.   SIGNATURES OF AGREEMENT

For: Bureau of Land Management

_____

Signature

_____

Date

William Mack, Jr
Black Rock Field Manager

For: Black Rock City, LLC

_____

Signature

7/29/16.
_____

Date

Charlie Dolman
Event Operations Director, BRC

## Attachment 1

**2016 COST RECOVERY (CR) ESTIMATE**
**Summary:**

| | |
|---|---|
| Labor Costs | $ 1,231,978 |
| Operational Costs | $ 405,500 |
| Sub Total of Direct Costs | $ 1,637,478 |
| FY 2016 Indirect Cost Rate of 23.1% | $ 378,257 |
| **Cost Estimate TOTAL** | **$ 2,015,735** |

**Labor Detail:**

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Authorized Officer (AO), Event IC | 452 | $32,499 |
| Law Enforcement Branch Chief | 532 | $38,229 |
| Civilian Operations Branch Chief | 928 | $46,652 |
| Public Information Officer | 148 | $10,498 |
| Admin Support | 106 | $3,544 |
| Safety Officer | 128 | $7,895 |
| Compliance (Environmental & Vending) Sup | 314 | $20,058 |
| Vending | 148 | $7,308 |
| Compliance Team | 148 | $7,308 |
| Compliance Team | 148 | $7,308 |
| Compliance Team | 148 | $6,031 |
| Compliance Team | 148 | $6,031 |
| GIS | 164 | $8,118 |
| Playa Logistics Lead | 349 | $17,249 |
| Playa Logistics | 349 | $17,249 |
| Playa Logistics | 216 | $8,800 |
| Playa Logistics | 216 | $8,800 |
| Playa Logistics Runner | 88 | $3,580 |
| Communications Supervisor | 430 | $30,556 |
| Dispatch Center Manager | 326 | $12,104 |
| CommL | 512 | $32,353 |
| Communications Tech | 384 | $23,826 |

| POSTION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Communications Tech | 368 | $18,147 |
| Communications Tech | 368 | $18,147 |
| Communications Tech | 368 | $18,147 |
| Playa Information Technology | 384 | $15,643 |
| IT Security | 326 | $16,176 |

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Law Enforcement Operations Chief | 232 | $17,417 |
| Law Enforcement Operations Chief | 232 | $17,417 |
| Medical Team Lead | 167 | $13,535 |
| Medical Team | 167 | $11,381 |
| Law Enforcement Patrol Commander | 284 | $19,295 |
| Law Enforcement Patrol Commander | 232 | $15,720 |
| Law Enforcement Patrol Commander | 245 | $19,753 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |

AR00775

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Investigative Lead | 432 | $37,601 |
| Law Enforcement Investigations | 233 | $16,202 |
| Law Enforcement Investigations | 137 | $10,959 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement OPR | 144 | $11,441 |
| Law Enforcement Evidence | 255 | $17,765 |
| Law Enforcement Evidence | 162 | $9,761 |
| Law Enforcement IMARS | 208 | $16,695 |
| Law Enforcement IMARS | 152 | $10,173 |
| Financial Support (Off Playa) | 80 | $5,329 |
| Contracting Support (Off Playa) | 80 | $4,046 |
| **TOTAL** | | **$1,231,978** |

## Operations Detail:

| DESCRIPTION | AMOUNT |
|---|---|
| Microwave Internet Program | $130,000 |
| Satellite Tracking (Delorme) | $56,500 |
| Medical Modular Building Rental | $6,000 |
| CAD Servers Licensing/Maintenance | $13,000 |

AR00776

| | |
|---|---|
| HHS Agreement | $20,000 |
| Travel | $80,000 |
| Vehicle Utilization | $50,000 |
| Misc. Supplies/Equip. | $50,000 |
| **TOTAL** | **$405,500** |

Case 1:19-cv-03729-DLF Document 25-13 Filed 07/13/21 Page 63 of 365
A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT

DRAFT INTERNAL WORKING COPY

| ISSUE | 2014 PRACTICE | 2015 DRAFT SOW | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **1: BLM HQ SOW:**<br><br>**Modular Building Rentals** | In 2014 BRC provided (11) modular buildings for build-out of the BLM HQ, utilizing the MOU for best business practices.<br><br>The (11) trailers consisted of the following:<br><br>(1) 60-foot double wide trailer:<br><br>• Dining<br><br>(9) 60-foot single wide trailers:<br>• Emergency Operations Center (EOC)<br>• Dispatch<br>• Compliance (Environmental and Vending)/GIS<br>• Investigations/ Pershing County Sheriff's Office (PCSO)<br>• LE and Civilian Operations<br>• Medical<br>• Evidence<br>• Report Writing<br>• Logisics / Comms<br><br>(1) 40-foot single wide trailer:<br>• Jail | For the 2015 event BLM proposed (10) modular buildings utilizing the MOU for best business practices.<br><br>The (10) trailers consist of the following:<br><br>(5) 60-foot double wide trailers:<br><br>Same as 2014:<br>• Dining<br><br>Changes for 2015:<br>• EOC<br>• Dispatch (co-located with BRC)<br>• Compliance/GIS<br>• Investigations/PCSO<br><br>(5) 60-foot single wide trailers:<br><br>Same as 2014:<br>• Medical<br>• Evidence<br>• Report Writing<br>• Logistics/ Comms<br><br>Changed for 2015:<br>• Jail | The BLM will modify the draft SOW request<br><br>For the 2015 event BLM will propose BRC provides sufficient modular buildings to house the functions specified utilizing the MOU for best business practices. The BLM will only stipulate that the following functions be housed in double wide trailers:<br><br>1) Dinning<br><br>2) EOC<br><br>3) Dispatch<br><br>While it is understood additional modular space may be needed to support the below functions, the BLM will not stipulate that these functions be housed in double wide trailers. The functions can be housed in one or more single wide trailers at BRC's discretion.<br><br>4) Compliance/GIS<br><br>5) Investigations/PCSO | 1) Dining Trailer: In 2014 a double wide trailer was used as a dining/food service area. This practice will continue in 2015.<br><br>2) EOC Trailer: In 2014 the EOC trailer was an interagency location for management officials from the BLM, BRC, and other cooperating agencies to discuss event dynamics, manage significant events, and make adjustments to enhance public safety and security. Following a number of critical incidents where the EOC was used by incident management staff, the EOC single wide trailer layout and space proved to be inefficient and did not accommodate the needs of the BLM, BRC, or other cooperating agencies. Adjusting the size and layout of the EOC trailer to a double wide trailer in 2015 will improve interagency management of critical incidents.<br><br>3) Dispatch Trailer: In 2014 BLM and BRC dispatch operations were housed in separate single wide trailers. The BLM and BRC have mutually agreed to consolidate BRC/BLM dispatch functions for the 2015 event in (1) double wide. This will allow for increased communication, improved emergency response times, and more timely notification of significant events to partner agencies.<br><br>4) Compliance/GIS Trailer: In 2014 the civilian operations teams (compliance/vending/GIS) were split into (2) single wide trailers (i.e., compliance trailer and civ operations trailer). With unified command compliance and vending personnel now work cooperatively with BRC environmental groups to address environmental concerns. | BLM contacted BRC's modular building vendor (Modspace) for cost estimates. Modspace stated the proposed changes to the 2015 modular building proposal would equate to a rental cost increase of approximately $15,000 more than the rental costs incurred in 2014.<br><br>*NOTE: During a meeting on 7/9/15 between the BLM and BRC, the BLM apprised BRC that the BLM was open to revising the number and/or size of the proposed modular building rentals needed for HQ. BRC indicated they agreed with the number and size of modular buildings proposed for HQ in the 2015 Draft SOW and they were not seeking any changes. Furthermore BRC stated they had already procured all the trailers for the HQ including the (5) proposed double wide trailers.*<br><br>*BRC did indicate they wanted to be included in the HQ design layout in order to maximize efficiency of operations.* |

**A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT**

**DRAFT INTERNAL WORKING COPY**

5) Investigations/PCSO Trailer: In 2014 PCSO, BLM, and USPP investigative personnel were located in (1) single wide trailer.  The trailer was used for interagency meetings, investigative operations planning, undercover operations planning, report writing, interviews, and as a temporary safe haven for victims of sexual crimes.  The trailer was equipped with two offices, one of which was used as a PCSO command staff office.  The other was designated as an interview room.  A single interview room proved to be inadequate during sexual assault and person-on-person criminal investigations that require multiple interviews be conducted simultaneously.  Due to limited space many of these interviews were conducted outdoors; unfortunately exposing victims and witnesses to uncomfortable circumstances and, in some cases, compromising their request for anonymity.  A double wide would provide additional interview rooms and secure, separate locations for suspects, victims, and witnesses.  In addition, the PCSO command staff could maintain an office where they can hold private conversations and secure sensitive equipment.

AR07274

A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2014 PRACTICE | 2015 DRAFT SOW | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **2: BLM HQ SOW:** **Flush Toilets and Integrated Wash Basins** | In 2014 BRC provided (18) non-flush portable toilets and (10) stand-alone hand wash stations at the BLM HQ utilizing the MOU for best business practices. | For the 2015 event the BLM proposed (4) two stall flush toilets with integrated hand wash basins, and (2) four stall flush toilets with integrated hand wash basins, utilizing the MOU for best business practices. | The BLM will eliminate this draft SOW request. The BLM will revert back to the 2014 practice of using non-flush portable toilets and stand-alone hand wash stations. The BLM will require interior lighting (e.g., battery operated lights, etc.) within the non-flush portable toilets. To address health and safety needs associated with employee exposure to biohazards, the BLM will research the rental of (1) "emergency" self-contained decontamination station where running water and soap would be available. | Lighting within the portable toilets is necessary for employee use during night operations. While at the event, officers have physical contact with participants who are not wearing clothes and/or have some form of bio-hazard on their bodies to include blood, semen, feces and urine.  Though many officers try to wear nitrile gloves to provide a barrier during these interactions, there are times when this is not possible.  Additionally, officers are processing large quantities of illegal narcotics, some of which are of an unknown type with the potential for accidental epidermal exposure. Officers need a means of properly decontaminating their hands, face, etc. with soap and running water after handling the aforementioned situations. | No cost increase over 2014 is anticipated for the non-flush portable toilets. The self-contained decontamination station will cost approximately $20,000. Battery operated lights will cost approximately $250 or less. |
| **3: BLM HQ SOW:** **Shade Structures** | In 2014 no shade structures were requested by the BLM in the SOW.  However, once on site, the BRC volunteered to construct 12-foot wood and cloth shade structures, in front of (5) BLM trailers at HQ.  The BLM accepted this offer. The BLM logistics team also constructed a BLM owned "Hycroft" tent shade structure (20' x 20') in the center of HQ | For the 2015 event the BLM proposed BRC construct 12-foot wide shade structures in front of (5) trailers at HQ (i.e., Communications, Dispatch, Investigations, Report Writing, and Medical). Additionally, the BLM proposed BRC construct 24-foot wide shade structures in front of (3) other trailers at HQ (i.e., Dining, EOC, and Compliance) | The BLM will eliminate this draft SOW request. The BLM logistics team will provide and construct the BLM shade structures. This may include shade structures in front of the following trailers: Dining, Dispatch, EOC, Medical, and Compliance. The BLM logistics team will construct the BLM owned "Hycroft" tent shade structure in the center of the HQ. | Shade structures provide outdoor meeting spaces that offer a degree of protection from the elements for employees and BRC personnel. | *During a meeting on 7/9/15 between BLM and BRC, the BLM appraised BRC that the BLM would provide and install the shade structures for the HQ trailers.* *In response the BRC offered to provide and install shade structures for (3) of the HQ trailers.  Specifically the EOC, Medical, and Dining.* |

AR07275

A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2014 PRACTICE | 2015 DRAFT SOW | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **4: BLM HQ SOW:**<br><br>**Design Layout of Dining Trailer** | In 2014 BRC provided a double wide Dining trailer at the BLM HQ utilizing the MOU for best business practices.<br><br>The 2014 SOW requested a Dining trailer with hard floors and a rear door for food vendor access. The trailer delivered had carpeted floors and no rear vendor access door. BRC indicated it was the only trailer available at the time. To mitigate carpet hazards the BRC staff placed hard rubber floor tiles over the carpet; they were unable to install a rear door. | For the 2015 event the BLM again proposed the Dining trailer have hard flooring and a rear door for food vendor access.<br><br>In 2014, an excessive amount of dust and mud was tracked into the Dining trailer. BRC and food vendor personnel were unable to properly remove the dirt due to the carpeted flooring. Additionally, the lack of a rear door caused food vendor staff to use the same entrance as diners. This led to foot traffic congestion and food spills at the main entrance door. | The BLM will eliminate this draft SOW request.<br><br>While it is believed hard flooring and separate food vendor access are needed to address appropriate food handling and health and safety concerns, the BLM will accept whatever flooring and door configuration BRC provides in the Dining trailer. | | NA<br><br>*Note: BRC's 2015 modular building vendor (Modspace) has relayed to BLM they have already procured a double wide trailer with vinyl floors and are installing a rear door for the dining trailer.* |
| **5: BLM HQ SOW:**<br><br>**Design Layout of Dispatch Trailer** | In 2014 BRC provided a single wide Dispatch trailer at the BLM HQ utilizing the MOU for best business practices.<br><br>The Dispatch trailer was used to support a BLM-only dispatch operation. | For the 2015 event the BLM proposed BRC provide a double wide Dispatch trailer. | The BLM will retain this draft SOW request.<br><br>For the 2015 event the BLM will propose BRC provide a double wide Dispatch trailer.<br><br>The BLM will collaborate with BRC in planning the Dispatch trailer layout specifically as it relates to the construction of a dividing wall separating law enforcement and civilian dispatch operations. | In 2015 a double wide Dispatch trailer is needed as the BLM and BRC have mutually agreed to co-locate their dispatch operations in the same trailer for the 2015 event. Co-location will ensure necessary resources are dispatched in a timely manner to emergency calls for service and improve the community policing model. Additionally, it would eliminate the inefficient and unnecessary practice of dispatchers having to relay requests between BRC, BLM, and PCSO who have previously been located in two separate trailers. | BRC will realize a cost reduction of $2000 for the Dispatch trailer.<br><br>In 2014 BRC required (2) single wide trailers for dispatch operations; one for BLM and one for BRC. The rental cost for (2) single wide trailers was $14,000. Use of one double wide trailer for the integrated Dispatch trailer in 2015 will cost $12,000.<br><br>*Cost figures provided by Modspace (BRC's modular building vendor).* |

AR07276

**A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2014 PRACTICE | 2015 DRAFT SOW | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **6: BLM HQ SOW:** <br><br> **Security Fencing** | In 2014 BRC installed orange safety fencing around the BLM HQ to provide for site security utilizing the MOU for best business practices. The fencing was purchased in 2013 by the BLM through cost recovery. | For the 2015 event the BLM proposed a more secure type of fencing around the BLM HQ site. | <u>The BLM will clarify this draft SOW request.</u> <br><br> The BLM's proposal was misinterpreted as a request for a different fencing material. This was not the intent. The BLM simply sought to modify some elements of fencing configuration (e.g., decrease access points) to reduce unintentional incursion into the BLM HQ area. <br><br> For 2015 the BLM will propose BRC install the existing orange safety fencing around the BLM HQ (with minor configuration adjustments) utilizing the MOU for best business practices. | Orange safety fencing is needed to help define/control access into the HQ area and to ensure protection of the following: <br><br> • Sensitive information <br> • Law enforcement officers <br> • Civilian employees <br> • UC officers identities <br> • Sensitive equipment <br> • Government equipment <br> • Victims of crimes <br> • Evidence | No cost increase over 2014 is anticipated. |
| **7: IT Equipment Rental SOW** | In 2014 BRC rented IT equipment (e.g., laptop computers, docking stations, monitors, copiers) utilizing the MOU for best business practices. <br><br> This equipment was used for report writing, dispatch operations, and other administrative functions during the event. | For the 2015 event the BLM proposed BRC would continue to rent the IT equipment to address needed IT to address equipment shortfalls identified in 2014 and additional equipment needed to support staffing increases among BLM and PCSO personnel. | <u>The BLM will retain this daft SOW request.</u> <br><br> For the 2015 event BLM will propose BRC continue to rent the IT equipment needed to support the event. <br><br> The BLM will collaborate with BRC to ensure identified IT equipment shortfalls in 2014 and equipment needed to support staffing increases is appropriate. <br><br> The BLM will implement formal property transfer procedures to ensure rented IT equipment is properly accounted for. | IT equipment is a necessary component for conducting event operations, to include report writing, dispatch operations, and other administrative functions. | While there will be an increase in IT equipment rental cost, the cost increase is expected to be minimal. |

AR07277

**A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2014 PRACTICE | 2015 DRAFT SOW | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **8: Lodging at Blue Pit SOW** | In 2014 the BLM did not lodge at Blue Pit because Gerlach and the BLM owned Black Rock Station had sufficient lodging to accommodate event personnel. The BLM utilized all available motel rooms, rental homes, trailer homes, government owned travel trailers, etc. All accommodations were generally staffed at two persons per room.<br><br>Some personnel utilized personally owned travel trailers. | To address additional lodging needs, lodging shortages in Gerlach, and overcrowding at Black Rock Station, the BLM proposed building a lodging site at a gravel pit called Blue Pit. The gravel pit is located on BLM managed lands within the event closure area. This lodging site would be used to house BLM event incident management staff and PCSO management staff.<br><br>The proposed Blue Pit lodging facilities would include water and electrical supply, mobile flush toilets with hand wash basins, mobile shower facilities, and mobile laundry units.<br><br>The infrastructure requirements would be completed utilizing the MOU for best business practices. | The BLM will eliminate this draft SOW request.<br><br>Lodging at Blue Pit will not occur in 2015.<br><br>The BLM will continue to work with BRC to secure lodging within Gerlach (see No. 9 below)<br><br>The BLM will house additional personnel at Black Rock Station using travel trailers. If government-owned trailers were unavailable, units would need to be rented.<br><br>Note: Black Rock Station has toilet, shower, and laundry facilities. However, a review of the design criteria for the septic system has determined peak use periods during the 2014 event exceeded the system's design capacity by three times. As a result, expanded lodging at Black Rock Station in 2015 will still require the addition of some infrastructure components (e.g., portable generator, mobile shower unit) and/or periodic septic system pumping. | Due to the number of detailers assigned to work the event, coupled with a limited supply of lodging options, there is no longer sufficient lodging available from vendors in the Gerlach area. | The additional infrastructure (e.g., portable generator, mobile shower unit) will cost approximately $40,000.<br><br>The periodic septic system pumping will cost approximately $4,500.<br><br>*** During a meeting on 7/9/15 between the BLM and BRC, BRC made the BLM aware that after reviewing the lodging requirements by BLM, BRC has enough trailers and trailer pads to accommodate all of the BLM and PCSO personnel for the event. No additional infrastructure would be needed at the Black Rock Station.*** |

**A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2014 PRACTICE | 2015 DRAFT SOW | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **9: Lodging in Gerlach SOW** | In 2014 BRC rented lodging facilities for the BLM from Bruno's Country Club utilizing the MOU for best business practices.<br><br>The following lodging facilities were rented:<br>(40) motel rooms<br>(8) apartments<br>(2) houses<br>(8) trailer park houses<br>(12) trailer pads | For the 2015 event the BLM proposed BRC rent the following Bruno's Country Club facilities:<br><br>(40) motel rooms<br>(6) apartments<br>(3) houses<br>(9) trailer park houses<br>(16) trailer pads<br><br>This equates to (5) more lodging spaces than requested in 2014.<br><br>*Note: BLM asked Bruno Country Club's ownership for every lodging accommodation available. Bruno's provided a list of available lodging, which was included in the BLM SOW.* | <u>The BLM will modify this draft SOW request</u><br><br>The BLM proposes BRC rent facilities in Gerlach that will provide accommodation spaces equal to:<br><br>(40) motel rooms<br>(6) apartments<br>(3) houses<br>(9) trailer park houses<br>(16) trailer pads<br><br>The BLM will utilize any and all lodging facilities provided. | Under the MOU for best business practices, BRC has negotiated with Bruno's County Club and secured all available lodging.  This accounts for all available lodging options in the vicinity of the event.<br><br>The BLM explored potential lodging options outside of the Gerlach area, but concluded these options did not meet operational needs. | It is not anticipated there will be significant cost increases associated with the addition of 5 accommodation spaces in 2015.  However, because this SOW is completed by BRC in accordance with the MOU for best business practices, the BLM is not privy to the actual cost associated with this SOW. |

A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT
DRAFT INTERNAL WORKING COPY

| ISSUE | 2014 PRACTICE | 2015 DRAFT SOW | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **10: Portable Radios SOW** | In 2014 the BLM acquired 100 hand-held radios from the military, free of charge, to support the event.<br><br>In prior years the BLM has rented hand-held radios and charged them to cost recovery. | For the 2015 event the BLM was not able to acquire hand-held radios from the military.<br><br>At BRC's suggestion the BLM proposed BRC would purchase or rent approximately 140 radios (encrypted and non-encrypted) utilizing the MOU for best business practices. | The BLM will modify this draft SOW request<br><br>The BLM will acquire the necessary radios in the following manner:<br><br>1. The BLM will acquire non-encrypted radios for use by civilian detailers from the NV radio cache.<br><br>2. All LEOs who have government issued encrypted hand-held radios will bring those radios to the event.<br><br>3. Based on past statistics it is projected 20 BLM LE personnel and 40 PCSO LE personnel will not have the encrypted radios needed. To address the shortage, the BLM will purchase 60 encrypted P-25 compliant Midland or equivalent radios. The cost will be charged to cost recovery and held in a cache solely for use at the Burning Man events. | Radios are required equipment for personnel supporting the event. Civilian detailers are typically not provided with agency issued radios by their respective home offices and do not bring radios to the event. Conversely, law enforcement personnel are issued agency radios by their respective home offices. LE detailers are required to use encrypted radios to ensure sensitive information and PII are protected. History has shown some law enforcement detailers (both federal and state) have not been issued encrypted radios by their home office. A cache of encrypted radios needs to be maintained in order to supplement this shortfall.<br><br>The BLM conducted market research for the rental of encrypted handheld radios and found there are no contractors currently renting P-25 compliant encrypted radios. Radios of this type must be purchased. | The purchase of 60 P-25 compliant encrypted Midland or equivalent radios will result in approximately $60,000 charged to cost recovery.<br><br>*** During a meeting on 7/9/15 between the BLM and BRC, BRC stated they wanted to purchase 80 encrypted radios in 2015 to ensure the BLM and PCSO had the necessary radios. BRC further indicated they would make similar radio purchases in future years in order to create a radio cache sufficient to service the entire event.** |
| **11: Fuel Services SOW** | In 2014 BRC contracted a vendor to provide a remote fueling station at the BLM HQ. The facility was staffed by vendor employees.<br><br>*Note: Vendor employees set fueling time schedules that were not conducive for employees working within the event. As such, two days into the event the BLM assumed responsibility for the management of the refueling center.* | For the 2015 event the BLM proposed no changes in the fuel services SOW as compared to the 2014 event. | The BLM will modify this draft SOW request<br><br>For the 2015 event the BLM will propose BRC continue to provide a remote fueling station at the BLM HQ. However, vendor staff will not be required to operate the station.<br><br>The BLM logistics staff will assume responsibility for the management of the refueling station after it has been properly set up by the vendor. | A remote fueling station is needed to provide fuel for vehicles and generators. However, vendor established fueling schedules are not conducive to 24-hour operations. As such, the BLM logistics staff will assume responsibility for the management of the refueling station. This will allow for flexible fueling times that can be readily adjusted to accommodate the need. | The proposed decision would result in a cost savings as BRC would not be required to pay for vendor staff to operate the fueling station. |

AR07280

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2014 PRACTICE | 2015 DRAFT SOW | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **12: Ice, Water, Drinks SOW** | In 2014 BRC contracted for ice, water, and drinks utilizing the MOU for best business practices. The vendor was required to provide (250) bags of ice with resupply, (280) cases of bottled water with resupply, and (120) cases of Gatorade with resupply.  BLM mandated ice, water and Gatorade be purchased from a local distributor.<br><br>Once at the event, additional specialty drinks were requested by the BLM, such as coconut water and energy drinks. | For the 2015 event the BLM proposed the same amount and types of drinks, and included the purchase of 50 cases of coconut water and energy drinks.<br><br>BLM suggested contracting with a local vendor such as Wade Distributing. | The BLM will eliminate this draft SOW request.<br><br>For the 2015 event the BLM will propose the provision of ice, water and drinks be incorporated as part of a National Mobile Food Services Contract  (see #13 below)<br><br>Furthermore specialty drinks such as coconut water and energy drinks will not be requested. | Provision of ice, water, and drinks as part of a national food vendor contract is more efficient. | It is anticipated costs associated with ice, water, and dinks will be reduced as a result of incorporating them into the food contract. |
| **13: Food Vendor SOW** | In 2014 the BRC contracted with Spectrum to set up a satellite commissary at HQ, utilizing the MOU for best business practices.<br><br>Spectrum is the same company BRC uses to support the BRC commissary.  The BLM identified performance concerns with Spectrum during the 2014 event (e.g., the vendor ran out of food, served leftovers from the BRC commissary, transported food in open containers between the BRC commissary and the BLM | For the 2015 event the BLM proposed BRC would solicit bids from two contractors (approved from the National Caterer list) in addition to Spectrum. However, BRC could award the contract with approval of BLM's event contracting officer.<br><br>To address unmet federal regulations and safety concerns, the BLM provided an attachment to the SOW mandating the vendor meet the food service operating standards of a mobile food service unit to include: no self-service food lines, no re- | The BLM will modify this draft SOW request<br><br>For the 2015 event the BLM will propose to remove the food vendor contract from the best business practices MOU.  In stead, the BLM will post a contract for solicitation through the government contracting process. The SOW will mirror the National Mobile Food Services Contract SOW utilized by the Fire program.<br><br>A Food Unit Leader would be detailed to the event to ensure all federal guidelines are followed in relation to meal preparation and service at the event. | Utilization of a National Mobile Food Services Contract vendor will ensure food service operating standards are met and meal types are consistent with those provided at similarly sized government operations (e.g., fire camps).<br><br>A food unit leader will ensure well balanced menus are provided, maintain inventory of food and water, coordinate resupply, and ensure all appropriate health and safety measures are adhered to. | It is estimated the provision of meals/ice/water/drinks via a BLM contract using the National Mobile Food Services Contract SOW will result in a charge of approximately $200,000 in cost recovery.<br><br>* NOTE:  Given the contract solicitation time requirements, it may prove challenging to secure a National Mobile Food Services based contract at this late date.<br><br>Additionally, inquiries with BLM WO contracting staff indicate federal regulations prevent PCSO personnel from |

AR07281

A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT

**DRAFT INTERNAL WORKING COPY**

| | | | | | |
|---|---|---|---|---|---|
| | dining hall, food was prepared in an open air tent filled with no barrier to insects, blowing dust or unauthorized personnel). | warmed leftovers, and a vendor-employed cleaning staff for the dining hall.<br><br>Additionally, the food service schedule was modified to include an extended service schedule with hot meal availability in between scheduled service, and an attachment suggesting meal types and specific foods. | | | participating in BLM's food contract. As a result of the prohibition, the PCSO will have to negotiate an independent food contract with BRC. |

AR07282

<span style="color:red">**DRAFT INTERNAL WORKING COPY**</span>

| ISSUE | 2014 PRACTICE | 2015 PRACTICE | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **14: BRC Staff Labor Concerns in 2014** | In 2014 BRC provided workers to perform tasks associated with building and maintaining the HQ.  The size of the BRC workforce was based on BLM needs identified in the SOWs.<br><br>BLM made changes during the event which required additional unplanned work for BRC staff. | For the 2015 event the BLM proposed that no additional unplanned duties would be requested of BRC staff. | The BLM will clarify that BRC personnel will not be called upon to perform unplanned work.  The BLM logistics staff will perform all unplanned tasks related to building and maintaining the HQ site. | N/A | The proposed decision would result in a cost savings as BRC would not be required to pay for staff to perform unplanned or additional work. |
| **15: Dispatch** | In 2014, the event utilized a staff of 9 personnel for dispatch.  These personnel consisted of 1 BLM lead and 8 workers (only 1 of the 8 workers was a BLM employee, the remaining 7 were NPS or USFS personnel). | In 2015 the BLM has been unable to secure sufficient federal personnel to staff dispatch functions for the event.<br><br>As such, dispatch services must be contracted for the 2015 event.  The contract staff would consist of 1 lead and 12 workers. | | In 2014, the BLM had difficulty recruiting qualified federal law enforcement dispatchers to staff the event; the BLM was only able to secure (9) dispatchers for the event.  This staffing level is below what is needed to reasonably operate two 12-hour shifts for a three week period.  The BLM is experiencing similar recruiting difficulties for the 2015 event.  These recruitment difficulties are being further exacerbated by the 2015 fire season.<br><br>The dispatch center traditionally receives a high volume of calls for service from law enforcement and civilian staff working the event.  It is anticipated this workload will increase as a result of the dispatch co-location occurring in 2015.  In order to address critical staffing shortfalls, add a third shift rotation, and improve the effectiveness of the communication center, the BLM is seeking to contract for dispatch services to ensure an adequate number of qualified dispatchers can be secured. | Labor/travel costs for contract dispatch personnel in 2015 is estimated to be $190,000.  An increase of $75,000 over labor/travel costs for federal dispatch personnel in 2014. |

**A FRESH LOOK AT THE INITIAL PROPOSALS FOR THE 2015 BURNING MAN EVENT**

<span style="color:red">**DRAFT INTERNAL WORKING COPY**</span>

| ISSUE | 2014 PRACTICE | 2015 PRACTICE | 2015 PROPOSED DECISION | JUSTIFICATION | ESTIMATED COST PROPOSED DECISION |
|---|---|---|---|---|---|
| **16: OLES Labor Costs for Pre-Event Planning** | Historically, WO-120 law enforcement personnel have not charged labor hours expended for event planning to the BRC cost recovery account.<br><br>Non-LE personnel have charged labor hours for event planning to cost recovery. | In 2015, WO-120 personnel continue to expend labor hours for event planning directly related to processing the special recreation permit. These hours are not being charged to cost recovery. | | In the BLM Handbook H-2930-1 "Recreation Permit Administration", it reads, "Cost recovery covers all federal activities that convey special benefits to recipients beyond those accruing to the general public." The manual also states that direct costs associated with the permit are allowable expenses for cost recovery. "Direct costs may include personnel costs in the form of wages paid to BLM personnel working on the project, with allowances provided for fringe benefits and BLM's leave surcharge rate and any overtime associated with processing the application." | If WO-120 personnel began charging labor hours for event planning to cost recovery at this point in the planning process, the cost to BRC would be approximately $135,000 (plus 22.9% indirect fee) |
| **17: Closure Order Restrictions** | In 2014, the BLM worked with BRC to develop the Closure Order/Temporary Restrictions. | For the 2015 event, BLM developed the Closure Order/Temporary Restrictions without BRC input.<br><br>Due to time constraints for the Federal Register, BRC was not involved in this year's Closure Order/Temporary Restrictions development. | While the BLM is not required to coordinate with the SRP proponent in developing the Closure Order/Temporary Restrictions; the BLM will review the proposed Closure Orders/Restrictions with BRC in order to identify areas of concern.<br><br>See Attachment 1 – "2015 Closure Order and Stipulation Changes" | N/A | N/A |

**2015 CLOSURE ORDER AND STIPULATION CHANGES**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| **LASERS** | **Closure Order Addition:** The possession and or use of handheld lasers are prohibited. <br><br> **New Stipulation:** All mounted lasers will be inspected and approved by BRC. | During the 2014 event, BRC reported to BLM a staff member sustained an eye injury from a hand-held laser during the Man Burn. The use of hand held lasers is prevalent during the event, creating the potential for significant and permanent harm to participants and employees. | • BRC bans the use of handheld lasers in their own "Laser Policy". <br> • BRC is aware of the closure order and agrees with this restriction. <br> • BRC is not aware the BLM is proposing this issue as a stipulation. |
| **UNARMED AIRCRAFT SYSTEMS (UAS) (DRONES)** | **Closure Order Addition:** The use of Unmanned Aircraft Systems (UAS) is prohibited. <br><br> **New Stipulation:** Unmanned Aircraft Systems (UAS) or flying drones will not be used inside the closure order area. | The use of UAS over mass gatherings is problematic. Drone crashes can cause serious injuries or death. Also, the entire closure area for the event is located within five miles of the event airport. The FAA has identified the use of drones within five miles of an airport as unsafe. The FAA recommends that use of drones within 5 miles of an airport requires permission or notification of the airport control tower. There are no protocols in place to accomplish this, and there is no control tower at the Black Rock City Airport. | • BRC agrees this is a good idea for participants, but would rather use their own established protocols for permitting the use of drones. <br> • BRC is adamant the BLM allow a small number of drones for BRC use to document the event. <br> • BRC is aware of the closure order prohibition. <br> • BRC is not aware the BLM is proposing this issue as a stipulation. |

**2015 CLOSURE ORDER AND STIPULATION CHANGES**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| **MUTANT VEHICLES** | **Closure Order Addition:** Mutant vehicles and art cars cannot be operated prior to the event opening on 6:00 p.m. Sunday, August 30, 2015, except for their arrival at the event and on designated routes to and from the DMV for the purpose of registration.<br><br>**New Stipulation:** Mutant vehicles and art cars cannot be operated prior to the event opening on 6:00 p.m. Sunday, August 30, 2015, except for their arrival at the event and on designated routes to and from the DMV for the purpose of registration. | During the 2014 pre-event time frame, BLM staff was surprised by the high number of people on the playa throughout the pre patrol period who appeared to be driving around in art cars and mutant vehicles, rather than fulfilling the intent of the early arrival pass program of construction.   This created a party atmosphere and caused an unexpected workload for the pre-event law enforcement staff.  The pre-event is designed to allow "early arrival participants" an opportunity to build art displays and theme camps in anticipation of the main event. The pre-event is not intended to be an extension of the main event providing a party atmosphere for the "early arrival participants".<br><br>In 2014, a DNA was completed which allowed the opening and closing of the main gate to participants for a period up to 24 hours earlier than the scheduled beginning of the event and up to 24 hours after the scheduled end of the event. The purpose was to allow vehicles to enter earlier and exit later for a safer ingress and egress, maximizing use of daylight hours and minimizing traffic impacts on local roads. Participants are required to focus their activities on camp location setup and breakdown during the added ingress and egress period. Official BRC activities associated with Event participation are not permitted until the official event start time, or after the official conclusion of the event. The official start time of the Burning Man Event in 2015 is August 30th at 6pm, and the official end is September 7th at 6pm.<br><br>Also, according to BLM Instruction Memorandum No. 2011-019, "The proper administration of an SRP requires numerous steps and the full engagement of the BLM staff and managers.  The authorized officer may issue an SRP only when it has been their determination that the BLM has the capacity to properly administer the permit.  If the field office cannot fulfill, or complete, all the necessary steps of a use authorization, then no SRP shall be issued."<br><br>Note: BRC does not begin registration of art cars until the Saturday before the main event gate opening. Under the closure order, BLM would allow an exemption for art cars to travel to the DMV for the sole purpose of registration when DMV officially opens up. | • BRC has agreed to the pre-event art car prohibition. However, BRC executive management may request an exemption for a few of their personal art cars.  BRC explained this is for business and pleasure tours of the city during pre-event.<br>• BRC is aware of the closure order restriction<br>• BRC is not aware the BLM is proposing this issue as a stipulation. |

**2015 CLOSURE ORDER AND STIPULATION CHANGES**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| **DISTURBED / DANGEROUS PERSONS** | **New Stipulation:** BBRC Staff will immediately notify the BLM of every incident involving potentially dangerous or disturbed persons. | In 2014, BRC's Black Rock Rangers (BRR) encountered a dangerous and disturbed individual who barricaded himself inside a motorhome. BLM and PCSO notification was delayed approximately 8 hours while BRRs tried to resolve the situation, which created a dangerous situation that could have been mitigated had early notification occurred.<br><br>Note:  In the "20 Safety Issues" document submitted to BRC, under the heading "Significant Incident Reporting", the BLM raised concerns over the significant incidents that were not reported in a timely manner as required by BLM.  Of particular concern was an incident involving a barricaded subject, as described in item #9 of this document.   As such, Black Rock Rangers who encounter violations of the law need to immediately contact the appropriate law enforcement agency on playa.  The lack of timely incident reporting compromises public safety. | • BRC has agreed to increase education and training of BRRs to avoid this situation in the future.  For 2015, the BLM is assigning an employee to work alongside the BRR Officer of the Day.  The BLM employee will be able to learn of incidents in a timely manner, immediately identify situations requiring a law enforcement response, and educate BRRs on situational awareness.<br>• BRC is not aware the BLM is proposing this issue as a stipulation. |
| **LARGE ART CARS ON CITY STREETS** | **New Stipulation:** Large art cars are prohibited from operating on the city streets, and large art car camps will be placed on the outside streets of the city. | In previous event, BLM observed large art cars operating in the streets of Black Rock City among thousands of pedestrians and bicyclists, resulting in accidents, collisions, and near accidents. Due to the congested nature of pedestrian and bicycle traffic within the city, large art car operation creates a safety hazard. Large art cars often occupy the entire city street, forcing pedestrian traffic off of the roadway and limiting emergency vehicle access within the city. When these large art cars have a need to turn around, or turn onto another city street, pedestrians may be caught in blind spots creating a safety concern.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Art Car Operations", BLM LE observed art cars operating on crowded streets in the city, increasing the potential for collisions with pedestrians and bicyclists. Art cars operated on the open playa during periods of limited visibility, which also increases the potential for collisions.  These art car issues compromise public safety. | ▪ Per BRC policy, vehicles over 13 feet width may not drive in the City streets.<br>▪ BRC policy states "whenever appropriate, larger Art Car camps will be placed within one block of the edge."<br>▪ BRC is not aware the BLM is proposing this issue as a stipulation. |

**2015 CLOSURE ORDER AND STIPULATION CHANGES**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| **ART CARS WITH FLAME EFFECTS** | **New Stipulation:** Art cars with flame effects or pyrotechnics will not carry stored gasoline or diesel fuel when in operation. | BLM observed Art Cars with flame effects or pyrotechnical displays that were in possession of stored fuel for generators and other equipment, creating a serious fire hazard in proximity to a large number of people. If art cars require fuel for generators, they will have to return to their campsite or designated BRC fuel station.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Fuel Storage Management", roaming art cars were observed with large amounts of onboard stored fuel. Additionally, some art cars include pyrotechnic effects in close proximity to stored fuel.  In some cases, the fuel was observed in unapproved containers. These issues increase the risk for a major fire incident, and pose a serious threat to public. | • Per discussions, BRC agrees with this change.<br>• BRC is not aware the BLM is proposing this issue as a stipulation.<br>• BRC policy states "One way to significantly improve fuel safety on a Mutant Vehicle is to remove all extra fuel from the vehicle other than what is carried in the primary tank(s) used to fuel the drive motor and/or generator.<br>• BRC policy states "If a vehicle absolutely needs to have additional fuel onboard, for example to transport fuel from the fueling station back to camp, it must be no more than 5 US Gallons, and be stored in one appropriately-secured, DOT-approved fuel container. |

**2015 CLOSURE ORDER AND STIPULATION CHANGES**
**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| **ART CAR SPOTTERS** | **New Stipulation:** All art cars will incorporate safety officers (spotters) who will wear high-visibility reflective clothing and possess a high intensity flashlight. | Art car spotters provide a critical safety role for ensuring participant safety while getting on and off of art cars and while art cars are in motion. In order for participants to clearly identify spotters and request assistance, spotters must wear high-visibility reflective clothing and possess a high intensity flashlight.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Art Car Operations", BLM LE observed art cars operating on crowded streets in the city, increasing the potential for collisions with pedestrians and bicyclists. Art cars operated on the open playa during periods of limited visibility, which also increases the potential for collisions. Some large art cars have designs with exterior ladders and stairwells leading to upper decks, which encourages some participants to get on and off while the art car is still moving.  Art car "spotters" who help direct large moving art cars with limited driver visibility were observed without high visibility clothing during the day and without flashlights at night, which compromise public safety. | • Per discussions, BRC agrees with this change.<br>• BRC is not aware the BLM is proposing this issue as a stipulation.<br>• Per BRC policy, "vehicles that are large or in instances where the driver does not have a clear view of the front and back of the vehicle, walkers must be used at all times when the vehicle is in motion. The number of walkers required will vary based on the size and type of vehicle, but must be a sufficient number of people to ensure safe navigation. The walkers must have some type of markings or attire that will identify them as walkers for that particular vehicle. Examples of markings/attire include; Reflective safety vests, brightly colored or reflective hats, brightly colored or reflective bandanas, brightly colored or reflective shirts." |
| **PROPANE AND ACCELERANT REFUELING** | **New Stipulation:** All propane and accelerant refueling will occur at identified refueling stations, or by a licensed professional. | Refuel of propane will be completed by a licensed professional to ensure safety whether at a BRC contracted refueling station or mobile propane vehicle. | • BRC is not aware the BLM is proposing this issue as a stipulation. |
| **ART CAR RELATED INJURIES** | **New Stipulation:** BRC will notify BLM law enforcement immediately of all art-car related accidents or injuries. | In past years BLM has learned of accidents and collisions, some with injuries, between art cars and pedestrians and bicyclists long after the incident or through third party reports.  All accidents between a vehicle and a pedestrian must be reported for possible law enforcement investigation. | • BRC is not aware the BLM is proposing this issue as a stipulation. |

**2015 CLOSURE ORDER AND STIPULATION CHANGES**
**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| **BURN PERIMETERS** | **New Stipulation:** Participants who are caught violating established burn perimeters by Sandmen will be turned over to BLM Law Enforcement. | In 2014, BLM law enforcement observed BRC's Sandmen capture a burn-perimeter violator and released them back into the crowd.  This is a serious safety concern since, at other Burning Man sponsored events, notably in Utah in 2014; participants have been injured or killed by violating burn perimeters.  Once this occurs, BLM law enforcement will determine the next course of action.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Security and Safety Plan for Scheduled Burn Events", the BLM raised concerns over the Sandmen not being licensed, bonded, insured or trained to use any type of physical force to detain participants at Burning Man. BLM also raised a concern of the Sandman's Standard Operating Procedures (SOPs) which instructs Sandmen to release participants who enter the burn perimeter back into the crowd. | • Per discussions, BRC agrees with this procedure.<br>• BRC is not aware the BLM is proposing this issue as a stipulation. |
| **BURN PLANS** | **New Stipulation:** BRC will include BLM at the 1600 briefing on the Thursday before the Man Burn.   BRC will provide BLM with a completed "Large Burn Logistics" check down prior to ignition of any large burn.  BRC will provide BLM a daily update on scheduled burns, to include times, burn plans, and identification of burn IC. | In order to ensure public safety at the forefront during planned burn events, BRC needs to prepare and submit all burn plans to the BLM well in advance of any planned burn. | • Per discussions, BRC agrees with this procedure.<br>• BRC is not aware the BLM is proposing this issue as a stipulation. |
| **EVACUATION PLAN** | **New Stipulation:** BRC will develop an evacuation plan and include in the BRC Operating Plan. | BLM identified that there was no evacuation plan in BRC's Operating Plan.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Participant Evacuation Contingency Plan", a comprehensive participant evacuation contingency plan has not been developed with affected cooperators. BLM, BRC and the other cooperators need to develop a contingency plan in the event of an emergency which requires the city to be evacuated; without an evacuation contingency plan, public safety is compromised. | ▪ Per discussions, BRC agrees with this requirement and has provided an evacuation plan as part of their 2015 Operations Plan.<br>▪ BRC is not aware the BLM is proposing this issue as a stipulation. |

**2015 CLOSURE ORDER AND STIPULATION CHANGES**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| **BLACK WATER PUMPING** | **New Stipulation:** BRC will ensure that all RVs with blackwater tanks have access to pumping service contractor(s). | In 2014, BLM received numerous complaints from participants and vendors regarding the lack of availability of blackwater tank pumping, which could create a health and sanitation problem.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Sanitation Management", BLM LE and Civilian Operations reported insufficient resources were dedicated to removing blackwater from participant campsites. Public health is compromised by insufficient blackwater pumping resources throughout the city.<br><br>Note: The Nevada Department of Health and Human Services' AAR, page 4, states "…a few theme camp participants registered complaints about the limited availability of septic tank pumping services." | • Per discussions, BRC is aware of this concern.<br>• BRC is not aware the BLM is proposing this issue as a stipulation. |
| **EMERGENCY RESPONSE VEHICLE** | **New Stipulation:** BRC will station a specialized dedicated emergency response vehicle capable of both basic life support and firefighting at the airport. (Can be combined with Stip 33). | The airport at Black Rock City is one of the busiest in the state during Burning Man with hundreds of takeoffs and landing possible per day. Aircraft mishaps and accidents have happened in the past. Having dedicated emergency assets stationed at the airport provides immediate response in the event of a crash.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Placement of Emergency Vehicles at the Airport", it was observed by members of LE and HGH's Incident Commander that there were no dedicated emergency response vehicles located at the airport, which becomes one of Nevada's busiest during the event. In the event of an airport emergency, a lack of immediate response could compromise public safety. Airplane crashes at the Black Rock City airport have occurred in the past, including this year. | • Per discussions, BRC agrees with this requirement and has verbally committed to having a dedicated emergency response vehicle at the airport.<br>• BRC is not aware the BLM is proposing this issue as a stipulation. |

**2015 CLOSURE ORDER AND STIPULATION CHANGES**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| **EMS DEPLOYMENT** | **New Stipulation:** BRC will provide forward deployment of EMS during large raves and burn events. | Due to apparent increasing drug use at large raves, and because of the size of crowds at large burn events, BLM LE finds itself increasingly occupied by participants in need of EMS. Stationing EMS if a forward position during these types of events will alleviate the pressure on LE and provide faster response for participants in need of EMS.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Deployment of Medical Resources", inadequate proactive deployment of EMS assets to large events in the city such as mobile raves and scheduled burns. BLM LE observed that medical resources were not adequately pre-staged at mobile raves and as a result law enforcement officers were tasked with providing emergency care on a regular basis. Forward deployment of medical resources to large events and mobile raves will reduce emergency response time by ESD, and reduce BLM LE's involvement in medical situations, thereby allowing LE to continue their law enforcement mission. | • Per discussions, BRC agrees with this requirement and has verbally committed to providing this service.<br>• BRC is not aware the BLM is proposing this issue as a stipulation. |
| **RESCUE CAPABILITIES** | **New Stipulation:** BRC will provide modern industry-standard technical rescue, extrication and high-angle rescue capabilities and equipment throughout pre- during- and post-event. | In 2014 BLM observed that BRC's technical rescue, extrication and high-angle rescue equipment was antiquated and substandard.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "BRC Fire, Rescue, Hazmat Programs", BLM and HGH observed and reported shortcomings in equipment and management of fire, rescue and hazmat programs. HGH's 2014 AAR, page 23, states "Currently the technical rescue and extrication capabilities of the on playa response system are of great concern, do not meet national standards, are antiquated, are not safe…" As a result of the lack of standard extrication capabilities, public safety was impacted. | ▪ Per discussions, BRC agrees with this requirement and has provided BLM with a written policy in their 2015 Operations Plan.<br>▪ BRC is not aware the BLM is proposing this issue as a stipulation. |

**2015 CLOSURE ORDER AND STIPULATION CHANGES**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| **BURNABLE STRUCTURES** | **New Stipulation:** All structures to be burned will meet BRC engineering standards for burnable structures, or they will not be burned. | In 2014 BRC allowed the burning of a structure called "Embrace" that was made of wood that was too thin to meet BRC engineering standards, and could create a dangerous ember cast when burned. It was determined that it would be burned anyway to reduce the greater threat of a potential unplanned burn, or arson.<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Art Project Management", BLM LE and Civilian Operations staff observed public safety issues associated with art burns in 2014. During the "Man" burn the upright supports were so thick that it took a prolonged time for the piece to fall, which led to concerns voiced by BRC about its staff's ability to hold the crowd back to a safe distance. BRC requested that BLM LE remain on site to assist with crowd control until the Man structure safely fell.  The art piece "Embrace" was constructed with material that was too thin to burn per BRC's engineering guidelines. BRC told the artist it would not be allowed to be burned and the artist agreed. It was later brought to the UC's attention by BRC that there was a high likelihood the art piece would be set on fire illegally by participants.  Due to the inability to prevent the uncontrolled burning of the art piece by participants, a serious public safety hazard was created. To protect public safety, the UC and BRC agreed that the piece would be burned under special | ▪ Per discussions, BRC is aware of this concern.<br>▪ BRC has provided BLM with a plan for providing a secondary collapse mechanism for burnable structures for the 2015 event.<br>▪ BRC is not aware the BLM is proposing this issue as a stipulation. |
| **POPULATION REPORTING** | **New Stipulation:** BRC will provide up to the minute and on-demand population reporting to the BLM. | BRC's system for providing population counts failed in 2014. BLM requires up to the minute population counts in order to properly administer the permit and prepare and plan for emergency developments**.**<br><br>Note: In the "20 Safety Issues" document submitted to BRC, under the heading "Population Tracking and Reporting Program", BLM Civilian Operations staff noted that BRC was unable to fulfill the intent of the Special Recreation Permit (SRP) Stipulations requiring accurate and timely population reporting before, during and after the event, despite numerous reminders to do so. The 2014 BLM Special Recreation Permit (SRP) Evaluation, page 2, states that BRC's population tracking and reporting program was inadequate and did not meet the BLM requirements or SRP stipulations. As a matter of public safety, BLM must have an accurate population count, up to the minute when requested, in order to insure appropriate response to any major emergency that may occur. | • Per discussions, BRC agrees with this requirement.<br>• BRC is not aware the BLM is proposing this issue as a stipulation. |

AR0239

**2015 CLOSURE ORDER AND STIPULATION CHANGES**

**DRAFT INTERNAL WORKING COPY**

| ISSUE | 2015 NEW CLOSURE ORDER RESTRICTION AND EVENT STIPULATION | JUSTIFICATION FOR CHANGE | BRC POSITION |
|---|---|---|---|
| SAFETY SIGNAGE | **New Stipulation:** Speed limits, agreed upon by both BRC and BLM, will be posted on both Gate Road and the 12-Mile/Point 1 Road. BRC will provide clearly identifiable mileage markers on Gate Road to facilitate emergency response. Will-call area will have an organized layout including signage. | In 2014, BRC was unable to adequately post agreed-upon speed limits along roads leading to the event, reducing LE's ability to provide for public safety. Additionally, mile markers are needed along gate road to improve emergency response time to incidents that occur along the roadway.  Similarly, the will-call parking lot requires an organized and signed layout in order for emergency service providers to respond to call for service.   The will call area a large parking area located along Gate Road used for the purpose of staging vehicles and participants who are not immediately allowed to enter the event for a variety of reasons; at times the will call parking area contains over 100 vehicles and several hundred participants.<br><br>Note:  In the "20 Safety Issues" document submitted to BRC, under the section "D-Lot Design and Management" , the BLM noted the will call parking area has become a massive overflow parking area with no internal organizational structure or directional markings to allow for effective location of emergency incidents. During the 2014 event, BLM LE and Civilian Operations staff observed public safety issues including uncontrolled partying, loitering and trespassing.  The poor design of will call made it very difficult for BLM law enforcement or EMS to respond to or locate calls, compromising public safety. | • Per discussions, BRC is aware of this concern and has verbally agreed to re-design the will call parking area and provide the requested mile markers and speed limit signs.<br>• BRC is not aware the BLM is proposing this issue as a stipulation. |

AR07234

## FINDING OF NO SIGNIFICANT IMPACT

### Burning Man 2012-2016 Special Recreation Permit
### Environmental Assessment
### DOI-BLM-NV-W030-2012-0007-EA

Based on the Environmental Assessment (EA) DOI-BLM-NV-W030-2012-0007-EA, dated June 2012, I have determined that the Proposed Action, with implementation of all of the mitigation and monitoring measures developed in the analysis for the Proposed Action (refer to EA Chapter Six), will not have a significant effect on the human environment; therefore, an Environmental Impact Statement (EIS) will not be required.

I have determined that the proposed action is in conformance with the approved Resource Management Plan (July 2004) for the Black Rock-Desert–High Rock Canyon Emigrant Trails National Conservation Area and Associated Wilderness and other Contiguous Lands in Nevada, and is "…consistent with other Federal Agency, state, and local plans to the maximum extent consistent with Federal law and Federal Land Policy Management Act (FLPMA) provisions" (BLM Land Use Planning Handbook H-1601-1). This finding and conclusion is based on my consideration of the Council on Environmental Quality's (CEQ) criteria for significance (40 CFR 1508.27), with regard to both context and intensity factors.

### Context
The project area is located in Pershing County, Nevada on the Black Rock Desert playa. The Burning Man event has been held at various locations on the playa since 1990. The playa is within the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area (NCA). The enabling legislation for the NCA contains language that allowed for continued permitting of large-scale events: "It is expected that such permitted events will continue to be administered in accordance with the management plan for the conservation area and other applicable laws and regulations." The Resource Management Plan also allowed for large-scale permitted activities in limited portions of the NCA on the Black Rock Desert playa.

### Intensity
#### 1) *Impacts that may be both beneficial and adverse.*
Implementation of the proposed action is anticipated to have beneficial impacts to the assessment area for economics due to the direct and indirect spending associated with the event.

Impacts from implementation of the proposed action that stand out as potentially adverse are in the areas of traffic; public health and safety (see answer to number 2 below); air quality and waste.

The population that causes the roads to deteriorate from NDOT's level of service (LOS) D to E, assuming a maximum exodus of 1,000 vehicles per hour on the last day of the event, was determined through the analysis to be 65,400 people. A number of mitigation measures were recommended through the National Environmental Policy Act (NEPA) analysis to help alleviate impacts from traffic volume. As NDOT strives to maintain LOS D or better on all of its roadways, implementation of recommended mitigation is necessary to maintain acceptable levels of service. A specific mitigation involving the release of no more than 1000 vehicles per hour from Black Rock City during the exodus period was developed through NEPA analysis to avoid deterioration of the external roadway system to an unacceptable level of service (LOS E or F). The key roadways (as shown in Figure 3-10 of the EA) used by Burning Man participants

include portions of Interstate 80, State Route (SR) 445, SR 447, SR 427, County Road 34, and SR 446, in its entirety.

There would be elevated localized emissions of criteria pollutants $NO_2$, $SO_2$, CO, $PM_{10}$, $PM_{2.5}$ and greenhouse gas emissions, principally $CO_2$, within the Public Closure Area (as shown in Figure 2-1 of the EA). The smaller ($PM_{2.5}$) particles could be aloft for a very long time and distance, while the largest and most visible particles (over $PM_{10}$) are likely to settle in and near the assessment area, as defined in the EA. Dust abatement practices during the event and precipitation following the event would both serve to stabilize the playa surface and reduce dust. See answer number five below regarding degree of uncertainty regarding air quality.

Based on interdisciplinary discussions and public comment, it was determined that debris continues to be an issue of the event. Although the proposed action includes measures to prevent, control and clean-up debris, recommended mitigation was developed in the analysis to further reduce impacts related to improper disposal of waste.

Recommended oil drip survey mitigation was also developed in the analysis to build on existing oil drip survey baseline information. The intent of this mitigation is to further quantify and assess how much oil might be deposited on the playa during the event and take action to reduce the amount of hydrocarbon waste if it is shown to be increasing at the playa.

## 2)  *The degree to which the proposed action affects public health or safety.*

Traffic volume and potential for road deterioration are issues that have been evaluated in the EA and for which there are proposed measures as well as recommended mitigation included in the EA to address.

There is potential for natural or man-made emergency that could cause need for evacuation. The most likely would be a weather-related emergency. The EA includes summaries of BRC's contingency plans including BRC's separate contingency plan for an extreme weather event.

The playa dust includes both gypsum, an alkaline dust, and silica, a known carcinogen. These become airborne during high wind events and when the crust of the playa is broken through surface disturbing activities. Event participants would be at risk of inhaling these particulates. Participants are made aware of the potential for high wind events that cause "white out" conditions and methods to reduce exposure, such as the use of dust masks and goggles. Potential impacts to offsite receptors would be lower than that of participants due to dilution and deposition.

Dehydration, sunburn and "playa foot" are other public health issues associated with the implementation of the proposed action. Through years of conducting this event, BRC has been able to much reduce the incidence of dehydration, sunburn and "playa foot" due to its communication and distribution of educational materials on these subjects.

There is risk of vehicle collisions by participants traveling to and from the event (as shown in Figure 3-10 of the EA) involving rangeland animals including cattle, wild horses and burros. There is also risk of collisions with birds both migratory and species such as Sage grouse.

2

FONSI
DOI-BLM-NV-W030-2012-0007-EA

**3)  *Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.***

The project area is within the NCA. The management plan for the NCA provides for events of this scale, while minimizing impacts on important historic, scenic, cultural, wildlife, and other resources.

There are no park lands, prime farmlands, or wild and scenic rivers within proximity of the event. The playa is classified as a lake by the National Wetlands Inventory. There are no other wetland features within the Public Closure Area or traversed by the event access road. Hydrocarbon waste has the potential to affect water quality and change of composition of the playa lake surface. Recommended mitigation was developed to aid in quantifying the amount of oil drips on the playa and would require operational changes to reduce oil drips as indicated by research results.

In the surrounding region, the proposed action has the potential to increase visitation to "natural" hot springs and result in increased sedimentation of hot spring pools, alteration of channel and flow characteristics, and addition of foreign substances to water sources, which may degrade these wetlands and associated riparian vegetation.

**4)  *The degree to which the effects on the quality of the human environment are likely to be highly controversial.***

No anticipated effects have been identified that are scientifically controversial.  As a factor for determining within the meaning of 40 CFR 1508.27(b)(4) whether or not to prepare a detailed EIS, "controversy" is not equated with "the existence of opposition to a use." *Northwest Environmental Defense Center v. Bonneville Power Administration*, 117 F.3d 1520, 1536 (9th Cir. 1997).  "The term 'highly controversial' refers to instances in which 'a substantial dispute exists as to the size, nature, or effect of the major federal action rather than the mere existence of opposition to a use.'" *Hells Canyon Preservation Council v. Jacoby*, 9 F.Supp.2d 1216, 1242 (D. Or. 1998).  Comment letters on the Preliminary EA provided no expert scientific evidence supporting claims that the project will have significant effects, or that it is highly controversial.

**5)  *The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.***

Concerns were raised by the general public during scoping and the review of the preliminary EA regarding the formation of both the perimeter fence dunes and the small transient dunes on the playa surface, referred to locally as "playa serpents".  The proposed action contains measures for the removal of dune formations caused by the event, including those formed along the perimeter fenceline.  Standing water in winter months helps to dissipate these features; during winters with low precipitation, these small dunes remain in place for longer periods.  The Desert Research Institute study (Adams and Sada 2010) concluded that human activity is likely the cause of the increased dune formation noted on the playa.  It is unclear the extent to which the formation of these features are a result of the Burning Man event or an increase in dispersed or other permitted recreational activities on the playa in general.  Additional comparative studies might help to clarify these issues at a future time if these trends continue.  The scope, methodology and participants of any future studies would have to be carefully considered.

AR07270

There is a level of uncertainty with regard to impacts to air quality. It was determined during the development of the EA that, in the case of this project, air quality modeling would not provide information of real value due to the large uncertainty about the nature, number and location of sources within the city. Dust abatement practices during the event and precipitation following the event would both serve to reduce dust.

Concerns have been raised about where dust generated on the playa travels, who/what it affects, where it is deposited and what the effects of the deposited dust are on various resources. This is another topic similar to transient dunes that involves the entire playa and would benefit from future studies. As with any studies regarding transient dunes, the scope, methodology and participants of any future studies would have to be carefully considered.

Although not highly uncertain or involving unique or unknown risks, recommended mitigation was developed in the EA concerning hydrocarbon waste to better quantify and assess how much oil might be deposited on the playa during the event. Also, a recommendation was included in the EA for a monitoring protocol to determine the amount of unburned material left at the sites of BRC "authorized burns". This monitoring recommendation arose from public comment and would be implemented by the BLM.

**6)** *The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.*
The permit authorization will not establish a precedent for future actions with significant effects and does not represent a decision in principle about a future consideration. All future proposed management actions in the NCA will be subject to NEPA standards and independent decision making. Also, although this environmental analysis evaluates a proposed permit period of five years, annual permits would be required.

**7)** *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*
Based on the environmental assessment and implementation of the recommended mitigation measures, no significant cumulative impacts are expected. When evaluated together with other past, present or reasonable foreseeable activities in the area, the authorized activity does not result in cumulatively significant impacts at the local or watershed scale.

**8)** *The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the NRHP or may cause loss or destruction of significant scientific, cultural, or historical resources.*
No direct impacts are expected within the Closure Area. There is potential for indirect impacts to the many eligible and unevaluated cultural resources located outside the Closure Area as a result of increased visitation at Black Rock Hot Springs, Double Hot Springs, Great Boiling Springs, Soldier (Mud) Meadows, and Trego Hot Springs. The proposed action operating plan would encourage participants to stay at the event and not visit nearby sensitive areas by charging a re-entry fee, stationing a BRC hot spring "steward" at each of the nearby BLM-managed hot springs (to discourage participant use), and through detailed public education efforts during the event. BLM law enforcement personnel would also patrol the areas on BLM managed land to help protect sensitive environmental and cultural resources on a daily basis.

4

FONSI
DOI-BLM-NV-W030-2012-0007-EA

**9)** *The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the ESA of 1973.*

A species list provided by the U.S. Fish and Wildlife Service indicated that the following listed species occur in the assessment area: desert dace (*Eremichthys acros*; Threatened) and Lahontan cutthroat trout (*Oncorhynchus clarki henshawi*; Threatened). Desert dace occur in the hot springs and associated outflows south and west of Soldier Meadows Ranch. Designated critical habitat for this species encompasses 50 feet on each side of thermal springs and their outflow streams. Within the assessment area (Figure 3-3), Lahontan cutthroat trout occur in Colman Creek, North Fork Battle Creek, and Snow Creek. The assessment area also encompasses Donnelly Creek, which is an unoccupied designated recovery stream.

No species listed as threatened or endangered under the Endangered Species Act occur on the playa; therefore, direct impacts would not occur. Winnemucca District conducted a phone conference with the USFWS (Reno, Nevada) on February 3, 2012, regarding potential indirect impacts to LCT and Desert dace and their habitat. The USFWS indicated a "no effect" through this phone conference based on the information that the Winnemucca District has available regarding the event's potential indirect impacts. No formal or informal consultation was necessary with the USFWS for this project.

Species that are candidates for listing under the federal Endangered Species Act (ESA), that were evaluated in the EA, include: greater sage-grouse (*Centrocercus urophasianus*), elongate mud meadows springsnail (*Pyrgulopsis notidicola*), Columbia spotted frog (*Rana luteiventris*), and Soldier Meadows cinquefoil (*Potentilla basaltica*). No direct impacts would occur to these four species. Like the threatened species, there is potential for indirect impact within the assessment area due to increased use of developed and undeveloped recreation sites and other areas within the assessment area.

**10)** *Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.*

The proposed action does not violate or threaten any known Federal, State, or local law or requirement imposed for the protection of the environment.


Gene Seidlitz
District Manager
Winnemucca District

6/12/12
Date

5



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html



In Reply Refer To:
2930 (NV-30.03)
LLNVW03500-16-01

AUG 0 2 2016

CERTIFIED MAIL 7014 2870 0001 4871 2275 – RETURN RECEIPT REQUESTED

Charlie Dolman
Event Operations Director                :          Burning Man 2016 Event
Black Rock City, LLC                      :          Special Recreation Permit
660 Alabama St
San Francisco, CA 94110-2008

Dear Mr. Dolman:

On January 19, 2016 the Bureau of Land Management (BLM) received a Special Recreation Permit (SRP) Application and draft Operating Plan from Black Rock City, LLC (BRC) for the 2016 Burning Man Event (2016 Event).

On April 5, 2016 the BLM received the signed 2016 Cost Recovery Agreement (Initial CRA) from BRC, in the amount of $184,224.00, to cover BLM incurred costs associated with preliminary 2016 Event planning and associated National Environmental Policy Act analysis. The Initial CRA stated that the CRA outlined the BLM's initial costs and would be amended to reflect the overall BLM costs for 2016 Event monitoring and planning. BLM received BRC's initial payment under the Initial CRA on April 06, 2016.

After collaboration and discussion between the BLM and BRC, the BLM provided BRC with the final estimate and decision for the CRA (Final CRA) with supporting documents to review, sign and return with an installment payment in the amount of $315,000 due by June 27, 2016. The Final CRA identified all estimated costs to the BLM associated with implementing the 2016 Event SRP, including the amount identified in the Initial CRA, and is the overriding CRA for the 2016 SRP. BRC did not sign the Final CRA at that time. However, BRC did make the installment payment identified in the Final CRA in the amount of $315,000 on June 29, 2016.

On August 1, 2016, the BLM received a signed copy of the Final CRA from BRC for the 2016 Event. BRC agreed to remit $1,700,735 to BLM by August 10, 2016. A copy of the signed Final CRA for the 2016 Burning Man event, along with the CR Estimate spreadsheet, is enclosed for your files. Your signature constitutes your agreement with the processing category decision and the CR Estimate.

AR00704

Along with the signed Final CRA, BRC enclosed a letter outlining its concerns with regard to the BLM's costs to administer the Burning Man SRP. While the BLM appreciates that BRC objects to the BLM's administration of the Burning Man SRP, the agency's actions are consistent with its statutory and regulatory authority. Regardless, the BLM appreciates the opportunity to work collaboratively with BRC in order to ensure that the agency administers the SRP safely and effectively.

If you have any questions please contact me at 775-623-1500.

Sincerely,

William Mack, Jr.
Black Rock Field Manager
Winnemucca District

Enclosure
CR Agreement
CR Estimate Spreadsheet




Form 2930-2
(January 2011)

### UNITED STATES
### DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT

## SPECIAL RECREATION PERMIT
(43 U.S.C. 1201; 43 U.S.C. 1701; 16 U.S.C. 460L-6(a); and 43 CFR 2930)

Permit No.

**NVW03500-16-01**

BLM Issuing Office

**Black Rock Field Office
Winnemucca District**

---

Permittee  **Black Rock City, LLC**

Authorized Representative  **Charlie Dolman-Event Operations Director**

---

Address  **Black Rock City, LLC
660 Alabama St
San Francisco, CA 94110-2008**

Phone Number  **415-865-3800**

Email Address  **charlie.dolman@burningman.org**

Web Site  **www.burningman.org**

---

Permit is for *(check all that apply):* ☑ Commercial  ☐ Competitive  ☐ Organized Group  ☑ Vending

Date Issued **08/02/2016**  Date Expires **10/08/2016**  *(Terms greater than one year subject to annual authorization.)*

Seasonal or other period of use limitations  **See 2.01 Operations Plan**

Permit Fee Formula  **Commercial: Greater of $105/year or 3% of gross revenue**

Assigned Sites *(commercial only):* ☑ None  No. of Assigned Sites subject to fees _____

Special Area Fees Apply: ☐ Yes ☑ No  Special Area Fee _____

Minimum insurance coverage requirements  **High Risk: $1,000,000 per occurrence, $_____ annual aggregate**

Permit is valid only if a current Certificate of Insurance, listing the United States as additional insured, is on file with the issuing BLM Office.

Post use report due date(s)  **January 31, 2017**  Bond Requirement: ☑ None  Bond Amount _____

---

Purpose and activities authorized
**2016 Burning Man event**

---

Approved Area of Operation

**Black Rock Desert, High Rock Canyon, Emigrant Trails, NCA. Southern portion approximately 10 miles north of Gerlach, NV.**

---

Certification of Information:  I certify use of this permit will be as per the operations plan on file with BLM.  I acknowledge I am required to comply with any conditions or stipulations required by the BLM including the General Terms listed on page two of this form and any additional stipulations which may be attached.

Additional Stipulations are attached:  ☑ Yes ☐ No

_____
(Permittee Signature)

**8/2/16**
(Date)

---

Approved and issued for the conduct of permitted activities and locations shown on this permit and in conformance with the operating plan.  Permit is subject to General Terms and any additional stipulations attached.

_____
**William Mack, Jr.**
(BLM Authorized Officer Printed Name)

_____
(BLM Authorized Officer Signature)

**8/2/16**
(Date)

---

(Continued on page 2)



## United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
Winnemucca District Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445-2921
Phone (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
http://www.nv.blm.gov/nv/st/en/fo/wfo.html



In Reply Refer to:
2930(NV-030.12)
LLNVW03500-16-01

**DEC 1 5 2016**

CERTIFIED MAIL                                    7014 2870 0001 4873 7063
*Return Receipt Requested*


Mr. Charlie Dolman
Event Operations Director
Black Rock City, LLC.
660 Alabama St.
San Francisco, CA 94110-2008


Dear Mr. Dolman:

Following coordination with Black Rock City, LLC the Bureau of Land Management (BLM) has completed the 2016 Burning Man Special Recreation Permit (SRP) Evaluation. The evaluation reflects whether BRC complied with the 2016 SRP requirements, standard stipulation and special stipulations. There were a few identified population tracking and reporting issues related to Special Stipulation #4. None of the issues identified rise to the level of a permit violation. These issues and causes will be addressed, along with recommended solutions, during the 2017 planning process.

Contact Michael Vermeys, Project Manager – Burning Man, at 775.623.1582 with any further questions or concerns related to this 2016 Burning Man SRP Evaluation.


Sincerely,

William Mack, Jr.
Field Manager
Black Rock Field Office


Enclosed
2016 BLM SRP Evaluation


2016 Burning Man Special Recreation Permit Evaluation

**AR01072**



## United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Winnemucca District Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

# Special Recreation Permit Annual Evaluation

| **Event/Permittee Name:** | Burning Man | **Permit #:** | LLNVW03500-16-01 |
|---|---|---|---|
| **Organization:** | Black Rock City, LLC | **Year:** | 2016 |

The following criteria will be used to assess your performance/adherence to permit stipulations and procedural deadlines. The performance evaluation will be used to document both acceptable and unacceptable performance and will be used to determine your eligibility for future permits.

## General

1. Permittee submitted an application for a new permit at least 120 days prior to permit period, or 60 days prior to expiration of the existing permit unless a multi-year permit is still valid. (Permit period is defined as January 1 thru December 31).

   ⦿ Yes          ○ No          ○ N/A

2. Construction of facilities and structures occurred no earlier than Monday August 1, 2016. Removal of all above-ground material was completed no later than Monday, September 21, 2016 as described in Stipulation 7.

   ⦿ Yes          ○ No          ○ N/A

   *In 2016, construction and vending activities were noticed within the Closure Order area 3 days prior to the authorization of the SRP. BRC resolved the issue immediately.*

3. Permittee completed post-event inspection site cleanup to a standard measuring less than an average of one square foot of debris per acre, as determined by BLM inspection and the final phase of the cleanup was completed by Friday, October 7, 2016 (30 days after the event).

   ⦿ Yes          ○ No          ○ N/A

AR01073

4. BRC ensured there was appropriate representation from BRC on the Unified Command, available 24 hours a day, seven days a week during the event and provided the name(s) of BRC representation to BLM by July 30, 2016.

    ⦿ Yes    ○ No    ○ N/A

## Permit Fees

5. Fee of 3% of gross receipts collected during previous fiscal year of 2015.

    ⦿ Yes    ○ No    ○ N/A

6. Payment equal to at least 25% of the estimated commercial use fees (3% of estimated gross receipts) was received by the BLM prior to the start of the event.

    ⦿ Yes    ○ No    ○ N/A

7. 100% of the cost recovery fee estimate was received prior to the start of the event as provided in the Cost Recovery Agreement.

    ⦿ Yes    ○ No    ○ N/A

## Required Reports

8. During the period of site occupancy (August 5 - September 21, 2016) BRC provided the BLM with the number of participants within the event site each day, by the appropriate pre-determined times.

    ⦿ Yes    ○ No    ○ N/A

9. BRC provided BLM with information on participant arrivals, participant departures (exodus), ticket scanning and population statistics. BRC also provided BLM, at the appropriate pre-determined times, population statistics from all paid participants and volunteers entering the Main Gate, the Airport and all other access points.

    ⦿ Yes    ○ No    ○ N/A

*However, technical difficulties continued to plague the PRAM system during arrival reporting. Departure reporting needs to be brought into PRAM system or a better exodus reporting mechanism needs to be developed.*

2016 Burning Man SRP Evaluation Page 2

10. During the period of site occupancy (August 5 - September 21, 2016), BRC provided the BLM with population numbers each day according to the reporting standard agreed upon with the BLM. BRC provided the BLM with the recorded peak population for the entire event.  The BLM was able to request population data at any time during the event.

    ○ Yes       ◉ No       ○ N/A

*BRC did provide BLM with the recorded peak population for the entire event. BRC also provided BLM with any requested on the spot population reports. BRC failed to start their population reporting emails on August 5, 2016 and BRC's final report failed to start on August 5, 2016.*

11. Within 60 days after the event, BRC provided the BLM with detailed information regarding the number of staff and participants on the event site for the period of site occupancy (August 5 - September 21, 2016).

    ○ Yes       ◉ No       ○ N/A

*BLM received BRC's final population report on Nov 2, 2016, within the sixty days however, population reporting on the document did not start until August 9, 2016. Date of occupancy started on August 5, 2016.*

**Insurance**

12. Permittee obtained a comprehensive liability insurance policy which protected and indemnified the public and U.S. Department of the Interior – BLM against property damage or bodily injury.

    ◉ Yes       ○ No       ○ N/A

13. Insurance named the U.S. Department of the Interior – BLM as additionally insured.

    ◉ Yes       ○ No       ○ N/A

14. Current authenticated certificate of insurance on file with the Winnemucca District Office.

    ◉ Yes       ○ No       ○ N/A

    a.   Verification of insurance received within 30 days prior to activity.

       ◉ Yes       ○ No       ○ N/A

AR01075

b. Notification of renewal received 15 days prior to expiration date.

◉ Yes          ○ No          ○ N/A

15. Minimum general liability limits were: $300,000 per occurrence and $600,000 annual aggregate for bodily injury, $10,000 property damage per occurrence, and $25,000 annual aggregate, if policy injury and property damage a combined limit of $300,000 is acceptable.

◉ Yes          ○ No          ○ N/A

16. For large, complex or special events the BLM may require larger amounts of coverage for comprehensive liability insurance for any one occurrence.

◉ Yes          ○ No          ○ N/A

*Consistent with the general guidelines for large-scale events, BRC obtained the following policy limits: $1 million per occurrence and $2 Million annual aggregate.*

## Operating Plan

17. Updated operating plan on file with BLM. Plan includes information on areas of use, operation schedule, emergency plan, vehicle access routes, cost to participants, garbage/waste disposal plan, a copy of the most recent brochure and any additional services provided.

◉ Yes          ○ No          ○ N/A

18. Operating plan procedures were followed.

◉ Yes          ○ No          ○ N/A

## Findings

19. Black Rock City, LLC was in compliance with the Special Recreation Permit Stipulations.

◉ Yes          ○ No

20. Unsatisfactory Performance – Permit Probation

○ Yes          ◉ No

a. BLM issued written Notice of Non Compliance Decision explaining the nature of apparent violation and unsatisfactory performance.

○ Yes          ◉ No

2016 Burning Man SRP Evaluation Page 4

AR01076

b.  Permit suspended.

　　　◯ Yes　　　◉ No

**Remarks:**

A few population reporting issues were identified in this 2016 Burning Man event SRP Evaluation. None of the issues identified in this SRP Evaluation rise to the level of a permit violation. The issues and causes will be addressed, along with recommended solutions during the 2017 planning process.

Evaluated by: ___Michael Vermeys___      Title:  ___Project Manager- Burning Man___

Signature: _____      Date: _12/15/16_

Approved by: ___William Mack, Jr.___      Title:  ___Field Manager___

Signature: _____      Date: _12/15/16_

Permittee Signature: _____      Date: _12/26/16_
(if available)

2016 Burning Man SRP Evaluation Page 5

# BURNING MAN

## 2016 POST EVENT INSPECTION REPORT



**Compiled by:**

**Michael Vermeys, Project Manager - Burning Man**

**Robin Sears, Outdoor Recreation Planner - Burning Man**

**Zwaantje Rorex, GIS Specialist**



AR01081



# Introduction

A Post Event Inspection (PEI) is required following each Burning Man event per Stipulation #58 of the Black Rock City, LLC (BRC) 2016 Burning Man event Special Recreation Permit (SRP). Stipulation #58 specifically states,

> "Inspections of the event site, in the fall post event, will be coordinated by the BLM using randomly placed transects on the site and a measurable cleaning standard. The inspecting party will intensively collect debris found on the ground within each transect. A follow-up spring inspection will be conducted only when deemed necessary by the BLM. The Post Event Cleanup Standard shall be the average total surface area of debris collected from either the fall or spring transects will not exceed the equivalent of an average of <u>one (1) square foot per acre</u> from identified inspection areas."

This 2016 PEI report summarizes the BLM's findings following cleanup efforts by BRC's Playa Restoration Crew and includes collection protocol, calculations utilized, a discussion of the results and recommendations.

# Background

Since 2000, BLM and BRC's Playa Restoration crew have closely coordinated conducting the PEI. However, over this 16 year time span, three updated inspection protocols have been used; 2000-2003, 2004-2012 and 2013 to present. The main objective of every cleanup inspection was and still is to determine if BRC's post event cleanup efforts of the Black Rock Desert playa, within the fenced perimeter of the event area, were successful and met the Cleanup Standards outlined the SRP. In 2016, Stipulation #57 stated,

> "BRC shall make personnel available immediately after the end of the post-event cleanup period and if deemed appropriate to determine any latent adverse impacts, such as pit depressions, bumps, depressions from roadways, ruts from vehicular traffic, or surfacing buried materials, to ensure that the site is returned to pre-event condition."

Additionally, Stipulation #60 states,

> "If cleanup studies indicate the Post Event Cleanup Standard has been or is likely to be exceeded, the permit will be suspended until the site has been cleaned up to a level not to exceed 50% of the standard and the Operations Plan includes reasonable measures to assure that the Post Event Cleanup Standard will not be exceeded during the life of the permit."

The 2016 PEI was conducted and completed by six BLM employees and approximately 37 of BRC's Playa Restoration Crew on Tuesday October 4, 2016. The small, micro-debris or Matter Out of Place (MOOP) collected at each monitoring site was sorted and recorded at the Winnemucca District Office on October 18-19, 2016. Geographic Information System (GIS) post-process mapping and analysis was completed for all monitoring sites on October 27, 2016.

1



2016 Burning Man - Post Event Inspection report

# PEI Protocol

The *BLM- Post-Event Inspection Protocol 2013* (attached) was utilized for the 2016 PEI. The following is a brief synopsis of the 2013 Protocol PEI.

Within the Burning Man event fenced perimeter of 3,642 acres, four Core Inspection Areas were delineated (Map 1). Within the Core Inspection Areas, 60 monitoring sites were randomly generated via ArcGIS program application and plotted for inspection. On-Playa, these monitoring site locations were staked with flags labeled with the site name. Per protocol, both random and Points of Interest* sites were measured at 1/10 of an acre using a 37' 2" rope affixed to the stake placed at the exact UTM locations. A full clockwise circle rotation by the team delineates the radius of 1/10 of an acre. Monitoring teams had a minimum of 3 people spaced no more than 10' apart along the rope and completed at least one zone or 5-8 sites. At each staked monitoring point, one person held the terminal end of the rope keeping the rope free of slack. This individual set the pace of movement to ensure the group worked at a consistent pace, maintaining full site coverage searching for and collecting MOOP. MOOP collected was placed in a gallon-size plastic bag labeled with: site and zone identifier and collection date.

\* Results at Points of Interest sites are not included in the cumulative total average of MOOP collected from the Random sites and therefore will not be used to determine if the Cleanup Standards were met.

### MOOP Sorting and Measuring

A total of 66 bags of MOOP were collected by BRC's Playa Restoration crew and BLM. At the Winnemucca District Office, MOOP was sorted and separated out and evenly spread across the 1' x 1' Daubenmire cover class frame and measured for length and width (in$^2$) to determine surface area coverage, Photos 1 and 2 of MOOP bag contents within a Daubenmire cover class frame.

- MOOP collected from each monitoring site within each Core Inspection Area was averaged, resulting in a total average, essentially, greater than or less than the Cleanup Standard of 1.0 ft²/acre;

  (4.5 in.)(2.5 in.) = 11.25 in$^2$ (.006944 f$^2$) = .07812 f$^2$ (10 acre) = 0.78 f$^2$/acre - Example

- The number of MOOP items per monitoring site was extrapolated out to the entire acreage within each Core Inspection Area;

  Debris items per/acre were calculated as: # of items/0.10 ac. site X 10ac = # of items/acre.

- The average size (in$^2$) of MOOP was also recorded;

  Number of debris items per site or zone / Total in$^2$ of monitoring site debris.

2





BLM

Post 2016 Burning Man

# Core Inspection Areas

Map 1

Black Rock Field Office

**Core Insepction Areas**

- City Grid (1,197 acres)
- Open Playa (1,451 acres)
- Walk-In Camping (365 acres)
- Other (629 acres)

BLM

No Warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

Date: 11/10/2016

1:25,000

0 0.25 0.5 0.75 1

Miles

Coordinate System: NAD 1983 UTM Zone 11N
Projection: Transverse Mercator
Datum: North American 1983
False Easting: 500,000.0000
False Northing: 0.0000
Central Meridian: -117.0000
Scale Factor: 0.9996
Latitude Of Origin: 0.0000
Units: Meter

Centerlines

2016 City Pentagon

2016 Burning Man - Post Event Inspection report



Photo 1. WIC 2. 8"x 2"= 1.11 f$^2$/acre          Photo 2. HEaT. 4.75" x 2" = 0.66 f$^2$/acre

**Random Site Selection:**

According to the 2016 Burning Man event SRP Stipulations, only random generated monitoring sites were analyzed in determining whether PEI Cleanup Standards were met (Map 2). Sixty random monitoring sites were sampled; **City Grid** (1,197 acres with 29 sites), **Walk-in-Camping** (365 acres with 7 sites), **Open Playa** (1,451 acres with 18 sites) and **Other** (629 acres with 6 sites), Table 1.

| CORE Inspection Area | Number of Monitoring Points | Monitoring Zones |
|---|---|---|
| **City Grid**<br>Main area designated for camping; The City | 29 | Zones 4-8 |
| **Walk-in-Camping**<br>Camping area where no motorized vehicles are allowed | 7 | Zone 10 |
| **Open Playa**<br>Area east of The City Grid, Other and Walk-in-Camping | 18 | Zones 1-3 |
| **Other**<br>Area west of The City Grid, Playa and Walk-in-Camping | 6 | Zone 9 |

Table 1. Core Inspection Areas, Assoc. Zones and monitoring points per Zone

AR01085

Post 2016 Burning Man

# Inspection Zones & Monitoring Sites

Map 2

BLM

Black Rock Field Office

BLM

No Warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

Date: 11/10/2016

NATIONAL SYSTEM OF PUBLIC LANDS
U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

1:25,000

0 0.25 0.5 0.75 1

Miles

Coordinate System: NAD 1983 UTM Zone 11N
Projection: Transverse Mercator
Datum: North American 1983
False Easting: 500,000.0000
False Northing: 0.0000
Central Meridian: -117.0000
Scale Factor: 0.9996
Latitude Of Origin: 0.0000
Units: Meter

2016 City Pentagon

AR01086



2016 Burning Man - Post Event Inspection report

**Points of Interest Inspection Sites:**

Since 2013, six Points of Interest sites (Map 3) have been targeted for monitoring via the same monitoring protocol as the random site because site-specific data is helpful determining potential issues associated with the high traffic volume these areas generate, Table 2. All Points of Interest are surveyed by BLM and BRC Playa Restoration Crew Leads.

| *Name* | *Justification* | *Northing (UTM)* | *Easting (UTM)* |
|---|---|---|---|
| **The Man** | The large-scale construction effort, frequency of visitation and structure burn | 4515467 | 3142064 |
| **The Temple** | The large-scale construction effort, frequency of visitation and structure burn | 4515695 | 3128005 |
| **United Site Services (USS)** | This area receives a high degree of traffic with large amounts of grey and black water | 4515293 | 3136882 |
| **Dept. of Public Works (DPW)** | The level of use and population density of this area during the event | 4514982 | 3133975 |
| **Joint Operations Command (JOC)** | The level of use and population density of this area during the event | 4515366 | 3134836 |
| **Heavy Equipment and Transportation (HEaT)** | The use and storage of Heavy Equipment and Transportation items in this area | 4515744 | 3128203 |

Table 2. Points of Interest and locations

4



**Post 2016 Burning Man** | **Targeted Points of Interest** Relative Area of Debris (ft²/acre) | **M a p 3**

B L M

Black Rock Field Office

The Temple

The Man

JOC

USS

HEaT

DPW

**Targeted Sites Monitoring Results**

● 0.67 - 0.99 Ft² of moop per acre

● 1.0 - 2.10 Ft² of moop per acre

For exact values reference Table 8 Burning Man Post Event Monitoring Site Results

**Core Areas**

City Grid (1,197 acres)

Open Playa (1,451 acres)

Walk-In Camping (365 acres)

Other (629 acres)

No Warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

Date: 12/8/2016

NATIONAL SYSTEM OF PUBLIC LANDS
U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

1:25,000

0   0.25   0.5   0.75   1
Miles

Coordinate System: NAD 1983 UTM Zone 11N
Projection: Transverse Mercator
Datum: North American 1983
False Easting: 500,000.0000
False Northing: 0.0000
Central Meridian: -117.0000
Scale Factor: 0.9996
Latitude Of Origin: 0.0000
Units: Meter

2016 City Pentagon

AR01088



# Core Inspection Area Results

MOOP collected from each monitoring site within each Core Inspection Area was averaged, resulting in a total average (Map 4). The number of MOOP items per monitoring site is extrapolated out to the entire acreage within each Core Inspection Area. The average size (inches$^2$) of MOOP is also recorded.

**City Grid Core Inspection Area (1,197 acres)**

| City Grid Summary | | | |
|---|---|---|---|
| Year | Debris Area (ft$^2$/ac) | # of Items/acre | Item Size (in$^2$) |
| | Average Area | Average | Average Size |
| *2006* | 0.298 | 185 | 0.25 |
| *2007* | 0.392 | 202 | 0.33 |
| *2008* | 0.596 | 416 | 0.22 |
| *2009* | 0.514 | 275 | 0.37 |
| *2010* | 0.505 | 237 | 0.33 |
| *2011* | 0.735 | 304 | 0.35 |
| *2012* | 0.532 | 160 | 0.48 |
| *2013* | 0.527 | 186 | 0.4 |
| *2014* | 0.59 | 289 | 0.29 |
| *2015* | **1.33** | 504 | 0.37 |
| *2016* | **1.25** | 557 | 0.36 |

Table 3. City Grid Core Inspection Area 2006-2016 comparison

**City Grid Core Inspection Area Summary:**

In 2016, PEI results show that 29 monitoring sites within City Grid had an average of 1.25 ft²/acre of MOOP or 0.25 ft²/acre above the Cleanup Standard. Thus, the City Grid Core Inspection Area <u>exceeded</u> the average allowable debris per the 2016 SRP Cleanup.

- 14 of the 29 City Grid monitoring sites exceeded the Cleanup Standard.
- The average number of MOOP extrapolated per acre in City Grid was 557 (Table 3.)
- The average size of each item of debris was 0.36 in$^2$



**Post 2016 Burning Man**

# Random Monitoring Sites
## Relative Area of Debris (ft²/acre)

**Map 4**

B L M

Black Rock Field Office

City Grid

Other

Open Playa

Walk-In Camping

**Core Area Monitoring Results**

- 🟢 0.05 - 0.9 Ft² / acre
- 🔴 1.0 - 4.0 Ft² / acre

For exact values reference Table 8 Burning Man Post Event Monitoring Site Results

**Core Areas**

- ⬜ City Grid (1,197 acres)
- ⬜ Open Playa (1,451 acres)
- 🟫 Walk-In Camping (365 acres)
- ⬛ Other (629 acres)

No Warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

Date: 12/8/2016

NATIONAL SYSTEM OF PUBLIC LANDS
U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**1:25,000**

0    0.25    0.5    0.75    1

Miles

Coordinate System: NAD 1983 UTM Zone 11N
Projection: Transverse Mercator
Datum: North American 1983
False Easting: 500,000.0000
False Northing: 0.0000
Central Meridian: -117.0000
Scale Factor: 0.9996
Latitude Of Origin: 0.0000
Units: Meter

2016 City Pentagon

AR01090



2016 Burning Man - Post Event Inspection report

**Walk-in Camping Core Inspection Area (365 acres)**

| | Walk-in-Camping | | |
|---|---|---|---|
| **Year** | Debris Area (ft$^2$/ac) | # of Items/acre | Item Size (in$^2$) |
| | Average Area | Average Count | Average Size |
| **2006** | 0.147 | 32 | 0.25 |
| **2007** | 0.145 | 84 | 0.25 |
| **2008** | 0.278 | 46 | 0.87 |
| **2009** | 0.242 | 56 | 0.58 |
| **2010** | 0.26 | 63 | 0.61 |
| **2011** | 0.127 | 50 | 0.41 |
| **2012** | 0.124 | 33 | 0.55 |
| **2013** | 0.124 | 38 | 0.46 |
| **2014** | 0.38 | 149 | 0.37 |
| **2015** | 0.35 | 123 | 0.38 |
| **2016** | 0.50 | 113 | 0.80 |

Table 4. Walk-In Camping Core Inspection Area 2006-2016 comparison

**Walk-in Camping Core Inspection Area Summary:**

In 2016, PEI results showed that seven monitoring sites within the Walk-in Camping had an average of 0.50 ft²/acre of MOOP. Thus, the cleanup effort within Walk-in Camping Core Inspection Area <u>did</u> meet the 2016 SRP Cleanup Standard.

- Six out of seven monitoring sites were measured below the Cleanup Standard.
- The average size of each item of debris was 0.80 in$^2$
- The average number of MOOP extrapolated per acre in Walk-in Camping was 113 which is trending down since 2014 (Table 4)

6

AR01091



2016 Burning Man - Post Event Inspection report

## Open Playa Core Inspection Area (1,451 acres)

| Open Playa | | | |
|---|---|---|---|
| Year | Debris Area (ft²/ac) | # of Items/acre | Item Size (in²) |
| | Average Area | Average Count | Average Size |
| **2006** | 0.194 | 91 | 0.36 |
| **2007** | 0.417 | 181 | 0.45 |
| **2008** | 0.291 | 111 | 0.25 |
| **2009** | 0.396 | 159 | 0.4 |
| **2010** | 0.306 | 96 | 0.48 |
| **2011** | 0.398 | 194 | 0.35 |
| **2012** | 0.273 | 144 | 0.27 |
| **2013** | 0.53 | 96.6 | 0.79 |
| **2014** | 0.389 | 168 | 0.33 |
| **2015** | 0.53 | 233 | 0.32 |
| **2016** | 0.92 | 242 | 0.57 |

Table 5. Open Playa Core Inspection Area 2006-2016 comparison

## Open Playa Core Inspection Area Summary:

In 2016, PEI results showed that seven monitoring sites within the Open Playa had an average of 0.92 ft²/acre of MOOP. The cleanup effort within the Open Playa Core Inspection Area <u>did</u> meet the average allowable debris per 2016 SRP Cleanup Standard.

- Thirteen out of eighteen monitoring sites were measured below the Cleanup Standard.

- The average size of each item of debris was 0.57 in²

- The average number of MOOP extrapolated per acre in Open Playa was 242, which is trending higher since 2013 (Table 5)

AR01092



2016 Burning Man - Post Event Inspection report

**Other Core Inspection Area (629 acres)**

| Year | Other | | |
| | Debris Area (ft$^2$/ac) | # of Items/acre | Item Size (in$^2$) |
|---|---|---|---|
| | Average Count | Average Count | Average Count |
| **2006** | 0.071 | 34 | 0.34 |
| **2007** | 0.113 | 68 | 0.25 |
| **2008** | 0.159 | 40 | 0.22 |
| **2009** | 0.08 | 23 | 0.53 |
| **2010** | 0.359 | 109 | 0.58 |
| **2011** | 0.454 | 140 | 0.58 |
| **2012** | 0.112 | 69 | 0.23 |
| **2013** | 0.04 | 20 | 0.66 |
| **2014** | 0.315 | 75 | 0.61 |
| 2015 | 0.28 | 95 | 0.33 |
| **2016** | 0.41 | 120 | 0.57 |

Table 6 Other Core Inspection Area 2006-2016 comparison

**Other Core Inspection Area Summary:**

In 2016, PEI results showed that seven monitoring sites within the Other had an average of 0.41 ft²/acre of MOOP. The Other Core Inspection Area did meet the 2016 SRP Cleanup Standard of 1.0 ft²/acre.

- All six monitoring sites were measured below the Cleanup Standard.

- The average size of each item of debris was 0.41 inch$^2$

- The average number of MOOP extrapolated per acre in Open Playa was 120, which is trending higher since 2013 (Table 6)

8



2016 Burning Man - Post Event Inspection report

# Points of Interest Inspection Site Results

MOOP collected from each Point of Interest monitoring site (Table 7) is the total used for calculation and to determine whether cleanup efforts measured greater than or less than the Cleanup Standard.* The number of MOOP items per monitoring site is extrapolated out to the entire acreage within each Point of Interest. The average size (in$^2$) of MOOP is also recorded.

*The data collected at Points of Interest sites will not be included in the average total surface area of MOOP collected from the Random Sites, thus will not be used to determine if the cleanup standard has been met.

Chart 1: Point of Interest monitoring results

**2016 Point of Interest**

| Site | Debris Area: ft²/acre |
|------|----------------------|
| DPW | 1.30 |
| Heat | 0.66 |
| JOC | 2.08 |
| Services | 0.72 |
| Temple | 0.73 |
| The Man | 0.90 |

**Point of Interest Inspection Sites Summary:**

This was the 4th year of recording targeted monitoring at the six Points of Interest. In 2016, PEI results showed that the two of the six Points of Interest monitoring sites exceeded the 2016 SRP Cleanup Standard of 1.0 ft²/acre. The JOC was measured at 2.08 ft²/acre and DPW was measured at 1.3 ft²/. Although not a factor in determining overall success of the 2016 PEI the cumulative average of the six Points of Interest was 1.07 ft²/acre, Table 7.

9

AR01094



2016 Burning Man - Post Event Inspection report

| Year | Debris Area (ft$^2$/ac) | # of Items/acre | Item Size (in$^2$) |
|------|-------------------------|-----------------|--------------------|
|      | Cumulative Average Count | Average Count | Average Count |
| **2013** | 3.27 | 197 | 0.62 |
| **2014** | 2.64 | 706 | 0.54 |
| **2015** | 1.54 | 433 | 0.51 |
| **2016** | 1.07 | 545 | 0.31 |

Table 7. 2016 Point of Interest monitoring site MOOP ft²/acre

# PEI Discussion

### CORE Inspection Areas

Three out of four Core Inspection Areas met the 2016 Burning Man event SRP Cleanup Standards.

Plainly, Walk-in Camping and Other Core Inspection Areas generally have lighter participant foot and vehicle traffic as opposed to City Grid and Open Playa Core Inspection Areas which both sustain heavy concentration of foot and vehicle traffic. Both Walk-in Camping and Other Core monitoring sites consistently fall below Cleanup Standards. Chart 2 (below) MOOP average per year and associated paid population levels for the past 11 years.

Results show that BRC's Playa Restoration Crew does locate and collect larger MOOP objects from the City Grid suggesting that more time, equipment and/or personnel is dedicated to that area. However, in both 2015 and 2016 the average amount of MOOP within the City Grid exceeded the allowable Cleanup Standard of 1ft$^2$/acre. The Open Playa Inspection Area average of 0.92 ft$^2$/acre is trending toward impermissible Standards and should be an area of concern for the 2017 Playa Restoration Crew and BRC in general.

Excluding the Other Inspection Area, Walk-In Camping, City Grid and Open Playa had at least one random Monitoring Site exceeding the Cleanup Standard of 1 ft$^2$/acre. A total of 20 out of 60 random Monitoring Sites exceeded the Cleanup Standard, Table 8. The exact UTM locations for each monitoring site exceeding Cleanup Standards are listed on Table 9.

AR01095



2016 Burning Man - Post Event Inspection report



Chart 2: Population and amount of debris per year

**Point of Interest Inspection Sites**

The JOC was measured at 2.08 ft²/acre and DPW was measured at 1.3 ft²/acre, both above the Cleanup Standard of 1 ft²/acre, respectively. The cumulative average of the six Points of Interest was 1.07 ft²/acre.

The JOC monitoring point was measured at the exact spot where a double-wide trailer had been set. Upon disassembly of the two trailers, the joint putty glue was scraped from the trailer edges causing a mass scatter of hardened glue debris left on-site. This debris field highly contributed to the amount of MOOP collected.

DPW is an expansive "camp" where BRC conducts event operations which is consistent with the debris found; wood splinters, metal screws/nails, paper, plastic and glass shards.

The Temple had a lesser amount of debris than The Man in 2016. MOOP found at the Man included decomposed granite (DG), metal screws, plastic and wood particles. DG is generally not counted as MOOP unless the size of the DG found is roughly larger than a golf ball.

HEaT and USS had the lowest MOOP collection totals suggesting that the HEaT and USS teams did a considerate amount of MOOP cleanup prior to the Playa Restoration Crew.

# Conclusion

The 2016 Burning Man event PEI concludes that cumulatively across all four Core Inspection Areas, BRC's Playa Restoration crew was successful in meeting the 2016 Burning Man SRP Cleanup Standard of less than 1.0 ft²/acre with an average Core Inspection Area measurement

11



2016 Burning Man - Post Event Inspection report

of **0.77 ft²/acre.** Current cleanup efforts and protocol are adequate for keeping up with the cumulative amount of MOOP associated with the event however cleanup efforts and protocol may need to be revisited for efficacy as total event population's increase over time.

| | |
|---|---|
| City Grid- | 1.25  ft²/acre |
| Walk-in Camping- | .50  ft²/acre |
| Open Playa- | .92  ft²/acre |
| Other- | .41  ft²/acre |
| **Total  Average** | 3.08/4 = **0.77 ft²/acre** |

# Recommendations

Following the 2016 Burning Man event PEI, the following are identified recommendations:

- BLM should revise the 2013 PEI Protocol to add calculation formulas and GIS protocols.

- BLM/BRC should continue to monitor all six Points of Interest Monitoring Sites

- BLM should continue to document annual PEI efforts through data sheets and GIS database retention of all monitoring data collected.

- BRC could explore the integration, compatibility and testing of the Fulcrum application, which BRC utilizes for Environmental Compliance purposes, for future PEI's.

- BRC should continue supporting and promoting the Playa Restoration Crew efforts.

- BRC should continue to educate participants in the ethos of Leave No Trace® and intensify *Pack it In, Pack it Out* communications. Camps, both large and small, leaving large, bulky items and piles of trash following exodus dramatically impacts the amount of time and coverage the Playa Restoration Crew has to address micro-debris.

- BLM/BRC should ensure that Contractor's and Vendor's working the event are made aware of the Leave No Trace® policy.

- BLM recommends that BRC conduct a Spring 2017 cleanup effort at the monitoring sites and Points of Interest that exceeded the Cleanup Standard of 1 ft²/acre in Fall 2016.

- BLM/BRC should determine whether the Points of Interest monitoring sites should be included for Environmental Compliance Monitoring during the event.

Attachments:

*BLM- Post-Event Inspection Protocol 2013*

## 2016 Burning Man - Post Event Inspection Report

| Core Area | Plot | Core Area Acres | Length x(in) | Length y(in) | Size (in²) | Size (ft²) | Square Feet Per Acre | Avg Size (ft²)/acre | # of Items | # of Items Per Acre | Avg # of Items/Acre | Debris Size | Avg Debris Size (in²) | Area Items/Core Area (acreage) | Avg Size (ft2)/Core Area (acreage) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| City Grid | CG_10 | | 5.00 | 2.50 | 12.50 | 0.09 | 0.87 | | 29.00 | 290 | | 0.43 | | | |
| City Grid | CG_12 | | 7.50 | 3.50 | 26.25 | 0.18 | 1.82 | | 88.00 | 880 | | 0.30 | | | |
| City Grid | CG_13 | | 5.50 | 2.00 | 11.00 | 0.08 | 0.76 | | 30.00 | 300 | | 0.37 | | | |
| City Grid | CG_14 | | 8.00 | 5.00 | 40.00 | 0.28 | 2.78 | | 106.00 | 1,060 | | 0.38 | | | |
| City Grid | CG_15 | | 2.50 | 1.00 | 2.50 | 0.02 | 0.17 | | 15.00 | 150 | | 0.17 | | | |
| City Grid | CG_16 | | 3.50 | 2.50 | 8.75 | 0.06 | 0.61 | | 20.00 | 200 | | 0.44 | | | |
| City Grid | CG_17 | | 6.50 | 1.50 | 9.75 | 0.07 | 0.68 | | 41.00 | 410 | | 0.24 | | | |
| City Grid | CG_18 | | 9.50 | 2.00 | 19.00 | 0.13 | 1.32 | | 36.00 | 360 | | 0.53 | | | |
| City Grid | CG_21 | | 3.50 | 1.50 | 5.25 | 0.04 | 0.36 | | 11.00 | 110 | | 0.48 | | | |
| City Grid | CG_23 | | 5.50 | 2.25 | 12.38 | 0.09 | 0.86 | | 41.00 | 410 | | 0.30 | | | |
| City Grid | CG_24 | | 12.00 | 3.25 | 39.00 | 0.27 | 2.71 | | 113.00 | 1,130 | | 0.35 | | | |
| City Grid | CG_27 | | 5.50 | 2.43 | 13.37 | 0.09 | 0.93 | | 38.00 | 380 | | 0.35 | | | |
| City Grid | CG_28 | | 5.50 | 2.25 | 12.38 | 0.09 | 0.86 | | 72.00 | 720 | | 0.17 | | | |
| City Grid | CG_29 | | 8.00 | 2.50 | 20.00 | 0.14 | 1.39 | | 111.00 | 1,110 | | 0.18 | | | |
| City Grid | CG_30 | 1,197.02 | 8.00 | 2.00 | 16.00 | 0.11 | 1.11 | 1.25 | 78.00 | 780 | 556.90 | 0.21 | 0.36 | 666,615.20 | 1496.60 |
| City Grid | CG_31 | | 10.00 | 3.50 | 35.00 | 0.24 | 2.43 | | 135.00 | 1,350 | | 0.26 | | | |
| City Grid | CG_32 | | 6.00 | 3.75 | 22.50 | 0.16 | 1.56 | | 73.00 | 730 | | 0.31 | | | |
| City Grid | CG_33 | | 6.00 | 3.50 | 21.00 | 0.15 | 1.46 | | 33.00 | 330 | | 0.64 | | | |
| City Grid | CG_34 | | 5.25 | 3.00 | 15.75 | 0.11 | 1.09 | | 65.00 | 650 | | 0.24 | | | |
| City Grid | CG_35 | | 12.00 | 3.50 | 42.00 | 0.29 | 2.92 | | 151.00 | 1,510 | | 0.28 | | | |
| City Grid | CG_37 | | 3.50 | 1.50 | 5.25 | 0.04 | 0.36 | | 14.00 | 140 | | 0.38 | | | |
| City Grid | CG_41 | | 10.00 | 1.00 | 10.00 | 0.07 | 0.69 | | 25.00 | 250 | | 0.40 | | | |
| City Grid | CG_48 | | 4.50 | 2.50 | 11.25 | 0.08 | 0.78 | | 37.00 | 370 | | 0.30 | | | |
| City Grid | CG_50 | | 8.50 | 4.50 | 38.25 | 0.27 | 2.66 | | 46.00 | 460 | | 0.83 | | | |
| City Grid | CG_54 | | 4.50 | 2.50 | 11.25 | 0.08 | 0.78 | | 33.00 | 330 | | 0.34 | | | |
| City Grid | CG_56 | | 5.50 | 2.50 | 13.75 | 0.10 | 0.95 | | 29.00 | 290 | | 0.47 | | | |
| City Grid | CG_57 | | 6.25 | 4.00 | 25.00 | 0.17 | 1.74 | | 94.00 | 940 | | 0.27 | | | |
| City Grid | CG_59 | | 5.00 | 3.00 | 15.00 | 0.10 | 1.04 | | 24.00 | 240 | | 0.63 | | | |
| City Grid | CG_9 | | 4.00 | 2.00 | 8.00 | 0.06 | 0.56 | | 27.00 | 270 | | 0.30 | | | |
| Open Playa | OP_36 | | 4.50 | 2.50 | 11.25 | 0.08 | 0.78 | | 35.00 | 350 | | 0.32 | | | |
| Open Playa | OP_38 | | 3.25 | 2.50 | 8.13 | 0.06 | 0.56 | | 18.00 | 180 | | 0.45 | | | |
| Open Playa | OP_39 | | 5.75 | 3.50 | 20.13 | 0.14 | 1.40 | | 36.00 | 360 | | 0.56 | | | |
| Open Playa | OP_40 | | 3.50 | 2.75 | 9.63 | 0.07 | 0.67 | | 32.00 | 320 | | 0.30 | | | |
| Open Playa | OP_43 | | 4.00 | 1.00 | 4.00 | 0.03 | 0.28 | | 10.00 | 100 | | 0.40 | | | |
| Open Playa | OP_47 | | 2.25 | 3.50 | 7.88 | 0.05 | 0.55 | | 13.00 | 130 | | 0.61 | | | |
| Open Playa | OP_49 | | 3.50 | 2.00 | 7.00 | 0.05 | 0.49 | | 21.00 | 210 | | 0.33 | | | |
| Open Playa | OP_52 | | 7.00 | 2.50 | 17.50 | 0.12 | 1.22 | | 45.00 | 450 | | 0.39 | | | |
| Open Playa | OP_53 | 1,451.28 | 4.00 | 2.25 | 9.00 | 0.06 | 0.62 | 0.92 | 14.00 | 140 | 242 | 0.64 | 0.57 | 350,724.79 | 1337.47 |
| Open Playa | OP_55 | | 2.00 | 1.50 | 3.00 | 0.02 | 0.21 | | 8.00 | 80 | | 0.38 | | | |
| Open Playa | OP_58 | | 5.50 | 2.75 | 15.13 | 0.11 | 1.05 | | 20.00 | 200 | | 0.76 | | | |
| Open Playa | OP_60 | | 1.38 | 2.00 | 2.75 | 0.02 | 0.19 | | 10.00 | 100 | | 0.28 | | | |
| Open Playa | OP_61 | | 2.50 | 1.50 | 3.75 | 0.03 | 0.26 | | 12.00 | 120 | | 0.31 | | | |
| Open Playa | OP_62 | | 4.50 | 1.75 | 7.88 | 0.05 | 0.55 | | 16.00 | 160 | | 0.49 | | | |
| Open Playa | OP_63 | | 5.50 | 9.75 | 53.63 | 0.37 | 3.72 | | 100.00 | 1,000 | | 0.54 | | | |
| Open Playa | OP_64 | | 3.50 | 1.50 | 5.25 | 0.04 | 0.36 | | 16.00 | 160 | | 0.33 | | | |
| Open Playa | OP_65 | | 2.50 | 2.00 | 5.00 | 0.03 | 0.35 | | 12.00 | 120 | | 0.42 | | | |
| Open Playa | OP_66 | | 12.00 | 4.00 | 48.00 | 0.33 | 3.33 | | 17.00 | 170 | | 2.82 | | | |
| Other | Other_11 | | 3.25 | 1.50 | 4.88 | 0.03 | 0.34 | | 19.00 | 190 | | 0.26 | | | |
| Other | Other_22 | | 12.00 | 1.00 | 12.00 | 0.08 | 0.83 | | 10.00 | 100 | | 1.20 | | | |
| Other | Other_42 | 629.15 | 3.50 | 2.50 | 8.75 | 0.06 | 0.61 | 0.41 | 7.00 | 70 | 120 | 1.25 | 0.57 | 75,498.52 | 260.33 |
| Other | Other_46 | | 1.50 | 1.00 | 1.50 | 0.01 | 0.10 | | 5.00 | 50 | | 0.30 | | | |
| Other | Other_5 | | 4.50 | 1.75 | 7.88 | 0.05 | 0.55 | | 25.00 | 250 | | 0.32 | | | |
| Other | Other_7 | | 1.50 | 0.50 | 0.75 | 0.01 | 0.05 | | 6.00 | 60 | | 0.13 | | | |
| Walk-In Camping | WIC_1 | | 4.50 | 2.00 | 9.00 | 0.06 | 0.62 | | 14.00 | 140 | | 0.64 | | | |
| Walk-In Camping | WIC_19 | | 4.00 | 1.50 | 6.00 | 0.04 | 0.42 | | 6.00 | 60 | | 1.00 | | | |
| Walk-In Camping | WIC_2 | | 8.00 | 2.00 | 16.00 | 0.11 | 1.11 | | 27.00 | 270 | | 0.59 | | | |
| Walk-In Camping | WIC_26 | 365.29 | 2.40 | 1.00 | 2.40 | 0.02 | 0.17 | 0.50 | 9.00 | 90 | 113 | 0.27 | 0.80 | 41,225.15 | 182.64 |
| Walk-In Camping | WIC_3 | | 5.50 | 2.00 | 11.00 | 0.08 | 0.76 | | 18.00 | 180 | | 0.61 | | | |
| Walk-In Camping | WIC_4 | | 3.00 | 1.00 | 3.00 | 0.02 | 0.21 | | 3.00 | 30 | | 1.00 | | | |
| Walk-In Camping | WIC_8 | | 3.00 | 1.00 | 3.00 | 0.02 | 0.21 | | 2.00 | 20 | | 1.50 | | | |
| Targeted | DPW_6 | | 7.50 | 2.50 | 18.75 | 0.13 | 1.30 | | 68.00 | 680 | | 0.28 | | | |
| Targeted | Hea_67 | | 4.75 | 2.00 | 9.50 | 0.07 | 0.66 | | 31.00 | 310 | | 0.31 | | | |
| Targeted | JOC_25 | N/A | 8.00 | 3.75 | 30.00 | 0.21 | 2.08 | N/A | 110.00 | 1,100 | N/A | 0.27 | 0.31 | N/A | N/A |
| Targeted | Srvcs_20 | | 8.25 | 1.25 | 10.31 | 0.07 | 0.72 | | 47.00 | 470 | | 0.22 | | | |
| Targeted | Temple_51 | | 5.25 | 2.00 | 10.50 | 0.07 | 0.73 | | 49.00 | 490 | | 0.21 | | | |
| Targeted | The Man_44 | | 6.50 | 2.00 | 13.00 | 0.09 | 0.90 | | 22.00 | 220 | | 0.59 | | | |

Table 8. Burning Man 2016 PEI Monitoring Site Results

13



2016 Burning Man - Post Event Inspection report

| Plot Name | Type | Ft$^2$ Per Acre | Northing | Easting |
|---|---|---|---|---|
| CG_13 | City Grid | 1.82 | 4516153 | 312991 |
| CG_15 | City Grid | 2.78 | 4516267 | 312624 |
| CG_21 | City Grid | 1.32 | 4516489 | 312670 |
| CG_27 | City Grid | 2.71 | 4516760 | 312700 |
| CG_30 | City Grid | 1.39 | 4516816 | 314441 |
| CG_31 | City Grid | 1.11 | 4516834 | 314810 |
| CG_32 | City Grid | 2.43 | 4516852 | 312874 |
| CG_33 | City Grid | 1.56 | 4516921 | 312468 |
| CG_34 | City Grid | 1.46 | 4516926 | 312725 |
| CG_35 | City Grid | 1.09 | 4516998 | 315024 |
| CG_37 | City Grid | 2.92 | 4517036 | 312357 |
| CG_54 | City Grid | 2.66 | 4518054 | 312511 |
| CG_59 | City Grid | 1.74 | 4518332 | 313125 |
| CG_9 | City Grid | 1.04 | 4515968 | 314543 |
| OP_39 | Open Playa | 1.40 | 4517138 | 314480 |
| OP_52 | Open Playa | 1.22 | 4517996 | 314601 |
| OP_58 | Open Playa | 1.05 | 4518299 | 314937 |
| OP_63 | Open Playa | 3.72 | 4518704 | 313924 |
| OP_66 | Open Playa | 3.33 | 4519098 | 314587 |
| WIC_19 | Walk-In Camping | 1.11 | 4516465 | 315831 |
| DPW_6 | DPW | 1.30 | 4516467 | 312133 |
| JOC_25 | JOC | 2.08 | 4517388 | 313825 |

Table 9. Burning Man 2016 PEI Monitoring Site UTM's (Exceeding Standards)

AR01099

Attachment 1.



Chart 4. Population and Debris Area Correlation



Chart 5. Debris Area Trends

AR01100



Photo 3.                                                                          *Photo R. Sears*

Daubenmire cover class frame containing debris collected from a sample monitoring site. Each bag of MOOP is systematically placed inside a Daubenmire cover class frame and examined to determine the type of debris, number of items and surface area covered by the debris (in2) for each of the monitoring plots collected for the purposes of the annual BRC SRP Post Event Inspection report. All contents are measured, sorted and categorized for data analysis.

**Black Rock City LLC**
# BURNING MAN 2016
### After Action Report (AAR)



*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04648

2016
Black Rock City LLC
BURNING MAN AFTER ACTION REPORT

_____

**Report Contents**                                        **Page Number**

I.     EXECUTIVE SUMMARY                                        4

II.    BLACK ROCK CITY OPERATIONS                              7
       A.  Safety, Security & Emergency Services               7
           i.    Introduction                                  7
           ii.   Medical: Advanced Life Support & Rampart Operations   7
           iii.  Medical: Basic Life Support                   10
           iv.   Fire Rescue Hazmat                            11
           v.    Crisis Intervention                           12
           vi.   Public Safety Communications                  12
           vii.  Black Rock Rangers                            13
       B.  Infrastructure, Logistics, Transport & Playa Restoration   16
           i.    City Planning                                 16
           ii.   Department of Mutant Vehicles                 19
           iii.  Population Reporting                          19
           iv.   Sanitation                                    20
           v.    Transportation Management                     21
                 a.  BRC Road Operations                       21
                 b.  Burner Air & NV88 Ops                     22
                 c.  Burner Express Bus                        23
           vi.   Playa Restoration                             24

III.   INTERAGENCY OPERATIONS                                  25
       A.  Planning & Permitting                               25
           i.    Special Recreation Permit, Closure Order & Stipulations   25
           ii.   Cost Recovery, MOU & Proffer Accounts         27
           iii.  Compliance Programs & Protocols               32
                 a.  Environmental                             32
                 b.  Vending                                   33
                 c.  Media                                     35
           iv.   Agency Cooperators                            35
       B.  Interagency Emergency Operations, Protocols & Procedures   36
           i.    Joint Operations Center (JOC)                 36
           ii.   Daily Coordination & the Emergency Operations Center (EOC)   37
           iii.  Emergency Notification & Activation           38
       C.  Emergency & Interagency Communications              38
           i.    Radios                                        38

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04649

2016
Black Rock City LLC
BURNING MAN AFTER ACTION REPORT

_____

**Report Contents**                                            **Page Number**

    ii.   Paging System                                    39
  D.  Law Enforcement                                      39
    i.   BLM & PCSO Operations/Integration             39
    ii.   Evictions & Trespass                         41

IV.   APPENDICES                                             43
  A.  2016 BRC Operations Plan                             43
  B.  Medical Statistics from Rampart Emergency Care Services   44
  C.  LE Feedback                                          46

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04650

## I.  EXECUTIVE SUMMARY

The Burning Man event, now in its 26th year in Nevada, is the central hub of Burning Man culture around the world and is produced by Black Rock City LLC (BRC), a wholly owned subsidiary of Burning Man Project, a 501(c)(3) non-profit organization. The 2016 Burning Man event took place in the Black Rock Desert - High Rock Canyon Emigrant Trails National Conservation Area, and the Special Recreation Permit (SRP) was administered by the United States Bureau of Land Management (BLM) Winnemucca District, Black Rock Field Office. Burning Man is the largest Leave No Trace (LNT) event in the world and has an exemplary environmental track record for every year the event has been held on public lands.

The 2016 Burning Man event in Black Rock City ran for eight days, from 6:00 pm on Sunday, August 28, through 6:00 pm on Monday, September 5, and the full closure order was in effect from August 1 through September 21. Event population peaked at 67,290 participants on Friday, September 2, at 11:30 am, well under the 70,000 paid-participant cap. Additional staff and volunteers supported the city and among them covered all aspects of event operations, including infrastructure, technology, art, and emergency services.

Planning for the Burning Man event is a year-round process that involves significant levels of cooperation across a range of Federal, State and County agencies and contractors, and the success of the event is testament to the collaborative work conducted by all parties. As the event has evolved, additional stakeholders have been identified and included in the annual planning and debriefing process. Burning Man is committed to excellent agency relationships and counts civic responsibility as one of our guiding principles.

Burning Man commits significant human and financial resources each year to all aspects of public health and safety, and the organization's commitment to safety is reflected by the event's exceptional track record. Detailed operational plans are completed each year to cover multiple contingencies including advanced and basic medical care at the event, law enforcement, traffic safety, city planning, communications, community response and mediation, inspections, permitting, vehicle licensing, child welfare, crisis intervention, fire prevention and fire response, hazardous materials identification and removal, perimeter security, gate operations, and volunteer training.

BRC operations encompass over 40 departments and teams, organized year-round and executed on site for the duration of the closure order, surveying the streets, installing shade, manning the airport, placing camps, creating infrastructure, managing art, licensing vehicles, planning and providing emergency services and other community services, selling ice, ensuring sanitation, educating participants, and building the city. Operations evolve every year as the

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04651

2016
Black Rock City LLC
BURNING MAN AFTER ACTION REPORT

_____

Burning Man event grows and conditions change. 2016 event operations were extremely successful, with no major incidents to report and many milestones achieved, including development and management of the environmental and vending compliance programs. The Burning Man organization is extremely grateful to, and proud of, the professionals and volunteer personnel who work together to make Black Rock City safe and vibrant.

Collaborative planning between BRC and BLM reached new heights in 2016. Changes in BLM leadership at both the State and District levels had tremendously positive impacts on communication and transparency, which translated into stronger, more trusting relationships and improved operations on site. Planning and execution for BLM's event operations were moved back to Nevada, and involvement of the Office of Law Enforcement and Security (OLES) was reduced. The Authorized Official and BLM planning team were responsive and professional, more open to new ideas and proposals from BRC, while also representing the best interests of the agency. BLM and BRC worked together throughout the year to define the roles and responsibilities of each entity: BLM as the SRP administrator and BRC as the permittee and event producer. After the tensions and problems in recent years, 2016 was a giant step forward.

BRC appealed BLM's 2015 costs because BLM's requirements were excessive and unjustified. BLM costs escalated 303% from 2011 to 2015, even as total on-site population increased by only 43%. Total fees and costs paid to BLM in 2015 were $4.5 million. Many of the same requirements were imposed in 2016. However, BLM reduced staffing and found efficiencies in 2016, and BRC anticipates a $250,000 reduction in BLM costs versus 2015. While there is still work to be done, BRC is more confident in the collaborative planning process now. Our goal is to understand BLM's requirements and where the agency has discretion, and to align with BLM on resources required for event operations. We look forward to working with the BLM planning team in 2017.

BRC works closely with Pershing County and the Pershing County Sheriff's Office (PCSO) year-round to plan for Burning Man and support PCSO's on-site operations. In 2016, as in 2015, PCSO implemented an integrated law enforcement (LE) command structure with BLM. BRC paid for PCSO's personnel and provided and paid for PCSO's meals, radios, pagers, computers, printers, fuel, infrastructure, power, light towers, dispatch, computer-automated design (CAD) data entry, internet, telephones, housing space and trailers, sanitation, waste management, jail, decontamination station, medical care, offices, report writing center, evidence trailer, Unified Command post, dust abatement, fencing, and the shared Emergency Operations Center. BRC is concerned because PCSO stated in its 2016 Post Mission Synopsis that its officers received no training or orientation in advance of working the Burning Man event. BRC would like to work with PCSO to provide information and materials for officer training to ensure they are familiar with Black Rock City and best prepared for the conditions there. BRC has

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04652

additional concerns about statements in the Synopsis that we will address directly with Pershing County.

BRC recognizes the necessary and important functions law enforcement performs at the Burning Man event and appreciates the level of planning and commitment required to provide effective public safety services for more than 75,000 people in a remote location. However, BRC feels strongly that law enforcement staffing levels are too high, and some of the tactics employed by law enforcement personnel in Black Rock City are too aggressive. Staffing levels should take into consideration the circumstances on the ground including BRC's operational departments as force multipliers, the low incidence of person-on-person crimes, lack of violent crime and traffic accidents, and low incidence of illegal substance trafficking and drug-related medical problems. BRC looks forward to working with BLM and PCSO during the 2017 planning season to gain additional understanding and make further progress.

Burning Man is the largest SRP on BLM administered lands. BRC appreciates our long partnership with BLM and our shared values of environmental stewardship and education. The Burning Man event draws thousands of people from across the country and around the world to the remote Black Rock Desert and to the state of Nevada each year, many of whom are visiting for the first time. Their impressions of public lands and the BLM are shaped through their experience on the playa. The event also draws positive worldwide attention and media coverage, showcasing art, culture, and environment in the American west. We take our responsibilities seriously and value our event's history in Northern Nevada. We look forward to many more years in Nevada and the Black Rock Desert, working closely with BLM and Pershing County, and all of our cooperating agencies.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04653

## II. BLACK ROCK CITY OPERATIONS

Burning Man's operations are vast. The 2016 Operations Plan has been attached as an appendix to this report and provides a comprehensive description of BRC's operations and contingency plans. The following sections in this AAR highlight BRC's operations, programs, and processes that are stipulated by the Burning Man SRP.

### A. Safety, Security & Emergency Services

#### i. Introduction

Public health, safety, and security are paramount to Burning Man. BRC prioritizes health and safety during year-round planning and on site in the Black Rock Desert. BRC works directly with our contracted advanced life support (ALS) medical provider, with multiple cooperating agencies across the state of Nevada and at the Federal level, and with regional hospitals and medical centers. BRC's own Emergency Services Department is staffed with over 600 highly trained and qualified, licensed paid personnel and volunteers. Many ESD personnel are experts in their field, with years of off-playa professional experience in their skill area, including emergency medical response, fire fighting, hazardous materials identification and removal, rescue operations, crisis intervention, and logistics. Many years of operation and evolution have allowed for significant levels of redundancy to be built into ESD operating processes, and each sub-department necessarily maintains flexibility in response, thus ensuring high quality patient care and highly organized, strategic response in the variable environmental and cultural conditions of Black Rock City. All medical operations are laid out and described in a detailed manual that is annually updated and reviewed by doctors and other subject matter experts.

#### ii. Medical: Advanced Life Support & Rampart Operations

For the second consecutive year, BRC contracted with CrowdRx, Inc. to provide and coordinate ALS medical services for the Burning Man event. Also for the second time, the primary medical care facility, Rampart Emergency Care Center ("Rampart"), was fully licensed by the State of Nevada Bureau of Health Care Quality and Compliance as an Independent Center for Emergency Care. The medical laboratory within Rampart was also licensed by the State of Nevada Bureau of Health Care Quality and Compliance as a CLIA-waived, exempt laboratory.

The 2016 advanced life support medical operation was comprised of a team of Nevada licensed emergency physicians, physician assistants, registered nurses, paramedics, advanced emergency medical technicians, emergency medical technicians, and a variety of support personnel. Throughout the event, CrowdRx coordinated ambulance services with ten advanced

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04654

life support ambulances, three supervisor vehicles, and one fixed-wing air ambulance. On the ground, the ambulances were operated by Nevada-licensed ambulance company Symons Ambulance Inc. In the air, CrowdRx coordinated 24/7 on-site air ambulance services, provided by American MedFlight.

**Rampart, Clinical Operations, and Staffing**

CrowdRx continued to fine-tune clinic operations and staffing in 2016. The layout of Rampart was slightly modified to improve flow and patient care. Additional changes may be considered for 2017, but overall the layout and structure of Rampart worked very well. For 2017 CrowdRx has recommended a dedicated suture station, additional intake/registration staff during peak hours, and adjustments to doctor shift times. These recommendations will be evaluated and implemented as needed.

In total, CrowdRx reported 1,849 patients in their SitRep Final 2016, as compared with 1,819 patients in the SitRep Final 2015, a 1.6% increase. (Please note that the number of patients reported in the 2015 CrowdRx AAR medical statistics was 1,728, but BRC subsequently noted that the correct number of patients in the 2015 SitRep was 1,819.) As expected, a majority of patients suffered from non-life threatening injuries such as mild dehydration, soft-tissue injuries, lacerations, and orthopedic injuries. While the overall increase in patient volume was small at 1.6%, certain days saw a significant increase in patient volume compared to 2015. Friday, September 2, was the busiest day with 259 patient contacts. Saturday, September 3, saw an increase in patient contacts of over 65% compared to 2015, but 2015 was an outlier, and the number of patients treated on Burn day in 2016 was actually down about 35% from 2011-2014. (Additional patient stats are attached as an appendix to this document.)

Rampart staff saw a significant number of patients presenting with extremely minor complaints that should not be the responsibility of CrowdRx or BRC. BRC will be working with CrowdRx to increase messaging to participants about playa preparation, self-reliance, and what services Rampart does and does not provide, at Station 6 and inside Rampart, as well as via other channels including social media and BMIR.

**ESD/Rampart**

Rampart continues to enjoy a great relationship with ESD. Rampart staffed a paramedic in Station 6 this year to help with triage and perform some limited ALS procedures. This helped take the pressure off the Clinic during peak times and should be considered for 2017. CrowdRx does recommend off-season planning for ESD QRV calls into Rampart with incoming patients and patient transfer, and BRC agrees with this recommendation.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04655

**Air Transport and Delta Operations**

Once again CrowdRx contracted with American Medflight for air ambulance transportation; they were utilized as the primary mode of transportation to area hospitals. American Medflight continued to be an outstanding asset and partner for Rampart and BRC. From assisting with transporting a BLM canine (at no charge) to the repatriation of patients to the playa, American Medflight was always ready to help out.

Symons Ambulance provided the ground ambulances (Delta units). Ambulances were supplied and staffed in accordance with NRS 450B as Advanced Life Support level units. All ground ambulances and air ambulances were inspected on-site at the beginning of the event by the Division of Public and Behavioral Health, Emergency Medical Services Program, and were found to be in compliance with applicable regulations and requirements. Posting the ambulances throughout the City worked very well and will be continued in 2017. There continued to be issues with Delta units being dispatched to calls that should have been managed by ESD personnel in QRVs, and this will be addressed for 2017.

In 2015 BRC added two more ambulances, for a total of 10; however, this increase in ambulance coverage may be excessive as neither of the ambulances were deployed in 2015 or 2016. The two additional ambulances will be evaluated for 2017, and eliminating them will be considered. Ambulance staffing and shift duration were at times challenging, and eliminating the two additional ambulances would help this problem. A Delta unit was stationed at the Joint Operations Center (JOC) for the duration of the event with only **1.3 hours** of time in service and on a call. BRC recommends repositioning the JOC-staged Delta to Station 73, which would make the Delta unit available to other participants but still close to the JOC should it be needed there.

There were 31 air transports from Black Rock City in 2016, compared to 19 in 2015, and four ground transports in 2016 compared to seven in 2015. CrowdRx and BRC worked with area hospitals during the offseason to expand planning and communication, and these efforts have improved operations and patient transfer from the event site.

ALS ambulances were once again stationed in a "system status" matrix, providing for decreased response times to incidents. This system worked well, and there was a good balance between the ESD QRVs and ALS ambulances being used to respond to calls. There were minor communication issues when some dispatch information did not seem to get passed on to the next dispatcher after shift change, but these issues were addressed on site and will improve for 2017.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04656

### iii. Medical: Basic Life Support

ESD is the first port of call for most people with a medical complaint or concern in Black Rock City. All ESD medical personnel working the 2016 event were vetted and licensed by the State of Nevada. ESD operated six fully staffed first aid stations located throughout Black Rock City. Integration between ESD and CrowdRx was excellent. ESD continued to work closely with CrowdRx to refine the coordination of medical calls in the field, dispatch of medical assets, and delivery of care at Rampart. These roles and assets were communicated to BLM and PCSO daily during Tier 1 meetings via a situation status (Sit Stat) report that highlighted infrastructure and personnel resources across all BRC departments tasked with providing for safety at the event. BRC reports no issues related to the chain of command in medical responses in 2016.

Daily briefing meetings, attended by all ESD branch and section leaders, duty chiefs and supervisors, and ALS medical (CrowdRx) and fire vendors, were highly successful, improving information sharing and triggering improved efficiencies. Statistics were gathered and analyzed earlier in 2016, eliminating the issues encountered in 2015 with respect to inadequate and delayed statistics capture by the medical branch and allowing more timely reporting of trends and numbers to the Nevada Department of Health. Implementation of the modified CDC form for identification and tracking of potential foodborne illnesses was a success in 2016, again providing timely and complete information to the Nevada Department of Health.

ESD provided six basic life support (BLS) first-aid stations in 2016, placed strategically throughout the City. After two years of Station 12 operations, BRC will reconsider the need for this station, as patient numbers are very low. Station 12 is rarely utilized and could be a home station for QRV 12 without needing 24/7 staff. In cases of walk-ins, Black Rock Rangers would call in a QRV. Station 6 configuration of conex box clinical areas instead of trailers worked well, except when Rampart overflow caused the station to be used as an IV hydration point. BRC will evaluate repurposing the Occupational Health building during the event to hydrate participants and provide for additional privacy when needed.

BRC continued to use mobile resources to transfer low to medium acuity patients to Rampart in 2016 but will explore holding and treating simple wounds, IV hydrations, and UTI patients in the ESD stations in the future to achieve higher efficiency and and best use of resources, and to relieve pressure at Rampart. BRC will work closely with CrowdRx in the planning season to continue to assess and improve triage flow from ESD to Rampart and dispatch protocols.

ESD enjoyed a strong relationship, excellent pre-event planning, and effective communications with Zendo, an organization and theme camp providing two quiet spaces with peer to peer counseling for participants who are feeling overwhelmed. Zendo and BRC presented a

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04657

successful Harm Reduction training for BLM and look forward to providing additional trainings in the future.

ESD implemented a successful recognition program for volunteers to encourage volunteerism during less desirable shifts and to increase volunteer retention. The ESD website continued to be effective, with near 100% access of the site after staff and volunteers are contacted alerting them to new information available on the site.

ESD saw an increase in patients presenting with extremely minor complaints and requests for band-aids, tampons, and condoms. BRC will increase communications to participants in 2017 regarding self-reliance, including what to bring to Burning Man in their personal care and first-aid kits.

### iv. Fire Rescue Hazmat

Fire operations went very smoothly in 2016, with operational protocols proving safe and effective, and with the department benefitting from significant equipment upgrades in 2015 and 2016. For 2016 Engine-3 was built with a permanent mount and no longer needed to rely on rental trucks. The E-3 platform is larger than E-9's and will continue to allow more space for organized equipment and future fabrication. As equipment is added or upgraded, Fire Department personnel receive additional hands-on training to ensure they are familiar with the equipment and capable of using it safely and effectively. Improvements to water tanks will be implemented for 2017 to address aging and wear and tear.

BRC contracted with Julie's Tactical Tenders (JTT) to place a Type-1 engine at 5:15 and Esplanade next to Rampart to address extended response times, and this solution seems to have worked well. BRC will continue this practice in 2017 with either the JTT Type-1 or a donated ESD Type-1 and may use this Type-1 to cover the Black Rock City Airport pre-event.

The Fire Department provided a decontamination unit at the JOC for use by law enforcement personnel, and all parties were satisfied with the resource. The Fire Rescue Hazmat team is not the appropriate resource for cleaning up human waste. Issues with human waste at the jail should be handled by the appropriate personnel.

Departmental training goals were accomplished in 2016, including drills for a technical rescue and Mass Casualty Incident (MCI). A flare operation and training will be added to the standard curriculum for 2017, as will a joint JTT and ESD fire attack drill to ensure that a large fire transition from Type-6's to tactical tenders is practiced.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04658

_____

### v. Crisis Intervention

ESD's Crisis Intervention Team (CIT) used a Google Form for data entry this year, eliminating paper forms and the risks of loss and inappropriate discovery. The LE interview/computer room worked very well and was centrally located at Rampart. To ensure the highest level of survivor support possible, BRC needs to revise existing protocols and add a section to the CIT field guide/operations manual that states CIT staff cannot take photos for LE or any other departments. While CIT wants to support our participants, each entity (BRC and LE) needs to have its own documentation person.

### vi. Public Safety Communications

Communication with participants, staff, and volunteers about public safety continued to be robust in 2016, with law enforcement and health and safety information presented in multiple editions of the Jack Rabbit Speaks email newsletter, the Event Preparation and Journal sections of the Burning Man website, and the online and printed Survival Guide provided to all ticket holders.

BRC worked with BLM and PCSO on an updated harm reduction communications plan that started with collaboration and consensus on key messages, followed by distribution in the Survival Guide, Jack Rabbit Speaks newsletter, social media, nationwide and international email lists, updates to regional coordinators, and Public Service Announcements on BMIR and GARS radio.

Up to the minute traffic, weather and news were broadcast live to thousands of participants throughout the event on BMIR and via Twitter. News reports occurred within the first five minutes of the top of the hour beginning Friday afternoon pre-event to accommodate the influx of traffic related to the earlier Gate opening. The Burning Man webcast operated smoothly throughout the week.

BRC used the Gate Area Radio System (GARS) to broadcast public service announcements to participants arriving and departing the event on Gate Road. For 2016 we ensured GARS was updating in sync with BMIR, which improved consistency over 2015. For 2017, GARS management will transfer from Gate to the BRC Communications team to increase efficiency of news reporting. For 2017 Exodus, BRC will update Gate wait times to every 30 minutes. BRC will also educate participants on how we calculate Gate wait times, as some participants expressed frustration that their departures (not related to the missing minor) were longer than what we were reporting. Participants sometimes counted time from camp departure, versus BRC reporting wait times from Greeters to the pavement at County Road 34.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04659

During the event, participant communication resources for public safety included BMIR, Black Rock City's official radio station. BMIR operates 24 hours per day during the event and informs listeners as to public safety concerns including weather, gate wait times, and traffic. BMIR continued to play a key role in pushing out traffic, weather and safety messaging both pre-event and during the event. As BMIR streams its signal on the internet via native BMIR apps and iHeart Radio, BRC is able to reach participants at home preparing for the event and as they travel to Black Rock City.  Internet listening to BMIR totaled just over 20,000 unique listeners in addition to over the air listening via FM in the City.

The missing minor during Exodus was the most significant communications challenge of the event, as BMIR and GARS initially reported the incident incorrectly as an AMBER Alert. Both stations were notified and immediately switched to reporting a "missing minor." BRC continued to update the public through these channels until the minor was located, informing participants of the extended backup and then resuming regular traffic wait time reporting.

### vii. Black Rock Rangers

**The Black Rock Rangers** (Rangers) were founded in 1992 to serve a search and rescue function. They are Black Rock City's eyes and ears on the ground, patrolling in pairs on foot and bicycle 24 hours a day. Rangers are readily identified by their khaki attire and khaki hat with Black Rock Ranger insignia. Because they are on foot and bicycle and easily recognizable to participants, they are often called upon to assist. They communicate by radio with each other, with other operational teams, and with dispatch. More than 800 Rangers staffed the 2016 Burning Man event, with 300+ off-duty Rangers reachable at all times in case of emergency.

- Rangers facilitate public safety throughout the city 24 hours per day.
- Rangers provide reliable information and directions, and they remind participants of community expectations - from Leave No Trace and Civic Responsibility to driving rules and neighborly behavior.
- Rangers are first responders and able to call in resources when needed, including first aid, emergency medical services, environmental compliance, and law enforcement.
- Rangers specialize in non-confrontational mediation and can help resolve disputes or complaints before they escalate, such as camp disputes or noise problems.
- Rangers help reunite lost children with their families.
- Specially trained Rangers provide perimeter support for events like the Man burn and for public safety incidents to assist law enforcement with crowd control.

✗  Rangers are **NOT** law enforcement. They do **NOT** carry weapons.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04660

Many Rangers are volunteers. All of them receive training annually. More than 30 Ranger trainings are offered each year across the U.S. and Canada. Ranger special teams include:

- **Trainers**: develop training curriculum to provide new and veteran Rangers key communications and conflict resolution skills.
- **Mentors**: coach, assess and select new Black Rock Rangers.
- **Green Dots**: help participants experiencing internal or emotional distress.
- **Law Enforcement & Agency Liaison (LEAL)**: work with law enforcement and agency personnel to attain the best possible alignment between officials and participants.
- **Ranger Burn Safety**: coordinate all Ranger functions related to art burn safety.
- **Rapid Night Response**: specialize in getting qualified Rangers to serious situations fast in challenging nighttime conditions.
- **Intercept**: provide traffic safety enforcement, primarily on the inner playa.
- **Logistics**: attend to Ranger infrastructure and support needs.
- **Communications**: manage communications protocols and systems.
- **Shift Leads**: support Rangers on shift, securing resources and communicating with other departments to ensure timely response to incidents.

**The safety of minors** remains a top priority for the Black Rock Rangers. For the fifth consecutive year, the Black Rock Rangers operated the Family Unification Network (FUN), which allows parents to register their children and obtain wristbands for them at Black Rock Ranger HQ. These wristbands can facilitate faster unification of children separated from their families.

There were two reports of lost children in 2016 and two reports of children found separated from their parents. As in years past, 100% of the children were successfully reunited with their parents or guardian, unharmed in any way. In all cases law enforcement was on scene to oversee the release of the minors to their guardians. Three of the incidents were resolved within 20 minutes, but there was one incident involving a 17-year-old that occurred during Exodus on Sunday evening, September 4, and resulted in the closing of the Gate, hours of backup, and thousands of people being temporarily unable to leave the city.  Details of this incident are included in the Emergency Management section of this report.

In 2016, there were reports of **battery against Rangers** by participants. BRC will work with law enforcement to find additional solutions for dealing with combative participants, which could include increased training and education, eviction from the event, and/or the use of other remedies available under Nevada law.

Ranger response was instrumental to address **certain events unique to 2016**: longer than anticipated construction phase at Catacomb of Veils, unauthorized traffic to airport and fuel

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04661

_____

station, and a structure collapse at a theme camp. Rangers held long-term safety perimeters around the Catacomb of Veils (approximately five days) and at the structure collapse (12 hours). Rangers enforced driving rules pertaining to unauthorized driving to and from the airport and unauthorized driving to get fuel for theme camps.

2016 was the third year of the **Ranger Gerlach Patrol**. Operations were smoother but also busier than in previous years. The Ranger management team instituted a better log system to track contacts and incidents, allowing better documentation for later reference. Gerlach Patrol Rangers worked closely and effectively with the Washoe County Sheriff's Office, and they shared a very good rapport. The two resident deputies in Gerlach were accessible, cooperative, and seemed to genuinely appreciate the Ranger role and the service provided to the community. Gerlach Patrol Rangers responded to calls for assistance in Empire, and their assistance was appreciated by WCSO deputies. Clarification will be made for 2017 as to scope of responsibility in this area.

LE observed **personal motorized conveyances**, electric bicycles, land-boards, etc., travelling at high speeds, moving through intersections without stopping or yielding properly, and weaving in and out of traffic and pedestrians. LE reminded BRC that the speed limit is enforceable to these types of conveyances and stated that each year there seems to be more and more of them, increasing the number of reckless operation issues. Black Rock Rangers responded by identifying the problem and correcting the behavior when observed, and BRC will continue to address the issue in 2017.

**Shift Command training** was rolled out this year and found to be effective, well-executed, and well-received. This comprehensive core training included the most complicated and crucial operations procedures. BLM LE suggested post-event that BLM and PCSO conduct tabletop exercises with Rangers for 2017. BRC enthusiastically supports this suggestion and has suggested that Ranger Shift Lead training is the right time and place for these exercises.

BRC would like to reduce the need for law enforcement traffic and speed safety patrols on **Gate Road.** Historically the event has not reported any traffic accidents on Gate Road. BRC wants to mitigate hazards on Gate Road including driving over the recommended speed, poor vehicle lighting, and unsafe lane changes. BRC would like to increase Ranger and Perimeter presence along Gate Road and the Fallopian tubes during Ingress and Exodus. BRC would like to work with BLM and PCSO to define protocols and parameters for escalation of traffic and speeding issues to law enforcement. The Ranger department already has a successful Intercept program with the mission of vehicle safety. To date Intercept efforts have focused on the inner playa, and going forward Ranger Intercept efforts could become more comprehensive.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04662

___

B.  **Infrastructure, Logistics, Transport & Playa Restoration**

    i.  **City Planning**

**CITY MAP 2016**



In 2016, the art theme was DaVinci's Workshop. This theme was inspired by the Italian Renaissance of the middle fifteenth and early sixteenth centuries, when a historic convergence of inspired artistry, technical innovation and enlightened patronage launched Europe out of

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04663

medievalism and into modernity. Burning Man provided honorarium art grants to 59 artists and Man Pavilion grants to 29 artist groups for the Guild Workshops around the Man Base.

The annular streets were named:

- Esplanade
- Arno
- Botticelli
- Cosimo
- Donatello
- Effigiare
- Florin
- Guild
- High Renaissance
- Italic
- Justice
- Knowledge
- Lorenzo

The distance from the innermost Esplanade street to the Man was 2,500 feet. Esplanade to Arno Street, curb to curb, was 400 feet deep. Mid-city double-deep blocks were located between Effigare and Guild streets and were 440 feet deep. The remaining blocks were 200 feet deep.

**New for 2016:**

- Ice sales formerly at B street at 3:00 and 9:00 streets moved to mid-city on G street at 3:00 and 9:00 streets.
- All streets were 40 feet wide.
- All Plazas (except Center Camp) were 250 feet in diameter.
- Plazas formerly on K at 3:00 and 9:00 streets were moved to G at 3:00 and 9:00 streets.
- The plaza formerly on K at 6:00 street was moved to I at 6:00 street.
- Auxilary Parking — To open up more camping space, campers were able to park their extra vehicles across L at the flag fence, between 7:15 and 10:00 streets. There remained no camping or driving outside the flag fence between 5:00 and 10:00. For walk-in camping – located between 2:00 and 5:00 – participants parked vehicles across L street at the flag fence and set up their camp outside the parking flag fence.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04664

---

### Impact of 2016 Changes

- Moving ice sales mid-city at 3:00 and 9:00 was met with much appreciation from BRC participants, who had requested more centralized locations, and for the first time, the 9:00 ice sales surpassed sales at the "downtown" location in Center Camp.
- While some camps local to L street took advantage of the new nearby parking, we did not see much of an impact on density, and BRC noted the appearance of more activity, including temporary camping, and the appearance of human waste near the parking area, which was mitigated by adding toilet stations at the location.

### City Planning Subcommittee

The City Planning Subcommittee determined the 2016 changes. This group is made up of leadership in departments that provide services in Black Rock City involving camp placement, staff housing, safety, utilities, and technology tools that support BRC infrastructure. This subcommittee receives feedback and makes recommendations to the BRC Operations team on what city design changes could be beneficial each year. There are many ways staff and participants gave feedback on the City plan to the Planning Subcommittee: the event debrief, board and staff retreats, FLIP feedback (Feedback Loop Internal Processing), and the aliases feedback@ and complaints@ provided vehicles for BRC citizens. Departments forward concerns that they receive personally, or on their lists, to the appropriate members of this subcommittee.

### Placement

BRC Placement was responsible for vetting, assessing, delineating, and placing theme camps, department camps, villages, support camps, and other camps in a precise, planned, orderly manner throughout Black Rock City. In 2016, Placement placed a total of 1,359 camps including 892 theme camps, 68 villages, and 90 art support camps, 27 works support camps, and 48 Mutant Vehicle camps. Communication to camps begins with the spring Theme Camp Symposium, which changed format in 2016 and continued with newsletters, email lists, groups on Facebook and email. Coordination with the Government Relations, Outside Services, and Technology departments was highly successful in 2016. The logistics highlight of the year was providing sufficient pre-event transportation for the team to complete their work efficiently and in a timely manner.  The Placement Flagging team used more flags than ever (over 14,000) and finished ahead of schedule in 2016.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04665

### ii.  Department of Mutant Vehicles (DMV)

Burning Man is a bicycle city. Once participants park their vehicle at their camp site, they are not allowed to drive it until they depart. The only vehicles allowed to travel the City (besides staff, government and emergency vehicles) are Mutant Vehicles. BRC's Department of Mutant Vehicles (DMV) registers and manages these vehicles that are transformed into art work in order to be considered for a DMV driving pass. In 2016, 624 Mutant Vehicles applied to be inspected on the playa for a driving pass, but only 445 received a sticker. The DMV received 346 disabled driving pass applications, but only 240 total disabled driving passes were issued due to a typical annual attrition rate. It is challenging for many to follow through with their intent to bring or build a Mutant Vehicle.

A Deep-playa Music Zone or "DMZ" was once again established to mitigate the impact of large gatherings centered around Mutant Vehicles. Three banks of portapotties were stationed 5,000 feet from the Man in an arch between City clock positions 10:40 and 11:10. While Mutant Vehicles are asked to stay mobile with short stops in all other areas of of the deep playa, this zone allows for longer stops with sanitation and medical services nearby.

BRC saw a marked reduction in the amount of human waste in the DMZ in 2016. We owe this improvement to communication to and cooperation with the large Mutant Vehicles using the zone, who have also taken responsibility to remove waste themselves.

BRC's driving safety precautions, mutant vehicle and trailer guidelines, laser and walker rules are all included in the 2016 Operations Plan. In 2016, BRC's Black Rock Rangers Intercept team traveled the City via bike, truck and UTV to enforce these rules and regulations and reported issues to the DMV as appropriate. There were no serious accidents with any Mutant Vehicle in 2016.

### iii.  Population Reporting

Burning Man's paid participant number peaked at 67,290 on Friday, September 2, 2016, at 11:30 am. BRC's Population Reporting and Metrics (PRAM) tool began sending daily notification emails on Monday, August 22, 2016, the week before the event opened. BLM, PCSO, and BRC were also able to access populations statistics via a web interface that auto-updated every fifteen minutes. PRAM provided daily email reports and pages to a specified recipient list. PRAM provided three categories of population scanned by BRC using BRC's ticket vendor's system and equipment: Paid Participant scans, Staff scans (Exempt), and Children 12 and Under scans (Exempt). Midweek and pre-event, BLM requested that PRAM send notifications four times daily; BRC complied.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04666

_____

When paid participant population numbers hit the 66,500 threshold on Thursday afternoon, PRAM emails and pagers sent notification every fifteen minutes. This was the same protocol followed in 2015, but BLM and BRC staff agreed in 2016 that the threshold population should be changed to a higher number in future years. BLM and Pershing County requested that they be removed from pager notification entirely in future years.

PRAM was operational until Exodus began on Saturday of the Man burn (September 3). To calculate the population of participants during this departure period, BRC installed vehicle scanners at each lane of the Gate to count vehicles departing from the City. Then BRC multiplied the number of vehicles by the 2016 vehicle occupancy rate. Because of the complexity of the data points, the algorithms required to calculate vehicle size as well as occupancy, and the need to clean the data, the Exodus vehicle counts were not able to be integrated in PRAM in real time. Exodus numbers were included in BRC's post-event population report submitted to BLM on November 3, 2016.

BLM found BRC compliant overall in their SRP Annual Evaluation, but under the Required Reporting section, BLM noted the exodus reporting mechanism needs to be better developed and brought into alignment with PRAM; BRC failed to start our population reporting emails on August 5, 2016; and BRC's final report failed to start on August 5, 2016. BRC began reporting on August 9, the date BRC's gate became operational. BRC can correct these reporting issues in 2017.  BRC recommends reviewing and discussing the Exodus vehicle counting process with BLM. This was the first year that BRC relied on vehicle counters for Exodus population calculations; while BRC considers the system a success, we were unable to integrate the Exodus counts into PRAM in real time.

### iv. Sanitation

In 2016, BRC hired vendor United Site Services (USS) to deploy approximately 1600 portapotties throughout the City, as well as 90 along Gate Road. Each bank was installed with hand sanitizer. Keeping hand sanitizer stocked continued to be an issue in 2016, but much less so than in the past. BRC deployed 4 dispensers at each end of all major banks. Banks and hand sanitizer levels were checked three times a day. The Health Department worked closely with BRC liaisons and USS to ensure portapotties met state health standards.

USS was on site from August 10 through September 15, 2016, and provided 54 service trucks capable of septage vacuum; six pickup and delivery trucks; two water trucks; six tractor trailers for pickup and delivery; and miscellaneous other vehicles. The vendor staff lived on site at USS "Camp Clean" located at 7:00 and L. USS built out an office with computers and wifi to connect

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04667

to its Reno headquarters. BRC provided radios to ensure communication with event production staff.

In addition, USS provided private camp sales and services, RV service, portable toilets, graywater, tanks and showers to participants. USS obtained a separate SRP from BLM for this work. The USS dispatch office was open from 8 am in 8 pm daily. USS contingency plan and protocols were included in the 2016 Operations Plan (attached).

In 2016, USS was called repeatedly to respond to human waste issues that were not necessarily related to the potty banks they serviced. A particular area of concern was along the back block on the 9:00 side of the City, where BRC tested a new parking layout. This was addressed at the time with the placement of several potties as a stopgap.

A full review of human waste removal protocols is recommended. Reports of damaged potties increased in 2016; BRC needs to develop outreach and consider how to better engage participants in potty care.

### v.  Transportation Management

Transportation management to and from the event is the most stipulated subject in the Burning Man SRP. Twelve SRP stipulations describe mitigations required to manage vehicles traveling to and from the event. Analysis from the 2012-2016 Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) identified traffic as the number one limiting factor to growth of the Burning Man event. Participants driving to Black Rock City must travel 90 miles down a two-lane highway. Delays, vendors and fuel stations all impact the speed of the journey during peak ingress-egress periods of the event. Peak Ingress travel times are typically Sunday and Monday of event opening, and peak exodus travel times are Sunday and Monday of Labor Day weekend.

### a.  BRC Road Operations

In 2016, there were no major traffic delays along SR 447 and CR 34 during Burning Man. The traffic flow stayed steady and there were few issues along the ingress-egress route. The traffic was better in 2016 than in the prior three years. A significant part of this improvement was due to returning the Gate opening time to midnight, but BRC also implemented multiple changes to arrivals this year, including a significant increase in early arrivals passes on Saturday for work teams and an increase in messaging that encourages participants to travel at off-peak times. BRC also built incentives into our Burner Express Bus program that caused bus ridership to increase by 25% over 2015. The success of BRC's 2016 transportation management plan has been noted by all of BRC's cooperator agencies.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04668

BRC operated a Traffic Operations Center (TOC) 24/7 during Ingress and Egress days. Cooperators and vendors were able to call or email TOC staff and inform BRC of any obstructions on the road. Messages were relayed to participants in real time as the TOC maintained communications with participants via Twitter and Burning Man Information Radio (BMIR).  In addition to managing traffic communications, the TOC team deployed BRC flaggers to support Washoe County Road Department when Washoe County Sheriff's Office repaired potholes during the event. Overall coordination was good. The TOC was a good idea, used by many cooperator agencies, and the ability to communicate about obstructions in the road was helpful to both BRC and agencies.

BRC's Gate Perimeter and Exodus (GPE) staff members, a crew of 600, worked closely with BRC's ticket vendor and Box Office department to verify credentials and scan tickets, early arrival passes and vehicle passes. GPE was operational from August 9 through September 8, 2016, and during the event, GPE worked with BLM to ensure no one entered into the event site illegally. During Exodus, GPE metered and pulsed participant vehicles exiting 8 Mile to keep traffic in Gerlach and along SR 447 moving. During the Missing Child Tier 1 Activation of Sunday, September 4, GPE held traffic up until BLM and PCSO began scanning and searching vehicles. GPE has requested a review of the Missing Child Gate Closure protocols in light of its impact to Exodus traffic.

BRC employed a local vendor to manage all flagging operations along SR 447 and CR 34 before, during and after the event. Flagging permits were approved by NDOT, NHP, PLPT and WCSO. Flagging operations during Ingress were staged at the Empire Store, Gerlach Gas Station and the 8 Mile entrance to the Black Rock desert. During Exodus, flagging operations ran at the Gerlach Y, Gerlach Gas Station, Empire Gas Station and the 447-445 Intersection in Wadsworth. A full description of operations is in the 2016 Operations Plan.  BRC may want to expand the flagging operation times in 2017.

### b.  Burner Express Air & NV88 Operations

In 2016, BRC contracted with Advantage Flight Solutions (AFS) to manage all charter operations at the BRC Municipal Airport. AFS subcontracted with 12 charter companies and managed multiple flight operations, ensuring valid insurance and pilot licenses. AFS also brought 19-seat and 29-seat planes to increase participant occupancy per flight.  A webpage on the Burning Man domain was built for ticketing and BRC named the program Burner Express Air. AFS worked closely with BLM vending leads to maintain transparency and accuracy in SRP and commercial use fees. In order to bring in larger planes, BRC's runways had to be expanded and BLM's vending lead worked closely with BRC Airport, AFS, FAA, and external engineers to ensure the playa surface would not be damaged with an expanded runway. While there is room

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04669

for improvement, overall the 2016 Burner Express Air operations were a success.  BRC will work closely with BLM as we plan for 2017 airport charter operations.

The goal of the Burner Express Air program was to reduce the number of landings and takeoffs, while increasing the amount of Burning Man participants traveling to the event via plane. The table below shows the difference between 2015 and 2016 air traffic and participant arrivals.

**Black Rock City Airport Traffic**

| Year | Landings | Takeoffs | Scenic Flights | Population Served |
|------|----------|----------|----------------|-------------------|
| 2015 | 1373 | 1355 | 349 | 2043 |
| 2016 | 1287 | 1192 | 627 | 2565 |
| **Difference** | **-86** | **-163** | **+278** | **+522** |

Even though the number of scenic flights doubled in 2016, BRC was still able to reduce the number of landings and takeoffs.  And with the reduction of landings and takeoffs, 522 more participants arrived at the event via the Airport in 2016. BRC's Box Office reported 2,565 participant gate use fees sold at the Airport, compared with 2,043 sold in 2015. This difference was due to the increase in carrying capacity of the larger charter planes. Thus, BRC achieved our goal of reducing flights but increasing participants numbers with the Burner Express Air program.

One challenge to the new Burner Express Air program was an increase in driving to and from the Airport. More people drove directly from their camp to pick up their friends and family at the BRC Airport despite lacking a driving sticker for their vehicle. BRC deployed staff during the event to manage these driving issues and will address this in the future through more proactive communications.

### c.  Burner Express Bus

Burner Express Bus (BXB) hit its stride in 2016. Now in its fourth year, BXB ridership increased by 26% over 2015, with a total of 9103 inbound and outbound tickets sold. The BXB program had a pretty typical attrition rate, with approximately 6 percent of ticket buyers not showing up at the embarkation site due to having secured ridership by other means. In 2016, BXB picked up inbound passengers from Reno at the Reno Airport and  from San Francisco  at the downtown Civic Center. Inside Black Rock City, the BXB depot spanned a full block at 6:15 and K. Outbound and inbound buses were managed by the BusBank, a vendor that secured a separate SRP with BLM, and has been working with BRC since 2013.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04670

In 2016, BRC added multiple incentive programs for BXB ridership: providing pre-purchased water onsite, selling a limited number of dedicated Black Rock City  entry tickets to BXB riders; and granting up to 1,000 BXB passengers early arrival status on Saturday pre-event. BXB water sales were a success and are being considered for next year. BRC plans to continue with incentive programs and creating opportunities for expansion within BXB. The BXB program is a great one, as it takes cars off the road and helps ease traffic congestion.Since BXB's inception in 2013, ridership has steadily grown.

### vi.  Playa Restoration & Post-Event Inspection

Burning Man is a Leave No Trace event. Not only are all participants expected to pack in what they pack out, but BRC, as the SRP holder, is expected to leave the event site clean and usable for the public's enjoyment within a month of the event's end. The team responsible for the post-event clean up initiative is called Playa Restoration, and two weeks after the 2016 event ended and all heavy machinery had been removed, 133 Playa Restoration team members spent two weeks walking every inch of Black Rock City, scanning the playa dust for Matter Out of Place, or "MOOP," a BRC-coined term. In the first week of October, BLM  conducted a post-event site inspection, sampling random sites on the 9 square miles that BRC is responsible for cleaning. BRC has never failed the test, and as usual, passed the 2016 Burning Man Post-Event Inspection.

For the first time in 2016, Playa Restoration collaborated with other departments during the event, working with the LNT Compliance (LNT-C) program to remediate sites and mitigate environmental issues found in theme camps. The LNT-C program is described in the compliance section of this document, but on Wednesday post-event, the Trash Train, a Playa Restoration program that measures and mitigates waste left behind by participants, noticed significant reductions in waste. BRC believes this may have been related to the increase in outreach and public communications by the LNT-C team throughout the event. Also starting on Wednesday post-event, Playa Restoration's Highway Clean Up crews travelled the roads of CR 34 and SR 447 picking up waste that flew off of departing vehicles. The Highway Clean Up crews reported they collected half the amount of waste left on the roads than in 2015. In 2016, large waste left behind by participants diminished.  BRC continues to acculturate participants on the impacts of even their smallest waste. BRC's participants care about the environment and want to do their best to contribute to the largest Leave No trace Event in the world. Playa Restoration's goal for 2017 is to increase community participation levels and reduce the amount of micro MOOP.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04671

_____

### III.   INTERAGENCY OPERATIONS

### A.   Planning & Permitting

#### i.   Special Recreation Permit, Closure Order & Stipulations

**SRP**

On August 2, 2016, BLM Winnemucca District, Black Rock Field Office Manager William Mack signed a Special Recreation Permit authorizing the Burning Man event to be held on public lands in the Black Rock Desert. The SRP allowed for a peak population of 70,000 participants, the expansion of Black Rock City Airport runway schematics to enable Dash 8 and Beechcraft 1900 aircraft landings, and event dates of August 28 through September 5, 2016.

The Closure Order for the Burning Man event went into effect on August 1, 2016, but the SRP was not signed until August 2, 2016. This delay impacted BRC's production schedule, as BRC was not allowed to place buildings or tools on site until the day after the SRP was signed. BRC has a tight production schedule and depends on every day of our 28-day build cycle. While inclement weather is always considered in production planning, starting operations on the third day of the closure impacted BRC adversely because it restricted operational flexibility in later weeks.

The SRP signature had been delayed because BRC could not sign the final Cost Recovery Agreement due to unanswered questions about the costs. BRC questioned the rationale for and the costs of many BLM government contracts and operations throughout the 2016 planning season. Discussions about BLM requirements went well into late July. In the future, BRC and BLM should discuss and agree to key permit-related costs sooner in the planning period.

**Closure Order**

In May 2016, without informing BRC, BLM reorganized the Burning Man Closure Order content and created a new section called Environmental Resource Management and Protection. This new section reorganized 2015 Closure Order language banning wastewater, human waste, fireworks, burns and littering but also included new language that was not reviewed with BRC before publishing. In 2016, BLM inserted bans on black water, hazardous materials, and vehicle oil leaks and strict rules for fuel storage and water disposal into the Closure Order. While much of this language was taken directly from BRC's website, it was taken without permission and was not discussed with BRC. This caused problems when BRC revised our environmental protection policies over the winter and changed our website pages in the spring, bringing BRC's

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04672

policy unwittingly into conflict with 2016 Closure Order regulations. BRC and BLM discussed this issue when the Closure Order was published in the summer and came up with solutions that temporarily fixed the disconnect for on-playa enforcement, but BRC and BLM need to align on Closure Order language before this regulatory document is published in the future.

BRC continues to object to unnecessary language in the Closure Order that duplicates Nevada state or Federal laws relating to driving and motor vehicle safety. BRC remains unclear on the rationale for including language about, for example, possessing a valid registration, driver's license, or functioning taillights, given that these  are mandated by existing law, regardless of whether the  Closure Order is in effect.

**Stipulations**

Attached to the Burning Man SRP are 60 special stipulations across six categories:
- General (25)
- Coordination (10)
- Fee Schedule (3)
- Sanitation (4)
- Traffic Management (12)
- Compliance Inspections (6)

In 2016, there were only three changes to the stipulations:
1. General #3: (NEW) Early Arrival scanned passes must be reported to BLM.
2. General #7: (NEW) Main gate allowed to open at 12:01 am on Sunday, August 28
3. Coordination #26: (CHANGE) BLM Representatives. William Mack - Authorized Official. Logan Briscoe - Law Enforcement.

**General Stipulation #3**: BRC recommends removing the early arrival reporting stipulation because early arrival scanned passes are not required for all persons entering the site pre-event. For instance, staff with wristband credentials do not need to carry early arrival passes because their credential is attached already to an early arrival arrival date, while participants, staff and build crews who enter the event site early with a ticket must have an early arrival pass. To manage population reporting pre-event, BRC reports both staff credentials and ticket numbers to BLM. Therefore, to BRC, a separate early arrival scanned pass report is not useful for counting population on site pre-event. We are unclear as to why BLM wants early arrival population counting, when population reporting based on actual entry with tickets and staff credentials is accurate.

**General Stipulation #7:** The opening of the main Gate at 12:01 am on Sunday, August 28, 2016, was a success. BRC recommends keeping the midnight opening stipulation. Up until

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

three years ago, BRC always opened the gates at midnight.  Over the past three years, the Gate has opened at :;00 pm, noon, and 10:00 am, respectively, and each year the traffic congestion on that first day of the event has increased. In the spring of 2016, BRC proposed returning to a midnight opening and BLM agreed. As a result, more participants arrived in Black Rock City on Sunday than the year before, but the traffic was smooth - as a twenty four hour ingress period distributed the traveling population more evenly. BRC also communicated with participants through all channels to ensure safe driving and to encourage driving at off-peak hours. BRC's cooperating agencies all agreed that traffic was better on that Sunday then in the past three years.

**Coordination Stipulation #26:**  William Mack's leadership changed the entire tone of our work on playa and at the Joint Operations Center. LE and Civilian staff were collaborative, respectful and clear with their boundaries. BRC and BLM agreed to disagree in some instances, but always put the public health and safety of the participants first. Excellent first year under William Mack's leadership.

### ii.  Cost Recovery, MOU & Proffer Accounts

**Cost Recovery**

In 2016, BLM required for the first time a **Planning Cost Recovery Agreement** (CRA) before the agency would begin planning the Burning Man event. The Planning CRA was delayed until May. BRC did not have adequate access to BLM during this time. BRC supports this type of agreement in the future if it means planning will not be interrupted or delayed. Once the Planning CRA was signed, BLM began joint planning with BRC.

Despite the challenges of a very short planning season, planning between BLM and BRC was successful and collaborative. In 2016, BLM and BRC experienced more cooperation and better communication than BRC can ever remember. There is still work to be done to improve operations and bring down BLM's costs, but BRC is confident in our ability to move forward together with BLM.

In 2016, BLM costs went down for the first time in Burning Man history. BLM reportedly reduced its labor **Table of Organization** (TO) by 14 persons and saved an estimated $250,000 through additional efficiencies. This quarter of a million dollar figure is an estimate at the time of this writing because BLM has not yet submitted its final decision for the 2016 Cost Recovery Account.

The reduction in BLM's TO did not lead to additional public health and safety problems, traffic accidents, or safety incidents. Any and all issues were addressed quickly and satisfactorily. In

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04674

fact, the 2016 Burning Man event was extremely successful and safe. BRC interprets this result to indicate that these reduced levels of BLM personnel are closer to what is actually needed to monitor and manage the SRP. We recommend work continue on this front, with additional efficiencies to be found for 2017.

BRC is still finalizing its accounting for the 2016 event, but here is a current (12/20/16) **summary of monies paid to BLM**:

- $2,199,959 for Cost Recovery Account signed in August 2016
- $972,133 for statements of work (SOWs) to build and staff BLM facilities and provide BLM resources including food, fuel, sanitation, vehicles, buildings, technology, equipment, and supplies
- $197,818 for the two proffer accounts that pay for BLM's year-round staff: Project Manager and Outdoor Recreation Planner

The total of these costs is $3,369,907. Final accounting may change this sum. This sum does not include the fees BRC pays annually to BLM as the SRP commercial use fee, which in 2016 will total approximately $1.1 million. The total paid by BRC to BLM in commercial use fees over the past six years is more than $5 million. BRC believes BLM should pay for administration of commercial use permits with the fees it receives from commercial use permits. This money should come from the 3% of gross revenues it gets from the Burning Man SRP and the SRPs of the vendors BLM permits at or near the Burning Man event, not from BRC's Cost Recovery or Proffer accounts.

On February 24, 2016, **BRC appealed BLM's 2015 Cost Recovery Decision** to the Interior Board of Land Appeals (IBLA). Briefing on the appeal was completed July 26, and the parties are awaiting action by the IBLA. Many of the costs that we appealed were required by BLM again in 2016, and BRC still doubts their validity. Much of our doubt stems from the dearth of information we receive from BLM about expenditures for labor, travel, and other charges assessed through cost recovery. Without this information, BRC has no way to understand whether these costs are warranted, and BLM has no way to justify them. We are hoping that the IBLA's decision will benefit BLM, BRC and other users of public land by providing more guidance for Cost Recovery planning.

While BRC appreciates BLM's self-identified savings between 2015 and 2016, BRC still has significant concerns about BLM's expenditures and requirements for the Burning Man SRP, in cost recovery and beyond. BRC would like to discuss these requirements with BLM during 2017 planning, and greatly appreciates the information we have received from BLM through the 2016 planning season and on-playa meetings. **It is BRC's goal to understand why all of BLM's**

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04675

**requirements exist for the Burning Man event and to align with BLM to the maximum extent possible**. Some of the areas of concern are:

- Size and scale of BLM's Joint Operations Center (JOC)
- Emergency event designation
- Satellite tracking devices for every BLM employee
- Federal and county private medical operations
- Compliance staff
- LE staffing and labor
- Communications and technical equipment

BLM has advised BRC that **Burning Man was designated an emergency event** in 2012 and every year since, the same designation applied to wildfires, hurricanes, and floods. This makes little sense, as Burning Man is cooperatively planned 12 months in advance. When Burning Man was originally designated an emergency event, allegedly by OLES, BLM's labor fees increased by $700,000 in one year and have stayed at those elevated levels. BRC has requested documentation about this designation for years, and multiple times in the past year, but the information has never been given to us. BRC wants to support the designation if it makes sense and is justified, but needs documentation to understand the basis for it.

**Statements of Work (SOWs) & Government Contracts**

With new contracts in 2016 for utility terrain vehicles (UTV), 16 law enforcement dispatchers and a new INET/CAD system, BLM SOWs cost BRC $972,133 in 2016. These costs represent a $250,000 increase over the $708,444 in SOW costs in 2015, and a $472,000 increase over the $600,000 that BRC paid in 2014, the first year of the SOW program. In 2014, BRC and BLM signed a multi-year Memorandum of Understanding (MOU), which created the framework for BRC to contract directly with the vendors that build out BLM's event infrastructure. The intent was to reduce costs by leveraging BRC's operational expertise and vendor relationships, and to BRC the approximately 23% of added costs that result from BLM's indirect administrative cost rate (IACR). Over the years, the costs of the SOWs have increased, but both parties agree that fundamentally the MOU is useful. The MOU expires in 2016 and will need to be rewritten and revised for 2017.

In 2016, BRC and BLM converted three of BLM's government contracts to SOWs in order to reduce costs and increase efficiency: UTVs, Dispatch and INET/CAD.  Under Cost Recovery in 2015, BRC paid BLM $384,573 for these contracts, including the 23% IACR. In 2016, BRC paid $369,719 directly to the vendors without the IACR, saving approximately $15,000. This small amount of savings is not because BLM reduced its infrastructure. In fact, BLM's UTV vehicular costs increased significantly due to late coordination and vendor requirements from BLM; BLM

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04676

added dispatchers explicitly for Pershing County and required professional outsourcing of the dispatch function; and BRC did not save money by taking on the dispatch contract. All savings from these contracts were because of the removal of the IACR.

In 2015 and in 2016, BRC fulfilled SOWs in food, fuel, sanitation, lodging, facilities and facility support for BLM's operations. In 2015, public outcry about BLM overspending at Burning Man caused BLM to reduce its initial SOW requirements, and in 2016 BLM reduced spending when BRC submitted proposals for new programs and infrastructure efficiencies. Both parties believe we are on a successful track. BRC plans to propose additional efficiencies for 2017 and looks forward to working with BLM during 2017 planning. Importantly, BRC wants to discuss and negotiate the terms of the SOWs and government contracts early, so that these decisions are not left for late July.

BRC remains highly concerned about being required to pay for separate Pershing County assets and resources through BLM cost recovery and SOWs. In 2016 BLM required BRC to pay for a dedicated dispatcher and CAD data entry for PCSO, even though PCSO is integrated with BLM for law enforcement. These assets and resources were not required in previous years, and there have been no incidents that would warrant the change. BRC believes these costs and requirements were unjustified. When BLM began integrating with Pershing County, it told BRC that there would be no additional costs. In 2015 BLM required BRC to buy 60 VHS radios with AES Encryption for BLM law enforcement at a cost of $83,000. After the 2015 event, on April 14, 2016, BLM told BRC they did not need these radios and intended that BRC issue the radios to PCSO. The initial requirement seemed excessive - that a private organization buy radios for a federal agency - as does BLM's revised intent - a federal agency allocating the assets of a private organization to a county agency.

**Proffer Accounts**

BRC has funded two BLM proffer account positions since 2014: **Burning Man Outdoor Recreation Planner (ORP)** and **Burning Man Project Manager (PM)**. BLM supervises these full time, year round positions but BRC pays for them. When creating these roles, BLM advised BRC the proffer account positions would save BRC money by removing these labor charges from Cost Recovery and eliminating the associated indirect cost rate, and would enable continuity for year round work on the Burning Man event.

Since their inception, these two positions have not been functional at the same time. In the spring of 2014, BLM hired the PM position. One year later, in the summer of 2015, an ORP joined the staff and began a multi-month training. In December 2015, the existing PM left. A new PM joined in the summer of 2016 and began a multi-month training. So for the first year (2014), there was only one BLM year round proffer position, which started in the summer; the next year

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04677

the second proffer position started training at the 2015 event; and in 2016, the BLM planning team functioned with only the ORP. In the almost three years of this program, the majority of the work for two roles has been completed by one person, and there has not been the continuity BRC or BLM hoped. Turnover has been steady, and staffing has changed each year. BLM does not need two full-time year-round proffer positions to manage the Burning Man event.

BRC still strongly questions the rationale of BRC paying for an ORP whose year round task is to register and manage SRPs for approximately 70 vendors operating on the Black Rock Desert during Burning Man, considering that BLM collects money directly from the vendors. BLM has informed BRC that these vendors pay BLM approximately $300,000 in commercial use fees each year. On top of these funds, BLM collects approximately $1.1 million dollars from BRC in annual commercial use fees. Per BRC's understanding of the regulations, this money must go directly back into the management and administration of the Recreation Fee Program. BRC cannot understand why a portion of the BRC and vendor commercial use fees does not pay for the ORP position, nor can BRC believe that managing 70 small SRPs is full time, year-round work. The SRP's of third-party vendors are completely separate from BRC's SRP and BRC should not be responsible for paying any costs associated with these other SRPs.  BRC helps facilitate the administration of 53 of these 70 vendor SRPs through its own compliance team, which manages on-playa vending and requires any vendor operating at Burning Man to provide evidence of a BLM SRP in advance.

Throughout 2016, BRC has questioned the verifiable workload of both the PM and the ORP. BLM provides work logs to BRC each quarter with vague weekly and daily activities. BLM has offered to make adjustments and provide more details, but the information BLM has provided is not sufficient to fulfill BLM's legal obligation or to answer BRC's questions about tasks performed and time spent on these positions.  If BRC cancels these contracts then the work would need to be justified and documented according to strict cost recovery deadlines.

BLM has recently informed BRC that a year round Law Enforcement position will be joining the BLM team in 2017, and BRC will be required to pay for 60% of the workload through a third proffer account or through cost recovery. BLM has informed BRC that we will have to fund this position even though the employee will be in training for the entire event season. BRC objects to paying for the training of a year round position that was developed without consultation with BRC.

### iii.   Compliance Programs & Protocols

BRC successfully managed the environmental and vending compliance programs in 2016. In prior years, BLM provided the technology and staff to partner with BRC on these initiatives, but this year BLM stepped back into a monitoring position. BRC appreciates BLM's willingness to

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04678

leave BRC to manage this program. As a result, BLM cut six compliance positions, and BRC expanded our volunteer base, as well as our technology and database management. BRC staff patrolled the city daily, documenting and mitigating participant and vendor issues. The program was deemed a success by BLM and BRC. BRC looks forward to building on the success of the 2016 program and reviewing the need for BLM compliance positions in the 2017 BLM Table of Organization.

### a. Environmental

The mission of BRC's Environmental Compliance team is to ensure Burning Man's compliance with SRP requirements and to promote Leave No Trace principles amongst participants and staff. These efforts reflect a shared commitment by BLM, BRC, and numerous other partners and volunteers. By educating Burners about playa-specific LNT ethics and how they can take personal responsibility for addressing environmental issues, the Compliance team actively promotes the Burning Man Principles of Radical Self-Reliance, Communal Effort, Civic Responsibility, Participation, and Immediacy.

Every morning of the event, eight 2-person teams of Earth Guardian volunteers canvassed Black Rock City in golf carts to promote LNT ethics and monitor and document violations of environmentally-related SRP stipulations. Every afternoon Black Rock Rangers partnered with Earth Guardian volunteers to revisit the violation sites and ensure all LNT issues had been appropriately addressed. When items needed immediate adjudication, the BRC compliance manager would radio BRC dispatch and call the appropriate BRC services to respond (fuel, fire, heat, housing, etc).

For the first time, BRC provided GPS tracking and environmental compliance documentation to volunteer teams using the FULCRUM application, which enables intuitive tablet application design, data visualization, and incorporation into GIS programs. BRC LNT Compliance team volunteers used GPS-enabled Tablets loaded with the FULCRUM application to document LNT issues and take georeferenced pictures, and this program tracked the mitigation of environmental issues ranging from blackwater to vehicle oil drips during the event week and Exodus. In 2016, 647 issues were identified, 535 issues were adjudicated, and 19 issues were not relocated. Ninety-three issues were not adjudicated before the end of the event, of which 85% were related to fuel storage and small gray and black water leaks (33%, 39%, and 11%, respectively). These 93 issues were successfully adjudicated after the event by the Playa Restoration team. During the event, BRC's overall adjudication rate was 83%, a significant increase from the 2015 team's adjudication rate of 70%.

BRC initiated a new team within LNT Compliance, named the Scooby Doos, which bridged environmental and vending compliance. In coordination with the Outside Services (OSS),

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04679

2016
Black Rock City LLC
BURNING MAN AFTER ACTION REPORT

_____

Placement, GPE, and BLM Vending teams, the Scooby Doos visited camps and educated participants on LNT principles and investigated potential unpermitted vending. They often led large MOOP talks and performed outreach to nearly 1,000 participants. Additionally, the successful impact of vendor outreach at McKinley Park in 2015 was evident in 2016, as there were very few environmental issues with vendor assets within the staging area.

**Environmental Compliance Categories**

| Category | % of total issues reported |
|---|---|
| Black water | 3.85% |
| Burn containment | 1.12% |
| DG/Art burn | 0.32% |
| Feces | 0.96% |
| Fuel storage | 55.86% |
| Fuel leak/spill | 16.69% |
| Gray water | 10.27% |
| MOOP | 0.96% |
| Other (transmission fluid, hydraulic fluid, large water spill) | 5.62% |

The most common environmental issue identified was improper fuel storage (55.86%). BRC and BLM should work together to fix the Closure Order issues described above in section III.a.1, and align communications about best practices in fuel storage and disposal of cooler water. BRC's Playa Restoration, ESD Hazmat, DPW and Heavy Equipment teams were excellent partners, and their involvement required LNT Compliance team to refine response protocols. For the full Environmental Compliance protocol, see the 2016 Operations Plan (attached).

**b. Vending**

BRC's Outside Services (OSS) program regulated access to the event for qualifying service providers supporting art projects and theme camps. Service providers participating in the OSS program are required to operate with cultural integrity, to respect commercial and environmental compliance regulations, and to have minimal impact on event infrastructure. Every OSS provider was required to register with BLM and obtain an SRP in order to be granted a contract with BRC. BRC and BLM worked closely together before and during the event to ensure compliance. For full details on the coordinated effort, see the 2016 Operations Plan (attached).

OSS had a successful year working with BLM to manage and comply with the SRP Stipulations and the Vending Compliance Protocol. BLM was very responsive to any issues that arose. Working closely with BLM onsite led to quick resolution of any non-compliance issues, and

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04680

having BRC-BLM daily meetings kept all on the compliance team aware of the issues that we were facing.

In 2016, BRC registered 53 OSS providers across the following delivery categories: RV rental, generators, heavy equipment, domes/yurts, produce/food, delivery, art car, and portable building. These providers purchased 248 entry credentials and 188 vehicle passes, and delivered:

- 169 RVs
- 266 generators
- 766 other items

In addition, six OSS providers  were certified Potable Water Haulers, and one was a sanitation provider. Additional unregistered commercial service providers, which were brought into compliance on site and mostly discovered post-event, are not included in the above numbers. BLM and BRC's total vending numbers numbers are slightly different due to BLM's onsite compliance program.

The following items need to be discussed by the 2017 Planning Team:

1. **Post-Event Reporting Process.** There was no written stipulation or guidance in the Vending Compliance Protocol that stated exactly what was going to be required in a post-event report to BLM.  BLM asked the OSS team to provide information about the OSS providers that was not clearly stipulated in any of the written agreements, causing much confusion between BLM, and BRC's OSS and Operations teams.
2. **Process for BLM Law Enforcement to Evict Non-Compliant Vending.** Having a process or written Standard Operating Procedure (SOP) for both BLM compliance and OSS/BRC personnel to follow would have made it much easier to remove violators from the event in an efficient and non-confrontational manner. It took a lot of questions and extra man power from both sides to complete the process.
3. **Reporting Standards for Compliance Meetings.** Post-event, BRC received feedback from BLM that BRC/OSS did not complete the necessary daily reporting process. However, BRC and BLM had daily Compliance meetings in which BRC reported the issues of the day and any citations that were issued, and we discussed any processes or problems that needed to be remedied. It was not specified if OSS or BLM needed to make a daily "report" from each of these meetings, however, all of the issues that were discussed did get resolved from the perspective of both BLM and BRC.
4. **Sit Stat Reporting Requirements.** Every morning, BLM required OSS to submit data about how many vendors were contacted, but did not provide guidance of what "contact" meant.  Was OSS supposed to include in the SitStat report each of the many vendors it

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04681

_____

contacted every day, or only those vendors found to be non-compliant? "Contact" needs a clearer definition, as vendors approach our OSS windows all day long at Point One, and each of these could be considered a "contact" unless this term is narrowed. Knowing WHY BLM is requiring this report would help OSS and BRC better understand what should and should not be reported.

5. **OSS Categorization - BLM Reporting.**  OSS needs to have a better breakdown of the "Delivered Item" category to better understand the types of items being delivered and the trends from each year. For example, there was some confusion as to whether heavy equipment was a "Delivered Item," so there was no way to differentiate that equipment from from containers or travel trailers. As heavy equipment poses a greater environmental risk than other items, it would benefit both BLM and BRC to be able to identify how many pieces are on site going through the OSS program.

Overall, working with the BLM Compliance team was very smooth and most problems got resolved quickly. The problems that took more time were heavily discussed in the daily compliance meetings, as was required by our Protocol and permit stipulations.  Also, the feedback from OSS providers indicated overwhelming satisfaction with BLM in the SRP permitting process, most rating the experience a 9 or 10 out of 10.

### c. Media

BLM and BRC will need to work to develop a media program plan for 2017 so that BLM understands BRC's process for registering and managing filming, photography, and other media production conducted at the event. Most of the media production teams on site are amatuer or non-commercial, but when a commercial project operates at Burning Man, it should obtain a BLM filming permit.

### iv.  Agency Cooperators

BRC works year round to plan, contract and coordinate with stakeholder agencies that have jurisdiction over the public health and safety of the event and surrounding communities in Northern Nevada. This coordination involves protocol review and meetings before, during, and after the event.

**Ongoing Agency Cooperators**

1. Pershing County Sheriff's Office (PCSO)
2. Pyramid Lake Paiute Tribe (PLPT)
3. Washoe County Sheriff's Office (WCSO)
4. Nevada Department of Transportation (NDOT)

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04682

5.  Federal Aviation Administration (FAA)
6.  Gerlach Volunteer Fire Department (GVFD)
7.  Washoe County Road Department (WCRD)
8.  Nevada Highway Patrol (NHP)
9.  Nevada State Health Department (NSHD)

**New Agencies for 2016:**

- In January, Truckee Meadow Fire Protection (TMFP) and Washoe County Emergency Operations Center (WC EOC) became responsible for managing the Gerlach Volunteer Fire Department. With new leadership and staff in place, it became clear that pre-event coordination would help align protocols and communications during the Burning Man event.

**B.  Interagency Emergency Operations, Protocols & Procedures**

BRC's interagency emergency protocols and procedures are documented in the 2016 Burning Man Operations Plan (attached). The Operations Plan is a living document, updated and distributed each year through digital sharing and flash drives. Print copies are provided upon request. Stakeholders provide multiple reviews and edits throughout the year. The 2016 Operations Plan reflects BRC's Unified Command best practices refined annually through collaboration during planning and at the event.

### i.  Joint Operations Center (JOC)

The area on playa that serves as the headquarters for BLM Civilian Operations and Law Enforcement, PCSO, and BRC's ESD Dispatch and Communications, was renamed in 2016 to the Joint Operations Center (JOC), in recognition of the cooperation and scope of operations taking place there. The JOC included all BLM buildings and functions, including buildings shared with PCSO.

### ii.  Daily Coordination & the Emergency Operations Center (EOC)

The Interagency Daily Meeting Schedule in the 2016 Operations Plan describes the daily coordination between agencies built into the event schedule. Before, during and after the event, BRC leadership met with Unified Command staff at the Emergency Operations Center to address public health and safety issues. Here is a list of the standing daily meetings for public health and safety stakeholders:

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04683

- 9:00 am – Black Rock Rangers, PCSO, and BLM LE
- 9:30 am – BRC ESD, BRC's ALS provider, and BRC's fire vendors
- 10:00 am – BRC ESD and sanitation liaison, ALS Medical Director, Nevada State Health Department
- 1:00 pm – Unified Command Staff (Tier 1)
  - BLM: multiple representatives including the Authorized Official, Law Enforcement leadership and shift leads, Civilian, Compliance, Communications and Logistics leads
  - BRC: Event Operations, Rangers, ESD, Safety, Government Relations, other staff leads as necessary
  - PCSO
  - BRC ALS provider
  - Other cooperators as appropriate including NSHD, WCSO
- 4:00 pm - Vending & Environmental Compliance

The Emergency Operations Center was moved out of BLM's Unified Command building and over to a new building managed by BRC. The double-wide structure worked well for meetings but could use some design improvements (size and layout) for use during Tier 1 activation incidents in particular, when Unified Command members need space to meet, make calls, and use the internet, separate from the main meeting room.

Daily Tier 1 meetings were held at the EOC. The main meeting room was just large enough and may need to be expanded in the future if Tier 1 membership grows or the number of guests increases. The presence of guests and subject matter experts during Tier 1 meetings was helpful from time to time. BRC appreciates BLM and PCSO flexibility in this regard.

From August 26 through September 6, 2016, Unified Command (T1 or Tier 1 group) met daily and reviewed the Situation and Status Report (SitStat), a modified ICS Form 209. This program and process worked well. SitStats included statistics and information about Black Rock City population, weather, art burns, airport landings and takeoffs, DMV registration, environmental compliance, vending permits, and incidents involving ESD fire, medical, or law enforcement. SitStat content was adjusted slightly over the course of the event to improve reporting. The Tier 1 group recognized the challenge of creating an accurate and comprehensive SitStat report every day. Some changes for 2017 will be considered, and BRC recommends a meeting pre-playa to discuss the proposals, including attendance and timing of the daily Tier 1 meetings, improving consistency in vending compliance statistics, and whether or not to expand Ranger stats in the SitStat.

In addition to the daily meetings listed above, BRC, PCSO, and BLM conducted approximately 30 hours of tours and meetings on site to improve understanding of operations and resource

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04684

use, and to increase transparency in expenditures for Cost Recovery and SOWs. These meetings and tours were very helpful to BRC, and we appreciate BLM and PCSO for meeting with us. BRC anticipates some meetings of this nature will be needed in future years, but not as extensively as in 2016.

### iii.  Emergency Notification & Activation

BRC, BLM, and PCSO defined, refined and relied upon a Unified Command management system to respond to incidents during the Burning Man event. BRC automated Tier 1 Activation and Notification, meaning that as soon as certain incidents were reported, Dispatch sent a page to Tier 1 group members. Early in the event BRC, BLM and PCSO agreed to change the page policy from auto-notification to verification first. Subsequently all agreed that "verification first" should be the guiding principle for all dispatch-created pages and that this was a best practice going forward.

There were seven Tier 1 notifications and three Tier 1 activations in 2016. One of the activations occurred during Exodus on Sunday, September 4, and involved a report of a missing 17-year-old girl. Two minutes after the report came in, per BRC's Lost and Found Child protocol, BRC closed the gates of Black Rock City. The incident caused thousands of participants to be delayed on Gate Road in their vehicles for several hours. The incident was resolved, but the Tier 1 activation highlighted opportunities going forward to improve response protocols. BRC will undertake this review for 2017 with BLM and PCSO, including advanced training for BRC Tier 1 staff.

### C.  Emergency & Interagency Communications

### i.  Radios

BRC provided radios to BLM, PCSO, and Nevada State Health Department (NSHD) for on-playa communication throughout the event. For BLM LE and PCSO, these were second or third radios. Of the six channels offered on these radios, the T1 group only used the Cooperators Channel, where BRC, NSHD and BLM compliance and logistics teams conducted civilian operations. No one from BLM (Civilian or LE) nor PCSO used the EOC Main channel, the frequency that had been agreed upon pre-event for interagency communications in an emergency. Instead, BRC, BLM and PCSO frequently communicated by text, and all agreed that the use of cellular devices should be included in future interagency communication planning. Post-event, BLM LE expressed preference for a cross-banding incident function or a mutual aid channel instead of using BRC's radios. BLM LE and PCSO told BRC a third radio was too inconvenient to carry and LE need to speak on a dedicated frequency. BRC spent $6,116 on 68 six-channel radios that were never used by BLM LE or PCSO.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04685

### ii. Paging System

BRC provided pagers to BLM, PCSO, and BRC Unified Command leadership team for emergency incident notification. As part of the process, the T1 team put specific protocols for pagers in place and automated some Tier 1 activation and notification triggers, which meant that as soon as certain incidents were called into dispatch, a page was automatically sent out to the Tier 1 group. Almost immediately BRC, BLM and Pershing county agreed to change auto-notification. Within a few days, all agreed that "verification first" should be the guiding principle for all dispatch-created pages.

At the end of the event, BLM told BRC:
- BLM did not want pages for population;
- BLM did not receive some pages in Gerlach;
- BLM wanted to be notified of Tier 1 activation through its dispatch center
- BLM wanted to consider texting as part of the Tier 1 communication plan

BRC is reviewing our internal pager protocols and communications management systems this winter with our operations and tech teams. After reviewing these issues internally, BRC and BLM will discuss and review communication protocols on the playa.

## D.  Law Enforcement

### i.  BLM & PCSO Operations/Integration

**Planning & Operations**

BRC appreciates law enforcement's **more cooperative approach** to planning in 2016. BRC would especially like to recognize the changes in leadership at BLM and the very positive impact they have had on planning, collaboration, transparency, and all aspects of the working relationship. BRC, BLM, and PCSO worked together to evaluate past years' law enforcement operations and identify efficiencies while still providing needed services to Black Rock City. Law enforcement staffing was one of the areas where efficiencies were identified by BLM and ultimately realized through a small but important reduction in BLM staffing levels.

**Communication** between BRC and BLM improved in 2016 and, although opinions sometimes differed, issues were discussed openly and both sides were acknowledged and their viewpoints considered, rather than BRC being dictated to or threatened by an authority figure as in years past. BLM demonstrated professionalism during planning and on-site operations, and performed up to the standards expected of the agency. BRC looks forward to working with BLM's planning

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04686

team again in 2017 with a continued emphasis on safety and identifying efficiencies, including improved methods of providing law enforcement service to the community.

PCSO experienced some delay in **logistical planning**, which impacted BRC's logistical planning and contract vending. BRC was able to accommodate PCSO's changing requests for housing and meals but would like to avoid last-minute changes in the future where possible.  As the event approaches, these changes have a greater impact on BRC finances, staff and resources.

**On-site cooperation and communication** between Black Rock Rangers and law enforcement were markedly improved from previous years. All parties spent time in meetings and in the field working together to find solutions to operational difficulties.

BRC and LE were jointly involved in **two daily meetings on playa**: the afternoon Tier 1 meeting at the EOC, and the 9 a.m. meeting at Ranger HQ. The intent of the latter meeting is to exchange information, provide an update of the past operational reporting period, and provide operational clarity to all entities. This meeting had become unproductive in the past few years, with BLM LE being uncooperative and acting without consideration of BRC's concerns or input. This year BLM's participation was professional, helpful, and respectful. PCSO Sergeant Nathan Carmichael and Deputy Jason Flanagan were knowledgeable and amiable. The meetings were informative, productive, and improved public health and safety. BRC greatly appreciates this increased level of cooperation and communication, and we appreciate BLM and PCSO's recognition of the Rangers as key allies and force multipliers.

Even though LE staffing levels were reduced from 2015, BRC staff and Burning Man participants observed and reported numerous occasions each day where **multiple law enforcement vehicles and large numbers of officers** conducted single-vehicle traffic stops on Gate Road and in the City. BRC strongly believes this level of enforcement is excessive, and that charging BRC for this activity is not proper. We want to work with BLM and PCSO to reduce these types of incidents in 2017.

BRC observed an improvement in LE **errant driving** issues from previous years. There were still problems that endangered public safety, however, including a very risky incident near the DPW Depot. BRC learned of this incident, and many other incidents of concern, through its LE Feedback program. A summary of LE Feedback is included as an Appendix to this document.

BRC would like to praise **BLM's quick responses and remedies** to three problematic driving issues: driving through camping areas within the City, speeding outside the perimeter fencing near the event entrance and JOC, and driving along the Gate Road flag line fence in white out

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04687

conditions, putting inbound traffic at risk for head-on collisions. All three situations were resolved immediately.

**Cooperation between LE and BRC** continued to improve in 2016. LE utilized BRC resources including the Gate, Perimeter, Exodus department and specialized teams within Black Rock Rangers. As a force multiplier, Black Rock Rangers assisted LE in locating people, witnesses, and vehicles in situations where a crime may have been committed. Black Rock Rangers and LE were jointly involved in multiple situations dealing with difficult people. Relationships between LE and BRC departments continue to improve, but there were still reports of LE berating or condescending to BRC staff. BRC would like to see these instances further reduced and eliminated.

In our 2015 AAR, BRC described **an incident during the event in which a PCSO deputy employed as a paramedic by Humboldt General Hospital (HGH) allegedly injected a participant with Ketamine** without the oversight of the onsite Medical Director. The participant subsequently went into respiratory failure twice and nearly died; BRC medics saved her life. BRC considers this matter to be of grave importance and worked throughout the year to address questions surrounding the incident. PCSO did not hire HGH medics as deputies in 2016. BRC met with our ALS provider, PCSO, and BLM on playa to discuss medical services and expectations, to understand protocols, and to agree on patient transfer processes and documentation. No incidents occurred during 2016 like the one in 2015.

### ii. Evictions & Trespass

BRC created an **eviction database** for LE and BRC to track LE-issued No Trespass Warnings and BRC-ordered evictions. This database was developed at LE's request to:

- Improve tracking and reporting
- Provide instant access to the list of persons evicted or issued trespass notices
- Prevent re-entry into the event by those who had been ejected

BLM, PCSO, and BRC all agreed that the database was helpful and should continue to be used. The database worked correctly with only one minor problem: the photos of the trespassers did not generate accurately.

The eviction database currently shows 30 entries. BRC is concerned that this number does not accurately reflect the total number of persons issued No Trespass Warnings at the event. PCSO issues the No Trespass Warnings, which require a signature from either BRC or BLM. PCSO's 2016 Post Mission Synopsis states that there were 46 arrests and that all of the people arrested were served with a No Trespass Warning. That means a minimum of 16 people are

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution
Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04688

unaccounted for in the eviction database. BRC wants the information filled in for 2016 and will meet with PCSO and BLM pre-event in 2017 to ensure the program works for all parties. BRC takes issue with all arrested participants being automatically trespassed. Everyone is innocent until proven guilty. Only participants who pose a threat of violence should not be allowed back into the event.

BRC and PCSO have created a process to review No Trespass Warnings for continued enforcement or revocation post-event. However, there is no such process in place with BLM. BRC would like to have an accurate report from BLM of the number and reasons for Trespass Orders being issued each year and the opportunity to review and discuss them. This process is important to evaluate whether BRC's communication and educational processes are working and to ensure fair and consistent treatment of participants.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04689

## IV. APPENDICES

## A.  BRC 2016 Operations Plan

(Due to size of document, a USB drive containing the 2016 Operations Plan is enclosed.)

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04690

2016
Black Rock City LLC
BURNING MAN AFTER ACTION REPORT

_____

## B.  Medical Statistics from Rampart Emergency Care Services and ESD

| PATIENT CONTACT BY TYPE | # |
|---|---|
| Altered Mental Status: Anxiety | 2 |
| Altered Mental Status: ETOH | 52 |
| Altered Mental Status: MDMA/Molly | 12 |
| Altered Mental Status: GHB | 7 |
| Altered Mental Status: Ketamine | 1 |
| Altered Mental Status: Marijuana | 5 |
| Altered Mental Status: Other | 33 |
| Altered Mental Status: Agitated/Combative | 6 |
| Altered Mental Status: Decreased LOC/Unconscious | 8 |
| Altered Mental Status: Seizure | 14 |
| Altered Mental Status: Syncope | 10 |
| Altered Mental Status | 0 |
| Altered Mental Status: Dizzy | 18 |
| Medical | 1 |
| Medical: ENT Complaint | 156 |
| Medical: Headache | 14 |
| Medical: Chest Pain | 23 |
| Medical: SOB/Dyspnea | 52 |
| Medical: Abdominal Pain | 61 |
| Medical: GI: N/V/D | 209 |
| Medical: UTI | 169 |
| Medical: GU/Gyn Complaint | 16 |
| Medical: Extremity Pain | 82 |
| Back Pain | 4 |
| Trauma: Multiple | 8 |
| Trauma: Fall | 83 |
| Trauma: MVA | 1 |
| Trauma: Head injury | 24 |
| Trauma: Neck injury | 4 |
| Trauma: Chest/Abdominal injury | 6 |

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04691

2016
Black Rock City LLC
BURNING MAN AFTER ACTION REPORT

| Trauma: Upper Extremity | 122 |
|---|---|
| Trauma: Lower Extremity | 117 |
| Trauma: Laceration | 177 |
| Environmental | 0 |
| Environmental: Burn | 12 |
| Environmental: Major | 0 |
| Environmental: Minor | 4 |
| Environmental: Allergy/Rash | 20 |
| Environmental: Bite/Sting | 4 |
| Environmental: Heat Illness | 42 |
| Environmental: Cold Illness | 3 |
| Environmental: Eye | 84 |
| Environmental: Playa Foot | 4 |
| Environmental: Respiratory | 0 |
| Renown | 0 |
| Other | 144 |
| Other: Psychiatric | 4 |
| Other: Wound Check | 29 |
| **TOTAL CONTACTS** | **1849** |

| Off Site Transports | # |
|---|---|
| Renown by air | 30 |
| Renown by ground | 4 |
| UC Davis by air | 1 |
| UC Davis by ground | 0 |
| **TOTAL TRANSPORTS** | **35** |

| **2015 Patient Contacts** | 1713 |
|---|---|
| **2015 Off Site Transports** | 23 |

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04692

### C.  Law Enforcement Feedback

**Summary**

People at Burning Man can submit information about their **interactions with law enforcement**. This program is called LE Feedback. Feedback is submitted during the event via paper form or electronic submission, and is submitted after the event via electronic submission. Feedback is not solicited. Feedback forms are available at Ranger HQ and online through Burning Man's website. BRC's Law Enforcement Advisor evaluates the feedback submissions, omitting submissions that are incomplete. BRC believes this reporting system can provide detailed feedback for law enforcement agencies to evaluate and enhance programs and officer performance, thereby improving their public service and perception of law enforcement at the event. BRC would be happy to provide redacted LE Feedback submissions to BLM and PCSO upon request.

**Analysis**

LE Feedback submissions **decreased by 61%**, from 245 in 2015 to 96 in 2016. This decrease could be an anomaly or it could mean that fewer participants were affected enough to respond. Each submission was analyzed and classified as:

- Meeting expectations;
- Exceeding expectations; or
- Falling below expectations

In 2016, 56% of the submissions described officers meeting or exceeding expectations, and 44% reported officers falling below expectations. These results are similar to 2015, with 54% and 46%, respectively; however, the ratio of positive reports to overall reports specifically mentioning officer performance and professional conduct increased from 5% in 2015 to 15% in 2016. BRC appreciates the work done by LE to build public trust and respect.

One person wrote:

> *"I don't know what was said to the BLM this year or what training they received different from before, but I hope they do it again next year, they were great!"*

Many people said officers were: "polite," "professional," "supportive," "educational," "friendly," "empathetic," "participative," and "helpful." A key repeating factor is that officers took time to listen and communicate and interact with those they came into contact with. There were many

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

reports that demonstrate professionalism by officers. BRC and the participants encourage this kind of officer participation and performance.

**Top Issues**

The top issues identified in 2016 from the feedback submissions are:
1. Poor officer professionalism, performance or conduct
2. Excessive officer presence
3. Treatment of those in custody
4. Poor and dangerous driving by officers
5. Disregard for personal property
6. Confiscation of prescription medication
7. Traffic stops, K9 searches, and probable cause
8. Law enforcement officers spreading rumors

**1.** Participants reported multiple issues related to **professionalism, performance and conduct** including officers being "rude" and "discourteous," "threatening," "aggressive," "intimidating," and making "disrespectful" statements to participants.

One participant reported that he:

> *"Had to go to Fernley to pick up antibiotics for a friend with a large infection. Left very early, about 5:30. Driving on Gate Road at 10 mph got stopped by an officer who said, "What? Are you coming from a rave or something?" In a very derogatory way. He assumed that the only reason I'd be awake at 5:30 was if I'd been up all night at a rave. Very rude and assuming."*

**2.** Many reports described excessive levels of law enforcement, 6-8 officers and 3-5 law enforcement vehicles conducting single vehicle traffic stops for minor speeding issues and alleged registration violations.

**3.** The **treatment of individuals in custody** was reported as a concern by several people. These concerns included, but were not limited to, the temporary holding facility on playa being kept extremely cold, and no access to blankets, beds or comfortable seating. Participants claimed to be kept locked up for long periods of time and denied water, made to wait long periods of time to urinate even though toilets were right outside, and made to wait a long time before they were transported to Lovelock. Reports say officers berated individuals in custody.

**4. Poor and dangerous driving by officers** continued to be among the top feedback concerns of participants. Reports included speeding on city streets and on the open playa, driving too

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04694

close to artwork and art cars, and speeding at night, putting pedestrians and bicyclists in harm's way. BRC management staff noticed a significant improvement near the JOC in 2016 compared to previous years, but we would like to see LE continue to push safe driving efforts. BRC is particularly concerned about an incident that occurred on September 2, 2016 and was reported by eight different witnesses involving multiple LE vehicles driving at high speeds near bicycles and pedestrians through the DPW Depot, fuel yard, and Transfer Station. The first car apparently caused white-out conditions, and the other vehicles did not slow down.

**5. Disregard for personal property** appeared to increase as a serious concern in 2016. Participants who had their vehicles searched reported not only damage to personal belongings but that the searching officers clearly had disregard for their personal belongings. Participants were left to repack their vehicles without LE assistance. Many people said they had to repack their belongings in the dark while other vehicles were driving around them during heavy traffic times and difficult weather conditions, creating a hazardous situation for them and others. There were also reports of personal possessions being confiscated and not returned.

**6.** Of great concern to BRC and our participants are the many reports of LE (A) confiscating **prescription medication, vitamins, and homeopathic remedies**, and (B) citing for possession of controlled substances if prescription medicine was not stored in the original pharmaceutical containers. Most people who travel utilize special daily dispensary containers, bags or other means to save space and bring only what they need for the duration of their travels, leaving the original container at home. Many people will also keep an immediate supply or daily dose in a pocket on their person. In the last two years, LE has elected to confiscate and issue citations for possession of any medication, vitamins, or homeopathic remedies not in their dispensing containers. While there may in fact be some who do abuse prescription drugs, there are many more people who do not, and who need and take their medical as prescribed. The confiscation of prescription drugs by LE has left many participants without needed medication, which is an unnecessary inconvenience at best and a health danger at worst, requiring them to travel to the nearest pharmacy (hours away) to replace their medication. One participant had to drive all the way back to San Francisco, as he could not get the life-saving medication he needed locally. This is untenable. With the technology available to LE for the identification of substances, officers should be able to distinguish unlawful possession from legally possessed substances.

**7.** 21% of submissions commented on **traffic stops**. The majority of traffic stops reported were for alleged registration violations (50%), followed by incremental speeding (25%) and mechanical violations (25%). Of all traffic stops, 75% led to a search of the vehicle by law enforcement. Participants reported that many of the mechanical problems were minor violations, did not pose an imminent danger, and were easily corrected by removing accumulating dirt from taillight connections, reconnecting wiring that had come loose on the bumpy road, or providing

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04695

the registration certificate. One participant said he received a citation for not using a turn signal in the City (where speeds are only 1-5 mph). Traffic enforcement for mechanical violations and speeding are primarily used by law enforcement agencies as a means to reduce accidents in urban and problem areas; however, traffic accidents are nearly non-existent in Black Rock City.

Participant perception overwhelmingly maintains that law enforcement's main focus is **vehicle searches**, not their personal protection. Multiple submissions indicated a brief exchange between the driver and the officer before the focus of the stop quickly shifted from the initial violation to a request to search the vehicle. Many participants reported that they cooperated and provided officers with their medical marijuana, but then their vehicles were searched anyway. Many of these searches did not result in any further drugs other than the legally obtained medical marijuana for which the occupants were cited. Participants were left to believe they were misled and lied to by the police. Many expressed that they wanted to trust the police, but in the end felt they were victims of collusion by officers. The lack of traffic accidents and the high rate of searches to traffic stops make it easy to conclude that this type of enforcement is not for public safety, but rather used as a pretext for the purpose of searching vehicles. BRC continues to object strenuously to the use of these tactics by law enforcement and to the resultant costs.

Four of the 13 feedback reports that discussed **the use of K9s to sniff and search vehicles** said the officers told the driver that the dog alerted to illicit drugs but that they did not find any illicit drugs. This is a 31% failure rate. One of the reports came from an off-duty K9 officer not wanting to identify himself at the time. He was very confident that illicit drugs have never been in his vehicle. Another report was from an experienced K9 trainer. Both participants said they watched the K9 work and did not feel the K9 alerted but that the handler manipulated the dog.

Nine of the 13 K9 reports suggest that the officers may have **prolonged the traffic stop** after determining that the reason for the initial stop was unfounded. Most of these reports state that the vehicles were stopped for a possible registration violation, and officers determined during the initial contact that the registration was valid, but still detained the vehicle for a K9 search. As BLM's Acting Special Agent in Charge for Region 3 (SAC) explained to BRC's Law Enforcement Advisor, the U.S. Supreme Court held in 2015 that absent reasonable suspicion, police may not extend a vehicle stop in order to conduct a dog sniff.

One report alleges that a bus was stopped early during ingress for a possible registration violation, and although the registration was valid, officers continued to work the scene and deploy K9 resources. A dog alerted, officers searched the vehicle, found and confiscated illicit drugs and a large sum of money, made arrests, and notified the SAC. According to the report, when the SAC arrived on scene and determined the stop had been delayed beyond the reason for the initial stop, officers returned the money and released everyone in custody. BRC hopes this is a training issue that will be resolved before the 2017 event.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04696

---

Of serious concern to BRC were feedback reports of **law enforcement officers walking in the Gate lanes** making contact with vehicles that were stopped in long lines for event processing. Participants reported that officers walked up to the driver's window demanding that the occupants roll down the windows to check on the welfare of the occupants. During two of these encounters, officers said they smelled marijuana and questioned the driver and occupants. BRC would like to see this type of action suspended.

In 2015, some of the most heated feedback BRC received was regarding the use of K9s at the event. The submissions reported on the role of K9s in vehicle searches, K9 urination and defecation on the playa, and the use of K9s in searches of **U.S. mail deliveries**. BRC is grateful that BLM reviewed and evaluated the K9 U.S. mail program and discontinued the practice. BRC is further grateful that we did not receive negative feedback in 2016 regarding K9 urination and defecation on the playa, indicating that K9 handlers cleaned up after their dogs.

**8.** BRC is concerned about the report of a **BLM officer allegedly telling** participants that people were being sprayed with LSD. No such incident was reported to BRC. If this incident did happen, BRC wants to understand why it was not reported. If this incident did not happen, BRC would like for BLM to communicate directly with this officer to prevent this rumor from being spread again.

*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

AR04697



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
LLNVW03500-16-01
2930 (NV030.00)

**DEC** 3 0 **2016**

CERTIFIED MAIL 7016-2140-0000-2401-6750 – RETURN RECEIPT REQUESTED

Charlie Dolman
Event Operations Director                    :       Burning Man 2016 Event
Black Rock City, LLC                          :       Special Recreation Permit
660 Alabama St
San Francisco, CA 94110-2008

Dear Mr. Dolman:

Please find enclosed the Bureau of Land Management's (BLM) 2016 After Action Review (AAR).

The enclosed AAR covers both Civilian and Law Enforcement Operations for the 2016 event. This AAR serves as the post event operational assessment of the management of the event and BLM. During planning for the 2017 Burning Man event operation, a variety of creative and cost-effective solutions to issues identified in this document, and other issues as they may arise, could be considered in lieu of specific recommendations identified here, as BLM and BRC continue to work together to ensure the success of the Burning Man Event on public lands.

Thank you for working with BLM to ensure that the 2016 Burning Man Event was safe and successful. Please contact Michael Vermeys, BLM Burning Man Project Manager, at 775-623-1582 with any questions.

Sincerely,

William Mack, Jr
Field Manager
Black Rock Field Office

Enclosure:
BLM After Action Review for 2016

AR04296

---

**Black Rock City LLC**

# BURNING MAN 2015

### After Action Report (AAR)



AR00535

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

debrief and 2015 planning. Furthermore, the 20 issues seemed to rely heavily on unconfirmed information or speculation, causing the accuracy and credibility of the document to suffer. Throughout the 40 days BLM required BRC to meet with and report to BLM staff, who edited BRC's report, and attempted further edits, to substantially change the content. Despite these problems and obstacles, and despite the decay in trust caused by the ill conceived process, and despite the fact that BLM in Washington D.C. seemed underprepared for the BRC meeting and stated unequivocally their unwillingness to work with Burning Man, and despite the unexpected presence of other agencies and individuals unknown to Burning Man at the D.C. meeting, BRC successfully answered every question, addressed every concern, and met all subsequent deadlines imposed. BRC demonstrated new solutions and existing protocols to BLM on playa, and the 2015 event proceeded smoothly. BRC still disputes and disagrees with many of the claims made in the March 2015 letter.

The 2015 process imposed by BLM to address safety concerns at the 2014 event highlights a bigger question BRC would like to explore in 2016, and that is the boundaries around BLM's roles and responsibilities as administrator of the Burning Man SRP, versus the roles and responsibilities of BRC as the permittee. Several of the issues outlined by BLM, and the solutions BLM proposed in written and spoken edits to the BRC report, and written comments contained in the 2014 BLM After Action Report (AAR) suggest BLM intends to expand further into BRC event management and operations. BRC feels strongly that this is not the right track and that both parties should be clear going forward about expectations and deliverables. BRC welcomes the opportunity to participate in BLM's review of our SRP.

Normally **cost recovery** is discussed in early spring, with ample time for review, opportunity for negotiation, and agreements on revision. In 2015 the $2.9 million cost recovery estimate was given to BRC in late July, just 10 days before on-site operations were scheduled to begin. Furthermore, BRC was not given descriptions of work or copies of contracts or explanations for BLM expenses, and we were told that if we did not sign the contract that week, the SRP could not move forward. BRC requested a provision be added to the agreement providing BRC the opportunity to review 2015 costs and requirements with BLM at a future date but was denied.

BLM's costs increased again in 2015, up **303%** from 2011 even as total on-site population increased only 43% during that same period and insignificantly from 2014. Many of these cost increases are, in BRC's estimation, unjustified. Annual cost increases for staffing, labor hours, law enforcement (LE), equipment, infrastructure, and contracts are routinely issued without sufficient explanation or evidence, and are unsustainable. BRC would like to better understand BLM's requirements and further identify areas for reasonable cutbacks and improved efficiency in 2016.

Costs for certain BLM operations and infrastructure are paid outside of cost recovery through a **memorandum of understanding** (MOU), including costs for operations and infrastructure that have been identified as more efficient or reasonable to be handled by BRC. One benefit of the

5

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT
_____

MOU to BRC is a savings of the additional 22.9% indirect administrative cost rate (IACR) charged by BLM for expenses paid through cost recovery. In 2014 and 2015 these MOU costs included building BLM's on-site headquarters, providing BLM meals and commissary services, and obtaining BLM radio equipment. In 2015 BLM issued statements of work (SOWs) that called for a new off-site compound for BLM supervisors, guests, and Pershing County Sheriff's Office (PCSO). The combined cost for this new compound and the existing BLM headquarters was estimated to be $1.0 to $1.2 million, or double the cost of the 2014 SOWs. In July, with the Nevada State Office facilitating the conversation, and with pressure from the media, public, and Nevada Congressional delegation, BLM made revisions to its MOU statements. Still MOU costs increased $48,000 over 2014.   The size and scale of BLM's headquarters, infrastructure, meeting rooms, housing, and all items covered through the MOU process should be evaluated and reduced as part of the cost recovery, MOU and planning process for 2016.

Normal event planning documents like the Cost Recovery Agreement (CRA), stipulations and closure order for 2015 were **significantly delayed by BLM**. Insufficient time was given to BRC review and negotiation of these important documents and the rules, requirements, and protocols contained therein. In addition, BRC's proposed action for 2017-2021 was delayed by the Winnemucca District Office. BRC submitted a draft proposed action in December 2014 to ensure adequate time for review, collaboration, and processing before the 2017 event. The proposal was unilaterally rejected by BLM, not for any inadequacies contained within, but because, according to BLM, the agency would not accept it until planning for 2015 was complete and planning for 2016 was well underway. BRC notes this for the record and hopes the delay will not adversely affect 2017 planning and permit approval.

BRC recognizes the necessary and important functions **law enforcement** performs at the Burning Man event and appreciates the level of planning and commitment required to provide effective public safety services for more than 75,000 people in a remote location. BRC further recognizes the dedicated work of many officers and support staff providing community service in addition to their primary duties and responsibilities. BRC appreciates the law enforcement personnel who return each year to work the Burning Man event. However, many of the programs implemented and tactics employed by law enforcement personnel in Black Rock City are out of line with the community they are there to serve and protect. BRC has observed first hand and has received hundreds of accounts from participants about problematic law enforcement behavior and aggressive tactics that are unnecessarily intimidating and harassing. It is not uncommon to observe four police vehicles and multiple officers with K9s pulling over a single participant vehicle for a minor traffic violation. BRC does not condone police intimidation or harassment and should not have to pay for these tactics at Burning Man.

Neither BLM nor PCSO has provided a staffing model to justify the numbers of officers and investigators at the event. BRC has requested data and statistics, including calls for service and wait times, to better understand law enforcement staffing requirements and trends but has not received this information. It is our opinion that law enforcement staffing levels have been and

AR00540

_____

continue to be too high. Staffing levels should take into consideration the very real circumstances on the ground in Black Rock City including BRC's operational departments as force multipliers, the low incidence of person-on-person crimes, lack of violent crime and traffic accidents, and low incidence of illegal substance trafficking and drug-related medical problems. BRC would like to work with BLM and PCSO to assess and adjust law enforcement staffing levels for 2016.

Overstaffing coupled with higher than necessary pay grades, focus on unnecessary tactics, and excessive requirements for infrastructure and support have led to high costs. BRC feels many of these costs have not been adequately explained or justified and wants to work with BLM during 2016 planning to better understand agency requirements and identify areas for efficiency.

BRC would also like to understand the role of BLM law enforcement in the SRP and how law enforcement reports in to the Authorized Official. The attendant roles and responsibilities of law enforcement in SRP decision-making, and the BLM chain of command for the Burning Man permit, have been unclear and caused confusion in planning and on the ground during the event.

BRC **event operations** encompass over 40 departments and teams, organized year-round and executed on site for the duration of the closure order, surveying the streets, installing shade, manning the airport, placing camps, creating infrastructure, managing art, licensing vehicles, planning and providing emergency services and other community services, selling ice, ensuring sanitation, educating participants, and building the city. Operations evolve every year as the event grows and conditions change. 2015 event operations were extremely successful, despite extensive dust storms and near-freezing nighttime temperatures, with no major incidents to report and many milestones achieved. The Burning Man organization is extremely grateful to, and proud of, the professional and volunteer personnel who work together to make Black Rock City safe and vibrant.

BRC has maintained a superlative **compliance record** in all areas of the SRP: safety, commercial, and environmental. Beyond improvements made in response to BLM's safety letter, BRC safety teams successfully rolled out and managed new drone controls and a hand-held laser ban in 2015. Vending is carefully tracked by BRC and BLM, and all vendors are reported to BLM for SRP compliance. BRC operational teams including Environmental Compliance, Black Rock Rangers, and Earth Guardians, work closely with the Burning Man community to provide education, enforce regulations, provide adjudication, and ensure compliance within Black Rock City. Burning Man has remarkably little impact on the NCA, and our environmental record is a model for other events and communities around the world. BRC included BLM in our environmental compliance program in 2015 and understands the crucial permit monitoring role BLM plays but questions the need for BLM operational assistance when our successful track record is already well established. BRC does not wish to complicate operations or pay for

AR00541

1  CLEMENTINE JOSEPHSON
   Regional Solicitor
2  JANELL M. BOGUE
   Assistant Regional Solicitor
3  U.S. Department of the Interior
   Office of the Regional Solicitor
4  Pacific Southwest Region
   2800 Cottage Way, Room E-1712
5  Sacramento, CA 95825
   Telephone:    (916) 978-5690
6  Facsimile:    (916) 978-5694
   janell.bogue@sol.doi.gov
7
8  Attorneys for the Bureau of Land Management

9              UNITED STATES DEPARTMENT OF THE INTERIOR
                   OFFICE OF HEARINGS AND APPEALS
10                 INTERIOR BOARD OF LAND APPEALS

11  BLACK ROCK CITY LLC,                )  IBLA 2016-115
                                        )
12            Appellant,                )
                                        )
13       v.                             )  Appeal from Cost Recovery Decision for
                                        )  Burning Man 2015 Special Recreation Permit
14  BUREAU OF LAND MANAGEMENT,          )
                                        )
15            Respondent.               )
                                        )
16                                      )

17              **BLM ANSWER TO STATEMENT OF REASONS**

18        The United States of America, Department of the Interior, Bureau of Land Management

19  ("BLM"), by and through its attorney of record, does hereby submit the BLM's answer to Black

20  Rock City LLC's ("Appellant's") statement of reasons ("Appeal") to the Interior Board of Land

21  Appeals ("Board").  The BLM hereby requests that the Board affirm the BLM's above-captioned

22  decision.

23  **I.    BACKGROUND**

24       **A.    Event history**

25        Burning Man is a combination art festival, social event, and experiment in community

26  living.  Administrative Record ("AR") Doc. 92 at 1-1.  Burning Man was first held on the Black

27  Rock Desert in 1990 and has continued on an annual basis.  *Id.*  Attendance at Burning Man has

28  generally grown steadily on an annual basis.  *Id.*

AR04466

1       The organization that puts on Burning Man, Black Rock City LLC ("BRC" or

2   "Appellant"), applied for and received a multi-year special recreation permit ("SRP") from the

3   BLM to conduct the event for the years of 1992 to 1995. *Id.* Due to the increasing size of the

4   event and issues associated with that growth, the BLM completed additional environmental

5   analysis and BRC applied for and received a second SRP from the BLM in 1996. *See Coalition*

6   *for the High Rock/Black Rock Emigrant Trail National Conservation Area*, 147 IBLA 92 (1998).

7   In 1997, Burning Man was held on private land on Hualapai Flat in Washoe County, Nevada.

8   AR Doc. 92 at 1-1. In 1998 and 1999, Burning Man was moved back onto public lands at the

9   southern end of the Black Rock Desert playa, about four miles north of Gerlach, Nevada. *Id.*

10  The BLM completed an Environmental Assessment ("EA") under the National Environmental

11  Policy Act and issued an SRP for these years. *Id.* From 2000 to 2011, the event was held

12  approximately 8.5 miles northeast of Gerlach after the preparation of four EAs and the issuance

13  of an SRP for each year. *Id.* In 2011, the event sold out for the first time. *Id.* In 2012, the BLM

14  prepared an EA that analyzed Burning Man for the years 2012 through 2016. As the Proposed

15  Action, the EA analyzed a Burning Man event with a maximum population of 58,000 to 70,000

16  people, with the BLM authorized officer determining the maximum population within that range

17  for each year of the permit. For the 2015 event, the BLM granted an SRP to Appellant on

18  August 7, 2015 and it allowed a maximum population of 70,000. AR Docs. 36, 39.

19      **B.**    **Cost Recovery**

20      From at least 2000 through 2006, BRC paid a permit fee for its SRP based upon "per

21  person per day" use. *See Black Rock City LLC*, 173 IBLA 49, 51 (2007). A portion of that fee

22  covered the BLM's costs of processing and administering the permit. *Id.* at 52. Accordingly,

23  that fee grew as the event's population and the participants' length of stay grew. For example,

24  the fee paid by BRC went from approximately $484,000 in 2000 to $710,000 in 2005. *Id.*

25  However, starting in 2007, the BLM determined that the Burning Man event required cost

26  recovery under the BLM's SRP regulations. *See* 43 C.F.R. § 2932.30. Relevant to this appeal,

27  the BLM determined that more than 50 hours of staff time would be required to process the SRP

28  for the 2015 Burning Man event and thus cost recovery of direct and indirect expenses related to

AR04467

issuing and administering the permit must be charged under the BLM's regulations. *Id.*; AR Doc. 44. The BLM calculated an estimate of the direct and indirect costs for its administration of the 2015 Burning Man SRP.[1] That amount totaled $2,944,827, which included estimated labor and operations costs plus a 22.9 percent fee to account for indirect costs. *Id.* The BLM issued a decision outlining the total estimate on August 3, 2015. AR Doc. 44 ("Estimate Decision"). Along with the Estimate Decision, the BLM transmitted an unsigned copy of the cost recovery agreement ("CRA") for BRC to execute. BRC executed the CRA and did not appeal the Estimate Decision. BRC began making payments on the estimated costs and paid the full amount prior to the beginning of the 2015 Burning Man event, in accordance with the CRA and BLM's regulations. *See* 43 C.F.R. § 2932.32. After the event was complete and the BLM compiled its total actual costs for administering the SRP and the 2015 Burning Man event, it issued a decision transmitting those costs to BRC. AR at Docs. 13 ("Closeout Decision"). The Closeout Decision dated January 26, 2016 explained that based upon the Estimate Decision and the actual costs incurred by the BLM, BRC was owed a <u>refund</u> of $151,104.73 due to overpayment. BRC timely filed its appeal from the Closeout Decision.

## II.    STATUTE, REGULATION, & POLICY

### A.    FLPMA

SRPs are issued under the general authority of the Secretary of the Interior to administer use of the public lands, pursuant to section 310 of the Federal Land Policy and Management Act (FLPMA). 43 U.S.C. § 1740; *see also Michael Voegele*, 174 IBLA 313, 318 (2008). Section 304(a) of FLPMA authorizes the Department of the Interior to establish reasonable charges with respect to applications for use of the public lands. 43 U.S.C. § 1734(a). The Secretary of the Interior may "require a deposit of any payments intended to reimburse the United States for

---

[1] BRC complains about the BLM's statements of work that were discussed early in the cost recovery estimate process. *See* Appeal at 2, 12-14. As BRC admits, however, none of those statements of work were incorporated into the cost recovery estimate decision or the CRA for the 2015 Burning Man event. *Id.* Accordingly, BRC's complaints about the statements of work are outside the scope of this appeal. Likewise, BRC's background section includes numerous unsupported assertions about BLM's administration of previous years' Burning Man event SRPs, which are not at issue in this appeal. *See* Appeal at 6-10. If BRC wished to appeal those previous BLM decisions, it should have done so, but the time for such appeals has long since passed. 43 C.F.R. § 4.411. Accordingly, the Board should not give any weight to BRC's unsubstantiated implications of BLM wrongdoing.

AR04468

reasonable costs with respect to applications…relating to such lands." *Id.*  Section 304(b) of FLPMA states that reasonable costs include, but are not limited to the costs of "monitoring construction, operation, maintenance and termination of any authorized facility; or other special activities."  43 U.S.C. § 1734(b).  That section further provides:

> In determining whether costs are reasonable under this section, the Secretary may take into consideration <u>actual costs</u> (exclusive of management overhead), the monetary value of the rights or privileges sought by the applicant, the efficiency to the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs.

*Id.*; *see also Michael Voegele*, 174 IBLA at 318 (emphasis added).  Section 303 grants the Secretary of the Interior the authority to enforce Federal law on public lands.  43 U.S.C. § 1733(a); *see also Black Rock City LLC*, 173 IBLA 49 at fn.11-12 (2007).

**B.    FLREA**

The Federal Lands Recreation Enhancement Act of 2004 (FLREA) (16 U.S.C. § 6801-6813) repealed the relevant provisions of the Land and Water Conservation Fund Act and authorized the Secretary of the Interior to issue SRPs and charge fees for specialized recreation uses of Federal recreation lands and waters such as group activities, recreation events, and motorized recreational vehicle use.  16 U.S.C. § 6802(h).  The FLREA states that any recreation fee must be consistent with the following six criteria:

> (1) The amount of the recreation fee shall be commensurate with the benefits and services provided to the visitor.
> (2) The Secretary shall consider the aggregate effect of recreation fees on recreation users and recreation service providers.
> (3) The Secretary shall consider comparable fees charged elsewhere and by other public agencies and by nearby private sector operators.
> (4) The Secretary shall consider the public policy or management objectives served by the recreation fee.
> (5) The Secretary shall obtain input from the appropriate Recreation Resource Advisory Committee, as provided in section 4(d) [16 USCS § 6803(d)].
> (6) The Secretary shall consider such other factors or criteria as determined appropriate by the Secretary.

16 U.S.C. § 6802(b).  Recreation fee is defined as "…an entrance fee, standard amenity recreation fee, expanded amenity recreation fee, or special recreation permit fee."  16 U.S.C. §

AR04469

6801(8).  While FLREA is the sole authority for recreation fees, other federal and state laws are unaffected.  16 U.S.C. § 6813(a), (d).

**C.    SRP Regulations**

The SRP regulations were promulgated by the Department of the Interior and became effective in 2002.[2]  43 C.F.R. § 2930; 67 Fed. Reg. 61732 (October 1, 2002).  The Burning Man has been classified by the BLM as a commercial use event, since BRC's use of the public lands is for business or financial gain.  *See* 43 C.F.R. § 2932.5.  The BLM is authorized to charge a fee for commercial use of the public lands under an SRP in an amount set by the BLM Director.[3]  43 C.F.R. § 2932.31(a).  The BLM Director may adjust those fees, as necessary, and must publish fees and adjustments in the Federal Register.[4]  43 C.F.R. § 2932.31(b), (c).

In addition to the commercial use fee set by the BLM Director described above, if the BLM anticipates that it will need more than 50 hours of staff time to process an SRP for commercial use in one year, it may charge a fee for recovery of the processing costs.  43 C.F.R. § 2932.31(e)(1).  Cost recovery charges include the BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement.  43 C.F.R. § 2932.31(e)(3).  All fees must be paid before the BLM will authorize use and any overpayment may be refunded.  43 C.F.R. §§ 2932.32, 2932.33.  Fees may be waived on a case-by-case basis for accredited academic, scientific, and research institutions, therapeutic, or administrative uses. 43 C.F.R. § 2932.34.

In accordance with FLPMA, SRPs must provide for the protection of natural resources and public safety on the public lands.  43 C.F.R. §§ 2932.26, 2932.41.

---

[2] The Department of the Interior issued a proposed rule in 2005 to modify the regulations to comply with FLREA on November 22, 2005 (70 Fed. Reg. 70570) and issued the final rule on February 21, 2007 (72 Fed. Reg. 7832). Those changes are not relevant to this appeal. *See Black Rock City LLC*, 173 IBLA at 58.

[3] BLM Instruction Memorandum 2014-055 sets forth the national special recreation permit fee schedule and establishes commercial use fees at 3% of gross revenue for March 1, 2014 through March 1, 2017. *See* AR Docs. 76 and 77.

[4] Effective October 1, 1999, fee adjustments are made every three years using 1984 as the base year and based on the change in the Implicit Price Deflator Index. The automatic three-year fee adjustment policies and fee calculation methodologies were published in the Federal Register in 1989 and 1999. *See* 54 Fed. Reg. 42998 and 64 Fed. Reg. 41133.

AR04470

1  **D.    1323 Manual**

2      The BLM's Manual 1323 – Cost Recovery for Reimbursable Projects/Activities ("1323

3  Manual") describes its policies and procedures for cost recovery.  AR Doc. 97.  The 1323

4  Manual states that the BLM's policy is that applicants "…will reimburse the Government for

5  direct and indirect costs involved in processing applications." *Id.* at .06A.  Indirect costs are

6  defined as:

7      …costs expressed as a percent of direct costs which are of such a nature that the
       amounts applicable to a specific project cannot be accurately or readily
8      determined.  Indirect/overhead costs are incurred either jointly for the benefit of
       more than one cost reimbursable project, or in units which are so small that they
9      cannot practically be reported separately on Time and Attendance Reports or
       other accounting documents.  Indirect/overhead costs include any costs which
10     must be coded to the following "overhead" activities: General Administration,
       Data Management, and Equal Employment Opportunity costs relative to BLM
11     employment.

12  *Id.* at Glossary page 2.  The 1323 Manual also describes the accounting procedures for

13  calculating indirect costs.

14     The Bureau's indirect/ overhead costs, exclusive of management overhead, are
       recovered by the application of a single predetermined indirect cost rate to direct
15     costs incurred.  <u>The Bureau has only one indirect cost rate and it is applicable to
       all cost recoverable services.</u>  This rate is subject to periodic review and change.
16     These indirect costs are automatically included in the category fee schedule.

17  *Id.* at .18B4 (emphasis added).

18  **E.    SRP Handbook**

19     The BLM Recreation Permit Administration Handbook H-2930-1("SRP Handbook") was

20  updated on November 17, 2014 and describes both SRP administration and cost recovery

21  procedures.  *See* AR Doc. 69.  It states, "For commercial permits that exceed the 50-hour

22  threshold, the BLM charges cost recovery in addition to fees arising from the national recreation

23  fee schedule." *Id.* at 1-22.  "Cost recovery covers all federal activities that convey special

24  benefits to recipients beyond those accruing to the general public." *Id* at 1-20.  The SRP

25  program uses the same cost recovery procedures as the BLM's lands and realty program, so the

26  1323 Manual is applicable to cost recovery for SRPs. *Id.* at 1-27.  The SRP Handbook defines

27  indirect costs consistent with the 1323 Manual, but with more detailed examples.

28

AR04471

Indirect costs represent those administrative and program costs that may be attributed to processing the application, including a portion of the costs of equipment, space rental, telephone services, postage, personnel transfer costs, administrative and clerical support, training, safety, public information, cartography and basic series mapping, aviation management, telecommunications, equipment maintenance, and systems design and implementation. Excluded from indirect costs are management overhead, managerial work, evaluations of office activities, program coordination, technical program direction, environmental education and interpretation, interagency planning, studies and research, preparation of NEPA documents relating to general program planning, law enforcement, and firefighting. Nominal indirect costs are recovered through the indirect cost rate, determined annually by the BLM's budget office in consultation with the Interior Business Center (IBC) (22.9 percent of total direct costs as of 2014), as part of the administration of cost recovery accounts.

*Id.* at 1-30. The SRP Handbook also requires the BLM to ensure public safety and resource protection. *Id.* at vii, 1-3. As part of this requirement, law enforcement related to the SRP is described as a direct cost. *Id.* at 1-28.

## F. Office of Management and Budget Circular No. A-25 (Revised)

The Office of Management and Budget ("OMB") Circular A-25, released on July 8, 1993, establishes Federal policy regarding fees assessed for the use of Government resources. AR Doc. 96.[5] OMB developed Circular A-25 in accordance with Title V of the Independent Offices Appropriations Act of 1952 ("IOAA"), codified at 31 U.S.C. § 9701. *Id.* Circular A-25 establishes a policy that "user charges will be sufficient to recover the full cost to the Federal Government..." *Id.* at Section 6.a.2. Section 6.d.1. defines full cost as "all direct and indirect costs to any part of the Federal Government" and includes direct and indirect personnel costs, physical overhead, and other indirect costs such as material and supply costs, utilities, insurance, travel, rents or imputed rents, and management and supervisory costs. *Id.* at Section 6.d.1.(a) through (e); *see also Black Rock City LLC*, 173 IBLA at 58, fn.5.

## G. BLM Instruction Memorandums

In compliance with its law, regulation, and policy described above, the BLM has issued Instruction Memorandums (IMs) outlining SRP administration and cost recovery. *See* AR Docs. 78 and 79 (IM 2014-032 - indirect cost recovery rate and waiver), 76 and 77 (IM 2014-055 -

---

[5] The revised version of OMB Circular A-25 was also published in the Federal Register. 58 FR 38142 (July 15, 1993). That version is included in the AR at Doc. 98.

adjustment of minimum SRP fees), 71 (IM 2014-119 - SRP administration).  For example, IM

2014-032 describes how the BLM must engage in cost recovery.

> The BLM incurs administrative costs on all cost-recoverable, reimbursable,
> contributed trust account, and road maintenance projects. As these are real
> administrative costs, the BLM should realize full cost recovery unless an
> approved waiver or reduction request of the indirect administrative cost rate can
> be justified.

AR Doc. 78 at 3.  That IM also provides examples of indirect costs, including administrative

support such as procurement, contracting, finance, office services, and record management,

public information, budget development, and training.  *Id.*  To implement the 1323 Manual's

explanation regarding a single indirect rate, the BLM issued IM 2015-100, which set the indirect

cost rate at 22.9 percent of direct costs across the BLM for Fiscal Year 2015.  AR Doc. 55.

## III.   LEGAL ARGUMENTS

### A.   Standard of Review

SRPs are issued under the general authority of the Secretary of the Interior to administer

use of the public lands, in accordance with FLPMA and FLREA.  BLM has considerable

discretion under section 302(b) of FLPMA in approving and issuing SRPs.  *See* 43 C.F.R. §

2932.26; *Michael Voegele*, 174 IBLA at 318; *Bookcliff Rattlers Motorcycle Club*, 171 IBLA 6,

13 (2006); *Daniel T. Cooper*, 150 IBLA 286, 291 (1999).  If a BLM decision has any rational

basis, it will not be held arbitrary and capricious, or an abuse of discretion.  *Michael Voegele*,

174 IBLA at 318; *Obsidian Services, Inc.*, 155 IBLA 239, 248 (2001).  An appellant challenging

a decision bears the burden of proof to show by a preponderance of the evidence that a

challenged decision is in error.  *Bookcliff Rattlers Motorcycle Club*, 171 IBLA at 13.  In *United

States v. Feezor*, 130 IBLA 146, 200 (1994), the Board provided a definition of "preponderance

of the evidence."

> To establish the preponderance of the evidence means to prove that something is
> more likely so than not so; in other words, the "preponderance of the evidence"
> means such evidence, when considered and compared with that opposed to it, has
> more convincing force and produces in your minds belief that what is sought to be
> proved is more likely to be true than not true.

AR04473

**B.      The BLM's Closeout Decision was adequately supported**

BRC first complains that the BLM failed to sufficiently explain its costs for the 2015 Burning Man event.  Appeal at 17-18.  A review of the case file shows differently.  The BLM provided ample explanation of its actual costs for administering the SRP along with the Closeout Decision.  Those documents included:

- A summary of the BLM's total costs, breaking out labor costs, equipment charges, travel costs, and the indirect cost recovery rate;
- A project log naming each person working on the Burning Man 2015 SRP, their position, duties, and the amount charged for that work;
- A summary sheet showing each contract entered into by the BLM for the Burning Man 2015 SRP and the purpose and cost of that contract, as well as copies of the contracts themselves;
- Travel expenses incurred by each person working on the Burning Man 2015 SRP;
- Vehicle utilization for each vehicle used for the Burning Man 2015 SRP;
- A list of the supplies and equipment used for the Burning Man 2015 SRP, as well as the receipts supporting each expense; and
- A breakout of BLM personnel working on the Burning Man 2015 SRP per state.

*See* AR Docs. 13-20.  The Closeout Decision was compiled from actual expense data which was formatted into user-friendly documents that were provided to BRC.  Declaration of Cassie Sandberg ("Sandberg Dec.") at ¶13.  Rather than rely upon the detailed information provided by the BLM, BRC argues that the BLM must provide "detailed reports demonstrating the necessity of the activities carried out by each member of BLM's Burning Man staff" so that "BRC can evaluate their validity."  Appeal at 18.  BRC, however, provides no support for such a requirement, likely because no law, regulation, or policy gives a permittee that right.  Thus, the standard suggested by BRC is inapplicable to this appeal.

Under the BLM's SRP regulations, cost recovery charges consist of the BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement.  43 C.F.R. § 2932.31(e)(3); *see also Bookcliff Rattlers*, 171 IBLA at 17-18

1    ("We find that the limiting language in 43 C.F.R. § 2932.31(e)(3) is consistent with [FLPMA]

2    section 304(b), and that its inclusion in the SRP cost recovery regulation meets the

3    'reasonableness' test set forth by the Court in *Nevada Power Co. v. Watt*, 711 F.2d at 927."). 

4    BRC has provided no evidence to show that the Closeout Decision includes more than those

5    costs incurred by the BLM for the 2015 Burning Man event.  The BLM provided BRC with not

6    only a summary of those costs, but also included the detailed contracts, invoices, and pay broken

7    out by each employee who worked to administer the SRP.  The BLM provided underlying data

8    that supported its Closeout Decision to BRC in order for it to ascertain the justification for

9    BLM's charges. *See Bookcliff Rattlers*, 171 IBLA at 21.  Here, the BLM used a computer

10   spreadsheet to compile the data upon which the Closeout Decision was based, but then also

11   provided the support underlying that compilation, including the contracts, receipts, and the total

12   hours worked by each person along with their duties.  This is more than sufficient documentation

13   to show how the BLM arrived at the amount in the Closeout Decision.

### C.    The BLM properly charged the indirect cost recovery rate

15           BRC next challenges the BLM's imposition of the indirect cost recovery rate ("indirect

16   rate") of 22.9% on all direct costs.  Appeal at 18-21.  BRC alleges both that the BLM's indirect

17   rate duplicates direct costs and also that the BLM should not charge the indirect rate for any

18   direct costs incurred during the Burning Man event. *Id.*  Those arguments, however, evidence a

19   fundamental misunderstanding of the BLM's cost recovery process and the rationale behind the

20   indirect rate, which is required by law, regulation, and policy.  Such a misunderstanding does not

21   support BRC's burden on appeal.

22           Federal government agencies are obligated to recover the full cost of providing a special

23   benefit from the benefit's recipient.  OMB Circular A-25; *see also* 31 U.S.C. § 9701 ("It is the

24   sense of Congress that each service or thing of value provided by an agency…to a person…is to

25   be self-sustaining to the extent possible.).  As applied to the Burning Man SRP, that means that

26   the BLM must charge BRC for those actual costs incurred for administering the permit.  Cost

27   recovery for SRPs is authorized by the SRP regulations.  43 C.F.R. § 2932.31.

28

Direct costs, as explained by the BLM's cost recovery manual, are those costs which are of such a nature that the amounts applicable to a specific project can be <u>accurately and readily determined.</u>  AR Doc. 97 at Glossary 2.  Direct costs are incurred for the benefit of a specific cost reimbursement project which is identified by a project number.  *Id.*

In contrast, indirect costs are costs expressed as a percent of direct costs which are of such a nature that the amounts applicable to a specific project <u>cannot be accurately or readily determined.</u>  *Id.*  Indirect/overhead costs are incurred either jointly for the benefit of more than one cost reimbursable project, or in units which are so small that they cannot practically be reported separately.  *Id.*  In other words, the indirect cost pays for those administrative support activities that support the BLM's overall mission.  AR Doc. 78 at 3.  "Indirect costs are coded to the subactivities that would be charged if the ROW project did not exist."  AR Doc. 97 at .18B2.  As described above, the BLM's SRP Handbook says that indirect costs may include "equipment, space rental, telephone services, postage, personnel transfer costs, administrative and clerical support, training, safety, public information, cartography and basic series mapping, aviation management, telecommunications, equipment maintenance, and systems design and implementation."  AR Doc. 69 at 1-29 through 30.  Every identifiable recipient of special benefits derived from Federal activities beyond those received by the general public must pay the indirect rate.  AR Docs. 78 at 3, 96 at 2.

BRC's argument that it has been charged twice implies that the indirect rate is the only way that the BLM may collect for those activities that are listed as examples of potential indirect costs.  For instance, BRC argues that the BLM may not recover as a direct charge the costs for BLM staff travel expenses because travel is listed as an example of an indirect cost in IM 2014-32.  Appeal at 20.  However, BRC does not provide any evidence to support its claim that BLM may not recover travel as a direct cost.  In making its argument, BRC ignores the fact that federal employee travel to and from the Burning Man event in order to work as part of the BLM's administration of BRC's SRP is clearly a cost that applicable to a specific project and can be accurately and readily determined.  *See* AR Doc. 97 at Glossary 2; *see also* Sandberg Dec. at 19.  Nowhere in the BLM's law, regulation, or policy does it specify that the BLM may recover for

travel only through the indirect rate, nor does BRC attempt to support its claims by pointing to such a provision.  Since the travel outlined in the Closeout Decision is a direct cost, it is subject to the indirect rate.

Similarly, BRC argues that the BLM cannot charge directly for GIS specialists working at the 2015 Burning Man event because cartography and mapping are listed as examples of indirect costs.  Appeal at 20.  BRC also objects to the BLM budget analysts and contract specialists, since budgeting and contracting are listed as examples of indirect costs.  *Id.*  But again, BRC ignores the fact that these employees provided an identifiable service that is only attributable to the 2015 Burning Man event.  Those roles are necessary for the BLM's administration of the Burning Man SRP and their labor since it was directly related to the event, it was captured for cost recovery.  Sandberg Dec. at ¶¶14-18; Declaration of David Freiberg ("Freiberg Dec.") at ¶¶15-16; Declaration of Mark Pirtle ("Pirtle Dec.") at ¶¶4-8.  They fit within the definition of direct costs and there is no legal support for BRC's argument that the BLM may only collect for those tasks through the indirect rate.  As direct costs attributable to the 2015 Burning Man SRP, they are included in the Closeout Decision and are subject to the indirect rate.

To follow BRC's argument to its logical end would mean that regardless of how much the BLM spent on administering the 2015 Burning Man SRP, it may not be able to recover the full amount of the actual costs, in contradiction of FLPMA section 304(b) and OMB Circular A-25, which direct the BLM to recover the full costs of processing permits for the use of the public lands.  In fact, the Department of the Interior, Office of the Inspector General issued a survey report in 1999 examining the BLM's use of the indirect rate.  AR Doc. 95.  That report found that the agency's then-common practice of limiting the indirect rate had resulted in a failure to collect the total reimbursable overhead costs of providing services to organizations and individuals, in violation of Circular A-25 and FLPMA.  *Id.* at 2-3.  The report recommended that the BLM identify management overhead costs and use that data in setting the indirect rate.  *Id.* at 4.  As BLM outlines in IM 2015-100, the agency now reviews the indirect rate annually and directs staff to work diligently to recoup indirect costs.  AR Doc. 55 at 8.

AR04477

Additionally, BRC also argues that it provided the infrastructure for BLM's operations at the 2015 Burning Man event and thus it should not be charged an indirect rate. Appeal at 21. This argument, though, ignores the fact that the BLM's processing and administration of the SRP occurs outside of the actual event itself. BLM works nearly year-round on the Burning Man SRP, so the agency incurs overhead/administration costs that the indirect rate is designed to recover. *See* Sandberg Dec. at ¶¶14-15. The BLM SRP handbook reiterates that cost recovery, which includes BLM's direct and indirect costs, starts upon receipt of a completed application. AR Doc. 69 at 1-29. Thus, the indirect rate is appropriate for the Burning Man event. *See* AR Doc. 80 (denying BRC's request for a waiver of the indirect rate in 2013).

It is clear that BRC wants to pay less in cost recovery for its SRP for the Burning Man event. But when granting an SRP, the BLM is charged with ensuring public safety and resource protection on the public lands. 43 C.F.R. § 2932.26. In doing so, the BLM must recover the full, actual costs of processing and administering the SRP. 43 C.F.R. § 2932.31. That includes both direct and indirect agency costs. *Id.* If BRC feels that those costs are excessive, it may decide to hold the event in someplace other than the public lands. *See Bookcliff Rattlers*, 171 IBLA at 19. In fact, BRC had that opportunity when the BLM provided it with the Estimate Decision. AR Doc. 44. But BRC signed the CRA and paid the full amount of the Estimate Decision, which included the estimated costs for holding the 2015 Burning Man event on public lands. In fact, BRC actually received a refund because the BLM's costs were <u>less</u> than estimated. Forcing the public to absorb the costs of ensuring resource protection and public safety on BLM-managed lands for BRC's commercial Burning Man event is contrary to law, regulation, and policy. Accordingly, BRC has not supported its burden on appeal to show that BLM's imposition of the indirect rate is improper.

**D.    Contracting processes are appropriate and within the BLM's discretion**

BRC argues next that the BLM's contracting practices are unjustified and unreasonable and for those reasons the BLM should not recover its actual costs for administering the 2015 Burning Man SRP. Appeal at 22-26. These contracts include the interagency agreements with the National Park Service, U.S. Park Police ("USPP") (AR Doc. 16 at 29-36) and the Department

of Agriculture, U.S. Forest Service ("USFS") (AR Doc. 16 at 66-73) for law enforcement officers.  Also included are contracts for computer aided dispatch ("CAD") services (AR Doc. 16 at 13-28), microwave internet services (AR Doc. 16 at 37-65), temporary dispatchers to work at the event (AR Doc. 16 at 2-12), and dispatch consoles (AR Doc. 16 at 77-81).  BRC, however, does not provide any evidence of BLM error with regard to any of these contracts in order to support its burden on appeal.

### 1.    BLM is not required to transfer contracts to BRC

First, BRC argues that BLM should have identified certain contracts as transferrable, in order to allow BRC to contract directly with the provider and potentially save costs.  Appeal at 22.  BLM, however, has discretion to determine which goods and services may be provided by an SRP applicant.  BLM's SRP handbook specifically says, "The BLM may exercise considerable discretion in allowing an applicant to provide products rather than doing so itself." AR Doc. 69 at 1-29 (emphasis added).  Nothing requires the BLM to offer such contracts to an applicant.  In fact, the BLM and BRC entered into a Memorandum of Agreement in 2014 whereby they agreed that the BLM would identify certain contracts as "inherently governmental" and would be procured by the BLM.  *See* Pirtle Dec. at ¶¶4-8.  For the 2015 Burning Man event, those contracts included the ones for microwave internet, CAD services, and dispatch consoles, and temporary dispatchers.  *Id.* at ¶¶5-6.  Thus under that MOU process, BRC knew early in the planning process which contracts would be procured by the BLM.  *Id.*  These contracts were also identified as being retained by the BLM in its operational assessment report for the 2014 event. AR Doc. 66 at 41.

BRC asserts that the BLM recently notified BRC that several of those contracts may be available to transfer for the 2016 event.  Appeal at 22.  Such action could result in cost savings for BRC in future years.  However, nothing about that change shows BLM error for the 2015 event.  The BLM evaluates the necessary contracts for the Burning Man event on a yearly basis and determines which ones will be offered to BRC to fulfill.  Pirtle Dec. at ¶¶5, 8.  That process, and the BLM's determination to retain certain contracts, is well within the agency's discretion. *See* AR Doc. 69 at 1-29.  The Board has long held that it "will not ordinarily substitute its

judgment for that of BLM officials delegated the authority to exercise discretion merely because there is more than one legitimate point of view on a subject." *Pronto Pics, Inc.*, 165 IBLA 90, 92 (2005). That BRC wishes to save money is clear, but that does not mean that the BLM acted arbitrarily in determining that it would procure certain services rather than offering the contracts to BRC. Accordingly, BRC has not shown BLM error.

<div align="center">

**2.       BLM's contracts for law enforcement are reasonable and within the agency's discretion**

</div>

Second, BRC asserts that the BLM's interagency agreements with the USPP and USFS are unjustified and were not explained to BRC prior to the Closeout Decision. Appeal at 22-25. Even if true, such complaints do not show that the BLM erred in its calculation of actual costs for the 2015 Burning Man event. Rather, it shows that BRC disagrees with how the BLM determines the appropriate level of law enforcement to administer the SRP for the Burning Man event. Given the BLM's requirement to protect the public safety and natural resources on public lands, its contracts with USPP and USFS to supplement BLM law enforcement staff are reasonable and proper. Moreover, the record shows that the BLM did provide an adequate explanation for the necessity of the level of law enforcement at the event. BRC's argument, therefore, does not support its burden on appeal.

As an initial matter, the BLM has the authority and discretion to determine the level of law enforcement necessary on the public lands. *See Black Rock City*, 173 IBLA at 66, fn. 11; *see also Reed v. U.S. Department of the Interior*, 231 F.3d 501, 505-506 (2000). BLM determined that it needed 84 law enforcement officers for the 2015 Burning Man event based upon the projected number of participants. Declaration of Zachary Oper ("Oper Dec.") at ¶¶6-11; Declaration of William Mack, Jr. ("Mack Dec.") at ¶¶7-8. Such a calculation is within the discretion of the agency and BRC provides no evidence to the contrary.

BRC then argues that the BLM's explanations for the USPP and USFS contracts are unjustified. Appeal at 23, 25. The BLM, however, documented how each contract provides a needed service to the BLM in its administration of the 2015 Burning Man SRP. As outlined in the documents accompanying the Closeout Decision, the USPP officers provide the BLM with

training, crowd assessments, operational planning, and on-the-ground support and attendance of cases. AR Doc. 16 at 31. The BLM noted in its scope of work that the agency's own law enforcement officers do not typically have the ability to work with the skills and specialties that the USPP possesses. *Id.* The BLM Budget Analyst working on the Burning Man event noted in an email to BRC that "[t]he expertise of the [USPP] officers is vital to the success of the law enforcement program at Burning Man." *See* Appeal at Declaration of Rosalie Barnes at Exhibit E. *See also* Oper Dec. at ¶7. Likewise, the BLM contracted for USFS officers for the 2015 Burning Man event because in the past, the BLM has not been able to provide sufficient officers to adequately conduct its integrated command center operation. AR Doc. 16 at 68; Oper Dec. at ¶8.

BRC further complains that the BLM's law enforcement staffing level is unjustified because there have not been many person-on-person crimes at the event in 2013, 2014, and 2015. Appeal at 23. Yet BRC provides no support for its implication that the BLM is only allowed to staff the event based upon the number of past incidents. The BLM is required to ensure resource protection and public safety on the public lands. 43 U.S.C. § 1733. It is the BLM's responsibility to determine appropriate staffing levels in order to meet the law enforcement operational objectives, which included safeguarding and protecting human life and natural resources, to ensuring that the event occurred without disruption, and maintaining law and order. Oper Dec. at ¶¶9-10. Given the size of the Burning Man event and the number of participants, as well as the rugged terrain, the BLM must be prepared for many different kinds of incidents. The agency and BRC each compile an After Action Report yearly to provide post-operational assessments of the management of the event, including recommendations for future years. *See* AR Docs. 2, 5, 66, 68. Those reports have documented incidents including a rainstorm that caused a closure of the entire event for a period of time, a participant that barricaded himself in a vehicle and threatened harm to himself and others, and a vehicle-caused fatality. AR Doc. 66 at 3-4. The After Action Reports also document thousands of law enforcement public contact and public assistance events, as well as hundreds of BLM citations that were issued for violations of

AR04481

1    federal laws or the closure order.  AR Doc. 5 at 37-38.  BLM's law enforcement staffing level

2    for the 2015 Burning Man event is not inconsistent with those reports.

3              Ultimately, the BLM has the discretion to determine the nature and extent of its law

4    enforcement presence in order to administer the Burning Man SRP.  Other than mere

5    disagreement with the BLM's staffing levels, BRC points to no error on the part of the agency.

6    Accordingly, BRC has not met its burden to overturn the BLM's Closeout Decision.

7                    **3.       BLM provided sufficient information about CAD**

8              Third, BRC argues that BLM's contract for CAD should not be included in cost recovery

9    because the BLM has failed to justify its existence.  Appeal at 25-26.  On the contrary, the BLM

10   has repeatedly outlined the usefulness and necessity of the CAD system.  The statement of work

11   for the CAD system contract explains how real-time tracking of law enforcement units and

12   events would improve officer safety.  AR Doc. 16 at 15.  In its After Action Review for both

13   2014 and 2015, the BLM described how the system continued to improve, how it integrated with

14   the Department of the Interior Incident Management and Reporting System ("IMARS") to

15   facilitate efficient reporting, and how it helped keep the BLM updated during the event.  AR

16   Docs. 5 at 12, 66 at 23 and 26.  BRC alleges that the CAD system has not delivered data and

17   reports, but the BLM's After Action Report for 2015 includes a breakdown of BLM law

18   enforcement events and citations for 2014 and 2015.  AR Doc. 5 at 37-38.  Jon Young, the

19   BLM's Technical Subject Matter Expert for Communications at the 2015 Burning Man event,

20   described how the system provides vital and timely information to law enforcement officers.

21   Declaration of Jon Young ("Young Dec.") at ¶¶4-12.  The record demonstrates the necessity of

22   the CAD system to the BLM's law enforcement operations at the Burning Man event.  The

23   Closeout Decision includes the BLM's actual costs of providing that system.  AR Doc. 16 at 13-

24   28.  Again, BRC merely expresses disagreements with the BLM's use of the CAD system at the

25   2015 Burning Man event, but has not shown error in the Closeout Decision.

26            **E.       BRC has not shown error in the actual costs for supplies and equipment**

27            BRC further claims that it should not pay for the BLM's actual costs for administering

28   the 2015 Burning Man SRP because it has identified "numerous improprieties in BLM's

AR04482

1    handling of equipment purchases and use." Appeal at 26. BRC's allegations, however, are

2    unsupported and do not show error in the BLM's calculations in the Closeout Decision. BRC's

3    claims therefore do not support its burden on appeal.

4          BRC first complains about the BLM's use of goggles for employees working at the 2015

5    Burning Man event. Appeal at 26-27. Goggles are considered necessary for the safety and

6    protection of BLM staff working at the event, due to the harsh conditions on the playa and the

7    frequent dust storms that occur. Pirtle Dec. at ¶9. Goggles are also designated as Personal

8    Protection Equipment ("PPE") by the BLM and once issued, are not thereafter re-issued to other

9    staff. *Id.* While many BLM staff working at the Burning Man event bring their own goggles, it

10   is unknown ahead of time exactly how many pairs of goggles will be needed and so the BLM

11   orders a sufficient quantity for everyone. *Id.* Contrary to BRC's assertion, the goggles are not

12   "thrown away" at the end of the event, and those that are unused are stored so they can be used at

13   future Burning Man events. *Id.*; AR Doc. 25 at 2. Such use of goggles has been the BLM's

14   standard operating procedure since 1996. Pirtle Dec. at ¶9. Ultimately, BRC's mere

15   disagreement with the BLM's practice of providing PPE to its employees working at the Burning

16   Man event is insufficient to show agency error.

17         Second, BRC argues that the GPS cameras purchased with cost recovery funds are

18   unnecessary. Appeal at 27. The GPS cameras are used to catalog and geo-reference

19   environmental compliance issues such as grey- and black-water spills, fuel spills, burn scars, and

20   other environmental damage to the playa surface during the Burning Man event. Freiberg Dec.

21   at ¶¶5-10. This allows the BLM to locate, log, and document the compliance issues, then return

22   to ensure that the issue has been remediated. *Id.* at ¶6. As the BLM has explained, that process

23   and the information gathered with the GPS cameras is integral to the BLM's duty to ensure

24   environmental compliance with the terms and stipulations of the Burning Man SRP and the

25   closure order. *Id.* The cameras were purchased exclusively for use at the Burning Man event

26   and are stored for the remainder of the year. *Id.* at ¶7; AR Doc. 25 at 1. Again, while BRC

27   disagrees with the use of the cameras, it has not demonstrated BLM error in the Closeout

28   Decision.

AR04483

1    Third, BRC claims that it should not be charged for satellite tracking devices used by the

2  BLM at the Burning Man event.  Appeal at 27.  It is the BLM's established safety practice at

3  Burning Man to use the two-way satellite tracking and communication devices.  Young Dec. at

4  ¶3.  The agency has determined that the functions of these devices are necessary to the safety of

5  BLM personnel at the Burning Man event.  *Id.*  Other than a mere disagreement with the use of

6  such devices and unsupported speculation that BRC could find a cheaper solution, BRC has not

7  shown error on the part of the BLM.  *Id.* at ¶10.

8    Finally, BRC takes exception to certain shipping charges included in the Closeout

9  Decision.  Appeal at 27-28.  However, the charge was incurred to ship communications and

10  dispatch equipment from the BLM Nevada State Office in Reno to Gerlach, near the site of the

11  BLM Incident Command Post for Burning Man.  Pirtle Dec. at ¶10.  Accordingly, it is a direct

12  cost of the BLM's implementation of the 2015 Burning Man SRP.  BRC provides no evidence of

13  BLM error in the agency's calculations.  Mere disagreement with a charge included in the

14  Closeout Decision is insufficient to support BRC's burden on appeal.

15    **F.    BLM's labor costs are reasonable**

16    The remainder of BRC's claims center on the manner and level of BLM's staffing at the

17  2015 Burning Man event.  Appeal at 28-45.  BRC argues that certain BLM staff are superfluous

18  and unjustified (Appeal at 28-32), objects to the BLM's classification of the event as an

19  "emergency event" (Appeal at 33), and claims that the law enforcement staffing levels and

20  activities are unwarranted (Appeal at 34-45).  However, the BLM's administration of the 2015

21  Burning Man SRP, including staffing, is reasonable and supported with evidence in the record.

22  BRC's mere opinion that the BLM should have administered the event differently is insufficient

23  to overturn the decision on appeal.

24    This Board has long held that even when an appellant's assertions are neither
    erroneous nor unreasonable, merely representing a different point of view in the
25    controversy over what course of action is in the public interest, a BLM decision in
    the exercise of its discretion will ordinarily be affirmed when such judgment has
26    been exercised by an official duly delegated with the authority to do so.

27  *Arizona Zoological Society*, 167 IBLA 347, 356 (2005) (*citing Rosita Trujillo*, 21 IBLA 289, 291

28  (1975)).

AR04484

First, BRC argues that many of the BLM's staff are unnecessary for administering the

2015 Burning Man SRP.  BRC highlights several such positions, including the BLM ranger

working on the CAD system (Appeal at 29), vending compliance staff (Appeal at 29-30), those

programming and working on the radio system (Appeal at 30-31), computer and IT staff (Appeal

at 31), GIS staff (Appeal at 31), and law enforcement officers (Appeal at 31, 34-45).  The BLM,

however, has explained why its staff and staffing levels are necessary for the Burning Man event.

For example, Jon Young, the BLM Arizona Chief Ranger, has extensive experience with the

CAD system, communications, and satellite tracking of law enforcement officers.  Pirtle Dec. at

¶11.  The record also describes the work done by the BLM's communications technicians,

including setup, maintenance, and removal of the communications and IT system for the event.

*Id.* at ¶¶12-13.  The BLM environmental and vending compliance teams, as well as the GIS staff,

are necessary to protect the public lands and are chosen based on their expertise and familiarity

with the BLM's SRP and recreation management programs.  Freiberg Dec. at ¶¶11-16.  The

BLM's rationale for its law enforcement staff levels are set yearly in order to safeguard and

protect human life and natural and cultural resources, ensure that the event occurred without

disruption, maintain law and order on BLM-administered lands, and to keep costs commensurate

with incident needs.  Oper Dec. at ¶¶6-11, 13.  The highly trained K-9 units have been used for

patrol operations and narcotics detection, resulting in several hundred citations for illegal

possession of controlled substances over the past two Burning Man events.  *Id.* at ¶11.  In

support of its claims of BLM excess, BRC points to the fact that it was only represented by five

staff at the daily operational meetings during the 2015 Burning Man event, while the BLM sent

11 staff.  Appeal at 31-32.  However, such an observation does not show error on the part of the

BLM.  The BLM has the discretion to determine how many staff it needs at meetings, and at the

entire Burning Man event, in order to properly administer the SRP.  It did so here, and BRC has

not provided any objective evidence of BLM error.

Second, BRC objects to the BLM's designation of the 2015 Burning Man event as an

emergency event.  In support, BRC offers only its opinion that it is "obvious" that Burning Man

is not an emergency because it is a planned recreational event.  Appeal at 33.  However, whether

an event is planned or not has no bearing on the BLM's designation as an emergency.  Under

Federal regulation, an emergency is "a temporary condition posing a direct threat to human life

or property, including a forest wildfire emergency."  5 C.F.R. §550.103; Oper Dec. at ¶17.  The

BLM has designated Burning Man as an emergency event since 2012.  Oper Dec. at ¶15.  The

designation was made because of the event's remote location, the substantial and rapid

population growth to over 70,000 people, and the limited nature of local resources.  *Id.* at ¶16.

The designation allows the BLM to prioritize Burning Man in the event of an incident requiring

additional resources, especially during the wildfire season.  *Id.*  In 2015, the emergency

designation was supported by the Nevada State Director and the Director of the Office of Law

Enforcement and Security with review and final approval by the BLM Assistant Director for

Human Capital Management.  5 C.F.R. § 550.106(a)(1); Oper Dec. at 15.  BRC has only shown

that it disagrees with the BLM's designation, rather than demonstrating an error on the part of

the agency.  Here, though, the emergency designation was made by agency experts to address

public safety and resource protection concerns.  "[T]he Board will not substitute its judgment for

that of the technical experts employed by the Department acting within their field of expertise in

the absence of clear error."  *Arizona Zoological Society*, 167 IBLA at 356 (2006).  Accordingly,

BRC has not supported its burden on appeal.

Third, BRC complains about specific tactics and practices of the BLM's law enforcement

staff.  Appeal at 34-44.  Such complaints are not within the scope of the appeal of the Closeout

Decision, as they are irrelevant to the BLM's calculation of the direct and indirect costs for the

2015 Burning Man event.  The manner in which BLM's law enforcement officers perform their

jobs is solely within the discretion of the agency.  Furthermore, the Board has explained that

although it hears appeals arising from BLM decisions, it does not supervise the BLM.  *See*

*Southern Utah Wilderness Alliance*, 172 IBLA 183, 184-185 (2007).  "The Board does not

exercise supervisory authority over the BLM except in the context of deciding an actual appeal

case over which the Board has jurisdiction."  *Id., citing Defenders of Wildlife, Wyoming Outdoor*

*Council*, 169 IBLA 117, 127 (2006).  Accordingly, BRC's arguments about the tactics of law

enforcement officers during the 2015 Burning Man event are not properly before the Board and do not provide support to overturn the BLM's Closeout Decision.

## IV.    CONCLUSION

Based on the legal arguments above that are supported by evidence in the record, BRC has not met its burden to show BLM error by a preponderance of the evidence. BRC's mere opinion that the BLM should have spent less on administering the 2015 Burning Man SRP is insufficient to overturn the BLM's Closeout Decision. BRC submitted its SRP application and signed the CRA, which included the Estimate Decision. As the Board has stated, "the entire point of an estimate is to convey general cost information to an applicant so that it can decide whether to proceed." *Bookcliff Rattlers*, 171 IBLA at 19. BRC knew about the costs and proceeded with its event. It cannot now shift the burden for the costs of the 2015 Burning Man event onto the public. The Closeout Decision has a rational basis and is a proper exercise of the BLM's discretion. Since BRC has not demonstrated that the BLM is in error, the Closeout Decision should be affirmed.

DATED this 27th day of June 2016.

Respectfully submitted,

Janell M. Bogue
Attorney for the Bureau of Land Management

AR04487

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:    (916) 978-5690
Facsimile:    (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2016-115 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF DAVID FREIBERG** |
| | ) | |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, David Freiberg, hereby declare as follows:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.      I am currently employed as an Outdoor Recreation Planner for the Bureau of Land Management's (BLM), Shoshone Field Office (SFO). I have been employed with the BLM in this position since February of 2016, and also from 2001-2014. Before this position, I was the Winnemucca District BLM Project Manager for the Burning Man Special Recreation Permit (SRP) during the 2014 and 2015 Burning Man events.

2.      I have 15 years' experience working for the BLM and two years' experience with the Burning Man SRP, both in planning the BLM operation and executing the operation at the event site.

AR04488

3.      My duties during the 2015 event as a BLM Project Manager included working as a planning team member with advisory, planning and operational responsibilities for all administrative aspects of the Special Recreation Permit for Burning Man, except final decision-making and Law Enforcement planning and operations. As a planning team member I also had input on the development of the event Table of Organization; the development of the event Cost Recovery Agreement Estimate; the development of the event Permit Stipulations; and the development of the event Closure Order Restrictions.  During event operations, as the BLM Project Manager I was responsible for ensuring the BLM SRP was properly administered including permittee adherence to terms of the permit, stipulations, closure orders, vending permits, safety and day to day coordination and liaison with Black Rock City, LLC.

4.      To my knowledge, Burning Man is by far the largest and most complicated SRP administered by BLM nationwide.  The camping event has a population in excess of 70,000 people.

## GPS Cameras

5.      The BLM purchased $4,197 worth of GPS-enabled hand-held cameras for the 2015 Burning Man event in order to catalog and geo-reference environmental compliance issues such as grey- and black-water spills, fuel spills, burn scars and other environmental damage to the Playa surface, as identified by the Environmental Compliance Team during the 2015 Burning Man Event.

6.      These cameras were an integral part of ensuring that the Black Rock Desert Playa surface was not adversely affected by the Burning Man Event. The GPS-enabled cameras allowed the BLM to both geospatially and graphically log an environmental compliance issue discovered during the event, then find it again efficiently to ensure the issue has been remediated. The cameras also provided data for the administrative record of the 2015 Burning Man event, and provide data which helps inform stipulation and Closure Order compliance and out-year event planning to ensure minimal environmental damage caused by the Burning Man event. This process is integral to the BLM's duty to ensure environmental compliance with the terms and stipulations of the Burning Man SRP and Temporary Closure Orders.

7.      During the non-event remainder of the year, these GPS-enabled cameras are stored safely and separately from other non-event related BLM equipment. Because these cameras were purchased with cost-recovery money, they are only used by BLM to prepare for and during the Burning Man event, and are not used for any reason unrelated to the Burning Man SRP.

8.      In 2015, there were some technical difficulties experienced by the BLM Environmental Compliance Team. However, the Environmental Compliance program was a success and the use of the cameras was both helpful and necessary.

9.      BLM has used GPS-enabled cameras to accomplish the work of the Environmental Compliance Team since before I became project manager in 2014.

10.     GPS-enable cameras are commonly used to document and catalog environmental compliance issues associated with SRPs throughout the BLM.

AR04489

**BLM Compliance Teams**

11.     The BLM Environmental Compliance Team for the 2015 Burning Man event included eight team members and one supervisor to ensure compliance with the SRP terms, stipulations, and closure orders that were designed to protect natural resources on the public lands.

12.     The BLM Environmental Compliance Team staff was chosen based on their expertise and familiarity with BLM's Special Recreation Permit and recreation resource management programs. BLM also considered staff's familiarity and experience with the Burning Man event, which is unlike any other SRP administered by the BLM both in size and complexity. Most BLM staff who meet these requirements are GS-11 or higher, however BLM does bring in qualified lower-graded staff when they are available.

13.     The Vending Compliance Team for the 2015 Burning Man event included two team members and one team lead.

14.     Vending Compliance Team members must have sufficient skills and experience to complete compliance and monitoring on over 70 vending SRPs that are issued for the Burning Man event. They must also possess the skills needed to process newly identified SRPs as they are discovered during the event, and adjudicate complicated and nuanced SRP-related questions, situations and disputes. Most BLM staff who possess these skills and experience are GS-11 or higher.

15.     The GIS Team for the 2015 Burning Man event included one team member and one team lead.

16.     The GIS Team coordinates all collection and applications of spatial data during the Burning Man event, ranging from processing and mapping the data collected by the Vending and Environmental Compliance Teams, to coordinating the GPS-tracking of the locations of both civilian and law enforcement staff during the event. Only a BLM GIS specialist possesses the experience and skills to accomplish these critical tasks during the event. BLM GIS specialists are usually GS-11 or higher.

Dated this 21st of June 2016.

David Freiberg

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:     (916) 978-5690
Facsimile:     (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management


UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2016-115 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF WILLIAM MACK,** |
| | ) | **JR.** |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, William Mack, Jr., hereby declare as follows:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.      I am currently employed as a Field Manager for the Bureau of Land Management's (BLM), Black Rock Field Office (BRFO). I have been employed with the BLM in this position since July of 2014. Before this position, I was the Assistant Field Manager-Minerals for the BLM Kemmerer Field Office in Kemmerer, WY.

2.      I have 20 years' experience working for the BLM and two years' experience with the Burning Man Special Recreation Permit (SRP).

3.      My duties during the 2015 Burning Man event as Field Manager were limited, as the BLM Winnemucca District Manager oversaw the issuance and implementation of the SRP. My involvement increased to an advisory capacity following the departure of the District Manager in

July of 2015; however, the implementation of the SRP was still overseen by the new Acting District Manager.

4.      As an advisor to the District Manager/Acting District Manager I had little to no input in the development of the event Table of Organization; the development of the event Cost Recovery Agreement Estimate; the development of the event Permit Stipulations; or the development of the event Closure Order Restrictions. I did review these documents; however, and they were ultimately finalized and approved by the District Manager.

5.      During event operations, I continued my advisory role to the Acting District Manager and served as the Incident Commander for Civilian Operations when the Acting District Manager was not present on playa.

6.      In November of 2015, I was assigned to a 60-day detail as the Acting District Manager and was responsible for the closeout of the 2015 Cost Recovery Agreement and After Action Review (AAR).

7.      In 2015, the BLM staffed the Burning Man event with 9 environmental compliance staff, 3 vending staff, 1 safety officer, 2 GIS staff and 84 Law Enforcement (LE). Overall BLM staff, including Operations and LE, totaled 130 staff.  Their labor costs and expenses for the event were charged to the Cost Recovery Account.

8.      At peak occupancy the 2015 Burning Man event had 76,772 total occupants which equates to 1 LE per 914 people.

9.      In 2014 the BLM and BRC both signed and agreed via a Memorandum of Agreement (MOA) to the creation of proffer accounts to fund the full-time BLM Burning Man Project Manager and Outdoor Recreation Planner positions. The two positions are funded 80% BRC and 20% BLM. The MOA states that either party reserves the right to withdraw from the agreement at any time. Neither proffer account position is charged to the CRA before, during, or after the event.

10.     The Burning Man event is a year round workload for these two position that includes the following tasks: preparing NEPA documents for the event and the vending SRPs, preparing the actual SRPs, issuing and collecting fees for 60 plus vendor SRPs, attending numerous meetings and conference calls, preparing the After Action Review (AAR), assisting in the preparation of the Cost Recovery Estimate (CRE) and Cost Recovery Account Closeout, and reviewing numerous documents submitted to the BLM by BRC.

11.     The BLM bases the labor portion of the CRE on Federal General Schedule grades/wages of the potential staff working the event and refunds are supplied to BRC for funds that are not used. BLM employees are salaried employees and not hourly employees.

12.     It is the overall responsibility of the BLM and its staff to monitor all aspects of the implementation of the SRP including but not limited to safety, GIS, Environmental and Vending Compliance.  As the permitting agency, the BLM has the obligation to assign adequate staff to monitor these areas of activity during the event to ensure compliance with the SRP stipulations and Closure Order by the permittee. BLM Instruction Memorandum 2014-119 states that if an office is unable to fulfill or complete the necessary steps of issuing and managing an SRP authorization, then the SRP must not be issued.  BLM holds the overall responsibility for compliance on Federal Lands and bases staffing levels for the SRP implementation on a 70,000+

person population density within a city of 1.7 square miles in a remote area with the nearest full service community over 200 miles away.

13.     Under the SRP regulations the approval of an SRP is a discretionary action for the BLM Authorized Officer. All costs incurred by the BLM in order to implement the SRP must be reimbursed by the permittee through Cost Recovery. The permittee does not have to accept and/or sign or bear any obligation to engage in a Cost Recovery Agreement with the BLM if the permittee determines that the agreement is not in their best interest.


Dated this 21st day of June 2016.

William Mack, Jr.

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:     (916) 978-5690
Facsimile:      (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2016-115 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF ZACHARY OPER** |
| | ) | |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, Zachary Oper, hereby declare as follow:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1. I am currently employed as the Bureau of Land Management (BLM) Office of Law Enforcement and Security (OLES) Region 3 Special Agent-in-Charge (acting). I have been employed with the BLM in this position since May, 2016. Prior to receiving this promotion, I was employed as the BLM OLES Nevada Assistant Special Agent-in-Charge (ASAC). I have been employed as the Nevada ASAC since October, 2010. I was employed as a BLM Special Agent in Nevada from April, 2006 until October, 2010.

AR04494

2. I have 10 years of experience working at the Burning Man event, both in planning the BLM operation and executing the operation at the event site. I have served in multiple positions, to include Liaison Officer, Investigator assigned to the Major Crimes Unit, Logistics Chief, Deputy Officer in Charge, Investigative Team Lead, and Undercover Officer.

3. The BLM, Winnemucca District manages the Black Rock Desert Region and within this region are the Black Rock Desert and the "playa". The playa encompasses about 265 square miles (169,000 acres) of public and private lands in the Washoe, Pershing, and Humboldt Counties, Nevada.

4. The Burning Man Event is a combination art festival, social event, and experiment in community living. The event has been held on public lands administered by the BLM in Pershing County, Nevada on the barren playa of the Black Rock Desert, approximately 10 miles north east of the community of Gerlach, Nevada.

5. I have reviewed the appeal that was filed by Black Rock City LLC (BRC), the organizer of Burning Man and the applicant for Burning Man's SRP. I am personally familiar with the SRP and attended several phone calls, conference calls and meetings with BLM and BRC prior to and during the 2015 event.

6. Since the 2013 event and continuing through the 2015 event, the BLM implemented an integrated law enforcement operation with the Pershing County Sheriff's Office. This joint operation was instrumental in accomplishing the public safety mission as the population approached 70,000 participants. A few of the major improvements included additional law enforcement staffing for pre-event and post event patrol, integration of federal and county law enforcement operations, dispatch integration, permit/vending compliance, implementation of a formal Incident Command System (ICS), and substantial infrastructure advancements to the Incident Command Post (ICP). The BLM, Pershing County, and U.S. Park Police (USPP) worked under the ICS structure utilizing a common dispatch center. We also worked collaboratively on investigations and patrol functions, and operated under common operational guidance.

7. BLM officers, USPP detectives, and Pershing County deputies were assigned to the Major Crimes Unit to investigate person-on-person crimes (e.g assault, battery, sexual assault, rape, kidnapping, homicide, etc.). Officers assigned to the unit provided investigative support, case management strategies, intelligence gathering, liaison with the U.S. Attorney's Office, Pershing County District Attorney's Office, and Pershing County Sheriff's Deputies for any arrests (federal or state), evictions, drug possession/sales cases, and any other case types requiring follow-up investigative assets. The USPP detectives were incorporated within the Table of Organization in 2015 as part of the Major Crimes Unit because of their extensive experience and technical expertise investigating complex person on person crimes. In 2015, 8 USPP officers were assigned to the Major Crimes Unit. The use of USPP personnel provided a specialized skillset and their services were offered to PCSO and Pershing County District Attorney's Office as part of the integrated command structure in 2015. The USPP did not provide any training to BLM officers in 2015, nor did they provide "assessments and

AR04495

operational reports." These were not additional assets added to the operation. They fulfilled pre-established positions set by the BLM Authorizing Officer.

8. The USFS officers were utilized in the 2015 event to fulfill staffing needs identified in the 2015 Table of Organization. Several USFS K9 officers who had previous experience working the event were requested to fulfill several of the K9 positions on the Table of Organization. Regardless of whether the positions are filled by a BLM Ranger or a Forest Service Law Enforcement Officer (LEO), the cost to BRC is essentially the same or slightly lower, in large part because most U.S. Forest Service LEOs are full performance GS9's, whereas most BLM Rangers are full performance GS11's. These were not additional assets added to the operation. They fulfilled pre-established positions set by the Authorizing Officer.

9. It is BLM's responsibility to determine staffing levels and costs associated with the administering the law enforcement function at the event through the Cost Recovery Agreement (CRA). Adjustments to the staffing model since the 2013 event were based on the need to meet the operational objectives of the event. BLM was not singularly focused on one issue (e.g. drug interdiction). As stated in the 2015 Law Enforcement Operations Plan, the law enforcement operational objectives were to safeguard and protect human life, to safeguard and protect natural and cultural resources, to ensure the permitted event occurs without disruption, to maintain law and order throughout BLM administered lands for the duration of the operational period, and to keeps costs commensurate with incident needs. The 2015 Law Enforcement Operations Plan included 84 LEOs who were paid from the Burning Man CRA.

10. For the 2015 event, the BLM planning team identified 54 uniformed patrol positions on the table of organization to meet the operational objectives of the event. Uniformed patrol officers from the BLM and the U.S. Forest Service were deployed throughout Black Rock City in five patrol sectors. Officers were divided into three overlapping shifts, providing 24 hour coverage. The overlapping shifts were required to have adequate 24/7 law enforcement coverage and to account for travel to and from Gerlach. Uniform patrol officers were deployed throughout Black Rock City and along perimeter areas at the direction of their respective Patrol Supervisors. They were responsible for enforcing federal laws, regulations, event closure orders, and permit stipulations. These high visibility patrols were conducted using marked law enforcement vehicles, ATVs, UTVs, golf carts, and/or on foot.

11. BLM K-9 handlers and law enforcement officers are highly trained professionals that only conduct traffic stops based on reasonable suspicion or probable cause, in accordance with federal law. K-9 units were utilized at the event for patrol operations and narcotic detection. During the 2015 event, BLM law enforcement utilized 8 K-9 units. There were three K-9 units assigned to day shift, two K-9 units assigned to swing shift, and three K-9 units assigned to night shift. Every year a significant number of controlled substances violations are discovered by law enforcement inside the Burning Man event. In 2014, BLM and USFS issued 205 citations for illegal possession of a controlled substance; 116 citations were issued in 2015. According to the 2015 Pershing County Sheriff's Office (PCSO) Post Festival Report, PCSO made a total of 29 arrests related to ranging from possession to trafficking of

controlled substances; additionally, "143 citations were issued for various offenses to include controlled substances violations." It should be noted that BRC staff control gate operations (entry and exodus) without a law enforcement presence; as such, I am not aware of any narcotic violations reported to law enforcement by BRC gate personnel during the 2015 event. Either BRC gate personnel lack the proper training and expertise to locate narcotics or they are purposely ignoring violations of law.

12. Under 43 C.F.R. § 8364.1, BLM has the authority to issue closure/restriction orders on use of public lands, where such action is necessary to protect persons, property, public lands and resources. The regulation requires the BLM to "include a statement on the reasons for the closure," explaining why a particular "use" requires a restriction order, setting forth the rationale for restricting "uses" of the public lands that might not typically be considered in a closure order. It should be noted that the closure/restriction orders help the Burning Man event organizers implement unique event rules to include limiting access to public lands, requiring paid entry and mutant vehicle registration, etc. These are all restrictions specific to this special recreation permit.

13. PCSO does not have the authority to enforce existing state traffic laws at the event.  Black Rock City consists of a surveyed, engineered, and maintained road network to include street names, signs, traffic control devices, and signed speed limits. Since enforcement of these traffic laws are not enforced by a state or local law enforcement entity at the event, the BLM put forth a restriction order regarding motor vehicle use and operation. The dried up lakebed (the playa) becomes a city of 76,000 people at peak population. A substantial amount of vehicles traverse across the playa during the event. Additional closure orders and restrictions are implemented to safeguard and protect human life and natural resources, to ensure the permitted event occurs without disruption, and to maintain law and order throughout BLM administered lands for the duration of the operational period. BLM law enforcement only takes enforcement action on federal laws. Enforcement of state laws falls exclusively on the Pershing County Sheriff's Office or any other state law enforcement entity with jurisdiction.

14. Both Pershing and Washoe County Deputies have advised the Nevada Revised Statutes (NRS) traffic regulation definitions do not apply on the dried-up lake bed and consequently those statutes do not apply during the Burning Man event. As such, they aren't able to enforce the NRS traffic regulations on the playa. Below are Nevada Revised Statute (NRS) definitions as relating to roads:

- NRS 484A.215 "Road" defined. "Road" means the entire width between the boundary lines of every highway outside the territorial limits of a city and open to the use of the public for purposes of vehicular traffic. (Added to NRS by 1969, 1480)—(Substituted in revision for NRS 484.144)

- NRS 484A.220 "Roadway" defined. "Roadway" means that portion of a highway which is improved and ordinarily used for vehicular traffic, exclusive of the shoulder. (Added to NRS by 1973, 448)—(Substituted in revision for NRS484.145)

AR04497

- NRS 484A.095 "Highway" defined. "Highway" means the entire width between the boundary lines of every way dedicated to a public authority when any part of the way is open to the use of the public for purposes of vehicular traffic, whether or not the public authority is maintaining the way. (Added to NRS by 1969, 1478; A 1981, 1690)—(Substituted in revision for NRS 484.065)

15. Since 2012, the BLM has designated Burning Man as an emergency event. This emergency designation has been supported by the Nevada State Director and the Director of the Office of Law Enforcement and Security with review and final approval by the BLM Assistant Director for Human Capital Management. 5 CFR § 550.106(a)(1). This decision is solely within the discretion of the BLM.

16. The Burning Man event has been designated as an emergency event because of its unique circumstances. The event is located in a remote area, two hours from the nearest city. This large mass gathering event has contingency plans due to previous significant incidents that have occurred at the event including loss of human life, property damage due to fire, and a significant weather event that impacted the participants, the permittee, and Federal, state, and local law enforcement agencies. Due to its remote location, substantial and rapid population growth, and limited local resources, all of infrastructure to house and support a city population of 76,000 has to be transported to this remote location. An emergency designation allows the BLM to prioritize the Burning Man event in the event of an incident requiring additional resources, especially during the time of year where the agency is dealing with other resource-intensive events like wildland fires.

17. Emergency is defined as a temporary condition posing a direct threat to human life or property, including a forest wildfire emergency. 5 CFR § 550.103. Given its remote location, number of people present at the event, and level of risk associated with the activities that occur at the event; the overall Burning Man event proceedings create many temporary conditions posing a direct threat to human life and property despite the amount of planning done for the event. Some of this planning includes the development of a Tier 1 Management Team to address significant incidents. This included creating contingency plans for the following items: Militia Presence and Activities, Active Shooter/Active Threat, Weather Event, Civil Disturbance/Unrest, Fire, Fatality Accidents, Explosive Devices, Lost or Missing Child, and Structural Collapse. The Tier 1 Management Team was comprised of administrators from the Pershing County Sheriff's Office, BLM, Black Rock City LLC (BRC), and CrowdRx (event medical provider). This planning is valuable and useful in case such events do occur, but it does not change the need for the BLM's emergency designation.

18. The only result of the emergency designation is a change in the annual maximum earnings limitation for certain employees. As outlined in 5 CFR § 106, the annual maximum earnings limitation requires that for any pay period in which the head of an agency determines that an emergency exists, the agency must pay an affected employee premium pay under the limitations described in 5 CFR § 550.106(c) and § 550.107 instead of under the biweekly limitation described in § 550.105(a). An employee's regular pay is still the same and depending on a specific employee's grade, the emergency designation may not have any effect on overtime/premium pay at all.

AR04498

19. Pursuant to Instruction Memorandum (IM) No. 2014-149, Fiscal Year 2015 Bureau, and Statewide Law Enforcement Special Events/High-Use Recreation Area Priorities and Management of Law Enforcement Assets, the 2015 Burning Man event was classified as a national detail. The IM defines a national detail as "a high use weekend or special event where the ability to manage the activity in a reasonably safe manner for both the public and the LEOs assigned exceeds the capability of the resources within the State where the event is occurring." This supports the BLM's determination that the Burning Man event is an emergency event, as even during normal operations it requires resources from outside the state to ensure safety of the public and the public land resources.

Dated this 20th day of June 2016.

Zachary Oper

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:     (916) 978-5690
Facsimile:     (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2016-115 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF MARK PIRTLE** |
| | ) | |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, Mark Pirtle, hereby declare as follows:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.      I am currently employed as a Reemployed Annuitant for the Bureau of Land Management's (BLM), Winnemucca District Office (WDO), as a Special Projects Manager for the Burning Man (BM) Special Recreation Permit (SRP). I have been employed with the BLM in this position since June 2012. Before this position, I was the BLM, Office of Law Enforcement and Security (OLES) Special Agent-in Charge (SAC) of Region 3 (Nevada/Utah). I retired from the SAC position in January 2012, after 26 years of service.

2.      I have 20 years' experience working the BM SRP, both in planning the BLM operation and executing the operation at the event site. I have served in multiple positions, to include BLM's planning team member and/or lead, BLM's event lead for illegal drug interdiction,

AR04500

BLM's event lead for all law enforcement operations, BLM's event Deputy Incident Commander, BLM's event Incident Commander, BLM's event Project Manager, BLM's event Facility Manager and currently (2016) serving as Civilian Operations Branch Chief.

3.       My duties during the 2015 event as a BLM Special Project Manager/Event Facility Manager included planning team member with lead responsibilities in the development of the event logistic program; the development of the event communication network program; the development of the event lodging plan; the development of the event Incident Command Post (ICP) Compound plan; the development of the event Incident Action Operational Plan; and the development of the BLM/BRC Memorandum of Understanding (MOU)/Statements of Work (SOW) program.  As a planning team member I also had input on the development of the event Table of Organization; the development of the event Cost Recovery Agreement Estimate; the development of the event Contracting plan; the development of the event Permit Stipulations; and the development of the event Closure Order Restrictions.  During event operations, as the BLM Facility Manager I was field supervisor of the BLM's logistic team and communication network team. In addition, I was also the BLM coordinator of all the BRC MOU/SOW activities.

**Contracting**

4.       In early 2014, as the event project manager of that year, I was assigned to develop a Memorandum of Understanding (MOU) between the BLM and Black Rock City (BRC) LLC. The MOU outlined how the BLM could provide BRC with the ability to procure (contract) designated logistical support items for BLM's operation during the annual Burning Man event. Those contracts are listed on Attachment 1 to the MOU.  The BLM also agreed to identify actions (contracts) that are inherently governmental and as such will remain procured by the BLM. Those contracts are listed on Attachment 2 to the MOU.  The MOU was signed by BRC (Charlie Dolman, BRC Executive Operations Director) on February 27, 2014 and was counter signed by BLM (Gene Seidlitz, BLM Winnemucca District Manager and Authorizing Officer of SRP) on March 3, 2014. The MOU is in effect through the 2016 event. A copy of the MOU is attached to this declaration as Exhibit A.

5.       During coordinated planning of the 2015 event between BLM and BRC, BLM identified, as per the MOU, the contracts (Inter-Agency Agreements) between the BLM and the U.S. Park Police and the U.S. Forest Service, for the purpose of having those agencies provide law enforcement officers to work for BLM law enforcement at the event, as inherently governmental and therefore would not be part of the MOU program and would be procured by the BLM. Additionally, BLM identified the Computer Aided Dispatch (CAD) services contract with iNET, the Microwave Internet services contract with Lyman, the Dispatcher services contract with Law Enforcement Temporary Placement and the Dispatch Consoles rental services with Modular Communications Systems as inherently governmental and therefore would not be part of the MOU program and would be procured by the BLM.

6.       BLM did present to BRC, through the MOU program, six designated logistical support contracts to be procured by BRC for BLM, the Incident Command Post (ICP) build-out contract, the Gerlach Lodging contract, the ICP Food Vendor Services contract, the ICP Fueling Services contract, the IT Equipment rental contract and the Portable Radio purchase contract. In earlier coordination conversations between BLM and BRC, BRC representatives stated they did not want the UTV/Golf Cart rental contract as part of the MOU program, even though BLM told BRC it could be part of the MOU program, so that remained as a BLM procured contract.

AR04501

7.      In 2015, the BLM entered into two Inter-Agency Agreements (IAA) contracts, one with the U.S. Park Police and one with the U.S. Forest Service for the purpose of having those agencies provide law enforcement officers to work with and for BLM law enforcement at the 2015 event. This was not a new practice in 2015. BLM had processed IAAs with the U.S. Forest Service for approximately six previous Burning Man event operations. BLM had processed IAAs with the U.S. Park Service for approximately two previous event operations. Also, in 2015 BLM had entered into a CAD services contract with iNET for the second year in a row. All of these contracts were identified to BRC early in the 2015 planning process as inherently governmental, as per the MOU, and therefore would not be part of the MOU program and would be procured by the BLM.  Therefore it was never a possibility for BRC to realize the cost saving (indirect cost) of the MOU program for these contracts.

8.      During yearly Burning Man event planning, BLM evaluates all the necessary contracts to provide the logistical support items needed for the BLM's event operations and SRP administration. Some contract types will always remain inherently governmental, like IAAs. However, other service contracts are re-evaluated every year and BLM has the discretion to offer the contract to BRC as part of the MOU program. It has not been the BLM's practice to offer contracts to BRC through the MOU program in the first or second year of a contract, in order to retain sufficient oversight.  However, once the BLM feels comfortable with the skills of a particular contractor or the ability to procure a specific good or service, BLM can offer the contract to BRC through the MOU program, as long as BLM has approval over the contractor and BRC agrees to follow Federal contracting rules as outlined in the MOU.

**Supplies for 2015 Burning Man event**

9.      In 2015, BLM had 136 detail employees working the on-site at the event. BLM purchases goggles for issue to the event detailers due to the many playa dust storms that occur every year during the event operational days. BLM purchases the goggles with cost recovery agreement estimate funds under the category of "miscellaneous supplies and equipment". Goggles are considered Personal Protection Equipment (PPE) by BLM and therefore once issued, are not re-issued to other people. Many detailers that have been to previous Burning Man events do bring their same goggles back from previous events and reuse them, as long as they are still servicable, but they are not told they have to reuse previously issued goggles or are they told they have to turn in their used goggles at the end of the operation because goggles are designated as PPE. Because it is unknown prior to the event exactly how many goggles will be needed, the BLM orders enough for all employees plus a quantity of extras in case of loss or damage.  Any goggles purchased in a particular year that are not issued out are stored so they can be issued out in future BM events.  This practice has been BLM's standard operating procedure since 1996, which is as long as I have been involved in the event operations.

10.     In 2015, the communication team and the dispatch team reported to the ICP compound site on playa during set-up week on 8/19/16 to begin the establishment of the radio communication network and the dispatch center. Several pieces of equipment ordered from vendors on "back order status" did not arrive to the Nevada State Office (NSO) before the teams left on 8/19. Those items had to be re-routed by FedEx shipments to the BLM facility (Black Rock Station) in Gerlach, which is 8 miles from the ICP compound site.  This cost was charged to the CRA.

**BLM Staff**

11.     Jon Young is BLM's Arizona program Law Enforcement (LE) State Chief Ranger (SCR). As a SCR he is a GS-13. As part of his AZ SCR duties, he is the LE representative in the BLM's oversight group for Interagency Dispatch Centers and has acquired the skills to be qualified as an expert in this field. Because of his expertise, as a collateral duty, he has worked at the Burning Man event for the last several years. He serves as the event LE technical expert for support in communications, computer aided dispatching, and satellite tracking. In 2015, he worked in both the planning and operational phases of the event, and his labor for those tasks was charged to the BM CRA. His event position required him to provide BLM's CAD reports to the Office of Law Enforcement and Security (OLES) leadership, which then can be shared with BRC, as determined appropriate by OLES event management.

12.     In 2015, BLM had five agency communication technicians assigned to the event to build and maintain the communications network around and in Black Rock City. The lead of communication team is part of BLM's event planning team. The communication team must install four temporary repeaters around the Black Rock Desert, setup a 40' communication tower at the event management compound, install radio consoles in the temporary event dispatch center and program and issue portable event radios and program mobile radios for all detailers at the event. Then the team must maintain this communication infrastructure during the three weeks of pre-event, main event and post event. At the end of the event the team must dismantle the communication network and service for next year's use. This team and their duties have been the standard practice for BLM's BM event operation for approximately the last seven years, since the event footprint became so big. Per federal government regulation, the BLM must conduct radio communications on agency assigned frequencies and on P-25 radios. These requirements are also in effect during the BLM's BM event operations. BRC has asked BLM during multiple event years to conduct BLM event radio communications over their (BRC's) communication network and every year BLM tells them we cannot.

13.     In 2015, BRC acquired the IT equipment required for BLM's event operations through the MOU program. Approximately 100 pieces of IT equipment were rented for BLM by BRC. However, BLM had to provide BLM IT Specialist(s) to install and hook up the IT equipment in the modular buildings at the event management compound. The BLM IT Specialist(s) also had to break down, pack and send back the IT equipment to BRC's vendor. The labor for the BLM IT Specialist(s) was charged to the CRA.

Dated this 20th day of June 2016.

Mark Pirtle

**Exhibit A to Declaration of Mark Pirtle**

AR04504

| BLM MOU Number: NV-0201404_____ | Page 1 of 3 Pages |
|---|---|

## MEMORANDUM OF UNDERSTANDING

### Among

### THE U. S. DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, WINNEMUCCA DISTRICT OFFICE

### And

### BLACK ROCK CITY LLC

### Concerning:

Implementation of the Burning Man 2012 – 2016 Special Recreation Permit (SRP) Environmental Assessment (EA), DOI-BLM-NV-WO30-2012-0007-EA, referenced as 'Burning Man.'

I.   **Purpose:**

The purpose of this Memorandum of Understanding (MOU) among the U.S. Department of the Interior, Bureau of Land Management, (BLM), Winnemucca District Office (WMDO) and Black Rock City LLC (BRC) is to outline a cooperative plan defining the future logistical planning efforts for the 2014 through 2016 Burning Man events. This MOU will provide BRC with the ability to procure designated logistical support items for BLM's operation during the annual Burning Man event located in Pershing County, Nevada.

II.  **Authority:** The following Legislative Authorities are applicable under this MOU

Federal Lands Recreation Enhancement Act (REA)
Federal Land Policy and Management Act of 1976 (FLPMA)
§43 CFR 2930 Special Recreation Permit Regulation
National Conservation Area (NCA) Section 5(C)(3)

III. **Procedures:**

A.   The BLM agrees to:

1.   Provide BRC with a list of logistical support requirement to be procured by BRC for use by the BLM for the purpose of the BLM's Burning Man Event management operation. (Attachment 1)

2.   Provide BRC detailed specifications and or Statement of Work (SOW) for each requirement identified in Attachment 1.

3.   Identify actions that are inherently Governmental and as such will be procured by the BLM (Attachment 2).

4.   Provide BRC a BLM point of contact throughout the planning and procurement process.

5.   Review all asset deployment operational plans provided by BRC and provide BRC with comments and/or concerns.

6.   If needed, provide BRC a SOW for any modifications to an established contract.

| BLM MOU Number: NV-0201404 | Page 2 of 3 Pages |
|---|---|

7. Provide BRC with post-event feedback regarding contractor performance on those requirements procured by BRC.

B. **Black Rock City LLC agrees to:**

1. Review proposed BLM procurement actions, conduct market research on availability of assets.

2. Provide the BLM with a solicitation and award schedule for each requirement listed on Attachement I.

3. Notify the BLM when solicitation and/or award schedules change.

4. Provide the BLM with a copy of each award.

5. Provide the BLM with an operational plan on each asset deployment.

6. Utilize Federal Acquisition Regulation (FAR) 8 Required Sources of Supplies and Services to the fullest extent practicable.

7. Provide the BLM a point of contact throughout the planning and procurement process.

8. Acts as the primary logistical support contact with each contractor procured for the BLM.

9. Will coordinate a pre-performance meeting for each award prior to the Burning Man event.

10. Will coordinate performance meetings with contractor and the BLM for questions and communications on an "as-needed" basis.

11. If needed, will coordinate modification to existing contract upon request of BLM.

C. **All parties mutually agree to:**

1. Use common format/software for shared materials.
2. Provide timely notice of schedule changes related to procurement planning, soliciting, award, deployment and demobilization.
3. Work cooperatively throughout the procurement process to ensure BLM contracting standards are met and keep communication channels open during the planning, procurement and set-up periods.

IV. **Administration:**

A. **Non-fund Obligation Document** - Nothing in this MOU shall obligate any of the Parties to commit or transfer funding. Specific work projects or activities that involve the transfer of funds, services, or property among the Parties will require execution of separate agreements, and be contingent upon the availability of appropriated funds. Such activities will be independently authorized by appropriate statutory authority. This MOU does not provide such authority. Negotiation, execution, and

AR04506

BLM MOU Number: NV-0201404_____                    Page 3 of 3 Pages

administration of each such agreement must comply with all applicable statutes and regulations.

B. Nothing in this MOU will be construed as affecting the authorities of the parties, or as binding beyond their respective authorities or to require any of the parties to obligate or expend funds in excess of available appropriations.

C. Conflicts between the parties concerning procedures under this MOU which cannot be resolved at the operational level will be referred to successively higher levels as necessary for resolution.

D. Upon request by any of the parties, all parties shall review this agreement to assure that it continues to reflect the appropriate understandings and procedures to provide for current needs and capabilities and adherence to the Public Laws.

E. Either party may propose changes to this MOU during its term by providing written notification to the other party. Such changes will be in the form of an amendment and will become effective upon signature by both parties.

F. Either party may terminate their involvement under this MOU upon providing a 30-day written notice of such termination to the other party.

G. This MOU will become effective upon the latest signature date and will remain in effect until December 31, 2016 or until expiration of the Burning Man 2012 – 2016 Special Recreation Permit (SRP) Environmental Assessment (EA), DOI-BLM-NV-WO30-2012-0007-EA, whichever is sooner. This MOU may be extended or amended only upon written agreement of both parties.

V.    **PRINCIPAL CONTACTS.** The principal contacts for this instrument are:

**Bureau of Land Management**         **Black Rock City LLC**
**Gene Seidlitz**                     **Charlie Dolman**
5100 E. Winnemucca Blvd.              660 Alabama St.
Winnemucca, NV 89445                  San Francisco, CA 94110
Phone: 775-623-1501                   Phone: 415-865-3800 x 164
E-Mail: gseidlit@blm.gov              E-Mail:
                                      charlie.dolman@burningman.com

VI.    Approvals:

FOR THE U.S. DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, WINNEMUCCA DISTRICT OFFICE
By:

GENE SEIDLITZ, DISTRICT MANAGER          Date 3/3/14
BLM WDO

FOR BLACK ROCK CITY LLC
By:

CHARLIE DOLMAN, EVENT OPERATIONS DIRECTOR   Date 2/27/14
BRC LLC

AR04507

**Attachment 1**

Logistical support assets required by the BLM for management of the Burning Man 2015 Event to be provided by BRC with delivery to the BLM Incident Command Post (ICP) or specified location in accordance with specifications and/or statement of work (SOW).

1) SOW for ICP Facilities/Services:
   a. Rental, placement, and service of modular buildings
   b. Rental and placement of furniture for modular buildings
   c. Rental, placement, and service of temporary power equipment
   d. Rental, placement, and service of portable toilets and hand wash stations (ICP and BLM City Substation locations)
   e. Sewer and Potable water service to the BLM and the BLM contractor trailers at BLM ICP location.
   f. Rental, placement, and service of lighting equipment
   g. Rental, placement, and service of roll-off trash dumpsters
   h. Construction/assembly of fencing around the BLM ICP

2) SOW for IT equipment rentals for ICP trailers:
   a. Rental and service of IT equipment for use at ICP

3) SOW for re-fueling services for BLM vehicles:
   a. On-site (on playa) fuel (gasoline and Diesel) services for all the BLM detail vehicles

4) SOW for meal services and purchase/delivery/storage of bagged ice/bottled water/bottles sports drinks at ICP for BLM detailer's:
   a. On-site (on playa at ICP) meal services for all the BLM & PCSO detailers for Pre-Event, Main Event & Post Event (8/18 – 9/5)

5) SOW for BLM detailer's lodging at Bruno's:
   a. Lodging for BLM & PCSO detailers at Brunos (Hotel rooms, Apartments, Street houses, Trailer Park houses, Trailer Park spaces-for BLM/PCSO trailers)

6) SOW for purchase of 60 AES encryption capable Midland STP-105B-GF-CL VHS Portable radios for BLM/PCSO event detailers:
   a.    60 P25 VHF portable (AES Encryption Capable) radios
   b.    120 Rechargeable Batteries
   c.    60 Antennas
   d.    21 Speaker Mics
   e.    29 3 wire Surveillance Kits
   f.    10 6-station Gang Charger
   g.    20 Single Unit Desktop Chargers
   h.    Shipping to SNDO in Las Vegas

## Attachment 2

Logistical support assets required by the BLM in the management of the Burning Man 2015 Event that the BLM will provide to the BLM Incident Command Post (ICP) or specified location in accordance with specifications and/or statement of work (SOW).

1) Gov't Contract: Technical services and support of Computer Aided Dispatch (CAD)
2) Gov't Contract: Technical services and support of Internet (Microwave)
3) Gov't Contract: Rental and service of Dispatch Consoles for dispatch modular building
4) Gov't Contract: Rental and service of Utility Terrain Vehicles (UTVs) for use by the BLM
5) Gov't Contract: Delorme Live Tracking  Service
6) Gov't Contract: Dispatch Personnel and Services
7) Gov't Contract: Radio Base Station Purchase
8) IAA: USFS
9) IAA: USPP
10) IAA: HHS

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:     (916) 978-5690
Facsimile:     (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2016-115 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF CASSIE SANDBERG** |
| | ) | |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, Cassie Sandberg, hereby declare as follow:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.      I am currently employed as the Bureau of Land Management's (BLM), Office of Law Enforcement and Security (OLES), Budget Analyst. I have been employed with the BLM since May 2001. I have held my current position since December 2012. Before becoming the Budget Analyst for OLES, I was the Budget Analyst for BLM Utah for 6 years.

2.      My duties include budget and cost management functions for OLES. I provide guidance and support for budget development, execution and monitoring, program management analysis, evaluations and studies, and cost management. I devise and recommend the adoption of procedures and requirements to implement budgetary and financial management processes,

AR04510

policies, and regulations. I perform budget execution work involving the monitoring of obligation and the actual expenditures and monitor the use and rate of expenditures of budgeted funds. I conduct trend and prepare data summaries for inclusion in routine and special reports on budget execution.

3.      I have approximately 10 years of experience in formulation of budgets which include 3 budgets for cost recovery calculations. I have approximately 4 years of experience with the Burning Man SRP.

4.      I developed the cost recovery estimate for the 2015 Burning Man event, including the detailed estimate that was attached to the 2015 Decision and Cost Recovery Agreement.

5.      To calculate the cost recovery estimate for the 2015 Burning Man event, I reviewed the files from the 2014 Burning Man event and consulted with BLM staff who administered that event and the BLM staff who will be administering the 2015 Burning Man event. In order to provide a cost estimate for operations, data was collected from market research from potential third-party contract vendors, and 2014 operational final costs. Labor estimated costs were calculated by determining the number and type of positions needed for 2015 event. The hourly rates of the positions (GS pay scale) were projected at a standard pay rate by position type until personnel selections were finalized. The hours needed by position were also projected based estimated shift schedules needed to staff the event. The total cost per position was the projected hourly rate multiplied by the projected hours needed. I totaled the cost recovery estimate by Direct Costs (operational and labor costs) and then multiplied the direct cost total by the established Indirect Cost Rate to identify with the Indirect Cost amount.

6.      Labor Costs included only personnel costs for the listed positions and the estimated hours are event-specific. Additionally, the estimated hours for those positions listed as Agency Administrators include only the hours those positions will spend on event-specific work and does not include occasional internal meetings throughout the calendar year.

7.      Other specific tasks were performed by the following positions during the event time frame: Finance Lead, Contracting Officer, and GIS Specialists. The Finance Lead is tasked with daily budgetary of the event along with assistance from the Contracting Officer for time keeping, files, and maintained the incident documents. The Finance Lead, and Contracting Officer includes only the hours those positions will spend on event-specific work. The GIS specialists coordinate with the compliance team to document incidents observed by compliance team members. The reports generated by the GIS specialists are submitted to BRC, which is required to mitigate the documented environmental and public health and safety issues found on the playa. The Public Information Officer includes only the hours the position spends on event-specific work.

8.      The Labor Detail, as listed on the cost recovery estimate, does not include any excluded administrative or program costs, as directed by BLM policy including Instruction Memorandum 2015-100.

9.      The Operations Detail included the BLM's Direct Costs for costs associated with all non-labor expenses required for the event. This included any third-party contracts that the BLM entered into for supplies and services to facilitate the 2015 Burning Man event. These contracts included: mission support technicians, computer aided dispatch, microwave IP network, satellite

AR04511

trackers, dispatch consoles, UTVs, 3-wire radio microphones, base station purchase, googles, and GPS cameras.

10.    The Operations Detail, as listed on the cost recovery estimate, does not include any excluded administrative or program costs, as directed by BLM policy including Instruction Memorandum 2015-100.

11.    Based upon the direction provided in BLM policy, including Instruction Memorandum 2015-100, I included a 22.9 percent surcharge on the Direct Costs to account for the BLM's indirect costs incurred in permitting the 2015 Burning Man event.

12.    BLM's Indirect Costs account for administrative and program activities that are done for the 2015 Burning Man event but cannot be captured as a Direct Cost. Examples of these activities include: cell phone costs, sending mail/packages, secretarial support to reserve travel for meetings, portion of the costs of general equipment used each day such as laptops, desktops, and telephones, and maintenance for vehicles completed by the fleet manager. Another example includes activities required when invoices are submitted for third party contracts issued by BLM. The invoices are routed through our National Operational Center payments division for payment.

13.    To calculate the cost recovery close out for the 2015, I collected actual expense data from the financial system. I pulled raw data reports specific to the Burning Man event by querying the Work Breakdown Structure (WBS) established only for the 2015 event. Costs included in the close out reports were only those with the identified WBS. I sorted the expenses into categories (e.g. labor, contracts, travel, and micro-purchasing). I formatted the raw data reports into user-friendly documents to be provided to BRC.

14.    My time (Budget Analyst) associated with developing the cost recovery estimate and calculating the cost recovery close out was not charged to the Burning Man event. The amount listed under Budget Analyst in the close out was only for the time spent on playa, directly related to recording the time and costs of the event.

15.    The Contracting Officer's time associated with obligating and close out of the contracts specific to the Burning Man event was not charged to the Burning Man event. The amount listed under Contracting Officer in the close out was only for the time spent on playa, directly related to recording the time of the event and completing supply and material purchasing needed during the event.

16.    The time charged by the GIS specialists and Public Information Officer in the close out were only for event specific duties, all of which would not be expended if there was not an event.

17.    In reference to the indirect administrative cost rate, no costs for general administrative support were charged to the Burning Man event.

18.    As identified in the cost recovery close out, costs for public information, finance, and GIS, were only specific costs directly associated with the event therefore are not in the category of "costs that cannot be directly identified" as defined in the indirect cost rate.

19.    The travel per person identified in the cost recovery close out is the direct travel associated with employees' traveling to and from the Burning Man event, which would not occur if there was not an event. All expenses included in the cost recovery close out are costs which can directly be identified and specifically occur because of the Burning Man event. Personnel transfers; identified as something that may be included in the indirect cost recovery rate, refer to

costs which are related to Permanent Change of Station personnel transfers when an employee accepts a new position within BLM.

20.     The close out documents included all information that the BLM was required to provide to BRC in accordance with the BLM Manual 1323 "Cost Recovery for Reimbursable Projects/Activities.".  The close out documents included sufficient information detailing the costs associated with the cost recovery account.  The project log includes a date and description of the work performed for the amount charged. The project log and other attachments are only required to detail the charges expensed to the cost recovery account, and not to explain why the BLM expended the costs.

Dated this 22nd of June 2016.

Cassie Sandberg

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:     (916) 978-5690
Facsimile:      (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2016-115 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF JON YOUNG** |
| | ) | |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, Jon Young, hereby declare as follows:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.  I am currently employed as the State Chief Ranger for the Bureau of Land Management's (BLM), Office of Law Enforcement and Security (OLES), Region 5 Arizona. I have been employed with the BLM in this position since May 2011. Before this position, I was a BLM, Law Enforcement Ranger in Arizona and California for 9 years. I have 18 years of total law enforcement experience with the United States Department of the Interior.

2.  I have 10 years' experience working the Burning Man Event, both in planning the BLM operation and executing the operation at the event site. I have served in multiple positions, to include Law Enforcement Officer, Law Enforcement Supervisor, Law

AR04514

Enforcement Branch Chief and Technical Subject Matter Expert for Communications and currently (2016) serving as the Technical Subject Matter Expert for Communications.

3. My duties during the 2015 event as a BLM Technical Subject Matter Expert for Communications included being a planning team member with lead responsibilities of the development of the event microwave network system; the development of the event dispatch trailer and operation; the development of the Computer Aided Dispatch system; the coordination of the deployable cellular network; the development of the event Incident Command Post (ICP) Compound plan; and the acquisition, development and deployment of the 2 way satellite tracking devices for employee safety. As a planning team member I also had input on the development of the event Table of Organization; the development of the event Cost Recovery Agreement Estimate; and the development of the statements of work for specific service acquisitions. During event operations, as the BLM Technical Subject Matter Expert for Communications I was field supervisor of the BLM's contractors for Computer Aided Dispatch and Microwave Network. In addition, I also provided daily oversight for the Dispatch Center and technical operations.

**Computer Aided Dispatch**

4. BLM entered into a Computer Aided Dispatch (CAD) contract for the 2015 event with iNet.

5. iNet provided real time statistical analysis pertaining to type and disposition of events involving BLM during the Burning Man event. This information was used to generate daily statistical reports which were reviewed by BLM law enforcement command staff to analyze statistics, identify trends, and ensure proper allocation of patrol assets throughout the patrol sectors in the city. The statistical information was used to generate a final CAD report which is used for planning of subsequent Burning Man events.

6. iNet also provided satellite tracking device data, to include accurate utilization and display of intersection mapping for each officer in the city. This allowed dispatchers the ability to view accurate and real time location of officers and incidents, which allows them greater efficiency in dispatching of additional units by sending the nearest available units.

7. iNet CAD provided a NCJIS State/NCIC interface which allowed dispatcher to run specific criminal justice queries through Nevada to determine wanted and driver's license checks, stolen vehicle and vehicle registration check, probation, protection order files, sex offender registration, and NCIC wanted files. This real time access to this information is vital to providing law enforcement officers timely information they need to safely resolve an incident in the field.

8. The CAD displayed all relative information as it pertained to a person or plate that has already been assigned to a previous incident in CAD. iNet CAD also provided an interface with Department of Interior's Incident Management Analysis and Reporting System (IMARS). iNet CAD transferred CAD data from the event record within CAD to the IMARS database. As a result, information related to the incident, such as a suspect or victim's personal information, vehicle information, and incident location information are automatically populated into the IMARS system. This greatly increases efficiencies by

AR04515

reducing the amount of time spent by the law enforcement officer completing mandatory reports within the IMARS application.

9.  Statistical data captured within iNet CAD was incorporated within Black Rock City's SitStat report, a daily report generated by BRC and used by representatives of the Unified Command (BLM, BRC, and Pershing County Sheriff's Office) to review during the daily UC meeting held every afternoon during the 2015 event. Law enforcement information captured through the CAD, reported on the SitStat, included number of citations, warnings, evictions, trespass, arrests, sex assaults, domestic violence, and public assists. These categories of information were requested by BRC and provided by way of the iNet CAD. After the 2015 event, BRC requested and was provided a summary of the statistical information gathered through the iNet CAD system from 2013-2015. The 2014-2015 statistics were provided in the BLM After Action Report, while a 2013 statistical summary was provided to BRC via email on February 23, 2016.

10. The term "CAD data" is broad and is probably better defined as "CAD Reports." The CAD database contains large quantities of data, much of which is Criminal Justice Information and is labeled as Controlled//Unclassified. All of the records in this database are subject to the Privacy Act of 1974, 5 U.S.C. § 552a, which establishes a code of fair information practices that governs the collection, maintenance, use, and dissemination of information about individuals that is maintained in systems of records by federal agencies. As such, BLM cannot share the "CAD data." What BLM can share, and does share, are the "CAD Reports" statistical summary of Incident Data, Event Data, number of Events, Types of events, all categorized by ranges of dates / times, filters, etc.

11. To my knowledge, for the 2015 Burning Man Event, all shareable CAD Reports were shared with BRC. It was always my understanding that CAD Reports and statistical data were shared at on playa meetings and through the After Action Review.  For the 2016 Burning Man event BLM and BRC are working on a shared CAD System, for which BRC is directly contracting for with iNet Dispatch. This is a clear indication to me that BRC values the CAD system.

12. The contract was structured for iNet Dispatch and the CAD system to provide services to BLM, rather than to BRC.

**Satellite Tracking and Communication Devices**

13. BLM has an established safety practice of using 2 way satellite tracking and communication devices (brand name DeLorme) at the Burning Man event. BLM's 2015 AAR reported that the devices are a great way of tracking employees at the event. BLM also has an established safety practice of using the same type of devices nationwide for daily government operations. There are several reasons for this safety practice. The devices track (near real time) the position of government employees. The devices also capture location information and allows for the (near real time) display of the location and allow for the capture of this location information into a Computer Aided Dispatch (CAD) system. The devices further allow for 2-way Short Message Service (SMS) messages to be sent between field users, directly from the device or through a Bluetooth pairing connection with most smartphones. Additionally, the devices have an emergency activation feature (SOS) which allows for sending an emergency notification/request for assistance. The SOS feature is configurable to allow sending this message to a group of

cell phones and email addresses. The integration with the CAD system allows for a Common Operating Picture (COP). The purpose and functionality of these devices is not simply limited to tracking. BLM feels these devices and functions are necessary for the safety of our personnel.

14. BRC did not offer to investigate alternative solutions or offer alternative solutions for the devices. At no time did BLM dissuade BRC from offering ideas or solutions needed by the government. In preparation for the 2016 Burning Man Event, BRC has made an offer to the government to use BRC's MotoTrbo Radio GPS tracking solution by giving government employees a non-government radio to track them. The offer for GPS Tracking through additional technology does not offer equivalent functionality to meet BLM requirements, but more importantly, is in direct conflict with existing Departmental Policy, Department of the Interior, Departmental Manual 446 DM - Chapter 16 - Law Enforcement Radio and Telecommunications Systems, which states in Chapter 16.7 - Use of non-government owned communication devices is strictly prohibited for government business. This includes two way radios, satellite-based communication devices, smart phones, etc. BLM purchased the hardware for this service under cost recovery for the Special Recreation Permit. As such, and in concurrence with BRC's request, this hardware is only used for the Burning Man event and is stored the remainder of the year.

Dated this 20 of June 2016.

Jon Young

## CERTIFICATE OF SERVICE

Re:   Black Rock City LLC v. Bureau of Land Management; IBLA 2016-115

I, the undersigned, declare that:

I am a citizen, of the United States, over the age of eighteen, and not a part of this litigation.  On June 27, I served the

### BLM ANSWER TO STATEMENT OF REASONS

by placing a true copy enclosed in a sealed envelope via U.S. Postal Service certified mail and electronic transmission (email) at Sacramento, California, addressed as follows:

> United States Department of Interior
> Office of Hearings and Appeals
> Interior Board of Land Appeals
> 801 N. Quincy St., Suite 300
> Arlington, VA  22203
> Phone: 703-235-3750
> Email Address: ibla@oha.doi.gov
>
> Elizabeth B. Stallard, Esq.
> Downey Brand LLP
> 100 West Liberty, Suite 900
> Reno, NV 89501-1958
> Phone: 775-329-5900
> Email Address: estallard@downeybrand.com

I declare under penalty of perjury that the foregoing is true and correct.  Executed on the 27th day of June, at Sacramento, California.

James Hines
Administrative Assistant

**Black Rock City LLC**
# BURNING MAN 2017
### After Action Report (AAR)



*Copyright Black Rock City LLC*
*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution*
*Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

**AR01362**

Black Rock City LLC

BURNING MAN AFTER ACTION REPORT

_____

with Pershing County that covers all law enforcement services from PCSO. BRC strongly objects to BLM requirements for additional PCSO personnel through our cost recovery with BLM.

Burning Man is the largest SRP on BLM administered lands. BRC appreciates our long partnership with BLM and our shared values of environmental stewardship and education. The Burning Man event draws thousands of people from across the country and around the world to the remote Black Rock Desert and to the state of Nevada each year, many of whom are visiting for the first time. Their impressions of public lands and the BLM are shaped through their experience on the playa. The event also draws positive worldwide attention and media coverage, showcasing art, culture, and environment in the American west. We take our responsibilities seriously and value our event's history in Northern Nevada. We look forward to many more years in Nevada and the Black Rock Desert, working closely with BLM and Pershing County, and all of our cooperating agencies.

*Copyright Black Rock City LLC*

*Confidential Commercial/Financial Information for Permit Acquisition Use Only | Not for Distribution Outside of BLM | FOIA Exemption No. 4; 5 U.S.C. § 552(b)(4) and 43 CFR § 2.23(a)(1)*

**AR01367**

Form 1221-2
(June 1969)



**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

MANUAL TRANSMITTAL SHEET

| Release |
|---|
| 1-1488 |
| Date |
| 4/23/87 |

Subject

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

1. <u>Explanation of Materials Transmitted</u>:  This release transmits the policy and procedures governing charges to the non-Federal sector for Bureau services.  It incorporates recent changes in policy and procedures as the result of court decisions in the area of cost recovery.  Also, this release outlines procedures for determining cost recovery categories for Mineral Leasing Act and Federal Land Policy and Management Act right-of-way applications, procedures for collecting and depositing right-of-way processing and monitoring fees and procedures for identifying and collecting processing costs incurred on hydropower applications referred from the Federal Energy Regulatory Commission (FERC).

2. <u>Reports Required</u>:  None.

3. <u>Materials Superseded</u>:  The Manual pages superseded by this release are listed under "REMOVE" below.  No other directives are superseded.

4. <u>Filing Instructions</u>:  File as directed below.

<u>REMOVE</u>:

All of 1323  (Rel. 1-1406)

(Total:  17 Sheets)

<u>INSERT</u>:

1323

(Total:  32 Sheets)

Assistant Director,
Management Services

AR07783

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

## Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  Files and Records Maintenance

.1   Cost Reimbursement for Rights-of-Way (ROW's) and Temporary Use Permits
     (TUP's)
     .11  ROW Grants
          A.  MLA Grants
          B.  FLPMA Grants
          C.  Hydropower Applications
     .12  Temporary Use Permits (TUP's) Issued Incident to ROW's
          A.  Applicability
          B.  TUP's Related to ROW's in Minor Categories
          C.  TUP's Related to ROW's in Major Categories
     .13  Exclusions from Cost Reimbursement Procedures
     .14  Cost Recovery Categories
          A.  Minor Categories
          B.  Major Categories
          C.  BLM Costs Associated with Federal Energy Regulatory Commission (FERC)
              Applications
     .15  Cost Reimbursement for Application Processing
          A.  Nonrefundable Fees
          B.  Determination of Category
          C.  Each Category Determination Must be Documented
          D.  Nonrefundable Application Processing Fee Payments
          E.  Payments for MLA Major Category (VI) Applications
          F.  Payments for FLPMA Major (V) Applications
          G.  Cost Adjustments for FLPMA S304(b) Factors - FLPMA Applications
          H.  Actions Pending Decision on Appeal
     .16  Cost Reimbursement for Grant/TUP Monitoring
          A.  Minor Categories
          B.  Major Categories
     .17  Advance Payment Requirement for Major Category Grants
          A.  Overpayments
          B.  Underpayments
          C.  Reestimates

Rel. 1-1488
4/23/87

BLM MANUAL
Supersedes Rel.  1-1406

AR07784

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

    .18  Accounting Procedures
        A.   Collections - Accounting for Nonrefundable Fees and Other Payments
        B.   BLM Costs - Accounting for Processing and Monitoring Costs
        C.   Project Code Assignments
        D.   Internal Cost and Payment Reports for Major Category Projects
        E.   Internal Control of Costs Charged to ROW Projects
        F.   Multiple Applications
        G.   Joint Applications
        H.   Other Applications
        I.   Rejection, Withdrawal, or Relinquishment
        J.   Assignments

.2  All Other ROW's  (Reserved)

.3  Other Land Actions  (Reserved)

.4  Cadastral Survey  (Reserved)

Glossary of Terms

Illustrations
1.   Right-of-Way Cost Recovery Category and Fee Determination Record
2.   Financial Plan
3.   Cost Reimbursement Plan
4.   Major Category Decision
5.   Major Category MOU
6.   Reimbursable Project Log
7.   Major Category Project Number Establishment
8.   Major Category Account Activation

Appendices
1.   Billing and Collection Procedures for Rights-of-Way Grants and
     Temporary Use Permits
2.   The Project Manager, A Key to Uniformity and Consistency

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

.01  Purpose.  This Manual Section establishes policy and procedures governing charges to the non-Federal sector for Bureau of Land Management (Bureau) services.

.02  Objectives.  The objective of the cost recovery program is to recover the costs of services to the non-Federal sector for Bureau services in a manner that:

   A.  Complies with legislative authority for cost recovery.

   B.  Reflects Departmental cost recovery policy as stated in the Departmental Manual, Part 346.

   C.  Relies on acceptable cost accounting practices for identifying and compiling recoverable costs.

   D.  Promotes consistency in the application of cost identification techniques, accounting procedures, and reporting requirements.

   E.  Utilizes an effective system of internal controls to assure that all allowable costs are recovered and that costs charged are proper and correctly recorded for those cost recoverable activities which are identified by a project number.

.03  Authority.  The laws and regulations authorizing recovery of costs for processing and monitoring reimbursable projects are:

   A.  The Federal Land Policy and Management Act of 1976 (FLPMA), (43 U.S.C. 1701 et seq.) for right-of-way application processing and grant monitoring (Section 1764 (g)) and for service charges, reimbursement payments, and excess payments with respect to applications and documents relating to the public lands (Section 1734).

   B.  The Mineral Leasing Act of 1920 (MLA), (41 Stat. 449, as amended, 30 U.S.C. 185) for oil and gas pipeline right-of-way application processing and grant monitoring.

   C.  The Copy Fee Statute (43 U.S.C. 1460), for sale of document copies.

   D.  Title V of the Independent Offices Appropriations Act of 1952 (IOAA), (31 U.S.C. 483a) is a government-wide authority that permits cost recovery for services to the non-Federal sector.  The IOAA may be used in the absence of other specific authority.  However, the IOAA must be implemented through rulemaking.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

E.  43 CFR 2808 and 2883.1-1 provides procedures for cost recovery for rights-of-way.

F.  Departmental Manual, Part 346.

G.  Federal Power Act of 1920 as amended, Part 1 (16 U.S.C. 792), for reimbursing the United States for the cost of administration.

H.  18 CFR 4.41 identifies the data which must be provided to a hydropower project applicant by a Federal land management agency when the project is proposed on Federal lands administered by that agency.

.04  Responsibility.

A.  Director and Deputy Director (Associate), acting under broad Departmental guidance, are responsible for overall compliance with statutory authorities and Departmental policies governing cost recovery.

B.  The Assistant Director for Management Services and the Assistant Director for Lands and Renewable Resources exercise leadership, direction, and authority from a bureauwide perspective for the management of this program.  In this capacity they provide Bureauwide policy, program direction, leadership, and line management for the cost recovery program.

C.  The Chief, Division of Finance, has staff responsibility for developing, implementing, and monitoring the financial procedures for cost recovery on ROW's and other types of reimbursable projects.

D.  Other Washington Office Division Chiefs have staff responsibility for developing, implementing, and monitoring the operational aspects of their programs as they relate to cost recovery.

E.  The Service Center Director, State Directors, and BLM Director-BIFC, are responsible for administering the cost recovery program and recommending changes in the regulations or procedures to improve its overall effectiveness in their respective areas of jurisdiction.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

.05  References.  (See Bureau Manual Sections 1341, 2801, and 2805.)

.06  Policy.

A.  Applicants for or holders of ROW grants and TUP's issued incident thereto, or participants in other types of reimbursable projects, who are identifiable recipients of services beyond those which accrue to the public at large, will reimburse the Government for direct and indirect costs involved in processing applications.  These reimbursements will also include the costs of monitoring the construction, operation, maintenance, and termination phases of a grant or project, including rehabilitation of the land involved.  These reimbursements may be accomplished through payment of nonrefundable application processing and grant monitoring fees and, in addition, payment for actual costs under the MLA or reasonable costs under FLPMA as recorded in the BLM accounting system for projects which are assigned project codes.

B.  Cost recovery is initiated at the time an application on an approved form is accepted by the Bureau Authorized Officer (AO) or a hydropower application is referred from FERC.  A letter of intent is not an approved application form.

C.  All Bureau personnel have a responsibility to the public and the Bureau's right-of-way program not to initiate any formal case processing work until the applicant's cost recovery obligations have been met. Therefore, no work on an application except preapplication conferences shall begin until the appropriate application processing fee is submitted by the prospective applicant.  For major projects an estimate of the total processing and monitoring cost must be coordinated with the applicant and a decision issued clearly identifying the expected work and costs involved.  For these rights-of-way, the required fee must have been submitted, a project number assigned, and the initial payment received. For additional guidance on cost recovery, review 43 CFR 2808 and 43 CFR 2883.

.07  Files and Records Maintenance.  Establish and maintain case files in accordance with BLM Manual Section 1274.  Cost recovery data is to be included in case files established for cost recoverable projects.  See BLM Manual Section 1271 for case files disposition.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

.1  Cost Reimbursement for Rights-of-Way Grants (ROW's) and Temporary Use Permits (TUP's).

  .11  ROW Grants.

    A.  MLA Grants.  Title I and Title II of the Mineral Leasing Act of 1920 (MLA), as amended, (30 U.S.C. 185) are the authorities for granting and renewing ROW's through Federal lands for oil and gas pipelines. Section 28(l) of the Act requires reimbursement to the United States for administrative and other costs incurred in processing applications and monitoring the construction, operation, maintenance, and termination of oil and gas pipelines and related facilities.  The regulations covering reimbursement for direct and indirect costs incurred in processing and monitoring ROW's issued under MLA are in 43 CFR 2883.  The regulations which apply to appeals of authorized officer decisions are in 43 CFR 2884.1(b).

    B.  FLPMA Grants.  Section 304(b) of the Federal Land Policy and Management Act of 1976 (FLPMA) is the authority to require a deposit of any payments intended to reimburse the United States for reasonable costs with respect to the processing of applications and other activities relating to such applications or grants.  Section 304(b) states:

    "The moneys received for reasonable costs under this subsection shall be deposited with the Treasury in a special account and are hereby authorized to be appropriated and made available until expended.  As used in this section 'reasonable costs' include, but are not limited to the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities.  In determining whether costs are reasonable under this section, the Secretary may take into consideration actual costs (exclusive of management overhead), the monetary value of the rights or privileges sought by the applicant, the efficiency to the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs."

Section 504(g) further states:

    "The Secretary concerned may, by regulation or prior to promulgation of such regulations, as a condition of a right-of-way, require an applicant for, or holder of a right-of-way to reimburse the United States for all reasonable administrative and other costs incurred in processing an application for such right-of-way and in inspection and monitoring of construction, operation, and termination of the facility pursuant to such right-of-way."

The regulations which apply to appeals of Authorized Officer decisions are in 43 CFR 2804.1(b) and 43 CFR 2808.6.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

C. Hydropower Applications. Part I of the Federal Power Act of 1920, as amended, (16 U.S.C. 792) contains the authority for the Federal Energy Regulatory Commission (FERC) to recover the cost of administration of hydropower applications for the purpose of reimbursing the United States. Work performed by the Bureau in responding to application requests referred from FERC are considered to be part of the recoverable cost of administration. The data required by FERC from the hydropower applicant in order to process an application is identified in 18 CFR 4.41. The applicant is required to consult with the land managing agency having jurisdiction to develop the required data. Costs incurred by the agency in providing this data, record notation costs, and land classification costs are recoverable by FERC.

.12  Temporary Use Permits (TUP's) Issued Incident to ROW's.

A. Applicability. TUP's are subject to the same regulations governing cost reimbursement as those for ROW grants. TUP's include, but are not limited to, temporary access, storage areas, construction camps, soil disposal areas, temporary communication sites, etc.

B. TUP's Related to ROW's in Minor Categories.

1. When submitted as part of the ROW application the TUP's are combined with the ROW application for category determination. Nonrefundable application fees are applicable to the combined application (ROW and TUP).

2. TUP applications submitted separately from ROW applications are treated as separate cases for category determination.

C. TUP's Related to ROW's in Major Categories. TUP applications related to major category ROW applications are treated as part of the ROW application for category determination and cost recovery purposes. Recovery of actual processing/monitoring costs (MLA) and reasonable processing/monitoring costs (FLPMA) apply to the TUP as well as the ROW.

.13  Exclusions from Cost Reimbursement Procedures. Cost reimbursement procedures detailed in this Manual Section do not apply to (1) cost share roads on reciprocal right-of-way agreements, (2) Federal agencies (FLPMA only), and (3) State and local governmental entities or agencies or instrumentalities thereof (both FLPMA and MLA) where public lands shall be used for governmental purposes, and such lands and resources shall continue to serve the general public. The only exception is for ROW grants or TUP's issued to State or local governments or agencies or a municipal utility or cooperative whose principal source of revenue is derived from charges levied on customers for services rendered that are similar to services rendered by a profitmaking corporation or business enterprise (43 CFR 2806 for FLPMA grants and 2883.1-1 for MLA grants). Adjustments and/or waivers for FLPMA applications are identified in .15G below.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

.14  Cost Recovery Categories.  The cost reimbursement provisions of
43 CFR 2808.3-1 and 2883.1-1, as amended, establish a cost recovery fee
schedule with six ROW cost reimbursement categories for MLA and five
categories for FLPMA applications.  Each category reflects a
progressively more complex level of application processing and
monitoring.  The minor categories require the advance payment of a
nonrefundable application processing fee.  The fee for each category is
based on the average cost of processing typical cases covered by the
category.  Applications in the major MLA category requires the advance
payment of a $5,000 nonrefundable application processing fee plus
periodic advance payments of processing costs that exceed the
nonrefundable fee.  The FLPMA major category applications require payment
of reasonable processing and monitoring costs as determined in accordance
with .15F and .15G below.  Periodic advance payments are required
quarterly.  Interim billings are required for both MLA and FLPMA when
anticipated processing costs for the quarter are expected to exceed the
quarterly payment.  See .15B below for determination of category.  The
following is the definition of cost recovery categories.

A.  Minor Categories.  The minor categories require the advance
payment of a nonrefundable application processing fee.  The fee for each
category is based on the estimated average cost of processing typical
cases covered by the category.  Minor categories are defined in the
Glossary of Terms and as follows:

1.  Category I.

a.  Applications which commonly qualify for this category are
for:

(1)  An additional use of an existing ROW.

(2)  Minor projects over or under areas already disturbed.

b.  Data necessary to comply with NEPA and required by the
authorized officer to make a decision are available in the office or is
furnished by the applicant or the proposal qualifies for a NEPA
categorical exclusion as per Bureau or Departmental policy.

c.  A field examination is not required.  No adjustment
to the Category I level is made, if on occasion an examination is made,
as long as the other distinguishing features of Category I still apply.
A team concept is not used.

2.  Category II.

a.  Applications which commonly qualify for this category are
for:

(1)  Public lands upon which heavy ROW demands exist.

.14A2a(2)

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

        (2)  Oil and natural gas field development where generally the application is for a ROW to serve an existing lease area.

        (3)  A significant amount of environmental and inventory work has been completed in the past as a result of development.  A team concept is not used.

        b.  Data necessary to comply with NEPA and required by the authorized officer to make a decision are available in the office or is furnished by the applicant.

        c.  One field examination is required to verify existing data.  The examination is normally no longer than 1 day in duration and is made by one individual.  Only rarely will representatives of two or more disciplines be present.  A team concept is not used.

    3.  Category III.

        a.  Applications which commonly qualify for this category are for ROW's on public lands upon which no new concentrations of ROW demands are expected (i.e., new gas or oil field).

        b.  Data necessary to comply with NEPA and required by the authorized officer to make a decision are available in the office or are furnished by the applicant.

        c.  Two field examinations are required to verify existing data.  Each field trip is usually no longer than 1 day in duration and is made by no more than two specialists.  An examination is conducted to:

        (1)  Familiarize the specialist(s) with the specific conditions of the area under application prior to preparation of the NEPA compliance and decision document.

        (2)  Ensure that no unusual or unique resource conditions are present.

    4.  Category IV.

        a.  Applications which commonly qualify for this category are for ROW's which require the gathering of a limited amount of original data to comply with NEPA.

        b.  NEPA compliance requirements exceed Category III in that one or more (but not more than two) specific resources (e.g., Threatened and Endangered (T&E) species, cultural resources, fisheries or wildlife habitats, etc.) require impact evaluation.  In contrast to Category V, the majority of the impact evaluation is developed from previously compiled data.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

c.  Field examination requirements differ from Category III since two or three trips may be required to process the ROW application. Two or more disciplines may participate.

5.  <u>Category V (MLA only)</u>.

a.  Applications which commonly qualify for this category are those ROW's for which NEPA compliance and the decisionmaking process requires gathering of a substantial amount of original data and the assessment of this data requires formation of an interdisciplinary team.

b.  A field examination normally requires three or more trips to process the application.  Only rarely will more than three trips be necessary.

B.  <u>Major Categories</u>.  Applications in the major MLA category (VI) require the advance payment of a $5,000 nonrefundable application processing fee plus the periodic advance payments of processing costs that exceed the nonrefundable fee.  Applications in the major FLPMA category (V) require payments of reasonable processing and monitoring costs as per a cost decision in accordance with .15F4 below.  Periodic advance payments are required quarterly.  Interim billings are required for both MLA and FLPMA when anticipated processing costs for the quarter are expected to exceed the quarterly payment. See .15B below for guidance in determination of categories.  The following is the definition of the major cost recovery categories.

1.  <u>Category V (FLPMA Only)</u>.

a.  Applications which commonly qualify for this category are those ROW's for which NEPA compliance and the decisionmaking process requires gathering a substantial amount of original data and the assessment of this data requires formation of an interdisciplinary team.

b.  The field examination normally requires three or more trips to process the application.

c.  A standard nonrefundable application processing fee does not apply (see .14 above).

2.  <u>Category VI (MLA Only)</u>.

a.  This applies to all ROW applications for which the processing requirements will exceed $5,000.  A standard nonrefundable $5,000 application processing fee is required.

b.  NEPA compliance requiring the preparation of an EIS automatically places the ROW application in Category VI.  Major EA's that require more work than those in Category V may also place the ROW application in this category.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

c.  The number of field examinations is not a factor in determining if the application will be placed in Category VI.

C.  BLM Costs Associated with Federal Energy Regulatory Commission (FERC) Applications.

1.  Processing and evaluation costs, recordation costs, and land classification costs for response to applicants requesting hydropower exemption, preliminary permits, or licenses from FERC are to be recorded in accordance with the project numbering system in .18C below.  Record all costs for records notation in subactivity 4212, land classification associated with FERC hydropower projects in subactivity 4220, and environmental input as per 18 CFR 4.41 in subactivity 4211.

2.  Copies of Bureau cost records as recorded in the Financial Management System (FMS) are to be forwarded to FERC by the Headquarters Office so that such costs may be recovered by FERC from the hydropower licensees.  The recovered expenses are then deposited in the Treasury. The Bureau's costs for providing these services are funded through the normal appropriations process.

.15  Cost Reimbursement for Application Processing.

A.  Nonrefundable Fees.

1.  Cost reimbursement for the minor categories is limited to the payment of a fixed nonrefundable fee established for each category.  The following nonrefundable application processing fee schedule has been developed for the minor categories of ROW applications.

APPLICATION PROCESSING FEE SCHEDULE
(MINOR CATEGORIES)

| MLA | | FLPMA | |
|---|---|---|---|
| Category | Nonrefundable Fee | Category | Nonrefundable Fee |
| I | $ 125 | I | $125 |
| II | 275 | II | 300 |
| III | 350 | III | 550 |
| IV | 600 | IV | 925 |
| V | 1,000 | | |

.15A2

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

2.  Cost reimbursement for the major category MLA applications consists of a fixed nonrefundable fee and any amounts necessary to reimburse the Bureau for total actual processing costs including indirect costs.  Reimbursement for FLPMA applications will be determined in accordance with .15F below.  For MLA major category applications the nonrefundable fee shall be $5,000.  The $5,000 nonrefundable application fee is to be identified as a credit and included in the estimate for the first advance payment.  An additional amount as determined by the authorized officer may be required to cover processing costs prior to receipt of the first payment from the applicant under the periodic billing procedure.  Unused advance payments are refundable, or if the applicant requests in writing, may be applied to the right-of-way or permit rental.  The following nonrefundable fee schedule has been developed for major categories:

APPLICATION PROCESSING FEE SCHEDULE
(MAJOR CATEGORIES)

| MLA | | FLPMA | |
|---|---|---|---|
| Category | Nonrefundable Fee | Category | Nonrefundable Fee |
| VI | $ 5,000 | V | 1/ |

B.  Determination of Category.  The authorized officer determines the appropriate category and nonrefundable fee upon receipt of, but prior to processing, the application.  To determine the appropriate category for a proposed project, estimate travel expenditures by assuming that the travel would be accomplished economically and efficiently.  Use only the number of employees actually needed and only the number of vehicles needed to transport them in the course of the field examination.  A trip is considered to be one round trip (do not include trips for monitoring) to one right-of-way location using a vehicle of the type normally available at a BLM Field Office.  This is generally a three to six-passenger vehicle carrying from one to six persons.  When several separate ROW locations are visited in a trip each ROW location visited is considered a trip for category determination purposes.  The authorized officer may change a category determination to a major category at any time it is determined that preparation of an EIS is required.  No other category determination changes are permitted.

1/  Major (category V) FLPMA applications do not require a nonrefundable application processing fee.  Reasonable processing and monitoring costs as required are recoverable.  Unused advance payments are refundable, or if the applicant requests in writing, may be applied to the right-of-way or permit rentals.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

C. Each Category Determination Must be Documented. A copy of the completed decision document, ROW Cost Recovery Category and Fee Determination Record, Form 1323-2, a brief and simple statement identifying the application and category is given to the applicant before final acceptance or processing of the application. (See Illustration 1.) A category determination is a final decision for purposes of appeal under part 4 of 43 CFR. In those cases where the authorized officer has been dealing with an applicant's agent, the Form 1323-2 and instructions for appealing the authorized officer's decision should be sent by certified mail to the applicant.

D. Nonrefundable Application Processing Fee Payments. The estimated nonrefundable application processing fee must be paid before application acceptance or the commencement of any other application processing procedure, except preapplication conferences.

1. If the fee submitted is less than the amount determined by a category decision, issue the category decision and require additional payment before processing the application. Normally the estimated category established during preapplication conferences will not change. However, the estimated category may change if the project was inadequately described or misrepresented (see 2801.31B).

2. If the fee submitted exceeds the fee determined by a category decision, accept the application. Initiate a refund of the overpayment for minor categories. Overpayments may be applied to the required grant monitoring fee or rental if requested by the applicant in writing. Overpayments for major application processing likewise may be applied towards the payment of rentals and/or monitoring.

3. If the applicant successfully appeals a category decision, initiate a refund of the overpayment. All or part of the overpayment may be applied to the required grant monitoring fee or rental if requested in writing by the applicant.

E. Payments for MLA Major Category (VI) Applications. Category VI applications require the reimbursement of all actual Bureau processing and monitoring costs. When an application is filed along with the nonrefundable application processing fee, the authorized officer completes the following:

1. Completes a preliminary scoping of the issues involved, (see 2801.22B).

2. Completes a preparation (work) plan; including monitoring, (see 2801.22G).

3. Develops a preliminary financial plan and cost reimbursement plan (Illustrations 2 and 3) estimating the actual costs to be incurred by the United States in the processing of the application and monitoring of the grant.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

4. The authorized officer then requires the applicant to make periodic payments in advance of such costs being incurred by the Bureau. The nonrefundable fee payment is credited toward the applicant's cost reimbursement obligation. If excess funds remain after completion of all application and monitoring activities, these can be refunded upon Bureau initiation or receipt of a written request by the holder. Additional cost recovery fees may be requested at the time of project termination.

F. Payments for FLPMA Major Category (V) Applications.

1. Major Category (V) applications under FLPMA require the reimbursement of reasonable Bureau processing and monitoring costs. Upon a determination that an application falls under Category V:

a. The authorized officer:

(1) Shall complete a preliminary scoping of the issues involved (see 2801.22B).

(2) Shall complete a preparation (work) plan: including monitoring (see 2801.22B).

(3) Shall develop a preliminary financial plan and cost reimbursement plan (see Illustrations 2 and 3) estimating the actual costs to be incurred by the United States in the processing of the application and monitoring the grant.

(4) Shall encourage the applicant to do all or part of any special study or analysis required to complete a plan of development (see H-2801-1) or needed in connection with the processing of the application to standards established by the authorized officer. (Note: The cost of studies or analysis paid for by the applicant are not considered part of actual costs for the purpose of calculating reasonable FLPMA cost recovery. The Bureau regards such costs as voluntary expenditures by applicants for their convenience generally to expedite application processing.)

(5) Shall discuss with the applicant cost reimbursement alternatives, potential delays in processing the application, and the availability of current BLM funds to do required work.

(6) May require the applicant to submit a construction cost estimate for the entire project which also identifies those costs to construct the proposed facilities on public lands for which a right-of-way grant and/or temporary use permit is sought. (Note: No such information is required when an applicant files a waiver in accordance with paragraph .15F1b(2) below.)

b. The applicant shall choose one of the following cost reimbursement alternatives:

1323 – COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

(1)  Seek a reduction or waiver of cost reimbursement under section 304(b) of the FLPMA.  Under this alternative, the applicant shall submit a written analysis of the project showing specific monetary value considerations, public benefits, public services, or other data or information which supports a proposed finding that an application, grant, or temporary use permit qualifies for a reduction or waiver of cost reimbursement.  Decisions under this paragraph shall not be limited by the one percent provisions of .15F1b(3) and .15F4 below.

(2)  Choose to waive consideration of reasonable costs and agree to pay all actual costs incurred by the United States in processing the application and monitoring the grant or temporary use permit.  The waiver shall be in writing and shall be filed with the authorized officer.  (Note:  Where a waiver is filed, it applies to all actual costs, if any, above the one percent of construction costs level under .15F1b(3) below.

(3)  Enter into an agreement with the United States, whereby the applicant agrees to pay the actual costs of processing the application and monitoring the grant that are determined to be one percent or less of the estimated costs of constructing the proposed facilities on public lands.  Under this agreement the applicant shall not be responsible for any actual costs exceeding the one percent level.

2.  The authorized officer shall verify the applicant's construction cost estimate and other information/data submitted or developed under .15F1b(1) and (3) below.  In verifying cost information, the following may be necessary:

a.  Review actual cost information for similar projects that have been completed on public lands.

b.  Review construction cost source documents, such as Bonneville Power Administration (BPA) annual powerline construction cost report, CRSP Transmission Study Data or other industry reports, applicant reports to public utility commissions, annual reports to stockholders, etc.

c.  Seek help in verification from the Headquarters Office, an outside consultant, or bureau staffs having on-the-ground experience in areas such as construction and heavy equipment operation.

d.  Raise questions to the applicant for response prior to proceeding further with case related activities.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

3. The evaluation of information submitted under .15F2 above shall be in accordance with the criteria of section .15g below.

4. The authorized officer shall provide the applicant with a written determination (decision) of the reasonable costs to be reimbursed by the applicant or holder and those that will be funded by the United States under .15F1b(1) through (3) above and/or 43 CFR 2808.5 (see Illustrations 4 and 5). Where an appeal is filed, actions pending decisions on appeal shall be in accordance with 43 CFR 2808.6.

5. Where the State Director has issued a decision granting a reduction or waiver in reimbursable costs under .15F4 above the money necessary to fund the United States' share of the costs shall be provided through the Bureau's appropriation process, be available in the BLM State Office's existing budget, be made available by the Headquarters office from an existing budget, be contributed by the applicant, or be otherwise made available (special appropriations) for the processing of the application or processing shall not proceed. (Note: There is no specific timeframe for such funds to be made available; consequently, delays could be significant. It is essential that the applicant be advised of the potential for delays as part of the authorized officer/applicant coordination process.)

6. The authorized officer may reestimate the actual cost, coordinate with the applicant/holder and adjust the financial plan at any time that a significant change warranting a reestimate has occurred (see appendix 1, paragraph 5j). When a reestimation of the reasonableness of actual costs is made, a new decision shall be issued in accordance with .15F4 above.

G. Cost Adjustments for the FLPMA S 304(b) Factors - FLPMA Applications.

1. The State Director, after consultation with an applicant or a holder, has the discretion to reduce or waive entirely the reasonable processing and or monitoring costs required to be reimbursed for any right-of-way or temporary use permit under this subpart.

2. In reaching a decision, the State Director may require the applicant/holder to submit a written analysis of the project showing specific monetary value considerations, public benefits, public services, or other data or information which supports a proposed finding that an application, grant, or temporary use permit qualifies for a reduction or waiver of cost reimbursement. Action on a FLPMA Category V application shall be suspended pending the State Director's decision.

.15G2a

### 1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

a. In reaching a decision, it is important that the monetary value of the rights and privileges sought (monetary value) be considered. Monetary value is the objective value of the right-of-way or permit, i.e., what the right-of-way or permit is worth to the applicant in financial terms. Where the value of a project to the applicant is great in relation to actual costs, it is reasonable to assume that payment of the fee will not create a hardship for the applicant and that it is reasonable to expect that the fee should be paid. Also, where the applicant has the ability to pay the costs, a waiver or reduction of the fees may represent an unwarranted subsidy which should be avoided (subject however to consideration of the other reasonableness factors, especially public service and public benefit consideration).

b. The State Director may base the decision to reduce or waive reimbursable costs on any of the following factors:

(1) The applicant's/holder's financial condition is such that payment of the fee would result in undue financial hardship. If a reduction/waiver is being considered under this criteria, however, the question should be raised and evaluated as to whether the applicant has the technical and financial capability to construct the project, which is a requirement under S504(j) of FLPMA.

(2) The application processing or grant monitoring costs are determined to be grossly excessive in relation to the cost of constructing the facilities or project requiring the right-of-way or temporary use permit.

(3) A major portion of the application processing or grant monitoring costs are the result of issues not related to the actual right-of-way or temporary use permit.

(4) The applicant/holder is a nonprofit organization, corporation, or association which is not controlled by or a subsidiary of a profitmaking enterprise.

(5) The studies undertaken in connection with processing of the application have a public benefit. Costs incurred for the benefit of the general public interest, rather than for the exclusive benefit of the applicant, involve expenditures by the Government for studies, data collection, etc., that have value or utility to the Government or the general public independent of the application processing. Experience has shown that certain areas or classes of work as follows may be specifically identified as benefiting:

.15G2b(5)(a)

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

(a)  Work which the Bureau has planned to perform but
does earlier than planned due to the filing of an application.  This work
may be in the form of a special study, i.e., an archaeological study,
threatened/endangered species study, etc.  In evaluating such planned
work, keep in mind that where long term planning is involved (greater
than 5 years) there is a strong possibility that the work would never
occur.  Consequently, no reduction would be warranted.

(b)  Land use planning (including plan amendments)
required under FLPMA but done earlier because of the filing of an
application.

(c)  Special studies done as part of the application
processing which becomes base data for the Bureau and is usable for other
Bureau activities.  The "benefit" accrues as a result of the development
of new useful data, but not from data which was already available from
some source and merely included in the applicant's documentation.

(6)  The facility or project requiring the right-of-way
grant will provide a special service to the public or to a program of the
Secretary.  Several considerations are appropriate under this factor:

(a)  Generally, public service does not exist where the
consumer pays for the cost of the service provided.

(b)  Reduction or waiver may be appropriate in the case
of governmentally sponsored projects funded through general tax revenues

(c)  Where a secondary public service is involved, such
as the development of a recreational opportunity resulting from project
construction, the service should be open to the general public at no
charge.

(d)  Adjustments are limited only to services resulting
from construction of a project for which a charge is not rendered.
Services are to be measured by a one-time allowance for tangible items
such as the number of hunter days resulting from a new access road for 1
year or the number of fisherman days resulting from the construction of a
reservoir for 1 year.  Multiple-year use calculations are not allowed.

NOTE:  In considering items 5 and 6, monitoring activities
generally do not create either new studies providing public
benefits or public service warranting a reduction or waiver under
this section.

NOTE:  Generally, nonmajor projects (categories I through IV)
are not of regional or national significance and, therefore,
there is not an opportunity for public benefits or public
services.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

(7)   A right-of-way grant is needed to construct a facility to prevent or mitigate damages to any lands or improvements or mitigate hazards or danger to public health and safety resulting from an Act of God, an act of war, or negligence of the United States.

(8)   The holder of a valid existing right-of-way grant is required to secure a new right-of-way grant in order to relocate facilities which are required to be moved because the lands are needed for a Federal or federally funded project, if such relocation is not funded by the United States.

(9)   Relocation of a facility on a valid existing right-of-way grant requires a new or amended right-of-way grant in order for the holder to comply with the law, regulations, or standards of public health and safety and environmental protection which were not in effect at the time the original right-of-way grant was issued.

(10)   It is demonstrated that because of compelling public benefits or public services provided, or for other causes, collection of reimbursable costs by the United States for an application for a grant or permit would be inconsistent with prudent and appropriate management of the public lands and the equitable interests of the applicant/holder or of the United States.

3.   The State Director may incorporate a reduction or waiver of reimbursable costs under this Section in a determination affecting reimbursement of costs made under this subpart. A record shall be made of any such determination and given to the applicant. This determination is a final decision for purposes of appeal under 43 CFR 2804.1.

4.   Notwithstanding the validity of the basis for reduction or waiver of the costs required to be reimbursed under this subpart, the State Director shall not reduce or waive such costs if funds to process the application or to monitor the grant are not available. The State Director may delay any such decision pending the availability of funds.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

H.  Actions Pending Decision on Appeal.  Where an applicant appeals a decision issued under 43 CFR 2808.3 or 2808.5 concerning the reasonableness of amounts to be reimbursed, further work by the Bureau in processing the application shall be suspended (category V only) by the authorized officer pending final Departmental decision on the appeal.

.16  Cost Reimbursement for Grant/TUP Monitoring.

A.  Minor Categories.  Payments for monitoring grants or TUP's in minor categories consist entirely of a one time nonrefundable fee in accordance with the following schedule.  The monitoring category will be the same category as determined for application processing.  Payment of the required fee shall be made before the grant or TUP is issued.

### MONITORING FEE SCHEDULE

| MLA | | FLPMA | |
|---|---|---|---|
| Category | Fee | Category | Fee |
| I | $ 25 | I | $ 50 |
| II | 50 | II | 75 |
| III | 75 | III | 100 |
| IV | 150 | IV | 200 |
| V | 250 | V | as required |
| VI | as required | | |

B.  Major Categories.  Payments for monitoring major category MLA grants or TUP's consist of the prepayment of those amounts which are necessary to reimburse the Bureau for actual monitoring costs, including allocated indirect costs.  These costs are incurred in monitoring the construction, operation, maintenance, and termination of ROW facilities and for protection and rehabilitation of the lands involved.  Monitoring costs for FLPMA grants or TUP's are included in the determination made for application processing.

1.  A holder of an MLA grant whose application was determined to be in Category VI shall reimburse the United States for the actual cost of monitoring the grant or permit.  In the case of FLPMA grants, the authorized officer shall estimate the actual costs expected to be incurred in monitoring the grant or permit and include such estimate of costs with the processing costs to reach total reasonable costs determined in .15F above.  For both MLA and FLPMA, the authorized officer will require the holder to make periodic payments of such estimated reimbursable costs prior to such costs being incurred by the United States.

1323 – COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

2.  Following termination of an MLA grant or temporary use permit, the authorized officer shall determine and the holder shall pay any such additional amounts as are necessary to reimburse the United States for any costs which exceed the payments required by paragraph .16B1 above.

3.  Section B2 also applies to a FLPMA right-of-way grant or temporary use permit where the applicant has filed a waiver agreeing to pay all actual costs.

4.  Where a waiver has not been filed for a FLPMA right-of-way grant or temporary use permit, total processing and monitoring costs cannot exceed the amount determined under .15F above.

5.  If the periodic payments required by .16B1 above exceed the actual costs to the United States, the authorized officer may adjust the next billing to reflect the overpayment, or make a refund from applicable funds under the authority of 43 U.S.C. 1734.  A holder shall not set off or otherwise deduct any debt due to it or any sum claimed to be owed it by the United States without the prior written approval of the authorized officer.  If requested in writing by the applicant, overpayments may be applied to the payment of rentals required by 43 CFR 2803.1-2 or 2883.1-2.

.17  Advance Payment Requirement for Major Category Grants.  Major category grants require an advance payment from the applicant/holder to cover the estimated actual (MLA) or reasonable (FLPMA) costs to be incurred by the Bureau for either processing or monitoring before the next payment is expected.  The authorized officer estimates the costs to be incurred through the next full quarter.  The applicant is billed by DSC for this amount less any overpayment of previous fees paid.  Payment of the amount billed for processing or monitoring must be made before the costs are incurred by the United States.  Advance payment requirements must be reviewed at least quarterly.  The total advance payments on hand must be at least sufficient to cover the estimated total costs to be incurred before the next payment is expected.  Interim billings should be made whenever the scheduled periodic payments are inadequate to recover anticipated costs.  No grant or permit shall be issued until all processing costs determined to be due the United States are paid in full.  Applicants are required to submit the full amount of any advance payment requested by the authorized officer.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

A.  Overpayments.  A temporary overpayment occurs when the Bureau's periodic cost estimate, which is the basis for determining advance payment requirements, is higher than the actual costs subsequently incurred.

1.  Periodic Adjustments of Overpayments.  Normally an overpayment is credited toward the next period's advance payment requirement and no further action is taken.  However, if the amount of overpayment is excessive, the authorized officer may make an appropriate refund under the authority of 43 U.S.C. 1734.

2.  Final Overpayment Adjustment.  After completion of all cost recoverable work on major category ROW's, including processing and monitoring costs, the authorized officer must refund the excess of advance payments over the total costs incurred.  The refund should be made only after sufficient time has elapsed to ensure that all recoverable Bureau costs have been determined and properly accounted for.  The holder may request a refund in writing or the Bureau may initiate the refund.

B.  Underpayments.  The total processing and monitoring costs of a specific major category project may at no time exceed the total advance payment received.  However, the total processing and monitoring costs of a FLPMA major category project are not collected once costs reach 1 percent of construction costs on public lands unless the applicant has agreed in writing to pay all actual costs or has received an alternate reasonable cost decision in accordance with .15f1b(1) above.

1.  Application Processing.  The authorized officer must discontinue application processing when an applicant makes payment for less than the amount requested, or when a deficit funding condition is imminent.  The authorized officer shall not issue a ROW grant or TUP to a major category applicant who has not paid all bills submitted by the Government relative to the particular project.  (See Manual Section 2802.41A1f for further details concerning ROW projects.)

2.  Grant Monitoring.  When a deficit funding condition is imminent, the authorized officer must immediately bill the holder of the grant and initiate action to suspend or terminate the ROW or TUP.  Only critical monitoring may be continued without payment.  Critical monitoring is that needed to inspect ongoing activities pending suspension or termination of a grant to assure that enviromental damage is not occurring.

.17C

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

C.  Reestimates.  The authorized officer may reestimate the actual
costs and adjust the financial plan at any time a change warranting a
reestimate has occurred (see Appendix 1, para. 5J). When such a
reestimation results in substantial change, a redetermination of
reasonableness of actual costs under 43 CFR 2808.3 and/or 2808.5 shall
also be made and an appealable decision issued thereto.

.18  Accounting Procedures.

A.  Collections - Accounting for Nonrefundable Fees and Other
Payments.  (See Appendix 1.)

1.  Account 14X5017.1, Rights-of- Way Cost Recoveries, Bureau of
Land Management.  This account is used for deposit of all nonrefundable
fees and other payments for application processing and monitoring on ROW
grants and TUP's in the Bureau of Land Management.

a.  Nonrefundable fees received for minor categories in both
FLPMA and MLA ROW's are deposited to subactivity 5102 and the applicable
project code (see .18C below).  All monies received for major category
ROW's are deposited to subactivity 5101 and the project code assigned to
the specific project (see .18C1b below).

b.  When a category determination is changed from a minor
category to a major category, the nonrefundable fee deposited to
subactivity 5102 must be reclassified to subactivity 5101 and the project
code assigned to the specific project.  The balance of the nonrefundable
processing fee of $5,000 for MLA projects or reasonable fees for FLPMA
projects must be paid prior to any further processing action.  See .18B5
below for expenditure identification.

B.  BLM Costs - Accounting for Processing and Monitoring Costs.
(See Appendix 1.)

1.  Minor Category Projects.  Application processing and grant
monitoring costs are coded to subactivity 4211 and the applicable project
code.  Processing and monitoring fees deposited to subactivity 5102 are
offset against the costs in subactivity 4211 and allocated back to the
State Offices as needed and/or available.

.18B2

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

2.  <u>Major Category Projects</u>.  Direct costs incurred to process
or monitor are coded to subactivity 5101 and the project number assigned
to the specific project.  Indirect costs are coded to the subactivities
that would be charged if the ROW project did not exist.

3.  <u>Supporting Documentation (Major Category Projects)</u>.  All
direct costs must be supported by documentation to establish that the
costs were accurately determined and properly recorded.  Supporting
documentation may include time and attendance reports, invoices,
authorizations, certifications, computations, agreements, and other
evidential matter.  Duty time coded to these projects must be supported
by daily log entries which describe the work performed.  Daily activity
logs are maintained as shown in Illustration 6.

4.  <u>Indirect/Overhead Cost Recovery</u>.  The Bureau's indirect/
overhead costs, exclusive of management overhead, are recovered by the
application of a single predetermined indirect cost rate to direct costs
incurred.  The Bureau has only one indirect cost rate and it is applicable
to all cost recoverable services.  This rate is subject to periodic review
and change.  These indirect costs are automatically included in the
category fee schedule.

5.  <u>Category Changes</u>.  Actual processing expenditures are not
kept for specific minor category applications.  Therefore when a category
determination is changed from a minor category to a major category,
expenditures cannot be reclassified and charged to subactivity 5101 and
the major category project number.  Anticipated processing costs for
reclassified major category projects must be paid in advance in
accordance with .17 above.

.18C

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES·

C.  Project Code Assignments.  Applications falling into minor categories are to be identified and coded as shown in .18C1(a) below. All applications within a given State and fiscal year are to be identified with the same code.  The responsible official in the State Office must assign an individual project code to each major category ROW at the time the application is accepted (see Illustration 7).  Except in the case of multiple applications (see .18F below), the project code in subactivity 5101 is used to account for payments and costs during both the application processing and grant monitoring phases of the ROW.  In order to identify and allow recovery of costs for preparation of responses to applicants requesting exemptions, preliminary permits, or licenses from the Federal Energy Regulatory Commission (FERC), project codes are necessary.  Project codes are assigned as follows:

1.  Project Coding/Numbering System.

a.  Minor Category Codes (4211):

|  | Characters | | | |
|---|---|---|---|---|
| Description | 1st | 2nd | 3rd | 4th |
| FLPMA ROW | F | L | A (AZ) | A (FY 91) |
| MLA ROW | M | L | B (CA) | B (FY 92) |
| Non-Reimbursable ROW | N | R | C (CO) | C (FY 93) |
| Non-Case related | N | C | D (ID) | D (FY 94) |
|  |  |  | E (MT) | E (FY 85) |
|  |  |  | F (NV) | F (FY 86) |
|  |  |  | G (NM) | G (FY 87) |
|  |  |  | H (OR) | H (FY 88) |
|  |  |  | J (UT) | J (FY 89) |
|  |  |  | K (WY) | K (FY 90) |
|  |  |  | L (AK) |  |
|  |  |  | M (ES) |  |
|  |  |  | N (DSC) |  |
|  |  |  | P (WO) |  |

Sample:  A MLKF project code is a minor category Mineral Leasing Act right-of-way in Wyoming filed in FY 1986.

AR07808

.18C1b

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

b.  Major Category Project Numbers (5101,5410,5420,5440,7150).

| Description | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| | | Characters | | |
| FLPMA Cost Recovery ROW | X | A (AZ) | A (1) | A (1) |
| MLA Cost Recovery ROW | Y | B (CA) | B (2) | B (2) |
| Other Realty Cost Recovery | Z | C (CO) | C (3) | C (3) |
| | | D (ID) | D (4) | D (4) |
| | | E (MT) | E (5) | E (5) |
| | | F (NV) | F (6) | F (6) |
| | | G (NM) | G (7) | G (7) |
| | | H (OR) | H (8) | H (8) |
| | | J (UT) | J (9) | J (9) |
| | | K (WY) | K (0) | K (0) |
| | | L (AK) | | |
| | | M (ES) | | |
| | | N (DSC) | | |
| | | P (WO) | | |

Sample:  A XFGJ project number designates a major category FLPMA Cost
Recoverable ROW in Nevada with a State number 79.  The same third and
fourth characters may be used for an MLA and FLPMA project.  The first
and second characters will segregate the project.

c.  Cost Codes for Preparing Responses to Hydropower
Exemptions, Preliminary Permits, or License Requests Referred by FERC.

| Description | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| | | Characters | | |
| FERC Request | H | P | -- | -- |
| Municipal Applicant | -- | -- | M | -- |
| Non-municipal Applicant | -- | -- | N | -- |
| Exemption | -- | -- | -- | E |
| Preliminary Permit | -- | -- | -- | P |
| License | -- | -- | -- | L |
| Other Application Type | -- | -- | -- | O |

Sample:  Nonreimbursable work on a FERC environmental statement for a
non-municipal hydropower license would be coded to 4211-09-HPNL.  Work
performed to post to the land records a non-municipal hydropower
exemption would be coded to 4212-22-HPNE (4213 in Alaska).
Nonreimbursable work performed on a resource inventory (T&E, soils,
wildlife, etc.) for a municipal hydropower license application would be
coded to 4211-06-HPML.  Withdrawal work performed on a municipal
hydropower preliminary permit would be coded to 4220-10-HPMP.  Note that
existing program element codes are used with appropriate subactivity
numbers.  Refer to BLM Manual 2805.3 for discussion of hydropower
applications.

.1862

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

2. Additional Characters Needed. If available characters are exhausted for the third and fourth characters, the Director (880) assigns additional alpha characters to the State Office for these projects.

3. Two or More States on Same Project. If more than one State is involved in an ROW, the Director (330) will select a lead State. The lead State must assign one of its project codes for the full length of the ROW. Refer to BLM Manual 2801 for more specific information.

D. Internal Cost and Payment Reports for Major Category Projects. All financial transactions coded to a specific major category project code appear on a Special Projects Detail List (SPDL) identified by the same project code. The SPDL is produced by the Service Center, Division of Finance (D-512). Microfiche copies of this report are sent monthly to each District and State Office. The SPDL is the official Bureau record of costs charged to specific ROW projects. It is imperative that this report be carefully checked for accuracy by the authorized officer and/or project leader as it is used as the basis for any project cost analysis and reports to the applicant/holder. State and District Office personnel should ensure that the authorized officers receive a copy of the SPDL on a timely basis each month. In addition to the SPDL microfiche, the Service Center sends two copies of the Cost Recoverable Status Report, 70311, to each State Office. The SPDL is cumulative only for each fiscal year, i.e., the report does not capture prior year costs. It is, therefore, critical that a hard copy reproduced from the microfiche for each project from the October report be placed in the official case file.

E. Internal Control of Costs Charged to ROW Projects.

1. Responsibility of the Authorized Officer. Authorized Officers have the primary responsibility for internal control over costs coded to cost recoverable projects. This includes responsibility for assuring that all costs charged to specific projects are not only proper but also accurately recorded in the Bureau's accounting system. This responsibility may be redelegated at the authorized officer's option. No costs may be coded to a cost recoverable project without prior approval of the authorized officer. The authorized officer must review all cost transactions as they appear on the SPDL and take whatever action is necessary to verify that individual transactions are proper and accurately coded, and must reclassify those that are not. The authorized officer must be able to justify all costs charged against a specific project.

AR07810

.18E2

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

2. Rules Governing Specific Personnel. The following rules
pertain to the coding to specific right-of-way cases of personnel time,
travel, and other costs incurred by Bureau personnel which satisfy the
definition of direct cost in the Glossary of Terms.

a. Costs for the Washington Office Directorate, Service
Center Director, State Directors, and Associate State Directors shall not
be coded to reimbursable right-of-way cases except as provided in .18E2d
below.

b. Costs for District Managers and Area Managers shall be
coded directly to a right-of-way case only when performing tasks to
process a specific application (including application approval) or to
issue, monitor, or terminate a specific grant.

c. Costs for the designated project managers at any level of
the organization, and all staff and line support essential to a specific
right-of-way case, shall be coded directly to the specific application or
grant only when performing tasks to process the application or to monitor
or terminate the grant. The mere assignment of an individual to a
specific right-of-way case is not a sufficient basis for charging time or
other costs to the case if no actual case processing, monitoring, or
termination work is performed.

d. Costs for the Washington Office Staff may, when properly
authorized, be coded directly to a right-of-way case only when performing
tasks to process a specific application or to monitor or terminate a
specific grant. However, this is expected to occur infrequently. Proper
authorization is considered to be a written duty assignment from the
Assistant Director, Land and Renewable Resources.

F. Multiple Applications. Two or more applications may be
received for one ROW system. They may be either competing or
noncompeting applications. In all cases, each applicant is required to
make the nonrefundable fee payment set by the appropriate ROW category.
(See .18 above for procedures for depositing payments.)

1. Fees for Minor Category ROW Applications are deposited to
subactivity 5102 and the applicable project code (see .18C above).

2. Fees for Major Category ROW Applications are deposited to
subactivity 5101 and the appropriate project number. Additional cost
recovery procedures for these cases are handled as follows:

.18F2a

## 1323 – COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

a. To process costs for competing applications, the authorized officer establishes one project number for costs that relate to all the applicants and additional project numbers for each competing applicant. Costs which relate to all applicants are paid for by the applicants in equal shares or in accordance with a formula agreed to in writing by all applicants and approved by the authorized officer. Each applicant shall be responsible for the reimbursement of applicable costs identified with the application. Those costs identifiable with a specific application are charged to the appropriate project number.

b. If several applications are filed separately, but judged by the authorized officer to comprise a single project, a single project number may be issued to handle cost accounting and recovery. A single billing may be issued for all the applicants and sent to the participant of their choice, who will assume responsibility for payment. Alternatively, billings may be handled as in .18F2a above. In either case, noncompeting, multiple applicants are jointly and severally liable for the cost incurred.

c. Once an ROW is issued, a project number for costs of monitoring the ROW may be established for each new ROW issued, if separate project numbers were not established for each of the applicants as provided in .18F2a above.

G. Joint Applications.

1. Liability for Nonrefundable Fee and Actual Costs or Reasonable Costs. When through a partnership, joint venture, or other business arrangement more than one person, partnership, corporation, association, or other entity, together apply for a ROW grant or TUP, all such persons or other entities are jointly and severally liable for the nonrefundable fee and actual Bureau costs (MLA) or reasonable costs (FLPMA) when the application pertains to a major category grant.

2. Identification of Lead Applicant. Applicants participating in a joint application must identify a single "lead" applicant to act as the contact point for cost reimbursement purposes.

3. Accounting for Costs. Receipts and costs pertaining to a major category joint application are accounted for under a single subactivity 5101 project number.

.18H

1323 - COST RECOVERY FOR RIMBURSABLE PROJECTS/ACTIVITIES

H.  Other Applications.

1.  Incomplete Applications.  If a significant deficiency is noted in the application, including a nonrefundable application processing fee that is less than the amount required, it shall not be accepted.  An explanation is given to the applicant.  However, many times minor deficiencies in applications which have been received in the mail can be corrected by a telephone call.  If the applicant presents the application in person, every effort should be made to resolve the correctable deficiencies at that time.  If the applicant insists on filing a deficient application, it may be accepted only if the required nonrefundable application processing fee is attached.  In such cases, the applicant must be informed that the nonrefundable application processing fee cannot be refunded if the authorized officer later determines the application is still unacceptable.

2.  Applications to Amend ROW.  If a proposed amendment to the grant or TUP is substantial and/or significant and processing costs are involved, the authorized officer shall require the filing of an amended application.  The amendment is subject to cost recovery on the same basis as a new application.  If the amendment is not substantial, written approval may be granted by the authorized officer, and cost reimbursement is not required.

3.  Renewal of Grant or TUP.  Renewal of a grant or TUP, where the existing use and facilities will continue without change, is not subject to cost reimbursement.

I.  Rejection, Withdrawal, or Relinquishment.

1.  Rejection.  If an application is rejected, the nonrefundable application processing fee is retained.  The applicant is liable for any additional costs actually incurred by the Bureau (MLA) or reasonable costs (FLPMA), if the applicant is subject to major category cost reimbursement procedures.  The bill for payment of any such additional processing costs is due 30 days from receipt.

Rel. 1-1488
4/23/87

AR07813

.18I2

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES


2.  <u>Withdrawal or Relinquishment</u>.  If an application is withdrawn, or a ROW relinquished, the nonrefundable processing or monitoring fee is retained and for major category applications, the applicant/holder is liable for additional costs actually incurred (MLA) or reasonable costs (FLPMA).  The amount owed includes costs incurred in processing the application through the date when the authorized officer received written notice of the withdrawal, and costs subsequently incurred in terminating the application or the ROW.  Such amounts that have not been paid are due within 30 days of receipt of the bill. Nonrefundable monies remaining after obligation of all costs incurred for withdrawn or terminated major category applications are to be reclassified to subactivity 5102.


J.  <u>Assignments</u>.  All applications to transfer in whole or part any ROW, title of interest in ROW, or TUP must be accompanied by a nonrefundable fee of $50.  Exceptions for an assignment are the same as in .13 above.  Where multiple assignments are requested by a holder as part of a single action the assignment fee may be set by the authorized officer at less than $50 per assignment so as to recover actual assignment costs.  Deposit fees to 14x5017.1.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

## Glossary of Terms

### -A-

actual cost (AC):  means the financial measure of resources expended or
used by the Bureau of Land Management in processing a right-of-way
application or monitoring the construction, operation, and termination
of a facility authorized by a grant or permit.  Actual costs include
both direct and indirect costs exclusive of management overhead.

authorized officer (AO):  is any employee of the Department of the
Interior delegated the authority to perform the duties relative to
specific cost recovery projects as described in this Manual Section.
Responsibility for specific actions may be further delegated to a
collection officer, adjudicator, realty specialist, etc., and overall
operational responsibility to a project manager.

### -C-

construction cost estimate:  means the construction cost requirements on
public land necessary for the applicant to achieve the goals of the
project.  The estimate shall include expenditures for labor (gross
wages and fringe benefits), supervision, engineering, materials,
equipment, stores, and contracts.  Additionally, the estimate shall
include an indirect cost element for such things as property rents,
utility charges, general administration and data collection, etc.,
used partly, but not exclusively, on a particular project.

costs incurred for the benefit of the general public:  means funds
expended by the United States undertaken solely in connection with
the processing of an application for studies and data collection
determined to have value or utility to the United States or the
general public separate and apart from the application processing.

cost recovery schedule categories:  are ROW cost recovery categories as
defined in 43 CFR 2808.2(a)(1)(6) and 2883.1-1(a)(3).  The categories
are defined more fully in .14A and .14B of this Manual Section. Each
category describes a progressively more complex level of ROW
application processing.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

-D-

direct costs: costs which are of such a nature that the amounts
applicable to a specific project can be accurately and readily
determined. Direct costs are incurred for the benefit of a specific
cost reimbursement project which is identified by a project number.
Any case work time is a direct cost. This could include procurement,
travel, and personnel time for reviewing applications and other case
documents, site visits, preparing grants, meeting NEPA requirements,
appraisals, and other work or cost connected with specific application
processing and grant monitoring. Costs which are not incurred for the
benefit of a specific right-of-way case are not direct costs of the
case and must not be charged to the project. These costs, which may
generally include such things as wilderness reviews and programmatic
environmental impact statements, must be coded to the appropriate
subactivity for which they were primarily incurred.

-E-

efficiency to the Government processing: means the ability of the United
States to process an application with a minimum of waste, expense, and
effort.

existing data: data which has been previously gathered through
inventories and/or preparation of NEPA documents. This data does not
require verification by field examination and is readily available for
use without a significant amount of record search.

-F-

field examination: on-site evaluation of an applicant's proposal which
contributes to a determination as to whether a land use authorization
may be issued, and if so, under what conditions.

I-

indirect/overhead costs: are costs expressed as a percent of direct
costs which are of such a nature that the amounts applicable to a
specific project cannot be accurately or readily determined.
Indirect/overhead costs are incurred either jointly for the benefit of
more than one cost reimbursable project, or in units which are so
small that they cannot practically be reported separately on Time and
Attendance Reports or other accounting documents. Indirect/overhead
costs include any costs which must be coded to the following
"overhead" activities: General Administration, Data Management, and
Equal Employment Opportunity costs relative to BLM employment. (Costs
of enforcing EEO stipulations in grants are direct costs and must be
coded to project monitoring.)

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

-M-

major category applications:  actual cost reimbursement for processing
    and monitoring expenditures for MLA applications (category VI) and
    reasonable cost reimbursement as determined by applying the section
    304(b) criteria of FLPMA for processing applications and monitoring
    grant for FLPMA applications (category V).

management overhead costs:  components of Bureau indirect/overhead costs
    which must be excluded from cost recovery under Section 304(b) of the
    Federal Land Policy and Management Act of 1976.  This exclusion is
    automatically accomplished by the DSC by eliminating management
    overhead costs from the indirect/overhead cost pool used to compute
    the Bureau's indirect cost rate.  It is important to understand that
    the term "management overhead" pertains only to indirect/overhead
    costs and not to direct costs.  Any manager's time which is a direct
    project cost is not management overhead and, therefore, is a
    recoverable cost which must be coded to the benefiting cost recovery
    project.  A manager's time which is not a direct cost of a specific
    project is coded to whatever other activity would be charged if the
    specific project did not exist.  Overhead costs from the standpoint of
    FLPMA excludes reimbursement of costs related to the Bureau
    Directorate including all State Directors and the entire headquarters'
    (Washington Office) staff except where an individual of that staff is
    required to perform work for a Field Office on a specific cost
    reimbursable case.

minor category applications:  reimbursement of processing and monitoring
    costs are on a fee schedule basis for MLA applications in categories
    I-V and for FLPMA applications in categories I-IV.  Except in rare
    instances, FLPMA applications do not warrant adjustment of the fee
    schedule as a result of FLPMA section 304(b) considerations.

monetary value (MV) of the rights and privileges sought:  means the
    objective value of the right-of-way or permit.  In other words, MV is
    what the right-of-way or permit is worth to the applicant in financial
    terms.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

-N-

nonrefundable application processing payment:  a payment by the applicant for costs incurred by the Government incident to processing an application for a ROW grant, or TUP incident thereto, including preparation of reports and statements concerning the impact of the proposal upon the environment.

nonrefundable monitoring cost payment:  a payment by the grant holder for costs incurred by the Government incident to monitoring the construction, operation, maintenance, and termination of facilities authorized under minor category ROW's including the protection and rehabilitation of the lands involved. (These payments also apply to costs incurred in the preparation and administration of notices to proceed and processing TUP's applied for subsequent to grant issuance.)

-O-

original data:  data not contained in sources available to the Bureau or an applicant and which must be gathered through field examination. Data contained in existing documents which are verified through field examination are not original data.

-P-

project manager:  the individual designated by the authorized officer to represent him in all facets of the project.  (See Appendix 2.)

public service provided:  means tangible improvements, such as roads, trails, recreation facilities, etc., with significant public value that are expected in connection with the construction and operation of the project for which a right-of-way grant is sought.

-R-

reasonable costs:  as defined in S304(b) of FLPMA, as amended, (43 U.S.C. 1734).

right-of-way application:  an acceptable right-of-way application may be a properly completed SF-299, APD (Application for Permit to Drill), or SN (Sundry Notice).  See BLM manual 2801.32.

Illustration 1
Form 1323-2
(.15D)

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Right-of-Way Cost Recovery

Category and Fee Determination Record

Form 1323-2
(February 1985)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**RIGHT-OF-WAY COST RECOVERY
CATEGORY AND FEE DETERMINATION RECORD**

INSTRUCTIONS: Circle "X" opposite applicable statement. The highest numbered category containing a circled "X" is the right-of-way or temporary use permit cost recovery category.

| APPLICATION PROCESSING ACTIVITIES | I | II | III | IV | V | VI |
|---|---|---|---|---|---|---|
| 1. NEPA documentation | | | | | | |
| a. All existing data in office of Authorized Officer | X | Ⓧ | X | | | |
| b. Limited amount of original data available.  No interdisciplinary team required. | | | | X | | |
| c. Existing documentation not sufficient without substantial compilation of original data & supplemental documentation.  Interdisciplinary team required. | | | | | X | |
| d. Processing costs exceed $5,000. | | | | | | X |
| e. Requires Environmental Impact Statement. | | | | | | X |
| 2. Field Examinations | | | | | | |
| a. Field examination is not required. | X | | | | | |
| b. One field examination is required. | | X | | | | |
| c. Two field examinations are required. | | | Ⓧ | | | |
| d. Two or three field examinations are required. | | | | X | | |
| e. Three or more field examinations are required. | | | | | X | |

Applicant  Shell Oil          Case No. I-24147

I have determined that the appropriate category is Category _III_ . The nonreturnable application processing payment for this category is $ 350.00 . This decision is final for purposes of appeal under 43 CFR 2804.1.  Notwithstanding the pendency of such appeal, an application shall not be accepted for processing without payment of the fee determined by the Authorized Officer.

| Authorized Officer | Title | Date |
|---|---|---|
| Mary Moss | Authorized Officer | 1/10/86 |

Remarks:

Note: When the category rating differs between
NEPA documentation (Section 1) and field
Examination (Section 2) the higher
category rating is assigned.

Illustration 2
(.15E3)

1323 – COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Financial Plan

Financial Plan
Dry Basin Project
BLM – All Offices

| | FY 85 | FY86 | Total |
|---|---|---|---|
| Workmonths | 57.25 | 30.00 | 87.25 |
| Personnel Costs[1] | $200,375.00 | $105,000.00 | $305,375.00 |
| Travel/Aircraft | 15,135.00 | 9,500.00 | 24,635.00 |
| Procurement[2] | 12,200.00 | 6,000.00 | 18,200.00 |
| Subtotal | $227,710.00 | $120,500.00 | $348,210.00 |
| Indirect Costs[3] | 40,532.38 | 21,449.00 | 61,981.38 |
| TOTAL (direct/indirect) | $268,242.38 | $141,949.00 | $410,191.38 |
| TOTAL | $268,300.00 | $142,000.00 | $410,300.00 |

[1] $3,500.00 average workmonth cost.

[2] Includes equipment leasing, supplies, and printing.

[3] 17.8% indirect cost rate which is subject to change.

BLM MANUAL
Supersedes Rel. 1-1406

Cost Reimbursement Plan
Dry Basin Project
BLM - All Offices

| Direct Costs | FY 85 1st Qtr | FY 85 2nd Qtr | FY 85 3rd Qtr | FY 85 4th Qtr | FY 86 1st Qtr | FY86 2nd Qtr | Total |
|---|---|---|---|---|---|---|---|
| Workmonths | 1.25 | 23 | 20 | 13 | 18 | 12 | 87.25 |
| Personnel Costs[1] | $4,375.00 | $80,500.00 | $70,000.00 | $45,500.00 | $63,000.00 | $42,000.00 | $305,375.00 |
| Travel/Aircraft | 1,050.00 | 6,035.00 | 4,200.00 | 3,850.00 | 5,600.00 | 3,900.00 | 24,635.00 |
| Procurement[2] | -- | 1,100.00 | 1,100.00 | 10,000.00 | 1,000.00 | 5,000.00 | 18,200.00 |
| Subtotal | $5,425.00 | $87,635.00 | $75,300.00 | $59,350.00 | $69,600.00 | $50,900.00 | $348,210.00 |
| Indirect Costs[3] | 965.65 | 15,599.03 | 13,403.00 | 10,564.30 | 12,388.80 | 9,060.20 | 61,981.38 |
| TOTAL (direct/indirect) | $6,390.65 | $103,234.03 | $88,703.40 | $69,914.30 | $81,988.80 | $59,960.20 | $410,191.38 |
| TOTAL (rounded) | $6,400.00 | $103,200.00 | $88,700.00 | $70,000.00 | $82,000.00 | $60,000.00 | $410,300.00 |

[1] $3,500.00 average workmonth cost.

[2] Includes equipment leasing, supplies, and printing.

[3] 17.8% indirect cost rate which is subject to change.

Rel. 1-1488
4/23/87

Illustration 3
(.15E3)

AR07821

1323 – COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Major Category Decision

2800
(CA-060.23)

MAY 13, 1986

CERTIFIED MAIL No. P 710 429 754
RETURN RECEIPT REQUESTED

                                    DECISION

Southern California Edison Co.      :
P.O. Box 410                        :
100 Long Beach Blvd.                :   Southern California Edison Co. (SCE)
Long Beach, CA 90801

ACCEPTANCE OF THE MEMORANDUM OF AGREEMENT AND COST RECOVERY PLAN
FOR DEVERS-PALO VERDE NO. 2 TRANSMISSION LINE

SCE. has agreed to file an application in order that the Bureau of Land
Management may continue its review of the proposed 500 KV transmission line
from the Devers substation in California to the Palo Verde generating plant in
Arizona. The application need not identify a specific description of lands to
be involved at this time. However prior to completion of the Supplemental
Environmental Impact Statement and granting of a right-of-way, all lands to be
affected will be identified.

A determination has been made by the Bureau that the cost of processing this
right-of-way is in excess of $5,000, and therefore cost recovery is required.
The attached memorandum of agreement between the Bureau of Land Management and
SCE and the cost recovery plan thoroughly explains the agencies' responsibili-
ties, the review schedule and the estimated costs of processing the
application.

In order to proceed with processing this application both parties (BLM and
SCE) agree that the estimated cost of $38,080.00 (as described in the Cost
Recovery Plan) is fair and reasonable. It is also agreed that SCE will be
billed, in advance, on a quarterly basis. Payment within 30 days is
required. You have the right to appeal these cost estimates to the Board of
Land Appeals, Office of the Secretary, in accordance with the regulations
contained in 43CFR, Part 4, and the enclosed Form 1842-1. If an appeal is
taken, your notice of appeal must be filed in this office so the file can be
transmitted to the Board. A copy of your Notice of Appeal and of any
statement of reasons, written arguments or briefs must also be served on the

1323 — COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Major Category MOU

---

**Southern California Edison Company**

P. O. BOX 410

100 LONG BEACH. BOULEVARD

LONG BEACH. CALIFORNIA 90801

REAL PROPERTIES DEPARTMENT

TELEPHONE
(213) 481-2887

Mr. Gerald E. Hillier
California Desert District Manager
Bureau of Land Management
1695 Spruce Street
Riverside, CA  92507

February 25, 1986

Attention:  Mr. Bill Collins

Gentlemen:

SUBJECT:  Devers-Palo Verde No. 2 500kV T/L
Memorandum of Understanding (MOU)

Enclosed are an original and one copy of an MOU between Southern
California Edison (SCE) and the Bureau of Land Management (BLM)
for the Devers-Palo Verde No. 2 500kV T/L executed by SCE.  Please
have both copies executed by the BLM and return one for our files.

The changes suggested by the BLM have been complied with.  Please
note that the paragraph reserving to SCE the right to contest any
fees or assessments has been removed.  It is our understanding
that the BLM felt that since SCE, by law, has the right to
contest, or appeal a BLM Decision, this paragraph was
unnecessarily cumbersome and therefore did not need to be in the
MOU.  Also on page 4, Section IV, Item 5 has been reworded as
suggested by Mike Burke, California Public Utilities Commission.
Page 5, Section V regarding "NON-LIABILITY" has been removed per
your request.

We thank you for your patience and assistance in getting this
document in its final form, acceptable by both parties.  I look
forward to working with you on this project.

Very truly yours,

C. A. PRINCE
Right of Way Agent

2591ac

Enclosures

---

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Major Category MOU

MEMORANDUM OF UNDERSTANDING

BETWEEN

BUREAU OF LAND MANAGEMENT, CALIFORNIA DESERT DISTRICT

AND

SOUTHERN CALIFORNIA EDISON COMPANY

FOR THE DEVERS-PALO VERDE NO. 2 500kV TRANSMISSION LINE

SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

I.   INTRODUCTION AND PURPOSE

The Southern California Edison Company (SCE) is proposing
to build a second 500kV transmission line from the Palo
Verde Nuclear Generating Station in Arizona to the Devers
Substation near Palm Springs, California.  The proposed
alignment, for the most part, will be parallel to the
existing Devers-Palo Verde No. 1 500kV T/L, lying north of
the existing line in California and south of the existing
line in Arizona.  Bureau of Land Management (BLM) and SCE,
hereinafter referred to individually as Party or collec-
tively as Parties, have agreed that a Supplemental
Environmental Impact Statement, hereinafter referred to as
EIS, be prepared by the BLM for this transmission line.  It
is the purpose of this Memorandum of Understanding
(Memorandum) to establish an agreement between BLM and SCE
regarding their respective roles and the conditions and
procedures to be followed in preparing the EIS.

This EIS will, by reference or other methods, incorporate
information along with the Environmental Impact Statement
(EIS) previously prepared in connection with the
Devers-Palo Verde No. 1 Project which cover the existing
corridors and which contain data basic to the EIS.

It is the intent of both Parties hereto that the EIS be
prepared covering all federal environmental requirements of
each participating Party.  It is also the intent of the
Parties hereto that the EIS be prepared using, to the
fullest extent possible, data previously developed and that
all efforts in regard to EIS preparation be consistent with
the goals of data adequacy and economy.  Additionally, it
is the intent of the Parties hereto that joint public
meetings will be held instead of separate meetings.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Major Category MOU

The EIS shall comply with the National Environmental Policy
Act of 1969 (NEPA) and all subsequent regulations imple-
menting this law, as well as the California Environmental
Quality Act of 1970 (CEQA).  (See Council on Environmental
Quality (CEQ) regulations, 40 CFR Parts 1500-1508 and
Chapter 3, Division 6, Title 14 of the California
Administrative Code, respectively.)  It is intended that
SCE will file the EIS as part of the proceeding for a
Certificate of Public Convenience & Necessity (CC&N) before
the CPUC.

II.   **PROCEDURE**

BLM and SCE will jointly develop an EIS preparation plan
within three months of execution of this Memorandum.  This
plan will describe the key issues to be addressed in the
EIS and will discuss the organization, scheduling, tenta-
tively scheduled coordination meetings and scope of the EIS
and related EIS activities.

BLM and SCE have established primary persons to contact for
all matters relating to preparation of the EIS.  The
designated individuals are:

   William H. Collins:   BLM, California Desert District
   Carol A. Prince:      SCE, Real Properties Department

Each participating Party may designate a new primary con-
tact person by so notifying the other participating Party.

BLM and SCE will mutually and freely consult and will keep
other concerned organizations informed regarding progress
on the EIS, including additional data needs, scope of
applicable activities and all issues of importance.

Regularly scheduled and ad hoc coordination meetings will
be held between the previously identified primary contact
persons, state agencies and others, as appropriate, in
order to ensure communication and coordination among all
participating organizations.

BLM and SCE agree that in the event EIS preparation falls
30 days or more behind the schedule established in the EIS
Joint Preparation Plan, the Parties hereto will develop a
schedule to overcome such delay within the total time frame
established for EIS completion.

BLM and SCE agree that in the event the Parties hereto are
not in agreement regarding any major issue encountered
during development of the EIS, the Parties hereto will work
diligently to resolve such disagreement, keeping in mind
the objective of one adequate, economical EIS.

- 2 -

Illustration 5, Page 4

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Major Category MOU

III. **BLM RESPONSIBILITIES**

1. BLM will be the lead Federal agency in the EIS prepara-
tion and will be solely responsible for ensuring full
compliance with the requirements of NEPA and other
pertinent Federal laws and regulations.

   BLM will be responsible for the Federal public review
   of the EIS, any necessary public hearings, analysis of
   public documents, distribution of the final EIS and the
   decision document. However, it is recognized that SCE,
   as required by CEQA, will also meet its responsibilities
   for public review, required notices, consultation and
   hearings under CEQA. (Refer to California Public
   Utilities Code and related Regulations and Orders
   outlining SCE and PUC responsibilities during
   preparation of the Devers-Palo Verde No. 2 EIR.)

2. The BLM California Desert District Manager will have
management lead on behalf of all Federal agencies,
including the BLM Phoenix and Yuma District Offices
for contribution to the EIS and will be ultimately
responsible for the scope, content and adequacy of
those portions of the EIS relating to Federal agency
requirements or regulations.

3. The BLM California Desert District will provide SCE,
within 30 days of execution of this Memorandum, a
written estimate of the total costs to be incurred by
BLM for the California Desert District (including Indio
Resource Area) and Phoenix and Yuma Districts for work
associated with this Memorandum.

   BLM will provide SCE with a quarterly estimate of
   costs, to be paid in advance by SCE.

   Additional payments will be made if needed. BLM will
   promptly refund excess payments.

   BLM will provide, or cause to be provided, to SCE on a
   monthly basis, statements of charges for each employee
   showing labor hours, labor costs and expenses for this
   subject transmission line.

4. BLM will invite SCE to attend meetings with Federal,
state, regional and local agencies and other groups as
appropriate.

5. BLM will consult with SCE during impact analysis and
mitigation planning.

6. BLM will review data, environmental descriptions, and
analyses available from SCE and other sources and will

- 3 -

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Major Category MOU

not duplicate work already done unless it is estab-
lished that the work is unacceptable for purposes of
the proposed transmission line EIS.  BLM will consult
with SCE prior to determining whether existing work
must be modified or redone.  However, BLM will make the
final determination on the inclusion or deletion of
material wherever there is a question as to the content
or relevance of any material (including all data,
analyses and conclusions) in the EIS.

IV.   **SCE RESPONSIBILITIES**

1.  SCE will be responsible for ensuring full compliance
    with the requirements of CEQA and other pertinent state
    laws and regulations.

2.  SCE will provide a complete description of any proposed
    actions for review by BLM.

3.  SCE will provide BLM with any technical and environ-
    mental information SCE has which may be useful during
    EIS preparation.

4.  Public meetings will be conducted by BLM recognizing
    potential participation by SCE management and
    representatives.

5.  SCE will pay the cost of the consultant firm(s)
    selected jointly by CPUC and BLM to prepare both the
    Supplemental EIS and the required EIR document(s).
    Direct costs incurred by BLM will be reimbursed to
    BLM.  All consulting expenses incurred in compliance
    with both NEPA and CEQA will be reimbursed through the
    PUC's account, established under Rule 17.1 of the PUC's
    Rules of Practice and Procedures.

6.  SCE will respond to data requests and will provide
    review comments within a reasonable period of time.

7.  SCE will attend meetings and will participate in the
    preparation of mitigation measures as appropriate.

8.  SCE will reimburse BLM for direct costs reasonably
    incurred by BLM to perform work required by this
    Memorandum, in accordance with Section III, part 3, of
    this Memorandum.

9.  SCE will provide an advance payment of $10,000 from
    which BLM employees will be reimbursed for labor costs
    and other expenses acquired for work done in connection
    with the preparation of the EIS.  This would include
    such things as coordination meetings, help in the
    preparation and review of EIS documents and attendance
    at public meetings and hearings.

- 4 -

Illustration 5, Page 6

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Major Category MOU

V.   **TERMINATION**

Each Party to this Memorandum may terminate their partici-
pation in this agreement after 30 days' prior written
notice to the other Party.  During the intervening 30 days,
both Parties hereto agree to actively attempt to resolve
any outstanding disputes or disagreements.

FOR BUREAU OF LAND MANAGEMENT          FOR SOUTHERN CALIFORNIA EDISON

By:                                     By:
    California Desert District              Manager,
                                            Real Properties Department

                                            FEB 26 1986

Date:     2/28/86                       Date:


331LANDACQ


- 5 -

Illustration 6, Page 1
Form 1323-1
(.18B3)

1323 - COST RECOVERY FOR REIMBURSABLE PROJECT/ACTIVITIES

Reimbursable Project Log

| Form 1323-1 (June 1983) | UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT | | PROJECT |
|---|---|---|---|
| | | | Number _YFBC_ |
| | REIMBURSABLE PROJECT LOG | | Name _Continental Pipeline_ |
| Employee Name _Jerry Smith_ | | Title _Realty Specialist_ | |

| DATE | PROJECT SEGMENT OR COMPONENT | DESCRIPTION OF WORK DONE | HOURS (Total) |
|---|---|---|---|
| 2-1-85 | Entire Route | Met with project sponsor in field. Discussed cultural resource protection, endangered species habitat, noxious weed control, and topsoil stockpiling. Erosion control during and after construction discussed. Sponsor agreed to have a qualified archaeologist on the project during construction in area identified and flagged on the ground with red ribbon adjacent to Mud Spring. Sponsor agreed that no work would be done between February 1 and June 15 within 2 miles of the bald eagle nest on Dead Man Ridge. Sponsor agreed to stockpill topsoil along the right-of-way, and to spread it over disturbed area after construction is completed prior to reseeding. | |
| | | All travel in Govt pickup (184 miles) | 10 |
| 2-2-85 | access road | Met with project sponsor and district engineer (John Brown). Staked approx. location of major culverts and agreed on diameter. Sponsor agreed to install a 60" gal. steel pipe arch in Louse Creek. Travel in Govt pickup (190 miles). | 3½ |
| 2-3-85 | Entire route | Wrote stipulations based on agreement reached with project sponsor and related requirements. | 4½ |
| | | Note: Brown completes Form 1323-1 also.) | |
| Signature of Authorized Officer _Jerry Smith_ | | | Date _2-18-85_ |
| (See Instructions on reverse) | | | |

INSTRUCTIONS

This form is to be used on Major Category Projects only. It should be used to explain ant time coded to subactivity 5101 unless the project authorized officer (AO) determines that logs with different formats already in use provide the same information.

Use a separate project log sheet for each project. Entries must be made each day that work is performed on a project and should be made immediately following the work. Do not attempt to record more than 1 day's activity by postponing the recording of work activity.

Date and sign each page and submit the log(s) to the project AO at the end of each payperiod along with other documents showing charges against the project, such as travel vouchers, purchase orders, utility billings, etc. Entries in the log must agree with the Time and Attendance (T&A's). A copy of the log(a) is attached to the T&A report copy retained by the official timekeeper and periodically checked by the AO to verify the data.

The AO must check each log against the Special Project Detail List (SPDL) each month to ensure that a log is on file to support each item of work appearing on the SPDL. If logs are missing, the AO must take action to obtain the missing logs.

As a result of this review, the AO initiates action through the timekeeper to correct or delete any erroneous or inappropriate entries.

It is imperative that accurate and complete daily records be kept as the project log will be used for both legal and administrative purposes.

Illustration 6, Page 2

1323 - COST RECOVERY FOR REIMBURSABLE PROJECT/ACTIVITIES

Reimbursable Project Log

### INSTRUCTIONS

Submit completed logs to the project Authorized Officer (AO) at the end of each pay period.

The AO must review the entries and indicate approval by signing the log in the space provided.

PROJECT SEGMENT OR COMPONENT — Give name or number of segment, spread, or project component. If work pertains to entire project enter "entire project."

DESCRIPTION OF WORK DONE — Use as many lines as necessary to describe work accomplished. Describe mode, destination, and purpose of travel. Include names or persons contacted and topic of discussions. *(Attach additional sheet, if necessary.)*

Use separate sheet for each project.

Record only time spent on reimbursable project (5100 subactivity).

Fill out daily, or more frequently if type of work changes or work is done on more than one project.

Illustration 7
(.18C1)

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Major Category Project Number Establishment



IN REPLY REFER TO:

**United States Department of the Interior**

BUREAU OF LAND MANAGEMENT
CALIFORNIA DESERT DISTRICT
1695 Spruce Street
Riverside, California 92507

CA-18888
2800
(CA-063.04)

APR 1 6 1986

Memorandum

To:      SDs, California, Arizona & New Mexico
         DMs, Phoenix, Yuma & Las Cruces

From:    District Manager, California Desert District

Subject: U.S. Telecom Fiber Optic Right-of-Way Cost Recovery Account Number

We have assigned a cost recovery project number for this application.
Effective today, please charge all costs incurred in processing and monitoring
this project to X8DA.

The case serial number for this application is CA-18888. This serial number
should be used for all documents generated during the life of this project.

We will be issuing one right-of-way document to U.S. Telecom.

The above mentioned District Managers as well as myself will execute the
document on behalf of the United States.

Please contact Bill Collins at FTS 796-6428 if you have any questions
concerning this application.

Westland

cc: CA-931.1
    CA-066

ACTING

Illustration 8

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Major Category Account Activation

 **United States Department of the Interior**

BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240

IN REPLY REFER TO:

1681
(CA-061.60)

Memorandum

To:      Director DSC (D-515)

From:    District Manager, California Desert

Subject: 5101 Account Activation

Please activate account 5101-XBDA, U.S. Telecom, Inc. for the States of
California, New Mexico, and Arizona. The billing address is:

> U.S. Telecom, Inc.
> P.O. box 11315
> Kansas City, Missouri 64112
> Attention: Joe Williams

Enclosed is the first quarter estimate and an estimate for the entire duration
of the project. Payment for the first quarter of $8,000 is attached. There-
fore, it is not neccesary to mail the billing to the company, simply retain it
for your files.

1323 - COST RECOVERY FOR REIMBURSABLE PROJECT/ACTIVITIES

Billing and Collection Procedures

on Rights-of-Way Grants and Temporary Use Permits

---

The following billing and collection procedures are to be used on rights-of-way (ROW) grants and Temporary Use Permits (TUP's). Steps 1 and 2 are applicable to all categories of ROW's and TUP's. Step 3 applies to minor categories and steps 4 through 7 apply to major categories.

| Responsible Office/Official | Step | Action |
|---|---|---|
| | 1. | PREAPPLICATION ACTIONS |
| Proponent | | a. Contacts BLM office responsible for receiving application. |
| Authorized Officer | | b. May set up a preapplication meeting with proponent(s) to discuss the proposal. |
| | | c. Obtains data to determine cost reimbursement category. AO estimates category and fee and provides this information to proponent(s) for application filing purposes. Preapplication work for all categories is charged to 4211. |
| | 2. | APPLICATION FILING |
| Proponent | | a. Submits application and map with estimated non-refundable application fee. |
| Authorized Officer | | b. Accepts and serializes application and establishes case file. No written decision is required to accept an application. |
| | | c. Reviews application for accuracy and completeness. Requests additional information from proponent if necessary. |
| | | d. Completes the Right-of-Way Cost Recovery Category and Fee Determination Record (Form 1323-2) and issues decision of category determination and fee by Certified Mail. |
| Applicant | | e. Receives decision and returns any additional fee to the receiving office along with any requested information. |
| Authorized Officer | | f. Does not process application until total fee and/or requested information is submitted. |
| | | g. Completes case file examination. |
| | 3. | APPLICATION FILING STEPS FOR MINOR ROW'S |
| Collection Officer | | a. Prepares Form 1370-41, Receipt and Accounting Advise, and deposits nonrefundable fee to 14X5017.1, Rights-of-Way Cost Recoveries, Bureau of Land Management. Prepares Collection Data Sheet, Form 1370-35. Deposits fees to subactivity 5102 and the applicable project code. Sends receipt copy of Form 1370-41 to applicant and case file copy to case file. This completes the cost reimbursement actions required for processing applications for ROW's in minor categories. |
| | | b. Collects from applicant, prior to grant issuance, the nonrefundable monitoring fee. |
| | | c. Repeat step 3a. |
| Authorized Officer | | d. Where there is a decision to reject an application, notifies the applicant of the decision by Certified Mail. |

1323 - COST RECOVERY FOR REIMBURSABLE PROJECT/ACTIVITIES

Billing and Collection Procedures

on Rights-of-Way Grants and Temporary Use Permits

| | | |
|---|---|---|
| | 4. | APPLICATION PROCESSING FOR CHANGES FROM A MINOR CATEGORY TO A MAJOR CATEGORY |
| Authorized Officer | | a. Assigns a project code to the project. |
| | | b. Transfers the amount of the nonrefundable application processing fee previously deposited to 14X5017.1, subactivity 5102, to 14X5017.1, subactivity 5101 and the project code assigned to the specific project. |
| | | c. Performs the actions required under 5a. |
| | | d. Proceed to step 5d. |
| | 5. | APPLICATION PROCESSING FOR MAJOR CATEGORY ROW's |
| Authorized Officer | | a. Reviews application, prepares Project Preparation Plan and financial plan and develops a cost reimbursement plan which includes total costs of processing and monitoring. The AO shall inform the applicant by decision (FLPMA) and prepares an MOU (FLPMA or MLA) of the estimated amount to be reimbursed. Estimates first quarter cost. No processing work is to be done or charges made to 5101 until a project is established and initial payment received. |
| | | b. Assigns a project code to the project. |
| Collection Officer | | c. Prepares Form 1370-41, Receipt and Accounting Advice, and deposits application fee to 14X5017.1, Rights-of-Way Cost Recovery. The nonrefundable fee and other payments received are deposited to subactivity 5101 and the project code assigned to the specific project. Sends copy of the 1370-41 to D-515 for information and file purposes and prepares a Collection Data Sheet, Form 1370-35. |
| | | d. When the first quarter cost estimate is received from the AO, send request for a bill to D-515.(See Illustration 8) |
| Authorized Officer | | e. On a monthly basis, reviews and monitors Financial Management System reports (FO-305 and FO-311) to ensure that cost reports reflect valid charges to each project. |
| | | f. Forty-five days prior to the beginning of each calendar quarter, prepares a billing request of estimated costs to be incurred during the next quarter. If needed, an interim billing request may also be requested. Forwards billing request to D-515. |
| | | g. Subsequent quarterly billing requests will include a separate line item adjustment for overpayments or underpayments of actual costs incurred in previous quarters. |
| | | h. If grant is to be issued and total payments exceed total costs, advises applicant of grant approval and offsets overpayments against future billings for grant monitoring. |
| | | i. If the application is to be rejected or is withdrawn, and total payments exceed total costs, notifies applicant of rejection and of pending refund. Sends request for refund to D-515. When total costs do not exceed nonreimbursable payments, AO sends request to D-515 to reclassify unexpended funds to subactivity 5102. |

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

Billing and Collection Procedures

on Rights-of-Way Grants and Temporary Use Permits

|                     |     |                                                                                                                                                                                                                                                                           |
|---------------------|-----|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                     |     | j. The AO may reestimate the actual costs (MLA) and reasonable costs (FLPMA) and adjust the financial plan at any time it is determined that a change warranting a reestimate has occurred. When a substantial change results, a redetermination of reasonableness of costs and a decision (FLPMA) or decision on actual costs (MLA) issued. |
|                     | 6.  | ROW GRANT ISSUANCE                                                                                                                                                                                                                                                         |
| Authorized Officer  |     | a. Upon receipt of all processing costs and initial monitoring payments, issue ROW grant.                                                                                                                                                                                  |
|                     | 7.  | GRANT MONITORING                                                                                                                                                                                                                                                           |
| Authorized Officer  |     | a. Continues cost recovery procedures as described in step 5.                                                                                                                                                                                                              |
|                     |     | b. If the AO determines that substantial monitoring efforts will continue, a balance shall be maintained in the account to cover all monitoring costs.                                                                                                                      |
|                     |     | c. If he determines that substantial monitoring costs will not be incurred, the AO will send a refund request to D-515 for the balance in the account and will ask D-515 to cancel the project code once all project costs have been incurred and paid.                     |
|                     |     | d. If at any future time, substantial government costs will be incurred in monitoring or terminating the grant, a new project code will be requested and assigned to the project.                                                                                           |

1323 - COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

The Project Manager

A Key to Uniformity and Consistency

Control and monitoring capability for major rights-of-way can be greatly enhanced by having one project manager who represents BLM even though lands in several resource areas, districts, or States may be involved.

If a project spans more than one State, the Director designates a lead State. The State Director should designate a project manager. Other State Directors should designate project coordinators to represent their respective States in project related matters. Similarly, District Managers and Area Managers should designate individuals to serve as coordinators to handle their local involvement in the project.

To the extent possible, the project manager should be assigned for the entire life of the project, from inception through construction. The intent is not to prevent transfers for career development, but rather to avoid routinely shifting the lead from one manager to another as the project progresses through its various stages and to avoid having more than one lead person at a time.

This would provide continuity in our dealing with applicant/holders and a central contact point through whom the downward flow of guidance and the upward flow of feedback may occur.

The project manager once designated, should assume the lead in the preapplication process described in BLM Manual 2802 and serve as BLM's point of contact with the applicant/holder. The project manager is the one who must assure that all the requirements outlined in BLM Manual 2802 - 2805, 2880, and 1323 are met efficiently and on time.

The project manager should be familiar with the area where the project is located and the probable impacts of the work proposed. The project manager must also know how to use the BLM cost recovery system as a management tool and be able to handle related negotiations with applicants/holders. Among the many duties, several stand out as deserving special attention in the light of lessons recently learned from court cases, appeals and findings of the Inspector General.

1. Documentation

Because project related work is wholly or partially funded by the applicant/holder, charges are likely to be carefully scrutinized. The manager must assure that every individual charging time or other costs to the project records the following in a project log such as BLM Form 1323-1:

   a. decisions made
   b. agreements reached
   c. work done
   d. money spent
   e. unusual procedures or stipulation changes
   f. controversy
   g. other information necessary to understand what was done and why

2. Control of Project Related Expenditures

The project manager should control the purse strings of the project by knowing what expenditures are necessary and approving all expenditures before they are made. By doing so, it will be much easier to ensure that costs stay within the estimates. Conversely, the need to change estimates will become apparent more quickly and can be discussed with the applicant/holder.

It is crucial that the Special Project Detail List (SPDL) be compared to individual logs and obligation documents to ensure that the applicant/holder is only billed for valid charges. The project manager is responsible for removing invalid charges.

AR07836

1323 – COST RECOVERY FOR REIMBURSABLE PROJECTS/ACTIVITIES

The Project Manager

A Key to Uniformity and Consistency

---

**3.  Coordination with Other BLM Offices and Other Agencies and Interest Groups**

NEPA compliance is often the largest project related cost and may require substantial coordination with other agencies, offices, or groups.

The project manager must coordinate with other interested parties to identify potential conflicts and avenues for cooperation.  A key to success will be to locate responsible contacts for each party, including BLM offices, and keep in touch with them as work progresses.  Any BLM office intending to charge time or incur costs relative to the project must provide appropriate estimates to the project manager in accordance with established schedules.

**4.  Assuring Grant Harmony**

The project manager must be familiar with the entire content of any grant(s) written for the project to assure harmony with earlier decisions and agreements that may have been reached with the applicant.  If grants are prepared in separate offices (possibly in different States) he must review them to detect and resolve conflicting requirements.

Project managers and persons assigned to support them should have other work to do in addition to that directly related to the project, but project related duties must be given sufficient priority to maintain schedules agreed upon with the applicant/holders.

**Summary**

Having one manager throughout the life of a project can produce consistency and uniformity spanning both time and administrative boundaries.  This protects project sponsors from drastic changes from one year to the next and from one Resource Area, District or State, to the next.  The project manager, being a single point of contact for all aspects of a project, enhances top management's control of right-of-way activities, including cost recovery.

---

**Black Rock City LLC**

# BURNING MAN 2014

## After Action Report (AAR)

### *Final Report*

1

AR04760

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

Report Contents                                                                Page Number

I.   Executive Summary                                                              4

II.  BRC Agency Relations: BLM & Cooperating Agencies
     A.  Introduction                                                               5
     B.  Cost Recovery, Special Recreation Permit (SRP), & Cooperator Fees          6
     C.  Closure Order & Stipulations                                              6
     D.  Agency Cooperation                                                         7
     E.  BLM & PCSO Infrastructure                                                  9
         a.  Incident Command Post (ICP)                                            9
         b.  Pershing County Sheriff's Office (PCSO)                                10
     F.  Cooperator & Daily Event Meetings                                          10
     G.  Communications & Public Relations                                          11
     H.  Compliance                                                                 11
     I.  Post-Event Site Inspection                                                 12

III. Public Safety
     A.  Introduction                                                              14
     B.  Unified Command                                                            15
     C.  Law Enforcement                                                            16
         a.  BLM & Pershing County Law Enforcement Integration                      17
         b.  Evictions                                                              18
         c.  Law Enforcement Feedback                                               18
         d.  Acculturation Training                                                 20
         e.  LE Reporting                                                           20
     D.  Emergency Services                                                         21
         a.  Basic Life Support (BLS): ESD First Responders                         21
         b.  Advanced Life Support (ALS): HGH Rampart                               22
         c.  Fire & Rescue                                                          23
         d.  BRC 911 Dispatch                                                       24
     E.  BRC Rangers                                                                25
     F.  Public Safety Communications                                              27

IV.  Event Operations
     A.  Introduction                                                              29
     B.  Operating Plan                                                             30
     C.  Ticketing & Population Reporting                                           30
     D.  City Layout                                                                30
     E.  City Infrastructure                                                        31
     F.  Event Communications & Media Relations                                     32

AR04761

2014

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

| | | |
|---|---|---|
| G. | Sanitation Services | 32 |
| H. | Airport Operations | 34 |
| I. | Burner Express Bussing Program | 35 |
| J. | Gate, Perimeter & Exodus | 35 |
| K. | Traffic & Traffic Controls | 36 |
| L. | Highway Clean Up | 37 |
| M. | Playa Restoration | 38 |
| N. | BRC Roles and Transitions | 38 |
| O. | Art & FAST | 39 |
| P. | DMV | 39 |

V. Summary of Recommendations     41

VI. Appreciations     47

AR04762

2014

Black Rock City, LLC

BURNING MAN AFTER ACTION REPORT

_____

## I.  Executive Summary

The Burning Man event, now in its 24th year, is the central hub of the Burning Man culture represented by over 200 regional contacts located in 95 cities and producing over 60 events globally. The organization administering this culture is a 501C(3) Non Profit which owns outright the LLC subsidiary that produces the event in Nevada.

The Nevada event, which ran for eight days in 2014 in the Black Rock National Conservation Area, was attended by 65,922 participants. Additional crew, staff and volunteers supported the city, and between them covered all aspects of the event operations from infrastructure, through emergency services and community support. Black Rock City, LLC (BRC) permitted 350 global media agencies, placed over 350 art pieces and 1,200 themed camps, licensed over 600 art cars and managed 28 burns.

Planning for the Burning Man event is a year round collaborative process that involves significant levels of cooperation across a range of Federal, State and County agencies and contractors, and the success of the event is testament to the work all parties put into this process.

In 2014 there were a small number of significant incidents on playa, including a major rain incident and a fatality. The event management team, in concert with the cooperating agencies, worked well through the event Unified Command (UC) management structure to enact pre-established protocols across a range of operations including national and international media communications to manage these incidents.

BRC partnered with the Bureau of Land Management (BLM) to administer both commercial and environmental compliance programs, further improving the event's overall compliance with the Special Recreation Permit (SRP) requirements regarding use of public land as prescribed in the Code of Federal Regulations (CFR).

BRC is committed to public safety and looks forward to continued detailed planning for the Burning Man event where all parties bring knowledge and experience to the table for delivery of a world class event.

AR04763

2014
Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

**II.      BRC Agency Relations: BLM & Cooperating Agencies**

**A.      Introduction**

The Burning Man event began Sunday, August 24, 2014 at 6:00 PM and closed Monday, September 1, 2014 at 6:00 PM. The 2014 SRP-determined maximum allowable peak population was the same as 2013: 68,000.  BRC did not exceed this population limit. The event lasted 8 days, and the full Closure Order was in effect from July 29, 2014 - September 15, 2014.  BLM's costs increased in 2014, but significant savings were achieved through BRC's management of contracts and costs associated with the Incident Command Post (ICP). Both BLM and BRC increased their staffing for their jointly facilitated Environmental and Commercial Compliance programs and interacted with more participants than ever before. BRC and BLM worked collaboratively throughout the event week, responding to challenges and new issues effectively. The post-event site inspection was conducted by BLM on September 30, 2014. At the time of this report, the final results had not been announced, although passing looks likely.

Collaboration and communications with cooperating agencies reached an all time high in 2014. Of special note is the collaboration that occurred amongst the agencies during the rain event on Monday, August, 25, 2014. In addition to rain contingency planning and rapid response, Janelle Thomas, of Nevada Department of Transportation (NDOT) went above and beyond the call of duty on that day and worked around the clock, managing permissions and communications along the I-80 corridor.  Ltnt Jim Peterson of Nevada Highway Patrol (NHP) also worked tirelessly to manage traffic ingress at the 447/427 intersection. Other agencies such as Washoe County Sheriff's Office (WCSO) and Pyramid Lake Paiute Tribe put in dedicated time and service to keep Burning Man participants safe during that challenging day. It is also worth noting that WCSO, NDOT and NHP worked year round with BRC  to mitigate and plan for Burning Man traffic congestion along Hwy 447. The traffic jams south of the Empire Store that were a problem in 2013 were mitigated in 2014, thanks to group problem solving and their leadership.

Cooperator Meetings were held throughout the year.  During the event, the daily Cooperator Meeting was replaced by the Unified Command meeting.   The Burning Man Communications Department dedicated one member of their staff to work with all of the Public Information Officers (PIO's) from the cooperating agencies. This BRC staff member also attended daily Unified Command meetings and worked closely with BLM and others for messaging through Facebook, Twitter, Burning Man Information Radio (BMIR) and other social media outlets. This was an excellent initiative and will continue in future years, with slight modifications to improve the design.

AR04764

---

**B.  Cost Recovery, Special Recreation Permit (SRP) & Cooperator Fees**

The 2014 event marked the eighth cycle of cost recovery for BLM and BRC.  The cost recovery estimate was very detailed and once again included significant cost increases - approximately $900,000. These costs were explained as being required to fix errors in the previous operation and also to increase staffing levels on the playa per BRC request. These increases were unexpected after the $1.7 million increase in 2013.

BRC has also seen significant rise in cooperator fees, in addition to those charged by  BLM, associated with production of the event. In 2014 these fees totalled over $1,000,000.

Of note, BLM provided statement of works for the delivery of the BLM operational infrastructure, and BRC was able to provide a significant array of operational infrastructure at the ICP. This afforded not only strong operational efficiency, but also drove fiscal efficiency.

The 2014 maximum allowable peak population remained the same as 2013 at 68,000 paid participants. BRC and BLM worked together to understand how this total participant count could exclude working staff and volunteers. BRC covered initial ground work including ticket sales categorization and supporting language derived from the original BRC Environmental Assessment (EA) and the BLM stipulations (stips). Subsequently, the BLM undertook a NEPA process to approve staff and contractor exclusions.

Population reporting should be evaluated and agreed upon by BLM and BRC during event planning for 2015 so that there is consistency in messaging to all stakeholders, cooperating agencies, participants, and the public at large.

**Recommendations:**
- *Population reporting language should be agreed upon by BLM and BRC during event planning for 2015 so that there is consistency in messaging.*
- *Closely examine the population reporting stipulation, including exodus management, so that BRC can continue to provide the Federal Government and the American Public the confidence it needs in assurance of fair use of public lands.*
- *Identify areas for cost savings with BLM and other cooperating agencies.*

**C.  Closure Order & Stipulations**

The Closure Order for the Burning Man event was in effect from July 29 to September 15, 2014. The public closure area comprised about 13% of the entire Black Rock Desert.

This year BRC and BLM created an educational infographic based on the closure order. This was designed as a rules and regulations 'cheat sheet' for staff and participants and was

6

distributed in the printed materials Greeter packet (one for every person entering Black Rock City). BRC and BLM also designed a law enforcement (LE) version for officers and Rangers which included important dates, times, vehicle registration stickers, and information about Black Rock City services.

Negotiations of the SRP stipulations went smoothly in 2014. BLM and BRC were able to arrive at mutually agreeable language to ensure that all concerns were satisfied, including EA parameters, public health and safety, and economic impacts. In addition both parties spent time editing and refining the layout and order of the stipulation document to reduce redundancy and, where possible, to continue to improve the content.

There are now 55 stipulations associated with the Burning Man SRP, and BRC's role in ensuring compliance on all these fronts is getting more complex every year. Stipulations are assigned to key staff members for oversight and ownership, and every year BRC and BLM recognize the need for editing and improvement of the stipulations to ensure clarity of intention and the highest level of compliance possible.

BRC recognizes the importance of complying with all stipulations and is continually looking for ways to ensure the highest level compliance possible. In 2015, stipulations that need review and refinement from BRC's perspective are the ones referring to population reporting and commercial compliance.

Accurate population reporting during the 48 hours of exodus is a challenge for BRC, given the rate at which the population exits, and the variables that constrain estimates related to vehicle occupancy. Additionally, the reporting system, while entirely accurate, did not facilitate quick easy access to the site occupancy figures. BRC will work with the ticketing vendor and BLM to improve all aspects of the population report process going forwards.

The commerce stipulation relates to language that requires both BRC and BLM to sign contracts with commercial vendors on playa. BRC would like that language adjusted for the availability for either party to waive their contractual needs.

**Recommendations:**
- *Continue to collaborate on educational material on the Closure Order and rules for staff and participants.*
- *BRC and BLM to review population and commercial compliance stipulations, as well as any others, that need to be changed or modified for next year.*

## D.    Agency Cooperation

Year-round meetings and relations with all cooperating agencies, and an unprecedented level of communication and collaboration, resulted in mutually beneficial contracts, permits,

AR04766

_____

licenses, policies and procedures to successfully address public health and safety, environmental concerns, and economic impacts.  Of special note is the collaboration that was required and successfully maintained during the rain event on Monday, August 25, 2014. Throughout the day, agencies worked closely with one another to manage incoming traffic on the roads, population camping alongside the roads, and the many thousands of participants inside the event closure area.  BRC is grateful to all of the agencies for their help on that day.

2014 Cooperating Agencies & Contractors included:

1. Pershing County Sheriff's Office (PCSO)
2. Washoe County Sheriff's Office (WCSO)
3. Washoe County Roads Division (WCRD)
4. Pyramid Lake Paiute Tribe (PLPT)
5. Nevada Department of Transportation (NDOT)
6. Nevada Highway Patrol (NHP)
7. Nevada Department of Health (NSHD)
8. Federal Aviation Authority (FAA)
9. Gerlach Volunteer Fire Department (GVFD)
10. Humboldt General Hospital (HGH)

The Cooperating Agencies met in Reno, NV, on July 18, 2014 and on playa (two days prior to the event opening) on August 22, 2014. Many other meetings were held throughout the year. Highlights of interagency collaborations for 2014 follow.

BRC met with traffic cooperators  (NHP, WCSO, NDOT, BLM) and the Empire Store in March 2014 to plan for flagging and traffic controls around the store's location on SR 447, eight miles south of Gerlach.  This meeting set the stage for traffic controls and flaggers at the Empire Store for the first time in the event's history. The flagging intervention transformed the 2013 traffic backup experienced south of Empire on Sunday of event Ingress. With NHP and NDOT feedback, these controls will be further modified for 2015. The Empire Store has agreed to participate and cooperate with BRC, NDOT and NHP in the planning for such controls.

The BRC Rangers, Burner Express (Burning Man's bussing program) and WCSO collaborated to create the "Free Ride to Reno" Program, specifically to meet the concerns of Gerlach residents. This program staged outgoing Burner Express buses in Gerlach to pick up folks who might be stranded in Gerlach without a ticket. This program was supervised by Black Rock City Rangers who were present in Gerlach throughout the day, helping locals and participants with Gerlach related issues. The Ranger presence was popular with Gerlach residents. While the Free Ride to Reno program ended up transporting around five persons to Reno, the Rangers had contacts with hundreds of people each day. Both programs will continue in future years.

8

AR04767

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

Building on the success of the Pyramid Lake Paiute Tribal Blessing in 2013, where spiritual advisors and Council elders were invited to visit the Temple and site pre-event. BRC invited the Pyramid Lake Paiute Tribe (PLPT) Museum to participate in and create a global and collaborative art installation at the Man Base Souk. The museum accepted and the installation they created was about the history of Pyramid Lake and the meaning and importance of water to the Pyramid Lake Paiutes. BRC hopes to continue to support and nurture the Tribe's creative presence at the event. As in 2013, PLPT spiritual advisor Dean Barlese and Council elders visited the Temple and event in 2014.

**Recommendations:**
- *BRC and cooperating agencies should review the rain contingency plans.*
- *Continue to have Black Rock Rangers in Gerlach during the event week.*
- *Continue the Free Ride to Reno program.*
- *BRC and traffic related agencies should continue to meet to improve planning for Empire store.*

## E. BLM & PCSO Infrastructure

### a. Incident Command Post (ICP)

In 2014 BRC undertook to deliver the infrastructure around the main parts of the BLM logistics and infrastructure. BRC provided a dedicated project manager and crew for this role, and the completed works took the whole build and break period, pre and post event, to complete. The project was predominantly a success as well as fiscally beneficial for BRC. Thanks must go to Mark Pirtle for developing very thorough statement of works to guide the BRC Project Manager and contractors.

There are areas for improvement, specifically related to the requirement by BLM to move things once work is already completed. Several times BLM officers required that things be moved and/or extra capacity be added after building was complete. This could be overcome by better planning and communication, and by building additional capacity in key services (such as power) during the initial build process.

The other major issue was around BRC staff being scheduled to operate (cleaners, waste management, logistics) inside the ICP and BLM changing this plan at the last minute. More forethought will help reduce these issues in 2015.

With regard to the naming of the BLM ICP at Point 1, and given the use of Incident Command System (ICS) language around UC and incidents as they happen out in Black Rock City, and the planned nature of nearly all of the operations at Burning Man, it may serve UC members to think of an alternative name for this operations base.

9

AR04768

---

**Recommendations:**
- *BRC should continue to deliver the BLM operations post at the event.  All parties should work together to refine the SOWs to reduce unrequired double work.*
- *All UC members should collaborate to ensure the Operational center is named appropriately to avoid confusion at incidents on the ground in the city.*

### b. Pershing County Sheriff's Office (PCSO)

In 2014 BRC accommodated Pershing County officers at the BRC Shower Property in Gerlach. Pershing County trailers and recreational vehicles were parked and hooked up to services for electricity. Water and septic pumping was provided by BRC vendors.  Officers had access to shared toilet and shower facilities, which were maintained as needed.  These accommodations addressed several concerns expressed by PCSO in 2013 and helped reduce costs for Pershing County. BRC is pleased to have provided this service to PCSO.

**Recommendation:**
- *BRC and PCSO should continue to work together to identify areas for resource support and cost efficiencies.*

## F. Cooperator & Daily Event Meetings

BRC and BLM undertook an overhaul of the on playa meeting process in 2014.  To accommodate this, BRC's daily ops team meeting and Event Leadership Team (ELT) meeting were combined. Along with a new reporting protocol, this ensured the usefulness and lifespan of the meeting cycle much further into the event.

The traditional 3:15 cooperators meeting was replaced by the Unified Command meeting, including BLM, BRC, HGH and PCSO. There were separate meetings in the morning for LE & Rangers, ESD, DPW and NSHD and GVFD. The UC meeting was effective and covered not only nuts and bolts and some facts and figures but created opportunity for deeper discussion around issues that were pertinent.

From a BRC perspective the new schedule worked well and information flowed effectively through and between the various departments and organizations, however there was some feedback from certain cooperators that they lacked the opportunities previously so useful for cooperation.

WCSO provided feedback that they were not appropriately connected, and the fatality public communication demonstrated this. 2015 planning should include this agency more closely in protocol planning.

AR04769

_____

**Recommendations:**
- *BRC & BLM further refine and evolve the meeting schedule and representatives to become more efficient and effective in 2015.*
- *Examine the functions of each cooperators meeting to understand how better to inform them.*


**G.      Communications & Public Relations**

A BRC Communications Department representative was part of the Unified Command structure and this worked out very well by allowing for streamlined information sharing and information distribution. This position came into play particularly in collecting and disseminating accurate information related to the accidental fatality and ensuring all parties had the opportunity to review, edit and sign off on information that was released to the public.

This process could have been improved if PIOs for all relevant agencies had the opportunity to meet in advance of the event to develop communications protocols for a variety of scenarios and for all involved to clearly understand the process for having any information relating the the event be reviewed and approved before being released to the public. Additionally, an on-playa meeting of PIOs prior to Gate opening would have allowed everyone to determine how to quickly locate their counterparts on short notice to address time-sensitive issues, like preparing, reviewing and disseminating approved information about the fatality.

The Unified Command meetings were also helpful in providing timely information that BRC Communications could distribute via BMIR on playa and via the iHeartRadio mobile device app to participants heading to and departing from the event. This information was also distributed via BRC's widely read Facebook page and Twitter feeds.

**Recommendations:**
- *PIOs should schedule a meeting in advance of the event (possibly coinciding with a cooperators meeting) to discuss goals and objectives for the 2015 event and lay out a framework for preparing, securing approval and disseminating communications on site.*
- *PIOs should schedule a meeting on playa in advance of gate opening to coordinate on-site collaboration on information preparation, approval and dissemination to the public and determine the most effective way to find each other quickly on playa.*
- *PIOs should be briefed on requirements relating to videography at the event, how it can be used, and the review process by BRC.*


**H.      Compliance**

The environmental compliance team consisted of an interdepartmental group of BLM scientists, BRC Earth Guardians, BRC Fire, and BRC Rangers. The team doubled the amount

AR04770

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

_____

of outreach and public contacts made in 2013, the team's first year.  Now in its second year, BLM and BRC worked well together pre-event to optimize existing protocols and the outreach schedule. There was some discussion during Exodus about appropriate roles for the environmental compliance team. Post event, the team from BRC and BLM met with Playa Restoration to discuss what technology tools might be used so that both parties could share data. There was discussion as to whether a different technology, camera or otherwise should be used.

BRC and BLM worked well together on issues of commercial compliance. BRC manages commercial vending on the playa through it's Outside ServiceS program (OSS). All vendors wishing to operate on the playa must engage in this program and its contract. BLM and BRC cooperate around this program to ensure all vendors are properly approved.

Burning Man hired a compliance manager for the airport, and BLM tripled their staff.  There was a BLM presence at Point 1/West Point and at the airport at all times. BRC and BLM met daily to debrief compliance issues at the Earth Guardian pavilion. BLM notified BRC of all theme camps they were considering to be in need of a vendor permit; and most of the time, BRC waived the need for an additional contract. This year, BLM mostly issued "warnings" to potential commercial services and suggested that next year the services might have to obtain an SRP.   This friendly notification - education tactic- was appreciated by BRC and participants.  Commercial compliance also looked carefully at sanitation and sanitation practices in BRC. More detail in the Sanitation section below.

**Recommendations:**
- *BRC and BLM to discuss and review roles for the compliance team during the event.*
- *BRC and BLM to discuss technology tools for consistent usage amongst all LNT departments.*
- *BRC and BLM review and edit the commercial stipulations to reflect any changes to the process as needed.*

I.     **Post-Event Site Inspection**

On Tuesday 9/29/14, one month after the end of the Burning Man event, BLM conducted their annual site inspection of the Burning Man/Black Rock City site area, effectively testing Burning Man's Leave No Trace effort on the Black Rock Desert and ensuring compliance with the SRP stipulations.

The site inspection set up 60 randomly generated GPS waypoints that are each 1/10th of an acre in size. Additionally, five specifically placed waypoints were plotted: Man Base, Temple, United Site Services, BLM ICP, and the DPW Depot. Within each 1/10th of an area waypoint all traces of debris found on the desert surface (also known as MOOP- Matter Out Of Place) were to be collected and collectively measured. Tested on 6.5 acres, the BLM site inspection

AR04771

2014
Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

standard allows for one square foot of moop per acre. At the writing of this report, BLM has not  yet issues an official "pass or fail" of the site inspection.

13

AR04772

III.   **Public Safety**

A.   **Introduction**

Public safety and health in Black Rock City, including the safety and well being of BRC citizens, staff, and volunteers, are paramount to the Burning Man organization. Public health and safety require cooperation among multiple key stakeholders and entities including law enforcement, medical, fire and rescue operations, BRC Rangers, Event Operations, BRC Communications and Public Information Officers, DMV, DPW and all cooperating agencies. This cooperation provides the platform for city-wide systems and protocols to improve each year as the event grows and evolves.

In 2014, new initiatives around public health and safety included implementation of a Unified Command, daily on site meetings between law enforcement and BRC Rangers, a new BRC Event Safety Officer role, new fuel vendors with art car and theme camp fueling programs, and new burn management teams. Technology was upgraded, including a new digital dispatch system for 911 and a new microwave link for BLM and PCSO communications. Law enforcement integration between BLM and Pershing County Sheriff's Office was advanced. Acculturation training was provided to BLM & PCSO LEOs, and there was a new informational graphic Law Enforcement Guide for all staff, crew, participants and public safety officials working at the event.

Outward communication with participants, staff, and volunteers about public safety continued to be robust in 2014, including a new BMAN Traffic Twitter account that provided up to the minute information to thousands of subscribers throughout the event and especially during the Monday rain event.

Black Rock City has an unparalleled track record of public health and safety, an exceptionally low incidence of violent crime, and excellent city services ranging from First Aid to mental health. For 2015 BRC is currently evaluating and planning continued enhancements including the development of a new Chief of Emergency Operations role, significant upgrades to the BRC radio communications system, a new rescue operations response vehicle, certification of the fire brigade as an industrial fire brigade, and a city wide upgrade of the medical first responder network.

Law enforcement in Black Rock City is provided by BLM and Pershing County, with support from the Black Rock Rangers. 2014 saw significant improvements in community policing inside the city. Participants reported over 120 positive interactions with law enforcement officers who were helpful, professional, and friendly.  BRC recognizes that these reports likely represent hundreds more positive interactions and greatly appreciates the work done by BLM and PCSO to provide community benefit and ensure public safety at Burning Man.

14

There were some significant operational challenges related to public safety during the event, including communication between the BLS and ALS operation, some law enforcement issues, and the activation and management of scene control through Unified Command, especially during the fatality. BRC looks forward to addressing these issues with all the relevant parties over the coming months to help improve the operations of all entities working at the event.

## B.  Unified Command

In 2014, BRC, BLM, and cooperating agencies developed and implemented, for the first time, a Unified Command system to respond to high level incidents and significant or large scale emergencies should they occur within BRC.

UC planning meetings were held throughout the year starting in April. All members participated in pre-event tabletop exercises in Reno at the Washoe County Emergency Operations Center to prepare for possible scenarios. The tabletop exercises proved successful and highly useful, as they did anticipate two of the three UC triggering situations that actually occurred during the event.  Further tabletop exercises were undertaken on playa, both at the UC level and within the BRC organisation. BRC would like to further develop these exercises in 2015 and see additional work done specifically around the activation of the UC and the nomenclature of various components including on the ground Incident Command (IC) response (which could be UC) and the static strategic level Emergency Operations Center (EOC).

The Unified Command should have been and was in part deployed three times during the 2014 event. The three triggering incidents requiring multiple agencies responding in concert were the ingress rain event, pedestrian versus vehicle fatality, and potentially dangerous person in a bus.

The ingress rain event occurred on Monday August 25th and required a cooperative response by BRC, BLM, and eight agencies: Nevada Department of Transportation, Washoe County Sheriff, Pershing County Sheriff, Washoe County Roads, Nevada Highway Patrol, Pyramid Lake Paiute Tribe, Nevada Division of Public & Behavioral Health, and the Gerlach Volunteer Fire Department. Traffic in and into Black Rock City was stopped for approximately 12 hours, and thousands of vehicles were delayed en route to the event. During this incident there was an extraordinary level cooperation by all UC entities. Responses to evolving situations such as traffic congestion were targeted and successful, response times were generally short, travelers and participants remained mostly peaceful and were appreciative of cooperator efforts and assistance.

Future considerations for weather events include off playa staging of a variety of resources, including staff and portable potties, ensuring all relevant parties are included as appropriate

15

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

during the UC stand up, and analysing the UC operating structure to ensure that each agency provides appropriate representation for localised and centralized incident management both on scene and at the BLM ICP as needed. BRC looks forward to continued development of the rain contingency plan through active discussion with all cooperators and vendors.

The accidental vehicle fatality was tragic and had a tremendous impact on those involved as well as the greater Burning Man community. Accidents of this nature are extremely rare at Burning Man[1]. The response was successful in terms of response time, cooperation amongst agencies, and public communications. Future work must be done to ensure UC protocols around key role attendance are followed and also that protocols around safe and effective scene management are understood and followed by all personnel. Specifically work must done between BRC first responders and HGH ALS responders to clarify operating protocols and hierarchy for harmonious scene operation.

BRC Rangers responded to requests from Gate staff around the driver of a bus which was located on gate road. Ultimately BLM LE, ESD first responders and firemen were involved in the scene. This part of the operation was a success and the person was removed from harms way. There were, however, several points of failure in this incident. Firstly the BRC Ranger did not check that he was following the right course of action as laid out in the Black Rock Ranger protocols; this led to a significant delay in the call to LE, despite evident fear being demonstrated by those local to the scene. Secondly, BLM LE on arrival, failed to appropriately stand up a UC for the incident. As noted ultimately the incident was successfully mitigated, however all parties must work together to improve communications and specifically BRC staff understanding of BRC Ranger engagement and escalation protocols.

2014 was a learning year for UC that saw areas of success and opportunities for improvement.  All members have agreed to continue working together to evaluate existing protocol and processes and make appropriate changes for 2015. A serious concern for BRC is the occurrence of "freelancing" by individuals, or arriving on scene and taking command when not on duty, a serious NIMS breach of protocol. This must be addressed in advance through detailed planning and commitment by all parties.

**Recommendations:**
- *UC members should meet well in advance of the 2015 event.*
- *UC members should continue to develop scenarios and run tabletop exercises to evolve methods and processes, including specifically UC activation.*
- *Additional planning for rain contingency should take place, with a focus on determining locations, staging resources, and establishing inter-agency communications.*
- *UC members should look at nomenclature and staffing, including BRC EOD operational capacity limitations.*

---

[1] The only other mutant vehicle fatality at Burning Man occurred in 2003.

AR04775

_____

- *BRC and HGH should work to improve operational alliance and relations.*

## C.  Law Enforcement

2014 was the most effective planning effort to date for law enforcement agencies and BRC leading up to the event. Pre-event planning between BRC, BLM, and PCSO provided improved understanding of existing procedures and management structure, and strengthened key relationships, all of which helped during the event, particularly during high risk or high stress scenarios.

BRC appreciates communicative pre-event planning with LE and would like to see this continue.  BRC would also like to work with all parties to identify enforcement priorities and communication opportunities for 2015 well in advance of the event to increase operational understanding and ensure true effective collaboration and public safety.

### a. BLM & Pershing County Law Enforcement Integration

2013 marked the first year of LE integration between BLM and the Pershing County Sheriff's Office at Burning Man. Some aspects of integration, including officer relationships on the ground, went smoothly. However, following the event all parties identified specific areas of concern and areas for improvement. BRC, BLM, and PCSO worked well together, beginning in early 2014, to address these concerns and ensure that all LE parties were provided the resources and support required for operational safety and efficiency. A high level of understanding and cooperation resulted from the initial meetings and continued through the event. Sheriff Machado's leadership on behalf of PCSO and Eric Boik's leadership on behalf of BLM LE were especially effective and appreciated.

In 2014 PCSO and BLM shared oversight, dispatch, vehicles, investigative responsibilities, and logistical support services in BRC. Integration seemed to go smoothly, a vast improvement over 2013, with PCSO and BLM working together to respond to calls ranging from stolen property to a tragic accident.  Many participants reported appreciation for help they received and interactions they had with officers. Black Rock Rangers reported success working closely with both BLM and PCSO.

There will be a new Pershing County Sheriff for the 2015 event.  Jerry Allen and his team will need information about new systems, protocols, equipment, and resources available in BRC, and they will want to discuss PCSO priorities for law enforcement at the event. Sheriff-Elect Allen has indicated a desire to discuss Nevada laws and County ordinances with BLM, and to review applicable Federal statutes and regulations. BRC looks forward to meeting with PCSO and BLM in the new year.

AR04776

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

_____

**Recommendations:**
- *All parties should convene very early in 2015 to ensure a successful LE operation in 2015 and the best understanding of operations, staffing, resources, protocols, regulations and relevant statutes*
- *Black Rock Rangers should be included early in the planning process, especially meeting with the new Pershing County Sheriff and his staff.*

### b. Evictions

The Black Rock Rangers recorded seven evictions in 2014. This included three trespassers, one Legal 2000, one BLM law enforcement requested eviction, one voluntary eviction (participant who allegedly assaulted someone agreed on his own accord to leave), and one for aggressive behavior. BRC, BLM and PCSO cooperated on evictions as needed. However, BRC would like to see expanded reporting from BLM with regards to evictions. BRC would like to know the number of evictions and circumstances surrounding each eviction, both the day the eviction occurs and in a summary report after the event.

One additional area that needs to be evaluated, and which BRC plans to evaluate leading up to the 2015 event, is the impact of an evicted participant on the small local township of Gerlach.

**Recommendation:**
- *BRC to work with BLM and WCSO to better manage evictions and any subsequent loitering issues in the surrounding areas.*
- *BRC to work with BLM and PCSO to improve eviction reporting.*

### c. Law Enforcement Feedback

BRC received 231 complete LE Feedback submissions for the 2014 event.  Ninety-two (60%) were positive, 48 (31%) were negative, and 14 (9%) were neutral. Feedback was far more positive than it was in 2013 or 2012. Comments were submitted about BLM, PCSO, BRC Rangers, and other entities including NHP.

The vast majority of positive comments described officers who were helpful, professional, respectful, and friendly. Participants and staff appreciated the less intrusive, community oriented presence of law enforcement within the city past the Greeter Station compared to recent years.  Several people were grateful for receiving a warning instead of a ticket for minor infractions.

Several participants expressed gratitude for help they received during the rain event, particularly on SR 447, CR 34, and Gate Road. A number of people recognized the

18

---

year-round work done by all parties to improve agency relations, and many people said they simply wanted to acknowledge and recognize the good work being done by LE entities, as they imagined that didn't happen often enough.

The level of positive feedback about law enforcement in 2014, and the efforts reflected by that feedback, is extremely encouraging and very deeply appreciated by participants, Burning Man staff, volunteers, and surrounding community members.   BRC is pleased with these improvements and grateful for the level of professionalism, helpfulness, approachability, and friendliness exhibited by all cooperating agencies with jurisdiction in Black Rock City, Gerlach, Nixon, and other surrounding communities.

Neutral feedback included people who got pulled over for minor or contested infractions, and ticketed, but felt they were treated fairly, and those who reported an interaction with law enforcement that was purely factual with no positive or negative sentiment.

Negative feedback was centered on alleged pretext stops, drug-sniffing dogs, and vehicle searches; speeding by law enforcement vehicles with associated concerns for public safety; harassing, threatening, aggressive, or intimidating behavior by officers; and undercover officers entering camps. Some people reported false, misleading, or disrespectful statements by officers, and many said their personal belongings were broken or excessively handled.  A number of participants reported that their prescription medication was seized or thrown out.

BRC remains concerned about law enforcement speeding when not responding to an emergency and hopes to alleviate this situation through pre-event planning and training.  BRC feels this is an important issue of public safety, particularly at night, and hopes that this problem can be addressed and eliminated in 2015.

BRC would like to work with BLM to reduce the number of vehicle stops in Black Rock City and reduce traffic caused by vehicle stops, particularly during Exodus.  BRC would like to work with BLM to improve communication with participants about strict rules regarding vehicle bicycle racks in Black Rock City that they might not encounter in other cities, and about best ways to interact with officers when pulled over. BRC would also like to identify ways to ensure careful planning and packing by participants are not sacrificed between Gate Road and campsites when vehicles are subjected to search.

Improved communication and training would be beneficial to BRC and cooperating agencies so that a greater understanding of BRC systems and protocols could inform decision-making and interactions during the event.  For example, if BLM staff were better informed about BRC compliance procedures and communications with participants, additional pamphlets would not be produced and handed out during Exodus, a process that was duplicative, costly, caused traffic slow downs, and negatively impacted Collexedus.

AR04778

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

Of concern to BRC are comments received around threatening, intimidating, aggressive, and harassing behavior by law enforcement officers, or misleading statements made by officers. BRC understands there are many factors affecting people's perception of law enforcement interactions, and that there are a number of law enforcement tactics available to LEOs, but would also like to find ways of minimizing this particular type of interaction, where possible, in Black Rock City.

BRC is very grateful to BLM and PCSO for their law enforcement work in Black Rock City and for the high level of cooperation between agencies and with BRC.  BRC hopes to continue building on best practices and successes as the Burning Man event grows.  BRC looks forward to continued planning and improvements for the 2015 event.

**Recommendations:**
- *Continue focus on supportive community policing.*
- *Reduce the number of vehicle stops and searches, and ensuing traffic congestion.*
- *Eliminate LE speeding when not responding to emergencies.*
- *Minimize threatening and intimidating, or misleading statements by officers.*
- *Improve communication to participants and staff regarding law enforcement priorities, rules and regulations, and appropriate interactions with officers.*

### d. Acculturation Training

BRC was invited to provide acculturation and orientation training for BLM officers during the Saturday before the gate opened. Presentations included information about Black Rock City demographics, city plans and services, theme camps, art, Burning Man ethos and principles, nomenclature, safety considerations, the Black Rock Desert and National Conservation Area, Black Rock City departments, and city layout. BRC greatly appreciates this opportunity and hopes to continue next year.

### e. LE Reporting

BRC should better understand violation trends in Black Rock City. BRC must be able to report when needed to board members, public officials, and media about public safety at Burning Man. BRC also needs to maintain this data for the historical record. BRC has received very limited information from BLM with regards to annual violations, arrests, and citations, and would like to improve the reporting process for 2015.  PCSO has provided consistent information regarding LE activity and has also offered to work with BRC to evaluate this process for future improvements.

**Recommendation:**
- *BRC and BLM, PCSO to work together to improve the reporting process for LE*

AR04779

D.     **Emergency Services**

Emergency Services in Black Rock City include first responder services provided by the BRC Emergency Services Department (ESD), ambulance and advanced life support (ALS) services provided by Humboldt General Hospital (HGH), fire and rescue services provided by the ESD Fire Department, and dispatch services provided by ESD Dispatch BRC911.

### a. Basic Life Support (BLS): ESD First Responders

The ESD First Responder network, with over 500 trained staff and volunteers, is the first port of call for most people with a medical complaint or concern while in Black Rock City. Each BRC ESD sub-department is staffed by volunteers from around the country and responds to situations ranging from Hazmat incidents to rescue requests and a full array of first aid needs. Many ESD personnel are experts in their field, with years of off-playa professional experience in the skill area they donate to the event.

ESD took on a new top level management structure in 2014. This included representation on the UC and new posts internally to the department. Three experienced staff members provided oversight of the Administration, Operations and Communications branches of the department, with Branch Chiefs reporting up. All ESD divisions and branches are supported by Plans, Logistics and HR sections.

BRC understands that at all times the right people must be in the relevant positions and is working diligently to ensure that this is improved for 2015. BRC is currently reviewing the high level guidance of the ESD operation and how to ensure continued compliance and operational best practice. In 2015 BRC anticipates a new position to oversee all emergency operations at the event.

Many years of operation has allowed for significant levels of redundancy to be built into each of the ESD operating processes, and the First Responder network is malleable enough to allow flexibility in response, thus ensuring ability to respond to the ever changing nature of BRC. All of these operations are laid out and described in a very detailed ESD Manual which is annually updated and reviewed by doctors.

Following changes in ESD top level leadership for 2014, BRC undertook to ensure the standard of first responder service was un-interrupted, by severely limiting the scope of operational changes.

ESD operated two fully staffed first aid stations located on opposite sides of the city, in the 3:00 and 9:00 Plazas, which saw around 3,300 patients in total. The majority of these patients

21

were addressed without incident, and the remainder, around 500, were successfully handed over to HGH, the event ALS function.

Average first responder response times for the entire operational period in the city was 7:26 minutes, a time comparable and often better than most large urban centers.

ESD first responders are only allowed to practice basic first aid on the playa, and all staff are required to sign a scope of practice declaration at check-in on arrival. Those who wish to practice medicine are directed towards volunteering with the hospital. In 2014 there were two incidents where ESD first responders failed to appropriately cede control of an incident to HGH, one of these was the fatality. The BRC Event Operations Director addressed these issues with ESD management specifically at the time they occurred, but BRC understands and agrees more work must be done to ensure that scenes are correctly handled and management is handed to the Senior operator on site  without issue.

In 2015 BRC is undertaking a review of the first responder operation including legal compliance with both Nevada Revised Statutes and Federal law around provision of first responder care at large scale special events, as well as reviewing the scope of the operation to be sure the breadth of capacity matches the requirements of the city. This review will be comprehensive and transparent.

Finally, ESD relations with the event ALS provider HGH must be improved for all aspects of the operation- from logistical planning including event access issues, to on site delivery, to scene management and year round communications. Event safety is paramount, and all parties must have a clear understanding of protocols, requirements, and resources.

**Recommendation:**
- *BRC undertakes to review and amend as appropriate the operational status of ESD to ensure that BRC participants, staff and volunteers are receiving the best care, that integration with HGH is legal and secure as well as efficient and safe for the event, with Public Safety being primary concern for all parties.*

## b. Advanced Life Support (ALS): HGH Rampart

Humboldt General Hospital (HGH) provided ALS medical services at the RAMPART station to event participants and staff for 13 days over the period of the 2014 event.  HGH reported seeing 2,860 patients, with peak service on Friday and Saturday of the event week. As in years past, the majority of issues were soft tissue injury & dehydration. HGH saw an increase in Red (high acuity) patients but kept down the number of transported patients to 22 (vs 36 in 2014). HGH facilitated off playa transport through their own ambulance fleet and additionally through their contract with an external vendor, a service that provided nine of the transports.

22

---

Black Rock City overall continues to treat about 9% of the population through the medical system (first responder combined with ALS), a figure that has remained within a 1 or 2% limit for the last ten years.

BRC provided key infrastructure to HGH for the 2014 event, including Point 1 access passes, on site power and water, radios, and other utility services. There were issues around the timely delivery and quantity of these services and passes, increased after HGH arrived earlier than planned, and BRC has undertaken to review both the services and delivery process to be sure that the event public safety function receives support in a more appropriate and timely manner in the future.

HGH submitted a final AAR report directly to BRC and BLM in 2014. While there are many points that are well founded, with which BRC agrees, and that are addressed throughout this report in the relevant sections, there are many factual errors and hyperbolic inaccuracies with which BRC takes serious issue and that necessitated a response document from BRC. Copies of this response have been forwarded to both HGH and BLM for public record and should be coupled with the HGH AAR for completeness of record.

It is imperative that the ALS contractor work collaboratively with BRC and operate in a way that unequivocally supports public health and safety at the Burning Man event. It is imperative that the ALS provider fulfill their contractual requirements and communicate with BRC at each and every step in planning and implementation to ensure complete understanding and correct performance of protocols and systems. It is equally imperative that BRC departments cooperate fully with the ALS contractor and that all BRC personnel have a shared understanding of those systems and protocols. BRC commits to ensuring these relationships and performance standards improve for 2015 and beyond.

**Recommendation:**
- *BRC undertakes to review all aspects of the event ALS function including provision of infrastructure resources, event access, integration with ESD and medical oversight.*

### c. Fire & Rescue

In 2014 the BRC Fire Department (BRC FD) made significant improvements in training, operations and public safety. The department is fortunate that 59% of the volunteers are veteran BRC FD members with five or more years participation and a core group of 20% with 10 or more years. The Burning Man organization continues to make capital investment in Fire Department equipment and rolling stock. BRC FD owns one type 6 Engine (all other units are rented for the event) and in 2015 will purchase a light rescue truck for Hazmat and special

AR04782

_____

operations. Additional lifting and stabilization equipment will be added to the rescue truck equipment list for the 2015 event.

BRC FD initiated a study (through the donated time of a fire behavior specialist) of fire behavior for the large art burns. Fire behavior models are historically based on wildland incidents and not fixed locations, where a known fuel load and weather conditions can be carefully calculated. In order to better protect the attendees of the event, BRC FD is collecting fire behavior data for precise model development. The intent is to better define safety zones and perimeters based on the data collected.  2014 was the first year of a multi-year project.

Volunteers also brought nationally recognized expertise to our Hazardous Materials Response Team, deploying highly technical analysis and monitoring equipment at the event. The HazMat team is working with BLM and HGH to use this specialized equipment to aid in the identification of suspicious or contaminated materials.

Coordination between departments within the Burning Man organization greatly improved this year with a greater emphasis on art safety and compliance related to fuel safety and storage. BRC FD leadership worked closely with each of the large art burns and many smaller ones to ensure that safe, well coordinated, and well-understood projects were executed per plan. Interiors were swept for occupants using thermal imaging equipment (TIC) and perimeters were set with regard to a checklist of definable parameters.

The population of the event continues to be dynamic in its form and placement. Hard sided structures are becoming more common and more highly concentrated. Highly concentrated camps that stockade larger RV's can create access obstacles for fire equipment.  Additionally large RV's can burn more intensely thus creating problems of exposures and fire spread.

**Recommendation:**
- *BRC FD will work with our fire protection contractor to evaluate the risk and necessary changes to response plans to help mitigate the problem of access into some camps in the city. Coordination with the Placement team and additional public education also needs to be employed.*

### d. BRC 911 Dispatch

BRC 911 Dispatch dispatches ESD first responders, HGH ALS units, BRC Rangers and has a direct private communications channel with the dedicated LE dispatch, which is located in the adjacent building.  The BRC 911 radio channel, which is given to all BRC radio users (around 2,500 people) is recorded at all times of operation and the operators log all calls in the dispatch log detailing all the incidents and the subsequent actions, including resource allocation from the initial incoming call to the scene close. Some of the ESD dispatchers are

AR04783

---

professionals, others are volunteers; all are trained specifically to operate in BRC and most are repeat operators with many years experience dispatching in BRC.

While there were no reported issues around the dispatch function in either previous event years or during the 2014 event, issues of concern were raised post event by HGH. BRC is undertaking a thorough review of the operation, including compliance with Nevada Revised Statutes (NRS), to ensure a continued high level of service for BRC emergency staff.

The Cellular on Wheels (COW) installed by the BLM's technology provider was intended to provide cellular cover last minute for BLM operations specifically, however for some time it also provided 911 access to participants. This initially provided great concern about event participants calling 911 for help and care being delayed at the event (a remote 911 site would dispatch a Reno ambulance which may take many hours to reach the event). BRC 911 managers reached out to local area dispatch centers to arrange last minute interaction. Ultimately the COW failed due to capacity and other technical issues, however BRC and BLM must discuss BLM's requirements for emergency communications to ensure public safety can not be affected.

BRC is proud that scene response times as recorded in the 911 CAD system are comparable if not better than many urban environments and cities (reference) for both first responder and acute care.

**Recommendation:**
- *Closely examine the BRC 911 Operations to be sure the best service is being provided for Public Safety in BRC.*

## E. BRC Rangers

The Black Rock Rangers are Black Rock City's eyes and ears on the ground, responding to the daily needs of citizens city-wide. The Rangers fielded over 600 volunteer staff in 2014, a significant increase from the 500 fielded in the prior several years.  This growth was a proactive effort to expand routine patrols of BRC, to increase surge capacity, and to cover new initiatives including growth pre/post event operations, stationing Rangers in Gerlach, and LNT compliance activity.

The safety of minors remains a top priority for the Rangers.  For the third year in a row the Rangers operated the Family Unification Network (FUN), which allows parents to register their children and obtain wristbands for them at Ranger HQ. These wristbands can facilitate faster unification of children separated from their families.

As in year's past 100% of children who were reported lost, were successfully reunited with their parents or guardian, unharmed in any way. The Black Rock Rangers work closely with

AR04784

the Pershing County Sheriff's Office, the participant community, and other cooperating agencies to ensure children that children who had been separated from their parents were returned safely and as quickly as possible.  The procedures enacted when a parent reports a lost child in Black Rock City remain highly effective: four children were reported lost by a parent or guardian in 2014, and all were located within 10 minutes.  In all cases, law enforcement was on scene in short order to oversee the release of the minors to their guardians.

Additional family safety initiatives and opportunities in Black Rock City include the Black Rock Scouts, Kidsville, and the Child Resource Center.  The Black Rock Scouts provide programs that teach families with children about the Black Rock Desert and Burning Man, including city resources. Kidsville is a long-time theme camp that is available as a safe and supportive camping area for families in Black Rock City.  The Child Resource Center is run by ESD and located at Station 9. It is a safe, quiet, nurturing place where children who are reported found can go until their parents are located.

Rangers provide perimeter support for large events, major burns including the Man and Temple, and for incidents.  The Fire Art Safety Team (FAST) has developed a team of volunteers that, under the direction of the Rangers, can provide similar support to a larger number of burns.   At the Man burn, incompletely planned participation of BLM law enforcement was a detriment and required last-minute procedural changes.

For the first time, Rangers were stationed in Gerlach to support the town by reminding visitors to respect property and by responding to requests from Gerlach citizens and the Burning Man office on Main Street.  The program was very well received by the community in Gerlach.

During the Monday rain event, Rangers within BRC stopped vehicular traffic to protect road infrastructure, provided information to citizens, and encouraged citizens to shelter in place.  A team of Rangers was sent to the Gate to support the Gate and Box Office staff, respond to emergencies, and manage the crowds.  Rangers in Gerlach helped with traffic management in town.  Another Ranger team in vehicles supported law enforcement efforts to manage and later clear out traffic along the highway.

Black Rock Rangers were the first responders at the vehicle fatality, providing CPR, calling in medical and law enforcement, establishing a perimeter at the scene, and tending to the needs of the various people that were present at the accident, including the victim's boyfriend.

Black Rock Rangers met daily with BLM LE and PCSO to review the previous 24 hours activity and plan for the day ahead. The Rangers found these meetings to be extremely useful and very much appreciates the opportunity to provide and receive information about law enforcement, public safety, and general conditions in Black Rock City.  BRC would like to include the Rangers earlier in LE aspects of the event planning process for 2015. Including

26

Black Rock Rangers in some planning meetings and discussions would benefit all stakeholders by increasing understanding of roles, capabilities, and opportunities for greater cooperation.

**Recommendations:**

- *Ranger staffing should increase to more than 700 volunteers in 2015, providing sufficient trained staff such that any further growth in the BRC population can be accommodated with nominal growth in Ranger staffing.*
- *Continue, and expand the Gerlach program.  Feedback from the town indicates the program was overdue and worthwhile.*
- *Include Black Rock Rangers in LE planning further in advance of the event.  Rangers and law enforcement should meet briefly throughout the year to establish working relationships, clarify priorities for each team, and plan any join work in better detail. Advanced communication should include the role LE is to play at major burns, how we can all contribute the most to increase safety, and logistical details such as parking and operational areas for personnel.*
- *Rangers should be more proactive about stationing personnel at or near the Gate during peak periods to provide support there when it is most needed.*
- *BRC should brief the new Pershing County Sheriff and key staff on the Ranger organization, as was done for BLM LE leadership in 2014, to familiarize PCSO management with what the Rangers do and how we are organized.  That briefing may be useful for officers in general.*

## F. Public Safety Communications

Communication with participants, staff, and volunteers about public safety continued to be robust in 2014, with two issues of the Burning Man newsletter Jack Rabbit Speaks dedicated to law enforcement and health and safety, information presented in the Event Preparation section of the Burning Man website and Burning Blog, the online and printed Survival Guide provided to all ticket holders,  and a new Rules & Regulations informational graphic handout provided in all Greeter packets.

These sources in part contained information and guidelines provided and updated by both Nevada State Health and Humboldt General Hospital. BRC will invite feedback on the content of this communication from all relevant cooperators in 2015.

In addition to the resources and initiatives listed above, a new BMAN Traffic Twitter account provided up to the minute information to thousands of subscribers throughout the event and especially during the ingress rain event. Real time information shared with participants and the general public during the rain event helped with on the ground decisions and planning for participants, traffic control along I-80, SR 447, CR 34, and Gate Road, and eased the burden

AR04786

2014
Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

on public agencies to communicate changing conditions to those along the route to Black Rock City.

During the event, participant communication resources for public safety included BMIR, Black Rock City's official radio station. BMIR operates 24 hours per day during the event and informs listeners as to public safety concerns including weather, gate wait times, and traffic.

AR04787

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

IV.   **EVENT OPERATIONS**

 A. Introduction

Burning Man Event Operations encompasses many departments covering all ranges of operation from sanitation to art management. Overall the city requires thousands of staff  and volunteers to operate, who collectively give over a quarter of a million man hours. All of the operating systems have redundancy inbuilt to ensure stable operation regardless of the volunteer status of many staff.

During the event, BRC has internal meetings on a daily basis to facilitate communication and operational awareness across all levels of managers. These meetings were factored into the Unified Command daily meeting plan and also included cooperators and related meetings as well as SitStat development. The rain event on Monday, August 25, 2014, required all BRC operating departments to be working in concert to ensure safe, and as far as possible, uninterrupted operation of the city. BRC successfully deployed contingency resources around the city and off playa, helped by smooth interdepartmental communications.

BRC's participant population peaked at 65,922 on Friday morning, August 29, 2014.  Although the maximum allowable peak population was the same as in 2013, BRC increased camping space by 4% and expanded the inner open playa by 200 feet in diameter. As in prior years, camping on the 9 o'clock side of the city was most popular and all departments helped in attempting to educate and direct participants to other areas.

For the past three years, BRC has worked to develop and streamline traffic communications and alternative access to the event, namely bussing and flight management. BRC communications added mechanisms to distribute traffic updates and news via BMIR and social media outlets.  These new protocols for media and communications helped the event's smooth ingress and egress. This year, bussing doubled its ridership and the airport lowered its numbers, but airport added additional charter regulations, compliance standards and an additional runway to increase safety for planes and passengers.

BRC's takes great pride in, and puts great effort into, maintaining its reputation as the largest Leave No Trace event on public lands. All participants are expected to pack out what they pack in, and after the event, Highway Clean up crews traveled SR 447, SR 446 and CR 34, picking up large items left behind by BRC motorists. This was one of the cleanest years in recent history, thanks in part to the Pyramid Lake Paiute Tribe and Gerlach General Improvement District' efforts. To support participant efforts, the Playa Restoration crew worked for two weeks with a staff of about 120 people, picking up and documenting all MOOP left behind (deliberately and inadvertently) by BRC participants. On September 30, 2014, BLM

29

conducted its post-event site inspection. At the time of this report, there had not been an official ruling if BRC had passed the inspection but all indications looked good.

## B. Operating Plan

BRC updated its 2014 Operating Plan to include thirteen contingency plans and protocols including compliance, traffic mitigation, drone policy, Unified Command standard operating procedures, lost child protocol, rain contingency for CR 34 and SR 447, rain contingency for the playa, illegal substance policy, minor safety plan and fuel spill response. The 2014 Operating Plan also included the event production calendar, ticketing policies, communications, DPW and departmental operating procedures. The 2014 Operating Plan did not included individual departments' handbooks and volunteer training standards.

**Recommendations:**
- *Further align the two Rain Contingency Plans.*
- *Continue to refine and identify contingency plans with cooperating agencies.*

## C. Ticketing & Population Reporting

Black Rock City population peaked below the maximum allowable limit of 68,000 at 8:00 AM on Friday, August 29, 2014 with 65,922 paid participants.

BRC employed a new ticket vendor for 2014. This provided a far more robust mechanic for selling tickets and recording population capacity, which was a huge step forwards, however the system was not effective for hourly population or vehicle pass reporting.  BRC is working with the vendor to ensure a more effective reporting system in 2015.  Population reporting is discussed further in section II, BRC Agency Relations.

The Box Office experienced some significant capacity and process management issues in 2014 that sprung from a wide range of issues. Most visibly this resulted in very long wait times at the box office located by the Gate. BRC is addressing these issues on an individual basis, which will serve to fix the problem as a whole.

**Recommendation:**
- *BRC to work with its ticket vendor to ensure more manageable population reporting mechanisms built into the back end of the ticket sale tool for better stipulation compliance.*

## D.  City Layout

BRC increased the diameter of the inner playa open space from 2300 to 2500', and additionally increased all but the 0:15 and 0:45 streets up to 40'. Overall this resulted in an

AR04789

increase in city camping space of about 4%, or a gross increase from ~721.5 acres in 2013 to 752.34 acres in 2014.

Per the trend in recent years the 9 o'clock side of the city was busier than the 3 o'clock side and filled up earlier. BRC Rangers, Placement, Greeters, BMIR and Gate-Perimeter-Exodus (GPE) all worked together to help mitigate this situation, including broadcast media messaging, foot patrols, physical signage and verbal communications.

All elements of the city plan were adequate for the population in attendance and there was no need in 2014 to activate the contingency plans around opening extra streets. BRC would like to explore the opportunity of working with BLM to create dedicated car parking space as has sometimes been created ad-hoc by participants.

BRC continually reviews all details of the city plan including access routes for ice trucks, medical locations, city size and the location of support compounds. Each function is addressed following feedback from all parties to ensure continued best service to all aspects of the operation.

**Recommendations:**
- *Continue to address the trends/challenges of participants camping on the 10 o'clock side of the City.*

## E. City Infrastructure

The Department of Public Works (DPW) provides the resources required by the departments and entities which operate the city, thus DPW provides shade, catering, power, water, housing, vehicles, fuel supplies, workshops (metal, electrical, wood), trash handling and recycling to thousands of staff and volunteers. The build and break of all these resources takes 28 days and requires a crew of hundreds.

BRC undertakes a comprehensive department wide planning process to ensure all staff and support camps are factored into the build process. This includes contractor camps, such as United Site Services and Humboldt General Hospital.

In 2014, pre-event rain held up the build process which in turn had knock on effects on some crews, and delayed or otherwise affected the operations of some departments, for example Power. BRC will evaluate the rain contingency plan to ensure that there is appropriate flexibility in allocation such that public safety is not affected should this occur in the future.

Some of the BRC operating departments also found themselves understaffed for the scope of operation in 2014. Departments affected included housing, water and power. Whilst ultimately

AR04790

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

successful in delivery, BRC is reviewing all the operating plans and requirements of these departments to ensure smoother operation going forwards.

In 2014 BRC introduced several highly effective new features to BRC fuel services. Firstly a new fuel vendor, (a fully certified nationally recognized fuel supplier) - provided significantly increased fuel vending capacity and deliveries to theme camps around the playa. Secondly, BRC created the "Fuel Funnel" - a participant facing booking portal based at Playa Info for camps to book and reserve fuel deliveries. Thirdly, BRC created a dedicated station for Mutant Vehicle fueling only. This station was well received by the art car community and was very busy for the first year of operation. The intention behind these process upgrades was two fold - to decrease fuel storage in theme camps thereby improving public safety and secondly to decrease environmental damage potential. BRC will continue to develop these processes and offerings in the coming years.

**Recommendations:**
- *Review and amend as appropriate BRC Fuel Safety Guidelines ensuring continued compliance with latest thinking and new developments.*
- *Continue to promote use of authorized fuel vendors as a way of limiting fuel requirements for individual camps, while continuing to highlight fuel safety.*
- *Review staffing needs for DPW operations and infrastructure across all DPW departments.*

## F. Event Communications & Media Relations

Nearly 350 media outlets were approved to cover the 2014 event. The BRC communications team and its volunteers operate a press room - "Media Mecca" - on the playa, providing media with a central location to complete the registration process, learn about the event, file their stories, meet with interview subjects, recharge batteries and power sources and get questions answered. The communications team also uses Media Mecca to proactively push out key messages to the media, which, among others, included positive messaging on BLM's stewardship of the NCA, the positive benefit of having families as part of the BRC community, and Burning Man's positive economic impact on Northern Nevada.

BRC Communications works extensively with approved media outlets in advance of the event to acculturate first-timers as to what to expect, how to prepare and how to make the most of their experience on the playa to help with their storytelling. We actively encourage media to volunteer or otherwise engage with theme camps, art projects and participants. Unlike other events, media are required to purchase tickets and be entirely responsible for their accommodations, and the exclusion of  Brown M&M's from their rider, at the event.

The Communications Department implemented a new online registration process that automated a large part of the previously labor-intensive communication, project review,

AR04791

contract distribution, contract approval and on-site check in process that allowed the team to operate with a slightly smaller number of volunteers than in 2013.

BRC Communications played a significant role in the new traffic communications plan, integrating hourly data provided by the Traffic Operations Center with timely messaging from the Unified Command and BRC departments. A new Twitter account - @BManTraffic - created for this purpose - grew within a week to more than 4,000 followers and the account was viewed more than 300,000 times during the event and the following week during exodus. Feedback from participants was particularly positive around the gate shutdown (and media coverage of the weather incident went worldwide), with particular appreciation for a focus on mobile and real-time communications.

**Recommendations:**
- *As mentioned previously, for 2015 BRC would like to see a group PIO meeting (possibly coinciding with a cooperators meeting) pre-event and a second PIO meeting on playa in advance of the gate opening.*
- *In 2015 the Communications Team will be more proactive in educating vendors regarding rules for filming and photographing on the playa and the review process they are required to follow. For BLM, BRC will work on an expedited review process that could allow BLM to issue content - primarily video - the same day.*

## G. Sanitation Services

BRC had approximately 1,600 portable potties placed on the event site in 2014 with 26 trucks to service them.  Each unit was serviced a minimum of three times per day (four times for portable potty banks in high traffic areas) and per vendor contract no units reached more than 60% capacity.

BRC worked closely with its national sanitation vendor in 2014 to ensure both better service for BRC units and for participant contracts. The vendor implemented a participant services dispatch function as well as distinct markings for pump truck routes and services. Overall there was a significant upswing in the standard of services for all parties. There were still issues around hand sanitizer dispensers being empty at some stations, despite the vendor having a sanitizer dedicated team. BRC and the vendor are working closely to device a theft proof solution for 2015 (participants were stealing the bags from inside the dispensers).

The vendor provided two mobile potty-trains for BRC to deploy during the 2014 event. These units were used for mobile mutant vehicle raves and during ingress and egress. A few times low visibility conditions made it difficult to deploy the units and so while there was some success on the deep playa sanitation provision, BRC will continue to explore ideas for improving this further in 2014 through working with the DMV and other relevant BRC operating departments.

AR04792

This year two other smaller sanitation vendors appeared on site, both of whom were pushing to be allowed to service participants on an ad-hoc basis, which makes the whole process hard to take responsibility for. BRC would like to stop this happening in the future and is working closely with vendor to deliver a program in 2014 that will help address the inevitable community concerns around monopoly.

**Recommendations:**

- *BRC to review the ability, regulation and operational implications of vendors outside of the main vendor's control who provide sanitation services on the playa.*
- *BRC will work closely with its vendor to evaluate the playa wide potty capacity and to address issues around participants RV pumping, dedicated theme camp resources and deep playa coverage.*
- *Devise a theft proof solution for hand sanitizer dispensers.*

## H. Airport Operations

The BRC municipal airport (call sign 88NV) began operating pre-event (Friday morning) and continued until after the close of the event (Monday 6pm).  During the event the airport was open from 06:00 to 19:30 each day, though landings with new arrivals were not  permitted after 18:30.

There were 2,160 flight operations (takeoffs and landings) in 2014, not including ultralights. Two runways were used in 2014, one for take off, one for landing, allowing for increased airspace in the air traffic pattern. The busiest time was Tuesday afternoon when the runway re-opened after being shut down by the Monday rains.  The number of landings that day was 144, thus the number of total operations was 288, over a 5 1/2 hour period.  (In comparison, the Reno-Tahoe International Airport has about 100 passenger flights a day.) There were 103 General Aviation aircraft based at the airport, the pilots of which gifted 299 scenic rides to event participants.

Safety is paramount in the operation of the airport, and thus all pilots are required to read, and acknowledge having read, relevant safety information on the BRC 88NV website before being given the landing code required by the Unicom operators for landing permission.

There were no safety incidents during the event however there was one incident post event. A pilot staff member somersaulted his plane forwards after catching the propeller on a dune which the plane hit after taxiing off the runway at low speeds. All parties were notified (FAA, BLM, WCSO) and reports were taken from all parties. There was no environmental damage and the aircraft was safely removed to the BRC work ranch 20 miles west of the playa. BRC will work with the BLM to ensure clarity around the timing for the notification of such issues.

AR04793

_____

In 2014 BRC allowed for 8 Air Carrier services  carrying over 1,300 passengers into the event. BRC and BLM worked together to ensure commercial compliance of these operations and enforce compliance on those seeking to avoid contracting.

**Recommendation:**
- *Maintain safety and continue to work closely with Cooperating Agencies.*

### I. Burner Express Bussing Program

Following recommendations in the 2012 Environmental Assessment and BRC's internal traffic planning analysis, BRC once again partnered with a bussing contractor to deliver the Burner Express bus service in 2014.  The service doubled the amount of riders in 2014 and brought approximately 2,500 participants to Black Rock City from San Francisco and Reno, thus the program significantly reduced the number of cars traveling to and from Black Rock City, with each bus having an average of 42 passengers. Bus Bank provided a professional service including luggage trucks, and an on-playa city wide shuttle to help riders get from the bus depot to their camps.

There was one incidence of BLM LE stopping and searching the luggage truck before it got to the bus depot. This resulted in significant effort to get all the luggage both out and then back into the truck, significant wait time for riders waiting to receive their luggage as well as no owners being present during the dog search of the property.

BRC is looking to expand the bussing program in 2015 to continue to reduce both traffic and emissions.

**Recommendations:**
- *BRC and Burner Express Program will continue to improve the rider experience and promote ridership, encouraging program expansion.*
- *Improve LE policy around Burner Express.*

### J. Gate, Perimeter & Exodus

The 2014 Gate operations ran from August 5th at 5:00 AM through September 5th at 6:00 PM. Time extensions greatly helped traffic run smoothly during both ingress and egress this year. During the rain event the Gate was closed and the staff had excellent support from the cooperators in managing participants who were stuck on gate road.

The Gate team, working in concert with the Rangers, was successful in intercepting a delivery van of participants attempting to sneak into the event, and with the addition of new radar equipment the perimeter team had significant success intercepting people trying to break into the event, catching around 100 people.

35

Gate worked closely with the Burner Express, and set up lane 13 to expedite entry of the buses into the city. Point 1 continued to develop it's dedicated team which was in place for the five weeks of the operation; this will be developed yet further in the coming years to handle increases in the Outside Services program and other operations.

See section K for a report on Exodus (event egress).

**Recommendation:**
- *Continue to develop relationship between Gate staff and BLM LE and other cooperators.*

## K. Traffic & Traffic Controls

In 2014 BRC created and implemented a Traffic Operations Center (TOC). This center was located in Black Rock City, staffed 24 hours a day for Ingress and Egress, and operated out of a small office complete with a landline, BRC radios, video monitors, and computers with web access. The TOC provided a clear central point of contact for all traffic related activity and a hub for communications with off-playa cooperators and participation. BRC also provided radios to NHP and WCSO cooperators, though these radios did not work consistently offsite.

BRC worked with a traffic monitoring company that installed temporary bluetooth readers along SR 447 and CR 34. This data provided real travel times from Wadsworth to 8 Mile access of the Black Rock Desert.  BRC monitored the tool closely for fails and flaws. Vetted data was integrated into BRC's Communication Plan (Twitter, Radio, Facebook and other media outlets).   Although in 2014 the traffic monitoring tools were provided as a gift, BRC hopes to integrate this technology further in future years.

BRC worked with Nevada Department of Transportation (NDOT) to obtain temporary permits for traffic controls needed for the event.  This year BRC obtained permits for flagging at the intersection of SR 446 and SR 447, flagging at the Gerlach fuel station, flagging at Empire, and flagging at the "Y"-intersection of CR 34 in Gerlach. Flagging was conducted by BRC's certified flagger team and external vendors. BRC also obtained an NDOT permit to reduce the speed limit around the Empire store at the request of WCSO based on safety concerns. These plans were enforced by NHP and WCSO.  Both agencies did an excellent job keeping the roads safe.

During the rain event, BRC worked closely with NDOT, NHP and BLM to make sure all temporary traffic controls met NDOT's approval.  BRC also worked closely throughout the event week with WCRD, communicating daily with leadership to discuss traffic patterns, flaggers,  and safety concerns.

AR04795

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

BRC met with traffic agencies pre-event to work on the Empire Store flagging plan, and while a flagging plan was put in place this year, all parties agree improvements can still be made. Numerous vendors encroached on NDOT's right away and planning needs to be done to prevent this in future years.

In spring 2014, BLM signed a decision, in line with the NEPA documents governing the event, that allowed, for the purposes of participant ingress, BRC's main gate to be opened at 10:00 AM on Sunday, August 24, 2014. For the purposes of participant egress the main gate was allowed to remain open until 12:00 PM on Tuesday, September 2, 2014. During the extended ingress and egress hours  participants were required to focus their  activities on camp location setup and breakdown.   This decision was communicated to event participants through the Survival Guide and Jack Rabbit Speaks newsletter.  This decision helped BRC plan for traffic mitigations throughout the event. Traffic flowed smoothly during ingress and reached its heaviest at 11:00 PM on Sunday night of event open. Exodus was as smooth as it has ever been. Notably traffic departing from the event on Tuesday increased, demonstrating the effectiveness of the ingress/egress extension.

**Recommendations:**

- *Design bluetooth data capture in such a way that participants and cooperators can access the reports directly.*
- *BRC to provide a landline for outside agencies to call into the event. Evaluate wifi connected radio repeater for offsite agencies.*
- *BRC and BLM should coordinate around communications to participants during exodus to ensure streamlined integration and smallest possible impact on exodus.*
- *Continue to monitor and improve communications between 8 Mile exit point and flagging operations at the Y - transfer station to prevent back ups from occurring.*
- *Meet with the owners of the Empire Store pre-event to create a flagging and vendor plan that meets the standards of all cooperator agencies.*
- *Meet with GGID and the Vendor approval body pre-event to keep vending plans safe and out of the road.*

**L.  Highway Clean Up**

Burning Man's highway cleanup crew, comprised of three roadside crew vehicles with four people each, cleaned up all of the surrounding highways and communities from Wednesday through Saturday post-event (9/2/14 - 9/6/14), picking up highway debris.  Additionally, the highway cleanup crew revisited all the surrounding highways and communities on four occasions until 9/26/14 to ensure that Burning Man's Leave No Trace standards and waste management concerns in those areas were met.

**Recommendation:**

AR04796

- *Continue the Highway Clean Up program, with minor adjustments to timing of traveling crews.*

## M.  Playa Restoration

Two weeks after the event closed and when the bulk of large object removal was complete, the Playa Restoration line sweep started work.  Approximately 125 volunteers and staff worked for two weeks to remove all Matter Out of Place. The MOOP was documented by camera and GPS. At the time of this report, the final documentation was not complete, but the MOOP map, a simple graphic that outlines camps and their LNT effort, was distributed. The MOOP map of 2014 was the greenest (therefore cleanest) map in Burning Man's history. Playa restoration crews patrol a grid system at 7- to 10-foot intervals. Crews walk the entire permitted area and staff sort solid waste on the playa and dispose of debris in an approved landfill or recycling facility.

Burn marks from fires are shoveled, raked, and dragged to remove all debris and break up any hardened surface associated with baking of the playa surface. The perimeter fence was the last structure to be removed. On October 1, 2014, the playa was ready for the BLM post event inspection.

**Recommendation:**
- *Continue to promote and talk about this remarkable program.*

## N. BRC Roles and Transitions

In 2014 BRC introduced an Event Safety Officer (ESO) role to BRC Ops. This role undertook to ensure that the event safety function was represented at all levels of the operation and that all staff had resources to call on in the event of a safety concern. The role was well received by all parties and addressed many issues occurring on playa both within the BRC organization and amongst the participant population.

The ESO undertook to chair a new Safety Committee that gathered together departments who have safety related functions, allowing staff to discuss safety concerns and issues and gather help and information from the collective knowledge bank.  This committee met four times during the build, break and live event weeks, as well as in the run up to the event, and the conversations generated many solutions to interesting problems such as arise in the course of operation of BRC.

BRC introduced a new Law Enforcement Advisor role. The function of the role is to assist integration of BRC operations and LE operations, and to ensure BRC continues to not only understand, but be understood by LE. Roger Vind (retired Nevada Highway Patrol) attended key meetings pre event, actively assisted during the event with Rangers and LE integration,

AR04797

and facilitated BLM relationship conversations. BRC will continue this role in the future, and is looking to expand the scope of Roger's integration, drawing on his experience managing incidents at a statewide level.

**Recommendation:**

- *Further develop the scope and remit of the ESO role and drive integration of this role into all the operating departments of the event to ensure participant and staff safety remains a primary BRC focus.*

## O. Art & FAST

There were over 350 placed art pieces at Burning Man in 2014.   BRC increased burn perimeter abilities with more staff including a new trained team provided to augment those provided by the artists themselves.  The Fire Art Safety Team (FAST) had a strong presence overseeing not only the main burns of the event, but also working closely with flame effect artists.

Providing for a safe Burn is a complicated process and BRC was pleased to be able to burn 23 pieces in 2014. For each and every burn there is a designated burn manager, a strict process of site and support services sign offs, and rigid communication practices to ensure public safety. All structures are checked and re-checked by FAST, then ESD fire uses thermal imaging cameras to make one final safety check before ignition.

Embrace was a large art structure that people could enter, and because of key design elements, BRC confirmed with the artist nearly one year before the event that the piece would not be allowed to burn. At the event, following feedback from members of the Artist community, BRC was concerned that some community members would try to burn the piece anyway. To resolve this issues BRC worked with the artist to safely burn the piece and through communicating this out to the artist community was able to mitigate the safety concerns and provide a safe burn for thousands of participants. Interestingly there was reduced ice sales on the day following this burn and much quieter Friday night. It has been suggested that this was because many people had stayed awake for the 7:00 AM Embrace burn and were tired or sleeping on Friday.

**Recommendations:**

- *Continue to work closely with artists to ensure there is clear understanding around burn practices and acceptable materials for burning.*
- *Continue to recruit folks into the burn teams so they they can be appropriately trained and provide support to smaller art teams wishing to burn.*

## P. DMV

AR04798

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

In 2014 the Department of Mutant Vehicles licensed over 600 art cars for day and nite use. DMV also issued driving passes to disabled users and managed the delivery of the new BRC driving sticker program for those working in the city.

During pre event planning BLM indicated uncertainty around the level of driving on playa, and so in 2014 BRC introduced a new driving sticker for staff and volunteers vehicles, and for the most part, this worked well. There were some notable exceptions to this, as some properly stickered vehicles were pulled over. As a whole however, this program worked well and BLM and BRC cooperated to ensure that BRC staff were able to perform their work safely and securely.

In 2014 there was a fatality resulting from a participant being run over by a trailer towed by a large art car. BRC is currently conducting a full investigation into this incident and will be updating art car safety guidelines accordingly for 2015. Safety is paramount for the event, and this work has the support of all parties including DMV and the art car community.

**Recommendations:**
- *Review all Art Car licensing processes, especially as they relate to trailers, to be sure public safety is maintained for operators and the community.*

AR04799

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

_____

**V. Summary of Recommendations:**

II.   BRC Agency Relations: BLM & Cooperating Agencies

A.   Introduction

B.   Cost Recovery, Special Recreation Permit (SRP), & Cooperator Fees
   - *Population reporting should be agreed upon by BLM and BRC during event planning for 2015 so that there is consistency in messaging.*
   - *Closely examine the population reporting stipulation, including exodus management, so that BRC can continue to provide the Federal Government and the American Public the confidence it needs in assurance of fair use of public lands.*
   - *Continue to Identify areas for cost savings with BLM and other cooperating agencies.*

C.   Closure Order & Stipulations
   - *Continue to collaborate on educational material on the Closure Order and rules for staff and participants.*
   - *BRC and BLM to review population and commercial compliance stipulations, as well as any others, that need to be changed or modified for next year.*

D.   Agency Cooperation
   - *BRC and Cooperating Agencies to review the rain contingency plans in light of 2014 event.*
   - *Continue to have Black Rock Rangers in Gerlach during the event week.*
   - *Continue the Free Ride to Reno program.*
   - *BRC and traffic related agencies should continue to improve planning for Empire store.*

E.   BLM & PCSO Infrastructure
   a.   Incident Command Post (ICP)
   - *BRC should continue to deliver the BLM operations post at the event.  All parties should work together to refine the SOWs to reduce unrequired double work.*
   - *All UC members should collaborate to ensure the Operational center is named appropriately to avoid confusion at incidents on the ground in the city.*

   b.   Pershing County Sheriff's Office (PCSO)
   - *BRC and PCSO should continue to work together to identify areas for resource support and cost efficiencies.*

AR04800

F. Cooperator & Daily Event Meetings
- *BRC & BLM further refine and evolve the meeting schedule and representatives to become more efficient and effective in 2015.*
- *Examine the functions of each cooperators meeting to understand how better to inform them.*

G. Communications & Public Relations
- *PIOs should schedule a meeting in advance of the event (possibly coinciding with a cooperators meeting) to discuss goals and objectives for the 2015 event and lay out a framework for preparing, securing approval and disseminating communications on site.*
- *PIOs should schedule a meeting on playa in advance of gate opening to coordinate on-site collaboration on information preparation, approval and dissemination to the public and determine the most effective way to find each other quickly on playa.*
- *PIOs should be briefed on requirements relating to videography at the event, how it can be used, and the review process by BRC.*

H. Compliance
- *BRC and BLM should discuss and review roles for the compliance team during the event.*
- *BRC and BLM should discuss technology tools for consistent usage amongst all LNT departments.*
- *BRC and BLM should review and edit the commercial stipulations to reflect any changes to the process as needed.*

III. Public Safety

A. Introduction

B. Unified Command
- *UC members should meet well in advance of the 2015 event.*
- *UC members should continue to develop scenarios and run tabletop exercises to evolve methods and processes, including specifically UC activation.*
- *Additional planning for rain contingency should take place, with a focus on determining locations, staging resources, and establishing inter-agency communications.*
- *UC members should look at nomenclature and staffing, including BRC EOD operational capacity limitations.*
- *BRC and HGH should work to improve operational alliance and relations.*

C. Law Enforcement

AR04801

2014
Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

_____

   a. BLM & Pershing County Law Enforcement Integration
- *All parties should convene very early in 2015 to ensure a successful LE operation in 2015 and the best understanding of operations, staffing, resources, protocols, regulations and relevant statutes.*
- *Black Rock Rangers should be included early in the planning process, especially meeting with the new Pershing County Sheriff and his staff.*

   b. Eviction Procedures
- *Cooperate with BLM and WCSO to better manage evictions and any subsequent loitering issues in the surrounding areas.*
- *BRC to work with BLM and PCSO to improve eviction reporting.*

   c. Law Enforcement Feedback
- *Continue focus on supportive community policing.*
- *Reduce the number of vehicle stops and searches, and ensuing traffic congestion.*
- *Eliminate LE speeding when not responding to emergencies.*
- *Minimize threatening and intimidating, or misleading statements by officers.*
- *Improve communication to participants and staff regarding law enforcement priorities, rules and regulations, and appropriate interactions with officers.*

   d. Acculturation Training
- *Continue in future years.*

   e. LE Reporting
- *BRC and BLM, PCSO to work together to improve the reporting process for LE.*

D.  Emergency Services
   a. Basic Life Support (BLS): ESD First Responders
- *BRC undertakes to review and amend as appropriate the operational status of ESD to ensure that BRC participants, staff and volunteers are receiving the best care, that integration with HGH is legal and secure as well as efficient and safe for the event, with Public Safety being primary concern for all parties.*

   b. Advanced Life Support (ALS): HGH Rampart
- *BRC undertakes to review all aspects of the event ALS function including provision of infrastructure resources, event access, integration with ESD and medical oversight.*

   c. Fire & Rescue
- *BRC FD will work with our fire protection contractor to evaluate the risk and necessary changes to response plans to help mitigate the problem of access*

43

AR04802

*into some camps in the city. Coordination with the Placement team and additional public education also needs to be employed.*

d. BRC 911 Dispatch
- *Closely examine the 911 Operations to be sure the best service is being provided for Public Safety in BRC.*

E. BRC Rangers
- *Ranger staffing should increase to more than 700 volunteers in 2015, providing sufficient trained staff such that any further growth in the BRC population can be accommodated with nominal growth in Ranger staffing.*
- *Continue, and expand the Gerlach program. Feedback from the town indicates the program was overdue and worthwhile.*
- *Include Black Rock Rangers in LE planning further in advance of the event. Rangers and law enforcement should meet briefly throughout the year to establish working relationships, clarify priorities for each team, and plan any join work in better detail. Advanced communication should include the role LE is to play at major burns, how we can all contribute the most to increase safety, and logistical details such as parking and operational areas for personnel.*
- *Rangers should be more proactive about stationing personnel at or near the Gate during peak periods to provide support there when it is most needed.*
- *BRC should brief the new Pershing County Sheriff and key staff on the Ranger organization, as was done for BLM LE leadership in 2014, to familiarize PCSO management with what the Rangers do and how we are organized. That briefing may be useful for officers in general.*

IV. Event Operations

A. Introduction

B. Operating Plan
- *Further align the two Rain Contingency Plans.*
- *Continue to refine and identify contingency plans with cooperating agencies.*

C. Ticketing & Population Reporting
- *BRC to work with its ticket vendor to ensure more manageable population reporting mechanisms built into the back end of the ticket sale tool.*

D. City Layout
- *Continue to address the trends of participants camping on the 10 o'clock side of the City.*

44

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

E. City Infrastructure
- *Review and amend as appropriate BRC Fuel Safety Guidelines ensuring continued compliance with latest thinking and new developments.*
- *Continue to promote use of authorized fuel vendors as a way of limiting fuel requirements for individual camps, while continuing to highlight fuel safety.*
- *Review staffing needs for DPW operations and infrastructure.*

F. Event Communications & Media Relations
- *As mentioned previously, for 2015 BRC would like to see a group PIO meeting (possibly coinciding with a cooperators meeting) pre-event and a second PIO meeting on playa in advance of the gate opening.*
- *In 2015 the Communications Team will be more proactive in educating vendors regarding rules for filming and photographing on the playa and the review process they are required to follow. For BLM, BRC will work on an expedited review process that could allow BLM to issue content - primarily video - the same day.*

G. Sanitation Services
- *BRC to review the ability, regulation and operational implications of vendors outside of the main vendor's control who provide sanitation services on the playa.*
- *BRC will work closely with its vendor to evaluate the playa wide potty capacity and to address issues around participants RV pumping, dedicated theme camp resources and deep playa coverage.*
- *Devise a theft proof solution for hand sanitizer dispensers.*

H. Airport Operations
- *Maintain safety and continue to work closely with Cooperating Agencies.*

I. Burner Express Bussing Program
- *BRC and Burner Express Program will continue to improve the rider experience and promote ridership, encouraging program expansion.*
- *BRC and BLM to improve LE policy around Burner Express.*

J. Gate, Perimeter & Exodus
- *Continue to develop relationship between Gate staff and BLM LE and other cooperators. Consider Free Ride to Reno integration.*

K. Traffic & Traffic Controls
- *Design bluetooth data capture in such a way that participants and cooperators can access the reports directly.*

AR04804

2014

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

- *BRC to provide a landline for outside agencies to call into the event. Evaluate wifi connected radio repeater for offsite agencies.*
- *BRC and BLM should coordinate around communications to participants during exodus to ensure streamlined integration and smallest possible impact on exodus.*
- *Continue to monitor and improve communications between 8 Mile exit point and flagging operations at the Y - transfer station to prevent back ups from occurring.*
- *Meet with the owners of the Empire Store pre-event to create a flagging and vendor plan that meets the standards of all cooperator agencies.*
- *Meet with GGID and the Vendor approval body pre-event to keep vending plans safe and out of the road.*

L.  Highway Clean Up
- *Continue the Highway Clean Up program, with minor adjustments to timing of traveling crews.*

M.  Playa Restoration
- *Continue to promote and talk about this remarkable program.*

N.  BRC Roles and Transitions
- *Further develop the scope and remit of the ESO role and drive integration of this role into all the operating departments of the event to ensure participant and staff safety remains a primary BRC focus.*

O.  Art & FAST
- *Continue to work closely with Artists to ensure there is clear understanding around Burn practices and acceptable materials for burning.*
- *Continue to recruit folks into the Burn teams so they they can be appropriately trained and provide support to smaller art teams wishing to Burn.*

P.  DMV
- *Review all Art Car licensing processes, especially as they relate to trailers, to be sure public safety is maintained for operators and the community.*

AR04805

Black Rock City, LLC
BURNING MAN AFTER ACTION REPORT

---

**VI. Appreciations**

BRC is grateful to all of the cooperators who collaborated in the planning, production and follow-up of a safe and successful 2014 Burning Man event.  BRC could not produce the event without the professional and diligent efforts of our cooperating agencies.  A big thank you to everyone involved!

BRC would like to express big thanks to Pershing County Sheriff Rich Machado for his leadership and years of service at Burning Man.

BRC appreciates Jim Peterson of Nevada Highway Patrol for his leadership in traffic planning throughout the year and especially during the 2014 rain event.

BRC would like to express it's heartfelt gratitude to Mark Pirtle of BLM for his 19 years of support, hard work, and good humor.  BRC appreciates the leadership and professionalism of BLM law enforcement represented by Eric Boik.

Lastly, BRC is grateful to BLM District Manager Gene Seidlitz for enabling himself to be on the playa both pre and post event as well as for the duration of the 2014 live event, thus ensuring a wide perspective and understanding of both the BLM operation and BRC operation which puts all parties in good stead for the future.

**Respectfully submitted.**

Charlie Dolman
Event Operations Director
Black Rock City LLC

Rosalie Barnes
Agency Relations Manager
Black Rock City LLC

Marnee Benson
Public Policy Representative
Black Rock City LLC

AR04806

## United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
Winnemucca District Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445-2921
Phone: (775) 623-1500  Fax: (775) 623-1503
Email: wfoweb@blm.gov
http://www.blm.gov/nv/st/en/fo/wfo.html



In Reply Refer to:
LLNVW03500-15-01
2930 (NV020.00)

CERTIFIED MAIL 7014 2870 0001 4873 0156
RETURN RECEIPT REQUESTED

Charlie Dolman
Event Operations Director                    :        Burning Man 2015 Event
Black Rock City, LLC                         :        Special Recreation Permit
660 Alabama St
San Francisco, CA 94110-2008

March 12, 2015

Dear Mr. Dolman:

On January 30, 2015, I sent you a letter and the 2014 Special Recreation Permit (SRP) close-out documents. I stated in that letter "The Bureau of Land Management (BLM) will soon be providing additional details to BRC about public safety concerns." Enclosed with this letter is the BLM's "Safety, Health and Security Issues of 2014 Burning Man Event" report that documents the issues and concerns we identified during the 2014 Burning Man event.

I was on-site before, during, and after the Burning Man event to administer the 2014 SRP. For those two weeks, I determinedly interacted with BLM staff and BLM Law Enforcement, as well as all cooperators and Black Rock City, LLC (BRC). Throughout the 2014 event, I saw first-hand numerous successes, sound procedures, deficiencies, and failures within both the BLM and BRC. By being the eyes, ears and boots on the ground for two weeks, I gained a better understanding and appreciation of the SRP and all facets of SRP compliance. Burning Man truly is an amazing event to plan for and implement, and it takes knowledgeable and dedicated staff, willing cooperators and compliant participants effectively working together from start to finish to make this a safe and enjoyable experience for everyone.

The BLM has previously discussed, both with BRC and cooperators, the immediate need to enhance and ensure public safety and security at the 2015 Burning Man event. Safety is essential and a priority and will require a commitment from all of us to succeed.

In advance of the 2015 event, BRC and the BLM continue to have the opportunity to enhance the focus and priority on health, safety and security by making important modifications for this year and future years. In order to ensure the 2015 SRP meets the standard of safety expected and required by the BLM, we invite BRC to further engage in a mutual effort to improve event public health, safety, and security.

AR04750

As you know, I will be meeting with the Founders on March 17, 2015, at 10:00. I will be discussing the attachment with the Founders. In the afternoon of the March 17 and all day on March 18 BRC and BLM staff will further meet and coordinate on topics involving 2014, 2015, and out years.

In regards to enhancing the focus and priority on health, safety and security, within 40 days of receiving this letter and enclosure, we would like BRC to prepare a report that outlines your proposed solutions to each of the public health, safety and security issues we've identified. Please plan to present your report and proposed solutions to me and the Winnemucca team, as well as the Nevada State Director, Office of Law Enforcement and Security and BLM/DOI Washington Office leadership. These presentations will be scheduled once we receive your report but they will occur no later than April 24, 2015, in order to make the necessary adjustments prior to the 2015 Burning Man event.

Thank you for your attention to this important issue; we look forward to working with you to improve the public health, safety, and security of the Burning Man event for 2015 and future years. If you have any questions regarding this letter and/or your forthcoming report/presentation, please contact me at 775-623-1500.

Sincerely,

Gene Seidlitz
District Manager
Winnemucca District

Enclosure
cc: Larry Harvey, Marian Goodell, Harley Dubois, Will Roger Peterson, Michael Michel, Crimson Rose
Honorable Congressman Amodei

# Safety, Health and Security Issues of 2014 Burning Man Event

## Safety, Health and Security Issues and Concerns

### 1. BRC Medical Program.

BLM observed disorganized medical responses between Humboldt General Hospital (HGH) and BRC's Emergency Services Department (ESD) due in part to problems in the chain-of-command structure. In addition, per the HGH 2014 After Action Report (AAR), problems exist with medical program assets and with the overall management and development of the program.

BLM Law Enforcement (LE) and BLM Civilian Operations staff observed miscommunication, which led to the appearance of duplication of medical services between ESD and HGH and caused confusion. For example, if a civilian or law enforcement officer observed or responded to a medical incident they would communicate the incident, medical observation/injury, and request medical assistance through the BLM dispatch center.  The BLM dispatch center would then communicate the medical request to the BRC dispatch center that would dispatch ESD or HGH personnel.  During the event, the dispatching of medical personnel is completed by BRC and the appropriate medical response did not always occur. As a result, public safety was impacted by the confusion.

During a rain event which closed the city in 2014, the plan to establish unified command was not followed properly. HGH's 2014 AAR, page 19, states, "Given that a unified command system was not correctly stood up, the potential exists that crews, participants and others were exposed to added hazards given the failure of not including all critical partners in the UC organization. In subsequent years it is essential that a more collective approach be taken during any type of critical incident." On page 3 of the BLM's Operational Assessment (Weather Event) this issue was further highlighted. As a result, public safety was impacted by the lack of effective unified command (UC).

ESD dispatchers were not properly qualified. HGH's 2014 AAR, page 22, states, "The lack of standardized training, familiarity with emergency communications, and the lack of sufficient emergency dispatch certifications and/or licensure created a number of hurdles for emergency responders during the 2014 event." As a result, public safety was impacted because of these identified communication issues.

Either there were not enough emergency response vehicles available or the available vehicles were not efficiently assigned. HGH's 2014 AAR, page 20, states, "At several times during the event the EMS Operation reached a "Status Zero" state (no units available), during these times QRVs (Quick Response Vehicles) and Command Units were utilized to answer calls." As a result, public safety was impacted by the availability of emergency equipment such as ambulances.

AR04752

**2. BRC Fire, Rescue, Hazmat Programs.**

BLM and HGH observed and reported shortcomings in equipment and management of fire, rescue and hazmat programs. HGH's 2014 AAR, page 23, states, "Currently the technical rescue and extrication capabilities of the on playa response system are of great concern, do not meet national standards, are antiquated, and are not safe..." As a result of the lack of standard extrication capabilities, public safety was impacted.

During the response to the fatality during the event, BLM LE communicated to BRC the need for the clean-up of bodily fluids. BRC was disorganized in their response, and BRC staff assigned refused to do the cleanup without respirators. Hazmat procedures must be better defined, and staff available to complete work with proper equipment.

**3. Fatality Medical Response and On-Scene Management.**

BLM and other cooperators observed and reported disorganized and unprofessional medical response and scene management during an accident in which a woman was run over and killed by the trailer of a roving art car. On page 3-4 of the BLM's Operational Assessment (Fatality) this issue was highlighted. It was also discussed in the HGH 2014 AAR, page 18, which describes the event as it unfolded "... (When a) non-licensed ESD Field Supervisor disagreed (with the incident commander), he became hostile towards HGH staff, attempted to take over the scene, and acted in an unprofessional manner. "BLM LE on scene identified communication and chain of command issues when they observed ESD personnel disagreeing with the medical director's assessment of the deceased patient. ESD and Black Rock Ranger (BRR) personnel began to interfere with what had quickly transitioned from a medical incident to a law enforcement incident with a crime scene that needed to be protected. At one point, BRC personnel had to be physically restrained by HGH staff to prevent interference with the crime scene, body, and other HGH medics. The inappropriate and confused response to this incident showed a lack of professionalism, management control and proper procedures.

**4. Transportation Management.**

During a 15 hour city closure caused by a rain event, hundreds of vehicles were left stranded on the roads and highways leading to the event. UC members observed there was a lack of contingency planning for off-site traffic to address public safety on roads and highways leading to and from the event during this type of incident. This lack of contingency planning resulted in public safety problems. This issue was highlighted and discussed on page 3 of BLM's Operational Assessment (Weather Event).

**5. Art Project Management.**

BLM LE and Civilian Operations staff observed public safety issues associated with art burns in 2014. During the "Man" burn the upright supports were so thick that it took a prolonged time for the piece to fall, which led to concerns voiced by BRC about its staff's ability to hold the crowd back to a safe distance. BRC requested that BLM LE remain on site to assist with crowd control until the Man structure safely fell.

2

The art piece "Embrace" was constructed with material that was too thin to burn per BRC's engineering guidelines. BRC told the artist it would not be allowed to be burned and the artist agreed. It was later brought to the UC's attention by BRC that there was a high likelihood the art piece would be set on fire illegally by participants. Due to the inability to prevent the uncontrolled burning of the art piece by participants, a serious public safety hazard was created. To protect public safety, the UC and BRC agreed that the piece would be burned under special circumstances.  BLM's Operational Assessment (Embrace Art Burn) noted this issue on page 4.

### 6.  Security and Safety Plan for Scheduled Burn Events.

BRC utilizes staff known as "Sandmen" to physically prevent spectators from approaching the burns before it is safe to do so. However, BRC informed BLM that the Sandmen are not licensed, bonded, insured or trained to use any type of physical force to detain participants at Burning Man. BRC communicated to BLM that the Sandman's Standard Operating Procedures (SOPs) states that after interceding a participant attempting to enter a burn, they are released back into the crowd rather than detained. BLM has questions regarding the legal authority of BRC staff providing security and detaining participants around art burns.  Public safety is compromised by the lack of legal authority, and SOPs which threaten participant safety.

### 7.  Sanitation Management.

BLM LE and Civilian Operations observed and reported human waste on the open playa associated with mobile rave participants who did not have convenient access to portable toilets. Insufficient resources were dedicated to removing blackwater from participant campsites. Public health is compromised by insufficient portable toilets where they are needed and insufficient blackwater pumping resources throughout the city. These issues were also noted on page 37 of BLM's Operational Assessment (Environmental Compliance Recommendations). The Nevada Department of Health and Human Services' AAR, page 4, states, "…a few theme camp participants registered complaints about the limited availability of septic tank pumping services." Also stated on page 5, "Throughout the event empty hand sanitizer containers continued to be found at the port-a-potty banks, particularly on the 6-10 o'clock side of the city… No hand sanitizer was installed on the posts at the open playa port-a-potty banks until this (was brought) to the attention of USS… the Burning Man organization must stress the importance of properly setting-up and stocking hand sanitizer with USS." Public health is compromised by a lack of functioning hand sanitizing stations.  Also noted throughout the event were sporadic and untimely schedules for daily pumping of porta potties.

### 8.  Early Arrival Program.

BRC's early arrival pass program for participants involved in the construction of large art projects, large art cars and large theme camps has grown to allow in excess of ten thousand people in the city before the official gate opening and start of the event. In 2014, the BLM observed a large number of early arrival pass participants not complying with the intent of the early arrival construction mission.

The day before the main gate opened, BRC provided BLM with their 8:00 a.m. population statistics report that showed 13,545 early arrival pass participants on playa. BLM Rangers and

AR04754

other BLM staff were surprised by the high number of people on the playa throughout the early arrival period who appeared to be partying, bicycling, playing music, and driving around in art cars, rather than fulfilling the intent of the early arrival pass program of construction.

BRC and Burning Man participants should adhere closely to the intent of the early arrival program. BLM's operation, including both LE and Civilian Operations, will need to begin earlier and with increased staff in order to provide an adequate level of public safety and permit compliance if this trend continues.

### 9. D-Lot Design and Management.

D-Lot is a large parking area located along Gate Road used for the purpose of staging vehicles and participants who are not immediately allowed to enter the event for a variety of reasons. D-Lot at times contains hundreds of vehicles. The footprint of D-Lot is a large fenced-in area. D-Lot has become a massive overflow parking area with no BRC internal organizational structure or directional markings to allow for effective location of emergency incidents.

BLM LE and BLM Civilian Operations staff observed public safety issues including uncontrolled partying, loitering and trespassing. The design of D-Lot makes it very difficult for BLM law enforcement or EMS to respond to or locate calls, compromising public safety systems. A number of people in D-Lot were attempting to obtain tickets, and remained partying in D-Lot after they were told no tickets were available. In one example, the Pershing County Sheriff's Office and BLM Law Enforcement received a call for service to assist Black Rock Rangers with a mentally disturbed/barricaded subject located in D-Lot. This incident was not immediately reported to BLM LE, as it would have been in the city, because of the unmanaged nature of D-lot, which exacerbated and extended the incident. A large crowd of people from within the D-lot area gathered around the incident and observed law enforcement interact with the subject.

None of the people in D-Lot were accounted for in population counts or site occupancy reports. This poses public safety issues because of the unknown and high numbers of people in D-Lot, the types of activities they engage in and D-lot's disorganized layout. Also in BLM's Operational Assessment page 3 (Barricaded Subject) BLM noted issues/concerns of the lack of BRC oversight/management of D-Lot.

### 10. Fuel Storage Management.

In 2014, roaming art cars were observed with large amounts of onboard stored fuel. Additionally, some art cars include pyrotechnic effects in close proximity to stored fuel. Camps throughout the city were observed with large amounts of stored fuel for use in generators and other equipment. In some cases, the fuel was observed in unapproved containers. These issues increase the risk for a major fire incident, and pose a serious threat to public safety.

### 11. Deployment of Medical Resources.

Inadequate proactive deployment of EMS assets was provided to large events in the city such as mobile raves and scheduled burns. BLM LE observed that medical resources were not

4

adequately pre-staged at mobile raves and as a result BLM and County law enforcement officers were tasked with providing emergency care on a regular basis. Forward deployment of medical resources to large events and mobile raves will improve emergency response time by ESD, and reduce LE's involvement in medical situations, thereby allowing LE to continue their law enforcement mission.

### 12. Placement of Emergency Vehicles at the Airport.
It was observed by members of LE and HGH's Incident Commander that there were no dedicated emergency response vehicles located at the airport, which becomes one of Nevada's busiest during the event. In the event of an airport emergency, a lack of immediate response could compromise public safety. Airplane crashes at the Black Rock City airport have occurred in the past, including this year.

### 13. Highway 34 Road Conditions.
Hwy 34 was not designed to accommodate the amount and type of traffic generated by the event, leading to the deterioration of the road. If Hwy 34 fails completely during the event, it could pose a serious public safety issue as drivers could encounter damaged roadways leading to accidents, vehicle damage, long delays or becoming stranded if the roadway becomes impassable.

The Washoe County Community Services Department AAR, page 6, states, "Simply put, the road was never constructed for use on this scale. It has outlived its useful life and in order to avoid more disruptive and costly interruption to this critical artery to the Burning Man event and residents and visitors to the valleys north of Gerlach that immediate financial planning should be committed to a capital reconstruction project on this road." Without a capital reconstruction of the road, public safety will continue to be compromised by the deterioration of the road.

### 14. Population Tracking and Reporting Program.
BLM Civilian Operations staff noted that BRC was unable to fulfill the intent of the Special Recreation Permit (SRP) Stipulations requiring accurate and timely population reporting before, during and after the event, despite numerous reminders to do so. The 2014 BLM Special Recreation Permit (SRP) Evaluation, page 2, states that BRC's population tracking and reporting program was inadequate and did not meet the BLM full requirements or SRP stipulations. As a matter of public safety, BLM must have an accurate population count, up to the minute when requested, in order to insure appropriate response to any major emergency that may occur.

### 15. BRC Event Table of Organization.
BLM requires a detailed Table of Organization (TO) of BRC's management program at least 45 days in advance of the event. In order for BLM to effectively respond to emergencies it is necessary to quickly identify and contact specific BRC staff in various departments down to the field supervisor levels. The lack of a detailed TO compromises public safety.

AR04756

**16. BRC Event Management Program Description.**

BRC does not have a sufficiently detailed event management program description in their Plan of Operations. In order to ensure SRP compliance, BLM needs a more detailed description of BRC's event management program outlining each operational division's mission and scope, roles and responsibilities, supervisory controls and training program.  In order to effectively respond to event management issues, BLM needs to refer to a detailed program management description.

**17. Participant Evacuation Contingency Plan.**

A comprehensive participant evacuation contingency plan has not been developed with affected cooperators. BLM, BRC and the other cooperators need to develop a contingency plan in the event of an emergency which requires the city to be evacuated. Without an evacuation contingency plan public safety is compromised.

**18. Significant Incident Reporting.**

Significant incidents were not reported in a timely manner as required by BLM. In 2014, BLM staff learned of an on-playa airplane crash that occurred during post event through a report on the television news. Also in 2014, during the incident with a barricaded subject, as described in #9 of this report, BLM LE was not notified until hours after the incident began which extended and exacerbated the threat to public safety. In other incidents, an art car collision with a pedestrian was not reported to BLM, and several medical evacuations which occurred during pre-event were not reported to BLM until days later. Black Rock Rangers who encounter violations of the law need to immediately contact the appropriate law enforcement agency on playa. Lack of timely incident reporting compromises public safety.

**19. Art Car Operations.**

BLM LE observed art cars operating on crowded streets in the city, increasing the potential for collisions with pedestrians and bicyclists. Art cars operated on the open playa during periods of limited visibility, which also increases the potential for collisions. Some large art cars have designs with exterior ladders and stairwells leading to upper decks, which encourages some participants to get on and off while the art car is still moving.  Some pyrotechnic art cars carry stored extra fuel which creates hazards of both fire and explosion.  Pyrotechnic art cars operate on the city streets in close proximity to inflammable structures. Art car "spotters" who help direct large moving art cars with limited driver visibility were observed without high visibility clothing during the day and without flashlights at night, creating a public safety hazard. These art car issues compromise public safety.

**20. Illicit Narcotics.**

Law enforcement and medical workload is increasing in order to address participant behavior and health while under the influence of controlled substances, which creates a public safety issue for employees and participants.  Often the first responders to drug-related complaints at mobile raves and large parties are law enforcement officers. This takes up large amounts of

6

time, and prevents officers from continuing with their regular duties, which could lead to increases in law enforcement staffing levels.

The BLM's Operational Assessment, page 4 (Use of Dangerous Drugs), notes the use of dangerous drugs comprises the safety, health and security of everyone at the event. The 2014 HGH AAR, page 25 states, "Medical professionals report an increase in what appears to be the use of synthetic illicit drugs, and GHB. These illicit drugs can cause life threatening complaints and require immediate clinical intervention." Illicit drug use is a threat to public safety.

AR04758

AR04759

Form 2930-2
(March 2014)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**SPECIAL RECREATION PERMIT**
(43 U.S.C. 1201; 43 U.S.C. 1701; 16 U.S.C. 460L-6(a); and 43 CFR 2930)

Permit No.

NVW03500-15-01

BLM Issuing Office

Winnemucca District
Black Rock Field Office

Permittee  Black Rock City LLC

Authorized Representative  Charlie Dolman

Address  660 Alabama Street
San Francisco, CA 94110-2008

Phone Number  415-865-3800

Email Address  charlie.dolman@burningman.org

Web Site  www.burningman.com

Permit is for *(check all that apply):* ☑ Commercial  ☐ Competitive  ☐ Organized Group  ☐ Vending

Date Issued _____ Date Expires _____ *(Terms greater than one year subject to annual authorization.)*

Seasonal or other period of use limitations  *See Burning Man Plan of Operations

Permit Fee Formula  Commercial: Greater of $105/year or 3% of gross revenue

Assigned Sites *(commercial only):* ☑ None    No. of Assigned Sites subject to fees _____

Special Area Fees Apply: ☐ Yes ☑ No    Special Area Fee _____

Minimum insurance coverage requirements  High Risk: $1,000,000 per occurrence, $     annual aggregate

Permit is valid only if a current Certificate of Insurance, listing the United States as additional insured, is on file with the issuing BLM Office.

Post use report due date(s) _____ Bond Requirement: ☑ None  Bond Amount _____

Purpose and activities authorized
2015 Burning Man Event

Approved Area of Operation

Southern Portion of the Black Rock Desert - High Rock Canyon Emigrant Trails National Conservation Area.

Certification of Information:  I certify use of this permit will be as per the operations plan on file with BLM.  I acknowledge I am required to comply with any conditions or stipulations required by the BLM including the General Terms listed on page two of this form and any additional stipulations which may be attached.

Additional Stipulations are attached: ☑ Yes ☐ No

_____
(Permittee Signature)

AUGUST 4, 2015
_____
(Date)

Approved and issued for the conduct of permitted activities and locations shown on this permit and in conformance with the operating plan.  Permit is subject to General Terms and any additional stipulations attached.

Robert B. Towne
_____
(BLM Authorized Officer Printed Name)

_____
(BLM Authorized Officer Signature)

8/7/2015
_____
(Date)

(Continued on page 2)

AR08024

## GENERAL TERMS

a.   The permittee shall comply with all Federal, State, and local laws; ordinances; regulations; orders; postings; or written requirements applicable to the area or operations covered by the Special Recreation Permit (SRP or permit). The permittee shall ensure that all persons operating under the authorization have obtained all required Federal, State, and local licenses or registrations. The permittee shall make every reasonable effort to ensure compliance with these requirements by all agents of the permittee and by all clients, customers, participants, and spectators.

b.   An SRP authorizes special uses of the public lands and related waters and, should circumstances warrant, the permit may be modified by the BLM at any time, including modification of the amount of use. The authorized officer may suspend or terminate an SRP if necessary to protect public resources, health, safety, the environment, or because of non-compliance with permit stipulations. Actions by the BLM to suspend or terminate an SRP are appealable.

c.   No value shall be assigned to or claimed for the permit, or for the occupancy or use of Federal lands or related waters granted thereupon. The permit privileges are not to be considered property on which the permittee shall be entitled to earn or receive any return, income, price, or compensation. The use of a permit as collateral is not recognized by the BLM.

d.   Unless expressly stated, the permit does not create an exclusive right of use of an area by the permittee. The permittee shall not interfere with other valid uses of the federal land by other users. The United States reserves the right to use any part of the area for any purpose.

e.   The permittee or permittee's representative may not assign, contract, or sublease any portion of the permit authorization or interest therein, directly or indirectly, voluntarily or involuntarily. However, contracting of equipment or services may be approved by the authorized officer in advance, if necessary to supplement a permittee's operations. Such contracting should not constitute more than half the required equipment or services for any one trip or activity and the permittee must retain operational control of the permitted activity. If equipment or services are contracted, the permittee shall continue to be responsible for compliance with all stipulations and conditions of the permit.

f.   All advertising and representations made to the public and the authorized officer must be accurate. Although the addresses and telephone numbers of the BLM may be included in advertising materials, official agency symbols may not be used. The permittee shall not use advertising that attempts to portray or represent the activities as being conducted by the BLM. The permittee may not portray or represent the permit fee as a special federal user's tax. The permittee must furnish the authorized officer with any current brochure and price list if requested by the authorized officer.

g.   The permittee assumes responsibility for inspecting the permitted area for any existing or new hazardous conditions, e.g., trail and route conditions, landslides, avalanches, rocks, changing water or weather conditions, falling limbs or trees, submerged objects, hazardous flora/fauna, abandoned mines, or other hazards that present risks for which the permittee assumes responsibility.

h.   In the event of default on any mortgage or other indebtedness, such as bankruptcy, creditors shall not succeed to the operating rights or privileges of the permittee's SRP.

i.   The permittee cannot, unless specifically authorized, erect, construct, or place any building, structure, or other fixture on public lands. Upon leaving, the lands must be restored as nearly as possible to pre-existing conditions.

j.   The permittee must present or display a copy of the SRP to an authorized officer's representative, or law enforcement personnel upon request. If required, the permittee must display a copy of the permit or other identification tag on equipment used during the period of authorized use.

k.   The authorized officer, or other duly authorized representative of the BLM, may examine any of the records or other documents related to the permit, the permittee or the permittee's operator, employee, or agent for up to three years after expiration of the permit.

l.   The permittee must submit a post-use report to the authorized officer according to the due dates shown on the permit. If the post-use report is not received by the established deadline, the permit will be suspended and/or late fees assessed.

m.   The permittee shall notify the authorized officer of any incident that occurs while involved in activities authorized by these permits, which result in death, personal injury requiring hospitalization or emergency evacuation, or in property damage greater than $2,500 (lesser amounts if established by State law). Reports should be submitted within 24 hours.

(Form 2930-2, page 2)

AR08025

# *Burning Man*

*www.burningman.com*

March 3, 2016

William Mack, Jr.
Black Rock Field Office
Field Manager
Bureau of Land Management
Winnemucca District
5100 E. Winnemucca Blvd.
Winnemucca, NV 89445

Re: Burning Man Indirect Administrative Cost Rate Waiver Request

Dear Mr. Mack,

Black Rock City LLC (BRC) requests that BLM waive or significantly reduce the Indirect Administrative Cost Rate (IACR) assessed to Burning Man's 2016 Cost Recovery (CR) Account, which we understand to be 23.1% of direct costs. In 2015 BRC paid BLM $2,273,167 in cost recovery and another $520,555 in indirect costs to administer the Burning Man Special Recreation Permit (SRP). It is BRC's understanding from BLM Instruction Memorandum No. 2014-032 that "the State Director, or his designee, has the authority to approve or deny any indirect fee reductions or waivers" for this type of permit. This letter serves as BRC's formal request for an expedited review and provides the basis for that request and justification for approval.

On February 4th, 2016, BLM told BRC that BLM will not begin work on the 2016 Burning Man event until there is a CR agreement in place. On February 16th, BLM Project Manager David Freiberg sent BRC a $179,000 CR estimate for signature. This CR estimate is intended to cover BLM's planning work through April 30th, 2016. This is the first time that BLM has requested a separate CR for Burning Man planning. BRC wants to comply with all requirements, work cooperatively with BLM, and avoid delays in planning the 2016 event.

BRC also understands that: "All requests for reduction or waivers must be approved or denied prior to beginning work on the project." (BLM Instruction Memorandum No. 2014-032.) In order for BRC to sign the CR agreement, and to minimize any delays in 2016 planning, BRC respectfully requests BLM's decision by April 1st.

BLM Instruction Memorandum No. 2014-032 states: "The decision to waive or reduce the indirect cost rate is based primarily on the degree to which the project benefits the BLM." This letter explains how Burning Man benefits BLM, the reasons that the Burning Man SRP is unique under CR, and how BRC is already paying for BLM's indirect costs through CR, proffer accounts, and MOU's. BRC does not disagree with BLM's need to recover actual costs and not unduly burden the American public, but we feel we qualify for a waiver due to unique circumstances that exist with the Burning Man event and SRP.

AR04729

**Benefits to BLM**

Every year, Burning Man draws thousands of people from across the country and around the world to visit BLM managed lands and the remote Black Rock Desert - High Rock Canyon Emigrant Trails National Conservation Area (NCA) in Northern Nevada. The Burning Man event introduces approximately 31,000 first-time visitors, and accounts for the vast majority of visitors, to the NCA each year. Their impressions of public lands, Nevada, and the BLM are shaped through their experience on the playa during the Burning Man event.

Burning Man is the largest Leave No Trace event in the country. Burning Man is recognized as a Leave No Trace model for other events and communities around the world. Event participants receive orientation on environmental stewardship while attending Burning Man and leave with a greater respect for the lands and programs managed by the BLM. They in turn become ambassadors for America's public lands and lend support to BLM and its mission. It could be accurately stated that Burning Man is one of the largest public lands outreach programs in existence.

The Burning Man event draws positive worldwide attention and media coverage, showcasing art, culture, and environment on BLM managed lands and in the American West.  Millions of articles, Tweets, videos, and blog posts reflect our production success and consideration of environmental stewardship in the beautiful, harsh Nevada desert, and showcase BRC cooperation with the BLM. Burning Man brings unparalleled positive benefits to BLM through worldwide attention and press coverage.

Burning Man provides significant financial benefit to Northern Nevada and to BLM. BRC's Census estimates that the average Burning Man participant spent $616 in Nevada in 2015. That equates to $47.6 million dollars in 2015 alone and does not include the additional millions of dollars the Burning Man organization spends on supplies and contractors, nor does it speak specifically to the small businesses - like the Empire Store - that derive the majority of their annual revenue from Burning Man related sales and services. As part of cost recovery, BRC paid $1.54 million in wages and overtime to BLM staff members, and BRC paid hundreds of thousands more to Pershing County, Washoe County, Nevada Department of Health, and the Pyramid Lake Paiute Tribe.

BLM personnel specifically request assignments at the Burning Man event and receive valuable on-the-job training and experience not found anywhere else in the country and not available in such concentration over a short time period. Additionally, BLM personnel come from all over the United States, increasing familiarity across territory and program responsibilities, and improving agency unification and morale. This experience is exceptionally valuable to BLM staff and to BLM as an institution.

In 2015, BRC paid 3% of gross receipts or $1,011,216 in commercial land use fees to the BLM Winnemucca District Office. Part of this money should be used to offset the year-round costs of planning for and managing visitor use at the Black Rock High Rock NCA, including services, staff, and infrastructure at Black Rock Station. It is BRC's understanding that BLM would have difficulty managing this facility without this source of funds. The money derived from Burning Man commercial land use fees is a direct benefit to BLM and to the recreating public.

AR04730

In addition to commercial land use fees from Burning Man, BLM collected $203,000 from vendors at the Burning Man event in 2015. These funds will go directly back to the NCA; therefore, this $203,000 benefits the general public and is part of BLM's programmatic governmental function. BRC should not pay for this SRP program, and BLM should waive the IACR assessment.

Fees collected through commercial land use fees are also designated for public education. BLM provides public education during the Burning Man event at the BLM Interpretive Camp on the playa. With nearly 70,000 visitors in 2014 and 2015, this camp provides an excellent opportunity for BLM to educate Burning Man participants about public lands and the BLM mission. And yet, it is our understanding that BLM paid the Great Basin Institute only $15,000 to create and staff the camp in 2014, when Burning Man paid BLM $906,439 in commercial land use fees.

Visitor attendance, Burning Man's Leave No Trace principles, worldwide attention and media coverage of the Black Rock Desert, significant economic impact to Northern Nevada, high revenue from commercial land use fees, advantages to BLM personnel, and millions of dollars in commercial land use fees all combine to provide unprecedented benefit to BLM and help further BLM's mission on America's public lands.

### Burning Man: A Unique Situation & Comprehensive Cost Recovery System

The Burning Man SRP has a 25-year history and is the largest in the country. BRC has been working with BLM since 1990 to permit the event in the Black Rock Desert of Northern Nevada, where each year thousands of people gather for one week to form a temporary city. No other SRP on BLM managed lands comes close to Burning Man in terms of size, organization, and Leave No Trace ethos. The National Conservation Area (NCA) has even written Burning Man into its land-use plan. Section 5(C)3 of the NCA legislation allows the Secretary of the Interior "to permit large-scale events in defined, low impact areas of the Black Rock Desert playa."

Because of this long history, BLM should have achieved significant efficiencies in administering the Burning Man SRP. Even though the event has grown and evolved each year, Burning Man has a predictable planning schedule, well-established event operations, and familiar production protocols. Twenty-five years of learning and experience have created streamlined processes for both BRC and the BLM, and these efficiencies should be reflected in the elimination of some fees that are associated with BLM's indirect costs.

The Burning Man event is complex and well funded. In 2015, BRC paid for BLM expenses through cost recovery, two proffer accounts and multiple Memoranda of Understanding (MOU). These mechanisms guaranteed payment and provision for all of BLM's planning and operational requirements. The sum total paid to BLM through these mechanisms in 2015, including the 22.9% IACR of $520,555, was $3,544,392. In addition, BRC paid BLM 3% of gross receipts for commercial use of BLM lands, equating to $1,011,216. The total paid to BLM in 2015, in direct payments or by provision of services and infrastructure, was a staggering $4,555,608.

BLM has indicated it accounts internally in granular detail for every cost incurred by the agency related to the Burning Man event, and BLM requires BRC to pay for all of these costs. Through cost recovery, BRC pays for BLM year-round planning, on-site labor costs,

-3-

year-round and event-specific travel, vehicle utilization, contracts, accounting, miscellaneous supplies, fuel and mileage, public communications, law enforcement, dispatch, radios, and contract management. Through two proffer accounts, BRC pays for two full-time, year-round BLM positions: one Project Manager and one Outdoor Recreation Planner. Through an additional MOU, BRC funds and provides BLM's housing, offices, evidence room and jail, computers, technologies, internet, printers, supplies, food, fuel, water, and ice cream during the event. The level of detail in Burning Man cost recovery includes indirect costs that are also included in the IACR assessment.

## Direct and Indirect Costs

*BLM Instruction Memorandum No. 2014-032* defines *indirect costs* as "costs that cannot be directly identified with producing a specific product or service, but can be shown to bear some relationship to result from or be in support of the product or service. Following are some examples of indirect costs:

1. Administrative support related to the BLM's overall mission. This area represents the largest portion of indirect costs and includes such costs as procurement, contracting, finance, office services, property management, vehicle management, supply, payroll, voucher processing, personnel services, records management, and document control.
2. Public information and inquiries
3. Budget development and program planning, coordination, and direction
4. Training, employee development, and personnel transfers, including costs of travel and time-in transit."

*BLM H-2930-1 Recreation Permit and Fee Administration Handbook Rel. 2-300 (11/17/14)* says that *direct costs* include personnel costs, travel expenses (e.g., vehicle rental costs or fleet vehicle mileage costs), any necessary purchased services (e.g., printing, automated data product services, or copying), and miscellaneous supplies and specialized equipment. *Indirect costs* are those administrative and program costs that may be attributed to processing the application, including equipment, space rental, telephone services, postage, personnel transfer costs, administrative and clerical support, training, safety, public information, cartography and basic series mapping, aviation management, telecommunications, equipment maintenance, and systems design and implementation.

Indirect costs are further defined in the *BLM 2800 RIGHTS-OF-WAY Glossary* and *Draft 2016 Burning Man Cost Recovery* as those which cannot be specifically identified with the application, expressed as a percentage of direct costs. The percentage figure represents those administrative and program costs, excluding management overhead, that can be attributed to processing the application, including the list above plus budget and program development, and inquiries and reports.

## Overlap

It is BRC's understanding that we already pay many of the allowable indirect costs through cost recovery, proffer accounts, and MOUs. BRC should not be charged twice for the same costs. Some of the costs that BRC pays directly, that also seem to be captured in the IACR assessment, are:

1. Administration and administrative support
2. Contracting Specialist
3. Finance and Budget Analyst

AR04732

4. Public Information and Public Affairs Specialist
5. Logistics and Coordination Specialists
6. Procurement personnel
7. Program planning and development
8. Training
9. Postage
10. GIS personnel and GPS equipment
11. Systems design and implementation
12. Other support services

Administrative support services are identified as an indirect cost, yet BLM's year-round administrative staff are paid through BRC's two proffer account positions. Contracting is identified as an indirect cost, but BRC was charged $14,998 for a Contract Specialist. Budget development is identified as an indirect cost, but BRC was charged $20,125 for a Budget Analyst in 2015. Public information is identified as an indirect cost, but BRC was charged $11,007 in labor for BLM's Public Information function in 2015. BRC paid separately for logistics and coordination specialists, procurement, and program planning. BRC should not have to pay to train BLM employees, but we did, and then we were charged the IACR. Postage is identified as rationale for assessing indirect costs, but cost recovery receipts show that BRC paid for the shipment of a majority of items purchased in 2015. Cartography and mapping are identified as indirect costs, but BRC was charged $21,086 for GIS labor and $4,197 for GPS cameras in 2015. BRC should not be charged the indirect cost rate for any of these charges.

**Event Infrastructure and Operational Resources**

The IACR is currently assessed on BLM cost recovery functions, contracts, and labor that occur exclusively during Burning Man, either in the town of Gerlach or at the Burning Man event site. All BLM infrastructure and support services during this time, in these locations, are already provided and paid by BRC. It is BRC's understanding that few, if any, indirect costs are incurred by BLM during Burning Man.

During Burning Man, for the duration of the Closure Order, BRC pays for and provides BLM fuel and transportation, and we pay for BLM equipment and supplies. BLM reports are written on site. No postage is required. BLM does not utilize off-site buildings or electricity, except for buildings and electricity provided by BRC; BLM does not have to connect internet or pay rent. *There is no planning or permit processing taking place during the closure order dates whatsoever - all BLM operations are in execution phase.* The IACR should not be assessed on any of these operational, administrative, or programmatic costs.

Further consideration should be given to the fact that BRC provides significant free health care services to all BLM employees on site in the form of six fully equipped first-aid stations, ambulance transport, and an on-site Nevada licensed Emergency Care Center. There is no reason BRC should be charged for an additional specialized federal tactical medical operation, and then again charged for administrative costs on top of it, all the while paying for event medical services that far exceed any regulatory requirement.

According to the 2015 Project Log, only seven BLM staff members were involved in BLM functions on dates outside the event closure order. It is BRC's best estimate that the total dollar amount of this off-site labor was $107,653. Therefore, if the IACR is to be assessed at

-5-

AR04733

all, it should be on this amount alone and would have totalled $24,653 in 2015 versus the $520,555 BRC was charged.

## 3% Vendor SRP Fees

In 2015, BLM collected $203,000 from vendors entering the Burning Man event through BRC's Airport and Outside Services (OSS) Program. Every registered vendor and charter air service company pays BLM 3% of gross revenue per BLM SRP regulations. It is BRC's understanding that part of the fees collected from this program are intended to pay for management of the program. However, in 2015 BLM's vending compliance team was staffed in part by an Outdoor Recreation Planner, paid for entirely by BRC through a proffer account, and three additional compliance personnel, paid for entirely by BRC through cost recovery. BRC paid BLM staff to collect 3% vending SRP fees from vendors at the Burning Man event. Then we paid an additional 22.9% IACR of those costs. It appears BLM was paid three times for this service. BRC should not pay for BLM staff to manage the vendor SRP program, and we should not be charged the IACR on top of it.

## Waiver Request

BRC does not disagree with BLM's indirect fee structure, which is intended to capture the costs of Government service; rather we believe it is inappropriate and contrary to Congressional intent for BRC to pay duplicative indirect fees on top of the direct fees charged by BLM, and we believe we qualify for a waiver under unique circumstances.

BRC respectfully requests a waiver of the IACR assessment for the reasons explained above and summarized here:
1. Burning Man provides tremendous, unparalleled benefit to BLM, the State of Nevada, the Black Rock High Rock NCA, and the public.
2. BLM should have realized efficiencies in planning and operations after 25 years of permitting Burning Man.
3. Most of the allowable indirect costs are already paid through cost recovery, proffer accounts, and MOUs.
4. Most of the assessed indirect costs are not applicable to on-site BLM functions and operations, which are self-contained.
5. Burning Man provides a significant, predictable level of funding to BLM each year.
6. Waiving the indirect administrative cost rate assessment will not reduce BLM's ability to fulfill agency responsibilities.

In 2014, BRC requested a reduction or waiver of the indirect fee and was denied, in part because the request was submitted in July, shortly before the event and during the event planning period. Now BRC is applying for a waiver or reduction before planning for the 2016 event begins. BRC requests expedited consideration of this request so that 2016 planning is not delayed.

Should a waiver not be granted, BRC requests that BLM reduce the IACR and recognize the redundancies between the administrative support costs that these fees are intended to cover and the administrative fees BRC already pays as part of cost recovery.

AR04734

Should a waiver not be granted, BRC would also seek to raise this issue with members of the Interior Department's Appropriations Committees, due to the perceived duplicative nature of the indirect and direct fees being assessed BRC and possibly other permittees.

Finally, should a waiver not be granted, BRC would like to formally request information about indirect cost expenditures by BLM, specifically, allocations of the $520,555 received from BRC in 2015 and what services were provided to BRC under the indirect costs category.

**Conclusion**

BRC respectfully submits this waiver request and looks forward to your decision. BRC does not want to delay 2016 planning. BRC wishes to work closely with BLM and greatly appreciates the Nevada State Director's guidance and leadership.

Please don't hesitate to contact me for additional information, and please let me know what else BRC can provide to help ensure you have everything needed to evaluate our request.

Regards,

Marnee Benson
Political Affairs Manager
Burning Man

cc:     John Ruhs, BLM Nevada State Director
        Janine Velasco, Assistant Director, BLM Business Fiscal and Information Resources

-7-

AR04735

## COST RECOVERY AGREEMENT

### BURNING MAN SPECIAL RECREATION PERMIT: NVW03500-16-01
### APPLICANT: Black Rock City, LLC.
### LEAD BLM OFFICE: Winnemucca District, Black Rock Field Office

**I.      AUTHORITY:** Section 304(b) of the Federal Land Policy and Management Act (FLPMA) [43 U.S.C. 1734(b), as amended and 43 CFR Subpart 2932.

**II.     PURPOSE:** This Agreement between the above referenced Applicant and the Bureau of Land Management (BLM) establishes procedures to reimburse BLM for costs incurred to process a Special Recreation Permit (SRP) NVW03500-16-01. If the BLM decides to authorize an SRP, this Agreement shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred for the 2016 Burning Man SRP, reflecting both event monitoring and planning. This Agreement will serve as the initiation of the 2016 Cost Recovery Agreement (CRA) developed to cover BLM incurred costs associated with project planning, with a final estimate for all additional 2016 expenses due by May 07, 2016, in order to develop a final estimate and decision for the overall 2016 CRA.

**III.    PROVISIONS OF AGREEMENT**

**A.**      In accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31, Applicant agrees to reimburse BLM for the costs incurred by BLM for processing the Application, and should a SRP be issued, costs for issuing a SRP and monitoring the SRP.

**B.**      This Agreement is subject to the Reimbursable Cost Provisions and the Direct and Indirect Costs to the government outlined in OMB Circular A-25, Treasury Account: 14X5017, Service Charges, Deposits, and Forfeitures, and 43 CFR Subpart 2932. The Cost Estimate is included, and it will be amended should actual expenses exceed the amounts identified in Attachment 1.

**C.**      A cost recovery account will be established for the SRP. The BLM requires you to remit 100% of the estimated cost recovery costs before the start of the 2016 Event. Please refer to the payment schedule below. After the permit is complete and all work is finished, the BLM will notify you if additional funds are required or if you are entitled to a refund.

The following schedule for payments has been developed to allow for the amount due from the estimate to be paid in two (2) installments and have 100% of the cost recovery estimate paid prior to the start of the event:

| Payment | Date | Amount Due |
|---------|------|------------|
| #1 | April 08, 2016 | $184,224 |
| #2 | Estimate for all additional 2016 expenses due by May 07, 2016 | TBD |

Following the close-out of the event permit, an accounting of the cost recovery funds will be provided to Black Rock City, LLC by January 31, 2017.

AR04736

## IV.    REIMBURSABLE COST PROVISIONS

A.      BLM agrees to process the Application to the extent funding under the Agreement permits. Processing will include, but not be limited to, the following: coordination, administration and approval of any necessary NEPA compliance; consultation with appropriate Federal, State, Tribal, and local officials; preparation of the administrative record, monitoring the construction, operation and termination of any resultant authorization; and other necessary processing actions consistent with a final decision.

B.      BLM agrees to timely notify the Applicant, in writing, of any changes to the indirect rate. Refer to the Definition of Direct and Indirect Costs in Section V. Applicant shall have the right to conduct, at its own expense, reasonable audits of the books, records, and documents of BLM relating to the items on any particular accounting statement provided by BLM.

C.      Cost Recovery funds, once obligated by BLM, are not refundable and will not be made refundable by termination of the Project, withdrawal of the Application, or non-issuance of a SRP.

D.      In accordance with 43 CFR 2932.31, 2932.32, and 2932.33(c), if BLM denies the Application, Applicant must reimburse BLM for all costs BLM incurred in processing the Application. If the Applicant withdraws the application, Applicant will reimburse BLM for processing costs incurred by BLM in closing its review of the Application and which cannot reasonably be avoided after BLM receives written notice of withdrawal of the Application.

E.      Nothing herein shall be deemed to require BLM to maintain books, records, or documents other than those usually maintained by them, provided that such books, records, and documents reasonably segregate and identify the costs for which reimbursement is required and comply with generally accepted accounting practices for such documentation.

The designated points of contact with whom each party to this Agreement will communicate concerning any aspect of this Agreement are as follows:

Bureau of Land Management                  Black Rock City, LLC
William Mack, Jr                            Charlie Dolman
Black Rock Field Manager                    Event Operations Director
5100 E. Winnemucca Blvd                     660 Alabama St
Winnemucca, NV 89445                        San Francisco, CA 94110-2008
775-623-1578                                415-865-3800
wmack@blm.gov                               Charlie.dolman@burningman.org

## V.    DEFINITION OF DIRECT AND INDIRECT COSTS

Direct costs are those costs which can be specifically identified with the Application and which are incurred for the benefit of said applicant in that the costs would not have been incurred but for the Application and are appropriate in order for BLM to process the Application. Examples of direct costs include, but are not limited to, personnel costs in the form of wages paid to BLM personnel working on the Application, with allowances provided for fringe benefits and leave surcharge rate and any overtime associated with processing the Application; travel expenses; purchased services, if necessary, such as printing, automated data processing services and photographic reproduction; and any miscellaneous supplies and equipment of a specialized nature, the use of which is directly applicable to processing the Application.

AR04737

Indirect costs are those which cannot be specifically identified with the Application. These indirect costs have been calculated at a rate of 23.1 percent of direct costs. The indirect costs are subject to change annually. This percentage figure has been developed in accordance with Department of the Interior procedures and represents those administrative and program costs, excluding management overhead, which can be attributed to processing the Application. Indirect costs include a portion of the costs for capitalized and non-capitalized equipment; space rental; telephone services; postage; personnel transfer costs; budget and program development; administrative and clerical support; training; safety management; public information, inquiries and reports; cartography and basic series mapping; aviation management; telecommunications; maintenance of equipment and tools; and systems design and implementation.

Treasury Account 14X5017, Service Charges, Deposits, and Forfeitures further described as BLM Recreation Cost Recovery is defined in the table below:

| Treasury Account | 14X5017, Service Charges, Deposits, and Forfeitures |
|---|---|
| BLM Fund Code, Subactivity, and Title | XXXL5017AP, Fund 341, L51050000, Recreation Cost Recovery |
| Source of collections/appropriations | Cost recovery charges are associated with recreation activities or events and shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. As such, this Subactivity covers revenues and expenditures associated with any Special Recreation Permit that has been determined to be Cost Recovery by BLM personnel as outlined in 43 CFR 2930-1 Permits for Recreation on Public Lands and H-2930-1, Recreation Permit Administration Handbook. <br> Project codes are mandatory and will be assigned and administered by the State Office from their block of unassigned project numbers. They are used to differentiate revenues and obligations for each specific permit. <br> Fees are collected in advance for specified tasks that must be carried out before significant recreation events can be permitted to occur on public lands, and BLM is expected to account to each applicant on the cost of all aspects of the work BLM performs. |

As noted in the definition in the table, this account stipulates cost recovery charges shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. Because Burning Man is a full cost recovery event, indirect costs will apply as they would for all other commercial permits that require full cost recovery.

## VI.    EFFECTIVE DATE:

This Agreement shall be effective, as of the latter date of its execution by both parties. Unless terminated earlier, it shall continue until the BLM authorized officer deems the agreement provisions have been satisfied.

Please sign the agreement below, and return to the BLM, Winnemucca District Black Rock Field Office Manager by April 08, 2016.

AR04738

## VII.    SIGNATURES OF AGREEMENT

For: Bureau of Land Management

For: Black Rock City, LLC

_____

_____

Signature

Signature

_____

_____

Date

Date

William Mack, Jr
Black Rock Field Manager

Charlie Dolman
Event Operations Director, BRC

AR04739

## Attachment 1

**2016 COST RECOVERY (CR) ESTIMATE**
**Summary:**

| | |
|---|---|
| Labor Costs-Event Planning | $  130,647 |
| Operational Costs | $  15,000 |
| Sub Total of Direct Costs | $  145,647 |
| Labor Costs-Event NEPA Planning | $  4,007 |
| | |
| FY 2016 Indirect Cost Rate of 23.1% | $  34,570 |
| Cost Estimate TOTAL | $  184,224 |

**Labor Detail (Event Planning):**

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Agency Administrator, William Mack | 173 (1 WM) | $12,806 |
| Planning Team Lead/Logistics Manager, Mark Pirtle | 346 (2 WM) | $21,518 |
| Law Enforcement Lead, Logan Briscoe | 346 (2 WM) | $21,518 |
| OLES Representative, Zach Oper | 173 (1 WM) | $12,807 |
| Finance Lead, Mary Laub | 173 (1 WM) | $12,807 |
| Finance Lead Assistant, Cassie Sandberg | 86.5 (.5 WM) | $6,404 |
| Contracting Officer, Mary Laub | 174 (1 WM) | $12,806 |
| Contracting Officer Assistant, Cassie Sandberg | 86.5 (.5 WM) | $6404 |
| Communication Unit Lead, Dalton Black | 174 (1 WM) | $10,770 |
| Technology Specialist, Jon Young | 174 (1 WM) | $12,807 |
| TOTAL | | $130,647 |

**Operations Detail:**

| DESCRIPTION | AMOUNT |
|---|---|
| Travel | $15,000 |
| TOTAL | $15,000 |

**Labor Detail (NEPA Planning):**

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| BRFO AFM, Mark Hall | 15 | $933 |
| WD P&EC, Lynn Ricci | 15 | $933 |
| BRFO Archeologist, Kathy Ataman | 10 | $594 |
| BRFO Wildlife Biologist, Kathy Cadigan | 10 | $480 |
| BRFO Wilderness Specialist, Zwaantje Rorex | 10 | $515 |
| BRFO Recreation Specialist, Joey Carmosino | 10 | $552 |
| TOTAL | | $4,007 |

AR04740

## Attachment 2

### *Addendum to 2016 Burning Man Event CRA Est. for Planning*

The following information provides the planning assignments of the BLM's 2016 Planning Team during the timeframe of the Planning CRA Est. provided to BRC. In addition, the position types and position responsibilities are described. (See estimated hours and estimated labor cost in "Labor Detail" table on page 4 of agreement)

Assignments to the Planning Team during the timeframe of the planning CRA Est:

1) Review current BRC Operating Plan for 2016 event. Provide comments back to BRC where needed. Discuss with BRC the roles and responsibilities of the permittee and permitter for the 2016 event. Approve final version of BRC plan for initial BLM planning.

2) Establish planning protocols between BLM and BRC planning teams and establish weekly or bi-weekly coordination conference calls.

3) Develop BLM draft Action Plan for 2016 operations at event. Components of Action Plan will include the following:

   a) Event Operations Management Plan

   - BLM Management TO (IC, Branch Chiefs, PM, PIO, Finance, Contracting)

   - Unified Command TO (BLM, PCSO, BRC)

   b) LE Operational Plan

   - LE Risk Assessment

   - LE Ops Mission (Management, Patrol, Investigations, Medics, Support)

   - LE Event Positions

   c) Civilian Operational Plan

   - Civilian Ops Mission (Management, Environmental Compliance, Vending, GIS, Safety)

   - Civilian Ops Event Positions

   d) Support Operational Plan

   - Support Ops Mission

   - Support Ops Event Positions (Communications, Dispatch, Technical, IT, Logistics)

   e) Final Event TO

AR04741

f) MOU Contracting Plan with SOWs

- Lodging Plan

- Hdqt's Compound Plan

- Food Vendor/Ice, Water, Sport Drinks Plan

- IT Equipment Plan

- Fuel Services Plan

- CAD Plan

g) Gov't Contracting Plan with SOWs

h) Amended CRA Est. with all cost

i) Permit Stipulations

j) Closure Order Restrictions

**Assignments to the BLM BRFO NEPA Planning Team during the timeframe of the planning CRA Est:**

1) The NEPA Planning Team within the Black Rock Field Office will assist the BLM Burning Man Project Manager in the preparation and review for adequacy of the 2016 Burning Man Event DNA document, including the Mitigated FONSI and Final Decision Record, as well as the associated stipulations. The AFM and P&EC will also work with other BRFO NEPA Planning Team Members to review, address, and respond to all public comments received associated with the public comment period of the NEPA process for the 2016 Burning Man Event DNA document.

**Positions and Responsibilities of the Planning Team members during the timeframe of the planning CRA Est:**

1) Agency Administrator: This position will serve as the agency representative in the planning project and will represent the NSD and the WDM in all planning decisions. This position will be involved in all planning workshops in the development of the components of the Action Plan and will be the final approving authority of draft recommendations to the SD. This position will be filled by William Mack.

2) Event Planning Team Lead/Logistics Manager: This position will serve as the planning team lead and will represent the agency administrator when not available. This position will be the main coordinator between the BLM planning team and the BRC planning team in operational plan development. This position will have the responsibility to keep the planning effort moving forward and develop recommendations to the other subject matter experts in the planning team. This position will coordinate with other planning team members in development of all the components of the Action Plan. This position will have

the dual role of representing logistics needs and planning during the development of the Action Plan components. In the development of the Action Plan components, this position will serve as subject matter expert and coordinator for the Support Operational Plan, the MOU Contract SOWs and the Gov't Contract SOWs. This position will be filled by Mark Pirtle.

3) Law Enforcement Planning Lead: This position will serve as subject matter expert and main planner for the law enforcement operation. This position will be in charge of the development of the LE Operational Plan. This position will be the main coordinator between the BLM planning team and the PCSO planning team. This position will coordinate with other planning team members in development of all the other components of the Action Plan. This position will be filled by Logan Briscoe.

4) OLES Representative: This position will serve as a planning team member representing the BLM's Office of Law Enforcement and Security. This position will serve as subject matter expert for the law enforcement operations and needed support functions. This position will work with the LE Planning Lead in the development of the LE Operational Plan. This position will coordinate with OLES leadership in the acquiring of OLES assets needed by the event law enforcement operation. This position will be filled by Zachary Oper.

5) Finance Lead: This position will serve as the main developer of the final CRA Est. and serve as subject matter expert in the development of all Action Plan components involving the expenditures of funds. This position will be divided between Cassie Sandberg and Mary Laub.

6) Contracting Officer: This position will serve as event contracting officer and will be responsible for developing and processing all Gov't contracts through the BLM system. This position will be divided between Cassie Sandberg and Mary Laub.

7) Communication Unit Leader: This position will serve as the subject matter expert and main planner/developer of the BLM radio network for the event. This position will be filled by Dalton Black.

8) Technology Specialist: This position will serve as the subject matter expert and main planner/developer of the BLM technology needs, to include dispatch, CAD and internet services. This position will be filled by Jon Young.

Positions and Responsibilities of the BLM BRFO NEPA Planning Team members during the timeframe of the planning CRA Est:

1) All members of the NEPA Planning Team within the Black Rock Field Office will be responsible for assisting the BLM Burning Man Project Manager in the preparation and review for adequacy of the 2016 Burning Man Event DNA document and associated stipulations. The AFM and P&EC will also work with other BRFO NEPA Planning Team Members to review, address, and respond to all public comments received associated with

the public comment period of the NEPA process for the 2016 Burning Man Event DNA document.

*Note: There are two more members of the BLM 2016 Planning Team not listed in the Planning CRA Est. "Labor Details" table or this addendum. They are the Event Project Manager and the Event Outdoor Recreation Planner. They are not listed in the CRA Est. because their labor cost associated with the Planning Team work is paid for by a BRC Proffer Account. Therefore, their duties/responsibilities in planning are not outlined in this addendum to avoid confusion.*

AR04744



**Pirtle, Mark <mpirtle@blm.gov>**

## Re: Cost Recovery Estimate for 2016 Burning Man SRP
1 message

**Mack Jr, William** <wmack@blm.gov>                                           Fri, Mar 18, 2016 at 12:19 PM
To: Rosalie Barnes <rosalie@burningman.org>
Cc: "Freiberg, David" <dfreiberg@blm.gov>, Charlie Dolman <charlie.dolman@burningman.org>, Marnee Benson
<marnee.benson@burningman.org>, Mark Pirtle <mpirtle@blm.gov>

Hello Rosalie

I wanted to follow up on your below email and try to provide some clarification per your request:

The following information provides the planning assignments of the BLM's 2016 Planning Team during the timeframe of the Planning CRA Est. provided to BRC. In addition, the position types and position responsibilities are described. (See estimated hours and estimated labor cost in "Labor Detail" table on page 4 of the Draft Agreement)

<u>Assignments to the Planning Team during the timeframe of the planning CRA Est:</u>

    1)   Review current BRC Operating Plan for 2016 event. Provide comments back to BRC where needed. Discuss with BRC the roles and responsibilities of the permittee and permitter for the 2016 event. Approve final version of BRC plan for initial BLM planning.

    2)   Establish planning protocols between BLM and BRC planning teams and establish weekly or bi-weekly coordination conference calls.

    3)   Develop BLM draft Action Plan for 2016 operations at event. Components of Action Plan will include the following:

        a)  Event Operations Management Plan

          - BLM Management TO (IC, Branch Chiefs, PM, PIO, Finance, Contracting)

          - Unified Command TO (BLM, PCSO, BRC)

        b)  LE Operational Plan

        - LE Risk Assessment

        - LE Ops Mission (Management, Patrol, Investigations, Medics, Support)

        - LE Event Positions

        c)  Civilian Operational Plan

          - Civilian Ops Mission (Management, Environmental Compliance, Vending, GIS, Safety)

          - Civilian Ops Event Positions

        d)  Support Operational Plan

          - Support Ops Mission

          - Support Ops Event Positions (Communications, Dispatch, Technical, IT, Logistics)

        e)  Final Event TO

**AR01103**

f)   MOU Contracting Plan with SOWs

   - Lodging Plan

   - Hdqt's Compound Plan

   - Food Vendor/Ice, Water, Sport Drinks Plan

   - IT Equipment Plan

   - Fuel Services Plan

   - CAD Plan

g)   Gov't Contracting Plan with SOWs

h)   Amended CRA Est. with all cost

i)   Permit Stipulations

j)   Closure Order Restrictions

<u>Positions and Responsibilities of the Planning Team members during the timeframe of the planning CRA Est:</u>

1)   Agency Administrator: This position will serve as the agency representative in the planning project and will represent the NSD and the WDM in all planning decisions. This position will be involved in all planning workshops in the development of the components of the Action Plan and will be the final approving authority of draft recommendations to the SD. This position will be filled by William Mack.

2)   Event Planning Team Lead/Logistics Manager: This position will serve as the planning team lead and will represent the agency administrator when not available. This position will be the main coordinator between the BLM planning team and the BRC planning team in operational plan development. This position will have the responsibility to keep the planning effort moving forward and develop recommendations to the other subject matter experts in the planning team. This position will coordinate with other planning team members in development of all the components of the Action Plan. This position will have the duel role of representing logistics needs and planning during the development of the Action Plan components. In the development of the Action Plan components, this position will serve as subject matter expert and coordinator for the Support Operational Plan, the MOU Contract SOWs and the Gov't Contract SOWs. This position will be filled by Mark Pirtle.

3)   Law Enforcement Planning Lead: This position will serve as subject matter expert and main planner for the law enforcement operation. This position will be in charge of the development of the LE Operational Plan. This position will be the main coordinator between the BLM planning team and the PCSO planning team. This position will coordinate with other planning team members in development of all the other components of the Action Plan. This position will be filled by Logan Briscoe.

4)   OLES Representative: This position will serve as a planning team member representing the BLM's Office of Law Enforcement and Security. This position will serve as subject matter expert for the law enforcement operations and needed support functions. This position will work with the LE Planning Lead in the development of the LE Operational Plan. This position will coordinate with OLES leadership in the acquiring of OLES assets needed by the event law enforcement operation. This position will be filled by Zachary Oper.

5)   Finance Lead: This position will serve as the main developer of the final CRA Est. and serve as subject matter expert in the development of all Action Plan components involving the expenditures of funds. This position will be divided between Cassie Sandberg and Mary Laub.

AR01104

6) Contracting Officer: This position will serve as event contracting officer and will be responsible for developing and processing all Gov't contracts through the BLM      system. This position will be divided between A.J. Ramos and Mary Laub.

7) Communication Unit Leader: This position will serve as the subject matter expert and main planner/developer of the BLM radio network for the event. This position will     be filled by Dalton Black.

8) Technology Specialist: This position will serve as the subject matter expert and main planner/developer of the BLM technology needs, to include dispatch, CAD and      internet services. This position will be filled by Jon Young.

Note: There are two more members of the BLM 2016 Planning Team not listed in the Planning CRA Est. "Labor Details" table or this addendum. They are the Event Project Manager and the Event Outdoor Recreation Planner. They are not listed in the CRA Est. because their labor cost associated with the Planning Team work is paid for by a BRC Proffer Account. Therefore, their duties/responsibilities in planning are not outlined in this write-up to avoid any confusion.

Please let me know if I may have inadvertently overlooked any of your concerns outlined in your email and I will follow up with responses.

Thank You

*Respectfully,*

*********************************************

*William Mack, Jr.*
Black Rock Field Office
Field Manager
Bureau of Land Management
Winnemucca District
5100 E. Winnemucca Blvd.
Winnemucca, NV 89445
Office: (775) 623-1578
Cell: (775) 455-5940
Fax: (775) 623-1503
*"Black Rock Desert-High Rock Canyon*
*Emigrant Trails National Conservation Area"*
*********************************************



"In a moment of decision, the best thing you can do is the right thing to do, the next best thing is the wrong thing, and the worst thing you can do is nothing."

Theodore Roosevelt

Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain. [5 c.f.r. 2635.101(b)(1)]

AR01105

This e-mail, including any attachments, is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient or the employee or agent responsible for delivery of this e-mail to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this email or its contents is strictly prohibited. If you received this e-mail in error, please notify the sender immediately and destroy all copies.

On Fri, Mar 11, 2016 at 12:40 PM, Rosalie Barnes <rosalie@burningman.org> wrote:
Hi William,

I want to follow up with you about the proposed Cost Recovery ("CR") estimate for the 2016 BRC SRP. As we discussed previously, I understand that BLM cannot commence work on the 2016 event until the CR agreement is signed. I also understand that you are looking forward to getting the agreement signed so that BLM can begin tackling the work that needs to be done for this year's SRP. Please note that all of us here at BRC feel the same way. There is much work to be done, and we look forward to collaborating with you.

Last week I thought that the only thing needed before signing the CR agreement was BLM's decision on BRC's request for an IDR waiver. However, something else has come up that could also delay the signing of the CR agreement. I want to let you know now so that perhaps we could begin to get a head start on this piece. That way we can hit the ground running once the IDR decision is made.

BRC Legal has just informed me that there is an IBLA case that requires BLM to give underlying data upon which a cost estimate is based to the applicant so that the applicant has a basis upon which to understand and accept the estimate. Please see Bookcliff Rattlers Motorcycle Club, 171 IBLA 6 (December 20, 2006), which states:

"Where BLM makes use of computer spreadsheets to accumulate data upon which a cost **estimate** for an SRP is based, it must reveal underlying data sufficient for the applicant being charged to ascertain the justification for its conclusions; otherwise, the applicant has no basis upon which to understand and accept the decision or, in the alternative, to appeal and dispute it."

When we last spoke about this, you mentioned that the amount was only an estimate and that BLM would provide an explanation of the figures after the event. However, Legal is informing me that the IBLA case specifically says that an applicant is entitled to this information *before* accepting a CR estimate. Basically we are seeking an explanation of the items that are in the proposed CR estimate.

We do not want to hold up the process any longer. But, based on the huge increase in costs that has happened over the last four years (before you and John Ruhs came on board), BRC really wants to ensure that the costs are justified, and that the correct processes are being followed. I think it would be much easier for all of us to get this worked out before the CR agreement is signed—especially since that guidance is what the IBLA case calls for in this situation. Plus, that would could avoid any unnecessary appeal of the 2016 costs.

Let me know if you want to discuss on the phone, or perhaps if you want someone from BRC's Legal Department to coordinate directly with the Solicitor's Office about this question.

Sincerely,
--
Rosalie Fay Barnes
Government Relations Manager
Burning Man

(c) 617-285-2867
(o) 415-865-3800 ext.163

AR01106



**Burning Man**

━━━━━━━ Catalyst for creative culture in the world ━━━

660 Alabama St., 4th Fl
San Francisco, CA 94110

William Mack, Jr.
Black Rock Field Office
Field Manager
Bureau of Land Management
Winnemucca District
5100 E. Winnemucca Blvd.
Winnemucca, NV 89445

March 25, 2016

Re: 2015 Black Rock City After Action Report

Dear Mr. Mack,

Enclosed please find the 2015 Black Rock City LLC (BRC) After Action Report (AAR). This report reviews:

- Planning, Permitting, & Agency Relations
- Public Health & Safety
- BRC Event Operations

Thank you for your patience as this report went through final revisions. Please let me know if you have any questions or concerns. I would be happy to follow up with any additional information needed.

BRC is in receipt of the 2015 BLM AAR. Thank you very much for your work on this document. We appreciate the time and consideration that clearly went into this assessment, but we do have serious concerns about the extensive lists of recommendations and the additional costs they represent, and also that many of the recommendations do not include an adequate problem description to explain why new resources or solutions would be needed. However, we also recognize that each year as the Burning Man event evolves there is opportunity for improvement. BRC appreciates BLM's acknowledgment in the AAR and in recent meetings that BLM's recommendations are not mandatory and that "a variety of creative and cost-effective solutions to issues identified in [the AAR], and others as they may arise, could be considered in lieu of specific recommendations." We look forward to working with you and your planning team to identify not only creative and cost-effective solutions to new issues, but also to identify improved efficiencies within existing operations.

As we have debriefed and reviewed the 2015 event, both internally within the Burning Man organization and externally with BLM and other Burning Man cooperating agencies, we have already begun drafting new plans for 2016, and we are eager to share them with you. BRC has plans for new processes, and proposals for increased BRC management of event functions, including environmental compliance and vending compliance, that we believe will lead to shared success in planning and on the playa. Our solutions would strictly limit the need for BLM to operate in these areas and allow BLM to instead focus on appropriate primary monitoring responsibilities while BRC manages enforcement and adjudication. Our solutions would even permit BLM to scale back the resources dedicated by the agency below 2015 levels.

AR00533

We have also given deep consideration to public safety and security programs, and we have identified practical ways in which current law enforcement staffing levels could be reduced, infrastructure needs met, and programs scaled back. BRC understands the important role law enforcement plays in overall public safety at the event, and we believe we have identified achievable operational upgrades that can reduce the BLM commitment while still upholding public health and safety.

We'd like to take this opportunity to appreciate you and your Burning Man planning team for the work you all have done to close out 2015 and lay the groundwork for a successful 2016. Thank you for setting a new standard in collaboration with BRC.

All the best,

Marnee Benson
Political Affairs Manager

Rosalie Barnes
Government Relations Manager

Charlie Dolman
Event Operations Director

Cc      John Ruhs, Nevada State Director
        David Freiberg, Project Manager