**Cost Recovery Comparison for the 2015 -vs- 2016 Burning Man Event**

Prepared by Mark Pirtle, BLM Burning Man Planning Team Lead
Logan Briscoe, BLM NV LE Supervisor, Zone 1
and William Mack, Jr., Black Rock F.O., Field Manager

06/27/2016

**Introduction:**  The purpose of this memorandum is to brief the BLM Nevada State Director on Cost Recovery; specifically as it relates to how the 2015 Cost Recovery and the 2016 Cost Recovery differs for the  Burning Man Event.

**Planning Component:** In preparation and planning for the 2016 Burning Man Event the BLM Planning team has made major strides to reevaluate the BLM's operations for the event and look for ways to improve efficiency and effectiveness.

**Significate changes to the 2016 BLM Event Operation (compared to 2015) that will result in reduced cost to BRC LLC through the CRA and MOU programs:**
- Compliant with SRP regulation in that all planning, operational and closeout labor cost are charged to CRA.
- Smaller Event Planning Team under the leadership of WDO & NSO instead of OLES.
- Smaller BLM Compliance Program
- Reduction of 14 total TO playa positions.
- Reduction of 10 LE playa positions
- One IC position (Civilian) on playa.
- No Finance and Contractor positions full time on playa.
- No Park Police IAA
- Larger MOU BRC Contracting Program with three additional contracts offered to BRC that were Gov't contracts in 2015.
- Reduced number of BLM modular buildings by 2 in JOC Build-Out MOU SOW.
- Reduced number of BLM IT Equipment by 34 items in IT MOU SOW.
- Improved Communication Program on playa with dispatch and communications network programs combined under one supervisor.
- Discontinued program of BRC purchasing event portable radios for BLM detailers through the MOU program, now supplied by BLM through excessed Fire radios.
- Discontinued rental of dispatch console program, now supplied by BLM ComL program as package of communications tower.
- Discontinued further purchases of base station radios.

**Implementation Component:** For the 2016 Burning Man event BLM looked into the overall financial impact to the event cost recovery as it relates to labor, contracts, SOWs, MOUs, travel, and overall event operations.

AR01029

1)  **2015 to 2016 BLM BM Event Project Components Comparison:**

| 2015 Operation | 2016 Operation |
|---|---|
| **Event Operational Days** | **Event Operational Days** |
| Pre Event - 5 day Pre-Event Operation | Pre Event - 4 day Pre-Event Operation |
| On Playa Training - Cancelled | On Playa Training - 1 Day (During last day of Pre Patrol) |
| Main Event - 9 day Main-Event Operation | Main Event - 9 day Main-Event Operation |
| Post Event - 3 day Post-Event Operation | Post Event - 3 day Post-Event Operation |
| **Event Operations Components** | **Event Operations Components** |
| IC (2 Positions) | IC (1 Position) |
| Event Management Program (4 Positions) | Event Management Program (4 Positions) |
| Project Management Program (1 Position) | Project Management Program (1 Position) |
| PIO Program (1 Position) | PIO Program (1 Position) |
| Safety Program (1 Position) | Safety Program (1 Position) |
| Communication/Dispatch Program (20 Positions) | Communication/Dispatch Program (24 Positions) |
| Logistic Program (4 Positions) | Logistic Program (5 Positions) |
| Environ/Vending Compliance Program (14 Positions) | Environ/Vending Compliance Program (8 Positions) |
| On Playa Admin, Finance, Contracting Support (2 Positions) | On Playa Admin Support (1 Position) |
| LE Patrol Program (54 Positions) | LE Patrol Program (54 Positions) |
| LE Investigative Program (13 Positions) | LE Investigative Program (7 Positions) |
| Integrated (w PCSO) Investigative Program (11 Positions) | Integrated (w PCSO) Investigative Program (6 Positions) |
| Medical Program (4 Positions) | Medical Program (4 Positions) |
| IMARS Program (2 Positions) | IMARS Program (2 Positions) |
| Evidence Program (2 Positions) | Evidence Program (2 Positions) |
| LE BRC Liaison Program  (1 Position) | OPR Program (1 Position) |
| **Event Support Components** | **Event Support Components** |
| BLM Event Planning Team Program | BLM Event Planning Team Program |
| BLM Financial Support Program (OLES) | BLM Financial Support Program (WDO/NSO) |
| BLM Contracting Support Program (OLES) | BLM Contracting Support Program (WDO/NSO) |
| BLM Emergency Designation Program | BLM Emergency Designation Program |
| BLM Radio Network Program | BLM Radio Network Program |
| BLM Internet Program | BLM Internet Program |
| COW (Cell Phone Service) Program | COW (Cell Phone Service) Program |
| BLM Detailer Satellite Tracking Program | BLM Detailer Satellite Tracking Program |
| BLM CAD Program | BLM CAD Program |
| Gov't Contracting Services Program | Gov't Contracting Services Program |
|     Microwave Internet Contract |     Microwave Internet Contract |
|     Satellite Tracking Contract |     Satellite Tracking Contract |
|     BLM UTV/Golf Cart Rental Contract |     JOC BLM Medical Modular Building Rental Contract |
|     BLM CAD Services Contract | Inter-Agency Assist Agreement Program |
|     BLM Dispatcher Services Contract |     HHS IAA- 2 positions |
|     BLM Dispatch Radio Console Rental Contract |     USFS IAA - TBD (3 Positions Planned) |
|     BLM Radio Base Station Purchase Contract | BRC MOU Contracting BLM Required Services Program |
| Inter-Agency Assist Agreement Program |     JOC Compound Build-Out SOW |
|     HHS IAA- 2 positions |     JOC Fueling Services SOW BLM Detailers Lodging SOW |
|     USFS IAA - (6 Positions) |     JOC BLM Detailer Meal Services SOW |
|     USPP IAA – (8 Positions) |     BLM/BRC-ESD Joint CAD Services SOW |
| BRC MOU Contracting BLM Required Services Program |     BLM Dispatcher Services SOW |
|     JOC Compound Build-Out SOW |     BLM IT Equipment Rental Services SOW |
|     JOC Fueling Services SOW BLM Detailers Lodging SOW |     BLM Detailers Gerlach Lodging SOW |
|     JOC BLM Detailer Meal Services SOW |     BLM UTV/Golf Cart Rental SOW |
|     BLM IT Equipment Rental Services SOW | Unified Command (Tier 1) Event Management Program |
|     BLM Detailers Gerlach Lodging SOW |     BRC / BLM / PCSO |
|     Portable Radios (60) Purchase SOW | Joint Operational Center Compound Program |
| Unified Command (Tier 1) Event Management Program |     BRC / BLM / PCSO |
|     BRC / BLM  / PCSO | |
| Joint Operational Center Compound Program | |
|     BRC / BLM  / PCSO | |

AR01030

## 2) 2015 to 2016 BLM BM Table of Organization (TO) Comparison:

**2015 TO**

| Total Positions On Project | Planning/Closeout Only Positions | On Playa Positions | Civilian Operations BLM Positions | Civilian Operations Contracted/IAA Positions | LE Operations BLM Positions | LE Operations IAA Positions |
|---|---|---|---|---|---|---|
| 136 | N/A | 136 | 33 | 15 | 74 | 14 |

| Position Types - CivOps - BLM Positions |
|---|
| Civilian Incident Commander - 1 |
| Civilian Ops Chief -1 |
| Project Manager - 1 |
| Facility Manager - 1 |
| ComL - 1 |
| Communications Team - 5 |
| Logistic Team Lead - 1 |
| Logistic Team - 3 |
| Environmental Team Lead - 1 |
| Environmental Team - 8 |
| Vending Team Lead - 1 |
| Vending Team - 2 |
| GIS - 2 |
| Safety Officer - 1 |
| PIO - 1 |
| IT Security - 1 |
| Contracting Officer/Admin - 1 |
| Financial Officer - 1 |
|  |

| Position Types - LEOps - BLM Positions |
|---|
| LE Incident Commander - 1 |
| LE Patrol Ops Chief - 1 |
| LE Planning - 1 |
| LE Liaison - 1 |
| LE Patrol Day Shift  - 16 |
| LE Patrol Swing Shift  - 16 |
| LE Patrol Night Shift  - 16 |
| LE Investigative Lead - 1 |
| LE Investigative Team - 12 |
| LE Integrated INV Team - 3 |
| Medical Team - 2 |
| Evidence Team - 2 |
| IMARS Team - 2 |

| Position Types – CivOps – Contracted/IAA |
|---|
| Contracted Dispatchers - 13 |
| IAA HHS Medical Team - 2 |

| Position Types – LEOps - IAA |
|---|
| IAA USFS LEO Patrol Team - 6 |
| IAA USPP Integrated INV Team - 8 |

AR01031

**2016 TO**

| Total Positions On Project | Planning/Closeout Only Positions | On Playa Positions | Civilian Operations BLM Positions | Civilian Operations Contracted/IAA Positions | LE Operations BLM Positions | LE Operations IAA Positions |
|---|---|---|---|---|---|---|
| 124 | 2 | 122 | 28 | 17 | 74 | 3 |

| Position Types – Planning/Closeout (Not on Playa) |
|---|
| Financial Officer - 1 |
| Contracting Officer - 1 |

| Position Types - CivOps - BLM Positions |
|---|
| Incident Commander - 1 |
| Civilian Branch Chief -1 |
| Project Manager - 1 |
| Communications Supervisor - 1 |
| Dispatch Center Manager - 1 |
| ComL - 1 |
| Communications Team - 5 |
| Logistic Team Lead - 1 |
| Logistic Team - 4 |
| Compliance Team Lead - 1 |
| Environmental Team - 4 |
| Vending Team - 2 |
| GIS - 1 |
| Safety Officer - 1 |
| PIO - 1 |
| IT Security - 1 |
| Admin Support - 1 |
|  |

| Position Types - LEOps - BLM Positions |
|---|
| LE Branch Chief - 1 |
| LE Patrol Ops Chiefs - 2 |
| LE Patrol Day Shift - 17 |
| LE Patrol Swing Shift  - 17 |
| LE Patrol Night Shift  - 17 |
| LE Investigative Lead - 1 |
| LE Investigative Team - 6 |
| LE Integrated INV Team - 6 |
| Medical Team - 2 |
| OPR - 1 |
| Evidence Team - 2 |
| IMARS Team - 2 |

| Position Types – CivOps – Contracted/IAA |
|---|
| Contracted Dispatchers - 15 |
| IAA HHS Medical Team - 2 |

| Position Types – LEOps - IAA |
|---|
| IAA USFS LEO Patrol Team – 3* |

**3)  2015 to 2016 CRA Estimates Comparison:**

**2015  COST RECOVERY** <u>FINAL</u> **Estimate Summary:**

| | |
|---|---|
| Labor Costs | $  1,464,616 |
| Operational Costs | $  931,500 |
| Sub Total of Direct Costs | $  2,396,116 |
| | |
| FY 2016 Indirect Cost Rate of 22.9% | $  548,711 |
| **Cost Estimate TOTAL** | **$  2,944,827** |

**2016  COST RECOVERY** <u>PLANNING</u> **ESTIMATE ESTIMATE Summary:**

| | |
|---|---|
| Labor Costs | $  130,647 |
| Operational Costs | $  15,000 |
| Sub Total of Direct Costs | $  145,647 |
| Labor Cost-Event NEPA | $  4,007 |
| | |
| FY 2016 Indirect Cost Rate of 23.1% | $  34,570 |
| **Cost Estimate TOTAL** | **$  184,224** |

**2016  COST RECOVERY** <u>FINAL</u> **ESTIMATE Summary:**

| | |
|---|---|
| Labor Costs | $  1,231,978 |
| Operational Costs | $  427,500 |
| Sub Total of Direct Costs | $  1,659,478 |
| | |
| FY 2016 Indirect Cost Rate of 23.1% | $  383,339 |
| **Cost Estimate TOTAL** | **$  2,042,817** |

**TOTAL OF 2016 CRA ESTIMATE: <u>$2,227,041</u>**

**TOTAL OF 2015 CRA ESTIMATE: <u>$2,944,827</u>**

**(Difference: 2016 Estimate is $717,786 less than 2015)**

**<u>2015 Actual Cost to BRC: MOU + CRA Final</u>**

MOU Program (BRC Reported):     $650,000

CRA Closeout Actual **(Minus Refund):** <u>$2,793,722</u>

                                                              **$3,443,722**

Refund:                                  $151,104

**2016 Actual Cost to BRC: MOU + CRA (Final)**

MOU Program (BRC Reported):          $ (?*)

CRA Closeout Actual **(Minus Refund)**:     $ (?**)

                                              **$ (?)**

**\*** This figure will be larger in 2016 due to the fact
  that BRC accepted 3 additional BLM support
  contracts under the MOU program
  (UTVs, Dispatch, CAD), however, by BRC accepting
  these contracts the indirects costs associated with the contracts
  are significantly reduced compared to 2015.

\*\* The refund amount in 2016 is unknown at this
   time but a similar amount is probable due to the
   fact that the majority of the refund for 2015 and
   previous years was based on labor related cost.

**AR01034**



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
LLNVW03500-16-01                          **MAY 0 5 2016**
2930 (NV030.00)

CERTIFIED MAIL 7014 2870 0001 4871 3326 -- RETURN RECEIPT REQUESTED

Raymond Allen
General Counsel                          :       Burning Man 2015 CRA Appeal
Black Rock City, LLC                      :       Implications for 2016 Costs
660 Alabama St
San Francisco, CA 94110-2008

Dear Mr. Allen:

I am taking this opportunity to respond to your letter dated April 25, 2016. Your letter accompanied the Black Rock City, LLC (BRC) Statement of Reasons (SOR) for the pending appeal before the Interior Board of Land Appeals (IBLA) regarding the 2015 Burning Man Cost Recovery Closeout Decision (2015 Closeout). Your letter outlined your concerns that items in the appeal were potential issues for 2016, based on reports from BRC staff who attended the April 11-13 BLM-BRC planning meetings in Reno.

In composing this response, I have taken to heart your advice to work with BLM legal counsel. I appreciate this opportunity to explain why I am following the advice of the Department of the Interior (DOI), the DOI Office of the Solicitor, and the Office of Management and Budget (OMB) and declining to change or modify the BLM's processes and/or procedures associated with the development of a 2016 Cost Recovery Agreement (CRA) Decision.

First, let me clarify that the 2016 CRA Decision does not affect BRC's pending appeal before the IBLA on related issues. BRC's appeal of the 2015 CRA Decision is a completely separate issue from anything proposed for the 2016 CRA Decision. Furthermore, the IBLA has not yet issued a decision in BRC's pending appeal of the 2015 CRA Decision and Closeout. The BLM respectfully acknowledges BRC's concerns identified in its SOR and will coordinate with BRC on those concerns; however, BLM cannot make decisions for the 2016 CRA based on the information contained in BRC's SOR.

Second, as the authorized officer for the Burning Man Special Recreation Permit (SRP), I am committed to the timely processing of BRC's SRP application in accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31. The BLM will continue to comply with applicable law, regulation, and policy in processing BRC's SRP application and preparing the 2016 CRA. BRC has the right to appeal any resulting BLM decision if it chooses to do so.

AR04355

The 2016 CRA is a key element in moving the permitting process forward in a timely fashion. As the IBLA has explained previously, a CRA estimate for an SRP serves to inform an applicant's decision on whether to hold an event on public lands or not. "If the Board upholds the estimates, BMRC may opt to move the race to other lands, or choose one of the alternatives. Further, a Board decision reversing the estimates entirely or in part may impact BMRC's decision as to whether or not to move forward." *Bookcliff Rattlers Motorcycle Club*, 171 IBLA 6, 19 (2006).

In order for the BLM to keep the permitting process for the 2016 event moving forward, the agency will need to know as soon as possible whether BRC wants to continue with the BLM's processing of BRC's 2016 Special Recreation Permit (SRP) in accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31 as has been done in previous years. As you know, the BLM's SRP regulations specify that the agency will not process an SRP application or authorize a use until all required fees or installments have been paid. *43 CFR 2932.32*. Consequently, the BLM must have a CRA in place to ensure that its costs for processing and administering the Burning Man SRP are timely paid.

While BRC may certainly request that both parties wait until IBLA has made a final ruling on BRC's pending appeal of the 2015 CRA Decision and Closeout before entering into the 2016 CRA, please be advised that this would potentially result in a delay in the processing of BRC's 2016 SRP application.

The BLM is further committed to continuing the good relationship between it and BRC and we look forward to your response. If you have any questions or comments on this topic or letter, please contact me at (775) 623-1578.

Sincerely,

William Mack, Jr.
Field Manager
Black Rock Field Office

cc: BLM NV-910
    BLM NV-930
    BLM NV-912

    Pacific Southwest Regional Solicitor
    Janell Bogue
    U.S. Department of the Interior
    Office of the Solicitor, Pacific Southwest Region
    2800 Cottage Way, E-1712, Sacramento, CA 95825

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

FEDEX EXPRESS 8055 1736 9872 – DIRECT SIGNATURE REQUIRED

Charlie Dolman
Event Operations Director                          :      Burning Man 2016 Event
Black Rock City, LLC                               :      Special Recreation Permit
660 Alabama St
San Francisco, CA 94110-2008

06/23/2016

## DECISION

Dear Mr. Dolman:

On January 19, 2016 the Bureau of Land Management (BLM) received a Special Recreation Permit (SRP) Application and Draft Operating Plan from Black Rock City LLC (BRC) regarding the 2016 Burning Man Event.

The BLM and BRC have met several times over the past few months to discuss efficiency and effectiveness associated with the Cost Recovery Agreement (CRA) for the Burning Man Event. Through these meetings and discussions great progress was made in working towards a more focused and well-rounded Cost Recovery (CR) Estimate for the 2016 Event.

In April of 2016 the BLM and BRC signed an initial CRA, in the amount of $184,224.00, to cover planning cost for the 2016 Event. With this Decision, the BLM is issuing the 2016 CR Estimate Decision and Agreement to BRC for signature, in order to finalize the 2016 CRA.

## DECISION

My decision is to move forward with CRA and CR Estimate for the 2016 SRP for the Burning Man event. This decision incorporates the previously signed CRA for Planning signed by BLM and BRC in April of 2016. The enclosed CRA between the BLM and BRC establishes procedures to reimburse the BLM for its costs incurred to preplan, plan, process, implement, monitor, and administer the SRP NVW03500-16-01 for the 2016 Burning Man event.

Attached to the CRA is the CR Estimate, a detailed spreadsheet that outlines the BLM's estimated costs for the 2016 Burning Man event.

BLM and BRC shall continue to work together to identify cost savings through efficiency in business practices.

## RATIONALE

My decision is based on a thorough review of the direct and indirect costs associated with the 2016 SRP for the Burning Man event. The BLM has engaged in extensive planning, review and research to arrive at the CR Estimate for the 2016 SRP.

The attached CR Estimate spreadsheet breaks out the cost categories, including labor, operations, materials, and supplies. There could possibly be adjustments to the CR Estimate based on market research, MOUs and efficiencies in business practices.

## AUTHORITY

43 C.F.R. § 2932.31(e) (1) Commercial Use
In addition to the fees set by the Director, BLM, if BLM needs more than 50 hours of staff time to process a Special Recreation Permit for commercial use in any one year, we may charge a fee for recovery of the processing costs.

43 C.F.R. § CFR 2932.31 (e) (3)
Cost Recovery charges will be limited to BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement.

## APPEAL

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 C.F.R., Part 4 and the enclosed Form 1842-1. If an appeal is taken, your notice of appeal must be filed with the BLM, Winnemucca District Manager within 30 days from receipt of this decision. The appellant has the burden of showing that the decision appealed from is in error.

In addition, within 30 days of receipt of this decision, the appellant has the right to file a petition for stay (suspension) of the decision together with the appeal in accordance with the regulations at 43 C.F.R. § 4.21. Copies of the notice of appeal and petition for a stay must also be submitted to each party named in this decision and to the Interior Board of Land Appeals and to the appropriate Office of the Solicitor (see 43 C.F.R. § 4.413) at the same time the original documents are filed in this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.

A petition for stay of decision pending appeals shall show sufficient justification based on the following four standards:

>  (1) The relative harm to the parties if the stay is granted or denied,
>  (2) The likelihood of the appellant's success on the merits,
>  (3) The likelihood of immediate and irreparable harm if the stay is not granted, and
>  (4) Whether the public interests favors granting the stay.

The CRA for the 2016 Burning Man event, along with the CR Estimate spreadsheet, is enclosed for your signature and record.  Upon receipt of the signed CRA, an executed copy will be returned to BRC.  Your signature constitutes your agreement with the processing category decision and the CR Estimate.

If you have any questions on this decision please contact me at 775-623-1500.

Sincerely,

William Mack, Jr.
Black Rock Field Office Manager
Winnemucca District

Enclosures
- CR Agreement
- CR Estimate Spreadsheet

AR01080



**Computer Aided Dispatch (CAD) System Reports for the 2016 Burning Man Event**

Prepared by Jon Young, BLM State Chief Ranger - Arizona

06/22/2016

**Introduction:** The purpose of this memorandum is to brief the BLM Nevada State Director on the preparation, planning and implementation of information sharing between the Bureau of Land Management (BLM) and the Black Rock City LLC (BRC), d.b.a. Burning Man; specifically as it relates to Computer Aided Dispatch (CAD) System Reports for the 2016 Burning Man Event.

**Planning Component:** In preparation and planning for the 2016 Burning Man Event the subject of "information sharing" has been at the forefront of many discussions. This has been highly specific regarding the Computer Aided Dispatch (CAD) system used at the event by BLM.[1] There has been a general lack of agreement regarding what information was requested, what was shared and when it was shared. This stems from lack of clear definitions surrounding the information and lack of clear expectations regarding when and how information will be shared. One example of the lack of clear definitions is the continued reference, by BRC to "CAD data" in communications with BLM. The term "CAD data" is broad and should be narrowed and is probably better defined as "CAD Reports." The CAD database contains large quantities of data, much of which is Criminal Justice Information and is labeled as Controlled//Unclassified. All of the records in this database are subject to the Privacy Act of 1974, 5 U.S.C. § 552a, which establishes a code of fair information practices that governs the collection, maintenance, use, and dissemination of information about individuals that is maintained in systems of records by federal agencies. As such, BLM cannot share the "CAD data." What BLM can share, and does share, are the "CAD Reports" statistical summaries of Incident Data, Event Data, number of Events, Types of events, all categorized by ranges of dates / times, filters, etc. In planning and coordination calls for the 2016 event Jon Young, BLM's Technical Subject Matter Expert for Communications and Red Grasso, BRC's Communication Chief have clarified expectations regarding information sharing specifically as it relates to "CAD reports." To verify agreement with this process, Young conferred with William Mack, Logan Briscoe, Mark Pirtle and Pershing County Sheriff Jerry Allen, whom all agreed.

**Implementation Component:** For the 2016 Burning Man event BLM and BRC are working on a shared Computer Aided Dispatch (CAD) System. This will allow direct sharing of CAD reports from within the CAD system. BLM and BRC are currently working on the CAD System build for 2016. The current plan is to have the CAD system administrator from each agency (BLM and BRC) be able to directly pull CAD reports from the other agency as well as their own agency. The entire database rules for sharing and boundaries have not been fully established yet, but we are working through the process with the intent to share as openly as we are able to. In the BLM-BRC Joint Statement of Work for the shared CAD system, specific language was included for the

---

[1] The CAD system provided by iNet Public Safety was solely used by BLM during the event in 2013, 2014 and 2015. BRC is planning to share the system with BLM for the 2016 event using the same vendor. **AR01016**

vendor which instructs them on how to protect and safeguard "CAD Data" while allowing for the sharing of "CAD Reports." The below language is taken directly from the statement of work:

> *Shared Statistical Reporting*
> *(The vendor shall) Develop a shared reporting environment within the CAD System "Dispatch Group" and/or "Agency." ESD and BLM will, in writing to the vendor and the other agency, designate a single CAD System User from each agency who will be allowed Report Access to the other "Dispatch Group" and/or "Agency." Vendor will provide security recommendations and implement controls to limit report access to only the two designated users. ESD and BLM will notify the vendor in writing of any changes to designated personnel and will include the other agency authorized personnel on any change notifications. Any request to change designated "Report Access" personnel, will not be considered valid unless notification to the other agency personnel is contemporaneous.*

This will allow BRC access to "BLM CAD Reports" at any time during the event, and should they choose to exercise the option with the CAD vendor, anytime during the following year and at future events. This will also allow BLM access to "BRC CAD Reports." The reports within the CAD system are custom developed for each agency, but allow for querying based on the selection of a variety of parameters, such as date, time-range, geographic area, agency(s), etc. This open approach to sharing "statistics" and "CAD reports" will not violate any laws or regulations. This approach will also allow both agencies to move past the conversation about whether or not sharing has occurred and whether or not the timeline was acceptable. This should also allow the agencies to have a more purposeful conversation about use the use of these "statistics" for event management and future planning.



**Emergency Designation for the 2016 Burning Man Event**

Prepared by Zach Oper, BLM Special Agent In Charge (SAC) – Region 3
and Mark Pirtle, BLM Burning Man Planning Team Lead

06/23/2016

**Introduction:** The purpose of this memorandum is to brief the BLM Nevada State Director on the Emergency Designation; specifically as it relates to overtime and labor costs for the 2016 Burning Man Event.

Since 2012, this emergency designation has been supported by the Nevada State Director and the Director of the Office of Law Enforcement and Security with review and final approval by the BLM Assistant Director for Human Capital Management.  5 CFR § 550.106(a)(1) "Annual maximum earnings limitation" states the following: "For any pay period in which the head of an agency (or designee), or the Office of Personnel Management on its own motion, determines that an emergency exists, the agency must pay an affected employee premium pay under the limitations described in paragraph (c) of this section and§ 550.107 instead of under the biweekly limitation described in § 550.105(a)."

Emergency is defined as a temporary condition posing a direct threat to human life or property, including a forest wildfire emergency. The Burning Man event causes many temporary conditions posing a direct threat to human life and property. In conjunction with the appellant and other government agencies, the 2015 event established a Tier 1 Management Team to address significant incidents. This included creating contingency plans for the following items: Militia Presence and Activities, Active Shooter/Active Threat, Weather Event, Civil Disturbance/Unrest, Fire, Fatality Accidents, Explosive Devices, Lost or Missing Child, and Structural Collapse. The Tier 1 Management Team was comprised of administrators from the Pershing County Sheriff's Office, BLM, Black Rock LLC (appellant), and CrowdRx (event medical provider).

**Planning Component:** In preparation and planning for the 2016 Burning Man Event the subject the Emergency Designation has been at the forefront of all conversations. The Burning Man event is located in a remote area, two hours from the nearest city. This large mass gathering event has contingency plans due to previous significant incidents that have occurred at the event to include, but not be limited to: Loss of human life, property damage due to fire, and a significant weather event that impacted the participants, the permittee, and Federal, state, and local law enforcement agencies. Due to it's remote location, substantial and rapid population growth, and limited local resources, all of infrastructure to house and support a city population of 76,000 has to be transported to this remote location.. This includes bringing in most of the emergency resources to include building a hospital. The appellant has addressed the emergency needs by establishing an Emergency Services Department. Their department coordinates all professional emergency resources on the playa 24 hours a day. Their responsibilities cover all responses in the field including reports of fire, medical or psychiatric emergencies. Since 2005, BRC LLC has increased their emergency management resources to handle the increased load and complexity to keep Black Rock City as safe as possible.

AR01018

Pursuant to Instruction Memorandum (IM) No. 2014-149, Fiscal Year 2015 Bureau, and Statewide Law Enforcement Special Events/High-Use Recreation Area Priorities and Management of Law Enforcement Assets, the 2015 Burning Man event was classified as a national detail. The IM defines a national detail as "a high use weekend or special event where the ability to manage the activity in a reasonably safe manner for both the public and the LEOs assigned exceeds the capability of the resources within the State where the event is occurring".

As outlined above, the Burning Man event is a temporary condition illustrating the need for the BLM to protect human life and property, qualifying the event under the "Emergency" designation.

**Implementation Component:** For the 2016 Burning Man event BLM looked into the overall financial impact to the event cost recovery from the Emergency Designation. Without the Emergency Designation established for the event, the BLM would potentially have to do up to 3 rotations of certain GS level graded employees during the length of the event due to the capping out on available work hours by said employees. This rotation of BLM employees would potentially create an extreme increase to the cost recovery due to additional travel, training, supplies, and vehicle costs (LE vehicles). The Burning Man Operations is currently using 77 BLM LEOs out of the approximately 250 BLM LEOs, that are currently employed in the agency, for a single event rotation. To deploy two or three detailer rotations would mean virtually no other public lands anywhere else within the bureau would have LE support during the time period of the Burning Man event if the Emergency Designation was not implemented. This would not be a feasible option for the agency. In order to carry out such a staffing rotation the BLM would have to rely heavily on other agencies such as the U.S. Park Police, National Park Service, and/or U.S. Forest Service for LE staffing assistance; if they had officers available to deploy to the event that were not being assigned to other duties during that time period of the event. This would also potentially add additional contracting/indirect costs as BLM would have to enter into contracts with each agency that provided LE staffing assistance for the event. Given this situation, to apply the Emergency Designation reduces the overall potential costs that would have otherwise been charged to the cost recovery and allows for one set group of detailers to remain at the event from start to finish. **(See comparison tables below)**

## Comparison Tables Emergency -vs- Non-Emergency

**Time Table:**

| Start of PP 18 | Start of Detailer Deployments Start of ED | End of PP 18 | Start of PP 19 | End of PP 19 | Start of PP 20 | End of Detailer Deployments End of ED | End of PP 20 |
|---|---|---|---|---|---|---|---|
| 8/7/16 | 8/17/16 | 8/20/16 | 8/21/16 | 9/3/16 | 9/4/16 | 9/10/16 | 9/17/16 |

**Background Information:** An Emergency Designation effects an event detailer's pay in two ways, it allows the overtime (OT) rate paid to become a true time and a half rate and removes the per pay period cap of paid regular hours and OT hours combined.

## CRA OT Labor, Travel, Vehicle costs for event WITH the 25 Day Emergency Designation

OT Rate used in this Table is labor code 113, resulting in higher OT labor cost.

GS grade/steps and OT hours used in this Table are the estimates reflexed in the 2016 BM CRA Est.

95 Detailers that are GS-11 or higher and would cap-out during a pay period without an emergency designation are used in this Table.

The 25 Day Emergency Designation period (8/17 – 9/10) covers the 25 day deployment of BLM detailers for the event operations and affects three pay periods (PP-18, 19 & 20). Same detailers work the full 25 day deployment period (one rotation) because no employees would cap-out during a pay period.

| Position/Name (Civilian Ops) | Estimated OT Hrs | OT Rate (113 Labor Code) | OT Rate x OT Hours (Total Estimated Cost) |
|---|---|---|---|
| IC - GS 13/5 | OT hrs - 110 | OT rate- $68.79 | OT total- $7,567 |
| Civ BC - GS 11/5 | OT hrs - 128 | OT rate - $48.35 | OT total - $6,188 |
| LE BC – GS 12/5 | OT hrs - 116 | OT rate - $57.84 | OT total- $6,709 |
| Comm Sup - GS 13/5 | OT hrs - 134 | OT rate - $68.79 | OT total - $ 9,217 |
| Comp Sup - GS 12/5 | OT hrs - 98 | OT rate - $57.84 | OT total- $5,668 |
| LogL - GS 11/5 | OT hrs - 173 | OT rate - $48.25 | OT total - $8,347 |
| LogLA - GS 11/5 | OT hrs - 173 | OT rate - $48.25 | OT total - $8,347 |
| ComL - GS 12/5 | OT hrs - 200 | OT rate - $57.84 | OT total - $11,568 |
| ComLA  GS 12/5 | OT hrs - 200 | OT rate - $57.84 | OT total - $11,548 |
| IT Security - GS 11/5 | OT hrs - 134 | OT rate - $48.25 | OT total - $6,465 |
| Com Tech - GS 11/5 | OT hrs - 200 | OT rate - $48.25 | OT total - $9,650 |
| Com Tech - GS 11/5 | OT hrs - 200 | OT rate - $48.25 | OT total - $9,650 |
| Com Tech - GS 11/5 | OT hrs - 200 | OT rate - $48.25 | OT total - $9,650 |
| Safety Off - GS 12/5 | OT hrs - 72 | OT rate - $57.84 | OT total - $4,164 |
| PIO - GS 13/5 | OT hrs - 52 | OT rate - $68.76 | OT total - $3,577 |
| CompGIS - GS 11/5 | OT hrs - 76 | OT rate - $48.25 | OT total - $3,667 |
| CompVend - GS 11/5 | OT hrs - 76 | OT rate - $48.25 | OT total - $3,667 |
| CompEnv - GS 11/5 | OT hrs - 76 | OT rate - $48.25 | OT total - $3,667 |
| CompEnv - GS 11/5 | OT hrs - 76 | OT rate - $48.25 | OT total - $3,667 |
| LE OC (Day) - GS 13/5 | OT hrs - 96 | OT rate - $68.79 | OT total- $6,604 |
| LE OC (Night) - GS 13/5 | OT hrs - 96 | OT rate - $68.79 | OT total- $6,604 |
| LE INVL - GS 13/5 | OT hrs - 96 | OT rate - $68.79 | OT total- $6,604 |
| LE PC (Swing) - GS 13/5 | OT hrs - 109 | OT rate - $68.79 | OT total- $7,498 |

| | | | |
|---|---|---|---|
| LE PC (Day)- GS 12/5 (Pre, Main, Post) | OT hrs - 124 | OT rate - $57.84 | OT total- $7,498 |
| LE PC (Night)- GS 12/5 (Main, Post) | OT hrs - 104 | OT rate - $57.89 | OT total- $6,021 |
| LE MEDL - GS 13/5 | OT hrs - 71 | OT rate - $68.79 | OT total- $4884 |
| LE MED - GS 12/5 | OT hrs - 71 | OT rate - $57.84 | OT total- $4,107 |
| LE Evidence - GS 12/5 | OT hrs - 87 | OT rate - $57.89 | OT total- $5,036 |
| LE Evidence - GS 11/5 | OT hrs - 87 | OT rate - $48.25 | OT total- $4,198 |
| LE OPR - GS 13/5 | OT hrs - 72 | OT rate - $68.79 | OT total- $4,953 |
| LE BLM INV - GS 12/5 | OT hrs - 81 | OT rate - $57.84 | OT total- $4,685 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE INT INV - GS 13/5 | OT hrs - 65 | OT rate - $68.79 | OT total- $4,471 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $57.84 | OT total- $3,760 |

| | | | |
|---|---|---|---|
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $48.25 | OT total- $4,101 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $48.25 | OT total- $4,101 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $48.25 | OT total- $4,101 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $48.25 | OT total- $4,101 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $48.25 | OT total- $4,101 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $48.25 | OT total- $4,101 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $48.25 | OT total- $4,101 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $48.25 | OT total- $4,101 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $48.25 | OT total- $3,860 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $48.25 | OT total- $3,860 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $48.25 | OT total- $3,860 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $48.25 | OT total- $3,860 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $48.25 | OT total- $3,860 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $48.25 | OT total- $3,860 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $48.25 | OT total- $3,860 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $48.25 | OT total- $3,860 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |

AR01022

| | | | |
|---|---|---|---|
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $48.25 | OT total- $3,136 |
| LE IMARS - GS 13/5 (Administrator) | OT hrs - 96 | OT rate - $68.79 | OT total- $6,603 |
| LE IMARS – GS 12/5 (Tech) | OT hrs - 72 | OT rate - $57.84 | OT total- $4,164 |
| | | | Labor Total: $431,725 |
| Estimated Travel Cost for 95 Detailers with one Rotation | | | $62,700 |
| Estimated Vehicle Utilization Cost for 95 Detailers with one Rotation | | | $45,125 |
| Cost total for labor, travel and vehicle utilization for 95 Detailers with one Rotation | | | **$539,550** |

AR01023

**CRA Labor, Travel, Vehicle costs for event WITHOUT the 25 Day Emergency Designation**

OT Rate used in this Table is labor code 110, resulting in lower OT labor cost.

GS grade/steps and OT hours used in this Table are the estimates reflexed in the 2016 BM CRA Est.

95 Detailers that are GS-11 or higher and would cap-out during a pay period without an emergency designation are used in this Table.

The deployment of BLM detailers for the event operations covers a 25 day period (8/17 – 9/10) and affects two pay periods (PP-18 & 19).

Three detailers per position (3 rotations, one per Pay Period) could be required during the 25 day deployment period because detailers could cap-out before the pay period is over.

The implementation of rotations would result in additional costs to the CRA in Travel and Vehicle Utilization.

| Position/Name (Civilian Ops) | Estimated OT Hrs | OT Rate (110 Labor Code) | OT Rate x OT Hours (Total Estimated Cost) |
|---|---|---|---|
| IC - GS 13/5 | OT hrs - 110 | OT rate- $45.86 | OT total- $5,045 |
| Civ BC - GS 11/5 | OT hrs - 128 | OT rate - $38.76 | OT total - $4,961 |
| LE BC – GS 12/5 | OT hrs - 116 | OT rate - $38.76 | OT total- $4,496 |
| Comm Sup - GS 13/5 | OT hrs - 134 | OT rate - $45.86 | OT total - $6,145 |
| Comp Sup - GS 12/5 | OT hrs - 98 | OT rate - $38.76 | OT total- $3,798 |
| LogL - GS 11/5 | OT hrs - 173 | OT rate - $38.76 | OT total - $6,705 |
| LogLA - GS 11/5 | OT hrs - 173 | OT rate - $38.76 | OT total - $6,705 |
| ComL - GS 12/5 | OT hrs - 200 | OT rate - $38.76 | OT total - $7,752 |
| ComLA  GS 12/5 | OT hrs - 200 | OT rate - $38.76 | OT total - $7,752 |
| IT Security - GS 11/5 | OT hrs - 134 | OT rate - $38.76 | OT total - $5,194 |
| Com Tech - GS 11/5 | OT hrs - 200 | OT rate - $38.76 | OT total - $7,752 |
| Com Tech - GS 11/5 | OT hrs - 200 | OT rate - $38.76 | OT total - $7,752 |
| Com Tech - GS 11/5 | OT hrs - 200 | OT rate - $38.76 | OT total - $7,752 |
| Safety Off - GS 12/5 | OT hrs - 72 | OT rate - $38.76 | OT total - $2,791 |
| PIO - GS 13/5 | OT hrs - 52 | OT rate - $45.86 | OT total - $2,385 |
| CompGIS - GS 11/5 | OT hrs - 76 | OT rate - $38.76 | OT total - $2,946 |
| CompVend - GS 11/5 | OT hrs - 76 | OT rate - $38.76 | OT total - $2,946 |
| CompEnv - GS 11/5 | OT hrs - 76 | OT rate - $38.76 | OT total - $2,946 |
| CompEnv - GS 11/5 | OT hrs - 76 | OT rate - $38.76 | OT total - $2,946 |
| LE OC (Day) - GS 13/5 | OT hrs - 96 | OT rate - $45.86 | OT total- $4,403 |
| LE OC (Night) - GS 13/5 | OT hrs - 96 | OT rate - $45.86 | OT total- $4,403 |

AR01024

| LE INVL - GS 13/5 | OT hrs - 96 | OT rate - $45.86 | OT total- $4,403 |
|---|---|---|---|
| LE PC (Swing) - GS 13/5 | OT hrs - 109 | OT rate - $45.86 | OT total- $4,999 |
| LE PC (Day)- GS 12/5 (Pre, Main, Post) | OT hrs - 124 | OT rate - $38.76 | OT total- $4,806 |
| LE PC (Night)- GS 12/5 (Main, Post) | OT hrs - 104 | OT rate - $38.76 | OT total- $4,031 |
| LE MEDL - GS 13/5 | OT hrs - 71 | OT rate - $45.86 | OT total- $3,256 |
| LE MED - GS 12/5 | OT hrs - 71 | OT rate - $38.76 | OT total- $2,752 |
| LE Evidence - GS 12/5 | OT hrs - 87 | OT rate - $38.76 | OT total- $3,372 |
| LE Evidence - GS 11/5 | OT hrs - 87 | OT rate - $38.76 | OT total- $3,372 |
| LE OPR - GS 13/5 | OT hrs - 72 | OT rate - $45.86 | OT total- $3,302 |
| LE BLM INV - GS 12/5 | OT hrs - 81 | OT rate - $38.76 | OT total- $3,140 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE BLM INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE INT INV - GS 13/5 | OT hrs - 65 | OT rate - $45.86 | OT total- $2,519 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE INT INV - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |

AR01025

| LE PAT Shift L - GS 12/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
|---|---|---|---|
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $38.76 | OT total- $3,295 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $38.76 | OT total- $3,295 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $38.76 | OT total- $3,295 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $38.76 | OT total- $3,295 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $38.76 | OT total- $3,295 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $38.76 | OT total- $3,295 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $38.76 | OT total- $3,295 |
| LE PAT - GS 11/5 (Pre, Main) | OT hrs - 85 | OT rate - $38.76 | OT total- $3,295 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $38.76 | OT total- $3,101 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $38.76 | OT total- $3,101 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $38.76 | OT total- $3,101 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $38.76 | OT total- $3,101 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $38.76 | OT total- $3,101 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $38.76 | OT total- $3,101 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $38.76 | OT total- $3,101 |
| LE PAT - GS 11/5 (Main, Post) | OT hrs - 80 | OT rate - $38.76 | OT total- $3,101 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |

AR01026

| | | |
|---|---|---|
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE PAT - GS 11/5 | OT hrs - 65 | OT rate - $38.76 | OT total- $2,519 |
| LE IMARS - GS 13/5 (Administrator) | OT hrs - 96 | OT rate - $45.86 | OT total- $4,403 |
| LE IMARS – GS 12/5 (Tech) | OT hrs - 72 | OT rate - $38.76 | OT total- $2,791 |
| | | | Labor Total: $319,314 |
| Estimated Travel Cost for 95 Detailers with three Rotations | | | $188,100 |
| Estimated Vehicle Utilization Cost for 95 Detailers with three Rotations | | | $135,375 |

AR01027

| | | | |
|---|---|---|---|
| Cost total for labor, travel and vehicle utilization for 95 Detailers with three Rotations | | | **$642,789** |

**Summary Table:**

| Total Cost **with** Emergency Designation with one Rotation |
|---|
| **$539,550** |
| Total Cost **without** Emergency Designation with three possible Rotations |
| **$642,789** |

AR01028



**Burning Man**

Catalyst for creative culture in the world

660 Alabama St., 4th Fl
San Francisco, CA 94110

6/27/16

William Mack
BLM Black Rock Field Office
5100 East Winnemucca Blvd.
Winnemucca, NV 89445

Dear William,

Thank you for sending the 2016 Burning Man Cost Recovery Agreement (CRA) and your Decision to move forward with the CRA for the Burning Man event. We look forward to another safe and compliant event in the Black Rock Desert.

Black Rock City LLC (BRC) received your Decision on Thursday, June 23rd, and were given until today, Monday, June 27th, to review and sign the CRA and remit a payment in the amount of $315,000. I have enclosed a check for $315,000 but have not signed the CRA, nor is BRC ready to approve the outstanding Statements of Work (SOWs) submitted by BLM through our Memorandum of Understanding (MOU).

The total cost estimate included in the 2016 CRA is $2,227,041, which includes the 23.1% indirect cost rate assessment. In addition, the eight SOWs equal approximately $987,782.

This table compares the **2016 estimate to 2015 actuals:**

|  | 2016 Estimate | 2015 Actual | Difference |
|---|---|---|---|
| CRA | $1,843,702 | $2,273,167 | <$429,465> |
| Indirect Cost Assessment | $383,339 | $520,555 | <$137,216> |
| SOWs | $987,782 | $648,282 | <$339,500> |
| TOTAL | $3,214,823 | $3,442,004 | <$227,181> |

**The 2016 cost estimate indicates a savings of $227,181 or 6.6% over 2015 actual costs.** We believe this significant savings reflects some of the work we have done together to identify operational efficiencies and unnecessary requirements on the part of the previous BLM administration. BRC thanks you and your team for this success. The 2016 estimate still represents a 276% BLM cost increase in just five years, and we feel more significant work needs to be done. This work is in step with BLM's commitment to **realign roles and responsibilities** to ensure that BRC is appropriately responsible for planning, organizing and producing the Burning Man event, complying with all regulations and stipulations, and returning the public event site to the management of the BLM, while BLM is responsible for administering the permit and providing an appropriate level of law enforcement and oversight.

AR04640



**Burning Man**

660 Alabama St., 4th Fl
San Francisco, CA 94110

**Catalyst for creative culture in the world**

BRC has filed an **appeal of BLM's 2015 costs**. In that appeal BRC identified costs that were insufficiently explained or unjustified. Some of those costs have been explained and justified for 2016, but many more have not. These issues remain unresolved. In addition, BRC has concerns about three of the eight SOWs proposed by BLM relating to IT, dispatch operations, and computer aided dispatch (CAD). BRC has submitted questions that have either not been answered at all, or have not been answered sufficiently to confirm that the cost or function is necessary for BLM to administer our permit. We hope to address these outstanding issues, when we meet with you, John Ruhs, and Bill O'Sullivan on July 5th.

I would also like to follow up on the **initial planning CRA** signed by BRC on April 4th. BRC signed this CRA and submitted $184,224 to ensure BLM was appropriately staffed and available to plan the 2016 Burning Man event. This is the first time in the history of our permit that BRC has been asked to sign such a CRA, but we were told this level of detail and funding was necessary to align BLM actual planning hours and costs with payments from BRC. As you know, with cost recovery comes the requirement that BLM document and account for its expenses, and BRC expects a detailed accounting of those planning hours as soon as practicable. If available at this time, we would like to request a detailed accounting of the planning expenditures to date, to include Operational Costs and for each member of the planning team:
- Full name
- Year-round job title
- Burning Man planning title
- Description of Burning Man planning responsibilities fulfilled
- Pay grade
- Pay rate
- Dates and hours worked
- Travel dates, costs and purpose
- Meetings attended

I look forward to our meeting next week and to resolving these outstanding issues. Thank you again for your continued work on the Burning Man permit.

Sincerely,

Charlie Dolman

AR04641



**Black Rock City LLC**
660 Alabama Street, 4th Floor
San Francisco, CA 94110-2008
415-865-3800

Wells Fargo Bank, N.A.

11-4288/1210

6/27/2016

PAY TO THE
ORDER OF    BUREAU OF LAND MANAGEMENT

$ **315,000.00

Three Hundred Fifteen Thousand and 00/100****************************************************************************** DOLLARS

BUREAU OF LAND MANAGEMENT
WINNEMUCCA DISTRICT OFFICE
5100 EAST WINNEMUCCA BLVD.
WINNEMUCCA, NV 89445

2 SIGNATURES REQUIRED IF OVER $1000.00

AUTHORIZED SIGNATURE

MEMO
2016BM COST RECOVERY (PYMT 2)

⑈020514⑈ ⑈121104288⑈ 24248076899⑈

BLACK ROCK CITY, LLC

20514

BUREAU OF LAND MANAGEMENT            6/27/2016
Date        Type  Reference          Original Amt.   Balance Due    Discount        Payment
6/27/2016   Bill  2016-2             315,000 00      315,000.00                     315,000.00
                                                                    Check Amount    315,000.00

AR04642

Receipt

**United States Department of the Interior**
**Bureau of Land Management**
WINNEMUCCA DISTRICT OFFICE
5100 E WINNEMUCCA BLVD
WINNEMUCCA, NV 89445
Phone: 775-623-1500

Receipt

No:             3595620

**Transaction #: 3698899**
**Date of Transaction: 06/29/2016**

| CUSTOMER: |
|---|
| BLACK ROCK CITY LLC - DBA BURNING MAN<br>660 ALABAMA ST FLOOR 4<br>SAN FRANCISCO,CA 94110-2008 US |

| LINE # | QTY | DESCRIPTION | REMARKS | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| 1 | 1.00 | RECREATION - OTHER / COST RECOVERY (5105) / COST RECOVERY<br>**PROJECT: LVRCF1604630** | 2016 BURNING MAN COST RECOVERY ESTIMATE | - n/a - | 315000.00 |
| | | | | **TOTAL:** | **$315,000.00** |

| PAYMENT INFORMATION | | | |
|---|---|---|---|
| 1 | AMOUNT: 315000.00 | POSTMARKED: | N/A |
| | TYPE: CHECK | RECEIVED: | 06/29/2016 |
| | CHECK NO: 20514 | | |
| | NAME: BLACK ROCK CITY LLC - DBA BURNING MAN<br>660 ALABAMA ST FLOOR 4<br>SAN FRANCISCO CA 94110-2008 US | | |

| REMARKS |
|---|
| |

This receipt was generated by the automated BLM Collections and Billing System and is a paper representation of a portion of the official electronic record contained therein.

**AR04643**
6/29/2016

**COST RECOVERY AGREEMENT**

**BURNING MAN SPECIAL RECREATION PERMIT:** NVW03500-16-01
**APPLICANT**: Black Rock City, LLC.
**LEAD BLM OFFICE**: Winnemucca District, Black Rock Field Office

**I.      AUTHORITY**: Section 304(b) of the Federal Land Policy and Management Act (FLPMA) [43 U.S.C. 1734(b), as amended and 43 CFR Subpart 2932.

**II.      PURPOSE**: This Agreement between the above referenced Applicant and the Bureau of Land Management (BLM) establishes procedures to reimburse BLM for costs incurred to process a Special Recreation Permit (SRP) NVW03500-16-01.  If the BLM decides to authorize an SRP, this Agreement shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred to administer the 2016 Burning Man SRP.

**III.      PROVISIONS OF AGREEMENT**

A.      In accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31, Applicant agrees to reimburse BLM for the costs incurred by BLM for processing the Application, and should a SRP be issued, costs for issuing a SRP and monitoring the SRP.

B.      This Agreement is subject to the Reimbursable Cost Provisions and the Direct and Indirect Costs to the government outlined in OMB Circular A-25, Treasury Account: 14X5017, Service Charges, Deposits, and Forfeitures, and 43 CFR Subpart 2932.  The Cost Estimate is included, and it will be amended should actual expenses exceed the amounts identified in Attachment 1.

C.      A cost recovery account will be established for the SRP. The BLM requires you to remit 100% of the estimated cost recovery costs before the start of the 2016 Event. Please refer to the payment schedule below.  After the permit is complete and all work is finished, the BLM will notify you if additional funds are required or if you are entitled to a refund.

The following schedule for payments has been developed to allow for the amount due from the estimate to be paid in two (2) installments and have 100% of the cost recovery estimate paid prior to the start of the event:

| Payment | Date | Amount Due |
|---|---|---|
| #1 | (Received) | $184,224 |
| #2 | (Received) | $315,000 |
| #3 | August 10, 2016 | $1,700,735 |
| **Total Cost Estimate** | | **$2,199,959** |

Following the close-out of the event permit, an accounting of the cost recovery funds will be provided to Black Rock City, LLC by January 31, 2017.

**IV.      REIMBURSABLE COST PROVISIONS**

A.      BLM agrees to process the Application to the extent funding under the Agreement permits. Processing will include, but not be limited to, the following: coordination, administration and approval

**AR00778**

of any necessary NEPA compliance; consultation with appropriate Federal, State, Tribal, and local officials; preparation of the administrative record and resolving any protests, appeals and litigation that might result from the proposal, preparation of all decisions,  monitoring the construction, operation and termination of any resultant authorization; and other necessary processing actions consistent with a final decision.

B.      BLM agrees to timely notify the Applicant, in writing, of any changes to the indirect rate.  Refer to the Definition of Direct and Indirect Costs in Section V.  Applicant shall have the right to conduct, at its own expense, reasonable audits of the books, records, and documents of BLM relating to the items on any particular accounting statement provided by BLM.

C.      Cost Recovery funds, once obligated by BLM, are not refundable and will not be made refundable by termination of the Project, withdrawal of the Application, or non-issuance of a SRP.

D.      In accordance with 43 CFR 2932.31, 2932.32, and 2932.33(c), if BLM denies the Application, Applicant must reimburse BLM for all costs BLM incurred in processing the Application.  If the Applicant withdraws the application, Applicant will reimburse BLM for processing costs incurred by BLM in closing its review of the Application and which cannot reasonably be avoided after BLM receives written notice of withdrawal of the Application.

E.      Nothing herein shall be deemed to require BLM to maintain books, records, or documents other than those usually maintained by them, provided that such books, records, and documents reasonably segregate and identify the costs for which reimbursement is required and comply with generally accepted accounting practices for such documentation.

The designated points of contact with whom each party to this Agreement will communicate concerning any aspect of this Agreement are as follows:

<table>
<tr><td>Bureau of Land Management</td><td>Black Rock City, LLC</td></tr>
<tr><td>William Mack, Jr</td><td>Charlie Dolman</td></tr>
<tr><td>Black Rock Field Manager</td><td>Event Operations Director</td></tr>
<tr><td>5100 E. Winnemucca Blvd</td><td>660 Alabama St</td></tr>
<tr><td>Winnemucca, NV 89445</td><td>San Francisco, CA 94110-2008</td></tr>
<tr><td>775-623-1578</td><td>415-865-3800</td></tr>
<tr><td>wmack@blm.gov</td><td>Charlie.dolman@burningman.org</td></tr>
</table>

## V.      DEFINITION OF DIRECT AND INDIRECT COSTS

Direct costs are those costs which can be specifically identified with the Application and which are incurred for the benefit of said applicant in that the costs would not have been incurred but for the Application and are appropriate in order for BLM to process the Application.  Examples of direct costs include, but are not limited to, personnel costs in the form of wages paid to BLM personnel working on the Application, with allowances provided for fringe benefits and leave surcharge rate and any overtime associated with processing the Application; travel expenses; purchased services, if necessary, such as printing, automated data processing services and photographic reproduction; and any miscellaneous supplies and equipment of a specialized nature, the use of which is directly applicable to processing the Application.

Indirect costs are those which cannot be specifically identified with the Application.  These indirect costs have been calculated at a rate of 23.1 percent of direct costs.  The indirect costs are subject to

change annually.  This percentage figure has been developed in accordance with Department of the Interior procedures and represents those administrative and program costs, excluding management overhead, which can be attributed to processing the Application.  Indirect costs include a portion of the costs for capitalized and non-capitalized equipment; space rental; telephone services; postage; personnel transfer costs; budget and program development; administrative and clerical support; training; safety management; public information, inquiries and reports; cartography and basic series mapping; aviation management; telecommunications; maintenance of equipment and tools; and systems design and implementation.

**Treasury Account 14X5017**, Service Charges, Deposits, and Forfeitures further described as BLM Recreation Cost Recovery is defined in the table below:

| Treasury Account | 14X5017, Service Charges, Deposits, and Forfeitures |
|---|---|
| **BLM Fund Code, Subactivity, and Title** | **XXXL5017AP, Fund 341, L51050000, Recreation Cost Recovery** |
| Source of collections/appropriations | Cost recovery charges are associated with recreation activities or events and shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. As such, this Subactivity covers revenues and expenditures associated with any Special Recreation Permit that has been determined to be Cost Recovery by BLM personnel as outlined in 43 CFR 2930-1 Permits for Recreation on Public Lands and H-2930-1, Recreation Permit Administration Handbook. <br><br> Project codes are mandatory and will be assigned and administered by the State Office from their block of unassigned project numbers. They are used to differentiate revenues and obligations for each specific permit. <br><br> Fees are collected in advance for specified tasks that must be carried out before significant recreation events can be permitted to occur on public lands, and BLM is expected to account to each applicant on the cost of all aspects of the work BLM performs. |

As noted in the definition in the table, this account stipulates cost recovery charges shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. Because Burning Man is a full cost recovery event, indirect costs will apply as they would for all other commercial permits that require full cost recovery.

## VI.   **EFFECTIVE DATE**:

This Agreement shall be effective, as of the latter date of its execution by both parties.  Unless terminated earlier, it shall continue until the BLM authorized officer deems the agreement provisions have been satisfied.

Please sign the agreement below, and return to the BLM, Winnemucca District Black Rock Field Office Manager by June 27, 2016**.**

**AR00780**

**VII.     SIGNATURES OF AGREEMENT**

For: Bureau of Land Management                     For: Black Rock City, LLC


_____                  _____
Signature                                                                Signature


_____                              _____
Date                                                                       Date

William Mack, Jr                                                   Charlie Dolman
Black Rock Field Manager                                    Event Operations Director, BRC

AR00781

## Attachment 1

**2016 COST RECOVERY (CR) ESTIMATE**
**Summary:**

| | |
|---|---|
| Labor Costs | $ 1,231,978 |
| Operational Costs | $ 405,500 |
| Sub Total of Direct Costs | $ 1,637,478 |
| FY 2016 Indirect Cost Rate of 23.1% | $ 378,257 |
| **Cost Estimate TOTAL** | **$ 2,015,735** |

**Labor Detail:**

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Authorized Officer (AO), Event IC | 452 | $32,499 |
| Law Enforcement Branch Chief | 532 | $38,229 |
| Civilian Operations Branch Chief | 928 | $46,652 |
| Public Information Officer | 148 | $10,498 |
| Admin Support | 106 | $3,544 |
| Safety Officer | 128 | $7,895 |
| Compliance (Environmental & Vending) Sup | 314 | $20,058 |
| Vending | 148 | $7,308 |
| Compliance Team | 148 | $7,308 |
| Compliance Team | 148 | $7,308 |
| Compliance Team | 148 | $6,031 |
| Compliance Team | 148 | $6,031 |
| GIS | 164 | $8,118 |
| Playa Logistics Lead | 349 | $17,249 |
| Playa Logistics | 349 | $17,249 |
| Playa Logistics | 216 | $8,800 |
| Playa Logistics | 216 | $8,800 |
| Playa Logistics Runner | 88 | $3,580 |
| Communications Supervisor | 430 | $30,556 |
| Dispatch Center Manager | 326 | $12,104 |
| CommL | 512 | $32,353 |
| Communications Tech | 384 | $23,826 |

| POSTION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Communications Tech | 368 | $18,147 |
| Communications Tech | 368 | $18,147 |
| Communications Tech | 368 | $18,147 |
| Playa Information  Technology | 384 | $15,643 |
| IT Security | 326 | $16,176 |

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Law Enforcement Operations Chief | 232 | $17,417 |
| Law Enforcement Operations Chief | 232 | $17,417 |
| Medical Team Lead | 167 | $13,535 |
| Medical Team | 167 | $11,381 |
| Law Enforcement Patrol Commander | 284 | $19,295 |
| Law Enforcement Patrol Commander | 232 | $15,720 |
| Law Enforcement Patrol Commander | 245 | $19,753 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Investigative Lead | 432 | $37,601 |
| Law Enforcement Investigations | 233 | $16,202 |
| Law Enforcement Investigations | 137 | $10,959 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement OPR | 144 | $11,441 |
| Law Enforcement Evidence | 255 | $17,765 |
| Law Enforcement Evidence | 162 | $9,761 |
| Law Enforcement IMARS | 208 | $16,695 |
| Law Enforcement IMARS | 152 | $10,173 |
| Financial Support (Off Playa) | 80 | $5,329 |
| Contracting Support (Off Playa) | 80 | $4,046 |
| **TOTAL** | | **$1,231,978** |

**Operations Detail:**

| DESCRIPTION | AMOUNT |
|---|---|
| Microwave Internet Program | $130,000 |
| Satellite Tracking (Delorme) | $56,500 |
| Medical Modular Building Rental | $6,000 |
| CAD Servers Licensing/Maintenance | $13,000 |

| | |
|---:|:---|
| HHS Agreement | $20,000 |
| Travel | $80,000 |
| Vehicle Utilization | $50,000 |
| Misc. Supplies/Equip. | $50,000 |
| **TOTAL** | **$405,500** |



**Burning Man**

660 Alabama St., 4th Fl
San Francisco, CA 94110

RECEIVED BLM
WINNEMUCCA NV

2016 AUG -1  PM 1:29

Catalyst for creative culture in the world

July 29, 2016

William Mack
Black Rock Office Field Manager
Bureau of Land Management
5100 East Winnemucca Boulevard
Winnemucca, NV 89445

Dear William:

Enclosed please find the Cost Recovery Agreement ("CRA") for the 2016 Burning Man event signed by Black Rock City LLC ("BRC"). BRC will remit $1,727,817 to BLM by the agreement deadline of August 10, 2016. This letter outlines BRC's concerns with both the CRA and the estimated costs.

Because production of Black Rock City is about to begin, BRC has signed this CRA. We continue to have concerns that many of BLM's estimated costs are based on historical decisions that do not comply with cost recovery regulations. BRC signs this CRA reserving all rights to appeal BLM's final decision on cost recovery for the 2016 SRP. My hope is that the final decision will reflect only BLM's reasonable costs to administer our permit, and will include a reasoned, thorough explanation for each cost. I also suggest amending the CRA when time allows so that the terms do not exceed BLM's regulatory authority, as discussed at the end of this letter. BRC will be happy to cooperate with you and your staff in that regard.

The CRA estimates BLM's total costs for administering the 2016 Burning Man SRP at $2,199,959, which includes the $184,224 that BRC paid for BLM's estimated planning costs pursuant to a separate CRA signed by the parties in April.[1] This year, BRC is taking on two of BLM's contracts, for dispatch and CAD services, costing approximately $385,000, so the estimated total reduction in costs from 2015 to 2016 is around $209,000, or 7.5%.

---

[1] The present CRA is confusing because it references two different total cost estimates: $2,199,959 in the table on page 1, and $2,015,735 in the table at the top of Attachment 1. The planning costs that were subject to the separate CRA are included on page 1 to derive the "total total" estimate for the 2016 Burning Man SRP. But this CRA does not identify the $184,224 as planning costs or incorporate the earlier agreement. Adding to the confusion is the reference to 2 installment payments, when the table shows that BRC is making a total of 3 cost recovery payments. We would appreciate greater precision in the CRA, so the documentation is clear about the amounts BRC is paying and what we are paying for. We are happy to work with BLM to clarify the language.

www.burningman.org

**AR01126**

BRC appreciates that BLM has identified certain efficiencies. We believe, as we have communicated to BLM throughout this year, that substantial additional cost savings could have been realized in this 2016 cost recovery estimate. We are also concerned that the CRA includes a number of costs that are not reasonable under cost recovery guidelines.

As you are aware, BRC's concerns about BLM's costs to administer the 2015 Burning Man SRP led us to appeal BLM's final decision on cost recovery. That appeal is now pending before the Interior Board of Land Appeals. To the extent that any of the charges to which BRC objected in our 2015 appeal have been retained by BLM in this 2016 estimate CRA, BRC fully incorporates by reference the objections to those costs set forth in our Statement of Reasons and Reply in support of our appeal. These objectionable charges include, but are not limited to, any costs relating to: (1) BLM's improper decision to preemptively designate the Burning Man event an "emergency," including associated overtime and travel costs; (2) BLM's application of the indirect administrative cost rate to direct costs incurred for BLM's operations on-playa where BRC provides all of the infrastructural overhead; and (3) BLM's $56,500 contract for the provision of unnecessary Delorme satellite trackers for its personnel.

Additionally, BRC has the following specific concerns about the 2016 CRA and the estimated costs it reflects:

## 1. "Labor Detail" Generally:

As BLM has recognized, due in large part to the unwillingness of prior BLM leadership to discuss or negotiate BLM's costs related to the Burning Man SRP, BRC is at a significant information deficit. The information about estimated labor charges that BLM has included with this CRA is all that we have ever received and is not sufficient to enable BRC to understand the work that these personnel are expected to perform, or to discern whether each position and its number of estimated hours are reasonably related to the administration of BRC's permit. The only "detail" provided is a title of 2-4 words, a total number of estimated hours, and a total estimated cost. Several of the titles include acronyms or abbreviations with no explanatory key.

BRC is concerned that further detail will not be forthcoming with BLM's final decision on 2016 cost recovery. The "Description of Work" field in the labor log attached to BLM's 2015 final decision consisted of just a handful of words for each employee. It provided no actual description of the tasks performed by these individuals, nor did it identify their GS pay level or the dates or shifts worked. A few weeks ago, in connection with filing its answer to BRC's cost appeal, BLM gave BRC access to a spreadsheet titled "YTD Labor Detail." This document provided a breakdown of the different categories of pay received by each of its employees, but included no explanation for the various "pay codes" or data in other columns, no pay levels, and no further detail on responsibilities.

At BLM's request, BRC supplies detailed position descriptions for our operations personnel in our Operations Plan. We understand that BLM, as the permittor, is entitled to certain information about BRC's operations. We also understand that BRC, as permittee, is entitled to certain information from BLM regarding its costs. In terms of labor, the level of detail that BLM

2

AR01127

provides must be sufficient to enable BRC to ascertain BLM's justification for concluding that these particular positions were necessary to administer the permit, and that they needed to be staffed for a particular number of hours and at a particular rate of pay.

2. **Specific Personnel Positions:**

With respect to the information provided in the CRA's "Labor Detail" table, BRC has the following comments:

○ Compliance and Vending Personnel: This spring, BLM accepted BRC's proposal to manage the environmental and vending compliance program. BLM has removed six compliance-related positions from the 2016 CRA. Per BLM-BRC discussions, we expect to see further cost reductions in future CRAs based on the successful implementation of the BRC-managed compliance program.

○ Dispatch, Communications, and IT Personnel: I want to thank you and State Director John Ruhs for agreeing to meet with BRC on playa in 2016 to familiarize us with BLM operations and provide an opportunity for review and evaluation. Of particular interest to BRC are the operations and resource requirements for dispatch, CAD, communications, and IT. These operations are complex, and we would like to better understand them and the associated costs, which are significant. We believe that with collaboration between BRC and BLM, we can together achieve improved operations and greater efficiency. We're concerned that BLM started tracking public assists and public contacts in 2015, which BLM planning staff have said are nonessential; that these activities accounted for 70% of BLM's dispatched calls; and that BLM's dispatch costs are now increasing for 2016. We're also concerned about the allocation of resources to Pershing County when those resources are allocated without prior agreement from BRC or when those resources undermine BRC's contract with Pershing County, as happened in 2015 when BLM allocated separate dispatch resources to Pershing County. BRC did not learn about this allocation until very recently. BLM has told us that additional resources are being required for 2016, including a new Dispatch Center Manager, partly to accommodate Pershing County's request for a separate dispatcher to dispatch calls and capture CAD data for Pershing County's separate CAD system in Lovelock. BRC should not have to pay for these separate systems.

○ Playa Logistics Personnel: We understand that the position BLM added to this team for 2016, "Playa Logistics Runner," is a part-time position that will be activated if and when necessary for the transport of equipment or supplies to the event site from the Reno area and environs. As we have advised, BRC personnel travel regularly between Gerlach and Reno, and can be available to assist BLM with these deliveries so that this runner position need not be activated.

○ Law Enforcement Investigations Personnel: As discussed in BRC's Statement of Reasons in support of our 2015 cost appeal, BLM has not adequately justified charging BRC for investigative personnel, who BRC understands are focused on the investigation of major

3

crimes. The arrest and citation statistics for the past several Burning Man events show an extremely low incidence of person-on-person crime, with only a few such offenses committed each year. Virtually none of these person-on-person crimes would call for the level of investigations that a major crimes investigator would perform. Fatalities are exceedingly rare, the last of which occurred in 2014 in a vehicular accident that the Pershing County Coroner determined was caused by pedestrian error. Pershing County has dozens of capable deputies on site to investigate and otherwise address this handful of serious incidents. There is no rational basis for BLM's conclusion that it requires a team of 13 BLM investigative officers to police the 2016 event.

- ○ Law Enforcement Patrol: The number of patrol positions for 2016 has remained the same as 2014 and 2015. BRC is concerned that BLM has not accounted for an increase in the number of Pershing County deputies working at the Burning Man event for the past two years, as BLM staff have said that BLM would do. BRC understands that BLM developed its table of organization before even receiving Pershing's table of organization, and that BLM first decides which personnel will be staffing the event and then decides what these staff members will be doing. As noted in BRC's Statement of Reasons and Reply in support of its 2015 cost appeal, we are concerned that these officers are engaged in unnecessary and duplicative activities aimed at giving them something to do, rather than addressing actual safety issues at the event.

- ○ Law Enforcement OPR: We understand that this individual represents BLM's Office of Professional Responsibility, an office charged with investigating BLM employee conduct. BLM should not charge BRC for the costs of having a representative from this office at the event, as a permittee should not be responsible for covering the costs of BLM's internal investigations.

## 3. Medical Facility, Labor, and Contract Services

BRC provides a state-licensed, state-of-the-art emergency care facility in a central location at the Burning Man event site. This facility is fully staffed by trauma doctors and all relevant support staff, and is equipped to provide X-ray, laboratory, and pharmacy services, 24 hours per day for the two weeks including and surrounding the event. BRC also provides 10 ambulances and a fixed winged aircraft to respond to an emergency at any time.

Given the medical facilities that BRC already provides - which are better equipped, more appropriately staffed, and closer in proximity to potential incidents that might occur at the event - BLM has not provided sufficient justification for its insistence on having a separate medical trailer and private medical staff for BLM (and now also Pershing County) employees. The 2015 BLM After Action Report recorded 240 patient visits to BLM's Medical trailer, 18 of which were K-9 visits. An "overwhelming majority" of the visits were for extremely minor complaints, including eye washes and over-the-counter pain reliever.

AR01129

In the 2016 CRA, BLM's medical costs are estimated to total more than $50,000: around $25,000 for the labor of two BLM medical personnel, $20,000 for BLM's contract with the Department of Health and Human Services to supply additional medical personnel, and $6,000 for the rental of a medical modular building. While BRC does not object to BLM providing private medical care to its staff and to Pershing County staff, we do object to paying any of the associated costs. Private medical care and a private medical building for government personnel are unnecessary to the administration of the Burning Man permit; they therefore do not qualify as a reasonable cost under cost recovery regulations.

### 4.   Costs Related to a BRC Appeal of a BLM Final Decision

Finally, I would like to address the recent confusion around the CRA's applicability to BLM's appeal-related costs. We appreciate your confirmation that BLM has not charged BRC for the time BLM staff spent responding to BRC's appeal of BLM's final cost recovery decision for the 2015 SRP. The authority on which the CRA is based does not allow BLM to charge a permittee for its costs of responding to the proponent's appeal of a BLM decision. See 43 U.S.C. 1734(b).

As defined in BLM's Recreation Permit and Fee Administration Handbook, "cost recovery" means:

> "[F]ees charged by the BLM to pay the costs of processing a special recreation permit. Processing charges may include the cost of environmental analysis, consultation with other agencies, and efforts toward public participation. Processing costs may also include monitoring, use supervision, permit compliance, and post-use reports and closeout. Application fees, set by state directors, are also considered a form of cost recovery."

The costs of responding to a proponent's appeal of a BLM final decision are not considered "processing charges." The Handbook's chapter on "Decisions, Alternative Dispute Resolution, Protests and Appeals" confirms that "final decisions are appealable," but makes no suggestion that it is appropriate to charge the permittee for BLM's costs of resolving an appeal.

BRC is concerned that the following clause in Section IV.A. of the CRA exceeds BLM's authority, to the extent that BLM charges BRC for any of these purported "processing" costs: "preparation of the administrative record and resolving any protests appeals and litigation that might result from the proposal."

Your recent correspondence indicates that BLM believes this language allows it to charge BRC for exercising our right to appeal a final decision. Since BLM is not authorized to do so, we would like to see this language clarified or removed. BRC's signing of the CRA is without prejudice to any of BRC's rights and remedies, including its right to appeal BLM's final decision on 2016 cost recovery and its right to dispute any unauthorized costs that might be assessed by BLM for responding to an appeal.

******

AR01130

BRC appreciates the efforts of BLM's 2016 planning team in identifying efficiencies. We still, however, have a number of unanswered questions about specific BLM costs and fees, as detailed above and in our discussions with BLM over the past year. We expect that BLM's final decision on 2016 cost recovery will comply with the agency's obligations to assess only its reasonable costs of administering the Burning Man permit, and to provide a reasoned explanation for all assessed costs.

BRC looks forward to continuing to coordinate and strategize with BLM on future permits. We hope that collaborative planning for the 2017 event can begin at the 2016 event site, with both BRC and BLM conducting a full operational review and analysis of resources used.


Sincerely,

Raymond Allen
General Counsel

Enclosure


Cc:    John Ruhs, BLM Nevada State Director
       Robert Towne, Acting BLM Winnemucca District Manager

AR01131





United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
2930 (NV-30.03)
LLNVW03500-16-01

AUG 0 2 2016

CERTIFIED MAIL 7014 2870 0001 4871 2275 – RETURN RECEIPT REQUESTED

Charlie Dolman
Event Operations Director            :          Burning Man 2016 Event
Black Rock City, LLC                 :          Special Recreation Permit
660 Alabama St
San Francisco, CA 94110-2008

Dear Mr. Dolman:

On January 19, 2016 the Bureau of Land Management (BLM) received a Special Recreation Permit (SRP) Application and draft Operating Plan from Black Rock City, LLC (BRC) for the 2016 Burning Man Event (2016 Event).

On April 5, 2016 the BLM received the signed 2016 Cost Recovery Agreement (Initial CRA) from BRC, in the amount of $184,224.00, to cover BLM incurred costs associated with preliminary 2016 Event planning and associated National Environmental Policy Act analysis. The Initial CRA stated that the CRA outlined the BLM's initial costs and would be amended to reflect the overall BLM costs for 2016 Event monitoring and planning. BLM received BRC's initial payment under the Initial CRA on April 06, 2016.

After collaboration and discussion between the BLM and BRC, the BLM provided BRC with the final estimate and decision for the CRA (Final CRA) with supporting documents to review, sign and return with an installment payment in the amount of $315,000 due by June 27, 2016. The Final CRA identified all estimated costs to the BLM associated with implementing the 2016 Event SRP, including the amount identified in the Initial CRA, and is the overriding CRA for the 2016 SRP. BRC did not sign the Final CRA at that time. However, BRC did make the installment payment identified in the Final CRA in the amount of $315,000 on June 29, 2016.

On August 1, 2016, the BLM received a signed copy of the Final CRA from BRC for the 2016 Event. BRC agreed to remit $1,700,735 to BLM by August 10, 2016. A copy of the signed Final CRA for the 2016 Burning Man event, along with the CR Estimate spreadsheet, is enclosed for your files. Your signature constitutes your agreement with the processing category decision and the CR Estimate.

Along with the signed Final CRA, BRC enclosed a letter outlining its concerns with regard to the BLM's costs to administer the Burning Man SRP.  While the BLM appreciates that BRC objects to the BLM's administration of the Burning Man SRP, the agency's actions are consistent with its statutory and regulatory authority.  Regardless, the BLM appreciates the opportunity to work collaboratively with BRC in order to ensure that the agency administers the SRP safely and effectively.

If you have any questions please contact me at 775-623-1500.

Sincerely,

William Mack, Jr.
Black Rock Field Manager
Winnemucca District

Enclosure
CR Agreement
CR Estimate Spreadsheet

AR01133

RECEIVED BLM
WINNEMUCCA NV

**COST RECOVERY AGREEMENT**

RECEIVED BLM
WINNEMUCCA NV

2016 AUG -1  **BURNING MAN SPECIAL RECREATION PERMIT:** NVW03500-16-01 M 1: 38
**APPLICANT:** Black Rock City, LLC.
**LEAD BLM OFFICE:** Winnemucca District, Black Rock Field Office

**I.      AUTHORITY:** Section 304(b) of the Federal Land Policy and Management Act (FLPMA) [43 U.S.C. 1734(b), as amended and 43 CFR Subpart 2932.

**II.      PURPOSE:** This Agreement between the above referenced Applicant and the Bureau of Land Management (BLM) establishes procedures to reimburse BLM for costs incurred to process a Special Recreation Permit (SRP) NVW03500-16-01. If the BLM decides to authorize an SRP, this Agreement shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred to administer the 2016 Burning Man SRP.

**III.      PROVISIONS OF AGREEMENT**

**A.**      In accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31, Applicant agrees to reimburse BLM for the costs incurred by BLM for processing the Application, and should a SRP be issued, costs for issuing a SRP and monitoring the SRP.

**B.**      This Agreement is subject to the Reimbursable Cost Provisions and the Direct and Indirect Costs to the government outlined in OMB Circular A-25, Treasury Account: 14X5017, Service Charges, Deposits, and Forfeitures, and 43 CFR Subpart 2932. The Cost Estimate is included, and it will be amended should actual expenses exceed the amounts identified in Attachment 1.

**C.**      A cost recovery account will be established for the SRP. The BLM requires you to remit 100% of the estimated cost recovery costs before the start of the 2016 Event. Please refer to the payment schedule below. After the permit is complete and all work is finished, the BLM will notify you if additional funds are required or if you are entitled to a refund.

The following schedule for payments has been developed to allow for the amount due from the estimate to be paid in two (2) installments and have 100% of the cost recovery estimate paid prior to the start of the event:

| Payment | Date | Amount Due |
|---|---|---|
| #1 | (Received) | $184,224 |
| #2 | (Received) | $315,000 |
| #3 | August 10, 2016 | $1,700,735 |
| **Total Cost Estimate** | | **$2,199,959** |

Following the close-out of the event permit, an accounting of the cost recovery funds will be provided to Black Rock City, LLC by January 31, 2017.

**IV.      REIMBURSABLE COST PROVISIONS**

**A.**      BLM agrees to process the Application to the extent funding under the Agreement permits. Processing will include, but not be limited to, the following: coordination, administration and approval

AR04367

of any necessary NEPA compliance; consultation with appropriate Federal, State, Tribal, and local officials; preparation of the administrative record and resolving any protests, appeals and litigation that might result from the proposal, preparation of all decisions, monitoring the construction, operation and termination of any resultant authorization; and other necessary processing actions consistent with a final decision.

B.      BLM agrees to timely notify the Applicant, in writing, of any changes to the indirect rate. Refer to the Definition of Direct and Indirect Costs in Section V. Applicant shall have the right to conduct, at its own expense, reasonable audits of the books, records, and documents of BLM relating to the items on any particular accounting statement provided by BLM.

C.      Cost Recovery funds, once obligated by BLM, are not refundable and will not be made refundable by termination of the Project, withdrawal of the Application, or non-issuance of a SRP.

D.      In accordance with 43 CFR 2932.31, 2932.32, and 2932.33(c), if BLM denies the Application, Applicant must reimburse BLM for all costs BLM incurred in processing the Application. If the Applicant withdraws the application, Applicant will reimburse BLM for processing costs incurred by BLM in closing its review of the Application and which cannot reasonably be avoided after BLM receives written notice of withdrawal of the Application.

E.      Nothing herein shall be deemed to require BLM to maintain books, records, or documents other than those usually maintained by them, provided that such books, records, and documents reasonably segregate and identify the costs for which reimbursement is required and comply with generally accepted accounting practices for such documentation.

The designated points of contact with whom each party to this Agreement will communicate concerning any aspect of this Agreement are as follows:

| Bureau of Land Management | Black Rock City, LLC |
|---|---|
| William Mack, Jr | Charlie Dolman |
| Black Rock Field Manager | Event Operations Director |
| 5100 E. Winnemucca Blvd | 660 Alabama St |
| Winnemucca, NV 89445 | San Francisco, CA 94110-2008 |
| 775-623-1578 | 415-865-3800 |
| wmack@blm.gov | Charlie.dolman@burningman.org |

## V.    DEFINITION OF DIRECT AND INDIRECT COSTS

Direct costs are those costs which can be specifically identified with the Application and which are incurred for the benefit of said applicant in that the costs would not have been incurred but for the Application and are appropriate in order for BLM to process the Application. Examples of direct costs include, but are not limited to, personnel costs in the form of wages paid to BLM personnel working on the Application, with allowances provided for fringe benefits and leave surcharge rate and any overtime associated with processing the Application; travel expenses; purchased services, if necessary, such as printing, automated data processing services and photographic reproduction; and any miscellaneous supplies and equipment of a specialized nature, the use of which is directly applicable to processing the Application.

Indirect costs are those which cannot be specifically identified with the Application. These indirect costs have been calculated at a rate of 23.1 percent of direct costs. The indirect costs are subject to

AR04368

change annually. This percentage figure has been developed in accordance with Department of the Interior procedures and represents those administrative and program costs, excluding management overhead, which can be attributed to processing the Application. Indirect costs include a portion of the costs for capitalized and non-capitalized equipment; space rental; telephone services; postage; personnel transfer costs; budget and program development; administrative and clerical support; training; safety management; public information, inquiries and reports; cartography and basic series mapping; aviation management; telecommunications; maintenance of equipment and tools; and systems design and implementation.

**Treasury Account 14X5017**, Service Charges, Deposits, and Forfeitures further described as BLM Recreation Cost Recovery is defined in the table below:

| Treasury Account | 14X5017, Service Charges, Deposits, and Forfeitures |
|---|---|
| **BLM Fund Code, Subactivity, and Title** | **XXXL5017AP, Fund 341, L51050000, Recreation Cost Recovery** |
| Source of collections/appropriations | Cost recovery charges are associated with recreation activities or events and shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. As such, this Subactivity covers revenues and expenditures associated with any Special Recreation Permit that has been determined to be Cost Recovery by BLM personnel as outlined in 43 CFR 2930-1 Permits for Recreation on Public Lands and H-2930-1, Recreation Permit Administration Handbook. Project codes are mandatory and will be assigned and administered by the State Office from their block of unassigned project numbers. They are used to differentiate revenues and obligations for each specific permit. Fees are collected in advance for specified tasks that must be carried out before significant recreation events can be permitted to occur on public lands, and BLM is expected to account to each applicant on the cost of all aspects of the work BLM performs. |

As noted in the definition in the table, this account stipulates cost recovery charges shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. Because Burning Man is a full cost recovery event, indirect costs will apply as they would for all other commercial permits that require full cost recovery.

## VI.   EFFECTIVE DATE:

This Agreement shall be effective, as of the latter date of its execution by both parties. Unless terminated earlier, it shall continue until the BLM authorized officer deems the agreement provisions have been satisfied.

Please sign the agreement below, and return to the BLM, Winnemucca District Black Rock Field Office Manager by June 27, 2016.

AR04369

## VII.    SIGNATURES OF AGREEMENT

For: Bureau of Land Management

_____
Signature

_____
Date

William Mack, Jr
Black Rock Field Manager

For: Black Rock City, LLC

_____
Signature

_____
Date

Charlie Dolman
Event Operations Director, BRC

AR04370

## Attachment 1

**2016 COST RECOVERY (CR) ESTIMATE**
**Summary:**

| | |
|---|---|
| Labor Costs | $ 1,231,978 |
| Operational Costs | $ 405,500 |
| Sub Total of Direct Costs | $ 1,637,478 |
| | |
| FY 2016 Indirect Cost Rate of 23.1% | $ 378,257 |
| **Cost Estimate TOTAL** | **$ 2,015,735** |

**Labor Detail:**

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Authorized Officer (AO), Event IC | 452 | $32,499 |
| Law Enforcement Branch Chief | 532 | $38,229 |
| Civilian Operations Branch Chief | 928 | $46,652 |
| Public Information Officer | 148 | $10,498 |
| Admin Support | 106 | $3,544 |
| Safety Officer | 128 | $7,895 |
| Compliance (Environmental & Vending) Sup | 314 | $20,058 |
| Vending | 148 | $7,308 |
| Compliance Team | 148 | $7,308 |
| Compliance Team | 148 | $7,308 |
| Compliance Team | 148 | $6,031 |
| Compliance Team | 148 | $6,031 |
| GIS | 164 | $8,118 |
| Playa Logistics Lead | 349 | $17,249 |
| Playa Logistics | 349 | $17,249 |
| Playa Logistics | 216 | $8,800 |
| Playa Logistics | 216 | $8,800 |
| Playa Logistics Runner | 88 | $3,580 |
| Communications Supervisor | 430 | $30,556 |
| Dispatch Center Manager | 326 | $12,104 |
| CommL | 512 | $32,353 |
| Communications Tech | 384 | $23,826 |

| POSTION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Communications Tech | 368 | $18,147 |
| Communications Tech | 368 | $18,147 |
| Communications Tech | 368 | $18,147 |
| Playa Information Technology | 384 | $15,643 |
| IT Security | 326 | $16,176 |

**AR04371**

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Law Enforcement Operations Chief | 232 | $17,417 |
| Law Enforcement Operations Chief | 232 | $17,417 |
| Medical Team Lead | 167 | $13,535 |
| Medical Team | 167 | $11,381 |
| Law Enforcement Patrol Commander | 284 | $19,295 |
| Law Enforcement Patrol Commander | 232 | $15,720 |
| Law Enforcement Patrol Commander | 245 | $19,753 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol SL | 137 | $9,215 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 189 | $10,676 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 176 | $9,929 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Patrol | 137 | $7,688 |
| Law Enforcement Investigative Lead | 432 | $37,601 |
| Law Enforcement Investigations | 233 | $16,202 |
| Law Enforcement Investigations | 137 | $10,959 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement Investigations | 137 | $9,215 |
| Law Enforcement OPR | 144 | $11,441 |
| Law Enforcement Evidence | 255 | $17,765 |
| Law Enforcement Evidence | 162 | $9,761 |
| Law Enforcement IMARS | 208 | $16,695 |
| Law Enforcement IMARS | 152 | $10,173 |
| Financial Support (Off Playa) | 80 | $5,329 |
| Contracting Support (Off Playa) | 80 | $4,046 |
| | TOTAL | $1,231,978 |

**Operations Detail:**

| DESCRIPTION | AMOUNT |
|---|---|
| Microwave Internet Program | $130,000 |
| Satellite Tracking (Delorme) | $56,500 |
| Medical Modular Building Rental | $6,000 |
| CAD Servers Licensing/Maintenance | $13,000 |

AR04373

| | |
|---|---|
| HHS Agreement | $20,000 |
| Travel | $80,000 |
| Vehicle Utilization | $50,000 |
| Misc. Supplies/Equip. | $50,000 |
| **TOTAL** | **$405,500** |



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Winnemucca District
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html



In Reply Refer To:
2930 (NV-30.03)
LLNVW03500-16-01

**AUG 0 2 2016**

CERTIFIED MAIL– 7014 2870 0001 4871 2275– RETURN RECEIPT REQUESTED

## D E C I S I O N

Charlie Dolman
Event Operations Director
Black Rock City, LLC                    :         Special Recreation Permit
660 Alabama St.                         :         NVW03500-16-01
San Francisco, CA 94110-2008


## INTRODUCTION

The Bureau of Land Management (BLM), Winnemucca District (WD), Black Rock Field Office has completed the Burning Man 2016 Special Recreation Permit (SRP) Determination of NEPA Adequacy (DNA), DOI-BLM-NV-W030-2016-0011-DNA. The DNA evaluated BLM proposed changes to the 2012-2016 stipulations and Black Rock City, LLC's (BRC) application for a 2016 Burning Man Event SRP and associated paid participant population cap of 70,000 for the 2016 event.

The event would be held on public lands managed by the BLM in Pershing County, Nevada on the Black Rock Desert playa, approximately 10 miles northeast of the community of Gerlach, Nevada.

In 2012, the Burning Man 2012-2016 Special Recreation Permit Environmental Assessment (EA), DOI-BLM-NV-W030-2012-0007, was completed for the Burning Man Event. The Decision Record (DR) and the Finding of No Significant Impact (FONSI) are dated June 12, 2012

AR00707

The BLM's regulations for SRP administration allow the BLM to impose stipulations and conditions to meet management goals and objectives and to protect lands and resources and the public interest. 43 C.F.R. § 2932.41. The BLM may also amend any special stipulations in order to protect public health, public safety, or the environment. 43 C.F.R. § 2932.56. Under the 2012 DR, authorization for any event during the 2012-2016 period is subject to a separate SRP decision. Prior to issuance of any year's SRP decision, a detailed review and evaluation of the previous year's event will be conducted; as necessary, the special stipulations will be modified (subject to NEPA) to address issues and concerns raised during the previous event or otherwise identified for the applicable year's event. See 2012 DR at Page 2. Finally, the 2012 DR requires that each year's SRP decision and/or the special stipulations must specify a maximum paid participant population allowed for that year's event. See 2012 DR at Page 2.

To achieve the above requirements, the BLM reviewed and evaluated all the stipulations set forth in the 2012 DR and BRC's 2015 SRP to ensure that a 2016 SRP would adequately address issues of public safety and environmental protection. Ultimately, the BLM authorized officer determined that it was necessary to modify the Burning Man 2012-2016 SRP Stipulations.

The proposed changes are included in the DNA. The commencement and ending dates for the 2016 event are proposed to be August 01, through October 07, 2016, and the actual event will occur on August 28 through September 05, 2016.

## DECISION

Based on the Burning Man SRP 2016 DNA, it is my decision to modify the Burning Man 2012-2016 Special Recreation Permit Stipulations as described in the DNA. The modified stipulations are referred to as the Burning Man 2016 Special Recreation Permit Stipulations and are attached herein.

It is my Decision to:

1) Authorize Black Rock City, LLC to conduct the Burning Man event on public lands in Pershing County, Nevada in 2016.

2) Authorize a population cap of 70,000 paid participants for the 2016 event.

3) Authorize the Black Rock City Airport-NV88 (refer to EA 2012-2016) expansion of the original schematics of 60 x 5000 feet up to 100 x 7000 feet. The expansion of the runway will allow for safely landing Dash-8 and Beech 1900 aircraft.

4) Authorize the 2016 SRP to extend from August 01 through October 07, 2016, with the actual event occurring August 28 through September 05, 2016.

My decision is subject to the implementation of the attached Burning Man 2016 Special Recreation Permit Stipulations and the following conditions carried over from the 2012 DR:

1) The SRP for any year is subject to cancellation or modification during the permit period based upon performance of the permittee, changes in law, regulation or policy, changes in resource conditions, or upon newly available information.

2) Authorization for any events during the 2012-2016 period is subject to a separate SRP decision. Prior to issuance of any year's SRP decision, a detailed review and evaluation of the previous year's event will be conducted; as necessary, the special stipulations will be modified (subject to NEPA) to address issues and concerns raised during the previous event or otherwise identified for the applicable year's event.

3) Additionally, each year's SRP decision and/or the special stipulations attached thereto will specify the maximum population allowed for that year's event. The maximum paid participant population authorized in any year may not exceed 70,000 participants.

## RATIONALE

Rationale for this decision is based on factors including, but not limited to:

1) This decision is in compliance with the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area Act of 2000, which was enacted by Congress to create special designations for 1.2 million acres of public lands managed by the BLM in northwestern Nevada.

2) This decision is in conformance with the Resource Management Plan (RMP), approved July 2004 for the Black Rock-Desert–High Rock Canyon Emigrant Trails National Conservation Area and Associated Wilderness and other Contiguous Lands in Nevada.

3) BLM consulted with Pyramid Lake Paiute Tribe and Nevada Department of Transportation, the two governments involved in the development of the *Burning Man 2012-2016 Special Recreation Permit Stipulations*.

4) Based on the consultation, coordination and previous public involvement that has occurred, it is determined that this is a well informed decision.

5) Based on the DNA, it is determined that this decision will not result in any undue or unnecessary environmental degradation of the public lands and is consistent with federal, state, and local laws, regulations and plans.

6) On the basis of the information contained in the DNA, implementation of the proposed action will not have environmental impacts beyond those already addressed the EA.

7) The 2012 DR and FONSI support this decision. There would be no change in the selected alternative identified in the 2012 DR. There would be no change in the rationale identified in the 2012 DR.

AR00709

8) Reviewing the maximum population level each year allows BRC, the BLM and other cooperators to plan and administer the event in a more predictable and orderly manner, assures that available infrastructure in the area of the event is able to support the participants, and in turn improves protection of natural and cultural resources.

9) Implementation of the Burning Man 2016 Special Recreation Permit Stipulations will serve to monitor for impacts and reduce or prevent impacts.

10) Based on the President's National Energy Policy and Executive Order 13212, the Proposed Action will not generate any adverse energy impacts or limit energy production and distribution. Therefore, no "Statement of Adverse: Energy Impact" is required per WO IM No 2002-053 and NV IM 2002-049.

**AUTHORITY:**

43 C.F.R. § 2930 Permits for Recreation on Public Lands

The statutory authorities underlying the regulations in this part are the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*, and the Federal Land Recreation Enhancement Act (FLREA), 16 U.S.C. § 6801 *et seq.* FLPMA contains the Bureau of Land Management's (BLM's) general land use management authority over the public lands, and establishes outdoor recreation as one of the principal uses of those lands (43 U.S.C. § 1701(a)(8)). Section 302(b) of FLPMA directs the Secretary of the Interior to regulate through permits or other instruments the use of the public lands, which includes commercial recreation use. Section 303 of FLPMA authorizes the BLM to promulgate and enforce regulations, and establishes the penalties for violations of the regulations. FLREA authorizes the BLM to collect fees for recreational use in areas meeting certain criteria (16 U.S.C. § 6802(f) and (g)(2)), and to issue special recreation permits for group activities and recreation events (16 U.S.C. § 6802(h). 18 U.S.C. § 3571 and § 3581 *et seq.* establish sentences of fines and imprisonment for violation of regulations.

**APPEAL PROVISIONS**

A person who wishes to appeal to the Interior Board of Land Appeals must do so under 43 C.F.R. § 4.411 and must file in the office of the officer who made the decision (not the board), in writing to William Mack, Jr., Black Rock Field Manager, Winnemucca District Office, 5100 East Winnemucca Boulevard, Winnemucca, Nevada 89445. A person served with the decision being appealed must transmit the notice of appeal in time to be filed in the office where it is required to be filed within thirty (30) days after the date of service.

The notice of appeal must give the serial number or other identification of the case and may include a statement of reasons for the appeal, a statement of standing if required by § 4.412(b), and any arguments the appellant wishes to make. Attached Form 1842-1 provides additional information regarding filing an appeal.

No extension of time will be granted for filing a notice of appeal. If a notice of appeal is filed after the grace period provided in §4.401(a), the notice of appeal will not be considered and the case will be closed by the officer from whose decision the appeal is taken. If the appeal is filed during the grace period provided in §4.401(a) and the delay in filing is not waived, as provided in that section, the notice of appeal will not be considered and the appeal will be dismissed by the Board.

The appellant shall serve a copy of the notice of appeal and any statements of reason, written arguments, or briefs under §4.413 on each adverse party named in the decision from which the appeal is taken and on the Office of the Solicitor, Pacific Southwest Regional Solicitor, U.S. Department of the Interior, 2800 Cottage Way, Room E-1712, Sacramento, California 95825-1890.

Service must be accompanied by personally serving a copy to the party or by sending the document by registered or certified mail, return receipt requested, to the address of record in the bureau, no later than 15 days after filing the document.

In addition, within thirty (30) days of receipt of this decision you have the right to file a petition for a stay together with your appeal in accordance with the regulations at 43 C.F.R. § 4.21. The petition must be served upon the same parties specified above.

Pursuant to 43 C.F.R. § 4.21(b)(1), a petition for stay, if filed, must show sufficient justification based on the following standards:

1) The relative harm to the parties if the stay is granted or denied;
2) The likelihood of the appellant's success on the merits;
3) The likelihood of immediate and irreparable harm if the stay is not granted; and,
4) Whether the public interest favors granting the stay.

43 CFR 4.21(b)(2) provides that the appellant requesting a stay bears the burden of proof to demonstrate that a stay should be granted.

Sincerely,

William Mack, Jr.
Black Rock Field Manager
Winnemucca District

Attachments:
2016 Special Recreation Permit
Burning Man 2016 Special Recreation Permit Special Stipulations
Form 1842-1

AR00711

# Burning Man )( Project

**Catalyst for creative culture in the world**

660 Alabama St., 4th Fl
San Francisco, CA 94110

Mark E. Hall PhD
Field Manager
Bureau of Land Management - Winnemucca
5100 E. Winnemucca Blvd.
Winnemucca NV 89445

April 11, 2017

Dear Mr. Hall,

Attached please find a signed Cost Recovery Agreement (CRA) covering Phase 1, Planning Labor/Government Contracts for the 2017 Burning Man event. Charlie Dolman, Operations Director, has signed the CRA, and our Finance Department has prepared a check for $472,238, which will be issued when we receive the CRA signed by BLM.

Burning Man appreciates the opportunity to work collaboratively with BLM to ensure a safe and successful event, and we look forward to the meeting with you and your team.

Sincerely,

Marnee Benson
Political Affairs Manager
Burning Man

Bureau of Land Management
Received

APR 1 4 2017

District Office
Winnemucca Nevada

www.burningman.org

AR01438

**COST RECOVERY AGREEMENT**
**Phase 1 (Planning & Gov't Contracts Funds)**

**BURNING MAN SPECIAL RECREATION PERMIT:** NVW03500-17-01
**APPLICANT:** Black Rock City, LLC.
**LEAD BLM OFFICE:** Winnemucca District, Black Rock Field Office

**I.      AUTHORITY:** Section 304(b) of the Federal Land Policy and Management Act (FLPMA) [43 U.S.C. 1734(b), as amended and 43 CFR Subpart 2932.

**II.      PURPOSE:** This Agreement between the above referenced Applicant and the Bureau of Land Management (BLM) establishes procedures to reimburse BLM for costs incurred to process a Special Recreation Permit (SRP) NVW03500-17-01.  If the BLM decides to authorize an SRP, this Agreement shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred for the 2017 Burning Man SRP, reflecting both event monitoring and planning. This Agreement will serve as the initiation of the 2017 Cost Recovery Agreement (CRA) (Phase 1-Planning Labor/Government Contracts) developed to cover BLM incurred costs associated with project planning, with a final estimate for all additional 2017 expenses due by May 30, 2017, in order to develop a final estimate and decision for the overall 2017 CRA.

**III.      PROVISIONS OF AGREEMENT**

**A.      In** accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31, Applicant agrees to reimburse BLM for the costs incurred by BLM for processing the Application, and should a SRP be issued, costs for issuing a SRP and monitoring the SRP.

**B.      This** Agreement is subject to the Reimbursable Cost Provisions and the Direct and Indirect Costs to the government outlined in OMB Circular A-25, Treasury Account: 14X5017, Service Charges, Deposits, and Forfeitures, and 43 CFR Subpart 2932.  The Cost Estimate is included, and it will be amended should actual expenses exceed the amounts identified in Attachment 1.

**C.      A** cost recovery account will be established for the SRP. The BLM requires you to remit 100% of the estimated cost recovery costs before the start of the 2017 Event. Please refer to the payment schedule below.  After the permit is complete and all work is finished, the BLM will notify you if additional funds are required or if you are entitled to a refund.

The following schedule for payments has been developed to allow for the amount due from the estimate to be paid in multiple installments and have 100% of the cost recovery estimate paid prior to the start of the event:

| Payment | Date | Amount Due |
|---------|------|-----------|
| #1 | April 6, 2017 (Phase 1) | **$472,238** |
| #2 | Estimate for all additional 2017 expenses due by Date TBD, 2017 in Phase 2 of the CRA and will be broken down into multiple installments | TBD |

AR01439

Following the close-out of the event permit, an accounting of the cost recovery funds will be provided to Black Rock City, LLC by January 31,2018`.

## IV.     REIMBURSABLE COST PROVISIONS

A.      BLM agrees to process the Application to the extent funding under the Agreement permits. Processing will include, but not be limited to, the following: coordination, administration and approval of any necessary NEPA compliance; consultation with appropriate Federal, State, Tribal, and local officials; preparation of the administrative record, monitoring the construction, operation and termination of any resultant authorization; and other necessary processing actions consistent with a final decision.

B.      BLM agrees to timely notify the Applicant, in writing, of any changes to the indirect rate.  Refer to the Definition of Direct and Indirect Costs in Section V.  Applicant shall have the right to conduct, at its own expense, reasonable audits of the books, records, and documents of BLM relating to the items on any particular accounting statement provided by BLM.

C.      Cost Recovery funds, once obligated by BLM, are not refundable and will not be made refundable by termination of the Project, withdrawal of the Application, or non-issuance of a SRP.

D.      In accordance with 43 CFR 2932.31, 2932.32, and 2932.33(c), if BLM denies the Application, Applicant must reimburse BLM for all costs BLM incurred in processing the Application.  If the Applicant withdraws the application, Applicant will reimburse BLM for processing costs incurred by BLM in closing its review of the Application and which cannot reasonably be avoided after BLM receives written notice of withdrawal of the Application.

E.      Nothing herein shall be deemed to require BLM to maintain books, records, or documents other than those usually maintained by them, provided that such books, records, and documents reasonably segregate and identify the costs for which reimbursement is required and comply with generally accepted accounting practices for such documentation.

The designated points of contact with whom each party to this Agreement will communicate concerning any aspect of this Agreement are as follows:

**Bureau of Land Management**            **Black Rock City, LLC**
Mark E. Hall                             Charlie Dolman
Black Rock Field Manager (Acting)        Event Operations Director
5100 E. Winnemucca Blvd                  660 Alabama St
Winnemucca, NV 89445                     San Francisco, CA 94110-2008
775-623-1578                             415-865-3800 mehall@blm.gov
                                         Charlie.dolman@burningman.org

## V.     DEFINITION OF DIRECT AND INDIRECT COSTS

Direct costs are those costs which can be specifically identified with the Application and which are incurred for the benefit of said applicant in that the costs would not have been incurred but for the Application and are appropriate in order for BLM to process the Application.  Examples of direct costs include, but are not limited to, personnel costs in the form of wages paid to BLM personnel working on the Application, with allowances provided for fringe benefits and leave surcharge rate and any overtime associated with processing the Application; travel expenses; purchased services, if necessary,

**AR01440**

such as printing, automated data processing services and photographic reproduction; and any miscellaneous supplies and equipment of a specialized nature, the use of which is directly applicable to processing the Application.

Indirect costs are those which cannot be specifically identified with the Application. These indirect costs have been calculated at a rate of 23.4 percent of direct costs. The indirect costs are subject to change annually. This percentage figure has been developed in accordance with Department of the Interior procedures and represents those administrative and program costs, excluding management overhead, which can be attributed to processing the Application. Indirect costs include a portion of the costs for capitalized and non-capitalized equipment; space rental; telephone services; postage; personnel transfer costs; budget and program development; administrative and clerical support; training; safety management; public information, inquiries and reports; cartography and basic series mapping; aviation management; telecommunications; maintenance of equipment and tools; and systems design and implementation.

Treasury Account 14X5017, Service Charges, Deposits, and Forfeitures further described as BLM Recreation Cost Recovery is defined in the table below:

| Treasury Account | 14X5017, Service Charges, Deposits, and Forfeitures |
|---|---|
| BLM Fund Code, Subactivity, and Title | XXXL5017AP, Fund 341, L51050000, Recreation Cost Recovery |
| Source of collections/appropriations | Cost recovery charges are associated with recreation activities or events and shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. As such, this Subactivity covers revenues and expenditures associated with any Special Recreation Permit that has been determined to be Cost Recovery by BLM personnel as outlined in 43 CFR 2930-1 Permits for Recreation on Public Lands and H-2930-1, Recreation Permit Administration Handbook. Project codes are mandatory and will be assigned and administered by the State Office from their block of unassigned project numbers. They are used to differentiate revenues and obligations for each specific permit. Fees are collected in advance for specified tasks that must be carried out before significant recreation events can be permitted to occur on public lands, and BLM is expected to account to each applicant on the cost of all aspects of the work BLM performs. |

As noted in the definition in the table, this account stipulates cost recovery charges shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. Because Burning Man is a full cost recovery event, indirect costs will apply as they would for all other commercial permits that require full cost recovery.

## VI.   EFFECTIVE DATE:

This Agreement shall be effective, as of the latter date of its execution by both parties. Unless terminated earlier, it shall continue until the BLM authorized officer deems the agreement provisions have been satisfied.

AR01441

Please sign the agreement below, and return to the BLM, Winnemucca District Black Rock Field Office Manager by March 31, 2017.

## VII.    SIGNATURES OF AGREEMENT

For: Bureau of Land Management

_Mark E Hall_
Signature

_13 April 2017_
Date

Mark E. Hall
Black Rock Field Manager

For: Black Rock City, LLC

_____
Signature

_4/4/17 ._
Date

Charlie Dolman
Event Operations Director, BRC

AR01442

## Attachment 1

**2017 COST RECOVERY (CR) ESTIMATE Summary:**

| Labor Costs | $  128,189 |
|---|---|
| Operational Costs (Travel) | $   15,000 |
| Operational Cost (Gov't Contracts) | $  239,500 |
| Sub Total of Direct Costs | $  382,689 |
| Indirect Cost (Rate of 23.4%) | $  89,549 |
| Cost Estimate TOTAL | $  472,238 |

**Labor Detail (Event Planning):**

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Agency Administrator/Authoring Officer Planning | 150 | $10,814 |
| SRP Project Manager Planning | 350 | $23,317 |
| Event Outdoor Rec Planner Planning | 150 | $7,587 |
| Civilian Operations Planner Planning | 350 | $17,703 |
| LE Operations Planner Planning | 350 | $26,520 |
| OLES Planning | 80 | $7,209 |
| Technology Planning | 150 | $13,517 |
| Communications Planning | 150 | $10,814 |
| Finance Planning | 80 | $4,046 |
| Contracting Planning | 80 | $5,330 |
| Event NEPA Planning | 20 | $1,332 |
| TOTAL | | $128,189 |

**Operations Detail (Government Contracts):**

| DESCRIPTION | AMOUNT |
|---|---|
| FRN Posting Charges | $3,500 |
| CAD Server(s) Purchase Contract | $50,000 |
| Repeater Purchase Contract | $15,000 |
| Satellite Tracking Services Contract | $56,000 |
| CAD Servers Licensing Contract | $ 8,000 |
| Network Services and Support Contract | $ 107,000 |
| TOTAL | $ 239,500 |

**Operations Detail (Planning Travel):**

| DESCRIPTION | AMOUNT |
|---|---|
| Travel | $15,000 |
| TOTAL | $15,000 |

Receipt

**United States Department of the Interior**
**Bureau of Land Management**                    Receipt
WINNEMUCCA DISTRICT OFFICE
5100 E WINNEMUCCA BLVD
WINNEMUCCA, NV 89445                    No:          3809506
Phone: 775-623-1500

| Transaction #: 3917284 |
| --- |
| Date of Transaction: 04/14/2017 |

| CUSTOMER: |
| --- |
| BLACK ROCK CITY LLC<br>660 ALABAMA ST<br>SAN FRANCISCO,CA 94110-2008 US |

| LINE # | QTY | DESCRIPTION | REMARKS | UNIT PRICE | TOTAL |
| --- | --- | --- | --- | --- | --- |
| 1 | 1.00 | RECREATION - OTHER / COST RECOVERY (5105) / COST RECOVERY PROJECT: LVRCF1705210 | COST RECOVERY PYMT 1 | - n/a - | 472238.00 |
| | | | | **TOTAL:** | **$472,238.00** |

| PAYMENT INFORMATION | | | | |
| --- | --- | --- | --- | --- |
| 1 | AMOUNT: | 472238.00 | POSTMARKED: | 04/13/2017 |
| | TYPE: | CHECK | RECEIVED: | 04/14/2017 |
| | CHECK NO: | 21990 | | |
| | NAME: | BLACK ROCK CITY LLC<br>660 ALABAMA ST, 4TH FLOOR<br>SAN FRANCISCO CA 94110-2008 US | | |

| REMARKS |
| --- |
| |

This receipt was generated by the automated BLM Collections and Billing System and is a paper representation of a portion of the official electronic record contained therein.

AR01445
4/14/2017




United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
LLNVW03500-17-01
2930 (NV-30.02)

CERTIFIED MAIL 9171 9690 0935 0077 5557 52 – RETURN RECEIPT REQUESTED

Charlie Dolman
Event Operations Director                  :          Burning Man 2017 Event
Black Rock City LLC                        :          Special Recreation Permit
660 Alabama St
San Francisco, CA 94110-2008

Dear Mr. Dolman:

On January 09, 2017 the Bureau of Land Management (BLM) received a Special Recreation Permit (SRP) application and draft Operating Plan from Black Rock City LLC (BRC) for the 2017 Burning Man Event (2017 Event).

Enclosed you will find two copies of the Cost Recovery Agreement (CRA) for the 2017 Event covering Phase 2, Continuing Planning, Operational, and Closeout. This CRA between the Applicant and the BLM establishes procedures to reimburse BLM for costs incurred to process the 2017 Burning Man SRP. As noted in the CRA, please return both signed copies of the CRA to this office on or before July 14, 2017 and remit the first payment to this office on or before July 14, 2017. The BLM will return a signed copy of the CRA to you for your files.

It bears noting that the total Cost Recovery Estimate (CRE) for the 2017 event totals $2,503,453. This is an increase of $303,497 over the 2016 Burning Man event. Additional charges to the CRE in 2017 include: 1) capturing the salaries for the SRP Project Manager and the SRP Outdoor Recreation Planner that was previously paid by a BRC proffer account (adding approximately $140,000 to the CRE); 2) two one-time 2017 communication and information technology equipment purchases in government contracting; 3) an increase in the indirect rate charged by the National Operations Center (NOC) from 23.1% to 23.4%; and 4) a 1.3% cost-of-living pay increase for all federal employees in the 2017 fiscal year.

AR01454

The BLM appreciates the opportunity to work collaboratively with BRC to ensure that the agency administers the SRP effectively.  Please contact BLM Burning Man Project Manager, Michael Verneys, at 775.623.1582 with any questions.

Sincerely,

Mark E Hall

Mark E. Hall Ph.D.
Acting Black Rock Field Manager
Winnemucca District

Enclosure: CRA

2

AR01455

FOR INTERNAL USE ONLY

1

CRA 2017 Hours Breakout

| Position/Name (Civilian Ops) | Planning Hours | Operational Hours Regular OT Hours | | Closeout Hours | Total Hours |
|---|---|---|---|---|---|
| AO - GS 13/5 | 80 | Regular Hrs OT Hours | 56 20 | 100 | 256 |
| IC - GS 13/5 | 212 | Regular Hrs OT Hours | 216 250 | 137 | **815** |
| Civ OC - GS 12/5 | 40 | Regular Hrs OT Hours | 120 170 | 100 | **430** |
| Comm Sup - GS 13/5 | 200 | Regular Hrs OT Hours | 120 170 | 40 | **530** |
| Comp Sup - GS 12/5 | 0 | Regular Hrs OT Hours | 72 98 | 0 | **170** |
| Disp CM - GS 9/5 | 40 | Regular Hrs OT Hours | 128 134 | 8 | **310** |
| Log Sup - GS 11/5 | 16 | Regular Hrs OT Hours | 144 173 | 0 | **333** |
| ComL - GS 13/5 | 16 | Regular Hrs OT Hours | 120 170 | 40 | **346** |

AR01460

FOR INTERNAL USE ONLY

CRA 2017 Hours Breakout

| | | | | | |
|---|---|---|---|---|---|
| IT Spec - GS 11/5 | 80 | Regular Hrs<br><br>OT Hours | 128<br><br>160 | 40 | **408** |
| IT Security - GS 11/5 | 80 | Regular Hrs<br><br>OT Hours | 128<br><br>160 | 16 | **384** |
| Com Tech  GS 11/5 | 24 | Regular Hrs<br><br>OT Hours | 128<br><br>188 | 16 | **356** |
| Com Tech - GS 11/5 | 0 | Regular Hrs<br><br>OT Hours | 128<br><br>188 | 0 | **316** |
| Com Tech - GS 11/5 | 0 | Regular Hrs<br><br>OT Hours | 128<br><br>188 | 0 | **316** |
| Com Tech - GS 11/5 | 0 | Regular Hrs<br><br>OT Hours | 128<br><br>188 | 0 | **316** |
| Com Tech – GS 11/5<br>(Pre & Post Only) | 0 | Regular Hrs<br>OT Hours | 40<br>40 | 0 | **80** |
| Safety Off - GS 12/5 | 8 | Regular Hrs<br><br>OT Hours | 56<br><br>72 | 0 | **136** |
| Admin Assist - GS 7/5 | 40 | Regular Hrs<br><br>OT Hours | 56<br><br>50 | 40 | **186** |
| PIO - GS 13/5 | 40 | Regular Hrs<br><br>OT Hours | 80<br><br>52 | 16 | **188** |

AR01461

FOR INTERNAL USE ONLY

3

CRA 2017 Hours Breakout

| | | | | | |
|---|---|---|---|---|---|
| GIS - GS 11/5 | 40 | Regular Hrs<br><br>OT Hours | 88<br><br>76 | 0 | **204** |
| CompVend - GS 11/5 | 40 | Regular Hrs<br><br>OT | 40<br><br>98 | 160 | **338** |
| CompVend - GS 11/5<br>(Pre & Post Only) | 0 | Regular Hrs<br><br>OT Hours | 64<br><br>48 | 0 | **112** |
| CompEnv - GS 11/5 | 0 | Regular Hrs<br><br>OT Hours | 72<br><br>76 | 0 | **148** |
| CompEnv - GS 11/5 | 0 | Regular Hrs<br><br>OT Hours | 72<br><br>76 | 0 | **148** |
| CompEnv - GS 9/5<br>(Pre & Post Only) | 80 | Regular Hrs<br><br>OT Hours | 64<br><br>48 | 0 | **192** |
| Log - GS 11/5 | 0 | Regular Hrs<br><br>OT Hours | 176<br><br>173 | 0 | **349** |
| Log - GS 9/5 | 0 | Regular Hrs<br><br>OT Hours | 104<br><br>112 | 0 | **216** |
| Log - GS 9/5 | 0 | Regular Hrs<br><br>OT Hours | 104<br><br>112 | 0 | **216** |
| Log Runner - GS 9/5 | 0 | Regular Hrs<br><br>OT Hours | 40<br><br>48 | 0 | **88** |

AR01462

CRA 2017 Hours Breakout

| | | | | |
|---|---|---|---|---|
| IMARS - GS 12/5 | | Regular Hrs<br>OT Hrs | 88<br>115 | | 203 |
| IMARS - GS 12/5 | 24 | Regular Hrs<br>OT Hrs | 88<br>115 | 16 | 243 |
| IMARS – GS 11/5<br>(Off Site/Part Time) | | Regular Hrs | 80 | | **80** |
| Financial Support<br>GS 12/5<br>Planning/Closeout Only-<br>Not on Playa | 0 | Regular Hrs<br><br>OT Hours | 0<br><br>0 | 160 | **160** |
| Contracting Support<br>GS 11/5<br>Planning/Closeout Only-<br>Not on Playa | 80 | Regular Hrs<br><br>OT Hours | 0<br><br>0 | 40 | **120** |
| | | | | | **Total Civ Ops**<br><br>**8437** |

AR01463

FOR INTERNAL USE ONLY

CRA 2017 Hours Breakout

| Position/Name (LE Ops) | | Total Hrs By Category P&O/ Reg Hrs O/ OT Hrs | | | Estimated Total Amount (Reg + OT) |
|---|---|---|---|---|---|
| LE OC - GS 12/5 | 80 | Regular Hours | 120 | 80 | **396** |
| | | OT Hours | 116 | | |
| LE PM - GS 12/5 | 300 | Regular Hrs | 120 | 200 | **736** |
| | | OT Hrs | 116 | | |
| LE POC (Day) - GS 13/5 | 16 | Regular Hours | 80 | 16 | **184** |
| | | OT Hours | 72 | | |
| LE POC (Night) - GS 13/5 | 0 | Regular Hours | 80 | 0 | **152** |
| | | OT Hours | 72 | | |
| LE INVC - GS 13/5 | 24 | Regular Hours | 120 | 0 | **240** |
| | | OT Hours | 96 | | |
| LE PC (Day) - GS 12/5 (Pre, Main) | 16 | Regular Hours | 136 | 0 | **261** |
| | | OT Hours | 109 | | |
| LE PC (Swing- GS 12/5 (Pre, Main, Post) | 16 | Regular Hours | 160 | 0 | **300** |
| | | OT Hours | 124 | | |
| LE PC (Night)- GS 12/5 (Main, Post) | 16 | Regular Hours | 128 | 0 | **248** |
| | | OT Hours | 104 | | |

FOR INTERNAL USE ONLY

6

CRA 2017 Hours Breakout

| | | | | | |
|---|---|---|---|---|---|
| LE MEDL - GS 13/5 | 6 | Regular Hours | 56 | 6 | **163** |
| | | OT Hours | 95 | | |
| LE MED - GS 12/5 | 0 | Regular Hours | 56 | 0 | **151** |
| | | OT Hours | 95 | | |
| LE MEDL HHS | 0 | Regular Hours | 96 | 0 | **167** |
| | | OT Hours | 71 | | |
| LE MEDL HHS | 0 | Regular Hours | 96 | 0 | **167** |
| | | OT Hours | 71 | | |
| LE Evidence - GS 12/5 | 40 | Regular Hours | 96 | 80 | **331** |
| | | OT Hours | 115 | | |
| LE Evidence - GS 11/5 | 16 | Regular Hours | 88 | 40 | **259** |
| | | OT Hours | 115 | | |
| LE OPR - GS 13/5 | 0 | Regular Hours | 72 | 0 | **144** |
| | | OT Hours | 72 | | |
| LE INV Sup - GS 12/5 TAC | 40 | Regular Hours | 72 | 16 | **209** |
| | | OT Hours | 81 | | |
| LE INV Sup - GS 12/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE INV Sup - GS 12/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |

AR01465

FOR INTERNAL USE ONLY

CRA 2017 Hours Breakout

| | | | | | |
|---|---|---|---|---|---|
| LE INV Sup - GS 12/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE INV Sup - GS 12/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE INV Sup - GS 12/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE INV - GS 13/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE INV - GS 13/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE PAT PS- GS 12/5 | 16 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **153** |
| LE PAT PS- GS 12/5 | 16 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **153** |
| LE PAT PS- GS 12/5 | 16 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **153** |
| LE PAT PS- GS 12/5 | 16 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **153** |
| LE PAT PS- GS 12/5 | 16 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **153** |

AR01466

FOR INTERNAL USE ONLY

CRA 2017 Hours Breakout

| | | | | | |
|---|---|---|---|---|---|
| LE PAT PS- GS 12/5 | 16 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **153** |
| LE PAT - GS 11/5<br><br>(Pre, Main)<br>K9 | 8 | Regular Hours<br><br>OT Hours | 104<br><br>85 | 0 | **197** |
| LE PAT - GS 11/5<br><br>(Pre, Main)<br>K9 | 8 | Regular Hours<br><br>OT Hours | 104<br><br>85 | 0 | **197** |
| LE PAT - GS 11/5<br><br>(Pre, Main)<br>K9 | 8 | Regular Hours<br><br>OT Hours | 104<br><br>85 | 0 | **197** |
| LE PAT - GS 11/5<br><br>(Pre, Main) | 0 | Regular Hours<br><br>OT Hours | 104<br><br>85 | 0 | **189** |
| LE PAT - GS 11/5<br><br>(Pre, Main) | 0 | Regular Hours<br><br>OT Hours | 104<br><br>85 | 0 | **189** |
| LE PAT - GS 11/5<br><br>(Pre, Main) | 0 | Regular Hours<br><br>OT Hours | 104<br><br>85 | 0 | **189** |
| LE PAT - GS 11/5<br><br>(Pre, Main) | 0 | Regular Hours<br><br>OT Hours | 104<br><br>85 | 0 | **189** |
| LE PAT - GS 11/5<br><br>(Pre, Main) | 0 | Regular Hours<br><br>OT Hours | 104<br><br>85 | 0 | **189** |
| LE PAT - GS 11/5<br><br>(Main, Post) | 0 | Regular Hours<br><br>OT Hours | 96<br><br>80 | 0 | **176** |

AR01467

FOR INTERNAL USE ONLY

CRA 2017 Hours Breakout

| | | | | | |
|---|---|---|---|---|---|
| LE PAT - GS 11/5 (Main, Post) | 0 | Regular Hours<br><br>OT Hours | 96<br><br>80 | 0 | **176** |
| LE PAT - GS 11/5 (Main, Post) | 0 | Regular Hours<br><br>OT Hours | 96<br><br>80 | 0 | **176** |
| LE PAT - GS 11/5 (Main, Post) | 0 | Regular Hours<br><br>OT Hours | 96<br><br>80 | 0 | **176** |
| LE PAT - GS 11/5 (Main, Post) | 0 | Regular Hours<br><br>OT Hours | 96<br><br>80 | 0 | **176** |
| LE PAT - GS 11/5 (Main, Post) | 0 | Regular Hours<br><br>OT Hours | 96<br><br>80 | 0 | **176** |
| LE PAT - GS 11/5 (Main, Post) | 0 | Regular Hours<br><br>OT Hours | 96<br><br>80 | 0 | **176** |
| LE PAT - GS 11/5 (Main, Post) | 0 | Regular Hours<br><br>OT Hours | 96<br><br>80 | 0 | **176** |
| LE PAT - GS 11/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE PAT - GS 11/5 | | Regular Hours<br><br>OT Hours | 72<br><br>65 | | **137** |
| LE PAT - GS 11/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |

FOR INTERNAL USE ONLY

CRA 2017 Hours Breakout

| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | **137** |
| | | OT Hours | 65 | | |

AR01469

FOR INTERNAL USE ONLY

CRA 2017 Hours Breakout

| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |
| LE PAT - GS 11/5 | 0 | Regular Hours | 72 | 0 | 137 |
| | | OT Hours | 65 | | |

AR01470

FOR INTERNAL USE ONLY

12

CRA 2017 Hours Breakout

| | | | | | |
|---|---|---|---|---|---|
| LE PAT - GS 11/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE PAT - GS 11/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE PAT - GS 11/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE PAT - GS 11/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE PAT - GS 11/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| LE PAT - GS 11/5 | 0 | Regular Hours<br><br>OT Hours | 72<br><br>65 | 0 | **137** |
| | | | | | **Total LE Ops 12902** |

AR01471

# BLACK ROCK CITY LLC PROPOSAL TO PROVIDE MEDICAL SERVICES FOR BLM PERSONNEL AT BURNING MAN

PREPARED FOR BUREAU OF LAND MANAGEMENT

MARCH 17, 2017

AR04720

Black Rock City LLC
660 Alabama Street
San Francisco, CA 94110

March 17, 2017

Mark E. Hall, PhD
Assistant Field Manager
Black Rock Field Office
Winnemucca District Office

Re: Proposal for BRC supported medical provision at the JOC

Dear Mr. Hall,

Black Rock City LLC (BRC) is pleased to submit this proposal for consolidating medical services within Black Rock City. The attached proposal outlines the services BRC currently provides and the proposed enhancements to our current medical model to meet the needs of BLM and the Pershing County Sheriff's Office (PCSO). We appreciate the commitment to quality and efficiency you have shown and welcome the opportunity to provide a city-wide, best in class medical provision model in Black Rock City.

While the attached proposal details the scope of our proposal, BRC thinks the following are advantages our proposal has to offer:
- BRC and our vendors have the personnel, skills, and experience to provide seamless, 24/7 medical care throughout the event operations period
- Our Rampart facility is a Nevada licensed Emergency Care Center, staffed 24/7 with board certified emergency physicians, providing diagnostic and treatment capabilities not available at the Joint Operations Center (JOC)
- BRC has six first aid stations staffed with Nevada licensed providers and located conveniently throughout Black Rock City for treatment of injuries and illnesses such as cuts, blisters, and eye irritation.

We have included background information to help educate new BLM staff members and those not familiar with BRC's scope of expertise.

BRC appreciates this opportunity and looks forward to the next step in the evaluative process. We request a meeting with BLM to discuss this proposal and answer any questions you may have.

Thank you,


Black Rock City LLC

# Executive Summary

Over the last five years, Black Rock City has experienced a relatively minor increase in city size yet we have implemented major enhancements to our safety and prevention models.  We have tripled the number of first aid stations, created a Nevada licensed Emergency Care Center, added chemical identification technologies (FT-IR, GC/MS, and Raman), and provided for immediate air ambulance transport to Reno and beyond.

The intent of this proposal is to outline a clear path forward that provides seamless medical care for the BLM team, reduces administrative and operational expenses, maintains or improves service quality, and provides stability and sustainability in the years to come. To this end, we have provided four options for your consideration that will accomplish these goals and maximize the use of available resources while eliminating unnecessary expenses. A single care model in Black Rock City also maximizes operational effectiveness and is critical in achieving our mission objectives—quality patient care and timely response.

BRC believes this proposal provides the following advantages to BLM staff requiring care at the Burning Man event:
1. Delivery of quality emergency services utilizing existing on-playa resources
2. 24/7 board certified emergency physician care
3. Superior diagnostics, including radiology, sonography, and i-Stat laboratory
4. Superior orthopedic treatment and pharmaceuticals
5. Immediate access to air transport resources
6. Elimination of wasteful overhead and inefficiencies

AR04722

# Background

The Burning Man event is the central hub of Burning Man culture around the world and is produced by Black Rock City LLC (BRC), a wholly owned subsidiary of Burning Man Project, a 501(c)(3) non-profit organization. The 2016 Burning Man event took place in the Black Rock Desert - High Rock Canyon Emigrant Trails National Conservation Area, and the Special Recreation Permit (SRP) was administered by the United States Bureau of Land Management (BLM) Winnemucca District, Black Rock Field Office.

The 2016 Burning Man event in Black Rock City ran for eight days, from 6:00 pm on Sunday, August 28, through 6:00 pm on Monday, September 5, and the full closure order was in effect from August 1 through September 21. Event population peaked at 67,290 participants on Friday, September 2, at 11:30 am, well under the 70,000 paid-participant cap. Emergency Operations (medical, fire, communications, and crisis intervention) ran from Wednesday, August 24 until September 7.

Medical facilities for participants were located throughout the city (see City Map-Appendix A) with a licensed Emergency Care Center located on the Esplanade near the center of the city, and six first aid stations placed adjacent to Rampart and in strategic locations throughout the rest of the city. We deployed ten Advanced Life Support (ALS) capable ambulances, six Quick Response Vehicles (QRV's) providing first aid, and a fixed wing air ambulance.

Prior to 2012, Burning Man participants needing intermediate or advanced medical care were often transported by ambulance or personal vehicle to Reno, as there were minimal medical resources available in Black Rock City. In August 2012, BRC committed to providing a more comprehensive patient care model, introducing radiology, sonography, electrocardiogram, a comprehensive pharmacy formulary (Appendix B), and on-site fixed wing air ambulance. We increased the numbers of available ambulances and in 2015 we received full license reciprocity for every medical care provider within our Emergency Services Department, thereby creating a vast web of medical care support in Black Rock City.

BLM added its own medical function at the JOC in 2011, consisting of one BLM team leader, one BLM medic, and two Health and Human Services (HHS) medics. With the addition of enhanced care capabilities at Rampart in 2012 it was BRC's expectation that the BLM medical program would no longer be seen as necessary. While the BLM medical trailer was conveniently located at the JOC, it was not convenient for officers who became ill or injured in the field (as the JOC location is approximately one mile removed from the city proper), and it was not helpful for officers requiring more than basic care. The medical building at the JOC lacked the superior diagnostic equipment, medications, and emergency trained physicians and nurses available at Rampart thereby requiring any officer needing higher level care to seek that care at Rampart.

According to BLM After Action Reports the "overwhelming majority" of patients seen at the BLM medical facility have been treated with over-the-counter pain relievers (e.g., Tylenol) or provided eyewashes. Numbers of patient contacts reported by BLM in 2014, 2015, and 2016 are as follows:

|  | Patients | K-9s | Total |
|---|---|---|---|
| **2014** | 217 | 41 | 258 |
| **2015** | 240 | 18 | 258 |
| **2016** | 214 | 1 reported | 215 |

For comparison, the following are patient care statistics for ESD and Rampart:

|  | ESD 1st Aid Stations | Rampart | Total |
|---|---|---|---|
| **2014** | 3251 | 2860 | 6111 |
| **2015** | 4937 | 1849 | 6786 |
| **2016** | 4383 | 1829 | 6212 |

The anticipated additional patient contacts represent an increase of approximately 3.7% overall, a very small change. Alternatively, if all BLM and PCSO personnel choose to go to the Rampart Emergency Care Center exclusively, the patient increase would be more significant at that facility, approximately 12.5%.

The BRC medical operation is capable of managing medical care for BLM and PCSO personnel and upholding all standards of care. Surge capacity at Rampart can already handle well beyond the proposed additional increase of 12.5%, but BRC will adjust Rampart resources accordingly if BLM accepts BRC's proposal.

The cost of BLM's medical operation each year is substantial. 2015 and 2016 costs exceeded $43,000:
- BLM personnel - $30,000
- HHS personnel - $30,000 (HHS did not charge BLM for their two medics)
- Trailer ~ $9,000
- Meals ~ $2,600+ (based on 4 staff for 14 days)
- Power ~ $1500
- Housing - between $0 (if staying at Black Rock Station) and $4,760 (if staying at Bruno's)
- Equipment and supplies - unknown
- Medications - unknown
- Travel - unknown
- Planning - unknown
- Vehicles and fuel - unknown

It is BRC's belief that the added layer of care provided at the JOC by BLM/HHS is unnecessary, costly, and inefficient.

# Burning Man Resources

BRC and its vendors have historically provided the following resources on site during the operational period:

1. Nevada licensed Emergency Care Center
    a. Acute and minor care wings staffed with licensed nurses and medics, and with emergency medicine board certified physicians
    b. Radiology
    c. Sonography
    d. Electrocardiography
    e. Laboratory diagnostics
    f. Comprehensive pharmacy formulary
    g. IV hydration and treatment
    h. Teleradiology diagnostics
2. ALS ambulances; Rapid Sequence Intubation (RSI) capabilities
3. One on-site fixed wing air ambulance; another fixed wing air ambulance is on standby in Reno as needed
4. Careflight helicopter air ambulance on standby
5. Physical and personnel surge capacity to accommodate hundreds of patients through BRC's Emergency Services Department
6. A minimum of three strategically located first aid stations staffed with licensed medics, physicians, and nurses on duty
7. Six roaming and/or staged medical vehicles staffed by licensed medics
8. Two fire response vehicles, one hazmat/rescue vehicle, each vehicle staffed with at least one personnel with EMT or higher licensure
9. All medical personnel licensed in Nevada via temporary reciprocity agreement
10. Certified hazardous materials specialists
11. Raman, FTIR, and GC/MS testing capabilities

# Proposal

BRC's proposal includes three options. <u>All options include our commitment to K-9 care</u> (below). Our approach maximizes the utilization of existing personnel, resources, and facilities with restructured governance and financial efficiency. Our proposal considers the wise use of resources, personnel, and available funds while delivering an efficient provision of quality medical services. We will do this from one point of operational control, eliminating wasteful overhead and inefficiencies. BRC would like to advocate for additional advantages of our respective organizations collaboratively working together.  The strengths of each entity will complement the other; increased interaction between BLM and Rampart will provide for familiarity with each other's processes and environs, thereby increasing process efficiencies; and synergistic outcomes are greater than the sum of individual efforts.

**Option 1: JOC Ambulance**

This option eliminates the BLM/HHS medical trailer at the JOC and replaces its function with 24/7 coverage throughout the operational period by licensed ALS ambulance personnel. Care would be provided in an ambulance stationed and staffed at the JOC. This option would provide for rapid care and diagnosis by the same personnel available to secure expedited transport to the higher level of care at Rampart. Under this option, BLM and PCSO personnel would also have access to prioritized care at any of the six ESD first-aid stations throughout Black Rock City.

**Option 2: Rampart Private Room**

This option eliminates the BLM/HHS medical trailer at the JOC and replaces its function with 24/7 coverage throughout the operational period by licensed doctors and medical personnel at the Rampart Emergency Care Center, where a private room for prioritized examination and treatment would be available to BLM and PCSO personnel seeking care. This option would provide for prioritized rapid care and diagnosis by the same personnel responsible for securing expedited transport to off-site hospitals. Under this option, BLM and PCSO personnel would also have access to prioritized care at any of the six ESD first-aid stations throughout Black Rock City.

**Option 3: JOC Ambulance + Rampart Private Room**

This option combines Options 1 and 2 by eliminating the BLM/HHS medical trailer at the JOC and replacing its function with 24/7 coverage throughout the operational period by licensed ALS ambulance personnel at the JOC and licensed doctors and medical personnel at the Rampart Emergency Care Center, where a private room for prioritized examination and treatment would be available to BLM and PCSO personnel. This option would provide for rapid care and diagnosis at the JOC by the same personnel available to secure expedited transport to the higher level of care at Rampart and for prioritized rapid care and diagnosis by the same personnel responsible for securing expedited transport to off-site hospitals.

**K-9s**

The alkaline dust, high winds, extreme temperatures, loud noise and fireworks create a very harsh environment, and while humans can voice their concerns and protect themselves with goggles, shoes, face masks, respirators and ear plugs, these protections aren't available for dogs.  Burning Man doesn't allow animals at the event for these reasons. BRC recognizes the importance of animal care in desert conditions. In 2016 BRC employed a veterinarian on site to care for BLM K-9s beyond the care delivered by the handler. We are committed to continuing to provide this service in the future. A veterinarian would be available 24/7 via pager and available for house calls at the JOC or other location should the need arise for veterinary services. All four Options include this BRC service.

## Our Commitment

All of the operational safeguards in place today will remain in effect under our proposed systems. Our commitment to the health and safety of every person in Black Rock City, and to the health and safety of BLM personnel, remains unchanged. We believe BLM and PCSO will be best served by receiving expedient care from our highly qualified healthcare professionals. We are committed to prioritized evaluation and treatment for BLM and PCSO personnel, with a swift return to service. Whether a BLM officer chooses to seek care at the JOC, a first aid station, or at the Rampart Emergency Care Center, we will ensure the highest quality care, patient privacy, and documentation as required by BLM and by Nevada law and regulations.

**Appendix A- City Map 2016**



**Appendix B- Emergency Care Center Formulary**

Adenosine

Albuterol

Amioderone

Aspirin

Atropine

Bactrim

Benzocaine

Calcium Chloride

Cephalexin

Ciprofloxin

Clindamycin

Dextrose

Dexamethasone

Diltiazem

Diphenhydramine

Dobutamine

Dopamine

Epinephrine

EMLA

Etomidate

Fentanyl

Fluconazole

Furosemide

Gentamicin

Glucagon

Glucose

Haldol

Heparin

Hydroxyzine

Ibuprophen

Insulin

Ipratropium

Ketorolac

Labetolol

Levalbuterol

Lidocaine

Lorazepam

Magnesium

Methylprednisone

Metoclopramide

Midazolam

Mylanta

Metoprolol

Morphine

Naloxone

Naphazoline

Nitroglycerin

Nitrofurantoin

Ondasetron

Oxytocin

Pepto-Bismol

Potassium

Phenazopyridine

Prednisone

Promethazine

Proparacaine HCL

Racemic Epinephrine

Rocuronium

Sensorcaine

Silvadene

Succinylcholine

Tetanus

Thiamine

Triamcinolone

Vasopressin

Vecuronium

Zithromycin

AR04728



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To
LLNVW03500-17-01
2930 (NV030.02)

**JUN 0 5 2017**

CERTIFIED MAIL 9171 9690 0935 0077 5564 83

9171 9690 0935 0077 5564 83

Marnee Benson
Political Affairs Manager
Black Rock City LLC
660 Alabama Street
San Francisco, CA 94110-2008

Re: Black Rock City LLC (BRC) proposal to provide medical services for government personnel
at Burning Man

Dear Ms. Benson:

The Bureau of Land Management (BLM) recently completed its review of BRC's proposal, dated
March 17, 2017, to consolidate medical staffing for the 2017 Burning Man event.

The BLM appreciates that BRC spent a significant amount of time and effort to prepare the
proposal. However, due to our specialized operational needs for medical staffing at the 2017
Burning Man event, the BLM is unable to accept BRC's proposal. We feel it is necessary to continue
to staff a Medical Team at the Joint Operations Center for the Burning Man event in order to
provide time sensitive response and specialized care to federal employees working the event and to
extend BLM's capability to respond to a mass casualty event. The costs quoted for the BLM
Medical Program in the BRC proposal are substantially higher than actual charges submitted by the
BLM in cost recovery. This necessary operational function for the Burning Man event will be
included in the event cost recovery estimate.

The BLM recognizes the importance of building the relationship with both National Event Services
(formerly CrowdRx) and BRC Emergency Services Division in order to create medical unity on the
playa. That relationship can translate into lifesaving integrated support and we look forward to
continuing that work in order to make the 2017 Burning Man event safe and successful. Thank you
again for your proposal.

Sincerely,

Mark E. Hall
Black Rock Field Manager
Winnemucca District

AR04359



**Burning Man**

660 Alabama St., 4th Fl
San Francisco. CA 94110

Catalyst for creative culture in the world

27 July 2017

Bureau of Land Management
Attn: Dr. Mark Hall
Winnemucca District Office
5100 East Winnemucca Blvd
Winnemucca, NV 89445

**PAYMENT THREE OF THREE FOR BRC SPECIAL RECREATION PERMIT (SRP) COST RECOVERY**

Dr. Hall:

Enclosed please find a signed Phase 2 Cost Recovery Agreement (Continuing Planning, Operational, and Closeout) and the third and final payment from Black Rock City LLC ("BRC") towards the 2017 Burning Man Special Recreation Permit. This payment in the amount of $1,015,607 brings BRC's total 2017 payment to $2,503,453.

BRC has been pleased to work with you and your team during the 2017 planning season and greatly appreciates the level of collaboration and communication you have brought to this process, especially in a year with higher than average precipitation levels in the winter and spring resulting in unusually wet playa conditions early in the summer. Thank you for working with us to help us understand our site options.

We submit the cost recovery agreement but continue to have concerns that many of BLM's requirements and costs are based on historical decisions and current policies that do not comply with cost recovery regulations, including BLM's medical operation and law enforcement staffing levels. BRC signs this CRA reserving all rights to appeal BLM's final decision on cost recovery for the 2017 SRP. Our hope is that the final decision will reflect only BLM's reasonable costs to administer our permit, and will include a reasoned, thorough explanation for each cost. It is also our hope that BLM will reconsider certain policies and requirements in the future so that costs are reasonable and justified.

We are particularly concerned about BLM's continuously escalating requirements and costs for its communications and information technology programs, which in 2016 was about $780,000 in cost recovery and statements of work combined. In 2014, when Burning Man's total population was almost the same as it was in 2016, the cost of BLM's communication operation was about $390,000. The cost doubled in two years. It is difficult to understand this 100% increase when population has not changed, crime has not increased, regulations have not changed, and BRC has taken on more responsibility in compliance and contract management. We do not wish for our event to be used as a training ground or experimental venue for new, unnecessary, or advanced technology. It is our desire to reevaluate these communications and information technology programs before the 2018 event so that BLM's requirements and costs are limited to those that are necessary to administer our SRP.

AR01458



**Burning Man**

Catalyst for creative culture in the world

660 Alabama St., 4th Fl
San Francisco. CA 94110

We look forward to seeing you in Black Rock City. Again, thank you for working with us and planning for the 2017 Burning Man event.

Should you have any questions, please contact me via phone at (775) 722-9693 or email me at Marnee.Benson@burningman.org.

We thank you and your team for your ongoing collaboration and coordination.

With Appreciation,

Marnee Benson
Manager, Political Affairs
Burning Man

AR01459



United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
2930 (NV-30.12)
LLNVW03500-18-01

CERTIFIED MAIL 9171-9690-0935-000503404-29 – *RETURN RECEIPT REQUESTED*

Charlie Dolman                                              :              Burning Man 2018 Event
Event Operations Director                             :              Special Recreation Permit
Black Rock City, LLC
660 Alabama St
San Francisco, CA 94110-2008

Dear Mr. Dolman:

On January 08, 2018 the Bureau of Land Management (BLM) received a Special Recreation Permit (SRP) application and draft Operating Plan from Black Rock City LLC (BRC) for the 2018 Burning Man Event (2018 Event).

Enclosed you will find the Cost Recovery Agreement (CRA) initiation for the 2018 Event covering Phase 1, Planning Labor/Government Contracts. This CRA between the Applicant and the BLM establishes procedures to reimburse BLM for costs incurred to process the 2018 Burning Man SRP. If the BLM decides to authorize an SRP, this CRA shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred for the 2018 Burning Man SRP, reflecting both planning and operational (Phase 2). As noted in the CRA, please return a signed copy of the CRA to this office on or before January 26, 2018 and remit Payment 1 to this office on or before January 31, 2018. The final estimate for all additional 2018 expenses will be to BRC on or about May 31, 2018 under a Decision letter for the overall 2018 CRA Estimate.

The BLM appreciates the opportunity to work collaboratively with BRC to ensure that the agency administers the SRP effectively.

Please contact BLM Burning Man Planner, Mark Pirtle, at 775-861-6674 with any questions.

Sincerely,

Mark E. Hall
Black Rock Field Manager
Winnemucca District

Enclosure:
2018 CRA Phase 1-Planning Labor/Government Contracts

**AR02847**



**Burning Man**

Catalyst for creative culture in the world

660 Alabama St., 4th Fl
San Francisco, CA 94110

Bureau of Land Management
Attn: Dr. Mark Hall
Winnemucca District Office
5100 East Winnemucca Blvd
Winnemucca, NV 89445

February 9, 2018

**2018 COST RECOVERY PHASE 1 PLANNING LABOR AND GOVERNMENT CONTRACTS**

Dear Dr. Hall,

Black Rock City LLC (BRC) received your letter and Phase 1 Cost Recovery Agreement (CRA) with the Cost Recovery Estimate (CRE) attached. Thank you for providing the CRA early in the year. Our team is looking forward to the 2018 planning season, working with BLM to plan a safe and successful Burning Man event.

The 2018 Phase 1 CRE is $235,628 higher than 2017, including the following new line items:

| | |
|---|---|
| • Dispatch Services Contract | $215,000 |
| • Microwave/Internet Bandwidth Contract | $20,000 |
| • Radio Base Station digital upgrade | $25,000 |
| • IT Program Planning 150 hours | $10,814 |

We understand from BLM that the Dispatch Services Contract was moved from the BRC Statement of Work (SOW) program back into a government contract in order to allow additional interested parties to compete for the contract, and that the contract can move back into the BRC SOW program in 2019. As you know, the BRC SOW program can be mutually beneficial, reducing BLM's workload and saving BRC the BLM indirect administrative cost (which at 21.8% will be $46,870 for the dispatch contract alone). As such, BRC appreciates the opportunity to include these expensive contracts in the BRC SOW program. We also appreciate the opportunity for additional service providers to compete for the contract and potentially provide better service and/or service at a more reasonable cost.

We also understand from BLM that you must make the microwave/internet bandwidth contract a government contract for 2018, instead of a BRC SOW as in 2017. We hope to learn more about this requirement during 2018 planning.

The 2018 Phase 1 CRA includes $25,000 for a radio base station digital upgrade. BRC has serious ongoing concerns about this requirement and all of BLM's communications, technology, and information technology expenses for the Burning Man event. As you know the event has remained very much the same in terms of population and scope of operations over the past four years, and yet BLM's costs continue to climb. In 2014, the cost of BLM's communications, technology, and IT operation was about $390,000. The next year, costs increased an astonishing 92% to $750,000, and they have continued to increase. In addition, BRC is faced each year with significant, seemingly never-ending "one-time" costs such as this radio base station digital upgrade and $50,000 worth of servers and server racks in 2017. It is extremely difficult to understand why BLM would need $50,000 in new servers and racks for the Burning Man event. We do not wish for our cost recovery

AR02848



**Burning Man**

Catalyst for creative culture in the world

660 Alabama St., 4th Fl
San Francisco, CA 94110

to be treated like the bank account for an annual buying spree. We remain likewise concerned about the BLM requiring a private entity to pay for federally mandated upgrades to BLM equipment.  Additionally, BRC wants to make sure that equipment being purchased for our Special Recreation Permit is not being used for other purposes throughout the year.  It is our desire to reevaluate these communications and information technology programs long before the 2018 event, before BLM commits to additional contracts and expenditures, so that BLM's requirements and costs are limited to those that are necessary to administer our SRP.

We have already submitted check #23514 in the amount of $707,866.00 to your office under separate cover. Enclosed please find the signed 2018 Phase 1 CRA. We submit this Phase 1 CRA but continue to have concerns that many of BLM's requirements and costs are excessive. BRC signs this CRA reserving all rights to appeal BLM's final decision on cost recovery for the 2018 SRP. Our hope is that the final decision will reflect only BLM's reasonable costs to administer our permit.

Mark, it was a pleasure working with you and your team in 2017. We greatly appreciate the level of professionalism, collaboration and communication you brought to the planning process and event operations, including during the spring when uncertain playa conditions prevailed after the winter rains. Our team is very much looking forward to working with you, Becky Anders, and Mark Pirtle again this year.

Thank you sincerely,

Marnee Benson
Associate Director, Government Affairs
Burning Man

AR02849

**COST RECOVERY AGREEMENT**
**Phase 1 (Planning & Gov't Contracts Funds)**

**BURNING MAN SPECIAL RECREATION PERMIT:** NVW03500-17-01
**APPLICANT:** Black Rock City, LLC.
**LEAD BLM OFFICE:** Winnemucca District, Black Rock Field Office

**I.      AUTHORITY:** Section 304(b) of the Federal Land Policy and Management Act (FLPMA) [43 U.S.C. 1734(b), as amended and 43 CFR Subpart 2932.

**II.      PURPOSE:** This Agreement between the above referenced Applicant and the Bureau of Land Management (BLM) establishes procedures to reimburse BLM for costs incurred to process a Special Recreation Permit (SRP) NVW03500-17-01. If the BLM decides to authorize an SRP, this Agreement shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred for the 2018 Burning Man SRP, reflecting both event monitoring and planning. This Agreement will serve as the initiation of the 2018 Cost Recovery Agreement (CRA) (Phase 1-Planning Labor/Government Contracts) developed to cover BLM incurred costs associated with project planning, with a final estimate for all additional 2018 expenses due by April 30, 2018, in order to develop a final estimate and decision for the overall 2018 CRA.

**III.      PROVISIONS OF AGREEMENT**

A.      In accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31, Applicant agrees to reimburse BLM for the costs incurred by BLM for processing the Application, and should a SRP be issued, costs for issuing a SRP and monitoring the SRP.

B.      This Agreement is subject to the Reimbursable Cost Provisions and the Direct and Indirect Costs to the government outlined in OMB Circular A-25, Treasury Account: 14X5017, Service Charges, Deposits, and Forfeitures, and 43 CFR Subpart 2932. The Cost Estimate is included, and it will be amended should actual expenses exceed the amounts identified in Attachment 1.

C.      A cost recovery account will be established for the SRP. The BLM requires you to remit 100% of the estimated cost recovery costs before the start of the 2018 Event. Please refer to the payment schedule below. After the permit is complete and all work is finished, the BLM will notify you if additional funds are required or if you are entitled to a refund.

The following schedule for payments has been developed to allow for the amount due from the estimate to be paid in multiple installments and have 100% of the cost recovery estimate paid prior to the start of the event:

| Payment | Date | Amount Due |
|---------|------|------------|
| #1 | January 26, 2018 (Phase 1) | **$ 707,866.00** |
| #2 | Estimate for all additional 2018 expenses will be documented in Phase 2 of the CRA and will be broken down into multiple installments. The dates of Phase 2 payment will be documented in the Phase 2 CRA | TBD |

Following the close-out of the event permit, an accounting of the cost recovery funds will be provided

AR02850

to Black Rock City, LLC by January 31, 2018`.

## IV.    REIMBURSABLE COST PROVISIONS

A.    BLM agrees to process the Application to the extent funding under the Agreement permits. Processing will include, but not be limited to, the following: coordination, administration and approval of any necessary NEPA compliance; consultation with appropriate Federal, State, Tribal, and local officials; preparation of the administrative record, monitoring the construction, operation and termination of any resultant authorization; and other necessary processing actions consistent with a final decision.

B.    BLM agrees to timely notify the Applicant, in writing, of any changes to the indirect rate.  Refer to the Definition of Direct and Indirect Costs in Section V. Applicant shall have the right to conduct, at its own expense, reasonable audits of the books, records, and documents of BLM relating to the items on any particular accounting statement provided by BLM.

C.    Cost Recovery funds, once obligated by BLM, are not refundable and will not be made refundable by termination of the Project, withdrawal of the Application, or non-issuance of a SRP.

D.    In accordance with 43 CFR 2932.31, 2932.32, and 2932.33(c), if BLM denies the Application, Applicant must reimburse BLM for all costs BLM incurred in processing the Application.  If the Applicant withdraws the application, Applicant will reimburse BLM for processing costs incurred by BLM in closing its review of the Application and which cannot reasonably be avoided after BLM receives written notice of withdrawal of the Application.

E.    Nothing herein shall be deemed to require BLM to maintain books, records, or documents other than those usually maintained by them, provided that such books, records, and documents reasonably segregate and identify the costs for which reimbursement is required and comply with generally accepted accounting practices for such documentation.

The designated points of contact with whom each party to this Agreement will communicate concerning any aspect of this Agreement are as follows:

Bureau of Land Management
Mark E. Hall
Black Rock Field Manager (Acting)
5100 E. Winnemucca Blvd
Winnemucca, NV 89445
775-623-1578

Black Rock City, LLC
Charlie Dolman
Event Operations Director
660 Alabama St
San Francisco, CA 94110-2008
415-865-3800 mehall@blm.gov
Charlie.dolman@burningman.org

## V.    DEFINITION OF DIRECT AND INDIRECT COSTS

Direct costs are those costs which can be specifically identified with the Application and which are incurred for the benefit of said applicant in that the costs would not have been incurred but for the Application and are appropriate in order for BLM to process the Application.  Examples of direct costs include, but are not limited to, personnel costs in the form of wages paid to BLM personnel working on the Application, with allowances provided for fringe benefits and leave surcharge rate and any overtime associated with processing the Application; travel expenses; purchased services, if necessary, such as printing, automated data processing services and photographic reproduction; and any

AR02851

miscellaneous supplies and equipment of a specialized nature, the use of which is directly applicable to processing the Application.

Indirect costs are those which cannot be specifically identified with the Application. These indirect costs have been calculated at a rate of 23.4 percent of direct costs. The indirect costs are subject to change annually. This percentage figure has been developed in accordance with Department of the Interior procedures and represents those administrative and program costs, excluding management overhead, which can be attributed to processing the Application. Indirect costs include a portion of the costs for capitalized and non-capitalized equipment; space rental; telephone services; postage; personnel transfer costs; budget and program development; administrative and clerical support; training; safety management; public information, inquiries and reports; cartography and basic series mapping; aviation management; telecommunications; maintenance of equipment and tools; and systems design and implementation.

**Treasury Account 14X5017**, Service Charges, Deposits, and Forfeitures further described as BLM Recreation Cost Recovery is defined in the table below:

| Treasury Account | 14X5017, Service Charges, Deposits, and Forfeitures |
|---|---|
| BLM Fund Code, Subactivity, and Title | XXXL5017AP, Fund 341, L51050000, Recreation Cost Recovery |
| Source of collections/appropriations | Cost recovery charges are associated with recreation activities or events and shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. As such, this Subactivity covers revenues and expenditures associated with any Special Recreation Permit that has been determined to be Cost Recovery by BLM personnel as outlined in 43 CFR 2930-1 Permits for Recreation on Public Lands and H-2930-1, Recreation Permit Administration Handbook. Project codes are mandatory and will be assigned and administered by the State Office from their block of unassigned project numbers. They are used to differentiate revenues and obligations for each specific permit. Fees are collected in advance for specified tasks that must be carried out before significant recreation events can be permitted to occur on public lands, and BLM is expected to account to each applicant on the cost of all aspects of the work BLM performs. |

As noted in the definition in the table, this account stipulates cost recovery charges shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. Because Burning Man is a full cost recovery event, indirect costs will apply as they would for all other commercial permits that require full cost recovery.

## VI.    EFFECTIVE DATE:

This Agreement shall be effective, as of the latter date of its execution by both parties. Unless terminated earlier, it shall continue until the BLM authorized officer deems the agreement provisions have been satisfied.

AR02852

Please sign the agreement below, and return to the BLM, Winnemucca District Black Rock Field Office Manager by January 26, 2018.

## VII.      SIGNATURES OF AGREEMENT

For: Bureau of Land Management                    For: Black Rock City, LLC

_____                    _____
Signature                                          Signature

_____                    2/12/18
Date                                               Date

Mark E. Hall                                       Charlie Dolman
Black Rock Field Manager                           Event Operations Director, BRC

AR02853

## Attachment 1

**2018 Phase 1 COST RECOVERY (CR) ESTIMATE Summary:**

| | |
|---|---|
| Labor Costs | $ 135,171.00 |
| Operational Costs (Travel) | $ 15,000.00 |
| Operational Cost (Gov't Contracts) | $ 429,000.00 |
| Misc Purchase (FRN Posting Fee) | $ 2,000.00 |
| Sub Total of Direct Costs | $ 581,171.00 |
| Indirect Cost (Rate of 21.80%) | $ 126,695.00 |
| **Cost Estimate TOTAL** | **$ 707,866.00** |

**Labor Detail (Event Planning):**

| POSITION | ESTIMATED HOURS | ESTIMATED AMOUNT |
|---|---|---|
| Agency Administrator/Authoring Officer Planning | 150 | $10,814 |
| Civilian Operations Planning | 350 | $23,317 |
| LE Operations Planner Planning | 450 | $34,065 |
| Environmental Program Planning | 150 | $7,587 |
| Vending Program Planning | 150 | $7,587 |
| Communications Planning | 150 | $10,814 |
| IT Program Planning | 150 | $10,814 |
| Technology Planning | 150 | $13,517 |
| Contracting Planning | 150 | $9,994 |
| Finance Planning | 80 | $5,330 |
| Event NEPA Planning | 20 | $1,332 |
| **TOTAL** | | **$135,171** |

**Operations Detail (Government Contracts):**

| DESCRIPTION | AMOUNT |
|---|---|
| Satellite Tracking Services Contract | $ 55,000 |
| CAD Servers Licensing Contract | $ 4,000 |
| Network Services and Support Contract | $ 110,000 |
| Dispatch Services Contact | $ 215,000 |
| Microwave/Internet Bandwidth Contract | $ 20,000 |
| Radio Base Station digital Upgrade | $ 25,000 |
| **TOTAL** | **$ 429,000** |

AR02854

**Operations Detail (Planning Travel):**

| DESCRIPTION | AMOUNT |
|---|---|
| Travel | $15,000 |
| TOTAL | **$15,000** |

**Miscellaneous Purchases (FRN Posting Fee):**

| DESCRIPTION | AMOUNT |
|---|---|
| FRN Posting | $2,000 |
| TOTAL | **$2,000** |

AR02855



Pirtle, Mark <mpirtle@blm.gov>

---

## BRC Questions for BLM re: 2017 Cost Recovery Closeout
1 message

Marnee Benson <marnee.benson@burningman.org>                                    Thu, Feb 15, 2018 at 11:56 AM
To: "Pirtle, Mark" <mpirtle@blm.gov>, "Hell, Merk" <mehall@blm.gov>, Becky Andres <randres@blm.gov>
Cc: Charlie Dolman <charlie.dolman@burningman.org>, Erin MacCool <playground@burningman.org>, Roger Vind <roger.vind@burningman.org>

Hello BLM~

Attached please find a list of questions from BRC regarding BLM's Cost Recovery expenditures under the 2017 Burning Man SRP. We will have more questions when we meet next Wednesday, but this is the vast majority.

Thank you very much for the opportunity to meet with you and review these costs. We know it is time consuming to put together a comprehensive Cost Recovery Closeout package and answer our questions, but we have also seen benefits to this process as BRC has been able to align with BLM more significantly as we gain understanding of your requirements and limitations. As you know, it is our goal to both support BLM's planning and operations, and to ensure we are being charged only what is reasonable and properly justified to administer our SRP.

We anticipate many of the answers to our questions will be simple and help explain the charges enough so that BRC fully understands and supports the expense and the requirement itself. Some of the answers will inevitably be more complex and likely prompt follow-up questions or conversation. We will have our planning team (copied on this email) at the meeting next week, and we will have others from BRC available to call in. We have also reviewed our questions from last year and the year prior to best prepare.

We appreciate your team for the detailed closeout package we received, for consulting your subject matter experts, and for arranging to meet with us next week in Reno. We are very much looking forward to wrapping up 2017 and beginning planning for 2018.

Thank you again and please let us know if you have questions or concerns.

Marnee Benson
Associate Director of Government Affairs
Burning Man
marnee.benson@burningman.org
w. (415) 865-3800
c. (775) 722-9693
www.burningman.org



📎  **2017 Cost Recovery Questions for BLM Feb 15 2018.docx**
      26K

**AR06564**

**LABOR COSTS**
1. Please provide more details about what the DNA people did? Was this a new function in 2017?
2. Please provide the pay period dates for the column "Processed Pay Period."
3. How many and what types of cases did the PCSO investigators work on?
4. Please provide details about the work done by Jon Young (595 hours) and Dalton Black (407 hours).
5. Please provide details about the work done by Ryan King (386 hours), Douglas Carter (346 hours), Michael Grimes (343 hours), James Iaguilli (328 hours), Douglas Young (291 hours), and Toni Suminski (287 hours).

**TRAVEL COSTS**
1. What do the codes in the Commitment Item column mean?
2. What was Dalton Black's trip purpose and destination on June 10 and June 13?
3. What was Joseph Lazzaro's $1,022 charge and purpose on 9/6?
4. What was Michael Vermeys $1,148 charge and purpose on 7/31?
5. What was Jon Young's $729 charge and purpose on 7/11?

**GOVERNMENT CONTRACTS**

OVERALL
1. It is our understanding that BLM requires an evaluation of each contract after the fact. Has BLM performed these reviews for 2017? Can they be provided to BRC?

STERLING COMPUTERS 1.1
1. Is BLM allowed to rent servers instead of purchasing?
2. Is BLM allowed to use the cloud?
3. Were there other, less costly servers available for BLM to purchase?
4. Please respond to the following statements by BRC's analyst. The BRC analyst is a technical expert but not an expert in Government regulations.
   a. BRC rejects the "Requirement Information" by BLM IT Specialist Raymond Cananaugh, in its entirety and sections VII a) i, iii and v specifically.
   b. BRC asserts:
      i. The notion that a CAD package, Microsoft SQL server or other software can only be run one particular server model, made one manufacturer is prima face ridiculous. PC servers are the textbook example of commercial off-the-shelf hardware ("COTS"), commodities available from many vendors.
      ii. Comparable all-inclusive solutions are readily available from many manufacturers, including HP, Oracle, Cisco, Supermicro and others. They also provide a "modular chassis which integrates servers, storage, and network components all into a single chassis configuration." E.g.
         1. https://www.hpe.com/us/en/product-catalog/servers/bladesystem-enclosures.hits-12.html

1

2. https://www.cisco.com/c/en/us/products/servers-unified-computing/ucs-b-series-blade-servers/index.html

iii.   A blade server is not cost-effective. The chosen option consists for four blade server in a chassis. Four individual rack servers from Dell with the same or better specifications would have cost about $29,500. For a quantity of four, the "superior management from a single point" does not justify an 85% premium.

iv.   A blade server is not a robust solution for the harsh environment of Black Rock Desert (heat, dust, dirty power, transportation). Blade servers are high density, difficult to cool and are designed to live in clean, climate controlled data centers. This particular model has a single point of failure in its network switch. Four separate servers would provide a more robust solution.

v.   The specifications are excessive: a total of 128 CPU cores, 256 GB of RAM, 3.2 TB of Solid State Disks.

vi.   In addition to the $54,449.55 in this section, the chosen solution triggered avoidable follow-on expenses of one-time $2,058.65 (receipts R-52 and R-54) and annual licensing costs of $3,737.40 in section 3.1

vii.   Instead of buying the hardware out right, it could have been rented for the short period needed.

viii.   Renting the equivalent servers in the cloud for a month would have cost $2.500. In BM's experience servers used in Black Rock City last about 3-4 years due the stresses of the environment and transportation. For the equivalent lifetime, the cloud solution would have cost $7,500.

ix.   Quoting the government:

   - "Can an Agency be compliant with the Criminal Justice Information Services Security Policy and also cloud compute? [...] the answer is yes". Page G-16 of the Criminal Justice Information Services Security Policy in section 5.1

   - BLM requires its Internet contractor to provide a "High Availability Network" with 99.999% uptime. (This means in a year, the Internet can only down for 5 minutes.) Page 5 of the Statement of Work in section 5.1
- "The servers that it is loaded on are used only during the event and shelved for the remainder of the year." - William Mack Jr, e-mail in section 3.1

x.   So according to the government's own statements. the cloud is secure, the network is contracted to be highly available and the solution is only needed during the event. A cloud solution would have cost at most 13% of the chosen solution.

xi.   By issuing this factually incorrect Requirement Information document, BLM failed to consider different manufacturers, different server models, renting and cloud options, all of which offered substantial cost reductions.

AR06566

DANIEL'S ELECTRONICS 2.1

1. Is an 8W repeater and a 30W amplifier, combined with the high gain antennas on the handsets from section 7.1, necessary to cover a distance of 2 miles on licensed (exclusive) frequencies?

SHI INTERNATIONAL CORP. 3.1

1. BLM bought 20 Microsoft SQL Server licenses. These are NOT workstation licenses for, say, 20 CAD operators, but 20 DATABASE SERVER licenses. Note that one database server can securely hold for multiple databases. Why are 20 servers licenses needed when there are only 4 servers in section 1.1?

2. There seems to be some confusion and inconsistencies regarding the length of the licenses. Different, and sometimes the same, BLM personnel claimed variously that they are needed "only during the event", 9 days, 4 months, or "the whole year". What actually got purchased were licenses for not quite 8 months. One wonders how the "services are available the whole year" when the servers are "shelved for the remainder of the year" (meaning the time not during the event) and the licenses expire. Could you help us understand this?

HIGH DESERT INTERNET 5.1

1. The RFP was for a "firm fixed price," and a "Firm Fixed Price Purchase Order" for $107,810 was issued. But $108,710 was paid. What does "firm fixed price" mean?

2. The RFP requires a wide range of skills and services that only few companies can provide. If the contract were split in network services and IT support services, more companies might be able to bid. Is this a consideration or possibility for BLM?

3. Last year BRC and BLM met and discussed this contract and these services. NOTES from that meeting:
   a. BRC is interested in taking on what we can from this contract. The issue for BLM is security. Based on Jon Young's advice, Mark Hall decided not to parse out this contract for 2017. BLM wants to look forward to 2018 for possible changes but let's start the conversation in May 2017. BLM wants a proposal from BRC.

4. Will this contract be parsed out for 2018?

5. Would BLM consider and potentially approve a proposal from BRC for 2018?

MIDLAND RADIO CORP 7.1

1. Why did BLM need 70 lithium ion rechargeable batteries in 2017?

2. Why does BLM need 260 lithium ion rechargeable batteries altogether? This is the number you have required BRC to purchase since 2015.

3. Why did BLM need (2) 6-bank chargers in 2017?

4. Why did BLM need (65) radio microphones in 2017?

5. Why did BLM need (40) radio antennas in 2017?

**MISC SUPPLIES & EQUIPMENT**
1. Is anything on this list used by BLM at any time of the year other than Burning Man?
2. Where are the items on this list stored?
3. Were any of the items listed thrown away after use? Which ones?
4. Were any of the items on this list purchased for use by PCSO? Which ones?
5. Why does Burning Man have to pay for BLM's uniforms? R-1, R-4, R-5
6. Why did BLM need 6 Ebtech Hum X Voltage Hum Filters? R-6
7. Why did BLM need:
   a. (9) MaximalPower RHF 617-1N X3 3.5mm Receiver/Listen Only Surveillance Headset Earpiece 3 Packs   R-7
   b. (16) MaximalPower RHF 617-1N X3 3.5mm Receiver/Listen Only Surveillance Headset Earpiece 2 Packs   R-8
   c. (6) MaximalPower RHF 617-1N X3 3.5mm Receiver/Listen Only Surveillance Headset Earpiece 2 Packs  R-10
8. Why did BLM need:
   a. (33) 2.5mm Listen/Receive Only Covert Acoustic Tube Earpiece Headset for Two Way Radio Speaker Mic Microphone RLN4941? R-9
   b. (56) Zeadio ZP-AR169-AII Pin 2.5mm Receiver/Listen Only Surveillance Acoustic Earpiece with Warmould for Ham Radio, Two-way Radios, Transceivers and Radio Speaker Mics Jacks. **R-9**
9. Why did BLM need (10) Plantronics EncorePro HW540 Mono Corded Headsets "for Dispatch?" R-11
   a. What were the dispatchers using in 2016 and 2015?
   b. Where are these headsets now?
10. Why did BLM need a Big Alarm [SentrySafe 1.19-cu ft Electronic/Keypad Commercial/Residential Floor Safe](#)? R-12
    a. Why was this item necessary for BLM to be able to administer the Burning Man SRP?
    b. How did BLM manage without this safe in past years?
11. Who are the Polo shirts for?  R-13
    a. Why should Burning Man pay for shirts for BLM?
12. Why did BLM need 2 Cable Entry Gland STDs? R-14
13. Why did BLM need a Powerwerx 30 Amp Redundant Rack Mount Switching Power Supply and RIGrunner 4007U with Digital Display and USB output? R-15
14. Why did BLM need (6) DC Line Noise Filter (20 Amps max) with Powerpole connectors? R-16
15. What vehicle was detailed? R-17
16. Why did BLM approve a $1,430 travel charge for Arellano Heating & Air Conditioning? R-18
    a. Did BLM ask BRC for help fixing the thermostat on the Communications tower before calling Arellano Heating & Air Conditioning?
    b. Was the repair of this AC unit essential to BLM's operations at Burning Man?
    c. Did BLM try to find a repair person in Fernley before agreeing to hire a company in Yerington?

AR06568

    d.  Why did Arellano Heating & Air Conditioning charge $1,430 for travel? What does this amount cover?

17. Why did BLM need (8) RIOS Standard Interface Cables? R-19
18. Please provide page 1 of R-20
19. Why did BLM need (2) Inverted Fiberglass Omni Antennas? R-21
20. Why did BLM need 400 feet of ½" Foam Heliax Cable? R-21, R-22
21. Why did BLM need the Compact Duplexer? R-22
22. Why did BLM need (4) 19" Sliding Heavy Duty Shelves? R-22
23. How many potties were located at the substation? R-24
    a.  Why did the restroom(s) at the Substation need to be serviced every day?
    b.  How many people were using the substation during each shift?
24. Why did BLM purchase another compressor in 2017? R-28
    a.  What happened to the compressors from previous years?
25. Why should Burning Man be required to pay for BLM's car wax? R-33
26. Please confirm that BLM 30 gallons of wiper fluid at Burning Man. R-34
27. Please explain why BLM required 15 squeegees. R-35
28. Why did this vehicle get stuck in the playa mud? R-40
    a.  Where exactly was this located?
    b.  What was the date of the incident?
    c.  Whose vehicle was this?
    d.  Was this incident caused by driver error?
    e.  Why should Burning Man have to pay for this auto detail?
29. Why did BLM require a SoundOff Signal Speaker w/ Universal Bail Bracket? R-41
30. Why did BLM require a Ridgid 9 Gallon Wet/Dry Vac? R-43
31. Why is Burning Man being charged for this Jeep detail? R-46
    a.  Whose vehicle is this?
32. Why were the items on R-52 needed in addition to the $54,449.55 Midland contract?
33. Which camera was this for: Synology CLP4 Camera License Pack. We are only aware of the PTZ camera at the esplanade station and the jail cameras, all provided by the internet contractor. R-53
34. Why were the items on R-54 needed in addition to the $54,449.55 Midland contract?
35. Really? BRC is being charged for someone's luggage cart? R-55
36. Wow. Why did BLM require (6) Lieutenant Bars, Gold Plated, Small, Pair Double Clutch Pins, (6) 2-Pack ¾" Mini Gold Lieutenant Officers Rank With Double Clutch Back, and (3) Lieutenant Bars Gold in order to administer the Burning Man SRP? R-57, R-58, R-59
    a.  Where are these items now?
37. Why did BLM require (4) Encrypted external 2TB hard drives; Fortress FIPS Portable? R-60
38. Why did BLM require the items on R-61?
39. Do returning BLM personnel get a new pair of goggles to use every year at Burning Man? R-66
40. Why is BRC required to pay for BLM's pepper spray? Will we also be required to pay for BLM's bullets? R-70
41. What were the LED Glow in the dark armbands used for? R-72

AR06569

42. Why is BRC required to pay for scarves for BLM personnel? R-75
    a.   Where are these scarves now?
    b.   Why are these personal apparel items being charged to the proponent?
    c.   Do returning BLM personnel receive a new scarf each year?
43. What are the batteries used for? R-77
44. Why did BLM need 26 (more?) bottles of eye drops? R-82
45. Why did BLM need a Hush Bagless Upright Vacuum? R-83
    a.   Why did BLM need 2?
46. What were these additional LED armbands used for? R-87
47. What are these (30) items and what were they used for? R-89

**BRC QUESTIONS TO BLM CONCERNING 2017 BURNING MAN EVENT SRP COST
RECOVERY CLOSEOUT DOCUMENTS (Received Feb 15, 2018)
PART 1**
**(BLM Answers in Red)**

**LABOR COSTS**

1.  Please provide more details about what the DNA people did? Was this a new function in 2017?

    *In 2017 the labor of the WDO employees assigned to work on the BM SRP related DNA's are captured in the Phase 1 labor table as "Event NEPA Planning". They worked on two BM SRP related DNA's: SRP/Permit DNA (includes SRP stipulations) & Vending DNA. This was done in 2016, also with labor identified in the 2016 Phase 1 labor table.*

2.  Please provide the pay period dates for the column "Processed Pay Period."

    *The "Processed Pay Period" column on the labor FBMS spread sheets refers to the gov't pay period the labor was charged in. Example, in column it shows 201719, that means the labor charge was for labor worked in pay period 19 in fiscal year 2017. See attached 2017 GSA Pay Period Calendar to assign dates to a particular pay period. Example, PP 201719 is for dates September 3 to September 16.*

3.  How many and what types of cases did the PCSO investigators work on?

    *This is a question that needs to be answered by the PCSO and is unrelated to the BLM Cost Recovery.*

4.  Please provide details about the work done by Jon Young (595 hours) and Dalton Black (407 hours).

    *(4a): In 2017, during the planning phase, Jon Young was a collateral planning team member of the BLM's 2017 BM SRP Planning Team. His responsibilities were to lead in the technology planning, which included the CAD program, the Dispatch program, the Internet Network program, the IT program, the Satellite Tracking program, the IMARS program and the GIS program. Additionally, he was responsible for the writing of four Government contracts SOWs and three MOU contract SOWs related to technology planning i.e. Government - CAD Servers purchase, CAD Servers Licensing, Satellite Tracking, Network Services ; MOU – CAD Services, Dispatch Services, Internet Bandwidth purchase. In 2017, during the operational phase, Jon Young served as the BLM's Communications Chief and was supervisor of the Radio Communication operation, the CAD operation, the Dispatch operation, the Internet Network operation, the IT operation, the Satellite Tracking operation, the IMARs operations, and the GIS operation. He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. Additionally, while on playa, he was contracting COR for two Government service contracts and BLM Representative to three MOU contracts. In the 2017 Phase 1 CRA Est. labor table, Young shared in the 150 hours of the Communication Planning for his initial planning labor. In the 2017 Phase 2 CRA Est. labor table, Young's estimated hours (continuing planning & operational) was 530 hours. The total 2017 estimated hours for Young's labor to complete*

*his assigned 2017 BM SRP duties was approximately 580 hours. His total labor charge to the final 2017 BM SRP CRA was 595 hours.*

*(4b): In 2017, during the planning phase, Dalton Black was a collateral planning team member of the BLM's 2017 BM SRP Planning Team. His responsibilities were to lead in the radio communications planning, which included the radio repeater network, the dispatch radio system and the detailer's handheld and mobile radio equipment. Additionally, he was responsible for the writing of two Government contracts SOWs i.e. radio repeater purchase and detailer's radio accessories purchase. In 2017, during the operational phase, Dalton Black served as the BLM's Radio Communications Lead in the Communications operation and was supervisor of the Radio Communication team. He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 1 CRA Est. labor table, Black's shared in the 150 hours of the Communication Planning for his initial planning labor. In the 2017 Phase 2 CRA Est. labor table, Black's estimated hours (continuing planning & operational) was 346 hours. The total 2017 estimated hours for Black's labor to complete his assigned 2017 BM SRP duties was approximately 396 hours. His total labor charge to the final 2017 BM SRP CRA was 407 hours.*

5.  Please provide details about the work done by Ryan King (386 hours), Douglas Carter (346 hours), Michael Grimes (343 hours), James Iaguilli (328 hours), Douglas Young (291 hours), and Toni Suminski (287 hours).

*(5a): In 2017, during the operational phase, Ryan King served as the BLM's IT Security Technician in the Communications operation. He assisted in the set-up of the BLM's IT equipment operation to ensure all BLM network security regulations/protocols were followed and maintained throughout the event operation. He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 2 CRA Est. labor table, King's estimated hours (planning & operational) was 384 hours. His total labor charge to the final 2017 BM SRP CRA was 386 hours.*

*(5b): In 2017, during the operational phase, Douglas Carter served as one of BLM's radio communications technician in the Communications operation (night shift). He assisted in the set-up, maintaining and break-down of the BLM's radio repeater network, the dispatch radio system and the detailer's handheld and mobile radio equipment. He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 2 CRA Est. labor table, Carter's estimated operational hours was 316 hours. His total labor charge to the final 2017 BM SRP CRA was 346 hours.*

*(5c): In 2017, during the planning phase, Michael Grimes was a collateral planning team member of the BLM's 2017 BM SRP Planning Team. His responsibilities were to plan for the BLM's and PCSO's IT equipment needs and their deployment during the event operation. Additionally, he was responsible for the writing of the MOU contract SOW for the renting of the IT equipment. In 2017, during the operational phase, Michael Grimes served as the BLM's IT technician in charge of the IT equipment deployment, operational maintenance*

2

*and break-down.  He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 1 CRA Est. labor table, Grimes shared in the 150 hours of the Communication Planning for his initial planning labor. In the 2017 Phase 2 CRA Est. labor table, Grimes's estimated hours (continuing planning & operational) was 408 hours. The total 2017 estimated hours for Grimes's labor to complete his assigned 2017 BM SRP duties was approximately 458 hours. His total labor charge to the final 2017 BM SRP CRA was 343 hours.*

*(5d): In 2017, during the operational phase, James Iaguilli served as one of BLM's radio communications technician in the Communications operation. He assisted in the set-up, maintenance and break-down of the BLM's radio repeater network, the dispatch radio system and the detailer's handheld and mobile radio equipment. He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 2 CRA Est. labor table, Iaguilli's estimated operational hours was 316 hours. His total labor charge to the final 2017 BM SRP CRA was 328 hours.*

*(5e): In 2017, during the operational phase, Douglas Young served as one of BLM's radio communications technician in the Communications operation. He assisted in the set-up, maintaining and break-down of the BLM's radio repeater network, the dispatch radio system and the detailer's handheld and mobile radio equipment. He was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 2 CRA Est. labor table, Young's estimated operational hours was 316 hours. His total labor charge to the final 2017 BM SRP CRA was 291 hours.*

*(5f): In 2017, during the operational phase, Toni Suminski served as the BLM's Dispatch Center Manager in the Communications operation. During the planning phase she assisted in the training of the contract dispatchers and the set-up of the BLM's dispatch center. During the operational phase she managed the dispatch center and supervised the work of the contract dispatchers. She was on playa for Set-up week, Pre-event week, Main event week, Post-event week and Break-down week. In the 2017 Phase 2 CRA Est. labor table, Suminski's estimated hours (planning & operational) was 310 hours. Her total labor charge to the final 2017 BM SRP CRA was 287 hours.*

**TRAVEL COSTS**

1.  What do the codes in the Commitment Item column mean?

*211EOO is the FBMS funding code for Non Foreign Employee Travel "Meals per diem" cost in a gov't travel voucher.*

*211DOO is the FBMS funding code for Non Foreign Employee Travel "Lodging" cost in a gov't travel voucher.*

*211BOO is the FBMS funding code for Non Foreign Employee Travel "fees charged by DOI Travel Management Company" in a gov't travel voucher.*

*211IOO is the FBMS funding code for Non Foreign Employee Travel "Miscellaneous Expenses" cost in a gov't travel voucher.*

*211POO is the FBMS funding code for Non Foreign Employee Travel "Use of a POV (Personally Owned Vehicle)" in a Gov't travel voucher.*
*211TOO is the FBMS funding code for Non Foreign Employee Travel "Taxi Charges" cost in a Gov't travel voucher.*
*211ROO is the FBMS funding code for Non Foreign Employee Travel "Vehicle Rental" cost in a Gov't travel voucher.*
*211COO is the FBMS funding code for Non Foreign Employee Travel "Airline Ticket" cost in a Gov't travel voucher.*
*269FOO is the FBMS funding code for Non Foreign Employee Travel "Fuel for Rental Vehicle" cost in a Gov't travel voucher.*

2.   What was Dalton Black's trip purpose and destination on June 10 and June 13?
*During the planning phase in June, Black was assigned to come to Reno and go out to Winnemucca Lake to evaluate whether the BLM could set up a communication center close to Winnemucca Lake in case the event had to be moved to Winnemucca Lake instead of the Black Rock.*

3.   What was Joseph Lazzaro's $1,022 charge and purpose on 9/6?
*Lazzaro was assigned to the BLM LE operation. Lazzaro flew from his duty station in Alaska to support the Burning Man event.  The charge date listed on the Travel Costs worksheet reflects the date the charge posted to his government card, not necessarily the date of purchase.  The $1,022 posted to Lazzaro's credit card on 9/6 is for the rental vehicle he required for transport from the airport to the event, performance of duties at the event, and the return to the airport after the event.*

4.   What was Michael Vermeys $1,148 charge and purpose on 7/31?
*Vermeys reported to Gerlach from Battle Mountain, NV (his residency) on 7/31 to start his duties as CivOps Chief during the event operation. Part of those duties was to assist BRC in the survey flagging of the JOC site and thereafter assist BRC in the building of the JOC compound. This travel voucher was his main travel voucher for his travel to Gerlach, his assignment at the event and his travel home after the event.*

5.   What was Jon Young's $729 charge and purpose on 7/11?
*In July, as part of planning duties of the Communication Chief, Young traveled to Reno for Mandatory Nevada Civil Applicant Account training from Nevada Department of Public Safety.  This training was necessary to ensure compliance with Nevada Department of Public Safety in obtaining criminal history record information checks for event contract dispatch employees working in the state of Nevada for the 2017 Burning Man Event. Nevada Department of Public Safety held this training session in Reno, NV, for BLM.*

AR01423

**GOVERNMENT CONTRACTS**

<u>OVERALL</u>

1.   It is our understanding that BLM requires an evaluation of each contract after the fact. Has BLM performed these reviews for 2017? Can they be provided to BRC?

*Answer from David Appold (NSO), Lead Contracting Officer for BM SRP Gov't Contracts: An evaluation/review of any government contract is only conducted as part of a BLM requested contract audit. As of today, no contract audits of BM SRP related contacts has been requested, and if any audits had been completed, they could not be provided to BRC.*

5

*Internal Working Document*

**INFORMATION MEMORANDUM FOR THE STATE DIRECTOR**

DATE:            May 25, 2018

FROM:           Mark Hall, Phd., Black Rock Field Office Manager

THROUGH:    Ester McCullough, Winnemucca District Office Manager

SUBJECT:     Bureau of Land Management (BLM) Nevada Law Enforcement Plan Review and Recommendations.

## I.      INTRODUCTION

This memorandum provides information and recommendations for next steps regarding employee safety at the Burning Man Event in light of concerns identified in the 2017 Air Quality baseline report.

## II.     BACKGROUND

BLM instituted medical standards in 2012 and did so in close coordination with the Office of Personnel Management (OPM) and the Office of Occupational Safety and Health (OSH). This is the first documented occasion of an interest in examining employee health and safety as it relates to environmental conditions. An outreach by the Office of Law Enforcement and Security (OLES) to have OSH visit the event site was rebuffed by the 2012 planning team. Prior to the 2013 Burning Man event, the OSH team proposed a dust inhalation study at the event and was declined by the Department of Interior, Director of the Office of Occupational Safety and Health due to a lack of coordination with the event planning team.

In May 2013, BLM Division of Safety, Health, and Emergency Management Captain, Ann Krake emailed an associated press article referencing Valley Fever and noting that the Burning Man event is at risk for this illness. The email was received by the event planning team but there is no indication steps specific to the concern were taken for employees working the event. The Department of Health and Human Services (HHS) did deploy to the event and has each year since 2013 to provide onsite medical care for employees. The event medical unit documented at least 136 work hours saved due to services provided to employees in early and preventative care during the 2017 event.

Dust inhalation was identified in the 2017 Burning Man event risk management assessment and the HHS threat assessment with mitigations through utilizing shemagh style scarves and goggles.

BLM embarked on an Environmental Impact Study (EIS) in 2017 based on a proposed action to permit the Burning Man event at 100,000 participants from 2019-2028. A baseline air quality study was conducted at the 2017 Burning Man event to further the EIS. The draft summary report of this study was received by the EIS team in April 2017. The results indicate the air quality was above the Environmental Protection Agency (EPA) acceptable limits from August 19, 2017, through September 6, 2017. Quantities of particulates airborne exceeded EPA acceptable standards for both PM 10 and PM 2.5 from 8.6 to 14.6 times the acceptable levels.

1

AR08585

*Internal Working Document*

The playa surface is known to contain the carcinogen silica, however, the baseline air quality summary does not provide a particulate analysis to inform how much silica was airborne.

Following the 2017 event, two known incidents of employees filing CA-2s for illness relating to dust exposure at the event.  The BLM has known that employees often report "Playa Cough" following the event and that the dust exposure can be extreme for employees.  The Air Quality baseline report is the first documented study identifying the severity of the risk to employees. The BLM Division of Safety, Health, and Emergency Management reached out to the event planning team again in 2015 to have a Department of Interior Industrial Hygienist perform a study at the 2015 event due to concerns regarding "Playa Cough".  BLM Winnemucca District Manager Gene Seidlitz declined this offer.

## III.    POSITIONS OF INTERESTED PARTIES

The Office of the Solicitor, Janell Bogue, reviewed the 2017 Air Quality baseline study and consulted peers familiar with labor laws and regulations.  The office opined the study did not justify hazard pay for BLM employees but that it is imperative to have BLM Washington Office review the study for safety concerns.

The air quality concerns will be addressed in the EIS document set for completion prior to the 2019 event.  The 2018 BLM planning team for the Burning Man event is concerned about protecting employee health in the interim.  Potential mitigations for 2018 may include specialized HEPA filters for JOC buildings and vehicles.  Respirators are not a practical solution for law enforcement officers working the event due to reduced visibility, lack of ability to smell, and filter replacement.  A clear vision of appropriate mitigation short of reducing participant numbers or cancelling the event is not apparent.

Black Rock City, LLC. (BRC) is concerned about rising costs associated with BLM administering the Burning Man SRP.  BRC will likely appeal any increase in permit administration costs associated with mitigations for air quality and employee safety.

## IV.    NEXT STEPS

The 2018 BLM planning team would like to pursue previously proposed studies with the OSH during the 2018 event to establish internal baseline analysis and look at next steps for inclusion in the EIS.

The BLM Nevada State Director's opinion and input on next steps is desired.

## V. ATTACHMENTS

PREPARED BY:  Becky Andres, Zone 1 Staff Law Enforcement Ranger, 775-315-3497

AR08586

**Attachment 1**

**2018 Phase 2 CRA Estimate**

| Summary | | |
|---|---|---|
| Labor Costs | $ | 1,534,408.25 |
| Operational Costs | $ | 225,000.00 |
| Subtotal of Direct Costs | $ | 1,759,408.25 |
| Indirect Costs (Rate of 21.8%) | $ | 383,551.00 |
| **Cost Estimate TOTAL** | **$** | **2,142,959.25** |

**LABOR DETAIL**

**105 CRA Labor Positions**

| POSITION | ESTIMATED HOURS (Reg & OT) | ESTIMATED AMOUNT |
|---|---|---|
| | | |
| Authorized Officer (AO)/Incident Commander (IC) | 412 | $34,276.64 |
| Branch Chief – Compliance & Support (BC) | 926 | $60,287.96 |
| Law Enforcement Branch Chief | 396 | $30,428.04 |
| Law Enforcement Project Manager/Operations Chief | 736 | $53,813.24 |
| Compliance & Support Operations Chief | 306 | $21,382.54 |
| SRP Monitor | 610 | $42,731.50 |
| Public Information Officer | 271 | $15,810.57 |
| Admin Support | 186 | $8,979.68 |
| Safety Officer | 136 | $9,499.44 |
| Compliance (Environmental & Vending) Sup | 530 | $16,928.62 |
| Vending Compliance (Pre, Main. Post) Post) | 240 | $13,992.00 |
| Vending Compliance (Pre, Main. Post) Post) | 240 | $13,992.00 |
| Environmental Compliance (Pre, Main. Post) | 240 | $13,992.00 |
| Environmental Compliance (Pre, Main. Post) | 240 | $13,992.00 |
| GIS | 204 | $9,840.64 |
| Playa Logistics Lead | 422 | $20,362.40 |
| Playa Logistics | 349 | $20,347.39 |
| Playa Logistics | 216 | $8,506.96 |
| Playa Logistics | 216 | $8,506.96 |
| Playa Logistics Runner | 88 | $3,465.04 |
| Communications Supervisor | 530 | $58,627.50 |
| Dispatch Center Manager | 310 | $14,946.88 |
| Communications Lead | 346 | $24,174.94 |
| Communications Tech | 332 | $23,183.08 |
| Communications Tech | 316 | $18,409.00 |
| Communications Tech | 316 | $18,409.00 |
| Communications Tech (Pre & Post) | 80 | $4,664.00 |
| IT Specialist | 408 | $19,665.84 |
| IT Security | 384 | $26,845.76 |
| IT Network (Pre) | 65 | $5,405.80 |
| IMARS Tech | 203 | $14,175.17 |
| IMARS Tech | 243 | $20,195.16 |

| | | |
|---|---|---|
| IMARS Tech (Set-up Only) | 65 | $6,388.20 |
| Law Enforcement Patrol Captain | 184 | $17,405.20 |
| Law Enforcement Patrol Captain | 152 | $14,787.92 |
| Medical Team Lead | 163 | $16,440.17 |
| Medical Team | 151 | $12,999.23 |
| Law Enforcement Patrol Lieutenant | 261 | $19,849.69 |
| Law Enforcement Patrol Lieutenant | 261 | $19,849.69 |
| Law Enforcement Patrol Lieutenant | 261 | $19,849.69 |
| Law Enforcement Patrol Sargent | 153 | $12,311.49 |
| Law Enforcement Patrol Sargent | 153 | $12,311.49 |
| Law Enforcement Patrol Sargent | 153 | $12,311.49 |
| Law Enforcement Patrol Sargent | 153 | $12,311.49 |
| Law Enforcement Patrol Sargent | 153 | $12,311.49 |
| Law Enforcement Patrol Sargent | 153 | $12,311.49 |
| Law Enforcement Patrol | 197 | $13,257.43 |
| Law Enforcement Patrol | 197 | $13,257.43 |
| Law Enforcement Patrol | 197 | $13,257.43 |
| Law Enforcement Patrol | 189 | $12,798.31 |
| Law Enforcement Patrol | 189 | $12,798.31 |
| Law Enforcement Patrol | 189 | $12,798.31 |
| Law Enforcement Patrol | 189 | $12,798.31 |
| Law Enforcement Patrol | 189 | $12,798.31 |
| Law Enforcement Patrol | 176 | $11,937.44 |
| Law Enforcement Patrol | 176 | $11,937.44 |
| Law Enforcement Patrol | 176 | $11,937.44 |
| Law Enforcement Patrol | 176 | $11,937.44 |
| Law Enforcement Patrol | 176 | $11,937.44 |
| Law Enforcement Patrol | 176 | $11,937.44 |
| Law Enforcement Patrol | 176 | $11,937.44 |
| Law Enforcement Patrol | 176 | $11,937.44 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Patrol | 137 | $9,354.83 |
| Law Enforcement Investigative Chief | 240 | $22,770.72 |

| | | |
|---|---|---|
| Law Enforcement Investigative Support | 209 | $16,603.33 |
| Law Enforcement Investigative Support | 137 | $11,211.01 |
| Law Enforcement Investigative Support | 137 | $11,211.01 |
| Law Enforcement Investigative Support | 137 | $11,211.01 |
| Law Enforcement Investigative Support | 137 | $11,211.01 |
| Law Enforcement Investigative Support | 137 | $11,211.01 |
| Law Enforcement Investigations | 137 | $11,211.01 |
| Law Enforcement Investigations | 137 | $11,211.01 |
| Law Enforcement Investigations | 137 | $11,211.01 |
| Law Enforcement Investigations | 137 | $11,211.01 |
| Law Enforcement Investigations | 137 | $11,211.01 |
| Law Enforcement Investigations | 137 | $11,211.01 |
| Law Enforcement OPR | 144 | $14,133.60 |
| Law Enforcement Evidence | 331 | $21,636.49 |
| Law Enforcement Evidence | 259 | $17,504.41 |
| Financial Support (Off Playa) | 80 | $5,611.20 |
| Contracting Support (Off Playa) | 120 | $8,416.80 |
| **TOTAL** | | $1,534,408.25 |

| Operational Cost Summary | |
|---|---|
| Travel | $ 80,000.00 |
| Vehicle Utilization | $ 50,000.00 |
| Misc. Supplies/Equipment Purchase | $ 35,000.00 |
| USFS IAA | $ 40,000.00 |
| HHS IAA | $ 20,000.00 |
| **Total** | **$ 225,000.00** |

**Burning Man** **Project**

■ Catalyst for creative culture in the world ■

660 Alabama St., 4th Fl
San Francisco, CA 94110

July 6, 2018

Bureau of Land Management
Attn: Dr. Mark Hall
Winnemucca District Office
5100 East Winnemucca Blvd
Winnemucca, NV 89445

**PAYMENT TWO OF THREE FOR BRC SPECIAL RECREATION PERMIT (SRP) COST
RECOVERY**

Dear Dr. Hall:

Enclosed please find a signed Phase 2 Cost Recovery Agreement Continuing Planing,
Operational, and Closeout (CRA) and second payment from Black Rock City LLC (BRC) towards
the 2018 Burning Man Special Recreation Permit. This payment in the amount of $1,071,480
brings BRC's total 2018 payment to $1,779,346 with a third and final payment of $1,071,479.25
remaining and due July 27, 2018.

We submit the cost recovery agreement and payment but continue to have concerns that many of
BLM's requirements and costs seem to be unjustified as outlined in our 2015, 2016 and 2017 cost
appeals, specifically with respect to law enforcement staffing, communications/IT operations and
personnel that cost nearly $1 million for our 8-day event, and BLM's redundant medical operation.
BRC signs this CRA reserving all rights to appeal BLM's final decision on cost recovery for the
2018 SRP. Our hope is that the final decision will reflect only BLM's reasonable costs to administer
our permit, and will include a thorough explanation for each requirement and charge. It is also our
hope that BLM will reconsider certain policies and requirements in the future so that all costs are
reasonable and justified to administer our Special Recreation Permit.

I wrote you an email on June 13th noting that BLM's predicted cost recovery expenses for 2018 are
half a million dollars higher than 2017 actual costs. In that email I requested detailed information
about the cost increases. BRC appreciates the information you provided in response on June 20th.
You mapped out the basic process BLM used to arrive at the Cost Recovery Estimate (CRE), but
we still have questions, as you didn't explain what the additional costs were for or why they are
being required this year. Specifically:

**LABOR**
1. What dollar amount of planning labor costs were carried over to Phase 2 and why weren't
   they included in Phase 1?
2. What are the specific tasks and positions connected to the planning labor costs carried over
   to Phase 2?
3. Which two civilian positions were converted from Pre and Post only to Pre, Main, and Post,
   and why were they converted?

**Burning Man Project**

Catalyst for creative culture in the world

660 Alabama St., 4th Fl
San Francisco, CA 94110

4.  For the positions in #3, what specific tasks are being done this year that weren't done last year?
5.  What are the GS grades for BLM's detailers at Burning Man, and are they the lowest grade that could be used to fill each position?
6.  How many hours were added for each position you named as requiring more hours for 2018 than 2017: Authorized Officer/Incident Commander, Logistics Supervisor, and Public Information Officer?
7.  What specific tasks need to be done in 2018 that weren't done in 2017 by the Authorized Officer/Incident Commander, Logistics Supervisor, and Public Information Officer?
8.  What number of hours, what dollar amounts, and what positions on the TO correspond to IT Network set-up support and IMARS set-up support?
9.  What specific tasks are being performed under IT Network set-up support and IMARS set-up support?
10. What is the total dollar amount in the CRE of the 1.4% pay increase for Government employees?

**OPERATIONS**
11.     What is the reduction of $58,000 attributed to?

<u>We respectfully request the answers to these questions before we submit our third and final payment.</u>

Thank you for working with us and planning for the 2018 Burning Man event. We appreciate you and your team for your ongoing collaboration. We look forward to seeing you in Black Rock City.

Sincerely,

Marnee Benson
Associate Director, Government Affairs
Burning Man

**COST RECOVERY AGREEMENT**
**Phase 2 (Planning, Operational & Closeout Funds)**

**BURNING MAN SPECIAL RECREATION PERMIT: NVW03500-1B-01**
**APPLICANT: Black Rock City, LLC.**
**LEAD BLM OFFICE: Winnemucca District, Black Rock Field Office**

**I.      AUTHORITY:** Section 304(b) of the Federal Land Policy and Management Act (FLPMA) [43 U.S.C. 1734(b), as amended and 43 CFR Subpart 2932.

**II.      PURPOSE:** This Agreement between the above referenced Applicant and the Bureau of Land Management (BLM) establishes procedures to reimburse BLM for costs incurred to process a Special Recreation Permit (SRP) NVW03500-1B-01. If the BLM decides to authorize an SRP, this Agreement shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred for the 201B Burning Man SRP, reflecting both event monitoring and planning. This Agreement will serve as the continuance of the 2018 Cost Recovery Agreement (CRA) (Phase 2-Continued Planning Labor/ IAA's Funding / Operational Cost / Closeout Labor) developed to cover BLM incurred costs associated with project planning, with a final estimate for all additional 2018 expenses due by June 4, 2018, in order to develop a final estimate and decision for the overall 2018 CRA.

**III.      PROVISIONS OF AGREEMENT**

**A.**      In accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31, Applicant agrees to reimburse BLM for the costs incurred by BLM for processing the Application, and should a SRP be issued, costs for issuing a SRP and monitoring the SRP.

**B.**      This Agreement is subject to the Reimbursable Cost Provisions and the Direct and Indirect Costs to the government outlined in OMB Circular A-25, Treasury Account: 14X5017, Service Charges, Deposits, and Forfeitures, and 43 CFR Subpart 2932. The Cost Estimate is included, and it will be amended should actual expenses exceed the amounts identified in Attachment 1.

**C.**      A cost recovery account will be established for the SRP. The BLM requires you to remit 100% of the estimated cost recovery costs before the start of the 2018 Event. Please refer to the payment schedule below. After the permit is complete and all work is finished, the BLM will notify you if additional funds are required or if you are entitled to a refund.

The following schedule for payments has been developed to allow for the amount due from the estimate to be paid in multiple installments and have 100% of the cost recovery estimate paid prior to the start of the event:

Costs

| Phase | DIRECT COSTS | INDIRECT COST RATE | INDIRECT COSTS | TOTAL |
|-------|--------------|--------------------|----------------|-------|
| 1 | $581,171.00 | 21.8% | $126,695.00 | $707,866.00 |
| 2 | $1,759,408.25 | 21.8% | $383,551.00 | $2,142,959.25 |
| TOTAL | $2,340,579.25 | | $510,246.00 | $2,850,825.25 |

AR02772

**PAYMENTS**

| PAYMENT | AMOUNT | DATE DUE |
|---|---|---|
| 1 | $707,866.00 | RECEIVED |
| 2 | $1,071,479.62 | June 30, 2018 |
| 3 | $1,071,479.63 | July 27, 2018 |

Following the close-out of the event permit, an accounting of the cost recovery funds will be provided to Black Rock City, LLC by January 31, 2019.

**IV.      REIMBURSABLE COST PROVISIONS**

A.      BLM agrees to process the Application to the extent funding under the Agreement permits. Processing will include, but not be limited to, the following: coordination, administration and approval of any necessary NEPA compliance; consultation with appropriate Federal, State, Tribal, and local officials; preparation of the administrative record, monitoring the construction, operation and termination of any resultant authorization; and other necessary processing actions consistent with a final decision.

B.      BLM agrees to timely notify the Applicant, in writing, of any changes to the indirect rate. Refer to the Definition of Direct and Indirect Costs in Section V.  Applicant shall have the right to conduct, at its own expense, reasonable audits of the books, records, and documents of BLM relating to the items on any particular accounting statement provided by BLM.

C.      Cost Recovery funds, once obligated by BLM, are not refundable and will not be made refundable by termination of the Project, withdrawal of the Application, or non-issuance of a SRP.

D.      In accordance with 43 CFR 2932.31, 2932.32, and 2932.33(c), If BLM denies the Application, Applicant must reimburse BLM for all costs BLM incurred in processing the Application.  If the Applicant withdraws the application, Applicant will reimburse BLM for processing costs incurred by BLM in closing its review of the Application and which cannot reasonably be avoided after BLM receives written notice of withdrawal of the Application.

E.      Nothing herein shall be deemed to require BLM to maintain books, records, or documents other than those usually maintained by them, provided that such books, records, and documents reasonably segregate and identify the costs for which reimbursement is required and comply with generally accepted accounting practices for such documentation.

The designated points of contact with whom each party to this Agreement will communicate concerning any aspect of this Agreement are as follows:

Bureau of Land Management
Mark E. Hall
Black Rock Field Manager (Acting)
5100 E. Winnemucca Blvd
Winnemucca, NV 89445
775-623-1578

Black Rock City, LLC
Charlie Dolman
Event Operations Director
660 Alabama St
San Francisco, CA 94110-2008
415-865-3800 mehall@blm.gov
Charlie.dolman@burningman.org

AR02773

## V.   DEFINITION OF DIRECT AND INDIRECT COSTS

Direct costs are those costs which can be specifically identified with the Application and which are incurred for the benefit of said applicant in that the costs would not have been incurred but for the Application and are appropriate in order for BLM to process the Application. Examples of direct costs include, but are not limited to, personnel costs in the form of wages paid to BLM personnel working on the Application, with allowances provided for fringe benefits and leave surcharge rate and any overtime associated with processing the Application; travel expenses; purchased services, if necessary, such as printing, automated data processing services and photographic reproduction; and any miscellaneous supplies and equipment of a specialized nature, the use of which is directly applicable to processing the Application.

Indirect costs are those which cannot be specifically identified with the Application. These indirect costs have been calculated at a rate of 21.8 percent of direct costs. The indirect costs are subject to change annually. This percentage figure has been developed in accordance with Department of the Interior procedures and represents those administrative and program costs, excluding management overhead, which can be attributed to processing the Application. Indirect costs include a portion of the costs for capitalized and non-capitalized equipment; space rental; telephone services; postage; personnel transfer costs; budget and program development; administrative and clerical support; training; safety management; public information, inquiries and reports; cartography and basic series mapping; aviation management; telecommunications; maintenance of equipment and tools; and systems design and implementation.

Treasury Account 14X5017, Service Charges, Deposits, and Forfeitures further described as BLM Recreation Cost Recovery is defined in the table below:

| Treasury Account | 14X5017, Service Charges, Deposits, and Forfeitures |
|---|---|
| BLM Fund Code, Subactivity, and Title | XXXL5017AP, Fund 341, L51050000, Recreation Cost Recovery |
| Source of collections/appropriations | Cost recovery charges are associated with recreation activities or events and shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. As such, this Subactivity covers revenues and expenditures associated with any Special Recreation Permit that has been determined to be Cost Recovery by BLM personnel as outlined in 43 CFR 2930-1 Permits for Recreation on Public Lands and H-2930-1, Recreation Permit Administration Handbook. Project codes are mandatory and will be assigned and administered by the State Office from their block of unassigned project numbers. They are used to differentiate revenues and obligations for each specific permit. Fees are collected in advance for specified tasks that must be carried out before significant recreation events can be permitted to occur on public lands, and BLM is expected to account to each applicant on the cost of all aspects of the work BLM performs. |

AR02774

As noted in the definition in the table, this account stipulates cost recovery charges shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use.  Because Burning Man is a full cost recovery event, indirect costs will apply as they would for all other commercial permits that require full cost recovery.

## VI.   EFFECTIVE DATE:

This Agreement shall be effective, as of the latter date of its execution by both parties.  Unless terminated earlier, it shall continue until the BLM authorized officer deems the agreement provisions have been satisfied.

Please sign the agreement below, and return to the BLM, Winnemucca District Black Rock Field Office Manager by June 25, 2018.

## VII.   SIGNATURES OF AGREEMENT

For: Bureau of Land Management

_Mark E. Hall_
Signature

_11 July 2018_
Date

Mark E. Hall
Black Rock Field Manager

For: Black Rock City, LLC

_____
Signature

_____
Date

Charlie Dolman
Event Operations Director, BRC

AR02775



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500|Fax: (775) 623-1741
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

*@v 2/5/18*
*ww 2/5/19*

In Reply Refer To:
2930 (NV030.14)
NVW03500-19-(

**FEB 0 6 2019**

9171 9690 0935 0211 8267 31

CERTIFIED MAIL No. 9171 9690 0935 0211 8267 31

Marnee Benson
Associate Director of Government Affairs      :      Special Recreation Permit
Black Rock City, LLC                          :      NVW03500-19-01
660 Alabama St
San Francisco, CA 94110-2008

Dear Ms. Benson:

On January 29, 2019 the Bureau of Land Management (BLM) received a Special Recreation Permit (SRP) application and draft Operating Plan from Black Rock City LLC (BRC) for the 2019 Burning Man Event (2019 Event).

Enclosed you will find the Cost Recovery Agreement (CRA) initiation for the 2019 Event covering Phase 1, Planning Labor/Projected Government Contracts. This CRA between the Applicant and the BLM establishes procedures to reimburse BLM for costs incurred to process the 2019 Burning Man SRP. If the BLM decides to authorize an SRP, this CRA shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred for the 2019 Burning Man SRP, reflecting both planning and operational (Phase 2). As noted in the CRA, please return a signed copy of the CRA to this office on or before February 14, 2019 and remit Payment 1 to this office on or before February 15, 2019. The final estimate for all additional 2019 expenses will be to BRC on or about May 31, 2019 under a Decision letter for the overall 2019 CRA Estimate.

Official Record Copy

The BLM appreciates the opportunity to work collaboratively with BRC to ensure that the agency administers the SRP effectively.

Please contact Authorizing Officer, Mark Hall, at 775-623-1529 with any questions.

Sincerely,

**MARK E. HALL**

Mark E. Hall
Black Rock Field Manager
Winnemucca District

Enclosure:
2019 CRA Phase 1-Planning Labor/Projected Government Contracts

AR03423



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
LLNVW03500-19-0l
2930 (NV030.10)

CERTIFIED MAIL NO. 9171 9690 0935 0211 8503 92
RETURN RECEIPT REQUESTED

Marnee Benson
Associate Director of Government Affairs
Burning Man Project                                          2019 Burning Man Event
660 Alabama St.                                            Special Recreation Permit
San Francisco, CA 94110-2008                                   LLNVW03500-19-01

Dear Ms. Benson,

On February 25, 2019 the Bureau of Land Management (BLM) received a signed Phase 1 Cost
Recovery Agreement (CRA) for continued Planning Labor and Projected Government Contracts,
towards the 2019 Burning Man Special Recreation Permit. This agreement reflects the name change
requested by you, on February 18, 2019.

The initial CRA included a letter dated February 14, 2019 on behalf of Burning Man. Questions
from the letter will be addressed in future correspondence.

Enclosed you will find a signed copy of the Cost Recovery Agreement (CRA) for the 2019 Event
covering Phase 1, Planning Labor and Projected Government Contract Funds.

The BLM appreciates the opportunity to work collaboratively with Burning Man Project to ensure
that the agency administers the SRP effectively. Please contact me with any questions.

Sincerely,

Mark E. Hall Ph.D.
Field Manager
Black Rock Field Office

Enclosure

AR03440



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

*(w) 6/24/19*

In Reply Refer To:
LLNVW03500-19-0l
2930 (NVW030.10)

**JUN 2 5 2019**

<u>CERTIFIED MAIL 9171 9690 0935 0005 4953 58</u>
<u>RETURN RECEIPT REQUESTED</u>

> 9171 9690 0935 0005 4953 58

Marnee Benson
Associate Director of Government Affairs
Burning Man Project                    :        Burning Man 2019 Event
660 Alabama St                         :        Special Recreation Permit
San Francisco, CA 94110-2008

Dear Ms. Benson:

On January 29, 2019 the Bureau of Land Management (BLM) received a Special Recreation
Permit (SRP) application for the 2019 Burning Man Event (2019 Event).

Enclosed you will find two copies of the Cost Recovery Agreement (CRA) for the 2019 Event
covering Phase 2, Continuing Planning, Operational, and Closeout. This CRA between the
Applicant and the BLM establishes procedures to reimburse BLM for costs incurred to process
the 2019 Burning Man Special Recreation Permit (SRP). As noted in the CRA, please return
both signed copies of the CRA to this office on or before July 12, 2019 and remit the first
payment to this office on or before July 12, 2019. The BLM will return a signed copy of the
CRA to you for your files.

It bears noting that the total Cost Recovery Estimate (CRE) for the 2019 event totals
$2,953,966.79. This is an increase of $103,141.54 over the 2018 Burning Man Event CRE.
Additional charges to the CRE in 2019 include: 1) additional Operational Costs to include
expenses previously paid by BMP under the MOU (Contracts not accepted by BMP under the
MOU contributed to the increase in the CRE); 2) a 1.9 % cost-of-living pay increase for all
federal employees in the 2019 fiscal year.

A decrease in the indirect rate charged by the National Operations Center (NOC) from 21.8% to
21.6%. The BLM closely reviewed labor and travel estimates and reduced both for the Cost
Recovery Estimate.

Official Record Copy

AR03459

The BLM appreciates the opportunity to work collaboratively with Burning Man Project to ensure that the agency administers the SRP effectively. Please contact BLM Burning Man Project Manager, Chelsea McKinney, at (775) 623-1771 with any questions.

Sincerely,

MARK E. HALL

Mark E. Hall Ph.D.
Black Rock Field Manager
Winnemucca District

Enclosure: Phase 2 Cost Recovery Agreement

AR03460

## 2019 COST RECOVERY AGREEMENT
### Phase 2 (Planning, Operational, & Closeout Funds)

**BURNING MAN SPECIAL RECREATION PERMIT:** NVW03500-19-01
**APPLICANT:** Burning Man Project
**LEAD BLM OFFICE:** Winnemucca District, Black Rock Field Office

**I.     AUTHORITY:** Section 304(b) of the Federal Land Policy and Management Act (FLPMA) [43 U.S.C. 1734(b), as amended and 43 CFR Subpart 2932.

**II.     PURPOSE:** This Agreement between the above referenced Applicant and the Bureau of Land Management (BLM) establishes procedures to reimburse BLM for costs incurred to process a Special Recreation Permit (SRP) NVW03500-19-01. If the BLM decides to authorize an SRP, this Agreement shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred for the 2019 Burning Man SRP, reflecting both event monitoring and planning. This Agreement will serve as the continuance of the 2019 Cost Recovery Agreement (CRA) (Phase 2- Conintued Planning Labor/IAA's Funding/Operational Cost/Government Contracts/Closeout Labor) developed to cover BLM incurred costs associated with project planning.

**III.     PROVISIONS OF AGREEMENT**

A.     In accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31, Applicant agrees to reimburse BLM for the costs incurred by BLM for processing the Application, and should a SRP be issued, costs for issuing a SRP and monitoring the SRP.

B.     This Agreement is subject to the Reimbursable Cost Provisions and the Direct and Indirect Costs to the government outlined in OMB Circular A-25, Treasury Account: 14X5017, Service Charges, Deposits, and Forfeitures, and 43 CFR Subpart 2932. The Cost Estimate is included, and it will be amended should actual expenses exceed the amounts identified in Attachment 1.

C.     A cost recovery account will be established for the SRP. The BLM requires you to remit 100% of the estimated cost recovery costs before the start of the 2019 Event. Please refer to the payment schedule below. After the permit is complete and all work is finished, the BLM will notify you if additional funds are required or if you are entitled to a refund.

The following schedule for payments has been developed to allow for the amount due from the estimate to be paid in multiple installments and have 100% of the cost recovery estimate paid prior to the start of the event:

| Payment | Date | Amount Due |
|---------|------|------------|
| #1 | February 15, 2019 (Phase 1) | **$ 745,008.00** *(received 2/15/19)* |
| #2 | July 12, 2019 | $1,104,479.00 |
| #3 | August 1, 2019 | $1,104,479.79 |

Following the close-out of the event permit, an accounting of the cost recovery funds will be provided to Burning Man Project by January 31, 2020.

AR03461

## IV.     REIMBURSABLE COST PROVISIONS

A.      BLM agrees to process the Application to the extent funding under the Agreement permits. Processing will include, but not be limited to, the following: coordination, administration and approval of any necessary NEPA compliance; consultation with appropriate Federal, State, Tribal, and local officials; preparation of the administrative record, monitoring the construction, operation and termination of any resultant authorization; and other necessary processing actions consistent with a final decision.

B.      BLM agrees to timely notify the Applicant, in writing, of any changes to the indirect rate. Refer to the Definition of Direct and Indirect Costs in Section V.  Applicant shall have the right to conduct, at its own expense, reasonable audits of the books, records, and documents of BLM relating to the items on any particular accounting statement provided by BLM.

C.      Cost Recovery funds, once obligated by BLM, are not refundable and will not be made refundable by termination of the Project, withdrawal of the Application, or non-issuance of a SRP.

D.      In accordance with 43 CFR 2932.31, 2932.32, and 2932.33(c), if BLM denies the Application, Applicant must reimburse BLM for all costs BLM incurred in processing the Application.  If the Applicant withdraws the application, Applicant will reimburse BLM for processing costs incurred by BLM in closing its review of the Application and which cannot reasonably be avoided after BLM receives written notice of withdrawal of the Application.

E.      Nothing herein shall be deemed to require BLM to maintain books, records, or documents other than those usually maintained by them, provided that such books, records, and documents reasonably segregate and identify the costs for which reimbursement is required and comply with generally accepted accounting practices for such documentation.

The designated points of contact with whom each party to this Agreement will communicate concerning any aspect of this Agreement are as follows:

Bureau of Land Management                    Burning Man Project
Mark E. Hall                                 Marnee Benson
Black Rock Field Manager                     Associate Director of Government Affairs
5100 E. Winnemucca Blvd                      660 Alabama St
Winnemucca, NV 89445                         San Francisco, CA 94110-2008
775-623-1500                                 415-865-3800
mehall@blm.gov                               marnee.benson@burningman.org

## V.     DEFINITION OF DIRECT AND INDIRECT COSTS

Direct costs are those costs which can be specifically identified with the Application and which are incurred for the benefit of said applicant in that the costs would not have been incurred but for the Application and are appropriate in order for BLM to process the Application.  Examples of direct costs include, but are not limited to, personnel costs in the form of wages paid to BLM personnel working on the Application, with allowances provided for fringe benefits and leave surcharge rate and any overtime associated with processing the Application; travel expenses; purchased services, if necessary, such as printing, automated data processing services and photographic reproduction; and any miscellaneous supplies and equipment of a specialized nature, the use of which is directly

AR03462

applicable to processing the Application.

Indirect costs are those which cannot be specifically identified with the Application. These indirect costs have been calculated at a rate of 21.6 percent of direct costs. The indirect costs are subject to change annually. This percentage figure has been developed in accordance with Department of the Interior procedures and represents those administrative and program costs, excluding management overhead, which can be attributed to processing the Application. Indirect costs include a portion of the costs for capitalized and non-capitalized equipment; space rental; telephone services; postage; personnel transfer costs; budget and program development; administrative and clerical support; training; safety management; public information, inquiries and reports; cartography and basic series mapping; aviation management; telecommunications; maintenance of equipment and tools; and systems design and implementation.

**Treasury Account**, Service Charges, Deposits, and Forfeitures further described as BLM Recreation Cost Recovery is defined in the table below:

| Treasury Account | Service Charges, Deposits, and Forfeitures |
|---|---|
| **BLM Fund Code, Subactivity, and Title** | **L51050000, Recreation Cost Recovery** |
| Source of collections/appropriations | Cost recovery charges are associated with recreation activities or events and shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. As such, this Subactivity covers revenues and expenditures associated with any Special Recreation Permit that has been determined to be Cost Recovery by BLM personnel as outlined in 43 CFR 2930-1 Permits for Recreation on Public Lands and H-2930-1, Recreation Permit Administration Handbook. Project codes are mandatory and will be assigned and administered by the State Office from their block of unassigned project numbers. They are used to differentiate revenues and obligations for each specific permit. Fees are collected in advance for specified tasks that must be carried out before significant recreation events can be permitted to occur on public lands, and BLM is expected to account to each applicant on the cost of all aspects of the work BLM performs. |

As noted in the definition in the table, this account stipulates cost recovery charges shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. Because Burning Man is a full cost recovery event, indirect costs will apply as they would for all other commercial permits that require full cost recovery.

## VI.   EFFECTIVE DATE:

This Agreement shall be effective, as of the latter date of its execution by both parties. Unless terminated earlier, it shall continue until the BLM authorized officer deems the agreement provisions have been satisfied.

AR03463

Please sign the agreement below, and return to the BLM, Winnemucca District Black Rock Field Office Manager by July 12, 2019.

## VII.    SIGNATURES OF AGREEMENT

For: Bureau of Land Management            For: Burning Man Project


_____           _____
Signature                                 Signature


_____           _____
Date                                      Date

Mark E. Hall                              Marnee Benson
Black Rock Field Manager                  Associate Director of Government Affairs

AR03464

**2019 Phase 2 CRA Estimate**

| Summary | | |
|---|---|---|
| Labor Costs | | $1,484,577.95 |
| Operational Costs | $ | 332,000.00 |
| Subtotal of Direct Costs | $ | 1,816,577.95 |
| Indirect Costs (Rate of 21.6%) | $ | 392,380.84 |
| Cost Estimate TOTAL | $ | 2,208,958.79 |

**Draft LABOR DETAIL**

**106 CRA Labor Positions**

**Labor Detail:**

| POSITION | ESTIMATED HOURS (Reg & OT) | ESTIMATED AMOUNT |
|---|---|---|
| Authorized Officer (AO)/Incident Commander (IC) | 342 | $28,519.56 |
| Branch Chief – Compliance & Support (BC) | 726 | $48,695.04 |
| Law Enforcement Branch Chief | 256 | $21,280.12 |
| Law Enforcement Project Manager/Operations Chief | 536 | $40,983.72 |
| Compliance & Support Operations Chief | 282 | $19,739.46 |
| SRP Monitor | 610 | $42,851.22 |
| Public Information Officer | 271 | $15,842.08 |
| Admin Support | 186 | $9,000.58 |
| Safety Officer | 136 | $9,515.60 |
| Vending Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Vending Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Vending Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Environmental Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Environmental Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Environmental Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| GIS | 204 | $9,860.60 |
| Playa Logistics Lead | 422 | $20,405.82 |
| Playa Logistics | 349 | $20,382.56 |
| Playa Logistics | 216 | $8,521.60 |
| Playa Logistics | 216 | $8,521.60 |
| Playa Logistics Runner | 88 | $3,470.72 |
| Communications Supervisor | 530 | $37,166.90 |
| Dispatch Center Manager | 310 | $14,974.62 |
| Communications Lead | 346 | $24,218.82 |
| Communications Tech | 332 | $23,219.96 |
| Communications Tech | 316 | $18,435.20 |
| Communications Tech | 316 | $18,435.20 |
| Communications Tech (Pre & Post) | 80 | $4,672.00 |
| IT Specialist | 408 | $23,855.36 |
| IT Security | 384 | $26,900.48 |
| IT Network (Pre) | 65 | $5,416.70 |
| IMARS Tech | 211 | $14,760.67 |

| | | |
|---|---|---|
| JMARS Tech (Set-up Only) | 65 | $6,400.70 |
| Law Enforcement Patrol Captain | | $17,806.96 |
| Law Enforcement Patrol Captain | 152 | $17,877.36 |
| Medical Team Lead | 163 | $16,819.49 |
| Medical Team | 151 | $15,815.33 |
| Law Enforcement Patrol Lieutenant | 261 | $20,309.00 |
| Law Enforcement Patrol Lieutenant | 261 | $20,309.00 |
| Law Enforcement Patrol Lieutenant | 261 | $20,309.00 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol | 197 | $13,568.43 |
| Law Enforcement Patrol | 197 | $13,568.43 |
| Law Enforcement Patrol | 197 | $13,568.43 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Investigative Lead | 240 | $23,296.32 |

AR03466

| | | |
|---|---|---|
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigations | 209 | $16,987.48 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement OPR | 144 | $14,459.76 |
| Law Enforcement Evidence | 331 | $22,144.29 |
| Law Enforcement Evidence | 259 | $17,915.01 |
| Financial Support (Off Playa) | 80 | $5,629.60 |
| Contracting Support (Off Playa) | 120 | $8,444.40 |
| | TOTAL | $1,484,577.95 |

| Operational Cost Summary | | |
|---|---|---|
| Travel | $ | 50,000.00 |
| Vehicle Utilization | $ | 50,000.00 |
| Misc. Supplies/Equipment Purchase | $ | 40,000.00 |
| GSA Contract Vehicle modification | $ | 10,000.00 |
| Mod to Network Services and Support | $ | 20,000.00 |
| Mod to Microwave Internet Bandwith | $ | 50,000.00 |
| Dispatch Console Repairs | $ | 20,000.00 |
| Dumpster Rental and Service | $ | 5,500.00 |
| LE Substation Support Facilities and JOC Decon Trailer | $ | 16,500.00 |
| Generator rentals and service (Bruno's Motel) | $ | 10,000.00 |
| USFS IAA | $ | 40,000.00 |
| HHS IAA | $ | 20,000.00 |
| Total | $ | 332,000.00 |

AR03467

**Burning Man**

Catalyst for creative culture in the world

660 Alabama St., 4th Fl
San Francisco, CA 94110

Bureau of Land Management
Received

JUL 1 2 2019

District Office
Winnemucca Nevada

Bureau of Land Management
Attn: Dr. Mark Hall
Winnemucca District Office
5100 East Winnemucca Blvd
Winnemucca, NV 89445

July 11, 2019

**PAYMENT 2/3 FOR BURNING MAN SRP COST RECOVERY**

Dear Mark:

Enclosed please find a signed Phase 2 Cost Recovery Agreement Continuing Planning, Operational, and Closeout (CRA) and second payment from Burning Man Project (BMP) towards the 2019 Burning Man Special Recreation Permit (SRP). This payment in the amount of $1,104,479 bring's BMP's total 2019 payment to $1,849,487 with a third and final payment of $1,104,479.79 remaining and due August 1, 2019.

We submit the cost recovery agreement and payment but continue to have concerns that many of BLM's requirements and costs seem to be unjustified as outlined in our still outstanding 2015, 2016, 2017, and 2018 cost appeals. BRC signs this CRA reserving all rights to appeal BLM's final decision on cost recovery for the 2019 SRP. Our hope is that the final decision will reflect only BLM's reasonable costs to administer our permit, and will include a thorough explanation for each requirement and charge. It is also our hope that BLM will reconsider certain policies and requirements in the future so that all costs are reasonable and justified to administer our Special Recreation Permit.

On July 3rd I sent you an email with questions about the Phase 2 Cost Recovery Agreement and followed up on July 9th. Chelsea McKinney responded with some very helpful information but did not provide details in response to three of the questions. We request that you provide the following by July 18:
1. What specific purchases will be included in Misc. Supplies & Equipment?
2. Please provide the specs for the following:
    a. Mod to Network Services and Support
    b. Mod to Microwave Internet Bandwidth

In addition:
- Do the hours and dollar amounts listed in the Phase 2 Labor Detail INCLUDE the hours and dollars listed in the Phase 1 Labor Detail, or are they above and beyond the hours and dollars listed in the Phase 1 Labor Detail?
- Could you provide the dates for each position listed on the Phase 2 Labor Detail?

Thank you for working with us and planning for the 2019 Burning Man event. We appreciate you and your team for your ongoing collaboration. We look forward to seeing you in Black Rock City.

www.burningman.org

AR03475

 

# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
LLNVW03500-19-01
2930 (NVW030.10)

<u>CERTIFIED MAIL NO. 9171 9690 0935 0211 8622 89</u>

Marnee Benson
Associate Director of Government Affairs
Burning Man Project                              2019 Burning Man Event
660 Alabama St.                                   Special Recreation Permit
San Francisco, CA 94110-2008                       LLNVW03500-19-01

Dear Ms. Benson,

On July 12, 2019 the Bureau of Land Management (BLM) received a signed Phase 2 Cost Recovery Agreement (CRA) for continued Planning, Operational, and Closeout Funds towards the 2019 Burning Man Special Recreation Permit. The CRA included a second payment, as well as a letter from you dated July 11, 2019 on behalf of Burning Man.

Enclosed you will find a signed copy of the Cost Recovery Agreement (CRA) for the 2019 Event covering Phase 2, Continuing Planning, Operational, and Closeout for your records.

The BLM appreciates the opportunity to work collaboratively with BRC to ensure that the agency administers the SRP effectively. Please contact the BLM Burning Man Project Manager, Chelsea McKinney at (775) 623-1500 with any questions.

Sincerely,

Mark E Hall

Mark E. Hall Ph.D.
Field Manager
Black Rock Field Office

Enclosure

AR03495

AR03496

**2019 COST RECOVERY AGREEMENT**
**Phase 2 (Planning, Operational, & Closeout Funds)**

**BURNING MAN SPECIAL RECREATION PERMIT:** NVW03500-19-01
**APPLICANT:** Burning Man Project
**LEAD BLM OFFICE:** Winnemucca District, Black Rock Field Office

**I.     AUTHORITY:** Section 304(b) of the Federal Land Policy and Management Act (FLPMA) [43 U.S.C. 1734(b), as amended and 43 CFR Subpart 2932.

**II.     PURPOSE:** This Agreement between the above referenced Applicant and the Bureau of Land Management (BLM) establishes procedures to reimburse BLM for costs incurred to process a Special Recreation Permit (SRP) NVW03500-19-01. If the BLM decides to authorize an SRP, this Agreement shall be amended to reflect the overall costs to be reimbursed to the BLM for costs incurred for the 2019 Burning Man SRP, reflecting both event monitoring and planning. This Agreement will serve as the continuance of the 2019 Cost Recovery Agreement (CRA) (Phase 2- Conintued Planning Labor/IAA's Funding/Operational Cost/Government Contracts/Closeout Labor) developed to cover BLM incurred costs associated with project planning.

**III.     PROVISIONS OF AGREEMENT**

A.     In accordance with Section 304(b) of FLPMA, BLM Handbook H-2930-1, BLM Manual 1323, and 43 CFR 2932.31, Applicant agrees to reimburse BLM for the costs incurred by BLM for processing the Application, and should a SRP be issued, costs for issuing a SRP and monitoring the SRP.

B.     This Agreement is subject to the Reimbursable Cost Provisions and the Direct and Indirect Costs to the government outlined in OMB Circular A-25, Treasury Account: 14X5017, Service Charges, Deposits, and Forfeitures, and 43 CFR Subpart 2932. The Cost Estimate is included, and it will be amended should actual expenses exceed the amounts identified in Attachment 1.

C.     A cost recovery account will be established for the SRP. The BLM requires you to remit 100% of the estimated cost recovery costs before the start of the 2019 Event. Please refer to the payment schedule below. After the permit is complete and all work is finished, the BLM will notify you if additional funds are required or if you are entitled to a refund.

The following schedule for payments has been developed to allow for the amount due from the estimate to be paid in multiple installments and have 100% of the cost recovery estimate paid prior to the start of the event:

| Payment | Date | Amount Due |
|---|---|---|
| #1 | February 15, 2019 (Phase 1) | **$745,008.00** *(received 2/15/19)* |
| #2 | July 12, 2019 | $1,104,479.00 |
| #3 | August 1, 2019 | $1,104,479.79 |

Following the close-out of the event permit, an accounting of the cost recovery funds will be provided to Burning Man Project by January 31, 2020.

## IV.   REIMBURSABLE COST PROVISIONS

A.      BLM agrees to process the Application to the extent funding under the Agreement permits. Processing will include, but not be limited to, the following: coordination, administration and approval of any necessary NEPA compliance; consultation with appropriate Federal, State, Tribal, and local officials; preparation of the administrative record, monitoring the construction, operation and termination of any resultant authorization; and other necessary processing actions consistent with a final decision.

B.      BLM agrees to timely notify the Applicant, in writing, of any changes to the indirect rate. Refer to the Definition of Direct and Indirect Costs in Section V.  Applicant shall have the right to conduct, at its own expense, reasonable audits of the books, records, and documents of BLM relating to the items on any particular accounting statement provided by BLM.

C.      Cost Recovery funds, once obligated by BLM, are not refundable and will not be made refundable by termination of the Project, withdrawal of the Application, or non-issuance of a SRP.

D.      In accordance with 43 CFR 2932.31, 2932.32, and 2932.33(c), if BLM denies the Application, Applicant must reimburse BLM for all costs BLM incurred in processing the Application.  If the Applicant withdraws the application, Applicant will reimburse BLM for processing costs incurred by BLM in closing its review of the Application and which cannot reasonably be avoided after BLM receives written notice of withdrawal of the Application.

E.      Nothing herein shall be deemed to require BLM to maintain books, records, or documents other than those usually maintained by them, provided that such books, records, and documents reasonably segregate and identify the costs for which reimbursement is required and comply with generally accepted accounting practices for such documentation.

The designated points of contact with whom each party to this Agreement will communicate concerning any aspect of this Agreement are as follows:

Bureau of Land Management
Mark E. Hall
Black Rock Field Manager
5100 E. Winnemucca Blvd
Winnemucca, NV 89445
775-623-1500
mehall@blm.gov

Burning Man Project
Marnee Benson
Associate Director of Government Affairs
660 Alabama St
San Francisco, CA 94110-2008
415-865-3800
marnee.benson@burningman.org

## V.    DEFINITION OF DIRECT AND INDIRECT COSTS

Direct costs are those costs which can be specifically identified with the Application and which are incurred for the benefit of said applicant in that the costs would not have been incurred but for the Application and are appropriate in order for BLM to process the Application.  Examples of direct costs include, but are not limited to, personnel costs in the form of wages paid to BLM personnel working on the Application, with allowances provided for fringe benefits and leave surcharge rate and any overtime associated with processing the Application; travel expenses; purchased services, if necessary, such as printing, automated data processing services and photographic reproduction; and any miscellaneous supplies and equipment of a specialized nature, the use of which is directly

applicable to processing the Application.

Indirect costs are those which cannot be specifically identified with the Application. These indirect costs have been calculated at a rate of 21.6 percent of direct costs. The indirect costs are subject to change annually. This percentage figure has been developed in accordance with Department of the Interior procedures and represents those administrative and program costs, excluding management overhead, which can be attributed to processing the Application. Indirect costs include a portion of the costs for capitalized and non-capitalized equipment; space rental; telephone services; postage; personnel transfer costs; budget and program development; administrative and clerical support; training; safety management; public information, inquiries and reports; cartography and basic series mapping; aviation management; telecommunications; maintenance of equipment and tools; and systems design and implementation.

**Treasury Account**, Service Charges, Deposits, and Forfeitures further described as BLM Recreation Cost Recovery is defined in the table below:

| Treasury Account | Service Charges, Deposits, and Forfeitures |
|---|---|
| BLM Fund Code, Subactivity, and Title | L51050000, Recreation Cost Recovery |
| Source of collections/appropriations | Cost recovery charges are associated with recreation activities or events and shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. As such, this Subactivity covers revenues and expenditures associated with any Special Recreation Permit that has been determined to be Cost Recovery by BLM personnel as outlined in 43 CFR 2930-1 Permits for Recreation on Public Lands and H-2930-1, Recreation Permit Administration Handbook. Project codes are mandatory and will be assigned and administered by the State Office from their block of unassigned project numbers. They are used to differentiate revenues and obligations for each specific permit. Fees are collected in advance for specified tasks that must be carried out before significant recreation events can be permitted to occur on public lands, and BLM is expected to account to each applicant on the cost of all aspects of the work BLM performs. |

As noted in the definition in the table, this account stipulates cost recovery charges shall be levied to compensate the Government for the costs of authorizing and administering the recreation-related use. Because Burning Man is a full cost recovery event, indirect costs will apply as they would for all other commercial permits that require full cost recovery.

## VI.    EFFECTIVE DATE:

This Agreement shall be effective, as of the latter date of its execution by both parties. Unless terminated earlier, it shall continue until the BLM authorized officer deems the agreement provisions have been satisfied.

Please sign the agreement below, and return to the BLM, Winnemucca District Black Rock Field Office Manager by July 12, 2019.

## VII.    SIGNATURES OF AGREEMENT

For: Bureau of Land Management

_____
Signature

_____
Date

Mark E. Hall
Black Rock Field Manager

For: Burning Man Project

_____
Signature

_____
Date

Marnee Benson
Associate Director of Government Affairs

2019 Phase 2 CRA Estimate

| Summary | | |
|---|---|---|
| Labor Costs | | $1,484,577.95 |
| Operational Costs | $ | 332,000.00 |
| Subtotal of Direct Costs | $ | 1,816,577.95 |
| Indirect Costs (Rate of 21.6%) | $ | 392,380.84 |
| Cost Estimate TOTAL | $ | 2,208,958.79 |

Draft LABOR DETAIL

106 CRA Labor Positions

Labor Detail:

| POSITION | ESTIMATED HOURS (Reg & OT) | ESTIMATED AMOUNT |
|---|---|---|
| Authorized Officer (AO)/Incident Commander (IC) | 342 | $28,519.56 |
| Branch Chief – Compliance & Support (BC) | 726 | $48,695.04 |
| Law Enforcement Branch Chief | 256 | $21,280.12 |
| Law Enforcement Project Manager/Operations Chief | 536 | $40,983.72 |
| Compliance & Support Operations Chief | 282 | $19,739.46 |
| SRP Monitor | 610 | $42,851.22 |
| Public Information Officer | 271 | $15,842.08 |
| Admin Support | 186 | $9,000.58 |
| Safety Officer | 136 | $9,515.60 |
| Vending Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Vending Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Vending Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Environmental Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Environmental Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| Environmental Compliance (Pre, Main, Post) | 240 | $14,016.00 |
| GIS | 204 | $9,860.60 |
| Playa Logistics Lead | 422 | $20,405.82 |
| Playa Logistics | 349 | $20,382.56 |
| Playa Logistics | 216 | $8,521.60 |
| Playa Logistics | 216 | $8,521.60 |
| Playa Logistics Runner | 88 | $3,470.72 |
| Communications Supervisor | 530 | $37,166.90 |
| Dispatch Center Manager | 310 | $14,974.62 |
| Communications Lead | 346 | $24,218.82 |
| Communications Tech | 332 | $23,219.96 |
| Communications Tech | 316 | $18,435.20 |
| Communications Tech | 316 | $18,435.20 |
| Communications Tech (Pre & Post) | 80 | $4,672.00 |
| IT Specialist | 408 | $23,855.36 |
| IT Security | 384 | $26,900.48 |
| IT Network (Pre) | 65 | $5,416.70 |
| IMARS Tech | 211 | $14,760.67 |

| | | |
|---|---|---|
| IMARS Tech (Set-up Only) | 65 | $6,400.70 |
| Law Enforcement Patrol Captain | | $17,806.96 |
| Law Enforcement Patrol Captain | 152 | $17,877.36 |
| Medical Team Lead | 163 | $16,819.49 |
| Medical Team | 151 | $15,815.33 |
| Law Enforcement Patrol Lieutenant | 261 | $20,309.00 |
| Law Enforcement Patrol Lieutenant | 261 | $20,309.00 |
| Law Enforcement Patrol Lieutenant | 261 | $20,309.00 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol Sargent | 153 | $12,596.36 |
| Law Enforcement Patrol | 197 | $13,568.43 |
| Law Enforcement Patrol | 197 | $13,568.43 |
| Law Enforcement Patrol | 197 | $13,568.43 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 189 | $13,098.51 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 176 | $12,217.44 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Patrol | 137 | $9,574.23 |
| Law Enforcement Investigative Lead | 240 | $23,296.32 |

| | | |
|---|---|---|
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigative Support | 137 | $9,574.23 |
| Law Enforcement Investigations | 209 | $16,987.48 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement Investigations | 137 | $11,470.44 |
| Law Enforcement OPR | 144 | $14,459.76 |
| Law Enforcement Evidence | 331 | $22,144.29 |
| Law Enforcement Evidence | 259 | $17,915.01 |
| Financial Support (Off Playa) | 80 | $5,629.60 |
| Contracting Support (Off Playa) | 120 | $8,444.40 |
| **TOTAL** | | $1,484,577.95 |

| Operational Cost Summary | |
|---|---|
| Travel | $ 50,000.00 |
| Vehicle Utilization | $ 50,000.00 |
| Misc. Supplies/Equipment Purchase | $ 40,000.00 |
| GSA Contract Vehicle modification | $ 10,000.00 |
| Mod to Network Services and Support | $ 20,000.00 |
| Mod to Microwave Internet Bandwith | $ 50,000.00 |
| Dispatch Console Repairs | $ 20,000.00 |
| Dumpster Rental and Service | $ 5,500.00 |
| LE Substation Support Facilities and JOC Decon Trailer | $ 16,500.00 |
| Generator rentals and service (Bruno's Motel) | $ 10,000.00 |
| USFS IAA | $ 40,000.00 |
| HHS IAA | $ 20,000.00 |
| Total | $ 332,000.00 |

AR03503

AR03504



**U.S. Department of the Interior**
**Bureau of Land Management**
**Black Rock Field Office**

June 2019

# Burning Man Event Special Recreation Permit

## Final Environmental Impact Statement-Volume 1





**Costs:**
**BLM:** $280,000 (through cost recovery from proponent)
**Proponent:** $1,034,092

# TABLE OF CONTENTS

Chapter
Page

**EXECUTIVE SUMMARY**................................................................................................**ES-1**

ES.1    Introduction ...................................................................................................ES-1
ES.2    Purpose of and Need for Federal Action ...................................................ES-1
ES.3    Scoping, Consultation, and Coordination ..................................................ES-1
ES.4    Management Alternatives .............................................................................ES-2
        ES.4.1    Alternative A (Proposed Action) .................................................ES-2
        ES.4.2    Alternative B (Reduced Population Alternative) ......................ES-3
        ES.4.3    Alternative C (Alternate Site Alternative) ..............................ES-3
        ES.4.4    Alternative D (No Population Change/Action Alternative) ...........ES-3
        ES.4.5    Alternative E (No Permit/Event Alternative) ..........................ES-3
ES.5    Agency Preferred Alternative ....................................................................ES-3
ES.6    Environmental Consequences .....................................................................ES-3
ES.7    Comparison of Environmental Consequences of the Alternatives ...........ES-4

**CHAPTER 1. INTRODUCTION** .......................................................................... **1-1**

1.1    Event History ..................................................................................................1-1
1.2    Purpose of and Need for Federal Action ......................................................1-1
1.3    Decision to be Made ......................................................................................1-1
1.4    Issues Identified during Scoping ...................................................................1-1
        1.4.1    Biological Resources ......................................................................1-2
        1.4.2    Cultural Resources ........................................................................1-2
        1.4.3    Health and Safety ...........................................................................1-2
        1.4.4    Physical Resources .........................................................................1-2
        1.4.5    Social Values and Economics .......................................................1-2
        1.4.6    Special Designations .......................................................................1-2
        1.4.7    Visitor Uses ....................................................................................1-2
1.5    Summary of Permits for the Action ...............................................................1-2
1.6    Public Involvement and Review of the Draft EIS (DEIS) ...........................1-3
1.7    Changes Between the Draft EIS and the Final EIS .......................................1-4
        1.7.1    Changes to the Alternatives (Chapter 2) ..................................1-4
        1.7.2    Changes to the Affected Environment and Environmental
                  Consequences (Chapter 3) .......................................................1-4
        1.7.3    Changes to the Consultation and Coordination (Chapter 4) ...........1-5
        1.7.4    Changes to Figures (Appendix A) ..............................................1-5
        1.7.5    Changes to Cumulative Effects (Appendix D) ..........................1-5
        1.7.6    Changes to Mitigation and Monitoring (Appendix E) ..............1-5
        1.7.7    Added Appendix K, Public Comments and BLM Response ...........1-5
        1.7.8    Changes to the Public Health and Safety at the Burning Man Event
                  Report ........................................................................................1-5
        1.7.9    Changes to the Biological Baseline Report ...............................1-5
        1.7.10  Changes to the NASA Develop Group Study on the Black Rock Playa ..........1-6
        1.7.11  Unchanged Elements of the DEIS ..............................................1-6

**CHAPTER 2. ALTERNATIVES** .............................................................................. **2-1**

2.1    Introduction ....................................................................................................2-1

2.2      Alternative A: Proposed Action ..................................................................2-1
         2.2.1   Introduction to Alternative A (Proposed Action) ...............................2-1
         2.2.2   BRC Alternative A (Proposed Action) Components............................2-1
         2.2.3   Additional Components of Alternative A (Proposed Action) Identified
                 by the BLM ...........................................................................2-8
2.3      Alternative B (Reduced Population Alternative) ......................................2-11
2.4      Alternative C (Alternate Site Alternative) ...............................................2-11
2.5      Alternative D (No Population Change/Action Alternative) .......................2-11
2.6      Alternative E (No Permit/Event Alternative) ...........................................2-12
2.7      Agency Preferred Alternative .................................................................2-12
2.8      Alternatives Considered but Eliminated from Detailed Analysis ...............2-12
         2.8.1   Hold the Event on Another Playa or Other Location Outside the
                 Black Rock Desert..................................................................2-12
         2.8.2   Hold the Event During a Different Time of Year ...........................2-12
         2.8.3   Analyze an SRP Length Other than 10 Years ..............................2-12
         2.8.4   Require the Event Be Age Restricted .........................................2-13
         2.8.5   Hold the Event Without Burning ...............................................2-13
         2.8.6   Hold the Event at an Alternate Event Site Outside the National
                 Conservation Area Boundary ...................................................2-13
         2.8.7   Provide On-Site Sanitation Services ..........................................2-13
         2.8.8   Provide Alternative Transportation Options.................................2-13
2.9      BLM Land Use Plan Conformance ........................................................2-14
2.10     Comparison of Environmental Consequences of the Alternatives .............2-14

CHAPTER 3. AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES..................3-1

3.1      Introduction .........................................................................................3-1
3.2      Resources ............................................................................................3-1
         3.2.1   Supplemental Authorities...........................................................3-1
         3.2.2   Additional Affected Resources ...................................................3-2
3.3      Biological Resources.............................................................................3-3
         3.3.1   Migratory Birds........................................................................3-3
         3.3.2   Special Status Species ...............................................................3-6
         3.3.3   Threatened and Endangered Species .........................................3-10
         3.3.4   Vegetation (Including Invasive, Nonnative Species)......................3-12
         3.3.5   Wetlands and Riparian Areas...................................................3-16
         3.3.6   Wildlife .................................................................................3-17
3.4      Cultural Resources..............................................................................3-20
         3.4.1   Cultural (Including National Historic Trails) ................................3-20
         3.4.2   Native American Religious Concerns ..........................................3-24
         3.4.3   Paleontology ..........................................................................3-26
3.5      Health and Safety ...............................................................................3-28
         3.5.1   Public Health and Safety (Including Law Enforcement)..................3-28
         3.5.2   Waste, Hazardous or Solid .......................................................3-34
3.6      Physical Resources..............................................................................3-40
         3.6.1   Air.........................................................................................3-40
         3.6.2   Noise ....................................................................................3-49
         3.6.3   Soils (Playa Sediments) ...........................................................3-51
         3.6.4   Visual Resources (Including Night Skies) ...................................3-57
         3.6.5   Water Resources.....................................................................3-62

3.7    Social Values and Economics .................................................................................3-67
        3.7.1    Economics .................................................................................................3-67
        3.7.2    Environmental Justice ..............................................................................3-77
        3.7.3    Social Values .............................................................................................3-80
3.8    Special Designations ..........................................................................................3-87
        3.8.1    National Conservation Areas ..................................................................3-87
        3.8.2    Wilderness ................................................................................................3-88
        3.8.3    Wilderness Study Areas ...........................................................................3-91
3.9    Visitor Uses ........................................................................................................3-92
        3.9.1    Recreation ................................................................................................3-92
        3.9.2    Transportation and Traffic .................................................................... 3-105
3.10   Cumulative Impacts Summary ......................................................................... 3-113
        3.10.1   Biological, Cultural, and Physical Resources ........................................ 3-113
        3.10.2   Public Health and Safety ........................................................................ 3-116
        3.10.3   Social Values and Economics ................................................................. 3-117
        3.10.4   Special Designations .............................................................................. 3-118
        3.10.5   Visitor Uses ............................................................................................ 3-119

CHAPTER 4. CONSULTATION AND COORDINATION ................................................................. 4-1
4.1    Introduction .......................................................................................................4-1
4.2    Public Information Meetings, Notice of Intent, and Public Comments ..............4-1
4.3    Draft EIS Public Comment Period and Public Comments .................................4-1
4.4    Consultation and Coordination with Agencies and Tribal Governments ...........4-2
        4.4.1    Government-to-Government Consultation with Native American Tribes ..... 4-2
        4.4.2    Nevada State Historic Preservation Officer Consultation .......................4-2
        4.4.3    US Fish and Wildlife Service Consultation ...............................................4-2
        4.4.4    US Environmental Protection Agency ......................................................4-3
        4.4.5    National Park Service and National Trails Association ............................4-3
4.5    Cooperating Agencies ........................................................................................4-3

# TABLES

                                                                                                          Page

ES-1   Summary of Environmental Consequences .........................................................................5
1-1    Required Federal, State, and Local Permits ................................................................... 1-3
3-1    Supplemental Authorities ...............................................................................................3-1
3-2    Additional Affected Resources .......................................................................................3-2
3-3    Traffic Volume Near the Lower Truckee River .......................................................... 3-10
3-4    Weed Risk Assessment Factors ................................................................................... 3-13
3-5    Summary of Medical Incidents at Burning Man Event ............................................... 3-29
3-6    On-site Particulate Monitoring Data ........................................................................... 3-41
3-7    Emissions Inventory for Criteria Pollutants by Alternative ....................................... 3-44
3-8    Emissions Inventory for Hazardous Air Pollutants by Alternative ............................ 3-44
3-9    Emissions Inventory for Greenhouse Gases by Alternative ....................................... 3-45
3-10   AERMOD Maximum Model Impacts at Event Closure Area Boundary ..................... 3-46
3-11   Ambient Measured Sound Levels ................................................................................ 3-49
3-12   Pre-Event and Event Sound Levels, 2017 ................................................................... 3-50
3-13   Soil Erosion Acres in the Closure Area and Event Entrance Road ............................ 3-53
3-14   Average Participant Spending (2017) ......................................................................... 3-69

3-15    Comparison of Total Annual Economic Contribution in the Assessment Area and
        in Nevada by Alternative ..................................................................................................3-74
3-16    Comparison of Tax Contributions from Participant and Operational Spending in the
        Assessment Area by Alternative ......................................................................................3-74
3-17    Assessment Area Ecosystem Goods and Services Supported by BLM-Administered
        Lands ..................................................................................................................................3-83
3-18    Wilderness Areas in the Assessment Area .....................................................................3-88
3-19    Wilderness Study Areas in the Assessment Area ...........................................................3-91
3-20    Annual Visitation to Black Rock Desert–High Rock Canyon NCA (2010–2017) ....................3-92
3-21    Visitor Use by Activity (2010–2017)...............................................................................3-93
3-22    Number of Participants Per Special Recreation Permit Event (2010–2017)...............................3-95
3-23    Average Daily Traffic Volumes and Levels of Service ...................................................3-106
4-1     Tribal Consultation ...........................................................................................................4-2
4-2     Cooperating Agency Participation ...................................................................................4-3

# FIGURES *(see Appendix A)*

1-1    Black Rock Desert Playa

2-1    Comparison of Alternatives
2-2    Event Locations by Alternative
2-3    City Infrastructure from the 2018 Event

3-1    Biological Resources
3-2    Vegetation Types
3-3    Cultural, Paleontological, and Native American Religious Concerns
3-4    Air Quality, Climate, and Public Health and Safety
3-5    Wastes, Hazardous or Solid
3-6    Noise
3-7    Ecological Site Descriptions
3-8    Visual Resources
3-9    Water Resources
3-10   Economics, Environmental Justice, and Social Values
3-11   Special Designations
3-12   Recreation
3-13   Transportation and Traffic

# APPENDICES

A    EIS Figures
B    Special Recreation Permit and Stipulation Information
C    Impact Analysis Methodology
D    Detailed Cumulative Assessment
E    Mitigation and Monitoring
F    Visual Assessment of Historic Properties Forms
G    Key Observation Point Photos for Visual Resources and Cultural Resources
H    Glossary and Index
I    References
J    List of Preparers
K    Content Analysis Report

Commenters requested a supplemental DEIS stating that there was insufficient data incorporated into the EIS and inadequate NEPA analysis. Requirements for preparing a supplemental EIS are found in the CEQ regulations at 40 CFR 1502.9(C)(1), which states, in part, "Agencies: Shall prepare supplements to either the draft or final environmental impact statement (EIS) if, i) The agency makes substantial changes in the Proposed Action that are relevant to environment concerns; ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the Proposed Action or its impacts."

Based on Environmental Protection Agency (EPA) and other public comments received on the DEIS and taking into consideration CEQ guidance with respect to supplemental EIS documents, the BLM has determined that a supplemental EIS is not necessary. This is because there were no substantial changes in the Proposed Action that are relevant to environmental concerns presented in the DEIS. Moreover, there were no significant new circumstances or information relevant to environmental concerns and bearing on the Proposed Action or impacts. The BLM prepared the DEIS in accordance with BLM Handbook H-1790-1, SO 3355, and Nevada Instruction Memorandum (IM) 2019-007. The EIS utilized best available science in determining impacts for each of the alternatives and meets the requirements of NEPA.

## 1.7 CHANGES BETWEEN THE DRAFT EIS AND THE FINAL EIS

Modifications to the DEIS were based on public comment, cooperating agency coordination, tribal consultation, and the BLM's internal review of the DEIS. Consistent with 43 CFR 1503.4, the BLM has responded to substantive comments provided during the public comment period (see **Appendix K**) and prepared this FEIS. Changes in this FEIS from the DEIS are indicated with grey shading; text removed from the DEIS is indicated with strikethrough. Minor grammatical and formatting changes from the DEIS were made but are not indicated with shading or strikethrough. Changes from the DEIS generally include the following:

- Additions to Chapter 1, Introduction; the Executive Summary; and Chapter 4, Consultation and Coordination, to describe the public comment process on the DEIS
- Adjustments to Chapter 2, Alternatives, to clarify intent or resolve discrepancies and identify the preferred alternative
- Additions and revisions to Chapter 3, Affected Environment and Environmental Consequences, in response to revised mitigation and monitoring measures or updated information received from the public, BRC, cooperating agencies, and Native American tribes since the DEIS
- Revisions to appendices to address public comments, feedback from cooperating agencies and Native American tribes, and updated information, including the BLM's adaptive management approach to mitigation and monitoring, updated references, and revised terminology
- Revisions to the Public Health and Safety at the Burning Man Event Report, Biological Baseline Report, and NASA Develop Group Study of the Black Rock Playa

### 1.7.1 Changes to the Alternatives (Chapter 2)
- **Section 2.2.2**—Clarified the Event end time for the Proposed Action
- **Section 2.2.3**—Clarified stipulations and additional BLM compliance elements
- **Section 2.2.3**—Deleted text under Burner Express Bus and Air Operations and Fuel Storage sections
- **Section 2.6**—Clarified no action alternative definition
- New **Section 2.7**—Added agency preferred alternative text

### 1.7.2 Changes to the Affected Environment and Environmental Consequences (Chapter 3)
- **Section 3.3.1**—Updated Alternative A and Alternative B analyses
- **Section 3.3.2**—Updated Alternative A analysis

the lack of Event stipulations, avoidance areas, and monitoring and policing of sensitive resources. Impacts would be reduced in the long term as participation declines.

In addition, the BLM may apply subsequent management strategies, protection measures, or closures would be applied to address issues related to large informal gatherings and ensure that resources are protected. Over the long term, the overall disturbance footprint would likely be reduced. If the BLM applied, managed, and enforced a Closure Order, the impact intensity would be further reduced, compared with Event alternatives, because an informal gathering at the playa would be precluded in the Closure Area.

## 3.5   HEALTH AND SAFETY

### 3.5.1   Public Health and Safety (Including Law Enforcement)

#### Affected Environment

*Emergency Response*

Emergency response by law enforcement agencies at the Event include responding to person-on-person crimes, such as disorderly conduct, theft, assaults, and batteries; and fire and medical emergencies, such as vehicle accidents, injuries, structural collapse, structure fires, and drug intoxication. The proponent prepares operational and contingency plans annually to address emergency response by medical, hazardous materials, and fire personnel. Investigating person-on-person crimes at the Event are is the primary responsibility of the Pershing County Sheriff's Office; BLM officers augment the Pershing County Sheriff's Office as needed, depending on call volume and available staffing, to ensure responsiveness to participants' public health and safety. Law enforcement staffing is based on current and future Event populations and is determined by responsible agencies, based on current and future management studies incorporating proximity, capacity, and response time of emergency services, to address emergency response and public health and safety.

*Respiratory Concerns*

The Closure Area is on the Black Rock Playa, which contains alkaline gypsum and silica dust that becomes airborne in high concentrations with Burning Man Event activities and wind (Adams and Sada 2010). Exposure to alkaline gypsum dust with a silica component is regulated by the Occupational Safety and Health Administration as a known carcinogen[8]. Detailed air quality analyses, including threshold limits, are found in **Section 3.2.1**. Children take in more air per unit body weight than adults, resulting in greater impacts from poor air quality (CARB 2000).

*Human Health Concerns*

While the Burning Man Event is an at-will recreational event, medical incidents associated with the event can and have occurred. **Table 3-5** summarizes medical incidents during the Event from 2012 through 2017. The playa is a rugged, austere environment with risks from heat, dehydration, sun exposure, and chemical burns to skin from exposure to playa surface soils (BLM 2012a).

Traffic-related injuries occur in the Closure Area and on travel routes to the Event. In 2014, a participant was killed in an accident involving an art car.

Within the Event Closure Area, Leave No Trace® principles are communicated to participants, but unauthorized dumping has occurred, including unsanitary debris, such as trailers and trash, next to the Closure Area and along travel routes affecting surrounding communities. See **Section 3.5.2** Waste, Hazardous or Solid and **Section 3.7** Social Values and Economics sections for further discussion.

---

[8] a substance capable of causing cancer in living tissue

**Table 3-5**
**Summary of Medical Incidents at Burning Man Event[1]**

| Incident | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Patients | 4,821 | 6,196 | 5,443 | 5,313 | 4,899 | 5,039 |
| Off-site transports | 29 | 34 | 22 | 26 | 31 | 53 |
| Altered state, influence of drugs/alcohol | 76 | 240 | 127 | 79 | 126 | 325 |
| Combative patients | Not Reported | Not Reported | Not Reported | 1 | 6 | Not Reported2 |
| Falls | Not Reported | Not Reported | Not Reported | 37 | 83 | 71 |

Source: BRC-provided statistical information
[1]BRC has not provided 2018 medical data

Illegal controlled substance ingestion at the Event is a human health concern, with potential impacts from the rise of the national opioid epidemic. The "gifting culture" of the Event results in participants accepting items from other participants, potentially ingesting substances unknown to them. Participants who believe they are ingesting one substance, only to find out they have ingested something completely different, could overdose. Foods, such as dried apricots and breath mints laced with illicit substances, have been located at the Event. In addition, law enforcement responds to assaultive or combative subject calls during the Event, due to illegal controlled substance abuse. This use jeopardizes the safety of the public, first responders, and BRC staff and volunteers. Law enforcement resources enforce state and federal law to combat illicit drug use at the Event. Illicit drug use can result in an urgent need to evacuate one's refuse, resulting in increases of human feces deposited on the playa and left unclaimed by participants in recent years.

Participants fall from structures and art pieces at the Event, which is a human health concern before, during, and after the Event as art is built, experienced, and dismantled.

First responder resources, including fire, emergency medical services, and law enforcement, are drawn down during the Event, as personnel from across northern Nevada support the Event. Communities across northern Nevada are left with reduced emergency services staff, particularly in Pershing County. BLM resources at the Event are brought from across the nation, leaving millions of acres of public lands without BLM law enforcement coverage during the Event. The drawdown of BLM and partnering law enforcement is exacerbated when the Event falls on Labor Day weekend, one of the nation's busiest weekends on public lands.

Limited access controls and lack of professional security resources at entrance points into the city, coupled with limited law enforcement staffing, are two critical Event vulnerabilities. BRC operates the gate and searches for stowaways at peak traffic flow areas to prevent ingress and prevent traffic backlog onto paved routes in the area. There is not enough law enforcement assigned to the Event to provide a high-visibility presence at gate operations at the three portals into the city: the main gate, airport, and Point 1.

Additional baseline information on the following public health and safety topics areis included in the BLM Public Health and Safety at the Burning Man Event Report (BLM 2019b): evacuation protocols, explosives, fire safety, hygiene and food safety, missing juveniles, and disease. The BLM Public Health and Safety at the Burning Man Event Report (BLM 2019b) also lists comparable environments are also listed in the BLM Public Health and Safety at the Burning Man Event Report (BLM 2019. Additional baseline information on the following public health and safety topics are included in the BLM Public Health and Safety Baseline Report (BLM 2018b): evacuation protocols, explosives, fire safety, hygiene and food safety, missing juveniles, and disease.

## Environmental Consequences

The Assessment Area for public health and safety is depicted on **Figure 3-4**, Air Quality, Climate and Public Health and Safety, in **Appendix A**.

*Direct and Indirect Impacts under Alternative A (Proposed Action)*

The increased number of bodies on the playa during build week necessitates more law enforcement and emergency medical services prior to, during, and following the Main Event. Mitigation Measure PHS-1 could offset government staffing limitations as described in this analysis. Through the analysis, the BLM determined the agency could not adequately administer the permit with appropriate law enforcement resources while providing for public health and safety and resource protection as mandated in BLM Handbook H-2903-1. Impacts could increase for public health and safety factors, such as aircraft activity, disease vectors, explosives, evacuation, fire safety, hygiene and food safety, and structure collapse.

Mitigation Measure PHS-6 could reduce impacts on neighboring jurisdictions supporting emergency medical evacuations from the Event during the Closure Order period. All PHS Mitigation Measures (**Appendix E**) would be necessary to provide for the protection of public health and safety and to maintain the human environment.

**Event Population of 85,000 in 2019.** The modest increase in 2019 would not create additional significant impacts beyond those listed in the BLM Public Health and Safety at the Burning Man Event~~Public Health and Safety Baseline~~ Report (~~BLM 2018b~~BLM 2019b). Refer to **Section 3.6.1**, Air, for detailed projections of air quality impacts related to this population increase that would affect public health and safety. BLM law enforcement issued an average of 420 citations between 2013 and 2017, with a population ranging from 65,922 to 79,435. A population increase of approximately 5,000 is a 6.25 percent increase and can be expected to result in approximately 26 more citations. The median rate of reported sexual assaults per day at the Event between 2014 and 2017 ranged from 0.81 to 2.40 and is likely to increase proportionate to the Event population; approximately 23 incidents are projected in 2019.

Refer to the BLM Public Health and Safety at the Burning Man Event~~Public Health and Safety Baseline~~ Report (~~BLM 2018b~~BLM 2019b) for comparable environments and related statistics. This population increase would also require an increase over the baseline numbers of 75 law enforcement personnel of approximately 5 additional officers, proportionate to population growth, further reducing the BLM's national resources (~~BLM 2018b~~BLM 2019b). Refer to **Section 3.7**, Social Values and Economics, for further discussion regarding partner agency impacts.

**Event Population of 90,000 in 2020.** The population increase proposed for 2020 represents a 12 percent increase in population from the baseline analysis. This increase raises the potential for all impacts ~~regarding all impacts~~ identified in the BLM Public Health and Safety at the Burning Man Event~~Public Health and Safety Baseline~~ Report (~~BLM 2018b~~BLM 2019b). Public health and safety indicators, including BLM citations, reported sexual assaults, and arrests, can be expected to also increase by a 12 percent margin from the existing environment. This would require an increase of a minimum of nine personnel in federal law enforcement, reducing the BLM's ability to execute other priority missions, such as border security, marijuana eradication, and patrols of heavily visited recreational areas on BLM-administered lands during Labor Day weekend, in addition to daily BLM law enforcement activities on BLM-administered lands nationwide. Additionally, this increase would negatively affect public health and safety in Pershing County due to a further drawdown on first responders available to ~~the~~ service the remainder of the county. Refer to **Section 3.7**, Social Values and Economics, for further discussion regarding partner agency impacts.

**Event Population of 95,000 in 2021.** The population increase proposed for 202~~10~~ represents an approximate 16 percent increase in population from the baseline analysis. This increase would raise concerns regarding all impacts identified in the BLM Public Health and Safety at the Burning Man Event~~Public Health~~

~~and Safety Baseline~~ Report (~~BLM 2018b~~BLM 2019b). Public health and safety indicators, including BLM citations, reported sexual assaults, and arrests made by the Pershing County Sheriff's Office, can be expected to proportionately increase by a ~~15~~16 percent margin from the existing environment (~~BLM 2018b~~BLM 2019b). This would require an increase of a minimum of 12 personnel in federal law enforcement, reducing the BLM's ability to execute other priority missions, as described above. Refer to **Section 3.7**, Social Values and Economics, for further discussion regarding partner agency impacts.

**Event Population of 100,000 in 2022.** The population increase proposed for 20~~20~~22 represents a 25 percent increase in population from the baseline analysis. This increase would increase all potential impacts identified in the BLM Public Health and Safety at the Burning Man Event~~Public Health and Safety Baseline~~ Report (~~BLM 2018b~~BLM 2019b). Public health and safety indicators, including BLM citations, reported sexual assaults, and arrests made by the Pershing County Sheriff's Office, can be expected to proportionately increase by a 25 percent margin from the existing environment. This increase would require an increase in law enforcement to approximately 50 percent of all BLM law enforcement nationwide at 2018 agency staffing levels, reducing the BLM's ability to execute other agency missions, as described above. This increase would require an onerous and potentially unattainable increase in BLM law enforcement while increasing public health and safety risks on BLM-administered lands outside ~~of~~ the Event location. Auxiliary law enforcement resources could be contracted, although jurisdictional limitations may apply. Additionally, this increase would negatively affect public health and safety in Pershing County as a whole due to drawdown on first responders available to the remainder of the county. Refer to **Section 3.7**, Social Values and Economics, for further discussion regarding partner agency impacts.

*Direct and Indirect Impacts under Alternative B*
Aircraft activity, disease vectors, explosives, evacuation, fire safety, hygiene and food safety, structure collapse, and terrorism could decrease in concern with a decreased population due to reduced exposure for each impact. For specific examples of these impacts, refer to the Public Health and Safety at Burning Man Event Report (BLM 2019b). Reducing the Event population would allow for mitigation success to include Mitigation Measures PHS-1 and PHS-6, based on the assumption that the SRP proponent's mitigation programs retain the level of integrity and participation historically implemented.

This alternative would provide for the optimal human environment and allows for Mitigation Measures PHS-1 through PHS-6 (**Appendix E**) to be scaled to the Event size. Emergency response, flooding, human health impacts, and respiratory impacts would remain potential impacts with a reduced Event population. Law enforcement resources would be better positioned to provide for public health and safety and reduce illegal substance incidents and sexual assaults by nearly 40 percent. This alternative would decrease strain on law enforcement agency resources, increasing response capabilities ~~outside of~~outside the Event. The potential for civil unrest could decrease with a reduced Event population, as law enforcement resources and the SRP proponent's staff would be better poised to address an issue before momentum is gained. The potential for civil unrest could also increase due to the lack of available participant tickets.

*Direct and Indirect Impacts under Alternative C*
This alternative would substantially increase potential impacts related to civil disobedience, emergency response, law enforcement, and evacuation due to the more remote location and associated transportation challenges of emergency response to this location for all population considerations. For specific examples of these impacts, refer to the Public Health and Safety at Burning Man Event Report (BLM 2019b). This alternative would increase negative impacts on the human environment as discussed in Alternative A.

Through the analysis, the BLM determined the agency could not adequately administer the permit with appropriate law enforcement resources while providing for public health and safety and resource protection as mandated in BLM Handbook H-2903-1. The increased number of bodies on the playa during build week would necessitate more law enforcement and medical staffing prior to the Main Event. Mitigation Measure

PHS-1 could offset government staffing limitations as described in this analysis. The analysis by population with the inclusion of Mitigation Measure PHS-6 would be the same as that described under Alternative A (Proposed Action). All PHS Mitigation Measures (**Appendix E**) would be necessary to provide for the protection of public health and safety and to maintain the human environment.

*Direct and Indirect Impacts under Alternative D*

Impacts on public health and safety, including, but not limited to, illegal substance activity, sexual assaults, terrorism, mass casualty incidents, respiratory impacts, and adequate staffing of emergency response resources at the Event, would be the same as those described in the ~~BLM~~ Public Health and Safety ~~Baseline~~ at the Burning Man Event Report (~~BLM 2018b~~BLM 2019b). For specific examples of these impacts, refer to the Public Health and Safety at Burning Man Event Report (BLM 2019b). The human environment would remain unchanged from the existing environment. Through the analysis, the BLM determined a hardship for the agency to adequately administer the permit with appropriate law enforcement resources while providing for public health and safety and resource protection as mandated in BLM Handbook H-2903-1. Mitigation Measure PHS-1, however, could offset government staffing limitations as described in the ~~baseline~~ Public Health and Safety at the Burning Man Event report. Mitigation Measure PHS-6 could reduce impacts on neighboring jurisdictions supporting emergency medical evacuations from the Event during the Closure Order period. All PHS Mitigation Measures (**Appendix E**) would be necessary to provide for the protection of public health and safety and to maintain the human environment.

*Direct and Indirect Impacts under Alternative E*

Due to the historic nature of the Event and the commitment from Event participants, a no permit/Event alternative would likely result in an unorganized gathering of thousands of people. A Closure Order for entry onto the event site in the affected environment could be necessary to prevent unauthorized group use of the Black Rock Playa. This alternative would still require a law enforcement presence to ensure the activities absent the Event in the time frame under Alternative A (Proposed Action) do not threaten natural and cultural resources and negatively affect public health and safety on BLM-administered lands.

If unorganized or unauthorized gatherings at the Event site occurred, emergency response, flooding, human health impacts, respiratory impacts, unorganized aircraft activity, disease vectors, explosives, evacuation, fire safety, hygiene and food safety, structure collapse, emergency medical response, and terrorism would remain as potential impacts on public health and safety. The potential for civil unrest could increase under the no permit/Event alternative, as participants could protest the decision. The BLM would mitigate impacts through administrative adaptive management. The BLM would also expect impacts to decrease in the long term as participation declines. If the BLM applied, managed, and enforced a Closure Order, the impact intensity would be further reduced, compared with Event alternatives, because an informal gathering at the playa would be precluded in the Closure Area.

*Proposed Mitigations for All Event Alternatives*

Contracted BLM-approved, third-party, private security at all portals of entry to screen participants, staff, and volunteers entering the Event (Mitigation Measure PHS-1; **Appendix E**) would reduce entry of firearms and other contraband into the Event (~~BLM 2018b~~BLM 2019b). For example, events such as the Electric Daisy Carnival hire security personnel for entry screening to reduce subsequent impacts on law enforcement staffing the Event from banned contraband entering the Event (~~BLM 2018b~~BLM 2019b). Erecting physical perimeter barriers and controls ~~Hardened physical perimeter barriers, such as jersey barriers or K-rail fencing,~~ would reduce the risk of vehicle entry through perimeter fencing (Mitigation Measure PHS-3) (BLM 2019b). Using an adaptive management approach and monitoring data collected during each Event (Monitoring Measure PHS-2; **Appendix E**), the BLM would evaluate the effectiveness of the proposed mitigation measure and work with BRC to ensure the mitigation adequately addresses the identified concern. Failure to successfully mitigate concerns may result in the BLM applying additional mitigations (as defined in

this document) to the SRP. Any failure to mitigate concerns to an immediate threat to public health and safety may result in immediate changes identified by BLM. ~~Hardened physical perimeter barriers, such as jersey barriers or K-rail fencing, would reduce the risk of vehicle entry through perimeter fencing (BLM 2018b). Contracted BLM-approved, third-party, private security at all portals of entry to screen participants, staff, and volunteers entering the Event (Mitigation Measure PHS-1;~~ **Appendix E**~~) would reduce entry of firearms and other contraband into the Event (BLM 2018b). For example, events, such as the Electric Daisy Carnival, hire security personnel for entry screening to reduce subsequent impacts on law enforcement staffing the Event from banned contraband entering the Event (BLM 2018b).~~ This could result in changes to the SRP stipulations.

A Sexual Assault Response Team contracted for placement in Gerlach, Nevada (Mitigation Measure PHS-2), would ease the burden on victims of assault and allow for a stronger support network to accompany the victim to and from the examination (~~BLM 2018b~~BLM 2019b). This could increase successful prosecutions and provide a deterrent to elevated incidents of sexual assault. The availability of Sexual Assault Response Team exams removed from the Event, yet close enough to drive a victim, would save the cost of flying a victim to and from the Event in a medically equipped aircraft and increase the capacity of the air ambulance to remain on call for advanced life support functions.

Inspection by Nevada-licensed building inspectors of habitable structures over 10 feet tall would provide additional protection in preventing structure collapses during the Event and may be employed through adaptive management if the BLM determines BRC operational practices are ~~determined by BLM to be~~ insufficient (Mitigation Measure PHS-4; **Appendix E**). Implementation of licensed inspections would ~~reduces~~ the threats of structure collapse to the health and safety of participants and first responders (~~BLM 2018b~~BLM 2019b). Using an adaptive management approach and monitoring data collected during each Event (Monitoring Measure PHS-3; **Appendix E**), the BLM would evaluate the effectiveness of the proposed mitigation measure and work with BRC to ensure the mitigation adequately addresses the identified concern. This could result in changes to the Event SRP stipulations. Failure to successfully mitigate concerns may result in the BLM applying additional mitigations (as defined in this document) to the SRP. Any failure to mitigate a threat to public health and safety may result in immediate changes identified by BLM.

Mitigation Measure PHS-5 would require BRC to minimize disruptions of services to the PLPT and local communities, reducing public health and safety impacts related to emergency services and utilities. Using an adaptive management approach and monitoring data collected during each Event (Monitoring Measure PHS-4; **Appendix E**), the BLM would evaluate the effectiveness of the proposed mitigation measure and work with BRC to ensure the mitigation adequately addresses the identified concern. This could result in changes to the Event SRP stipulations. Any failure to mitigate a threat to public health and safety may result in immediate changes identified by BLM.

~~Inspection by Nevada-licensed building inspectors of habitable structures over 10 feet tall provides additional protection in preventing structure collapses during the Event (Mitigation Measure PHS-4;~~ **Appendix E**~~). Implementation of licensed inspections reduces the threats of structure collapse to the health and safety of participants and first responders (BLM 2018b).~~

Proposed air quality mitigation measures identified in **Appendix E** would alleviate public health and safety concerns from elevated levels of particulate matter during the Closure Order (Mitigation Measures AQ-1 through AQ-5). Requiring BRC to recontour Gate Road (Mitigation Measure SOIL-3), maintain motor vehicle speed limits (Mitigation Measure AQ-2), and develop other solutions to reduce dust events would reduce the potential for air quality-related health impacts on participants, staff and volunteers, and vendors and contractors. By providing its employees and contractors with respirators or other equipment (Mitigation Measure AQ-5), the BLM would further minimize air quality-related health risk impacts on its employees and contractors.

### 3.5.2   Waste, Hazardous or Solid

*Affected Environment*

The Assessment Area for wastes encompasses areas within 0.5 miles of the Closure Area, including CR 34 and SR 445, 446, and 447 (see **Figure 3-5**, Wastes, Hazardous or Solid, in **Appendix A**).

Mining has occurred in this region of Nevada, and such sites can contain hazardous waste. Although there are no mines in the Assessment Area, the abandoned Cassidy Mine is approximately 1.0 to 1.5 miles to the northwest.

In the Assessment Area, most of the illegally dumped material is litter that has been dropped by individuals or windblown into the area. These materials tend to be found along authorized and unauthorized transportation routes, such as those for highway vehicles and off-highway vehicles (OHVs), and in authorized and unauthorized recreation areas. It is a misdemeanor for any person to throw or deposit on any public highway within Nevada, or within 1,000 feet from the center of any public highway, any dead animal, dirt, garbage, or rubbish (Nevada Revised Statues 202.185). Nevada law defines a misdemeanor as a crime punishable by up to 6 months or less in jail and a fine not to exceed $1,000.

In the 1940s, Black Rock Desert was used as a bombing range (Friends of Black Rock High Rock 2018). There are no known explosives in the Assessment Area, but incidents in Nevada have included lost live ordnance, crashes, dumped fuel tanks, and wayward missiles. Mining-related explosives from historical and active mining operations have been found on BLM-administered land (BLM 2013a).

The NDEP, Bureau of Waste Management protects human health, public safety, and the environment from the effects of improper, inadequate, or unsound management of hazardous waste; establishes programs for regulation of the storage, generation, transportation, and treatment and disposal of hazardous waste; and ensures safe and adequate management of hazardous waste (Nevada Revised Statues 459.400).

Event SRP regulations state the discharge of any and all trash/litter (also known as matter out of place) onto the playa/ground surface is prohibited. BRC installs a temporary trash fence around the entire Event perimeter to collect solid waste from blowing beyond the Event Closure Area. All Event participants must pack out and properly dispose of all trash at an appropriate disposal facility off the playa. BRC asks all participants to pack out their own solid waste according to Leave No Trace® principles on its website (BRC 2018b) and provides guidance to participants on how to reduce their solid waste, a list of available locations for solid waste disposal and recycling, and information on the restrictions regarding solid waste disposal on its website (BRC 2018be).

BRC is responsible for all Closure Area solid waste removal and cleanup and transports any solid waste remaining at the site to an appropriate landfill. BRC establishes a cleanup crew that employs methods developed between 1998 and 2008. The cleanup crew divides the site into an extensive grid system that is patrolled at 7- to 10-foot intervals. The cleanup crew picks up any solid waste found within their grid.

The BLM's post-cleanup inspection protocol is detailed in the 2013 and 2017 Post-Event Inspection reports. Inspection was conducted at 60 random points and 5 targeted points. These points represent approximately 1.5 percent of the total area of the city. To pass the inspection, there must be an average of 1 square foot (or less) of trash per acre. For 2013 through 2017, the averages ranged from a low of 0.32 square foot/acre in 2013 to a high of 0.77 square foot/acre in 2016. More details can be found in the Post-Event Inspection reports available at https://go.usa.gov/xnBTu.

BRC is responsible for patrolling the areas of special concern for cleanup of Event-related solid waste for CR 34 from the 12-Mile entrance to SR 447; SR 447 from CR 34 to Wadsworth; CR 447 from Gerlach to the California state line; and SR 446 from Nixon to SR 445 near Sutcliffe. Also, it may include, as necessary, CR 34 north of the Event site to Jackson Lane.

# RECORD OF DECISION
# AND
# SPECIAL RECREATION PERMIT APPROVAL

## DOI-BLM-NV-W030-2018-0003-EIS
## Special Recreation Permit Number NVW03500-19-01

## Burning Man Special Recreation Permit Renewal

**July 2019**

Prepared by:

US Bureau of Land Management
Winnemucca District
Black Rock Field Office
5100 E. Winnemucca Blvd.
Winnemucca NV 89445-2921



BLM

Black Rock Field Office/Nevada

AR04375

It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

BLM/NV/WN/ES/15-11+1793

DOI-BLM-NV-W030-2018-0003-EIS

AR04376

# RECORD OF DECISION
## AND
## SPECIAL RECREATION PERMIT

## BURNING MAN SPECIAL RECREATION PERMIT RENEWAL
## FINAL ENVIRONMENTAL IMPACT STATEMENT

### Special Recreation Permit Number NVW03500-19-01
### DOI-BLM-NV-W030-2018-0003-EIS

**Bureau of Land Management**
**Winnemucca District**
**Black Rock Field Office**
**Winnemucca, Nevada**

_____
**Joseph R. Balash,**
**Assistant Secretary for Land and Minerals Management**
**Department of the Interior**

7/16/19
_____
**Date Signed**

This page intentionally left blank.

AR04378

# Record of Decision

## INTRODUCTION

The Black Rock Field Office (BRFO) of the United States (US) Department of the Interior, Bureau of Land Management (BLM) received an application from Black Rock City, LLC (BRC) to obtain a special recreation permit (SRP) to produce the Burning Man Event (Event) on an annual basis for the next 10 years. The Event is located on public land administered by the BLM Winnemucca District in Pershing County, Nevada, approximately 8.5 miles northeast of Gerlach, Nevada.

The Burning Man Event SRP Final Environmental Impact Statement (Final EIS) analyzed five alternatives:

1. Alternative A (Proposed Action): The BLM would issue an SRP for the Event that allows an annual incremental population increase of 5,000 participants starting in 2019 for a maximum population of 100,000 in 2022 through 2028.

2. Alternative B (Reduced Population Alternative): The BLM would issue an SRP for the Event at a maximum population of 50,000.

3. Alternative C (Alternate Site Alternative): This alternative would be similar to Alternative A (Proposed Action), except the larger 18,940-acre Closure Area boundary and 3,900-acre Event perimeter would shift to the north, and there would be no phased Closure Area.

4. Alternative D (No Population Change Alternative): The BLM would issue an SRP for the Event with the same population cap (80,000), durations, and conditions as the 2018 Event.

5. Alternative E (No Permit/Event Alternative): The BLM would not issue an SRP for the Event.

A description of the Proposed Action and the alternatives analyzed can be found in Chapter 2 of the Final EIS. **Appendix A** of the Final EIS includes maps of the alternatives.

## SELECTED ALTERNATIVE

The BLM, in accordance with the Federal Lands Recreation Enhancement Act ([REA]; Public Law (P.L.) 108-447), has selected Alternative D from the Final EIS. This will result in the issuance of an SRP for the Event with the same population cap, similar conditions as the 2018 Event, and with the required mitigations from **Appendix E** of the Final EIS. All SRPs have standard stipulations as authorized through the REA; however, those standard stipulations do not address the complexity of the Burning Man Event. Accordingly, additional stipulations will be added to the SRP and be edited annually dependent on monitoring and necessary adaptive management measures. Under the terms of the SRP, there will be no more than 80,000 total attendees, including Event participants, BRC staff, and BRC volunteers, allowed on the playa from the start of the Closure Order to the end of the Closure Order.

The BLM will implement a phased Closure Area, which will include a 9,570-acre[1] Closure Area footprint during build week and after the Event. During the Event, the Closure Area footprint will be 14,320 acres (see Figures 2-1, 2-2, and 2-3 in **Appendix A** of the Final EIS). **Appendix B** of the Final EIS contains additional stipulations (previously referred to as special stipulations) from the 2018 Event; applicable mitigation measures, as determined by the BLM, are in **Appendix E** of the Final EIS. Stipulations may be amended, added, or changed as determined necessary by the BLM. The duration of the permitted Event will change from 64 days to up to 74 days, to more accurately reflect on-the-ground conditions and to incorporate the Golden Spike Ceremony, which was not previously part of the Closure Order.

The BLM developed the mitigations in the Final EIS in response to the impacts that exist and were disclosed in the Draft EIS and Final EIS, after accounting for the proponent's Plan of Operations and best management practices. As the Plan of Operations changes for each Event, mitigation measures may be adjusted annually.

Elements of the BLM's selected alternative are summarized below (the exact details will be in BRC's Event Plan of Operations).

### Population Definition and Reporting

For 2019, as in the 2018 Event, BRC will keep the maximum Event population at 80,000 or less. For 2020, BRC will be required to keep the maximum Event population from exceeding a total of 80,000 for the duration of the Closure Order. A population overage of up to 300 people could be permitted for up to 8 hours for a given year's event; the BLM will set the exact number in the SRP stipulations. The BLM will work with BRC to develop an independent, third-party population monitoring system to count each person entering and exiting the Event through designated points of entry and to report daily numbers to the BLM.

### Event Production

The boundary of the Event site will be within an approximately 3,400-acre pentagon (see **Appendix A** of the Final EIS). The Event site will be within the Closure Area, the physical space that will be temporarily closed during the Event. The Closure Order will last up to 74 days. There will be two phases of the Closure Order. Closure Order Phase 1 will last the entire duration and will take effect approximately 40 days before Labor Day; it will encompass 9,570 acres. In addition, Closure Order Phase 2 will occur 14 days before Labor Day and will last for approximately 21 days; it will encompass an additional 4,760 acres, for a total Closure Order size of 14,330 acres (see **Appendix A** of the Final EIS). The Closure Order will shrink back to the Phase 1 size approximately 6 days after Labor Day.

Each year, the Event will start at 12:01 a.m. on Sunday the weekend before Labor Day and end at noon the Tuesday after Labor Day.

---

[1] Data from geographic information systems have been used in developing acreage calculations and for generating many of the figures in **Appendix A** of the Final EIS. Calculations are dependent upon the quality and availability of data, and most calculations in the Final EIS are rounded to the nearest 10 acres. Given the scale of the analysis, the compatibility constraints between datasets, and the lack of data for some resources, all calculations are approximate.

**AR04380**

Within 5 days of the Event's end, all participants and most BRC staff will vacate the site. Within 21 days of the Event's end, BRC staff and volunteers will remove all structures, large equipment, and the perimeter fence. BRC will complete all cleanup work by October 1.

### Traffic Management and Access

Before each Event, BRC will submit a traffic plan to the BLM. The plan will include the following strategies:

1. State-licensed flaggers will be used along State Route (SR) 447 and County Road (CR) 34, as determined by the BLM in coordination with the Pyramid Lake Paiute Tribe (PLPT), Nevada Department of Transportation (NDOT), and Nevada Highway Patrol (NHP), to help ensure traffic flows through nearby communities during peak travel times before and after the Event.

2. During Exodus, BRC will employ a metered release protocol, which will ensure that no more than 800 vehicles per hour exit onto CR 34 from Gate Road.

3. BRC will communicate the need for safe travel, including promoting the traffic operations center, advising participants year-round and in real time on traffic trends and best practices, and promoting BRC's RideShare carpool program.

Motorized transportation in the Event perimeter will be restricted to BLM staff, law enforcement, BRC staff, vendors, mutant vehicles, vehicles for disabled persons, and satellite shuttles. The BLM will enforce a 5 miles per hour speed limit on all motorized vehicles inside the city.

### Vehicle Passes

BRC will issue a maximum of 33,000 vehicle passes, including for BRC staff and volunteer vehicles.

### Art

BRC will review and revise project plans to ensure build design and installation safety. BRC safety teams will continuously inspect the artwork before and during the Event.

### Dust Abatement

Private vendors hired by BRC will provide dust abatement along designated routes and streets within the Event site. Dust-abatement trucks will operate from the day the perimeter is established through site cleanup.

### Fire

BRC will actively educate participants in the construction and supervision of burn barrels in order to protect the playa surface and to create safe campfire containment. BRC will be responsible for implementing procedures for the complete cleanup of each burn site, including using decomposed granite, a raised platform, or other means to protect the playa surface; removing ash, charcoal, and unburned material such as nails, screws, glass, and any decomposed granite; and grading and raking the surface to eliminate scarring.

### Cultural Resources

BRC will inform all participants and staff that collection, excavation, or vandalism of historic and archaeological artifacts or sites is illegal. BRC will notify the BLM immediately upon any discovery of archaeological artifacts or human remains.

AR04381

### Hot Springs Protection

Use of the hot springs is not allowed as part of the Burning Man Event SRP. BRC will educate participants about the potential for environmental damage when using the hot springs.

### Event Cleanup

BRC will remove debris in the Closure Area and dispose of it in an authorized facility. Hazardous waste will be disposed of in accordance with state and federal laws.

Off-site cleanup will include litter and debris pickup along roads and highways surrounding the Event site. Litter and debris that BRC collects will be disposed of at authorized facilities in accordance with all applicable laws and regulations.

The BLM, in coordination with the NDOT and PLPT, will monitor the effectiveness of BRC's trash collection plan. Monitoring results may result in the need for adaptive management, which may include additional mitigation measures to reduce the impact from wastes on the playa and surrounding roadways and communities.

### Security and Public Safety

BRC will meet with BLM law enforcement and the Pershing County Sheriff's Office year-round to plan operations and infrastructure. BRC will meet with BLM law enforcement and the Pershing County Sheriff's Office daily during and immediately after the Event to evaluate on-site operations, and respond to and adapt on-site operations to possible changing conditions.

BRC will meet with the BLM and those agencies with federal, state, or county jurisdiction, such as the Federal Aviation Administration, Pershing County, Washoe County, PLPT, and the State of Nevada, as needed annually. The BLM will inquire with responsible agencies to ensure their needs are being met.

The BLM and BRC will operate independent communications systems for the duration of each party's respective operational needs. The two systems will operate 24 hours per day to provide security, emergency response, and public safety to ensure coordinated emergency response.

BRC will educate participants and staff about federal, state, and local laws concerning the sale and use of illegal substances.

### Hazardous Materials

BRC will manage hazardous materials response. All hazardous waste will be disposed of in accordance with state and federal laws.

### Food and Drink Service and Potable Water Hauling

BRC will comply with all State of Nevada requirements for food and beverage service and potable water hauling. Any person who is hauling, delivering, vending, providing, or selling potable water to any individual or organized camp, other than their own private or individual camp, must be permitted by the Nevada Division of Public and Behavioral Health.

***Additional Components of the Selected Alternative***

In the Final EIS, Section 2.2.3, the BLM analyzed additional components, which are included in this Record of Decision (ROD) and will be implemented now and in future years. The Golden Spike Ceremony, which typically marks the beginning of the Event when anywhere from 200 to 400 people arrive on the playa for the ceremony, will be included in the Event SRP starting in 2019. Historically, the Golden Spike Ceremony has occurred on the Thursday prior to the start of the Event SRP Closure Order.

The BLM and BRC will review and revise the full environmental compliance protocol annually. Per the Federal Land Policy and Management Act of 1976 (FLPMA), the BLM has the authority to institute changes during the Event to maintain public health and safety, as well as resource protection. BRC is responsible for obtaining all other necessary permits as required by federal, state, and local laws.

## MITIGATION, MONITORING, AND ADAPTIVE MANAGEMENT

All mitigation and monitoring measures listed in **Appendix E** of the Burning Man Event SRP Final EIS will be implemented in 2019, except for the following mitigation and monitoring measures, which will be implemented in a phased approach when most appropriate and logistically feasible. The BLM has a goal of implementing all mitigation and monitoring measures by 2022.

- An adaptive management approach will be taken regarding security at all portals of entry. A third-party contractor will be employed to screen vehicles, participants, vendors, contractors, and staff and volunteers entering the Event. This mitigation will be implemented as soon as logistically possible, but will not be in effect for the 2019 Event (Mitigation Measure **PHS-1**).

- Beginning 21 days before Labor Day until 7 days after Labor Day during the Closure Order, BRC will provide a licensed ambulance service for emergency services. This mitigation measure will be implemented beginning in 2020 (Mitigation Measure **PHS-6**).

- BRC will increase its environmental compliance teams commensurate with the population size; teams will begin operating during build week and continue through Exodus. This mitigation measure will be implemented beginning in 2020 (Mitigation Measure **WHS-7**).

- BRC and the BLM must implement shielding interventions on mast-mounted work lights. This mitigation measure will be implemented beginning in 2020 (Mitigation Measure **VIS-2**).

- In coordination with Washoe County and the NDOT, BRC will provide cost recovery for the maintenance of CR 34 and SR 447, respectively, associated with Event traffic. This mitigation measure will be implemented beginning in 2020 (Mitigation Measure **ECON-1**).

- BRC must post a reclamation bond sufficient to remove large art installations and theme camp materials left behind after Exodus. This bond is intended to remove the risk of unnecessary or undue degradation to the national conservation area (NCA) and defray the costs to taxpayers. This mitigation measure will be implemented beginning in 2020 (Mitigation Measure **NCA-1**).

- BRC will inform all pilots of flight restrictions associated with wilderness and wilderness study areas. This mitigation measure will be implemented beginning in 2020 (Mitigation Measure **WILD-1/WSA-1**).

- Vendor and film permit applications associated with the Event must be submitted 194 calendar days before Labor Day. The costs of BLM employee labor will be recouped via cost recovery from BRC. This mitigation measure will be implemented beginning in 2020 (Mitigation Measure **REC-1**).

AR04383

- The proponent will submit to the BLM and Pershing County its final Plan of Operations for each year's Event at least 45 calendar days before the first Closure Order begins for that year's Event. This mitigation measure will be implemented beginning in 2020 (Mitigation Measure **REC-2**).

- BRC will report directly to the BLM the number of vehicles entering the Closure Area under a vehicle pass. The number of vehicle passes will be limited to 33,000, which responds to the findings and recommendations in the traffic analysis prepared for the EIS (Solaegui 2018). This mitigation measure will be implemented beginning in 2020 (Mitigation Measure **TRAN-1**).

- For the 2020 Event, BRC will contract with a third-party ticketing agency to report directly to the BLM the number of individuals entering the Closure Area. The number of participants, BRC staff, volunteers, and vendors will be limited to 80,000 (Monitoring Measure **REC-1**).

- The cultural resources and Native American religious concerns mitigation measures (Mitigation Measures **CULT-1** through **CULT-5**) will be implemented in accordance with the memorandum of agreement (MOA) with the Nevada State Historic Preservation Office (SHPO).

Because of the complex nature of the Burning Man Event, the BLM will employ an adaptive management approach to some mitigation measures. As the first step in this process, the BLM will work with BRC to develop an initial mitigation approach starting with the 2019 Event. Beginning with the 2019 Event, monitoring, as described in Table E-2 of **Appendix E** in the Final EIS, will provide the BLM with the necessary information to determine the effectiveness of the initial mitigation approach. If monitoring results demonstrate that the initial mitigation approach effectively prevents the unnecessary and undue degradation of public lands and protects public health and safety, then no additional mitigation or stipulations will be required. If monitoring results demonstrate that the initial mitigation approach is not effective, then the BLM will apply the mitigation measures listed in **Appendix E**. The BLM may also add or remove stipulations for each annual Event in response to new monitoring data. Adaptive management will apply to the following mitigation measures:

- BRC will be required to implement physical perimeter barriers and controls to reduce the risk of unauthorized entry to the Event (Mitigation Measure **PHS-3**).

- BRC will facilitate structural integrity inspections of all structures over 10 feet tall that are designed for lodging space (Mitigation Measure **PHS-4**).

- To reduce litter and trash in the PLPT Reservation, along SR 447, and other routes accessing the playa, BRC, as part of its annual Event Plan of Operations, must develop a trash collection plan for the major egress routes from the Event (Mitigation Measure **WHS-1**).

- To reduce Event participant, employee, and contractor exposure to dust generated from vehicle traffic on Gate Road, BRC should consider rerouting Gate Road to an area north of Black Rock City (Mitigation Measure **AQ-1**).

- BRC will restore the playa contours by the end of the Closure Order (Mitigation Measure **SOIL-3**).

- The monitoring measures of the Artificial Light at Night Assessment (Craine and Craine 2017) will be implemented by a BLM-approved contractor via cost recovery (Mitigation Measure **VIS-1**).

- The BLM will not implement Monitoring Measure **VIS-3**. Through a third party contractor approved by the BLM and paid for through cost-recovery, annual monitoring of the artificial light at night will occur (Monitoring Measure **VIS-1**), and if the threshold outlined in Mitigation Measure

AR04384

**VIS-1** is exceeded, the proponent, in the following year, will develop a lighting plan with measures to reduce the amount of artificial light at night.

## RATIONALE

The BLM's decision to issue an SRP for an Event with a maximum population of 80,000 is based on the environmental consequences analyzed in Chapter 3 of the Final EIS and the following rationale:

1. Cooperating agencies and other governmental agencies indicated they could not support the Event growing. Letters from the Mayor of the City of Reno, NDOT, and the NHP indicated they could not provide staff and accommodate growth over the current population level of 80,000 (see **Appendix K** of the Final EIS), particularly since this Event occurs over the Labor Day weekend when other recreation events occur in surrounding areas and communities. Additionally, the Pershing County Board of Commissioners, Pershing County Sheriff's Office, and the PLPT indicated they could not support the current event and requested a reduction in population. The Summit Lake Paiute Tribe, due to the closure of the playa and the inconvenience it causes for travel to their reservation, also requested a smaller population size. While not substantive, the BLM received public comments from Burning Man Event participants who expressed the view that the Event had grown too large and become too commercial; they wanted a smaller Event.

2. This decision responds to issues raised during public scoping and public comments received on the public Draft EIS. Substantial public involvement throughout the National Environmental Policy Act (NEPA) process has informed the BLM's decision (see Final EIS **Appendix K**, Public Comments and BLM Response).

3. The BLM developed mitigations in response to the impacts analyzed in the EIS and cooperating agency and public concerns regarding those impacts. While BRC's Event Plan of Operations and best management practices were taken into account, they do not result in an Event that avoids all the impacts; thus, the BLM developed mitigation and the phased approach through monitoring and adaptive management as described in **Appendix E** of the Final EIS. For example, a common theme in several of the cooperating agency and nongovernmental organization letters was the trash left behind and how long it took to be removed (see **Appendix K** of the Final EIS). Mitigation Measures **WHS-1**, **WHS-5**, and **WHS-7** (see **Appendix E** of the Final EIS) address these impacts. Another common theme was damage to the main roads into the event. Mitigation Measures **TRAN-1** and **ECON-1** address these impacts.

4. At an Event population of 80,000, the BLM and emergency services have a capacity to respond and manage the Event. Some of the imposed mitigations will help state, county, and local government services to successfully support the Event. Growing to a larger Event at current staffing levels would overextend resources and create financial hardships. The mitigation, monitoring, and adaptive management approach in this decision and as described in **Appendix E** of the Final EIS respond to concerns raised during government-to-government consultation and coordination and cooperation with cooperating agencies. These concerns include the associated impacts of solid waste, public health and safety, traffic, infrastructure limitations, socioeconomic impacts, and staffing capabilities.

5. The mitigation and monitoring measures for air quality (see Mitigation Measures **AQ-1**, **AQ-2**, and **AQ-3**, and Monitoring Measure **AQ-1** in **Appendix E** of the Final EIS) are designed to protect worker, volunteer, and participant public health and safety. The Environmental Protection Agency (EPA) noted concerns on the levels of particulate matter observed during the 2017 Event.

**AR04385**

The BLM has concerns for worker health and safety, and preliminary studies by the Department of the Interior industrial hygienists raise concerns and show the need for further studies and analysis.

6.  The mitigation and monitoring measures for solid waste (see Mitigation Measures **WHS-1**, **WHS-5**, and **WHS-7**, and Monitoring Measures **WHS-5**, **WHS-6**, **NAT-1**, and **REC-3** in **Appendix E** of the Final EIS) are designed to alleviate the problem of trash being left behind along roadways and in communities. The City of Reno, NDOT, Washoe County, NHP, PLPT, and some of the public comment letters all noted this as a major concern.

7.  The mitigation and monitoring measures for public health and safety (see **Appendix E** of the Final EIS) were designed in coordination between BLM subject matter experts, the Department of Homeland Security, the Federal Bureau of Investigation, and the Pershing County Sheriff's Office. These are best practices for large public gatherings, specifically outdoor events. The BLM will employ adaptive management practices where appropriate and will liaise with BRC during the implementation of these mitigation measures. For Mitigation Measure **PHS-1**, law enforcement has documented that the current BRC screening system is insufficient for prohibited items. For Mitigation Measure **PHS-3**, while only minor incursions have occurred into the Event, the risk of incursions into large public gatherings is well documented both in the US and abroad (see Public Health and Safety at the Burning Man Event [BLM 2019]). For Mitigation Measure **PHS-6**, cooperating agency coordination and government-to-government consultation have made clear that calls for service related to the Burning Man Event disrupt emergency services to surrounding communities during the Closure Order.

8.  The mitigation and monitoring measures for fuel storage (see Mitigation Measure **WHS-8** and Monitoring Measure **WHS-4** in **Appendix E** of the Final EIS) are designed to prevent unnecessary and undue degradation of the natural resources of the Black Rock Desert–High Rock Canyon Emigrant Trails NCA from fuel spills. The BLM has the legal authority and obligation to administer the Black Rock playa in accordance with 40 Code of Federal Regulations 112.

9.  This decision is authorized by the National Conservation Act of 2000 designating the Black Rock Desert–High Rock Canyon Emigrant Trails NCA (P.L. 106-554): "The Secretary may continue to permit large scale events in defined low impact areas of the Black Rock Desert Playa in accordance with the management plan pursuant to this Act." The resource management plan, approved July 2004 for the Black Rock Desert–High Rock Canyon Emigrant Trails National Conservation Area and Associated Wilderness and other Contiguous Lands in Nevada, allows for large gatherings. Existing mitigation measures do not fully alleviate impacts on visual resources in the NCA and adjacent wilderness and wilderness study areas. Current practices are not in conformance with the resource management plan; however, mitigation, monitoring, and adaptive management (see Mitigation Measures **VIS-1**, **VIS-2**, and **NCA-1**, and Monitoring Measures **VIS-1**, **VIS-2**, **VIS-3**, **NCA-1**, and **REC-5** in **Appendix E** of the Final EIS) will reduce the potential for growth of these impacts during future Events.

10. This decision conforms to the BLM's Greater Nevada and Northeastern California Greater Sage-Grouse ROD and Approved Resource Management Plan Amendment, approved in March 2019.

11. Due to the noncompliances issued to BRC and unsatisfactory performance in 2018, and consistent with the REA (P.L. 108-447), the BLM will not issue an SRP for more than 1 year. Should BRC gain compliance, the BLM may then issue an SRP for the remainder of the 10 years. However, in accordance with H-2930-1, Recreation and Fee Administration Handbook, and the REA, the BLM will need to authorize SRP annually.

12. To reduce impacts on the NCA and surrounding travel corridors, the mitigations and monitoring for this Event were developed and are contained in **Appendix E** of the Final EIS. As described above, some mitigations will be phased in. Phasing is occurring for two main reasons: 1) given the date of the ROD and the start of the 2019 Burning Man Event, the complexity and logistical issues of some mitigations require months to resolve; and 2) some mitigations will be implemented if monitoring and adaptive management illustrate they are needed (see *Mitigation, Monitoring, and Adaptive Management*, above). The BLM has a goal of implementing all mitigation and monitoring by 2022.

13. The decision is the result of and will continue meaningful government-to-government consultation and self-determination for tribes and Native communities. As sovereign nations affected by the Event permitted by the BLM, the BLM has a responsibility to mitigate and reduce effects. The BLM will continue to conduct government-to-government consultation to ensure the mitigations and stipulations address the identified effects: solid waste, public health and safety, traffic, cultural and Native American religious impacts, and socioeconomic impacts.

14. Due to the timing of this decision, as in the 2018 Event, BRC will keep the maximum Event population at 80,000 or less for the 2019 Event. In 2020, a total population cap of 80,000 attendees, which includes paid participants and BRC staff and volunteers, for the duration of the Closure Order will be implemented. Based on environmental monitoring, adaptive management may allow a peak population instead of a total population. Under a total population cap model, the proponent would close the entry gate when 80,000 participants have entered the playa. Even if participants leave the event, no additional participants would be allowed to enter. Under a peak population model, up to 80,000 participants would be allowed on the playa at any given time. As participants leave the event, the proponent would allow that same number of people to enter the playa.

15. The decision to authorize an Event with a population of 80,000 is consistent with the Recreation and Fee Administration Handbook (H-2930-1) because it allows the BLM to adequately administer the SRP. Mitigation and monitoring (see **Appendix E** of the Final EIS) are identified to provide for resource protection, public health and safety, and minimization of conflicts with other NCA users, and to serve the public interest. At the same time, the decision maintains an opportunity for the BLM to authorize the Event consistent with the Department of the Interior's priority of building a meaningful conservation stewardship legacy by expanding public access for sport and recreation opportunities on public lands.

16. Based on the environmental impact analysis contained in the EIS, the BLM has determined that by using the mitigation and monitoring described above and in **Appendix E** of the Final EIS, this decision will minimize environmental impacts on the public lands to an acceptable level, as outlined in the Final EIS.

17. To the maximum extent, this decision, subject to implementation of the mitigation measures in **Appendix E** of the Final EIS and obtaining required permits, is consistent with other federal, state, and local plans.

18. Prior to this decision, the BLM completed the process required by the National Historic Preservation Act (54 U.S.C. 300101 et seq.). A MOA between the BLM and the Nevada SHPO has been executed. That MOA describes required mitigation for the adverse impacts on historic properties and Native American religious concerns in the Closure Area.

19. The decision will not adversely affect any threatened or endangered species.

AR04387

20. The decision meets the purpose and need for the federal action. The implementation of the mitigation and monitoring measures listed in **Appendix E** of the Final EIS, and with applicable adaptive management, will meet FLPMA goals to prevent unnecessary and undue degradation. The absence of required mitigation and monitoring has the likelihood, over time, of creating unnecessary and undue degradation.

21. All SRPs have standard stipulations from the REA; however, those standard stipulations do not address the complexity of the Burning Man Event. Accordingly, additional stipulations will be added to the SRP. The BLM will review and revise the additional stipulations annually dependent on monitoring and necessary adaptive management measures. **Appendix B** of the Final EIS contains an example of additional stipulations from a previous Event. The BLM has applied additional stipulations to the Burning Man Event SRP since at least the 2012 Event.

22. Future additional SRP stipulations and future applicant-committed environmental protection measures will serve to monitor, reduce, and/or prevent impacts. Monitoring and adaptive management are needed to assess the effectiveness of the stipulations and any future applicant-committed environmental protection measures.

23. Maintaining the 80,000 population limit, per this decision, in conjunction with the identified mitigation, monitoring, and adaptive management listed in **Appendix E** of the Final EIS, provides the opportunity for BRC to proactively eliminate or minimize effects to a manageable or acceptable level. This will be done through BRC's Event Plan of Operations.

Rationale for the BLM's decision to select the No Population Change alternative over the other alternatives is based on the environmental consequences analyzed in Chapter 3 of the Final EIS and the following:

1. With current resources, it would be challenging for the BLM to maintain consistency with FLPMA while at the same time addressing cooperating agency concerns about public health and safety under the Proposed Action. At a population of 100,000 (Alternatives A and C), the BLM could not adequately administer the SRP while providing for public health and safety and preventing unnecessary and undue degradation of lands. At an Event population of 100,000, with current BLM resources, the Event could possibly conflict with the multiple-use mandate of FLPMA because it could preclude other public lands users during the Closure Order. Cooperating agencies and other governmental agencies indicated they could not support the Event growing. Letters from the Mayor of the City of Reno, NDOT, and NHP indicated they could not provide staff and accommodate growth over the current population level of 80,000 (see **Appendix K** of the Final EIS). It is particularly difficult for agencies to staff the Event because it is over the Labor Day weekend when other recreation events in surrounding areas and communities occur.

2. The BLM is aware of BRC's approach to minimizing impacts through its best management practices; however, BRC cannot control all Event participant actions, which has led to the need for the mitigation and monitoring measures included in **Appendix E** of the Final EIS and incorporated in this decision. At an Event population of 100,000 (Alternatives A and C), these effects would be increased. Of particular concern are traffic, trash, air quality, and infrastructure as identified in Chapter 3 of the Final EIS. In the case of trash, the NDOT, NHP, and PLPT expressed concerns about the current level of trash left behind from the Event. It is a reasonable assumption that a population of 100,000 would result in even more trash left behind.

3. Cooperating agencies expressed concerns with Event population growth on traffic and maintenance issues on SR 447, Interstate 80, and CR 34. Traffic and maintenance are concerns at the current population level, and growth of the Event would exacerbate concerns of maintenance costs and overcrowding of surrounding roadways.

4. While some impacts may be reduced with an Event population of 50,000 (Alternative B), for several years BRC has successfully held the Burning Man Event with a population up to 80,000. BRC's best practices, combined with required mitigation measures, monitoring, and adaptive management outlined in the Final EIS will mitigate impacts to the point where a reduced Event population of 50,000 was not selected. At an Event population of 50,000, there would be the potential for an adverse economic impact on northern Nevada. Since 2012, the Event has grown to its current population level, and northern Nevada communities have become accustomed to the associated economic outcomes.

5. The BLM's decision to not select the No Event Alternative (Alternative E) is similar to the rationale for the reduced population alternative. In addition, the Event has occurred on the playa for over 20 years consistent with the BLM's multiple-use mandate under FLPMA. Additionally, the City of Reno has communicated the positive art and cultural aspects in the city from the Event.

## NATIVE AMERICAN CONSULTATION

The BLM sent letters on November 27, 2017, requesting consultation on the Proposed Action to the following tribes: PLPT, Reno-Sparks Indian Colony, and Summit Lake Paiute Tribe. The BLM has been actively engaged in government-to-government consultation with tribes throughout the EIS process. During consultation, tribal and cultural committee members expressed concerns regarding unauthorized artifact collection, especially along the travel routes. They also expressed concerns regarding increased visitation and impacts on springs and other culturally important sites surrounding the playa. Members noted that their concerns extend beyond tribal reservation boundaries. Additional information regarding Native American consultation can be found in the Final EIS, Section 4.4.1.

## COOPERATING AGENCIES

The cooperating agency relationships established during this project facilitated the exchange of views and expertise between BLM personnel and other government officials and staff. This form of consultation, unique to planning and NEPA processes, was crucial to shaping the EIS. The BLM formalized cooperating agency relationships with eight governmental parties: PLPT, NDOT, Pershing County, Pershing County Sheriff's Office, Federal Bureau of Investigation, Humboldt County, US Department of Homeland Security, and Washoe County.

## INTERGOVERNMENTAL PARTNERS

Under FLPMA, the BLM's coordination responsibilities include maximizing consistencies with the plans and policies of other government entities.

The BLM conducted coordination with the Nevada SHPO and the US Fish and Wildlife Service.

NEPA regulations require that EISs be filed with the EPA (40 Code of Federal Regulations 1506.9). The BLM submitted the Draft EIS and Final EIS to the EPA, as required by Council on Environmental Quality regulations. Chapter 4 of the Final EIS explains intergovernmental partners.

AR04389

## PUBLIC INVOLVEMENT

### Public Scoping

Public scoping is detailed on Page 4-1 in Chapter 4 of the Final EIS. Public outreach began in November 2017. The BLM published a notice of intent on June 20, 2018. The BLM held two public scoping meetings on July 9 and 10, 2018, in Fernley and Lovelock, Nevada, respectively. A full description of the concerns brought forward during scoping can be found in the project scoping summary report (BLM 2018a).

Issues of concern identified in project scoping include:

- What are the impacts on wildlife and their habitats (aquatic and terrestrial) from air, light, noise, and waste (hazardous and solid) pollution; invasive species; and traffic. How will they be mitigated?
- What are the impacts from the Event on vegetation, wetlands, and riparian areas, and how will they be mitigated?
- What are the impacts on significant cultural and paleontological resources, including National Historic Trails, and can they be mitigated? What are the impacts on Native Americans from spiritual, cultural, and social values and economics?
- Can the BLM provide the support and resources needed to administer the SRP, while providing for public health and safety and preventing unnecessary and undue degradation to BLM-administered lands?
- How does the Burning Man Event affect air, soil, and water resources? Can mitigations be developed to prevent unnecessary and undue degradation?
- What are the regional economic contributions and effects on community services and federal, state, and local budgets?
- How do the public and participants view the Event? Are there any disproportionate impacts from the Burning Man Event on environmental justice and other populations?
- How does the Burning Man Event affect the values of the Black Rock Desert–High Rock Canyon Emigrant Trails NCA, wilderness areas, and wilderness study areas?
- How does the Burning Man Event affect access and transportation, SRPs, and other users and their experiences within the Assessment Area?

### Draft EIS

The BLM published the notice of availability for the Draft EIS in the *Federal Register* on March 15, 2019. During the 45-day public comment period, the BLM held two public meetings in Lovelock and Sparks, Nevada.

The BLM received a total of 2,061 submissions; 1,736 of these were considered unique submissions, and 325 were form letter campaigns (discussed further in **Appendix K** of the Final EIS).

### Final EIS

The BLM published the notice of availability for the Final EIS in the *Federal Register* on June 14, 2019, and uploaded the Final EIS to the EPA on June 7, 2019. The 30-day review period ended on July 14, 2019.

AR04390

## ALTERNATIVES INCLUDING THE PROPOSED ACTION

A detailed description of the Proposed Action; alternatives, including the No Permit/Action Alternative; and those considered but not carried through this EIS are listed in detail in Chapter 2 of the Final EIS.

## SPECIAL RECREATION PERMIT APPROVAL

The 2930-2 Forms for the Special Recreation Permit are provided in **Appendix B** of the EIS.

AR04391

This page intentionally left blank.

AR04392



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
LLNVW03500-18-01
2930 (NV030.00)

**JUN 0 1 2018**

<u>CERTIFIED MAIL NO. 9171 9690 0935 0164 8863 94</u>
<u>RETURN RECEIPT REQUESTED</u>

Charlie Dolman
Event Operations Director
Black Rock City LLC                                    2018 Burning Man Event
660 Alabama St.                                        Special Recreation Permit
San Francisco, CA 94110-2008                           LLNVW03500-18-01

Dear Mr. Dolman,

On February 07, 2018 the Bureau of Land Management (BLM) received a Special Recreation Permit (SRP) application and draft Operating Plan from Black Rock City LLC (BRC) for the 2018 Burning Man Event (2018 Event).

Enclosed you will find two copies of the Cost Recovery Agreement (CRA) for the 2018 Event covering Phase 2, Continuing Planning, Operational, and Closeout. This CRA between the Applicant and the BLM establishes procedures to reimburse BLM for costs incurred to process the 2018 Burning Man SRP. As noted in the CRA, please return both signed copies of the CRA to this office on or before June 25, 2018 and remit the first payment to this office on or before June 30, 2018. The BLM will return a signed copy of the CRA to you for your files.

It bears noting that the total Cost Recovery Estimate (CRE) for the 2018 event totals $2,850,825.25 This CRE is an increase of $347,374.25 over the 2017 Burning Man CRE. The increase is due to an increase in labor cost of $135,350.25, an increase in Operational Cost of $176,500.00 and an increase in Indirect Cost of $37,524.00.

AR02866

The BLM appreciates the opportunity to work collaboratively with BRC to ensure that the agency administers the SRP effectively. Please contact the acting BLM Burning Man Project Manager, Chelsea McKinney at (775) 623-1771 with any questions.

Sincerely,

Mark E. Hall

Mark E. Hall Ph.D.
Field Manager
Black Rock Field Office

Enclosures:
(2) CRA
2018 Phase 2 CRA Estimate

**61732**    Federal Register / Vol. 67, No. 190 / Tuesday, October 1, 2002 / Rules and Regulations

## DEPARTMENT OF THE INTERIOR

**Bureau of Land Management**

**43 CFR Parts 2930, 3800, 6300, 8340, 8370, and 9260**

**[WO–250–1220–PA–24 1A]**

**RIN 1004–AD25**

**Permits for Recreation on Public Lands**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Final rule.

---

**SUMMARY:** This final rule updates the regulations of the Bureau of Land Management (BLM) that tell how to obtain recreation permits for commercial recreational operations, competitive events and activities, organized group activities and events, and individual recreational use of special areas. It establishes a new system for determining costs for reimbursement to BLM, helping to ensure a fair return to the public for special uses of the public lands. It adds new regulations on how to obtain Recreation Use Permits for fee areas, such as campgrounds, certain day use areas, and recreation-related services.

The final rule also meets the policy goal of reorganizing the regulations in a more systematic way. The rule relocates the regulations to the subchapter dealing with other land use authorizations, reorganizes them into an order that flows more logically, and simplifies the language.

The final rule is necessary for several reasons. First, it emphasizes and highlights the cost recovery requirements for issuing recreation permits. Second, it updates BLM regulations to reflect changes over the last 15 years in recreational activities and large-scale events. Third, it provides guidance and standards for use of developed recreation sites.

**EFFECTIVE DATE:** October 31, 2002.

**ADDRESSES:** You may send inquiries or suggestions to: Department of the Interior, Bureau of Land Management, Mail Stop WO–250, 1849 C St., NW., Attention: Lee Larson, Washington, DC 20240.

**FOR FURTHER INFORMATION CONTACT:** Lee Larson at (202) 452–5168. Persons who use a telecommunications device for the deaf (TDD) may contact Mr. Larson by calling the Federal Information Relay Service (FIRS) at (800) 877–8339, 24 hours a day, 7 days a week.

**SUPPLEMENTARY INFORMATION:**

I. Background

II. Responses to Comments
III. Final Rule as Adopted
IV. Procedural Matters

## I. Background

BLM published the regulations at 43 CFR part 8370 on September 12, 1978 (43 FR 40738). These regulations covered only Special Recreation Permits for use of lands other than developed recreation sites. BLM has reserved a separate subpart 8371 on use of fee areas and developed sites since 1978. BLM amended subpart 8372—Special Recreation Permits Other Than on Developed Recreation Sites—on August 29, 1984 (49 FR 34337), by defining "actual expenses," by revising the section on "Enforcement," by adding a section on exceptions to the Special Recreation Permit requirements, and by revising the section on "Fees." They were amended again on March 31, 1988 (53 FR 10394), by adding a section on "Appeals" that allows appeals but places decisions in full force and effect pending appeal unless the Secretary of the Interior decides otherwise.

BLM published the proposed rule on Permits for Recreation on Public Lands in the **Federal Register** on May 16, 2000 (65 FR 31234). The proposed rule, while it revised and redesignated the entire subpart 8372 in the CFR, focused on how to obtain recreation permits for commercial recreational operations, competitive events and activities, organized group activities and events, and individual recreational use of special areas. It proposed a cost recovery system. It also proposed new regulations for campgrounds and other fee areas.

The period for public comment on the proposed rule expired on July 17, 2000. BLM received about 400 public comment letters or other communications during this comment period.

## II. Responses to Comments

In this portion of the Supplementary Information, we will discuss the sections of the proposed rule upon which the public commented, or that need to be changed for some other reason. If we do not discuss a particular section or paragraph, it means that no public comments addressed the provision. However, we may change wording of other sections where we find clarification or style changes necessary or appropriate, and there is no other need for substantive amendment in the final rule.

### Section 2931.3   Authorities

One comment suggested adding the Recreational Fee Demonstration

Program authorization (Pub. L. 104–134) to the authorities listed. This program allows BLM to keep fees generated at recreational sites, through a permanent appropriation, in a special Treasury account that carries over from year to year. It also allows more innovative fee collection approaches, including cooperation with other Federal agencies and State and local government, and collection of fees where we had not collected them before.

This Program is a temporary program established by Congress. Unless Congress makes the authority permanent, we cannot cite it as authorization for general fee and permit regulations.

### Section 2932.5   Definitions

*Actual expenses.* One comment addressed the definition of "actual expenses." The comment suggested that insurance and bonding costs, contingency funds (that trip organizers may set up to replace lost or damaged equipment, for example), and amortization should be counted in the calculation to determine whether an activity is noncommercial because the participants share the expenses.

BLM will consider amortization when the equipment being used belongs to all of the participants rather than just one. Otherwise, one person is receiving a financial benefit from the trip, making the trip commercial. We agree that insurance covering a group for a specific activity may conceivably be a shared expense, and have amended the definition of "actual expenses" so that the regulations would not prevent that. BLM does not require bonds for noncommercial, noncompetitive outings. The regulations do not disqualify trips from being noncommercial because of contingency funds, so long as they are used to defray actual expenses of the activity or returned to the participants.

*Commercial use.* Several comments questioned the definition of "commercial use." One stated that the definition was not clear and might lead BLM to determine that an outdoor retailer must obtain a Special Recreation Permit (SRP) if any of their customers used public land for recreation. The comment urged that the text be amended to provide that only persons providing goods and services or both on public lands, as opposed to retail outlets on private land, will need SRPs.

Some comments disagreed that public advertising should be a criterion for deciding whether an event or activity was commercial. They suggested that BLM define the term "public advertising." Some wanted

AR08035

announcements to members of organizations included in the definition while others wanted communications within groups to be specifically excluded.

Two comments addressed paragraph (1)(iv) of the definition of "commercial use." One respondent found the paragraph ambiguous, unworkable, and dependant on the perception of the participant. The other comment supported the definition but suggested changing "participants pay for" to "the permittee receives payment for." The comment stressed that the requirement should bind the permittee, not the participant. Our response to this comment is that the section is a definition. It does not itself impose requirements on any party. "Participants pay for * * *" is a good description of an action that would identify a use as commercial.

One comment suggested changing the definition to: "Commercial use is providing goods or services on BLM administered lands and related waters for compensation of any kind."

One comment agreed that the definition of "commercial" is appropriate, but stated that it should be modified to clarify that a fee or donation used to offset the administrative expenses of a trip program qualifies the activity as commercial in nature. Specifically, it urged that we add at the end of the sentence at (1)(ii): "including compensation for administrative expenses associated with the activity, whether those expenses are paid by contribution or by trip fees."

If the definition of "commercial use" is read in its entirety, the meaning is clear. It refers only to uses occurring on public lands and related waters. We have added language to the definition to make it clear that the commercial operator is the person or organization that leads or sponsors the activity, not the retailer who sells recreational equipment to the general public.

The common meaning of "public advertising" is generally well understood to include appeals and inducements to the general public through newspapers, broadcast media, Internet sites available to the general public, listing on public or community event calendars, publicly displayed signs, posters and flyers. Public advertising does not include communications within the known membership of an identifiable group. The proposed regulation specified but did not define "public advertising." In the final rule, we have changed the definition of "commercial use" to specify that it is paid advertising that qualifies a use as commercial. We

believe the suggestion in the comment to include announcements to group members in public advertising to be overly broad. If a private, social organization plans an activity on public land, information about the activity must be shared with the membership. This might take place in organization news letters, bulletins, posters in the club house, etc. All these communications tools could be considered advertising if we adopted the approach the comment suggested. Paid advertising outside the organization would be considered public advertising, but we do not consider that publicity such as a notice on a public bulletin board alone makes a trip commercial.

The definition as proposed provides an adequate description to allow BLM staff and members of the public to decide whether an activity is commercial.

The plain text of paragraph (1)(ii) is quite clear when it says that collection of a fee or other compensation that is not strictly a sharing of actual expenses or exceeds actual expenses incurred for the purposes of the activity, service or use, makes an event commercial. If an event organizer collects a fee to cover overhead or administrative costs, BLM would conclude that the use is commercial.

*Organized group activity.* We have amended the definition of "organized group activity" to make it clear that it covers only recreational use. See the discussion of section 2932.11, below, for an explanation.

*Section 2932.11   When Do I Need a Special Recreation Permit?*

Numerous comments addressed organized group permits.

Most of these comments were opposed to implementation of a group permit regulation. Most of them based their opposition on their interpretation of the definition of "organized group activity," contending that, as written, it could require a permit for anyone wishing to use public lands anywhere at any time. Most also mentioned the right to freedom of assembly, contending that the proposed regulation abrogates that right.

Several comments supported the elimination of the 50-vehicle ceiling for permit waivers, but suggested another threshold for when BLM should require group permits. Several other comments suggested that this is a new requirement, and therefore is a major action that requires further review.

The definition of "organized group activity" in § 2932.5 clearly concerned

many of the respondents. As proposed, the definition was:

"Organized group activity" means a structured, ordered, consolidated, or scheduled meeting on or occupation of the public lands for the purpose of recreational or other use that is not commercial or competitive.

This definition does lend itself to the interpretation described by those who commented, by expanding the scope of the definition to include meetings and other non-recreational uses. We have amended the definition in the final rule to make it clear that it covers only recreational uses.

We have also amended § 2932.11 to provide that organizers of group events or activities need a permit only if required by a BLM management or activity plan or when we determine that resource concerns, potential user conflicts, or public health and safety concerns indicate that a permit is necessary. We have also amended the rule to treat small group events the same way we treat small competitive events. That is, we may waive the permit requirement (see § 2932.12) if an organized event is not commercial, not advertised, does not pose appreciable risks to people or the environment, and does not require special BLM management or monitoring.

Any threshold on the number of people making up a group that needs a permit would be difficult to establish on a national basis. BLM will determine the threshold, if any, for each area. (For example, 10 people in a sensitive riparian area may constitute an organized group, but a less sensitive upland area may be able to handle 200 people without special management attention.) BLM will base this determination on planning, resource concerns, potential user conflicts, public health and safety, or a combination of these factors.

The requirement for a group permit is not new. Our approach is similar to that of the National Park Service, which codified implementing regulations at 36 CFR 71.10 in 1974. BLM's authority for this type of permit is section 4 of the Land and Water Conservation Fund Act (LWCFA) of 1965 (16 U.S.C. 460*l*–1 *et seq.*).

One comment addressed the effect of the proposed rule on institutional groups. It suggested that the permit waiver requirements are overly broad, and would essentially prevent any institution from qualifying for a waiver for any type of use.

We may require academic, educational, scientific, and research groups to obtain a permit, depending

AR08036

upon how they structure their trips. For example, if BLM determines that the institutional group is commercial use or if the primary purpose of a use is recreational, and academic aspects are incidental, we would not waive the permit requirement. If the use is noncommercial, the primary purpose is academic, the use supports management objectives, and BLM has either requested the institution to complete a project or study, or BLM can benefit from a project or study that the institution proposes and intends to complete if permitted, BLM could issue an administrative use authorization. BLM may issue permits to use special areas to institutional groups making noncommercial use of these areas on a cost sharing basis. Where BLM has allocated access to particular kinds of uses and numbers of trips through land use planning, we may award additional, non-allocated permits on a space available basis.

*Section 2932.14   Do I Need a Special Recreation Permit To Hunt, Trap, or Fish?*

A number of comments questioned why hunting, fishing, and trapping were singled out as activities not needing a permit. Some described this section as arbitrary and capricious for including only these uses, and not other, less consumptive uses. One comment noted that these uses still need a permit if they meet the requirements of commercial, competitive, or organized group permits. One comment concerned the requirement for guides involved in hunting, fishing, and trapping to acquire an SRP. The respondent suggested that the provision should indicate that the guide would need an SRP only if the guiding is taking place on public lands and related waters. The comment writer also wanted the rule to provide that drop-off or air taxi service would not require an SRP.

The intent of this section is to reiterate that hunting, fishing, and trapping primarily fall under the purview of the States. However, both the proposed rule and the final rule require a commercial enterprise that provides guide or outfitter service in support of hunting, fishing, or trapping to have a Special Recreation Permit. However, we have amended this provision to make it clear that if an organized group wished to go on a hunting trip on public lands, or someone wanted to hold a fishing tournament as a competitive event, BLM would require a Special Recreation Permit. The point of this amendment is that if the subject of an activity or event is hunting or fishing, it does not excuse

the organizer or sponsor from obtaining a permit if the regulations otherwise require a permit because the event is commercial or competitive.

The title of the regulations, "Part 2930—Permits for Recreation on Public Lands," limits the content of the regulations to permits for recreational use of public lands. For the purposes of brevity, we do not repeat the phrase, "on public land and related waters," throughout the text.

Drop-off/pickup air taxi services that meet the definition of "commercial use" in § 2932.5 would need an SRP unless they had an airport lease or right of way for commercial use.

*Section 2932.22   When Do I Apply for a Special Recreation Permit?*

We received 6 comments that primarily addressed the requirement that applicants submit applications for Special Recreation Permits at least 180 days before their activities are to begin. Several other comments addressed this issue along with other concerns.

Most of these comments maintained that 180 days would be too far in advance, particularly for small competitive groups, or small organized groups and event sponsors, to have to apply.

Several of the comments also stated that it would not be fair to applicants to tell them as late as four months after they submitted their applications that we would not be able to issue a permit in time for their activity to take place, as provided in proposed § 2932.25.

On the other hand, none of the commercial outfitters who addressed this issue objected to the 180 day advance requirement.

While the preamble states that the local BLM office may provide for a shorter review period, this exception is not reflected in the regulation. The BLM handbook also specifies that we may be able to act on applications filed fewer than 180 days before your proposed activity or event.

We believe that 180 days is a reasonable requirement for permits that require environmental assessment beyond that already covered in a land use plan, programmatic EA, or categorical exclusion. If the proposed activity occurs in critical habitat for a threatened or endangered species, for example, BLM may have to engage in lengthy consultation with another agency. Therefore, we believe that the 180 day requirement reflects BLM's needs for most proposed competitive, commercial, and organized group or event activities. In some cases (for example, where there is great demand for access to the public lands), local

offices may need to require that applications be submitted in advance of 180 days. This may happen when it is necessary to schedule a series of separate annual events on succeeding weekends. However, we have amended the provision in the final rule to make it clear that BLM may reduce the time requirement for events or activities that do not require extensive environmental documentation or consultation. We have also revised section 2932.25 to provide for earlier warning from BLM that permit application will require more than routine review.

*Section 2932.24   What information Must I Submit With My Application?*

Comments from the outfitter community suggested that we should amend § 2932.24(a)(3) by adding a provision for applications to include a statement of how the applicant's activity would contribute to the public's use and enjoyment of the land and resources that we manage.

While this information would be useful, and BLM would certainly consider it when evaluating an application (as provided in §2932.26), it is not necessary. Further, it might be misleading to make it a requirement for applications. Lack of a concrete public benefit does not disqualify an activity that is the object of a Special Recreation Permit application. We do not want to suggest in the regulations that a general public benefit is a prerequisite for obtaining a permit under these regulations.

*Section 2932.31   How Does BLM Establish Fees for Special Recreation Permits?*

A few comments that addressed this section did not recommend any change to the Proposed Rule. However, they strongly urged BLM to seek professional guidance from the appraisal industry, user groups, and others concerned with or affected by how fees will be determined, when we compile our fee schedules.

We concur with these comments, and plan such consultation. No change in the rule is necessary to respond to these comments.

More than 200 comments addressed the cost recovery provisions in paragraph (d) of this section (paragraph (e) in the final rule). About 20 of these came from outfitters and commercial operators. However, most of these comments came from participants in a single event, Burning Man in Nevada. Nearly all the comments opposed imposition of both cost recovery and use fees for the same permit. Several comments suggested that the 50 hour

Federal Register / Vol. 67, No. 190 / Tuesday, October 1, 2002 / Rules and Regulations     **61735**

threshold for charging cost recovery is too low, and suggested that cost recovery should be charged after 75–100 hours of BLM staff time, or 200 hours, in the case of some comments. Nearly all the comments from participants in the Burning Man event agreed that BLM should recover our administrative costs. However, they thought that BLM should not "profit" by charging both cost recovery and use fees, which many dubbed "double dipping."

Outfitters and commercial operators generally opposed cost recovery on permit renewals. Also, most of them raised the issue of how cost recovery should be applied in the case of multi-year permits.

Outfitters and several other respondents suggested that the costs of preparing programmatic environmental assessments (EAs) not be included in cost recovery charges, since the benefits fall to the general public and succeeding applicants, while the cost falls to one applicant.

There were a number of comments that asked us not to charge any fees for land which is publicly owned and already supported through taxes. Many of these comments also questioned whether BLM would wisely use the fees we collect.

BLM received its authority to seek cost recovery associated with issuing authorizations to use the public lands in 1976 from section 304(b) of the Federal Land Policy and Management Act (FLPMA) (43 U.S.C. 1734(b)). We selected the 50-hour threshold for charging full cost recovery because it is consistent with the BLM's Lands and Realty program, and is consistent with the approach of the U.S. Forest Service, which issues Special Use Permits to authorize general land uses as well as recreation. Cost recovery guidelines in Office of Management and Budget (OMB) Circular A–25 direct Federal agencies to limit cost recovery to situations when a service or privilege provides special benefits to an identifiable recipient, beyond those that accrue to the general public. Consequently, costs associated with development of programmatic EAs would not normally trigger cost recovery fee, because BLM does not assign them to the single initial applicant.

As to permit renewals, the practical effect of the rule as written, with its 50-hour threshold, is that permit renewals will not trigger cost recovery, unless you propose a substantial change in your operation that would require additional environmental analysis.

In response to the concerns expressed by the public about the appearance of

double charging, we have made several changes in paragraph (e). These changes should have the effect of clarifying when cost recovery charges apply and when permit fees apply to commercial, competitive, and organized group activities or events. We separated cost recovery requirements for commercial use from competitive or organized group/event use. We did this to distinguish between the commercial fee that BLM assesses for the privilege of using the public lands for a business, versus the need to assess cost recovery for either type of use to help pay for the preparation of an authorization and for its administration.

• The costs would have to reach the threshold in one year for cost recovery to be invoked on a multi-year permit;

• We specifically exclude programmatic or general land use plan documentation from cost recovery, except if the documentation work has been done because of or to benefit a specific applicant;

• In cases where we charge for cost recovery for recreational events (as opposed to commercial use), the final rule provides that the charges will be in place of permit fees.

• In some cases where we would normally charge for cost recovery, we may elect to charge a permit fee instead of cost recovery if the permit fee is greater than cost recovery would be.

### Section 2932.33   When Are Fees Refundable?

Comments from the outfitter community suggest removing the prerequisite that BLM actually award a permit to someone else before we refund fees to an applicant who cancels or reduces his or her application for a Special Recreation Permit. They suggest that the standard should be whether the outfitter relinquished the use in time to make it available to others, not whether others have actually applied for the use and the agency is able to award it. (Note that this provision pertains to fees, not cost recovery requirements.)

We agree with the comment and have removed the words "and we are able to award such use." The sentence in question only applies to areas where use is allocated to commercial or non-commercial use or both. An area where recreation use has been "allocated" is an area where demand has outstripped supply, or use needs to be restricted to protect the resources. Management or operations plans for allocated areas will determine the amount of time BLM would normally need to reallocate your use, and thus the deadline for you to notify us and qualify for a refund or

credit. However, whether to provide a refund is at the discretion of BLM.

### Section 2932.34   When May BLM Waive Special Recreation Permit Fees?

One comment stated that this section made it too easy for organizers of activities that the comment described as clearly commercial to obtain fee waivers. The comment urged that organizers of activities that are commercial in nature should not be able to avoid paying fees merely because the users have certain characteristics, or label themselves in certain ways.

The language in the proposed rule was very similar to that in the previous regulation at 43 CFR 8372.4(c)(2)–(3), which directed that BLM not assess fees for scientific and educational outings. In the proposed rule, we attempted to clarify this provision to eliminate the possibility that recreational outings may obtain a fee waiver because they have educational aspects, such as a professor accompanying a group of tourists to explain the geology or history of an area. As a practical matter, BLM has granted very few fee waivers under this authority. An applicant's status as an academic, scientific, research, or therapeutic institution is not, by itself, a basis for waiving fees. BLM has a responsibility to evaluate proposals to determine whether fee waivers are warranted. A professor proposing to take students onto public lands for research or study for academic credit would qualify for a waiver under this regulation. However, groups proposing activities meeting the definition of commercial use would not be granted fee waivers if they merely belong to an academic, scientific, research, or therapeutic institution. The key factor is whether the activity itself, rather than the sponsoring institution, qualifies for a waiver. We did not amend this provision in the final rule.

### Section 2932.42   How Long Is My Special Recreation Permit Valid?

A comment from a trade association representing outfitters recommended that, considering the investment required by outfitters, the maximum term for SRPs should be 10 years, unless BLM finds that special circumstances require a shorter period.

As a practical matter, the renewal and transfer policies contained in the proposed rule improve tenure over that provided in the previous regulations. Section 2932.51 makes it clear that BLM will renew a permit if it is in good standing and consistent with our land use plans and policies, and if the permittee has a satisfactory record of performance. This regulation follows

AR08038

existing BLM policy on permit renewal and transfers. Regardless of the term of the permit, BLM may cancel or amend it for cause as described in 2932.56.

However, BLM recognizes that the maximum of a 5-year permit is a matter of concern for the outfitting and guiding community. Elsewhere in today's **Federal Register** appears a proposed rule that would change the maximum term for a Special Recreation Permit to 10 years. Because this is a substantial change that was not discussed in the proposed rule, it is necessary and appropriate to allow a period of time for public comment.

Section 2932.43   What Insurance Requirements Pertain to Special Recreation Permits?

We received fewer than 10 comments addressing insurance and bonding issues. Outfitters and commercial interests generally supported the insurance requirements as they relate to their activities. However, other comments addressed bonding or insurance requirements for organized group activities or events. One comment was opposed to any insurance or bonding requirement. The others suggested changes to ensure that the requirements are based on the kind of event or activity for which BLM is issuing permits. According to these comments, there are many types of group activities or recreation events that may require a permit, but for which insurance or bonding should not be necessary because the event or activity poses no risk to participants or the environment. One respondent suggested that BLM establish criteria for when we would waive insurance and bonding requirements. Two comments suggested that any requirement for insurance for small groups would be onerous and would force small groups or events to either proceed without authorization (and risk prosecution) or cancel their proposed activity or event.

One comment suggested that there should not be an exception excusing vendors from obtaining insurance, and one comment suggested that BLM impose fines and penalties on permittees that cause environmental degradation or other damage rather than require insurance or bonding for possible damages occurring under an organized group or event Special Recreation Permit.

One comment suggested insurance coverage requirements should be published and updated in the same fashion as fees.

This section of the proposed rule was essentially unchanged from the previous regulations in subpart 8372. We added the provision that BLM may require

insurance or bonding for organized groups or events, leaving the final decision on insurance and bonding requirement for groups and events to the BLM. We realize and agree that many small scale activities and events will not and should not require insurance or bonding, but do not believe it is reasonable to establish national criteria for waiving insurance requirements.

BLM's Special Recreation Permit Handbook, which will be available in field offices and on the internet soon after the effective date of this final rule, will contain criteria for our determination of minimum insurance coverage requirements. The amounts of coverage we require vary based on the risk involved in the activity. That risk depends on the nature of the activity, the conditions where the activity will take place, the number of participants, skill level of the participants, and risk management implemented by the permittee. In other words, the local BLM office administering the event can best determine what coverage you need, as opposed to BLM headquarters setting limits on a national basis. Our actual experience is that most permittees carry more insurance than BLM would normally require.

As written, the exception for vendors is not a blanket exception. Rather, it gives the BLM the discretion to require insurance for vendors when necessary. Not all vending poses risks to the public (tee-shirt sales, for example), while others (such as food sales) will require insurance.

Imposition of fines and penalties on permittees who cause damage, rather than requiring up-front insurance or bonding, would not assure the public that its interests are being protected. Fines are often uncollectible. Civil judgments are difficult to obtain and collect. Damage repair in such cases would at best take longer.

Section 2932.52   How Do I Apply for a Renewal?

Some comments expressed concern about the requirement in the proposed rule that an application for renewal be made "in the same form as for a new permit." The concern is the regulation may imply a full, "from scratch" evaluation.

That is not the intent, and we have amended the text to say "on the same form." You must file renewals on the SRP application form, and should file updates to operations plans at the same time. You need only write "unchanged" on the parts of the form where permit needs and other information have not changed. We expect that processing renewals will be much less involved

than issuing new permits. For example, an application to continue a previously approved use usually does not require preparation of a new NEPA document. However, if field conditions have changed, we may need to conduct new environmental analyses.

Section 2932.54   When May I Transfer My Special Recreation Permit to Other Individuals, Companies, or Entities?

Comments from the outfitting community expressed concern that the language in this section may provide an avenue for a local manager to reduce or destroy the market value of an outfitting company by denying transfers or withholding approval of certain transfers to target specific operations or styles of operations.

BLM recognized the need for guidance on transfers and published its national Special Recreation Permit Policy in 1984 (49 FR 5300, February 10, 1984), which, among other things, authorized transfers. We process transfers under the following guidelines:

1. You must provide adequate documentation to BLM that you intend a bona fide business transfer or sale. The transfer or sale must include a substantial portion of the equipment and other tangible assets needed to conduct a business. BLM will not approve any attempted transfer or sale of authorized use alone.

2. The previous permittee generally should have operated at an acceptable standard for at least one full year.

3. BLM will evaluate the proposed business sale and transfer the permit privileges to a qualified buyer, if—

• The transfer is consistent with planning decisions; and

• The proposed sale includes tangible property necessary to conduct the activities authorized.

4. The proposed permittee must provide a written operation plan to BLM, including any anticipated operational changes from the present permittee.

This section of the final rule codifies and improves BLM's policy on permit transfers.

The discussion in the preamble of the May 16, 2000, proposed rule stated that BLM will allow a transfer as long as you meet the requirements of this section. This policy, that we will approve a permit transfer only if the business or a substantial part of it is sold, continues in this final rule.

Section 2932.55   When Must I Allow BLM To Examine My Permit Records?

One comment stated the section was overreaching, saying that it would attempt to authorize BLM to obtain

privileged material from attorneys, accountants, and other professionals.

The intent of the rule is to allow the BLM to meet its legislative and regulatory requirements in FLPMA, LWCFA, and OMB Circular A–25. For BLM to meet its legislative requirements to protect natural resources and to help ensure public health and safety, we issue stipulations with each permit. We use monitoring and an evaluation process to help us ensure that permittees provide the public with qualified, experienced guides. It also helps to ensure that the permittee follows permit stipulations to protect natural and cultural resources. Finally, audits help ensure that the public receives fair compensation from businesses conducted on public lands by allowing us to review the financial aspects of their permit operations and make sure adequate fees are paid. OMB Circular A–25 emphasizes this requirement. We need to ensure that BLM has access to records regardless of the entity that physically possesses them. BLM would certainly respect items covered by attorney/client and other privileges. It is up to you or your attorney to assert that privilege if and when BLM requests documents you believe to be privileged. Accounting records relating to the SRP are precisely the types of information the BLM would seek to review. Such confidential information may be protected from public disclosure under the Freedom of Information Act (5 U.S.C. 551 *et seq.*). BLM would protect it to the extent allowable by law.

*Section 2932.56   When will BLM Amend, Suspend, or Cancel My Permit?*

Several comments suggested removing the third reason for altering a permit, protection of the environment. These respondents found the requirement to be vague, given the contentious nature of determining carrying capacities of the land and associated waters and the environmental effects of various activities. The comments suggested that BLM should be obligated to perform some level of investigation or analysis to ensure that the outfitters' actions are responsible for undesired environmental impacts before imposing the sanctions provided for in this section.

BLM will not amend, suspend, or cancel a permit without a good reason. Doing so would be arbitrary and capricious, and could not bear the scrutiny of administrative or judicial review. BLM will only alter a permit for environmental protection reasons after we perform a thoroughly documented analysis and the permittee has an opportunity to review it. The provision needs to remain in the regulations. Protecting the public lands from unnecessary or undue degradation is a core duty of BLM and we would be remiss in not including environmental considerations as a basis for modifying a permit. The same reasoning applies to suspensions and cancellations of permits.

BLM may suspend or amend a permit if—
• There is a problem with public safety;
• There are clear violations of permit stipulations to protect public safety or the environment; or
• Resource or legal conditions change during the permit period (for example, a threatened or endangered species listing occurs that affects the permit area).

The BLM will use the annual evaluation process to determine whether there is any failure to perform or any violation of a permit that would lead to canceling a permit. If the reason for the adverse action is out of your control, (such as the endangered species listing just mentioned) BLM will consult with you to come to an amicable solution, if possible. Administrative procedures are always available to a permittee affected by an adverse action. This includes appeal to IBLA under 43 CFR part 4, specifically § 4.410, and any other administrative remedy applicable to the permittee.

One comment suggested that BLM should have authority to suspend a permit or deny a new application for a permit because of violations of similar stipulations on another permit.

We agree with this comment. We have amended § 2932.56(b)(2) by removing the final phrase, "while exercising your privileges under your Special Recreation Permit." This removes the requirement that your disqualifying conduct is specific to the subject permit, rather than to any similar permit. Further, any action that violates environmental or natural resource law may also be disqualifying, whether you have a permit or not.

Issuing permits to individuals who have histories of violating the conditions of their permits is an ongoing problem for all Federal agencies. Additional authority is necessary to deny permits to individuals or companies that have habitually violated permit conditions. Authority is needed to deny permits to individuals that have had permits canceled by other agencies and to those individuals who have a demonstrated history of willful destruction of private, state, or Federal properties, especially in relation to natural, cultural, and historical resources. We have had a number of former permittees who have had permits canceled for cause by one BLM office, or by another agency, who subsequently apply for and receive a BLM permit from another office, only to cause similar problems in the new area. BLM needs authority to stop this from occurring. It is our responsibility, as a regulatory agency, to give the public a reasonable assurance that businesses operating on the public lands are responsible and have a sense of stewardship and the duty of care for the lands they operate on and the clients they serve and who provide a safe and high quality experience to the public requesting these kinds of services.

Several comments addressed the language at paragraph (c): "If we suspend your permit, your responsibilities under the permit would continue during the suspension." In certain situations, it may be necessary for BLM to suspend assigned authorized use for a period of time. Examples of such instances include periods of high fire danger, flood conditions or high water, presence of health hazards, or high likelihood of degradation of environmental resources. These situations are usually temporary and will not normally extend the life of the permit. Situations could arise where only a portion of a permit would be suspended, and BLM would allow the permittee to continue operating in the areas not subjected to the suspension; in such cases permit obligations would continue. These suspensions may not have any affect on the reporting requirements, payment of fees, or expiration date of the permit.

## III. Final Rule as Adopted

This portion of the Supplementary Information describes and explains section-by-section changes we have made in the final rule that were not prompted by public comments. The changes recognize—
• Longstanding field practice,
• Statutory law,
• Need for internal consistency in the final rule,
• Need for improved clarity in the regulations, or
• Some combination of these factors.

*Section 2932.12   When May BLM Waive the Requirement To Obtain a Permit?*

We have revised paragraph (c)(5) in the final rule. This paragraph states the final criterion for waiving the permit requirement for competitive events. We added the lack of need for specific

**61738**    **Federal Register** / Vol. 67, No. 190 / Tuesday, October 1, 2002 / Rules and Regulations

management by BLM personnel as a reason for waiving the permit requirement.

This change makes the text for competitive events consistent with the text changes resulting from public comment for organized group or event use. It recognizes that some competitive events are so small that they have such inconsequential effects that we do not need to exercise any control over them. The "requires no specific management" wording makes it clear that BLM recognizes no need to make any on-site management changes, *e.g.*, closing a recreation site to public use because it is reserved for an event. An example might be a Boy Scout orienteering competition with a limited number of participants. Although it would be technically competitive, it would not be commercial, award cash prizes, advertise, or appreciably affect the environment. It probably would not require monitoring under paragraph (c)(5), and in most circumstances would not require BLM management action before, during, or after the event. The local BLM manager would have discretion in this case to require or waive the permit, perhaps requiring one if only to be aware that there are a certain number of children on the public lands in a particular area, and possibly needing protection or rescue.

*Section 2932.34   When May BLM Waive Special Recreation Permit Fees?*

We have amended this section to make it clear that to have a fee waiver approved for educational, scientific, or research uses, you must be an accredited institution. Without this change, the provision would be unnecessarily vague.

*Section 2932.52   How Do I Apply for a Renewal?*

We have amended paragraph (b) by removing the requirement that BLM "establish and publish deadlines for submitting renewal applications." Instead, establishment of such deadlines for submitting renewal applications will be discretionary with the local BLM manager.

This change relieves BLM of the unnecessary burden of publishing deadlines for renewal applications in the **Federal Register** or newspapers. BLM mostly communicates directly with permittees, and if the renewal deadline is not stated in the original permit, we will alert the permittee as the deadline approaches. There is no need to publish application deadlines for renewal of permits. The change is also consistent with current language in

the Special Recreation Permit Manual/ Policy Statement and Handbook.

*Section 2932.54   When May I Transfer My Special Recreation Permit to Other Individuals, Companies, or Entities?*

BLM has amended paragraph (b) of this section to make it clear that the transferee must meet all BLM requirements, including the payment of fees, before we will allow a transfer and issue a new SRP. Read in isolation, the proposed rule provision seemed to require only the payment of fees. The revised provision makes it clear that a transferee must meet all BLM requirements before we will allow a permit to be transferred.

*Section 2932.57   Prohibited Acts and Penalties*

We have added two provisions to the list of Prohibited acts. The first prohibits permittees from interfering with other users of the public lands. The second prohibits refusal to disperse when BLM has suspended or canceled a permit.

The first of these is based on 43 CFR 9239.2–5, which in turn implements an 1885 law prohibiting interference with persons using or traveling on public lands (23 Stat. 322; 43 U.S.C. 1063). The second addition is similar to a prohibited act already in the recreation regulations at §8365.1–4, which prohibits failure to disperse when directed by BLM. The prohibitions, in other words, are not new in this rule, and would apply to special recreation permittees whether they appear in part 2930 or not.

We have also made changes in the penalty provisions of paragraph (b) of this section. Paragraph (b)(1) is amended to refer to the penalties in 18 U.S.C. 3571 as well as FLPMA.

This will ensure that the fines that became applicable in 1987 under the alternative fines section in the U.S. Criminal Code are applicable. Also, any future increases in fines will also be applicable because they most likely will be increased in section 3571.

We also have added a new paragraph (b)(3) that imposes the penalties in 18 U.S.C. 3571 on failing to obtain any permit or pay any fee required in subpart 2932, pursuant to the Land and Water Conservation Fund Act, as amended.

This amendment places in subpart 2932 the penalty provisions already found in §9268.3(e)(1) of BLM's law enforcement regulations. This is needed to allow us to apply criminal penalties provided by the Land and Water Conservation Fund Act and to ensure that we have access to those infraction level penalties in locations where the

class A misdemeanor penalty may lead to procedural problems.

*Subpart 2933—Recreation Use Permits for Fee Areas*

Recreation use permits (RUP) are authorizations for short term recreational use of developed facilities, equipment, services, or specialized sites furnished at Federal expense. RUPs are most frequently used in BLM to authorize individual and group recreational use of these sites. Sites that charge a fee meet the fee criteria established by the LWCFA, as amended. BLM issues RUPs to ensure that the people of the United States receive a fair and equitable return for the use of these facilities and to help recover the cost of construction, operation, maintenance, administration, and management of the permits.

BLM has been able to administer and manage these types of sites through fee provisions in the LWCFA, 36 CFR Part 7, and policy. Keeping up with the growing demands of users and the complexity of uses, their compatibility or lack thereof, and conflicting types and amounts of use, is becoming more difficult without regulations. The purpose of this rule is to allow BLM to notify the public in a more detailed and formal way of our policies and the laws and regulations for administering and managing these areas.

This subpart codifies a permit system pertaining to "fee areas" on public lands managed by BLM. Fee areas are sites that provide specialized facilities, equipment, or services related to outdoor recreation. These include areas that are developed by BLM, receive regular maintenance, may have on-site staffing, and are supported by Federal funding. Not all fee areas necessarily have all of these attributes. Examples of fee areas are campgrounds that include improvements such as picnic tables, toilet facilities, tent or trailer sites, and drinking water; and specialized sites such as swimming pools, boat launch facilities, guided tours, hunting blinds, and so forth. The provisions in these regulations are codifications of existing procedures and policies. They are designed to allow the most efficient administration possible of the permit system, and the easiest access by the public.

The provisions in this subpart did not attract public comments. However, we have found it necessary to add a section on prohibited acts and penalties. We will propose this new section in a new proposed rule after publication of this final rule.

AR08041

*Cross-references*

Finally, the final rule changes cross-references in other parts of Title 43 from subpart 8372 to part 2930.

## IV. Procedural Matters

The principal author of this final rule is Lee Larson of the Recreation Group, Washington Office, BLM, assisted by Ted Hudson of the Regulatory Affairs Group, Washington Office, BLM.

*Regulatory Planning and Review (E.O. 12866)*

This document is not a significant rule and was not subject to review by the Office of Management and Budget under Executive Order 12866.

(1) This rule will not have an effect of $100 million or more on the economy. It will not adversely affect in a material way the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities.

(2) This rule will not create a serious inconsistency or otherwise interfere with an action taken or planned by another agency.

(3) This rule does not alter the budgetary effects or entitlements, grants, user fees, or loan programs or the rights or obligations of their recipients.

(4) This rule does not raise novel legal or policy issues.

During fiscal year 1996, BLM issued just over 21,000 Special Recreation Permits, with revenues totaling a little over $1.5 million deposited into the Land and Water Conservation Fund (LWCF). During fiscal year 1997, BLM issued just over 32,000 Special Recreation Permits, with revenues totaling about $2.9 million, of which nearly $1.9 million was deposited into the LWCF with the balance attributed to the Fee Demonstration Project and other miscellaneous accounts. During fiscal year 1998, BLM issued just over 37,500 such permits, and collected just over $4.8 million in fees, of which nearly $1.6 million was deposited into the LWCF, with the balance attributed to the Fee Demonstration Project and other miscellaneous accounts. (These numbers are derived from the Public Land Statistics; the variety of laws directing the revenues to numerous funds accounts for different average fees from year to year. We give these numbers to illustrate that the revenues charged under BLM's recreation program are minuscule compared with those realized by the overall national recreation industry.) Special Recreation Permits are generally obtained by commercial outfitters and guides (about 2,500), river running companies (about

800), sponsors of competitive events (about 1,000), "snow bird" seasonal mobile home campers who use BLM's long term visitor areas (about 14,000), and private individuals and groups using certain special areas. Under current regulations, use fees are to be collected according to a schedule established by the Director, BLM, and published periodically in the **Federal Register**. BLM may charge actual costs if they exceed the fee on the schedule. The schedule is based on 3 percent of the gross annual receipts of the permittee or an $80 flat annual fee, whichever is greater. Snow birds pay a flat seasonal fee of $100. The flat annual fee for commercial outfitters and guides is adjusted periodically in line with the Implicit Price Deflator. The final rule provides for use fees to equal fair market value, which can be determined through comparative market analysis, competitive bidding, or other means. The State of Colorado charges river outfitters 5 percent of gross receipts to run trips on the Arkansas River, which features the Royal Gorge. This may be an indication of the type of fee increase that may be phased in under the final rule. BLM will determine fair market values for outfitter permits on a local or regional level, based on comparative market analyses and considering public input.

During fiscal year 1996, BLM issued over 116,000 Recreation Use Permits for use of fee sites, with revenues totaling about $600,000. During fiscal year 1997, BLM issued about 184,000 Recreation Use Permits for use of fee sites, with revenues totaling about $705,000. During fiscal year 1998, BLM issued about 280,000 Recreation Use Permits for use of fee sites, with revenues totaling about $1.3 million. The cost of such a permit averaged just over $5.00 for 1996, just under $4.00 for 1997, and a little over $4.60 for 1998. The final rule allows BLM to charge fees based on the types of services or facilities provided at the fee site, the cost of providing them, and fees charged by public and private entities at similar sites nearby. Changes caused by this rule are not quantifiable in this document, but will not result in charges greater than fair market value. Any increase in prices for these users would have to have economic consequences of hundreds of dollars per permit for the effect on the economy to total $100 million, the threshold for a major rule in the Executive Order.

*Regulatory Flexibility Act*

The Department of the Interior certifies that this document will not have a significant economic effect on a

substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). According to the president of the American Recreation Coalition, outdoor recreation is a $350 billion industry made up of small businesses. As stated in the previous section, BLM fees collected for Special Recreation Permits in fiscal year 1997 were about $2.9 million. BLM revenues collected thus amounted in that year to less than 1/1,000 of 1 percent of the gross industrial revenues, and not all of the BLM revenues were collected from commercial recreationists. The results in other years are similar. BLM considers that increases in these fees to fair market value could not create a significant impact on the outdoor recreation industry. However, BLM recognizes that most commercial recreation enterprises—outfitters, guides, river-running companies, local retail outlets—are small businesses, and that about 3,500 of them annually hold BLM commercial or competitive permits. For these reasons, any changes in fees to fair market value will be phased in, and fees will be set locally and only after opportunity for public participation leading to decisions on fair market value.

*Small Business Regulatory Enforcement Fairness Act (SBREFA)*

This rule is not a major rule under 5 U.S.C. 804(2), the Small Business Regulatory Enforcement Fairness Act. This rule:

Does not have an annual effect on the economy of $100 million or more. See the discussion under Regulatory Planning and Review, above.

Will not cause a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions. The rule will have no effect on the 3 percent basic use fee that BLM's fee schedule (set by the 1984 policy, not regulations) requires outfitters to pay. The rule imposes cost recovery requirements provided for in section 304 of FLPMA (43 U.S.C. 1734), and in the Land and Water Conservation Fund Act (16 U.S.C. 460*l et seq.*, 460*l*–5), and Office of Management and Budget Circular No. A–25. The cost increases under this rule will be de minimus in the context of the entire outdoor recreation industry, and even in the context of the small proportion of it that uses public lands managed by BLM. See the discussion above under Regulatory Flexibility Act.

Does not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to

AR08042

compete with foreign-based enterprises. The adjustment of user fees to fair market value and the implementation of cost recovery should not affect the ability of mostly small businesses evenly treated to compete with one another. Recreationists are not likely to be driven to foreign recreation markets by finding an increase in user fees in the western part of this country, due to the insignificance of such increases compared to the costs of travel to comparable foreign recreation destinations. Much recreation equipment is manufactured in foreign countries, but it is sold by small business retailers in this country. The adjustment of user fees to fair market value should not affect buyers' choice of foreign versus domestic made equipment.

The Small Business Administration established the Small Business and Agricultural Regulatory Enforcement Ombudsman and ten Regional Fairness Boards to receive comments from small businesses about Federal agency enforcement actions. The Ombudsman annually evaluates these enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on enforcement aspects of this rule, you may call 1–888–734–4247.

*Unfunded Mandates Reform Act*

This rule does not impose an unfunded mandate on State, local, or tribal governments or the private sector of more than $100 million per year. The rule does not have a significant or unique effect on State, local, or tribal governments or the private sector. The rule has no effect on governmental or tribal entities. A statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*) is not required.

*Takings (E.O. 12630)*

In accordance with Executive Order 12630, the rule does not have significant takings implications. While the final rule provides for permits to be canceled under certain circumstances, including violations of law or regulations, or failure to comply with permit stipulations, and while for some commercial permittees a Special Recreation Permit may be essential to the exercise of property rights in a business, the rule does not allow such a forfeiture without due process of law. A takings implications assessment is not required.

*Federalism (E.O. 13132)*

In accordance with Executive Order 13132, the rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement. The rule does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. The rule does not preempt State law.

*Civil Justice Reform (E.O. 12988)*

In accordance with Executive Order 12988, the Office of the Solicitor has determined that this rule does not unduly burden the judicial system and meets the requirements of sections 3(a) and 3(b)(2) of the Order.

*E.O. 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This rule is not a significant energy action. It will not have an adverse effect on energy supplies. The rule does not limit land use by energy companies. It applies only to permits for recreational use of public lands, how BLM issues and administers them.

*Paperwork Reduction Act*

The Office of Management and Budget has approved the information collection requirements in the proposed rule under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.*, and has assigned clearance number 1004–0110. The section of this final rule with information collection requirements is section 2932.24, and BLM estimates the public reporting burden of this section to average, respectively, one-half hour per response. This estimate includes the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to Information Collection Clearance Officer, Bureau of Land Management, U.S. Department of the Interior, 1849 C Street, NW., Mail Stop 401–LS, Washington, DC 20240, and Desk Officer for the Department of the Interior, Office of Information and Regulatory Affairs, Office of Management and Budget, New Executive Office Building, Washington, DC 20503, Attention: 1004–0110.

*National Environmental Policy Act*

Based on an environmental assessment approved May 5, 2000, we have determined that this final rule does not constitute a major Federal action significantly affecting the quality of the human environment. A detailed statement under the National Environmental Policy Act of 1969 is not required.

List of Subjects

*43 CFR Part 2930*

Penalties; Public lands; Recreation and recreation areas; Reporting and recordkeeping requirements; Surety bonds

*43 CFR Part 3800*

Administrative practice and procedure, Environmental protection, Intergovernmental relations, Mines, Public lands-mineral resources, Reporting and recordkeeping requirements, Surety bonds, Wilderness areas

*43 CFR Part 6300*

Penalties, Public lands, Reporting and recordkeeping requirements, Wilderness areas.

*43 CFR Part 8340*

Public lands, Recreation and recreation areas, Traffic regulations

*43 CFR Part 8370*

Penalties; Public lands; Recreation and recreation areas; Reporting and recordkeeping requirements; Surety bonds

*43 CFR Part 9260*

Continental shelf, Forests and forest products, Law enforcement, Penalties, Public lands, Range management, Recreation and recreation areas, Wildlife.

Dated: July 8, 2002.

**Rebecca W. Watson,**

*Assistant Secretary of the Interior.*

For the reasons explained in the preamble, and under the authority of 43 U.S.C. 1740, chapter II, subtitle B of title 43 of the Code of Federal Regulations is amended as follows:

1. Part 2930 is added to read as follows:

## PART 2930—PERMITS FOR RECREATION ON PUBLIC LANDS

### Subpart 2931—Permits for Recreation; General

Sec.

2931.1   What are the purposes of these regulations?

2931.2   What kinds of permits does BLM issue for recreation-related uses of public lands?

2931.3   What are the authorities for these regulations?

2931.8   Appeals.

2931.9   Information collection.

**Subpart 2932—Special Recreation Permits for Commercial Use, Competitive Events, Organized Groups, and Recreation Use in Special Areas**

2932.5   Definitions.
2932.10   When do you need Special Recreation Permits.
2932.11   When do I need a Special Recreation Permit?
2932.12   When may BLM waive the requirement to obtain a permit?
2932.13   How will I know if individual use of a special area requires a Special Recreation Permit?
2932.14   Do I need a Special Recreation Permit to hunt, trap, or fish?
2932.20   Special Recreation Permit applications.
2932.21   Why should I contact BLM before submitting an application?
2932.22   When do I apply for a Special Recreation Permit?
2932.23   Where do I apply for a Special Recreation Permit?
2932.24   What information must I submit with my application?
2932.25   What will BLM do when I apply for a Special Recreation Permit?
2932.26   How will BLM decide whether to issue a Special Recreation Permit?
2932.30   Fees for Special Recreation Permits.
2932.31   How does BLM establish fees for Special Recreation Permits?
2932.32   When must I pay the fees?
2932.33   When are fees refundable?
2932.34   When may BLM waive Special Recreation Permit fees?
2932.40   Permit stipulations and terms.
2932.41   What stipulations must I follow?
2932.42   How long is my Special Recreation Permit valid?
2932.43   What insurance requirements pertain to Special Recreation Permits?
2932.44   What bonds does BLM require for a Special Recreation Permit?
2932.50   Administration of Special Recreation Permits.
2932.51   When can I renew my Special Recreation Permit?
2932.52   How do I apply for a renewal?
2932.53   What will be my renewal term?
2932.54   When may I transfer my Special Recreation Permit to other individuals, companies, or entities?
2932.55   When must I allow BLM to examine my permit records?
2932.56   When will BLM amend, suspend, or cancel my permit?
2932.57   Prohibited acts and penalties.

**Subpart 2933—Recreation Use Permits for Fee Areas**

2933.10   Obtaining Recreation Use Permits.
2933.11   When must I obtain a Recreation Use Permit?
2933.12   Where can I obtain a Recreation Use Permit?
2933.13   When do I need a reservation to use a fee site?
2933.14   For what time may BLM issue a Recreation Use Permit?
2933.20   Fees for Recreation Use Permits.
2933.21   When are fees charged for Recreation Use Permits?
2933.22   How does BLM establish Recreation Use Permit fees?
2933.23   When must I pay the fees?
2933.24   When can I get a refund of Recreation Use Permit fees?
2933.30   Rules of conduct.
2933.31   What rules must I follow at fee areas?
2933.32   When will BLM suspend or revoke my permit?

**Authority:** 43 U.S.C. 1740; 16 U.S.C. 460l–6a.

## PART 2930—PERMITS FOR RECREATION ON PUBLIC LANDS

### Subpart 2931—Permits for Recreation; General

#### §2931.1   What are the purposes of these regulations?

The regulations in this part—
(a) State when you need a permit to use public lands and waters for recreation, including recreation-related business;
(b) Tell you how to obtain the permit;
(c) State the fees you must pay to obtain the permit; and
(d) Establish the framework for BLM's administration of your permit.

#### §2931.2   What kinds of permits does BLM issue for recreation-related uses of public lands?

The regulations in this part establish permit and fee systems for:
(a) Special Recreation Permits for commercial use, organized group activities or events, competitive use, and for use of special areas; and
(b) Recreation use permits for use of fee areas such as campgrounds and day use areas.

#### §2931.3   What are the authorities for these regulations?

(a) The statutory authorities underlying the regulations in this part are the Federal Land Policy and Management Act, 43 U.S.C. 1701 *et seq.*, and the Land and Water Conservation Fund Act, as amended, 16 U.S.C. 460l–6a.
(1) The Federal Land Policy and Management Act (FLPMA) contains the Bureau of Land Management's (BLM's) general land use management authority over the public lands, and establishes outdoor recreation as one of the principal uses of those lands (43 U.S.C. 1701(a)(8)). Section 302(b) of FLPMA directs the Secretary of the Interior to regulate through permits or other instruments the use of the public lands, which includes commercial recreation use. Section 303 of FLPMA contains BLM's authority to enforce the regulations and impose penalties.
(2) The Land and Water Conservation Fund (LWCF) Act, as amended, authorizes BLM to collect fees for recreational use (16 U.S.C. 460l–6a(a),

(c)), and to issue special recreation permits for group activities and recreation events, and limits the services for which we may collect fees (16 U.S.C. 460l–6a(a), (b), (g)).
(3) The Sentencing Reform Act (18 U.S.C. 3571) is the authority for the possible penalties for violations of these regulations.
(b) The regulations at 36 CFR part 71 require all Department of the Interior bureaus to use the criteria in that part to set recreation fees. These criteria are based on the LWCF Act and stated in §§ 71.9 and 71.10 of that part.

#### §2931.8   Appeals.

(a) If you are adversely affected by a decision under this part, you may appeal the decision under parts 4 and 1840 of this title.
(b) All decisions BLM makes under this part will go into effect immediately and will remain in effect while appeals are pending unless a stay is granted under § 4.21(b) of this title.

#### §2931.9   Information collection.

The information collection requirements in this part have been approved by the Office of Management and Budget under 44 U.S.C. 3501 *et seq.* and assigned clearance number 1004–0119. BLM will use the information to determine whether we should grant permits to applicants for Special Recreation Permits on public lands. You must respond to requests for information to obtain a benefit.

### Subpart 2932—Special Recreation Permits for Commercial Use, Competitive Events, Organized Groups, and Recreation Use in Special Areas

#### §2932.5   Definitions.

*Actual expenses* means money spent directly on the permitted activity. These may include costs of such items as food, rentals of group equipment, transportation, and permit or use fees. Actual expenses do not include the rental or purchase of personal equipment, amortization of equipment, salaries or other payments to participants, bonding costs, or profit.

*Commercial use* means recreational use of the public lands and related waters for business or financial gain.
(1) The activity, service, or use is commercial if—
(i) Any person, group, or organization makes or attempts to make a profit, receive money, amortize equipment, or obtain goods or services, as compensation from participants in recreational activities occurring on public lands led, sponsored, or

AR08044

organized by that person, group, or organization;

(ii) Anyone collects a fee or receives other compensation that is not strictly a sharing of actual expenses, or exceeds actual expenses, incurred for the purposes of the activity, service, or use;

(iii) There is paid public advertising to seek participants; or

(iv) Participants pay for a duty of care or an expectation of safety.

(2) Profit-making organizations and organizations seeking to make a profit are automatically classified as commercial, even if that part of their activity covered by the permit is not profit-making or the business as a whole is not profitable.

(3) Use of the public lands by scientific, educational, and therapeutic institutions or non-profit organizations is commercial and subject to a permit requirement when it meets any of the threshold criteria in paragraphs (1) and (2) of this definition. The non-profit status of any group or organization does not alone determine that an event or activity arranged by such a group or organization is noncommercial.

*Competitive use means—*

(1) Any organized, sanctioned, or structured use, event, or activity on public land in which 2 or more contestants compete and either or both of the following elements apply:

(i) Participants register, enter, or complete an application for the event;

(ii) A predetermined course or area is designated; or

(2) One or more individuals contesting an established record such as for speed or endurance.

*Organized group activity means* a structured, ordered, consolidated, or scheduled event on, or occupation of, public lands for the purpose of recreational use that is not commercial or competitive.

*Special area means:*

(1) An area officially designated by statute, or by Presidential or Secretarial order;

(2) An area for which BLM determines that the resources require special management and control measures for their protection; or

(3) An area covered by joint agreement between BLM and a State under Title II of the Sikes Act (16 U.S.C. 670a *et seq.*)

*Vending means* the sale of goods or services, not from a permanent structure, associated with recreation on the public lands or related waters, such as food, beverages, clothing, firewood, souvenirs, photographs or film (video or still), or equipment repairs.

## § 2932.10   When you need Special Recreation Permits.

### § 2932.11   When do I need a Special Recreation Permit?

(a) Except as provided in § 2932.12, you must obtain a Special Recreation Permit for:

(1) Commercial use, including vending associated with recreational use; or

(2) Competitive use.

(b) If BLM determines that it is necessary, based on planning decisions, resource concerns, potential user conflicts, or public health and safety, we may require you to obtain a Special Recreation Permit for—

(1) Recreational use of special areas;

(2) Noncommercial, noncompetitive, organized group activities or events; or

(3) Academic, educational, scientific, or research uses that involve:

(i) Means of access or activities normally associated with recreation;

(ii) Use of areas where recreation use is allocated; or

(iii) Use of special areas.

### § 2932.12   When may BLM waive the requirement to obtain a permit?

We may waive the requirement to obtain a permit if:

(a) The use or event begins and ends on non-public lands or related waters, traverses less than 1 mile of public lands or 1 shoreline mile, and poses no threat of appreciable damage to public land or water resource values;

(b) BLM sponsors or co-sponsors the use. This includes any activity or event that BLM is involved in organizing and hosting, or sharing responsibility for, arranged through authorizing letters or written agreements; or

(c) The use is a competitive event that—

(1) Is not commercial;

(2) Does not award cash prizes;

(3) Is not publicly advertised;

(4) Poses no appreciable risk for damage to public land or related water resource values; and

(5) Requires no specific management or monitoring.

(d) The use is an organized group activity or event that—

(1) Is not commercial;

(2) Is not publicly advertised;

(3) Poses no appreciable risk for damage to public land or related water resource values; and

(4) Requires no specific management or monitoring.

### § 2932.13   How will I know if individual use of a special area requires a Special Recreation Permit?

BLM will publish notification of the requirement to obtain a Special

Recreation Permit to enter a special area in the **Federal Register** and local and regional news media. We will post permit requirements at major access points for the special area and provide information at the local BLM office.

### § 2932.14   Do I need a Special Recreation Permit to hunt, trap, or fish?

(a) If you hold a valid State license, you do not need a Special Recreation Permit to hunt, trap, or fish. You must comply with State license requirements for these activities. BLM Special Recreation Permits do not alone authorize you to hunt, trap, or fish. However, you must have a Special Recreation Permit if BLM requires one for recreational use of a special area where you wish to hunt, trap, or fish.

(b) Outfitters and guides providing services to hunters, trappers, or anglers must obtain Special Recreation Permits from BLM. Competitive event operators and organized groups may also need a Special Recreation Permit for these activities.

## § 2932.20   Special Recreation Permit applications.

### § 2932.21   Why should I contact BLM before submitting an application?

If you wish to apply for a Special Recreation Permit, we strongly urge you to contact the appropriate BLM office before submitting your application. You may need early consultation to become familiar with BLM practices and responsibilities, and the terms and conditions that we may require in a Special Recreation Permit. Because of the lead time involved in processing Special Recreation Permit applications, you should contact BLM in sufficient time to complete a permit application ahead of the 180 day requirement (see § 2932.22(a)).

### § 2932.22   When do I apply for a Special Recreation Permit?

(a) For all uses requiring a Special Recreation Permit, except private, noncommercial use of special areas (see paragraph (b) of this section), you must apply to the local BLM office at least 180 days before you intend your use to begin. Through publication in the local media and on-site posting as necessary, a BLM office may require applications for specific types of use more than 180 days before your intended use. A BLM office may also authorize shorter application times for activities or events that do not require extensive environmental documentation or consultation.

(b) BLM field offices will establish Special Recreation Permit application procedures for private noncommercial

individual use of special areas, including when to apply. As you begin to plan your use, you should call the field office with jurisdiction.

### § 2932.23   Where do I apply for a Special Recreation Permit?

You must apply to the local BLM office with jurisdiction over the land you wish to use.

### § 2932.24   What information must I submit with my application?

(a) Your application for a Special Recreation Permit for all uses, except individual and noncommercial group use of special areas, must include:

(1) A completed BLM Special Recreation Application and Permit form;

(2) Unless waived by BLM, a map or maps of sufficient scale and detail to allow identification of the proposed use area; and

(3) Other information that BLM requests, in sufficient detail to allow us to evaluate the nature and impact of the proposed activity, including measures you will use to mitigate adverse impacts.

(b) If you are an individual or noncommercial group wishing to use a special area, contact the local office with jurisdiction to find out the requirements, if any.

### § 2932.25   What will BLM do when I apply for a Special Recreation Permit?

BLM will inform you within 30 days after the filing date of your application if we must delay a decision on issuing the permit. An example of when this could happen is if we determine that we cannot complete required environmental assessments or consultations with other agencies within 180 days.

### § 2932.26   How will BLM decide whether to issue a Special Recreation Permit?

BLM has discretion over whether to issue a Special Recreation Permit. We will base our decision on the following factors to the extent that they are relevant:

(a) Conformance with laws and land use plans;

(b) Public safety,

(c) Conflicts with other uses,

(d) Resource protection,

(e) The public interest served,

(f) Whether in the past you complied with the terms of your permit or other authorization from BLM and other agencies, and

(g) Such other information that BLM finds appropriate.

### § 2932.30   Fees for Special Recreation Permits.

### § 2932.31   How does BLM establish fees for Special Recreation Permits?

(a) The BLM Director establishes fees, including minimum annual fees, for Special Recreation Permits for commercial activities, organized group activities or events, and competitive events.

(b) The BLM Director may adjust the fees as necessary to reflect changes in costs and the market, using the following types of data:

(1) The direct and indirect cost to the government;

(2) The types of services or facilities provided; and

(3) The comparable recreation fees charged by other Federal agencies, non-Federal public agencies, and the private sector located within the service area.

(c) The BLM Director will publish fees and adjusted fees in the **Federal Register**.

(d) The State Director with jurisdiction—

(1) Will set fees for other Special Recreation Permits (including any use of Special Areas, such as per capita special area fees applicable to all users, including private noncommercial visitors, commercial clients, and spectators),

(2) May adjust the fees when he or she finds it necessary,

(3) Will provide fee information in field offices, and

(4) Will provide newspaper or other appropriate public notice.

(e)(1) *Commercial use.* In addition to the fees set by the Director, BLM, if BLM needs more than 50 hours of staff time to process a Special Recreation Permit for commercial use in any one year, we may charge a fee for recovery of the processing costs.

(2) *Competitive or organized group/event use.* BLM may charge a fee for recovery of costs to the agency of analyses and permit processing instead of the Special Recreation Permit fee, if—

(i) BLM needs more than 50 hours of staff time to process a Special Recreation Permit for competitive or organized group/event use in any one year, and

(ii) We anticipate that permit fees on the fee schedule for that year will be less than the costs of processing the permit.

(3) *Limitations on cost recovery.* Cost recovery charges will be limited to BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement. Programmatic or general land use plan NEPA

documentation are not subject to cost recovery charges, except if the documentation work done for or provides special benefits or services to an identifiable individual applicant.

(f) We will notify you in writing if you need to pay actual costs before processing your application.

### § 2932.32   When must I pay the fees?

You must pay the required fees before BLM will authorize your use and by the deadline or deadlines that BLM will establish in each case. We may allow you to make periodic payments for commercial use. We will not process or continue processing your application until you have paid the required fees or installments.

### § 2932.33   When are fees refundable?

(a) *Overpayments.* For multi-year commercial permits, if your actual fees due are less than the estimated fees you paid in advance, BLM will credit overpayments to the following year or season. For other permits, BLM will give you the option whether to receive refunds or credit overpayments to future permits, less processing costs.

(b) *Underuse.*

(1) Except as provided in paragraph (b)(2) of this section, for areas where BLM's planning process allocates use to commercial outfitters, or non-commercial users, or a combination, we will not make refunds for use of the areas we allocate to you in your permit if your actual use is less than your intended use.

(2) We may consider a refund if we have sufficient time to authorize use by others.

(c) *Non-refundable fees.* Application fees and minimum annual commercial use fees (those on BLM's published fee schedule) are not refundable.

### § 2932.34   When may BLM waive Special Recreation Permit fees?

BLM may waive Special Recreation Permit fees on a case-by-case basis for accredited academic, scientific, and research institutions, therapeutic, or administrative uses.

### § 2932.40   Permit stipulations and terms.

### § 2932.41   What stipulations must I follow?

You must follow all stipulations in your approved Special Recreation Permit. BLM may impose stipulations and conditions to meet management goals and objectives and to protect lands and resources and the public interest.

### § 2932.42   How long is my Special Recreation Permit valid?

You may request a permit for a day, season of use, or other time period, up

AR08046

to a maximum of 5 years. BLM will determine the appropriate term on a case-by-case basis.

### § 2932.43   What insurance requirements pertain to Special Recreation Permits?

(a) All commercial and competitive applicants for Special Recreation Permits, except vendors, must obtain a property damage, personal injury, and public liability insurance policy that BLM judges sufficient to protect the public and the United States. Your policy must name the U.S. Government as additionally insured or co-insured and stipulate that you or your insurer will notify BLM 30 days in advance of termination or modification of the policy.

(b) We may also require vendors and other applicants, such as organized groups, to obtain and submit such a policy. BLM may waive the insurance requirement if we find that the vending or group activity will not cause appreciable environmental degradation or risk to human health or safety.

### § 2932.44   What bonds does BLM require for a Special Recreation Permit?

BLM may require you to submit a payment bond, a cash or surety deposit, or other financial guarantee in an amount sufficient to cover your fees or defray the costs of restoration and rehabilitation of the lands affected by the permitted use. We will return the bonds and financial guarantees when you have complied with all permit stipulations. BLM may waive the bonding requirement if we find that your activity will not cause appreciable environmental degradation or risk to human health and safety.

### § 2932.50   Administration of Special Recreation Permits.

### § 2932.51   When can I renew my Special Recreation Permit?

We will renew your Special Recreation Permit upon application at the end of its term only if—

(a) It is in good standing;

(b) Consistent with BLM management plans and policies; and

(c) You and all of your affiliates have a satisfactory record of performance.

### § 2932.52   How do I apply for a renewal?

(a) You must apply for renewal on the same form as for a new permit. You must include information that has changed since your application or your most recent renewal. If information about your operation or activities has not changed, you may merely state that and refer to your most recent application or renewal.

(b) BLM will establish deadlines in your permit for submitting renewal applications.

### § 2932.53   What will be my renewal term?

Renewals will generally be for the same term as the previous permit.

### § 2932.54   When may I transfer my Special Recreation Permit to other individuals, companies, or entities?

(a) BLM may transfer a commercial Special Recreation Permit only in the case of an actual sale of a business or a substantial part of the business. Only BLM can approve the transfer or assignment of permit privileges to another person or entity, also basing our decision on the criteria in § 2932.26.

(b) The approved transferee must complete the standard permit application process as provided in § 2932.20 through 2932.24. Once BLM approves your transfer of permit privileges and your transferee meets all BLM requirements, including payment of fees, BLM will issue a Special Recreation Permit to the transferee.

### § 2932.55   When must I allow BLM to examine my permit records?

(a) You must make your permit records available upon BLM request. BLM will not ask to inspect any of this material later than 3 years after your permit expires.

(b) BLM may examine any books, documents, papers, or records pertaining to your Special Recreation Permit or transactions relating to it, whether in your possession, or that of your employees, business affiliates, or agents.

### § 2932.56   When will BLM amend, suspend, or cancel my permit?

(a) BLM may amend, suspend, or cancel your Special Recreation Permit if necessary to protect public health, public safety, or the environment.

(b) BLM may suspend or cancel your Special Recreation Permit if you—

(1) Violate permit stipulations, or

(2) Are convicted of violating any Federal or State law or regulation concerning the conservation or protection of natural resources, the environment, endangered species, or antiquities.

(c) If we suspend your permit or a portion thereof, all of your responsibilities under the permit will continue during the suspension.

### § 2932.57   Prohibited acts and penalties.

(a) *Prohibited acts.* You must not—

(1) Fail to obtain a Special Recreation Permit and pay the fees required by this subpart;

(2) Violate the stipulations or conditions of a permit issued under this subpart;

(3) Knowingly participate in an event or activity subject to the permit requirements of this subpart if BLM has not issued a permit;

(4) Fail to post a copy of any commercial or competitive permit where all participants may read it;

(5) Fail to show a copy of your Special Recreation Permit upon request by either a BLM employee or a participant in your activity;

(6) Obstruct or impede pedestrians or vehicles, or harass visitors or other persons with physical contact while engaged in activities covered under a permit or other authorization; or

(7) Refuse to leave or disperse, when directed to do so by a BLM law enforcement officer or State or local law enforcement officer, whether you have a required Special Recreation Permit or not.

(b) *Penalties.*

(1) Under the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1733(a)), if you are convicted of committing any prohibited act in paragraph (a) of this section, or of violating any regulation in this subpart or any condition or stipulation of a Special Recreation Permit, you may be subject to a fine under 18 U.S.C. 3571 or other penalties in accordance with 43 U.S.C. 1733.

(2) You may also be subject to civil action for unauthorized use of the public lands or related waters and their resources, for violations of permit terms, conditions, or stipulations, or for uses beyond those allowed by the permit.

(3) If you are convicted of failing to obtain a permit or paying a fee required in this subpart, you may be subject to a fine under 18 U.S.C. 3571, pursuant to the Land and Water Conservation Fund Act, as amended.

## Subpart 2933—Recreation Use Permits for Fee Areas

### § 2933.10   Obtaining Recreation Use Permits.

### § 2933.11   When must I obtain a Recreation Use Permit?

You must obtain a Recreation Use Permit for individual or group use of fee areas. These are sites where we provide or administer specialized facilities, equipment, or services related to outdoor recreation. You may visit these areas for the uses and time periods BLM specifies. We will post these uses and limits at the entrance to the area or site, and provide this information in the local BLM office with jurisdiction over the area or site. You may contact this

office for permit information when planning your visit.

### § 2933.12 Where can I obtain a Recreation Use Permit?

You may obtain a permit at self-service pay stations, from personnel at the site, or at other specified locations. Because these locations may vary from site to site, you should contact the local BLM office with jurisdiction over the area or site in advance for permit information.

### § 2933.13 When do I need a reservation to use a fee site?

Most sites are available on a first come/first serve basis. However, you may need a reservation to use some sites. You should contact the local BLM office with jurisdiction over the site or area to learn whether a reservation is required.

### § 2933.14 For what time may BLM issue a Recreation Use Permit?

You may obtain a permit for a day, season of use, year, or any other time period that we deem appropriate for the particular use. We will post this information on site, or make it available at the local BLM office with jurisdiction over the area or site, or both.

### § 2933.20 Fees for Recreation Use Permits.

### § 2933.21 When are fees charged for Recreation Use Permits?

You must pay a fee for individual or group recreational use if the area is posted to that effect. You may also find fee information at BLM field offices or BLM Internet websites.

### § 2933.22 How does BLM establish Recreation Use Permit fees?

BLM sets recreation use fees and adjusts them from time to time to reflect changes in costs and the market, using the following types of data:

(a) The direct and indirect cost to the government;

(b) The types of services or facilities provided; and

(c) The comparable recreation fees charged by other Federal agencies, non-

Federal public agencies, and the private sector located within the service area.

### § 2933.23 When must I pay the fees?

You must pay the required fees upon occupying a designated recreation use facility, when you receive services, or as the BLM's reservation system may require. These practices vary from site to site. You may contact the local BLM office with jurisdiction over the area or site for fee information.

### § 2933.24 When can I get a refund of Recreation Use Permit fees?

If we close the fee site for administrative or emergency reasons, we will refund the unused portion of your permit fee upon request.

### § 2933.30 Rules of conduct.

### § 2933.31 What rules must I follow at fee areas?

You must comply with all rules that BLM posts in the area. Any such site-specific rules supplement the general rules of conduct contained in subpart 8365 of this chapter relating to public safety, resource protection, and visitor comfort.

### § 2933.32 When will BLM suspend or revoke my permit?

(a) We may suspend your permit to protect public health, public safety, the environment, or you.

(b) We may revoke your permit if you commit any of the acts prohibited in subpart 8365 of this chapter, or violate any of the stipulations attached to your permit, or any site-specific rules posted in the area.

## PART 3800—MINING CLAIMS UNDER THE GENERAL MINING LAWS

2. The authority citation for part 3800 continues to read as follows:

**Authority:** 5 U.S.C. 552; 16 U.S.C. 1131–1136, 1271–1287, 1901; 25 U.S.C. 463; 30 U.S.C. 21 *et seq.*, 21a, 22 *et seq.*, 1601; 43 U.S.C. 2, 154, 299, 687b–687b–4, 1068 *et seq.*, 1201, 1701 *et seq.*; 62 Stat. 162.

3. Section 3802.1–1(d) is amended by removing the phrase "subpart 8372 of

this title" and adding in its place the phrase "part 2930 of this chapter."

## PART 6300—MANAGEMENT OF DESIGNATED WILDERNESS AREAS

4. The authority citation for part 6300 continues to read as follows:

**Authority:** 43 U.S.C. 1701 *et seq.*, 16 U.S.C. 1131 *et seq.*

5. Section 6302.20(i) is amended by removing the phrase "section 8372.0–5(c)" and adding in its place the phrase "section 2932.5."

## PART 8340—OFF–ROAD VEHICLES

6. The authority citation for part 8340 is revised to read as follows:

**Authority:** 43 U.S.C. 1201, 43 U.S.C. 315a, 16 U.S.C. 1531 *et seq.*, 16 U.S.C. 1281c, 16 U.S.C. 670 *et seq.*, 16 U.S.C. 460*l-6a*, 16 U.S.C. 1241 *et seq.*, and 43 U.S.C. 1701 *et seq.*

7. Section 8344.1 is amended by revising the cross-reference "subpart 8372" to read "part 2930."

## PART 8370—USE AUTHORIZATIONS [REMOVED]

8. Part 8370 is removed.

## PART 9260—LAW ENFORCEMENT—CRIMINAL

9. The authority citation for part 9260 continues to read as follows:

**Authority:** 16 U.S.C. 433; 16 U.S.C. 460*l–6a*; 16 U.S.C. 670j; 16 U.S.C. 1246(i); 16 U.S.C. 1338; 18 U.S.C. 1851–1861; 18 U.S.C. 3551 *et seq.*; 43 U.S.C. 315(a); 43 U.S.C. 1061, 1063; 43 U.S.C. 1733.

10. Section 9268.3 is amended by removing from the first sentence of paragraph (e)(1) the phrase "subpart 8372 of this title" and adding in its place the phrase "part 2930 of this chapter."

[FR Doc. 02–24748 Filed 9–30–02; 8:45 am]

**BILLING CODE 4310–84–P**

AR08048

**Re: [EXTERNAL] Re: Starting the planning meetings for 2019 BM event**

Hall, Mark E <mehall@blm.gov>
Thu 4/18/2019 7:46 AM

**To:** Marnee Benson <marnee.benson@burningman.org>
**Cc:** Charlie Dolman <charlie.dolman@burningman.org>; Mckinney, Chelsea M <cmmckinney@blm.gov>; Andres, Rebecca L <randres@blm.gov>; Pirtle, Mark O <mpirtle@blm.gov>; Briscoe, Logan <lbriscoe@blm.gov>; McCullough, Ester M <emccullo@blm.gov>; Jones, Jennifer L <jljones@blm.gov>; Rorex, Zwaantje T <zrorex@blm.gov>; Raby, Jon K <jraby@blm.gov>; Erin MacCool <playground@burningman.org>; Roger Vind <roger.vind@burningman.org>; Heather Nuanes <heather.nuanes@burningman.org>

Morning All,

Sorry for the delay in replying--on the road Tuesday with meetings, and a meeting filled Wednesday in the office.

I'll split out the numbers for the two meetings Marnee.

Yes, we should get agenda items out on Wednesday--for this week I think the closure order will be the focus on the BLM-BMP/BRC meeting.

And thanks for listing the team on Burning Man's side.

Talk later this morning, MEH

Mark E. Hall, PhD
Field Manager
Black Rock Field Office
Winnemucca District Office
775-623-1529.

On Tue, Apr 16, 2019 at 1:22 PM Marnee Benson <marnee.benson@burningman.org> wrote:
> (+ Playground, Roger, Heather)
>
> Mark,
>
> Thank you for your email yesterday regarding 2019 planning. I see your wisdom scheduling PCSO first, so that is fine. And thank you for allowing the additional time for BMP-BLM only.

**AR03447**

Last year we put agenda items directly in the calendar invitation after emailing them out. That system seemed to work well. Does BLM want to do that again? Heather Nuanes is copied here and will participating in the meetings - she would be happy to coordinate with BLM to ensure the agendas are done on Wednesday if that works for you.

As a reminder, BMP is not prepared to discuss items with PCSO that are not directly related to their law enforcement operations on playa. We will also want to provide a different phone number for the 11:00 BLM-BMP meeting. Heather can put that number in the Calendar invitation.

Your April 15 email also included your letter of February 27 regarding the BLM Planning Team for 2019. Here is Burning Man Project's 2019 Planning Team.

**BMP's Planning Team for the 2019 Event:**

- Marnee Benson, Associate Director of Government Affairs
- Charlie Dolman, Event Director
- Erin MacCool, Associate Director of Event Operations
- Roger Vind, Law Enforcement Advisor
- Heather Nuanes, Government Affairs Coordinator

As you know, we have many **Subject Matter Experts** available to attend 2019 planning meetings as well, including:

1. Kate Gonnella, Emergency Services Department Chief
2. Wilfredo Sanchez Vega, Department Manager, Black Rock Rangers
3. Jim Graham, Communications Special Projects
4. Emma Weisman, Agency Relations Manager
5. Red Grasso, ESD Radio Systems Administrator
6. Bryan Anderson, ESD iNet Systems Administrator
7. Brian Herbek, ESD Communications Chief
8. Anna Duffy, ESD Crisis Intervention Team Chief
9. Dee Zaster, 88NV Airport Operations Manager
10. Audrey Whaling,Project Manager, Black Rock City Operations, Burner Express Bus & Air
11. Chris Neary, Associate Director of DPW

We will add them (and others) as needed.

We look forward to our first meetings this Thursday April 18 and to working with BLM ahead of the 2019 event.

Thank you,
Marnee

Marnee Benson
Associate Director of Government Affairs
**Burning Man**
marnee.benson@burningman.org
w. (415) 865-3800
www.burningman.org


On Mon, Apr 15, 2019 at 9:46 AM Hall, Mark <mehall@blm.gov> wrote:
> Marnee,
> Thanks for your email.  The BLM would like the first meeting on the planning meetings to be with PCSO-BLM-BMP.  Last year, there were too many Thursday mornings where the BLM & BRC ended early, and then there was an awkward amount of time where we waited till the PCSO could phone in.  If the business involving the PCSO's is short, then after they hang up we can move forward with BLM-BMP business.
>
> The BLM is more than happy to give you guys an hour or whatever time is needed.  I will amend the schedule.
>
> Noted on the vending and environmental compliance meetings.  On the list of topics for upcoming meetings, just let us know when you would like to start the conversation.
>
> Also attached is the 2019 BLM Planning team for the 2019 Event.
>
> Best, MEH
>
> Mark E. Hall, PhD
> Field Manager
> Black Rock Field Office
> Winnemucca District Office
> 775-623-1529.
>
>
> On Wed, Apr 10, 2019 at 2:22 PM Marnee Benson <marnee.benson@burningman.org> wrote:
>> Mark,
>>
>> Thank you for initiating this conversation and offering a first list of topics BLM plans to discuss with BMP this year. We have some ideas for your consideration and are looking forward to getting started with 2019 planning meetings. I want to apologize to Chelsea for not responding to her email on this same topic - I began to draft a reply and then needed to shift and focus on the EIS.

Also please note that I have removed Sheriff Allen from this thread so that we can discuss our plan with BLM before adding other agencies.

Our recommendations for your consideration:

1. We would like to reserve an hour with BLM each week, not 30 minutes. This model has worked in the past, and as you said, we are getting a bit of a late start. There will be important items to discuss.

2. We suggest that we do not need to plan our permit with the Pershing County Sheriff's Office each week for twice the amount of time we meet only with BLM. BLM is our permitting agency and though local law enforcement is an important factor in planning for the Burning Man event, it is not the driving force.

The past two years your new requirement has been that we meet with PCSO each week for an hour. You have seen that often those meetings are cancelled, have no agenda items, or the Sheriff is not available. We are too busy to carve out this much time each week for a meeting that doesn't need to happen or might get cancelled, and would prefer to resume the previous model, where we convene with PCSO when needed, or that we reserve an hour every other week.

We recommend that we meet with BLM first on a given day, and then PCSO, not the other way around.

3. We suggest alternating every other week for environmental and vending compliance.

4. With the future of the event so uncertain, our planning and leadership teams are heavily invested in the EIS process, so we'll need to be strategic about prioritizing our 2019 planning topics.

5. Regarding your recommended topics:

- the closure order
- any changes to the BMP's Plan of Operations/Operating Plan?
- reviewing the 2018 stipulations
- any art projects or theme camps akin to the 747?

We agree this is an excellent list. These are topics we would discuss with BLM and then decide together what aspects impact and involve PCSO. Regarding the stipulations: This year we would like to hear BLM's plans or thoughts for any changing or adding stips <u>before</u> you create draft stips, and be given the opportunity to weigh in and possibly help inform you.

6. Topics we should consider adding (many would involve PCSO):

1. Post Use Inspection & Reporting
2. Tier One Meetings

   3. JOC & EOC
   4. Radio and pager use
   5. Protocols for BLM and PCSO reporting incidents to BRC

7. 10-11am on Thursdays works well for us to meet with BLM. We are not available to meet this Thursday but hope to agree on a schedule to begin next week.

Thank you,
Marnee

Marnee Benson
Associate Director of Government Affairs
**Burning Man**
marnee.benson@burningman.org
w. (415) 865-3800
www.burningman.org


On Thu, Apr 4, 2019 at 1:45 PM Hall, Mark <mehall@blm.gov> wrote:

> Hi All,
>
> You should be seeing an invite for the 2019 Burning Man planning meetings.  We are starting a touch late this year. The 10-11 AM meeting is intended for conversations between BMP-BLM-PCSO.
>
> Marnee and Charlie, note that I've scheduled an 11 AM meeting that is just for BMP-BLM issues on the event.  While only 30 minutes it can be extend to a full hour.
>
> I'll let Chelsea and Zwaantje set up the Vending and Environmental compliance meetings for later in the day on Thursday.
>
> Topics that come to my mind that need to be discussed--
> 1. the closure order
> 2. any changes to the BMP's Plan of Operations/Operating Plan?
> 3. reviewing the 2018 stipulations
> 4. any art projects or theme camps akin to the 747?
>
> I'm sure there is more that I am missing, this is just what comes to mind this afternoon.

Best, MEH

Mark E. Hall, PhD
Field Manager
Black Rock Field Office
Winnemucca District Office
775-623-1529.

1   DOWNEY BRAND LLP
    ELIZABETH B. STALLARD (Bar No. 10769)
2   100 West Liberty, Suite 900
    Reno, NV 89501-1958
3   Telephone:    775.329.5900
    estallard@downeybrand.com
4
    Attorneys for Appellant
5   BLACK ROCK CITY LLC

6

7

8            UNITED STATES DEPARTMENT OF INTERIOR

9              INTERIOR BOARD OF LAND APPEALS

10

11  BLACK ROCK CITY LLC,              Case Identification No.:  IBLA 2016-115

12          Appellant,                Special Recreation Permit
                                      LLNVW03500-15-01
13      v.                            2930 (NV020.00)

14  BUREAU OF LAND MANAGEMENT,        **APPELLANT BLACK ROCK CITY LLC'S
                                      STATEMENT OF REASONS IN SUPPORT
15          Appellee.                 OF APPEAL**

16

17

18

19

20

21

22

23

24

25

26

27

28

1442965.3

APPELLANT'S STATEMENT OF REASONS                               AR04590

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................................... 1

II. FACTUAL BACKGROUND .............................................................................. 3

    A. Overview Of The Burning Man Special Recreation Permit .................... 3

    B. Burning Man Has An Exceptional Record Of Safety And Environmental Compliance Due To An Engaged Community And BRC's Extensive Operational Expertise .................................................................................. 5

    C. Between 2011 And 2014, BLM Increased Its Costs To Administer The Burning Man SRP By Almost 300% ...................................................... 6

        1. After several years of incremental increases, BLM's costs rose by 60% in 2012, coincident with a change in BLM regional law enforcement leadership ............................................................... 6

        2. In 2013, BLM's costs more than doubled again, to almost $3 million .................................................................................................. 8

        3. BLM increased its costs by another half-million dollars in 2014 ............... 9

    D. The 2015 SRP Process Was Marred By BLM Delays, And BLM's Costs Increased Yet Again ............................................................................ 11

        1. BLM delayed planning for the 2015 event by requiring BRC to address purported "safety issues." ............................................... 11

        2. 2015 planning was further delayed by BLM's demand that BRC provide a new luxury compound for BLM's special guests ..................... 12

        3. When BLM finally issued its cost recovery estimate for the 2015 Burning Man SRP, it again failed to sufficiently explain its costs .......... 14

        4. BLM issued its Final Decision on 2015 cost recovery without adequately justifying its costs .................................................... 15

III. LEGAL STANDARD ....................................................................................... 16

IV. ARGUMENT .................................................................................................... 17

    A. BLM Has Not Met Its Obligations Under Cost Recovery Guidelines To Sufficiently Explain Its Costs For The 2015 Burning Man SRP .......................... 17

    B. BLM Violated Cost Recovery Guidelines By Charging BRC Multiple Times For The Same Costs .................................................................. 18

        1. BLM improperly charged BRC directly for costs already captured by the indirect administrative cost rate ..................................... 18

        2. Charging the IACR rate on costs incurred during the Burning Man event amounts to impermissible overcharging ........................................ 21

    C. BLM's Contracting Practices With Respect To The 2015 SRP Were Unjustified And Unreasonable ............................................................... 22

        1. BLM incurred unnecessary contracting costs due to its failure to coordinate with BRC ............................................................... 22

        2. BLM entered into several unjustified contracts ............................... 22

            a. BLM's contract with the U.S. Park Police ................................ 22

DOWNEY BRAND LLP

1442965.3

i

AR04591

**TABLE OF CONTENTS**
(continued)

Page

        b.    BLM's contract with the U.S. Forest Service ................................ 24

        c.    BLM's contract with Inet Dispatch ................................................. 25

D.    BRC Should Not Be Required To Reimburse BLM's Costs For Unnecessary Equipment And Supplies .................................................. 26

E.    BLM's Labor Costs Are Unjustified And Unreasonable ...................................... 28

    1.    BRC should not be required to reimburse BLM's costs for superfluous staff or unjustified labor hours ............................................. 28

    2.    BRC should not be charged any costs associated with BLM's unjustified designation of Burning Man as an "emergency event.".......... 33

    3.    BLM has not justified its law enforcement officer staffing levels............ 34

        a.    BRC should not be charged the labor costs associated with BLM's unreasonably aggressive law enforcement tactics............ 34

    4.    BRC personnel expertly manage health and safety issues at Burning Man and must be taken into account in determining appropriate BLM law enforcement levels ..................................................................... 41

    5.    BLM is improperly charging BRC for the use of law enforcement officers to provide unnecessary community and civilian services............ 42

        a.    BRC should not be charged for unnecessary time spent by BLM law enforcement officers on "community policing.".......... 42

        b.    BRC should not be charged for unnecessary time spent by BLM law enforcement officers on environmental compliance issues........................................................................... 43

V.    CONCLUSION ............................................................................................................ 45

DOWNEY BRAND LLP

ii

# TABLE OF AUTHORITIES

**Page**

## FEDERAL STATUTORY AUTHORITIES

18 U.S.C. 3061 ................................................................................................................ 40

42 U.S.C. 4321 .................................................................................................................. 4

43 U.S.C. 1701 .................................................................................................................. 4

43 U.S.C. 1734 ........................................................................................................... 29, 32

I.R.C. (26 U.S.C.) § 501(c)(3) .......................................................................................... 4

## FEDERAL RULES AND REGULATIONS

5 CFR 550.103 ............................................................................................................ 7, 33

5 CFR 550.106 ............................................................................................................ 7, 33

36 CFR 2.34 .................................................................................................................... 37

43 CFR 2932.31 ........................................................................................... 10, 30, 39, 43

43 CFR 8365.1-7 ............................................................................................................. 38

DOWNEY BRAND LLP

## I.  INTRODUCTION

Since 2011, the Winnemucca District Office of the Bureau of Land Management ("BLM") has been dramatically and unjustifiably increasing the costs it claims for managing the special recreation permit ("SRP") for Burning Man, a week-long gathering that takes place in Nevada's Black Rock Desert.  Burning Man is well-known for its principles of radical self-reliance and civic responsibility, and for its leave-no-trace environmental practices.

From 2011 to 2015, BLM's claimed costs for the Burning Man SRP climbed from around $730,000 to more than $3.5 million, an increase of over 300 percent.  In the same four years, the population of Burning Man participants increased by just 43 percent.  There was no change in public health, public safety, environmental conditions, or anything else at the event that would justify a material increase to BLM's costs, let alone the 303 percent increase that BLM actually imposed.

Black Rock City LLC ("BRC"), the organizer of the Burning Man event, continued to ask BLM to justify these dramatically increasing costs with each year's SRP.  Yet BRC had no choice but to agree to the additional costs, or face having no SRP when it was already deep into planning and preparation for that year's event.  In this way, BRC's meticulous organization of and preparation for Burning Man was used against it: producing a safe and successful event meant that BRC committed significant resources to each year's event well before BLM got around to providing its annual cost estimates.  Moreover, BRC was warned that requiring BLM to address an appeal of a prior year's cost recovery decision might mean the Winnemucca District Office would not have time to process the current year's SRP.  As a consequence, BRC was forced to accept and absorb BLM's exorbitant and unsubstantiated cost increases for years.

In addition to charging BRC for all of BLM's direct and indirect costs through cost recovery, BLM entered into a separate memorandum of understanding with BRC in 2014, agreeing that BRC would provide various on-site infrastructure, goods, and services to BLM pursuant to annual statements of work ("SOWs").  BLM claimed this arrangement would enable BRC to save some money, but by 2015, there could be no doubt that BLM was taking advantage of the SOW process to procure unnecessary services at BRC's expense.

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1    The SOWs that BLM presented for the 2015 event included a demand for a new housing

2  facility called the "Blue Pit Compound" for BLM leadership and unspecified "VIPs."  BLM's

3  Blue Pit specifications called for hot water, air conditioning, refrigerators, couches, laundry

4  machines, and flush toilets cleaned daily by BRC personnel.  Another SOW called for BLM staff

5  to have 24-hour access to ice cream (BLM went so far as to specify the need for "Choco Tacos")

6  and other extravagant catering provisions, including 13 different cuts of meat.  In BRC's estimate,

7  the costs of all the 2015 SOWs would exceed one million dollars.  The Blue Pit Compound and

8  its associated luxury features would alone cost several hundred thousand dollars, all to be paid by

9  BRC — and ultimately by Burning Man's participants, the individuals who purchase tickets for

10  the event each year.

11    Details of the requested Blue Pit Compound and catering services were obtained by the

12  media, and a public outcry rightfully followed.  Senate Minority Leader Harry Reid called BLM's

13  requests "unprecedented and extravagant," as well as "outlandishly unnecessary."  BLM was

14  ultimately forced to abandon its demand for the Blue Pit Compound after being subjected to this

15  public scrutiny.

16    Many of the costs that BLM did require BRC to pay in 2015 are just as obviously

17  unreasonable, and must therefore be disallowed in accordance with cost recovery guidelines.  As

18  explained in this Statement of Reasons, BLM's 2015 cost recovery decision is replete with

19  unnecessary expenditures, including inflated staffing levels and the provision of various goods

20  and services for which there was no legitimate justification.

21    One of the most glaring examples of this deficiency is BLM's expenditures on law

22  enforcement labor, which have skyrocketed in recent years despite a lack of corresponding

23  increase in public safety concerns at the event.  At the 2015 event, BLM's law enforcement

24  staffing again exceeded what was necessary for public safety, and many officers were obviously

25  redundant as a result of the local law enforcement presence that BLM required BRC to arrange as

26  a condition of the SRP.  As a result, BRC was forced to pay BLM law enforcement to spend

27  hundreds of hours on tasks that were largely unnecessary and duplicative of BRC's

28  responsibilities, such as monitoring environmental compliance and providing information to

1442965.3                                                2

1   Burning Man participants.

2       Statements by BLM personnel have also confirmed BLM's wasteful practices with respect

3   to items for which it forced BRC to pay.  These include BLM's determination that expensive

4   goggles are essentially disposable, although they could easily be reused, and BLM's purchase of

5   unnecessary satellite tracking devices, GPS cameras, and other equipment.  BLM also should not

6   be able to pass on the costs and consequences of its own acknowledged inefficiencies to BRC,

7   such as by requiring BRC to pay for unexplained travel or duplicate supply orders.

8       Nor should BLM have charged BRC directly for costs that were covered by the indirect

9   administrative cost rate ("IACR"), which BLM assessed on all of its direct expenses.  BLM not

10  only improperly categorized various expenditures as direct costs — including contracting, budget

11  development, and public information services — but then required BRC to pay the 22.9% IACR

12  on top of these costs.

13      Finally, and even if many of BLM's 2015 costs may ultimately be justified, because BLM

14  failed to provide sufficient information for purposes of making that assessment, its 2015 cost

15  recovery is deficient and subject to challenge.

16      SRPs are not meant to be a substitute for agency budgets, or based on what a permittee is

17  able to pay instead of the actual reasonable cost of administering the associated SRP.  Equally

18  obvious, SRP costs are not intended to cover junkets for federal employees, a chance to try out

19  fancy technology, or other fringe benefits that would never be approved for regular agency

20  operations.  Quite simply, just because the BLM is spending someone else's money does not

21  mean it can do so recklessly.

22      Thus, and as explained herein, BRC respectfully requests that the IBLA disallow BLM's

23  2015 cost recovery for the Burning Man SRP.

24              **II.    FACTUAL BACKGROUND**

25  **A.    Overview Of The Burning Man Special Recreation Permit.**

26      Since 1990, the Burning Man event ("Burning Man" or "the event") has been held over

27  Labor Day weekend and the preceding week on public lands managed by BLM in what is now the

28  Black Rock Desert—High Rock Canyon Emigrant Trails National Conservation Area of northern

DOWNEY BRAND LLP

1442965.3                          3

DOWNEY BRAND LLP

1    Nevada ("Black Rock NCA"). (Declaration of Harley K. Dubois ("Dubois Decl.") at ¶ 2.) The

2    event location, commonly called Black Rock City (or "the City"), has been situated within

3    Pershing County for the last several years. (*Id.*) Burning Man began its tenure in the Black Rock

4    NCA as a weekend camping trip for a small group of people. (*Id.* at ¶ 4.) Over the past 25 years,

5    the event has grown in size, popularity, and complexity, and the total population[1] of the 2015

6    event was 67,564 participants. (*Id.*)

7         Burning Man has been produced by BRC since 1997. (*Id.* at ¶ 5.) In 2013, BRC became

8    a wholly owned subsidiary of Burning Man Project ("BMP"), a California nonprofit public

9    benefit corporation recognized as exempt under section 501(c)(3) of the Internal Revenue Code.

10    (*Id.*) BMP's mission is to facilitate and extend the culture of the Burning Man event into the

11    larger world. (*Id.*)

12         BLM issues a special recreation permit ("SRP") for Burning Man every year.

13    (Declaration of Rosalie Barnes ("Barnes Decl.") ¶ 2.) Each SRP has been issued pursuant to the

14    requirements of the National Environmental Policy Act ("NEPA") and Federal Land Policy and

15    Management Act ("FLPMA"). 42 U.S.C. § 4321, *et seq.* (1969); 43 U.S.C. § 1701, *et seq.*

16    (1976). The permitting process has included several environmental assessments over the years,

17    the most recent of which covers the period 2012 to 2016, and as with previous assessments,

18    resulted in BLM issuing a mitigated Finding of No Significant Impact ("FONSI"). (Barnes Decl.

19    at ¶ 3.)

20         Over the last 25 years, BRC and BLM have cooperated to develop and refine a Leave No

21    Trace standard for the event that BLM has since adopted for use with all events on BLM-

22    managed public lands. (*Id.* at ¶ 4.) BLM typically inspects the Burning Man event site six weeks

23    after the end of the SRP period. (*Id.*) BRC has passed every inspection. (*Id.*)

24         Each year, the Burning Man SRP contains special stipulations ("Stipulations") designed

25    specifically for the uniqueness of the event and intended to address impacts and issues identified

26

27    [1] All references herein to Burning Man's population are to the peak number of paid participants at the event in a particular year. (Declaration of Charles Dolman, Ex. G [Stipulation 1].)

28    Population varies significantly over the course of the event.

1442965.3

APPELLANT'S STATEMENT OF REASONS    AR04597

1   in the mitigated FONSI that would require additional regulation by BLM beyond existing federal,

2   state, and county laws and regulations.  (*Id.* at ¶ 6; *see also* Declaration of Charles Dolman

3   ("Dolman Decl."), Ex. G.)  The Stipulations address event population, public health and safety,

4   environmental compliance, and traffic management in surrounding areas.  (Barnes Decl. at ¶ 6.)

5   Burning Man has been compliant with all Stipulations each year except 2011 and 2013, when

6   population slightly and inadvertently exceeded the set limit during a portion of the event.  (*Id.*)

**B.      Burning Man Has An Exceptional Record Of Safety And Environmental
         Compliance Due To An Engaged Community And BRC's Extensive Operational
         Expertise.**

9   Burning Man is guided by Ten Principles, which co-founder Larry Harvey authored in

10  2004 "as a reflection of the community's ethos and culture as it had organically developed since

11  the event's inception." (Dubois Decl. at ¶ 6, Ex. A.)  Among these principles are communal

12  effort, civic responsibility, participation, and radical self-reliance, all of which are reflected in

13  Burning Man's excellent record of health, safety, and environmental compliance.  (*Id.*)

14  BRC event operations encompass over 50 departments and teams, organized year round

15  and expertly executed onsite for the duration of event operations.  (*Id.* at ¶ 8.)  They survey the

16  streets, build City infrastructure, install shade, manage the airport, place camps, manage art,

17  license vehicles, plan and provide emergency and other community services, sell ice, ensure

18  sanitation, and educate participants.  (*Id.*)  BRC has built these departments and best practices

19  over the past 25 years.  (*Id.* ¶¶ 7, 8.)  Every year, BRC engages thousands of competent, trained,

20  licensed, and certified health and safety employees, contractors, and volunteers in the production

21  of Burning Man.  (*Id.* at ¶ 8.)  Many employees and volunteers have 10 to 20 years of experience

22  at Burning Man, as well as 10 to 20 years of experience in their respective fields of expertise.

23  (*Id.*)

24  In 2015, BRC's health and safety personnel included 700 Black Rock Rangers, who

25  provided security at the perimeter of scheduled artwork burns and patrolled the City on foot and

26  bicycle 24 hours per day for the duration of the event; 700 licensed, professional Emergency

27  Services personnel, from a variety of medical and emergency services backgrounds, who staffed

28  six first-aid stations over the course of the event and responded to reports of fires, hazardous

1    waste incidents, and medical calls for service; dozens of licensed doctors, nurses, and emergency

2    medical personnel employed by BRC's contracted provider of advanced life support services,

3    CrowdRx, who staffed the City's emergency care facility and ambulances; and 700 Gate,

4    Perimeter and Exodus staff, who provided traffic management and security at the entrance gates

5    and airport around ingress, egress (known as "Exodus"), and the perimeter of the event site.

6    (Dolman Decl. at ¶ 19.) These groups responded to public health and safety incidents;

7    proactively deployed personnel and resources to the sites of major events within Burning Man,

8    such as the burning of the Man sculpture; and communicated daily with BLM representatives to

9    coordinate on a wide variety of public, health and safety issues. (*Id.* at ¶ 20.) BLM and BRC

10   executed well-established protocols, developed with the Pershing County Sheriff's Office

11   ("PCSO") and other cooperating agencies, for reporting crimes and calling law enforcement to

12   the scene of any emergency. (*Id.* at ¶ 21.)

13        BRC also utilized 600 trained volunteers and employees in its Department of Public

14   Works, who constructed the event's infrastructure; a team of 24 compliance staff, who ensured

15   vending and environmental compliance with BLM regulations throughout the event; and more

16   than 5,000 Community Services volunteers and employees who ensured airport safety and

17   compliance and interfaced with Burning Man participants on numerous issues, including

18   providing information and directions. (*Id.* at ¶ 22.)

19        It is undeniable that BRC's comprehensive commitment to public health and safety and

20   operational excellence, coupled with its dedicated professional staff, have led to Burning Man's

21   exceptional compliance record in all areas of the SRP. (*Id.* at ¶¶ 17, 23.)

22   **C.    Between 2011 And 2014, BLM Increased Its Costs To Administer The Burning Man**
23        **SRP By Almost 300%.**

24        **1.    After several years of incremental increases, BLM's costs rose by 60% in 2012, coincident with a change in BLM regional law enforcement leadership.**

25        Since 2007, BLM has charged BRC for the costs of administering the Burning Man SRP

26   under cost recovery regulations and guidelines, which require that BRC pay all of BLM's direct

27   and indirect costs, plus 3% of BRC's gross receipts as a commercial use fee. (Declaration of

28   Raymond Allen ("Allen Decl.") at ¶ 3; National Special Recreation Permit Fee Schedule,

DOWNEY BRAND LLP

1442965.3                                    6

1   available at http://www.blm.gov/style/medialib/blm/co/programs/recreation/

2   srp_state_page.Par.80235.File.dat/IM2011-041_att1[1].pdf.) From 2011 through 2015, BRC paid

3   BLM a total of more than $4 million in commercial-use fees and more than $12.2 million in costs.

4   (Allen Decl. at ¶ 4.)

5      Between 2007 and 2011, BLM increased its costs from around $626,000 to around

6   $859,000, or about 10% per year. (*Id.* at ¶ 5.) During this same period, BRC's population

7   increased from 47,097 to 53,963, indicating average annual growth around 4%. (*Id.*)

8      In 2012, Officer Dan Love became the Special Agent in Charge for Region 3, which

9   includes the Black Rock NCA, and assumed leadership of law enforcement operations for the

10   Burning Man SRP. (*Id.* at ¶ 6.) That year, BLM's costs for administering the Burning Man SRP

11   jumped 60% from the year before, to a total of $1,371,731. (*Id.* at ¶ 7.) BRC's population

12   increased by only 4% that year, and BLM failed to provide BRC with an adequate written

13   explanation for the substantial cost increase. (*Id.* at ¶¶ 8, 9.) BLM likewise did not adequately

14   justify its decision to raise its law enforcement staffing levels by 37% — from 51 officers in 2011

15   to 70 in 2012. (*Id.* at ¶¶ 7, 9.) BRC is aware of no safety issues from prior Burning Man events

16   that necessitated such an increase, and BLM has never identified any. (*Id.* at ¶ 9.)

17      Also in 2012, BLM designated Burning Man as an "emergency" event (for the first time,

18   to BRC's knowledge), even though Burning Man is carefully planned year-round by BRC and

19   BLM. (*Id.* at ¶ 10.) Although BLM has never documented any difficulties securing sufficient

20   staff, BLM informed BRC that the purpose of the "emergency" designation was to facilitate the

21   assignment of BLM officers from other regions to the Burning Man SRP. (*Id.*) This was in part

22   because federal employees who provide services in connection with an emergency event are

23   entitled to premium pay. *See* 5 C.F.R. § 550.106(a). BLM did not, and cannot, explain how the

24   pre-planned and permitted Burning Man event could appropriately be designated an "emergency"

25   event under applicable law. *See* 5 C.F.R. § 550.103. BRC has been unable to confirm whether

26   BLM has continued to apply the "emergency" designation to Burning Man, including for the

27   2015 event, because BLM's labor log lacks sufficient detail to make such an assessment. (Allen

28   Decl. at ¶ 10.) The data that BLM supplied to BRC about its labor costs includes only the total

DOWNEY BRAND LLP

1442965.3

7

1   number of hours worked and total pay received by each staff member; it does not indicate

2   whether any overtime or premium pay was received or how much. (Dolman Decl., Ex. H,

3   Attachment 2.)

4       Despite all of these issues, and although BLM failed to provide BRC with sufficient

5   evidence to justify BLM's 2012 expenses or cost increases, BRC felt it had no choice but to

6   acquiesce to the 2012 final cost decision, after BLM's Winnemucca District Manager, Gene

7   Seidlitz, warned that BLM would not have enough time to process BRC's 2013 SRP if BRC

8   appealed the 2012 cost amounts. (Allen Decl. at ¶¶ 9, 13.) Otherwise, Seidlitz's failure to

9   process the SRP would have resulted in disastrous financial losses to BRC. (Allen Decl. at ¶ 13.).

10       **2.**    **In 2013, BLM's costs more than doubled again, to almost $3 million.**

11       Nothing about the 2012 event gave BRC reason to suspect that BLM's costs for the 2013

12   SRP would substantially increase again. (*Id.* at ¶ 14.) There was no crime wave, epidemic, civil

13   unrest, or other kind of incident that would warrant an escalation of BLM resources. (*Id.*) In

14   keeping with these facts, BLM's After Action Report ("AAR") for the 2012 event did not identify

15   any significant infrastructural, administrative, or health and safety deficiencies. (*Id.*) BRC

16   passed its 2012 post-event inspection and no notice of noncompliance was issued. (*Id.*)

17       BLM stated that its 2013 cost recovery estimate agreement with BRC would be in place

18   by January 2013, and would include no significant cost increases, but BLM did not submit the

19   cost recovery estimate by its own deadline. (*Id.* at ¶ 15.) By March 2013, based on Seidlitz's

20   assurances that the cost recovery estimate agreement would be forthcoming and would include no

21   significant cost increases, BRC had sold thousands of tickets to the 2013 Burning Man event at

22   prices reflecting the typical annual increase in BRC's total expenses, including BLM's costs.

23   (*Id.*)

24       Then, on March 26, 2013, Seidlitz and Love informed BRC staff that — despite the

25   considerable increase in 2012 — BLM's 2013 costs would more than double again to over $2.93

26   million, a total increase of 234% since 2011. (*Id.* at ¶ 16.) At the time, BLM represented to BRC

27   that the 2013 increase would be due to a one-time upgrade of BLM's infrastructure and personnel

28   for "safety" reasons, including a doubling in size of BLM's Incident Command Post, increases in

DOWNEY BRAND LLP

1442965.3

8

1    the number of BLM's staff and hours, and implementation of a new computer-aided dispatch

2    ("CAD") system.  (Dolman Decl. at ¶ 5.)  BLM also assured BRC that this upgrade would

3    provide data to justify and explain the costs BLM charged through cost recovery, ultimately

4    reducing those costs and providing BRC with tangible benefits and cost savings for years to

5    come.  (Allen Decl. at ¶ 17.)

6         BRC reminded BLM that cost recovery guidelines require BLM to provide a reasoned,

7    written explanation for all costs charged to the permittee.  (*Id.* at ¶ 18.)  In response, BLM

8    remarkably asserted that these guidelines did not apply to law enforcement, which "costs what it

9    costs," and that BRC, a private organization, was not entitled to any explanation of these costs but

10   nonetheless would need to pay them before BLM would issue the SRP.  (*Id.*)  Seidlitz also

11   informed BRC that BLM's Winnemucca District Office could not function without the money

12   that the Burning Man SRP provides, which BRC understood to mean that BRC was perhaps

13   responsible for covering budget shortfalls for his office.  (*Id.* at ¶ 19.)

14        At the time of the March 26 meeting, the 2013 Burning Man event was just five months

15   away, and BRC had already sold thousands of tickets and incurred significant event production

16   expenses based on BLM's assurances that it would issue the SRP.  Due to the lack of time and

17   BLM's unwillingness to negotiate its costs, BRC was forced to acquiesce to the unjustified 114%

18   cost increase and sign the cost recovery agreement.  (*Id.* at ¶ 20.)[2]

19        **3.    BLM increased its costs by another half-million dollars in 2014.**

20        In planning for the 2014 Burning Man event, BRC once again relied on BLM's assurances

21   that costs would not substantially increase for the foreseeable future, and that the 2012 and 2013

22   cost increases would enable improved service, communications, planning, and data collection.

---

23   [2] BRC actually could not afford to pay the additional $1.5 million that BLM was suddenly and

24   unexpectedly requiring.  (Allen Decl. at ¶ 20.)  During the March 26 meeting, BRC staff
     explained that BRC would only be able to finance the cost increase if BLM allowed the event's

25   population to increase, enabling BRC to sell more tickets.  (*Id.*)  Every year since BLM began
     constraining the population, BRC had requested permission to grow the event's population so that

26   it could manage BLM's increasing costs, but BLM had refused to allow Burning Man to grow —
     except for small increases in some years.  (*Id.*)  Yet within minutes of BRC making this same

27   request at the March 26 meeting, BLM approved a substantial population increase to ensure that

28   BRC would agree to BLM's doubling of costs in 2013.  (*Id.*)

DOWNEY BRAND LLP

1    (Allen Decl. at ¶ 17; Dolman Decl. at ¶ 5.)  This, in turn, would finally enable BLM to provide

2    BRC with an objective assessment of BLM's staffing levels and rising costs, which had never

3    been done in the event's history.  (Allen Decl. at ¶ 11; Dolman Decl. at ¶ 5.)  BLM did not,

4    however, furnish BRC with any of the data that it promised and for which it required BRC to pay.

5    (Dolman Decl. at ¶ 6.)  Nor did any documented increase in public health and safety result from

6    the more than $1.5 million in additional costs BLM allegedly incurred to administer the Burning

7    Man permit in 2013.  (Allen Decl. at ¶ 22.)

8           Then, in January 2014, BLM provided BRC with a cost recovery proposal for the 2014

9    Burning Man SRP predicting BLM's costs would increase by another $700,000, to approximately

10   $3.7 million.  (Barnes Decl. at ¶ 8.)  When BRC pushed back on these increases, BLM claimed it

11   could not reduce these estimated operational costs.  (*Id.*)  Instead, it offered BRC an opportunity

12   to "save money" by agreeing to a memorandum of understanding ("MOU"), whereby BRC would

13   fulfill certain contracts for BLM and avoid paying the indirect administrative cost rate ("IACR"),

14   which BLM applies to all of its direct expenditures charged through cost recovery.  (*Id.*)[3]

15   Seeking to curb BLM's skyrocketing costs in the only way it apparently could, BRC agreed to the

16   MOU and associated statements of work ("SOWs"), which totaled about $600,000.  (Barnes Decl.

17   at ¶ 8.)  This in turn took many of BLM's costs out of the checks and balances process that cost

18   recovery affords, thereby enabling BLM to charge BRC for goods and services that BLM would

19   not be able to include in a cost recovery decision.

20          In 2014, BLM also required BRC to establish two proffer accounts to directly compensate

21   two BLM employees for their alleged year-round work on Burning Man's SRP: a project

22   manager and an outdoor recreation planner.  (*Id.* at ¶ 9.)  Again, BLM presented the proposal as a

23   cost-saving opportunity for BRC, both because it would avoid paying the IACR on this labor and

24   because BLM would not need to hire seasonal employees for every Burning Man event, thereby

25   ostensibly improving the efficiency of BLM's management of the Burning Man SRP.  (*Id.*)  BRC

26   paid almost $70,000 to fund these two proffer accounts in 2014.  (*Id.* ¶ 10.)

27   ───────────────
[3] BLM had the option of waiving the IACR if it really wanted to save money for BRC, but BLM
28   chose not to do so.  *See* 43 CFR 2932.31(d)(2); 2932.34.

DOWNEY BRAND LLP

1442965.3

10

1    BLM's costs to administer the 2014 Burning Man SRP — including the amounts paid by

2    BRC through the cost recovery agreement, MOU, and the two proffer accounts — totaled more

3    than $3.4 million.  (Declaration of Marnee Benson ("Benson Decl.") at ¶ 9, Ex. F.)  Thus, for the

4    2014 SRP, BRC paid about $300,000 less than BLM's initial estimate of $3.7 million, but still

5    paid $500,000 more than it did for the 2013 permit (and approximately $2.5 million more than it

6    did for the 2011 permit).

7    As explained herein, in just three years, BLM's costs increased by 291%, while the

8    event's population had grown by just 39%.  (*Id.*)  Importantly, and as with the huge increases in

9    the two previous years, BRC did not receive an adequate justification for the further escalation of

10   BLM's costs in 2014.  (Barnes Decl. at ¶ 8.)

11   **D.    The 2015 SRP Process Was Marred By BLM Delays, And BLM's Costs Increased**
12   **Yet Again.**

13        **1.    BLM delayed planning for the 2015 event by requiring BRC to address**
     **purported "safety issues."**

14   On January 30, 2015, BLM issued the closeout documents for the 2014 Burning Man

15   SRP.  (Dolman Decl. at ¶ 9.)  All BLM reports, including the site inspection, BLM's After Action

16   Report, and the Final Cost Recovery Decision, indicated that BRC was in compliance.  (*Id.*)

17   Yet on March 12, six weeks later and a full six months after the 2014 Burning Man event,

18   BLM sent BRC a letter identifying 20 "Safety, Health and Security Issues" related to the 2014

19   event.  (Dolman Decl. at ¶ 10; Ex. B.)  BLM presented the letter to BRC outside of the normal

20   annual event debriefing process, causing both parties to shift their focus from vital 2015 event

21   planning and preventing timely and constructive cost negotiation.  (*Id.* at ¶ 12.)

22   BLM demanded that BRC prepare a comprehensive report and deliver an in-person

23   presentation to BLM in Washington, D.C., within 40 days.  (*Id.*, Ex. B at 2.)  BLM also required

24   BRC to prepare extensive documentation and mitigate all of the purported issues before the 2015

25   event.  (*Id.*, Ex. B, at 1-2.)  The list of 20 "issues" related to BRC event operations, but BRC was

26   not consulted at all in its research or preparation.  (*Id.* at ¶ 11.)  Instead, BLM relied heavily on

27   erroneous speculation and faulty data obtained from BRC's former medical contractor.  (*Id.*; *see*

28   *also id.*, Ex. C at 4-5, 22-23.)  Consequently, BLM's letter reflected a significant lack of

11

DOWNEY BRAND LLP

1   understanding of BRC operations and safety protocols and blamed BRC for problems that either

2   did not exist, or were actually caused by the former medical contractor.

3        While work was ongoing to address and clarify the issues BLM had raised with respect to

4   the 2014 event, BLM refused to issue draft cost recovery documents or work with BRC on the

5   Closure Order and Stipulations for the 2015 event. (*Id.* at ¶ 12.)  Between March 12 and April

6   22, BLM insisted that BRC staff meet with and report to BLM staff regarding BRC's response.

7   These BLM staff edited BRC's report to substantially change its contents.  Although BRC pushed

8   back on some of BLM's efforts, BRC was also in a very difficult position because it was already

9   deep into 2015 planning and needed BLM to approve the 2015 SRP. (*Id.* at ¶ 13.)  BRC asked

10  BLM to correct errors in the letter, but BLM refused, and also did not allow BRC to correct many

11  of the errors from the letter in BRC's report or presentation. (*Id.*)  In addition, BLM staff

12  hampered BRC efforts to meet BLM's deadlines by expressing their unwillingness to work with

13  BRC's event leadership, canceling numerous meetings with BRC, imposing deliverables and

14  deadlines midstream, and refusing to respond to BRC's requests for information needed to better

15  understand and comply with BLM's demands. (*Id.*)  BRC nonetheless met all deadlines BLM

16  imposed, participated in the requested D.C. meeting on April 22, successfully answered every

17  question posed at that meeting by BLM and other federal agencies, and thoroughly addressed

18  every concern that was raised. (*Id.* at ¶ 14.)

19       The added cost to BRC to address BLM's purported concerns about the 2014 event was

20  approximately $250,000, plus six weeks of dedicated staff time. (*Id.* at ¶ 15.)  BRC still disputes

21  and disagrees with many of BLM's claims in the March 12 letter, and believes they were largely

22  an attempt to manufacture a basis for BLM to exercise further control over event production and

23  justify further cost increases under the vague guise of "safety." (*Id.* at ¶ 11.)

24      **2.**    **2015 planning was further delayed by BLM's demand that BRC provide a new luxury compound for BLM's special guests.**

25  In June, BLM presented BRC with eight statements of work ("SOWs") for the items and

26  services that BLM would obligate BRC to provide and fund at the 2015 event site pursuant to the

27  MOU signed in 2014. (Barnes Decl. at ¶ 11.)  One SOW proposed a new lodging compound in

28

DOWNEY BRAND LLP

1442965.3

12

1    the Black Rock NCA, referred to as the "Blue Pit," for BLM and PCSO leadership and BLM and

2    Department of Interior VIPs who were scheduled to briefly visit the event. (*Id.* at ¶ 12; Ex. A.)

3    Total costs for the SOWs were estimated at $1.2 million, double the cost of the 2014 SOWs,

4    although few, if any, new BLM personnel were expected to work at the 2015 event. (*Id.* at ¶ 11.)

5    BLM's Blue Pit specifications called for flush toilets (to be cleaned daily by BRC staff), hot

6    water showers, and laundry facilities; a separate SOW further required that BRC furnish a full

7    menu of specific food items, including 13 cuts of steak, roast, and ribs. (*Id.* at ¶¶ 12, 13; Exs. A,

8    B.)   BLM provided no justification for insisting that BRC provide and pay for these luxury

9    services and infrastructure to accommodate BLM and its guests. (*Id.* at ¶ 14; Ex. C.)  BRC also

10   understands that BLM's own procurement process prevented it from directly contracting for such

11   extravagant catering services. (Dolman Decl. at ¶ 27.)

12         While BRC was still evaluating the SOWs, an unknown party provided copies of them to

13   a reporter with the *Reno Gazette-Journal*. (Benson Decl. at ¶ 4.)  The newspaper quoted

14   Winnemucca District Manager Gene Seidlitz — who was responsible for the Burning Man SRP,

15   cost recovery estimate, and SOWs — as claiming that the luxury compound was for "safety,

16   security and health" reasons. (*Id.*, Ex. A, at 3.)  Seidlitz failed to identify those reasons to either

17   the press or BRC, or to explain how luxury amenities would increase safety.  BLM spokesperson

18   Stephen Clutter did offer that the Blue Pit's amenities were "the same stuff [U.S. military

19   personnel] have for deployments in Afghanistan," but did not explain why BLM personnel at

20   Burning Man required the same amenities, or were facing the same demands, as soldiers

21   conducting an active military operation. (*Id.*)

22         The national press picked up the story, and Nevada's congressional representatives issued

23   statements and made inquiries into BLM's management of the Burning Man SRP. (*Id.* at ¶¶ 5, 6;

24   Exs. B, C.)  In an open letter to Secretary of the Interior Sally Jewell, Senator Harry Reid noted

25   that he "agree[d] that the BLM should take its permitting duties seriously and work with Burning

26   Man to both guarantee the safety of its participants and the protection of the environment, [but]

27   providing outlandishly unnecessary facilities for the BLM and its guests should be beyond the

28   scope of the permitting requirements." (*Id.*, Ex. C.)

1442965.3                                         13

DOWNEY BRAND LLP

1    In a published op-ed following this congressional attention, BLM Director Neil Kornze

2    committed to BLM providing BRC with revised work orders "includ[ing] only what is essential

3    for our core operational needs for providing appropriate health, safety, and environmental

4    safeguards on the playa." (*Id.* at ¶ 7; Ex. D.) BLM rescinded the Blue Pit SOW in mid-July.

5    (Barnes Decl. at ¶ 15.) Later that month, Seidlitz was transferred to BLM's Nevada State Office

6    and removed from administration of the 2015 Burning Man SRP. (Benson Decl. at ¶ 8; Ex. E.)[4]

7    **3.    When BLM finally issued its cost recovery estimate for the 2015 Burning Man**
     **SRP, it again failed to sufficiently explain its costs.**

8

9    Planning for the 2015 event was severely hampered by the time and effort required to

10   address BLM's March 12 letter and the Blue Pit SOW. BLM delayed providing BRC with the

11   2015 cost recovery estimate agreement until July 24, 2015, a mere month before the 2015 event.

12   (Barnes Decl. at ¶ 18.) BLM then pressured BRC to sign the $2.9 million dollar estimate without

13   adequate review, advising that the SRP could not issue until BRC had signed. (*Id.* at ¶ 20.)

14   Included in the estimate were a number of contracts to which BLM had already committed,

15   although BRC had never had the opportunity to review, discuss, or agree to the contracted

16   services or amounts. (*Id.* at ¶ 19.)

17   During an August 1 call with BLM, BRC raised a number of other concerns about the

18   costs, including that BLM's explanations were deficient under the cost recovery regulations, and

19   that many of BLM's direct costs were already covered by the assessed IACR. (*Id.*) BLM

20   informed BRC that it was too late to make changes to the cost recovery estimate or to waive the

21   IACR, and that BRC could appeal the costs after the Final Decision issued. (*Id.* at ¶ 20.) The

22   estimate agreement was signed on August 3, and the Burning Man SRP issued August 7, just

23   three days before the 2015 Closure Order went into effect and four days after BRC had begun

24   surveying the site for the upcoming event. (*Id.* at ¶ 21.) BRC expressed serious concern about

25   BLM's unprofessional course of action in putting forth a cost recovery estimate with such

26   ─────────────────
     [4] To date, BRC has received no explanation from BLM about what BLM believes is essential for
27   providing appropriate health, safety and environmental safeguards. BLM conducted a
     comprehensive review of BRC's SRP after the 2015 Burning Man event, but declined to share the
28   results of the review with BRC. (Allen Decl. at ¶ 26.)

DOWNEY BRAND LLP

1    unjustified costs, and BLM's Nevada State Office and Acting District Manager agreed that the

2    lateness of the cost recovery estimate was unacceptable. (Allen Decl. at ¶ 24; Ex. B.) It was

3    almost as if BLM was inviting BRC to appeal the costs Seidlitz had so capriciously put into place

4    because there was no time for BLM to make the appropriate changes to achieve compliance with

5    cost recovery requirements.

6         Despite BLM's unnecessary delays, BRC produced another safe and successful Burning

7    Man event from Sunday, August 30, through Monday, September 7, 2015. (Dolman Decl. at ¶

8    17.) BRC passed the environmental inspection on November 20, 2015, and was deemed in

9    compliance with the 2015 SRP and Special Stipulations on January 25, 2016. (*Id.* at ¶ 23; Exs. E,

10   F.)

11        **4.    BLM issued its Final Decision on 2015 cost recovery without adequately
              justifying its costs.**

12

13        Having been unable to obtain an adequate explanation for BLM's 2015 costs before

signing the cost recovery estimate agreement, BRC renewed its requests for more information

14   from BLM after the Burning Man event concluded. On October 15, 2015, BRC sent an email to

15   BLM requesting the following details about BLM's costs, so that BRC could determine whether

16   they were justified and whether to exercise its right to appeal the Final Decision: (1) labor logs

17   for each BLM staff position, including time sheets showing the dates and hours worked, the

18   particulars of the tasks performed, and how that work related to administering the SRP; (2) copies

19   of all contracts, work orders, and invoices charged to BRC in the Final Decision, a description of

20   how the contracted work related to administering the SRP, and an assessment of whether the

21   deliverables in these agreements were met; (3) information about the agreement between BLM

22   and the U.S. Park Police, including the number of Park Police officers engaged, the dates and

23   hours worked, and how the work related to administering the SRP; (4) details of all travel costs,

24   including dates, locations, mileage, and purpose of the trip; and (5) copies of all receipts for

25   supplies and equipment charged through cost recovery, including a description of how they were

26   used to administer the SRP. (Barnes Decl. at ¶ 22; Ex. D.)

27        On January 27, 2016, despite BRC's requests and BLM's obligations under cost recovery

28

DOWNEY BRAND LLP

1    guidelines, BLM issued its Final Decision on cost recovery for the 2015 Burning Man SRP with

2    minimal explanatory information. (Dolman Decl. at ¶ 25; Ex. H.)  BLM's direct and indirect

3    costs totaled $2,793,722.27.  (*Id.*, Ex. H at 1.)[5]  The Final Decision consisted of a cover letter and

4    six spreadsheets, including a one-page "Cost Recovery Close Out Summary" and five sheets

5    listing BLM's expenditures on labor, travel, contracts, miscellaneous supplies and equipment, and

6    vehicle utilization.  (Dolman Decl., Ex. H.)  Copies of the contracts and receipts for most of the

7    equipment and supplies included on those spreadsheets were also included.  (*Id.*, Ex. H,

8    Attachments 3, 6.)  BLM's more than $1.45 million in labor costs and more than $67,000 in travel

9    costs were summarized in two tables, which provide only summary information regarding the

10   costs incurred, and consequently do not allow any assessment as to the propriety or necessity of

11   those costs.  (*Id.*, Ex. H, Attachments 2, 4.)

12        On January 30, BRC wrote to BLM requesting written explanations for why each of

13   BLM's costs was necessary for the administration of the Burning Man SRP.  (Barnes Decl. at ¶

14   26; Ex. G.)  On February 22, BRC sent another request for written justification of BLM's costs.

15   (*Id.* at ¶ 27; Ex. H.)  To date, BLM has not provided a written response to either of these requests.

16   (*Id.* at ¶¶ 26, 27.)

17        On February 24, 2016, BRC timely filed its Notice of Appeal of BLM's 2015 Final

18   Decision to the Interior Board of Land Appeals ("IBLA").  (Allen Decl. ¶ 27, Ex. D.)

19                          **III.   LEGAL STANDARD**

20        BLM's justification of the costs for its administration of the 2015 Burning Man SRP can

21   only be upheld if the justification has a rational basis, is "supported by the facts of record

22   demonstrating that [BLM's] action is not arbitrary, capricious, or an abuse of discretion," and is

23   consistent with the governing statutory authority.  *Michael Voegele*, IBLA 2007-255, 174 IBLA

24   318 (2008); *see also Bookcliff Rattlers Motorcycle Club*, IBLA 2004-151, 171 IBLA 6 (2006).

25   The IBLA has previously confirmed that in cases of SRP cost recovery, BLM cannot rely solely

---

[5] Including the amounts paid for the SOWs and the proffer account funding BLM's Burning Man
Project Manager, BRC paid a total of more than $3.5 million for BLM's costs in 2015.  (Barnes
Decl. at ¶¶ 16, 17.)

DOWNEY BRAND LLP

1  on spreadsheets to meet its obligation of providing a reasoned and factual explanation of costs.

2  Instead, "[w]here BLM makes use of computer spreadsheets to accumulate data upon which a

3  cost [recovery decision] for an SRP is based, it must reveal underlying data sufficient for the

4  applicant being charged to ascertain the justification for its conclusions; otherwise, the applicant

5  has no basis upon which to understand and accept the decision or, in the alternative, to appeal and

6  dispute it." *Bookcliff Rattlers*, 171 IBLA 21.

7       The fact that BLM's fee calculations may derive from internal documentation such as an

8  instruction memorandum does not mean they are entitled to greater deference. The Board must

9  examine BLM's cost determinations for reasonableness. *See Mark Patrick Heath*, IBLA 2010-

10  34, 181 IBLA 137 (2011). The burden of proof is on the appellant to demonstrate that BLM

11  failed to meet these requirements. *See Michael Voegele*, 174 IBLA 323.

12                    **IV.   ARGUMENT**

13  **A.**     **BLM Has Not Met Its Obligations Under Cost Recovery Guidelines To Sufficiently Explain Its Costs For The 2015 Burning Man SRP.**

14

15       From the limited data that BLM provided to explain nearly $2.8 million in costs, it is not

16  reasonably possible for BRC — or anyone else — to ascertain BLM's justification for charging

17  these costs to the permittee. BLM's failure to comply with its cost recovery obligations is

18  particularly notable with respect to its labor costs, which account for more than half of total

19  claimed expenditures and for which the only documentation furnished to BRC was a six-page

20  "Cost Recovery Project Log." (Dolman Decl., Ex. H, Attachment 2.) This project log provides

21  no specific information about the tasks that any of the listed employees performed in connection

22  with the Burning Man SRP. BLM's "Travel Per Person" spreadsheet is equally deficient,

23  summarizing more than $67,000 in costs with only nominal information. (*Id.*, Attachment 4.)

24       BLM's failure is difficult to see as inadvertent, given that BRC repeatedly reminded BLM

25  of its cost recovery obligations in communications leading up to and following the 2015 Burning

26  Man Event. Prior to signing the Cost Recovery Estimate Agreement in early August, BRC

27  requested detailed information regarding BLM's costs and the justification therefor. (Barnes

28  Decl. at ¶ 19.) BRC then reiterated this request numerous times over the next several months

DOWNEY BRAND LLP

1442965.3

17

1   while BLM finalized the cost recovery determination. (*Id.* at ¶¶ 22-27.) Despite these requests,

2   BLM nonetheless issued its Final Decision without most of this requested, and legally necessary,

3   information. (Dolman Decl., Ex. H.)

4        In the absence of the requisite reasoned and factual explanation of the costs attributable to

5   BLM's administration of the SRP for the 2015 Burning Man event, the IBLA must conclude that

6   the allocation of most, if not all, of these costs to BRC was arbitrary and capricious. *Bookcliff*

7   *Rattlers*, 171 IBLA 21.  Since BLM has not provided the data necessary to justify its cost

8   recovery conclusions in the Final Decision, BRC respectfully requests that the IBLA refund BRC

9   the full amount paid.  Should the IBLA find that a full refund is not appropriate, however, BRC

10   asks that each of the various specific improper cost charges set forth below be refunded.

11        BRC notes that the identification of improper charges in this Statement of Reasons is

12   likely incomplete, as its efforts to challenge BLM's cost recovery conclusions have been

13   hampered by a lack of information necessary to confirm that certain cost charges are improper.

14   Accordingly, to the extent any cost is not refunded as a consequence of this appeal, BRC requests

15   that the IBLA remand the Final Decision to BLM and require BLM to provide the necessary

16   information, conduct an objective assessment of its costs based on that data, provide detailed

17   reports demonstrating the necessity of the activities carried out by each member of BLM's

18   Burning Man staff, and provide an updated identification of any remaining cost charges so that

19   BRC can evaluate their validity, seek further relief if necessary, and ensure that it is charged

20   appropriately for future SRPs.

21   **B.**    **BLM Violated Cost Recovery Guidelines By Charging BRC Multiple Times For The Same Costs.**

22

23        **1.**    **BLM improperly charged BRC directly for costs already captured by the indirect administrative cost rate.**

24        As noted above, BLM requires BRC to pay an indirect administrative cost rate — 22.9%

25   in 2015 — on all direct costs charged through cost recovery, including labor on the event site,

26   year-round and event-specific travel, vehicle utilization, contracts, accounting, radios and other

27   supplies and equipment, fuel and mileage, public communications, law enforcement, dispatch,

28   and contracts. (Dolman Decl., Ex. H, Attachment 1.)

DOWNEY BRAND LLP

The rationale for applying the IACR is to allow BLM to recover costs that cannot be accurately or readily determined with respect to an SRP, and thus cannot be captured by the direct costs charged to the permittee. (Barnes Decl., Ex. J at 3.)  Per BLM SRP guidelines, indirect costs represent "those administrative and program costs that may be attributed to processing the application, including a portion of the costs of equipment, space rental, telephone services, postage, personnel transfer costs, administrative and clerical support, training, safety, public information, cartography and basic series mapping, aviation management, telecommunications, equipment maintenance, and systems design and implementation." (Allen Decl., Ex. A, at 1-29 – 1-30.)

In 2014, BLM issued an instructional memorandum to provide further guidance to BLM employees in application of the IACR. (Barnes Decl., Ex. J.)  The memorandum explained that indirect costs were "those <u>costs that cannot be directly identified</u> with producing a specific product or service, but can be shown to bear some relationship to result from or be in support of the product or service." (*Id.* at 3 (emphasis added).)  Examples of indirect costs listed in the memorandum include:

- Administrative support related to the BLM's overall mission. This area represents the largest portion of indirect costs and includes such costs as procurement, contracting, finance, office services, property management, vehicle management, supply, payroll, voucher processing, personnel services, records management, and document controls.
- Public information and inquiries.
- Budget development and program planning, coordination, and direction.
- Training, employee development, and personnel transfers, including costs of travel and time in transit.

(*Id.*)  The IBLA has further confirmed that if BLM uses the IACR for management overhead, BLM must reduce its cost recovery estimates accordingly. *Bookcliff Rattlers*, 171 IBLA 26.

In its Final Decision for the 2015 Burning Man SRP, BLM charged BRC a total of $520,555 for indirect costs. (Dolman Decl., Ex. H, Attachment 1.)  BLM also charged BRC <u>directly</u> for a great many of the functions and services that are included in the IACR.  BRC is therefore effectively being forced to pay BLM multiple times for the same expense: first in full as

DOWNEY BRAND LLP

1442965.3

19

1    a direct cost, and then again because BLM charges BRC an additional 22.9 percent on top of this

2    direct cost (and every other direct cost) for the very same item or service.  BLM's practice

3    violates cost recovery guidelines, and there is no rational basis for the amounts levied as a result.

4         Direct costs BLM improperly charged to BRC in 2015 include:

5         •    $67,141 for travel expenses incurred by BLM staff, since BLM identifies

6    "personnel transfers, including costs of travel and time in transit" as indirect costs (*id.*,

7    Attachment 4)[6];

8         •    $21,086 for two BLM "GIS Specialists" to provide geographic information system

9    services, and an additional $4,197 for GPS cameras, since BLM identifies cartography and

10   mapping as indirect costs (*id.*, Attachment 2 at 3, 5; Attachment 1);

11        •    $20,125 for a "Budget Analyst," since BLM identifies "budget development" as an

12   indirect cost (*id.*, Attachment 2, at 4);

13        •    $14,998 for the labor of a "Contract Specialist," since BLM identifies

14   "contracting" as a form of administrative support and an indirect cost (*id.*);

15        •    $11,007 for a "Public Information Officer," since BLM identifies "public

16   information and inquiries" as an indirect cost (*id.* at 2; Ex. A at 11-12); and

17        •    Almost $2,000 for the shipment of items purchased by BLM in 2015 for use at the

18   Burning Man event, since BLM identifies "postage" as an indirect cost (*id.*, Attachment 6).

19   _____

20   [6] As noted above, BLM provided only a three-page "Travel Per Person" spreadsheet as the
     backup data for its claimed travel expenses. (Dolman Decl., Ex. H, Attachment 4.) BRC objects

21   to paying, directly or indirectly, for any unjustified BLM travel.  This includes the $9,739
     purportedly incurred by three people attending a "BLM Executive Managers, Internal/External

22   Partners" meeting. (*Id.*)  BLM has provided BRC with no information about this meeting, such as
     why it was necessary for the administration of BRC's SRP or why travel for three people cost

23   almost $10,000.  BRC also objects to paying for the travel expenses related to event planning by
     any BLM personnel based in Utah.  The Burning Man event takes place in, and is permitted by,

24   BLM's Winnemucca District Office in northern Nevada.  Therefore, permit planning and
     operations — including law enforcement, accounting, and contracts — should be managed from

25   BLM's northern Nevada offices to ensure that BLM is not charging the permittee for costs
     resulting from BLM's inefficient use of labor.  The Final Decision BLM provided to BRC does

26   not give any explanation for BLM's decision to staff Utah-based employees to manage the
     Burning Man SRP.  Absent sufficient explanation, such costs are arbitrary and capricious, and

27   BRC should not be required to pay them.

28

DOWNEY BRAND LLP

1      Even if all of these costs were properly imposed, which BRC disputes, it was nonetheless

2    improper for BLM to charge BRC directly for these costs, as they were already covered by the

3    22.9% IACR that BLM levied on all its direct costs related to the Burning Man SRP.

4    Accordingly, all of these costs should be refunded, and the IACR amount adjusted downward in

5    keeping with the reduced direct cost amount.

6        **2.    Charging the IACR rate on costs incurred during the Burning Man event**
          **amounts to impermissible overcharging.**
7

8        BRC objects to BLM's assessment of any IACR on BLM's labor or other costs incurred

9    during the Burning Man event, whether in the nearby town of Gerlach, Nevada, or at the event

10   site. For the duration of BLM's 2015 event operations, BRC provided and paid for most of

11   BLM's infrastructure and support services in both of these locations, including fuel,

12   transportation, equipment, technology, and supplies. (Dolman Decl. at ¶ 26.) The other costs

13   intended to be addressed by the IACR were similarly covered by BRC, assuming that they are

14   incurred at all during this period. For example, BLM reports were written onsite, so no postage

15   would have been required. BRC also provided buildings, electricity, and internet services to

16   BLM. (*Id.*) Since BLM incurred minimal indirect costs to administer the Burning Man SRP, its

17   assessment of the full IACR on any of its direct costs during the Closure Order period constitutes

18   impermissible overcharging, and therefore lacks a rational basis.

19       According to the 2015 Project Log, only seven BLM staff members were engaged in

20   activities related to the Burning Man SRP on dates outside the Closure Order. (*Id.*, Ex. H,

21   Attachment 2.) Based on the limited information provided by BLM regarding its labor

22   expenditures, BRC estimates the total cost of that labor was $107,653. (*Id.*) Since BLM has

23   provided no documentation that it incurred indirect costs in connection with any of its other labor

24   or direct costs, BLM should only have assessed the IACR on this $107,653 and charged $24,653

25   for indirect costs in 2015. The difference of $495,902 should be refunded to BRC.

26

27

28

DOWNEY BRAND LLP

1442965.3

21

**C.** **BLM's Contracting Practices With Respect To The 2015 SRP Were Unjustified And Unreasonable.**

      **1.** **BLM incurred unnecessary contracting costs due to its failure to coordinate with BRC.**

Per BLM guidelines, it is appropriate for BRC to be given the first opportunity to provide necessary services and functions before BLM enters into external contracts to provide these services and functions. (Allen Decl., Ex. A at I-29 ("BLM may exercise considerable discretion in allowing an applicant to provide products rather than doing so itself.").) Yet BRC was not given this opportunity with respect to several contracts included in BLM's Final Decision on cost recovery for the 2015 SRP. (Barnes Decl. at ¶ 19.)

It was not until February 2016 that BLM identified its contracts with Lyman Communications, Modular Communications Systems, and Law Enforcement Temporary Placement Service as potentially transferable to BRC. (*Id.* at ¶ 28.) BLM should have identified these three contracts during the 2015 planning process so that BRC could have decided to take them on and realize cost savings in 2015. BLM's failure to do so was not reasonable, and the resulting costs incurred should be refunded or reduced accordingly.

      **2.** **BLM entered into several unjustified contracts.**

Although BRC requested information and justification regarding BLM's intended contracts, including why they were necessary to the administration of the Burning Man SRP, BLM failed to provide such information prior to presenting BRC with a cost recovery estimate agreement. (Barnes Decl. at ¶ 18; Allen Decl., Ex. B.) As a result, BRC was unable to identify or challenge contracts that might be unnecessary or excessive. Yet even the limited information currently available to BRC confirms that BLM's costs were unreasonable with respect to at least the three contracts discussed below.

      a.   BLM's contract with the U.S. Park Police.

In 2015, BLM contracted with the U.S. Park Police to "provide special operations support," and charged the cost of this contract — $110,060.87 — to BRC through cost recovery. (Dolman Decl., Ex. H, Attachment 3 (Park Police contract).) Per the contract, the support provided by the Park Police was to include crowd control and related training to BLM employees;

1442965.3

22

DOWNEY BRAND LLP

1   assistance with incorporating investigative units into BLM operational plans; an unspecified

2   number of officers, supervisors, and technicians to investigate person-on-person crimes; staff to

3   close out cases and/or testify for cases investigated; supplies for officers, staff, and technicians for

4   collection of evidence or other items; and staff and assessment for BLM operations. (*Id.*) The

5   contract also obligated BLM to provide Park Police with handheld radios; an operational plan;

6   housing at Bruno's Country Club in Gerlach; instruction on BLM policies, regulations, and

7   practices; and labor, overtime, travel, and per diem for Park Police officers. (*Id.*)

8         In December 2015, BLM's Office of Law Enforcement and Security finally offered an

9   explanation to BRC as to why it had contracted with the U.S. Park Police: its officers' "unique

10   investigative skills" were purportedly required to investigate "person-on-person crimes" at

11   Burning Man including "sexual assault, property theft, assault, battery, and other related criminal

12   acts." (Barnes Decl. at ¶ 24; Ex. E.) This explanation simply does not justify the associated

13   expenditures. The rate of person-on-person crimes is extraordinarily low in Black Rock City, and

14   BRC already pays PCSO to enforce state criminal laws, pursuant to a binding agreement between

15   the two entities to provide law enforcement at Burning Man. (Dolman Decl. at ¶ 28.) In 2013,

16   there were just four arrests for person-on-person crimes; in 2014, three such arrests. (Benson

17   Decl. at ¶ 10.) And at the 2015 event, only seven participants were arrested for a person-on-

18   person crime out of a population of nearly 68,000. (*Id.*) All 2015 arrests were handled by PCSO,

19   the entity with primary jurisdiction over these types of crimes. (Dolman Decl. at ¶ 28.) As BLM

20   knew the handful of person-on-person crimes that might occur at the event would be handled by a

21   County agency with clear jurisdiction, BLM's decision to hire an additional federal agency to

22   investigate the very same crimes lacks a reasonable basis.

23         BRC also should not have to pay for costs incurred by BLM for the Park Police to provide

24   "training" for BLM employees or "assessment and operational reports." (*Id.*, Ex. H, Attachment

25   3 (Park Police contract, section III).) It is BLM's responsibility to ensure its employees are

26   properly trained; the permittee is not obligated to pay for operational assessments of the federal

27   government. (Declaration of Robert Abbey ("Abbey Decl.") at ¶ 6.) Charging BRC to contract

28   for additional training and reporting therefore violates cost recovery guidelines.

DOWNEY BRAND LLP

1442965.3

23

1    Finally, to the extent BLM is contracting with the Park Police to "provide crowd control,"

2    such services were obviously unnecessary. (Dolman Decl., Ex. H, Attachment 3 (Park Police

3    contract).)  As noted above, BRC engaged 700 Black Rock Rangers in 2015 to provide security

4    and conduct patrols on foot and bicycle throughout the event site. (*See* Section II.B.)  Moreover,

5    there has never been a riot or significant crowd-control problem in the history of Burning Man.

6    (Dubois Decl. at ¶ 10.)  Of course, even if the Park Police were purportedly onsite for such a

7    purpose, the fact that they did not even attend Tier 1 meetings at the event, during which any

8    issues relating to crowds would have been discussed, confirms they were not taking any steps to

9    fulfill such a role in any event. (Dolman Decl. at ¶ 29.)

10    As the services of the Park Police were unnecessary, BRC requests a refund of the entire

11    amount charged for this contract.

12    b.    BLM's contract with the U.S. Forest Service.

13    The Park Police was not the only other federal law enforcement agency that BLM

14    engaged for the 2015 Burning Man event.  BLM also entered into a contract with the U.S. Forest

15    Service and charged BRC for the costs of this contract — $59,967.32 — through cost recovery.

16    (Dolman Decl., Ex. H, Attachment 3 (Forest Service contract).).  As with the Park Police, BLM

17    has failed to justify the existence or total amount of this contract, and BRC therefore should not

18    be required to pay for it.

19    The contract stated that the Forest Service would "provide law enforcement officers and

20    patrol vehicles to provide law enforcement patrol of BLM lands during the Burning Man event as

21    determined by the BLM." (*Id.*)  Under the contract, BLM was obligated "to pay for labor and

22    overtime hours, travel related expenses and per diem" for all Forest Service personnel at the

23    event. (*Id.*)  Notably, the contract also required the Forest Service to provide BLM with "all law

24    enforcement reports generated during the course of the detail." (*Id.*)

25    The contract does not, however, specify how many Forest Service officers or vehicles

26    must be provided.  This information is critical to understanding the justification for the contract,

27    as the number of requisitioned officers and vehicles would be tied to BLM's need therefor.  Nor

28    does the contract specify what the officers would be doing at the event or why their presence was

DOWNEY BRAND LLP

1442965.3

24

1  necessary.  BLM has provided no basis whatsoever for concluding that Forest Service personnel

2  and equipment were reasonably necessary for the administration of the SRP.  BLM has not even

3  justified the number of BLM law enforcement officers employed at the Burning Man event, let

4  alone an additional, unspecified number of Forest Service personnel.  (Allen Decl. at ¶ 11.)

5  Moreover, BLM has not provided documentation as to what those officers actually did at

6  the event, so as to demonstrate the need for their presence.  BRC has never been given copies of

7  any reports generated by the Forest Service, or even confirmation that such reports were provided

8  to BLM as required by the contract.  (Dolman Decl. at ¶ 30.)  Finally, even if BLM could justify

9  the labor costs of this contract (and so far, it has not), it cannot justify charging BRC for the per

10  diem expense because BRC provided — at its own expense — housing, food, and beverages to

11  the Forest Service personnel present at the event.  (*Id.* at ¶ 26.)

12                                c.    BLM's contract with Inet Dispatch.

13  In 2013, BLM more than doubled its costs related to the Burning Man SRP in a single

14  year, citing as part of the reason a need to implement a computer-aided dispatch ("CAD") system.

15  (Dolman Decl. at ¶ 5.)  BLM claimed it would use this CAD system to provide BRC with daily

16  reports of BLM law enforcement activity at the Burning Man event, including the types of

17  infractions, precisely where they occurred and when, the number of calls for service received by

18  BLM, response and wait times, and the number and identification of responding vehicles and

19  officers.  (*Id.*)  BLM also claimed that since the CAD system would track all calls for service, the

20  system would be able to generate reports that would help satisfy BRC's consistent request for

21  documentation and justification of BLM's law enforcement activities, per the federal cost

22  recovery guidelines.  (*Id.*)  Yet none of this has happened.  BLM has not provided BRC with a

23  single incident-specific CAD report in any of the last three years and has furnished virtually no

24  statistical information that would be tracked via CAD.  (*Id.* at ¶¶ 6, 7; Ex. A at 38.)

25  BRC paid the costs for BLM's CAD system in 2013, 2014, and 2015.  (*Id.* at ¶ 6.)  In

26  2015 alone, the costs of BLM's contract with Inet Dispatch, LLC for the CAD system exceeded

27  $138,000.  (*Id.*, Ex. H, Attachment 3 (Inet Dispatch contract).)  Yet the CAD system has not

28  delivered the data and reports that BLM promised it would.  Just as remarkably, BLM has

DOWNEY BRAND LLP

1442965.3

25

1    informed BRC that it did not use CAD data in its law enforcement staffing models, even though

2    BLM justified the expense of the CAD system by asserting it would serve exactly this purpose.

3    (*Id.* at ¶ 8.)

4           The available evidence indicates that the CAD system has not served its intended purpose.

5    Thus, by including the Inet Dispatch contract in its cost recovery decision, BLM forced BRC to

6    pay for services that were not delivered to BRC and apparently not fully or accurately used by

7    BLM.  As BLM has failed to justify the existence of this contract, it should not be entitled to

8    recover the associated costs from BRC.

9    **D.    BRC Should Not Be Required To Reimburse BLM's Costs For Unnecessary Equipment And Supplies.**

10          In 2015, BLM charged BRC well over $100,000 for equipment and supplies it purchased

11   in conjunction with the Burning Man SRP.  (Dolman Decl., Ex. H, Attachments 2, 6.)  BRC

12   should not have to pay for any items that are not accounted for on a final inventory, and BLM has

13   never provided a complete accounting of the items purchased through cost recovery that are

14   stored for the following year's event.  (Barnes Decl. at ¶ 25; Ex. F.)  This information is

15   necessary for BRC to evaluate equipment costs and determine whether BLM is using cost

16   recovery to charge for superfluous supplies.  Despite the incomplete information BLM has

17   provided about BLM's supplies, BRC has nonetheless been able to identify numerous

18   improprieties in BLM's handling of equipment purchases and use.

19          For example, BLM purchased 170 pairs of expensive new goggles from Botach Tactical

20   in 2015, at a total cost of $4,248.30, although BLM apparently had only 104 employees on site at

21   the 2015 event, and many BLM staff return to work at the event each year, which would enable

22   them to reuse equipment like goggles.  (Dolman Decl., Ex. H, Attachment 3 (Botach Tactical

23   contract); Barnes Decl. ¶ 23.)  When BRC questioned this purchase, BLM explained that the

24   goggles are thrown away after each year's event, and then new goggles are purchased the

25   following year.  (Barnes Decl. at ¶ 23.)  BLM could have reused the goggles it threw away for

26   subsequent events — or at least given them to BRC for repurposing, as BRC paid for them, and

27   there is no reason to believe the goggles became unusable after the minimal use that occurred.

28

1442965.3

DOWNEY BRAND LLP

26

1    BRC should not be forced to pay for BLM's wasteful practice of using equipment for a couple of

2    weeks and then throwing it away without regard for reuse or repurposing.

3        BRC also should not be required to pay for equipment that is unnecessary to administer

4    the Burning Man SRP. In 2015, that unnecessary equipment included $4,197 worth of GPS

5    cameras for the purpose of environmental enforcement.[7] In past years, environmental compliance

6    efforts by BRC and BLM have been successful and more than adequate without these additional

7    GPS cameras. Perhaps most egregious, BLM has even conceded that this new equipment was

8    ineffective in 2015, referring to the cameras and geodatabase software used by its Environmental

9    Compliance Team as "time and labor-intensive, confusing and counterintuitive, and … not …

10   efficient tool(s)." (Dolman Decl., Ex. A at 9.) Yet BLM charged BRC for it anyway.

11       In addition, BRC should not have been charged $56,494.20 for Delorme InReach Devices

12   used by BLM to conduct satellite tracking of its own personnel. (Dolman Decl., Ex. H,

13   Attachment 3 (Alvarez & Associates, LLC contract).) BLM has not demonstrated a need for

14   these tracking devices, and also conceded that its employees did not even understand how the

15   devices functioned. (*Id.*, Ex. A at 14.) Furthermore, BRC was not offered the opportunity to

16   investigate a more cost-effective solution; had BRC been able to do so, it would likely have

17   identified a solution costing less than half as much. (*Id.* at ¶ 34.) BRC should not be required to

18   pay for ineffective equipment, equipment that was not used properly by BLM, or any excess

19   BLM staff time spent attempting to learn to use that equipment.

20       Nor should BRC be charged for unreasonable costs incurred by BLM to ship equipment.

21   According to BLM's Miscellaneous Supplies and Equipment spreadsheet, BLM incurred

22   $1,483.27 for a single FedEx delivery fee. (*Id.*, Ex. H, Attachment 6.) BLM provided no

23   explanation for this large fee, not even the receipt or an identification of the item that was

24   shipped. BRC therefore cannot confirm whether this unidentified item could have been delivered

25   for a much lower cost, or whether this item was even necessary in the first place.

26   ――――――――――――

27   [7] As discussed above, BRC also objects to being charged for these GPS cameras because these
     costs are among those covered by the IACR that BLM assesses on all its direct costs. (*See*

28   Section IV.B.1.)

DOWNEY BRAND LLP

1    BLM has admitted to inefficiencies in its inventory and ordering procedures, noting in its

2    2015 AAR that "[t]here were multiple persons ordering supplies for the operation without any

3    communication or coordination.  In some cases there were insufficient supplies and in other cases

4    a large surplus." (*Id.*, Ex. A at 15.)  BRC should not be forced to bear the costs of BLM

5    inefficiencies that result from BLM's acknowledged communication failures.

6    **E.     BLM's Labor Costs Are Unjustified And Unreasonable.**

7    BRC has never contended that it is unnecessary for BLM to staff the Burning Man event

8    in order to properly administer the SRP.  To the contrary, BRC cannot produce the Burning Man

9    event without BLM's participation, and some BLM staff are integral to the safety and success of

10   the event.  But BLM has failed to properly account for and justify its labor costs, or to provide a

11   "reasoned and factual explanation" of its labor costs, which would enable BRC to determine

12   whether all such costs were acceptable or arbitrary, and therefore appealable. *Bookcliff Rattlers*,

13   171 IBLA 21.  Based on the limited information provided by BLM, BRC submits that many of

14   BLM's labor costs were unjustified.

15   **1.     BRC should not be required to reimburse BLM's costs for superfluous staff**
     **        or unjustified labor hours.**
16

17   For the 2011 Burning Man SRP, BLM charged BRC a total of just over $500,000 in labor

18   costs.  (Benson Decl., Ex. F.)  By 2015, just four years later, that figure had ballooned by 185% to

     more than $1.45 million.[8]  (Dolman Decl., Ex. H, Attachment 2.)  In sharp contrast, Burning
19
     Man's population increased by just 43% in that same time period.  (Benson Decl., Ex. F.)  BLM
20
     has supplied BRC with insufficient evidence that existing public safety or environmental
21
     compliance concerns warranted this disproportionate increase, or that public safety or
22
     environmental compliance has been improved as a result.  Absent such evidence, the only
23
     reasonable conclusion is that BRC is being charged for BLM's inefficient and unjustified use of
24
     labor, including employing an excessive number of law enforcement officers and other personnel
25
     and assigning them duties that are superfluous, unnecessary, or beyond the scope of what BLM is
26

27   [8] This figure does not include the separate proffer account for BLM's year-round Project

28   Manager, which BRC funded at an additional cost of $102,388 in 2015.  (Barnes Decl. at ¶ 17.)

1442965.3

APPELLANT'S STATEMENT OF REASONS                                            AR04621

DOWNEY BRAND LLP

1    authorized to charge through cost recovery.

2         BRC requested detailed documentation of the costs associated with all BLM staff

3    members who worked at the event or were otherwise employed in the administration of the 2015

4    Burning Man SRP.  (Barnes Decl., Exs. D, G, H.)  Notwithstanding BRC's requests and BLM's

5    obligations under cost recovery regulations, BLM has failed to provide adequate detail.  The only

6    documentation BLM has furnished regarding its labor expenditures for the 2015 Burning Man

7    event is a spreadsheet titled "2015 Burning Man Event Cost Recovery Project Log." (Dolman

8    Decl., Ex. H, Attachment 3.)  This spreadsheet contains minimal information about BLM staff:

9    each employee's total number of hours worked, total amount of pay for those hours, and a

10   threadbare "Description of Work" performed, such as "Swing Shift Special Investigations" or

11   "Ensure Environmental Compliance." (*Id.*)  Missing from the spreadsheet are critical details like

12   the employee's hourly wage; the number of hours worked per day; whether any overtime, hazard,

13   or premium pay was received; what the employee's particular responsibilities were; why the work

14   needed to be done by a person of that pay grade; and why the work was necessary to the

15   administration of BRC's permit.  The incomplete information contained on BLM's Project Log

16   does not suffice under cost recovery guidelines to justify BLM's $1.45 million in labor costs.  43

17   U.S.C. § 1734(b); *Bookcliff Rattlers*, 171 IBLA 21.

18        BRC specifically objects to the following BLM labor charges as both unjustified and

19   unreasonably high:

20        •    526 hours, totaling $44,307, for State Chief Ranger Young to work on BLM's

21   CAD system.  (Dolman Decl., Ex. H, Attachment 3 at 6.)  This system has purportedly been in

22   use for three years and should not have required months of dedicated work in 2015.  (Dolman

23   Decl. at ¶¶ 5, 6.)  BLM also has not indicated what Ranger Young's pay level is, or why a State

24   Chief's pay level is required for this work.  Finally, BLM has not provided BRC with any reports

25   from this CAD system, as discussed above.  (*See* Section IV.C.2.c.)  BRC therefore objects to

26   paying for this labor.

27        •    278 hours, totaling $14,183, for vending compliance.  (Dolman Decl., Ex. H,

28   Attachment 3 at 3.)  Vendors are required to obtain an SRP from BLM, and in 2015,

DOWNEY BRAND LLP

1   approximately 70 vendors provided services to or at Burning Man. (Barnes Decl. at ¶ 29.) Per

2   BLM regulations, if a particular SRP required over 50 hours of BLM time, BLM was authorized

3   to charge its costs to <u>that permittee</u> through cost recovery; if an SRP required less than 50 hours

4   of BLM time, the fee was set at a minimum of $105. 43 CFR 2932.31(e)(2)-(3). (*See also* Allen

5   Decl., Ex. A at 1-22.) But the SRPs of third-party vendors are completely separate from BRC's

6   SRP, and BRC should not be responsible for paying any costs associated with these other SRPs.

7   All vendors operating at Burning Man already pay BLM 3% of their gross receipts, totaling

8   around $232,000 in 2015. (Barnes Decl. at ¶ 6.)[9] And BRC helps facilitate the administration of

9   BLM's vendor SRPs through its own compliance team, which manages on-playa vending

10  operations and requires any vendor operating at Burning Man to provide evidence of a BLM SRP

11  in advance. (Barnes Decl. at ¶ 31.) BRC should not have been charged through cost recovery for

12  nearly 300 additional hours of BLM personnel time to administer its vendor SRP program.[10]

13       •       1,645 hours of labor, totaling $101,610, for five individuals to program and

14  support the radios used by BLM at the 2015 Burning Man event. (Dolman Decl., Ex. H,

15  Attachment 3, at 1, 2, 5.) BLM has provided BRC with insufficient justification for incurring

16  these substantial costs, or even for using this particular model of radio rather than the radios used

17  by BRC.[11] Evidencing the unreasonableness of BLM's labor costs, BRC staff utilized

18  approximately 1700 radios at the 2015 event, and they were all programmed in approximately

19  _____

20  [9] BRC also pays these 3% commercial-use fees to BRC, amounting to approximately $1 million
    in 2015. (Barnes Decl. at ¶ 30.)

21  [10] BRC further notes that it paid BLM $33,856 in 2014, through a separate proffer account, to
    employ a year-round Outdoor Recreation Planner to manage BLM's SRP program for the
22  Burning Man event, including both vending and environmental compliance. (Barnes Decl. at ¶
    10.) As this position was vacant in 2015, BRC did not pay for it, but the position was since been
23  filled. (*Id.*) Thus, in 2016, BRC will be paying for a full-time BLM employee to manage
    Burning Man vending compliance, and BLM will inappropriately seek further reimbursement for
24  vending compliance through cost recovery. (*Id.*)

25  [11] In 2015, BLM claimed that BRC would need to purchase 140 of these special radios for BLM
    because BLM did not have enough radios available. (Declaration of Red Grasso ("Grasso Decl.")
26  at ¶¶ 4-7.) Under its separate MOU with BLM, BRC purchased about half of the radios in 2015.
    (*Id.* at ¶ 8.) BRC recently learned that BLM had more than enough radios available for the 2015
27  Burning Man event, and that it is improper for BLM to be using radios purchased by BRC. (*Id.* at
    ¶¶ 9-12. *See also* Abbey Decl. at ¶ 7.)
28

1    130 hours. (Grasso Decl. at ¶ 3.)

2    • 426 hours and $23,707 for computer and information technology work. (Dolman

3    Decl., Ex. H, Attachment 3, at 2, 4.) BLM has provided BRC with no details to justify this level

4    of expenditures on technology work. Moreover, BRC supplies and pays for all of BLM's

5    technology needs at the Burning Man event site through the parties' separate MOU and SOWs.

6    (*Id.* at ¶ 26.)

7    • 492 hours and $21,086 for work related to BLM's geographic information system

8    ("GIS"). (*Id.*, Ex. H, Attachment 3, at 3, 5.) Despite all this labor, this system failed to operate

9    effectively, and BLM's 2015 AAR concedes that BLM does not even have a list of hardware

10   requirements for the system. (*Id.*, Ex. A at 21.) Furthermore, as discussed above, these costs are

11   among those intended to be covered by the IACR that BLM charged to BRC on all direct costs.

12   (*See* Section IV.B.1.) None of this labor should be charged to BRC.

13   • At least 21 law enforcement officers who worked 168 hours or more during the

14   event, the equivalent of at least 14 12-hour shifts. (*Id.*, Ex. H, Attachment 3, at 1-6.) While some

15   BLM law enforcement personnel must be on site for the duration of event operations to assist

16   with public health and safety issues, BLM has provided BRC with no reasoned explanation for

17   incurring such enormous expenditures on law enforcement labor, as discussed in more detail

18   below. (*See* Section IV.E.3.) Absent a sufficient justification, BRC should not have to pay these

19   costs.

20   • 1,440 hours and $99,646 to train, certify and use canine units in connection with

21   law enforcement activities at the Burning Man event. (Dolman Decl., Ex. H, Attachment 3, at 1,

22   2, 4, 5.) BLM has provided no justification for spending so much money on this optional law

23   enforcement tool, particularly when PCSO is the primary enforcer of controlled substance laws at

24   the event. (Declaration of Roger Vind ("Vind Decl.") at ¶ 9; Abbey Decl. at ¶ 8; Dolman Decl. at

25   ¶ 28; *see also* Section IV.E.3.a.)

26   BLM's excessive labor charges for the Burning Man SRP result in part from its use of

27   inefficient and superfluous personnel at the event site. For example, in 2015, BLM was

28   represented by at least 11 personnel — five civilian staff and six law enforcement officers — at

1442965.3

31

DOWNEY BRAND LLP

1   daily operational meetings with BRC, while BRC was comprehensively represented by no more

2   than five staff members at these meetings. (Dolman Decl. at ¶ 31.)

3        Another employee with superfluous hours was BLM's new Safety Officer, who was

4   purportedly engaged to work with BRC's Safety Officer and confirm that the largely inaccurate

5   and inflated health and safety concerns identified by BLM in its March 2015 letter had been

6   resolved. (*Id.* at ¶ 32.) BRC was charged for 239 hours of labor by the BLM Safety Officer,

7   totaling nearly $17,000, so that he could shadow BRC's Safety Officer and identify a handful of

8   issues requiring follow up. (*Id.* See also Dolman Decl., Ex. A at 11.)

9        BLM's Project Log also does not indicate whether BRC is being charged for labor spent

10  on unjustified projects. For example, BLM should not seek reimbursement for any costs

11  associated with its aborted Blue Pit project or other VIP planning costs, as discussed above. (*See*

12  Section II.D.2.) Yet the data provided by BLM makes it impossible to know if such costs have

13  been excluded.

14       Nor does the Project Log indicate the pay level of the personnel BLM engages to work the

15  event, why a particular pay level is needed for each job, and why a certain number of staff is

16  needed to perform a certain function. To ensure that the permittee is not charged unnecessarily

17  high costs for labor, BLM should use the lowest level required for each position that it staffs in

18  connection with the SRP. 43 U.S.C. § 1734(a), (b); *Bookcliff Rattlers*, 171 IBLA at 21. In its

19  2015 AAR, *BLM recommends a lower GS level for environmental compliance management than*

20  *has been employed for the past three years.* (Dolman Decl., Ex. A at 8 ("The 2016

21  Environmental Compliance Team Lead can be recruited at a grade level below the GS-13 who

22  has served in the position during the last three events.").) BLM also has not shown why it needed

23  11 compliance personnel in 2015, as opposed to fewer, particularly since BRC's own staff

24  handled the vast majority of compliance issues. (Barnes Decl. at ¶ 32.)

25       Finally, BLM staffs the event with three 12-hour shifts per day, for a total of 36 hours of

26  coverage for each 24-hour day. (Dolman Decl. at ¶ 33.) BLM has informed BRC staff that the

27  overlapping shift from 4 pm to 4 am is needed so that BLM has additional officers available

28  during those allegedly "peak" times. (*Id.*) BLM has not adequately explained its claimed need

1442965.3

32

DOWNEY BRAND LLP

1    for more on-shift officers or for this significant shift overlap. BRC should not be required to pay

2    for the additional labor and overtime necessitated by BLM's deliberate inefficiencies.

3        BLM's unwillingness — and likely inability — to provide BRC with a sufficient

4    explanation of what these workers did for thousands of hours suggests that BLM is using the

5    Burning Man cost recovery process to inappropriately fund BLM training and career

6    development, make up for poor planning on BLM's part, and fill shortfalls in the annual budget

7    of the BLM Winnemucca District Office and other BLM offices that benefit from the labor

8    revenue. (Allen Decl. at ¶ 19.) BRC is entitled to a full accounting of BLM's labor costs, and a

9    reduction in the amount charged through cost recovery for any labor unnecessary to the

10   administration of BRC's SRP.

### 2.    BRC should not be charged any costs associated with BLM's unjustified designation of Burning Man as an "emergency event."

12   As discussed above, BLM erroneously designated the Burning Man SRP as an emergency

13   event in 2012. (*See* Section II.C.1.) Due to BLM's failure to provide sufficient documentation of

14   its labor costs, BRC is unable to confirm whether this designation, and the associated premium

15   pay for BLM staff, applied to subsequent Burning Man events, including 2015. (Allen Decl. at ¶

16   10.)

17       An "emergency event" is a "temporary condition posing a direct threat to human life or

18   property, including a forest wildfire emergency." 5 CFR § 550.103. The emergency declaration

19   must be made only by the agency head, and can only be made <u>after</u> the emergency has begun. 5

20   CFR § 550.106(a)(1). It is obvious that Burning Man does not meet the definition of an

21   emergency event. It is a recreational event, not a natural disaster, carefully planned for months in

22   advance as a collaborative effort among BRC, BLM, and all cooperating agencies. BLM's

23   arbitrary designation of any Burning Man SRP as an "emergency event" therefore violates BLM

24   regulations. BLM should be required to clarify whether its 2015 costs include premium pay,

25   hazard pay, or other costs resulting from an unlawful emergency designation, and, if so, all such

26   costs must be excluded.

27

28

DOWNEY BRAND LLP

33

**3. BLM has not justified its law enforcement officer staffing levels.**

In 2012, the number of BLM law enforcement officers working at the Burning Man event increased by 37%, from 51 to 70, while the event's population grew by just 4%. (Allen Decl. at ¶¶ 7, 8.) BLM failed to adequately justify those enormous increases in law enforcement staffing, and its law enforcement costs have continued to climb without sufficient explanation. (*Id.* at ¶ 9.) In 2015, BLM charged BRC approximately $940,000 for law enforcement labor costs — 62% of BLM's total labor expenditures and more than a third of the total amount charged to BRC through cost recovery. (Dolman Decl., Ex H, Attachments 1, 3.)

BLM has never provided BRC with documentation sufficient to justify a particular number of federal law enforcement officers or a particular level of staffing is necessary at the event. (Allen Decl. at ¶ 11.) Indeed, BLM has not even identified how many federal law enforcement officers worked at the 2015 Burning Man event or were on shift at any given time. In addition to the 70 BLM officers purportedly present, an unspecified number of U.S. Forest Service and U.S. Park Police officers were on site pursuant to their contracts with BLM. (*See* Sections IV.C.2.a, b.) To BRC's knowledge, BLM has also never conducted an objective assessment in order to determine the number of law enforcement officers needed to ensure public health and safety at the event. (Allen Decl., Exs. C1 at 4-7, C4 at 4-6.) BRC should not be required to reimburse BLM's massive law enforcement labor costs unless and until an objective assessment, aligned with cost recovery regulations, determines that BLM's chosen level of law enforcement is truly needed to support public safety at the Burning Man event.

The need for such an assessment is obvious. Based on the available statistical information, BLM's law enforcement labor costs over the last several years, including in 2015, far exceeded what was required to ensure public health and safety at the Burning Man event.

      a.    <u>BRC should not be charged the labor costs associated with BLM's unreasonably aggressive law enforcement tactics.</u>

Person-on-person and other serious crimes are exceedingly rare at Burning Man, as are injury-causing traffic accidents. (Benson Decl. at ¶ 10; Barnes Decl. at ¶ 35.) BLM therefore cannot reasonably rely on safety concerns to justify law enforcement labor costs on the order of

DOWNEY BRAND LLP

1    $1 million for the Burning Man event.  Instead, BLM has resorted to using aggressive law

2    enforcement tactics aimed at intimidating and harassing Burning Man participants and staff.

3    (Vind Decl. at ¶ 4.)  These tactics include conducting traffic stops for minor mechanical

4    infractions like a dust-obscured license plate; using multiple vehicles and as many as eight

5    officers to conduct a single traffic stop; advising participants that if they do not consent to a

6    search of their vehicle, BLM will detain them and bring in a canine unit; and seizing packages

7    sent through the U.S. Postal Service intended for delivery to event participants.  (Vind Decl. at ¶

8    4; Dolman Decl. at ¶ 35.)

9           BLM has never documented whether these various techniques, and their substantial

10    associated costs, have resulted in any discernible improvements to public safety and security.  In

11    fact, there is every reason to believe that BLM's excessive law enforcement presence adversely

12    impacts public safety at the event.  BLM law enforcement officers have created public safety

13    issues by speeding through congested pedestrian areas and across the open playa when not

14    responding to an emergency, and by driving without headlights or any lights at night.  (Vind Decl.

15    at ¶ 5.)  And after the 2015 Burning Man event, members of the House Committee on Oversight

16    and Government Reform launched a Congressional Inquiry into the conduct of BLM law

17    enforcement personnel in Utah and Nevada, citing specific concerns around "bullying and

18    intimidation" of Burning Man participants at the Burning Man event.  (Benson Decl. at ¶ 12; Exs.

19    G, H.)

20           While the federal government may be authorized to conduct self-initiated law enforcement

21    activity, like traffic stops and package seizures (as distinct from dispatched responses or calls for

22    service), BLM is violating cost recovery regulations by charging BRC for aggressive officer-

23    initiated activities lacking any valid public safety justification.  BLM has provided no

24    documentation or data showing that its extensive, proactive law enforcement efforts have

25    improved public safety or reduced crime.  To the contrary, the U.S. Attorney's office apparently

26    has no interest in prosecuting the citations that BLM issues at Burning Man.  Since at least 2008,

27    virtually every BLM citation for possession of a controlled substance or driving under the

28    influence has been either dismissed outright or reduced to a much lesser charge, like lack of

DOWNEY BRAND LLP

1442965 3

35

1   working taillights or littering, if the participant challenged the citation. (Declaration of David S.

2   Levin ("Levin Decl.") at ¶¶ 4, 5.) BRC should not be required to pay the costs associated with

3   BLM's aggressive tactics and unjustified law enforcement activities with respect to minor

4   infractions.

5                                    *(1)      Unnecessary traffic stops.*

6          Since 2013, BLM has focused much of its law enforcement activity on "traffic safety"

7   stops on the temporary dirt road that BRC constructs off the county road for event entrance and

8   egress (the "Gate Road"). (Barnes Decl. at ¶ 33.) BLM typically initiates these traffic stops for

9   violations of restrictions set out in the temporary Closure Order BLM issues in conjunction with

10  the Burning man event every year. (*Id.*, Ex. I.)

11         The intended purpose of the Closure Order is "to protect public safety and resources on

12  public lands within and adjacent to the Burning Man event on the Black Rock Desert playa." (*Id.*

13  at 1.) The Closure Order restricts activities during the event that are otherwise lawful on the

14  Black Rock playa the rest of the year, such as firearm use (banned by BRC at Burning Man),

15  unrestricted driving speeds (regulated by BRC during Burning Man), and aircraft landings

16  (managed by BRC during Burning Man), but it is not intended to duplicate existing federal or

17  state regulations that already apply year-round on the site. (*Id.*; *see also* Allen Decl., Ex. A at I-

18  42 ("The BLM … may not additionally stipulate or otherwise regulate matters that are the

19  responsibility of other federal, state, or local agencies. The BLM's stipulations must not conflict

20  with other agency regulations and requirements where other agencies have clear jurisdiction.")

21         Since 2013, however, BLM has insisted that the Burning Man Closure Order include a

22  number of restrictions that duplicate, overlap, and/or conflict with existing permanent federal

23  regulations, as well as state and county laws. (Barnes Decl., Ex. I at 7-13.) Many of these

24  restrictions relate to motor vehicle operation, like possessing a valid driver's license and

25  registration and having certain headlights, taillights, and license plates.[12] (*Compare, e.g., id.* at 11

---

[12] Additional restrictions relate to driving under the influence of alcohol or dangerous drugs,

27  possession of an open container by the driver of a vehicle, disorderly conduct, and furnishing
    alcohol to a minor, all of which are prohibited by existing law. (*Compare, e.g.,* Barnes Decl., Ex.

28  I at 10-11 (Closure Order restriction against disorderly conduct) *with* NRS 203.010, *et seq.*

DOWNEY BRAND LLP

1   (Closure Order restriction mandating driver's license) and 12 (Closure Order restriction

2   regulating headlights and taillights), *with* NRS 483.230 (state law mandating driver's license) and

3   NRS 484D.100, 130 (state laws regulating headlights and taillights).)

4          Every year, BRC separately contracts with PCSO to enforce these existing state and local

5   laws at the Burning Man event. (Dolman Decl. at ¶ 28.) Given that serious crimes and injury-

6   causing automobile accidents are extremely rare at the event, BLM has no reasonable basis for its

7   apparent determination that more than 70 of its own law enforcement officers, plus a number of

8   Park Police and Forest Service Officers, are also required to enforce minor traffic and other

9   infractions. (Benson Decl. at ¶ 10; Barnes Decl. at ¶ 35.)

10          There is a 10 mile-per-hour suggested speed limit for vehicles on Gate Road during the

11   event, and a five mile-per-hour suggested speed limit for the approximately 600 BRC-licensed art

12   cars (vehicles that have been artistically modified), the only vehicles allowed to drive within the

13   event site (other than staff, emergency services, and government agency vehicles). (Barnes Decl.

14   at ¶¶ 35, 36.) Minor offenses like unlit taillights and obscured license plates simply do not pose

15   public health and safety risks sufficient to justify the hundreds of traffic stops that BLM conducts.

16          At the 2015 event, BLM law enforcement conducted 899 traffic stops at a cost of

17   thousands of man hours and hundreds of thousands of dollars to BRC. (Dolman Decl., Ex. A at

18   37.) BLM is overstepping its jurisdiction by enforcing motor vehicle restrictions in the Closure

19   Order after vehicles have left the state highway for Burning Man's temporary Gate Road. Worse,

20   BRC understands that many BLM traffic stops at the Burning Man event result from insufficient

21   training of BLM officers in event speed restrictions and other protocols, or in state laws

22   pertaining to motor vehicle or trailer operation. (Vind Decl. at ¶ 6.) BLM's 2015 AAR concedes

23   this point. (Dolman Decl., Ex. A at 22.) For example, numerous vehicles entering the event site

24   are from states that do not require a license plate on the front of a car or the back of a small

25   trailer, and they are lawfully allowed to drive in Nevada without these plates under applicable

26   reciprocity laws, but BLM officers have nonetheless pulled them over and issued citations to the

27   (Nevada laws prohibiting breaches of peace) and 36 CFR 2.34 (federal regulation prohibiting

28   disorderly conduct).)

1442965.3

37

1   drivers of these vehicles. (Vind Decl. at ¶ 6; NRS 482.395 (Nevada law authorizing reciprocal

2   agreements with other states regarding motor vehicle registration, conduct, and operation).) It is

3   unreasonable to require BRC to pay for BLM's use of inadequately trained or misinformed

4   officers to erroneously enforce state laws that are not the primary jurisdiction of those officers. If

5   anything, these consistent errors confirm precisely why these issues should not be handled by

6   BLM.

7        BLM's own regulations expressly prevent it from usurping the law enforcement powers of

8   state and local police. *See* 43 C.F.R. § 8365.1-7 ("Except as otherwise provided by Federal law

9   or regulation, State and local laws and ordinances shall apply and be enforced by the appropriate

10  State and local authorities. This includes, but is not limited to, State and local laws and

11  ordinances governing: (a) Operation and use of motor vehicles, aircrafts and boats; ... (d) Injury

12  to persons, or destruction or damage to property."). BLM is not authorized to promulgate

13  temporary restrictions that duplicate existing state and local laws, and BRC should not be charged

14  for any BLM time spent policing restrictions that BLM did not have the authority to enforce.

15       The available evidence indicates that BLM includes unnecessary and redundant

16  restrictions in the Burning Man Closure Order (such as motor vehicle restrictions that already

17  exist under state law) for the purpose of artificially inflating the number of citations issued by

18  BLM, and thereby improperly justifying increases in its own law enforcement staffing at the

19  event. BLM is entitled to police the Burning Man event for violations of laws and restrictions

20  that BLM has jurisdiction to enforce. But charging BRC for excessive extra-jurisdictional law

21  enforcement responses, or harassing and intimidating deterrent tactics, violates cost recovery

22  guidelines, not to mention potentially infringes on the constitutional rights of Burning Man

23  participants to freely associate and enjoy the event.

24            *(2)     Unwarranted anti-trafficking activities.*

25       Due to the lack of traffic safety concerns at the Burning Man event, BRC has questioned

26  the high number of traffic stops conducted by BLM. (Barnes Decl. at ¶ 37.) BLM has conceded

27  that it implements "traffic stops" for the purpose of finding illegal narcotics. (*Id.*) Although

28  BLM has not provided BRC with any documentation demonstrating how much of BLM's 2015

1442965.3

38

DOWNEY BRAND LLP

1   law enforcement costs were dedicated to enforcement of controlled substance laws, BRC

2   understands that some BLM law enforcement officers spend one-third to one-half of their 12-hour

3   shifts conducting traffic stops on Gate Road for this purpose. (*Id.*) There is simply no

4   justification for these aggressive law enforcement activities.

5   In 2014, BLM issued no citations for trafficking a controlled substance; in 2015, it issued

6   just two such citations. (Dolman Decl., Ex. A at 38.) Likewise, BRC's medical statistics show

7   that illegal drugs do not pose a substantial public safety risk at the event. In the last several years,

8   BRC's advanced care medical facility has only treated between 0.04% and 0.07% of Burning

9   Man's total population for drug-related complaints. (Benson Decl. at ¶ 11.) As noted above, to

10  address the exceedingly low incidence of serious criminal activity at the event, BRC already

11  contracts with PCSO to carry out law enforcement activities at the event. (Dolman Decl. at ¶ 28.)

12  BLM's law enforcement staffing simply exceeds what is necessary for public safety at Burning

13  Man. (Vind Decl. at ¶¶ 8, 9.)

14  Given the extremely low incidence of trafficking, BLM's extensive use of canine units to

15  search for contraband is also unjustified. BRC should not be required to pay the substantial costs

16  associated with the canines and the officers who train and oversee them, absent evidence that

17  canine units have a significant positive impact on health and safety that is unachievable through

18  less expensive means. (Dolman Decl., Ex. H, Attachment 3, at 1, 2, 4, 5; Abbey Decl. at ¶ 8;

19  Vind Decl. at ¶ 9.) SRP permittees should only be responsible for costs necessary to the

20  management of related the SRP per cost recovery guidelines. 43 CFR 2932.31(e)(3) ("Cost

21  recovery charges will be limited to BLM's costs of issuing the permit, including necessary

22  environmental documentation, on-site monitoring, and permit enforcement."). (*See also* Abbey

23  Decl. at ¶ 5.) BRC is aware of no legal precedent for charging a private organization for BLM's

24  unnecessarily aggressive enforcement of controlled substances laws, including the use of canine

25  units on public lands. (Abbey Decl. at ¶ 8.)

26  BRC also does not condone, nor should it be required to pay for, harassing or intimidating

27  law enforcement tactics or the use of sham traffic stops to address a drug trafficking problem that

28  does not exist and to issue citations for drug possession that the U.S. Attorney is unwilling to

1442965.3

39

DOWNEY BRAND LLP

1  prosecute. (Levin Decl. at ¶ 4.) Given the extremely low incidence of serious narcotics crimes at

2  the event, BLM is using a sledgehammer to crack a nut. BRC should not be held responsible for

3  BLM's internal interest in artificially increasing citation numbers to justify further law

4  enforcement expenditures at the event. (*Id.* at ¶ 6.) BLM law enforcement has the right to police

5  public lands, but under cost recovery guidelines, BLM must demonstrate a rational basis for

6  charging BRC for these aggressive enforcement efforts. *Bookcliff Rattlers*, 171 IBLA 13; *Larry*

7  *Amos*, 163 IBLA 188. BLM has failed to do so.

8                         *(3)     Interference with U.S. mail.*

9            BRC objects to being required to pay for time spent by BLM law enforcement officers on

10  inspecting and confiscating packages sent via the U.S. Postal Service. In 2015, according to

11  reports received by BRC and a published news article, BLM seized a number of packages and

12  letters that had been delivered from the U.S. Post Office in Gerlach into the custody of an

13  individual for delivery to participants in Black Rock City. (Dolman Decl. at ¶ 35; Exs. I, J.) This

14  individual leads a theme camp called the Black Rock City Post Office, which provides package

15  deliveries as a complimentary service to other participants. (*Id.* at ¶ 35.)

16            Postal package inspection, investigations, and management are under the jurisdiction of

17  the United States Postal Service and the FBI. *See, e.g.*, 18 U.S.C. § 3061. BLM has not

18  demonstrated that it had jurisdiction to seize those packages or whatever property was contained

19  within them, or that its seizures were justified. BLM also has not revealed whether any of the

20  packages contained illegal contraband, or whether any citations were issued or arrests made in

21  connection with the seizures. When BRC staff inquired about the outcome of the confiscated

22  packages, BLM declined to provide that information, but advised that BLM law enforcement

23  would not be conducting these postal package inspections at future Burning Man events.

24  (Dolman Decl. at ¶ 36.) BRC therefore believes that these tactics was unnecessary, provided no

25  public safety benefit, and exceeded BLM's jurisdiction. Absent evidence that this law

26  enforcement activity had any positive impact on public safety at the event, BRC objects to paying

27  for any of BLM's costs related to the duplicative and unnecessary tracking, inspection, or

28  confiscation of these packages.

DOWNEY BRAND LLP

**4.    BRC personnel expertly manage health and safety issues at Burning Man and must be taken into account in determining appropriate BLM law enforcement levels.**

BLM's law enforcement staffing levels also fail to properly account for BRC's safety record and operational expertise, or for the civically engaged participants who attend the event. Public health and safety at the event is paramount to BRC, and its prioritization of health and safety for all attendees is reflected by the event's exceptional public health and safety track record. (Dubois Decl. at ¶¶ 6, 7.) BRC commits significant human and financial resources each year to all aspects of public health and safety at the Burning Man event. (*Id.* at ¶ 8.) BRC's planning for the Burning Man event is a year-round process that involves significant levels of cooperation across a range of federal, state, and county agencies and contractors. (*Id.* at ¶ 9.)

As discussed above, BRC engages thousands of qualified and experienced health and safety personnel to plan and staff the event. (*See* Section II.B.) In collaboration with cooperating agencies, BRC's personnel develop detailed operational plans to cover multiple contingencies, including advanced and basic medical care, law enforcement, traffic safety, city planning, communications, community response and mediation, inspections, permitting, vehicle licensing, child welfare, crisis intervention, fire prevention and fire response, hazardous materials identification and removal, perimeter security, gate operations, and extensive volunteer training. (Dubois Decl. at ¶ 9.) BRC believes its efforts to be unparalleled in other special events or temporary mass gatherings, and they have led to BRC's superlative safety record. (*Id.*)

In the vernacular of law enforcement, BRC's health, safety, and security personnel must be considered "force multipliers," or factors that dramatically increase (or multiply) the effectiveness of law enforcement at the event. (Vind Decl. at ¶ 7.) Prior to the 2015 event, BLM's Special Agent in Charge advised BRC that because Burning Man is an event rather than a municipality, a lower ratio of law enforcement officers to population was appropriate for Burning Man, and force multipliers like the Black Rock Rangers should be taken into account in assessing the need for law enforcement. (Allen Decl. at ¶ 25.) Despite this acknowledgement of BRC's professional public health and safety staff, BLM does not appear to have accounted for them in law enforcement planning for the 2015 event. (*Id.*) BRC objects to paying BLM's costs resulting

1442965.3

41

DOWNEY BRAND LLP

1  from excessive law enforcement staffing levels.

2  **5.      BLM is improperly charging BRC for the use of law enforcement officers to**
3  **provide unnecessary community and civilian services.**

4  Because BLM engaged far more law enforcement officers than were actually needed to

5  fulfill BLM's primary law enforcement responsibilities, BLM assigned duties to these officers

6  that are the responsibility or primary jurisdiction of other agencies, and/or the responsibility of

7  BRC as the permittee. (Dolman Decl., Exs. H, Attachment 3; A at 5-9.) BLM has not provided a

8  reasoned and factual explanation of why these activities are necessary to the administration of

9  BRC's permit, and the available evidence indicates that they are not. BRC should not be required

10 to pay the labor costs for activities that are redundant, unnecessary, or beyond the scope of

11 BLM's authority.

12 a.      BRC should not be charged for unnecessary time spent by BLM law
enforcement officers on "community policing."

13 In 2013, BLM began using law enforcement methods that it termed "community policing"

14 at the Burning Man event. (Allen Decl. at ¶ 21.) BLM told BRC that these methods would

15 enable BLM law enforcement to move away from more aggressive tactics. (*Id.*) As the recent

16 Congressional inquiry illustrates, this has not been the case. (Benson Decl., Ex. H.) BRC has not

17 received an adequate explanation from BLM of the value of its community policing efforts or

18 why BRC should incur the associated cost. (*Id.* at ¶¶ 21, 22.)

19 One aspect of the program has been the introduction of a law enforcement substation in

20 the center of Black Rock City where participants can report crimes. (Barnes Decl. at ¶ 38.) BLM

21 has provided BRC with minimal information about crime reports collected by BLM at this

22 location, but given Burning Man's safety record and the numerous other channels that exist for

23 reporting a crime, the value of this substation to BRC and overall health and safety at the event is

24 extremely limited. (*Id.*) Indeed, BLM reports that the officers at this substation mainly engage in

25 public outreach, an unnecessary service that is redundant to BRC's Earth Guardians and Black

26 Rock Rangers. (*Id.*; Dolman Decl., Exs. A at 25-27, D at 7-8, 52-53.) BRC understands that two

27 hours of every law enforcement shift at the event are devoted to staffing this substation. (Barnes

28 Decl. at ¶ 38; Vind Decl. at ¶ 11.) BRC should not be required to pay these unnecessary staffing

DOWNEY BRAND LLP

1    costs.

2           BLM has also stated that law enforcement officers now assist participants with directions

3    and information, noting in its 2015 AAR that its officers engaged in 1,474 public assists and

4    1,595 public contacts. (Dolman Decl., Ex. A at 26.)  While BRC appreciates BLM's desire to

5    assist and engage with participants at the Burning Man event, these activities are not required to

6    administer Burning Man's SRP.  Community policing efforts may be appropriate in certain

7    municipalities when taxpayers are funding the program, but Burning Man does not require these

8    efforts and BRC should not be obligated to pay for them.  BRC has thousands of its own staff and

9    volunteers, a fully staffed "Playa Info" camp, a 24-hour radio station, maps, a Survival Guide,

10   and numerous other information channels to assist participants, including the participants

11   themselves. (Dolman Decl. at ¶ 6.)  Given the lack of justification for BLM's community service

12   efforts, charging BRC for their cost is patently unreasonable and violates cost recovery

13   guidelines.

14          b.      BRC should not be charged for unnecessary time spent by BLM law
                    enforcement officers on environmental compliance issues.
15

16          In its 2015 AAR, BLM advised that it had shifted more law enforcement focus to

17   environmental compliance, education, and enforcement "[d]ue to the increased focus PCSO

18   placed on possession of controlled substance cases during the 2015 event." (Dolman Decl., Ex. A

19   at 30.)  In other words, PCSO's heightened focus on controlled substance cases made it

20   unnecessary for BLM to devote the same number of officers to that work.  But rather than

21   eliminating those law enforcement positions, BLM sought to create new work for them in the

22   form of environmental enforcement, thereby unreasonably increasing costs to BRC.  To be

23   entitled to cost recovery, BLM needs to demonstrate that the use of all personnel is necessary for

24   the administration of BRC's permit. *Bookcliff Rattlers*, 171 IBLA at 21; 43 CFR 2932.31(e)(3).

25   But BLM has never provided a justification for having law enforcement officers take a more

26   prominent role in environmental compliance, and BRC is aware of no evidence that doing so is

27

28

DOWNEY BRAND LLP

1    "necessary."[13]

2         To the contrary, Burning Man has a robust environmental compliance ethos and is the

3    largest Leave No Trace event in the world. (Barnes Decl. at ¶ 5; Dolman Decl., Ex. D at 4.)

4    Three years ago, BRC co-developed an environmental outreach and compliance program with

5    BLM's Civilian Operations division to identify, document, mitigate, and adjudicate gray water,

6    black water, fuel safety, and hydrocarbon issues. (Barnes Decl. at ¶ 5.) BRC's outreach teams,

7    the Black Rock Rangers and Earth Guardians, take the lead in identifying and ameliorating

8    environmental issues in partnership with Burning Man participants. (*Id.*) BLM's 2015 AAR

9    commends the efforts of the Black Rock Rangers and Earth Guardians, suggesting that they be

10   recognized as partners and receive written thanks, and even indicates that the partnership be

11   nominated for the annual BLM Making a Difference Volunteer Award. (Dolman Decl., Ex. A at

12   8.)

13        BRC should not have to pay BLM for the unjustified use of law enforcement officers on

14   environmental compliance issues. As the proponent and permittee, BRC is accountable for the

15   event's compliance with stipulations and the SRP, and BRC should continue to have primary

16   responsibility for educating participants about, and monitoring and ensuring compliance with,

17   environmental rules and regulations at the event. The assistance of BLM law enforcement in this

18   area is not required except in the rare instance that a particular compliance issue merits escalation.

19   BRC and the BLM Civilian Operations compliance team have an excellent track record of

20   escalating problematic compliance issues to law enforcement. (Barnes Decl. at ¶ 5.) BLM has

21   never documented a problem with the way these issues were handled.

22        BRC should not have to pay for an unjustified increased focus on environmental

23

24   [13] BLM's 2015 AAR claims that its increased environmental compliance efforts caused "the
     number of citations issued for waste water dumping [to] drastically increase[], as did the number
25   of citations issued for depositing of human waste." (Dolman Decl., Ex. A at 39.) In fact, BLM
     issued just 128 environmental compliance-related citations in 2015, out of 5,584 total contacts.
26   (*Id.* at 4.) This remarkably low citation rate demonstrates that the principal purpose served by
     BLM's increased environmental compliance efforts in 2015 was to give law enforcement officers
27   something to do, since staffing levels exceeded what was necessary for the event. (Vind Dec. at ¶
     11.)
28

1442965.3                                    44

DOWNEY BRAND LLP

1    compliance by BLM law enforcement simply because these officers did not have anything else to

2    do at the event.  In 2015, the joint BRC-BLM environmental compliance team identified 637

3    environmental violations, but only 12 resulted in BLM law enforcement citations.  (*Id.*)  This type

4    of self-initiated activity supports the conclusion that BLM law enforcement staffing levels exceed

5    what is required for administration of Burning Man's SRP.  (Vind Decl. at ¶ 11.)

6                              V.    **CONCLUSION**

7                For more than 25 years, BRC and its predecessors have successfully produced the Burning

8    Man event in the Black Rock Desert, and the annual gathering has developed from a weekend

9    camping trip for a few dozen people into a temporary metropolis of nearly 70,000 participants in

10   2015.  As part of its commitment to public health and safety in producing the event each year,

11   BRC cooperates with BLM and dozens of other federal, state, and local agencies; engages

12   thousands of professional and experienced staff and volunteers in event operations; and fosters a

13   community of participants who value principles like self-reliance and communal effort.

14               BRC has long understood and complied with its obligation to reimburse BLM for its

15   reasonable and necessary expenses incurred in administering the Burning Man permit.  For the

16   last several years, however, BLM's claimed expenses have skyrocketed without sufficient

17   justification and beyond any demonstrated need.  Again for the 2015 SRP, BLM's Final Decision

18   on cost recovery failed to comply with its obligations to provide BRC with a reasoned and factual

19   explanation for BLM's claimed costs.  As explained herein, the available evidence indicates that

20   many of these costs were arbitrary, duplicative, or otherwise unreasonable.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

DOWNEY BRAND LLP

1442965.3

45

1  Therefore, and for all of the foregoing reasons, BRC respectfully requests that the IBLA

2  disallow all unjustified costs included in BLM's 2015 Final Decision, and remand this appeal as

3  necessary to BLM to itemize all unexplained costs in order for those amounts to be properly

4  refunded to BRC.

5

6  DATED: April 26, 2016                     DOWNEY BRAND LLP

7

8                                           By:_____

9                                               ELIZABETH B. STALLARD
                                                Attorney for Appellant
10                                              BLACK ROCK CITY LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOWNEY BRAND LLP

APPELLANT'S STATEMENT OF REASONS                    AR04639