

U.S. Department of the Interior
Bureau of Land Management

# News Release

NEVADA STATE OFFICE NO. 2016-23
FOR RELEASE: July 1, 2016
CONTACT: Rudy Evenson, 775-861-6411, revenson@blm.gov

### BLM Issues Temporary Closure As Organizers Prepare for Burning Man

Winnemucca, Nev. – The Bureau of Land Management (BLM) Winnemucca District Office announced in the *Federal Register* on Friday, July 1, 2016 a temporary closure and temporary restrictions on certain activities on public lands immediately surrounding the physical site of the 2016 Burning Man event. The temporary closure and temporary restrictions provide for public safety and protect public resources, and will be in effect from Aug. 1 through Sept. 21.

Burning Man is a festival held from Aug. 28 through Sept. 5 on BLM public lands in Nevada's Black Rock Desert where nearly 70,000 people are expected to congregate and build a temporary city to celebrate art and self-expression. The temporary closure will remain in effect three weeks prior to and three weeks following the Burning Man event in order to facilitate set up and preparation for the event, including fencing the site perimeter prior to the event, and completing site cleanup following the event.

The temporary closure affects 14,153 acres, or about 13 percent, of the Black Rock playa within the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area (NCA). The temporary closure reserves the 8-Mile entrance to the Black Rock Desert playa solely for Burning Man ticket holders, but all other playa access points and nearly 87 percent of the playa remains open to public use.

Similar temporary closures have been in effect in past years for the Burning Man event and have been implemented with minimal disruption to other public uses and access points within the area.

Temporary restrictions are in effect to underscore that certain activities remain prohibited during the festival. Prohibited activities include disorderly conduct, driving under the influence, under age use of alcohol, possession of weapons, fires, and discharge of waste water within the closure area.

The BLM will post information signs and make maps available to the public that provide detailed information about the temporary closure and temporary restrictions. This information will be available at main entry points around the playa, at the BLM Winnemucca District Office, at the Black Rock Visitor Center, and on the BLM's website. The full text of the *Federal Register* notice can be viewed at http://1.usa.gov/29hx3fC.

## – BLM –

*The BLM manages more than 245 million acres of public land, the most of any Federal agency. This land, known as the National System of Public Lands, is primarily located in 12 Western states, including Alaska. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation. The BLM's mission is to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations.  In Fiscal Year 2015, the BLM generated $4.1 billion in receipts from activities occurring on public lands.*

AR00763

# 2016 Burning Man
## Closure Area

Winnemucca District Office
**Bureau of Land Management**
**U.S. Department of the Interior**



**Black Rock Desert / High Rock Canyon National Conservation Area**

**Legend**

- ⊙ Black Rock City Points
- State Route
- Roads
- Burning Man Closure Area
- Black Rock City Boundary
- BLM National Conservation Area
- BLM Wilderness Study Area
- Bureau of Land Management
- Private

Date: 5/20/2016
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

0   1   2   4
Miles

AR00764   1:100,000

NORTH


NCA Proposed RMP/Final EIS and at 43 CFR 1610.5–2. All protests must be in writing and mailed to the appropriate address, as set forth in the **ADDRESSES** section above. Emailed protests will not be accepted as valid protests unless the protesting party also provides the original letter by either regular or overnight mail postmarked by the close of the protest period. Under these conditions, the BLM will consider the emailed protest as an advance copy and it will receive full consideration. If you wish to provide the BLM with such advance notification, please direct emails to *protest@blm.gov.*

Unlike land use planning decisions, implementation decisions included in this Proposed RMP/Final EIS are not subject to protest under the BLM planning regulations, but are subject to an administrative review process through appeals to the Office of Hearings and Appeals, Interior Board of Land Appeals, pursuant to 43 CFR part 4 Subpart E. Implementation decisions generally constitute the BLM's final approval allowing on-the-ground actions to proceed. Where implementation decisions are made as part of the land use planning process, they are subject to the appeals process or other administrative review as prescribed by specific resource program regulations once the BLM resolves the protests to land use planning decisions and issues an Approved RMP and ROD. The Approved RMP and ROD will, therefore, identify the implementation decisions made in the plan that may be appealed to the Office of Hearing and Appeals.

Before including your phone number, email address, or other personal identifying information in your protest, you should be aware that your entire protest—including your personal identifying information—may be made publicly available at any time. While you can ask us in your protest to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

Authority: 40 CFR 1506.6, 40 CFR 1506.10, 43 CFR 1610.2, 43 CFR 1610.5.

**Ruth Welch,**
*BLM Colorado State Director.*
[FR Doc. 2016–15526 Filed 6–30–16; 8:45 am]
**BILLING CODE 4310–JB–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

[LLNVW00500.L51050000.EA0000. LVRCF1604630 241A; MO#]

### Notice of Temporary Closure and Temporary Restrictions of Specific Uses on Public Lands for the Burning Man Event (Permitted Event), Pershing County, NV

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that under the authority of the Federal Land Policy and Management Act of 1976, as amended (FLPMA), the Bureau of Land Management (BLM) Winnemucca District, Black Rock Field Office, will implement a temporary closure and temporary restrictions to protect public safety and resources on public lands within and adjacent to the Burning Man event on the Black Rock Desert playa.

**DATES:** The temporary closure and temporary restrictions will be in effect from August 1 to September 21, 2016.

**FOR FURTHER INFORMATION CONTACT:** Mr. William Mack, Jr., Black Rock Field Office Manager, Winnemucca District, 5100 E. Winnemucca Blvd., Winnemucca, NV 89445–2921, telephone: 775–623–1500, email: *wmack@blm.gov.* Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 to contact the above individual during normal business hours. The FIRS is available 24 hours a day, 7 days a week, to leave a message or question with the above individual. You will receive a reply during normal hours.

**SUPPLEMENTARY INFORMATION:** The temporary closure and temporary restrictions affect public lands within and adjacent to the Burning Man event permitted on the Black Rock Desert playa within the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area in Pershing County, Nevada. The legal description of the affected public lands in the temporary public closure area is:

Mount Diablo Meridian, Nevada

T. 33 N., R. 24 E., unsurveyed,
　Sec. 1, that portion lying northwesterly of East Playa Road;
　Sec. 2, that portion lying northwesterly of East Playa Road;
　Sec. 3;
　Sec. 4, that portion lying southeasterly of Washoe County Road 34;
　Sec. 5;
　Sec. 8, NE¼;
　Sec. 9, N½;

Sec. 10, N½;
　Sec. 11, that portion of the N½ lying northwesterly of East Playa Road.
T. 33½ N., R. 24 E., unsurveyed,
　Secs. 25, 26, and 27;
　Sec. 28, that portion lying easterly of Washoe County Road 34;
　Sec. 33, that portion lying easterly of Washoe County Road 34;
　Secs. 34, 35, and 36.
T. 34 N., R. 24 E., partly unsurveyed,
　Sec. 23, S½;
　Sec. 24, S½;
　Secs. 25 and 26;
　Sec. 27, E½NE¼, E½SW¼, SE¼;
　Sec. 33, NE¼NE¼, S½NE¼, that portion of the SW¼ lying northeasterly of Washoe County Road 34, SE¼;
　Secs. 34, 35, and 36.
T. 33 N., R. 25 E.,
　Sec. 4, that portion lying northwesterly of East Playa Road.
T. 34 N., R. 25 E., unsurveyed,
　Sec. 16, S½;
　Sec. 21;
　Sec. 22, W½NW¼, SW¼;
　Sec. 27, W½;
　Sec. 28;
　Sec. 33, that portion lying northwesterly of East Playa Road;
　Sec. 34, that portion of the W½ lying northwesterly of East Playa Road.

The temporary closure area comprises approximately 14,153 acres in Pershing County, Nevada.

The public closure is necessary for the period of time from August 1 through September 21, 2016, because of the Burning Man event activities in the area, starting with fencing the site perimeter, final setup, the actual event (August 28 through September 5), initial phases of cleanup, and concluding with final site cleanup.

The public closure area comprises about 13 percent of the Black Rock Desert playa. Public access to other areas of the playa will remain open and the other 87 percent of the playa outside the temporary closure area will remain open to dispersed casual use.

The event area is contained within the temporary closure area. The event area is defined as the portion of the temporary closure area (1) entirely contained within the event perimeter fence, including 50 feet from the outside of the event perimeter fence; and (2) within 25 feet from the outside edge of the event access road; and includes the entirety of the aircraft parking area outside the event perimeter fence.

The temporary closure and temporary restrictions are necessary to provide a safe environment for the participants of the permitted event and for members of the public visiting the Black Rock Desert, and to protect public land resources by addressing law enforcement and public safety concerns associated with the event. The event is expected to attract approximately

70,000 paid participants to a remote rural area, more than 90 miles from urban infrastructure and support, including public safety, transportation, and communication services. During the event, Black Rock City, the temporary city associated with the event, becomes one of the largest population areas in Nevada. This event is authorized on public land under Special Recreation Permit #NVW03500–16–01.

The permitted event takes place within Pershing County, a rural county with a small population and a small Sheriff's Department. The temporary closure and temporary restrictions are necessary to enable BLM law enforcement personnel to provide for public safety and to protect the public lands, as well as to support and assist state and local agencies with enforcement of existing laws.

A temporary closure and temporary restrictions order, under the authority of 43 CFR 8364.1, is appropriate for a single event. A temporary closure and temporary restrictions order is specifically tailored to the timeframe that is necessary to provide a safe environment for the public and for participants at the Burning Man event, and to protect public land resources while avoiding imposing restrictions that may not be necessary in the area during the remainder of the year.

The BLM will post information signs and maps about the temporary closure and temporary restrictions at main entry points around the playa, at the BLM Winnemucca District Office, at the Nevada State Office, at the Black Rock Visitor Center and on the BLM's Web site: *www.blm.gov/nv/st/en/fo/wfo.html.*

In addition to the Nevada Collateral Forfeiture and Bail Schedule as authorized by the United States District Court, District of Nevada under the authority of Section 303(a) of FLPMA, 43 CFR 8360.0–7, and 43 CFR 8364.1, the BLM will enforce a temporary public closure and the following temporary restrictions will apply within and adjacent to the Burning Man event on the Black Rock Desert playa from August 1 through September 21, 2016:

*Temporary Restrictions*

(a) Environmental Resource Management and Protection

(1) No person may deface, disturb, remove, or destroy any natural object.

(2) Fires/Campfires: The ignition of fires on the surface of the Black Rock playa without a burn blanket or burn pan is prohibited. Campfires may only be burned in containers that are stably elevated above the playa/ground surface and in a manner that do not pose a risk of fire debris falling onto the playa/ground surface. Plastic and other nonflammable materials may not be burned in campfires. The ignition of fires other than a campfire is prohibited. This restriction does not apply to event-sanctioned and regulated art burns during the event.

(3) Fireworks: The use, sale, or possession of personal fireworks is prohibited except for uses of fireworks approved by the permit holder and used as part of a Burning Man-sanctioned art burn event.

(4) Grey and Black Water Discharge: The discharge and dumping of grey water and black water onto the playa/ground surface is prohibited. Grey water is defined as water that has been used for cooking, washing, dishwashing, or bathing and/or contains soap, detergent, food scraps, or food residue, regardless of whether such products are biodegradable or have been filtered or disinfected. Black water is defined as waste water containing feces, urine, and/or flush water.

(5) Human Waste: The depositing of human waste (liquid and/or solid) on the playa/ground surface is prohibited.

(6) Trash: The discharge of any and all trash/litter (Matter Out Of Place (MOOP)) onto the playa/ground surface is prohibited. All event participants must pack out and properly dispose of all trash at an appropriate disposal facility off the playa.

(7) Hazardous Materials: The dumping or discharge of vehicle oil, petroleum products, or other hazardous household, commercial, or industrial refuse or waste onto the playa/ground surface is prohibited. This applies to all recreational vehicles, trailers, motorhomes, port-a-potties, generators, and other camp infrastructure.

(8) Fuel Storage: All fuel must be stored in a designated fuel storage area located at least ten feet away from any flammable materials, including vehicles and camping trailers. Fuel storage areas must be provided with shade to prevent fuel containers from bloating, leaking, or spilling. The storage of more than 110 gallons of fuel in a single camp is prohibited. Storage areas for over 20 gallons of fuel must include a secondary containment measure capable of holding 110 percent of the fuel being stored to prevent leaks and spills onto the playa/ground surface. Storage areas for less than 20 gallons of fuel must include a tarp, plywood, or other measure to prevent leaks and spills onto the playa/ground surface.

(9) Water Discharge: The unauthorized dumping or discharge of water onto the playa/ground surface, onto city streets and/or other public areas, or onto camp electric systems in a manner that creates a hazard or nuisance is prohibited. This provision does not prohibit the use of water trucks contracted by the event organizer to provide dust abatement measures.

(b) Commercial Activities

In accordance with Handbook H–2930–1 Chapter 1–C. Vending and the 2016 Special Recreation Permit Stipulation for the permitted event, ALL venders and air carrier services must provide proof of authorization to operate at the event issued by the permitting agency and/or the permit holder upon request. Failure to provide such authorization would potentially result in eviction from the event.

(c) Aircraft Landing

The public closure area is closed to aircraft landing, taking off, and taxiing. Aircraft is defined in Title 18, U.S.C., section 31(a)(1) and includes lighter-than-air craft and ultra-light craft. The following exceptions apply:

(1) All aircraft operations, including ultra-light and helicopter landings and takeoffs will occur at the designated 88NV Black Rock City Airport landing strips and areas defined by airport management. All takeoffs and landings will occur only during the hours of operation of the airport as described in the Burning Man Operating Plan. All pilots that use the Black Rock City Airport must agree to and abide by the published airport rules and regulations;

(2) Only helicopters providing emergency medical services may land at the designated Emergency Medical Services helicopter pad or at other locations when required for medical incidents. The BLM authorized officer or his/her delegated representative may approve other helicopter landings and takeoffs when deemed necessary for the benefit of the law enforcement operation; and

(3) Landings or takeoffs of lighter-than-air craft previously approved by the BLM authorized officer may occur.

(d) Alcohol/Prohibited Substance

(1) Possession of an open container of an alcoholic beverage by the driver or operator of any motorized vehicle, whether or not the vehicle is in motion, is prohibited.

(2) Possession of alcohol by minors: *The following are prohibited:*

(i) Consumption or possession of any alcoholic beverage by a person under 21 years of age on public lands; and

(ii) Selling, offering to sell, or otherwise furnishing or supplying any alcoholic beverage to a person under 21 years of age on public lands.

AR00766

(3) Operation of a motor vehicle while under the influence of alcohol, narcotics, or dangerous drugs:

(i) Title 43 CFR 8341.1(f)(3) prohibits the operation of an off-road motor vehicle on public land while under the influence of alcohol, narcotics, or dangerous drugs.

(ii) In addition to the prohibition found at 43 CFR 8341.1(f)(3), it is prohibited for any person to operate or be in actual physical control of a motor vehicle while:

(A) The operator is under the combined influence of alcohol, a drug, or drugs to a degree that renders the operator incapable of safe operation of that vehicle; or

(B) The alcohol concentration in the operator's blood or breath is 0.08 grams or more of alcohol per 100 milliliters of blood or 0.08 grams or more of alcohol per 210 liters of breath.

(C) The amount of a prohibited substance in the operator's urine or blood is equal to or greater than the following nanograms per milliliter (ng/ml):

(1) Amphetamine: Urine, 500 ng/ml; blood, 100 ng/ml;

(2) Cocaine: Urine, 150 ng/ml; blood, 50 ng/ml;

(3) Cocaine metabolite: Urine,150 ng/ml; blood, 50 ng/ml;

(4) Heroin: Urine, 2,000 ng/ml; blood, 50 ng/ml;

(5) Heroin metabolite:

(i) Morphine: Urine, 2,000 ng/ml; blood, 50 ng/ml;

(ii) 6-monoacetyl morphine: Urine, 10 ng/ml; blood, 10 ng/ml;

(6) Lysergic acid diethylamide: Urine, 25 ng/ml; blood, 10 ng/ml;

(7) Marijuana: Urine, 10 ng/ml; blood, 2 ng/ml;

(8) Marijuana metabolite: Urine, 15 ng/ml; blood, 5 ng/ml;

(9) Methamphetamine: Urine, 500 ng/ml; blood, 100 ng/ml;

(10) Phencyclidine: Urine, 25 ng/ml; blood,10 ng/ml;

(iii) Tests:

(A) At the request or direction of any law enforcement officer authorized by the Department of the Interior to enforce this closure and restriction order, who has probable cause to believe that an operator of a motor vehicle has violated a provision of paragraph (i) or (ii) of this section, the operator shall submit to one or more tests of the blood, breath, saliva, or urine for the purpose of determining blood alcohol and drug content.

(B) Refusal by an operator to submit to a test is prohibited, and proof of refusal may be admissible in any related judicial proceeding.

(C) Any test or tests for the presence of alcohol and drugs shall be determined by and administered at the direction of an authorized law enforcement officer.

(D) Any test shall be conducted using accepted scientific methods and equipment of proven accuracy and reliability operated by personnel certified in its use.

(iiii) Presumptive levels:

(A) The results of chemical or other quantitative tests are intended to supplement the elements of probable cause used as the basis for the arrest of an operator charged with a violation of paragraph (i) of this section. If the alcohol concentration in the operator's blood or breath at the time of testing is less than alcohol concentrations specified in paragraph (ii)(B) of this section, this fact does not give rise to any presumption that the operator is or is not under the influence of alcohol.

(B) The provisions of paragraph (iv)(A) of this section are not intended to limit the introduction of any other competent evidence bearing upon the question of whether the operator, at the time of the alleged violation, was under the influence of alcohol, a drug or multiple drugs, or any combination thereof.

**iv. Definitions**

(A) Open container: Any bottle, can, or other container which contains an alcoholic beverage, if that container does not have a closed top or lid for which the seal has not been broken. If the container has been opened one or more times, and the lid or top has been replaced, that container is an open container.

(B) Possession of an open container includes any open container that is physically possessed by the driver or operator, or is adjacent to and reachable by that driver or operator. This includes, but is not limited to, containers in a cup holder or rack adjacent to the driver or operator, containers on a vehicle floor next to the driver or operator, and containers on a seat or console area next to a driver or operator.

(e) Drug Paraphernalia

(1) The possession of drug paraphernalia is prohibited.

(2) Definition: Drug paraphernalia means all equipment, products and materials of any kind which are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of any state or Federal law, or regulation issued pursuant to law.

(f) Disorderly Conduct

(1) Disorderly conduct is prohibited. Disorderly conduct means that an individual, with the intent of recklessly causing public alarm, nuisance, jeopardy, or violence, or recklessly creating a risk thereof:

(i) Engages in fighting or violent behavior;

(ii) Uses language, an utterance, or gesture, or engages in a display or act that is physically threatening or menacing, or done in a manner that is likely to inflict injury or incite an immediate breach of the peace.

(iii) Obstructs, resists, or attempts to elude a law enforcement officer, or fails to follow their orders or directions.

(g) Eviction of Persons

(1) The public closure area is closed to any person who:

(i) Has been evicted from the event by the permit holder, whether or not the eviction was requested by the BLM;

(ii) Has been evicted from the event by the BLM; or

(iii) Has been ordered by a law enforcement officer to leave the area of the permitted event.

(2) Any person evicted from the event forfeits all privileges to be present within the perimeter fence or anywhere else within the public closure area even if they possess a ticket to attend the event.

(h) Motor Vehicles

(1) Motor vehicles must comply with the following requirements:

(i) The operator of a motor vehicle must possess a valid driver's license.

(ii) Motor vehicles and trailers must possess evidence of valid registration, except for mutant vehicles, or other vehicles registered with the permitted event organizers and operated within the scope of that registration.

(iii) Motor vehicles must possess evidence of valid insurance, except for mutant vehicles, or other vehicles registered with the permitted event organizers and operated within the scope of that registration.

(iv) Motor vehicles and trailers must not block a street used for vehicular travel or a pedestrian pathway.

(v) Motor vehicles must not exceed the posted speed limit.

(vi) No person shall occupy a trailer while the motor vehicle is in transit upon a roadway, except for mutant vehicles, or other vehicles registered with the permitted event organizers and operated within the scope of that registration.

(vii) Motor vehicles, other than a motorcycle or golf cart, must be equipped with at least two working headlamps, at least two functioning tail lamps and at least two functioning brake lights, except for mutant vehicles, or other vehicles registered with the permitted event organizers and operated within the scope of that registration, so long as they are adequately lit according to Black Rock City, LLC Department of Mutant Vehicle requirements.

(viii) Trailers pulled by motor vehicles must be equipped with at least two functioning tail lamps and at least two functioning brake lights.

(ix) Motor vehicles must display an unobstructed rear license plate that is in a place and position to be clearly visible, maintained free from foreign materials, and in a condition to be clearly legible, except for mutant vehicles, or other vehicles registered with the permitted event organizers and operated within the scope of that registration.

(2) The public closure area is closed to motor vehicle use, except as provided below. Motor vehicles may be operated within the public closure area under the circumstances listed below:

(i) Participant arrival and departure on designated routes;

(ii) BLM, medical, law enforcement, and firefighting vehicles are authorized at all times;

(iii) Vehicles, mutant vehicles, or art cars operated by the permit holder's staff or contractors and service providers on behalf of the permit holder are authorized at all times. These vehicles must display evidence of event registration at all times in such manner that it is visible to the rear of the vehicle while the vehicle is in motion;

(iv) Vehicles used by disabled drivers and displaying official state disabled driver license plates or placards are authorized at all times;

(v) Motorized skateboards, electric assist bicycles, or Go-Peds with or without handlebars;

(vi) Participant drop-off of approved burnable(s) and wood to the Burn Garden/Wood Reclamation Stations (located on open playa at 3:00, 6:00, 9:00 Promenades and the Man base) from 10:00 a.m. Sunday through the end of day Tuesday, post event; and

(vii) Passage through, without stopping, the public closure area on the west or east playa roads.

(viii) Support vehicles for art vehicles, mutant vehicles and theme camps will be allowed to drive to and from fueling stations.

(3) Definitions:

(i) A motor vehicle is any device designed for and capable of travel over land and which is self-propelled by a motor, but does not include any vehicle operated on rails or any motorized wheelchair.

(ii) Motorized wheelchair means a self-propelled wheeled device, designed solely for and used by a mobility-impaired person for locomotion.

(iii) ''Trailer'' means every vehicle without motive power designed to carry property or passengers wholly on its own structure and to be drawn by a motor vehicle. This includes a U-Haul, Camp trailer, pop-up trailer, 4′ x 7′ or larger flatbed trailer, enclosed cargo trailer, or RV style trailer.

(i) Public Camping

The public closure area is closed to public camping with the following exceptions:

(1) The permitted event's ticket holders, who are camped in designated event areas provided by the permit holder;

(2) Ticket holders who are camped in the authorized pilot camp;

(3) The permit holder's authorized staff, contractors, and BLM authorized event managers.

(j) Public Use

The public closure area is closed to use by members of the public, unless that person is traveling through, without stopping, the public closure area on the west or east playa roads; possesses a valid ticket to attend the event; is an employee or authorized volunteer with the BLM, a law enforcement officer, emergency medical service provider, fire protection provider, or another public agency employee working at the event and that individual is assigned to the event; is a person working at or attending the event on behalf of the permit holder; or is authorized by the permit holder to be onsite prior to the commencement of the event for the primary purpose of constructing, creating, designing or installing art, displays, buildings, facilities or other items and structures in connection with the event; or is a commercial operation to provide services to the event organizers and/or participants authorized by the permit holder through a contract or agreement and authorized by BLM through a Special Recreation Permit.

(k) Unmanned Aircraft Systems

(1) The use of unmanned aircraft systems (UAS) is prohibited, unless the operator is registered through and complies with the Remote Control BRC program (RCBRC) and operates the UAS in accordance with Federal laws and regulations.

(2) Definitions:

(i) Unmanned aircraft means an aircraft operated without the possibility of direct human intervention from within or on the aircraft.

(ii) An UAS is the unmanned aircraft and all of the associated support equipment, control station, data links, telemetry, communications and navigation equipment, etc., necessary to operate the unmanned aircraft.

(l) Lasers

(1) The possession and/or use of handheld lasers are prohibited. A laser means any hand held laser beam device or demonstration laser product that emits a single point of light amplified by the stimulated emission of radiation that is visible to the human eye.

(m) Weapons

(1) The possession of any weapon is prohibited except weapons within motor vehicles passing, without stopping, through the public closure area on the west or east playa roads.

(2) The discharge of any weapon is prohibited.

(3) The prohibitions above shall not apply to county, state, tribal and Federal law enforcement personnel who are working in their official capacity at the event.

(4) ''Art projects'' that include weapons and are sanctioned by the permit holder will be permitted after obtaining authorization from the BLM authorized officer.

(5) Definitions:

(i) Weapon means a firearm, compressed gas, or spring powered pistol or rifle, bow and arrow, cross bow, blowgun, spear gun, hand-thrown spear, sling shot, irritant gas device, electric stunning or immobilization device, explosive device, any implement designed to expel a projectile, switch-blade knife, any blade which is greater than 10 inches in length from the tip of the blade to the edge of the hilt or finger guard nearest the blade (e.g., swords, dirks, daggers, machetes), or any other weapon the possession of which is prohibited by state law. Exception: This rule does not apply in a kitchen or cooking environment or where an event worker is wearing or utilizing a construction knife for their duties at the event.

(ii) Firearm means any pistol, revolver, rifle, shotgun, or other device which is designed to, or may be readily converted to, expel a projectile by the ignition of a propellant.

(iii) Discharge means the expelling of a projectile from a weapon.

AR00768

**(n) Penalties**

Any person who violates the above rules and restrictions may be tried before a United States Magistrate and fined in accordance with 18 U.S.C. 3571, imprisoned no more than 12 months under 43 U.S.C. 1733(a) and 43 CFR 8360.0–7, or both.

In accordance with 43 CFR 8365.1–7, State or local officials may also impose penalties for violations of Nevada law.

*Authority:* 43 CFR 8364.1.

**William Mack, Jr.,**
*Black Rock Field Office Manager, Winnemucca District.*

[FR Doc. 2016–15681 Filed 6–30–16; 8:45 am]
BILLING CODE 4310–HC–P

## INTERNATIONAL TRADE COMMISSION

**[Investigation No. 731–TA–856 (Third Review)]**

## Ammonium Nitrate From Russia; Institution of a Five-Year Review

**AGENCY:** United States International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** The Commission hereby gives notice that it has instituted a review pursuant to the Tariff Act of 1930 ("the Act"), as amended, to determine whether revocation of the antidumping duty order on ammonium nitrate from Russia would be likely to lead to continuation or recurrence of material injury. Pursuant to the Act, interested parties are requested to respond to this notice by submitting the information specified below to the Commission;[1] to be assured of consideration, the deadline for responses is August 1, 2016. Comments on the adequacy of responses may be filed with the Commission by September 14, 2016.

**DATES:** *Effective Date:* July 1, 2016.

**FOR FURTHER INFORMATION CONTACT:** Mary Messer (202–205–3193), Office of Investigations, U.S. International Trade Commission, 500 E Street SW., Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202–

205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000. General information concerning the Commission may also be obtained by accessing its internet server (*http://www.usitc.gov*). The public record for this proceeding may be viewed on the Commission's electronic docket (EDIS) at *http://edis.usitc.gov.*

**SUPPLEMENTARY INFORMATION:**
*Background.*—On May 19, 2000, the Department of Commerce suspended an antidumping duty investigation on imports of ammonium nitrate from Russia (65 FR 37759, June 16, 2000). Following five-year reviews by Commerce and the Commission, effective April 5, 2006, Commerce issued a continuation of the suspended investigation on imports of ammonium nitrate from Russia (71 FR 17080). Effective May 2, 2011, Commerce terminated the suspension agreement and issued an antidumping duty order (76 FR 23569, April 27, 2011). Following the second five-year reviews by Commerce and the Commission, effective August 10, 2011, Commerce issued a continuation of the antidumping duty order on imports of ammonium nitrate from Russia (76 FR 49449). The Commission is now conducting a third review pursuant to section 751(c) of the Act, as amended (19 U.S.C. 1675(c)), to determine whether revocation of the order would be likely to lead to continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time. Provisions concerning the conduct of this proceeding may be found in the Commission's Rules of Practice and Procedure at 19 CFR parts 201, Subparts A and B and 19 CFR part 207, subparts A and F. The Commission will assess the adequacy of interested party responses to this notice of institution to determine whether to conduct a full review or an expedited review. The Commission's determination in any expedited review will be based on the facts available, which may include information provided in response to this notice.

*Definitions.*—The following definitions apply to this review:

(1) *Subject Merchandise* is the class or kind of merchandise that is within the scope of the five-year review, as defined by the Department of Commerce.

(2) The *Subject Country* in this review is Russia.

(3) The *Domestic Like Product* is the domestically produced product or products which are like, or in the

absence of like, most similar in characteristics and uses with, the *Subject Merchandise.* In its original determination, its full first five-year review determination, and its expedited second five-year review, the Commission defined the *Domestic Like Product* as all ammonium nitrate corresponding to Commerce's scope.

(4) The *Domestic Industry* is the U.S. producers as a whole of the *Domestic Like Product,* or those producers whose collective output of the *Domestic Like Product* constitutes a major proportion of the total domestic production of the product. In its original determination, its full first five-year review determination, and its expedited second five-year review determination, the Commission defined the *Domestic Industry* as all domestic producers of the *Domestic Like Product.*

(5) An *Importer* is any person or firm engaged, either directly or through a parent company or subsidiary, in importing the *Subject Merchandise* into the United States from a foreign manufacturer or through its selling agent.

*Participation in the proceeding and public service list.*—Persons, including industrial users of the *Subject Merchandise* and, if the merchandise is sold at the retail level, representative consumer organizations, wishing to participate in the proceeding as parties must file an entry of appearance with the Secretary to the Commission, as provided in section 201.11(b)(4) of the Commission's rules, no later than 21 days after publication of this notice in the **Federal Register**. The Secretary will maintain a public service list containing the names and addresses of all persons, or their representatives, who are parties to the proceeding.

Former Commission employees who are seeking to appear in Commission five-year reviews are advised that they may appear in a review even if they participated personally and substantially in the corresponding underlying original investigation or an earlier review of the same underlying investigation. The Commission's designated agency ethics official has advised that a five-year review is not the same particular matter as the underlying original investigation, and a five-year review is not the same particular matter as an earlier review of the same underlying investigation for purposes of 18 U.S.C. 207, the post employment statute for Federal employees, and Commission rule 201.15(b) (19 CFR 201.15(b)), 79 FR 3246 (Jan. 17, 2014), 73 FR 24609 (May 5, 2008). Consequently, former employees are not required to seek Commission approval

---

[1] No response to this request for information is required if a currently valid Office of Management and Budget (OMB) number is not displayed; the OMB number is 3117–0016/USITC No. 16–5–359, expiration date June 30, 2017. Public reporting burden for the request is estimated to average 15 hours per response. Please send comments regarding the accuracy of this burden estimate to the Office of Investigations, U.S. International Trade Commission, 500 E Street SW., Washington, DC 20436.

1  CLEMENTINE JOSEPHSON
   Regional Solicitor
2  JANELL M. BOGUE
   Assistant Regional Solicitor
3  U.S. Department of the Interior
   Office of the Regional Solicitor
4  Pacific Southwest Region
   2800 Cottage Way, Room E-1712
5  Sacramento, CA 95825
   Telephone:    (916) 978-5690
6  Facsimile:    (916) 978-5694
   janell.bogue@sol.doi.gov
7
   Attorneys for the Bureau of Land Management
8

9                UNITED STATES DEPARTMENT OF THE INTERIOR
                        OFFICE OF HEARINGS AND APPEALS
10                      INTERIOR BOARD OF LAND APPEALS

11  BLACK ROCK CITY LLC,                    )   IBLA 2017-126
                                            )
12             Appellant,                   )
                                            )
13      v.                                  )   Appeal from Cost Recovery Decision for
                                            )   Burning Man 2016 Special Recreation Permit
14  BUREAU OF LAND MANAGEMENT,              )
                                            )
15             Respondent.                  )
                                            )
16  _____)

17              **BLM ANSWER TO STATEMENT OF REASONS**

18          The United States of America, Department of the Interior, Bureau of Land Management

19  ("BLM"), by and through its attorney of record, does hereby submit the BLM's answer to Black

20  Rock City LLC's ("BRC's") statement of reasons ("Appeal") to the Interior Board of Land

21  Appeals ("Board").  The BLM hereby requests that the Board affirm the BLM's above-captioned

22  decision.

23  **I.      BACKGROUND**

24          **A.      Event history**

25          Burning Man is a combination art festival, social event, and experiment in community

26  living.  Administrative Record ("AR") Doc. 144 at 1-1.[1]  Burning Man was first held on the

---

[1] Much of this background is also laid out in the BLM's Answer in BRC's appeal of the 2015 Burning Man event cost recovery decision docketed as IBLA 2016-115.

AR07608

1    Black Rock Desert in 1990 and has continued on an annual basis. *Id.* Attendance at Burning

2    Man has generally grown steadily on an annual basis, although the population limit has remained

3    at 70,000 for the past two years. *Id.*; AR Docs. 18, 30, 96.

4          The organization that puts on Burning Man, BRC, applied for and received a multi-year

5    special recreation permit ("SRP") from the BLM to conduct the event for the years of 1992 to

6    1995. *Id.* Due to the increasing size of the event and issues associated with that growth, the

7    BLM completed additional environmental analysis and BRC applied for and received a second

8    SRP from the BLM in 1996. *See Coalition for the High Rock/Black Rock Emigrant Trail*

9    *National Conservation Area*, 147 IBLA 92 (1998). In 1997, Burning Man was held on private

10   land on Hualapai Flat in Washoe County, Nevada. AR Doc. 144 at 1-1. In 1998 and 1999,

11   Burning Man was moved back onto public lands at the southern end of the Black Rock Desert

12   playa, about four miles north of Gerlach, Nevada. *Id.* The BLM completed an Environmental

13   Assessment ("EA") under the National Environmental Policy Act and issued an SRP for these

14   years. *Id.* From 2000 to 2011, the event was held approximately 8.5 miles northeast of Gerlach

15   after the preparation of four EAs and the issuance of an SRP for each year. *Id.* In 2011, the

16   event sold out for the first time. *Id.* In 2012, the BLM prepared an EA that analyzed Burning

17   Man for the years 2012 through 2016. As the Proposed Action, the EA analyzed a Burning Man

18   event with a maximum population of 58,000 to 70,000 people, with the BLM authorized officer

19   determining the maximum population within that range for each year of the permit. For the 2016

20   event, the BLM granted an SRP to BRC on August 2, 2016 and it allowed a maximum

21   population of 70,000. AR Docs. 29, 30.

22         **B.      Cost recovery**

23         From at least 2000 through 2006, BRC paid a permit fee for its SRP based upon "per

24   person per day" use. *See Black Rock City LLC*, 173 IBLA 49, 51 (2007). A portion of that fee

25   covered the BLM's costs of processing and administering the permit. *Id.* at 52. That fee grew as

26   the event's population and the participants' length of stay grew. For example, the fee paid by

27   BRC went from approximately $484,000 in 2000 to $710,000 in 2005. *Id.* Starting in 2007, the

28

AR07609

1  BLM determined that the Burning Man event required cost recovery under the BLM's SRP

2  regulations. *See* 43 C.F.R. § 2932.30.

3       Relevant to this appeal, the BLM determined that more than 50 hours of staff time would

4  be required to process the SRP for the 2016 Burning Man event and thus cost recovery of direct

5  and indirect expenses related to issuing and administering the permit must be charged under the

6  BLM's regulations. *Id.*; AR Docs. 58, 69. The BLM calculated an estimate of the direct and

7  indirect costs for its administration of the 2016 Burning Man SRP.[2] The estimated planning

8  portion was \$184,224 (AR Doc. 68) and the estimated labor and operations costs were

9  \$2,015,735, making the total estimate for the BLM's costs to administer the special recreation

10 permit equal \$2,199,959. AR Doc. 39. The cost recovery estimate was signed on August 2,

11 2016. AR Doc. 32 ("Estimate Decision"). Along with the Estimate Decision, the BLM

12 transmitted an unsigned copy of the cost recovery agreement ("CRA") for BRC to execute. BRC

13 executed the CRA and did not appeal the Estimate Decision. BRC began making payments on

14 the estimated costs and paid the full amount prior to the beginning of the 2016 Burning Man

15 event, in accordance with the CRA and BLM's regulations. AR Doc. 26; *see also* 43 C.F.R. §

16 2932.32.

17      After the event was complete and the BLM compiled its total actual costs for

18 administering the SRP and the 2016 Burning Man event, it issued a decision transmitting those

19 costs to BRC. AR Docs. 1-7 ("Closeout Decision"). The Closeout Decision dated January 31,

20 2017 explained that based upon the Estimate Decision and the actual costs incurred by the BLM,

21 BRC was owed a <u>refund</u> of \$33,831.59 due to overpayment. AR Doc. 1 at 1. BRC timely filed

22 its appeal from the Closeout Decision.

23

---

24 [2] BRC complains about the increases in costs for previous years' Burning Man events. *See* Appeal at 5-12. None of

25 those previous years' costs are included in the decision under appeal and in some cases, BRC complains about costs
   that were never actually included in the relevant years' cost recovery decisions. *See* Appeal at 10. If BRC wished to

26 appeal those BLM decisions, it should have done so, but the time for such appeals has long since passed. 43 C.F.R.
   § 4.411. For the 2015 Burning Man event, BRC did in fact appeal (IBLA 2016-115). Likewise, BRC's background

27 section includes numerous unsupported assertions about BLM's administration of previous years' Burning Man
   event SRPs, which are not at issue in this appeal. *Id.* Accordingly, BRC's complaints about past BLM actions are

28 not relevant to this appeal and the Board should not give any weight to BRC's unsubstantiated assertions of BLM
   error in past years.

AR07610

## II.   STATUTE, REGULATION, AND POLICY

### A.   FLPMA

SRPs are issued under the general authority of the Secretary of the Interior to administer use of the public lands, pursuant to section 310 of the Federal Land Policy and Management Act (FLPMA). 43 U.S.C. § 1740; *see also Michael Voegele*, 174 IBLA 313, 318 (2008). Section 304(a) of FLPMA authorizes the Department of the Interior to establish reasonable charges with respect to applications for use of the public lands. 43 U.S.C. § 1734(a). The Secretary of the Interior may "require a deposit of any payments intended to reimburse the United States for reasonable costs with respect to applications…relating to such lands." *Id.* Section 304(b) of FLPMA states that reasonable costs include, but are not limited to the costs of "monitoring construction, operation, maintenance and termination of any authorized facility; or other special activities." 43 U.S.C. § 1734(b). That section further provides:

> In determining whether costs are reasonable under this section, the Secretary may take into consideration <u>actual costs</u> (exclusive of management overhead), the monetary value of the rights or privileges sought by the applicant, the efficiency to the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs.

*Id.*; *see also Michael Voegele*, 174 IBLA at 318 (emphasis added). Section 303 grants the Secretary of the Interior the authority to enforce Federal law on public lands. 43 U.S.C. § 1733(a); *see also Black Rock City LLC*, 173 IBLA 49 at fn.11-12 (2007).

### B.   FLREA

The Federal Lands Recreation Enhancement Act of 2004 (FLREA) (16 U.S.C. § 6801-6813) repealed the relevant provisions of the Land and Water Conservation Fund Act and authorized the Secretary of the Interior to issue SRPs and charge fees for specialized recreation uses of Federal recreation lands and waters such as group activities, recreation events, and motorized recreational vehicle use. 16 U.S.C. § 6802(h). The FLREA states that any recreation fee must be consistent with the following six criteria:

> (1) The amount of the recreation fee shall be commensurate with the benefits and services provided to the visitor.

AR07611

(2) The Secretary shall consider the aggregate effect of recreation fees on recreation users and recreation service providers.
(3) The Secretary shall consider comparable fees charged elsewhere and by other public agencies and by nearby private sector operators.
(4) The Secretary shall consider the public policy or management objectives served by the recreation fee.
(5) The Secretary shall obtain input from the appropriate Recreation Resource Advisory Committee, as provided in section 4(d) [16 USCS § 6803(d)].
(6) The Secretary shall consider such other factors or criteria as determined appropriate by the Secretary.

16 U.S.C. § 6802(b). Recreation fee is defined as "…an entrance fee, standard amenity recreation fee, expanded amenity recreation fee, or special recreation permit fee." 16 U.S.C. § 6801(8). While FLREA is the sole authority for recreation fees, other federal and state laws are unaffected. 16 U.S.C. § 6813(a), (d).

**C.      SRP Regulations**

The SRP regulations were promulgated by the Department of the Interior and became effective in 2002.[3] 43 C.F.R. § 2930; 67 Fed. Reg. 61732 (October 1, 2002). The Burning Man has been classified by the BLM as a commercial use event, since BRC's use of the public lands is for business or financial gain. *See* 43 C.F.R. § 2932.5. The BLM is authorized to charge a fee for commercial use of the public lands under an SRP in an amount set by the BLM Director.[4] 43 C.F.R. § 2932.31(a). The BLM Director may adjust those fees, as necessary, and must publish fees and adjustments in the Federal Register.[5] 43 C.F.R. § 2932.31(b), (c).

In addition to the commercial use fee set by the BLM Director described above, if the BLM anticipates that it will need more than 50 hours of staff time to process an SRP for commercial use in one year, it may charge a fee for recovery of the processing costs. 43 C.F.R. § 2932.31(e)(1). Cost recovery charges include the BLM's costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement. 43 C.F.R.

---

[3] The Department of the Interior issued a proposed rule to modify the regulations to comply with FLREA on November 22, 2005 (70 Fed. Reg. 70570) and issued the final rule on February 21, 2007 (72 Fed. Reg. 7832). Those changes are not relevant to this appeal. *See Black Rock City LLC*, 173 IBLA at 58.
[4] BLM Instruction Memorandum 2014-055 sets forth the national special recreation permit fee schedule and establishes commercial use fees at 3% of gross revenue for March 1, 2014 - March 1, 2017. AR Docs. 122 and 123.
[5] Effective October 1, 1999, fee adjustments are made every three years using 1984 as the base year and based on the change in the Implicit Price Deflator Index. The automatic three-year fee adjustment policy and fee calculation method were published in the Federal Register in 1989 and 1999. *See* 54 Fed. Reg. 42998 and 64 Fed. Reg. 41133.

AR07612

§ 2932.31(e)(3).  All fees must be paid before the BLM will authorize use and any overpayment

may be refunded.  43 C.F.R. §§ 2932.32, 2932.33.  Fees may be waived on a case-by-case basis

for accredited academic, scientific, and research institutions, therapeutic, or administrative uses.

43 C.F.R. § 2932.34.  In accordance with FLPMA, SRPs must provide for the protection of

natural resources and public safety on the public lands.  43 C.F.R. §§ 2932.26, 2932.41.

**D.     1323 Manual**

The BLM's Manual 1323 – Cost Recovery for Reimbursable Projects/Activities ("1323

Manual") describes its policies and procedures for cost recovery.  AR Doc. 150.  The 1323

Manual states that the BLM's policy is that applicants "…will reimburse the Government for

direct and indirect costs involved in processing applications." *Id.* at .06A.  Indirect costs are

defined as:

> …costs expressed as a percent of direct costs which are of such a nature that the
> amounts applicable to a specific project cannot be accurately or readily
> determined.  Indirect/overhead costs are incurred either jointly for the benefit of
> more than· one cost reimbursable project, or in units which are so small that they
> cannot practically be reported separately on Time and Attendance Reports or
> other accounting documents.  Indirect/overhead costs include any costs which
> must be coded to the following "overhead" activities: General Administration,
> Data Management, and Equal Employment Opportunity costs relative to BLM
> employment.

*Id.* at Glossary page 2.  The 1323 Manual also describes the accounting procedures for

calculating indirect costs.

> The Bureau's indirect/ overhead costs, exclusive of management overhead, are
> recovered by the application of a single predetermined indirect cost rate to direct
> costs incurred.  <u>The Bureau has only one indirect cost rate and it is applicable to
> all cost recoverable services.</u>  This rate is subject to periodic review and change.
> These indirect costs are automatically included in the category fee schedule.

*Id.* at .18B4 (emphasis added).

**E.     SRP Handbook**

The BLM Recreation Permit Administration Handbook H-2930-1("SRP Handbook") was

updated on November 17, 2014 and describes both SRP administration and cost recovery

procedures.  *See* AR Doc. 110.  "For commercial permits that exceed the 50-hour threshold, the

BLM charges cost recovery in addition to fees arising from the national recreation fee schedule."

*Id.* at 1-22.  "Cost recovery covers all federal activities that convey special benefits to recipients

beyond those accruing to the general public." *Id* at 1-20.  The SRP program uses the same cost

recovery procedures as the BLM's lands and realty program, so the 1323 Manual is applicable to

cost recovery for SRPs.  *Id.* at 1-27.  The SRP Handbook defines indirect costs consistent with

the 1323 Manual, but with more detailed examples.

> Indirect costs represent those administrative and program costs that may be
> attributed to processing the application, including a portion of the costs of
> equipment, space rental, telephone services, postage, personnel transfer costs,
> administrative and clerical support, training, safety, public information,
> cartography and basic series mapping, aviation management, telecommunications,
> equipment maintenance, and systems design and implementation. Excluded from
> indirect costs are management overhead, managerial work, evaluations of office
> activities, program coordination, technical program direction, environmental
> education and interpretation, interagency planning, studies and research,
> preparation of NEPA documents relating to general program planning, law
> enforcement, and firefighting. Nominal indirect costs are recovered through the
> indirect cost rate, determined annually by the BLM's budget office in consultation
> with the Interior Business Center (IBC) (22.9 percent of total direct costs as of
> 2014), as part of the administration of cost recovery accounts.

*Id.* at 1-30.  The SRP Handbook also requires the BLM to ensure public safety and resource

protection.  *Id.* at vii, 1-3.  As part of this requirement, law enforcement related to the SRP is

described as a direct cost.  *Id.* at 1-28.

**F.    Office of Management and Budget Circular No. A-25 (Revised)**

The Office of Management and Budget ("OMB") Circular A-25, released on July 8,

1993, establishes Federal policy regarding fees assessed for the use of Government resources.

AR Doc. 149.[6]  OMB developed Circular A-25 in accordance with Title V of the Independent

Offices Appropriations Act of 1952 ("IOAA"), codified at 31 U.S.C. § 9701.  *Id.*  Circular A-25

establishes a policy that "user charges will be sufficient to recover the full cost to the Federal

Government..."  *Id.* at Section 6.a.2.  Section 6.d.1. defines full cost as "all direct and indirect

costs to any part of the Federal Government" and includes direct and indirect personnel costs,

physical overhead, and other indirect costs such as material and supply costs, utilities, insurance,

travel, rents or imputed rents, and management and supervisory costs.  *Id.* at Section 6.d.1.(a)

through (e); *see also Black Rock City LLC*, 173 IBLA at 58, fn.5.

---

[6] The revised version of OMB Circular A-25 was also published in the Federal Register. 58 FR 38142 (July 15, 1993).  That version is included in the AR at Doc. 148.

AR07614

1     **G.**    **BLM Instruction Memorandums**

2     In compliance with its law, regulation, and policy described above, the BLM has issued

3 Instruction Memorandums ("IMs") outlining SRP administration and cost recovery. *See* AR

4 Docs. 124 and 125 (IM 2014-032 - indirect cost recovery rate and waiver), 122 and 123 (IM

5 2014-055 - adjustment of minimum SRP fees), 112 and 113 (IM 2014-119 - SRP

6 administration). For example, IM 2014-032 describes how the BLM must engage in cost

7 recovery.

8     The BLM incurs administrative costs on all cost-recoverable, reimbursable,
contributed trust account, and road maintenance projects. As these are real

9     administrative costs, the BLM should realize full cost recovery unless an
approved waiver or reduction request of the indirect administrative cost rate can

10     be justified.

11 AR Doc. 124 at 3. That IM also provides examples of indirect costs, including administrative

12 support such as procurement, contracting, finance, office services, and record management,

13 public information, budget development, and training. *Id.* To implement the 1323 Manual's

14 explanation regarding a single indirect rate, the BLM issued IM 2016-107, which set the indirect

15 cost rate at 23.1 percent of direct costs across the BLM for Fiscal Year 2016. AR Doc. 61.

16 Processing of SRPs for commercial activities or groups is specifically listed as requiring the

17 indirect cost recovery rate. *Id.* at 2.

18 **III.**    **LEGAL ARGUMENTS**

19     **A.**    **Standard of Review**

20     SRPs are issued under the general authority of the Secretary of the Interior to administer

21 use of the public lands, in accordance with FLPMA and FLREA. BLM has considerable

22 discretion under section 302(b) of FLPMA in approving and issuing SRPs. *See* 43 C.F.R. §

23 2932.26; *Michael Voegele*, 174 IBLA at 318; *Bookcliff Rattlers Motorcycle Club*, 171 IBLA 6,

24 13 (2006); *Daniel T. Cooper*, 150 IBLA 286, 291 (1999). If a BLM decision has any rational

25 basis, it will not be held arbitrary and capricious, or an abuse of discretion. *Michael Voegele*,

26 174 IBLA at 318; *Obsidian Services, Inc.*, 155 IBLA 239, 248 (2001). An appellant challenging

27 a decision bears the burden of proof to show by a preponderance of the evidence that a

28 challenged decision is in error. *Bookcliff Rattlers Motorcycle Club*, 171 IBLA at 13. To

AR07615

demonstrate error by preponderance of the evidence, an appellant must "prove that something is more likely so than not so; in other words, the 'preponderance of the evidence' means such evidence, when considered and compared with that opposed to it, has more convincing force and produces in your minds belief that what is sought to be proved is more likely to be true than not true." *United States v. Feezor*, 130 IBLA 146, 200 (1994). "Statements alleging impropriety unaccompanied by evidence and supporting documentation or mere differences of opinion are insufficient to demonstrate error in BLM's decision." *Animal Protection Institute of America*, 118 IBLA 63, 66-67 (1991).

**B.     The BLM's Closeout Decision is rational and adequately supported**

BRC first complains that the BLM failed to sufficiently explain its costs for the 2016 Burning Man event. Appeal at 15-18. A review of the case file shows differently. The BLM provided ample explanation of its actual costs for administering the SRP along with the Closeout Decision. Those documents included: 1) a summary of the BLM's total costs, breaking out labor costs, equipment charges, travel costs, and the indirect cost recovery rate; 2) a project log naming each person working on the Burning Man 2016 SRP, the dates they worked, their position, duties, and the amount charged for that work; 3) a summary sheet showing each contract entered into by the BLM for the Burning Man 2016 SRP and the purpose and cost of that contract, as well as copies of the contracts themselves; 4) travel expenses incurred by each person working on the Burning Man 2016 SRP; 5) vehicle utilization for each vehicle used for the Burning Man 2016 SRP; and 6) a list of the supplies and equipment used for the Burning Man 2016 SRP, as well as the receipts supporting each expense. *See* AR Docs. 1-8.

The Closeout Decision was compiled from actual expense data which was formatted into user-friendly documents that were provided to BRC. Declaration of Mark Pirtle ("Pirtle Dec.") at ¶4. Rather than rely upon the detailed information provided by the BLM, BRC argues that the BLM must provide "detailed time records" for all staff and "the same information that BLM would itself require to support a claim for reimbursement" for travel. Appeal at 17. BRC further argues that the BLM should use the lowest pay level required for each position it staffs and also must demonstrate to BRC that it engaged in that exercise for each employee that worked on the

AR07616

1  BRC SRP. *Id.* at 16.  BRC, however, provides no legal support for such a requirement, likely

2  because no law, regulation, or policy requires such action.  Instead, "[t]he recipient of a BLM

3  decision is entitled to a reasoned and factual explanation providing a basis for understanding and

4  accepting the decision or, alternatively, for appealing and disputing it before the Board."

5  *Bookcliff Rattlers*, 171 IBLA at 21.  The Closeout Decision, including the explanatory

6  spreadsheets, copies of receipts and contracts, as well as the documents comprising the

7  administrative record (which include emails, letters, and memorandums from the BLM to BRC

8  throughout the processing of the SRP) indeed provide a reasoned and factual explanation of the

9  total costs charged to BRC through cost recovery for the 2016 Burning Man event.  BRC's

10 opinion that more detail should have been provided or that the costs should have been lower does

11 not show error in the Closeout Decision.

12       Under the BLM's SRP regulations, cost recovery charges consist of the BLM's costs of

13 issuing the permit, including necessary environmental documentation, on-site monitoring, and

14 permit enforcement.  43 C.F.R. § 2932.31(e)(3); *see also Bookcliff Rattlers*, 171 IBLA at 17-18

15 ("We find that the limiting language in 43 C.F.R. § 2932.31(e)(3) is consistent with [FLPMA]

16 section 304(b), and that its inclusion in the SRP cost recovery regulation meets the

17 'reasonableness' test set forth by the Court in *Nevada Power Co. v. Watt*, 711 F.2d at 927.").

18 BRC has provided no evidence to show that the Closeout Decision includes more than those

19 costs incurred by the BLM for the 2016 Burning Man event.  The BLM provided BRC with not

20 only a summary of those costs, but the agency also included the detailed contracts, invoices, and

21 pay broken out by each employee who worked to administer the SRP.  BRC complains about the

22 specific level of detail provided by the BLM, but this no more than a difference of opinion rather

23 than a demonstration of error.  For example, BRC argues that the BLM should provide BRC with

24 information about the tasks performed by each employee charged through the Closeout Decision.

25 *See* Appeal at 16 (arguing that the BLM should have provided the pay level for each employee)

26 and 17 (stating that the BLM should provide time records for each employee outlining the

27 number of on-duty hours claimed for each calendar day).  The BLM did actually provide such

28 detail.  *See* AR Doc. 3 (description of work, total hours worked, and total pay for each employee

1   charged to the cost recovery account).  This is the underlying data supporting the BLM's

2   Closeout Decision allowing BRC to ascertain how the BLM's charges were calculated.  *See*

3   *Bookcliff Rattlers*, 171 IBLA at 21.  The BLM used a computer spreadsheet to compile the data

4   upon which the Closeout Decision was based (AR Docs. 11-15), but then also provided the

5   support underlying that compilation, including the contracts, receipts, and the total hours worked

6   by each person along with their duties during the BLM's planning for the event and during the

7   event itself.  This is more than sufficient documentation to show how the BLM arrived at the

8   amount in the Closeout Decision.  Accordingly, the BLM's Closeout Decision is properly

9   supported, rational, and should be affirmed.

10          **C.      BLM's designation as an emergency event was not in error**

11          Second, BRC objects to the BLM's designation of the 2016 Burning Man event as an

12  emergency event.  In support, BRC points to the language of the relevant regulation and offers its

13  opinion that because the event is a planned as a collaborative effort between many agencies that

14  it cannot constitute an emergency.  Appeal at 19-21.  However, whether an event is planned or

15  not has no bearing on the BLM's designation as an emergency.

16          Under Federal regulation, an emergency is "a temporary condition posing a direct threat

17  to human life or property, including a forest wildfire emergency."  5 C.F.R. §550.103;

18  Declaration of William Mack ("Mack Dec.") at ¶6.  The BLM has designated Burning Man as an

19  emergency event each year since 2012.  AR Docs. 64, 98, 114, 128, 140.  The designation was

20  made because of the event's remote location, the substantial and rapid population growth to over

21  70,000 people, and the limited nature of local resources.  AR Doc. 57 at 1; Mack Dec. at ¶7.[7]

22  The designation allows the BLM to prioritize Burning Man in the event of an incident requiring

23  additional resources, especially during the wildfire season.  Mack Dec. at ¶¶4,6.  In 2016, the

24  emergency designation was recommended by the BLM Nevada State Director with review and

25  final approval by the BLM Assistant Director for Human Capital Management.  5 C.F.R. §

26  550.106(a)(1); AR Doc. 64.  The emergency designation further allows the agency to pay the

27

28  [7] *See also* Declaration of Zachary Oper filed in support of the BLM's Answer in BRC's appeal of the 2015 Burning
    Man Event Closeout Decision (IBLA 2016-115).

AR07618

1    overtime rate as a true time-and-a-half rate and it removes the per-period pay cap of paid regular

2    hours and overtime hours combined.  5 C.F.R. § 550.107; *see also* AR Doc. 57 at 2.

3        Prior to its designation of the 2016 Burning Man event as an emergency, the BLM

4    calculated the estimated costs that would be charged through cost recovery both with and without

5    the designation.  *Id.*  Without the emergency designation, the BLM would potentially need up to

6    three rotations of employees to work at the event, since some employees at certain General

7    Schedule ("GS") grade would have their work hours limited.  *Id.* at 2.  That would require

8    additional costs for travel, vehicle use, fuel, and operations equipment for those additional

9    rotations.  *Id.*  Additional rotations of BLM employees would also stretch the agency's overall

10   workforce thin, especially for law enforcement positions.  *Id.*  The BLM had already determined

11   that the 2016 Burning Man event was a National Detail, because it exceeded the level of law

12   enforcement support that Nevada BLM could provide.  AR Doc. 91.  Using three rotations could

13   require the BLM to rely more on law enforcement officers from outside the BLM (via an

14   interagency agreement), if such officers were even available to work at the event.  AR Doc. 57.

15   Interagency agreements carry associated contracting and indirect cost recovery rates, also

16   increasing the amount that BRC would be required to pay through cost recovery.  *Id.*  Given the

17   BLM's requirements for administering the Burning Man SRP, it was estimated that the

18   emergency designation actually *reduces* the overall costs to BRC.  *Id.*  Using the same GS grades

19   that were reflected in the Estimate Decision, the BLM projected that there would be 95

20   employees that would be affected by the pay period cap.  Designating the event as an emergency

21   and using one rotation for those employees would cost $539,550 including labor, travel, and

22   vehicle utilization.  *Id.* at 6.  Without the emergency designation, the BLM would have to utilize

23   three rotations and costs would be projected to increase to $642,798.  *Id.* at 11.  Thus the BLM

24   estimated that the emergency designation would actually decrease its labor, travel, and vehicle

25   utilization costs by over $100,000.  *Id.*

26       BRC has only shown that it disagrees with the BLM's designation, rather than

27   demonstrating error on the part of the agency.  BRC's mere opinion that the BLM should have

28   administered the event differently is insufficient to overturn the decision on appeal.

This Board has long held that even when an appellant's assertions are neither erroneous nor unreasonable, merely representing a different point of view in the controversy over what course of action is in the public interest, a BLM decision in the exercise of its discretion will ordinarily be affirmed when such judgment has been exercised by an official duly delegated with the authority to do so.

*Arizona Zoological Society*, 167 IBLA 347, 356 (2005) (*citing Rosita Trujillo*, 21 IBLA 289, 291 (1975)).

BRC argues that the emergency designation may only be applied after the emergency condition has started and thus the BLM's determination prior to the 2016 Burning Man event is improper. Appeal at 20. But the plain language of the regulation does not actually limit the agency in that manner and BRC does not cite to any legal authority supporting its interpretation. BRC also attempts to lay error at the feet of prior BLM employees, who were not involved in the planning or decision-making for the 2016 Burning Man event at all. *See* Appeal at 21. For the 2016 event, the emergency designation was made by agency experts familiar with the Burning Man event in order to address public safety and resource protection concerns. "[T]he Board will not substitute its judgment for that of the technical experts employed by the Department acting within their field of expertise in the absence of clear error." *Arizona Zoological Society*, 167 IBLA at 356 (2006). Accordingly, BRC has not supported its burden on appeal and the BLM Closeout Decision should be affirmed.

### D.    BRC has not shown error in the Closeout Decision regarding the BLM's law enforcement operations

Third, BRC challenges the BLM's Closeout Decision with regard to the agency's law enforcement operations. BRC specifically disagrees with how the BLM determines the appropriate level of law enforcement for the Burning Man event (Appeal at 21-26), argues that the BLM is improperly performing public outreach rather than law enforcement activities (Appeal at 26-28), and challenges the BLM's use of satellite tracking for its law enforcement officers (Appeal at 31-32). However, BRC's mere disagreement with the BLM's law enforcement operations does not show BLM error in the Closeout Decision. *See Bookcliff Rattlers Motorcycle Club*, 171 IBLA at 13. The BLM has shown that its law enforcement operations are necessary to protect public safety and natural resources, especially considering

AR07620

1  that the Burning Man event temporarily becomes the eighth largest city in Nevada with

2  approximately 76,000 people on the BLM-administered lands of the Black Rock playa.  AR Doc.

3  19 at 1.  Moreover, the record shows that the BLM has provided an adequate explanation for the

4  necessity of its law enforcement operations at the event.  BRC's arguments, therefore, do not

5  support its burden on appeal.

6          **1.**      **Law enforcement staffing level**

7        As an initial matter, the BLM has the authority and discretion to determine the level of

8  law enforcement necessary on the public lands.  *See Black Rock City*, 173 IBLA at 66, fn. 11; *see*

9  *also Reed v. U.S. Department of the Interior*, 231 F.3d 501, 505-506 (2000).  Under FLPMA, the

10  BLM is required to ensure resource protection and public safety on the public lands.  43 U.S.C. §

11  1733.  Staffing levels are set in order to meet the law enforcement operational objectives, which

12  for the Burning Man event included safeguarding and protecting human life and natural

13  resources, to ensuring that the event occurred without disruption, and maintaining law and order.

14  Declaration of Logan Briscoe ("Briscoe Dec.") at ¶6.  Given the size of the Burning Man event

15  and the number of participants, as well as the rugged terrain, the BLM must be prepared for

16  many different kinds of incidents.  The BLM determined that 75 law enforcement officers were

17  needed for the 2016 Burning Man event based upon the projected number of participants.

18  Briscoe Dec. at ¶7.  Such a calculation is entirely within the discretion of the agency and here,

19  the BLM's determination is reasonable

20        BRC initially argues that the BLM has never assessed the appropriate number of law

21  enforcement officers needed at the Burning Man event.  Appeal at 22.  In support of its

22  arguments, BRC attempts to place the responsibility for staffing levels on BLM employees that

23  were not involved with the 2016 Burning Man event.  *Id.*  But its unsupported allegations cannot

24  sustain the burden on appeal, especially when the record is clear that the BLM considered all the

25  relevant factors in setting its staffing levels for the 2016 event.  The BLM's Law Enforcement

26  Branch Chief for the 2016 Burning Man event describes how the BLM planning team

27  determined the number of law enforcement staff that would be required.  Briscoe Dec. at ¶¶7-12.

28  The planning team considered the recommended staffing levels from the International

Association of Chiefs of Police.  *Id.*  It also considered the number of deputies assigned to the event from the Pershing County Sheriff's Office ("PCSO").  *Id.* at ¶9.[8]  Further, the BLM planning team considered the after-action reviews ("AAR") and operational assessments compiled each year by both BLM and BRC.  *See* AR at Docs. 16, 17, 20, 21, 71, 72, 75, 76, 106, 109, 127, 133, 139.  Especially relevant to the 2016 Burning Man event, the BLM's 2015 AAR determined that law enforcement staffing levels were appropriate and should not change.  AR Doc. 75 at 30.  Despite this recommendation, law enforcement staffing levels actually decreased for 2016 versus 2015 and 2014, with no change in participant population.  *See* AR Doc. 18.

Next, BRC argues that the statistics show that the BLM's law enforcement officers are not necessary at the staffing levels implemented for the 2016 Burning Man event.  Appeal at 22-25.  BRC particularly complains about the BLM's public contacts and argues that the citations issued by the BLM "hardly pose a serious threat to public safety."  Appeal at 23.  BRC's unsubstantiated opinion, however, is not sufficient to support its burden on appeal.  The BLM has explained how it enforces public land laws, including ensuring public safety and resource protection, by educating public land users.  Briscoe Dec. at ¶13.  At the Burning Man event, law enforcement officers use proactive contact, generally classified as "public contact" in its computer-aided dispatch ("CAD") system, with participants in order to ensure that they are aware of all the relevant rules.  *Id.*  This is especially important for new participants who make up approximately 39% of the total city population.  *Id.* at ¶14.  Public contact is done during the officers' patrols and also at the law enforcement substation located along the Esplanade, which is the "main street" of Black Rock City.  *Id.* at ¶15.  Contrary to BRC's allegations, statistics alone do not dictate the level of law enforcement needed at the Burning Man event.  *Id.* at ¶17.  The record demonstrates how BLM's law enforcement officers act as a crime deterrent and work to maintain the safety of the event participants.  *Id.*  While BRC may believe that the BLM law

---

[8] After the 2016 Burning Man event, the Pershing County Sheriff noted, "The Burning Man festival has, for several years, far exceeded the resources of not only Pershing County, but the Law Enforcement resources of Northern Nevada as a whole."  2016 Pershing County Post Mission Synopsis at 2 (attached to BRC's Statement of Reasons as Exhibit B to Declaration of Roger Vind).

enforcement staffing levels are too high, BRC provides no legal support for its implication that the BLM is only allowed to staff the event based upon the number of past incidents.

As described above, the BLM and BRC each compile an AAR yearly to provide post-operational assessments of the management of the event, including recommendations for future years. *See* AR Docs. 16, 17, 20, 21, 71, 72, 75, 76, 106, 109, 127, 133, 139.  Those reports have documented incidents including a rainstorm that caused a closure of the entire event for a period of time, a participant that barricaded himself in a vehicle and threatened harm to himself and others, and a vehicle-caused fatality. AR Doc. 75 at 3-4.  The reports also documented an incident where a participant battered BRC's own Black Rock Rangers, requiring BLM's law enforcement officers to use force to subdue the assailant. AR Docs. 17 at 29-30, 21 at 14.[9]  The AARs also document thousands of law enforcement public contact and assistance events, as well as hundreds of BLM citations issued for violations of federal laws or the closure order.  AR Doc. 20.  BLM's law enforcement staffing level for the 2016 Burning Man event is not inconsistent with those reports.

BRC further complains about the BLM's use of an agent from the Office of Law Enforcement and Security, Office of Professional Responsibility ("OPR").  Appeal at 25-26.  During the Burning Man event, the BLM uses a supervisory structure to ensure that its law enforcement officers are following all applicable agency protocols and policies.  *See* Briscoe Dec. at ¶22.  The presence of an OPR agent is critical to meeting BLM requirements for reporting and evidence review. *Id.*  Additionally, the OPR agent is on-site and available to investigate any allegations of misconduct against federal personnel assigned to the Burning Man event.  *Id.* at ¶24.  Since Burning Man event participants come from across the country and sometimes the world, investigations would be logistically difficult to conduct after the event.  *Id.*[10]  Accordingly, the special challenges presented by the Burning Man event have led the BLM

---

[9] As a result, BRC expressed interest in hiring private security personnel for the 2017 Burning Man event. *See* Briscoe Dec. at ¶16.  This potentially illustrates the need for more law enforcement at Burning Man, not less.
[10] In the past, BRC has supported the presence of an OPR agent at the Burning Man event and correctly recognized that this serves as a way to be transparent and responsive regarding participant complaints about BLM law enforcement operations.  Briscoe Dec. at ¶23.

AR07623

to determine that the presence of an OPR agent is required and necessary to the administration of the Burning Man SRP and should therefore be subject to cost recovery under the applicable regulations.  Again, BRC provides no evidence of BLM error and while BRC might disagree with the BLM's rationale, such disagreement does not support the burden on appeal.

Ultimately, the BLM has the discretion to determine the nature and extent of its law enforcement presence in order to administer the Burning Man SRP.  Other than mere disagreement with the BLM's staffing level, BRC points to no error in law, regulation, or policy on the part of the agency.  Accordingly, BRC has not met its burden to overturn the BLM's Closeout Decision.

### 2.  Substation

BRC next argues that it should not be required to pay for the costs associated with the BLM's law enforcement substation.  Appeal at 26-28.  However, the BLM has explained and demonstrated the important law enforcement purposes served by the substation and BRC's complaints do not support its burden on appeal.

As described above, the BLM's law enforcement substation is centrally located in Black Rock City.  Briscoe Dec. at ¶26.  The Joint Operations Center ("JOC"), the main hub for both civilian and law enforcement operations, is located approximately a half-mile outside of Black Rock City and so participant access is somewhat limited.  *Id.*  The substation is a central location where Burning Man participants can access law enforcement, in order to do things like report criminal activity and file missing person reports.  *Id.* at ¶¶ 26-27; *see also* Declaration of Jon Young ("Young Dec.") at ¶10.  This central location and ready access is especially important given the size and scale of the event.

For the 2016 Burning Man event, the BLM assigned one officer to work at the substation.  Briscoe Dec. at ¶28.  Patrols were ongoing throughout the event but there were limited uniformed officers on duty at any one time compared to the approximately 76,000 people on the playa at peak population.  *Id.* at ¶¶11-12, 28.  Having a location where participants had direct access to law enforcement was determined to be important to public safety.  *Id.* at ¶¶28-29.  The substation also provides a place where officers can interview witnesses or victims without the

AR07624

1    added stress and time that could result from removing them to the JOC. *Id.* at ¶27. For these

2    reasons, the BLM has determined that the substation is necessary to ensure public safety at the

3    Burning Man event.

4         Officers also can utilize the substation to write reports so they don't have to travel back to

5    the JOC, which creates efficiencies and reduces labor costs. *Id.* at ¶27. Given that the trailer that

6    serves as the substation was purchased by the BLM with its own funds, not via cost recovery, the

7    substation actually provides a no-cost benefit to BRC. *Id.* at ¶27. BRC alleges that the BLM's

8    purpose for establishing the substation is for public relations. Appeal at 26-27. But as outlined

9    above, the substation serves an important public safety purpose for the Burning Man event. The

10   substation may be incidentally beneficial to the BLM because those Burning Man participants

11   who had a fun and safe experience at the event will have a positive view of public lands in

12   general. The substation's main purpose, though, is as a necessary component of the BLM's

13   overall public safety and resource protection goal for the Burning Man event. OMB Circular A-

14   25 directs the government to seek full reimbursement for the special benefit provided, even when

15   the public receives an incidental benefit.

16        [W]hen the public obtains benefits as a necessary consequence of an agency's
          provision of special benefits to an identifiable recipient (i.e., the public benefits
17        are not independent of, but merely incidental to, the special benefits), an agency
          need not allocate any costs to the public and should seek to recover from the
18        identifiable recipient either the <u>full cost to the Federal Government of providing
          the special benefit</u> or the market price, whichever applies.
19

20   AR Doc.149 at 3 (emphasis added). While BRC may disagree with the BLM's establishment of

21   the law enforcement substation at the 2016 Burning Man event, it has not shown error in the

22   Closeout Decision.

23                        **3.     Satellite tracking**

24        Next, BRC claims that it should not be charged for satellite tracking services used by the

25   BLM at the Burning Man event. Appeal at 31-32. Since 2013, it is the BLM's established safety

26   practice at Burning Man to use these two-way satellite tracking and communication devices.

27   Briscoe Dec. at ¶7. The agency has determined that the functions of these devices are necessary

28   to the safety of BLM personnel at the Burning Man event. *Id.* They track, in near real-time, the

location and position of officers and integrate with the CAD system.  *Id.*  The trackers also have an SOS feature that allows officers to send an emergency notification or request for assistance. *Id.*  The trackers used at the Burning Man event were purchased using cost recovery funds in previous years and in accordance with BRC's request, are only used for the Burning Man event. *Id.* at ¶9.  The costs included in the Closeout Decision are for necessary firmware updates and service charges for the 2016 Burning Man event.  *Id.*

BRC has, in the past and in its Appeal, suggested that other methods would be sufficient to track BLM's law enforcement officers.  Appeal at 31-32; Briscoe Dec. at ¶8.  However, those suggestions have been determined to be insufficient for the BLM's safety needs.  Briscoe Dec. at ¶8.  Thus, BRC offers only its mere disagreement with the use of such devices and unsupported speculation that radios would be sufficient for tracking purposes.  BRC's opinion is insufficient to support its burden on appeal and accordingly, BRC has not shown error on the part of the BLM.

### E.    BRC has not shown error in the Closeout Decision for the BLM's communications and information technology systems

BRC also challenges the BLM's Closeout Decision with regard to the costs required to set up and run BLM's communications and information technology systems at the 2016 Burning Man event.  Specifically, BRC objects to the costs involved in: 1) setting up and running the systems (Appeal at 28-29); 2) provisioning radios used by BLM staff (Appeal at 31, 37); 3) IT systems to serve the substation (Appeal at 32-33), and 4) internet to serve the JOC (Appeal at 33-34).  Again, BRC only demonstrates its disagreement with the BLM and fails to provide any objective evidence of BLM error in the Closeout Decision.

### 1.    Communications and network systems

First, BRC claims that the BLM's costs for labor for the communications and network systems were in error.  Appeal at 28-29.  But other than speculating that BLM employees worked too many hours on setting up the systems, BRC provides no objective evidence of error.  For example, BRC complains about the hours logged by the BLM Communications Branch Chief for the 2016 Burning Man event.  *Id.*  However, that BLM employee has extensive experience

AR07626

planning for the Burning Man event and was heavily involved in the communications planning

aspects in 2016. Young Dec. at ¶3. He helped to develop the Estimate Decision, as well as the

statements of work for communications-related service acquisitions. *Id.* He also had lead

responsibility for development of the microwave network system, the event dispatch system, and

the CAD system, and was responsible for deploying the satellite trackers used by BLM law

enforcement. *Id.* For the eight months leading up to the 2016 Burning Man event, a significant

portion of his time was spent planning the communications and network systems for the BLM's

operations at the event and all of those hours, plus the hours he worked at the event itself, were

accurately logged. *Id.* at 4-5. BRC provides no objective evidence of error. Instead, BRC

acknowledges that the BLM requires these critical infrastructure systems but argues, without

supporting evidence, that it should take less time to provide them. Appeal at 29. Such an

argument does not support BRC's burden on appeal, especially when BLM's own experts have

demonstrated that the time and costs were necessary to administer the SRP. *See* Young Dec. at

¶¶3-6.

### 2.    Radios

Second, BRC argues that BLM has no reasonable basis for the costs of radio encryption

and accessories used at the 2016 Burning Man event. Appeal at 31. The radios as well as their

associated services and accessories are necessary to the BLM's administration of the SRP and

the actual costs are correctly charged to BRC's cost recovery account. In reality, the charges in

2016 represent a cost savings to BRC over the long term, as detailed below.

Prior to the 2015 event, the BLM and BRC agreed to create a cache of radios for use at

the Burning Man event. Declaration of Dalton Black ("Black Dec.") at ¶4. BRC purchased 60

radios in 2015, which were used at the 2015 event and then were utilized by BRC for its own

purposes throughout the year. *Id.* at ¶¶4, 6. BRC planned to purchase another 60 radios in 2016.

*Id.* at ¶4. But before BRC made its purchase in 2016, the BLM was able to acquire, at no cost to

BRC, radios that could be used for the cache. *Id.* at ¶¶7-8. The only costs that were charged to

BRC's cost recovery account were the necessary encryption and accessories for the new radios

such as microphones, rechargeable batteries, and chargers. *Id.* at ¶¶8, 11. Those radios remain

1 in the cache during the year and are only used for the Burning Man event. *Id.* at ¶4. So while

2 BRC complains about the costs for radio encryption and accessories, the BLM's acquisition of

3 the radios at no charge actually saved BRC nearly $100,000. *Id.* at ¶8.

4      Contrary to BRC's claim, the BLM never told BRC that the radios purchased in 2015

5 were unnecessary. *Id.* at ¶7. In fact, those radios were used by law enforcement at the 2016

6 Burning Man event. *Id.* at ¶9. BRC then sold those radios to PCSO after the 2016 Burning Man

7 event. *Id.* at ¶10. Thus while BRC complains about the cost for services to equip the radios used

8 at the 2016 Burning Man event, it provides no evidence of BLM error in the agency's

9 calculations. Mere disagreement with a charge included in the Closeout Decision is insufficient

10 to support BRC's burden on appeal.

11 **3.      Substation communications and network system**

12      Third, BRC argues that BLM's contracts for services to support the substation including

13 the microwave, internet, and network systems, are unreasonable and not supported. Appeal at

14 32-33. BRC's objections depend upon its characterization of the substation as unnecessary, but

15 the BLM has described why the substation is needed as a central location for law enforcement

16 services within Black Rock City. *See* III.D.2., above. The BLM's systems actually mirror how

17 BRC provides similar systems to its fire and emergency medical substations throughout Black

18 Rock City. Young Dec. at ¶¶10-11. The record includes the contracts for providing those

19 systems, showing that the Closeout Decision only includes the BLM's actual costs for those

20 services. AR Doc. 34. Again, BRC merely expresses disagreements with the BLM's use of the

21 substation, and its associated communications and network systems at the 2016 Burning Man

22 event, but has not shown error in the Closeout Decision.

23 **4.      JOC microwave internet and communications**

24      Fourth, BRC complains that the BLM's contract for microwave internet and other

25 communications for the JOC are unsupported. Appeal at 33-34. BRC argues that the BLM does

26 not need the internet speed required in the scope of work and that it doubled from 15 Mbps in

27 2014 to 30 Mbps in 2016. *Id.* However, the cost of the microwave internet service is the same

28 regardless whether the contractor provides 15 Mbps or 30 Mbps. Young Dec. at ¶15. BRC

incurred no additional costs due to the increase in speed. *Id.* BRC further complains about the use of the microwave internet to create a "bridge" for the use by PCSO from Lovelock to the JOC. Appeal at 34. But again, there was no additional cost for this service and it was not included in the statement of work, so nothing was charged to BRC's cost recovery account for that service. Young Dec. at ¶15; AR Doc. 35 at 16-22. BRC argues that the BLM does not need the required number of VoIP lines or cameras for monitoring the JOC. Appeal at 33. However, these items have been determined necessary for the BLM's administration of the SRP for the 2016 Burning Man event. *See* Young Dec. at 12-14.[11] Accordingly, BRC has not carried its burden on appeal to show error in the BLM's Closeout Decision regarding the agency's communications and network systems necessary for the JOC.

### F.    BRC has not shown error regarding the BLM Medical Team

BRC also complains about the BLM's use of a medical unit for federal employees working at the Burning Man event. Appeal at 29. The agency has explained, however, that its BLM Medical Team is a necessary operational function for the BLM to administer the SRP for Burning Man. Briscoe Dec. at ¶¶30-34. The BLM Medical Team serves as a federal patient advocate, providing personalized medical care for all government employees working at the Burning Man event and maintaining a sealed medical history on each person. *Id.* at ¶31. The BLM Medical Team is capable of providing federal employees immediate access to critical incident stress management services if needed during the event and initiating necessary workmen's compensation paperwork. *Id.* In addition, the BLM Medical Team members are trained in tactical medicine and are capable of providing care under fire, tactical first aid in an unsecured trauma scene, and can act as a force multiplier in active shooter and mass casualty environments. *Id.* at ¶32. These services are invaluable in keeping over 100 federal employees healthy in the austere environment at the Burning Man event. *Id.* Other the labor of the single BLM employee responsible for pre-event planning and working at the event (AR Doc. 3 at 7), there are minimal costs. *See* AR Doc. 7 at lines R-8 ($346.92), R-12 ($2,500.00), and R-14

---

[11] The 17 VoIP lines required for 2016 actually represents a decrease from previous years. *See* AR Docs. 82 at 58 (20 lines in 2015), 102 at 62 (21 lines in 2014).

AR07629

1   ($47.50).  The Department of Health and Human Services, which also provides staff for the

2   BLM Medical Team, has not traditionally charged for its services at the Burning Man event.  *See*

3   AR Docs. 2, 80, 103 (showing that HHS has not invoiced the BLM for its services at the Burning

4   Man events for 2014-2016).  The only other cost of the BLM Medical Team is the cost for the

5   modular building at the JOC, which is described in more detail below.  *Id.*; *see also* AR Doc. 48.

6           BRC has instead proposed that federal employees use the first aid stations and the

7   medical facility that is available to event participants.  *See* Appeal at 29.  However, the BLM has

8   determined that BRC's proposal would not provide for a tactical medical response team, provide

9   adequate space for uniformed law enforcement to securely receive care, allow for pre-screening

10  of BLM employees, ensure patient confidentiality, provide continuity of care and patient

11  advocacy, or initiate worker's compensation claims.  Briscoe Dec. at ¶33.  Federal employees

12  working at the Burning Man event would lose access to secure medical care with trusted

13  providers.  *Id.*  Due to the specialized needs of the BLM's operations at the Burning Man event,

14  including care to uniformed law enforcement officers, the BLM has determined that the BLM

15  Medical Team is not a redundant function when compared to the medical services BRC provides

16  for the participants at the Burning Man event.  *Id.*  The services provided by the BLM Medical

17  Team are invaluable to the government and integral to employee safety and health while working

18  at the Burning Man event.  BRC has only provided its unsubstantiated opinion otherwise.  *Id.* at

19  ¶¶30-34.

20          As part of its argument, BRC alleges that the BLM Medical Team provides CPR

21  certification for employees at the Burning Man event and so it should not be included as part of

22  the cost recovery process.  Appeal at 29.  However, the BLM Law Enforcement Branch Chief

23  confirmed that CPR training and certification is not done at the Burning Man event and is instead

24  provided at the government's expense at each BLM office throughout the year.  Briscoe Dec. at

25  ¶35.  Accordingly, Appellant's allegation has no merit.

26          BRC further complains that the BLM Medical Team is unnecessary, so the cost of the

27  modular building that houses it should not be charged through cost recovery.  Appeal at 34-35.

28  The BLM determined, however, that medical services for federal employees are necessary at the

AR07630

Burning Man event and thus the cost of a modular building at the JOC, totaling $5,401.94, is an actual cost that must be captured through cost recovery. AR Doc. 48.  BRC had the opportunity to contract for the modular building itself and thus avoid the 23.1% indirect cost recovery rate that it would incur if the BLM contracted for the building. *See* AR Doc. 60; Pirtle Dec. at ¶11. However, BRC declined that contract, arguing that the BLM Medical Team is unnecessary and that federal employees should instead use BRC's medical facilities. *Id.*

Since the BLM must recover the full costs it incurs to administer the SRP for the Burning Man event and the BLM Medical Team has been determined to be necessary to the BLM's administration of the SRP, it was included in cost recovery in accordance with FLPMA, the BLM's SRP regulations, the BLM's cost recovery and recreation policies, and OMB Circular A-25.  BRC has not shown error and accordingly the Closeout Decision should be affirmed.

### G.    BLM's vendor monitoring is appropriate

BRC further complains that it should not be required to pay for the costs of monitoring vendors who serve Burning Man event participants.  Appeal at 30.  As part of the event, vendors may provide needed services to participants including bus transportation to the event, RV greywater cleaning, or site cleanup post-event.  Many of these vendors serve the so-called "plug and play" camps.[12]  Since these vendors are working on public lands, they are required to obtain a permit.  While they could be covered under the main Burning Man SRP, that option would require BRC's oversight because any violation of permit terms by one of those vendors would be a violation of BRC's SRP.  Mack Dec. at ¶17.  As an alternative, the BLM has allowed each vendor to obtain its own permit, so that compliance with permit terms can be monitored vendor by vendor.  Over 75 vendors provided services to participants in 2016 and the labor to ensure they have the required permits is therefore charged to BRC's cost recovery account.

BRC essentially argues that the BLM should charge its vendor compliance labor to the individual vendors themselves, or that the fees charged by the BLM for commercial use SRPs are sufficient to reimburse that labor.  Appeal at 30.  Neither argument has merit here.  The vendors

---

[12] More information about plug and play or turnkey camps is available on the Burning Man website at https://burningman.org/event/camps/turnkey-camping/ (last visited June 26, 2017).

AR07631

are only present to provide services to the participants at the Burning Man event, for which BRC
is responsible, and in fact those vendors cannot provide their services to other public land users
because the area is subject to a closure order. Mack Dec. at ¶14. In some cases, BRC actually
controls which vendors may be present and issues its own authorizations for vendors. *See* AR
Doc. 30 at Stipulation 13 (outlining the process for BRC to recommend/authorize vendors to the
BLM so that the BLM can determine if it will issue an SRP). Indeed, estimates of BLM's labor
costs for vendor compliance were included in the Estimate Decision and BRC did not object at
that time. AR Doc. 32. Additionally, the 3% of gross receipts paid by all commercial SRP
holders does not pay for processing and administration of the permit, as BRC argues. *See*
Appeal at 30. Instead, fees for commercial use permits are intended to provide a fair return to
the government for the opportunity to make a profit by using public lands and related waters.
AR Doc. 110 at 1-23 through 1-25 (example illustrates that both cost recovery and a commercial
use fee are charged for commercial events). Accordingly, it is appropriate and reasonable for the
BLM to monitor vendor compliance at the Burning Man event and to include those costs in the
Closeout Decision. BRC has not shown BLM error and therefore has not supported its burden
on appeal.

### H.    BLM's purchase of goggles is not in error

BRC argues that the BLM's should not charge through cost recovery for the purchase of
goggles for employees working at the Burning Man event. Appeal at 36-37. As the BLM
explained in BRC's appeal of the 2015 Closeout Decision, goggles are considered necessary for
the safety and protection of BLM staff working at the event, due to the harsh conditions on the
playa and the frequent dust storms that occur. Pirtle Dec. at ¶12. Goggles are also designated as
Personal Protection Equipment ("PPE") by the BLM and once issued, are not thereafter re-issued
to other staff.[13] *Id.* While some BLM staff working at the Burning Man event bring their own
goggles, it is unknown ahead of time exactly how many pairs of goggles will be needed and so
the BLM orders a sufficient quantity for everyone. *Id.* Even those employees who have worked

---

[13] The Department of Labor, Occupational Safety and Health Administration ("OSHA") has more information about
PPE at https://www.osha.gov/SLTC/personalprotectiveequipment/ (last visited June 24, 2017).

AR07632

at the event in the past may have lost or damaged the goggles during the prior year's event or over the intervening time period.  BRC provides absolutely no evidence to support its claim that the BLM allows its employees to "keep such equipment for personal use."  Those goggles that are unused are stored so they can be used at future Burning Man events.  *Id.*  Such use of goggles has been the BLM's standard operating procedure since 1996.  Pirtle Dec. at ¶12.  Ultimately, BRC's mere disagreement with the BLM's practice of providing PPE to its employees working at the Burning Man event is insufficient to show agency error.

## I.     The Closeout Decision does not include labor for BLM's interpretive camp

BRC speculates that the BLM used the cost recovery process to pay for labor to set up and operate the BLM's interpretive camp at the 2016 Burning Man event.[14]  Appeal at 27-28. The interpretive camp helps introduce Burning Man participants to BLM public land management and the Black Rock Desert National Conservation Area.  BRC, however, provides no evidence to support its assumption that the BLM charged costs for the interpretive camp to BRC's cost recovery account.  Indeed, the BLM Authorizing Officer for the 2016 Burning Man event confirmed that the costs for setup, labor, and teardown at the interpretive camp were paid by the BLM itself.  *See* Mack Dec. at ¶¶12-13.  While the BLM's AAR describes how several BLM logistics staff set up the interpretive camp, BRC's cost recovery account was not charged for that time.  *Id.*; AR Doc. 17 at 16.  For that reason, BRC's speculation does not support its burden on appeal.

## J.     The BLM properly charged the indirect cost recovery rate

Finally, BRC challenges the BLM's imposition of the indirect cost recovery rate ("indirect rate") of 23.1% on all direct costs.  Appeal at 37-40.  BRC alleges both that the BLM's indirect rate duplicates direct costs and also that the BLM should not charge the indirect rate for any direct costs incurred during the Burning Man event.  *Id.*  Those arguments, however,

---

[14] BRC also argues that it should not have been charged for the costs of the BLM's junior ranger badges and law enforcement wristbands, which are handed out to participants.  Appeal at 26.  Those costs were inadvertently charged to BRC's cost recovery account.  The BLM has requested that the Board allow the agency to amend the Closeout Decision in order to refund BRC for the costs of those items.  *See* BLM's Request to Amend the Decision Under Appeal filed on June 29, 2017.

AR07633

evidence a fundamental misunderstanding of the BLM's cost recovery process and the rationale behind the indirect rate, which is required by law, regulation, and policy. Such a misunderstanding does not support BRC's burden on appeal.

Federal government agencies are obligated to recover the full cost of providing a special benefit from the benefit's recipient. OMB Circular A-25; *see also* 31 U.S.C. § 9701 ("It is the sense of Congress that each service or thing of value provided by an agency…to a person…is to be self-sustaining to the extent possible.). As applied to the Burning Man SRP, that means that the BLM must charge BRC for those actual costs incurred for administering the permit. Cost recovery for SRPs is authorized by the SRP regulations. 43 C.F.R. § 2932.31.

Direct costs, as explained by the BLM's cost recovery manual, are those costs which are of such a nature that the amounts applicable to a specific project can be accurately and readily determined. AR Doc. 150 at Glossary 2. Direct costs are incurred for the benefit of a specific cost reimbursement project which is identified by a project number. *Id.*

In contrast, indirect costs are costs expressed as a percent of direct costs which are of such a nature that the amounts applicable to a specific project cannot be accurately or readily determined. *Id.* Indirect/overhead costs are incurred either jointly for the benefit of more than one cost reimbursable project, or in units which are so small that they cannot practically be reported separately. *Id.* In other words, the indirect cost pays for those administrative support activities that support the BLM's overall mission. AR Doc. 124 at 3. "Indirect costs are coded to the subactivities that would be charged if the ROW project did not exist." AR Doc. 150 at .18B2. As described above, the BLM's SRP Handbook says that indirect costs may include "equipment, space rental, telephone services, postage, personnel transfer costs, administrative and clerical support, training, safety, public information, cartography and basic series mapping, aviation management, telecommunications, equipment maintenance, and systems design and implementation." AR Doc. 110 at 1-29 through 30. Every identifiable recipient of special benefits derived from Federal activities beyond those received by the general public must pay the indirect rate. AR Docs. 148 at 3, 149 at 2.

AR07634

1    BRC's argument that it has been charged twice implies that the indirect rate is the only

2    way that the BLM may collect for those activities that are listed as examples of potential indirect

3    costs.  For instance, BRC argues that the BLM may not recover as a direct charge the costs for

4    BLM staff travel expenses because travel is listed as an example of an indirect cost in IM 2014-

5    32.  Appeal at 38.  However, BRC does not provide any evidence to support its claim that BLM

6    may not recover travel as a direct cost.  In making its argument, BRC ignores the fact that federal

7    employee travel to and from the Burning Man event in order to work as part of the BLM's

8    administration of BRC's SRP is clearly a cost that applicable to a specific project and can be

9    accurately and readily determined.  *See* AR Doc. 150 at Glossary 2.  Nowhere in the BLM's law,

10   regulation, or policy does it specify that the BLM may recover for travel only through the

11   indirect rate, nor does BRC provide support for its interpretation.  Since the travel outlined in the

12   Closeout Decision is a direct cost, it is subject to the indirect rate.

13   Similarly, BRC argues that the BLM cannot charge directly for the agency's public

14   information officer working at the 2016 Burning Man event because public information and

15   inquiries are listed as examples of indirect costs.  Appeal at 39.  BRC also objects to the costs for

16   communications equipment used at the 2016 Burning Man event and a new tire for a BLM

17   vehicle that was damaged at the event, arguing that office supplies and vehicle maintenance are

18   listed as examples of indirect costs.  *Id.*  But again, BRC ignores the fact that those staff and that

19   equipment provided an identifiable service that is *only* attributable to the 2016 Burning Man

20   event.  They are necessary for the BLM's administration of the Burning Man SRP and since it

21   was directly related to the event, it was captured for cost recovery.  There is no legal support for

22   BRC's argument that the BLM may only collect for those services or tasks through the indirect

23   rate.  As direct costs attributable to the 2016 Burning Man SRP, they are included in the

24   Closeout Decision and are consequently subject to the indirect rate.

25   To follow BRC's argument to its logical end would mean that regardless of how much

26   the BLM spent on administering the 2016 Burning Man SRP, the agency may not be able to

27   recover the full amount of the actual costs, contradicting FLPMA section 304(b) and OMB

28   Circular A-25, which direct the BLM to recover the full costs of processing permits for the use of

the public lands.  In fact, the Department of the Interior, Office of the Inspector General issued a survey report in 1999 examining the BLM's use of the indirect rate.  AR Doc. 147.  That report found that the agency's then-common practice of limiting the indirect rate had resulted in a failure to collect the total reimbursable overhead costs of providing services to organizations and individuals, in violation of Circular A-25 and FLPMA.  *Id.* at 2-3.  The report recommended that the BLM identify management overhead costs and use that data in setting the indirect rate.  *Id.* at 4.  As BLM outlines in IM 2016-107, the agency now reviews the indirect rate annually and directs staff to work diligently to recoup indirect costs.  AR Doc. 61 at 8.

Additionally, BRC also argues that it provided the infrastructure for BLM's operations at the 2016 Burning Man event and thus it should not be charged an indirect rate.  Appeal at 39. While BRC provided some infrastructure such as trailers and other equipment through the BLM/BRC contracting MOU, BRC did not provide all of it and the indirect rate applies to the BLM-provided materials.  Pirtle Dec. at ¶¶9-11; AR Docs. 63, 116.  BLM's labor costs are also subject to the indirect rate.  *See* AR Doc. 150 at Glossary 2.  Moreover, BRC's argument ignores the fact that the BLM's processing and administration of the SRP occurs outside of the actual event itself.  BLM works nearly year-round on the Burning Man SRP, so the agency incurs overhead/administration costs that the indirect rate is designed to recover.  Mack Dec. at ¶18. The BLM SRP handbook reiterates that cost recovery, which includes BLM's direct and indirect costs, starts upon receipt of a completed application.  AR Doc. 110 at 1-29.  Thus, the indirect rate is appropriate for the Burning Man event.  *See* AR Doc. 69 (denying BRC's request for a waiver of the indirect rate in 2016), 129 (2013 denial).

It is clear that BRC wants to pay less in cost recovery for its SRP for the Burning Man event.  But when granting an SRP, the BLM is charged with ensuring public safety and resource protection on the public lands.  43 C.F.R. § 2932.26.  In doing so, the BLM must recover the full, actual costs of processing and administering the SRP.  43 C.F.R. § 2932.31.  That includes both direct and indirect agency costs.  *Id.*  If BRC feels that those costs are excessive, it may decide to hold the event in someplace other than the public lands.  *See Bookcliff Rattlers*, 171 IBLA at 19; *see also* Mack Dec. at ¶19.  In fact, BRC had that opportunity when the BLM provided it with

AR07636

1  the Estimate Decision.  AR Doc. 58.  But BRC signed the CRA and paid the full amount of the

2  Estimate Decision, which included the estimated costs for holding the 2016 Burning Man event

3  on public lands and the indirect cost recovery rate.  In fact, BRC actually received a refund

4  because the BLM's costs were <u>less</u> than estimated.  *See* AR Doc. 1.  The BLM cannot force the

5  public to absorb the costs of Burning Man, and to do so would be contrary to law, regulation, and

6  policy.  Accordingly, BRC has not supported its burden on appeal to show that BLM was in error

7  when it imposed the indirect cost recovery rate on this commercial event.

8  **IV.    CONCLUSION**

9       Based on the legal arguments above that are supported by evidence in the record, BRC

10  has not met its burden to show BLM error by a preponderance of the evidence.  BRC's mere

11  opinion that the BLM should have spent less on administering the 2016 Burning Man SRP is

12  insufficient to overturn the BLM's Closeout Decision.  BRC submitted its SRP application and

13  signed the CRA, which included the Estimate Decision.  As the Board has stated, "the entire

14  point of an estimate is to convey general cost information to an applicant so that it can decide

15  whether to proceed."  *Bookcliff Rattlers*, 171 IBLA at 19.  BRC knew about the costs and

16  proceeded with its event.  It cannot now shift the BLM's costs to administer the SRP for the

17  2016 Burning Man event onto the public.  The Closeout Decision has a rational basis and is a

18  proper exercise of the BLM's discretion.  Since BRC has not demonstrated that the BLM is in

19  error, the Closeout Decision should be affirmed.

20       DATED this 29th day of June 2017.

21                                              Respectfully submitted,

22

23                                              Janell M. Bogue
                                                Attorney for the Bureau of Land Management

24

25

26

27

28

AR07637

1

**CERTIFICATE OF SERVICE**

2  Re:   <u>Black Rock City LLC v. Bureau of Land Management</u>; IBLA 2017-126

3       I, the undersigned, declare that:

4       I am a citizen, of the United States, over the age of eighteen, and not a part of this

5  litigation.  On June 29, I served the

6                    **BLM ANSWER TO STATEMENT OF REASONS**

7  by placing a true copy enclosed in a sealed envelope via U.S. Postal Service certified mail and

8  email at Sacramento, California, addressed as follows:

9                    United States Department of Interior
                    Office of Hearings and Appeals
10                   Interior Board of Land Appeals
                    801 N. Quincy St., Suite 300
11                   Arlington, VA  22203
                    703-235-3750
12                   ibla@oha.doi.gov

13                   Elizabeth B. Stallard, Esq.
                    Downey Brand LLP
14                   100 West Liberty, Suite 900
                    Reno, NV 89501-1958
15                   775-329-5900
                    estallard@downeybrand.com

16

17       I declare under penalty of perjury that the foregoing is true and correct.  Executed on the

18  29th day of June, at Sacramento, California.

19

20

21                                              _____

22                    Kim Machuca
                    ~~Administrative~~ Assistant

23

24

25

26

27

28

AR07638

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:     (916) 978-5690
Facsimile:     (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management


UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2017-126 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF DALTON BLACK** |
| | ) | |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, Dalton Black, hereby declare as follows:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.      I am currently employed as the Nevada State Telecommunications Manager for the Bureau of Land Management (BLM). I have been employed with the BLM in this position since February 2013. Before this position, I was a Telecommunications Specialist for the BLM for 6 years. I have worked in the Telecommunications department with the BLM for 10 years.

2.      I have 6 years of experience working the Burning Man Event (Event), both in planning the BLM operation and executing the operation at the event site. I have served in two positions. I was a Communications Technician for 2 years and a Communications Unit Leader for the other 4 years.

AR07639

3.      My duties during the 2016 event, as the Communications Unit Leader, included designing the radio system, installing new dispatch consoles, creating the frequency plan and installing the radio network.

**BLM's Contract with Midland Radio Corporation**

4.      Prior to the 2015 event, the BLM and Black Rock City, LLC (BRC) jointly agreed to create a radio cache for the Burning Man event. This cache would hold all the radios that would be needed for each year's Burning Man event for both the BLM and the Pershing County Sheriff's Office and would be used exclusively for the event. The Pershing County Sheriff's Office's own radios do not function on the Burning Man event's radio system. 120 radios were planned for purchase in total. 60 radios would be purchased before the 2015 event and 60 radios would be purchased before the 2016 event.

5.      BRC and the BLM initially agreed that the radios would be made by Motorola because the BLM's law enforcement officers were familiar with them, but then determined that Midland radios were $5,000 less per radio. As agreed, BRC purchased 60 Midland radios prior to the 2015 event for a cost savings of $300,000 in 2015 over the Motorola radios. Those 60 radios were used at the 2015 Burning Man event by Pershing County Sheriff's Office staff as well as BLM civilian staff members.

6.      After the 2015 Burning Man event, BRC expressed interest in using those 60 Midland radios from the cache for other purposes throughout the year. BLM agreed to remove the encryption and programing from the radios and leave them with the BRC's radio contractor for the remainder of the year, with the agreement that BLM would pick the radios up before the 2016 event.

7.      After the 2015 event, the BLM completed testing with multiple radios of various brands to determine a standardized radio for its fire program. This testing concluded with a decision to transition from its existing Midland radios to another brand. This left the BLM with 80 Midland radios that were no longer needed for the fire program. The BLM communicated to BRC that those radios could be used for the Burning Man event radio cache, rather than BRC buying additional radios as had been agreed upon before the 2015 event. The BLM communicated to BRC that it planned to use those 80 radios transferred from the fire program for BLM employees at the Burning Man event, while the 60 radios purchased before the 2015 event would be used by the Pershing County Sheriff's Office. The BLM did not determine that any radios were unnecessary or unneeded.

8.      By acquiring radios for the Burning Man event cache from the fire program, the BLM saved BRC money that BRC would have spent on purchasing radios as it had agreed to do. BRC was only financially responsible for covering the costs of having the radios encrypted and buying the additional accessories needed. That cost was $21,976. That cost was actually less than anticipated, because Midland only charged the BLM for encrypting 50 radios and the BLM had spare accessories available, so they did not all need to be purchased.

9.      For the 2016 event, the BLM needed 120 radios total for its employees. 80 radios were needed by BLM law enforcement staff and those came from the Burning Man event radio cache,

as transferred from the fire program. The remaining 40 radios were needed by BLM civilian staff and those came from the BLM's own telecommunications program. The BLM covered the cost of encrypting and programing these 40 radios and those costs were not charged to BRC. The BLM determined that those radios would be used for the 2016 Burning Man event and then would be repurposed within the BLM, so the agency would not shift the financial burden for these costs to the BRC. The encryption and programming cost to the BLM for these 40 radios was $12,000. The 60 Midland radios purchased by BRC prior to the 2015 event, and used by BRC throughout the year, were used by the Pershing County Sheriff's Office.

10.     After the 2016 event, I understand that BRC sold the 60 Midland radios and accessories directly to the Pershing County Sheriff's Office.

**Radio Accessories**

11.     All accessories and radio equipment purchased by BLM for the 2016 event were for the 80 Midland radios that were contributed to the Burning Man event radio cache through the BLM fire program.  BRC agreed to the purchase of those items, which include microphones, rechargeable batteries, and battery chargers.

12.     The accessories purchased by BRC for the 2015 event were for the 60 Midland radios purchased by BRC and used by the Pershing County Sheriff's Office and BLM civilian staff. These same accessories were used by and sold to the Pershing County Sheriff's Office after the 2016 event.

13.     The four Pelican radio cases purchased before the 2016 event are used to house the 80 Midland radios that came from the BLM fire program and are now a part of the Burning Man event radio cache.  Since these 80 radios are only used for the Burning Man event, they must be stored securely during the rest of the year.

14.     The radio harnesses were purchased for Burning Man event Command Staff that are required to carry two radios (BLM radios and BRC radios) at the event.

15.     The AA radio batteries were used for the 40 radios provided by the BLM for the its civilian staff. These batteries were purchased through the Fire Cache in Boise, Idaho. They were ordered and shipped through the same process the BLM uses for all events.

Signature:____/s/Dalton Black_____Date:__6/28/2017__

AR07641

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:     (916) 978-5690
Facsimile:     (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management


UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2017-126 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF LOGAN BRISCOE** |
| | ) | |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, Logan Briscoe, hereby declare as follows:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.      I am currently employed as the Bureau of Land Management (BLM), Nevada, Zone 1 Supervisory Ranger (Winnemucca and Carson City Districts). I have been employed with the BLM in this position since June of 2014. Prior to this position, I was the Field Staff Law Enforcement Ranger in the BLM Tres Rios Field Office (Colorado) since 2005.

2.      I have 4 years of experience working at the Burning Man event, both in planning the BLM operation and executing the operation at the event site. I have served in multiple positions at the event, to include Patrol Officer, Patrol Commander, Planning Section Operations Chief, and Law Enforcement Branch Chief.

AR07642

3.      The BLM, Winnemucca District manages the Black Rock Desert-High Rock Canyon Emigrant Trail National Conservation Area (NCA); within this NCA are the Black Rock Desert and the "playa." The playa encompasses about 265 square miles (169,000 acres) of public and private lands in the Washoe, Pershing, and Humboldt Counties, Nevada.

4.      The Burning Man Event is a combination art festival, social event, and experiment in community living. The event is held on public lands administered by the BLM in Pershing County, Nevada on the playa of the Black Rock Desert, approximately 10 miles northeast of the community of Gerlach, Nevada.

5.      I have reviewed the appeal filed by Black Rock City LLC (BRC), the organizer of Burning Man and the applicant for the Burning Man Special Recreation Permit. I am personally familiar with the 2016 special recreation permit (SRP) and I served as the lead planner for law enforcement operations for the 2016 event, as well as the Law Enforcement Branch Chief during the event.

**Law enforcement officer staffing levels**

6.      It is BLM's responsibility to determine staffing levels and costs associated with the administering the law enforcement function at the event through the Cost Recovery Agreement (CRA). As stated in the 2016 Law Enforcement Operations Plan, the overall goal of the operation is to provide for public safety and resource protection through the enforcement of federal laws, state laws, county ordinances, regulations, event closure orders, and permit stipulations.  To achieve the goal, the law enforcement operational objectives for the 2016 event were: to safeguard and protect human life, to safeguard and protect natural and cultural resources, to ensure the permitted event occurs without disruption, and to keep costs commensurate with incident needs.

7.      To ensure these objectives were met, the BLM planning team determined 75 federal law enforcement officers were needed.  Of these 75 officers, 10 were assigned administrative support or oversight roles, leaving 65 officers to patrol and provide investigative support in the city. Officers were divided into three overlapping shifts (21 officers per shift), providing 24 hour coverage through the city while accounting for travel to and from Gerlach.  These officers conducted high visibility patrols throughout Black Rock City across five patrol sectors through a combination of vehicle and foot patrols.

8.      Because the event is held on federal public lands administered by the BLM under an SRP, it is the responsibility of the BLM to ensure effective law enforcement exists during the event.  Federal public lands administered by the BLM fall under proprietary jurisdiction, meaning state and local law enforcement agencies, in this case the Pershing County Sheriff's Office (PCSO), also have the authority and responsibility for ensuring public safety.  At the event site, PCSO is the only agency with the jurisdiction to investigate person-on-person crime, which includes domestic violence, assault and battery, theft, sexual assaults, etc.  As such, BLM must ensure affected state and/or local law enforcement agencies have the resources to ensure response to, and investigation of, person-on-person crimes.

AR07643

9.    During the 2016 event, PCSO staffed the event with 18 patrol deputies and or investigators. This means there were approximately three times more BLM officers than PCSO officers assigned to patrol and investigative support for the event. Because of disparity, BLM officers responded to PCSO calls for service because PCSO patrol officers were not available. This was problematic because BLM officers have limited training in investigating person-on-person crimes falling under the Nevada Revised Statutes. Due to the sensitive nature of these crimes, coupled with the specific skillset and knowledge required to conduct such investigations, PCSO must be staffed at a level allowing them to investigate all person-on-person crimes investigations from the onset of the initial report.

10.    In accordance with the recommendations of the International Association of Chiefs of Police (IACP), the ratio of law enforcement officers to population for a population range of 50,000-99,999 people should be 1.8 officers per 1,000 people. The peak population of Black Rock City is approximately 76,000. According to the PCSO Post Mission Synopsis (PMS) report from the 2016 event, PCSO has approximately one deputy for every 400 persons permanently residing in Pershing County, outside of the event. PCSO explains this level of staffing is needed to perform all of the duties statutorily mandated for the Sheriff's Office. In the 2016 PMS report, the Sheriff recommended funding be provided by BRC to allow his office to staff the event with 40 deputies per shift (or 80 deputies total).

11.    Using the IACP recommended staffing ratio, at the highest level of staffing at the 2016 event, during overlapping shifts (representing 13 hours during a 24 hour period), BLM had 42 officers (patrol and investigations), and the Pershing County Sheriff's Office (PCSO) had 9, yielding 1.8 officers per 2,682 people. During the lowest level of staffing at the 2016 event, with a single shift on duty (representing 11 hours during a 24 hour period), BLM had 21 uniformed officers (patrol and investigations) and PCSO had 9, yielding 1.8 officers per 4,560 people. Both of these ratios are well above the IACP recommendation.

12.    For the BLM only, from the hours of 8:00 AM to 3:00 PM, day shift is the only shift on playa with a total of 17 BLM uniformed officers (patrol) deployed throughout Black Rock City. At the peak population, approximately 76,000 people were present within the city, which yields an officer to participant ration of 1 to 4,470. During the hours of 3:00 PM to 5:00 PM, there is overlap between the day shift and swing shift, resulting in 34 BLM patrol officers, leading to an officer to participant ratio of 1 to 2,235. From 5:00 PM to 7:00 PM, swing shift is the only shift on playa, staffed by 17 BLM patrol officers, leading to an officer to participant ratio of 1 to 4,470. From 7:00 PM to 3:00 AM, the swing shift and night shift overlap, staffed by 34 patrol officers, leading to an officer to participant ratio of 1 to 2,235. From 3:00 AM to 5:00 AM, night shift is the only shift of playa, staffed with 17 BLM patrol officers, leading to an officer to participant ration of 1 to 4,470. From 5:00 AM to 8:00 AM, the night shift and day shift overlap, staffed by 34 uniformed officers, leading to an officer to participant ratio of 1 to 2,235.

13.    The appellant has stated that BLM law enforcement's engagement in public contacts during the event indicates the BLM is overstaffing the event. The central tenet of BLM law enforcement is achieving compliance with laws and regulations at the lowest level possible level through educating public land users. As affirmed in a May 12, 2017 e-mail from Secretary of the Interior Zinke, Department of Interior law enforcement officers "…may be called on to render emergency medical care, investigate complex resource crimes, perform harrowing technical

AR07644

rescues, or engage in proactive community policing." As such, a large component of achieving compliance with rules and regulations on public lands is through proactively contacting members of the public by BLM law enforcement rangers. This principle holds true during patrols of public lands outside of the event, as well as during the event.

14.     According to the BRC Census from the 2016 event, approximately 39% of participants at the Burning Man event are new. As such, many of the visiting public do not have a clear understanding of the rules and regulations governing the event. BLM law enforcement officers make hundreds of contacts a day, a product of conducting high visibility patrols in a largely pedestrian city. In the operational briefing for the 2016 event, BLM officers were instructed to seek out positive contacts with the public through the course of their patrols. These contacts allowed BLM law enforcement officers to educate the visiting public on rules and regulations that govern the event, as well as provide information pertaining to Black Rock City resources. Although BRC may have a different belief about what BLM law enforcement's job should be during the event, the methodology by which BLM law enforcement officers approach the job capitalizes on positive interactions with the public in helping achieve compliance at the lowest level.

15.     Through staffing of a BLM law enforcement substation, located along the Esplanade, or the "main street" of Black Rock City, participants make hundreds of contacts each day with the law enforcement officer staffing the substation. During the 2016 event, these contacts were reported through dispatch and captured within Computer Aided Dispatch (CAD) as public contacts. The appellant feels BLM is engaging in public relations efforts in order to justify the presence of law enforcement personnel on site. Contrary to BRC's opinion, these public contacts are not used by the BLM to support or justify staffing levels for the event. As previously mentioned, the BLM determines staffing levels to ensure the four main objectives identified in the operations plan are met. "Public contacts" as an event type in CAD do not have a follow-up administrative reporting requirement, and as such are not used as a measurement of workload when determining the appropriate level of BLM law enforcement staffing for the event. On the contrary, incidents involving a law enforcement action taken, such as warnings, citations, or arrests, do involve the additional task of report writing and contribute to the workload requirements and staffing needs of the event.

16.     Although BRC contends BLM law enforcement is overstaffed, BRC's Law Enforcement Liaison stated in a meeting on May 17, 2017 that BRC was planning to employ contracted security personnel for BRC staff at the event because BRC staff were assaulted in the 2016 event. In BRC's 2016 event After Action Review at page 14, BRC states there were reports of battery against Rangers (referring to Black Rock Rangers) by participants. BRC stated they would work with law enforcement to find additional solutions for dealing with combative participants, which could include increased training and education, eviction from the event, and/or the use of other remedies available under Nevada law. On May 25, 2017, BRC's Director of Event Operations informed BLM they were interested in using private security to address the "violent human niche" at the event; however, due to the "flakiness" of security companies, the three they had lined up fell through. He indicated BRC was still interested in using private security for future events, but it would not happen for the 2017 event. BRC's attempt to provide additional security for staff at the 2017 event serves as an indication law enforcement staffing during the event may not be sufficient.

AR07645

17.     Statistics cannot be relied upon as the only measurement tool of the effectiveness or need for law enforcement at the event. Relying solely on quantitative data ignores the deterrent effect high visibility patrols have on criminal activity within Black Rock City. Deterrence is most powerful when a would-be violator perceives they will be caught committing a crime. BLM law enforcement provides proactive, highly visible patrols throughout the city and participants can observe law enforcement taking action, which works to minimize criminal behavior. Additionally, participants often state they feel the presence of law enforcement officers in the city makes them feel safer. While, like deterrence, this variable cannot be measured statistically, the mere presence of law enforcement in the city is important to the safety of members of the visiting public.

18.     Black Rock City consists of 56 miles of surveyed, engineered, and maintained roads, to include street names, signs, traffic control devices, and signed speed limits. In order to drive a privately owned vehicle into the event, a vehicle pass must be purchased from BRC. As reported by BRC, 39,700 vehicle passes were sold for the 2016 event. This number grows when you include BRC staff vehicles. There is only one gate for general admission ticket holders to enter the event; during the peak ingress period, thousands of vehicles are entering through this point in a span of hours. Despite the large volume of vehicles entering the event on the access road, BRC states traffic offenses hardly pose a serious threat to public safety. However, BRC themselves have implemented their own standards for ensuring vehicle safety. Through exemptions provided in the closure and restriction order, BRC is allowed to authorize "mutant vehicles" to operate during the event through BRC's own licensing protocols. BRC listed a number of "driving rules" in the "DMV-Mutant Vehicles" section of the 2016 Event Operation Plan. In this section, BRC requires anyone driving in the event adhere to these driving rules, which include but are not limited to driving licensed vehicles, abiding by applicable federal and state laws, obeying the speed limit, and prohibiting driving under the influence of drugs or alcohol. The appellant asserts the PCSO has primary responsibility for enforcing state traffic laws at the event, but that is not accurate. PCSO has advised the BLM that the Nevada Revised Statutes (NRS) specific to traffic regulations do not apply on the playa during the Burning Man event. As such, the PCSO does not have the authority to enforce existing state traffic laws at the event. Since these traffic laws are not enforced by a state or local law enforcement entity at the event, the BLM put forth a restriction order regarding motor vehicle use and operation to provide for public safety during for the 40,000 vehicles that entered and exited the 2016 event. BLM is therefore responsible for motor vehicle safety at the Burning Man event.

19.     As previously stated, a substantial number of vehicles traverse across the playa during the event during ingress and egress. The appellant contends enforcement of traffic laws during the event by BLM law enforcement is unreasonable in light of BRC's safety record. This opinion does not account for the deterrent effects of BLM law enforcement conducting proactive, highly visible law enforcement patrols on the roadways leading to and within the city. In 2016, BLM law enforcement made 1,254 traffic stops. Assuming all 39,700 vehicles entered the gate once during the event, BLM law enforcement conducted a traffic stop on approximately 3% of the vehicles entering the city.

20.     Every year a significant number of controlled substances violations are investigated by law enforcement inside the Burning Man event. The majority of illicit substances are transported via privately owned vehicles, entering the event from one of two entrance points. These

AR07646

controlled substances are often times uncovered through the course of a traffic stop. Removing these substances before they enter the city helps reduce the potential for harm to members of the visiting public and employees. In 2016, federal law enforcement officers issued 82 citations for possession of controlled substances; PCSO issued 152. Additionally, PCSO made 46 arrests in 2016, many of which were related to trafficking of controlled substances. It should be noted that BRC staff control gate operations (both entry and exodus) without a law enforcement presence. During the 2016 event, I am not aware of any narcotic violations reported to law enforcement by BRC gate personnel. Either BRC gate personnel lack the proper training and expertise to locate narcotics or they are purposely ignoring violations of law.

21.     Referring to use of K9 units used to detect illicit substances, the appellant opines BLM has not provided justification for spending so much on this law enforcement tool because PCSO is the primary enforcer of controlled substance laws at the event. BLM policy directs BLM to make public lands drug-free through enforcement of applicable in cooperation with all Federal, State, and local law enforcement agencies. Policy further requires the BLM to counter illegal drug activity on public lands by aggressively seeking to detect and investigate drug activity; seeking prosecution of persons engaged in drug cultivation, manufacture, trafficking, and use; and obtaining and coordinating drug-related intelligence to assist investigation, interdiction, and prosecution efforts. During the planning phase of the event, BLM law enforcement and PCSO collaborated on the appropriate strategy for detecting, investigating, and prosecuting drug offenses during the 2016 event. Part of the strategy to use BLM K9 units as a tool for narcotic detection. During the 2016 event, 9 K9 units were deployed (3 per shift) to further the drug enforcement strategy.

22.     The appellant claims it is not reasonable for BLM to charge BRC for costs associated with the presence of a representative from BLM's Office of Professional Responsibility (OPR) at the event. During the event, the BLM uses a supervisory structure to ensure BLM officers are following a myriad of agency protocols and policies, both in the patrol and investigation functions. Similarly, the BLM staffs one special agent from OPR to review Use of Force (UOF) reports to ensure compliance with the agency UOF policy. During the 2016 event, 8 UOF reports were filed by BLM Rangers; this is a high level when compared to normal BLM operations outside of the event. Use of force complaints must be investigated by OPR according to BLM policy, and numerous evidentiary items associated with a UOF incident must be collected by a Senior OPR Special Agent soon after the incident as they are perishable. The presence of the OPR agent on playa is critical to meeting these requirements.

23.     It is important to note, BRC has supported the presence of an OPR agent in the past as a mechanism to be more responsive toward participant complaints against law enforcement operations and actions during the event.

24.     Additionally, the OPR agent is on-site and available to investigate all incidents, allegations, or complaints of misconduct against federal personnel assigned to the event. Due to the fact participants are from all over the country, and up to 20% international visitors, it would be a logistical challenge to conduct follow-up investigations remotely or after the fact. By having an OPR agent on-site, follow up interviews and investigations can occur in a transparent, timely and efficient manner as directed by policy. Due to the unique circumstances of the event, the BLM feels the position is required and necessary under cost recovery.

AR07647

**BLM community relations/public outreach efforts**

25.     BLM law enforcement officers hand out "swag" materials to participants, engaging in one of Black Rock City's guiding principle of gifting.  This engagement with the community helps break down barriers between law enforcement and participants, building on community relations.  The appellant stated BLM charged BRC approximately $2,400 worth of materials handed out to Burning Man participants on behalf of the BLM.  The BLM employee directed to make these purchases was provided with a BLM cost code for purchasing, but the employee mistakenly charged these items to cost recovery account.

26.     The Joint Operations Center (JOC) houses BLM and PCSO law enforcement activities, to include command staff, investigations, report writing, and the jail.  The JOC is located approximately ½ mile from the outside of Black Rock City proper.  Due to the pedestrian nature of BRC, participant access to law enforcement resources at the JOC is limited.  In order to ensure participant access to law enforcement services, the BLM set-up a Law Enforcement Substation in the heart of the city, next to Rampart hospital during the 2016 event.

27.     The appellant stated BLM's staffing of the LE Substation did not have any effect on public safety at the 2016 event, and as such, BLM did not demonstrate the costs were reasonable to the administration of BRC's permit.  The BLM contends the LE Substation is used as an established location within the city where participants can report criminal activity and file missing person's reports.  Additionally, the LE Substation affords a location central to the city for interviews of witness and victims without the added stress of removing witnesses and victims to the JOC for interviews.  The LE Substation is equipped with a radio, which allows officers to coordinate a response to a crime report within the city.  In addition to being utilized to improve participant access to law enforcement services, the LE Substation is used as a mobile report writing station.  This allows for efficiency and reduces labor costs because officers can write a report without travelling out of the city to the JOC.  The trailer housing the LE Substation was purchased with BLM funding, not through cost recovery.

28.     During the 2016 event, once officer was assigned to work the LE Substation.  As previously stated, the primary focus of the LE Substation was to provide participant access to law enforcement and allow for more efficient reporting, with a secondary function of community interaction.   Since BRC cannot provide law enforcement services to the participants of the event, the LE Substation is necessary to provide participants direct access.  The LE Substation was not a redundancy to the Black Rock Ranger station because it was staffed with sworn law enforcement officers capable of receiving criminal reports and coordinating a law enforcement response.  Visitation to the LE Substation is evidence that, while Black Rock Rangers and Earth Guardians provide useful service to participants, these services were not sufficient to meet the needs of participants looking for directions or reporting crimes within Black Rock City.  The mere presence of a law enforcement officer at the LE Substation may lead to an informal interaction with a member of the public.  As previously stated, BLM officers are encouraged to engage with the visiting public as part of integration with the community.

29.     It is customary in municipalities to staff a law enforcement substation central to the population with strong community outreach to build trust with citizens and increase operational efficiencies.  The IACP recognize the importance of mobile computing capabilities specifically

AR07648

at substations to increase efficiencies and increase proximity of officers to citizens.  Black Rock City is touted as one of the largest cities in Nevada during the event and as such it is reasonable to compare municipality policing methodology to the event as nothing else like it exists on other public lands administered by the BLM.

**BLM Medical Team**

30.    The appellant contends BLM's use of a separate medical facility is wasteful ad redundant and should not be imposed on BRC through cost recovery.  In 2016, the BLM Medical Team was required at the event to mitigate threats to employee health, safety, and well-being through a 24-hour mobile medical element. The team provided time-sensitive response and care to BLM employees in a secured environment at the JOC.  If not for the Burning Man event, these threats would not exist or need mitigated through the BLM Medical Team.  As such, the medical trailer and labor costs for the BLM Medical Team were charged against the CRA for the 2016 event.

31.    The BLM Medical Team leader is responsible for planning and coordination throughout the year to ensure a comprehensive medical plan is in place to mitigate threats to public health and safety.  During the event, the medical unit leader ensures the team serves as a federal patient advocate, providing personalized medical care for all government employees. This team is solely dedicated to providing care for federal employees assigned to the event.  As such, definitive patient care is delivered rapidly, which is one of the most critical tenets of mitigating medical threats to employees working at Burning Man. The BLM Medical Team maintains a sealed medical history on each person assigned to the Burning Man event in case a patient becomes unable to communicate, imperative to continuity of treatment. In addition to on-site care, the BLM Medical Team provides care on and off-playa with medical staff available at Black Rock Fire Station and house calls in Gerlach, NV. The BLM Medical Team is capable of providing federal employees immediate access to peer/Critical Incident Stress Management services if needed during the event and initiating necessary workmen's compensation paperwork. The BLM Medical Team provides personalized care to employees and has earned employee trust in care, provides comprehensive care, and reduces advanced medical issues during the event. The BLM Medical Team provides daily briefings to employees tailored to trends noted during the event to further employee health and safety.

32.    BLM Medical Team members are trained in tactical medicine and are capable of providing care under fire, tactical first aid in an unsecured trauma scene, and act as a force multiplier in active shooter and mass casualty environments. These services are invaluable to keeping over 100 federal employees healthy in an austere environment.  In addition, each shift was assigned a patrol officer also certified as an Emergency Medical Technician (EMT) to be used as a force multiplier to the BLM Medical Team, if needed. The layered approach of the medical plan for the 2016 event provided continuity of care from operations to the BLM Medical Team, similar to medical units in wildland firefighting, providing personalized medical surveillance, early preventative care, occupational medicine, and the ability to recognize changes in employees that may be in need of care.

33.    Due to the specialized needs of the BLM operation, the BLM does not feel the BLM Medical Team is a redundant function when compared to the medical services BRC provides for the participants of the event. There is no assurance BRC and their medical provider can ensure

rapid and immediate patient care for federal employees as they have primary care for a city of approximately 76,000 people. In addition, BRC's medical provider does not provide a tactical medical response team, provide adequate space for uniformed law enforcement personnel to securely receive care, does not allow for pre-screening of BLM employees or ensure patient confidentiality, does not provide continuity of care or patient advocacy, and cannot initiate workers compensation claims.

34.     The Federal Emergency Management Agency (FEMA) Special Events Contingency Planning Job Aids Manual (Special Events Manual) advises emergency management to consider medical personnel for public safety workers and to ensure safety of medical staff. Further, FEMA advises alcohol consumption, illicit drug use, type of event, and psychosocial behavior are significant intensifying variables in special event medical programming. FEMA's Special Events Manual advises medical requirements at an event be planned for the most critical injury or illness foreseeable and determination of a need for a mobile medical team. It is important to note these are the guiding principles for urban large scale, short-term special events with supplemental resources in close proximity to the event; due to the remote, austere environment in which federal personnel work at Burning Man, these variables are intensified, further driving the need for the BLM Medical Program.

35.     The appellant's statement regarding BLM wanting to have its own medical contractor at the event for CPR certification has no merit. The BLM has never considered utilizing a medical contractor at the event to certify employees on CPR. This training is conducted at the government's expense throughout the year in each BLM office.

Signature: _____     Date: __6/28/2017__
          /s/ Logan Briscoe

AR07650

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:    (916) 978-5690
Facsimile:     (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2017-126 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF WILLIAM MACK,** |
| | ) | **JR.** |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, William Mack, Jr., hereby declare as follows:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.       I am currently employed as a District Manager for the Bureau of Land Management (BLM) Arizona, Colorado River District. I was formerly the Field Manager for the BLM Nevada Black Rock Field Office (BRFO) from mid-July of 2014 to mid-January of 2017.

2.       I have over 20 years of experience working for the BLM and three years of experience with the Burning Man SRP.

3.       My duties during the 2016 Burning Man event as Field Manager were as the Authorizing Official (AO) for the Burning Man event permit and as the Incident Commander (IC) on playa during the event and implementation of the SRP. I had input in the development of

AR07651

the event Table of Organization; the development of the event Cost Recovery Agreement Estimate; the development of the event Permit Stipulations; and the development of the event Closure Order Restrictions. I was responsible for leading the effort for the closeout of the 2016 Cost Recovery Agreement and After Action Review (AAR).

**Emergency Designation**

4.      The Burning Man event is held in a remote desert location with the nearest full service community over 200 miles away. During the time of year that the event is held, it is also the peak time of Fire Season for the BLM around the U.S. If a situation of a serious magnitude should occur where the BLM needed to request additional resources, the BLM NV program that is responsible for implementing the Burning Man event would fall in direct competition with the BLM's Nationwide Fire Program for resource needs. Designating the Burning Man event as an emergency event allows it to be listed at the top of the list for resource needs should additional resources ever be necessary, regardless of the cause.

5.      Since 2012, an emergency designation has been supported by the Nevada State Director and the Director of the Office of Law Enforcement and Security with review and final approval by the BLM Assistant Director for Human Capital Management. 5 CFR § 550.106(a)(1) "Annual maximum earnings limitation" states the following: "For any pay period in which the head of an agency (or designee), or the Office of Personnel Management on its own motion, determines that an emergency exists, the agency must pay an affected employee premium pay under the limitations described in paragraph (c) of this section and§ 550.107 instead of under the biweekly limitation described in § 550.105(a)." The BLM will continue to follow the appropriate agency protocols and regulatory guidelines that insure appropriate pay for federal staff who work the Burning Man event.

6.      Emergency is defined as a temporary condition posing a direct threat to human life or property, including a forest wildfire emergency. The Burning Man event causes many temporary conditions posing a direct threat to human life and property. In conjunction with Black Rock City LLC (Appellant) and other government agencies, the 2016 event established a Tier 1 Management Team to address significant incidents. This included creating contingency plans for the following items: Militia Presence and Activities, Active Shooter/Active Threat, Weather Event, Civil Disturbance/Unrest, Fire, Fatality Accidents, Explosive Devices, Lost or Missing Child (which caused an exodus shutdown during the 2016 event), and Structural Collapse. The Tier 1 Management Team was comprised of administrators from the Pershing County Sheriff's Office, BLM, Black Rock City LLC, and Crowd-Rx (event medical provider).

7.      The Burning Man event is located in a remote area, two hours from the nearest city. This large mass gathering event has contingency plans due to previous significant incidents that have occurred at the event to include, but not be limited to: Loss of human life, property damage due to fire, and a significant weather event that impacted the participants, the permittee, and Federal, state, and local law enforcement agencies. Due to its remote location, substantial and rapid population growth, and limited local resources, all of the infrastructure to houses and support a city population in upwards of 80,000 plus people has to be transported to this remote location. This includes bringing in most of the emergency resources to include building a hospital. The Appellant has addressed the emergency needs by establishing an Emergency Services

AR07652

Department. Their department coordinates all professional emergency resources on the playa 24 hours a day. Their responsibilities cover all responses in the field including reports of fire, medical or psychiatric emergencies. Since 2005, the Appellant has increased their emergency management resources to handle the increased load and complexity of Black Rock City as the event continues to evolve each year.

8.      Pursuant to Instruction Memorandum (IM) No. 2015-133, Law Enforcement Staffing Requirements for Fiscal Year 2016 Special Events and High Use Recreation Areas, the 2016 Burning Man event was classified as a national detail. The IM defines a national detail as "a high use weekend or special event where the ability to manage the activity in a reasonably safe manner for both the public and the LEOs assigned exceeds the capability of the resources within the State where the event is occurring."

9.      The 2016 Emergency Designation gave the BLM nationwide priority in requesting resources to staff the event as well as being listed to receive additional emergency first response should the need arise. BLM requires a minimum of 70 officers to safely fulfill the law enforcement portion of administering the Burning Man event permit. As of August 9, 2016, the entire BLM agency had a combined total of 260 law enforcement credentialed staff that could potentially be assigned to work at the Burning Man event. That number includes all leadership and management staff. To staff the event without the "Emergency Designation" would require a three wave rotation of 70 officers, or a combined total of 210 officers, to be assigned to the event. To take this approach would exhaust BLM law enforcement resources nationwide both in the field and in critical leadership positions. In addition, the costs of not having the designation in place, which only requires one set of 70 officers, would increase lodging, meal, travel, and other associated costs for BLM Law enforcement personnel assigned to the event. Adequate lodging for 70 officers in the rural community in which the event is held is barely attainable as multiple officers share motel rooms and travel trailers to meet housing need. The rural community near the Burning Man event site currently does not have lodging capacity for an additional 140 officers.

10.     The 2016 Emergency Designation lifts the pay-cap placed on federal employees to ensure that they are fairly compensated for the service they provide through their work at the event. Absent lifting the pay-cap, officers would be compensated at less than their normal pay rate, regardless of if the employee is exempt or non-exempt. This would not be a fair and reasonable practice to law enforcement officers on public lands. This also incentivizes detailed officers to volunteer to staff the event and without this incentive it would be difficult to provide the needed safety and security to event participants and the affected public lands. Officers at the Burning Man event endure an austere working environment and subpar living conditions while working and to do so for less than their normal pay rate is not appealing or adequately providing for just federal employee compensation.

11.     As outlined above, the Burning Man event is a temporary condition illustrating the need for the BLM to protect human life and property, qualifying the event under the "Emergency" designation.

AR07653

**Interpretive Camp and Promotional Items**

12.    BLM established an interpretive camp at the 2016 Burning Man event to introduce participants to BLM public lands and various recreational activities. This station is staffed by employees from the Black Rock Field Office during the event as they are the subject matter experts for the area as well as volunteer partners who also hold a vast amount of knowledge on the Black Rock NCA/Desert/Wilderness Areas/Playa. The BLM does not utilize the cost recovery account for the Burning Man event for any of the labor or supplies used for that interpretive camp.  Labor to set up/tear down the camp and staff it during the event comes from the BLM's own budget.  BLM logistics staff did set up and tear down the camp, but those hours were not charged to BRC's cost recovery account.

13.    BLM also gives away promotional items to participants at the interpretive camp and during other public contacts.  Those items include BLM-branded wristbands, stickers, and lip balm.  As the Authorizing Officer, I directed BLM employees to charge the cost of those promotional items to BLM's own budget, rather than the cost recovery account for the Burning Man SRP.

**Vendor Compliance**

14.    In 2016 the Burning Man event had 75 plus vendors who attend the event specifically to provide services to the participants of the Burning Man event. These vendors were not covered/authorized under the Burning Man event SRP. The vendors were present on federal lands specifically because of the event. If the event were not present these 75 plus vendors would not be present on federal lands conducting commercial business activities.

15.    To process and administer 75 plus additional SRPs that are directly associated with the BLM's implementation and monitoring of the Burning Man event's SRP results in a direct cost to the BLM for labor associated with the issuance and monitoring of those additional permits. The Vending Compliance Team for the 2016 Burning Man event included one team members and one team lead (total of two).

16.    Vending Compliance Team members must have sufficient skills and experience to complete compliance and monitoring on over 75 vendor SRPs that are issued for the Burning Man event. They must also possess the skills needed to process newly identified SRPs as they are discovered during the event, and adjudicate complicated and nuanced SRP-related questions, situations and disputes.

17.    Although each vendor is issued an individual permit for its commercial business practices conducted at the Burning Man event, they are present to conduct those business activities for participants directly tied to the Burning Man event as a result of BRC's SRP. BRC does reserve the right to cover all 75 plus vendors under the Burning Man event SRP as a remedy to the BLM having to issue multiple SRPs to these 75 plus vendors. BRC has the right to have all vendors covered under its SRP and to manage the entire vending program. This method was done in past years, however, any violation by a vendor was also a violation to BRC's SRP and BRC declined to continue to manage the venders in that manner as this would count as a major violation and would put the overarching event SRP in a probationary status.  Even if this

AR07654

approach was taken BRC would still have to pay for the labor associated with processing and monitoring of the vendors application and their operations during the event by BLM.

18.     The Burning Man event is a year round workload that includes but not limited to preparing NEPA documents for the event and vending SRP, preparing the actual SRPs, issuing and collecting fees for 75 plus vendor SRPs, attending numerous meetings and conference calls, preparing the AAR, assisting in the preparation of the cost recovery estimate and cost recovery account closeout, and reviewing numerous documents submitted to the BLM by BRC. It is the overall responsibility of the BLM and its staff to monitor all aspects of the implementation of the SRP including but not limited to safety, GIS, Environmental and Vending Compliance, and as the permitting agency the BLM reserves the right to assign adequate staff to monitor these areas of activity during the event to ensure compliance with the SRP stipulations and Closure Order by the permittee. BLM holds the overall responsibility for compliance on Federal Lands and not the permit holder.

19.     Per the SRP regulations, approval of an SRP is a discretionary action made by the Authorized Officer. When the permit will take more than 50 hours to process or administer, all costs incurred by the BLM in order to implement the SRP must be reimbursed to the BLM by the permittee through cost recovery.  If the permittee believes that cost recovery is not in its best interest, then the permittee can choose to move its event off public lands.

Signature: _____ Date: 6/26/17

AR07655

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:     (916) 978-5690
Facsimile:     (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2017-126 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF MARK PIRTLE** |
| | ) | |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, Mark Pirtle, hereby declare as following:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.      I am currently employed as a Reemployed Annuitant for the Nevada Bureau of Land Management (BLM), Winnemucca District Office (WDO), as a Special Projects Manager for the Burning Man (BM) Special Recreation Permit (SRP). I have been employed with the BLM in this position since June 2012. Before this position, I was the BLM, Office of Law Enforcement and Security (OLES) Special Agent-in Charge (SAC) of Region 3 (Nevada/Utah). I retired from the SAC position in January 2012, after 26 years of service.

2.      I have 21 years of experience working the BM SRP, both in planning the BLM operations and executing the operations at the event site. I have served in multiple positions, to include BLM's planning team member and/or lead, BLM's event lead for illegal drug

AR07656

interdiction, BLM's event lead for all law enforcement operations, BLM's event Deputy Incident Commander, BLM's event Incident Commander, BLM's event Project Manager, BLM's event Facility Manager, BLM's Civilian Operations Chief and currently serving as the BLM's 2017 planning team lead and event Incident Commander.

3.    My duties during the 2016 event as a BLM Civilian Operations Chief included planning team member with lead responsibilities in the development of the event logistic program; the development of the event communication network program; the development of the event lodging plan; the development of the event Incident Command Post (ICP) Compound plan; the development of the event Incident Action Operational Plan; and the development of the BLM/BRC Memorandum of Understanding (MOU)/Statements of Work (SOW) program. As a planning team member I also had input on the development of the event Table of Organization; the development of the event Cost Recovery Agreement Estimate; the development of the event Contracting plan; the development of the event Permit Stipulations; and the development of the event Closure Order Restrictions. During event operations, as the BLM Civilian Operations Chief I was field supervisor of the BLM's logistic team, communication team and compliance team. In addition, I was also the BLM coordinator of all the BRC MOU/SOW activities on playa.

**Cost Recovery Closeout**

4.    To calculate the cost recovery close out for the 2016, I collected actual expense data from the financial system. I requested raw data reports specific to the Burning Man event by querying the Work Breakdown Structure (WBS) established only for the 2016 event. Costs included in the close out reports were only those with the identified WBS. I sorted the expenses into categories (e.g. labor, contracts, travel, and micro-purchasing). I formatted the raw data reports into user-friendly documents to be provided to BRC.

5.    Based upon the direction provided in BLM policy, including Instruction Memorandum 2016-107, I included a 23.1 percent surcharge on the Direct Costs to account for the BLM's indirect costs incurred in permitting the 2016 Burning Man event.

6.    BLM's Indirect Costs account for administrative and program activities that are done for the 2016 Burning Man event but cannot be captured as a Direct Cost. Examples of these activities include: cell phone costs, sending mail/packages, secretarial support to reserve travel for meetings, portion of the costs of general equipment used each day such as laptops, desktops, and telephones, and maintenance for vehicles completed by the fleet manager. Another example includes activities required when invoices are submitted for third party contracts issued by BLM. The invoices are routed through our National Operational Center payments division for payment.

7.    In reference to the indirect administrative cost rate, no costs for management overhead were charged to the Burning Man event's cost recovery account.

8.    The close out documents included all information that the BLM was required to provide to BRC in accordance with the BLM Manual 1323 "Cost Recovery for Reimbursable Projects/Activities." The close out documents included sufficient information detailing the costs associated with the cost recovery account. The project log includes a date and description of the

AR07657

work performed for the amount charged. The project log and other attachments are only required to detail the charges expensed to the cost recovery account, and not to explain why the BLM expended the costs.

## BLM's Contract with Modular Space Corporation for the BLM Medical Team

9.      In 2016, as BLM's Planning Team Lead, I was assigned to coordinate the contracting Memorandum of Understanding (MOU) program between the BLM and Black Rock City (BRC) LLC, so the BLM could provide BRC with the ability to procure (contract) designated logistical support items for BLM's operation during the annual Burning Man event.

10.      The MOU was signed by BRC (Charlie Dolman, BRC Executive Operations Director) on February 27, 2014 and was counter signed by BLM (Gene Seidlitz, BLM Winnemucca District Manager and Authorizing Officer of SRP) on March 3, 2014. The MOU was in effect through the 2016 event.

11.      One of the 2016 MOU contracts that BLM offered and BRC accepted, in part, was the Joint Operations Center (JOC) buildout contract. The JOC is the compound just outside the city where the BLM, PCSO and BRC ESD operations are headquartered. A component of this buildout contract is the renting of modular buildings for BLM & PCSO to work out of at the JOC. BRC contracted Modular Space Corporation to provide the modular buildings for the JOC. In the BLM provided Statement of Work (SOW) for the JOC buildout contract, BLM identified eight (8) modular buildings needed at the JOC for BLM & PCSO operations. One of the eight (8) modular buildings, a 60' long /12' wide trailer, was assigned the function of the BLM Medical Team's work space. BRC told BLM they would accept the JOC buildout MOU SOW if BLM removed the medical trailer from it because they did not agree that BLM should even have a medical team at the event and they were going to object to the whole medical program in an IBLA appeal at the end of the event. Given that, BRC asked BLM to contract the medical trailer with a government contract directly with Modular Space so its cost would be part of the 2016 Cost Recovery Agreement, not the MOU program, so BRC could appeal that cost. BLM agreed and contracted the medical trailer for approximately $5,400 from Modular Space Corporation via a government contract.

## Goggles

12.      In 2016 BLM had 155 employees and contractors "on site" at the event. BLM purchased and issued goggles due to the many playa dust storms that occur every year during the event operational days. BLM purchases the goggles with cost recovery agreement estimate funds under the category of "miscellaneous supplies and equipment." Goggles are considered Personal Protection Equipment (PPE) by BLM and therefore are not re-issued to other people. Many detailers that have been to previous events do bring their same goggles back from previous events and reuse them, as long as they are still servable, but they are not told they have to reuse previously issued goggles or are they told they have to turn in their used goggles at the end of the operation because goggles are designated as PPE. Any goggles purchased in a particular year with CRA funds, that are not issued out, are stored so they can be issued out in future BM event operations. This practice has been BLM's standard operating procedure for as long as I have been involved in the event operations beginning in 1996.

AR07658

Signature: _____ Date: 6/27/17

AR07659

CLEMENTINE JOSEPHSON
Regional Solicitor
JANELL M. BOGUE
Assistant Regional Solicitor
U.S. Department of the Interior
Office of the Regional Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
Telephone:     (916) 978-5690
Facsimile:     (916) 978-5694
janell.bogue@sol.doi.gov

Attorneys for the Bureau of Land Management

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF LAND APPEALS

| | | |
|---|---|---|
| BLACK ROCK CITY LLC, | ) | IBLA 2017-126 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF JON YOUNG** |
| | ) | |
| BUREAU OF LAND MANAGEMENT, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

I, Jon Young, hereby declare as follows:

I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

1.      I am currently employed as the State Chief Ranger for the Bureau of Land Management's (BLM), Office of Law Enforcement and Security (OLES), Region 5 Arizona. I have been employed with the BLM in this position since May 2011. Before this position, I was a BLM, Law Enforcement Ranger in Arizona and California for 9 years. I have 19 years of total law enforcement experience with the United States Department of the Interior.

2.      I have 11 years' experience working the Burning Man Event, both in planning the BLM operation and executing the operation at the event site. I have served in multiple positions, to include Law Enforcement Officer, Law Enforcement Supervisor, Law Enforcement Branch

AR07660

Chief and Technical Subject Matter Expert for Communications and currently (2017) serving as the Technical Subject Matter Expert for Communications and Communications Branch Chief.

3.      My duties during the 2016 event as a BLM Technical Subject Matter Expert for Communications included being a planning team member with lead responsibilities of the development of the event microwave network system; the development of the event dispatch trailer and operation; the development of the Computer Aided Dispatch system; the coordination of the deployable cellular network; the development of the event Incident Command Post (ICP) Compound plan; and the acquisition, development and deployment of the 2 way satellite tracking devices for employee safety among other things. As a planning team member I also had input on the development of the event Table of Organization; the development of the event Cost Recovery Agreement Estimate; and the development of the statements of work for specific service acquisitions. During event operations, as the BLM Technical Subject Matter Expert for Communications I was field supervisor of the BLM's contractors for Computer Aided Dispatch and Microwave Network. In addition, I also provided daily oversight for the Dispatch Center and technical operations.

**Labor Costs**

4.      During the eight months leading up to the 2016 Burning Man Event, I contributed a substantial portion my time toward working on, collaborating on, and preparing for the delivery of a safe and successful Burning Man event. I did this work with the full knowledge of my government supervisor and used a substantial portion of my government "base time" working on the event. These were hours compensated by Cost Recovery dollars, but this was also time I was unavailable to perform my normal government functions. During the planning phase for the 2016 Event, every hour of my time was logged on a "project log" with a detailed explanation provided for each hour worked.

5.      I also worked at the 2016 Event and accurately all logged my time that was involved in supporting the event and Black Rock City LLC's (BRC's) Special Recreation Permit (SRP). My duties required me to arrive early and setup the communications infrastructure and equipment before the "pre-patrol" portion of the event and remain late and break down the communication infrastructure and equipment after the event. The majority of my labor costs were the result of time spent at the event location.

6.      There were a number of other communications employees who worked tirelessly to set up the communications infrastructure and equipment necessary to support the event. These employees are among the first government employees at the event and the last ones to depart. They not only build the systems, but also maintain the systems 24 hours per day to ensure high-reliability. A number of these employees worked to support BRC, improve their efficiency, and reduce their cost. On July 15, 2016, BRC officially requested that BLM receive a shipment of Information Technology and computer equipment on behalf of BRC. The equipment was shipped from a third party contractor to the BLM Nevada State Office in Reno, Nevada. BLM Communications employees received the equipment, inventoried it, and loaded it into a transport truck and hand delivered it to BRC personnel at the Joint Operations Center (JOC). BRC also requested BLM account for the equipment at the end of the event and package, transport and ship the equipment back to the contractor. BLM was pleased to collaborate with BRC on this effort to

AR07661

reduce duplicate workload, reduce costs for BRC and work efficiently in collaboration. This was not a small amount of work, added complexity and complications for BLM, but BLM delivered on their promise to BRC.

## Satellite Tracking and Communication Devices

7.      BLM has an established safety practice of using 2-way satellite tracking and communication devices (brand name DeLorme) at the Burning Man event. BLM's 2015 After Action Review (AAR) reported that the devices are a great way of tracking employees at the event. BLM also has an established safety practice of using the same type of devices nationwide for daily government operations. There are several reasons for this safety practice. The devices track (near real time) the position of government employees. The devices also capture location information and allows for the (near real time) display of the location and allow for the capture of this location information into a Computer Aided Dispatch (CAD) system. The devices further allow for 2-way Short Message Service (SMS) messages to be sent between field users, directly from the device or through a Bluetooth pairing connection with most smartphones. Additionally, the devices have an emergency activation feature (SOS) which allows for sending an emergency notification/request for assistance. The SOS feature is configurable to allow sending this message to a group of cell phones and email addresses. The integration with the CAD system allows for a Common Operating Picture (COP). The purpose and functionality of these devices is not simply limited to tracking. BLM feels these devices and functions are necessary for the safety of our personnel. Each Authorizing Officer (AO) for the successive years of the event since 2013, has assessed, acknowledged and supported the enhanced operational efficiency and safety provided by this solution.

8.      Black Rock City, LLC (BRC) did not offer any reasonable alternative solutions for the devices. At no time has BLM dissuaded BRC from offering ideas or solutions needed by the government. In preparation for the 2016 Burning Man Event, BRC made an offer to the government to use BRC's MotoTrbo Radio GPS tracking solution by giving government employees a non-government radio to track them. BRC's offer for GPS Tracking through additional technology does not offer equivalent functionality to meet BLM requirements, but more importantly, is in direct conflict with existing Departmental Policy, Department of the Interior, Departmental Manual 446 DM - Chapter 16 - Law Enforcement Radio and Telecommunications Systems, which states in Chapter 16.7 - Use of non-government owned communication devices is strictly prohibited for government business. This includes two way radios, satellite-based communication devices, smart phones, etc. The suggestion offered in BRC's Statement of Reasons, that the BLM's regular radios are sufficient and that officers work in pairs, likewise is insufficient to meet the BLM's safety needs.

9.      BLM purchased the hardware for this service under cost recovery for BRC's SRP. As such, and in concurrence with BRC's request, this hardware is only used for the Burning Man event and is stored the remainder of the year.  The costs charged to BRC's cost recovery agreement are for firmware updates on the hardware and service for the Burning Man event.

## Substation and JOC Network/Internet/Communications

AR07662

10.     The substation concept was created by BLM in response to years' worth of criticism and complaints from BRC about BLM Law Enforcement not integrating with the participants and principles of Burning Man/Black Rock City as well as they thought we could. The substation was developed as a tactic for "Community Based Policing" allowing officers to engage in proactive positive communications with the community. The substation was also developed as a tactic for allowing officers to be effective and efficient when working within Black Rock City. Officers are able to take reports, make phone calls, perform routine work requirements, etc. at the substation rather than traveling back to the JOC.  The BLM has determined that the costs associated with the technology for the substation are requirements to operate effectively and efficiently.

11.     The BLM developed the substation by following routine business practices successfully used by BRC, which has numerous remote fire and emergency medical substations all throughout Black Rock City. The extension of microwave backhaul, internet and phone services to the substation is neither unnecessary or unreasonable and in fact, mirrors the way BRC delivers network, phone and internet services through microwave backhaul to all of their divisions and business operations throughout Black Rock City. BLM has gone to great lengths to conduct unlicensed microwave frequency deconfliction with the Burning Man Information Technology (BMIT) division. This is to ensure BLM's infrastructure, network and support requirements are not adversely affecting BRC's infrastructure, network and support elements.

12.     The Internet Protocol (IP) camera at the substation, which can be remotely viewed and monitored, has been part of BLM's requirements for at least three years, if not longer. These items are provided as part of a third party contract and are not purchased or owned by BLM. As a result, the cost is quite low. The open market cost of these items continue to drop in price and are relatively inexpensive to purchase. BLM leadership has determined this is necessary and beneficial for support of the event. This equipment and its operation is similar to the Burning Man Event Live Webcast publicly available each year at: https://burningman.org/event/live-webcast/. The difference is BLM does not make the substation camera publicly accessible and retains local control of camera operations and imagery. The camera used by BLM is in a different location from the BRC camera, provides different viewpoints and has the added benefit of allowing the viewing of officers at the substation, though this is not its primary purpose.

13.     The temporary holding facility used at the JOC is used to temporarily hold suspects who are under arrest until they can be transported for booking. It is not uncommon for multiple suspects to be in holding at any given time. The holding of these suspects impinges on their liberty; however, they are still entitled to constitutional rights. They have the right to be housed in humane facilities, the right to be free from "Cruel and Unusual" punishment, the right to be free from sexual crimes, including sexual harassment, the right to complain about prison conditions and voice their concerns about the treatment they receive. They also have a right of access to the courts to air these complaints. In our litigious society, it is common for individuals to assert violations of their rights have occurred while in custody. The video monitoring of the temporary holding facility is a prudent measure to protect the rights of accused individuals. It is also a prudent measure to provide the BLM and PCSO, as agencies, from potential liability incurred while supporting the Burning Man Event. I am not aware of any holding facility, which does not use video monitoring. It is a "Best Business Practice" in the field of criminal justice and is expected by the court systems and by detained or incarcerated individuals. BRC has made a

AR07663

voluntary choice to produce the Burning Man Event and in doing so creates a substantial increased liability for BLM and PCSO. It is reasonable and necessary to protect the rights of accused individuals and to protect the agencies from liability.

14.     The JOC is a large compound used to support public safety operations for the Burning Man Event. It is several hundred yards across this compound. BLM uses eight separate buildings in this compound. Inside those buildings are 23 rooms or spaces used for various purposes. In some spaces more than one phone/phone line is needed to support the mission. BLM has never, to my knowledge, made the argument that phones/phone lines would be used simultaneously. The number of phones, placed, strategically around the compound are used to execute business functions in an efficient manner. BLM has evaluated the purpose and need for each phone/phone line, and requests and uses the minimum necessary to accomplish the mission. Voice over IP (VoIP) technology is different from traditional telephone technology and the cost structure is much different. The fact that multiple lines are used does not mean the cost is excessively high or unreasonable.

**Internet Services**

15.     The "bandwidth" associated with the Microwave Wireless Internet Services contract does not demonstrate a substantial change to the cost of the contract. The contractor has stated the cost would be the same regardless of whether they are providing 15Mbps or 30 Mbps. The contractor has to allocate us a portion of a microwave backhaul circuit and will charge for this portion regardless of what we use. The largest portion of the cost of this contract is the hardware, personnel time, licensing, setup and breakdown for the event. The bridged route created for Pershing County Sheriff's Office from Lovelock to the JOC was not a part of the statement of work for the Microwave Wireless Internet Services Contract. BLM and the contractor agreed to do this for the benefit of PCSO, because it was technologically possible, did not add substantial work or cost and was in the best interest of all parties supporting the event. It is BLM's responsibility to work constructively and cooperatively with all partner agencies to deliver effective and efficient public safety within our authority and jurisdiction. This effort was merely BLM being a good partner to PCSO and did not result in cost increases to BRC.

Dated this 28 of June 2017.

JON YOUNG   Digitally signed by JON YOUNG
Date: 2017.06.29 10:53:18 -07'00'

Jon Young

## CERTIFICATE OF SERVICE

Re:   Black Rock City LLC v. Bureau of Land Management

IBLA 2017-126

I, the undersigned, declare that:

I am a citizen, of the United States, over the age of eighteen, and not a part of this litigation.  On June 29, I served the

## BLM ANSWER TO STATEMENT OF REASONS

by placing a true copy enclosed in a sealed envelope via U.S. Postal Service certified mail and email at Sacramento, California, addressed as follows:

> United States Department of Interior
> Office of Hearings and Appeals
> Interior Board of Land Appeals
> 801 N. Quincy St., Suite 300
> Arlington, VA  22203
> 703-235-3750
> ibla@oha.doi.gov
>
> Elizabeth B. Stallard, Esq.
> Downey Brand LLP
> 100 West Liberty, Suite 900
> Reno, NV 89501-1958
> 775-329-5900
> estallard@downeybrand.com

I declare under penalty of perjury that the foregoing is true and correct.  Executed on the 29th day of June, at Sacramento, California.

_____

# BLM 2016 Burning Man Event



# After Action Review
# (AAR)

AR04297

**BLM**
**AFTER ACTION REVIEW**
**2016 BURNING MAN EVENT**

## Introduction

The Burning Man Event is a Bureau of Land Management (BLM) Special Recreation Permit (SRP) permitted gathering of participants who engage in an "experiment in temporary community dedicated to radical self-expression and self-reliance". Burning Man is the largest and most complicated special recreation event on BLM administered lands.

Since 1990, the event has been held annually in the Black Rock Desert – High Rock Canyon – Emigrant Trails National Conservation Area within the Winnemucca District's Black Rock Field Office (BRFO). The Black Rock Desert is a remote rural area approximately two hours from the nearest city. During the week proceeding Labor Day, participants convene to create Black Rock City. During the event, the city becomes the eighth largest city in Nevada. In 2016, the event reached a peak participant population of 67,290, on Friday, 9/2/16 at 11:30 AM. Black Rock City LLC (BRC) staff numbers reached approximately 9,000. This resulted in a total population of approximately 76,000 bodies on playa during the event at the highest population peak.

This document serves as the After Action Review (AAR) of BLM's event operation with additional comments on some of BRC event production, the Pershing County Sheriff Office's (PCSO) event operation and considerations moving forward to 2017 event planning.

## 2016 Event Background

In November 2015, after the end of the 2015 event operations, the BLM Nevada State Director (NSD) impaneled a team in the BLM Nevada State Office (NSO) to conduct a review of the Burning Man (BM) Special Recreation Permit (SRP). The review team consisted of BLM NSO staff, BLM Washington Office (WO) staff, other BLM state program recreation specialists from other states and Burning Man event subject matter experts in civilian and law enforcement event operations. The team worked approximately four months and produced a SRP review report for the

AR04298

BLM NSD. Two of the main recommendations of the review team were adopted for the planning and execution of the 2016 BLM event operations. The first adopted recommendation was to bring the planning and execution of BLM's event operations back to the leadership of the BLM NV state and district programs, minimizing the involvement of the Office of Law Enforcement and Security (OLES), both out of the Region 3 SAC office in Utah and the staff in the Washington Office. Based on this recommendation the BLM NSD approved the establishing of a new BLM management/planning team for the planning and execution of BLM's event operations with mainly the BLM BRFO and NSO employees. The second adopted recommendation was to ensure that BLM's labor expenses were covered under the SRP's Cost Recovery Agreement (CRA) so MLR funds (BRFO's office budget funds) were not impacted.

## 2016 BLM Event Planning

In furtherance of bringing back the responsibility of planning and executing the event to the BLM Nevada leadership, the establishment of a new BLM management/planning team was approved by the NSD. The team consisted of:  the Black Rock Field Office Manager, who served as the Authorizing Official (AO) for the event SRP; the Nevada State program's Zone 1 Supervisory Law Enforcement Ranger who served as the Law Enforcement planner; a BRFO employee who served as Civilian Operations planner; NSO employees who served as event communications lead, event contracting officer and event finance lead; and a OLES employee who served as the technology lead. Additionally, the two full time event coordinators, the BRFO event Project Manager and the BRFO event Outdoor Recreation Planner were part of the planning team. Most of the planning team members held operational positions during the execution of the event operations.

At the start of the 2016 planning phase, in furtherance of capturing all planning costs in the CRA, the AO developed a new strategy in the event CRA program. The CRA estimate document would be submitted to BRC in two parts. The first part being the initiation of the CRA with only the BLM estimated planning costs identified within the documenting and the second part being the final overall CRA that encompassed the overall estimated BLM costs, both planning and operational.

3

AR04299

Though there were two phases to implementing the CRA, there was only one final CRA for the 2016 event. This was accepted by BRC and resulted in funding the event CR account earlier than in previous years.   This ensured the planning team labor expenses were covered by the event CRA.

The new BLM planning team started the planning duties by reviewing the BLM's 2015 event Operational plan, the After Action Review document from the 2015 event and the Contracting Plan from the 2015 event.  Additionally, many upfront discussions between BLM and BRC were conducted on roles and responsibility between the event permittee (BRC) and the event permitter (BLM).  As a result of the reviews and discussions the 2016 BLM planning team developed the following components of the 2016 Operational Plan:

2016 BLM Event Table of Organization (TO):

The 2016 BLM event operation consisted of 122 positions. Six positions in event management, forty-one positions in the Civilian Operations and seventy-five positions in the Law Enforcement Operations.

>Event Management Positions (6):
>- Incident Commander (AO served in this position)
>- Project Manager
>- Public Information Officer
>- Administration Assistant
>- Civilian Operations Chief
>- Law Enforcement Operations Chief
>
>Civilian Operations Positions (41):
>- Communications Chief
>- Communications Unit Leader
>- IT Equipment Specialist
>- 4 Communication Technicians
>- IT Security Specialist
>- 2 IMARS Coordinators
>- IMAR Reviewer
>  (Note: 2 IMARS positions were planned; the reviewer was added shortly after arriving on playa, recommended by

4

AR04300

coordinators. This position was not on playa, the duties were conducted remotely)
- Dispatch Center Manager
- 15 Dispatchers (Contractors)
- Compliance Supervisor
- GIS Coordinator
- Safety Officer
- 4 Environmental Compliance
- 2 Vending Compliance
- Logistic Supervisor
- 4 Logistic Specialist

Law Enforcement Operations Positions (75):
- 2 Patrol Chiefs
- 3 Patrol Commanders
- 6 Shift Supervisors
- 44 Patrol Officers
  (Note: 45 Patrol Officer positions were planned, one officer fell out shortly before arriving on playa and he could not be replaced)
- Investigative Chief
- 6 Investigative Support Investigators (BLM Patrol Program)
- 6 Integrated Investigators (PCSO Program)
- ORP Investigator
- 2 Evidence Officers
- Medical Team Leader
- 3 Tactical Medics

The 2016 BLM planning team reduced eleven (11) LE positions from the LE Investigative operation and reduced six (6) positions from the Civilian Compliance operation, when compared to the 2015 BLM operation. For the 2016 operation, the BLM planning team added 3 more dispatchers to the Dispatch operation which resulted in a net reduction of the 2016 event TO positions of 14. This resulted in cost reduction for BRC in the CRA program.

AR04301

<u>2016 BLM Event Contracting Plan:</u>

Every event year the BLM planning team must identify what support contracts will be needed to conduct the BLM event operation and how will the contracted support items/services be contracted, as a government contact or a BRC Memorandum of Understanding (MOU) contract. The 2016 planning team developed the 2016 event Contracting Plan which consisted of eight (8) support contracts presented to BRC through the BRC Contracting MOU program and five (5) contracts retained by BLM as government contracts. The BLM planning team prepared the Statements of Work (SOW) for the MOU program contracts and the SOW for the government contracts.

The 8 support contracts offered by the BLM planning team and accepted by BRC were:

- Joint Operation Center (JOC) compound build-out and services contract
- IT Equipment Rental contract
- Fueling Services contract
- Meal Services contract (including ice and bottle drinks)
- Lodging contract
- UTV/Golf Cart Rental contract
- CAD Services contract
- Dispatch Services contract

The 5 support contracts retained by the BLM planning team for gov't contracting were:

- Microwave Internet contract
- Network Services contract
- Live Tracking Services contract
- CAD Server Hardware contract
- CAD Server Licensing contract

- BLM Modular Building rental contract
  (Note: This was a component of the JOC MOU contract offered to BRC but was not accepted by BRC and became an unplanned 6th gov't contract, outside of the original 2017 BLM Contracting Plan)

AR04302

The 2016 BLM planning team offered three (3) more event support contracts to BRC, through the MOU program, when compared to the 2015 event operation. This resulted in cost reduction for BRC in the CRA program and an overall cost savings in BRC's total financial obligation in the SRP program.

Other Components of the 2016 BLM Operation developed by the Planning Team:

- 2016 JOC Compound Design
- 2016 Permit Stipulations
- 2016 Event Closure Order with 2017 Closure Order Restrictions
- 2016 Event Environmental Compliance Protocols
- 2016 Event Vending Protocols
- 2016 Incident Action Plan (IAP)
- 2016 LE Operational Plan

**2016 BLM Event Operations**

The following section of this AAR will speak to the 2016 configurations and duties of the different BLM 2016 Operational components. It will also document any changes that were made from previous BLM event operations. At the end of the 2016 event operations, each operational component's Chief/Supervisor/Lead was asked to evaluate their program and submit internal recommendations for consideration/evaluation by the 2017 planning team that may be forwarded to the AO.  This document will not list any of the internal recommendations for consideration/evaluation.   If any of the recommendations for consideration/evaluation are determined to have merit by the 2017 planning team and forwarded to the AO, they will be discussed with BRC or other effected cooperators during the 2017 planning phase.

2016 ICS Management Team (6 Positions):

The BLM's event management team structure changed in 2016 to a more streamlined structure. There were six (6) positions. There was a single Incident Commander position from the civilian side of BLM (non-law enforcement), which was staffed by the AO.  For the IC's command staff, there was an Operations Chief

7

for Civilian Operations and an Operations Chief for Law Enforcement Operations. None of these positions were filled with OLES staff.  The IC staff also included the event SRP Project Manager, an event Public Information Officer position and an Administrative Assistant position. There were no Financial or Contracting Officer positions as part of the IC staff in 2016.  The BLM's event management team structure for future events is planned to be evaluated in the new EIS.

The BLM's 2017 planning team will consider/evaluate any recommendations for consideration/evaluation in the BLM's event management structure that may be brought forward, both internally and/or externally, for the 2017 BLM event operational plan.

<u>2016 Civilian Operations (41 Positions)</u>

The 2016 Civilian Operational component was divided among three programs, the Communications, Compliance and Logistic programs. Streamlined from the BLM's 2015 operation, whereas the communication's dispatch function and the IMARS function were brought into the civilian operations from the law enforcement operation. Also, the radio network and equipment function, the IT equipment function, the IT security function and the dispatch function were all put under one supervisor, the Communications Chief.

The BLM's 2017 planning team will consider/evaluate any recommendations for consideration/evaluation in the Civilian Operations structure/functions that may be brought forward, both internally and/or externally, for the 2017 BLM event operational plan.

<u>Communications Program (27 Positions)</u>

The Communication program consisted of a program Chief, an IT security specialist, 2 IMARS coordinators, 1 IMARS reviewer, a radio communications Lead, 4 radio communication technicians, 1 IT equipment specialist, a dispatch center manager and 15 contract dispatchers.

AR04304

The BLM's 2017 planning team will consider/evaluate any recommendations for consideration/evaluation in the communication program components involving structure/equipment/functions that may be brought forward, both internally and/or externally, for the 2017 BLM event operational plan.

### Communication Radio Network & Equipment

In 2016 the BLM Communication Radio Network & Equipment program consisted of one communications Lead and 4 communication technicians, the same as in 2015. At the end of the 2015 event, the radio communications team began developing a permanent cache of event project hand held radios from the BLM's NV Fire program which were no longer needed.  This resulted in the termination of the previously started program whereas BRC would buy event radios for BLM's use over several years. The first 60 hand held radios purchased by BRC under the old program were retained by BRC and issued to PCSO for their event operation in 2016. BLM did not need to purchase any additional radio repeaters, now having 4 permanent repeaters for the event project. BLM did not need to rent the IP dispatch consoles, as in previous years, due to the acquisition of IP consoles by the BLM Nevada Communications program which can be used in BLM's communication program at the event, thus a cost saving to BRC.

### IT Security

The BLM's IT Security program is coordinated by the event IT security specialist who is assisted by the IT equipment specialist. In 2016 BLM added a Domain Server to help manage user/computer accounts on the dispatch (DPS) network. This eliminated some of the security concerns of the J-Link (Justice Link) dispatch computers during the audit. By adding

9

AR04305

the managed switches in each modular building, and having the VLAN structure were not only a success, it also provided a level of security for the different networks. BLM also added a NAS (Synology) server to manage shared drives for dispatch, store important event information, and use as a central storage device to record the jail camera video.

## IT Equipment

The IT equipment program consist of two parts, the first part being the BRC MOU rental contract of required items for BLM's event operation, and the second part being the installation and continuing service of said IT equipment by the BLM's event IT Specialist. The MOU IT SOW presented to BRC in 2016 was based on the 2015 event list of equipment with some reductions. In 2016 the IT specialist conducted a full review of the IT equipment used to conduct the BLM's operation.  The results of this review will be presented to the 2017 planning team for consideration when developing the 2017 MOU IT SOW.

Something new in 2016 was BRC also renting IT equipment for their operation under the same MOU contract (Hartford) and requesting BLM receive and transport BRC equipment to the playa. There were logistical challenges in sharing this service with BRC BMIT and BRC ESD IT. Information on what was ordered by BRC was not shared in advance of delivery making it challenging for BLM to accurately inventory what BRC ordered. This process also put extra work on BLM staff. At the end of the event, BRC ESD IT did not return the equipment to BLM, but left it sitting in the ESD Dispatch and BLM personnel had to go searching for it. There were challenges with inventory and return shipping of the BRC equipment which caused extra work for BLM personnel. BLM is willing to take the same approach under the MOU program in 2017, but

10

additional communication with BRC BMIT and BRC ESD IT will be required to make this more successful.

## IMARS

In 2016 the event IMARS function consisted of 2 coordinator positions. This provided 24 hour IMARS assistance to BLM LE officers.  Two coordinators were assigned on playa, mainly working out of the Report Writing Modular Building. A third IMARS position was assigned remotely to review and edit all IMARS entries.

## CAD Program

During 2016 planning BRC informed BLM they were going to contract the same Computer Aided Dispatch (CAD) company, iNET Public Safety, for their CAD program as BLM had done, via a gov't contract, for the last two years. Because of this, BRC requested that BLM shift the CAD contract from a gov't contract to the contracting BRC MOU program. This would allow BRC to contract iNET for both programs under one contract. BLM agreed and a SOW defining BLM's CAD needs was presented to BRC under the MOU program. BRC did contract iNET for both CAD services, in fact, BRC entered into a multi-year contract with iNET which should result in cost savings for BRC.

## Dispatch Program

During 2016 planning BRC informed BLM they would like to contract BLM's dispatching service (LE Temporary Placement Services) through the MOU program instead of BLM contracting it as a gov't contract.  BLM was hesitant to comply with this request but did allow it on a one-year test basis, with the possibility that it would come back as a gov't contract if

11

BLM determined this services better fit its operation as a gov't contract. At the end of the event BLM heard from both BRC personnel and LE Temporary Placement Services personnel that the relationship between the two was problematic throughout the process and that the contract was awarded very late to LETPS by BRC.

The 2016 BLM dispatching program consisted of twelve event frequencies, plus access to four WDO field frequencies. Of the twelve event frequencies, four were repeated channels with mountain top repeaters (Command, Clock 3 Zone, Clock 6 Zone, Clock 9 Zone) seven were tach channels (car to car) with no dispatcher monitoring and one Tach channel had a base station console for dispatch monitoring (C-12).  The dispatch center was set-up with 6 base station consoles:

(1) the Center Manager console, that was not cross-metered, so it could monitor all event channels. It also had a iNet CAD console;

(2) the Shift Supervisor console, which was cross-metered to monitor only all repeated channels and C-12. It also had a iNet CAD console;

(3) the Command console, which was cross-metered to monitor only the command and C-12 channels. It also had a iNet CAD console;

(4) the Clock-3 Zone console, which was cross-metered to monitor  only the Clock-3 channel. It also had a iNet CAD console;

(5) the Clock-6 Zone console, which was cross-metered to monitor only the Clock-6 channel and C-12 channels. It also had a iNet CAD console and a PCSO CAD console;

(6) the Clock-9 Zone console, which was cross-metered to monitor only the Clock-9 channel. It also had a iNet CAD console.

AR04308

The Command channel was used for BLM overhead and BLM Civilian program communications; the C-12 channel was used as a BLM LE overflow channel and for the BLM LE perimeter team communications; the Clock-3 channel was used for BLM LE patrol communications on the 2:00 O'Clock side of city; the Clock 6 channel was used for PCSO patrol and BLM/PCSO Investigations communications; the Clock 9 channel was used for BLM LE patrol communications on the 10:00 O'Clock side of city.

<u>Compliance Program (9 Positions)</u>

In 2016 the Compliance program was streamlined from the BLM's 2015 operation, whereas the environmental, vending, GIS and safety functions  were all put under one supervisor. The program consisted of a program supervisor, 4 environmental compliance team members, 2 vending compliance team member, a GIS technician and a safety officer. This was a reduction of 4 environmental compliance team members, 1 vending compliance team member and 1 GIS technician from the 2015 operation. This reduction resulted from the early planning discussion between BLM and BRC whereas BRC requested to take the lead in identifying and remediating environmental and vending issues and BLM's primary role would be to monitor BRC's performance. To make this happen, BLM and BRC worked together to modify the event's environmental and vending programs protocols, which are part of BRC Operation Plan and BLM's IAP.

The BLM's 2017 planning team will consider/evaluate any recommendations for consideration/evaluation in the compliance program components involving structure/equipment/functions that may be brought forward, both internally and/or externally, for the 2017 BLM event operational plan.

13

## Environmental Compliance

The BLM's environmental compliance monitoring program in 2016 was staffed by 4 BLM specialists.  They were successful in coordinating with the BRC's environmental compliance teams in identifying and remediation.  The combination of the Earth Guardians, Playa Restoration, Black Rock Rangers, ESD and Hazmat worked out very well, considering this was a first year program. There were far fewer serious environmental compliance issues identified during the 2016 event than in previous years. Also, most issues that were identified were significantly less serious, and much easier to clean up quickly. Direct communication with BRC's different compliance teams via radio during the event and BRC's immediate response to environmental issues as they were reported, resulted in excellent compliance and remediation. This also resulted in far fewer citations being issued for environmental violations.

## Vending/Commercial Compliance

In 2016 the BLM Vendor Compliance Monitoring Team was staffed by 2 BLM specialists, and BLM coordinated jointly with BRC's Outside Services (OSS) department, which was staffed by 10 or more, to ensure that commercial operations on BLM-administered public lands maintained all necessary BLM and BRC authorizations. The majority of the issues were identified at Point One, the vendor access point, where OSS staff stops each vendor, checks for credentials, searches the vehicle, and issues equipment stickers.  Point One opened on Aug 22, 2016 and allowed vendors to stage their equipment at McKinley Park.   BRC and BLM worked closely to address those vendors at Point One without the necessary credentials to gain compliance. It was invaluable to be on site pre-event to meet and greet the vendors at Point One. Contacts were made with 95% of the vendors by Friday and several permits were

14

hand delivered on-playa to ensure receipt of their hard copies. Approximately six (6) mailed copies were undelivered due to the short turnaround time of permitting after the initial BM SRP is signed.  Two vendors were found in non-compliance and issued on-site SRP's and four vendors were issued verbal warnings, citations or ceased their activities and will be applying for SRP's next year.  Six individuals renting RV's without a SRP were evicted by Black Rock Rangers and will have to appear in court for a ruling and may or may not participate in the event in 2017.  In 2016 BLM made equipment locations and RV placement reporting a priority. The vending staff visited these locations throughout the event, time permitting, to evaluate such equipment for leaks and other possible stipulation violations.

<u>GIS</u>

The BLM's GIS function in 2016 consisted of one GIS staff compared with two in 2015. This was done because BRC agreed to take on many of the GIS-related tasks associated with collecting and processing information related to environmental and vending compliance issues discovered during the event. This approach proved to be successful and overall the GIS function was a success in 2016.

<u>Safety Program</u>

In 2016, one BLM safety officer staff worked with BRC's safety and ESD staff in order to evaluate and remediate safety issued identified during the event, and to ensure BRC and participant compliance with regulations and stipulations related to safety during the event. The BLM Safety Officer also ensured the safety of the BLM's operation, including the Joint Operations Center (JOC). This was the second year BLM had a Safety Officer assigned to event operations.

AR04311

Logistical Program

In 2016 the logistic program consisted of a logistic lead, 2 logistic day workers, one logistic night worker and an off-site logistic runner. The off-site logistic runner was a new position for BLM's event operation and proved to be very effective in saving travel time obtaining and delivering off-site items required for BLM's event operation.

Two members of the team arrived on August 18th with the 2 additional team members arriving one week later on August 25th. The first two employees spent the first week setting up modular office buildings, outside trash facilities, and transporting items from Black Rock Station (BRS) to the Joint Operation Center (JOC). For the remainder of the first week, the initial two employees finished setting up the JOC and staged materials for the setup of the BLM interpretive camp, beginning on Saturday August 27th. Saturday the 27th, all four employees worked to begin the setup of the interpretive camp, which was scheduled to begin operations to the public on Tuesday the 30th. The night shift employee began at 1730 on the 28th, and stayed on this schedule until Labor Day.

The general breakdown and packaging procedure went smoothly, and all items were returned to BRS, cleaned, organized, and inventoried for future years. The two connex boxes procured several years ago are still serving as the storage location for the items in the off season.

The BLM's 2017 planning team will consider/evaluate any recommendations for consideration/evaluation in the logistic program's structure/function that may be brought forward, both internally and/or externally, for the 2017 BLM event operational plan.

AR04312

<u>2016 Law Enforcement Operations (75 Positions)</u>

The 2016 Law Enforcement Operational component was divided among three programs: Uniformed Patrol, Investigations and Medical.  Law enforcement event orientation returned in 2016 to ensure objectives, protocols, and expectations for the event were clearly demonstrated and understood.  The orientation occurred on Friday August 26th and consisted of an operational overview, legal updates by the Assistant United States Attorney's Office and Pershing County District Attorney's Office, overview of BRC operations by BRC's LE advisor, presentation by BRC on harm reduction, and JOC orientation covering event specific protocols and procedures. With this orientation occurring on Friday, main event patrol operations were able to start on Saturday during the early arrival influx.

<u>Uniformed Patrol Function (53 Positions)</u>

The Uniformed Patrol program consisted of 2 Patrol Chiefs, 3 Patrol Commanders, 6 Shift Supervisors and 44 Patrol Officers (Note: 45 Patrol Officers were approved in the 2016 event TO but one position could not be refilled when the assigned officer withdrew).   In 2016, the BLM LE Liaison and LE Planner positions from the 2015 TO were eliminated.  These positions were replaced with an additional Patrol Chief to ensure 24 hour coverage (day and night operations).  Patrol shifts (day, swing, night) were reduced from 14-hour shifts in 2015 to 13-hour shifts in 2016. A total of nine K9 teams were assigned to the event (3 per shift).   All K9 teams were certified by the District Court Judge for Pershing County prior to the event, allowing them to be utilized for narcotics detection and possible prosecution by the Pershing County District Attorney's Office.

The patrol program operated during all three event phases:
<u>Pre-event:</u> August 23-August 26, 2016 (10 Officers)
5 officers were assigned to one of two 13-hour shifts (day, night).  Each shift had a shift supervisor.

17

Main event: August 27-September 4, 2016 (53 Officers)
17 officers were assigned to one of three overlapping 13-hour shifts (day, swing, night). Each shift had a patrol commander and two shift supervisors. During main event there were also two patrol chiefs assigned to one of two overlapping shifts.

Post-event: September 5-September 8, 2016 (10 Officers)
5 patrol officers were assigned to one of two 13-hour shifts (day, night).  Each shift had a shift supervisor. In direct response to the decline of the city population, the total number of officers was reduced accordingly throughout the post event period.

BLM law enforcement staffed a LE sub-station at "5:15 and Esplanade".  The station was staffed by at least one BLM law enforcement officer.  The presence of the station allowed BLM law enforcement the opportunity to informally engage with participants while simultaneously fulfilling the role as a public contact station for participants to ask questions, receive information, and report illegal activity directly to law enforcement.

BLM's 2017 planning team will consider and evaluate any recommendations related to the patrol structure/function that may be brought forward, both internally and/or externally, for development of the 2017 BLM event operational plan.

Investigative Function (16 Positions)

The Investigations function for the 2016 event consisted of 4 programs: Investigative Support (patrol), Integrated Investigations, the Office of Professional Responsibility (OPR), and Evidence. The Investigative program consisted of 1

18

AR04314

Investigation Chief, 6 Investigative Support, 6 integrated Investigations, 1 OPR investigator and 2 Evidence officers.

BLM's 2017 planning team will consider and evaluate any recommendations related to the investigative structure/function that may be brought forward, both internally and/or externally, for development of the 2017 BLM event operational plan.

Investigative Support

These uniformed investigators worked directly for their respective patrol commanders. There were 2 investigators assigned to each of the three main event shifts.  These teams were utilized to investigate complex violations of federal laws, such as SRP violations.

Integrated Investigations

These plain clothes investigators worked directly for the Pershing County Sheriff.  A total of 9 investigators (3 PCSO detectives and 6 BLM agents) were split into three shifts (day, swing, night) to ensure 24 hour coverage.  Each shift had 1 PCSO detective lead supported by 2 BLM investigators. Their primary duties involved investigating complex or felony level state cases. Due to PCSO staffing limitations, some BLM agents assigned to integrated investigators had to conduct initial investigations involving people on people crimes without PCSO support.

OPR Program

The Office of Professional Responsibility (OPR) program serves the internal affairs function for the BLM law enforcement. This position was eliminated from the BLM 2015 event operation after being part of the 2013 and 2014

19

AR04315

operations. Due to the reporting and review requirements of BLM's Use of Force policy, coupled with the fact the Burning Man event produces numerous Use of Force Incidents each year, the 2016 planning team brought this function back to the BLM's event LE operation. During the event the OPR program reviewed eight Use of Force reports for consistency with this policy. Reports were found to be well written and it was determined appropriate force was used.

Evidence

The Evidence Program consisted of 2 evidence technicians to provide 24-hour coverage. This was the same as the 2015 event operation. In addition to processing evidence, the evidence technicians compiled and organized all case documentation (reports, video, photographs, etc.) for prosecutors and case agents.

Medical Program

The 2016 BLM medical unit was operational during main event. For the 5th year in a row, BLM entered into a contract with the U.S. Department of Health and Human Services (DHHS) Center for Tactical Medicine (CTM) to provide medical care for federal employees working the event. The unit consisted of 1 medical program Lead and 3 tactical medics.

Two of the medical team members were from DHHS tactical medicine program and two were from BLM's tactical medical program. The program reported 214 patients treated in 2016. Improvements in the program for 2016 included better stocking of medical equipment, better enforcement of work rest cycles, and strategic assignment of patrol officers/paramedics to each patrol shift.

20

AR04316

## 2016 PCSO Event Operations

Because the event is held on federal public lands administered by the BLM under the SRP program, it is the responsibility of the BLM to ensure an effective law enforcement/public safety program exists during the event. Because of this BLM SRP responsibility the ultimate liability always remains on the BLM.   Federal public lands administered by the BLM is proprietary jurisdiction, which means the state and local law enforcement agencies, in this case the Pershing County Sheriff's Office, also have the authority and responsibility for ensuring public safety.   PCSO is the lead investigating agency when it comes to investigating person on person crimes, which includes domestic violence, assault and battery, theft, sexual assaults, etc.  BLM must ensure affected state and/or local law enforcement agencies are involved in the event for response and investigation into person on person crimes, whether they are integrated with BLM's LE operation or not.

During the 2016 event, in the patrol program, there were approximately three times more BLM officers than PCSO officers (54 BLM /18 PCSO) working the event. As a result, in the patrol program, BLM officers responded to PCSO calls for service because PCSO patrol officers were not available.  In the integrated investigations unit, there were twice as many BLM investigators than PCSO investigators (6 BLM / 3 PCSO).   This disparity in numbers was even more problematic in the integrated investigative program because BLM officers have limited training in investigating person on person crimes falling under the Nevada Revised Statute.  As such, they are only able to conduct a basic investigation until a PCSO investigator arrives.  Due to the sensitive nature of these crimes, coupled with the specific skillset and knowledge required to conduct such investigations, PCSO needs to be able to handle all person on person crimes investigations from the outset of the initial report, which would allow BLM officers to concentrate more time and effort on federal violations.

However, PCSO needs to be allowed to increase their staffing in the patrol and investigative programs at the event to fulfill their and BLM's obligations to event participants and to respond to their jurisdictional crimes themselves in a timely manner.  BLM, as the permitter of the event, has some responsibility to ensure that

21

AR04317

this happens and therefore will encourage BRC to make sure sufficient funds are made available to PCSO that will result in an increased staffing level. BLM's planning team cannot make final decisions on BLM law enforcement staffing for the 2017 event until BRC and PCSO make decisions regarding PCSO's law enforcement program.  BLM recognizes this falls under the settlement agreement between BRC and Pershing County.  Regardless of whether BLM or PCSO are "integrated" under this agreement, BLM and PCSO are always going to jointly plan event operations as they pertain to the law enforcement function at the event. BLM's primary concern is that PCSO be staffed at the appropriate level to meet BLM's obligation to ensuring an adequate level of public safety is being provided for participants.

## 2016 BRC Event Production

As per the SRP program, BRC submitted their 2016 Event Operations Plan to BLM during the planning phase of the 2016 event. The document was approximately 300 pages long and very comprehensive. BRC had approximately 37 programs involved in the production of the event. BRC deployed approximately 13 event departments to manage the event programs. All of the event production programs and departments where documented in the operational plan and reviewed by BLM. During the planning phase BRC had a planning team that worked jointly with the BLM planning team.  BRC's planning team consisted of representatives from the Event Operations desk (Director and/or Deputy Director), a representative from the Governmental Affairs desk (Lead), two representatives from the Political Affairs desk (Lead and LE liaison). In addition, subject matter experts participated when needed on a given subject.

One of the main underlining missions of the joint planning teams is to decide the roles and responsibilities of each entity as permitter and permittee for the upcoming event. There were many early planning team discussions on roles and responsibility in 2016 and some changes were made from previous events. These changes were reflexed in BRC's 2016 Event Operations Plan and BLM's Event Operations Plan.

AR04318

Once on playa most of these program departments' ran independently of BLM event operations. However, some of these program departments coordinate directly or involve BLM event operations.

The following are comments on those important BRC programs and departments that run independently of BLM event operations:

### BRC Medical Program (Crowd Rx & BRC ESD)

This was the second year of BRC contracting Crowd Rx as the event ALS provider. Crowd Rx has proved to be the most effective ALS provider since the event medical needs became so demanding and the event's medical response so complicated. Overall BLM believes that Crowd Rx provided excellent medical coverage and incident reporting throughout the 2016 event for BRC and the event participants.

One issue that needs further development of a solution is patient transfer.  BLM, BRC, and PCSO need to finalize a path forward on how the three parties will share patient information with each other in the event the custody of a patient is transferred from one party to another.  A determination needs to be made and agreed upon specifying at what point is a participant no longer a participant (i.e. if the person is arrested and is now in the custody of the PCSO and is being prepared to be transported to PC jail, is that person still considered a participant or is that person now a detainee in the custody of PCSO). This determination will aid in identifying which party at a given time holds the responsibility for medical care of that person.

Another issue that needs further development of a solution is BLM and/or PCSO event working K-9 medical care. For the incident that occurred with the BLM K-9 at the 2016 event, a exposure to hazardous substance which resulted in the need for

23

medical attention, BLM and BRC ( with Crowd Rx) need to work together to come up with a plan/protocol/procedure that will identify what actions are needed for a timely and successful response. The BLM acknowledges that this is not a matter of responsibility for BRC (Crowd Rx) and would like to see if there is any cooperation/coordination that could be had for such matters should they occur in the future.

## BRC Media Program

BLM and BRC will need to work to develop a media program plan for the 2017 and out years' events for filming, photography, and other media production conducted at the event. During the 2016 event, the BLM requested that BRC share media related information with the BLM and BRC refused.  As such the development of a media management program is needed to insure that the Burning Man event and its media related attendees are in compliance with the BLM's film permitting regulations for public lands.

## BRC Airport Operation

Overall BLM believes that AFS provided excellent airport management throughout the 2016 event for BRC. Operations ran smoothly during the event with the addition of the new BRC airline program.

The FAA identified concerns to the BLM during the 2016 event related to where the airport emergency response vehicles were located in relationship to the distance to the airport. FAA also wants to see more emergency response drills practiced at the airport to make sure that the response equipment is working appropriately as well as to make sure that the response time is the best it can be for the event in the given conditions.

24

AR04320

Also, BLM feels an adequate reporting responsibilities plan for reporting all airport related fees collected by BRC or BRC's airline contractor is needed for future events. The plan needs to identify who is reporting for what area and who is responsible for submitting the 3% payment to BLM. This includes discussion on the insurance plans for pilots/planes coming to the event that are not a part of the BRC airline program and is not required to carry a similar insurance plan as those who participate in the BRC airline program.

BRC Gate Operations

Overall BLM believes that gate operations ran smoothly throughout the 2016 event for BRC and the event participants. Traffic was managed well and very few, if any, issues occurred during entrance.

BRC needs to develop a plan for gate operations that addresses traffic backup and participant management at the gate during an extended backup scenario resulting from an emergency situation (i.e. closing the gate during the implementation of the Lost Child Protocol) as happen at the 2016 event on Sunday evening during a high time of mass exodus.

The following are comments on those important BRC programs and departments that impact and/or assist BLM's event operations.

MOU Contracting Program

For the third year in a row, the BRC/BLM contracting MOU program has been very successful for BLM and BRC has improved the service to BLM with every year.  BLM recognizes the work involved for BRC in this program and hopes the cost savings to BRC, through the program, is beneficial to BRC.  It is a complicated program, which requires

25

AR04321

coordination between BRC and BLM, first in the SOWs submission and acceptance portion of the program and second in the coordination with the BRC contractors.  With the fact that this program has been so successful and the fact that this program's agreement document expired in 2016, which is discussed later in this document, BLM is planning discussions with BRC to see if this program can be continued in the future.

JOC Team Program

This was the third year of BRC's Joint Operation Center (JOC) construction and service logistic team.  Every year the program gets better and BLM is very pleased with this program and feels that this program goes a long way in making the event successful when it comes to the relationship between BRC and BLM on playa.  The leader of the JOC team has already developed and submitted a plan to BRC and BLM for the 2017 JOC compound construction and servicing, including efficiency changes.

One discussion item in 2016 during event operations between BLM, the BRC JOC Team and ESD JOC representatives was to plan in 2017 that the BLM CAD servers could be housed in the BRC JOC ESD Tech building instead of a BLM owned air conditioned trailer, which is set up outside the dispatch building, on the BLM side.  This has been the practice the last several years. If BRC was able to provide this service for BLM, it would require a segregated area of the BRC Tech building that had controlled BLM/contractor access.

Event Sit Stat Program

This was the second year of the current Sit Stat program during event operations.  Over the last two years it has been refined

26

AR04322

and in 2016 it was a very valuable tool used by the Tier 1 team while managing the event programs and resources.

One suggestion that was brought up in the on playa event close-out meeting concerning the Sit Stat program was to add a third page to the 2017 sit stat document to show a comparison to last year's event stats to show trend changes.

## Event Tier 1 Program

BLM and BRC needs to stay committed to the Tier 1 Program in order for it to be effective. This means at critical stages/situations during the event ONLY the identified Tier 1 Team members are allowed to attend when emergency activation meetings are called, any other needed expertise will be brought into the meeting as needed and agreed upon by all Tier 1 program representatives.

## BRC Population Reporting Program

In 2016, for the second year in a row, BRC contracted Ticketfly, a well-known event ticketing company out of California to assist in selling the event tickets and tracking the participants that enter the event. The population that entered the event was counted through the PRAM-Ticketfly scanning system from Main Gate opening (August 9) until Exodus began (September 3). Through the PRAM-Ticketfly scanning system Staff Exemptions, Kids, and Paid Participants were broken out into separate categories for tracking.

Exodus began on Saturday, September 3rd and an alternative counting system had to be implemented because BRC cannot manually scan every person exiting the event. Instead, BRC counted vehicles. In 2015, BRC counted vehicles manually and entered the numbers each hour into the PRAM system.  In

27

2016, BRC installed vehicle scanners at each lane of the Main Gate to automate vehicle counts out of the City. Because of the complexity of the data points, the algorithms required to calculate vehicle size as well as occupancy, and the need to clean the data, the Exodus vehicle counts were not able to be integrated in PRAM in real time. Exodus numbers were included in the post-event population report and it was noted where PRAM reporting ended and the vehicle counting began. After Exodus ended, September 6th, BRC reported on population through Commissary dinner counts (September 6th – 19th).

More work is needed in the population reporting program. The program is developing well, however, there are still some gaps (accurate exodus and pre-event reporting) that need to be addressed in order to sustain the most accurate population reporting possible during all stages of the event.

## BLM/BRC Joint CAD Program

In 2016, for the first year, BLM and BRC ESD used the same CAD services contractor, iNET.  This program was successful. During the 2016 on playa closeout meeting there was an item for consideration by and for BRC to have BRC's Black Rock Ranger CAD program brought into the iNET CAD system.  If this was done it could increase the communication and cooperation between the BRR's and BLM/PCSO LE calls for service dispatching.

## BRC Ranger Department

Communication and coordination between BRC Law Enforcement Advisor and Black Rock Ranger (BRR) leadership with BLM planners during the planning phase of the event led to effective and efficient communication during the event.  This

28

level of cooperation allowed for issues to be conveyed and resolved in a timely manner.

During the event, the BLM Patrol Chief and a representative of PCSO attended every 0900 BRR meeting to discuss any issues or concerns from the previous day's activities with BRR leadership.  This continues to be a valuable method through which issues can be resolved. Overall, officers reported positive interactions with BRRs, noting timely responses and a willingness to help BLM LE and PCSO.  They were extremely helpful in locating or trying to locate suspects while waiting for a law enforcement response.  Officers continue to report successes with using specialty units such as LEAL and Green Dots with resolving situations.

During the post event BRC, PCSO, and BLM meeting, BRC officials expressed their gratitude and opinion that communication and transparency with law enforcement was much improved from previous events.
However, a few issues were brought forward by the BLM's law enforcement program concerning BRR operational interactions on playa during the event.

Several instances occurred during the event which delayed reporting of serious incidents to law enforcement.   On several occasions, law enforcement was not called in a timely manner or was told to stand down by BRRs, resulting in participant(s) and BRRs being battered or assaulted by the combative participants.   Steps should be taken by the 2017 planning team to ensure more timely notification of such incidents to law enforcement.

In one instance, law enforcement had to use force on a combative subject.  The subject was transported to the hospital, examined and released.   After being released, the subject

AR04325

battered Black Rock Rangers.  Officers had to use force on the subject a second time in the same day.  LE, BRC and Crowd Rx all expressed concerns over how to best handle "problem children" the first time so the pattern of behavior doesn't repeat itself.  Steps should be taken by the 2017 planning team to develop a clear process for handling participants who fit into this category.

In another instance, when investigators of the Integrated Investigation program arrived on scene of a reported sexual assault, they were met by BRRs.  Investigators discovered BRRs were with the victim/witness for over an hour prior to requesting law enforcement assistance, even conducting a preliminary investigation prior to LE arrival, to include the victim's information and a basic detailed description of what had occurred.  Investigators raised concerns over the lack of immediacy in reporting, as well as concerns over BRR's launching an inquiry before contacting law enforcement. The BLM 2017 planning team will be made aware of these issues for discussion with the BRC planning team during the planning phase for the 2017 event. In the 2017 planning season, steps should be taken by the planning team to improve the timeliness of reporting of sexual assaults directly to law enforcement.

## BRC Safety Department

For the second year in a row the BLM safety officer coordinated and worked closely with BRC's safety program. BRC's safety program is reported to be proactive and a vibrant program but is very busy evaluating and remediating safety issued identified during the event, and to ensure BRC and participant compliance with regulations and stipulations related to safety during the event.  Also for the second year in a row the BRC safety program took over the responsibility of managing

30

the laser and drone participant program at the event, which before the 2015 event was getting out of control. BLM's safety officer reported seeing no unlicensed lasers at the 2016 event. Additionally the BLM's safety officer reported only seeing 4 drones flying during the event. All were being flown at night, and operators could not be located to identify if the operators were licensed or not. This BRC safety department management of participant laser/drones programs appears to be very successful.

This is the second year in a row where a structure collapse has injured Burning Man participants. The harsh environmental influences of the playa (heat, UV damage, repeated exposure to high winds) cause building materials to degrade with a loss of structural integrity over time. Participants need to be aware of the weight bearing limitations of the materials they are utilizing and need to refresh or adequately check the integrity of their building supplies, prior to and following each event.   Utilize social media to disseminate pre-event information. Message should emphasize the need for participants to evaluate their building materials prior to arrival at the event.

Per the BRC Fuel Storage Plan, a fire lane of 20' shall be kept free of obstructions to provide emergency access for fire vehicles if needed. However, throughout the City very few readily recognizable fire lanes were identified or signed as such.

Concerning mutant vehicles and Art Cars with trailers, BLM safety staff witnessed everything from bungee straps to bed sheets being used as a barricade. Ground guides for "large" moving art cars, were for the most part, "readily seen" however, the walkers should have more identifiable or distinctive attire or visual effects (flags, hand held lights, etc) that identify them as walkers for that particular vehicle. Examples of markings/attire include; Reflective safety vests, brightly colored or reflective hats, brightly colored or reflective bandanas, brightly colored or

AR04327

reflective shirts.  Specify and standardize the requirement for reflective ANSI Type vest, they are inexpensive and readily identifiable from the other Burning Man participants on the busy playa.

At the art burns attended by the BLM Safety Officer: Great Bug Zapper, Jedi Dog Temple, Fantasy Dimensions, Plug and Play, Da Vinci Virus, Helios, Release the Man, Black Rock Lighthouse , downwind ember cast were observed falling on the Art Cars staged around the burns to watch.

## Vendor/Commercial Compliance Program (OSS)

In 2016 BRC requested to take over the duties of being the event lead in commercial compliance, with their Outside Services (OSS) department, with BLM primary role being to monitor BRC's performance. BLM's monitoring in 2016 showed that BRC was highly successful in fulfilling this role and meeting the vending event protocol requirements in reducing commercial issues during the 2016 event.

BRC OSS department was staffed by 10 or more, to ensure that commercial operations on BLM-administered public lands maintained all necessary BLM and BRC authorizations. There were approximately 80 vendors and a few listed under umbrella SRP's. The number of vendors was up from 2015 with many first time permit-holders in 2016.

BLM's Vending Compliance found that BRC did a good job notifying BLM on situations needing immediate assistance. Once BLM evaluated the situation jointly with BRC OSS, we effectively obtained the necessary resources to remediate the situation. This allowed for BRC and BLM to work closely on resource protection and stipulation violations. BRC had a team

AR04328

of "Scooby Doo's" this year, whose purpose was to investigate commercial activity in large camps and spread a Leave No Trace message.

This program should be refined and continued in 2017, with consideration of the following improvements:

• BRC and BLM needs to work towards not permitting SRPs on playa unless penalties are in order. This practice is time consuming, difficult in the location and not fair to those who properly applying.

• BRC and BLM needs to develop and implement strategies for large commercial camps. BRC and BLM must work towards identifying large theme/sound camps that retain a multitude of vendor support, a situation where it is not always clear if a particular vendor is permitted or not.

Environmental Compliance Program (Earth Guardians, BRRs, Hazmat, Playa Restoration, ESD)

In 2016 BRC took over the duties of being the event lead in identifying and remediating environmental compliance issues with BLM primary role being to monitor BRC's performance. BLM's monitoring in 2016 showed that BRC was highly successful in fulfilling this role and meeting the environmental event protocol requirements in reducing environmental issues during the 2016 event. Much of the credit for this should go to BRC's outreach and messaging to participants prior to the event.

This program should be refined and continued in 2017, with consideration of the following improvements:

• BLM should work with Earth Guardians on compliance training before the event in order to ensure that both BLM and

33

BRC view violations and remediation the same way for consistency.  BLM and BRC should increase pre-event coordination on training materials and topics.  Recommend using 2016 photos as examples for 2017 training, i.e. what does grey and black water look like, RV valves and caps, etc.

• BRC should make their environmental remediation staff available 24 hours a day to respond to urgent issues.

• BRC and BLM should modify the Compliance Protocol so that BRC's Playa Restoration department is available to identify and remediate issues from the time BRC occupies the playa until the Playa Restoration department begins their work after the event.

• It appeared that Earth Guardian/Black Rock Ranger efforts to identify and remediate compliance issues slowed down later in the event week, there should be a full effort during the entire main and post event.

• BRC should continue their very effective outreach and messaging program in order to continue to prevent environmental issues from occurring. Increase the "Pack it In/Pack it Out" message.

• Compliance work and meeting schedules should be clear prior to event.  Make a general timeline that shows how work and messaging will change during the event.

• Apply the fuel storage stipulation consistently to all amounts rather than based on volume as it is confusing to participants and subject to interpretation especially as fuel amounts decrease over the event.

• Emphases increased to prevent human waste incidents in deep playa during mobile raves.  Park mobile raves closer to

34

AR04330

port-a-potty banks and put signs in mobile dance zones to remind burners to use the port-a-potties. BRC should dispatch Hazmat units to search for and quickly clean up human waste deposited during deep play music events.

- Target BRC participant messaging on human waste issues in 2017.  Text messaging orders for service from permitted and contracted grey/black water and potable water service providers could help alleviate violations, wait times and uncertainty.  This would allow burners to text where and when they need pump and refill services.  Provide stats to burners on the amount of human waste generated. Hand out or ask burners to bring pee bottles and poop bags for camp and deep playa events.

- Increase creativity/humor on LNT education outreach.  Make LNT or outreach swag stamped with BLM and BRC logos, highlight the partnership and outreach message. Consider different types of media/social media outreach and reminders/PSAs on BRC radio.

In the above BLM comments on individual BRC programs/departments, whereas comments included considerations for future improvements, these considerations will be passed to the BLM 2017 planning team to discuss with BRC during the 2017 planning phase.

## **Moving Forward to 2017 Planning**

### NEPA

The 2016 event was the 5th year under the current 5-year Environmental Assessment (EA) NEPA analysis document. The event paid participant population cap remained at 70,000, as in 2015. The process to develop the new Environmental Impact Statement (EIS) level NEPA analysis document began at the end of the 2016 event.  This process could take several years to complete. The NSD, Authorizing Officer and event Solicitor have decided to continue the authorization of future event permits under the current EA analysis until the EIS is completed

AR04331

and it becomes the NEPA document of reference in authorizing the event SRP. This means that the event paid participant population cap of 70,000 will remain in effect until the new EIS is completed.  Based on this, the NSD and Authorizing Officer's direction for BLM's planning and executing for the future events authorized under the current EA (2017 & potentially 2018), will mirror the planning and execution of the 2016 event. BLM's planning team will continue to look for efficiencies and cost savings in planning for the 2017 event but the base line will be the 2016 BLM operational plan.

Event Cost Recovery Program

As discussed in the above 2016 Event Planning section, for the first time, the 2016 event CRA Estimate program involved a two-part CRA Estimate procedure, an early Planning CRA Estimate document to capture planning labor cost and a later Operational CRA Estimate document to capture gov't contracts, operational labor and all other charges. This worked out very well for BLM's SRP requirements by ensuring early planning labor cost were captured in the CRA program. However, the 2016 Planning CRA was not signed until April 5th so the planning team could not start in earnest until April. The Operational CRA was not signed until August 8th which was too late for the BLM's gov't contracting program. (Note: BRC provided additional funds for gov't contracting to the CRA account before the Operational CRA was signed without any CRA documentation). The procedure was good but the dates were too late. BLM will propose and present BRC a Planning CRA Estimate document in January 2017 which will document both the planning labor cost and the gov't contracts cost (contract cost predicated on the BLM 2017 Contracting Plan). This will allow BLM to set up the event CRA account by February 1st and have funds for the planning team to start work and the NSO event contracting team to start the contracting program. BLM will present BRC with the Operational CRA Estimate sometime in late spring or early summer, depending on when the BLM planning team has completed the 2017 operational plan. This planned proposal was discussed with BRC as a concept in the close-out meetings with BRC at the end of the 2016 event operations on playa.

If BRC does not prefer the two-part CRA estimate procedure, BLM can present to BRC the full event CRA estimate with planning labor, gov't contracting and all

AR04332

operational components cost, documented in separate tables, in January as one document. This document would mirror the same BLM event operation as in 2016, however if efficiencies are found by the BLM planning team later in the planning phase that result in an reduction of BRC funds needed by BLM, BRC would recover those unused funds in a refund once the CRA is closed out at the end of the year.  These unused funds could result from BLM TO positions not being filled after BLM and BRC agrees to shift more operational responsibilities to BRC and/or PCSO takes over more operational responsivities in the event law enforcement program.

BLM's Event Management Program

As part of event management between BLM and BRC, starting in 2014, BLM and BRC entered into a contracting Memorandum of Understanding (MOU) whereas some BLM support contracts were presented to BRC to contract through their own contracting program. BLM developed and sent BRC Statements of Work for each support contract that BRC contracting would use to award the contracts. Over the last three event years this has been a very successful program, for BLM by reducing BLM workload and for BRC by reducing operational cost. The current MOU document expired with the 2016 event. BLM has prepared a new MOU document and will be presenting it to BRC for consideration. A couple of noted changes to the new MOU document will be that any references to Attachment 1 (contracts for BRC contracting) and Attachment 2 (contracts for gov't contracting) will now be referred to as "BLM Contracting Plan", which may change yearly. Another change is an addition of a statement which reads "If a MOU SOW, submitted to BRC by BLM for any support item, is accepted by BRC, all components of said SOW must be accepted by BRC in whole. BLM will not consider partial component acceptance for a given SOW".  (Note: This addition resulted from BRC parceling out the rental of the BLM's medical modular building from the JOC compound build-out and servicing SOW in 2016's MOU program).

The Winnemucca District will be hiring a Staff LE Ranger prior to the 2017 event.  This will create a singular point of contact for event LE planning, coordination, and management, reducing the majority of collateral duty assignments previously required by other LEO's within the BLM.  This will

37

implement another recommendation of the Burning Man SRP Review Report. The LE planning lead will ultimately report to the AO for concurrence with planning recommendations and decisions, but oversight and supervision would be from the Zone 1 Supervisory Staff Law Enforcement Ranger. The hiring process for this position is scheduled to begin in December 2016. This position will be funded as a CRA position, or if BRC chooses, as an additional Memorandum of Agreement (MOA) proffer position.

During the 2016 event, the Department of Homeland Security (DHS) Infrastructure Security Team conducted a site visit to the event to identify options for consideration for improving the overall security of the event. Based on feedback received from the team, they will be providing the BLM with options for consideration. Additionally, DHS requested to be involved with the planning phases of the event to assist BRC and BLM with developing proper security protocols. BLM recommends furthering our relationship with DHS as we begin development of the EIS.

AR04334





## United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca. Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
NVW03500-18-01
2930 (NV030.15)

*Hand Delivered on Playa*

### NON-COMPLIANCE

Dear Mr. Dolman,

On August 26, 2018, staff from Black Rock City, LLC. (BRC), determined the weather event on playa was severe enough in limiting visibility to close the gate. Bureau of Land Management (BLM) personnel recognized this as a Tier 1 Notification per BRC Operational Protocols – Emergency Operations Center & Tier 1, and initiated a Tier 1 Notification absent BRC initiating a Tier 1 Notification. This severe weather event should have been a BRC initiated Tier 1 Notification per BRC's Operational Protocols – Emergency Operations Center and Tier 1.

On August 28, 2018, staff from the Black Rock Field Office (BRFO) of the Bureau of Land Management (BLM), became aware of an individual who was rescued by (BRC), Emergency Services Division (ESD), with a possible suicidal ideation. ESD requested law enforcement to look for a suicide note in the vehicle while they gave transport to the patient. Law Enforcement responded and no one was left on scene. This Suicide Attempt should have been a Tier 1 Notification per BRC's Operational Protocols – Emergency Operations Center & Tier 1. This ESD event E18-10332. BLM did not receive a Tier 1 Notification for this event.

On August 28, 2018, Rampart treated a Sexual Assault victim, ESD Event E18-10456. This Sexual Assault should have been a Tier 1 Notification per BRC's Operational Protocols – Emergency Operations Center & Tier 1. This ESD event E18-10456. BLM did not receive a Tier 1 Notification for this event.

These incidents are in violation of BRC's Plan of Operations, which BLM has approved. The Sexual Assault reporting failure is also in violation of BRC's Permit Stipulation 20(A)(i). These incidents are in violation of 43 CFR 2932.57(a)(2), violations of stipulations and conditions of the Burning Man Special Recreation Permit.

**AR02956**

To resolve this non-compliance and come into compliance, BRC must:

1. Immediately correct Reporting Deficiencies.
2. Investigate and provide a written explanation for the above mentioned reporting failures by noon on Friday, August 31, 2018.


## APPEAL PROVISIONS

A person who wishes to appeal to the Interior Board of Land Appeals must do so under 43 CFR 4.411 and must file in the of the officer who made the decision (not the board), in writing to: Mark E. Hall, Authorized Officer and Field Manager, Black Rock Field Office, Winnemucca District Office, 5100 East Winnemucca Blvd., Winnemucca, NV 89445. A person served with the decision being appealed must transmit notice of appeal in time to be filed in the office where it is required to be filed within thirty (30) days after the date of service.

The notice of appeal must give the serial number or other identification of the case and may include a statement of reasons for the appeal, a statement of standing if required by 43 CFR 4.412(b), and any arguments the appellant wishes to make. Attached form 1842-1 provides additional information regarding filing an appeal.

No extension of time will be granted for filing a notice of appeal. If a notice of appeal is filed after the grace period provided in 43 CFR 4.401(a), the notice of appeal will not be considered and the case will be closed by the officer from whose decision the appeal is taken. If the appeal is filed during the grace period provided in 43 CFR 4.401(a) and the delay in filing is not waived, as provided in that section, the notice of appeal will not be considered and the appeal will be dismissed by the Board.

The appellant shall serve a copy of the notice of appeal and any statements of reason, written arguments or briefs under 43 CFR 4.413 on each adverse party named in the decision from which the appeal is taken and on the Office of the Solicitor, Pacific Southwest Regional Solicitor, US Department of the Interior, 2800 Cottage Way, Room E-1712, Sacramento, CA 95825-1890.

Service must be accompanied by personally serving a copy to the party or by sending the document by registered or certified mail, return receipt requested, to the address of record in the bureau, no later than 15 days after filing the document.

In addition, within thirty (30) days of receipt of this decision you have the right to file a petition for a stay together with your appeal in accordance with the regulations at 43 CFR 4.21. The petition must be served upon the same parties specified above.

Pursuant to 43 CFR 4.21(b), a petition for stay, if filed, must show sufficient justification based on the following standards:

1) The relative harm to the parties if the stay is granted or denied;
2) The likelihood of the appellant's success on the merits;

3) The likelihood of immediate and irreparable harm if the stay is not granted; and,

4) Whether the public interest favors granting the stay.

43 CFR 4.21(b)(2) provides that the appellant requesting a stay bears the burden of proof to demonstrate that a stay should be granted.

Sincerely,

Mark E. Hall, PhD
Authorized Officer
Field Manager
Black Rock Field Office

AR02958



*Suicidal*



## Event Details

Print Date  08/28/18 18:59          TZ  America/Los_Angele

| | | | | |
|---|---|---|---|---|
| **Event** | BMAN1811011 | **Agency** | BLM | **Create Date** 08/28/18 14:22 |
| **Agency Create:** | 08/28/18 14:22 | **Scheduled Date:** | | |
| **Pickup Date:** | | **Dispatched:** | 08/28/18 14:26 | |
| **On Scene:** | | **Closed Date** | 08/28/18 14:44 | |
| **Event Type** | REQUEST LE | **Event Sub Type** | | **Priority:** 1 |
| **Status** | CLOSED | **Primary unit:** | B120 | |
| **Call Source:** | DISPATCH | **Zone:** | 3 O'Clock Response | |
| **Disposition:** | LE ASSIST | | | |
| **Location** | @300 A | | **Phone#:** | |
| **Common Name:** | 300 A | | **See MAP** | |
| **City/Town:** | | **State:** | **Zip Code** | |
| **Cross Street:** | | **Cross Street** | | |
| **Complainant** | D2, null | | **Phone#:** | |

**Destination:**

### Comments

| Date | Comments | Operator | Device |
|---|---|---|---|
| 08/28/18 12:34 | Event E18-10332 created with agency ESD. | cam bremner | ESD-Pos4 |
| 08/28/18 12:35 | Event E18-10332 assigned with agency ESD. | cam bremner | ESD-Pos4 |
| 08/28/18 12:35 | The zone has been changed from '3 O'clock Response Area' to '3 O'Clock Response Area'. | cam bremner | ESD-Pos4 |
| 08/28/18 12:36 | WALKUP to delta unit | cam bremner | ESD-Pos4 |
| 08/28/18 12:36 | possible seizure | cam bremner | ESD-Pos4 |
| 08/28/18 12:40 | post ictal will be transpo | cam bremner | ESD-Pos4 |
| 08/28/18 12:54 | BC requesting a couple more rangers for crouwd control | cam bremner | ESD-Pos4 |
| 08/28/18 12:55 | BR Ranger Chavez has been dispatched. ETA 1 minute. | curtis kline | ESD-Pos3 |
| 08/28/18 13:49 | Event E18-10332 closed with agency ESD. | cam bremner | ESD-Pos4 |
| 08/28/18 14:21 | per EMS 1 this patient was significantly injured and is a possible suicidal ideation. EMS is requesting law enforcement to investigate the scene to see if there are any notes that would indicate SI. | bryan anderson | ESD-Pos2 |
| 08/28/18 14:22 | apparently the person was locked in a hot car and they had to force entry (break window) to access the patient. | bryan anderson | ESD-Pos2 |
| 08/28/18 14:22 | copying cell to LE. | bryan anderson | ESD-Pos2 |

BMAN1811011                                                        1 / 3

### Comments

| Date | Comments | Operator | Device |
|---|---|---|---|
| 08/28/18 14:22 | BMAN1811011 Linked to E18-10332. The event type of E18-10332 is MEDICAL- SERIOUS. | bryan anderson | ESD-Pos2 |
| 08/28/18 14:26 | Event BMAN1811011 assigned with agency BLM. | cpamsh | POSITION 2 |
| 08/28/18 14:26 | B120 dispatched to @300 A and is primary. (MILLER, JEFFERY ) | cpamsh | POSITION 2 |
| 08/28/18 14:26 | B120 Enroute to @300 A. (MILLER, JEFFERY ) | cpamsh | POSITION 2 |
| 08/28/18 14:26 | B121 Enroute to @300 A. (CHODOROWSKI, DEREK ) | cpamsh | POSITION 2 |
| 08/28/18 14:28 | LE ENROUTE | cpamsh | POSITION 2 |
| 08/28/18 14:33 | BRC SUPPORT CHIEF ENRT TO GUIDE BLM IN | WBLANTON | POSITION 3 |
| 08/28/18 14:34 | C139 Enroute to @300 A. (ROGERS, JOHN ) | CFORD | POSITION 4 |

| 08/28/18 14:34 | C109 Enroute to @300 A. (THORNHILL, SHAWN ) | CFORD | POSITION 4 |
| 08/28/18 14:34 | B116 Enroute to @300 A. (SUTTON, CHARLES ) | CFORD | POSITION 4 |
| 08/28/18 14:34 | C120 Enroute to @300 A. (MITCHELL, EARL ) | CFORD | POSITION 4 |
| 08/28/18 14:37 | B120: ADV SUBJ HAS BEEN TRANSPORTED TO HOSPITAL | cparrish | POSITION 2 |
| 08/28/18 14:37 | B120: CANCEL ADDTL UNITS | cparrish | POSITION 2 |
| 08/28/18 14:38 | B121 has cleared from BMAN1811011. | cparrish | POSITION 2 |
| 08/28/18 14:39 | B120: ADV INITIAL CALL WAS RESPONDED TO AT 1240 HRS | cparrish | POSITION 2 |
| 08/28/18 14:43 | B116 has cleared from BMAN1811011. | cparrish | POSITION 2 |
| 08/28/18 14:44 | Event disposition set to: LE ASSIST | cparrish | POSITION 2 |
| 08/28/18 14:44 | B120 has cleared from BMAN1811011. | cparrish | POSITION 2 |
| 08/28/18 14:44 | Event BMAN1811011 closed with agency BLM. | cparrish | POSITION 2 |
| 08/28/18 14:44 | Event BMAN1811011 closed with agency BLM. | cparrish | POSITION 2 |
| 08/28/18 14:44 | Event BMAN1811011 closed with agency BLM. | cparrish | POSITION 2 |
| 08/28/18 14:44 | C109 has cleared from BMAN1811011. | cparrish | POSITION 2 |
| 08/28/18 14:44 | C120 has cleared from BMAN1811011. | cparrish | POSITION 2 |
| 08/28/18 14:44 | C139 has cleared from BMAN1811011. | cparrish | POSITION 2 |
| 08/28/18 14:48 | INCIDEN T# 1808280059 | JCULLIFER | POSITION 6 |

### Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| 08/28/18 14:26 | B120 | BLM | ENROUTE | | BLACK ROCK | @300 A |
| 08/28/18 14:26 | B120 | BLM | ENROUTE | | BLACK ROCK | @300 A |
| 08/28/18 14:26 | B121 | BLM | ENROUTE | | | @300 A |
| 08/28/18 14:26 | B121 | BLM | ENROUTE | | | @300 A |
| 08/28/18 14:34 | C139 | BLM | ENROUTE | | 300 A AREA | @300 A |

BMAN1811011        2 / 3

### Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| 08/28/18 14:34 | C139 | BLM | ENROUTE | | 300 A AREA | @300 A |
| 08/28/18 14:34 | C109 | BLM | ENROUTE | | 300 A AREA | @300 A |
| 08/28/18 14:34 | C109 | BLM | ENROUTE | | 300 A AREA | @300 A |
| 08/28/18 14:34 | B116 | BLM | ENROUTE | | 300 A AREA | @300 A |
| 08/28/18 14:34 | B116 | BLM | ENROUTE | | 300 A AREA | @300 A |
| 08/28/18 14:34 | C120 | BLM | ENROUTE | | 300 A AREA | @300 A |
| 08/28/18 14:34 | C120 | BLM | ENROUTE | | 300 A AREA | @300 A |
| 08/28/18 14:37 | B120 | BLM | ENROUTE | ADV SUBJ HAS BEEN TRANSPORTED TO HOSPITAL | BLACK ROCK | @300 A |
| 08/28/18 14:37 | B120 | BLM | ENROUTE | ADV SUBJ HAS BEEN TRANSPORTED TO HOSPITAL | BLACK ROCK | @300 A |
| 08/28/18 14:37 | B120 | BLM | ENROUTE | CANCEL ADDTL UNITS | BLACK ROCK | @300 A |
| 08/28/18 14:37 | B120 | BLM | ENROUTE | CANCEL ADDTL UNITS | BLACK ROCK | @300 A |
| 08/28/18 14:38 | B121 | BLM | CLEAR | B121 Unit Alert: ENROUTE | | |
| 08/28/18 14:38 | B121 | BLM | CLEAR | B121 Unit Alert: ENROUTE | | |
| 08/28/18 14:39 | B120 | BLM | ENROUTE | ADV INITIAL CALL WAS RESPON DED TO AT 1240 HRS | BLACK ROCK | @300 A |
| 08/28/18 14:39 | B120 | BLM | ENROUTE | ADV INITIAL CALL WAS RESPON DED TO AT 1240 HRS | BLACK ROCK | @300 A |
| 08/28/16 14:43 | B116 | BLM | CLEAR | | | |
| 08/28/18 14:43 | B116 | BLM | CLEAR | | | |
| 08/28/18 14:44 | B120 | BLM | CLEAR | LE ASSIST | ADV INITIAL CALL WAS RESPON DED TO AT 1240 HRS | | |
| 08/28/18 14:44 | B120 | BLM | CLEAR | | | |

AR02809

|  |  |  |  | LE ASSIST | ADV INITIAL CALL WAS RESPONDED TO AT 1240 HRS |
|---|---|---|---|---|
| 08/28/18 14:44 | C139 | BLM | CLEAR |
| 08/28/18 14:44 | C139 | BLM | CLEAR |
| 08/28/18 14:44 | C120 | BLM | CLEAR |
| 08/28/18 14:44 | C120 | BLM | CLEAR |
| 08/28/18 14:44 | C109 | BLM | CLEAR |
| 08/28/18 14:44 | C109 | BLM | CLEAR |

## Persons

| Date | Surname | Names | D.O.B | State | Drivers | Sex | Race | Operator | Device |
|---|---|---|---|---|---|---|---|---|---|

## Property

| Date | Association | QTY | Make | Model Cat. | Description | Serial# | Operator | Device |
|---|---|---|---|---|---|---|---|---|

BMAN1811011

3 / 3

AR02810



## Event Details

| | Print Date | 08/29/18 03:01 | TZ: America/Los_Angele |
|---|---|---|---|

| **Event** | BMAN1811134 | **Agency** | BLM | **Create Date** | 08/29/18 02:48 |
|---|---|---|---|---|---|
| **Agency Create:** | 08/29/18 02:50 | **Scheduled Date:** | | | |
| **Pickup Date:** | | **Dispatched:** | 08/29/18 02:55 | | |
| **On Scene:** | 08/29/18 02:55 | **Closed Date** | 08/29/18 03:00 | | |
| **Event Type** | ASSAULT | **Event Sub Type** | TRAMA / MAJOR | **Priority:** | 4 |
| **Status** | CLOSED | **Primary unit:** | B360 | | |
| **Call Source:** | Ops2 | **Zone:** | 3 O'clock Response | | |
| **Disposition:** | NO ACTION | | | | |
| **Location** | Rampart | | | **Phone#:** | |
| **Common Name:** | Rampart | | | **See MAP** | |
| **City/Town:** | | **State:** | | **Zip Code** | |
| **Cross Street:** | | **Cross Street:** | | | |
| **Complainant** | 32, SAT | | | **Phone#:** | |

**Destination:**

### Comments

| Date | Comments | Operator | Device |
|---|---|---|---|
| 08/29/18 02:50 | SAT 30 team on scene at Rampart, encountered 2nd incident and will handle | Tyler.Johnston | ESD-Pos6 |
| 08/29/18 02:50 | Event E18-10456 created with agency ESD | Tyler.Johnston | ESD-Pos6 |
| 08/29/18 02:50 | AUTOMATIC: BMAN1811134 Linked to E18-10456. The event type of E18-10456 is CIT-SA. | Tyler.Johnston | ESD-Pos6 |
| 08/29/18 02:50 | AUTOMATIC: BMAN1811134 Linked to R18-0068. The event type of R18-0068 is CIT-SA. | Tyler.Johnston | ESD-Pos6 |
| 08/29/18 02:53 | Event E18-10456 assigned with agency ESD. | Tyler.Johnston | ESD-Pos6 |
| 08/29/18 02:55 | Event BMAN1811134 assigned with agency BLM. | dcave | POSITION 2 |
| 08/29/18 02:55 | B360 dispatched to <UNKNOWN> and is primary. (BUCHANAN, STANLEY ) | dcave | POSITION 2 |
| 08/29/18 02:55 | B360 On Scene at Rampart. (BUCHANAN, STANLEY ) | dcave | POSITION 2 |
| 08/29/18 03:00 | B360: PER B360 SAT30 HAS LEFT LOCATION | CSMITH | POSITION 3 |
| 08/29/18 03:00 | Event disposition set to: NO ACTION | dcave | POSITION 2 |
| 08/29/18 03:00 | Event BMAN1811134 closed with agency BLM. | dcave | POSITION 2 |
| 08/29/18 03:00 | B360 has cleared from BMAN1811134. | dcave | POSITION 2 |

BMAN1811134          1 / 2

### Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| 08/29/18 02:55 | B360 | BLM | ATSCENE | | Rampart | |
| 08/29/18 02:55 | B360 | BLM | ATSCENE | | Rampart | |
| 08/29/18 03:00 | B360 | BLM | ATSCENE | PER B360 SAT30 HAS LEFT LOCATION | Rampart | |
| 08/29/18 03:00 | B360 | BLM | ATSCENE | PER B360 SAT30 HAS LEFT LOCATION | Rampart | |
| 08/29/18 03:00 | B360 | BLM | CLEAR | PER B360 SAT30 HAS LEFT LOCATION | | |
| 08/29/18 03:00 | B360 | BLM | CLEAR | PER B360 SAT30 HAS LEFT LOCATION | | |

AR02776

**Persons**

| Date | Surname | Names | D.O.B | State | Drivers | Sex | Race | Operator | Device |
|------|---------|-------|-------|-------|---------|-----|------|----------|--------|

**Property**

| Date | Association | QTY | Make | Model | Cat. | Description | Serial# | Operator | Device |
|------|-------------|-----|------|-------|------|-------------|---------|----------|--------|

BMAN1811134

2 / 2

AR02777



### Event Details

| | | Print Date | 08/29/18 02:59 | TZ: America/Los_Angele |
|---|---|---|---|---|
| **Event** | BMAN1811062 | **Agency** | BLM | **Create Date** | 08/28/18 21:01 |

| | | | |
|---|---|---|---|
| **Agency Create:** | 08/28/18 21:01 | **Scheduled Date:** | |
| **Pickup Date:** | | **Dispatched:** | 08/28/18 21:12 |
| **On Scene:** | 08/28/18 21:13 | **Closed Date** | 08/29/18 01:10 |
| **Event Type** | REQUEST LE | **Event Sub Type** | **Priority:** 5 |
| **Status** | Sup Reviewed | **Primary unit:** | C140 |
| **Call Source:** | OTHER | **Zone:** | 3 O'clock Response |
| **Disposition:** | REPORT | | |
| **Location** | @Ranger HQ Sanctuary | **Phone#:** | |
| **Common Name:** | Ranger HQ | | See MAP |
| **City/Town:** | | **State:** | Zip Code |
| **Cross Street:** | | **Cross Street:** | |
| **Complainant** | Khaki, null | | **Phone#:** |

**Destination:**

#### Comments

| Date | Comments | Operator | Device |
|---|---|---|---|
| 08/28/18 21:01 | Req: LE Consult | anna tonkonogui | ESD-Pos3 |
| 08/28/18 21:01 | Event E18-10401 created with agency ESD. | anna tonkonogui | ESD-Pos3 |
| 08/28/18 21:01 | BMAN1811062 Linked to E18-10401. The event type of E18-10401 is REQUEST LE. | anna tonkonogui | ESD-Pos3 |
| 08/28/18 21:10 | Aggressive participant. req expedited response | anna tonkonogui | ESD-Pos3 |
| 08/28/18 21:12 | Event BMAN1811062 assigned with agency BLM. | SREYNOLDS | POSITION 2 |
| 08/28/18 21:12 | B357 dispatched to @Ranger HQ:Sanctuary and is primary. (SUMSION, JADE ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:12 | B357 Enroute to @Ranger HQ:Sanctuary. (SUMSION, JADE ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:12 | C123 Enroute to @Ranger HQ:Sanctuary. (KERN, JOHN ) | CKUNERT | POSITION 5 |
| 08/28/18 21:13 | B240 dispatched to @Ranger HQ:Sanctuary. (FELIX, ERNESTO ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:13 | B240 Enroute to @Ranger HQ:Sanctuary. (FELIX, ERNESTO ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:13 | I410 Enroute to @Ranger HQ:Sanctuary. (VAN AIRSDALE, GLENN ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:13 | B360 Enroute to @Ranger HQ:Sanctuary. (BUCHANAN, STANLEY ) | SREYNOLDS | POSITION 2 |

BMAN1811062                                                             1 / 13

#### Comments

| Date | Comments | Operator | Device |
|---|---|---|---|
| 08/28/18 21:13 | B234 On Scene at @Ranger HQ:Sanctuary. (ZOHOVETZ, PAUL ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:13 | B240 On Scene at @Ranger HQ:Sanctuary. (FELIX, ERNESTO ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:14 | B354 dispatched to @Ranger HQ:Sanctuary. (CASTRO, JUSTIN ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:14 | B354 On Scene at @Ranger HQ:Sanctuary. (CASTRO, JUSTIN ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:14 | I368 Enroute to @Ranger HQ:Sanctuary. (ROMERO, CLAYTON ) | ssmth | POSITION 3 |
| 08/28/18 21:15 | C140 On Scene at @Ranger HQ:Sanctuary. (MOKESKI, MICHAEL ) | CKUNERT | POSITION 5 |
| 08/28/18 21:17 | B240: ONE DETAINED AT 2116 HOURS | SREYNOLDS | POSITION 2 |
| 08/28/18 21:17 | The primary Unit has changed to C123 for event BMAN1811062. | SREYNOLDS | POSITION 2 |
| 08/28/18 21:17 | B357 has cleared from BMAN1811062. | SREYNOLDS | POSITION 2 |

AR02782

| | | | |
|---|---|---|---|
| 08/28/18 21:18 | I410 has cleared from BMAN1811062. | SREYNOLDS | POSITION 2 |
| 08/28/18 21:18 | B360 has cleared from BMAN1811062. | SREYNOLDS | POSITION 2 |
| 08/28/18 21:18 | ALL UNITS STAND DOWN WE HAVE ENOUGH RANGERS ON SCENE | SREYNOLDS | POSITION 2 |
| 08/28/18 21:18 | C123 On Scene at @Ranger HQ:Sanctuary.  (KERN, JOHN ) | CKUNERT | POSITION 5 |
| 08/28/18 21:22 | I368 has cleared from BMAN1811062. | samith | POSITION 3 |
| 08/28/18 21:23 | C140: Contact made with C140. Timer reset to 10 | CKUNERT | POSITION 5 |
| 08/28/18 21:25 | The source has been changed from 'DISPATCH' to 'OTHER'. | LGOWDY | POSITION 1 |
| 08/28/18 21:31 | B234: SUSP IS FEMALE | SREYNOLDS | POSITION 2 |
| 08/28/18 21:32 | State Query Response for query #56041: 7 Responses  WITHOUT HITS  detected! | WC_SVC_EDSS | system |
| 08/28/18 21:32 | The source has been changed from 'DISPATCH' to 'OTHER'. | marcos della | ESD-Pos2 |
| 08/28/18 21:32 | State Query #56041. | SREYNOLDS | POSITION 2 |
| 08/28/18 21:32 | Contact # ( 267054 ) added: MEMKE, MARIANNA / 1989-06-21 / / . | SREYNOLDS | POSITION 2 |
| 08/28/18 21:36 | C140: C140 Unit Alert: ATSCENE | OStrickland | POSITION 4 |
| 08/28/18 21:37 | C140: Contact made with C140. Timer reset to 10. | CKUNERT | POSITION 5 |
| 08/28/18 21:38 | B234: TRANSPORTING THE SUBJ TO RAMPART FOR A SA POSSIBLY | SREYNOLDS | POSITION 2 |
| 08/28/18 21:38 | The source has been changed from 'OTHER' to 'Control1'. | marcos della | ESD-Pos2 |
| 08/28/18 21:39 | Event E18-10401 closed with agency ESD. | marcos della | ESD-Pos2 |
| 08/28/18 21:39 | C123: BE TAKING STATEMENT FROM INDV ASSC W/INCIDENT | CKUNERT | POSITION 5 |
| 08/28/18 21:39 | C123: Contact made with C123. Timer reset to 10. | CKUNERT | POSITION 5 |
| 08/28/18 21:40 | AT RAMPART | SREYNOLDS | POSITION 2 |
| 08/28/18 21:41 | B234: AT RAMPART | SREYNOLDS | POSITION 2 |
| 08/28/18 21:41 | B354: AT RAMPART | SREYNOLDS | POSITION 2 |
| 08/28/18 21:41 | C140: OUT AT RAMPART | CKUNERT | POSITION 5 |

BMAN1811062                                                                2 / 13

## Comments

| Date | Comments | Operator | Device |
|---|---|---|---|
| 08/28/18 21:41 | C140 location set to: OUT AT RAMPART. | CKUNERT | POSITION 5 |
| 08/28/18 21:41 | I406 dispatched to @Ranger HQ:Sanctuary.  (WILSON, LISA ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:41 | I406 Enroute to @Ranger HQ:Sanctuary.  (WILSON, LISA ) | SREYNOLOS | POSITION 2 |
| 08/28/18 21:47 | I406 On Scene at @Ranger HQ:Sanctuary.  (WILSON, LISA ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:51 | PCSO INC/180280103 | stallmedge | POSITION 6 |
| 08/28/18 21:51 | C140: Contact made with C140. Timer reset to 10. | CKUNERT | POSITION 5 |
| 08/28/18 21:51 | C123: Contact made with C123. Timer reset to 10. | CKUNERT | POSITION 5 |
| 08/28/18 21:55 | B200 dispatched to @Ranger HQ:Sanctuary.  (ROOP, MICHAEL ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:55 | B230 dispatched to @Ranger HQ:Sanctuary.  (STOLTS, DAVID ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:55 | B200 Enroute to @Ranger HQ:Sanctuary.  (ROOP, MICHAEL ) | SREYNOLDS | POSITION 2 |
| 08/28/18 21:55 | B230 Enroute to @Ranger HQ:Sanctuary.  (STOLTS, DAVID ) | SREYNOLDS | POSITION 2 |
| 08/28/18 22:01 | The primary Unit has changed to C140 for event BMAN1811062 | CKUNERT | POSITION 5 |
| 08/28/18 22:02 | C123 has cleared from BMAN1811062. | CKUNERT | POSITION 5 |
| 08/28/18 22:02 | C129 On Scene at @Ranger HQ:Sanctuary.  (BRUNJES, JONATHON ) | CKUNERT | POSITION 5 |
| 08/28/18 22:02 | C129 has cleared from BMAN1811062. | CKUNERT | POSITION 5 |
| 08/28/18 22:02 | C140: Contact made with C140. Timer reset to 10. | CKUNERT | POSITION 5 |
| 08/28/18 22:02 | B230 On Scene at @Ranger HQ:Sanctuary.  (STOLTS, DAVID ) | SREYNOLDS | POSITION 2 |
| 08/28/18 22:02 | B200 On Scene at @Ranger HQ:Sanctuary.  (ROOP, MICHAEL ) | SREYNOLDS | POSITION 2 |
| 08/28/18 22:23 | C140: Contact made with C140. Timer reset to 10. | CKUNERT | POSITION 5 |
| 08/28/18 22:26 | B230 has cleared from BMAN1811062. | SREYNOLDS | POSITION 2 |
| 08/28/18 22:26 | B200 hes cleared from BMAN1811062. | SREYNOLDS | POSITION 2 |
| 08/28/18 22:36 | State Query Response for query #56060: 7 Responses  WITHOUT HITS  detected! | WC_SVC_EDSS | system |

AR02783

| 08/28/18 22:36 | Contact # ( 267075 ) added: MENKEEVA, MARINA / 1999-06-21 / / . | CKUNERT | POSITION 5 |
| 08/28/18 22:36 | State Query #56060. | CKUNERT | POSITION 5 |
| 08/28/18 22:36 | C140: Contact made with C140. Timer reset to 10. | C140 Unit Alert: ATSCENE | CKUNERT | POSITION 5 |
| 08/28/18 22:47 | C140: Contact made with C140. Timer reset to 15. | C140 Unit Alert: ATSCENE | CKUNERT | POSITION 5 |
| 08/28/18 22:49 | B234: SUBJ IS IN INTERVIEW WITH PCSO AND I406 | SREYNOLDS | POSITION 2 |
| 08/28/18 22:49 | B234 has cleared from BMAN1811062. | SREYNOLDS | POSITION 2 |
| 08/28/18 22:49 | B240 has cleared from BMAN1811062. | SREYNOLDS | POSITION 2 |
| 08/28/18 23:02 | C140: Contact made with C140. Timer reset to 30. | C140 Unit Alert: ATSCENE | CKUNERT | POSITION 5 |
| 08/28/18 23:24 | REQ PCSO CASE # | vnunn | POSITION 5 |
| 08/28/18 23:25 | C140: PCSO CASE 18-246 | SPERSON | POSITION 6 |

BMAN1811062                                                                                         3 / 13

## Comments

| Date | Comments | Operator | Device |
|---|---|---|---|
| 08/28/18 23:32 | C140: Contact made with C140. Timer reset to 15. | vnunn | POSITION 5 |
| 08/28/18 23:50 | C140: Contact made with C140. Timer reset to 15. | C140 Unit Alert: ATSCENE | vnunn | POSITION 5 |
| 08/29/18 00:07 | C140: Contact made with C140. Timer reset to 30. | C140 Unit Alert: ATSCENE | vnunn | POSITION 5 |
| 08/29/18 00:08 | C110 Enroute to @Ranger HQ Sanctuary. (REED, GLENN ) | vnunn | POSITION 5 |
| 08/29/18 00:08 | C113 Enroute to @Ranger HQ Sanctuary. (BOHAN, JESSICA ) | vnunn | POSITION 5 |
| 08/29/18 00:13 | C110: PER BLACK ROCK RANGER CAN CANCEL REF COMBATIVE PATIENT IS GONE AND THEY DO NOT WANT TO PURSUE CHARGES | vnunn | POSITION 5 |
| 08/29/18 00:15 | C110 On Scene at @Ranger HQ Sanctuary. (REED, GLENN ) | vnunn | POSITION 5 |
| 08/29/18 00:15 | C113 On Scene at @Ranger HQ Sanctuary. (BOHAN, JESSICA ) | vnunn | POSITION 5 |
| 08/29/18 00:17 | I406 location set to: al ;report. | dcave | POSITION 2 |
| 08/29/18 00:18 | B355 dispatched to @Ranger HQ Sanctuary. (SAWTELL, PETER ) | vnunn | POSITION 5 |
| 08/29/18 00:18 | I406 has cleared from BMAN1811062. | dcave | POSITION 2 |
| 08/29/18 00:19 | B355 has preempted BMAN1811062. | RLOVE | POSITION 4 |
| 08/29/18 00:19 | B355 Enroute to @Ranger HQ Sanctuary. (SAWTELL, PETER ) | dcave | POSITION 2 |
| 08/29/18 00:35 | B355: B355 Unit Alert: ENROUTE | dcave | POSITION 2 |
| 08/29/18 00:35 | B355 location set to: 200 E . | dcave | POSITION 2 |
| 08/29/18 00:37 | C140: Contact made with C140. Timer reset to 20. | C140 Unit Alert: ATSCENE | vnunn | POSITION 5 |
| 08/29/18 00:56 | B355 has cleared from BMAN1811062. | RLOVE | POSITION 4 |
| 08/29/18 00:57 | C140: Contact made with C140. Timer reset to 60. | C140 UnitAlert: ATSCENE | LGOWDY | POSITION 1 |
| 08/29/18 01:10 | Event disposition set to: REPORT | vnunn | POSITION 5 |
| 08/29/18 01:10 | C140 has cleared from BMAN1811062. | vnunn | POSITION 5 |
| 08/29/18 01:10 | Event BMAN1811062 closed with agency BLM. | vnunn | POSITION 5 |
| 08/29/18 01:10 | Event BMAN1811062 closed with agency BLM. | vnunn | POSITION 5 |
| 08/29/18 01:10 | Event BMAN1811062 closed with agency BLM. | vnunn | POSITION 5 |
| 08/29/18 01:10 | C110 has cleared from BMAN1811062. | vnunn | POSITION 5 |
| 08/29/18 01:10 | B354 has cleared from BMAN1811062. | vnunn | POSITION 5 |
| 08/29/18 01:10 | C113 has cleared from BMAN1811062. | vnunn | POSITION 5 |
| 08/29/18 01:14 | DISREGARD C110 COMMENT AT 00:13 09 TO CANCEL ENTERED IN WRONG EVENT | vnunn | POSITION 5 |
| 08/29/18 02:32 | Event BMAN1811062 status changed to Sup Reviewed with agency BLM | LGOWDY | POSITION 1 |

## Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|

BMAN1811062                                                                                         4 / 13

AR02784

## Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| 08/28/18 21:12 | B357 | BLM | DISPATCH | | | @RangerHQ |
| 08/28/18 21:12 | B357 | BLM | DISPATCH | | | @Ranger HQ |
| 08/28/18 21:12 | B357 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 21:12 | B357 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 21:12 | C123 | BLM | ENROUTE | | EVERYWHERE | @Ranger HQ |
| 08/28/18 21:12 | C123 | BLM | ENROUTE | | EVERYWHERE | @Ranger HQ |
| 08/28/18 21:13 | B240 | BLM | DISPATCH | | | @Ranger HQ |
| 08/28/18 21:13 | B240 | BLM | DISPATCH | | | @Ranger HQ |
| 08/28/18 21:13 | B240 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 21:13 | B240 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 21:13 | I410 | BLM | ENROUTE | | T8 | @Ranger HQ |
| 08/28/18 21:13 | I410 | BLM | ENROUTE | | T8 | @Ranger HQ |
| 08/28/18 21:13 | B360 | BLM | ENROUTE | | T8 | @Ranger HQ |
| 08/28/18 21:13 | B360 | BLM | ENROUTE | | T8 | @Ranger HQ |
| 08/28/18 21:13 | B234 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:13 | B234 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:13 | B240 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:13 | B240 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:14 | B354 | BLM | DISPATCH | | JOC | @Ranger HQ |
| 08/28/18 21:14 | B354 | BLM | DISPATCH | | JOC | @Ranger HQ |
| 08/28/18 21:14 | B354 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:14 | B354 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:14 | I368 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 21:14 | I368 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 21:15 | C140 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:15 | C140 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:17 | B240 | BLM | ATSCENE | ONE DETAINED AT 2116 HOURS | @Ranger HQ | |
| 08/28/18 21:17 | B240 | BLM | ATSCENE | ONE DETAINED AT 2116 HOURS | @Ranger HQ | |
| 08/28/18 21:17 | B357 | BLM | CLEAR | | | |
| 08/28/18 21:17 | B357 | BLM | CLEAR | | | |
| 08/28/18 21:18 | I410 | BLM | CLEAR | | | |
| 08/28/18 21:18 | I410 | BLM | CLEAR | | | |
| 08/28/18 21:18 | B360 | BLM | CLEAR | | | |
| 08/28/18 21:18 | B360 | BLM | CLEAR | | | |
| 08/28/18 21:18 | C123 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:18 | C123 | BLM | ATSCENE | | @Ranger HQ | |
| 08/28/18 21:22 | I368 | BLM | CLEAR | | | |
| 08/28/18 21:22 | I368 | BLM | CLEAR | | | |
| 08/28/18 21:23 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. | @Ranger HQ | |
| 08/28/18 21:23 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. | @Ranger HQ | |

BMAN1811062

## Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| 08/28/18 21:31 | B234 | BLM | ATSCENE | SUSP IS FEMALE | @Ranger HQ | |
| 08/28/18 21:31 | B234 | BLM | ATSCENE | SUSP IS FEMALE | @Ranger HQ | |
| 08/28/18 21:36 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. | @Ranger HQ | |
| 08/28/18 21:36 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. | @Ranger HQ | |
| 08/28/18 21:37 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. | @Ranger HQ | |
| 08/28/18 21:37 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. \| | @Ranger HQ | |

AR02785

| | | | | Contact made with C140. Timer reset to 10. | | |
|---|---|---|---|---|---|---|
| 08/28/18 21:38 | B234 | BLM | ATSCE NE | TRANSPORTING THE SUBJ TO RAMPART FOR A SA POSSIBLY | @Ranger HQ | |
| 08/28/18 21:38 | B234 | BLM | ATSCE NE | TRANSPORTING THE SUBJ TO RAMPART FOR A SA POSSIBLY | @Ranger HQ | |
| 08/28/18 21:39 | C123 | BLM | ATSCE NE | BE TAKING STATEMENT FROM INDV ASSC W/INCIDE NT | @Ranger HQ | |
| 08/28/18 21:39 | C123 | BLM | ATSCE NE | BE TAKING STATEMENT FROM INDV ASSC W/INCIDE NT | @Ranger HQ | |
| 08/28/18 21:39 | C123 | BLM | ATSCE NE | Contact made with C123. Timer reset to 10. | BE TAKING STATEME NT FROM INDV ASSC W/INCIDE NT | @Ranger HQ | |
| 08/28/18 21:39 | C123 | BLM | ATSCE NE | Contact made with C123. Timer reset to 10. | BE TAKING STATEME NT FROM INDV ASSC W/INCIDE NT | @Ranger HQ | |
| 08/28/18 21:41 | B234 | BLM | ATSCE NE | AT RAMPART | @Ranger HQ | |
| 08/28/18 21:41 | B234 | BLM | ATSCE NE | AT RAMPART | @Ranger HQ | |
| 08/28/18 21:41 | B354 | BLM | ATSCE NE | AT RAMPART | @Ranger HQ | |
| 08/28/18 21:41 | B354 | BLM | ATSCE NE | AT RAMPART | @Ranger HQ | |
| 08/28/18 21:41 | C140 | BLM | ATSCE NE | OUT AT RAMPART | @Ranger HQ | |
| 08/28/18 21:41 | C140 | BLM | ATSCE NE | OUT AT RAMPART | @Ranger HQ | |
| 08/28/18 21:41 | C140 | BLM | ATSCE NE | OUT AT RAMPART | OUT AT | |
| 08/28/18 21:41 | C140 | BLM | ATSCE NE | OUT AT RAMPART | OUT AT | |
| 08/28/18 21:41 | I406 | BLM | DISPATCH | | IN THE CITY | @Ranger HQ |
| 08/28/18 21:41 | I406 | BLM | DISPATCH | | IN THE CITY | @Ranger HQ |
| 08/28/18 21:41 | I406 | BLM | ENROUTE | | IN THE CITY | @Ranger HQ |
| 08/28/18 21:41 | I406 | BLM | ENROUTE | | IN THE CITY | @Ranger HQ |
| 08/28/18 21:47 | I406 | BLM | ATSCE NE | | @Ranger HQ | |
| 08/28/18 21:47 | I406 | BLM | ATSCE NE | | @Ranger HQ | |
| 08/28/18 21:51 | C140 | BLM | ATSCE NE | Contact made with C140. Timer reset to 10. | OUT | OUT AT | |

BMAN1811062                                                                 6 / 13

**Currently Assigned Units**

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| | | | | AT RAMPART | | |
| 08/28/18 21:51 | C140 | BLM | ATSCE NE | Contact made with C140. Timer reset to 10. | OUT AT RAMPART | OUT AT | |
| 08/28/18 21:51 | C123 | BLM | ATSCE NE | Contact made with C123. Timer reset to 10. | Contact made with C123. Timer reset to 10. | BE TAKING STATEME NT FROM INDV ASSC W/INCIDE NT | @Ranger HQ | |
| 08/28/18 21:51 | C123 | BLM | ATSCE NE | Contact made with C123. Timer reset to 10. | Contact made with C123. Timer reset to 10. | BE TAKING STATEMENT FROM INDV ASSC W/INCIDE NT | @Ranger HQ | |
| 08/28/18 21:55 | B230 | BLM | DISPATCH | | | @Ranger HQ |
| 08/28/18 21:55 | B200 | BLM | DISPATCH | | | @Ranger HQ |
| 08/28/18 21:55 | B230 | BLM | DISPATCH | | | @Ranger HQ |
| 08/28/18 21:55 | B200 | BLM | DISPATCH | | | @Ranger HQ |
| 08/28/18 21:55 | B200 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 21:55 | B200 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 21:55 | B230 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 21:55 | B230 | BLM | ENROUTE | | | @Ranger HQ |
| 08/28/18 22:02 | C123 | BLM | CLEAR | Contact made with C123. Timer reset to 10. | Contact made with C123. Timer reset to 10. | BE TAKING STATEMENT | | |

AR02786

|  |  |  |  | FROM INDV ASSC W/INCIDENT |  |
|---|---|---|---|---|---|
| 08/28/18 22:02 | C123 | BLM | CLEAR | Contact made with C123. Timer reset to 10. \| Contact made with C123. Timer reset to 10. \| BE TAKING STATEMENT FROM INDV ASSC W/INCIDENT |  |
| 08/28/18 22:02 | C129 | BLM | ATSCENE |  | @Ranger HQ; |
| 08/28/18 22:02 | C129 | BLM | ATSCENE |  | @Ranger HQ. |
| 08/28/18 22:02 | C129 | BLM | CLEAR |  |  |
| 08/28/18 22:02 | C129 | BLM | CLEAR |  |  |
| 08/28/18 22:02 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| OUT AT RAMPART | OUT AT |
| 08/28/18 22:02 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| OUT | OUT AT |

## Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
|  |  |  |  | AT RAMPART |  |  |
| 08/28/18 22:02 | B230 | BLM | ATSCENE |  | @Ranger HQ |  |
| 08/28/18 22:02 | B230 | BLM | ATSCENE |  | @Ranger HQ |  |
| 08/28/18 22:02 | B200 | BLM | ATSCENE |  | @Ranger HQ |  |
| 08/28/18 22:02 | B200 | BLM | ATSCENE |  | @Ranger HQ |  |
| 08/28/18 22:23 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| OUT AT RAMPART | OUT AT |  |
| 08/28/18 22:23 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| OUT AT RAMPART | OUT AT |  |
| 08/28/18 22:26 | B200 | BLM | CLEAR |  |  |  |
| 08/28/18 22:26 | B200 | BLM | CLEAR |  |  |  |
| 08/28/18 22:26 | B230 | BLM | CLEAR |  |  |  |
| 08/28/18 22:26 | B230 | BLM | CLEAR |  |  |  |
| 08/28/18 22:36 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. \| C140 Unit Alert: ATSCENE \| Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| OUT AT RAMPART | OUT AT |  |
| 08/28/18 22:36 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 10. \| C140 Unit Alert: ATSCENE \| Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| Contact made with C140. Timer reset to 10. \| OUT AT RAMPART | OUT AT |  |
| 08/28/18 22:47 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 15. \| C140 Unit Alert: ATSCENE \| Contact made with C140. Timer reset to 10 \| C140 Unit Alert: ATSCENE \| Contact made with C140. Timer reset to 10. \| | OUT AT |  |

AR02787

Contact made with C140.
Timer reset to 10. |
Contact made with C140.
Timer reset to 10. | OUT

## Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| | | | | AT RAMPART | | |
| 08/28/18 22:47 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 15. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 10. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 10. | Contact made with C140. Timer reset to 10. | Contact made with C140. Timer reset to 10. | OUT AT RAMPART | OUT AT | |
| 08/28/18 22:49 | B234 | BLM | ATSCENE | SUBJ IS IN INTERVIEW WITH PCSO AND I406 | @Ranger HQ. | |
| 08/28/18 22:49 | B234 | BLM | ATSCENE | SUBJ IS IN INTERVIEW WITH PCSO AND I406 | @Ranger HQ. | |
| 08/28/18 22:49 | B234 | BLM | CLEAR | SUBJ IS IN INTERVIEW WITH PCSO AND I406 | | |
| 08/28/18 22:49 | B234 | BLM | CLEAR | SUBJ IS IN INTERVIEW WITH PCSO AND I406 | | |
| 08/28/18 22:49 | B240 | BLM | CLEAR | ONE DETAINED AT 2116 HOURS | | |
| 08/28/18 22:49 | B240 | BLM | CLEAR | ONE DETAINED AT 2116 HOURS | | |
| 08/28/18 23:02 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 30. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 15. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 10. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 10. | Contact made with C140. Timer reset to 10. | Contact made with C140. Timer reset to 10. | OUT AT RAMPART | OUT AT | |
| 08/28/18 23:02 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 30. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 15. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 10. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 10. | Contact made with C140. Timer reset to 10. | Contact made with C140. Timer reset to 10. | OUT AT RAMPART | OUT AT | |

## Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|

AR02788

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| 08/28/18 23:25 | C140 | BLM | ATSCENE | PCSO CASE 18-246 | OUT AT | |
| 08/28/18 23:25 | C140 | BLM | ATSCENE | PCSO CASE 18-246 | OUT AT | |
| 08/28/18 23:32 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 15. | PCSO CASE 18-246 | OUT AT | |
| 08/28/18 23:32 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 15. | PCSO CASE 18-246 | OUT AT | |
| 08/28/18 23:50 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 15. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 15. | PCSO CASE 18-246 | OUT AT | |
| 08/28/18 23:50 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 15. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 15. | PCSO CASE 18-246 | OUT AT | |
| 08/29/18 00:07 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 30. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 15. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 15. | PCSO CASE 18-246 | OUT AT | |
| 08/29/18 00:07 | C140 | BLM | ATSCENE | Contact made with C140. Timer reset to 30. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 15. | C140 Unit Alert: ATSCENE | Contact made with C140. Timer reset to 15. | PCSO CASE 18-246 | OUT AT | |
| 08/29/18 00:08 | C110 | BLM | ENROUTE | | RANGER | @Ranger HQ |
| 08/29/18 00:08 | C110 | BLM | ENROUTE | | RANGER | @Ranger HQ |
| 08/29/18 00:08 | C113 | BLM | ENROUTE | | RANGER | @Ranger HQ |
| 08/29/18 00:08 | C113 | BLM | ENROUTE | | RANGER | @Ranger HQ |
| 08/29/18 00:13 | C110 | BLM | ENROUTE | PER BLACK ROCK RANGER CAN CANCEL REF COMBATIVE PATIENT IS GONE AND THEY DO NOT WANT TO PURSUE CHARGES | RANGER | @Ranger HQ |
| 08/29/18 00:13 | C110 | BLM | ENROUTE | PER BLACK ROCK RANGER CAN CANCEL REF COMBATIVE PATIENT IS GONE AND THEY DO NOT WANT TO PURSUE CHARGES | RANGER | @Ranger HQ |
| 08/29/18 00:15 | C113 | BLM | ATSCENE | | @Ranger HQ | |

BMAN1811062

10 / 13

## Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| 08/29/18 00:15 | C113 | BLM | ATSCENE | | @Ranger HQ | |
| 08/29/18 00:15 | C110 | BLM | ATSCENE | PER BLACK ROCK RANGER CAN CANCEL REF COMBATIVE PATIENT IS GONE AND THEY DO NOT WANT TO PURSUE CHARGES | @Ranger HQ | |
| 08/29/18 00:15 | C110 | BLM | ATSCENE | PER BLACK ROCK RANGER CAN CANCEL REF COMBATIVE PATIENT IS GONE AND THEY DO NOT WANT TO PURSUE CHARGES | @Ranger HQ | |
| 08/29/18 00:17 | I406 | BLM | ATSCENE | | ai :report | |
| 08/29/18 00:17 | I406 | BLM | ATSCENE | | ai :report | |
| 08/29/18 00:18 | B355 | BLM | DISPATCH | | | @Ranger HQ |
| 08/29/18 00:18 | B355 | BLM | DISPATCH | | | @Ranger HQ |
| 08/29/18 00:18 | I406 | BLM | CLEAR | | | |
| 08/29/18 00:18 | I406 | BLM | CLEAR | | | |

**AR02789**

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| 08/29/18 00:19 | B355 | BLM | PREEMPT | | | |
| 08/29/18 00:19 | B355 | BLM | PREEMPT | | | |
| 08/29/18 00:19 | B355 | BLM | ENROUTE | | | @Ranger HQ: |
| 08/29/18 00:19 | B355 | BLM | ENROUTE | | | @Ranger HQ |
| 08/29/18 00:35 | B355 | BLM | ENROUTE | | 200 E | |
| 08/29/18 00:35 | B355 | BLM | ENROUTE | | 200 E | |
| 08/29/18 00:37 | C140 | BLM | ATSCENE | Contact made with C140.   Timer reset to 20.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 30.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| PCSO  CASE 18-246 | OUT AT | |
| 08/29/18 00:37 | C140 | BLM | ATSCENE | Contact made with C140.   Timer reset to 20.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 30.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| PCSO  CASE 18-246 | OUT AT | |
| 08/29/18 00:56 | B355 | BLM | CLEAR | | | |
| 08/29/18 00:56 | B355 | BLM | CLEAR | | | |
| 08/29/18 00:57 | C140 | BLM | ATSCENE | Contact made with C140.  | OUT AT | |

BMAN1811062                                                                                 11 / 13

## Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|---|---|---|---|---|---|---|
| | | | | Timer reset to 60.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 20.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 30.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| PCSO  CASE 18-246 | | |
| 08/29/18 00:57 | C140 | BLM | ATSCENE | Contact made with C140.   Timer reset to 60.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 20.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 30.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| PCSO  CASE 18-246 | OUT AT | |
| 08/29/18 01:10 | C140 | BLM | CLEAR | Contact made with C140.   Timer reset to 60.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 20.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 30.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| C140  Unit Alert: ATSCENE \|   Contact made with C140.  Timer reset to 15.  \| PCSO  CASE 18-246 | | |
| 08/29/18 01:10 | C140 | BLM | CLEAR | | | |

AR02790

Contact made with C140.
Timer reset to 60. | C140
Unit Alert: ATSCENE |
Contact made with C140.
Timerreset to 20. | C140
Unit Alert: ATSCENE |
Contact made with C140.
Timer reset to 30. | C140
Unit Alert: ATSCENE |
Contact made with C140.
Timer reset to 15. | C140
Unit Alert: ATSCENE |
Contact made with C140.
Timer reset to 15. | PCSO

BMAN1811062                                                        12 / 13

## Currently Assigned Units

| Date | Unit | Agency | Status | Comment | Location | Destination |
|------|------|--------|--------|---------|----------|-------------|
| | | | | CASE 18-246 | | |
| 08/29/18 01:10 | C113 | BLM | CLEAR | | | |
| 08/29/18 01:10 | C113 | BLM | CLEAR | | | |
| 08/29/18 01:10 | B354 | BLM | CLEAR | AT RAMPART | | |
| 08/29/18 01:10 | B354 | BLM | CLEAR | AT RAMPART | | |
| 08/29/18 01:10 | C110 | BLM | CLEAR | PER BLACK ROCK RANGER CAN CANCEL REF COMBATIVE PATIENT IS GONE AND THEY DO NOT WANT TO PURSUE CHARGES | | |
| 08/29/18 01:10 | C110 | BLM | CLEAR | PER BLACK ROCK RANGER CAN CANCEL REF COMBATIVE PATIENT IS GONE AND THEY DO NOT WANT TO PURSUE CHARGES | | |

## Persons

| Date | | Surname | Names | D.O.B | State | Drivers | Sex | Race | Operator | Device |
|------|--|---------|-------|-------|-------|---------|-----|------|----------|--------|
| 08/29/18 01:10 | Contact | MEMKE | MARIANNA, | 06/21/89 00:00 | | | F | | vnunn | POSITION 5 |
| 08/29/18 01:10 | Contact | MENKEEVA | MARINA | 06/21/99 00:00 | | | F | | vnunn | POSITION 5 |

## Property

| Date | Association | QTY | Make | Model | Cat. | Description | Serial# | Operator | Device |
|------|-------------|-----|------|-------|------|-------------|---------|----------|--------|

BMAN1811062                                                        13 / 13

**AR02791**

http://10.144.243.70:8080/iNetInfo-BLM/RunReport?reportName=eventcaddetails&pAge...   8/29/2018

*Internal Document*

**INFORMATION MEMORANDUM FOR THE STATE DIRECTOR**

DATE:        June 26, 2018

THROUGH:  Ester McCullough – District Manager, Winnemucca District Office (WDO) *Est MMC G*

FROM:       Mark E. Hall, PhD. – Field Manager, Black Rock Field Office (BRFO) *MEHall 26 June 2018*

SUBJECT:   "Must Report" Conference Call with Black Rock City, LLC (BRC), and Pershing County Sheriff's Office (PCSO)

## I.      INTRODUCTION

The purpose of this memo is information only regarding the discussion between BLM staff, BRC, and PCSO regarding BRC's "Must Reports" protocol on June 22, 2018.

## II.     BACKGROUND

Marnee Benson, BRC Associate Director of Government Affairs, requested a conference call outside of scheduled planning calls to discuss and review BRC's revised "Must Reports" protocol from BRC's 2018 Burning Man Operations Plan.

The "Must Reports" protocol is a list of incidents that must be reported immediately to law enforcement. This protocol resulted from an event in 2014, where BRC staff failed to report a sexual assault. In 2015, BRC included a "Situation Escalation" protocol in their operations plan which became the "Must Reports" protocol in BRC's 2016 Operating Plan. The 2016 protocol listed; Lost or Found Child, Juvenile or Elder Abuse, Domestic Violence, Sexual Assault, Death, Barricaded subject and/or hostage, and Suicide Attempted. BLM required "Must Reports" protocol in BRC's Operating Plan in 2017 and 2018 and in the permit stipulations.

The revised 2018 "Must Report" protocol, removed 4 out of the 7 items listed in BRC's 2017 Operating Plan. These included; Domestic Violence, Sexual Assault, Barricaded subject and/or hostage, and Suicide attempted.

## III.    POSITIONS OF INTERESTED PARTIES

BRC was represented by Marnee Benson, Charlie Dolman, Ray Allen, Roger Vind, Erin MacCool, "Peaches" and "Crow". BRC stated their legal team revised the protocol to be in line with Federal and Nevada reporting requirements. BRC stated sexual assault survivors/victims did not want to come forward for personal reasons and that BRC wants to be more empathetic to participants surviving a sexual assault and support them if they do not want to contact law enforcement. BRC referenced the Violence Against Women Act, proclaiming the law provides protections for the survivor and in removing this incident from "Must Reports" protects victims of sexual assault from additional trauma of talking with law enforcement. Historically, males and females report being victims of sexual assault at the event.

AR04450

*Internal Document*

BLM, represented by Becky Andres, Mark Pirtle, and Chelsea McKinney, view the revision of the "Must Reports" section of the Operating Plan, as a severe reduction in required law enforcement reporting. The removal of Domestic Violence, Barricaded subject and/or hostage, suicide attempted and Sexual Assault raised concerns about providing for public safety. BLM sought clarification of why more than half of incidents were removed. BRC responded the three listed items in the 2018 "Must Report" protocol are legally required and the remaining four are not. BRC was informed Mark Hall requires all 2017 incidents be listed in the 2018 protocol with an additional environmental incident for "HazMat" spills over 50 gallons.

BRC and BLM discussed the authority of Mark Hall to make the request. BRC wanted the authority and statute of the authority provided to them. BLM reiterated that under a Special Recreation Permit (SRP) the BLM may request changes to a proponent's operational plan if it is determined to be deficient. BLM reiterated this is the process required of all proponents.

PCSO, represented by Sheriff Jerry Allen, raised similar concerns as the BLM and referenced training materials in the 2018 Burning Man Black Rock Rangers Manual discussing reporting items as listed in the 2016 and 2017 "Must Reports." PCSO voiced concerns this could lead to confusion among the Black Rock Rangers. PCSO voiced concern over the manual guidance where sexual assault reporting is filtered by a Black Rock Ranger "Khaki" (Supervisor) and not necessarily reported to law enforcement, this concern is shared by the BLM.

Suicide attempts are a point of concern needing further BRC internal consultation. BLM and PCSO recommended the incident remain in "Must Report" as law enforcement must secure the scene before emergency medical personnel respond. PCSO could not say there was a statute requiring law enforcement respond first but it is established in the industry as best practice and PCSO would research Nevada Revised Statutes. BLM recounted a suicide attempt on playa involving BRC medical staff requesting law enforcement where medical did not enter the scene because the individual possessed a knife. BRC will follow up with BRC medical response staff.

BRC was unwavering in their response to not maintain the same protocols of 2017, despite no BRC objections in prior years. Becky Andres, absent consensus, stated Mark Hall is requesting a certified letter from BRC regarding BRC's legal objections to maintaining the 2017 list.

All parties profess the same goal of providing the best care and response to these incidents. The subject of sexual assault is a high priority for all parties. The BLM maintains its SRP authority to require all prior incidents maintained in the 2018 "Must Reports" protocol. In maintaining this requirement, BLM continues to provide for public health and safety at the Burning Man Event.

**PREPARED BY:**

Becky Andres, Law Enforcement, 775-315-3497
Chelsea McKinney Acting Burning Man Project Lead, 775-623-1771



## cranking some numbers on sexual assault at Burning Man

7 messages

**Hall, Mark** <mehall@blm.gov>             Thu, Jul 5, 2018 at 8:45 AM
To: Logan Briscoe <lbriscoe@blm.gov>, Rebecca Andres <randres@blm.gov>, Eric Boik <eboik@blm.gov>, Mark Pirtle <mpirtle@blm.gov>, "Mckinney, Chelsea" <cmmckinney@blm.gov>, Bryce Shields <bshields@pershingcounty.net>, Jerry Allen <jallen@pershingcounty.net>, Janell Bogue <janell.bogue@sol.doi.gov>

Being a numbers geek, I decided to take a look at the Burning Man number of sexual assaults for the years we have it reported to calculate the rate. Since it is a small data set, I adopted a Bayesian statistical approach (a Bayesian looks at the underlying parameters as being variables dependent on the observed data and arising from some sort of distribution, whereas the more common frequentist approach just looks at the maximum likelihood and how well the data fits a set model).

Assuming the number of sexual assaults originates from a poisson distribution (most things involving small numbers of individuals follows a poisson distribution);

# of sexual assaults = (rate) x (# of days)

# days is constant and equals 8. Taking the data from Logan's emails, and assuming the rate follows a gamma distribution (we won't go into the derivation of that...), we end up with--

| Date | Rate (Sexual assault/day) |
|------|---------------------------|
| 2014 | 95% Highest Posterior Density: 0.35 - 1.64 |
|      | Median: 0.81 |
| 2015 | 95% HPD: 1.1 - 2.95 |
|      | Median: 1.83 |
| 2016 | 95% HPD: 0.73 - 2.36 |
|      | Median: 1.4 |
| 2017 | 95% HPD: 1.61 - 3.83 |
|      | Median: 2.49 |

The only data that folks have been able to dig up for comparison so far (thanks for those who have helped get that!) is the number rapes in the calendar year for Sparks (a city of similar size as Black Rock City) for 2014 and 2015. Doing a similar analysis yields--

| Date | Rate (Rape/day) |
|------|-----------------|
| 2014 | 95% HPD: 0.15 - 0.23 |

AR02941

Median: 0.19

2015            95% HPD: 0.11 - 0.19
                Median: 0.14

While I'm well aware there is a difference in definitions, I am somewhat bothered by what I'm seeing.  Yes, they are not a typical city of 80,000 people and from a public health and safety viewpoint, there are some really big issues.

Any thoughts, comments, etc. ?

MEH


Mark E. Hall, PhD
Field Manager
Black Rock Field Office
Winnemucca District Office
775-623-1529.

---

**Logan Briscoe** <lbriscoe@blm.gov>                          Thu, Jul 5, 2018 at 9:17 AM
To: "Hall, Mark" <mehall@blm.gov>
Cc: Rebecca Andres <randres@blm.gov>, Eric Boik <eboik@blm.gov>, Mark Pirtle <mpirtle@blm.gov>, "Mckinney, Chelsea" <cmmckinney@blm.gov>, Bryce Shields <bshields@pershingcounty.net>, Jerry Allen <jallen@pershingcounty.net>, Janell Bogue <janell.bogue@sol.doi.gov>

Thanks for the statistical analysis, Mark. I agree this issue at Burning Man is concerning and alarming.  While I have no idea what your methodology means,  the final numbers help tell the story.  Here is a another statistic that helps frame the concerns we have raised (https://www.rainn.org/):

**The Majority of Sexual Assaults Are Not Reported to the Police - Only 310 out of every 1,000 sexual assaults are reported to police, as pulled from the Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, National Crime Victimization Survey.**

[Quoted text hidden]

---

**Eric Boik** <eboik@blm.gov>                                 Thu, Jul 5, 2018 at 10:16 AM
To: mehall@blm.gov
Cc: Logan Briscoe <lbriscoe@blm.gov>, Rebecca Andres <randres@blm.gov>, Mark Pirtle <mpirtle@blm.gov>, cmmckinney@blm.gov, bshields@pershingcounty.net, jallen@pershingcounty.net, janell.bogue@sol.doi.gov

Mark -

That is some deep stuff and excellent work.  My only comment is the # of days that you used in your formula.  I can not recall if the statistics Logan provided (and captured historically) are during the Main Event, Pre-Event through Post-Event, or the entire time the closure is in affect.  Depending on the reporting time line, it may not make much of a difference. I bet the numbers still illustrate a concern.

Nice work 

[Quoted text hidden]
--
Eric Boik
State Chief Ranger
**BLM Nevada State Office**
1340 Financial Blvd.
Reno, NV 89502

AR02942

Office: (775) 861-6621
Mobile: (775) 225-5320
eboik@blm.gov

---

Rebecca Andres <randres@blm.gov>                              Thu, Jul 5, 2018 at 12:17 PM
To: Eric Boik <eboik@blm.gov>
Cc: mehall@blm.gov, Logan Briscoe <lbriscoe@blm.gov>, Mark Pirtle <mpirtle@blm.gov>, cmmckinney@blm.gov,
bshields@pershingcounty.net, jallen@pershingcounty.net, janell.bogue@sol.doi.gov

The sexual assault numbers come from PCSO only for this math so it is 99% main event. Any reports BLM may have
taken in IMARS were filtered out as much as possible.

Very interesting numbers, especially for the EIS. Thanks for the breakdown Mark!

Sent from my iPhone
[Quoted text hidden]

---

Bryce Shields <bshields@pershingcounty.net>                    Thu, Jul 5, 2018 at 1:57 PM
To: "Hall, Mark" <mehall@blm.gov>
Cc: Logan Briscoe <lbriscoe@blm.gov>, Rebecca Andres <randres@blm.gov>, Eric Boik <eboik@blm.gov>, Mark Pirtle
<mpirtle@blm.gov>, "Mckinney, Chelsea" <cmmckinney@blm.gov>, Bryce Shields <bshields@pershingcounty.net>, Jerry
Allen <jallen@pershingcounty.net>, Janell Bogue <janell.bogue@sol.doi.gov>

That is good work. Thanks Mark. I think your analysis reflects what law enforcement and prosecutors in my office
have suspected for the last several years, but have been unable to quantify or otherwise demonstrate. Obviously, the
numbers strengthen the BLM's (and Pershing County's) position that the SAs must be timely reported to law
enforcement as a condition of the permit. Can your analysis be simplified even more into layman terms? Is this
something that will be brought up in scoping for the EIS? -Bryce

From: Hall, Mark [mailto:mehall@blm.gov]
Sent: Thursday, July 05, 2018 8:46 AM
To: Logan Briscoe; Rebecca Andres; Eric Boik; Mark Pirtle; Mckinney, Chelsea; Bryce Shields; Jerry Allen; Janell Bogue
Subject: cranking some numbers on sexual assault at Burning Man

[Quoted text hidden]

---

Hall, Mark <mehall@blm.gov>                                    Thu, Jul 5, 2018 at 2:00 PM
To: Bryce Shields <bshields@pershingcounty.net>
Cc: Logan Briscoe <lbriscoe@blm.gov>, Rebecca Andres <randres@blm.gov>, Eric Boik <eboik@blm.gov>, Mark Pirtle
<mpirtle@blm.gov>, "Mckinney, Chelsea" <cmmckinney@blm.gov>, Jerry Allen <jallen@pershingcounty.net>, Janell Bogue
<janell.bogue@sol.doi.gov>

Yeah, we can work on making it more reader/layman friendly and it will get worked into
the EIS.

Thanks, MEH

Mark E. Hall, PhD
Field Manager
Black Rock Field Office
Winnemucca District Office

AR02943

775-623-1529.

[Quoted text hidden]

---

**Bryce Shields** <bshields@pershingcounty.net>        Thu, Jul 5, 2018 at 2:20 PM
To: "Hall, Mark" <mehall@blm.gov>

Okay. I am still waiting to hear back from someone from UNR regarding their training. I will pass it along to you when I get it. -Bryce

**From:** Hall, Mark [mailto:mehall@blm.gov]
**Sent:** Thursday, July 05, 2018 2:00 PM
**To:** Bryce Shields
**Cc:** Logan Briscoe; Rebecca Andres; Eric Boik; Mark Pirtle; Mckinney, Chelsea; Jerry Allen; Janell Bogue
**Subject:** Re: [EXTERNAL] RE: cranking some numbers on sexual assault at Burning Man

[Quoted text hidden]



# United States Department of the Interior



**BUREAU OF LAND MANAGEMENT**
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

In Reply Refer To:
NVW03500-18-01
2930 (NV030.00)

Certified Mail Number: 9171 9690 0935 0005 1854 64
<u>Return Receipt Requested</u>

Mr. Raymond Allen
General Counsel
Burning Man
660 Alabama St., 4th Floor
San Francisco, CA 94110

Dear Mr. Allen,

The Bureau of Land Management (BLM) received your certified letter dated June 27, 2018. In that letter, you stated that Black Rock City, LLC (BRC) would remove sexual assaults from the "Must Report" policy in the Burning Man Operating Plan.

After consultation with the U.S. Attorney's Office, the Department of Interior Solicitor's Office, the Pershing County Sheriff's Office, and the Pershing County District Attorney, it is my determination that BRC must immediately report all sexual assault incidents to law enforcement. The requirement to report does not predicate a violation of a victim's right to remain anonymous. In instances where a victim requests anonymity, BRC can inform law enforcement of the victim's request and law enforcement will not attempt to make contact with the victim. At a minimum, BRC will be required to report the day, time, and location in the city where the assault occurred, as well as any other pertinent details that do not implicate the victim's identity if anonymity was requested. BRC's immediate reporting of information about sexual assault is necessary to identify trends and document known instances of assault on BLM-administered public lands. The BLM must engage in due diligence to provide for public health and safety on BLM administered lands at the Burning Man event.

Due to BRC's declaration of not including sexual assaults in the Must Report Protocol, the requirement to immediately report will be added as a stipulation to the 2018 BLM issued permit for the Burning Man event. The stipulation will read:

AR08312

BRC will immediately report all received reports of sexual assault to law enforcement including the day, time, and location in the city of the reported incident. Black Rock Rangers will facilitate and assist law enforcement in locating the victim unless the victim requests anonymity. Notification must include a Tier 1 notification.

The BLM further requests BRC revise the 2018 Black Rock Ranger (BRR) Manual requiring "Khaki" to filter what is reported to law enforcement (for example pages 31, 71). The BLM and the Pershing County Sheriff has not authorized the BRRs to act as an agent of the government in determining what needs to be reported. All BRRs must be empowered to request law enforcement immediately if they suspect an assault has occurred.

Additionally, BRC's definition of consent within the 2018 Ranger Manual is inadequate (p. 71-72). Consent either exists or does not exist regardless of an individual's initial consent, any individual can withdraw consent at any time in an encounter and if that individual is incapacitated and cannot withdraw consent, they are also no longer capable of retaining consent.

The Pershing County Sheriff's Office and District Attorney's Office has stated that they will be tracking all reports of sexual assault in Pershing County to provide for public health and safety. The issue of sexual assaults on public lands during the Burning Man event is a major concern for the Department of Interior, and the measures described in this letter will help ensure public health and safety at the event. With the rate of sexual assault increasing in the 2017 event (median: 2.49/day) from the 2016 event (median: 1.40/day), the BLM looks forward to working with BRC to ensure public health and safety on the playa during the 2018 Burning Man event.

Sincerely,

Mark E. Hall
Burning Man Authorized Officer
Field Manager
Black Rock Field Office



**US Department of the Interior**
**Bureau of Land Management**
**Winnemucca District, Nevada**

Burning Man Event Special Recreation Permit
Environmental Impact Statement



# Public Health and Safety at the Burning Man Event
# June 2019

AR08167

This page intentionally left blank.

AR08168

# TABLE OF CONTENTS

Section                                                                                                    Page

**PUBLIC HEALTH AND SAFETY AT THE BURNING MAN EVENT** ..................................................... 1

  1.1 Background ............................................................................................................... 1
  1.2 Public Health and Safety ............................................................................................ 1
     1.2.1 Aircraft Activity ............................................................................................. 2
     1.2.2 Civil Disorder ................................................................................................ 2
     1.2.3 Disease Vectors ............................................................................................. 3
     1.2.4 Medical ........................................................................................................ 4
     1.2.5 Law Enforcement .......................................................................................... 4
     1.2.6 Evacuation .................................................................................................... 8
     1.2.7 Explosives .................................................................................................. 10
     1.2.8 Fire Safety ................................................................................................. 10
     1.2.9 Flooding ..................................................................................................... 11
     1.2.10 Human Health Concerns ............................................................................. 11
     1.2.11 Controlled Substances ................................................................................ 14
     1.2.12 Sexual Assaults .......................................................................................... 16
     1.2.13 Mass Casualty Response .............................................................................. 16
     1.2.14 Hygiene and Food Safety ............................................................................. 17
     1.2.15 Missing Juveniles ....................................................................................... 17
     1.2.16 Respiratory Concerns ................................................................................. 18
     1.2.17 Government Employee Health and Safety ...................................................... 18
     1.2.18 Structure Collapse ...................................................................................... 19
     1.2.19 Terrorism .................................................................................................. 19
  1.3 Comparable Environments ....................................................................................... 21
     1.3.1 Sparks, Nevada ........................................................................................... 21
     1.3.2 Electric Daisy Carnival ................................................................................ 22
  1.4 References .............................................................................................................. 24

# TABLES

Page

1   Law Enforcement Statistics ...................................................................................... 9
2   Summary of Medical Incidents ................................................................................ 14
3   BLM-Issued Drug Citations .................................................................................... 15
4   Burning Man Event Sexual Assault Statistics ............................................................. 16
5   Sparks Crime Statistics ........................................................................................... 22
6   Sparks Sexual Assault (Rape) Statistical Analysis ...................................................... 22
7   2018 3-day Event Experience According to Open Source Statistics ............................. 23

# FIGURES

Page

1   Winnemucca District Fire Occurrence 2008-2018 .................................................... 12

June 2019            *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*            i
*Public Health and Safety at the Burning Man Event*

**AR08169**

| ACRONYMS AND ABBREVIATIONS | Full Phrase |
|---|---|
| BLM | Bureau of Land Management |
| BRC | Black Rock City, LLC. |
| | |
| EA | environmental assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESD | Emergency Services Division |
| Event | Burning Man Event |
| | |
| FAA | Federal Aviation Authority |
| | |
| HHS | United States Department of Health and Human Services |
| | |
| MCI | mass casualty incident |
| | |
| NAC | Nevada Administrative Code |
| NAAQS | National Ambient Air Quality Standards |
| NDPH | Nevada Division of Public Health |
| NEPA | National Environmental Policy Act |
| NRS | Nevada Revised Statutes |
| | |
| OSHA | Occupational Safety and Health Administration |
| | |
| PCSO | Pershing County Sheriff's Office |
| PELS | permissible exposure limits |
| PLPT | Pyramid Lake Paiute Tribe |
| | |
| RC | remote control |
| | |
| SR | State Route |
| SRP | special recreation permit |

# Public Health and Safety at the Burning Man Event

## 1.1   BACKGROUND

The Burning Man Event (Event) has occurred completely on public lands administered by the Bureau of Land Management (BLM) since 1990, with the exception of 1997 when the Event was held primarily on private lands. The Burning Man Event underwent an environmental assessment (EA) in 2012 as part of the National Environmental Policy Act (NEPA) to determine the environmental and societal impacts of the Event. The Black Rock City, LLC (BRC) Proposed Action is to renew the special recreation permit (SRP) allowing the Event and to analyze a proposed increase to a total Event population of 100,000. The population, also called bodies on the playa, is all Burning Man Event attendees, including participants and BRC staff and volunteers. The population does not include government personnel or vendors. This public health and safety report addresses the existing environment of the Burning Man Event from the 2012 EA to the present day.

## 1.2   PUBLIC HEALTH AND SAFETY

Public health and safety are analyzed in the proposed Closure Area, including the surrounding communities of Gerlach, Fernley, Reno/Sparks, Nixon, Wadsworth, Lovelock, and Winnemucca. The area also includes traffic routes (with a 0.5-mile buffer) and the air basin (Black Rock Desert Hydrographic Region). The scope of public health and safety concerns includes the existing environment with factors affecting public health and safety, and it includes consideration for mitigations in place per planning and operational actions. The Burning Man Event includes a population of approximately 80,000 with participants, staff, and volunteers inside the city perimeter, approximately 9,715 acres or 15 square miles, with a density of approximately 5,270 persons per square mile.

The BLM's public health and safety management ensures compliance with federal, state, and local laws to protect public land users and public land resources from undue harm. Federal law mandates the BLM to provide for environmental safety in all activities on public lands, to promptly respond to any hazard, and to mitigate or remove hazards. This is in accordance with federal and state laws and regulations, including the Comprehensive Environmental Response, Compensation, and Liability Act. BLM policy for SRPs and discretionary actions dictates the BLM must determine if the agency can manage the Event while protecting against health or safety risks to the public and unnecessary or undue degradation of public lands (BLM Handbook 2930-1).

Parties responsible for hazards and contamination of public lands may be held liable for damages and restoration. Public health and safety, including law enforcement, also pertains to all items in the permit regulations, stipulations, and annual Burning Man Event Closure Order published in the *Federal Register*. Public health and safety within the defined geographical scope applies to participant and nonparticipant impacts before, during, and after the proposed Burning Man Event. While BRC implements programs and Event regulations to increase mitigations to public safety, the BLM must determine all reasonable efforts made from the agency and Event organizer to provide for public health and safety, prevent unnecessary or undue degradation of public lands, and ensure all mitigations to do so are implemented (BLM Handbook 2930-1).

June 2019          *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*          1
*Public Health and Safety at the Burning Man Event*

**AR08171**

Public health and safety concerns outside of the Event site relate to increased transient populations in surrounding communities for several months after the Event. Increased instances of hitchhiking and residing in vehicles in public areas are observed in communities in the I-80 corridor following the Event (BLM Social Values and Economic Assessment 2018). Abandonment of recreational vehicles, trailers, and vehicles in suburban communities around the Event increases in the month following the Event. The Event increases the workload of neighboring communities' medical resources, tow truck operations, sanitation, and law enforcement (BLM Social Values and Economic Assessment 2018). Law enforcement officers brought from other agencies across northern Nevada leave an absence in their home agency, drawing down available public safety resources in northern Nevada (BLM Social Values and Economic Assessment 2018).

## 1.2.1    Aircraft Activity

BRC operates a Federal Aviation Administration (FAA)-approved un-towered private airport, 88NV, during the Event. The 2012 EA analyzed the existence of one runway at this airport and through determinations of NEPA adequacy, the 88NV expanded to three runways with one runway dedicated to emergency medical evacuations in 2018. Aircraft authorized by BRC to operate at 88NV include contracted charter planes, private operators, and medical evacuations under contracted services.

A potential for hard landings exists on remote, unpaved landing strips; a minimal number of incidents have occurred with minor injuries and property damage to aircraft. The airport did not experience an aircraft crash, per FAA definition, in its history of operation until 2018 when the FAA defined an incident as a crash. Investigation is pending at the time of this writing by the FAA and National Transportation Safety Board. An aircraft crash at the Event site has a low probability of occurrence, albeit a potential for a high degree of severity should it occur. This means it is unlikely that a significant crash would occur, but if an aircraft were to crash into the Event site or loaded with passengers, resulting in a mass casualty scenario, the impacts would be severe. BRC mitigates this risk by providing communications at the airport, restricting operator access at the airport, and delineating runways.

BRC has developed drone-use protocols for participants due to the rising popularity of remote control (RC) aircraft or unmanned aerial vehicles, and the need to ensure public safety. BRC regulates all RC aircraft and requires that they be operated responsibly and subject to restricted fly zones and other rules of operation based on the FAA regulations and the Academy of Model Aeronautics safety code. The FAA requires all operators of RC aircraft flying within 5 miles of an airport to notify that airport of their operations. All operators must register and follow all policies, rules, restrictions, and conditions; failure to comply can lead to confiscation of the aircraft, removal from the Event, and/or criminal penalties.

## 1.2.2    Civil Disorder

Civil disorder may occur if services within the city are disrupted beyond the expectations of Event participants. In 2007, a male participant, disgruntled with the cultural shift at the Burning Man Event, lit the man effigy ablaze several days prior to the scheduled burn. A civil unrest built within the community, and the suspect was removed from the Event location immediately because riotous crowds were forming with an intent to cause harm to the suspect. Quick messaging through BRC messaging outlets informed the crowd the suspect was no longer at the Event location, and Black Rock Rangers were able to dismantle the crowds. Civil disorder could overwhelm law enforcement resources on-site in the event another disruption occurs, causing the population within the Event to become riotous.

2                    *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*                    June 2019
*Public Health and Safety at the Burning Man Event*

**AR08172**

In 2016, a juvenile was reported missing and was not located for several hours. As per BRC protocol, BRC closed the gate for approximately 4 hours, preventing the juvenile from leaving the Event with an adult. Unrest ensued from those trying to exit the Event site during the gate closure. Supplemental law enforcement responded to the line of vehicles queued up to leave the Event to prevent full-scale civil disorder. BRC also deployed more staff to the area to calm the crowd trying to exit. The juvenile was located within the city by BRC staff, and the gate resumed operations, calming the unrest.

A dispute broke out between participants and a theme camp known as White Ocean. The participants did not appreciate White Ocean's elitism and exclusivity and took action through vandalism. White Ocean was the victim of vandalism and theft resulting in thousands of dollars of property damage from civil disorder. The theme camp was a problem for BRC in that the theme camp did not adhere to BRC's ten principals, and it was a problem for the BLM for repeated environmental compliance issues. White Ocean disbanded the theme camp following the 2017 Event without ever naming the vandals who caused the property damage.

In 2018, BRC contacted the BLM Authorized Officer at the Event to lift population control measures of one vehicle entering the Event for every vehicle leaving the Event. BRC requested this change due to a growing unruliness of participants waiting to enter the Event despite volunteers working diligently to settle waiting participants. The BLM agreed to pulse 200 vehicles into the Event every ~~two~~ 2 hours to alleviate the unrest in participants waiting to enter the Event. This resulted in a sustained population over 80,000 for several hours to alleviate unrest and avert full-blown civil disorder. For further detail on the 2018 incident, reference the BLM 2018 Burning Man Event Special Recreation Permit Evaluation (BLM 2019).

### 1.2.3   Disease Vectors

Fly Ranch non-potable water used for dust abatement contains contaminants that could be harmful if ingested. Dust abatement trucks are labeled non-potable, and participants are discouraged by BRC from running behind dust abatement trucks, in accordance with the applicant's annual operations plan (BRC~~urning Man~~ 2017). Participants do not always heed the warnings and occasionally run into dust abatement water that flows behind the trucks. A detailed water quality analysis is located in the Burning Man Special Recreation Permit Environmental Impact Statement (EIS) outlining water contaminants and potential health threats.

Blood-borne pathogen exposure from injured participants or from needles found during a search are a risk to law enforcement, the applicant's Emergency Services Division (ESD), and other BRC employees and volunteers. Law enforcement mitigates this risk by encouraging officers to use puncture-resistant gloves when searching and barrier gloves when administering first aid or when responding to calls for service at medical facilities.

Widespread illness is a risk if the flu or norovirus infects attendees and is addressed in the human health concerns section of this document. Valley Fever is a known risk in conditions presented on the Black Rock Desert. Valley Fever has not presented itself during the Burning Man Event, but the possibility of this disease vector is ever present in the austere environment of the Black Rock High Rock National Conservation Area in Pershing County, Nevada. Individuals are more susceptible to Valley Fever where it exists in soils where dust is created and dust storms occur; ~~and~~ individuals should wear an N-95

June 2019                Burning Man Event Special Recreation Permit Final Environmental Impact Statement                3
Public Health and Safety at the Burning Man Event

AR08173

respirator and seek shelter if these conditions present. (More information is available at: https://www.cdc.gov/fungal/diseases/coccidioidomycosis/causes.html.)

West Nile virus is also prevalent in the area with recorded incidents in Lyon and Washoe Counties in 2018. In 2014, nine mosquito traps in Gerlach, Nevada, tested positive for West Nile virus from mosquitos in the trap (https://www.kolotv.com/home/headlines/Burners-May-Be-E-273670861.html). Mosquitos are the vectors for this virus and can spread the virus to humans. Mosquitos are commonly found around areas with water. (More information can be found at: https://www.cdc.gov/cholera/index.html.)

### 1.2.4    Medical

The Burning Man Event is located approximately 150 miles from the nearest Trauma II Level hospital in Reno, Nevada. As such, medical services during the Event are provided by BRC. Prior to 2012, BRC provided insufficient medical services on the playa and increased , increasing resources and efforts in 2012. In 2012, BRC began looking for ways to treat participants on the playa rather than transporting them to area hospitals, decreasing time to treatment by managing complaints on-site. Medical care is divided into two components: ESD Medical and Rampart. ESD Medical is a group of approximately 400 Nevada-licensed medical care professionals who volunteer at six medical stations around Black Rock City. All ESD Medical providers must be licensed in the state of Nevada in accordance with Nevada Revised Statutes (NRS) 450B.695. They have historically provided only first aid level care. Medical stations are used to provide faster care and ensure appropriate triage of patients.

Rampart is a Nevada-licensed independent center for emergency care for the 14 days during the Event. It is staffed by licensed care providers and provides basic emergency care, including cardiac monitoring, intravenous hydration, medications, radiology services, limited laboratory studies, and transport off the playa as needed. Rampart subcontracts the air and ground ambulance services on and off the playa.

The BLM also provides a medical unit on-site. This unit is dedicated to government employees' health and safety concerns. Definitive patient care is delivered rapidly, which is one of the most critical tenets of mitigating medical threats to government employees assigned to work the Burning Man Event. The BLM medical unit has treated officers for exposure to illegal controlled substances, illness related to playa conditions, and dehydration in addition to other medical needs on the playa.

BRC stages one fixed-wing air ambulance on-site while one is on standby in Reno, Nevada. The fixed-wing air ambulance is limited in patient volume and has a maximum carrying capacity of two patients. Careflight can also deploy a rotor wing air ambulance in the event planned medivac resources are exhausted. The nearest Trauma I Level hospital is the University of California, Davis, hospital in Sacramento, California, which is accessible by air ambulance in approximately two hours.

Statistical analyses of BRC's medical data found a linear relationship between the number of ESD cases and the participant population. There is a positive trend in the number of ESD cases and an increase in population.

### 1.2.5    Law Enforcement

Emergency response by law enforcement agencies at the Event includes responding to numerous crimes, such as disorderly conduct, theft, destruction of property, and person-on-person crimes such as

4                    Burning Man Event Special Recreation Permit Final Environmental Impact Statement                    June 2019
Public Health and Safety at the Burning Man Event

AR08174

assaults, batteries, and sexual assaults. The law enforcement agencies also respond to vehicle crashes, fire and medical emergencies, injuries, structural collapse, structure fires, and drug intoxication. The applicant prepares operational and contingency plans annually to address emergency response by medical, hazmat, and fire personnel.

Investigating person-on-person crimes at the Event is the primary responsibility of the Pershing County Sheriff's Office (PCSO); BLM officers augment the PCSO as needed, depending on call volume and available staffing, to ensure responsiveness to participants' public health and safety. Additionally, BLM law enforcement is responsible for protecting public land resources and public safety concerns through application of the 43 Code of Federal Regulations and other federal laws, to include a Temporary Closure and Restriction Order.

Adequate law enforcement staffing levels are based on current and future Event populations. Responsible agencies determine law enforcement staffing, with the exception of Pershing County, which is limited by a legal agreement between the applicant and Pershing County. Staffing levels may also be supported by current and future management studies, to address emergency response and ensure adequate public health and safety.

The number of law enforcement personnel required to support the BLM law enforcement function at the Event is drawn from national resources and represents a significant drawdown of the agency's available sworn law enforcement staff. The number of officers required to support the administration of the Burning Man Event special recreation permit represents approximately a 40 percent drawdown on BLM national law enforcement resources for 258 million acres of public lands administered by the BLM. This hinders the agency's ability to provide for the protection of resources and the safety of the public throughout the country, in addition to responding to other emergency situations such as wildfires, hurricanes, marijuana interdiction, National Detail and normal protections to public lands. This Event creates an obstacle to fulfilling the agency's mission bureau-wide.

The BLM determined 75 officers were required for the 2016–2018 Burning Man Events. In 2017, the BLM was only able to fill 73 officer positions due to staffing shortages nationwide and competing agency priorities. As such, the BLM must rely on partner agencies to reach the target of 75 officers at the Event at its current population.

In 2017, Hurricanes Harvey, Irma, and Maria activated the Federal Emergency Management Agency's Emergency Support Function 13 Public Safety and Security (ESF-13), the largest-scale response in ESF-13 history. This activation provides federal government support to affected regions and relies on federal law enforcement officers to respond to designated areas to assist. In response to Hurricane Harvey, 1,891 federal law enforcement officers responded; 149 were from the Department of the Interior, including 27 from the BLM (DOI 2018). The BLM's Hurricane Harvey response initiated during the 2017 Burning Man Event, and response resources from the BLM nationwide, were limited because officers were assigned to the Burning Man Event.

In response to Hurricane Irma, 660 federal law enforcement officers responded; 144 were from the Department of the Interior, including 30 from the BLM (DOI 2018). Hurricane Irma made landfall 4 days after the majority of officers were released from the Burning Man Event and 2 days after most of those officers returned home; many officers returning from the Burning Man Event responded to Hurricane Irma. In response to Hurricane Maria, 445 federal law enforcement officers responded with a contingent

June 2019          Burning Man Event Special Recreation Permit Final Environmental Impact Statement          5
Public Health and Safety at the Burning Man Event

AR08175

staged in Puerto Rico prior to the hurricane making landfall; 90 officers were from the Department of the Interior, including 42 from the BLM (DOI 2018).

The BLM deployed resources for ESF-13 hurricane response approximately 7 days after the 2018 Burning Man Event. The full deployment numbers are not available, as the hurricane season is ongoing at the time of this writing. BLM officers assigned to the Burning Man Event remain responsible to respond to all hazard events due to agency responsibilities, resulting in organizational burnout from extended assignments occurring in a tight time frame. Hurricane season often overlaps with the Burning Man Event.

Marijuana interdiction on public lands occurs in late summer and early fall on BLM-administered lands. Eradication of marijuana cultivation sites on BLM-administered lands is a priority for the agency due to the millions of dollars in environmental damages and threats to public safety from hazardous materials found on-site and dangerously aggressive inhabitants. Marijuana interdiction operations cannot be delayed when known suspects are occupying a marijuana cultivation site. A delay may result in the plants being harvested, occupants leaving the scene, and only the trash, environmental damage, and hazardous materials left for investigators. BLM special agents in Nevada have succeeded in apprehensions of multiple suspects and restoration of public lands in recent years. In 2018, BLM law enforcement sought assistance from special agents for a Burning Man Event-related investigation, but additional agents were unavailable, working an active marijuana interdiction case.

PCSO personnel for the Event must be contracted from northern Nevada and local agencies to supplement the county resources and mitigate the drawdown on resources necessary to respond to normal county emergency response needs. The PCSO attempted to fill 21 positions for 8 days during the main Burning Man Event in 2016 and 2017 despite only having an allowed full-time, year-round staff of 15 (when fully staffed). In 2017, the PCSO only had 13 positions filled at the time of the Event. The draw for deputies to move on to larger agencies creates perpetual turnover for the PCSO. The Pershing County Sheriff must balance staffing the Burning Man Event while providing adequate coverage for the rest of the county and special events over the holiday weekend.

Pershing County hired 22 temporary deputies for the 2011 festival, which was prior to BRC attempting to increase the population to 70,000 paid participants. The number of 22 deputies included 8 deputies per day to run the jail. These positions were (and still are) necessary for the increase of criminal activity that occurred (and continues to occur) in a portion of Pershing County that is absent human population for the vast majority of the year, only requiring approximately two calls for service a year outside of the Burning Man Event. This usage of 8 deputies for the jail has meant only 14 patrol positions to provide law enforcement response to the remainder of the population at the Event.

In the 2012 EA, the PCSO advised it would need to hire 32–34 additional deputies just for the population to increase to its current permitted level (BLM 2012) and to keep up with the increase in crime and calls for service at a 70,000-paid participant cap. The PCSO has been unable to obtain the adequate number of deputies pursuant to the 2012 EA and will continue to have an extremely difficult time attempting to contract any additional deputies for this festival, continuing to staff the Event with just 22 deputies with the increased population following the 2012 EA (BLM 2012). Obtaining the proper level of law enforcement to staff the event at 80,000 is exceedingly challenging and to increase staffing to match an increasing population to 100,000 persons at this point is virtually impossible for the Pershing County Sheriff under the current confines of the legal agreement between Pershing County and the proponent. Obtaining the proper level of law enforcement to increase the population to 100,000 persons

6                    *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*                    June 2019
*Public Health and Safety at the Burning Man Event*

AR08176

~~at this point is virtually impossible for the Pershing County Sheriff under the current confines of the legal~~
~~agreement between Pershing County and the proponent.~~

The BLM and PCSO also experience issues borrowing resources from other agencies due to the Event encompassing the Labor Day holiday. The PCSO has been told by peer agencies that the Event lacks the law enforcement resources to provide for adequate officer safety and as such would not allow their staff to work the Event under contract with the PCSO (EMPSi 20198). The Burning Man Event has, for several years, far exceeded the resources of not only Pershing County but law enforcement resources of northern Nevada as a whole. The PCSO has had to contract with several different law enforcement officers within the state to provide some semblance of law enforcement expected by the participants. This endeavor is becoming increasingly difficult to perform from year to year, as the population of the Burning Man Event continues to increase, and the payment to Pershing County for this festival remains relatively stagnant (PCSO ~~PMS~~ 2017b).

Due to limited BLM law enforcement resources to staff the Event, the BLM has been forced to enter into interagency agreements with the US Forest Service to fill patrol positions. This process has become more and more difficult due to competing demands on US Forest Service officers in their respective regions. Staffing the Event regularly taxes both the BLM and PCSO to gather the minimal resources necessary to provide for public safety, and recruitment is a year-round endeavor.

Within the Zone 1 Nevada law enforcement program, which is responsible for providing law enforcement coverage across 13.2 million acres of public lands in the Carson City and Winnemucca District Offices, to include the Black Rock Desert, all law enforcement personnel were assigned to work the Burning Man Event in 2018. As a result, no patrols were provided outside of the Burning Man Event for a 10-day period. Heavily visited recreation areas within the zone, such as Sand Mountain Recreation Area and the Hungry Valley Recreation Area, were not patrolled during Labor Day weekend.

Currently, if fully staffed, the PCSO and BLM combine for 96 officers, including command staff, for an approximate 80,000-person population with a straight line staffing of 1.2 officers per 1,000 population. This falls below the industry standard of 1.8 per 1,000 population. Burning Man differs from a normal population analysis because the participants at the Event regularly stay active 24-hours a day and do not report to work and school as in normal policing environments. The 96 officers on-site are split across three shifts to provide 24-hour coverage with peak staffing targeted at peak participant activity (7:00 p.m. to 2:00 a.m.).

The Pyramid Lake Paiute Tribe (PLPT) provided comments during government-to-government consultation relative to Burning Man's impact on tribal law enforcement resources. PLPT is experiencing a shortage in law enforcement resources for year-round coverage, which is exasperated during the Burning Man Event ingress and egress through tribal lands. PLPT has to reassign law enforcement normally dedicated to protecting cultural and spiritual resources that are prone to vandalism to address law enforcement incidents within the communities. As a result, cultural and spiritual resources on tribal lands, already susceptible to vandalism, go unprotected during the highest traffic flow of the year through the reservation. ~~PLPT enlisted assistance from the Bureau of Indian Affairs in 2018, but that~~ ~~effort was met with a publicly hostile response from BRC.~~

PLPT observes increases in trespassing at Pyramid Lake, human waste, drug incidents, and traffic congestion creating an unsafe environment for pedestrians. PLPT further notes delays due to Event

June 2019          Burning Man Event Special Recreation Permit Final Environmental Impact Statement          7
Public Health and Safety at the Burning Man Event

AR08177

traffic affecting tribal employees reporting to work in medical clinics and schools, reducing critical services to the tribal community. PLPT experiences reductions in emergency medical services in the community as participants need care and transport due to illness or injury in route to the Event, leaving the tribal community without resources. PLPT has observed impacts in the form of increased drug activity on and through the reservation associated with the Burning Man Event participants.

The Washoe County Sheriff's Office and Nevada Highway Patrol staff supplemental officers to the area during the Event due to an increase in call volume during the Event. This draws law enforcement resources away from the Reno, Nevada, area during an active end of summer season with large community events and a holiday weekend.

Law enforcement statistics listed represent the violations of regulations encountered by law enforcement; this should not be conflated with convictions, as the prosecutors establish priorities for prosecutions in their respective jurisdictions (**Table 1**). Violations of BLM regulations are tied to public health and safety and/or protection of natural resources; as such, the statistics provide a metric for measuring impacts on public health and safety and protection of natural resources. An increase in BLM law enforcement actions represents an increase in threats to public health and safety and natural resources. Factors relevant to these threats include traffic violations, illicit drug activity, and damages to resources (e.g., improper fuel storage, improper discharge of grey water, and depositing of human waste on the playa) affecting the National Conservation Area (NCA) and environmental justice populations (BLM Social Values and Economic Assessment 2018).

Law enforcement arrests include but are not limited to instances of assault, assault on officers, battery, battery on officers, interstate drug trafficking, distribution of narcotics, and possession of controlled substances.

**Table 1** summarizes BLM law enforcement actions, excluding warnings, during the 2001 through 2017 Burning Man Events.

### 1.2.6   Evacuation

Burning Man Event evacuation may be necessary in the case of natural or human-made disasters during Event operations. Wildfire, rain, sustained high winds, mass casualties, and large-scale structure fires may create conditions necessary to evacuate the Event site location.

The applicant uses radio, social media, and traditional media outlets to broadcast emergency information to participants, in accordance with the applicant's annual Event operations plan. The primary evacuation route is Pershing County Road 34, to State Route (SR) 447, south toward Nixon. If the primary route is unavailable, the secondary routes are Jungo Road to Interstate 80 or SR 447, north toward Cedarville, California. SR 447 is a paved road but is limited by degradation or possible road failure if vehicle traffic exiting the Event were to exceed 700 vehicles per hour (BRCurning Man 2017). Jungo Road is unpaved and is known to cause mechanical failure, such as multiple flat tires, due to rough road conditions; it is not recommended for passenger cars. In addition, tow service along Jungo Road is very limited.

8                     *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*                     June 2019
*Public Health and Safety at the Burning Man Event*

**AR08178**

**Table 1**
**Law Enforcement Statistics**

| Year | Burning Man Event Population | BLM Operation Number of Officers | BLM Law Enforcement Actions Citations / Arrests | BLM Officer to Participant Ratio |
|---|---|---|---|---|
| | | Burning Man Event BLM Law Enforcement Activity Summary (2001–2017) | | |
| 2001 | 26,700 | 34 | 98 (55 drug) / 6 | 1 per 785 |
| 2002 | 30,100 | 31 | 237 (149 drug) / 2 | 1 per 970 |
| 2003 | 30,381 | 33 | 177 (102 drug) / 5 | 1 per 920 |
| 2004 | 35,511 | 45 | 208 (108 drug) / 4 | 1 per 789 |
| 2005 | 35,289 | 45 | 229 (156 drug) / 8 | 1 per 784 |
| 2006 | 39,100 | 45 | 155 (81 drug) / 1 | 1 per 868 |
| 2007 | 48,011 | 45 | 331 (176 drug) / 2 | 1 per 1,066 |
| 2008 | 49,599 | 45 | 193 (123 drug) / 11 | 1 per 1,102 |
| 2009 | 43,558 | 45 | 287 (187 drug) / 9 | 1 per 967 |
| 2010 | 51,515 | 51 | 293 (158 drug) / 9 | 1 per 1,010 |
| 2011 | 53,735 | 51 | 376 (218 drug) / 8 | 1 per 1,053 |
| 2012 | 52,385 | 70 | 365 (253 drug) / 14 | 1 per 748 |
| 2013 | 69,613 | 70 | 433 (285 drug) / 6 | 1 per 994 |
| 2014 | 65,922 | 72 | 392 (205 drug) / 0 | 1 per 916 |
| 2015 | 76,412 | 97 | 534 (154 drug) / 0 | 1 per 788 |
| 2016 | 75,711 | 75 | 326 (85 drug) / 0 | 1 per 1,009 |
| 2017 | 79,432 | 75 | 413 (196 drug) / 0 | 1 per 1,059 |

* Note: The average BLM law enforcement officer ratio to participant over 16 years has been 1 BLM officer per 931 participants. This participant/officer ratio is for general information only and does not reflect actual operations within the Event. This distribution shows a Poisson Distribution with one change point in 2004 and no statistically significant staffing changes after the 2004 change point.

Bayesian and frequentist Poisson regression analysis indicates that there is a strong relationship between the total number of citations and the population (Poisson indicates 6 citations for every 1,000 population, Bayesian indicates 4-9 citations for every 1,000).

Bayesian and frequentist Poisson Statistical Analysis performed by Dr. Mark Hall, BLM Black Rock Field Manager. All other statistics performed by Staff Law Enforcement Ranger Becky Andres.

Note: The PCSO assumed more drug cases beginning in 2015; the reduction of BLM drug charges does not reflect a reduction in drug possession at the Event.

| Year | Burning Man Event Population | PCSO Operation Number of Officer Positions | PCSO Law Enforcement Actions Citations/Arrests | PCSO Officer to Participant Ratio |
|---|---|---|---|---|
| | | Burning Man Event Pershing County Law Enforcement Activity Summary (2015–2017) | | |
| 2015 | 76,412 | 24 | 147/43 | 1 per 3,183 |
| 2016 | 75,711 | 22 | 152/46 | 1 per 3,441 |
| 2017 | 79,432 | 22 | 125/64 | 1 per 3,611 |

* Note: The average PCSO law enforcement officer ratio to participant over 3 years has been 1 PCSO deputy per 3,412 participants. This participant/officer ratio is for general information only and does not reflect actual operations within the Event. Additionally, in 2015 a rotation of 74 deputies was utilized to fill the 24 positions; in 2016 a rotation of 39 deputies was utilized to cover the 22 positions, and in 2017 a rotation of 38 deputies was necessary to cover the 22 positions.

June 2019                    *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*                    9
*Public Health and Safety at the Burning Man Event*

AR08179

Natural disasters include wildfires, rain, and high winds. Rain exceeding approximately one-quarter inch in a single event can render the playa inaccessible by motor vehicles; this would result in sanitation and emergency response concerns. Portable toilet vaults need daily maintenance for proper sanitation, and a significant rain event would impede these services. This can have a negative impact on the health and safety of the public. Wildfires can close major ingress/egress routes to the Event, preventing the free flow of traffic and cutting off vital services to the city such as fuel, ice, and sanitation.

Human-made disasters include conditions causing mass casualties, such as structure fire, airplane crashes, and structure collapse. The applicant proposes annual fire response and rescue plans in its emergency services operational plan. Fire response may require a law enforcement response for scene security, firefighter safety, and evacuations. Law enforcement also augments the applicant's resources in response to structure collapse by providing site security and emergency response.

### 1.2.7   Explosives

Unexploded ordnance is a public health and safety risk on public lands. The BLM coordinates mitigation, neutralization, and removal of all known explosives. The playa was once utilized as a military ammunition range, but no known unexploded ordnances remain in the affected environment. There are no known hazards in the affected environment from existing activities. Burning Man produces a large fireworks display at the burning of the effigy on the Saturday night before Labor Day. BRC provides security for these explosives prior to the deployment on-site.

Explosives not included in Burning Man Event operational plans are prohibited during the Event. BRC obtains a permit from Pershing County to cover all firework displays associated with the Event. Fireworks are illegal on public lands anytime without a proper permit and authorization from landowners/managers. Although possession and use of unauthorized fireworks are prohibited by the Event closure order, they are encountered annually by law enforcement within the Event. BRC staff and volunteers were located in 2016 and 2018 discharging fireworks in violation of the closure order in the days following the main Event. Law enforcement destroys confiscated fireworks.

### 1.2.8   Fire Safety

The applicant provides fire safety response resources and operational plans for all fire events within the proposed Closure Area, including fire art (BRCurning Man 2017). BRC identifies three fire response categories: single occupancy, multiple occupancy, and airport/aircraft. Through a separate plan, BRC provides for major burn and small-scale burn (art) logistics, to include fire response. Despite the applicant's planning, a determined participant ran into the Man Burn in 2017 and died from his injuries. The BLM requires BRC to provide firefighters certified in wildland firefighting per the 2012 EA.

The growing number of camp trailers at the Event, in addition to fuel storage within camps, create a concern for a rapidly spreading structural fire, not necessarily contained in one structure. In 2015, the BLM expressed concerns with shortcomings in equipment and management of fire, rescue, and hazmat programs. BRC responded by adding two new tactical tenders to increase fire response and suppression capability. In addition, an airport crash tender with foam fire suppression capabilities was added for quick response to incidents at the airport. BRC also acquired new rescue and extrication resources to augment and expand existing BRC rescue capabilities.

10          *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*          June 2019
*Public Health and Safety at the Burning Man Event*

**AR08180**

A requirement that BRC provides structural, qualified firefighters within the fire response group needs to be considered in future permitting requirements. One trailer did catch fire, and quick-thinking responders towed the trailer away from other dwellings and prevented fire spread; this mitigation is not possible to accomplish with all trailer locations at the Event site. The BLM and interagency partners provide wildland fire suppression response and fire prevention messaging on travel routes to the Event.

In 2018, a rental box truck ignited at its camp while the camp was breaking down and loading equipment. Fire and law enforcement responded, secured the scene, and extinguished the fire. The box truck and its contents were a total loss and created environmental compliance issues as petroleum products leaked onto the playa. BRC and the camp occupants remediated the compliance issues by removing contaminated playa soils.

In 2018, an RV leaving the Event caught fire approximately 30 miles south of the Event on SR 447. The vehicle fire spread when it was parked on the shoulder of SR 447, becoming a wildland fire. The wildland fire closed SR 447 for approximately an hour while fire crews controlled the fire and insured safe passage. The road closure created traffic congestion for miles as participants trying to exit the area were stopped. This is just one example of Event traffic affecting ~~impacting~~ ingress and egress routes with human-caused fires. See **Figure 1**, Winnemucca District Fire Occurrence 2008-2018, below.

## 1.2.9   Flooding

The playa surface becomes impassible in the event of even a small amount of rain. In 2014, the playa received enough rain to paralyze vehicular travel on the playa for approximately 12 hours. The inability to traverse the Event site by vehicle eliminated public services, including portable toilet servicing, rapid emergency response for medical and law enforcement incidents, and servicing of camp equipment. Flooding on the playa is a rare occurrence but threatens a significant risk to Event operations and public health and safety.

BRC mitigates this risk by messaging to participants to bring a 5-gallon bucket in the event sanitation services are disrupted and the bucket is needed to deposit human waste. Absent sanitation services, public health and safety diminishes due to the increased risk of exposure to disease vectors during a flood event if resources are unable to provide sanitation services to the existing 1,700 portable toilets used by participants. In addition, flooding can cut off vital services to the city such as fuel and ice delivery. Without adequate ice, food spoilage could occur. Without fuel deliveries, emergency services would be unable to provide required services within the city.

## 1.2.10  Human Health Concerns

The playa is a rugged, austere environment with risks from heat, dehydration, sun exposure, and chemical burns to skin from exposure to playa surface soils. Heat-related injuries for participants and BRC staff are reportedly treated at BRC's on-site medical facility and by the BLM medical unit for government employees assigned to the Event. The austere environment creates respiratory distress and discomfort in the eyes for some individuals. It is recognized some employees working the Event develop "Playa Cough" sometimes for weeks following their assignment after the Event.

June 2019                    *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*                    11
*Public Health and Safety at the Burning Man Event*

**AR08181**

**Figure 1, Winnemucca District Fire Occurrence 2008-2018**



| Agency | Unit_ID | Unit_Name | Fire_Code | Inc_ID | Fire_Name | Acres | Date |
|--------|---------|-----------|-----------|--------|-----------|-------|------|
| BLM | NVWID | Winnemucca District | FUV8 | | RV | 3.3 | 9/7/2010 |
| BLM | NVWID | Winnemucca District | HXM8 | | MM58 | 0.1 | 8/24/2013 |
| BLM | NVWID | Winnemucca District | HXR7 | | MM58 2 | 0.1 | 8/24/2013 |
| BIA | NVWNA | Western Nevada Agency | J22Y | 2015-NVWNA-030654 | STATE ROUTE | 0.1 | 9/1/2015 |
| BIA | NVWNA | Western Nevada Agency | J2L2 | 2015-NVWNA-030631 | Riverbend | 1.5 | 8/24/2015 |
| Other | NVWID | Winnemucca District Office | KPA2 | 2016-NVWID-020206 | 12 Mile | 0.1 | 9/1/2016 |
| BLM | NVWID | Winnemucca District | | 2017-NVWID-020324 | Granite FA | 0.3 | 9/12/2017 |
| BLM | NVWID | Winnemucca District | K990 | 2017-NVWID-020281 | MM61 | 0.1 | 8/24/2017 |
| BIA | NVCCD | Carson City District Office | L4DC | 2018-NVCCD-030585 | Nugent | 0.1 | 9/1/2018 |
| BLM | NVWID | Winnemucca District Office | L4KA | 2018-NVWID-020330 | MM60 | 7.9 | 9/4/2018 |
| BLM | NVWID | Winnemucca District Office | L4QT | 2018-NVWID-020336 | MM 14 | 1.7 | 9/7/2018 |

Winnemucca District Fire Occurrence 2008 -2018

Division of Fire and Aviation
Bureau of Land Management
5100 E. Winnemucca Blvd.
Winnemucca, NV 89445

⊗ Fire Origin

6  3  0    6    12    18
Miles

Scale 1:1,000,000

12              Burning Man Event Special Recreation Permit Final Environmental Impact Statement       June 2019
                         Public Health and Safety at the Burning Man Event

AR08182

On-site medical care provided by the BLM and the United States Department of Health and Human Services (HHS) mitigates the lasting effects of the austere environment by providing primary and preventative medical care at the Event site. HHS is also equipped with capabilities to assist employees with Office of Workman's Compensation Program paperwork as applicable. HHS providers are also trained in critical incident stress management, and this service was offered to all staff following the traumatic event of witnessing a man burn alive in 2017. BRC offered critical incident care to participants and staff through their volunteer response team.

The Burning Man Event is located approximately 150 miles from the nearest Trauma Level II hospital in Reno, Nevada. BRC stages one fixed-wing air ambulance on-site while one is on standby in Reno, Nevada. The nearest Trauma I Level hospital is the University of California, Davis, hospital in Sacramento, California.

Traffic-related injuries occur in the Closure Area on the playa; two participants were run over by vehicles during the 2017 Event. Additionally, motor vehicle crashes occur within the Closure Area and on travel routes to the Event. In 2014, a participant was killed in a crash involving an art car when the individual fell from the art car and was run over by a trailer being towed behind the art car. The PCSO took a total of six reports in 2014 involving art car accidents (one fatal and three injuries [PCSO AAR 2014]). Participants largely do not drive while present at the Event except to reach their campsite and upon exodus. BRC implements and manages a Department of Mutant Vehicles to register any vehicle the organization permits to operate on the playa through vehicle inspections and education to restrict vehicle use during the Event. BRC approves large art cars to operate on crowded streets within the city and on the open playa. Some of these art cars store a fuel supply and operate ~~pyrotechnics~~ fire effects. For more information on traffic related concerns and detailed statistics, refer to Burning Man Event Special Recreation Permit DFEIS Section 3.9.2, Transportation and Traffic and the 2017 Burning Man Event Traffic Study (Solaegui Engineers 2018).

Within the Event Closure Area, Leave No Trace® principles are communicated to participants; however, unauthorized dumping of unsanitary debris, such as trailers and trash, next to the Closure Area and along travel routes have an impact on surrounding communities. Large amounts of waste are deposited along the roadside, spreading into neighboring lands by the wind. Businesses in Fernley rent extra trash receptacles at their own expense to accommodate trash left behind from Burning Man Event participants (see **Section 3.7.1** of the Burning Man Special Recreation Permit EIS). Trash and abandoned vehicles and trailers can be found along the travel routes and in Reno suburbs (EMPSi 2019*b*). Within the Event Closure Area, participants often cannot reach a portable toilet in time, and depositing human waste on the playa is an issue creating sanitation concerns. BRC has appointed part of the restoration team to clean up solid human waste found on the playa during the Event.

Participants fall from structures and art pieces at the Event, which is a human health concern before, during, and after the Burning Man Event. Injuries from falls at the Event range from minor injury and discomfort to serious injury, such as paralyzing spinal injuries and potentially death.

Local area first responder resources, including fire, emergency medical services, and law enforcement, are drawn down during the Event, as personnel from across northern Nevada support the Event. Communities across northern Nevada are left with reduced emergency services staff, particularly in Pershing County. Additionally, BLM personnel at the Event are brought from across the nation over Labor Day weekend, one of the busiest weekends on public lands across the nation. This results in

June 2019          *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*          13
*Public Health and Safety at the Burning Man Event*

AR08183

millions of acres of public lands without BLM law enforcement coverage during the Burning Man Event, reducing public safety on public lands falling outside the Event.

**Table 2** summarizes medical incidents during the 2012 through 2017 events.

**Table 2**
**Summary of Medical Incidents**

| Incident Type | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Patients | 4,821 | 6,196 | 5,443 | 5,313 | 4,899 | 5,039 |
| Off-site transports | 29 | 34 | 22 | 26 | 31 | 53 |
| Altered state, influence of drugs/alcohol | 76 | 240 | 127 | 79 | 126 | 325 |
| Combative patients | Not Reported | Not Reported | Not Reported | 1 | 6 | Not Reported2 |
| Falls | Not Reported | Not Reported | Not Reported | 37 | 83 | 71 |

Source: BRC provided statistical information
Note: Single fatalities occurred at the Event in 2014, 2017, and 2018
Bayesian and frequentist Poisson regression analysis indicates that there is a strong relationship between the total number of medical incidents and the population (Poisson indicates 8 medical incidents for every 1,000 population increase over 2,400, Bayesian indicates 7-17 medical incidents for every 1,000 population increase over 2,400). Both studies found a negligible number of medical incidents for a population of 2,400 or less.
Bayesian and frequentist Poisson Statistical Analysis performed by Dr. Mark Hall, BLM Black Rock Field Manager.

## 1.2.11  Controlled Substances

Illegal possession, use, and distribution of a controlled substance at the Burning Man Event are a public health and safety concern, and are potential impacts from the rise of the national opioid epidemic.  The "gifting culture" of the Burning Man Event results in people accepting items from strangers and ingesting substances unknown to them. Participants who believe they are ingesting one substance only to find out they have ingested something completely different may overdose. After the 2014 Event, the Event medical provider, Humboldt General Hospital, reported an increase in the use of synthetic illicit drugs and Gamma-Hydroxybutyrate (GHB, commonly known as liquid ecstasy). The report stated illicit drugs can cause life-threatening complaints and require immediate clinical intervention (HGH AAR 2014).

In addition to being a public health concern, illegal drug use at the Event increases safety concerns of staff and law enforcement. Ingestion of certain illegal substances leads to violent participant behavior. These encounters often lead to use of force situations in which law enforcement must go "hands on" to bring participants under control to prevent risk of harm or injury to the public and employees working the Event. On an annual basis, the public, BRC staff, and law enforcement officers have been assaulted or battered as a result of illegal drug use and/or alcohol consumption. Response to these calls consumes patrol resources, which can be tied up for over an hour dealing with a combative subject. This leaves large parts of the city without patrols or units to respond to other calls for service.

Law enforcement responds to assaultive or combative subject calls during the Event, from illegal controlled substance abuse and/or alcohol consumption. This use jeopardizes the safety of the public, first responders, and BRC staff and volunteers. Law enforcement agencies at the Event enforce state and federal law to combat illicit drug use. BRC has an illegal substance policy that clearly states the use and possession of illicit drugs and drug paraphernalia are violations of law. Despite this, BRC does not search vehicles for illegal substances upon entry. Previous BRC entrance policies have informed participants

14                    *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*                    June 2019
*Public Health and Safety at the Burning Man Event*

AR08184

their cars would be searched for prohibited items, some of which include explosives, fireworks, firearms, loose feathers, and tubs of confetti. Illegal controlled substances have not been listed, nor has BRC ever contacted law enforcement to report discovery of illegal controlled substances. The BLM does not have a record of BRC gate operations ever referring an incident to law enforcement for illegal substances found upon entry at the Event.

Absent discovery of illegal controlled substances during BRC searches upon entry, detection of illegal substances falls on law enforcement. Within the confines of Pershing County, the Burning Man Event contains the largest concentration of narcotics violations in the county for the entire year (PCSO PMS 2017b). During the 2017 Burning Man Event, the PCSO seized the following types and amounts of controlled substances:

- Over 639 grams of marijuana
- Over 818 grams of psilocybin mushrooms
- Over 120 grams of ketamine
- 13.5 grams of methamphetamine
- Over 231 grams of cocaine
- Over 334 grams of 3-4 methylenedioxymethamphetamine (MDMA)
- Over 217 doses of LSD

From 2012 through 2017, BLM law enforcement issued an average of 196 citations per Event for possession of controlled substances, far exceeding the average of six citations per year issued throughout the Winnemucca District Office, outside of the Burning Man Event.

The proponent attempted in 2017 and 2018 to hire and deploy a private security force, in what the proponent referred to as intermediate protection for their staff. The applicant advised the primary role of the security force would be to attempt to calm those who use violence against their staff due to psychosis brought on by the consumption of illicit narcotics and/or alcohol. The security force has advised they will be able to go "hands on" and attempt to diffuse the situation prior to law enforcement response. It is imperative to note the root of violent behavior against others at the Event, to include law enforcement, is illegal drug use. Attempting to stem violent participant behavior without addressing illegal drug use will not have a significant impact on participant or law enforcement safety.

**Table 3**
**BLM-Issued Drug Citations**

| Year | Drug Citations Issued During Burning Man Event | Drug Citations Issued in Winnemucca District (outside of Burning Man) |
|------|------|------|
| 2012 | 253 | 7 |
| 2013 | 285 | 2 |
| 2014 | 205 | 0 |
| 2015 | 154 | 22 |
| 2016 | 85 | 0 |
| 2017 | 196 | 7 |

Source: (BLM data)

June 2019
Burning Man Event Special Recreation Permit Final Environmental Impact Statement
Public Health and Safety at the Burning Man Event
15

AR08185

## 1.2.12  Sexual Assaults

The occurrence of sexual assaults at the Event is a major concern for the BLM since it poses a serious threat to public health and safety. The PCSO has the jurisdiction and authority to investigate sexual assaults that occur during the Event. In 2014, the PCSO noticed a marked increase in sexual assaults. Many of the victims reported blacking out, which is characteristic of GHB or date rape drugs. Since 2014, an average of 12 sexual assaults are investigated by law enforcement over the course of the 8-day Event.

Not all sexual assault victims report incidents to law enforcement at the Event. According to the Department of Justice, three out of ten sexual assaults are not reported to law enforcement (Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, and National Crime Victimization Survey 2018). Sexual assault response teams are multidisciplinary teams who partner together to provide interagency, coordinated responses that make victims' needs a priority, hold offenders accountable, and promote public safety. Despite the number of sexual assaults occurring at the Event, sexual assault response teams are not available for victims within 100 miles of the Event site. If a sexual assault occurs at the Event, the victim must be transported off-site for forensic medical exams without a support network in place.

**Table 4**
**Burning Man Event Sexual Assault Statistics**

| Year | # of Sexual Assaults Reported to Law Enforcement at Burning Man Event | Rate of Sexual Assault (Occurrences/Day) Bayesian 95% Highest Posterior Density[1] | Median |
|---|---|---|---|
| 2014 | 6 | 0.35–1.64 | 0.81 |
| 2015 | 15 | 1.1–2.95 | 1.83 |
| 2016 | 11 | 0.73–2.36 | 1.4 |
| 2017 | 21 | 1.61–3.83 | 2.49 |

[1] The number of sexual assaults is assumed to be represented by a Poisson distribution whose mean is represented by the rate of sexual assault multiplied by the time period.

## 1.2.13  Mass Casualty Response

A mass casualty incident (MCI) is any incident in which emergency medical resources, such as personnel and equipment, are overwhelmed by the number and severity of casualties. Due to the uniqueness and austere environment of Black Rock City, there are any number of events that could precipitate an MCI, including but not limited to foodborne illness, natural disasters, illicit substance use, building collapses, plane crashes, or vehicle accidents. BRC has a Multiple Casualty Incident Plan in place that addresses the roles of each responding entity in Black Rock City to effectively triage, treat, transport, and track patients, and manage the overall incident. During an MCI response, the BRC ESD is the lead agency for providing a medical response and developing a strategy with the Event medical provider, law enforcement, and other resources, in the case of a medical emergency.

Law enforcement is primary in responding to a mass casualty event, such as an active shooter, a plane crash, or terrorism. Depending on the scale of the event, law enforcement may draw from other resources in the region. Due to the Event's remote location, there are only minimal resources in the area next to the Event; as such, response from other agencies and resources would be delayed. Immediate relief may come from the few officers Washoe County deploys to Gerlach, Nevada, during the Event and the Nevada Highway Patrol officers assigned to SR 447 during the Event. The Washoe

16                Burning Man Event Special Recreation Permit Final Environmental Impact Statement                June 2019
Public Health and Safety at the Burning Man Event

AR08186

County special response team is capable of an approximate ~~two~~2-hour response time to the Event site, as is a quick deployment contingency from the National Guard in Reno, both with members who can fit on rotor wing aircraft for transport to the Event.

Members who must arrive by ground transport would have an extended response time of up to five hours. Pershing County is in partnership with a three-county emergency response team (Pershing, Humboldt, and Lander) with a response time of approximately two hours for those members who fit in a medical helicopter. Response would be greater for members arriving by ground transport and may exceed five hours. The Federal Bureau of Investigations would be the lead investigating agency should a mass casualty incident occur on BLM-administered lands.

## 1.2.14  Hygiene and Food Safety

The Nevada Division of Public and Behavioral Health (NDPH) provides resources for large-scale food and water services at the Burning Man Event on the agency website (http://dpbh.nv.gov/Reg/Temp-E/Temporary_Events_Home/). The state statutes and regulations used to permit and regulate this mass gathering event are outlined in NRS and Nevada Administrative Code (NAC) Chapter 446 regarding food establishments and NRS and NAC Chapter 444 regarding sanitation, which includes sections on temporary mass gathering events as well as sewage disposal, septic tank pumping contractors, and non-sewered toilets (NDPH ~~AAR~~ 2014).

According to the NDPH website, a temporary permit is required to serve food or beverages to participants or to provide food and beverages to theme camps serving 125 or more people. Vendors offering potable water also require a temporary permit, as designated on the NDPH website. The NDPH conducts on-site inspections during the Event to ensure permit compliance. BRC obtains permits for relevant services provided at the Event and cooperates with inspections.

Under their operation plans, the applicant provides hand sanitizer at all restroom locations and encourages participants to use the hand sanitizer (BR~~Curning Man~~ 2017). It is unknown how many participants heed this advice and maintain hygienic eating conditions. No running water is available on the playa though some participants utilize camp trailers and rented shower and restroom facilities to manage hygiene and refrigeration of perishable items. BRC sells ice on the playa for participants as a preventative food spoilage measure.

## 1.2.15  Missing Juveniles

The safety and security of juvenile participants is important to all parties. BRC estimates 500 juveniles under 12 years old attend the Event each year. The applicant produces an annual operational plan addressing response to missing juveniles at the Event. Also, law enforcement response is required for children in need of supervision, in accordance with the Nevada Revised Statute (Sections 62A.370, 62B.320, 62C.050, 200.508, 202.870, and 202.879). The Nevada Revised Statute defines a juvenile as any unemancipated person under the age of 18.

The PCSO is the primary response agency for missing persons in Pershing County; when children in need of supervision are located, they cannot be released into adult custody until the PCSO has approved the release. Pershing County Code 9.12.100 defines the responsibilities of parents, guardians, or other adult persons having the care and custody of a minor. The applicant provides a missing minor operation plan annually, but the PCSO retains sole authority for releasing juveniles. Annually, multiple

June 2019          *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*          17
*Public Health and Safety at the Burning Man Event*

AR08187

registered sex offenders register with the PCSO and attend the Event, compounding concerns when a minor is reported missing. It is uncommon for the PCSO to receive a report of missing juveniles in the county outside of the Burning Man Event.

During the 2018 Event, a juvenile was lured from an art piece the juvenile was working on by an adult male operating an ice cream truck registered by BRC as an art car. BLM law enforcement located the truck and discovered the juvenile was provided an intoxicating substance by the adult, who was unknown to the juvenile prior to this event. The juvenile was removed from the scene and placed in the custody of the Division of Child and Family Services until the juvenile could be reunited with a parent or legal guardian. The suspect was found to be in possession of illegal drugs, pornography, and restraint devices and was arrested by PCSO and evicted from the Event site by the BLM.

## 1.2.16  Respiratory Concerns

The Closure Area is on the Black Rock Desert playa, which contains alkaline gypsum and silica dust that become airborne in high concentrations with Burning Man Event activities and wind (Adams and Sada 2010). Exposure to alkaline gypsum dust with a silica component is regulated by the Occupational Safety and Health Administration (OSHA) as a known carcinogen for workers, to include all government and contracted employees working in the environment at the Event site. Detailed air quality analyses, including threshold limits, are found in **Section 3.6.1** of the Burning Man Special Recreation Permit EIS. The Burning Man Event is a temporary event reoccurring annually with a population that includes environmentally sensitive groups such as children and the elderly. Children take in more air per unit body weight than adults, resulting in greater impacts from poor air quality (CARB 2000).

The National Ambient Air Quality Standards (NAAQS) are established by the Environmental Protection Agency (EPA) and establish acceptable levels for exposure to ambient air particles. The playa surface is known to contain a naturally occurring carcinogen, silica, which when combined with iron, also present in the playa surface, can contribute to silicosis of the lung with repeated exposure (Burning Man EA 2012; EPA 1996). Baseline air quality reporting from the 2017 Burning Man Event indicates the $PM_{10}$ and $PM_{2.5}$ particulate density measured exceeded EPA NAAQS thresholds by 8.6–14.6 times allowable exposure during the Event operation period. In addition, silica and iron were represented as the top two elements in the chemical analysis of oxides and metals in the sampling filter analysis.

## 1.2.17  Government Employee Health and Safety

OSHA thresholds vary from the EPA and are based on exposure during an 8-hour shift over the course of a 40-year career. Data collected in 2017 for comparison with the NAAQS are not directly comparable with OSHA exposure limits for ambient and respiratory air quality. An air quality study was performed by government industrial hygienists during the 2018 Burning Man Event. The study found six samples exceeding the OSHA permissible exposure limits (PELS) for respirable crystalline silica and three exceeded OSHA PELS for total respirable dust. Crystalline silica is a contributing factor to silicosis of the lung and a known carcinogen naturally occurring on the playa surface. Additional sampling in future years will improve data and monitoring. All samples exceeding PELS occurred with winds in excess of 18–20 miles per hour. It is recommended that all exposed employees use an N95 Respirator when winds are in excess of 18–20 miles per hour and reduce the use of open-air vehicles (BLM 2018). Further precautions include specialized filters in vehicles and offices, entry vestibules at the Joint Operations Center (JOC) facilities, and relocating the JOC to a location upwind of Gate Road (BLM 2018).

18                    *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*                    June 2019
*Public Health and Safety at the Burning Man Event*

AR08188

An alternative to implementing respirator use is to shelter in place in an enclosed space (i.e., a vehicle or building). Sheltering in place means limiting exposure to windblown fugitive dust by all means necessary and may mean temporarily discontinuing exterior ventilation. Vehicles with a recycle air function drawing only air from the interior of the vehicle should be placed in this mode. Visibility is also affected at high winds, and employees operating motor vehicles should reduce speeds or shelter in place in a stopped vehicle until visibility is restored.

Industrial hygienists also identified concerns regarding employee noise exposure at the Event. Individual noise monitors that emit a colored light when decibel levels reach the point of OSHA-required hearing protection were recommended to ensure employee health protections are in place (BLM 2018).

Due to the extended nature of the Event assignments, and an average of 10 days working 13–16 hour shifts, government personnel and contractors need access to housing, food, and hygiene resources. Current government personnel and contractor staffing levels strain available resources in Gerlach. Planning for future Event growth will require ensuring adequate services to government employees assigned to the Event.

### 1.2.18  Structure Collapse

The Burning Man Event includes several temporary structures, such as stages, impromptu hotels, and other dwellings, that lack extensive safety features or licensed Nevada building inspection. Structure collapses pose a threat to public safety with a moderate potential for occurrence and a substantial injury risk to the participants involved. Historically, there is a low occurrence of structure collapse within the city. In 2016, a structure collapse resulted in three minor injuries and one trauma injury, resulting in off-playa transport after the weight of participants on the structure caused a second-story floor collapse. The Event growth and further development of theme camps increase this risk due to a greater number of structures erected on the playa. This remains a low-risk impact on public health and safety with minor to traumatic injuries depending on the severity of the incident.

BRC inspects structures and stages as part of the Event's safety program; it is unknown what qualifications the BRC inspectors possess. Pershing County does not deploy building inspectors to the Event site due to staffing limitations; the county only has one building inspector. BRC has a Structural Collapse Plan for an emergency response to a structure collapse during the Event.

### 1.2.19  Terrorism

Terrorism has never occurred at the Burning Man Event; however, several vulnerabilities exist. The presence of large numbers of people, the iconic status of Burning Man, and widespread media coverage of the Event could make the festival an attractive target for an individual or team of attackers. Since the Event is a soft target with the potential to draw the ire of international and domestic terrorists, tactics from active shooter, vehicular assault, and improvised explosive devices are real threats with a low to moderate risk of occurrence. The impacts of a terrorist act at the Event could prove fatal and result in a mass casualty scenario that exceeds the capacity of law enforcement and medical resources on-site. A novel depicting the Burning Man Event as a terrorist target was published in 2017 and depicts weaknesses in the Event security and actions to overcome existing security mitigations. The changing global culture around acts of terrorism makes this risk difficult to adequately assess, as events such as the October 1, 2017, shooting at a country music festival in Las Vegas, Nevada, are undetected prior to occurrence.

June 2019               *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*               19
*Public Health and Safety at the Burning Man Event*

**AR08189**

Vehicle assaults as acts of terrorism are becoming more frequent worldwide. Notably in October 2017, an individual assaulted a busy bicycle path in New York City with a rented truck. The 2017 incident at the Unite the Right rally in Charlottesville, Virginia resulted in a fatality and multiple injuries. A vehicle attack occurred at Ohio State University in 2016 resulting in multiple injuries. Other assaults have occurred in Canada, Australia, Paris, and London as this method of terrorism is encouraged by terrorist organizations due to the financial ease, expediency, and dramatic public response resulting from such attacks. The highly pedestrian environment and propensity for large gatherings of people in one location within Black Rock City make vehicle terrorism a concern at the Burning Man Event.

### Event Vulnerabilities

The Burning Man Event is classified as a large, outdoor, public gathering. Unlike limited-duration events at fixed facilities, large, outdoor, public gatherings are not confined to a physical structure and do not rely on a permanent allocation of dedicated security resources. Rather, they usually rely on local law enforcement to provide security during the Event. Nearly all aspects of security must be uniquely planned and formulated for each individual gathering. Large, outdoor, public gatherings are typically open-access events and have been successfully targeted by terrorists on numerous occasions in the past (DHS 2011).

The Burning Man Event lacks a defined "See Something, Say Something" program to educate participants as to what qualifies as suspicious behavior and how to report concerns. Event organizers and public agencies lack transparent communication regarding threats and intelligence of criminal activities within the Event site. Because of the layout of the city, there are multiple locations to place explosives or hazardous agents. Public involvement in identifying and reporting suspicious items is necessary to prevent this type of activity.

Burning Man organizers resist physical barriers to prevent vehicular attacks against its population, citing vehicle operation restrictions during the Event without regard for malicious intent. The Event does not use barriers to mitigate high-speed avenues of approach, deny vehicle entry, and provide perimeter protection. The perimeter fence at the Event is an orange plastic trash fence; the Event lacks effective physical barricades for protection of unauthorized entry. In 2018, a vehicle drove through the plastic trash fence and through the walk-in camping section of the city, entering the Event without authorization and at great public safety risk. The vehicle was never located by BRC or law enforcement after it gained entry to the Event. Barriers would reduce vehicle speeds and prevent vehicle penetration to help mitigate concerns. Options for barriers include, but are not limited to, fixed and retractable bollards, heavy objects walls and ha-ha barriers, water obstacles, and Jersey barriers.

Limited access controls and lack of professional security resources at entrance points into the city, coupled with limited law enforcement staffing, are two critical event vulnerabilities. BRC operates the gate and searches for stowaways at peak traffic flow areas to prevent ingress and prevent traffic backlog onto paved routes in the area. There is not enough law enforcement assigned to the Event to provide a high-visibility presence at gate operations at the three portals into the city: the Main Gate, Airport, and Point 1.

Possession of weapons, including firearms, is prohibited during the Event. Due to the lack of available resources to search all vehicles entering the Event for weapons or explosives, especially during the peak of ingress, prohibited items such as firearms do enter into the city. There are numerous examples of firearms being discovered by law enforcement inside of the Burning Man Event that were not screened

20          *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*          June 2019
*Public Health and Safety at the Burning Man Event*

**AR08190**

upon entry to the Event. In 2015, a death investigation led to the discovery of a Burning Man employee who possessed a firearm in the employee's personal vehicle, as well as a firearm in the vehicle leased to BRC and assigned to the employee (PCSO Post-Festival Report 2017a). In 2017, a traffic stop within the Burning Man Event led to the discovery of a large quantity of cocaine in a recreational vehicle. A loaded AR-15 rifle was also found within the vehicle with a round in the chamber. This vehicle was allowed into the Event as an "early entry" participant and was not discovered during screening by BRC at the entrance gate. These incidents create concern regarding the quality/validity of searches by BRC at entry points. Since BRC controls access through the gates, processes must be in place to ensure proper searches for contraband are being conducted.

The presence of firearms exposes another vulnerability for the Event: the lack of exercises for emergency plans involving an active shooting response. The October 1, 2017, shooting at a country music festival in Las Vegas, Nevada, resulted in hundreds of casualties and fatalities and overwhelmed local law enforcement and emergency medical services, despite being in the middle of the thirtieth-largest city in the United States. In an austere environment such as Burning Man, with limited law enforcement and medical resources to draw from in the surrounding areas, an active shooting response plan is critical to ensure additional resources are available. The BLM received recommendations for enhanced physical site security from the Department of Homeland Security in 2016 to include establishing a reporting system for participants, increased transparency in risk analysis and intelligence sharing between all event management entities, proactive gate searches to mitigate active shooter incidents, physical barriers in crowded areas within the city, and a hardened perimeter security measure.

## 1.3   COMPARABLE ENVIRONMENTS

### 1.3.1   Sparks, Nevada

Sparks, Nevada, is similar in population size to the total Burning Man Event population of approximately 80,000 people. The Sparks Police Department employs 159 employees, 126 of whom are sworn law enforcement officers, to keep the community safe (http://sparkspolice.com/). Sparks contains a large working population, including commuters to Reno and USA Parkway. Residents in Sparks are not active 24 hours a day in their routine lives. Sparks reported an unemployment rate of 3.8 percent in August 2017, indicating the majority of the population is working and sleeping according to social norms.

The Sparks Police Department published a Personnel Utilization Study identifying an optimal rate of 34 percent of an officer's shift responding to calls for service, with the rest of the time being consumed by community policing, outreach, and proactive measures (Sparks 2013). The 2010 Census revealed Sparks had a population of 2,524 persons per square mile, which is much lower than the average for comparable communities of 4,706 persons per square mile (Sparks 2013). The Sparks Personnel Utilization Study shows violent crime increases in cities with a greater population density in comparison with Sparks. The study indicates that in December 2012, the sworn law enforcement staff was adequately staffed with 107 personnel but understaffed in civilian operations at 41 personnel (Sparks 2013). The Burning Man Event's population is approximately 16,000 persons per square mile.

Sparks is located adjacent to Reno, Nevada, with a Trauma II Level hospital and ample ambulance response. The nearest Trauma I Level hospital is the University of California, Davis, hospital in Sacramento, California, which is accessible by air ambulance. The Washoe County Sheriff's Office, Nevada Highway Patrol, Reno Police Department, and several federal law enforcement agencies can

June 2019          Burning Man Event Special Recreation Permit Final Environmental Impact Statement          21
Public Health and Safety at the Burning Man Event

AR08191

support the Sparks Police Department in the event of a major or mass casualty incident, with response times for a critical incident of less than 15 minutes.

### Table 5
### Sparks Crime Statistics

| Category | 2014 | 2015 |
|---|---|---|
| Cases Taken | 12,170 | 12,297 |
| Calls for Service | 77,223 | 81,189 |
| Non-Injury Accidents | 764 | 817 |
| Injury Accidents | 348 | 411 |
| Fatal Accidents | 5 | 2 |
| Total Accidents | 1,117 | 1,230 |

#### Unified Crime Reporting – Violent

| Category | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Homicide | 3 | 4 | 0 | 4 | 8 | 8 | 2 | 3 | 2 | 2 |
| Rape | 40 | 36 | 51 | 40 | 40 | 46 | 32 | 44 | 68 | 54 |
| Robbery | 124 | 134 | 128 | 112 | 103 | 75 | 68 | 70 | 56 | 99 |
| Aggravated Assault | 214 | 179 | 237 | 242 | 211 | 157 | 133 | 156 | 181 | 204 |
| Human Trafficking | - | - | - | - | - | - | - | - | - | - |
| Total | 381 | 353 | 416 | 398 | 362 | 286 | 235 | 273 | 307 | 359 |

#### Unified Crime Reporting – Property

| Category | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Burglary | 893 | 832 | 904 | 850 | 699 | 655 | 609 | 559 | 545 | 672 |
| Larceny | 2,104 | 2,422 | 2,282 | 2,007 | 1,829 | 1,600 | 1,710 | 1,706 | 1,701 | 1,759 |
| Grand Theft Auto | 455 | 349 | 304 | 248 | 233 | 191 | 240 | 253 | 248 | 272 |
| Total | 3,452 | 3,603 | 3,490 | 3,105 | 2,761 | 2,446 | 2,559 | 2,518 | 2,494 | 2,703 |

#### Unified Crime Reporting – Total

| Category | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Cases | 3,833 | 3,956 | 3,906 | 3,503 | 3,123 | 2,732 | 2,794 | 2,791 | 2,801 | 3,062 |

Source: Sparks Crime Statistics from http://sparkspolice.com/wp-content/uploads/2016/10/SparksPolice-Historical-Stats-2016.pdf

### Table 6
### Sparks Sexual Assault (Rape) Statistical Analysis

| Year | # of Sexual Assaults Reported to Law Enforcement | 95% Highest Posterior Density (Occurrences/Day)[1] | Median |
|---|---|---|---|
| 2014 | 68 | 0.15–0.23 | 0.19 |
| 2015 | 54 | 0.11–0.19 | 0.14 |

[1] The number of sexual assaults is assumed to be represented by a Poisson distribution whose mean is represented by the rate of sexual assault multiplied by the time period.

## 1.3.2   Electric Daisy Carnival

The Electric Daisy Carnival is a multiday music festival held annually in Las Vegas, Nevada, on private leased property at the Las Vegas Speedway under the law enforcement jurisdiction of the Las Vegas Metropolitan Police Department. The Las Vegas Metropolitan Police Department staffs approximately 350 officers per day at the event while event producers hire approximately 1,500 to 2,000 private security staff per day for a peak population of 140,000 participants per day. The event location, Las Vegas Speedway, is less than 15 miles from Las Vegas, Nevada, with three trauma centers operating at Level I and Level II response. Air and ground ambulances are available to transport victims, and private

22                    Burning Man Event Special Recreation Permit Final Environmental Impact Statement                    June 2019
Public Health and Safety at the Burning Man Event

AR08192

vehicles are available to transport noncritical patients the short distance to care. Supplemental law enforcement resources are also available from Henderson, Nevada.

Clark County Ordinance 6.65.120 mandates one law enforcement officer per 500 attendees at every special event permitted or two law enforcement officers per 1,000 participants. The Clark County Sheriff is authorized to staff events at a higher ratio and determine the type of officers if the agency deems it necessary, with all enforcement costs paid by the event organizers. Electric Daisy Carnival also employs on-site medical care with approximately 60 intake beds and six trauma beds for immediate care of participants.

**Table 7**
**2018 3-day Event Experience According to Open Source Statistics**

| 2018 | Population | Total Arrests | Felony Narcotics Arrests | Ejections |
|------|-----------|---------------|--------------------------|-----------|
| Day 1 | 137,582 | 33 | 29 | 32 |
| Day 2 | 138,593 | 35 | 33 | 65 |
| Day 3 | 135,225 | 30 | 28 | 166 |
| | TOTAL | 98 | 90 | 263 |

***Average population 137,133. Six traffic tickets were issued on Day 3.

June 2019       *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*       23
*Public Health and Safety at the Burning Man Event*

**AR08193**

## 1.4   References

Adams, Kenneth D., and Donald W. Sada. 2010. Black Rock Playa, Northwestern Nevada: Physical Processes and Aquatic Life. Desert Research Institute. May 24.

BLM (Bureau of Land Management (BLM). Burning Man 2012–2016 Special Recreation Permit NVW03500-12-01 Environmental Assessment. BLM Winnemucca District Office, Winnemucca, Nevada.

_____. 2018. Burning Man Data Discussion. BLM Washington Office, Washington, DC.

_____. 2019. 2018 Burning Man Special Recreation Permit Evaluation.

BRC (Black Rock City, LLC.)Burning Man. 2017. Burning Man Event Special Recreation Permit Operations Plan. BLM Winnemucca District Office, Winnemucca, Nevada.

CARB (California Air Resources Board). 2000. The Health Effects of Air Pollution on Children. Fall. Internet website: http://www.aqmd.gov/docs/default-source/students/health-effects.pdf.

Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, National Crime Victimization Survey. 1973–2016. Internet website: https://www.bjs.gov/index.cfm?ty=dcdetail&iid=245.DHS (Department of Homeland Security). 2011. Protective Measures Guide for the U.S. Outdoor Venues Industry. June 2011. Internet website: https://publicintelligence.net/dhs-outdoor-venues/.

DOI (Department of the Interior). 2018. An Unprecedented Response: DOI Support to ESF-13 During the 2017 Hurricane Season, After Action Review. Washington, DC. March 2018.

EMPSi (Environmental Management and Planning Solutions, Inc.). 2018. The Burning Man Event Special Recreation Permit Environmental Impact Statement Assessment of Economics, Social Values, and Environmental Justice. Reno, Nevada. March 2019.

EPA (Environmental Protection Agency). 1996. Review of the National Ambient Air Quality Standards for Particulate Matter: Policy Assessment of Scientific and Technical Information. Washington DC. July 1996. Internet website: https://www3.epa.gov/ttn/naaqs/standards/pm/data/1996pmstaffpaper.pdf.

HGH AAR (Humboldt General Hospital). 2014. Humboldt General Hospital Burning Man Event After Action Report. Winnemucca, NV.

NDPH AAR (Nevada Department of Public Health). 2014. Burning Man After Action Report. Reno, Nevada.

PCSO AAR (Pershing County Sheriff's Office). 2014. Pershing County Sheriff's Office After Action Report. Pershing County, Lovelock, Nevada.

_____. PCSO Post Festival Report (Pershing County Sheriff's Office). 2017a. Post Festival Report. Pershing County, Nevada. 2017.

24          Burning Man Event Special Recreation Permit Final Environmental Impact Statement          June 2019
Public Health and Safety at the Burning Man Event

AR08194

_____. 2017b.~~PCSO PMS (Pershing County Sheriff's Office). 2017.~~ Pershing County Sheriff's Office – Post Mission Statement. Pershing County, Nevada. ~~2017.~~

Solaegui Engineers. 2018. Burning Man Environmental Impact Statement Traffic Analysis. Prepared for EMPSi, Reno, Nevada.

June 2019                     *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*                     25
*Public Health and Safety at the Burning Man Event*

AR08195

This page intentionally left blank.

26          *Burning Man Event Special Recreation Permit Final Environmental Impact Statement*          June 2019
*Public Health and Safety at the Burning Man Event*

**AR08196**

| BLM LAW ENFORCEMENT EVENTS BY TYPE* | | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| PUBLIC ASSISTS** | 450 | 1474 | 213 |
| PUBLIC CONTACTS** | 166 | 1595 | 6903 |
| TRAFFIC STOPS | 860 | 899 | 1254 |
| VERBAL WARNINGS | 520 | 548 | 317 |
| WRITTEN WARNINGS | 230 | 211 | 45 |
| CITATIONS | 392 | 534 | 326 |
| RESOURCE COMPLIANCE CHECKS | 17 | 118 | 20 |

*Numbers based on final CAD Report

**In order to capture a more complete picture of what BLM law enforcement officers do during the event, an emphasis was placed on recording all public assist and visitor contacts during the 2015 event. These contacts have always occurred, but they were not always reported to dispatch and documented through the CAD.

| BLM CITATIONS BY TYPE | | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| AIRCRAFT LANDING | 0 | 1 | 1 |
| DISORDERLY CONDUCT | 8 | 7 | 3 |
| DRUG PARAPHERNALIA | 29 | 35 | 3 |
| DUI ALCOHOL | 1 | 1 | 0 |
| DUI DRUGS | 2 | 1 | 1 |
| FIRE | 0 | 1 | 1 |
| FIREWORKS | 2 | 2 | 0 |
| ALCOHOL/FURNISH TO MINOR | 1 | 0 | 0 |
| CREATING A HAZARD | 10 | 26 | 35 |
| IN A CLOSED AREA | 44 | 15 | 0 |
| INTERFERENCE | 4 | 3 | 1 |
| MOTOR VEHICLE IN CLOSURE | 11 | 5 | 11 |
| MOTOR VEHICLE NO DRIVERS LICENSE | 14 | 12 | 9 |
| MOTOR VEHICLE NO INSURANCE | 3 | 1 | 3 |
| MOTOR VEHICLE NO PERMIT | 2 | 0 | 0 |
| MOTOR VEHICLE NO PLATE | 1 | 1 | 2 |
| MOTOR VEHICLE NO REGISTRATION | 12 | 16 | 29 |
| MOTOR VEHICLE NO BRAKE LIGHTS | 0 | 6 | 10 |

AR04335

| | | | |
|---|---|---|---|
| MOTOR VEHICLE NO TAILLIGHTS | 1 | 10 | 7 |
| MOTOR VEHICLE OBSTRUCTED PLATE | 1 | 0 | 0 |
| MOTOR VEHICLE SPEEDING | 3 | 77 | 58 |
| MOTOR VEHICLE CARELESS DRIVING | 1 | 5 | 0 |
| MOTOR VEHICLE WRECKLESS | 1 | 0 | 0 |
| MOTOR VEHICLE MISCELLANEOUS | 0 | 4 | 16 |
| OPEN CONTAINER | 5 | 7 | 2 |
| POSSESSION OF A CONTROLLED SUBSTANCE | 205 | 116 | 82 |
| TRAFFICKING | 0 | 2 | 0 |
| PUBLIC USE | 11 | 0 | 0 |
| RESISTING | 1 | 4 | 2 |
| TRESPASS | 6 | 8 | 5 |
| WASTE WATER | 2 | 34 | 2 |
| WEAPONS | 4 | 3 | 3 |
| MISC | 0 | 3 | 40 |
| DEPOSIT OF HUMAN WASTE* | 7 | 128 | 81 |
| **TOTAL** | **392** | **534** | **407** |

*It is estimated 40 citations coded as MISC in CAD were issued for Depositing Human Waste on Playa

AR04336

**BLM Burning Man Event LE Positions**
**(2010 – 2016)**

| Year | Permit Participant Population Cap | City Population | # BLM Officers |
|------|------|------|------|
| 2010 | 50,000 | 51,515* | 51 |
| 2011 | 50,000 | 53,735* | 51 |
| 2012 | 60,900 | 56,149* | 70 |
| 2013 | 68,000 | 69,613* | 70 |
| 2014 | 68,000 | 75,234** | 88 |
| 2015 | 70,000 | 76,412** | 88 |
| 2016 | 70,000 | 67,290** | 75 |

*These population numbers reflex just participant population. They do not include BRC staff for the "Bodies on Playa Population" number.

**These population numbers reflex participant and BRC staff population which is categorized as bodies on playa population.

AR04340

# PERSHING COUNTY SHERIFF'S OFFICE

# 2018 BURNING MAN FESTIVAL

# POST MISSION SYNOPSIS

AR01601

## <u>DISCLAIMER</u>

The statements contained within this document are those of the author, Jerry Allen, the elected Sheriff of Pershing County at the time this document is authored and the Festival was performed.  These statements are made referencing the facts available either through public documents, public sourcing and/or factual information gathered by actually being at the Festival and working the same.

All efforts have been made to put forth the most accurate information without embellishment.  All references to cases and citations are actual numbers that have been initiated specifically due to the Burning Man Festival.

These views and statements do not necessarily reflect the thoughts of anyone else in Pershing County, either resident or elected Official.  For those individual accounts, the specific elected Officer(s) or residents should be spoken to.

It has been my intent to provide the most accurate information available to the Pershing County Board of County Commissioners. This document is not produced to influence the feelings of said Board or of any other entity, and will not be changed due to any individual or groups feeling regarding any facts contained within. Unless irrefutable facts are brought forward which would invalidate any portion of this document, the document will not be changed by the author.

# Introduction and Background

The Burning Man Festival is a world known 'counterculture' Festival that is held annually in the Black Rock Desert portion of Pershing County, on land wholly within the geographical boundary of Pershing County and managed by the Bureau of Land Management (BLM).

The Burning Man Festival was started in San Francisco, on Baker Beach, in 1986 and was attended by 35 people[1]. This event became an annual Festival and quickly outgrew the venue and societal standards of Baker Beach in the San Francisco area. By 1990, the 'Burners', as the collective participants are referred to, were no longer allowed to burn the 'Man' on the beach, nor perform some of the activities they were openly performing. In the same year, the Festival was moved from San Francisco to a remote area of the Black Rock Desert. The Black Rock Desert is partially located in three (3) separate counties within Nevada. The Festival has been held since then, except for one year[2], in the Black Rock Desert. Over the years the Festival has progressed north and is now wholly within the boundaries and jurisdiction of Pershing County. As far back as 1991, the event was such a large size as to require a permit to be issued by the BLM.

Burning Man touts the Festival as a 'Social Experiment', an 'Experiment in Society', or any other verbiage they can think of not to call it a Festival. However, in 1997 it was referred to as "THE WORLD'S MOST DANGEROUS ART FESTIVAL"[3]. For the purposes of this document, this event will be referred to as a Festival, as it has numerous events, parties, shows, acts, rides and other features of any other Festival. This Festival also meets the definition given in numerous dictionaries as well as being referenced several times within Burning Man's timeline.[4]

The BLM issues a Special Recreation Permit (SRP) for the Festival to Black Rock City LLC, which creates what Burning Man personnel refer to as a temporary city, Black Rock City (BRC).[5] As such, BLM is the regulatory agency for the Permit as well as any stipulations that are included therein. BLM has a Law Enforcement branch that is tasked with investigating and enforcing Federal laws regarding the use and abuse of the land and resources, as well as the stipulations of the SRP.

The Pershing County Sheriff's Office (PCSO) is tasked as the ultimate authority in providing County Law Enforcement for the attendees; paid, volunteers or employees of the Festival. PCSO investigates all manner of crimes from Trespassing to Homicide, misdemeanor to Felony, and anything in between. The same as it would for the permanent population within the boundaries of Pershing County. PCSO also issues No Trespassing Warnings to those who BRC or BLM decide are no longer welcome at the Festival.

For the past several years, PCSO and the BLM have worked in an 'integrated command' structure to attempt to provide the best response to calls for service within the Festival as well as keep the costs to

---

[1] burningman.org/timeline/1986
[2] burningman.org/timeline/1997
[3] burningman.org/timeline/1997
[4] burningman.org/timeline/1994
[5] BRC is not recognized as a city/town as defined in NRS 266

AR01603

BRC and ultimately the participant as low as possible. This integration is also due to the severe constraints placed on PCSO by the confines of a document referred to as the 2013 Settlement Agreement.

Pershing County usually has a population of approximately 6,800 people within the County. This population includes approximately 1,600 inmates incarcerated at the Lovelock Correctional Center. For this population, the Pershing County Sheriff's Office has 15 full time Sworn Law Enforcement Deputies, including the Sheriff, to perform all of the duties statutorily mandated for the Sheriff's Office. These duties include providing for all Law Enforcement duties for the general public as well as maintaining the jail for the County, which is located in Lovelock, approximately 160 miles from the Festival. With the amount of staffing available at the Sheriff's Office there is approximately 1 Deputy for every 578 persons permanently residing in Pershing County, minus those incarcerated within the State Prison.

During the approximate 10-12 days of the active portion of the Burning Man Festival, the population of the Festival alone balloons to upwards of 80,000+ persons; still with only the 15 Sworn Full-Time Deputies employed by the Pershing County Sheriff's Office. This enormous increase in population mandates that additional Law Enforcement staffing must be hired, on a temporary basis, to assist with the influx of population and issues which accompany the massive increase in people to a non-populated, an rarely visited portion of Pershing County.

Additionally, there are several hundred people on the Black Rock Desert, (pre and post Festival) providing for set up and clean-up of the Burning Man Festival. While many of these people are there to truly assist in the mission of Burning Man, such as at any Festival; there have been those that have required an additional response from Law Enforcement. Outside of the Festival, this portion of Pershing County is only responded to a couple of times a year, due to its remote location, lack of residents, lack of permanent infrastructure and lack of amenities.

The Burning Man Festival has, for several years, far exceeded the resources of not only Pershing County, but the Law Enforcement resources of Northern Nevada as a whole. The Pershing County Sheriff's Office has had to 'contract' with several Law Enforcement Officers within the State to provide some semblance of Law Enforcement expected by the participants. This endeavor is becoming increasingly difficult to perform from year to year, as the population of BRC continues to increase, the daily regular pay for a Law Enforcement Officer increases and the payment to Pershing County for this Festival remains relatively stagnant.

As this Festival is a temporary assignment on the actual Desert, this is truly a 'mission' for the Pershing County Sheriff's Office and not a standard patrol duty. This Festival requires numerous resources that are not available to Pershing County on a daily basis. Some of these are housing for additional staff, dispatch services, feeding staff, a temporary jail (holding facility), etc. Although both the BLM and BRC provide many necessities to PCSO for the active portion of this Festival, these necessities are absent for the remainder of the portion of the Festival that is not active-set up and tear down. On some years, this response time frame is busier than others.

# Planning

It was a very robust and lengthy planning season.  This year's planning session was made more difficult due to the fact BRC is still in the planning for their next permit and they are undergoing the Environmental Impact Statement (EIS) process with the BLM.  The Pershing County Sheriff's Office is one of many cooperating agencies assisting with this process.

The EIS process led to approximately tripling of the amount of meetings, in person and telephonic, for this year's planning season.  This put further strain on the PCSO to attempt to be true collaborators for the planning of not only this year's Festival, but also the planning for the future of this Festival. With limited staffing, the planning for such a large Festival takes more time and effort than what PCSO can dedicate. Without adding to our current staffing, PCSO will not be able to continue to hold the level of collaboration we have been able to provide in the past couple of years.

BRC advised they were going to rehire Humboldt General Hospital ambulance service for transportation and EMT response to calls for service at the Festival. This created a mixed emotion for PCSO, as we are glad to work with an organization we work very well with the remainder of the year; however it also caused a hardship on PCSO, as we have come to rely on borrowing four (4) camp trailers from them for housing our contract staff.  With HGH EMS working the Festival, PCSO had to attempt to find another viable solution for our housing needs. Additionally, PCSO lost access to a house we have rented in the recent past for additional housing.  The loss of this house was due to the owner moving back to the area and needing his house.  PCSO lost 3 beds for staffing due to this loss of access.  The loss of these resources created a need to find an additional 13 beds for contract staffing prior to the Festival.

This year included a cooperators meeting format of 2015 and 2017.  In this meeting, the group worked on a scenario which had happened the previous year to attempt to work out the kinks.  While this had some benefits for any other potential issues of this nature, this incident had already been handled live the previous year.

BRC advised they were going to be hiring a private Security company for the safety of their own staff and the Black Rock Rangers (BRR).  BRC advised the scope of work they were hoping their security company would be able to perform.  This plan caused some confusion for the PCSO planning team, as PCSO rarely receives reports of BRC employees/volunteers being assaulted or battered; which would necessitate an added response for employee safety.  It is even more rare that PCSO is requested to proceed with any type of investigation or submission of charges against anyone reported to have assaulted or battered an employee/volunteer of BRC. Most if not all of the 'victims' from BRC employees/volunteers request the aggressor get help because the suspect's behavior is most likely not how they normally act.

Due to this plan being brought forward extremely late in the planning process, BRC's plan for a private security company was not accepted by BLM and was not carried out for this year's Festival.  However I expect this plan will continue to be proposed by BRC.

An ongoing issue which continues to make for such a long planning season is the inability for the BRC planning team to make many actionable decisions at the time of the scheduled meetings.  Most of the information had to be taken back to BRC's governing board in San Francisco and then another meeting would have to be scheduled around everyone's increasingly busy schedules.

The issue which caused the most consternation between PCSO and BRC was the continued lack of knowledge of the Nevada Revised Statutes by BRC's law enforcement liaison. For the fourth (4) year in a row, members of PCSO had to explain the difference between Trespassing (a violation of the law) and Evictions (a legal decision which must be made by a court, before PCSO can take any enforcement action). One would think with a retired Law Enforcement Officer and a plethora of attorney's at BRC's disposal, this would not be a lingering issue every year.

Additionally there were conversations involving requests by BRC to violate PCSO protocols, to allow BRC to know about activities and missions involving Law Enforcement activities prior to those missions being undertaken.  These notifications would make those mission(s) not only ineffective, they have the very real potential of providing a much worse outcome, the compromising of Officer Safety in an environment where Law Enforcement is already outnumbered a minimum of  800:1.  This year solidified for PCSO that meeting with the current liaison is ineffective, inefficient and should be terminated for the good of the planning team.

This years' planning period became extremely toxic between PCSO and BRC.  I did not complete and submit my 2017 PMS until July 2018.  This caused some delays in meetings as well as the flow of information.

Again, PCSO attempted to provide for 'Separate Command' as defined within the 2013 Settlement Agreement.  This was, again, not possible due to the extremely tight restrictions on PCSO's budget.  Although the Settlement Agreement allows for an increase in funding if PCSO goes to Separate command, when PCSO obtained quotes for outside services, it quickly became apparent that even with the increase in funding PCSO would not be able to function in any meaningful way without the substantial assistance of both BRC and the BLM which has been provided for the past several years.  PCSO was advised by some of the vendors they could not provide PCSO with the cost savings they provide BRC, mostly due to the fact PCSO would not order the quantity BRC does.  The vendors also advised they were not allowed to release any of the costs of any of the services provided to BRC due to contractual limitations.

BRC previously provided a partial spreadsheet with some of the costs they state they provide to PCSO.  BRC alleges that the costs they provided in 2016 were $264,000.00. However after several requests, this spreadsheet has not been completed and no verifiable information has been provided to quantify the provided costs and numbers. PCSO has also not been provided with numbers for the 2017 or 2018 Festivals.

For reference, between the $264,000 allegedly provided by BRC coupled with the $240,000 allotted through the Settlement Agreement would total $504,000.00.  This amount far

---

AR01606

exceeds the $400,000 which would be allocated to Pershing County if the Festival stayed under the 69,999 person peak population and PCSO was able to provide for a Separate Command Structure.

When attempting to perform some research regarding meals alone, it appears that BRC states they pay more than $70 per meal for PCSO personnel and inmates. This is an extremely exaggerated figure.

With the report of costs provided, coupled with the above research by PCSO it should be readily apparent PCSO will be unable to provide for a Separate Command structure any time until the 2013 Settlement Agreement in renegotiated and a reasonable cost recovery system can be negotiated.

This year PCSO requested $238.062.88 to provide Law Enforcement services for the Festival. The increase in request was due to the need to purchase additional trailers for contract employees coupled with a requirement under the NRS to provide all uniform Law Enforcement Officers with body cameras. Since there is no way within the current Settlement Agreement for Pershing County to request more funding from BRC, the Board of County Commissioners approved and allocated the PCSO budget request from the monies already allocated for the 2018 Festival. Although this budget request provided for necessary equipment, it did not allow for more personnel, which has been needed for quite some time.

Even under the current Environmental Assessment that BRC is working under, the suggestion for PCSO staffing was 32-35 Deputies per day at a population level of 70,000 total bodies on the playa.[6] This number will never be recognized with the current budgetary restraints from the 'Agreement', which leaves the participants with inadequate Law Enforcement services for the Festival.

With the severe constraints of the 2013 Settlement Agreement, there is little room to independently provide for even the basics for a Festival of this magnitude, let alone provide for any large contingencies. With that stated, there are no monies left to respond to any emergencies regardless of size.

Any funding for an emergency situation would come out of the County's regularly budgeted funding sources, which are allocated far before the budget and Festival take place.

A budget spreadsheet will be provided in a separate section[7].

---

[6] Burning Man 20012-2016 Special Recreation Permit NVW03500-12-01 (4.14.1 & 4.18.1)
[7] Appendix A

# **Population Statistics**

The population statistics for the 2018 Festival were once again reported to both the BLM and PCSO by BRC through a population reporting system controlled by BRC. The population of Black Rock City was provided, at minimum, twice a day, once by text notification and then again in the daily Tier 1 meeting. The reporting structure for population information seems to work well, for the population which is reported, as it reaches all of the people who need access to the data.

At two times during the 2018 Festival, the paid participant population of BRC exceeded the cap of 70,000. This prompted action from the BLM to attempt to curtail the influx of paid participants. (Refer to BLM's report for specifics) This overage also prompted action from PCSO who deployed an LED traffic information 'reader board' to advise participants prior to arriving at the 8 mile access gate that the Festival was oversold and the entry gate was closed. This sign was deployed in an effort to curtail participants from being held in the entry line and becoming increasingly agitated by not being allowed to enter the Festival which they had already paid for. The deployment of the sign prior to the entry gate was to allow participants the option to return to Gerlach or Empire or points beyond to await a better time to enter the Festival.

The peak 'paid participant' population number I was provided, during the active portion of the Festival, was 70,358. The peak bodies on playa population number reported during the Festival was 77,630.

A population spreadsheet will be provided separately.[8]

It is noteworthy that for a population of 5,200 full time residents of Pershing County (*6,800 minus 1,600 inmates housed at the Lovelock Correctional Center*), PCSO has 9 Sworn Deputies for Patrol, 5 Sworn Deputies for Detention and 1 Deputy assigned to the Youth Resource position, when we are fully staffed. This increase of population alone should have been met with an additional number of Sworn Deputies, commensurate with the additional population. This number would be 134 Sworn Deputies to provide patrol functions at this Festival. (*1 Deputy per approximately 577 permanent residents of Pershing County*)

I continue to be highly suspicious of the reported population numbers as there is no independent verification or audit system in place to perform a quality control check. From previous Festivals, it appears to the naked eye, as if BRC is well beyond the reported numbers, but at this time there is no way to verify this.

To support this suspicion, this year BRC added a partial perimeter street during the active portion of the Festival. Through previous planning meeting discussions, BRC personnel advised that by adding an entire perimeter street that would account for approximately 10,000 additional persons at the Festival.

---

[8] Appendix B

# OPERATIONS

The 2018 Burning Man Festival started, as many of them do, prior to the opening of the gates to allow general paid participants to enter and assist with set up of the larger theme camps or work for BRC operations. This is outside of the 8 days of the reported 'active portion' of the Festival.

Operations were extremely busy for the PCSO, as we again had some technical difficulties at the beginning of the Festival. These included a lack of PCSO IT personnel for the setup of our computers and network. This included setup of new equipment for our newly obtained body and vehicle cameras. This function was accomplished by Sheriff Allen with valuable assistance provided by BLM IT staff again.

During the 2018 Festival, there was another wildland fire that caused Highway 447 to be closed for a portion of time and threatened a longer closure. This is the second year in a row the main artery to obtain services and to gain access to points beyond the Black Rock Desert was closed. This caused a hardship at the end of the Festival due to having to transport the remains of a deceased person from the Festival.

PCSO ran into some vehicle issues with our inmate transport vehicles. We had several blowout/flat tires which caused delay in the response of our vehicles to transport inmates.

At the culmination of the Festival, PCSO had released most of our staffing due to the above mentioned budgetary constraints. On the Tuesday after the Festival was supposed to be over, September 4, 2018, PCSO was called to a report of a man down, which unfortunately ended with a Coroner call. Adequate staffing was not available due to lack of funding and personnel needing to return to their regular full time jobs. PCSO reaffirmed we need additional personnel both pre and post Festival. On the same date, the previously mentioned fire caused Hwy 447 to be closed and impassible for a period of time.

As previously mentioned, this closure caused delay in transportation of the remains to the WCME office. Another hardship on PCSO was there were no funeral homes that were willing to come to the playa to pick up any remains. As such, PCSO staff had to provide transport for the remains, which took essential resources from the Festival.

As this was a coroner report associated with the Festival and covered in section 4 of the Settlement Agreement, a separate bill will be submitted.

On the same date, PCSO received a call for a suspected carjacking across CR 34 from the main entry/exit road for the Festival. The suspect was able to make it to Gerlach where he committed several other Felony crimes and was arrested by WCSO for those alleged crimes. PCSO had probable cause for his arrest due to the victim making a positive identification of the

suspect and there being evidence found in the vehicle. This case again was after the active part of the Festival, but wholly surrounding participants of the Burning Man Festival.

Although BRC's Black Rock Rangers normally provide assistance to PCSO regarding calls for service, an opinion of the Nevada Attorney General allowed BRC to act as a 'buffer' between persons reporting to be victims of Sexual Assaults and Law Enforcement. In some other jurisdictions within the State, there is an independent service to act as an advocate for the victim. Instead of following that model, BRC responded to calls they initially received and spoke with the victim(s) prior to Law Enforcement Officers being able to talk to the victims. Although the Pershing County Sheriff's Office respects the right of a victim of any crime to remain anonymous and therefore not want to be a victim, we have never had a third party interfere with these interviews and speak on the behalf of a victim. This lack of being able to receive this information directly from the victim(s) caused a disruption for all of the Pershing County Deputies. It also caused the already tenuous relationship between BRC and PCSO to degrade. This was further exacerbated by the fact BRC expanded their interference to other Law Enforcement calls for service. Although none of these incidents apparently rose to the level of taking criminal action against any BRC employees, there were a few incidents which required additional supervisor response from PCSO and more de-escalation than should have been required.

This continued hindrance prompted a letter from Sheriff Allen to cease and desist these actions regarding any further interference with criminal report(s) outside of reports of Sexual Assaults. After this letter was served, PCSO Deputies were able to resume a more normalized response to calls for service.

Despite this interaction, PCSO received twelve reports of Sexual Assault during the active portion of the Festival. PCSO is currently still investigating four of those reports. The other victims chose not to go forward with testing and prosecution against the perpetrators.

PCSO received a report of a Sexual Assault on December 3, 2018. This report was initially made to Reno Police Department and we are currently awaiting the report from them. Unfortunately, these late reports are not outside of the 'norm' as it relates to this Festival.

BRC again provided substantial assistance to PCSO regarding buildings at the Joint Operation Center as well as access to their property in Gerlach, known as the Shower property, for our trailers. They also provided the meals for our staff and inmates held within the temporary jail located within the JOC. Without this assistance, PCSO would not be able to provide many services to the participants of this Festival.

# ENFORCEMENT STATISTICS

During the 2018 Festival we were able to capture the following information:

- 140 Cases were drawn specifically for the 2018 Burning Man Festival.
  - These cases include the following citations as well as arrests and informational reports.
- There were 44 arrests at the 2018 Festival[9].  These arrests ranged from Trespassing, Domestic Battery, Possession of Illegal Controlled Substances, Sexual Assault and Assault with a Deadly Weapon.
- There were 56 citations[10] issued for various offenses, mostly for the illegal possession of controlled substances.
- We continue to have negative enforcement with far less than one (1) % of the population at any given time.
- We continue to receive calls for service even after the Festival.
  - Many of these calls after the fact are for reports of either damage or theft of personal property, some of which turn out to be insurance fraud related.
  - Prior to the end of the cleanup of the Festival, PCSO received a report of 4 missing juveniles who had allegedly left the camp on bicycles in an unknown direction.
    - Search and Rescue was called out to assist with this mission, however before they were deployed, PCSO was advised WCSO had made contact with all 4 juveniles in the Gerlach area.

PCSO was better able to compile a comprehensive account of the weight of illegal narcotics seized from the Burning Man Festival.  Those weights will be provided in a separate included spreadsheet.[11]

The Burning Man Festival continues to contain the largest single concentration of narcotics violations in Pershing County for the entire year.

---

[9] Appendix C
[10] Appendix D
[11] Appendix E

# FINANCIALS

For Pershing County, our budget for the Burning Man Festival is wholly based on population of the Festival. Due to that, some references regarding population will be repeated in this section. It should be noted that our budget is based on a figure provided by BRC prior to the start of the Festival. If there are any population overages, like there were in the 2018 Festival, those cannot be budgeted for prior to the start of the Festival.

The Pershing County Sheriff's Office requested and was approved $238,062.88 to provide Law Enforcement services to the 2018 Burning Man Festival. This does not include all of the numerous hours which were put in prior to the Festival for planning. It also does not account for hours worked by my Administrative staff or other civilian staff, as I absorb those costs in my regular budget.

- This allocation of funding also does not include:
  - The supplies and services BLM assisted with.
  - The cost of additional housing (trailers), waste removal and generator(s) for the Shower Property, provided by BRC.
  - The cost of meals provided through BLM and BRC.
  - The cost of Dispatch provided through BLM.

It has proved increasingly difficult to provide for a comprehensive budget for several reasons:

- The Burning Man Festival budget is based on 'peak population'; as such there may be a variance in what is budgeted for and what is paid. PCSO budgets for a certain population range based on an estimate provided by BRC and previous history.
  - If the population is less than planned for, Pershing County would not receive monies which were budgeted for and then would have to be covered by the individual Office's budgets.
  - If the population goes above what is budgeted for, supplies and personnel may run out due to lack of prior planning.
    - This potentially leaves Pershing County open to liability.
    - It does not allow for proper services to be available for the participants.
    - It causes the contract personnel to become overworked/overstressed which could cause further issues with good decision making.
- The overall payment will not be realized until after the Festival, due to the 'peak population' not being publicly reported until then.
  - For example, the revenue for the 2018 Festival was not calculated until the final payment was made on or about October 13, 2018.
  - With BRC exceeding the peak population of 70,000, the payment to Pershing County reached a higher pay bracket.
  - This budget number was not available prior to having a budget approved, thus becoming difficult to know what expenses could be afforded because we did not have an accurate amount to start the budget process with.

## ISSUES NEEDING SOLUTIONS PRIOR TO THE 2019 BM FESTIVAL

1. A solution needs to be made regarding radio connectivity to Lovelock.
   a. This will entail a permanent mountaintop repeater system which would carry radio signal from the Black Rock Desert to the Pershing County Sheriff's Office and back.
   b. This repeater system is needed for more than the Burning Man Festival; however it will get the majority of its use during the Festival.
2. The integration of PCSO radios with BLM and other Law Enforcement entities radios.
   a. With the continual advancement of technology, a viable solution needs to be prepared to continue to have robust communications between all Law Enforcement entities within the working area of the Festival.
   b. PCSO cannot currently talk to NHP or WCSO on their systems due to incompatibilities. This needs to be rectified in the event of an MCI.
3. Blue Pit still needs to be reevaluated as a staging/lodging area for Law Enforcement.
   a. This area is within approximately 5 minutes response time from the Pit to the Command Post.
      i. This close proximity would allow for extremely rapid response of the personnel who will be responsible for making important decision relating to the safety of all of the participants.
      ii. It would also provide for expedited response for staff needing to be called out to respond to a critical incident without having to deal with the added stress of traffic.
   b. This area is separated enough from the Festival to provide some quiet time for the staff.
   c. This area would not require any other special permitting.
   d. The proximity of the Blue Pit would also be closer to the Festival which would allow for:
      i. Less distance for providing sanitary services and fresh water.
      ii. Less travel time during the major influx of traffic.
         1. This alone could save upwards of 45 minutes to an hour of travel time-a timeframe that is unacceptable at a planned Festival.
4. Funding and available personnel will need to be secured to provide for a minimum of 40 PCSO Deputies per shift.
   a. The shifts will need to start prior to the start of the active portion of the Festival (pre-Festival).
   b. Some of these shifts will also need to extend past the end of the Festival, due to the influx of calls and the lingering paperwork and evidence that needs to be secured after every Festival (post-Festival).
   c. We also need more personnel, not necessarily sworn, available after the Festival to assist in 'break down' of our infrastructure.
5. Burning Man and Pershing County need to abolish and dispose of the 2013 Settlement Agreement and either a new agreement needs to be worked out, or a system of cost recovery needs to be put into effect.

a. Cost recovery has been in place for BLM for several years and allows for a realistic opportunity to provide necessary response and coverage for an event of this magnitude.
   i. Both BRC and BLM work with multimillion dollar budgets to accomplish their missions and both entities have several avenues to obtain additional funding if needed either before or during the Festival.
   ii. Pershing County works with a budget of approximately 3% of other entities budgets.

b. The 'Agreement' only allows for funding for eight days. The reality is the participant portion of the Festival for 2018 was 10 days, by BRC's own admissions, due to a 'side agreement' between BRC and BLM, which has been in place for several years, to allow for early ingress and egress to alleviate traffic.
   i. This has been verified by Marian Goodell on a TED talk where she stated 'Burning Man is a 9 day event.'[13]

c. There are people on the Playa for well over the nine days of the actual Festival, and these are people that PCSO regularly has to have interaction with, as previously reported.

6. Burning Man has become a year round event for the Pershing County Sheriff's Office.
   a. Due to the extra burden placed on this Office for just this Festival, the County needs to find a solution, possibly through cost recovery, to provide the Pershing County Sheriff's Office with a full-time sworn person to accommodate this Festival.
      i. This position needs to be sworn due to the fact that even up to 12 months after a BM Festival has concluded, this Office commonly receives reports of criminal activity.
      ii. These reports will sometimes need further investigation, which can only be performed by a Sworn Deputy.
   b. BRC is proposing to allow the population of this Festival to reach the 100,000 person range. BRC currently is approaching 80,000 bodies on playa.
   c. It should be noted the BLM has a position specifically dedicated to just the Burning Man Festival as do other entities.

7. Pershing County needs to formulate a plan to oversee and audit the population count of this Festival.
   a. The numbers provided by BRC cannot be fully relied upon especially as they are continually allowing traffic to come in through 'Burner Express' buses and "Burner Air' their commercial flight option which brings participants to the playa, without having to go through the main gate and be counted.
   b. With payment to Pershing County wholly tied to the population of this city, I think it is prudent for Pershing County to be able to verify, without question of authenticity, the actual 'bodies on playa' population.

8. Pershing County needs to fund personnel to ensure the businesses providing services at the Festival have proper licensing with the County. BRC ensures that there are mechanisms in place for them to regulate their vendors within the Festival. There however, is no mechanism for the County to provide the same oversight. This needs to be rectified, as the County is ultimately responsible for the licensing of some of the

---

[13] https://journal.burningman.org/2014/06/philosophical-center/tenprinciples/marian-goodell-speaks-at-tedx-tokyo/

AR01614

vendors within the Festival.  It is ludicrous to have entities such as the Health Department from the State of Nevada on site without also having the equivalent from Pershing County looking for violations of our licensing ordinances, especially where service of alcoholic beverages and food products is concerned.

9.  The majority of the Cooperators meetings should be held in the Lovelock area, since Pershing County is the County in which this Festival actually takes place.  This would allow for more participation from other Pershing County entities which are becoming more vital for this Festival to operate.

   a.  BRC has been opposed to this in the past due to the lack of communication resources for many of their cooperators to call in.
   b.  BRC has also stated there is not enough room within one building in Pershing County to hold these meetings as well as Pershing County being unable to provide similar A/V resources as the DEM in Washoe County.  However, if a critical incident does happen on the playa, it will be Pershing County who would be the primary entity to provide for Emergency Management, not Washoe County.
      i.  Pershing County will be using their own infrastructure within Lovelock to assist with necessary peripheral duties and it would be nice to have BRC become accustomed to the area as well as the resources available within Pershing County.

10. Planning for the 2019 Festival should take place between those departments within BRC responsible for Operations of the Festival and PCSO.  For far too long, PCSO has been planning this Festival with the legal and government relations departments of BRC.  This action has continually bogged down the meetings and schedules, as referenced earlier within this document.
   a.  While BRC's legal department may need some limited input, if planning items reach to the legal realm, the more appropriate and therefore effective method would be to plan the Festival with those who are tasked with the operational responsibilities of the Festival.
   b.  It would be more appropriate for the legal team of BRC to speak with the Pershing County District Attorney's Office if there are legal issues that need to be rectified, as the District Attorney's Office is the legal representative of Pershing County.
   c.  As previously stated, a different individual should be looked at to provide Law Enforcement Liaison services on behalf of BRC, as this relationship has become too toxic to be salvaged.

Those persons who are to be involved in the planning process, on behalf of BRC, also need to have the authority to make actionable decisions at the time of the meetings. This change should allow for real time decisions, so we are not languishing and waiting for additional meetings to happen and decisions to be made.

# APPENDIX A

# 2018 PCSO Burning Man Budget Request

Payment @ $240,000.00

| 2018 BM Payment-Integrated Command | Per CPI calculation-https://dlnta.bls.gov/cgi-bin/cpicalc.pl?cost1=275%2C000.00&year1=201401&year2=201806 | | | | | | $ | 258,543.07 |

| Status | Total Hours scheduled | Regular Hours | | Standard Hourly Rate | Overtime Hours | | Overtime Hourly Rate | | |
|---|---|---|---|---|---|---|---|---|---|
| Admin-Sworn | 266 | 80 | $ | 41.04 | 186 | $ | 45.67 | $ | 11,777.82 |
| Admin | 120 | | | | 120 | $ | 38.00 | $ | 4,560.00 |
| Day Shift Supervisor | 210 | 44 | $ | 32.25 | 166 | $ | 35.89 | $ | 7,376.74 |
| Day Shift Patrol | 770 | 770 | $ | 38.65 | 0 | $ | - | $ | 29,760.50 |
| Night Shift Supervisor | 168 | 168 | $ | 45.09 | 0 | $ | - | $ | 7,575.12 |
| Night Shift Patrol | 1386 | 1386 | $ | 38.65 | 0 | $ | - | $ | 53,568.90 |
| Evidence Tech | 252 | 252 | $ | 38.65 | 0 | $ | - | $ | 9,739.80 |
| Jail Shifts | 960 | 960 | $ | 38.65 | 0 | $ | - | $ | 37,104.00 |
| Total Personnel | | | | | | | | $ | 161,462.88 |

| | | | | |
|---|---|---|---|---|
| Supplies | Clothing, Office Supplies, Evidence supplies, PPE | | $ | 10,000.00 |
| CAD interface | Permanent Infrastructure | | $ | 10,000.00 |
| Body Cameras | Permanent Infrastructure | | $ | 21,000.00 |
| Trailers | Permanent Infrastructure | | $ | 30,000.00 |
| A/C Unit | Plan 'B' | | $ | 5,600.00 |
| Total Supplies | | | $ | 76,600.00 |

| | | | |
|---|---|---|---|
| Total 2018 Budget Request | | $ | 238,062.88 |
| Total Remaining | | $ | 20,480.19 |

AR01617



AR01618



Graph courtesy of Dave Skelton

AR01619



Graph courtesy of Dave Skelton

AR01620



Graph courtesy of Dave Skelton

AR01621

# APPENDIX B

AR01622





Graph courtesy of Dave Skelton

AR01624

# APPENDIX C

AR01625

# 2018 BURNING MAN ARRESTS

| No. | Name | Charge(s) | Bail Amount |
|---|---|---|---|
| 1 | Chad Raines | Trafficking of a Controlled Substance-Sched 1-4-14 Grams-4 counts<br>Unlawful Possession Controlled Substance-Not for Sales | $ 370,000.00 |
| 2 | Alex Newman | Possession Controlled Substance for Sales | $ 10,000.00 |
| 3 | Jonathan King | Possession Controlled Substance for Sales<br>Obstruct Public Officer | $ 11,140.00 |
| 4 | Daniel Samonas | Driving under the Influence-1st Offense | $ 1,140.00 |
| 5 | Andre Hall | Possession Controlled Substance-Not for Sales | $ 20,000.00 |
| 6 | Jonathan Edmonds | Trafficking Controlled Substance-Schedule 1-4-14 G-2 counts<br>Unlawful Possession of Controlled Substance-Not for Sales<br>Abuse/Neglect/Endangerment of a Child | $ 60,000.00 |
| 7 | Misha Nizker | Trafficking Controlled Substance Sched 1-4-14 G<br>Possession Controlled Substance-not for sales<br>Trafficking Controlled Substance Sched 1-over28 G | $ 50,000.00 |
| 8 | Christiane Ferreira Da Costa | Trafficking Controlled Substance-Sched 1-over 28 G<br>Unlawful Possession Controlled Substance-Not for Sales<br>Trafficking Controlled Substance-Sched 1-4-14 G | $ 30,000.00 |
| 9 | Josef Goldstein | Unlawful Possession Controlled Substance-Not for Sales | $ 5,000.00 |
| 10 | Alexander Main | Possession Controlled Substance for Sales<br>Obstruct Public Officer<br>Possession of Dangerous drug-W/O a prescription | $ 17,500.00 |
| 11 | Cole Schlecht | Possession Controlled Substace for Sales<br>Possession of Dangerous drug-W/O a prescription | $ 35,000.00 |
| 12 | Ryan Gibbs | Trafficking Controlled Substance-Sched 1-over 28 G | $ 30,000.00 |
| 13 | Jessica Van Acker Dugas | Unlawful Possession Controlled Substance-Not for Sales-2 counts | $ 10,000.00 |
| 14 | Moustapha Moughrabi | Unlawful Possession Controlled Substance-Not for Sales-2 counts | $ 10,000.00 |
| 15 | Klaudia Krupa | Unlawful Possession Controlled Substance-Not for Sales<br>Unlawful Use/Possession of Paraphernalia | $ 5,640.00 |
| 16 | Alfredo Castellanos Heuer | Unlawful Possesson Controlled Substance<br>Trafficking Controlled Substance-Schedule 1-4-14 G | $ 25,000.00 |
| 17 | Adam Redstone | Unlawful Trespass on Land of another | $ 195.00 |
| 18 | Simon Yang | Unlawful Possession Controlled Substance-Not for Sales<br>Unlawful Use/Possession of Paraphernalia | $ 5,640.00 |
| 19 | Anthony Nicolaides | Unlawful Possession Controlled Substance-Not for Sales-2 counts | $ 10,000.00 |
| 20 | Dylan Lineberger-Scholl | Unlawful Possession Controlled Substance-Not for Sales | $ 5,000.00 |

| | | | | |
|---|---|---|---|---|
| 21 | Michael Singleton | Domestic Battery-1st Offense | $ | 3,140.00 |
| 22 | Nicholas David | Resist/Obstruct Public Officer 2 counts | $ | 2,637.00 |
| 23 | Jonathan Giraldo | Domestic Battery 1st Offense | $ | 3,140.00 |
| 24 | Melvin Stiefel | Possess Dangerous Drug W/O valid Prescription 2 counts | $ | 5,000.00 |
| 25 | Scott Lomill | Unlawful Possession Controlled Substance-Not for Sales<br>Unlawful Use/Possession of Paraphernalia<br>Possess Dangerous Drug W/O valid Prescription | $ | 15,640.00 |
| 26 | Keith Allen | Unlawful Possession Controlled Substance-Not for Sales | $ | 5,000.00 |
| 27 | Adam Redstone | Unlawful Trespass on Land of another | $ | 195.00 |
| 28 | John Griffin | Domestic Battery | $ | 3,140.00 |
| 29 | Luit Italianer | Unlawful Possession Controlled Substance-Not for Sales<br>Unlawful Use/Possession of Paraphernalia | $ | 5,640.00 |
| 30 | Daniel Devivo | Unlawful Possession Controlled Substance-Not for Sales-3 counts | $ | 15,000.00 |
| 31 | Gabriel Garza | Battery, Resist/Obstruct a Public Officer | $ | 3,420.00 |
| 32 | Marei Markmann | Unlawful Use/Under the Influence of a Controlled Substance | $ | 5,000.00 |
| 33 | Kevin Castellanos | Unlawful Possession Controlled Substance-Not for Sales-3 counts | $ | 15,000.00 |
| 34 | Jessica Lewis | Bribery of a Judicial Officer<br>Possession Controlled Substance for Sales<br>Resist/Obstruct Public Officer-2 counts | $ | 13,640.00 |
| 35 | Sherry Clark | Assault<br>Battery | $ | 2,280.00 |
| 36 | Renee Raville | Trafficking Controlled Substance-Sched 1 15-28 Grams<br>Trafficking Controlled Substance-Sched 1 4-14 Grams<br>Possession Controlled Substance for Sales-2 counts<br>Possession of Dangerous Drug w/o Prescription | $ | 110,000.00 |
| 37 | Robin Livingston | Trafficking Controlled Substance-Sched 1 4-14 Grams<br>Possession of a Controlled Substance | $ | 40,000.00 |
| 38 | Suman Gopalrao | Unlawful Possession Controlled Substance for Sales-2 counts<br>Trafficking Controlled Substance-Sched 1 4-14 Grams<br>Unlawful Use/Possession of Paraphernalia | $ | 31,280.00 |
| 39 | Joshua Coffin | Trafficking Controlled Substance-Sched 1 over 28 grams-3 counts | $ | 750,000.00 |
| 40 | Sean Voigt | Trafficking Controlled Substance-Sched 1 over 28 grams | $ | 250,000.00 |
| 41 | Eliakim Blatt | Trafficking Controlled Substance-Sched 1 over 28 grams-3 counts | $ | 750,000.00 |
| 42 | Jessica Hamilton | Trafficking Controlled Substance-Sched 1<br>Unlawful Possession Controlled Substance-Not for Sales-2 Counts<br>Possession of Dangerous Drug W/O Prescription | | |

|    |    | Possession Controlled Substance for Sales | $ | 40,000.00 |
| 43 | Caroline Sanchez | Driving Under the Influence-1st Offense | | |
|    |    | Obsrtucting Public Officer | $ | 3,640.00 |
| 44 | John Doe | ADW, Carjacking | | |

AR01628

# APPENDIX D

**AR01629**

# 2018 Burning Man Citations

| | Cited Person | Charge(s) | Bail |
|---|---|---|---|
| 1 | DANAKIAN, HIKE | 1 count of Interstate Commerce | $ 1,140.00 |
| 2 | STEINWORTH, JOHN JOSEPH III | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$   640.00 |
| 3 | CASLIN, CHRISTIAN J | 2 counts of Interstate Commerce | $ 2,280.00 |
| 4 | GARVEY, HEATHER MARIE | 1 count of Interstate Commerce | $ 1,140.00 |
| 5 | BLEDSOE, DANIEL LEO | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$   640.00 |
| 6 | OVERLY, BROOK | 1 count of Interstate Commerce | $ 1,140.00 |
| 7 | BUENO-MOLINA, JOSE ANTONIO | 2 counts of Interstate Commerce | $ 2,280.00 |
| 8 | SUTO, MICHAEL | 1 count of Interstate Commerce | $ 1,140.00 |
| 9 | MURPHY, BRENT THOMAS | 1 count of Interstate Commerce | $ 1,140.00 |
| 10 | WILLIAMS, KENNETH M | 2 counts of Interstate Commerce | $ 2,280.00 |
| 11 | SANCHEZ, MARK ANDREW | 1 count of Interstate Commerce | $ 1,140.00 |
| 12 | CURTIS, KEVAN LEE | 2 counts of Interstate Commerce | $ 2,280.00 |
| 13 | MORALES, JUAN-PABLO | 1 count of Interstate Commerce | $ 1,140.00 |
| 14 | MECHENAY, AYA | 1 count of Interstate Commerce | $ 1,140.00 |
| 15 | GREATTINGER, LINDSAY M | 1 count of Interstate Commerce | $ 1,140.00 |
| 16 | COOPER, SCOTT J | 1 count of Interstate Commerce | $ 1,140.00 |
| 17 | PHILLIPS, JOHN T | 1 count of Interstate Commerce | $ 1,140.00 |
| 18 | SPURRIER, MICHAEL RICHARD | 1 count of Interstate Commerce | $ 1,140.00 |
| 19 | SANDOVAL, PETER JAMES | 1 count of Interstate Commerce | $ 1,140.00 |
| 20 | PERI, ADREW JOSEPH | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$   640.00 |
| 21 | COSTA, MARIA ESTEFANIA | 1 count of Interstate Commerce | $ 1,140.00 |
| 22 | KELLY, AARON | 1 count of Interstate Commerce | $ 1,140.00 |
| 23 | HANRAHAN, JONATHAN P | 1 count of Interstate Commerce | $ 1,140.00 |

AR01630

| 24 | MCLAUGHLIN, CHRISTIAN | 1 count of Interstate Commerce | $ 1,140.00 |
| 25 | SANCHEZ-GOMEZ, ANDRES | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 26 | HIMELFARB, YANAI | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 27 | CHAUDHRY, MOHAMMED I | 1 count of Interstate Commerce | $ 1,140.00 |
| 28 | PAPANGELOU, NIKOLAOS | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 29 | MATISSE, EVA | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 30 | MONTOYA, JUSTIN | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 31 | CRESPO-LEON, JULIAN | 1 count of Interstate Commerce | $ 1,140.00 |
| 32 | RODRIGUEZ, GABRIEL A | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 33 | BOERA, ANNA DMITRIYEVNA | 1 count of Interstate Commerce | $ 1,140.00 |
| 34 | BHANDARI, ADITYA | 1 count of Interstate Commerce | $ 1,140.00 |
| 35 | KROECK, KYLE GALEN | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 36 | WILLIAMS JR, LEROY | Driving While Revoked | $ 335.00 |
| 37 | HARVEY, TRISTAN | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 38 | WISDOM, MELISSA | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 39 | ZWERSKI, BRETT | Expired Registration | $ 115.00 |
| 40 | PERI, ANDREW | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 41 | YERXA, JASON | Taillights required | $ 75.00 |
| 42 | SALIAH, OREN | 1 count of Interstate Commerce | $ 1,140.00 |
| 43 | PENNIMAN, GRAHAM EDWARD | 1 count of Interstate Commerce | $ 1,140.00 |
| 44 | SPENGLER, VERONICA | 1 count of Interstate Commerce | $ 1,140.00 |
| 45 | HORN, KASSANDRA YVETTE | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |

| 46 | SHARPE, MICHAEL LOWELL | 1 count of Interstate Commerce | $ 1,140.00 |
| 47 | POLO, ROBYN LEANNE | 3 count of Interstate Commerce<br>1 count of Possesion of Para | $ 3,420.00<br>$ 640.00 |
| 48 | SALTZGIVER, SHANE PATRICK | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 49 | MAR, ALEXANDER H | 2 count of Interstate Commerce | $ 2,280.00 |
| 50 | ARREOLLA, MICHAEL V | 1 count of Interstate Commerce | $ 1,140.00 |
| 51 | VILLAMENA, VINCENZO | 2 count of Interstate Commerce<br>1 count of Possesion of Para | $ 2,280.00<br>$ 640.00 |
| 52 | LEVY, BAR | 1 count of Interstate Commerce<br>1 count of Possesion of Para | $ 1,140.00<br>$ 640.00 |
| 53 | TONK, CHRISTOPHER | 1 count of Interstate Commerce | $ 1,140.00 |
| 54 | HOTTEL, JOSHUA | 1 count Driving while suspended/revoked | $ 355.00 |
| 55 | CARDENAS, JULIE | 1 count of Interstate Commerce<br>1 county of Possession of Para | $ 1,140.00<br>$ 640.00 |
| 56 | KULKIN, MITCHELL | 1 count of Interstate Commerce<br>1 county of Possession of Para | $ 1,140.00<br>$ 640.00 |

# APPENDIX E

**AR01633**

| Date | Case Number | Marijuana Grams | Psilocybin Grams | Ketamine grams | Heroin grams | Methamphetamine Grams | Cocaine Grams | Molly Grams | MDMA Grams | Amphetamine Grams | MDA Grams | Ecstasy Grams | PCP Grams | Pills | LSD-Actual | LSD-Conversion | Mebutamate | Tripentaerythritol Grams |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/25/2018 | 18-210 | | | 1 | | | | | | | | | | 115 | | | | |
| 8/26/2018 | 18-214 | | 50 | 5 | | | 6 | 15 | | | | | | | 3 | | | |
| 8/25/2018 | 18-215 | | | | | | | 1 | | 1 | | | | | | | | |
| 8/26/2018 | 18-216 | | 0.36 | | | | 2 | | | | | | | | | | | |
| 8/26/2018 | 18-217 | | | | | | | | | | | | | | 119 Tabs | 119 | | |
| 8/26/2018 | 18-219 | | | | | | | | | | | | | | | | | |
| 8/26/2018 | 18-220 | | | | | | 1 | | | | | | | | | | | |
| 8/27/2018 | 18-221 | | | | | | 1 | | | | | | | | | | | |
| 8/27/2018 | 18-222 | | | | | | | | 1 | | | | | | 4 Tabs | 4 | | |
| 8/27/2018 | 18-224 | | | | | >1 | | | | | | | | | | | | |
| 8/27/2018 | 18-225 | | | 6 | | | 1 | | | | | | | | | | | |
| 8/27/2018 | 18-228 | | 110 | | | 18 | | | | | | | | | | | | |
| 8/27/2018 | 18-229 | | | | | | | | | | | | | | 5 | | | |
| 8/27/2018 | 18-230 | 35 | 14 | | | | | | | | 16 | | | | | | | |
| 8/27/2018 | 18-231 | | 2 | | | | | | | | | | | | 1 Tab | 1 | | |
| 8/28/2018 | 18-232 | | | | | | | | >1 | | | | | | | | | |
| 8/28/2018 | 18-233 | | 2 | | | | | | >1 | | | | | | 11 Tabs | 11 | | |
| 8/28/2018 | 18-234 | | 70 | 258 | | | 3 | | 10 | | | 10 Pills | | | 10 Tabs | 10 | | |
| 8/28/2018 | 18-235 | | 1 | | | | | | | | | | | | | | | |
| 8/28/2018 | 18-236 | | | | | | 2 | | | | | | | | | | | |
| 8/28/2018 | 18-238 | | | | | | 7 | | | | | | | | 13 | | | |
| 8/28/2018 | 18-239 | | 1 | | | | | | | | | | | | | | | |
| 8/28/2018 | 18-244 | | 62 | | | | | | | | | | | | 5 | 16 | 16 | 115 |
| 8/28/2018 | 18-245 | | | | | | 2 | 7 Capsules | | | | | | | | | | |
| 8/28/2018 | 18-247 | | | | | | 1 | | | | | | | | | | | |
| 8/28/2018 | 18-248 | | | | | | | | | | | | | | | | 3 Tabs | |
| 8/29/2018 | 18-249 | | | | | | | | 1 | | | | | | | | | |
| 8/29/2018 | 18-250 | | | | | | | | 1 | | | | | | | | | |
| 8/29/2018 | 18-251 | | | | | | 8 | | 7 | | | | | | | | | |
| 8/29/2018 | 18-252 | | | | | | | | >1 | | | | | | | | | |
| 8/29/2018 | 18-256 | | 22 | | | | | | | | | | | | | | | |
| 8/29/2018 | 18-264 | | >1 | | >1 | | | | | | | >1 | | | | 8 | | |
| 8/29/2018 | 18-266 | | 3 | | | | | | | | | | | | | | | |
| 8/29/2018 | 18-267 | | 5 | | | | | | | | | | | | | | | |
| 8/29/2018 | 18-268 | | | | | | | | 5 | | | | | | | | | |
| 8/30/2018 | 18-269 | | | | | | | | >1 | >1 | | | | | | | | |
| 8/30/2018 | 18-271 | | | 1 | | | | | | | | | | | | | | |
| 8/30/2018 | 18-274 | | 9 | | | | | | | | | | | | | | | |
| 8/30/2018 | 18-275 | | | | | | 1 | | | | | | | | | | | |
| 8/30/2018 | 18-277 | | 2 | | | | | | | | | >1 | | | | | | |
| 8/30/2018 | 18-278 | | | | | | | | | | | >1 | | | | | | |
| 8/30/2018 | 18-279 | | | 11 | | | | | >1 | | | | | | 2.5 | | | |
| 8/30/2018 | 18-285 | | 2 | | | | >1 | | | | | | | | 6 | | | |
| 8/30/2018 | 18-286 | | | | | | | | 1 | | | | | | 10 | | | |
| 8/30/2018 | 18-287 | | | | | | | >1 | | | | | | | | | | |
| 8/30/2018 | 18-289 | | | | | | | | | | | 2 Tabs | | | | 4 Tabs | 4 | |
| 8/30/2018 | 18-291 | | | >1 | | | >1 | | >1 | | | | | | | | | |
| 8/31/2018 | 18-293 | | | | | | 2 | | | | | | | | | | | |
| 8/31/2018 | 18-294 | | | | | | | | 1 | | | | | | | | | |
| 8/31/2018 | 18-296 | | | | | | 2 | | 2 | | | | | | | | | |
| 8/31/2018 | 18-297 | | | | | | | | | | | >1 | | | 2 | 2 | 2 | |
| 8/30/2018 | 18-298 | | | >1 | | | | | | | | | | | | | | |

AR01634

| Date | Case | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/31/2018 | 18-299 | | | | | | 2 | | | | | 3 | | 16 | 2 | 2 | | |
| 8/31/2018 | 18-300 | 76 | 1 | | | | | | | | | | | | | | | |
| 8/31/2018 | 18-307 | | | | | | 5 | | | | | | | | | | | |
| 8/31/2018 | 18-311 | | | | | | | | 1 Pill | | | | | | 11 Tabs | 11 | | |
| 9/1/2018 | 18-317 | | | | | | | | 1 | | | | | | | | | |
| 9/1/2018 | 18-318 | | | | | | 1 | | 1 | | | | | 1 | | | | |
| 9/1/2018 | 18-319 | | | 1 | | | | | 1 | | | | | | 5 Tabs | 5 | | |
| 9/1/2018 | 18-322 | | 1 | | | | 1 | | | | | | | 1 | | | | |
| 9/1/2018 | 18-323 | | 2 | 1 | | | 1 | | | | | | | | | | | |
| 9/1/2018 | 18-322 | | | | | | | | 3 | | | | | | | | | |
| 9/1/2018 | 18-330 | | 3 | | | | | | | | | | | | | | | |
| 9/1/2018 | 18-331 | | | | | | | | >1 | | | | | | | | | |
| 9/1/2018 | 18-332 | | | | | | | | 3 | | | | | | | | | |
| 9/1/2018 | 18-333 | | | | | | 6 | | 26 | | | | | 25.5 | | | | |
| 9/2/2018 | 18-334 | | 4 | | | | | | | | | | | | 2 Tabs/Liq | 2 | | |
| 9/2/2018 | 18-335 | | | | | | 1 | | | | | | | | | | | |
| 9/2/2018 | 18-336 | | 4 | 3 | | | | | 3 | | | | | | 31 Tabs | 31 | | |
| 9/2/2018 | 18-337 | | 4 | | | | | | | | | 5 Pills | | | Liquid | | | |
| **TOTAL WEIGHT/DOSAGES** | | 111 | 373.36 | 288 | 0 | 18 | 54 | 15 | 70 | 1 | 16 | 3 | 0 | 213 | 20 | 218 | 3 | 115 |

AR01635

Case 1:19-cv-03729-DLF   Document 65-15   Filed 07/12/21   Page 199 of 362



**Vermeys, Michael <mvermeys@blm.gov>**

## Re: CAD Reports SOW _2016 Event

Rosalie Barnes <rosalie@burningman.org>                                    Fri, Jul 22, 2016 at 9:56 AM
To: "Mack Jr, William" <wmack@blm.gov>
Cc: Charlie Dolman <charlie.dolman@burningman.org>, "Towne, Robert" <r1towne@blm.gov>, Mark Pirtle
<mpirtle@blm.gov>, Logan Briscoe <lbriscoe@blm.gov>, Jon Young <j5young@blm.gov>, Marnee Benson
<marnee.benson@burningman.org>, Red Grasso <red.grasso@burningman.org>, Roger Vind <roger.vind@burningman.org>,
Kate Gonnella <kate.gonnella@burningman.org>, Michael Vermeys <mvermeys@blm.gov>

Thank you very much! We appreciate the thoughtfulness of Jon's response to our questions. We will review the CR
Estimate and respond shortly. R

On Fri, Jul 22, 2016 at 9:32 AM, Mack Jr, William <wmack@blm.gov> wrote:
Good morning Rosalie and Charlie
Below please find (1) the response to the requested information on the CAD Data provided by BLM's subject matter
expert Mr. Jon Young and (2) a revised Cost Recovery Estimate-Agreement. As a result of collaboration and open
discussion between BLM and BRC over the past few weeks, more efficiencies were found which lead to the CRE
revision. Based on the very detailed and adequate response provided by Mr. Young to BRC's request, please send Mark
Pirtle your acceptance (or decline) email for the CAD SOW by end of business today. As you are aware it is almost the
end of July and there is still a lot that has to be completed by August 01, 2016 in order to keep the processing of BRC's
SRP on track and on time. Your attention to this matter is greatly appreciated. Thank You and please let me know if you
have any questions or concerns.


### PROLOGUE

Terminology and semantics are important in this realm. The term "data" is broad and should be narrowed and is
probably better defined and referred to as "statistics" and/or "statistical reports" and/or "CAD reports." The CAD
database contains large quantities of "data", much of which is Criminal Justice Information and is categorized as
Controlled Unclassified Information (CUI), pursuant to Executive Order 13556, and all of the records in this database are
subject to the Privacy Act of 1974, 5 U.S.C. § 552a, which establishes a code of fair information practices that governs
the collection, maintenance, use, and dissemination of information about individuals that is maintained in systems of
records by federal agencies. As such, BLM cannot share the "CAD data." What BLM can share, and does share, are the
"CAD Reports" statistical summaries of Incident Data, Event Data, number of Events, Types of events, all categorized
by ranges of dates / times, tags, labels, filters, etc. All of these items represent what is known as a "Data Dictionary."
CAD Reports are an analysis and structure of the underlying elements of the "Data Dictionary."

Another important part of this discussion is CAD versus RMS or Computer Aided Dispatch versus Records Management
System. A CAD system interfaces with an RMS to input captured data for use in creation of agency records and reports.
The CAD data represents a limited set of data regarding an event or incident. A Records Management System
represents a more comprehensive set of data regarding an event or incident.

*CAPTURING:*

Computer Aided Dispatch (CAD) systems are designed to allow for rapid information capture for the purposes of finding
and allocating resources to an event or incident which requires action. The primary purpose of a CAD system is
maintenance of information about available public safety resources, the secondary purpose of a CAD system is
information capture related to events. There are many other purposes, but another common purpose is creation of
reports. The main point to be made here is that it is not the primary purpose of a CAD system to analyze statistics and
create reports.

Responses are captured below each item

Motor Vehicle Accidents (Property, Injury, Fatal, Auto-Ped)

*BLM does not specifically track "Motor Vehicle Accidents" as an independent element in the CAD or RMS or
Data Dictionary. BLM instead tracks "Accident Investigations" regardless of the specific conveyance or type of
accident. Event types and Sub-types related to this are:*

**AR01120**

*ACCIDENT INVESTIGATION - FATAL*
*ACCIDENT INVESTIGATION - NON-FATAL*
*ACCIDENT INVESTIGATION - OTHER*
*ACCIDENT INVESTIGATION - PROPERTY DAMAGE ONLY*

*This is included in existing reports. This is included in report 2c) Event types and sub-type.*

1. Total number of accidents by type:

*This would be represented as the total number of events with event type "Accident Investigations" and would include the listed sub-event types above.*

*This is included in existing reports. This is included in report 2c) Event types and sub-type.*

2. Total number of persons injured:

*This would be represented as the total number of events with event type "Accident Investigation" with the sub-type of Non-Fatal.*

*This is included in existing reports. This is included in report 2c) Event types and sub-type.*

*It is unclear whether this query is only related to Motor Vehicle Accidents, however, BLM also tracks events in the "Medical" category which are:*

*MEDICAL MINOR*
*MEDICAL TRAUMA / MAJOR*
*MEDICAL MENTAL HEALTH*

*A report could be created which would aggregate the total number of Accident Investigation(s) - Fatal, Accident Investigation(s) - Non-Fatal and Medical Events. BLM does not have a specific use for this report, if BRC would like this report to be created on BLM side of the CAD, it would have to be specifically requested from the CAD Vendor.*

*A report could also be created from the BRC-ESD side of the CAD which would aggregate the total number of Trauma- Minor;*
*Medical, Minor; Medical, Serious; Trauma- Serious; Trauma- Minor . BLM does not have a specific use for this report, if BRC would like this report to be created on BRC-ESD side of the CAD, it would have to be specifically requested from the CAD Vendor.*

3. Total number of persons killed:

*This would be represented as the total number of events with event type "Accident Investigation" with the sub-type of FATAL. This would not be specific to Motor Vehicle Accidents, but would include any fatality. This included in existing reports.*

*This is included in existing reports. This is included in report 2c) Event types and sub-type.*

*This is also available on the BRC-ESD side of the CAD and would be represented as the total number of events with event type "Death." I do not know what, if any, reports were requested on the BRC-ESD side of the CAD. If this report exists, BLM would have a cursory interest in this report, if BRC would like this report to be created on BRC-ESD side of the CAD, it would have to be specifically requested from the CAD Vendor.*

4. Total hours of accident Investigations:

*A CAD report on this would not accurately capture the time spent on accident investigations, but would only capture the time spent at the scene of accident investigations based on CAD Data. This would be more accurately titled as "Total initial hours spent at the scene of accident investigations." BLM does not have a use for this type of report.*

Calls for Service (Dispatched or Field Generated):

1. Total number of dispatched calls for service by type:

*We do not differentiate between "Field Events" (Field Generated) and "Calls for Service." (Dispatched). The total number of events is available in existing reports and total number of events by type is available in*

**AR01121**

*existing reports.*

*This included in existing reports, however it will include all events as there is no differentiation between "Calls for Service" and "Field Events."*

*This is included in report 2c) Event types and sub-type.*

*This should also be available in the BRC-ESD CAD reports as it is a fairly standard report.*

2. Total number of field generated calls for service by type (excludes traffic stops):

*We do not differentiate between "Field Events" (Field Generated) and "Calls for Service." (Dispatched). The total number of events is available in existing reports and total number of events by type is available in existing reports. Traffic Stops are included in this report.*

*This included in existing reports, however it will include all events as there is no differentiation between "Calls for Service" and "Field Events."*

*This is included in report 2c) Event types and sub-type.*

*This should also be available in the BRC-ESD CAD reports as it is a fairly standard report.*

3. Dispatched Response time average by day (first dispatched to first arrived unit):

*These times are captured in every event. It would be possible to create a report such as this. Keep in mind the BLM model is a "Field Event" model not a "Call for Service" model, as such the "Dispatched Time" and "On Scene Time" are often the same time, therefore the "average" is likely to be very low. It is not clear to me what the purpose of a report such as this would be other than to evaluate a "Call for Service" model. BLM does not have a use for this report, if BRC would like this report to be created on the BLM side of the CAD, it would have to be specifically requested from the CAD Vendor.*

<u>Traffic Enforcement, Stops, Citations, Arrests, Verbal Warnings, MRO, Vehicle Searches:</u>

*Unfamiliar with the acronym MRO, the only thing I could find through a web search is "Mentally Retarded Offender (law enforcement)." Please clarify if needed.*

1. Total number of traffic stops for moving violation:

*These are two separate reports.*

*Total number of traffic stops is available in an existing report. This is included in report 2c) Event types and sub-type, however it does not have a sub-type.*

*Moving violations are only recorded as part of a "document" and "disposition" and are not recorded as traffic stops are made. It is possible to get the total number of "moving violations" for which a warning or federal violation notice was issued and the general category of the offense (Closure Order, etc.)*

*Total number of moving violations is available in an existing report. This is included in report 1c) Documents and Dispositions by Agency, this is also available in report 1a) Documents and Dispositions by Agency per Zone.*

2. Total number of traffic stops for equipment violation:

*These are two separate reports.*

*Total number of traffic stops is available in an existing report. This is included in report 2c) Event types and sub-type, however it does not have a sub-type.*

*Equipment violations are only recorded as part of a "document" and "disposition" and are not recorded as traffic stops are made. It is possible to get the total number of "equipment violations" for which a warning or federal violation notice was issued and the general category of the offense (Closure Order, etc.)*

*Total number of equipment violations is available in an existing report. This is included in report 1c) Documents and Dispositions by Agency, this is also available in report 1a) Documents and Dispositions by Agency per Zone.*

AR01122

Special Assignments, traffic control, prisoner transports, Temp holding staffing etc…:

Type of assignment:

*Special Assignments are not tracked through the CAD in a statistical fashion. An assignment "may" be captured in a notes field if an officer calls it in to dispatch. There is no report for this and it would not be possible to create one from this type of data.*

Response times (per areas / dispatch zone):

*It would be possible to create a report such as this. BLM does not have a specific use for this report, if BRC would like this report to be created on the BLM side of the CAD, they may request it from the CAD Vendor.*

Geographic trends (per time and crime):

*Geographic trends are available in a couple of reports. They pertain to event types and documents, dispositions. Actual criminal charges related to crimes are not captured in CAD, but are captured in RMS. It is not possible through the CAD to analyze crime trends as that data does not reside in the CAD.*

*Report 1b) shows documents and dispositions by zone. This report is shown in graphical bar charts with labels.*

*Report 2b) shows event types and sub-types by zone. This report is shown in graphical bar charts with labels.*

*BLM would like to develop maps related to geographic trends of events and documents during the event, but in most cases the GIS resources needed to do this are scarce on playa and cannot dedicate the time to creating these types of maps during the event. This would involve extracting the Point and Label data from the CAD and displaying it in a GIS Map format.*

**SUMMARY:**

**I appreciate the detailed email request and the critical thought which went into putting it together. Data capture and analysis is a fascinating topic. I appreciate the opportunity to provide thoughtful answers in the hopes of creating a better common understanding of what is captured, why it is captured and how we can use what we have to share openly and inform operations.**

*Respectfully,*

*******************************************
*William Mack, Jr.*
**Black Rock Field Office**
**Field Manager**
**Bureau of Land Management**
**Winnemucca District**
**5100 E. Winnemucca Blvd.**
**Winnemucca, NV 89445**
Office: **(775) 623-1578**
Cell: **(775) 455-5940**
Fax: **(775) 623-1503**
*"Black Rock Desert-High Rock Canyon*
*Emigrant Trails National Conservation Area"*
*******************************************



**AR01123**

**"In a moment of decision, the best thing you can do is the right thing to do, the next best thing is the wrong thing, and the worst thing you can do is nothing."**

**Theodore Roosevelt**

**Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain. [5 c.f.r. 2635.101(b)(1)]**

This e-mail, including any attachments, is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient or the employee or agent responsible for delivery of this e-mail to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this email or its contents is strictly prohibited. If you received this e-mail in error, please notify the sender immediately and destroy all copies.

On Thu, Jul 7, 2016 at 3:15 PM, Rosalie Barnes <rosalie@burningman.org> wrote:
Hello William and 2016 Planning Team, per our ongoing conversations about CAD reports from the 2016 Event, BRC wants to know if the following data points can be captured and shared with BRC. We will ask the contractor directly but we are asking you, BLM, now so you can inform us about any resistance or regulations that might prevent the sharing of this content.

Motor Vehicle Accidents (Property, Injury, Fatal, Auto-Ped)
1. Total number of accidents by type:
2. Total number of persons injured:
3. Total number of persons killed:
4. Total hours of accident Investigations:

Calls for Service (Dispatched or Field Generated):
1. Total number of dispatched calls for service by type:
2. Total number of field generated calls for service by type (excludes traffic stops):
3. Dispatched Response time average by day (first dispatched to first arrived unit):

Traffic Enforcement, Stops, Citations, Arrests, Verbal Warnings, MRO, Vehicle Searches:
1. Total number of traffic stops for moving violation:
2. Total number of traffic stops for equipment violation:

Special Assignments, traffic control, prisoner transports, Temp holding staffing etc…:
1. Type of assignment:

Response times (per areas / dispatch zone):

Geographic trends (per time and crime):

Please let us know as soon as you can! Happy to set up a call!

Thank you,

--
Rosalie Fay Barnes
Government Relations Manager
Burning Man

(c) 617-285-2867
(o) 415-865-3800 ext.163

--
Rosalie Fay Barnes
Government Relations Manager
Burning Man

**AR01124**

(c) 617-285-2867
(o) 415-865-3800 ext.163

AR01125



**Pirtle, Mark <mpirtle@blm.gov>**

## Re: Medical Trailer MOU
1 message

**Mack Jr, William <wmack@blm.gov>**          Fri, Jun 17, 2016 at 1:03 PM
To: Marnee Benson <marnee.benson@burningman.org>
Cc: "Pirtle, Mark" <mpirtle@blm.gov>, Charlie Dolman <charlie.dolman@burningman.org>, Rosalie Barnes
<rosalie@burningman.org>, Erin MacCool <playground@burningman.org>

Thank You Marnee. The BLM has made great strides this year in identifying efficiency in our plans and operations going
into the 2016 event. BLM understands BRC's opinion however it is the BLM who decides what operational needs are
necessary for BLM staff during the event as BRC determines what is best and necessary for BRC's staff. As we discussed
on our call yesterday a Cost recovery Agreement will need to be in place very soon in order for the BLM to fully and
timely process the permit; this includes being able to complete government contracts associated with the event. Thank
You again.


*Respectfully,*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
*William Mack, Jr.*
**Black Rock Field Office**
**Field Manager**
**Bureau of Land Management**
**Winnemucca District**
**5100 E. Winnemucca Blvd.**
**Winnemucca, NV 89445**
Office: (775) 623-1578
Cell: (775) 455-5940
Fax: (775) 623-1503
*"Black Rock Desert-High Rock Canyon*
*Emigrant Trails National Conservation Area"*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



**"In a moment of decision, the best thing you can do is the right thing to do, the next best thing is the wrong thing, and the worst
thing you can do is nothing."**

**Theodore Roosevelt**

Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private
gain. [5 c.f.r. 2635.101(h)(1)]

This e-mail, including any attachments, is intended for the use of the individual or entity to which it is addressed. It may contain information that is
privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient or the employee or agent responsible for delivery of
this e-mail to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this email or its contents is strictly
prohibited. If you received this e-mail in error, please notify the sender immediately and destroy all copies.


On Fri, Jun 17, 2016 at 12:45 PM, Marnee Benson <marnee.benson@burningman.org> wrote:
   Mark and William-

   Thank you for the opportunity to consider an MOU between BRC and BLM for BRC to provide BLM's medical trailer
   through an SOW rather than cost recovery. This option would save BRC the significant expense of the 23.1% indirect

AR01108

Case 1:19-cv-03729-DLF Document 35-25 Filed 04/17/21 Page 206 of 362

administrative cost assessment and save BLM logistical and operational time and effort. As proposed, the MOU would also try to preserve BRC's right to a refund if the trailer and medical operation are found to be unnecessary per our 2015 cost appeal.

That being said, we have decided not to move forward with an MOU for the BLM medical function. BRC feels we would need more time to vet the MOU option, and we understand BLM needs to move forward quickly. As you know, BRC believes that the BLM medical function as mandated in 2015 is unnecessary and should not be a requirement for our permit. We would prefer this requirement be removed or modified significantly, and therefore feel it best to keep the program in cost recovery. BRC does not want to appeal 2016 costs but may have to, and this process ensures our rights.

Thank you again for your thinking on this issue, and please let me know if we've missed anything. We greatly appreciate your flexibility as we work together to create improved processes and agreements.

Mamee Benson
Political Affairs Manager
**Burning Man**
mamee.benson@burningman.org
w. (415) 865-3800
c. (775) 722-9693
www.burningman.org

AR01109

**INFORMATION/BRIEFING MEMORANDUM**
**FOR THE STATE DIRECTOR – NEVADA**

**DATE:**       May 15, 2017

**THROUGH:**   Michael Toombs, Winnemucca District Manager (Acting) *[signature]* 5/15/2017

**FROM:**       Mark Hall, Black Rock Field Office Manager (acting) and Authorizing Official
               for the 2017 Burning Man Event   *MEHall*   9/14/2017

**SUBJECT:**    Bureau of Land Management (BLM) Informational Briefing regarding Law
               Enforcement (LE) Substation at Burning Man Event

This memorandum provides background on the BLM LE Substation at the Burning Man Event.

**KEY FACTS**

*Stakeholder Positions: Black Rock City LLC (BRC), expressed concerns regarding the cost of the LE Substation as unnecessary to the administration of the Burning Man SRP. BRC states in the 2016 Cost Recovery Appeal, "What is unreasonable is BLM's decision to charge BRC for services that are unneeded or redundant to what BRC already provides." Further BRC states in the 2016 Cost Recovery Appeal "Even if these law enforcement personnel did provide directions and engage in other community service activities, these activities were entirely discretionary, unnecessary, and duplicative of the extensive infrastructure and support services that BRC already provides through its thousands of volunteers and employees."*

*Public Lands Affected: Portions of the Black Rock Desert-High Rock Canyon Emigrant Trails National Conservation Area; Black Rock Field Office; Winnemucca District*

**BACKGROUND**

The Joint Operations Center (JOC) houses BLM and Pershing County Law Enforcement activities, to include command staff, investigations, report writing, and the jail. The JOC is located approximately ½ mile from the outside of Black Rock City proper, limiting participant access to these law enforcement resources. In 2013, the BLM purchased a trailer to be used as the LE Substation at the event with the goal of improving participants' access to BLM law enforcement services within the city. This BLM LE Substation trailer has been located in the heart of Black Rock City, next to Rampart hospital, since 2013. As a result, participants of the event know where they can contact law enforcement to report criminal activity, which is beneficial to the health and safety of the public.

The substation has provided a local, established location where participants can come to report criminal activity within the city, file missing person's reports, ask for directions, and serves as a report writing station for law enforcement. The report writing function of the LE Substation allows

1

for efficiency and reduces labor costs because officers can write a report without travelling out of the city to the JOC. The LE Substation affords a location central to the city for interviews of witness and victims without the added stress of removing witnesses and victims to the JOC for interviews. The LE Substation is equipped with a radio, which allows officers to coordinate a response to a crime report within the city. After Action Reviews (AARs) in 2013, 2014, 2015, and 2016 respectively reported positive feedback from participants regarding positive interactions with BLM law enforcement at the LE Substation.

During the 2013 and 2014 events, two officers were assigned rotating two-hour shifts twenty-four hours a day during the main event. In addition to improving participant accessibility to law enforcement, the LE substation instituted a community policing element during the 2013 and 2014 event. This involved outreach to participants by "gifting" swag, in line with BRC's gifting culture, one of Burning Man's Ten Principles.

In the 2015 and 2016 event, the number of officers assigned to work the substation was reduced from two to one. This staffing allowed minimal impacts to patrol sectors in accommodating substation staffing. The primary focus of the substation was to provide participant access to law enforcement and allow for more efficient reporting, with a secondary focus on community outreach.

**DISCUSSION**

In a 2017, Black Rock City LLC appealed the cost of staffing and equipping the LE Substation as a measure of cost recovery as unnecessary for the administration of the Special Recreation Permit (SRP). BLM contends the functions fulfilled by the LE Substation (i.e. criminal reporting, report writing, interview capacity, and community outreach) would not be necessary in the NCA absent the Burning Man Event SRP. The LE Substation is not a redundancy to the Black Rock Ranger station because it is staffed with sworn law enforcement officers capable of receiving criminal reports and coordinating a law enforcement response. Visitation to the LE Substation is evidence that, while Black Rock Rangers and Earth Guardians provide useful service to participants, these services are not sufficient to meet the needs of participants looking for directions or reporting crimes within Black Rock City.

It is customary in municipalities to staff a law enforcement substation central to the population with strong community outreach to build trust with citizens and increase operational efficiencies. The International Association of Chiefs of Police (IACP) recognize the importance of mobile computing capabilities specifically at substations to increase efficiencies and increase proximity of officers to citizens. Burning Man touts Black Rock City as one of the largest cities in Nevada during Main Event and as such it is reasonable to compare municipality policing methodology to the event modeling as nothing else like it exists on lands administered by the BLM.

As each year is a new event, the BLM Planning Team will pay one ranger solely with BLM funds (L1232 and L1711) to perform community outreach, working a 13-hour day shift. This outreach will be counted in these programs workload measures, and the position will not be counted against a patrol position on the event Table of Organization. This approach has not been done in the past.

2

The LE Substation will continue to be staffed 24 hours a day under the cost recovery agreement to cover the law enforcement function of the LE Substation.  This will allow the BLM unscrutinized outreach, funded solely by BLM, without interrupting the primary mission of the LE Substation.

**NEXT STEPS**

The 2017 BLM LE Burning Man planning team will continue to utilize the LE Substation during Main Event for purposes of providing participant access to law enforcement services within the city as well as providing officers' access to report writing.  The LE Substation will continue to be staffed with one ranger, continuing the staffing reduction implemented in 2016, funded through cost recovery.   Since BRC cannot provide law enforcement services to the participants of the event, the LE Substation is necessary to ensure participants have direct access to BLM and Pershing County law enforcement.  Additionally, the Winnemucca District Office will pay one ranger solely with BLM funds to perform community outreach at the LE Substation, working a 13-hour day shift.  This allows for two rangers staffing the LE Substation during daytime hours.

3

AR04818

 **United States Department of the Interior** 

BUREAU OF LAND MANAGEMENT
Office of Law Enforcement and Security
1849 C Street NW
Washington, DC 20240

June 8, 2015

Memorandum

To:         Carole Carter-Pfisterer, Assistant Director, Human Capital Management

From:       Salvatore Lauro, Director, Office of Law Enforcement and Security

Subject:    Lifting of Pay Cap for personnel deployment to Interior Lands in Nevada in support of
            the 2015 Burning Man Event

I request the personnel deployment to Public Lands in Nevada, in support of the 2015 Burning Man
Event, be designated as an emergency special event as stated in 5 CFR 550.103. If approved, this request
would allow for lifting the bi-weekly pay cap as authorized by 5 CFR 550.106 and the Fair Labor
Standards Act (FLSA) overtime requirements under 5 CFR 551.221(f) for personnel participating in
direct support of this event. These employees would then be entitled to premium pay under the annual
maximum earning limitations while performing the emergency work.

The FLSA status of the employees assigned to the 2015 Burning Man Event shall be reviewed and
administered in accordance with previously cited Federal regulations. If approved, the temporary waiver
of the bi-weekly pay cap as well as the emergency determination for deciding FLSA designations shall
begin on approximately August 16, 2015 and continue until the conclusion of the 2015 Burning Man
Event, approximately September 13, 2015.

The Office of Law Enforcement and Security will designate a point of contact to keep a record of this
situation, including the date the emergency began, the number of employees affected, hours expended for
the specific mission, and the type of premium pay involved.

[√] Approved          [   ] Disapproved

Carole Carter-Pfisterer                        6/15/15
Carole Carter-Pfisterer                        Date

AR00703

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**for providing Microwave Internet, technical services and support in the Gerlach, NV area for the
BLM 2016 Burning Man Event**

**PROJECT TITLE:**

BLM 2016 Burning Man Microwave Internet

**BACKGROUND:**

The Burning Man Recreational Event is an international art festival and an experiment in a "temporary community dedicated to radical self-expression and self-reliance". The temporary community of Black Rock City is created for eight days and becomes the 7th largest city in Nevada. The event takes place on the Black Rock Desert within the Black Rock/High Rock NCA, managed by the Winnemucca District Office. A Special Recreation Permit (SRP) is issued to Black Rock City LLC which is responsible for all activities within Black Rock City. The SRP has approximately 13 general stipulations and 55 special stipulations. The BLM also generates a Closure Order for the event that is announced in the Federal Register which designates the event area as a temporary closure and documents temporary restriction of certain activities within the temporary closure.

The BLM's operational mission is to ensure public safety and resource protection through the enforcement of the event closure order, the SRP stipulations, Federal laws/regulations and Nevada state laws/regulations at the event. To accomplish this mission the BLM has adopted the Incident Command System (ICS) and integrated multiple agencies into one operation. The ICS operation will be a combination of overhead, operational and support positions. The ICS operation will cover all three event periods of the detail: Pre-Event; Main Event; Post-Event (8/23 - 9/9: 18 days).

**SCOPE OF WORK:**

The Contractor shall provide a fully functional FCC Licensed carrier class microwave network and associated Wireless Internet Service, technical services, technical support, software applications and hardware to ensure a fully functional, operational and reliable Law Enforcement Data network and Incident network at the Joint Operations Center (JOC).

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**REQUIREMENTS:**

Required equipment, services, tasks and responsibilities of the contractor shall consist of the following:

1. **Internet over microwave at BLM HQ, 30 Mbps bi-directional (minimum):**
   Contractor must provide an FCC licensed carrier class microwave network and associated Wireless Internet Service which will be sent to the JOC via microwave transmission, encrypted with FIPS140-2 compliant AES 256k encryption at licensed frequency/frequencies to prevent interference and interception. The contractor must provide all necessary public and private IP addressing.

2. System must be built, deployed, tested and operational by Wednesday, August 17, 2016 at 23:59 hours.

3. Contractor must be prepared to handoff an Ethernet service connection at a demarcation point at the JOC on August 17, 2016 at 23:59 hours or sooner.

4. Contractor must have technical support available during the entire "PERIOD OF SERVICE." Contractor must have dedicated technical support personnel available to respond within 4 hours in the event of network failure.

5. Contractor must provide a "High Availability Network" (5-9's or 99.999% per year / or 99.5% per 24 hours). System "High Availability" is required from 08/17/2016 23:59 hours through 09/09/2016 23:59 hours.

6. Contractor must provide network bandwidth which is dedicated and must not be shared with other clients. Minimum bandwidth requirement is 30 Mbps bidirectional.

7. Contractor must provide a microwave system which is fully FCC licensed on the routes to the primary delivery location at the JOC, to prevent interference / interception and to meet with federal requirements. Contractor is responsible for any and all costs and/or fees for licensing.

8. Weather including wind, dust and rain are common at the location. The network must be capable of operation regardless of weather conditions.

9. It is a requirement for this contractor to work collaboratively and cooperatively with additional contractors, vendors, federal, state, local agencies during the performance period both at the location and at off-site locations if necessary.

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**10.** The contractor shall provide all system design and pre-event engineering. The contractor shall provide a detailed written plan and technical drawing and furnish it to the BLM Project Lead as soon as possible after contract award, but no later than Monday August 15th, 2015 17:00 hours.

**11.** The contractor shall provide a temperature controlled environment for all indoor system electronics.

**12.** The contractor shall provide a "relatively" dust free / dust controlled environment for all indoor system electronics.

**13.** The contractor shall provide any on-site transportation needed for contractor personnel and contractor equipment at the location during the performance period.

**14.** The contractor shall be responsible for all transportation of all contractor personnel and contractor equipment to and from the event.

**15.** The contractor shall be responsible for all power for remote repeater locations and/or any part of the network which is not at the JOC.

**16.** If the contractor chooses to use solar power at remote repeater locations, the system must be engineered to include an uninterruptible power supply (UPS) capable of maintaining the system at "High Availability."

**17.** The contractor shall be available to participate in pre-coordination meetings by telephone and/or video teleconference.

**18.** The contractor shall provide reports on bandwidth utilization and monitoring for the duration of the "Service Period." Daily, Weekly and Service Period Reports will be provided at the request of the Project Inspector. Proactive delivery of reports through electronic delivery by email is desired.

**OCCUPATION / OCCUPATION CODE(s):**

http://www.bls.gov/soc/
15-1143 Computer Network Architects
15-1152 Computer Network Support Specialists
49-2021 Radio, Cellular, and Tower Equipment Installers and Repairers

**SPECIAL REQUIREMENTS:**

The microwave network will require a network to be built over long distances in a remote geographic area, which typically involves placing temporary hardware, such as repeaters/relays

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

on mountain peaks or ridgelines. The contractor will be required to gain access to remote, rugged terrain of their choosing in order to build a functional network. Much of the land in this geographic area is under the administration and management of the United States Department of the Interior, Bureau of Land Management (BLM.) If the contractor selects repeater locations which are on lands administered and managed by BLM, BLM will grant the contractor any necessary temporary authorizations which may be needed to access or use those locations. No authorization shall be granted in violation of laws or regulations. If the contractor selects repeater locations which are not on lands administered and managed by BLM, such as privately owned, tribal or other lands, the contractor is responsible for obtaining any necessary authorizations which may be needed to access or use those locations. Selection of these sites, must be done in conjunction with BLM. The contractor is responsible for any costs or fees necessary to access these locations or obtain agreements to use these locations. The contractor shall be responsible for any specialized vehicles or equipment needed to access remote locations or install equipment at these locations.

**GOVERNMENT FURNISHED REQUIREMENTS:**

The tasks and responsibilities of the government shall consist of the following:

1. Provide electrical power to the contractor electrical equipment for the network at the BLM JOC.
2. Provide a government Project Lead for coordination and direction pre-event and on-site.
3. Provide a shipping address in Gerlach, Nevada to the contractor may ship small and urgent packages necessary to the project.
4. The government MAY provide temporary storage for contractor equipment pre-event and post-event at the BLM Black Rock Station in Gerlach, Nevada, if space is available which will not adversely affect normal government operations at this site.

**ACKNOWLEDGEMENTS:**

The government acknowledges the network at the BLM JOC and within Black Rock City is dependent on power provided by the government and/or another contractor to the government. The contractor will not be responsible for system outages or failures which are caused by lack of power or power inadequacies. The contractor is responsible for providing contractor power requirements for the location to the government in advance of the performance period, but not later than August 15th, 2016.

**DELIVERABLES:**

The tasks and responsibilities identified in the Statement of Work shall fall into the following categories:

1. Technical Services
2. Network Services

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

3. Data Services
4. System Administration Services
5. Network Administration Services
6. Accounting of Billable Activities

The contractor shall provide a detailed accounting of all billable services following the period for which the services were performed.

## UNITED STATES DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## OFFICE OF LAW ENFORCEMENT AND SECURITY

## STATEMENT OF WORK (SOW)

**LOCATION:**

BLM 2015 Burning Man BLM Joint Operations Center (BLM JOC)

Black Rock Desert near Gerlach, NV (Pershing County, Nevada)

2016 City location(s):

The Man                N40.78630, W-119.20650

Perimeter Point 1      N40.78300, W -119.23562

Perimeter Point 2      N40.80598, W -119.21944

Perimeter Point 3      N40.80221, W -119.18559

Perimeter Point 4      N40.77628, W -119.18008

Perimeter Point 5/BLM JOC  N40.76436, W -119.21094

It is expected that the network will require infrastructure placement in multiple locations possibly in multiple counties, in order to deliver service to the above location.

**PERIOD OF PERFORMANCE:**

From Contract Award through completion. August 1, 2016 (estimated) through July 31, 2016.

**PERIOD OF SERVICE:**

August 17, 2016 through September 9, 2016. (24 Days)

08/17/2016 – Provided Services at BLM JOC fully operational at or before 23:59 hours

09/08/2015 – "Post Patrol" portion of event ends, contractor begins "break down"

09/08/2015 – Contractor may depart when "break down" complete.

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**LEGAL AUTHORITIES AND REGULATORY REQUIREMENTS:**

The design, construction and operation of the network and transmission of all data must comply with all commonly accepted commercial network standard and regulations and with the following legal and regulatory requirements:

- 44 U.S.C. § 3541– Federal Information Security Management Act (FISMA) of 2002
- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 140-2, Security Requirements for Cryptographic Modules
- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 197, Advanced Encryption Standard (AES) 256 bit cypher.
- 28 C.F.R. § 20 - Criminal Justice Information Systems
- 43 C.F.R. Public Lands: Interior
- 16 U.S.C. § 470 – National Historic Preservation Act

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

 **CONTACTS:**

**BLM Project Lead/Technical Point of Contact/Project Inspector (PI)**

Jon Young
State Chief Ranger
Bureau of Land Management
One North Central Avenue Suite 800
Phoenix, AZ 85004-4427
(O): 602-417-9319
(C): 623-826-1286
(F): 602-417-9545
j5young@blm.gov

**BLM Contracting Specialist**

Kim Ferguson, Contract Specialist
BLM Nevada State Office
(Ely District Office)
702 No Industrial Way, Ely, NV 89301
Ph: 775-861-6441
Cell: 775-861-6443
Fx: 775-549-9827
k1fergus@blm.gov

**BLM Procurement Analyst**

David W. Appold
Supervisory Procurement Analyst
Division of Support Services
BLM Nevada
 (775) 861-6417 (Phone)
(775) 861-6634 (Fax)
dappold@blm.gov

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**for providing IP Network, technical services and support in the Gerlach, NV area for the BLM 2016 Burning Man Event**

**PROJECT TITLE:**

BLM 2016 Burning Man IP Network

**BACKGROUND:**

The Burning Man Recreational Event is an international art festival and an experiment in a "temporary community dedicated to radical self-expression and self-reliance". The temporary community of Black Rock City is created for eight days and becomes the 7th largest city in Nevada. The event takes place on the Black Rock Desert within the Black Rock/High Rock NCA, managed by the Winnemucca District Office. A Special Recreation Permit (SRP) is issued to Black Rock City LLC which is responsible for all activities within Black Rock City. The SRP has approximately 13 general stipulations and 55 special stipulations. The BLM also generates a Closure Order for the event that is announced in the Federal Register which designates the event area as a temporary closure and documents temporary restriction of certain activities within the temporary closure.

The BLM's operational mission is to ensure public safety and resource protection through the enforcement of the event closure order, the SRP stipulations, Federal laws/regulations and Nevada state laws/regulations at the event. To accomplish this mission the BLM has adopted the Incident Command System (ICS) and integrated multiple agencies into one operation. The ICS operation will be a combination of overhead, operational and support positions. The ICS operation will cover all three event periods of the detail: Pre-Event; Main Event; Post-Event (8/25 - 9/11: 18 days).

**SCOPE OF WORK:**

The Contractor shall provide a fully functional computer network, technical services, technical support, software applications and hardware to ensure a fully functional, operational and reliable Law Enforcement Data network and Incident network at the BLM Headquarters (BLM JOC) and other nearby locations in "Black Rock City, Nevada."

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**REQUIREMENTS:**

Required equipment, services, tasks and responsibilities of the contractor shall consist of the following:

1. **Network design, configuration, routing and switching**
   Contractor must provide layer 2 and/or layer 3 network design and configuration, which will allow for configuration and creation of multiple simultaneous Local Area Network (LAN) segments. The contractor must then implement this network.  The contractor must provide all necessary private IP addressing, unless otherwise provided. Public IP addressing will be Government Furnished Equipment (GFE).

2. **Ethernet Cabling at BLM JOC.**
   Contractor must provide, run, install, bury, secure and terminate Category 5 (cat 5) or higher cabling at the BLM JOC to the "critical" buildings identified by the government. A trenching machine is available on site to assist with long or difficult cable runs as needed and will be coordinated on-site through the Burning Man / BLM Facilities Manager. The "critical" buildings are listed below and shown on an attached map, but this is a highly dynamic event and the contractor should account for unplanned changes and adjustments.
   Critical Buildings for wired Ethernet:
   - Integrated Command
   - Event Support
   - Emergency Dispatch Center (EDC) aka "Dispatch"
   - Jail
   - Medical
   - Investigations
   - Report writing

3. **GOVERNMENT only Wi-Fi access at BLM JOC:**
   Contractor must provide robust, reliable, Wi-Fi network to provide coverage of the entire BLM JOC. Hidden and password protected SSID allows only BLM and other authorized personnel to access the Wi-Fi network. Wi-Fi network may or may not use MAC address control. MAC address control is not desirable due to the temporary nature of this network and event. Wi-Fi network must be capable of simultaneously supporting a minimum of 200 devices with independent leases.

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

4. **Verizon Wireless cell signal extender(s) (minimum 1):**
   Contractor to provide a solution for BLM cell service at BLM JOC over the IP network for failover / backup. Each unit must be capable of 6 simultaneous cellular telephone calls. The one (1) minimum extender must allow for 18 simultaneous cellular phone calls at BLM JOC. Contractor must be able to manage access list of cellular device subscribers from BLM, if needed. Contractor must be able to manage and adjust access list during event to add cellular device subscribers as needed throughout the event duration.

5. **GOVERNMENT only access network and Wi-Fi extended to center camp:**
   Contractor shall extend the network and the internet from BLM JOC to the law enforcement substation near center camp. Contractor must provide an Ethernet connection to the Sub-Station. Wi-Fi speed and connection will be subject to the end user's device antenna gain.

6. **Pan Tilt Zoom (PTZ) IP Camera**
   Contractor must provide a Pan Tilt Zoom (PTZ) IP Camera at the Law Enforcement substation near center camp. The PTZ camera must be able to be controllable over the extended microwave network from the BLM JOC. The contractor must provide at least one PTZ controller at BLM JOC with a large flat screen high definition television for monitoring (42" minimum diagonal.) The contractor must install, setup and configure all related equipment at all locations.

7. **IP Cameras for "In-Custody" suspect monitoring at jail**
   Contractor must provide, install, configure and test a minimum of two (2) IP Cameras in the jail and one (1) camera outside the jail at the BLM JOC. The cameras must be able to be monitored over the network at the BLM JOC in the Investigations Building. The cameras will be placed in opposite corners of the jail and should be wide view cameras to ensure the entirety of the jail is seen through the use of both cameras. The cameras must record video and audio. The contractor must provide, install configure and test a monitor, controller (if needed) and Network Video Recorder (NVR) in a building to be determined on-site, this will be to monitor the cameras inside and outside the jail. The cameras must be able to be monitored on a single display screen in a split view format. The monitor must be a large flat screen high definition television for monitoring (42" minimum diagonal.) The contractor must provide a wall mount for the display. The Network Video Recorder (NVR) must be capable of recording all camera feeds for 24 hours continuously. The NVR must have the ability to easily extract the video through a USB port or SD Card for case information. The NVR should have the ability to simultaneously record the video to multiple recording devices, such as hard drives or Network Accessible Storage (NAS). The contractor must provide a minimum of two (2) signs which state "Warning Audio and Video Surveillance In Progress" or similar. The contractor must install, setup and configure all related equipment at all locations.

8. **Voice Over Internet Protocol (VOIP) telephone lines and telephones**

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

Contractor must provide a minimum of 17 VOIP telephone circuits or independent phone lines, which must be capable of operating simultaneously and have individually assigned numbers. Each phone must allow for long distance calling through standard dialing procedures. The contractor will be responsible for any and all charges associated with this service. The contractor will furnish a list of phone numbers to the government POC, as soon as possible before the event. The contractor shall provide a minimum of twenty one (20) telephone handsets, setup installed and maintained. These handsets must include speaker phone function.

9. **Voice Over Internet Protocol (VOIP) Facsimile (FAX) lines**
   Contractor must provide a minimum of 2 VOIP fax circuits or independent fax lines, which must be capable of operating simultaneously and have individually assigned numbers.  Each fax must allow for long distance calling through standard dialing procedures. The contractor will be responsible for any and all charges associated with this service. The contractor will furnish a list of fax numbers to the government POC, as soon as possible before the event. Fax machines are Government Furnished Equipment (GFE.)

10. Contract personnel must arrive on site at the location on Wednesday, August 17, 2016 and begin set-up and no later than 17:00 hours.

11. Network and Internet access to the Emergency Dispatch Center (EDC) will be a priority and must be delivered NLT Friday, August 19th, at 23:59 hours.

12. System must be fully built, deployed, tested and operational by Monday, August 22, 2016 at 23:59 hours.

13. Contractor must have dedicated technical support on-site during the entire "Service Period." Contractor must have dedicated technical support personnel available to respond within 15 minutes in the event of network failure.

14. Contractor must provide a "High Availability Network" (5-9's or 99.999% per year / or 99.5% per 24 hours). System "High Availability" is required from 08/23/2016 00:01 hours through 09/09/2016 23:59 hours.

15. Contractor must provide a network which is dedicated and must not be shared with other clients.

16. Contractor must provide a microwave system on the routes from the BLM JOC to the LE Substation. To prevent interference / interception the contractor will be required to do frequency coordination with other microwave users. Should there be any; contractor is responsible for any and all costs and/or fees for licensing.

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**17.** Weather including wind, dust and rain are common at the location. The network must be capable of operation regardless of weather conditions.

**18.** Contractor must provide for a full contingency / failover option at the location. Contingency / failover must be readily deployed during the performance period. Contingency / failover must be automatically deployed by the contractor in the event of known primary system outage or failure. Automatically is defined as: "If the contractor is aware of an outage or failure, they should take immediate action to correct the outage or failure without a request from the government." This does not mean the "Contingency/Failover" happens through machine automation. Any machine automation to reduce potential downtime is preferred.

**19.** It is a requirement for this contractor to work collaboratively and cooperatively with additional contractors, contractors, federal, state, local agencies during the performance period both at the location and at off-site locations if necessary.

**20.** The contractor shall provide all system design and pre-event engineering. The contractor shall provide a detailed written plan and technical drawing and furnish it to the BLM Project Lead as soon as possible after contract award, but no later than Wednesday, August 17th, 2016 17:00 hours.

**21.** The contractor shall provide a temperature controlled environment for all indoor system electronics.

**22.** The contractor shall provide a "relatively" dust free / dust controlled environment for all indoor system electronics.

**23.** The contractor shall be responsible for lodging of contractor personnel on-site through the use of a contractor furnished RV or camper trailer. The government will provide space for parking and power, potable water and sewage service.

**24.** The contractor shall be responsible for food and beverages for contractor personnel from August 17th through August 22nd. Catering service will begin on August 23, 2016. Catering service will conclude on September 7, 2016. The contractor shall be responsible for food and beverages for contractor personnel from September 8th to 9th.

**25.** The contractor shall provide any on-site transportation needed for contractor personnel and contractor equipment at the location during the performance period.

**26.** The contractor shall be responsible for all transportation of all contractor personnel and contractor equipment to and from the event.

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**27.** The contractor shall be responsible for all power for remote repeater locations and/or any part of the network which is not at the BLM JOC or in Black Rock City.

**28.** If the contractor chooses to use solar power at remote repeater locations, the system must be engineered to include an uninterruptible power supply (UPS) capable of maintaining the system at "High Availability."

**29.** The contractor is encouraged to engineer the network to include an uninterruptible power supply (UPS) at the BLM JOC and the substation.

**30.** The contractor shall be available to participate in pre-coordination meetings by telephone and/or video teleconference.

**31.** The contractor shall provide network monitoring and network filtering to increase productivity, regulate bandwidth usage, and prevent risky behavior through enforcement of granular policies on user activities. The contractor shall provide network hardware and/or software to control access to web sites, applications, and Web 2.0 platforms based on users, groups, time, bandwidth, and other criteria. The contractor will conduct these activities at the direction of the Project Inspector.

**32.** The contractor shall provide reports on bandwidth utilization and monitoring for the duration of the "Service Period." Daily, Weekly and Service Period Reports will be provided at the request of the Project Inspector. Proactive delivery of reports through electronic delivery by email is desired.

**OCCUPATION / OCCUPATION CODE(s):**

> http://www.bls.gov/soc/
> 15-1152 Computer Network Support Specialists
> 49-2021 Radio, Cellular, and Tower Equipment Installers and Repairers

**GOVERNMENT FURNISHED REQUIREMENTS:**

The tasks and responsibilities of the government shall consist of the following:

1. Provide through third party service provider(s) microwave internet transport, bandwidth and public IP addressing for use by the contractor.
2. Provide onsite parking for contractor furnished RV or camper trailer.
3. Provide electrical power to the contractor furnished RV or camper trailer.
4. Provide electrical power to the contractor electrical equipment for the IP network at the BLM JOC and the Sub-Station.
5. Provide food and beverages for the contractor through catering service from August 23rd through September 7th.
   a. Meals will be served three times per day at regular intervals.

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

      b.  Meals will be provided for no more than five contractor personnel.

6. Provide water fill service through an on-site contractor.
7. Provide sewage pump out service through an on-site contractor.
8. Provide a government Project Lead for coordination and direction pre-event and on-site.
9. Provide a shipping address in Gerlach, Nevada to the contractor may ship small and urgent packages necessary to the project.
10. The government MAY provide temporary storage for contractor equipment pre-event and post-event at the BLM Black Rock Station in Gerlach, Nevada, if space is available which will not adversely affect normal government operations at this site.

**ACKNOWLEDGEMENTS:**

The government acknowledges the network at the BLM JOC and within Black Rock City is dependent on power provided by the government and/or another contractor to the government. The contractor will not be responsible for system outages or failures which are caused by lack of power or power inadequacies. The contractor is responsible for providing contractor power requirements for the location to the government in advance of the performance period, but not later than August 17th, 2016.

The government acknowledges the network at the BLM JOC and within Black Rock City is dependent on transport provided by the government and/or another contractor to the government. The contractor will not be responsible for system outages or failures which are caused by lack of transport or transport inadequacies. The contractor is responsible for documenting and immediately reporting any issues with transport to the government project lead.

**DELIVERABLES:**

The tasks and responsibilities identified in the Statement of Work shall fall into the following categories:

1. Technical Services
2. Network Services
3. Data Services
4. System Administration Services
5. Network Administration Services
6. Accounting of Billable Activities

The contractor shall provide a detailed accounting of all billable services following the period for which the services were performed.

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**LOCATION:**

BLM 2016 Burning Man BLM Headquarters (BLM JOC)

Black Rock Desert near Gerlach, NV (Pershing County, Nevada)

2016 City location(s):

| | |
|---|---|
| The Man | N40.78630, W-119.20650 |
| Perimeter Point 1 | N40.78300, W -119.23562 |
| Perimeter Point 2 | N40.80598, W -119.21944 |
| Perimeter Point 3 | N40.80221, W -119.18559 |
| Perimeter Point 4 | N40.77628, W -119.18008 |
| Perimeter Point 5/BLM JOC | N40.76436, W -119.21094 |

It is expected that the network will require infrastructure placement in multiple locations possibly in multiple counties, in order to deliver service to the above location.

**PERIOD OF PERFORMANCE:**

From Contract Award through completion. July 1, 2016 (estimated) through July 31, 2017.

**PERIOD OF SERVICE:**

August 17, 2016 through September 9, 2016. (25 Days)

08/17/2016 – Contractor must arrive at BLM JOC begin "setup"

08/22/2016 – Provided Services at BLM JOC fully operational at or before 23:59 hours

09/8/2016 – "Post Patrol" portion of event ends, contractor begins "break down"

09/9/2016 – Contractor may depart when "break down" complete.

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**LEGAL AUTHORITIES AND REGULATORY REQUIREMENTS:**

The design, construction and operation of the network and transmission of all data must comply with all commonly accepted commercial network standard and regulations and with the following legal and regulatory requirements:

- 44 U.S.C. § 3541– Federal Information Security Management Act (FISMA) of 2002
- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 140-2, Security Requirements for Cryptographic Modules
- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 197, Advanced Encryption Standard (AES) 256 bit cypher.
- 28 C.F.R. § 20 - Criminal Justice Information Systems
- 43 C.F.R. Public Lands: Interior
- 16 U.S.C. § 470 – National Historic Preservation Act

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**OFFICE OF LAW ENFORCEMENT AND SECURITY**

**STATEMENT OF WORK (SOW)**

**CONTACTS:**

**BLM Project Lead/Technical Point of Contact/Project Inspector (PI)**

Jon Young
State Chief Ranger
Bureau of Land Management
One North Central Avenue Suite 800
Phoenix, AZ 85004-4427
(O): 602-417-9319
(C): 623-826-1286
(F): 602-417-9545
j5young@blm.gov

**BLM Contracting Specialist**

Kim Ferguson, Contract Specialist
BLM Nevada State Office
(Ely District Office)
702 No Industrial Way, Ely, NV 89301
Ph: 775-861-6441
Cell: 775-861-6443
Fx: 775-549-9827
k1fergus@blm.gov

**BLM Procurement Analyst**

David W. Appold
Supervisory Procurement Analyst
Division of Support Services
BLM Nevada
 (775) 861-6417 (Phone)
(775) 861-6634 (Fax)
dappold@blm.gov

**2017 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

**Providing Computer Aided Dispatch (CAD) technical services and support in the Gerlach, NV area for the 2017 Burning Man Event**

# PROJECT TITLE:

Black Rock City Computer Aided Dispatch (CAD)

# BACKGROUND:

The US Department of Interior, Bureau of Land Management (BLM) and Black Rock City LLC, through its Emergency Services Department (ESD), operate a joint Emergency Dispatch Center (EDC) in which each agency handles Calls For Service (CFS) in a coordinated operation during the annual Burning Man Event. While the space in the dispatch center is shared, each agency is able to remain operationally segregated due to state law, restrictions, and operational integrity.

In previous years, BLM and ESD operated their own CAD systems and information was communicated verbally between dispatchers. Both agencies desire to share a CAD platform in order to share information more efficiently and effectively thus improving officer safety, decreasing emergency response times, strengthening public safety at the event, and providing such data for post event analysis to help shape future plans.

# SCOPE OF WORK:

The Contractor shall provide a fully functional Computer Aided Dispatch (CAD) System, technical services, onsite and remote technical support, software applications and hardware to ensure a fully functional, operational and reliable Public Safety CAD at the Emergency Dispatch Center in "Black Rock City, Nevada." The Contractor shall provide services to both BLM and ESD.

# REQUIREMENTS:

The Contractor shall provide technical services, onsite and remote technical support, software applications and hardware to ensure a functional and operational CAD in the EDC.

The Contractor shall provide Client/Server Support Engineering Services for the EDC, which includes a variety of System, Database, Network, GIS and Computer Aided Dispatch (CAD) Database Administration and Support Services relating specifically to the CAD network operations of the communication center.

## 2017 BURNING MAN EVENT

## STATEMENT OF WORK (SOW)

Required tasks and responsibilities of the contractor shall consist of the following:

1. Provide one (1) On-Site Server License, for iNetCAD/AVL.
2. Provide fourteen (14) client subscription licenses for browser-based computer aided dispatch software, for 3 months each license, for iNetCAD Client. (Each client is only needed for 1-month onsite, but is needed for training in advance of the event and reporting post event.) Contractor is encouraged to offer any suggestions for efficient licensing for a temporary event such as this.
    a. License Breakout
        i. BRC – 5 licenses (5 EDC)
        ii. BRC – 1 GIS license (1 EDC)
        iii. BLM – 6 licenses (6 EDC)
        iv. BLM/BRC Shared HA iNet CAD Server Licenses
        v. BLM – 10 iNetMobile Client Licensed (if Optioned)

3. Provide two (2) iNetCAD Dashboards Data Explorer Licenses
    a. BRC – 1 license
    b. BLM – 1 license

4. Provision and maintain a High Availability CAD environment on site, which includes at minimum:
    a. Application Server
    b. Database Server
    c. GIS Server
    d. State of Nevada Criminal Justice Interface (NCJIS/ JusticeLink)
    e. IMARS Interface

5. **Hardware Transition** *(if optioned)*
    The contractor will transition existing high availability Computer Aided Dispatch (CAD) environment from the existing server hardware to new server hardware.

6. **Database, ArcGIS Server**

    Integrate customer provided Geospatial information to display relevant data as it pertains to the Burning Man Event to include Geographic Information Systems (GIS) Maps, layer files, shape files, geodatabases and imagery. This includes actively identifying a response area based on the Global Positioning Satellite (GPS) / Automated Vehicle Location (AVL) Tracking device data, accurate utilization and display of intersection mapping, and ability to provide reports and maps based on this data.

7. **Database, Data segregation plan and database security architecture** Develop, deploy and integrate into the CAD system a data segregation plan and database security architecture to allow for simultaneous independent operation of multiple "Dispatch Groups" with full data and database security. Must prevent the storage, access, viewing, and display of any "Criminal Justice Information," in any non- law enforcement "Dispatch Group." Criminal Justice Information

## 2017 BURNING MAN EVENT

## STATEMENT OF WORK (SOW)

includes, but is not limited to  Controlled Unclassified Information (CUI), Personally Identifiable Information (PII) and any information defined in 28 C.F.R. § 20 - Criminal Justice Information Systems. Must prevent the storage, access, viewing, and display of any "Health Insurance Portability and Accountability Act (HIPPA) Information," in any non-emergency medical "Dispatch Group." Security permissions must be both role based and agency based at minimum.

**8. Alphanumeric Paging Interface (Software Maintenance)**

Work with ESD to create an automated interface with Alphanumeric Paging infrastructure. The event relies on brief incident information automatically provided by CAD to the paging system in order to alert units/individuals of certain events.  Contractor will work with ESD to support basic call data, such as, but not limited to Incident Type, Incident Location, and Incident Number to be automatically sent in an mutually agreed upon format to the paging system.

**9. GPS/AVL Interface (Software Maintenance)**

Integrate Global Positioning Satellite Tracking device data through an open source or contractor provided application interface (API) to depict locations real time on the CAD GIS map layers. Contractor will be provided test devices on site at the event to ensure accuracy.

**10. GPS/AVL Interface (Database Maintenance)**

Integrate Global Positioning Satellite Tracking device data through an open source or contractor provided application interface (API) to capture locations into the CAD database in the coordinate fields. Clear previous years' device IMEI Information and User information out of the CAD Database and populate with current information. Error and validation check to ensure no duplication of IMEI information, which is known to cause interruptions in the API. Contractor will be provided test devices on site at the event to ensure accuracy.

**11. NCJIS State/NCIC Interface (Software Maintenance)**

Integrate criminal justice interface via a Nevada State Switch with the CAD to run the specific queries through Nevada to determine wanted and driver's license checks, stolen vehicle and vehicle registration check, Canadian persons wanted and driver's license check, Canadian vehicle registration and stolen check, probation, protection order files, sex offender registration, NCIC wanted files, NLETS transactions for above checks and additional as defined by the needs of the customer.

**12. IMARS Interface (Niche Interface – DOI Records Management System) (Software Maintenance)**

Create a database source for exporting event data from the CAD Database to IMARS through XML Schema and XSLT transformation and/or Representational State Transfer (REST) Application Program Interface (API). If a connection cannot be sustained by the customer, the contractor will be required to provide batch data to be pushed to IMARS in a non-automated procedure on a per hour, per day or per event basis. If a connection can be sustained, the IMARS data will be pushed to IMARS at the close of each Law Enforcement event and queried during each query (if REST)

**13. Shared Statistical Reporting**

## 2017 BURNING MAN EVENT

## STATEMENT OF WORK (SOW)

Develop a shared reporting environment within the CAD System "Dispatch Group" and/or "Agency." ESD and BLM will, in writing to the contractor and the other agency, designate a single CAD System User from each agency who will be allowed Report Access to the other "Dispatch Group" and/or "Agency." Contractor will provide security recommendations and implement controls to limit report access to only the two designated users. ESD and BLM will notify the contractor in writing of any changes to designated personnel and will include the other agency-authorized personnel on any change notifications. Any request to change designated "Report Access" personnel, will not be considered valid unless notification to the other agency personnel is contemporaneous.

14. Display all relative information as it pertains to a person or plate that has already been assigned to a previous incident in CAD.

15. Allow for and provide a user interface for feedback to improve CAD workflow, query return clarity, use of the command line, report output, and GIS integration.

16. The Contractor is **NOT** expected to fulfill the primary role of Information Technology (IT) Support in the EDC, as both ESD and BLM will have IT Support Personnel on site. Because of the emergency nature of this operation and tenuous nature of connectivity, the contractor **IS,** however, anticipated to have a high degree of expertise and skill in IT Support. As such, the contractor should be empowered to work to provide IT support and assistance in the temporary absence of IT personnel or as needed to solve problems. The contractor is expected, when necessary, where possible and appropriate to:

   a. Provide technical support for additional Law Enforcement software applications on the CAD Network in the absence of IT personnel.

   b. Perform System Administration functions for Microsoft Windows environment, in the absence of IT personnel.

   c. Perform System Administration functions for Group Policy environment, in the absence of IT personnel.

   d. Perform Database Administration (DBA) functions for Microsoft SQL Server or equivalent.

   e. Perform Network Administration functions for CISCO environments, in the absence of IT personnel.

   f. Develop test cases and performs functional quality tests for Law Enforcement Applications in the absence of IT personnel.

   g. Write automation scripts for Microsoft Windows and SQL Server database application packages or similar.

**2017 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

    h.  Solve product, operating system, hardware, network and database problems of low to moderate complexity and scope.

    i.  Understand and communicate end user requirements to BRC and BLM.

    j.  Provide technical and help desk support for end-users.

**17.** Database Source Creation for exporting event data from the CAD Database to reporting tools such as Microsoft Access and/or Sequel Server Crystal Reports and/or Jasper. Provide at least ten custom reports for given parameters provided by the customer.

**18.** Contractor personnel must arrive on site at the location on Thursday, August 17, 2017 and begin set-up and testing, no later than 13:00 hours, Pacific Daylight Time (UTC- 08:00).

**19.** System must be built, deployed, tested and operational by Monday, August 21, 2017 at 23:59 hours, Pacific Daylight Time (UTC-08:00).

**20.** Contractor must have dedicated technical support on-site during the entire "Service Period." Contractor must have dedicated technical support personnel available to respond within 15 minutes in the event of CAD System failure.

**21.** Contractor must provide a "High Availability" CAD System" required from 08/22/2017 00:01 hours through 09/07/2017 23:59 hours, Pacific Daylight Time (UTC-08:00), for BRC-ESD. ESD intends to "Go Live" on 8/23/2017

**22.** Contractor must provide a "High Availability" CAD System" required from 08/22/2017 00:01 hours through 09/07/2017 23:59 hours, Pacific Daylight Time (UTC-08:00), for BLM. BLM intends to "Go Live" on 8/22/2017.

**23.** It is a requirement for this contractor to work collaboratively and cooperatively with additional contractors, contractors, federal, state, local agencies during the performance period both at the location and at off-site locations if necessary.

**24.** The contractor shall be responsible for lodging of contractor personnel on-site using a contractor furnished RV or camper trailer. BRC will provide space for parking and power, potable water and sewage service.

**25.** The contractor shall be responsible for food and beverages for contractor personnel from August 17 through August 23. BRC catering service will begin on August 23, 2017 and will conclude on September 07, 2017.

**26.** The contractor shall provide any on-site transportation needed for contractor personnel and contractor equipment at the location during the performance period.

**27.** The contractor shall be responsible for all transportation of all contractor personnel and contractor

**2017 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

equipment to and from the event.

**28.** The contractor shall be available to participate in pre-coordination meetings by telephone and/or video teleconference.

### 2017 BURNING MAN EVENT

### STATEMENT OF WORK (SOW)

**29. Pre-Event System Implementation - Engineering Services (6/15 – 8/13/2017)** Project Management, Core CAD Software Upgrade & Certification, Map Assessment/Integration, Interfaces Upgrade & Certification, Interfaces Feature Modification Development, Report Review & Custom Report Development, CAD Feature Modification/Development, Training.

**30.** Provide pre-event training documentation and electronic based training in the format of a webinar for 2-3 people for ESD and 2-3 people for BLM on iNetCAD Dashboards Data Explorer. Provide a licensed Demo product users may utilize during training.

**31.** Provide pre-event training documentation and electronic based training in the format of a webinar for 13-15 people for ESD and 13-15 people for BLM. Provide a licensed Demo product users may utilize during training.

**32. Event (on-site) Engineering Services (Support & Engineering)**
Project Management, Core CAD Software Development & Maintenance, Map Assessment/Integration, Interfaces Upgrade & Certification, Interfaces Feature Modification Development, Report Review & Custom Report Development, CAD Feature Modification/Development, Training

**33.** Provide on-site training for BLM and ESD IT Support. Training will consist of an overview of the system so IT personnel can competently check the system's functionality.

**34.** Provide on-site support for set up and/or take down of all contractor provided equipment.

**35. Post Event Engineering Services**
For BLM, participate in meetings, move system/Install/Setup Server and system on hosted network during the off-season, conduct closeout, and issue final reports. Ensure database, data availability and user access during off-season. Contractor shall provide BRC and BLM post event recommendations and feedback on what went well with the implementation and operation of the cad along with recommendations for future improvement.

If Optioned by BRC:
For BRC, participate in meetings, move system/Install/Setup Server and system on hosted network during the off-season, conduct closeout, issue final reports. Ensure database, data availability and user access during off-season.


## SPECIAL REQUIREMENTS:

Automated Parsing of Data:

Parse specific fields from the Department of Motor Vehicle return through Nevada Criminal Justice Information System (NCJIS) and/or the International Justice and Public Safety Network (NLETS). Automate population of fields from the person and vehicle returns to automatically run the registered owner of a vehicle and create a local file.

IMARS Automation- Automation of data being pushed from the computer-aided dispatch to IMARS is

**2017 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

dependent upon a network connection that is set up and maintained by the Customer and the Nevada Department of Public Safety. If a connection can be made and sustained, the customer requests data to be pushed at the time of each event's conclusion and queried during each query (if REST)

# SPECIAL REQUIREMENTS:

Background Investigation:

Contractor employees shall hold or be able to obtain, at minimum, a current National Agency Check with Inquiries (NACI) background investigation with a favorable adjudication and if needed Criminal Justice Investigative System certification. These must be in place prior to commencement of any technical work and live operation of the criminal justice portion of the system.

Contractor employees needs a favorable background investigation meeting or exceeding NCJIS screening standards.

The contractor is required to provide the following documentation to BLM by June 16, 2017 to initiate the NCJIS background check and security clearance process.

**Applicant Requirements:**
1. A list of the employees assigned to work the event. Please include name, date of birth, place of birth, current address, and social security number.
2. Employees will need their fingerprints taken (see attached recording legible fingerprints document). They agency administering the fingerprints is required to sign the fingerprint card in the appropriate box. The employee is also required to sign the fingerprint card.
3. Each employee will need to fill out the Nevada Department of Public Safety (NVDPS) Fingerprint Background Waiver Form. Put "*Bureau of Land Management*" as the requesting agency.
4. Submit items 1-3 to **Eric Boik** at the BLM Nevada State Office, 1340 Financial Blvd., Reno, NV, 89502.
5. Any previous felony convictions may preclude the employee from being authorized to work this event.

Once the above is received, BLM will complete the following.

**BLM Requirements:**
1. Submits the fingerprint cards to NVDPS in Carson City, Nevada.
2. Once favorable background investigation is complete, BLM Terminal Agency Coordinator (TAC) will request a new operator ID for each employee, as appropriate.
3. The BLM TAC will conduct a criminal history check for each employee assigned to the operation.
4. The BLM TAC will coordinate training prior to the start of the operation. This may require earlier arrival.
5. The BLM will coordinate with the NVDPS to conduct and onsite criminal justice security inspection.

**2017 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

# BRC FURNISHED REQUIREMENTS:

The tasks and responsibilities of BRC shall consist of the following:

1. Provide CAD workstation hardware and non-CAD software.
2. Provide onsite parking for contractor furnished RV or camper trailer.
3. Provide electrical power to the contractor furnished RV or camper trailer.
4. Provide electrical power for the contractor supplied equipment.
5. Provide food and beverages for the contractor through catering service from August 23 through September 09.
    a. Meals will be served three times per day at regular intervals.
    b. Meals will be provided for no more than five contractor personnel.
6. Provide water fill service through an on-site contractor.
7. Provide sewage pump out service through an on-site contractor.
8. Provide project contacts for coordination and direction pre-event, event and post-event.
9. Provide a shipping address in Gerlach, Nevada to the contractor may ship small and urgent packages necessary to the project.

# GOVERNMENT FURNISHED REQUIREMENTS:

The tasks and responsibilities of BLM shall consist of the following:

1. Provide CAD workstation hardware and non-CAD software.
2. Provide government owned CAD Server Hardware (1 Server)
3. Provide government owned Microsoft SQL Server Operating System (OS)
4. Provide government owned ESRI ArcGIS Enterprise License (if needed)
5. Provide government owned ESRI ArcGIS Workstation License
6. Provide government owned network hardware: Adaptive Security Appliances (2 ASA's)
7. Provide government owned network hardware: Switches (2 switches)

**2017 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

# ACKNOWLEDGEMENTS:

The government acknowledges the network at the BLM HQ and within Black Rock City is dependent on power provided by the government and/or another contractor to the government. The CAD contractor will not be responsible for system outages or failures, which are caused by lack of power or power inadequacies. The contractor is responsible for providing contractor power requirements for the location to the government in advance of the performance period, but not later than August 1, 2017.

# DELIVERABLES:

Categories for tasks and responsibilities identified in the Statement of Work may fall into the following categories:
1. Project Management
2. Systems Architecture
3. Systems Engineering
4. Database Administration Services
5. System Administration Services
6. Network Administration Services
7. CAD Application Support Services
8. User Training
9. Recommendations
10. Accounting of Billable Activities

Weekly meetings with the contractor shall be held to track all work being performed.

The contractor may provide a detailed accounting of billable services following the period for which the services were performed.

# LOCATION:

Black Rock Desert near Gerlach, NV (Pershing County, Nevada)

**PERIOD OF PERFORMANCE**
July 1, 2017 to December 31, 2017. This will account for the configuration prior to deployment as well as support post event for database maintenance.

**PERIOD OF SERVICE:**
August 17, 2017 through September 8, 2017. (23 Days)

08/17/2017 – Contractor must arrive at Black Rock Desert to begin "setup"

08/22/2017 – Provided Services fully operational at or before 00:01 hours

09/08/2017 – "Post Patrol" portion of event ends, contractor begins "break down"

09/09/2017 – Contractor may depart when "break down" complete.

AR07214

## 2017 BURNING MAN EVENT

## STATEMENT OF WORK (SOW)

# LEGAL AUTHORITIES AND REGULATORY REQUIREMENTS:

Because this CAD system is jointly operated by the US Department of Interior, Bureau of Land Management (BLM) and Black Rock City LLC, Emergency Services Department (ESD), the operation of the CAD System and transmission of all data must comply with all commonly accepted standards, laws and regulations. Most of these standards, laws and regulations pertain specifically to government information security; however, they are also "best business practices" for Black Rock City, LLC.

- 44 U.S.C. § 3541– Federal Information Security Management Act (FISMA) of 2002

- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 140-2, Security Requirements for Cryptographic Modules

- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 197, Advanced Encryption Standard (AES) 256 bit cypher

- National Institute of Standards and Technology (NIST), Special Publication SP 800-53A, Assessing Security and Privacy Controls in Federal Information Systems and Organizations: Building Effective Assessment Plans

- 28 C.F.R. § 20 - Criminal Justice Information Systems

- 5 U.S.C. § 552a - The Privacy Act of 1974

**2017 BURNING MAN EVENT**

**STATEMENT OF WORK (SOW)**

# CONTACTS:

**BRC Contracting Signatory**

Charlie Dolman
Director, Event Operations
Burning Man
Black Rock City, LLC.
(415) 865-3800 x164
charlie.dolman@burningman.org

**BLM Project Contact/Technical Point of Contact**

Jon Young
State Chief Ranger
Bureau of Land Management
One North Central Avenue Suite 800
Phoenix, AZ 85004-4427
(O): 602-417-9319
(C): 623-826-1286
(F): 602-417-9545
j5young@blm.gov

**BRC Project Contact**

Bryan Anderson Dispatch
Chief
Emergency Service Department Black
Rock City, LLC.
(C): 541-619-0794
bryan.anderson@burningman.org

**FINALIZATION**

If BRC accepts this SOW under the MOU Program, please send written confirmation (E-Mail) of the acceptance to Mark Hall, Mark Pirtle and Jon Young by June 30, 2017.

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2017**

**STATEMENT OF WORK (SOW)**

**for providing Microwave Wireless Internet, technical services and support in the Gerlach, NV area to BLM for the 2017 Burning Man Event**

**PROJECT TITLE:**

2017 Burning Man Event BLM Microwave Wireless Internet Service

**BACKGROUND:**

The Burning Man Recreational Event is an international art festival and an experiment in a "temporary community dedicated to radical self-expression and self-reliance". The temporary community of Black Rock City is created for eight days and becomes the seventh largest city in Nevada. The event takes place on the Black Rock Desert within the Black Rock/High Rock NCA, managed by the Winnemucca District Office. A Special Recreation Permit (SRP) is issued to Black Rock City LLC, which is responsible for all activities within Black Rock City. The SRP has approximately 13 general stipulations and 55 special stipulations. The BLM also generates a Closure Order for the event that is announced in the Federal Register, which designates the event area as a temporary closure and documents temporary restriction of certain activities within the temporary closure.

The BLM's operational mission is to ensure public safety and resource protection through the enforcement of the event closure order, the SRP stipulations, Federal laws/regulations and Nevada state laws/regulations at the event. To accomplish this mission the BLM has adopted the Incident Command System (ICS) and integrated multiple agencies into one operation. The ICS operation will be a combination of overhead, operational and support positions. The ICS operation will cover all three event periods of the detail: Pre-Event; Main Event; Post-Event (8/22 - 9/7: 17 days).

**SCOPE OF WORK:**

The Contractor shall provide a fully functional FCC Licensed carrier class microwave network and associated Wireless Internet Service, technical services, technical support, software applications and hardware to ensure a fully functional, operational and reliable Law Enforcement Data network and Incident network at the Joint Operations Center (JOC).

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2017**

**STATEMENT OF WORK (SOW)**

**REQUIREMENTS:**

Required equipment, services, tasks and responsibilities of the contractor shall consist of the following:

1. **Internet over microwave at BLM HQ, 30 Mbps bi-directional (minimum):**
   Contractor must provide an FCC licensed carrier class microwave network and associated Wireless Internet Service which will be sent to the JOC via microwave transmission, encrypted with FIPS140-2 compliant AES 256k encryption at licensed frequency/frequencies to prevent interference and interception. The contractor must provide all necessary public and private IP addressing.

2. System must be built, deployed, tested and operational by Thursday, August 17, 2017 at 23:59 hours.

3. Contractor must be prepared to handoff a fully functional internet service connection at a demarcation point at the JOC on Thursday, August 17, 2017 at 23:59 hours or sooner.

4. Contractor must have technical support available during the entire "PERIOD OF SERVICE." Contractor must have dedicated technical support personnel available to respond within 4 hours in the event of network failure.

5. Contractor must provide a "High Availability Network" (5-9's or 99.999% per year / or 99.5% per 24 hours). System "High Availability" is required from 08/17/2017 23:59 hours through 09/07/2017 23:59 hours.

6. Contractor must provide network bandwidth, which is dedicated and must not be shared with other clients. Minimum bandwidth requirement is 30 Mbps bidirectional.

7. Contractor must provide a microwave system, which is fully FCC, licensed on the routes to the primary delivery location at the JOC, to prevent interference / interception and to meet with federal requirements. Contractor is responsible for any and all costs and/or fees for licensing.

8. Weather including wind, dust and rain are common at the location. The network must be capable of operation regardless of weather conditions.

9. It is a requirement for this contractor to work collaboratively and cooperatively with additional contractors, vendors, federal, state, local agencies during the performance period both at the location and at off-site locations if necessary.

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2017**

**STATEMENT OF WORK (SOW)**

**10.** The contractor shall provide all system design and pre-event engineering. The contractor shall provide a detailed written plan and technical drawing and furnish it to the BLM Project Lead as soon as possible after contract award, but no later than Tuesday, August 1, 2017 17:00 hours.

**11.** The contractor shall provide a temperature-controlled environment for all indoor system electronics.

**12.** The contractor shall provide a "relatively" dust free / dust controlled environment for all indoor system electronics.

**13.** The contractor shall provide any on-site transportation needed for contractor personnel and contractor equipment at the location during the performance period.

**14.** The contractor shall be responsible for all transportation of all contractor personnel and contractor equipment to and from the event.

**15.** The contractor shall be responsible for all power for remote repeater locations and/or any part of the network, which is not at the JOC.

**16.** If the contractor chooses to use solar power at remote repeater locations, the system must be engineered to include an uninterruptible power supply (UPS) capable of maintaining the system at "High Availability."

**17.** The contractor shall be available to participate in pre-coordination meetings by telephone and/or video teleconference.

**18.** The contractor shall provide reports on bandwidth utilization and monitoring for the duration of the "Service Period." Daily, Weekly and Service Period Reports will be provided at the request of the Project Inspector. Proactive delivery of reports through electronic delivery by email is desired.

**OCCUPATION / OCCUPATION CODE(s):**

> http://www.bls.gov/soc/
> 15-1143 Computer Network Architects
> 15-1152 Computer Network Support Specialists
> 49-2021 Radio, Cellular, and Tower Equipment Installers and Repairers

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2017**

**STATEMENT OF WORK (SOW)**

**SPECIAL REQUIREMENTS:**

The microwave network will require a network to be built over long distances in a remote geographic area, which typically involves placing temporary hardware, such as repeaters/relays on mountain peaks or ridgelines. The contractor will be required to gain access to remote, rugged terrain of their choosing in order to build a functional network. Much of the land in this geographic area is under the administration and management of the United States Department of the Interior, Bureau of Land Management (BLM.) If the contractor selects repeater locations, which are on lands administered and managed by BLM, BLM will grant the contractor any necessary temporary authorizations, which may be needed to access or use those locations. No authorization shall be granted in violation of laws or regulations. If the contractor selects repeater locations, which are not on lands administered and managed by BLM, such as privately owned, tribal or other lands, the contractor is responsible for obtaining any necessary authorizations, which may be needed to access or use those locations. Selection of these sites must be done in conjunction with BLM. The contractor is responsible for any costs or fees necessary to access these locations or obtain agreements to use these locations. The contractor shall be responsible for any specialized vehicles or equipment needed to access remote locations or install equipment at these locations.

**GOVERNMENT FURNISHED REQUIREMENTS:**

The tasks and responsibilities of the government shall consist of the following:

1. Provide electrical power to the contractor electrical equipment for the network at the BLM JOC.
2. Provide a government Project Lead for coordination and direction pre-event and on-site.
3. Provide a shipping address in Gerlach, Nevada to the contractor may ship small and urgent packages necessary to the project.
4. The government MAY provide temporary storage for contractor equipment pre-event and post-event at the BLM Black Rock Station in Gerlach, Nevada, if space is available which will not adversely affect normal government operations at this site.

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
BLM BURNING MAN OPERATION 2017**

**STATEMENT OF WORK (SOW)**

**ACKNOWLEDGEMENTS:**

The government acknowledges the network at the BLM JOC and within Black Rock City is dependent on power provided by the government and/or another contractor to the government. The contractor will not be responsible for system outages or failures, which are caused by lack of power or power inadequacies, which are outside of their control. The contractor is responsible for documenting, in writing, and immediately reporting any issues with power to the government project lead. The contractor is responsible for providing contractor power requirements for the location to the government in advance of the performance period, but not later than August 1, 2017.

**DELIVERABLES:**

The tasks and responsibilities identified in the Statement of Work shall fall into the following categories:

1. Technical Services
2. Network Services
3. Data Services
4. System Administration Services
5. Network Administration Services
6. Accounting of Billable Activities

The contractor shall provide a detailed accounting of all billable services following the period for which the services were performed.

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2017**

**STATEMENT OF WORK (SOW)**

**LOCATION:**

2017 Burning Man BLM Joint Operations Center (BLM JOC)

Black Rock Desert near Gerlach, NV (Pershing County, Nevada)

2016 City location(s):

The Man              N40.78630, W-119.20650

Perimeter Point 1    N40.78300, W -119.23562

Perimeter Point 2    N40.80598, W -119.21944

Perimeter Point 3    N40.80221, W -119.18559

Perimeter Point 4    N40.77628, W -119.18008

Perimeter Point 5/BLM JOC  N40.76436, W -119.21094

It is expected that the network will require infrastructure placement in multiple locations possibly in multiple counties, in order to deliver service to the above location.

**PERIOD OF PERFORMANCE:**

From Contract Award through completion. July 1, 2017 (estimated) through December 31, 2017.

**PERIOD OF SERVICE:**

August 17, 2017 through September 7, 2017. (22 Days)

08/17/2017 – Provided Services at BLM JOC fully operational at or before 23:59 hours

09/07/2017 – "Post Patrol" portion of event ends, contractor begins "break down"

09/08/2017 – Contractor may depart when "break down" complete.

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2017**

**STATEMENT OF WORK (SOW)**

**LEGAL AUTHORITIES AND REGULATORY REQUIREMENTS:**

The design, construction and operation of the network and transmission of all data must comply with all commonly accepted commercial network standard and regulations and with the following legal and regulatory requirements:

- 44 U.S.C. § 3541– Federal Information Security Management Act (FISMA) of 2002
- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 140-2, Security Requirements for Cryptographic Modules
- National Institute of Standards and Technology (NIST), Federal Information Processing Standard (FIPS) Publication 197, Advanced Encryption Standard (AES) 256 bit cypher.
- 28 C.F.R. § 20 - Criminal Justice Information Systems
- 43 C.F.R. Public Lands: Interior
- 16 U.S.C. § 470 – National Historic Preservation Act
- 29 U.S.C § 794d - Electronic and Information Technology (Section 508 Compliance Amendment to the Rehabilitation Act of 1973)
- FBI CJIS Security Policy
- Department of the Interior Acquisition Policy Release (DIAPR) 2012-09 – IPv6
- Department of the Interior Request and Risk Acceptance for Permanent Opening of Social Media and Web 2.0 Technology Websites

All work shall be performed in accordance with NIST SP 800-37 rev. 4, 800-18, 800-30, 800-60, 800-53, 800-53A, Federal Information Processing Standard (FIPS) 199 & 200, DOI guides & templates, and the DOI Privacy Impact Assessment.

Guides and other references related to standards within this SOW may be found at:
NIST: http://csrc.nist.gov/publications/PubsSPs.html
NIST Checklist: http://checklists.nist.gov
FIPS: http://www.nist.gov/itl/fips.cfm
DOI Privacy Impact Assessment Guide:
https://www.doi.gov/sites/doi.gov/files/migrated/ocio/information_assurance/privacy/upload/DOI-PIA-Guide-09-30-2014.pdf
NIBRS: https://www.fbi.gov/about-us/cjis/ucr/nibrs.
DOJ Information Sharing: https://it.ojp.gov/2417
EDXL: https://en.wikipedia.org/wiki/EDXL
*Any other guides and templates shall be provided at time of award by the CO

The quoted solution may undergo Assessment & Authorization activities, and the quoted solution may undergo continuous monitoring as set forth in NIST SP 800-37 rev. 4. The contractor will take appropriate and timely action to correct or mitigate any weaknesses discovered during such activities.

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**BLM BURNING MAN OPERATION 2017**

**STATEMENT OF WORK (SOW)**

**CONTACTS:**

**BLM Project Lead/Technical Point of Contact/Project Inspector (PI)**

Jon Young
State Chief Ranger
Bureau of Land Management
One North Central Avenue Suite 800
Phoenix, AZ 85004-4427
(O): 602-417-9319
(C): 623-826-1286
(F): 602-417-9545
j5young@blm.gov

**BLM Contracting Specialist**

Greg Kothman, Contract Specialist
BLM Nevada State Office
1340 Financial Boulevard, Reno, NV 89502
Ph: (775) 861-6440
Fx: (775) 861-6634
gkothman@blm.gov

**BLM Contracting Specialist**

Kim Ferguson, Contract Specialist
BLM Nevada State Office
(Ely District Office)
702 No Industrial Way, Ely, NV 89301
Ph: 775-861-6441
Cell: 775-861-6443
Fx: 775-549-9827
k1fergus@blm.gov

**BLM Procurement Analyst**

David W. Appold
Supervisory Procurement Analyst
Division of Support Services
BLM Nevada
 (775) 861-6417 (Phone)
(775) 861-6634 (Fax)
dappold@blm.gov



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Winnemucca District Office
Black Rock Field Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada 89445
Phone: (775) 623-1500 Fax: (775) 623-1741
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html



@w 7/17/19

In Reply Refer To:
LLNVW03500-19-01
2930 (NVW030.10)

**JUL 1 7 2019**

9171 9690 0935 0211 8277 07

CERTIFIED MAIL NO. 9171 9690 0935 0211 8277 07

Burning Man Project
Marnee Benson
Associate Director of Government Affairs
660 Alabama St.,4ᵗʰ Floor
San Francisco, CA 94110

Dear Ms. Benson,

This letter is in response to the questions presented in Burning Man Project's (BMP) letter dated
July 11, 2019.  BMP had the following questions in regards to the Phase 2 Cost Recovery
Agreement:

1. What specific purchases will be included in Miscellaneous Supplies and Equipment?
2. Please provide the specs for the following:
   a. Mod to Network Services and Support
   b. Mod to Microwave Internet Bandwidth
3. Do the hours and dollar amounts listed in the Phase 2 Labor Detail *include* the hours and
   dollars listed in the Phase 1 Labor Detail, or are they above and beyond the hours and
   dollars listed in Phase 1 Labor Detail?
4. Could you provide the dates for each position listed on the Phase 2 Labor Detail?

**Question 1**
The BLM cannot provide specific information for Miscellaneous Supplies and Equipment at this
time, because this varies from year to year.  The BLM has customarily provided BMP with the
specific information during the closeout of cost recovery.  However, the estimate is based on past
costs and practices, so is reasonable for purposes of the cost recovery estimate.

**Question 2 (a and b)**
The BLM cannot provide you information on the final specifications of the Network Services
and Support or the Microwave Internet Bandwidth, since that would be an unauthorized
disclosure of information under the relevant government contracting statues, regulation, and
policy. However, the BLM can provide you a link to the website where the government contracts

Official Record Copy

AR03476

are announced so you can review each Statement of Work (SOW). Please see the following hyperlink and reference number below to find the SOW.

https://www.fedconnect.net/FedConnect/PublicPages/PublicSearch/Public_Opportunities.aspx

- Network Services and Support : Reference Number, 140L3919Q0032
- Microwave Internet Bandwidth: Reference Number, 140L3919Q0029

**Questions 3**
The hours and dollar amounts listed in the Phase 2 Labor Detail do not include Phase 1 hours and dollar amounts.

**Question 4**
The BLM will not provide BMP the dates for each position listed on the Phase 2 Labor Detail. Though the BLM makes plans for staff to arrive at the event every year, there are inevitably changes to those plans based on unforeseen circumstances (i.e., people taking other positions, family emergencies, issues during travel, etc.). The BLM will provide detail regarding the hours in the cost recovery close out decision, but the estimate is based on past costs and practices, so it is reasonable for purposes of the cost recovery estimate.

Should you have any further questions or concerns, please contact Chelsea McKinney or myself at 775-623-1500.

Sincerely,

MARK E. HALL

Mark E. Hall Ph.D.
Field Manager
Black Rock Field Office



**BLM MEDICAL - Burning Man 2018 - Overview**

The BLM Operational Medical Unit (OMU) again partnered with the U.S. Department of Health and Human Services (DHHS) Center for Tactical Medicine (CTM) to provide premier medical care for federal employees working at Burning Man.  The fundamental goal of tactical medicine is to "protect the protectors" by providing a full spectrum of medical support in the form of sick call and trauma care along the pre-incident, incident, and post incident continuum.

Due to the unique working relationship between the BLM OLES and DHHS, medical care is extended to all federal employees and contractors working at Burning Man, not just law enforcement personnel. The intent is to provide 24-hour professional on site medical care to federal employees so they remain healthy and fully engaged.

DHHS/BLM OMU provide a fully functioning medical clinic at the JOC capable of treating any condition within that spectrum.  Federal employees work long, strenuous shifts at Burning Man and rely on the tactical medics to keep them healthy.  Four (4) tactical medics were assigned to the 2018 event, represented by DHHS (PA-C/EMT) and BLM OMU (EMT-P/EMT-B).  Additionally, the medical unit was supplemented by BLM Rangers, who are licensed EMT-B/AEMT(s), assigned to each shift to act as a shift EMT(s).

These shift EMT(s) provided daily "medical minutes," which were training and/or educational sessions during each respective shift's daily briefings.  These sessions covered simple medical topics such as dehydration, recovery position and tourniquet application.

The DHHS/BLM OMU medical unit provides a number of facets that are unavailable from Rampart/Black Rock medical providers:

- K-9 Medical Care
- Occupational Medical Care
- Office of Worker's Compensation Programs (OWCP)
- Flexible Off-Playa Medical Care
- Fitness for duty evaluations
- Critical Incident Stress Management (CISM) Care
- Capability to provide an integrated law enforcement/medical response for a critical incident

| OMU/DHHS Medical Support - Statistics | | | | | |
|---|---|---|---|---|---|
| *Year* | *Treated* | *Gov* | *Non-gov* | *Medications Administered* | *Types of Injuries/ Illnesses* |
| *2015* | 262 | 237 | 25 | 46 | 38 |
| *2016* | 217 | 174 | 43 | 48 | 35 |
| *2017* | 195 | 146 | 49 | 42 | 27 |
| *2018* | 188 | 145 | 43 | 48 | 33 |
| **Average=** | | 216 | 176 | 40 | 46 | 33 |
| **Total=** | | 862 | 702 | 160 | 184 | 133 |

DHHS/OMU provided more in-depth/diagnosed medical care for seventeen (16) federal employees and contractors.  These cases included prescriptions, physical exams and/or follow-up visits with the personnel.

If these employees/contractors were unable to be seen by the DHHS/BLM OMU personnel, they would have needed to be replaced/relieved for at least an eight (8) shift in order to drive to/from Fernley or Reno to be seen by a PA/Physician.

Consequently, the presence of the DHHS/BLM medical clinic provided a minimum man-hour savings of *128 hours or 16 shifts*.

This included one employee who was treated for chest pains and the OMU Medical Unit possessed necessary medical tests to determine it was not a heart attack.  Rampart Hospital did not have these tests, so without the OMU Medical Unit, this employee would have needed to be transported off playa via aircraft for cardiac testing.

There is also an unquantified number of personnel who were able to avoid becoming sick because of the sick-call efforts from OMU/DHHS.  Multiple employees received mitigations for early signs of illness, preventing further development of potentially debilitating symptoms.

OWCP was initiated for officers injured on duty, streamlining the process and creating efficiencies in operations.

The DHHS/OMU medical unit again provided care for K-9s affected by the environmental conditions during the event, conducted daily K-9 welfare checks and provided any needed treatments.

Additionally, some Rampart Medical Staff came to the OMU Medical Unit for both basic/advanced medical supplies and equipment which were not provided by Rampart Hospital.

Recommendations/Future Needs

- Wash Sink located inside the Medical Trailer

**AR04439**





AR04440

# BURNING MAN 2018

## SPECIAL RECREATION PERMIT STIPULATIONS



AR04822

## TABLE OF CONTENTS

# CONTENTS

**PERMIT ADMINISTRATION**

**GENERAL**

**COORDINATION**

**FEE SCHEDULE**

**SANITATION**

**TRAFFIC MANAGEMENT**

**COMPLIANCE INSPECTIONS**

# PERMIT ADMINISTRATION

**In addition to the 13 general terms and conditions listed on the back of the Special Recreation Permit Form 2930-2, the following Special Stipulations shall apply to the 2018 Burning Man Event.**

## GENERAL

1. The maximum authorized population (also referred to as the "population cap") at any point in time during the 2018 event is 70,000 paid participants. The population cap does not include volunteers, government personnel, emergency service providers, vendors, and contractors. Black Rock City LLC ("BRC") is required to keep the maximum population of the event from exceeding this population cap. Consequences to BRC for exceeding the population cap may include, but are not limited to, a finding of non-compliance; suspension or cancellation of this permit per 43 C.F.R. § 2932.56; a monetary or other penalty per 43 C.F.R. § 2932.57; denial of subsequent application(s) for a SRP per 43 C.F.R. § 2932.26; and/or imposition of additional terms and conditions in subsequent years' permits (if granted) that are designed to keep the event population within the maximum authorized population, consistent with 43 C.F.R. §§ 2932.26 and 2932.41. The Bureau of Land Management ("BLM") reserves the right to assess additional cost recovery for any costs the BLM incurs as a result of any population exceedances, per 43 C.F.R. § 2932.31.

2. If during the event it appears that the number of participants arriving to enter Black Rock City is likely to exceed the population cap, then BRC must promptly notify the BLM and provide a detailed Contingency Plan explaining how it plans to manage the additional air and ground traffic. The BLM's acceptance of such a contingency plan does not constitute approval for BRC to exceed the population cap under Special Stipulation 1, nor does it constitute any form of cure for noncompliance with Special Stipulation 1. The purpose of this Special Stipulation 2 is to ensure that BRC will follow specific procedures to address the safety and health of arriving and departing participants when participants may be made to wait upon arrival before they are allowed to enter Black Rock City.

If during the event it appears that the camping area is insufficient to accommodate the number of participants, then BRC must promptly notify the BLM and provide a detailed Contingency Plan explaining how it plans to accommodate the additional participants.

3.  A. During the period of site occupancy, and according to an agreed-upon reporting standard with the BLM, BRC shall provide the BLM with daily population statistics and information on participant arrivals, ticket scanning, and participant departures. The population statistics will include and break out separately, the number of paid participants, staff, and total persons on site and will account for all entrance and departure through all event access points, namely the Main Gate, Airport, and Point 1. In addition, BRC must provide the BLM with event population statistics at any other time upon request.

B. BRC will notify the BLM immediately if the population exceeds 69,000 paid participants, and will manage operations per BRC's Population Overage plan.

C. For historical purposes and press inquiries, BRC shall also provide the BLM with the recorded maximum population for the entire event (otherwise known as peak population).

D. Within 60 days after the event, BRC shall provide the BLM with detailed information regarding the number of staff and participants at the event site for the period of site occupancy. This information shall include daily counts for both the non-event and event period.

E. Starting on August 25, 2018, and ending on September 4, 2018, BRC will provide the total number of government personnel, emergency service providers, vendors, "work access" passes and contractors (e.g., service providers, staff, infrastructure contractors, art contractors, maintenance and operational personnel)

4.  These Special Stipulations incorporate, by reference, information included in the 2018 Burning Man Event Operations Plan (Operations Plan). If there is a conflict between the Operations Plan and the Special Stipulations, the Stipulations shall control. BRC shall provide its latest version of the Operations Plan to the BLM before the BLM will issue the permit for the 2018 event. BRC shall provide a final Operations Plan to the BLM 45 days prior to the event. Modifications to the final Operations Plan concerning the stipulations and compliance with them will be coordinated with the BLM and may be accepted or denied by the Authorized Officer.

5.  The location of the 2018 Burning Man Event Area is limited to the public closure area, with ingress and egress from the 8-Mile or Event playa entrance, the 12-mile or Vendor playa entrance, and the playa Airport. The specific location of the event site will be identified and requested by BRC and approved by the BLM prior to the commencement of event setup.

6.  The event is authorized to last 192 hours starting on the Sunday that falls eight days before Labor Day and ending on Labor Day. Event activities may officially commence at 6:00 PM on Sunday, August 26, 2018 and shall end at 6:00 PM on Monday, September 3, 2018 (Labor Day). For the purposes of participant ingress, the main gate may be opened as early as 12:01 AM on Sunday, August 26, 2018. For the purposes of participant egress the main gate will be opened until 12:00 PM on Tuesday, September 4, 2018. During the extended ingress and egress hours, participants are required to focus their activities on camp location setup and breakdown. Pre-event surveys and site layout (including use of the communications tower) may begin on Friday, July 27, 2018. Site occupancy, including construction of facilities and structures, may occur no earlier than Sunday, July 29, 2018 (the start of the event closure order). Removal of all above-ground material (i.e., items that could pose a hazard to other playa users) will be completed no later than Monday, October 1, 2018 (the end of the event closure orders). The exception to this requirement is the communications tower, which may remain on-playa throughout the cleanup period for safety purposes. The dates, calendar and procedures for event set up and cleanup will be outlined in the 2018 BRC Operations Plan.

7. The final phase of cleanup and restoration will be completed no later than Monday, October 1, 2018 in accordance with the last day the authorized 2930-2 (SRP). If unforeseen weather conditions arise, minor adjustments to the post-event cleanup deadlines may be granted by the BLM authorized officer.

AR04824

8. Upon advance notice to BRC, the BLM reserves the right to alter the terms, conditions, and stipulations of the permit for significant changes in BLM policy or administrative procedure, to prevent use conflicts, prevent resource damage, or protect public safety as provided in 43 C.F.R. § 2932.56.

9. BRC shall post a copy of its permit, these Special Stipulations, and the Federal Register Closure and Restriction Orders in prominent view at Center Camp Playa Info where cooperators and participants have an opportunity to read them. Additionally, the documents referenced above shall also be available for participants and staff on the Burning Man website within 15 days of the BLM's issuance of the permit.

10. Except as otherwise noted in Special Stipulation 1, violation of the permit terms, conditions and stipulations may be subject to penalties prescribed in 43 C.F.R. Part 2930. Additionally, such violations may result in permit revocation, suspension, or probation. Violations may also be cause for the BLM to deny approval of a subsequent Permit or Operating Authorization (43 C.F.R. § 2932).

11. Commercial use is prohibited within the Black Rock City closure area unless specifically authorized by BRC and/or the BLM. Commercial use is defined by 43 C.F.R. § 2932.5, and includes, but is not limited to, commercial film production, food services, waste disposal, recreational/trailer rental and/or air carrier services. BRC and/or the BLM will monitor the compliance of all commercial operators entering the event via the Point 1 Gate and the Airport.

A. Prior to the event:

    i. BRC shall notify potential vendors and air carrier services in writing that they must obtain a BLM Special Recreation Permit (SRP) in order to enter into contract with BRC.

    ii. BRC shall also provide the BLM with a list of known vendors, commercial film/still photography production companies, and air carrier services that BRC recommends be granted a BLM SRP to operate at the event.

    iii. The BLM will immediately notify BRC if any recommended vendors and air operators do not meet the BLM's SRP requirements at 43 C.F.R. § 2932 and cannot be authorized to operate on public lands during the event.

    iv. BRC will immediately notify the BLM if BRC terminates any authorized vendors or air carrier services contract/agreement.

    v. BRC will describe the procedure for BRC and BLM coordination of authorizing vendors, commercial film/still photography production companies, and air carrier services in the 2018 BRC Operations Plan.

    vi. BRC will manage commercial filming per the Commercial Filming Compliance Protocol in the BRC Operations Plan.

B. During the event:

    i. BRC shall require all authorized vendors, commercial film/still photography production companies, and air carrier services to display identification as proof of their authorization to operate at the event by BRC and the BLM.

    ii. Any vendors and air carrier services must show proof of their SRP within a reasonable amount of time (no more than 8 hours) when asked by authorized BLM and BRC personnel,

AR04825

as required by the Closure Order(s) and BRC's OSS or Air Carrier contracts. Commercial film/still photography production companies must show proof of their permit or notice that they do not need one within a reasonable amount of time.

iii.  BRC will inform the BLM's Vendor Compliance Lead of unauthorized vendors, commercial film/still photography production companies and air carrier services discovered at the event.

iv.  Any vendors and air carrier services found operating without a contract with BRC and unpermitted by BLM at the event, will be found to be in noncompliance and may face eviction, and/or receive citations for noncompliance with 43 C.F.R. § 2932, or be required to obtain a BRC contract and a BLM SRP, if required.

v.  If BLM finds any commercial film/still photography production companies operating at the event without a BLM permit or BLM notice that one is not necessary, it will coordinate with BRC as outlined in the Commercial Filming Compliance Protocol in the BRC Operations Plan.

vi.  BRC will provide a copy of the 2018 Closure Orders to all vendors, commercial film/still photography production companies, and air carrier services prior to the start of the event.

12. BRC staff and volunteers shall comply with all applicable supplemental regulations as promulgated in the Closure Order(s) published in the Federal Register prior to the 2018 event.

13. In regard to historical and archeological resources:

A. All participants and support staff will be informed that collection, excavation or vandalism of historical and archaeological artifacts or sites is illegal on public land. If BRC learns of the discovery of archaeological artifacts (objects greater than 50 years old) or human remains, BRC shall notify the BLM immediately.

B. BRC shall comply with 43 C.F.R. § 7.18 and shall not make available to the public any information concerning the nature and location of any archaeological resource.

C. Should BRC discover an archaeological resource, it must stop all activities in the discovery vicinity and protect the site until event completion or until notified otherwise by the BLM authorized officer.

14. BRC shall provide the appropriate identification to its authorized personnel (i.e. staff ID, decals, designated camping areas, etc.) and will inform the BLM of the nature and appearance of such identification prior to the event.

15. All mounted lasers on registered mutant vehicles, placed art projects and placed theme camps must be inspected and approved by BRC.

16. The use of unmanned aircraft systems (UAS) is prohibited, unless the operator is registered through and complies with the Remote Control BRC program (RCBRC) and operates the UAS in accordance with Federal laws and regulations.

AR04826

17. With regard to mutant vehicles and art cars:

    A. Mutant Vehicles more than 13 feet wide are issued "Playa Only" driving licenses, restricting operation within the city streets. BRC shall locate known "Playa Only" car camps on the outside streets of the city.

    B. Art cars with flame effects shall not carry additional gasoline or diesel fuel tanks when in operation. Propane tanks are allowed on art cars with flame effects upon inspection from the Fire Art Safety Team (FAST) team at the Department of Mutant Vehicles (OMV) registration.

    C. For vehicles with limited visibility as determined by BRC OMV, easily identifiable walkers and/or spotters are required. Examples of easily identifiable clothing include: reflective safety vests, brightly colored or reflective hats, bandanas or shirts.

    D. BRC shall notify BLM immediately when there is an art car related injury requiring medical treatment and transport to Rampart.

18. BRC's propane shall be dispensed at identified refueling stations by a licensed professional.

19. BRC shall cooperate with the BLM when requested, to assist in removing individuals from the event as provided in 43 C.F.R. § 2932.57(a)(7). If BRC evicts anyone under BRC's internal procedures BRC will notify the BLM of the eviction and identify the evicted individuals.

20. BRC shall develop the following policies and procedures in their Operations Plan:

    A. Must Reports - to include prompt notification to BLM when additional BRC resources are required to reduce the intensity of a potential conflict or developing situation involving Burning Man participants

        i. BRC will immediately report all received reports of sexual assault to law enforcement including the day, time, and location in the city of the reported incident. Black Rock Rangers will facilitate law enforcement in locating the victim unless the victim requests anonymity. Notification must include a Tier 1 notification.

    B. Evacuation Plan

    C. Sanitation, medical, fire protection, security, participant camping, traffic management, drones, lasers, burn perimeters, and safety.

21. Regarding Burns:

    A. BRC shall include BLM at the 1600 briefing on the Thursday before the Man Burn.

    B. BRC shall provide BLM a "Daily Burn Sheet" that shall include information on each burn, the perimeter size, the FAST Lead for the burn, image and location of the perimeter.

    C. At large scale burns, participants who are stopped by BRC Rangers for repeatedly violating established burn perimeters shall be promptly turned over to BLM Law Enforcement.

    D. All structures to be burned must meet BRC engineering standards for burnable structures, or they shall not be burned.

22. BRC shall provide forward deployment of appropriate ESD assets during large planned events including large scale burns. BRC shall ensure BLS and ALS care, and medical transport, are available during large unplanned events, including music events in the mobile sound zone.

23. BRC will provide the Winnemucca District a phone number to contact the Burning Man Airport during hours of operation and a point of contact who may be reached before, during and after the event. The phone number must be provided to the Winnemucca District no later than 24 hours before the Burning Man Airport (88NV) opens.

24. In the event of a fire within 100 nautical miles of the Burning Man 88NV airport, and with the issuance of a TFR, a BLM Division of Fire and Aviation air space coordinator may be assigned to the Burning Man airport. The air space coordinator will partner with 88NV management to record tail numbers of inbound and outbound flights at 88NV, notify departing pilots of active TFRs and regulate departures of traffic to and from event.

25. Single Entry Commercial Aircraft Services, known as Singleton's, will be required to show proof of insurance to BRC via the BXA Charter program. Carriers who do not show proof of insurance may not land.

## COORDINATION

26. BRC personnel shall meet with BLM staff and representatives from the various cooperators during the event period at such other times and places as needed. At these meetings, BRC shall provide daily attendance figures (as required in Special Stipulation 1) and exchange other information necessary to allow all parties to effectively administer and assess the event daily. BRC and BLM will have a daily meeting plan for the purposes of communication and exchange of information. Details will be included in the 2018 BRC Operations Plan.

27. BRC shall make a member of its Board, or authorized representative(s), available to the BLM prior to the event for planning coordination. This member of its Board, or authorized representative(s) will also be available to the BLM after the event for After Action Review coordination. BRC's Board member or authorized representative(s) must be authorized to represent and act on BRC's behalf to coordinate as needed with the BLM, law enforcement, and other event cooperators on issues requiring action. BRC must provide BLM with its authorized representative(s)/point of contact(s) by 07/29/2018.

   The BLM's representatives are the following:
      Mark Hall - Incident Commander (AO)
      Mark Pirtle - Compliance & Support Branch Chief
      Logan Briscoe - Law Enforcement Branch Chief
   (Note: The BLM representatives may use designees to represent them for certain functions)

28. BRC and BLM, and other agencies as shall be mutually deemed appropriate, shall cooperate in the development of a Unified Command (UC) structure, including designation of "Tier 1" leadership positions, for the management of available safety, security and infrastructure resources during an emergency incident. UC operations will be managed from the Joint Operations Center (JOC) unless it is deemed more appropriate by Tier 1 leadership to have an incident-specific UC location. During the event, and during the immediate pre and post operating period, Tier 1 members will coordinate daily to review and discuss operating procedures and outcomes. Tier 1 members will coordinate in the event of an emergency threshold incident as defined in the BRC Ops Plan. BRC will ensure there is appropriate BRC representation in the Tier 1 leadership, available 24 hours a day 7 days a week during the event and will provide the name(s) of BRC representation to BLM by July 30, 2018.

AR04828

29. Meetings required with affected parties:

    a.  BRC shall confer with the following entities prior to the event to address local issues and concerns: Washoe County Sheriff's Office, NDOT, Federal Aviation Administration, Washoe County Roads Department, Nevada Highway Patrol and the Gerlach Volunteer Fire Department.

    b.  A representative from BRC will meet with representatives from the BLM prior to the event to coordinate logistics for operation of the communication compound.

    c.  BRC shall meet with the Pyramid Lake Paiute Tribe to address concerns and impacts to Tribal reservation resources anticipated from the Burning Man event.

    d.  BRC shall keep the BLM informed regarding progress on formal agreements/MOUs with affected Parties.

30.  BRC will develop and implement a plan to address the potential for minors at the event to be exposed to adult activities. The plan should include placement of themed camps and measures such as educating parents and guardians that they are legally responsible for supervising the minor children in their care and advising adult-oriented theme camps to post a gatekeeper during times when the camp's activities might not be suitable for minors. BRC will make a diligent effort to enforce actions identified in the plan. A copy of the plan shall be provided to the BLM and the Pershing County Sheriff's Office before or within 10 days of the BLM's grant of the permit.

31. BRC shall develop and cooperate in the implementation of contingency plans for operations of critical health and safety services under adverse conditions, including those that could cause cancellation or temporary suspension of the event. Such causes may include adverse weather, natural or human caused disaster, or social unrest. This effort shall apply to participants within the event area and en-route to and leaving the event.

    A.  Prior to the event, BRC shall disseminate emergency information to participants via the Burning Man Website, the Burning Man Survival Guide, and any other appropriate media.

    B.  During the event:

        i.   Should event cancellation be necessary, critical health and safety systems must be as operational as reasonably possible during the duration of any temporary suspension, or until participants are able to leave the event site and the Gerlach/Empire area.

        ii.   BRC and the BLM will monitor forecast weather conditions. If weather forecasts suggest a high probability of adverse weather conditions that may result in disruptions to the event, both parties in conjunction with other appropriate agencies and cooperators will follow response plans and maintain appropriate strategies and actions to deal with potential impacts on participants. In the event of natural disaster or civil unrest, response plans, appropriate strategies and actions will be initiated immediately after any disaster or unrest occurs.

        iii.   BRC shall cooperate with the BLM and county law enforcement to warn participants headed into the event of event closure or other restrictions.

        iv.   BRC shall provide participants with current and projected conditions, allowed and prohibited actions deemed necessary for public health and safety as well as protection of the environment, and other appropriate public service announcements via BMIR, flyers, or loud speaker broadcasts as needed.

      v.   If event termination is required, an appropriate time frame will be established by the Tier 1 group and other cooperators to facilitate safe removal of people and property.

32. In cooperation with emergency services providers and law enforcement agencies, BRC shall within a reasonable time after learning of them, notify the BLM and appropriate agencies of all accidents related to the event that occur before, during, and after the event that result in death or personal injury requiring hospitalization. Accident reports involving death or injury will be coordinated with the Pershing County Sheriff's Office and the BLM.

33. BRC's medical contractor shall report daily to the BLM, and the Nevada Division of Public and Behavioral Health, providing a numerical breakdown of patient categories and transports, including a breakdown of reasons for transport; and no later than 60 days after the event shall provide to the BLM a written final statistical report of such medical cases.

34. Within 12 hours upon learning of any incident that occurs before, during or after the event that could possibly result in a liability claim, BRC shall confer with the BLM and as deemed necessary by either party, submit a written incident report to the BLM.

35. BRC shall manage fire suppression operations in Black Rock City in accordance with their annual Operating Plan to include operations pre, during, and post-event. BRC shall provide a minimum of two fire suppression apparatus (Type 6) and a Special Operations Response Apparatus. All personnel staffing apparatus shall comply with Firefighter 1 Certification from their home state, or NWCG Firefighter 2 Qualification. The fire suppression apparatus will be strategically placed within Black Rock City as determined necessary by BRC, including one fire tender and one apparatus (Type 1) dedicated to coverage for the airport during hours of operation.

## FEE SCHEDULE

36. The BLM shall collect a commercial use fee from BRC for the use of public lands for the event. The fee, as set by regulation 43 C.F.R. § 2930 and *BLM Handbook H-2930-1 Special Recreation Permits*, will be equal to 3% of the adjusted gross income derived from the use authorized under the SRP, plus any applicable assigned site fee and/or exclusive use fee, plus cost recovery, including application fees. Through the Collections and Billing System (CBS), the BLM will invoice BRC for a payment of at least 25% of the estimated commercial use fee (i.e. 3% of estimated gross receipts). Payment must be received by the BLM prior to the start of the event. Determination of gross income will be based on all payments received by BRC and its employees or agents for goods or services provided in connection with commercial activities authorized by the SRP. BRC shall provide BLM with an itemized detailed gross revenue report, prepared by a Certified Public Accountant, including, but is not limited to, ticket sales, authorized contractors operating under the Burning Man SRP, coffee and ice sales, revenue from filming and photography, Plug- and-Play camps, fees associated with outside services and private donations received by BRC for management of the event on public lands.

The following schedule for payments will be used:

| Payment | Due Date | Amount Due |
|---------|----------|------------|

AR04830

| 1. | 10 days after permit is issued by BLM; generated in CBS. | 25% of estimated commercial use fees |
|----|---------------------------------------------------------|--------------------------------------|
| 2. | January 31st, 2019 due date in CBS. | The remaining balance of commercial use fees |

37. BRC shall provide BLM with an itemized gross revenue report for all ticket sales and event entry sales. The report will include the number of tickets sold in each category and the price per ticket for the following categories as listed in the BRC "2018 Ticket Structure":

- PRE-SALE
- DIRECTED GROUP SALE
- MAIN SALE
- LIMITED $1,200 TICKETS
- LOW INCOME TICKET PROGRAM
- KID'S TICKETS
- OMG SALE

38. BRC is responsible for the cost recovery payment, consisting of the actual costs of administering the Special Recreation Permit, including all direct and indirect costs, in addition to the commercial use fees. BRC must sign a Cost Recovery Agreement (CRA) within 10 days of the issuance of the permit. 100% of the cost recovery fee estimate shall be received prior to the start of the event as provided in the 2018 CRA.

39. Any commercial vendors supplying goods or services directly to Burning Man participants at the event must have a permit from the BLM.

40. Per 43 CFR 5.2 and Public Law 106-206, commercial film producers/companies and commercial still photographers may need a permit from the BLM before they film/capture images on the playa.

## SANITATION

41. BRC shall ensure there are an adequate number and suitable placement of toilets as needed throughout Black Rock City according to BRC's Operations Plan and the Nevada Division of Public and Behavioral Health's Mass Gathering permit requirements, in conjunction with the Nevada Revised Statute sanitation requirements. Throughout the event, restrooms shall be placed in in strategic locations to accommodate participant's needs. Sufficient portable toilets must be supplied at areas likely to be used after dark. BRC shall ensure the toilets in the open playa are adequately lit and visible during nighttime activities. In conjunction with Mutant Vehicle mass gathering producers, BRC will stage sanitation resources in the deep playa. BRC will manage restrooms near the Temple according to the BRC Operations Plan.

42. BRC will educate participants about pumping limits, portable toilet locations, and best practices in desert camping. BRC shall continue to educate the event participants regarding the importance of appropriate disposal of human waste prior to the 2018 Burning Man event. BRC shall include a page on the Burning Man website that

AR04831

specifies the appropriate disposal of human waste for participants using personal portable toilets and provides information regarding the risks to human health of improperly disposed of human wastes. BRC shall inform the event participants on the legal ramifications to the individual and to the applicant of inappropriately disposed human waste including the possible revocation of permits, see NAC 444.5466 Disposal of sewage; plumbing (for Camping) and NAC 444.5492 (regarding provision of toilet facilities for mass gatherings). BRC will place portable toilets near the Temple throughout Sunday night.

## TRAFFIC MANAGEMENT

43. BRC's Traffic Management Plan will include detail on Burning Man's traffic controls during ingress and egress. This plan will be approved by the BLM authorized officer.

44. No more than 1,000 vehicles per hour shall be released from Black Rock City during the exodus period to avoid deterioration of the external roadway system to an unacceptable level of service (LOS E or F) (Note: Transportation engineers and planners commonly use the term level of service (LOS) to measure and describe the operational status of a roadway network. The Nevada Department of Transportation (NDOT) strives to maintain LOS D or better on all of its roadways. LOS levels E and F are considered unacceptable by NDOT).

45. BRC shall allow any dispatched tow truck that is licensed to operate in the State of Nevada to access the event through the 12-mile access vendor's gate for the purpose of removing vehicles in need of repair, and/or to carry out minor repairs to allow inoperable vehicles to be driven away from the event.

46. BRC shall manage highway clean-up operations in accordance with their annual Operations Plan to include litter and debris collection along the roads and highways surrounding the event. Operations shall focus on:
County Road 34 from the "12-Mile" entrance to State Road (SR) 447
SR 447 from County Road 34 to Wadsworth
Gerlach to the California state line, and
SR 446 from Nixon to SR 445 near Sutcliffe
and may include as necessary CR34 north of the event site to Jackson Lane.

Weather, traffic and other safety concerns permitting, BRC will begin this cleanup effort on Wednesday post-event, and complete the effort by October 1, 2018. BRC representatives will also meet and confer with local entities that have reported concerns about event participants leaving trash, and BRC will work to mitigate these issues in order to prevent a reoccurrence of complaints, and to promote Leave No Trace ethics outside of the event.

BRC shall coordinate with NDOT and the Freeway Service Patrol to ensure that debris removal is conducted according to NDOT standards and protocols. BRC shall coordinate with Washoe County as needed to identify county roads impacted by event related trash and debris. BRC shall make best efforts to collect all event related trash that can be safely collected and will notify and coordinate with the appropriate agencies for any remaining items.

BRC shall coordinate with NDOT and the Washoe County Roads Department regarding the appropriate type of traffic control devices and shall use such devices in accordance with both agency's requirements. A copy of all necessary permits for encroachment within NDOT and Washoe County Roads Department right-of-ways for temporary traffic control measures (i.e. speed limit trailers, etc.) shall be provided to the BLM and to appropriate agencies/jurisdictions by BRC prior to the start of operations.

47. Flaggers shall be used at the intersection of SR-447 and SR-427 to provide for greater public safety within

AR04832

the Pyramid Lake Paiute Reservation.

48. BRC shall cooperate with Washoe County Sheriff's Office and NDOT to request a temporary speed limit reduction through the town of Empire. The BLM recommends a posted maximum speed limit of 25 mph. A reduced speed limit would improve the safety of parking along SR-447 through Empire and pedestrians crossing the roadway.

49. BRC shall provide traffic control, using traffic control devices as determined by Washoe County Roads Department and NDOT, at County Road 34 entrances/exits to the Burning Man event, the "Y" intersection of SR-447/County Road 34 and in the towns of Gerlach and Empire during heavy traffic periods.

50. To reduce impacts to the Pyramid Lake Paiute reservation located along the access routes, BRC shall coordinate with the Pyramid Lake Paiute Tribe. BRC shall work with the Pyramid Lake Tribe in developing the applicant's plan to increase public awareness and educational campaigns about Leave No Trace® on tribal land, including for example, signage on roads, Public Service Announcements on BMIR, blog-posts, etc. Also, BRC shall continue to support and promote tribal enterprises that are setup to collect participant trash and recycling for a fee, which also helps with economic benefits of the region.

51. Event speed limits shall be posted on both Gate Road and the 12-Mile/Point I Road. BRC will provide clearly identifiable mileage markers on Gate Road to facilitate emergency response. Will-call area shall have an organized layout including signage.

52. BRC shall delineate the perimeter edges and ends of the NV-88 runways, with visible safety cones, as specified in the annual BRC Event Operation Plan.

**COMPLIANCE INSPECTIONS**

53. BRC's operation and compliance with the terms, conditions and stipulations of the Special Recreation Permit, Form 2930-2 and BRC's Operation Plan will be evaluated through performance inspections before, during, and following the event. All campsites, vendor operating areas, commercial film/still photography production areas, and permittee operating areas are subject to compliance checks to monitor environmental, vending and film/still photography compliance-related stipulations. This includes the Department of Public Works, First Camp, Heavy Equipment Yards, and the United Site Services Operation Area, among others.

54. BRC shall coordinate with the BLM and any other relevant agency to monitor environmental protection measures identified in these Special Stipulations, the temporary closure order, and BRC's Operations Plan. BRC will manage operations in accordance with their annual Operations Plan. BRC will document and mitigate all violations of environmental protection measures within 24 hours of the violation being brought to BRC's attention. The 2018 BRC Operations Plan shall describe the monitoring, communication, and mitigation protocols for Environmental Compliance, including but not limited to:
A. Trash fence integrity;
B. Appropriate campfire containment measures and prohibitions;
C. Protection of archaeological resources;
D. Camping within designated areas only;
E. Grey and black water dumping prohibitions;
F. Proper trash removal and cleanup;
G. Mitigation of vehicle oil dripping;
H. Hazardous materials;
I. Promotion of Leave No Trace ethics;
J. Motorized vehicle, motorcycle and ATV limitations and prohibitions as they relate to environmental

compliance and possible impacts;
K. Appropriate disposal of human waste; and
L. Burn containers raised off the playa.

55. BRC shall make personnel available immediately after the end of the post-event cleanup period, and if deemed appropriate by the BLM, during the spring following the event, to inspect the site with the BLM to determine any latent adverse impacts, such as pit depressions, bumps, depressions from roadways, ruts from vehicular traffic, or surfacing buried materials, to ensure that the site is returned to pre-event condition. Inspections of the event site, in the fall post-event, will be coordinated by the BLM using randomly placed transects on the site and a measurable cleaning standard. The inspecting party will intensively collect debris found on the ground within each transect. A follow-up spring inspection will be conducted only when deemed necessary by the BLM. The Post-Event Cleanup Standard shall be the average total surface area of debris collected from either the fall or spring transects will not exceed the equivalent of an average of 1 square foot per acre from identified inspection areas. BRC may make a written request for an extension of time for the completion of the cleanup if weather or some other catastrophic event interferes with access to the site for cleanup purposes. The BLM authorized officer may consider such a request. If cleanup studies indicate the Post-Event Cleanup Standard has been or is likely to be exceeded, the permit will be suspended until the site has been cleaned up to a level not to exceed 50% of the standard and the Operations Plan includes reasonable measures to assure that the Post-Event Cleanup Standard will not be exceeded during the life of the permit.

Black Rock City
Authorized Officer Signature:  _Raymond Ahr_  8/15/18
                                                          Date

# BURNING MAN PLAN:

## *SAFETY, HEALTH AND SECURITY ISSUES AND CONCERNS OF THE 2014 BURNING MAN EVENT*

submitted to

Bureau of Land Management
Washington, D.C.

April 22, 2015



Authored by Burning Man Project San Francisco, CA
Charlie Dolman, Marnee Benson, Ray Allen, Marian Goodell, Rosalie Barnes

For Official BLM Use Only: Not for Public Distribution

AR06444

# TABLE OF CONTENTS

TABLE OF CONTENTS — *1*
EXECUTIVE SUMMARY — *2*
MAIN REPORT — *5*
    ISSUE 1: MEDICAL, UNIFIED COMMAND, DISPATCH — *5*
    ISSUE 2: FIRE, RESCUE, HAZMAT — *12*
    ISSUE 3: FATALITY MEDICAL RESPONSE & SCENE MANAGEMENT — *14*
    ISSUE 4: TRAFFIC MANAGEMENT — *15*
    ISSUE 5: ART PROJECT MANAGEMENT — *16*
    ISSUE 6: SECURITY & SAFETY PLAN FOR SCHEDULED BURN EVENTS — *16*
    ISSUE 7: SANITATION MANAGEMENT — *18*
    ISSUE 8: EARLY ARRIVAL PROGRAM — *20*
    ISSUE 9: D LOT DESIGN AND MANAGEMENT — *22*
    ISSUE 10: FUEL STORAGE MANAGEMENT — *24*
    ISSUE 11: DEPLOYMENT OF MEDICAL RESOURCES TO LARGE EVENTS — *25*
    ISSUE 12: EMERGENCY VEHICLES AT THE AIRPORT — *27*
    ISSUE 13: CONDITION OF COUNTY ROAD 34 — *27*
    ISSUE 14: POPULATION TRACKING & REPORTING — *28*
    ISSUE 15: BRC EVENT TABLE OF ORGANIZATION (TO) — *29*
    ISSUE 16: EVENT MANUAL — *30*
    ISSUE 17: EVACUATION PLAN — *30*
    ISSUE 18: SIGNIFICANT INCIDENT REPORTING — *31*
    ISSUE 19: MUTANT VEHICLE OPERATIONS — *32*
    ISSUE 20: ILLICIT NARCOTICS — *34*
TIMELINE — *35*

# EXECUTIVE SUMMARY

The **Bureau of Land Management** (BLM) submitted to **Black Rock City, LLC** (BRC) a letter and document on March 12, 2015. The document included 20 areas of concern related to **safety, health, and security** at the 2014 Burning Man event. BLM Winnemucca District Office instructed BRC to prepare a report and deliver a presentation within 40 days to address these areas of concern and to provide an outline of improvements and proposed solutions for each.

BRC recognizes and shares the concerns of BLM and other Burning Man **cooperating agencies** and supports the aims and goals of this process: helping to ensure the health, safety and security of all staff, volunteers, participants and cooperators at the Burning Man event.  BRC has provided an overview of 2014 public safety, health, and security concerns in the body of the main report and specific improvements and solutions being implemented for the 2015 event.  The last section of the report consists of  a chart and timeline with deliverable dates for all improvements and solutions listed in the main report.

Producing the **Burning Man event** is a year-round collaborative process that involves eleven different federal, state and county agencies, multiple contracts, vendor support services, operational departments and supportive administrative services, and thousands of volunteers and additional personnel. As a result Black Rock City operations are extremely robust. Black Rock City evolves every year by identifying areas for improvement and expansion, and then implementing changes. In this way the organization and the city stay nimble and responsive at the same time they are able to look ahead and plan for the future.

Important issues and areas for improvement were identified after the 2014 event by BLM, BRC, and Burning Man's cooperating agencies related to top-level planning including **Unified Command** (UC).  2014 was the first year for Unified Command at Burning Man, and UC successfully planned and trained pre-event for a rainstorm and barricaded participant. More work is being done in advance of the 2015 event to ensure a greater level of preparedness, response, and cohesion amongst all agencies.

BRC and BLM will have in place for 2015 a comprehensive **rain response plan**, **fatality response plan**, and **evacuation plan**.  Burning Man's cooperating agencies will be deeply involved in the development and implementation of these plans.

Additionally, BLM has asked for an **Event Manual** and detailed **Table of Organization**, both of which will be delivered by July 2015.

Important concerns were voiced post event 2014 around **medical service** in Black Rock City including scene management, dispatch, protocols, and the Advanced Life Support (ALS)- Basic Life Support (BLS) interface.  These concerns are being addressed for 2015 including expansive improvements to Burning Man's Emergency Services Department (ESD) and the provision of a new ALS provider with extensive national event experience, extensive temporary mass gathering experience, and extensive UC experience. Increased coordination pre-event and on playa between ESD and the ALS provider and increased reporting to BLM have been built into the annual event production process to ensure delivery of medical service continues to improve each year and continues to exceed all federal, state, and local requirements.

BRC and BLM have identified ways in which BRC can more fully support **law enforcement** and increase safety with stronger messaging to participants about **illicit narcotics**, improved reporting and escalation of **significant incidents**, more medical resources at large events, better pre-event planning with agencies and departments, and more direct communications between LE and Black Rock Ranger supervisors.

Concerns were raised by BLM and Humboldt General Hospital (HGH) regarding BRC **fire and rescue** equipment, management of fire, rescue, and hazmat, and lack of **dedicated emergency response vehicles at the airport**.  These issues have been resolved for 2015.

In Burning Man's 2014 Special Recreation Permit evaluation, BLM reported  specific shortcomings with Stipulations 3 and 5 regarding **population reporting**. For 2015 BRC is solving this problem by providing live data tracking of arrivals via web access that will be available 24 hours per day, include a past data search function via web access that will be available 24 hours per day, iterative updates of departures and Black Rock City population via web access that will be available 24 per hours per day, emailed reports, and a full report of all data post-event.

 BRC continues to work with **Washoe County** and BLM regarding **County Road 34**. This road is essential for access to the Black Rock Desert and to communities beyond Gerlach, Nevada.  Washoe County has assured BRC and BLM that the County will respond effectively and safely to any instances of road failure or damage in 2015, and all parties recognize the importance of implementing a long-term solution.

BLM noted concerns about **sanitation management** at the 2014 event, and solutions will be implemented for 2015.

BLM has requested significantly more information about, participation in, and approval of **BRC departments and business operations**, including art project management, art burns, gate operations, fuel storage, and mutant vehicles. BRC will work closely with BLM to improve understanding of management of BRC departmental and organizational processes, trainings, and protocols for 2015 and beyond.

BRC recognizes the time taken by BLM to **review the 2014 event** and appreciates BLM's depth of concern around safety, health and security in Black Rock City as expressed in the March 12, 2015 letter. BRC greatly appreciates BLM's partnership as permitting entity for Burning Man and greatly appreciates Burning Man's home in the Black Rock High Rock National Conservation Area.

# MAIN REPORT

This section of the report will summarize issues that arose at the 2014 event and BLM concerns voiced in the March 12th letter and safety document, in the same numerical order as the safety document, and then address each of those issues with solutions and improvements. Some of the solutions and improvements are planned or proposed, and some have already been implemented. BRC looks forward to BLM/ Department of Interior (DOI) feedback and recommendations, and working together to improve these systems for at the Burning Man event.

BRC is taking this opportunity to address concerns, review resources, update protocols, and make improvements to internal systems, personnel, equipment, training, and operational procedures.

---

## ISSUE 1: MEDICAL, UNIFIED COMMAND, DISPATCH

After the 2014 event, BLM raised concerns around disorganized response between Humboldt General Hospital (HGH) and BRC's Emergency Services Department (ESD), and problems with chain-of-command on scene. BRC shares these important concerns.  BLM further noted that miscommunication on scene did and could cause confusion and lead to duplication of services.

BRC recognizes the need to improve ESD function and to further inform the ALS provider regarding the structure and responsibilities of ESD and the process for Emergency Management at the event. BRC is committed to solving these issues and making all necessary improvements.

In 2014 HGH did not have adequate training (within HGH or by BRC) for staff regarding ESD structure and responsibilities, and they have asked for additional information and training, which BRC will gladly provide.

All branches of ESD — Fire, Rescue, Hazmat, Medical, CIT — receive pre-event on-playa orientation. Training is provided by Chiefs and Supervisors at different locations depending on branch (e.g. Fire orientation is given by the Fire Chief at Station 5). ESD incident responders are trained by Medical Supervisors and/or the Medical Section Chiefs. BRC is happy to provide access to BLM for these trainings.

Pre-event off-playa training is required for all ESD personnel. Training includes ICS 100, the ESD Ops Manual and online BRC environment orientation materials. More senior BRC ESD staff must also complete ICS1200 and FEMA IS-15b. BRC is happy to provide BLM access to this training.

In addition, ESD personnel will receive improved training around incident command including roles and responsibilities of all emergency service providers and stakeholders.  It is important for all parties to understand organizational structure and responsibilities and to interface successfully, providing mutual support in all cases.

ESD line level personnel must have one year experience in the event environment prior to joining ESD, and they must meet NRS regulations. Supervisor roles are limited to those with between 3-5 years experience in ESD. Medical Duty Chiefs (MDC) all have 7+ years experience in ESD. Professional qualifications must also support this role, e.g doctors cannot be Medical Duty Chiefs as their experience is not relevant to field operations.

In order to improve **chain-of-command** and **communication**, BRC is taking the following steps for 2015:

1. Hired Emergency Operations Chief (EOC) (Rob Schnepp) as part of ESD leadership to ensure full alignment of all emergency function SOPs on the playa.
   a. The EOC will be responsible and accountable for emergency operations hierarchy, communications & scene management

2. Hire a Nevada Licensed Event Medical Director to provide high level guidance around mass gathering medicine best practice and joint medical direction for ALS and BLS.  BRC is currently in conversation with two experienced Medical Directors licensed in NV. BRC will inform BLM around who accepts this offer as soon as the information is available.

3. Hired ESD Plans Chief (Tim Ryan) to improve coordination of documentation and information management processes within ESD and amongst all cooperators including daily event sitstat

4. Hire Medical Duty Managers (MDM) to to separate the administrative (MDM) and operational aspects (MDC) of BLS aid stations increasing management oversight time for line staff.

5. For 2015 event season onwards adopt industry standard nomenclature for UC and incident command operations

6. Change Executive Officer (XO) title to the industry standard Battalion Chief (BC)
    a. The BC will serve as incident commander for emergencies that expand past initial basic response. These events may include multi-casualty incidents, significant fires, and special operations situations involving hazardous materials releases or technical rescue.
    b. The BC will activate Unified Command in coordination with BLM when appropriate.
    c. The BC will ensure appropriate movement & city coverage of field assets including BLS, ALS and Fire response units.
    d. The BC will coordinate with internal and external response agencies operating on the playa. These agencies include:
        i. Nevada Highway Patrol
        ii. Nevada DOT
        iii. Nevada State Health
        iv. Pershing County
        v. Gerlach Volunteer Fire
        vi. Washoe County Sheriff
        vii. Pershing County Sheriff
        viii. Pyramid Lake Paiute Tribe

7. Improvements to ESD personnel requirements, communications, and training:
    a. BRC, BLM, and ALS provider to meet as needed, but not fewer than once each year to ensure alignment on medical direction, reporting structure, protocols, orientation and training.
    b. ESD and ALS leadership will meet bi-weekly pre-event; discussion will align medical direction, reporting structures and protocols. BLM will be briefed.
    c. ESD to work closely with ALS provider pre-event to provide additional orientation information and improved training including ESD materials. BLM will be briefed.
    d. All ESD personnel to be licensed in the State of Nevada in accordance with the Sponsoring Organization designation. Confirmation to be provided to BLM by Nevada State Health.
    e. Require IS15B training for all ESD Chiefs. Confirmation to be provided to BLM.
    f. Require ICS 200 training to be undertaken by all ESD Shift Leads, Supervisors, and Branch Managers, and Duty Chiefs. Confirmation to be provided to BLM.

g. Recommend ICS 100 refresher for all ESD personnel who have not taken it within the past five years. Confirmation to be provided to BLM.

h. ESD Operations Manual to be updated as part of annual review including BLS scope of practice protocols to be approved by event Medical Director and more thorough treatment of incident command (ESD Ops Manual to be provided to BLM).

i. Upgraded training resources provided for all ESD personnel and shared with BLM

j. Expand ESD training on playa to include greater emphasis on incident command, scope of practice, and roles and responsibilities of ESD, ALS, and cooperating agencies.

8. Revise ALS contract and communications, provide training, and coordinate more closely pre-event to improve integration of ALS roles and responsibilities with ESD function

a. Require ALS provider to complete an event orientation program for all responders operating on the playa. Content to include familiarization of ESD capabilities (personnel, tools and equipment), operational organizational chart for BRC and ESD, ESD dispatch procedures, scene management algorithm, and overview of Unified Command. Orientation provided pre event and in groups pre event on playa.

b. Require ALS personnel to wear approved uniform to eliminate confusion about roles and responsibilities in terms of incident command.

9. Collocate  ALS EMS Ops Chief at BRC dispatch center 24/7 during live event operations

10. Improve ESD and ALS coordination with BLM, Pershing County and all law enforcement pre-event and on site

11. Addition of four First Aid stations at 4:30, 7:30, 6:00, and deep playa

2014 was the first year for Unified Command (UC) at the Burning Man event. UC experienced successes including running several tabletop exercises that were applied during the event. Unified Command also identified areas for future improvement.  Key areas for improvement are nomenclature conventions and establishing agreed upon conditions for standing up a UC.  Evolving and improving UC involves BRC, BLM, and cooperators.

BRC and BLM have already begun planning for 2015. This planning includes risk assessment and UC activation threshold review. This process also includes Pershing County, and BRC expects the need for evaluating and fine-tuning UC will continue each year as partnerships continue to mature to support the growth of the city.

During the 2014 rain event, it was noted by BLM, BRC and other cooperators that there was a lack of clarity on process for standing up a UC, this included issues around centralized meeting points and radio communications.  It was also noted that the ALS provider should have been included at the onset of the rain event.  As a result, while all parties worked cooperatively together and the coordinated response was successful, BRC looks forward to improving and refining protocols with BLM and all partners.

UC planning and training for 2015 will focus on protocols, nomenclature, notification, and communication to ensure all parties understand the response process and their roles and responsibilities in UC. BRC looks forward to improving and refining protocols with all partners.

In order to improve the **Unified Command** function, BRC is taking the following steps for 2015:

1. Distinguish between Unified Command and Emergency Operations Center (EOC) and the trigger points for each
2. Review and improve UC activation SOP ensuring all parties, including Pershing County Commission availability for planning and event meetings
3. May 2015: UC members undertake risk assessment and SOP evaluation to include UC development and operations, evacuation plan, rain response, fatality response plan, communication, and mass casualty incident plans
4. As a UC finalize evacuation plan, rain response, communication, and mass casualty incident plans in June & July 2015
5. Conduct tabletop training exercises on playa pre-event August 2015
6. Involve ALS provider more extensively in Unified Command planning as well as other cooperators

---

BLM cites HGH concerns that ESD dispatchers were not suitably familiar with emergency communications and were not sufficiently licensed or certified (Emergency Medical Dispatch). BRC recognizes and appreciates the crucial importance of the dispatch function in Black Rock City. BRC is fully committed to addressing problems that arose in 2014 or may arise in the future with dispatch at the Burning Man event.

BRC Dispatch provides the critical link between the staff out in the city and their emergency response help. BRC runs a custom built CAD database hardwired into the latest digital dispatching and radio communications system. Our CAD system allows incident management and resource allocation per incident as well as time and location tracking.  BRC Dispatch runs five dispatch positions live 24/7 for 14 days and responds to over 1,600 calls ranging from paging requests to more serious medical incidents.

BRC complies with all laws and regulations regarding dispatch services:
- ● ([https://www.leg.state.nv.us/NRS/NRS-450B.html](https://www.leg.state.nv.us/NRS/NRS-450B.html))
- ● ([https://leg.state.nv.us/NRS/NRS-041.html](https://leg.state.nv.us/NRS/NRS-041.html))

BRC provides detailed, focused training for all dispatch operators; training includes ESD departmental management structure, beat orders, event communications and Black Rock City orientation.

As with most large events the producer manages the event using two way radio infrastructure. In this scenario dispatchers do not communicate with the patient and therefore legally cannot offer Medical Advice. BRC Dispatch is a resource tracking and incident coordination center. The primary goal is to ensure resources arrive as quickly as possible at any incident. In 2015 there will be oversight of this process by BRC Battalion Chief and UC members including BLM.

Dispatch in Black Rock City is an extremely focused and professional working environment. BRC ESD requires that all personnel that wish to progress from dispatcher to dispatch supervisor must do so only by gaining understanding and experience over multiple dispatch shifts. First-shift dispatch trainee personnel shadow an experienced dispatch trainer while monitoring only low traffic input channels (911-alt) which they must do for at least one shift before progressing to busier channels. Dispatch Supervisors have successfully progressed through all of the levels. Dispatch supervisors have over 70 hours of working in the BRC ESD Dispatch Center. For every step progression is at the discretion of BRC Dispatch Supervisor and/or Communications Chief

In order to improve the event emergency **dispatch** function, BRC is taking the following steps for 2015:

1. Collocate in the same building all event emergency service function dispatchers: medical, fire, rescue and LE
2. As part of the UC planning process review dispatch operating protocols as well as resource allocation and availability both internally and with all relevant UC partners to ensure aligned, coordinated response and mutually understood language.

3. Update and improve all documentation for the BRC dispatch training program (required for all ESD dispatch personnel)
4. Require ICS 200 for all BRC Lead Dispatchers

NOTE: BRC ESD Communications Chief recommends BLM to apply for the **Operational Communications Assessments** (OP-ASMT) offering from the Department of Homeland Security's Office of Emergency Communications Interoperability Communications Technical Assistance Program (ICTAP) in order to have an independent evaluation of the communications operations at the 2015 event. (http://www.dhs.gov/office-emergency-communications-technical-assistance-program).

---

BLM noted concerns about availability and efficient assignment of **emergency response vehicles** and cited the HGH AAR regarding EMS operations reaching a "Status Zero" state and Quick Response Vehicles (QRVs) and Command Units being utilized to answer calls.

BRC understands the critical importance of availability and efficient assignment of emergency response vehicles to public health and safety at the event. BRC further recognizes the need for continual evaluation and is committed to this process. BRC is working to ensure all agencies are dispatching through a coordinated response protocol. BRC has undertaken a full analysis of 2014 CAD data to identify trends in minutes over time for ambulance availability.

BRC understands that there are many BLS call types where a QRV or Command Unit is appropriate for response and welcomes the opportunity to align with BLM and the ALS provider on these protocols.

In order to improve the availability and assignment of **emergency response vehicles**, BRC is taking the following steps for 2015:

1. BRC will provide results of the 2014 CAD analysis to the 2015 ALS provider and to BLM; analysis shows no time at which Status Zero was reached.
2. Pre-event communication to enable agreement on emergency response unit protocols between ALS provider and BRC. BLM will be briefed.
3. ALS to provide two additional ambulances during peak injury times such as Friday night / Saturday morning of the event and also as will be identified through CAD data analysis.

---

## ISSUE 2: FIRE, RESCUE, HAZMAT

BLM and HGH reported shortcomings in equipment and management of fire, rescue and hazmat programs, citing a lack of compliance with standard extrication capabilities.  BLM also noted a disorganized response by BRC staff when cleaning up bodily fluids at the scene of the fatal accident.

Each year BRC evaluates all equipment and management of fire, rescue, and hazmat programs. BRC understands the need for a higher level of assessment as the event grows.  BRC also recognizes the need to better inform and consult with BLM and the ALS provider about BRC fire, rescue, and hazmat response capabilities.

BRC meets or exceeds all standards and regulations related to fire and rescue.  The Burning Man event is held on federal land and is governed by federal OSHA regulations including:
- CFR 1910.146 (confined space)
- CFR 1910.156 (volunteer fire brigade)
- CFR 1910.126-650 (trench and collapse operations)

Additionally, BRC is mindful and aware of applicable voluntary consensus standards such as NFPA 472, NFPA 1670 and 1006. These standards (or OSHA law) do not specify equipment that must be carried or supplied. Rather, NFPA 1670 states that an organization undertaking rescue operations, "must ensure that equipment commensurate with the operational capability is provided. This shall include training on all equipment." To that end, BRC tools and equipment carried on the apparatus and available through the BRC Department of Public Works meet this requirement.  BRC ensures all ESD fire and rescue personnel are properly trained on equipment they will be using. BRC has collaborated with Nevada EMS Chief Pat Irwin and Pershing County Fire Chief Mike Heideman to ensure compliance and fit for purpose level of equipment.

ESD rescue personnel are recruited nationally and trained to various levels in high angle rescue, machinery rescue, structural collapse, confined space and vehicle extrication. ESD rescue personnel are trained to the competencies as outlined in NFPA 1670 and certified to many of the job performance requirements of NFPA 1006.  ESD rescue personnel are certified in a variety of rescue topics in accordance with their home state and many are active members in good standing with the FEMA Urban Search and Rescue system. Most are assigned to rescue apparatus or truck companies with rescue responsibilities in their home agencies.

The tools and equipment used in Black Rock City are matched with the expected hazards anticipated during the event. In addition, the BRC Department of Public Works maintains a vast array of heavy equipment with certified operators that are available to ESD through special call. This equipment includes scissor lifts, large cranes, front loaders, forklifts, cutting torches, large pry bars and heavy hand tools.

ESD personnel includes approximately 80 fire volunteers, all of whom are required to be certified as an EMT and to have Firefighter 1 or Wildland firefighter certification.

All BRC personnel tasked to respond to hazardous materials incidents are certified to the level of hazardous materials technician as outlined in 29 CFR 1910.120 (q). There are no specific tools or equipment listed in Federal OSHA. To that end, the tools and equipment carried for hazardous materials response meet or exceed expected level of response.

ESD Special Services includes 21 rescue and hazardous materials responders as well as 19 certified hazardous materials technicians per CFR 1910.120 (q). Eleven personnel are certified rescue technicians in their home state, and five are affiliated with state or federal USAR teams.  Seven personnel are certified in their home state as rope rescue technicians, and 17 are either trained or certified as vehicle extrication personnel. Nine members of ESD are certified as confined space rescue personnel in accordance with CFR 1910.146, and nine are certified as collapse rescue technicians.

BRC is committed to an exceptional level of fire, rescue, and hazmat management and operation in Black Rock City and appreciates all of the concerns raised by BLM and HGH.

In order to improve equipment and management of **fire, rescue, and hazmat programs**, BRC is taking the following steps for 2015:

1. Acquire a new rescue/hazmat response vehicle and provide training to responders
2. Add additional tools for fire and rescue response including two additional tactical tenders and 2,000 gallons of water for fire suppression (a total of 75,000 gallons)
3. Add a staffed fire response vehicle (foam unit) at the BRC airport
4. Discuss fire, rescue, and hazmat equipment and management with ALS provider and BLM
5. Expand ESD training on playa to include command and control, and roles and responsibilities of ESD, ALS, BLM and cooperating agencies

## ISSUE 3: FATALITY MEDICAL RESPONSE & SCENE MANAGEMENT

After the 2014 BLM noted concern regarding disorganized and unprofessional medical response occurring on scene during a fatal accident involving an art car. BRC recognizes the critical importance of clear understanding, agreement, and adherence to chain-of-command, and equal importance of clear understanding, agreement, and adherence to medical protocol on scene.

In the case of the tragic fatality, ESD and ALS personnel disagreed about protocol, which led to confusion and strong emotions. As a result, the scene was less controlled. To ensure smooth scene management in the future, BRC will enhance training for ESD personnel and require improved training for ALS providers.  BRC recognizes that best practice includes compassion and respect by all responding agencies, especially in high stress situations.

In order to improve **medical response and scene management** for 2015, BRC is taking the following steps, in addition to the steps listed above in ISSUE 1:
1. BRC and the ALS provider will work pre-event with BLM/ Pershing County and all law enforcement to ensure shared understanding of protocols related to fatalities and/or establishing a medical scene as a crime scene.  This will include a specific UC developed Fatality Response Plan.
2. BRC is requiring all ESD personnel to be licensed in the state of Nevada under Sponsoring Organization designation requirements.

## ISSUE 4: TRAFFIC MANAGEMENT

On Monday August 25, 2014, traffic into Black Rock City was stopped due to rain. Vehicle, bicycle, and foot traffic within the city was limited to necessary functions, response, and operations.  Hundreds of vehicles were temporarily staged to the side of the roads leading to the event, including Hwy 447 and County Road 34, and hundreds more re-routed to Pyramid Lake for camping.  Hundreds of additional vehicles were asked to remain in place along gate road.

Cooperation among agencies was high during the 2014 rain event, which resulted in successful multi agency response to public and participant safety needs. BLM, BRC and cooperating agencies also gained valuable experience that will effectively

inform and improve rain response planning for 2015 and beyond. BRC greatly appreciates the success of UC planning and tabletop training in responding to public and participant needs both on playa and off during the 2014 rain event.

BLM noted that UC members observed a lack of contingency planning for off-site traffic to address public safety on roads and highways leading to and from the event during this type of incident.  This was indicated when BLM sought support and leadership by BRC Gate/Exodus for traffic control on Cr 34 and BLM was told that BRC Gate/Exodus was unable to lead this effort.

In order to improve traffic management related to possible rain events or other events that affect Traffic Management in 2015, BRC is taking the action described in the Unified Command section of Issue 1 of this report and the additional steps listed below.

BRC is addressing the event UC activation processes and SOPs for 2015 with all cooperators. This will include the continued development of the event rain response plan and the involvement of all partners in this plan. The UC timeline is included at the top of this document.

In order to improve **traffic management** and contingency planning, BRC is taking the following steps for 2015:
1. As part of the UC planned Rain Contingency plan provide for more off-playa sanitation units and servicing, units to be placed pending location of incident
2. Rain Plan to also include alternative camping locations for participants not able to get onto the playa.

## ISSUE 5: ART PROJECT MANAGEMENT

In 2014 the Man included thick support beams in the legs that took longer to burn than years past and resulted in a longer than usual time for the piece to fall to the ground.  BRC maintained the perimeter for crowd control for the duration of this burn, with no safety violations or security breaches. BRC Rangers requested BLM law enforcement presence toward the end of the wait time and BLM, LE responded with assistance.  See improvements listed in this section and discussion in Issue 6: Security and Safety Plan for Scheduled Burn Events.

The Embrace art piece was not scheduled to burn. As with all Honorarium art projects, extensive planning and coordination took place pre-event between BRC and the Embrace team.  This planning and coordination includes all stages from

concept through build and burn or deconstruction.  Planning includes timelines and construction materials. The Embrace team understood the requirements for their piece and signed a contract that included provisions for not burning the piece.  They wrote and BRC approved a plan for dismantling and removing the piece post-event.

During the course of the Burning Man event, BLM and BRC learned that some participants might be considering or discussing burning Embrace. BRC and BLM responded and worked with the Embrace team, and all relevant BRC and BLM departments to manage a safe, successful, controlled burn.  Even though this burn was not planned pre-event, all design and construction aspects of the piece were understood by BRC, which enabled BRC to plan and conduct a safe burn. Additional measures were taken for public safety including holding the burn at 7:00 am on Friday morning, in broad early daylight and implementing stringent post-burn clean-up procedures. The Embrace Burn followed the BRC Burn Protocols process including management teams, perimeter management, and communication process.

The BRC event management team including the Unified Command must always respond actively to situations as they arise in Black Rock City. Should BRC and UC see no other way than to demolish or remove an art piece in order to maintain public safety, the appropriate action will be taken.

BRC Art management process specifically retain the rights of BRC to control the contents of the city and this is clear in all communications to the artists.

In order to improve the **art management** process for 2015, BRC is taking the following steps:

1. Continue annual internal review and improvement of art management process and artist communications.
2. Updated artist contract. Ensure all artists are aware of details and requirements including acceptable materials and practices for pieces that are intended to burn, and BRC reserved right prevent burns or demolish / remove piece.
3. Ensure the Man, when supersize, has a secondary and tertiary collapse mechanism incorporated into the design.

## ISSUE 6: SECURITY AND SAFETY PLAN FOR SCHEDULED BURN EVENTS

BLM raised concerns about the Black Rock Rangers Sandman team, who do security and perimeter control for large-scale planned burns. Specifically BLM noted that these personnel are not insured, licensed, bonded or trained to use physical force. Additionally BLM raised concerns around some of the SOPs of the Sandmen.

Sandmen share responsibility for public safety at scheduled burn events. The Sandman team has very thorough selection, training and deployment protocols that are followed meticulously. To qualify for the Sandman program a Ranger must:

1. Be a returning Ranger in good standing with experience working at least one (two preferred) smaller burn perimeter (in other another team)
2. Have prior experience with applied empty-hand defensive tactics
3. Have no prior record of violent offense or abuse (checked by Sandmen leads and BRC HR)
4. Undertake the official Sandman training and be passed by the Sandman Trainers and Sandman Leads. Training includes process for laying hands on, language for communication with participants in the fire circle

Not all Rangers who apply to be Sandmen are accepted into the training program, and not all those who are accepted into the training program pass. From the Sandman training manual:

> "The role of Sandman involves the highest risk of physical injury or death in all of Ranger practice and presents special physical, mental, and emotional challenges. None of these risks or challenges can be taken  lightly, and the role requires special experience, training, equipment, dedication, and commitment. Finally, Sandmen are not heroes. No Sandman should ever take unnecessary risks in the performance of their duties. First and foremost, Sandmen protect themselves and their teammates so that they may successfully help others."

BRC wishes to maintain an excellent record of safety during scheduled burns and will work to create transparency for BLM on the comprehensive **burn management processes and plans** including Sandmen protocols, in place through inclusion of BLM LE in the planning process with the Fire Arts Safety Team (F.A.S.T.), Rangers and ESD.

BRC and BLM should work together during this planning process to ensure that the BLM presence is there to retain participants ejected from the fire circle by the Ranger teams. BLM will also ensure that ejection/evictions/L2000 are carried out for participants ejected from the fire circle.

In order to address concerns around **Sandmen** and **burn perimeter safety and security**, BRC is taking the following steps for 2015:
1. BRC will include BLM in the Burn management planning process for the improvement of security at the event.
2. Ensure all Sandmen are certified and accredited security in the state of Nevada. Confirmation to be provided to BLM.
3. Ensure BRC insurance covers all aspects of the Sandmen operation. Confirmation to be provided to BLM.

---

## ISSUE 7: SANITATION MANAGEMENT

BLM raised several concerns about sanitation management at the 2014 event:
- Lack of access to portable toilets during large scale mobile music events
- Insufficient pumping resources dedicated to removing blackwater from participant campsites
- Uncertain schedules for daily pumping of porta potties
- Empty hand sanitizer containers
- Timing of installation of hand sanitizer at open playa banks

BRC recognizes the importance of sanitation management to public health and safety and the concerns raised by BLM.  BRC has made improvements each year as the Burning Man event has grown.

In 2014 BRC managed 1,664 **portable units** placed at dozens of locations throughout the city. The placement and management of the units, along with accompanying hand sanitizer, is complex, well understood, and evolves as appropriate from year to year.

Burning Man has worked with a single **nationally recognized vendor**, United Site Services (USS), to provide sanitation services and has worked with the same management team for 15 years. The contract between the two entities lays out performance standards which include levels of service, numbers of potty units, numbers of trucks, staffing behavior and management accountability.

In addition to the 1,664 portable toilets, USS provides 50 **pumper trucks**, running regular, pre-scheduled mapped routes throughout Black Rock City based upon time of day, known gatherings and events, anticipated burns and any other intelligence available to predict spikes in population density at any given bank. Maintenance and cleaning of portable toilets must adhere to **performance standards** (maximum 60% full) based on contractual stipulations.

Per contract, USS stages 100 standard units to be deployed if necessary in the event of rain or other **emergency**. In 2014, during the rain event, BRC learned the importance of having some units available off-playa and will have units available to deploy along County Road 34 or SR 447 more easily if they are needed in the future. In addition, USS can bring in a significant number of potties (upward of 1,500) and 20-30 additional trucks (from Reno, Carson City, Sacramento, San Francisco), within 24 hours provided that roads are passable. Even more resources are available within 48 hours — USS has assets in all surrounding states.

USS provides trucks labeled "RV Servicing Only" that patrol the city following scheduled pre-determined routes. These units are for participants in need of **servicing**. BRC works with USS to help produce effective patrol routes and schedules. USS also provides customer service at their office at the end of the 6:30 street. USS has the resources needed to handle all of the private pumping of RVs, trailers and holding tanks in Black Rock City in 2015, BRC has provided RV density information to USS to assist in planning this resource. The 2015 Sanitation Management plan will be included in the BRC Event Manual.

In order to improve **sanitation management**, BRC is taking the following steps for 2015:
1. Provide potty units at the newly designated large scale mobile music zone in deep playa
2. Working pre-event with mobile sound camps to know schedule of events. BLM will be briefed
3. Continue to encourage the Burning Man community to use placed potty banks
4. Improve participant trailer and RV estimates (thus pumping) based on aerial images of 2014; use 2015 census data to further improve estimates. Share data with USS. BLM will be briefed
5. USS to continue conducting annual review of fleet, and add vehicles and services as needed
6. Through targeted email communication encourage theme camps to arrange pumping in advance to facilitate servicing
7. Post publicly the price list of USS pumping services (USS has a vending SRP)
8. Improve night-time visibility for participants around potty bank locations

9. Addition of new BRC Compliance position; will ensure environmental standards are in compliance and all vendors are inspected by Nevada Department of Health and this is reported to the UC
10. Allow access to two additional alternative sanitation service vendors; both of these vendors were on site in 2014 and in current good standing with BRC
11. Alternate vendors will be inspected by the Nevada Department of Health. BLM will be briefed
12. Alternate vendors will not be allowed to engage in cash sales; all servicing must be pre-arranged
13. Alternative vendor trucks will be clearly labeled to distinguish them from USS trucks
14. Increase to four the number of hand sanitizer units on either side of the bank at most main potty banks
15. Review sanitizer placement schedule and update as needed
16. Provide foaming sanitizer to reduce overconsumption
17. Encourage participants, via BRC communications channels (see Issue 20 Illicit Narcotics), to bring their own hand sanitizer and not to steal hand sanitizer out of the dispensers

---

## ISSUE 8: EARLY ARRIVAL PROGRAM

BLM has expressed concern that BLM law enforcement and Civilian Operations were understaffed pre-event due to the large number of early arrivals on the playa. BRC is committed to improved clarity around pre event population information to assist with better planning for all agencies including BLM.

BRC's Early Arrival program provides entry to the event site for staff, volunteers and other personnel who build the city prior to the main gate's open time in order for the city to be safely operational before the majority of the participants arrive. This includes personnel for BLM, event cooperators including ALS provider, art pieces, theme camps, art cars, BRC organizational infrastructure and other city services.

Approximately 23% of the Black Rock City total population arrives before the event gates open to the general public. Because of the lack of facilities and infrastructure in the Black Rock Desert, everything needed for the event must be transported from other locations and built on site. This includes event infrastructure such as power and water, staff housing, city services such as shade and portable toilets, cooperator infrastructure such as the BLM Incident Command Post (ICP), theme camps and elaborate vehicles — the entire city. Black Rock City is surveyed and fenced by hand;

thousands of t-stakes are pounded, and thousands of meals are prepared. The city literally emerges from the ground up.

The work and energy it takes to create Burning Man is evident in the weeks leading up to the live event. The survey crew is first, with only a dozen people, and the numbers slowly but steadily increase as more teams and crews arrive to do their job in the order that makes sense and provides for the highest level of safety and efficiency, until artists and theme camps and mutant vehicles arrive to bring the creative heart of Black Rock City to life.

One-third of the pre-event population ($\sim$5,000) is leadership of Black Rock Rangers, Emergency Services, art projects, mutant vehicles, theme camps and the 80 departments of BRC. Another two-thirds of the pre-event population is crew ($\sim$13,000). BRC, Theme Camp or Artist team leadership typically arrives first to lay the groundwork and make initial preparations, and crew members arrive next. Every shade structure, every art piece, every camp, and every intersection takes leadership and a crew to build and build safely. Early Arrival passes are granted to these people.

Theme Camps use 50% of all early arrival passes to build interactive camps. The next largest group requiring early arrival passes is the art department, requiring some 15% of all early arrival passes. The Department of Mutant vehicles is a close third, using another 15% of early arrivals to allow access to mutant vehicle owners and teams operating large vehicles, some with and some without flame effects.

All  mutant vehicles must be tested, operated, and fully registered with the Department of Mutant Vehicles before driving during the event or on the open playa. All vehicles are required to obey applicable speed limits. Mutant vehicles and personal vehicles must be appropriately stickered. Mutant vehicles and personal vehicles are used to transport staff and crew from installation and campsites to the ARTery, portable toilets, BRC meetings, and other camps and sites. Crews need constant access to tools, food, shelter, and although Black Rock City is primarily a pedestrian and bicycle city during the live event, pre-event transportation during the day and at night must include vehicles.

In addition to mutant vehicle functionality, art must be complete and secure, and BRC and theme camps' sound systems working, lights fully functional, kitchens built, shade safe and all ready before the event goes live. Many crews work during the day, but equally many work during the night, when temperatures are cooler. This is why, pre-event, Black Rock City appears to be such an active, celebratory place 24 hours per day.

The rules of the Temporary Closure Orders/Temporary Restrictions and Stipulations come into effect pre-event. People on site are directly constructing art, mutant vehicles, and theme camps, or they are indirectly supporting this work by cooking, cleaning, driving, and managing logistics.

Please refer to Issue 14: Population Tracking and Reporting, for further information regarding pre-event population reporting.

In order to improve the BRC **early arrival program**, BRC will undertake the following for 2015:

1. Work closely with BLM and ALS, and other cooperators to provide clear guidance on the predicted population model in order to allow all parties to ensure all operations are staffed appropriately to support the building of Black Rock City and to ensure safety, health and security are in place

---

## ISSUE 9: D LOT DESIGN AND MANAGEMENT

**Language clarification**: The parking area outside of BRC's gate referred to as "D-LOT" by BLM in the Safety, Health & Security Issues document is actually the "Will Call Lot".

**D Lot** is a processing area for entrants with ticketing problems or needing further assistance in locating their tickets, vehicle passes or Early Arrival passes. At most there are 10-20 vehicles in D Lot at any one time. D Lot is a very small (100x100 yards) lot located behind the box office. D Lot is managed by the D Lot Supervisor, and there are D Lot Leads working every shift and reporting to Gate Operations Manager.

**Will Call Lot** is a parking area for entrants needing access to the Box Office, where they pick up tickets and vehicle passes. Will Call Lot changes in size depending on need. Will Call Lot can hold between 600-800 vehicles at one time under normal conditions. In 2014, BRC witnessed higher than usual demand on the Box Office, which resulted in a heavy Will Call parking lot demand. Will Call Lot is managed by the Will Call Supervisor, who reports to the Gate Operations Manager, and at any one time there are up to 10 Will Call Lot Leads working.

BLM raised concerns about D Lot design and management, specifically:
- The lack of internal organizational structure or directional markings in D Lot
- Uncontrolled partying, loitering, and trespassing

- Unmanaged nature of D Lot contributing to delayed reporting and response to barricaded suspect
- People in D Lot not included in population reporting

BRC does not allow trespassing of any kind. Due to high demand and long processing times at Box Office in 2014, there were entrants waiting in the Will Call Lot for extended periods of time, up to 6 hours. With more processing windows and fewer entrants needing access to Box Office in 2015, BRC expects wait times will decrease significantly and reduce this perception. For 2015 BRC targets a wait time of between 3 and 4 hours at peak ingress.

All entrants accessing BRC, either via D Lot or Will Call Lot, are scanned by BRC ticket scanners before proceeding into the city. Population reporting includes all people who have been processed at the Gate, and not people who are waiting to gain entrance into Black Rock City.

In order to improve **management of Will Call Lot**, BRC is taking the following steps for 2015:
1. Providing postal delivery option for approx. 50% of the 2014 Will Call traffic to significantly ease the load on the Box Office and Will Call Lot.
2. The Box Office is receiving a significant upgrade including:
   a. Increased staffing: From ~70 to ~120
   b. More windows: From 10 to 15
   c. Longer hours: Open two days earlier (still 24/7)
   d. Shaded queue that will efficiently provide organization and shade for at least 400 people
3. The Will Call Lot is receiving a significant upgrade including:
   a. New Will Call traffic flow with emergency access lanes
   b. Increased BRC Ranger presence at key times
   c. New safety measures in 2015 include
      i. Additional Will Call Lot staff (local traffic management)
      ii. Light wands for traffic management staff
      iii. More flagging
      iv. More cones
      v. Signs for section emergency service location

---

## ISSUE 10: FUEL STORAGE MANAGEMENT

*See also ISSUE 19 Mutant Vehicle Operations*

BLM noted in the 2014 Safety Issues/Concerns document that Art Cars were carrying large amounts of fuel, some in close proximity to "pyrotechnics". Camps in BRC were also noted to have fuel stores, in some cases large amount, and in some cases in unapproved containers.

**Language clarification**: In the BLM Safety Health and Security letter Art Cars are referred to as having Pyrotechnic effects on-board. No Pyrotechnics (or fireworks) are allowed on Mutant Vehicles, only inspected flame effects.

BRC has guidelines for fuel storage for both theme camps and mutant vehicles. Liquid petroleum fuel storage compliance is regulated by Rangers, Earth Guardians, ESD and FAST. Mutant Vehicle Flame Effects and related fuel storage standards are regulated by FAST and the DMV. No Flame Effect or Mutant Vehicle can operate without registering first with FAST and DMV. Full inspection and passing of the inspection is proven with a laminate and DMV sticker that changes each year and must be carried at all time by the artists. FAST flame effect and fuel storage inspections are overseen by Eric Smith the chief propane inspector for NV state government. Mr Smith is supported by his team of FAST volunteers.

     a.  For fireworks : NFPA 1123 Code for Fireworks Display
     b.  For Flame Effects : NFPA 160 Flame Effects Before Audience as well as NFPA 54 and 58 the LP Gas codes.
     c.  For MV flame effects fuel storage we use NFPA 58 (2011): 6.23.3 Container Installation Requirements, DOT 172: 101/8&500

No more than 110 Gallons or two 55-gallon drums may be stored in camping areas. This follows state and federal guidelines for public unlicensed transport of liquid fuel.

To support theme camps arrangements can be made to have fuel delivered daily to large generators or in drums through BRC-approved and state-licensed independent vendors. At the event, contact may be made through the Fuel Funnel at Playa Info at Center Camp for fuel deliveries.

Fuel must be in stored in appropriate containers per state guidelines, which include 55 fuel drums and Department of Transportation (DOT) approved 5 gallon or smaller containers. A secondary containment device or structure capable of holding 110% of the largest single container in the containment is required. Further fuel guidelines on BRC website address marking of fuel storage areas and fire extinguisher locations.

In 2014 a Mutant Vehicle Fuel Station was installed on the open playa so that Mutant Vehicles could obtain fuel at the event removing the need to store in camp.

This program will continue in 2015. In 2015, FAST and DMV are revising standards for Mutant Vehicles for fuel storage, including how much can be stored on board and how far it needs to be from open flame effects.

To improve **Fuel Safety** for 2015:
1. Use targeted per user group (art cars lists, theme camp lists, artist lists) email communications to drive further adoption of the Mutant Vehicle fuel station
2. New rule for 2015: no liquid fuel storage on your art car - return to camp to refuel.
3. Use targeted communication to drive further adoption of the theme camp fueling service
4. Distribute new printed materials providing guidance for theme camps around fuel storage and related safety. Distribute printed leaflet at all points of contact between theme camps and fuel operations
5. Enhance BRC and BLM on the ground compliance at the Filling Station and theme camps for safety and health

## ISSUE 11: DEPLOYMENT OF MEDICAL RESOURCES TO LARGE EVENTS

BLM raised concern around inadequate proactive deployment of EMS assets to large scale mobile music events. BRC concurs with this assessment and will achieve this in 2015. Currently ESD and Black Rock Rangers stage personnel and mobile resources at all large scale events when those events are scheduled, but BRC recognizes the need for improvement. Solutions are identified below.

BLM LE further noted a concern around law enforcement officers responding to medical situations on a regular basis by providing emergency care, which draws LE and other resources away from the law enforcement mission. BRC will fully support the LE mission, improve information flow, and coordinate with LE to provide improved ESD dispatch of medical resources. BRC is taking several steps, outlined below, to address this situation.

BLM also raised concern around inadequate proactive deployment of EMS assets to large scheduled burns. BRC has well established protocols for proactive deployment of medical resources to scheduled burns. ESD is fully informed pre-event about all scheduled burns. In addition, ESD meets daily during the event with the Fire Arts Safety Team (FAST) to discuss scheduled burns; appropriate medical resources are then calculated and deployed.  Scheduled burns are discussed at each ESD morning

meeting to confirm locations, conditions, and shared understanding of deployment strategies and resource needs.

All scheduled burns identified as needing ESD support are additionally staffed with Rapid Intervention Teams (RITs). RITs are teams of two. There are firefighter RITs and medical RITs. There are 16 fire and 4 medical RITs stationed at the Man burn and Temple burn. All other supported burns have RITs appropriate to the size and conditions of the particular burn. Steps to improve medical response at scheduled burns are listed below.

In order to improve the availability of medical resources at **large scale mobile music events**, BRC is taking the following steps for 2015:

1. Established a zone in deep playa where large scale mobile events will take place. This zone is large enough for multiple separate event to take place concurrently
2. Working with mobile sound camps to identify schedule for large scale mobile events and dedicate ALS, ESD and Black Rock Ranger resource teams as appropriate. BLM will be briefed
3. Work pre-event with ALS provider to coordinate medical resources and response. BLM will be briefed

In order to improve the availability of medical resources at **scheduled burns**, BRC is taking the following steps for 2015:

1. Work with law enforcement to understand problems, improve communication, and improve support of the LE function
2. Work pre-event with ALS provider to coordinate resources and response. BLM will be briefed

---

## ISSUE 12: EMERGENCY VEHICLES AT THE AIRPORT

BLM law enforcement noticed a lack of dedicated emergency response vehicles at the BRC airport. BRC foresees increased air traffic in future years at the BRC airport, as has been the trend in recent years, and will be staging emergency response resources 24/7 for the duration of airport operations.

In order to improve **emergency preparedness at the BRC airport**, BRC is taking the following steps for 2015:

1. Stage an EMT staffed Class B foam response vehicle at the BRC airport 24/7 for the duration of airport operations. The vehicle will be in compliance with all federal, state, and local requirements

## ISSUE 13: CONDITION OF COUNTY ROAD 34

BLM notes that any and all drivers could encounter damaged roadways along County Road 34, leading to accidents, delays, or people becoming stranded and further notes if County Road 34 fails completely, it could pose a serious public safety issue. Washoe County Community Services Department notes that in the long term County Road 34 needs a capital reconstruction to avoid disruption for Burning Man participants and year-round residents and visitors to the valleys north.

BRC recognizes the critical need to maintain safe roads in Washoe County and other local adjoining counties leading to the Burning Man event and beyond. BRC also recognizes the potential impact of event vehicles on the condition of County Road 34.

BRC understands that capital projects within Washoe County require prioritization and funding, and BRC wishes to fully support the county and all stakeholders in this process. BRC & BLM greatly appreciates Washoe County's commitment to public safety and greatly appreciates the county's informative, thorough evaluation and education process.

BRC is working cooperatively with Washoe County and BLM to examine practical and political solutions for this concern and understands the importance of the road structural integrity to the upcoming NEPA Compliance process that BRC must undertake to allow for a new proposed SRP period post 2016.

Washoe County has assured BLM Project Manager and BLM Field Manager as to the ability of the road to handle 2015 event traffic and also to their own ability to respond quickly, efficiently and effectively to all road integrity issues raised.

In 2014, BRC worked cooperatively with Washoe County providing a road safety flagging operation to assist with event time repair operations.

In order to improve conditions of **County Road 34**, BRC is taking the following steps for 2015:

1. BRC has met with and will continue to meet with Washoe County Roads Department (WCRD) and BLM to develop and understand best practices for road integrity, maintenance and care for both the short and long term
2. For the 2015 event, BRC will provide flagging operations for road repairs required during the Burning Man event and integrate into its traffic plans a communications strategy for delays due to road repairs
3. Long term, BRC will work with BLM and WCRD to explore potential mitigations of impacts through alternative means of ingress and egress to 8 mile (mile marker 3 and Jungo Road) and the potential of vehicle pass limits (~30k) through the NEPA compliance process

---

## ISSUE 14: POPULATION TRACKING & REPORTING

BRC did not adequately fulfill stipulation requirements for population reporting in 2014. The Burning Man Special Recreation Permit (SRP) requires accurate and timely reporting per the event SRP stipulations. BRC recognizes the importance of accurate and timely population counts with respect to public health and safety and is committed to improvement and compliance in 2015.

BRC has identified the opportunity to review and fine-tune 2015 BLM SRP stipulations related to population reporting. BRC will work with BLM to clarify questions around the reporting process and the output result and timing. Additionally BRC is working with the Burning Man ticket vendor to specifically address difficulties in reporting during egress.

In May 2014, BRC provided BLM with pre and post event population predictions. These population estimates were used by BRC to plan internally for scaling up infrastructure, commissary meals, emergency services and Black Rock Ranger staffing levels. BLM also used these population estimates for BLM pre-event staffing and logistics planning.

BRC predicted the peak population of all bodies onsite (including staff and paid participants) during the 2014 event would be 75,408. The actual peak population matched this estimate closely with a reported 75,234 on 8/29/2014. BRC was accurate to within 0.23% in the 2014 event peak population estimate. BRC will provide to BLM a population prediction model for 2015 in June.

In order to improve **population tracking and reporting**, BRC is taking the following steps for 2015:
1. Review reporting stipulations with BLM

2. Working closely with the Burning Man ticketing vendor to deliver a new digital reporting system, accessible securely on the internet to BLM, that will provide:
    a. Live data tracking of arrivals via web access that will be available 24 hours per day
    b. Past data search function via web access that will be available 24 hours per day
    c. Iterative updates of departures and Black Rock City population via web access that will be available 24 per hours per day to BLM
    d. Emailed reports daily or hourly to BLM and cooperators
    e. A full report of all data post-event per BLM stipulation
3. Provide monthly ticket sales reports to BLM pre-event starting May 2015
4. Account for extended ingress and egress in population prediction models

## ISSUE 15: BRC EVENT TABLE OF ORGANIZATION (TO)

BLM requires a detailed Table of Organization at least 45 days in advance of the event. BLM has noted that the inability to quickly identify and contact BRC field supervisor level personnel compromises public safety.

BRC will produce clear TOs for operational departments for 2015. BRC will augment the existing BRC and Cooperators contact sheet to support the TO. BRC recognizes the importance of Chain of Command and of understanding the reporting and responsibility structure of all agencies and will work with BLM to ensure that chain of command and operational integrity is maintained.

In order to improve **inter-organizational awareness and operational capacity** BRC will:

1. Provide by July 15, 2015 a BRC TO to BLM and cooperators for the principle BRC operating departments
2. Work collaboratively with BLM and all cooperators to ensure all parties understand chain of command requirements and limitations

## ISSUE 16: EVENT MANUAL

BLM noted that BRC does not have a sufficiently detailed event manual in the Plan of Operations. The event manual should include an outline of each operational

department's mission and scope, roles and responsibilities, supervisory controls, and training program.

For 2015 BRC will:
1. Deliver a complete **event manual** that includes an outline of each operational department's mission and scope, roles and responsibilities, supervisory controls, and training program

---

## ISSUE 17: EVACUATION PLAN

BLM noted that BRC currently has no formal, comprehensive participant evacuation contingency plan. BRC is undertaking the process to create and document this plan for 2015. This process will include BLM and all other cooperators to ensure highest level of public safety possible. A draft plan will be ready in June 2015, and the evacuation plan will be finalized in July 2015.

For 2015, BRC will:
1. Create a draft **evacuation plan** by June 2015 and a final evacuation plan by July 2015. BLM and all cooperators will be included in this process.

---

## ISSUE 18: SIGNIFICANT INCIDENT REPORTING

BLM raised concern around significant incidents not being reported in a timely manner as required by BLM. BRC wishes to comply at all times with BLM reporting requirements and understands the importance of clear, timely communications, particularly with respect to significant incidents. Event stipulations refer to reasonable time, and BRC acknowledges there is work to be done here, including consideration of external notification and awareness driven by social media.

Incidents can occur at any time during the closure order, in Black Rock City or off site. Some incidents involve transport to a hospital, and some are not medical in nature. BRC recognizes the need to work closely with BLM to more clearly define expectations and parameters to ensure BRC compliance with requirements. This will be achieved through clarity and removing subjectivity from the stipulations.

In order to improve **significant incident reporting**, BRC is taking the following steps for 2015:

1. Co-develop with BLM LE Escalation Training for Rangers detailing escalation and communication protocols
2. BLM to provide clarity around desired reporting requirements and reporting time
3. Create/distribute daily sitstat report listing all appropriate agency representatives and contact information
4. Shift Battalion Chief to monitor radio traffic and escalate/notify as needed
5. Hiring of Law Enforcement Advisor.  BRC to provide clarity to BLM on this role

---

## ISSUE 19: MUTANT VEHICLE OPERATIONS

In 2014 BLM observed mutant vehicles operating on crowded streets in the city and on the open playa during dusty conditions. BLM observed vehicles with ladders and staircases, as well as spotters who help direct large vehicles not being immediately identifiable. BLM noted "pyrotechnic" vehicles carrying extra fuel. BRC appreciates BLM perspective and guidance on these important issues and understands the importance of clear safety standards for all vehicles operating in Black Rock City.

**Language clarification**: No pyrotechnics are allowed on mutant vehicles. Some mutant vehicles have flame effects, but none have pyrotechnics. The "fuel" carried on vehicles with flame effects is propane-LP gas, which conforms to state regulations.

LP gas propane is safe for mutant vehicle use, provided it meets inspections, which all mutant vehicles in Black Rock City do. The Chief Inspector for the State of Nevada LP-Gas Board oversees Black Rock City's flame effects operations along with BRC's own expert staff. This team teaches flame effects classes around the country.

The Department of Mutant Vehicles operates year round, overseeing the application, feedback and registration programs of the over 600 mutant vehicles that serve as art and voluntary public transportation for an otherwise bike- and pedestrian-only city. All mutant vehicle operators must submit an application and be approved before operating in Black Rock City during the event. All mutant vehicles in Black Rock City are licensed directly by the BRC DMV. All vehicles must pass inspections for day and night use; separate licenses are issued for each, and each vehicle must pass inspection in the respective time of day/night.

Extensive safety rules, recommendations, and inspection standards exist for mutant vehicles operating in Black Rock City, and rules are strictly enforced. Rules apply to

speed, brake conditions, fire extinguishers, lights and lighting, driving protocols, physical features, sound, and restricted driving and sound zones. Drivers must comply with all applicable Nevada state laws. Violators, whether vehicle or operator, will lose driving privileges. Additionally BRC DMV works with BRC Placement team to ensure large art car camps are located in areas of the city where the car can access the open playa without driving down city streets.

The DMV provides education workshops to potential mutant vehicle artists and operators. These workshops define and delineate mutant vehicle standards and operating requirements, community expectations, and all aspects of safety from structural features to driving protocols.

**Driving rules in Black Rock City:**
- Only drive vehicles licensed or allowed to drive in Black Rock City
- Abide by all applicable federal and Nevada state laws, including all open container laws (no open containers within reach of the driver)
- Stop for on-boarding and off-boarding participants
- Obey all speed limits including 5 mph or less during the live event (less if in hazardous situations such as tight crowds)
- Give the right of way to pedestrians, bicycles, and emergency services vehicles
- All mutant vehicles are considered public conveyance and agree to give rides to the community as often as possible
- Follow reasonable and applicable vehicle laws for road safety
- Stop immediately upon being hailed by any law enforcement officer, BRC staff member, Black Rock Ranger, or emergency services personnel
- No driving under the influence of drugs or alcohol
- No driving on pedestrian-designated streets (see city map for details)
- No driving during whiteouts
- No driving on wet or freshly-watered roads
- Obey sound policies
- Any additional guidelines set forth by Burning Man

In order to improve **mutant vehicle performance**, BRC is taking the following steps for 2015:

1. All trailers / vehicle voids must be safely lit and have shields that prevent people from jumping into the void between tractor and trailer
2. Reinforce communications through targeted emails to DMV user groups focusing on the safety content of the mutant vehicle owners manual, including clarifying information with respect to trailer policy, access mechanics (ladders), speed, fuel storage and no driving zones

---

3. Ensure spotters on duty are clearly visible to participants. Colored vests to distinguish spotter from participant
4. Re-brief the Ranger Intercept (Mutant Vehicle rule enforcement) teams as part of daily shift briefing process from shift leads

## ISSUE 20: ILLICIT NARCOTICS

BLM raised concerns with respect to illicit narcotics, including an increase in law enforcement and medical in order to address participant behavior and health while under the influence of controlled substances. BLM LE reported increased workload due to being first on scene at large fixed and mobile gatherings in Black Rock City. BLM also notes that the HGH AAR cites an increase in the level of synthetic drug use.

BRC supports BLM's concern around all aspects of public safety affected by illicit narcotics. BRC supports BLM concern around LE remaining focused on law enforcement. Accordingly, BRC is evaluating temporary mobile medical response capacity to ensure improved resource allocation to these areas at the relevant times.

First and foremost, BRC does not in any way condone or support the use or trafficking of illicit narcotics. BRC actively discourages the use of illicit drugs and will provide additional communication around the dangers of sharing drinks, date rape drugs and personal awareness and safety. BRC will specifically target first-year participants to increase awareness around these dangers.

Communication, education and awareness will be coordinated with BLM LE and the Pershing County Sheriff. Key points will be integrated into BRC's website, e-newsletter, Survival Guide, and other print resources.

The BRC e-newsletter, Jack Rabbit Speaks (JRS), has over 200,000 subscribers. Each year leading up to the event, the JRS covers specific topics in a given issue, including Public Health and Safety and Law Enforcement. For 2015, the Health and Safety issue is scheduled to go out in June, and the Law Enforcement issue will go out in early August. Both of these newsletters will include messaging around illicit narcotics as developed in conjunction with BLM and Pershing County LE.

BRC recognizes that best practices dealing with illicit narcotic use at large scale events also includes harm reduction. **Harm reduction** is a set of practical strategies and ideas aimed at reducing negative consequences associated with drug use.  In conjunction with BLM and other cooperating agencies, BRC is developing a harm reduction **education program** for 2015.

BRC notes that many large scale mobile dance events are planned in advance and resources may be strategically staged, as has occurred in previous years. Per Issue 11 BRC is also working collaboratively with large scale mobile events to include these mobile events in the pre-event planning process around staging resources.

In order to improve public safety affected by **illicit narcotics,** BRC is undertaking the following changes for 2015:

1. Clearly state through BRC communication channels that BRC discourages use of illicit narcotics
2. Clearly communicate through BRC channels the dangers of drug use focusing on personal safety including accepting drinks from strangers, mixing drugs and date rape
3. Improve planning and deployment of temporary mobile medical resources for large scale events
4. Develop clear and mutually agreed Harm Reduction program and supporting language in coordination with BLM and Pershing County LE and other recognized entities, e.g. BED and Zendo Project.

# TIMELINE

The following timeline shows target delivery and completion dates for the improvements and solutions listed in the main report. **This timeline applies to 2015 only**. Items listed as "Event" are deliverable at the event. BRC and BLM will conduct progress review bi-weekly through the 2015 event. Meeting dates with BLM and cooperators will depend on BLM and cooperator availability.

| | | **ISSUE 1: MEDICAL, UNIFIED COMMAND, DISPATCH** | DATE |
|---|---|---|---|
| | | | |
| | | **CHAIN OF COMMAND and COMMUNICATION** | |
| | | | |
| 1 | | Hired Emergency Operations Chief (EOC) (Rob Schnepp) as part of ESD leadership to ensure full alignment of all emergency function SOPs on the playa. The EOC will be responsible and accountable for emergency operations hierarchy, communications & scene management | February 2 |
| 2 | | Hire a Nevada Licensed Event Medical Director to provide high level guidance around mass gathering medicine best practice and joint medical direction for ALS and BLS. BRC is currently in conversation with two experienced Medical Directors licensed in NV. BRC will inform BLM around who accepts this offer as soon as the information is available | July 1 |
| 3 | | Hired ESD Plans Chief (Tim Ryan) to improve coordination of documentation and information management processes within ESD and amongst all cooperators including daily event sitstat | February 2 |
| 4 | | Hire Medical Duty Managers (MDM) to to separate the administrative (MDM) and operational aspects (MDC) of BLS aid stations increasing management oversight time for line staff | July 1 |
| 5 | | For 2015 event season onwards adopt industry standard nomenclature for UC and incident command operations | May 11- July 9 |
| 6 | | Change Executive Officer (XO) title to the industry standard Battalion Chief (BC) | Feb 1 |
| 7 | | Improvements to ESD personnel requirements, communications, and training | |
| | a | BRC, BLM, and ALS provider to meet as needed, but not fewer than once each year to ensure alignment on medical direction, reporting structure, protocols, orientation and training | May 11-July 30 |

| | b | ESD and ALS leadership will meet bi-weekly pre-event; discussion will align medical direction, reporting structures and protocols. BLM will be briefed | May 1 -August 15 |
|---|---|---|---|
| | c | ESD to work closely with ALS provider pre-event to provide additional orientation information and improved training including ESD materials. BLM will be briefed | May 1 -August 15 |
| | d | All ESD personnel to be licensed in the State of Nevada in accordance with the Sponsoring Organization designation. Confirmation to be provided to BLM | August 1 |
| | e | Require IS15B training for all ESD Chiefs. Confirmation to be provided to BLM | April 1 - August 1 |
| | f | Require ICS 200 training to be undertaken by all ESD Shift Leads, Supervisors, and Branch Managers, and Duty Chiefs. Confirmation to be provided to BLM | April 1 - August 1 |
| | g | Recommend ICS 100 refresher for all ESD personnel who have not taken it within the past five years. Confirmation to be provided to BLM | April 1 - August 1 |
| | h | ESD Operations Manual to be updated as part of annual review including BLS scope of practice protocols to be approved by event Medical Director and more thorough treatment of incident command (ESD Ops Manual to be provided to BLM) | June 15 |
| | i | Upgraded training resources provided for all ESD personnel and shared with BLM | June 15 |
| | j | Expand ESD training on playa to include greater emphasis on incident command, scope of practice, and roles and responsibilities of ESD, ALS, and cooperating agencies | August 15- 30 |
| 8 | | Revise ALS contract and communications, provide training, and coordinate more closely pre-event to improve integration of ALS roles and responsibilities with ESD function | April 1 - August 1 |
| | a | Require ALS provider to complete an event orientation program for all responders operating on the playa. Content to include familiarization of ESD capabilities (personnel, tools and equipment), operational organizational chart for BRC and ESD, ESD dispatch procedures, scene management algorithm, and overview of Unified Command. Orientation provided pre event and in groups pre event on playa | May 1 -August 1 |
| | b | Require ALS personnel to wear approved uniform to eliminate confusion about roles and responsibilities in terms of incident command | Event |
| 9 | | Collocate ALS EMS Ops Chief at BRC dispatch center 24/7 during live event operations | Event |
| 10 | | Improve ESD and ALS coordination with BLM, Pershing County and all law enforcement pre-event and on site | May 11- Event |
| 11 | | Addition of four First Aid stations at 4:30, 7:30, 6:00, and deep playa | Event |
| | | | |
| | | **UNIFIED COMMAND** | |

|   |   |   |   |
|---|---|---|---|
| 1 | | Distinguish between Unified Command and Emergency Operations Center (EOC) and the trigger points for each | May 11- July 9 |
| 2 | | Review and improve UC activation SOP ensuring all parties, including Pershing County Commission availability for planning and event meetings | May 11- July 9 |
| 3 | | May 2015: UC members undertake risk assessment and SOP evaluation to include UC development and operations, evacuation plan, rain response, fatality response plan, communication, and mass casualty incident plans | May 11 |
| 4 | | As a UC finalize evacuation plan, rain response, communication, and mass casualty incident plans in June & July 2015 | June 4 & July 9 |
| 5 | | Conduct tabletop training exercises on playa pre-event August 2015 | August 26 |
| 6 | | Involve ALS provider more extensively in Unified Command planning as well as other cooperators | May 11- August 26 |
| | | | |
| | | **DISPATCH** | |
| | | | |
| 1 | | Collocate in the same building all event emergency service function dispatchers: medical, fire, rescue and LE | Event |
| 2 | | As part of the UC planning process review dispatch operating protocols as well as resource allocation and availability both internally and with all relevant UC partners to ensure aligned, coordinated response and mutually understood language | May 11- July 9 |
| 3 | | Update and improve all documentation for the BRC dispatch training program (required for all ESD dispatch personnel) | May 11- July 9 |
| 4 | | Require ICS 200 for all BRC Lead Dispatchers | April 1 - August 1 |
| | | | |
| | | **EMERGENCY RESPONSE VEHICLES** | |
| | | | |
| 1 | | BRC will provide results of the 2014 CAD analysis to the 2015 ALS provider and to BLM; analysis shows no time at which Status Zero was reached. | June 1 |
| 2 | | Pre-event communication to enable agreement on emergency response unit protocols between ALS provider and BRC. BLM will be briefed. | May 11- July 9 |
| 3 | | ALS to provide two additional ambulances during peak injury times such as Friday night / Saturday morning of the event and also as will be identified through CAD data analysis. | Event |

## ISSUE 2: FIRE, RESCUE, HAZMAT

| 1 | Acquire a new rescue/hazmat response vehicle and provide training to responders | May 15 & Event |
|---|---|---|
| 2 | Add additional tools for fire and rescue response including two additional tactical tenders and 2,000 gallons of water for fire suppression (a total of 75,000 gallons) | May 15 & Event |
| 3 | Add a staffed fire response vehicle (foam unit) at the BRC airport | Event |
| 4 | Discuss fire, rescue, and hazmat equipment and management with ALS provider and BLM | May 11-July 30 |
| 5 | Expand ESD training on playa to include command and control, and roles and responsibilities of ESD, ALS, BLM and cooperating agencies | August 1-30 |
| | | |
| | **ISSUE 3: FATALITY MEDICAL RESPONSE & SCENE MANAGEMENT** | |
| 1 | BRC and the ALS provider will work pre-event with BLM/ Pershing County and all law enforcement to ensure shared understanding of protocols related to fatalities and/or establishing a medical scene as a crime scene. This will include a specific UC developed Fatality Response Plan | May 11- July 9 EOC Planning |
| 2 | BRC is requiring all ESD personnel to be licensed in the state of Nevada under Sponsoring Organization designation requirements | August 1 |
| | | |
| | **ISSUE 4: TRAFFIC MANAGEMENT** | |
| 1 | As part of the UC planned Rain Contingency plan provide for more off-playa sanitation units and servicing, units to be placed pending location of incident | May 11-July 9 EOC Planning |
| 2 | Rain Plan to also include alternative camping locations for participants not able to get onto the playa. | May 11-July 9 EOC Planning |
| | | |
| | **ISSUE 5: ART PROJECT MANAGEMENT** | |
| 1 | Continue annual internal review and improvement of art management process and artist communications. | March 1 |
| 2 | Updated artist contract. Ensure all artists are aware of details and requirements including acceptable materials and practices for pieces that are intended to burn, and BRC reserved right prevent burns or demolish / remove piece. | February 1 |
| 4 | Ensure the Man, when supersize, has a secondary and tertiary collapse mechanism incorporated into the design. | July 1 |
| | | |
| | **ISSUE 6: SECURITY AND SAFETY PLAN FOR SCHEDULED BURN EVENTS** | |

---

**BURNING MAN PLAN:** *Safety, Health and Security Issues and Concerns of the 2014 Burning Man Event*

| 1 | | BRC will include BLM in the Burn management planning process for the improvement of security at the event. | May 11-July 9 EOC Planning |
| 2 | | Ensure all Sandmen are certified and accredited security in the state of Nevada. Confirmation to be provided to BLM. | April 1 - August 1 |
| 3 | | Ensure BRC insurance covers all aspects of the Sandmen operation. Confirmation to be provided to BLM. | April 1 - August 1 |

| | | **ISSUE 7: SANITATION** | DATE |
|---|---|---|---|
| | | | |
| 1 | | Provide potty units at the newly designated large scale mobile music zone in deep playa | Event |
| 2 | | Working pre-event with mobile sound camps to know schedule of events. BLM will be briefed. | August 30 |
| 3 | | Continue to encourage the Burning Man community to use placed potty banks | June 1- August 30 |
| 4 | | Improve participant trailer and RV estimates (thus pumping) based on aerial images of 2014; use 2015 census data to further improve estimates. Share data with USS. BLM will be briefed. | April 15 |
| 5 | | USS to continue conducting annual review of fleet, and add vehicles and services as needed. | On-going |
| 6 | | Through targeted email communication encourage theme camps to arrange pumping in advance to facilitate servicing | June 1 - August 30 |
| 7 | | Post publicly the price-list of USS pumping services (USS has a vending SRP) | June 30 |
| 8 | | Improve night-time visibility for participants around potty bank locations | Event |
| 9 | | Addition of new BRC Compliance position; will ensure environmental standards are in compliance and all vendors are inspected by Nevada Department of Health and this is reported to the UC | June 30 |
| 10 | | Allow access to two additional alternative sanitation service vendors; both of these vendors were on site in 2014 and in current good standing with BRC | June 30 |
| 11 | | Alternate vendors will be inspected by the Nevada Department of Health. BLM will be briefed. | August 30 |
| 12 | | Alternate vendors will not be allowed to engage in cash sales; all servicing must be pre-arranged. | Event |
| 13 | | Alternative vendor trucks will be clearly labeled to distinguish them from USS trucks | Pre-Event |
| 14 | | Increase to four the number of hand sanitizer units on either side of the bank at most main potty banks | Event |
| 15 | | Review sanitizer placement schedule and update as needed | June / July |
| 16 | | Provide foaming sanitizer to reduce overconsumption | Event |

| 17 | | Encourage participants, via BRC communications channels (see Issue 20 Illicit Narcotics), to bring their own hand sanitizer and not to steal hand sanitizer out of the dispensers | June 1 - August 30 |
|---|---|---|---|
| | | | |
| | | **ISSUE 8: EARLY ARRIVAL PROGRAM** | |
| 1 | | Work closely with BLM and ALS, and other cooperators to provide clear guidance on the predicted population model in order to allow all parties to ensure all operations are staffed appropriately to support the building of Black Rock City and to ensure safety, health and security are in place | June 30 |

| | | **ISSUE 9: D LOT DESIGN AND MANAGEMENT** | **DATE** |
|---|---|---|---|
| 1 | | Providing postal delivery option for approx. 50% of the 2014 Will Call traffic to significantly ease the load on the Box Office and Will Call Lot | Event |
| 2 | | The Box office is receiving a significant upgrade including: | |
| | a | Increased staffing: From ~70 to ~120 | Event |
| | b | More windows: From 10 to 15 | Event |
| | c | Longer hours: Open two days earlier (still 24/7) | Event |
| | d | Shaded queue that will efficiently provide organization and shade for at least 400 people | Event |
| 3 | | The Will Call Lot is receiving a significant upgrade including: | |
| | a | New Will Call traffic flow with emergency access lanes | Event |
| | b | Increased BRC Ranger presence at key times | Event |
| | c | New safety measures in 2015 include | Event |
| | i | Additional Will Call Lot staff (local traffic management) | Event |
| | ii | Light wands for traffic management staff | Event |
| | iii | More flagging | Event |
| | iv | More cones | Event |
| | v | Signs for section emergency service location | Event |
| | | | |
| | | **ISSUE 10: FUEL STORAGE MANAGEMENT** | |
| 1 | | Use targeted per user group (art cars lists, theme camp lists, artist lists) email communications to drive further adoption of the Mutant Vehicle fuel station | May 1 - August 1 |
| 2 | | New rule for 2015: no liquid fuel storage on your art car - return to camp to refuel | May 1 - August 1 |
| 3 | | Use targeted communication to drive further adoption of the theme camp fueling service | May 1 - August 1 |

| | | | |
|---|---|---|---|
| 4 | | Distribute new printed materials providing guidance for theme camps around fuel storage and related safety. Distribute printed leaflet at all points of contact between theme camps and fuel operations | June 30 - Event |
| 5 | | Enhance BRC and BLM on the ground compliance at the Filling Station and theme camps for safety and health | Event |
| | | | |
| | | **ISSUE 11: DEPLOYMENT OF MEDICAL RESOURCES TO LARGE EVENTS** | |
| | | **Large Scale Mobile Music Events** | |
| 1 | | Established a zone in deep playa where large scale mobile events will take place. This zone is large enough for multiple separate event to take place concurrently | March 1 |
| 2 | | Working with mobile sound camps to identify schedule for large scale mobile events and dedicate ALS, ESD and Black Rock Ranger resource teams as appropriate. BLM will be briefed | May 1 - Event |
| 3 | | Work pre-event with ALS provider to coordinate medical resources and response. BLM will be briefed | May 1 - Event |
| | | | |
| | | **Scheduled Burns** | |
| 1 | | Work with law enforcement to understand problems, improve communication, and improve support of the LE function | May 11- July 9 |
| 2 | | Work pre-event with ALS provider to coordinate resources and response. BLM will be briefed | May 1-August 30 |
| | | | |
| | | **ISSUE 12: EMERGENCY VEHICLES AT THE AIRPORT** | |
| 1 | | Stage an EMT staffed Class B foam response vehicle at the BRC airport 24/7 for the duration of airport operations. The vehicle will be in compliance with all federal, state, and local requirements | Event |

| | | |
|---|---|---|
| | **ISSUE 13: CONDITION OF COUNTY ROAD 34** | DATE |
| 1 | BRC has met with and will continue to meet with Washoe County Roads Department (WCRD) and BLM to develop and understand best practices for road integrity, maintenance and care for both the short and long term | April 13 and ongoing |
| 2 | For the 2015 event, BRC will provide flagging operations for road repairs required during the Burning Man event and integrate into its traffic plans a communications strategy for delays due to road repairs | Event |
| 3 | Long term, BRC will work with BLM and WCRD to explore potential mitigations of impacts through alternative means of ingress and egress to 8 mile (mile marker 3 and Jungo Road) and the potential of vehicle pass limits (~30k) through the NEPA compliance process | 2016- 2017 |

---

**BURNING MAN PLAN:** *Safety, Health and Security Issues and Concerns of the 2014 Burning Man Event*

AR06485

|  |  | **ISSUE 14: POPULATION TRACKING & REPORTING** |  |
|---|---|---|---|
| 1 |  | Review reporting stipulations with BLM | Awaiting Draft |
| 2 |  | Working closely with the Burning Man ticketing vendor to deliver a new digital reporting system, accessible securely on the internet to BLM, that will provide: | August 1 |
|  | a | Live data tracking of arrivals via web access that will be available 24 hours per day | Event |
|  | b | Past data search function via web access that will be available 24 hours per day | Event |
|  | c | Iterative updates of departures and Black Rock City population via web access that will be available 24 per hours per day to BLM | Event |
|  | d | Emailed reports daily or hourly to BLM and cooperators | Event |
|  | e | A full report of all data post-event per BLM stipulation | Post-Event |
| 3 |  | Provide monthly ticket sales reports to BLM pre-event starting May 2015 | May 1 - Post Event |
| 4 |  | Account for extended ingress and egress in population prediction models | June 30 |
|  |  |  |  |
|  |  | **ISSUE 15: BRC EVENT TABLE OF ORGANIZATION (TO)** |  |
| 1 |  | Provide TO to BLM and cooperators for the principle BRC operating departments | July 9 |
| 2 |  | Work collaboratively with BLM and all cooperators to ensure all parties understand chain of command requirements and limitations | May 11-July 9 |
|  |  |  |  |
|  |  | **ISSUE 16: EVENT MANUAL** |  |
|  |  | For 2015 BRC will deliver an event manual that includes an outline of each operational department's mission and scope, roles and responsibilities, supervisory controls, and training program | August 1 |
|  |  |  |  |
|  |  | **ISSUE 17: EVACUATION PLAN** |  |
|  |  | A draft participant evacuation plan will be ready in June 2015, and the plan will be finalized in July 2015 | May 11 - July 9 |
|  |  |  |  |
|  |  | **ISSUE 18: SIGNIFICANT INCIDENT REPORTING** | DATE |
| 1 |  | Co-develop with BLM LE Escalation Training for Rangers detailing escalation and communication protocols | May 11- July 9 |

| 2 | BLM to provide clarity around desired reporting requirements and reporting time | May 15 |
| 3 | Create/distribute daily sitstat report listing all appropriate agency representatives and contact information | Event |
| 4 | Shift Battalion Chief to monitor radio traffic and escalate/notify as needed | Event |
| 5 | Hiring of Law Enforcement Advisor. BRC to provide clarity to BLM on this role | February 1 |
| | | |
| | **ISSUE 19: MUTANT VEHICLE OPERATIONS** | |
| 1 | All trailers / vehicle voids must be safely lit and have shields that prevent people from jumping into the void between tractor and trailer | Event |
| 2 | Reinforce communications through targeted emails to DMV user groups focusing on the safety content of the mutant vehicle owners manual, including clarifying information with respect to trailer policy, access mechanics (ladders), speed, fuel storage and no driving zones | June 1 - August 15 |
| 3 | Ensure spotters on duty are clearly visible to participants. Colored vests to distinguish spotter from participant | Event |
| 4 | Re-brief the Ranger Intercept (Mutant Vehicle rule enforcement) teams as part of daily shift briefing process from shift leads | Event |
| | | |
| | **ISSUE 20: ILLICIT NARCOTICS** | |
| 1 | Clearly state through BRC communication channels that BRC discourages use of illicit narcotics | June 1- August 30 |
| 2 | Clearly communicate through BRC channels the dangers of drug use focusing on personal safety including accepting drinks from strangers, mixing drugs and date rape. | June 1- August 30 |
| 3 | Improve planning and deployment of temporary mobile medical resources for large scale events | Present- Event |
| 4 | Develop clear and mutually agreed Harm Reduction program and supporting language in coordination with BLM and Pershing County LE | Present-Event |





# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Winnemucca District Office
5100 East Winnemucca Boulevard
Winnemucca, Nevada  89445
Phone: (775) 623-1500 Fax: (775) 623-1503
Email: wfoweb@blm.gov
www.blm.gov/nv/st/en/fo/wfo.html

**MAR 0 8 2016**

In Reply Refer To:
LLNVW03500-15-01
2930 (NV020.00)

CERTIFIED MAIL 7014 2870 0001 4871 4705 - RETURN RECEIPT REQUESTED

Rosalie Barnes
Government Relations Manager                    :    Burning Man 2015 Event
Black Rock City, LLC                            :    Special Recreation Permit
660 Alabama St
San Francisco, CA 94110-2008

Dear Ms. Barnes:

On March 12, 2015 BLM shared with Black Rock City LLC a letter describing 20 safety health
and security concerns identified by BLM during the 2014 Burning Man event. BRC prepared an
April 22 written response, titled "Burning Man Plan: Safety, Health and Security Concerns of the
2014 Burning Man Event" and delivered a presentation in Washington DC addressing those
concerns. BRC then prepared another final written response, dated August 7th, 2015, titled
"BRC's Response to BLM's Safety Concerns", which documented in detail BRC's efforts to
date to implement changes addressing the identified 20 Issues and Concerns. During the 2015
event, BRC's Daniel Torpey led three individual "Safety Tours" to provide on-the-ground
demonstrations and examples of BRC's safety improvements.

BLM would like to thank BRC for all of the hard work, creativity and effort that went into
finding workable solutions to address the identified 20 issues and concerns. BLM recognizes that
it was a monumental task to accomplish these changes in the timeframes that were offered. BLM
views this effort as a success. In this letter BLM has addressed each of the identified 20 issues.
Observations contained in this letter were made by BLM staff during the 2015 event, through
BRC-provided safety tours during the 2015 event and through the evaluation of BRC's
presentation and documentation of changes made to improve safety during the 2015 event.

The most recent written document from BRC that addresses the 20 Issues and concerns is
"BRC's Response to BLM's Safety Concerns" dated August 7th, 2015 (BRC's August 7th
response). This report will reference BRC's solutions to the identified 20 issues, as they are

**AR04291**

presented in that document. This report also discusses BLM's observations and evaluations collected during the successful 2015 Burning Man Event.

This letter should not be construed to imply that all safety issues of an event of this scale have been addressed. Absolute event safety is an ongoing goal that should be improved upon whenever possible. Rather, the information in this letter is designed to specifically address BRC responses to the 20 safety issues and concerns identified by BLM during the 2014 event.  BLM and BRC should work together to continue to improve event safety, including identifying new issues as well as working to improve safety for issues previously identified.

BLM is required to do its best to ensure the safety, health and security of the American public as a condition of issuing a Special Recreation Permit (SRP), including the Burning Man SRP. BLM is confident that BRC has made an appropriate and satisfactory effort to address BLM's 2014 identified safety issues and concerns. BLM looks forward to continuing to work together to ensure that future Burning Man events are as safe as possible.

Additionally, BLM acknowledges and accepts BRC's response and efforts to address all 20 of the identified safety issues as described in the August 7th letter to BLM, and as observed by BLM during the 2015 Burning Man event. In addition, BLM provides the following observation and comments:

**Issue 1: BRC Medical Program.** BLM observed a noted improvement in BRC's medical response and chain of command. BLM observed medical assets being dispatched promptly and appropriately during the 2015 event. BRC also developed and provided to BLM an appropriate Rain Contingency Plan for 2015, as requested by BLM. BLM also observed that BRC's medical assets, including ambulances and Quick Response Vehicles (QRV's), were appropriately available and properly stationed.

**Issue #2: BRC Fire, Rescue, Hazmat Programs.** BLM observed technical extrication equipment satisfactorily upgraded to a modern standard, and improved Hazardous Materials response including a quick and thorough Hazmat cleanup of bodily fluids following an incident at BLM Headquarters. BLM observed two additional fire-fighting water tenders, and an emergency firefighting vehicle stationed near the airport.

**Issue #3: Fatality Medical Response and On-Scene Management.** BLM observed a professional and organized response to all serious medical incidents. While there were no event fatalities (there was a pre-event death from natural causes, which was handled professionally and appropriately), BRC demonstrated their ability to handle serious medical incidents appropriately and provided BLM with a Fatality Response protocol prior to the 2015 event, as requested.

**Issue #4: Transportation Management.** While there were no serious rain events during the 2015 Burning Man Event, BRC did provide BLM with an appropriate Rain Contingency Plan.

**Issue #5: Art Project Management.** BLM observed that BRC held art project creators to a high standard of safety, at times insisting on art project modifications for safety purposes. BLM was provided with Burn Contingency Plans as agreed, and the Man structure took significantly less

time to fall in 2015 than 2014. BRC did implement secondary and tertiary collapse mechanisms in 2015, which appeared to fail. However due to the shorter amount of time it took the structure to fall, they were not necessary.

**Issue #6: Security and Safety Plan for Scheduled Burn Events.** BLM and BRC coordinated appropriately and as agreed to provide safety and security for major burn events during the 2015 Event. During the Man Burn, one participant chose to run into the prohibited area and was detained by BRC, then turned over to BLM Law Enforcement as agreed, and then released after a short interview. Legal authority for BRC's "Sandman" operations was properly researched and appropriately used during the 2015 event.

**Issue #7: Sanitation Management.** BLM noted an increase in portable toilets throughout the city, particularly on the open playa, and hand sanitizer stations were appropriately available. New concerns related to blackwater and greywater were identified during the 2015 event due to an apparent increase in the number of recreational vehicle used by participants. However, despite this increase, BLM observed that pumping services were readily available in most cases, and opportunities existed for participants to schedule services on playa. Portable toilets stationed on the open playa to service mobile raves were appropriately placed where they were needed and in cases where they were not effective BRC responded promptly to either encourage the rave to move closer to the portable toilets, or move the portable toilets. This resulted in better sanitation associated with mobile raves.

**Issue #8: Early Arrival Program.** BLM again observed a large number of people on the playa during the 2015 pre event and early arrival periods, but not beyond what BRC expected, according to pre-event population estimates provided to BLM. BLM noted that while pre-event staffing may require adjustments in planning and BLM staffing levels to appropriately provide safety and security, there were no significant identified issues or problems in 2015 attributable to early arrival numbers.

**Issue #9: D-Lot Design and Management.** The D-lot area was misidentified in 2014 as "D-Lot" when it should have been described as "Will-Call". BLM observed in 2015 that the Will-Call area was organized, easily accessible to emergency services, and had a dramatically lower population during the 2015 event. Traffic and people appeared to flow smoothly and easily through the Will Call parking and ticketing area.

**Issue #10: Fuel Storage Management.** BLM observed an apparent decrease in the number of art cars and mutant vehicles carrying stored fuel, other than propane for permitted flame-effects. In cases where fuel was identified as being stored on moving art cars and mutant vehicles, participants were immediately willing to remove it in order to solve the problem. BLM observed that between BRC's outreach and education efforts, as well as DMV inspection and messaging, there was greater understanding among participants for fuel storage requirements in Black Rock City in 2015. While BLM Compliance Teams did note a number of cases of inappropriately stored fuel in camps throughout the city, the willingness of participants to comply with storage requirements was high. BLM and BRC should coordinate to ensure this issue continues to be appropriately addressed during future events.

AR04293

**Issue #11: Deployment of Medical Resources.** BLM observed appropriate forward deployment of medical resources to large gatherings, raves and burns during the 2015 event. BLM observed that this improved forward deployment approach helped speed emergency response times, as well as alleviated the need to law enforcement assets to be present for extended periods during routine medical responses.

**Issue #12: Placement of Emergency Vehicles at the Airport.** BLM observed a staffed emergency firefighting vehicle placed in close proximity to the airport in 2015. During the first several days of the event this vehicle was not stationed at the airport, but nearby. To fulfill the requirement of the Burning Man permit stipulations, BRC moved the vehicle to the airport upon BLM request. It was noted that BRC did conduct an unannounced airport fire drill during the event that demonstrated an acceptable response time for airport emergencies. BLM and BRC should work together in future years to ensure the stipulations agree with appropriate placement of the emergency airport firefighting staff and vehicle.

**Issue #13: Highway 34 Road Conditions.** BLM observed an apparent significant reduction in event-associated deterioration of Highway 34 during and after the 2015 event. At the time of this report's writing, The Washoe County Roads Department has not yet submitted an After Action Review, so further comment on this issue is premature.

**Issue #14: Population Tracking and Reporting Program.** BLM was provided with daily and on-demand population reports as required by the Burning Man permit stipulations 1-4, with some notable exceptions. Several technical malfunctions related to population reporting occurred in 2015, temporarily resulting in confusing or incorrect population reports. Each of these issues were addressed and resolved in a reasonable amount of time. BRC has assured BLM that they will work toward preventing these technical issues in the future.

**Issue #15: BRC Event Table of Organization.** BLM was provided with a table of organization as requested prior to the 2015 event.

**Issue #16: Event Management Program Description.** BLM noted that BRC provided an Event Management Program Description as agreed in 2015, which included each operational division's mission and scope, roles and responsibilities, supervisory controls and training program.

**Issue #17: Participant Evacuation Contingency Plan.** BRC provided BLM with an appropriate comprehensive Event Evacuation Contingency Plan as agreed.

**Issue #18: Significant Incident Reporting.** In 2015 all significant incidents were reported to BLM appropriately, and according to the agreed upon Burning Man event permit stipulations.

**Issue #19: Art Car Operations.** BLM observed that BRC rules prohibiting large art cars, and art cars using flame effects were not permitted to operate on the city streets in 2015. BLM observed a few occasions where "spotters", used to safely guide large art cars, were not readily visible or not present, but for the most part these rules were observed. Ladders and stairwells used for ingress and egress to large art cars were in large part safely located. Barrier used to prevent participants from coming between art cars and their trailers were widely used, with a few

identified exceptions where the barriers appeared to be inadequate or functioning improperly. BRC and BLM should work together in future years to ensure an improved and continuing high level of compliance with these safety procedures.

**Issue #20: Illicit Narcotics.** BLM observed an apparent decrease in the number of serious medical events related to illicit narcotics which required large amounts of officer's time, compared to the 2014 event. However, there was also a noted increase in the number of citations and arrests related to the possession or use of illicit narcotics.  The use of illicit narcotics continues to be an issue of serious concern for the health, safety and security of the Burning Man Event. BLM and BRC should continue to work together to implement and improve solutions to this ongoing issue.

For any questions regarding this letter, please contact David Freiberg at (208) 732-7271.


Sincerely,

William Mack, Jr.
Field Manager
Black Rock Field Office
5100 E. Winnemucca Blvd
Winnemucca, NV 89455

AR04295



# U.S. Department of the Interior
## Bureau of Land Management



# BRIEFING PAPER

**INTERNAL WORKING DOCUMENT**

## 2014 Burning Man Event
## OPERATIONAL ASSESSMENT

| SECTIONS | PG. |
|---|---|
| 1. Introduction | 2 |
| 2. Significant Incidents | 3 |
| 3. Unified Command | 5 |
| 4. Event Planning | 7 |
| 5. Ingress / Egress Extension | 11 |
| 6. Law Enforcement Operations | 12 |
| 7. BLM Medical | 20 |
| 8. Communications Center | 22 |
| 9. Evictions | 24 |
| 10. Reporting Writing | 26 |
| 11. Statistics | 27 |
| 12. Civilian Operations | 28 |
| 13. Gate | 30 |
| 14. Vending | 32 |
| 15. Logistics | 34 |
| 16. Environmental Compliance | 36 |
| 17. Communications | 38 |
| 18. Public Information Officer | 39 |
| 19. Contracting | 40 |
| 20. Business Practices | 42 |
| 21. Conclusion | 44 |

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency. It and its contents may not be reproduced without written permission. The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

**AR07110**

## 1. INTRODUCTION

The Burning Man Event is a Bureau of Land Management (BLM) permitted gathering of participants who engage in an "experiment in temporary community dedicated to radical self-expression and self-reliance". Burning Man is the largest special recreation event on BLM administered lands.

Since 1990, the event has been held annually in the Black Rock Desert – High Rock Canyon – Emigrant Trails National Conservation Area within the Winnemucca District Office. The Black Rock Desert is a remote rural area approximately two hours from the nearest city with law enforcement and emergency medical services. During the week preceding Labor Day, participants convene to create Black Rock City. During the event, the city becomes the fifth largest city in Nevada. In 2014, the event reached a participant/volunteer population of 75,234. Event gates opened at 10:00 a.m. on Sunday, August 24, 2014 and closed at 12:00 p.m. on Tuesday, September 2, 2014.

This document serves as the post event operational assessment of the management of the event by BLM. BLM anticipates further discussions with BRC to pursue changes in their management operation that will lead to a healthier, safer and more secure event.

**2014 BURNING MAN EVENT**
At the 2014 event, a Unified Command (UC) organization was implemented to manage the multi-jurisdictional and multi-agency interests of the 2014 event. The UC approach resulted in a single integrated management organization. The event included many areas of improvement such as an Incident Command Post (ICP) expansion which provided the necessary space for dining, law enforcement interviewing and report writing, dispatching, radio communications, environmental and vending compliance, and other important functions.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency. It and its contents may not be reproduced without written permission. The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited. Public availability to be determined by 5 U.S.C. 552.

AR07111

## 2. SIGNIFICANT INCIDENTS

During the 2014 event, a series of significant incidents occurred.  Some of these incidents required UC activation to effectively communicate, acquire resources, and provide an integrated media campaign.

### WEATHER EVENT

In the early morning hours on August 25, during participant ingress, a rain storm occurred in the event area which caused a Level 1 closure of the city by Black Rock City, LLC (BRC). As a result of the city closure during ingress, thousands of event participants were stranded with their vehicles along the entrance road, HWY 34, and HWY 447. The UC was activated to manage this incident. A strategy was implemented to clear the highways and find safe places for participants to wait for the city to reopen and ingress to resume.  For approximately 15 hours, participants were staged along the side of the road on HWY 34 between the 8 Mile entrance and Gerlach. Some were staged in the town of Gerlach and the town of Empire, and some were directed to the Pyramid Lake Paiute Tribe Camping areas, while Nevada Highway Patrol (NHP) kept HWY 447 closed to participant ingress traffic from Interstate 80.  The highways were reopened to ingress traffic at approximately 1 a.m., after BRC lifted the Level 1 closure. Participants staged on HWY 34 were released first, followed by Gerlach and Empire. Once this traffic was alleviated HWY 447 was reopened.

### BARRICADED SUBJECT

The Pershing County Sheriff's Office (PCSO) and BLM law enforcement received a call for service to assist Black Rock Rangers (BRR) with a mentally disturbed/barricaded subject at approximately 4:30 p.m. This incident occurred the same day as the significant weather event, which closed access to incoming participants.  The subject was inside of a bus in an area known as "D" Lot, which is located near the main entrance.  The UC was activated to manage this event. A large crowd of participants gathered around the incident and observed law enforcement interacting with the subject. The subject repeatedly stated he was not coming out of the bus and threatened various people with harm. The PCSO and BLM officers were eventually able to convince the subject to retrieve his identification.  The subject held both of his hands out of the open window, reached into his wallet, and produced his driver's license.  The subject then retrieved his Burning Man ticket from inside the bus and returned to the window.  When the subject placed his hands outside the open window, a BLM and PCSO officer grabbed the subject, pulled him out of the window, and secured him in handcuffs. The subject was transported to Reno for a mental evaluation.

### FATALITY

On August 28, 2014 at approximately 12:15 a.m., a participant at the 2014 event was fatally

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

injured when she was run over by the wheels of a trailer pulled by an art car.  BRC's Emergency Services department (ESD), Humboldt General Hospital (HGH), PCSO, United States Park Police (USPP) and BLM Rangers and Agents responded to the scene. The UC was activated to manage this incident.  ESD and HGH arrived on scene at approximately the same time.  The incident commander for HGH was one of the first medics on scene and assumed the role of incident commander.  The incident commander conducted an initial assessment of the victim and noted she sustained massive traumatic injuries to the abdomen, torso and head.  Due to the nature of the injuries, and the incident commander's extensive experience responding to accidents involving trauma, he knew there were no life-saving measures that could be taken and confirmed the victim could not be resuscitated.

## "EMBRACE" ART BURN

 The burning of the "Embrace" structure required multiple last minute meetings and preparations by the BLM and BRC to ensure a safe environment.  Initially, this structure was not scheduled to burn due to the thin veneer type of wood used in its construction, and the potential for a dangerous ember cast.  However, BRC gave permission to the artist who created "Embrace" to burn the structure on Friday morning, August 29 at 7:00 a.m. This was a historic burn because of the time of the burn and size of the structure.  The burn took place as scheduled with a large participant audience.

## USE OF DANGEROUS DRUGS

During the 2014 event, officers responded to numerous medical calls involving participants who had overdosed on controlled substances such as Ketamine, GHB, LSD, mushrooms and other dangerous drugs. In some incidents reported to PCSO, victims of sexual assaults reported being dosed with date rape drugs such as GHB, Ketamine, and rohypnol. Additionally, the use of dangerous drugs resulted in violent participant behavior. The use of dangerous drugs compromises the safety, health and security of everyone at the event. Response to these calls consumes patrol resources, which can be tied up for over an hour dealing with a combative subject. This has the potential to leave sections of the city without adequate law enforcement resources.

## SIGNIFICANT INCIDENT SUMMARY

BLM and BLM LE communicated and managed all significant incidents with a professional presence and leadership along with other members of the UC.  As the permitter, BLM had a critical leadership presence, communicating and implementing decisions and resolutions to significant incidents while advocating and implementing strong public health, safety and security measures.  BLM will continue to learn from these significant incidents and plan and implement accordingly.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## 3.  UNIFIED COMMAND

Designated representatives from the BLM Office of Law Enforcement and Security (OLES), BLM Winnemucca District, PCSO, BRC, Washoe County, Pershing County, and Humboldt General Hospital (the primary medical service provider for the event), were a part of the UC structure.

The UC collocated at the ICP on the outer edge of BRC (near 7:00 and L).  The UC used one set of incident objectives and a single planning process.  The UC held daily meetings at 3:00 p.m. at the ICP to discuss daily statistics, significant incidents, and overall event management.

At the 2014 event, the UC team oversaw both the law enforcement and civilian components of event management.  This involved multiple jurisdictions and agencies.  Yet, it enabled all partners to effectively manage legal, geographic, and functional responsibilities as well as coordinate, plan, integrate, and interact effectively.  The agency administrators within the UC made collaborative decisions and were able to coordinate incident management, resource protection, public information, and law enforcement resources.  The UC organization overcame much of the inefficiency and duplication of effort that previously occurred.

**TRAINING**
In preparation for the 2014 event, a multi-agency UC training was hosted at the Washoe County Emergency Operations Center on June 23 and 24.  The training was facilitated by two BRC volunteers who possess a background in the Incident Command System.  The training was attended by representatives from the PCSO, BLM civilian and law enforcement staff, Humboldt General Hospital, Washoe County, and multiple BRC division leaders.
The goal of the training was to familiarize each agency with the UC model and understand roles and responsibilities.  In addition, it provided a venue to meet other cooperators face to face and to initiate or enhance relationships.  The training incorporated Incident Command System nomenclature as well as scenario discussions such as weather events, active shooter, and other potential significant incidents.  The scenario discussions allowed each agency to discuss their role, available resources, and cooperatively plan a template should an incident occur.  The training was a positive step forward in advancing partner agency cooperation and collaboration.  The Pershing County Commission was invited to attend the training, but did not have representation.

On August 20 during the 2014 pre-event, a UC table-top training was hosted at the ICP. The table-top training was attended by representatives from the BLM, BLM law enforcement, BRC, Humboldt General Hospital, and the PCSO.  The Pershing County Commission was invited to attend but did not have representation.

The UC table-top exercises focused on two potential events including a weather event and an active shooter barricaded in an RV.  The weather event scenario depicted significant rainfall during the event exodus which caused the main gate road to shut down and participants

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

were left to find shelter within BRC.  The UC team discussed alternative modes of departure, sanitation concerns, access to medical care, and cooperative media releases.  The UC team also discussed and identified BRC as the primary UC agency responsible for managing a weather event.

The active shooter scenario detailed a participant who shot his girlfriend and numerous other participants in the immediate area.  The shooter fled and barricaded himself in an RV and announced a bomb threat. The UC team identified the PCSO as the primary agency with jurisdiction.  PCSO would work collaboratively with BLM law enforcement and leverage their law enforcement resources on mitigating the incident.  HGH would be the lead medical resource and begin triaging injured participants.  The UC stated they would make notifications to other LE agencies to provide support and nearby medical facilities on the incident.  The UC would assemble a joint information center to communicate with external media outlets.  The training was approximately two hours in duration and provided valuable communication, knowledge, and situational awareness in advance of the main event.

## UNIFIED COMMAND RECOMMENDATIONS

There should be one comprehensive daily update report with input from all cooperators to discuss during the 3:00 p.m. cooperators meeting.

It is recommended that all respective agencies (BLM, BLM LE, BRC, HGH, Washoe County, Pershing County/Pershing County Sheriff, and State Agencies) at the Burning Man event continue to operate under a UC System for 2015 and beyond.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## 4.  EVENT PLANNING

Planning and coordinating for the Burning Man event is a year round workload.  The staffing, coordination, and planning process for 2014 began at the conclusion of the 2013 event.   BRC and the BLM recognized the need for a full time, year round position to assist in the planning of the event.  In 2014, the BLM Winnemucca District, with assistance from BRC, hired a Project manager (PM) to work full time on the Burning Man event.  The PM played an integral role with planning and coordinated directly with the Winnemucca District, BRC, and OLES to implement numerous changes to the planning and execution of Burning Man.  The PM's involvement in the planning process increased the continuity of operations and alleviated some of the planning burden placed on the Winnemucca District Manager, Region 3 Special Agent In-Charge, and Nevada State Chief Ranger.

The 2014 event relied on support from employees across the BLM.  Support in the way of both law enforcement and civilian operations was received from BLM offices across the west, including Alaska.  Law enforcement operations were supported by a larger cadre of civilian personnel than in previous years.   Two civilian operation chiefs were detailed to the event and were beneficial to the planning and management of 2014 event.  Their assistance in the planning process was invaluable and their participation on conference calls and in meetings leading up to the event was helpful and necessary for the execution of a successful operation.  The civilian operation chiefs provided oversight, leadership and accountability to the vending, compliance, logistics, gate, public affairs, and communications teams.  This allowed law enforcement personnel to focus on public safety and enforcement of Federal laws and regulations.

Law enforcement staffing for 2014 relied primarily on the BLM's national detail list in order to assign rangers and agents to the Burning Man detail.  This list of names was compiled approximately ten months prior to the start of the event.  Staffing relied heavily upon this list for the majority of the 72 rangers and agents assigned to law enforcement operations (command staff, patrol officers, integrated units and investigations).  Most if not all of the officers at the 2014 were volunteers taken from this list resulting in positive attitudes, a willingness to work and constructive interaction with event participants and staff. Planning for staffing and drafting of the table of organization (TO) was an ongoing process and continued up until two days prior to the beginning of pre patrol.  Rangers and agents who were initially on the TO found they had other commitments or were assigned to other incidents as dictated by their field office or district managers.  Names on the alternate list were exhausted by the time a final TO was completed on August 17, just prior to the beginning of pre patrol.

The Burning Man event is the most complex permitted activity on public land managed by the BLM.  There is a tremendous amount of information which needs to be disseminated to officers who patrol the event for two to three weeks each year.  Even though most of the patrol officers are veterans of the event, it is still necessary to provide refresher training on

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07116

best practices, protocols and expectations in order for a successful and safe event to take place.  In planning for 2014, command staff provided two WebEx briefings for rangers and agents assigned to the event.  These briefings were designed to give an overview of Burning Man, define roles and responsibilities, and discuss expectations.  One of these briefings was provided for supervisors assigned to the event and the other was for patrol officers and civilian operations personnel.  These were provided and designed to decrease the amount of time required during the main event briefing and training day which occurred on Saturday, August 23.   The second WebEx training had approximately 100 participants.  With this many individuals on the call, there were multiple distractions to include dropped calls and various types of background noise.

On Saturday, August 23, command staff provided training to all law enforcement personnel assigned to the event.  This began with a main operational briefing to all law enforcement and civilian personnel.  The Winnemucca District Manager, Region 3 Special Agent in Charge and the Pershing County Sheriff addressed the group as a whole.  Following this briefing, law enforcement personnel divided into four groups according to their respective shifts (days, swings, nights, and investigations).   These groups participated in eight training modules which were provided in 45 minute increments and consisted of the following:

1.  Procedures, Protocols, ICP Tour, Finance
2.  Main Shift Briefing, Expectations, Report Writing
3.  Radio Protocols
4.  Medical
5.  Crowd Control
6.  IMARS and Evidence
7.  Vending and Environmental Compliance.
8.  BRC acculturation training.

Officers found the training to be beneficial and necessary; however, there was room for improvement.  Many of the training modules did not run for the allotted time frame of 45 minutes which led to officers having down time in between sessions.  Additionally, these training sessions were designed to provide the same material to all officers.  However, different questions were asked by some of the groups throughout the training modules which brought up additional information that needed to be relayed to all officers.

## EVENT PLANNING RECOMMENDATIONS

Planning for the Burning Man event continues to improve.  In 2014, most planning was completed well before the event took place.  The TO was constantly changing up until the event began but this is to be expected with a detail this large.  The national detail list is helpful in determining which rangers and agents to detail to the event but it should not be a requirement for officers to work the detail.  The Burning Man detail is highly sought after by

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

rangers and agents alike.

If officers do not want to assist in the detail they should not be forced to do so as their initial attitude upon arrival to the event is often poor and can easily affect the attitude and perception of those who are at the event voluntarily and are willing to work.

The WebEx training sessions are valuable and decrease the amount of time spent in briefing on-playa.  These trainings should continue but should be split up between law enforcement and civilian operations.  "Burning Man 101" needs to return for all personnel assisting in the event who either have not been there before or have not worked the event in three years.  Some of the training modules presented on the training day could be delivered in smaller WebEx training sessions (procedures, protocols, expectations, vending, compliance) and provided to law enforcement personnel prior to arriving at the event.  The other training modules would need to be provided on-playa to include the main law enforcement briefing.  In 2014, law enforcement personnel were split into two separate groups for the law enforcement briefing at the ICP.  The information provided to each group was the same, however, as with the training modules listed above, one group asked different questions than the other which resulted in more information being provided to some groups.

The concept of having seven different training modules on the day prior to the beginning of main patrol operations failed.  In order for the training/briefing day to succeed, there should be one training session for all officers which would run for seven to eight hours.  This would consist of the main shift briefing, procedures, protocols, finance, report writing, radio communications, IMARS, evidence, vending and compliance.  Some of these could be covered in WebEx training sessions.  Following this briefing, groups could break out into their respective shifts and receive the medical and crowd control training.  This would provide for consistent messaging and ensure all officers receive the same information stemming from questions and answers.  It would also allow for more time to be dedicated to medical and crowd control.  After the training is completed, officers would be provided the opportunity to familiarize themselves with the city and the layout of various art installations which is helpful when responding to calls for service.

As part of the planning process for the 2015 event, shift commanders should be identified no later than March 1st and should be more involved in the planning process and assignment of shift personnel.

In the future, civilian operations should have a WebEx training that is separate from law enforcement.  Additionally, in previous years, command staff had provided a basic "Burning Man 101" training to law enforcement officers who had not worked the event in the past or who had not worked the event for several years.  This would be beneficial to newcomers at the event and reduce the amount of time spent by seasoned law enforcement officers on the basics of the detail.

The draft 2015 Table of Organization will be in place by March 2015.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07118

The UC structure worked well in 2014 however, there is room for improvement.  UC team training in Reno should be held again prior to the 2015 event.  Successes and failures could be identified and the team could continue to learn and grow.

Command staff needs to ensure the number of officers on patrol is consistent with the population of the city during the pre patrol, to include the day of the main event training.

The US Attorney's Office and Pershing County District Attorney's Office were unavailable to deliver a legal update during the main event briefing due to limited staffing available on weekends.   OLES will communicate well in advance of the 2015 event to ensure officers patrolling the event are given a legal update and review from the US Attorney's Office and Pershing County District Attorney's Office.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

**AR07119**

## 5.  INGRESS / EGRESS EXTENSION

**INGRESS / EGRESS EXTENSION**

BRC proposed that BLM complete a Determination of NEPA Adequacy (DNA) to evaluate the possibility of opening the gates to participant ingress early and leaving the gates open later for participant egress.  BRC stated the main reason for doing this was to alleviate traffic congestion and related public safety issues on HWY 34 and 447, and to maximize use of daylight hours for driving.  BLM agreed and completed a DNA which made it possible to open the main gate early in 2014, starting at 10:00 a.m. on Sunday, August 24 and stay open until 12:00 p.m. on Tuesday, September 2.  Even though these extended entry and exit times were allowed, BRC was told that no event activities would take place during these extended periods.  During these extended ingress and egress hours BRC was to require participants to focus their activities on camp location, setup, and breakdown.

### INGRESS / EGRESS EXTENSION RECOMMENDATIONS

**INGRESS / EGRESS EXTENSION**

Extending ingress and egress to the event, as described in stipulation 10, was a success in 2014 and helped alleviate traffic congestion and associated safety issues.  It is recommended BLM allow similar ingress and egress extensions for future events.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07120

## 6.  LAW ENFORCEMENT OPERATIONS

### INTEGRATION

Following the 2012 event, the BLM identified the critical importance of a fully integrated law enforcement operation with the PCSO. In previous years, both agencies had separate dispatch centers, worked independently under different operational plans, and did not communicate effectively. The 2013 event included full law enforcement integration for the first time. The integrated model proved to be the most efficient way to provide for public safety, the protection of natural resources, and enforcement of laws and event regulations. Integration allowed each agency access to a common dispatch center, joint management of law enforcement resources, and the ability to effectively manage the enforcement of state and federal laws.

Building on the 2013 event, adjustments were made in planning the 2014 event which improved the law enforcement integration with Pershing County. The BLM Region 3 SAC and the Pershing County Sheriff were members of the UC. Both agencies utilized a common dispatch center and worked collaboratively on investigations and patrol functions.
During the 2014 event, each shift (day, swing, night) consisted of three integrated patrol units. Each unit was staffed by a BLM Ranger and a Pershing County Deputy in a marked BLM patrol vehicle. These units reported directly to a Pershing County Shift Supervisor. When a law enforcement contact resulted in a violation of state law falling under the jurisdiction of Pershing County, a Pershing County Deputy served as the primary case officer. The deputies responded to person-on-person crimes, issued trespass notices in support of BLM's closure order, and responded to incidents to determine whether state charges were more appropriate than federal charges. When a law enforcement contact involved violation of federal law, the BLM Ranger served as the primary case officer. Integrated units also staffed the mobile command trailer stationed in BRC and provided for prisoner transports to the appropriate holding facility. In certain situations, the integrated units utilized resources from the investigative division to fulfill investigative needs or as force-multiplying assets.

Procedurally, when a federal officer encountered a situation which developed into a potential state case, the officer requested an integrated unit through dispatch. The integrated patrol unit responded to the federal officer's location and the Pershing County Deputy determined if the incident met thresholds for state prosecution. If the integrated unit adopted the case for state prosecution, the Pershing County Deputy became the case agent. If the Pershing County Deputy declined the case on the merits, the federal officer determined whether to proceed federally.

BLM officers, U.S. Park Police Detectives, U.S. Park Police Identification Technicians (ID Techs), and Pershing County Deputies were also assigned to major crimes teams to investigate complex cases, sexual assaults, and other crimes falling under Nevada state law. The major crimes units responded to 30 incidents involving sexual assault, narcotic violations, domestic violence, a fatal motor vehicle accident, public disturbance, trespass, assault, and

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07121

stalking. The major crimes teams charged one individual with sexual assault, four individuals with narcotic violations, one individual for domestic violence, and two individuals with trespassing.

Throughout the event, threshold levels of drug possession for adoption of a case for prosecution by PCSO were unclear and inconsistent. Early in the event it was clearly established any cases involving the possession of marijuana would not be adopted by PCSO for prosecution. For all other controlled substances, the thresholds changed throughout the event. Conversely, threshold levels for federal prosecution were established well in advance of the event and provided in writing by the U.S. Attorney's Office.

Procedurally, when a federal officer discovered a large amount of controlled substances in a vehicle, an integrated unit was called to the scene for assessment and determination on whether or not the county would accept the case for prosecution. Once on scene, the PCSO Deputy would gather information and place a call to the PCSO supervisor on duty. At times, the supervisor would respond to the scene and assess the facts of the case before making a determination on prosecution.

## COMMUNITY POLICING

In 2014 the BLM enhanced community policing measures which increased positive feedback from participants.  The community policing approach assisted in changing the general attitude and temperament of participants to be more trustful of law enforcement, as illustrated by the overwhelming majority of positive BRC law enforcement feedback forms.  This paradigm shift is a direct result of community policing within the city and is recognized as a central tenet to ensuring the success of the BLM mission during the event.

The objective of community policing during the event is to build collaborative relationships between law enforcement, Burning Man staff, and participants to develop common solutions to problems and increase trust in law enforcement.  During the 2014 event, BLM law enforcement met daily with Black Rock Ranger supervisors to identify ways in which law enforcement and the BRR could collaboratively solve problems.  One goal of law enforcement at Burning Man is compliance with regulations and stipulations.  BRR were able to assist law enforcement with this goal by resolving issues in the city that did not require the attention of BLM law enforcement.   Examples include unauthorized parking, disputes over theme camp boundaries, and notifying participants of required event driving stickers.  This collaboration illustrates the ability of law enforcement to partner with BRC to collaborate and execute common solutions.

One of the best tools available for law enforcement to convey a message to a community is through the media.  In an effort to demonstrate the willingness of BLM law enforcement to establish an open and honest dialogue with participants, members of the BLM law enforcement command staff conducted a live radio show with Burning Man Information Radio (BMIR) for the third year in a row.  The intent behind the show was to present the

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

mission and goals of law enforcement during the event in an unbiased, personable manner. Transparency and open dialogue with community members is a key component to the community policing model and was emphasized during the radio show.   This included a general discussion of the laws and regulations that participants must abide by, which are important considering a large percentage of participants were attending the event for the first time.  The intent behind participation in the BMIR show is to provide facts, dispel rumors, encourage and promote participant interaction with law enforcement, and educate participants to achieve compliance at the lowest possible level.

Law enforcement officers assigned to the event initiated numerous public contacts in the city.  Officers received high praise from participants this year for creating a safe environment for participants.  This praise was echoed by the BRR.  Public interactions are the most common method through which BLM law enforcement builds relationships with participants. These positive interactions are important in building trust and creating an environment of respect amongst the participants.

By assigning officers to specific patrol areas during the 2014 event, the reliability of a law enforcement presence throughout all areas of the city ensured an equitable level of protection.  A combination of foot, vehicle, and UTV patrols were utilized in an effort to connect with neighborhoods in the community.  In addition to the thousands of daily interactions with participants, a total of 334 documented public assists were made with members of the public during this year's event.  Documented public assists ranged from medical aid to providing directions or escorting lost individuals to their campsites.  The following examples illustrate the value BLM law enforcement placed on providing for public safety during the 2014 event:

- A BLM Ranger patrolling the playa near the boundary fence encountered two elderly females in their 80's that were lost, and without water, during an intense afternoon dust storm.  The BLM Ranger gave the participants a ride back to the campsite, keeping a dangerous situation from turning into a tragic one.
- A BLM Ranger assigned to perimeter patrol observed an individual walking away from the event. Upon contact, the ranger determined the participant to be very upset over a recent break-up with his girlfriend.   The ranger spent an hour with the participant, talking through his problems, ultimately convincing the participant to return to the city and his camp.   During this contact, the ranger learned the distraught participant was walking into the desert with no plan to return.  The law enforcement presence and willingness to spend the necessary time with the distraught person kept a dangerous situation from turning tragic.

## MOBILE COMMAND TRAILER

A key component to the community policing model at the event is the mobile command trailer.  The law enforcement mobile command trailer was staged at "5:15 and Esplanade" next to the Humboldt General Hospital and near the Black Rock Ranger Station.  The trailer

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

was staffed by the integrated patrol units.  The integrated units worked at the mobile command trailer and provided a non-confrontational and educational venue for participants to meet with law enforcement officers.  The mobile command trailer provided an opportunity for participants to have positive interactions with law enforcement and learn about the mission of law enforcement.

In addition, the mobile command trailer served as a central location for participants to report criminal activity.  When participants presented information that required immediate law enforcement action, the integrated unit staffing the trailer contacted dispatch for assignment of law enforcement resources.  If a response unit was not available, the integrated unit locked up the mobile command trailer and responded to the reported incident.  The mobile command trailer also served as a location for interviewing suspects/witnesses and report writing.

| STAFFING |
|:--------:|

**PATROL**
During the pre-event detail (August 19-August 23), a total of 15 patrol officers worked overlapping 12-hr shifts (day, swing, night).  The estimated population on August 19 was 2,649 and grew to an estimated 18,000 by August 23, nearly 1/4th of the peak population.  While some of these participants were actively engaged in construction of the city, the majority were pursuing recreational interests.   This unexpected increase in population caused law enforcement to adjust shift hours for greater shift overlap on August 23.  This change was necessary for officer safety and to provide for an appropriate level of law enforcement services.

During the main detail (August 23-September 1), the total number of federal patrol officers was 53.   Similar to the 2013 event, each shift consisted of a shift commander and two patrol supervisors.  This model provided direct oversight and command of field operations and personnel assignments.  Patrol officers were assigned to one of three overlapping 12-hour shifts (day, swing, night).  Each shift had three integrated units (BLM and PCSO deputies) that were responsible for staffing the mobile command post, delivering trespass notices, and investigating crimes in which Pershing County had jurisdiction.  In addition, each shift had one unit specifically assigned to perimeter security.  These units were responsible for coordinating with the Burning Man gate and perimeter shift leads and served as a liaison between BLM law enforcement and the Burning Man perimeter function.

Shift commanders and patrol supervisors conducted daily briefings at the beginning of each shift and held a debrief at the end of each shift. The briefings allowed patrol supervisors to emphasize areas of concern, address daily goals, assign specific duties, provide sensitive intelligence, and pass pertinent information to the next shift. Law enforcement operation chiefs attended these briefings to provide direction from agency administrators and the UC.

Patrol supervisors and shift commanders assigned each patrol unit to a designated part of

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

the city for their shift. These areas consisted of Gate Road, 3 o'clock, 9 o'clock, and perimeter locations. Officers were expected to stay in their assigned patrol area, respond to calls for service, and proactively conduct vehicle and foot patrols. Specific patrol areas were assigned to provide law enforcement services throughout the city and allow for immediate response to calls for service. This model worked well in 2014 and should be followed for future events.

For the post event (September 2-5), a total of 15 patrol officers worked overlapping 13-hr shifts (day/night).  The command staff structure was demobilized on Wednesday, September 3. In direct response to the decline of the city population, the total number of officers was reduced to five on Thursday, September 4.  By Friday, September 5th, the number of patrol officers was further reduced to one.

## INVESTIGATIONS

The investigative division consisted of 30 total officers including 14 BLM Special Agents, 3 BLM Rangers, 1 USFS Officer, 3 U.S. Park Police detectives/officers, 3 U.S. Park Police ID Techs, and 6 Pershing County Deputies. Investigators supported the uniformed patrol component by supplementing patrol activities and assuming control of complex investigations. Investigative team leaders developed a plan to coordinate vending and environmental compliance investigations with BLM civilian employees at the event. They also acted as the primary intelligence gathering unit throughout the event.

## INTEGRATION RECOMMENDATIONS

Every effort should be made to build upon the foundation created during the 2014 event. The success of BLM and Pershing County integration is largely attributed to PCSO Sheriff Rich Machado's vision and leadership which was exemplified by PCSO supervisors Bob McDonald and Mary McDonald.  Sheriff Machado understood the value and efficiency of law enforcement integration and worked closely with OLES leadership to make integration a reality and success.  Sheriff Machado will retire in January 2015 which means the level of integration at future events will be largely dictated by a new administration.  BLM-OLES leadership will engage the Pershing County Sheriff Elect, the Pershing County District Attorney Elect, the Pershing County Commission, and other political entities to highlight the benefits of law enforcement integration.

Planning for law enforcement integration must include joint training, especially with integrated units and major crime teams.  This would allow personnel familiarization prior to the start of the 2015 event and alleviate indecision when considering avenues of criminal prosecution.  Prior to the 2014 event, PCSO deputies were unable to participate in joint training with the BLM because they were required to complete state training for the Sheriff and were not scheduled to begin working until the event gates opened.

The inherent nature of person on person crimes such as sexual assault, rape, and battery requires a Pershing County deputy be heavily involved.  These cases will be exclusively

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

prosecuted through the Pershing County District Attorney's Office.  Therefore, Pershing County deputies must be part of the investigation or a federal officer must be deputized to carry the burden of state prosecution and liaison with the District Attorney.

If the lack of available jail cells at the Pershing County Jail is a limiting factor in accepting cases for prosecution, there are several recommendations that should be considered to alleviate the problem.  One possible solution would be contracting with either Washoe County or the Lovelock Correctional Center for temporary housing of inmates.   This would create a financial burden on Pershing County, who would have to pay to house inmates in these alternate facilities.   This money could be recouped through cost recovery or by contractual modification.   A second alternative would be establishing a VTC connection with the county courts in Lovelock, coupled with creating a larger detention facility at the ICP.  By increasing the detention facility capacity to several holding cells, individuals arrested on state charges could be held until a VTC link could be established for initial appearance before the county judge.  If the ICP detention facility was full, transport to Lovelock would be used as a secondary option.  A third alternative would be the issuance of a summons by PCSO in lieu of an arrest.  While this may not be possible for all cases, it should be considered as an alternative tool for prosecuting controlled substance cases.

The second and third alternatives would also prevent the loss of an integrated unit to transporting prisoners to Lovelock, which can take up to five hours round-trip.  In 2014, the integrated units were solely responsible for transporting prisoners to Lovelock.  This reduced the number of available integrated resources in the field.   It is recommended that non-integrated PCSO units be utilized for prisoner transport in future events.

## COMMUNITY POLICING RECOMMENDATIONS

It is recommended that use of the mobile command trailer continue for future events.  It is also recommended all patrol officers assigned to main event spend time at the mobile command trailer.  This would prevent closing of the trailer during increased workloads for the integrated patrol units. The BLM should also continue purchasing public land educational items.  These items are shared with the participants for education on leave no trace and law enforcement. This will highlight the importance of providing outreach and public relations within the community.  Similar to the BLM interpretive camp, it would prove helpful to have a BLM law enforcement kiosk for display at the mobile command trailer.

It is also recommended officers at the mobile command trailer provide feedback forms for participants to comment on their interactions with law enforcement.  One idea is to use a touch screen mobile device for participants to provide instantaneous feedback.  Officers could also provide instructions to participants for completing online feedback forms to capture participant feedback.  In addition, a tracking system needs to be established to document the number and type of contacts made at the mobile command post.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07126

During the 2014 event, the Black Rock Ranger Headquarters received feedback on ranger activities and reported on feedback received during the BRR meeting every morning.   In the future, it is recommended that BRC provide BLM law enforcement with copies of all written feedback they receive throughout the event.   This will allow command staff the opportunity to track and analyze participant interaction with law enforcement during the event.

It is also important that law enforcement continue to develop a partnership with the BRR to improve reporting procedures and establish protocol for BRR interactions.  Numerous times during this year's event, BRRs were requested to assist BLM law enforcement and were either non-responsive or they had lengthy response times.  BLM shift commanders do not currently have any means of speaking directly with the BRR Officer of the Day (OOD). To increase effectiveness of communication, it is recommended that patrol commanders have access to a BRC radio so they can communicate directly with the OOD.  This will provide shift commanders a direct line of communication with BRR, allowing for more effective and efficient communication of on-the-ground needs.

It is recommended that more officers bring UTVs from their home units to increase the number of UTV patrols for the 2015 event. In 2014, UTV patrol proved to be a useful tool for interacting with participants and navigating the event site.

To increase outreach and promote transparency of the BLM law enforcement function during the event, BLM public affairs could be utilized to create a short video highlighting the concepts of community policing.  This video would help cast a positive image on BLM's law enforcement mission and its integration with BRC and PCSO to provide for public safety and enjoyment at the event.  Additionally, BLM could prepare public service announcements to air on BMIR throughout the event.

## STAFFING RECOMMENDATIONS

### UNIFORMED PATROL

On several occasions, it was necessary to hold over two to four officers from the swing shift to assist the night shift officers with patrol duties.  This occurred when there was a high volume of calls and/or multiple units were assigned prisoner transports.  This amounted to one to two hours and was authorized by the BLM Law Enforcement Night Operations Chief. Rather than assign more officers to the event, this practice should continue in the future.

The assignment of patrol sectors should continue in the future.  This mechanism allowed for law enforcement resources to be deployed throughout the event site and provided flexibility for increasing coverage in high use areas.

### STAFFING

No additional LE staffing is anticipated. However, for the pre-patrol program, more officers could be brought on duty early in direct relation to the growing population.   As an example,

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

BLM could increase the number of officers to 20 on Thursday and 25 on Friday in incremental response to the growing city population.   A second alternative would be to have the main-event briefing on a Thursday or Friday (population 6,500+ or 11,000+) and begin the first shift on Friday or Saturday (population 11,000+ or 18,000+).  Either of these options could be used to increase adequate patrol coverage in the city.  Alternatively, the BLM and BRC could tightly control and limit the number of participants who are allowed to enter the event prior to the official opening and keep law enforcement pre-event staffing at a similar level as 2014.

During the 2014 event, the operations chief was integrated with the UC structure.  As a result, operation chiefs attended numerous meetings throughout the day, to include the internal meetings, UC meetings, the Black Rock Ranger meetings, and various other coordination meetings between BRC and BLM.   The position was often times unavailable for meeting the operational needs of the patrol branch.  As a recommendation for future events, the table of organization should have a law enforcement branch chief (part of UC), a day operations and night operations chief, supported by shift commanders and patrol supervisors.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## 7.  BLM MEDICAL

For the past three years, the BLM OLES partnered with the U.S. Department of Health and Human Services (DHHS) Center for Tactical Medicine (CTM) to provide premier medical care for federal employees working at Burning Man.  The primary DHHS tactical medics have a strong working relationship with the BLM.

Tactical medicine is the subspecialty of emergency medicine that focuses on the incorporation of force protection principles to provide medical support to law enforcement missions.  Often referred to as Tactical Emergency Medical Support (TEMS), the fundamental goal of tactical medicine is to "protect the protectors" by providing a full spectrum of medical support to special response teams along the pre-incident, incident, and post incident continuum.

The mission of the CTM is to provide the highest quality medical oversight, training, and operational support to federal law enforcement in the course of their duties.  This is accomplished with specially trained medical personnel who are dually trained in law enforcement.  Due to the unique working relationship between the BLM OLES and DHHS, medical care is extended to all federal employees working at Burning Man, not just law enforcement personnel.  The intent is to provide 24-hour professional on site medical care to federal employees so they remain healthy and fully engaged.

The Burning Man event poses a daunting task for the DHHS tactical medics.  They must plan for every conceivable scenario; from routine health care such as illness and minor abrasions to catastrophic mass casualty.  They set up a fully functioning medical clinic at the ICP capable of treating any condition within that spectrum.  Federal employees work long, strenuous shifts at Burning Man and rely on the tactical medics to keep them healthy.  Four tactical medics were assigned to the 2014 event.  These medics represented the DHHS and BLM law enforcement program.  They were supplemented in the field by several BLM Rangers and Special Agents who have collateral duties as EMTs.  However, those rangers and agents were not part of the medical unit under the UC structure in 2014.  Under the UC structure, a designated medical unit leader reported directly to the law enforcement operations chiefs.

The medical unit was operational only during the main event.  During that time, they logged approximately 217 patient visits and 41 law enforcement K-9 treatments.  An overwhelming majority of those patients were seen for routine medical care such as eye wash, minor wound care, over the counter pain relief, and over the counter medicine.  It became readily apparent the medical unit should be fully operational during pre-patrol and post patrol at future Burning Man events.  The need for medical care during that time was evident and federal employees volunteering to work during those periods should not be without quality medical care.   Much like during the main event, there should be access to on site 24-hour medical care when federal employees are working at Burning Man, regardless of whether

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

the gates to the event are open.  This can be accomplished by using BLM medics who are part of the newly established national law enforcement medical program to staff the medical unit outside of the main event.

## BLM MEDICAL RECOMMENDATIONS

The tactical medics from DHHS must adhere to the UC structure and be accountable to the law enforcement operations chief or designated supervisor.  There were times during the 2014 event when the medics were not responsive to the operations chief and spent significant amounts of time patrolling BRC instead of staffing the medical trailer at the ICP.  The medical unit functioned more like an independent entity than as an integral part of the UC structure.  The medical unit must work for and with the law enforcement operations chief, not as an independent branch.  The primary mission of the medics is to provide for the safety and health of federal employees working the event, not to patrol the city or spend an inordinate amount of time at rave locations.  At a minimum, the medical trailer should be staffed by one DHHS tactical medic and one BLM EMT at all times.  There were periods during the 2014 event where all of the medics were deployed inside BRC even though they were not responding to a medical emergency.  For example, a law enforcement operations chief cited three separate instances where he went to the medical trailer for treatment and found it unstaffed.

Future planning should consider using BLM law enforcement EMTs to supplement the medical unit as a collateral duty to assigned shift work.  This would accomplish two goals:  adequately staffing uniformed patrol shifts and supplementing the medical staff with trained BLM law enforcement personnel who could patrol the city and quickly respond to medical needs if necessary.  It would also justify assigning additional medical resources to the pre, main, and post event detail because certain BLM law enforcement personnel could fulfill dual roles.  Ultimately, the medical unit leader must be responsible for managing assets and ensuring 24-hour medical coverage at the ICP and in the field while being fully integrated in the UC structure.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## 8.  COMMUNICATIONS CENTER

The 2014 event included an onsite law enforcement and civilian communication center.  The law enforcement communication center was staffed by federal dispatchers and managed by a lead mission support technician from the Federal Law Enforcement Communication Center (FLECC).  The communication center was located at the ICP and operated out of a single wide 60 foot trailer.  The communication center provided 24 hour dispatch services to approximately 150 law enforcement and civilian employees during the 2014 event.

In order to have a fully functional law enforcement communication center (dispatch) with criminal history capabilities required a tremendous amount of pre-planning and multiagency coordination.  The Nevada Criminal Justice Information System (NCJIS) is the primary link for providing criminal history information.  NCJIS is managed by the Nevada Department of Public Safety. To link into NCJIS requires a justice link test server, firewall, internet connection, cisco connection, and computer aided design (CAD) database server.  NCJIS is required to ensure that each dispatch connection is adequately protected.  Each of the above connection links requires NCJIS coordination and approval.  Due to the law enforcement communication center being operated at a temporary location, NCJIS conducted an onsite audit during the 2014 event.

The technical expertise required a specialized skillset and months of pre-planning.  The pre-planning team consisted of a lead mission support technician, Arizona State Chief Ranger, two Burning Man project managers, supervisory telecommunications specialist, Nevada State Office telecommunications specialist, Las Vegas special agent, and the Nevada Assistant Special Agent in Charge.  This workload required the above specialists to mitigate their 2014 workload measures and spend months of planning to meet the dispatching needs of the 2014 event.   Because of the technical expertise and skillset required for these positions, the loss of any one has the potential to weaken the effectiveness and functionality of the communication center unless a competent back-up has been identified.

### COMMUNICATIONS CENTER RECOMMENDATIONS

For the 2015 event, if approved, the BLM should explore one of two options early in the planning process.

1.  Hire a third party company to provide the law enforcement dispatch services to work at the ICP.  NCJIS will require a background investigation for each dispatcher.
2.  Use radio over internet protocol (ROIP) technology and work with an off-site federal communication center to provide dispatch services for the 2015 event.  This would include detailing additional dispatchers to that center to account for the increased workload.  This communication center would need to be NCJIS compliant or an equivalent system, a CAD database server, and other requirements specific to running

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

a fully functional law enforcement dispatch center.

The ESD dispatching console should be co-located in the same building as the BLM communication center.  This would ensure adequate resources can be dispatched in response to emergency service calls, and would eliminate the inefficient and unnecessary need to relay requests between dispatchers located in different buildings.

A mutual aid channel should be established for future events.  This channel would be vital in a serious law enforcement event, such as an active shooter or mass casualty event, which would require a response from multiple external law enforcement agencies.

The CAD database continues to improve each year. In order to seek excellence and maintain quality service the BLM should consider a year-round contract.  This service would allow the BLM to facilitate year-round meetings, provide realistic timeframes, and develop objectives. This contract would further allow the DOI/BLM IMARS team and CAD vendor to communicate and increase productivity during implementation at the event.

It is recommended BLM take steps to build capacity within the technical positions of the communications center.  This would ensure its functionality and effectiveness continues in the instance key personnel cannot return or are forced to leave the event early.   This can be done through cross-training and development or recruitment of capable dispatchers.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07132

## 9. EVICTIONS

The BLM evicted seven participants from the 2014 event based on authority granted within Title 43 of the Code of Federal Regulations.  All evicted persons were issued trespass notices and forfeited all privileges to be present within the public closure area.  Reasons for evictions included possession of controlled substances, possession of dangerous weapons, creating a hazard or nuisance, and disorderly conduct.  BLM officers working the event who requested an eviction for "just cause" received concurrence of the law enforcement operations chief and/or the investigations chief prior to each eviction.  In support of the eviction, the BLM officer requesting the eviction submitted a probable cause statement or incident report documenting the circumstances leading up to the eviction request. Because BLM coordinates with PCSO to complete each eviction, BLM and PCSO should dialogue to develop standard eviction protocols

Evicted persons received a formal trespass notice from the PCSO, informing them they had been evicted from the Burning Man event and were not allowed to re-enter.  Once the decision to evict was made, the evicting officer requested assistance from the BRR through BLM dispatch.  The response for assistance with an eviction was inconsistent throughout the event.  Several times, the BRR provided BLM assistance in ensuring evicted persons were escorted outside of the closure area.

Other times, evicting officers were advised BRC had no BRR available to assist with a BLM eviction.   This service is very helpful as it allows BLM to continue providing critical law enforcement services throughout the city.  As such, the BLM should communicate the importance of this relationship early on in the event and work closely with Black Rock Ranger supervisors to ensure success.

### EVICTION RECOMMENDATIONS

BLM will adhere to new standard operating procedures (SOPs) for evictions that will clearly identify the steps and procedures for all evictions such as:

- Request for eviction is made to shift commander or investigations supervisor who then seeks concurrence with the operations chief.
- If a decision to evict is made, a PCSO unit will be called to the scene.
- The participant's ticket will be seized by the evicting officer and a receipt for property will be issued.
- If the participant is not in possession of a ticket (e.g. ticket is waiting at will call) follow-up will be made with BRC staff at will call to locate and seize the ticket.
- BLM and PSCO coordinate to develop standard eviction protocols, which then lead to consistent standard operating procedures.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

- Pershing County will issue the evicted person a trespass notice advising them of the consequences should they return to the event.
- The evicted person will be photographed, and the photos will be provided to dispatch for use in an eviction log that will be updated each shift.
- In conjunction with BRR, the evicted person will be escorted from the event.  If the evicted person cannot be transported by BRC, a pre-identified drop point outside of the closure area will be identified for use by law enforcement officers.
- Once the eviction is complete, a copy of the trespass notice will be provided to the shift commander or investigations supervisor.
- All evictions must be entered into IMARS and tracked through CAD.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

**AR07134**

## 10.  REPORT WRITING

In 2013, incident data captured through the CAD system was transferred into IMARS upon completion of the detail.  Officers were required to complete their IMARS reports while back at their home duty stations. As a result, some officers failed to complete these reports in a timely manner.  In 2013, the data conversion was problematic and led to incomplete data transfer and incorrect assignment of officers.  As a result, changes were implemented for the 2014 event.  DOI provided an IMARS database administrator and IMARS system administrator on site.  Once network communications were established, DOI personnel automated the process so CAD events were imported into IMARS within 10 minutes of the event being closed in the CAD.  This real-time import allowed officers to complete their IMARS reports prior to the end of their respective shifts.  Unlike the 2013 event, the data transfer from CAD to IMARS in 2014 was much more accurate.  This saved officers from having to manually enter incident times, addresses, suspect, or vehicle information.   Many officers had positive comments on the requirement they complete all paperwork at the end of each shift as it allowed them to return to their home units without the need to complete paperwork.

### REPORT WRITING RECOMMENDATIONS

For the 2015 event, it is recommended DOI personnel be available onsite as they are essential to contributing to the success of IMARS and report writing.  These DOI personnel provide onsite technical support for field officers which leads to greater efficiency and accuracy of reporting.  For the 2015 event, there will likely be a newer version of IMARS software.  Additionally, if the BLM is successful in deploying driver's license readers and a disconnected mode support prior to the event, DOI IMARS personnel will be critical to ensuring the success of reporting during the event.

Continue to use the violation notice processing method developed in 2014.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## 11. STATISTICS

During the 2014 event, there were a total of 1,902 incidents reported by law enforcement. The following is a breakdown of these incidents:

- 334 Public Assists
- 860 Traffic Stops
- 520 Verbal Warnings
- 230 Written Warnings
- 392 Citations
  - 104 issued on entrance road
  - 205 for possession of a controlled substance
    - 117 Marijuana
    - 30 Ecstasy
    - 18 Cocaine
    - 40 Other
  - 52 of the PCS citations were for multiple drug types
  - 50 for motor vehicle violations

According to BRC's count, the peak population of Black Rock City was 75,234 (participants and staffs/volunteers).  Using this number, only 0.5% of participants at the event received a citation.  Only 1.4% of the city's population was contacted for a law enforcement incident. BLM Rangers and Agents exercised a great deal of discretion when issuing citations and education was the preferred method in which they dealt with most violations.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## 12.  CIVILIAN OPERATIONS

During the 2014 event, the BLM planned for and deployed 40 positions in the civilian operation section of the event management program.  The civilian operation section included a UC position, three management programs, and six civilian event functions which included supervisory positions (operations chiefs), two event support positions, and three event operational positions. The support functions included the logistic team and the communication team.  The operational positions included vending compliance, environmental compliance, and the gate team.  *(Note: the dispatch and medical functions were managed by the law enforcement operation section)*  All of the civilian functions reported to the BLM UC position, through the civilian operations chiefs.  The civilian management programs included the PM, contracting, finance, and the PIO/statistics tracking, which reported directly to the BLM UC position. The civilian operations section worked very well during the 2014 event however there are a few recommended changes to the section. Individual functions recommended changes are also addressed.

For another year, the working knowledge and subject matter expertise from Mark Pirtle greatly assisted pre planning, planning, and implementation.  Mark was also able to mentor the permanent PM for Winnemucca District and this shadowing assignment was needed and allowed.

Another success within the civilian operations was the two operations chiefs.  The operations chiefs and their ability to plan, schedule and track provided a much needed presence during the planning stages of the event.  Without the operation chiefs this workload would have been on the PM/DM and some tasks may not have been completed.  During the event the operation chiefs provided the DM/AA/PM and others the eyes, ears and boots on the ground on all facets of the SRP.  Their personalities, critical thinking skills and problem solving occurred hourly and daily and were a true asset to the civilian operations and to the AA.

In past years BLM, thru the Great Basin Institute (GBI), has planned and implemented the Interp Camp in the city.  The current assistance agreement with GBI has been modified to include the Interpretation Camp.  Each year the theme of the camp has varied, and the theme is agreed upon in the early calendar year so that planning, ordering, and implementation can be successful.  For the past two years, there has been an enhanced desire from the Washington Office, BRC, and the friends of High Rock Black Rock to have BRC play an active role in leading and implementing of BLM's Interp Camp.  These active roles have been discussed and discouraged by the Winnemucca District. Thus, BLM Winnemucca District will continue to be the lead.

### CIVILIAN OPERATIONS RECOMMENDATIONS

Create new position of facility manager for the planning and implementation of the lodging

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

program (Bruno's or man camp), the planning and execution of the food vending program, the planning and execution of the BRC ICP facility build out program, (COR of BRC contracts), the planning and execution of the logistics team, the planning and execution of the gate team, and the planning and execution of the communication team (repeaters/radio network).  During the event, this position would report to the civilian operations chief. During planning, this position would be part of the BLM planning team and report to the PM.

In turn, only one operations chief will be part of the 2015 planning and implementation and the second position may be approved with the recommended facility manager.

Also during the pre-planning stages for 2015, the AA, PM, and operations chief will further define and finalize roles and responsibilities for the operations chief and facility manager. In the spirit of integration and teamwork, in 2015, the Interp Camp staffing and operations will be placed on the table of organization under the supervision of the civilian operations chief.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07138

## 13.  GATE

During the 2014 event management operation, BLM planned for and deployed five BLM civilian employees from the BLM fire program as the BLM gate team during the main event. The gate team was supervised by the civilian operations chief.  A new section to BLM's IAP was added to outline the protocols/duties of the gate team.  A duty station within BRC's gate operation center was dedicated to the BLM gate team.  The BLM gate team had a lead and two teams of two for 24 hour coverage at the gate.  A marked BLM workstation trailer was provided to the gate team at their duty station.  The intent of BLM event management was for the BLM gate team to engage and integrate with BRC's gate operations as much as possible, to develop a good working relationship with BRC gate supervision, observe and learn BRC gate procedures, engage with and assist incoming participants when appropriate, report perceived, developing or potential problems at the gate involving BRC's population reporting/tracking system and any health and safety issues, including the reporting of sovereign citizen or militia markings by incoming participants and to actively participate and assist BRC in any gate closure operations resulting from lost child events, weather events and SRP compliance (participant population cap) events. The deployment of the BLM gate team was successful and should continue in future events with the idea of more integration with BRC and more responsibilities for the combined management of gate operations by the BLM gate team.

### GATE RECOMMENDATIONS

Continue discussions between BLM planning team and BRC on the event management intent of the BLM's deployment of a gate team in 2015 for more integration and responsibilities.

Review BLM gate team protocols and update with agreed upon increase of duties and responsibilities.

Review BLM gate team staffing levels to reflect any increase in duties and responsibilities.

Based on the diverse activities at the gate, BLM will recommend additional staffing at the gate in 2015.

In 2015 the BLM gate team will be more interactive and integrated into BRC's team and also with the participants.

It is also recommended that the gate team have educational trinkets and other "gifting" items related to BLM and/or BLM law enforcement to hand out.

Provide an appropriately marked BLM workstation trailer to the gate team.

Provide a light tower at BLM workstation gate location.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07139

Provide a burn barrel at BLM workstation gate location for night operations, due to cold temperatures.

Provide BLM gate team with BRC radios.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07140

## 14.  VENDING

BRC and BLM also developed a vending protocol which required mutual agreement and information sharing for all permits issued before and during the event.  In 2014, the Black Rock Field Office issued 76 SRPs for vending in association with the Burning Man event, roughly a 100% increase over the previous year.  The vending team also works closely with BRC in order to ensure both entities are aware of all known vending operations within the city and airport.

BLM collects a 3% fee for gross receipts on each SRP processed in order to obtain fair value for the private commercial use of public lands.  The fees collected from vendors at Burning Man can be used to further the mission of the NCA and other public lands within the Winnemucca District.

The vending compliance team consisted of three civilian BLM employees including a team lead and two field-going staff.  The original team had four members but one was unable to attend in 2014.  The team's workload was supervised by the civilian operations chief, and advised by the PM.  A BRC liaison was designated as the point of contact for communications between BLM and BRC.  One BLM vending team member was stationed at the airport and another at the Point 1 vendor gate near the 12 Mile entrance.  The goal of the vending program is to monitor and conduct compliance checks on vendors who hold special SRP as part of the Burning Man event, and to ensure that those vendors who may need SRPs are identified and processed appropriately.  The team member stationed at the airport did compliance monitoring on existing SRPs, and look for other air carriers who may require an SRP.  The team member stationed at the point 1 vendor gate does compliance monitoring for commercial vendors and seeks out those vendors who may require a permit. Due to the inability of one team member to work the event in 2014, the team lead also functioned as a rover, seeking out and monitoring SRPs on an ongoing basis and looking for non-permitted vending operations.  All three team members served as rovers within BRC as needed.   In 2014, a full-time outdoor recreation planner was detailed to the Winnemucca District for the sole purpose of handling business related to event vending SRPs, the Burning Man SRP, associated NEPA issues, and to plan and implement the vending compliance.

In 2014 BLM was equipped to issue SRPs on-playa during the event.  Previously the only option for vendors found operating illegally was ceasing operations, citations, evictions, or a combination of the three.  The ability to issue SRPs on-playa provided another option for well-intentioned vendors, or those who did not realize their operations would be classified as vending.

Because the BLM had the ability to issue SRPs on-playa in 2014, the vending team was able to make several positive contacts with individuals and theme camps who technically needed an SRP, but were not aware of it. This allowed BLM to bring them into compliance while developing a good relationship with the vendor.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

The vending protocol and SRP process led to a smooth flow of information between BLM and BRC.  It also made it clear how individual situations would be handled both before the event and on-playa. This led to upfront coordination and effective working relationships between Winnemucca BLM, BRC, and vendors in 2014.

## VENDING RECOMMENDATIONS

Continue with the upfront coordination between Winnemucca BLM and BRC on the process/protocol for vending SRPs.

BLM should continue to maintain the ability to issue SRPs on-playa during the event.

Recommend BLM continue to use and update vending protocol for 2015.

Bring vending team in during pre-event.  This would allow the vending team to interact with vendors and camps that are issued SRPs, identify problems early, and establish good working relationships with vendors and BRC.  This would also allow the vending team to process and issue new SRPs to vendors who may need one in a more timely fashion.

When issuing SRPs, vendors should be required to identify their location in BRC.  This would allow the vending team to quickly find the vendors.

Continue to hold a daily meeting with BRC.

Obtain a summary of BLM permitted air carrier traffic in advance.

The staffing for the vending team will remain at four positions (team lead, airport team member, point 1 team member and rover).

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## 15. LOGISTICS

During the 2014 event the logistics team consisted of six civilian BLM employees including a team lead.  The team was supervised by the civilian operations chief. The team was divided into a three person day shift and a two person night shift with the team lead overlapping during the pre, main and post events for 24 hour coverage.  A subset of the team was deployed during the set-up and breakdown weeks.  This was the first year BRC assumed the responsibilities for the ICP build-out and ICP servicing, as per the BRC contracting MOU.  The BLM logistic team worked well with the BRC Department of Public Waste (DPW) assigned personnel at the ICP; however there was initial confusion on the division of labor between the logistic team and DPW because many of the previous duties of the logistic team were assumed by DPW.  This was true during the set-up and breakdown weeks.

The logistics team assumed all responsibilities that required work inside the BLM modular buildings or escorted DPW personnel during any responsibilities that required their presence inside the modular building.  The logistics team also assumed the responsibilities of assigning and maintaining the UTV program and running/maintaining the BRS lodging program, which resulted in improvements over previous years.  The BLM event management team considered the logistics team a major success due their outstanding attitudes, efficiency, timeliness, and excellent personal communication skills.

Black Rock Station continues to be a valuable resource for BLM during the pre-event, event and post event.  The barracks and trailers continue to serve the purpose and need of those who lodge and use the barracks or interp center.

### LOGISTICS RECOMMENDATIONS

With the success of the BRC contracting program for the ICP build-out and servicing, the BLM can reduce the staffing of the logistics team by one position.  BLM would retain a team lead, a two person day shift, and a two person night shift.  The type of detailer that will be recruited for these logistics positions should be mix of Winnemucca district employees and off-district federal employees with maintenance backgrounds.  The logistics team will begin work during setup week and continue through breakdown week, a period of approximately five to six weeks.

The event UTV program supported the management, law enforcement, compliance, vending, gate, communications, and PIO teams for transportation within the event.  In 2014 20 UTVs were rented under a government contract. This proved to be too few to support event operations.  It is recommended that during planning, each team be asked to provide the number and type of UTVs required to carry out their missions and the total rentals be increased to meet that need.  Each team can be assigned specific UTVs, based on their need, to control throughout the event.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

During the 2014 event approximately 20 detailers were lodged at BRS, in a combination of dorm rooms and camping trailers.  With only two restrooms with showers in the dorm building and given that some of the camping trailers had non-functioning restrooms and showers; there was a overcrowding of the restrooms and showers.   It is recommended that BLM rent a commercial shower and restroom trailer, either contract directly or add to BRC contracting, to be stationed at BRS.  BLM WD will be excessing two camp trailers and will purchase two new ones.  In addition, initial discussions are occurring to plan for and implement additional gravel RV pads for additional trailers for this event.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## 16.  ENVIRONMENTAL COMPLIANCE

The Burning Man SRP is for an event that occurs within the Black Rock - High Rock Emigrant Trails National Conservation Area, which is managed under the NCA Resource Management Plan (RMP) of 2004.  The RMP allows for special recreation events such as the Burning Man event.  Significant biological, historical, cultural, geological, and botanical resources are identified in the RMP.

The Burning Man SRP is the largest SRP issued by the BLM and requires hundreds of staff to administer.  This SRP is the only one of its kind among land management resource agencies. The Burning Man SRP requires, in addition to the 13 standard stipulations, 55 additional special stipulations to effectively administer the permit, protect health and human safety, and to protect and conserve the natural and cultural resources of the NCA.

The BLM and BRC planning teams developed environmental processes and protocols to guide the environmental compliance teams during the event to ensure that stipulation violations leading to environmental issues are mitigated quickly.

During the 2014 event, the BLM environmental compliance team, with assistance from BLM law enforcement and BRC Earth Guardians, shared Leave No Trace information with 9,859 participants.  They adjudicated 306 identified environmental issues. BLM law enforcement did not issue any environmental compliance related citations.

During the 2014 event the environmental compliance team consisted of an environmental compliance lead and ten field-going employees who monitored the closure area and city for environmental compliance and temporary closure order violations and then process the violations according to an established protocol.  The primary goal of the environmental compliance team was to ensure compliance with Burning Man SRP stipulations, temporary closure orders and protect public lands from adverse environmental impacts.  The environmental compliance team was under the supervision of the civilian operations chief.

The environmental compliance team seeks out environmental compliance issues, and then educates participants on how to avoid potential problems, helps solve simple problems, reports problems to law enforcement for additional action, and follows up on previous actions.  The team works closely with BLM's GIS team to spatially document and follow up on identified environmental compliance issues.  The team integrates with members of BRC's Earth Guardians staff to ensure a unified and integrated approach, and to provide a positive Leave No Trace message from both BRC and the BLM.  The team also acts as the non-law enforcement BLM interface with participants and others to provide information about BLM involvement, operations, and public lands.

Advanced planning and integration with law enforcement was a key component of knowing in advance who the law enforcement representative would be for possible citations and/or follow up.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

### ENVIRONMENTAL COMPLIANCE RECOMMENDATIONS

Due to the increasing population of first-time participants that require more educational contacts, and the overall increased complexity of BRC's sanitation program, the BLM civilian operations will initiate discussions with OLES and BRC on the appropriate size of future BLM and BRC environmental compliance teams.

Continue partnership and integration with BRC's Earth Guardians staff.  Begin compliance team work during pre-event period due to the potential for environmental issues related to the significant presence of early arrivals and the complexity of the large theme camps and art projects construction.  In addition, for post event, ensure environmental compliance staffing is in place on the playa until dispatch is closed.

Add Leave No Trace information dissemination during exodus and coordinate this in advance with BRC and other cooperators.  Work with BRC to develop and distribute outreach/education materials describing the most common environmental issues to be included in ticket information packets and/or permits.

For 2015, BLM law enforcement investigations will be involved in the pre-planning of the environmental compliance program.  During the event it is recommended that more law enforcement detailers be assigned to the environmental compliance program.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

**AR07146**

## 17.  COMMUNICATIONS

The communications lead was an integral member of the planning team with responsibilities for developing the communications network, i.e. repeaters, and the procurement and programming of individual radios.

During the 2014 event the communications team consisted of six civilian BLM employees including a team lead and an IT specialist.  The team was supervised by the civilian operations chief.  The team was divided into a three person day shift and a two person night shift with the team lead overlapping during the pre, main and post events for 24 hour coverage.  A subset of the team was deployed during the set-up and break-down weeks.  The communication team worked well in 2014 however several recommendations for improvement were put forward by the team for the 2015 event.

### COMMUNICATIONS RECOMMENDATIONS

The communications lead should be more involved in the planning effort earlier in the process and interact with the PM on approved changes to the communication network and equipment.

In addition, the communications lead will be part of the planning team communication sub-group.

Rent six radio consoles with matching headsets (an increase of one).  Purchase of one additional radio base station.

Purchase of ICP mobile radio tower by NSO for use at BM event.

Purchase of Cross-band switches for two frequencies to allow for cross communications between BLM and BRC radios.

Reduce communications team by one, only have one communications tech for night shift.  Add IT event specialist to planning team and assign as call-manager during planning and event operations.

Complete the permanent transfer of the Department of Defense handheld encrypted radios to BLM (radios used on loan during 2014 event).  If not possible, explore the use of NIFC non-encrypted radios for civilian operations.

Review Winnemucca Communication Plan for possible installation of new repeater site (Selenite Range) for use during Burning Man event.  This will improve the BLM communication network along Gate Road and HWY 34.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

**AR07147**

## 18. PUBLIC INFORMATION OFFICER

The 2014 event public information officer (PIO) team consisted of one lead PIO and one events statistician/PIO assistant.  The PIO was supervised by the agency administrator and the civilian operations chief.  The PIO team created press releases, responded to media and public inquiries, posted real-time information including photos, video vignettes, and social media postings, provided ongoing press release information for events occurring at Burning Man, and coordinated with BRC Media Mecca staff as needed to prove integrated information to the public as well as internally.  The PIO was also responsible for coordinating the creation and dissemination of internal and external agency information, as well as integrated information during emergency events and situations.  The PIO helps establish plans and protocols in advance of likely significant events in order to be prepared to provide information quickly when needed. The statistician/PIO assistant kept track of event statistics and assisted the lead PIO in capturing photos, video, compiling information, creating press releases and completing real-time social media posts to sites such as Twitter and Facebook.

### PUBLIC INFORMATION OFFICER RECOMMENDATIONS

Staff the PIO team during the pre-planning process and add to planning team in order to better develop communication plans and protocols.  In concert with BRC and other cooperators, enhance the integration and interaction with all event PIOs. Deploy PIO team to the playa during pre-event.  Document event statistics position responsibilities in IAP to serve additional duty as assistant PIO to provide for more complete event coverage.  Utilize staff assistance from National Training Center to provide on-site technical expertise for video production.  Integrate with BRC media team to produce a video to illustrate major Leave No Trace activities related to playa restoration during the post use site inspection as well as highway and byway road cleanup efforts.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07148

## 19. CONTRACTING

### BLM CONTRACTING

During the 2014 event, five logistical support areas were either determined to be inherently governmental or were not adopted by BRC through the MOU process.  Therefore these required assets and services were retained by the BLM to be procured through the government contracting process.  These logistical support areas included the CAD, the microwave internet services, the rental of UTVs, the rental of dispatch consoles and the procurement of loaner handheld AES encryption radios.

### BRC CONTRACTING

During the 2014 event a new trial program was developed concerning the procurement of required assets and services for the BLM's event operation. Based on a best business practices concept BLM and BRC entered into a MOU which allowed BRC to adopt the procurement of designated logistical support assets and services needed by BLM during the event.  Six separate logistical support areas were agreed upon by BRC, which were based on statements of work provided by the BLM.  These logistical support areas included the ICP build-out and servicing, the meal service at ICP, the fueling service at ICP, the lodging service at Bruno's, the IT equipment rentals and the ice, water, sport drink purchase. These logistical support assets and services were provided to BLM through BRC contractors and BRC operated or owned services.  Throughout the event, BRC's performance in the six logistical support areas was monitored by the PM and when required, adjustments were made by BRC based upon BLM requests.

Overall the trial program was determined, by the BLM to be a huge success.  In addition, based on statements by the BRC event management team during the post event assessment, BRC deemed the program as a success for BRC.

One problem was documented by BLM law enforcement.  Many DPW crew workers from different DPW divisions were assigned to the ICP construction and servicing project.  This required many DPW crew members to go back and forth from the ICP.  BLM law enforcement could not track who from the DPW organization was authorized to be at the ICP which became a security issue.  BRC instituted a wrist band system but this was deemed inadequate by BLM law enforcement.

### CONTRACTING RECOMMENDATIONS

Continue to operate under the contracting MOU with BRC for future events.  For the 2015 event, review all BLM required assets and services and request BRC to procure or provide the appropriate logistical support.  Continue and enhance the coordination with BRC on planning, scheduling and tracking all BRC contracted items and services.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07149

BLM would retain the following contracts:

- CAD
- Rental of Dispatch Consoles
- Rental of UTVs
- Retain rental of handheld encrypted radios as a government contract (if needed).

Research the use of a BLM agreement with UNR for secure internet communications at the event.  University of Nevada at Reno is developing a new statewide microwave internet system in Nevada.  In addition, research the use of the Burning Man microwave network for non-secure internet needs.  This will allow for redundancy on two separate paths.

Continue to use BRC contractor for ICP food and meals provider.  Continue to require a double-wide modular building for the ICP cafeteria.

Develop with BRC better credentials for authorized DPW crew members assigned to the ICP construction and servicing project. The credentials must be visible from a distance.   It is recommended a sign in and out program should be established.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

**AR07150**

## 20.  BUSINESS PRACTICES

OLES Budget and Finance Officer and OLES Contract/Acquisitions -  The past and current presence and leadership of Cassie Sandberg and AJ Ramos have brought the budget and contracting to a professional and effective level regarding accuracy and compliance.  Their leadership and presence has greatly assisted the Winnemucca District by having these responsibilities within their purview.

### COST RECOVERY
The cost recovery (CR) estimate was developed as accurately as possible, including projected expenses for issuing and administering the Burning Man SRP.  There is always some variance in the exact cost for each year's event based on a variety of factors, which include the number of BLM staff assigned, vehicle expenses (e.g., mileage, fuel costs, etc.), the grade and step of staff assigned, and the cost of contracts and services required to issue and implement the permit.  Therefore, it is expected BLM's expenses associated with administering the permit will also change

### CHECK IN
Based on a review of the 2013 event, the check in process was modified for efficiency.  Check in took place at the Black Rock Station.  Employees were given specific times to check in and asked to complete several tasks such as radio programming and detailer information sheets before arriving.  Supervisors and officers participating in pre-patrol followed a separate check in procedure.  However, a majority of the ICS staff and BLM employees arrived at the designated check in times and the process moved quickly.

### CHECK OUT
Check out took place at the Black Rock Station.  Similar to the check in procedure, employees were assigned specific check out times based on their last scheduled shift.  Prior to check out, personnel were given the appropriate amount of sleep.  Employees were required to bring all event issued equipment and pertinent paperwork to check out.

### TIMEKEEPING
Event personnel were required to turn in crew time reports (CTRs).  It was beneficial for the finance unit to track time daily.  If issues arose with hours submitted, those issues were immediately resolved with the shift commanders and patrol supervisors.

### PURCHASING
Purchasing was consolidated to only a few people on the command and logistics staff.  This allowed for better tracking of expenditures, documentation, and cost effective bundling of items purchased.  All purchases had to be approved in advance by the district manager, SAC, or law enforcement operations chief.  An inventory of supplies and items remaining was taken at the end of the main event to ensure duplicate and/or additional items currently in storage are not purchased again.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## BUSINESS PRACTICES RECOMMENDATIONS

Budget/Contracts – Continue to have Cassie Sandberg and AJ Ramos actively lead and participate in the cost recovery estimate, budget/finance and contracts/purchasing.

### COST RECOVERY
The CR agreement should be established as early as possible.  However, it should not be established later than the end of February 2015.  Consideration should be given to increasing the amount of pre-event labor required from the management staff and other key personnel.

### CHECK IN / CHECK OUT
Check in and check out procedures should continue to be distributed to employees attending the event at least one week prior to the event.  This will ensure all requisite documentation is complete and allow employees attending the event for the first time to become familiar with the process.   Employees should continue to be assigned designated check in/check out times for future events

### TIMEKEEPING
It is recommended to continue to track time daily for monitoring of the costs and projections during the event.

### PURCHASING
It is recommended to continue to consolidate purchasing and have prior approval from management before the purchase is made.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

## 21.  CONCLUSION

The Region 3 OLES and Winnemucca District achieved success in coordinating and conducting a safe and enjoyable event for BLM employees and BLM law enforcement officers, Pershing County law enforcement officers, and other federal employees.  This success would not have been possible without the dedication and resilience demonstrated by the Region 3 OLES management staff, the dedication of the BLM employees assigned to the event, and the support of the Washington Office, Nevada State Office and the Winnemucca District.

Throughout the 2014 planning and implementation process, numerous new intra and inter-agency relationships were established and will continue to grow.  These relationships will be instrumental in seeking excellence in public safety and management.

This assessment will serve as a guide toward continuing to adjust to changing participant behavior and demographics, monitoring law enforcement trends, managing personnel, and adopting new techniques as change dictates.

On the playa and after the event, the DM and BRC PM had several discussions and meetings in regard to the 2014 event and one frequently discussed topic was the need to ensure the planning and implementation for enhanced safety by BRC is at the forefront.  This includes BRC's and all cooperator's management of the event.  BLM anticipates further discussions with BRC to pursue changes in their management operation that will lead to a healthier, safer and more secure event. Safety is a priority, a commitment and a must.

This report is the property of the BLM, Office of Law Enforcement and Security and is loaned to your agency.  It and its contents may not be reproduced without written permission.  The report is for **OFFICIAL USE ONLY** and its disclosure to unauthorized persons is prohibited.  Public availability to be determined by 5 U.S.C. 552.

AR07153



Hall, Mark <mehall@blm.gov>

## Gate Rd into event closed

3 messages

---

**Hall, Mark** <mehall@blm.gov>                                                            Sun, Aug 26, 2018 at 3:56 PM
To: "McCullough, Ester" <emccullo@blm.gov>, Marci Todd <m1todd@blm.gov>, Michael Courtney <mcourtney@blm.gov>
Cc: "Walker, Donovan" <d1walker@blm.gov>, Kyle Hendrix <khendrix@blm.gov>, Fernando Pitones <fpitones@blm.gov>

Hi Ester, Mike, and Marci,

Due to high winds and poor visibility on Gate Rd. into the event, the gate into Black
Rock City is being closed.  While BRC is outreaching to NHP and others, this means
traffic will be backing up on Highway 34 and 447 and in Gerlach.  The windstorm is
predicted to last through 8 PM or so this evening.

Best, MEH

Mark E. Hall, PhD
Field Manager
Black Rock Field Office
Winnemucca District Office
775-623-1529.

---

**Walker, Donovan** <d1walker@blm.gov>                                                    Sun, Aug 26, 2018 at 4:22 PM
To: Jared Rosoff <jrosoff@blm.gov>, Alan Dabash <adabash@blm.gov>
Cc: Mark Hall <mehall@blm.gov>, Ester McCullough <emccullo@blm.gov>, CNIDC Lisa Walker <l2walker@blm.gov>,
Jonathan Palma <jjpalma@blm.gov>, Bradley Milam <bmilam@blm.gov>, Dennis Strange <dstrange@blm.gov>, "Petersen,
Paul A" <ppeterse@blm.gov>

Jared, Alan,

Please plan on staffing until 21:00 this evening. for Fernley and Gerlach for Engines
1342 and 5342. In the event the traffic jam results in a fire. Charge to Severity.

LLNVW00240 LF2100000.HT0000 LFSRD9NG0000.

All other WD resources are already extended until 2000.  Thank you!

Donovan Walker
*Interagency Fire Management Officer*
**Winnemucca District - BLM**
**Santa Rosa Ranger District - USFS NV-HTF**
**775-623-1526 office**
**775-304-1001 cell**
[Quoted text hidden]

---

**Pitones, Fernando** <fpitones@blm.gov>                                                   Sun, Aug 26, 2018 at 6:07 PM
To: Mark Hall <mehall@blm.gov>
Cc: Ester McCullough <emccullo@blm.gov>, Marci Todd <m1todd@blm.gov>, Michael Courtney <mcourtney@blm.gov>,
Donovan Walker <d1walker@blm.gov>, "Hendrix, Kyle" <khendrix@blm.gov>

**AR00009**

Ester, Mike, and Marci,

Just to update you on the situation regarding the Gate Rd closure: BRC will be maximizing vehicle staging on Gate rd and providing additional Black Rock Rangers to assist participants and to mitigate any public unrest. Once that area is filled, BRC will be using upper and lower Blue Pit (gravel pit.) BRC plans to stage additional portable restrooms in Blue Pit. In the event that both Gate Rd and upper and lower Blue Pit fills up, BRC is prepared to stage additional portable restrooms and vehicle on the playa as a last resort. Any flights that were scheduled to arrive at Black Rock City airport, will not be allowed to land during this weather event. According to Pershing County Sheriff, there are no plans to have any road closures at this point. BLM Law Enforcement will continue as normal and be prepared for any situation that arises. The extreme wind conditions are supposed to continue until 8pm tonight, with clear skies projected this evening. If the situation changes, I will keep all informed.

Respectfully,


Fernando J. Pitones Sr.
Public Affairs Officer
Winnemucca District Office
Winnemucca, NV 89445
Office- 775-623-1502
Cell- 775-304-1559
fpitones@blm.gov


:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

Follow BLM Nevada Winnemucca District on Social Media

Twitter | Facebook | YouTube | Flickr


[Quoted text hidden]

AR00010

Attachment 1

**National Law Enforcement Details**
**FY 2015**

| Detail Location | CA | CA | CA | CA | AZ | NV |
|---|---|---|---|---|---|---|
| Hosting Office | El Centro | El Centro | El Centro | El Centro | AZSO | Winnemucca |
| Detail Name | ISDRA Halloween | ISDRA Thanksgiving | ISDRA New Year's | ISDRA Presidents Day | ROAM Border Details | Burning Man Event |
| Dates | Oct 30-Nov 2, 2014 | Nov 26-30 2014 | Dec 26-Jan 4, 2015 | Feb 13-17 2015 | Various | Aug 16-Sept 12, 2015 |
| No. of Detailed LEOs Needed | 30[1] | 35[1] | 35[1] | 30[1] | 96[2] | 53[3] |
| | **State Quota** | **State Quota** | **State Quota** | **State Quota** | **State Quota** | **State Quota** |
| AZ | 5 | 5 | 5 | 5 | 14 | 8 |
| CA | 10 | 12 | 12 | 10 | 31 | 18 |
| CO | 2 | 2 | 2 | 2 | 6 | 3 |
| ID | 1 | 2 | 2 | 1 | 5 | 3 |
| MT | 1 | 1 | 1 | 1 | 4 | 2 |
| NM | 2 | 2 | 2 | 2 | 5 | 3 |
| NV | 3 | 4 | 4 | 3 | 11 | 6 |
| OR | 3 | 4 | 4 | 3 | 10 | 5 |
| UT | 2 | 2 | 2 | 2 | 6 | 3 |
| WY | 1 | 1 | 1 | 1 | 4 | 2 |
| Total | 30 | 35 | 35 | 30 | 96 | 53 |

[1] ISDRA Special Resource Needs for each event:
- Four Police Canine Teams
- Five Supervisory Rangers to serve as shift supervisors
- One Supervisory LEO or State Chief Ranger to serve as Operations Chief

[2] LEOs may be assigned to Phoenix or Gila Districts

[3] Burning Man Special Resource Needs:
- Six LEOs with cage-equipped vehicles for prisoner transport
- Three female LEOs
- Six LEOs to serve as Patrol Supervisors
- Ten K9 Teams
- Personnel changes may be necessary due to mission objectives

AR012038