IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BLACK ROCK CITY LLC and <br> BURNING MAN PROJECT <br><br> Plaintiffs, <br><br> v. <br><br> DEBRA HAALAND, <br> SECRETARY OF THE INTERIOR *et al.* <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civ. Action No. 1:19-cv-03729-DLF <br> ) <br> ) <br> ) REPLY TO DEFENDANTS' RESPONSE <br> ) TO PLAINTIFFS' MOTION FOR <br> ) ATTORNEYS' FEES AND COSTS <br> ) <br> ) |

     Pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"), Plaintiffs Black Rock City LLC and Burning Man Project (collectively, "Plaintiffs" or "BMP") filed a Motion for Attorney's Fees and Costs (ECF No. 44) ("Motion") to seek an award for reasonable fees and costs incurred from Plaintiffs' representation by counsel Holland & Knight LLP and David Levin of the Levin Law Firm in the above-referenced case. Defendants filed a Response in Opposition to Plaintiffs' Motion for Attorneys' Fees and Costs (ECF No. 47) ("Opposition") in which it challenged Plaintiffs' status as eligible parties under EAJA, claiming that special circumstances exist and Defendants' position was substantially justified to support a significant reduction in the fee award.[1] Defendants also labor to show that specific time entries are not compensable under various theories. For the reasons set forth below, and as described in Plaintiffs' Motion, Plaintiffs are eligible parties and are entitled to a full award of attorneys' fees and costs under EAJA.

---

[1] Defendants do not dispute that the Motion is timely and that the Plaintiffs are prevailing parties under EAJA. ECF 47 at 1.

1

I.   **PLAINTIFFS ARE ELIGIBLE PARTIES UNDER EAJA.**

Defendants attack Plaintiffs eligibility for fees under the misplaced theory that BMP had more than 500 employees at the time the suit was filed. ECF No. 47 at 1-6. BMP has already filed a sworn affidavit (based on review of employment records) stating that at the time the suit was filed BMP had only 118 full-time and 15 part-time employees. *See* Belsky Decl. ECF No. 44-4 ¶ 11). EAJA expressly states that the relevant number of employees of eligible party status is "at the time the civil action was filed." 28 U.S.C. § 2412(d)(2)(B). Defendants do not dispute in their Opposition that Plaintiffs met the criteria at the time that this lawsuit was filed, claiming instead that BMP has ulterior motives for its hiring practices.

Defendants' first defense to their obligation to pay fees is the theory that BMP should have had more than 500 employees at the time the civil action was filed but for some questionable employment practices. Defendants go as far as to suggest that BMP deliberately terminated employees in December in order to meet the eligibility requirements. ECF No. 47 at 3. Defendants' suggestion that Plaintiffs purposefully "did not schedule its seasonal employees for work in December 2019" so that this lawsuit could be filed when the total number of employees was below 500, (ECF No. 47 at 5), has zero support.

Having overseen this Event for several decades, BLM is well aware that the Event relies on hundreds of temporary workers and thousands of volunteers for less than one month per year to put on the Event during late August and early September.[2] Hence, the vast majority of people supporting the Event provide services only immediately surrounding and during the Event. As stated in the Supplemental Declaration of Mr. Adam Belsky, attached hereto as **Exhibit A**

---

[2] As BLM is aware, the Event takes place on an annual basis during the same week of the year (during the week leading up to Labor Day) and runs for the same number of days.

("Supplemental Belsky Declaration"), the functions performed by these temporary positions are simply not needed anywhere other than on the Playa for the Event itself during that limited time. Belsky Supp. Decl. ¶ 8; *see* Note 3 *infra*.

BMP has never employed more than 160 full time workers in a single year, including at the time of filing this lawsuit. Belsky Supp. Decl. ¶¶ 7, 9.  Hence, from 2015 to the present, Plaintiffs employed less than 500 year-round employees. Belsky Supp. Decl. ¶ 7. As BLM is aware, for a small window during and immediately surrounding the Event, Plaintiffs rely on temporary workers and volunteers. Belsky Supp. Decl. ¶ 8. The people brought on to support the Event perform functions that are only necessary during the Event itself.[3] Belsky Supp. Decl. ¶¶ 6, 8. In other words, its employment numbers during and immediately surrounding the Event itself are unusual and not demonstrative of the organization's limited size and resources. Congress did not intend for a non-profit organization that otherwise meets the requirements of an eligible party to be precluded from the access to justice benefits afforded by EAJA simply due to temporary employment for a limited period of time per year.

In making this argument that Plaintiffs deliberately shed employees, Defendants rely on case law that pertains to the net worth criteria under EAJA, which Plaintiffs are not relying upon for eligible party status. EAJA expressly states that "an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 501(c)(3)) exempt from taxation under section

---

[3] For example, the Lamplighters are responsible for placing kerosene lanterns on the ground to illuminate a pathway to the Burning Man during the Event, and the Man Watch volunteers are responsible for keeping vigil around the Man for the duration of the Event until it is scheduled to burn. The Arctica volunteers provide ice to participants during the Event. These, and many more volunteer teams (including but not limited to Burn Perimeter Support, Greeters, Gate, Box Office, Perimeter, and Exodus, Temple Guardians, and others) serve no purpose outside of the Event and therefore would not be employed outside of the Event. Thus, the notion that BMP "did not schedule its seasonal employees for work in December" to game the system, (ECF No. 47 at 5), has zero credibility – BMP does not need a person standing in the desert greeting people in December.

501(a) of such Code . . . may be a party *regardless of the net worth of such organization.*" *Id.* (emphasis added). In other words, a 501(c)(3) tax-exempt organization's net worth is irrelevant to its eligible party status under EAJA.[4] Defendants do not dispute that BMP is a 501(c)(3) tax-exempt organization. Therefore, whether or not BMP has, in the words of Defendants, "sufficient assets to employ over 500 employees," (ECF No. 47 at 4), is irrelevant to the determination that BMP is an "eligible" party under EAJA. Notwithstanding, even if it were relevant, Plaintiffs do not have the resources to support more than 500 employees year-round. Belsky Supp. Decl. ¶ 6. BMP is a non-profit organization that operates at net zero; any profit that Plaintiffs make from an annual Event are sunk into BMP's charitable mission, planning and preparation for the following year's Event. Belsky Supp. Decl. ¶ 5. There are no other profit streams that would support employing over 500 employees year-round. Belsky Supp. Decl. ¶ 6. For these reasons, even Defendants' misplaced reliance on net worth arguments to undermine Plaintiffs' eligible party status fails.

Defendants also argue that Plaintiffs' reliance on the *Greenpeace* decision is improper. ECF No. 47 at 5-6 (citing *Greenpeace, Inc. v. Stewart,* 2020 WL 2465321, at *3 (9th Cir. May 12, 2020)). While Plaintiffs acknowledge that the Ninth Circuit's opinion in *Greenpeace* is not legally binding on this Court, this Court has nonetheless found opinions from the Ninth Circuit to be persuasive.[5] The underlying facts of the *Greenpeace* case are substantially analogous to this case, in that Greenpeace is also a non-profit organization that utilizes temporary workers, which do not

---

[4] The explanation of eligibility for non-profit organizations within the Senate Committee Report confirms this interpretation – "[i]n the case of entities, those whose net worth at the initiation of the adversarial proceeding exceeded $5 million *or* who had more than 500 employees. Charitable tax exempt organization so designated under 501(c)(3) of the Internal Revenue Code are exempt from the *monetary* ceiling." H.R. [Conference] Rep. No. 1434, 96th Cong., 2d Sess. 26 (1980).

[5] *See, e.g., Asylumworks v. Mayorka*, No. 20-cv-3815, 2023 WL 2733722 (D.D.C. Mar. 31, 2023).

reflect its typical workforce of under 500 employees that it had employed at the time that it filed the underlying action.[6] In contrast, none of the District of Columbia cases cited by Defendants provide such a direct analogy, *i.e.,* none of them involve a non-profit organization that employs seasonal workers causing them to temporarily exceed the 500-employee threshold outside of the time that the lawsuit was filed.[7] *Greenpeace* is the only case counsel is aware of that is illustrative of how a court has addressed these unique circumstances, and therefore merits consideration here.

Defendants further argue that Plaintiffs do not adequately describe their methodology for identifying the number of employees at the time the lawsuit was filed. Plaintiffs identified the number of employees in the same manner as *Greenpeace*, based on a sworn declaration of the General Counsel, who reviewed employment records from Human Resources and payroll. *See* Belsky Decl.in Support of Motion for Fees ¶¶ 10-11, ECF No. 44-4. For the avoidance of doubt, Mr. Belsky provides an additional statement on how he determined the number of its employees at the time of filing this lawsuit through Plaintiffs' Human Resources department in his Supplemental Declaration attached hereto. *See* Belsky Supp. Decl. ¶ 9.[8]

---

[6] If anything, *Greenpeace* can be distinguished from Plaintiffs because it more frequently employs seasonal workers exceeding 500 employees than Plaintiffs do.

[7] *See Am. Ass'n of Retired Persons v. EEOC,* 873 F.2d 402 (D.C. Cir. 1989) (individual and organization petitioners analyzing impact of non-eligible third plaintiff in lawsuit); *Unification Church v. INS*, 762 F.2d 1077 (D.C. Cir. 1985) (church employing 7,000 individuals); *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1325 (D.C. Cir. 1982) (individual seeking fees where eligibility is not at issue). Defendants' cited cases outside of the District of Columbia also do not address these circumstances. *See Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.,* 675 F.3d 1036 (7th Cir. 2012) (individual petitioners analyzing impact of one organization not included in fee petition); *Est. of Woll by Woll v. United States*, 44 F.3d 464, 468-69 (7th Cir. 1994) (individual estate seeking fees); *SEC. v. Conserv Corp.,* 908 F.2d 1407 (8th Cir. 1990) (corporate officer whose fees were paid by corporate employer or insurer); *Miller v. United States*, 926 F. Supp. 642 (N.D. Ohio 1996) (individual estate seeking fees).

[8] Plaintiffs dispute Defendants' request that Plaintiffs be limited in elaborating on these details in this Reply. ECF No. 47 at 5. Plaintiffs are simply providing additional details in response to an argument made by Defendants relating to Plaintiffs' Motion for the Court's consideration, which indeed is the purpose of allowing Plaintiffs an opportunity to reply. Furthermore, this Court has previously accepted additional information supporting eligibility in a reply brief on a EAJA petition. *See, e.g., Ivy Sports Medicine, LLC*

Lastly, Defendants argue that Plaintiffs do not adequately address the eligibility of both organizations (Black Rock City, LLC ("BRC") and Burning Man Project ("BMP")). ECF No. 47 at 6. BRC was incorporated in 1997 by members of the community who created the Burning Man Project, and was the operational body responsible for production of Event until 2018. Since 2013, BRC has been wholly owned by the charitable non-profit Burning Man Project ("BMP"), which assumed responsibility for producing the Event in 2019. BRC retains no profits and all earnings are dedicated to the charitable activities of BMP. Hence, Plaintiffs treat these entities together because BRC is wholly owned by BMP (and therefore is a "disregarded" entity for tax purposes). Belsky Supp. Decl. ¶ 4. While BRC was named as a Plaintiff for purposes of standing (as the predecessor permittee for purposes of Event administration) BMP has at all times overseen this litigation. It would be inappropriate to lessen Plaintiffs' recovery of fees under this circumstance.

In sum, BMP is a 501(c)(3) tax-exempt organization that employed less than 500 employees at the time of filing this lawsuit, but that relies on seasonal employees during a small window in which they utilize temporary workers in order to hold the Event. BMP has neither the need nor the resources to support a workforce of more than 500 employees year-round. For these reasons, Plaintiffs are an eligible party to receive an award of attorneys' fees and costs under EAJA as Congress intended.

## II. NO SPECIAL CIRCUMSTANCES EXIST TO WARRANT DENIAL OF FEES.

Defendants argue that Plaintiffs' temporary, seasonal employment of more than 500 employees for purposes of operating its Event amounts to "special circumstances" as contemplated under EAJA, making award of fees "unjust." ECF No. 47 at 8. Consistent with their eligibility

---

*v. Burwell*, 174 F. Supp. 3d 130 (D.D.C. 2016); *United Church Bd. For World Ministries v. S.E.C.*, 649 F. Supp. 492 (D.D.C 1986).

6

arguments, Defendants make the unsupported allegations that that Plaintiffs are "manipulat[ing] its eligibility through creative human resources practices [to] strategically time filing of an action to coincide with lower end of cyclical swings in employment." *Id.* For the reasons already discussed in Section I, Defendants argument fails. Plaintiffs are a non-profit organization with a year-round workforce of under 500 employees *except* for temporary workers and volunteers hired to conduct Event-specific functions during and immediately surrounding the 10-day Event. The normal practices of putting on the Event, of which BLM is clearly aware, is hardly "aberrational." ECF No. 47 at 9.

A Court has the discretion to deny or reduce awards for equitable reasons based on "special circumstances" under EAJA. 28 U.S.C. § 2412(d)(1)(A). Here, Defendants claim that awarding Plaintiffs fees under EAJA in this case would subsidize "the purchase of legal services" by a large entity "easily able to afford legal services . . . with the intent of forcing the public to pay its attorneys' fees." ECF No. 47 at 8 (citing *Unification Church,* 762 F.2d at 1082). This is simply untrue. Plaintiffs are a non-profit organization, as verified in BMP's 990 Forms (Exhibit A to Belsky Declaration submitted in support of Plaintiffs' Motion), and any profit received is sunk into BMP's charitable mission and planning and preparation costs for the next annual Event. Belsky Supp. Decl. ¶ 5. BMP is by no means a "large entity"; rather, BMP employs no more than 160 full time employees outside of the Event window. Belsky Supp. Decl. ¶ 7. Like most small non-profit organizations, BMP relies heavily on volunteers and those willing to share resources on a pro bono basis, as well as cooperation with BLM, in order to continue operation of its annual Event. Without such assistance, BMP would not be able to operate as it currently does. In short, Plaintiffs are exactly the type of entities that Congress intended to provide access to legal services through EAJA.

**III.     DEFENDANTS' POSITION WAS NOT SUBSTANTIALLY JUSTIFIED.**

Defendants fail to demonstrate that their position in this case was substantially justified. ECF No. 47 at 9-11. As explained in Plaintiffs' Motion for Summary Judgment, (ECF No. 28), Plaintiffs sought relief from unreasonable costs imposed by BLM in connection with the special recreation permits ("SRPs") issued under the Federal Land Policy and Management Act ("FLPMA"). BLM ignored the "reasonableness" limit for costs charged to BMP to administer the 2015 through 2019 SRPs as set forth in the Closeout Decisions. Plaintiffs' Motion for Summary Judgment at 10. Plaintiffs prevailed on their central argument that BLM ignored its basic statutory duties under FLPMA by failing to justify that the costs in 2015-2019 Closeout Decisions were "reasonable" under the Act.

Under FLPMA, BLM may collect "reasonable filing and service fees and reasonable charges" in connection with SRPs. 43 U.S.C. § 1734(a).  BLM may collect a deposit for "reasonable costs." *Id.*  FLPMA defines "reasonable costs" to include "the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities." 43 U.S.C. § 1734(b).  In determining whether a given charge is "reasonable," the Act instructs that the Bureau "may take into consideration actual costs" among other factors. *Id.* Hence, the requirement that the costs charged to a permittee have to be "reasonable" is clear.  BLM's many arguments to the contrary were not substantially justified.

Having convinced itself that its discretion was unfettered, BLM made little effort to demonstrate that the cost recovery decisions were limited to "reasonable costs." Defendants did not even acknowledge the relevant standard, choosing instead to mock BMP's use of the word "reasonable." For example, BLM went as far as to state that "BMP's arguments boil down to a

hope that the Court will scrutinize BLM's judgment under a ubiquitous 'reasonableness' standard." ECF No 34 at 13. Yet, the "reasonableness" standard comes directly from the underlying statute and the word "reasonable" is indeed ubiquitous in the language of FLPMA and caselaw.

As held by this Court, "the Closeout Decisions fail even deferential review, as the administrative record lacks substantial evidence that the costs they charged to BMP were reasonable." *Black Rock City LLC v. Haaland*, No. 19-cv-3729 (DLF), 2022 WL 834070, at * 4 (D.D.C. March 21, 2022). None of the Closeout Decisions "addresses whether the special recreation permit fees were reasonable." *Id.* at *8; *see* 43 U.S.C. § 1734(b). BLM's "argument that it addresses reasonableness in its Estimate Decisions does not persuade." *Id.* (the "briefing does not identify what portions of its Estimate Decisions are relevant to reasonableness"). Finally, the Administrative Record cites "cannot cure the defects in the Bureau's Closeout Decisions." *Id.*

Moreover, this was hardly a case of "first impression." ECF No. 47 at 11.[9] The seminal case on the issue was decided in 1983. *See Nevada Power Co. v. Watt*, 711 F.2d 913, 925 (10th Cir. 1983) ("the reasonableness factors were intended to limit the Secretary's authorization to charge reasonable costs").[10] Contrary to Defendants' arguments, this was a "plainly prescribed" limit, (ECF No. 47 at 10), that BLM has chosen to ignore since BMP's first appeal was filed in 2015. Thus, BLM had no sensible basis to argue that FLPMA did not limit its cost recovery to "reasonable costs" and instead relied on frivolous arguments about the import of the Cost Estimates and accusing Plaintiffs of creating a false standard.

---

[9] Defendants' argument that this was a case of first impression is in contrast to their later suggestion that this was a "garden-variety administrative law matter" not worthy of enhanced fees and a "relatively straightforward case" that did not require more than one lawyer. ECF No. 47 at 12, 16.

[10] *Bookcliff Rattlers Motorcycle Club*, IBLA 2004-151, 171 IBLA 6, 17 (2006) ("The Court in *Nevada Power* held that the Secretary cannot disregard the 'reasonableness factors' set forth in section 304(b) of the FLPMA in determining costs to be recovered.")

While the Court did not agree with all of Plaintiffs' theories, that does not mean that Defendants arguments were substantially justified.[11] Ultimately, BMP demonstrated that the challenged actions were "arbitrary" or "capricious" within the meaning of the APA. *Black Rock City*, 2022 WL 834070, at * 9. That was all that Plaintiffs needed to prevail. Defendants' arguments are not substantially justified merely because the Court did not agree with Plaintiffs at every turn.

Defendants also ask the Court to take notice of the 2022 Closeout Decision and assert that BLM has "significantly modified the structure and content of subsequent Closeout Decisions to address the Court's concerns." ECF No. 47 at 10, n.5 (citing to 2022 Closeout Decision, attached as Exhibit 1). While the 2022 Closeout Decision is not before the Court, the need for Defendant to, in the words of Defendant, "significantly modif[y]" subsequent Closeout Decisions should be viewed as further acknowledgement of the deficiencies in their 2015-19 decisions and defenses.

It also bears noting that BLM admits "Defendants have not completed remand of the Closeout Decisions for 2015-2019 at issue in this litigation." *Id.* Eighteen months have passed since the Court issued its decision in March 2022. This illustrates the ongoing pattern of BLM refusing to take any action to address Plaintiffs' concerns, dating back to at least 2015.

Moreover, while BLM would like to tout their 2022 Cost Recovery Decision as evidence that they have turned over a new leaf, on its face it is clear that this agency decision suffers from similar flaws. For example, BLM employees continue to claim to work near impossible hours on administration of the Event, all of which is charged to BMP through cost recovery. BLM's 2022

---

[11] In making such an argument, Defendants erroneously conflate the prevailing party factor with substantial justification of the Government's position. These are two distinct analyses, and the burden of each fall on different parties. Plaintiffs have shown that they are a prevailing party, which Defendants do not dispute. ECF No. 47 at 1. It is up to the Defendants to show that their position was substantially justified in terms of its overall "litigation position and the agency's actions," *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 967 (D.C. Cir. 2004), not just its position on matters in which Plaintiffs did not prevail. Simply pointing out the minor points for which Plaintiffs did not prevail does not show that Defendants' position was substantially justified overall.

Labor Log indicates that one city patrolman (Alvarado) worked 157 hours, another (Makens) worked 181 hours, and one vending compliance monitor (Andersen) worked 203 hours over the course of the 8-day "Main Event" (as opposed to pre- and post-event). ECF No. 47-1 at 13-14. Thus, Alvarado worked over 19 hours per day, Makens worked 22 hours and Andersen over 25 hours per day for eight days straight. These are but a few examples of repeated anomalies with BLM's cost recovery for the Event. Merely stating in the Closeout Decision letter that BLM finds something "reasonable" does not make it so.

### IV. PLAINTIFFS ARE ENTITLED TO FEES INCURRED SINCE FILING OF THE ORIGINAL COMPLAINT.

Contrary to BLM's argument (*see* ECF No. 47 at 19), BMP is entitled to fees incurred since the inception of this case. The underlying challenge has always been the same. As stated in the initial complaint, (ECF No. 1) ("Complaint"), BMP "challenges the costs imposed by Defendant Winnemucca District Office for the Bureau of Land Management ("BLM"), the process by which those costs have been demanded, the inadequate justification for the costs, and the unreasonable delay confronted by BRC during the appeal of those costs." Compl. ¶ 2. This has always been the goal, but BMP had to overcome jurisdictional hurdles to get to this Court.

Consistent with the SRP regulations, BMP, as a party adversely affected by a decision of the BLM, was required to timely exercise its right to appeal the cost recovery decisions to the IBLA to seek relief from BLM's abusive practices. 43 C.F.R. §§ 4.410, 2931.8. BLM's appeal regulations also have an exhaustion provision requiring that an administrative appeal be filed with IBLA for cost recovery actions before a lawsuit can be filed in United States District Court. 43

C.F.R. § 4.21(c).[12] Each year, Plaintiffs filed an administrative appeal of BLM's cost recovery decision before the IBLA in accordance with these requirements. But by that time, Plaintiffs had already paid the cost recovery in full so there was no agency action to stay. Thus, as long as IBLA had jurisdiction, there was no clear right to be in federal court and the cost recovery decision remained in effect. 43 C.F.R. § 2931.8(a). However, as explained in the Complaint, the IBLA did not rule on any of the appeals, thereby keeping BMP in limbo. Thus, BMP challenged the IBLA's unreasonable delay as a constructive denial of the appeals and requested the Court to provide judicial resolution of the cost recovery appeals. BLM's Motion to Dismiss, (ECF No. 16-1), asserted that an IBLA decision would not be a prerequisite to district court review.[13] Motion to Dismiss at 20. Based on this, and consistent with the Federal Rules of Civil Procedure, Plaintiffs amended the complaint to add the details concerning the cost recovery decisions and drop IBLA as a party to avoid an adverse decision that this was an "unreasonable delay" case, Again, the substantive goal of this suit was always the same – a decision that BLM's cost recovery decisions were arbitrary and capricious and unsupported by the agency's record. The differences between the Complaint and Amended Complaint were largely administrative in nature. Moreover, Plaintiffs' initial complaint was "nonfrivolous and raised in good faith", *Hensley v. Eckerhart,* 461 U.S. 424, 440 (1983), because Plaintiffs believed that an unreasonable delay resulting in constructive denial was the only path available for bringing these issues before this court.

---

[12] Consistent with all of the other cost recovery decisions, the 2022 cost recovery decision provided as Exhibit 1 to Defendants' Opposition requires a notice of appeal to be filed with the IBLA. ECF No. 47 at 30 ("INFORMATION ON TAKING APPEALS TO THE INTERIOR BOARD OF LAND APPEALS").

[13] While BLM cited to *Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*, 864 F.3d 1105, 1113 (10th Cir. 2017), that case deals with situations where IBLA denies a stay (in these circumstances "the initial decision becomes final and the aggrieved party is entitled to judicial review." *Id.* Given the routine backup of the IBLA docket, the Department of Interior had an obvious interest in avoiding any ruling that IBLA's unreasonable delay was final agency action. But, BLM continues to require appeal to the IBLA as a prerequisite for judicial review, attaching the appeal form to all cost recovery decisions.

**V.   TIME ENTRIES ARE REASONABLE AND DO NOT REQUIRE FURTHER REDUCTION.**

Defendants attempt to whittle away at Plaintiffs' fees request by questioning certain time entries under various theories. ECF No. 47 at 11-21. An objective review demonstrates that Plaintiffs' Motion meets the burden of establishing the reasonableness of this fee request. The bills reflect the professional judgement of a Partner with more than 26 years of experience in billing to private clients. Petersen Supp. Decl. ¶ 4. Defendants are grasping at straws to strike attorney time reasonably expended and necessary to this litigation in order to reduce the fee that Plaintiffs are properly due under EAJA.[14] For example, Defendants refer to entries mentioning the IBLA as "unrelated." ECF No. 47 at 13-14. Defendants appropriately recognize that Plaintiffs have spent hundreds of hours briefing the 2015-2019 cost recovery appeals before the IBLA, but Defendants fail to recognize that these hours were expended *before* coming to this Court.[15] Petersen Supp. Decl. ¶ 18. Reference to IBLA in the attorney time entries submitted to this Court relate to jurisdictional questions that were initially at issue in this case. Petersen Supp. Decl. ¶ 18. As described in Section IV above, Defendants' Motion to Dismiss, (ECF No. 16), raised jurisdictional questions as to whether Plaintiffs could bring their claims directly into this Court while its IBLA appeals were still pending. The IBLA actions were also addressed at the request of opposing counsel, who used this lawsuit to ask that the IBLA appeals be dismissed or suspended. Petersen

---

[14] This Court has previously declined to "engage in the kind of 'nitpicking' invited by [these] smaller scale objections," instead finding that "[n]o reduction is warranted to account for a handful of entries that could have perhaps benefitted from slightly more detail." *Amer. Immigration Council v. DHS,* 82 F. Supp 3d 396, 411 (D.D.C. 2015). *See also Nat'l Venture Capital Association v. Nielson*, 318 F. Supp. 3d 145 (D.D.C 2018); *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 825 F. Supp. 2d 226 (2011); *Baker v. D.C. Public Schools*, 815 F. Supp. 2d 102 (D.D.C. 2011); *Alfonso v. District of Columbia,* 464 F. Supp. 2d 1 (D.D.C. 2006).

[15] In fact, Defendants relied heavily on that record for their motions practice in this case. ECF No. 34 at 18. "Given the five-year span of Plaintiffs' case and year-round interaction of the parties, it was certainly proper for BLM decisionmakers to consider relevant IBLA submissions in rendering cost recovery decisions before the Court." This makes clear that both parties saved on attorney time as a result of the IBLA appeals.

13

Supp. Decl. ¶ 18. Plaintiffs' attorneys therefore had to analyze these questions, make strategic decisions related thereto, and ultimately dismiss the IBLA appeals.

Similarly, Defendants argue that Plaintiffs' attorneys billed for "issues outside of the scope of the litigation" such as permitting and NEPA. ECF No. 47 at 14. This case is about cost recovery *under a permit.* That permit has numerous conditions relating to the NEPA decision and mitigation conditions for the annual Event.[16] Plaintiffs are challenging the reasonableness of BLM's cost recovery charges. One cannot assess the reasonableness of BLM's cost recovery charges without considering whether those charges are appropriately tailored to administration of the permit, and by extension, NEPA compliance. Fees incurred in connection with such analyses were therefore reasonable and necessary to the litigation. Petersen Supp. Decl. ¶ 20. Likewise, the minimal coordination with Plaintiffs' "political team" was necessary for insight into communications that this team was having with BLM, which was highly relevant to overall litigation strategy. Plaintiffs' attorneys did not include time entries for fee award under EAJA for media relations, lobbying, publicity, or "efforts to sway public opinion and influence policy makers." ECF No. 47 at 15. The political team that handles such matters bill their time for that type of work to a separate matter, which was not included in the hours submitted to this Court for a fee award. Petersen Supp. Decl. ¶¶ 16, 17.

Moreover, tasks that Defendants describe as "administrative," (ECF No. 47 at 14-15), are those commonly undertaken by an associate in a law firm. Indeed, associates who do not review and verify consistency with the local rules before filing are often not associates for very long. Petersen Supp. Decl. ¶ 15. Attorneys have an ethical obligation to provide competent representation, which includes thoroughness, preparation, and diligence reasonably necessary for

---

[16] A NEPA environmental impact statement is one of the recoverable costs. *See* 43 U.S.C. § 1734(b)

14

the representation.[17] Plaintiffs' attorneys exercised good billing judgment and used administrative assistants for non-legal tasks, which is not billed to the client and not included in this fee petition. Petersen Supp. Decl. ¶ 14. In short, the billed hours included in this fee petition were reasonably expended to achieve the success in this case.

As for Defendants' arguments that Plaintiffs' attorneys time entries were "insufficient", (ECF No. 47 at 15), Defendants cannot point to anything in such descriptions that hinders the Court's ability to determine the reasonableness of the hours with a high degree of certainty. In the words of the Circuit Court, "it is not necessary to know ... the precise activity to which each hour was devoted . . . . no more is necessary than fairly definite information as to the hours devoted to various general activities, *e.g.*, pretrial discovery, settlement negotiation, and the hours spent by various classes of attorneys, *e.g.*, senior partners, junior partners, (and) associates. Preparing for 'oral argument'— like conducting 'pretrial discovery' or 'settlement negotiations'— meets that standard." *Jordan v. U.S. Dep't of Interior,* 691 F.2d 514, 520 (D.C. Cir 1982) (quoting *National Ass'n of Concerned Veterans v. Sec'y of Def.,* 675 F.2d 1319 (D.C. Cir. 1982)) (internal quotations omitted).

The tasks are described in the common nomenclature of attorney billing practices and billed in .1-hour (6-minute) increments, and the entries are clear and descriptive of the tasks performed. Petersen Supp. Decl. ¶ 7. Defendants' suggestion that repetitive language (e.g. "work on combined opposition and reply memorandum") is a reason to cut entries is baseless. Entries are purposefully repetitive for consistency's sake, which is a common practice in law firms to serve client expectations and facilitate client review of legal bills. Petersen Supp. Decl. ¶ 7. Typical clients (including Plaintiffs) expect legible time entries that are concise and comprehensible for a

---

[17] These principles are included in the Rules of Professional Conduct adopted by the Court of Appeals for the District of Columbia. *See* Rule 1.1, Rule 1.3.

layperson, and the same basic language is utilized throughout each entry to serve that purpose. Petersen Supp. Decl. ¶ 7. Furthermore, entries are not overly descriptive or verbose, as Defendants appear to suggest they should be, to protect the attorney-client relationship and the client's legal strategy in the event that the legal bills end up before a third party. Again, all of these nuances are common billing practice for law firms exercising good billing judgment and client service. Petersen Supp. Decl. ¶¶ 7-10.

Furthermore, working on a motion for summary judgment takes time, there is no other way to describe such work, and lawyers can work on different sections simultaneously. Utilizing an associate/partner team to draft a brief is common practice, and results in more effective representation. An associate conducts the research and primary writing, and the partner discusses his comments with the associate and edits the document. It is also not uncommon or improper for a lawyer to have discussions with their client team, and to meet with the client on a regular basis to get their input. Petersen Supp. Decl. ¶ 16. All of this is particularly true in factually heavy case such as this. This is not a "garden variety case" as suggested by Defendants. ECF 47 at 12.

In summary, the entries list the tasks that were performed and the time to complete the task. A reasonable person can review the entries and understand whether or not such tasks supported the litigation and were relatively reasonable in length. And, as discussed in the Petersen Declaration, time was already reduced based on the best professional judgment of the partner in charge of the matter. Petersen Supp. Decl. ¶¶ 10, 11. For these reasons, this Court should reject Defendants' arguments in Section IV of its Opposition and grant Plaintiffs the reasonable fee award requested.

Lastly, Plaintiffs indicated that they would provide the amount of recoverable attorneys' fees and expenses incurred in connection with the EAJA claim. As described in the Supplemental

Declaration of Rafe Petersen and Exhibits thereto, all attached hereto as **Exhibit B**, Plaintiffs have incurred an additional $61,484.29 of attorneys' fees and $3,546.28 of legal costs in connection with this EAJA claim briefing. Petersen Supp. Decl. ¶¶ 21-24. Given Defendants' belief that was a "case of first impression," (ECF No. 47 at 12), Plaintiffs also note that the Court has discretion to use a larger fee multiplier for Mr. Petersen's expertise in this novel area of law (cost recovery).

When taken together with the total fees described in Plaintiffs' Motion, and for the reasons set forth in Plaintiffs' Motion and this Reply, Plaintiffs respectfully request that the Court orders Defendants to pay a minimum of $234,260.38 in attorneys' fees and $19,876.17 in legal costs under the Equal Access to Justice Act.

Respectfully submitted this 28th day of September, 2023.

HOLLAND & KNIGHT LLP

By: /s/ Rafe Petersen

Rafe Petersen (Bar ID Number: 465542)
Alexandra E. Ward (Bar ID Number: 1687003)
800 17th Street NW, #1100
Washington, D.C. 20006
rafe.petersen@hklaw.com
alexandra.ward@hklaw.com
T: (202) 419-2481
F: (202) 955-5564

*Attorneys for Plaintiffs Black Rock City LLC and Burning Man Project*