**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BLACK ROCK CITY LLC and BURNING
MAN PROJECT,

        *Plaintiffs*,

      v.                                  No. 19-cv-3729 (DLF)

DEBRA HAALAND, SECRETARY OF
THE INTERIOR, *et al.*,

        *Defendants*.

**<u>MEMORANDUM OPINION AND ORDER</u>**

After prevailing at summary judgment against the Bureau of Land Management and related federal defendants, plaintiffs Burning Man Project and Black Rock City LLC move under Rule 54(d)(2) of the Federal Rules of Civil Procedure and the Equal Access to Justice Act, 28 U.S.C. § 2412(d), for attorney's fees. Pls.' Mot. for Att'ys Fees, Dkt. 44. For the reasons that follow, the Court will grant the motion and allow the plaintiffs to recover 90% of their requested attorney's fees.

## I.   BACKGROUND

The plaintiffs, Burning Man Project and Black Rock City LLC (collectively, "the Project"), and the Bureau of Land Management and other federal defendants (collectively, "the Bureau") are familiar to each other from their annual cooperation on the festival event known as Burning Man. *Black Rock City LLC v. Haaland*, 2022 WL 834070, at *2 (D.D.C. 2022). Once a year, the Burning Man event "draws roughly 70,000 people to federal lands in Nevada's Black Rock Dessert for a combination art festival, social event, and experiment in community living." *Id.* (citation omitted). The Project, a California nonprofit that "assumed responsibility for producing the Burning Man

1

Event in 2019," Am. Compl. ¶ 13, Dkt. 21, uses those lands pursuant to special recreation permits granted by the Bureau of Land Management, *see Haaland*, 2022 WL 834070, at *2. As part of the permitting process, the Bureau works with the Project to plan and administer these events. *Id*. Among other things, the Bureau provides law enforcement for those events, oversees their environmental compliance, and administers several support contracts. *Id*.

The Project's work revolves around the late-summer festival, and its workforce numbers fluctuate correspondingly. Most of the year, the Project employs "[fewer] than 200 employees," and the Project has "never . . . employed more than 160 full-time workers in a single year." Belsky Supp. Decl. at ¶ 7–8, Dkt. 48-1. Representatively, in December 2019, it employed 133 full-time workers. *Id.* at ¶ 9. But during the event season, these numbers increase substantially. The Project "rel[ies] on temporary workers . . . to operate its Event," so it hires hundreds "for less than one month per year" to "perform tasks that are specific to the Event" and terminates their employment afterward. *Id.* at 8–9; Pls.' Reply at 2, Dkt. 48. As such, in 2019, the Project reported to the Internal Revenue Service that it had employed a total 986 employees for the year. Belsky Supp. Decl. at ¶ 9. This pattern has repeated for years. *See* Defs.' Mem. in Opp'n to Pls.' Mot. for Att'ys Fees at 3, Dkt. 47 (listing forms that show "951 employees in 2015, 858 employees in 2016, 902 employees in 2017, and 946 employees in 2018").

After the 2019 event, the Project filed this action under the Administrative Procedure Act ("APA"). Am. Compl., Dkt. 21. The Project claimed that the Bureau acted arbitrarily and capriciously through its "imposition of excessive, unjustified, and unreasonable permit costs; delays in issuing [cost] decisions; and [refusal] to refund unreasonable and unjustified charges" between 2015 and 2019. *Id.* ¶ 1. The parties cross-moved for summary judgment. Pls.' Mot., Dkt. 28; Defs.' Mot., Dkt 30.

The Court partially granted the Project's motion for summary judgment. *Haaland*, 2022 WL 834070, at *9. It determined that the Bureau failed to justify and explain the final costs it imposed on the Project, including special recreation permit fees and other associated event costs. Although the Bureau described the final costs in its written decisions, it omitted any explanation of how those figures were reached, and it "never address[ed] whether those costs were 'reasonable.'" *Id.* at *8. Accordingly, the Court found those decisions arbitrary or capricious under the APA, 5 U.S.C. § 706(2)(A). *Id.* at *9. The Court did not vacate the Bureau's decisions but instead remanded them for further explanation of the costs imposed. *Id.* The Bureau appealed the Court's decision, but the parties settled while the appeal was pending.

The Project now moves for attorney's fees from the Bureau under Rule 54(d)(2) of the Federal Rules of Civil Procedure and the Equal Access to Justice Act, 28 U.S.C. § 2412(d). Pls.' Mot. for Att'ys Fees.

## II.    LEGAL STANDARDS

Under the Federal Rules of Civil Procedure, "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless substantive law requires [otherwise]." Fed. R. Civ. P. 54(d)(2)(A). A party that wins a judgment against the United States may recover attorney's fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d). Under the Act, a court must award the fees unless certain exceptions apply. As relevant here, a court may not award attorney's fees unless the prevailing litigant is an eligible "party." *See id.* § 2412(d)(2)(B). A court also may not award fees if it finds that "the position of the United States was substantially justified or that special circumstances make an award unjust." *Id.* § 2412(d)(1)(A).

The party bearing the burden of proof changes based on the exception. "The party seeking fees"—here, the Project—"has the burden of establishing its eligibility" under the EAJA. *Orantes-Hernandez v. Holder*, 713 F. Supp.2d 929, 942 (D.D.C. 2010) (citation omitted). But the party opposing the fees—the Bureau—"then has the burden of proving that its actions were substantially justified in law and fact and/or that special circumstances make awarding fees unjust." *Id.* Finally, the Project bears the burden of establishing the reasonableness of its fee request. *Role Models America, Inc. v. Brownlee*, 353 F.3d 962, 973 (D.C. Cir. 2004).

## III.    ANALYSIS

The Bureau invokes three statutory exceptions to contest the requested fee award: first, it contends that the Project is not eligible for fees because it is not a "party," as defined by the EAJA; second, it argues that, despite the Court's decision in favor of the Project, the Bureau's final cost decisions were substantially justified; and finally, the Bureau asserts that special circumstances foreclose fees here. The Court largely disagrees and will award the Project reasonable fees.

### A.    Eligible "Party" Criteria

The EAJA only allows the award of attorney's fees to a "party." The Act defines a "party" to include "any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed," with an exemption from the net-worth provision for registered 501(c)(3) organizations. 28 U.S.C. § 2412(d)(2)(B). The parties agree that the Project's net worth did not exceed $7 million at the time this action was filed. They disagree, however, over the employment statistics that the Court should consider in deciding whether the Project qualifies as a "party" under the EAJA.

4

The text of the EAJA ties the number of employees to "the time the civil action was filed." 28 U.S.C. § 2412(d)(2)(B). This phrase means the date on which the action was filed. *E.g.*, *Fields v. United States*, 29 Fed.Cl. 376, 377 (Fed. Cl. 1993) (using a specific calendar date as the "time the civil action was filed"); *cf. Estate of Woll by Woll v. United States*, 44 F.3d 464, 468 (7th Cir. 1994) (stating that net worth should "be measured as of the date the complaint was filed"). It is undisputed that on December 13, 2019, the date this action was filed, the Project had less than 500 employees—133, to be exact. Belsky Supp. Decl. at ¶ 9.[1] And contrary to the Bureau's suggestion, *see* Defs.' Mem. in Opp'n to Pls.' Mot. for Att'ys Fees at 2, it is "[t]he text itself, rather than the subjective intentions of legislators" that "governs [the Court's] review," *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 915 (D.C. Cir. 2017).

The Bureau resists this conclusion and insists that the Court look to the Project's employment statistics for an entire year. Def. Opp. at 3. For example, the Project's numbers for 2019 show that it hired approximately 900 workers over the course of that year. *Id.* (citing Project's 2019 Form 990 tax filings). Pointing to similar statistics for previous years, the Bureau suggests that the Project strategically reduced its employee numbers before filing suit. *Id.*

To the contrary, however, the Project's employment data over the course of several years shows that it consistently operated as a small organization that temporarily enlarged its ranks each year to support the annual Burning Man event. *See* Belsky Supp. Decl. at ¶ 5–8 (noting that the Project employs hundreds of temporary workers for the annual event, does "not have extra profits or resources to support more than 500 year-round employees," and that the temporary workers'

---

[1] The Bureau notes that the Project did "not disclose[] [its] methodology for identifying the number of employees" or represent that it terminated its seasonal employees before December 2019, Defs.' Mem. In Opp'n at 4–5. But the Project's updated declaration from its general counsel, which the Project submitted to respond to the Bureau's argument, clarifies its employee statistics. Belsky Supp. Decl. at ¶ 9.

tasks are "specific to the Event and have no purpose or function outside of the Event."). In this respect, the Project is more akin to an enterprise that hires temporary or seasonal workers than to a larger-scale organization. *See, e.g., Greenpeace, Inc. v. Stewart*, 2020 WL 2465321, *3 (9th Cir. 2020) (plaintiff with less than 500 employees at the time action was filed deemed eligible for an EAJA award even though it hired thousands of "temporary and seasonal workers" throughout the year).

The Bureau further argues that the Project failed to provide sufficient factual information that co-plaintiff Black Rock City, a limited liability company, is eligible for EAJA relief. Defs.' Mem. in Opp'n at 6-7. Regardless whether Black Rock City LLC is an eligible party under the EAJA, the Court will not apportion the fees and reduce the Burning Man Project's fee award on this basis. *See State of La., ex rel Guste v. Lee*, 853 F.2d 1219, 1225 (5th Cir. 1988) ("If the ineligible party's participation is nominal or narrow, then the eligible parties should not be denied . . . access [to EAJA relief]"). From the outset, the Burning Man Project led this litigation, and the record shows that since 2013, "Black Rock City LLC has been a disregarded entity wholly owned by Burning Man Project." Belsky Affidavit at 1–2, Dkt. 48-1. The LLC "retains no profits and all earnings of the plaintiffs are dedicated to the charitable mission and activities of [the Project]." *Id*. Accordingly, its nominal participation in this case does not undermine Burning Man Project's fee eligibility as a "party" under the EAJA.

### B. "Substantially Justified" Criteria

The EAJA allows the award of attorney's fees "unless the court finds that the position of the United States was substantially justified . . . ." 28 U.S.C. § 2412(d)(1)(A). The "position of the United States" refers both to "the position taken by the United States in the civil action" and to "the action or failure to act by agency upon which the civil action is based." *Id.* § 2412(d)(2)(D).

To satisfy this test, a position must have a "reasonable basis both in law and fact." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Bureau has not met its burden to show that its closing cost decisions were substantially justified. To be sure, that the Bureau acted arbitrarily and capriciously does not alone render its position unjustified. *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 836 F.3d 32, 40 (D.C. Cir. 2016). Still, where an agency is "wholly unresponsive" to a plaintiff's concerns, the agency's "indifference" goes beyond "ordinary arbitrary and capricious agency action to qualify as lacking substantial justification." *Id.* (internal quotation marks omitted). So too here. For years, the Project consistently asked the Bureau to explain its rationale for its cost decisions, and repeatedly, the Bureau failed to do so. From 2015 through 2019, the Bureau "*never* address[ed] whether [its] costs were 'reasonable,'" *Haaland*, 2022 WL 834070, at *8 (emphasis added), as required by the Federal Land Policy and Management Act, *see* 43 U.S.C. § 1734(a)–(b). Where an agency's duty is made clear by a statute or regulation, the agency's failure to uphold that duty is not reasonably based in law. *Role Models*, 353 F.3d at 968. Granted there is a dearth of case law on cost recovery for special recreation permits, Defs.' Mem. in Opp'n at 11, the "general . . . rule" that this Circuit's cases establish still "applies with obvious clarity" to the Bureau's indifference, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Because the Bureau failed to follow established law, its position was not substantially justified.

### C.  Special Circumstances

The EAJA allows a court to deny attorney's fees if "special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). This provision is a "built-in check," *Scarborough v. Principi*, 541 U.S. 401, 404 (2004), that "expresses a congressional directive for courts to apply traditional equitable principles in determining whether a prevailing party should receive a fee award under

the EAJA," *Air Transport Ass'n of Can. v. Fed. Aviation Admin.*, 156 F.3d 1329, 1333 (D.C. Cir. 1998).  The special-circumstances exception is reserved for the rare case, such as when a party comes to the Court with unclean hands or would unfairly receive a windfall.  *Id.* at 1333–34.

Largely recycling arguments the Court has rejected, the Bureau has not met its burden to show that a fees award in this case would be unjust.  The record does not support the Bureau's suggestions that the Project manipulated its employment numbers or strategically timed the filing of this action to qualify for EAJA relief.  The record shows that the Project sought administrative relief on the same grounds several times before turning to federal court.  Pls.' Mem. for Summ. Judgment at 6–9, Dkt. 28.  And the Project's employee and financial statistics undermine the Bureau's contention that the Project is a "large, well-resourced, and sophisticated organization" that can afford its own lawyers, *see* Defs.' Mem. in Opp'n at 8.  Because the Bureau has not demonstrated that the Project has unclean hands or that awarding fees would violate any equitable principle, the Court turns next to the amount of the fee award.

### D.  Reasonableness of Fees

The Burning Man Project is entitled to fees that it "reasonably incurred."  *In re Donovan*, 877 F.2d 982, 990 (D.C. Cir. 1989).  "In determining whether fees are reasonable, courts ordinarily focus on two questions: (1) whether the attorneys charged a reasonable hourly rate and (2) whether the time attorneys logged on the case was reasonable—*i.e.*, did the attorneys waste or otherwise unnecessarily spend time on the matter."  *Id.*

#### 1. *Reasonableness of Rate*

The reasonable hourly rate in this case is the EAJA statutory rate, adjusted for locality and cost of living.  *See Role Models*, 353 F.3d at 969.  The parties agree that the rates published by the Ninth Circuit and recognized by this Court meet that criteria: 2019 ($205.25), 2020 ($207.78),

2021 ($217.54), 2022 ($231.49),[2] and 2023 ($244.62).  U.S. Court of Appeals for the Ninth Cir., *"Statutory Maximum Rates Under the Equal Access to Justice Act"*, https://www.ca9.uscourts.gov/attorneys/statutory-maximum-rates,       [https://perma.cc/R8EH-C37B].   The Court adopts these rates because "an increase in the cap is justified only by work requiring specialized skills or knowledge beyond what lawyers use on a regular basis." *Role Models*, 353 F.3d at 969.  In this litigation, the Project's lawyers did not employ specialized expertise.

> 2. *Reasonableness of Hours*

For the most part, the Court rejects the Bureau's challenges to the Project's requested fees and finds nearly all of the claimed hours reasonable.

The Court disagrees that hours the Project spent drafting the original complaint are not recoverable.  Defs.' Mem. in Opp'n at 19.  To be sure, "[h]ours spent on unsuccessful claims that are distinct in all respects from the successful ones should be excised." *SecurityPoint*, 836 F.3d at 40.  But the original and amended complaints here were not distinct: they relied on identical facts; propounded a slightly altered legal theory; and bore the same underlying purpose.  *Compare* Dkt. 1, *with* Dkt. 17; *Hensley v. Eckerhart*, 461 U.S. 424, 434–35 (1983) (discounting "distinctly different claims for relief that are based on different facts and legal theories").

Nor does the Court conclude that the Project achieved only "limited success." Defs.' Mem. in Opp'n at 19–21.  Although five of the Project's arguments failed, its winning argument was dispositive. *See Haaland*, 2022 WL 834070, at *8–9.  And courts decline to apportion fee awards "mechanically on the basis of [a party's] success or failure on particular issues," *Hensley*, 461 U.S.

---

[2] Upon the Court's most recent reference, the Ninth Circuit table uses $234.95 for the 2022 figure. However, the parties both agree on $231.49 for the 2022 figure. Pls.' Mot. for Att'ys Fees at 10; Defs.' Mem. in Opp'n at 12. The Court will adopt the parties' agreed-upon rate.

at 438.   The Court remanded the case because it was "unsure of the Bureau's reasoning," not because "any portion of the [Bureau's] Closeout Decisions survives APA review." *Haaland*, 2022 WL 834070, at *9.   The Project's victory was no less than what it set out to achieve. *Hensley*, 461 U.S. at 439–40.

Because the Court finds most of the Project's fee entries to be both reasonable and justified, it will not address each of the Bureau's objections. *See Bennett v. Castro*, 74 F.Supp.3d 382, 406 (D.D.C. 2014) ("Defendant's objections are too numerous to address individually.").   It will, however, reduce the fee award in a modest amount due to several deficiencies.

First, the Court will discount the award for time spent on public relations.   "Time spent by [a movant] contacting the media . . . is not properly reimbursable." *Martini v. Fed. Nat'l Mortg. Ass'n*, 977 F.Supp. 482, 487 (D.D.C. 1997).   Nor is time "spent on media-related activities," *Bennett*, 74 F.Supp.3d at 404, or "to sway public opinion and influence []policy-makers," *Harvey v. Mohammed*, 951 F.Supp.2d 47, 65 (D.D.C. 2013).   The Court will thus exclude Mr. Petersen's 0.8 hours on December 16, 2019 for "Discussions and analysis related to support for complaint and press outreach for litigation"; his 0.7 hours on February 23, 2021 for "Confer with political team regarding status of litigation and litigation strategy"; and his 6.1 hours on April 9, 2021 that included "Update political team concerning status of litigation and litigation strategy. Follow-up discussions concerning same." Petersen Decl., Dkt. 44–3.

Second, the Court will not credit unduly vague entries.   As the Circuit has reasoned, entries that "do not adequately describe the legal work for which the client is being billed" make "it impossible for the court to verify the reasonableness of the billings," and their inadequacy must factor into the fee award. *In re Sealed Case*, 890 F.2d 451, 455 (D.C. Cir. 1989).   A fee application "need not present . . . the precise activity to which each hour was devoted nor the specific

attainments of each attorney," "very broad summaries of work done and hours logged are insufficient." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982).   By way of example, judges in this district have considered sufficient such entries as "Research and drafting of FOIA part of complaint," *Harvey*, 951 F.Supp. at 66, "Organize deposition documents," *id.*, and "Email to team regarding call with HUD," *Bennett*, 74 F.Supp.3d at 405.   But entries like "research and writing for appellate brief," logged on "eight consecutive weekdays," *Role Models*, 353 F.3d at 971, or an hour-plus-long "Call with [another attorney]" with no subject matter have been deemed insufficient bases for recovery, *Bennett*, 74 F.Supp. 3d at 406.   The entries in the Project's attorneys' logs run the gamut.   Most are fine, but others are too vague, leaving the Court to guess what happened.   *E.g.*, Targ Entry, July 20, 2020 ("Prepare for and participate in call with team."); Petersen Entries, May 2021 (using variations on "Continue to work on combined reply and opposition memorandum for summary judgment" across nine days for 44.3 hours of work); Dobles Entry, November 8, 2019 ("Attention to federal complaint"); Peterson Entry, October 20, 2020 ("Conference call with team to discuss strategy"); Petersen Entry, December 11, 2020 ("Discussions and analysis related to litigation status"); *see generally* Petersen Entries, multiple dates ("Follow-up discussions concerning same").

Further, a great many entries teeter over the line between proper billing and "block billing," or "lumping together multiple tasks," which is disfavored.   *Role Models*, 353 F.3d at 970; *see, e.g.*, Levin Entry, February 16, 2021 (logging 4.5 hours on three tasks, one of which is "multiple correspondence exchanges"); Dobles Entry, April 16, 2020 (logging 5.5 hours for three distinct research projects).   The absence of clarity makes it challenging for the Court to verify that these hours were reasonably expended.

Finally, some of the costs billed for expenses do not align with work performed by attorneys at the corresponding times.  For instance, logs reveal Westlaw searches on January 16, 2020, March 19, 2020, and April 7, 2020—together totaling almost $2000 in search fees—but no attorney time is logged for those days, and the Project's counsel do not explain the discrepancy Such mismatches call into question the reliability of the billing records.

Although these errors are not egregious, the Court will follow the approach that other courts in this district have taken and impose a "fixed reduction" in the amount of the fee award.  *Role Models*, 353 F.3d at 973.  Serious deficiencies have justified up to a 50% reduction.  *Id.*  On the other end of the spectrum, courts have modestly reduced fees for less serious deficiencies.  For example, in a case in which "several dozen [entries] lack[ed] adequate subject-matter descriptions, and a handful more [were] lumped together" the court ordered a 10% reduction.  *Bennett*, 74 F.Supp. at 406.  And in another case "rife with block-billing" and "a large number" of vague entries, the Court awarded a 12.5% reduction.  *Nat'l Law Ctr. on Homelessness and Poverty v. U.S. Dep't of Veteran Affs.*, 10 F.Supp.3d 21, 29 (D.D.C. 2013).  Because the deficiencies here are relatively modest, the Court will apply a 10% reduction of the award across the board.

Accordingly, it is

**ORDERED** that the Project's Motion for Attorney's Fees, Dkt. 44, is **GRANTED**; it is further

**ORDERED** that the Project is entitled under the EAJA to reasonable fees and costs in the amount of $210,834.34 in attorney's fees and $17,888.55 in legal costs.

DABNEY L. FRIEDRICH
United States District Judge

March 28, 2024

12