**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BLACK ROCK CITY LLC, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DOUG BURGUM,<br>Secretary, U.S. Department of the Interior,<br>*et al.*,<br><br>*Defendants*. | No. 19-cv-3729 (DLF) |

**MEMORANDUM OPINION**

Plaintiffs Burning Man Project and Black Rock City LLC (collectively, BMP) bring this action to recover permit fees the Bureau of Land Management charged them for the use of public lands for the 2015 through 2019 Burning Man festivals. The Court previously held that the Bureau acted "arbitrar[ily]" or "capricious[ly]," within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), by failing to justify the final costs it imposed on BMP. *See Black Rock City LLC v. Haaland*, No. 19-CV-3729, 2022 WL 834070, at *8–9 (D.D.C. Mar. 21, 2022). Accordingly, the Court remanded the matter to the Bureau without vacatur for further explanation. *See id.* at *9; Order of March 21, 2022, Dkt. 36. Before the Court is BMP's motion to enforce that judgment. Dkt. 50. For the reasons that follow, the Court will grant the motion in part and deny it in part.

## I. BACKGROUND

### A. Statutory and Regulatory Background

The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*, "establishes comprehensive rules for the management and preservation of federal lands." *Nat'l*

*Wildlife Fed'n v. Burford*, 835 F.2d 305, 307 (D.C. Cir. 1987). The FLPMA authorizes the Bureau of Land Management to issue permits for the use of federal lands, *see* 43 U.S.C. §§ 1731, 1732(b), and to collect "reasonable filing and service fees and reasonable charges" in connection with those permits, *id.* § 1734(a). In determining whether a charge is "reasonable," the Bureau may consider:

> actual costs (exclusive of management overhead), the monetary value of the rights or privileges sought by the applicant, the efficiency to the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs.

*Id*. § 1734(b). The Federal Lands Recreation Enhancement Act (FLREA), 16 U.S.C. § 6801 *et seq.*, supplemented this authority during the relevant period by permitting the Bureau to "establish, modify, charge, and collect recreation fees at Federal recreational lands," including fees for "special recreation permit[s]" authorizing "group activities" and "recreation events." *Id.* § 6802(a), (h).[1]

Regulations implementing these statutes, 43 C.F.R. § 2932.31(a)–(e), permit the Bureau to charge fees beyond baseline fees published in the Federal Register for commercial permits requiring more than fifty hours of processing. Those additional fees may cover the "costs of issuing the permit, including necessary environmental documentation, on-site monitoring, and permit enforcement." *Id.* The Bureau may require a permit applicant to pay estimated fees in advance, but it must provide a refund or credit if the "actual fees due are less than the estimated fees [the applicant] paid in advance." *Id.* §§ 2932.31(f), 2932.33(a).

---

[1] Congress amended § 6802(h) in 2025. *See* Pub. L. No. 118-234, § 311(b)(3), 138 Stat. 2836, 2893. Because the permits and fees at issue here concern the 2015 through 2019 events, and Congress did not clearly provide that the amendment applies retroactively, the Court refers to the version of the statute then in effect. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994); *Quantum Ent. Ltd. v. U.S. Dep't of the Interior*, 714 F.3d 1338, 1343–45 (D.C. Cir. 2013).

**B. Factual and Procedural Background**

Burning Man is an annual festival organized by BMP on federal land in Nevada's Black Rock Desert. Administrative Record (AR) 4847, Dkt. 35. Each year, BMP must obtain a special recreation permit from the Bureau to use those lands. *Id.* The Bureau also works with BMP to plan and administer the festival, including, among other things, providing law enforcement support, overseeing environmental compliance, and administering support contracts. *Id.* at 4848. Before each festival, the Bureau issues an estimate calculating the costs it expects to incur from the event and the amount BMP must pay in advance. *See, e.g.*, *id.* at 1454–55. After the event, the Bureau issues a closeout decision reconciling the estimated and actual fees and providing any refund due. *See, e.g.*, *id.* at 1243–45.

BMP initiated this action under the Administrative Procedure Act (APA) to challenge the closeout decisions for the Burning Man festivals held between 2015 and 2019. *See* Am. Compl. ¶¶ 85, 87, Dkt. 21. The parties then cross-moved for summary judgment. Pls.' Mot. for Summ. J., Dkt. 28; Defs.' Mot. for Summ. J., Dkt. 30. The Court partially granted BMP's motion, determining that the Bureau had acted arbitrarily or capriciously, within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), by failing to justify and explain the final costs it imposed on BMP. *See Haaland*, 2022 WL 834070, at *8–9. The Court remanded the closeout decisions to the Bureau for further explanation but declined to vacate them. *Id.* at *9. The Court's opinion identified the showing the Bureau would need to make for the Court to determine whether the fees charged to BMP were "reasonable costs" under the governing statutes:

> [T]he agency must generally identify what functions it performed in support of the permitted activity, what concrete resources it devoted to those functions, and why its expenditures on those resources were reasonable under the circumstances. In addition, the Bureau should provide some explanation for year-to-year changes in the costs it seeks to recover . . . and explain any special designations applied to the Burning Man event . . . . The Bureau can meet some of these requirements through

> reliance on complementary federal regulations[,] . . . [b]ut the agency must have relied on those materials at the time of the decisions, and it must now make the entirety of the above showing on the record for the corresponding closeout decision.

*Id.* at *7.

In response to the Court's decision, the Bureau issued a new closeout decision in a "single document to address costs [the Bureau] incurred for processing and administering" all five Burning Man events from 2015 to 2019. *See* Pls.' Mot. to Enforce J., Ex. A (Remand Letter) 2, Dkt. 50-1. The Bureau concluded that the costs it had previously charged BMP were "reasonable and necessary in the context of each year's Event for the reasons outlined in [the Remand Letter] and the referenced exhibits." *Id.* at 23. The 23-page Remand Letter and accompanying 365 pages of exhibits provide a breakdown of the costs imposed and the Bureau's accompanying explanations. Dkt. 50-1.

BMP now moves to enforce the Court's previous judgment on the ground that the Remand Letter still falls short of the explanation the Court required. Dkt. 50.

## II. LEGAL STANDARDS

"District courts have the authority to enforce the terms of their mandates." *Anglers Conservation Network v. Ross*, 387 F. Supp. 3d 87, 93 (D.D.C. 2019) (quoting *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014)). "The exercise of this authority is 'particularly appropriate' when a case returns to a court on a motion to enforce the terms of its mandate to an administrative agency." *Flaherty*, 17 F. Supp. 3d at 55 (quoting *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984)). A court should grant a motion to enforce if a "prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it." *Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39 (D.D.C. 2014) (quoting *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11 (D.D.C. 2004)). By contrast, "if a plaintiff 'has received

all relief required by that prior judgment, the motion to enforce [should be] denied.'" *Id.* (alteration in original) (quoting *Heartland Hosp.*, 328 F. Supp. 2d at 11). "Included within 'a court's power to administer its decrees is the power to construe and interpret the language of the judgment.'" *Id.* (quoting *Heartland Hosp.*, 328 F. Supp. 2d at 11–12).

## III. ANALYSIS

### A. Scope of Judicial Review

Much of the relief BMP seeks is beyond the scope of the Court's prior mandate and thus cannot be granted through a motion to enforce. "Success on a motion to enforce a judgment gets a plaintiff only 'the relief to which [the plaintiff] is entitled under [its] original action and the judgment entered therein.'" *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) (alterations in original) (quoting *Watkins v. Washington*, 511 F.2d 404, 406 (D.C. Cir. 1975)). The Court remanded the closeout decisions so that the Bureau could provide the explanation necessary to support its determinations and did so "'without expressing a view' on whether the decisions [were] lawful." *Haaland*, 2022 WL 834070, at *9 (citation omitted). The Court did not determine that the costs were unreasonable, nor did the Court order the Bureau to refund any fees to BMP. *See id.* Accordingly, BMP cannot obtain through the current motion a determination that the Bureau failed to substantiate every direct cost charged for the 2015 through 2019 festivals. Nor can BMP obtain, for example, an order requiring the Bureau to refund such costs, grant an additional 22.56% refund for associated indirect costs, or produce additional information to facilitate the calculation of those refunds.[2] *See id.* In short, the Court will deny without prejudice the motion to enforce to the extent it seeks relief beyond the express terms of the prior mandate.

[2] For similar reasons, the Court declines to revisit through the current motion the legal standards the Court applied in its previous ruling, to the extent the plaintiffs make such a request. *See* Pls.'

That limitation does not, however, require BMP to file a new action to obtain judicial review of the Bureau's post-remand explanation. *Contra* Defs.' Opp'n 1, 6, Dkt. 53 (arguing that BMP needs to file a new action to obtain judicial review of the Remand Letter). Courts routinely consider renewed motions for summary judgment challenging agency action taken in response to remands without vacatur. *See, e.g.*, *Am. Waterways Operators v. Regan*, 590 F. Supp. 3d 126, 131 (D.D.C. 2022) (considering renewed motion for summary judgment challenging EPA's determination on remand); *Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 103–05, 124 (D.D.C. 2016) (granting summary judgment after twice remanding the matter to the agency for further explanation of its rationale). BMP may seek review of the Remand Letter through a renewed motion for summary judgment. But because BMP has moved to enforce the Court's previous judgment, the Court's task here is limited to determining whether the Bureau complied with the requirements imposed by the Court's judgment. *See Ferring Pharms., Inc. v. Azar*, 296 F. Supp. 3d 166, 174 (D.D.C. 2018); *McCarthy*, 61 F. Supp. 3d at 39.

The Court therefore does not decide here whether the Remand Letter is substantively lawful or whether the Bureau's underlying determinations are correct. It decides only whether the Remand Letter satisfies the requirements of the Court's earlier decision by providing enough information for the Court to evaluate the Bureau's reasoning. The Court turns to that question now.

---

Mot. to Enforce J. 6–8 (arguing that the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), requires the Court to revisit its earlier decision and review the Bureau's decisions without deference); Defs.' Opp'n 6–9. *But see* Pls.' Reply 15–16, Dkt. 56 (clarifying that the plaintiffs do not seek reconsideration of the Court's prior ruling, but instead contend that *Loper Bright* means the Court should afford the Bureau no deference in reviewing the Remand Letter).

**B. Compliance with Remand**

"In determining whether an agency has complied with the terms of a remedial order on remand, the Court is guided not only by the text of that order but also by its relevant opinion[]." *Anglers Conservation Network v. Ross*, 387 F. Supp. 3d 87, 93 (D.D.C. 2019) (citing *City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346–47 (D.C. Cir. 1977)). Indeed, "[t]he court is generally the authoritative interpreter of its own remand." *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1090 (D.C. Cir. 2016) (quoting *AT&T Wireless Servs., Inc. v. FCC*, 365 F.3d 1095, 1099 (D.C. Cir. 2004)).

The Court previously held that "the administrative record lack[ed] substantial evidence that the costs [the Bureau] charged to BMP were reasonable" and remanded the closeout decisions to the agency without vacatur "for additional explanation." *Haaland*, 2022 WL 834070, at *4, *9; Order of March 21, 2022, Dkt. 36. The Court instructed the Bureau on remand to: (1) "identify what functions it performed in support of the permitted activity"; (2) identify "what concrete resources it devoted to those functions"; (3) explain "why its expenditures on those resources were reasonable under the circumstances"; (4) "provide some explanation for year-to-year changes in the costs [the Bureau] seeks to recover"; (5) "explain any special designations applied to the Burning Man event"; and (6) "make the entirety of the above showing on the record for the corresponding closeout decision[s]" and not based on post hoc rationalizations. *Haaland*, 2022 WL 834070, at *7.

Although BMP disputes that the costs identified by the Bureau were reasonable, it does not appear to contest that the Remand Letter complied with the first two requirements by identifying the functions performed by the Bureau and the concrete resources devoted to those functions. *See*

Pls.' Mot. to Enforce J. 8–9. BMP does, however, argue that the Remand Letter fell short of the other four requirements. *Id*. The Court agrees in part.

*First*, the Court instructed the Bureau not merely to identify the resources it used but also to explain "why its expenditures on those resources were reasonable under the circumstances." *Haaland*, 2022 WL 834070, at *7. The Remand Letter provides additional explanation concerning why the Bureau needed to perform certain functions, but it does not adequately explain why the particular resources it devoted to those functions—and thus the resulting expenditures—were reasonable under the circumstances. For example, with respect to labor, the Remand Letter states that the Bureau prepared a "Table of Organization (T/O)" that set out event staff positions. Remand Letter 5. The explanation for each iteration then identifies the number of personnel that the Bureau determined were "reasonable and necessary." *See, e.g.*, *id.* at 10 ("The 2015 Event T/O reflected a total of 130 operational positions, which are both reasonable and necessary for the 2015 Event."). Although the Letter contends that the labor allocations were "[b]ased on its experience with administering . . . Burning Man" and the need to "ensure public safety and resource protection," *id.* at 5, those assertions merely explain why staff was necessary; they do not explain why the Bureau reasonably required 130 positions. *Id.* at 10. The Letter does not, for example, connect the number of positions to the number of expected attendees, the size or characteristics of the event site, anticipated safety needs, or any other consideration that would explain the staffing decisions. Without that link, the Letter does not explain why all 130 positions—or the amount paid to fund those positions—were reasonable under the circumstances.

The other expense categories include similar analytical deficiencies. For example, the Remand Letter explains that the Bureau paid for logistics support to assist with activities such as unpacking equipment, setting up an operations center, and refueling vehicles. *Id.* at 7–8. In

addressing the number of personnel assigned to this category, however, the Bureau says only that it "has concluded that the number of logistics employees each year and their duties are reasonable and necessary." *Id.* at 8; *see also id.* at 16, 19 (asserting the same). Similarly, the Bureau identifies the management positions assigned to each section, along with a safety officer and public information officer, but simply concludes that the "number of staff and their duties are reasonable." *Id.* at 12, 14, 17, 19, 21.

To be clear, the Court is not reaching any conclusion here as to whether any particular expenditure was in fact reasonable. It is deciding only whether the Bureau has adequately explained why it incurred those expenses and why the amounts were reasonable, so that the Court has enough information to evaluate them under § 1734(b). Although the Bureau has provided considerably more information about the resources it used and why certain functions were necessary, it has not consistently explained why the particular level and type of resources devoted to those functions—and the resulting expenditures—were reasonable under the circumstances. The Bureau therefore has not fully complied with the Court's remand order.

*Second*, BMP argues that the Bureau failed to comply with the Court's instruction to "provide some explanation for year-to-year changes in the costs it seeks to recover." *Haaland*, 2022 WL 834070, at *7. The Court disagrees. The Remand Letter contains a year-by-year comparison and identifies several reasons for changing costs. For 2015, for example, the Bureau states that total costs increased by approximately 1% from 2014, principally because of a government-wide pay raise of 1% that year. Remand Letter 12. For 2016, total costs decreased by more than 22%, because the Bureau reduced positions and allowed BMP to provide certain services directly. *Id.* at 15. For 2017, costs increased by approximately 8.23%, which the Bureau attributes principally to a government-wide pay raise of 2.1% that year, newly created positions,

communications equipment purchases, and increased travel costs to accommodate staffing shortages. *Id.* at 17. For 2018, costs increased by approximately 10.09% due to another government pay raise and the transfer of contracts for internet and dispatch services from BMP to the Bureau's control. *Id.* at 20. For 2019, costs increased by approximately 5.39% due to a government-wide pay raise, the movement of contracts for IT equipment rental and vehicle rental from BMP to the Bureau's control, and the creation of a sexual assault response team. *Id.* at 22.

BMP further contends that the Bureau's explanation of the year-to-year changes fails to account for changes within certain subcategories. For example, BMP notes that the Bureau charged it significantly more for network services contracts in 2018 and 2019 as compared to the prior years, during which the less expensive services were sufficient to meet the Bureau's needs. Pls.' Mot. to Enforce J. 33. The Bureau's letter, however, acknowledges that "the cost for the internet bandwidth contract increased . . . with no change in contract requirements." Remand Letter 21. And the Court's prior order required "some explanation" for year-to-year changes, not an accounting of every change in every individual cost category. *Haaland*, 2022 WL 834070, at *7. BMP may later dispute whether the change in cost was reasonable, but the Bureau provided an explanation. At this stage, that is enough. Because the Bureau provided explanations for the principal year-to-year changes in the costs it sought to recover, including changes in several significant cost categories, it complied with this aspect of the Court's mandate.

*Third*, BMP contends that the Bureau failed to "explain [the] special designations applied to the Burning Man event" as the Court's mandate required. *Id.* Specifically, BMP challenges the Bureau's use of the "Emergency" and "Mission Critical" designations to authorize premium pay for law-enforcement personnel assigned to Burning Man. Pls.' Mot. to Enforce J. 26–27. Although the Bureau does not address these designations in the body of the Remand Letter, the

exhibits include declarations explaining the use of the designations. The record reflects that Burning Man has been designated an emergency event "[s]ince 2012." Remand Letter Exs. 67, Dkt. 50-1. The declarations explain that "[t]he Burning Man event has been designated as an emergency event because of its unique circumstances," including that the event "is located in a remote area, two hours from the nearest city" and that prior significant incidents "includ[ed] loss of human life, property damage due to fire, and a significant weather event." *Id.*; *see id.* at 113 (noting similar reasons for emergency designation in 2016). The exhibits similarly explain that the Mission Critical designation, which replaced the Emergency designation in 2017, was based on the potential threats to human life or safety, serious damage to property, or serious disruption of operations at the event, and that, absent the designation and resulting lifting of the pay cap, the Bureau would have needed to assign additional officers to staff the events. *Id.* at 210–11, 300. The declarations therefore provide the explanation for the special designations that the Court required.

*Fourth*, BMP contends that the Bureau attempted to cure the deficiencies identified in the Court's prior opinion by relying on evidence and explanations developed after the original closeout decisions. The Court's previous opinion permitted the Bureau to explain its prior decisions; it did not permit the Bureau to construct a new evidentiary or factual basis for those decisions after the fact. *See Haaland*, 2022 WL 834070, at *7 (requiring the Bureau to explain why the costs were reasonable based "on the record for the corresponding closeout decision"). BMP identifies two categories of purportedly post hoc evidence: (1) FBI statistics published in 2020 concerning the average number of law-enforcement officers maintained by cities with populations between 50,000 and 99,000 people, *see* Remand Letter 5–6 n.2; and (2) declarations previously submitted to the Interior Board of Land Appeals, Pls.' Mot. to Enforce J. 2 n.4.

The Court agrees that the FBI statistics constitute post hoc justifications for the Bureau's decisions. Those statistics postdate the 2015–2019 closeout decisions and therefore could not have informed the Bureau's contemporaneous determination of what level of law-enforcement resources was reasonable. The Bureau may not use later-published information to supply a factual basis that was missing from the original decisions.

The declarations on which the Bureau relies are less problematic. As BMP acknowledges, the declarations attached to the Remand Letter were "submitted to the [Interior Board of Land Appeals]" during the administrative proceedings concerning the closeout decisions. *See* Pls.' Mot. to Enforce J. 2 n.4. Although the declarations postdate the closeout decisions, an agency may provide an "amplified articulation" of the reasoning underlying an earlier decision when a court remands for further explanation. *See, e.g.*, *Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 436, 448–53 (D.D.C. 2015); *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006). Accordingly, the Bureau can rely on declarations that postdate a closeout decision to further articulate or clarify the reasons underlying its original decisions, including its use of the emergency and mission critical designations as discussed above, so long as it does not use them to supply new factual predicates that were not before the Bureau when it made the corresponding closeout decisions.

**C. Remedy**

Given the deficiencies in the Remand Letter, the appropriate course is to remand the closeout decisions to the Bureau once more, without vacatur, so that the Bureau may comply with the Court's earlier directive. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (explaining that remand without vacatur may be appropriate where the agency's decision has not been shown to contain serious deficiencies and vacatur would be

disruptive); *see also Haaland*, 2022 WL 834070, at *9. The Court recognizes that the Bureau has already had one opportunity to address the deficiencies identified in the Court's 2022 opinion. Even so, the Court will grant the Bureau one last opportunity to explain its decisions because the Remand Letter has substantially advanced that effort. *See Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, No. 14-CV-2103, 2016 WL 1714312, at *4 (D.D.C. Feb. 2, 2016) (remanding without vacatur and providing the agency another opportunity to comply with the court's instructions on remand). Within sixty days of this Memorandum Opinion and accompanying Order, the Bureau shall supplement its explanation of the closeout decisions in accordance with the above noted deficiencies and the Court's March 21, 2022 judgment.

**CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part BMP's Motion to Enforce the Judgment, Dkt. 50. A separate order consistent with this decision accompanies this memorandum opinion.

Dabney L. Friedrich
DABNEY L. FRIEDRICH
United States District Judge

September 29, 2026